# EXHIBIT G

Westlaw.

Not Reported in F.Supp.    Page 1

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

**H**

United States District Court; D. Arizona.
**In re Cement and Concrete Antitrust Litigation**
**(This document relates to: All Ready-Mix**
**Actions, Master File No. CIV. 76-488A PHX**
**CAM)**
**MDL Docket No. 296**

Filed December 22, 1980

MUECKE, D. J.

**Settlement Order No. 13**

*(Re: Ready-Mix Fee Applications)*

**\*1** The Court having established in Settlement Order No. 1 a schedule for the filing and consideration of applications for the award of fees and expenses by plaintiffs' counsel from the settlement fund; the members of the class having been advised of the applications for fees and expenses in the notices which were mailed to them and in the notice by publication; the Court in Settlement Order No. 4 having appointed a committee consisting of plaintiffs' co-lead counsel (Kenneth R. Reed, Josef D. Cooper and Frederick P. Furth) and one independent member (Charles R. Hoover) to review all of the fee applications against the settlement fund and to file a report and recommendations on these petitions with the Court; plaintiffs' counsel having filed their applications for the award of fees and expenses; the Committee having made an interim report to the Court at the September 30, 1980, pretrial conference during which all interested parties were afforded the opportunity to be heard; the Court in Settlement Order No. 7 having established a further schedule for the submission of the Committee's report, the filing of objections thereto, reply memoranda in support thereof, and the hearing thereof; the Committee having submitted its report and recommendations; certain objections thereto having been filed; the matter having come on for hearing before this Court at the December 16, 1980, pretrial conference;

Now, Therefore, in consideration of the foregoing and of all matters of record herein, the Court hereby makes its awards of fees and expenses.

I.

*History of the Litigation*

In September 1975, the Antitrust Division of the Office of the Attorney General of Arizona began an investigation of both the ready-mix concrete and cement industries. As a result of this investigation, the State of Arizona filed price-fixing complaints against members of both industries on September 23, 1976. The State filed a complaint in this Court alleging violations of section 1 of the Sherman Act, 15 U. S. C. § 1, and Ariz. Rev. Stat. Ann. § 44-1402 and sought damages and injunctive relief on behalf of a class. In the Superior Court for Maricopa County, the State filed a complaint alleging violations of Ariz. Rev. Stat. Ann. § 44-1407 and seeking civil penalties and injunctive relief. Named as defendants in the ready-mix counts of these complaints were the Arizona Rock Products Association, Allied Concrete, Inc., Allied Concrete and Materials Company, Arizona Sand & Rock Company, and its parent, California Portland Cement Company, Chandler Ready-Mix, Inc., Columbia Building Materials, Inc., Johnson & Stewart Materials, Inc., Phoenix Sand & Rock, Inc., Mesa Sand and Rock, Inc., Phoenix Redi-Mix Company, Inc., New Pueblo Materials, Inc., The Tanner Companies, Tri-City Ready-Mix, Inc., Union Rock & Materials Corp., and the Phoenix Cement Company division of Amcord, Inc.

After the State of Arizona had filed, additional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

private actions were also filed alleging the same conspiracy among Arizona ready-mix producers to fix the prices and incidental terms of sale for ready-mix concrete, grout, and rock products within the State of Arizona. Most of these actions were filed on behalf of a class of purchasers of those products within the state. Many of these complaints also contained a separate count alleging a nationwide conspiracy of cement manufacturers to stabilize prices and terms of the sale of cement, which counts are unaffected by the present settlements. See generally *In re Cement and Concrete Antitrust Litigation* [1977-2 TRADE CASES P 61,64 8], 437 F. Supp. 750 (J.P.M.D.L. 1977)

**\*2** One of the first tasks faced by plaintiffs was to organize the efforts of the different plaintiffs' counsel. In Pretrial Order No. 3, this Court appointed Kenneth R. Reed as plaintiffs' liaison counsel, chairman of plaintiffs' steering committee, and as one of plaintiffs' co-lead counsel. The Court also appointed Josef D. Cooper and Frederick P. Furth as members of plaintiffs' steering committee and as plaintiffs' two other co-lead counsel. William C. Barnard and Arthur J. Davich were also appointed to serve as members of plaintiffs' steering committee. Plaintiffs' steering committee oversaw and coordinated the efforts of the different plaintiffs' counsel in the prosecution of this litigation. In addition, Frederick P.Furth was primarily responsible for coordinating discovery matters; Josef D. Cooper for briefing; and Kenneth R.Reed for overall direction and coordination.

After substantial motion activity directed to the allegations of plaintiffs' complaints, discovery relating to the motion for class certification and the merits of plaintiffs' claims began in the summer of 1977. During the course of discovery, plaintiffs deposed some 88 witnesses, most of whom were employed by the ready-mix defendants. During the same period, plaintiffs' counsel were also defending the depositions of their own clients against defendants' efforts to defeat the motion for class certification. Hundreds of thousands of documents were produced, inspected and copied and extensive sets of interrogatories were served and answered. Following extended briefing and oral argument, this

Court on March 9, 1979, certified that plaintiffs' claims against the ready-mix defendants should proceed as a class action. *In re Cement and Concrete Antitrust Litigation,* 1979-1 CCH TRADE CASES P 62,502 (D. Ariz. 1979).

The first settlement of the ready-mix claims was not reached until after almost three years of litigation. On September 19, 1979, plaintiffs lodged a settlement agreement with Columbia Building Materials, Inc.in the amount of $200,000.00. On October 1, 1979, an additional settlement with Phoenix Redi-Mix Company, Inc. in the amount of $200,000.00 was lodged. And, on October 3, 1979, a further settlement with New Pueblo Materials, Inc. in the amount of $60,000.00 was also lodged. With total settlements of $460,000.00 already in hand, negotiations with the remaining defendants intensified. On November 21, 1979, plaintiffs lodged another settlement agreement which resolved the claims of the class against all of the remaining ready-mix defendants except Amcord, Inc. This settlement was for $5 million and brought the recovery to $5.46 million. Notice of all of these settlements was mailed to class members and on July 1, 1980, this Court in Settlement Order No. 1 approved these settlements as fair, just and reasonable. A settlement in the amount of $700,000.00 was reached with Amcord, Inc.and lodged on August 15, 1980. This settlement was preliminarily approved by the Court on September 30, 1980; notice of it was mailed to class members; and its final approval came on for hearing December 16, 1980. The total settlement amount including the settlement with Amcord is $6.16 million. By the time claims distribution is made to the class members, estimated to be May 1981, accrued interest will swell the total settlement fund to more than $7.3 million.

II.

*Fee Review Committee*

**\*3** This Court has previously been faced with the task of passing upon plaintiffs' counsel's fee applications in antitrust class actions such as this.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

*In re Arizona Bakery Products Litigation* [1976-2 TRADE CASES P 61,12 0], Master File Civ. No. 74-208A PHX CAM (D. Ariz.); *In re Arizona Dairy Products Litigation* [1979-1 TRADE CASES P 62,605], Master File Civ. No. 74-569A PHX CAM (D. Ariz.) That task was not an easy one and in a memorandum to counsel following the consideration of the *Dairy* fee awards, this Court said:

The Court has recently spent a great deal of time in determining the awards of attorney fees and expenses in the *Arizona Dairy Products Litigation*.

In so doing, the Court has determined that use of a standardized reporting form might serve the interests of counsel for class plaintiffs in antitrust litigation by providing the Court with more information upon which to base fee and expense awards. In addition, use of such a form would permit more expeditious determination of fee awards by providing for a uniform method of record keeping and reporting.

Therefore, the Court requests that counsel, if they so desire, forward to the Court such blank forms and records as are now in use to keep track of attorney time, and keep track of how such time is spent. Counsel are also invited to submit such suggestions as they feel would be appropriate for inclusion in a standardized record such as the Court proposes to institute. It should be kept in mind, however, that the form contemplated by the Court would provide for very detailed record keeping, and detailed reporting and summarization of such records in petitions for fees and expenses, all for the purpose of providing the Court with a more efficient and objective basis for determining fees in cases of this kind, should this become appropriate.

In Pretrial Order No.41, this Court appointed a committee of plaintiffs' co-lead counsel to implement this standardized time and expense reporting procedure:It Is Hereby Ordered that a committee of Kenneth R. Reed, Josef D.Cooper and Frederick P. Furth is hereby appointed to establish procedures for the periodic reporting of the time expended and expenses incurred by plaintiffs' counsel and for periodically reviewing such reports by plaintiffs' counsel in order thereby to assist the Court in connection with any fee applications which might ultimately come before this Court for

consideration.

To assist the Court in consideration of the fee applications here, this Court followed the precedent established by Judges Robson and Will in the *Folding Cartons Litigation* and, in Settlement Order No. 4, appointed a committee to review all of plaintiffs' fee applications against the ready-mix settlement fund and to file a report and recommendations on these petitions. Plaintiffs' co-lead counsel were selected for the Committee because of their familiarity with this litigation and their ability to evaluate the reasonableness of the different applications. Mr. Hoover was selected for the Committee because of his experience as both a plaintiff's and defendant's antitrust attorney, to provide a measure of independent judgment to the deliberations of the Committee, and to provide a vehicle for any necessary communications with the Court.

*4 The Committee reviewed in detail the various fee petitions and supplements thereto that were filed. The Committee first considered the general history of this litigation and then undertook very detailed reviews of individual petitions. The Committee reviewed the propriety of all claimed time and expenses included in the various petitions. Once the allowable hours had been determined, the Committee determined the appropriate hourly rate to be applied to determine the lodestar for each attorney or paralegal for whom a fee was requested. Finally, the Committee decided upon an appropriate multiplier on an individual basis to be applied to the lodestar figures for the different attorneys and paralegals. Decisions made at each of these stages became interrelated with decisions made at later stages. Thus, decisions on applicable hourly rates were interrelated with the selection of multipliers and the computation of lodestars determined to some extent the multipliers which could be applied. All of the Committee's decisions were affected by the Committee's judgment that the total award of fees and expenses should not exceed 25 percent of the total settlement fund.

The Committee either met personally with or has had telephone conferences with each counsel who

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 4

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

had submitted an application. The first round of these conferences was to verify the information contained in the various applications, to obtain additional documentation or explanation, and to explain the Committee's analysis. In accordance with Settlement Order No.7, there was a second round of conferences in which the Committee provided to each counsel the Committee's preliminary recommendations regarding each such counsel's application and made itself available to discuss those preliminary recommendations with the individual counsel.

The three petitions by the members of the Committee were reviewed more vigorously than any others. In each case, the three members of the Committee other than the particular claimant conferred and sought substantial additional information from the claimant. These particular claims received the most scrutiny partially because of the membership of the individual claimants on the Committee, and partially because they collectively represented the bulk of the work which had been undertaken in this litigation.

The Court now has before it the Committee's final report and recommendations, together with certain objections that have been filed to that report and additional memoranda in support of the report and recommendations. The Committee's report was unanimous on all but one point. That point was whether the Attorney General of Arizona should be entitled to have a multiplier applied to its lodestar figure. On this issue, the majority of the Committee recommended that a multiplier should be applied to the Attorney General's lodestar. The minority member of the Committee recognized " that there are substantial reasons in this case to apply the multiplier to the Attorney General" but nonetheless felt bound by this Court's decision in *Dairy* where a multiplier was denied the Attorney General. Assuming, *arguendo*, that a multiplier should be applied to the lodestar of the Attorney General, the Committee was unanimous on what that multiplier should be.

**\*5** This Court has treated the report of the Committee as if it were the report of a magistrate or special master submitted pursuant to 28 U. S. C. §

636(b)(1)(A) and has reviewed the recommendations of the Committee to determine if they are clearly erroneous or contrary to law. Having reviewed and considered the report and recommendations of the Committee as well as the memoranda submitted by the parties, the Court hereby accepts and approves the report and recommendations of the Committee as submitted. As to the matter whether the Attorney General of Arizona should be entitled to have a multiplier applied to its lodestar figure, the Court hereby accepts and approves the report and recommendations of the majority of the Committee as submitted.

III.

*Analysis of Claimed Hours and Expenses*

The starting point of the computations made by the Committee was a detailed analysis of the actual hours and expenses included in each of the individual fee applications. In each instance, all of the original time records of the applicants were individually reviewed as were the detailed explanations for claimed expenses. A total of 22,655.125 hours of attorneys' and paralegals' time was included in the applications as originally filed. During the Committee[s initial consultations with claimants, 1,365.73 of these hours were withdrawn bringing the total to 21,289.75 hours which was further reduced by the Committee to 16,145.95 hours, resulting in a total reduction of 28.7 percent. To the same effect, claimed expenses which originally totalled $208,255.62 were reduced by the Committee to $192,306.24, a reduction of approximately 8 percent.

The most common reason for disallowance was the determination that claimed hours were applicable, if at all, to the *Cement* portion of this litigation and should be considered at a subsequent date in relationship to that matter. Any disallowance on this basis was recommended by the Committee to be without prejudice to claiming that time in *Cement*. To the same effect, the fact that the Committee recommended that hours should be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

considered at a subsequent date in connection with *Cement* did not necessarily mean that the Committee concluded that any such hours should be compensated in *Cement*.

The allocation of time between *Cement* and *Concrete* was not an easy one. Different attorneys followed different approaches in making the allocation. The problem was acerbated by the fact that most early timekeeking was kept jointly because the two claims were not then clearly distinguished by plaintiffs' attorneys. The Committee decided that any equitable and consistent allocation of time between *Cement* and *Concrete* would have to be based upon an individual analysis of each time record. Where an individualized allocation of time had not been made by an applicant, the Committee itself reviewed all of that applicant's time records to make its own allocation. Where appropriate, all of the time reflected in a particular time slip was allocated entirely to *Cement* or entirely to *Concrete* depending upon the subject matter reflected in that time slip. Where this was not possible, the Committee allocated the time claimed in particular time records based upon the Committee's best estimation and recollection of the relevant weighting of the events for which time was claimed. If, for example, a particular pretrial conference dealt primarily with *Cement* matters, only 10 percent of the time for attendance at that pretrial conference would be allocated to *Concrete* with the remainder being assigned to *Cement*. Those allocations ranged from as little as 10 percent to as much as 50 percent or more of the time being allocated to *Concrete* with the balance to *Cement*. When a more precise allocation was not possible, the Committee followed a rule-of-thumb approach of allocating onethird of claimed time to *Concrete* and twothirds to *Cement*. The Committee's reallocation of time between *Concrete* and *Cement* resulted in a substantial reduction of the number of hours originally claimed.

*\*6 A question separate from the allocation between *Concrete* and *Cement* was the issue whether particular hours claimed should be compensable out of the common settlement fund. Each individual time record was reviewed by the Committee and a

decision was made whether the time recorded should be allowed in full, reduced, or disallowed in full. All specific reductions or disallowances were reviewed by the Committee with the particular claimants. A few of the general principles applied by the Committee should be mentioned.

The doctrinal basis for the award of fees and expenses in a case such as this is the "Equitable Fund" theory. See *Sprague v. Ticonic National Bank,* 307 U. S. 161 (1939); *Trustees v. Greenough,* 105 U. S. 527 (1881). Those whose efforts created the common fund should be compensated by the beneficiaries of the fund created. The compensation should come from the fund. Recent case law has established that the compensation should be a function of the number of hours reasonably expended in creating the fund rather than as a function of some percentage of the fund. E.g., *In re Chicken Antitrust Litigation,* 1980-2 CCH TRADE CASES P 63,485 (N.D. Ga. 1980). A corollary of the Equitable Fund theory is that hours which were not reasonably attributable to the creation of the fund should not be compensated from the fund.

In reviewing each individual time record, the Committee made a decision whether the particular time was reasonably related to the creation of the fund. Where no contemporaneous time records were maintained, the Committee had an inadequate basis to judge the time and therefore recommended its disallowance.

Time was also disallowed where - in the judgment of the Committee - it was excessive for the task performed or because it was duplicative of time spent by another lawyer or paralegal. Where, for example, an attorney's attendance at a court hearing or meeting was unnecessary, the Committee recommended disallowing such time. The Committee looked with particular scrutiny upon instances where more than one attorney from the same firm attended the same court hearing or meeting. Except in the most compelling circumstances, the Committee recommended disallowing the time claimed by the second or third person from the same firm attending the same hearing or meeting.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 6

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

Excessive amounts of time spent reviewing correspondence and pleadings were also recommended for disallowance by the Committee. Counsel who are primarily responsible for a particular matter or who have overall responsibility for the litigation have an understandable need to review all appropriate correspondence and pleadings. The same cannot be said for attorneys whose role is more peripheral. Counsel whose roles in this litigation were relatively limited should not be compensated from the common fund for excessive amounts of unproductive time spent reviewing the work of others. It was impossible for the Committee to determine with absolute precision whether any particular time slip should be disallowed or partially reduced for this reason. Accordingly, where the Committee concluded that a particular firm's petition when viewed as a whole contained what appeared to be an excessive or disproportionate amount of unproductive time spent reviewing the work of others, the Committee recommended a 25 percent reduction to the amount of hours claimed by those who spent such unproductive time. While absolute precision was not attained, the Committee believed that where this 25 percent reduction was applied it fairly corrected for the duplicative or unproductive time submitted.

*7 Another category of time disallowed by the Committee was where the work being performed by a particular individual should have been performed by another individual whose hourly rate was lower. Oftentimes, attorneys performed work which in the judgment of the Committee would better and more economically have been performed by a paralegal. In such cases, the Committee recommended that the particular hours be allowed but that they be compensated at the lower hourly rate applicable for paralegals.

Another general category of time which the Committee did not believe should be compensated from the common fund was time spent in connection with the preparation of fee petitions or the recording and reporting of time in anticipation of fee petitions. See, e.g., *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.* [1976-2 TRADE CASES P 61,039], 540 F. 2d 102, 110-11 (3d Cir. 1976). Any such time was

obviously expended for the pecuniary benefit of the individual attorneys and should not be considered as helping to create the common fund. The attorneys who submitted fee petitions all appeared to recognize this fact and time spent in the preparation of fee petitions was generally excluded. In a few cases, however, such time was apparently inadvertently included in a fee petition and where this occurred the Committee recommended that such time be disallowed.

A final general category of disallowance or reduction by the Committee concerned travel time. In *In re Arizona Dairy Products Litigation,* this Court reduced the awards for time spent travelling:

It is the opinion of the Court that the requested fees for time spent in transit are excessive. It has been the Court's experience that, no matter how diligent the effort, it is virtually impossible to render the highest quality service while riding in airplanes, automobiles and other vehicles. Furthermore, it is the Court's opinion that, as in most professions and business, some part of the cost of time spent in travel should be borne by the individual attorney.

The Committee correctly read this opinion to mean that not all travel time should be disallowed. The Committee reasoned that a lawyer's sole stock in trade is his or her ability over time. Whether an hour of that time is spent in a courtroom or aboard an airplane, the opportunity cost would be the same. Moreover, it was the collective experience of the members of the Committee that lawyers billing their clients on a current hourly basis ordinarily charge those clients for the reasonable time spent in transit. Nor did the Committee believe it would be accurate to adopt a rule that time spent aboard an aircraft could not also be devoted to productive endeavors. Nonetheless, the Committee followed this Court's earlier ruling in *Dairy* and made appropriate reductions in claimed hours on account of travel time.

With regard to claimed expendes, the Committee followed much the same approach as it did regarding the hours claimed. Thus, if the Committee recommended disallowing the time claimed by the second or third person from the same firm attending the same hearing or meeting,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                Page 7

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

the Committee also recommended disallowing any travel expenses for that person. To the same effect, the Committee considered that certain types of expenses such as microfiche machine rental or word processing costs were more properly considered to be items of general overhead rather than normal out-of-pocket expenses and recommended disallowing such items.

**\*8** The Court has reviewed and considered the Committee's approach to analyzing the actual hours and expenses included in the individual fee applications. The Court hereby finds and determines that the report and recommendations of the Committee in this regard are neither clearly erroneous nor are they contrary to the law. Accordingly, the Court hereby accepts and approves the report and recommendations of the Committee regarding its approach to the analysis of the actual hours and expenses as submitted.

IV.

*Determination of Appropriate Hourly Rates*

The next principal endeavor of the Committee was to determine a recommended reasonable hourly rate for each attorney and paralegal. A threshhold question was whether to judge the reasonableness of the hourly rates within the market in Phoenix, Arizona, where the litigation was centered or in the communities in which counsel might practice. The Committee recognized that in the *Dairy* litigation, this Court based its decision upon "what the Court feels are reasonable rates of compendation for persons of comparable skill and experience in the Phoenix area." The Committee reasoned that the *Dairy* litigation like the present *Concrete* case was a suit where the operative facts arose exclusively within the State of Arizona and discovery was primarily centered in Arizona. Accordingly, the Committee judged the reasonableness of rates within the context of Phoenix.

Another threshhold question was whether to use the hourly rates currently being charged, e.g., *In re THC Financial Corp. Litigation,* 86 F.R.D. 721 (D.

Haw. 1980); *In re Master Key Antitrust Litigation,* 1978-1 CCH TRADE CASES P 61,887, at 73,720 (D. Conn. 1977) ("Normally the lodestar determination should be based on the attorney's current rates at the time of the filing of the fee petitions."); *City of New York v. Darling-Delaware,* 1977-2 CCH TRADE CASES P 61,802, at 73,328 (S.D.N.Y. 1977) ("When the attorneys have waited so long for any compensation, it seems that a calculation at present rates is appropriate to compensate for loss of interest and inflation."); or historical hourly rates in effect at the time the work was performed. E.g., *Locklin v. Day-Glo Color Corp.* [1974-2 TRADE CASES P 75,367], 378 F. Supp.423, 427 (N.D. Ill. 1974). Each of these approaches had some support in the case law and each was followed in at least some petitions.

The Committee expressed its view that there was much to commend the use of current hourly rates. When some of the work for which compensation was being sought was performed well in excess of four years before payment would be made, it would be inequitable to award compensation on the basis of the hourly rate in effect at the time the work was performed without any correction for the lengthy delay in payment. The nature of the inequity would be twofold. First, if four years elapse between the time that hours and money were invested and payment was made, some form of interest should be paid to compensate for the delay in payment. Second is the fact of inflation. To the extent that 1980 dollars are used to purchase goods or services at 1976 prices, the seller of those goods or services is being treated unfairly. One method considered by the Committee to correct for this lengthy delay in payment was to award fees on the basis of hourly rates in effect at the time the compensation award was made. The Committee felt that to the extent that annual revisions of hourly rates simply corrected for increased inflation, then at least the second aspect of this fundamental inequity would be avoided. One drawback of this approach was that the annual changes in rates were not consistent from petition to petition. A second approach considered was a mathematical computation correcting for both the inflationary and interest factors. The Committee felt that it could not seriously consider

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 8

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

this approach because of the absence of available data and the complicating step it would add to the Committee's calculation. A third approach considered by the Committee was to use historical hourly rates but to include in the recommended multipliers a component intended to reflect the delay factor.

**\*9** While the Committee believed that the weight of the case law and basic equity suggested the use of current hourly rates, the peculiar circumstances of the fee applications against the *Concrete* settlement fund led the Committee to recommend historical hourly rates with an adjustment to the multiplier to compensate for the delay factor. This conclusion was also dictated by the proportion of the total settlement fund that would have been represented by fee awards had current hourly rates been utilized. The Committee concluded that the total award of fees and expenses should not exceed 25 percent of the total settlement fund. Had current hourly rates been used in conjunction with the level of multipliers felt necessary by the Committee in order to reward the excellence of counsel and to compensate for the contingency, the total award would have surpassed this level. The use of historic rates with multipliers that reflected some measure of the delay in payment allowed the Committee to recommend a total award that was less than 25 percent of the Settlement Fund. In circumstances where the total fee awards would be a lower proportion of the total settlement fund, the Committee believed the use of current hourly rates would be more appropriate. Accordingly, with certain limited exceptions detailed below, the Committee utilized historical hourly rates in effect at the time the work was performed as a basis of its lodestar computations.

Settlement Order No. 4 required that fee petitions contain a statement of the historical hourly rates of the individuals for whose time compensation was being sought. Where this information was provided in the petitions it was -as a general proposition - utilized by the Committee. Where this information was not so provided, the Committee made further inquiry of applicants in order to ascertain the applicable historical hourly rates. If an applicant provided a supplementary

statement of his or her historical hourly rates, that figure was used by the Committee; if not, the Committee made its own determination of what it believed to be a reasonable historical hourly rate. Not only were the petitions of the particular attorneys considered in this matter, they were also compared against previous petitions in other cases where the particular attorneys had set forth their opinions of the value of their time in the same years. They were also reviewed in light of whatever awards were previously made by this or other Courts to these individuals.

One category of time for which historical hourly rates were not used was where attorneys performed work that in the judgment of the Committee would better have been performed by paralegal personnel. In such cases, the maximum hourly rate for paralegal personnel was utilized in the computation of the lodestar amounts.

Another general category where rates lower than historical hourly rates were used was in the case of attorneys with fewer than three years of practice. The Committee considered to be relevant the factors discussed above relating to the use of historical or current rates and the desire to hold the total award of fees and expenses to less than 25 percent of the total settlement fund. Accordingly, the Committee felt constrained to apply to the time of such junior attorneys the lower of the claimed historical hourly rate or $60.00 per hour. The Committee believed that the $60.00 per hour rate was in keeping with the rates generally in effect for such junior attorneys in Phoenix, Arizona.

**\*10** Another area where historical hourly rates were limited to a maximum level was in the case of paralegals. Although the Committee was aware that this Court has previously utilized a cost approach for paralegals, its recommendation was that that procedure should not be followed in this instance and that it be abandoned for the future. The Committee was strongly influenced by cases such as *In re Anthracite Coal Antitrust Litigation,* 1979-1 CCH TRADE CASES P 62,437, at 76,586-87 (M.D. Pa. 1979), which reasoned:
[T]he Court must consider the question of whether the petitioning firms may recover for the services of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 9

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

law clerks and paralegals based upon an hourly billing rate for each or whether recovery for services of such paraprofessionals is limited to the actual amount of out-of-pocket expense incurred by the petitioning firms in employing such personnel.

The latter approach is apparently the one adopted by the United States Court of Appeals for the Second Circuit. In *City of Detroit v. Grinnel Corp.* [1974-1 TRADE CASES P 74,986], 495 F. 2d 448, 473 (2d Cir.1974), the Court states that paralegals' time cannot be considered in determining the proper fee to be awarded in a case similar to this one. The Court indicated that its ruling was based upon the principle that attorney's fees may be awarded for the performance of professional duties only and should not be awarded for the execution of duties which are more properly performed by persons other than attorneys such as trustees or receivers. The opposite approach has been taken by several judges in the Eastern District of Pennsylvania. In *Dorfman v. First Boston Corp.,* 70 F.R.D. 366, 373-74 (E.D. Pa. 1976), Chief Judge Lord concluded based upon evidence presented to him at an attorney's fees hearing that the prevailing practice in the Philadelphia area is to bill the services of paraprofessionals on an hourly basis and that such services are properly included in the number of hours which relate to the award of attorney's fees. Judge Lord indicated that any other rule would encourage law firms conducting litigation involving the possible recovery of attorney's fees to assign work more properly done by a paraprofessional to an associate or junior partner in the firm so that recovery could be had for the performance of his services. That approach has been followed by Judge Becker in *Entin v. Barg,* 412 F. Supp. 508, 517 (E.D. Pa. 1976) and Judge Fullam in *Commonwealth of Pennsylvania v. O'Neill,* 431 F. Supp. 700, 711 (E.D. Pa. 1977).

It is the view of the Court that firms like the petitioning firms in these cases divide work assignments within the firm based upon the manner in which the services can be performed most efficiently and with the least possible expense and that whether or not such firms are awarded time for law clerks' and paralegals' services in an attorney's fees case will have little or no effect upon the division of labor within the firm. However, the Court is not persuaded by the rationale of the Court

of Appeals for the Second Circuit that an award for such services should be disallowed based upon a principle which appears to have no application in this context. In this Circuit, a District Court is free to devalue the services of an attorney if he performs work which could more properly or equally as well have been performed by a paraprofessional or a person completely disassociated from the legal profession such as a trustee or receiver. Thus, an award of attorneys' fees for performance of " nonprofessional" duties need not be made if the Court is convinced that an attorney should not have undertaken such tasks and such a decision is not inconsistent with allowing a firm to recover the fair value of services rendered by paraprofessionals. It is the view of this Court that the proper inquiry to be made with respect to whether the service of paraprofessionals should be included in an attorney's fees award is whether as a matter of normal billing practice such services are charged to a client based upon the number of hours spent by the paraprofessional to the case times an hourly fee for his services or whether compensation for such work is included as part of overhead and taken from the fee charged by the attorney. If the former is true, the firm's overhead and profit are derived from the fees charges for paraprofessional as well as attorney's services and, because the billing practices with respect to the two are identical, there is no reason to differentiate between them for purposes of awarding attorney's fees. The opposite result would deprive a petitioning firm of properly-earned compensation. However, if the latter is the usual case, then to award attorney's fees based upon an hourly rate charged for paraprofessionals would be a duplication of fees awarded to the attorneys themselves because the paraprofessionals' salaries and other expenses would already have been allocated to that part of the firm's overhead which is taken into account in determining the particular attorney's hourly billing rate.

**\*11** It was the experience of the members of the Committee that the services of paralegals of the type performed here were generally billed separately from the services of attorneys and that attorneys' hourly rates did not include an overhead component for such paralegals. Under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 10

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
(Cite as: Not Reported in F.Supp.)

rationale of *Anthracite Coal,* the Committee felt that this fact dictated that the lodestars for both attorneys and paralegals should be computed on the basis of their respective reasonable hourly rates rather than as a function of cost.

There was an additional reason considered by the Committee why paralegals should be compensated at reasonable hourly rates rather than on a cost basis. In computing fees to be awarded under the Equitable Fund doctrine, there is a "responsibility to jealously guard the rights of the beneficiaries of the fund." *In re Chicken Antitrust Litigation, supra,* 1980-2 CCH TRADE CASES at 76,541. Compensation of paralegals on a cost basis would, in the short run, result in the greatest savings to class members. In a broader perspective, however, this approach to paralegal compensation would eliminate an incentive to have work performed by personnel whose charges to the class are less. Stated differently, if a profit could be earned from the services of a junior associate but paralegals could only be reimbursed on the basis of out-of-pocket costs, there would be a natural inclination to assign work that could be done either by a junior attorney or a paralegal to the junior attorney. On balance, the Committee was convinced that the interests of class members would best be served by compensating paralegals on the basis of the reasonable hourly rates at which their time is billed in the community.

The Committee spent considerable time examining the reasonable hourly rates for paralegals in the community and a great deal of information was discussed concerning the cost factors of paralegals. From the attorneys submitting fee petitions and from other information obtained in the Phoenix area, it appeared to the Committee that the cost before bonuses for paralegals was in the range of $20.00 to $25.00 per hour. The law firm of which one of the Committee members is a partner is targeting a minimum paralegal hourly rate of $35.00 to $40.00. The actual experience in average billing runs somewhere between $31.00 and $35.00 per hour. With this knowledge and the knowledge from the fee petitions as to fees actually being charged for these paralegals, the Committee recommended that the fee rate for paralegals be the

hourly rate requested, but in no instance in excess of $30.00 an hour.

This Court has reviewed and considered the Committee's approach to determining recommended reasonable hourly rates for each attorney and paralegal. This Court hereby finds and determines that the report and recommendations of the Committee in this regard are neither clearly erroneous nor are they contrary to the law. Accordingly, the Court hereby accepts and approves the report and recommendations of the Committee regarding its approach to determining recommended reasonable hourly rates for each attorney and paralegal as submitted.

V.

*Determination of Appropriate Multiplers*

**\*12** Once the lodestar amounts had been determined, the next step in the Committee's analysis was the determination of appropriate multipliers to be applied to the lodestars in order to compute the final recommended fee awards. The Committee followed the approach used by this Court in *Dairy.* Accord, e.g., *Grunin v. International House of Pancakes* [1975-1 TRADE CASES P 60,22 2], 513 F. 2d 144 (8th Cir. 1975); *City of Detroit v. Grinnel Corp.* [1974-1 TRADE CASES P 74,986], 495 F. 2d 448 (6th Cir. 1974); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.* [1973-2 TRADE CASES P 74,761], 487 F. 2d 161 (3d Cir. 1973); *In re Equity Funding Securities Litigation,* 438 F. Supp. 1303 (C.D. Cal. 1977); *Liebman v. J. W. Petersen Coal & Oil Co.,* [1974-1 TRADE CASES P 75,117], 63 F.R.D. 684 (N.D.Ill.1974). The factors considered by the Committee were as follows:

(1)*The time and labor required by the attorneys and their staffs.* Attorneys and paralegals expended more than 16,000 allowable hours in the prosecution of this matter. This was certainly a considerable commitment of time and effort but what was most notable is the relative efficiency of this prosecution when compared to *Dairy.* In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

*Dairy,* in excess of 12,000 hours of attorneys' time had been expended by the date of the interim fee award on April 16, 1979, and at least that amount of paralegals' time had also been expended. Thus, the successful prosecution to completion of the *Concrete* litigation required fully one-third less time than the partial prosecution of the *Dairy* litigation. This was done even though there were many more defendants named in *Concrete* than in *Dairy* and the number of depositions was greater in *Concrete* than *Dairy.* Though the 16,000 hours was obviously a considerable investment of time and resources, the time was spent with a greater measure of efficiency than in *Dairy.* Duplicative efforts were consciously reduced by plaintiffs. Plaintiffs followed the general practice, for example, of having no more than two attorneys present at any deposition. The Committee felt that the significant commitment to this litigation was deserving of increased multipliers but, more importantly, that the efficiency with which plaintiffs prosecuted their claims was also deserving of higher multipliers.

The Committee also considered the financial investment that was made in this litigation. Almost $200,000.00 of allowable costs were advanced by plaintiffs to prosecute the claims of the class. Advancing so large a sum entailed a not-insignificant risk and the Committee felt that parties who made this investment should be compensated accordingly. The importance of the financial commitment to this litigation goes beyond the mere amount of money put at risk. In this -as in most other antitrust class actions of this sort -plaintiffs established a joint cost-sharing fund to help pay for common expenses. Assessments made for the benefit of this fund were made ratably against the different plaintiffs. The Committee concluded that the plaintiffs who paid all of their assessments promptly bore a fairer share of the financial costs of this litigation than those who were delinquent, who paid only a portion of their assessments, or who paid their assessments only after substantial settlements had already been reached. The Committee reasoned that - all other factors being equal - the higher multiplier should go to those who fully and promptly bore their fair share of the financial costs of this litigation.

**\*13** (2)*The novelty and difficulty of the questions presented.* This litigation presented a number of novel and difficult legal questions such as plaintiffs' successful response to defendants' efforts to divide this litigation into a series of smaller conspiracies; tolling of the statute of limitations and the temporal scope of appropriate discovery; class certification; and obtaining civil discovery in the face of a simultaneous Department of Justice antitrust grand jury investigation, to name but a few. While plaintiffs were not always successful on these difficult matters, they brought to them the highest caliber legal expertise.

In addition, defendants vigorously contested virtually every stage of this litigation. Defendants objected to the production of documents and answering interrogatories and sought to quash the entirety of plaintiffs' deposition program. Defendants repeatedly resisted plaintiffs' effort to obtain an early trial setting for this cause. Plaintiffs met defendants' tactics with commendable tenacity, diligence and hard work. The Committee concluded that this action was well lawyered from both sides.

(3)*The skill requisite to perform the legal service properly.* The Committee felt that this litigation required that the legal skill of plaintiffs' counsel be of the highest caliber. The Committee was of the opinion that the skill generally exhibited by plaintiffs' counsel met this high standard.

(4)*The preclusion of other employment by the attorney due to the acceptance of this case.* The Committee recognized that by accepting representation of the plaintiff class and by making the significant commitment of time and resources that they did, the private plaintiffs' counsel were prevented from accepting other work at their normal billing rates and, in much the same fashion, the Attorney General of Arizona was prevented or delayed from investigating and prosecuting other alleged violations of the antitrust laws.

(5)*The customary fee.* In determining the lodestar amounts, the Committee made appropriate reductions in the number of hours and evaluated the reasonableness of the fee rates in comparison with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

other attorneys in the community with similar qualifications and experience. The lodestar amounts so determined reflected the Committee's best judgment on the reasonable price for the services performed had those services been paid on a current basis, without any contingency, and without any consideration for particular excellence or efficiency. The factors of delay, contingency and exceptional excellence or efficiency were reflected in the multipliers recommended by the Committee.

(6)*The nature of the fee - fixed or contingent.* For most of the plaintiffs' counsel in this case, as in most other class action antitrust damage suits, any fee was contingent upon winning the lawsuit or reaching a satisfactory settlement. This contingency was undertaken and vast amounts of time and money were invested with no assurance of success. Indeed, it was not until after almost three years of litigation that plaintiffs obtained even their first settlement. The Committee concluded that the contingent nature of this litigation justified that appropriate multipliers be applied to the lodestars.

**\*14** The presence of a prior governmental action is ordinarily considered as an aspect of the risk or contingent nature of a litigation. As is discussed more fully below, the Committee felt that this this case presented a unique application of this general principle. As applied here, a majority of the Committee felt that this factor tended to increase the multiplier applied to the lodestar of the Attorney General and the entire Committee concluded that this should decrease the multipliers applied to the different private counsel.

(7)*The time limitations imposed by the client or the circumstances.* The Committee did not consider this factor to be significant in reaching its recommendations and did not contribute to any multiplier recommendations.

(8)*The amount involved and the results obtained.* The settlements in this matter totalled slightly in excess of $6.16 million and the total settlement fund with accrued interest through the date of distribution will be more than $7.3 million. This was the largest recovery in any antitrust class action

in Arizona and in that sense the Committee felt it demanded that appropriately high multipliers be awarded to reward this measure of success and to encourage future antitrust enforcement.

The Committee also viewed the $7.3 million in the fund to be a limiting factor. To compensate fully for the contingent nature of this litigation, the delay in payment, the excellence of at least some of plaintiffs' counsel, and the efficiency with which plaintiffs as a group proceeded, the Committee concluded that multipliers significantly higher than those it recommended would be entirely appropriate. If higher multipliers were applied, however, the total fee award would have exceeded 25 percent of the total settlement fund which the Committee had established as a maximum. While the Committee recognized that the $7.3 million available for distribution is a handsome amount, it nonetheless limited the size of the multipliers that could be awarded.

(9)*The experience, reputation and abilities of the attorneys.* Petitioners in this litigation are attorneys of the highest caliber many of whom have previously practiced before this Court. Some of plaintiffs' attorneys are experienced in multidistrict antitrust litigation and have nationwide reputations.

(10) *The undesirability of the case.* This factor was not considered to be significant by the Committee in reaching its recommendations and did not contribute to any multiplier recommendations.

(11) *The nature and length of the professional relationship with the client.* This factor was considered by the Committee to be relevant to the multiplier only in the case of the Attorney General of Arizona and is discussed below in the context of that application.

The Committee concluded that the nature of the relationship with the client had some relevance to all of the fee applications, however. Counsel are compensated under the Equitable Fund doctrine to provide reasonable compensation for their services and to avoid the unjust enrichment of class members at the expense of those responsible for creating the fund. That rationale is missing where

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

those who created the fund are separately compensated by their clients for their services. Accordingly, the Committee recommended that for any counsel to be entitled to an award of fees and expenses, that counsel should agree to waive any payment of fees or expenses from his or her client on account of the hours and expenses being compensated.

*15 (12) *Awards in similar cases* Although awards in similar cases were considered by the Committee in the determination of recommended lodestars, they did not enter into the determination of the multipliers. The Committee believed that appropriate multipliers must be individually determined for each lawsuit based upon the factors relevant to that suit.

Having considered these factors, one of the next questions considered by the Committee was whether the recommended multipliers should be uniform for all personnel within a law office or whether each individual's multiplier should be separately determined. The Committee thought there was much to be said in favor of applying uniform multipliers to the lodestars of all personnel within a single law office. The Committee viewed such an approach as reflecting the reality of this litigation since the responsibility here was apportioned to different law firms rather than to individuals. The Committee believed that a uniform approach would reduce a disincentive against having work performed by personnel with relatively lower hourly rates. If the highest multipliers were only applied to the individuals with the highest hourly rates, reasoned the Committee, the incentive would be reduced to have work performed by lower paid individuals with the net result that the overall fees paid by members of the class would be increased.

Nonetheless, in the circumstances involved in the *Concrete* fee applications, the Committee felt constrained to recommend that multipliers be separately determined for each individual within a law office. The Committee reached this conclusion because if uniform multipliers had been applied to all personnel within an office which were sufficiently high to compensate the efforts of the most experienced personnel in those offices then the

total of all fee awards would have been too high a proportion of the total settlement fund. Had the total proportion of the fee award to the total settlement fund not been so high through the use of uniform multipliers, the Committee would have recommended utilizing uniform multipliers since the Committee considered this to generally be the preferable approach.

The range of multipliers recommended was from 1.0 to 2.85. The highest level of multipliers was reserved for plaintiffs' three co-lead counsel, Messrs. Reed, Cooper and Furth. As appears more fully below, these three individuals bore primary responsibility for prosecuting this litigation and for overseeing and directing the efforts of their co-counsel. Their offices made the greatest commitments of time and resources to this litigation and they therefore bore the greatest amount of risk. The quality of legal representation provided by these attorneys was the highest. As plaintiffs' liaison counsel and chairman of plaintiffs' steering committee, Mr. Reed was recommended to have a multiplier of 2.85. Messrs. Cooper and Furth were recommended to have a multiplier of 2.75.

The next level of multipliers was 2.25. This multiplier was recommended for the lead counsel in the different firms who were active counsel for class representatives and for the attorneys in the offices of plaintiffs' co-lead counsel who directly assisted those co-lead counsel. The caliber of service performed by the attorneys in this category was exceptional and greatly enhanced the processing and successful settlement of this litigation. Mr. Barnard would ordinarily have been recommended to have a 2.25 multiplier under this rationale but because of his national reputation, his unusual abilities and his special contribution to this case, the Committee recommended he have a multiplier of 2.5 in recognition of his special contribution.

*16 A multiplier of 1.5 was being recommended for another category of attorneys. These are attorneys whose contribution to the litigation the Committee felt merited recognition and reward but who were not entitled to the 2.25 multiplier being recommended for other counsel because their overall role in the entire litigation was less

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

significant or the degree of risk they bore was less than for others.

The next level of multiplier generally recommended was 1.25. This multiplier was applied to the lodestars of attorneys who contributed to the prosecution of the litigation but whose involvement was minimal. In view of the fact that historical rather than current hourly rates were being used, the Committee felt it mandatory that some correction be made to reflect the delay in payment. While the Committee felt that a multiplier of 1.25 did not fully compensate for the delay in payment and the use of historical rather than current hourly rates, the Committee determined that this multiplier was the highest that could be generally applied consistent with the overall fee awards.

The Committee applied a multiplier of 1.0 to attorneys' time in three categories. The first category was in those cases where the attorney's client had voluntarily dismissed its complaint relatively early in the litigation and the attorney had no further involvement in the litigation following that point. The second category of attorney's time in which a 1.0 multiplier was being recommended was characterized broadly as "claims administration" time. This was time generally subsequent to the final approval of the settlements on July 1, 1980, and dealt largely with the processing and administration of class members' claims against the settlement fund. By July 1, 1980, all contingencies had effectively been eliminated from the time spent on these matters and the delay in payment had been reduced to the point that the time expended could be viewed almost as if it were currently billable. In these circumstances, the Committee concluded that a multiplier of no more than 1.0 was appropriate. The final category in which a 1.0 multiplier was used was in the case of attorneys and paralegals whose contribution to the litigation the Committee felt not to be significant or otherwise not deserving of a multiplier greater than 1.0.

The Committee gave consideration to applying a multiplier less than 1.0 in some cases. In view of the use of historical hourly rates and the substantial reductions in time the Committee considered nonproductive, no multiplier below 1.0 was

recommended.

The maximum recommended multiplier for paralegals was 1.5. This multiplier was only recommended for those paralegals who made an outstanding and unusual contribution to the case. Multipliers of 1.25 and 1.0 were also recommended for paralegals based upon the Committee's judgment of the relative contribution of those paralegals to the case.

There were several reasons for the Committee's recommendation of multipliers for paralegals. See generally *In re Anthracite Coal Antitrust Litigation, supra.* The principal reason was to create an incentive for the use of paralegals. The maximum rate recommended for paralegals was $30.00 an hour. The minimum rate being recommended for attorneys was $50.00 an hour. Even with a maximum 1.5 multiplier for a paralegal, there would be a savings to the class to have work done by a paralegal instead of a lawyer. If only a cost approach were allowed and any multiplier were denied, the Committee felt that the natural inclination would be to move work to a young lawyer on the theory that his or her employer had some "profit" position in that young lawyer's time.

\*17 The Court has reviewed and considered the Committee's approach to determining appropriate multipliers to be applied to the lodestars. This Court hereby finds and determines that the report and recommendations of the Committee in this regard are neither clearly erroneous nor are they contrary to law. Accordingly, the Court hereby accepts and approves the report and recommendations of the Committee regarding its approach to determining appropriate multipliers as submitted.

## VI.

### *Individual Fee Awards*

With these general principles in mind, the Committee next addressed the individual petitions. Attached as Exhibits hereto are detailed schedules

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 15

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
(Cite as: Not Reported in F.Supp.)

setting forth this Court's specific awards for each petitioner. The Committee's application of these general principles to each of the individual petitions follows.

*Attorney General of Arizona*

The application of the Attorney General of Arizona was the most extensive of those considered by the Committee and it presented the Committee with the most difficult legal questions. As noted, this application was the only one on which the Committee was unable to reach unanimous agreement. The majority of the Committee concluded that the particular circumstances of this litigation and the Attorney General's unique role here required that some multiplier be applied to the Attorney General's lodestar. The minority member of the Committee agreed that there were substantial reasons in this case to apply a multiplier to the Attorney General but interpreted this Court's *Dairy* opinion to prohibit any multiplier in excess of 1.0 for any state attorney general. The Committee was unanimous, however, on what multiplier should be applied to the Attorney General's lodestar in the event that there was no absolute prohibition against the use of a multiplier for a state attorney general.

In addition to serving as counsel for the State and its political subdivisions in antitrust damage actions, Ariz. Rev. Stat. Ann. §§ 41-192)A)(1) and -193(A)(3), the Attorney General of Arizona is also charged with the duty of seeking injunctive and penal relief under Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1401 *et seq.* The Attorney General conducted the investigation which led to the filing of the first complaint in this litigation. Kenneth R. Reed, who was Chief Counsel of the Attorney General's Antitrust Division, was appointed by this Court to serve as plaintiffs' liaison counsel, chairman of plaintiffs' steering committee and one of plaintiffs' co-lead counsel. Mr. Reed is a highly capable and experienced antitrust attorney with a national reputation. The State of Arizona was also one of the representatives of the class in this matter.

The hours and expenses claimed by the Attorney General were far greater than those submitted by

any other counsel. They were reviewed according to the same standards discussed above and appropriate disallowances and reallocations were made. If anything, the fact that the Attorney General's claimed hours were greater than any other counsel and that Mr. Reed was a member of the Committee meant that the Attorney General's petition was subjected to more rigorous scrutiny than any other. These disallowances and reallocations were discussed in detail by the Committee and were approved by the Attorney General.

*18 The dual role of the Attorney General as an attorney in an antitrust class action seeking treble damages and as the State's chief law enforcement officer responsible for enforcing Arizona's penal antitrust statute, Ariz. Rev. Stat. Ann. § 44-1407, presented to the Committee a unique question regarding what, if any, hours claimed by the Attorney General should be compensated. The members of the Committee other than Mr. Reed concluded that hours spent by the Attorney General in furtherance of law enforcement activities should not be compensated from the settlement fund in this damage action. There was no question that such activities benefitted the members of the class. It was the Attorney General's investigation, after all, that led to the discovery of the alleged conspiracy and the filing of the initial complaint. The information obtained by the Attorney General during this investigation was highly instrumental in the efficiency with which this litigation progressed. And the Attorney General's prosecution to trial of the companion State Court penal lawsuit played no small part in reaching the settlements since the first three settlements totalling $460,000.00 were all reached on the eve of trial and the fourth settlement of $5 million was reached after the jury had been empaneled and opening arguments had been made. Quite obviously, the Attorney General's law enforcement activities were of direct and substantial benefit to members of the class. Conversely, the activities of the private counsel provided some measure of assistance to the Attorney General in the prosecution of the Superior Court penal action. Private counsel deposed witnesses who otherwise would have to have been deposed by the Attorney General for the Superior Court action. This

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 16

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

assistance by the private counsel in the Attorney General's prosecution of the Superior Court penal action was rewarded by the Committee in multipliers which were higher than they otherwise would have been.

The Committee nonetheless concluded that time spent on furtherance of law enforcement activities should not be compensated from the common fund in this damage action. The Committee reasoned that responsibility for enforcing Arizona's penal laws was one which the Attorney General had quite apart from the responsibility of prosecuting damage actions. The considerations which supported the award of fees under the Equitable Fund theory did not apply to efforts spent in enforcing the State's penal laws, in the view of the Committee. The Committee found further support for disallowing this time by the multiplier it recommended for the Attorney General and the fact that the State of Arizona obtained some monetary relief in connection with its Superior Court action pursuant to Ariz. Rev. Stat. Ann. § 44-1407-though that recovery did not fully compensate the State for its expenses there. The Committee rejected the Attorney General's argument that time spent in furtherance of these law enforcement activities which benefitted the class should be compensated from the general fund. The Committee recognized that these efforts benefitted the class but concluded that any benefit should be reflected in the multiplier to be applied to the hours spent in the prosecution of the damage action rather than by compensating hours spent in furtherance of law enforcement efforts.

**\*19** On the basis of the foregoing, the Committee recommended the disallowance of all time and expenses of the Attorney General in connection with his statutory pre-filing investigation pursuant to Ariz. Rev. Stat. Ann. § 44-1406; all time and related expenses in court hearings, trial preparation and trial of the Superior Court proceedings; and all time and expenses for preparing pleadings and other papers filed in the Superior Court action. The Committee discussed the time and expenses so disallowed in detail with the Attorney General who agreed to the identification of such hours and expenses but who disagreed with the basis for disallowing them.

The Committee also considered what, if any, hourly rate should be applied to the time of the Attorney General. Three possibilities were considered by the Committee: (1) that the Attorney General be paid no compensation whatsoever for the time expended by his staff and only be reimbursed for direct out-of-pocket expenses; (2) that the hourly rate should be based upon the cost to the State of Arizona of employing the attorneys and paralegals in the Attorney General's office, cf., e.g., In re Master Key Antitrust Litigation, 1978-1 CCH TRADE CASES P 61,887 (D. Conn. 1977); and (3) that the hourly rate to be applied to the Attorney General's time should be the reasonable rate charged by private counsel in the community with similar qualifications. E.g., In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions [1975-1 TRADE CASES P 60,277], 410 F. Supp. 706, 717-18 (D. Minn. 1975); In re Gypsum Cases [1974-2 TRADE CASES P 75,272], 386 F. Supp.959, 986-87 (N.D. Cal. 1974). The Committee recognized that in the Bakery and Dairy litigations this Court had compensated the Attorney General based on a reasonable hourly rate for private counsel in the community of comparable experience, but the Committee nonetheless considered this question again ab initio.

One argument considered by the Committee for disallowing the Attorney General compensation altogether was the notion that the taxpayers of this State have already funded the antitrust enforcement efforts of the Attorney General's office and to require the class members to pay for the Attorney General's services would be some form of double payment. The Committee was unable to find any authority to support this argument and, in any event, ultimately rejected it because in the circumstances presented here felt that it was not well-founded in fact. Although the Antitrust Division of the Attorney General's office received some legislative appropriations, the Committee concluded that the primary source of funding for antitrust enforcement efforts was the State of Arizona Antitrust Revolving Fund. Pursuant to Ariz. Rev. Stat. Ann. §§ 41-191.01 and -191.02, the Arizona Legislature has directed that all recoveries of fees and expenses and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 17

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

10 percent of all other monetary recoveries in antitrust cases be deposited to the Antitrust Revolving Fund. This fund is used solely to finance antitrust investigations and prosecutions. The Committee felt that in its creation of the Antitrust Revolving Fund and in its appropriations for the Antitrust Division, the Arizona Legislature had effectively directed that antitrust enforcement efforts in-this state operate on a selfsustaining basis. The costs of this litigation were largely borne out of the Antitrust Revolving. Fund and the Committee concluded that those expenditures should be repaid in order to finance future antitrust enforcement efforts in this State. The Committee therefore rejected the argument that the taxpayers had already paid for the services of the Attorney General in this litigation. The Committee felt that any legislative intent was directly the contrary.

The Committee found no basis for denying the Attorney General any compensation whatsoever. *In re Chicken Antitrust Litigation,* 1980-2 CCH TRADE CASES P 63,485, at 76,557-58 (N.D. Ga. 1980). ("In truth, the issue has never been whether public attorneys general should be awarded fees at all. . .. [T]he issue here has always been what fee would be fair and reasonable to both the class and the state attorneys, not whether a fee should be awarded at all.")

**\*20** The Committee also reasoned that even if it were to assume that the Attorney General's antitrust efforts were fully funded by tax dollars, it would still not be logical to have the taxpayers bear the full financial burden of the Attorney General's activities here. The Committee reasoned that under the Equitable Fund doctrine, the beneficiaries of the fund should compensate those who created the fund so that the beneficiaries would not be unjustly enriched. The Committee felt that if general tax revenues raised from all of the citizens of this State were used to create a fund which benefitted only the relatively few who were eligible to and did submit claims against the settlement fund, the claimants would be unjustly enriched at the expense of all taxpayers. The Committee concluded that this inequitable result would best be avoided by compensating the Attorney General from the fund he had helped to create.

The Committee considered next whether the Attorney General's hourly rate should be based upon cost. The Committee found that the weight of authority rejected this approach and instead compensated state attorneys general based upon the rates of comparable private counsel. *State of Illinois v. Sangamo Construction Co.,* 1980-2 CCH TRADE CASES P 63,502 (C.D. Ill. 1980); *In re Chicken Antitrust Litigation, supra; In re Sugar Industry Antitrust Litigation,* Master File No. MDL-201, Opinion re: Attorneys' Fees and Costs (N.D.Cal., Nov. 28, 1979); *In re Armored Car Antitrust Litigation,* 1979-1 CCH TRADE CASES P 62,662 (N.D. Ga. 1979); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, supra; In re Gypsum Cases, supra; Liebman v. J.W. Peterson Coal & Oil Co., supra. Master Key* was virtually alone in applying a cost basis to the hours of state attorneys and, even there, Judge Blumenfeld applied a rate something in excess of average cost.

In the *Antibiotics* cases, Judge Lord persuasively argues that state attorneys general should receive compensation on a par with that awarded private counsel. Judge Lord noted that enforcement of the antitrust laws serves broad public purposes and the state should have the option of using public employees or retaining outside counsel to prosecute antitrust cases. I agree with much of Judge Lord's reasoning, but I think that he is in the end too generous. State attorneys general operate in an environment significantly different from private counsel. They are sworn to uphold and serve the public good. They do not maintain fully staffed and equipped law offices at their own expenses and do not undertake the risks of attracting or satisfying clients. Most important, their overhead is different. They pay no taxes on the attorneys' fees awarded them. For these reasons and also because of the limited role of such counsel in the cases, I have not adjusted the awards of the attorneys general or special assistants to reflect risk. But like Judge Lord, I think that the enforcement of the antitrust laws by state officials should be encouraged. I have therefore compensated these lawyers at a rate of $40 per hour which would seem slightly greater than average cost. 1978-1 CCH TRADE CASES at 73,726-27 (citations and footnotes omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 18

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

**\*21** The Committee concluded that the more typical approach and that taken in the vast majority of the cases was exemplified by the reasoning of Judge O'Kelley in *In re Chicken Antitrust Litigation,* who, after consideration of all relevant factors, compensated state attorneys based upon rates of comparable private counsel:Though they normally keep running totals of the number of hours spent on each of their cases, these lawyers do not bill the state for their time as do private attorneys their clients. Moreover, they do not carry the same overhead that private firms do; it is not unusual for a state to bill its legal department for its office space and supplies at prices the department has no say in establishing. Nor do public attorney generals command as high a salary as do private lawyers.
Assuming, for good reason, that the quality of services provided by a state attorney is comparable to that performed by private counsel, the court would not appraise his time at its full market value if it focused exclusively on what his client, the state, normally pays its attorneys. But what then is the reasonable value of their contribution to this litigation: If the court were to ignore the differences between public and private counsel in awarding fees, then the state would receive a wind-fall in the sense that it will be awarded far more from the settlement fund in attorney's fees than it had to pay to receive these services. . .. On the other hand, if the court does not award the full measure of their contribution to the settlement of these cases, then the class will receive a benefit to which, under this analysis, it is not entitled.

. . . .

The court recognizes that many of the services provided by the public attorney generals conferred appreciable benefits upon the class as a whole. Besides such beneficial chores as working on the Settlement Administration Committee and researching issues affecting the whole class, they performed the very critical function of easing the tensions and overcoming the suspicions between public and private counsel. By maintaining good relations between the two at times when difficult issues threatened to drive them apart, the state attorneys were able to deliver all the states and thus ensure the defendants the total peace they demanded.
Because of the very fundamental differences between private and public attorneys, the court inquiried at some length during the evidentiary hearing about the basis for awarding fees to the state from the settlement fund. Of the three states petitioning for attorneys' fees, only New Jersey has thoroughly investigated the per capita cost of operating its antitrust division. On the basis of the analysis, the state concludes that for the years 1976-1979 the cost per attorney hour was $51.88, $80.53, $100.96, and $51.51, respectively. Massachusetts estimates that the per attorney costs of operating its antitrust department during the fiscal year 1979 ran $69.21 an hour; total expenses for this accounting period came to $290,654.00.
One possible basis for computing the lodestar of a fee award to the states, then, is the estimated hourly cost of supplying legal services. This formula, however, would arrive at a fair approximation of the market value of the state attorneys' contribution to the class as a whole only if the court were to conclude that because public attorneys possessed less skill and experience, their services were of less value to the class than those performed by private counsel. The court already has valued time spent by private attorneys carrying lesser burdens in this litigation than that assumed by some of these public attorney generals at a rate as high as $125 per hour. Under the circumstances the court concludes that in assigning a value to the time expended by state attorneys for the purpose of computing a lodestar award, it will not distinguish between public and private counsel. The hourly rates selected will reflect the general quality of the public attorneys, their reputations, expertise, and status within the antitrust bar. 1980-2 CCH TRADE CASES at 76,557-58.

**\*22** The Committee was not persuaded by Judge Blumenfeld's reasoning and instead accepted the rationale in *Chicken Antitrust* and comparable decisions. The Committee recognized that the " overhead [may be] different" for state attorneys than private counsel, but in view of Judge O'Kelley's opinion and the Attorney General's suggestion that at least in some cases the hourly cost to the State is higher than the reasonable hourly rates of those in the private sector, this difference was not dispositive. As to the notion that state

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                 Page 19

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

attorneys general "do not maintain fully staffed and equipped law offices at their own expense," the Committee rejected that argument since the Attorney General's office is larger and more fully equipped than any of the private counsel who have submitted fee petitions and because the Attorney General's reliance upon the Arizona Antitrust Revolving Fund is somewhat akin to operating at his own expense. And, finally, to the extent that Judge Blumenfeld was persuaded by "the limited role of [states'] counsel" in *Master Key,* the Committee found that that argument was not persuasive here where the Attorney General of Arizona spearheaded this litigation and served as plaintiffs' liaison counsel, chairman of plaintiffs' steering committee and one of plaintiffs' co-lead counsel.

The Committee also considered the practical ramifications of awarding the Attorney General's staff a lower hourly rate than other comparable counsel in the community. Had the Attorney General simply represented the State of Arizona and not the entire class, the Attorney General would have been entitled to attorney's fees based upon a reasonable hourly rate for comparable private counsel. *State of Illinois v. Sangamo Construction Co., supra.* The Committee felt that to award the Attorney General less than this reasonable hourly rate for taking on the added burdens of representing the class would be to place a penalty upon the laudatory public service of class representation. The Committee did not believe that the Attorney General should be penalized for his representation of the class in this matter. Particularly where future antitrust enforcement depends upon success in obtaining monetary recoveries, the Committee concluded that the Attorney General's recovery should not be reduced because he took on the added responsibility of representing the class and not simply the State of Arizona.

The Committee therefore recommended that this Court adhere to its earlier decisions in *Bakery* and *Dairy* and compute the lodestar of the Attorney General on the basis of a reasonable hourly rate rather than cost. Since the Attorney General did not bill his services in the same fashion as do private counsel, it then became necessary for the

Committee to determine what would have been reasonable hourly rates for the personnel in the Attorney General's office. For a great many of the Attorney General's personnel for many of the years involved here, the Committee was able to rely upon this Court's earlier decisions in *Bakery* and *Dairy* for a determination of appropriate hourly rates. Where earlier rulings by this Court in *Bakery* and *Dairy* were not available for guidance, the Committee made reasonable extrapolations from those earlier awards or assigned hourly rates which in the Committee's judgment would be reasonable rates for persons of comparable skill and experience in the Phoenix area.

**\*23** The Committee next considered what, if any, multiplier should be applied to the Attorney General's lodestar. The Committee was aware that this Court did not apply a multiplier to the Attorney General's time in *Dairy*:
The attorneys for plaintiffs in this matter are highly respected members of the legal community. The Court is of the opinion that had plaintiffs' attorneys not pursued this litigation, they would have been profitably engaged in the representation of other clients. By accepting representation of the plaintiff classes, petitioners were prevented from accepting other work at their normal billing rates.
The same cannot be said for the Arizona Attorney General's office, however. Although Mr. Reed and his staff may have pursued other cases had he not been a representative of the consumer class in this litigation, it must be remembered that he was already the paid representative of the consumer class by virtue of being in the employ of the State of Arizona. It is primarily for this reason that the Court has decided not to apply a multiplier greater than 1.0 to the Attorney General's request, even though the Court is of the opinion that Mr. Reed's ability is of the highest and his services and that of his staff invaluable.

The majority of the Committee did not consider that this Court's rationale for denying the Attorney General a multiplier in *Dairy* should necessarily be dispositive here. That Mr. Reed and the members of his staff were salaried employees of the State of Arizona did not seem to the majority an appropriate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

basis for denying the State the benefit of applying a multiplier. Associate attorneys and paralegals in private firms are salaried employees and the majority reasoned that that status was not considered by the Committee to be a basis for denying their employers the benefit of a multiplier. To the same effect, the majority felt *Dairy* was a much different case since it involved a statewide consumer class which presumably included all Arizona taxpayers while the present case involves a much more limited class. The majority felt that if the inclusion of all Arizona taxpayers in the *Dairy* class led to denying the Attorney General a multiplier, and *Dairy* should not be followed here where reduction of the Attorney General's compensation would unjustly enrich the relatively limited number of class members at the expense of all Arizona taxpayers. As to the notion that private counsel "would have been profitably engaged in the representation of other clients" had they not prosecuted this litigation, the majority concluded that the opportunity cost for the Attorney General was not significantly different.

There was a more fundamental reason, however, why the majority did not believe that *Dairy* should necessarily be applied here. In *Dairy*, the Attorney General did not seek to represent the consumer class until the litigation had been pending more than four years. Settlements were reached shortly thereafter and at the time of this Court's interim fee award in *Dairy*, the Attorney General simply had not made a major investment of time or resources to that case nor had he played that significant a role in that litigation. In the present case by contrast, the Attorney General has invested more time and resources than any other counsel and has literally spearheaded this litigation.

**\*24** The majority concluded that the distinction between the role of the Attorney General in *Dairy* at the time of the Court's interim fee awards there and his role in this litigation is the same sort of distinction which is used to differentiate the multipliers applied to the lodestars of private counsel. Accordingly, as was the case where the Committee considered the hourly rate to be applied to the Attorney General's time, the Committee also addressed *ab initio* the issue what, if any, multiplier

should be applied to the Attorney General's lodestar.

At the outset, the majority reasoned that to the extent that delay in payment and use of historic rather than current rates constituted some portion of the multiplier then that factor should apply equally to public as to private counsel. *In re Sugar Industry Antitrust Litigation, supra.* The majority did not consider this rationale contrary to this Court's decision in *Dairy* because there the Attorney General had such a brief involvement prior to the settlements and interim fee award so as not to invoke the delay factor. The majority therefore concluded that the Attorney General of Arizona was entitled to some multiplier simply by the fact that he had to wait upwards of four years to be compensated for the time and money expended.

As to the broader application of multipliers to the lodestars of public attorneys, the cases considered by the Committee were more evenly divided than those which addressed the hourly rates to be applied to state attorneys' time. Cases such as *Antibiotics* have awarded state attorneys general higher multipliers than private counsel based upon the contributions by the public counsel and the risk factor. There, Judge Lord awarded private counsel a multiplier of 1.5 and reserved the highest multiplier of 2.0 for the public attorneys. The majority of the Committee found Judge Lord's reasoning persuasive and particularly applicable here where the Arizona Attorney General's antitrust enforcement efforts are dependant upon the Antitrust Revolving Fund:
The fee applications and fee awards of the public attorneys will be discussed *infra.* The Court wishes to emphasize that the role of both private and public attorneys has been substantial in this case. . ..
The Court also recognizes the great contribution by the public attorneys in the States of California and Oregon. . .. The lawyers in the Attorney General's office of the State of California represented California very competently, ably and as well as any private lawyer might have. Mr. Speigel and Mr. Murphy, of the State of California's Attorney General's office, have done an outstanding job throughout this litigation. This Court has the highest esteem for these men as individuals and as litigants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 21

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
(Cite as: Not Reported in F.Supp.)

The same must be said of the State of Oregon. The Attorney General's office has done an excellent job in representing its consumers. Mr. Stephen Dunne, and before him Mr. Ed Nugent, have taken an active and able role in the litigation. The State of Oregon also has employed very capable paralegals to assist it where possible. Oregon's contributions to these cases have been significant. These public lawyers have represented their State as well as any private litigant.

**\*25** Accordingly, the Court is going to award fees to both the Attorney General of the State of California and to the Attorney General of the State of Oregon as if they were private lawyers. In so doing, the Court does not wish to discourage the use of private attorneys to represent States' Attorneys General in actions such as these. With the exception of California, Oregon and a few other States, most Attorneys General's offices are not sufficiently staffed to bring these types of actions.

When staffing is available and funds are available, the risk of political intervention through the restraining of funds by the Legislature is always great. What was an Attorney General's antitrust staff one day may be abrogated by an irate State Legislator on the next. The plan here implemented affords the various Attorneys General an option as to how they might handle their class action cases.

In the event that they choose to proceed without retaining private counsel, the prospect of their recovery of substantial attorneys' fees will reassure those involved in the state budget process that such funds may be ultimately recovered for the state itself. On the other hand, in those instances where such funds cannot be obtained by the states, the retention of private counsel is still a viable option.

The plan gives to the Attorney General that freedom from political pressures which is desirable under these circumstances.

To California's and Oregon's credit, their States have not chosen to act irresponsibly in this area. The lawyers have been well funded, are very experienced, and have taken an active and strong role in this litigation. The consumers of these two States, as well as their Attorneys General, can be proud of their staffs' fine performance. The Court would encourage this type of conduct on behalf of these Attorneys General in the future.

. . . .

Each fee application and the amounts awarded are listed below:

### 1. *State of California.*

The State of California has filed an application requesting a reasonable attorneys fee from the consumer class. The contributions of the State of California have been discussed above. In computing the State of California's award, the Court is assessing 14,472 hours of time at one risk factor and 6,128 hours of lawyers time at a second risk factor. Applying the hourly rate of $100.00 an hour to the first 14,472 hours, the Court arrives at an hourly rate of $1,447,200.00. Applying a risk factor of 2 to this rate, the Court arrives at a total fee computation for this portion of the hours of $2,894,400.00. The Court is using a higher risk factor for these early hours because of the tremendous early contributions of the State of California. This includes the great amount of time spent by the State of California in preparing its early economic briefs and also its great amount of time in pursuit of this litigation. The Court feels that a risk factor of 2 for these early hours is most reasonable. After using a risk factor of 2 for the original 14,472 hours, the Court applies a $100.00 rate to the remaining 6,128 hours. This equals $612,800. Applying a risk factor multiple of 1.5 equals $919,200.00 as a fee computation for this portion. To that figure, the Court adds $24,680.00 for paralegal time. This equals a total fee award of $3,838,280.00. The Court feels that this fee award is fair and reasonable.

### 2. *State of Oregon.*

**\*26** The State of Oregon also has filed a petition seeking reasonable attorneys fees. The contributions of the State of Oregon were discussed above and are great. The Oregon application states a total of 6,432.5 hours total time upon these actions. This time is divided into 3,143.5 hours attorneys time and 3,389 hours paralegal time. Applying a multiple of $100.00 an hour to the lawyers time results in a total attorneys charge of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                 Page 22

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

$314,350.00. Applying a $20.00 an hour rate for paralegal time results in a total of $67,780.00. This combined total is $382,130.00. Applying the contingency factor of 1.5, the Court arrives at a fee computation of $573,195.00.

Other cases cited by the majority such as *Sangamo* expressly hold that public attorneys are to be judged on the same basis as private counsel. There were still other cases such as *Armored Car* where state attorneys general were treated on the same basis as private counsel and there was no discussion by the Court of possible distinctions between the two. On the other hand, the majority recognized that there were cases such as *Master Key* and *Chicken Antitrust* where multipliers were denied to state attorneys general on the facts presented there but which left open the possibility of different treatment under different circumstances. The majority of the Committee was unable to discern any hard-and-fast rule that state attorneys general should always be denied a multiplier or always awarded one. Rather, application of multipliers to the lodestars of public attorneys seemed to the majority to have turned on the particular facts of individual cases.

The majority concluded that there were factors unique to public attorneys which would affect the multipliers to be applied to their lodestars. The Attorney General directed the Committee's attention to the Arizona Antitrust Revolving Fund statute, Ariz. Rev. Stat. Ann. §§ 41-191.01 and -191.02. Any fee award to the Attorney General is deposited to the State of Arizona Antitrust Revolving Fund where it may be used only for future antitrust investigations and prosecutions. If a multiplier is intended as an incentive to future antitrust enforcement, the Attorney General argued, the justification for the multiplier would be wellserved when the fee award is deposited to a fund where it can only be used for antitrust enforcement. The Attorney General also argued that the substantial amounts of its time which had been disallowed because they related to law enforcement activities were reason for an increased multiplier for the time that remained. The Attorney General also argued that the time spent during his pre-filing investigation, for example, greatly added to the efficiency with which he and his co-counsel prosecuted this class action. The Attorney General

contended that to disallow the pre-filing time while compensating the allowable time on a reduced basis would be a double penalty and would result in class members' paying much less than the value of the services and benefits they received. The Attorney General further argued that it would be incongruous to deny him a multiplier for his time in preparing written analyses of the evidence he had compiled while awarding private counsel multipliers for reading those same written analyses.

**\*27** On the other hand, the Committee recognized that it might be argued that taxpayer funding of state antitrust enforcement might be one reason why no multiplier should be applied, although Judge Lord in *Antibiotics* apparently felt otherwise. Whatever relevance this consideration may have elsewhere, it seemed inapplicable to the majority in this case in light of the funding mechanism for Arizona's antitrust enforcement. Indeed, the majority considered the Arizona Legislature's reliance upon the Antitrust Revolving Fund to underwrite antitrust enforcement to be a reason for applying a higher multiplier here.

The Committee also considered the Attorney General's role in this litigation. Unlike cases such as *Master Key* and *Chicken Antitrust* where the role of the public attorneys was relatively insignificant, the Attorney General of Arizona was the principal architect of this litigation. Indeed, the Attorney General has argued that this litigation even more than *Antibiotics* presents the strongest possible case for the award of a multiplier to a state attorney general. The Attorney General conducted the investigation which led to the commencement of this litigation and was plaintiffs' liaison counsel throughout the course of this litigation. The Attorney General was responsible for the organization and direction of the activities of other plaintiffs' counsel and the Office of the Attorney General was itself directly and intimately involved with virtually every aspect of this litigation.

Putting aside the depositions of plaintiffs and employees of cement companies, a total of 88 individuals were deposed in the ready-mix portion of this litigation. Of these 88 individuals, the Office of the Attorney General examined 62 either

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 23

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

before or after these cases were filed and -as to the remainder-was directly involved in the preparation of other attorneys who would be conducting the examination. The first drafts of all of the requests for documents and interrogatories originated with the Office of the Attorney General and the Attorney General was directly involved in the preparation and editing of all papers filed by plaintiffs in this litigation. The Attorney General's expertise developed during his pre-filing investigation and the electronic data retrieval system developed by the Attorney General contributed significantly to the efficiency with which this case progressed.

The Office of the Attorney General was, in addition, directly involved in-if not also solely responsible for-all of the settlements reached in this matter. In August and September 1979, for example, the Office of the Attorney General negotiated with Columbia Building Materials the first ready-mix settlement in this litigation. In September 1979, the Attorney General also negotiated settlements with defendants New Pueblo and Phoenix Redi-Mix. And, in October 1979, after the jury had been empaneled and opening statements made in the Superior Court action, the Attorney General (together with Josef D. Cooper) negotiated a settlement with Allied Concrete, Allied Concrete & Materials, California Portland, Arizona Sand & Rock, Chandler Ready-Mix, Johnson & Stewart, Phoenix Sand & Rock, Mesa Sand & Rock, Tanner, Tri-City Ready-Mix and Union Rock in the amount of $5.0 million which at the time was the largest single antitrust settlement in Arizona history. And, finally, the Attorney General assisted Josef D. Cooper in negotiating the $700,000 settlement with Amcord which concluded the ready-mix portion of this litigation.

**\*28** For all of the foregoing reasons, the majority of the Committee concluded that the Office of the Attorney General should be awarded a multiplier in this litigation. Having considered the Attorney General's status as a public servant and the assistance he received in the Superior Court penal action from the private counsel here which tended to reduce the multiplier; as well as the tremendous commitment of time and resources devoted to this litigation; the leadership role played; the

efficiency, dedication and high quality of legal services; the national reputation of Mr. Reed as an experienced and able antitrust lawyer; the ramifications of the Arizona Antitrust Revolving Fund statute; the other factors mentioned above; and particularly the substantial amounts of the Attorney General's time which have been disallowed all of which tended to increase the multiplier, the majority of the Committee recommended that the highest multiplier in this litigation of 2.85 be applied to the lodestar of Mr. Reed and that other multipliers be applied to the lodestars of his staff members.

As indicated, the Committee was divided on the basis of two votes for (Messrs. Cooper and Furth) and one vote against (Mr. Hoover) as to whether the recommendation should include a multiplier for the Attorney General's time. The majority view was that the multiplier should be applicable. The Committee's view was that if a multiplier were applicable, that the multiplier suggested is reasonable. On that particular point as to the magnitude of the multiplier, the Committee's recommendation was unanimous. Thus, the only division in the Committee was to whether a multiplier in excess of 1.0 should be applicable. Mr. Hoover's view was that the Court's previous holding in *Dairy* was the applicable position and that unlike other portions of this recommendation where the Committee recommended that the Court depart from the *Dairy* decision, that the Court should follow its previous order in this matter. Mr. Hoover recognized, however, that there were substantial reasons in this case to apply a multiplier to the Attorney General.

The Court accepts the majority recommendation on whether to award a multiplier to the Attorney General. The minority position is both illogical and is inconsistent with other decisions on which the Committee reached unanimous agreement. The majority was correct to decide that *Dairy* did not establish an absolute rule that public attorneys could never receive a multiplier under any circumstances. The multipliers to be applied in any case depend upon the particular facts and circumstances unique to that case. The Committee itself recognized this fact in its report where it said:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                       Page 24

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

Although awards in similar cases were considered by the Committee in the determination of recommended lodestars, they did not enter into the determination of the multipliers. The Committee believed that appropriate multipliers must be individually determined for each lawsuit based upon the factors relevant to that suit.

**\*29** It was incorrect then for the minority member of the Committee to focus on only one factor in the *Dairy* decision and to ignore the other factors in *Dairy* which required that a multiplier be denied the Attorney General in the interim fee award there and also to ignore the substantial reasons in this case to apply a multiplier to the Attorney General.

The minority position is also inconsistent with other decisions on which the Committee reached unanimous agreement. The Committee unanimously agreed that some multiplier was required to compensate for the delay in payment since historical hourly rates were used to compute lodestars and since there was a lengthy delay between the time funds were expended and plaintiffs were reimbursed for those costs. It is inconsistent and illogical to apply historical hourly rates to all counsel, to apply multipliers to some private counsel to compensate for the delay in payment for use of historical rates, but to deny the Attorney General any multiplier. *In re Sugar Industry Antitrust Litigation, supra.* To the same effect, since the Committee recognized that one basis of the Equitable Fund doctrine was to avoid the unjust enrichment of the beneficiaries of the fund at the expense of those who created the fund, it would be inconsistent with the rationale underlying the Equitable Fund doctrine to compensate the Attorney General on the basis of commercial hourly rates where the cost may be greater. The application of a multiplier should avoid this inconsistency both for private counsel and for the Attorney General where costs exceed the recommended hourly rate. Finally, there is the matter of the disallowed hours. In disallowing certain hours, the majority did so with a view that the Attorney General would receive an appropriate multiplier for the hours which remained. It would be inconsistent and unfair to the Attorney General to determine the hours for which he would receive

compensation based on the assumption that a multiplier would be applied to those hours and then deny any multiplier when it came time to compensate those hours.

For the reasons stated by the majority and because of the defects in the minority's position, the Court is of the view that some multiplier should be applied to the Attorney General's lodestar in this case. Since the Committee was unanimous on the particular multiplier to be applied to the Attorney General in the event this Court concluded some multiplier was appropriate, the Court accepts the unanimous recommendation of the Committee on the multiplier to be applied.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid the Attorney General of Arizona and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards the Attorney General of Arizona fees after multiplier of $362,475.30 and reasonable costs of $91,740.18 for a total award of $454,215.48, all in accordance with the detailed schedule attached hereto.

**\*30** *Furth, Fahrner, Bluemle, Mason & Wong*

The law firm of Furth, Fahrner, Bluemle, Mason & Wong was counsel for plaintiffs Rubenstein Development Company and Harry M.Rubenstein, both individually and on behalf of Central Palm Plaza Company, an Arizona joint venture. Frederick P. Furth served as one of plaintiffs' co-lead counsel and as a member of plaintiffs' steering committee. Mr. Furth is a highly capable and experienced antitrust attorney with a national reputation. Mr. Furth was one of the attorneys for the class in this matter.

The claimed hours and expenses for this firm were reviewed in detail by the Committee. Because of questions which appeared to the Committee regarding the petitioner's allocation of time between *Cement* and *Concrete*, the Committee reviewed in detail all of the petitioner's time records for both *Cement* and *Concrete* and made its own

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 25

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

reallocations between the two. Both because of the significant number of hours being claimed and because of Mr. Furth's membership on this Committee, this petition was subjected to extraordinary scrutiny. The reductions and reallocations were in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner.

The hourly rates for petitioner have been reduced in accordance with the general principles outlined above. Mr. Furth's hourly rate was reduced to $155.00 per hour for each of the years included in this fee petition even though his claimed historical hourly rate during each of these years was much higher. This reduction is in keeping with the Committee's standard of following reasonable rates of compensation for persons of comparable skill and experience in the Phoenix area. The reductions in hourly rates have been discussed with and have been accepted by the petitioner.

The multipliers being applied are in accordance with the general principles outlined above. Mr. Furth was one of plaintiffs' three co-lead counsel and served as a member of plaintiffs' steering committee. In this capacity, Mr. Furth assisted Mr. Reed with the overall coordination and direction of this litigation. Mr. Furth was assigned by Mr. Reed the responsibility of overseeing and directing plaintiffs' discovery efforts. Mr. Furth discharged this responsibility admirably. Plaintiffs' discovery in this litigation proceeded quickly and efficiently thanks to Mr. Furth's efforts. Mr. Furth also played an important role in plaintiffs' settlement discussions. Mr. Furth participated personally in some of the early settlement discussions with defendants and helped formulate plaintiffs' strategy regarding the settlements which were eventually reached.

The other partners, associates and staff members of Mr. Furth's firm also contributed significantly to this litigation. Members of Mr. Furth's firm conducted the depositions of 10 different witnesses. Mr. Furth's partner Robert L. Bluemle conducted the initial portions of plaintiffs' damage study. And members of Mr. Furth's firm were involved in

virtually every aspect of plaintiffs' discovery efforts including the coding of materials for inclusion in the electronic data retrieval system used by plaintiffs in this litigation. In all of these activities, the highest caliber of legal skill was evidenced and significant contribution was made to the ultimate recovery by the class.

**\*31** The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Furth, Fahrner, Bluemle, Mason & Wong and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Furth, Fahrner, Bluemle, Mason & Wong fees after multiplier of $358,827.05 and reasonable costs of $10,614.36 for a total award of $369,441.41, all in accordance with the detailed schedule attached hereto.

*Cooper & Scarpulla*

The law firm of Cooper & Scarpulla was counsel for plaintiffs Estes Homes, *et al.* Josef D. Cooper served as one of plaintiffs' co-lead counsel and as a member of plaintiffs' steering committee. Although Mr. Cooper was not formally one of the attorneys for the class, he functioned in this litigation as if he were one of the class' attorneys and assumed the financial risk and burden commensurate with that role. *In re THC Financial Corporation Litigation*, 86 F.R.D. 721, 740 (D. Haw. 1980) ("Nonetheless . . . contributions from lawyers not formerly appointed class counsel but who have benefitted the class are justly compensable."), citing *Aamco Automatic Transmission, Inc. v. Tayloe* [1979-1 TRADE CASES P 62,660], 82 F.R.D. 405 (E.D.Pa. 1979). Mr. Cooper is a highly capable and experienced antitrust attorney with a national reputation. Mr. Cooper's partner, Francis O. Scarpulla, is also a highly capable and experienced antitrust attorney.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. Both because of the significant number of hours being claimed and because of Mr. Cooper's membership on this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 26

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

Committee, this petition was subjected to extraordinary scrutiny. These reductions have been discussed in detail with and have been accepted by the petitioner.

The multipliers being applied are in accordance with the general principles outlined above. Mr. Cooper was one of plaintiffs' three co-lead counsel and served as a member of plaintiffs' steering committee. In this capacity, Mr. Cooper assisted Mr. Reed with the overall coordination and direction of this litigation. Mr. Cooper was assigned by Mr. Reed the responsibility of overseeing and directing the preparation of all briefs and other memoranda filed on behalf of plaintiffs. Mr. Cooper discharged this responsibility admirably. The briefs and memoranda filed by plaintiffs evidenced the able advocacy that has come to be expected from Mr. Cooper's office. Mr. Cooper also played an important role in plaintiffs' settlement discussions. Mr. Cooper participated personally in virtually all of those discussions and helped formulate plaintiffs' strategy regarding all of the settlements. He was primarily responsible for negotiating the $700,000 settlement with Amcord which brought this litigation to a successful conclusion. Mr. Reed repeatedly consulted with Mr. Cooper regarding formulating and implementing plaintiffs' strategy for conducting this litigation.

**\*32** Mr. Scarpulla and associates of the firm were also very active in discovery matters. No fewer than 21 depositions were taken by persons from this firm. Members of this firm were heavily involved in other discovery matters including a major role in coding materials for inclusion in the electronic data retrieval system used by plaintiffs in this litigation. And, as noted above, persons from this firm performed exceptionally well in connection with the briefs and memoranda filed by plaintiffs and particularly so in connection with plaintiffs' reply memorandum in support of their amended motion for class certification.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Cooper & Scarpulla and hereby finds and determines that the

report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Cooper & Scarpulla fees after multiplier of $319,930.93 and reasonable costs of $23,196.40 for a total award of $343,127.33, all in accordance with the detailed schedule attached hereto.

*Davich & Pollock*

The law firm of Davich & Pollock was counsel for plaintiffs Bill Carson, *et al.* Arthur J. Davich served as a member of plaintiffs' steering committee. Mr. Davich is a highly capable and experienced trial attorney and has appeared before this Court in a number of other antitrust cases. Mr. Davich was one of the attorneys for the class.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner.

The multipliers being applied are in accordance with the general principles outlined above. Mr. Davich was a member of plaintiffs' steering committee in which capacity he assisted Mr. Reed in formulating and implementing plaintiffs' strategy for this litigation and was assigned by Mr. Reed the tasks of overseeing plaintiffs' financial affairs and the maintenance of time and expense records as required by this Court's direction in Pretrial Order No. 41. Mr. Davich also played a highly significant and important role in plaintiffs' discovery efforts. Mr. Davich took the depositions of five of defendants' employees, interviewed a number of witnesses, and assisted other plaintiffs' counsel in the preparation for and examination of other witnesses. Personnel from Mr. Davich's firm were involved in virtually all of the inspection and copying of documents from defendants in Phoenix and his firm was one of those which played a major role in coding materials for inclusion in the electronic data retrieval system used by plaintiffs in this litigation. Mr. Davich was also solely responsible for plaintiffs' successful early efforts to obtain access to the fruits of the Attorney General's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 27

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

prefiling investigation. These were efforts which contributed significantly to the progress and efficiency of plaintiffs' joint efforts. Finally, when the size of Mr. Davich's firm is taken into account, the magnitude of his contribution to this litigation was greater than any of the other private counsel and the degree of risk was, therefore, greater.

**\*33** The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Davich & Pollock and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Davich & Pollock fees after multiplier of $227,288.80 and reasonable costs of $10,865.98 for a total award of $238,154.78, all in accordance with the detailed schedule attached hereto.

*Law Offices of Josef D. Cooper*

The Law Offices of Josef D. Cooper is one of the successors to the firm of Cooper & Scarpulla whose role in this litigation is discussed more fully above.

The claimed hours and hourly rates for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner. The expense records of the petitioner were in the hands of its certified public accountant for a tax audit at the time fee petitions were filed and no claim for expenses was therefore submitted. The Committee recommended that this firm be allowed to submit a supplementary petition for these expenses. The multipliers being applied are in accordance with the general principles outlined above.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees to be paid the Law Offices of Josef D. Cooper and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards the Law Offices of Josef D. Cooper fees after multiplier of $115,032.72 for a total award of $115,032.72, without prejudice to the

right to submit a supplementary petition for expenses, all in accordance with the detailed schedule attached hereto.

*Sommer & Barnard*

The law firm of Sommer & Barnard was counsel for plaintiff Buck Brown Contracting Co. William C. Barnard served as a member of plaintiffs' steering committee. Mr. Barnard is a highly capable and experienced antitrust attorney with a national reputation. Mr. Barnard's partner, James E. Hughes, is also a highly capable and experienced antitrust attorney. Mr. Barnard was one of the attorneys for the class in this matter.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner.

With the exception of Mr. Barnard, the multipliers recommended by the Committee are in accordance with the general principles outlined above. Mr. Barnard was a member of plaintiffs' steering committee. In this capacity, he assisted Mr. Reed with the overall coordination and direction of this litigation. He participated personally in the settlement negotiations with one of the defendants and lent his expertise to formulating plaintiffs' overall discovery strategy. Both Mr. Barnard and Mr. Hughes took depositions of defendants on behalf of plaintiffs and their firm assisted with the coding of materials for inclusion in the electronic data retrieval system used by plaintiffs in this litigation. Because of his national reputation, his unusual abilities and his special contribution to this case, Mr. Barnard was recommended by the Committee to have a multiplier of 2.5 rather than the multiplier of 2.25 which would otherwise have been applied to his lodestar.

**\*34** The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Sommer & Barnard and hereby finds and determines that the report and recommendations are neither clearly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                      Page 28

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
(Cite as: Not Reported in F.Supp.)

erroneous nor are they contrary to law and the Court therefore awards Sommer & Barnard fees after multiplier of $99,260.37 and reasonable costs of $14,149.92 for a total award of $113,410.29, all in accordance with the detailed schedule attached hereto.

*Bryans & House*

The law firm of Bryans & House was counsel for plaintiff Wooldridge Construction Company. This firm was among the counsel for the class in this matter but did not serve on plaintiffs' steering committee.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. This firm did not include its historical hourly rates in its petition and did not timely provide them following a request by the Committee. The hourly rates utilized are therefore the Committee's judgment of reasonable rates of compensation for persons of comparable skill and experience in the Phoenix area. These reductions have been discussed in detail with and have been accepted by the petitioner.

The multipliers being applied are in accordance with the general principles outlined above. While members of this firm participated in plaintiffs' discovery efforts, they did not assume the degree of responsibility carried by the other firms already discussed.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Bryans & House and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Bryans & House fees after multiplier of $50,637.61 and reasonable costs of $11,130.65 for a total award of $61,768.26, all in accordance with the detailed schedule attached hereto.

*Miller, Pitt & Feldman*

The law firm of Miller, Pitt & Feldman was counsel

for plaintiffs Estes Homes, *et al.* This firm did not serve as counsel for the class and did not serve on plaintiffs' steering committee, although it did perform work on behalf of the class. This firm also had a retainer agreement with its clients which reduced, to some extent, the degree of risk it undertook.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner.

The multipliers being applied are in accordance with the general principles outlined above. While members of this firm participated in plaintiffs' discovery efforts and were personally involved in the early settlement discussions with Columbia Building Materials, they did not assume the degree of responsibility carried by other firms for which a higher multiplier is being recommended.

**\*35** The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Miller, Pitt & Feldman and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Miller, Pitt & Feldman fees after multiplier of $39,167.75 and reasonable costs of $12,310.83 for a total award of $51,478.58, all in accordance with the detailed schedule attached hereto.

*Kendrick, Netter & Bennett*

The law firm of Kendrick, Netter & Bennett was counsel for plaintiffs Public Storage, Inc., Stabler Construction Co., Inc. and Mayer Construction Co., Inc. This firm did not serve as counsel for the class or on any of plaintiffs' committees. Indeed, in June 1978, the action filed by this firm was dismissed without prejudice on behalf of all three of its clients.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 29

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner. With one exception, the multipliers recommended by the Committee are in accordance with the general principles outlined above. That exception is in the case of time expended in connection with the deposition of William C. Bell. In the judgment of the Committee, the time spent in connection with the deposition of William C. Bell was sufficiently productive to justify a 1.5 multiplier as to that time only rather than the 1.0 multiplier being applied to other time of this firm because of the early dismissal of its client's complaint.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Kendrick, Netter & Bennett and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law, and the Court therefore awards Kendrick, Netter & Bennett fees after multiplier of $32,835.00 and reasonable costs of $5,629.27 for a total award of $38,464.27, all in accordance with the detailed schedule attached hereto.

*Lancy & Ryan*

The law firm of Lancy & Ryan was counsel for York Concrete Company, York Concrete, Inc. and Sea Foamed of San Diego, Inc. Although this firm was among the counsel for the class in this matter, it did not serve on plaintiffs' steering committee, and did not play a significant role in the prosecution of this matter.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner. The multipliers recommended were in accordance with the general principles outlined above.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Lancy & Ryan and

hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Lancy & Ryan fees after multiplier of $16,755.87 and reasonable costs of $6,115.80 for a total award of $22,871.67, all in accordance with the detailed schedule attached hereto.

*\*36 Goldman & Kaplan*

The law firm of Goldman & Kaplan was counsel for Mesa Apartment Associates, *et al*. This firm did not serve as counsel for the class or on any of plaintiffs' committees. Indeed, in 1978, the action filed by this firm was dismissed.

The claimed hours, hourly rates and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the petitioner. No multiplier is recommended in view of the relatively early dismissal of this case.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Goldman & Kaplan and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Goldman & Kaplan fees with no multiplier of $6,882.50 and reasonable costs of $3,480.86 for a total award of $10,363.36, all in accordance with the detailed schedule attached hereto.

*Law Offices of Francis O. Scarpulla*

The Law Offices of Francis O. Scarpulla is one of the successors to the firm of Cooper & Scarpulla whose role in this litigation is discussed more fully above.

The claimed hours and expenses for this firm were reviewed in detail by the Committee and reduced in accordance with the general principles discussed above. These reductions have been discussed in detail with and have been accepted by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                 Page 30

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

petitioner. The claimed historical hourly rates of Mr. Scarpulla have been reduced so that they do not exceed the hourly rates being recommended for plaintiffs' co-lead counsel. The claimed historical hourly rates of paralegal Ms. Brown have been reduced to the $30.00 per hour maximum for paralegals being recommended by the Committee. These reductions in hourly rates have been discussed with and have been accepted by the petitioner. The multipliers being applied are in accordance with the general principles outlined above.

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid the Law Offices of Francis O. Scarpulla and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards the Law Offices of Francis O. Scarpulla fees after multiplier of $7,120.50 and reasonable costs of $1,098.57 for a total award of $8,219.07, all in accordance with the detailed schedule attached hereto.

*Kenneth R. Reed*

As noted above, Kenneth R. Reed has been plaintiffs' liaison counsel, chairman of plaintiffs' steering committee and one of plaintiffs' co-lead counsel. During the period of time covered by these fee petitions, Mr. Reed was also Chief Counsel of the Antitrust Division of the Office of the Attorney General of the State of Arizona.

Mr. Reed has submitted an application for the reimbursement of expenses in the amount of $1,830.40. These were expenses incurred personally by Mr. Reed and which were not reimbursed to him by his employer the State of Arizona. The reason these expenses were not reimbursed to Mr. Reed by the State of Arizona was generally that they were in excess of the relatively limited per diem and travel allowances allowable under Arizona statutes or that they were for items for which the State of Arizona does not compensate its employees. All of these expenses incurred by Mr. Reed were reasonable and were for expenditures for which the private counsel in this

litigation are being compensated.

***37** The Court has reviewed and considered the Committee's report and recommendations regarding the expenses to be paid Kenneth R. Reed and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Kenneth R. Reed his reasonable costs of $1,830.40 for a total award of $1,830.40.

*Mariscal, Weeks, McIntyre & Friedlander*

The law firm of Mariscal, Weeks, McIntyre & Friedlander was counsel for plaintiffs Blankenship Builders, Inc. and Buck G. Blankenship. The plaintiffs represented by this firm were not class representatives and the work done by this firm was not done directly on behalf of the class.

One of the threshhold questions considered by the Committee was whether this firm should be compensated from the general settlement fund or should look solely to its client for payment. The Committee concluded that the class enjoyed some benefit by having a relatively small number of individual lawsuits filed by substantial individual plaintiffs such as those involved here. The Committee was also persuaded by the consideration that the clients should not be put to a disadvantage because they filed suit rather than remaining simply a class member. While the Committee would likely have reached a different conclusion had a greater number of class members filed individual suits, in the circumstances presented here the Committee concluded that the firm of Mariscal, Weeks, McIntyre & Friedlander should be compensated from the general settlement fund.

The claimed hours and expenses for this firm were reviewed in detail by the Committee and were reduced so that one-third was allocated to *Concrete* and two-thirds to *Cement*. These reductions have been discussed in detail with and have been accepted by the petitioner. The claimed historical hourly rate has been used. A multiplier of 1.25 is being applied in accordance with the general principles outlined above.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798
**(Cite as: Not Reported in F.Supp.)**

The Court has reviewed and considered the Committee's report and recommendations regarding the fees and expenses to be paid Mariscal, Weeks, McIntyre & Friedlander and hereby finds and determines that the report and recommendations are neither clearly erroneous nor are they contrary to law and the Court therefore awards Mariscal, Weeks, McIntyre & Friedlander fees after multiplier of $1,380.00 and reasonable costs of $143.02 for a total award of $1,523.02, all in accordance with the detailed schedule attached hereto.

In summary, the applications for fees and expenses and the awards are as follows: [Not reproduced.-CCH].

## V.

Now, Therefore, in consideration of the foregoing and of all matters of record herein and good cause appearing therefor,

It Is Hereby Ordered, Adjudged and Decreed:

1. The Court hereby finds and determines that the report and recommendations of the Committee are neither clearly erroneous nor are they contrary to law and the Court hereby accepts and approves the report and recommendations of the Committee as submitted.

**\*38** 2. Attorneys' fees and costs are hereby awarded to the respective counsel in the amounts shown in the foregoing table.

3. Any counsel receiving such an award of fees and costs shall be required to waive any payment of fees or expenses from his or her client on account of the time and expenses being compensated herein and to return to the client any payment for such fees or expenses already received.

4. Any counsel receiving such an award of fees and costs shall be required to agree to return to the Settlement Fund such monies as may be required as a result of any modification which may occur in this Order after appeal or otherwise. Failure to reimburse the Settlement Fund, in the event that

becomes necessary, shall constitute contempt of Court, and any defaulting counsel shall be liable for the costs, including attorneys' fees, of instituting appropriate legal proceedings to regain any fees and costs not promptly returned.

5. Plaintiffs' liaison counsel is hereby directed to prepare and submit individual forms of judgment for each counsel receiving an award of fees and costs. Prior to submitting any such judgment, plaintiffs' liaison counsel shall first obtain a written statement from the counsel to whom the judgment applies that such counsel (a) waives any payment of fees or expenses from his or her client on account of the time and expenses being compensated and agrees to return to the client any payment for such fees or expenses already received, and (b) agrees to return to the Settlement Fund such monies as may be required as a result of any modification which may occur in this Order after appeal or otherwise. Plaintiffs' liaison counsel's submission of any such form of order shall be accompanied by a certificate that he has received such a written statement from the counsel to whom such judgment applies.

6. It is expressly determined that there is no just cause for delay in entering this Order and Judgment and pursuant to Rule 54(b), Federal Rules of Civil Procedure, this Order and Judgment shall be entered forthwith.

D.Ariz. 1980.
In re Cement and Concrete Antitrust Litigation
Not Reported in F.Supp., 1980 WL 1994 (D.Ariz.), 1980-81 Trade Cases P 63,798

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.