# EXHIBIT A

Westlaw.

Slip Copy                                                                 Page 1

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

▷
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
Robert **NICHOLS**, et al.
v.
**SMITHKLINE BEECHAM** CORP.,
No. Civ.A.00-6222.

April 22, 2005.

Bryan L. Clobes, Michael S. Tarringer, Michael J.
Willner, Ellen Meriwether, Miler Faucher &
Cafferty, Philadelphia, PA, Dianne M. Nast,
Michael G. Nast, Roda & Nast, PC, Lancaster, PA,
Kenneth A. Wexler, The Wexler Firm, Chicago, IL,
Marc H. Edelson, Hoffman & Edelson, LLC,
Doylestown, PA, for Plaintiff.
Ann Kathryn Snyder, Janice Louise Shipon,
Dechert LLP, George G. Gordon, Joseph A. Tate,
Thomas L. Kenyon, Brennan J. Torregrossa,
Dechert, Price and Rhoads, Philadelphia, PA, for
Defendant.
Christine C. Levin, Dechert LLP, Philadelphia, PA,
for Respondent.
Christopher J. Valeriote, Husch & Eppenberger
LLC, St. Louis, MO, Donald M. Davis, Margolis
Edelstein The Curtis Center, Philadelphia, PA, E.
McCord Clayton, Philadelphia, PA, Kimberly R.
West, Wallace, Jordan, Ratliff & Brandt,
Birmingham, AL, Annamarie Daley, Robins Kaplan
Miller & Ciresi LLP, Minneapolis, MN, Curtis P.
Cheyney, III, Swartz Campbell & Detweiler,
Philadelphia, PA, W. Scott Simmer, Robins Kaplan
Miller & Ciresi LLP, Washington, DC, for Movant.

*MEMORANDUM*

PADOVA, J.
**\*1** THIS DOCUMENT RELATES TO: ALL
ACTIONS

Plaintiffs, consumers and third party payors ("TPPs"

), who paid all or part of the purchase price of Paxil
brand paroxetine hydrochloride ("Paxil") for
consumer use (referred to herein as "Plaintiffs" or "
End-Payor Plaintiffs"), have brought this class
action antitrust suit against SmithKline Beecham
Corporation, d/b/a/ GlaxoSmithKline ("GSK" or "
Defendant"), alleging, individually and on behalf of
a class of all others similarly situated, that
anticompetitive actions on the part of GSK caused
them to overpay for Paxil and generic paroxetine
hydrochloride. Plaintiffs have asserted claims
pursuant to Section 16 of the Clayton Act, 15
U.S.C. § 26, alleging that GSK has violated Section
2 of the Sherman Antitrust Act, 15 U.S.C. § 2, by
stockpiling and causing patents to be listed with the
Food and Drug Administration ("FDA") in a
manner which enabled Defendant to unlawfully
extend its market monopoly for Paxil by delaying
FDA approval of generic paroxetine hydrochloride.
Plaintiffs have also asserted claims pursuant to state
antitrust and consumer protection statutes and
common law. Before the Court is Plaintiffs' Motion
for Final Approval of Settlement and Plan of
Distribution (Docket No. 168) and Plaintiffs'
Motion for Award of Attorneys Fees and
Reimbursement of Expenses (Docket No. 167).
After a Fairness Hearing held on March 9, 2005,
and for the reasons that follow, the Court grants
both Motions.


I. BACKGROUND

Plaintiffs claim that GSK unlawfully excluded
competition in the market for Paxil and generic
paroxetine hydrochloride [FN1] by engaging in the
following unlawful acts: (1) conducting sham patent
infringement litigation against generic
manufacturers which triggered automatic 30 month
regulatory stays of generic competition; (2) making
intentional misrepresentations to the Patent and
Trademark Office ("PTO") in order to obtain
patents related to paroxetine hydrochloride; and (3)
making intentional misrepresentations to the Food

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
(Cite as: Slip Copy)

& Drug Administration ("FDA") which enabled GSK to exclude competition by generic manufacturers. GSK was issued U.S. Patent No. 4,721,723 (the " '723 Patent") on January 26, 1988, which patent claims crystalline paroxetine hydrochloride hemihydrate and its use in treating depression. On December 29, 1992, the FDA approved GSK's New Drug Application ("NDA") for a drug containing paroxetine hydrochloride hemihydrate which GSK markets as Paxil. In connection with its NDA for Paxil, GSK submitted to the FDA a list of all patents it owned that claimed paroxetine hydrochloride, or a method of using that drug. The FDA lists patents for approved drugs in the Approved Drug Products with Therapeutic Equivalence Evaluations publication (the "Orange Book") once an NDA is approved.

> FN1. Generic drugs are drugs which the Food and Drug Administration ("FDA") has found to be bio-equivalents of previously approved brand name drugs. Pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355, to obtain approval of their generic bio-equivalents, generic drug manufacturers submit Abbreviated New Drug Applications to the FDA which incorporate the safety and effectiveness data previously submitted by the company that obtained approval of the brand name drug and which include detailed information proving that the drug is the bio-equivalent of the brand name drug.

Pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.,* once the FDA approved GSK's NDA for Paxil, GSK obtained a five-year statutory monopoly in the market for that drug. In accordance with 21 U.S.C. § 355(c)(2), after GSK obtained approval of its NDA, it was obligated to submit information on any new patent it obtained that claimed paroxetine hydrochloride or methods of its use to the FDA within 30 days of such patent's issuance. The FDA would then list the new patent in a supplement to the Orange Book. Plaintiffs claim that, beginning in 1995, GSK misled the PTO into issuing invalid patents to protect its monopoly on Paxil and defrauded the

FDA by submitting those invalid patents to the FDA for listing in the Orange Book in order to wrongfully exclude competition by generic manufacturers.

*2 Plaintiffs maintain that, in 1995, GSK began to apply for patents on new anhydrous polymorphs of paroxetine hydrochloride, which patents began to issue in 1999 and which were then submitted by GSK to the FDA for listing in the Orange Book. Patent No. 5,872,132 ("the '132 Patent") was approved by the PTO on February 16, 1999, and claimed an allegedly new crystalline form of paroxetine hydrochloride anhydrate designated as Form C. Patent No. 4,900,423 ("the '423 Patent") was approved on May 4, 1999 and claimed a second anhydrate crystalline form of paroxetine hydrochloride. GSK submitted both of these patents to the FDA for listing in the Orange Book in 1999. On June 27, 2000, the PTO approved GSK's Patent No. 6,080,759 ("the '759 Patent") for an invention titled Paroxetine "Hydrochloride Form A." The '759 Patent claims a paroxetine hydrochloride anhydrate Form A made according to the process for making paroxetine hydrochloride anhydrate Form A. GSK then submitted this patent to the FDA for listing in the Orange Book. On September 5, 2000, the PTO approved Patent No. 6,113,944 ("the '944 Patent") for "Paroxetine Tablets and Process to Prepare Them" which patent claims a pharmaceutical composition in tablet form containing paroxetine hydrochloride produced on a commercial scale. GSK then submitted the '944 Patent to the FDA for listing in the Orange Book.

Plaintiffs further claim that, once generic competitors of GSK began to file Abbreviated New Drug Applications ("ANDAs") seeking approval of generic bioequivalents of Paxil in 1998, GSK filed baseless patent infringement actions against those competitors, which alleged that the bioequivalent drugs infringed on the '723 Patent and the other, more recently issued, patents on forms of paroxetine hydrochloride owned by GSK. Pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355, the filing, by a branded drug patent owner, of a patent infringement suit against a generic competitor automatically blocks the FDA's approval of the competitor's ANDA for up to 30 months. Plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 3

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

allege that GSK violated the antitrust laws by filing these baseless patent infringement actions against generic competitors in order to block FDA approval of its competitors' ANDAs and, thus, indefinitely extend its market monopoly for Paxil.

The first such suit was brought against Apotex Corporation ("Apotex"), after Apotex submitted ANDA No. 75-356 to the FDA on March 31, 1998, seeking approval of a paroxetine hydrochloride anhydrous drug. On June 26, 1998, GSK sued Apotex in the United States District Court for the Northern District of Illinois for infringement of the '723 Patent. On March 3, 2003, Judge Posner, sitting by designation, ruled that Apotex's generic product did not infringe the '723 Patent and dismissed SmithKline's suit with prejudice. *See SmithKline Beecham Corp. v. Apotex Corp.,* 247 F.Supp. 1011 (N.D.Ill.2003) (Posner, J.), *aff'd* 365 F.3d 1306 (Fed.Cir.2004). On April 23, 2004, the United States Court of Appeals for the Federal Circuit (the "Federal Circuit") affirmed Judge Posner's decision on other grounds. *See SmithKline Beecham Corp. v. Apotex Corp.,* 365 F.3d 1306 (Fed.Cir.2004). The Federal Circuit found that Apotex's anhydrous paroxetine hydrochloride would infringe on the '723 Patent, but found that the '723 Patent was invalid as a result of public use of the product claimed in claim 1 of the '723 Patent prior to GSK's application for the '723 Patent. *Id.* at 1315, 1320.

*3 GSK filed additional patent infringement actions against Apotex in 1999, 2000 and 2001 in the United States District Court for the Eastern District of Pennsylvania, for infringement of the '423 Patent, the '759 Patent, and the '944 Patent. *See SmithKline Beecham Corp. v. Apotex Corp., et al.,* Civ.A.No. 99-cv-4304 (E.D.Pa.); *SmithKline Beecham Corp. v. Apotex Corp., et al.,* Civ.A.No. 00-cv-4888 (E.D.Pa.); *SmithKline Beecham Corp. v. Apotex Corp., et al.,* Civ.A.No. 01-cv-0159 (E.D.Pa.). GSK also filed two patent infringement actions against Geneva Pharmaceuticals, Inc. ("Geneva") in the United States District Court for the Eastern District of Pennsylvania in 1999 and 2000, for infringement of the '723, '132, '759 and '944 Patents, after Geneva submitted ANDA No. 75-566 to the FDA for approval of paroxetine hydrochloride tablets. *See*

*SmithKline Beecham Corp. v. Geneva Pharm., Inc., et al.,* Civ.A.No. 99-cv-2926 (E.D.Pa.) and *SmithKline Beecham Corp. v. Geneva Pharm., Inc., et al.,* Civ.A.No. 00-cv-5953 (E.D.Pa.). GSK filed a patent infringement action against Zenith Goldline Pharmaceuticals, Inc. ("Zenith") in the Eastern District of Pennsylvania in 2000, claiming infringement of the '723, '423, and '132 Patents after Zenith submitted ANDA No. 75-691 to the FDA seeking approval of paroxetine hydrochloride tablets. *See SmithKline Beecham Corp. v. Zenith Goldline Pharm., Inc., et al.,* Civ.A.No. 00-cv-1393 (E.D.Pa.). GSK also filed a patent infringement action against Pentech Pharmaceuticals, Inc. ("Pentech"), in 2000, after Pentech submitted ANDA No. 75-771 to the FDA for approval of paroxetine hydrochloride capsules. This lawsuit was filed in the Northern District of Illinois and claimed that Pentech infringed the '723 and '132 Patents. *See SmithKline Beecham Corp. v. Pentech Pharm., Inc., et al.,* Civ.A.No. 1:00-02855 (N.D.Ill.). GSK sued Alphapharm PTY, Ltd. ("Alphapharm") for infringement of '723, '132, '759, and '423 Patents in the United States District Court for the Eastern District of Pennsylvania in 2001, after Alphapharm submitted ANDA No. 75-716 to the FDA for approval of paroxetine hydrochloride tablets. *See SmithKline Beecham Corp. v. Alphapharm PTY, Ltd., et al.,* Civ.A.No. 01-cv-1027 (E. D.Pa.).

Plaintiffs claim that, as a result of these illegal acts, GSK has unreasonably restrained, suppressed and eliminated competition in the market for paroxetine hydrochloride; illegally maintained its monopoly on the market for paroxetine hydrochloride; fixed, raised, maintained or stabilized the price for Paxil to supra-competitive prices; and overcharged Plaintiffs and members of the class many millions of dollars by depriving them of the benefits of competition from lower-priced generic versions of paroxetine hydrochloride. On July 1, 2003, following Judge Posner's March 2003 decision in *SmithKline Beecham Corp. v. Apotex Corp.,* 247 F.Supp.2d 1011 (N.D.Ill.2003), GSK announced that it had asked the FDA to delist the '723 Patent, '132 Patent, and '423 Patent. On September 8, 2003, Apotex began to market its generic paroxetine hydrochloride product.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 4

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
(Cite as: Slip Copy)

*4 Plaintiffs have asserted four claims for relief. They have asserted a claim for injunctive relief on behalf of a nationwide class of indirect purchasers of Paxil for consumer use (the "Class"), pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. (Consol. Am. Class Action Compl. Count I.) The federal antitrust claim alleges that GSK has extended its monopoly on paroxetine hydrochloride beyond the time period permitted by United States patent law by submitting false patent information to the FDA, submitting fraudulent statements to and omitting material facts from the PTO, and prosecuting baseless, sham patent lawsuits against potential generic competitors, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (*Id.*) Plaintiffs maintain that, as a result of GSK's violations of the Sherman Act, Plaintiffs and other members of the Class have been injured by paying higher prices for paroxetine hydrochloride than they would have paid in absence of the violation. (*Id.*)

Plaintiffs also assert an antitrust claim pursuant to the antitrust statutes of various states and the District of Columbia on behalf of indirect purchasers of Paxil for consumer use who are residents of those states and the District of Columbia. (*Id.* Count II.) Plaintiffs allege that GSK has intentionally and wrongfully maintained and abused its monopoly power with respect to the purchases of Paxil in violation of the antitrust laws of Arizona, California, the District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, and Wisconsin. (*Id.*) Plaintiffs further allege that, as a result of GSK's conduct, Plaintiffs and those members of the Class who reside in these states, and the District of Columbia, have been injured by paying higher prices for paroxetine hydrochloride than they would have paid but for GSK's actions, for which they are entitled to monetary damages pursuant to the aforementioned antitrust laws. (*Id.*)

Plaintiffs have also asserted a claim for deceptive trade practices pursuant to the consumer protection statutes of various states and the District of Columbia on behalf of indirect purchasers of Paxil for consumer use who are residents of those states

and the District of Columbia. (*County of Suffolk, New York, et al. v. Smithkline Beecham Corp.,* Civ.A.No. 03-cv-5620 (E.D.Pa.), Compl. Count III.) Plaintiffs allege that GSK engaged in unfair competition, or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the consumer protection laws of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West Virginia. (*Id.*) Plaintiffs claim that, as a result of GSK's conduct, they and the members of the Class who reside in those states, and the District of Columbia, have been injured by paying higher prices for paroxetine hydrochloride than they would have paid but for GSK's actions and they seek monetary damages pursuant to the aforementioned consumer protection laws. (*Id.*)

*5 Plaintiffs have also asserted a claim for monetary damages pursuant to the common law of unjust enrichment of every state and the District of Columbia on behalf of the entire Class. (*Id.* Count IV.) Plaintiffs allege that, as a result of its unlawful conduct, GSK has been unjustly enriched by the receipt of unlawfully inflated prices and illegal monopoly profits on its sales of Paxil and that it would be inequitable for Defendant to retain its ill-gotten gains. (*Id.*) Plaintiffs further allege that they and the other members of the Class are entitled to restitution of the amount of that unjust enrichment. (*Id.*)

A. *Litigation History*

Robert Nichols and Edith Cousins filed the first class action complaint against GSK in this Court on December 8, 2000. Additional cases were subsequently filed and consolidated with the *Nichols* action. [FN2] After extensive briefing regarding whether these cases should be stayed pending the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 5

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

conclusion of the underlying patent lawsuits, the named Plaintiffs filed a Consolidated Amended Class Action Complaint on May 16, 2001, asserting claims for violation of Section 2 of the Sherman Act, violation of state antitrust laws, and unjust enrichment. On July 10, 2001, the Court entered a comprehensive Case Management and Scheduling Order which had been negotiated by the parties. Pursuant to this Order, Co-Lead Counsel were appointed to represent the Class and a schedule was established for discovery and merits issues, including expert discovery, class certification, and dispositive motions. [FN3] After successfully moving to dismiss Plaintiffs' claim for equitable disgorgement, GSK filed an Answer on September 19, 2001.

> FN2. The cases which have been consolidated with the *Nichols* action are: *Dorothy L. Tyminski-Porter v. SmithKline Beecham Corp.,* Civ.A.No. 00-cv-6231 (E.D.Pa.), filed on December 8, 2000; *Lynda Willits v. SmithKline Beecham Corp.,* Civ.A.No. 01-cv-0423 (E.D.Pa.), filed on January 26, 2001; *Terry Kirchoff v. SmithKline Beecham Corp.,* Civ.A.No. 01-cv-6974 (E.D.Pa.), filed on December 26, 2001; and *County of Suffolk, New York, John Kelly and Olivia Haeberger v. Smithkline Beecham Corp.,* Civ.A.No. 03-cv-5620 (E.D.Pa.), filed on October 8, 2003.

> FN3. The law firms of Miller, Faucher and Cafferty, L.L.P., Roda & Nast, P.C., and The Wexler Firm L.L.P. were appointed as Plaintiffs' Co-Lead Counsel.

Plaintiffs filed their Motion for Class Certification on October 4, 2001. Prior to filing their Motion, Plaintiffs retained the economic consulting firm of Nathan Associates to evaluate and address the feasability of proving impact and damages on a class-wide basis. Dr. Gary French of Nathan Associates provided Plaintiffs with a Declaration analyzing the economic impact of GSK's allegedly anticompetitive activities and vehicles of common proof, which Declaration was filed by Plaintiffs in support of their Motion for Class Certification.

Following the filing of Plaintiffs' Motion for Class Certification, the parties began extensive discovery relevant to class certification. Both parties served and responded to written document requests and interrogatories and produced responsive documents. The parties had disagreements with respect to the extent of class certification discovery, and motions were filed and extensively briefed with respect to that discovery during the winter and early spring of 2002. In addition, GSK filed a Motion to Stay this action pending resolution of the underlying patent infringement actions. This Motion was also thoroughly briefed. The Court heard argument with respect to the discovery motions, and Defendants' Motion to Stay, on April 2, 2002. The Court decided the discovery motions, and denied the Motion to Stay, on April 29, 2002. Additional motions related to class action discovery were filed by the parties and decided by the Court in May, August and September, 2002.

\*6 Class certification discovery continued through the summer and fall of 2002, including Rule 30(b)(6) depositions, depositions of the named Plaintiffs, and the deposition of Dr. French. Following Dr. French's deposition, GSK moved to strike the affidavit, and preclude the testimony, of Dr. French. This Motion was extensively briefed by the parties and was denied. GSK filed its response to Plaintiffs' Motion for Class Certification on November 2, 2002. Plaintiffs then took the deposition of Defendant's expert, Dr. Richard Rapp, and prepared their Reply Memorandum, which was filed on January 13, 2003. Defendant filed a Sur-Reply Memorandum in opposition to the Motion on January 21, 2003.

An evidentiary hearing was held on Plaintiff's Motion for Class Certification on February 12, 2003. Immediately following that Hearing, the parties began to discuss the possibility of settlement. On March 14, 2003, at the request of the parties, the Court placed this action on the civil suspense docket while the parties continued settlement negotiations. The parties were, however, unable to reach a settlement and this case was placed back on the active docket on October 13,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

2003.

While this case was in suspense, two additional antitrust suits relating to Paxil were filed against GSK in this Court. On August 6, 2003, the Stop & Shop Supermarket Company, Giant of Maryland, L.L.C., and American Sales Company, Inc., filed suit against SmithKline Beecham, Corp. on behalf of a nationwide class of direct purchasers of Paxil, asserting one claim of monopolization pursuant to 15 U.S.C. § 2. *See Stop & Shop Supermarket Co., et al. v. SmithKline Beecham Corp.,* Civ.A.No. 03-cv-4578 (E.D.Pa.). On October 8, 2003, the County of Suffolk, New York, John Kelly and Olivia Haeberger filed suit against Smithkline Beecham Corp., on behalf of a nationwide class of indirect purchasers of Paxil for consumer use, asserting federal and state antitrust claims, a claim for deceptive trade practices pursuant to state consumer protection law, and a state common law claim of unjust enrichment. *County of Suffolk, New York, et al. v. Smithkline Beecham Corporation,* Civ.A .No. 03-cv-5620 (E.D.Pa.). The *County of Suffolk* action was consolidated with the *Nichols* action on January 15, 2004. (Jan. 15, 2004 Order.)

The *County of Suffolk* complaint added a claim against GSK pursuant to state consumer protection statutes and claims based upon GSK's marketing practices to the claims asserted in the Consolidated Amended Class Action Complaint. Consequently, the Court allowed the parties to file supplemental class certification briefs in the fall of 2003 and the winter and spring of 2004. A supplemental hearing on the Motion for Class Certification was scheduled for August 4, 2004. In addition, the Court entered a new case management order, establishing a structure for the consideration of allocation issues among TPP and consumer Class members and allowing the parties to commence merits discovery in January 2004.

*7 Plaintiffs in this action coordinated merits discovery with Plaintiffs in the *Stop & Shop* action. GSK produced more than 160,000 pages of documents on 13 CD-ROMs in January 2004 and subsequently produced another 56 CD-ROMs containing over 660,000 documents. Co-Lead Counsel arranged to have these documents collected in a single data base. Co-Lead Counsel in this action and plaintiffs' counsel in *Stop & Shop* established a joint document review protocol and jointly paid for a web-based data system to facilitate the transmission of data and information between counsels' offices in Chicago and Boston. The coordinated document review continued until the parties signed agreements in principal settling the two cases. In addition to reviewing documents produced by GSK, the coordinated discovery efforts also included third party discovery from the manufacturers of generic pharmaceuticals, and additional discovery motion practice.

After the April 23, 2004 decision of the Federal Circuit finding that the '723 Patent was invalid, and after the parties had engaged in considerable merits discovery, the parties in this case and in *Stop & Shop* began substantive settlement negotiations with GSK. On June 14, 2004, Co-Lead Counsel in this case and plaintiffs' counsel in *Stop & Shop* met in Philadelphia to prepare a joint presentation to GSK with regard to settlement. On June 15, 2004 they met with counsel for GSK. The parties continued to discuss settlement in both cases throughout the summer and the supplemental hearing on the Motion for Class Certification was continued. In mid-August 2004, Co-lead Counsel and GSK reached an agreement in principle to settle this action. [FN4] On October 1, 2004 Plaintiffs filed a Motion for Settlement Preliminary Approval and Class Certification. The Motion was granted on October 18, 2004, and the following Settlement Class was certified by the Court pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> FN4. Plaintiffs' counsel in the *Stop & Shop* action also reached an agreement with GSK to settle that action. The Settlement Agreement in *Stop & Shop* provides that plaintiffs in that case will release their claims against GSK in exchange for a cash payment of $100,000,000. *Stop & Shop Co., et al. v. SmithKline Beecham Corp.,* Civ.A.No. 03-4578 (E.D.Pa.) (Kodroff Decl. ¶ 93).

All persons or entities in the United States who

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

purchased or paid for Paxil and/or its generic alternatives (known as paroxetine) during the period of January 1, 1998 through September 30, 2004 for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries. Excluded from the Class are governmental entities (provided, however, a governmental entity is included only to the extent it makes prescription drug purchases as part of a health benefit plan for its employees); Defendants and their officers, directors, management, employees, subsidiaries, and affiliates; persons or entities who purchased Paxil or its generic alternatives for purposes of resale; any person or entity whose only purchase(s) of Paxil were made directly from Defendants or their affiliates and/or whose purchases of generic paroxetine were made directly from the manufacturer thereof (the " End-Payor Class").

(Oct. 18, 2004 Order ¶ 3.) On March 9, 2005, after notice to the End-Payor Class, the Court held a hearing to ascertain the fairness of the settlement.

### B. *Settlement Terms*

**\*8** The Stipulation and Agreement of Settlement (the "Settlement" or "Settlement Agreement") outlines the details of the settlement. GSK paid $65 million into an escrow account on behalf of the End-Payor Class (the "Settlement Fund"). (Settlement Agreement ¶ 9.) The Settlement Fund, less End-Payor Plaintiffs' attorneys' fees and expenses in the amount approved by the Court, and less any modifications allowed under the Settlement Agreement, [FN5] will be distributed to End-Payor Class members who file appropriate and timely claim forms. (*Id.* ¶¶ 11-12.) End-Payor Plaintiffs' counsel will be paid approved attorneys' fees and expenses from the Settlement Fund within five business days of the Court's order finally approving the Settlement. (*Id.* ¶ 12.) The amount remaining in the Settlement Fund (the "Net Settlement Fund") will then be distributed in accordance with the Corrected Distribution Plan.

FN5. The Settlement Agreement provides that the Settlement Fund will be modified

to provide *pro rata* refunds to GSK for members of the End-Payor Class who request exclusion from the class ("opt-outs" ). (Settlement Agreement ¶ 11.) The amount of the refund to GSK will be based upon the amount that would have been paid to the opt-outs if they had remained in the Settlement Class. (*Id.*) Dr. James Geha has filed an objection to this provision of the Settlement Agreement on the grounds that consumer opt-outs are treated differently from TPP opt-outs. The Court finds that the Settlement Agreement does not treat consumer opt-outs differently from TPP opt-outs and Dr. Geha's objection is, therefore, overruled.

The Net Settlement Fund will be allocated between consumer who are End-Payor Class members (" consumer Class members") and TPPs who are End-Payor Class members ("TPP Class members") as follows: 27.5% of the Net Settlement Fund will be allocated to payment of claims and notice and settlement administrative expenses relating to claims by consumer Class members (the "Consumer Pool") and 72.5% of the Net Settlement Fund will be allocated to payment of claims and notice and settlement administrative expenses relating to claims by TPP Class members (the "TPP Pool"). (Corrected Distribution Plan at 1.) After the deduction of notice and settlement expenses, valid claims made by consumers will be paid on a *pro rata* basis from the Consumer Pool, based upon the amount of each claimant's purchases of Paxil or generic paroxetine hydrochloride. (*Id.* at 2.) Consumer Class members are eligible to recover up to 100% of their out-of-pocket costs to purchase Paxil or generic paroxetine hydrochloride. (*Id.*) Similarly, valid claims made by TPPs will be paid on a *pro rata* basis from the TPP Pool after deduction of notice and settlement expenses relating to claims by TPPs. (*Id.*) TPP Class members are also eligible to recover up to 100% of their out-of-pocket costs to purchase Paxil or generic paroxetine hydrochloride. (*Id.*)

Upon entry by the Court of the Order and Final Judgment in a form to be agreed upon by the parties and approved by the Court, End-Payor Class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 8

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

members will release all claims "against the Releasees concerning the purchase, marketing, sale, manufacture, pricing of, or the enforcement of intellectual property related to Paxil or generic paroxetine, or in any way arising out of or related to GSK's agreement with Par Pharmaceuticals pursuant to which Par is selling paroxetine." [FN6] (Settlement Agreement ¶ 16.)

> FN6. The "Releasees" are defined as " Defendants and their present and former direct and indirect parents, subsidiaries, divisions, partners and affiliates, and their respective present and former stockholders, officers, directors, employees, managers, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, trustees, successors and assigns of each of the foregoing)...." (Settlement Agreement ¶ 16.)

Dr. James Geha also objects to the Settlement on the grounds that the Release is overly broad and may release claims which were not properly adjudicated in this matter. The Court finds that the Release addresses claims which were raised, or could have been raised in this litigation and, therefore, is not overly broad. Dr. Geha's objection is, accordingly, overruled.

### C. Fairness Hearing

On March 9, 2005, the Court held a hearing to determine the fairness of the proposed settlement. Co-Lead Counsel described the notice made to the End-Payor Class (the "Notice") and the method of notice. Co-Lead Counsel also outlined the terms of the Settlement Agreement and Corrected Plan of Distribution, specifically addressing the allocation of the Net Settlement Fund between consumers and TPPs. Co-Lead Counsel further addressed the Motion for Award of Attorneys Fees and Reimbursement of Expenses. The Court also heard from counsel for two consumer objectors and eight TPP objectors (who had filed one joint objection) to the proposed Settlement. The objectors were given

the opportunity to file supplemental memoranda proposing amendments to the Corrected Distribution Plan. Co-Lead Counsel and counsel for GSK also addressed the objections.

### II. MOTION FOR FINAL APPROVAL OF SETTLEMENT

**\*9** "While the law generally favors settlement in complex or class action cases for its conservation of judicial resources, the court has an obligation to ensure that any settlement reached protects the interests of the class members." *In re Aetna Inc. Securities Litig.,* MDL No. 1219, 2001 WL 20928, at \*4 (E.D.Pa. Jan.4, 2001) (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir.1995)). Consequently, prior to approving a settlement, the Court must determine whether the notice provided to class members was adequate. *Id.* (citations omitted). The Court must also "scrutinize the terms of the settlement to ensure that it is 'fair, adequate and reasonable." ' *Id.* (quoting *In re General Motors,* 55 F.3d at 785).

### A. Adequacy of Notice

The due process requirements of the Fifth Amendment and the Federal Rules of Civil Procedure require adequate notice to class members of a proposed settlement. *Id.* at \*5. "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 306 (3d Cir.1998) (citing *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12, 105 S.Ct. 2965, 86 L.Ed.2d 628)). The due process requirements of the Fifth Amendment are satisfied by the "combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class." *Id.* The notice must be " reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 9

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

action and afford them an opportunity to present their objections." *Lachance v. Harrington,* 965 F.Supp. 630, 636 (E.D.Pa.1997) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

Moreover, "in a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e)." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.,* MDL No. 1203, 2005 WL 636788, at *18 (E.D.Pa. Mar.15, 2005) (citing *Carlough v. Amchem Prods., Inc.,* 158 F.R.D. 314, 324-25 (E.D.Pa.1993)). Rule 23(c)(2) provides that class members must receive the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B). Rule 23(c)(2) also requires that "the notice indicate an opportunity to opt out, that the judgment will bind all class members who do not opt out and that any member who does not opt out may appear through counsel." *In re Diet Drugs,* 226 F.R.D. 498, 2005 WL 636788, at *18 (citing Fed.R.Civ.P. 23(c)(2)).

In addition to the requirements of Rule 23(c)(2), Rule 23(e) "requires that notice of a proposed settlement must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing." *Id.* (citing 2 H. Newberg, *Newberg on Class Actions,* § 8.32, at 8-103). The court should consider both "the mode of dissemination and its content to assess whether notice was sufficient." *Id.* Although the "notice need not be unduly specific, ... the notice document must describe, in detail, the nature of the proposed settlement, the circumstances justifying it, and the consequences of accepting and opting out of it." *Id.* (citing *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.,* 369 F.3d 293, 308-10 (3d Cir.2004)).

**\*10** The Court finds that the Notice provided in this case satisfies the requirements of due process and

the Federal Rules of Civil Procedure. Pursuant to the Order dated October 18, 2004, End-Payor Plaintiffs employed Hilsoft Notifications to design and oversee Notice to the End-Payor Class. (Pls. Ex. D ¶ 3.) Hilsoft Notifications has extensive experience in class action notice situations relating to prescription drugs and cases in which unknown class members need to receive notice. (*Id.* ¶¶ 2, 7-22.) End-Payor Plaintiffs also employed Complete Claim Solutions, Inc. ("CCS") as Settlement Administrator of the Settlement Fund. (Pls. Ex. E ¶ 2.) CCS also assisted in the process of providing notice to potential class members. (*Id.*) Individual Notice was mailed on November 18, 2004 to 37,671 TPPs. (Pls. Ex. D ¶ 33.) 1,423 of the mailed Notices were returned undeliverable and 952 Notices were re-mailed to updated addresses. (Pls. Ex. E ¶¶ 11-12.) In addition to the individual mailed Notice, Notice to TPPs was also published in the December 2004 issue of HR Magazine, the leading and most targeted business publication available to reach TPPs. (Pls. Exs. D. ¶ 34 and D(3).) Pursuant to the Court's October 18, 2004 Order preliminarily approving the Settlement Agreement, requests for exclusion were required to be postmarked by January 20, 2005. As of that date, CCS had received 23 requests for exclusion from TPPs acting on their on behalf or on behalf of self-funded plans that they administer. [FN7] (Pls. Ex. E ¶ 15.)

> FN7. As of the date of the Fairness Hearing, CCS had requested additional documentation from certain TPPs regarding their authority to request exclusions on behalf of self-funded plans that they administer. (3/9/05 N.T. at 5-17.) The requests for exclusion requested on behalf of those self-funded plans are in addition to the 23 requests for exclusion reported by CCS prior to the Fairness Hearing.

End-Payor Plaintiffs used published Summary Notice to reach consumer members of the End-Payor Class, not individual mailed Notice. Summary Notice for consumers was published in the Sunday supplements placed in 947 newspapers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 10

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

and in seven consumer publications (*Better Homes and Gardens, Cosmopolitan, Family Circle, National Enquirer, People, TV Guide* and *Reader's Digest* ) with on sale dates from December 1-5, 2004 and in Reader's Digest's February 2005 edition, which went on sale on January 1, 2005. (Pls. Exs. D ¶ 34 and D(3).) Additional Summary Notice was given through an informational release issued to approximately 4,200 press outlets throughout the country and through radio public service announcements ("PSAs"). (Pls. Exs. D ¶¶ 40-43, D(4), and D(5).) PSAs were distributed to 1,641 radio stations nationwide on November 18, 2004. (Pls. Ex. D ¶ 42.) CCS also created and maintained a website, paxilclaims.com, beginning on November 18, 2004. (Pls. Ex. E ¶ 14.) This website includes links to all of the Notice documents and allowed consumers to submit claims electronically via on-line claim form submission. ( *Id.*) As of January 21, 2005, the website had received 67,670 hits. (Pls. Ex. D ¶ 39.) CCS also maintained a toll free number to respond to inquiries by potential claimants. (Pls. Ex. E ¶ 9.) As of January 28, 2005, CCS had received 24,532 telephone calls to the toll free number. As a result of those calls, 7,954 consumer Notice Packets (including written Notice and a claim form) were mailed to consumer members of the End-Payor Class and 25 TPP Notice Packets were mailed to TPP members of the End-Payor Class. (*Id.* ¶ 10.) As of January 20, 2005, CCS had received 10 requests for exclusion from consumers. (*Id.* ¶ 15.) Todd Hilsee, of Hilsoft Notifications, believes that Notice has reached 81.9% of all Paxil users. (Pls. Ex. D ¶ 5.)

*11 The individual mailed Notice and the publication Notice provided in this case outline, in plain English, a description of End-Payor Plaintiffs' claims, the general terms of the Settlement, the proposed allocation of the Net Settlement Fund, the rights being released by End-Payor Class members who do not request exclusion, and the definition of the End-Payor Class. (Pls.Exs.D(2), D(3), E(1) and E(2).) The Notice also explains how End-Payor Class members can obtain more information; informs them of the right to appear and be heard at the Fairness Hearing; gives the location, date and time of the Fairness Hearing; provides information

on the right to object to the Settlement and the procedure for filing objections to the Settlement; and explains how Class members can request exclusion from the End-Payor Class. (*Id.*) The Notice also includes the names and contact information of the relevant attorneys, as well as information on filing a proof of claim. (*Id.*) In addition, the Notice states that End-Payor Plaintiffs' counsel will request 30% of the Settlement Fund for attorneys' fees, in addition to reimbursement of expenses and payments to class representatives. (*Id.* ) After reviewing the individual mailed Notice, the publication Notice, the PSAs and the informational release, the Court concludes that the substance of the Notice provided to members of the End-Payor Class in this case was adequate to satisfy the concerns of due process and the Federal Rules. [FN8] *In re Aetna,* 2001 WL 20928, at *5 (citing *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 175 (E.D.Pa.2000).

> FN8. Eugene Clasby has filed an objection to the Settlement in which he objects to the Notice on the grounds that, while the Notice informs consumer Class members of the percentage of the Net Settlement Fund which will be allocated to the Consumer Pool, it does not disclose the percentage of total damages which were incurred by consumer Class members. (3/9/05 N.T. at 25-26.) Consumer Class members Frank Giganti, Lillian Rogers, Kathleen McWhorter, William McWhorter and Melissa Nolet collectively filed an objection to the Settlement in which they object to the Notice on the grounds that, because it does not state the amount of damages suffered by the Class, they cannot make a fair assessment of the adequacy of the Settlement. The Court finds that the Notice sufficiently apprises End-Payor Class members of the nature of the pending litigation and of the Settlement's general terms. These objections to the Notice are, therefore, overruled.

B. *Presumption of Fairness*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

Rule 23(e) of the Federal Rules of Civil Procedure requires that the Court must approve any settlement of a class action and states that the Court may only approve a settlement "after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1). The United States Court of Appeals for the Third Circuit ("Third Circuit") has determined that courts should accord a presumption of fairness to settlements if the court finds that: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Cendant Corp. Litig.,* 264 F.3d 201, 232 n. 18 (3d Cir.2001) (citing *In re General Motors,* 55 F.3d at 785).

Co-Lead Counsel have provided the Court with a Joint Declaration showing that the Settlement Agreement in this case resulted from intensive, arms-length negotiations between Co-Lead Counsel and GSK which took place over a period of months. (Joint Decl. ¶¶ 29-30, 47-50.) The Settlement was reached after End-Payor Plaintiffs' counsel engaged in years of discovery (including discovery conducted jointly with counsel for plaintiffs in the *Stop & Shop* action), reviewed hundreds of thousands of documents, followed the underlying patent infringement actions, took depositions and third party discovery, and retained and worked closely with an expert in analyzing issues of impact and damages. (*Id.* ¶¶ 11, 16, 19, 37-44.) The Declaration filed by Co-Lead Counsel also describes their prior experience in complex class action litigation, including antitrust litigation and similar pharmaceutical industry antitrust class actions involving brand name drugs. (*Id.* ¶¶ 63-68.) In addition, only eight objections to the Settlement Agreement were filed. Accordingly, the Court will apply a presumption of fairness in analyzing the Settlement.

### C. The Girsh Factors

**\*12** The Third Circuit developed a nine factor test in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), " which provides the analytic structure for

determining whether a class action settlement is fair, reasonable, and adequate under Rule 23(e)." *In re Cendant,* 264 F.3d at 231 (citation omitted). The nine factors are:
(1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 232 (quoting *Girsh,* 521 F.2d at 156-57).

### 1. Complexity and duration of the litigation

"This factor captures 'the probable costs, in both time and money, of continued litigation." ' *Id.* at 233 (citing *In re General Motors,* 55 F.3d at 812). An antitrust class action, such as this one, is " arguably the most complex action to prosecute" as " [t]he legal and factual issues involved are always numerous and uncertain in outcome." *In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (citations and internal quotation marks omitted).

In the absence of settlement, complex legal and factual issues would remain to be decided in this case, including certification of the putative class, the validity of GSK's patents relating to Paxil, the time at which generic competitors would have been ready to enter the market for paroxetine hydrochloride, the pricing of Paxil and its generic competitors at various times, and disputes related to monetary damages suffered by various subgroups of Class members. Although this litigation has been ongoing for four years, and the parties have completed substantial merits discovery, the Court recognizes that significant costs would still result in the absence of settlement. At the time the parties first informed the Court they had arrived at a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

settlement, the parties had not concluded merits discovery, the Motion for Class Certification was awaiting a supplemental hearing, the parties would likely have filed dispositive motions, and this case would have required a lengthy trial involving 20 or more witnesses. Given the enormous amounts of money at stake in this litigation, and the vigorous advocacy of counsel for both parties over the last four years, it can reasonably be expected that whichever party did not prevail at trial would file post-trial motions and an appeal. Consequently, it is reasonable to expect that this case would continue for several more years absent settlement. Accordingly, the Court finds that the complex nature of the issues involved in this litigation, combined with the lengthy duration of this case, strongly supports settlement. *See In re Aetna,* 2001 WL 20928, at *6; *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 254 (D.Del.2002), *aff'd* 391 F.3d 516 (3d Cir.2004).

### 2. *The reaction of the class*

**\*13** This factor "attempts to gauge whether members of the class support the settlement." *In re Linerboard,* 296 F.Supp.2d at 577 (quoting *In re Wafarin,* 212 F.R.D. at 254). The deadline for filing objections to the Settlement was February 15, 2005. Only eight objections were filed. Of those objections, two were filed by TPPs and six were filed by consumers. (*See* Compendium of Objections to Proposed Class Action Settlement.) The small number of objections by TPPs is particularly relevant as "these are sophisticated businesses with, in some cases, large potential claims, and they could be expected to object to a settlement they perceived as unfair or inadequate." *In re Warfarin,* 212 F.R.D. at 254-55. Accordingly, the Court finds that the reaction of the End-Payor Class weighs in favor of settlement.

### 3. *Stage of proceedings and amount of discovery completed*

This factor enables the Court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant,* 264

F.3d at 235 (quoting *In re General Motors,* 55 F.3d at 813). As described above, this settlement was reached after more than four years of litigation, including substantial class and merits discovery, and analysis of the underlying patent infringement lawsuits. End-Payor Plaintiffs' counsel reviewed hundreds of thousands of pages of documents, worked closely with an expert on economic issues, consulted with counsel in the patent infringement lawsuits, engaged in third party discovery of the generic pharmaceutical manufacturers, and took depositions. (Joint Decl. ¶¶ 19-23, 25, 36-45.) Moreover, the Settlement Agreement was reached after months of arms-length negotiations with counsel for GSK. The Court concludes, therefore, that the parties had "an adequate appreciation of the merits" of this case at the time they negotiated the settlement. *In re Cendant,* 264 F.3d at 235 (citation omitted). Accordingly, the Court finds that this factor strongly supports settlement.

### 4. *Risks of establishing liability*

This factor enables the Court to examine " 'what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." ' *In re Cendant,* 264 F.3d at 237 (quoting *In re General Motors,* 55 F.3d at 814). "When considering this factor, the court should avoid conducting a mini-trial. Rather the court may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." ' *In re Aetna,* 2001 WL 20928, at *9 (quoting *In re Ikon,* 194 F.R.D. at 181).

Co-Lead Counsel recognize that GSK has asserted several strong defenses to their theories of liability in this case. Plaintiffs have alleged that GSK violated the antitrust laws by engaging in patent litigation against generic manufacturers of paroxetine hydrochloride in order to prevent or delay their entry into the market, thereby violating the antitrust laws. GSK, however, claims that its actions are protected by the *Noerr-Pennington* doctrine, pursuant to which the Supreme Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 13

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

recognized that the Sherman Antitrust Act does not restrain "attempts to influence the passage or enforcement of laws." *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 135-36, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *see also United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (*"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose .") (underscore added). In *Cal. Motor Transp. Co. v. Trucking Unltd.,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court extended the *Noerr-Pennington* doctrine to the right to access the courts, but noted that the filing of sham litigation would not be immune from suit under the Sherman Act. *Id.* at 510-11 (citing *Noerr,* 365 U.S. at 144). In order to prevail on their claim that GSK's patent infringement suits constituted sham litigation, Plaintiffs would have to demonstrate that GSK's actions were both "objectively baseless" and "an attempt to interfere directly with the business relationships of a competitor." *Prof. Real Estate Investors, Inc. v. Columbia Picture Indus., Inc.,* 508 U.S. 49, 60-61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (citations omitted). Co-Lead Counsel recognize that they face significant hurdles in demonstrating that GSK's actions were "objectively baseless." Indeed, Judge Posner, who ruled in *SmithKline Beecham Corp. v. Apotex Corp.,* 247 F.Supp. 1011 (N.D.Ill.2003), that Apotex did not infringe on the '723 Patent, stated in *Asahi Glass Co. v. Pentech Pharm., Inc.,* 289 F.Supp.2d 986 (N.D.Ill.2003) (Posner, J.), that "[w]hether or not Pentech infringed patent 723 or other patents held by Glaxo, including patents on anhydrous forms of the paroxetine molecule, is uncertain, but there is nothing to suggest that the claim of infringement was frivolous." *Id.* at 992.

*14 Plaintiffs have also alleged that GSK defrauded the PTO with respect to its patents relating to Paxil in order to monopolize the market for paroxetine hydrochloride. In order to prove fraud on the PTO, Plaintiffs must establish that GSK obtained its patents related to Paxil by "means of either a fraudulent misrepresentation or a fraudulent omission;" that GSK had a "clear intent to deceive the examiner and thereby cause the PTO to grant an

invalid patent;" and "that the patent would not have issued but for the misrepresentation or omission." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1070-71 (Fed.Cir.1998). Plaintiffs would face an elevated burden of proof with respect to this theory of liability, as such claims must be " based on independent and clear evidence of deceptive intent together with a clear showing of reliance." *Ulead Sys. v. Lex Computer & Mgmt. Corp.,* 351 F.3d 1139, 1144 (Fed.Cir.2003) (citing *Nobelpharma,* 141 F.3d at 1070-71). Plaintiffs have represented, in connection with the Court's consideration of the Settlement Agreement, that the fraud on the PTO theory has been asserted in some of the underlying patent infringement lawsuits and that the theory has not prevailed in any of those actions. Consequently, Plaintiffs recognize that they might not prevail on the fraud on the PTO theory in this case. In addition, Plaintiffs would have to overcome a *Noerr-Pennington* defense to their claim that GSK's patent applications were fraudulent. Plaintiffs anticipate that they would face similarly difficult issues of proof with respect to their claims that GSK defrauded the FDA with respect to its listings of GSK's patents and that GSK expanded and entrenched its unlawful monopoly on the market for paroxetine hydrochloride by engaging in unfair marketing and promotional practices. For these reasons, the Court finds that Plaintiffs would face considerable risks in connection with their various theories of liability. Accordingly, the Court finds that the risks of establishing liability favor settlement.

### 5. Risks of establishing damages

"Like the fourth factor, 'this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." ' *In re Cendant,* 264 F.3d at 238 (quoting *In re General Motors,* 55 F.3d at 816). In making this inquiry, the Court considers the "potential damage award if the case were taken to trial against the benefits of immediate settlement." *In re Warfarin,* 212 F.R.D. at 256 (citing *In re Prudential,* 148 F.3d at 319). Plaintiffs' analysis of damages in this case is complex, and rests primarily on the reports of their expert witness, Dr. French. He estimates damages to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 14

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

all members of the End-Payor Class as between $466.6 and $693.5 million, depending on when generic manufacturers of paroxetine hydrochloride would have been able to enter the market but for GSK's actions. (French Aff., 1/31/05, ¶ 39.) Dr. French's trial testimony would likely be challenged on *Daubert* or other grounds, thereby subjecting Plaintiffs to the risk that their expert would be rejected by the Court pursuant to Federal Rule of Evidence 104(a), or by the jury in assessing credibility. *In re Aetna,* 2001 WL 20928, at *10. Moreover, Plaintiffs acknowledge that Defendant has raised strong arguments in opposition to their theory of damages, including challenges to the methodology used by Dr. French to establish class wide impact and damages. Proof of damages at trial would undoubtedly result in a " 'battle of the experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe." ' *In re Cendant,* 264 F.3d at 239. For these reasons, the Court concludes that the risks of establishing damages weigh in favor of settlement.

### 6. *Risks of maintaining class action status through trial*

***15** This factor allows the Court to weigh the possibility that, if a class were certified for trial in this case, it could be decertified prior to trial. Federal Rule of Civil Procedure 23(a) provides that "a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable, and proceeding to trial would always entail the risk, even if slight, of decertification." *In re Cendant,* 264 F.3d at 239 (citations omitted). In this case, Plaintiffs have alleged several theories of liability under federal and state antitrust laws, state consumer protection laws, and state common law. GSK has vigorously contested class certification throughout the pendency of this action. If this case were to proceed to trial, the variations in the state laws under which Plaintiffs' state law claims have been brought would create significant issues with respect to typicality and adequacy of representation and the predominance of individual issues in connection with the Motion for Class Certification. Moreover, if the class were certified, it could be decertified at

any time later in the litigation as a result of the difficulties presented by the need to apply so many different states' laws. *See Warfarin,* 212 F.R.D. at 256 ("The risk of decertification appears to be significant in the case at bar because of the potential difficulty of managing a nationwide class action under multiple state laws.... Other courts, including the Third Circuit, have raised concerns about maintaining nationwide class actions under multiple state laws such as this."). Accordingly, the Court finds that this factor strongly supports settlement.

### 7. *Ability to withstand greater judgment*

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant,* 264 F.3d at 240. There is no evidence in the record with regard to this factor. Consequently, the Court finds that this factor does not favor or disfavor settlement.

### 8. *Range of reasonableness*

The eight and ninth *Girsh* factors "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Aetna,* 2001 WL 20928, at *11 (citing *In re Prudential,* 148 F.3d at 322). In making this assessment, the Court compares " 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing' ' with " 'the amount of the proposed settlement." ' *In re General Motors,* 55 F.3d at 806 (quoting *Manual for Complex Litigation* 2d § 30.44, at 252). The damages estimates should "generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside." *Id.* (citation omitted). "The primary touchstone of this inquiry is the economic valuation of the proposed settlement." *Id.* The Court must, in making this assessment, recognize that "settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

and guard against demanding too large a settlement based on the [C]ourt's own view of the merits of the litigation." *In re Aetna,* 2001 WL 20928, at *11 (citing *In re General Motors,* 55 F.3d at 806).

*16 As discussed above, Dr. French has estimated a range of damages to the End-Payor Class depending on when generic paroxetine hydrochloride entered the market. (French Aff. ¶¶ 10, 23.) In calculating damages, Dr. French used a "shift-back" methodology, in which he shifted back in time the allocation of the prescription market between Paxil, Paxil CR (also sold by GSK) and generic paroxetine hydrochloride, and the difference in cost between generic paroxetine hydrochloride and name brand Paxil and Paxil CR. (*Id.* ¶ 23-37.) Dr. French calculated damages for these three scenarios as follows: $466,587,000 in damages assuming generic entry beginning in May 2001; $568,661,000 in damages assuming generic entry beginning in September 2000; and $693,538,000 in damages assuming generic entry in September 1999. (French Aff. Summary of Damages.) The Settlement Fund is $65 million, or between 9.3% and 13.9% of damages. This percentage is consistent with those approved in other complex class action cases. *See In re Warfarin,* 212 F.R.D. at 257; *In re Cendant,* 264 F.3d at 241. Taking all of the risks of litigation into consideration, as well as the total amount of the Settlement Fund and the percentage of total damages represented by the Settlement Fund, the Court finds that this Settlement is within the range of reasonableness.[FN9]

    FN9. Dr. James Geha has objected to the Settlement on the grounds that it is inadequate because it does not provide that consumers receive reimbursement for their entire out of pocket costs for Paxil and interest on those costs. The Court has considered his objection, and Dr. Geha's Response to GSK's Reply to his objection, but finds that, taking all of the risks of litigation into consideration, this settlement is within the range of reasonableness even though all consumers may not receive, in settlement, reimbursement of their entire out of pocket costs of purchasing Paxil,

including interest from the date of purchase. Accordingly, Dr. Geha's objection is overruled.

In summary, the Court finds that the majority of the *Girsh* factors weigh in favor of settlement and concludes that the Settlement in this case is fair, reasonable and adequate.[FN10]

    FN10. Dr. Geha and Gary and Rhonda Marcus have also objected to the Settlement on the grounds that it does not include injunctive relief. As generic paroxetine hydrochloride has been available to End-Payor Class members for more than eighteen months as of the date of this Memorandum, the Court finds that injunctive relief would provide no additional benefit. The objections filed by Dr. Geha and by Gary and Rhonda Marcus are, accordingly, overruled with respect to this issue. Objections to the Settlement were also filed by Gwenette Lee and Raul Antonio Riojas. However, although both Ms. Lee and Mr. Riojas have indicated that they object to the Settlement, they have not stated any specific reasons for their objections. The objections filed by Ms. Lee and Mr. Riojas are, therefore, overruled.

**D. *Fairness of the Distribution Plan***

In addition to analyzing the terms of the Settlement Agreement with GSK, the Court must also determine the fairness of the Corrected Distribution Plan. "Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.' " *In re Ikon,* 194 F.R.D. at 184 (quoting *In re Computron Software Inc.,* 6 F.Supp.2d 313, 321 (D.N.J.1998)).

As discussed above, the Corrected Distribution Plan allocates 27.5% of the Net Settlement Fund to the Consumer Pool and 72.5% of the Net Settlement Fund to the TPP Pool. (Corrected Distribution Plan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 16

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

at 1.) End-Payor Plaintiffs seek an award of attorneys fees and expenses in the amount of $19.5 million; reimbursement of expenses in the amount of $546,480.79; incentive awards to each of the five named Plaintiffs who are consumers in the amount of $2,500; and incentive awards to each of the two named Plaintiffs who are TPPs in the amount of $5,000. [FN11] This leaves a total of $44,931,019.21 for distribution to the End-Payor Class. Consequently, pursuant to End-Payor Plaintiffs' Corrected Distribution Plan, $12,356,030.28 will be available to pay the administrative costs and claims for consumer Class members and $32,574,988.93 will be available to pay the administrative costs and claims for TTP class members. The Corrected Plan of Distribution also provides that if any undistributed money remains in either the Consumer Pool or the TPP Pool after all approved claims have been paid, Co-Lead Counsel will apply to the Court for an order directing appropriate distribution of the remaining funds. (*Id.* ¶ 19.)

> FN11. The consumer named Plaintiffs are Robert Nichols, Betty Holt, Dorothy L. Tyminski-Porter, Terry Kirchoff, John Kelly and Olivia Haeberger. The TTP named Plaintiffs are the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund and the County of Suffolk, New York.

**\*17** Several class members, both consumers and TPPs, have objected to the fairness of the proposed allocation of the Net Settlement Fund between the Consumer Pool and the TPP Pool. Objections to the proposed allocation were made by consumers Frank Giganti, Lillian Rogers, Kathleen McWhorter, William McWhorter, and Melissa Nolet (who collectively filed one objection, the "Giganti Objectors"); Dr. James Geha; Gary and Rhonda Marcus; and Eugene Clasby. TPPs Blue Cross Blue Shield of Florida, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Michigan, Blue Cross and Blue Shield of Alabama, Premera Blue Cross, Blue Shield of California, Blue Cross and Blue Shield of North Carolina, and WellPoint, Inc. (collectively the "Blue Cross Plans" ) jointly filed an objection to the proposed

allocation, as did TPP Community CarePlus.

The Giganti Objectors maintain that the allocation should not be approved by the Court because there is a conflict of interest between the consumer and TPP members of the End-Payor Class with respect to allocation. They contend that the allocation is not reasonable because consumers and TPPs were not represented by separate counsel with respect to the allocation. End-Payor Plaintiffs counsel, however, arrived at the allocation percentages after first asking the Court to appoint separate counsel to represent the interests of each of these groups of Class members. On December 2, 2003, at the request of Plaintiffs, the Court amended the Case Management Order to designate the law firms of Hoffman & Edelson and Heins Mills to represent consumers and the law firms of Goodkind Labaton and Gustafson Gluek to represent TPPs in connection with the allocation of funds between consumers and third-party payors in the context of settlement. (Joint Decl. of Hollis Salzman, Karla Gluek, Brian Williams, and Mark Edelson ¶ 6.) Beginning in July, 2004, these firms became involved in structuring the allocation of the settlement for their respective groups and made recommendations to Co-Lead Counsel. (*Id.* ¶ 8.) These attorneys worked closely with Co-Lead Counsel and with Dr. French in structuring the allocation. (*Id.* ¶¶ 9-13.) They concluded that TPPs spent far in excess of consumers for Paxil prescriptions. (*Id.* ¶ 14.) They also determined that TPPs, who are institutions with greater aggregate claims than consumers, were more likely to submit proofs of claim than individual consumers. (*Id.* ¶ 15.) Consequently, they expected that proofs of claim filed by TPPs, both singularly and in the aggregate, would be significantly larger than the proofs of claim filed by consumers. (*Id.* ¶ 16.) In order to protect consumer claims from being overwhelmed by TPP claims, they concluded that 27.5% of the Net Settlement Fund should be reserved for paying the administrative costs and claims of consumers and that the remaining 72.5% of the Net Settlement Fund would be used to pay the administrative costs and claims of the TPP Class members. (*Id.* ¶ 17.) The Court finds that the interests of the consumer and TPP members of the End-Payor Class were ably represented by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 17

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
(Cite as: Slip Copy)

counsel appointed to represent them with respect to allocation and the objection filed by the Giganti Objectors is hereby overruled with respect to this issue.

**\*18** Gary and Rhonda Marcus and Eugene Clasby object to the allocation of the Net Settlement Fund between consumers and TPPs. The Marcuses object to the allocation of 72.5% of the Net Settlement Fund to TPPs as too great. They maintain that reserving a majority of the Net Settlement Fund for TPPs deprives consumers of a realistic opportunity to recover full payment of their claims. Eugene Clasby also objects to the allocation of 72.5% of the Net Settlement Fund to the TPPs because consumers suffered the majority of monetary damages as a result of GSK's actions. Mr. Clasby recommends that the majority of the Net Settlement Fund be reserved for consumers. [FN12]

> FN12. The Blue Cross Plans initially objected to the Corrected Distribution Plan on the grounds that it reserved too great a percentage of the Net Settlement Fund for payment of consumer claims. The Blue Cross Plans have withdrawn that objection. (Blue Cross Plans' Reply Brief at 1.)

End-Payor Plaintiffs maintain that the proposed allocation of the Net Settlement Fund between consumers and TPPs is fair and reasonable. They have submitted evidence that the TPPs were responsible for paying approximately two-thirds of the total amount spent on Paxil during the damages period. (French Aff. Summary of Damages.) They have also submitted evidence that TPPs are more likely to submit proofs of claim than consumers, and that their proofs of claim would be significantly larger than those filed by consumers. Co-Lead Counsel have also brought to the Court's attention the allocations approved in other, similar, brand name pharmaceutical antitrust class actions. The *In re Warfarin* court approved a plan of allocation which reserved 18% of the net settlement fund for consumers and allowed them to share in the remaining 82% on a *pro rata* basis with the TPP claimants. *In re Warfarin,* 212 F.R.D. at 258. The Third Circuit agreed with the district court that the

allocation did not favor TPPs at the expense of consumers, and noted that, because of this allocation, consumers who filed claims would receive "100% of their Recognized Loss, while TPP's will receive only approximately 35.6% of their Recognized Loss." *In re Warfarin,* 391 F.3d at 539.

The Court finds that the allocation of the Net Settlement Fund between the Consumer Pool and TPP Pool was agreed upon by counsel appointed to represent the interests of consumers and TPPs only after extensive negotiations and consultation with Dr. French. The Court further finds that the fairness and reasonableness of the allocation of the Net Settlement Fund is adequately supported by the evidence before the Court in connection with this Motion. Eugene Clasby's and Gary and Rhonda Marcuses' objections to the allocation of the Net Settlement Fund between the Consumer Pool and the TPP Pool are, therefore, overruled.

The Marcuses also object to the Corrected Distribution Plan on the grounds that it does not provide for the disposition of undistributed funds, instead allowing counsel to apply to the Court in the event that undistributed funds remain in either the Consumer or TPP Pool after distribution. The Blue Cross Plans and Community CarePlus also object to the Corrected Distribution Plan on this basis. They have asked the Court to amend the Corrected Distribution Plan to require that any undistributed funds from either the TPP or Consumer Pool be distributed to claimants from the other Pool until those claims have been paid in full. Dr. Geha also objected to the Corrected Plan of Distribution on the grounds that it does not provide for undistributed funds. He recommends that any undistributed funds be given to charity.

**\*19** Co-Lead Counsel have submitted a proposed amendment to the Corrected Distribution Plan to resolve the objections concerning the treatment of undistributed funds. They propose that the Corrected Plan of Distribution be amended to include the following language:
If, after the claims administrator has calculated all approved Consumer claims up to the maximum amount, money would still remain in the Consumer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 18

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

Pool, any such remaining amount shall be paid into the TPP Pool for distribution to TPP approved claimants, so long as there is insufficient money in the TPP Pool to pay all TPP claims up to the maximum amount.

Similarly, if, after the claims administrator has calculated all approved TPP claims up to the maximum amount, money would still remain in the TPP Pool, any such remaining amount shall be paid into the Consumer Pool for distribution to Consumer claimants, so long as there is insufficient money in the Consumer Pool to pay all Consumer claims up to the maximum amount.

If, after all approved claims have been calculated to the maximum amount, moneys remain in either the Consumer Pool or TPP Pool, the remaining amounts in either or both Pools shall be distributed as appropriate and as ordered by the Court following on [sic] application by Plaintiffs Lead Counsel.

(Pls. Supp. Mem. at 9-10.) Co-Lead Counsel maintain that, under the proposed amendment, any residual could be efficiently used to benefit members of the End-Payor Class without the need for an expensive second distribution. (*Id.*) The Blue Cross Plans have indicated to the Court that this new language would resolve their objection. (Blue Cross Plans Reply at 2.) The Court finds that Co-Lead Counsel's proposed amendment to the Corrected Distribution Plan with respect to the treatment of residual funds adequately resolves the objections of the Blue Cross Plans, Community CarePlus and Gary and Rhonda Marcus with respect to this issue and the Corrected Distribution Plan shall be amended accordingly. The objections of the Blue Cross Plans, Community Care Plus and Gary and Rhonda Marcus as to the treatment of residual funds in the Corrected Plan of Distribution are, therefore, sustained. Dr. Geha's objection to the treatment of residuals, in which he suggests that any residual be donated to charity rather than paid to members of the End-Payor Class who have not been paid 100% of their damages, is overruled.

The Court concludes that the allocation of the Net Settlement Fund into two pools accurately reflects the differences in the amounts spent by consumers and TPPs to purchase Paxil and the differences in the number and size of their anticipated claims. Moreover, Co-Lead Counsels' amendment to the Corrected Plan of Distribution will ensure that any residual in either Pool will be distributed to End-Payor Class members who have not received the maximum payment of their damages while minimizing additional administrative costs. The Court finds, accordingly, that the Corrected Plan of Distribution, as amended in accordance with End-Payor Plaintiffs' Supplemental Memorandum, is fair and reasonable.

### III. MOTION FOR APPROVAL OF APPLICATION FOR ATTORNEYS' FEES AND COSTS

**\*20** End-Payor Plaintiffs seek an award of attorneys' fees in the amount of 30% of the $65 million Settlement Fund, reimbursement of expenses in the amount of $546,480.79, and incentive awards to each consumer named Plaintiff in the amount of $2,500 and to each TPP named Plaintiff in the amount of $5,000.

#### A. *Attorneys' Fees*

"District courts approving class action settlements must thoroughly review fee petitions for fairness. Although the ultimate decision as to the proper amount of attorneys' fees rests in the sound discretion of the court, the court must set forth its reasoning clearly." *In re Aetna,* 2001 WL 20928, at \*13 (citations omitted). Courts typically use one of two methods for assessing attorneys' fees, either the percentage of recovery method or the lodestar method. *In re Rite Aid Corp. Securities Litig.,* 396 F.3d 294, 300 (3d Cir.2005). The Court will utilize the percentage of recovery method in this case as it is "generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *Id.* (quoting *In re Prudential,* 148 F.3d at 333). When a district court uses the percentage of recovery method, it "first calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by the total

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case." *In re Cendant*, 264 F.3d at 256 (footnote omitted) (citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 733-35 (3d Cir.2001)). The Third Circuit has directed the district courts to use the following seven factors in determining whether a percentage of recovery fee award is reasonable:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir.2000); *see also In re Rite Aid*, 396 F.3d at 301. Although the district courts should " engage in robust assessments of the fee award reasonableness factors when evaluating a fee request," these factors are not to be applied in a formulaic way. *In re Rite Aid*, 396 F.3d at 301-02.

### 1. *The size of the fund and number of persons benefitted*

End-Payor Plaintiffs' counsel have obtained a substantial cash settlement of $65 million, plus interest, on behalf of the Settlement Class. The End-Payor Class benefitted by the Settlement includes thousands of TPPs and hundreds of thousands of consumers. Furthermore, as discussed above, the Settlement Fund comprises between 9.3% and 13.9% of total damages. The Court finds that this factor favors the reasonableness of the percentage of recovery requested by End-Payor Plaintiffs' counsel as a fee in this case.

### 2. *Objections*

**\*21** There have been only six substantive objections

to the settlement in this case, and only three of those objections mention the fee requested by End-Payor Plaintiffs' counsel, even though the Notice clearly disclosed that counsel would request 30% of the Settlement Fund as a fee. This is an extremely low level of objections considering that individual notice was mailed to 37,671 TPPs and considering the effort which was made to ensure that consumer Class members were exposed to publication notice through publication in national magazines, press releases, PSAs and the website.

The Court finds that the extremely small number of objections to the Settlement, and the even smaller number of objections to the requested fee, weigh in favor of approval of the requested fee in this case. *See In re Rite Aid*, 396 F.3d at 305 (finding that the "District Court did not abuse its discretion in finding the absence of substantial objections by class members to the fee requests weighed in favor of approving the fee request" where objections had been filed by only two of 300,000 class members who had received mailed notice); *see also In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at \*5 (E.D.Pa. June 2, 2004) ("The absence of objections supports approval of the Fee Petition.") (citing *In re Cell Pathways, Inc. Sec. Litig., II*, Civ.A.No. 01-cv-1189, 2002 U.S. Dist. LEXIS 18359, at \*24 (E. D.Pa. Sept. 23, 2002)); *In re Aetna*, 2001 WL 20928, at \*15 (noting that "the Class Members's view of the attorneys' performance, inferred from the lack of objections to the fee petition, supports the fee award").

Objections to the fee requested by End-Payor Plaintiffs' counsel were made by Dr. Geha, Gary and Rhonda Marcus, and the Giganti Objectors. Dr. Geha and the Marcuses object to the fee request because the Settlement Agreement allows counsel to be paid before the allocation to class members has been completed and because the fee requested is too high. Dr. Geha and the Marcuses object to the payment of fees before the payment of claims on the grounds that once End-Payor Plaintiffs' counsel have been paid, they will have no incentive to see the case through to the end. There is no evidence before the Court which would support a finding that, after four years of litigation, Plaintiffs' counsel would simply abandon the End-Payor Class. Dr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

Geha's and the Marcuses' objections to the percentage of the Settlement Fund requested as attorneys' fees do not take into consideration any of the *Gunter* factors which the Court must consider in analyzing a fee request. Accordingly, Dr. Geha's and the Marcuses' objections to the fee request are overruled.

The Giganti Objectors contend that 30% is too high a percentage of the Settlement Fund to be a reasonable attorneys' fee in this case. They maintain that the percentage of recovery allocated to attorneys' fees should not be more than 24.3%, which is the mean fee percentage found in Logan, Moshman & Moore, *Attorney's Fees in Class Action Settlements: An Empirical Study,* NYU Center for Law & Business Working Paper Series, 9/24/03. The Court finds that reducing the percentage of recovery awarded as a fee in this case to a mean fee percentage derived from other cases without consideration of the *Gunter* factors, as recommended by the Giganti objectors, would require the Court to utilize an impermissibly formulaic approach. *See In re Rite Aid,* 396 F.3d at 303 ("We have generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees.") (citation omitted); *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 736 ("[A] district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case."). Consequently, the Giganti Objectors' objection to the percentage of recovery attorneys' fee requested in this case is overruled. After considering these objections, the Court finds that this factor favors the reasonableness of the percentage of recovery requested by End-Payor Plaintiffs' counsel as a fee in this case.

### 3. *The skill and efficiency of Plaintiffs' counsel*

**\*22** The skill and efficiency of End-Payor Plaintiffs' counsel also weighs in favor of the requested percentage of recovery fee award "as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel,

the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Ikon,* 194 F.R.D. at 194 (citation omitted). End-Payor Plaintiffs counsel are highly experienced in complex antitrust class action litigation as evidenced by the attorney biographies filed with the Court. (Hazard Decl. ¶ 24., Pls. Mot. For Award of Attorney Fees Vol. 2.) They have obtained a significant settlement for the Class despite the complexity and difficulties of this case. Defense counsel are also very experienced in complex class action antitrust litigation and displayed great skill in defending this suit. The Court finds that this factor favors approval of the percentage of recovery requested as a fee in this case.

### 4. *Complexity and duration of the litigation and risk of non-payment*

This litigation presented enormously complex legal and factual issues. In light of GSK's strong defenses to Plaintiffs' theories of liability, and the possibility that this case could not be maintained as a class action through trial, the risk of non-payment has been high throughout this litigation. In addition, this case has been ongoing for more than four years, during which time End-Payor Plaintiffs' counsel have participated in extensive motion practice and both class certification and merits discovery. The Court finds, therefore, that these factors weigh in favor of the percentage of recovery requested as a fee by End-Payor Plaintiffs' counsel.

### 5. *The amount of time devoted to this case*

End-Payor Plaintiffs' counsel have devoted more than 17,000 hours of work on this litigation over the past four years, excluding time spent preparing for the Fairness Hearing after February 1, 2005. (Joint Decl. ¶ 59.) The current lodestar value of that time, calculated using the actual billing rates for each attorney rather than a blended rate, is $6,182,200. The Court finds that this factor weighs in favor of the percentage of recovery requested as a fee in this case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

*6. Awards in similar cases*

This factor requires the Court to compare the percentage of recovery requested as a fee in this case against the percentage of recovery awarded as a fee in other common fund cases in which the percentage of recovery method, rather than the lodestar method, was used. *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 737. In *In re Rite Aid,* the Third Circuit noted three studies which found that fee awards of approximately 30% of the common fund were not unusual. *In re Rite Aid,* 396 F.3d at 303 ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.' ') (citation omitted). Moreover, attorneys fee awards of approximately 30% of the common fund have been approved by judges in this judicial district in the following cases: *In re Linerboard,* 2004 WL 1221350, at *1 (approving attorney's fee award of 30% of a settlement fund of approximately $200,000,000); *In re ATI Techs., Inc. Sec. Litig.,* Civ.A.No. 01-2541, 2003 U.S. Dist. LEXIS 7062 (E.D.Pa. Apr. 28, 2003) (approving attorney's fee award of 30% of a settlement fund of $8,000,000); *In re Aetna,* 2001 WL 20928, at *16 (approving attorney's fee award of 30% of net settlement fund of $81,000,000).

**\*23** The United State Court of Appeals for the Ninth Circuit (the "Ninth Circuit") has surveyed percentage based attorney's fee awards in common fund cases. *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir.2002) (surveying percentage of recovery attorney's fees awarded between 1996 and 2001 in cases with common funds of $50-200 million). The *Vizcaino* survey examined percentage based fee awards ranging from 2.8% to 40%. *Id.* at 1052-54. Attorneys' fees of 30% of the common fund were awarded in four of thirty-four cases studied by the Ninth Circuit. [FN13] *Id.* Percentage based fees of 25-40% were awarded in seventeen of the thirty-four cases surveyed. *Id.* Indeed, the

*Vizcaino* court affirmed a fee award of 28% of a common fund of approximately $97,000,000. *Id.* at 1052.

> FN13. Those cases are *In re Informix Corp. Sec. Litig.,* Civ.A.No. 97-1289 (N.D.Cal. Nov. 23, 1999); *Kurzweil v. Philip Morris Co.,* Civ.A.Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999); *In re Commercial Explosives Antitrust Litig.,* MDL No. 1093 (D.Utah Dec. 29, 1998); and *In re Nat'l Health Laboratories Sec. Litig.,* Civ.A.Nos. 92-1949, 93-1694 (S.D.Cal. Aug. 15, 1995). *See Vizcaino,* 290 F.3d at 1052-53 (collecting cases).

Since *Vizcaino,* courts have awarded attorneys' fees amounting to between 25% and 35% of the common fund in the following cases: *In re Buspirone Antitrust Litig.,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (awarding 33.3% of a $220 million dollar fund); *In re Cardizem CD Antitrust Litig.,* Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) (awarding 30% of a $110 million fund); *In re Vitamins Antitrust Litig.,* Civ.A.No. 99-197, MDL No. 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding about 34% of an approximately $360 million fund). *See In re Visa Check/Mastermoney Antitrust Litig.,* 297 F.Supp.2d 503, 525 n. 33 (E.D.N.Y.2003) (collecting cases). In 2003, the Class Action Reporter published a survey of fee awards in common fund class actions. *See* Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 167-234 (2003). Thirty-seven of the cases included in the survey involved common funds between $50 million and $75 million. *Id.* at 171. The average percentage of recovery awarded as an attorneys' fee in cases with common funds between $50 million and $75 million was 23.6%. *Id.* The percentage of recovery awarded as a fee was 30% or more in eight of those cases, and 25% or more in 16 of those cases. *Id.* Based upon these surveys, and the relevant case law, the Court finds that the percentage of the Settlement Fund requested as a fee by End-Payor Plaintiffs' counsel does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

substantially deviate from the percentage of recovery awarded as fees in similar common fund cases. The Court further finds that this factor favors the percentage of recovery requested as an attorneys' fee in this case.

### 7. Lodestar cross-check

The Third Circuit has suggested that, in addition to reviewing the *Gunter* factors, "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method ." *In re Rite Aid,* 396 F.3d at 305 (citing *Prudential,* 148 F.3d at 333). The lodestar is calculated by "multiplying the number of hours worked by the normal hourly rates of counsel. The court may then multiply the lodestar calculation to reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Aetna,* 2001 WL 20928, at *15 (citing *In re Ikon,* 194 F.R.D. at 195). "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *In re Rite Aid,* 396 F.3d at 306-07 (footnotes and citations omitted). It is appropriate for the court to consider the multipliers utilized in comparable cases. *Id.* at 307 n. 17.

**\*24** The lodestar in this case is $6,182.200, based on the actual billing rates of all attorneys who worked on this case. (Joint Decl. ¶ 59.) A fee award of $19 million would result in a lodestar multiplier of 3.15. The Third Circuit has recognized that multipliers " 'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." ' *In re Cendant PRIDES,* 243 F.3d at 742 (quoting *In re Prudential,* 148 F.3d at 341). The 2003 Class Action Reporter survey found that the average lodestar multiplier was 2.75 for percentage of recovery fee awards in cases with common funds between $50 million and $75 million. *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 171. The

multipliers for the thirty-seven cases surveyed with common funds between $50 and $75 million ranged from a low of 1.16 to a high of 6.19. *Id.* The lodestar multipliers for the cases surveyed by the Ninth Circuit in *Vizcaino* ranged from .06 to 8.5. *Vizcaino,* 290 F.3d at 1052-54. The fee awarded in *In re Buspirone* resulted in a multiplier of 8.46; the fee awarded in *In re Cardizem CD* resulted in a multiplier of 3.7; the fee awarded in *Kurzweil* resulted in a multiplier of 2.46. *See In re Visa Check/Mastermoney,* 297 F.Supp.2d at 525 n. 33. The fee awarded in *In re Visa Check/Mastermoney* resulted in a multiplier of 3.5. *Id.* at 524. In addition, the fee awarded in *In re Aetna* resulted in a multiplier of 3.6. *In re Aetna,* 2001 WL 20928, at *15. The fee awarded in *In re Linerboard* resulted in a multiplier of 3.67 using counsel's current rates. *In re Linerboard,* 2004 WL 1221350, at *16 n. 9.

The Court concludes that the lodestar multiplier of 3.15, which would result from a fee award of $19 million in this case, is in line with the lodestar multipliers utilized in comparable complex class actions and supports the requested attorneys' fee. The Court further finds that this multiplier is justified by the risk of non-recovery in this case and the need to reward counsel for their significant achievement on behalf of the End-Payor Class. Having analyzed the *Gunter* factors and the lodestar cross-check, the Court finds that the requested fee of 30% of the Settlement Fund is fair and reasonable.

### B. Costs

"Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna,* 2001 WL 20928, at *13 (citing *In re Ikon,* 194 F.R.D. at 192). Co-Lead Counsel have requested reimbursement of litigation expenses incurred from the beginning of this litigation through January 31, 2005, totaling $546,480.79. (Pls. Mot. for Award of Attorneys' Fees Ex. E.) The Court finds that the requested expenses are reasonable.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                        Page 23

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

### C. *Awards to Representative Plaintiffs*

Plaintiffs have asked the Court to approve incentive awards to each consumer named Plaintiff in the amount of $2,500 and to each TPP named Plaintiff in the amount of $5,000. " 'Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." ' *Cullen v. Whitman Medical Corp.,* 197 F.R.D. 136, 145 (E.D.Pa.2000) (quoting *In re So. Ohio Corr. Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997)). It is particularly appropriate to compensate named representative plaintiffs with incentive awards where they have actively assisted plaintiffs' counsel in their prosecution of the litigation for the benefit of a class. *Tenuto v. Transworld Systems, Inc.,* Civ.A.No. 99-4228, 2002 WL 188569, at *5 (E.D.Pa. Jan.31, 2002); *see also In re Linerboard,* 2004 WL 1221350, at *18 ("Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly.") (citing *In re Plastic Tableware Antitrust Litig.,* Civ.A.No. 94-CV-3564, 2002 WL 188569 (E.D.Pa. Dec.4, 1998)). The named Plaintiffs in this case worked closely with Co-Lead Counsel throughout the investigation, prosecution and settlement of the claims in this litigation. (Pls. Mem. in Support of Mot. for Award of Attys' Fees at 43.) The incentive awards requested in this case are similar to the awards approved in comparable complex class actions in this judicial district. *See In re Linerboard,* 2004 WL 1221350, at *19 (approving incentive awards of $25,000 to each of five named plaintiffs); *Tenuto,* 2002 WL 188569, at *5 (approving $2,000 incentive award to named plaintiff); *In re Residential Doors Antitrust Litig.,* MDL No. 1039, Civ.A.Nos. 94-3744, 96-2125, 1998 WL 151804, at *11 (E.D.Pa. Apr.2, 1998) (approving $10,000 incentive awards to each of four named plaintiffs). Accordingly, the Court finds that the requested incentive payments are reasonable.

### IV. CONCLUSION

*25 For the foregoing reasons, the Court concludes that the Settlement Agreement and Plan of Distribution, as amended, are fair, adequate and reasonable and they are approved. The Court further concludes that the requested award of attorneys' fees and reimbursement of expenses is fair and reasonable and it is approved. The Court also concludes that Plaintiffs' request to pay incentive awards from the Settlement Fund to the named Plaintiffs is fair and reasonable and that request is also approved. An appropriate Order follows.

### ORDER

This Court, having certified a settlement class by Order dated October 18, 2004, and now having considered End-Payor Plaintiffs' Motion For Final Approval of Settlement and Plan of Distribution, seeking final approval of the proposed settlement of this class action lawsuit against Defendant SmithKline Beecham Corporation d/b/a/ GlaxoSmithKline ("defendant" or "GSK"), End-Payor Class Counsel's Motion for Award of Attorney Fees and Reimbursement of Expenses, and the Proposed Plan of Allocation; finding that Notice of Settlement has been mailed and published; finding that all members of the End-Payor Settlement Class ("Settlement Class") have been provided the opportunity to file timely objections to the proposed Settlement Agreement between the parties, as described in the Notice of Proposed Settlement and Summary Notice; and having considered the matter and all of the submissions filed in connection therewith, and the oral presentations of counsel at the final approval hearing held on March 9, 2005; and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. This Court has jurisdiction over this End-Payor action and each of the parties to the Settlement Agreement.

2. Terms used in this Final Order and Judgment that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Final Order and Judgment as defined in the Settlement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 24

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

Agreement.

3. As required by this Court in its Preliminary Approval Order and as described in extensive detail in the Affidavit of Todd B. Hilsee on Design Implementation and Analysis of Settlement Notice Program and the Affidavit of Thomas R. Glenn, attached as exhibits to End-Payor Plaintiffs' Motion for Final Approval of Settlement and Plan of Distribution: (a) Notices of the proposed settlements were mailed by First-class mail to all Class Members whose addresses could be obtained with reasonable diligence, and to all potential Class Members who requested a copy; and (b) Summary Notice of the proposed Settlement was published in numerous national magazines and newspapers and posted continuously on the Internet at the website http://www.paxilclaims.com. Such notice to members of the Class is hereby determined to be fully in compliance with requirements of Fed.R.Civ.P. 23(e) and due process and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto. *See In re Prudential Ins. Co. of America Sales Practice Litig.,* 962 F.Supp. 450, 526 (D.N.J.1997); *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D.Del.2002).

*26 4. Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in the fairness hearing, it is hereby determined that all Class Members, except those who timely requested exclusion and are identified in the Declaration of Thomas R. Glenn, dated January 31, 2005, as opting out of the Settlement, are bound by this Final Order and Judgment.

5. As set forth more fully in the Settlement Agreement, defendant has agreed to pay a total of sixty-five million dollars ($65,000,000) in settlement of this action (the "Settlement Fund"). The defendant has deposited, by wire transfer, this amount into an escrow account designated by Lead Counsel.

6. The Court held a hearing on March 9, 2005, to consider the fairness, reasonableness, and adequacy of the proposed Settlement. In determining the fairness of the Settlement, the Court considered the following factors:
(1) the complexity, expense, and likely duration of the litigation;
(2) the reaction of the Class to the Settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the Settlement fund in light of the best possible recovery; and
(9) the range of reasonableness of the Settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 534-35 (3d Cir.2004); *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975).

7. By Order dated October 18, 2004, this Court, pursuant to Fed. R. Civ. Proc. 23(g), appointed Miller Faucher and Cafferty LLP, Roda Nast, P.C., and The Wexler Firm LLP as Co-Lead Counsel for the Settlement Class. This Court has given significant weight to the "belief of experienced counsel that settlement is in the best interest of the class." *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D.Pa.1997), *quoting Austin v. Pennsylvania Dept. of Corrections,* 876 F.Supp. 1437, 1472 (E.D.Pa.1995). In fact, this Court recognizes that the Settlement was not achieved until after intense, arm's length negotiations in lengthy litigation involving these nationally-recognized members of the class action bar, with particular experience in antitrust litigation. *See Warfarin,* 391 F.3d at 535. Based on the facts of the case and Class Counsel's experience in these types of cases, it was Class Counsel's considered opinion that the immediate benefits represented by the Settlement far outweighed the possibility, perhaps a remote possibility, of obtaining a better result at trial, especially given the hurdles inherent in proving liability on behalf of the Class and the additional expense and delay inherent in any trial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

and the inevitable appeals.

**\*27 8.** The anticipated duration and expense of additional litigation if this case had not settled is significant. The parties would have had to conduct additional discovery and extensive preparations for trial. This would have included significant time and expense in preparing expert witness reports and expert witnesses for deposition and trial. Thus, bringing this case to trial would likely have been a very long and costly proposition, the outcome of which would not have been certain. This factor supports the adequacy of the Settlement.

9. The Settlement of this End-Payor action is the result of *bona fide* and arm's length negotiations conducted in good faith between End-Payor Class Counsel and Defendants.

10. A review of all relevant factors supports the Settlement. Therefore, the Settlement Agreement is hereby approved and found to be, in all respects, fair, reasonable, adequate, and in the best interest of the Class as a whole and in satisfaction of Rule 23 of the Federal Rules of Civil Procedure and due process requirements, and it shall be consummated pursuant to its terms.

11. The Court approves the Corrected Plan of Distribution of Settlement Proceeds as proposed by Class Counsel and summarized in the Notice and as amended in accordance with the accompanying Memorandum. The Third Circuit has endorsed the very type of structural safeguards Class Counsel had here governing the allocation of the proceeds of the Settlement. *Warfarin,* 391 F.3d at 535. Thus, the proceeds of the Settlement Fund shall be distributed as described therein and in accordance with the Settlement Agreement. The objections of the Blue Plans, Community Care Plus and Gary and Rhonda Marcus as to the treatment of residual funds in the Corrected Plan of Distribution are hereby sustained. All other objections to terms of the Settlement, the notice, and the fee requested by Counsel for the End-Payor Class are hereby overruled.

12. All claims in the captioned action are hereby dismissed with prejudice, and without costs except as expressly provided herein, with such dismissal subject only to compliance by the parties with the terms and conditions of the Settlement Agreement and this Final Order and Judgment.

13. (a) Upon this Settlement Agreement becoming final in accord with paragraph 6 of the Settlement Agreement and subject to the reservations contained in paragraph 17 of the Settlement Agreement, Defendants and their present and former direct and indirect parents, subsidiaries, divisions, partners and affiliates, and their respective present and former stockholders, officers, directors, employees, managers, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, trustees, successors and assigns of each of the foregoing) (the "Releasees") shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity that End Payor Plaintiffs or any of the Settlement Class members who have not timely excluded themselves from the Settlement, whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of any conduct, events or transactions, prior to the date of the Settlement Agreement alleged or which could have been alleged in these actions against the Releasees concerning the purchase, marketing, sale, manufacture, pricing of, or the enforcement of intellectual property related to Paxil or generic paroxetine, or in any way related to defendant's agreement with Par Pharmaceuticals pursuant to which Par is selling paroxetine. The claims covered by the release are referred to herein collectively as the "Released Claims."

**\*28 (b)** In addition, each End Payor Class Member hereby expressly waives and releases, upon the Stipulation becoming effective, any and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:
Section 15.42. *General Release; extent.* A general release does not extend to claims which the creditor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law or any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Each End Payor Class Member may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of this paragraph, but each End Payor Class Member hereby expressly waives and fully, finally and forever settles and releases, upon this Stipulation becoming effective, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims with respect to the subject matter of the provision of this paragraph whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts. Each End Payor Class Member also hereby expressly waives and fully, finally and forever settles and releases any and all Released Claims it may have against Defendants under § 17200, *et seq.,* of the California Business and Professions Code, which claims are expressly incorporated into this paragraph.

(c) Notwithstanding the above, the Settlement Class members are hereby deemed to have settled with and released only the Released Parties that such Settlement Class members have released pursuant to this paragraph, and neither the Settlement Agreement, any part thereof, nor any other aspect of the Settlement or release, shall be deemed to release or otherwise affect in any way any rights a Settlement Class member has or may have against any other party or entity whatsoever other than the Released Parties with respect to the Released Claims pursuant to this paragraph. In addition, the releases set forth in this paragraph shall not release any claims between Settlement Class members and the Released Parties concerning product liability, breach of contract, breach of warranty, or personal injury. Furthermore, the releases set forth in this paragraph shall not act as a release of any claim Settlement Class members have or may have as a

class member in the putative class action captioned *In re Pharmaceutical Industry Average Wholesale Price Litigation,* MDL No. 1456, pending in the United States District Court for the District of Massachusetts, or any related claim that Settlement Class members have or may have as a Class member, Opt-Out or otherwise apart from such putative class action, or any litigation alleging similar claims; provided, however, that in such litigation defendant preserves its right to assert that any recovery by Settlement Class members in such litigation related to the drug Paxil should be set off by their pro rata share of the Settlement Fund. Moreover, the releases set forth in this paragraph shall only apply to a governmental entity's purchases of, or reimbursement for, Paxil made by the governmental entity as part of a health benefit plan for its employees and the releases in this paragraph shall not act as a release of any claim the governmental entity has or may have with respect to any other purchases of, or reimbursement for, Paxil by the governmental entity, including claims arising from the marketing, sale, manufacture, pricing, or enforcement of intellectual property related to the governmental entity's other purchases of, or reimbursement for, Paxil.

**\*29** 14. The Settlement in this case creates a common fund. The Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). *See also In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 192 (E.D.Pa.2000) ("[T]here is no doubt that attorneys may properly be given a portion of the Settlement Fund in recognition of the benefit they have bestowed on class members.").

15. Courts in the Third Circuit apply the "Percentage of the Fund" method for calculating attorney fees in common fund cases. *See In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722 (3d Cir.2001); *See also In re Rite Aid Corp. Sec. Litig.,* 2005 U.S.App. LEXIS 1269 (3d Cir. Jan. 26, 2005).

16. The requested award of attorney fees is found to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 27

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

be fair and reasonable. *See In Re Linerboard Antitrust Litig.,* 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004); *In re Aetna, Inc. Sec. Litig.,* 2001 U.S. Dist. LEXIS 68 (E. D.Pa. January 4, 2001) (Padova, J.).

17. In making its decision, the Court has considered the seven factors set forth in *Gunter v. Ridgewood Energy Corp.*:
(1) the size of the fund created and the number of persons benefited;
(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel;
(3) the skill and efficiency of the attorneys involved;
(4) the complexity and duration of the litigation;
(5) the risk of nonpayment;
(6) the amount of time devoted to the case by plaintiffs' counsel; and
(7) the awards in similar cases.

*Gunter,* 223 F.3d at 195 n. 1. *See also In re Linerboard Antitrust Litig.,* No. MDL 1261, 2004 WL 1221350, at *4 (E.D.Pa. June 2, 2004).

18. The Court awards Class Counsel attorney fees in the amount of 30 percent of the Settlement Fund (with interest earned from the date of the deposit of the funds at the same rate earned by the funds), to be allocated among Class Counsel as reasonably determined by Co-Lead Counsel. The Court further awards Class Counsel $ 546,480 .79 as reimbursement of their reasonable disbursements and expenses, and $ 22,500.00 in total payments to be distributed to each named Class Plaintiff as set forth in End-Payor Class Counsels' Motion for Award of Attorneys Fees and Reimbursement of Expenses, for their role in bringing about the recovery on behalf of the Class. All of the foregoing amounts are to be paid exclusively out of the Settlement Funds to Co-Lead Counsel without additional contribution or payment by Defendant. Any appeal from this paragraph shall not affect the finality of the remainder of this Final Order and Judgment, including but not limited to the date on which the Settlement will be deemed final under the terms of the Settlement Agreement.

**\*30** 19. The Court finds that the Settlement Fund is

a "qualified settlement fund" as defined in section 1.468B-1(c) of the Treasury Regulations in that it satisfies each of the following requirements:

(a) The Settlement Fund is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

(b) The Settlement Fund is established to resolve or satisfy one or more claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liabilities; and

(c) The assets of the Settlement Fund are segregated from other assets of GSK, the transferor of payments to the Settlement Fund.

20. Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

(a) The Settlement Fund met the requirements of paragraphs 19(b) and 19(c) of this Order prior to the date of this Order approving the establishment of the Settlement Fund subject to the continued jurisdiction of this Court; and

(b) GSK and the Claims Administrator may jointly elect to treat the Settlement Fund as coming into existence as a "qualified settlement fund" on the later of the date the Settlement Fund met the requirements of paragraphs 19(b) and 19(c) of this Order or January 1 of the calendar year in which all of the requirements of paragraph 19 of this Order are met. If such relation-back election is made, the assets held by the Settlement Fund on such date shall be treated as having been transferred to the Settlement Fund on that date.

21. Neither this Final Order and Judgment, the Settlement Agreement, nor any of its terms or the negotiations or papers related thereto shall constitute evidence or an admission by Defendant, that any acts of wrongdoing have been committed, and they shall not be deemed to create any inference that there is any liability therefore. Neither this Final Order and Judgment, the Settlement Agreement, nor any of the terms or the negotiations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762
**(Cite as: Slip Copy)**

or papers related thereto shall be offered or received in evidence or used for any purpose whatsoever, in this or any other matter or proceeding in any court, administrative agency, arbitration or other tribunal, other than as expressly set forth in the Settlement Agreement.

22. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason for delay and therefore directs entry of this Final Order and Judgment as a final judgment that is immediately appealable.

23. Without any way affecting the finality of this Final Order and Judgment, the Court hereby retains exclusive jurisdiction over this action until the Settlement Agreement has been consummated and each and every act agreed to be performed by the Parties thereto shall have been performed, and thereafter for all other purposes necessary to effectuate the terms of the Settlement Agreement.

SO ORDERED.

E.D.Pa.,2005.
Nichols v. SmithKline Beecham Corp.
Slip Copy, 2005 WL 950616 (E.D.Pa.), 2005-1 Trade Cases P 74,762

Briefs and Other Related Documents (Back to top)

• 2005 WL 3591836 () Affidavit of Gary L. French, Ph.D., Regarding the Objections of the Blue Cross/Blue Shield Plans (Mar. 02, 2005)
• 2001 WL 34847511 () Affidavit of Gary L. French, Ph.D. Regarding Plaintiff's Motion for Final Approval of Settlement (Oct. 01, 2001)
• 2001 WL 34848180 () Second Declaration of Gary L. French, Ph.D. (Oct. 01, 2001)
• 2000 WL 34417256 (Trial Pleading) Class Action Complaint (Dec. 08, 2000)
• 2:00cv06222 (Docket) (Dec. 08, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

6 of 158 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

September 2, 2005 Friday
Late Edition - Final

**SECTION:** Section C; Column 2; Business/Financial Desk; Pg. 2

**LENGTH:** 635 words

**HEADLINE:** Intel Sharply Rebuts A.M.D.'s Antitrust Suit

**BYLINE:** By LAURIE J. FLYNN

**DATELINE:** SAN FRANCISCO, Sept. 1

**BODY:**

In a sharp rebuttal to an antitrust lawsuit, the Intel Corporation on Thursday denied any wrongdoing and characterized Advanced Micro Devices, its rival and accuser, as a victim of its own mistakes.

Intel's formal response came nine weeks after A.M.D. accused Intel of unfair pricing and rebates, and of coercing customers to prevent them from using A.M.D. microprocessors. At 63 pages, the Intel rebuttal was 15 pages longer than the lawsuit itself.

"The claims are factually incorrect and contradictory," Intel states in its response, filed in Federal District Court in Delaware. "The evidence will show that every failure and setback for which A.M.D. today seeks to blame Intel is actually a direct result of A.M.D.'s own actions or inactions."

Intel, of Santa Clara, Calif., has more than 80 percent of the unit sales and 90 percent of the revenues in the market for so-called x86 microprocessors. Intel's response describes a range of business missteps that it says A.M.D. made, resulting in its current market position. Most notably, Intel contends that A.M.D. did not invest enough in new plants in recent years to stay competitive and is therefore "capacity constrained" -- meaning it is selling all the chips it can make -- rather than being improperly limited by any actions on Intel's part.

A.M.D.'s suit also alleges that Intel used illegal tactics to persuade dozens of companies -- including Dell, Sony and Toshiba -- not to use A.M.D. chips. In its response on Thursday, Intel called A.M.D.'s claims contradictory, since A.M.D. currently does business with many of those same companies.

A.M.D., based in Sunnyvale, Calif., has not indicated what damages it is seeking. But regardless of the outcome, the suit is expected to take years to litigate and involve hundreds of witnesses and documents.

"We believe this will be one of the largest pieces of litigation in U.S. history," said D. Bruce Sewell, Intel's chief counsel, given the scope and the number of documents and witnesses involved. Mr. Sewell said he expected the discovery portion of the case to take a year or more. A.M.D. lawyers said they planned to begin deposing witnesses next week.

A.M.D.'s lawsuit on June 27 came after the Japanese Fair Trade Commission concluded in March that Intel had stifled competition there by offering rebates to five computer companies, including Toshiba and Sony, in exchange for their agreeing to limit purchases from A.M.D. or Transmeta, another Intel rival. At the time, Intel said it disagreed with the outcome but would not contest it.

The European Commission is also investigating allegations of Intel misconduct there, and in July European regulators raided the offices of Intel and some of its customers in four countries, seeking evidence of illegal activity.

Intel Sharply Rebuts A.M.D.'s Antitrust Suit The New York Times Sep

Tom McCoy, an A.M.D. lawyer, said Thursday that the ruling in Japan, along with the raids in Europe, added credibility to the company's complaints about Intel's practices.

The case caps a long history of legal battles between the two companies, the most significant culminating in 1995, when a legal settlement between them gave A.M.D. the right to make chips based on Intel's x86 design.

David A. Balto, an antitrust lawyer with Robins Kaplan Miller & Ciresi, said Intel's strongly worded response indicated the company considered the suit a real threat. Mr. Balto, who was policy director with the Federal Trade Commission when that agency was investigating Intel's practices before the 1995 settlement, said he thought that A.M.D. had put together a strong case that would take three or four years to litigate.

The next step in the dispute is expected on Sept. 29, when a Federal Multidistrict Court in North Carolina will consider whether to combine dozens of class-action suits related to the same charges.

**URL:** http://www.nytimes.com

**LOAD-DATE:** September 2, 2005