When Intel learned that Fry's was very successfully marketing Fujitsu's Athlon XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

170.    The story is even worse in Europe. AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively. Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

171.    In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains (including Dixon and PC World) that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just because of the small amount of business it does with AMD. Toys 'R' Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers (including Conforama, Boulanger), causing them to cease dealing with AMD or drastically reduce their AMD business.

172.    AMD nonetheless has gained some retail market share. Due to price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors. Within notebook roadmaps, AMD represents approximately 10%. On a shelf-space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for

roughly 30% and 22% of their sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

173. In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-based products but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products*.

174. This is how the program works at Circuit City. If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine, but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-powered machines, and this "tax" applies to all Intel-powered machines that the retailer buys, back to the very first machine.

175. The following illustrates the competitive disadvantage this creates for AMD. If Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a quarter, Intel would pay it $15 of MDF per computer, for a total of $3 million. However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units). Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit City would receive an additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for doing business with AMD. For AMD to make Circuit City whole, it would have to vastly increase its MDF on its 20% share to $35 MDF per unit (40,000 times $35 = $1.4M), which together with Intel's $1.6 million would bring the total MDF back to $3 million. In other words, to just capture a 20% share, AMD must offer two or three times as much MDF as Intel, because it has far fewer units over which to spread the

difference.  Given these perverse economies, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a quarter.  (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share well short of 20%.)

176.    Nor is Intel above threatening retailers to gain preferred treatment.  For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor.  Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed.  When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened.

177.    Intel's dealings with retailers are unlawfully exclusionary, have no procompetitive justification, and are intended to maintain its monopoly.

**D.    Intel's Standard Setting and Other Technical Abuses**

**1.    Intel's Exclusion of AMD from Industry Standards**

178.    Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility.  Indeed, standards are not only ubiquitous in the computer industry, they are essential.  But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards.  It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

179.    By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with

memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

180.    The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips. Even though the JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

181.    The ADT Consortium was cleverly structured with multiple tiers of membership, each with different levels of access to information. The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, not during its development. The development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers. No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

182.    AMD desperately needed access to the developing standard and input into its definition in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel. AMD lobbied repeatedly for higher tier membership status but was continually turned down. Intel had structured the ADT Consortium's rules to require a unanimous vote, which gave Intel veto power over any decision to allow AMD to join the development committee, and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

183.    By foreclosing AMD from input or access to the memory standard during its development process, Intel deliberately placed AMD at a severe competitive disadvantage. As a

consequence of its exclusion, AMD could not monitor participants' suggestions and object to Intel-proposed features that were without substantial benefit to consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture. Further, by keeping the ADT Consortium standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

184.    Indeed, Intel is attempting a repeat performance with respect to a new memory standard, this time excluding AMD by avoiding the open standard-setting committee entirely. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a secret committee to develop the next generation memory interface standard. Under this agreement, the memory manufacturers are prohibited from sharing information about their own product designs implementing the memory interface standard. This prevents AMD from completing design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

185.    By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, thereby assuring itself an undeserved head-start and unfair competitive advantage.

**2.    Intel's Promotion of Industry Standards that Disadvantage Intel's Competitors**

186.    Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards that have no substantial consumer benefit and whose sole or dominant purpose is to competitively disadvantage AMD and other rivals based on its highly integrated microprocessor architecture.

187.    As an example, JEDEC began developing standards in 2004 governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known

as dual inline memory modules, or "DIMMs," consist of printed circuit boards upon which a number of memory chips are mounted. The DIMMs connect memory chips to the computer's motherboard through a series of metal connectors known as pins. One purpose of the JEDEC standards was to define the functions of the pins to enable chipmakers to design compatible memory controllers that would allow their microprocessors to communicate with the memory on the DIMMs.

188.    The JEDEC committee, which comprises members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC committee began work on standards for DDR3 memory modules for desktop computers, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules. This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

189.    However, when the JEDEC committee began to define pins for DDR3 laptop memory modules in this consistent manner, Intel reversed its position, counterproposing instead that the committee rearrange the pin definitions. Intel's proposal had no discernable technical merit or basis.

190.    In fact, Intel's motivation for proposing a modification of the laptop memory module pin definition was to competitively disadvantage AMD. Any modification to the laptop memory module pin definition would force Intel and AMD to modify their memory controllers. AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor. This produces significant computing advantages, but modification of an embedded memory controller requires significantly more time and expense.

191.    Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part. The JEDEC ultimately rejected Intel's proposal, confirming the

proposal's lack of technical merit, but this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

### 3. Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace

192.    Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

193.    An example is Intel's compilers.  Independent software vendors ("ISVs") generally write software programs in high-level languages such as C, C++, or Fortran.  Before these programs can be understood by a computer system, they must be translated into object code, which is a machine-readable language, by a software program called a compiler.  Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.).  Intel offers compilers for use with a variety of operating systems and programming languages.

194.    Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations.  Such programs include mathematical modeling, multimedia, and video game applications.

195.    Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform.  To achieve this, Intel designed the compiler to compile code along several alternate code paths.  Some paths are executed when the program runs on an Intel platform and others are executed when the program runs on a computer with an AMD microprocessor.  (The choice of code path is determined when the program is started, using a feature known as "CPUID," which identifies the computer's microprocessor.)  By design, the code paths were not created equally.  If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency.  However, if the

program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash.

196.    ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations.  Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations.  Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor, not because of design deficiencies on the part of AMD but because of Intel's deviousness.

## VIII.   EFFECTS OF INTEL'S MISCONDUCT

197.    Intel's unlawful conduct has caused and will continue to cause substantial harm to competition in the market for x86 microprocessors in domestic, import, and export sales, to the harm of Plaintiffs and the Class members.  Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice.

198.    Intel's anticompetitive acts both inside and outside the territorial boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce that is not trade and commerce with foreign nations and on United States import trade and commerce.  In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel excludes them from the product market worldwide.  As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

199.    Intel's conduct has caused and will continue to cause substantial harm to the businesses or property of Plaintiffs and the Class, through the following unlawful suppression of competition:

- When AMD entered the server market in 2002 with its Athlon microprocessor – a part designed for desktops, not servers – the small OEMs and white-box vendors deploying the chip nonetheless managed to secure approximately 3% of the worldwide server market. AMD introduced its next generation Opteron microprocessor for servers the following year, and the chip won rave reviews and passionate customer testimonials, including Best of Show at the June 2003 ClusterWorld Conference and Expo and Best Processor award in July 2003 from InfoWorld. Nonetheless, by means of its exclusionary and anticompetitive conduct, as of the Fourth Quarter 2004, Intel had limited AMD's worldwide server market share to less than 5%, not appreciably more than before it introduced the Opteron.

- Intel's exclusionary conduct has successfully boxed AMD and others out of the mobile PC sector. Intel's exclusive deals with Dell, Sony and Toshiba alone bar AMD from a third of the world market and half of U.S. domestic sales. Intel's economic coercion and fidelity rebates have foreclosed AMD and others from an appreciable share of the remainder of the market.

- AMD's Athlon64 is widely recognized as fully competitive with Intel's best desktop offering with the added benefit that it runs 64-bit software. Nonetheless, with the exception of a channel-restricted HP machine and a single Fujitsu-Siemens' model, AMD has failed to get a single major OEM, which collectively dominate the lucrative commercial desktop sector, to launch broadly an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on AMD or another Intel rival unless it partners with a Tier One desktop OEM, but Intel's exclusionary conduct, including its economic coercion of Dell, HP, IBM,

Gateway and Acer, prevents that. As a result, AMD's commercial desktop share is no greater now than it was in 2002.

200.    Intel's exclusionary and restrictive practices described herein have suppressed competition in the x86 Microprocessor Market, resulting in higher prices for Intel x86 microprocessors, even after accounting for discounts or rebates attributable to microprocessor purchases. The overcharges imposed by Intel have been passed on to Plaintiffs and the Class members in the form of higher prices for personal computers, workstations, and servers containing Intel x86 microprocessors.

201.    Intel's supra-competitive prices are not the result of superior products or business acumen or competition on the merits. Instead, Intel has been able, at the financial expense of Plaintiffs and Class members, to artificially inflate prices for its products by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully acquiring and maintaining its monopoly in the worldwide x86 Microprocessor Market.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

202.    Each of the foregoing allegations is incorporated in this claim for relief.

203.    The relevant product market is the x86 Microprocessor Market.

204.    The relevant geographic market is the world.

205.    Intel possesses monopoly power in the relevant market, maintaining a market share of over 90 percent by revenue and 80 percent by unit volume.

206.    Substantial barriers to entry and expansion exist in the relevant market.

207.    Intel has the power to control prices and exclude competition in the relevant market.

208.    Since before June 28, 2001, Intel has engaged in conduct with anticompetitive effects to: (a) unlawfully maintain and enhance its monopoly in the relevant market and to keep

prices high; and (b) stifle competition and eliminate consumer choice through unlawful exclusionary behavior designed to keep AMD and other competitors and potential competitors weak, undersized, and unable to achieve a minimum efficient scale of operation needed to offer a viable substitute for Intel's x86 microprocessors.

209.    Intel has also combined or conspired with others in furtherance of its efforts to monopolize the worldwide market for x86 microprocessors.

210.    There is no legitimate business justification for Intel's conduct.

211.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for x86 microprocessors purchased indirectly from Intel than they would have paid and would pay in the future in the absence of Intel's unlawful acts, including paying more for personal computers and other products in which x86 microprocessors are a component, as a result of higher prices paid for x86 microprocessors by the manufacturers of those products.

212.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

### (Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720)

213.    Each of the foregoing allegations is incorporated in this claim for relief.

214.    Intel's contract, combination, trust or conspiracy was entered into, carried out, effectuated and perfected mainly within the State of California, and Intel's conduct within California injured all Class members throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.

215.    Beginning at a time presently unknown to Plaintiffs, but at least as early as June 28, 2001, and continuing to today, Intel and its co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Through agreements with its

customers and with standards-setting bodies as alleged herein, Intel conspired in violation of Section 16720 to maintain monopoly power in the relevant market and to set prices for x86 microprocessors at supra-competitive levels.

216.    For the purpose of forming and effectuating the unlawful trust, Intel has done those things that it combined and conspired to do as alleged in this Complaint, including but in no way limited to the following:

        a.      entering into exclusive and near-exclusive deals with OEMs;

        b.      pressuring OEMs to agree not to support product launches of Intel's competitors;

        c.      entering into exclusive and near-exclusive deals with distributors; and

        d.      entering into exclusive and near-exclusive deals with retailers.

217.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

        a.      price competition in the sale of microprocessors has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

        b.      prices for microprocessors sold by Intel and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

        c.      those who purchased microprocessors from Intel have been deprived of the benefit of free and open competition.

218.    Plaintiffs and the Class members paid and continue to pay supra-competitive, artificially inflated prices for microprocessors.

219.    As a direct and proximate result of Intel's unlawful conduct, Plaintiffs and the Class members have been injured in their businesses and property in that they paid more for Intel's x86 microprocessors (or for products containing such microprocessors) than they would have paid absent Intel's unlawful conduct.  As a result of Intel's violation of Section 16720,

Plaintiffs and the Class members seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**THIRD CLAIM FOR RELIEF**

**(Violation of California's Tort Law Against Monopolization)**

220.    Each of the foregoing allegations is incorporated in this claim for relief.

221.    By virtue of the conduct described above, Intel has engaged in tortious and unlawful monopolization of the x86 Microprocessor Market.

222.    Intel's conduct gives rise to a cause of action for common law monopoly under California law on behalf of all Plaintiffs and Class members.

223.    As a direct and proximate result of Intel's unlawful acts of monopolization, Plaintiffs and the Class members have suffered actual damages in an amount to be proven at trial.

224.    Intel's acts of monopolization were intended to monopolize and suppress competition in the relevant market and to injure consumers. Intel's acts include acts of fraud, malice and oppression and were and are taken with conscious disregard for the rights of consumers, including Plaintiffs and the Class members. Accordingly, an award of punitive damages is justified in order to make an example of Intel, to punish it, and to deter it and others from engaging in the same or similar conduct. Plaintiffs and the Class members seek an award of punitive damages in an amount according to proof at trial.

**FOURTH CLAIM FOR RELIEF**

**(Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200 *et seq.*)**

225.    Each of the foregoing allegations is incorporated in this claim for relief.

226.    Intel's business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Intel's conduct within California injured all Class members throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.

227. Beginning on a date unknown to Plaintiffs, but at least as early as June 28, 2001, and continuing to the present, Intel committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

228. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Intel for acts that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law ("UCL").

229. Intel's conduct as alleged in this Complaint constitutes unfair, unlawful and/or fraudulent practices within the meaning of the Unfair Competition Law, including but not limited to the following:

        a.      Intel violated the UCL by means of its violations of Section 2 of the Sherman Act, as set forth above;

        b.      Intel violated the UCL by means of its violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above; and

        c.      Intel's acts and practices are unfair to consumers of x86 microprocessors in the State of California and throughout the United States within the meaning of the UCL.

230. Plaintiffs and Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Intel as a result of such business acts or practices.

231. Intel's illegal conduct is continuing, and there is no indication that it will not continue such activity in the future.

232. Intel's unlawful and unfair business practices have caused and continue to cause Plaintiffs and the Class members to pay supra-competitive and artificially-inflated prices for microprocessors (or for products containing such microprocessors).  Plaintiffs and the Class members suffered injury in fact and lost money or property as a result of the unfair competition.

233.    As alleged in this Complaint, Intel has been unjustly enriched as a result of its wrongful conduct and by its unfair competition.  Plaintiffs and Class members are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits obtained by Intel as a result of such business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

### FIFTH CLAIM FOR RELIEF

### (Violations of State Antitrust and Restraint of Trade Laws)

234.    Each of the foregoing allegations is incorporated in this claim for relief and this claim is alleged in the event that the Court does not apply California law on a nationwide basis.

235.    Intel has violated Arizona Revised Stat. Code §§ 44-1401 *et seq.*

236.    Intel has violated California Bus. & Prof. Code §§ 16700 *et seq.*

237.    Intel has violated District of Columbia Code Ann. §§ 28-4503 *et seq.*

238.    Intel has violated Iowa Code §§ 553.1 *et seq.*

239.    Intel has violated Kansas Stat. Ann. §§ 50-101 *et seq.*

240.    Intel has violated 10 Maine Rev. Stat. §§ 1101 *et seq.*

241.    Intel has violated Michigan Comp. Laws. Ann. §§ 445.773 *et seq.*

242.    Intel has violated Minnesota Stat. §§ 325D.52 *et seq.*

243.    Intel has violated Mississippi Code Ann. § 75-21-1 *et seq.*

244.    Intel has violated Nebraska Rev. Stat. §§ 59-801 *et seq.*

245.    Intel has violated Nevada Rev. Stat. Ann. §§ 598A *et seq.*

246.    Intel has violated New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

247.    Intel has violated New York Gen. Bus. Law § 340 *et seq.*

248.    Intel has violated North Carolina Gen. Stat. §§ 75-1 *et seq.*

249.    Intel has violated North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

250.    Intel has violated South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

251.    Intel has violated Tennessee Code Ann. §§ 47-25-101 *et seq.*

252.    Intel has violated Vermont Stat. Ann. 9 §§ 2453 *et seq.*

253.    Intel has violated West Virginia Code §§ 47-18-1 *et seq.*

254.    Intel has violated Wisconsin Stat. §§ 133.01 *et seq.*

255.    As a direct and proximate result of Intel's unlawful conduct, Class members in each of these states have been injured in their businesses and property in that they paid more for Intel's x86 microprocessors (or for products containing such microprocessors) than they would have paid absent Intel's unlawful conduct.

### SIXTH CLAIM FOR RELIEF

**(Violations of State Consumer Protection and Unfair Competition Laws)**

256.    Each of the foregoing allegations is incorporated in this claim for relief and is alleged in the event that the Court does not apply California law on a nationwide basis.

257.    Intel has violated Alaska Stat. §§ 45.50.471 *et seq.*

258.    Intel has violated Arkansas Rev. Stat. §§ 4-88-101 *et seq.*

259.    Intel has violated California Bus. & Prof. Code §§ 17200 *et seq.*

260.    Intel has violated District of Columbia Code §§ 28-3901 *et seq.*

261.    Intel has violated Florida Stat. §§ 501.201 *et seq.*

262.    Intel has violated Georgia Code Ann. §§ 10-1-390 *et seq.*

263.    Intel has violated Idaho Code §§ 48-601 *et seq.*

264.    Intel has violated Kansas Stat. §§ 50-623 *et seq.*

265.    Intel has violated Louisiana Rev. Stat. §§ 51:1401 *et seq.*

266.    Intel has violated 5 Maine Rev. Stat. §§ 205-A *et seq.*

267.    Intel has violated Mass. Gen. Laws ch. 93A §§ 1 *et seq.*

268.    Intel has violated Montana Code §§ 30-14-101 *et seq.*

269.    Intel has violated Nebraska Rev. Stat. §§ 59-1601 *et seq.*

270.    Intel has violated Nevada Rev. Stat. §§ 598.0903 *et seq.*

271.    Intel has violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

272.    Intel has violated New Mexico Stat. §§ 57-12-1 *et seq.*

273.    Intel has violated New York Gen. Bus. Law §§ 349 *et seq.*

274.    Intel has violated North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

275.    Intel has violated Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

276.    Intel has violated Utah Code §§ 13-11-1 *et seq.*

277.    Intel has violated 9 Vermont Stat. §§ 2451 *et seq.*

278.    Intel has violated West Virginia Code §§ 46A-6-101 *et seq.*

279.    As a direct and proximate result of Intel's unlawful conduct, Class members in each of these states have been injured in their business and property in that they paid more for Intel's x86 microprocessors (or for products containing such microprocessors) than they would have paid absent Intel's unlawful conduct.

## SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment and Disgorgement of Profits)

280.    Each of the foregoing allegations is incorporated in this claim for relief.

281.    Intel has been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits.

282.    Under common law principles of unjust enrichment, Intel should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members for Intel's x86 microprocessors (or for products containing such microprocessors).

283.    Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

## X.    DEMAND FOR TRIAL BY JURY

284.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury of all issues so triable under the law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    That Intel's conduct alleged herein be adjudged and decreed to violate the laws alleged in this Complaint.

B.     That Plaintiffs and the Class members recover damages, as provided by the state laws alleged in this Complaint, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Intel in the maximum amount permitted by such laws;

C.     That Intel, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing its anticompetitive conduct or adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Plaintiffs and Class members be awarded restitution, including disgorgement of profits obtained by Intel as a result of its acts of unfair competition and unjust enrichment.

E.     That Plaintiffs and Class members awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     That Plaintiffs and Class members recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     That Plaintiffs and Class members have such further relief as the case may require and the Court may deem just and proper under the circumstances.

Dated:  April 28, 2006

PRICKETT, JONES & ELLIOTT, P.A.

James L. Holzman (DE Bar # 663)
J. Clayton Athey (DE Bar #4378)
Eric M. Anderson (DE Bar#4376)
PRICKETT, JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6500
jlholzman@prickett.com
jcathey@prickett.com
emanderson@prickett.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
mhausfeld@cmht.com dsmall@cmht.com
blandau@cmht.com abaker@cmht.com

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony Shapiro
Craig R. Spiegel
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com
craig@hbsslaw.com

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

*Co-Lead and Interim Counsel for Plaintiffs*

Daniel Hume
David Kovel
Kirby McInerney & Squire LLP
830 Third Avenue
10th Floor
New York, NY 10022
dhume@kmslaw.com
dkovel@kmslaw.com
*Counsel for Raphael Allison and Matthew Kravitz*

James R. Malone, Jr.
Michael D. Gottsch
Chimicles & Tikellis LLP
361 W. Lancaster Avenue
Haverford, PA 19041
michaelgottsch@chimicles.com
jamesmalone@chimicles.com
*Counsel for Elizabeth Bruderle Baran and Paul C.*
*Czysz*

Eugene A. Spector
Jeffrey L. Kodroff
Jeffrey J. Corrigan
William G. Caldes
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
espector@srk-law.com
jkodroff@srk-law.com
jcorrigan@srk-law.com
bcaldes@srk-law.com
*Counsel for David Arnold, Paul Ramos and*
*Michael Ruccolo*

Craig Corbitt
Judith A. Zahid
Zelle, Hofmann, Voelbel, Mason & Gette LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104
ccorbitt@zelle.com
jzahid@zelle.com
*Counsel for Michael Brauch, William Cronin and*
*Law Offices of Laurel Stanley*

Francis O. Scarpulla
Law Offices of Francis O. Scarpulla
44 Montgomery St.
Suite 3400
San Francisco, CA 94104
foslaw@pacbell.net
*Counsel for Michael Brauch, William Cronin and*
*Law Offices of Laurel Stanley*

Bruce L. Simon
Esther L. Klisura
Cotchett Pitre Simon & McCarthy
840 Malcolm Rd.
Suite 200
Burlingame, CA 94010
bsimon@cpsmlaw.com
eklisura@cpsmlaw.com
*Counsel for Trotter-Vogel Realty Inc., dba*
*Prudential California Realty*

Jerry E. Nastari
Corey, Luzaich, Pliska, deGhetaldi & Nastari
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030
jen@coreylaw.com
*Counsel for Rob Marshall, dba Marshall Realty*

R. Bruce McNew
Taylor & Mcnew, LLP
3711 Kennett Pike
Suite 210
Greenville, DE 19807
Mcnew@taylormcnew.com
*Counsel for Rob Marshall, dba Marshall Realty*

Anthony J. Bolognese
Joshua H. Grabar
Bolognese & Associates, LLC
1617 JFK Blvd., Suite 650
Philadelphia, PA 19103
abolognese@bolognese-law.com
jgrabar@bolognese-law.com
*Counsel for Phil Paul and Christian Ambruoso*

Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Kaplan Fox & Kilsheimer LLP
805 Third Avenue
New York, NY 10022
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com
*Counsel for Christian Ambruoso*

Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak
Much Shelist Freed Denenberg Ament &
Rubenstein, P.C.
191 N. Wacker Drive
Suite 1800
Chicago, IL 60606
skanner@muchshelist.com
dmillen@muchshelist.com
rwozniak@muchshelist.com
*Counsel for Phillip Boeding, HP Consulting
Services, Inc., Stuart Munson, and Lee Pines*

Robert Mills
Harry Shulman
The Mills Law Firm
145 Marina Boulevard
San Rafael, CA 94901
rwm@millslawfirm.com
harry@millslawfirm.com
*Counsel for Stuart Munson*

Daniel B. Allanoff
Meredith Cohen Greenfogel & Skirnick P.C.
117 South 17th St.
22nd Floor
Architects Building
Philadelphia, PA 19103
dallanoff@mcgslaw.com
*Counsel for Benjamin J. Allanoff*

Jeffrey Goldenberg
Murdock Goldenberg Schneider & Groh, L.P.A.
35 East Seventh Street; Suite 600
Cincinnati, OH 45202-2446
jgoldenberg@mgsglaw.com
*Counsel for Ronald Konieczka and Patricia
Niehaus*

Roberta Liebenberg
Donald Perelman
Gerard A. Dever
Fine Kaplan & Black RPC
1835 Market St.
28th Floor
Philadelphia, PA 19103
rliebenberg@finekaplan.com
dperelman@finekaplan.com
gdever@finekaplan.com
*Counsel for Kevin Stoltz*

Gerald Rodos
Jeffrey Gittleman
Barrack Rodos & Racine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
grodos@barrack.com
jgittleman@barrack.com
*Counsel for Michael K. Simon*

Kenneth A. Wexler
Edward A. Wallace
Andrae P. Reneau
Wexler Toriseva and Wallace LLP
One North LaSalle Street
Suite 2000
Chicago, IL 60602
kaw@wtwlaw.us
eaw@wtwlaw.us
apr@wtwlaw.us
*Counsel for Peter Jon Naigow*

Daniel Gustafson
Jason Kilene
Gustafson Gluek PPLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com
*Counsel for Fairmont Orthopedics & Sports
Medicine, P.A., Henry Kornegay, Melinda Harr,
D.D.S., P.C., and Robin S. Weeth*

Marc Edelson
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901
medelson@hofedlaw.com
*Counsel for Stuart Schupler*

Samuel D. Heins
Vincent J. Esades
Troy J. Hutchinson
Heins Mills & Olson, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
heins@heinsmills.com
vesades@heinsmills.com
thutchinson@heinsmills.com
*Counsel for Bergerson & Associates, Inc.*

Douglas G. Thompson, Jr.
Richard M. Volin
Karen J. Marcus
Finkelstein Thompson & Loughran
The Duvall Foundry
1050 30th St., N.W.
Washington, DC 20007
kjm@ftllaw.com
*Counsel for Carrol Cowan, Russell Dennis, Damon
DiMarco, Leonard Lorenzo, and Ian Walker*

Robert S. Kitchenoff
Mindee J. Reuben
Weinstein Kitchenoff & Asher LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
kitchenoff@wka-law.com
reuben@wka-law.com
*Counsel for Joseph Samuel Cone*

Natalie Finkelman
Shepherd, Finkelman, Miller & Shah LLC
30 East State Street
Media, PA 19063
nfinkelman@classactioncounsel.com
*Counsel for Ludy Chacon, Darice Russ and
Francis H. Slattery, IV*

Marc A. Wites
Wites & Kapetan, P.A.
4400 North Federal Highway
Lighthouse Point, FL 33064
mwites@wklawyers.com
*Counsel for Ludy Chacon, Darice Russ and*
*Francis H. Slattery, IV*

Ira Neil Richards
R. Andrew Santillo
Trujillo Rodriguez & Richards, LLC
The Penthouse
226 W. Rittenhouse Square
Philadelphia, PA 19103
irichards@trrlaw.com
asantillo@trrlaw.com
*Counsel for Ludy Chacon, Darice Russ and*
*Francis H. Slattery, IV*

Mark A. Griffin
Raymond J. Farrow
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
rfarrow@kellerrohrback.com
mgriffin@kellerrohrback.com
*Counsel for Henry Kornegay*

Juden Justice Reed
Peter E. Borkon
Schubert & Reed LLP
Three Embarcadero Center
Suite 1650
San Francisco, CA 94111
jreed@schubert-reed.com
pborkon@schubert-reed.com
*Counsel for Patrick J. Hewson*

Lance A. Harke
Howard M. Bushman
Harke & Clasby LLP
155 South Miami Ave.
Suite 600
Miami, FL 33130
lharke@harkeclasby.com
hbushman@harkeclasby.com
*Counsel for  Maria I. Prohias and Nathaniel*
*Schwartz*

Michele C. Jackson
Lieff Cabraser Heimann & Bernstein LLP
Embarcadero Center West
275 Battery St.
30th Floor
San Francisco, CA 94111
mjackson@lchb.com
*Counsel for Huston Frazier, Jeanne Cook Frazier
and Brian Weiner*

David S. Stellings
Jennifer Gross
Lieff Cabraser Heimann & Bernstein, LLP
780 Third Avenue, 48th Floor
New York, New York 10017-2024
dstellings@lchb.com
jgross@lchb.com
*Counsel for Huston Frazier, Jeanne Cook Frazier
and Brian Weiner*

Mario N. Alioto
Trump Alioto Trump & Prescott LLP
2280 Union St.
San Francisco, CA 94123
malioto@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

Joseph M. Patane
Law Office of Joseph M. Patane
2280 Union St.
San Francisco, CA 94123
jpatane@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

Garrett D. Blanchfield, Jr.
Mark Reinhardt
Richard Wendorf & Blanchfield
E-1250 First National Bank Building
332 Minnesota St.
St. Paul, MN 55101
g.blanchfield@rwblawfirm.com
mreinhardt@comcast.net
*Counsel for Susan Baxley*

Eric J. Belfi
Murray Frank & Sailer, LLP
275 Madison Avenue
New York, New York 10016
ebelfi@murrayfrank.com
*Counsel for Susan Baxley*

Bruce J. Wecker
Hosie McArthur LLP
1 Market St.
Spear Street Tower
Suite 2200
San Francisco, CA 94105
bwecker@hosielaw.com
*Counsel for Dwight E. Dickerson*

Jeffrey F. Keller
Kathleen R. Scanlan
Elizabeth A. Acevedo
Carey G. Been
Keller Grover LLP
425 Second Street, Suite 500
San Francisco, CA 94107
jfkeller@kellergrover.com
kscanlan@kellergrover.com
eacevedo@kellergrover.com
cbeen@kellergrover.com
*Counsel for Susan Baxley, Steven J. Hamilton,*
*David E. Lipton, Ronald Konieczka, Patricia M.*
*Niehaus, Maria I. Prohias, and Kevin Stoltz*

Steven O. Sidener
Joseph M. Barton
Gold Bennett Cera & Sidener LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
ssidener@gbcslaw.com
jbarton@gbcslaw.com
*Counsel for Plaintiff Jerome Feitelberg*

Roy M. Bell
Jason S. Hartley
Ross, Dixon & Bell LLP
550 West B Street, Suite 400
San Diego, CA 92101
PH: 619-235-4040
rbell@rdblaw.com
jhartley@rdblaw.com
*Counsel for Gabriella Herroeder-Perras*

Hollis L. Salzman
Kellie Safar
Labaton Sucharow & Rudoff LLP
100 Park Avenue
New York, New York 10017
hsalzman@labaton.com
ksafar@labaton.com
*Counsel for Gideon Elliott, Angel Genese and Nir Goldman*

Allan Steyer
D. Scott Macrae
Steyer Lowenthal Boodrookas Alvarez & Smith LLP
One California Street, Suite 300
San Francisco, CA 94111
asteyer@steyerlaw.com
smacrae@bamlawlj.com
*Counsel for Cheryl Glick-Salpeter, Jay Salpeter and Jodi Salpeter*

Susan G. Kupfer, Esq.
Glancy Binkow & Goldberg LLP
455 Market Street, Suite 1810
San Francisco, CA 94104
skupfer@glancylaw.com
*Counsel for Law Offices of Kwasi Asiedu*

Michael Nedelman
Nedelman Pawlak
32000 Northwestern Highway, Suite 240
Farmington Hills, MI 48334
mnedelman@nedelmanpawlak.com
*Counsel for Lee Pines*

## CERTIFICATE OF SERVICE

I, J. Clayton Athey, hereby certify that on this 28th day of April, 2006, I caused the foregoing Consolidated Complaint to be served on the following counsel in the manner stated below:

### VIA ELECTRONIC FILING

Frederick L. Cottrell, III, Esquire
Chad Michael Shandler, Esquire
Steven J. Fineman, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Charles P. Diamond, Esquire
Mark A. Samuels, Esquire
Linda J. Smith, Esquire
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
CDiamond@omm.com
MSamuels@omm.com
lsmith@omm.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Adam L. Balick, Esquire
Bifferato Gentilotti Biden & Balick
711 North King Street
Wilmington, DE 19801-3503
abalick@bgbblaw.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Laurin Grollman, Esquire
Salem M. Katsh, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
lgrollman@kasowitz.com
skatsh@kasowitz.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Richard L. Horwitz, Esquire
W. Harding Drane, Jr., Esquire
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
rhorwitz@potteranderson.com
wdrane@potteranderson.com
*Counsel for Intel Corporation and Intel
Kabushiki Kaisha*

David Mark Balabanian, Esquire
Joy K. Fuyuno, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
david.balabanian@bingham.com
joy.fuyuno@bingham.com
*Counsel for Intel Corporation*

19684.1\302870v1

Christopher B. Hockett, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111
chris.hockett@bingham.com
*Counsel for Intel Corporation*

Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
dfloyd@gibsondunn.com
*Counsel for Intel Corporation*

Robert E. Cooper, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
rcooper@gibsondunn.com
*Counsel for Intel Corporation*

Donald F. Drummond, Esquire
Drummond & Associates
One California Street, Suite 300
San Francisco, CA 94111
ballen@drummondlaw.net
*Counsel for Dressed to Kill Custom Draperies LLC, Jose Juan, Tracy Kinder and Edward Rush*

Darren B. Bernhard, Esquire
Peter E. Moll, Esquire
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Bernhardd@howrey.com
*Counsel for Intel Corporation and Intel Kabushiki Kaisha*

B.J. Wade, Esquire
Glassman Edwards Wade & Wyatt, P.C.
26 N. Second Street
Memphis, TN 38103
bwade@gewwlaw.com
*Counsel for Cory Wiles*

Nancy L. Fineman, Esquire
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA 94010
nfineman@cpsmlaw.com
*Counsel for Trotter-Vogel Realty Inc.*

Robert D. Goldberg, Esquire
Biggs and Battaglia
921 North Orange Street, P.O. Box 1489
Wilmington, DE 19899
goldberg@batlaw.com
*Counsel for Charles Dupraz, Vanessa Z. DeGeorge, Melissa Goeke, Nancy Bjork, James R. Conley, Jeff Vaught, Jim Kidwell Richard Caplan, Virginia Deering, Ficor Acquisition Co. LLC, Tom Hobbs, David Kurzman, Leslie March, Andrew Marcus, Paula Nardella, Bill Richards, Maria Pilar Salgado, Ron Terranova, Nancy Wolft Ryan James Volden and Carl Yamaguchi*

Donald Chidi Amamgbo, Esquire
Amamgbo & Associates, APC
1940 Embarcadero Cove
Oakland, CA 94606
donaldamamgbo@citycom.com
*Counsel for Athan Uwakwe*

Jeffrey F. Keller, Esquire
Jade Butman, Esquire
Law Offices of Jeffrey F. Keller
425 Second Street, Suite 500
San Francisco, CA 94107
jkeller@jfkellerlaw.com
jbutman@kellergrover.com
*Counsel for David E. Lipton, Maria I. Prohias,
Patricia M. Niehaus, Peter Jon Naigow, Ronld
Konieczka, Steve J. Hamilton, Susan Baxley
and Kevin Stoltz*

Gordon Ball, Esquire
Ball & Scott
550 W. Main Ave., Suite 750
Knoxville, TN 37902
gball@ballandscott.com
*Counsel for Andrew Armbrister and Melissa
Armbrister*

Joseph M. Patane, Esquire
Law Offices of Joseph M. Patane
2280 Union Street
San Francisco, CA 94123
jpatane@tatp.com
*Counsel for Karol Juskiewicz and Lawrence
Lang*

James Gordon McMillan, III, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue,
Suite 1400
Wilmington, DE 19801
jmcmillan@bmf-law.com
*Counsel for Raphael Allison and Matthew
Kravitz*

Michele C. Jackson, Esquire
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West, 275 Battery Street,
30th Floor
San Francisco, CA 94111
mjackson@lchb.com
*Counsel for Huston Frazier, Jeanne Cook
Frazier and Brian Weiner*

A. Zachary Naylor, Esquire
Robert Kriner, Jr., Esquire
Robert R. Davis, Esquire
James R. Malone, Jr., Esquire
Chimicles & Tikellis, LLP
One Rodney Square,  P.O. Box 1035
Wilmington, DE 19899
zacharynaylor@chimicles.com
robertkriner@chimicles.com
robertdavis@chimicles.com
jamesmalone@chimicles.com
*Counsel for Gideon Elliott, Angel Genese, Nir
Goldman, Paul C. Czysz, Elizabeth Bruderle
Baran, Carrol Cowan, Russell Dennis, Damon
DiMarco, Kathy Ann Chapman, Caresse
Harms, JWRE Inc., Leonard Lorenzo, Michael
E. Ludt, John Maita, Chrystal Moeller, Robert
J. Rainwater, Mary Reeder, Stuart Schupler
and Sonia Yaco*

Harry Shulman, Esquire
Robert Mills, Esquire
The Mills Law Firm
145 Marina Boulevard
San Rafeal, CA  94901
harry@millslawfirm.com
deepbluesky341@hotmail.com
*Counsel for Stuart Munson*

Ali Oromchian, Esquire
Finkelstein, Thompson & Loughran
601 Montgomery Street, Suite 665
San Francisco, CA 94111
ao@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco,
Carrol Cowan, Leonard Lorenzo and Russell
Dennis*

Douglas A. Millen, Esquire
Steven A. Kanner, Esquire
Much Shelist Freed Denenberg Ament &
Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL  60606
dmillen@muchshelist.com
skanner@muchshelist.com
*Counsel for HP Consulting Services Inc. and
Phillip Boeding*

Vincent J. Esades, Esquire
Muria J. Kruger, Esquire
Marguerite E. O'Brien, Esquire
Heins Mills & Olson, P.L.C.
3550 I.D.S. Center
80 S. Eight Street
Minneapolis, MN  55402
vesades@heinsmills.com
mkruger@heinsmills.com
mobrien@heinsmills.com
*Counsel for Bergerson & Associates Inc.*

Garrett D. Blanchfield, Jr., Esquire
Mark Reinhardt, Esquire
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite E-1250
St. Paul, MN  55101
g.blanchfield@rwblawfirm.com
mreinhardt@comcast.net
*Counsel for Susan Baxley*

Hollis L. Salzman, Esquire
Kellie Safar, Esquire
Goodking Labaton Rudoff & Sucharow, LLP
100 Park Avenue
New York, NY 10017
hsalzman@labaton.com
ksafar@labaton.com
*Counsel for Angel Genese, Gideon Elliott and
Nir Goldman*

R. Bruce McNew, Esquire
Taylor & McNew, LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
mcnew@taylormcnew.com
*Counsel for Robert Marshall*

Jason S. Kilene, Esquire
Daniel E. Gustafson, Esquire
Gustafson Gluek PLLC
650 Northstar East, 608 Second Avenue South
Minneapolis, MN 55402
jkilene@gustafsongluek.com
dgustafson@gustafsongluek.com
*Counsel for Fiarmont Orthopedics & Sports
Medicine PA*

David Boies, III, Esquire
Straus & Boies, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
dboies@straus-boies.com
*Counsel for Dressed to Kill Custom Draperies
LLC, Jose Juan, Edward Rush and Tracy
Kinder*

Lance A. Harke, Esquire
Harke & Clasby
155 S. Miami Avenue
Miami, FL 33130
lharke@harkeclasby.com
*Counsel for Nathaniel Schwartz and Maria I.
Prohias*

Allan Steyer, Esquire
Steyer Lowenthal Boodrookas Alvarez &
Smith LLP
One California Street, Third Floor
San Francisco, CA 94111
asteyer@steyerlaw.com
*Counsel for Cheryl Glick-Salpeter, Jay
Salpeter, Jodi Salpeter and Michael H. Roach*

Bruce J. Wecker, Esquire
Hosie McArthur LLP
One Market Street
Spear Street Tower #2200
San Francisco, CA 94105
bwecker@hosielaw.com
*Counsel for Dwight E. Dickerson*

Mario Nunzio Alioto, Esquire
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123
malioto@tatp.com
*Counsel for Karol Juskiewicz and Lawrence
Lang*

Francis O. Scarpulla, Esquire
Law Offices of Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
foslaw@pacbell.net
*Counsel for Lazio Family Products, Law
Offices of Laurel Stanley, William F. Cronin,
Michael Brauch and Andrew Meimes*

Steven A. Asher, Esquire
Robert S. Kitchenoff, Esquire
Weinstein Kitchenoff & Asher, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
asher@wka-law.com kithenoff@wka-law.com
*Counsel for Joseph Samuel Cone*

Francis A. Bottini, Jr., Esquire
Wolf Haldenstein Adler Freeman & Herz
750 B Street, Suite2770
San Diego, CA  92101
bottini@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Fred Taylor Isquith, Esquire
Adam J. Levitt, Esquire
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave., 11th Floor
New York, NY  10016
isquith@whafh.com
levitt@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Edward A. Wallace, Esquire
The Wexler Firm LLP
One N. LaSalle Street, Suite 2000
Chicago, IL  60602
eawallace@wexlerfirm.com
*Counsel for Peter Jon Naigow*

Jeffrey S. Goddess, Esquire
Rosenthal, Monhait, Gross & Goddess
Mellon Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
jgoddess@rmgglaw.com
*Counsel for Ludy A. Chacon, Joseph Samuel Cone, Darice Russ and Michael K. Simon*

Jason S. Hartley, Esquire
Ross, Dixon & Bell LLP
550 West B Street, Suite 400
San Diego, CA  92101
jhartley@rdblaw.com
*Counsel for Gabriella Herroeder-Perras*

Craig C. Corbitt, Esquire
Zelle, Hofmann, Voelbel, Mason & Gette LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
ccorbitt@zelle.com
*Counsel for William F. Cronin, Law Offices of Laurel Stanley and Lazio Family Products*

Scott E. Chambers, Esquire
Schmittinger & Rodriguez, P.A.
414 S. State Street
P.O. Box 497
Dover, DE  19903
schambers@scbmittrod.com
*Counsel for David Arnold, Andrew S. Cohn,*
*Jason Craig, Maria Griffin, Lena K. Manyin,*
*Paul Ramos and Michael Ruccolo*

Reginald Von Terrell, Esquire
The Terrell Law Group
223 25th Street
Richmond, CA 94804
REGGIET2@aol.com
*Counsel for Athan Uwakwe*

Juden Justice Reed, Esquire
Schubert & Reed LLP
Two Embarcadero Center, Suite 1600
San Francisco, CA  94111
jreed@schubert-reed.com
*Counsel for Patrick J. Hewson*

Natalie Finkelman Bennett, Esquire
Shepherd, Finkelman, Miller & Shah
65 Main Street
Chester, CT  06412-1311
nfinkelman@classactioncounsel.com
*Counsel for Ludy A. Chacon*

VIA U.S. MAIL

Russell M. Aoki, Esquire
Aoki Sakamoto Grant LLP
One Convention Place
701 Pike Street, Suite 1525
Seattle, WA  98101
*Counsel for Kevin Stoltz*

Michael L. Kirby, Esquire
Kirby Noonan Lance & Hoge LLP
One America Plaza
600 West Broadway, Suite 1100
San Diego, CA  92101
mkirby@knlh.com
*Counsel for Justin Suarez*

Richard A. Ripley, Esquire
Bingham McCutchen
1120 20th Street, NW, Suite 800
Washington, DC 20036
richard.ripley@bingham.com
*Counsel for Intel Corporation*

Jeffrey A. Bartos, Esquire
Guerrieri, Edmond, Clayman & Bartos, PC
1625 Massachusetts Avenue, NW
Washington, DC  20036
*Counsel for Jose Juan, Dressed to Kill Custom*
*Draperies, LLC, Tracy Kinder and Edward*
*Rush*

Donald L. Perelman, Esquire
Fine Kaplan & Black, RPC
1835 Market Street, 28th Flr
Philadelphia, PA  19103
dperelman@finekaplan.com
*Counsel for Kevin Stoltz*

Randy R. Renick, Esquire
Law Offices of Randy Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA  91103
rrr@renicklaw.com
*Counsel for Shanghai 1930 Restaurant*
*Partners L.P. and Major League Softball Inc.*

Daniel Hume, Esquire
Kirby McInerney & Squire LLP
830 Third Avenue, 10th Floor
New York, NY 10022
dhume@kmslaw.com
*Counsel for Raphael Allison and Matthew Kravitz*

Daniel B. Allanoff, Esquire
Steven Greenfogel, Esquire
Meredith Cohen Greenfogel & Skirnick, P.C.
22nd Floor, Architects Building
117 S. 17th Street
Philadelphia, PA 19103
dallanoff@mcgslaw.com
sgreenfogel@mcgslaw.com
*Counsel for Benjamin Allanoff*

Scott Ames, Esquire
Serratore & Ames
9595 Wilshire Blvd., Suite 201
Los Angeles, CA 90212
scott@serratoreames.com
*Counsel for Major League Softball, Inc.*

Clerk Michael J. Beck
Clerk, MDL Judicial Panel
One Columbus Circle, N.E.
Room G-255, Federal Judiciary Bldg.
Washington, DC 20002-8004
*Pro Se*

Douglas G. Thompson, Jr., Esquire
Finkelstein, Thompson & Loughran
1050 30th Street N.W.
Washington, DC 20007
dgt@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco, Carrol Cowan, Leonard Lorenzo and Russell Dennis*

Harvey W. Gurland, Esquire
Duane Morris
200 S. Biscayne Blvd., Suite 3400
Miami, FL 33131
*Counsel for Intel Corporation*

J. Clayton Athey (ID#4378)