IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: ) | |
| ) | |
| INTEL CORP. MICROPROCESSOR ) | MDL Docket No. 05-MD-1717-JJF |
| ANTITRUST LITIGATION ) | |
| ) | |
| PHIL PAUL, on behalf of himself and all ) | |
| others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 05-485-JJF |
| ) | |
| v. ) | CONSOLIDATED ACTION |
| ) | |
| INTEL CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**CONSOLIDATED COMPLAINT**

James L. Holzman (DE Bar # 663)
David W. Gregory (DE Bar #4408)
PRICKETT, JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6500
jlholzman@prickett.com dwgregory@prickett.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
mhausfeld@cmht.com dsmall@cmht.com
blandau@cmht.com abaker@cmht.com

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA  94104
mplehmann@furth.com tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony Shapiro
Craig R. Spiegel
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111
guido@saveri.com
rick@saveri.com
*Co-Lead and Interim Counsel for Plaintiffs*

**TABLE OF CONTENTS**

**PAGE**

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE .........................................................................3

III.    PARTIES .............................................................................................................4

IV.     CLASS ALLEGATIONS ....................................................................................6

V.      FACTUAL BACKGROUND                                                                          9

    A.      Early History...........................................................................................9

    B.      AMD Moves from Second Source to Innovator .................................12

VI.     THE x86 PROCESSOR INDUSTRY                                                           14

    A.      Competitive Landscape.........................................................................14

    B.      Customers for x86 Microprocessors ...................................................15

VII.    INTEL'S UNLAWFUL PRACTICES                                                          18

    1.      Practices Directed At OEMs ................................................................19

        a.      Exclusive and Near-Exclusive Deals ...........................................19

        b.      Product-Line, Channel or Geographic Restrictions ......................22

        c.      Exclusionary Rebates....................................................................25

        d.      Threats of Retaliation....................................................................30

        e.      Interference with AMD Product Launches ...................................31

        f.      Product Bundling ..........................................................................33

    2.      Practices Directed At Distributors .......................................................34

    3.      Practices Directed At Retailers ............................................................36

    4.      Intel's Standard Setting and Other Technical Abuses .............................39

        a.      Intel's Exclusion of AMD from Industry Standards.....................39

        b.      Intel's Promotion of Industry Standards that
                Disadvantage AMD ......................................................................41

        c.      Intel's Leveraging of Its Other Product Lines to
                Unfairly Disadvantage AMD in the Marketplace.........................43

VIII.   EFFECTS OF INTEL'S MISCONDUCT ........................................................44

IX.     CLAIMS FOR RELIEF ...............................................................................46

        FIRST CLAIM FOR RELIEF
        (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1) .................................45

        SECOND CLAIM FOR RELIEF
        (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2) .................................47

        THIRD CLAIM FOR RELIEF
        (Violation of the California Cartwright Act) ..........................................................48

        FOURTH CLAIM FOR RELIEF
        (Violation of California's Tort Law Against Monopolization) .............................49

        FIFTH CLAIM FOR RELIEF
        (Violation of the California Unfair Competition Law) .........................................50

        SIXTH CLAIM FOR RELIEF
        (Violations of State Antitrust and Restraint of Trade Laws) ................................52

        SEVENTH CLAIM FOR RELIEF
        (Violations of State Consumer Protection and Unfair Competition Laws) ...........53

        EIGHTH CLAIM FOR RELIEF
        (Unjust Enrichment and Disgorgement of Profits) ................................................54

X.      DEMAND FOR TRIAL BY JURY .................................................................53

XI.     PRAYER FOR RELIEF ................................................................................53

001862-16  104874 V1

Plaintiffs, by and through their counsel, on behalf of themselves and all others similarly situated, bring this action against Intel Corporation ("Intel") for damages and injunctive relief, and demand trial by jury.  In this Consolidated Complaint ("Complaint"), Plaintiffs allege:

## I.    NATURE OF THE ACTION

1.    Intel holds a monopoly in a market critical to our economy:  microprocessors that run the Microsoft Windows and Linux families of operating systems (the "x86 Microprocessor Market").  Intel dominates the x86 Microprocessor Market, with a market share greater than 80 percent measured by unit volume and greater than 90 percent measured by revenue.  It has engaged in a series of anticompetitive acts that were designed to, and did, stifle and eliminate competition in, and prevent entry into, the x86 Microprocessor Market.  These anticompetitive acts have foreclosed consumer choice and allowed Intel to charge inflated prices for its products.

2.    For over a decade Intel has unlawfully maintained its monopoly by engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with Intel's major competitor, Advanced Micro Devices, Inc. ("AMD").  Among other things:

- Intel has forced major customers into exclusive or near-exclusive deals.

- Intel has conditioned rebates, allowances and market development funding on customers' agreement to severely limit or forgo entirely purchases from AMD.

- Intel has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD and others.

- Intel has threatened retaliation against customers introducing AMD computer platforms, particularly in strategic market segments.

- Intel has established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice.

- Intel has forced PC makers and technology partners to boycott AMD product launches and promotions.

- Intel has abused its market power by forcing on the industry technical standards and products that have as their central purpose the handicapping of AMD and others in the marketplace.

3.     Intel's economic coercion of customers extends to all levels – from large computer-makers like Hewlett-Packard and IBM to small system-builders to wholesale distributors to retailers such as Circuit City.  All face the same choice:  accept conditions that exclude AMD's products or suffer discriminatory pricing and competitively crippling treatment. In this way, Intel has avoided fair competition and precluded AMD and others of the opportunity to stake their prices and quality against Intel's for every potential microprocessor sale and thus has damaged purchasers of computers by eliminating competition both as to quality and price.

4.     Intel's conduct has become increasingly egregious over the past several years as AMD has achieved technological leadership in critical aspects of microprocessor architecture.  In April 2003, AMD introduced its Opteron microprocessor, the first microprocessor to take x86 computing from 32 bits to 64 bits – an advance that allows computer applications to address exponentially more memory, thereby increasing performance and enabling features not possible with just 32 bits.  Unlike Intel's 64-bit architecture of the time (Itanium), the AMD Opteron and its subsequently-introduced desktop cousin, the AMD Athlon64, offer backward compatibility, allowing PC users to continue using 32-bit software as, over time, they upgrade their hardware. Bested in a technology duel as to which it long claimed leadership, and subject to losing market share and price control, Intel increased exploitation of its market power to pressure customers to refrain from migrating to AMD's superior, lower-cost microprocessors.

5.     Intel's conduct has unfairly and artificially capped AMD's market share, and constrained AMD from expanding to reach the minimum efficient levels of scale necessary to compete with Intel as a predominant supplier to major customers.  As a result, computer manufacturers continue to buy most of their requirements from Intel, continue to pay monopoly

prices, continue to be exposed to Intel's economic coercion, and continue to submit to artificial limits Intel places on their purchases from AMD.  With AMD's opportunity to compete thus constrained, the cycle continues, and Intel's monopoly profits continue to flow.

6.      Consumers ultimately foot this bill, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs.  Society is worse off for lack of innovation that only a truly competitive market can drive.  The Japanese Government recognized these competitive harms when on March 8, 2005, its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned for its exclusionary misconduct directed at AMD.  Intel chose not to contest the charges.

7.      Plaintiffs, on their own behalf and on behalf of the class defined below, seek to recover for the injuries to their business or property resulting from overpayments for Intel microprocessors.  Plaintiffs also seek injunctive relief and costs, including reasonable attorneys' fees.

## II.      JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the defendant.

9.      Venue is proper because Intel Corporation resides, is found, has agents and transacts business in this district as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

### III.    PARTIES

10.     Within four years preceding June 28, 2005, each plaintiff purchased, in the United States and not for resale, one or more Intel x86 microprocessors or computers with Intel x86 microprocessors and suffered injury as a result of Intel's illegal conduct described in this Complaint.

11.     Plaintiff Benjamin J. Allanoff is a resident of Topanga, California.

12.     Plaintiff Raphael Allison is a resident of Brooklyn, New York.

13.     Plaintiff David Arnold is a resident of Coral Gables, Florida.

14.     Plaintiff Elizabeth Bruderle Baran is a resident of the County of Milwaukee, Wisconsin.

15.     Plaintiff Michael Brauch is a resident of San Francisco, California.

16.     Plaintiff Ludy Chacon is a resident of Pompano Beach Florida.

17.     Plaintiff Joseph Samuel Cone is a resident of Greensboro, North Carolina.

18.     Plaintiff Carrol Cowan is a resident of the District of Columbia.

19.     Plaintiff William F. Cronin is a resident of Dallas, Texas.

20.     Plaintiff Paul C. Czysz is a resident of the County of Somerset, New Jersey.

21.     Plaintiff Russell Dennis is a resident of Chittenden County, Vermont.

22.     Plaintiff Damon DiMarco is a resident of the State of New York.

23.     Plaintiff Gideon Elliott is a resident of the County of Santa Fe, New Mexico.

24.     Plaintiffs Huston Frazier and Jeanne Cook Frazier are residents of Napa County, California.

25.     Plaintiff Angel Genese is a resident of the County of Passaic, New Jersey.

26.     Plaintiff Cheryl Glick-Salpeter is a resident of Glen Cove, New York.

27.     Plaintiff Nir Goldman is a resident of the County of Alameda, California.

28.     Plaintiff Steven J. Hamilton is a resident of Sumner, Washington.

29.     Plaintiff Patrick J. Hewson is a resident of Carbondale, Illinois.

30.     Plaintiff Karol Juskiewicz is a resident of Fairfield, California

001862-16  104874 V1

31.    Plaintiff Ronald Konieczka is a resident of Cincinnati, Ohio.

32.    Plaintiff Henry Kornegay is a resident of Billings, Montana.

33.    Plaintiff Matthew Kravitz is a resident of Wilmington, Delaware.

34.    Plaintiff Lawrence Lang is a resident of Tiburon, California.

35.    Plaintiff David E. Lipton is a resident of Richmond, California.

36.    Plaintiff Leonard Lorenzo is a resident of Hillsborough County, Florida.

37.    Plaintiff Andrew Meimes is a resident of New York City, New York.

38.    Plaintiff Peter Jon Naigow is a resident of Brown Deer, Wisconsin.

39.    Plaintiff Patricia M. Niehaus is a resident of Ft. Mitchell, Kentucky.

40.    Plaintiff Phil Paul is a resident of Cherry Hill, New Jersey.

41.    Plaintiff Maria I. Prohias is a resident of, Miami, Florida.

42.    Plaintiff Paul Ramos is a resident of Miami, Florida.

43.    Plaintiff Michael Roach is a resident of Coronado, California.

44.    Plaintiff Michael Ruccolo is a resident of Palm Beach Gardens, Florida.

45.    Plaintiff Darice Russ is a resident of Milwaukee Wisconsin.

46.    Plaintiff Jodi Salpeter is a resident of Whitestone, New York.  Jay Salpeter, father of Jodi, is a resident of Glen Cove, New York, and paid for the laptop computer purchased by Jodi.

47.    Plaintiff Nathaniel Schwartz is a resident of Miami, Florida.

48.    Plaintiff Michael K. Simon is a resident of Rydal, Pennsylvania.

49.    Plaintiff Francis H. Slattery, IV, is a resident of Audobon, New Jersey.

50.    Plaintiff Kevin Stoltz is a resident of Mukilteo, Washington.

51.    Plaintiff Dana F. Thibedeau is a resident of Middleton, Massachusetts.

52.    Plaintiff Ian Walker is a resident of the County of San Francisco, California.

53.    Plaintiff Robin S. Weeth is a resident of La Crosse, Wisconsin.

54.    Plaintiff Brian Weiner is a resident of New York, New York.

001862-16  104874 V1

55.     Plaintiff Bergerson & Associates, Inc. is a Minnesota company with its principal place of business in Burnsville, Minnesota.

56.     Plaintiff Fairmont Orthopedics & Sports Medicine, P.A. has its place of business in Fairmont, Minnesota.

57.     Plaintiff Law Offices of Laurel Stanley is a California business entity located in Oakland, California.

58.     Plaintiff Marshall Realty has its principal place of business in San Bruno, California.

59.     Plaintiff Melinda Harr, D.D.S., P.C. has its place of business in Fargo, North Dakota.

60.     Plaintiff The Harman Press is a business located in Los Angeles, California.

61.     Plaintiff Trotter-Vogel Realty, Inc. dba Prudential California Realty is an independently owned and operated member of Prudential Real Estate Affiliates, Inc., with its principal place of business in San Bruno, California.

## IV.    CLASS ALLEGATIONS

62.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on their own behalf and on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who from June 28, 2001 through the present, purchased a microprocessor that executes the x86 instruction set in the United States, other than for resale, indirectly from the Defendant or any controlled subsidiary or affiliate of Defendant. The Class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

63.     In the event California law is not applied to the claims of all Class members for damages regardless of where they reside, Plaintiffs will seek certification of the following subclass (the "Subclass") under Rule 23(b)(3) for damages, in addition to certification of the Class under rule 23(b)(2) for purposes of injunctive relief:

001862-16 104874 V1

> All persons and entities residing in the United States who from
> June 28, 2001 through the present, purchased a microprocessor that
> executes the x86 instruction set in one of the Included States, other
> than for resale, indirectly from the Defendant or any controlled
> subsidiary or affiliate of Defendant.  The Class excludes the
> Defendant; the officers, directors or employees of the Defendant;
> and any subsidiary, affiliate or other entity in which Defendant has
> a controlling interest.  The Class also excludes all federal, state or
> local governmental entities, all judicial officers presiding over this
> action and their immediate family members and staff, and any
> juror assigned to this action.

64.    For purposes of the Subclass, the "Included States" are Alaska, Arizona,

Arkansas, California, the District of Columbia, Florida, Idaho, Iowa, Kansas, Louisiana, Maine,

Massachusetts, Michigan, Montana, Minnesota, Mississippi, Montana, Nebraska, Nevada, New

Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island,

South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

65.    Plaintiffs do not know the exact number of Class members because such

information is in the exclusive control of Intel and third parties.  However, due to the nature of

the trade and commerce involved, Plaintiffs believe that the members of the Class number in the

thousands and are geographically diverse so that joinder of all members of the Class is

impracticable.  Fed. R. Civ. P. 23(a)(1).

66.    There are questions of law and fact common to the Class, including but not

limited to the following:

a.    whether Intel engaged in anticompetitive conduct that renders it liable to
the Class under state antitrust and consumer protection laws;

b.    whether Intel possessed monopoly power in the relevant market;

c.    whether Intel acquired or maintained monopoly power within the relevant
market through anticompetitive activity;

d.    whether Intel's unlawful conduct has caused legally cognizable injury to
Plaintiffs and the Class by enabling Intel to increase, maintain, or stabilize
above competitive levels the prices that Plaintiffs and Class members have
paid for x86 microprocessors, and if so, the appropriate class-wide
measure of damages;

e.    whether Intel formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of, or allocate the market for, microprocessors;

f.    whether the combination or conspiracy caused microprocessor prices to be higher than they would have been in the absence of Intel's conduct;

g.    the operative time period of the combination or conspiracy;

h.    whether Intel's conduct caused injury to the business or property of Plaintiffs and the members of the Class;

i.    the appropriate measure of the amount of damages suffered by the Class;

j.    whether Intel violated Section 1 of the Sherman Act;

k.    whether Intel violated Section 2 of the Sherman Act;

l.    whether Intel violated Sections 16720 and 17200 of the California Business and Professions Code; and

m.    whether Intel violated the antitrust, unfair competition, and consumer protection laws of the other states as alleged below.

67.    These common questions and others predominate over questions, if any, that affect only individual members of the Class.  Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

68.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members.  Plaintiffs, by advancing their claims, will also advance the claims of all members of the Class because Intel participated in activity that caused members of the Class to suffer similar injury.  Fed. R. Civ. P. 23(a)(3).

69.    Plaintiffs and their counsel will fairly and adequately protect the interests of absent Class members.  There are no material conflicts between Plaintiffs' claims and those of absent Class members that would make class certification inappropriate.  Counsel for Plaintiffs are experienced in complex class action litigation, including litigation involving antitrust allegations, and will vigorously assert Plaintiffs' claims and those of the members of the Class. Fed. R. Civ. P. 23(a)(4).

70.     Intel has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

71.     A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.  Fed. R. Civ. P. 23(b)(3).  The damages suffered by each Plaintiff and Class member are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent class certification, it would not be feasible for Plaintiffs and Class members to redress the wrongs done to them.  Even if Plaintiffs and the Class members could afford individual litigation, which is not the case, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## V.     FACTUAL BACKGROUND

### A.     Early History

72.     The brain of every computer is a general-purpose microprocessor, an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed.  A microprocessor is defined by its instruction set – the repertoire of machine language instructions that a computer can follow.  So, too, are computer operating systems, which are software programs that perform the instructions in the set allowing the computer to perform meaningful tasks.  The first generation of microprocessors, which were capable of handling 4 bits and later 8 bits of data simultaneously, evolved to provide 16-bit capability (the original DOS processors), then 32-bit capability (allowing the use of advanced graphical interfaces such as later versions of Windows), and now 64-bit capability.

73.     When IBM defined the original PC standards in the early 1980s, it had available to it a variety of microprocessors, each with its own instruction set. Among these were microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and AMD. IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.*, 80*86,* 801*86*, 802*86*, 803*86*), and a compatible operating system offered by Microsoft, known as DOS. Unwilling to be consigned to a single source of supply, however, IBM demanded that Intel contract with another integrated circuit company and license it to manufacture x86 chips as a second source. AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its own, competing architecture, and it undertook to manufacture x86 chips as a second source of supply. Assured that it would not be dependent upon a monopoly supplier of x86 chips, IBM introduced the PC in August 1981 – and its sales exploded.

74.     Although an arbitrator later found that "AMD's sponsorship helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement") by which each would serve as a second source for products developed by the other. For example, Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip. Instead, in a "deliberate[]" effort "to shackle AMD progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable and deliberately unusable by AMD engineers." The conduct was, in the arbitrator's words, "inexcusable and unworthy." And it was not isolated. Intel elsewhere tried to "sabotage" AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to use all of its economic force and power on a smaller competitor to have its way."

75.     In another underhanded effort to stifle AMD's business, Intel decided in 1984 that it would become the sole source for the promising 80386 chip, notwithstanding the Agreement. To fully realize its objective, Intel engaged in an elaborate and insidious scheme to mislead AMD (and the public) into erroneously believing that AMD would be a second source, thereby

001862-16  104874 V1

keeping AMD in the Intel "competitive camp" for years. This duplicitous strategy served a broader purpose than simply preventing AMD from competing with Intel. Customers' perception that AMD would continue to serve as Intel's authorized second source was essential to Intel's aim of entrenching the x86 family of microprocessors as the industry standard (as it had been essential to IBM's original introduction of the PC). Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources. Intel could not preserve the appearance that AMD would second source the 386 if it terminated the Agreement or otherwise disclosed its intent. Thus, Intel stalled negotiations over product exchanges, while at the same time allowing AMD to believe that it could ultimately obtain the 386. This injured competition by deterring and impeding serious competitive challenges to Intel and directly injured AMD by depriving it of the revenues and profits it would have earned from such a challenge.

76.     Intel implemented this secret plan for the purpose of acquiring and maintaining an illegal monopoly in the x86 line of microprocessors, which it did by at least 1987. As was its plan, Intel's conduct drained AMD's resources, delayed AMD's ability to reverse-engineer or otherwise develop and manufacture competitive products, and deterred AMD from pursuing relationships with other firms. In so doing, Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of the x86 line of microprocessors and related peripherals and secured the benefit of substantial competitively sensitive AMD information regarding its product development plans. When AMD petitioned to compel arbitration in 1987 for Intel's breach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to effectively remove AMD as a competitor."

77.     In 1992, after five years of litigation, the arbitrator awarded AMD more than $10 million plus prejudgment interest and a permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86

instruction set.  Confirmation of the award was upheld by the California Supreme Court two years later.  In bringing the litigation to a close, the arbitrator hoped that by his decision, "the competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices."  Not for the first time, and certainly not for the last, Intel's anticompetitive zeal was woefully underestimated.

**B.     AMD Moves from Second Source to Innovator**

78.     Shortly after confirmation of the award, AMD settled its outstanding disputes with Intel in a 1995 agreement that gave AMD a shared interest in the x86 instruction set but required it to develop its own architecture to implement those instructions.  The settlement had the unintended benefit of forcing AMD to reinvent itself.  Beginning in the late 1990s, AMD committed its resources to innovating, not just to be different, but rather to deliver solutions of greatest benefit to its customers.  Going its own way proved beneficial:  AMD's first x86 chip without Intel pin-compatibility, the Athlon microprocessor delivered in 1999, marked the first (but not last) time AMD was to leapfrog Intel technologically and beat it to market with a new generation Windows microprocessor (and break the 1GHz speed barrier to boot).

79.     But AMD's biggest breakthrough came four years later when it introduced an extension of x86 architecture that took Windows processors into the realm of 64-bit computing.  Unlike Intel, which invested billions in its Itanium microprocessor and a new, uniquely 64-bit proprietary instruction set (which, because it was proprietary, would have been a game-ending development for AMD had it become the industry standard), AMD undertook to supplement the x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run as well.  AMD's efforts culminated when, in April 2003, it brought to market its Opteron microprocessor for servers (the workhorse computers used by businesses to run corporate networks, e-commerce websites and other high-end, computationally-intense applications).  Opteron was the industry's first x86 backward-compatible, 64-bit chip.  Six months later, AMD launched the Athlon64, a backward-compatible, 64-bit microprocessor for desktops and mobile computers.

80.    The computing industry hailed AMD's introduction of 64-bit computing as an engineering triumph.  Said *Infoworld* in its August 27, 2004, issue:

> You just gotta love a Cinderella story. . . .  AMD's rapid rise from startup to $5 billion semiconductor powerhouse is, as Humphrey Bogart's English teacher once said, the stuff of which dreams are made. . . .  In the process, AMD has become known as the company that kept Intel honest, the Linux of the semiconductor world. . . .  After decades of aping Intel architectures, the AMD64 architecture, rooted in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-bit version of Xeon.  In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server market that the Intel Itanium was supposed to dominate.

In what represented a paradigm shift in the microprocessor world, Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it.  As noted by *Infoworld*, Intel then copied AMD's technology for its own 64-bit offerings – an event that poignantly marked AMD's technological emergence.  Intel has yet to catch up.

81.    AMD has since extended its AMD64 technology to the balance of AMD's microprocessor lineup (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile AMD Athlon 64, AMD Sempron, and AMD Turion 64 products).  Owing also to AMD's pioneering developments in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has seized technological leadership in the microprocessor industry.  Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named "Processor Company of 2005" at, to Intel's embarrassment, an Intel-sponsored industry awards show.

82.    Tellingly, AMD's market share has not kept pace with its technical leadership.  Intel's misconduct is the reason.  Intel has unlawfully maintained the monopoly IBM bestowed on it and systematically excluded AMD from any meaningful opportunity to compete for market share by:  preventing the companies that buy chips and build computers from freely deploying AMD processors; relegating AMD to the low-end of the market; preventing AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to

- 13 -

Intel; and erecting impediments to AMD's ability to increase its productive capacity for the next generation of AMD's state of the art microprocessors. Intel's exclusionary acts and the resulting impact on members of the proposed Class are the subject of the balance of this Complaint.

## VI.    THE X86 PROCESSOR INDUSTRY

### A.    Competitive Landscape

83.    The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run the x86 instruction set. This has given Intel effective ownership of personal computing. Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

84.    The relevant product market is x86 microprocessors because a putative monopolist in this market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable. While existing end-users can theoretically shift to other operating system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 processors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

85.    The relevant geographic market for x86 microprocessors is worldwide. Intel and AMD compete globally; PC platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one

country than another. Indeed, in its July 1998 answer to a complaint by the Federal Trade Commission, Intel admitted that the relevant geographic market is the world.

86.    Intel dominates the worldwide x86 Microprocessor Market. According to published reports, over the past several years it has consistently achieved more than a 90% market share as measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to less than 1%. Intel has captured at least 80% of x86 microprocessor unit sales in seven of the last eight years. Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating barely the 20% level. The following chart is illustrative:

### x86 Worldwide CPU Unit Market Share

|        | 1997  | 1998  | 1999  | 2000  | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|-------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2% | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 16.7% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1%  | 1.1%  | 1.4%  | 1.7%  | 1.7%  |

87.    Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD. National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later. At the beginning of this year only two other x86 chip makers remained, Via Technologies, Inc. and Transmeta Corporation, which together account for less than 2% of the market. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its market share to a sustaining level.

88.    Intel is shielded from new competition by huge barriers to entry. A chip fabrication plant capable of efficiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion. In addition, a new entrant needs the financial wherewithal to underwrite billions more in research and development costs to design a competing x86 microprocessor and overcome almost insurmountable intellectual property and knowledge barriers.

## B.    Customers for x86 Microprocessors

89.    Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow fifty percent by the end of the decade.

Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices.  Most x86 microprocessors are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobile PCs by a margin of three to one.  Of the total worldwide production of computers powered by x86 microprocessors, 32% are sold to U.S. consumers.  U.S. sales of AMD-powered computers account for 29% of AMD's production.

90.     The majority of x86 microprocessors are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers.  Regarded by the industry as "Tier One" OEMs over most product categories are:  Hewlett-Packard ("HP"), which now owns Compaq Computer; Dell, Inc.; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens, a Europe-based joint venture.  Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the mobile PC segment of the PC market.  HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile PC sales, and almost 60% of worldwide server sales.  Both are U.S.-based companies, as are IBM and Gateway/eMachines, and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

91.     Worldwide, Tier One OEMs account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PCs.  According to industry publications, unit market share in 2004 among the Tier One OEMs were as follows:

### OEM Market Shares – 2004

| Company | Server/WS | Desktop | Mobile |
| --- | --- | --- | --- |
| Hewlett-Packard | 29.86% | .69% | .23% |
| IBM/Lenovo | 28.34% | 16.18% | 17.27% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |

| Toshiba | 0.31% | 0.05% | 12.73% |
|---|---|---|---|
| NEC | 2.06% | 2.02% | 4.50% |
| Sony | — | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

92.     The balance of x86 production is sold to smaller system builders and independent distributors.  The latter, sell to smaller OEMs, regional computer assemblers, value-added resellers and other, smaller distributors.  Currently, distributors account for over half of AMD's sales.

93.     OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers).  With the exception of Dell, which markets to consumers only directly (mostly over the internet), most OEMs also sell through retail chains.  Intel and AMD compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

94.     Through its economic muscle and relentless marketing – principally its *"Intel Inside"* and *"Centrino"* programs, which financially reward OEMs for branding their PCs as Intel machines – Intel has transformed the OEM world.  Once innovative companies themselves, the OEMs have largely become undifferentiated distributors of the Intel platform, offering "*Intel Inside*" and *"Centrino"* computers largely indistinguishable from those of their rivals.  As their products have become commoditized, the Tier One OEMs operate on small or negative margins, and, as shown in the following chart, the overwhelming portion of PC profit flows to Intel.

- 17 -

**Operating Margins 2001-04 – Intel vs. OEMs**



95.    This profit drain has left OEMs and others in the distribution chain in a quarter-to-quarter struggle to eke out even a modest return on their assets, thereby making them continually susceptible to Intel's economic coercion, which is described next.

## VII.    INTEL'S UNLAWFUL PRACTICES

96.    Intel has maintained its x86 microprocessor monopoly by deploying a host of financial and other exclusionary business strategies that in effect limit its customers' ability and/or incentive to deal with AMD.  Although differing from customer to customer and segment to segment, the Intel arsenal includes direct payments in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer "loyalty" that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those who give, or even contemplate giving, too much of their business to AMD, or who refuse to limit their AMD business to Intel-approved models, brands, lines and/or sectors, or who cooperate too closely with AMD's promotion of its competitive processors; and misuse of industry standards-setting processes so as to disadvantage AMD products in the marketplace.

97.    Intel's misconduct is global.  It has targeted both U.S. and offshore customers at all levels to prevent AMD from building market share anywhere, with the goal of keeping AMD small and keeping Intel's customers dependent on Intel for very substantial amounts of product.

In this way, OEMs remain vulnerable to continual threats of Intel retaliation, AMD remains capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its economic hold over them, allowing it to continue to demand that customers curtail their dealings with AMD.  And the cycle repeats itself:  by unlawfully exploiting its existing market share, Intel is impeding competitive growth of AMD, thereby laying the foundation for the next round of foreclosing actions with the effect that AMD's ability to benefit from its current technological advances is curtailed to the harm of potential customers and consumers.

98.    The following is not intended as an exhaustive catalog of Intel's misconduct, or a complete list of its unlawful acts, but only as examples of the types of improper exclusionary practices that Intel has employed.

### 1.    Practices Directed At OEMs

#### a.    Exclusive and Near-Exclusive Deals

99.    **Dell**.  In its history, Dell has not purchased a single AMD x86 microprocessor despite acknowledging Intel shortcomings and customer clamor for AMD solutions, principally in the server sector.  As Dell's President and CEO, Kevin Rollins, said publicly last February:

> Whenever one of our partners slips on either the economics or technology, that causes us great concern. . . .  For a while, Intel admittedly slipped technologically and AMD had made a step forward.  We were seeing that in customer response and requests.

100.    Nonetheless, Dell has been and remains Intel-exclusive.  According to industry reports, Intel has bought Dell's exclusivity with outright payments and favorable discriminatory pricing and service.  In discussions about buying from AMD, Dell executives have frankly conceded that they must financially account for Intel retribution in negotiating pricing from AMD.

101.    **Sony**.  With the introduction of its Athlon microprocessor in 1999, AMD began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs internation-ally, including into the U.S.  By the end of 2002, AMD had achieved an overall Japanese unit market share of approximately 22%.  To reverse the erosion of its business, in 2003 Intel paid

- 19 -

Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop and mobile PCs. As a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Sony.

102.    **Toshiba**. Like Sony, Toshiba was once a significant AMD customer, but also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to use AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that Intel's financial inducements amounted to "cocaine," but said they were hooked because reengaging with AMD would jeopardize Intel market development funds estimated to be worth $25-30 million per quarter. Toshiba made clear to AMD that the tens of millions of dollars of additional marketing support was provided by Intel on the explicit condition that Toshiba could not use AMD microprocessors. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Toshiba.

103.    **NEC**. AMD also enjoyed early success with NEC, capturing nearly 40% of its microprocessor purchases for desktop and mobile PCs in the first quarter of 2002. In May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel at least 90% of NEC's business in Japan, and they established an overall worldwide quota on NEC's AMD dealings. The impact was immediate. While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, AMD's share quickly plummeted after the payments to virtually zero in the first quarter of 2003. NEC has made clear to AMD that AMD's Japanese share must stay in the single digits pursuant to NEC's agreement with Intel. Worldwide, AMD's share dipped from nearly 40% to around 15%, where it stands today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to NEC.

104.   **Fujitsu**.  In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website.  Fujitsu complied by making any potential AMD-buyer click past Intel products to get to the AMD offerings.  Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business.  Intel offered an undisclosed package of financial incentives in return for Fujitsu's agreement to restrict its dealings with AMD.  Fujitsu's catalog currently limits AMD to a single notebook product.  In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Fujitsu.

105.   **Hitachi**.  According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer.  The agreement caused AMD's Hitachi business to fall precipitously.  For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter.  But by the middle of the year, AMD sold no microprocessors to Hitachi at all.  In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi.

106.   **Gateway/eMachines**.  From 2001 to 2004, Gateway was exclusively Intel.  In 2001 former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large sums not to deal with AMD, which he could not refuse:  "I have to find a way back to profitability.  If by dropping you, I become profitable, that is what I will do."  Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release announcing its Intel exclusivity.  The announcement came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron.

107.   **Supermicro**.  Intel's exclusive dealing also extends to small, specialty OEMs of which Supermicro is a good example.  Supermicro, the preeminent system assembler for servers and other high-end computers, historically has followed the Dell strategy of never buying from AMD.  This arrangement foreclosed AMD from a large part of the approximately one fifth of the server sector not controlled by the Tier One OEMs.  Following two years of negotiation, Supermicro finally agreed last year to begin developing an Opteron-powered server, but it so

feared Intel retaliation that it secretly moved the AMD development to quarters behind its main manufacturing facility.  Further, it forbade AMD from publicizing the product or beginning any marketing prior to its actual release.  When Supermicro finally broke away from years of Intel exclusivity in April 2005, it restricted distribution of its newly-released Opteron-powered product to only sixty of its customers and promoted it with a glossy, upscale brochure devoid of its name and labeled "secret and confidential".

### b.    Product-Line, Channel or Geographic Restrictions

108.    Intel has also bought more exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel.  For example, in exchange for discriminatory discounts, subsidies or payments, Intel has largely foreclosed AMD from the lucrative commercial desktop sector.  Intel has focused on the major OEMs because when IT executives from Fortune 1000 companies purchase desktop computers, they look for a strong brand on the box – Dell, IBM or HP.  Knowing this, Intel has relentlessly fought to block the introduction of an AMD-powered commercial desktop by the major OEMs that have not ceded total exclusivity to Intel.  What follows are only representative examples of Intel misconduct.

109.    **HP**.  In 2002, when AMD set out to earn a place in HP's commercial desktop product roadmap, HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation.  Eager to break into the commercial market and to earn a place in HP's successful "Evo" product line, AMD agreed instead to provide HP with the first million microprocessors for free in an effort to overcome Intel's financial hold over HP.  On the eve of the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's commercial line a "Richter 10" event.  Intel immediately pressured HP into (1) withdrawing the AMD offering from its premier "Evo" brand and (2) withholding the AMD-powered computer from HP's network of independent value-added resellers, HP's principal point of access to small business users for whom the PC was designed in the first place.  Intel went so far as to pressure HP's senior management to consider firing the HP executive who spearheaded the AMD

commercial desktop proposal.  As a result of Intel's coercion, the HP-AMD desktop offering was dead on arrival.  HP ended up taking only 160,000 of the million microprocessors AMD offered for free.  As of today, HP's AMD-equipped commercial desktops remain channel-restricted, and AMD's share of this business remains insignificant.

110.    Intel also purchased HP's exclusivity for its most popular notebook line.  HP captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1-inch display notebook (the DV 1000) with a popular power saving feature called Quick Play.  When AMD sought to convince HP to carry a similar AMD-powered notebook, HP declined.  It explained that Intel had paid between $3 and $4 million to lock up this product line for at least one year.

111.    **Gateway**.  After Gateway's 2004 merger with eMachines, AMD attempted to revive the relationship it had enjoyed with Gateway until 2001 but experienced extremely limited success.  While Gateway built one AMD-powered desktop model at the request of Circuit City, AMD remains locked out entirely of Gateway's direct internet sales, its commercial offerings and its server line.  According to Gateway executives, Gateway has paid a high price for even its limited AMD dealings.  They claim that Intel has beaten them into "guacamole" in retaliation.

112.    **IBM**.  AMD and IBM began negotiations in August 2000 over a proposed commercial PC business partnership.  After seven months and with a deal nearing completion, Intel approached IBM with an incentive-based program under which Intel would become IBM's "preferred supplier" for processors in commercial products.  "Preferred" meant exclusive.  IBM accepted Intel's proposal and terminated discussions with AMD.  In return for that exclusivity, according to IBM executive Ed Thum, Intel paid IBM "millions of dollars in market develop-ment funds."

113.    Intel also acted to thwart AMD efforts to partner with IBM on servers.  Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server chip in April 2003 – signaling to the industry and IT professionals its confidence in the product – Intel soon dissuaded IBM from aggressively marketing Opteron servers.  After investing heavily in its design, IBM consigned its one Opteron computer model to a single target market segment (High

- 23 -

Performance and Technical Computing). This was done, according to an industry report that was confirmed by an IBM executive, because Intel paid IBM to shelve any further Opteron development. IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron server it had already designed and previewed with customers.

114.    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its "ThinkCentre" roadmap, IBM executives explained that the move would cost them important Intel subsidies, and they declined.

115.    **Fujitsu**. In 2002, Fujitsu and AMD formed an alliance to develop a low-power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2003, on which AMD spent over 20 million yen designing. Shortly before the launch, Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line.

116.    **Fujitsu-Siemens**. Fujitsu-Siemens, a European joint-venture, was once a mainstay for AMD's desktop business, with AMD chips powering over 30% of Fujitsu-Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its AMD computers on its website and removing all references to commercial AMD-powered products in the company's retail catalog.

117.    Intel has also succeeded in convincing Fujitsu-Siemens to impose market restrictions on its AMD-powered PCs. Its parent, Fujitsu, sells an AMD-equipped Lifebook

S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the European market as well. Similarly, Fujitsu-Siemens designed the FMC Lifebook MG Series notebook for the European market, but it refused to offer that computer in Asia or North America. Finally, although Fujitsu-Siemens produces an AMD-equipped commercial desktop, the Scenico, it refuses to advertise it on its website, offering it instead only as a build-to-order product. Having invested significantly to bring these computers to market, Fujitsu-Siemens has offered no explanation for its refusal to exploit them worldwide. AMD's unit share of Fujitsu-Siemens' business recently fell below 30% for the first time in four years.

118.   **NEC.**  Intel was forced to relax its hold on NEC's business when long-time NEC customer, Honda Motor Company, demanded that NEC supply it with servers powered by AMD's Opteron microprocessors. After underwriting the considerable expense of designing and manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the product to any of its other customers.

119.   There is no reason, other than Intel's chokehold on the OEMs, for AMD's inability to exploit its products in important sectors, particularly commercial desktops. These computers, which large corporate customers buy in the tens of thousands at a time, represent a lucrative opportunity for the supplier. Yet, the microprocessors that power them are identical to microprocessors in consumer computers, a sector in which AMD has won both praise and market share. The only material difference between the consumer and commercial segments is that many more system builders supply desktops to consumers, making it more difficult for Intel to control their microprocessor choice.

c.      **Exclusionary Rebates**

120.   Intel has also imposed on OEMs a system of first-dollar rebates that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing AMD from competing for a meaningful share of the market. In general, the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its

customers a target level of purchases of Intel microprocessors.  If the customer achieves the target, it is entitled to a rebate on all of the quarter's purchases of all microprocessors – back to the very first one – generally in the neighborhood of 8-10% of the price paid.  Intel provides the rebate in cash at the quarter's close.  OEMs operate on razor-thin margins, so qualifying for an Intel rebate frequently means the difference between reporting a profit or a loss in the coming – and closely watched – quarterly earnings.

121.     In contrast to "volume discounts" that sellers offer on a graduated and nondiscriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a substantial portion of the market.  Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a dominant percentage of a customer's needs.  It is able to develop discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without ever referencing it) because industry publications accurately forecast and track anticipated sales and because OEM market shares – which industry publications also report weekly, monthly and quarterly – do not change significantly quarter to quarter.

122.     Intel's retroactive discounts can operate to price microprocessors so low that AMD is put at a competitive disadvantage it cannot overcome.  Consider an OEM which anticipates purchasing 100 microprocessors that both Intel and AMD sell for $100 each.  Intel knows that because of its prior model introductions, the customer will have to buy 60 from Intel. The customer considers buying its expected balance for its new models from AMD, but Intel offers it a rebate that will entitle it to a 10% retroactive discount if, but only if, it purchases 90 units or more.  If the customer buys 30 of the 40 additional units from Intel to qualify for the rebate, its incremental cost for the 30 will be $3,000 (30 units at $100/unit) less the 10% rebate going back to the first unit it purchased, which amounts to $900 (90 units at $10/unit), for a total of $2,100.

123.     AMD can only capture the 30 units if it offers a price that makes the customer indifferent between getting the Intel rebate and getting an overall equivalent deal on AMD

microprocessors. Thus, for the 30 units that are up for grabs, AMD would have to lower its price to $70 per unit (because 30 units at $70/unit equals the $2,100 net cost for buying from Intel). In effect, the rebate forces AMD to charge $20 less than the $90 discounted Intel price if it attempts to get any business from the customer at all. That is because it is selling the customer only 30 units, over which it has to spread a $900 discount while Intel can spread it out over 90. At the end of the day, this creates a serious competitive disadvantage for AMD. As shown in the example, AMD is forced to discount its price three times as much as Intel just to match the Intel discount, not because its processors are inferior – far from it – but because Intel has assured for itself, by its past predatory practices, a significant base of assured demand that enables Intel to inexpensively spread its first-dollar discount. Importantly, this new base of demand – driven by the OEM's purchasing – will enable Intel to repeat its exclusionary practice when the next line of models is unveiled.

124. At least in the short run, most if not all of the major OEMs must engage significantly with Intel: (1) because AMD is too small to service all their needs while continuing to satisfy other customer demand; (2) because to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle; and (3) because Intel has encouraged end-users to specify that processors be of the same family among similar computers in one installation, as this is perceived to increase reliability (although technically this is not the case). Intel uses its retroactive discounts to make its large, captive market share self-perpetuating. In any one quarter, AMD cannot economically match Intel's retroactive rebate because it competes for too small a share of the customer's volume over which to spread the dollars necessary to equal the customer's total Intel cost savings. As a result, AMD loses the business and goes into the next selling cycle with Intel imbedded in additional customer products over which Intel can spread its rebates. This serves again to artificially constrain AMD's opportunity to match Intel's ensuing round of retroactive discounts. Intel's intertemporal leveraging of its market share effectively forecloses AMD from ever having a fair opportunity to compete.

- 27 -

125.    Intel exacts a severe penalty from OEMs that fail to meet their targets.  For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold very well, helping AMD capture nearly 60% of HP's U.S. retail sales for the quarter.  Intel responded by withholding HP's fourth quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal.  Instead, Intel "allowed" HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's mainstream retail business.

126.    Intel has deployed a variety of variants of this basic rebate scheme.  In the case of one European OEM, for example, Intel imposes the additional condition that the customer purchase target volumes of specific processors, generally microprocessors against which AMD's products compete particularly well.  In the case of another, Intel offers as an inducement discounted microprocessors rather than rebates.  In the case of the European division of one United States OEM, Intel has imposed a target of between 70-90% of the customer's requirements.  Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up to 20% below "normal" cost, thereby enabling the customer to obtain favorable pricing on bundled products (*e.g.*, a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors.

127.    Intel makes similar offers to smaller OEMs, but they are generally unwritten, and Intel leaves undefined the consequences of failing to meet a target.  Thus, a customer falls short at its peril, knowing only that it may lose its account with Intel and have to source future products from Intel distributors, which is both more expensive and provides less security of supply than direct purchase.

128.    All of Intel's rebate schemes are discriminatory and market-foreclosing.  If the customer chooses to purchase any significant quantity of microprocessors from AMD, it will not qualify for its Intel rebate, and the price will be higher on all the Intel processors it buys across the board.  By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but to

a greater harm to AMD and ultimately consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

129.    Intel's use of retroactive rebates leads, in some cases, to below-cost pricing on incremental sales.  The following example shows why a customer's incremental cost of purchasing from Intel those units that both Intel and AMD could supply can be zero or even negative, a price AMD cannot match.  Consider an OEM which has purchased 90 units of a microprocessor at $100 per unit under an Intel rebate scheme that entitles it to a 10% first-dollar discount but only after it purchases more than 90 units.  Its cost for the 90 processors is $9,000.  The OEM is now considering a purchase of 10 more units.  If it makes the additional purchase from Intel, the OEM will meet the expenditure condition and will qualify for the 10% per unit discount on all units.  Accordingly, the total spent will remain $9,000.  The incremental cost of the 10 additional microprocessors, as well as Intel's incremental revenue, will be zero (the $1,000 additionally spent, less the $1,000 thereby saved).  In other words, this scheme leads to incremental units being offered to the OEMs for nothing, leaving AMD hopelessly boxed out.

130.    Importantly, even if Intel were to earn some incremental revenue on the marginal units, these additional revenues could be below the incremental cost of their production.  As a result, Intel's additional profit on the sale would be negative, but for the fact that it had a long-run exclusionary effect on AMD.  (Obviously, if Intel earns no revenues on its additional sales, it has to be foregoing profits.)  As this analysis shows, some of Intel's discriminatory, retroactive rebates amount to unlawful, predatory, below-cost pricing.

131.    Even where Intel's prices are above cost on the incremental volumes and despite its retroactive rebate schemes, these rebates enable Intel to lower prices selectively in the contested market segment while maintaining higher prices in its captive market.  For example, Intel can offer rebates that are granted across the entire volume of sales but that are triggered only if the OEM increases its purchases beyond the portion of its requirements that is captive to Intel.  Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM

will not buy less than the benchmark and, instead, will source the overwhelming share of its purchases from Intel, thereby "qualifying" for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

132.    The use of retroactive rebates to limit AMD to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered platforms.  OEMs incur substantial expense in designing and engineering a new computer and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it.  Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell.  Hence, Intel's practices exacerbate normal impediments to entry and expansion.

### d.    Threats of Retaliation

133.    Beyond exclusive dealing, product and channel restrictions and exclusionary rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-capping" to deter OEMs from dealing with AMD.  Intel has a variety of pressure points at its disposal:  it can unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate – all of which can turn a profitable quarter for an OEM into an unprofitable one.  Other pressure points on accounts Intel deems disloyal include threatening to delay or curtail supplies of scarce processors or essential technical information.  Examples abound.

134.    As Gateway executives have said, Intel's threats beat them into "guacamole."  But Gateway is not alone.  Prior to its merger with HP, Compaq Computer received Intel threats every time it engaged with AMD.  For example, Compaq's CEO, Michael Capellas, disclosed in late 2000 that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed.  Reporting that "he had a gun to his head," Capellas informed an AMD executive that he had to stop buying AMD processors.

- 30 -

135.    In 2002, Intel pointed its gun at NEC.  Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors.  Without that roadmap, NEC would have been at a distinct competitive disadvantage.  Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003.

136.    NEC's European subsidiary, NEC-CI, which operates NEC's European and non-Japanese Asian divisions, reported that Intel executives said they would "destroy" NEC-CI for engaging with AMD in the commercial desktop segment.  Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase.

137.    AMD was engaged in discussions with IBM about introducing an Opteron "blade" server, when IBM suddenly announced that any such product it distributed could not bear an IBM logo.  When pressed for an explanation, IBM reported that it could not appear overly supportive of AMD server products because it feared Intel retaliation.

### e.    Interference with AMD Product Launches

138.    Key to gaining quick market acceptance of a new microprocessor is a chipmaker's ability to develop a lineup of reputable launch partners, consisting of OEMs prepared to roll out products featuring the chip, major customers who are willing to buy and embrace it, and other industry allies, such as major software vendors and infrastructure partners who can attest to its quality and reliability.  Particularly for commercial and enterprise (*i.e.*, server-work station) purchasers, a successful and impressive launch is essential to generating confidence among the computer professionals who will be the potential audience for the new microprocessor.

139.    Aware of the importance of product launches, Intel has done its utmost to undermine AMD's.  Several examples are set forth below.

140.    AMD's September 23, 2003, launch of Athlon64 was a watershed event for the company.  Upon learning the launch schedule, Intel did its best to disrupt it.  For example, Acer committed to support the AMD rollout by making a senior executive available for a videotaped

endorsement and by timing the introduction of two computers, a desktop and a notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan.  Days before the event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan, expressed to him Intel's "concern" and said Acer would suffer "severe consequences" if it publicly supported AMD's launch.  The Barrett visit coincided with an unexplained delay by Intel in providing $15-20 million in market development funds owed to Acer.  As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled its promotional materials, banned AMD's use of the video, and delayed the announcement of its Athlon64-powered computers.  Acer's President subsequently reported that the only thing different about Intel's threats was the messenger – they were "usually done by lower ranking managers," not Intel's CEO.

141.     HP also withdrew precipitously from the Athlon64 launch after committing to participate.  HP had agreed to support the launch by producing a promotional video and by sending senior executives to all three launch sites.  Just before launch, however, HP manager John Romano pulled the video and announced that HP would only be sending a junior manager, and then only to Europe.

142.     Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy.

143.     Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support.  A computer industry journal reported Intel's fingerprints:  "They all [vendors] told me that prior to the launch, they received a phone call from Intel.  Intel asked if they were going to the launch.  If they replied yes, the Intel rep asked them if it was 'important to them to go,' or 'if they really wanted to go.'  Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went.'"

144.     Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens.  Indeed, Intel representatives told

Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support as all of the others would back out. With the exception of IBM, Intel was right.

145.    These are not isolated examples but rather illustrations of Intel's relentless campaign to undermine marketing efforts by its one remaining competitor.  For example, IBM pulled its AMD-powered computers from the 2004 Palisades eServer and PC Show, citing a contractual agreement with Intel said to prohibit it from endorsing those competitive products. And at the 2004 Super Computing Show, an annual conference devoted to high performance computing, Intel offered two other AMD customers money to remove AMD systems from their booths.  At CeBit, Intel threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying AMD products, which were removed.

### f.    Product Bundling

146.    Intel also uses product bundling as an exclusionary weapon in many ways.  Intel's most common deployment is in bidding for a new OEM platform:  it bundles microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in amounts exceeding the OEM's requirements for the new platform.  (The excess, of course, is only compatible with Intel processors, thereby providing the OEM a strong inducement to go with Intel rather than AMD on uncommitted models.)  AMD does not sell chipsets or motherboards; they are provided by independent suppliers such as ATI, nVidia and Via, which incur their own costs and control their own pricing.  Hence, to match Intel's bundled microprocessor-chipsets-motherboards offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors but also will compensate the OEM for the savings it will lose on chipset and motherboard purchases.  The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unprofitable.  It also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's.

- 33 -

147.   As retaliation for dealing with AMD, Intel has also used chipset pricing as a bludgeon.  For example, Acer committed to launch the AMD Athlon XP in 2003.  Acer executives worldwide had worked with AMD to bring the product to market post-launch.  But on the eve of the launch, Acer management in Taiwan pulled the plug.  AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if *any* processor business were awarded to AMD outside of Europe.

148.   Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 2.   Practices Directed At Distributors

149.   Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic.  For example, Intel entered into an exclusive deal with Synnex, which is one of the largest United States distributors.  Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement.

150.   As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets.  For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off talks to distribute AMD chips.  A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up.

151.   Intel also offers a panoply of special programs for distributors that carry Intel microprocessors exclusively:  marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.  When such more nuanced means of achieving exclusivity fail, Intel has simply bribed distributors not to do business with AMD.  For example, a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, which caused the Intel representatives to ask, "How much would it take?"

- 34 -

152.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota.  Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business.  But unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them.  Intel does not share this information with them; they simply receive a check at the end of a quarter.  As a result, every AMD chip they purchase is at their peril.

153.    Finally, distributors that choose to do business with AMD have been conditioned to expect Intel retaliation.  For example, when ASI, one of the largest computer hardware and software distributors, began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings.  Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with AMD would trigger Intel retaliation.  When ASI finally accepted Master Distributor status in January 2005, Intel began reducing the level of market development funds ASI received.

154.    Avnet, Inc., one of the world's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation.  Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector.  And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip.  When Avnet did so anyway, Intel threatened to cut if off.  Another distributor got even worse treatment.  In retaliation for Supercom's AMD dealings in Canada, Intel pressured Supercom's customers to switch to another distributor.

155.    These are not the only distributors that Intel has attempted to coerce from doing business with AMD.  Others include R.I.C. in Germany, Paradigit in the Netherlands, and Quote Components in the Netherlands.

156.    Intel's dealings with distributors are unlawfully exclusionary, have no procompetitive justification, and are intended to maintain its monopoly.

### 3.    Practices Directed At Retailers

157.    In both the U.S. and internationally, approximately one fifth of desktop and notebook computers are purchased at retail stores.  A handful of retailers dominate the U.S. PC market.  Best Buy and Circuit City are the largest.  Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

158.    Most PCs sold at retail are sold during four or five buying seasons that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc.), and retailers refresh their inventory for each.  A chipmaker faces a two-step process to get its platform on shelves:  first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines.  Shelf space does not come for free.  The major retailers demand market development funds ("MDF") in exchange.  MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars – e.g., space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff.  The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

159.    Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the ability to exert pressure to keep AMD out of their product plans.  Also, it has significantly greater financial resources with which to buy retail shelf space.

160.    But to leverage those advantages, Intel has also made exclusive deals with many key retailers around the world.  For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk.  Fry's is Fujitsu's only retailer in the United States.  When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

161.    The story is even worse in Europe.  AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively.  Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

162.    In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains including Dixon and PC World that collectively account for two thirds of the U.K. PC market.  In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%.  Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just because of the small amount of business it does with AMD.  Toys 'R' Us in the U.K. is also exclusive to Intel.  Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models.  In France, Intel has brought pressure on the largest retailers (including Conforama, Boulanger), causing them to cease dealing with AMD or drastically reduce their AMD business.

163.    AMD nonetheless has gained some retail market share.  Due to price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors.  Within notebook roadmaps, AMD represents approximately 10%.  On a shelf-space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves.  And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively.  These numbers confirm that AMD's products perform well at retail, provided that space is available.

001862-16  104874 V1

164.    In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-based products but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products*.

165.    This is how the program works at Circuit City. If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine; but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-powered machines, and this "tax" apples to all of the Intel-powered machines that the retailer buys, back to the very first machine.

166.    The following illustrates the competitive disadvantage this creates for AMD. If Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a quarter, Intel would pay it $15 of MDF per computer, for a total of $3 million. However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units). Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit City would receive an additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for doing business with AMD. For AMD to make Circuit City "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per unit (40,000 times $35 = $1.4M), which together with Intel's $1.6 million would bring the total MDF back to $3 million. In other words, to just capture a 20% share, AMD must offer two or three times as much MDF as Intel, because it has far fewer units over which to spread the difference. Given these perverse economies, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a

- 38 -

quarter. (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share well short of 20%.)

167.    Nor is Intel above threatening retailers to gain preferred treatment. For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor. Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened.

168.    Intel's dealings with retailers are unlawfully exclusionary, have no procompetitive justification, and are intended to maintain its monopoly.

### 4.    Intel's Standard Setting and Other Technical Abuses

#### a.    Intel's Exclusion of AMD from Industry Standards

169.    Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

170.    By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its

processors, thus dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

171.    The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips.  Even though the JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

172.    The ADT Consortium was cleverly structured with multiple tiers of membership, each with different levels of access to information.  The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, but not during its development.  The actual development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers.  No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

173.    AMD desperately needed access to the developing standard and input into its definition in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel.  AMD lobbied repeatedly for higher tier membership status but was continually turned down.  Intel had structured the ADT Consortium's rules to require a unanimous vote – a rule that gave Intel veto power – over any decision to allow AMD to join the development committee, and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

174.    By foreclosing AMD from input or access to the memory standard during its development process, Intel deliberately placed AMD at a severe competitive disadvantage.  As a consequence of its exclusion, AMD could not monitor participants' suggestions and object to Intel-proposed features that were without substantial benefit to consumers and were instead

- 40 -

motivated by Intel's desire to disadvantage AMD's microprocessor architecture. Further, by keeping the ADT Consortium standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

175.    Indeed, Intel is attempting a repeat performance with respect to a new memory standard, this time excluding AMD by avoiding the open standard-setting committee entirely. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a secret committee to develop the next generation memory interface standard. Under this agreement, the memory manufacturers are prohibited from sharing information about their own product designs implementing the memory interface standard. This has the effect of preventing AMD from completing design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

176.    By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, thereby assuring itself an undeserved head-start and unfair competitive advantage.

    **b.    Intel's Promotion of Industry Standards that Disadvantage AMD**

177.    Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards that have no substantial consumer benefit and whose sole or dominant purpose is to competitively disadvantage AMD based on its highly integrated microprocessor architecture.

178.    As an example, JEDEC began developing standards in 2004 governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known as dual inline memory modules, or "DIMMs," consist of printed circuit boards upon which a number of memory chips are mounted. The DIMMs connect memory chips to the computer's

motherboard through a series of metal connectors known as "pins." One purpose of the JEDEC standards was to define the functions of the pins to enable chipmakers to design compatible memory controllers that would allow their microprocessors and the memory on the DIMMs to communicate.

179.    The JEDEC committee, which comprises members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC committee began work on standards for DDR3 memory modules for desktop computers, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules. This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

180.    However, when the JEDEC committee began to define pins for DDR3 laptop memory modules in this consistent manner, Intel reversed its position, counterproposing instead that the committee rearrange the pin definitions. Intel's proposal had no discernable technical merit or basis.

181.    In fact, Intel's motivation for proposing a modification of the laptop memory module pin definition was to competitively disadvantage AMD. Any modification to the laptop memory module pin definition would force Intel and AMD to modify their memory controllers. AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor. This produces significant computing advantages, but modification of an embedded memory controller requires significantly more time and expense.

182.    Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part. The JEDEC ultimately rejected Intel's proposal, confirming the proposal's lack of technical merit, but this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

- 42 -

c.    **Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace**

183.    Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

184.    An example is Intel's compilers. Independent software vendors ("ISVs") generally write software programs in high-level languages such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code, which is a machine-readable language, by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a variety of operating systems and programming languages.

185.    Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations. Such programs include mathematical modeling, multimedia, and video game applications.

186.    Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along several alternate code paths. Some paths are executed when the program runs on an Intel platform and others are executed when the program runs on a computer with an AMD microprocessor. (The choice of code path is determined when the program is started, using a feature known as "CPUID," which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency. However, if the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash.

- 43 -

187.    ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations.  Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations.  Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor, not because of design deficiencies on the part of AMD but because of Intel's deviousness.

## VIII.   EFFECTS OF INTEL'S MISCONDUCT

188.    Intel's unlawful conduct has caused and will continue to cause substantial harm to competition in the market for x86 microprocessors in domestic, import, and export sales and directly has harmed members of the Class.  Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice.

189.    Intel's anticompetitive acts both inside and outside the territorial boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce that is not trade and commerce with foreign nations and on United States import trade and commerce.  In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel excludes them from the product market worldwide.  As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

190.    Intel's conduct has caused and will continue to cause substantial harm to Plaintiffs and the Class, as evidenced by the following unlawful effects on competition:

- When AMD entered the server market in 2002 with its Athlon microprocessor – a part designed for desktops, not servers – the small OEMs and white-box vendors

- 44 -

deploying the chip nonetheless managed to secure approximately 3% of the worldwide server market. AMD introduced its next generation Opteron microprocessor for servers the following year, and the chip won rave reviews and passionate customer testimonials, including Best of Show at the June 2003 ClusterWorld Conference and Expo and Best Processor award in July 2003 from InfoWorld. Nonetheless, by means of its exclusionary and anticompetitive conduct, as of the Fourth Quarter 2004, Intel had limited AMD's worldwide server market share to less than 5%, not appreciably more than before it introduced the Opteron.

- Intel's exclusionary conduct has successfully boxed AMD out of the mobile PC sector. Intel's exclusive deals with Dell, Sony and Toshiba alone bar AMD from a third of the world market and half of U.S. domestic sales. Intel's economic coercion and fidelity rebates have foreclosed AMD from an appreciable share of the remainder of the market.

- AMD's Athlon64 is widely recognized as fully competitive with Intel's best desktop offering with the added benefit that it can run 64-bit software. Nonetheless, with the exception of a channel-restricted HP machine and a single Fujitsu-Siemens' model, AMD has failed to get a single major OEM, which collectively dominate the lucrative commercial desktop sector, to launch broadly an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on AMD unless it partners with a Tier One desktop OEM, but Intel's exclusionary conduct, including its economic coercion of Dell, HP, IBM, Gateway and Acer, prevents that. As a result, AMD's commercial desktop share is no greater now than it was in 2002.

191. Intel's unlawful conduct has restrained and impacted the competition in the market for x86 Microprocessors and has allowed Intel to change unlawful monopoly prices for

- 45 -

its products and has resulted in inflated prices paid by members of the Class for Intel's relevant products.

## IX.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

192.    Each of the foregoing allegations is incorporated in this claim for relief.

193.    The relevant product market is the x86 Microprocessor Market.

194.    The relevant geographic market or submarket is the United States.

195.    Intel possesses monopoly power in the relevant market, maintaining a market share of over 90 percent by revenue and 80 percent by unit volume.

196.    Substantial barriers to entry and expansion exist in the relevant market.

197.    Intel has the power to control prices and exclude competition in the relevant market.

198.    Since before June 28, 2001, Intel has engaged in conduct with anticompetitive effects to:  (a) unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high; (b) stifle competition and eliminate consumer choice through unlawful exclusionary behavior designed to keep AMD and other competitors and potential competitors weak, undersized, and unable to achieve a minimum efficient scale of operation needed to offer a viable substitute for Intel's x86 microprocessors.  Intel has done so with the intent to maintain its monopoly in the relevant market.

199.    Intel has also combined or conspired with others to monopolize the market for x86 microprocessors in the United States and elsewhere.

200.    There is no legitimate business justification for Intel's conduct.

201.    Plaintiffs and the Class members have been injured and will continue to be injured in their business and property by paying more for x86 microprocessors purchased indirectly from Intel than they would have paid and will pay in the absence of Intel's unlawful acts, including paying more for personal computers and other products in which x86

- 46 -

microprocessors are a component as a result of higher prices paid for x86 microprocessors by the manufacturers of those products.

202.    Plaintiffs and the Class are entitled to an injunction that prevents the violations alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

### (Violation of the California Cartwright Act)

203.    Each of the foregoing allegations is incorporated in this claim for relief.

204.    Defendant's contract, combination, trust or conspiracy was centered in, carried out, effectuated and perfected mainly within the State of California, and Defendant's conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

205.    Beginning at a time presently unknown to Plaintiffs, but at least as early as June 28, 2001, and continuing to today, Intel and its co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code.  Intel and its co-conspirators have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, microprocessors at supra-competitive levels.

206.    The violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Intel and its co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, microprocessors.

207.    For the purpose of forming and effectuating the unlawful trust, Intel and its co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

       a.    to fix, raise, maintain and stabilize the price of microprocessors;

       b.    to allocate markets for microprocessors amongst themselves;

- 47 -

        c.      to submit rigged bids for the award and performance of certain microprocessors contracts; and

        d.      to allocate amongst themselves the production of microprocessors.

208.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

        a.      price competition in the sale of microprocessors has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

        b.      prices for microprocessors sold by Defendant and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the States of California and throughout the United States; and

        c.      those who purchased microprocessors from Defendant and its co-conspirators have been deprived of the benefit of free and open competition.

209.    Plaintiffs and the members of the Class paid supra-competitive, artificially inflated prices for microprocessors.

210.    As a direct and proximate result of Intel's unlawful conduct, Plaintiffs and the Class members have been injured in their business and property in that they paid more for x86 microprocessors than they otherwise would have paid in the absence of Intel's unlawful conduct. As a result of Intel's violation of Section 16720, Plaintiffs and the Class members seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## <u>THIRD CLAIM FOR RELIEF</u>

### (Violation of California's Tort Law Against Monopolization)

211.    Each of the foregoing allegations is incorporated in this claim for relief.

212.    By virtue of the conduct described above, Intel has engaged in tortious and unlawful monopolization of the x86 Microprocessor Market.

213.    Intel's conduct gives rise to a cause of action for common law monopoly under California law on behalf of all Plaintiffs and Class members.

- 48 -

214.    As a direct and proximate result of Intel's unlawful acts of monopolization, Plaintiffs and the Class members have suffered actual damages in an amount to be proven at trial.

215.    Intel's acts of monopolization were intended to monopolize and suppress competition in the relevant market and to injure consumers.  Intel's acts included acts of fraud, malice and oppression and were taken with conscious disregard for the rights of consumers, including Plaintiffs and the Class members.  Accordingly, an award of punitive damages is justified in order to make an example of Intel, to punish it, and to deter it and others from engaging in the same or similar conduct.  Plaintiffs and the Class members seek an award of punitive damages in an amount according to proof at trial.

## FOURTH CLAIM FOR RELIEF

### (Violation of the California Unfair Competition Law)

216.    Each of the foregoing allegations is incorporated in this claim for relief.

217.    Defendant's business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Defendant's conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

218.    Beginning on a date unknown to Plaintiffs, but at least as early as June 28, 2001, and continuing thereafter at least up through and including the present, Defendant committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

219.    This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendant for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

220.    The Defendant's conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosure of Defendant, as alleged herein, constitute a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:

      a.    The violations of Section 1 of the Sherman Act, as set forth above;

      b.    The violations of Section 2 of the Sherman Act, as set forth above;

      c.    The violations of Section 16720, *et seq.*, of the California Business and Professions Code, set above;

      d.    Intel's acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

      e.    Intel's act and practices are unfair to consumers of microprocessors in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

      f.    Intel's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

221.    Plaintiffs and Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Intel as a result of such business acts or practices.

222.    Intel's illegal conduct is continuing, and there is no indication that Defendant will not continue such activity into the future.

223.    Intel's unlawful and unfair business practices have caused and continue to cause Plaintiffs and the Class members to pay supra-competitive and artificially-inflated prices for

microprocessors. Plaintiffs and the Class members suffered injury in fact and lost money or property as a result of such unfair competition.

224.    As alleged in this Complaint, Intel has been unjustly enriched as a result of its wrongful conduct and by its unfair competition. Plaintiffs and Class members are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits obtained by Intel as a result of such business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**(Violations of State Antitrust and Restraint of Trade Laws)**

225.    Each of the foregoing allegations is incorporated in this claim for relief and this claim is alleged in the event that the Court does not apply California law on a nationwide basis.

226.    Intel has violated Arizona Revised Stat. Code §§ 44-1401 *et seq.*

227.    Intel has violated California Bus. & Prof. Code §§ 16700 *et seq.*

228.    Intel has violated District of Columbia Code Ann. §§ 28-4503 *et seq.*

229.    Intel has violated Iowa Code §§ 553.1 *et seq.*

230.    Intel has violated Kansas Stat. Ann. §§ 50-101 *et seq.*

231.    Intel has violated 10 Maine Rev. Stat. §§ 1101 *et seq.*

232.    Intel has violated Michigan Comp. Laws. Ann. §§ 445.773 *et seq.*

233.    Intel has violated Minnesota Stat. §§ 325D.52 *et seq.*

234.    Intel has violated Mississippi Code Ann. § 75-21-1 *et seq.*

235.    Intel has violated Nebraska Rev. Stat. §§ 59-801 *et seq.*

236.    Intel has violated Nevada Rev. Stat. Ann. §§ 598A *et seq.*

237.    Intel has violated New Jersey Stat. §§ 56:9-1 *et seq.*

238.    Intel has violated New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

239.    Intel has violated New York Gen. Bus. Law § 340 *et seq.*

240.    Intel has violated North Carolina Gen. Stat. §§ 75-1 *et seq.*

241.    Intel has violated North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

- 51 -

242.     Intel has violated South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

243.     Intel has violated Tennessee Code Ann. §§ 47-25-101 *et seq.*

244.     Intel has violated Vermont Stat. Ann. 9 §§ 2453 *et seq.*

245.     Intel has violated West Virginia Code §§ 47-18-1 *et seq.*

246.     Intel has violated Wisconsin Stat. §§ 133.01 *et seq.*

247.     As a direct and proximate result of Intel's unlawful conduct, Class members in each of these states have been injured in their business and property in that they indirectly paid more for x86 microprocessors than they would have paid absent Intel's unlawful conduct.

## SIXTH CLAIM FOR RELIEF

### (Violations of State Consumer Protection and Unfair Competition Laws)

248.     Each of the foregoing allegations is incorporated in this claim for relief and is alleged in the event that the Court does not apply California law on a nationwide basis.

249.     Intel has violated Alaska Stat. §§ 45.50.471 *et seq.*

250.     Intel has violated Arkansas Rev. Stat. §§ 4-88-101 *et seq.*

251.     Intel has violated California Bus. & Prof. Code §§ 17200 *et seq.*

252.     Intel has violated District of Columbia Code §§ 28-3901 *et seq.*

253.     Intel has violated Florida Stat. §§ 501.201 *et seq.*

254.     Intel has violated Idaho Code §§ 48-601 *et seq.*

255.     Intel has violated Kansas Stat. §§ 50-623 *et seq.*

256.     Intel has violated Louisiana Rev. Stat. §§ 51:1401 *et seq.*

257.     Intel has violated 5 Maine Rev. Stat. §§ 207 *et seq.*

258.     Intel has violated Mass. Gen. Laws ch. 93A § 1 *et seq.*

259.     Intel has violated Montana Code §§ 30-14-101 *et seq.*

260.     Intel has violated Nebraska Rev. Stat. §§ 59-1601 *et seq.*

261.     Intel has violated Nevada Rev. Stat. §§ 598.0903 *et seq.*

262.     Intel has violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

263.     Intel has violated New Mexico Stat. §§ 57-12-1 *et seq.*

264.    Intel has violated New York Gen. Bus. Law §§ 349 *et seq*.

265.    Intel has violated North Carolina Gen. Stat. §§ 75-1.1 *et seq*.

266.    Intel has violated Rhode Island Gen. Laws §§ 6-13.1-1 *et seq*.

267.    Intel has violated Utah Code §§ 13-11-1 *et seq*.

268.    Intel has violated 9 Vermont Stat. §§ 2451 *et seq*.

269.    Intel has violated West Virginia Code §§ 46A-6-101 *et seq*.

270.    As a direct and proximate result of Intel's unlawful conduct, Class members in each of these states have been injured in their business and property in that they indirectly paid more for x86 microprocessors than they would have paid absent Intel's unlawful conduct.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**(Unjust Enrichment and Disgorgement of Profits)**

271.    Each of the foregoing allegations is incorporated in this claim for relief.

272.    Intel has been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits.

273.    Under common law principles of unjust enrichment, Intel should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

274.    Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

**X.    DEMAND FOR TRIAL BY JURY**

275.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury of all issues so triable under the law.

**XI.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.    That Intel's conduct alleged herein be adjudged and decreed to be:

a.    a restraint of trade or commerce in violation of Section 2 of the Sherman Act;

- 53 -

001862-16  104874 V1

b.      a restraint of trade or commerce in violation of in violation of State antitrust laws;

c.      violations of the state consumer protection and unfair competition laws identified in this Complaint; and

d.      acts of unjust enrichment.

B.      That Plaintiffs and the Class members recover damages, as provided by state laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Intel in an amount to be trebled in accordance with such laws;

C.      That Intel, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner:  (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the sale of microprocessors, information concerning bids of competitors;

D.      That Plaintiffs and Class members be awarded restitution, including disgorgement of profits obtained by Intel as a result of its acts of unfair competition and unjust enrichment.

E.      That Plaintiffs and Class members awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      That Plaintiffs and Class members recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      That Plaintiffs and Class members have such further relief as the case may require and the Court may deem just and proper under the circumstances.

PRICKETT, JONES & ELLIOTT, P.A.


_____

James L. Holzman (DE Bar # 663)
David W. Gregory (DE Bar #4408)
1310 King Street
Wilmington, DE  19801
(302) 888-6500
jlholzman@prickett.com
dwgregory@prickett.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD &
    TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC  20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA  94104
mplehmann@furth.com tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony Shapiro
Craig R. Spiegel
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111
guido@saveri.com
rick@saveri.com

Co-Lead and Interim Class Counsel for
Plaintiffs

[ADD HERE REST OF PLAINTIFFS'
COUNSEL – WORKING ON LIST]

Dated:  April 28, 2006

001862-16  104874 V1

## CERTIFICATE OF SERVICE

I, James L. Holzman, hereby certify that on this 28th day of April, 2006, the foregoing

Consolidated Complaint.

## VIA ELECTRONIC FILING

Adam L. Balick
Balick & Balick
711 North King Street
Wilmington, DE 19801-3503
abalick@balick.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Frederick L. Cottrell, III
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
cottrel1@rlf.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
fineman@r1f.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Chad Michael Shandler
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
shandler@rlf.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

James Gordon McMillan, III
Bouchard Margules & Friedlander
222 Delaware Avenue
Suite 1400
Wilmington, DE 19801
jmcmillan@bmf-law.com
*Counsel for Raphael Allison and Matthew*
*Kravitz*

Richard L. Horwitz
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
*Counsel for Intel Corporation and Intel*
*Kabushiki Kaisha*

Scott E. Chambers
Schmittinger & Rodriguez, P.A.
414 S. State St.
P.O. Box 497
Dover, DE 19903
schambers@schmittrod.com
*Counsel for David Arnold, Andrew S. Cohn,*
*Jason Craig, Maria Griffin, Lena K. Manyin,*
*Paul Ramos and Michael Ruccolo*

Robert Ray Davis
Chimicles & Tikellis, LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
robertdavis@chimicles.com
*Counsel for Gideon Elliott, Angel Genese and*
*Nir Goldman*

- 57 -

A. Zachary Naylor
Chimicles & Tikellis, LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
zacharvnavlor@chimicles.com
*Counsel for Nancy Bjork, James R. Conley,
Carrol Cowan, Vanessa Z. DeGeorge, Russell
Dennis, Damon DiMarco, Charles Dupraz,
Melissa Goeke, Caresse Harms, JWRE Inc.,
Jim Kidwell, Leonard Lorenzo, Michael E.
Ludt, John Maita, Chrystal Moeller, Robert J.
Rainwater, Mary Reeder, Jeff Vaught, Ryan
James Volden and Sonia Yaco*

Robert D. Goldberg
Biggs & Battaglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899
goldberg@batlaw.com
*Counsel for Richard Caplan, Virginia
Deering, Ficor Acquisition Co. LLC,
Giacobbe-Fritz Fine Art LLC, Tom Hobbs,
David Kurzman, Leslie March, Andrew
Marcus, Paula Nardella, Bill Richards, Maria
Pilar Salgado, Ron Terranova, Nancy Wolft
and Carl Yamaguchi*

Jeffrey S. Goddess
Rosenthal, Monhait, Gross & Goddess
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
i goddess@rmgglaw.com
*Counsel for Ludy A. Chacon, Joseph Samuel
Cone, Darice Russ and Michael K. Simon*

R. Bruce McNew
Taylor & McNew LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
mcnew@taylormcnew.com
*Counsel for Robert Marshall*

Reginald Von Terrell
The Terrell Law Group
223 25th Street
Richmond, CA 94804
REGGIET2@aol.com
*Counsel for Athan Uwakwe*

Ali Oromchian
Finkelstein Thompson & Loughran
601 Montgomery Street
Suite 665
San Francisco, CA 94111
ao@ftllaw.com
*Counsel for Ian Walker*

Charles P. Diamond
O'Melveny & Myers LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067
CDiamond@omm.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Mark A. Samuels
O'Melveny & Myers LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067
MSamuels@omm.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067
lsmith@omm.com
*Counsel for AMD International Sales &
Service LTD and Advanced Micro Devices,
Inc.*

Gordon Ball
Ball & Scott
550 Main Avenue
750 NationsBank Center
Knoxville, TN 37902
gball@ballandscott.com
*Counsel for Andrew Armbrister and Melissa
Armbrister .*

- 58 -

Garrett D. Blanchfield, Jr.
Richard Wendorf & Blanchfield
E-1250 First National Bank Building
332 Minnesota St.
St. Paul, MN  55101
g.blanchfield@rwblawfirm.com
*Counsel for Susan Baxley*

Jeffrey F. Keller
Law Offices of Jeffrey F. Keller
425 Second St.
Suite 500
San Francisco, CA  94107
jfkeller@kellergrover.com
*Counsel for Susan Baxley and Kevin Stoltz*

Donald F. Drummond
Drummond & Associates
One California St.
Suite 300
San Francisco, CA  94111
ballen@drummondlaw.net
*Counsel for Dressed to Kill Custom Draperies LLC, Jose Juan, Tracy Kinder and Edward Rush*

Michele C. Jackson
Lieff Cabraser Heimann & Bernstein LLP
Embarcadero Center West
275 Battery St.
30th Floor
San Francisco, CA  94111
mjackson@lchb.com
*Counsel for Huston Frazier, Jeanne Cook Frazier and Brian Weiner*

Juden Justice Reed
Schubert & Reed LLP
Three Embarcadero Center
Suite 1650
San Francisco, CA  94111
jreed@schubert-reed.com
*Counsel for Patrick J. Hewson*

David Mark Balabanian
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111-4067
david.balabanian@bingham.com
*Counsel for Intel Corporation*

Jef Feibelman
Burch Porter & Johnson
130 N. Court Ave.
Memphis, TN  38103
jfeibelman@bpjlaw.com
*Counsel for Intel Corporation*

Joy K. Fuyuno
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111
joy.fuyuno@bingham.com
*Counsel for Intel Corporation*

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC  20004
Bernhardd@howrey.com
*Counsel for Intel Corporation and Intel Kabushiki Kaisha*

Christopher B. Hockett
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA  94111
chris.hockett@bingham.com
*Counsel for Intel Corporation*

Jerry W. Laughlin
Rogers Laughlin Nunnally Hood & Crum
100 South Main St.
Greeneville, TN  37743
jlaughlin2@earthlink.net
*Counsel for Intel Corporation*

Maria Nunzio Alioto
Trump Alioto Trump & Prescott LLP
2280 Union St.
San Francisco, CA  94123
malioto@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

- 59 -

Joseph M. Patane
Law Office of Joseph M. Patane
2280 Union St.
San Francisco, CA 94123
jpatane@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

B.J. Wade
Glassman Edwards Wade & Wyatt P.C.
26 N. Second St.
Memphis, TN 38103
bwade@gewwlaw.com
*Counsel for Cory Wiles*

David Boies, III
Straus & Boies LLP
4041 University Drive
5th Floor
Fairfax, VA 22030
dboies@straus-boies.com
*Counsel for Jose Juan*

Robert E. Cooper
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
rcooper@gibsondunn.com
*Counsel for Intel Corporation*

Donald Chidi Amamgbo
Amambgo & Associates APC
1940 Embarcadero Cove
Oakland, CA 94606
DonaldAmamgbo@Citycom.com
*Counsel for Athan Uwakwe*

Francis O. Scarpulla
Law Offices of Francis O. Scarpulla
44 Montgomery St.
Suite 3400
San Francisco, CA 94104
foslaw@pacbell.net
*Counsel for Lazio Family Products*

Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
dfloyd@gibsondunn.com
*Counsel for Intel Corporation*

Fred T. Isquith
Wolf Haldenstein Adler Freeman & Herz LLC
270 Madison Ave.
11th Floor
New York, NY 10016
Isquith@whafh.com
*Counsel for Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Chrystal Moeller, Robert 1. Rainwater, Mary Reeder and Sonia Yaco*

Bruce J. Wecker
Hosie & McArthur
1 Market St.
Spear Street Tower
Suite 2200
San Francisco, CA 94105
bwecker@hosielaw.com
*Counsel for Dwight E. Dickerson*

Nancy Fineman
Cotchett Pitre Simon & McCarthy
840 Malcolm Rd.
Suite 200
Burlingame, CA 94010
nfineman@cpsmlaw.com
*Counsel for Trotter-Vogel Realty Inc. and Marshall Realty*

- 60 -

<u>VIA U.S. MAIL FIRST CLASS</u>

Robert J. Kriner, Jr.
Chimicles & Tikellis, LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE  19899
*Counsel for Stuart Schupler*

Daniel B. Allanoff
Meredith Cohen Greenfogel & Skirnick P.C.
117 South 17th St.
22nd Floor
Architects Building
Philadelphia, PA  19103
*Counsel for Benjamin J. Allanoff*

Daniel Hume
Kirby McInerney & Squire L.L.P.
830 Third Avenue
10th Floor
New York, NY  10022
*Counsel for Raphael Allison and Matthew
Kravitz*

Craig C. Corbitt
Zelle Hofmann Voelbel Mason & Gette LLP
44 Montgomery Street
Suite 3400
San Francisco, CA  94104
*Counsel for William F. Cronin and Law
Offices of Laurel Stanley*

Douglas G. Thompson, Jr.
Finkelstein Thompson & Loughran
1050 30th St., N.W.
Washington, DC  20007
*Counsel for Ian Walker*

Harvey W. Gurland
Duane Morris
200 S. Biscayne Blvd.
Suite 3400
Miami, FL  33131
*Counsel for Intel Corporation*

Richard A. Ripley
Bingham McCutchen
1120 20th Street, NW
Suite 800
Washington, DC  20036
*Counsel for Intel Corporation*

Scott Ames
Serratore & Ames
9595 Wilshire Blvd.
Suite 201
Los Angeles, CA  90212
*Counsel for Major League Softball Inc.*

Edward A. Wallace
The Wexler Firm LLP
One North LaSalle St.
Suite 2000
Chicago, IL  60602
*Counsel for Peter Jon Naigow*

Lance A. Harke
Harke & Clasby LLP
155 South Miami Ave.
Suite 600
Miami, FL  33130
*Counsel for Nathaniel Schwartz*

Randy R. Renick
128 North Fair Oaks Avenue
Suite 204
Pasedena, CA  91103
*Counsel for Shanghai 1930 Restaurant
Partners L.P.*

Donald L. Perelman
Fine Kaplan & Black RPC
1835 Market St.
28th Floor
Philadelphia, PA  19103
*Counsel for Kevin Stoltz*

Michael L. Kirby
Kirby Noonan Lance and Hoge
600 West Broadway
Suite 1100
San Diego, CA  92101-3302
*Counsel for Justin Suarez*

Russell M. Aoki
Aoki Sakamoto Grant LLP
One Convention Place
701 Pike St.
Suite 1525
Seattle, WA  98101
*Counsel for Kevin Stoltz*

001862-16  104874 V1

Clerk Michael J. Beck
Clerk, MDL Judicial Panel
One Columbus Circle, N.E.
Room G-255, Federal Judiciary Bldg.
Washington, DC  20002-8004

                                          /s/ James L. Holzman
                                   James L. Holzman (DE Bar ID 663)

001862-16  104874 V1