**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and<br>AMD INTERNATIONAL SALES & SERVICE, LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 05-441 (JJF) |
| | ) | |
| INTEL CORPORATION and<br>INTEL KABUSHIKI KAISHA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| INTEL CORP. MICROPROCESSOR ANTITRUST<br>LITIGATION | ) | MDL Docket No. 05-1717 (JJF) |
| | ) | |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | ) | C.A. No. 05-485-JJF |
| | ) | |
| Plaintiffs, | ) | CONSOLIDATED ACTION |
| | ) | |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**INTEL'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS
MOTION TO DISMISS FOREIGN COMMERCE CLAIMS FOR LACK OF
SUBJECT MATTER JURISDICTION AND STANDING**

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated: June 9, 2006

POTTER ANDERSON & CORROON LLP
Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     THE FTAIA REQUIRES THAT THE CHALLENGED CONDUCT
        CAUSE DIRECT EFFECTS IN U.S. COMMERCE THAT GIVE
        RISE TO AMD'S CLAIM ........................................................................ 3

        A.      The FTAIA's First Prong Applies to Conduct and Not Claims ..................... 3

        B.      AMD's Allegations of Lost Sales to Foreign Customers Do
                Not Involve Any Direct Domestic Effects ..................................... 5

        C.      The Foreign Conduct Alleged in the Complaint Did Not
                "Give Rise to" AMD's Claim ..................................................... 8

        D.      The Existence of a Worldwide Market is Irrelevant to
                Jurisdiction .................................................................... 10

        E.      The FTAIA Does Not Allow Recovery of Damages for
                Conduct Excluded From the Sherman Act by the FTAIA ........................... 12

        F.      AMD's Status As A U.S. Company Does Not Transform Its
                Direct Foreign Harm Into Direct Domestic Harm .............................. 13

III.    AMD'S RELIANCE ON *CONTINENTAL ORE* AND OTHER PRE-
        *EMPAGRAN* CASES IS MISPLACED .................................................. 14

IV.     AMD'S FOREIGN SALES OF ITS GERMAN-MADE
        MICROPROCESSORS DO NOT CONSTITUTE EXPORT TRADE ..................... 16

V.      AMD'S ARGUMENTS ABOUT DISCOVERY AND EVIDENCE
        REGARDING FOREIGN CONDUCT HAVE NO BEARING ON
        SUBJECT MATTER JURISDICTION ................................................. 18

VI.     PRINCIPLES OF COMITY ALSO SUPPORT DISMISSAL ................................. 19

VII.    AMD LACKS STANDING TO PRESS ITS FOREIGN CLAIMS
        UNDER U.S. LAW ............................................................... 19

VIII.   CONCLUSION ................................................................. 20

## TABLE OF AUTHORITIES

### CASES

*Anza v. Ideal Street Supply Corp.*,
2006 U.S. LEXIS 4510 (June 5, 2006) ........................................................... 8

*Associated General Contractors, Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) ................................................................................. 19

*CSR Ltd. v. Cigna Corp.*,
405 F. Supp. 2d 526 (D.N.J. 2005) ............................................................ 13

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*,
148 F.3d 1080 (D.C. Cir. 1998) ................................................................. 9

*Continental Ore Co. v. Union Carbide*,
370 U.S. 690 (1962) ............................................................................. 14, 15

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
289 F.2d 86 (9th Cir. 1961) ...................................................................... 15

*Den Norske Stats Oljeselskap AS v. HeereMac v.o.f.*,
241 F.3d 420 (5th Cir. 2001) .............................................................. 9, 10, 11

*In re Dynamic Random Access Memory Antitrust Litigation*,
2006 U.S. Dist. LEXIS 8977 (N.D. Cal. Mar. 1, 2006) .............................. 11, 19

*Empagran S.A. v. F. Hoffman-LaRoche Ltd.*,
417 F.3d 1267 (D.C. Cir. 2005) ......................................................... *passim*

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004) ....................................................................... 4, 8, 11, 19

*Gordon v. Lewiston Hospital*,
423 F.3d 184 (3d Cir. 2005) ...................................................................... 10

*Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*,
1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. Jan. 18, 1977) ............................... 9

*Information Resources, Inc. v. Dun & Bradstreet Corp.*,
127 F. Supp. 2d 411 (S.D.N.Y. 2001) .......................................................... 6

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chemical B.V.*,
2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 7, 2005) ................................ 7

*Lewis v. Casey*,
518 U.S. 343 (1996) ................................................................................. 20

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................ 2, 11

*Optimum, S.A. v. Legend Corp.*,
    926 F. Supp. 530 (W.D. Pa. 1996) ........................................................... 7

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ................................................................................ 15

*Tampa Electric Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ................................................................................ 10

*Turicentro, S.A. v. Am. Airlines, Inc.*,
    303 F.3d 293 (3d Cir. 2002) ............................................................... *passim*

*United Phosphorous, Ltd. v. Angus Chemical Co.*,
    322 F.3d 942 (7th Cir. 2003) ........................................................... 4, 14, 15

*United Phosphorus, Ltd. v. Angus Chemical Co.*,
    131 F. Supp. 2d 1003 (N.D. Ill. 2001) ................................................. 13, 18

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) ................................................................... 14

*United States v. LSL Biotechnologies*,
    379 F.3d 672 (9th Cir. 2004) ............................................................ *passim*

*United States v. Sisal Sales Corp.*,
    274 U.S. 268 (1927) ................................................................................ 14

*United States v. Weber Aircraft Corp.*,
    465 U.S. 792 (1984) ................................................................................. 3

## STATUTES

15 U.S.C. § 4001(a)(1) ................................................................................ 17

15 U.S.C. § 4001(a)(6) ................................................................................ 17

15 U.S.C. § 4001(b) .................................................................................... 16

15 U.S.C. § 4002(a)(1) ................................................................................ 16

15 U.S.C. § 4002(a)(2) ................................................................................ 17

15 U.S.C. § 4002(a)(3) ................................................................................ 17

15 U.S.C. § 6a ......................................................................................................1, 9, 12, 15

FTAIA House Report, H.R. Rep. No. 97-686, at 9-10....................................................... 13

## I.     PRELIMINARY STATEMENT

AMD avoids the central issue of Intel's Motion to Dismiss:  whether, applying the specific language of the Foreign Trade Antitrust Improvement Act ("FTAIA"), 15 U.S.C. § 6a, this Court has jurisdiction over the foreign conduct that Intel seeks to dismiss.  The FTAIA, by its plain language, sets out a multi-pronged conduct and effects-based test, reflecting Congress's determination that the U.S. antitrust laws "shall not apply to *conduct involving trade or commerce . . . with foreign nations*" unless (1) such conduct has a "direct substantial and reasonably foreseeable effect" on U.S. domestic commerce, and (2) such domestic effect "gives rise to," *i.e.,* proximately causes, a claim of this plaintiff under the U.S. antitrust laws.  *Id*.  (emphasis added).

AMD thus has the burden of first showing that the foreign *conduct* detailed in the Complaint has the requisite direct effects on U.S. commerce.  AMD attempts to circumvent the statutory language by framing its jurisdictional arguments around a "monopolization claim," rather than the *conduct* test in the FTAIA.  Where the statute expressly states that no jurisdiction shall exist over "conduct involving trade or commerce . . . with foreign nations" unless the conduct has direct domestic effects, AMD asks the Court to accept jurisdiction over a "claim" made up of conduct involving foreign trade directly affecting only foreign commerce and of *other* conduct affecting U.S. commerce.

AMD compounds its disregard for the FTAIA's plain language by proffering a construction of the FTAIA that would read the word "direct" out of the statute.  AMD's assertion that the foreign conduct alleged in the Complaint directly affected U.S. commerce is based on a tortuous chain of causation whereby anything that affects AMD's profitability is claimed to harm U.S. commerce by making it harder for AMD to discount to U.S. customers.  But as the Ninth Circuit made clear in a decision that AMD studiously ignores, a direct effect is an "immediate consequence" of the conduct.  *United States v. LSL Biotechnologies.*, 379 F.3d 672, 680 (9th Cir. 2004).   The path from a lost foreign sale by AMD's German

manufacturing subsidiary to the inability of a "weakened" competitor to later offer a discount to a domestic customer is indirect – not the "immediate consequence" of the conduct.

AMD also attempts to avoid the statutory language by equating U.S. jurisdiction with geographic market scope. But geographic market definition and FTAIA jurisdiction are two distinct concepts. The geographic market is an economic concept defining the area where a purchaser can turn for supply. It has nothing to do with whether U.S. courts have jurisdiction over *conduct* involving foreign trade. Nowhere in the FTAIA did Congress suggest that the economic concept of market definition is material to jurisdiction.

Faced with these fundamental, irremediable flaws in its position, AMD resorts to irrelevant non-statutory arguments: that Intel and AMD are headquartered in California, that AMD is somehow a U.S. exporter even though it makes its microprocessors in Germany, and that AMD will seek discovery or introduce evidence of conduct involving foreign trade no matter how this motion is resolved. And lacking legal support in case law decided under the FTAIA, AMD attempts to prop up its arguments by relying heavily on pre-FTAIA cases that are factually distinguishable and inconsistent with the FTAIA, while entirely ignoring key FTAIA decisions cited in Intel's opening brief.

AMD's arguments, if adopted, would fundamentally rewrite the statute and disrupt the Congressional purpose in passing the FTAIA. The foreign conduct that is the subject of this motion – offers to sell foreign manufactured microprocessors in foreign countries to foreign companies – implicates the core issues of regulation of commerce, and thus foreign sovereignty. "American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986). U.S. antitrust jurisdiction reaches foreign conduct only insofar as it directly effects U.S. commerce. *Empagran S.A. v. F. Hoffman-La Roche Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) (hereinafter cited as *Empagran Remand Decision*). AMD's interpretation of the statute would thrust U.S. courts into regulating the rules of commerce of foreign nations without the required direct effects in U.S. commerce.

## II.    THE FTAIA REQUIRES THAT THE CHALLENGED CONDUCT CAUSE DIRECT EFFECTS IN U.S. COMMERCE THAT GIVE RISE TO AMD'S CLAIM

### A.    The FTAIA's First Prong Applies to Conduct and Not Claims

AMD ignores this Court's duty to apply the *language* of the FTAIA to the allegations of AMD's complaint. The FTAIA expressly instructs that the U.S. antitrust laws "shall not apply to conduct" involving trade with foreign nations unless such conduct has a "direct, substantial and reasonably foreseeable" effect on commerce in the United States.[1] The key provision at issue – what constitutes a direct effect on U.S. commerce – is "simple and straightforward." *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300, 304 (3d Cir. 2002). Accordingly, "the plain language of the statute . . . is sufficient to resolve the question presented." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 798 (1984). *Accord LSL Biotechnologies*, 379 F.3d at 680 (applying plain meaning construction to FTAIA).

AMD does not dispute that Intel's conduct in selling microprocessors to foreign companies located in foreign countries "involves conduct in foreign trade." Opp. at 3, 7 ("foreclosure of AMD from foreign customers"), 15 ("damages AMD suffered abroad"), 16 ("foreign harm"), 21 ("AMD's foreign damages"), 22 ("global *effect*") (emphasis in original). Instead, AMD argues that, in spite of the FTAIA's plain language, the statute should be interpreted as applying to all conduct, foreign or domestic, subsumed within a "claim." *See* Opp. at 16. In other words, under AMD's analysis, the "conduct" encompassed by its "claim" includes at once both an Intel sale in the U.S. to Hewlett-Packard and an Intel marketing promotion in Germany with Aldi, a German supermarket. *See* Comp. ¶ 100.

The FTAIA imposes a threshold requirement that conduct involving foreign trade have a direct effect on U.S. commerce. Only if the conduct in fact has the requisite direct domestic effect does the Court even reach the question whether such conduct alone, or combined with other conduct, proximately gives rise to plaintiff's antitrust "claim." The

---

[1] The text of the FTAIA is set out in Appendix A to Intel's Opening Brief.

Supreme Court thus explained in *F. Hoffman-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155 (2004) that the FTAIA:

> initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Id.* at 161 (emphasis and brackets in original). Congress could have easily chosen to base the jurisdictional test on whether a legal "claim" as a whole had effects on U.S. commerce, but it chose to base jurisdiction on the locus of effects of a specified subset of "conduct" – that involving foreign commerce. This interpretation, which limits U.S. jurisdiction to conduct involving foreign commerce having direct domestic effects, is consistent with the well-accepted principle that "statutes should be read in accord with the customary deference to the application of foreign countries' laws within their own territories." *Empagran*, 542 U.S. at 176 (Scalia, J, concurring). Thus, the short answer to AMD's "claim-based" construction of the FTAIA is that Congress did not write the statute that way. *See United Phosphorous, Ltd. v. Angus Chemical Co.,* 322 F.3d 942, 944-53 (7th Cir. 2003) (en banc) (application of FTAIA is jurisdictional; it is not part of the substantive elements of a Sherman Act claim).

AMD's attempt now to commingle U.S. conduct with purportedly "intertwined" conduct in foreign commerce flies in the face of AMD's Complaint, which expressly states that the challenged conduct "differ[ed] from customer to customer and segment to segment." (Comp. ¶ 35.) Contrary to AMD's current position, the Complaint sets out distinct instances of alleged conduct, separated in time, that independently arose in foreign commerce. For example, AMD alleges:

> "The story is even worse in Europe. AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively. Intel subsidies

also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market." Compl. ¶ 100.

"In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains including Dixons and PC World that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small amount of business it does with AMD. Toys'R'Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers, including Conforama, Boulanger, causing them to cease dealing with AMD or drastically reduce their AMD business." Compl. ¶ 101.

"Hitachi. According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi [a Japanese OEM], which had been a substantial AMD customer. The agreement caused AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the year, AMD sold no microprocessors to Hitachi at all. . . ." Compl. ¶ 44.

*See also* Compl. ¶¶ 40-43, 54-57, 65, 74, 75, 81, 83, 86, 89, 93, 94, 106 (reciting alleged effects in foreign commerce).

AMD's argument for the Court to assert jurisdiction over the conduct in these Complaint allegations, involving various third parties in different countries in different places in the distribution chain, by lumping them with U.S. conduct under the rubric of a single "claim," would rewrite the FTAIA to regulate foreign conduct having no direct U.S. effects. *Empagran* made clear that the existence of U.S. conduct, and even of U.S. effects that would not arise but for the challenged foreign conduct, is insufficient to thrust U.S. courts into regulating foreign economies. What the FTAIA requires is direct and substantial U.S. effects from the challenged foreign conduct. AMD conspicuously failed to plead these effects.

### B.     AMD's Allegations of Lost Sales to Foreign Customers Do Not Involve Any Direct Domestic Effects

AMD does not even attempt to address whether the specific Complaint allegations that Intel has moved to dismiss satisfy the first prong of the FTAIA – that the conduct at issue

have direct, substantial and reasonably foreseeable effects in U.S. commerce. Intel cited case law in its motion, which AMD largely ignores, holding that "direct" means there is no intervening factor between the defendant's conduct and the domestic effect. *LSL Biotechnologies*, 379 F.3d at 680 (domestic effect must be "immediate consequence" of alleged anticompetitive conduct with no "intervening developments"); *Empagran Remand Decision*, 417 F.3d at 1270-71 ("direct causal relationship, that is, proximate causation"). *See* Intel Opening Br. at 22-25 (citing additional cases). Because its Complaint allegations do not satisfy the specific FTAIA standards, AMD is forced to construct a tortuous chain of causation that is far removed from the "immediate consequence" that the FTAIA demands.

AMD argues that "Intel's ability to coerce U.S. customers from giving AMD more business depends on keeping AMD economically powerless to make these customers whole for the costs that Intel can impose on them[,]" and that this depends on "cut[ting] AMD off from business opportunities throughout the market, including opportunities with foreign customers." Opp. at 2. *See also* Opp. at 9 (cognizable effects include anything that affects AMD's global "size and economic power"), 11 (cognizable effects include anything that limits AMD's "economic muscle"). Thus, under AMD's logic, a deal between Intel and a German retailer to promote Intel-based systems (*see* Compl. ¶100) directly affects U.S. commerce because it reduces AMD's German subsidiary's sales of German-made microprocessors in Germany, which in turn affects the profitability of the U.S. AMD parent, which in turn affects the funds that AMD has for discounting to U.S. customers, which in turn affects the discounts that it offers in particular U.S. transactions, which in turn affects its competitiveness in the United States, and which in turn affects U.S. commerce.

The link between AMD's German subsidiary's loss of a sale of a German-made microprocessor to a Japanese or European OEM or retailer and AMD's ability to compete for a U.S. customer is anything but direct. "Reduced income flowing from a foreign subsidiary is not a 'direct' domestic injury." *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d

411, 417 (S.D.N.Y. 2001).[2]  The *direct* effect of Intel's alleged conduct in selling microprocessors to foreign customers was sustained in the foreign country where AMD claims to have been denied a sale of its foreign manufactured chips.

For example, the Complaint alleges that "AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales." *See* Compl. ¶ 100.  The direct effects from this alleged conduct occurred in Germany, where AMD was allegedly shut out from selling its German-made micropro-cessors.  Any subsequent ripple effects in the U.S. based on the contention that AMD would have enhanced "economic muscle" in competing domestically if it achieved a greater share of foreign sales (Opp. at 11), do not satisfy the FTAIA's directness requirement.  *See Latino Quimica-Amtex S.A. v. Akzo Nobel Chem. B.V.,* 2005 U.S. Dist. LEXIS 19788, at *24-25, 27, 33, 36 (S.D.N.Y. Sept. 7, 2005) (D.I. 114, Ex. A) (FTAIA does not contemplate causes of action alleging direct foreign effects ultimately having a "ripple effect" on U.S. domestic market).  That AMD is basing its claim on ripple effects is apparent from its argument that, if Intel did not engage in the alleged foreign conduct, "AMD would over time have the opportunity to grow sufficiently" to break Intel's purported monopoly.  Opp. at 11 n.8.  AMD thus acknowledges that the effects of the alleged foreign conduct on AMD's ability to compete are not the "immediate consequence" of the conduct.  *See LSL Biotechnologies*, 379 F.3d at 680-81.  The same analysis applies to all other Complaint allegations that Intel has moved to dismiss.[3]

---

[2]  *Accord Optimum, S.A. v. Legend Corp.,* 926 F. Supp. 530, 533 (W.D. Pa. 1996) ("An allegation that income flows between corporations is insufficient to establish the requisite domestic effect").  *See also* Intel's Opening Brief 19-20.  AMD's assertion (Opp. 24 n.13) that its subsidiaries should be viewed as a single entity ignores the case law and the FTAIA, which states that the jurisdictional focus is on the location of the effects.

[3]  Moreover, how much AMD has in its coffers itself, let alone how AMD chooses to compete in the United States, depends on myriad factors, rendering AMD's presumably logical path speculative and uncertain.  For example, according to AMD's 2005 10-K filing with the Securities and Exchange Commission, among the many factors affecting AMD's profitability are: (i) the cyclical nature of the semiconductor industry, which "has

AMD's FTAIA construction would subject to U.S. antitrust jurisdiction conduct having only direct effects in each of the foreign countries in which AMD alleges Intel interfered with its sales. Such conduct, however, may be legal under the applicable foreign law in those jurisdictions, and this construction effectively imposes U.S. antitrust laws on foreign nations, without the required direct U.S. effects from the relevant conduct. The Supreme Court in *Empagran* expressly cautioned against such an expansion of U.S. jurisdiction. 542 U.S. at 165 ("Why should American law supplant . . . Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers[?]"). AMD's interpretation would be contrary to the language of the FTAIA and violate the Supreme Court's holding that it must be construed to "avoid unreasonable interference with the sovereign authority of other nations." *Id.* at 164.

### C. The Foreign Conduct Alleged in the Complaint Did Not "Give Rise to" AMD's Claim

AMD also cannot satisfy the FTAIA's second prong – that the alleged domestic effect "gives rise to," *i.e.*, proximately causes, its antitrust claim. See *Empagran Remand Decision*, 417 F.3d at 1270-71 ("The statutory language 'gives rise to' – indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus' the appellants advanced in their brief"). AMD argues that "unless Intel's exclusion is

---

experienced severe downturns" (AMD 10-K for 2005 at 55); (ii) [w]orldwide economic and political conditions" (*id.* at 64); (iii) "substantial declines in average selling prices" (*id.* at 56); (iv) AMD's ability to "reduce our manufacturing costs" and achieve "manufacturing efficiency" (*id.* at 56, 59); (v) AMD's ability to "develop, introduce and sell on a timely basis, new products or enhanced versions of existing products at competitive prices" (*id.* at 56); (vi) "currency exchange rate fluctuations" (*id.* at 64); and (vii) "changes in interest rates" (*id.* at 64). *See* App. Ex. 6. *Cf. Anza v. Ideal Street Supply Corp.*, 2006 U.S. LEXIS 4510, at *15-17 (June 5, 2006) (Ex. A hereto) (Supreme Court holds that plaintiff's "alleged injury was not the direct result of a RICO violation" because "[b]usinesses lose and gain customers for many reasons" and plaintiff's "lost sales could have resulted from factors other than petitioners' alleged acts of fraud").

AMD did not even attempt to take issue with Intel's argument (Intel Opening Br. at 19 & n. 16) that for similar reasons AMD's manufacturing investment decisions were not directly affected by the foreign conduct alleged in AMD's Complaint.

cumulatively sufficient on a world-wide basis, it cannot sustain its monopoly power within the U.S. portion of the global market." Opp. at 11. In other words, AMD claims that there could be no domestic effects absent the foreign effects of the alleged conduct.

Despite using slightly different language, AMD's argument invokes the identical causation standard rejected in the *Empagran Remand Decision*. AMD effectively asserts that "but for" the alleged foreign effects, there would be no domestic effects. This assertion has the FTAIA requirements backwards. The FTAIA requires proof that defendant's conduct have a *direct* domestic effect and that this domestic effect proximately give rise to plaintiffs' claims. 15 U.S.C. § 6a. *See Empagran Remand Decision* at 1269 (appellants must demonstrate that "the U.S. effects of the appellees' allegedly anti-competitive conduct 'gave rise to' their claims"); *Den Norske Stats Oljeselskap AS v. HeereMac v.o.f.*, 241 F.3d 420, 427 (5th Cir. 2001) (FTAIA "requires more than a 'close relationship' between the domestic injury and the plaintiff's claim; it demands that the domestic effect 'give rise' to the claim").[4]

---

[4]    AMD's reliance on *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998), is misplaced. AMD characterizes that decision as standing for the broad proposition that a "foreign plaintiff that suffered damages abroad as a result of monopolization of a foreign market could seek recovery in a U.S. court because that monopolization also caused antitrust injury in the United States." Opp. at 19. But *Caribbean Broadcasting* did not sanction an attempt to lump together foreign effects and domestic effects under the pretext that they involve a single "claim." There the conduct at issue – misrepresentations regarding the reach of a Caribbean radio station on which U.S. companies advertised – misled both foreign and U.S. advertisers and resulted in U.S. advertisers paying supra-competitive prices for advertising and the plaintiff losing U.S. sales as a direct result of the exclusionary conduct. 148 F.3d at 1086. Thus, the same *conduct* had a *simultaneous* direct foreign *and* domestic effect, with the claim arising from the direct domestic effect. This is a far cry from AMD's attempt to combine conduct involving foreign trade having only direct foreign effects with conduct in domestic or import commerce in an attempt to gain U.S. jurisdiction over the foreign conduct.

AMD similarly misplaces its reliance on *Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Eng'g Co.*, 1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. Jan. 18, 1977), an unpublished opinion decided before the FTAIA's enactment. There, a foreign plaintiff sued to recover an overcharge it paid to a U.S. exporter, alleging that the U.S. company's foreign affiliate unlawfully conditioned its sale to the plaintiff on the plaintiff's agreement to buy from the U.S. company (despite the existence of another U.S. exporter offering better prices). *Id.* at *9-11. The *Industria* plaintiff's injury arose directly from foreclosure of competition of a *U.S. exporter*, which was the act that produced the overcharge to the plaintiff.

**D.    The Existence of a Worldwide Market is Irrelevant to Jurisdiction**

AMD similarly contends that Intel's foreign conduct is subject to U.S. jurisdiction because "foreclosure of AMD from foreign customers" was "relevant and essential" to proof of "global monopoly" in "a world-wide market." Opp. at 7. The scope of the geographic market, however, does not establish the scope of U.S. jurisdiction under the FTAIA. *See Empagran Remand Decision*, 417 F.3d at 1270-71 ("global market" does not relieve plaintiffs of obligation to satisfy FTAIA's requirements). Instead, a geographic market represents "the area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elect. Co. v. Nashville Coal Co*., 365 U.S. 320, 327 (1961); *see Gordon v. Lewiston Hosp*., 423 F.3d 184, 212 (3d Cir. 2005) (geographic market "area in which a potential buyer may rationally look for the goods or services he seeks"). That the geographic market is worldwide means that a U.S. customer may rationally look outside the United States for microprocessors. It does not establish that AMD's alleged loss of a sale of its German-manufactured microprocessors to a Japanese OEM or British retailer has a direct effect on U.S. commerce.

AMD's argument recalls the *Empagran* plaintiffs' attempt to enlarge U.S. jurisdiction by claiming that the relevant market for vitamins was worldwide and that harm to U.S. consumers from a price-fixing conspiracy involving a worldwide market could not have been sustained but for foreign conduct that raised the prices of vitamins in foreign sales to foreign customers. The D.C. Circuit rejected this "but-for" causation approach to jurisdiction, holding that "'but-for' causation between the domestic effects and the foreign injury claim is simply not sufficient" under the FTAIA. 417 F.3d at 1270-71.

Similarly, in *Den Norske*, a case ignored by AMD, plaintiffs brought an antitrust claim based on foreign conduct that had direct foreign effects and sought to obtain U.S. jurisdiction by arguing that their foreign injury arose from a "single unified global conspiracy that also harmed U.S. commerce." 241 F.3d at 427 n.24. Although plaintiffs' alleged injury

occurred outside U.S. commerce, plaintiffs argued that defendants were able to maintain "monopolistic prices" domestically only because of an overall scheme that included the foreign conduct.

The Fifth Circuit rejected the plaintiffs' claim that the FTAIA's jurisdictional requirements were satisfied merely because the relevant market was "a single, unified, global market." *Id*. at 425. It further held that a mere "connection and interrelatedness between the high prices paid for services in the Gulf of Mexico [in U.S. commerce] and the high prices paid in the North Sea [in foreign commerce]" could not confer jurisdiction under the FTAIA. *Id*. at 427. The "assumed existence of a single, unified global conspiracy does not relieve [the plaintiff] of its burden of alleging that its injury arose from the conspiracy's proscribed effects on United States commerce." *Id.* at 427 n.24. *Accord In re Dynamic Random Access Memory Antitrust Litig*., 2006 U.S. Dist. LEXIS 8977 at *13 (N.D. Cal. Mar. 1, 2006) (D.I. 114, Ex. D) (rejecting claim that foreign injury that is "intertwined with the domestic effects" is sufficient to establish jurisdiction).[5]

AMD's similar contention that the non-US. effects are "inextricably bound up" with the U.S. effects ignores that the required showing is of direct, substantial, and foreseeable effects arising from the conduct involving foreign trade. It is not satisfied by some other unspecified relationship between foreign and domestic effects arising from the disparate conduct, separated by time, customer, and geography, alleged by AMD here. *See Empagran*, 542 U.S. at 166 ("The higher foreign prices of which the foreign plaintiffs complain here are not the consequence of any domestic anticompetitive conduct that *Congress sought to forbid,*

---

[5]   *See also Matsushita*, 475 U.S. at 582-84 & n.7 ("Respondents also argue that the check prices, the five company rule, and the price fixing in Japan are all part of one large conspiracy that includes monopolization of the American market through predatory pricing. The argument is mistaken. However one decides to describe the contours of the asserted conspiracy – whether there is one conspiracy or several – respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief. That showing depends in turn on proof that petitioners conspired to price predatorily in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury") (citations omitted).

for Congress did not seek to forbid any such conduct insofar as it is here relevant, *i.e.*, insofar as it is intertwined with foreign conduct that causes independent foreign harm") (emphasis in original).

### E. The FTAIA Does Not Allow Recovery of Damages for Conduct Excluded From the Sherman Act by the FTAIA

AMD argues that it can pursue a "claim" for all damages, even those arising in foreign commerce. Opp. at 16. AMD's position is contradicted by the plain meaning of the FTAIA. The FTAIA first requires proof that defendant's conduct involving foreign trade have a direct domestic effect and second that this domestic effect directly give rise to plaintiffs' claims. 15 U.S.C. § 6a. A U.S. court cannot award damages or impose a remedy for conduct in foreign commerce over which it has no jurisdiction.[6]

AMD's damages argument is also refuted by the statutory language. The FTAIA confines recovery to the limited effects of certain conduct. Specifically, for conduct involving foreign commerce that directly affects only export commerce (15 U.S.C. §6a(2)(B)), recovery is limited "to such conduct *only for injury to the export business in the U.S.*" (emphasis added). This provision leads to at least two logical conclusions: (1) that if "such conduct" does not have the requisite direct effect at all, no recovery for injury from that conduct is permitted; and (2) when "such conduct" only directly affects export commerce, only a *portion* of the claimed injury may be redressed under the Sherman Act, even if alleged to be part of a single "claim."[7]

---

[6]  AMD argues that jurisdiction is dependent on a plaintiff's election of a methodology for computing damages, and that because it might, at the end of the day, seek damages for lost market share (itself based on lost sales) instead of specific, identified lost sales, this is somehow relevant to jurisdiction. Opp. at 22-23 n.12. No court, however, has ever held that a plaintiff's choice of a damages methodology is a factor for a court to even consider under the FTAIA's jurisdictional test, and nothing on the face of the statute supports such a construction.

[7]  Thus, to the extent that AMD exported microprocessors from the U.S. prior to 2002 (Opp. at 7), its claim would be limited by statute to harm to its U.S. export business.

- 12 -

### F.     AMD's Status As a U.S. Company Does Not Transform Its Direct Foreign Harm Into Direct Domestic Harm

AMD concedes that it "is not alleging that the 'mer[e]' fact of its 'American owner-ship' affords this Court jurisdiction."  Opp. at 24.  This concession is compelled by the FTAIA's language, which only concerns the location of the direct effects of defendant's con-duct and makes no mention of the parties' citizenship.[8]  It is also consistent with numerous cases.  *E.g., Turicentro*, 303 F.3d at 301 ("[w]hether plaintiffs are United States citizens is irrelevant to our inquiry"); *United Phosphorus, Ltd. v. Angus Chem.. Co.,* 131 F. Supp. 2d 1003, 1009-10 (N.D. Ill. 2001) (FTAIA removes U.S. jurisdiction over antitrust conduct unless it has direct domestic effect, "even where the antitrust conduct originates in the U.S. or involves American-owned entities operating abroad"), *aff'd,* 322 F.3d 942 (7th Cir. 2003) (en banc); *CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 546 (D.N.J. 2005) ("the Court must reject any implication that the FTAIA's 'direct, substantial, and reasonably foreseeable effect' requirement is met because certain of Defendants' actions were taken or overseen in the United States").

Despite the statutory language, the case law, and its own disclaimer, AMD peppers its brief with references to its citizenship, beginning with the very first sentence of its brief and culminating with its argument that jurisdiction "is especially appropriate because AMD is an American company."  Opp. at 23.  AMD does not cite any case law – and there is none – that foreign effects (lost sales of foreign-manufactured products by a foreign sales company to foreign customers) can be transformed into direct domestic effects simply because a U.S. citizen owns shares in the directly affected foreign entities.

---

[8]     The legislative history is clear that conduct by firms that directly causes a foreign effect "should not, merely by virtue of the American ownership, come within the reach of our antitrust laws."  FTAIA House Report, H.R. Rep. No. 97-686, at 9-10.  AMD's attempt to minimize the importance of this statement of legislative intent, by noting that the next sentence refers to harm to a "domestic competitor" is misguided:  the phrase refers to an American exporter – which AMD is not.

III.    **AMD'S RELIANCE ON** *CONTINENTAL ORE* **AND OTHER PRE-***EMPAGRAN* **CASES IS MISPLACED**

AMD relies heavily upon *old* cases including *Continental Ore Co. v. Union Carbide*, 370 U.S. 690 (1962), *United States v. Sisal Sales Corp.,* 274 U.S. 268 (1927), and *United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ("*Alcoa*"), for the proposition that Intel's conduct in foreign commerce satisfies the FTAIA because it allegedly made "[AMD] less able to compete domestically." Opp. at 10. But nearly every case cited by AMD was decided before *Empagran* and most were decided before enactment of the FTAIA. *See Turicentro*, 303 F.3d at 304 n.12 ("The Supreme Court's opinion in *Pfizer* does not alter our analysis, because it preceded the enactment of the [FTAIA] by four years"). As the Ninth Circuit recognized in *LSL Biotechnologies*, the pre-FTAIA cases, which do not require a "direct" effect on U.S. commerce, are inconsistent with the subsequently-enacted FTAIA. 379 F.3d at 678-79.

AMD cites *Alcoa*, which held that the Sherman Act would reach only conduct that "did in fact produce some substantial effect in the United States," but contained no directness requirement. *Alcoa*, 148 F.2d at 443-44. As the Ninth Circuit recognized in *LSL Biotechnologies,* applying the *Alcoa* test "would render meaningless the word 'direct' in the FTAIA." 379 F.3d at 679. Doing so, as the court pointed out, "would contravene the FTAIA's purpose." *Id*. *See also United Phosphorous,* 322 F.3d at 951 ("the legislative history shows that jurisdiction stripping is what Congress had in mind in enacting the FTAIA"). AMD's pre-FTAIA cases did not address jurisdiction under the FTAIA and are not germane to the statutory construction issue presented here.

AMD also relies heavily on *Continental Ore*, but its reliance is misplaced. Apart from being a pre-FTAIA case, *Continental Ore* involved a domestic exporter's exclusion from a foreign market, which would place the case squarely within the FTAIA exception for conduct harming "export trade or export commerce with foreign nations, of a person engaged

- 14 -

in such trade or commerce in the United States." 15 U.S.C. § 6a(1)(B).[9]  Continental Ore's

exclusion from exporting a product manufactured in the United States is a far cry from

AMD's sale of German-made microprocessors to foreign companies in foreign countries.

AMD argues that "Section 2 monopolization claims cannot be broken apart into the

series of constituent acts by which the monopoly was cumulatively acquired, each to be

considered independently" (Opp. at 12-13 (citing *Continental Ore*, 370 U.S. at 698-99)).

That argument is wholly irrelevant to the question of jurisdiction before the Court.  The

language quoted by AMD addressed defendant's acts under the Sherman Act (all of which

affected the plaintiff in the U.S.), and *not* the issue of jurisdiction over foreign effects.  The

Court could not have even purported to be addressing jurisdiction under the later-enacted

FTAIA, which on its face requires the Court to evaluate jurisdiction based on the location of

the direct effects of specified conduct.[10]  AMD's interpretation of *Continental Ore* also

cannot be squared with *Empagran*'s holding that conduct with the only direct effects being

foreign is outside the jurisdiction of the U.S. courts even when linked to a conspiracy having

direct domestic effects.  *See also United Phosphorous,* 322 F.3d at 944-53 (FTAIA

jurisdiction presents separate issues from substantive antitrust claim).

Indeed, the plain language and structure of the FTAIA itself requires that the alleged

conduct of Intel involving "trade or commerce with . . . foreign nations" be evaluated sep-

arately from conduct not involving such trade or commerce.  15 U.S.C. § 6a (The [Sherman]

Act does not apply to *conduct involving trade or commerce (other than import trade or

commerce) with foreign nations.*")  *Continental Ore* does not (and could not) even purport to

---

[9]  The Court there held that the plaintiff could pursue a claim for its exclusion from the Canadian market, into which it had sold a product called Van-Ex (370 U.S. at 694), which, according to the decision below, was manufactured in Long Island, New York.  *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 289 F.2d 86, 88 (9th Cir. 1961).

[10]  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on [a] point conclusively resolved by broad language in cases where the issue was not presented or even envisioned").

address the question whether conduct involving only trade with foreign nations (*e.g.,* an offer by Intel to pay for shelf space in a computer store in France), can escape the FTAIA's jurisdictional requirements when the plaintiff seeks to "package" the conduct with other individual instances of conduct (*e.g.,* sales in the U.S.) to make a "claim."

## IV.     AMD'S FOREIGN SALES OF ITS GERMAN-MADE MICRO-PROCESSORS DO NOT CONSTITUTE EXPORT TRADE

AMD argues, without legal support, that it satisfies the FTAIA because its German-made microprocessors constitute U.S. "export commerce" due to a "U.S. contribution" to their design and engineering.  Opp. at 26-27.  But AMD concedes that it "moved the fabrication part of its business overseas" and that its microprocessors are "presently fabricated in Germany."  Opp. at 6-7, 26.  AMD thus does not export *microprocessors* from the U.S., and the shipment of its microprocessors from Germany to foreign nations is not "export trade or export commerce" under the FTAIA.  This conclusion does not, as AMD contends, improperly elevate "form over reality."  *Id.* at 27.  It is based on law and common sense.

The FTAIA itself does not define "export trade" or "export commerce."  As the Third Circuit noted in *Turicentro,* however, the Act is part of the Export Trading Company Act of 1982 ("ETCA"), P.L 97-290, 96 Stat. 1233 (1982).  303 F.3d at 298-99.  Title I of the ETCA sets out the purpose of the legislation, including the FTAIA, and defines key statutory terms. As set out in section 102(b) of the ETCA, 15 U.S.C. § 4001(b),  the statutory purpose is to "increase United States exports of products and services" through four actions that include "modifying the application of the antitrust laws to certain *export trade*" under the new FTAIA.  *Id.* (emphasis added).  Section 103 of the ETCA states that, for purposes of this same ECTA Title, "the term 'export trade' means trade or commerce in *goods or services produced in the United States which are exported*, or in the course of being exported, *from the United States* to any other country."  15 U.S.C. § 4002(a)(1) (emphasis added).  This

definition of "export trade" requires the exportation of a U.S.-manufactured product, and not merely a U.S. engineering contribution to a foreign-made product.

The Third Circuit adopted a similar product-based interpretation of the term "import" in *Turicentro*, where it noted that while the FTAIA "does not define the term 'import,' [] the term generally denotes a product (or perhaps a service) [that] has been brought into the United States from abroad." 303 F.3d at 303.

It is also clear that microprocessor design and engineering is not a "service" within the meaning of the ETCA. Section 103(a)(2) of the ETCA defines services to include such things as consulting, insurance, and tourism. 15 U.S.C. § 4002(a)(2). These examples contemplate a foreign client engaging the services of a U.S. provider. The term does not include AMD's design of a microprocessor, as AMD does not sell a "design" or service": a purchaser who buys a microprocessor from AMD buys a *product* (made in Germany).[11]

Similarly, AMD's assertion that "in this era of outsourcing of the ministerial aspects of production" the situs of manufacturing somehow matters less (Opp. at 27), does not carry weight. Microprocessor manufacturing is anything but "ministerial," and AMD itself alleges that manufacturing facilities cost billions of dollars. Compl. ¶27. More important, the manufacturing situs goes to the heart of the ETCA's, and thus the FTAIA's, purpose. The very first congressional finding in the ETCA is that "United States exports are responsible for creating and maintaining one out of every nine manufacturing jobs in the United States." 15 U.S.C. § 4001(a)(1). The ETCA was designed to protect U.S. manufacturing, and thereby

---

[11]    In fact, Title I of the ETCA also refers to "export trade services," which do *not* constitute "export trade" and instead are "provided in order to *facilitate* the export of goods and services produced in the United States." 15 U.S.C. § 4002(a)(3) (emphasis added); *see also* 15 U.S.C. § 4001(a)(6) ("[C]ompanies attempting to offer export trade services lack financial leverage to reach a significant number of potential United States exporters"). Title I of the ETCA defines the term "export trade services" to include "product research and design." 15 U.S.C. § 4002(a)(3). Thus, the "U.S. design" of AMD's chips theoretically could facilitate export trade (if AMD manufactured its chips in the U.S. instead of in Germany), but it does not itself constitute "export trade or export commerce."

U.S. manufacturing jobs.  AMD seeks to interpret the FTAIA for the exact opposite purpose: to protect AMD's "outsourcing" of investment and manufacturing jobs to Germany.  AMD's decision to outsource manufacturing bars AMD from invoking the protections of U.S. antitrust laws as an "exporter" of microprocessors.[12]

### V.    AMD'S ARGUMENTS ABOUT DISCOVERY AND EVIDENCE REGARDING FOREIGN CONDUCT HAVE NO BEARING ON SUBJECT MATTER JURISDICTION

AMD asserts that "evidence of Intel's foreign practices, and the discovery needed to develop it, would remain a part of the litigation" even if Intel's motion is granted, and implies that determinations on discovery and evidence are dispositive of jurisdiction.  Opp. at 6.  In so arguing, AMD ignores that Congress, through the FTAIA, mandated that the court conduct a *jurisdictional* analysis.  The FTAIA's test focuses on the effects of foreign conduct on U.S. commerce.  Whether information is discoverable or admissible at trial is governed by the separate and different standards set out in the Federal Rules of Civil Procedure and Evidence.

To be sure, a ruling that the Court lacks jurisdiction over foreign conduct could inform the Court's decisions on discovery and evidence down the road.  If the foreign conduct is dismissed, the Court might find that certain discovery requests may not lead to the discovery of admissible evidence or that the benefits of some discovery are outweighed by the burden, but the Court's decisions in this regard are an issue for another day.  There is no merit to AMD's contention that its purported entitlement to discovery is relevant to the FTAIA's jurisdictional analysis.  *See, e.g., United Phosphorous,* 131 F. Supp. 2d at 1009-10 ("FTAIA . . . presents a jurisdictional question that must be resolved by a court before a case may proceed to a determination regarding its merits") (citations omitted).

---

[12]    Thus, AMD's "Warner Bros." analogy (Opp. at 26) bears no resemblance to the situation here.  AMD would be closer to the mark if it described a script written by someone in the United States that was then cast, shot, edited, mixed for sound, and distributed by a German company for European theatergoers and the plaintiff was foreclosed from selling the film in Europe through conduct that occurred in Europe.  In no way does the film's distribution in Europe constitute a U.S.  "export" of the film for purposes of the FTAIA.

## VI.    PRINCIPLES OF COMITY ALSO SUPPORT DISMISSAL

AMD raises the specter that Intel might go "unpunished" (assuming that lowering prices to foreign customers warrants punishment) unless this Court finds it has jurisdiction over the foreign effects of Intel's conduct.  Opp. at 13, 27.  That specter is easily dispelled. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Associated General Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quotations omitted).

In fact, a foreign AMD entity has already filed a lawsuit in Japan to obtain redress for alleged Intel conduct that directly affected it in Japan, and AMD has made complaints to competition authorities in other foreign jurisdictions.  AMD does not need this Court to protect its legitimate interests in Japan or anywhere else in the world.  More to the point, however, this Court could not disregard the FTAIA and assert jurisdiction over the alleged foreign effects of Intel's conduct in Japan or elsewhere even if the specter raised by AMD were true.  Congress wrote no exception into the FTAIA to allow for jurisdiction where a foreign sovereign does not act.  *See Empagran*, 542 U.S. at 169 ("But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat").

## VII.    AMD LACKS STANDING TO PRESS ITS FOREIGN CLAIMS UNDER U.S. LAW

The Third Circuit expressly affirmed dismissal in *Turicentro* because plaintiffs lacked standing to obtain redress for foreign injuries under U.S. antitrust laws.  303 F.3d at 307 ("Plaintiffs' injuries occurred exclusively in foreign markets.  They are not of the type Congress intended to prevent through the Foreign Trade Antitrust Improvements Act or the Sherman Act.").  The same is true here, and requires dismissal of the parts of AMD's Complaint on which Intel has moved.  *See also In re Dynamic Random Access Memory Antitrust Litig.,* 2006 U.S. Dist. LEXIS 8977, at *17-18 (D.I. 114, Ex. D) ("The same

considerations that mandate a finding of no subject matter jurisdiction weigh against a finding of antitrust standing").

AMD's contention that because it has standing to challenge some conduct (that involving alleged domestic harm) it has standing to challenge all conduct (Opp. at 30) is incorrect.  "Standing is not dispensed in gross."  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see also id.* ("If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.  That is of course not the law").

**VIII.    CONCLUSION**

The Court lacks subject matter jurisdiction over significant portions of AMD's Complaint.  Intel's motion to dismiss should be granted.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  June 9, 2006

POTTER ANDERSON & CORROON LLP

By: _/s/ Richard L. Horwitz_____
    Richard L. Horwitz (#2246)
    W. Harding Drane, Jr. (#1023)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**<u>CERTIFICATE OF SERVICE</u>**

I, Richard L. Horwitz, hereby certify that on June 9, 2006, the attached document was hand delivered to the following persons and was electronically filed with the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801

James L. Holzman
J. Clayton Athey
Eric M. Andersen
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE  19899

I hereby certify that on June 9, 2006, I have Federal Expressed the documents to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, NY  10019

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New  York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA  94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA  94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
steve@hbsslaw.com
tony@hbsslaw.com

By:    /s/ Richard L. Horwitz
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      POTTER ANDERSON & CORROON LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE  19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com