IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| INTEL CORP. MICROPROCESSOR | : | MDL Docket No. 05-1717-JJF |
| ANTITRUST LITIGATION, | : | |
| | : | |
| ADVANCED MICRO DEVICES, INC. and | : | |
| AMD INTERNATIONAL SALES & | : | |
| SERVICE, LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 05-441-JJF |
| | : | |
| INTEL CORPORATION and INTEL | : | |
| KABUSHIKI KAISHA, | : | |
| | : | |
| Defendants. | : | |

Charles P. Diamond, Esquire; Linda Smith, Esquire and Mark Samuels, Esquire of O'MELVENY & MYERS LLP, Los Angeles, California.
Henry C. Thumann, Esquire of O'MELVENY & MYERS LLP, Washington, D.C.
Jesse A. Finkelstein, Esquire; Frederick L. Cottrell, III, Esquire; Chad M. Shandler, Esquire and Steven J. Fineman, Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware.

Attorneys for Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Services, Ltd.


Robert E. Cooper, Esquire and Daniel S. Floyd, Esquire of GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California.
Peter E. Moll, Esquire and Darrent B. Bernhard, Esquire of HOWREY LLP, N.W. Washington, D.C.
Richard L. Horwitz, Esquire and W. Harding Drane, Jr., Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Intel Corporation and Intel Kabushiki Kaisha.

**MEMORANDUM OPINION**

September 26, 2006
Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court is the Motion of Defendants' Intel Corporation and Intel Kabushiki Kaisha To Dismiss AMD's Foreign Commerce Claims For Lack Of Subject Matter Jurisdiction And Standing (D.I. 111 in Civil Action No. 05-441; D.I. 64 in MDL Docket No. 05-1717). For the reasons discussed the Court will grant Defendants' Motion.

## BACKGROUND

Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. (collectively, "AMD") filed this action against Intel Corporation and Intel Kabushiki Kaisha (collectively, "Intel") alleging antitrust claims under the Sherman Act and violations of the California Business and Professions Code. Specifically, AMD alleges that Intel has willfully maintained a monopoly in the x86 Microprocessor Market by engaging in anticompetitive conduct, including such activities as forcing major customers into exclusive or non-exclusive deals, conditioning rebates and other monetary incentives on customers' agreement to limit or forego purchases from AMD, forcing PC makers and technology partners to boycott AMD product launches and promotions and threatening retaliation against customers introducing AMD computer platforms. AMD also alleges that Intel has willfully interfered with AMD's economic relationships with its actual and potential customers and engaged in a scheme to extend secret and discriminatory rebates to customers for the

purpose of injuring AMD in violation of the California Business and Professions Code.

Intel has filed an Answer to the Complaint denying AMD's allegations. In addition, Intel has filed the instant Motion To Dismiss contending that the Court lacks subject matter jurisdiction over AMD's antitrust claims, to the extent that those claims are based upon the foreign effect of Intel's alleged conduct.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss a complaint if the Court lacks subject matter jurisdiction over the plaintiff's claim, or the plaintiff lacks standing to bring its claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the Court must accept all factual allegations in the complaint as true and all reasonable inferences must be drawn in favor of the plaintiff. The Court's inquiry under Rule 12(b)(1) is limited to the allegations in the complaint, the documents referenced in or attached to the complaint, and matters in the public record. Gould Electronics Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000). However, the Court may consider documents attached as exhibits to a motion to

2

dismiss without converting the motion to dismiss to a motion for summary judgment, if the plaintiff's claims are based on the documents and the documents are undisputedly authentic. <u>Pension Benefit Guaranty Corp. v. White Consolidated Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the plaintiff's complaint. <u>Mortensen v. First Fed. Sav. and Loan</u>, 549 F.2d 884, 891 (3d Cir. 1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. <u>Gotha v. United States</u>, 115 F.3d 176, 179 (3d Cir. 1997).

Pursuant to Rule 12(h)(3), subject matter jurisdiction may be challenged at any time during the course of a case and may be raised <u>sua sponte</u> by the Court. Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff "must bear the burden of persuasion" and establish that subject matter jurisdiction exists. <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406 (3d Cir. 1991).

3

## DISCUSSION

I.  **Whether AMD's Complaint Should Be Dismissed For Failure To Satisfy The Jurisdictional Requirements Of The Foreign Trade Antitrust Improvements Act Of 1982**

The Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") amends the Sherman Act to clarify the extent to which the antitrust laws of the United States reach conduct concerning trade or commerce with foreign nations. The FTAIA provides:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless-
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect-
>
>   (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
>   (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act] other than this section.
>
> If [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a (1997). Elaborating on this provision of the FTAIA, the United States Supreme Court explained that the FTAIA:

> initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American

4

> commerce, *i.e..* it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

<u>F. Hoffman-La Roche Ltd. v. Empagran S.A.</u>, 542 U.S. 155 (2004) (emphasis and brackets in original).

By its Motion, Intel contends that AMD's Complaint should be dismissed for failure to satisfy the jurisdictional requirements of the FTAIA. Specifically, Intel contends that AMD seeks relief for alleged business practices of Intel that affect the sale of AMD's microprocessors in foreign countries. Although AMD is headquartered in the United States, Intel points out that AMD's microprocessor manufacturing occurs in Germany and the assembly of the German-made microprocessors into final products occurs in Malaysia, Singapore and China. Intel contends that AMD seeks recovery for lost sales of these foreign-made microprocessors to foreign countries. Intel points out that AMD is seeking redress through the Japanese courts, the European Commission and the Korean Fair Trade Commission for the same business practices of Intel that are alleged here. Because any alleged harm suffered by Intel occurred outside of the United States and AMD is already seeking redress for that harm in the appropriate foreign tribunals, Intel contends that the Court lacks jurisdiction over Intel's "foreign commerce claims" under both the FTAIA and

5

principles of foreign comity.

In response, AMD contends that it is not asserting any "foreign commerce claims." Rather, AMD contends that the x86 Microprocessor Market is a single, unitary world-wide market and that proof of its monopolization claim under Section 2 of the Sherman Act requires an examination into the foreign conduct of Intel which is alleged to have domestic effects. AMD contends that in this case Intel's foreign conduct and the foreign harm it caused are inextricably bound with Intel's domestic conduct restraining trade and the resulting domestic antitrust injury to AMD. As an American company selling an American engineered and designed product, AMD contends that it may invoke United States antitrust laws to address the conduct of its American competitor.

AMD also disputes Intel's assertion that it ceased being an exporter when it moved the fabrication portion of its business overseas. However, AMD contends that even if it is no longer an exporter, it continued to export microprocessors made in the United States through at least 2002, a period of time within the limitations period, and therefore, Intel's foreign restraints affected the export commerce of the United States.

AMD further contends that its litigation in foreign venues does not impact this Court's jurisdiction, because Intel has not advanced any evidence of any tension between United States antitrust laws and their foreign counterparts. Thus, AMD

6

contends that parallel proceedings are appropriate and the interests of comity do not limit the Court's jurisdiction.

After considering the allegations of the Complaint in the light most favorable to AMD and in the context of the applicable law and the parties' respective arguments, the Court concludes that it lacks jurisdiction over AMD's claims that are based on lost sales of AMD's German-made microprocessors to foreign customers as alleged in (1) paragraphs 40-44, 54, 57, and 74 relating to Japanese OEMs; (2) paragraphs 55, 56, 65, 75 and 81 related to European OEMs; (3) paragraphs 81, 83 and 86 relating to alleged interference with the launch of an AMD-based system by foreign OEMs or sales to these OEMs; (4) paragraphs 89, 93, 94 relating to interference with foreign distributors' sales in foreign countries; (5) paragraphs 100 and 101 relating to interference with sales to retailers in Europe; and (6) paragraph 106, which alleges interference with the German retail chain Vobis. As a threshold matter, the FTAIA applies to conduct involving trade or commerce with foreign nations. The Court does not understand the parties to contest that this threshold requirement is satisfied. The conduct alleged in the Complaint clearly applies to foreign trade in that it concerns Intel's conduct selling microprocessors to foreign companies located in foreign countries. Thus, the Court concludes that the first requirement of the FTAIA is satisfied.

7

Because the alleged conduct comes within the purview of the FTAIA, the Court must next consider the "geographical effect of that conduct." Turicentro, 303 F.3d 293, 301 (3d Cir. 2002). Specifically, the Court must determine whether AMD has alleged that Intel's foreign conduct had a direct, substantial and foreseeable effect on United States commerce.

AMD contends that Intel's foreign conduct is an essential part of its domestic monopolization scheme. According to AMD, Intel's foreign conduct "neuters" AMD and makes it less able to compete domestically. In this regard, AMD alleges:

> In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide. As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

(Compl. ¶ 128). Explaining its position further, AMD contends that Intel has kept AMD "from selling microprocessors abroad with the purpose and effect of weakening AMD as a domestic rival." (D.I. 147 in Civil Action No. 05-441 at 10; D.I. 107 in MDL Docket No. 05-1717 at 10.) According to AMD, "Intel's ability to coerce U.S. customers from giving AMD more business depends on keeping AMD economically powerless to make these customers whole for the costs that Intel can impose on them. To so marginalize AMD, Intel has necessarily had to cut AMD off from business

8

opportunities throughout the market, including opportunities with foreign customers." (Id. at 2.)

Courts discussing the "direct effects" requirement of the FTAIA have recognized that "direct effect" means that there must be an "immediate consequence" of the alleged anticompetitive conduct with no "intervening developments." United States v. LSL Biotechnologies, 379 F.3d 672, 680 (9th Cir. 2004). In the Court's view, however, AMD's chain of effects is full of twists and turns, which themselves are contingent upon numerous developments. Intel's characterization of AMD allegations, which the Court finds to be accurate, illustrates the Court's point:

> Thus, under AMD's logic, a deal between Intel and a German retailer to promote Intel-based systems (see Compl. ¶ 100) directly affect U.S. commerce because it reduces AMD's German subsidiary's sales of German-made microprocessors in Germany, which in turn affects the profitability of the U.S. AMD parent, which in turn affects the funds that AMD has for discounting to U.S. customers, which in turn affects the discounts that it offers in particular U.S. transactions, which in turn affects its competitiveness in the United States, and which in turn affects U.S. commerce."

(D.I. 165 in Civil Action No. 05-441 at 6; D.I. 138 in MDL Docket No. 05-1717 at 6.) With respect to this specific example, courts have recognized that reduced income flowing from a foreign subsidiary to a domestic parent is not a direct domestic effect or injury. Info. Res., Inc. v. Dun & Bradstreet Corp., 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2001); Optimum S.A. v. Legend Corp.,

9

926 F. Supp. 530, 533 (W.D. Pa. 1996) ("An allegation that income flows between corporations is insufficient to establish the requisite domestic effect."). More generally, however, AMD's primary contention that its lost foreign sales have resulted in lost profitability which in turn, has resulted in lost revenues to shareholders and missed opportunities to invest and compete in the United States is premised on a multitude of speculative and changing factors affecting business and investment decisions, including market conditions, the cost of financing, supply and demand, the success or failure of research and development efforts, the availability of funds and world-wide economic and political conditions. (D.I. 113 in Civil Action No. 05-441 at Exh. 15; D.I. 66 in MDL Docket No. 05-1717 at Exh. 15, excerpts from AMD Annual Reports, 2001-2004, discussing intervening factors that affect AMD's investment decisions.)

AMD places great weight on its allegations that it is an American company engaged in a world-wide market; however, such allegations do not create jurisdiction without substantial, direct effects on the domestic market. See e.g., Turicentro, 303 F.3d at 301 ("Whether plaintiffs are United States citizens is irrelevant to our inquiry."); Den Norske Stats Oljeselskap AS v. Heeremac VOF, 241 F.3d 420, 425 (5th Cir. 2001) (rejecting allegation of worldwide conspiracy as sufficient to satisfy jurisdictional requirements of FTAIA and stating that "[t]he

10

assumed existence of a single, unified, global conspiracy does not relieve [plaintiff] of its burden of alleging that its injury arose from the conspiracy's proscribed effects on United States commerce"). While the Court understands the nature of a global market, the allegations of foreign conduct here result in nothing more than what courts have termed a "ripple effect" on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such "ripple effects." See Latino Quimica-Amtex v. Azko Nobel Chems. B.V., 2005 U.S. Dist. LEXIS 19788, *24-25, 27, 33, 36 (S.D.N.Y. Sept. 7, 2005).

Because AMD has not alleged that Intel's conduct resulted in a substantial and direct domestic effect, AMD cannot demonstrate that any such domestic effect gives rise to its claim. The FTAIA requires a plaintiff to allege that its claims were directly caused by the domestic effects of the conduct and not the foreign effects. Stated another way, the "statutory language 'gives rise to' - indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus.'" Empagran S.A. v. F. Hoffman-Laroche, Ltd., 417 F.3d 1267, 1270-1271 (D.C. Cir. 2005). In this case, any alleged harm suffered by AMD has been directly caused by the foreign effects of Intel's alleged conduct, namely lost foreign sales. The other "ripple effects" of Intel's foreign conduct on the U.S. market may not have arisen "but for" Intel's alleged conduct; however, "but for"

11

causation is not the type of direct causation contemplated by the FTAIA.

AMD alleges in its Complaint that Intel's alleged conduct has resulted in higher PC prices and a "loss of freedom" or consumer choice for computer purchasers in the United States. (D.I. 1 in Civil Action No. 05-441 at ¶¶ 6, 136.) To the extent that these effects are based on Intel's alleged foreign conduct, the Court concludes that they too are insufficient to establish the proximate causation required by the FTAIA. As explained by the Court previously, these types of effects are not direct domestic effects of any alleged foreign conduct of Intel, but secondary and indirect effects that are also the by-product of numerous factors relevant to market conditions and the like. Second, AMD's allegations refer to the computer market and not the microprocessor market, and therefore, the effects to which AMD refers are not effects linked to the relevant market.

AMD also argues that it has sufficiently alleged proximate causation because its foreign injury and the foreign effects of Intel's conduct are "inextricably bound up with domestic restraints of trade." In this regard, AMD contends that the individual instances of lost sales by AMD, whether in the United States or abroad, do not give rise to their own monopolization claim, but rather, that the individual incidents taken together constitute a single monopolization having a foreseeable and

12

substantial effect on U.S. commerce. AMD argues that it is this "single global *effect* that gives rise to AMD's claim for damages." (D.I. 147 in Civil Action No. 05-441 at 22; D.I. 107 in MDL Docket No. 05-1717.)

In support of its position, AMD directs the Court to <u>Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC</u>, 148 F.3d 1080 (D.C. Cir. 1998). According to AMD, the <u>Caribbean Broad</u> court "held that a *foreign* plaintiff that suffered damages abroad as a result of a monopolization of a *foreign* market could seek recovery in a U.S. court, because that monopolization also caused antitrust injury in the United States." (D.I. 147 in Civil Action No. 05-441 at 20, emphasis in original; D.I. 107 in MDL No. 05-1717 at 20, emphasis in original.) However, the Court does not read the <u>Caribbean Broad</u> case to support AMD's argument that foreign conduct with a direct foreign effect should be combined with domestic conduct in an attempt to confer jurisdiction over the foreign conduct under the rubric of a single claim. In <u>Caribbean Broad</u>, U.S. companies advertised on a Caribbean radio station accused of misrepresenting its reach. The alleged misrepresentations caused harm to foreign and U.S. advertisers and resulted in U.S. advertisers paying ultra-competitive prices for advertising and losing U.S. sales.

The Court agrees with Intel that in <u>Caribbean Broad</u>, the same conduct had simultaneous, direct foreign and direct domestic

13

effects, with the plaintiffs' antitrust claim arising from those direct domestic effects. Here, there is no simultaneous direct domestic effect from Intel's alleged foreign conduct. Stated another way, the foreign harm for which AMD seeks to recover arises from the effects of the alleged foreign conduct and there is no direct link between the foreign conduct and the domestic antitrust injury. To the extent that the alleged foreign conduct caused any domestic effects at all, those effects are outside of the direct causal chain, and thus, insufficient to support the exercise of the Court's jurisdiction over AMD's claim.

AMD relies on several cases, including Continental Ore Co. v. Union Carbide, 370 U.S. 690 (1962) and United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945) ("Alcoa"), to supports its claim that foreign conduct which makes a company less likely to compete domestically falls within the scope of the Sherman Act. In Continental Ore, the Supreme Court recognized that "[a] conspiracy to monopolize or restraining the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries." 370 U.S. at 704. However, Continental Ore and the majority of other cases relied upon by AMD predate the FTAIA and the Supreme Court's decision in Empagran elucidating the direct effects and causation requirements of the FTAIA. Further, much of the discussion

14

relied upon by AMD in Continental Ore focuses on the substantive requirements of the Sherman Act and not on threshold jurisdictional questions like those raised by the FTAIA. See United Phosphorous Ltd. v. Angus Chem. Co., 322 F.3d 942, 944-953 (7th Cir. 2003) (recognizing that FTAIA present jurisdictional questions which are separate from substantive requirements of an antitrust claims). Because the cases relied upon by AMD do not require a direct effect on U.S. commerce, they are fundamentally inconsistent with the FTAIA and its purpose of limiting rather than expanding the Court's antitrust jurisdiction. LSL Biotechnologies, 379 F.3d at 679 (recognizing that pre-FTAIA cases like Alcoa do not contain the direct effects requirement of the FTAIA); United Phosphorous, 322 F.3d at 951 (stating that "the legislative history shows that jurisdiction stripping is what Congress had in mind in enacting the FTAIA"). Accordingly, the Court is not persuaded by AMD's arguments to the extent that they are premised on pre-FTAIA law.

In sum, the Court concludes that it lacks subject matter jurisdiction under the FTAIA over AMD's claims, to the extent those claims are based on foreign conduct and foreign harm. AMD has not demonstrated that the alleged foreign conduct of Intel has direct, substantial and foreseeable effects in the United States which gives rise to its claim. AMD's allegations, taken in the light most favorable to AMD, describe a foreign effect and

15

a foreign harm that have had ripple effects for the domestic market, but have not had any direct, substantial and reasonable effect which would give rise to an antitrust claim within the jurisdictional reach of the Sherman Act. Accordingly, the Court will dismiss AMD's claims based on alleged lost sales of AMD's microprocessors to foreign customers and strike the allegations in the Complaint forming the basis for those claims, namely paragraphs 40-44, 54-57, 74-75, 81, 83, 96, 89, 93-94, 100-101 and 106.

## II. Whether AMD's Complaint Should Be Dismissed For Lack Of Standing

In the alternative, Intel also contends that AMD lacks standing under the Sherman Act to pursue its claims for injuries arising in foreign commerce. Intel contends that AMD's claims are based on the alleged monopolization of trade among foreign nations and injuries in foreign markets cannot be redressed through the antitrust laws of the United States.

In response, AMD contends that a plaintiff who alleges injury caused by the anticompetitive conduct of a competitor suffers an injury than can be redressed through the Sherman Act. AMD contends that "Intel's conduct has directly caused AMD's competitive injury, both in U.S. commerce and throughout the world-wide market of which the U.S. portion is but an indivisible part." (D.I. 147 in Civil Action No. 05-441 at 30; D.I. 107 in MDL Docket No. 05-1717 at 30.)

To establish standing to bring an antitrust claim, the plaintiff "must have suffered an injury the antitrust laws were intended to prevent, and the injury must flow from that which makes the defendants' acts unlawful." Turicentro, 303 F.3d at 307. As the Third Circuit has recognized, this analysis implicates many of the same jurisdictional issues under the FTAIA.

For the reasons discussed in the context of the FTAIA, the Court concludes that the alleged injuries suffered by AMD as a result of Intel's foreign conduct are foreign injuries that occurred in foreign markets. Because such foreign injuries are "not the type of injury Congress intended to prevent through the [FTAIA] or the Sherman Act," the Court concludes that AMD lacks standing to pursue its claims based on foreign injury. Accordingly, for this additional reason, the Court will dismiss AMD's claims for foreign injuries arising as a result of Intel's alleged foreign conduct.

## CONCLUSION

For the reasons discussed, the Court will grant Intel's Motion To Dismiss AMD's Foreign Commerce Claims For Lack Of Subject Matter Jurisdiction And Standing.

An appropriate Order will be entered.