**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION | MDL No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, | C.A. No. 05-485-JJF |
| Plaintiffs, | CONSOLIDATED ACTION |
| v. | |
| INTEL CORPORATION, | |
| Defendant. | |

**DEFENDANT INTEL CORPORATION'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS
THE FIRST AMENDED CONSOLIDATED COMPLAINT**

OF COUNSEL:
David M. Balabanian
James L. Hunt
Christopher B. Hockett
Nora C. Cregan
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA  94111-4067
(415) 393-2000

Richard A. Ripley
BINGHAM McCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000

Dated: November 3, 2006

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendant
Intel Corporation*

## TABLE OF CONTENTS
(continued)

Page

I. INTRODUCTION ...................................................................1

II. STATEMENT OF THE CASE ................................................4

    A. The Microprocessor Industry............................................4

    B. AMD's Lawsuit Against Intel ...........................................5

    C. Plaintiffs' Consolidated Complaint ...................................6

        1. Intel's Alleged Price Conduct.......................................6

        2. Intel's Alleged Non-Price Conduct ..............................8

        3. The Alleged Claims For Relief......................................9

III. LEGAL STANDARD OF REVIEW .....................................10

IV. PLAINTIFFS DO NOT ALLEGE AN INJURY
COGNIZABLE UNDER FEDERAL OR STATE
ANTITRUST LAWS ...........................................................10

    A. Plaintiffs Fail To Allege An Antitrust Injury ...........................12

    B. Plaintiffs Are Not The Proper Parties To Bring The
Antitrust Claims In Their Complaint ...............................16

        1. The Complaint Alleges No Causal
Connection Between The Claimed Injury
And The Challenged Conduct .....................................17

        2. There Are "More Direct Victims" Of The
Alleged Wrongful Conduct.........................................20

        3. Plaintiffs' Alleged Injuries Are Too Remote
And Speculative To Support Standing .........................25

    C. Plaintiffs' Alleged Non-Price Injuries Cannot
Confer Antitrust Standing................................................26

V. NON-CALIFORNIA PLAINTIFFS CANNOT INVOKE
CALIFORNIA LAW .............................................................28

    A. California Law Does Not Apply Under Choice-Of-
Law Rules ........................................................................29

        1. The Choice Of Law Is Outcome-
Determinative; Therefore, Nationwide
Application Of California Law Would
Frustrate The Laws Of Other States .............................29

        2. MDL Courts Apply The Choice Of Law
Rules Of The Transferor Fora.......................................32

TABLE OF CONTENTS
(continued)

Page

3.    Under Applicable Choice-Of-Law Rules,
      California Law Does Not Apply Nationwide ................................33

VI.   OTHER LEGAL DEFECTS BAR PLAINTIFFS' STATE
      ANTITRUST CLAIMS ON THEIR FACE........................................39

      A.    Certain States' Antitrust Laws Do Not Reach
            Interstate Or International Conduct ........................................40

      B.    New York Antitrust Law Does Not Permit Class
            Actions By Indirect Purchasers ..............................................41

VII.  PLAINTIFFS FAIL TO STATE CLAIMS UNDER
      STATE CONSUMER PROTECTION STATUTES ...........................41

      A.    Plaintiffs Lack Standing To Bring A UCL Claim or
            State Consumer Protection/Unfair Competition
            Claims .....................................................................................42

            1.    Plaintiffs Do Not, And Cannot, Allege
                  Injury In Fact ................................................................42

            2.    Plaintiffs Do Not, And Cannot, Allege
                  Causation ......................................................................43

      B.    Plaintiffs Invoke Consumer Protection Statutes
            That Do Not Allow Class Actions ...........................................44

      C.    Plaintiffs Have Not Alleged Facts Showing That
            Intel Engaged in Fraudulent, Deceptive, or
            Unconscionable Conduct .........................................................45

            1.    Plaintiffs Have Not Pled Facts Sufficient To
                  State A Claim For Fraudulent Or Deceptive
                  Conduct As Required Under Laws Of
                  Arkansas, Idaho, Kansas, Maine, New
                  Mexico, New York And Utah........................................45

            2.    Plaintiffs Have Not Alleged That Intel
                  Engaged In Any Unconscionable Conduct,
                  As Required By Arkansas, Utah And New
                  Mexico Law ..................................................................47

      D.    Plaintiffs Are Not Permitted To Raise Antitrust
            Claims Under The Guise Of California's Unfair
            Competition Law ......................................................................48

VIII. PLAINTIFFS' COMMON LAW TORT CLAIMS ALSO
      FAIL ..................................................................................................48

TABLE OF CONTENTS
(continued)

Page

A.  California Does Not Recognize A Common Law
    Tort Of Monopolization........................................................................49

B.  Plaintiffs' Effort To Cast Their Allegations As An
    Unjust Enrichment Tort Fails As A Matter Of Law ..................................49

C.  The Monopolization And Unjust Enrichment "Tort"
    Claims Should Also Be Dismissed For Lack Of
    Alleged Injury In Fact And Causation........................................................54

IX.  CONCLUSION..................................................................................................55

TABLE OF AUTHORITIES
(continued)

Page

## CASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
369 F.3d 732 (3d Cir. 2004) ................................................................ 12, 16, 24

*Alberta Gas Chems., Ltd. v. E.I. Du Pont De Nemours & Co.*,
826 F.2d 1235 (3d Cir. 1987) ................................................................ 11

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
228 F.3d 429 (3d Cir. 2000) ........................................................ 20, 25, 53

*Am. Ad Mgmt., Inc. v. General Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) ........................................................ 16, 17

*APJ Assocs., Inc. v. N. Am. Philips Corp.*,
317 F.3d 610 (6th Cir. 2003) ................................................................ 51

*Asher v. Abbott Labs.*,
737 N.Y.S.2d 4 (App. Div. 2002) ........................................................ 41

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters*, 459 U.S. 519 (1983) ................................................... *passim*

*Atl. Richfield Co. v. United States Petroleum Co.*,
495 U.S. 328 (1990) ................................................................................ 15

*Baptist Health v. Murphy*,
___ S.W.2d ___, No. 04-430, 2006 WL 242670
(Ark. Feb. 2, 2006) ................................................................................ 47

*Barish v. Chrysler Corp.*,
3 N.W.2d 91 (Neb. 1942) ........................................................................ 17

*Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*,
118 F.3d 178 (3d Cir. 1997) ........................................................ 20, 22, 23

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................ 42

*Berghausen v. Microsoft Corp.*,
765 N.E.2d 592 (Ind. Ct. App. 2002) ........................................................ 50

TABLE OF AUTHORITIES
(continued)

Page

*Blakemore v. Super. Ct.,*
  129 Cal. App. 4th 36 (2005) ...................................................................... 41

*Blocker v. Small Bus. Admin.,*
  916 F. Supp. 37 (D.D.C. 1996) ................................................................. 44

*BMW of N. Am. v. Gore,*
  517 U.S. 559 (1996) ................................................................................... 35

*Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.,*
  96 F.3d 10 (1st Cir. 1996) ......................................................................... 18

*Bowen v. New York News, Inc.,*
  522 F.2d 1242 (2d Cir. 1975) .................................................................... 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ............................................................................ 12, 13

*Cargill, Inc. v. Monfort of Colo., Inc.,*
  479 U.S. 104 (1986) ................................................................................... 16

*Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.,*
  20 Cal. 4th 163 (1999) .............................................................................. 48

*Chin v. Chrysler Corp.,*
  182 F.R.D. 448 (D.N.J. 1998) ................................................................... 39

*City of Pittsburgh v. West Penn Power Co.,*
  147 F.3d 256 (3d Cir. 1998) ............................................................ 10, 11, 12, 20

*Cox v. Microsoft Corp.,*
  737 N.Y.S.2d 1 (App. Div. 2002) ............................................................. 41

*Dailey v. First Correctional Med.,*
  C.A. No. 03-923-JJF, 2006 WL 1517767
  (D. Del. May 30, 2006) .............................................................................. 10

*Dimidowich v. Bell & Howell,*
  803 F.2d 1473 (9th Cir. 1987) .................................................................. 30

*Doe v. Delie,*
  257 F.3d 309 (3d Cir. 2001) ..................................................................... 10

## TABLE OF AUTHORITIES
(continued)

Page

*Doll v. Major Muffler Ctrs., Inc.*,
   687 P.2d 48 (Mont. 1984) ................................................................................ 31

*Donovan v. City of Dallas*,
   377 U.S. 408 (1964) ...................................................................................... 42

*Dove Valley Bus. Park Assocs., Ltd. v. Bd. of County Comm'rs*,
   945 P.2d 395 (Colo. 1997) ............................................................................. 51

*Duchek v. Jacobi*,
   646 F.2d 415 (9th Cir. 1981) ........................................................................ 42

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987) ........................................................................ 25

*Evancho v. Fisher*,
   423 F.3d 347 (3d Cir. 2005) ......................................................................... 10

*Everest v. Leviton Mfg. Co.*,
   Civ-04-612, 2006 WL 381832 (Me. Super. Ct. Jan. 13, 2006) ................................... 46

*Ferrone v. Resnick*,
   No. CV000443779S, 2002 WL 442314
   (Conn. Super. Ct. Feb. 25, 2002) .................................................................... 52

*Florida Seed Co., Inc. v. Monsanto Co.*,
   105 F.3d 1372 (11th Cir. 1997) .................................................................... 21

*Frank Krasner Enters., Ltd. v. Montgomery County*,
   401 F.3d 230 (4th Cir. 2005) ....................................................................... 43

*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*,
   789 F. Supp. 760 (S.D. Miss. 1992) ............................................................... 17

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*,
   341 F.3d 1292 (11th Cir. 2003) .................................................................... 33

*Gregory Mktg. Corp. v. Wakefern Food Corp.*,
   787 F.2d 92 (3d Cir. 1986) .......................................................................... 13

TABLE OF AUTHORITIES
(continued)

Page

*Gregory v. Albertsons*,
104 Cal. App. 4th 845 (2002) ................................................................. 48

*Gross v. New Balance Athletic Shoe, Inc.*,
955 F. Supp. 242 (S.D.N.Y. 1997) ......................................................... 26

*Hathaway v. McKinley*,
830 S.W.2d 53 (Tenn. 1992) ................................................................... 33

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972)................................................................................ 11

*Hedges v. Dixon County*,
150 U.S. 182 (1893)................................................................................ 50

*Hicks v. Feiock*,
485 U.S. 624 (1988)................................................................................ 40

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977).........................................................................*passim*

*In re Air Passenger Computer Reservation Sys.*,
727 F. Supp. 564 (C.D. Cal. 1989) ........................................................ 20

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ................................................................. 31

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*,
174 F.R.D. 332 (D.N.J. 1997)................................................................ 39

*In re Microsoft Corp. Antitrust Litig.*,
241 F. Supp. 2d 563 (D. Md. 2003)........................................................ 50

*In re Napster, Inc. Copyright Litig.*,
354 F. Supp. 2d 1113 (N.D. Cal. 2005)................................................. 20

*In re New Motor Vehicles Can. Export Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ..........................................46, 47, 52

*In re Pharm. Indust. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005)............................................................... 34

TABLE OF AUTHORITIES
(continued)

Page

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004) ................................................................... 35, 50, 53

*In re Rezulin Prods. Liab. Litig.*,
   392 F. Supp. 2d 597 (S.D.N.Y. 2005) ....................................................... 53

*In re Terazosin Hydrochloride Antitrust Litig.*,
   160 F. Supp. 2d 1365 (S.D. Fla. 2001) ........................................................ 33, 35, 50

*In re Vitamins Antitrust Litig.*,
   No. 99-197, 2001 WL 849928 (D.D.C. April 11, 2001) ............................................. 53

*Jackson v. Philip Morris, Inc.*,
   46 F. Supp. 2d 1217 (D. Utah 1998) ................................................................. 46

*Johnson v. Frankell*,
   520 U.S. 911 (1997) ................................................................................ 40

*Johnson v. Microsoft Corp.*,
   802 N.E.2d 712 (Ohio Ct. App. 2003) ........................................................... 50, 53

*Jones v. Wells Fargo Bank*,
   112 Cal. App. 4th 1527 (2003) ..................................................................... 54

*Kearney v. Salomon Smith Barney, Inc.*,
   39 Cal. 4th 95 (2006) ........................................................................ 37, 38, 39

*Khodara Envtl., Inc. v. Blakey*,
   376 F.3d 187 (3d Cir. 2004) ....................................................................... 42

*Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*,
   313 U.S. 487 (1941) ................................................................................ 32

*Kloth v. Microsoft Corp.*,
   444 F.3d 312 (4th Cir. 2006) ....................................................................... 27

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ....................................................................... 20

*Kolling v. Dow Jones & Co.*,
   137 Cal. App. 3d 709 (1982) ....................................................................... 17

TABLE OF AUTHORITIES
(continued)

Page

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ................................................................. 31, 42, 49

*Laufer v. U.S. Life Ins. Co. in City of New York*,
    No. BER-L-9082-04, 2005 WL 1869211
    (N.J. Super. Ct. Law Div. 2005) ................................................................. 39

*Liew v. Official Receiver and Liquidator*,
    685 F.2d 1192 (9th Cir. 1982) ................................................................. 39

*Lorix v. Crompton Corp.*,
    720 N.W.2d 15 (Minn. Ct. App. 2006) ................................................................. 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 42

*Lyon v. Caterpillar, Inc.*,
    194 F.R.D. 206 (E.D. Pa. 2000) ................................................................. 34

*MAI Systems v. UIPS*,
    856 F. Supp. 538 (N.D. Cal. 1994) ................................................................. 43

*McBride v. Boughton*,
    123 Cal. App. 4th 379 (2004) ................................................................. 49

*Melchior v. New Line Prods., Inc.*,
    106 Cal. App. 4th 779 (2003) ................................................................. 49

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    269 F. Supp. 2d 1213 (C.D. Cal. 2003) ................................................................. 21

*Morris v. Sears, Roebuck & Co.*,
    765 So. 2d 419 (La. Ct. App. 2000) ................................................................. 44

*Newark Branch NAACP v. Town of Harrison N.J.*,
    907 F.2d 1408 (3d Cir. 1990) ................................................................. 43

*Nicholson v. Marine Corps West Fed. Credit Union*,
    953 F. Supp. 1012 (N.D. Ill. 1997) ................................................................. 34

*Nursing Enters., Inc. v. Marr*,
    719 So. 2d 524 (2006) (La. Ct. App. 1998) ................................................................. 31

TABLE OF AUTHORITIES
(continued)

Page

*O'Neill v. Coca-Cola Co.*,
   669 F. Supp. 217 (N.D. Ill. 1987) ............................................................................. 20

*Parnell v. Schmidt & Assoc., Inc.*,
   Civ. A04-4072 JAR, 2004 WL 2284905 (D. Kan. Oct. 5, 2004) ................................ 46

*Peterson v. Visa U.S.A., Inc.*,
   No. Civ. A. 03-8080, 2005 WL 1403761
   (D.C. Super. Ct. Apr. 22, 2005) ................................................................................. 24

*Pfizer, Inc. v. Superior Ct.*,
   141 Cal. App. 4th 290 (2006) .................................................................................... 38

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)................................................................................................... 34

*Poe v. Sears, Roebuck & Co.*,
   No. Civ. A 1:96-CV-358-RLV, 1998 WL 113561
   (N.D. Ga. Feb. 13, 1998) ........................................................................................... 34

*PPG Industries, Inc. v. Transamerica Ins. Co.*,
   20 Cal. 4th 310 (1999) .............................................................................................. 54

*Pritkin v. Dep't of Energy*,
   254 F.3d 791 (9th Cir. 2001) ..................................................................................... 43

*Rosenthal v. Fonda*,
   862 F.2d 1398 (9th Cir. 1988) ............................................................................ 38, 39

*S.D. Collectibles, Inc. v. Plough, Inc.*,
   952 F.2d 211 (8th Cir. 1991) ..................................................................................... 21

*San Diego County Gun Rights Comm. v. Reno*,
   98 F.3d 1121 (9th Cir. 1996) ..................................................................................... 43

*Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997) ...................................................................................... 13

*Scully Signal Co. v. Joyal*,
   881 F. Supp. 727 (D.R.I. 1995) ................................................................................. 31

TABLE OF AUTHORITIES
(continued)

Page

*Simon v. E. Ken. Welfare Rights Org.*,
    426 U.S. 26 (1976) ............................................................................. 43

*Singh v. Blue Cross/Blue Shield of Mass., Inc.*,
    308 F.3d 25 (1st Cir. 2002) ............................................................... 31

*Spence v. Glock GES.m.b.H*,
    227 F.3d 308 (5th Cir. 2000) ............................................................ 31

*State v. Daicel Chem. Inds., Ltd.*,
    106 P.3d 428 (Idaho 2005) ............................................................... 46

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999) ............................................................. 25

*Stutzle v. Rhone Poulenc S.A.*,
    No. 002768, 2003 WL 22250424
    (Pa. Ct. Com. Pl. Sept. 26, 2003) ................................................ 50, 53

*Sun Dun, Inc. of Washington v. Coca-Cola Co.*,
    740 F. Supp. 381 (D. Md. 1990) ....................................................... 30

*System Operations, Inc. v. Scientific Games Devel. Corp.*,
    555 F.2d 1131 (3d Cir. 1977) ........................................................... 32

*Terral v. Burke Constr. Co.*,
    257 U.S. 529 (1922) .......................................................................... 42

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ................................................................... 33

*Tucci v. Club Mediterranee, S.A.*,
    89 Cal. App. 4th 180 (2001) ............................................................. 36

*United States v. Dentsply Int'l, Inc.*,
    Civ. A99-005-SLR, 2001 WL 624807
    (D. Del. March 30, 2001) ............................................................ 41, 45

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964) .......................................................................... 32

TABLE OF AUTHORITIES
(continued)

Page

*Vinci v. Waste Mgmt., Inc.*,
    36 Cal. App. 4th 1811 (1995) ............................................................................... 12, 20

*Warth v. Seldin*,
    422 U.S. 490 (1975).......................................................................................... 42, 43

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th 224 (2001) ................................................................................... 37

*Woodhaven Apts. v. Washington*,
    942 P.2d 918 (Utah 1997).......................................................................................... 47

## STATUTES

15 U.S.C. § 15 (2006) ...................................................................................................... 11
15 U.S.C. § 18 (2006) ...................................................................................................... 13
28 U.S.C. § 1332 (2006) .................................................................................................. 32
28 U.S.C. § 1367 (2006) .................................................................................................. 32
28 U.S.C. § 1404 (2006) .................................................................................................. 32
ALASKA STAT. § 45.50.531(b) (2005) .............................................................................. 44
CAL. BUS. & PROF. CODE § 16720 ................................................................................... 28
CAL. BUS. & PROF. CODE § 16750(a) (2006) ................................................................... 24
CAL. BUS. & PROF. CODE § 17200 ....................................................................... 28, 34, 38
CAL. CIV. CODE § 1782(a) (2006) .................................................................................... 31
GA. CODE ANN. § 10-1-399(a) (2006) .............................................................................. 44
IDAHO CODE § 48-603 (2006) .................................................................................... 31, 46
IOWA CODE § 553.1 *et seq.* (2006) .................................................................................. 30
IOWA CODE § 553.12 (2005) ............................................................................................ 30
KAN. STAT. ANN. § 50-115 (2006) ................................................................................... 30
KAN. STAT. ANN. §§ 50-101 *et seq.* (2005) ..................................................................... 30
LA. REV. STAT. § 51:1409 (2006) .................................................................................... 44
LA. REV. STAT. 51:1402(3) (2006) ................................................................................... 31
ME. REV. STAT. ANN. tit. 10, § 1101 *et seq.* (2006) ........................................................ 30
ME. REV. STAT. ANN. tit. 10, § 1104(1) (2005) ............................................................... 30
ME. REV. STAT. tit. 10, § 1102 (2006) ............................................................................. 30
MINN. STAT. § 325D.57 (2004) ........................................................................................ 23

TABLE OF AUTHORITIES
(continued)

Page

MONT. CODE ANN. § 30-14-133(1) (2005) .................................................... 44

N.M. STAT. ANN. § 57-12-10B (2006) ......................................................... 30

N.M. STAT. ANN. § 57-12-10E (2006) ......................................................... 30

N.M. STAT. ANN. § 57-12-2E (2006) .......................................................... 47

NEB. REV. STAT. § 59-802 (2006) ............................................................ 30

NEB. REV. STAT. § 59-821 (2006) ............................................................ 30

NEW YORK GEN. BUS. LAW § 340 *et seq.* (2006) .......................................... 30

Proposition 64 § 1(a) ......................................................................... 38

Proposition 64 § 1(e) ......................................................................... 42

UTAH CODE § 13-11-19(a) (2006) ............................................................. 45

WIS. STAT. § 133.03(2) (2006) ................................................................. 30

## OTHER AUTHORITIES

19 Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE:
    JURISDICTION 2D § 4513 (2d ed. 1996) .................................................. 45

19 Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE:
    JURISDICTION 2D § 4520 (2d ed. 1996) .................................................. 32

RESTATEMENT (FIRST) OF RESTITUTION § 107(1) ............................................. 51

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971) .................................. 34

RESTATEMENT (SECOND) OF TORTS § 431 ...................................................... 54

RESTATEMENT (SECOND) OF TORTS § 433 ...................................................... 54

RESTATEMENT (SECOND) OF TORTS §§ 440-453 ................................................ 54

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT
    Topic 2 ................................................................................ 52

## RULES

FED. R. CIV. P. 17(b) ......................................................................... 44

FED. R. CIV. P. 9(b) .......................................................................... 46

## I.     INTRODUCTION

After AMD sued Intel for alleged antitrust violations, plaintiffs here filed dozens of copycat actions claiming that they too were harmed by the Intel practices about which AMD complained.  But according to AMD, the effect, past and present, of those practices was to *lower* the price of Intel's chips unfairly, to AMD's detriment as Intel's competitor.

Plaintiffs are consumers of products containing Intel microprocessors.  *See* First Amended Consolidated Complaint ("Complaint"), D.I. 108, ¶ 10.  Nowhere does their complaint explain how the ***lower*** prices Intel allegedly charged its customers for its microprocessors were transmuted into ***higher*** prices for the downstream products plaintiffs purchased from third parties containing these microprocessors.  Instead, plaintiffs simply copied hundreds of paragraphs from AMD's complaint alleging that Intel's discounts and rebates lowered the price of computer chips to levels AMD could not match, assuming that alleged harm to AMD for Intel's discounting necessarily harmed purchasers of ***Intel***-based systems by tacking on four conclusory sentences claiming that these practices "suppressed competition . . . resulting in higher prices for Intel x86 microprocessors."  *Id*. ¶¶ 234-235.

That leap of illogic does not state a claim.  Even the most relaxed pleading standards do not require the Court to accept as true allegations that effectively claim that black is white or that up is down.  Low microprocessor prices do not (and Intel submits, cannot) produce high computer prices.  The Complaint fails to allege any non-conclusory facts that, if proven true, would establish injury to plaintiffs or their standing to sue.  This fundamental flaw infects all of plaintiffs' claims.

Plaintiffs must allege facts showing that Intel caused them injuries of the type the antitrust laws were intended to prevent, and that flow from that which allegedly makes the actions illegal.  But the facts alleged in the Complaint reveal ***no*** injury to plaintiffs, much less specific injury of the type required to state a claim under the antitrust laws.  This Court will ultimately have to determine whether Intel's competitor AMD can

conjure a viable antitrust claim from the facts alleged in its complaint.[1]  But whether AMD can show antitrust injury is irrelevant to plaintiffs' claims.  Plaintiffs have not alleged facts showing how *they* were or could have been injured by Intel's allegedly ongoing predatory price-cutting.  Indeed, plaintiffs clearly stood and stand to benefit from the discounts that allegedly hurt AMD.  Against this factual backdrop, a perfunctory *non sequitur* that plaintiffs were harmed by "higher prices" is not enough to establish antitrust injury.[2]  Because plaintiffs lack standing to sue under any antitrust law, state or federal, the Court should dismiss their antitrust claims.

As for their state unfair competition, consumer protection and common law claims, all applicable state laws require plaintiffs to allege facts showing that the defendant's conduct proximately caused them injury in fact.  As discussed above, the Complaint contains no such facts.  Accordingly, the Court should also dismiss these other claims.

In addition to the Complaint's lack of alleged facts establishing the requisite injury to plaintiffs and standing to sue, there are numerous other defects:

(1)     The Non-California Plaintiffs Cannot Invoke California Law.  Only eighteen of the 94 plaintiffs in this case are alleged to be residents of California.  *See* Complaint ¶¶ 11-105.  Nevertheless, the Complaint asserts claims on behalf of all 94 plaintiffs under California statutory and common law.  *See id*. ¶¶ 248, 256, 260, 319.  The law does not allow that.  Each of the states where non-California plaintiffs made their alleged purchases has an interest in having its own law applied.  Under commonly recognized choice of law principles, California law would not apply nationwide.

_____

[1]     Intel believes that AMD is actually complaining about competition rather than seeking to protect it.

[2]     It is especially inappropriate in a case of this size for plaintiffs to rely on cursory and nonsensical allegations on an issue so critical to their case.

Therefore, the Court should dismiss the 76 non-California plaintiffs' purported claims under California law;

(2)    <u>Plaintiffs Fail to Meet the Requirements of Many State Statutes</u>.  Plaintiffs attempt to assert claims under dozens of state statutes.  However, many of those claims are defective for failure to allege necessary facts or adhere to statutory pleading requirements.  For example, a number of state statutes that plaintiffs invoke do not allow class action claims (*see* parts VI (B) and VII (B), below).  Others do not reach interstate or international conduct (part VI (A), below).  Still others require consumer protection claims to be based on fraudulent, deceptive or unconscionable conduct that plaintiffs do not, and cannot, allege here (part VII (C), below).  Finally, California prohibits the use of its Unfair Competition Law as a vehicle for asserting antitrust claims (part VII (D), below).  All of these defects require dismissal of the relevant statutory claims;[3] and

(3)    <u>The Law Does Not Recognize Plaintiffs' Common Law Claims</u>.  Plaintiffs allege separate causes of action under "California's tort law against monopolization," and for "unjust enrichment" under California law, or, in the alternative, "the laws of the individual States and the District of Columbia."  Complaint, ¶¶ 255, 317, 319.  California, however, does not recognize a monopolization tort, nor does it recognize claims for unjust enrichment.  Under the laws of other states, plaintiffs' unjust enrichment claim similarly lacks any legal basis.  The laws of several states preclude unjust enrichment claims in this context as impermissible attempts to escape the effect of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Other states besides California do not recognize claims for unjust enrichment at all.  Finally, this claim also fails because even under the law of states that permit a claim for unjust enrichment, plaintiffs have failed to allege, and cannot allege, that Intel obtained any benefit from plaintiffs.

---

[3]    By dismissing these claims, the Court will also significantly reduce the size and complexity of this case.

In sum, and as further detailed below, each of plaintiffs' claims against Intel is insufficient as a matter of law, and the Court should dismiss the Complaint in its entirety.

## II.     STATEMENT OF THE CASE

### A.     The Microprocessor Industry

Microprocessors are small computer chips containing circuitry that functions as the brain of a computer or other electronic device.  They are capable of executing a menu of instructions and performing requested mathematical computations at high speed.  *See* Complaint ¶ 116.  Intel invented x86 microprocessors over 30 years ago and is the world's leading manufacturer of them.  *Id*. ¶¶ 1, 117.

Programmable microprocessors used in computers are often described by their instruction set, that is, the machine language that a particular computer employs.  *See id*. ¶ 116.  The term "x86 microprocessors" is sometimes used to identify programmable microprocessors that use Intel's x86 instruction set.  *See id*. ¶ 117.  x86 microprocessors are the specific type of microprocessor at issue in these actions.[4]  AMD manufactures and sells x86 microprocessors in competition with Intel.  *See id*. ¶¶ 117, 127-132.

Original equipment manufacturers of computers ("OEMs") are the primary purchasers of x86 microprocessors.  *See id*. ¶ 134.  In general, OEMs are large, well-known companies.  *See id*.  Some, such as Dell, IBM, Gateway and Hewlett Packard, are U.S. companies.  The majority, such as Lenovo, Fujitsu/Siemens, Acer, Toshiba, NEC and Sony, are foreign.  *See id*. ¶¶ 134, 135.  Neither Intel nor AMD manufactures computers.  Both companies manufacture and sell an input product, microprocessors, to OEMs and others.  OEMs incorporate x86 microprocessors in the computers they build.[5]

---

[4]     *See* Complaint ¶ 83.  Intel disputes plaintiffs' allegation that other programmable microprocessors are not reasonably interchangeable with x86 microprocessors, but, pursuant to Rule 12 of the Federal Rules of Civil Procedure, accepts as true this factual allegation in the Complaint for purposes of this motion.

[5]     Other significant components of a computer include the motherboard, power supply, hard drive memory, Random Access Memory (RAM) and operating system

Some OEMs sell their computers to retailers from which consumers such as plaintiffs buy their computers. *See id*. ¶¶ 136-137. Some sell to distributors, who in turn supply those retail chains. *See id.* Some OEMs also sell directly to consumers. *See id*. ¶¶ 136-137. The balance of microprocessor production is sold to small system builders who assemble computers for sale to end users, and to independent distributors, who in turn sell the microprocessors to small computer manufacturers, regional computer assemblers and others. *See id*. ¶ 136.

### B.    AMD's Lawsuit Against Intel

On June 27, 2005, AMD sued Intel in this District, challenging a variety of purported Intel practices regarding the sale and marketing of "x86 microprocessors." AMD alleged violations of Section 2 of the Sherman Act (monopolization), Section 17045 of the California Businesses and Professions Code (unlawful rebates and discounts) and the tort of interference with prospective economic advantage (based on the alleged violations of the two referenced statutes). All of the specific actions AMD's complaint attributes to Intel consist of discounts, rebates, promotional programs and other payments that effectively ***reduced*** the price that Intel customers paid for Intel microprocessors. AMD contends these price reductions were unlawful and implemented in a manner that unfairly impinged upon its ability to compete in the global market for microprocessors. *See* Case No. 05-441-JFF, D.I. 1. AMD does not allege (nor could it allege) that Intel has raised its prices to harm competition.

Shortly after AMD filed suit against Intel, plaintiffs brought a large number of purported class actions, relying entirely on the factual allegations in AMD's complaint—indeed mostly copying them verbatim.

---

(Footnote Continued from Previous Page)
software.

C.     **Plaintiffs' Consolidated Complaint**

1.     **Intel's Alleged Price Conduct**

Plaintiffs all claim to be buyers of PCs or other electronic devices containing Intel microprocessors, *see, e.g.*, Complaint ¶¶ 10, 234, but otherwise their complaint simply mimics the claims asserted by AMD.  Indeed, plaintiffs base their claims on the same anecdotal allegations that form the basis of AMD's complaint—allegations about Intel's price cuts, rebates and other concessions to OEMs, retailers and distributors.  *See id.* ¶¶ 140, 145, 163-175, 189-219.  Specifically, plaintiffs allege the following actions by Intel in each of these channels.

**OEMs.**  Plaintiffs allege that, in response to competition from AMD, Intel (1) provided Dell with favorable pricing, including "outright payments" and favorable service, *id.* ¶ 144; (2) "paid Sony multimillion dollar sums, disguised as discounts and promotional support", *id.* ¶ 145; (3) offered Toshiba market development funds "estimated to be worth $25-30 million per quarter," which Toshiba accepted, *id.* ¶ 146; (4) "agreed to pay NEC more than three hundred million yen [$2.7 million USD] per quarter" in exchange for caps on NEC's purchases/non-AMD commitment, *id.* ¶ 147; (5) "offered [Gateway/eMachines] large sums", *id.* ¶ 150; (6) paid Hewlett-Packard "between $3 and $4 million" to secure Intel a position with HP's notebook line, *id.* ¶ 154; (7) paid IBM "millions of dollars in market development funds" as part of "an incentive-based program" to become a "preferred supplier", *id.* ¶ 156; (8) offered Fujitsu-Siemens a "special discount" on Intel's Celeron microprocessor, *id.* ¶ 160; (9) offered Fujitsu "an undisclosed package of financial incentives" for Fujitsu to expand its Intel business, and separately offered Fujitsu a discount on microprocessors for Fujitsu's consumer notebook line that AMD could not match, *id.* ¶¶ 148, 159; (10) "imposed" rebates on OEMs if they reached target purchase levels that Intel set "unilaterally", *id.* ¶ 163; and (11) offered OEMs its microprocessors as part of product "bundles" that resulted in OEMs receiving chipsets or motherboards (other components of the PCs that the plaintiffs allegedly

bought) for "free" or at a "heavy discount." *Id.* ¶¶ 172, 189.

Plaintiffs allege that these discounts, price breaks, payments and rebates operated to set Intel microprocessor prices at a level *so low* that Intel's rivals like AMD were unwilling or unable to match them. *Id.* ¶¶ 165, 167. In fact, plaintiffs actually allege that "Intel's use of retroactive rebates leads, in some cases, to below-cost pricing on incremental sales"—prices that rival microprocessor makers allegedly cannot match. *Id.* ¶ 172; *see also id.* ¶ 165 ("Intel's retroactive discounts can operate to price microprocessors so low that Intel's rivals are put at a competitive disadvantage they cannot overcome.").

**Retailers.** According to plaintiffs, about 20% of U.S. desktop and notebook computers are purchased at retail stores. *Id.* ¶ 200. Plaintiffs allege that a "handful" of retailers dominate the U.S. PC market. Best Buy and Circuit City are the largest of these. *Id.* Other retailers with smaller shares are Wal-Mart/Sam's Club, Staples, Office Depot and Office Max. *Id.*

Plaintiffs claim that these major U.S. retailers are power buyers that "demand market development funds (MDF)" in return for shelf space for the OEMs' computers. *Id.* ¶ 201. Plaintiffs assert that in some cases "the MDF required [by retailers] to secure shelf space can run as high as $25 per box. . . ." *Id.* According to plaintiffs, "MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker [like Intel or AMD] must buy [from retailers] for tens of thousands of dollars." *Id.* Plaintiffs allege that Intel has "significantly greater financial resources" than AMD with which to satisfy these retailers' expectations regarding shelf-space allocation. *Id.* ¶ 202.

Against this backdrop, plaintiffs allege that Intel: (1) paid MDF to Office Depot in exchange for a "premier status" with that retailer for computers containing Intel microprocessors, *id.* ¶¶ 202-203; (2) offered Fry's Electronics "a large payment" to remove Fujitsu's AMD-based notebook from Fry's shelves (but do not allege that Fry's

accepted the offer), *id.*; and (3) offered Circuit City an MDF based on the percentage

which Intel-based computers represented of Circuit City's total PC revenue.  *Id.* ¶ 208.

**Distributors.**  Plaintiffs allege that Intel offered independent distributors

"marketing bonuses, increased rebates, credit programs for new customers . . . payment

for normal freight charges, and special inventory assistance" in connection with Intel's

sales of microprocessors to these entities.  *Id.* ¶ 194.  According to plaintiffs, Intel also

offered rebates to distributors that achieved targeted purchasing levels.  *See id.* ¶ 195.

After describing the above alleged discounts, rebates, marketing and promotional

payments, plaintiffs claim (without explanation) that as a result of Intel's charging ***lower***

prices to microprocessor purchasers and acceding to retailers' demands for MDF to

assure shelf space for the computers containing those discounted Intel microprocessors,

competition was harmed, and consumers who bought those computers paid a ***higher*** price

than they would have had Intel not discounted the microprocessors and secured the

necessary shelf space.  *See id.* ¶¶ 231-235.

## 2.     Intel's Alleged Non-Price Conduct

Plaintiffs assert that Intel has engaged in two types of non-price conduct.  First,

plaintiffs allege that Intel has attempted to "drive the adoption of [technical computer]

standards" through standard-setting organizations like JEDEC[6] with the sole purpose of

disadvantaging its rivals, including AMD.  *Id.* ¶¶ 220-225.  The Complaint admits,

though, that JEDEC did not adopt any of the alleged Intel-sponsored standards that the

Complaint identifies as improper.  *See id.* ¶ 225.  Second, plaintiffs assert that Intel

improperly designed its compilers—software programs that translate high-language

---

[6]     JEDEC stands for Joint Electron Device Engineering Council.  According to its web site, JEDEC "is the leading developer of standards for the solid-state industry."  *See* http://www.jedec.org/ (last visited Oct. 25, 2006).  JEDEC's members number nearly 2,700 participants, appointed by some 270 companies, including Intel, AMD and most of the OEMs identified in the Complaint.  *See id.*

computer programs into an object code that the computer system can understand—to work better with an Intel platform than with an AMD platform, allegedly resulting in "degrade[d] performance" for users of an AMD platform.  *Id*. ¶¶ 226-230.  The Complaint however, concedes that "different companies write different compilers" that compete with Intel's compilers.  *Id*. ¶ 227.

### 3.     The Alleged Claims For Relief

Plaintiffs allege seven causes of action under:  (1) Section 2 of the Sherman Act (for injunctive relief), (2) California's antitrust statute, the Cartwright Act,[7] (3) the claimed California "tort law" against monopolization, (4) the California Unfair Competition Law, (5) the antitrust and restraint of trade laws of 19 states and the District of Columbia,[8] (6) the consumer protection and/or unfair competition laws of 22 states and the District of Columbia,[9] and (7) the "common law"[10] of unjust enrichment.

---

[7]     Like many states, California enacted its own antitrust statute modeled on the Sherman and Clayton Acts.  California follows federal antitrust precedent except in areas where, by statute or by precedent, it has explicitly diverged.  For example, although *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), disallowed indirect purchaser claims under the Sherman Act, California permits them.  Also of note, the Cartwright Act contains no parallel to Section 2 of the Sherman Act – unilateral conduct is not covered.

[8]     Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.  *See* Complaint ¶¶ 268-290.

[9]     Alaska, Arkansas, California, the District of Columbia, Florida, Georgia, Idaho, Kansas, Louisiana, Maine, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, Utah, Vermont, West Virginia, and Wisconsin.  *See* Complaint ¶¶ 291-315.  According to the Complaint, the Court is to apply the laws of the various jurisdictions listed for the fifth and sixth causes of actions "in the event the Court does not apply California law on a nationwide basis."  *Id*. ¶¶ 268, 291.

[10]     The Complaint purports to base this claim under California law, or, in the alternative, the law of all the other jurisdictions at issue.  Complaint ¶¶ 316-320.

## III.    LEGAL STANDARD OF REVIEW

Dismissal is appropriate pursuant to Rule 12(b)(6) if the complaint fails to set forth a cognizable legal theory or lacks sufficient facts to support such a theory.  *See Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005).  Although the Court "must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them," *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001), it need not accept as true "unsupported conclusions and unwarranted inferences" when deciding a motion to dismiss.  *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998) (affirming dismissal of action; holding that plaintiff lacked antitrust standing in the absence of injury and causation) (citations omitted).  *Accord Dailey v. First Correctional Med.*, C.A. No. 03-923-JJF, 2006 WL 1517767 at *1 (D. Del. May 30, 2006) ("the Court should reject 'unsupported allegations,' 'bald assertions,' or 'legal conclusions'") (citations omitted).

Further, the Court should neither "assume that the [plaintiff] can prove facts that it has not alleged," *West Penn Power Co.*, 147 F.3d at 263 n.13 (citation omitted), nor accept plaintiff's "hypothesiz[ing]" that defendant was connected to the harm alleged where such a conclusion is "not a reasonable inference to be drawn from the facts alleged." *Evancho,* 423 F.3d at 351.  Rather, "courts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable" and to view the complaint "in a realistic, rather than a slavish, manner."  *See West Penn Power Co.*, 147 F.3d at 263.  These principles require dismissal of plaintiffs' claims, as detailed below.

## IV.    PLAINTIFFS DO NOT ALLEGE AN INJURY COGNIZABLE UNDER FEDERAL OR STATE ANTITRUST LAWS

Plaintiffs' First Amended Consolidated Complaint asserts claims for injunctive relief from actual or threatened violations of the Sherman Act, and for damages under the

antitrust laws of 19 states and the District of Columbia. *See* Complaint ¶¶ 236-253, 268-290. To state a claim under any of these antitrust laws, plaintiffs must first satisfy the threshold inquiry that they have standing to assert the claims. *West Penn Power Co.*, 147 F.3d at 264.

Section 4 of the Clayton Act states that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit. 15 U.S.C. § 15 (2006). However, the Supreme Court has interpreted the statute to be subject to certain constraints. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* (*citing Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n.14 (1972)). "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 [of the Clayton Act] there is a point beyond which the wrongdoer should not be held liable. . . . It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Id.* at 534-35 (citations omitted).

Consequently, "the focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine." *Associated Gen. Contractors*, 459 U.S. at 535 n.31. Even where "[harm] to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . [antitrust standing requires] a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Alberta Gas Chems., Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987) (citation omitted). Specifically, this Court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors*, 459 U.S. at 535. The Third Circuit employs the following five factors in this analysis:

(1)    the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall (*i.e.*, "antitrust injury");

(2)    the causal connection between the antitrust violation and the harm to the plaintiff;

(3)    the existence of more direct victims of the antitrust injury (whether the plaintiff is the party most likely to seek redress of the antitrust violation);

(4)    the directness or indirectness of the injury; and

(5)    the risk of duplicative recovery or the complexity in apportioning damages.

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740-41 (3d Cir. 2004).[11]

    As explained below, plaintiffs cannot demonstrate the first of these factors—antitrust injury—which is dispositive of the standing inquiry. Furthermore, analysis of the remaining factors, applied to the plaintiffs' claims, independently confirm that they lack antitrust standing.

### A.    Plaintiffs Fail To Allege An Antitrust Injury

    Determining whether a plaintiff has antitrust standing begins with the antitrust injury requirement. *See West Penn Power*, 147 F.3d at 264-65 & n.14. Well-settled Supreme Court and Third Circuit antitrust jurisprudence demands that an antitrust claimant assert harm "that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 487-89 (1977); *West Penn*

---

[11]    This standard applies equally to plaintiffs' state law claims, including their Cartwright Act claim. *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 n.1 (1995) ("Because the Cartwright Act has objectives identical to the federal antitrust acts," California courts "look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act"); applying *Associated General Contractors* analysis to Cartwright Act claim). Appendix A details those cases that have either directly or by implication found that federal antitrust injury and antitrust standing requirements apply with equal force to claims under state antitrust statutes.

12

*Power*, 147 F.3d at 265; *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997) (upholding Rule 12(b)(6) dismissal of complaint for failing to allege antitrust injury).[12]

     In *Brunswick*, bowling lane operators sued Brunswick over its acquisition of a rival bowling business, claiming that the acquisition violated Section 7 of the Clayton Act, 15 U.S.C. § 18 (2006), which prohibits mergers that restrain competition. The *Brunswick* plaintiffs sought to recover profits they lost to the rival bowling business after the merger, asserting that 'but for' the merger, the rival's bowling centers would have failed, thereby driving revenue to plaintiffs. *Brunswick*, 429 U.S. at 479-81. The Court held that even if the merger were unlawful, the plaintiffs suffered no antitrust injury because the thing that would have made the acquisitions an antitrust violation—undue concentration in the bowling center industry—had nothing to do with the plaintiffs' claimed losses. The Court found that the plaintiffs would "have suffered the identical 'loss'—but no compensable injury—had the acquired centers instead obtained refinancing or been purchased" by an entity whose purchase did not raise competitive concerns. *Id.* at 487. Thus, the plaintiffs' injury did not flow from that which made the acquisition illegal. *Id.* at 487-88.

     The Third Circuit reached the same conclusion in *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92 (3d Cir. 1986). In that case, the defendant apple juice manufacturer had given discriminatory discounts to a purchaser for whom the plaintiff acted as broker. The plaintiff refused the manufacturer's direction to fabricate reasons for the price discrimination and was terminated; it then sued for alleged antitrust violations. *Id.* at 92-93.

     The Third Circuit affirmed the district court's dismissal of the plaintiff's antitrust

---

[12]    The *Brunswick* standard, although articulated in the context of a federal claim, also governs the state antitrust laws on which plaintiffs rely. *See* Appendix A.

claims.  Although the defendant had engaged in allegedly anticompetitive practices and had caused plaintiff injuries (reduced commission on the discounted sales and eventual termination), those injuries "did not result from the anticompetitive nature of these practices."  *Id.* at 95.  The Court reasoned:

> If [the defendant] had reduced its prices for all buyers, for example, [plaintiff] would still have lost commissions, but there would have been no antitrust violation.  Conversely, if [defendant] had provided [the preferred buyer] with special discounts, but simply absorbed the loss itself and neither told [the plaintiff] nor demanded that [plaintiff] fabricate an explanation for other customers, the agreement would be equally anticompetitive, but [the plaintiff] would have suffered no injury.

*Id.* at 96.  Since the harms the plaintiff allegedly suffered did not flow from what made the conduct illegal, *i.e.*, diminished competition in the apple juice market, the plaintiff did not suffer antitrust injury.  *Id*. at 96-98.

Here, plaintiffs' position in the market dooms their claims to the same fate. Plaintiffs are consumers of computer hardware containing Intel microprocessors, microprocessors that the Complaint alleges, in great detail, were the subject of price cuts, rebates and other price concessions,[13] some so great that Intel's rivals could not match them.[14]  But plaintiffs do not claim that they bought their computers from manufacturers or retailers who declined to accept Intel's price breaks.  From all that appears in the Complaint, plaintiffs instead bought their PCs from manufacturers and retailers who received and benefited from Intel's alleged price concessions.

Therein lies a fatal defect in plaintiffs' claim.  Even if Intel had imposed anticompetitive conditions on its discounts, plaintiffs have not alleged, and cannot allege, an injury to their property or business flowing from the imposition of those conditions,

---

[13]    *See, e.g.*, Complaint ¶¶ 140, 145, 163-175, 189, 193-195.

[14]    *See, e.g.*, *id.* ¶¶ 165, 172, 173 ("[S]ome of Intel's discriminatory, retroactive rebates amount to unlawful, predatory, below-cost pricing.").

*i.e.*, from that which makes the alleged conduct unlawful.  For example, plaintiffs allege that Dell Computers "remains Intel-exclusive" notwithstanding AMD's purported superior quality because "Intel has bought Dell's exclusivity with outright payments and favorable discriminatory pricing and service."  Complaint ¶ 144.  But Dell PC purchasers in a world without the purported illegal exclusivity/loyalty commitments would be either in the same situation as they are in the real world, *i.e.*, indirect beneficiaries of price-discounted Intel microprocessors, or ***worse off***, in that their computers would have non-discounted Intel microprocessors.[15]  Thus, there is no basis to infer that Dell's purported "Intel-exclusive" commitment had any adverse effect on plaintiffs who purchased the Intel microprocessors with discounts conditioned on these commitments.[16]

This result is not surprising.  "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.  Hence, they cannot give rise to antitrust injury."  *Atl. Richfield Co. v. United States Petroleum Co.*, 495 U.S. 328, 340 (1990).  Thus plaintiffs cannot, as a matter of law, allege an antitrust injury.[17]  *See Am. Ad Mgmt., Inc. v. General Tel. Co.*,

---

[15]    The same is true with respect to Intel's alleged conduct with other OEMs: Gateway/eMachines – exclusivity for "large sums" that enabled Gateway to become "profitable", Complaint ¶ 150; Sony – exclusivity in exchange for "multimillion dollar sums disguised as discounts and promotional support", *id.* ¶ 145; Toshiba – exclusivity in exchange for "tens of millions of dollars of additional marketing support", *id.* ¶ 146; NEC – cap on AMD purchases in exchange for "300 million yen [approx. $2.68 million USD] per quarter", *id.* ¶ 147; IBM – exclusivity in exchange for "millions of dollars in market development funds", *id.* ¶ 156; Hewlett-Packard – exclusivity on a single laptop product for "at least" one year in exchange for payment of between "$3 and $4 million." *Id.* ¶ 154.

[16]    At least twenty named plaintiffs are purchasers of Dell computers according to their individually filed Complaints: Christian Ambruoso; Phillip Boeding; Michael Brauch; Joseph Cone; Carrol Cowan; Russell Dennis; Dwight Dickerson; Angel Genese; Nir Goldman; Gideon Elliott; Stuart Munson; Phil Paul; Gabrielle Herroeder-Perras; Trotter-Vogel Realty, Inc.; HP Consulting Services, Inc.; Melinda Harr, D.D.S. P.C.; Jerome Feitelberg; Lee Pines; Robin Weeth; and Bergerson & Associates, Inc.

[17]    Even if AMD had suffered an antitrust injury, that would be immaterial to these

190 F.3d 1051, 1056 (9th Cir. 1999) ("There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct."); *Associated Gen. Contractors*, 459 U.S. at 539 (no antitrust injury because union's goals might be served by reduced competition among employers); *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1255 (2d Cir. 1975) (independent distributors lacked standing to contest exclusive dealing clause in franchise agreements, which "could only benefit plaintiffs" by excluding franchise dealers as potential competitors in the sale of other newspapers).

With no antitrust injury, there can be no antitrust claim under either federal or state law.[18]

### B.    Plaintiffs Are Not The Proper Parties To Bring The Antitrust Claims In Their Complaint

Even if plaintiffs could demonstrate an antitrust injury, that factor alone would not confer standing. *Cargill*, 479 U.S. at 110 n.5 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish [antitrust] standing. . . ."). Plaintiffs must still plead facts that satisfy the five-factor balancing test. A careful review of plaintiffs' detailed First Amended Consolidated Complaint reveals that none of the remaining factors[19] in this analysis supports plaintiffs' assertion that they have antitrust

---

(Footnote Continued from Previous Page)
plaintiffs' claims. *See 2660 Woodley Rd. Joint Venture*, 369 F.3d at 740 ("[T]he mere fact that certain conduct has an anticompetitive effect does not mean that a given plaintiff has suffered an antitrust injury, or that a given plaintiff is the appropriate party to seek recovery under the antitrust laws.").

[18]    This includes plaintiffs' injunctive relief claim. *See* Complaint ¶¶ 236-246. The antitrust injury requirement applies with equal force to damages claims and equitable claims seeking injunctive relief. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112 (1986) (holding that it would be "anomalous... to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred").

[19]    Plaintiffs have limited their antitrust claims to states that expressly decline to follow *Illinois Brick*, which bars indirect purchaser claims, in part, to avoid complicated apportionment of damages and the risk of harm to the claims of direct purchasers. Because the last factor of the *Associated General Contractors* test is intended to give

standing.

>    **1.    The Complaint Alleges No Causal Connection
>    Between The Claimed Injury And The
>    Challenged Conduct**

The second factor in the standing analysis is the causal connection between the antitrust violation and the harm to the plaintiff. Plaintiffs must "allege some credible injury caused by the unlawful conduct." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1056. *Accord Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (1982) ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries.").[20] The Complaint fails to allege a legally sufficient causal connection.

Plaintiffs' overcharge theory posits that Intel's alleged volume-based discounts, rebates and payments to OEMs for their purchases of Intel microprocessors and to retailers dealing in Intel-based computers containing the discounted microprocessors somehow caused prices of those computers to increase. Although plaintiffs incorporate from AMD's complaint hundreds of paragraphs describing how Intel allegedly injured AMD with price concessions, they say almost nothing about how Intel's discounts could have hurt them. What they do say is contained in just four conclusory sentences:

> Intel's exclusionary and restrictive practices described herein have suppressed competition in the x86 Microprocessor Market, resulting in higher prices for Intel x86 microprocessors, even after accounting for discounts or rebates attributable to microprocessor purchases. The overcharges imposed by Intel have been passed on to Plaintiffs and the Class members in the form of higher

_____

(Footnote Continued from Previous Page)

effect to the policies of *Illinois Brick,* its effect in this standing analysis is neutral.

[20]    *See, e.g., Barish v. Chrysler Corp.*, 3 N.W.2d 91, 96 (Neb. 1942) (to recover under the Nebraska's antitrust act, plaintiff must demonstrate injuries "in his business or his property"); *Futurevision Cable Systems, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 780 (S.D. Miss. 1992) (because Mississippi's antitrust law is "analytically identical" to federal law, plaintiff must demonstrate causal injury).

prices for personal computers, workstations, and servers containing Intel x86 microprocessors.

Intel's supra-competitive prices are not the result of superior products or business acumen of competition on the merits. Instead, Intel has been able, at the financial expense of Plaintiffs and Class members, to artificially inflate prices for its products by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully acquiring and maintaining its monopoly in the worldwide x86 Microprocessor Market.

Complaint ¶¶ 234-235.[21]

Conclusory and illogical statements like these are not enough, especially given the detailed recitation of pro-competitive discounts, rebates and promotional dollars that Intel allegedly injected into the market through its direct and indirect customers (OEMs, Distributors and Retailers). First, the computer systems that plaintiffs claim they bought are the ones containing discounted Intel microprocessors. Nowhere do plaintiffs claim that, after a period in which Intel offered discounts and rebates (benefiting consumers) which allegedly weakened AMD, Intel then discontinued the discounts and rebates and, thanks to AMD's weakened position, was able to raise its prices to supra-competitive levels. From all that appears in AMD's allegations—slavishly copied by plaintiffs here—Intel's steep discounts and generous rebates continue to this day.[22]

---

[21]    Although plaintiffs speculate that certain of Intel's customers "feared [] retaliation," or report rumors that Intel "threat[ened]" a customer, *see, e.g.,* Complaint ¶¶ 151, 176, they fail to allege a single instance in which Intel ever actually "retaliated" by increasing prices of its microprocessors, much less that it did so and affected the price plaintiffs paid for a personal computer with an Intel chip. These purported unperformed threats cannot support plaintiffs' claimed injury. *See, e.g., Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.*, 96 F.3d 10, 17 (1st Cir. 1996) (antitrust plaintiff alleging a threat must further allege that it was carried out).

[22]    Indeed, plaintiffs copy AMD's present-tense allegations that "Intel's use of retroactive rebates *leads* in some cases, to below-cost pricing on incremental sales" – prices than rival microprocessor maker "cannot match," Complaint ¶ 172, and that "Intel's retroactive discounts *can operate* to price microprocessors so low that Intel's

Second, plaintiffs claim that Intel's discounts caused supra-competitive prices depends on a cumulative suppression of competition. *See* Complaint ¶¶ 231-233. For example, the Complaint asserts that AMD's growth in the server, desktop and mobile market segments from 2002-2004 was smaller than it should have been because "Intel's conduct has unfairly and artificially capped AMD's [] shares" and hindered "AMD's ability to increase its productive capacity for the *next generation* of AMD's state of the art microprocessors," making it impossible for AMD to "reach the minimum efficient levels of scale necessary to compete with Intel." *Id.* ¶¶ 5, 126 (emphasis added). This Court has already held that such a theory of causation relies on "chain of effects full of twists and turns, which themselves are contingent upon numerous developments." D.I. 279 at 9.

Moreover, the Complaint fails to articulate how this purported cumulative effect caused the plaintiffs, who purchased computers throughout the time period and many of whom made only a single computer purchase during that period, somehow to pay ***more*** for computers that contained ***discounted*** Intel microprocessors.

Finally, the plaintiffs' allegation of causation depends on the belief that the net prices Intel charged for its microprocessors, *i.e.*, net of the discounts and rebates (direct and indirect), were above a competitive level. *See* Complaint ¶ 234. However, the Complaint alleges that some of the net prices were below a level with which AMD could compete or even Intel's incremental cost. *See id.* ¶¶ 172-173. With respect to each of the transactions at issue, the Complaint alleges that AMD was offering a competitive microprocessor, but that the OEMs were buying from Intel because of the discounts and rebates. *See id.* ¶¶ 143-175. But the Complaint lacks any factual allegations to support

---

(Footnote Continued from Previous Page)
rivals are put at a competitive disadvantage they cannot overcome." *Id.* ¶ 165 (emphasis added).

an inference that those OEMs paid an above-market price.

Thus, the plaintiffs' allegation of causation is unsupportable and implausible, and cannot support antitrust standing. *See*, *e.g.*, *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 441 (3d Cir. 2000) (affirming dismissal because antitrust injury "too remotely connected" to alleged wrongdoing); *West Penn Power Co.*, 147 F.3d at 263 n.13, 268 (court need not accept "unsupported conclusions and unwarranted inferences"; no standing where plaintiff could not "prove a direct link between the alleged antitrust violation and their purported injury"); *In re Air Passenger Computer Reservation Sys.*, 727 F. Supp. 564, 569 (C.D. Cal. 1989) (no standing where plaintiffs' alleged injury did "not follow logically" from alleged conduct); *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 224 (N.D. Ill. 1987) (plaintiff "fail[ed] to assert any logical connection between vertical acquisitions and how they ultimately affect the . . . pricing policies" of defendants).

## 2. There Are "More Direct Victims" Of The Alleged Wrongful Conduct

Likewise, the plaintiffs get no support from the third factor in the antitrust standing analysis—whether more direct victims of the antitrust injury exist. With respect to this factor, the plaintiff must be, as a threshold matter, a participant, *e.g.*, a competitor or consumer, in the same relevant market as the alleged misconduct. *See, e.g., Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 184 (3d Cir. 1997);[23] *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996) (antitrust standing requires "the injured party be a participant in the same market as the alleged malefactors") (citation

---

[23]    The same limitations apply to California's Cartwright Act. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) (applying market participant rule to Cartwright Act standing); *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1125-26 (N.D. Cal. 2005) ("courts interpreting the Cartwright Act's antitrust standing requirement have consistently followed the 'market participant' rule"); *Vinci*, 36 Cal. App. 4th at 1816.

omitted); *Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) ("Basically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market."); *S.D. Collectibles, Inc. v. Plough, Inc.*, 952 F.2d 211, 213 (8th Cir. 1991) ("The antitrust laws were designed to protect competition and therefore standing is generally limited to actual market participants, that is, competitors or consumers") (citations omitted).

Here, the allegedly restrained market is the "x86 microprocessor market." Complaint ¶ 1; *see also id.* ¶ 231 (alleging that Intel's conduct has caused "substantial harm to competition in the market for x86 microprocessors"). Although the Complaint alleges that the named plaintiffs have purchased indirectly "one or more Intel x86 microprocessors or computers with Intel x86 microprocessors", *id.* ¶ 10, the Complaint also asserts that plaintiffs' injuries reflect overcharges only "in the form of higher prices for personal computers, workstations, and servers containing Intel x86 microprocessors." *Id.* ¶ 234.  The named plaintiffs or putative class members are not participants in the x86 microprocessor market; they have simply indirectly acquired Intel x86 microprocessors by way of purchasing a computer product containing the microprocessor.

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 269 F. Supp. 2d 1213 (C.D. Cal. 2003), helps illustrate this point.  In *Grokster*, Sharman Networks, a distributor of online file-sharing software, attempted to assert Sherman Act and Cartwright Act antitrust claims against content companies that allegedly controlled 85% of the relevant market for manufacturing, labeling, and distributing copyrighted music and films.  *Id.* at 1217.  Sharman claimed that the defendants unlawfully refused to license any copyrighted material to a third party, Altnet, which had contracted with Sharman to distribute that material over the Internet.  *Id.*  Like the plaintiffs here, Sharman alleged no direct dealings with the defendants, but claimed that it indirectly participated in the relevant market because of its arrangement with Altnet.  *See id.* at 1219-20.  Also, like the plaintiffs here, Sharman claimed injury flowing from the alleged antitrust violation

(lower revenue from Altnet after defendants cut off Altnet's supply of copyrighted content). *See id.* at 1219-20.

The court held Sharman had no standing to sue under either the Sherman Act or the Cartwright Act:

> [A] party does not have standing simply because it has a commercial relationship with a market participant, thereby giving it an economic interest in avoiding restraint of the relevant market by a third party. . . .
>
> As Sharman is *neither a competitor nor customer* in the restrained market, and because its injury is incidental, and not integral, to the alleged anticompetitive scheme, Sharman does not have standing.

*Id.* at 1221 (emphasis supplied).

*Barton & Pittinos, Inc. v. Smithkline Beecham Corporation* also illustrates this point. There, the plaintiff was a marketing company that promoted defendant Smithkline Beecham's ("SB") vaccine to nursing homes under a program where plaintiff would elicit orders for the defendant's vaccine and submit the order to a third party medical supplier who would obtain the vaccine from SB and sell it to the nursing homes. The plaintiff received a commission on each sale. *See* 118 F.3d at 179.

When SB terminated the program, plaintiff alleged that the termination was the result of a conspiracy between SB and pharmacists, who also sold the vaccines to nursing homes, and brought a claim under the Sherman Act. *See id.* at 179-80. On the issue of antitrust standing, the plaintiff argued that it was a market participant because it competed with pharmacists by way of the SB program. *See id.* at 182. The Third Circuit disagreed. Although it concurred that the pharmacists viewed *the program* as competition, the Third Circuit found that the standing inquiry was whether the plaintiff "was in competition with the pharmacists, not whether 'the program' was." *Id.* The Court held that plaintiff was not a competitor because the nursing homes could not turn to plaintiff alone to provide the vaccine; the SB program limited plaintiff's involvement in

the market to providing information about the product, and the plaintiff was not a medical supply operation capable of providing the SB vaccines.  Because plaintiff was neither a consumer nor competitor, it could not establish antitrust standing.  *See id.* at 182-84.

The plaintiffs here are further removed from the alleged restrained market than the plaintiffs in either *Sharman* or *Barton & Pittinos*.  Here, plaintiffs purchased a computer in which the microprocessor is but one of many components.  *See, e.g.*, Complaint ¶ 116.  Thus, their relationship is akin to the plaintiff in *Lorix v. Crompton Corp.*, 720 N.W.2d 15 (Minn. Ct. App. 2006).  Lorix sued Crompton Corporation under Minnesota's Antitrust Act, alleging that Crompton conspired with its rivals to fix the price of rubber-processing chemicals.  *Id.* at 16.  Plaintiff claimed that the supra-competitive rubber-processing chemical prices were passed on to her in the form of higher prices for automobile tires constructed from rubber fabricated using those price-fixed chemicals.  *Id.*  The lower court dismissed the claim, holding that plaintiff's alleged injuries were too remote to confer antitrust standing.  *Id.*

The Minnesota Court of Appeals affirmed on grounds that plaintiff was not a participant in the restrained market.  *Id.* at 18-19.  The court observed that "[a]ntitrust violations always 'cause ripples of harm to flow' throughout the economy, but antitrust legislation is not intended 'to allow every person tangentially affected by an antitrust violation to maintain an action.'"  *Id.* at 18 (citation omitted).  Thus, the court explained, "[f]ederal courts have consistently held that an antitrust plaintiff must be a consumer or competitor in the market restrained by alleged antitrust violations."  *Id.*  The plaintiff did not purchase the alleged price-fixed chemicals, but only automobile tires fabricated with the chemicals, and thus was not a market participant.  *Id.*  Importantly, the court rejected plaintiff's argument that because Minnesota's Antitrust Act expressly permitted suits by persons "injured directly or indirectly",[24] federal antitrust standing case are inapposite.

---

[24]    *Lorix*, 720 N.W. 2d at 17 (citing Minn. Stat. § 325D.57 (2004)).  *Compare* Cal.

*Id.* at 17-19.  The Court instructed that "Minnesota's [legislative] response to federal case law barring indirect-purchaser claims does not obviate the requirement that an antitrust plaintiff be a participant or competitor in the market restrained by the alleged antitrust violation.  Rather, it extends standing to indirect purchasers in that market."  *Id.* at 19. Similarly, plaintiffs here who indirectly purchased products containing Intel x86 microprocessors are not participants in the allegedly restrained market and thus lack antitrust standing.

Next, even if plaintiffs were participants in the allegedly restrained market, there are other entities more directly affected by the alleged conduct.  Most importantly, all of plaintiffs' lawsuits are offshoots of AMD's currently pending claim against Intel.  AMD, a competitor, is just one example of an entity more directly affected by the alleged conduct than purchasers of personal computers.  Others would include direct purchasers of microprocessors, and distributors and resellers of microprocessors or computers.  "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public in antitrust enforcement diminishes the justification for allowing a more remote party … to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542; *see also 2660 Woodley Rd. Joint Venture*, 369 F.3d at 741-42 (non-favored vendors prevented from selling goods to hotel owner due to hotel management corporation's pricing arrangement with favored vendors were "more direct" victims than plaintiff hotel owner which suffered from higher prices as a result of reduced competition among vendors; finding no antitrust injury); *Peterson v. Visa U.S.A., Inc.*, No. Civ. A. 03-8080, 2005 WL 1403761, at *5 (D.C. Super. Ct. Apr. 22, 2005) (finding that consumer lacked antitrust standing to challenge alleged

---

(Footnote Continued from Previous Page)
BUS. & PROF. CODE § 16750(a) (2006) (permitting a claim "regardless of whether such injured person dealt directly or indirectly with the defendant").

overcharge for debit card services because merchants who purchased services directly from card companies were "more direct victims" and "the motivated class to 'vindicate the public interest in antitrust enforcement'").

### 3.    Plaintiffs' Alleged Injuries Are Too Remote And Speculative To Support Standing

The final pertinent factor—directness or indirectness of the alleged injury—provides plaintiffs no support. Plaintiffs' claimed injuries (higher PC prices) lack any expressed or logical factual connection to Intel's alleged conduct. Nonetheless, even if plaintiffs had alleged a causal connection, it would, by necessity, be remote and speculative, and therefore insufficient.

An injury is unacceptably speculative and remote if it "may have been produced by independent factors." *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987) (citing *Associated General Contractors*); *see also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 927 (3d Cir. 1999); *Allegheny Gen. Hosp.*, 228 F.3d at 440. The essence of plaintiffs' allegations is that Intel offered various forms of discounts on x86 microprocessors to its direct customers. *See* Complaint ¶¶ 140 (alleging Intel engaged in business practices to "limit its customers' ability" to deal with AMD), 143-191 (alleging conduct directed at OEMs), 192-199 (alleging conduct directed at distributors), 200-211 (alleging conduct directed at retailers). But plaintiffs complain that they paid inflated prices for personal computers and/or servers sold—in separate markets—by third parties not before the Court. *See id*. ¶¶ 106, 234-235. Plaintiffs' theory—insofar as a theory is alleged—therefore depends almost entirely on the actions of non-parties. *See id.* ¶¶ 134-137. A few of these third parties are OEMs to which Intel directly sold its microprocessors. Most are retailers who purchased PCs and other products which contained microprocessors along with many other components. Plaintiffs were, therefore, at least two, if not more, levels removed from Intel's sale of the microprocessor.

25

This complex web of wholesale pricing, component pricing, and retail pricing—which is fraught with "changing factors affecting business and investment decisions, including market conditions, . . . supply and demand, [and] the success or failure of research and development efforts", D.I. 217, at 10,—results in a "chain of effects … full of twists and turns, which themselves are contingent upon numerous developments", D.I. 279 at 9, and makes any link between Intel's microprocessor sales and plaintiffs' PC purchases fatally attenuated.  Hundreds of disparate inputs necessarily play a role in the pricing decisions of these unidentified sellers, and plaintiffs fail to allege how the purported inflated price which a particular plaintiff paid for a particular PC could be traced to anything Intel did.  This is precisely the type of "vaguely defined link" that the Supreme Court condemned in *Associated General Contractors*.  459 U.S. at 540; *see also Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997) (no standing where consumers claimed New Balance and several of its retail shoe dealers conspired to fix prices, but putative class included customers who purchased New Balance shoes from non-conspiring retailers).

Thus, plaintiffs' claims are too indirect and speculative to confer antitrust standing.

### C.    Plaintiffs' Alleged Non-Price Injuries Cannot Confer Antitrust Standing

The Complaint refers generally to reductions in quality and choice that could have affected the products plaintiffs purchased.  *See* Complaint ¶ 231 ("Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit . . . bringing customers . . . enhanced innovation, and greater freedom of choice").  Plaintiffs' only specific allegations are:  (1) that Intel and others made an "ultimately unsuccessful" attempt to develop an industry standard which would have operated to AMD's disadvantage, *id.* ¶¶ 212-219; (2) that Intel proposed some industry standards which the standard setting organization "ultimately rejected", *id.* ¶¶ 220-225;

and (3) that Intel designed its compiler "with the goal of compromising performance for those who opt for AMD solutions" causing the latter to experience some degradation in performance. *Id.* ¶¶ 226-230.

These purported non-price injuries—if they are injuries at all—cannot, as a matter of law, create antitrust standing. Particularly relevant to this part of plaintiffs' claim is the recent decision of the Fourth Circuit in *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006).[25] The plaintiffs in that case were purchasers of computers in which Microsoft software had been pre-installed. Like plaintiffs here, they were indirect purchasers, trying to create a claim out of allegations made by others about the defendant's predatory practices. *See id.* at 318.

Like the present plaintiffs, the *Kloth* plaintiffs alleged injury to themselves other than to higher prices. Specifically, they claimed (1) they had been denied the benefit of superior technology, (2) they were prevented from reselling Microsoft software in the "used" market, and (3) their computers had been degraded by the Microsoft software. *Id.* at 317-18, 323. The Fourth Circuit affirmed dismissal of their claims concerning these non-price harms on the ground, *inter alia*, that plaintiffs had failed to allege antitrust standing.[26] *See id.* at 325.

The Court applied the criteria of *Associated General Contractors* to the three non-price injury claims. With respect to first, the court held:

> At bottom, the harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so diffuse that they could not possibly be adequately measured. The problem is not one of discovery or specific evidence, but of the nature of the injury claimed. Where the purported injuries amount to generalized or abstract

---

[25]    Interim Class Counsel here was also counsel of record for plaintiffs in *Kloth*.

[26]    The Fourth Circuit expressly stated that this was an alternative ground for its holding, in addition to its determination that the plaintiffs' claims were barred by *Illinois Brick*. *Kloth*, 444 F.3d at 323.

> societal harms, the plaintiffs cannot claim that they, as
> distinct from others in society, were specifically injured in
> their business or property or by the alleged antitrust
> violation . . . .

*Id.* at 324.

As for the second, the court concluded that "there are more direct victims—i.e., the retailers and OEMs—and [] it is too costly for courts to discern the allocation of such damages." *Id.* at 325. Finally, the court found that third claim "amount[ed] to claims for defective product." *Id.* "This type of injury," the court concluded, "is simply not a type for which plaintiffs can recover under the antitrust law." *Id.* For the same reasons, plaintiffs' alleged non-price injuries must suffer a similar fate here.

## V.     NON-CALIFORNIA PLAINTIFFS CANNOT INVOKE CALIFORNIA LAW

The non-California plaintiffs seek to assert statutory claims under California's Cartwright Act, CAL. BUS. & PROF. CODE § 16720, and its Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200, as well as California common law monopolization and unjust enrichment claims. Plaintiffs say that California law should "appl[y] to the claims of all Class members for damages, regardless of where they reside." Complaint ¶ 107. That misstates the law.

The Complaint alleges that 76 of the 94 named plaintiffs do not live in California and made their purchases of equipment containing Intel microprocessors outside of California. Complaint ¶¶ 10-105. The Complaint also alleges a global market. *Id.* ¶ 129. The claims are based on alleged conduct, decisions, distribution, and purchases occurring in various places in the United States and in many other countries. *See, e.g., id.* ¶¶ 141, 232. The conduct that brings a plaintiff within the purported class, and the only conduct that involves the plaintiffs—the purchase of computer hardware with an Intel x86 microprocessor—allegedly occurred not in California but in the state in which each

plaintiff resides. [27]  *Id.* ¶ 10.  Each of the states in which plaintiffs made their purchases—purchases from which Intel's alleged conduct was several steps removed—has an interest in having its own antitrust and tort laws applied.

Plaintiffs are therefore barred, under choice-of-law rules, from stating nationwide claims under California law.  The Second, Third and Fourth causes of action for violations of California's Cartwright Act, its supposed "tort law against monopolization," and its unfair competition law, Complaint ¶¶ 247-267, should all be dismissed as to all non-California plaintiffs.

**A.      California Law Does Not Apply Under Choice-Of-Law Rules**

**1.      The Choice Of Law Is Outcome-Determinative; Therefore, Nationwide Application Of California Law Would Frustrate The Laws Of Other States**

The Court can avoid performing a choice-of-law analysis only if the differences among the state laws with a potential interest in the matter are not outcome-determinative.  That is not so in this case.  There are substantial differences among the unfair competition and antitrust laws of the states under which plaintiffs have alleged causes of action—and those they have omitted.

Most obviously, plaintiffs are trying to use the California statutes to end-run the decisions of the many states that have followed *Illinois Brick* and do not permit indirect purchaser actions under their laws.  Permitting a California law-based nationwide class action of indirect purchasers in every state, regardless of the state's position on such claims, would negate the policy decisions of dozens of states as to how best to vindicate the goals of the antitrust laws.  *See Illinois Brick*, 431 U.S. at 746 (recognizing that some injured indirect purchasers may go uncompensated but concluding "on balance" that "the

---

[27]      The Complaint alleges all purchases by the named plaintiffs, except one, occurred "in the State in which he, she, or it resides."  Complaint ¶ 10.  The exception was an Arkansas resident who bought his computer in Louisiana. *Id.* ¶ 33.

legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws [] is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.").

In addition to the indirect purchaser split, state antitrust laws vary in many particulars, so much so that the adjudication of the same claims under different state antitrust laws can have dramatically different outcomes.  For example:

- ***Intrastate vs. Interstate Conduct.***  Some states limit the applicability of their antitrust laws to intrastate conduct, while others allow allegations stemming from interstate conduct.[28]

- ***Unilateral vs. Multilateral Conduct.***  California's Cartwright Act has no Section 2 equivalent and covers only multilateral conduct; other states regulate unilateral conduct.[29]

- ***Remedies.***  The availability of treble damages varies from state to state, as does the availability of other remedies.[30]

---

[28]    *Compare Sun Dun, Inc. of Washington v. Coca-Cola Co.*, 740 F. Supp. 381, 397 (D. Md. 1990) (finding that claims under D.C. Act were limited to conduct falling within the District); *with* IOWA CODE § 553.1 *et seq.* (2006) (reaching interstate commerce); *and* ME. REV. STAT. ANN. tit. 10, § 1101 *et seq.* (2006) (under which the law is unsettled as to whether this statute reaches interstate commerce).

[29]    *Compare Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir. 1987) (unilateral monopolization is not a cognizable claim under California law); KANSAS STAT. ANN. §§ 50-101 *et seq.* (2005) (unilateral monopolization is not proscribed); NEW YORK GEN. BUS. LAW § 340 *et seq.* (2006) (same); *with* ME. REV. STAT. ANN. tit. 10, § 1102 (2006) (adopting federal Sherman Act § 2 language); NEB. REV. STAT. § 59-802 (2006) (same); WIS. STAT. § 133.03(2) (2006) (same).

[30]    *See, e.g.*, IOWA CODE § 553.12 (2005) (allowing double damages as well as "other equitable relief"); KAN. STAT. ANN. § 50-115 (2006) (allowing "full consideration or sum paid" to be recovered but not indicating whether treble damages are available); ME. REV. STAT. ANN. tit. 10, § 1104(1) (2005) (allowing treble damages); NEB. REV. STAT. § 59-821 (2006) (allowing recovery of actual or liquidated damages, but only in an amount that bears a reasonable relation to the actual damages sustained, "which damages are not susceptible of measurement by ordinary pecuniary standards"); N.M. STAT. ANN. §§ 57-12-10B (2006), 57-12-10E (2006) (allowing only named plaintiffs to recover actual plus treble damages for "willful" violations, but limiting recovery by class members to actual

Likewise, consumer protection and unfair competition laws vary widely among the states:

- **Level of Culpability.**  State consumer fraud statutes also differ as to the requisite level of culpability required, from "rascality," to specific intent, to mere knowledge.[31]

- **Standing/Private Right of Action.**  Whether a private right of action is available, and to whom, and with what prerequisites, varies.[32]  Several states' consumer protection laws do not extend protection to business entities, limiting relief to persons purchasing goods or services primarily for family or personal use.[33]

- **Remedies.**  "Methodologies" for calculating actual damages differ, and some states, such as California, permit only equitable remedies as opposed to money damages.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).

- **No class action.** Several States prohibit consumer class actions under their statutes (e.g., Alaska, Georgia, Montana and Louisiana).  *See, infra,* Section VIIB, p. 44.  Courts have consistently held that subclasses do not cure these conflicts among the varying state consumer fraud laws at issue. *See, e.g., In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Spence v. Glock GmbH*, 227 F.3d 308, 311 n.5 (5th Cir. 2000).

A choice-of-law analysis, then, is unavoidable because these significant

differences in state law will determine the outcomes of the actions, and by claiming to

---

(Footnote Continued from Previous Page)
damages suffered).

[31]      *Compare, e.g., Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 47 (1st Cir. 2002) (requiring a showing of "rascality," under Massachusetts law), *with Nursing Enters., Inc. v. Marr*, 719 So. 2d 524, 528 (2006) (La. Ct. App. 1998) (requiring specific intent to harm), *and* IDAHO CODE § 48-603 (requiring actual or constructive knowledge).

[32]      *See, e.g.*, LA. REV. STAT. 51:1402(3) (2006) (only "natural person[s]" have standing); CAL. CIV. CODE § 1782(a) (2006) (requiring notice and opportunity to make correction, repair, or replacement before suit is brought).

[33]      *See, e.g., Doll v. Major Muffler Ctrs., Inc.*, 687 P.2d 48, 52 (Mont. 1984) (businesses not within the class of persons protected by consumer protection act); *Scully Signal Co. v. Joyal*, 881 F. Supp. 727, 745 (D.R.I. 1995) (Rhode Island consumer laws afford business entities no private right of action).

represent indirect purchasers nationwide, the named plaintiffs have implicated the interests of all 50 states.

2.    **MDL Courts Apply The Choice Of Law Rules Of The Transferor Fora**

The Court must apply a choice-of-law analysis to the claims of each of the named plaintiffs and the class members they represent. As a preliminary step, the Court must determine which choice-of-law test to use. In cases brought under either diversity jurisdiction, 28 U.S.C. § 1332 (2006), or supplemental jurisdiction, 28 U.S.C. § 1367 (2006),[34] federal courts apply the choice of law rules of the forum state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 494 (1941) ("in diversity cases the federal courts must follow conflict of laws rules prevailing in the states in which they sit"); 19 Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2D § 4520, at 635 (2d ed. 1996) (Erie Doctrine applies with respect to claims under supplemental jurisdiction in federal question jurisdiction cases); *System Operations, Inc. v. Scientific Games Devel. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977).

In multidistrict litigation, as in other inter-district transfers under 28 U.S.C. § 1404 (2006), the transferee court must apply the choice of law rules of the transferor forum state. *Van Dusen v. Barrack*, 376 U.S. 612 (1964) (transferee court must apply the law the transferor court would have applied absent a Section 1404(a) venue change). Transfers are intended only for convenience and efficiency, and not to change the substantive law applied. *Id.* at 616. Under *Van Dusen*, this Court must consider the choice of law provisions of transferor states Delaware, California, Florida, and Tennessee.[35]

---

[34]    Plaintiffs' First Amended Consolidated Complaint alleges supplemental jurisdiction, as did all but a few of the original complaints; those alleged diversity jurisdiction. *See* Complaint ¶ 8.

[35]    While one action was transferred from Kansas, which applies a third type of choice of law test, this Court need not apply Kansas choice-of-law principles because that

Plaintiffs should not be permitted to use an MDL transfer to affect the choice of law or the outcome of the actions. Consolidation makes plaintiffs' out-of-state claims no more appropriate than they were in their home districts. *See In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) (court must analyze each indirect purchaser's claim separately; named plaintiffs do not have standing based on commerce in other states, and "cannot rely on unidentified persons within those states to state a claim for relief").

### 3.    Under Applicable Choice-Of-Law Rules, California Law Does Not Apply Nationwide

The transferor fora implicate two different choice-of-law tests. The Court need not be concerned about sorting which claims survive under which state's choice-of-law rules, however, because plaintiffs who made their purchases outside California cannot be permitted to pursue California remedies under either of these analyses.

### a.    The "Most Significant Relationship" Test

This Court must apply the "most significant relationship" choice of law test to determine the choice of law for cases that originated in Delaware, Florida, and Tennessee, as each of these states has adopted that rule as described in the Restatement (Second) of Conflicts of Laws. *See* Restatement (Second) of Conflict of Laws § 145 (1971); *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 39 (Del. 1991); *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003) (applying Florida law); *Hathaway v. McKinley*, 830 S.W.2d 53, 54 (Tenn. 1992). The Restatement's "most significant relationship" test comprises four elements: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of

---

(Footnote Continued from Previous Page)
plaintiff, Marvin Chance Jr., is not named in the Consolidated Complaint.

33

the parties;[36] and (4) the place where the relationship, if any, between the parties is centered. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). Courts must weigh these factors "according to their relative importance with respect to the particular issue" to determine which state has the "most significant relationship" to the action. *Id.* The Court must apply these factors to the claims of each plaintiff, not to the consolidated cases as a whole. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 823 (1985).

Under this rubric, this Court must apply the law of the state of each plaintiff's purchase. *See, e.g., In re Pharm. Indust. Average Wholesale Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) (law of consumers' residence and place of purchase, not of defendants' principal places of business, applied); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 215 (E.D. Pa. 2000) (finding that law of consumers' home states, rather than state of defendant's principal place of business and alleged origin of misrepresentations, applied); *Poe v. Sears, Roebuck & Co.*, No. Civ. A 1:96-CV-358-RLV, 1998 WL 113561, *4 (N.D. Ga. Feb. 13, 1998) (applying law of plaintiffs' states of residence); *Nicholson v. Marine Corps West Fed. Credit Union*, 953 F. Supp. 1012, 1016-17 (N.D. Ill. 1997) (dismissing § 17200 claim, finding that law of state of plaintiff's injury and residence applied under Restatement (Second) test, not California law, the state of defendant's headquarters).

First, and most important, plaintiffs' allegations concede that they suffered no injury until they purchased, several steps down the stream of commerce from Intel, a product containing an Intel x86 chip. The states where the purchase occurred have the primary interest in protecting their citizens in the manner they deem appropriate, policing the stream of commerce in their states, and delineating the proper scope of relief for torts that occur within their borders. That Intel is a California business does not change that

---

[36]    The fact that a party is domiciled or does business in a given state carries little weight of itself. *See* Comments to RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). The fact that plaintiffs allege injury where they reside, however, weighs in favor applying law of plaintiffs' state of residence. *See id.*

conclusion, particularly where Intel has no direct relationship with any non-Californian plaintiff. Applying California law to every transaction across the nation whenever the defendant is a California resident would improperly frustrate the policies of all states that do not provide indirect purchaser claims. Likewise, the differing remedies, standing requirements and other substantive differences among these antitrust laws would conflict with other states' policy decisions. To apply California law here would be to contradict the reasoning set forth in *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996) by making California the default regulator of conduct in all states and protector of all consumers:

> [I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States. . . . To avoid such encroachment, the economic penalties that a State . . . inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy. . . . [The State] does not have the power, however, to punish [defendant] for conduct that was lawful where it occurred and that had no impact on [The State] or its residents.

*Id.* at 572-73; *see also In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d at 1371-72 (rejecting claims of purchasers under the laws of states other than their own); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 277-78 (D. Mass. 2004) (applying law of state in which consumers' purchases were made to indirect purchasers' antitrust claim).

Second, plaintiffs' specific factual allegations undercut their position that the conduct that caused their injury emanated solely from California. Unlike AMD, which sues Intel for unilateral conduct under Section 2 of the Sherman Act, plaintiffs here claim under California's Cartwright Act, which proscribes only *combinations and conspiracies* that restrain trade. Any combinations or conspiracies involving Intel would, by definition, have to involve its dealings with direct customers and large retailers located in

many places around the world, and far from California. *See, e.g.,* Complaint ¶¶ 129, 141, 143-62, 177-79, 204-210.

Moreover, although California's interest in this action is not insubstantial, it is also being vindicated by the California residents suing in this action. Adding plaintiffs from other states does nothing to serve the policies of California.

### b.    The "Governmental Interest" Test

California, unlike most other states, applies the governmental interest analysis, sometimes called the comparative impairment analysis, to determine which state's interest would be more impaired if its law were not applied. *See Tucci v. Club Mediterranee, S.A.*, 89 Cal. App. 4th 180, 189 (2001). The Court need only apply the governmental interest test to those claims originally brought in California. Of those, only ten non-California plaintiffs asserted claims under California law in transferred California actions.[37] Not surprisingly, all of those plaintiffs reside in states that prohibit indirect purchaser suits, and their California claims attempt to end-run the decisions of their states to follow *Illinois Brick*.

California's governmental interest analysis involves three steps. First, the court examines the laws of the states involved to determine if the foreign state law differs from that of the forum. Second, if there is a difference in the laws, the court examines each jurisdiction's interest in the application of its own law to determine whether a true

---

[37]    Those named plaintiffs are:  William Cronin (Texas) Steven Hamilton (Washington), Ronald Konieczka (Ohio), Andrew Meimes (New York), Peter Naigow (Wisconsin), Patricia Niehaus (Kentucky), Maria Prohias (Florida), Kevin Stoltz (Washington), Dana Thibedeau (Mass.), and Brian Weiner (New York).  *See* Complaint ¶¶ 28, 45, 58, 66, 68, 70, 76, 89, 91, 94.  The following non-California named plaintiffs asserted claims in cases transferred from California, but did not assert any claims under California statutory or common law in their California complaint:  Dressed to Kill Custom Draperies, LLC (Arizona), Patrick Hewson (Illinois), Jose Juan (New York), Tracy Kinder (West Virginia) and Edward Rush (District of Columbia).  *See* Complaint ¶¶ 97, 50, 55, 57, 79.

conflict exists.  Finally, if each jurisdictions has a legitimate interest in the applications of its rule of decision, California applies the law of the state that will do the least damage to the interests of other states.  *See id.; Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08 (2006).

Recent California Supreme Court jurisprudence demonstrates why California law does not apply to the claims of non-California residents here.  Under the government interest analysis, California courts analyze each interested state's statute and purpose as applied to the facts of the case.[38]  *See Kearney,* 39 Cal. 4th at 117-26.  In *Kearney*, California customers alleged that the Georgia-based defendant with extensive business activities in California violated California's invasion of privacy and unfair competition laws.  39 Cal. 4th at 99, 102.  The alleged conduct—recording telephone conversations with California clients without the clients' knowledge or consent—constituted a violation of California law, but not Georgia law.  The court found that California and Georgia each had a legitimate interest in having its law applied, but the Court ultimately applied California law, finding that California's interest would be impaired by applying Georgia law.  *See id.* at 128-131.  The Court found that the prescribed purpose of California's privacy statute was "to protect the privacy of confidential communications of California residents *while they are in California*."  *Id.* at 119-20 (citations omitted) (emphasis in original).  Georgia also had a privacy statute intended to protect its citizens' privacy.  *See id.* at 121 (citations omitted).  The Court concluded that Georgia's interests were not

---

[38]     Pre-*Kearney* California choice of law decisions that simply applied California law without undertaking the extensive choice of law analysis now required by the California Supreme Court improperly analyzed choice of law.  *Compare Kearney,* 39 Cal. 4th at 117-26 (requiring analysis of statutory scheme, legislative purpose, and state interests invoked by specific facts of the case when undertaking choice of law analysis) *with Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242-43 (2001) (affirming class certification for settlement purposes, finding that California law applied without analyzing other states' interests and the purpose or intent of their statutes).

implicated, as no Georgia residents had their privacy invaded.  However, it found that Georgia had an interest in having its law applied, based on its interest in permitting its companies to engage in certain behaviors and in "establishing the general ground rules under which persons in Georgia may act . . . ."  *See id.* at 123, 127.

Ultimately, the *Kearney* Court found that the objective and purpose of California's statute—to protect *California residents*' privacy—would be impaired by application of Georgia law.  *Id.* at 100, 119.

Here, California's decision to make indirect purchaser suits available as a remedy along with its other substantive remedies for consumers is intended to protect its *own* citizens.  *See* Proposition 64 § 1(a) (Section 17200 "is intended to protect California businesses and consumers from unlawful, unfair, and fraudulent business practices . . . .").  Although California's interest in protecting its own citizens applied to the *California* plaintiffs in *Kearney*, that local interest does not apply to the named plaintiffs in this case who do not reside in California.  *See Kearney*, 39 Cal. 4th at 110; *Rosenthal v. Fonda*, 862 F.2d 1398, 1403 (9th Cir. 1988) (noting California's weak interest in applying its policies to protect a non-resident plaintiff).

An expansive view of California's statutory interests is especially unwarranted in light of California voters' recent decision to restrict the scope of California's UCL.  *See Pfizer, Inc. v. Superior Ct.*, 141 Cal. App. 4th 290, 306-07 (2006) (holding that Proposition 64 added a standing and reliance requirement to the UCL that applied to each member of a putative class; noting that Proposition 64 "has had the effect of dramatically restricting these consumer protection measures").

California's interests in protecting its citizens and policing its resident corporations are already being vindicated through the claims of the California named plaintiffs here.  Where other states' laws differ, those states have strong interests in having their own laws applied to the claims of their citizens, in regulating business transactions taking place within their borders, and in ensuring that companies conducting

business within their borders, with a reasonable expectation that their state's law applies, are not subjected to liability under other states' laws. Those interests trump California's negligible interest in out-of-state transactions. *See, e.g., Rosenthal*, 862 F.2d at 1403 (applying New York law in a conflict of law case, noting New York's interest in extending its protections to non-residents doing business with New York businesses); *Kearney,* 39 Cal. 4th at 123 (noting a state's general interest in not having liability imposed on businesses acting therein reasonable reliance on its laws); *Liew v. Official Receiver and Liquidator*, 685 F.2d 1192, 1198 (9th Cir. 1982) (noting that foreign jurisdiction has interest in regulating business transactions within its borders and applying law of foreign jurisdiction, and that California's interest in deterring the conduct of resident businesses extends only to the relationship with its purchaser).[39]

Thus, under each test, the outcome is the same: plaintiffs should sue under their own states' laws. As a result, the named plaintiffs cannot represent purchasers in other states, nor can plaintiffs pick a single favorite state's laws and sue under them. Each named plaintiff's claims must be tested under the laws of the state where he or she purchased the product; the named plaintiffs cannot sweep along with them millions of indirect purchasers who bought in states whose laws provide no cause of action for them.

## VI.    OTHER LEGAL DEFECTS BAR PLAINTIFFS' STATE ANTITRUST CLAIMS ON THEIR FACE

Because California law cannot apply to the claims of all class members, the Court

---

[39]    *Accord, In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997) (applying governmental interest analysis in product liability action and finding law of consumer-plaintiffs' home states applied rather than law of state where defendant was headquartered and misrepresentations originated); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 457 (D.N.J. 1998) (applying interest analysis in product liability action; finding law of consumer-plaintiffs' home states applied); *Laufer v. U.S. Life Ins. Co. in City of New York*, No. BER-L-9082-04, 2005 WL 1869211, *7-9 (N.J. Super. Ct. Law Div. 2005) (refusing to find that New Jersey law applied to non-resident plaintiffs in consumer protection action where defendant's principal place of business was New Jersey and many misrepresentations occurred outside New Jersey).

must evaluate the Complaint's alleged violations of the antitrust and restraint of trade laws of 20 jurisdictions, and the unfair competition laws of 23. *See* Complaint ¶¶ 268-315. Each of the individual purported state law violations in the Complaint is set out in a single-sentence allegation that "Intel has violated [name of state statute]." *Id.* Not surprisingly, many of these allegations fail to state a claim as a matter of law.[40] By dismissing these defective claims now, the Court can greatly reduce the scope of this case and its complexity.

### A. Certain States' Antitrust Laws Do Not Reach Interstate Or International Conduct

Plaintiffs' claims under the antitrust laws of five states and the District of Columbia fail because those statutes are limited to intrastate conduct and do not reach the interstate and international acts alleged in plaintiffs' complaint. The essence of plaintiffs' claims is that Intel has attempted to monopolize a world-wide market for x86 microprocessors. *See* Complaint ¶¶ 141, 231-232, 238. Plaintiffs assert no state-specific activities. Nor do plaintiffs allege that Intel, either unilaterally or in concert with others, directed its purported anticompetitive conduct toward the commerce of any particular state.[41]

Plaintiffs' only allegation attempting to connect Intel's allegedly unlawful activities to antitrust violations in 19 states and the District of Columbia simply restates their conclusory injury claim: "[C]lass members in each of these States have been

---

[40]      In ruling on state law claims, the Court must look to the decisional law of the state's highest court. *Johnson v. Frankell*, 520 U.S. 911, 916 (1997). If no such authority is available, the rulings of the intermediate courts are to be persuasive unless this Court is convinced the state's highest court would decide differently. *Hicks v. Feiock*, 485 U.S. 624, 630 n.3 (1988) (citations omitted). Intel here cites high court precedent wherever available.

[41]      Intel is concurrently moving to dismiss plaintiffs' claims to the extent they rely on allegations of foreign conduct. *See* Intel's Motion to Dismiss Class Plaintiffs' Foreign Conduct Claims.

injured in their businesses and property in that they paid more for Intel's x86 microprocessors (or for products containing such microprocessors) than they would have paid absent Intel's unlawful conduct." *Id.* ¶ 290. Accordingly, plaintiffs' claims under the antitrust laws of the District of Columbia, Mississippi, Nevada, New York, South Dakota, and West Virginia necessarily fail because those jurisdictions limit the reach of their antitrust laws to intrastate conduct, which plaintiffs do not allege here.[42]

### B.    New York Antitrust Law Does Not Permit Class Actions By Indirect Purchasers

Plaintiffs seek damages on behalf of a sub-class under the antitrust laws of New York. *See* Complaint ¶ 282. However, New York courts have ruled that New York's state antitrust statutes bar all indirect purchaser damages class actions. *See Asher v. Abbott Labs.*, 737 N.Y.S.2d 4 (App. Div. 2002); *Cox v. Microsoft Corp.*, 737 N.Y.S.2d 1 (App. Div. 2002); *see*, e.g., *United States v. Dentsply Int'l, Inc.*, Civ. A99-005-SLR, 2001 WL 624807, *15-16 (D. Del. March 30, 2001) (upholding New York Donnelly Act's express bar on class actions).

Because plaintiffs purport to represent a class of indirect purchasers, *see* Complaint ¶ 72, their New York antitrust claim must be dismissed.

### VII.    PLAINTIFFS FAIL TO STATE CLAIMS UNDER STATE CONSUMER PROTECTION STATUTES

Plaintiffs bring unfair competition claims under California law based on unlawful and unfair conduct[43] and a separate claim under the consumer protection/unfair competition laws of 22 states (including California) and the District of Columbia. As

---

[42]    Exhibit B, App, A4, lists on a state-by-state basis those cases that have found that the state antitrust statutes are limited in scope to intrastate conduct.

[43]    Plaintiffs allege "fraudulent" conduct as a basis for their UCL causes of action. Complaint ¶ 263. However, they allege no facts that would suggest that Intel took any action likely to deceive members of the public – a necessary element of such a claim. *See, e.g., Blakemore v. Super. Ct.*, 129 Cal. App. 4th 36, 49 (2005).

demonstrated below, the Complaint fails, as a matter of law, to state claims under those statutes in 15 states: California, Alaska, Arkansas, Georgia, Idaho, Kansas, Louisiana, Maine, Massachusetts, Montana, New Mexico, New York, North Carolina, Rhode Island, and Utah.

### A.    Plaintiffs Lack Standing To Bring A UCL Claim or State Consumer Protection/Unfair Competition Claims

To demonstrate standing to bring certain of their state consumer protection/unfair practices claim, each plaintiff must allege: (1) injury in fact; (2) causation; and (3) redressability.[44] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 193 (3d Cir. 2004); *Bennett v. Spear*, 520 U.S. 154, 162 (1997). The lack of any one element of standing dooms a plaintiff's claims. Plaintiffs' allegations here lack two of them.

### 1.    Plaintiffs Do Not, And Cannot, Allege Injury In Fact

"Injury in fact" requires "distinct and palpable" injury to the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see, e.g., Lujan*, 504 U.S. at 566-67 (animal observers lacked injury in-fact where they could not show detriment to a specific project affecting a species of animal with which they had a specific connection). It is "proper" and "within the trial court's power," even on a motion to dismiss, "to require the [plaintiff] to go

---

[44]    Exhibit C, App. A5-A6, lists those states that require unfair competition plaintiffs to show elements equivalent to certain federal standing requirements. Prior to 2004, California permitted an uninjured person to sue under the California UCL. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). Proposition 64, enacted in 2004 inserted more traditional concepts of standing; now, persons may sue under UCL only if they were "injured in fact *under the standing requirements of the United States Constitution*." Prop. 64 § 1(e) (emphasis added). This standing requirement mirrors existing requirements for state claims brought in federal courts. *See Duchek v. Jacobi*, 646 F.2d 415, 419 (9th Cir. 1981) (however extensive their power to create and define substantive rights, the states have no power directly to enlarge or contract federal jurisdiction.); *Donovan v. City of Dallas*, 377 U.S. 408, 412-13 (1964); *Terral v. Burke Constr. Co.*, 257 U.S. 529, 531-33 (1922).

beyond . . . general allegations in the complaint and allege particularized facts supportive of its standing." *See Newark Branch NAACP v. Town of Harrison N.J.*, 907 F.2d 1408, 1415 & n.10 (3d Cir. 1990) (quoting *Warth*, 422 U.S. at 501-02).

As explained more fully above, plaintiffs' Complaint is bare of any logical theory—let alone any particularized facts—to support their conclusion that Intel's alleged conduct injured them. *See* part IV, above. Although they copy from AMD's complaint dozens of paragraphs describing how Intel allegedly injured *AMD,* their only attempt to link Intel's alleged actions to any injury to themselves is a conclusory allegation that, but for those actions, the price of computers and other devices containing Intel microprocessors would have been lower. *See* Complaint ¶¶ 234-235. As discussed above, those allegations are insufficient.

### 2.    Plaintiffs Do Not, And Cannot, Allege Causation

To establish causation as required for standing under the U.S. Constitution, a plaintiff must demonstrate that there is a fairly traceable causal connection between the injury and challenged conduct. *Simon v. E. Ken. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also MAI Systems v. UIPS*, 856 F. Supp. 538, 542 (N.D. Cal. 1994) (a "hazy chain of inferences" does not suffice to allege causation).

Plaintiffs are thus required to allege facts linking their injury to Intel's alleged trade practices and the claimed injury to AMD. They have not done so. *See* Part IV, above. Plaintiffs' allegations, therefore, are insufficient as a matter of law. *See San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126, 1130 (9th Cir. 1996) (plaintiffs lack standing where third parties could break the chain of causation by independently charging higher prices); *Frank Krasner Enters., Ltd. v. Montgomery County*, 401 F.3d 230, 235 (4th Cir. 2005) (court may deny standing when the "actions of an independent third party, who was not a party to the lawsuit, stood between the plaintiff and the challenged actions") (citations omitted); *Pritkin v. Dep't of Energy*, 254 F.3d 791, 799 (9th Cir. 2001) (plaintiff lacked standing; claim that third-party entity could not

institute its medical monitoring program because it did not receive funding from defendant Department of Energy was "highly speculative and dependent on uncertain actions by [the third party]."); *Blocker v. Small Bus. Admin.*, 916 F. Supp. 37, 41-42 (D.D.C. 1996) (financial injury "must be 'fairly traceable' to the defendant's action, not 'attenuated at best,' and it may not depend on the 'unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to control or predict'") (internal citations omitted).

### B. Plaintiffs Invoke Consumer Protection Statutes That Do Not Allow Class Actions

The consumer protection laws of Alaska, Georgia, Louisiana, and Montana, each of which plaintiffs assert, *see* Complaint ¶¶ 292, 297, 300 and 303, expressly prohibit consumer class actions. *See* ALASKA STAT. § 45.50.531(b) (2005) (repealing provision that had allowed class actions); GA. CODE ANN. § 10-1-399(a) (2006) (consumer alleging unlawful practices under the Georgia Act "may bring an action individually, but not in a representative capacity"); LA. REV. STAT. § 51:1409 (2006) (a plaintiff alleging losses due to unfair trade practices "may bring an action individually but not in a representative capacity"; *see also Morris v. Sears, Roebuck & Co.*, 765 So. 2d 419, 421 (La. Ct. App. 2000) (recognizing statutory preclusion of class actions); MONT. CODE ANN. § 30-14-133(1) (2005) (a consumer alleging unlawful practices under the Montana Act "may bring an individual but not a class action").

Whether the cases originated in federal court or were removed from state court, the Court must give effect to these state law prohibitions on class actions. The Federal Rules require federal courts to defer to state law in determining whether an individual has a capacity to "sue or be sued" as part of a class action. FED. R. CIV. P. 17(b). "[A] specific state policy denying class action enforcement of a particular state-created right should be honored by a federal court . . . whether sitting in diversity or pendent jurisdiction." 19 Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE:

JURISDICTION 2D § 4513, at 442 n.63 (2d ed. 1996). *See also Dentsply*, 2001 WL 624807 at *15-16 (upholding New York's Donnelly Act express bar on class actions; noting that a contrary finding would foil federal courts' "twin aims" in applying state substantive law: "discourag[ing] forum shopping and avoid[ing] inequitable administration of the laws") (citations and internal quotations omitted).

Thus, plaintiffs' claims under the Alaska, Georgia, Louisiana, and Montana consumer protection statutes must be dismissed.[45]

### C.    Plaintiffs Have Not Alleged Facts Showing That Intel Engaged in Fraudulent, Deceptive, or Unconscionable Conduct

Several state consumer protection statutes prohibit only fraudulent or deceptive conduct; others limit claims to only fraudulent or deceptive conduct and/or unconscionable trade practices.[46]  To the extent plaintiffs invoke the laws of these states, their claims must be dismissed.

### 1.    Plaintiffs Have Not Pled Facts Sufficient To State A Claim For Fraudulent Or Deceptive Conduct As Required Under Laws Of Arkansas, Idaho, Kansas, Maine, New Mexico, New York And Utah

Plaintiffs have only alleged "fraudulent" practices as the basis for their UCL cause of action, as well as the bases for violations of state consumer protection statutes of twenty-one other states and the District of Columbia.  Complaint ¶¶ 263, 291-314.  Yet, nowhere in the complaint do plaintiffs allege any facts showing that Intel took any action likely to deceive consumers.  For the reasons set forth below, plaintiffs' claims under

---

[45]    In addition, Utah has limited the scope of damages available in consumer protection class actions.  *See* UTAH CODE § 13-11-19(a) (2006) (classes may only recover declaratory, injunctive, and ancillary relief).  Plaintiffs' attempt to seek additional remedies on behalf of the putative class is likewise barred.

[46]    Exhibit D, App. A7-A8, lists on a state-by-state basis those cases that demonstrate the fraudulent or deceptive act requirement.

several states' laws must therefore be dismissed.

The Complaint contains one half-hearted and conclusory allegation of "fraudulent practices." Complaint ¶ 263 ("Intel's conduct as alleged in this complaint constitutes unfair, unlawful and/or fraudulent practices . . . .").[47] With only a bare assertion of a legal conclusion and without any facts to support such a theory, the Complaint fails to state a claim under the laws of Arkansas, Idaho, Kansas, Maine, New Mexico, New York, and Utah. *See In re New Motor Vehicles Can. Export Antitrust Litig.*, 350 F. Supp. 2d 160, 176-77 (D. Me. 2004) (dismissing several of plaintiffs' claims arising under various state consumer protection laws because "[n]owhere [did] the Second Amended Complaint specifically assert fraudulent or deceptive conduct").

With respect to plaintiffs' claim under the Idaho consumer protection statute, that law limits recovery to only prohibited "unfair methods of competition and unfair or deceptive acts of practices" enumerated in the statute. IDAHO CODE § 48-603 (2006). The conduct plaintiffs complain of here is not listed among the enumerated unfair practices. *See id.* Accordingly, plaintiffs have failed to allege a cognizable violation of the Idaho statute. *See State v. Daicel Chem. Inds., Ltd.*, 106 P.3d 428, 435 (Idaho 2005) (because sales conduct aimed at distributors, not consumers, no claim under ICPA based upon price-fixing by manufacturers). Thus this claim, Complaint ¶ 298, must also be dismissed.

---

[47]    Moreover, such an allegation must be pled with particularity subject to Rule 9(b)'s particularity requirement in Kansas, Maine, and Utah. FED. R. CIV. P. 9(b); *Parnell v. Schmidt & Assoc., Inc.*, Civ. A04-4072 JAR, 2004 WL 2282905, *2 (D. Kan. Oct. 5, 2004); *Everest v. Leviton Mfg. Co.*, Civ-04-612, 2006 WL 381832, *3 (Me. Super. Ct. Jan. 13, 2006); *Jackson v. Philip Morris, Inc.*, 46 F. Supp. 2d 1217, 1222 (D. Utah 1998). Plaintiffs' claims under the Kansas, Maine, and Utah consumer protection statutes, Complaint ¶¶ 293, 299, 301, 311, fail to satisfy this prerequisite.

2.    **Plaintiffs Have Not Alleged That Intel Engaged
In Any Unconscionable Conduct, As Required
By Arkansas, Utah And New Mexico Law**

Even assuming plaintiffs intended to state a claim for unconscionable trade practices (as opposed to and separate from their allegation of fraudulent practices) under the consumer protection laws of Arkansas, Utah, and New Mexico, plaintiffs' Complaint still fails to state a cause of action under these three state statutes. Though "unconscionable trade practices" vary in their definitions under each statute, the Complaint fails to satisfy any of these definitions.

Under Arkansas law, "an unconscionable act is an act that affronts the sense of justice, decency, or reasonableness." *See In re New Motor Vehicles Can. Export Antitrust Litig.*, 350 F. Supp. 2d at 178; *Baptist Health v. Murphy*, ___ S.W.2d ___, No. 04-430, 2006 WL 242670, *7 n.6 (Ark. Feb. 2, 2006). Courts interpreting unconscionability under Utah's consumer protection statute are split—some courts have looked to contract law principles to determine whether a violation of that state statute has occurred, *In re New Motor Vehicles Can. Export Antitrust Litig.*, 350 F. Supp. 2d at 204-205, while other courts have determined unconscionability based on whether it "shock[s] the conscience or produce[s] a profound sense of injustice." *Woodhaven Apts. v. Washington*, 942 P.2d 918, 924-25 (Utah 1997). New Mexico's statute defines an "unconscionable trade practice" as an act that (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or (2) "results in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2E (2006).

Whatever definition this Court uses, the alleged Intel conduct complained of in the Complaint does not, as a matter of law, constitute an unconscionable practice. Because the plaintiffs are indirect purchasers with no direct contact with Intel, they do not and cannot allege that Intel took advantage of them, let alone to a "grossly unfair degree." Further, given that the plaintiffs stood to benefit from the discounts on Intel

microprocessors, the price they paid for their Intel-based computers could not "affront the sense of justice" or "shock the conscience" or result in any "gross disparity." In fact, plaintiffs actually allege that Intel's conduct "leads, in some cases, to below-cost pricing on incremental sales." Complaint ¶ 172. Under any reasonable analysis, it cannot be unconscionable for Intel to *reduce* dramatically the price of microprocessors that go into computer equipment that plaintiffs purchased. Therefore, the Court should dismiss plaintiffs' consumer protection claims under Arkansas, New Mexico, and Utah law. *See id.* ¶¶ 293, 307, 311.

### D.    Plaintiffs Are Not Permitted To Raise Antitrust Claims Under The Guise Of California's Unfair Competition Law

In an attempt to plead around antitrust doctrine that bars their claims, plaintiffs re-raise their antitrust allegations under California's Unfair Competition Law. *See* Complaint ¶¶ 259-267. However, California law does not allow a plaintiff to evade the pleading requirements of its antitrust statute by camouflaging allegations concerning antitrust violations as consumer protection claims. *See Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184-87 (1999); *Gregory v. Albertsons*, 104 Cal. App. 4th 845, 856-57 (2002). As previously noted, the factual allegations outlined in plaintiffs' Complaint consist entirely of purported anticompetitive conduct by Intel— conduct that is regulated (if at all) by state antitrust law. *See, e.g.*, Complaint ¶¶ 1-6, 116-230. Plaintiffs have established no separate basis for their consumer protection claims, and as a result, this cause of action brought under the laws of California must also be dismissed.

## VIII.  PLAINTIFFS' COMMON LAW TORT CLAIMS ALSO FAIL

In addition to the statutory claims, plaintiffs also include claims under a supposed California tort of monopolization and the "common-law" of unjust enrichment. Complaint ¶¶ 254-258 (monopolization), 316-320 (unjust enrichment). As a matter of

law, neither claim can stand.

## A. California Does Not Recognize A Common Law Tort Of Monopolization

In an apparent attempt to plead around the concerted action requirement of the Cartwright Act, plaintiffs have asserted a cause of action under "California's [t]ort [l]aw [a]gainst [m]onopolization."  Complaint ¶¶ 254-258.  But there is no legal authority for such a damages claim by an indirect purchaser.  *Korea Supply Co.*, 29 Cal. 4th at 1164, n.13 ("[antitrust] law is so involved and is so primarily concerned with areas of public law *only tangentially related* to tort law that it must be regarded as *outside the scope* of the Restatement of Torts") (citation omitted).  Accordingly, plaintiffs' cause of action for the tort of monopolization should be dismissed.

## B. Plaintiffs' Effort To Cast Their Allegations As An Unjust Enrichment Tort Fails As A Matter Of Law

Plaintiffs' Seventh Claim For Relief attempts to assert a free-standing tort of unjust enrichment against Intel by claiming that Intel somehow profited from alleged overcharges that plaintiffs purportedly paid for computers containing Intel microprocessors.  *See* Complaint ¶¶ 316-320.  This claim is also defective.

First, plaintiffs assert this purported tort "under California law on behalf of all Class members."  Complaint ¶ 319.  But, "there is no cause of action in California for unjust enrichment."  *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793, 794 (2003) ("The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so."); *accord McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004) ("Unjust enrichment is not a cause of action . . . or even a remedy [under California law]").  Because California law does not recognize such a claim, it must be dismissed.

Second, plaintiffs' attempt under other states' laws to recover under a stand-alone nationwide unjust enrichment claim evades the clearly defined limits that courts impose on antitrust claims such as the one the Complaint asserts.  Where the law limits a

plaintiffs' right to recover damages, and where the plaintiff is not within those limits, that plaintiff cannot seek the same damages through an equitable claim. Where "'the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation[.]' . . . Courts of equity can no more disregard statutory . . . requirements and provisions than can courts of law." *Hedges v. Dixon County*, 150 U.S. 182, 192 (1893) (citation omitted).

Courts have applied the *Hedges* principle in precisely the situation presented here. *See, e.g., In re Terazosin Hydorchloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1379-80 (S.D. Fla. 2001).[48] In *Terazosin*, indirect purchaser plaintiffs alleged that defendants had violated federal and state antitrust statutes, consumer-protection statutes, and the common law of unjust enrichment. Despite lacking standing under federal antitrust laws to pursue their damages claims, plaintiffs insisted that they could plead a claim for unjust enrichment on the same facts and seek a monetary recovery from defendants by imposing

---

[48]    *See also In re Microsoft Corp. Antitrust Litig.*, 241 F. Supp. 2d 563, 565 (D. Md. 2003) (indirect purchaser plaintiffs who could not assert a claim for antitrust violations also could not assert a common law claim for unjust enrichment based on the same antitrust violations); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 n. 15 (D. Mass. May 12, 2004) (observing that states that have adopted the *Illinois Brick* prohibition have "expressed a policy against indirect purchaser actions that might otherwise be undermined by [claims for unjust enrichment]"); *Johnson v. Microsoft Corp.,* 802 N.E.2d 712, 719 (Ohio Ct. App. 2003) (holding that the indirect purchasers' restitution claim "was essentially the putative class's antitrust claim in a different guise, and that the same difficulties of pass-on theories and the like that troubled the court in *Illinois Brick* would confound calculation of any proper apportionment of damages between consumers such as [plaintiff] and the retailers from whom they bought their computers"); *Berghausen* v. *Microsoft Corp.*, 765 N.E.2d 592, 596 (Ind. Ct. App. 2002) (upholding dismissal of state law restitution claims because "[a] claim for restitution on behalf of indirect purchasers in an antitrust case implicates the same issues of multiple liability and duplicative recovery that were of concern in *Illinois Brick.*"); *Stutzle v. Rhone Poulenc S.A.*, No. 002768, 2003 WL 22250424 *1-2 (Pa. Ct. Common Pleas Sept. 26, 2003) (in case where, "[i]n essence, plaintiffs allege that defendant's illegal conduct amounts to an antitrust violation," court found that "to allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by Pennsylvania's antitrust law, is not a proper use of the claim and can only lead to mischief").

a "constructive trust" that they would share "pro rata" after a trial. *Id.* at 1380. The court concluded that plaintiffs' unjust enrichment theory of recovery "would lead to complex apportionment disputes among injured parties, undermine the efficient enforcement of antitrust laws, or expose defendants to the risk of multiple liability." *Id.* (citing *Illinois Brick*, 431 U.S. at 726-32). Because these are "identical concerns" to those delineated in *Illinois Brick*, the court dismissed the unjust enrichment claims brought under the common law of those states that adhere to *Illinois Brick*. *Id.*

If it were successful, plaintiffs' unjust enrichment claim here similarly exposes Intel to the risk of multiple liability. Moreover, it would also raise complex questions of apportionment between the direct purchasers (the OEMs) and the indirect-purchaser plaintiffs, which would require a determination of the amount of the alleged overcharge assumed by each participant in the distribution chain. This is precisely what *Illinois Brick*, and the states that follow it, prohibit.

Finally, plaintiffs' unjust enrichment claim fails on its merits anyway, even assuming the truth of the Complaint's allegations. It is black-letter law that unjust enrichment does not furnish a basis for liability where parties voluntarily have negotiated, entered into and fully performed their bargain, as consumers do in buying computers. In other words, unjust enrichment claims are a quasi-contract theory of recovery that implies a contract where none exists to prevent unjust enrichment. *See Dove Valley Bus. Park Assocs., Ltd. v. Bd. of County Comm'rs*, 945 P.2d 395, 403 (Colo. 1997) (unjust enrichment "is an equitable principle which allows courts to avoid the unjust enrichment of one party at the expense of another by creating bargains where the parties have not do so); *APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003) (unjust enrichment is "only appropriate in the absence of an express contract"). According to section 107(1) of Restatement (First) of Restitution:

> A person of full capacity who, pursuant to a contract with
> another, has performed services or transferred property to

the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.[49]

The court in *In re New Motor Vehicles Can. Export Antitrust Litig.*, 350 F. Supp. 160 (D. Me. 2004), dealt with precisely the same claim with respect to automobiles. There, the plaintiffs claimed that automobile manufacturers and dealers conspired to keep lower priced Canadian-built cars out of the United States, thereby causing overcharges for the United States-built cars that plaintiffs bought.  In dismissing the unjust enrichment claim, the court stated:  "The automobile purchasers here paid their purchase prices and obtained their vehicles.  The Second Amended Complaint does not seek to rescind these sales, and it does not assert that purchasers failed to receive the benefit for which they bargained in buying the vehicles."  *Id.* at 210.  The plaintiffs here are in the same situation.  They paid for their computers (none of which Intel manufactured or sold) and received them.  They do not seek, nor could they seek, to rescind those purchases, since Intel neither manufactured nor sold any of those computers.  Thus, plaintiffs cannot invoke this quasi-contractual tort.

Last, a claim for unjust enrichment requires the plaintiffs to demonstrate that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant appreciated or

---

[49]    *Accord Ferrone v. Resnick*, No. CV000443779S, 2002 WL 442314 *4 (Conn. Super. Ct. Feb. 25, 2002) (holding that the plaintiffs could not recover for unjust enrichment because "[t]he sale mutually benefited both parties" and the plaintiffs did not show "that the defendant received a benefit for which he did not pay"); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT Topic 2 ("Restitutionary Remedies for Breach of an Enforceable Contract") intro. note (2), at 298 (Tentative Draft No. 3, March 22, 2004) (referring to "one of the axioms of the law of unjust enrichment, according to which the measure of value between parties to a valid consensual exchange is definitively fixed by their agreement"); *id.* Topic 2 rep.'s note at 301 ("The controlling proposition is that claims based on restitution and unjust enrichment yield to the terms of a valid and enforceable contract between the parties[.]").

knew of the benefit; and (3) the defendant accepted or retained the benefit under such circumstances as to make non-payment inequitable. *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 279 (D. Mass. 2004); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000). Plaintiffs cannot satisfy those prerequisites either.

A majority of the cases to consider the issue has required that the benefit conferred be a *direct* benefit. For example, in *Johnson v. Microsoft Corp.*, 834 N.E. 2d 791 (Ohio 2005), the Ohio Supreme Court affirmed the dismissal of an unjust enrichment claim brought by consumers of Microsoft software against Microsoft, explaining that:

> The rule of law is that an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser. The facts in this case demonstrate that no economic transaction occurred between [plaintiff] and [defendant], and, therefore, [plaintiff] cannot establish that [defendant] retained any benefit "to which it is not justly entitled."

*Id.* at 799 (citation omitted); *see also In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 620 (S.D.N.Y. 2005) (finding that indirect drug purchasers lacked standing to sue for unjust enrichment because they did not directly confer a benefit on the defendant); *In re Relafen Antitrust Litig.*, 221 F.R.D. at 286 (finding that indirect purchaser antitrust plaintiffs could not pursue unjust enrichment claim under North Carolina law because they did not directly confer a benefit on the defendants); *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 849928 *9 (D.D.C. April 11, 2001) (dismissing unjust enrichment claims "based upon the lack of facts supporting a finding of a direct benefit conferred upon Defendants by Plaintiff"); *Stutzle*, 2003 WL 22250424, at *1 ("[p]laintiffs are indirect purchasers and had no direct dealings with defendants"; dismissing unjust enrichment claim).

Plaintiffs concede they are indirect purchasers and had no direct dealings with Intel. They did not and cannot allege that they conferred any benefit on Intel. This

deficiency is yet another independent basis for dismissing the unjust enrichment claim.

> **C.    The Monopolization And Unjust Enrichment "Tort"
> Claims Should Also Be Dismissed For Lack Of Alleged
> Injury In Fact And Causation**

As discussed above (*see* Parts IV and VII.A), plaintiffs fail to allege non-conclusory facts showing that Intel proximately caused them any actual injury.  Injury in fact and proximate causation are necessary elements of any tort claim.  *See PPG Industries, Inc. v. Transamerica Ins. Co.*, 20 Cal. 4th 310, 315-316 (1999); RESTATEMENT (SECOND) OF TORTS §§ 431, 433, 440-453 (1965).  Even if the law recognized the "torts" plaintiffs allege here (which it does not), the Complaint's lack of factual allegations showing injury in fact and proximate causation would require dismissal of these claims—along with all the others.  *Jones v. Wells Fargo Bank*, 112 Cal. App. 4th 1527, 1541 (2003) (upholding dismissal of tort claims for failure to allege required elements).

## IX.    CONCLUSION

For the reasons presented above, the Court should dismiss plaintiffs' Complaint.

Respectfully submitted,

OF COUNSEL:
David M. Balabanian
James L. Hunt
Christopher B. Hockett
Nora C. Cregan
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA  94111-4067
(415) 393-2000

Richard A. Ripley
BINGHAM McCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000

Dated: November 3, 2006

760057 / 29282

POTTER ANDERSON & CORROON LLP


By:  */s/ Richard L. Horwitz*_____
     Richard L. Horwitz (#2246)
     W. Harding Drane, Jr. (#1023)
     Hercules Plaza, 6th Floor
     1313 North Market Street
     P.O. Box 951
     Wilmington, DE 19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     wdrane@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

55

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on November 3, 2006, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

James L. Holzman
J. Clayton Athey
Eric M. Andersen
Prickett, Jones & Elliott, P.A.
1310 King Street
Post Office Box 1328
Wilmington, DE 19899

I hereby certify that on November 3, 2006 I have sent the documents by

Electronic Mail to the following non-registered participants:

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

By:    */s/ Richard L. Horwitz*　　　　　
　　　　Richard L. Horwitz (#2246)
　　　　W. Harding Drane, Jr. (#1023)
　　　　POTTER ANDERSON & CORROON LLP
　　　　Hercules Plaza, 6th Floor
　　　　1313 N. Market Street
　　　　Post Office Box 951
　　　　Wilmington, DE  19899-0951
　　　　(302) 984-6000
　　　　rhorwitz@potteranderson.com
　　　　wdrane@potteranderson.com