# EXHIBIT A

Westlaw.

2006 WL 1118892                                                                                    Page 1
--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

Only the Westlaw citation is currently available.

Supreme Court of Arkansas.
Jerry ANDERSON, Mike Stout, John Dunn, and
Check Mart of Hot Springs, LLC,
Appellants,
v.
Charles STEWART, Appellee.
**No. 05-886.**

April 27, 2006.

An Appeal from the Circuit Court of Garland County, Arkansas, No. CV2001- 8071, John Homer Wright, Circuit Judge.

TOM GLAZE.

This appeal, certified to us by the court of appeals, poses the issue as to whether the trial court erred in applying the doctrine of "piercing the corporate veil" and holding shareholders in a limited liability company individually liable. [FN1] We find no error, and affirm.

> FN1. The court of appeals certified the case to this court, suggesting that we should "decide the extent of the protection that Ark.Code Ann. § 4-32-304 affords investors who chose [to operate as a LLC]." However, the appellants do not raise this broad argument in their brief; accordingly, we do not address the issue suggested by the court of appeals.

Appellants Jerry Anderson and Mike Stout are the owners of Check Mart of Hot Springs, LLC; appellant John Dunn is the former owner of Check Mart. Check Mart is a "payday lender," or company that offers cash loans to customers in exchange for personal checks, drawn on the customer's bank account, that are presented to and held by Check Mart. Appellee Charles Stewart filed a class action complaint against Check Mart in November of 2001, alleging that, by charging interest disguised as "fees," Check Mart engaged in conduct amounting to usury, in violation of Ark. Const. art. 19, § 13. Stewart filed a motion seeking class certification on February 4, 2002, and the trial court granted Stewart's motion on

January 29, 2003. It defined the class as "any and all persons who have entered into deferred presentment agreements with [Check Mart] ... within five years of the date that [the] complaint was filed and continuing up through and until judgment may be rendered in this matter."

Also on January 29, 2003, the trial court entered an order granting Stewart's motion for summary judgment on liability, finding that there was no genuine issue of material fact, and that the fees charged by Check Mart "constitute interest and as such would render usurious the contracts between [Check Mart] and the members of this class." The trial court thus determined that the plaintiffs were entitled to judgment on the issue of liability as a matter of law.

On November 14, 2003, Stewart filed his second amended class action complaint, naming as defendants Stout and Anderson, the "sole owners of Check Mart of Hot Springs, LLC," and Dunn, who formerly owned Check Mart and who sold the business to Stout and Anderson. Stewart's complaint alleged that Check Mart, LLC was the alter ego of Stout, Anderson, and Dunn, who all received financial gain from their operation of the business. Stewart asserted that the trial court had already determined that the plaintiffs were entitled to judgment as a matter of law on the usury claim. In addition, Stewart raised a further cause of action under the Arkansas Deceptive Trade Practices Act (DTPA), Ark.Code Ann. § 4-88-101 et seq. (Repl.2001), alleging that Stout, Anderson, and Dunn were, as controlling and supervising persons, individually liable for the damages caused by Check Mart. Stewart also asked the trial court to pierce the corporate veil, asserting that the defendants operated Check Mart "for the sole purpose of engaging in activities [that] violated the Arkansas usury protections in the Arkansas Constitution," and that Check Mart lacked sufficient assets to satisfy any judgment against it and was inadequately capitalized.

The case was presented at a bench trial on November 9, 2004, and following the trial, the parties agreed to submit briefs on the issue of the liability of the individual defendants. On April 19, 2005, the trial court entered an order finding that the plaintiff class was entitled to damages of $122,027.50, attorneys' fees of $36,878.25, and costs of litigation of $908.42,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1118892                                                                                    Page 2
--- S.W.3d ----, 2006 WL 1118892 (Ark.)
(Publication page references are not available for this document.)

for a total judgment in favor of the class in the amount of $159,814.17. The court further found that the individual defendants were liable under the Deceptive Trade Practices Act, and apportioned the damages among the individual defendants based on the amount of time they had owned stock in the company. Anderson, Stout, and Dunn filed timely notices of appeal, and now argue that the trial court erred in piercing the corporate veil and holding them each individually liable under § 4-88-101, the DTPA.

 In bench trials, the standard of review on appeal is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Weiss v. McFadden,* 356 Ark. 123, 148 S.W.3d 248 (2004); *Carwell Elevator Co., Inc. v. Leathers,* 352 Ark. 381, 101 S.W.3d 211 (2003). This court gives due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *City of Rockport v. City of Malvern,* 356 Ark. 393, 155 S.W.3d 9 (2003); *Pyle v. Sayers,* 344 Ark. 354, 39 S.W.3d 774 (2001). Further, it is within the province of the trier of fact to resolve conflicting testimony. *Myrick v. Myrick,* 339 Ark. 1, 2 S .W.3d 60 (1999).

 As noted above, the appellants assert in their brief that the trial court erred in piercing the corporate veil to hold them individually liable. In making this argument, they raise two subpoints: 1) the Arkansas Deceptive Trade Practices Act only provides for proceedings by the Attorney General; and 2) there was insufficient evidence to support the piercing of the corporate veil.

 In the first of their two arguments, the appellants contend that Ark.Code Ann. § 4-88-113 of the Deceptive Trade Practices Act, "is applicable to proceedings brought by the Attorney General and does not extend by statute or case law to cases brought outside the scope of the Deceptive Trade Practices Act by the Attorney General." This claim is easily dismissed, as § 4-88- 113(f) clearly provides that "[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this [Act] has a cause of action to recover actual damages, if appropriate and reasonable attorney's fees." Because the statute provides a cause of action to "any person who suffers actual damages," there is no merit to the appellants' argument that only the Attorney General can bring a DTPA complaint. *See Wallis v. Ford Motor Company,* ___ Ark. ___, ___ S.W.3d ___ (May 12, 2005) (pointing out that § 4-

88-113(f) gives a private cause of action to any person who suffers actual damage or injury, but where the only alleged injury is the diminution in value of the product, a private cause of action is not cognizable under the statute).

 The second part of the appellants' argument is that there was insufficient evidence to support the trial court's decision to pierce the corporate veil. It is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. *First Commercial Bank v. Walker,* 333 Ark. 100, 969 S.W.2d 146 (1998); *Quinn-Matchet Partners, Inc. v. Parker Corp.,* 85 Ark.App. 143, 147 S.W.3d 703 (2004). In special circumstances, the court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. *EnviroClean, Inc. v. Arkansas Pollution Control & Ecology Comm'n,* 314 Ark. 98, 858 S .W.2d 116 (1993); *Don G. Parker, Inc. v. Point Ferry, Inc.,* 249 Ark. 764, 461 S.W.2d 587 (1971). The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case. *Winchel v. Craig,* 55 Ark.App. 373, 934 S.W.2d 946 (1996). The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice. *Humphries v. Bray,* 271 Ark. 962, 611 S.W.2d 791 (Ark.App.1981). Piercing the fiction of a corporate entity should be applied with great caution. *Banks v. Jones,* 239 Ark. 396, 390 S.W.2d 108 (1965); *Thomsen Family Trust v. Peterson Family Enters.,* 66 Ark.App. 294, 989 S.W.2d 934 (1999). The issue of whether the corporate entity has been fraudulently abused is a question for the trier of fact, and the one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury. *See National Bank of Commerce v. HCA Health Servs. of Midwest, Inc.,* 304 Ark. 55, 800 S.W.2d 694 (1990).

 Legal treatises have noted that common instances in which the separate corporate identity has been disregarded are when the corporation attempted to 1) evade the payment of income taxes, 2) hinder, delay, and defraud creditors, 3) evade a contract or tort obligation, 4) evade the obligations of a federal or state statute, and 5) perpetrate fraud and injustice generally. *See* H. Murray Claycomb, *Arkansas Corporations* § 3-15 (1991); *see also* 18 C .J.S. *Corporations,* § 9 (1990) (courts will apply substantive law in disregard of corporate license

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

when to interpose it would defeat public convenience, justify wrongs, protect fraud or defend crime, and in situations in which it would otherwise pose an obstacle to the protection or enforcement of private or public rights).

Arkansas cases in which the corporate veil has been pierced have generally involved some fraud or deception. See *EnviroClean, Inc. v. Arkansas Pollution Control & Ecol. Comm'n,* 314 Ark. at 104, 858 S.W.2d at 120 (two companies intended to deceive Pollution Control & Ecology Commission and abused the corporate form by misrepresenting a change in ownership and by attempting to circumvent PC & E's permitting process); *Humphries v. Bray,* 271 Ark. at 966, 611 S.W .2d at 793 (for purposes of determining whether, under workers' compensation statutes, separate companies under a single ownership constituted an employer with five employees, the court noted evidence, including tax records and payroll slips, showing that the owner's three companies were not operated separately); *Winchel v. Craig,* 55 Ark.App. at 381-82, 934 S.W.2d at 950-51.

In *Winchel v. Craig, supra,* the plaintiff-appellee, Craig, was injured by a fertilizer-spreading machine manufactured by appellants Jesse and Verda Winchels' company, Winchel Enterprises. Shortly after Craig filed his complaint, the Winchels resigned as officers of Winchel Enterprises and dissolved the corporation. *Winchel,* 55 Ark.App. at 375, 934 S.W.2d at 947. At trial, a jury found that the affairs of the corporation had been conducted in such a manner that the corporate entity should be disregarded, and the Winchels held personally liable. *Id.* On appeal, the court of appeals affirmed, writing as follows:

In the instant case, there is evidence that the appellee [Craig] was injured by a spreader manufactured by the corporation Winchel Enterprises; that appellants [Jesse and Verda Winchel] were its sole incorporators, stockholders, and officers; that the corporation had no liability insurance in case someone was hurt by its equipment; that the appellants dissolved Winchel Enterprises and sold or transferred its assets subsequent to appellee filing suit against the corporation; that about a month before the appellants resigned as officers of Winchel Enterprises, they formed a new corporation whose Articles of Incorporation stated that the purpose of the new corporation was to manufacture spreader beds--and this is the same kind of equipment that was manufactured by the first corporation; and that appellants made no provision upon dissolution of the old corporation to provide for payment of any

liability it might have to appellee as a result of this suit which was pending at that time. *Id.* at 381-82, 934 S.W.2d at 950-51.

On the other hand, in cases where the courts refused to pierce the corporate veil, the evidence failed to make a showing of illegality or fraudulent behavior. See *Don G. Parker, Inc. v. Point Ferry, Inc.,* 249 Ark. at 766, 461 S.W.2d at 589 (incorporators took all necessary legal steps to establish a corporation, the shareholders attended corporate meetings, and tax returns were properly filed in the name of the corporation; the only evidence of illegality was the fact that the corporation's ferry was not properly licensed, but the ferry was operated by a lessee, not by the corporation itself); *Banks v. Jones,* 239 Ark. at 399, 390 S.W.2d at 110 (no evidence that there was any interchange of employees, facilities, funds, or management between two companies owned by the same individual; the evidence showed that the two companies were on separate properties and had separate books, and that the corporation filed proper tax returns and carried liability insurance); *Quinn-Matchett Partners v. Parker Corp.,* 85 Ark.App. at 149-50, 147 S.W.3d at 707 (evidence showed that the corporation adhered to corporate formalities by keeping its own financial records and bank accounts, by filing separate tax returns, and by recording the loans made between it and its owner).

In the instant case, appellant Stout testified that he became a stockholder of Check Mart in early 2001 when he and appellant Jerry Anderson bought out appellant Dunn's interest; prior to becoming a stockholder, when Dunn owned the company, Stout had been the registered agent for the business. Dunn had been running the business for over a year at several different locations in Hot Springs when Stout and Anderson bought it. Stout testified that Check Mart closed in December of 2001; he could not recall whether the company continued to collect fees after that time. After Check Mart closed, Stout formed D & L Service Company, which Stout described as a "service company for a loan company out of South Dakota" that serviced loans and collected a fee from the South Dakota loan company. When asked whether a number of Check Mart's customers became customers of D & L Service Company, Stout said that he "would assume so, yes," although he stated that he did not work in the day-to-day operations, so he couldn't testify that he "knew it for a fact."

Stout denied knowing about any of Check Mart's business or customer records, acknowledging that his attorney handled the records and had furnished any

--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

and all documents relating to fees paid to Check Mart. Stout further acknowledged that Check Mart did not maintain any customer records or any other documents that would reflect the amount of fees that Check Mart received from its customers. He also agreed that, to his knowledge, D & L did not have any of Check Mart's customer records. Stout stated that the only person who would have knowledge of the company's day-to-day business records would be the manager, Bonnie Berg, who was not present at the trial to testify.

Stout agreed that, in order to have a check cashing business in Arkansas, one has to post a surety bond. In addition, he agreed that a party wishing to obtain a license to operate a check cashing operation must have proof of liquid assets in a certain amount. [FN2] Stout sought a letter of credit from First State Bank to satisfy the statutory cash-on-hand requirements, but cancelled the letter of credit on February 5, 2002, some three months after Stewart's lawsuit was filed. Stewart introduced the surety bond, naming Dunn as principal, that was posted by Check Mart when the company was started in March of 2000, and Stout agreed that the bond was the only bond ever posted for Check Mart. However, he did not recognize any other related documents, and he could not state positively whether the bond was ever canceled. Stout could also not be "absolutely positive" about whether Check Mart had surrendered its check cashing license to the State, although Check Mart's bond was canceled on February 6, 2002.

> FN2. Ark.Code Ann. § 23-52-107(1) (Repl.2000) requires an applicant for a check-cashing permit to "have a minimum of cash or other liquid assets of at least ... $20,000 for the operation of each location at which the applicant will engage in the check-cashing business and shall be required to post with the Department of Finance and Administration a fifty-thousand-dollar bond payable to the State of Arkansas[.]"

Stout testified that, other than Bonnie Berg, Check Mart had no other full-time employees, and that no one else besides himself, Dunn, or Anderson had ever been owners of the company. He also stated that he and his wife operated Check Mart of Conway, Inc., another "servicer" for the South Dakota loan company. He said that the way the Conway Check Mart operated was that a customer would come in and make a loan application, which was transmitted to South Dakota; if the loan was approved, a check was printed from the South Dakota office, and the customer could cash the check in the Conway office or take it to the customer's bank. The customer would leave a check at the Conway office as collateral for that loan. If the customer did not come back when the loan was due, Check Mart of Conway would deposit the customer's check "as a servicer for the loan company."

Stout said that he believed the State revoked the license for Check Mart of Hot Springs, and he agreed that after the instant lawsuit was filed, Check Mart had no assets. However, tax records introduced at trial showed that Stout reported $33,397 in gross receipts from Check Mart on his personal tax return in 2001.

Stewart also introduced copies of "dun letters" sent by Check Mart to customers who failed to make payments on their transactions with Check Mart and whose checks were dishonored by their banks. Stout "assumed" that Check Mart would maintain copies of any such letters sent to customers, but did not know for a fact. Stout denied having any knowledge of the amounts of fees paid to Check Mart by customers, and denied knowing whether Check Mart ever sued any of its customers, despite the introduction into evidence of a small claims complaint filed in the name of Check Mart and signed by Bonnie Berg, the store's manager. Further, Stout denied knowing anything about whether Check Mart maintained copies of checks written to the company. Stout professed that it was his intent for Check Mart to comply with the Arkansas Check Casher's Act, but did not know whether, or for how long, the Act required him to retain any records.

When asked whether Check Mart ever had an accountant, Stout stated that the company did not have an accountant, although he personally had one. Stout was unsure whether Berg kept the books for Check Mart "or if the accountant posted [them]," and did not know who prepared the company's profit-and-loss statement. That profit-and-loss statement for the period from January through November of 2001 reflected a loss of $7,078; Stout could not explain why the entire amount of that same loss was reported on his personal tax returns for 2001.

Stewart also called Sharon Harper to testify at the trial of this matter. Harper testified that she had begun doing business with Check Mart in 2000 and continued doing business with Check Mart until 2002. After 2002, Harper said that she did business with D & L Service Company, and the "same lady" who had worked for Check Mart was working for D

2006 WL 1118892                                                                                          Page 5

--- S.W.3d ----, 2006 WL 1118892 (Ark.)

**(Publication page references are not available for this document.)**

& L.

 On these facts, the trial court's decision to pierce the corporate veil and hold the individual defendants liable was not clearly erroneous. The evidence demonstrated that Check Mart and its owners failed to properly maintain business records, thereby failing to comply with the Check Casher's Act.  [FN3] In addition, Stout withdrew Check Mart's letters of credit and canceled the bond Check Mart had posted shortly after this lawsuit was filed, an act which Stewart contends was designed to ensure that Check Mart would not have the appropriate assets to satisfy any judgment that might be entered against the company. Further, Sharon Harper's testimony revealed that, even after Check Mart closed, the same individuals were operating the same kind of business in the form of D & L Service Company.

> FN3.  Ark.Code Ann. § 23-52-112(a) (Repl.2000) requires check cashers to "keep and use in its business any books, accounts, and records that the State Board of Collection Agencies may require to carry into effect the provisions of this chapter and the administrative regulations issued hereunder"; § 23-52-112(b) requires check cashers to "preserve all relevant records for a period of at least two (2) years after making the last entry on any transaction."

 These facts are strikingly similar to those in *Winchel v. Craig, supra,* where the court of appeals noted that after the defendant company was dissolved, a new one was formed with the identical purpose, and that no provision had been made upon dissolution of the old company for the payment of any liabilities the old company might have incurred. Given the evidence before it, we hold that the trial court did not err in piercing the corporate veil and holding the individual defendants personally liable.

 --- S.W.3d ----, 2006 WL 1118892 (Ark.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

H

**Briefs and Other Related Documents**


Supreme Court of Arkansas.
BAPTIST HEALTH, Appellant,
v.
Bruce E. MURPHY, M.D., Scott L. Beau, M.D.,
David C. Bauman, M.D., D. Andrew
Henry, M.D., David M. Mego, M.D., and William A.
Rollefson, M.D., Appellees.
**No. 04-430.**

Feb. 2, 2006.

**Background:** Cardiologists sought preliminary and
permanent injunction against private hospital to
prevent denial of staff appointments and clinical
privileges on ground that plaintiffs were direct or
indirect owners of or investors in another hospital
that competed with defendant. The Circuit Court,
Pulaski County, 13th Division, Raymond C. Kilgore,
Jr., J., granted a preliminary injunction. Hospital
appealed. The Supreme Court, 362 Ark. 506, ---
S.W.3d ---, reversed and remanded. On remand, the
Circuit Court, Raymond C. Kilgore, Jr., J., entered a
more detailed order, which again granted a
preliminary injunction. Hospital appealed.

 **Holdings:** The Supreme Court, Jim Hannah, C.J.,
held that:
 (1) plaintiffs showed substantial likelihood of
success, as to intent element of claim of tortious
interference with business expectancy, and
 (2) plaintiffs showed substantial likelihood of
success, as to impropriety element of claim of
tortious interference with business expectancy; and
 (3) harm to doctor-patient relationship would be
irreparable.
 Affirmed.

 Glaze, J., concurred.

 Xollie Duncan, Special Justice, filed a dissenting
opinion, in which Jim Burnett, Special Justice,
joined.

**[1]** Appeal and Error 🔑0

30k0 k.

Legal arguments presented to circuit court, regarding
plaintiff cardiologists' request to circuit court for
preliminary injunction against defendant private
hospital to prevent denial of staff appointments and
clinical privileges on ground that plaintiffs were
direct or indirect owners of or investors in another
hospital that competed with defendant, were
necessary to understanding of questions submitted to
Supreme Court for decision in interlocutory appeal
from circuit court's order granting preliminary
injunction, and thus, defendant hospital, as appellant,
was required to include the legal arguments in its
abstract of the transcript, even if the legal arguments
were repeated in the briefs submitted on appeal.
Sup.Ct. Rules, Rule 4-2(a)(5).

**[2]** Injunction 🔑0
212k0 k.
In determining whether to issue a preliminary
injunction, the trial court must consider two things:
(1) whether irreparable harm will result, in the
absence of an injunction or restraining order, and (2)
whether the moving party has demonstrated a
likelihood of success on the merits. Rules Civ.Proc.,
Rule 65.

**[3]** Appeal and Error 🔑0
30k0 k.
There may be factual findings by a circuit court that
lead to conclusions of irreparable harm and
likelihood of success on the merits, as elements for
preliminary injunction, and those findings shall not
be set aside unless clearly erroneous. Rules Civ.Proc.,
Rule 65.

**[4]** Appeal and Error 🔑0
30k0 k.
A conclusion that irreparable harm will result or that
the party requesting the injunction is likely to
succeed on the merits, as elements for preliminary
injunction, is subject to review under an abuse-of-
discretion standard. Rules Civ.Proc., Rule 65.

**[5]** Appeal and Error 🔑0
30k0 k.
When an appeal reaches a court via an order granting
a preliminary injunction, the appellate court will not
delve into the merits of the case further than is
necessary to determine whether the circuit court
exceeded its discretion in granting the injunction.
Rules Civ.Proc., Rule 65.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242670                                                                    Page 2
--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
(Cite as: 2006 WL 242670 (Ark.))

**[6]** Appeal and Error 🔑0

30k0 k.

The sole question before the appellate court, when reviewing a circuit court order granting a preliminary injunction, is whether the circuit court departed from the rules and principles of equity in making the order, and not whether the appellate court would have made the order. Rules Civ.Proc., Rule 65.

**[7]** Torts 🔑0

379k0 k.

To establish a claim of tortious interference with business expectancy, the plaintiff must prove: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

**[8]** Torts 🔑0

379k0 k.

For an interference to be actionable as tortious interference with business expectancy, it must be improper.

**[9]** Appeal and Error 🔑0

30k0 k.

Defendant private hospital's argument, on interlocutory appeal from circuit court's order granting preliminary injunction to plaintiff cardiologists to prevent denial of staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, that defendant had absolute right to refuse to deal with plaintiffs, so that plaintiffs lacked likelihood of success on their claim of tortious interference with business expectancy, was an argument raised for first time on appeal, which Supreme Court would not consider, rather than merely representing an identification by defendant of "additional case law" on a concept raised in circuit court, once it "had the benefit of additional time to conduct research."

**[10]** Appeal and Error 🔑0

30k0 k.

The Supreme Court will not consider arguments raised for the first time on appeal.

**[11]** Appeal and Error 🔑0

30k0 k.

All material information must be included in the appellant's abstract of the trial court transcript, and the Supreme Court will not be placed in the position of having seven Justices scour the one record for absent information. Sup.Ct. Rules, Rule 4-2(a)(5).

**[12]** Appeal and Error 🔑0

30k0 k.

In light of failure of defendant private hospital, as appellant, to include in abstract of the transcript the legal arguments presented to circuit court regarding plaintiff cardiologists' request to circuit court for preliminary injunction against defendant to prevent denial of staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, Supreme Court would not scour the record to determine whether defendant had presented an argument to circuit court that plaintiffs were not likely to succeed on the merits because defendant could not be liable to plaintiffs for tortious interference with business expectancy since defendant was not a "stranger" to plaintiffs' relationships with their patients, so that such argument was not being raised for first time on appeal, as would cause Supreme Court to decline to consider the argument. Sup.Ct. Rules, Rule 4-2(a)(5).

**[13]** Torts 🔑0

379k0 k.

Intentional torts involve consequences which the actor believes are substantially certain to follow his actions.

**[14]** Torts 🔑0

379k0 k.

The tort of interference with contractual relations is similar to other intentional torts in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct.

**[15]** Torts 🔑0

379k0 k.

Plaintiff cardiologists showed substantial likelihood of success, as element for preliminary injunction to prevent defendant private hospital from denying them staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, with respect to establishing that it had been substantially certain to defendant that its economic credentialing policy would interfere with

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

doctor-patient relationships, as element of plaintiffs' claim of tortious interference with business expectancy; plaintiffs presented evidence that many of their patients were covered by health insurance policies or other benefit plans that had exclusive contracts for treatment only at defendant hospital.

**[16] Torts** 🔑0
379k0 k.
In determining whether actor's conduct is improper, as element of tortious interference with business expectancy, court should consider: (1) nature of actor's conduct; (2) actor's motive; (3) interests of the other with which actor's conduct interferes; (4) interests sought to be advanced by actor; (5) social interests in protecting freedom of actor and contractual interests of the other; (6) proximity or remoteness of actor's conduct to the interference; and (7) relations between the parties. Restatement (Second) of Torts § 767.

**[17] Torts** 🔑0
379k0 k.
Plaintiff cardiologists did not show substantial likelihood of success, as element for preliminary injunction to prevent defendant private hospital from denying them staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, with respect to establishing that defendant's economic credentialing policy was improper, as element of plaintiffs' claim of tortious interference with business expectancy, because it allegedly violated federal anti-kickback statute, Arkansas Medicaid Fraud Act, and Arkansas Medicaid Fraud False Claims Act; defendant's policy did not create disincentive for plaintiffs to refer their patients to facilities other than defendant's. Social Security Act, § 1128B(b), 42 U.S.C.A. § 1320a-7b(b); West's A.C.A. §§ 5-55-111, 20-77-902.

**[18] Health** 🔑0
198Hk0 k.
Provision of Department of Health rules and regulations for hospitals, stating that hospital bylaws shall ensure admission of patients by a physician and patient choice of physician, does not preclude hospitals from establishing criteria for physicians' medical staff privileges.

**[19] Torts** 🔑0
379k0 k.
Plaintiff cardiologists showed substantial likelihood of success, as element for preliminary injunction to

prevent defendant private hospital from denying them staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, with respect to establishing that defendant's economic credentialing policy was improper, as element of plaintiffs' claim of tortious interference with business expectancy, because it allegedly violated Deceptive Trade Practices Act by being unconscionable; plaintiffs alleged a shortage of hospital beds in defendant's service area, that defendant had the "upper hand" because of exclusive-provider contracts, and that defendant's unconscionable conduct was demonstrated by use of its power to disrupt relationships between patients, who were at defendant's mercy, with their physicians. West's A.C.A. § 4-88-107(a)(10).

**[20] Antitrust and Trade Regulation** 🔑0
29Tk0 k.
An "unconscionable" act, as would violate Deceptive Trade Practices Act, is an act that affronts the sense of justice, decency, or reasonableness. West's A.C.A. § 4-88-107(a)(10).

**[21] Health** 🔑0
198Hk0 k.
The rule of judicial deference to a hospital's credentialing decisions, also known as the rule of non-review, is one which must be limited to those instances where that decision does not involve a violation of law, or is not used as a means for the commission of a tort.

**[22] Injunction** 🔑0
212k0 k.
Assuming plaintiff cardiologists would suffer reputational injury from defendant private hospital denying them staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, such reputational injury would not constitute irreparable harm, as element for preliminary injunction.

**[23] Injunction** 🔑0
212k0 k.
Harm to doctor-patient relationship, from defendant private hospital denying plaintiff cardiologists staff appointments and clinical privileges on ground that plaintiffs were direct or indirect owners of or investors in another hospital that competed with defendant, would constitute irreparable harm, as element for preliminary injunction.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242670                                                                                  Page 4
--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

Appeal from the Pulaski County Circuit Court, Thirteenth Division, No. CV04-2002; Raymond C. Kilgore, Jr., Judge.

The Health Law Firm, by: Harold H. Simpson and Seth Ward III, for appellant.

Blair & Stroud, by: H. David Blair; and Griffin & Block, PLLC, by: Clifford P. Block, for appellee.

JIM HANNAH, Chief Justice.

**\*1** Appellant Baptist Health appeals an interlocutory order of the Pulaski County Circuit Court, Thirteenth Division, granting a preliminary injunction enjoining Baptist from preventing appellees Bruce E. Murphy, M.D., Scott L. Beau, M.D., David C. Bauman, M.D., D. Andrew Henry, M.D., David M. Mego, M.D., and William A. Rollefson, M.D., from practicing medicine at its hospitals. This is the second such interlocutory appeal. In the first appeal, we reversed and remanded to the circuit court for further findings. *See Baptist Health v. Murphy,* --- Ark. ----, --- S.W.3d ---- (June 2, 2005). Pursuant to our remand, the circuit court entered a more detailed order, again granting a preliminary injunction, and this appeal followed. On appeal, Baptist argues that the circuit court abused its discretion in issuing a preliminary injunction. Specifically, Baptist argues that the circuit court abused its discretion in concluding (1) that appellees have a likelihood of success on the merits of their underlying request for permanent injunction, and (2) that absent the requested preliminary injunctive relief, the appellees would be irreparably harmed. We find no reversible error and, accordingly, we affirm.

*I. Facts*

Baptist is a private, charitable, nonprofit corporation that operates several full-service community hospitals throughout Arkansas. Appellees are cardiologists and are partners in Little Rock Cardiology Clinic, P.D. (LRCC). Appellees hold indirect interests in Arkansas Heart Hospital (AHH) through their direct ownership in LRCC, which owns 14.5% of AHH. Additionally, appellee Murphy directly owns three percent of AHH, and appellee Henry also directly owns a percentage of AHH. Appellees are on the medical staff of AHH and admit patients there. Appellees are also on the professional staff at Baptist Medical Center in Little Rock and admit patients there.

Baptist's Board of Trustees adopted the Economic Conflict of Interest Policy (Policy), which is the subject of this litigation, at its quarterly meeting in May 2003. The Policy mandates denial of initial or renewed professional staff appointments or clinical privileges at any Baptist hospital to any practitioner who, directly or indirectly, acquires or holds an ownership or investment interest in a competing hospital. [FN1]

Appellee Murphy's and appellee Beau's terms of appointment at Baptist expired on February 26, 2004. Because both appellees Murphy and Beau hold, either directly or indirectly, ownership or investment interests in AHH, both were deemed ineligible for reappointment by Baptist pursuant to the Policy. The remaining appellees also hold ownership or investment interests in AHH, and they will be similarly affected by the Policy upon the expiration of their respective terms of appointment.

On February 10, 2004, appellees sued Baptist in U.S. District Court for the Eastern District of Arkansas, alleging that the actions of Baptist violate the federal anti-kickback statute, the Arkansas Medicaid Fraud Act, the Arkansas Medicaid Fraud False Claims Act, and the Arkansas Deceptive Trade Practices Act. Appellees further alleged that Baptist's Policy tortiously interfered with the doctor-patient relationship. Baptist moved to dismiss for lack of federal jurisdiction, and U.S. District Judge James Moody entered an order granting the motion on February 24, 2004. *See Murphy v. Baptist Health,* No. 4:04CV00112 (E.D.Ark. Feb.24, 2004) (unpublished opinion).

**\*2** Appellees filed the instant lawsuit, almost identical in form to the federal lawsuit, in the Pulaski County Circuit Court on February 25, 2004, and they requested preliminary and permanent injunctive relief to enjoin Baptist from enforcing the Policy. After a hearing on February 26, 2004, and further briefing by the parties, the circuit court granted appellees' motion for preliminary injunction, finding that appellees would ultimately prevail at trial on all points, and that absent an injunction, appellees would suffer harm. Baptist then appealed to this court.

[1] By a per curiam order entered on June 2, 2005, this court remanded this case to the circuit court to make specific findings, pursuant to Ark. R. Civ. P. 65, on the issue of appellees' likelihood of success on the merits. *See Baptist Health v. Murphy, supra.* Further, we noted that Baptist failed to abstract the February 26, 2004, hearing before the circuit court on appellees' motion for preliminary injunction and ordered Baptist to submit a revised abstract and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

substituted brief. [FN2] *See id.*

 In its subsequent order submitted to this court after remand, the circuit court found that the physicians would likely prevail on their claim of tortious interference. Specifically, the circuit court found that the plaintiffs have a substantial likelihood of success in establishing at trial on the merits that the Policy (1) constitutes a conferral of economic benefits, a remuneration, in consideration for the referral of patients to Baptist's facilities, which practice is prohibited by the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), and comparable Arkansas statutes, Ark.Code Ann. § 5-55-111 and 20-77-902; and (2) is contrary to the Arkansas Department of Health Rules and Regulations for Hospitals and Related Institutions § 5(A)(10) and the Arkansas Deceptive Trade Practices Act, Ark.Code Ann. § 4-88-107(a)(10). Further, the circuit court found that the Policy results in termination of the physicians' privileges at Baptist and that the loss of privileges will cause the physicians to suffer reputational injury because in the future, the physicians must attempt to explain to patients, other institutions, or liability insurance companies that termination of their privileges was not due to their training, competency, or fitness as cardiologists. Finally, the circuit court found that Baptist's economic interest, as advanced by the Policy, is substantially outweighed by the irreparable harm arising out of the disruption of the physicians' relationships with their patients and with referring physicians, and with the physicians' ability to provide proper healthcare to their patients, to the detriment of the doctor-patient relationship.

## *II. Standard of Review*

 [2][3][4] In determining whether to issue a preliminary injunction pursuant to Rule 65, the trial court must consider two things: (1) whether irreparable harm will result in the absence of an injunction or restraining order, and (2) whether the moving party has demonstrated a likelihood of success on the merits. *Three Sisters Petroleum, Inc. v. Langley,* 348 Ark. 167, 72 S.W.3d 259 (2002). This court reviews the grant of a preliminary injunction under an abuse-of-discretion standard. *AJ & K Operating Co., Inc. v. Smith,* 355 Ark. 510, 140 S.W.3d 475 (2004). The standard of review is the same for the two essential components of a preliminary injunction: irreparable harm, and likelihood of success on the merits. *See id.* (citing David Newbern & John H. Watkins, *Civil Procedure* § 29-2, at 437 (3d ed.2002). There may be factual findings by a circuit court that lead to conclusions of irreparable harm and likelihood of success on the

merits, and those findings shall not be set aside unless clearly erroneous. *See id.* (citing *Amalgamated Clothing & Textile Workers Int'l Union v. Earle Indus., Inc.,* 318 Ark. 524, 886 S.W.2d 594 (1994)). But a conclusion that irreparable harm will result or that the party requesting the injunction is likely to succeed on the merits is subject to review under an abuse-of-discretion standard. *See id.*

 *3 [5][6] When an appeal reaches a court via an order granting a preliminary injunction, the appellate court will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction. *Villines v. Harris,* 340 Ark. 319, 11 S.W.3d 516 (2000) (*Villines v. Harris I* ) (citing *Special Sch. Dist. v. Speer,* 75 F.2d 420 (8th Cir.1935)). The sole question before the appellate court is whether the circuit court "departed from the rules and principles of equity in making the order," and not whether the appellate court would have made the order. *Villines v. Harris I* (quoting *Special Sch. Dist.,* 75 F.2d at 421-22).

   As an initial matter, Baptist argues that the circuit court improperly switched appellees' single cause of action from declaratory judgment to the tort of intentional interference. This argument is without merit. Appellees' complaint expressly stated that they were seeking both declaratory and injunctive relief, and that they were seeking to enjoin Baptist from acts that "tortiously interfere with the relationships plaintiffs hold with their patients." We now turn to Baptist's remaining arguments on appeal.

## *III. Likelihood of Success on the Merits*

 [7][8] As previously stated, the circuit court found that the physicians would likely succeed on their claim of tortious interference. To establish a claim of tortious interference with business expectancy, the plaintiff must prove: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Stewart Title Guar. Co. v. Am. Abstract & Title Co.,* --- Ark. ----, --- S.W.3d ---- (Oct. 13, 2005); *Vowell v. Fairfield Bay Cmty. Club, Inc.,* 346 Ark. 270, 276-77, 58 S.W.3d 324, 329 (2001). In addition to the above requirements, we have stated that for an interference to be actionable, it must be improper. *Stewart Title, supra; Hunt v. Riley,* 322 Ark. 453, 909 S.W.2d 329

(1995).

### A. Refusal to Deal

[9] Baptist first contends that it has an absolute right to refuse to deal with appellees and that it cannot be liable for a suit in tort for exercising its absolute right. As such, Baptist argues that any finding of a likelihood of success on the merits of a tortious-interference claim is in error.

[10] Appellees contend that Baptist raises its refusal-to-deal argument for the first time on appeal. In response, Baptist claims that it is raising no new concepts in the appeal, but that it has merely "identified additional case law" since it had "had the benefit of additional time to conduct research." We disagree. Upon review of the briefs presented to the circuit court, we believe Baptist is raising its refusal-to-deal argument for the first time on appeal. It is well settled that this court will not consider arguments raised for the first time on appeal. *See, e.g., Ford Motor Co. v. Arkansas Motor Vehicle Comm'n,* 357 Ark. 125, 161 S.W.3d 788 (2004).

### B. The Stranger Doctrine

**\*4** [11][12] Baptist next asserts that it cannot be liable for tortious interference because it is not a "stranger" to appellees' relationships with their patients. Again, because Baptist raises this argument for the first time on appeal, we will not consider it. Baptist claims that it raised the argument at the February 26, 2004, hearing before the circuit court; however, as previously noted, although directed to do so by this court, Baptist failed to abstract the legal arguments presented at the hearing. We have been resolute and consistent in holding that all material information must be included in the abstract and that we will not be placed in the position of having seven justices scour the one record for absent information. *Camden Cmty. Dev. Corp. v. Sutton,* 339 Ark. 368, 5 S.W.3d 439 (1999); *City of Maumelle v. Maumelle Lodge,* 335 Ark. 283, 983 S.W.2d 123 (1998). [FN3]

### C. Intentional Interference

[13][14] Baptist argues that it did not have the requisite intent to tortiously interfere with doctor-patient relationships because it did not directly intend to interfere with those relationships. In *Stewart Title, supra,* we noted:

We have said that intentional torts involve consequences which the actor believes are substantially certain to follow his actions. *Miller v. Ensco, Inc.,* 286 Ark. 458, 460, 692 S.W.2d 615, 617 (1985). The "tort of interference with contractual relations is similar to other intentional

torts 'in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct.' " *City National Bank of Fort Smith v. Unique Structures,* 929 F.2d 1308 (1991) (quoting RESTATEMENT (SECOND) OF TORTS (1977)). Further, tortious interference with business expectancy "has remained very largely a matter of at least intent to interfere ... and the means by which [the defendant] has sought to accomplish it." W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 130, at 1008-09 (5th ed.1984).

[15] Baptist claims that there is no evidence in the record that it was substantially certain that its policy would interfere with doctor-patient relationships. We disagree. The circuit court found that most of appellees' patients have chronic cardiac problems requiring periodic treatments and, as a consequence, the relationship between appellees and their patients is generally on a long-term basis. Further, the circuit court noted that many of these doctor-patient relationships would be severed if appellees were not allowed privileges at Baptist. One reason for this is because many of appellees' patients are covered by health-insurance policies or other benefit plans that have exclusive contracts for treatment only at Baptist. As noted by the circuit court, these patients are under substantial financial incentives to obtain required hospital services at Baptist's facilities. The circuit court found that once a patient's physician is no longer allowed privileges at Baptist, the doctor-patient relationship will be severed. After making these findings, the circuit court concluded:

**\*5** Defendant knew that the adoption of the economic credentialing policy would inevitably result in a disruption of the relationship between Plaintiffs and a significant number of their patients. The economic credentialing policy was adopted with the intention of forming a relationship with the Plaintiffs' patients, potential patients, and referring physicians who were required to use its facilities by establishing relationships with cardiologists other than the Plaintiffs.

Defendant, by adopting the economic credentialing policy, intended to disrupt the business expectancies arising out of Plaintiffs' relationships with their patients and with referring physicians with whom they have established patterns of referral. Further, by adopting the economic credentialing policy, Defendant intended to disrupt and interfere with the doctor-patient relationship existing between Plaintiffs and their patients and Plaintiffs' ability to provide health care to their

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

patients. Defendant's actions are an attempt to secure treatment of patients at Defendant's facilities and not Plaintiffs' facilities.

Baptist states that there is no finding that Baptist believed that an interference was "substantially certain" to result from the adoption and enforcement of its Policy. Baptist further states that the circuit court attempted to supply the lack of any proof of Baptist's intent to interfere in appellees' relationships or expectancies by citing *Great American Insurance Co. v. Ratliff,* 242 F.Supp. 983, 991 (E.D.Ark.1965), for the proposition that a result is deemed intentional if it is the natural and probable consequence of an act. To the extent that Baptist is arguing that the circuit court's findings are clearly erroneous because they do not include the words "substantially certain," we do not agree. We believe the language used in the circuit court's findings convey that Baptist was substantially certain that an interference would result from the adoption and enforcement of its Policy. Further, we cannot say that those findings are clearly erroneous.

*D. Improper Interference*

[16] Baptist argues that its conduct does not rise to the "improper" standard required for intentional interference. As previously noted, for an interference to be actionable, it must be improper. *See, e.g., Stewart Title, supra.* We have considered the factors outlined in Restatement (Second) of Torts § 767 (1979), for guidance about what is improper. *See Vowell, supra; Dodson v. Allstate Ins. Co.,* 345 Ark. 430, 444-45, 47 S.W.3d 866, 875 (2001) (citing *Mason v. Wal-Mart Stores, Inc.,* 333 Ark. 3, 969 S.W.2d 160 (1998)). In particular, section 767 states that in determining whether an actor's conduct is improper or not, we should consider: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *Vowell, supra; Dodson, supra* (citing *Mason, supra* ). [FN4]

*1. Violation of Anti-Kickback Statutes*

**\*6** [17] Baptist argues that the circuit court erred in finding that the impropriety requirement is satisfied by Baptist's violation of anti-kickback statutes. [FN5] The circuit court found:

   Defendant's economic credentialing policy creates a disincentive for Plaintiffs to refer their patients to facilities other than Baptist. Privileges to admit and

treat patients at Defendant's facilities are economically advantageous to Plaintiffs. Defendant's economic credentialing policy confers the advantage only to physicians that do not have investments in facilities that Baptist deems as competitors.
   Plaintiffs have a substantial likelihood of success in establishing at trial on the merits that this economic credentialing constitutes a conferral of economic benefits, a remuneration, in consideration for the referral of patients to Defendant's facilities, which practice is prohibited by the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), and comparable Arkansas statutes. Ark.Code Ann., § 5-55-111 and § 20-77-902.

Baptist maintains that stated another way, the circuit court has determined that the Policy creates an incentive for appellees to refer their patients to Baptist. Baptist argues that this is nonsensical because the Policy clearly does just the opposite--so long as appellees have the proscribed ownership interest, they are prohibited from referring patients to Baptist, not incentivized to do so.

While the Policy creates a disincentive for appellees to maintain ownership in a competing hospital, we do not agree that it creates a disincentive for them to refer their patients to facilities other than Baptist. Based on the record before us, we do not believe that appellees have established that Baptist's conduct constitutes a violation of the anti-kickback statutes. Accordingly, we hold that the circuit court clearly erred in finding that the impropriety requirement is satisfied by Baptist's violation of the anti-kickback statutes.

*2. Violation of Arkansas Department of Health Rules*

[18] Baptist argues that the circuit court erred in finding that it improperly interfered in the doctor-patient relationship because it violated § 5(A)(10) of the Arkansas Department of Health Rules and Regulations for Hospitals and Related Institutions. Baptist takes issue with the following finding:

   The Arkansas Department of Health Rules and Regulations for Hospitals and Related Institutions, § 5(A)(10), state that "bylaws [of an institution] shall ensure admission of patients by a physician [,] patient choice of physician and/or dentist and emergency care by a physician." The Court interprets this regulation to require that hospitals grant access to physicians who qualify under the institutions criteria for training, competency, and fitness for the purpose of treating patients within the facility.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

Baptist argues that the circuit court's interpretation, in essence, suggests that the "patient choice of physician" language in the regulation somehow trumps a hospital board's ability to set policy and establish criteria, except in the limited areas of training, competency, and fitness. Baptist's argument is well taken. We do not interpret § 5(A)(10) to mean that the hospital does not have the right to establish criteria for privileges of medical staff. We agree with Baptist's contention that § 5(A)(10) means that a patient may choose his or her physician, provided that the physician is in compliance with the hospital board's policies, has been appointed to the medical staff, and is credentialed to admit a patient and provide specified services. Therefore, we hold that the circuit court's finding that the "improper" element of tortious interference is satisfied by Baptist's violation of § 5(A)(10) is clearly erroneous.

### 3. Violation of the Arkansas Deceptive Trade Practices Act

**\*7** [19] Baptist argues that the circuit court's findings as to a violation of the Arkansas Deceptive Trade Practices Act are insufficient to support the "improper" standard. The circuit court made the following findings:

Frequently, there is a shortage of cardiac beds in the Little Rock area. During the period of December to May of each of the last four years, all or one of the hospitals in the Little Rock area were on diversion because of a shortage of critical care or cardiac beds. At times, there have been no beds at AHH, Baptist, or St. Vincent's hospital for up to 36 hours. Enforcement of the economic credentialing policy by Baptist would reduce the number of available beds for treatment of Plaintiffs' patients, with the inevitable consequence that it will from time to time happen in a critical life-or-death situation.

The Arkansas Deceptive Trade Practices Act, Ark.Code Ann. § 4-88- 107(a)(10), makes illegal any trade practice which is unconscionable, which includes conduct violative of public policy or statute. Defendant's economic credentialing policy is intended to require Plaintiffs to either divest themselves of their ownership interests in AHH or to have their relationships with their patients, who are required to use Defendant's facilities, disrupted or terminated. Therefore, the aforementioned economic credentialing policy appears to be in violation of the ... Arkansas Deceptive Trade Practices Act.

[20] Baptist disagrees with the circuit court's

determination that the application of the Policy is unconscionable. [FN6] For their part, appellees state that the circuit court concluded that Baptist's use of the patients "as pawns in its economic chess game with a facility it deems a competitor was unconscionable, and therefore unlawful under this provision." Appellees further assert that Baptist has the "upper hand because of exclusive-provider contracts," and that Baptist's unconscionable conduct is demonstrated by the use of its power to disrupt the relationships between patients, who are at Baptist's mercy, with their physicians.

We cannot say that the circuit court's findings are clearly erroneous, and we are not persuaded by Baptist's suggestion that an economic-credentialing policy applicable to board members, administration, and medical staff alike, cannot be unconscionable. We hold that the circuit court did not clearly err in finding that Baptist's conduct constituted a violation of the Arkansas Deceptive Trade Practices Act and that such violation can satisfy the impropriety requirement for a claim of tortious interference.

### 4. Rule of Non-Review

[21] Baptist argues that its Policy is not subject to judicial scrutiny because courts traditionally apply a "rule of non-review" to private hospital board decisions concerning medical staff eligibility. In support of this argument, Baptist cites cases from jurisdictions that apply the rule of non-review and, further, it points to this court's decision in *Brandt v. St. Vincent Infirmary*, 287 Ark. 431, 701 S.W.2d 103 (1985). In that case, this court held that a private hospital was not subject to judicial review with regard to treatment restrictions imposed on a psychiatrist. Dr. Brandt, a physician on the medical staff at St. Vincent's, treated patients with allergic modalities and nutritional therapy. Treatments included the use of mega-vitamins and candida vaccines, as well as the more traditional methods of psychiatry. Dr. Brandt was instructed by the St. Vincent Psychiatry Controls Committee to refrain from use of the mega-vitamins and candida vaccines except to patients with a diagnosed deficiency state or unless administered on an experimental basis. Dr. Brandt argued that the restrictions were arbitrary. The circuit court dismissed the complaint, and we affirmed, holding that the private hospital had a right to set its own polices regarding medical treatment. Appellees argue that *Brandt* does not foreclose judicial review because in that case, this court plainly stated:

**\*8** We see no compelling reason to conclude that a private hospital *which is following appropriate*

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

*state regulations* must also be subject to judicial scrutiny as to the reasonableness standard of public hospitals in order to preserve the public interest.
 *Brandt, 287 Ark. at 437, 701 S.W.2d at 106* (emphasis added). Appellees contend that the rule of deference to a hospital's credentialing decisions, or the rule of non-review, is one which must be limited to those instances where that decision does not involve a violation of law, or is not used as a means for the commission of a tort. Appellees' point is well taken. We do not believe that a private hospital may insulate itself from suit when, as here, there is a finding that the hospital's conduct has violated state law, namely the Arkansas Deceptive Trade Practices Act.

 In sum, having determined that the circuit court did not clearly err in finding (1) that Baptist had the requisite intent for tortious interference, and (2) that Baptist's conduct constituted a violation of the Arkansas Deceptive Trade Practices Act, thus satisfying the impropriety requirement for a claim of tortious interference, we hold that the circuit court did not abuse its discretion in concluding that appellees would likely succeed on the merits of their claim of tortious interference.

### IV. Irreparable Harm
 Baptist argues that the circuit court abused its discretion in determining that absent the requested preliminary injunctive relief, appellees would be irreparably harmed. The circuit court found that the application of the Policy would cause irreparable harm both to appellees' reputations and to appellees' relationships with their patients.

### A. Harm to Reputations
 [22] The circuit court found that the Policy would cause appellees to suffer reputational injury because in the future, appellees must attempt to explain to patients, other institutions, or liability insurance companies that termination of their privileges was not due to their training, competency, or fitness as cardiologists. Baptist contends that even assuming, without conceding, that the application of the Policy would cause appellees to suffer damage to their reputations, the damage does not constitute irreparable harm sufficient to warrant the granting of a preliminary injunction. We agree. In *Kreutzer v. Clark, 271 Ark. 243, 607 S.W.2d 670 (1980)*, appellant, a physician, sought a temporary restraining order after he was notified that his contract of employment with Boone County Hospital would be terminated. Appellant alleged that his contract was illegally terminated and that the termination would

cause him irreparable harm, in that it would damage his professional reputation and hinder his chances of obtaining acceptable employment. We rejected this argument, stating:
> We could not more forcefully disagree. These arguments are available anytime an employment contract is terminated. The chancellor need not indulge speculation about appellant's future employment opportunities in deciding the legal question here. No ground is lost by the denial of the interlocutory order which cannot be recouped in a court of law by a favorable judgment and an award of money damages.
 *9 *Kreutzer, 271 Ark. at 245, 607 S.W.2d at 671*.

 Here, the circuit court concluded that the denial of privileges would be harmful to the reputations of the physicians and that this finding constituted a reason for issuing the injunction. This finding is clearly erroneous. Pursuant to our holding in *Kreutzer*, we hold that in this case, the alleged potential damage to professional reputations does not justify a finding of irreparable harm sufficient for the issuance of a preliminary injunction.

### B. Harm to Doctor-Patient Relationships
 [23] Finally, Baptist contends that the circuit court erred in finding that irreparable harm to doctor-patient relationships would result absent the issuance of the injunction. The circuit court determined that irreparable harm would result from the disruption of appellees' relationships with their patients and with referring physicians, and with appellees' ability to provide proper healthcare to their patients, to the detriment of the doctor-patient relationships.

 Baptist states that any disruption to patient relationships is minimal due to the relative infrequency of appellees' admissions to Baptist's hospitals, the availability of physicians in appellees' clinic without a conflict under the Policy to admit and treat those patients at Baptist, and the regular practice of appellees and other physicians in appellees' clinic caring for another's patients when they are otherwise unavailable nights, weekends, holidays, vacations, during illness, or incapacity. We disagree. As pointed out by appellees, while members of a practice group may occasionally cover for each other, physicians are not fungible as to their relationships with patients or their specialties of practice. The circuit court's finding concerning irreparable harm to doctor-patient relationships is not clearly erroneous. We hold that the circuit court did not abuse its discretion in concluding that absent preliminary injunctive relief, the appellees would suffer irreparable harm.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

*V. Conclusion*

In sum, the circuit court did not abuse its discretion in concluding that appellees would likely succeed on the merits of their claim of tortious interference. In addition, the circuit court did not abuse its discretion in concluding that absent the requested preliminary injunctive relief, appellees would suffer irreparable harm. For the foregoing reasons, we hold that the circuit court did not abuse its discretion in issuing a preliminary injunction.

Affirmed.

Special Justices JIM BOYD and WESS DOSS, join.

GLAZE, J., concurs.

Special Justices DUNCAN and BURNETT, dissent.

CORBIN, IMBER, DICKEY and GUNTER, JJ., not participating.

XOLLIE DUNCAN, Special Justice, dissenting.

I respectfully dissent from the majority's finding that the circuit court did not clearly err in finding that Baptist's conduct constituted a violation of the Arkansas Deceptive Trade Practices Act. I would conclude that the impropriety requirement for a claim of tortious interference was not met and I would reverse the circuit court's finding that Appellee's have shown a likelihood to succeed on the merits.

Special Justice JIM BURNETT joins the dissent.

FN1. The Policy defines "direct ownership or investment" as an ownership or investment (1) by the practitioner or the practitioner's immediate family member or (2) where the beneficial interest remains in the practitioner or the practitioner's immediate family member, including but not limited to a trust arrangement. "Indirect ownership or investment" is defined in the Policy as a situation where between the practitioner (or the practitioner's immediate family member) and the competing hospital there exists an unbroken chain of any number of persons or entities having ownership or investment interests between them. Excluded from the Policy's definition of "ownership or investment interests" is an interest that was initially acquired on terms and conditions that were available to the

general public.

FN2. Baptist failed to comply with this court's order and has again filed a deficient abstract. Baptist's abstract of the hearing consists only of appellees' counsel's "opening remark" and the agreement reached by the parties at the circuit court's request. Citing Ark. Sup.Ct. R. 4-2(a)(5), Baptist explains that it did not abstract the legal arguments presented to the circuit court because the arguments are repeated in the briefs submitted on appeal and, thus, are "not necessary to 'an understanding of all questions submitted to the Court for decision.'" We disagree. Although it is within our discretion to affirm for noncompliance, *see* Ark. Sup.Ct. R. 4-2(b)(3), we choose to address Baptist's arguments on appeal.

FN3. We wish to emphasize that our conclusion in this case that Baptist has not preserved its refusal-to-deal and stranger-doctrine arguments for appeal has no bearing on what arguments Baptist may raise at a trial on the merits.

FN4. In *Mason v. Wal-Mart Stores, Inc.,* 333 Ark. 3, 969 S.W.2d 160 (1998), we rejected the contention that in order to satisfy the impropriety requirement in tortious-interference cases, a plaintiff must prove that the improper conduct is wrongful. We stated:
While we understand the sentiment that the tort should be reduced to situations in which a third party may be held liable for interference only when the alleged conduct is independently tortious as it was in *Mason v. Funderburk, supra,* we are unwilling to go that far. *Cf. Conoco Inc. v. Inman Oil Co., Inc.,* 774 F.2d 895, 907 (8th Cir.1985). ("We think that 'wrongful means' in this context refers to means which are intrinsically wrongful--that is, conduct which is itself capable of forming the basis of liability of the actor.") Our review of our cases leads us to the position that as RESTATEMENT § 766, our law requires that the conduct of the defendant be at least "improper," and we look to factors such as those stated in § 767 to determine whether defendant's conduct fits in that description. *Mason,* 333 Ark. at 13-14, 969 S.W.2d at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)
**(Cite as: 2006 WL 242670 (Ark.))**

       165.

       FN5. The circuit court correctly noted that while these statutes create no private right of action, a violation may be considered evidence of impropriety.

       FN6. An "unconscionable" act is an act that "affront[s] the sense of justice, decency, or reasonableness." *Black's Law Dictionary* 1561 (8th ed.2004).

  --- S.W.3d ----, 365 Ark. 115, 2006 WL 242670 (Ark.)

**Briefs and Other Related Documents (Back to top)**

• 2005 WL 3802480    (Appellate Brief) Baptist Health's Reply to Appellees' Response to Appellant's Substituted Brief (Sep. 13, 2005)Original Image of this Document (PDF)

• 2005 WL 4045868    (Appellate Brief) Appellees' Brief in Response to Appellant's Substituted Brief (Sep. 1, 2005)Original Image of this Document (PDF)

• 2005 WL 3802481    (Appellate Brief) Baptist Health's Revised Abstract, Substituted Brief & Addendum (Aug. 10, 2005)Original Image of this Document with Appendix (PDF)

• 2004 WL 3419164    (Appellate Brief) Baptist Health's Reply Brief (Jul. 29, 2004)Original Image of this Document (PDF)

• 2004 WL 3473076    (Appellate Brief) Baptist Health's Reply Brief (Jul. 29, 2004)Original Image of this Document (PDF)

• 2004 WL 3419165    (Appellate Brief) Appellees' Supplemental Abstract and Brief (Jul. 07, 2004)Original Image of this Document (PDF)

• 2004 WL 3473077    (Appellate Brief) Appellees' Supplemental Abstract and Brief (Jul. 07, 2004)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT C**

Not Reported in N.W.2d                                                                 Page 1
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

NORTH DAKOTA DISTRICT COURT.
Ralph & Diane BECKLER, on behalf of themselves
and all others similarly
situated, Plaintiffs,
v.
VISA U.S.A. INC. and Mastercard International,
Inc., Defendants.
SIOLEN KELLY HO, Barbara Hall and Virginia
Torres, on behalf of themselves and
all other consumers similarly affected, Plaintiffs,
v.
VISA U.S.A. INC. and Mastercard International,
Inc., Defendants.
Robert STARK, on behalf of himself and all others
similarly situated,
Plaintiff,
v.
VISA U.S.A. INC. and Mastercard International
Incorporated, Defendants.
**No. 09-04-C-00030.**

Aug. 23, 2004.

Steven W. Plambeck of Nilles, Hansen & Davies, Ltd., Fargo, ND; Stephen V. Bomse, David M. Goldstein of Heller Ehrman White & McAuliffe LLP, San Francisco, CA; Robert C. Mason and Miranda L. Berge of Arnold & Porter LLP, New York, NY, for Defendant Visa U.S.A. Inc.

Patrick J. Ward of Zuger Kirmis & Smith, Bismarck, ND; Kenneth A. Gallo of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; Gary R. Carney of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant MasterCard International Incorporated.

Michael J. Williams, Fargo, ND; David Markun, Edward S. Zusman and Kevin Eng of Markun Zusman Compton & David, LLP, San Francisco, CA, for Plaintiffs.

MEMORANDUM OPINION

HERMAN, J.

### NATURE OF PROCEEDINGS

**\*1** This is an antitrust action "on behalf of all consumers in the State of North Dakota who have been forced to pay artificially inflated prices as a result of defendants' anti-competitive actions" (see,

Paragraph 1, Class Action Complaint).

The alleged anti-competitive actions include an illegal "tying" arrangement requiring merchants to follow the "Honor All Cards" rules of the ubiquitous Visa and MasterCard associations.

### OTHER LITIGATION

In October 1996, a series of class action lawsuits were filed in the United States District Court for the Eastern District of New York, styled *In re Visa Check/Master Money Antitrust Litig.* (a/k/a Wal-Mart Stores, Inc. et al. v. Visa U.S.A. Inc. and MasterCard Int'l, Inc.), (the "Wal-Mart" action) No. 96-CV-5238, by certain retailers and retail trade associations against the defendants. The retailers alleged, among other things, that Visa and MasterCard violated federal antitrust laws by forcing merchants who accept their cards to accept Visa and MasterCard-branded debit cards. Plaintiffs claimed defendants' actions caused merchants to pay excessive fees on Visa and MasterCard off-line debit transactions, which injured competition, merchants and consumers. The retailers sought: (1) an injunction prohibiting defendants from engaging in the alleged violations of the federal antitrust laws (including the elimination of the alleged forced acceptance of the Vista and MasterCard-branded debit cards by merchants who accept Visa and MasterCard-branded credit cards), and (2) damages for the alleged excess portion of fees paid.

During the course of the *Wal-Mart* litigation, the Second Circuit Court of Appeals upheld the District Court's decision to certify a class of four million merchants (280 F.3d 124 (2d Cir.2001)) and the district Court later *granted* the retailers' cross-motion for summary judgment on a host of key issues (2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003)).

Finally, on June 4, 2003, the retailers entered into proposed settlements with Visa and MasterCard, which would, among other things, allow merchants to accept the Visa or MasterCard-branded credit cards without accepting their debit cards (and vice versa), reduce the prices charged to merchants for off-line signature debit transactions for a period of time, and pay over \$3 billion into a settlement fund. On January 23, 2004, the District Court entered an order and final judgment granting final approval to the settlements.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                     Page 2
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases  P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

Separate from the *Wal-Mart* case, the Department of Justice ("DOJ") commenced an action against Visa and MasterCard alleging federal antitrust violations. On October 7, 1998, the DOJ sued Visa U.S.A. Inc., Visa International Corp. (collectively "Visa"), and MasterCard International, Inc., alleging two violations of section 1 of the Sherman Act, 15 U.S.C. § 1.

The DOJ alleged that defendants' rules permitted member banks to issue credit and charge cards on both the Visa and MasterCard networks, but improperly prohibited them from issuing cards on the two major general purpose credit and charge card networks not controlled by banks: American Express and Discover. *United State v.. Visa U.S.A., Inc., 163 F.Supp.2d 322, 329 (S.D.N.Y.2001).* The government contended that these exclusionary practices restrained competition among credit card networks and credit card issuers, harming consumers in both the credit card and charge card markets.

**\*2** The district court, analyzing the government's claims under the "rule of reason," began by defining two relevant product markets: (1) a general purpose card market, and (2) a general purpose card network services. *Id. at 335.* Significantly, for purposes of this litigation, the court also rejected a broader market definition urged by Visa and MasterCard, holding that other forms of payment, such as debit cards, constitute a market separate from charge and credit cards. *Id. at 331, 336-39.* The court found that the defendants have market power in the network services market--the market in which the associations operate. *Id. at 340.* The court held that the challenged exclusionary rules "weaken[ed] competition and harm[ed] consumers." *Id. at 329-30, 399-400.*

Visa and MasterCard appealed, but the Second Circuit affirmed the district court's conclusion that their respective exclusionary rules violated the Sherman Act. *United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir.2003).*

More importantly, consumer based litigation similar to this case has been brought in the Supreme Court of the District of Columbia, *Peterson et al. v. Visa USA, Inc. and Master Card International, Inc.* Civil Action No. 03-008080 ("The Multi-State Action.") The Multi-State action was brought by plaintiffs (including the Becklers) from each of seventeen states (including North Dakota) plus the District of Columbia and is essentially identical to this claim, i.e. that the debit card overcharge was passed on to

consumers. Defendants have moved to dismiss the Multi-State action on grounds of *forum non conveniens.* Becaue the statutes of limitations are not necessarily tolled while this issue is being addressed, in the Multi-State action, the plaintiffs have filed their own class actions in their home states thus, this North Dakota filing by the Becklers.

Plaintiffs' motion to stay this proceeding has been withdrawn. There being no deadlines on the Multi-State decision nor any way to know if that decision will moot the individual State actions, this Court determines that it should proceed and address defendants' motion to dismiss.

### DISCUSSION

At the outset, the Court assumes that a "tying" arrangement illegal under the Clayton and Sherman Acts is also illegal under State law, North Dakota Century Code chapter 51-08.1. Moreover, at the motion to dismiss stage, the Court considers the allegations of the Complaint in the light most favorable to the plaintiffs. *See, Saefke v. Stenehjem, 673 N.W.2d 41, 44-45 (N.D.2003).* Defendants argue the plaintiffs do not have "standing" to bring these claims and that regardless of the merits of the retailers' litigation, this state claim should be dismissed.

Plaintiffs acknowledge that under federal law they could *not* maintain this class action. In essence, *Illinois Brick v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707(1977)* sounded the death-knell for "indirect purchaser" claims under the federal anti-trust laws. Many states, including North Dakota, later took legislative action to repeal the *Illinois Brick* bar to indirect purchaser claims. See, NDCC § 51-08.1-08(3) and its legislative history. The Court finds that this legislative endeavor was, in fact, an effective repeal of *Illinois Brick.*

**\*3** Defendants accepts that repeal, but argue the plaintiffs are not really "indirect purchasers" and that despite the narrow rule of *Illinois Brick,* an anti-trust plaintiff must always have some legal "standing" to bring, their claim. See, *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).*

### CONCLUSION

Clearly defendants here are not indirect purchasers in the ordinary sense. They do not allege to have been forced to purchase off line debit cards offered by defendants in addition to--or to the exclusion of--on-

Not Reported in N.W.2d                                                                    Page 3
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

line debit cards offered by small competitors. Indeed, the class of plaintiffs whom the Becklers seek to represent includes all North Dakota consumers, whether they purchased goods and services for cash, with checks, with credit cards, or with either form of debit cards. In essence, plaintiffs claim to have been overcharged ("injured" in anti-trust parlance) as a result of their ordinary, day-to-day purchases of an enormous variety of goods that these defendants neither manufactured nor sold.

 As "non-purchasers" of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote.

 Even though the consumer litigation is relatively new (both the Multi-State action and the follow-up individual state actions), several trial courts have reached this result. *Ho v. Visa U.S.A., Inc* No. 112316/00, slip op at 6 (N.Y. Cty April 26, 2004) attached as Exhibit 1; *Stark v. Visa U.S.A. Inc. and MasterCard International, LLC,* Case No. 03-055030-CZ Oakland County, Michigan, opinion and order attached as Exhibit 2.

 Counsel for defendants will prepare appropriate Findings of Fact, Conclusions of Law and Order for Judgment consistent with this Memorandum Opinion.

EXHIBIT 1
SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK: IAS PART 60

 SIOLEN KELLY HO, BARBARA HALL and VIRGINIA TORRES, on behalf of themselves and all other consumers similarly affected,

Plaintiffs,
-against-
 VISA   U.S.A.   INC.   and   MASTERCARD INTERNATIONAL, INC.,

Defendants.

 FRIED, J.

 Defendants Visa U.S.A. Inc. (Visa) and MasterCard International, Inc. (Master Card) move, pursuant to 3211(a)(7) and 3211(a)(1), to dismiss the amended complaint.

 Plaintiffs Siolen Kelly Ho, Barbara Hall, and Virginia Torres seek to sue on their own behalf and

on behalf of all similarly situated consumers. Plaintiffs allege that they are consumers at stores such as The Express, Victoria's Secret, Sears Roebuck Co., Macy's, and Bloomingdale's, all of which are part of the International Mass Retail Association (IMRA) and the National Retail Federation (NRF). Plaintiffs allege that those stores, along with more than three million retail establishments, accept Visa and MasterCard credit cards as a form of payment. Plaintiffs further allege that, although the acceptance of Visa and MasterCard credit cards is voluntary, the retailers are forced to accept Visa and MasterCard debit cards as a condition of being able to accept the more all-encompassing credit cards. According to plaintiffs, Visa and MasterCard charge the retailers more, per transaction, when a debit card is used by a customer, than when a credit card is used. According to plaintiffs, the retail stores pass on the increased charge to consumers, such as themselves, by raising the price of the products that they sell.

 *4 In 1996, several groups of retailers filed anti-trust actions in federal court challenging these practices of Visa and MasterCard. In 2003, that litigation resulted in a settlement involving the payment of damages of over $3 billion, and injunctive relief worth an additional $25 to $87 billion. (*In re Visa Check/Mastermoney Antitrust Litigation,* 297 F Supp 2d 503 [RDNY 2003] ).

 Plaintiffs' amended complaint asserts two causes of action. In their first cause of action, plaintiffs allege violations-of the Donnelly Act (General Business Law § 340), New York State's version of the federal Sherman Anti-Trust Act. 5 USC § 1 *et seq.* In their second cause of action, plaintiffs allege violations of General Business Law § 349, which makes unlawful deceptive acts and practices in the conduct of business.

 Citing *Cox v. Microsoft Corp. (290 A.D.2d 206 [1*st Dept 2002] ), defendants contend that plaintiffs' Donnelly Act cause of action must be dismissed, because the Act's treble damages remedy precludes private persons from bringing a class action under the act. See CPLR 901(b) (unless a statute which imposes a penalty specifically provides that an action to recover the penalty may be brought as a class action, such a class action is precluded).

 In response, plaintiffs offer to abandon their class action claims for Donnelly Act violations, and agree to further amend their complaint, if so required.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                              Page 4
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

However, defendants argue that, even if plaintiffs abandon their class action claims, the first cause of action must be dismissed. Defendants contend that plaintiffs lack standing because their alleged injuries are too remote.

In the case of *Illinois Brick Co. v. Illinois,* (431 U.S. 720 [1977] ), the United States Supreme Court held that purchasers of concrete blocks, who had paid enhanced prices for their purchases because their suppliers had been victimized by a price fixing conspiracy, could not bring a federal anti-trust action because they were indirect purchasers. In 1999, the New York State Legislature amended the Donnelly Act to provide that persons who had been damaged as a result of a violation of the Donnelly Act would not be deprived of standing to sue, merely because they did not deal directly with the defendant. (Gen. Bus. L. § 340 ( [6] ). Defendants contend that plaintiffs' injuries are too remote to qualify them as "indirect purchasers" under the Donnelly Act amendment.

Defendants argue that the proximate cause analysis utilized by the United States Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* (459 U.S. 519 [1983] ), to determine whether antitrust standing is proper under state laws similar to New York's, should be used here. That analysis, which was recently summarized by the United States District Court for the District of Columbia in *In re Lorazepam & Clorazepate Antitrust Litigation,* (295 F Supp 2d 30, 37 [DDC 2003] ). considered the following five factors in determining whether a plaintiff is a proper party to bring an antitrust case:
*5 1. The nature of plaintiff's claimed injury;
2. The directness of the injury;
3. The specific intent of the alleged defendants;
4. The character of the alleged damages, including the risk of duplicative recovery, the complexity of apportionment and their speculative nature; and
5. The existence of other, more appropriate plaintiffs.

Here, the plaintiffs' claims, as general consumers at stores which accept Visa and MasterCard, are clearly derivative of the stores' claims against those companies, and their alleged injuries are indirect. They have had no direct dealings with either of the defendants; they do not claim to use defendants' credit or debit card services in any way. Rather, they claim that stores where they shop raise their prices on all products in order to absorb the extra fees charged by Visa and MasterCard, and that they pay higher prices as a result. Thus, plaintiffs' claims are far more indirect than those in cases challenging the tobacco industry, on which plaintiffs rely, where the plaintiffs are cigarette smokers who actually purchased the defendants' product, though not directly from defendants. (See e.g. *Lennon v. Philip Morris Companies, Inc.,* 189 Misc.2d 577, 734 N.Y.S.2d 374 [Sup Ct. N.Y. County [Ramos, J.] 2001] ).

With respect to intent, in the *Lorazepam* case, on which plaintiffs here rely, those plaintiffs claimed that they were injured because they had to pay excessive prices for certain drugs. As the *Lorazepam* court noted, the aim of the manufacturers' preclusive conduct was to charge the elevated prices of which the plaintiffs complained. Here, in contrast, though Visa and MasterCard presumably intended to obtain higher rates from the stores that accepted their cards, there is no indication that they intended that the prices of all consumer goods in those stores would be increased.

With respect to the character and calculation of damages, and the complexity of calculating those damages, plaintiffs allege that the stores where they shop, such as The Express, Victoria's Secret, Sears Roebuck Co., Macy's, and Bloomingdale's, have absorbed the debit card fees by raising their prices. In their amended complaint, plaintiffs note that those stores are part of the IMRA and NRF, which, along with more than three million retail establishments, accept Visa and MasterCard credit and debit cards. Even assuming that plaintiffs' class action claims have been abandoned with respect to their Donnelly Act cause of action, their amended complaint appears to cover all of the purchases that they made as individual consumers at *any* retail store that accepts Visa and MasterCard, not merely at the handful of named stores-- purchases which potentially range from a few cents to hundreds, or even thousands, of dollars. The complexity and speculative nature of plaintiffs' claims are overwhelming.

Moreover, any recovery obtained by plaintiffs here is likely to be duplicative, in light of the fact that the retailers have already brought and resolved their claims with respect to the debit cards, and have obtained a multi-billion dollar settlement. Therefore, this is obviously not a situation where the antitrust violators will go unpunished, because the parties who are directly injured will not sue.

*6 For these reasons, I conclude that plaintiffs' alleged injury is far too remote to provide antitrust standing under the Donnelly Act, and the first cause of action must be dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs' second cause of action alleges that defendants violated General Business Law (GBL) § 349 by engaging "in a wide and far-reaching advertising campaign" to induce consumers to acquire debit cards without disclosing that the merchants are being charged high fixed prices for accepting the cards, which costs the retailers are compelled to pass on to all of their consumers.

Defendants argue that the second cause of action should be dismissed, because, like the Donnelly Act, Section 349 provides for treble damages, and therefore, a class action is impermissible. Under the Donnelly Act, any person who sustains damages by reason of a violation of the act "shall recover three-fold the actual damages." (Gen.Bus.L. § 340[5] ). In contrast, pursuant to section 349, plaintiffs may seek merely their actual damages or $50, whichever is greater, the imposition of treble damages being discretionary with the court. Gen. Bus. L. § 349[h] ). Plaintiffs indicate that they are willing to waive the possibility of treble damages, but seek to maintain their class action claims under section 349. As plaintiffs contend, class actions have been sustained under section 349, where plaintiffs have agreed to waive treble damages relief (*see Super Glue Corp. v. Avis Rent A Car System, Inc.,* 132 A.D.2d 604, 517 N.Y.S.2d 764 [2nd Dept 1987] ), and where class members were permitted to opt-out, if they wished to seek treble damages. *(See Ridge Meadows Homeowner's Assn., Inc. v. Tara Development Co., Inc.,* 242 A.D.2d 947 [4th Dept 1997] ). Thus the availability of treble damages does not preclude plaintiffs' second cause of action.

Defendants contend that, nonetheless, plaintiffs fail to satisfy the three elements of a section 349 claim: "that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." (*Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 [2000] ). Defendants contend that no misleading practice has been alleged by plaintiffs--that nothing in defendants' advertising even discussed fees paid by merchants for credit and debit cards, and that, in any case, the information regarding those cards, with their differing fees, was public knowledge. And again, defendants argue that the alleged injuries suffered by plaintiffs are far too remote and speculative to state a claim under GBL § 349.

As defendants contend, New York courts have held that mere failure to disclose that lower rates for

certain services were available, does not necessarily constitute a deceptive practice under Section 349. (*See e.g. Gershon v. Hertz Corp.,* 215 A.D.2d 202 [1st Dept 1995] ) [alternative car rental arrangements at lower rates]; *see also Super Glue Corp. v. Avis Rent A Car System, Inc.,* 159 A.D.2d 68, 557 N.Y.S.2d 959 [2nd Dept 1990] [excessive prices charged for insurance or refueling, without more, are not actionable as deceptive practice] ).

**\*7** Citing *State of New York v. Feldman,* (210 F Supp 2d 294 [SDNY 2002] ), plaintiffs contend that there can be a violation of Section 349 without an affirmative misrepresentation. However, *Feldman* did not involve claims of deceptive advertising. Rather, in *Feldman,* several States brought an antitrust enforcement action against a group of people allegedly involved in an unlawful scheme to rig bids at stamp auctions. Plaintiffs' second cause of action specifically alleges that it is based on a widespread campaign of advertising by defendants, although no specific advertisements are cited, and plaintiffs fail to demonstrate anything specific in defendants' advertisements which was misleading. To the extent that plaintiffs' allegations regarding deceptive practices are based on defendants' alleged massive advertising campaign, *Feldman* is of little assistance to them, and their second cause of action fails to state a claim. Therefore, it is not necessary to reach defendants' contention that information about their pricing structure was publicly known.

In their brief and in oral argument, plaintiffs appear to have reformulated their second cause of action as a general antitrust claim, like the claims of the New York State Attorney General in *Feldman* and not unlike their Donnelly Act claim in the first cause of action. In *Feldman* the court noted that New York courts have interpreted Section 349 as encompassing deceptive practices prohibited by the Federal Trade Commission Act, and that the government may use the FTC Act to enforce antitrust laws. Plaintiffs argue that Section 349 can be used to enforce general claims of deceptive practices where antitrust laws have been violated, and that defendants' debit card practices have already been held to violate antitrust laws.

Although plaintiffs' amended complaint does not assert such a general antitrust claim pursuant to Section 349, on a motion to dismiss, it is appropriate for the court to consider not merely whether the complaint has stated a particular cause of action, but whether, on the facts alleged, a cause of action exists. Therefore, I will consider whether plaintiffs can state

Not Reported in N.W.2d                                                                                 Page 6
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

a claim under Section 349 that is not limited to a claim for deceptive advertising.

Defendants contend that if plaintiffs seek to utilize section 349 as a general antitrust statute, the analysis used to determine standing for Donnelly Act claims should be used to determine standing under section 349, as well.

Plaintiffs cite *Securitron Magnalock Corp. v. Schnabolk, (65 F.3d 256, 264* [2nd Cir1995] [citations omitted] ) for the proposition that " 'any person who has been injured by reason of any violation of this section' " can maintain a cause of action under section 349, and argue that, because they have been injured by defendants' actions, they have standing. However, the court in *Securition* merely held that suits under section 349 were not limited to consumers, and that corporate competitors have standing to sue as well, so long as the underlying conduct results in some harm to consumers, or to the public at large. That case did not consider the question of the remoteness of the injury--which is at issue here.

**\*8** Recently, in a case in which health insurers sought to recover, from tobacco companies, the increased costs of medical services due to smoking, the United States Court of Appeals for the Second Circuit considered whether there may be a remoteness bar to standing under Section 349. (*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211* [2nd Cir2003] ). Noting that a New York court has permitted a suit for indirect injuries under Section 349, the U.S. Court certified the following question to the New York Court of Appeals: "Are claims by a third party payer of health care costs seeking to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349 too remote to permit suit under that statute?" *Id.* at 221. The Court of Appeals has accepted the certified question. (*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 100 N.Y.2d 636 [2003] ).*

At least until the Court of Appeals determines that a different type of analysis should be utilized to determine standing under Section 349, I conclude that an analysis akin to that utilized for Donnelly Act standing is appropriate. Utilizing that analysis, I further conclude that, even if the Count of Appeals determines that third-party payers of health care costs have standing to sue tobacco companies under

section 349, for the reasons discussed above, plaintiffs' alleged claims are too remote to support a general antitrust claim under Section 349. Furthermore, if plaintiffs were permitted to bring their section 349 claims as a class action, as they seek to, the complexity and speculative nature of calculating damages would increase geometrically, for those claims could involve nearly all the purchases of all of the consumers in the state of New York.

Accordingly, it is hereby

ORDERED that defendants' motion to dismiss is granted, and the complaint is dismissed with costs and disbursements to defendants as taxed by the Clerk of the Court on submission of an appropriate bill of costs; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

EXHIBIT 2
ROBERT STARK, on behalf of himself and all others similarly situated,

Plaintiff,

v

VISA U.S.A. INC. and MASTERCARD INTERNATIONAL INCORPORATED,

Defendants.
Case No. 03-055030-CZ
Hon. Colleen A. O'Brien
*OPINION AND ORDER*
INTRODUCTION

This matter is before the Court on Defendants' motion for summary disposition under MCR 2.116(C)(8). The Court heard oral argument and took the motion under advisement. After considering Defendants' motion and brief in support, Plaintiff's response and Defendants' reply in light of applicable law, and for the reasons discussed below, the Court grants. Defendants' motion for summary disposition.

This is an antitrust action. Defendants claim that Plaintiff lacks standing to sue for purported violation of the Michigan Antitrust Reform Act ("MARA") because he alleges only remote injuries and did not purchase--directly or indirectly--the services that Defendants allegedly restrained in violation of MARA.

BACKGROUND

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                        Page 7
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases  P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

**\*9** Plaintiff claims that Defendants engaged in tying arrangements in violation of the Michigan Antitrust Reform Act. ("MARA") MCL 445.772. Plaintiff claims that he and the Michigan class he represents have been damaged "indirectly" under the Act because they were forced to pay the overcharge that resulted from Visa and MasterCard's unlawful tying arrangement. For these alleged violations, Plaintiff seeks damages and attorneys' fees.

Plaintiff's Complaint in this matter is based on the same conduct of Defendants that was at issue in previous federal litigation. In October 1996, several groups of merchants commenced a class action against Visa and MasterCard in federal court. *In re Visa Check/MasterMoney Antitrust Litigation,* 192 F.R.D. 68 (E.D.N.Y., 2000), *aff'd* 280 F.3d 124 (C.A.2, 2001), *cert den* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002). The merchants alleged that under the "Honor All Cards" rules, as a condition of being permitted to accept Visa and/or MasterCard credit cards, they were also required to accept Visa and MasterCard debit cards. The merchants claimed that this constituted a tying arrangement and an attempt to monopolize a debit market in violation of federal antitrust laws. The merchants alleged that as result of those purported antitrust violations, they paid inflated fees for Visa and MasterCard debit transactions--fees that were higher than those they paid for debit transactions processed over other debit networks.

In February 2000, the federal court certified a nationwide class of more than four million merchants who had accepted Visa or MasterCard within the statute of limitations period. That class action was settled in April 2003 on the eve of trial. The federal court issued an order granting final approval of the settlements. See *In re Visa Check/MasterMoney Antitrust Litig.,* 297 F Supp 2d 503 (E.D.N.Y., 2003). Pursuant to the settlements, Visa and MasterCard each eliminated the asserted tying of credit and debit card services to merchants, thereby allowing merchants to reject consumers' Visa or MasterCard-branded debit cards but still accept consumers' Visa or MasterCard-branded credit cards. Visa and MasterCard also collectively paid more than three billion dollars into a settlement fund.

In the federal litigation, the merchants alleged that Visa and MasterCard imposed an overcharge on merchants by forcing them to accept Visa and MasterCard debit cards as a condition of accepting Visa and MasterCard credit cards. In the instant matter, Plaintiff contends that the merchants passed

that overcharge on to both him and Michigan consumers by increasing the price of goods.

Plaintiff claims to have paid higher prices on every purchase he made from merchants who accept Visa or MasterCard, regardless of whether he used a debit card to make the purchase. Plaintiff alleges that all consumers, including those who used cash, were affected by Defendants' actions. Therefore, the proposed class would include not only consumers who purchased goods using debit cards but also any consumers who purchased goods from any Michigan retailer that accepted Visa and/or MasterCard credit cards.

ANALYSIS

**\*10** Defendants' motion is brought pursuant to MCR 2.116(C)(8). Defendant argues that Plaintiff's claims should be dismissed because he lacks standing to sue under the Michigan Antitrust Reform Act for the injuries he alleged.

A motion under MCR 2.116(C)(8) tests the "legal sufficiency of the complaint on the basis of the pleadings alone." *Mack v. Detroit,* 467 Mich. 186, 193, 649 N.W.2d 47 (2002). "All factual allegations are accepted as true, along with any inferences or conclusions which may be fairly drawn therefrom." *Ambro v. American Nat'l Bank & Trust Co.,* 152 Mich.App. 613, 616-617, 394 N.W.2d 46 (1986).

Defendant's first argument is that Plaintiff cannot meet the five-factor test set forth in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). This Court agrees.

In *Associated General Contractors,* the United States Supreme court Supreme Court identified five factors for determining whether the relationship between the plaintiff's harm and the defendants' conduct is sufficiently close to confer standing to sue: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market; (2) whether the alleged injury alleged is a direct, first-hand impact of the restraint alleged; (3) whether there are more directly injured plaintiffs with motivation to sue; (4) whether the damages claims are speculative; and (5) whether the plaintiff's claims risk duplicative recoveries and would require a complex apportionment of damages. *Id.* at 538- 45.

First of all, Plaintiff is not a consumer or competitor in the allegedly restrained market. Here, in the alleged market, the merchants are the consumers of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 8
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

Visa and MasterCard debit card services; and other debit networks are the competitors of Visa and MasterCard. Thus, there is no connection between Plaintiff's purchases of consumer goods and the Defendants' alleged tying of debit services.

Second, the injury that Plaintiff alleges here is not a direct, first-hand impact of the restraint alleged. Here, the direct impact allegedly fell on the merchants. Plaintiff alleges only derivative and second-hand injuries from those that merchants purportedly incurred.

Third, there are more directly injured persons with motivation to sue to vindicate any interest in antitrust enforcement. Here, the alleged direct victims of Defendants' conduct, the merchants, litigated for seven years in a massive nationwide class action challenging the very same Visa and MasterCard conduct alleged in plaintiff's Complaint. The merchants directly affected have vindicated any interest in antitrust enforcement by suing the Defendants for the same alleged conduct. Thus, denying Plaintiff an antitrust remedy clearly will not leave any alleged antitrust violation "undetected or unremedied." *Id.* at 542.

Fourth, the Court agrees with Defendants that Plaintiff's damage claims are speculative. Here, Plaintiff asserts he paid overcharges on every single purchase that he made for several years from merchants who accepted Visa or MasterCard cards, However, there is nothing about the debit network systems of Visa or MasterCard that contributes in any way to the production of the consumer goods for which Plaintiff contends he paid inflated prices.

**\*11** Moreover, Plaintiff's claims risks duplicative recoveries and would require a complex apportionment of damages. Here, Plaintiff's claims are based on the very same conduct of Visa and MasterCard that was at issue in the federal merchant class action. Thus, Plaintiff is seeking recovery duplicative of the sums to be paid under the settlements to the Michigan merchants at which Plaintiff shopped. Moreover, Plaintiff's claims would require apportionment of damages using virtually every single purchase that Plaintiff made during the years for which he seeks damages. The Court agrees with Defendants that certainly any effort to make such an apportionment would be incredibly complex, if not impossible.

Plaintiff argues that Defendants' reliance on *Associated General Contractors* is misplaced for the

reason that the test in *Associated General Contractors* is inconsistent with MARA's grant of standing to persons injured "indirectly." MCL 445.778(2). Plaintiff argues that MARA's plain language, rather than federal standing rules, governs the question of who has standing to bring a claim under MARA. Thus, under Plaintiff's analysis, the Act in itself grants standing per se.

Federal antitrust law does not recognize actions by indirect purchasers. The death knell of actions by indirect purchasers was embodied in the case of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In *Illinois Brick,* the plaintiffs sought to recover an overcharge on concrete acquired from users and direct purchasers of the concrete, who allegedly had overpaid for the concrete due to a manufacturers' price-fixing conspiracy and had passed on that overcharge to the plaintiffs. *Id.* at 726- 27. The United States Supreme Court concluded that such plaintiffs should not be deemed to have suffered an injury cognizable under the federal antitrust laws, given the potential for multiple liability and the complexity that would be introduced into antitrust damages suits if such pass-on theories were permitted. *Id* at 727-29, 736-47.

After *Illinois Brick,* Michigan and several other states amended their antitrust statutes to reject the Illinois Brick rule. Such legislation became known as *Illinois Brick* repealer laws. See *A & M Supply Co. v. Microsoft Corp.,* 252 Mich.App. 580, 583, 654 N.W.2d 572 (2002).

Specifically, in 1985, the Michigan Legislature adopted a damages statute modeled on the federal Clayton Act, but which also provided a potential damages remedy to persons injured "directly or indirectly" by a violation of Michigan's antitrust law. MCL 445.778(2). Thus, the mere fact that a plaintiff is an "indirect purchaser" would not automatically bar an antitrust damages claim.

However, this Court agrees with Defendants that it does not necessarily follow that Michigan's repeal of the *Illinois Brick* rule also eliminated the *Associated General Contractors* standing requirements. The Supreme Court in *Illinois Brick* made clear that its decision addressed only whether there should be a bar on "indirect purchaser" suits. It expressly "d[id] not address the standing issue," explaining that the "indirect purchaser" question is "analytically distinct from the question of which persons have sustained injuries to remote to give them standing to sue." *Illinois Brick, supra* at 728 n. 7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                   Page 9
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

**\*12** Plaintiff argues that restrictive federal standing rules such as in *Associated General Contractors* do not apply to MARA indirect purchaser claims. Plaintiff points out that no Michigan trial or appellate court has ever applied the *Association General Contractors* factors in a case under MARA's indirect purchaser provisions. However, while Michigan appellate courts have not developed a test for determining when a plaintiff's injury is too remote to permit suit under MARA, the Act requires courts to give "due deference to interpretations given by the federal courts to comparable antitrust statutes. MCL 445.784. Moreover, the Court notes that courts in other states that have repealed the Illinois Brick rule have continued to apply antitrust standing requirements to dismiss the claims of plaintiffs who assert only derivative or remote injuries. See *Ho v. Visa USA, Inc.* Index No. 112316/00, N.Y. Sup. Crt. April 26, 2004; *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.* 196 F.3d 818 (C.A.7, 1999).

Furthermore, even if this Court did not apply the five-factor test in *Associated General Contractors*, Plaintiff's claim would still fail under MARA. The Court agrees with Defendants' second argument that because Plaintiff is not an indirect purchaser, he cannot sue under MARA.

MCL 445.788(2) provides in pertinent part:

> Any ... person ... injured directly or indirectly in his or her business or property by a violation of this act may bring an action ... for actual damages sustained by reason of a violation of this act ... (emphasis added).

The repealer language in 445.788(2) addresses "indirect purchasers" such as "an end user or licensee" of the product that the defendant had manufactured. *A & M Supply, supra* at 583, 654 N.W.2d 572. Plaintiff claims that he and the Michigan class he represents have been damaged "indirectly" under MARA's plain text because they were forced to pay the "overcharge" that resulted from Visa and MasterCard's unlawful tying arrangement. Plaintiff claims that he is an indirect purchaser of the debit car services because the monopoly overcharge on Defendants' debit card services is reflected in the artificially inflated prices of the consumer goods he purchases.

Thus, Plaintiff's alleged injuries admittedly do not stem from his purchase of the purportedly restrained debit card services that Defendants provided to

merchants. Plaintiff does not claim that he repurchased from merchants or other middlemen the allegedly restrained debit card services that defendants provided to merchants. Instead, as correctly pointed out by Defendants, Plaintiff claims only derivative and remote injuries on his purchases from merchants of an endless variety of merchandise not even manufactured or sold by defendants. Therefore, Plaintiff is actually a "non-purchaser" of the debit card services that Defendants provide to merchants. Thus, MARA would not be applicable.

**\*13** THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary disposition is GRANTED.

IT IS FURTHER ORDERED that this Opinion and Order resolves the last pending claim and closes the case.

IT IS SO ORDERED.

Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT D**

Westlaw.

Slip Copy                                                                                                Page 1
Slip Copy, 2006 WL 1517767 (D.Del.)
**(Cite as: 2006 WL 1517767 (D.Del.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Donald L. DAILEY, Sr., Plaintiff,
v.
FIRST CORRECTIONAL MEDICAL and Suesanne
Rickards, Defendants.
**No. Civ.A. 03-923-JJF.**

May 30, 2006.
Donald L. Daley, Sr., Plaintiff, pro se.

Daniel L. McKenty, and Steven F. Mones, of
McCullough & McKenty, P.A., Wilmington,
Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

 **\*1** Plaintiff, Donald L. Dailey, Sr., SBI # 257458, is
a *pro se* litigant presently incarcerated at the Sussex
Correctional Institution ("SCI") in Georgetown,
Delaware. Defendants are First Correctional Medical
("FCM") and Suesanne Rickards (collectively
"Defendants"). Plaintiff filed this action under 42
U.S.C. § 1983 for violation of his Eighth
Amendment rights. Presently before the Court is
Defendants' Motion to Dismiss (D.I.31) pursuant to
Fed.R.Civ.P. 12(b)(6). Plaintiff has not filed a
response. For the reasons that follow, the Court will
grant Defendants' Motion.

BACKGROUND

 Plaintiff alleges that because his left leg is shorter
than his right and he has screws and pins in his left
leg and ankle, he must wear special orthopedic boots
at all times. He further alleges that Defendants failed
to provide him with such boots from the beginning of
his incarceration in October 2002 until June 2003,
causing damage to his lower back and spine. (D.I.2.)
He also claims that he has been denied appropriate
medical treatment, not only for the back pain
allegedly caused by Defendants' failure to provide
him with special boots, but also for unrelated eye

problems. (*Id.*) He requests $240,000 in
compensatory damages. (*Id.*)

DISCUSSION
I. Standard of Law

 Rule 12(b)(6) permits a party to move to dismiss a
complaint for failure to state a claim upon which
relief may be granted. Fed.R.Civ.P. 12(b)(6). The
purpose of a motion to dismiss is to test the
sufficiency of a complaint, not to resolve disputed
facts or decide the merits of the case. *Kost v.
Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). To that
end, the Court assumes that all factual allegations in
Plaintiff's pleading are true, and draws all reasonable
factual inferences in the light most favorable to
Plaintiff. *Amiot v. Kemper Ins. Co.,* 122 Fed. Appx.
577, 579 (3d Cir.2004). However, the Court should
reject "unsupported allegations," "bald assertions," or
"legal conclusions." *Id.* A Rule 12(b)(6) motion
should be granted to dismiss a *pro se* complaint only
when "it appears beyond doubt that the plaintiff can
prove no set of facts in support of his claim which
would entitle him to relief." *Estelle v. Gamble,* 429
U.S. 97, 106 (1976) (quoting *Conley v. Gibson,* 355
U.S. 41, 45-46 (1957)).

II. Analysis

 Defendants contend that Plaintiff's Complaint fails to
state a claim upon which relief can be granted
because, *inter alia,* Plaintiff failed to exhaust all
available administrative remedies before filing a §
1983 claim as required by law. Because the Court
concludes that Plaintiff did not meet the threshold
requirement of exhausting all available administrative
remedies, the Court will dismiss Plaintiff's Complaint
without prejudice without ruling on the substance of
his claim.

 A prisoner may not bring a § 1983 claim with
respect to prison conditions "until such
administrative remedies as are available are
exhausted." 42 U.S.C. § 1997e(a) (2006). A plaintiff
must have exhausted all available remedies before
filing suit even if the relief he is seeking from the
court would not have been available through the
grievance process, *Booth v. Churner,* 532 U.S. 731,
741 (2001), and even if the process is not "plain,
speedy and effective" as required by federal
standards. *Porter v. Nussle,* 534 U.S. 516, 524

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                           Page 2
Slip Copy, 2006 WL 1517767 (D.Del.)
**(Cite as: 2006 WL 1517767 (D.Del.))**

(2002). To meet the exhaustion requirement, a prisoner must carry the grievance and appeal process through to completion even if he is dissatisfied with the prison's response or believes that further appeals would be futile. *Hartsfield v. Vidor,* 199 F.3d 305, 309 (6th Cir1999); *see also Roach v. SCI Grateford Med. Dep't,* 2006 U.S.App. LEXIS 10983 at *4-5 (3d Cir. May 2, 2006) (holding that the exhaustion requirement is not satisfied if filing a formal grievance would have been futile because the prisoner "already knew [prison officials'] responses to his complaint"). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak,* 312 F.3d 109, 112-13 (3d Cir2002).

**\*2** The Delaware Department of Correction administrative procedures provide for a multi-tiered grievance and appeal process. Medical grievances are first forwarded to the medical services staff who attempt an informal resolution of the matter. If this fails, the grievance goes to the Medical Grievance Committee, which conducts a hearing. If the matter is still not resolved, the inmate may once again appeal. DOC Policy 4.4 (revised May 15, 1998).

Plaintiff's complaint makes it clear that he did not exhaust all available administrative remedies before bringing this action. On two separate occasions, Plaintiff filed initial grievances, but did not pursue them past the first stage by requesting a Medical Grievance Committee hearing. He claims that he did not receive a response to the first grievance, and that he was "tricked" into signing off on the second as "resolved." Neither of these assertions, even if true, allows him to meet the mandatory exhaustion requirement. His remedy in both instances was to file another grievance or to appeal to the Medical Grievance Committee, not to bring a § 1983 claim in federal court. There is no indication here that the prison authorities have obstructed the grievance and appeal process in such a way that available remedies should be deemed exhausted.

Therefore, the Court concludes that Plaintiff has not exhausted all administrative remedies available to him, which is a prerequisite to bringing a § 1983 claim under § 1997e. Accordingly, the Court will grant Defendants' Motion to Dismiss.

CONCLUSION
For the reasons discussed, Defendants' Motion to Dismiss (D.I.31) will be granted. An appropriate order will be entered.

*ORDER*
At Wilmington, this *30* day of May, 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss (D.I.31) is *GRANTED.*

Slip Copy, 2006 WL 1517767 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv00923 (Docket) (Oct. 1, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Only the Westlaw citation is currently available.

Superior Court of Maine.
Robert EVEREST Plaintiff
v.
LEVITON MANUFACTURING COMPANY
Defendant.
**No. CV-04-612.**

Jan. 13, 2006.
Robert Everest, Russell Pierce--Retained, Norman Hanson & Detroy, Portland, for Plaintiff.

Leviton Manufacturing Company, Inc., Christopher Roach--Retained, Nikolas Kerest--Retained, John Aromando--Retained, Pierce Atwood, Portland, for Defendant.

ORDER ON DEFENDANT'S MOTION TO DISMISS

ROBERT E. CROWLEY, Justice.

**\*1** Before the court is Defendant Leviton Manufacturing Co.'s ("Defendant") motion to dismiss both counts of Plaintiff Robert Everest's ("Plaintiff") complaint, which asserts claims (1) under Maine's Unfair Trade Practices Act, 5 M.R.S.A. § 205-A et seq. ("UTPA") and (2) for Unjust Enrichment.

Defendant manufactures backwire push-in electrical receptacles, the main part of what are commonly called electrical outlets. Plaintiff Robert Everest, ("Plaintiff") asserts that he owns "one or more" backwire push-in receptacles manufactured by Leviton. He claims that, since no later than 1989, Defendant has known or should have known that backwire push-in receptacles fundamentally and unreasonably pose a significant risk of danger, including "arcing" and risk of fire, and that they pose an even greater risk if one attempts to reuse them after an initial installation. He claims that notwithstanding Defendant's knowledge of the dangerous defects inherent in these receptacles, it has failed to inform consumers thereof. He claims that Defendant continues to market these receptacles, concealing their defects in its sales and promotional materials, because it knows that electricians and consumers often may want the perceived ease and speed with which these receptacles can be installed.

Plaintiff has brought this suit as a class action on behalf of himself and all other consumers in Maine who have purchased Defendant's backwire push-in receptacles, but who have not sustained personal injury or property damage other than damage to the receptacle itself and any wire or insulation in the vicinity of the receptacle. [FN1] Plaintiff claims (1) Compensatory damages for the loss of money incurred as a result of Defendant's alleged unfair and deceptive practices, (2) Punitive damages to the extent Defendant's practices were committed with malice, and (3) Restitution of the amount by which Defendant was unjustly enriched by its practices.

FN1. The court has not yet addressed the question of class certification.

DISCUSSION
I. Standard of Review on a Motion to Dismiss

On a motion to dismiss, the court views the facts alleged in the complaint as if they were admitted. *Fortin v. Roman Catholic Bishop of Portland,* 2005 ME 57, P10 (Me.2005) (internal citations omitted). The court then examines the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory. *Id.*

II. The "No Injury" Suit

Defendant asserts that this case should be dismissed in its entirety because it is a request for protection from potential harm, and a request for relief from potential harm is not cognizable. Defendant also makes the related arguments that Plaintiff's case should be dismissed under the economic loss doctrine, and because Plaintiff lacks standing or because Plaintiff's claim is not ripe for determination.

If this were a case premised on the risk that the receptacle(s) purchased by Plaintiff might malfunction, there would be no cause of action. *See Kahn v. Shiley Inc.,* 217 Cal.App.3d 848, 857 (Ct.App.Cal.1990). Here, however, Plaintiff alleges not merely that the receptacles are unsafe and may malfunction. Rather, Plaintiff claims that Defendant acted fraudulently, in that it either knew or should have known that the receptacles were dangerously

defective, yet purposefully failed to inform consumers of the dangers of the product, and represented the quick-wire receptacles to be as safe as other receptacles. *See id.*

**\*2** For purposes of establishing fraud, it matters not that the receptacles are still functioning, arguably as intended. *Id.* Unlike other theories, i.e. negligence, failure to warn, and breach of warranty, in which the product must malfunction before a cause of action lies, in a fraud claim Plaintiff's injury is sustained at the time he makes the purchase in reliance on Defendant's purposeful misrepresentations, and the measure of his damages is the benefit of the bargain he made, i.e. the difference between the value of the product actually purchased and the value of the product as represented. *See Nelson v. Leo's Auto Sales, Inc.,* 185 A.2d 121, 123 (Me.1962) (adopting "benefit of the bargain" measure of damages in fraud cases); *Brawn v. Oral Surgery Assocs.,* 2003 ME 11, ¶ 21; 819 A.2d 1014, 1026 (listing the elements of a fraud claim in Maine as (1) the making of a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purposes of inducing another to act upon it, and (5) justifiable and detrimental reliance by the other.)

Thus, it is apparent from the nature of Plaintiff's claims that the economic loss doctrine, which bars tort recovery only in certain products liability cases, is inapplicable here. *See Oceanside at Pine Point Condo Owners Ass'n v. Peachtree Doors, Inc.,* 659 A.2d 267, 271 (Me.1995).

Likewise, as a claim sounding in fraud, this case is ripe for adjudication. Ripeness is determined with a view to the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Lincoln House, inc. v. Dupre,* 903 F.2d 845, 847 (1st Cir.1990) (internal quotations omitted). In determining whether a claim is ripe, the court should consider as one of the most important factors, the extent to which the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all. *See id.* (stating "Since the only damages alleged by [the plaintiff] cannot yet be proven, never having been incurred-- and since they may never be incurred--[the plaintiff] can hardly claim hardship if consideration of them is presently withheld")

Defendant's argument that Plaintiff's claim is not ripe for adjudication would be correct if this were a products liability case, and the Plaintiff were

claiming a right to compensation for the possibility of property damage or personal injury occurring from a product malfunction. However, the events of this case are not the contingent event of a house fire, but rather, the purposeful sale of receptacles by Defendant to Plaintiff with, as alleged, knowledge of the product's dangerously defective condition. *See id.* The event of sale, the product's suitability for the purposes for which it was manufactured, Plaintiff's reliance on Defendant's representations about the product, and Defendant's knowledge of the product's suitability or defectiveness at the time of sale may be determined without waiting for the product to malfunction. Thus, the claim is ripe for determination.

**\*3** Likewise, Plaintiff has standing to bring his claim. Standing is a threshold issue bearing on the court's power to adjudicate disputes. *Franklin Property Trust v. Foresite, Inc.,* 438 A.2d 218, 220 (Me.1981). To have standing, a party must have suffered an injury that is distinct from any harm suffered by the public at large. *Delogu v. City of Portland,* 2004 ME 18, n. 1. As alleged, Plaintiff asserts a pecuniary harm arising out of having purchased Defendant's alleged defective product. This allegation is concrete and particularized, and suffices to distinguish Plaintiff's injury from any injury suffered by the public at large.

III. Failure to Plead Fraud With Particularity

Plaintiff's claims under the UTPA and for unjust enrichment are premised on fraud. Therefore, under M.R.Civ.P. 9(b), Plaintiff's claims must be pled with particularity. Currently, the claims fail to plead with particularity either that (1) Plaintiff was induced to purchase Defendant's receptacles in reliance upon Defendant's false representations, [FN2] or (2) which of Defendant's false representations--product packaging, catalogs, website materials etc.--Plaintiff relied on. *See* Field, McKusick & Wroth, *Maine Civil Practice* § 9.2 at 221 (2d ed.1970). Without these assertions, Defendant is not fairly apprised of the claim against it. *Id.* Accordingly, the complaint as drafted is deficient, and, unless it is amended within 30 days of the date of this order, it will be dismissed with prejudice.

> FN2. Paragraphs 21 and 39 of the complaint, which together come closest to asserting reliance merely state:
> 21. Defendant, Leviton, has not informed consumers of the dangerous defects inherent in the referenced Leviton receptacles,

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 381832 (Me.Super.)
(Cite as: 2006 WL 381832 (Me.Super.))

notwithstanding its knowledge that these receptacles are not suitable for long-term normal use in residences from the time of their installation.

39. As a direct and proximate result of the above violations of the Maine Unfair Trade Practices Act, Plaintiff suffered damages by purchasing defective backwire push-in receptacles manufactured by Leviton which are prone to failure because of the inherent and unreasonably dangerous defects, as alleged herein, of which the Defendant had actual knowledge or reasonably should have known.

Defendant claims that Plaintiff has not alleged any damages and that the complaint should be dismissed on this ground. In fraud, the basis of Plaintiff's complaint, and therefore the source of his damages, damages are not premised on the product's malfunction or any consequential damages therefrom, but rather on damages arising Defendant's misrepresentations. Claims based in fraud require the plaintiff to plead "detrimental reliance," and implicit in this concept is some form of damages, identified above as the benefit of the bargain. *See Nelson, 185 A.2d at 123; see also Price v. Philip Morris, Inc.,* 2005 Ill. LEXIS 2071, p. 225 (Freeman, J. dissenting). "Detrimental reliance" does not require a plaintiff to quantify the benefit of the bargain at the pleading stage. Rather, in his complaint Plaintiff need only assert that the product he received was not the product he bargained for.

Defendant's "no damages" argument also extends to the sufficiency of the damages pled under the specific counts of his claim. Defendant argues that Plaintiff is required to allege a substantial pecuniary loss under his UTPA claim, and that he fails to do so. Defendant also argues that Plaintiff is required to allege that he conferred a benefit on Defendant in order to sustain his unjust enrichment claim, and that he fails to do so.

Plaintiff is required to allege a substantial pecuniary harm in order to sustain his claim under the UTPA, which he has failed to do. To justify a finding of unfairness pursuant to the UTPA, the injury asserted must be "substantial." *See Tungate v. MacLean-Stevens Studios, Inc.,* 1998 ME 162, ¶ 9. This requirement is designed to weed out trivial or speculative claims. *Id.* Unlike the injury in fact requirement for standing or the detrimental reliance requirement under a general fraud pleading, UTPA's "substantial harm" requirement imposes a

quantitative threshold in cases alleging a pecuniary harm. *See id.* at ¶ 10. Plaintiff states that he purchased "one or more" receptacles, and generally claims compensatory and punitive damages arising out of this purchase. However, he doesn't plead facts that, if proven, would show that he has suffered a substantial pecuniary loss. He has not asserted the purchase price of the receptacles or the number that he purchased, nor has he alleged that he installed the receptacles, or the cost of installation, nor has he alleged that the defective condition of the receptacles requires that they be replaced, or the cost of replacement. Without any indication of the minimum amount of compensatory damages Plaintiff claims he would be entitled to should he prove that Defendant engaged in unfair trade practices, Plaintiff has failed to allege a substantial injury under the UTPA. *Cf. Tungate v. MacLean-Stevens Studios, Inc.,* 1998 ME 162, ¶ 10 (granting summary judgment against the plaintiff on her UTPA claim in part because she had not shown a substantial injury.)

**\*4** Plaintiff's unjust enrichment claim, however, is not deficient for failure to allege a benefit conferred on Defendant by Plaintiff. This claim incorporates the factual allegations of the rest of the complaint, including Plaintiff's claim that he purchased "one or more" receptacles. The court can infer from this factual allegation that Plaintiff conferred some pecuniary benefit on Defendant through the chain of sale.

Plaintiff's unjust enrichment claim is deficient, however, for failing to allege that Defendant's acceptance or retention of the benefit was under such circumstances as would make it inequitable for it to retain the benefit without payment of its value. *See Forrest Assocs. v. Passamaquoddy Tribe,* 2000 ME 195, ¶ 14, 760 A .2d 1041, 1045-46.

Plaintiff's unjust enrichment claim states:

44. By virtue of its obtaining monies from the manufacture, distribution, marketing and/or sale of electrical receptacles that it knew, or reasonably should have known, were inherently defective and not in conformity with nationwide electrical code standards, Defendant presented a distinct risk of hazard to individuals or entities that had these receptacles installed on their premises, and that require repair and/or replacement to avoid such hazard. Defendant has been unjustly enriched to the detriment of Plaintiff and the other members of the Class.

However, it is not the mere risk of hazard presented by the receptacles sold by Defendant that makes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 4
Not Reported in A.2d, 2006 WL 381832 (Me.Super.)
**(Cite as: 2006 WL 381832 (Me.Super.))**

Defendant's retention of monies received through
their sale unjust. Rather, Defendant's retention of
monies received through the sale of the receptacles to
Plaintiff is only unjust if it was obtained through
fraudulent means. A manufacturer may sell a
dangerous or defective product to a consumer and
justly retain the pecuniary benefits of that sale so
long as the consumer who purchased the product
knew of its dangers or defects, and received what he
bargained for.

 The entry is:
   Plaintiff's complaint as drafted is deficient.
   Plaintiff is granted thirty days from the date of
   entry of this order to amend its complaint as
   follows: (1) to plead its claims under the UTPA
   and Unjust Enrichment with particularity as
   required by M.R.Civ.P. 9(b), including a clear
   statement of Plaintiff's reliance on Defendant's
   misrepresentations,        and       what       those
   misrepresentations were, (2) to plead Plaintiff's
   damages under the UTPA in sufficient detail to
   determine    whether    Plaintiff's   damages   are
   substantial, and (3) to amend the basis for its unjust
   enrichment claim to allege that it is Defendant's
   fraudulent conduct which makes Defendant's
   retention of the benefit conferred on it by Plaintiff
   inequitable. To the extent the unjust enrichment
   claim seeks recovery solely on the basis of the
   product's alleged deficiencies, it is dismissed.
   Defendant's motion to dismiss shall be granted if
   Plaintiff fails to amend his complaint within 30
   days in the foregoing manner.

 Not Reported in A.2d, 2006 WL 381832 (Me.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT F**



**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.
Paul FERRONE et al.,
v.
John RESNICK, Trustee of the Nathan A. Resnick Trust.
**No. CV000443779S.**

Feb. 25, 2002.

Purchasers of house filed complaint against vendor, alleging breach of contract, unjust enrichment, and other theories. After trial to the court, the Superior Court, Frank S. Meadow, Judge Trial Referee, held that: (1) payment of sewer-use charges by purchasers did not demonstrate understanding that house was connected to public sewer line; (2) vendor's testimony did not establish mutual mistake regarding type of sewer system; (3) vendor was not unjustly enriched; (4) provision in deed did not create implied warranty that property was connected to public sewer line; and (5) causes of action accrued when parties signed purchase and sale contract.

Judgment entered in favor of defendant.

West Headnotes

**[1] Vendor and Purchaser** ⊃60.1
400k60.1 Most Cited Cases
Payment of sewer-use charges by purchasers at time of sale of house did not demonstrate an understanding between vendor and purchasers that house was connected to public sewer line, and thus vendor did not breach contract of sale, even though house had private septic system, and even though warranty deed stated that sale of house was subject to any currently existing sewer use charges, where physical inspection of house was performed on behalf of purchasers, and supplement to purchase agreement, which was prepared as result on inspection, did not mention sewer system.

**[2] Reformation of Instruments** ⊃19(2)
328k19(2) Most Cited Cases

Vendor's testimony that he did not have any idea whether property sold to purchasers was connected to public sewer line did not establish mutual mistake between vendor and purchasers, who did not know that property had private septic system, regarding type of sewer system on property, and thus contact for sale of property would not be reformed.

**[3] Implied and Constructive Contracts** ⊃3
205Hk3 Most Cited Cases
Vendor, in selling house with private septic system to purchasers who believed house was connected to public sewer line, did not receive a benefit for which he did not pay and thus was not unjustly enriched, although purchasers would have reduced offer to purchase to compensate for cost of connecting house to public sewer line if they had known about private septic system, since sale benefitted both vendor and purchasers.

**[4] Covenants** ⊃48
108k48 Most Cited Cases
Provision in warranty deed that purchasers were taking property subject to "sewer-use charges as may exist" did not create implied warranty that property was connected to public sewer line.

**[5] Limitation of Actions** ⊃46(9)
241k46(9) Most Cited Cases

**[5] Limitation of Actions** ⊃49(1)
241k49(1) Most Cited Cases

**[5] Limitation of Actions** ⊃49(7)
241k49(7) Most Cited Cases
Purchasers' causes of action against vendor of property for breach of contract, mutual mistake, unjust enrichment, and breach of warranty accrued, and six-year limitations period began to run, when parties signed purchase and sale contract. C.G.S.A. § 52-576.

**[6] Limitation of Actions** ⊃24(6)
241k24(6) Most Cited Cases

**[6] Limitation of Actions** ⊃28(1)
241k28(1) Most Cited Cases
Purchaser's claims against vendor of property for mutual mistake, unjust enrichment, and breach of warranty were based on parties' purchase and sale

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 2002 WL 442314 (Conn.Super.)
**(Cite as: 2002 WL 442314 (Conn.Super.))**

contract, and therefore statute of limitations was six years. C.G.S.A. § 52-576.

**[7]** Limitation of Actions ☞99(1)
241k99(1) Most Cited Cases
Purchasers' cause of action against vendor of property for misrepresentation accrued, and three-year limitations period began to run, when parties signed purchase and sale contract. C.G.S.A. § 52-577.

MEMORANDUM OF DECISION

FRANK S. MEADOW, Judge Trial Referee.

*1 On or about November 30, 1995, the plaintiffs, Paul Ferrone and Cathy Ferrone, entered into a purchase and sale contract with the defendant, John Resnick, as trustee of the Nathan A. Resnick Trust, to purchase a single family house located at 180 Westwood Road, New Haven, Connecticut. On March 15, 1996, the parties closed on the property. At the closing, the usual adjustments were made, including adjustments for sewer use charges in the amount of $5.44, which were paid by the plaintiffs. The plaintiffs paid the purchase price of $143,000 and the defendant provided the plaintiffs with a warranty deed to the property.

The plaintiffs allege that they believed the property they purchased was connected to the public sewer line. However, on or about July 10, 1999, the plaintiffs learned that the property was served by a private septic system when the system stopped functioning. As a result, the plaintiffs removed the septic tank and installed a sewer system connected to the public sewer line. [FN1]

> FN1. The plaintiffs introduced bills from Bob's # 1, Inc., d/b/a CT Sewer Service, to show the repairs made and the money expended.

The plaintiffs filed a two-count complaint against the defendant on October 4, 2000. Subsequently, on April 30, 2001, the plaintiffs filed a five count second amended complaint, alleging breach of contract, material misrepresentation of fact, mutual mistake, unjust enrichment, and breach of implied warranty.

On October 23, 2001, the defendant filed an answer to the plaintiffs' second amended complaint, raising the statute of limitations and good faith reliance as special defenses.

This case was tried to the court on October 23, 2001.

Both parties submitted post-trial briefs.

PLAINTIFFS' COMPLAINT

[1] Count one alleges breach of contract by the defendant. The plaintiffs allege that the defendant breached the purchase and sale contract because the defendant sold the plaintiffs the property with a private septic system, not property with a connection to the public sewer service. The plaintiffs argue that since it is undisputed that they paid sewer use charges at the time of the closing, such payment demonstrates an understanding between the parties that the property was connected to the public sewer line. The plaintiffs rely on a phrase contained in the warranty deed which states that the premises were subject to "such current water and sewer-use charges as may exist" to argue that the payment of the sewer use charges were part of the consideration for the deed.

In opposition, the defendant argues that he fulfilled his contractual obligations to the plaintiffs. Specifically, the defendant argues that the plaintiffs contracted to purchase the property from the defendant and the defendant sold the property to the plaintiffs; therefore, there was no breach of contract.

An action for breach of contract requires proof of three elements: "(1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party and (4) damages." (Citation omitted; internal quotation marks omitted.) *McHenry v. Lubell*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 346842 (August 2, 2001, Skolnick, J.). "The general rule of damages in a breach of contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed." (Internal quotation marks omitted.) *Gazo v. Stamford*, 255 Conn. 245, 264, 765 A.2d 505 (2001).

*2 In the present case, the plaintiffs have not met their burden of proving a breach of contract. While it is undisputed that the plaintiffs and the defendant entered into a contract for the purchase and sale of the property, the testimony presented at trial does not demonstrate that the defendant failed to perform any of his contractual obligations.

Furthermore, paragraph B of the sales contract states that "[buyer] represents that [buyer] has examined the real property and is satisfied with the physical condition thereof ... and neither [seller] nor any representative of the [seller] has made any representation or promise other than those expressly

Not Reported in A.2d                                      Page 3
Not Reported in A.2d, 2002 WL 442314 (Conn.Super.)
**(Cite as: 2002 WL 442314 (Conn.Super.))**

stated herein upon which [buyer] has relied in making this [a]greement."

Paragraph I of the contract also indicates that "[seller] agrees to permit [buyer's] designees to physically inspect the real property ..." It is important to note that a physical inspection of the property was performed on behalf of the plaintiffs (Exhibit B) and that as a result of the inspection, there was a supplement to the agreement (Exhibit A) indicating work that the plaintiffs required that the defendant perform prior to the closing. There is no mention of the sewer system on either the inspection report or the subsequent supplement to the agreement.

Accordingly, judgment is entered on Count One for the defendant.

In Count Two, the plaintiffs allege that the defendant made material misrepresentations of fact. The plaintiffs allege that during the negotiations prior to the closing, the defendant and the defendant's real estate agent represented to the plaintiffs that the "sanitary sewer system was in good working order." The plaintiffs failed to introduce any evidence of the statements allegedly made by the defendant or his real estate agent.

An actionable misrepresentation of fact has occurred when a party misrepresents an existing fact, thereby inducing another party to enter into a contract. "[A] plaintiff asserting a claim ... [for fraudulent or negligent misrepresentation] must first prove a false statement or false representation on the part of defendant ." *Citino v. Redevelopment Agency,* 51 Conn.App. 262, 276, 721 A.2d 1197 (1998).

In the present case, the defendant's testimony demonstrates that he did not know what type of sewer system serviced the property. Moreover, the plaintiff, Paul Ferrone, testified that he did not meet the defendant until the day of the closing. The plaintiffs have failed to introduce evidence of any alleged false statements or false representations made by the defendant. Accordingly, judgment is entered in favor of the defendant on the second count.

[2] Count three alleges that there was a mutual mistake regarding the type of sewer system on the property and, therefore, the plaintiffs are entitled to have the contract reformed. The plaintiffs argue that both the plaintiffs and the defendant believed that the property was served by a public sewer line and not a private septic system. The defendant, however, argues that there is no evidence to prove that the

defendant ever stated that he had knowledge that the property was connected to the public sewer system.

**\*3** A mutual mistake exists "where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction ..." (Citations omitted; internal quotation marks omitted.) *Derby Savings Bank v. Oliwa,* 49 Conn.App. 602, 604, 714 A.2d 1278 (1998). "A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as a result of mutual mistake ..." (Citations omitted; internal quotation marks omitted.) *Id., at 603, 714 A.2d 1278.*

The "factual predicate necessary for a trial court's finding of mutual mistake ... is that [a] plaintiff ... ha[s] to prove that *both* parties bargained based upon the same mistaken understanding." (Emphasis in original.) *HLO Land Ownership Associates Ltd. Partnership v. Hartford,* 248 Conn. 350, 359 n. 10, 727 A.2d 1260 (1999).

In the present case, the plaintiffs did not introduce any evidence to prove that a public sewer connection was bargained for by the parties as part of the purchase and sale contract. Furthermore, the plaintiffs have failed to prove that the defendant mistakenly believed that the property was connected to the public sewer line. The plaintiffs have not established that "*both* parties bargained based upon the same mistaken understanding." (Emphasis in original.) *HLO Land Ownership Associates Ltd. Partnership v. Hartford, supra,* 248 Conn. at 359 n. 10, 727 A.2d 1260. The defendant testified that he "[n]ever thought about it" and that he "[did not] have any idea" whether the property was connected to the public sewer line.

The plaintiffs have failed to establish a mutual mistaken understanding. The court will not rewrite the contract. Judgment is entered in favor of the defendant as to this count.

[3] In count four, the plaintiffs allege that the defendant has been unjustly enriched to the detriment of the plaintiffs because had the plaintiffs known that the property was not connected to the public sewer line, they would have reduced their offer of purchase to compensate them for the cost to connect to the public sewer line. The plaintiffs argue that even if the

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 442314 (Conn.Super.)
**(Cite as: 2002 WL 442314 (Conn.Super.))**

Page 4

court finds that there is no breach of an implied warranty or no mutual mistake, the court should provide the plaintiffs with a remedy based on unjust enrichment because the defendant was unjustly enriched as a result of selling the property on the basis that it was connected to the public sewer line.

In opposition, the defendant argues that the plaintiffs paid the defendant the negotiated purchase price for the property and they received a warranty deed to the property in exchange for the purchase price; therefore, there is no unjust enrichment because "the plaintiffs did not bestow any benefit on the defendant and the defendant did not fail to pay the plaintiffs for any benefit."

**\*4** To recover under a theory of unjust enrichment, the plaintiffs must prove the following elements: "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefit, and (3) that the failure of payment was to the plaintiffs' detriment ..." (Citation omitted; internal quotation marks omitted in original.) *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 283, 649 A.2d 518 (1994).

In the present case, the plaintiffs have not satisfied all of the elements necessary to recover for unjust enrichment. Specifically, there was no evidence presented at trial to prove that the defendant received a benefit for which he did not pay. The sale mutually benefited both parties and, therefore, there is no unjust enrichment. Accordingly, judgment is entered on count four in favor of the defendant.

[4] In count five, the plaintiffs allege that the defendant breached an implied warranty contained in the deed because the property had a private septic system. Specifically, the plaintiffs allege that the "language in the deed constituted an implied warranty that the property was served by public sewer service, since the fact that the property was served by public sewer service was a condition precedent to the [p]laintiffs being obligated to pay sewer use charges on the property." The plaintiffs argue that the language contained in the deed stating that the defendant agreed to convey the property by "good and sufficient Warranty Deed ... subject to sewer use charges and current sewer assessment balance, if any" created an implied warranty that the property was connected to the public sewer line.

In opposition, the defendant argues that the "usual meaning of the pertinent words" contained in the deed cannot be interpreted to mean that the property

was served by a public sewer system and, therefore, the defendant did not breach any of the warranties in the deed. In support of his argument, the defendant relies on language in the deed which states that the premises were subject to "current ... sewer-use charges as *may exist.*" (Emphasis added.)

"In construing a deed, a court must consider the language and terms of the instrument as a whole. [The] basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed or other conveyance, and that it shall, if possible, be so construed as to effectuate the intent of the parties ..." (Citations omitted; internal quotation marks omitted.) *Hare v. McClellan,* 234 Conn. 581, 593, 662 A.2d 1242 (1995).

In the present case, the plaintiffs have not introduced any evidence to show that the intention of the parties was that the subject property be connected to the public sewer service. The plaintiff's trial testimony simply demonstrates that plaintiffs *assumed* that the property was connected to the public sewer line. Furthermore, the language of the deed does not indicate that any warranties were being made with regard to the sewer system. To the contrary, the deed states that the plaintiffs were taking the property subject to "sewer-use charges *as may exist.*" (Emphasis added.) Accordingly, judgment shall enter on count five in favor of the defendant.

### DEFENDANT'S SPECIAL DEFENSE

**\*5** The defendant raised the statute of limitations as a special defense. The defendant alleges that if the causes of action in the plaintiffs' operative complaint sound in negligence, they are barred by a three year statute of limitations. If the plaintiffs' claims sound in tort, the defendant alleges that the causes of action are barred because they did not accrue within the statutory period of three years. The defendant also alleges that if the plaintiffs are seeking the performance of an executory agreement, such cause of action is barred by the applicable one-year statute of limitation. Although it has been determined that judgment will enter in favor of the defendant on all five counts, the court will nonetheless address the statute of limitations issue.

[5][6] "No action ... on any contract in writing, shall be brought but within six years after the right of action accrues." General Statutes § 52-576. In the present case, the parties signed the purchase and sale contract on November 30, 1995. The plaintiffs filed their original complaint on October 4, 2000. Therefore, the plaintiffs' contract based claims for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                         Page 5
Not Reported in A.2d, 2002 WL 442314 (Conn.Super.)
**(Cite as: 2002 WL 442314 (Conn.Super.))**

breach, mutual mistake, unjust enrichment, and breach of warranty are not barred by the statute of limitations. [FN2] However, as discussed above, the plaintiffs failed to prove their case on the merits and, therefore, judgment is entered for the defendant with regard to the three contract based claims.

> FN2. The defendant incorrectly argues in his brief that the claims for mutual mistake, unjust enrichment, and breach of warranty are barred by a three-year statute of limitations. These claims are contract based and, therefore, the statute of limitations is six years.

[7] "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." General Statutes § 52-577. Even if the plaintiffs had proven misrepresentation, their claim would be barred by the statute of limitations because they did not file their claim within the three year period after the signing of the contract.

For the foregoing reasons, judgment shall enter on the complaint in favor of the defendant on all counts.

Not Reported in A.2d, 2002 WL 442314 (Conn.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: 2004 WL 3030037 (Vt.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Vermont, Chittenden County.
Anthony J. FUCILE
v.
VISA U.S.A. INC. and Mastercard International, Inc.
No. S1560-03 CNC.

Dec. 27, 2004.

John T. Sartore of Paul Frank & Collins, P.C., Burlington, VT; Stephen V. Bomse and David M. Goldstein of Heller Ehrman White & McAuliffe LLP, San Francisco, CA; Robert C. Mason of Arnold & Porter LLP, New York, NY, for Defendant Visa U.S.A. Inc.

Samuel Hoar, Jr. of Dinse, Knapp & McAndrew, Burlington, VT; Kenneth A. Gallo and Patricia C. Crowley of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; Gary R. Carney and Randi D. Adelstein of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant MasterCard International Incorporated.

Robert A. Mello of Mello & Klesch, LLP, South Burlington, VT; David Markun, Edward S. Zusman and Kevin Eng of Markun Zusman Compton & David, LLP, San Francisco, CA, for Plaintiffs.

ENTRY

NORTON, J.

**\*1** The plaintiff, Anthony J. Fucile, sues Visa and Mastercard on behalf of himself and all similarly situated individuals for damages incurred by purchasing products sold by merchants who used the defendants' debit card services. Mr. Fucile claims that because of the defendants' antitrust violations, merchants were forced to pay higher costs for the use of debit cards. The merchants, in turn, passed these costs along to consumers through the price of the goods they sold. Mr. Fucile brings this action under the Vermont Consumer Fraud Act. The defendants move to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6)

of the Vermont Rules of Civil Procedure. Because Mr. Fucile lacks standing under the Consumer Fraud Act, the court dismisses his complaint.

This action stems from a class action in the U.S. District Court for the Eastern District of New York. In that action, a class of retailers sued Visa and Mastercard for antitrust violations, claiming that the two defendants illegally required retailers to accept debit card services along with credit card services. The parties settled before trial, resulting in more than $3 billion in damages and injunctive relief worth between $25 billion to $87 billion. See generally *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F.Supp.2d 503 (E.D.N.Y.2003).

Mr. Fucile now seeks damages as a consumer from merchants affected by the antitrust violations at issue in the prior class action litigation, claiming that these violations constituted an unfair method of competition within the meaning of 9 V.S.A. § 2453(a). Mr. Fucile claims standing to bring this claim not as a purchaser, because he did not actually purchase the financial services from the defendants, but as an "indirect purchaser."

The defendants, however, argue that Mr. Fucile is neither a direct purchaser nor an indirect purchaser. Rather, he is a "non-purchaser," because he did not actually receive the financial services that were affected by the defendants' antitrust violation. Mr. Fucile merely complains about prices of goods that may or may not have been affected by the price of the defendants' financial services. Therefore, the defendants argue, he lacks standing.

A motion to dismiss for failure to state a claim upon which relief can be granted will issue only if it is beyond doubt that there exists no facts or circumstances that entitle a plaintiff to relief. *Powers v. Office of Child Support,* 173 Vt. 390, 395 (2002). In a motion to dismiss, the court assumes all facts that a plaintiff pleads are true and disregards all of a defendant's contrary assertions. *Id.* Here, the dispositive issue is whether a person in Mr. Fucile's position, having not actually acquired the product or service that is alleged to be tainted by unlawful trade, can seek damages under the Consumer Fraud Act. Because this standing issue is one of law, it is appropriate for disposition on a motion to dismiss for failure to state a claim upon which relief can be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
(Cite as: 2004 WL 3030037 (Vt.Super.))

granted. See, e.g., *Parker v. Town of Milton,* 169 Vt. 74, 76- 79 (1998).

 **\*2** The Consumer Fraud Act, literally read, provides limitless standing to any consumer. See 9 V.S.A. § 2451a(a) (defining consumer as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services"). Courts will not, however, interpret statutes in a manner that leads to "absurd results manifestly unintended by the Legislature." *In re G.T.,* 170 Vt. 507, 517 (2000). Although courts should interpret the Consumer Fraud Act liberally in order to serve its remedial purpose, courts should not "so freely stretch its meaning as to evade the Legislature's intent." *Wilder v. Aetna Life & Cas. Ins. Co.,* 140 Vt. 16, 19 (1981). Thus, the court must define some limits to who may have standing to sue under the Consumer Fraud Act.

 Although federal courts have limited antitrust actions to "direct purchasers" of goods or services, see *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977), Vermont has expressly disagreed with this limitation and allowed indirect purchaser suits under state law. See 9 V.S.A. § 2465(b); *Elkins v. Microsoft Corp.,* 174 Vt. 328, 337-38. (2002). But the standing issue in the instant case is a separate matter from the indirect purchaser issue. Indeed, the *Illinois Brick* Court did not address standing, stating that the indirect purchaser issue "is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages." *Illinois Brick,* 431 U.S. at 728 n. 7. Despite his claim that he qualifies as an "indirect purchaser," Mr. Fucile is far more remote than the plaintiff in *Elkins.* In *Elkins,* the plaintiff had actually acquired the product that was allegedly tainted by unfair methods of competition. See *Elkins,* 174 Vt. at 333. Here, Mr. Fucile never actually purchased the tainted financial services, but merely claims damages through the purchase of other products, the price of which may or may not have been affected by the financial services. Therefore, despite Vermont's indirect purchaser rule, the court must still determine if Mr. Fucile has standing given his remote relationship to the alleged wrongdoing.

 Federal courts have generally split into two camps with respect to antitrust standing. Some courts have opted for the "direct injury" test, which focuses on the relationship between the parties. Under this test, if the plaintiff is separated by intermediate victims, courts usually deny standing. See Annotation, *"Target Area" Doctrine as Basis For Determining Standing to Sue Under § 4 of Clayton Act (15*

*U.S.C.A. § 15) Allowing Treble Damages For Violation of Antitrust Laws,* 70 A.L.R. Fed. 637, § 2[a]. Other courts have used the "target area" test, which focuses on the general area of the economy injured by the antitrust violator. See *id.*

 The Supreme Court has not endorsed either test, but it has provided factors that lower courts should consider in determining standing. *Associated Gen. Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519, 537 n. 33 (1983). These factors include (1) whether there is a causal connection between the antitrust violation and the alleged harm, *id. at 537;* (2) the directness of the injury, considering the "chain of causation," *id. at 540;* (3) whether the violator had an improper motive, *id. at 537 and n. 35;* (4) whether the plaintiff's injury was of a type that Congress sought to redress by providing a private remedy, *id. at 538;* (5) whether the alleged damages are speculative, *id. at 542;* and (6) whether the nature of the action will keep "the scope of complex antitrust trials within judicially manageable limits," *id. at 543.*

 **\*3** Simply by glancing at these factors, one can see that the Court did not pull them from thin air. Rather, they reflect the Court's standing factors to determine whether a case or controversy exists, pursuant to Article III of the Constitution. [FN1] The three primary factors in this context are (1) injury, (2) causation, and (3) redressibility. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). The Vermont Supreme Court has expressly adopted these factors in other contexts. See, e.g., *Agency of Natural Resources v. U.S. Fire Ins. Co.,* 173 Vt. 302, 306 (2001). Although the Vermont Consumer Fraud Act has broader remedial purposes than federal statutes, the court nevertheless believes that the Vermont Supreme Court would also draw upon the standing factors in *Associated General Contractors* for guidance, at least to the extent that these factors are consistent with allowing "indirect purchaser" standing.

> FN1. The Court has noted that antitrust standing is somewhat different from constitutional standing because it requires additional considerations, but both share the same basic requirements. See *Associated Gen. Contractors,* 459 U.S. at 535 n .31.

 Therefore, in applying the general factors of *Associated General Contractors,* the court holds that Mr. Fucile does not have standing in this case. First, the causal chain here is simply too long. Mr. Fucile's damages are through an alleged inflated cost of goods

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
(Cite as: 2004 WL 3030037 (Vt.Super.))

sold by merchants who were injured by the defendants' inflated cost of financial services. He would have to demonstrate that the merchants actually passed their costs along to consumers through the price of their goods, rather than absorbing them by other means. The court would need to consider all other potential causes of inflated costs, such as any number of supply problems that affected the price of each different product the plaintiff class bought in Vermont during the relevant time period. This exercise in speculation extends far beyond a court's abilities. Although causation may be indirect, given the indirect purchaser rule in Vermont, it cannot extend beyond a reasonable length, as it does here. Thus, factors (1) and (2) weigh against standing.

Second, the defendants' intent in this case weighs in favor of standing. Although the complaint is unclear as to the defendants' intent to violate antitrust law, the extent of money that the defendants allegedly made because of their tying arrangement demonstrates that their actions were intentional. Moreover, the defendants are associations providing financial services to thousands of banks. One cannot imagine that they lack familiarity with antitrust laws in conducting their business, so inferring intent here is appropriate. Therefore, factor (3) weighs in favor of standing for Mr. Fucile.

Third, the injury here does not appear to be a type that the Legislature intended to redress through the Consumer Fraud Act. Although, as the Vermont Supreme Court has stated many times, courts should construe the Act liberally to effectuate its remedial purpose, the court cannot imagine that the Legislature intended the Act to redress injuries to all consumers, even those whose contact to the goods or services tainted by unfair competition is remote and tangential. One could divine any number of hypothetical scenarios analogous to this case that highlight the absurdity of allowing standing under these circumstances.

**\*4** For instance, assume the plaintiff in *Elkins* was not a computer purchaser, but a client whose attorney provided legal services using Microsoft software. The client could claim that her bill was slightly higher because the attorney was forced to pay a higher price for the software because of Microsoft's antitrust violations. Whether or not the client's alleged injury is accurate, the court cannot reasonably assume that the Legislature intended the Consumer Fraud Act to extend limitlessly. As Justice Brennan acknowledged in his *Illinois Brick* dissent, "[t]here is, of course, a

point beyond which antitrust defendants should not be held responsible for the remote consequences of their actions." 431 U.S. at 749 n. 2. The plaintiff here extends far beyond this point. Thus, factor (4) weighs against standing.

Finally, the alleged damages are highly speculative. Assuming that the merchants actually passed along added expenses in the price of goods sold, the court would need to determine the degree to which these expenses were passed along. This degree may vary from one good to another. For instance, merchants may pass on greater costs in product markets that are relatively inelastic and fewer costs in product markets that are relatively elastic. See *Illinois Brick*, 431 U.S. at 750 n. 3 (Brennan, J., dissenting). The court would then have to determine actual sales of goods to the plaintiff class during the relevant time period. Consumer fraud cases typically venture into the field of approximation, see *id.* at 758--59 (Brennan, J., dissenting), but these alleged damages venture into uncharted territories of sheer guesswork. Factors (5) and (6) therefore weigh against standing.

Tallying the above analysis, the court grants the defendants' motion to dismiss. The court also notes that even should the Vermont Supreme Court ultimately adopt a different standard than that in *Associated General Contractors,* such as the "target area" test as it existed prior to *Associated General Contractors,* this court would still dismiss. In its most liberal manifestation, the target area test considered not only whether an antitrust violator's actions were aimed at a particular sector of the market, but whether the violator could have foreseen that its actions would affect the sector. See, e.g., *Mulvey v. Samuel Goldwyn Prod., 433 F.2d 1073, 1076 (9th Cir.1970)*; see also *Hlinois Brick, 431 U.S. at 760 and n. 18* (Brennan, J., dissenting) (discussing "more liberal" target area test). Even under this test, Mr. Fucile lacks standing. The defendants could not be expected to foresee an antitrust violation affecting merchants to result in increased cost of goods throughout the entire consumer base and to so injure that consumer base as to result in liability to every consumer in the country. General consumers were not the target area of the defendants' actions; merchants were. Therefore, the court would grant the defendants' motion using this test, as well.

**\*5** Finally, the court briefly addresses Mr. Fucile's request that the court permit an amended answer to allow a narrower class, defined as those consumers who used debit cards in their transactions. The court denies this request, as it would not result in a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: 2004 WL 3030037 (Vt.Super.))**

different ruling. Mr. Fucile lacks standing because his
injury--as a general consumer of products that are not
directly related to the defendants' financial services--
is too remote. Whether he used a debit card, a credit
card, a check, or cash is irrelevant. His injury would
still be that of a general consumer, and he would lack
standing.

### ORDER

For the foregoing reasons, the defendant's motion to
dismiss is GRANTED.

### JUDGMENT FOR DEFENDANTS

The court having

granted the defense motion for
    dismissal

judgment is entered for defendants, this action is
dismissed.

Not Reported in A.2d, 2004 WL 3030037
(Vt.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>EXHIBIT H</u>**



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases P 74,722
**(Cite as: 2005 WL 323750 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
H-QUOTIENT, INC., Plaintiff,
v.
KNIGHT TRADING GROUP, INC. and Knight
Securities, L.P., Defendants.
**No. 03 Civ. 5889(DAB).**

Feb. 9, 2005.

*MEMORANDUM AND ORDER*

BATTS, J.

**\*1** Before the Court is a Motion to Remand to the Supreme Court of the State of New York, County of New York by Plaintiff H-Quotient, Inc. ("H-Quotient"). Plaintiff also seeks to recover the costs incurred as a result of the removal.

For the reasons stated herein, Plaintiff's Motion to Remand is DENIED and Plaintiff's Request for the Recovery of Costs is DENIED.

### I. BACKGROUND

Plaintiff H-Quotient, a Virginia corporation, is a developer and publisher of software producers for the hospital and health care industry. (Compl.¶ ¶ 1- 2.) Plaintiff's common stock is publicly traded and quoted on the Over the Counter Bulletin Board ("OTCBB"), an electronic trading service used by many small companies, that transmits real-time information of over-the-counter securities. OTCBB is operated and regulated by the National Association of Securities Dealers ("NASD"), a not-for-profit, self-regulatory organization of the securities industry authorized to do business in New York. (Id.¶ ¶ 9-10.)

Defendants Knight Trading Group, Inc. and Knight Securities, L.P. (collectively "Defendants"), Delaware organizations authorized to do business in New York and with their principal places of business in New Jersey and New York, acted as a broker and dealer for securities of companies quoted on the OTCBB. (Id.¶ 3, 4, 11.) Defendants served as market makers for the stock of Plaintiff, [FN1] which

involved "act[ing] on behalf of other brokerage houses by contracting with other stock brokerages to buy and sell Plaintiff's stock on behalf of such other stock brokerage's clients." (Id.¶ 15.) Simply put, Defendants held a certain number of shares of Plaintiff's stock in order to facilitate trading of the stock.

> FN1. T.D. Waterhouse Investor Services, Inc. and T.D. Waterhouse Capital Markets, Inc. also acted as a market maker for Plaintiff's stock. Claims against them were dismissed by Order of Dismissal, dated Dec. 3, 2003.

Plaintiff commenced this action in New York State Supreme Court, County of New York on July 29, 2003. [FN2] The Complaint alleges that Defendants took part in "the improper and illegal 'naked short' sale of Plaintiff's stock and the 'front-running' of Plaintiff's stock, *i.e.*, executing orders for their own account before filling orders received by customers, all to the detriment of Plaintiff, Plaintiff's stockholders and to the market for Plaintiff's stock in general." (Id.¶ 18.)

> FN2. On or about that same day, Plaintiff made an application by Order To Show Cause to Justice Karla Moskowitz, seeking a preliminary injunction to refrain Defendants from engaging in certain securities practices. Justice Moskowtiz signed the Order on July 31, 2003.

The Complaint raises three causes of action that sound in New York common law of torts, namely breach of duty to deal honestly with Plaintiff, attempt to damage the business of Plaintiff, and attempt to injure the character and business reputation of Plaintiff. Plaintiff also alleges a violation of New York General Business Law § 340, a New York antitrust statute known as the Donnelly Act.

On August 6, 2003, Defendants timely filed a Notice of Removal to the United States District Court for the Southern District of New York. Defendants assert that there is federal jurisdiction over this matter because the above-mentioned claims actually arise under federal securities and antitrust laws. Plaintiff filed the present Motion to Remand on September 16, 2003, pursuant to 28 U.S.C. § 1447. Plaintiff also

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722
**(Cite as: 2005 WL 323750 (S.D.N.Y.))**

seeks to recover the costs incurred as a result of the removal. Defendants filed their Memorandum in Opposition to the Motion to Remand on January 27, 2004.

## II. DISCUSSION

### A. Legal Standards

**\*2** "[A]ny civil action brought in a State court of which the districts courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the ... district and division embracing the place where such action is pending." *28 U.S.C. § 1441(a).* "Absent diversity of citizenship, federal-question jurisdiction is required." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987); *see also* 28 U.S.C. § 1441(b); *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6 (2003). Any doubts as to whether federal jurisdiction exists are to be resolved against removability. *Lupo v. Human Affairs Int'l,* 28 F .3d 269, 274 (2d Cir.1994) (quoting *Solmlyo v. J. Lu-Rob Enters., Inc.,* 932 F.2d 1043, 1045-46 (2d Cir.1991)). Furthermore, the party seeking removal bears the burden of establishing federal jurisdiction. *See United Food & Commercial Workers Union v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994).

Federal jurisdiction exists when a "case falls within the original 'federal question' jurisdiction of the United States district courts." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 8 (1983); *Perpetual Sec., Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir.2002). Federal district courts "have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also Beneficial Nat'l Bank,* 539 U.S. at 6.

The presence of federal question jurisdiction is governed by the well-pleaded complaint rule. *See Metro. Life Ins. Co. v. Taylor,* 481 U.S. at 58, 63 (1987). "[W]hether a case is one arising under the Constitution or a law or treaty of the United States, ... must be determined from what necessarily appears in the plaintiff's statement of his own claim ... unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson,* 234 U.S. 74, 75-76 (1914); *see also Caterpillar Inc.,* 482 U.S. at 392 (1987). If a complaint only "alleges ... state law based causes of action, it cannot be removed from state court to federal court even if there is a federal defense." *Hernandez v. Conriv Realty Associates,* 116 F.3d 35, 38 (2d Cir.1997) (citing *Caterpillar Inc.,*

482 U.S. at 392-93); *see Franchise Tax Bd.,* 463 U.S. at 14 ("since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case."). The well-pleaded complaint rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar,* 482 U.S. at 392.

Two exceptions exist to the well-pleaded complaint rule: the complete preemption [FN3] and artful pleading doctrines. [FN4]

> FN3. Courts often comment that the complete preemption doctrine is not really an exception to the well-pleaded complaint rule, but rather a corollary, because whenever the doctrine applies, the well-pleaded complaint rule is satisfied. *Caterpillar,* 482 U.S. at 393; *Marcus v. AT & T Corp.,* 138 F.3d 46, 53 (2d Cir.1998).

> FN4. The artful pleading doctrine is also more properly styled a "corollary" rather than an exception.

**\*3** In certain instances, courts have found that Congress "so completely preempt[ed] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life,* 481 U.S. at 63-64. Therefore, in such cases, removal is proper under 28 U.S.C. § 1441(b), which authorizes any claim that "arises under" federal law to be removed to federal court. *See Beneficial Nat'l Bank,* 539 U.S. at 8; *Caterpillar,* 482 U.S. at 392-93. The Supreme Court has found complete preemption in only three categories of cases: (1) certain claims under the Labor Management Relations Act, *see Beneficial Nat'l Bank,* 539 U.S. at 8; (2) suits brought by a beneficiary under Employment Retirement Income Security Act of 1974, *see id.;* and (3) Indian land grant rights, *see Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666-67 (1974). Recently, the Second Circuit also found complete preemption for cases arising under the Securities Litigation Uniform Standards Act. *See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 124 n. 5 (2d Cir.2003). The Court of Appeals noted, however, that "the complete preemption doctrine must be applied sparingly and with great restraint." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722
**(Cite as: 2005 WL 323750 (S.D.N.Y.))**

Another "exception" to the well-pleaded complaint rule is the artful pleading doctrine. Under this doctrine, a plaintiff may not avoid removal "by framing in terms of state law a complaint the real nature of [which] is federal, ... or by omitting to plead necessary federal questions in a complaint." *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 486-87 (2d Cir.1998) (quoting *Derrico v. Sheehan Emergency Hosp.,* 844 F.2d 22, 27 (2d Cir.1988)); *see also Marcus,* 138 F.3d at 55-56. Thus, removal is proper if "the elements of the [state law] claim [a]re virtually identical to those of a claim expressly grounded on federal law." *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 760 (2d Cir.1986); *see also In re NASDAQ Market Makers Antitrust Litigation,* 929 F.Supp. 174, 178 (S.D.N.Y.1996) (interpreting *Sarkisian* ).

Where there is a proper basis for removal, a federal district court has jurisdiction over the civil action as well as supplemental jurisdiction over "all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The district court, however, may decline to exercise supplemental jurisdiction over a claim if (1) the claim raises novel or complex issues of state law, (2) the state law claim "substantially dominates" over the federal claim, (3) the district court has dismissed all federal claims, or (4) there are other compelling reasons to decline jurisdiction. 28 U.S.C. § 1367(c)(1)-(4).

**B. Analysis**

In the present case, Plaintiff argues that this Court lacks subject matter jurisdiction and therefore must remand the action back to state court. Defendants bear the burden of demonstrating that this case is properly in federal court.

**\*4** Although the Parties in this case are diverse, removal is not proper based on diversity jurisdiction because Defendant Knight Trading Group, Inc. is a citizen of New York. *See* 28 U.S.C. § 1441(b) ("Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."). Therefore, Defendants must show that this Court has federal question jurisdiction over the subject matter of this action.

Defendants argue that federal question jurisdiction exists for the following reasons: (1) Plaintiff's claims based on naked short-selling arise under federal securities law, (2) Congress has completely preempted Plaintiff's claims with federal securities laws, and (3) Plaintiff has artfully pleaded an alleged federal antitrust violation as a claim under New York's Donnelly Act.

**1. The Donnelly Act and Federal Antitrust Violation**

Defendants argue that Plaintiff artfully pleaded its state antitrust claim under the Donnelly Act to prevent a federal claim under the Sherman Act, 15 U.S.C. § 7 *et seq.* According to Defendants, interstate commerce dominates the allegations in Plaintiff's complaint and Plaintiff makes no contentions that intrastate conduct, namely New York's local interests, were at all affected by Defendants' conduct. In Defendants' views, the resolution of this claim will turn upon a determination of whether it violated federal law by conducting an interstate conspiracy to restrain trade in an over-the-counter securities exchange market.

According to the Donnelly Act, contracts, or agreements for monopoly or in restraint of trade are illegal and void for those monopolies "in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. General Business Law § 340(1).

The New York Court of Appeals has not clearly laid out in what circumstances the Donnelly Act is preempted by the federal antitrust trust, the Sherman Act. However, New York courts have determined that "Where the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce, it is clear that federal antitrust laws operate to preempt the field and oust state courts of jurisdiction." *Two Queens, Inc. v. Scoza,* 745 N.Y.S.2d 517, 519 (1st Dep't.2002); *see also In re Wiring Device Antitrust Litigation,* 498 F.Supp. 79, 82 (E.D.N.Y.1980) (stating that where interstate commerce is involved, federal antitrust laws preempt the Donnelly Act) (citing *Beltone Electronics Corp. v. Selbst,* 1977-2 Trade Cases CCH PP 61,586, 72,387 (Sup.Ct.N.Y.Co.1977), *aff'd mem.,* 403 N.Y.S.2d 1019 (1st Dep't.1978)); *Flood v. Kuhn,* 443 F.2d 264, 268 (2d Cir.1971), *aff'd,* 407 U.S. 258 (1972) (court held that because burden on interstate commerce outweighs states' interests in regulating baseball's reserve system, Commerce Clause precludes application of state antitrust law).

**\*5** In this case, the participants of any alleged Donnelly Act violation are Defendants, Delaware organizations and a New Jersey market maker with

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722
**(Cite as: 2005 WL 323750 (S.D.N.Y.))**

their principal places of business in New York and New Jersey, and another New York based company. [FN5] Further, the conspiracy is directed at an electronic, over-the-counter securities exchange, operated by the NASD, a foreign corporation authorized to do business in New York. The stock at issue is that of Plaintiff's, a Virginia corporation with its principal place of business in Virginia. Plaintiff has not put forth any specific allegations in its pleadings of impact on intrastate commerce.

> FN5. As stated above, Plaintiff voluntarily dismissed its claims against the alleged co-conspirators, T.D. Waterhouse.

It appears to the Court that any of the activities alleged to have been committed by Defendants primarily affected interstate commerce. Defendants were dealing with the sale of stocks in a Virginia company, and did not limit its business to any particular state. Defendants are "unquestionably engaged in interstate commerce, [so] those who are damaged from an alleged restraint of trade find a remedy in the federal, not the state antitrust laws." *In re Wiring Device,* 498 F.Supp. at 82.

The Court finds that Plaintiff's fourth cause of action, alleging a Donnelly Act violation, actually arises under the federal antitrust statute, the Sherman Act.

Because federal question jurisdiction exists based on the Sherman Act, the Court will not address the remaining arguments against remand set forth by Defendants.

Plaintiff's remaining claims arise out of the Defendants' alleged "scheme" to drive down the price of its securities through naked short-selling. Hence, they all "derive from a common nucleus of operative fact ... such that [a plaintiff] would ordinarily be expected to try them all in one proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966). Because there is federal jurisdiction under the Sherman Act, this Court may retain supplemental jurisdiction over the state law claims. These claims are standard common law claims. None are novel or complex in any way, nor do the state law claims predominate over the federal claims.

### III. CONCLUSION
Based on the foregoing reasons, this Court hereby DENIES Plaintiff's Motion to Remand to state court and DENIES Plaintiff's Request for the Recovery of Costs.

Defendants shall answer the Complaint within 30 days of the date of this Order.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv05889 (Docket) (Aug. 06, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT I**

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

**H**

**Motions, Pleadings and Filings**


United States District Court,
D. Maryland.
In re MICROSOFT CORP. ANTITRUST
LITIGATION
John ROBY
v.
MICROSOFT CORPORATION
Michael LEWIS
v.
MICROSOFT CORPORATION
Henry MASCAGNI
v.
MICROSOFT CORPORATION
Hayley J. GARDNER
v.
MICROSOFT CORPORATION
Steve GRUBB
v.
MICROSOFT CORPORATION
Linda STEWART
v.
MICROSOFT CORPORATION
Murline ADDINGTON
v.
MICROSOFT CORPORATION
Travis D. MCHANN
v.
MICROSOFT CORPORATION
Billy LEWIS
v.
MICROSOFT CORPORATION
Booker T. BAILEY
v.
MICROSOFT CORPORATION
James PIGG
v.
MICROSOFT CORPORATION
Angela BRINKLEY
v.
MICROSOFT CORPORATION
Delanious HARRIED
v.
MICROSOFT CORPORATION
Gertrude GREEN
v.
MICROSOFT CORPORATION

Camelia CALVERT
v.
MICROSOFT CORPORATION
Mary WYATT
v.
MICROSOFT CORPORATION
**Nos. MDL 1332, Civ. JFM-03-741, Civ. JFM-03-742, Civ. JFM 03-743, Civ. JFM 03-744, Civ. JFM-03-745, Civ. JFM-03-746, Civ. JFM-03-747, Civ. JFM-03-748.**


Aug. 22, 2003.

Steven J. Aeschbacher, Thomas W. Burt, Richard J. Wallis, Microsoft Corporation, Redmond, WA, Joseph E. Neuhaus, Sullivan and Cromwell, David B. Tulchin, Sullivan and Sullivan, New York, NY, for Microsoft Corporation.

Brent H. Hazzard, Hazzard Law, Christopher W. Cofer, Cofer and Associates PA, Jackson, MS, for John Does, Michael NMI Lewis, Henry Mascagni, Hayley J. Gardner, Steve Grubb, Linda Stewart, Murline Addington, Travis D. McHann, Jr.

MEMORANDUM

MOTZ, J.

**\*1** Plaintiffs John Roby, Michael Lewis, Henry Mascagni, Hayley J. Gardner, Steve Grubb, Linda Stewart, Murline Addington, Travis D. McHann, Billy Lewis, Booker T. Bailey, Jr., James Pigg, Angela Brinkley, Delanious Harried, Gertrude Green, Camelia Calvert, and Mary Wyatt have filed suit against Microsoft Corporation, alleging that they were overcharged for Microsoft software. Now pending before me are Microsoft's motions to dismiss plaintiffs' complaints. [FN1] For the reasons stated below, the motions will be granted.

> FN1. The motions in the cases of Grubb, Bailey, Brinkley, and Calvert are technically motions for judgment on the pleadings.

I.

These actions arise out of plaintiffs' purchases of computers containing Microsoft operating systems. Plaintiffs allege, based largely on the findings of fact in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999), that Microsoft engaged in unfair, deceptive, and anticompetitive conduct designed to

Not Reported in F.Supp.2d                                                                                     Page 2
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
(Cite as: 2003 WL 22070561 (D.Md.))

achieve and maintain alleged monopolies in the markets for personal computer operating software, word processing software, and spreadsheet software. According to plaintiffs, as a result of these alleged monopolies, Microsoft charged monopoly prices for its software and denied plaintiffs free choice in the competitive market as well as the benefits of software innovation. Based on these allegations, each plaintiff asserts a claim under the Mississippi Antitrust Act, Miss.Code Ann. § 75-21-3 ("MAA"). Each plaintiff also asserts a claim for civil conspiracy. [FN2]

> FN2. Plaintiffs initially asserted claims under the Mississippi Consumer Protection Act, Miss.Code Ann. § § 75-24-1 et seq. They now concede, however, that the Consumer Protection Act does not create a private right of action for claims based on anticompetitive conduct.

## II.

The MAA provides that any corporation that "monopolize[s] or attempt[s] to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business" shall be deemed to be a prohibited "trust or combine" subject to liability as provided in the MAA. Miss.Code Ann. § 75-21-3. [FN3] Microsoft argues that the scope of this provision is limited to wholly intrastate conduct and that no wholly intrastate conduct is alleged by plaintiffs.

> FN3. The MAA was initially enacted in 1900. The language of the MAA remains almost entirely unchanged. (See Def.'s Tab 1.)

In Standard Oil Co. of Kentucky v. State ex rel. Attorney Gen., 107 Miss. 377, 65 So. 468 (Miss.1914), the Supreme Court of Mississippi addressed an alleged conspiracy between various oil companies to monopolize trade in petroleum throughout the United States. The defendant, who was allegedly allocated exclusive rights to sell petroleum products in Mississippi, moved to dismiss the complaint on the basis that the complaint alleged only conduct in interstate commerce that was beyond the reach of the Mississippi antitrust statute. In addressing the scope of the Mississippi antitrust statute, the Supreme Court of Mississippi explained:

> In the case at bar, if, with the intent to monopolize commerce in petroleum products throughout the United States, appellants had agreed to do and had actually done only such things as relate to that

portion of the commerce therein which is interstate, they would have been punishable only under the laws of the general government, even though they intended to, and in fact did thereby, monopolize also that portion of the commerce therein that is wholly intrastate. In other words, a conspiracy to monopolize trade in any commodity to be punishable under state laws must have as one of its objects a monopoly in the intrastate trade therein to be accomplished in part at least by transactions which are also wholly intrastate.

**\*2** Id. at 470-71 (emphasis added).

Standard Oil was based upon the "dual sovereignty" view of the Commerce Clause prevalent at the time the decision was rendered. That view was well articulated by the Supreme Court of the United States in Addyston Pipe & Steel Co. v. United States, a case relied upon the by the Mississippi Supreme Court in Standard Oil:

> Although the jurisdiction of Congress over commerce among the states is full and complete, it is not questioned that it has none over that which is wholly within a state, and therefore none over combinations or agreements so far as they relate to a restraint of such trade or commerce. It does not acquire any jurisdiction over that part of a combination or agreement which relates to commerce wholly within a state, by reason of the fact that the combination also covers and regulates commerce which is interstate.

175 U.S. 211, 248, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

In later years the Supreme Court's conceptual approach to the Commerce Clause changed, and the dual sovereignty doctrine became obsolete. See N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 49, 57 S.Ct. 615, 81 L.Ed. 893 (1937); see also Cantor v. Detroit Edison Co., 428 U.S. 579, 632-37, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (Stewart, J., dissenting) (discussing evolution of federal Commerce Clause jurisprudence with respect to the Sherman Act). However, the issue presented in this case is not whether today the State of Mississippi could constitutionally enact legislation that prohibits interstate anticompetitive conduct affecting intrastate commerce within Mississippi, regardless of how and where the means of effecting the illegal conduct are carried out. The issue is whether the legislature intended to do so when it enacted the MAA.

I am persuaded that it did not. The MAA was enacted one year after Addyston Pipe was decided and against the same conceptual background

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                              Page 3
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

embodied in that decision. Of course, I recognize that it can be argued that the Mississippi legislature's true intent when enacting the MAA was to regulate commerce to the fullest extent permitted by the Constitution. However, plaintiffs have cited no legislative history to support that view, and the fact that the legislature has not amended the MAA since 1914 when *Standard Oil* was decided argues against such an interpretation of the legislative intent. [FN4]

> FN4. Plaintiffs cite *Moore ex rel. State of Mississippi v. Abbott Labs.,* 900 F.Supp. 26 (S.D.Miss.1995), for the proposition that the highest court in Mississippi has not determined whether "Mississippi antitrust law is limited to intrastate conspiracies." *Id.* at 32. That is true to the extent that *Standard Oil* found the MAA to be applicable to an illegal agreement that was both interstate and intrastate in nature and was accomplished at least in part by transactions that were wholly intrastate. In any event, *Moore* was a removal case which did not directly determine the scope of the MAA's coverage.

I also note that limiting state antitrust statutes to intrastate is consistent with the jurisprudence of other states. For example, in *Arnold v. Microsoft Corp.,* No. 00-CI-00123, 2001 WL 193765 (Ky.Cir.Ct. July 21, 2000), *aff'd,* No.2000-CA-002144-MR, 2001 WL 1835377 (Ky. T.App.2001), *motion for review denied,* No.2002-SC-0116-D (Ky.2002), the court held that Kentucky's antitrust statute was limited to intrastate commerce. *Id.* at *9. The court noted:

> When a national company commits an anticompetitive act, it is certain to have at least some impact on at least one Kentucky resident. To use that as a means to bring a company's national or global operations under Kentucky law smacks of overreaching. This Court declines to do so. *Id.*

The question thus becomes whether plaintiffs have alleged at least *some* conduct by Microsoft which was performed wholly intrastate. In *Standard Oil,* the Mississippi Supreme Court found that there were sufficient allegations of such conduct because one of the objects of the alleged illegal conduct was "a monopoly of that portion of trade in petroleum products which lies wholly within the state of Mississippi, to be accomplished in part at least by

transactions lying wholly within the state." 65 So. At 471. In the present case it can be inferred that plaintiffs allege that one of the objects of Microsoft's allegedly illegal conduct was to establish an unlawful monopoly in the relevant product markets within Mississippi. Plaintiffs have failed to allege, however, that this monopoly was to be accomplished by any transactions "lying wholly within the state." To the contrary, even after having been alerted to the criticality of the issue by Microsoft's motion to dismiss, plaintiffs make only the entirely conclusory averment that "Defendant Microsoft obviously created a monopoly in both interstate and intrastate commerce." (Pls.' Opp'n at 7.) This falls far short of the type of allegation that the Mississippi Supreme Court contemplated in *Standard Oil.* [FN5]

> FN5. Because I am dismissing Plaintiffs' MAA claims, it is unnecessary for me to determine whether punitive damages are available under the MAA.

III.

**\*3** Microsoft also moves to dismiss plaintiffs' civil conspiracy claims. Under Mississippi law, a civil conspiracy claim cannot stand alone. It must reference an underlying tort. *Wells v. Shelter Gen'l Ins. Co.,* 217 F.Supp.2d 744, 755 (S.D.Miss.2002) (citing cases from numerous jurisdictions standing for the same proposition, *i.e.,* "absent the underlying tort, there can be no liability for civil conspiracy"). The only tort arising under Mississippi law referenced by plaintiffs is the asserted violation of the MAA which, for the reasons I have stated, is not viable. [FN6]

> FN6. Plaintiffs seem to suggest that they may assert a civil conspiracy claim under Mississippi law based upon alleged violations of federal law and the laws of other states. They have not, however, cited any authority to support this far-reaching proposition and, absent such authority, I am not prepared to accept it.

A separate order is being entered herewith.

Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138

**Motions, Pleadings and Filings** (Back to top)

• 2006 WL 1372578 (Trial Motion, Memorandum and Affidavit) Microsoft's Sur-Reply in Response to Plaintiffs' Supplemental Memorandum (Apr. 28,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

2006)Original Image of this Document (PDF)

• 2006 WL 1372577 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Supplemental Memorandum (Apr. 21, 2006)Original Image of this Document (PDF)

• 2006 WL 690391 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of its Motion to Stay Proceedings Pending State-Court Litigation (Feb. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 371982 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Its Motion to Stay Proceedings Pending State-Court Litigation or, in the Alternative, for an Order Coordinating Discovery with Plaintiffs' State Court Action (Jan. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 371983 (Trial Motion, Memorandum and Affidavit) Microsoft's Reply Memorandum in Support of Its Motion to Dismiss and Motion for Summary Judgment (Jan. 27, 2006)Original Image of this Document (PDF)

• 2005 WL 3778397 (Trial Motion, Memorandum and Affidavit) Defendant Microsoft Corporation's Reply Memorandum in Support of Motion to Stay All Proceedings Pending Transfer by the Judicial Panel on Multidistrict Litigation (Nov. 3, 2005)Original Image of this Document (PDF)

• 2005 WL 3778396 (Trial Motion, Memorandum and Affidavit) Defendant Microsoft Corporation's Notice of Motion and Motion to Stay All Proceedings Pending Transfer by the Judicial Panel on Multidistrict Litigation; Memorandum of Points and Authorities (Oct. 11, 2005)Original Image of this Document (PDF)

• 2005 WL 3778398 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Remand (Sep. 1, 2005)Original Image of this Document (PDF)

• 2004 WL 3737251 (Trial Pleading) First Amended and Supplemental Complaint and Jury Demand (Nov. 19, 2004)Original Image of this Document (PDF)

• 2003 WL 24210774 (Partial Expert Testimony) (Partial Testimony) (Dec. 18, 2003)Original Image of this Document (PDF)

• 2003 WL 23843454 (Trial Motion, Memorandum

and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843489 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843527 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843554 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843568 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843583 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843609 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843632 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843661 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843695 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843707 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843734 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843750 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843757 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843775 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843782 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843792 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843508 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843543 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843597 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843621 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843648 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843669 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843724 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original

Image of this Document (PDF)

• 2003 WL 23843737 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 24210773 (Partial Expert Testimony) (Partial Testimony) (Jul. 23, 2003)Original Image of this Document (PDF)

• 2003 WL 23843500 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843535 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843562 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion for Judgment on the Pleadings (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843574 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843590 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843614 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843643 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 1:03cv00750 (Docket) (Apr. 07, 2003)

• 1:03cv00746 (Docket) (Mar. 27, 2003)

• 1:03cv00744 (Docket) (Mar. 27, 2003)

• 1:03cv00747 (Docket) (Mar. 27, 2003)

• 1:03cv00745 (Docket) (Mar. 27, 2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases  P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

- 1:03cv00742 (Docket) (Mar. 27, 2003)

- 1:03cv00748 (Docket) (Mar. 27, 2003)

- 1:03cv00749 (Docket) (Mar. 27, 2003)

- 1:03cv00741 (Docket) (Mar. 27, 2003)

- 1:03cv00743 (Docket) (Mar. 27, 2003)

- 2002 WL 32951685    (Trial Pleading) First Amended Complaint for: 1. Illegal Maintenance of Intel-Compatible PC Operating System Monopoly (Sherman Act § 2) 2. Illegal Monopolization of Web Browser Market (Sherman Act § 2) 3. Unlawful Tying of Internet Explorer to Windows PC Operating Sy stem (Sherman Act § 1) 4. Attempted Monopolization of the Workgroup Server Operating System Market (Sherman Act § 2) 5. Unlawful Tying of Windows Workgroup Server Operating System to Windows PC Operating System (Sherman Act § 1) 6. Unlawful Tying of (Aug. 26, 2002)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

▷

**Motions, Pleadings and Filings**

United States District Court, District of Columbia.
In re: VITAMINS ANTITRUST LITIGATION
GREENE
v.
F. HOFFMAN-LAROCHE, LTD., et al.
**Nos. MISC NO. 99-197, MDL 1285.**

April 11, 2001.

MEMORANDUM OPINION Re: Greene Motions to
Dismiss

HOGAN, J.

**\*1** Pending before this Court are various motions to
dismiss filed by Defendants in the above captioned
action. [FN1] Based upon careful consideration of
Plaintiff's Complaint, Defendants' Motions to
Dismiss, Plaintiff's opposition thereto, Defendants'
Reply, and the entire record herein, the Court will
grant Defendants' Motions to Dismiss and
accordingly will dismiss Plaintiff's Complaint in its
entirety.

> FN1. Defendants Hoffmann-LaRoche, Inc.
> and Roche Vitamins, Inc. have filed a joint
> reply memorandum "on behalf of all
> defendants who have moved to dismiss this
> action," J. Reply Mem. at 1, including BASF
> Corp.; DuCoa, L.P.; Hoffmann-LaRoche,
> Inc.; and Roche Vitamins, Inc.

## I. BACKGROUND

Plaintiff, Judy Greene, brings the instant action on
behalf of herself and other indirect purchasers
similarly situated ("Proposed Class" or "Class"),
[FN2] pleading six separate causes of action. In her
Complaint, Plaintiff alleges: (1) violations of the
Tennessee Trade Practices Act ("TTPA"),
TEN.CODE ANN. § § 47-25-101, *et seq.;* (2)
violations of the Tennessee Consumer Protection Act
of 1977 ("TCPA"), TEN.CODE ANN. § 47-18-101,
*et seq.;* (3) common law fraud; [FN3] (4) money had
and received; (5) unjust enrichment; and (6) civil
conspiracy. Plaintiff purports to bring this action
pursuant to the Tennessee Trade Practices Act,

TEN.CODE ANN. § § 47-25-101, 105, and 106; the
Tennessee Consumer Protection Act of 1977,
TEN.CODE ANN. § 47-18-109; and *Blake v. Abbot
Laboratories,* No. 03A01-9509-CV-00307, 1996 WL
134947 (Tenn.Ct.App. March 27, 1996). Compl. ¶
12 at 8. Plaintiff alleges that Defendants engaged in a
conspiracy to fix prices, allocate markets, and
"commit other unlawful practices designed to inflate
the price of vitamin supplements sold to Plaintiff and
other purchasers in Tennessee and the other class
jurisdictions," *Id.* ¶ 1 at 2, thereby causing "members
of the [ ] Class [to pay] millions of dollars more for
vitamins supplements than they would have paid in
the absence of the illegal combination and
conspiracy." *Id.* ¶ 62 at 25.

> FN2. Greene brings this action on behalf of
> herself and other indirect purchasers of
> Defendants' vitamin products in Alabama,
> Arizona, California, the District of
> Columbia, Florida, Kansas, Maine,
> Michigan, Minnesota, Mississippi, New
> Mexico, North Carolina, North Dakota,
> South Dakota, Tennessee, West Virginia,
> and Wisconsin.

> FN3. Plaintiff has voluntarily withdrawn this
> claim. *See* Pl.'s Opp. Mem. at 1 n. 4
> (explaining that "[b]ecause Defendants'
> alleged fraudulent conduct may sufficiently
> be challenged by Plaintiffs under the
> antitrust and consumer protection laws of
> the Class Jurisdictions, Plaintiffs have thus
> voluntarily abandoned their common law
> fraud claim against all of the Defendants").

This action, originally filed in state court in
Tennessee, was removed to federal court and then
transferred to this Court. After transfer, nine
Defendants separately moved for dismissal. In their
Motions to Dismiss, Defendants raise issues
pertaining to personal jurisdiction over four of the
individual Defendants; the scope of the Tennessee
Trade Practices Act and the Tennessee Consumer
Protection Act of 1977; whether Plaintiff, as an
indirect purchaser, has standing to sue under those
statutes; whether Plaintiff may bring claims on behalf
of non-Tennessee class members; whether Plaintiff
has pleaded various claims with sufficient
particularity; whether Plaintiff has failed to state a
claim for money had and received, unjust enrichment,

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
(Cite as: 2001 WL 849928 (D.D.C.))

and civil conspiracy; whether Plaintiff's claims are barred by the applicable statute of limitations; and whether Plaintiff's action should dismissed, or in the alternative stayed, due to prior cases filed in Tennessee state courts.

## II. DISCUSSION

A. Applicable Standard for Evaluating Rule 12(b)(6) Motions to Dismiss

In a motion to dismiss under Rule 12(b)(6), the moving party has the burden of demonstrating that the non-movant can prove no set of facts in support of his claims. Fed. R. Civ. P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (stating that a complaint may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the complaint] which would entitle him to relief"). The Court must presume all factual allegations of the Complaint to be true and draw all reasonable inferences in favor of the nonmoving party. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983). "However, neither legal conclusions nor unwarranted factual inferences constitute material allegations, and the Court is not obliged to accept such statements as true." *Sanders v. Prentice-Hall Corp. Sys.,* 969 F.Supp. 481, 483 (W.D.Tenn.1997) (citing *McBride v. Village of Michiana,* No. 93-1641, 1994 U.S.App. LEXIS 19679, at * 7 (6th Cir. July 28, 1994) (per curiam)). The issue is "not whether Plaintiff will prevail, but whether, on the strength of the Complaint, the claimant is entitled to offer evidence to support his claims." *Id.* (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

B. Counts I and II--Violations of the TTPA and TCPA

**\*2** In her first cause of action, Plaintiff alleges that Defendants have pursued a course of conduct "constitut[ing] an unlawful arrangement, contract, trust, or combination in violation of the Tennessee Trade Practices Act [,][w]ith the specific intent to restrain, lessen, or tend to lessen competition from producers of vitamin supplements or components thereof sold to Plaintiff and other indirect purchasers in the Class Jurisdictions." Compl. ¶ 64, 65 at 26. Plaintiff alleges that members of the Proposed Class have paid more for vitamin products than they otherwise would have were it not for Defendants' alleged wrongful conduct. *Id.* ¶ 49 at 21. Plaintiff seeks "full consideration paid for the price-fixed products, and all other damages available under the antitrust statutes of the Class Jurisdictions." *Id.* ¶ A

at 38.

With respect to her second cause of action, Plaintiff relies upon the same facts supporting her TTPA claims and asserts that "[t]he conduct ... constitutes unfair or deceptive trade practices predominately and substantially affecting the conduct of trade or commerce in the State of Tennessee in violation of [the TCPA]." *Id.* ¶ 89 at 32. In relation to this cause of action, Plaintiff seeks actual damages, treble damages, and appropriate restitution. *Id.* ¶ B. at 38.

Defendants argue that "Plaintiff's Complaint fails to state a claim upon which relief can be granted as the Tennessee Trade Practices Act ... and the Tennessee Consumer Protection Act apply only to transactions which are predominately intrastate and the allegations contained in Plaintiff's Complaint involve interstate transactions." DuCoa Mem. at 3. Defendants place great emphasis on this Court's decisions in *FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25 (D.D.C.1999) (*Mylan I* ) and *FTC v. Mylan Labs., Inc.,* 99 F.Supp.2d 1 (D.D.C.1999) (*Mylan II* ), in which this Court dismissed claims for violations of the TTPA and the TCPA because plaintiff in that action "allege[d] a price-fixing conspiracy that operated on a national level and affected at least 32 states [and therefore] concern[ed] conduct that was predominately interstate, and outside the ambit of Tennessee's antitrust laws." *Mylan II,* 99 F.Supp.2d at 9. Plaintiff in the instant action "respectfully submit[s] that the Court would have benefitted from a more extensive analysis of Tennessee antitrust law than that evidently provided to it in [*Mylan* ]." Pl's. Opp. Mem. at 4-5. Although this Court twice ruled in the *Mylan* decisions that the TTPA and the TCPA reach only that conduct which is predominately intrastate in character, the Court will expound upon its rationale for so ruling and further explain why that same rationale mandates dismissal of Plaintiff's TTPA and TCPA claims. [FN4]

> FN4. The Court deals simultaneously with Plaintiff's TTPA and TCPA claims, because the same intra/interstate limitations that apply to the TTPA apply with equal force to the TCPA. *See Blake v. Abbott Labs., Inc.,* No. 03A01-9509-CV-00307, 1996 WL 13947, at *7 (Tenn.Ct.App. March 27, 1996). The *Blake* court noted that "the same limitations must apply to the [TCPA] as those applied to the [TTPA]. If it is determined that the acts complained of predominately affect interstate commerce, the defendants must prevail. It is a well-

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

settled principle of law that one cannot do indirectly what cannot be done directly." *Id.*

"[T]he current rule is that Tennessee's prohibition on restraints of trade will apply to transactions which are 'predominately' *intrastate* in character. [A] transaction does not have to be exclusively intrastate to fall within the [prohibitions of the TTPA]. Obviously, this is to be read together with the well-established rule that allegations of unlawful restraints of trade in the *interstate* context gives [sic] rise to a claim within the reach of the Sherman Act in which there is exclusive jurisdiction." *Dzik & Dzik, P.C. v. Vision Serv. Plan,* 1989 Tenn.App. LEXIS 25, at *5 (Tenn.Ct.App. Jan. 20, 1989) (emphasis added). This principle evolved from the seminal decision *Standard Oil Co. v. State,* 100 S.W. 705 (Tenn.1906). [FN5]

FN5. The pertinent facts of *Standard Oil* are as follows:
Standard Oil Company, a Kentucky corporation, was in competition with Evansville Oil Company, an Indiana corporation. *See Standard Oil Co. v. State,* 100 S.W. 705, 707 (Tenn.1906). Standard Oil maintained oil storage tanks in Gallatin, Tennessee, from which it stored and sold oil imported from other states. *See id. at 708.* Standard Oil conducted business through various agents, including C.E. Holt, O'Donnell Rutherford, and their superior J.E. Comer. *See id.* Evansville Oil also sold oil in Tennessee, but prior to the facts giving rise to the dispute, Standard Oil had no competition in the Gallatin market. *See id.* When Rosemon, an agent of Evansville Oil, procured orders from S.W. Love and other Standard Oil customers, Comer directed Holt to procure the countermand of the orders that had been given Evansville Oil. *See id.* In order to induce Love and others to countermand the Evansville Oil orders, Holt arranged to have one hundred gallons of oil delivered from the Standard Oil Gallatin storage tanks to customers who countermanded their orders. *See id.*

**\*3** In *Standard Oil,* Standard Oil and two of its employees, C.E. Holt and O'Donnell Rutherford, were indicted and charged with unlawfully contracting with S.W. Love "for the purpose and with a view to lessen full and free competition in the sale of coal oil, an article of sale imported into [the state of Tennessee], and carrying out said contract in [Sumner] county" in violation of Tennessee antitrust

laws. *Id.* at 706. The antitrust statute provided in relevant part:

Section 1. Be it enacted ... that ... all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of article of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful and void.

*Id.* At trial, Standard Oil and Holt were found guilty and Rutherford was acquitted. On appeal, Standard Oil and Holt first urged the court to read the statute as applying to interstate commerce, thus attacking the constitutionality of the statute by asserting that it was preempted, at least in part, by federal antitrust laws. Apparently focusing on the "importation language" of the statute, the parties argued that "the arrangement which the plaintiffs ... are alleged to have made was one relating to property to be thereafter imported into the State." *Id.* at 709. Relying on principles of statutory construction and legislative intent, the court rejected plaintiffs' statutory attack. The court also explained that:

We give no force to the work, "importation," appearing in section 1, because we think it was inaccurately used in referring to articles already imported; that is, that the phrase "importation or sale of articles imported into this state" was intended to include and describe, among the article of commerce to be protected, those which had been imported from other states and countries, commingled with the common mass of property in this state, and no longer articles of interstate commerce. It is well settled that commerce in such imported articles may be regulated by state legislation. It is certain that merchandise of this character was intended to be included within the provisions of this act, otherwise commerce, in the vast amount of valuable property of foreign production and manufacture that was then and is now in the state, would be wholly unprotected from the abuses legislated against. [ ... ] The legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate. It did not intend to stop short of its power or to exceed it.

**\*4** *Id.* at 710-11. The court also cautioned against

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

giving broad meaning to the words of the statute and concluded that:

It is evident, from what we have already said, that the prevention of unlawful contracts in relation to the importation of articles was not the inducement of the enactment of this statute, but that the primary and chief purpose of the legislature, beyond all question, was to protect commerce within this state. Its provisions upon this subject are to no extent and in no manner dependent upon one protecting the importation of merchandise from other States and countries.

*Id.* at 711. In addition, the court explained that the plaintiffs mischaracterized the charge against them as an indictment for lessening competition of oil to be imported into the state. The court clarified that the plaintiffs were charged with making an unlawful contract to lessen competition "in the sale of coal oil which the Standard Oil Company had imported in this state *and had, at the time of the agreement, stored in its storage tanks at Gallatin,* and there offered for sale." *Id.* at 712 (emphasis added). The court acknowledged that at one time the oil had been an article of interstate commerce, but pointed out that the oil "was not [an article of interstate commerce] when the agreement with S.W. Love was made. It was then at rest in this state, and was subject to its revenue laws and the police power of the state." *Id.* And therein lies the critical distinction upon which *Mylan* and the instant action lie.

In *Mylan I* and *Mylan II,* this Court distinguished the facts in *Mylan* from those in *Standard Oil,* explaining that [t]he challenged conduct ... in Standard Oil was deemed intrastate because it occurred after the product had been imported, not before as in the instant case." *Mylan I,* 62 F.Supp.2d at 51. This Court further explained that "[w]hen the challenged conduct occurs before the products arrive in Tennessee, the conduct is considered interstate in nature and the [T]TPA and TCPA should not apply." *Id.* In deciding *Mylan,* the Court also had occasion to consider *Blake v. Abbott Labs., Inc.,* No. 03A01-9509-CV-00307, 1996 WL 13947 (Tenn.Ct.App. March 27, 1996). In *Blake,* the Tennessee Court of Appeals found that the complaint stated a cause of action under the TTPA because the court could not determine from the record whether the allegedly wrongful acts predominately affected interstate commerce. The court explained that:

We have carefully examined the complaint. Contrary to the defendants' assertions, we fail to find an allegation that the alleged conspiracy took place outside the state or that the transactions complained of occurred outside the state. It is

alleged that the principal offices of the defendants are located outside the state ... and that the defendants intended their actions to artificially maintain high wholesale levels of infant formula in the entire United States. From that information, alone, however, we cannot infer that the conspiracy, if any, occurred outside the state or that the transactions occurred outside the state.

**\*5** *Blake,* 1996 WL 134947, at \*4. The instant action is distinguishable from *Blake* insofar as Plaintiff alleges a conspiracy hatched and implemented through meetings that took place in Ludwigshafen, Germany; Germany's Black Forest; Atlanta, Georgia; and various other non-specified locations. Although the alleged conduct may have a demonstrable effect in Tennessee, this effect is clearly incidental in comparison to the interstate character of the alleged conspiracy.

Plaintiff alleges that "Defendants' conspiracy has involved an astonishing array of uniform illegal conduct by a cartel that has deliberately targeted, and severely burdened, consumers in Tennessee and the other Class Jurisdictions." Compl. ¶ 2 at 2. While Plaintiff asserts that "[a] substantial part of the trade and commerce, as well as the arrangement, contract, agreement, trust, conspiracy, unfair or deceptive practices, and/or uniform and common course of conduct giving rise to Plaintiff's claims, occurred within and predominantly [a]ffected the state of Tennessee," *Id.* ¶ 9 at 7, the Court does not find that the facts pleaded by Plaintiff support her allegations as to the *predominantly* intrastate effect of the alleged wrongful conduct. Although inferences are to be drawn in Plaintiff's favor, this Court is not in the position of the *Blake* court, which "could not infer that the conspiracy ... occurred outside the State." *Blake,* 1996 WL 134947, at \*4. In the instant action, the Court need not draw inferences as to the inter- or intrastate character of the alleged conspiracy, because Plaintiff explicitly alleges meetings that took place in Ludwigshafen, Germany; Germany's Black Forest; Atlanta, Georgia; and various other non-specified locations.

The Court would also direct Plaintiff to *Lynch Display Corp. v. Nat'l Souvenir Center, Inc.,* 640 S.W.2d 837 (Tenn.Ct.App.1982). In *Lynch,* the subject of dispute was "a lease between [Historical Reviews, Inc. (HRI) ] a Tennessee corporation [operating a wax museum in Gatlinburg] and [Lynch Display Corporation (Lynch),] a Maryland corporation [manufacturing and leasing wax figures for museums] and an associated franchise agreement between [HRI and National Historical Museum, Inc.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

(NHM),] a District of Columbia corporation." *Id.* at 840. Appellants argued that the lessee wax museum "ha[d] been established in Gatlinburg for 17 years and regularly [sold] tickets to customers in exchange for admission and that this fact establishes significant intrastate commerce." *Id.* at 841. The court rejected this argument and reasoned that "[a]lthough this is unquestionably intrastate commerce, it is of a nature incidental to the predominant agreements in this dispute." *Id.*

Similarly in the instant action, although Plaintiff alleges that BASF executives located in Tennessee implemented the pricing decisions of BASF officials in Germany, Compl. ¶ 7(a) at 6, Plaintiff's allegations do not persuade this Court that this modicum of intrastate activity was more than incidental to the predominant agreement, which was a world-wide price fixing conspiracy. *See, e.g., Dzik,* 1989 Tenn.App. LEXIS 25, at *5-6 (acknowledging the intrastate implications arising from an agreement between a Tennessee corporation and a Georgia corporation, but ultimately reasoning that "the critical point is that to the extent intrastate commerce is affected ... it is of a nature only incidental to the predominant agreement between [the parties]"); *Valley Products Co., Inc. v. Landmark,* 877 F. Supp 1087, 1094- 95 (W.D. Tenn 1994) (stating that "[a]lthough the dispute need not be exclusively intrastate to fall within the statute, it must more than incidentally affect intrastate commerce" and dismissing plaintiff's antitrust claim because "HFS franchisees are located in every state in the country and the sale of guest amenities necessarily implicates many different geographic regions"). As stated above, the current Tennessee rule requires Plaintiff to allege transactions that are *predominately* intrastate in character.

**\*6** In sum, Plaintiff asserts a cause of action based not only on Tennessee law, but also on the law of fifteen other states plus the District of Columbia. While the multi-state nature of this conspiracy is not dispositive as to whether violations could have occurred in a manner that might be actionable under Tennessee law, the Court finds that Plaintiff's combined allegations of a conspiracy affecting numerous states and secret meetings held world-wide, and the notable lack of allegations regarding any part of the conspiracy that took place in Tennessee, other than the purchase of vitamin supplements by indirect purchasers and the actions of certain BASF executives located in Tennessee, compel this Court to cast Plaintiff's claims as predominately interstate in character. Plaintiff has not

pleaded a cause of action that is sufficiently intrastate in character so as to fall within the ambit of the Tennessee statutes. Accordingly, the Court will grant Defendants' Motions to Dismiss Plaintiff's TTPA and TCPA claims. [FN6]

> FN6. In rendering this decision, the Court acknowledges that at least one other federal district court has disagreed with the rationale underlying the interstate/intrastate distinction as articulated in *Lynch, Blake, Dzik & Dzik,* and *Mylan. See In re Cardizem CD Antitrust Litigation,* 105 F.Supp.2d 618, 667 (E.D.Mich.2000). However, this Court respectfully disagrees with *Cardizem's* predictions regarding the approach that the Tennessee Supreme Court might take with respect to the TTPA and TCPA, as well as with *Cardizem's* interpretation of *Blake.*

C. Count III--Common Law Fraud

As previously noted, Plaintiff has voluntarily withdrawn this claim against all of the Defendants. However, Plaintiff has not formally amended her Complaint to reflect the withdrawal of this claim. Given the procedural oddity created by Plaintiff's failure to formally amend her Complaint to withdraw the allegation of fraud, the Court notes that even if Plaintiff had not voluntarily withdrawn this claim, the fraud count would nonetheless be subject to dismissal.

Plaintiff's fraud count is set out in very general terms, asserting that Defendants' alleged wrongful conduct constitutes "a uniform course of illegal and fraudulent conduct." Compl. ¶ 97 at 34. As Plaintiff does not specify whether her fraud claim is based on silence or concealment of some supposedly material facts, or whether the action lies in some affirmative misrepresentations by the Defendants, Plaintiff's broad allegations leave this Court left to speculate as to the basis for Plaintiff's fraud cause of action. Accordingly, the Court will briefly discuss various theories of fraud and why Plaintiff has failed to state a claim under any of these theories.

As explained by the Tennessee Supreme Court, Tennessee recognizes three types of tortious misrepresentations:
> The first is set forth in Restatement of Torts 2d, § 402B, and provides that a purchaser may recover damages from a seller or manufacturer of a product for economic loss sustained by the buyer as a result of the misrepresentations. [Section] 402B applies,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 6
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

however, only to persons engaged in the selling or manufacturing of chattels and does not apply to individual or private sales.

*Jasper Aviation, Inc. v. McCollum Aviation, Inc.,* 497 S.W.2d 240, 242 (Tenn.1972). Plaintiff is a private consumer and an indirect purchaser of the Defendants' vitamin products and thus cannot state a claim for fraud under this first theory. However, the Tennessee Supreme Court has articulated two additional theories of suit.

 **\*7** The second theory is found in the Restatement of Torts (Second), § 552. *See id.* However, this theory is rooted in negligent misrepresentation, and this Court cannot infer an allegation of negligent misrepresentation from any set of facts pleaded by Plaintiff. *See, e.g., Bethlehem Steel Corp. v. Ernst & Whinney,* 822 S.W.2d 592, 595 (Tenn.1991) (discussing an action for negligent misrepresentation and noting that "Tennessee has adopted the Restatement (Second) of Torts § 552 as the guiding principle in negligent misrepresentation actions against other professionals and business persons"). In addition, § 552 liability arises only in connection with "business or professional persons who negligently supply false information for the guidance of others in their business transactions." *Id.* As with the previous theory, Plaintiff is precluded from bringing a cause of action based on § 552, because she does not allege that her purchases were business-related transactions.

 "The third theory of actionable misrepresentation is a plaintiff's suit for fraud and deceit." *Jasper Aviation,* 497 S.W.2d at 242. The elements of fraud are "an intentional misrepresentation with regard to a material fact; knowledge of the representation's falsity, *i.e.,* it was made 'knowingly' or 'without belief in its truth' or 'recklessly' without regard to its truth or falsity; the plaintiff reasonably relied on the misrepresentation and suffered damages; and the misrepresentation relates to an existing or past fact." *Menuskin v. Williams,* 145 F.3d 755, 764 (6th Cir.1998); *see also Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn.Ct.App.1991). Stated another way:

When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is a positive fraud. The representation must have been made with the knowledge of its falsity and with a fraudulent intent. The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that representation to his injury.

*Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228, 232 (Tenn.Ct.App.1976) (citations omitted). As noted by Defendants, Plaintiff "has not alleged what representations were made to her by which Defendant, when or where the alleged representations were made, or what representations she relied on which resulted in injury to her." DuCoa Mem. at 11-12.

 However, "[i]t is [also] well-settled that fraud can be an intentional misrepresentation of a known, material fact or it can be the concealment or nondisclosure of a known fact when there is a duty to disclose." *Justice v. Anderson County,* 955 S.W.2d 613, 616 (Tenn.Ct.App.1997). "The tort of fraudulent concealment is committed *when a party who has a duty to disclose* a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Chrisman v. Hill Home Dev., Inc.,* 978 S.W.2d 535, 539 (Tenn.1998) (emphasis added). In the instant action, if Plaintiff's claim lies in Defendants' silence and concealment of their price fixing and other allegedly unlawful activities, then this cause of action fails as well. In order to state a claim for fraud based upon silence or concealment, "one must show that the defendant owed a duty to speak or disclose the information." *McConkey v. McGhan Medical Corp.,* No. 3:98-CV-003, 2000 U.S. Dist. LEXIS 19895, at \*15 (E.D.Tenn. July 6, 2000). "Such a duty may be created where there is a fiduciary or contractual relationship between the parties creating a duty of trust and good faith." *Id.* "All the instances in which the duty to disclose exists and in which a concealment is therefore fraudulent, may be reduced to three distinct classes: (1) where there is a previous definite fiduciary relation between the parties; (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other; (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith." *Justice,* 955 S.W.2d at 616-17. All of these elements speak to either privity or a fiduciary relationship between the parties. Plaintiff does not plead any set of facts to support such a relationship and thus fails to demonstrate why any Defendant owed a duty of disclosure to Plaintiff.

 **\*8** To summarize, Plaintiff cannot state a claim for fraud under either of the two Restatement theories adopted by Tennessee courts, because those particular sections pertain to business transactions, and Plaintiff does not allege that she was defrauded by Defendants in any such type of transaction. In addition, Plaintiff cannot bring an action for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

affirmative fraud or deceit because she pleads no set of facts to indicate what type of representations were made by which Defendants, nor does Plaintiff adequately allege any reliance. Moreover, Plaintiff cannot sustain a cause of action for fraudulent concealment because she has not adequately pleaded facts that demonstrate a relationship between herself and Defendants that gives rise to a duty of disclosure. Based on the foregoing reasons, the Court will dismiss Plaintiff's cause of action for fraud.

D. Counts IV and V--Money Had and Received / Unjust Enrichment

In support of her claim for money had and received, Plaintiff asserts that Defendants' "fraudulent, illegal, unfair or deceptive conduct ... and the resulting overpayments made by Plaintiff and the Proposed Class," Compl. ¶ 100 at 35, entitles the Plaintiff and the Proposed Class to "compensatory damages to the extent of the money had and received by the Defendants." *Id.* ¶ D at 39. Defendants argue that Plaintiff, as an indirect purchaser, cannot maintain this cause of action because there are no direct dealings between Plaintiff and Defendants. DuCoa Mem. at 10-11; J. Reply Mem. at 9-10.

In support of her action for unjust enrichment, Plaintiff alleges that "Defendants have benefitted from their illegal restraints of trade and acts which lessen or tend to lessen competition through the overpayment by Plaintiff and the Proposed Class for vitamin supplements [and][i]t would be inequitable for the Defendants to ... retain any ... overpayment ... derived from their unfair or deceptive trade practices." *Id.* ¶ ¶ 102, 103 at 35. Plaintiff seeks "disgorgement [of] all such monies acquired through defendants' illegal and inequitable conduct," *Id.* ¶ 104 at 35, plus interest and costs. *Id.* ¶ E. at 39. Defendants respond by once again arguing that there were no direct dealings between Plaintiff and thus assert that Plaintiff cannot maintain an action for unjust enrichment. Plaintiff counters that Tennessee law has not directly addressed the issue as to whether a plaintiff must directly confer a benefit on a defendant in order to maintain an action for unjust enrichment. Pl.'s Opp. Mem. at 52.

As stated by the Supreme Court of Alabama, "the essence of ... unjust enrichment or money had and received is that facts can be proved which show that defendant holds money which in equity and good conscience belongs to plaintiff or was improperly paid to the defendant because of mistake or fraud." *Foshee v. General Telephone Co. of the Southeast,*

*322 So.2d 715, 717 (Ala.1975).* Under Tennessee law, both unjust enrichment and money had and received are equated with quasi-contract actions. *See, e.g.,* Blake Corp. v. Diversified Sys., Inc., 2000 U.S.App. LEXIS 22291, at *25 (stating that "[u]nder Tennessee law, 'actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and quantum meruit are essentially the same" ') (quoting *Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154 (Tenn.1966)*); *Bonham Group, Inc. v. Memphis,* No. 02A01-9709-CH-00238, 1999 Tenn.App. LEXIS 237, at *18 (Tenn.Ct.App. April, 16, 1999) (stating that "unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist"); *Steelman v. Ford Motor Credit Co., 911 S.W.2d 720, 723 (Tenn.Ct.App.1995)* (stating that "[a]n action for money had and received is based upon an implied assumpsit"). As noted in *Luithly v. Cavalier Corp.:*

> **\*9** Actions brought under these common law doctrines are essentially the same and the names are used interchangeably in the case law. In the past, such actions were also known as actions in assumption for money had and received, an 'equitable action to recover ... money which the defendant in justice ought not retain ... where defendant has moneys of the plaintiff which, ex equo et bono, he ought to refund."

No. 98-5507, 1999 U.S.App. LEXIS 10653, at *11 n. 2 (6th Cir. May 20, 1999) (quoting *Nash v. Towne, 72 U.S. 689 (1866)*).

Privity is not required to maintain such actions. *See Paschall's, 407 S.W.2d at 154* (stating that "[i]t is well established that want of privity between parties is no obstacle to recovery under quasi contract"). However, Tennessee courts have articulated a general standard that a plaintiff must meet in order to bring such a claim. As stated in *Haynes v. Dalton:*

> "Each case must be decided according to the essential elements of quasi-contract to wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. The most significant requirement for a recovery on a quasi-contract is that the enrichment to the defendant be unjust."

*848 S.W.2d 664, 665-66 (Tenn.Ct.App.1992)* (quoting *Paschall's, 407 S.W.2d at 155).*

Because Plaintiff is an indirect purchaser and had no direct dealings with Defendants, the Court is left to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

query whether Plaintiff satisfies the first prong of the standard, *i.e.,* a benefit conferred on Defendants by Plaintiff. In speaking to whether a plaintiff must directly confer a benefit upon a defendant, the court in *Lawyers Title Ins. Corp. v. United Am. Bank of Memphis* held that plaintiff did not state a claim for unjust enrichment because there was no direct transaction between plaintiff and defendant. 21 F.Supp.2d 785, 806 (W.D.Tenn.1998) (relying on the principle articulated in *Boyd v. Black,* 248 F.2d 156 (6th Cir.1957)). In addressing the plaintiff's claim for money had and received, the *Lawyers Title* court did not inquire into whether plaintiff conferred a direct benefit on the defendant but rather stated that "[u]nder Tennessee law, an action for money had and received 'is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not retain it and ex aequo bono it belongs to another." ' 21 F.Supp.2d at 807 (*quoting Interstate Life & Accident Co. v. Cook,* 86 S.W.2d 887, 891 (Tenn.Ct.App.1935)). This analysis seems merely to restate the general principle underlying all implied contract actions, without stating a separate test for an action for money had and received. However, the Court does note that *Interstate Life,* upon which the *Lawyers Title* court relies, explicitly states that an action for money had and received is based upon implied assumpsit. *See Interstate Life,* 86 S.W.2d at 891. Moreover, as discussed previously, *Haynes v. Dalton* and *Paschell's* require consideration of the three factors pertaining to the benefit conferred by plaintiff and received by defendant for all types of quasi/implied contract actions. [FN7] Therefore, based upon the lack of facts supporting a finding of a direct benefit conferred upon Defendants by Plaintiff, the Court will dismiss Plaintiff's claims for unjust enrichment and money had and received.

> FN7. As yet another factor warranting dismissal, the court in *Bonham* states that "before recovery can be had against the defendant on the theory of unjust enrichment, the provider of the benefit must have exhausted his remedies against the person with whom he had contracted." 1999 Tenn.App. LEXIS 237, at *20. The record is devoid of any evidence suggesting that Plaintiff first pursued claims against the retailers or other persons from whom she directly purchased vitamin supplements. This is yet another factor that weighs against Plaintiff's recovery under the unjust enrichment theory.

E. Count VI--Civil Conspiracy

**\*10** Plaintiff alleges that Defendants engaged in a conspiracy to fix prices, allocate markets, and "commit other unlawful practices designed to inflate the price of vitamin supplements sold to Plaintiff and other purchasers in Tennessee and the other class jurisdictions." Compl. ¶ 1 at 2. Plaintiff asserts that "[t]he intended common purpose of this conspiracy was to deceive Proposed Class members and the public as to the true cost of vitamin supplements," *Id.* ¶ 110 at 36, and that "[t]he further effect of this conspiracy was to violate state law." *Id.* ¶ 111 at 36. Plaintiff also alleges that "Defendants have conspired to purposely conceal the practice by which they artificially inflated the price of vitamin supplements." *Id.* ¶ 108 at 36.

"In Tennessee, a civil conspiracy is defined as a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means. Necessary elements for such a claim include common design, concert of action, and an overt act." *McConkey,* 2000 U.S. Dist. LEXIS 19895, at *14 (citations omitted); *see also Tennessee Publ'g Co. v. Fitzhugh,* 52 S.W.2d 157 (Tenn.1931); *Braswell v. Carothers,* 863 S.W.2d 722, 727 (Tenn.Ct.App.1993).

Tennessee courts considering the issue are nearly uniform in holding that conspiracy in and of itself is not a free-standing cause of action and that there must exist an underlying colorable claim. *See, e.g., Blake Corp. v. Diversified Sys., Inc.,* No. 98-5396, 2000 U.S.App. LEXIS 22291, at *18 (6th Cir. Aug. 24, 2000) (holding that when the determinative legal theory fails, "then the claim for conspiracy must also fail, for it cannot be that a conspiracy to do a thing is actionable where the thing itself would not be") (internal citation and quotation omitted); *Jackson v. Bohan,* 861 S.W.2d 241, 247-48 (Tenn.Ct.App.1993) (citing *Kirskey v. Overton Pub, Inc.,* 739 S.W.2d 230 (Tenn.Ct.App.1987)); *Pusser v. Gordon,* 684 S.W.2d 639, 642 (Tenn.Ct.App.1984) (holding that plaintiff could not recover for conspiracy to defraud because fraud could not be established, and stating that "[a] mere conspiracy to commit a fraud is never of itself a cause of action; it must be proved that there was a conspiracy to defraud and a participation in the fraudulent purpose, ... which worked injury as a proximate consequence"). Moreover, "the primary purpose of the agreement must be to cause injury to another; incidental injuries resulting from a pursuit of

the parties' own fair interest are not actionable." *Nat'l Med. Care, Inc. v. Gardiner,* No. 85-154- II, 1986 WL 3157, at *3 (Tenn.Ct.App. March 12, 1986).

 In *Fitzhugh,* the court explained that actionable damage must be alleged, and that "[t]he damage being the gist of the action, and the 'gist' being 'the cause for which an action will lie--the ground or foundation of a suit, without which it would not be maintainable,' actionable damages must be alleged, and must be shown at the time of the bringing of the action." *Fitzhugh, 52 S.W.2d at 157* (citation omitted). The court further stated that:

  **\*11** It is a general rule, that a conspiracy cannot be made the subject of a civil action, unless something is done which, without the conspiracy, would give a right of action. The damage done is the gist of the action, not the conspiracy. When the mischief contemplated is accomplished, the conspiracy becomes important, as it may affect the means and measure of redress. [B]ut the simple act of conspiracy does not furnish a substantive ground of action.

  *Id.* at 158.

 As discussed above, Plaintiff cannot sustain a claim for violations of either the TTPA nor the TCPA. Nor does Plaintiff state a claim for fraud. The dismissal of these counts eliminates any probable underlying cause of action on which to base a claim for civil conspiracy.  [FN8] Because Plaintiff fails to state a claim for violations of either the TTPA or TCPA and further fails to state a claim for any other alleged unlawful conduct at common law, this Court will grant Defendants' Motions to Dismiss Plaintiff's claim for civil conspiracy.

  FN8. Plaintiff directs the Court's attention to *Prism Partners v. Figlio,* No. 01A01-9703-CV-00103, 1997 Tenn.App. LEXIS 777 (Tenn.Ct.App. Nov. 7, 1997), to support her suggestion that "a conspiracy claim may survive dismissal even when the remaining causes of action have been dismissed." Pl's. Opp. Mem. at 54 n. 54. In *Prism Partners,* the court stated that dismissal of the underlying fraud claim did not automatically dispose of the conspiracy charge. The court made this determination based on the fact that the plaintiff had pleaded two separate torts, fraud and conspiracy. Therefore, this Court interprets *Prism Partners* to hold that the conspiracy charge could survive in that case based on one of the tort claims. However, to the extent that *Prism Partners*

results in a holding that states, implicitly or otherwise, that conspiracy can be maintained as a separate cause of action, it is clearly contrary to existing precedent.

 F. Alternative Grounds for Dismissal

 Because the Court has found grounds to dismiss all six counts of Plaintiffs Complaint, the Court will dismiss the Complaint in its entirety. Accordingly, the Court need not address Defendants' alternative grounds for dismissal, including personal jurisdiction, the applicable statutes of limitations, and the existence of prior pending state actions. Nor need the Court decide whether or not to allow this action to proceed as a class action, because there are no viable causes of action left to pursue.

 III. CONCLUSION

 Plaintiff has failed to state a claim for violations of the TTPA and the TCPA, because she has not alleged a cause of action that predominantly affects intrastate commerce. In addition, Plaintiff purports to voluntarily withdraw her action for fraud, but has failed to so amend her Complaint. The Court nonetheless finds that Plaintiff has failed to state a cause of action for either affirmative fraud or fraudulent concealment. Moreover, Plaintiff has also failed to state a claim for both unjust enrichment and money had and received because she has not pleaded facts that demonstrate that she directly conferred a benefit on any of the Defendants, as required by Tennessee law. And because all other causes of action are subject to dismissal, Plaintiff cannot bring an action for civil conspiracy, because Tennessee law does not recognize civil conspiracy as a free-standing cause of action. For the foregoing reasons, Defendants' Motions to Dismiss the Complaint in its entirety will be granted. An Order will accompany this Opinion.

 Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases  P 73,280

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3682686 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Further Support of Certain Defendants' Motions to Dismiss or for Judgment on the Pleadings (Aug. 25, 2004)Original Image of this Document (PDF)

• 2004 WL 3682685 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Certain Defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 10
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: 2001 WL 849928 (D.D.C.))**

Motions to Dismiss or for Judgment on the Pleadings (Jul. 6, 2004)Original Image of this Document (PDF)

• 2004 WL 3682684   (Trial Motion, Memorandum and Affidavit) Class Plaintiffs' Memorandum in Support of Motion for Final Approval of Settlements with the Sumitomo, Tanabe, Lonza, Degussa, Nepera, and Reilly Defendants and for Entry of Final Judgment (Jan. 16, 2004)Original Image of this Document (PDF)

• 2003 WL 24251856   (Trial Motion, Memorandum and Affidavit) Reply of Cargill and Tyson Plaintiffs in Support of Their Motion to Intervene (Dec. 11, 2003)Original Image of this Document (PDF)

• 2003 WL 24251853   (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement and form and Manner of Notice to the Classes (Dec. 4, 2003)Original Image of this Document (PDF)

• 2003 WL 24251854   (Trial Motion, Memorandum and Affidavit) Class Plaintiffs' Opposition to Cargill and Tyson Plaintiffs' Motion to Intervene (Dec. 4, 2003)Original Image of this Document (PDF)

• 2003 WL 24251855   (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement and form and Manner of Notice to the Classes (Dec. 4, 2003)Original Image of this Document (PDF)

• 2003 WL 24251871   (Trial Pleading) Answer of Defendant Mitsui & CO., Ltd. to Plaintiffs' Fourth Amended Complaint (Nov. 25, 2003)Original Image of this Document (PDF)

• 2003 WL 24251872   (Trial Pleading) Answer of Defendant Mitsui & Co. (U.S.A.), Inc. to Plaintiffs' Fourth Amended Complaint (Nov. 25, 2003)Original Image of this Document (PDF)

• 2003 WL 24251852   (Trial Motion, Memorandum and Affidavit) Motion of Cargill and Tyson Plaintiffs to Intervene (Nov. 21, 2003)Original Image of this Document (PDF)

• 1:99mc00197 (Docket) (May 27, 1999)

• 1999 WL 33988058   (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Opposition to Certain Defendants'

Motions to Dismiss or for Judgment on the Pleadings (1999)Original Image of this Document (PDF)

• 1998 WL 34368140   (Trial Pleading) Class Action Antitrust Complaint (Sep. 30, 1998)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT K**

Westlaw.

Not Reported in A.2d                                                                                                    Page 1
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
(Cite as: 2005 WL 1869211 (N.J.Super.L.))

H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey, Law Division.
Anita LAUFER, on behalf of herself and all others
similarly situated,
Plaintiff,
v.
THE UNITED STATES LIFE INSURANCE
COMPANY IN THE CITY OF NEW YORK and
Albert H.
Wohlers & Co. n/k/a Seabury & Smith Defendants,
No. BER-L-9082-04.

Aug. 8, 2005.

Madeline L. Houston and Melissa J. Totaro
(Houston & Totaro, attorneys) argued the cause for
plaintiff.

Peter Jason of the New York and Pennsylvania bars,
Gregory R. Haworth, and Margaret M. O'Rourke
(Duane Morris, LLP, attorneys) argued the cause for
defendant the United States Life Insurance Company
in the City of New York.

Joanne M.F. Wilcomes (McCarter & English, LLP,
attorneys) appeared on behalf of defendant Albert H.
Wohlers & Co. n/k/a Seabury & Smith.

HARRIS, J.

*I. INTRODUCTION*

**\*1** Plaintiff has moved for (b)(2) class certification
of her consumer fraud action. R. 4:32-1(b)(2). She
claims that she was the victim of affirmative
misrepresentations made by defendants that lulled her
into the false belief that she was insured for nursing
home [FN1] expenses. Whether she will prevail
against defendants and receive redress for her tale of
woe is uncertain. What is clear, nevertheless, is her
demonstration that she is an appropriate
representative to pursue injunctive and declaratory
relief against defendants on behalf of a class. Her
motion to certify a(b)(2) class is granted.

FN1. Arguably, nursing home expenses

were covered by plaintiff's insurance, as
long as the facility in which the expenses
accrued *did not* in whole or part have mostly
aged persons as its population.

In 1996, plaintiff Anita Laufer (Laufer), a New
Jersey resident,--as a member of Women's American
ORT (ORT) [FN2]--applied for increased coverage
under an extant group Catastrophe Major Medical
Insurance Plan (Plan) issued by defendant The United
States Life Insurance Company in the City of New
York (U.S. Life), a New York corporation [FN3]
with a place of business in Neptune, New Jersey.
Already enjoying protection under the Plan, Laufer
claims that she was induced and deceived by U.S.
Life's administrator--defendant Albert H. Wohlers &
Co. (now known as Seabury & Smith (Wohlers),
operating out of Park Ridge, Illinois)--to apply for
Enhanced Benefit Riders that expressly included
nursing home coverage, when, in reality nursing
home coverage was not available.

FN2. Women's American ORT describes
itself as: "a national Jewish organization
whose defining mission is this: to give a
person a livelihood is to save a life. A vital
component of the global ORT network,
Women's American ORT was founded in
1927 by a group of dedicated women who
gathered in a Brooklyn kitchen to raise
funds to assist European Jews in the
devastating aftermath of World War I. Since
then, Women's American ORT has grown
into the largest ORT affiliate and the leading
contributor to ORT programs." See
http://www.waort.org/history.html (last
visited on August 5, 2005).

FN3. See Yourman v. People's Sec. Life Ins.
Co., 992 F.Supp. 696 (D.N.J.1998).

Laufer has moved for a declaration that this litigation
shall proceed in part as a class action seeking only
injunctive and declaratory relief under the New
Jersey Consumer Fraud Act (N.J.S.A. 56:8-1 to -20)
(NJCFA). See R. 4:32-2 and R. 4:32-1(b)(2). Laufer
also seeks to preserve her incidental individual claim
for compensatory damages for herself only--and not
on behalf of the putative class--under the NJCFA. I
conclude that this action shall proceed as a class
action, but with a severely truncated class definition.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

*II. BACKGROUND*

 At an unspecified time prior to 1993, Laufer, through her ORT membership, became insured under a group $1,000,000 Excess Major Medical Accident and Sickness Policy (Policy Number AGC-268) underwritten by Insurance Company of North America (INA Policy). The INA Policy did not provide nursing home coverage; rather, it provided that expenses for a *convalescent care facility* would be reimbursed up to $150 per week for a maximum of 52 weeks. A convalescent care facility is defined in the INA policy as:

"Convalescent care facility" shall mean an institution, other than a hospital, set up according to law which: (1) provides permanent and full-time bed care facilities for in-patients; (2) provides the services of a physician and professional nurses at all times; (3) keeps a daily medical record for each patient; (4) mainly provides continuous skilled nursing care for sick or injured persons while they are recovering; and (5) *is not mainly a place for rest, custodial care, or care of the aged,* drug addicts, alcoholics, or persons with mental or nervous disorders.
**\*2** (emphasis supplied.)

 The INA Policy was discontinued on December 31, 1993, and a replacement policy (Group Policy No. E-160,398) was provided by U.S. Life, effective on January 1, 1994. The replacement policy did not reference nursing home expenses, but provided for reimbursement of charges made by a *convalescent home,* described as follows:
CONVALESCENT HOME means a licensed institution that has on its premises:
?Organized facilities to care for and treat its patients
?A staff of physicians to supervise such care and treatment
?A registered nurse on duty at all times.
"Convalescent home" does not mean a place or part of one, which is used mainly for:
?The aged  [FN4]

FN4. The replacement policy does not define the phrase "the aged." The Social Security Administration publishes *Income of the Aged Chartbook, 2002,* which describes in its Preface an "aged unit" as either a married couple living together, with husband or wife aged 65 or older (generally measured by the age of the husband), or a person 65 or older who does not live with a

spouse. See http://www .ssa.gov/policy/docs/chartbooks/income_ aged/2002/iac02.pdf (last visited on August 5, 2005).

?Alcoholics
?Drug addicts
?Persons with mental, nervous, or emotional disorders.

 Until 2002, the administrator of the INA Policy, the replacement policy, and the Plan was Wohlers. From time to time, Wohlers would send to existing policyholders correspondence touting the availability of enhanced benefits, usually at an increased premium. Laufer received an "Important Notice" from Wohlers in 1996, proclaiming that the Plan would be adjusted to improve her nursing home benefit. It stated:
The Nursing Home Benefit Rider increases your coverage ...
Up to $500 per week in benefits payable for convalescent or custodial care for a covered confinement in a nursing home.
 Later, in 1997, Laufer further increased her benefits under the Plan by adopting the Enhanced Benefits Riders, giving her $2,000,000 in total insurance protection, increasing her Nursing Home benefit by $100 per week, and increasing her semi-annual premium from $375.05 to $408.62. Laufer received bills from time to time from Wohlers that reflected her maximum benefits as $2,000,000, with a deductible amount of $35,000, and a Nursing Home Benefit of $600 (per week). In 2001, the semi-annual premium for these benefits was $556.23.

 Laufer also owned a major medical insurance policy that she obtained under the auspices of her employer, Murray Tool & Manufacturing. This policy, referred to in Laufer's deposition as the "Guardian insurance," was considered by Laufer to be adequate for her needs, but she maintained the INA Policy, the replacement policy, and the Plan because "I had nursing home coverage." Deposition of Laufer, June 9, 2005 at 41:21-22. Laufer further testified:
But since I had nursing home coverage, that was something everyone said you have to have, I kept it, not because of the medical. I never made a claim, I never had to.
Deposition of Laufer, June 9, 2005 at 43:9-12.

 Laufer claims that she learned in September 2002, for the first time, that none of her ORT insurance policies actually provided what she considered to be nursing home benefits. In a letter dated April 30,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 3
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
(Cite as: 2005 WL 1869211 (N.J.Super.L.))

2003, a representative of U.S. Life's parent corporation, AIG American General Life Companies (AIG), acknowledged that the Plan, in fact, did not expressly provide nursing home benefits notwithstanding Wohlers' correspondence that expressly referred to nursing home benefits. In a subsequent letter dated September 5, 2003, AIG stated:

**\*3** United States Life cannot comment on nor take responsibility for any representation made by Wohlers to Ms. Laufer as an inducement to purchase the coverage, as United States Life was not the underwriter of the plan at the time Ms. Laufer's coverage became effective. However, we do accept responsibility for the continued reference to a nursing home benefit after our policy became effective. *We recognize that use of the term has the capacity to mislead in that it implies coverage for a stay in a long-term custodial facility for the aged.* Accordingly, I offered to Ms. Laufer that, in the event she ever requires convalescent or custodial care, we would work with her to take full advantage of her benefits.

(emphasis supplied.)

Ultimately, in 2003, upon the advice of her attorney, Laufer cancelled the Plan.

I kept the coverage because of the nursing home clause, I had nursing home coverage which I believed to have and I found out I didn't have nursing home. But I wanted to find out if that was a legitimate case of--I was very angry, I went to the Congressman's office first to find out if there was something to what I was assuming, and he said yes, he sent me to the senior lawyers and they sent me to Houston & Totaro. And then--and they told me not to cancel the insurance, if I'm going to make a case against it, until I'm told. And when I was told I cancelled it. I was not going to keep it, I was only keeping it for that.

Deposition of Laufer, June 9, 2005 at 41:20 to 42:8.

Laufer did not replace the so-called nursing home benefits after canceling the Plan. She applied to John Hancock for long-term care insurance but was declined coverage. Laufer made no other applications for long-term care or nursing home insurance after the John Hancock declination.

The instant action was commenced on May 18, 2004. In a single-count complaint, Laufer seeks declaratory and injunctive relief under the NJCFA on behalf of herself and all others similarly situated, and compensatory damages under the NJCFA for her individual loss. The instant motion seeks certification

of a class under R. 4:32-1(b)(2) defined as follows:

All persons in the United States who at any time from May 12, 1998 through the present are or have been insured under a group catastrophe major medical insurance policy underwritten by United States Life Insurance Company in the City of New York and which at any time has been administered by Albert H. Wohlers & Co. n/k/a/ Seabury and Smith.

Defendants resist Laufer's motion arguing that she has not demonstrated adequate standing and she has failed to satisfy all of the criteria of R. 4:32- 1.

*CLASS MAINTAINABILITY OF DECLARATORY AND INJUNCTIVE RELIEF UNDER THE NEW JERSEY CONSUMER FRAUD ACT*

The NJCFA was enacted to "protect against fraudulent and unconscionable practices in the sale of goods and services." *Marascio v. Campanella,* 298 N.J.Super. 491, 500, 689 A.2d 852 (App.Div.1997). The purposes of the NJCFA are: (1) to compensate the victim for his or her actual loss; (2) to punish the wrongdoer through the award of treble damages; and (3) to attract competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. *See Lettenmaier v. Lube Connection, Inc.,* 162 N.J. 134, 139, 741 A.2d 591 (1999). The NJCFA is "remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection." *Joe D'Egidio Landscaping v. Apicella,* 337 N.J.Super. 252, 258, 766 A.2d 1164 (App.Div.2001) (citing *Lettenmaier v. Lube Connection, Inc., supra,* 162 N.J. at 139, 741 A.2d 591).

**\*4** The Legislature enacted the NJCFA in 1960 to give consumers relief from fraudulent practices in the marketplace and to deter merchants from employing those practices. *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 21, 647 A.2d 454 (1994). Today, the NJCFA makes it unlawful for a person to use "any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation ... in connection with the sale or advertisement of any merchandise...." N.J.S.A. 56:8-2. The Act protects against knowing misrepresentations, omissions of material fact, and violations of administrative regulations, whether or not the merchant acts in bad faith. N.J.S.A. 56:8-2; *Cox v. Sears Roebuck & Co., supra,* 138 N.J. at 16-17, 647 A.2d 454; *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 605, 691 A.2d 350 (1997). The NJCFA protects consumers from more than just "shifty, fast-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

talking, and deceptive merchant[s]" and "sharp practices and dealings...." *Cox v. Sears Roebuck & Co., supra,* 138 N.J. at 16, 647 A.2d 454 (internal quotations omitted). It also protects consumers from unfair practices "even when a merchant acts in good faith." *Ibid.* In furtherance of the legislation's overarching remedial purpose, a consumer may file a private cause of action against an offending merchant whenever that consumer suffers an ascertainable loss as a result of a violation. N.J.S.A. 56:8-19; *Weinberg v. Sprint Corp.,* 173 N.J. 233, 249, 801 A.2d 281 (2002) (citing *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 473, 541 A.2d 1063 (1988)).

 As noted, the NJCFA covers both affirmative acts and omissions. *Strawn v. Canuso,* 140 N.J. 43, 60, 657 A.2d 420 (1995). An affirmative misrepresentation is one that is material to the transaction and that is a statement of fact, found to be false, made to induce a person to engage in the transaction. Affirmative acts do not require a showing of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive. *Gennari v. Weichert Co. Realtors, supra,* 148 N.J. at 605, 691 A.2d 350. Additionally, there may be a violation of the NJCFA by the knowing concealment, suppression, or omission of any material fact with the intent that others rely on such concealment, suppression, or omission in connection with the transaction. *DiIorio v. Structural Stone & Brick Co., Inc.,* 368 N.J.Super. 134, 142, 845 A.2d 658 (App.Div.2004). As applicable here, Laufer claims that the correspondence sent by Wohlers on behalf of U.S. life had the capacity to mislead affected parties into believing that they enjoyed nursing home benefits--including facilities where the majority of the population is aged--as part of the Plan.

 The NJCFA affords a private cause of action under limited circumstances. To state a claim under the NJCFA, a private "plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.,* 367 N.J.Super. 8, 12-13, 842 A.2d 174 (App.Div.), *certif. denied,* 178 N.J. 249, 837 A.2d 1092, (2003) (citing *Cox v. Sears Roebuck & Co., supra,* 138 N.J. at 24, 647 A.2d 454). "To constitute consumer fraud ... the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer...." *New Jersey Citizen Action*

*v. Schering-Plough Corp., supra,* 367 N.J.Super. at 13, 842 A.2d 174 (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 416, 655 A.2d 417 (1995), *cert. denied,* 516 U.S. 1066, 116 S.Ct. 752, 133 L.Ed.2d 700 (1996)). In an action under the NJCFA, the test is whether the conduct of a defendant has the capacity to mislead the average consumer. *Cox v. Sears Roebuck & Co., supra,* 138 N.J. at 17, 647 A.2d 454; *Barry v. Arrow Pontiac, Inc.,* 100 N.J. 57, 69, 494 A.2d 804 (1985); *Dabush v. Mercedes Benz USA, LLC,* 378 N.J.Super. 105, 115-116, 874 A.2d 1110 (App.Div.2005); *Leon v. Rite Aid Corp.,* 340 N.J.Super. 462, 469-72, 774 A.2d 674, (App.Div.2001); *Chattin v. Cape May Greene, Inc. (I),* 216 N.J.Super. 618, 639, 524 A.2d 841 (App.Div.), *certif. denied,* 107 N.J. 148, 526 A.2d 209 (1987); *Miller v. American Family Publishers,* 284 N.J.Super. 67, 74, 663 A.2d 643 (Ch.Div.1995). In this regard, Laufer claims that she is an adequate surrogate for the supposed thousands of persons who received the misleading correspondence from Wohlers and who either paid premiums for illusory coverage or maintained their insurance in the vain expectation of future benefits for nursing home expenses. For herself, Laufer seeks remedies for a tangible ascertainable loss, *e.g., Thiedemann v. Mercedes-Benz USA, LLC,* 183 N.J. 234, 872 A.2d 783 (2005) (a private plaintiff must produce evidence from which a fact finder could find or infer that the plaintiff suffered an actual loss) presumably consisting of at least portions of the premiums she paid to U.S. Life from 1998 until 2003. For the class, all that Laufer seeks is a declaration that U.S. Life violated the NJCFA and a mandatory injunction requiring that the class be advised of the lack of nursing home benefits under the Plan and that U.S. Life violated the NJCFA. Under these circumstances, Laufer plainly has standing to pursue both her individual damage claims and the declaratory/injunctive remedies. In order to recover her individual damages under the NJCFA, Laufer will necessarily receive a declaration of rights--from the trier of fact--that will redound to the benefit of the class as well. If she is otherwise an appropriate representative, her ascertainable loss is all that is needed to apply a declaration of her rights to the class. If she is unsuccessful in convincing the trier of fact that a violation of the NJCFA occurred, then her hoped-for declaration will evaporate and an injunction will be unavailable for her and those for whom she is the representative.

 **\*5** A properly defined class is imperative for a suit to proceed as a class action because the class definition facilitates identifying, at the outset, the individuals

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 5
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
(Cite as: 2005 WL 1869211 (N.J.Super.L.))

affected by the litigation, and protects their interests. First, the definition determines who is entitled to notice, and, for class actions maintained under R. 4:32-1(b)(3), [FN5] provides an opportunity to opt out of the class. Failure to define a class precisely creates a substantial risk that putative class members cannot adequately exercise their right to opt out of or remain in the suit before they are bound by a class judgment. *Cf. General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160-61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting the unfairness to class members bound by a judgment when the class is overly broad). Second, the class definition determines the nature of the relief that can be awarded and who is entitled to that relief. Finally, clearly defining the class identifies the plaintiffs who will be bound by the judgment if they lose, and insures that those actually harmed by a defendant's wrongful conduct will receive the relief ultimately awarded. *See Simer v. Rios,* 661 F.2d 655, 670 (7th Cir.1981).

> FN5. Plaintiff has carefully constructed her action to avoid the superiority and predominance elements of R. 4:32-1(b)(3); rather, she seeks certification of the declaratory judgment and injunction class only under R. 4:32-1(b)(2).

For a class to be sufficiently defined, it must be precise: the class members must be presently ascertainable by reference to objective criteria. *See DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970); *Newton v. Southern Wood Piedmont Co.,* 163 F.R.D. 625, 632 (S.D.Ga.1995), *aff'd,* 95 F.3d 59 (11th Cir.1996); *Gomez v. Illinois State Bd. of Educ.,* 117 F.R.D. 394, 397 (N.D.Ill.1987); *Joseph v. General Motors Corp.,* 109 F.R.D. 635, 639 (D.Colo.1986). This means that the class should not be defined by criteria that are subjective or that require an analysis of the merits of the case. *See DeBremaecker v. Short, supra,* 433 F.2d at 734 (affirming dismissal of class action because definitional language was subject to individual interpretation); *Simer v. Rios, supra,* 661 F.2d at 669 (affirming denial of class certification because identifying class members based on each individual's state of mind would be a "Sisyphean task"); *Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403 (E.D.Pa.1995) (finding proposed definition untenable because determining class membership would require mini-hearings on the merits of each case). An imprecise class definition, which does not give rise to presently ascertainable class members, undermines judicial economy and efficiency, thereby interfering with one of the primary purposes of class action suits.

Thus, the class definition must meet a minimum standard of definiteness for a court to proceed with certification. I note, however, that a class definition will not fail merely because not every potential class member can be identified at the suit's commencement. *See Carpenter v. Davis,* 424 F.2d 257, 260 (5th Cir.1970).

The first problem that immediately appears is the overbroad nature of plaintiff's class definition as encompassing a national scope. Plaintiff has not provided an in-depth choice of law analysis and simply pins her hopes for the application of the NJCFA on a nationwide basis because U.S. Life has substantial contacts to New Jersey. This overlooks the fact that Wohlers--the source of the allegedly deceptive correspondence--operates out of Illinois. Why not deploy the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et. seq.?* In similar vein, since U.S. Life is a New York corporation, why not urge the use of Section 349 of the New York General Business Law that makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a)? Also, the Plan itself states "[t]his policy is issued in and governed by the laws of Alabama." Is the Alabama Deceptive Trade Practices Act, § 8-19-1 et seq., Ala.Code 1975 applicable? More importantly, what are the reasonable expectations of insureds in other states concerning what law should apply to their grievances? Would, say, a person insured under the Plan who was living in Massachusetts reasonably expect that New Jersey's law governs a dispute with U.S. Life?

**6** The answer to these questions lies not in intuition, but emerges only after a full bodied choice of law analysis, an analysis that has not been provided by the parties. Nevertheless, this much is known: New Jersey's consumer protection laws are not substantially the same as the rest of the nation's. *Fink v. Ricoh Corp.,* 365 N.J.Super. 520, 577-584, 839 A.2d 942 (Law Div.2003) (identifying numerous conflicts between the consumer fraud law of New Jersey and that of consumer fraud statutes of numerous other states). Accordingly, it is not the simple expedient of glossing over all of these differences in favor of the familiar NJCFA.

Laufer argues that all of the choice of law precedents arrayed against her by U.S. Life are only relevant to class maintainability determinations under R. 4:32-1(b)(3) where predominance of common issues must exist and the class action vehicle be the superior

Not Reported in A.2d                                                              Page 6
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

means of redressing the grievance(s) of the absent class. Laufer asserts that in analyzing her (b)(2) class claims, choice of law issues are rendered either irrelevant or unimportant. I disagree. While it is true that in a(b)(3) situation that seeks multi-jurisdictional application, the choice of law issues may monopolize the predominance and superiority elements, e.g. *In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir.2002)* ("[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules[.]"), fundamental principles of due process and common sense require a preliminary determination of whether the forum state's substantive law is applicable to out-of-state absent class members' grievances.

New Jersey trial judges have, in appropriate circumstances, the authority to certify a national class action under *Phillips Petroleum v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).* In that case, the Supreme Court held that the forum state may exercise jurisdiction over absent class members if given notice and opportunity to opt-out, i.e., minimal procedural due process protection. *Id. at 811-12.*

Where there is a conflict of law between New Jersey and the law of absent class members' residences, there is a risk that continuing to apply the law of this state could be unconstitutional. The Supreme Court addressed this issue in *Allstate Ins. Co. v. Hague, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).* In *Allstate,* the Court stated that the Due Process Clause and the Full Faith and Credit Clause provided modest restrictions on the application of the forum state's law. *Id.* These restrictions require "that for a state's substantive law to be selected in a constitutionally permissible manner, that state must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.,* 312-313.

Because New Jersey is the forum for this litigation, its choice of law rules apply. *Fu v. Fu, 160 N.J. 108, 117-118, 733 A.2d 1133 (1999).* Our rules employ a flexible governmental-interest analysis to determine which state has the greatest interest in governing the specific issue that arises in the underlying litigation. *Ibid.; Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996); Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986).* Ordinarily, choice of law determinations are made on an issue-by-issue basis, with each issue receiving separate analysis. *Gantes,*

*supra,* 145 N.J. at 484, 679 A.2d 106; *Veazey, supra,* 103 N.J. at 24, 510 A.2d 621 (1996); *White v. Smith, 398 F.Supp. 130, 134 (D.N.J.1975)* ("In order to determine which state has the greatest interest in the application of its own law, each issue must be analyzed separately."); *Grossman v. Club Med Sales, Inc., 273 N.J.Super. 42, 51, 640 A.2d 1194 (App.Div.1994)* (observing that "[i]t is thus conceivable that the law of one jurisdiction may apply to one issue in a matter and the law of a second jurisdiction to another."). See also *Clawans v. United States, 75 F.Supp.2d 368, 374-75 (D.N.J.1999)* (applying New Jersey law to issue of damages and Maryland law to issue of fault apportionment). This analysis focuses on the relationship between the parties with the respective jurisdictions and the nature of the events at issue that have taken place within each jurisdiction. In addition, the character of each jurisdiction's policy preferences is relevant to the particular litigation. *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 417 A.2d 488 (1980).* Thankfully, the question here is limited to the applicability of the NJCFA and whether it would be appropriate to apply that law to out-of-state members of the putative class.

**\*7** Laufer argues that New Jersey's law is the appropriate choice because New Jersey has special interests in this matter. These special interests include ensuring that companies associated with New Jersey conduct themselves in ways that do not trample the rights of consumers, wherever situated. Laufer must recognize that an individual's decisions whether to acquire and continue catastrophe major medical insurance are personal determinations influenced by a great many local conditions and personal circumstances. She furthermore must recognize that the consequences that flow from those decisions are felt most keenly in the environment of a insured's residence, often far from New Jersey. However, U.S. Life's administrator's dissemination of allegedly deceptive representations from Illinois also plays a significant role in purchase and retention decisions. Nevertheless, Laufer simply ignores everything except U.S. Life's fortuitous address in Neptune, New Jersey. The simplistic answer--from plaintiff's perspective--is that defendant is responsible for all actions of the administrator, and New Jersey is its home. Thus, to allow such a defendant insurance company to continue to spew misrepresentations throughout the nation runs counter to New Jersey's strong policy of discouraging such tortious conduct.

It is not merely a detached statement of law that the NJCFA provides some of the most comprehensive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consumer protections in the nation; it is a source of state pride and is reflected in the lifestyle that most of its citizens have come to enjoy. Nevertheless, New Jersey has not elected to be the litigation capital for all consumer disputes with New Jersey-located companies throughout the United States. Its consumer protection laws as applied by its court system, notwithstanding a salutary open door philosophy, are not automatically a sanctuary for all those consumers who seek redress from grievances caused by New Jersey entities if the consumer's home jurisdiction has greater contacts and interests in the dispute. And, indeed, home jurisdictions do have the greatest interest to protect their citizens in the acquisition process for insurance. Since the insurance proceeds are most likely to be utilized in or near the residences of the insureds, their home states have important and overriding concerns that trump New Jersey's supposed roving commission to ensure accurate disclosures to insureds.

US Life takes issue with Laufer as to whether or not she has demonstrated the requisite proofs in New Jersey's choice of law analysis in order to determine that the NJCFA is paramount and applies to all potential class members, wherever they may reside. US Life advocates that plaintiff has failed to demonstrate compliance with New Jersey's well-entrenched governmental-interest standard, which "requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." *Gantes, supra,* 145 N.J. at 484, 679 A.2d 106.

**\*8** This two-tiered test requires the court to decide whether an actual conflict exists between the laws of New Jersey and other jurisdictions. *Id.* If an actual conflict is identified, the second step is to determine the interest that each jurisdiction has in resolving the specific issue in dispute. *Id.* at 485, 679 A.2d 106. This determination is made through an identification of the governmental policies underlying the law of each jurisdiction and how the policies are affected by each jurisdiction's contacts to the litigation and to the parties. I have concluded that there are dramatic material conflicts between New Jersey's consumer protection laws and those of its sister states. To be sure, there is no uniformity in language among the laws, and disparate substantive and procedural aspects proliferate among the jurisdictions. Moreover, the differences for the most part lie in major areas, not in nuances. Some jurisdictions seem to emphasize consumer protections, while others consign the concept to a much lower order of magnitude on the spectrum of public policy. Even so,

every jurisdiction's consumers enjoy some legislatively endorsed protective devices. The variety of homegrown variations creates a welter of comparative data that reveals discordance with New Jersey's scheme in one or more of its definitional conventions, remedies, elements, standing rules, damages, or limitation of actions provisions.

The wide variation among the jurisdictions and these significant differences in applying principles of consumer protection belie the suggestion that there is any intrinsic coalescence between the NJCFA and any other jurisdiction's consumer protection scheme. The opposite is apparent: it is clear that under the NJCFA, out-of-state class members would probably be treated quite differently than if they sought remedies in their home jurisdictions for the same conduct. Accordingly, I must analyze the interest that each jurisdiction has in resolving the specific issue in dispute.

Each absent class member's local jurisdiction has an abiding interest 1) in protecting its consumers from homegrown injuries caused by foreign corporations and 2) in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each jurisdiction being the place where plaintiffs reside, usually the place where plaintiffs bought and utilized their insurance, and the locale where the sequelae of defendants' conduct are felt. Laufer argues that I can apply New Jersey law in the present action because New Jersey has the most significant contacts to the dispute. However, the only connectivity between New Jersey and members of the proposed class is that U.S. Life maintains a corporate presence and operational decision-making facilities are located here. Thus, it is submitted that New Jersey was the embarrassing source of deceptive information that flooded America at the hands of Wohlers. New Jersey, it is urged, has an overwhelming interest embodied by the NJCFA, to deter such conduct, presumably to preserve and restore the reputation of New Jersey insurance products in the marketplace.

**\*9** Laufer may be correct that the public policy of this state frowns on those business entities that take shelter here and use their New Jersey base of operations to trap unsuspecting consumers elsewhere. The particular jurisdiction in which that ambush occurs--the residence of the ultimate insured--also has vital interests of deterrence and compensation. Resident-victims of consumer fraud are generally best protected by their own local legislatures. Their elected representatives have already expressed

Not Reported in A.2d                                                           Page 8
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

interest in such protection by the passage of the wide-variety of consumer protection laws previously mentioned. That those protections may or may not be as extensive as New Jersey's is not the important factor. Rather, I must focus on what is New Jersey's interest in protecting those out-of-state consumers, even in light of the New Jersey source of the problem.

I conclude that New Jersey has a significantly diminished interest in a long-arm protective scheme for out-of-state victims of consumer fraud, especially where insurance is concerned. The opposite, however, is true for New Jersey's residents, a situation that is similar for all of the other 50 jurisdictions. In other words, where the potential buyer of insurance or the insured actually resides is the primary focus of consumer protection laws. It is that jurisdiction that has the greatest governmental interest in having its consumer protection laws applied. Indeed the abundance of insurance departments in state governments attest to the local oversight afforded consumers. They hardly need New Jersey's NJCFA as additional paternalistic protection. The point here is that a nationwide class that turns on New Jersey law would be anomalous and presumptuous. A more modest class comprised of New Jersey residents, led by Fair Lawn resident Laufer, who are clearly entitled to the protection of the NJCFA is appropriate.

Class actions "should be liberally allowed where consumers are attempting to redress a common grievance under circumstances that would make individual actions uneconomical to pursue." _Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 45, 752 A.2d 807 (App.Div.2000)._ An applicant for class treatment must establish the threshold requirements of numerosity, commonality, typicality, and adequacy of representation set forth in R. 4:32-1(a), and also satisfy one of the three alternative requirements set forth in R. 4:32-1(b). _Saldana v. City of Camden, 252 N.J.Super. 188, 193, 599 A.2d 582 (App.Div.1991)._ Under R. 4:32-1(b)(2), the party seeking certification must demonstrate that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

At this posture of the application, I am required to indulge "every favorable view" of plaintiff's complaint and the record. _Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 223, 294 A.2d 7 (1972)_(merits of

action are not involved in determination of the mode in which the action shall proceed unless the allegations are patently frivolous); _Delgozzo v. Kenny, 266 N.J.Super. 169, 181, 628 A.2d 1080 (App.Div.1993)_(" '[t]he court is bound to take the substantive allegations of the complaint as true' ")(quoting _Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir.1975),_ cert. denied, _429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976))._ In addition to the pleadings, the discovery taken in the matter is relevant. The evaluation of the legal and factual issues underlying a class certification motion, however, should be less penetrating as compared to a motion for summary judgment or at trial. _See In re Cadillac, 93 N.J. 412, 426, 461 A.2d 736 (1983)._

**\*10** While not bound by the interpretations given the federal class-action rule, New Jersey courts, when construing its class action rule, "... have consistently looked to the interpretations given the federal counterpart for guidance" _Delgozzo v. Kenny, supra, 266 N.J.Super. at 188, 628 A.2d 1080. See also Riley v. New Rapids Carpet Ctr., supra, 61 N.J. at 226, 294 A.2d 7_ ("[o]ur class-action rule, R. 4:32, is a replica of _Rule 23 of the Federal Rules of Civil Procedure_ as amended in 1966."); _Muise v. GPU, Inc. ., 371 N.J.Super. 13, 30-31, 851 A.2d 799 (App.Div.2004)_("construction of the federal rule may be considered helpful, if not persuasive, authority"). Thus, in order to determine whether the requirements for class action maintainability have been met, inquiry beyond the pleadings must be made because "a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." _Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996); accord, Carroll v. Cellco Partnership, 313 N.J.Super. 488, 495, 713 A.2d 509 (App.Div.1998)._

Within this jurisprudential framework, I embark upon an analysis of each of the issues required to be considered under R. 4:32. A trial court should not certify a class until it has been determined, through rigorous analysis, that all the prerequisites of the rule governing class actions have been satisfied. As a first hurdle, as noted, a class is appropriate for certification only if it meets the four prerequisites of a class action set out in R. 4:32-1(a). Under this rule, one or more members of a class may sue or be sued as representative parties on behalf of all, only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Once this threshold is surmounted, the additional requirements of R. 4:32- 1(b)(2) must be met. This second hurdle requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." R. 4:32-1(b)(2). Although U.S. Life and Wohlers may have acted on grounds generally applicable to the class and I may certify a(b)(2) class that requests incidental damages for plaintiff only, I must also assure myself that final injunctive relief would be "appropriate." In the Third Circuit, courts analyze the propriety of injunctive relief under the rubric of "cohesiveness." See *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 248 (3d Cir.1975) (explaining that a(b)(2) "class must be cohesive as to those claims tried in the class action"). "Indeed, a(b)(2) class may require more cohesiveness than a(b)(3) class ... because in a(b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Barnes v. American Tobacco Co.,* 161 F.3d 127, 142-143 (3d Cir.1998).

**\*11** Rule 4:32-2(d) provides that "an action may be brought or maintained as a class action with respect to particular issues....". Federal district courts under Fed.R.Civ.P. 23(c)(4)(A) are instructed that they should " 'take full advantage of th[is] provision' ' to certify separate issues "in order ... 'to reduce the range of disputed issues' in complex litigation" and achieve judicial efficiencies. *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1993) (quoting *In re A.H. Robins Co.,* 880 F.2d 709, 740 (4th Cir.1989)); *accord Hilao v. Estate of Marcos,* 103 F.3d 767, 782-87 (9th Cir.1996); *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918, 929 (9th Cir.1982). This is sound advice and applies equally under our state system. New Jersey courts have determined that principled discretion must be applied in the treatment of the class certification rule. The reason for this attitude is that class actions save time and money for the parties and the public and promote consistent decisions for people with similar claims. *Carroll v. Cellco Partnership,* supra, 313 N.J.Super. at 498, 713 A.2d 509 (citing *In re Cadillac, supra,* 93 N.J. at 430, 461 A.2d 736).

*Numerosity*

To begin, R. 4:32-1(a)(1) requires that the class be

"so numerous that joinder of all members is impracticable." This requirement does not demand that joinder be impossible, but rather that joinder would be extremely difficult or inconvenient. See *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,* 149 F.R.D. 65, 73 (D.N.J.1993) (impracticability does not mean impossibility, but rather that the difficulty or inconvenience of joining all members calls for class certification). Whether joinder of all of the class members would be impracticable depends on the circumstances surrounding the case and not merely on the number of class members. See *General Tel. Co. of the Northwest v. E.E.O.C.,* 446 U.S. 318, 329, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (numerosity requires examination of specific facts of each case and imposes no absolute numerical limitations). See also *Liberty Lincoln Mercury,* 149 F.R.D. at 73 (number is not, by itself, determinative); *Ardrey v. Federal Kemper Ins. Co.,* 142 F.R.D. 105, 109 (E.D.Pa.1992). While no minimum number of class members is required, "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong ... has been met." *Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir.2001). A class of 81 property owners seeking money damages is sufficiently large to meet the numerosity requirement. *Saldana v. City of Camden, supra,* 252 N.J.Super. at 193, 599 A.2d 582. In order to satisfy the numerosity requirement "[p]recise enumeration of the members of a class is not necessary." *Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397, 405 (D.N.J.1990); *see also In re Cadillac, supra,* 93 N.J. at 425, 461 A.2d 736.

Plaintiff's evidence of the number of affected insureds is somewhat lacking in probative value. She essentially says that because her discovery demands have gone unanswered, I should assume numerosity. This is untenable, except for the deafening silence on this issue from U.S. Life. It does not argue that Laufer has failed to demonstrate entitlement to class treatment due to a lack of sufficient class members. Accordingly, even though the record is bereft of information to suggest the complement of persons affected either nationally or within this state, I conclude that plaintiff has more than enough to satisfy the numerosity requirement of R. 4:32-1(a)(1).

*Commonality*

**\*12** Rule 4:32-1(a)(2) requires that there be questions of law or fact common to the class, "although not all questions of law or fact raised need be in common." *Weiss v. York Hospital,* 745 F.2d 786, 808-809 (3d Cir.1984), *cert. denied,* 470 U.S.

1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (citing 7 C. Wright & A. Miller, *Federal Practice & Procedure* § 1763, at 603 (1972)). Where class members' factual circumstances are materially identical and the "questions of law raised by the plaintiff are applicable to each [class] member," the commonality requirement is satisfied. *Weiss v. York Hospital, supra,* 745 F.2d at 809 (citations omitted). Further, the commonality requirement is met "[w]hen the party opposing the class has engaged in a course of conduct that affects a group of persons and gives rise to a cause of action," resulting in all of the members sharing at least one of the elements of that cause of action. *Newberg Class Actions,* § 3.10 (3d ed.1992). Common questions arise "from a 'common nucleus of operative facts' regardless of whether the underlying facts fluctuate over the class period and vary as to individual claimants." *In re Asbestos School Litig.,* 104 F.R.D. 422, 429 (E.D.Pa.1984), *aff'd in part, vacated in part sub nom.; In re School Asbestos Litig.,* 789 F.2d 996 (3d Cir.1986), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117, 35 Ed. Law Rep. 30 (1986). "A common nucleus of operative fact[s] is typically found [when] defendants have engaged in standardized conduct toward members of the proposed class." *In re Life USA Holdings Inc, Ins. Litig.,* 190 F.R.D. 359, 366 (E.D.Pa.2000); *Kugler v. Romain,* 58 N.J. 522, 279 A.2d 640 (1971). It should be kept in mind, however, that "commonality becomes obscured when the probable unique issues of liability, causation and damages in each case are considered, requiring individualized treatment at trial." *Saldana v. City of Camden, supra,* 252 N.J.Super. at 197, 599 A.2d 582.

The conduct at issue includes U.S. Life's and Wohlers' actions in obtaining and keeping insureds under the arguably false promise that the Plan included nursing home benefits, meaning old age facilities with skilled medical care. This uniform conduct militates in favor of finding a common core of operative facts and circumstances.

*Typicality*

Rule 4:32-1(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "When the same unlawful conduct was directed at or affected both the named plaintiff and the members of the putative class, the typicality requirement is usually met, irrespective of varying fact patterns that may underlie individual claims." *Cannon v. Cherry Hill Toyota, Inc.,* 184 F.R.D. 540, 544 (D.N.J.1999). In order to meet the typicality requirement, the plaintiff must

show that her "injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff ." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3:76 (4th ed.2002). The court must ask whether the action can be efficiently maintained as a class and whether the named plaintiff has incentives that align with those of absent class members to assure that the absentees' interests will be fairly represented. *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994). By ensuring that the class representative's claims are similar to those of the class, the typicality requirement, like commonality, promotes efficient case management and fair representation. Yet, despite this similarity, the commonality and typicality requirements serve distinct functions. The commonality requirement tests the sufficiency of the class claim. *See Hassine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988). The typicality requirement focuses on the relation between the representative party and the class as a whole. *Id.* The New Jersey Supreme Court has stated that "[t]he claims of the representatives 'must have the essential characteristics common to the claims of the class." ' *In re Cadillac, supra,* 93 N.J. at 425, 461 A.2d 736 (quoting 3B Moore's Federal Practice ¶ 23.06-2 (1982)).

**\*13** A central issue in the instant case, claimed to be shared by plaintiff and the members of the proposed class alike, is whether defendants' conduct amounted to a deceptive business practice under New Jersey law. Plaintiff has demonstrated that her circumstances mirror the myriad state of affairs of potential absent class members. Any argument contending that no longer being an insured results in atypicality is unavailing. Plaintiff was insured by U.S. Life until 2003, after maintaining her benefits long after receiving the allegedly deceptive information. Her grievance that seeks a declaration of rights is ripe for determination and will not result in an advisory opinion. Indeed, she must prove a deceptive business practice in order to recover her individual compensatory damages. Thus, there is nothing incongruous or inconsistent with her pursuit of remedies vis-à-vis the rights of the absent class. To the contrary, there appears to be parity with the putative class and therefore, typicality in this case.

*Adequacy of Representation*

The binding effect of all class action decrees raises significant due process questions that are directly relevant to R. 4:32-1(a)(4). If absent class members

are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate. Moreover, any presumption in favor of adequacy of representation is misplaced since plaintiff bears the burden of establishing all of the requirements of R. 4:32-1. *Muise v. GPU, Inc., supra,* 371 N.J.Super. at 32, 851 A.2d 799 (App.Div.2004) (a party seeking class certification has the burden of proof); *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974). [FN6]

> FN6. It is certainly true that in *Delgozzo v. Kenny, supra,* 266 N.J.Super. at 188, 628 A.2d 1080 the court stated that the *defendant* bears the burden of demonstrating that the proposed representation will be inadequate, citing *In re Asbestos School Litigation,* 104 F.R.D. 420, 430 (D.C. Pa 1984). *In re Asbestos,* however, cites *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982)--*a shareholder derivative action*--for this principle. I believe that the better reasoned principle places the burden of demonstrating adequacy, and all other elements of R. 4:32-1, squarely upon the party seeking class certification and not upon opposing parties.

The adequacy requirement mandates an inquiry into the zeal and competence of the representative's counsel and the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees. The adequacy inquiry also "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Furthermore, because absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times. Differences between the named plaintiff and absent class members render the named plaintiff an inadequate representative only where those differences create conflicts between the named plaintiff's and the absent class members' interests.

One accepting employment as counsel in a class action does not become a class representative through simple operation of the free enterprise system; rather,

both the class determination and designation of counsel as class representative comes from judicial determinations, and the attorney so benefited serves in something of a position of public trust, and she shares with the court the burden of protecting the class action device against public apprehensions that it encourages strike suits and excessive attorney fees. *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 481 F.2d 1045 (2d Cir.1973), on remand, *certiorari denied* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549.To determine whether the proposed class satisfies R. 4:32-1(a)(4), I must evaluate the adequacy of class counsel. Factors such as counsel's experience with class actions, knowledge of the subject matter at issue in the case, and the resources of counsel are relevant to this determination. *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 650 (C.D.Cal.1996); *In re Prudential Secs.,* 163 F.R.D. 200, 208 (S.D.N.Y.1995). The court is under an obligation to evaluate carefully the legitimacy of the named plaintiff's plea that she is a proper class representative. Thus, the Supreme Court has admonished federal district courts that they are to 'stop, look, and listen' before certifying a class, *Kremens v. Bartley,* 431 U.S. 119, 135, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977). The adequacy of representation issue is of critical importance in all class actions and the court is under an obligation to pay careful attention to the R. 4:32- 1(a)(4) prerequisite in every case. *Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713, 719 (8th Cir.1978). Finally, it should be noted that a named plaintiff has the burden of establishing that a case is certifiable as a class action and that, as the class representative, the named plaintiff meets all of the R. 4:32-1 requirements. In order properly to represent absent members of a class, counsel for named parties who seek to be class representatives must be more than merely an attorney admitted to practice before the particular court hearing the case; she must have sufficient experience and training to satisfy the trial court that she will be a strenuous advocate for the class, and her conduct in pretrial matters, discovery, and trial itself will be evidence of her capability adequately to represent the class. The requirement that the attorney for class representatives be experienced is intended to mean that she be experienced in the type of litigation involved. *Carpenter v. Hall,* 311 F.Supp. 1099 (S.D.Tex.1970).

**\*14** Generally, "[a]dequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class ."

Not Reported in A.2d                                                                                  Page 12
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
(Cite as: 2005 WL 1869211 (N.J.Super.L.))

*Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The proposed class here satisfies the standards of R. 4:32-1(a)(4). From my review of the record presented on this motion, plaintiff's attorneys appear to be qualified and experienced to conduct this litigation. I perceive no interests antagonistic to those of the potential class and no conflicts are apparent on the record. Moreover, as a resident of New Jersey, Laufer is an adequate representative for all of the Plan's insureds who reside in this state. She would not necessarily be an adequate representative for residents of other states because of the differences in state law.

*Criteria of R.4:32-1(b)(2)*

Rule 4:32-1(b)(2) necessitates the presence of two factors in addition to those previously discussed in R. 4:32-1(a) before the instant class can be certified. Those factors are:
  1. Defendants must have acted or refused to act on grounds generally applicable to the class;
  2. Final injunctive relief or corresponding declaratory relief with respect to the class as a whole must be appropriate.
There is little question that U.S. Life is alleged to have acted on grounds generally applicable to the class. Its Plan applies generally to all members of the putative class, and its administrator's communications with class members appears consistent, if not uniform. Since this case involves the use of form contracts and mass mailings, it is particularly appropriate to use the class action procedure. *See Cobb v. Monarch Finance Corp.,* 913 F.Supp. 1164 (N.D.Ill.1995). It is also well settled that a class can be certified under (b)(2) even though monetary damages are sought in addition to injunctive and declaratory relief. *Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.1986).

The use of a class action in this case would avoid duplicative lawsuits with potentially inconsistent results, and is a superior procedure to other available methods for the fair and effective adjudication of the controversy. Moreover, because individual class members may not opt out of a R. 4:32-1(b)(2) class action, it is appropriate that the class claims be "cohesive" and that there should be no hesitation to decline to certify cases with "disparate factual circumstances." *see Geraghty v. United States Parole Comm'n,* 719 F.2d 1199, 1205-06 (3d Cir.1983); *see also Barnes v. American Tobacco Co., supra,* 161 F.3d at 143; *Weltzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 248-49 (3d Cir.1975). I agree with Laufer's

assertion that defendants' alleged violations of the NJCFA likely would affect every potential class member similarly and therefore defendants have acted in way which is "generally applicable to the class." Furthermore, the fact that the complaint requests some monetary relief does not prevent me from certifying the class under R. 4:32-1(b)(2). *see, e.g., George v. Baltimore City Public Schools,* 117 F.R.D. 368, 372 (D.Md.1987) (holding that a request for ancillary money damages does not preclude class certification under Rule 23(b)(2)); *cf. Alexander v. Aero Lodge No. 735,* 565 F.2d 1364, 1372 (6th Cir.1977) (holding that a request for back pay in a Title VII action does not preclude certification under Rule 23(b)(2)). On the other hand, although this motion is not the appropriate time to decide the issue, claims for monetary damages generally are a sufficient remedy, thereby obviating injunctive relief. [FN7] *See Crowe v. De Gioia,* 90 N.J. 126, 132-133, 447 A.2d 173 (1982); *Subcarrier Comm., Inc. v. Day,* 299 N.J.Super. 634, 638, 691 A.2d 876 (App.Div.1997); *Medical Society of New Jersey v. Amerihealth HMO, Inc.,* 376 N.J.Super. 48, 62, 868 A.2d 1162 (App.Div.2005).

  FN7. Trial courts are required to give the most careful and complete consideration to the possibility of a mandatory injunction and are guided by the precepts discussed in *Sheppard v. Township of Frankford,* 261 N.J.Super. 5, 9-10, 617 A.2d 666 (App.Div.1992), in which the guidelines for permanent injunctive relief were adopted, as set forth in the *Restatement (Second) of Torts* § 936 (1977). This nonexclusive list of factors includes: 1) the character of the interest to be protected; (2) the relative adequacy of the injunction to the plaintiff as compared with other remedies; (3) the unreasonable delay in bringing suit; (4) any related misconduct by plaintiff; (5) the comparison of hardship to plaintiff if relief is denied, and hardship to defendant if relief is granted; (6) the interests of others, including the public; and (7) the practicality of framing the order or judgment. *Sheppard* mandates that a trial judge must balance these factors in a qualitative manner. *Ibid.* (*citing Crane v. Borough of Essex Fells,* 67 N.J.Super. 83, 91, 169 A.2d 845 (Ch.Div.1961), aff'd, 36 N.J. 544, 178 A.2d 196 (1962)). Such an inquiry "necessarily require[s] an individualized balancing of rights." *Horizon Health Center v. Felicissimo,* 135 N.J. 126, 148, 638 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 13
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

1260 (1994), *certif. denied,* 142 N.J. 574, 667 A.2d 191 (1995), and "a sensitive evaluation of the entire situation." *Trans American Trucking Service, Inc. v. Ruane,* 273 N.J.Super. 130, 133, 641 A.2d 274 (App.Div.1994).

**\*15** I also consider the manageability of the action in applying R. 4:32- 1(b)(2). The federal circuits do not speak with one voice on whether inquiry is appropriate regarding manageability considerations in evaluating (b)(2) class certification. The Fourth Circuit, for example, has held that "[i]ssues such as class action manageability are properly committed to the district court's discretion, because that court generally has a greater familiarity and expertise with the practical and primarily factual problems of administering a lawsuit than does a court of appeals." *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 757 (4th Cir.1998) (citations and quotations omitted). The court also stated that, "in exercising the 'broad discretion' to decide whether to allow a suit to proceed as a class action, some courts have ruled it is appropriate to take account of considerations not expressly addressed in Rule 23, including manageability in Rule 23(b)(2) cases ." *Id.* at 758 (citing 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1785 (2d ed.1986)). The *Lowery* court went on to hold that since "efficiency is one of the primary purposes of class action procedure, ... in appropriate circumstances a district court may exercise its discretion to deny certification if the resulting class action would be unmanageable or cumbersome." *Id.* at 759 n. 5.

Several other courts have endorsed this view. *See, e.g., Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1019 n. 111 (1986) (noting that "manageability problems that might block a class action under Rule 23(b)(3) may be entailed as well in the Rule 23(b)(2) format"); *Simer v. Rios,* 661 F.2d 655, 669 n. 24 (stating that "it is not all clear that the problems in managing a class action are not relevant in certifying (b)(1) and (b)(2) class actions"); *Seidel v. Gen. Motors Acceptance Corp.,* 93 F.R.D. 122, 126 (W.D.Wash.1981) (holding that manageability is and must be a concern when deciding class certification under Rule 23(b)(2)); *Duncan v. Tennessee,* 84 F.R.D. 21, 34 (M.D.Tenn.1979) (noting that manageability is a proper inquiry under Rule 23(b)(2)).

According to the Fifth Circuit, however, in *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1105 (5th Cir.1993), "questions of manageability and judicial

economy are ... irrelevant to 23(b)(2) class actions." The Ninth Circuit reached a similar conclusion in *Elliott v. Weinberger,* 564 F.2d 1219, 1229 (9th Cir.1977) ("[B]y its terms, Rule 23 makes manageability an issue important only in determining the propriety of certifying an action as a (b)(3), not a(b)(2), class action."), *aff'd in pertinent part sub nom. Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

I agree with the *Lowery* court. Elements of manageability and efficiency are not categorically precluded in determining whether to certify a R. 4:32-1(b)(2) class. While (b)(2) classes for injunctive and declaratory relief are usually easier to manage than damages class actions, courts also need to look to whether the class is amenable to uniform group remedies. *See Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 414 (5th Cir.1998); 2 Newberg & Conte, *supra,* at § 4:17 (while injunctive relief "may often be awarded without requiring a specific or time-consuming inquiry into the varying circumstances and merits of each class member's individual case," courts may still look to whether the class is amenable to "uniform group remedies" in assessing management of the class). The vehicle of class action litigation must ultimately satisfy practical as well as purely legal considerations.

**\*16** Peering now through the lens of manageability, I conclude that this action does not involve complicated, esoteric, or time-consuming issues. It is a relatively routine consumer fraud case to prepare and try; with or without a jury. Expert testimony will probably be very limited, if it were utilized at all. Jury instructions and trial control appear quite ordinary. Briefly, this rather garden-variety case implicates no special circumstances and will doubtless result in an uneventful trial.

*V. CONCLUSION*

Plaintiff's motion to certify a class is granted with a modified class definition. The class definition shall be:

> All residents of New Jersey who at any time from May 12, 1998 through the present are or have been insured under a group catastrophe major medical insurance policy underwritten by United States Life Insurance Company in the City of New York and which at any time has been administered by Albert H. Wohlers & Co. n/k/a/ Seabury and Smith.

I request that plaintiff's attorney prepare the appropriate interlocutory order to memorialize this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 14
Not Reported in A.2d, 2005 WL 1869211 (N.J.Super.L.)
**(Cite as: 2005 WL 1869211 (N.J.Super.L.))**

decision and submit it to opposing counsel and to the
court as soon as possible pursuant to R. 4:42-1(c).

 Not Reported in A.2d, 2005 WL 1869211
(N.J.Super.L.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

Not Reported in F.Supp.2d                                                                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 2282905 (D.Kan.)
**(Cite as: 2004 WL 2282905 (D.Kan.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.
David PARNELL Plaintiff,
v.
SCHMIDT & ASSOCIATES, INC., New York Life
Insurance Company, and Nylife
Securities, Inc. Defendants.
**No. Civ.A. 04-4072-JAR.**

Oct. 5, 2004.

Justice B. King, Fisher, Patterson, Sayler & Smith,
Topeka, KS, for Plaintiff.

Paul S. McCausland, Young, Bogle, McCausland,
Wells & Blanchard, PA, Wichita, KS, for
Defendants.

*MEMORANDUM AND ORDER DENYING
DEFENDANTS' MOTION TO DISMISS AND FOR A
MORE
DEFINITE STATEMENT*

ROBINSON, J.

 *1 Plaintiff, David Parnell, filed a petition in the
Douglas County District Court on March 16, 2004,
alleging violations of the Kansas Consumer
Protection Act (KCPA), fraud, negligent
misrepresentation, and breach of fiduciary duty. The
case was removed to this Court upon request of
defendants. Defendants filed a Motion to Dismiss
plaintiff's Petition on July 23, 2004, in lieu of an
Answer. On August 12, 2004, plaintiff filed his
response to defendants' Motion to Dismiss and a
Motion to Amend his Complaint (Doc. 7). The
Honorable K. Gary Sebelius granted plaintiff's
Motion to Amend on August 30, 2004 and plaintiff
filed his Amended Complaint on August 31, 2004
(Doc. 11).

 This matter is before the Court on defendants'
Motion to Dismiss (Doc. 3) which was filed prior to
plaintiff amending his Complaint. Defendants seek
dismissal of plaintiff's breach of fiduciary duty,

KCPA and fraud claims. In addition, defendants
request an order for a more definite statement as to
plaintiff's negligent misrepresentation claim. For the
reasons stated below, defendants' motion is denied.

DISCUSSION

 In their Motion to Dismiss, defendants ask this Court
to dismiss plaintiff's breach of fiduciary duty claim
(Count IV) pursuant to Fed.R.Civ.P. 12(b)(6) for
failure to state a claim upon which relief may be
granted. Defendants also seek dismissal of plaintiff's
KCPA (Count I) and fraud (Count II) claims for
failure to plead the claims with particularity as
required by Fed.R.Civ.P. 9(b). In addition,
defendants request an order for a more definite
statement regarding plaintiff's negligent
misrepresentation claim (Count III) pursuant to
Fed.R.Civ.P. 12(e). The Court addresses each of
defendants' arguments in turn.

 A. Failure to State a Claim--Breach of Fiduciary
Duty

 Defendants allege that plaintiff's breach of fiduciary
duty claim fails to state a cause of action and seek
dismissal. The court will dismiss a cause of action for
failure to state a claim pursuant to Fed.R.Civ.P.
12(b)(6) only when it appears beyond a doubt that the
plaintiff can prove no set of facts in support of the
theory of recovery that would entitle him to relief.
[FN1] The court accepts as true all well-pleaded
facts, as distinguished from conclusory allegations.
[FN2] In addition, all reasonable inferences are
viewed in favor of the plaintiff. [FN3] The issue in
resolving such a motion is not whether the plaintiff
will ultimately prevail, but whether he is entitled to
offer evidence to support the claims. [FN4]

    FN1. *Conley v. Gibson,* 355 U.S. 41, 45-46,
    78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Maher v.
    Durango Metals, Inc.,* 144 F.3d 1302, 1304
    (10th Cir.1998).

    FN2. *Maher,* 144 F.3d at 1304.

    FN3. *Witt v. Roadway Express,* 136 F.3d
    1424, 1428 (10th Cir.1998).

    FN4. *In re Sprint Corp. Sec. Litig.,* 232
    F.Supp.2d 1193, 1213 (D.Kan.2002) (citing
    *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2004 WL 2282905 (D.Kan.)
(Cite as: 2004 WL 2282905 (D.Kan.))

S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984))*.

Specifically, defendants allege that plaintiff has failed to establish the existence of a fiduciary relationship. Kansas law recognizes two types of fiduciary relationships: "(1) those specifically created by contract ... and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions." [FN5] The determination of whether or not an implied fiduciary relationship exists depends on the facts and circumstances of each individual case. [FN6] The concept of a fiduciary duty is thus an equitable one and no precise definition may be given. [FN7] Nevertheless, it is generally said that the term "fiduciary relationship" refers to any relationship of blood, business, friendship or association in which one of the parties places special trust and confidence in the other. [FN8] It exists in cases where there has been a special confidence placed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing the confidence. [FN9]

FN5. *Dennison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235 (1982).

FN6. *Id.* (quoting *Curtis v. Freden*, 224 Kan. 646, 651, 585 P.2d 993 (1978)).

FN7. *Id.*

FN8. PIK-Civil 3d 125.01.

FN9. *Id.*

**\*2** Plaintiff has alleged that he placed special trust and confidence in John Schmidt, acting as plaintiff's agent, in regards to the advising and purchase of securities. Plaintiff further alleges that this agency relationship created a fiduciary duty and that Schmidt, as a fiduciary, was required to act in good faith and with due regard to plaintiff's best interests and failed to do so. In their motion to dismiss, defendants emphasize the lack of an agreement establishing a fiduciary relationship. However, a fiduciary relationship may be created by express agreement *or* may be implied based upon the conduct of the parties. Taking all of plaintiff's factual allegations as true, plaintiff has sufficiently alleged an implied fiduciary relationship so as to entitle him

to present evidence to support the claim. Defendants' Motion to Dismiss Count IV is denied.

B. Failure to Plead With Particularity--KCPA and Fraud

Defendants contend that Counts I and II of plaintiff's Complaint should be dismissed for failure to satisfy Fed.R.Civ.P. 9(b), which requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Allegations of fraud must "set forth the time, place, contents of the false representation, and the identity of the party making the false statements and the consequences thereof." [FN10] The purpose of Rule 9(b) is "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based ..." [FN11] Claims that arise under the KCPA are also subject to Rule 9(b)'s particularity requirement. [FN12] The elements of an action under the KCPA are identical to an action for fraud except for the intent requirement. [FN13]

FN10. *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1236 (10th Cir.2000) (citing *Lawrence v. Nat'l Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 180 (10th Cir.1991)).

FN11. *Koch,* 203 F.3d at 1236-37 (citation omitted).

FN12. *Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1524 (D.Kan.1995).

FN13. *Id.*

Defendants allege that plaintiff has failed to specify the time and place of the alleged false misrepresentations. However, in light of plaintiff's Amended Complaint, which was filed on August 12, 2004, defendants' motion has been rendered moot. Any alleged defects in plaintiff's Complaint have been remedied. Plaintiff has established that the alleged false representations were communicated during August and September of 1999 as well as June, July, and August of 2000. Plaintiff has also established that these representations were made over the telephone and through the mail. Consequently, plaintiff's Amended Complaint satisfies the "who, what, where, and when" of the alleged fraud and KCPA violations. [FN14] Defendants' Motion to Dismiss Counts I and II is denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2004 WL 2282905 (D.Kan.)
**(Cite as: 2004 WL 2282905 (D.Kan.))**

FN14. *See, e.g., Ramada Franchise Sys., Inc. v. Tresprop, Ltd.,* 188 F.R.D. 610, 612 (D.Kan.1999).

C. Motion for More Definite Statement--Negligent Misrepresentation

 Defendants also allege that plaintiff should be required to make a more definite statement of Count III, negligent misrepresentation. Pursuant to Federal Rule of Civil Procedure 12(e), a party may move for a more definite statement to remedy a pleading which is so vague that the party can not reasonably frame a response. [FN15] Negligent misrepresentation occurs where, "[o]ne who, in the course of [business], supplies false information for the guidance of another person in such other person's business transactions." [FN16] The person who supplied the false information is liable for damages suffered by such other person caused by reasonable reliance upon the false information if: (1) the person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating the false information; (2) the person who relies upon the information is the person or one of a group of persons for whose benefit and guidance the information is supplied; and (3) the damages are suffered in a transaction that the person supplying the information intends to influence or in a substantially similar transaction. [FN17] A negligent misrepresentation claim may only be based on a misrepresentation of a present fact, not a future event. [FN18]

FN15. Fed.R.Civ.P. 12(e).

FN16. PIK-Civil 3d 127.43.

FN17. *Id.*

FN18. *Indy Lube Invs., L.L.C. v. Wal-Mart Stores, Inc.,* 199 F.Supp.2d 1114, 1123 (D.Kan.2002) (citations omitted).

 **\*3** All of the misrepresentations alleged in plaintiff's Amended Complaint involve present facts, such as whether the investments were suitable, registered, and within the scope of approved products. Plaintiff alleges that John Schmidt, in the course of his actions as an agent, failed to exercise reasonable care in obtaining or communicating information about the securities to plaintiff. Plaintiff also alleges that he purchased the IMA securities in reliance on Schmidt's representations and that plaintiff was the person for whose benefit and guidance the information was

supplied. Plaintiff has specified the time and place of the alleged misrepresentations in the Amended Complaint and, therefore, has sufficiently pled the elements of negligent misrepresentation. The Court must deny defendants' request for a more definite statement.

 IT IS THEREFORE ORDERED BY THE COURT that Defendants' Motion to Dismiss and for a More Definite Statement (Doc. 3) is denied.

 IT IS SO ORDERED.

 Not Reported in F.Supp.2d, 2004 WL 2282905 (D.Kan.)

 **Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2079795 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion by Defendants New York Life Insurance Company and Ny Life Securities, Inc. to Dismiss and for an Order Requiring A more Definite Statement as to Count III (2004)Original Image of this Document (PDF)

• 2004 WL 2079801 (Trial Pleading) Amended Complaint (2004)Original Image of this Document (PDF)

• 2004 WL 2079805 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion to Dismiss (2004)Original Image of this Document (PDF)

• 2004 WL 2079812 (Trial Pleading) Amended Complaint (2004)Original Image of this Document (PDF)

END OF DOCUMENT

# EXHIBIT M

Westlaw.

C

Only the Westlaw citation is currently available.

Superior Court of the District of Columbia.
David PETERSON, et al. Plaintiffs,
v.
VISA U.S.A. INC., et al. Defendants.
**No. Civ.A. 03-8080.**

April 22, 2005.

David E. Jones of Heller Ehrman White &
McAuliffe LLP, Washington, D.C.; Stephen V.
Bomse and David M. Goldstein of Heller Ehrman
White & McAuliffe LLP, San Francisco, CA; Robert
C. Mason of Arnold & Porter LLP, New York, NY,
for Defendant Visa U.S.A. Inc.

Kenneth A. Gallo, Patricia C. Crowley and Douglas
C. Melcher of Paul, Weiss, Rifkind, Wharton &
Garrison LLP, Washington, DC; Gary R. Carney of
Paul, Weiss, Rifkind, Wharton & Garrison LLP, New
York, NY; Noah J. Hanft, Eileen S. Simon and James
P. Masterson of MasterCard International, Purchase,
N.Y. for Defendant MasterCard International
Incorporated.

Paul Y. Kiyonaga and Debra L. Soltis of Kiyonaga
& Soltis, P.C., Washington, D.C.; Neal S. Manne,
Mark A. Evetts and Marc M. Seltzer of Susman
Godfrey L.L.P., Houston, TX, for Plaintiffs.

*MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION TO DISMISS*

HEDGE, J.

**\*1** This matter comes before the Court on the
Motion to Dismiss filed by defendants Visa U.S.A.,
Inc. ("Visa") and Mastercard International, Inc.
("Mastercard"). The Court has reviewed the filings
and the record in this case. In addition, the Court
heard oral arguments on August 3, 2004. Because the
Court finds that D.C. plaintiff lacks standing, his
claims are dismissed. The non-D.C. plaintiffs' claims
are also dismissed under the doctrine of *forum non
conveniens.* Defendants' Motion to Dismiss is
therefore granted.

I. BACKGROUND

This case centers on defendants' "Honor all Cards"
rule, which requires merchants that accept
defendants' credit cards to also accept their debit
cards. The "Honor all Cards" rule led to an earlier
lawsuit in federal court, in which a number of
merchants, including Wal-Mart, brought suit under
the Sherman Antitrust Act ("Sherman Act"). The
merchants alleged that defendants' policy constituted
an illegal tying arrangement and that defendants
conspired to create a monopoly over the debit card
market. *See Wal-Mart Stores, Inc. v. VISA USA, Inc.
(In re Visa Check/Mastermoney Antitrust Litig.), 280
F.3d 124, 131 (2d Cir.2001).* Plaintiffs in the federal
lawsuit argued that defendants' tying arrangement
forced merchants to pay a high processing fee on
debit transactions. *See id.* This federal lawsuit
resulted in a $3 billion settlement agreement. *See In
re Visa Check/Mastermoney Antitrust Litig., 396 F.3d
96 (2d Cir.2005).*

In contrast to the merchants in *In re Visa
Check/Mastermoney Antitrust Litig.,* plaintiffs in the
instant case consist of a District of Columbia
consumer ("D.C.plaintiff"), as well as consumers
from seventeen other states ("non-D.C.plaintiffs").
[FN1] Plaintiffs argue that merchants cannot afford to
forfeit credit card sales, and thus, "are coerced into
paying [defendants'] supracompetitive rates" for debit
card transactions. Amended Complaint at ¶ 4.
Plaintiffs contend that as a result of this scheme, the
merchants pass these overcharges on to consumers in
the form of price inflation. *See id.* at ¶ 7.
Significantly, plaintiffs fail to identify any specific
goods that they purchased, and that were burdened by
defendants' overcharges. Instead, they make the
broad assertion that they were overcharged on all
consumer goods. *Id.*

> FN1. The seventeen other states are:
> Arizona, Florida, Iowa, Kansas, Maine,
> Michigan, Minnesota, Mississippi,
> Nebraska, Nevada, New Mexico, New York,
> North Carolina, North Dakota, South
> Dakota, Vermont, and Wisconsin. Many of
> these non-D.C. plaintiffs have also filed
> claims in their respective states, and
> defendants have filed Motions to Dismiss
> these claims too. To date, defendants have
> advised the Court that 13 of these state
> courts have dismissed the cases.

Not Reported in A.2d                                                                                      Page 2
Not Reported in A.2d, 2005 WL 1403761 (D.C.Super.)
**(Cite as: 2005 WL 1403761 (D.C.Super.))**

Plaintiffs seek damages from defendants, arguing that the tying arrangement violates the District of Columbia Antitrust Act ("DCAA"), as well as the antitrust statutes of the seventeen states. In addition, plaintiffs seek injunctive relief, preventing defendants from enforcing their "No Discount or Surcharge" ("NDS") Rules. These rules, plaintiffs contend, prevent merchants from tallying the alleged overcharges on debit card transactions and adding them to the receipts as surcharges. *See id.* at ¶ 223. As a result, they allege, consumers fail to see the extra charges, and therefore lack the incentive to change to alternative payment methods.

**\*2** Defendants now move to dismiss plaintiffs' claims, arguing (1) that D.C. plaintiff lacks standing; and (2) that the Court should dismiss non-D.C. plaintiffs' claims under the doctrine of *forum non conveniens.*

II. LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Superior Court Civil Rule 12(b)(6) "is warranted when it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Herbin v. Hoeffel,* 806 A.2d 186, 194 (D.C.2002) (quoting *Klahr v. District of Columbia,* 576 A.2d 718, 721 (D.C.1990)) (internal quotations omitted). The "purpose of a Rule 12(b)(6) motion is to test the formal sufficiency of a statement of the claim for relief; it is not a procedure for resolving a contest about the facts or merits of the case." *Fraser v. Gottfried,* 636 A.2d 430, 432 (D.C.1994) (quoting C. Wright & A. Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed.1990)) (internal quotations omitted).

III. DISCUSSION

A. STANDING

D.C. plaintiff opposes defendants' Motion to Dismiss, arguing that he has standing to sue as an indirect purchaser pursuant to D.C.Code § 28-4508 and § 28-4509. Defendants argue that the plain language of these two sections and applicable case law prove that D.C. plaintiff lacks standing. Whether D.C.Code § 28-4508 and § 28-4509 provide D.C. plaintiff with standing raises an essential question for the Court because the absence of standing constitutes an appropriate basis for dismissal under Rule 12(b)(6). *See Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201 (D.C.2002) (remanding

with directions to dismiss complaint for lack of standing).

1. Standing under § 28-4509

Section 28-4509 of the DCAA provides, "[a]ny indirect purchaser in the chain of manufacture, production, or distribution of goods or services, upon proof of payment of all or any part of any overcharge for such goods or services, shall be deemed to be injured within the meaning of this chapter." D.C.Code § 28-4509(a). Defendants argue that D.C. plaintiff lacks standing as an indirect purchaser under § 28-4509 because he fails to "allege that he purchased--directly or indirectly--the purportedly excessively priced debit card services that Visa and MasterCard provided to merchants." Def. Mem. at 14. D.C. plaintiff counters that he purchased certain goods that were burdened with the monopoly overcharge. *See* Plaintiffs' Mem. in Opp. at 19.

D.C. plaintiff lacks standing under § 28-4509 because he is not an indirect purchaser of defendants' debit card services. The merchants are the direct purchasers, and an appropriate indirect purchaser would be the next purchaser in the chain of distribution, ie., an individual who purchases the debit card services from the merchants. D.C. plaintiff, however, does not fit anywhere in the chain of distribution for defendants' debit card services. He is a non-purchaser of the services.

**\*3** The history behind the passage of § 28-4509 helps to illustrate that D.C. plaintiff is not an indirect purchaser. This provision was passed in response to the Supreme Court's decision in *Illinois Brick v. Illinois,* 431 U.S. 720 (1977). *Illinois Brick* involved a manufacturer of concrete block that conspired to fix the prices in violation of the Sherman Act. Plaintiffs in *Illinois Brick,* the State of Illinois and local governmental entities in the Chicago area, were not direct purchasers of the concrete block. Rather, they were indirect purchasers, as the concrete block reached them only through a three-part chain of distribution. First, the defendants manufactured the block and sold it to masonry contractors. Second, the masonry contractors built masonry structures using the block. Finally, general contractors added the masonry structures into buildings and sold them to plaintiffs. *See id.* at 727.

The Supreme Court rejected plaintiffs' claim for standing as an indirect purchaser, holding, "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1403761 (D.C.Super.)
(Cite as: 2005 WL 1403761 (D.C.Super.))

injured in his business or property." *Id.* at 729 (internal quotations omitted). After the *Illinois Brick* decision, the D.C. Council passed § 28-4509, and in doing so "deliberately chose to reject the gloss put on the Clayton Act by *Illinois Brick* and to provide a contrasting antitrust scheme for the District of Columbia." Holder v. Archer Daniels Midland Co., Civ. Action No. 96-2975, 1998 WL 1469620 at 3.

D.C. plaintiff details the D.C. Council's reaction to *Illinois Brick* and emphasizes that it explicitly rejected the Supreme Court's holding. *See* Plaintiffs' Mem. in Opp. at 17-19. While it is true that the D.C. Council enacted § 28-4509 to overrule *Illinois Brick* and to allow indirect purchaser claims, D.C. plaintiff's claim does not fit into the indirect purchaser category. This is evident when comparing the facts of the instant case to *Illinois Brick.* Plaintiffs in *Illinois Brick* fit within the chain of manufacture, as they purchased buildings that contained the overpriced concrete block. In contrast, D.C. plaintiff did not purchase the debit card services from the merchants.

D.C. plaintiff contends that an indirect purchaser "need only have purchased some good or service that is burdened with a monopoly overcharge ... not have purchased the restrained good or service itself." Plaintiffs' Mem. in Opp. at 19. The problem with this argument is that D.C. plaintiff is claiming to have been overcharged on an enormous amount of products, and such a broad claim presents extraordinary complexities regarding proof. This proof would have to come from discovery from each merchant from whom goods were purchased. As the court in the parallel case filed in North Carolina accurately described: "[t]he Court cannot conceive of an economically feasible way to administer a trial which would require inquiry into how every market set the price for every consumer good sold in this state." *Morris v. Visa, et al.,* No. 03 CVS 2514, at ¶ 90 (attached as exhibit A to defendants' Consent Motion for Notice of Supplemental Authority, filed on October 28, 2004). Stated another way, the alleged harm is sufficiently indirect to the source of the alleged causative agent so as to be wholly speculative.

2. Standing under § 28-4508

**\*4** Section 28-4508 of the DCAA provides, "[a]ny person who is injured in that person's business or property by reason of anything forbidden by this chapter may bring a civil action for damages, for appropriate injunctive or other equitable relief, or for

both." D.C.Code § 28-4508(a). A dispute exists as to whether the Court should look to federal or local case law in interpreting the "by reason of" language. The wording in § 28-4508 is similar to that in the federal antitrust private cause of action provision. *See* 15 U.S.C. § 15(a) ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides...."). Defendants argue that because of the identical "by reason of" language in the federal statute, the Court should look to federal precedent in interpreting the local provision. Federal case law limits the potentially endless scope of the "by reason of" language. D.C. plaintiff counters that the Court should be guided by the analysis in *Holder v. Archer Daniels Midland Co.,* Civ. Action No. 96-2975, 1998 WL 1469620, not federal case law. He alleges that *Holder* adopted the "target area" test for standing, which considers "whether the injury to the plaintiff is a reasonably foreseeable consequence of the defendant's illegal conduct." *Id.* at 4 (quoting *Illinois Brick,* 431 U.S. at 760 n. 18) (internal quotations omitted).

The Court agrees with defendants' analysis. The DCAA allows "a court of competent jurisdiction ... [to] use as a guide interpretations given by federal courts to comparable antitrust statutes." D.C.Code § 28-4515. The identical "by reason of" language in § 28-4508 and its federal counterpart, together with the express authorization in § 28-4515 to look to federal precedent, convinces the Court of the merit of defendants' position. The Court will thus look at federal case law to determine whether D.C. plaintiff has standing under § 28-4508. [FN2]

> FN2. Even if the Court were to apply *Holder* and the "target area" test, D.C. plaintiff would still lack standing under § 28-4508. Under this test the Court would need to consider "whether the injury to the plaintiff is a reasonably foreseeable consequence of the defendant's illegal conduct." D.C. plaintiff purchased consumer goods, which, he alleges, were burdened by defendants' overcharges. An endless amount of plaintiffs could make similar claims. All one has to do is purchase goods from a merchant who accepts Visa and Mastercard credit cards. Such a remote and speculative injury is not a "reasonably foreseeable consequence of the defendant's illegal conduct."

Federal courts recognize that a literal reading of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2005 WL 1403761 (D.C.Super.)
**(Cite as: 2005 WL 1403761 (D.C.Super.))**

"by reason of" language would grant standing to an endless amount of purchasers within the chain of manufacture or distribution. The seminal case declining to adopt such a broad scope to the law of antitrust standing is *Associated General Contractors of Cal. Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519 (1983). In *Associated General Contractors* the Supreme Court noted, "federal courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534 (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262 n. 14 (1972)) (internal quotations omitted).

 In an effort to limit the scope of the federal provision's potentially broad sweep, the Supreme Court in *Associated General Contractors* described factors for a court to consider in deciding whether a plaintiff has standing. *See id.* at 537-45. Lower federal courts have subsequently summarized the Supreme Court's directive by enumerating the following five factors for a court to consider:
*5 (1) the causal connection between the alleged violation and the harm and the defendant's intent to cause the harm; (2) the directness of the claim; (3) the existence of more direct victims of the alleged antitrust violations; (4) the problem of speculative injury or complex apportionment of damages; and (5) whether the harm is the type for which the antitrust laws provide redress.
*In re Vitamins Antitrust Litig.,* 2001 U.S. Dist. LEXIS 8903, at 26-27 (D.D.C.2001) (citing *Associated General Contractors,* 459 U.S. at 537-45).* Application of these factors convinces the Court that D.C. plaintiff lacks standing under § 28-4508.

*Causal Connection and Intent to Harm*

 D.C. plaintiff sufficiently alleges a causal connection between defendants' antitrust violation and his injury, claiming that his purchases were burdened by defendants' overcharges. Such a connection, however, is so difficult to prove that it results in speculation. Further, this single factor is not enough by itself to confer standing. *See Associated General Contractors,* 459 U.S. at 537 (holding, "the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry.").

 As for the intent to harm factor, defendants could have reasonably anticipated harm to the merchants. In addition, they could have foreseen harm to consumers who were within the chain of distribution. It is unclear, however, that defendants could have

predicted harm to purchasers without any connection to the chain of distribution of defendants' debit card services.

*Directness of Claim*

 *Associated General Contractors* looked into the "directness or indirectness of the asserted injury." *Associated General Contractors,* 459 U.S. at 540. Merchants, not D.C. plaintiff, are the parties with the direct injuries in this case. D.C. plaintiff is neither a direct purchaser nor an indirect purchaser of defendants' debit card services. He is a non-purchaser of the services.

*Existence of More Direct Victims*

 *Associated General Contractors* looked at whether the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party...." *Associated General Contractors,* 459 U.S. at 542. This factor clearly weighs in favor of defendants. The merchants are the motivated class to "vindicate the public interest in antitrust enforcement." They have, in fact, already brought suit against defendants, which resulted in a $3 billion settlement agreement. [FN3]

> FN3. As a result of this settlement, the merchants actually hold the money to which plaintiffs claim they are entitled. This assumes the merchants passed on the costs. That assumption, however, may not be accurate since the merchants claim they are entitled to the funds thereby implying they absorbed the costs. In any event, allowing plaintiffs to recover from defendants would result in defendants paying double damages for the same injury. Moreover, the merchants could only claim the damages if they did not pass on the costs.

*Speculative or Complex Apportionment of Damages*

 It is speculative whether merchants passed on the overcharges to all of the goods purchased by D.C. plaintiff. D.C. plaintiff fails to point to any particular products. Rather, he claims that all items were burdened by defendants' overcharges. As discussed above, such a broad claim presents extraordinary problems regarding proof and speculation. [FN4]

> FN4. For example, was it gas prices,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

increased labor costs, or debit card charges, to name a few factors, that increased the cost of a purchased item, and if so, by how much?

*Type of Harm for Which Antitrust Laws Provide Redress*

**\*6** It is not clear that Congress intended to provide redress for the type of harm alleged by D.C. plaintiff. D.C. plaintiff is not an indirect purchaser, and thus, does not fit into the class of individuals Congress intended to protect under § 28-4509. It is doubtful that Congress intended to provide a remedy for claims as remote and speculative as the claims filed by D.C. plaintiff.

In sum, D.C. plaintiff's attempt to establish standing fails under both § 28-4509 and § 28-4508. He lacks standing under § 28-4509 because he is not an indirect purchaser. His argument that an indirect purchaser need only have been burdened by a monopoly overcharge presents great complexities with regard to proof. In addition, he lacks standing under § 28-4508 because of the following *Associated General Contractors* factors: (1) his claims are remote and speculative; (2) more direct victims exist to enforce the antitrust laws; and (3) he has not shown that his harm is the type for which the antitrust laws provide redress. [FN5]

> FN5. D.C. plaintiff lacks standing to pursue his claim for injunctive relief for the same reasons he lacks standing for his damages claim. He argues that even if he lacks standing to pursue his damages claim, he still would have standing to pursue his claim for injunctive relief because broader standing principles would apply. *See* Plaintiffs' Mem. in Opp. at 34. For this proposition, he cites *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104 (1986), a case in which the Supreme Court recognized that certain differences exist under the Clayton Act between standing for injunctive relief and standing for damages. *Id.* at 111 n.6. While the Court did find some differences, it also "found that under both § 16 [dealing with injunctive relief] and § 4 [dealing with damages] the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Id.* at 111. As discussed above, D.C. plaintiff fails to show that Congress intended to provide a remedy for his remote and speculative

injuries.

*3. D.C. Plaintiff's Attempt to Redefine the Class for Standing Purposes*

During oral arguments, plaintiffs' counsel asked for leave to amend the complaint in the event the Court accepts all of defendants' arguments. Counsel indicated that he could sufficiently redefine the class for standing purposes by asserting claims on behalf of consumers who actually purchased goods or services using a debit card. Such a redefinition, however, would not help to establish standing for D.C. plaintiff. For the purposes of D.C. plaintiff's allegations, a debit card consumer is no different than a consumer who pays with a credit card or cash. Plaintiffs' counsel conceded at oral argument that debit card consumers do not pay more per transaction than those who use a credit card or cash. More importantly, debit card consumers, like consumers using credit cards and cash, fail to fit within the chain of distribution of defendants' debit card services. Thus, they are not indirect purchasers under § 28-4509.

Redefining the class also fails to help D.C. plaintiff overcome the hurdles posed by the *Associated General Contractors* factors. For example, debit card consumers, like consumers paying with credit cards or cash, are not the direct victims of defendants' antitrust violations. Merchants suffer the direct injury, and as discussed above, they have already been compensated through the $3 billion settlement. Moreover, redefining the class does not solve the complexities that result from the remote and speculative nature of D .C. plaintiff's injuries.

**B. *FORUM NON CONVENIENS***

This Court has discretionary authority to dismiss a claim when it "finds that in the interest of substantial justice the action should be heard in another forum." D.C.Code § 13-425. The Court has the power to exercise this authority based "on any conditions that may be just." *Id.* Defendants argue that the Court should exercise its power under § 13-425 for non-D.C. plaintiffs' claims because of the claims' minor connection to the District of Columbia. *See* Def. Mem. at 32. Non-D.C. plaintiffs counter that defendants' "Honor all Cards" rule is a nationwide policy that affects thousands of District of Columbia residents. *See* Plaintiffs' Mem. in Opp. at 41.

**\*7** When evaluating a *forum non conveniens* claim, "the basic question to be resolved is whether the

Not Reported in A.2d                                                                                 Page 6
Not Reported in A.2d, 2005 WL 1403761 (D.C.Super.)
**(Cite as: 2005 WL 1403761 (D.C.Super.))**

District has so little to do with [the] case that its courts should decline to hear it." *Wyeth Labs., Inc. v. Jefferson,* 725 A.2d 487, 491 (D.C.1999) (quoting *Jenkins v. Smith,* 535 A.2d 1367, 1371 (D.C.1987)) (internal quotations omitted). This jurisdiction considers the following private and public interest factors when considering this issue:

> The private factors include potential obstacles to a fair trial, including the relative ease of access to proof, the availability and cost of compulsory process, the enforceability of any judgment obtained, and evidence of vexatiousness or harassment ... The public factors are those affecting the District's own interests, including the congestion of its court dockets with foreign litigation, the imposition of jury duty on District residents for litigation in which the District has no concern, and the inappropriateness of calling on District of Columbia courts to construe the law of another jurisdiction.
> *Id.* (quoting *Jenkins,* 535 A.2d at 1369).

The burden of proof is ordinarily on the defendant raising the *forum non conveniens* issue. *See id.* (citing *Mills v. Aetna Fire Underwriters Insurance Co.,* 511 A.2d 8, 10 (D.C.1986)). The situation, however, is much different " 'when the plaintiff is from another jurisdiction ... [because] it is much less reasonable to assume that his choice of a District of Columbia forum is convenient,' and therefore the plaintiff's choice deserves substantially less deference." *Id.* (quoting *Mills,* 511 A.2d at 10-11). "Moreover, when neither party resides in the District and the plaintiff's claim has arisen in another jurisdiction, the burden shifts to the plaintiff to justify bringing suit in the District rather than in a forum more significantly connected to the case." *Id.*

Applying these burden-shifting principles to the instant case makes it clear that non-D.C. plaintiffs bear the burden to justify trying this case in the District of Columbia. Neither party resides in the District, and non-D.C. plaintiffs' claims all arose in their own respective states. The burden in this case thus shifts to non-D.C. plaintiffs, and the following review of the private and public interest factors reveals that they fail to meet this burden.

*Private Interest Factors*

Consideration of the private interest factors points away from the District of Columbia and to non-D.C. plaintiffs' respective states as the most convenient forums. First, the District of Columbia is not especially convenient to the parties in this case

because neither non-D.C. plaintiffs nor defendants are residents of the District of Columbia. *See Eric T. v. Nat'l Med. Enters., Inc.,* 700 A.2d 749, 755 (D.C.1997) ("Because all of the plaintiffs and defendants ... are non-residents of the District, Judge Keary did not abuse her discretion in drawing the obvious conclusion that Maryland was a superior forum to the District in terms of the conventional 'private interest' factors, i.e. the convenience of the parties...."). Also, the choice of forum factor in this case is "a relatively minor item since the [non-D.C.] plaintiffs are not District residents." *Wyeth Labs., Inc.,* 725 A.2d at 493. Finally, non-D.C. plaintiffs' respective states would provide easier access to proof because non-D.C. plaintiffs allegedly made their purchases in retail establishments located in their states. *See id.* ("the private factors favor Maryland as a forum because ... the medical records are all located in Maryland.").

*Public Interest Factors*

**\*8** The Court's review of the public interest factors overwhelmingly fails to provide any justification for trying this case in the District of Columbia. First, the Court must consider the burden on its overcrowded docket, a factor that holds significant weight in this jurisdiction. *See Mills,* 511 A.2d at 11 ("in actions involving nonresident plaintiffs bringing claims arising outside the District of Columbia, this court has emphasized the decisiveness of the public interest in reducing the volume of cases on our overcrowded court calendars."); *Jimmerson v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.,* 663 A.2d 540, 546-47 (D.C.1995) ("we are well aware that our courts are congested with litigation, and that to the extent we can alleviate the case load of our courts by dismissing foreign litigation, the courts can reach other cases more promptly."). There is no justification for this Court to delve into this complex, foreign litigation when it already has an overcrowded calendar.

Second, the Court must consider the inappropriateness of requiring District of Columbia jurors to hear about alleged overcharges that occurred outside of their region. In *Eric T.,* the Court considered whether District jurors should be burdened by litigation involving Maryland and Virginia plaintiffs, and incidents that arose outside of the District. In dismissing the case based on *forum non conveniens,* the Court emphasized the impact on jurors, noting, "to dragoon D.C. residents into coming and sitting in this court for two or three or four weeks to hear how some Maryland providers

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1403761 (D.C.Super.)
**(Cite as: 2005 WL 1403761 (D.C.Super.))**

improperly confined a Maryland resident, I think would be quite an improper imposition on our D.C. jurors." *Eric T., 700 A.2d at 757* (quoting *Michele K. v. Psychiatric Inst. of Montgomery County, et al.,* No. CA 3321-95 (Super Ct. D.C. June 14, 1995) (Von Kann, J.)) (internal quotations omitted). If the Court in *Eric T.* felt that jurors should not have to hear about plaintiffs' injuries in Maryland and Virginia, then certainly jurors should not have to hear about non-D.C. plaintiffs' allegations, which occurred in states entirely outside the Washington D.C. metropolitan area.

Finally, the Court must consider the "inappropriateness of calling on District of Columbia courts to construe the law of another jurisdiction." *Wyeth Labs., Inc., 725 A.2d at 491* (quoting *Jenkins, 535 A.2d at 1369).* Trying this case would require this Court to construe the law of not just one other jurisdiction, but rather, of seventeen separate states. This jurisdiction has explained that the doctrine of *forum non conveniens* is designed "in part to help a court avoid having to untangle problems ... in law foreign to itself." *Mills, 511 A.2d at 13* (quoting *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509 (1947)*) (internal quotations omitted). This factor holds significant weight in the instant case in light of the number of state court decisions from around the country dismissing non-D.C. plaintiffs' claims. Non-D.C. plaintiffs ask this Court to entertain suits from seventeen other jurisdictions when thirteen of those seventeen states have already ruled against them.

**\*9** In sum, after considering the private and public interest factors, the Court is convinced that non-D.C. plaintiffs' respective states provide the most convenient forums for this case.

Accordingly, it is by the Court this 22nd day of April 2005, hereby

ORDERED that defendants' Motion to Dismiss is GRANTED; and it is further

ORDERED that the case is DISMISSED.

Not Reported in A.2d, 2005 WL 1403761 (D.C.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>EXHIBIT N</u>**

Westlaw.

Not Reported in F.Supp.                                                                                     Page 1
Not Reported in F.Supp., 1998 WL 113561 (N.D.Ga.)
**(Cite as: 1998 WL 113561 (N.D.Ga.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Georgia.
Gary POE on behalf of himself and all others
similarly situated, Plaintiff,
v.
SEARS, ROEBUCK AND CO., Defendant.
**No. CivA1:96-CV-358-RLV.**

Feb. 13, 1998.

Everette L. Doffermyre, Jr., Ralph Irving Knowles, Jr., Doffermyre Shields Canfield, Knowles & Devine, Atlanta, GA, James J. Thompson, Jr., Hare Wynn Newell & Newton, Birmingham, AL, William M. Audet, The Alexander Law Firm, San Jose, CA, Laura Malynn Shamp, Brown & Shamp, Atlanta, GA, for Gary Poe, on behalf of himself and all others similarly situated, plaintiff.

Dean S. Daskal, Elmer A. Simpson, Jr., Linda Grimes Birchall, Powell Goldstein Frazer & Murphy, Atlanta, GA, Stephen V. D'Amore, Steven F. Molo, Thomas J. Wiegand, Winston & Strawn, Chicago, IL, Timothy J. Nalepka, Sears Roebuck & Company, Hoffman Estates, IL, for Sears, Roebuck & Company, Inc., defendant.

ORDER

VINING, Senior J.

**\*1** Although several motions are pending before the court, this order will deal only with the plaintiff's motion for class certification [Doc. No. 11].

In this action the plaintiff alleges that Sears, Roebuck and Co. ["Sears"] designed and implemented a nationwide scheme to "promote, offer, and sell used batteries, old batteries and out of warranty' automobile batteries to unsuspecting customers as if the batteries were new, *i.e.,* not used, old and not 'out of warranty .' " Complaint at ¶ 11. The plaintiff asserts causes of action for fraud, negligent misrepresentation, and breach of contract; the plaintiff also seeks punitive damages. This action is brought under the court's diversity jurisdiction, since the plaintiff's claims implicate only state law, and no federal claims are asserted.

In his complaint the plaintiff sought certification of the following class:
> All persons and entities in the United States who purchased an automobile battery from Sears during the period from January 1, 1992, inclusive, to January 30, 1996, inclusive....
> Complaint at ¶ 6.
Excluded from the class were
> Sears; its officers, directors, and employees and the members of their immediate families; Defendant's subsidiaries, successors, affiliates and assigns; any entity in which Sears has a controlling interest; and any Judge to which this action is assigned and the members of that Judge's immediate family.
> Complaint at ¶ 7.
In his Amended Memorandum of Points and Authorities in Support of Motion for Class Certification, the plaintiff seeks certification of the following class:
> All persons and entities in the United States who purchased, as new, an old, used or "out of warranty" automobile battery from Sears during the period from January 1, 1992, inclusive, to January 30, 1996, inclusive....
> Amended Memorandum at 2.
The plaintiff seeks to exclude the same persons and entities that were to be excluded from the class identified in the original complaint. [FN1]

> FN1. The proper way to change the identity of the class the plaintiff seeks to represent is through amendment to the complaint, not through a reference in a brief. The class identified in the complaint is, of course, not certifiable since it consists of everyone who purchased an automobile battery from Sears, not just those persons who purchased a "used" battery. Consequently, this order will deal with class certification as though the plaintiff had properly amended his complaint with respect to the class he wishes to have certified. Furthermore, for convenience will use the term "used battery" as a shortened description of "old, used, or 'out of warranty' batteries."

Rule 23(a), Federal Rules of Civil Procedure, sets

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 2
Not Reported in F.Supp., 1998 WL 113561 (N.D.Ga.)
**(Cite as: 1998 WL 113561 (N.D.Ga.))**

out the four prerequisites for the maintenance of all class actions:

> (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If the four prerequisites of Rule 23(a) are met, the movant must then satisfy one of the subparts of Rule 23(b).

In his complaint, the plaintiff stated the action was appropriate for certification pursuant to all three subparts of Rule 23(b). [FN2] However, in his motion for class certification, the plaintiff seeks certification only under subsection (3); consequently, the court finds that the plaintiff has abandoned any argument that certification is appropriate under subsections (1) and (2).

> FN2. Under subsection (1) class certification is appropriate if the prosecution of separate actions would result in inconsistent or varying adjudications establishing incompatible standards of conduct or adjudications with respect to individual class members that would be dispositive of the claims of persons not parties to the litigation; subsection (2) allows class certification if the opposing party has acted on grounds generally applicable to the class; subsection (3) provides for certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

**\*2** It is axiomatic that before a court can determine numerosity and decide whether a class action represents the fairer and more efficient way to handle claims, the class members must be identifiable. "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir.1970). In this action, such identification is virtually impossible.

The plaintiff does not contend that every battery sold by Sears was a used battery; therefore, it would be necessary to distinguish between those persons who purchased new batteries and those customers who purchased used batteries. The plaintiff suggests that simply looking at the model number engraved on a battery and then comparing that date with the date on which a battery was sold would provide a method for ascertaining class members. However, the model number does not indicate the date of manufacture; there is a separate date identifier code on each battery. Significantly, Sears does not maintain a record of the battery date code at the point of sale; at most, a model number (which Sears calls a "stock number") is noted, and that model/stock number is not unique to each battery. For example, stock number 36175 appears on all DieHard Gold batteries that are in size group 75. Because the plaintiff has not shown a viable method for ascertaining members of the class, the court concludes that certification is not appropriate.

The court also concludes that certification is not appropriate because individual issues, both of law and fact, predominate over any common issues. The plaintiff's assertion of commonality of facts is based upon his allegation that Sears never told anyone that a battery was anything but new and that Sears represented by "packaging" [FN3] that each battery was, in fact, new. This assertion ignores the plaintiff's allegation in his complaint that "[e]mployees of Sears represented to consumers that the used, old and/or out-of-warranty Sears batteries being sold to them were new and fresh", Complaint at ¶ 12(b). Such allegation necessarily entails individualized representations to the customers.

> FN3. The plaintiff does not identify what this "packaging" is nor how it conveyed to a customer that a particular battery was new when, in actuality, it was not.

The most significant hurdle to class certification, however, is the fact that the plaintiff's claims are based on state law, and there is no one state whose law would provide the rule of decision on the plaintiff's claims. The plaintiff recognizes that there are differences in state law but argues that "the variances in state law, when properly categorized, are not insurmountable or extensive." Plaintiff's Reply Brief in Support of the Motion for Class Certification at 11. The plaintiff suggests that the court can group the various plaintiffs and their claims and also suggests that it would be appropriate, especially on the breach of contract claim, to use Illinois law, since that is the state where Sears is headquartered. The court disagrees.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1998 WL 113561 (N.D.Ga.)
**(Cite as: 1998 WL 113561 (N.D.Ga.))**

**\*3** However, this court notes several differences in elements of proof and standard of proof that make the utilization of a single standard impossible. For example, to establish fraud under Alabama law, a plaintiff must prove that a material, false misrepresentation was made, that he believed the misrepresentation, justifiably relied on it, and suffered damage. *See* Gonzalez v. Blue Cross/Blue Shield of Alabama, 689 So.2d 812 (Ala.1997). Under Georgia law, a plaintiff must, in addition to the above, prove that the speaker knew that the representation was false. *See* Bacote v. Wyckoff, 251 Ga. 862, 310 S.E.2d 520 (1984). However, California apparently does not require a showing that the misrepresentation was material. *See* Lazar v. Superior court of Los Angeles County, 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996).

With respect to the plaintiff's negligent misrepresentation claim, the court notes that, based upon the representations made by the plaintiff in his brief, 47 jurisdictions recognize the tort of negligent misrepresentation, but not all of them have adopted the standard set forth in the Restatement (2d) of Torts. Additionally, 42 jurisdictions allow proof by a "preponderance of the evidence," whereas the remainder require proof by "clear and convincing" evidence.

The plaintiff states, without providing any legal basis, that his breach of contract claim "should be analyzed under one state law, specifically, Illinois law. Here, because the contracts are the same, and given the nature of Sears' conduct, it is appropriate to apply Illinois state law." Plaintiff's Reply Brief in Support of the Motion for Class Certification at 14. This argument ignores Georgia's choice-of-law rules, and as the forum state in a diversity action, Georgia's choice-of-law rules control. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Georgia law the place of contract controls all substantive matters, such as the nature, construction, and interpretation of the contract. Menedez v. Perishable Distributors, Inc., 254 Ga. 300 (1985), *overruled on other grounds,* Posey v. Medical Center-West, Inc., 257 Ga. 55, 354 S.E.2d 417 (1987). Thus, this court would have to look to the law of the state where the customer purchased his battery to determine substantive law. This court would apply Georgia law as to all matters affecting only the remedy. *Id.*

There is one other aspect of the plaintiff's lawsuit that shows the problem of selecting the law of a particular state to be controlling for all claims. The

plaintiff has prayed for punitive damages. Indeed, since it is doubtful that a class member's claims could exceed the jurisdiction amount without an award of such damages, the prayer for punitive damages is the key to the federal courthouse door. Again, the different states have varying laws with respect to punitive damages. Georgia, along with several other states, requires proof "by clear and convincing evidence" that the defendant's actions showed willful misconduct, malice, or fraud. O.C .G.A. § 51-12-5.1(b). Texas requires a plaintiff to prove the elements of punitive damages by only a preponderance of the evidence. *See* Transportation Insurance Co. v. Moriel, 879 S.W.2d 10 (Tex.1994). Colorado requires proof beyond a reasonable doubt, Colo.Rev.Stat. § 13-25-127(2), and further provides that the amount of punitive damages cannot exceed the amount of actual damages awarded. Colo.Rev.Stat. § 13-21-102(1).

**\*4** From the above discussion it becomes evident that the plaintiff's suggestion that the court fashion subgroups of plaintiffs would not be workable. Any kind of matrix which tried to take into consideration all the varying elements (and standards of proof) would itself be so complex as to make the case unmanageable.

In concluding that the laws of the states wherein each class member resides, rather than the forum state or some generalized common law, the court is guided by both Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In *Erie* the Supreme Court rejected the idea that a federal court could formulate and apply a generalized common law. In *Shutts* the United States Supreme Court rejected the Supreme Court of Kansas's decision that in adjudicating the nationwide class action, a state court has greater latitude in applying its own law to the transactions in question than might otherwise be the case. The Court held that because of the conflict of Kansas law with that of other jurisdictions, "application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits ." 472 U.S. at 822, 105 S.Ct. At 2979 (footnote omitted). Because of this pronouncement by the Supreme Court this court is convinced that applying the law of a single state to the claims of all plaintiffs would not pass constitutional muster. Applying the law of all the states would render this action totally unmanageable. Therefore, class certification is inappropriate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 4
Not Reported in F.Supp., 1998 WL 113561 (N.D.Ga.)
**(Cite as: 1998 WL 113561 (N.D.Ga.))**

 For all the foregoing reasons, the plaintiff's motion
for class certification [[[Doc.   No. 11] is DENIED.
[FN4]

>        FN4. In ruling on this motion, the court did
>        not consider Sears, Third Supplemental
>        Memorandum in Opposition to Plaintiff's
>        Motion for Class Certification Due to the
>        Inadequacy of Gary Poe and his Counsel,
>        which was filed on November 12, 1997.
>        Consequently, the plaintiff's motion to strike
>        that memorandum [Doc.    No. 121] is
>        DENIED as MOOT.

 Not Reported in F.Supp., 1998 WL 113561
(N.D.Ga.)

   **Motions, Pleadings and Filings (Back to top)**

• 1:96CV00358 (Docket) (Feb. 14, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT O

Westlaw

Not Reported in A.2d                                                                                                      Page 1
Not Reported in A.2d, 2003 WL 22250424 (Pa.Com.Pl.)
**(Cite as: 2003 WL 22250424 (Pa.Com.Pl.))**

**c**
Only the Westlaw citation is currently available.

Pennsylvania Court of Common Pleas.
Harry STUTZLE, et. al., Individually and on behalf
of all others Similarly
Situated, Plaintiffs,
v.
RHONEPOULENC S.A.(n/k/a/Aventis S.A.), et. al.
**No. 002768OCT.TERM2002, CONTROL 062165.**

Sept. 26, 2003.

ORDER and MEMORANDUM OPINION

COHEN, J.

**\*1** AND NOW, this 26th day of September, 2003, upon consideration of Defendants' Preliminary Objections to Plaintiffs' complaint, all responses in opposition, all matters of record, and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby Ordered and Decreed that Defendants' preliminary objections are Sustained. Plaintiffs' complaint is dismissed.

MEMORANDUM OPINION
Before this Court are defendants' preliminary objections pursuant to Pa. R. Civ. P. 1028(a)(4) to plaintiffs' class action complaint. For the reasons set forth below, this Court sustains defendants' preliminary objections.

DISCUSSION
Defendants attempt to have each of the two claims in plaintiffs' class action complaint dismissed. These claims, which the court will address in order, are unjust enrichment and conspiracy.

A. Unjust Enrichment

In the complaint, plaintiffs allege that defendants have engaged in activities that caused the plaintiffs and the class members to pay more for Methoinine [FN1] than they should have absent the illegal conduct. (Plts. Complaint ¶ 68). Plaintiffs also allege that defendants received excessive and unreasonable profits by virtue of the higher prices paid by plaintiffs and that equity and good conscious requires that

defendants return these excess profits to the plaintiffs and the class members. (Id.). Defendants argue that the claim is legally insufficient because plaintiffs as indirect purchasers did not confer a benefit upon defendants.

> FN1. Methionine is sold as an animal feed additive, including DL-methionine, calcium salt of methionine hydroxy analog and any product that contains methionine sold as an animal feed additive. (Plts complaint ¶ 2).

To state a claim for unjust enrichment, the plaintiffs must allege that they conferred a benefit on the defendant, that defendant appreciated the benefit under the circumstances and that the defendant accepted and retained the benefit without payment for value. *Burgettstown/Smith Twp. Joint Sewage Auth. v. Langeloth Townsite Co.*, 403 Pa.Super. 84, 588 A.2d 43, 45 (Pa.Super.1991).

In the case *sub judice*, plaintiffs did not confer a benefit upon defendants. Plaintiffs are indirect purchasers and had no direct dealings with defendants. (Plts. Compliant ¶ 1). Perhaps defendants appreciated the value of the benefits, but any unjust enrichment claim would belong to the direct purchasers, not to indirect purchasers such as plaintiffs. See e. g. *Phillips v. Selig*, 2001 WL 1807951, \*8 (Sept. 19, 2001) (Sheppard).

Notwithstanding the fact that plaintiffs did not confer a benefit upon defendants, the plaintiffs have also failed to allege how the enrichment is unjust. The most significant element of the unjust enrichment doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. *Styler v. Hugo*, 422 Pa.Super. 262, 610 A.2d 347, 350 (Pa.Super.1993). Plaintiffs allege that defendants were unjustly enriched from excessive and unreasonable profits which resulted from defendant's illegal conduct. (Plts. Complaint ¶ 68). The "illegal conduct" described in the complaint is "a horizontal agreement and conspiracy between defendants and their co-conspirators to fix or maintain the price of Methionine and/or allocate markets and customers in connection with the sale of Methionine." (Plts complaint ¶ 1). In essence, plaintiffs allege that defendant's illegal conduct amounts to an antitrust

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22250424 (Pa.Com.Pl.)
**(Cite as: 2003 WL 22250424 (Pa.Com.Pl.))**

Page 2

violation. To date, no court in Pennsylvania has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations. *XF Enterprises, Inc. v. BASF Corp.,* 47 Pa. D. & C. 4th 147, 150 (2000) (Levin). Additionally, Pennsylvania has no legislation which provides for these damages. *Id.*

> *2 "The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman Law ... Such contracts were deemed illegal and were unenforceable at common law. But the resulting restraints of trade were not penalized and gave rise to no actionable wrong."

*XF Enterprises Inc. v. BASF Corp.,* 47 Pa. D & C. 4th 147, 150 (2000)(quoting *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 497 (1940)). Since the Pennsylvania legislature and the courts have not created a cause of action for damages sustained as a result of the antitrust violations, than plaintiffs failed to allege within their complaint how the benefit to defendants was unjust. Moreover, to allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by Pennsylvania's antitrust law, is not a proper use of the claim and can only lead to mischief. *XF Enterprises,* supra. 152 (use of a civil conspiracy claim as a means of collecting damages which are not allowable by Pennsylvania's antitrust law is not a proper use of the claim). Accordingly, plaintiff's unjust enrichment claim is dismissed with prejudice.

B. Civil Conspiracy

Defendants also assert preliminary objections to plaintiffs' cause of action for civil conspiracy. Plaintiffs allege that defendants engaged in an unlawful combination and conspiracy to fix, raise, maintain and stabilize at artificial and non competitive levels the price of Methionine and to conceal this unlawful activity. (Plts. Complaint ¶ 69). In their brief, plaintiffs argue that the civil conspiracy claim is legally sufficient because unjust enrichment is the predicate act for the conspiracy. (Plts. memorandum of law pp. 12-13). Since the court sustained defendants' preliminary objection with respect to plaintiffs' cause of action for unjust enrichment, the court also sustains defendants preliminary objections plaintiffs cause of action for civil conspiracy count.

CONCLUSION

For these reasons, this court finds that defendants' preliminary objections are sustained. Plaintiffs' complaint is dismissed.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P

Westlaw.

Not Reported in S.W.2d                                                                 Page 1
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**

Chancery Court of Tennessee, Davidson County.
State of Tennessee ex rel. William M. Leech, Jr.,
Attorney General & Reporter
v.
Levi Strauss & Co.
**No. 79-722-III**

Filed September 25, 1980

BRANDT, Chanc.

**Memorandum**
**\*1** This is an action by the Tennessee Attorney
General charging that Levi Strauss violated
Tennessee's anti-trust statutes. [FN1]

FN1. T. C. A. § 69-101 provides:
'Trusts and combinations lessening
competition or controlling prices unlawful
and void.--All arrangements, contracts,
agreements, trusts, or combinations between
persons or corporations made with a view to
lessen, or which tend to lessen full and free
competition in the importation or sale of
articles imported into this state, or in the
manufacture or sale of articles of domestic
growth or of domestic raw material, and all
arrangements, contracts, agreements, trusts,
or combinations between persons or
corporations designed, or which tend, to
advance, reduce, or control the price or the
cost to the producer or the consumer of any
such product or article, are declared to be
against public policy, unlawful, and void.'

The suit is before the Court upon the State's motion
to strike certain defenses and Levi Strauss's motion
for a judgment on the pleadings or in the alternative
for partial summary judgment. The three issues
raised by the motions are (1) the statute of limitation
to be applied to the actions under Tennessee's anti-
trust laws, (2) the authority of the State to maintain a
damage suit on behalf of its citizens under the
common law theory of *parens patriae*, and (3) the
effect of the now-repealed Tennessee Fair Trade Law
upon the fixing of retail prices by a manufacturer.
These are all questions of first impression in
Tennessee.

The complaint alleges that beginning in 1969 and

thereafter for several years, Levi Strauss conspired
and combined with others to arbitrarily and illegally
fix and control the prices at which Levi Strauss
wearing apparel was retailed in Tennessee. The State
has sued for damages in two capacities, first as a
purchaser itself of Levi Strauss products and second
as *parens patriae* on behalf of all Tennessee citizens
who were damaged by the alleged price-fixing. Class
certification is sought, the proposed class being
everyone in Tennessee who purchased Levi Strauss
goods at prices fixed by the alleged unlawful
conduct.

*Statute of Limitation*
Tennessee's anti-trust laws do not contain a statute of
limitation so the Court must look to other statutes to
determine which is applicable. The alternatives are
(1) the one year limitation for actions for statutory
penalties, T. C. A. § 28-304, (2) the three year period
for property tort actions, T. C. A. § 28-305, or (3) the
ten year limitation for 'all other cases not expressly
provided for', T. C. A. § 28-310. The Court
concludes that this civil damage suit brought by the
State is subject to the three year statute of limitation
in T. C. A. § 28-305.

A threshold issue is whether the suit is subject to any
statute of limitation at all. Section 28-115 of the
Code provides that the various statutes of limitation
'do not apply to actions brought by the State of
Tennessee, unless otherwise expressly provided.' In
*State v. Standard Oil Company*, 120 Tenn. 86 (1907),
a suit to enjoin conduct prohibited by the anti-trust
statute, the Supreme Court stated that 'there is no
statute of limitation applicable to the State in civil
actions.' *Id.* at 144.

**\*2** That sweeping pronouncement is not absolute. It
may be correct in many contexts, but not in the
context of the damage claim in the instant suit. In its
claim for damages the State is suing as a purchaser of
Levi Strauss products. In that respect the State is not
acting as a sovereign but rather as an ordinary
consumer. The State exemption from statutes of
limitation does not apply to the damage claim.

In deciding which statute of limitation to apply, it is
necessary to determine the character of the State's
price-fixing claim. Tennessee's anti-trust statutes
prohibit combinations which control the price to the
consumer of any product. T. C. A. § 69-101. A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

private cause of action for damages is given to 'any person who may be injured or damaged by any such . . . combination.' T. C. A. § 69-106. Although anti-trust actions are based upon statutes, it has been universally held that private anti-trust suits are actions sounding in tort. See *Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.* [1979-2 TRADE CASES ¶ 62,929], 604 F. 2d 897 (5th Cir. 1979) and the authorities cited in footnote 7, page 901. [FN2]

> FN2. The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890. 15 U. S. C. § 1. Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive.

The tortious injury to property statute of limitation obviously applies to cases of physical property damage. Tennessee courts are also applying the three year property damage limitation to suits for monetary loss which do not involve physical damage. The most significant case is *Vance v. Schulder*, 547 S. W. 2d 927 (Tn. 1977). There, the Supreme Court was faced with deciding which statute of limitation applied to a suit charging that fraudulent representations induced the sale of stock for less than its value. After a reasoned analysis of the nature of the cause of action, the Court concluded that a loss sustained from fraud and deceit is included in the phrase 'injuries to personal property' contained in T. C. A. § 28-305, the three year limitation. *Id.* at 932. The Court rejected the notion that the injury must be physical injury to property.

Relying upon *Vance* in a diversity suit, the Sixth Circuit Court of Appeals concluded that the three year limitation in § 28-305 is applicable to a suit charging fraud, misrepresentation and deceit. *Edwards v. Travelers Insurance of Hartford, Conn.*, 563 F. 2d 105 (6th Cir. 1977).

In urging that the Court apply the ten year 'all other cases' limitation of § 28-310, the State relies upon the United States Supreme Court's 1906 decision in *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U. S. 390 (1906). That was a private civil anti-trust action in which damages were awarded to the City of Atlanta because of collusive price-fixing. The cause of action arose in Tennessee and the case was tried in the United States District Court in Tennessee. The Sherman Anti-Trust Act did not provide a statute of limitation and the applicable

limitation was a matter of state law. [FN3] The Supreme Court was given the same three alternatives presented in the instant suit--the one year statutory penalty limitation (§ 28-304), the three year tortious injury to property limitation (§ 28-305) or the ten year 'all other cases' limitation (§ 28-310). The Supreme Court upheld the Sixth Circuit's decision that the ten year limitation applied.

> FN3. In 1955 Congress enacted a four year statute of limitation for civil suits filed under the Clayton Act, 15 U. S. C. § 15b.

**\*3** The Sixth Circuit was faced with the task of deciding whether an injury to one's 'business or property' in the Sherman Act was an injury to personal property in the Tennessee statute of limitation. In reaching its decision the Court noted that:

> While the precise question has not been decided by the Supreme Court of Tennessee, we do find an indisposition to give to the section [28-305] any such broad and indeterminate meaning as would include a suit which does not involve any actual injury to property.
> 127 F. at 31.

That statement concerning the absence of Tennessee authority is crucial to an understanding of the Supreme Court's decision. What the Sixth Circuit essentially did was attempt to decide the issue based upon what it perceived the Tennessee Supreme Court would have held on the same issue. The federal appeals court was saying that Tennessee had not extended the concept of injury to property beyond cases involving actual physical injury. [FN4]

> FN4. The Supreme Court's decision to uphold the Sixth Circuit was influenced by the fact that the author of the Sixth Circuit opinion, Judge Lurton, had been a justice on the Tennessee Supreme Court. Judge Lurton went on to become an associate justice on the United States Supreme Court.

If the Sixth Circuit and United States Supreme Court were called upon to decide the same issue today--that is, whether a tortious injury to property not involving physical damage falls within the injury to property limitation in § 28-305--the result would no doubt be different. The Tennessee Supreme Court decision in *Vance v. Schulder* and the cases which preceded it could not be disregarded by the federal courts.

Indeed, they have not been disregarded. As noted,

the Sixth Circuit, relying upon *Vance*, held the three year statute to apply to suits for fraud and misrepresentation.  *Edwards v. Travelers Insurance of Hartford, Conn., supra*.  In another Sixth Circuit case decided slightly before *Edwards*, the Court, again relying upon *Vance*, held that the ten year 'all other cases' limitation did not apply to suits arising under the Securities Exchange Act of 1934 [FN5] and Securities Exchange Commission Rule 10b-5. [FN6] *Clarke v. Wilson*, (Unreported Order, March 28, 1977).

> FN5. 15 U. S. C. § 78a, et seq.

> FN6. 17 C. F. R. § 240.10b-5.

 This Court can perceive of no reason why the principles stated by the Tennessee Supreme Court in *Vance v. Schulder* are not applicable to this suit.  This private anti-trust suit for injury or damage sounds in tort.  It is an action for injuries to personal property and is subject to the three year statute of limitation in T. C. A. § 28-305.

 **\*4** The decision on the statute of limitation does not at this stage of the litigation result in any action by the Court other than a declaration that the three year statute applies.  Under T. C. A. § 28-305 suits are barred unless commenced within three years 'from the accruing of the cause of action.'  The question of when the cause of action accrued in this case has not been addressed by the parties.

### Parens Patriae

 The State's posture as a plaintiff in this case is somewhat unusual.  It has sued as a direct purchaser of Levi Strauss products as would any other consumer and has also sued to recover on behalf of Tennessee citizens under the *parens patriae* theory.  [FN7] Levi Strauss challenges the State's authority to sue *parens patriae*.

> FN7. Private damage suits are authorized by T. C. A. § 69-106 which provides that:
> 'Any person who may be injured or damaged by any such arrangement, contract, agreement, trust, or combination, described in this chapter may sue for and recover, in any court of competent jurisdiction, of any person operating such trust or combination, the full consideration or sum paid by him for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.'

 The concept of *parens patriae* has its origin in English common law where the King was the guardian of 'infants, idiots and lunatics'--this is, persons suffering under a disability.  In the United States that responsibility has passed to the states and is manifested in various laws and practices which protect persons under disabilities.

 Relying on *parens patriae*, states can maintain anti-trust actions to protect the interests of their citizens, such as suits to enjoin unlawful activities which injure the state's economy.  [FN8] Such injury is perceived as injury to the quasi-sovereign interest of the State itself.  Utilization of *parens patriae* is dependent upon a showing that the state is asserting an interest separate from the claims of its citizens.

> FN8. *Georgia v. Pennsylvania R. R. Co.* [1944-45 TRADE CASES ¶ 57, 344], 324 U. S. 439 (1945).

 In the case at bar the State seeks to extend the concept to include an action by the State for injury to individual citizens.  As has been noted in the leading case on the issue, 'Judicial recognition of such authority would be a substantial departure from the scope of *parens patriae* authority as it has been recognized in this country to date.  * * * *Parens patriae* has received no judicial recognition in this country as a basis for recovery of money damages for injuries suffered by individuals.' *California v. Frito-Lay, Inc.* [1973- 1 TRADE CASES ¶ 74,364], 474 F. 2d 774 (9th Cir. 1973), cert. denied 412 U. S. 908 (1973).

 The question of a state's authority to suit *parens patriae* for damages to individual citizens was squarely faced by the Ninth Circuit in *Frito-Lay*.  There the State of California filed a federal anti-trust suit *parens patriae* as representative of its citizens who were the victims of alleged resale price-fixing by the snack food industry.  The State urged that it was impossible or impractical for the consumers to bring individual suits.  After examining the historical origins and legal authorities on *parens patriae*, the Court concluded that California could not maintain the suit.  The holding in *Frito-Lay* is compelling.

 **\*5** The response of Congress to the *Frito-Lay* decision is instructive.  In 1976 it passed the Hart-Scott-Rodino Anti-Trust Improvements Act, 15 U. S. C. § 15c.  The act specifically authorizes states to maintain federal anti-trust suits such as the instant suit.  The act establishes precise procedures which are to be followed in *parens patriae* damage suits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                    Page 4
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**

It is also significant that the Tennessee Legislature has granted the Attorney General authority to sue on behalf of injured citizens in the Consumer Protection Act. T. C. A. § 47-18-108(a)(b). The Legislature can pass similar legislation in the anti-trust field.

The State is asking this Court to do what every other court, with one exception [FN9] has declined to do-- extend the concept of *parens patriae* to permit suits by the State to collect damages for individual citizens. The object of the attempted broadening of *parens patriae*--the recovery of damages to injured consumers--is certainly worthwhile. And, considering the small amount of loss to each consumer, such an action by the State may be the only practical way the individual purchaser will recover. Nevertheless, this Court concludes that such a drastic departure from accepted practice must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established. The portion of the complaint seeking damages as *parens patriae* should be dismissed.

> FN9. The State's power to sue for damages *parens patriae* was upheld by a trial court in *State of Michigan v. Detroit Lumbermans Association* [1979-2 TRADE CASES ¶ 62,990], (Circuit Court for Wayne County, October 26, 1979). The damage claim was coupled with a claim for injunctive relief to prohibit further violations. The Court noted that the case was not one 'in which the State is seeking to prosecute the purely personal claims of its citizens, but rather it is seeking to protect the public interest in preserving a fair and open lumber market.' p. 10. In the 1978 Federal Trade Commission consent decree, Levi Strauss agreed not to engage in any prohibited practices in the future. Although the instant suit contains a prayer for injunctive relief, the F. T. C. consent decree leads to the conclusion that this is in all respects a damage suit.

### Fair Trade Law Impact

Levi Strauss argues that, even if it did conspire or combine with others to fix retail prices, such conduct was legal under Tennessee's Fair Trade Law. [FN10] That law was repealed in 1975, [FN11] but was in effect during most of the period during which the State alleges Levi Strauss unlawfully maintained retail prices.

> FN10. The Fair Trade Law was codified at T. C. A. § 69-201-69-205.

> FN11. Chapter 25, Public Acts of 1975.

The Fair Trade Law was in essence an exemption from the anti-trust laws. It legalized price-fixing by permitting a manufacturer and its vendee to enter into a contract which required the vendee to sell a commodity at the price dictated by the manufacturer. [FN12] Whether Levi Strauss had a price-fixing contract with its retailers is an issue of fact which cannot be resolved on motion for summary judgment. Resolution of the question must await trial.

> FN12. The law provided in pertinent part that:
> 'No contract relating to the sale or resale of a commodify which bears, or the label or content of which bears, the trade-mark, brand, or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of this state by reason of any of the following provisions which may be contained in such contract:  1.  That the vendee will not resell such commodity except at the price stipulated by the vendor.  2. That a producer making sale, or a vendee making resale, of any commodity required that his vendee will not resell except at the price stipulated by such producer or reselling vendee as the case may be.'

### Conclusion

*6 An order will be entered (1) declaring that this suit is subject to the three year statute of limitation of T. C. A. § 28-305, (2) dismissing the damage claim brought *parens patriae*, an (3) overruling the defendant's motion based upon the Fair Trade Law defense.

The Court's decision on the defendant's motion resolves the issues raised by the State's motion to strike certain defenses. The order will accordingly deny the State's motion to strike.

Counsel for both parties will agree upon an order for submission to the Court. If unable to agree the defendant should submit a proposed order to which the plaintiff can respond in accordance with the local rules.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                                                   Page 5
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**


 Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.),
1980-2 Trade Cases  P 63,558

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT Q**

Westlaw.

Not Reported in F.Supp.2d                                                                                       Page 1
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

▶

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.
UNITED STATES of America, Plaintiff,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
HOWARD HESS DENTAL LABORATORIES
INCORPORATED and Philip Guttierez d/b/a
Dentures Plus, on behalf of themselves and all others
similarly situated,
Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
Amnon KAMINER, Frieda Simon and Lorraine
Goldsmith, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
**No. CIV. A. 99-005-SLR, CIV .A. 99-255-SLR,
CIV. A. 99-854-SLR.**

March 30, 2001.

Carl Schnee, United States Attorney and Judith M.
Kinney, Assistant United States Attorney, United
States Attorney's Office, Wilmington, Delaware.
William E. Berlin, Esquire and Jon B. Jacobs,
Esquire of the United States Department of Justice,
Antitrust Division, Washington, D.C.

Pamela S. Tikellis, Esquire and Robert J. Kriner,
Esquire of Chimicles & Tikellis, Wilmington,
Delaware. Counsel for plaintiffs Howard Hess Dental
Laboratories et al. Thomas A. Dubbs, Esquire and
Hollis L. Salzman, Esquire of Goodkind Labaton
Rudoff & Sucharow, New York, New York. Of
counsel for plaintiffs Howard Hess Dental
Laboratories et al.

Neal J. Levitsky, Esquire of Agostini, Levitsky,
Isaacs & Kulesza, Wilmington, Delaware. Counsel
for plaintiffs Amnon Kaminer et al. Sigmund S.
Wissner-Gross, Esquire, May Orenstein, Esquire, and
Allen M. Eisenberg, Esquire of Heller, Horowitz &
Feit, New York, New York. Of counsel for plaintiffs
Amnon Kaminer et al.

James P. Hughes, Esquire and John W. Shaw,
Esquire of Young, Conaway, Stargatt & Taylor,

Wilmington, Delaware. Counsel for defendant
Dentsply International, Inc. Margaret M. Zwisler,
Esquire, Richard A. Ripley, Esquire, Kelly A.
Clement, Esquire, Eric J. McCarthy, Esquire, and
David P. Burns, Esquire of Howrey Simon Arnold &
White, Washington, D.C. Of counsel for defendant
Dentsply International, Inc.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** Plaintiff United States of America ("the
government") filed an antitrust action against
Dentsply International Inc. ("Dentsply") on January
5, 1999. Dentsply makes and sells artificial teeth and
other dental merchandise. The government generally
alleges that Dentsply uses anticompetitive tactics to
keep its competitors from entering the artificial tooth
market.

Plaintiff Howard Hess Dental Laboratories, Inc. and
Philip Guittierez d/b/a Dentures Plus (hereinafter
referred to collectively as "the Hess plaintiffs") filed
an antitrust class action against Dentsply on April 21,
1999. The Hess plaintiffs are dental laboratories.
Plaintiffs Amnon Kaminer, Frieda Simon, and
Lorraine Goldsmith (hereinafter referred to
collectively as "the Kaminer plaintiffs") filed another
class action against Dentsply in the Supreme Court of
the State of New York on behalf of a consumer class
. [FN1] Dentsply removed that action on diversity
grounds to the United States District Court for the
Southern District of New York, which transferred the
action to this court on November 29, 1999 pursuant
to 28 U.S.C. § 1404(a).

> FN1. The Kaminer plaintiffs' counsel
> indicated that Amnon Kaminer will be
> withdrawing his claim against Dentsply.
> (C.A. No. 99-854, D.I. 63 at 1 n. 1)

In its suit, the government specifically alleges that
Dentsply 1) acted unlawfully to maintain a monopoly
in violation of § 2 of the Sherman Act, 15 U.S.C. §
2; 2) entered into unlawful restrictive dealing
agreements that substantially lessen competition in
violation of § 3 of the Clayton Act, 15 U.S.C. § 14;
and 3) entered into unlawful agreements in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: 2001 WL 624807 (D.Del.))

unreasonable restraint of interstate trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. As a result, the government seeks injunctive relief and costs.

The Hess plaintiffs in their case allege the same three antitrust violations as the government. In addition to injunctive relief, the Hess plaintiffs seek compensatory and treble damages for the alleged violations.

The Kaminer plaintiffs in their suit seek compensatory and treble damages for alleged violations of the antitrust laws of sixteen states and the District of Columbia.

Dentsply is a Delaware corporation with its principal place of business in York, Pennsylvania. Dentsply transacts business in and is found within this district. Thus, this court has jurisdiction pursuant to 15 U.S.C. § 22.

Currently before the court are Dentsply's motions for summary judgment on the merits of the antitrust causes of action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45) [FN2] Also before the court are Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs based on standing and statute of limitations grounds. (C.A. No. 99-255, D.I. 133, 135; C.A. No. 99-854, D.I. 48, 51)

> FN2. Unless otherwise noted, docket entries refer to submissions made in C.A. No. 99-005.

II. BACKGROUND

This case focuses on the manufacture and sale of artificial teeth in the United States. Artificial teeth are marketed to dentists and dental laboratories for use in the fabrication of dentures. As a result of the need to match variances in the teeth in a human mouth, artificial teeth are manufactured in thousands of shade and mould [FN3] combinations. They are sold on a card of six anterior or eight posterior teeth of the same shade and mould. Thus, a full denture (one that replaces all natural teeth) requires 28 teeth and four cards. Partial dentures are constructed when only a few teeth need replacement. (D.I. 231 at 3)

> FN3. A review of the artificial teeth trade literature had found that the preferred spelling of this word is "mould" instead of "mold."

*2 Generally, the process of constructing a denture begins with the dentist, who writes a denture "prescription" that specifies size, shape, and color requirements for the teeth in the denture appliance and sends it to a dental laboratory for fabrication. The dental laboratories purchase artificial teeth from dental product dealers, from artificial teeth manufacturers, or from other dental laboratories. (Id. at 3-4) The dental product dealers purchase artificial teeth from manufacturers such as Dentsply, Vita Zahnfabrik H. Rauter GmbH & Co. KG ("Vita"), and Ivoclar AG ("Ivoclar")). (D.I. 244 at 3)

A. The Relevant Market and its Participants

The relevant market for purposes of this action is the sale of prefabricated, artificial teeth in the United States. [FN4] (D.I.1, ¶ 5) Dentsply is the world's leading manufacturer of dental prosthetics and other dental products. Its Trubyte Division sells, among other things, the artificial teeth used by dental laboratories to make dentures and other removable dental prosthetics. (Id.) Dentsply distributes its teeth exclusively through dental laboratory dealers. (D.I. 231 at 7)

> FN4. Dentsply accepts the government's market definition for the purposes of this summary judgment motion. (D.I. 231 at 23 n. 41)

The government alleges that Dentsply has maintained a market share in the artificial tooth market of 70% to 80% for the past ten years. (D.I.1, ¶ 7) Dentsply distributes its artificial teeth through approximately 30 dental laboratory dealers ("Trubyte dealers") with 200 branch outlets. Dentsply and the Trubyte dealers are not bound by a written contractual agreement. Trubyte dealers purchase teeth on a purchase order basis.

In 1995, Dentsply distributed its teeth through approximately 37 dental laboratory dealers with 238 branch outlets. (D.I. 233 at A-276-79). At that time, there were 344 "dental dealers" according to the Twenty-third Annual Directory of U.S. Dental Dealers. (Id. at A-280-311) Five years later, Dentsply distributed Trubyte teeth to only 30 dealers with 200 branch outlets. (Id. at A-312-27; D.I. 234 at A-534)

Dentsply's biggest competitors are Vita and Ivoclar. Vita is a German company that manufactures and sells premium teeth throughout the world. Vita distributes its teeth in the United States through

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

Vident, Inc. ("Vident"). Vident uses approximately 15 non-Trubyte subdealers to distribute Vita teeth. (D.I. 236 at A-1014-15) Ivoclar is a Liechtenstein company that manufactures and sells artificial tooth lines throughout the world. In the United States, Ivoclar promotes, sells, and distributes teeth through Ivoclar NA, its wholly-owned subsidiary. (D.I. 231 at 11) Ivoclar distributes its teeth directly to dental laboratories and has attempted to sell teeth through dental laboratory dealers. (D.I. 245 at B-1129) Other smaller competitors include Universal Dental Company, Austenal, Inc., and Heraeus Kulzer GmbH. (D.I. 231 at 16-18)

1. The Hess Plaintiffs

 The Hess plaintiffs represent a putative class of dental laboratories seeking money damages and injunctive relief. In their complaint, the Hess plaintiffs allege that they purchased Trubyte teeth from a Dentsply dental laboratory dealer at artificially high prices caused by Dentsply's unlawful restraint of trade and monopolization. (C.A. No. 99-255, D.I.1, ¶  4) The Hess plaintiffs purport to represent "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply dealers .... Excluded from the Plaintiff Class are ... any co-conspirator[s] of the defendant ...." (*Id.*, ¶ 10)

 **\*3** The named Hess plaintiffs purchased artificial teeth from dental laboratory dealers and, therefore, are indirect purchasers. The dental laboratory dealers, on the other hand, are the direct purchasers. In their opposition to Dentsply's motions for summary judgment, the Hess plaintiffs claim that some dental laboratories purchase artificial teeth from Dentsply. (C.A. No. 99-255, D.I. 151 at 44) This is done in one of two ways. First, Dentsply "drop ships" teeth to laboratories at the request of its dealers. Drop shipping occurs when a laboratory places an order with its dealer, which the dealer cannot fill out of its existing inventory. (D.I. 256 at C-13) The dealer sends the order, along with its dealer purchase order number, to Dentsply and directs Dentsply to ship the teeth directly to the laboratory. Dentsply then charges the dealer for the shipment. (*Id.*) The second way that laboratories "directly" purchase teeth from Dentsply is through the Dentsply Order Network ("DON"). The DON is an internet-based system that allows laboratories to order products by scanning a bar code of the product it wants. (*Id.* at C-139) That information goes to a network communications company who sends the order to the dealer selected by the laboratory. [FN5] (*Id.* at C-148) The

laboratory then fills the order just as if it received it on the telephone.

> FN5. The system also allows customers to order directly from Dentsply. (D.I. 256 at C-148) The Hess plaintiffs have not offered evidence that they or anyone else has used the DON to order directly from Dentsply.

2. The Kaminer Plaintiffs

 The Kaminer plaintiffs represent a putative class comprised of
  [a]ll individuals and entities who purchased false teeth manufactured by [Dentsply], from entities or persons other than [Dentsply] in New York, Alabama, California, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia.
 (C.A. No. 99-854, D.I.1, Ex. A, ¶  40) Although the class covers all indirect purchasers  [FN6], the named plaintiffs are residents of New York who purchased dentures in New York from New York dentists. (C.A. No. 99-854, D.I. 64, Ex. C at 6; Ex. D at 6) The Kaminer plaintiffs allege that Dentsply has restrained trade in the United States market for prefabricated artificial teeth in violation of New York Gen. Bus. Law §  340 and the indirect antitrust laws of fifteen states and the District of Columbia.

> FN6. The court notes that since the Kaminer class purports to cover all indirect purchasers, the Hess plaintiffs would also be included in that class.

B. Dentsply's Dealer Criteria

 The focal point of this antitrust suit is Dentsply's "Dealer Criteria." Dentsply published its Dealer Criteria in 1993. The Dealer Criteria lists requirements for becoming and remaining an authorized Dentsply Trubyte dealer. (D.I. 245 at B-272) Among other things, the Dealer Criteria provides that "dealers that are recognized as authorized distributors may not add further tooth lines to their product offerings." (*Id.* at B-273) There is no contractual agreement between Dentsply and its Trubyte dealers. Thus, although Trubyte dealers may not add a competing line of teeth, they can switch to a rival manufacturer at any time. (D.I. 231 at 21)

 **\*4** All of the plaintiffs in these cases (collectively, "plaintiffs") allege that this exclusive dealing policy

Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

was designed to and has thwarted competitors' attempts to build a dealer network and thus compete effectively in the United States. (D.I.1, ¶   30) Plaintiffs further allege that Dentsply, through its exclusive dealing policy, has undermined the efforts of competitors to maintain or recruit dental laboratory dealers and has induced some dealers to stop distributing competitors' teeth. (D.I.1, ¶   31) For example, in 1987, Frink Dental ("Frink"), a Trubyte dealer, agreed to start selling a competing tooth line. Dentsply terminated Frink as both a tooth and merchandise dealer. Dentsply also threatened to terminate other dealers that were supplying Frink with Trubyte teeth. Frink eventually agreed to stop selling the competing tooth line, and Dentsply reinstated Frink as a Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1493; D.I. 245 at 1540-48)

Atlanta Dental Supply ("ADS") is another example of a Trubyte dealer whom Dentsply allegedly intimidated into foregoing a competitive tooth line. Sometime after 1993, ADS became interested in selling a competitive tooth line because it received a number of requests for them. ADS reached a tentative agreement with the competitor, but backed off the deal after Dentsply threatened to drop ADS as an authorized Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1737-58)

In 1994, Pearson Dental Supply ("Pearson"), an authorized Trubyte dealer, took on a consignment of Vita teeth and began advertising them in its product catalog. Dentsply threatened to terminate Pearson. Pearson dropped Vita and then decided not to add a different competitor's line. (D.I. 244 at 6; D.I. 245 at B-1827-48)

In 1995, Dentsply permitted one of its former dealers, Dental Technicians Supply ("DTS"), to resume selling Trubyte teeth only after DTS agreed to stop selling Vita, Ivoclar, and Justi teeth in its Kansas City, Denver, and Orlando locations. Dentsply placed different restrictions on DTS's New York location that allowed DTS to continue selling Vita. (D.I. 244 at 6; D.I. 245 at B-2048- 80; 333-40; 236-44)

In November 1998, DTS was acquired by Darby Dental ("Darby"), a Trubyte dealer that was not permitted to sell Vita in any location. When Darby acquired DTS's New York office, Darby management wanted to retain the Vita line in order to satisfy existing New York DTS customers. Dentsply insisted that if Darby were to sell Vita in its newly acquired New York office, Darby would be violating the

Dealer Criteria. Dentsply gave Darby six months to exhaust DTS's Vita supply and offered to buy the remaining Vita inventory so that Darby would be in compliance. (C.A. No. 99-854, D.I. 64 at DPLY-A- 018242-43)

C. Alleged Anticompetitive Effects of Dentsply's Restrictive Dealing Agreements

Plaintiffs allege that Dentsply, through its Dealer Criteria and other conduct, has entered into restrictive dealing arrangements with dental laboratory dealers, and sold teeth to them, on the condition that those dealers not deal with rival manufacturers. Plaintiffs allege that independent dental laboratory dealers have been, and continue to be, the primary channel of distribution of artificial teeth to dental laboratories. (D.I.1, ¶   14) Dentsply's Trubyte Division distributes its teeth through a network of these independent dental laboratory dealers who collectively constitute approximately 80% of the outlets distributing artificial teeth and other dental laboratory products in the United States. (D.I.1, ¶   16) Because Dentsply has a substantial market share, many dental laboratories currently use Dentsply Trubyte teeth and expect local dental laboratory dealers to have the Trubyte line available. By requiring the dental laboratory dealers to carry only the Trubyte line of teeth, plaintiffs allege that competitors are not able to effectively compete in the United States. (D.I.1, ¶   24, 30) Plaintiffs further allege that Dentsply's conduct has undermined the efforts of small domestic competitors of Dentsply in the United States to maintain or recruit dental laboratory dealers. (D.I.1, ¶ 31)

 **\*5** Dentsply contends that because its exclusive dealing policy does not foreclose its competitors from the market for artificial teeth in the United States, the policy is not forbidden under the Sherman or Clayton Acts. Dentsply argues that rather than being foreclosed from the relevant market, alternative channels of distribution exist for Dentsply's rivals. For example, Ivoclar and Vita sell teeth directly to dental laboratories without going through an intermediary--a dental laboratory dealer. Thus, even if Dentsply's restrictive dealing arrangement has the effect of foreclosing access to dental laboratory dealers, Ivoclar, Vita, and other manufacturers can reach the end users--the dental laboratories--without hindrance. Trubyte dealers are free to stop selling Dentsply teeth and switch to a rival at any time. Dentsply further supports its restrictive dealing policy by arguing that it has procompetitive benefits.

D. Standing

Dentsply filed motions for summary judgment on standing grounds against the Hess and Kaminer plaintiffs. Dentsply's standing arguments against the Hess plaintiffs center around the Supreme Court's decision in *Illinois Brick,* [FN7] while the standing arguments against the Kaminer plaintiffs relate to the named plaintiffs' ability to maintain a class action antitrust suit.

> FN7. *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

E. Statutes of Limitations

Dentsply filed motions for summary judgment on statute of limitations grounds against the Hess and Kaminer plaintiffs. The allegations against both sets of plaintiffs are essentially the same . [FN8]

> FN8. Because the statute of limitations for antitrust actions in Maine and Wisconsin is six years, Dentsply does not seek summary judgment on statute of limitations grounds for claims arising under those laws. The federal antitrust laws and the antitrust laws of all other states involved here provide a limitations period of four years or less. *See* discussion *infra* Section IV.D.

Dentsply argues that the Hess and Kaminer plaintiffs' claimed injuries are derived from Dentsply's Dealer Criteria which was announced in February 1993. The Hess and Kaminer plaintiffs filed their suits in 1999, more than four years after Dentsply announced the policy. As a final, binding version of an allegedly anticompetitive policy, Dentsply argues that the suits are time-barred because they were not filed within four years after February 1993.

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude

that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting *Fed.R.Civ.P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION

**\*6** Plaintiffs charge that by agreeing with some dental laboratory dealers that the dealers would not carry competitive tooth lines, Dentsply willfully maintained and abused a monopoly in the United States market for prefabricated artificial teeth in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. (D.I.1, ¶ 41) Plaintiffs allege that by entering into, maintaining, and enforcing these restrictive dealing agreements, Dentsply causes a substantial lessening of competition in the relevant market in violation of § 3 of the Clayton Act, 15 U.S.C. § 14, and unreasonably restrains trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

A. Antitrust Claims

1. The Legal Standard

Plaintiffs' first cause of action is Dentsply's alleged violation of § 2 of the Sherman Act. Section 2 prohibits a business with monopoly power from maintaining that monopoly power through means that go beyond competition on the merits. [FN9] To prove a claim under § 2, the plaintiffs must show that 1) Dentsply has a monopoly and 2) Dentsply maintained that monopoly through anticompetitive conduct as opposed to accident or superior business acumen. *See*

Not Reported in F.Supp.2d                                                                                              Page 6
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

*United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966).

> FN9. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

Plaintiffs' second cause of action alleges violations of § 1 of the Sherman Act and § 3 of the Clayton Act. Section 1 of the Sherman Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Only unreasonable restraints of trade are prohibited. *See Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988). Thus, to establish a claim under § 1 of the Sherman Act, plaintiffs must show that 1) there was a contract, combination, or conspiracy; 2) that unreasonably restrained trade; and 3) affected interstate commerce. *See Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.,* 185 F.3d 154, 157 (3d Cir.1999). All exclusive dealing agreements must comply with § 1 of the Sherman Act. *Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 110 (3d Cir.1992), citing *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1239 (3d Cir.1975).

Section 3 of the Clayton Act makes it unlawful for a person to sell goods on the condition, agreement, or understanding that the purchaser shall not deal in the goods of a competitor where the effects of such conditions, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 14. In order to prove a claim under § 3 of the Clayton Act, plaintiffs must prove that the probable effect of Dentsply's restrictive dealing agreements is to decrease competition. *See Standard Fashion Co. v. Magrane-Houston Co.,* 258 U.S. 346, 356 (1922). Exclusive dealing contracts are unlawful where they significantly foreclose the opportunity for rivals to enter or remain in the market. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327-29 (1961). *See also,* Stephen F. Ross, *Principles of Antitrust Law,* 304-05 (1993). If an exclusive dealing policy "does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of [§ 1 and § 2 of the Sherman Act.]" *Tampa Electric,* 365 U.S. at 335.

### 2. Analysis

**\*7** Dentsply argues in support of its motions for summary judgment that its exclusive dealing agreements do not foreclose its rivals from reaching the end users--the dental laboratories. Dentsply points to four factors identified in the caselaw that preclude a claim of foreclosure:
 • Competitors use other dealers;
 • Competitors sell directly to end users;
 • Competitors can pursue new dealers; and
 • Dealers can switch to the defendant's competitors.
In this regard, Dentsply contends that where the record demonstrates the above factors, exclusion from the dealers of the defendant has been held not to constitute a substantial lessening of competition.

Dentsply is correct in its assertion that, in the cases it cites, no antitrust violations were found. Of the five cases cited, however, three were decided after trial on the merits. One was decided on a preliminary injunction record. [FN10] Only one was decided on a summary judgment record. *See CDC Techs. v. IDEXX Labs ., 186 F.3d 74 (2d Cir.1999). [FN11]* In that case, plaintiff CDC Technologies ("CDC") sold blood analysis machines to veterinarians. It filed suit against its competitor, IDEXX Laboratories ("IDEXX"), and alleged, among other things, unlawful restraint of trade in violation of § 3 of the Clayton Act and monopolization and conspiracy to monopolize in violation of § 1 of the Sherman Act. In particular, CDC alleged that IDEXX illegally entered into exclusive dealing arrangements with CDC's former distributors. The distributors' role with CDC had been to provide CDC with the names of veterinarians potentially interested in purchasing blood analysis machines. IDEXX, a later entrant in the market, signed up CDC's distributors to play the same role in furnishing the names of likely veterinarians. The distributors did not purchase or resell the machines; rather, they merely located prospective customers.

> FN10. In that case, *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984), the court specifically held that, "although we have concluded that the district judge should not have granted Roland's motion for a preliminary injunction, our discussion of the probable merits of Roland's antitrust claim is tentative. We do not exclude the possibility that on the fuller record made in the trial on the merits Roland will succeed in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-md-01717-JJF    Document 310-2    Filed 11/03/2006    Page 119 of 140

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

establishing its claim." *Id.* at 395-96.

FN11. Therefore, while some general principles may be distilled from these decisions, all but one are distinguishable based upon the procedural posture of this case.

 The district court granted IDEXX's motion for summary judgment, concluding that CDC could not prove that the exclusive dealing arrangements had anticompetitive effects because: 1) the role of the distributors was so limited; 2) CDC had successfully used other techniques to reach end users; and 3) the exclusive dealing arrangements were of short duration and easily terminable. *Id.* at 75. On appeal, the Second Circuit affirmed the grant of summary judgment, finding that CDC's Clayton Act claim failed on a threshold level because the Clayton Act "does not regulate an arrangement with a distributor or middleman unless it involves actual sales." *Id.* at 75-76.

 Of the three remaining cases, none have facts comparable to those at bar. For instance, in *U.S. Healthcare v. Healthsource,* 986 F.2d 589 (1st Cir.1993), the court found no antitrust violations where defendants controlled only 4% to 5% of the relevant market and the doctors who had signed the exclusivity contracts at issue were not prohibited from seeing patients from the plaintiff HMOs; the only consequence of their doing so was that the doctors would lose the pay differential for being an exclusive service provider. In the district court's opinion, such an "exclusive clause [was] simply not 'an exclusive dealing arrangement' cognizable under antitrust laws." ' *U.S. Healthcare v. Healthsource,* 1992 U.S. Dist. LEXIS 5826 at * 26 (citing *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1478 (D.Kan.1987)). The appellate court affirmed.

 **\*8** The defendant in *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215 (8th Cir.1987), had been one of plaintiff Ryko's distributors. Under its distributor contract, Eden had an exclusive geographic territory and was prohibited from selling competitive car-wash equipment, including a water reclaim device developed by Eden. In examining the exclusive dealing provisions of the distributor contract under § 1 of the Sherman Act and § 3 of the Clayton Act, the court declared that

   exclusive dealing should be evaluated under an analysis "which takes into account not only the market share of the firm but the dynamic nature of

the market in which the foreclosure occurs." *Id.* at 1234. With Ryko's market share of 8% to 10%, the court concluded that Eden had not shown that the restraint had a probable adverse effect on interbrand competition.

   Eden has produced no evidence suggesting that Ryko's exclusive dealing provisions generally prevent Ryko's competitors from finding effective distributors for (or other means of promoting and selling) their products. Rather, Eden charges that these provisions foreclose competition by preventing Eden from marketing its own water reclaim unit. The short answer to Eden's argument is that the concern of the antitrust law is the protection of competition, not individual competitors; the law is not designed to relieve a particular business of the burden of making the difficult choice between manufacturing its own product or distributing the product of another concern.
   *Id.*

 Finally, the court in *Omega Envtl. v. Gilbarco, Inc.,* 127 F.3d 1157 (9th Cir.1997), concluded that Omega had not shown at trial that Gilbarco's exclusive dealing policy foreclosed competition in the market under the Clayton Act. In so concluding, the court noted that Gilbarco's policy foreclosed roughly 38% of the relevant market for sales, a "significant" foreclosure rate. Nevertheless, the court recognized under the rule of reason that other factors weighed against a finding of unreasonable restraint of trade.

   First, exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern.... The record contains undisputed evidence that direct sales to end-users are an alternative channel of distribution in this market.... The record also contains undisputed evidence of potential alternative sources of distribution.
   Second, the short duration and easy termination of these agreements negate substantially their potential to foreclose competition.
   *Id.* at 1163-64.

 Based upon its reading of the above caselaw, Dentsply asserts that its Dealer Criteria satisfies each of the four factors considered by courts in evaluating the competitive effects of exclusive dealing policies. First, Dentsply's competitors use different dental laboratory dealers to sell to dental laboratories. For example, Vita sells its teeth through Vident and Vident's subdealers. Second, some of Dentsply's competitors sell directly to the end users. For example, Ivoclar distributes its artificial teeth directly

Not Reported in F.Supp.2d                                                                                     Page 8
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: 2001 WL 624807 (D.Del.))

to dental laboratories in the United States. Third, its competitors could pursue new dealers. Dentsply claims there are 344 "dental dealers" in the United States, of which only approximately 30 are Trubyte dealers. Finally, the Trubyte dealers can switch to competing tooth lines at any time. No contract binds a Trubyte dealer to Dentsply. Dealers are free to switch to Vita, Ivoclar, or any other tooth manufacturer at any time.

 **\*9** While the court agrees that the existence of alternative channels of distribution to end users lessens the likelihood that an exclusive dealing policy forecloses competition in the relevant market, Dentsply has not met its burden of showing that it is entitled to judgment as a matter of law. A genuine issue of material fact still exists as to whether selling directly to the end users is a viable option for manufacturers of artificial teeth.

 Moreover, a genuine issue of material fact exists with respect to the foreclosure rate. Dentsply claims that the foreclosure rate in this case is approximately 10% because it only controls 30 of the over 300 "dental dealers." The government claims, however, that the number of available dental laboratory dealers is far less than what Dentsply claims. Dentsply relies on the figure of "dental dealers" listed in the Directory of U.S. Dental Dealers. That number, according to the government, includes "operatory" dealers. These operatory dealers sell various merchandise and equipment to dentist offices as opposed to the dental laboratories who purchase teeth. Dentsply has not convinced the court that these "operatory" dealers "have actual or potential ability to deprive existing dental laboratory dealers of significant levels of business." *Id.* at 1163, citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir.1989).*

 Dentsply also argues that because its exclusive dealing policy has procompetitive benefits, plaintiffs must prove that rivals are foreclosed from the market to maintain their claims. For example, Dentsply markets and promotes its teeth to dental laboratories, dentists, and dental students through national advertising, sales calls by its sales representatives, and through training and education programs. (D.I. 231 at 35) Dentsply claims that its ability to recoup its investment in these promotional efforts necessarily depends upon its ability to restrict its dealers from distributing rival tooth products. (*Id.*) Dentsply is correct that the plaintiffs have the ultimate burden of proving that the probable effect of the Dealer Criteria is to "foreclose competition in a

substantial share of the line of commerce affected." *Tampa Electric, 365 U.S. at 327.* However, even if Dentsply creates demand for its Trubyte teeth, Dentsply has not presented enough evidence to demonstrate as a matter of law that its business justifications prevent the plaintiffs from meeting their burdens.

 For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on the merits of the antitrust action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45)

 B. Standing Under Federal Antitrust Laws

 1. The Legal Standard

 Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." *15 U.S.C. § 15(a).* Although the Clayton Act provides relief to anyone injured, the Supreme Court limited the scope of injured plaintiffs in *Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).*

 **\*10** In *Illinois Brick,* the State of Illinois and 700 local government entities sought treble damages from defendant concrete block manufacturers under § 4 of the Clayton Act for an alleged price-fixing conspiracy. Plaintiffs alleged that the defendants had passed on overcharges resulting from the price-fixing conspiracy to masonry contractors who then passed on the overcharges to general contractors who then passed the overcharges to plaintiffs who purchased buildings made from concrete block. The plaintiffs, therefore, were indirect purchasers of concrete block. *Id.* at 726-27.

 The issue before the Supreme Court was whether indirect purchaser plaintiffs could use the "pass on" theory to state a damage claim against an alleged antitrust violator. Previously, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968),* the Court held that antitrust defendants could not argue that plaintiffs seeking treble damages were not injured because the plaintiffs had "passed on" the illegal overcharge to their own customers. *Id. at 489.* Maintaining consistency, the *Illinois Brick* Court held that antitrust plaintiffs could not claim an injury resulting from overcharges passed on to them through those who purchased directly from the defendant. *Illinois Brick, 431 U .S. at 724-26, 735.* The Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

gave three reasons why the *Hanover Shoe* rule should apply to both plaintiffs and defendants. First, symmetry was necessary to avoid multiple liability. Without symmetry, both the brick masons and the state could sue the defendants and recover the full amount of the overcharge. *Id. at 730.* Second, the Court was concerned that judicial analysis of pass-on arguments would increase the complexity of antitrust litigation. *Id. at 731-32.* Finally, the majority argued that the private attorney general rationale underlying § 4 is best served by keeping all relief in the hands of the direct purchaser. *Id. at 737-47. See generally,* Ross, *supra,* at 218-19.

 The Supreme Court has identified some exceptions to the indirect purchaser rule. In *Illinois Brick* itself, the Court noted that exceptions to the indirect purchaser rule would include situations where the indirect purchaser acquired goods through a preexisting cost-plus contract or "where the direct purchaser is owned or controlled by its customer." *Illinois Brick,* 431 U.S. at 736 & n. 16.

 Since *Illinois Brick,* the Court has issued two notable opinions regarding antitrust standing. In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC* "), the Supreme Court synthesized its previous rulings on antitrust standing by analyzing five factors to resolve the standing issue before it. As the Third Circuit explained in *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850 (3d Cir.1996), the Supreme Court considered 1) the causal connection between the antitrust violation and the harm to the plaintiff, 2) whether the antitrust injury is "of the type that the antitrust statute was intended to forestall," 3) the directness or indirectness of the asserted injury, 4) the existence of more direct victims of the alleged violation, and 5) the potential for duplicative recovery or complex apportionment of damages. *See id.* at 850 (citing *AGC,* 459 U.S. at 537-44).

 **\*11** In *Kansas v. Utilicorp United, Inc.,* 497 U.S. 199 (1990), plaintiffs, state attorneys general representing residential users of natural gas, sued various producers of natural gas who allegedly conspired to fix prices. The indirect purchaser plaintiffs argued that *Illinois Brick* did not apply because the concerns regarding risk of multiple recovery and difficulty in apportionment would not be implicated where the regulated utilities passed on one hundred per cent of their costs to customers. *Id.* at 208. The Court rejected the plaintiffs' theory, holding that the absence of a particular *Illinois Brick* predicate in an individual case does not change the

bar against indirect purchaser suits. "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217.

 In addition to *Illinois Brick* 's "control exception," several courts have recognized a "co-conspirator exception." *See, e.g., McCarthy,* 80 F.3d at 855. Under this exception, indirect buyers have standing to bring an antitrust claim against defendants who are co-conspirators in a vertical antitrust conspiracy. *Id.* at 854. The Third Circuit, however, has "refused to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants." *Id.*

 2. Analysis

 The Hess plaintiffs attack the standing issue with several theories. First, they assert that some dental laboratories are "direct" purchasers from Dentsply for purposes of *Illinois Brick* . [FN12] The Hess plaintiffs claim that when Dentsply drop ships teeth directly to a dental laboratory or when the laboratory orders teeth through the internet-based DON, the Hess plaintiffs are direct purchasers and, thus, are entitled to pursue a damage claim under § 4 of the Clayton Act. When teeth are drop shipped or ordered through the DON, the shipment may go directly from Dentsply's York, Pennsylvania plant to the dental laboratory. According to § 2-103(d) of the Uniform Commercial Code, Dentsply is the "seller" of the goods. Section 2-106(1) defines a "sale" as "consist [ing] of the passing of title from the seller to the buyer for a price." Finally, § 2-401(2) dictates that such title passes to the buyer at the time and place for physical delivery of the goods. The Hess plaintiffs argue that since the Trubyte dealers never have physical custody of the teeth, title never passes to them. Since title passes directly from Dentsply to the dental laboratory, the Hess plaintiffs claim they are direct purchasers.

> FN12. The Hess plaintiffs' complaint specifically limits the class to "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply Dealers ...." (C.A. No. 99-255, D.I.1, ¶ 10) (emphasis added). In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs claimed that "discovery has revealed that a substantial portion of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 10
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

Dentsply's sales are made directly to labs." (C.A. No. 99-255, D.I. 151 at 44 n. 21) The Hess plaintiffs offered to amend the complaint to allege that some laboratories purchased teeth directly from Dentsply. (*Id.*)

 The court rejects this theory foremost because the complaint specifically alleges that the Hess plaintiffs are not direct purchasers. The named plaintiffs do not claim to have themselves purchased teeth directly from Dentsply. The court is likewise not convinced that this creative title theory is sufficient to overcome *Illinois Brick.* When a dental laboratory places an order through the DON or the teeth are drop shipped, the Trubyte dealer is still involved in the transaction. The dental laboratory pays the Trubyte dealer for the teeth and the Trubyte dealer in turn pays Dentsply. Because the Trubyte dealer acts as an intermediary between the dental laboratory and Dentsply, the court finds that the Hess plaintiffs are not direct purchasers under this theory.

 **\*12** The Hess plaintiffs next argue that even if they are indirect purchasers, they have standing because the Trubyte dealers are co-conspirators of Dentsply and, therefore, *Illinois Brick* does not apply. The Hess plaintiffs did not join the dental laboratory dealers as co-conspirators. Instead, the named Hess plaintiffs signed stipulations with 22 of the 26 Trubyte dealers. (C.A. No. 99-255, D.I.175) The stipulations provide that the Trubyte dealers will release Dentsply from all claims for antitrust violations in exchange for the named plaintiffs agreeing not to file suit against the Trubyte dealers. According to the Hess plaintiffs' expert, Raymond S. Hartman, that group of 22 Trubyte dealers represents approximately 95% of the gross sales of Dentsply's Trubyte tooth products. (*Id.,* ¶ 3) The Hess plaintiffs argue that the stipulations alleviate the concerns of duplicative recovery and difficulty in apportionment. Without addressing the merit of that claim, [FN13] the court declines to make a new exception to *Illinois Brick* in light of 1) the Third Circuit's "refus[al] to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants," *McCarthy,* 80 F.3d at 854, and 2) the Supreme Court's ruling in *Utilicorp* whereby the Court invoked *Illinois Brick* to deny indirect purchaser standing even though the same economic assumptions in *Illinois Brick* were not present. 497 U.S. at 217.

    FN13. The court is not convinced that the stipulations will have the purported effects of eliminating duplicative recovery or

difficulty in apportionment. The stipulations are only between the named plaintiffs and the 22 individual Trubyte dealers. Even if this court were to certify the class of dental laboratory dealers, the stipulations would not bind those class members who opt out of the class.

 Next, the Hess plaintiffs argue that Dentsply exerts virtual control over its Trubyte dealers and, therefore, *Illinois Brick* does not apply. The co-conspirator exception has been recognized in the Third Circuit when an antitrust defendant actually owns the direct purchaser. *See In re Sugar Indus. Antitrust Litig., 579 F .2d 13, 18-19 (3d Cir.1978)* (permitting indirect purchasers to maintain damage claims against defendant even though the plaintiffs actually purchased goods from divisions or subsidiaries of defendant). Since Dentsply does not own its authorized dental laboratory dealers, the Hess plaintiffs have failed to show that they fit within the "control exception" in its current form. The Hess plaintiffs recognize that "the Third Circuit has [not] yet extended the 'control exception' to *Illinois Brick* beyond the scope of the parent-subsidiary relationship." The Hess plaintiffs nevertheless invite the court to expand the law to situations in which the manufacturer's control over its dealers is sufficiently strong enough to eliminate any possibility that the dealers might sue. In the absence of Third Circuit precedent, the court declines to expand the law.

 The Hess plaintiffs argue further that they have standing because they also seek non-overcharge damages arising out of Dentsply's monopolistic and other conduct. In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs indicate that if they are barred by *Illinois Brick* from proving overcharge damages, they wish to retain the option of proving damages that, from their point of view, do not involve the difficulties of proof outlined in *Illinois Brick.* For example, the Hess plaintiffs claim that after discovery, they may be able to articulate a lost profits or other damages theory. Because the Hess plaintiffs have failed to articulate any theory of damages that would be anything other than the overcharges they incurred, the court holds that the Hess plaintiffs are barred by *Illinois Brick* from seeking money damages against Dentsply.

 **\*13** The court must still decide, however, whether the Hess plaintiffs can seek injunctive relief. Section 16 of the Clayton Act provides that "[a]ny person ... shall be entitled to sue for and have injunctive relief

Not Reported in F.Supp.2d                                                                                     Page 11
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. *Illinois Brick* 's indirect purchaser rule is not applicable to claims for injunctive relief. *McCarthy,* 80 F.3d at 856. In order to seek injunctive relief, the Hess plaintiffs must show 1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury. *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 400 (3d Cir.2000).

The Hess plaintiffs argue that they have been damaged in the form of over-payments for artificial teeth and will continue to be damaged as long as the conspiracy between Dentsply and its Trubyte dealers is allowed to remain in place. Dentsply argues that the Hess plaintiffs' claims for injunctive relief are essentially moot because the government's case also seeks injunctive relief. Dentsply suggests that the government can obtain the same relief for the Hess plaintiffs without tackling the procedural hurdles of Rule 23. Although Dentsply ultimately may be correct in its assertion, the court will reserve judgment on this issue until further argument on whether the interests of the Hess plaintiffs and those of the government are sufficiently identical to preclude the Hess plaintiffs from pursuing their claims for injunctive relief.

For the foregoing reasons, the court shall grant in part and deny in part Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99- 255, D.I.133) The motion is granted to the extent that the Hess plaintiffs seek damages. The motion is denied to the extent that they seek injunctive relief.

C. Standing Under State Antitrust Laws

1. The Legal Standard

Several states have enacted statutes known as *Illinois Brick* repealers. These statutes provide that indirect purchasers may recover damages for violations of state antitrust laws where overcharges were passed on to them by direct purchasers. In *California v. ARC America Corp.,* 490 U.S. 93 (1989), the Supreme Court upheld the legality of such statutes.

Although the state laws involved here do not follow the indirect purchaser rule, most of them nevertheless look to cases construing the federal antitrust laws for guidance in interpreting their statutes. [FN14] Thus, the court will look to federal antitrust cases to determine the general standing requirements under the state antitrust laws.

FN14. *See* D.C.Code Ann. § 28-4515 (1981); Fla. Stat. Ann. § 501.204(2) (West 1997 & Supp.1998); Mich. Comp. Laws Ann. § 445.784(2) (West 1989); N.M. Stat. Ann. § 57-1-15 (Michie 1995); S.D. Codified Laws § 37-1-22 (Michie 1994); W. Va.Code § 47-18-16 (1995); *Marshall v. Planz,* 13 F.Supp.2d 1231, 1246 (M.D.Ala.1998); *Vinci v. Waste Mgmt., Inc.,* 43 Cal.Rptr.2d 337, 338 n. 1 (Cal.Ct.App., 1st Dist.1995); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.,* 875 F.Supp. 8, 14 (D.Me.1994); *Keeting v. Philip Morris, Inc.,* 417 N.W.2d 132, 136 (Minn Ct.App.1987); *NAACP v. Claiborne Hardware Co.,* 393 So.2d 1290, 1301 (Miss.1980), *rev'd on other grounds,* 458 U.S. 886 (1982); *Chow v. Union Central Life Ins. Co,* 457 F.Supp. 1303, 1308 (E.D.N.Y.1978); *Rose v. Vulcan Materials Co.,* 194 S.E.2d 521, 530 (N.C.1973); *State ex rel. Leech v. Levi Straus & Co.,* 1980 WL 4696 at *2 n. 2 (Tenn. Ch. Ct.1980); *Grams v. Boss,* 294 N.W.2d 473 (Wis.1980). It is not clear whether Kansas and North Dakota use the federal antitrust laws for guidance in interpreting their own antitrust statutes.

2. Analysis

The Kaminer plaintiffs maintain they have standing to seek damages under the antitrust laws of sixteen states and the District of Columbia. Dentsply attacks their standing on several grounds. First, Dentsply argues that the Kaminer plaintiffs suffered no injury under the antitrust statutes of the fifteen states other than New York and the District of Columbia. Since the Kaminer plaintiffs are New York residents who purchased dentures from a New York dentist in New York, the Kaminer plaintiffs suffered no antitrust injury in, for example, Minnesota. The Kaminer plaintiffs maintain that they only need individual standing to assert the claims of the absent class members. If the court certifies the class of indirect purchasers from the various states, the Kaminer plaintiffs contend that they will be a representative member of that class. The Kaminer plaintiffs argue that Dentsply's argument on this point is more appropriately made in opposition to class certification, not individual standing. The court agrees.

**\*14** Dentsply next argues that the Kaminer plaintiffs do not have standing because they did not participate in the relevant market. The Kaminer plaintiffs'

Not Reported in F.Supp.2d                                                                                      Page 12
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: 2001 WL 624807 (D.Del.))

complaint defines the relevant product market as "the sale of prefabricated artificial teeth in the United States." (C.A. No. 99-854, D.I.1, ¶ 10) The Kaminer plaintiffs purchased dentures rather than prefabricated artificial teeth. Dentsply contends that only about 6% of the price that dentists charge for dentures is attributable to the raw materials of the dentures, including the artificial teeth. (C.A. No. 99-854, D.I. 52 at 4) Despite the lack of complete identity between dentures and prefabricated artificial teeth, the court finds a sufficient nexus on the record presented between the Kaminer plaintiffs' purchases and the relevant product market. At this stage of the proceedings, the Kaminer plaintiffs are participants in the artificial tooth market because they arguably are unable to fill their need for dentures without becoming indirect purchasers of prefabricated artificial teeth.

Dentsply argues that the Kaminer plaintiffs' alleged injury is too remote and speculative to confer upon them antitrust standing. While the *Illinois Brick* repealers allow indirect purchasers to recover for their antitrust injuries, Dentsply argues that they do not confer automatic standing upon indirect purchasers. Instead, Dentsply asserts that the court should apply the *AGC* factors in determining standing under the state indirect purchaser statutes. The Kaminer plaintiffs argue that the purpose of the *AGC* factors is to guide the court's exercise of judgment in deciding standing in the absence of explicit statutory directives. The Kaminer plaintiffs contend that the states have issued an explicit legislative conferral of standing on indirect purchasers.

The Supreme Court in *Illinois Brick* discussed what class of persons could sue for treble damages in an antitrust action and concluded that only direct purchasers could sue. In *AGC*, however, the Court discussed the "conceptually more difficult question of 'which persons have sustained injuries too remote from an antitrust violation to give him standing to sue for damages.'" *Merican Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964 (3d Cir.1983)*. Thus, although the various states may have "repealed" *Illinois Brick* under their state schemes, that alone does not mean that they rejected the requirement that a plaintiff demonstrate injury sufficient to confer individual standing. *See, e.g., Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc.,* 1998 U.S. Dist. LEXIS 8302, *17 n. 2, 27 (N.D.Cal.1998)(stating that although *Illinois Brick* does not apply to California antitrust statute, plaintiff must still allege a direct injury to sustain a claim).

In this regard, Dentsply argues that the Kaminer plaintiffs' theory requires proof that 1) Dentsply's Dealer Criteria and its other alleged anticompetitive behavior excluded competitive artificial tooth manufacturers from the market and limited competition in the sale of artificial teeth to dental laboratories; 2) the limited competition enabled Dentsply to exact monopoly profits from dental laboratory dealers; 3) Dentsply in fact charged supracompetitive prices for teeth; 4) all dealers, in turn, increased the prices they charged to dental laboratories; 5) when dental laboratories used Dentsply teeth in a denture, they increased the price that they charged the dentists for the denture and the price increase was attributable to the higher cost of the teeth; and 6) when the dentist sold the denature to the plaintiffs, all dentists independently chose to increase the price that they charged for the dentures.

**\*15** Regardless of whether Dentsply is correct in its analysis of plaintiffs' burden of proof, the court concludes that there are genuine issues of material fact relating to the Kaminer plaintiffs' antitrust injury that preclude the entry of summary judgment in favor of Dentsply as a matter of law under *AGC.*

As its final argument, Dentsply contends that New York law prohibits the Kaminer plaintiffs from maintaining their state law claims as a class action. When the Kaminer plaintiffs filed their complaint, they sought to maintain their various state claims, including New York's Donnelly Act, as a class action pursuant to Section 901(b) of the New York Civil Practice Law. Section 901(b) provides:

> Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action.

New York State case law characterizes the Donnelly Act's treble damages remedy as penal. *See, e.g., Rubin v. Nine West Group, Inc.,* 1999 N.Y. Misc. LEXIS 655, (Sup.Ct.N.Y.Co.1999). *See also, In re Microsoft Antitrust Litig., 127 F.Supp.2d 702, 727 (D.Md.2001)* (dismissing antitrust class action claims under New York law because class actions cannot be maintained if the remedy is penal).

The Kaminer plaintiffs argue that since Dentsply removed this case to federal court, Fed.R.Civ.P. 23 governs this action rather than N.Y. C.P.L.R. § 901(b). The court must determine which law to apply.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: 2001 WL 624807 (D.Del.))

The Third Circuit has recently reiterated the steps of analysis in choosing between a substantive state law and a potentially conflicting federal procedural rule. *See Chamberlain v. Giampapa,* 210 F.3d 154, 158-59 (3d Cir.2000). A federal court sitting in diversity must apply state substantive law and federal procedural law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). This substantive/procedural dichotomy of the "*Erie* rule" must be applied with the objective that "in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109 (1945). This focus on whether application of a state rule will or may affect the outcome is intended to serve "twin aims": "discouragement of forum shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U .S. 460, 468 (1965).

> Erie and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

**\*16** *Id.* at 468 n. 9.

The Supreme Court has added two caveats to these *Erie* principles. First, even though application of the state rule may hold some potential for affecting the outcome, a strong countervailing federal interest will dictate recourse to the federal rule. *Byrd v. Blue Ridge Rural Electric Coop, Inc.,* 356 U.S. 525 (1958). Second, the *Erie* rule may not be "invoked to void a Federal Rule" of Civil Procedure. *Hanna,* 380 U.S. at 470. Where a Federal Rule of Civil Procedure provides a resolution of an issue, that rule must be applied by a federal court sitting in diversity to the exclusion of a conflicting state rule so long as the federal rule is authorized by the Rules Enabling Act and consistent with the Constitution. *Id.*

Under *Hanna,* a federal court sitting in diversity first must determine whether a Federal Rule directly "collides" with the state law it is being urged to apply. *See id.* at 470-74. If there is such a direct conflict, the Federal Rule must be applied if it is constitutional and within the scope of the Rules Enabling Act. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 n. 7 (1996). If a "direct collision" does not exist, then the court applies the Erie rule to determine if state law should be applied. *Hanna,* 380 U.S. at 470.

The court finds no conflict between Fed.R.Civ.P. 23 and N.Y. C .P.L.R. § 901(b). Rule 23 of the Federal Rules of Civil Procedure governs the manner of determining whether class certification is appropriate in federal courts; § 901(b) establishes a bar to certain claims being considered for class action treatment on a threshold level. Given that Rule 23 and § 901(b) coexist without conflict, the court shall consider traditional *Erie* principles to determine which rule applies.

In order to ensure that the outcome of the litigation at bar will be substantially the same, "so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court," *Guaranty Trust,* 326 U.S. at 109, the court shall apply N.Y. C.P.L.R. § 901(b), which precludes these New York State residents from maintaining a class action under the Donnelly Act.

For the foregoing reasons, the court shall grant Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99-854, D .I. 51)

D. Statute of Limitations

1. The Legal Standard

Claims for monetary and injunctive relief under the Clayton Act are governed by a four-year statute of limitations. 15 U.S.C. § 15b; *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 815 F.2d 270, 277-78 (3d Cir.1987)(assuming that four-year limitation period in § 15b applies to injunctive relief). When the government files suit seeking to enforce the federal antitrust laws, however, the statute of limitations for private rights of action is tolled while the government's suit is pending and for one year afterwards. 15 U.S.C. § 16(i). The government filed its antitrust action against Dentsply on January 7, 1999. Thus, in order for the Hess plaintiffs' claims under the federal antitrust statutes to be timely, their causes of action must have accrued after January 7, 1995.

**\*17** Ten of the state laws at issue also follow the

Not Reported in F.Supp.2d                                                          Page 14
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

four-year statute of limitations. [FN15] Five states have a limitations period shorter than four years. [FN16] Maine and Wisconsin have six-year statutes of limitations.   [FN17] Although the Hess and Kaminer plaintiffs have different theories as to why their claims are timely, the underlying factual inquiries are the same.

> FN15. Cal. Bus. & Prof.Code § 16750.1 (West 1997); D.C.Code Ann. § 28-4511(b)(1981); Mich. Comp. Laws Ann. § 445.781(1) (West 1997); Minn.Stat. Ann. § 325D.64 (West 1997); N.M. Stat. Ann. § 57-1-12 (Michie 1995); N.Y. Gen. Bus. Laws § 340(5)(McKinney 1997); N.C. Stat. Ann. § 75-16.2 (1996); N.D. Cent.Code § 51-08.1-10 (1997); S.D. Codified Laws Ann. § 37-1-14.4 (1994); W. Va.Code Ann. § 47-18-11 (1997).

> FN16. Kan. Stat. Ann. § 60-512 (1997)(three years); Miss.Code. Ann. § 15-1-49 (1991)(three years); Ala.Code § 6-2-38(1)(two years); *State ex rel. Leech v. Levi Straus & Co.,* 1980 WL 4696 at *1 (Tenn. Ch. Ct.1980)(stating that antitrust actions in Tennessee are subject to the three-year statute of limitations in Tenn.Code. Ann. § 28-305); Fla. Stat. Ann. § 501.204(2) (stating that Florida's Deceptive and Unfair Trade Practices Act is to be construed in light of federal precedent interpreting the Federal Trade Commission Act which has a three-year limitations period under 15 U.S.C. § 57b).

> FN17. Wis. Stat. Ann. § 133.18 (West 1997); Me.Rev.Stat. Ann. tit. 14 § 752 (West 1980). Dentsply concedes that the Kaminer plaintiffs' claims under Wisconsin and Maine law are timely because the statutes of limitations encompass the time that Dentsply announced its Dealer Criteria for the first time.

2. Analysis

Dentsply argues that the Hess and Kaminer plaintiffs' claims are barred because neither of the plaintiff groups alleges an overt act by Dentsply during the limitations period. Dentsply admits that it issued its Dealer Criteria in February 1993 and has enforced the policy since that time. The issue for the court is whether the statute of limitations starts anew each time Dentsply enforces its Dealer Criteria or

whether the enactment of the Dealer Criteria was a final act in itself.

Generally a cause of action accrues when the defendant 1) commits an act that 2) injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). In the context of a continuing conspiracy to violate the antitrust laws, this is understood to mean that each time the plaintiff is injured by an act of the defendant, a cause of action accrues to him. *Id.*

The Hess and Kaminer plaintiffs urge the court to apply the continuing violations rule to the various statutes of limitations. They allege that the overt acts could include charging monopolistic prices or enforcing the Dealer Criteria. The injuries they allege include having a lack of choice in the market and paying supracompetitive prices for prefabricated artificial teeth or dentures.

The court finds that the continuing violations rule should apply to the facts at bar and that the single event of Dentsply's announcing its Dealer Criteria does not constitute the sole overt act permissibly alleged in this litigation. The court further finds, however, that the overt act alleged by a plaintiff must be causally related to the plaintiff's claimed injury. *See In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1163 (3d Cir.1993). Under this standard, there are genuine issues of material fact as to the application of the statutes of limitations to the various plaintiffs. [FN18]

> FN18. A jury, for instance, could find that by terminating a particular dealer or forcing a dealer to give up a competitive tooth line, Dentsply committed an overt act that caused the Hess or Kaminer plaintiffs to pay higher prices or face a limited selection during the limitations period. The court notes that since the Hess plaintiffs are now only seeking injunctive relief, they only need to allege a threatened loss or injury. *Warfarin,* 214 F.3d at 400. On the other hand, if the Kaminer plaintiffs were allowed to pursue their claims, each such plaintiff would have to show that he purchased dentures sometime after January 7, 1995.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on statute of limitations grounds. (C.A. No. 99-255, D.I. 135; C.A. No. 99-854, D.I. 48)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 15
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

V. CONCLUSION

For the foregoing reasons, the court denies Dentsply's motions for summary judgment on the merits of the antitrust causes of action. The court grants Dentsply's motion for summary judgment against the Hess plaintiffs on standing grounds to the extent that the Hess plaintiffs seek money damages. The court denies that motion to the extent that the Hess plaintiffs seek injunctive relief. The court grants Dentsply's motion for summary judgment against the Kaminer plaintiffs on standing grounds. The court denies Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs on statute of limitations grounds. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1205325   (Trial Motion, Memorandum and Affidavit) United States' Brief in Support of its Renewed Motion to Enter Final Judgment (Mar. 21, 2006)Original Image of this Document (PDF)

• 2004 WL 4908445   (Trial Motion, Memorandum and Affidavit) Renewed Motion for Entry of Final Judgment (Mar. 21, 2004)Original Image of this Document (PDF)

• 1:99cv00255 (Docket) (Apr. 21, 1999)

• 1:99cv00005 (Docket) (Jan. 05, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT R

# TEXT OF PROPOSED LAWS

## Proposition 64

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends sections of the Business and Professions Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

PROPOSED LAW

SECTION 1.    Findings and Declarations of Purpose

The people of the State of California find and declare that:

(a)  This state's unfair competition laws set forth in Sections 17200 and 17500 of the Business and Professions Code are intended to protect California businesses and consumers from unlawful, unfair, and fraudulent business practices.

(b)  These unfair competition laws are being misused by some private attorneys who:

(1)  File frivolous lawsuits as a means of generating attorney's fees without creating a corresponding public benefit.

(2)  File lawsuits where no client has been injured in fact.

(3)  File lawsuits for clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant.

(4)  File lawsuits on behalf of the general public without any accountability to the public and without adequate court supervision.

(c)  Frivolous unfair competition lawsuits clog our courts and cost taxpayers. Such lawsuits cost California jobs and economic prosperity, threatening the survival of small businesses and forcing businesses to raise their prices or to lay off employees to pay lawsuit settlement costs or to relocate to states that do not permit such lawsuits.

(d)  It is the intent of California voters in enacting this act to eliminate frivolous unfair competition lawsuits while protecting the right of individuals to retain an attorney and file an action for relief pursuant to Chapter 5 (commencing with Section 17200) of Division 7 of the Business and Professions Code.

(e)  It is the intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact under the standing requirements of the United States Constitution.

(f)  It is the intent of California voters in enacting this act that only the California Attorney General and local public officials are authorized to file and prosecute actions on behalf of the general public.

(g)  It is the intent of California voters in enacting this act that the Attorney General, district attorneys, county counsels, and city attorneys maintain their public protection authority and capability under the unfair competition laws.

(h)  It is the intent of California voters in enacting this act to require that civil penalty payments be used by the Attorney General, district attorneys, county counsels, and city attorneys to strengthen the enforcement of California's unfair competition and consumer protection laws.

SEC. 2.    Section 17203 of the Business and Professions Code is amended to read:

17203.  *Injunctive Relief—Court Orders*

Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. *Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.*

SEC. 3.    Section 17204 of the Business and Professions Code is amended to read:

17204.  *Actions for Injunctions by Attorney General, District Attorney, County Counsel, and City Attorneys*

Actions for any relief pursuant to this chapter shall be prosecuted exclu-

sively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person ~~acting for the interests of itself, its members or the general public~~ *who has suffered injury in fact and has lost money or property as a result of such unfair competition.*

SEC. 4.    Section 17206 of the Business and Professions Code is amended to read:

17206.  *Civil Penalty for Violation of Chapter*

(a)  Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, by any district attorney, by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, by any city attorney of a city, or city and county, having a population in excess of 750,000, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor, or with the consent of the district attorney, by a city attorney in any city and county, in any court of competent jurisdiction.

(b)  The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(c)  If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the State General Fund. If the action is brought by a district attorney or county counsel, the penalty collected shall be paid to the treasurer of the county in which the judgment was entered. Except as provided in subdivision (d), if the action is brought by a city attorney or city prosecutor, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half to the treasurer of the county in which the judgment was entered. *The aforementioned funds shall be for the exclusive use by the Attorney General, the district attorney, the county counsel, and the city attorney for the enforcement of consumer protection laws.*

(d)  If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of any reasonable expenses incurred by the board shall be paid to the state Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund, the moneys shall be paid to the state Treasurer. The amount of any reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality or county that funds the local agency.

(e)  If the action is brought by a city attorney of a city and county, the entire amount of the penalty collected shall be paid to the treasurer of the city and county in which the judgment was entered *for the exclusive use by the city attorney for the enforcement of consumer protection laws.* However, if the action is brought by a city attorney of a city and county for the purposes of civil enforcement pursuant to Section 17980 of the Health and Safety Code or Article 3 (commencing with Section 11570) of Chapter 10 of Division 10 of the Health and Safety Code, either the penalty collected shall be paid entirely to the treasurer of the city and county in which the judgment was entered or, upon the request of the city attorney, the court may order that up to one-half of the penalty, under court supervision and approval, be paid for the purpose of restoring, maintaining, or enhancing the premises that were the subject of the action, and that the balance of the penalty be paid to the treasurer of the city and county.

SEC. 5.    Section 17535 of the Business and Professions Code is amended to read:

17535.  *Obtaining Injunctive Relief*

# TEXT OF PROPOSED LAWS

## Proposition 64 *(cont.)*

Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful.

Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person ~~acting for the interests of itself, its members or the general public~~ *who has suffered injury in fact and has lost money or property as a result of a violation of this chapter. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of this section and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.*

SEC. 6.   Section 17536 of the Business and Professions Code is amended to read:

17536.   *Penalty for Violations of Chapter; Proceedings; Disposition of Proceeds*

(a)   Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, city attorney in any court of competent jurisdiction.

(b)   The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(c)   If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the State Treasurer.

If brought by a district attorney or county counsel, the entire amount of penalty collected shall be paid to the treasurer of the county in which the judgment was entered. If brought by a city attorney or city prosecutor, one-half of the penalty shall be paid to the treasurer of the county and one-half to the city. *The aforementioned funds shall be for the exclusive use by the Attorney General, district attorney, county counsel, and city attorney for the enforcement of consumer protection laws.*

(d)   If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of such reasonable expenses incurred by the board shall be paid to the State Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund the moneys shall be paid to the State Treasurer. The amount of such reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality which funds the local agency.

(e)   As applied to the penalties for acts in violation of Section 17530, the remedies provided by this section and Section 17534 are mutually exclusive.

SEC. 7.   In the event that between July 1, 2003, and the effective date of this measure, legislation is enacted that is inconsistent with this measure, said legislation is void and repealed irrespective of the code in which it appears.

SEC. 8.   In the event that this measure and another measure or measures relating to unfair competition law shall appear on the same statewide election ballot, the provisions of the other measures shall be deemed to be in conflict with this measure. In the event that this measure shall receive a greater number of affirmative votes, the provisions of this measure shall prevail in their entirety, and the provisions of the other measure relating to unfair competition law shall be null and void.

SEC. 9.   If any provision of this act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of this act are severable.

## Proposition 65

Pursuant to statute, Proposition 65 will appear in a Supplemental Voter Information Guide.

## Proposition 66

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends sections of the Penal Code and amends a section of the Welfare and Institutions Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

PROPOSED LAW

THE THREE STRIKES AND CHILD PROTECTION ACT OF 2004

SECTION 1.   Title

This initiative shall be known and may be cited as the Three Strikes and Child Protection Act of 2004.

SEC. 2.   Findings and Declarations

The people of the State of California do hereby find and declare that:

(a)   Proposition 184 (the "Three Strikes" law) was overwhelmingly approved in 1994 with the intent of protecting law-abiding citizens by enhancing the sentences of repeat offenders who commit serious and/or violent felonies;

(b)   Proposition 184 did not set reasonable limits to determine what criminal acts to prosecute as a second and/or third strike; and

(c)   Since its enactment, Proposition 184 has been used to enhance the sentences of more than 35,000 persons who did not commit a serious and/or violent crime against another person, at a cost to taxpayers of more than eight hundred million dollars ($800,000,000) per year.

SEC. 3.   Purposes

The people do hereby enact this measure to:

(a)   Continue to protect the people from criminals who commit serious and/or violent crimes;

(b)   Ensure greater punishment and longer prison sentences for those who have been previously convicted of serious and/or violent felonies, and who commit another serious and/or violent felony;

(c)   Require that no more than one strike be prosecuted for each criminal act and to conform the burglary and arson statutes; and

(d)   Protect children from dangerous sex offenders and reduce the cost to taxpayers for warehousing offenders who commit crimes that do not qualify for increased punishment according to this act.

# **EXHIBIT S**

# PLEASE BRING THIS DRAFT TO THE ANNUAL MEETING

As of the date of publication, this Draft has not been considered by the members of The American Law Institute and does not represent the position of the Institute on any of the issues with which it deals. The action, if any, taken by the members with respect to this Draft may be ascertained by consulting the Annual Proceedings of the Institute, which are published following each Annual Meeting.

## RESTATEMENT OF THE LAW THIRD

---

# The American Law Institute

---

## RESTATEMENT OF THE LAW RESTITUTION AND UNJUST ENRICHMENT

---

### *Tentative Draft No. 3*
(March 22, 2004)

---

### SUBJECTS COVERED:

Part II. Liability in Restitution
    Chapter 3.  Intentional Transactions
        Topic 2.  Self-Interested Intervention (§§ 27-30)
    Chapter 4.  Restitution and Contract
        Topic 1.  Restitution to a Performing Party with No Claim on the Contract (§§ 31-36)
        Topic 2.  Restitutionary Remedies for Breach of an Enforceable Contract (§§ 37-38)

---

Submitted by the Council to the Members of
The American Law Institute
for Discussion at the Eighty-First Annual Meeting
on May 17, 18, and 19, 2004

---

The Executive Office
THE AMERICAN LAW INSTITUTE
4025 Chestnut Street
Philadelphia, Pa. 19104-3099
Telephone: (215) 243-1600 • Telecopier: (215) 243-1636
E-mail: ali@ali.org • Website: http://www.ali.org

©2004 BY THE AMERICAN LAW INSTITUTE
ALL RIGHTS RESERVED

breach, not the value of the plaintiff's contractual performance (thereby distinguishing § 39 from §§ 31-36).

The rules stated in this Topic differ in two notable respects from the treatment of the same subject in the Second Restatement of Contracts. First, in offering an account of "restitution for breach" that does not depend on a theory of unjust enrichment, this Restatement reverts to a doctrinal position usually associated with the first Restatement of Contracts. See Restatement of Contracts § 347, Comment *b*, and § 349, Comment *a*; Restatement Second, Contracts §§ 344-345 and § 373, Comment *a*, and Chapter 16, Topic 4, Introductory Note. Second, in stating that the measure of damages available under § 38 is limited by the contract price of the performance in question, this Restatement departs from the authority of both Restatements of Contracts, neither of which recognizes such a limitation. See Restatement Second, Contracts § 373, Comment *d*. The practical result of the latter change is to foreclose restitution as a means by which a party bound to perform at a loss can escape the consequences of a disadvantageous bargain. See § 38, Comment *c*. This one exception aside, the contract remedies described in §§ 37 and 38 are generally uncontroversial; and the rules stated here and in the Second Restatement of Contracts are substantially in accord.

*(2) Restitution without unjust enrichment.* The confusion surrounding the equivocal meanings of the word "restitution" is at its most dense in the present context. It is the name that has long been given to the remedies described in §§ 37 and 38. Because each of them effects what is in some sense (or in multiple senses) a literal "restitution," the origin of the term is easily perceived. What has long been debated, by contrast, is whether the use of the word "restitution" to describe certain remedies for breach of contract has any thematic connection to the usage by which "restitu-

tion" designates a liability based on unjust enrichment. An argument that these particular contract remedies (whatever they should be called) are designed to prevent the unjust enrichment of the party in breach was first advanced more than a century ago; this is the position adopted by the Second Restatement of Contracts. Other writers (including The American Law Institute in the first Restatement of Contracts) take the view that "restitution" in the context of remedies for breach carries only its literal meaning of restoring or giving back, and that contract remedies of this character have no essential relation to the unjust enrichment of the defendant.

The present Restatement adopts this latter view for two reasons. As an initial matter, an account of traditional "restitution for breach" in terms of unjust enrichment cannot explain some notable features of the remedies in question. One of these is the fact that a plaintiff is never allowed a recovery "off the contract," measured by benefit conferred, when the defendant's breach is merely a failure to pay money — even if the plaintiff can show that the performance rendered is worth more than the price the defendant agreed to pay for it. See Restatement Second, Contracts § 373(2). Another is that the restitutionary contract remedies are sometimes available when the evident effect of the defendant's breach is not the enrichment of the defendant at the expense of the plaintiff, but rather the enrichment of the plaintiff at the expense of the defendant. See § 37, Illustration 2. Either outcome is anomalous only if the explanation of these contract remedies must be sought in principles of unjust enrichment.

More fundamentally, the attempt to explain the availability of "restitution for breach" in terms of unjust enrichment assumes either (1) that a party injured by a material breach is entitled to disregard the contract and deal with the

breaching party as if the performance in question had been rendered in the absence of contract, or else (2) that a party might be unjustly enriched by the receipt of a performance (a) to which the recipient is entitled under a valid and enforceable contract, and (b) for which the recipient is liable to pay the contract price. The first assumption is inconsistent with the rest of the law of contract; the second violates one of the axioms of the law of unjust enrichment, according to which the measure of value between parties to a valid consensual exchange is definitively fixed by their agreement. It follows that performance pursuant to a valid and enforceable contract cannot result in the unjust enrichment of either party. Unjust enrichment readily explains the restitution claims described in §§ 31-36, because the defendants in such cases are in fact subject to no liability on the contract: absent a liability in restitution, they will have obtained the benefit of a contractual performance with no obligation to pay for it. But such is not the case when the plaintiff has a claim to enforce the contract by an action for damages or specific performance.

The fundamental primacy of contract over restitution, and the effect of valid contractual dispositions in displacing any claim that a consensual transaction might be productive of unjust enrichment, is accurately expressed in more concrete terms by familiar judicial statements to the effect that "where there is contract, there can be no unjust enrichment." These and similar shorthand expressions — about the incompatibility of contract and quasi-contract, or of express and implied contract regarding the same subject matter — must be weighed with care, because their several implications cannot always be taken at face value. (Express and implied contracts, when not inconsistent, may readily coexist; and the viability in a contractual context of numerous claims in enrichment-based restitution is demonstrated

by the rules of §§ 31-36 and § 39.) Properly understood, however, these rules of thumb embody the most elementary limit to liability in restitution: namely, that an enrichment derived from a valid consensual exchange is neither unjust nor unjustified. See § 2 (Discussion Draft, 2000). Breach by the recipient does not alter the fact that the parties' agreement is the measure of their liability for benefits received by way of performance.

## REPORTER'S NOTE

*(1) Restitutionary remedies for breach.* From the earliest instances of "restitution for breach," found in English and American decisions of the 1840s and 1850s, commentators have questioned why the law should incorporate an alternative remedy for breach, "off the contract," allowing a plaintiff with enforceable contract rights to proceed against the defendant as if there were no contract between them. The historical explanation is that certain deficiencies of 19th-century contract remedies — the difficulty of affording effective relief to a party confronted with an anticipatory repudiation, or to a party seeking to recover reliance damages — were supplied by allowing a recovery in general assumpsit, usually quantum meruit, on the basis of the defendant's fictitious promise to pay for a fictitious benefit. See Kull, Restitution as a Remedy for Breach of Contract, 67 So. Cal. L. Rev. 1465, 1487-1490 (1994). After modern contract law had expanded to furnish such relief directly, explaining it in terms of the defendant's promissory liability, the original justification for allowing a choice between alternative recoveries — both "on" and "off" the contract — became gradually more obscure, leaving observers to search for other explanations. The idea that quantum meruit in this context was directed at the unjust enrichment of the breaching party was one of the answers proposed.

In a parallel development, the word "restitution" (usually as part of the expression, "rescission and restitution") was commonly used in the 19th century to refer to one specific aspect of "restitution for breach": namely, the rescission remedy described in § 37. After the Restatement of Restitution adopted the term "restitution" to designate in general terms a liability based on unjust enrichment, a natural im-

pulse led lawyers and judges to attempt to harmonize the most visible uses of the word. But the association of "restitution" (in the earlier, literal sense of the term) with "restitution" (as a response to unjust enrichment) is essentially anachronistic.

The proposition that "restitution for breach" is justified by the need to prevent the unjust enrichment of the defendant was tentatively advanced by Keener, Law of Quasi-Contracts 299 (1893), but the suggestion was not widely adopted. Corbin, Williston, and the first Restatement of Contracts all offered an account of "restitution for breach" in which unjust enrichment played no essential role. The standard (albeit confusing) distinction between "restitution" in other contexts and "restitution" as a remedy for breach of contract was summarized as follows by the court in Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 359, 347 F.2d 509, 530 (1965): "It is clear . . . that restitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its precontractual status quo, and not to prevent the unjust enrichment of the breaching party." The distinction continued to be drawn by influential writers — such as Dawson, Restitution Without Enrichment, 61 B.U. L. Rev. 563 (1981), and Perillo, Restitution in a Contractual Context, 73 Colum. L. Rev. 1208 (1973) — and it continues to appear in some judicial opinions influenced by *Acme Process*. (For instance, in Glendale Fed. Bank v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001), the court observed: "When proof of expectancy damages fails, the law provides a fall-back position for the injured party — he can sue for restitution. The idea behind restitution is to restore — that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach.") By and large, however, the former account of restitution as restoration has given way to the contrary view, adopted by the Second Restatement of Contracts, in which "restitution for breach" responds to a liability based on unjust enrichment. On this point the Second Restatement draws notable support from Palmer, Law of Restitution ch. 4 (1978), and Farnsworth, Legal Remedies for Breach of Contract, 70 Colum. L. Rev. 1286 (1970). The authority commanded by the Second Restatement — combined with the largely abstract quality of the dispute — explains why more recent U.S. decisions tend to repeat the unjust-enrichment rationale without examination of the matter. But see LaSalle Talman

Bank v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003) (contrasting "the theory of restitution of the first *Restatement of Contracts*" with that adopted by the Second).

Although widely repeated, the idea that "restitution for breach" gives effect to a liability in unjust enrichment runs directly counter to the view of the relation between contract and unjust enrichment that — outside the narrow context of the "losing contract" controversy — is uniformly accepted by the U.S. decisions. The controlling proposition is that claims based on restitution and unjust enrichment yield to the terms of a valid and enforceable contract between the parties:

> The doctrine of unjust enrichment or recovery in quasi-contract obviously does not deal with situations in which the party to be charged has by word or deed legally consented to assume a duty toward the party seeking to charge him. Instead, it applies to situations where as a matter of fact there is no legal contract, but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another.

Matarese v. Moore-McCormack Lines, Inc., 158 F.2d 631, 634 (2d Cir. 1946) (Clark, J.) See also Paracor Finance, Inc. v. General Elec. Credit Corp., 96 F.3d 1151, 1167 (9th Cir. 1996) (under both California and New York law, "unjust enrichment . . . does not lie when an enforceable, binding agreement exists defining the rights of the parties"); Mathias v. Jacobs, 238 F. Supp. 2d 556, 572 (S.D.N.Y. 2002) ("doctrine of unjust enrichment does not apply to situations where a written contract between the parties exists governing the particular transaction"); Advance Leasing & Crane Co. v. Del E. Webb Corp., 117 Ariz. 451, 452, 573 P.2d 525, 526 ("doctrine of quantum meruit has no application where an explicit contract exists"); Lowell Perkins Agency v. Jacobs, 250 Ark. 952, 958, 469 S.W.2d 89, 92 (1971) ("There can be no 'unjust enrichment' in contract cases"); Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 284, 649 A.2d 518, 522 (1994) ("[L]ack of a remedy under the contract is a precondition for recovery based on unjust enrichment"); Regional Pacesetters, Inc. v. Halpern Enterprises, Inc.,

165 Ga. App. 777, 782, 300 S.E.2d 180, 185 (1983) ("theory of unjust enrichment applies when as a matter of fact there is no legal contract"); Marshall v. Bare, 107 Idaho 201, 205, 687 P.2d 591, 595 (Ct. App. 1984) ("Recovery for unjust enrichment cannot be awarded where . . . there was an enforceable express contract covering the same subject matter"); Baer v. Woodruff, 111 Ohio App. 3d 617, 620, 676 N.E.2d 1195, 1196 (1996) ("liability on quasi contracts, or contracts implied in law, has no application if a valid and enforceable contract exists between the parties"); Swafford v. Harris, 967 S.W.2d 319, 324 (Tenn. 1998) (recovery in quantum meruit subject to the condition, inter alia, that there be "no existing, enforceable contract between the parties covering the same subject matter").

See also 1 E. Allan Farnsworth, Contracts § 2.20, at 176 (2d ed. 1998) (observing that "It is often said that an express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter"); 12 Williston, Law of Contracts § 1479, at 275 (3d ed. 1970) ("When the plaintiff has no alternative right on an enforceable contract, the basis of his recovery is the unjust enrichment of the defendant").

The position here adopted — that the remedies described in §§ 37 and 38 are independent of the defendant's unjust enrichment — invites the question whether they belong in the present Restatement at all. The practical answer is that readers will look for these rules in a Restatement of Restitution, and that it would be both unhelpful and hypertechnical to include in this work (at §§ 31-36 and § 39) the other instances of restitution in a contractual context, which do impose liability based on unjust enrichment, while excluding the important rules of §§ 37 and 38, which do not. A more theoretical answer depends on the range of meanings to be ascribed to the term "restitution." The word is primarily used in this Restatement as a term of art designating liability based on unjust enrichment and its associated remedies. But unless the word "restitution" is stripped of its ordinary meaning, it will continue to be used to describe legal remedies that are sometimes available against defendants who have not been unjustly enriched. See § 1, Comment __. The candid answer to the difficulty is to acknowledge that we have inherited an imperfect terminology, and that the overlapping (literal and technical) meanings of the word "restitution" correlate most of the

time but not always. See Birks, Unjust Enrichment and Wrongful Enrichment, 79 Tex. L. Rev. 1763 (2001), and Laycock, The Scope and Significance of Restitution, 67 Tex. L. Rev. 1277 (1989) (both commenting on the occasional discontinuities between "restitution" and liability for unjust enrichment).

## § 37. Rescission as a Remedy for Breach of Contract

**(1) Except as provided in subsection (2), a plaintiff entitled to damages for the defendant's total breach of contract may choose rescission of the contract as an alternative remedy for breach. The object of rescission is to restore the plaintiff to the precontractual status quo. To this end, a decree of rescission may require the defendant**

> **(a) to make specific restitution of property transferred under the contract;**

> **(b) to repay amounts received on account of the contract price; and**

> **(c) to pay incidental damages to which the plaintiff would otherwise be entitled.**

**A plaintiff who obtains such relief must restore to the defendant the value received by way of performance, but only to the extent required by § 51.**

**(2) Rescission as a remedy for breach of contract**

> **(a) is not available against a defendant whose defaulted obligation is exclusively an obligation to pay money;**

> **(b) does not permit the plaintiff to recover the value of a contractual performance that cannot be returned *in specie*; and**