# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ADVANCED MICRO DEVICES, INC. and
AMD INTERNATIONAL SALES & SERVICE,
LTD.,

                Plaintiffs,

       v.

INTEL CORPORATION and
INTEL KABUSHIKI KAISHA,

                Defendants.

C. A. No. 05-441 (JJF)

IN RE:

INTEL CORP. MICROPROCESSOR
ANTITRUST LITIGATION

MDL Docket No. 05-1717 (JJF)
(Discovery Matter No. 1)

## INTEL'S OPPOSITION TO AMD'S MOTION TO COMPEL

OF COUNSEL:

Robert E. Cooper
Joseph Kattan, PC
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated: November 13, 2006

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

**TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION ............................................................................................1

II.    AMD SEEKS BROAD, WORLDWIDE DISCOVERY FROM INTEL
      AND THIRD PARTIES ABOUT FOREIGN CONDUCT ....................................5

      A.    AMD's Foreign Conduct Discovery to Intel ...............................................5

      B.    AMD's Third-Party Foreign Conduct Subpoenas .......................................7

III.    AMD'S "EXPORT COMMERCE CLAIM" IS A REPACKAGING OF
       AN ARGUMENT EXPRESSLY REJECTED BY THE COURT ON THE
       MOTION TO DISMISS ....................................................................................9

      A.    Legal Framework Under the FTAIA Set Out By The Court .......................9

      B.    Any Impact on AMD's Investment Decisions Regarding Fab 25
            Was Not the Direct Effect of Intel's Foreign Conduct ...............................10

IV.    AMD'S EXPORT COMMERCE CLAIM IS BASED ON CONDUCT
       BARRED BY THE STATUTE OF LIMITATIONS AND THE FTAIA
       CUTS OFF THE CLAIM WHEN AMD EXITED THE U.S...............................17

      A.    AMD Decided to Exit the Microprocessor Business Before the
            Limitations Period........................................................................................17

      B.    The FTAIA Bars AMD from Foreign Conduct Discovery After It
            Exited the U.S. Manufacturing of Microprocessors in 2002 .....................19

V.    AMD'S CONTENTION THAT FOREIGN CONDUCT DISCOVERY IS
      NECESSARY FOR IT TO MEET ITS BURDEN OF PROVING
      ANTICOMPETITIVE CONDUCT IS MERITLESS..............................................21

VI.    AMD'S ARGUMENT THAT EVIDENCE OF EXCLUSIONARY OR
       ANTICOMPETITIVE CONDUCT IS RELEVANT TO PROVING
       MARKET POWER IS BASELESS, AS CONDUCT AND MONOPOLY
       POWER ARE SEPARATE INQUIRIES UNDER THE SHERMAN ACT .........24

CONCLUSION.............................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*In re Automotive Refinishing Paint Antitrust Litigation,*
    MDL 1426, 2004 U.S. Dist. LEXIS 29160 (E.D. Pa. Oct. 29, 2004)...........................24

*Bradburn Parent Teacher Store, Inc. v. 3M,*
    No. 02-7676, 2005 U.S. Dist. LEXIS 5315 (E.D. Pa. Mar. 30, 2005)..........................28

*Brunswick Corp. v. Riegel Textile Corp.,*
    752 F.2d 261 (7th Cir. 1984) ..................................................................................2

*F. Hoffmann-LaRoche Ltd, v. Empagran S.A.,*
    542 U.S. 155 (2004)...................................................................................3, 4, 13, 22

*Forsyth v. Humana, Inc.,*
    114 F.3d 1467 (9th Cir. 1997) ...............................................................................25

*In re Intel Corp. Microprocessor Antitrust Litigation,*
    MDL 05-1717-JJF, 2006 WL 2742297 (D. Del. Sept. 26, 2006) ......................... *passim*

*Invacare Corp. v. Respironics, Inc.*
    No. 1:04CV1580, 2006, U.S. Dist. LEXIS 7602
    (N.D. Ohio Feb. 28, 2006) ....................................................................................19

*LePage's, Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003)...................................................................................28

*Lewis v. ACB Business Services, Inc.,*
    135 F.3d 389 (6th Cir. 1998) .................................................................................19

*Los Angeles Land v. Brunswick Corp.,*
    6 F.3d 1422 (9th Cir. 1993) ...................................................................................25

*In re ML-Lee Acquisition Fund II L.P. and MI-Lee Acquisition Fund*
    *(Retirement Accounts) II, L.P. Sec. Litigation,*
    151 F.R.D. 37 (D. Del. 1993) .........................................................................5, 17, 19

*Martin v. El Paso Natural Gas Co.,*
    No. EP-79-CA-23, 1981 U.S. Dist. LEXIS 17053
    (W.D. Tex. Oct. 19, 1981) ....................................................................................19

*Oklahoma Press Publishing Co. v. Walling,*
    327 U.S. 186 (1946)..............................................................................................21

*Oppenheimer Fund, Inc. v. Sanders,*
  437 U.S. 340 (1978)..................................................................................4, 19

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,*
  940 F. Supp. 1101 (W.D. Mich. 1996) ...........................................................5

*In re Plastics Additives Antitrust Litigation,*
  No. Civ. A. 03-2038, 2004 WL 274 3591 (E.D. Pa. Nov. 29, 2004)...........................24

*Rebel Oil Co. v. Atlantic Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) ...............................................................26, 27

*Sirohi v. Trustee of Columbia University,*
  No. 94-Civ-6165, 1996 WL 71504 (S.D.N.Y. 1996) ....................................................5

*Spectrum Sports v. McQuillan,*
  506 U.S. 447 (1993)......................................................................................25

*United Phosphorous Ltd. v. Angus Chemical Co.,*
  322 F.3d 942 (7th Cir. 2003) .........................................................................10

*United Phosphorus Ltd. v. Angus Chemical Co.,*
  131 F. Supp. 2d 1003 (N.D. Ill. 2001), *aff'd* 322 F.3d 942 (7th Cir.
  2003) ............................................................................................................10

*United States of America v. Time Warner, Inc.,*
  No. MISC. A. 94-338, 1997 WL 118413, (D.D.C. Jan. 22, 1997)...........................20

*United States v. Dentsply,*
  399 F.3d 181 (3d Cir. 2005)..........................................................................25

*United States v. Dentsply,*
  No. Civ. 99-5 MMS, 2000 U.S. Dist. LEXIS 6925
  (D. Del. May 10, 2000)..................................................................................23

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001)........................................................................25

*In re Uranium Antitrust Litigation,*
  480 F. Supp. 1138 (N.D. Ill. 1979)..............................................................24

*Verizon Communications v. Law Offices of Curtis V. Trinko,*
  540 U.S. 398 (2004).......................................................................................22

*In re Vitamins Antitrust Litigation,*
  No. 99-197 TFH, 2001 WL 1049433 (D.D.C. June 20, 2001) ...........................24

**STATUTES**

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a (2004) ........................ *passim*

## I.    INTRODUCTION

What AMD now labels in its motion to compel as its "export commerce claim" is fundamentally the same claim that Judge Farnan dismissed on jurisdictional and standing grounds under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a (2004).[1]  According to AMD, Intel's foreign conduct caused AMD to lose sales to foreign customers, which in turn affected AMD's "forecasts" for microprocessor sales, which in turn affected AMD's investment decisions in manufacturing capacity, which caused AMD not to spend $500 million upgrading its Fab 25 microprocessor manufacturing facility in Austin, Texas, which in turn caused AMD's exit from microprocessor manufacturing in the United States.  The Court has already held that AMD failed to satisfy the FTAIA's jurisdictional requirements because its allegations about an impact on its manufacturing scale set out a "chain of effects . . . full of twists and turns, which themselves are contingent upon numerous developments" and were "premised on a multitude of speculative and changing factors affecting business and investment decisions. . . ." *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717-JJF, 2006 WL 2742297 at *4 (D. Del. Sept. 26, 2006).  AMD's allegations about impact to its manufacturing scale were, the Court held, insufficient to satisfy the FTAIA's requirement that the effect of the challenged conduct on U.S. commerce be "direct." *(Id.)*  The FTAIA imposes the same directness requirement on claims that conduct in foreign commerce caused harm to U.S. export trade.

The fact that the Court's opinion referred to AMD's "foreign commerce claims" and did not address AMD's export claims in detail does not establish that foreign conduct discovery should be allowed on these export claims, as AMD argues.  The claims in

---

[1] Statutes and cases cited herein are attached to the Compendium of Cited Authorities in Support of Intel's Opposition to AMD's Motion to Compel, filed contemporaneously herewith.

AMD's motion regarding the alleged impact of Intel's foreign conduct on its investment decisions regarding Fab 25 are not specifically set out in the Complaint and were not part of the argument to Judge Farnan during the briefing on jurisdictional issues. AMD's re-casted export commerce claims – premised not on the microprocessors it sold from the United States in export trade, but instead on lost "opportunities to export" stemming from the decision not to invest in Fab 25 and leading to its final closure in 2002 as a microprocessor manufacturing facility– on their face do not satisfy the FTAIA and do not provide a basis for discovery. The Court struck all of AMD's allegations regarding conduct in foreign commerce on jurisdictional and standing grounds. As detailed below, the Court's rulings bar AMD from engaging in its worldwide fishing expedition in search of discovery from Intel and third parties about conduct allegations over which the Court has no jurisdiction and which have been stricken from this case.

Discovery of foreign conduct is also inappropriate because AMD's contention that Intel's foreign conduct caused AMD to convert Fab 25 to a flash memory facility is barred by the Sherman Act's four-year statute of limitations. Contemporaneous and judicially noticeable statements from AMD's Chairman and other AMD officers demonstrate that AMD decided to discontinue making microprocessors at Fab 25 before the commencement of the limitations period. As a result, AMD's export commerce claims are time-barred. *See, e.g., Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 271 (7th Cir. 1984) ("Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs . . . even though, in the nature of things, the victim's losses lie mostly in the future").[2]

---

[2]    As also demonstrated herein, even if AMD could overcome these jurisdictional and statute of limitations hurdles, the FTAIA provides an independent basis to cut AMD's discovery off in 2002, when AMD ceased engagement as a U.S. microprocessor exporter. The FTAIA plainly states that the exemption for conduct affecting U.S. export trade applies only to "a person engaged in such trade or commerce in the United States," and damages can be recovered only "for injury to export business in the United States." 15 U.S.C. § 6a.

There is also no merit to AMD's contention that evidence of Intel's foreign conduct is relevant and admissible to prove that Intel has engaged in "anticompetitive" conduct to foreclose the worldwide microprocessor market and to establish that Intel possesses monopoly power. Congress has mandated that the Sherman Act "shall not apply" to foreign conduct that does not have the requisite direct and substantial effects on U.S. commerce or export trade. 15 U.S.C. § 6a. The Court has ruled accordingly, under the FTAIA and the Supreme Court's *Empagran* decision,[3] that the Sherman Act does not apply to Intel's foreign conduct: "[A]llegations of foreign conduct here result in nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple effects.'" *In re Intel Corp*, 2006 WL 2742297 *5. Because the Sherman Act does not reach Intel's foreign conduct, AMD cannot admit evidence about that foreign conduct to prove Intel engaged in "anticompetitive" acts. There is no warrant for ordering discovery to prove that conduct is "anticompetitive" when the Court lacks jurisdiction over the conduct. Moreover, whether and to what extent Intel allegedly has monopoly power is a separate and distinct inquiry from whether Intel has engaged in "anticompetitive" conduct. Discovery of Intel's foreign conduct is not necessary for the separate monopoly power inquiry that AMD intends to make.

Finally, AMD's reliance on case law about the need for broad discovery in antitrust cases entirely misses the mark. This is not a case in which the parties are debating the breadth of discovery that the plaintiff should get to prove some relevant allegation in its complaint. Rather, this is a case in which AMD seeks, in addition to the enormous amount of discovery material that Intel is providing to it, additional massive worldwide discovery about allegations of foreign conduct over which this Court has no jurisdiction and which have been stricken from the Complaint. AMD takes the untenable

---

[3]    *F. Hoffmann-LaRoche Ltd, v. Empagran S.A.*, 542 U.S. 155, 161 (2004).

position that the Court's Order changed nothing and that discovery should proceed from Intel and sixty-seven third parties exactly as it would have had AMD prevailed on the jurisdictional motion. Compounding the problem, AMD seeks this worldwide discovery from a host of foreign companies, several of which have raised objections under the FTAIA, and on burden and comity grounds. In *Empagran*, the Supreme Court noted that applying U.S. law to foreign conduct runs the "serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." 542 U.S. at 165. AMD is pursuing its foreign conduct claims before Japanese courts and European and Korean competition enforcement agencies. Those foreign forums are the appropriate place for AMD to challenge Intel's conduct in foreign commerce. There is no justification for burdening these third parties with AMD's discovery requests when the Court has removed all allegations relating to them from the case.

Even though discovery is broadly permitted under the Federal Rules, "[a]t the same time, discovery, like all matters of procedure, has ultimate and necessary boundaries," and "discovery of matter not reasonably calculated to lead to the discovery of admissible evidence is not within the scope of Rule 26 (b)(1)." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-352 (1978) (internal quotation marks omitted). The Supreme Court has expressly recognized that "it is proper to deny discovery of [information] that is relevant only to *claims or defenses that have been stricken or to events that occurred before an applicable limitations period*, unless the information sought is otherwise relevant to issues in the case." *Id.* (emphasis added). The parties all agree that this is an enormously complex and expensive case, requiring the production of millions of pages of documents. AMD has estimated that the terabytes of data that will be produced if printed out would extend more than 137 miles. Permitting discovery from Intel and numerous third parties into areas removed as a matter of law from the case, based on unsupportable legal and factual theories or on reference to general principles

4

supporting broad discovery, is not justified given the oppressive burden this case already imposes on all participants.[4]

## II.    AMD SEEKS BROAD, WORLDWIDE DISCOVERY FROM INTEL AND THIRD PARTIES ABOUT FOREIGN CONDUCT

AMD contends that the Court's jurisdictional ruling changed nothing. It argues that as to all 255 of its document requests, and all of the specifications in its subpoenas to the third parties, discovery should proceed on AMD's foreign conduct allegations as if the allegations remained in the Complaint. Intel has taken a more balanced position that recognizes the import of the Court's decision narrowing AMD's claims and striking allegations about foreign conduct, while acknowledging AMD's need for documents relevant to the broader market structure issues in the case.

### A.    AMD's Foreign Conduct Discovery to Intel

AMD has propounded 255 document requests to Intel, many of which call for the production of documents relevant to conduct that occurred in foreign commerce.[5] In

---

[4]    This conclusion of the Supreme Court of the "necessary boundaries" of discovery is further reinforced by Rule 26(b)(2) of the Federal Rules of Civil Procedure. *See In re ML-Lee Acquisition Fund II L.P. and MI-Lee Acquisition Fund (Ret. Accounts) II, L.P. Sec. Litig.*, 151 F.R.D. 37, 41 (D. Del. 1993) (Farnan, J.) ("The Court finds that plaintiffs' requests for documents related to all investments considered but not made are in the nature of a fishing expedition of marginal relevance when weighed against the significant burden on the defendants in producing those documents"). Moreover, striking non-actionable material from the complaint "should narrow the scope of discovery for litigants." *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1116 (W.D. Mich. 1996); *see also Sirohi v. Trustee of Columbia Univ.*, No. 94-Civ-6165, 1996 WL 71504 at *9 (S.D.N.Y. Feb. 20, 1996) (court struck discovery requests after it "significantly narrowed the complaint").

[5]    Among the requests that relate to foreign conduct, AMD seeks: all documents discussing the terms of Intel sales of microprocessors to any customer, including draft agreements, side letters, internal analysis, summaries, price lists, and invoices (Req. 5); all documents discussing the sale, promotion, and/or advertisement of microprocessors with any customer (Req. 6); all documents describing the price of Intel microprocessors offered for sale to any customer, including price lists, price analysis, average selling price calculations, price negotiations, and correspondence (Req. 9); all documents describing

response to these requests, Intel has objected to producing documents that specifically

relate to conduct in foreign commerce.[6]  Intel has, however, proposed that it will produce

documents and information sufficient to show all of the prices charged and discounts

provided by Intel, as well as strategic plans and other types of financial forecasts that

concern foreign markets.  For example, in Requests 5, 90, 106, 113 (and some others),

AMD seeks every piece of paper and bit of data from Intel "reflecting or constituting the

terms of Intel's sale of microprocessors to any [customer], including but not limited to

agreements, draft agreements, side letters, memoranda of understanding, memos,

correspondence, internal analyses, sales meeting summaries, price lists, and invoices."

Intel objected to providing every such document with regard to its transactions with

foreign customers, but has offered to produce documents sufficient to show the (i) prices

charged to foreign customers, including any discounts, rebates, or other financial

---

communications with any customer regarding AMD, AMD microprocessors or computer
systems containing AMD microprocessors (Req. 13); all documents discussing any
analysis of retail sales of computer systems (Req. 19); all documents discussing any
analysis of direct internet sales of computer systems (Req. 20); all documents prepared
for or in connection with prospective customers at any trade show (Req. 46); all
documents referring to or analyzing the combined or packaged sale of microprocessors,
Intel chipsets, and Intel motherboards (Req. 76); all documents discussing server bids to
end users (Req. 78); all documents constituting business plans for a particular customer
or customers in general (Req. 84); all documents referring to discounts to any customer
(Req. 90); all documents discussing the provision of engineering sales or technical
support for any customer (Req. 91); all agreements between Intel and any customer (Req.
106); all documents reflecting Intel's microprocessor sales on a customer-by-customer,
product-by-product, and invoice-by-invoice basis (Req. 113); all documents discussing
AMD's microprocessors (Req. 139); all documents discussing customer complaints by
Intel, by any OEM, retailer, distributor, or ODM (Req. 173); all documents relating to
problems or deficiencies with Intel's sales force (Req. 214); and all documents relating to
business reviews with any customer (Req. 218).  This is not an exhaustive list.  Many
more requests seek documents about conduct in foreign commerce.  AMD's document
requests, Intel's objections to those requests, and AMD's response to Intel's objections,
are attached to AMD's motion to compel.

[6]    Intel has amended its custodian list under the parties' Custodian Stipulation to remove
those individuals selected to respond to AMD's now-stricken complaint allegations
concerning foreign conduct.

consideration, and (ii) market development funds, Intel Inside funds or any other payments or inducements from Intel to its customers. In Requests 47 and 48 (and others), AMD seeks business plans and financial forecasts and similar documents. Intel has agreed to produce documents reflecting market share analyses in foreign countries, sales and demand forecasts, competitive analyses and strategic plans, and documents sufficient to show Intel's prices to foreign customers. Intel's responses to these requests are representative of Intel's responses to AMD's other document requests for information related to foreign conduct.[7]

As will be shown, the manner in which Intel proposes to produce documents concerning foreign markets strikes the appropriate balance under the case law between AMD's need for discovery on its market structure arguments, and the Court's ruling that the Sherman Act does not apply to Intel's foreign conduct.

### B.    AMD's Third-Party Foreign Conduct Subpoenas

AMD has subpoenaed dozens of third parties in connection with this litigation.[8] AMD's subpoenas seek broad, far-ranging conduct discovery about every transaction, discussion, communication, or event involving Intel, AMD and their foreign customers. For example, attached hereto as Ex. 2 is the subpoena that AMD served on Fujitsu, which is representative of the other subpoenas that AMD has served on foreign OEMs. Among other things, AMD seeks all documents reflecting communications with Intel concerning actual or proposed terms and conditions of the sale of microprocessors, including without limitation, pricing, quantities, discounts, rebates, Intel Inside funds, exceptions to customer-authorized prices, and market development funds (Req. 1); all documents

---

[7]    In its discovery responses, Intel made clear that it did not concede the relevance of this material, but was nonetheless proposing to produce a large quantity of information in an attempt to reach some compromise with AMD. *See* Intel's Objection Based on the Court's Ruling on Subject Matter Jurisdiction.

[8]    A list of the 67 third parties subpoenaed in this litigation is attached hereto as Ex. 1.

constituting internal discussions or other communications within Fujitsu concerning actual or proposed terms and conditions of sale of Intel or AMD microprocessors (Req. 2); all documents reflecting financial inducements from Intel to Fujitsu and all documents reflecting Intel's pricing of microprocessors (Req. 3, 6); all documents discussing any offer by Intel to provide discounted or free chipsets, motherboards, or other components (Req. 9); all documents constituting any offer to discount or subsidize or provide marketing support in connection with the sale of servers (Req. 10); all documents reflecting any offer of access to technical or roadmap information, engineering, technical or training support, or other consideration relating to the purchase of Intel microprocessors (Req. 12); documents sufficient to show prices paid, any discount or rebate, purchase volumes, product roadmaps, expected and realized revenue, cost and profitability of product lines, and the use of discounts for the purpose of competing for server sales (Req. 13); all documents reflecting analyses, summaries, reports or studies about the use of AMD and/or Intel microprocessors (Req. 14); all documents comparing Intel and AMD microprocessors (Req. 15); and all documents constituting consumer or customer feedback regarding Fujitsu's selection of AMD or Intel microprocessors (Req. 19).[9]

The Japan OEMs and other third parties have made clear that to comply with the AMD subpoenas would disrupt their business operations and force these companies to incur millions of dollars in expenses to identify, extract, translate, review and produce the requested documents.

---

[9]   In response to AMD's subpoenas, Intel also subpoenaed each of the foreign companies in order to ensure that Intel had access to the same discovery sought by AMD. However, should the court deny AMD's motion and not require these third parties to produce the documents AMD seeks, Intel will withdraw its subpoenas.

### III.    AMD'S "EXPORT COMMERCE CLAIM" IS A REPACKAGING OF AN ARGUMENT THAT JUDGE FARNAN EXPRESSLY REJECTED

#### A.    Legal Framework Under the FTAIA Set Out By The Court

The Court's opinion sets out the legal framework for analyzing AMD's export commerce claims under the FTAIA.[10] In describing AMD's foreign commerce claims, the Court recognized that AMD was alleging that Intel's foreign conduct denied AMD "a competitive opportunity to achieve minimum levels of efficient scale" in microprocessor manufacturing, because "lost foreign sales have resulted in lost profitability which, in turn, has resulted in lost revenues to shareholders and missed opportunities to invest and compete in the United States." *In re Intel Corp.*, 2006 WL 2742297 *4.

The Court stated that for AMD's allegations to meet the "direct effects" requirement of the FTAIA, AMD had the burden to show that effects on U.S. commerce were an "immediate consequence" of Intel's foreign conduct with "no intervening developments." The Court held that AMD had failed to meet that standard because "AMD's chain of effects [was] full of twists and turns, which themselves are contingent

---

[10]    The FTAIA applies to export trade (as well as to transactions entirely in foreign commerce) and exempts from the Sherman Act all foreign conduct that a plaintiff claims harms its export business unless the conduct has a direct, substantial, and reasonably foreseeable effect on U.S. export commerce and such conduct gives rise to an antirust claim of this plaintiff. The FTAIA, 15 U.S.C. § 6a, states:

"Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
(1) such conduct has a direct, substantial, and reasonably foreseeable effect--
(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States."

upon numerous developments." (*Id.* at \*4.) The Court reasoned that AMD's contention

that Intel's foreign conduct affected AMD's investments in manufacturing and

opportunities to achieve efficient scale were "premised on a multitude of speculative and

changing factors affecting business and investment decisions, including market

conditions, the cost of financing, supply and demand, the success or failure of research

and development efforts, the availability of funds, and world-wide economic and political

conditions." (*Id.* at \*4.) The Court ruled that "the allegations of foreign conduct here

result in nothing more than what courts have termed a ripple effect on the United States

domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple

effects.'"[11] (*Id.* at \*5.)

**B.    Any Impact on AMD's Investment Decisions Regarding Fab 25
        Was Not the Direct Effect of Intel's Foreign Conduct**

According to AMD, the company's export commerce claim arises "not from sales

it consummated, but from sales Intel's misconduct prevented." (AMD Br. at 8.) Thus,

AMD admits that it was not injured in connection with sales of microprocessors that it

made at Fab 25 and actually sold in export commerce. Instead, AMD argues that "in the

absence of Intel's misconduct and the consequent reduction in orders for AMD

---

[11]    AMD's contention (AMD Br. at 10) that "the jury determines whether foreign
conduct has had the requisite U.S. effect," and that the Court thus may not address the
issue now is simply wrong. Judge Farnan decided this question when, following the
Seventh Circuit's decision in *United Phosphorous Ltd. v. Angus Chem. Co.*, 322 F.3d
942, 944-953 (7th Cir. 2003), he recognized that the FTAIA presents jurisdictional
questions which are separate from substantive requirements of antitrust claims. *In re
Intel Corp.*, 2006 WL 2742297 \*7. The FTAIA clearly presents a jurisdictional question
that must be resolved by a court before a case may proceed to a determination regarding
its merits. Indeed, "without jurisdiction, the court cannot proceed at all in any cause.
The requirement that jurisdiction be established as a threshold matter is inflexible and
without exception," and "[a]t its essence the FTAIA concerns the very power of the court
to hear and decide antitrust claims." *United Phosphorus Ltd. v. Angus Chem. Co.*, 131 F.
Supp. 2d 1003, 1021, (N.D. Ill. 2001), *aff'd*, 322 F.3d 942 (7th Cir. 2003). It is hornbook
law that jurisdictional issues are resolved by the Court and not the jury.

microprocessors, AMD would not have closed Fab 25 at the end of 2002." Instead, AMD claims, "it would have continued microprocessor production" at Fab 25. (AMD Br. at 9-10.)

As an initial matter, AMD's specific theory concerning Fab 25 is not pled in AMD's Complaint; instead, AMD alleged more generally that Intel's conduct had denied it opportunities to reach an efficient manufacturing scale and had harmed AMD "in the domestic, import, and export trades." (Complaint ¶¶ 5, 129.) AMD's suggestion that Intel conceded that this claim is proper is simply wrong. What Intel said was the following: "this Court would likely have jurisdiction over claims relating to such sales [from Fab 25] . . . if AMD can allege and prove the requisite domestic effects." (Intel's Motion to Dismiss at 30 n.22). AMD now has stated that its export commerce claims do not relate to the export sales that it made and, as shown below, AMD has not alleged – and cannot prove – the requisite domestic effects.[12]

More importantly, AMD's moving papers demonstrate that whether and to what extent AMD chose to keep Fab 25 functioning as a microprocessor manufacturing facility

---

[12]    The clear focus of AMD's export claim is on the alleged impact of Intel's conduct in foreign commerce on the discontinuation of AMD's manufacturing operations at Fab 25, which allegedly denied AMD "opportunities to export." (AMD Br. at 9). AMD does not make claims based on microprocessors that it manufactured in that fab, which its moving papers state that it sold both in the United States and abroad. (See Overholser Dec. ¶ 4). AMD's antitrust claim of a harm to its export business is thus based on the theory that, but for Intel's foreign conduct, AMD would have undertaken the major investment necessary to upgrade and expand this domestic fab and thereby maintain an export business. The Court's jurisdictional ruling squarely applies to the claim that Intel's foreign conduct directly affected manufacturing scale at any AMD fab, including Fab 25. In describing AMD's foreign commerce claims, the Court recognized that AMD was alleging that Intel's foreign conduct denied AMD "a competitive opportunity to achieve minimum levels of efficient scale," and that AMD's "primary contention" was that such conduct "resulted in lost profitability which in turn, has resulted in lost revenues to shareholders and missed opportunities to invest and compete in the United States." *In re Intel Corp.*, 2006 WL 2742297 *3-4. AMD's current argument, that Intel's foreign conduct affected AMD's "opportunity to export" from Fab 25, is the very same argument that the Court addressed, except that AMD now makes it with particular focus on one of its fabs, instead of its manufacturing operations generally.

was on its face a highly complex decision that was dependent on a number of intervening factors and events.[13]  To maintain Fab 25 as a microprocessor fabrication facility, AMD acknowledges it would have had to upgrade the fab at a cost of about $500 million. This was in part because AMD's next generation of microprocessor technology required a copper interconnection technology that Fab 25 could not accommodate without substantial new investment.[14]  Investment decisions of that magnitude are necessarily based on a large number of factors that include, among many others, overall economic conditions, alternative investment opportunities, the costs of financing, the difficulty of upgrading the facility, and the various other factors cited in the Court's decision with regard to AMD's identical claim on the effect of Intel's foreign conduct on its ability to achieve efficient manufacturing scale.

The Court has already ruled that any effects on AMD's investment decisions in microprocessor fabs are "premised on a multitude of speculative and changing factors affecting business and investment decisions." *In re Intel Corp.*, 2006 WL 2742297 at *4. Even giving AMD the benefit of the doubt, its claims regarding Fab 25 are based on

---

[13]  AMD claims that it builds new fabs when reinvesting in an older fab becomes too great, *or* the disruption to production and making upgrades is too severe, *or* when the expected business volumes demand additional capacity beyond what an upgraded fab can provide. (AMD Siegle Decl. ¶ 6.)

[14]  By the late 1990s, AMD knew that Fab 25 was reaching the end of its useful life with the current tools and technology in place and that substantial additional investment in Fab 25 would be needed if it was to continue as a microprocessor manufacturing facility. Indeed, when Fab 25 opened, AMD began work "almost immediately" on AMD's next generation fab, designated Fab 30. (AMD Siegle Dec. ¶¶ 7-8.) AMD began construction of this facility, located in Dresden, Germany, in 1996, and Fab 30 opened in 2000. Fab 30 was engineered with extendibility to 130 nm process technology and used a state of the art copper interconnect process. In contrast, Fab 25 was not easily extendable to a new process technology and used an older aluminum interconnect process. (AMD Siegle Dec. ¶ 8.) Sometime in late 1999 or 2000, AMD estimated that Fab 25 could be retrofitted with state of the art tools, and could be converted to copper technology supporting 130 nm microprocessor production, for about $500 million. (AMD Siegle Dec. ¶¶ 11,13.)

postulated ripple effects, *i.e.,* that "but for" foreign sales allegedly lost due to Intel's foreign conduct, AMD would have had increased demand for its products, which in turn would have altered its investment decisions, which in turn would have caused AMD to decide to invest the $500 million to upgrade Fab 25 for continued microprocessor production, which in turn would have kept the facility open, which would have affected AMD's exports and then affected U.S. export commerce. As the Court held, however, "'but for' causation is not the type of direct causation contemplated by the FTAIA." *Id.* The FTAIA requires a showing of "proximate causation and is not satisfied by a mere 'but for' nexus."[15] *Id. (quoting Empagran v. F. Hoffman La Roche, Ltd.,* 417 F.3d 1267, 1270-71 (D.C. Cir. 2005).

AMD's export commerce claim actually adds another twist to the tortuous path of causation that the Court found to be a "ripple effect." Because AMD converted its microprocessor fab into a flash memory fab, market conditions and sales opportunities in the flash memory market necessarily had to enter its decisional calculus. Moreover, because AMD was ramping up a microprocessor plant that it had publicly stated could produce enough microprocessors to give AMD a very large increase in market share, AMD's decisions regarding Fab 25 necessarily had to be affected by AMD's assessment of the capabilities of its newer Fab 30.

This point can be demonstrated by AMD's contemporaneous statements to the investing public. At an earnings conference call in October 2001, AMD's Chief Financial Officer told financial analysts that AMD's Fab 30 in Germany had the capacity to produce 50 million microprocessors per year and thereby enable AMD to attain a 30%

---

[15] Because AMD cannot establish proximate causation, its export commerce claims do not "give rise to" a Sherman Act claim. As the Court held, for this additional reason, AMD cannot establish jurisdiction under the FTAIA's "gives rise to" requirement, and AMD also lacks standing to pursue its export commerce claim.

market share.[16]   According to the declaration of former AMD executive William Siegle

submitted in support of AMD's motion, AMD's long-term objective at the time of its

decision regarding Fab 25 was to achieve a 30% share. (AMD Siegle Decl. ¶¶ 10, 12, 13,

14, 16.) For AMD to invest in Fab 25, it would have had to conclude that its German fab

would not enable it to meet that objective. But it is apparent from its contemporaneous

public statements that AMD had concluded that it did not need Fab 25 to achieve its 30%

goal, and that this assessment would have contributed to the decision to convert that fab

to the manufacture of another product.

    Whatever AMD's decision path, it had to include assessments of the economy, the

overall computer industry, the capabilities of AMD's German fab, conditions in the flash

market, and many other similar considerations.[17]   The reasoning in Judge Farnan's

opinion thus applies with even greater force to the export commerce claims.

    AMD relies on the declaration of its former manufacturing executive William

Siegle to argue that it would have invested the $500 million to upgrade Fab 25. But Mr.

Siegle does not state that AMD ever decided to make the investment and then changed its

mind based on Intel's conduct. The most that he can muster is that one executive was

---

[16]   *See* Ex. 3 at 6; Advanced Micro Devices Earnings Conference Call, Third Quarter
2001.

[17]   AMD implies that it was Intel's conduct that was the critical factor in the change in
its sales projections that led to its Fab 25 decision, but in SEC filings and other judicially
noticeable statements, it painted a very different picture. *See,* Ex. 4 at 33 [AMD's Form
10-Q dated September 29, 2002]: "The highly cyclical semiconductor industry has
experienced significant downturns often in connection with maturing product cycles,
manufacturing overcapacity and declines in general economic conditions. The most
recent downturn, which began in the fourth quarter of 2000 and continues today, has been
severe and prolonged, and future downturns may also be severe and prolonged." *See
also*, Ex. 5 at 3 [AMD-Q1 2001 Advanced Micro Devices Earnings Conference call,
April 18, 2001] ("the recent collapse in demand for chips precipitating a reversal of
forecast in industry growth to a sharp decline for 2001 is the direct result of the bursting
of the bubble in the telecommunications sector"); Ex. 6 at ¶ 8 [AMD Reports Fourth
Quarter Results, AMD press release January 16, 2002] (the "worldwide personal
computer industry experienced its first year-to-year unit sales decline [in 2001]").

14

"leaning" toward making the investment. (AMD Siegle Decl. ¶ 13.) Importantly, Mr. Siegle does not state that AMD took a single step toward upgrading the fab, such as engaging building contractors and equipment vendors, developing the manufacturing process to be used in the fab, obtaining financing for the investment, negotiating with local authorities for tax benefits or subsidies, or any of the many steps that would normally be associated with such an investment. Moreover, as shown in Section IV (A) *infra*, AMD had decided to convert Fab 25 to a flash factory at least by April 2001, before the statute of limitations began to run in this case. The contemporaneous record shows that AMD was not going to upgrade Fab 25 in 2002 or 2003, as Mr. Siegle speculates.

Finally, AMD also suggests that had additional sales opportunities been available to it prior to the Fab 25 conversion, those sales necessarily would have come from Fab 25, as it was the "only" source of microprocessors. On the other hand, AMD also claims that after Fab 25 was committed to making flash memory, it is "likely that" AMD would have sourced additional AMD microprocessors from an external manufacturer (or foundry) had it received orders beyond the capacity of Fab 30. AMD claims that "[a]fter Fab 25 was committed to making memory chips," of the four foundries capable of 130 nm microprocessor production, "two were located in the United States (Motorola and IBM), introducing the distinct possibility that [AMD] would have sourced any shortfall by subcontracting for domestically-produced microprocessors." (AMD Siegle Decl. ¶ 22)

Neither of AMD's inconsistent speculations supports a claim of broad foreign discovery. The "distinct possibility" that AMD "would" have sourced parts from a U.S. foundry, if AMD had some unspecified degree of higher sales, is hardly the type of direct effect recognized by Judge Farnan and other courts as meeting the FTAIA's requirements and is far too speculative to justify the broad worldwide discovery sought here. In fact, AMD did enter into a foundry agreement shortly after Fab 25 became committed to

making flash memory chips, and that agreement was with a *foreign* manufacturer. In January 2002, AMD announced that it had entered into "a foundry agreement under which UMC [a foreign semiconductor producer with no U.S. facilities] will produce PC processors to augment AMD's Dresden Fab 30 production."[18]

Further, Fab 25 was, by AMD's own admission, using an outdated manufacturing technology that was incompatible with the "cutting–edge" technology used to manufacture its competitive microprocessors. (AMD Siegle Decl. ¶ 11). There is no basis to support AMD's speculation that any possible additional microprocessor sales AMD made during 2001 or 2002 would have, or could have competitively come from that outdated fab. Indeed, Mr. Siegle's declaration, coupled with judicially noticeable statements by AMD compel the opposite conclusion. As Mr. Siegle makes clear, AMD "did not entertain the alternative of running one of the two fabs at less than optimum capacity . . . [as] [a]ny shortfall that might develop, we concluded, could hopefully be covered by utilizing independently owned foundries to produce AMD processors." (AMD Siegle Decl. ¶ 17.)

Given that AMD believed that its German fab, by itself, would allow AMD to meet its 30% market share goal, it is apparent, by Mr. Siegle's own admission, that any short-term shortfall would have been covered by a foundry agreement. And AMD's contemporaneous actions demonstrate that the company had determined that a foundry agreement with a foreign producer was the most efficient way to augment any shortfall in its production while Fab 25 was under conversion and its German fab was ramping up. In any event, any decision to slow down or modify AMD's ongoing conversion of Fab 25 to flash manufacturing to make additional microprocessors would have itself required a multi-faceted analysis that would have broken any causal link between Intel's alleged

---

[18]    Ex. 7 at 1 [AMD 1/31/02 press release "AMD and UMC To Collaborate on 300-MM Wafer Fabrication Facility in Singapore."]

foreign conduct and AMD's manufacturing decision. The decision-making process would have required consideration, at a minimum, of the cost of delaying the conversion, AMD's various options for sourcing microprocessors during the conversion period, and particularly AMD's foundry agreement with UMC, as well as the demand for AMD's flash memory products, and thus would only be indirectly affected by the state of AMD's microprocessor sales.

As a result, AMD's indirect and speculative claims regarding Fab 25 do not alter the Court's order striking the foreign conduct allegations and do not provide the foundation to support subjecting Intel and the entire foreign computer industry to the enormous costs and burden of AMD's requested discovery of all information regarding all foreign transactions involving Intel. *See In re ML-Lee*, 151 F.R.D. at 41.

IV.     **AMD'S EXPORT COMMERCE CLAIM IS BASED ON CONDUCT BARRED BY THE STATUTE OF LIMITATIONS AND THE FTAIA CUTS OFF THE CLAIM WHEN AMD EXITED THE UNITED STATES**

A.     **AMD Decided to Exit the Microprocessor Business Before the Limitations Period**

AMD's Fab 25 claims also do not support its requested discovery because they are barred by the statute of limitations. AMD relies on the Siegle declaration to claim that it would have made a $500 million investment to upgrade Fab 25 and sell additional microprocessors within the limitations period. The Siegle declaration contains numerous details and recites various facts, figures, and dates, except for the most important detail, which it studiously avoids reciting: The date on which AMD decided to convert Fab 25 to manufacture flash memory instead of microprocessors. All that Mr. Siegle can muster is that "[u]ltimately" AMD determined that "the cost of upgrading Fab 25 could not be justified" (AMD Siegle Decl. ¶ 17) and that "[e]ventually" AMD decided to convert the

fab to flash manufacturing in support of a joint venture with a Japanese semiconductor company. (*Id.* ¶ 18.)

AMD concedes that the statute of limitations began to run no later than June 26, 2001, four years before AMD filed its Complaint. (AMD Br. at 1.) But AMD's decision to convert Fab 25 to a flash memory facility was made *at least two months before that date*. Specifically, on April 18, 2001, AMD's Chairman and CEO, W. Jerry Sanders, III, announced during AMD's quarterly earnings conference call: "The overall plan is to migrate Fab 25 into a Flash factory over time, and we have another plan to ensure that we can meet the worldwide demand for Athlons and Durons going forward."[19] Mr. Sanders's comments were repeated in the press two days later: "'The company plans to convert the Austin fab to flash memory, which is now made solely in Japan via a joint venture with Fujitsu, Ltd.,' Sanders said."[20] AMD never suggested subsequently that it was considering a change of plans or that its Chairman had misled investors.

To the contrary, AMD's Form 10-Q for the second quarter of 2001, which AMD filed with the SEC on August 10, 2001, reconfirmed the decision, stating: "We will begin converting Fab 25 to production of our Flash memory devices by the end of 2001."[21] AMD's Form 10-Q report for the third quarter of 2001 confirmed that during the quarter, AMD had "begun to convert Fab 25 from production of microprocessors to production of our Flash memory devices."[22]

---

[19]    Ex. 5 at 13 [AMD – Q1 2001 Advanced Micro Devices Earnings Conference Call, April 18, 2001]

[20]    Robertson, Jack, "Price war appears inevitable between Intel and AMD," EETimes Online, April 20, 2001. (Ex. 8 at 2.)

[21]    Ex. 9 at 32 [AMD Form 10-Q for the quarter ending July 1, 2001, filed August 10, 2001]

[22]    Ex. 10 at 32 [AMD Form 10-Q for the quarter ending September 30, 2001, filed November 14, 2001.]

Mr. Siegle's studied omission is a critical one. Whatever the causes for AMD's decision not to continue manufacturing microprocessors in Fab 25 – and the judicially noticeable evidence indicates that there were many causes – that decision was made no later than two months before the commencement of the statute of limitations. Intel's foreign conduct during the limitations period could not have affected AMD's "opportunities to export."

It is "proper to deny discovery of matter that is relevant only to . . . events that occurred before an applicable limitations period," if it has no other relevance to the case, as is the case here. *Oppenheimer Fund*, 437 U.S. at 352. Given the massive burden discovery is generally imposing on the parties and third parties to this case, denying discovery on time-barred foreign conduct allegations, already stricken from the Complaint, is appropriate. *See In re ML-Lee*, 151 F.R.D. at 41.[23]

### B.    The FTAIA Bars AMD from Foreign Conduct Discovery After It Exited the U.S. Manufacturing of Microprocessors in 2002

The FTAIA also provides an independent basis for cutting off AMD's discovery after the third quarter of 2002, no matter the ruling on Intel's other arguments. AMD converted Fab 25 to a flash memory manufacturing facility in the third quarter of 2002. At that time, AMD was no longer engaged in the U.S. microprocessor export business, and, pursuant to the FTAIA, could no longer bring any claim going forward upon which to base foreign conduct discovery.[24]

---

[23]   *See also Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) (limiting discovery where claims are time-barred); *Invacare Corp. v. Respironics, Inc.*, No. 1:04CV1580, 2006 U.S. Dist. LEXIS 7602 (N.D. Ohio Feb. 28, 2006); *Martin v. El Paso Natural Gas Co.*, No. EP-79-CA-23, 1981 U.S. Dist. LEXIS 17053 (W.D. Tex. Oct. 19, 1981).

[24]   AMD's President and CEO announced on November 18, 2002, that AMD had already completed the conversion of Fab 25 to the manufacture of flash memory. Ex. 11 at 12 (Presentation of AMD's current Chairman and CEO Hector Ruiz at AMD's 2002 Analyst Day); *see also* AMD 2002 Annual Report (Form 10K), Part I at 36 (Ex. 12); AMD 2003

The FTAIA sets out a rule placing all non-import activity outside the Sherman Act's reach. It then brings back certain conduct under the Sherman Act provided such conduct has a "direct, substantial and reasonably foreseeable effect . . . on export trade or export commerce with foreign nations, *of a person engaged* in such trade or commerce in the United States." Moreover, as to any such person engaged in U.S. export commerce the Sherman Act "shall apply to such conduct only for injury to export business in the United States." 15 U.S.C. § 6a (emphasis added); *In re Intel Corp.*, 2006 WL 2742297 at *7. The FTAIA's plain language demonstrates that the export exception applies only for those "engaged" in the export business in the U.S. Once AMD exited, it was no longer so engaged.[25]

As a result, even assuming for the sake of argument that AMD could demonstrate that Intel's foreign conduct directly affected U.S. commerce because it affected AMD's exports, and further assuming that AMD's Fab 25 contentions are not time-barred, *at most* AMD might be able establish a cognizable claim over which this Court has jurisdiction through the third quarter of 2002. After that date, when AMD was no longer engaged as an exporter, the FTAIA bars AMD's export claim and AMD would not be entitled to discovery on subsequent conduct.[26]

---

Annual Report (Form 10K) at 10 (Ex. 13) setting out that all AMD microprocessors are made in Dresden, Germany.

[25]    AMD has already directly stated that its export claim arises "not from sales it consummated but from sales Intel's misconduct prevented." (AMD Br. at 8.) Thus AMD cannot argue that even though it ceased manufacturing, it has a claim relating to exports after 2002 for the small remaining inventory it had left over. In any event, the FTAIA requires a "direct, substantial and reasonably foreseeable" effect on U.S. commerce. 15 U.S.C. § 6a (emphasis added). The sale of AMD's remaining inventory could not have harmed export trade at all and certainly could not establish a direct or substantial effect on the U.S.

[26]    The only case that AMD cites in support of a theory about "opportunities to export" is *United States of America v. Time Warner, Inc.*, No. MISC. A. 94-338, 1997 WL 118413, (D.D.C. Jan. 22, 1997). That case does not stand for the broad proposition that AMD claims, that is, that there exists a cognizable "opportunity to export" claim under the

V.    **AMD'S CONTENTION THAT FOREIGN
CONDUCT DISCOVERY IS NECESSARY
FOR IT TO MEET ITS BURDEN OF PROVING
ANTICOMPETITIVE CONDUCT IS MERITLESS**

AMD next argues that because AMD must show "that Intel's exclusionary

conduct was sufficiently material in relation to the overall relevant market so as to violate

U.S. antitrust laws," it must be allowed discovery into foreign conduct, for the purpose of

showing that the foreign conduct was "exclusionary" under the Sherman Act and caused

sufficient foreclosure of the worldwide market to prove a Section 2 claim. (AMD Br. at

14, 16-17).

To state AMD's proposition is to expose its irrefutable flaw: the language of the

FTAIA – nowhere referenced or addressed in AMD's brief – provides that "the [Sherman

Act] *shall not apply* to conduct with trade or commerce with foreign nations" unless it

has the requisite direct, substantial and reasonably foreseeable effect on U.S. commerce.

15 U.S.C. Section 6a (emphasis added). The Court has already held that the underlying

conduct for which AMD seeks discovery did not have the required effect. *In re Intel

Corp.* 2006 WL 2742297 at *7 ("AMD has not demonstrated that the alleged foreign

conduct of Intel has direct, substantial and foreseeable effects in the United States which

give rise to its claim"). In other words, AMD seeks to use conduct to which the Sherman

---

FTAIA. And it certainly does not permit a company that is no longer engaged in the
export business from challenging foreign conduct under the FTAIA. *Time Warner*
involved a Justice Department CID related to an antitrust investigation of a worldwide
price-fixing conspiracy. Defendant argued that the Justice Department had to establish
subject matter jurisdiction to pursue the CID, but the district court rejected the argument
under the Supreme Court's decision in *Okla. Press Publ. Co. v. Walling,* 327 U.S. 186
(1946), the "seminal case on administrative subpoenas," which held that the government
does not have to establish the basis for its subject matter jurisdiction in order to conduct
an investigation. By contrast, as a private litigant under the FTAIA, AMD must establish
subject matter jurisdiction to pursue its claims.

Act does not apply as a matter of law as part of its required showing of "anticompetitive" conduct by Intel in creating or maintaining monopoly power.[27]

AMD's argument defies the clear statutory language, the Supreme Court's *Empagran* decision, and this Court's jurisdictional ruling. The Supreme Court held that, "[t]he FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act *does not prevent them from* entering into business arrangements (say, joint-selling arrangements), *however anticompetitive*," unless the requisite effects on U.S. commerce from the conduct can be shown. *Empagran*, 542 U.S. at 161 (emphasis added). Both the Congress and the Supreme Court recognized that the FTAIA specifically allows U.S. companies to compete in foreign commerce using methods that might be claimed anticompetitive if the Sherman Act applied, without being subject to the Sherman Act.

To achieve this purpose, the statutory language "lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach," only bringing the conduct back within the Sherman Act's reach "*provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or certain export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Id.* at 162 (citing 15 U.S.C. §§ 6a(1), (2)) (emphasis in original).

Judge Farnan adopted this passage from *Empagran* in his subject matter jurisdiction opinion, and ruled that the "allegations of foreign conduct here result in nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple

---

[27] *See Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct").

effects.'" *In re Intel Corp.*, 2006 WL 2742297 at *7. AMD's failure to digest the impact of the Court's jurisdictional decision is evidenced throughout its brief by references to Intel's foreign conduct as "anticompetitive" and "exclusionary." (*See, e.g.*, AMD Br. at 7, 13.) But for conduct to be "anticompetitive" and "exclusionary" in any legal sense, it must violate the Sherman Act. Given that the Sherman Act does not reach Intel's foreign conduct, by definition that conduct cannot be anticompetitive or exclusionary under U.S. law. In short, because the FTAIA prevents the Sherman Act from reaching Intel's foreign conduct, AMD cannot admit evidence of that conduct to prove a violation of the Sherman Act.

Further, AMD incorrectly relies on Section 1 cases for the proposition that evidence of foreign conduct related to a worldwide conspiracy may be relevant to prove the existence of the conspiracy, or of an intent or motive. (AMD Br. at 17-19.) But unlike conspiracy cases, this is not a case where the plaintiff is seeking to establish a single conspiracy that had a "direct, substantial and reasonably foreseeable effect" on imports into the United States so that any evidence to show an agreement actually existed might be relevant. Rather, as AMD itself alleges (Compl. ¶ 35), this case involves a series of different transactions, involving different customers, with different mixes of products at different times – a distinct subset of which the Court has held is not regulated or covered by the Sherman Act. If the specific foreign activities do not come within Sherman Act scrutiny, they cannot be used to prove the intent to commit a violation or to "interpret" other domestic activities that are covered by the Sherman Act.

In this connection, AMD's reliance on *United States v. Dentsply*, No. Civ. A. 99-5 MMS, 2000 U.S. Dist. LEXIS 6925 (D. Del. May 10, 2000), is misplaced. In *Dentsply*, the discovery sought was overall foreign market share information, *i.e.*, total product revenue, and business or strategic plans (both of which Intel has already agreed to provide here), which the government claimed was necessary to rebut a specific affirmative defense. The requests there did not seek, and the ruling did not address,

23

specific interactions with foreign customers.  Furthermore, the Court ultimately ruled

against the government, and excluded the foreign discovery from trial as irrelevant.[28]

**VI.    AMD'S ARGUMENT THAT EVIDENCE OF EXCLUSIONARY OR ANTICOMPETITIVE CONDUCT IS RELEVANT TO PROVING MARKET POWER IS BASELESS, AS CONDUCT AND MONOPOLY POWER ARE SEPARATE INQUIRIES UNDER THE SHERMAN ACT**

AMD's contention that Intel's foreign conduct constitutes direct evidence of Intel's

monopoly power is not supported by the case law, and does not justify the broad and

expansive discovery AMD seeks from Intel and third parties.  Whether a defendant has

monopoly power is recognized as a separate and distinct inquiry from whether that

---

[28]  AMD's attempt to analogize disparate instances of competitive conduct to a unified conspiracy claim stretches too far.  Thus, AMD's reliance on Section 1 conspiracy case law is also misplaced.  In each of the cases that AMD cites, the theory of recovery was a world-wide price-fixing conspiracy that operated in the United States.  In other words, contrary to AMD's foreign commerce claims, the foreign conduct in the conspiracy cases itself had a direct domestic effect.  *See In re Plastics Additives Antitrust Litig*., No. Civ. A. 03-2038, 2004 WL 2743591, at *14 (E.D. Pa. Nov. 29, 2004) (plaintiffs claimed to be U.S. purchasers of plastic additives subject to a worldwide price fixing agreement; foreign activity may "illuminate[] defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which defendants fraudulently concealed the conspiracy from plaintiffs" and was thus discoverable); *In re Vitamins Antitrust Litig*., No. 99-197TFH, 2001 WL 1049433, at *13 (D.D.C. June 20, 2001) (having previously found plaintiffs' price-fixing claims to have satisfied the FTAIA standard, Court held that foreign documents "are relevant to plaintiffs' conspiracy, global price-fixing, and fraudulent concealment claims here and could potentially lead to the discovery of other admissible evidence with regard to the specifics of this conspiracy and the affirmative acts of fraudulent concealment"); *In re Automotive Refinishing Paint Antitrust Litig*., MDL 1426, 2004 U.S. Dist. LEXIS 29160 at *2 (E.D. Pa. Oct. 29, 2004) (plaintiffs' claimed that domestic and foreign defendants conspired "to fix, raise, maintain or stabilize prices for automotive refinishing paint in the United States"; Court expressly references FTAIA in determining that foreign conduct is discoverable); *In re Uranium Antitrust Litig*., 480 F. Supp. 1138, 1155 (N.D. Ill. 1979) (predates FTAIA; authorizing foreign conduct discovery where plaintiffs alleged an international cartel to fix the prices of uranium and one defendant admitted the "establishment of an international uranium cartel under which price controls and market allocations were established for at least some sales of uranium") (internal quotations omitted).

defendant has engaged in exclusionary or anticompetitive conduct; evidence of one is no substitute for evidence of the other. *See Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001); *Los Angeles Land v. Brunswick Corp.*, 6 F.3d 1422, 1426-27 (9th Cir. 1993). In other words, individual acts of purported anticompetitive conduct – particularly those involving *discounting* that are alleged to have created or maintained a monopoly – do not tend to establish the monopoly power itself, which must be established with different evidence. As the Supreme Court held in *Spectrum Sports*, a Section 2 violation cannot be established by showing only that "the defendant has engaged in 'unfair' or 'predatory' tactics," and a separate inquiry is required in such cases "into the relevant product and geographic market and the defendant's economic power in that market." 502 U.S. at 448.[29]

   *Los Angeles Land* is directly on point. There L.A. Land claimed that it could prove that Brunswick had monopoly power by showing varying types of allegedly anticompetitive conduct, including that Brunswick had forced a party not to contract with L.A. Land. The Ninth Circuit initially observed that L.A. Land's evidence that it was excluded from the relevant market was insufficient to establish monopoly power since "in order to prove Brunswick's possession of monopoly power, it was incumbent on L.A. Land to show that Brunswick had the power to exclude *competition* from the relevant market generally, not just to exclude a particular *competitor*". (6 F.3d at 1426-27.) The

---

[29] *See also United States v. Dentsply*, 399 F.3d 181, 187 (3d Cir. 2005) (Recognizing the separation between the conduct element of a monopolization claim and the monopoly power element: "Although not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly. A prerequisite for such a violation is a finding that monopoly power exists. In addition, the exclusionary conduct must have an anti-competitive effect. If those elements are established, the monopolist still retains a defense of business justification") (citations omitted); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (finding evidence of higher prices and profits insufficient proof of market power absent evidence of restricted market output).

court then noted the "key problem" with L.A. Land's proof—it had tried to use the
evidence of anticompetitive conduct underlying its Section 2 claim to show monopoly
power, when proof of monopoly power is an entirely distinct and separate inquiry:

> The only evidence of power to exclude competition to which L.A. Land
> directs our attention concerns particular anticompetitive acts aimed at
> Harold Gelber in 1985, and others aimed at L.A. Land itself. The latter
> acts are the subject of this litigation; though these acts may arguably have
> been unjustifiable, it is not possible to ascertain whether they are related
> to the maintenance of monopoly power and therefore "exclusionary" in
> the antitrust sense without proof of market power. In other words,
> evidence of these acts does not prove power to exclude competition.
> Assuming without deciding that the record fully supports findings that, as
> L.A. Land sought to prove at trial, Brunswick prepared a false or
> misleading market survey, delayed transmittal to DCC of L.A. Land's
> financing application, and prevailed upon Timberlake not to contract
> with L.A. Land, these findings only support the conclusion that
> Brunswick committed anticompetitive acts. *Whether those acts*
> *maintained a Brunswick monopoly is a question which logically*
> *requires some other proof of monopoly power. If this assessment were*
> *not correct then "possession of monopoly power" and "willful*
> *acquisition or maintenance of that power," would not be separate*
> *elements of a section 2 claim; rather, the latter would prove the former.*

*(Id.* at 1427; emphasis added.)

The cases that have specifically addressed the type of proof necessary to show
market power do not support AMD's position. Market power may be demonstrated
through either of two types of proof. One type of proof is direct evidence of the injurious
exercise of market power, and the other is circumstantial evidence of market power.
*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). AMD's
contention that Intel's foreign conduct constitutes direct evidence of Intel's monopoly
power is not supported by the case law, and does not justify the broad and expansive
discovery AMD seeks from Intel and third parties.

"If the plaintiff puts forth evidence of restricted output and supracompetitive
prices, that is direct proof of the injury to competition which a competitor with market
power may inflict, and thus, of the actual exercise of market power." *Rebel Oil*, 51 F.3d

at 1434. Such direct evidence — evidence that is "rarely available" (*Microsoft*, 253 F.3d at 51) – requires proof of both restricted output and supracompetitive prices; proof of supracompetitive prices alone is insufficient.[30] Similarly, the evidence that AMD seeks to discover here – evidence of aggressive foreign price competition not even covered by the Sherman Act – is not direct evidence of an exercise of monopoly power as the cases have defined it.

To demonstrate monopoly power circumstantially, "a plaintiff must (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434 (citing *Ryko Mfg. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir. 1987)). Individual instances of "exclusionary" or "anticompetitive" conduct do not define the market, demonstrate that Intel owns a dominant share of that market, evidence significant barriers to entry or lack of capacity to increase output or establish the required substantial and persistent power over prices. AMD has not — and cannot — point to any case that supports its contrary position.

Furthermore, Intel has already agreed to provide to AMD the pricing and other evidence that is relevant to a market power analysis. This includes (a) market share analyses, (b) sales and demand forecasts, (c) competitive analyses and strategic plans, (d) documents sufficient to show Intel's prices to foreign customers, including any discounts, lump sum payments, or any other financial consideration that affects the price, and (e) documents sufficient to show market development funds, Intel Inside funds, or any other

---

[30]    If evidence of anticompetitive conduct were relevant as direct evidence of the possession of monopoly power, then it is obvious that it would not be "rarely available," but would be universally available, as anticompetitive conduct is required to be shown in all Section 2 cases as part of a plaintiff's showing of unlawful acquisition or maintenance of monopoly in addition to the showing that the defendant has obtained or maintained a monopoly or has dangerously threatened to do so.

financial consideration from Intel to foreign customers. From this information, AMD will be able to make whatever arguments it can about Intel's alleged monopoly power in the relevant market. But AMD seeks to go far beyond this and conduct a massive discovery expedition to probe Intel's conduct in foreign commerce, purportedly because it wants to prove, contrary to the Court's holding and the FTAIA, that the individual instances of conduct were "exclusionary" or "anticompetitive," an inquiry not relevant to whether Intel actually possesses monopoly power. AMD's attempt to recast evidence of conduct as direct evidence of monopoly power is meritless.

In this connection, AMD relies primarily on *Bradburn Parent Teacher Store, Inc. v. 3M,* No. 02-7676, 2005 U.S. Dist. LEXIS 5315 (E.D. Pa. Mar. 30, 2005), for the proposition that "evidence of Intel's foreign exclusionary conduct constitutes direct evidence of Intel's power to exclude within the relevant market." *Bradburn* does not stand for the broad proposition for which AMD cites it. The issue in *Bradburn* was the collateral estoppel effect of a Section 2 jury verdict against 3M in a case involving purely domestic conduct that had been upheld by the Third Circuit in *LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) (en banc). In the *LePage's* appeal, the Third Circuit upheld the determination that 3M possessed monopoly power. The issue addressed in *Bradburn* was whether the *LePage's* verdict established that 3M had *both* the power to exclude competition *and* to control prices. The court determined that it did. Notably, the court considered the issue of 3M's conduct – including its use of rebate programs and market development funds and efforts to eliminate competitors – under the rubric of predatory conduct and not under the rubric of monopoly power.

AMD has thus made no showing, either as a matter of law or as a matter of logic, that Intel's alleged global market power or its foreign conduct is relevant or necessary to prove the claims AMD may advance under the FTAIA. As a result, this Court can and should preclude AMD's attempt to pursue discovery that imposes huge burdens on the

Court, the defendant and many third parties, while advancing no genuine issue in the litigation.

## CONCLUSION

For all the foregoing reasons, AMD's motion to compel should be denied.


OF COUNSEL:                                          POTTER ANDERSON & CORROON LLP

Robert E. Cooper
Joseph Kattan, PC                                    By:  _/s/ Richard L. Horwitz_____
Daniel S. Floyd                                          Richard L. Horwitz (#2246)
Gibson, Dunn & Crutcher LLP                              W. Harding Drane, Jr. (#1023)
333 South Grand Avenue                                   Hercules Plaza, 6th Floor
Los Angeles, CA 900071                                   1313 N. Market Street
(213) 229-7000                                           P.O. Box 951
                                                         Wilmington, DE 19899-0951
Peter E. Moll                                            (302) 984-6000
Darren B. Bernhard                                       rhorwitz@potteranderson.com
Howrey LLP                                               wdrane@potteranderson.com
1299 Pennsylvania Avenue
N.W. Washington, DC 20004                            Attorneys for Defendants
(202) 783-0800                                       Intel Corporation and Intel Kabushiki Kaisha

Dated:  November 13, 2006


761877 / 29282

29

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on November 13, 2006, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Eric M. Andersen
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on November 13, 2006, I have Electronically Mailed the

documents to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, New York 10019

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111


By:    */s/ Richard L. Horwitz*_____
       Richard L. Horwitz (#2246)
       W. Harding Drane, Jr. (#1023)
       POTTER ANDERSON & CORROON LLP
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899-0951
       (302) 984-6000
       rhorwitz@potteranderson.com
       wdrane@potteranderson.com

689962