# EXHIBIT 10

Westlaw.

6 F.3d 1422                                                                                                      Page 1
6 F.3d 1422, 1993-2 Trade Cases P 70,381
**(Cite as: 6 F.3d 1422)**

▷

United States Court of Appeals,
Ninth Circuit.
LOS ANGELES LAND CO ; Sierra Palm Partners;
West Lanes Inc , Plaintiffs-
Appellees,
v.
BRUNSWICK CORPORATION, Defendant-Appel-
lant.
No. 92-55134.

Argued and Submitted July 12, 1993.
Decided Oct. 13, 1993.

Developer of bowling centers brought antitrust and
state tort claims against defendant which manufac-
tured bowling equipment and owned and operated its
own bowling centers.   The United States District
Court for the Central District of California, Mariana
R. Pfaelzer, J., awarded treble damages on antitrust
claim and, alternatively, one third that amount under
state claim. Defendant appealed.  The Court of Ap-
peals, Cynthia Holcomb Hall, Circuit Judge, held
that: (1) defendant did not have monopoly power in
relevant geographic market; (2) defendant was not a
stranger to relationship between plaintiff and finance
company, as required for claim of tortious interfer-
ence with prospective economic advantage; and (3)
privilege of competition protected defendant from
claim that it tortiously interfered with plaintiff's pro-
spective economic advantage by prevailing upon con-
struction company not to deal with plaintiff

Reversed and remanded with directions

West Headnotes

**[1] Antitrust and Trade Regulation ☞621**
29Tk621 Most Cited Cases
    (Formerly 265k12(1.3))

**[1] Antitrust and Trade Regulation ☞644**
29Tk644 Most Cited Cases
    (Formerly 265k12(1.3))
In order to establish violation of § 2 of Sherman
Anti-Trust Act, plaintiff has to prove possession of
monopoly power in relevant market; willful

acquisition or maintenance of that power;  and causal
antitrust injury.     Sherman Anti-Trust Act, § 2, 15
U.S.C.A. § 2.

**[2] Antitrust and Trade Regulation ☞641**
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
For purposes of claim under § 2 of Sherman Anti-
Trust Act, "monopoly power" is power to control
prices or exclude competition. Sherman Anti-Trust
Act, § 2, 15 U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation ☞696**
29Tk696 Most Cited Cases
    (Formerly 265k12(6))
Operator of bowling center did not have power to
control prices or exclude competition, and thus
lacked monopoly power in relevant market, as re-
quired to
establish violation of § 2 of Sherman Anti-Trust Act;
although operator owned only existing retail bowling
center in relevant market during relevant time period,
there was no evidence suggesting that withdrawal of
competitors was in any way attributable to operator's
competitive conduct or any market conditions, and
there was no evidence of supracompetitive pricing by
operator. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. §
2.

**[4] Federal Courts ☞765**
170Bk765 Most Cited Cases
On review of denial of motion for judgment notwith-
standing verdict, Court of Appeals applies law truly
controlling the case, regardless of jury instructions.

**[5] Antitrust and Trade Regulation ☞641**
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
Plaintiff cannot establish monopolization offense by
a firm without market power solely on basis of un-
desirable or even significantly anticompetitive beha-
vior. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

**[6] Antitrust and Trade Regulation ☞647**
29Tk647 Most Cited Cases
    (Formerly 265k12(1.3))

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6 F.3d 1422                                                                Page 2
6 F.3d 1422, 1993-2 Trade Cases P 70,381
(Cite as: 6 F.3d 1422)

For purposes of monopolization claim, "entry barrier" may be defined as either additional long-term costs which are not incurred by incumbent firms but must be incurred by new entrance, or factors that deter entry into the market while permitting incumbent firms to earn monopoly returns. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

**[7] Torts ☞213**
379k213 Most Cited Cases
    (Formerly 379k10(1))
Under California law, tortious interference with prospective economic advantage involves economic relationship containing probability of future economic benefit to plaintiff; knowledge by defendant of existence of relationship; intentional acts on part of defendant designed to disrupt the relationship; actual disruption of relationship; and damages to plaintiff proximately caused by defendant's acts.

**[8] Torts ☞241**
379k241 Most Cited Cases
    (Formerly 379k10(3))
Bowling equipment seller was not a stranger to relationship between prospective buyer of its equipment and firm that would finance that purchase, as required for buyer to maintain claim under California law that seller tortiously interfered with buyer's prospective economic advantage.

**[9] Torts ☞241**
379k241 Most Cited Cases
    (Formerly 379k10(3))
Under California law, privilege of competition protected defendant, which sold bowling equipment and owned and operated bowling centers, from claim of tortious interference with competitor's prospective economic advantage by prevailing upon construction company not to deal with competitor; because competitor's contractual relations with construction company were merely contemplated or potential, defendant was free to refuse to deal with construction company unless it ceased dealing with competitor.
**\*1423** Stephen M. Shapiro, Mayer, Brown & Platt, Washington, DC, for defendant-appellant.

Eliot G. Disner, Shapiro, Posell & Close, Los Angeles, CA, for plaintiff-appellee.

Appeal from the United States District Court for the Central District of California.

Before: Floyd R. GIBSON, [FN*] HALL and KLEINFELD, Circuit Judges.

> FN* The Honorable Floyd R. Gibson, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Brunswick Corporation ("Brunswick") appeals from the district court's judgment following a jury verdict awarding to Los Angeles Land Company ("L.A. Land") $15,168,000 under section 2 of the Sherman Act, and, alternatively, one-third that amount under California common law governing tortious interference with prospective economic advantage. Brunswick contends that the district court should have granted its motions for directed verdict and judgment notwithstanding the verdict because L.A. Land failed to prove violations of federal antitrust law or state tort law. This case centers on the competing efforts of the two parties to build a bowling center in Palmdale in the Antelope Valley (a portion of Los Angeles County) at a time when Brunswick owned the only existing center in the Valley.

**\*1424** The district court had jurisdiction over the federal antitrust claims under 15 U.S.C. §§ 15, 26, and pendent jurisdiction over the state law claims. We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291. We reverse.

I. FACTS AND PROCEEDINGS BELOW
Brunswick wholly owns two subsidiaries--one which manufactures and sells bowling equipment, and another which owns and operates bowling centers in the United States and abroad. One of the centers under the control of the latter subsidiary is the Sands Bowl in the Antelope Valley. In spring of 1988, the Sands Bowl was the only bowling center in the Antelope Valley, an area with a rapidly expanding population.

L.A. Land is a real estate development company which, among various other enterprises, owns and operates three bowling centers in Southern California. In 1987, L.A. Land set in motion a plan to build

a bowling center in the Antelope Valley.  In April 1988, it sent an order for equipment to Brunswick, with specified conditions.  About that time, Brunswick itself developed an interest in opening a new bowling center in the Antelope Valley.

In 1986, Brunswick had formed an agreement with Deutsche Credit Corporation ("DCC") under which Brunswick helped its customers to obtain equipment financing from DCC by guaranteeing through a contingent repurchase arrangement that Brunswick rather than DCC would bear most of the risk of borrower default.  The agreement required Brunswick to assume contingent liability for the loan, gather information for the loan application package and transmit the package to DCC, and prepare a market survey to help DCC assess the viability of any new bowling center. When L.A. Land sought to purchase equipment from Brunswick for its proposed Antelope Valley center, it also sought equipment financing from DCC. However, DCC refused to accept a loan application directly from L.A. Land and instead directed it to process the application through Brunswick.   L.A. Land began attempting to arrange the financing through Brunswick sometime about April 1988.

Previous to the key events at issue in this case, L.A. Land opened a bowling center in San Dimas, California.  It purchased the equipment for that center from Brunswick, financed the purchase through DCC, and contracted with Timberlake Construction Company ("Timberlake") to build the center.   L.A. Land asked Timberlake to build its proposed center in the Antelope Valley, but Timberlake declined, citing a policy of not building in Brunswick market areas (i.e., areas where Brunswick owned and operated bowling centers.)   As of 1988, Timberlake had for some time built all of Brunswick's new U.S. bowling centers.

By August of 1988 (and possibly earlier), Brunswick decided to go ahead with plans to build a new bowling center in the Antelope Valley.   Brunswick had forwarded L.A. Land's equipment financing application to DCC at the end of July 1988   L.A. Land alleges that Brunswick delayed transmittal of the application so that Brunswick could get a head start on the construction of its own new bowling center in the Antelope Valley.    Ultimately, DCC turned down

L.A. Land's financing application, Brunswick built a new bowling center in the Antelope Valley, and L.A. Land did not.

L.A. Land commenced this action on August 30, 1988, and immediately requested a temporary restraining order to enjoin Brunswick's construction of its new center arguing that "the market can adequately bear just one more bowling center"; the district court denied the request.   At trial, L.A. Land contended that Brunswick committed three acts which violated federal antitrust law and constituted torts under California law:  (1) Brunswick delayed transmission of L.A. Land's financial information to DCC;  (2) Brunswick submitted to DCC an inaccurate market survey; and (3) Brunswick restricted Timberlake from building a bowling center in the Antelope Valley for L.A. Land.

Brunswick moved for a directed verdict after L.A. Land presented its case in chief and at the end of trial.   The district court denied those motions and sent the case to the jury, which rendered a verdict in favor of L.A. Land.   The court also denied Brunswick's motion for judgment notwithstanding the verdict, and entered a judgment awarding *1425 L.A. Land the trebled sum of $15,168,000 on the antitrust claim or, alternatively, $5,056,000 on the tort claim, and $1,435,974.80 in attorneys' fees and costs   This appeal of that judgment followed.

## II. STANDARD OF REVIEW

The standard for determining the propriety of a directed verdict or a judgment notwithstanding the verdict is the same for district and appellate courts: "whether, viewing the evidence as a whole, there is substantial evidence present that could support a finding ... for the nonmoving party."  *Syufy Enters. v. American Multicinema, Inc.,* 793 F.2d 990, 992 (9th Cir.1986) (internal quotation omitted), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987)  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation omitted).

In deciding this appeal from the denial of motions for directed verdict and judgment notwithstanding the verdict, we "review the evidence on [the] factual is-

6 F.3d 1422                                                                                          Page 4
6 F.3d 1422, 1993-2 Trade Cases P 70,381
**(Cite as: 6 F.3d 1422)**

sues in the light most favorable to [L.A. Land] and draw all reasonable inferences in its favor." *Oahu Gas Service, Inc. v. Pacific Resources Inc.,* 838 F.2d 360, 364 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). The question whether a party possesses monopoly power is essentially one of fact. *Id. at 363.* However, the question whether specific conduct is anticompetitive in violation of the Sherman Act is one of law which we therefore review de novo. *Id. at 368.* Likewise, we review de novo the question whether specific conduct constitutes a tort under California law. *Salve Regina College v. Russell,* 499 U.S. 225, 231-32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (a court of appeals should review de novo a district court's determination of state law).

### III. DISCUSSION

*A. Antitrust Claim*

[1] In a nutshell, L.A. Land's antitrust theory is that Brunswick monopolized the market for retail bowling services in Palmdale, and committed three specific acts in order to exclude L.A. Land from that market and thereby maintain its monopoly. At trial, L.A. Land had to prove three elements in order to establish a Sherman Act § 2 violation on its theory: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Pacific Express, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 817 (9th Cir.), *cert. denied,* 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992); *Universal Analytics v. MacNeal-Schwendler Corp.,* 914 F.2d 1256, 1257 (9th Cir.1990). The relevant product and geographic markets were conclusively defined before trial as retail bowling services in the Antelope Valley and are not contested; otherwise, all three elements are disputed in this appeal.

[2][3] We begin and end our inquiry with the question whether the record supports the jury's finding on the first element, i.e., that Brunswick possessed monopoly power in the relevant market. [FN1] We believe L.A. Land's whole antitrust claim founders on this issue. The definition of monopoly power is clearly established in the case law: "Monopoly power is the power to control prices or exclude com-

petition." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Viewing the evidence in the light most favorable to L.A. Land, the record simply does not support a finding that Brunswick had power to control prices or exclude competition.

> FN1. L.A. Land contends that Brunswick failed to dispute the sufficiency of the evidence to support a finding of monopoly power in its motion for directed verdict, and therefore waived the right to raise this challenge on appeal. This contention is clearly spurious, as L.A. Land itself noted in court that Brunswick raised the question of market power in its argument on the directed verdict motion. R.T. at 1843.

Brunswick contends that, in order to prove monopoly power, L.A. Land relied solely on the fact that Brunswick owned the only existing retail bowling center in the Antelope Valley during the relevant period. Brunswick argues that proof of its 100% market share does not demonstrate that it had the power to control prices or exclude competition in the absence of any evidence that it could prevent entry of other market participants. Case law supports this argument. *\*1426 See Oahu,* 838 F.2d at 366 ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors") (internal citation omitted); *United States v. Syufy Enters.,* 903 F.2d 659, 664 & n. 6, 671 (9th Cir.1990).

[4] L.A. Land responds with several arguments. First, L.A. Land points out that the evidence presented to the jury showed that Brunswick's share of the relevant market increased over time until it reached 100%. Brunswick's market share increased because two competitors withdrew from the market. One bowling center closed in 1979 after a fire, and the other, a 10-lane bowling center in Lancaster, closed in Spring 1988. Neither case which L.A. Land cites supports its assertion that the jury could properly rely on this evidence of withdrawals from the market to infer that Brunswick possessed monopoly power.

6 F.3d 1422
6 F.3d 1422, 1993-2 Trade Cases P 70,381
**(Cite as: 6 F.3d 1422)**

[FN2] One, _Oahu, 838 F.2d at 366,_ does not discuss withdrawal; the other, _Greyhound Computer Corp. v. International Business Machines, 559 F.2d 488, 497 (9th Cir.1977), cert denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978),_ states that the fact that "[t]wo substantial competitors who met IBM in the marketplace ... bowed out after sustaining heavy losses" helped support an inference of IBM's market dominance. In this case, however, L.A. Land does not suggest (and directs the court to no evidence which suggests) that the withdrawal of Brunswick's two competitors was in any way attributable to Brunswick's competitive conduct or any market conditions. Indeed, the evidence does not reveal any reason for their departures from the market, other than that one of the competitors chose not to reopen after a fire. Thus, we do not see how this evidence could support a finding of monopoly power.

> FN2. The jury instruction concerning monopoly power, to which Brunswick apparently did not object, did permit the jury to consider the departure of companies from the market as an indication of Brunswick's monopoly power. However, on review of a denial of a JNOV motion, this court applies the law truly controlling the case, regardless of the jury instructions. _Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 182-83 & n. 5 (9th Cir.1989), cert denied, 493 U.S. 1058, 110 S.Ct. 868, 107 L.Ed.2d 952 (1990)._

Second, L.A. Land contends that the evidence showed that Brunswick charged monopoly prices. However, it points to no actual evidence of supra-competitive pricing, and the record reveals none. L.A. Land does point out that the prices Brunswick charged at the Sands Bowl (the single bowling center in the market before L.A. Land sought to enter) were "comparable" to prices Brunswick charged at bowling centers which were in better condition and which had automatic scorers. But L.A. Land cites no authority, and we are aware of none, which supports the notion that "comparable" prices may be considered supracompetitive, even considering some difference in quality.

The only other pricing evidence to which L.A. Land points concerns the fact that the average price [FN3] Brunswick charged at Vista Lanes (the bowling center it built in Palmdale after L.A. Land failed to enter the market) during its first 11 months of operation was higher than the prices it charged at any other center during that time. However, considering the record as a whole, this evidence does not support an inference of monopoly pricing. Testimony at trial, apparently uncontradicted, established that at least by the time of trial Vista's prices were lower than some and higher than others in the greater Los Angeles area, and indeed lower than the prices L.A. Land charged at its bowling center in San Dimas. Thus, the record does not support a conclusion that Brunswick had the power to control prices in the relevant market.

> FN3. Average price is a composite of all the different prices charged in a bowling center and does not represent the actual price paid by any consumer.

[5] Third, L.A. Land asserts that the evidence established that Brunswick successfully excluded all competitors from the relevant market. We note that in order to prove Brunswick's possession of monopoly power, it was incumbent on L.A. Land to show that Brunswick had the power to exclude _competition_ from the relevant market generally, **\*1427** not just to exclude a particular _competitor._ Courts have consistently confirmed that the goal of the antitrust laws is to protect competition rather than competitors. See _Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, ----, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993)_ (the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself"); _Syufy, 903 F.2d at 668_ ("It can't be said often enough that the antitrust laws protect competition, _not_ competitors") (emphasis in original); _Oahu, 838 F.2d at 370_ ("The goal of the antitrust laws ... unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors."); _Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 927 (9th Cir.1980)_ ("Of course, it is free and open competition that the Sherman Act protects, and not any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

right of one competitor to be free of rough treatment at the hands of another."), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). A key problem in this case is that rather than adducing evidence of Brunswick's ability to impair competition generally (such as evidence that Brunswick could prevent competitor access to necessary supplies from any provider), L.A. Land focussed primarily on proving particular anticompetitive acts. But a plaintiff can not establish a monopolization offense by a firm without market power solely on the basis of undesirable or even significantly anticompetitive behavior. 3 Areeda & Turner, *Antitrust Law* ¶ 810 at 296 (1978).

The only evidence of power to exclude competition to which L.A. Land directs our attention concerns particular anticompetitive acts aimed at Harold Gelber in 1985, and others aimed at L.A. Land itself. The latter acts are the subject of this litigation; though these acts may arguably have been unjustifiable, it is not possible to ascertain whether they are related to the maintenance of monopoly power and therefore "exclusionary" in the antitrust sense without proof of market power. *See id.* ¶ 813 at 301. In other words, evidence of these acts does not prove power to exclude competition. Assuming without deciding that the record fully supports findings that, as L.A. Land sought to prove at trial, Brunswick prepared a false or misleading market survey, delayed transmittal to DCC of L.A. Land's financing application, and prevailed upon Timberlake not to contract with L.A. Land, these findings only support the conclusion that Brunswick committed anticompetitive acts. Whether those acts maintained a Brunswick monopoly is a question which logically requires some other proof of monopoly power. If this assessment were not correct then "possession of monopoly power" and "willful acquisition or maintenance of that power," *Pacific Express*, 959 F.2d at 817, would not be separate elements of a section 2 claim; rather, the latter would prove the former.

As to the Gelber evidence, even accepting L.A. Land's description of the evidence as accurate, it establishes no more than that Brunswick dissuaded Gelber from entering the market by threatening to compete (that is, by indicating that it intended to open a second bowling center in the market.) L.A. Land does not suggest that Brunswick set up any actual barriers to Gelber's entry into the market. *See Syufy*, 903 F.2d at 668 (a strong competitor's ability to deter entry by others is not a "structural barrier to entry"). Evidence of threatened competition can not rationally support an inference of power to exclude competition, particularly where a court has already determined that the acts in question were not exclusionary--Gelber brought an antitrust suit based on these events and lost. Thus, this evidence does not support a finding of monopoly power.

[6] Finally, L.A. Land contends it proved that substantial barriers to entry existed in the relevant market. It argues that evidence of "Brunswick's systematic campaign to exclude competitors, such as L.A. Land and Gelber" readily supports a jury finding of high barriers to entry. We reject this argument for the simple reason that anticompetitive conduct by one firm against another is not an "entry barrier." Barriers to entry may be defined as either "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn *1428 monopoly returns." Areeda & Hovenkamp, *Antitrust Law* ¶ 409' at 509-10 (1992 Supp.) (internal quotation omitted) [FN4] The evidence of Brunswick's behavior toward L.A. Land and Gelber fits neither definition.

> FN4. The main sources of entry barriers are: (1) legal license; (2) control over an essential or superior resource; (3) entrenched buyer preferences for established brands or company reputations; and (4) capital market evaluations imposing higher capital costs on new entrants. Economies of scale may also be considered an entry barrier in some situations. 2 Areeda & Turner, *Antitrust Law* ¶ 409b at 299-300 (1978). L.A. Land points to no evidence which fits in any of these categories.

L.A. Land also argues that the difficulty of obtaining financing for a new center's bowling equipment is a barrier to entry. This is a more serious proposition. There is some evidence in the record that lenders

generally have trepidations about financing bowling equipment purchases. Though there was also evidence that some 19 different lenders have financed purchases of Brunswick equipment since 1986, the jury was entitled to find that bowling equipment financing is hard to obtain. However, the jury could not rationally construe this factor as a barrier to entry, as there was no evidence that the lenders who were willing to finance bowling equipment imposed higher financing costs on new entrants than on established firms. *See* note 4. The fact that many lenders do not understand the bowling market does not mean that the capital costs for new entrants and incumbents in the market differ, or that it is any more difficult for new entrants to obtain financing than incumbents. *Cf. Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir.1991)* (a jury could not reasonably find cost of equipping a physician's office to be a significant entry barrier where evidence does not permit comparing that cost to potential competitors' resources or expected returns). The disadvantage of new entrants as compared to incumbents is the hallmark of an entry barrier. *See* 2 Areeda & Turner, *Antitrust Law* ¶ 409e at 303 ("The mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm."). Thus, the record does not support a finding of significant entry barriers.

The fundamental problem in this case is that L.A. Land pursued a flawed theory, which the district court should not have sent to the jury. L.A. Land's antitrust theory was a source of considerable confusion and controversy throughout this litigation in the district court. Early on in the case, L.A. Land chose *not* to allege that Brunswick monopolized the market for bowling equipment--that is, L.A. Land specifically eschewed a supply monopoly theory; consequently, it was precluded from obtaining discovery on that theory. Throughout the litigation, the question surfaced whether L.A. Land could prove its case without showing monopolistic control over the supply of equipment and access to lenders and builders. The district court on several occasions expressed its doubt about L.A. Land's theory, [FN5] but sent it to

the jury nonetheless. For example, in denying Brunswick's mid-trial directed verdict motion, the court stated:

> FN5. In its February 27, 1989 order denying Brunswick's first motion for summary judgment, the court stated the following:
> On the present record, plaintiffs have not met their burden of submitting sufficient evidence to make out a prima facie case for all the elements of the alleged antitrust offenses. Nevertheless, the Court believes that plaintiffs should have more time to engage in discovery to support their claims....
> The Court cautions plaintiffs, however, that the theory of their case is confused and problematic.
> Despite plaintiffs' insistence that the Brunswick market study is patently false, because the survey states that Palmdale can support only one new center, plaintiffs themselves argued to this Court during a prior hearing that Palmdale could only add one new center. Moreover, plaintiffs must offer proof that Brunswick's position as a manufacturer of bowling equipment gives Brunswick control of the many banks from which plaintiffs could receive financing. There is already some evidence that Brunswick has no such power in the financial markets.
> Because L.A. Land rejected a supply monopoly theory, it apparently never did offer proof that Brunswick, as a supplier, controlled all sources of financing.

I have decided to deny the motion. However, in denying the motion, I do not want *1429 to indicate that I think there is not any merit in what the defendants say. I think that there is enough to go to the jury, but I must tell you, Mr. Disner, that there are a couple of things in there that bother me tremendously and what bothers me is that ... because there were other lenders and there were other builders available, you just wonder if they couldn't have gone to those builders or those lenders, and that has been a problem all during the time we were arguing the motion.
R.T. at 1648.

In the factual circumstances of this case, a rational jury could not conclude that Brunswick possessed the power to exclude competition from the relevant market without hearing evidence that Brunswick had monopoly control of the equipment market. *Cf Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1414 (7th Cir.1989)* [FN6] L A Land never alleged that Brunswick had power to exclude from the market a potential competitor that chose to purchase equipment from a company other than Brunswick, nor did it prove that other suppliers did not exist. [FN7] A supply monopoly theory, if it could be substantiated, logically would have led to proof of Brunswick's power to exclude competition in the retail bowling market. The theory which L A Land did pursue, however, apparently led it to focus on proof of particular anticompetitive acts and leave unsatisfied the requirement that it show Brunswick possessed the power to control prices or exclude competition. Consequently, because the evidence does not support a finding of monopoly power, the antitrust claim must fail. *See Syufy, 903 F.2d at 671 n. 21* (plaintiff can not prevail on *section 2* claim without proof of defendant's power to exclude competition)

> FN6. In *Indiana Grocery*, the court observed that "[t]he output of the Indianapolis retail grocery market is, of course, groceries, *and Indiana Grocery concedes that Kroger could never control the supply of groceries in the Indianapolis retail market* If so, it is very difficult to see how Kroger could ever restrict total market output and thereby raise prices." *Id* (emphasis in original). The court further noted that "while market share may indicate market power in certain cases, the two are not necessarily the same Market share indicates market power only when sales reflect control of the productive assets in the business, for only then does it reflect an ability to curtail total market output." *Id* By failing to prove a supply monopoly, L A Land essentially failed to prove that Brunswick controlled access to the productive assets of the retail bowling services market

> FN7. The jury could have inferred from the

evidence presented, however, that Brunswick was a desirable supplier at the relevant time.

## B Tort Claims

[7] L A Land's tort claims were based on Brunswick's alleged interference in L A Land's business relationships with DCC and Timberlake. In order to succeed at trial on its claims of tortious interference with prospective economic advantage, L A Land had to prove these elements: (1) an economic relationship containing the probability of future economic benefit to L A Land; (2) knowledge by Brunswick of the existence of the relationship; (3) intentional acts on the part of Brunswick designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to L A Land proximately caused by Brunswick's acts *Buckaloo v. Johnson, 14 Cal.3d 815, 122 Cal.Rptr. 745, 752, 537 P.2d 865, 872 (1975)*.

The jury specifically answered in the affirmative the question whether Brunswick "intentionally and improperly interfere[d], without justification or privilege, with any prospective economic advantage of" L A Land. The jury further replied affirmatively to the question whether "any such act of interference proximately cause[d] damage" to L A Land. Because the form of verdict did not distinguish between Brunswick's alleged interference in L A Land's relationship with DCC and in its relationship with Timberlake, we consider both claims

### 1 L A Land-DCC Relationship.

[8] Brunswick argues that, as a matter of law, L A Land's allegations fail to support a tort claim because Brunswick was not a stranger to the relationship between L A Land and DCC, and indeed had a financial stake in that relationship. Brunswick contends, relying on *Gianelli Distributing Co. v. Beck & Co., 172 Cal.App.3d 1020, 219 Cal.Rptr. 203, 221 (1985)*, that evidence in the *1430 record must support a finding of an independent economic relationship between L A Land and DCC. Brunswick correctly asserts that evidence in the record instead shows that, because of its agreement with DCC,

6 F.3d 1422                                                                    Page 9
6 F.3d 1422, 1993-2 Trade Cases P 70,381
**(Cite as: 6 F.3d 1422)**

Brunswick was a necessary party to the prospective relationship between DCC and L.A. Land. *See, e.g.*, R.T. at 2275 (testimony by DCC official: "We weren't willing to make loans on new centers without some form of recourse guarantee[ ] from Brunswick so we wouldn't have made any of these loans without it."); R.T. at 2263 (testimony that DCC required Brunswick to prepare loan application packages for potential purchasers); R.T. at 2276 (testimony that DCC required Brunswick to prepare market surveys as part of loan packages because of Brunswick's superior knowledge of bowling industry).

L.A. Land does not point to any evidence which indicates an independent relationship between itself and DCC, or which contradicts evidence that DCC would not be in the business of financing equipment purchases by Brunswick's customers without Brunswick's financial participation and information-gathering. Instead, L.A. Land counters Brunswick's argument by asserting that Brunswick's defense that its interference was justified by its repurchase obligations under the DCC-Brunswick agreement is pretextual because there was no evidence that any perceived risks motivated Brunswick to discourage DCC from lending to L.A. Land. Apparently, L.A. Land fails to see that the issue is not Brunswick's motivation for interference as a matter of fact, but whether the tort claim falls as a matter of law because Brunswick was not a third party to the prospective relationship between L.A. Land and DCC. Brunswick could not have "interfered" if there was no independent economic relationship between DCC and L.A. Land in which to interfere. *See Kruse v. Bank of America, 202 Cal.App.3d 38, 248 Cal.Rptr. 217, 234 (1988)* ("The tort of intentional interference with economic advantage affords a remedy for wrongful interference with an economic relationship by a *third party*") (emphasis in original), *cert. denied, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989)* [FN8] Thus, we conclude that Brunswick has the better argument on this issue.

> FN8. Contrary to an assertion by L.A. Land in this appeal, Brunswick's reliance on *Kruse* does not mean that its argument rests on the premise that it and DCC were "identical." Given the evidence in the record that

Brunswick was not a disinterested "third party" to the relationship between L.A. Land and DCC, *Kruse* merely supports the proposition that L.A. Land's allegations do not state a tort claim as a matter of law because Brunswick was not a third party.

L.A. Land also contends that Brunswick's argument is "moot" because Brunswick did not request the jury to be instructed on the issue of L.A. Land's independent relationship with DCC. L.A. Land cites no authority for this proposition, and we reject it on the basis of *Air-Sea Forwarders,* which holds that the truly applicable law rather than the jury instructions governs review of a denial of a directed verdict or judgment notwithstanding the verdict. 880 F.2d at 182-83 & n. 5. Finally, L.A. Land argues that Brunswick's defense does not apply because the jury implicitly found malicious conduct by awarding one dollar in punitive damages. The only authority which L.A. Land provides to support this contention is a "Cf." citation to a case, *Lowell v. Mother's Cake & Cookie Co., 79 Cal.App.3d 13, 144 Cal.Rptr. 664 (1978),* which does not support its proposition either directly or inferentially. We are aware of no other authority which supports L.A. Land's argument.

2. L.A. Land-Timberlake Relationship.

[9] Brunswick argues that because it and L.A. Land were competitors for the services of bowling center builders, the "privilege of competition" protects it from liability for the pressure it applied on Timberlake not to build for L.A. Land. *See Buckaloo, 122 Cal.Rptr. at 752, 537 P.2d at 872* ("Perhaps the most significant privilege or justification for interference with a prospective business advantage is free competition."). Assuming without deciding that the record supports a finding that Brunswick prevailed upon Timberlake not to deal with its competitor, a number of authorities establish that Brunswick had the right under state law to do so.

In *\*1431A-Mark Coin Co. v. General Mills, Inc., 148 Cal.App.3d 312, 195 Cal.Rptr. 859, 867 (1983),* the court held that a firm's interference with another's prospective economic relation falls within the privilege of competition as long as: (1) the relation con-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

cerns a matter involved in the competition between
the firm and the other; (2) the firm does not employ
wrongful means; (3) the firm's action does not create
or continue an unlawful restraint of trade; and (4) the
firm's purpose is "at least in part" to advance its in-
terest in competing with the other. *Id.* (quoting Re-
statement (Second) of Torts § 768.) This court con-
firmed in *Pacific Express* that a firm's motive need
only stem *in part* from a genuine competitive pur-
pose. 959 F.2d at 819-20. Because the record shows
that L.A. Land's contractual relations with Timber-
lake were "merely contemplated or potential," Brun-
swick was free to "refuse to deal with third parties
[e.g., Timberlake] unless they cease dealing with"
L.A. Land. *A-Mark Coin, 195 Cal.Rptr. at 867*
(internal quotation omitted); *see New Kids on the
Block v. News America Publishing, Inc., 971 F.2d
302, 310 (9th Cir.1992).* L.A. Land points to no
evidence in the record that shows Brunswick's sole
motive in wedging itself between L.A. Land and
Timberlake, if it did so at all, was other than to ad-
vance its own economic interest, or that otherwise
suggests that the conditions for the privilege outlined
above did not exist. [FN9]

> FN9. An exception is that L.A. Land does
> assert (presumably relying on evidence per-
> taining to the antitrust claim) that the inter-
> ference here created an unlawful restraint of
> trade. Because we reverse the district
> court's judgment on the antitrust claim, no
> basis for this assertion remains.

In addition, L.A. Land's proposition is belied by the
facts of *A-Mark Coin,* which did not involve competi-
tion for a customer, but rather for a particular good.
In that case, the court held that the privilege of com-
petition protected the actions of a successful bidder
for a coin collection against an allegation by the un-
successful bidder of intentional interference with pro-
spective economic advantage. *A-Mark Coin, 195
Cal.Rptr. at 861-64.* Thus, Brunswick's conduct with
respect to Timberlake is privileged.

### IV. CONCLUSION
We conclude that the evidence regarding the antitrust
claim does not support a finding that Brunswick pos-
sessed monopoly power. We further conclude that

L.A. Land's claim that Brunswick interfered with its
prospective relationship with DCC fails as a matter of
law because Brunswick was not a stranger to that re-
lationship. Also, the privilege of competition protec-
ted Brunswick's conduct with respect to the prospect-
ive relationship between L.A. Land and Timberlake.
Therefore, we reverse the district court's judgment
and remand with directions to enter judgment in fa-
vor of Brunswick on L.A. Land's claims of both
monopolization and tort. Consequently, we deny
L.A. Land's request for attorneys' fees on appeal.

6 F.3d 1422, 1993-2 Trade Cases P 70,381

END OF DOCUMENT

# EXHIBIT 11

Westlaw.

151 F.R.D. 37
151 F.R.D. 37
(Cite as: 151 F.R.D. 37)

H

Motions, Pleadings and Filings

United States District Court,
D. Delaware.
In re ML-LEE ACQUISITION FUND II, L.P. and
ML-Lee Acquisition Fund (Retirement
Accounts) II, L.P. Securities Litigation.
Civ. A. No. 92-60-JJF.

Sept. 23, 1993.

Discovery requests were made and opposed in secur-
ities litigation. The District Court, Farnan, J., held
that: (1) information concerning procedures to be
utilized according to prospectus and actual operation
of investment funds were required to be produced;
(2) information regarding social contact among indi-
vidual defendants was not required; and (3) defend-
ants were not required to produce all drafts of final
documents submitted in discovery.

Ordered accordingly.

West Headnotes

[1] Federal Civil Procedure ⚖1272.1
170Ak1272.1 Most Cited Cases
Discovery should ordinarily be allowed under
concept of relevancy unless it is clear that informa-
tion sought can have no possible bearing upon sub-
ject matter of action. Fed.Rules Civ.Proc.Rule
26(b)(1), 28 U.S.C.A.

[2] Federal Civil Procedure ⚖1588
170Ak1588 Most Cited Cases
Information concerning procedures to be utilized ac-
cording to prospectus issued by investment funds,
and actual operation of funds, were required to be
produced, even though it was claimed that production
would be burdensome; information contained in re-
quested documents was "at the heart of the litiga-
tion." Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

[3] Federal Civil Procedure ⚖1587
170Ak1587 Most Cited Cases

Agreement between investment funds being sued and
credit corporation, under which credit corporation
was to make investments on behalf of funds, was
subject to discovery; credit corporation had made in-
vestment which was involved in suit. Fed.Rules
Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

[4] Federal Civil Procedure ⚖1581
170Ak1581 Most Cited Cases
Documents relating to investments by fund being
sued in securities fraud case were relevant and sub-
ject to discovery, as material relevant to issue con-
cerning decision to invest in companies and impact
that other investments in those companies may have
had on investment decision. Fed.Rules Civ.Proc.Rule
26(b)(1), 28 U.S.C.A.

[5] Federal Civil Procedure ⚖1581
170Ak1581 Most Cited Cases
Documents relating to relationships among individual
defendants, and relationship of defendants to various
companies in which resources of investment funds
were invested, were relevant in securities litigation
and were required to be produced, despite claim that
production was burdensome; information was relev-
ant to question whether any or all of defendants had
interest, by virtue of their economic relationships
with each other or in the companies which were tar-
gets of investment, that interfered with their obliga-
tion to act in best interest of funds. Fed.Rules
Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

[6] Federal Civil Procedure ⚖1581
170Ak1581 Most Cited Cases
Production of documents relating to social relation-
ships between individual defendants in securities lit-
igation would not be required to produced; informa-
tion to be obtained was only "marginally relevant" to
questions whether defendants may have been in-
volved in actions violative of securities laws in con-
nection with activities of investment funds with
which they were associated, and potential burden of
production was high. Fed.Rules Civ.Proc.Rule
26(b)(1), 28 U.S.C.A.

[7] Federal Civil Procedure ⚖1581

170Ak1581 Most Cited Cases

Defendants in securities litigation would not be required to produce documents with respect to investments they considered but did not make; request was in nature of "fishing expedition." Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

**[8] Federal Civil Procedure ⟞1581**

170Ak1581 Most Cited Cases

Documents concerning certification by advisors to investment funds, that recommended investments were within fund's guidelines, and indicating what action other defendants took with respect to advisors' recommendations, were required to be produced in securities litigation, even though production was "significant burden" upon defendants. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

**[9] Federal Civil Procedure ⟞1595**

170Ak1595 Most Cited Cases

Defendants in securities litigation would be required to produce insurance policy information; production was required to establish whether defendants had assets to satisfy judgments that might be entered against them. Fed.Rules Civ.Proc.Rule 26(b)(2), 28 U.S.C.A.

**[10] Federal Civil Procedure ⟞1581**

170Ak1581 Most Cited Cases

Defendants would not be automatically required to produce all drafts of final documents submitted in connection with discovery in securities litigating, due to large scope of discovery request; plaintiffs would be required to make particularized request for drafts in connection with specified documents. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

*38 Pamela S. Tikellis, Carolyn D. Mack, and Cynthia A. Calder of Chimicles Burt Jacobsen & McNew, Wilmington, DE, Michael J. Freed, and Carol V. Gilden of Much Shelist Freed Denenberg & Ament, Chicago, IL, William J. French, Robert L. Gegios, and Glen E. Lavy of Gibbs Roper Loots & Williams, Milwaukee, WI, James S. Youngblood, Atlanta, GA, for plaintiffs.

Kenneth J. Nachbar of Morris Nichols Arsht & Tunnell, Wilmington, DE, James N. Benedict, Mark Holland, David J. Lewittes, Martin L. Seidel, Laura L. Icken, James F. Moyle, and Jeffrey N. Naness of Ro-

gers & Wells, New York City, for defendants Mezzanine Investments II, L.P., ML Fund Administrators, Inc., Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc d/b/a Merrill Lynch Capital Markets, ML Mezzanine II, Inc., Matthew D. Castagna, Warren C. Smith, Jr., Rosalie Y. Goldberg, Robert Miller, Frederick J C. Butler, Kevin K. Albert, Jerome P. Greene, and J. Huston McCullough II.

Stephen E. Herrmann of Richards Layton & Finger, Wilmington, DE, Sanford F. Remz and Richard S. Nicholson of Hutchins Wheeler & Dittmar, Boston, MA, for defendants Thomas H. Lee, T.H. Lee Mezzanine II, Thomas H Advisors II, L.P., and Thomas H. Lee.

Michael D. Goldman, and Stephen C. Norman of Potter Anderson & Corroon, Wilmington, DE, John D. Donovan, Jr., and Michael K. Fee of Ropes & Gray, Boston, MA, for defendants ML Lee Acquisition Fund II, L.P., ML Lee Acquisition Fund (Retirement Accounts) II, L.P., Vernon R. Alden, Joseph L. Bower, and Stanley H. Feldberg.

David C. McBride, and Bruce M. Stargatt of Young Conaway Stargatt & Taylor, Wilmington, DE, Brackett B. Denniston, III, J. Anthony Downs, and Todd Hahn of Goodwin Procter & Hoar, Boston, MA, for defendant Hutchins Wheeler & Dittmar.

MEMORANDUM OPINION

FARNAN, District Judge.

1. Presently before the Court in this securities action are two motions (D.I. 85, 90) filed by plaintiffs to compel the production of documents in the possession of the defendants. [FN1] The motions will be addressed contemporaneously. The same set of document requests were sent to both the Merrill Lynch and Independent General Partner ("IGP") *39 defendants [FN2] and to the Funds-Lee defendants. [FN3] There are 23 particular document requests that are the subject of plaintiffs' motion to compel production by the Merrill Lynch and IGP defendants, while there are 52 such requests with respect to the Funds-Lee defendants. Every document request from the Merrill Lynch and IGP defendants that is the subject

of plaintiffs' motion to compel, except Request 67, is also the subject of the plaintiffs' motion to compel document production by the Funds-Lee defendants. Where possible, the Court shall consider the numerous document requests in a categorical fashion.

> FN1. Defendant's motions to defer consideration of plaintiffs' motions to compel pending resolution of defendants' motion to transfer (D.I. 92, 97) are denied as moot given this Court's denial of defendants' motion to transfer (D.I. 145). Plaintiffs' application for oral argument is denied.

> FN2. The Merrill Lynch defendants include Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Mezzanine Investment II, L.P., ML Mezzanine II, Inc., ML Fund Administrators, Inc., Matthew D. Castagna, Warren C. Smith, Jr., Rosalie Y. Goldberg, Robert Miller, Frederick J.C. Butler, Kevin K. Albert, Jerome P. Greene, J. Huston McCullough II. The Independent General Partner Defendants include Vernon R. Alden, Joseph L. Bower, and Stanley H. Feldberg.

> FN3. The Funds-Lee defendants include ML-Lee Acquisition Fund II, ML-Lee Acquisition Fund (Retirement Accounts) II, Thomas H. Lee, Thomas H. Lee Advisors II, L.P., Thomas H. Lee Company, T.H. Lee Mezzanine II.

2. The defendants generally contend that the documents sought are irrelevant and that production of those documents would be unduly burdensome. Defendants particularly contend that plaintiffs' requests for documents relating to investments that were contemplated, but not entered into by the Funds, is clearly a fishing expedition for new claims.

[1] 3. Under Fed.R.Civ.P. 26(b)(1), a party may obtain discovery of any nonprivileged matter relevant to or reasonably calculated to lead to evidence relevant to the pending action. As this Court stated in *La Chemise Lacoste v. Alligator Company, Inc.,* 60 F.R.D. 164, 171 (D.Del.1973), "discovery should or-

dinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." "The party seeking discovery has the burden of demonstrating its merits." *McLaughlin v. Copeland,* 455 F.Supp. 749, 753 (D.Del.1978).

[2] 4. The first category of documents relate generally to operation of the Funds and the defendants' participation in operating the Funds. These include the following documents: documents concerning the investment criteria, guidelines, restrictions, and process or procedure for making investments with the Funds (Requests ["R"] 1 and 12); documents referring to communications or meetings amongst any of the Funds' Designated General Partners (R. 19); documents that refer to services rendered by Merrill, MLPF & S or Advisors II, as an investment advisor to any defendant (R. 30); documents referring to the Funds' accounting policies in evaluating Funds' financial conditions (R. 35); all documents or drafts referring to the Funds prepared by or on behalf of any defendant or to be distributed to holders of units of the funds, or any other public entity (R. 33); documents referring to any management letters or other communications between the Funds and its independent auditor (R. 38); documents used or referred to in preparation of the Prospectus (R. 49); all documents referring to application for exemption from requirements of or registration under the Investment Advisers Act of 1940 (R. 53); minutes of all meetings of the general partners of the funds, and all documents referred to in those minutes (R. 61); all documents that confirm whether Advisors II or its affiliates made a simultaneous or contemporaneous co-investment in Hills or Petco (R. 67). The Court will grant the plaintiffs' motion to compel the production of all of these documents. While the Court is aware of the significant burden that will be imposed upon the defendants, the Court finds that information concerning the procedures to be utilized according to the Prospectus and the actual operation of the Funds is clearly at the heart of the litigation. Thus, the defendants must produce the requested documents as the Court finds that they are relevant or reasonably calculated to lead to relevant evidence.

[3] 5. The second category of documents relates to an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 F.R.D. 37
151 F.R.D. 37
(Cite as: 151 F.R.D. 37)

Page 4

agreement by Westinghouse Credit Corporation to make investments on behalf of the Funds. (R 7-9). The *40 Court finds this issue relevant to the litigation because Westinghouse invested in Hills. Therefore, the defendants must produce the requested documents as the Court finds that they are relevant or reasonably calculated to lead to relevant evidence.

[4] 6. The third category relates to documents concerning Hills or Petco. These documents include the following: documents concerning the financial status, debts, or restructuring of Hills or Petco (R 16, 26, 27, 28, 29, 31, 32, 46, 47); documents referring to communications or relationships with regard to the Funds between any defendants and Hills or Petco (R 21, 22, 23, 39, 40); documents referring to the Fund I investment in Petco (R 6); all minutes, recordings, documents relating to meetings of board of directors or committees of the non-individual defendants relating to Hills, Petco, or the Funds (R 45); all documents that refer to any written or oral presentation to any third-party relative to Hills' or Petco's business prospects made by or on behalf of Hills or Petco or any member of their respective management (R 42, 43); documents of Hills referring to negotiations about its debt securities, credit agreements, agreements with Drexel Burnham Lambert (R 50, 51, 52); all documents that any defendant observed regarding negotiations between Hills and Kimco concerning Kimco's purchase of Hills' debt (R 24); all documents or drafts referring to Hills or Petco prepared by or on behalf of any defendant or to be distributed to holders of units of the Funds, or any other public entity (R 34). The Court finds that these documents are relevant to the litigation and that, notwithstanding the burden to the defendants in producing the documents, defendants must produce these documents. The information held by any of the defendants with respect to Hills or Petco is material to the issues concerning the decision to invest in these companies and what impact any other investment on the part of the defendants in those companies may have had on that investment decision. To the extent that certain of the documents requested are not within the possession or control of the defendants, and the defendants are able to demonstrate such, those documents need not be produced. See *La Chemise*

*Lacoste*, 60 F.R.D. at 171 ("On the showing ... that the documents sought for production are not within [the defendant's] custody, control or possession, [the defendant] cannot be compelled to produce them.")

[5] 7. The third category of documents relates to the relationships amongst the defendants, and the relationships of the defendants to the various companies in which the Funds were invested. These requests are as follows: all documents referring to conversations regarding investments made or considered, investment objectives or guidelines, procedures for making investments, Westinghouse investments, creation of the Funds (R 48); all documents relating to securities or holdings of defendants in any company in which the Funds invested or considered making an investment; services provided by any of the defendants for any company in which they invested, or considered making an investment (R 54-56); documents relating to relationships between Designated IGPs and any of the Merrill Lynch or Lee Defendants; between Mezzanine Individual defendants and any of the Lee defendants; between individual defendants and any of the Lee defendants (R 57, 58, 60); documents referring to organizational charts (R 37). The Court finds generally that these documents, insofar as they pertain to the actual investments made by the Funds (*see* discussion *infra* of the fifth category of documents), are relevant to the litigation and that, notwithstanding the burden to the defendants in producing the documents, defendants must produce these documents. The information is relevant to the issue of whether any or all of the defendants had interests, by virtue of their economic relationships with each other or the target companies, that interfered with their obligations to act in the best interests of the Funds. To the extent that any documents requested do not exist, such as the organizational charts, the defendants need not produce them.

[6] 8. The fourth category relates generally to the social and business relationships between the defendants. The Court finds that plaintiffs' requests for all documents that relate to the social relationships *41 amongst any or all of the defendants (R 41) is only marginally relevant when weighed against the potential burden upon the defendants. Accordingly, the Court will not require the defendants to produce such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

documents. While Request 41 also seeks documents that concern the business relationships amongst all of the defendants, the Court is convinced that this request is adequately covered by Requests 57, 58 and 60.

[7] 9. The fifth category of documents relates to potential investments considered but not actually made. These include the following: documents referring to any potential investment reviewed by Advisors II and presented to the Funds' general partners for review and approval (R 59). The Court finds that plaintiffs' requests for documents related to all investments considered but not made are in the nature of a fishing expedition of marginal relevance when weighed against the significant burden on the defendants in producing those documents. While most discovery involves some "fishing", as with actual fishing, the hook must first be appropriately baited. *See McLaughlin, 455 F.Supp. at 753* ("While a plaintiff is entitled to a full opportunity to adduce evidence in support of the cognizable claims set out in his complaint, he is not entitled to discovery for the purpose of determining whether or not there may be a factual basis for a claim he has not made.") Plaintiffs have failed to demonstrate a sufficient degree of factual relevance to require the production of documents relating to investments that were considered but not made. Accordingly, the Court will not order the defendants to comply with Request 59 or any portion of any other Request for which production has been ordered which seeks to discover documents relating to investments considered but not made by the Funds.

[8] 10. The sixth category relates to documents concerning the certification by the advisors that recommended investments were within the Funds' guidelines and what action the other defendants took with respect to those recommendations. These documents include the following: all documents that identify all Qualified Investments by Advisors II recommended to the Funds and those that Advisors II certified as within the guidelines; those that show that the IGPs confirmed that the Advisors II certifications were correct; documents showing whether the Managing General Partner and a majority of the Designated IGPs approved noncertified investments (and all documents that served as the basis for de-

cision); all documents showing that Managing General Partner or the Designated IGPs did not approve recommended noncertified investments; (R 62, 63, 64, 65, 66) The Court finds that defendants must produce the requested documents that relate to all of the investments made by the Funds. While the Court is aware that this entails a significant burden upon the defendants, plaintiffs requests are relevant to the issue of whether the Funds' investments were targeted towards companies in which various defendants had substantial interests.

[9] 11. The last request, R 36, concerns insurance policies held by any of the defendants that would be relevant to the litigation. Notwithstanding certain of the defendants' (the Merrill defendants) contentions that they have sufficient assets to satisfy any judgment against them, pursuant to Rule 26(b)(2), the Court will order the defendants to produce this information.

[10] 12. Defendants argue that many of the plaintiffs' requests are targeted at drafts of documents as well as the final version of the documents. Defendants contend that drafts are not relevant, and that only the final versions, which would either have been made public or relied upon by any plaintiff or defendant in making decisions relative to the Funds, would be relevant. Plaintiffs respond by asserting that some courts have found that drafts are relevant. While drafts of certain specific documents may be relevant, and, therefore, discoverable, wholesale requests for general categories of documents and all drafts of those documents in complex cases such as this case would present an incredible burden upon the producing party. Thus, pursuant to Rule 26(b)(1), the Court will not compel the defendants to comply with generalized requests for drafts of documents *42 for which the final drafts are being provided to the plaintiffs.

An appropriate Order will be entered.

151 F.R.D. 37

**Motions, Pleadings and Filings (Back to top)**

• 1:92cv00060 (Docket) (Feb. 03, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 12

LEXSEE

**Clancey Martin, Plaintiff v. El Paso Natural Gas Company, Defendant.**

**No. EP-79-CA-23.**

**United States District Court for the Western District of Texas.**

**1981 U.S. Dist. LEXIS 17053; 92 Lab. Cas. (CCH) P34,116; 25 Wage & Hour Cas. (BNA) 250**

**October 19, 1981.**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sought to compel answers to his interrogatories and to deem admitted the requests for admissions served upon defendant employer. The employee brought this action for unpaid overtime compensation pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq

**OVERVIEW:** The employee's complaint alleged that he was a plant operator and that he was not paid overtime for hours worked in excess of 40 hours per week in violation of the FLSA. In response to the motion to compel answers to interrogatories, the employer argued that it was not required to furnish material more than three years old because the information would pertain to a period of time that was outside the statute of limitations. 29 U.S.C.S. § 255(a). The court denied discovery as to events occurring before the applicable limitation period because the information sought was not relevant evidence or calculated to lead to relevant evidence The employer asked the court to deem admitted the requests for admissions because the employer responded to the requests with partial admissions, partial denials, and objections. The court held, however, that Fed. R. Civ. P. 36(a) allowed a party to object to a request for admission or to deny part of it, if he acted in good faith and the court determined that the employer here acted in good faith

**OUTCOME:** The court granted the employee's motion to compel the employer to submit answers to interrogatories, and denied the employee's motion to deem requests for admissions as admitted

**CORE TERMS:** discovery, plant, deem, furnish, Fair Labor Standards Act, relevant evidence, events occurring, station, interrogatories, stationed, objected, partial

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Relevance*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN1] The district court has discretion to limit discovery to matters occurring within a particular period of time. It is proper to deny discovery as to events occurring before the applicable limitation period unless the party seeking discovery can show the relevance of the information sought to the issues in the case.

*Civil Procedure > Discovery > Methods > Admissions > Objections*
[HN2] Fed. R. Civ. P. 36(a) allows a party to object to a request for admission, or to deny part of it, if he acts in good faith

**COUNSEL:** [*1]

Philip S. Brown (Judge & Brown), Amarillo, Texas, for Plaintiff. Kenneth R. Carr (Grambling, Mounce, Sims, Galatzan & Harris), El Paso, Texas, Harold H. Young, Jr., Houston, Texas, for Defendant.

1981 U.S. Dist. LEXIS 17053, *1; 92 Lab. Cas. (CCH) P34,116;
25 Wage & Hour Cas. (BNA) 250

**OPINION BY:**

HUDSPETH

**OPINION:**

HUDSPETH, D.J.: Plaintiff, a former employee of the Defendant, brings this suit for unpaid overtime compensation pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. The Plaintiff alleges he was a plant operator at Defendant's Cornudas Station near Salt Flat, Texas, and that he was not paid overtime for hours worked in excess of 40 hours per week as required by law. For the purpose of discovery, Plaintiff filed his first and second set of interrogatories and a request for admissions. Defendant answered in part and objected in part. Plaintiff moves to compel answers to his interrogatories and to deem admitted the requests for admissions.

Two issues are presented by these discovery motions: (1) Is Defendant required to furnish information to Plaintiff concerning events prior to January 25, 1976, and (2) Is Defendant required to furnish information about other work stations besides Cornudas?

Defendant contends that it should not be required to furnish [*2] information pertaining to time periods prior to January 1976. Defendant argues that the suit was filed January 26, 1979, and the statute of limitations is two years, unless the violation was wilful, in which case it is three years. 29 U.S.C. § 255(a) Therefore, the Defendant argues, it cannot be required to furnish material more than three years old, as it would be outside any conceivable limitations period. [HN1]

The Court has discretion to limit discovery to matters occurring within a particular period of time. 8 Wright & Miller, Federal Practice and Procedure, § 2040 (1970). It is proper to deny discovery as to events occurring before the applicable limitation period unless the party seeking discovery can show the relevance of the information sought to the issues in the case Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 353 (1978). In the instant case, the discovery sought as to events occurring before January 1976 does not involve relevant evidence or matters calculated to lead to relevant evidence. See Adelman v. Nordberg Mfg. Co., 6 F.R.D. 383 (E.D. Wis. 1947); Stein v. Youngstown Steel Car Corp., [12 LC P63,494] 6 F.R.D. 362 (N.D. Ohio 1946). Defendant's objection [*3] to it should be sustained.

Defendant also contends that it is not required to disclose information about its automated gas turbine stations other than the Cornudas plant, including the names and addresses of the employees stationed at those other plants. The authorities cited by Plaintiff do not stand for the proposition that such discovery should be allowed in a Fair Labor Standards Act case. The few cases that do exist have limited discovery of employment records to those employees who are parties to the suit. Callaway v. Rolland Laboratories, Inc., 9 F.R.D. 88 (W.D. Mo. 1949); Jumps v. Leverone, 6 Wage & Hour Cas. 201 (N.D. Ill. 1946); Saxton v. W.D. Askew Co., 38 F.Supp. 323, 326 (N.D. Ga. 1941).

Some courts have allowed the circulation of a written notice potential plaintiffs who might otherwise be unaware of their legal rights or of the opportunity to join an existing suit as parties plaintiff Braunstein v. Eastern Photographic Laboratories, Inc., 600 F.2d 335 (2nd Cir. 1978), cert. denied 441 U.S. 944 (1979); Riojas v. Seal Produce Inc., 82 F.R.D. 613 (S.D. Tex. 1979). But see Kinney Shoe Corp. v. Vorhes, [82 LC P33,604] 564 F.2d 859 (9th Cir. 1977) (contra). Although [*4] Defendant has suggested that this is Plaintiff's motive in seeking names and addresses of other employees, the Plaintiff has never requested it on that basis. The question is, therefore, not before the Court. Again, Defendant's objection to this discovery is well taken.

Defendant responded to some of Plaintiff's requests for admissions with partial admissions or partial denials, and has objected to some of the requests. Plaintiff contends that Defendant cannot object, nor can it admit or deny in part only. However, [HN2] Rule 36(a), F.R.Civ.P., allows a party to object to a request for admission, or to deny part of it, if he acts in good faith. In this case, Defendant's good faith is indicated by the fact that it requests permission to supplement its answers when discovery is complete Plaintiff's motion to deem admitted should be denied.

Plaintiff has also moved for an order compelling Defendant to allow Plaintiff to inspect the homes of present employees stationed at the Cornudas plant. Defendant states that it does not object, but that since the individual employees rent the homes from it and have rights of privacy, it cannot force employees to allow entry into their homes [*5] by Plaintiff's representatives. The parties represented to the Court that they would attempt to secure the cooperation of the tenants and work out the

1981 U.S. Dist. LEXIS 17053, *5; 92 Lab. Cas. (CCH) P34,116;
25 Wage & Hour Cas. (BNA) 250

problem without court intervention, and it will be assumed that they have done so.

It is therefore Ordered that Plaintiff's motion to compel answers to interrogatories be, and it is hereby, Denied.

It is further Ordered that Plaintiff's motion to deem requests for admissions admitted be, and it is hereby, Denied.

# EXHIBIT 13

Westlaw.

66 S.Ct. 494                                                                              Page 1
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
**(Cite as: 327 U.S. 186, 66 S.Ct. 494)**

▷

<u>**Briefs and Other Related Documents**</u>

Supreme Court of the United States
OKLAHOMA PRESS PUB. CO.
v.
WALLING, Adm'r, Wage and Hour Division, U.S.
Department of Labor.
NEWS PRINTING CO., Inc.,
v.
SAME.
Nos. 61, 63.

Argued Oct. 17, 18, 1945.
Decided Feb. 11, 1946.

Proceeding by L. Metcalfe Walling, Administrator of
the Wage and Hour Division, United States Depart-
ment of Labor, against the Oklahoma Press Publish-
ing Company, to obtain an order compelling obedi-
ence to a subpoena. A judgment for plaintiff was af-
firmed, 147 F.2d 658, and the Oklahoma Press Pub-
lishing Company brings certiorari.

Affirmed.

Proceeding by L. Metcalfe Walling, Administrator of
the Wage and Hour Division, United States Depart-
ment of Labor, against the News Printing Company,
Inc., for an order requiring the production of docu-
mentary evidence pursuant to a subpoena duces
tecum. An order of dismissal, 49 F.Supp. 659, was
reversed, 148 F.2d 57, and the News Printing Com-
pany, Inc., brings certiorari.

Affirmed.

Mr. Justice MURPHY dissenting.

On Writ of Certiorari to the United States Circuit
Court of Appeals for the Tenth Circuit.

On Writ of Certiorari to the United States Circuit
Court of Appeals for the Third Circuit.

West Headnotes

**[1] Constitutional Law** ⬅➝**90.1(7.1)**
92k90.1(7.1) Most Cited Cases
  (Formerly 92k90.1(7), 92k90)

**[1] Labor and Employment** ⬅➝**2218(5)**
231Hk2218(5) Most Cited Cases
  (Formerly 232Ak1091 Labor Relations, 255k69
Master and Servant)
The application of the Fair Labor Standards Act to
business of publishing and distributing newspapers
does not violate the First Amendment. Fair Labor
Standards Act of 1938, §§ 9, 11(a), 29 U.S.C.A. §§
209, 211(a); U.S.C.A. Const. Amend. 1.

**[2] Constitutional Law** ⬅➝**275(3)**
92k275(3) Most Cited Cases
  (Formerly 92k275(2))

**[2] Labor and Employment** ⬅➝**2218(4)**
231Hk2218(4) Most Cited Cases
  (Formerly 232Ak1090, 232Ak1085 Labor Rela-
tions, 255k69 Master and Servant)

**[2] Labor and Employment** ⬅➝**2218(5)**
231Hk2218(5) Most Cited Cases
  (Formerly 232Ak1091 Labor Relations)
The Fair Labor Standards Act is not based on invalid
classification because of exclusion among others, of
seamen, farm workers and employees of small
weekly or semi-weekly newspapers. Fair Labor
Standards Act of 1938, § 13(a), 29 U.S.C.A. §
213(a); U.S.C.A. Const. Amend. 5.

**[3] Commerce** ⬅➝**62.49**
83k62.49 Most Cited Cases
  (Formerly 83k57)
The Fair Labor Standards Act as applied to the busi-
ness of publishing and distributing newspapers is not
invalid on ground that such business does not involve
commerce. Fair Labor Standards Act of 1938, §
13(a), 29 U.S.C.A. § 213(a).

**[4] Witnesses** ⬅➝**298**
410k298 Most Cited Cases
The privilege against self-incrimination gives no pro-
tection to corporations or their officers against the
production of corporate records pursuant to lawful ju-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 S.Ct. 494                                                                                    Page 2
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

dicial order. U.S.C.A.Const.Amend. 5.

**[5] Searches and Seizures** ☞76
349k76 Most Cited Cases
    (Formerly 170Ak1581, 349k7(15))
In case involving production of corporation's books
and papers in response to a subpoena or order author-
ized by law and safeguarded by judicial sanction, the
Fourth Amendment, if applicable, at most guards
against abuse only by way of too much indefiniteness
or breadth in the things required to be particularly de-
scribed, if the inquiry is one the demanding agency is
authorized by law to make and the materials specified
are relevant. U.S.C.A.Const. Amend. 4.

**[6] Labor and Employment** ☞2341
231Hk2341 Most Cited Cases
    (Formerly 232Ak1429 Labor Relations, 255k69
Master and Servant)
Under the Fair Labor Standards Act authorizing ad-
ministrative agency to inspect corporate records to
determine whether act is being violated and granting
subpoena power to aid in investigation, it is not ne-
cessary that a specific charge of complaint of viola-
tion of law be pending or that order be made pursuant
to one, but it is enough that investigation be for a
lawfully authorized purpose within power of Con-
gress to command and the requirement of reasonable-
ness comes down to specification of the document to
be produced adequate but not excessive, for purposes
of relevant inquiry. Fair Labor Standards Act of
1938, §§ 9, 11(a), 29 U.S.C.A. §§ 209, 211(a); Feder-
al Trade Commission Act, §§ 9, 10, 15 U.S.C.A. §§
49, 50.

**[7] Labor and Employment** ☞2339
231Hk2339 Most Cited Cases
    (Formerly 232Ak1426 Labor Relations, 255k69
Master and Servant)
Under the Fair Labor Standards Act the Wage and
Hour Administrator has authority to conduct inquiry
for purpose of determining whether employers are
subject to the Act and if so, whether they were violat-
ing the Act. Fair Labor Standards Act of 1938, §§ 9,
11(a), 29 U.S.C.A. §§ 209, 211(a); Federal Trade
Commission Act, §§ 9, 10, 15 U.S.C.A. §§ 49, 50.

**[8] Constitutional Law** ☞305(1)

92k305(1) Most Cited Cases
    (Formerly 92k305)

**[8] Federal Civil Procedure** ☞1581
170Ak1581 Most Cited Cases

**[8] Labor and Employment** ☞2341
231Hk2341 Most Cited Cases
    (Formerly 232Ak1428 Labor Relations, 255k69
Master and Servant)

**[8] Searches and Seizures** ☞77
349k77 Most Cited Cases
    (Formerly 349k7(15))
Under the Fair Labor Standards Act, the Wage and
Hour Administrator, rather than District Court, has
authority, in first instance, to determine question of
coverage in preliminary investigation of possibly ex-
isting violations, and in doing so to exercise his sub-
poena power for securing evidence on that question,
by seeking production of employer's relevant books,
records and papers and, in case of refusal to obey
subpoena, issued according to act's authorization, to
have aid of District Court in enforcing it, and the stat-
utory provisions conferring such authority do not vi-
olate the Fourth or Fifth Amendment. Fair Labor
Standards Act of 1938, §§ 9, 11(a), 29 U.S.C.A. §§
209, 211(a); Federal Trade Commission Act, §§ 9,
10, 15 U.S.C.A. §§ 49, 50; U.S.C.A.Const. Amends.
4, 5.

**[9] Labor and Employment** ☞2342
231Hk2342 Most Cited Cases
    (Formerly 232Ak1431 Labor Relations, 255k69,
255k9 Master and
Servant)
In proceeding by Wage and Hour Administrator for
order enforcing obedience to subpoena requiring cor-
porate employers engaged in newspaper publishing
business to produce records necessary to enable Ad-
ministrator to determine questions of coverage and
violation of the Fair Labor Standards Act, showing of
probable cause was sufficient to justify enforcement
order. Fair Labor Standards Act of 1938, §§ 9, 11(a),
29 U.S.C.A. §§ 209, 211(a); Federal Trade Commis-
sion Act, §§ 9, 10, 15 U.S.C.A. §§ 49, 50.

**[10] Labor and Employment** ☞2339

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 S.Ct. 494                                                                                                              Page 3
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

231Hk2339 Most Cited Cases
      (Formerly 232Ak1426 Labor Relations, 255k69
Master and Servant)
Under the Fair Labor Standards Act, the investigative
function of Wage and Hour Administrator in search-
ing out violations with a view to securing enforce-
ment of the Act is essentially the same as the function
of grand jury or court is issuing other pretrial orders
for discovery of evidence and is governed by the
same limitations, which are that Administrator shall
not act arbitrarily or in excess of his statutory author-
ity, but administrator's inquiry is not limited by fore-
cast of probable result of investigation. Fair Labor
Standards Act of 1938, §§ 9, 11(a), 29 U.S.C.A. §§
209, 211(a); Federal Trade Commission Act, §§ 9,
10, 15 U.S.C.A. §§ 49, 50.

[11] Labor and Employment ⇐⇒2342
231Hk2342 Most Cited Cases
      (Formerly 232Ak1434 Labor Relations, 255k69
Master and Servant)
Under Fair Labor Standards Act, authorizing Wage
and Hour Administrator to inspect employer's records
to determine the coverage of Act and violation there-
of and conferring subpoena power in aid of investiga-
tion, Administrator's right is subject to judicial super-
vision, and persons from whom Administrator seeks
relevant information are not required to submit to his
demand if it is unreasonable or overreaches his au-
thority, but a subpoena issued and enforced according
to law, is not objectionable on ground that it would
subject employer to inconvenience, expense and har-
assment. Fair Labor Standards Act of 1938, §§ 9,
11(a), 29 U.S.C.A. §§ 209, 211(a); Federal Trade
Commission Act, §§ 9, 10, 15 U.S.C.A. §§ 49, 50.

[12] Labor and Employment ⇐⇒2342
231Hk2342 Most Cited Cases
      (Formerly 232Ak1432 Labor Relations, 255k69
Master and Servant)
In proceeding by Wage and Hour Administrator for
enforcement of subpoena requiring employers to pro-
duce specified records to enable Administrator to de-
termine questions of coverage and violation of Fair
Labor Standards Act, employers had burden of estab-
lishing reasons for not enforcing the subpoena in or-
der to make appropriate defense. Fair Labor Stand-
ards Act of 1938, §§ 9, 11(a), 29 U.S.C.A. §§ 209,

211(a); Federal Trade Commission Act, §§ 9, 10, 15
U.S.C.A. §§ 49, 50.

Labor and Employment ⇐⇒2218(5)
231Hk2218(5) Most Cited Cases
      (Formerly 232Ak1091 Labor Relations)
Fair Labor Standards Act of 1938 does not, as ap-
plied to newspapers, abridge "freedom of the press"
contrary to federal Constitution. Fair Labor Standards
Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.;
U.S.C.A.Const. Amend. 1.
**495 Mr. *189 Elisha Hanson, of Washington, D.C.,
for petitioners.

Mr. Irving J. Levy, of Washington, D.C., for respond-
ent.

Mr. Justice RUTLEDGE delivered the opinion of the
Court.

These cases bring for decision important questions
concerning the Administrator's right to judicial en-
forcement of subpoenas duces tecum issued by him
in the course of investigations conducted pursuant to
s 11(a) of the Fair Labor Standards Act, 52 Stat.
1060, 29 U.S.C.A. s 211(a). His claim is founded dir-
ectly upon s 9, 29 U.S.C.A. s 209, which incorporates
the enforcement provisions of ss 9 and 10 of the Fed-
eral Trade Commission Act, 38 Stat. **496 717, 15
U.S.C.A. ss 49, 50. [FN1] The subpoenas sought the
production of specified records to determine whether
petitioners were violating the Fair Labor Standards
Act, including records relating to coverage. Petition-
ers, newspaper publishing corporations, maintain that
the Act is not applicable to them, for constitutional
and other reasons, and insist that the question of cov-
erage must be adjudicated before the subpoenas may
be enforced.

         FN1 The pertinent portions of these various
         statutory provisions are set forth in notes 23
         and 24.

*190 In No. 61, involving the Oklahoma Press Pub-
lishing Company, the Circuit Court of Appeals for
the Tenth Circuit has rejected this view, holding that
the Administrator was entitled to enforcement upon
showing of 'probable cause,' which it found had been
made. 147 F.2d 658. Accordingly it affirmed the Dis-

66 S.Ct. 494
327 U.S. 186, 66 S.Ct. 494, 90 L. Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

trict Court's order directing that the Administrator be given access to the records and documents specified. [FN2]

> FN2 Upon filing of the application, an order to show cause why enforcement should not be had was issued. Thereafter the matter was heard upon the pleadings, including the application and the respondent's return, together with affidavits filed by the parties. See note 4; also note 52 infra. The District Court made findings of fact and conclusions of law, see 7 Wage Hour Rep. 665, which among other things determined 'that the Company herein is subject to the Wage and Hour Act'; and issued its order for inspection accordingly. As to this finding and conclusion the Court of Appeals said: 'When the matter was submitted to the trial court on the rule to show cause, it concluded coverage, but it did not have to go that far.' 147 F.2d 658, 662.

In No. 63, the Circuit Court of Appeals for the Third Circuit likewise rejected the company's position, one judge dissenting on the ground that probable cause had not been shown. 148 F.2d 57. It accordingly reversed the District Court's order of dismissal in the proceeding to show cause, which in effect denied enforcement for want of a showing of coverage. Application of Walling, 49 F.Supp. 659. [FN3] The *191 Court of Appeals thought that requiring the Administrator 'to make proof of coverage would be to turn the proceeding into a suit to decide a question which must be determined by the Administrator in the course of his investigation' (148 F.2d 60), and relied upon Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424, as being persuasive that this could not be done. Regarding the subpoena as containing no unreasonable demand, it conceived the return and affidavits filed by the company, together with the Administrator's allegations of coverage, [FN4] as sufficient to require enforcement. Hence it directed that the District Court's discretion be exercised with that effect.

> FN3. In No. 63, as in No. 61, an order to show cause issued on filing of the applica-

tion. Upon return made, which included affidavits attached as exhibits, the Court rendered its opinion and entered its order dismissing the proceedings, stating however that since the Administrator 'has not had opportunity sufficiently to argue the question of coverage, that matter is left to such further proceedings as may be appropriate * * * ' 49 F.Supp. 659, 661. The opinion, noting that to deny enforcement 'would be to divide proceedings into two distinct stages,' one 'concerning the presence of 'Commerce,'' and the other to determine other elements of violation,' went on to say: 'There would seem to be no compelling reason why such should not be the case, for if the act does not apply to a certain business or part of an industry, it would seem to follow that the provisions of the Act should not be applied thereto * * *.' 49 f.supp. at page 660.

FN4 See note 53. The allegations of coverage in both applications were made upon information and belief and were general rather than specific or evidentiary in character. Each application set forth that the respondent was engaged in the business of publishing a newspaper or newspapers and by virtue of that activity was engaged in interstate commerce or in the production of goods for such commerce within the meaning of the Act.

In No. 61 the further allegations appeared that in the course of its business the company 'receives and sends daily news, intelligence, and communications in interstate commerce, and transports, ships and delivers goods produced by it from points within' to points outside Oklahoma; and that the Administrator 'having reasonable grounds to believe that the company' was violating specified sections of the Act, entered to make an investigation as provided in s 11(a), was refused permission to inspect records, etc.

Apart from one affidavit filed by the Administrator in No. 61 setting forth the circumstances of the company's failure to appear in

response to the subpoena, no other facts, beyond the allegations of the application, were submitted by him in either case. The companies however filed affidavits in both proceedings, which supplied additional facts, as well as the affiants' conclusions, concerning coverage. See text, Part IV, at notes 52, 53.

**\*497** Because of the importance of the issues for administration of the Act and also on account of the differences in the grounds for the two decisions, as well as between them **\*192** and decisions from other circuits, [FN5] certiorari was granted in both cases. 325 U.S. 845, 65 S.Ct. 1200, 1201.

> FN5 Specifically, General Tobacco & Grocery Co. v. Fleming, 6 Cir., 125 F.2d 596, 140 A.L.R. 783; modified in Walling v. La Belle Steamship Co., 6 Cir., 148 F.2d 198, following the decision in Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424, as to which see note 49 infra in text. The decisions in other circuits which have passed on the matter are substantially in accord with those in No. 61. See Martin Typewriter Co. v. Walling, 1 Cir., 135 F.2d 918; Walling v. Standard Dredging Corp., 2 Cir., 132 F.2d 322; Walling v. American Rolbal Corp., 2 Cir., 135 F.2d 1003; Cudahy Packing Co. v. Fleming, 5 Cir., 119 F.2d 209, reversed on other grounds, 315 U.S. 357, 788, 62 S.Ct. 651, 86 L.Ed. 895; Cudahy Packing Co. v. Fleming, 8 Cir., 122 F.2d 1005, reversed on other grounds, 315 U.S. 785, 62 S.Ct. 803, 86 L.Ed. 1191; Mississippi Road Supply Co. v. Walling, 5 Cir., 136 F.2d 391; Fleming v. Montgomery Ward Co., 7 Cir., 114 F.2d 384; Walling v. Benson, 8 Cir., 137 F.2d 501, 149 A.L.R. 186.

The issues have taken wide range. They are substantially the same in the two causes, except in one respect to be noted [FN6] In addition to an argument from Congress' intent, reliance falls upon various constitutional provisions, including the First, Fourth and Fifth Amendments, as well as the limited reach

of the commerce clause, to show that the Administrator's conduct and the relief he seeks are forbidden.

> FN6 See Part IV.

I.

Coloring almost all of petitioners' position, as we understand them, is a primary misconception that the First Amendment knocks out any possible application of the Fair Labor Standards Act to the business of publishing and distributing newspapers. The argument has two prongs.

[1] The broadside assertion that petitioners 'could not be covered by the Act,' for the reason that 'application of this Act to its newspaper publishing business would violate its rights as guaranteed by the First Amendment,' is **\*193** without merit. Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, and Associated Press v. United States, 326, U.S. 1, 65 S.Ct. 1416; Mabee v. White Plains Pub. Co., 327 U.S. 178, 66 S.Ct. 511. [FN7] If Congress can remove obstructions to commerce by requiring publishers to bargain collectively with employees and refrain from interfering with their rights of self-organization, matters closely related to eliminating low wages and long hours, Congress likewise may strike directly at those evils when they adversely affect commerce. United States v. Darby, 312 U.S. 100, 116, 117, 657, 61 S.Ct. 451, 458, 85 L.Ed. 609, 132 A.L.R. 1430. The Amendment does not forbid this or other regulation which ends in no restraint upon expression or in any other evil outlawed by its terms and purposes. [FN8]

> FN7 See also Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445; Fleming v. Lowell Sun Co., D.C., 36 F.Supp. 320, reversed on other grounds, 1 Cir., 120 F.2d 213, affirmed 315 U.S. 784, 62 S.Ct. 793, 86 L.Ed. 1191.

> FN8 No question is presented whether Congress could enforce its mandate by excluding from commerce the circulation of a publisher refusing to conform. Cf. Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445, 449.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 S.Ct. 494
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

[2] Petitioners' narrower argument, of allegedly invalid classification, [FN9] arises from the statutory exemptions and may be shortly dismissed. The intimation that the Act falls by reason of the exclusion of seamen, farm workers and others by s 13(a) is hardly more than a suggestion and is dismissed accordingly. Cf. **498Buck v. Bell, 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000. The contention drawn from the exemption of employees of small newspapers by s 13(a)(8) deserves only slightly more attention. [FN10] It seems to be two-fold, *194 that the amendment forbids Congress to 'regulate the press by classifying it' at all and in any event that it cannot use volume of circulation or size as a factor in the classification. [FN11]

> FN9 Since the Fifth Amendment, unlike the Fourteenth, contains no 'equal protection' clause petitioners burden due process with this duty here.

> FN10 The provision is as follows: 'Sec 13(a). The provisions of sections 6 and 7 shall not apply with respect to * * * (8) any employee employed in connection with the publication of any weekly or semiweekly newspaper with a circulation of less than three thousand the major part of which circulation is within the county where printed or published'
> The exemption shows conclusively that Congress intended the Act to apply to employees of publishers not within the terms of the exemption.

> FN11 To support these views, petitioners give interesting statistics concerning the total number of papers in the country, the number published daily, daily and Sunday, weekly, semiweekly and triweekly, and the number in each group having more or less than 3,000 circulation.

Reliance upon Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, to support these claims is misplaced. There the state statute singled out newspapers for special taxation and was held in effect to graduate the tax in accordance with volume of circulation. Here there was no singling out of the press for treatment different from that accorded other business in general. Rather the Act's purpose was to place publishers of newspapers upon the same plane with other businesses and the exemption for small newspapers had the same object. 83 Cong.Rec. 7445. Nothing in the Grosjean case forbids Congress to exempt some publishers because of size from either a tax or a regulation which would be valid if applied to all.

[3] What has been said also disposes of the contention drawn from the scope of the commerce power and its applicability to the publishing business considered independently of the Amendment's influence. Associated Press v. National Labor Relations Board, supra; Associated Press v. United States, supra.

II.

Other questions pertain to whether enforcement of the subpoenas as directed by the Circuit Courts of Appeals will violate any of petitioners' rights secured by the Fourth *195 Amendment and related issues concerning Congress' intent. It is claimed that enforcement would permit the Administrator to conduct general fishing expeditions into petitioners' books, records and papers, in order to secure evidence that they have violated the Act, without a prior charge or complaint and simply to secure information upon which to base one, all allegedly in violation of the Amendment's search and seizure provisions. Supporting this is an argument that Congress did not intend such use to be made of the delegated power, which rests in part upon asserted constitutional implications, but primarily upon the reports of legislative committees, particularly in the House of Representatives, made in passing upon appropriations for years subsequent to the Act's effective date. [FN12]

> FN12 See note 21. The Act became effective June 25, 1938.

The short answer to the Fourth Amendment objections is that the records in these cases present no question of actual search and seizure, but raise only the question whether orders of court for the production of specified records have been validly made; and no sufficient showing appears to justify setting them

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

aside. [FN13] No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections, which in fact were made. [FN14] Nor has any objection been taken to the breadth of the subpoenas or to any other special defect which would invalidate them. [FN15]

> FN13 As to the sufficiency of the showing, see Part IV.

> FN14 Cf. notes 2, 3, 4. The facts in both cases show that petitioners, when served with the subpoenas, declined to honor them upon the advice of counsel, and thereafter the Administrator applied to the court for enforcement in each case.

> FN15 Cf. text infra at notes 42--47; see also note 40.

**\*196** What petitioners seek is not to prevent an unlawful search and seizure. It is **\*\*499** rather a total immunity to the Act's provisions, applicable to all others similarly situated, requiring them to submit their pertinent records for the Administrator's inspection under every judicial safeguard, after and only after an order of court made pursuant to and in exact compliance with authority granted by Congress. This broad claim of immunity no doubt is induced by petitioners' First Amendment contentions. But beyond them it is rested also upon conceptions of the Fourth Amendment equally lacking in merit.

[4] Petitioners' plea that the Fourth Amendment places them so far above the law that they are beyond the reach of congressional and judicial power as those powers have been exerted here only raises the ghost of controversy long since settled adversely to their claim. [FN16] They have advanced no claim founded on the Fifth Amendment's somewhat related guaranty against self-incrimination, whether or not for the sufficient reason among others that this privilege gives no protection to corporations or their officers against the production of corporate records pursuant to lawful judicial order, which is all these cases involve. [FN17]

> FN16 See the authorities cited in notes 31 and 32.

> FN17 Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; Essgee Co. v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 726, 64 S.Ct. 805, 815, 88 L.Ed. 1024; cf. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202

The cited authorities would be sufficient to dispose of the Fourth Amendment argument, and more recent decisions confirm their ruling. [FN18] Petitioners however are insistent in their contrary views, both upon the constitutional phases and in their asserted bearing upon the intention of Congress. While we think those views reflect a confusion not justified by the actual state of the decisions the confusion has acquired some currency, as the **\*197** divided state of opinion among the circuits shows. [FN19] Since the matter is of some importance, in order to remove any possible basis for like misunderstanding in the future, we give more detailed consideration to the views advanced and to the authorities than would otherwise be necessary.

> FN18 Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424; Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, discussed infra, Part III, at notes 49--51.

> FN19 Cf. note 5 and text.

There are two difficulties with petitioners' theory concerning the intent of Congress. One is that the argument from the so-called legislative history flies in the face of the powers expressly granted to the Administrator and the courts by ss 9 and 11(a), so flatly that to accept petitioners' view would largely nullify them. [FN20] Furthermore the excerpted history from the later appropriation matters does not give the full

66 S.Ct. 494
327 U.S. 186, 66 S.Ct. 494, 90 L. Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

story and when that is considered the claimed inter-
pretation is not made out, regardless of its retrospect-
ive aspect. [FN21] Moreover, the *198 statute's lan-
guage leaves no room to doubt that Congress inten-
ded to **500 authorize just what the Administrator
did and sought to have the courts do [FN22]

> FN20 In such a situation, without an accom-
> panying change in the statute's language, an
> expression in committee reports on sub-
> sequent appropriations, coming largely from
> one house, hardly can be held to change or
> qualify the plain and unambiguous wording
> of the statute. Such a result would amount to
> retroactive amendment by committee report,
> a step in construction by reference to 'pro-
> spective legislative history' not heretofore
> taken.

> FN21 The controversy as to appropriations
> arose over the Administrator's request for
> sufficient funds to allow a periodic routine
> inspection of every plant that might be
> covered by the Act. See Hearings before the
> Subcommittee of the Committee on Appro-
> priations of the House of Representatives on
> the Department of Labor--Federal Security
> Agency Appropriation Bill for 1942, 77th
> Cong., 1st Sess., Pt. 1, 347--350. The Senate
> had acceded to this request. But the House
> Appropriations Committee thought the cost
> unjustifiable and therefore recommended
> that only enough funds be made available to
> permit the Administrator to make 'spot in-
> spections' of twenty-five per cent of the
> plants and also to permit him to inspect all
> plants against which complaints had actually
> been registered. H.R.Rep.No. 688, 77th
> Cong., 1st Sess., 13, 14; see also 87
> Cong.Rec. 4629, 5682, 5683. After the con-
> ferees had been unable to come to an agree-
> ment and the House had instructed its con-
> ferees to insist on the smaller appropriation,
> 87 Cong.Rec. 5682--5686, the Senate accep-
> ted the House version of the appropriation
> bill. 87 Cong.Rec. 5703.
> In the following year, 1942, the House Ap-
> propriations Committee noted with disap-

proval that 'the spot-checking system ap-
proved by the Congress' had not been adop-
ted and reiterated its desire that the recom-
mended procedure be followed.
H.Rep.No.2200, 77th Cong., 2d Sess., 8. See
also Hearings before the Subcommittee of
the Committee on Appropriations of the
House of Representatives on the Department
of Labor--Federal Security Agency Appro-
priation Bill for 1943, 77th Cong., 2d Sess.,
Pt. 1, 281--284; cf. Hearings before the Sub-
committee of the Committee on Appropri-
ations of the House of Representatives on
the Department of Labor--Federal Security
Agency Appropriation Bill for 1945, 78th
Cong., 2d Sess., Pt. 1, 403--405.
This history falls far short of sustaining the
view that Congress had no intent, either
when the statute was enacted or later, that
the Administrator should have the powers of
investigation expressly and clearly conferred
upon him.

> FN22 The sparse legislative history bearing
> on the question contains nothing to the con-
> trary. The bills originally introduced did not
> incorporate ss 9 and 10 of the Federal Trade
> Commission Act but contained substantially
> similar provisions. S.2475, 75th Cong., 1st
> Sess., s 15, 81 Cong.Rec. 4961; H.R.7200,
> 75th Cong., 1st Sess., s 15, 81 Cong.Rec.
> 4998. The House Committee on Labor re-
> ported of this section (then s 12) that it 'con-
> tains the usual administrative provisions au-
> thorizing the Board to conduct investiga-
> tions, subpena witnesses, and compel testi-
> mony.' H.Rep.No.1452, 75th Cong., 1st
> Sess., 18, also page 10. The Senate Commit-
> tee used the same language.
> Sen.Rep.No. 884, 75th Cong., 1st Sess., 8.
> The House bill having been recommitted to
> the Committee, 82 Cong.Rec. 1834, 1835, it
> drafted the subpoena section (then s 7) into
> essentially its present form. See
> H.R.Rep.No. 2182, 75th Cong., 2d Sess., 3,
> 11. The only substantially difference was
> that the subpoena power was given for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purpose of any 'hearing' but not for the purpose of any 'investigation.' However, s 15(b) of the bills introduced in both houses, supra, granted the subpoena power 'for the purpose of any investigation or any other proceeding under this Act * * *' And compare s 15(a). The difference was remedied by the Senate and House conferees; for out of conference came s 9 as it is now written. 83 Cong.Rec. 9160; 83 Cong.Rec. 9248, 9254. See also Cudahy Packing Co. v. Holland, 315 U.S. 357, 362, note 3, 788, 62 S.Ct. 651, 654, 86 L.Ed. 895.

Nothing in the reports or the discussion suggests that the power was not to be exercised, or that subpoenas issued in compliance with the terms of the statute were not to be enforced, exactly in accordance with the authority given.

Section 11(a) expressly *199 authorizes the Administrator to 'enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem appropriate to determine whether any person has violated any provision of this Act, or which may aid in the enforcement of the provisions of this Act.' [FN23] **501 The subpoena power conferred by s 9 (through adoption of s 9 of the Federal Trade Commission Act) is *200 given in aid of this investigation and, in case of disobedience, the District Courts are called upon to enforce the subpoena through their contempt powers, [FN24] without express condition requiring showing of coverage. [FN25]

> FN23 Section 11(a) is as follows: 'The Administrator or his designated representatives may investigate and gather data regarding the wages, hours, and other conditions and practices of employment in any industry subject to this Act, and may enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provi-

sion of this Act, or which may aid in the enforcement of the provisions of this Act. Except as provided in section 12 and in subsection (b) of this section, the Administrator shall utilize the bureaus and divisions of the Department of Labor for all the investigations and inspections necessary under this section. Except as provided in section 12, the Administrator shall bring all actions under section 17 to restrain violations of this Act.'

The section thus authorizes both general and specific investigations, one for gathering statistical information concerning entire industries, cf. Walling v. American Rolbal Corp., 2 Cir., 135 F.2d 1003, the other to discover specific violations. The pattern has become common since its introduction into federal law by the Interstate Commerce Commission legislation. See the summary given as to both federal and state instances in Handler, The Constitutionality of Investigations by the Federal Trade Commission (1928) 28 Col.L.Rev. 708, 905, at 905--909; see also 925-- 929.

> FN24 Section 9 of the Fair Labor Standards Act reads: 'For the purpose of any hearing or investigation provided for in this Act, the provisions of sections 9 and 10 (relating to the attendance of witnesses and the production of books, papers, and documents) of the Federal Trade Commission Act of September 16, 1914, as amended (U.S.C., 1934 edition, title 15, secs. 49 and 50), are hereby made applicable to the jurisdiction, powers and duties of the Administrator, the Chief of the Children's bureau, and the industry committees.' Section 9 of the Federal Trade Commission Act, 38 Stat. 717, provides that, for the purposes of the authorized investigations, the Commission or its agents shall have access to and the right to copy 'any documentary evidence of any corporation being * * * proceeded against,' with the power to require by subpoena 'the attendance and testimony of witnesses and the pro-

66 S.Ct. 494                                                                    Page 10
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
**(Cite as: 327 U.S. 186, 66 S.Ct. 494)**

duction of all such documentary evidence relating to any matter under investigation.'

The section then proceeds: '* * * in case of disobedience to a subpoena the commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

'Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any corporation or other person, issue an order requiring such corporation or other person to appear before the commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.'

Section 9 also contains a provision for immunity of individuals from prosecution, penalty or forfeiture on account of testimony or evidence produced in response to the subpoena. Section 10 imposes criminal penalties upon 'any person who shall refuse or neglect to attend and testify, or to answer any lawful inquiry or to produce documentary evidence, if in his power to do so, in obedience to the subpoena or lawful requirement of the commission.' No question is presented in these cases concerning this provision.

FN25 See Part IV, at note 54; also note 24.

**\*201** In view of these provisions, with which the Administrator's action was in exact compliance, this case presents an instance of 'the most explicit language' [FN26] which leaves no room for questioning Congress' intent. The very purpose of the subpoena and of the order, as of the authorized investigation, is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so.

FN26 See note 27.

Accordingly, if ss 9 and 11(a) are not to be construed as authorizing enforcement of the orders, it must be, as petitioners say, because this construction would make them so dubious constitutionally as to compel resort to an interpretation which saves rather than to one which destroys or is likely to do so. The Court has adopted this course at least once in this type of case. [FN27] But if the same course is followed here, the judgments must be reversed with the effect of cutting squarely into the power of **502 Congress. For to deny the validity of the orders would be in effect to deny not only Congress' power to enact the provisions sustaining them, but also its authority to delegate effective power to investigate violations of its own laws, if not perhaps also its own power to make such investigations.

> FN27 See Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 305, 306, 44 S.Ct. 336, 337, 68 L.Ed. 696, 32 A.L.R. 786, in which Mr. Justice Holmes speaking for the Court said: 'Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire (Interstate Commerce Commission v. Brimson, 154 U.S. 447, 479, 14 S.Ct. 1125, (1134), 38 L.Ed. 1047), and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce as to attribute to congress that intent.' See also note 40. Cf. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Harriman v. Interstate Commerce Commission, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253.

**\*202** III.

The primary source of misconception concerning the Fourth Amendment's function lies perhaps in the identification of cases involving so-called 'figurative' or 'constructive' search with cases of actual search and seizure. [FN28] Only in this analogical sense can

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
**(Cite as: 327 U.S. 186, 66 S.Ct. 494)**

any question related to search and seizure be thought to arise in situations which, like the present ones, involve only the validity of authorized judicial orders.

> FN28 'In other words, the subpoena is equivalent to a search and seizure and to be constitutional it must be a reasonable exercise of the power' Lasson, Development of the Fourth Amendment to the United States Constitution, 137, citing Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047; Hale v. Henkel, 201 U.S. 43, 76, 26 S.Ct. 370, 379, 50 L.Ed. 652. Cf. Boyd v. United States, 116 U.S. at pages 634, 635, 6 S.Ct. at page 534, 29 L.Ed. 746 (as to which see also notes 33 and 36): '* * * We are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited * * * is the equivalent of a search and seizure--and an unreasonable search and seizure--within the meaning of the Fourth Amendment.'
> See also Handler, Constitutionality of Investigation of the Federal Trade Commission (1928) 28 Col.L.Rev. 708, 905, at 909 ff., and authorities cited, characterizing the identification of an order for production with an actual search or seizure as 'the figurative interpretation.' P. 917, n. 56.

The confusion is due in part to the fact that this is the very kind of situation in which the decisions have moved with variant direction, although without actual conflict when all of the facts in each case are taken into account. Notwithstanding this, emphasis and tone at times are highly contrasting, with consequent overtones of doubt and confusion for validity of the statute or its application. The subject matter perhaps too often has been generative of heat rather than light, for the border along which the cases lie is one where government intrudes upon different areas of privacy and the history of such intrusions has brought forth some of the stoutest and most effective *203 instances of resistance to excess of governmental authority. [FN29]

> FN29 See, in addition to the better known

accounts of writs of assistance cited in Goldman v. United States, dissenting opinion, 316 U.S. at page 139, note 5, 62 S.Ct. at page 998, 86 L.Ed. 1322, Lasson, Development of the Fourth Amendment to the United States Constitution (1937).

The matter of requiring the production of books and records to secure evidence is not as one-sided, in this kind of situation, as the most extreme expressions of either emphasis would indicate. With some obvious exceptions, there has always been a real problem of balancing the public interest against private security. The cases for protection of the opposing interests are stated as clearly as anywhere perhaps in the summations, quoted in the margin, [FN30] **503 of two former members of this Court, each of *204 whom was fully alive to the dual necessity of safeguarding adequately the public and the private interest. But emphasis has not always been so aptly placed.

> FN30 The case for protection of the public interest was stated as follows: 'The opinion of the court reminds us of the dangers that wait upon the abuse of power by officialdom unchained. The warning is so fraught with truth that it can never be untimely. But timely too is the reminder, as a host of impoverished investors will be ready to attest, that there are dangers in untruths and half truths when certificates masquerading as securities pass current in the market. There are dangers in spreading a belief that untruths and half truths, designed to be passed on for the guidance of confiding buyers, are to be ranked as peccadillos, or even perhaps as part of the amenities of business. * * * A Commission which is without coercive powers, which cannot arrest or amerce or imprison though a crime has been uncovered or even punish for contempt, but can only inquire and report, the propriety of every question in the course of the inquiry being subject to the supervision of the ordinary courts of justice, is likened with denunciatory fervor to the Star Chamber of the Stuarts. Historians may find hyperbole in the sanguinary simile.' Mr. Justice Cardozo,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

66 S.Ct. 494
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

with whom joined the present Chief Justice and Mr. Justice Brandeis, dissenting in Jones v. Securities and Exchange Commission, 298 U.S. 1, 32, 33, 56 S.Ct. 654, 664, 665, 80 L.Ed. 1015. See, also, Handler, Constitutionality of Investigations of the Federal Trade Commission (1928) 28 Col.L.Rev. 708, 905, particularly at 933 ff.

On the other hand, the case for protected privacy was put by Mr. Justice Brandeis, dissenting, in Olmstead v. United States, 277 U.S. 438, 478, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944, 66 A.L.R. 376: 'The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone--the most comprehensive right and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth.'

The confusion, obscuring the basic distinction between actual and so-called 'constructive' search has been accentuated where the records and papers sought are of corporate character, as in these cases. Historically private corporations have been subject to broad visitorial power, both in England and in this country. And it long has been established that Congress may exercise wide investigative power over them, analogous to the visitorial power of the incorporating state, [FN31] when their activities take place within or affect interstate commerce [FN32] correspondingly *205 it has been settled that corporations

are not entitled to all of the constitutional protections which private individuals have in these and related matters. As has been noted, they are not at all within the privilege against self-incrimination, although this Court more than once has said that the privilege runs very closely with the Fourth Amendment's search and seizure provisions. [FN33] It is also settled that an officer of the company cannot refuse to produce **504 its records in his possession, upon the plea that they either will incriminate him or may incriminate it. [FN34] And, although the Fourth Amendment has been *206 held applicable to corporations [FN35] notwithstanding their exclusion from the privilege against self-incrimination, the same leading case of Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558, distinguishing the earlier quite different one of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, [FN36] held the process not invalid under the Fourth Amendment, although it broadly required the production of copies of letters and telegrams 'signed or purport(ed) to be signed by the president of said company during the month(s) of May and June, 1909, in regard to an alleged violation of the statutes of the United States by C. C. Wilson.' 221 U.S. at pages 368, 375, 31 S.Ct. at page 539, 55 L.Ed. 771, Ann.Cas.1912D, 558

FN31 Wilson v. United States, 221 U.S. 361, 382, 31 S.Ct. 538, 545, 55 L.Ed. 771, Ann.Cas.1912D, 558; Hale v. Henkel, 201 U.S. 43, 74, 75, 26 S.Ct. 370, 378, 379, 50 L.Ed. 652; The Fourth and Fifth Amendments and the Visitorial Power of Congress over State Corporations, Note (1930) 30 Col.L.Rev. 103.

FN32 Ibid ; Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047; Interstate Commerce Commission v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860; Baltimore & Ohio R.R. v. Interstate Commerce Commission, 221 U.S. 612, 31 S.Ct. 621, 55 L.Ed. 878; Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729; United States v. Louisville & N.R.R., 236 U.S. 318, 35 S.Ct. 363, 59

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

L.Ed. 598; Smith v. Interstate Commerce Commission, 245 U.S. 33, 38 S.Ct. 30, 62 L.Ed. 135; United States v. New York Central R.R., 272 U.S. 457, 47 S.Ct. 130, 71 L.Ed. 350; cf., however, Harrison v. Interstate Commerce Commission, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253; Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978. And see Handler, Constitutionality of Investigations by the Federal Trade Commission (1928) 28 Col L.Rev. 708, 903.

'The power is not limited to inquiring concerning matters which Congress may regulate otherwise than by requiring the production of information, at any rate when it is made to appear that some phase of the activity is in commerce or affects it. See United States v. New York Central R.R., 272 U.S. 457, 464, 47 S.Ct. 130, 132, 71 L.Ed. 350, and authorities cited; Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978. Nor must the 'jurisdictional' line be drawn in such cases before the information is called for. Cf. Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; Handler, op. cit. supra, at 918 ff., and authorities cited.

FN33 In the leading case of Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, Mr. Justice Bradley, speaking for the Court in relation to the compelled production of 'a man's own testimony, or of his private papers (specifically a business invoice) to be used as evidence to convict him of crime, or to forfeit his goods,' said in a much quoted statement: 'In this regard the fourth and fifth amendments run almost into each other.' The opinion, quoting at length from Lord Camden's discussion in the historic case of Entick v. Carrington, 19 Howell's State Trials, 1029, relies strongly in this phase upon his conjunction of the right to freedom from search and seizure 'where the law forceth evidence out of the owner's custody by process' and the privilege against

self-incrimination. 116 U.S. at page 629, 6 S.Ct. at page 531, 29 L.Ed. 746. Cf. also the statement of Mr. Justice Brandeis, quoted supra note 30.

FN34 Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Interstate Commerce Commission v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860.

FN35 Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Interstate Commerce Commission v. Brimson, 154 U.S. 447, 448 ff. 14 S.Ct. 1125, 38 L.Ed. 1047. See also Consolidated Rendering Co. v. Vermont, 207 U.S. 541, 28 S.Ct. 178, 52 L.Ed. 327, 12 Ann.Cas. 658.

FN36 See note 33. The ruling was limited, in view of the facts, to criminal proceedings and proceedings for forfeiture of property. Only a single document was called for. The vitiating element lay in the incriminating character of the unusual provision for enforcement. The statute provided that failure to produce might be taken as a confession of whatever might be alleged in the motion for production.

The Wilson case has set the pattern of later decisions and has been followed without qualification of its ruling. [FN37] Contrary suggestions or implications may be explained as dicta; [FN38] or by virtue of the presence of an actual illegal search and seizure, the effects of which the Government sought later to overcome by applying the more liberal doctrine *207 devolved in relation to 'constructive search'; [FN39] or by the scope of the subpoena in calling for documents so broadly or indefinitely that it was **505 thought to approach in this respect the character of a general warrant or writ of assistance, odious in both English and American history. [FN40] But no case has been cited or found in which, *208 upon similar facts, the Wilson doctrine has not been followed. Nor in any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 S.Ct. 494                                                                    Page 14

327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
**(Cite as: 327 U.S. 186, 66 S.Ct. 494)**

has Congress been adjudged to have exceeded its authority, with the single exception of Boyd v. United States, supra, which differed from both the Wilson case and the present ones in providing a drastically incriminating method of enforcement [FN41] which was applied to the production of partners' business records. Whatever limits there may be to congressional power to provide for the production of corporate or other business records, therefore, they are not to be found, in view of the course of prior decisions, in any such absolute or universal immunity as petitioners seek.

> FN37 See notes 31, 32, 40. Thus far Congress has not seen fit to leave to administrative officials authority to enforce subpoenas. The pattern adopted in ss 9 and 10 of the Federal Trade Commission Act, of referring enforcement to the courts, has become accepted, whether by virtue of reflections of the opinion in Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047, or for other reasons. The extent to which the pattern has been adopted is summarized, partially at least, in Handler, op. cit. supra, at 925 ff.

> FN38 See, for example, Essgee Co. v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917.

> FN39 E.g., in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, government officers, after arresting corporate officials at their homes, 'without a shadow of authority went to the office of their company and made a clean sweep of all the books, papers and documents found there,' taking them to the district attorney's office, where they were photographed. After an order of court to return the originals, but impounding the copies, subpoenas to produce the originals were enforced by an order, the refusal to obey which was held a contempt. The Court's strong language in reversing this decision undoubtedly was called forth by the Government's effort, not to say subterfuge, thus to avoid the ef-

fects of its initial wrong. Cf. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834 Ann.Cas.1915C, 1177. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.

> FN40 Thus, the aggravating circumstance in Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 337, 68 L.Ed. 696, 32 A.L.R. 786, cf. note 27, seems to have been the Commission's claim of 'an unlimited right of access to the respondents' papers with reference to the possible existence of practices in violation of section 5.' 264 U.S. at page 305, 44 S.Ct. at page 337, 68 L.Ed. 696, 32 A.L.R. 786. The Court said: 'It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up.' Page 306 of 264 U.S., page 337 of 44 S.Ct., 68 L.Ed. 696, 32 A.L.R. 786. (Emphasis added.) Cf. Silverthorne Lumber Co. v. United States, supra, note 39.
> However in Wheeler v. United States, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309, where no element of actual search and seizure was present, a subpoena was enforced which called for copies of all letters and telegrams, all cash books, ledgers, journals and other account books of the corporation covering a period of fifteen months; cf. Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047. And in Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 290, 7 L.Ed. 500, the subpoena called for all letters, telegrams or copies thereof passing between a national trade association and its members, including their officers and agents, over a period of two and one-half years, with reference to eighteen different items. The Court, by Mr. Justice Sutherland, said: 'The subpoena * * * specifies a reasonable period of time, and with reasonable particularity the subjects to which the documents called for relate. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

question is ruled, not by Hale v. Henkel, but by <u>Consolidated Rendering Co. v. Vermont, 207 U.S. 541, 553, 554, 28 S.Ct. 178 (181), 52 L.Ed. 327, 12 Ann.Cas. 658,</u> and Wheeler v. United States,' supra.

With reference to the breadth of the subpoena or order for production in the scope of what is called for, in addition to the authorities cited in this note and note 45, see <u>Hammond Packing Co. v. Arkansas, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530, 15 Ann.Cas. 645; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024;</u> Handler, op. cit. supra, at 913 ff.

<u>FN41</u> See note 36.

[5] Without attempt to summarize or accurately distinguish all of the cases, the fair distillation, in so far as they apply merely to the production of corporate records and papers in response to a subpoena or order authorized by law and safeguarded by judicial sanction, seems to be that the Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.

[6] As this has taken from in the decisions, the following specific results have been worked out. It is not necessary, *209 as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command. This has been ruled most often perhaps in relation to grand jury investigations, [FN42] but also frequently in respect to **506 general or statistical investigations authorized by Congress. [FN43] The requirement of 'probable cause, supported by oath or affirmation' literally applicable in the case of a war-

rant is satisfied, in that of an order for production, by the court's determination that the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry. [FN44] Beyond this the requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, as has been said, this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry. [FN45]

<u>FN42</u> E.g., <u>Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Wilson v. United States, 221 U.S. 361, 372, 31 S.Ct. 538, 541, 55 L.Ed. 771, Ann.Cas.1912D, 558.</u>

FN43 <u>Smith v. Interstate Commerce Commission, 245 U.S. 33, 38 S.Ct. 30, 62 L.Ed. 135; Baltimore & Ohio R.R. v. Interstate Commerce Commission, 221 U.S. 612, 31 S.Ct. 621, 55 L.Ed. 878;</u> cf. <u>Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729; Harriman v. Interstate Commerce Commission ,211 U.S. 407, 419, 29 S.Ct. 115, 118, 53 L.Ed. 253.</u> And see Handler, op. cit. supra, 918 ff.

<u>FN44</u> Cf. the authorities cited in notes 42 and 43.

<u>FN45</u> Cf. <u>Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374; Boyd v. United States, 116 U.S. at page 630, 6 S.Ct. at page 532, 29 L.Ed. 746,</u> and note 40 supra.

[7] When these principles are applied to the facts of the present cases, it is impossible to conceive how a violation of petitioners' rights could have been involved. Both *210 were corporations. The only records or documents sought were corporate ones. No possible element of self-incrimination was therefore

presented or in fact claimed. All the records sought were relevant to the authorized inquiry, [FN46] the purpose of which was to determine two issues, whether petitioners were subject to the Act and, if so, whether they were violating it. These were subjects of investigation authorized by s 11(a), the latter expressly, the former by necessary implication. [FN47] It is not to be doubted that Congress could authorize investigation of these matters. In all these respects, [FN48] the specifications *211 more than meet the requirements long established by many precedents.

>    FN46 The subpoena in No. 61 called for production of:
>    'All of your books, papers and documents showing the hours worked by and wages paid to each of your employees between October 28, 1938, and the date hereof, including all payroll ledgers, time sheets, time cards and time clock records, and all your books, papers and documents showing the distribution of papers outside the State of Oklahoma, the dissemination of news outside the State of Oklahoma, the source and receipt of news from outside the State of Oklahoma, and the source and receipt of advertisements of nationally advertised goods.' The specification in No. 63 was substantially identical except for the period of time covered by the demand.

>    FN47 See the language of the section, note 24 supra. Of course violation could be found only in situation where coverage would exist. Authority to investigate the existence of violations accordingly included authority to investigate coverage. Cf. Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424; Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, discussed in the text herein at notes 49--51; and authorities cited in note 32 supra.

>    FN48 The description was made with all of the particularity the nature of the inquiry and the Administrator's situation would permit. See note 46. The subpoenas were limited to

the books, papers and documents of the respective corporations, to which alone they were addressed. They required production at specified times and places in the cities of publication and stated the purpose of the investigation to be one affecting the respondent, pursuant to the provisions of ss 9 and 11(c), 'regarding complaints of violations by said company of Sections 6, 7, 11(c), 15(a), 15(a)(2) and 15(a)(5) of the Act.' Cf. the authorities cited in notes 32 and 45.

More recent confirmation of those rulings may be found in Endicott Johnson Corp. v. Perkins, supra, and **507Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, it is true that these cases involved different statutes substantially and procedurally. But, notwithstanding the possible influence of the doctrine of governmental immunity to suit in the Endicott Johnson case, it would be anomalous to hold that under the Walsh-Healy Act, 49 Stat. 2036, 41 U.S.C.A. ss 35--45, the District Court was not authorized to decide the question of coverage or, on the basis of its adverse decision, to deny enforcement to the Secretary's subpoena seeking relevant evidence on that question, because Congress had committed its initial determination to him; and at the same time to rule that Congress could not confer the same power upon the Administrator with reference to violations of the Fair Labor Standards Act. [FN49] The question at issue is not in either case the nature of the legal obligation violation of which the evidence is sought to show. It is rather whether evidence relevant to the violation, whatever the obligation's character, can be drawn forth by the exercise of the subpoena power.

>    FN49 This Court, in granting certiorari in the Endicott Johnson case, (317 U.S. 501, 63 S.Ct. 340) did so, among other reasons, 'because of probable conflict with' General Tobacco & Grocery Co. v. Fleming, 6 Cir., 125 F.2d 596, 140 A.L.R. 783, a case arising under the Fair Labor Standards Act. 317 U.S. at page 502, 63 S.Ct. at page 340, 87 L.Ed. 424.

The Myers case did not involve a subpoena duces tecum, but was a suit to enjoin the National Labor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 S.Ct. 494                                                                                    Page 17

327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531

**(Cite as: 327 U.S. 186, 66 S.Ct. 494)**

Relations Board from holding a hearing upon a complaint against an employer alleged to be engaged in unfair labor practices forbidden by the Wagner Act, 49 Stat. 449, 29 U.S.C.A. s 151 et seq. The hearing required an investigation and determination of coverage, involving as in this case the question whether the company was engaged in commerce. It denied this upon allegations thought to sustain the denial, as well as *212 the futility, expensiveness and vexatious character of the hearing to itself. [FN50] This Court held that the District Court was without jurisdiction to enjoin the hearing. Regarding as appropriate the procedure before the Board and as adequate the provisions for judicial review of its action, including its determination of coverage, the Court sustained the exclusive jurisdiction of the Board, and of the Court of Appeals upon review, to determine that question, with others committed to their judgment, in the statutory proceeding for determining whether violations of the Act exist. The opinion referred to the Board's subpoena power, also to its authority to apply to a District Court for enforcement, and stated that 'to such an application appropriate defense may be made.' But the decision's necessary effect was to rule that it was not 'an appropriate defense' that coverage had not been determined prior to the hearing or, it would seem necessarily to follow, prior to the Board's preliminary investigation of violation. If this is true in the case of the Board, it would seem to be equally true in that of the Administrator. [FN51]

FN50 To the argument of 'irreparable damage,' the Court said: 'The contention is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. * * * Obviously, the rule * * * cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact.' 303 U.S. at page 50, 58 S.Ct. at

page 463, 82 L.Ed. 638.

FN51 It is true that in the Myers situation the Board's determination is quasijudicial, is given finality as to the facts if there is evidence to sustain its findings, National Labor Relations Act, s 10(e), (49 Stat. 454, 29 U.S.C.A. s 160(e)), and is expressly made exclusive, ibid., s 10(a), whereas in the situations now presented the Administrator's investigation is only preliminary to instituting proceedings in court and thus has none of the finality or quasi-judicial character given to the Board's determination. But, as the Court noted, the Board also had preliminary investigative authority, incidental to preparation for the hearing, to which its subpoena power applies, National Labor Relations Act, s 11 (49 Stat. 455, 456, 29 U.S.C.A. s 161); and, as we have said, if the courts are forbidden to determine coverage prior to the Board's quasi-judicial proceeding for deciding that question, it would seem necessarily to follow that they are forbidden also to decide it prior to the Board's preliminary investigation to determine whether the proceeding shall be instituted. The mere fact that the first stage of formal adjudication is administrative in the one case and judicial in the other would seem to make no difference with the power of Congress to authorize either the preliminary investigation or the use of the subpoena power in aid of it.

**508 *213 In these results under the later as well as the earlier decisions, the basic compromise has been worked out in a manner to secure the public interest and at the same time to guard the private ones affected against the only abuses from which protection rightfully may be claimed. The latter are not identical with those protected against invasion by actual search and seizure, nor are the threatened abuses the same. They are rather the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

terest. Officious examination can be expensive, so much so that it eats up men's substance. It can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason.

On the other hand, petitioners' view if accepted would stop much if not all of investigation in the public interest at the threshold of inquiry and, in the case of the Administrator, is designed avowedly to do so. This would render substantially impossible his effective discharge of the duties of investigation and enforcement which Congress has placed upon him. And if his functions could be thus blocked, so might many others of equal importance.

**\*214** [8] We think, therefore, that the Courts of Appeals were correct in the view that Congress has authorized the Administrator, rather than the District Courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence upon that question, by seeking the production of petitioners' relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the District Court in enforcing it. No constitutional provision forbids Congress to do this. On the contrary, its authority would seem clearly to be comprehended in the 'necessary and proper' clause, as incidental to both its general legislative and its investigative powers.

### IV.

What has been said disposes of petitioners' principal contention upon the sufficiency of the showing. Other assignments, however, present the further questions whether any showing is required beyond the Administrator's allegations of coverage and relevance of the required materials to that question; and, if so, of what character. Stated otherwise they are whether the court may order enforcement only upon a finding of 'probable cause,' that is, probability in fact, of coverage, as was held by the Court of Appeals for the Tenth Circuit in No. 61, following the lead of the Eighth Circuit in Walling v. Benson, 137 F.2d 501, 149 A.L.R. 186, or may do so upon the narrower basis accepted by the Third Circuit in No. 63.

[9] The showing in No. 61 was clearly sufficient to constitute 'probable cause' in this sense under conceptions of coverage prevailing at the time of the hearing, [FN52] whether **\*215** or not that showing was necessary. Accordingly the judgment in that case must be affirmed.

> FN52 The evidence that the company or its employees were engaged the commerce, etc., was supplied largely by it in the return to the rule to show cause and the supporting affidavits, consisting of admissions and statements of fact concerning its modes of doing business. The admissions obviously were made upon petitioner's broad theory that the publishing business is not subject to the Act or to the commerce power. But those conclusions do not nullify the factual character of the admissions and, so taken, they adequately sustain the appellate court's conclusion of 'probable cause' of coverage.

In No. 63 the showing was less extensive, and it is doubtful that it would constitute 'probable cause' of coverage as that term **\*\*509** was used in the decisions from the Tenth and Eighth Circuits. [FN53] The Court of Appeals for the Third Circuit did not so label it, but held the showing sufficient.

> FN53 See notes 3, 4. The Administrator's allegations, more general than in No. 61, merely set forth that the company was a newspaper publisher, that the Administrator had reason to believe it was violating the Act, and that it was 'engaged in commerce and in the production of goods for commerce.' This conclusion was denied. The admissions of the return, including the affidavits, supplied only the pertinent facts in relation to coverage that the respondent, News Printing Co., was engaged in the business of publishing and distributing the 'Paterson Evening News,' a daily paper, that less than one per cent of its circulation of more than 23,000 copies, or a daily average of 278 copies, was distributed outside New Jersey, where the paper was published, and that the business was conducted in the same manner

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as other 'local' papers according to the methods shown by the affidavits. These disclosed nothing material concerning interstate phases of such businesses generally, except as might be inferred from statements that they publish national and international as well as local news, and must do so as quickly as possible after the events occur

Congress has made no requirements in terms of any showing of 'probable cause', [FN54] and, in view of what has already been said, any possible constitutional requirement **\*216** of that sort was satisfied by the Administrator's showing in this case, including not only the allegations concerning coverage, but also that he was proceeding with his investigation in accordance with the mandate of Congress and that the records sought were relevant to that purpose. Actually, in view of today's ruling in Mabee v. White Plains Pub. Co., supra, the showing here, including the facts supplied by the response, was sufficient to establish coverage itself, though that was not required.

> FN54 Section 9 of the Federal Trade Commission Act authorizes the Administrator to invoke the aid of the court 'in case of disobedience to a subpoena' and the court is authorized to give assistance 'in case of contumacy or refusal to obey a subpoena issued to any corporation or other person.' Cf. note 24.

[10] The result therefore sustains the Administrator's position that his investigative function, in searching out violations with a view to securing enforcement of the Act, is essentially the same as the grand jury's, or the court's in issuing other pretrial orders for the discovery of evidence, [FN55] and is governed by the same limitations. These are that he shall not act arbitrarily or in excess of his statutory authority, but this does not mean that his inquiry must be 'limited \* \* \* by \* \* \* forecasts of the probable result of the investigation \* \* \*.' Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979; cf. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. Nor is the judicial function either abused or abased, as has been suggested, [FN56] by leaving to it the determin-

ation of the \*217 important questions which the Administrator's position concedes the courts may decide. [FN57]

> FN55 The bill of discovery in equity would seem to furnish an instance. Cf. Sinclair Refining Co. v. Jenkins Petroleum Co., 289 U.S. 689, 696, 697, 53 S.Ct. 736, 738, 77 L.Ed. 1449, 88 A.L.R. 496. See also the provisions for pretrial examination and the taking of depositions. Federal Rules of Civil Procedure, Rules 26(b), 30(d), 45; 28 U.S.C.A. following section 723c; Union Central Life Ins. Co. v. Burger, D.C., 27 F.Supp. 556; Bloomer v. Sirian Lamp Co., D.C., 4 F.R.D. 167; Lewis v. United Air Lines Transport Corp., D.C., 27 F.Supp. 946, 947. The power of Congress itself to call for information presents a related illustration. McGrain v. Daugherty, 273 U.S. 135, 156--158, 47 S.Ct. 319, 322, 323, 71 L.Ed. 580, 50 A.L.R. 1.

> FN56 In General Tobacco & Grocery Co. v. Fleming, 6 Cir., 125 F.2d 596, 599, 140 A.L.R. 783, the court said: 'In the exercise of the judicial power to review questions of law, as conferred by an Act of Congress, the seal of a United States court should not become a mere rubber stamp for the approval of arbitrary action by an administrative agency.' In this case, No. 63, the District Court said: '\* \* \* the functions of the Courts remain, and those functions are not merely to act as an adjunct of administrative bodies \* \* \*.' 49 F.Supp. 659, 661.

> FN57 The issues of authority to conduct the investigation, relevancy of the materials sought, and breadth of the demand are neither minor nor ministerial matters. Nor would there be any failure to satisfy fully the discretionary power implied in the statute's use of the word 'may,' rather than 'shall,' see note 24, in authorizing the court to enforce the subpoenas. It would be going far to say that Congress could not proceed upon this basis, but could go forward only by requir-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

66 S Ct. 494

Page 20

327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
(Cite as: 327 U.S. 186, 66 S.Ct. 494)

ing a showing of probable cause of coverage in the sense of probability in fact of coverage. Cf. note 44 and text. Coverage is but one element in violation and if probable cause, in that sense, must be shown concerning it, is difficult to understand why probable cause must not be shown also concerning exemptions, see Martin Typewriter Co. v. Walling, 1 Cir., 135 F.2d 918; Walling v. LaBelle S.S. Co., 6 Cir., 148 F.2d 198, or any other essential element in violation.

**510 [11] Petitioners stress that enforcement will subject them to inconvenience, expense and harassment. That argument is answered fully by what was said in Myers v. Bethlehem Corp. [FN58] There is no harassment when the subpoena is issued and enforced according to law. The Administrator is authorized to enter and inspect, but the Act makes his right to do so subject in all cases to judicial supervision. Persons from whom he seeks relevant information are not required to submit to his demand, if in any respect it is unreasonable or overreaches the authority Congress has given. To it they may make 'appropriate defense' surrounded by every safeguard of judicial restraint. In view of these safeguards, the expressed fears of unwarranted intrusions upon personal liberty are effective only to recall Mr. Justice Cardozo's reply to the same exaggerated forebodings in Jones v. Securities & Exchange Commission: 'Historians may find hyperbole in the sanguinary simile.' [FN59]

FN58 See note 50 supra.

FN59 See note 30.

Nor is there room for intimation that the Administrator has proceeded in these cases in any manner contrary to *218 petitioners' fundamental rights or otherwise than strictly according to law. It is to be remembered that petitioners' are not the only rights which may be involved or threatened with possible infringement. Their employees' rights and the public interest under the declared policy of Congress also would be affected if petitioners should enjoy the practically complete immunity they seek.

[12] No sufficient reason was set forth in the returns or the accompanying affidavits for not enforcing the subpoenas, a burden petitioners were required to assume in order to make 'appropriate defense.'

Accordingly the judgments in both causes, No. 61 and No. 63, are affirmed.

Affirmed.

Mr. Justice JACKSON took no part in the consideration or decision of these cases.

Mr. Justice MURPHY, dissenting.

It is not without difficulty that I dissent from a procedure the constitutionality of which has been established for many years. But I am unable to approve the use of non-judicial subpoenas issued by administrative agents.

Administrative law has increased greatly in the past few years and seems destined to be augmented even further in the future. But attending this growth should be a new and broader sense of responsibility on the part of administrative agencies and officials. Excessive use or abuse of authority can not only destroy man's instinct for liberty but will eventually undo the administrative processes themselves. Our history is not without a precedent of a successful revolt against a ruler who 'sent hither swarms of officers to harass our people.'

Perhaps we are too far removed from the experiences of the past to appreciate fully the consequences that may result from an irresponsible though well-meaning use of *219 the subpoena power. To allow a non-judicial officer, unarmed with judicial process, to demand the books and papers of an individual is an open invitation to abuse of that power. It is no answer that the individual may refuse to produce the material demanded. Many persons have yielded solely because of the air of authority with which the demand is made, a demand that cannot be enforced without subsequent judicial aid. Many invasions of private rights thus occur without the restraining hand of the judiciary ever intervening.

Only by confining the subpoena power exclusively to the judiciary can there be any insurance against this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

66 S.Ct. 494
327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531
**(Cite as: 327 U.S. 186, 66 S.Ct. 494)**

corrosion of liberty. Statutory enforcement would not **\*\*511** thereby be made impossible. Indeed, it would be made easier. A people's desire to cooperate with the enforcement of a statute is in direct proportion to the respect for individual rights shown in the enforcement process. Liberty is too priceless to be forfeited through the zeal of an administrative agent.

327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531

**Briefs and Other Related Documents (Back to top)**

• 1945 WL 48493 (Appellate Brief) Brief for Petitioner, Oklahoma Press Publishing Company (Sep. 15, 1945)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

Westlaw.

98 S.Ct. 2380                                                                    Page 1
437 U.S. 340, 98 S.Ct. 2380, 57 L. Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

▷

<u>**Briefs and Other Related Documents**</u>

Supreme Court of the United States
OPPENHEIMER FUND, INC., et al., Petitioners,
v.
Irving SANDERS et al.
**No. 77-335.**

Argued Feb. 28-March 1, 1978.
Decided June 19, 1978.

  Class action was brought against open-end invest-
ment fund, its management corporation and others to
recover amount by which the allegedly artificially in-
flated price plaintiff paid for fund shares exceeded
their value.  The United States District Court for the
Southern District of New York, ruled that cost of
sorting out lists of class members was defendants' re-
sponsibility.  The Court of Appeals, 558 F.2d 636, af-
firmed.  Petition for writ of certiorari was granted.
The Supreme Court, Mr. Justice Powell, held
that: (1) rule empowering district courts to enter ap-
propriate orders in handling of class actions, rather
than discovery rules, was appropriate source of au-
thority for order directing defendants to help compile
a list of class members; (2) it was proper to order de-
fendants to direct their transfer agent to make avail-
able the computer tapes from which class members
could be identified; (3) it was abuse of discretion to
require defendants to bear expense of identifying
class members where plaintiffs could obtain informa-
tion by paying the agent the same amount which de-
fendants had to pay, and (4) neither defend-
ants' opposition to plaintiffs' proposed redefinition of
a class, fact that identification expense was relatively
modest in comparison to fund assets, that records
were kept on computer tapes or that defendants were
alleged to have breached a fiduciary duty to the class
were sufficient reasons to require defendants to bear
such expense.

  Judgment of Court of Appeals reversed and case re-
manded for further proceedings.

West Headnotes

**[1] Federal Courts** ⬤➞574
170Bk574 Most Cited Cases
Order allocating expense of identification of class
members, for purpose of sending individual notice,
was appealable under the collateral order doctrine.
Fed.Rules Civ.Proc. rule 23(c)(2), 28 U.S.C.A.

**[2] Federal Civil Procedure** ⬤➞176
170Ak176 Most Cited Cases
    (Formerly 170Ak161)
Civil rule empowering district courts to enter appro-
priate orders in the handling of class actions, rather
than discovery rules, was the appropriate source of
authority for order directing defendants to help
identify the members of plaintiff class since informa-
tion was sought to facilitate sending of required no-
tice rather than to define or clarify issues. Fed.Rules
Civ.Proc. rules 23(d), 26(b)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure** ⬤➞1272.1
170Ak1272.1 Most Cited Cases
    (Formerly 170Ak1272)
Consistently with the notice-pleading system estab-
lished by Federal Rules of Civil Procedure, discovery
is not limited to issues raised by the pleadings, for
discovery itself is designed to help define and clarify
the issues. Fed.Rules Civ.Proc. rule 26(b)(1), 28
U.S.C.A.

**[4] Federal Civil Procedure** ⬤➞1272.1
170Ak1272.1 Most Cited Cases
    (Formerly 170Ak1272)
Discovery is not limited to the merits of a case, for a
variety of fact-oriented issues may arise during litiga-
tion that are not related to the merits, for example,
where issues arise as to jurisdiction or venue discov-
ery is available to ascertain the facts therein on such
issues and, similarly, discovery may be used to illu-
minate issues on which a district court must pass in
deciding whether a suit should proceed as a class ac-
tion, such as numerosity, common questions and ad-
equacy of representation. Fed.Rules Civ.Proc. rules
23, 26(b)(1), 28 U.S.C.A.

**[5] Federal Civil Procedure** ⬤➞1261
170Ak1261 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                      Page 2
437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

Discovery, like all matters of procedure, has ultimate and necessary boundaries. Fed.Rules Civ.Proc. rule 26(b)(1), 28 U.S.C.A.

**[6] Federal Civil Procedure** ⬅➡1272.1
170Ak1272.1 Most Cited Cases
   (Formerly 170Ak1272)
Discovery of matter not "reasonably calculated to lead to the discovery of admissible evidence" is not within the scope of discovery rule and, thus, it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to the issues. Fed.Rules Civ.Proc. rule 26(b)(1), 28 U.S.C.A.

**[7] Federal Civil Procedure** ⬅➡1261
170Ak1261 Most Cited Cases
In deciding whether a request comes within the discovery rules, a court is not required to blind itself to the purpose for which the party seeks the information. Fed.Rules Civ.Proc. rule 26(b)(1), 28 U.S.C.A.

**[8] Federal Civil Procedure** ⬅➡1269.1
170Ak1269.1 Most Cited Cases
   (Formerly 170Ak1269)
When purpose of a discovery request is to gather information for use in proceedings other than the pending suit discovery properly is denied and, likewise, discovery should be denied when a party's aim is to delay bringing a case to trial, or embarrass or harass the person from whom he seeks discovery. Fed.Rules Civ.Proc. rule 26(b)(1), 28 U.S.C.A.

**[9] Federal Civil Procedure** ⬅➡1275
170Ak1275 Most Cited Cases
Although a representative plaintiff's request that a defendant help compile a list of class members is more properly handled under the class action, rather than discovery rules, it is not the law that class members' names and addresses never can be obtained under the discovery rules since there may be instances where such information could be relevant to class action issues or where a party has reason to believe that communications with some members of the class could yield information bearing on those or other issues. Fed.Rules Civ.Proc. rules 23, 26(b)(1), 28 U.S.C.A.

**[10] Federal Civil Procedure** ⬅➡178
170Ak178 Most Cited Cases
   (Formerly 170Ak161)
Although class action rule states that "the court shall direct" notice to class members, the rules vest power in the district court to order one of the parties to perform the tasks necessary to send notice, including authority, under appropriate circumstances, to require a defendant's cooperation in identifying the class members to whom notice must be sent. Fed.Rules Civ.Proc. rule 23(c)(2), (d), 28 U.S.C.A.

**[11] Federal Civil Procedure** ⬅➡178
170Ak178 Most Cited Cases
   (Formerly 170Ak161)
In regard to issue of which party should perform particular tasks necessary to send class notice the general rule must be that the representative plaintiff should perform such tasks, for it is he who seeks to maintain the suit as a class action and to represent other members of his class and, thus, ordinarily there is no warrant for shifting the cost of the representative plaintiff's performance of such tasks to defendant. Fed.Rules Civ.Proc. rule 23(d), 28 U.S.C.A.

**[12] Federal Civil Procedure** ⬅➡2731
170Ak2731 Most Cited Cases
General principle is that a party must bear the burden of financing his own suit.

**[13] Federal Civil Procedure** ⬅➡178
170Ak178 Most Cited Cases
   (Formerly 170Ak161)
Where a defendant in a class action can perform one of the tasks necessary to send notice with less difficulty or expense than could the representative plaintiff, the district court properly may exercise its discretion to order defendant to perform the task in question; in identifying the instances in which such an order may be appropriate a rough analogy may usefully be drawn to practice under rule authorizing a party responding to an interrogatory to specify and make available for examination those business records from which an answer may be derived. Fed.Rules Civ.Proc. rules 23(d), 33(c), 28 U.S.C.A.

**[14] Federal Civil Procedure** ⬅➡1262.1
170Ak1262.1 Most Cited Cases

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

(Formerly 170Ak1262)

Discovery rules contemplate that discovery will proceed without judicial intervention unless a party moves for a protective order or an order compelling discovery. Fed.Rules Civ.Proc. rules 26(b)(1), (c), 37(a), 28 U.S.C.A.

**[15] Federal Civil Procedure ⟪═══176**
170Ak176 Most Cited Cases
(Formerly 170Ak161)

Where a representative plaintiff can derive names and addresses of class members from a defendant's records with substantially the same effort as could defendant it is proper to require the plaintiff to perform such tasks but, where the burden of deriving the answer is not substantially the same and the tasks may be performed more efficiently by defendant, the district court has discretion whether to order defendant to perform such tasks. Fed.Rules Civ.Proc. rule 23(d), 28 U.S.C.A.

**[16] Federal Civil Procedure ⟪═══2731**
170Ak2731 Most Cited Cases

A party ordinarily must bear the expense of complying with orders properly issued by the district court.

**[17] Federal Civil Procedure ⟪═══2731**
170Ak2731 Most Cited Cases

Where district court decides that a defendant rather than a representative plaintiff should perform a task necessary to send class notice, the court must exercise its discretion in deciding whether to leave the cost of complying with its order where it falls, on the defendant, or place it on the party that benefits, i. e., plaintiff; in exercising such discretion, a rough analogy may usefully be drawn to the practice under the discovery rules. Fed.Rules Civ.Proc. rules 23(d), 26(c), 28 U.S.C.A.

**[18] Federal Civil Procedure ⟪═══2736**
170Ak2736 Most Cited Cases

Under the discovery rules, the presumption is that the responding party must bear the expense of complying with discovery request, although he may invoke the District Court's discretion to grant orders protecting him from undue burden or expense, including orders conditioning discovery on the requesting party's payment of the costs of discovery. Fed.Rules Civ.Proc. rule 26(c), 28 U.S.C.A.

**[19] Federal Civil Procedure ⟪═══2731**
170Ak2731 Most Cited Cases

Although burden of performing a task necessary to send class notice as well as shouldering expense thereof may be placed on a defendant rather than a representative plaintiff, a district court should be considerably more ready to place the cost of defendant's performing an ordered task on the representative plaintiff and, in the usual case, the test should be whether the expense is substantial rather than whether it is undue. Fed.Rules Civ.Proc. rules 23(d), 26(c), 28 U.S.C.A.

**[20] Federal Civil Procedure ⟪═══2731**
170Ak2731 Most Cited Cases

In some instances, the expense involved by a defendant in performing a task necessary to send class notice may be so insubstantial as not to warrant the effort required to calculate it and shift it to the representative plaintiff and, in other cases, it may be appropriate to leave the cost where it falls because the task ordered is one that the defendant must perform in any event in the ordinary course of business. Fed.Rules Civ.Proc. rule 23(d), 28 U.S.C.A.

**[21] Federal Civil Procedure ⟪═══2731**
170Ak2731 Most Cited Cases

In placing on a defendant the cost of performing a task necessary to send class notice, district courts must not stray too far from the principle that the representative plaintiff should bear all costs relating to the sending of notice because it is he who seeks to maintain the suit as a class action. Fed.Rules Civ.Proc. rule 23(d), 28 U.S.C.A.

**[22] Federal Civil Procedure ⟪═══1588**
170Ak1588 Most Cited Cases

**[22] Federal Civil Procedure ⟪═══2731**
170Ak2731 Most Cited Cases

Since membership in class sought to be represented in securities fraud suit could be identified only by reference to records in possession of defendants' transfer agent, it was not abuse of discretion to order defendants to direct the agent to make the records available to plaintiffs; however, it was abuse of discretion to require defendants to bear expense of identifying class members since plaintiffs could obtain the in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

98 S.Ct. 2380                                                                                           Page 4

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

formation by paying the transfer agent the same amount which defendants would have to pay, such information was required to comply with plaintiffs' obligations to provide notice and no special circumstances were shown to warrant requiring defendants to bear the

expense. Fed.Rules Civ.Proc. rules 23(b)(3), (c)(2), (d), 26-37, 28 U.S.C.A.; Investment Company Act of 1940, § 1 et seq., 15 U.S.C.A. § 80a-1 et seq.; Securities Act of 1933, §§ 1 et seq., 4, 5, 15 U.S.C.A. §§ 77a et seq., 77d, 77e; Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

**[23] Federal Civil Procedure ☞177.1**
170Ak177.1 Most Cited Cases
     (Formerly 170Ak177, 170Ak161)
A district court necessarily has some discretion in deciding the composition of a proper class and how notice should be sent and, likewise, it is not improper for the court to consider the potential impact that rulings on such issues may have on the expense that the representative plaintiff must bear in order to send the notice. Fed.Rules Civ.Proc. rule 23(b)(3), (c)(2), 28 U.S.C.A.

**[24] Federal Civil Procedure ☞2731**
170Ak2731 Most Cited Cases
Defendant's opposition to representative plaintiffs' proposed redefinition of class and to method of sending required notice was an insufficient reason for requiring defendants to bear expense of identifying class members. Fed.Rules Civ.Proc. rule 23(b)(3), (c)(2), 28 U.S.C.A.

**[25] Federal Civil Procedure ☞2736**
170Ak2736 Most Cited Cases
Fact that cost of obtaining names and addresses of class members, i.e., $16,000 was a relatively modest sum in comparison to assets of investment fund, i.e., in excess of $500 million, was not a sufficient reason for requiring defendants, who included the fund and who were ordered to direct their transfer agent to make the records available, to bear such expense since although in some circumstances the ability of a party to bear a burden may be a consideration, the test is normally whether the cost is substantial, not whether it is "modest" in relation to ability to pay. Fed.Rules Civ.Proc. rule 23(b)(3), (c)(2), 28

**[26] Federal Civil Procedure ☞2736**
170Ak2736 Most Cited Cases
Fact that part of records necessary to identify class members was kept on computer tapes did not justify imposing on defendants, who had right to control the tapes and who were ordered to make them available to plaintiffs, the resulting identification expense, especially absent an indication or contention that defendants acted in bad faith to conceal information; also, a defendant is not to be penalized for not maintaining his records in the form most convenient to some potential future litigants whose identity and perceived needs could not have been anticipated. Fed.Rules Civ.Proc. rule 23(b)(3), (c)(2), 28 U.S.C.A.

**[27] Federal Civil Procedure ☞2736**
170Ak2736 Most Cited Cases
Defendants, who were ordered to make certain records available to representative plaintiff for purpose of identifying class members, could not be held to bear the identification expense simply because they were alleged to have breached a fiduciary duty to the class, since a bare allegation of wrongdoing, whether by breach of fiduciary duty or otherwise, is not a fair reason for requiring a defendant to undertake financial burdens and risks to further a plaintiff's case and, likewise, it is not in the interests of a class of persons to whom a fiduciary duty is owed to require them, through the fiduciary, to help finance every suit by one of their number alleging a breach of fiduciary duty, without regard to whether the suit has merit. Fed.Rules Civ.Proc. rule 23(b)(3), (c)(2), 28 U.S.C.A.

**\*\*2383 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

\*340 Respondents brought a class action under Fed.Rule Civ.Proc. 23(b)(3) on behalf of themselves and a class of purchasers against petitioners (including an open-end investment fund, its management corporation, and a brokerage firm), seeking to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
(Cite as: 437 U.S. 340, 98 S.Ct. 2380)

Page 5

recover the amount by which the allegedly artificially inflated price respondents paid for fund shares exceeded their value. Respondents sought to require petitioners to help compile a list of the names and addresses of the members of the plaintiff class from records kept by the fund's transfer agent so that the individual notice required by Rule 23(c)(2) could be sent. The class proposed by respondents numbered about 121,000 persons, of whom about 103,000 still **2384 held shares, and, since 171,000 persons currently held shares, approximately 68,000 were not members of the class. To compile a list of the class members' names and addresses, the transfer agent's employees would have had to sort manually through many records, keypunch 150,000 to 300,000 computer cards, and create several new computer programs, all for an estimated cost of over $16,000. Respondents' proposed redefinition of the plaintiff class, opposed by petitioners, to include only those persons who bought fund shares during a specified period and who still held shares was rejected by the District Court as involving an arbitrary reduction in the class, but the court held that the cost of sorting out the list of class members was the petitioners' responsibility, while also rejecting respondents' proposal, opposed by petitioners, that the class notice be included in a regular fund mailing, because it would reach the 68,000 shareholders who were not class members. On petitioners' appeal, the Court of Appeals affirmed, holding that the federal discovery rules authorized the District Court to order petitioners to assist in compiling the class list and to bear the $16,000 expense incident thereto. *Held:*

1. Federal Rule Civ.Proc. 23(d), which empowers district courts to enter appropriate orders in the handling of class actions, not the discovery rules, is the appropriate source of authority for the District Court's order directing petitioners to help compile the list of class members. The information as to such members is sought to facilitate the sending of notice rather than to define or clarify issues in the case, *341 as is the function of the discovery rules, and thus cannot be forced into the concept of relevancy reflected in Fed.Rule Civ.Proc. 26(b)(1), which permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending ac-

tion." Pp. 2389-2392.

2. Where a defendant in a class action can perform one of the tasks necessary to send notice, such as identification, more efficiently than the representative plaintiff, the district court has discretion to order him to perform the task under Rule 23(d), and also has some discretion in allocating the cost of complying with such an order, although as a general rule the representative plaintiff should bear all costs relating to the sending of notice because it is he who seeks to maintain the suit as a class action. See *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732. Pp. 2392-2394.

3. Here, however, the District Court abuse its discretion in requiring petitioners to bear the expense of identifying class members and in not requiring respondents to pay the transfer agent, where respondents can obtain the information sought by paying the transfer agent the same amount that petitioners would have to pay, the information must be obtained to comply with respondents' obligation to provide notice to their class, and no special circumstances have been shown to warrant requiring petitioners to bear the expense. Pp. 2394-2396.

(a) Petitioners' opposition to respondents' proposed redefinition of the class and to the method of sending notice is an insufficient reason for requiring petitioners to pay the transfer agent, because it is neither fair nor good policy to penalize a defendant for prevailing on an argument against a representative plaintiff's proposals. Pp. 2394-2395.

(b) Nor is the fact that $16,000 is a "relatively modest" sum in comparison to the fund's assets a sufficient reason for requiring petitioners to bear the expenses, since the proper test is normally whether the cost is substantial, not whether it is "modest" in relation to ability to pay. Pp. 2394-2395.

(c) The District Court's order cannot be justified on the ground that part of the records in question were kept on computer tapes rather than in less modern forms. P. 2395.

(d) And petitioners should not be required to bear the identification expense simply because they are al-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                                     Page 6
437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
(Cite as: 437 U.S. 340, 98 S.Ct. 2380)

leged to have breached a fiduciary duty to respondents **2385 and their class, since a bare allegation of wrongdoing, whether by breach of fiduciary duty or otherwise, is not a fair reason for requiring a defendant to undertake financial burdens and risks to further a plaintiff's case. Pp. 2395-2396.

558 F.2d 636, reversed and remanded.

*342 Donald N. Ruby, New York City, for respondents.

Alfred Berman, New York City, for petitioners; Norman L. Greene, Gerald Gordon, John F. Davidson, and Daniel E. Kirsch, New York City, on the briefs.

Mr. Justice POWELL delivered the opinion of the Court.

Respondents are the representative plaintiffs in a class action brought under Fed.Rule Civ.Proc. 23(b)(3). They sought to require petitioners, the defendants below, to help compile a list of the names and addresses of the members of the plaintiff class from records kept by the transfer agent for one of petitioners so that the individual notice required by Rule 23(c)(2) could be sent. The Court of Appeals for the Second Circuit held that the federal discovery rules, Fed.Rules Civ.Proc. 26-37, authorize the District Court to order petitioners to assist in compiling the list and to bear the $16,000 expense incident thereto. We hold that Rule 23(d), which concerns the conduct of class actions, not the discovery rules, empowers the District Court to direct petitioners to help compile such a list. We further hold that, although the District Court has some discretion in allocating the cost of complying with such an order, that discretion was abused in this case. We therefore reverse and remand.

I

Petitioner Oppenheimer Fund, Inc. (Fund), is an open-end diversified investment fund registered under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (1976 ed.). The Fund and its agents sell shares to the public at their net asset value plus a sales charge. Petitioner Oppenheimer Management Corp. (Management Corp.) manages the Fund's investment portfolio. Pursuant to an investment advis-

ory *343 agreement, the Fund pays Management Corp. a fee which is computed in part as a percentage of the Fund's net asset value. Petitioner Oppenheimer & Co. is a brokerage firm that owns 82% of the stock of Management Corp., including all of its voting stock. The individual petitioners are directors or officers of the Fund or Management Corp., or partners in Oppenheimer & Co.

Respondents bought shares in the Fund at various times in 1968 and 1969. On March 26, May 12, and June 18, 1969, they filed three separate complaints, later consolidated, which alleged that the petitioners, other than the Fund, had violated federal securities laws in 1968 and 1969 by issuing or causing to be issued misleading prospectuses and annual reports about the Fund. [FN1] In particular, respondents alleged that the prospectuses and reports failed to disclose the fact that the Fund invested in "restricted" securities, [FN2] the risks involved in such investments, and the method used to value the restricted securities on the Fund's books. They also alleged that the restricted securities had been overvalued on the Fund's books, causing the Fund's net asset **2386 value, and thus the price of shares in the Fund, to be inflated artificially. On behalf of themselves and a class of purchasers, respondents sought to recover from petitioners, other than the Fund, the amount by *344 which the price they paid for Fund shares exceeded the shares' value. [FN3]

FN1. The complaints alleged violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq. (1976 ed.), the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (1976 ed.), the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (1976 ed.), and rules promulgated under these Acts. They also alleged pendent state-law claims of fraud and breach of fiduciary duty.

FN2. "Restricted" securities are "securities acquired directly or indirectly from the issuer thereof, or from an affiliate of such issuer, in a transaction or chain of transactions not involving any public offering . . . ." 17 CFR § 230.144(a)(3) (1977). The public sale or distribution of such securities is re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                                    Page 7
437 U.S. 340, 98 S.Ct. 2380, 57 L. Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
(Cite as: 437 U.S. 340, 98 S.Ct. 2380)

stricted under the Securities Act of 1933 until the securities are registered or an exemption from registration becomes available. See 15 U.S.C. §§ 77d, 77e (1976 ed.).

FN3. Later in the proceedings respondents' counsel estimated that the average recovery per class member would be about $15, and that the aggregate recovery might be $1 1/2 million.

In a separate count of their complaints, respondents also sought derivative relief on behalf of the Fund to recover excessive management fees paid by the Fund to Management Corp. as a result of the Fund's allegedly inflated net asset value.

In April 1973, respondents moved pursuant to Fed.Rule Civ.Proc. 23(b)(3) for an order allowing them to represent a class of plaintiffs consisting of all persons who bought shares in the Fund between March 28, 1968, and April 24, 1970. [FN4] Relying on *Eisen v. Carlisle & Jacquelin*, 54 F.R.D. 565 (S.D.N.Y.1972), respondents also sought an order directing petitioners to pay for the notice to absent class members required by Fed.Rule Civ.Proc. 23(c)(2). On May 1, 1973, however, the Court of Appeals for the Second Circuit held that the District Court in *Eisen* erred in ordering the defendants to pay 90% of the cost of notifying members of a Rule 23(b)(3) plaintiff class. *Eisen v. Carlisle & Jacquelin (Eisen III)*, 479 F.2d 1005. Respondents thereupon deposed employees of the Fund's transfer agent, which kept records from which the class members' names and addresses could be derived, in order to develop information relevant to issues of manageability, identification, and methods of notice upon which the District Court would have to pass. These employees' statements, together with information supplied by the Fund, established that the class proposed by respondents numbered about *345 121,000 persons. About 103,000 still held shares in the Fund, while some 18,000 had sold their shares after the end of the class period. Since about 171,000 persons currently held shares in the Fund, it appeared that approximately 68,000 current Fund shareholders were not members of the class.

FN4. Petitioners denied the material allegations of the complaints. In addition, they alleged a setoff against respondents and their class to the extent that the price paid by the Fund to redeem shares had exceeded their value. The non-Fund petitioners also alleged that if they were liable to respondents and their class for overvaluation of Fund shares, then the Fund would be liable to them for excess amounts received by the Fund as a result of the overvaluation.

The transfer agent's employees also testified that in order to compile a list of the class members' names and addresses, they would have to sort manually through a considerable volume of paper records, keypunch between 150,000 and 300,000 computer cards, and create eight new computer programs for use with records kept on computer tapes that either are in existence or would have to be created from the paper records. See App. 163-212. The cost of these operations was estimated in 1973 to exceed $16,000.

Having learned all this, and in the face of *Eisen III*, respondents moved to redefine the class to include only those persons who had bought Fund shares between March 28, 1968, and April 24, 1970, *and* who still held shares in the Fund. Respondents also proposed that the class notice be inserted in one of the Fund's periodic mailings to its current shareholders, and they offered to pay the cost of printing and inserting the notices, which was about $5,000. App. 146. These proposals would have made it unnecessary to compile a separate list of the members of the redefined class in order to notify them. Petitioners opposed redefinition of the class on the ground that it arbitrarily would exclude about 18,000 former Fund shareholders who had bought shares during the relevant period, possibly to their prejudice. They also opposed including the class notice in a Fund mailing which would reach the 68,000 current shareholders who were not class members. This, **2387 petitioners feared, could set off a wave of selling to the detriment of the Fund. [FN5]

FN5. Petitioners submitted the sworn affidavit of Robert Galli, Secretary of the Fund and Administrative Vice President and Sec-

98 S.Ct. 2380                                                                                          Page 8
437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

retary of Management Corp., which stated that this was a real possibility in light of "the current loss of investor confidence in the stock market and the uncertain conditions under which that market exists at this time." App. 130-131.

**\*346**  On May 15, 1975, more than six years after the litigation began, the District Court ruled on the motions then pending. *Sanders v. Levy,* 20 Fed Rules Serv.2d 1218 (SDNY 1975). The court first held that the suit met the requirements for class-action treatment under Rule 23(b)(3). *Id.,* at 1220-1221. It then rejected respondents' proposed redefinition of the class because it "would involve an arbitrary reduction in the class." *Id.,* at 1221. [FN6] At the same time, however, the court held that "the cost of culling out the list of class members . . . is the responsibility of defendants." *Ibid.* The only explanation given was that "the expense is relatively modest and it is defendants who are seeking to have the class defined in a manner which appears to require the additional expense." *Ibid.* Finally, the court rejected respondents' proposal that the class notice be included in a regular Fund mailing. Noting that the mailing would reach many current Fund shareholders who were not members of the class, the District Judge said that his "solution to this problem starts with my earlier ruling that it is the responsibility of defendants to cull out from their records a list of all class members and provide this list to plaintiffs. Plaintiffs will then have the responsibility to prepare the necessary notice and mail it at their expense." *Id.,* at 1222. [FN7]

> FN6. The District Court also rejected a proposal by petitioners to set April 25, 1969, as the closing date of the class period, holding that respondents had raised triable claims of misrepresentations after that date. 20 Fed.Rules Serv.2d, at 1221-1222.

> FN7. The court subsequently modified this order to allow the notice to class members who still were Fund shareholders to be inserted in the envelopes of a periodic Fund mailing, "provided that the notices are sent only to class members and that plaintiffs pay in full the Fund's extra costs of mailing, in-

cluding the costs of segregating the envelopes going to the class members from the envelopes going to other Fund shareholders." At the same time, the court held that the Fund should bear the identification costs in the first instance, "without prejudice to the right of this defendant, at the conclusion of the action, to make whatever claim it would be legally entitled to make regarding reimbursement by another party." The court denied the Fund's request that respondents be required to post bond for the identification costs.

**\*347** [1] On petitioners' appeal, a divided panel of the Court of Appeals reversed the District Court's order insofar as it required petitioners to bear the cost required for the transfer agent to compile a list of the class members' names and addresses. *Sanders v. Levy,* 558 F.2d 636 (C.A.2 1976). [FN8] The majority thought that *Eisen IV,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), which had affirmed *Eisen III* in pertinent part, required respondents to pay this cost because the identification of class members is an integral step in the process of notifying them. 558 F.2d, at 642. [FN9] On rehearing en **\*\*2388** banc, however, the Court of Appeals reversed the panel's decision and affirmed the District Court's order by a vote of seven to three. *Id.,* at 646. [FN10] It thought that *Eisen IV* did not control this case because respondents might obtain the class members' names and addresses under the **\*348** federal discovery rules, Fed.Rules Civ.Proc. 26-37. The en banc court further held that although Rule 26(c) protects parties from "undue burden or expense" in complying with discovery requests, the District Court did not abuse its discretion under that Rule in requiring petitioners to bear this expense. 558 F.2d, at 649-650.

> FN8. All three members of the panel agreed that the order allocating the expense of identification was appealable under the collateral-order doctrine of *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). 558 F.2d, at 638-639; *id.,* at 643 (Hays, J., dissenting in part). We agree. See *Eisen v. Carlisle & Jacquelin (Eisen IV),* 417 U.S. 156, 171-172, 94 S.Ct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2140, 2149-2150, 40 L.Ed.2d 732 (1974). The panel also unanimously affirmed the District Court's ruling that the suit could proceed as a class action. 558 F.2d at 642-643; id., at 643 (Hays, J., dissenting in part). This issue is not before us.

FN9. The panel majority also suggested that the Fund should not be required to bear this expense because it, unlike the other petitioners, was not named as a defendant in the class-action portion of this suit. See id., at 640. The Fund itself, which is in the position of a defendant because it ultimately may be liable for any damages that respondents and their class recover, see n. 4, supra, does not argue in this Court that it should not bear the expense because it is not a formal defendant. We therefore do not rely on any distinction that might be drawn between the Fund and the other petitioners in this respect.

FN10. District Judge Palmieri, the author of the panel majority opinion, did not participate in the rehearing en banc.

By holding that the discovery rules apply to this case, the en banc court brought itself into conflict with the Court of Appeals for the Fifth Circuit, which recently had held:

"The time and expense of gathering [class members'] names and addresses is a necessary predicate to providing each with notice of the action's pendency without which the action may not proceed [citing Eisen IV.] Viewed in this context, it becomes strikingly clear that rather than being controlled by the federal civil discovery rules, identification of absentee class members' names and addresses is part and parcel of rule 23(c)(2)'s mandate that the class members receive 'the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.' " In re Nissan Motor Corp. Antitrust Litigation, 552 F.2d 1088, 1102 (1977).

In the Fifth Circuit's view, Rule 23(d), which empowers district courts to enter appropriate orders in the handling of class actions, is the procedural device by which a district court may enlist the aid of a defendant in identifying class members to whom notice must be sent. The Nissan court found it unnecessary to decide whether Eisen IV requires a representative plaintiff always to bear the cost of identifying class members. Since the representative plaintiffs could perform the required search through the defendants' records as readily as the defendants themselves, and since the search had to be performed in order to advance the representative plaintiffs' case, they were required to perform it and thus to bear its cost. See 552 F.2d, at 1102-1103.

*349 We granted certiorari in the instant case to resolve the conflict that thus has arisen and to consider the underlying cost-allocation problems. 434 U.S. 919, 98 S.Ct. 391, 54 L.Ed.2d 275 (1977).

II

The issues in this case arise because of the notice requirement of Fed.Rule Civ.Proc. 23(c)(2), which provides in part:

"In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

In Eisen IV, the Court held that the plain language of this Rule "requires that individual notice be sent to all class members who can be identified with reasonable effort." 417 U.S., at 177, 94 S.Ct., at 2152. The Court also found no authority for a district court to hold a preliminary hearing on the merits of a suit in order to decide which party should bear the cost required to prepare and mail the class notice. Id., at 177-178, 94 S.Ct., at 2152. Instead, it held:

"In the absence of any support under Rule 23, [the representative plaintiff's] effort to impose the cost of notice on [defendants] must fail. The usual rule is that a plaintiff must initially bear the cost of notice to the class. . . . Where, as here, the relationship between the parties is truly adversary, the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit." Id., at 178-179, 94 S.Ct., at 2153.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                                                          Page 10

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
(Cite as: 437 U.S. 340, 98 S.Ct. 2380)

**\*\*2389** In *Eisen IV,* the defendants had offered to provide a list of many of the class members' names and addresses at their own expense in the first instance, if the representative plaintiff would prepare and mail individual notice to these class members. [FN11] *Eisen IV* therefore did not present issues concerning \*350 either the procedure by which a representative plaintiff might require a defendant to help identify class members, or whether costs may be allocated to the defendant in such a case. The specific holding of *Eisen IV* is that where a representative plaintiff prepares and mails the class notice himself, he must bear the cost of doing so.

> FN11. See App. in *Eisen v. Carlisle & Jacquelin,* O.T.1973, No. 73-203, pp. 184-185.

The parties in the instant case center much of their argument on the questions whether the discovery rules authorize a district court to order a defendant to help identify the members of a plaintiff class so that individual notice can be sent and, if so, which rule applies in this case. For the reasons stated in Part A below, we hold that Rule 23(d), not the discovery rules, is the appropriate source of authority for such an order. This conclusion, however, is not dispositive of the cost-allocation question. As we explain in Part B, we think that where a defendant can perform one of the tasks necessary to send notice, such as identification, more efficiently than the representative plaintiff, the district court has discretion to order him to perform the task under Rule 23(d). In such cases, the district court also has some discretion in allocating the cost of complying with its order. In Part C, however, we conclude that the district court abused its discretion in this case.

A

[2][3][4] Although respondents' request resembles discovery in that it seeks to obtain information, we are convinced that it more properly is handled under Rule 23(d). The critical point is that the information is sought to facilitate the sending of notice rather than to define or clarify issues in the case.

The general scope of discovery is defined by Fed.Rule Civ.Proc. 26(b)(1) as follows:

> "Parties may obtain discovery regarding any

matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the \*351 claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

The key phrase in this definition--"relevant to the subject matter involved in the pending action"--has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. See *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947) [FN12] Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. *Id.,* at 500-501, 67 S.Ct. at 388. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits. [FN13]

> FN12. "[T]he court should and ordinarily does interpret 'relevant' very broadly to mean matter that is relevant to anything that is or may become an issue in the litigation." 4 J. Moore, Federal Practice ¶ 26.56 [1], p. 26-131 n. 34 (2d ed. 1976).

> FN13. For example, where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues. See *Id* , ¶ 26.56[6]; Note, The Use of Discovery to Obtain Jurisdictional Facts, 59 Va.L.Rev. 533 (1973). Similarly, discovery often has been used to illuminate issues upon which a district court must pass in deciding whether a suit should proceed as a class action under Rule 23, such as numerosity, common questions, and adequacy of rep-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

resentation. See Annot., Discovery for Purposes of Determining Whether Class Action Requirements Under Rule 23(a) and (b) of Federal Rules of Civil Procedure Are Satisfied, 24 A.L.R.Fed. 872 (1975).

[5][6] At the same time, "discovery, like all matters of procedure, has ultimate and necessary boundaries." **2390Id., at 507, 67 S.Ct., at 392. Discovery *352 of matter not "reasonably calculated to lead to the discovery of admissible evidence" is not within the scope of Rule 26(b)(1). Thus, it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, [FN14] or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case. [FN15] For the same reason, an amendment to Rule 26(b) was required to bring within the scope of discovery the existence and contents of insurance agreements under which an insurer may be liable to satisfy a judgment against a defendant, for that information ordinarily cannot be considered, and would not lead to information that could be considered, by a court or jury in deciding any issues. [FN16]

> FN14. See, e. g., United States v. 416.81 Acres of Land, 514 F.2d 627, 632 (C.A.7 1975); Bourget v. Government Employees Ins. Co., 313 F.Supp. 367, 372-373 (Conn.1970), reversed on other grounds, 456 F.2d 282 (C.A.2 1972).

> FN15. See 4 J. Moore, Federal Practice ¶ 26.56[1], pp. 26-126 to 26-128 (2d ed. 1976), and cases there cited.

> FN16. Before Rule 26(b)(2) was added in 1970, many courts held that such agreements were not within the scope of discovery, although other courts, swayed by the fact that revelation of such agreement tends to encourage settlements, held otherwise. See Advisory Committee's Notes on 1970 Amendment to Fed.Rule Civ.Proc. 26, 28 U.S.C. App., p. 7777; 4 J. Moore, Federal Practice ¶ 26.62[1] (2d ed. 1976). The Advisory Committee appears to have viewed

this amendment as changing rather than clarifying the Rules, for it stated: "[T]he provision makes no change in existing law on discovery of indemnity agreements other than insurance agreements by persons carrying on an insurance business." 28 U.S.C. App., p. 7778 (emphasis supplied).

[7][8] Respondents' attempt to obtain the class members' names and addresses cannot be forced into the concept of "relevancy" described above. The difficulty is that respondents do not seek this information for any bearing that it might have on issues in the case. See 558 F.2d, at 653 (en banc dissent). [FN17] *353 If respondents had sought the information because of its relevance to the issues, they would not have been willing, as they were, to abandon their request if the District Court would accept their proposed redefinition of the class and method of sending notice. Respondents argued to the District Court that they desired this information to enable them to send the class notice, and not for any other purpose. Taking them at their word, it would appear that respondents' request is not within the scope of Rule 26(b)(1). [FN18]

> FN17. This difficulty may explain why the District Court, after calling for briefs on the question whether the discovery rules applied, see Brief for Respondents 10 n. 4, did not expressly rely on those rules. See also Note, Allocation of Identification Costs in Class Actions: Sanders v. Levy, 91 Harv.L.Rev. 703, 708-709 (1978) (distinguishing between "information . . . sought solely to provide adequate notice" and "valid discovery")
> In deciding whether a request comes within the discovery rules, a court is not required to blind itself to the purpose for which a party seeks information. Thus, when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied. See Mississippi Power Co. v. Peabody Coal Co., 69 F.R.D. 558, 565-568 (S.D.Miss.1976); Econo-Car International, Inc. v. Antilles Car Rentals, Inc., 61 F.R.D.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                                    Page 12

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470

**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

8, 10 (V.I. 1973), reversed on other grounds, 499 F.2d 1391 (C.A.3 1974). Likewise, discovery should be denied when a party's aim is to delay bringing a case to trial, or embarrass or harass the person from whom he seeks discovery. See *United States v. Howard*, 360 F.2d 373, 381 (C.A.3 1966); *Balistrieri v. Holtzman*, 52 F.R.D. 23, 24-25 (E.D.Wis.1971). See also n. 20, *infra*.

FN18. Respondents contend that they should be able to obtain the class members' names and addresses under the discovery rules because it is "well settled that [a] plaintiff is entitled to conduct discovery with respect to a broad range of matters which pertain to the maintenance of a class action under Rule 23." Brief for Respondents 25 n. 17; see n. 13, *supra*. The difference between the cases relied on by respondents and this case is that respondents do not seek information because it may bear on some issue which the District Court must decide, but only for the purpose of sending notice.

[9] The en banc majority avoided holding that the class members' names and addresses **2391 are "relevant to the subject matter involved in the pending action" within the meaning of Rule 26(b)(1) simply because respondents need this information in *354 order to send the class notice. Tacitly acknowledging that discovery must be aimed at illuminating issues in the case, the court instead hypothesized that there is "a potential issue in all [Rule 23(b)(3) class-action] litigation whether the required notice has properly been sent. A list of the names and addresses of the class members would of course be essential to the resolution of that issue." 558 F.2d, at 648. But aside from the fact that respondents themselves never pretended to be anticipating this "potential issue," it is apparent that the "potential issue" cannot arise until respondents already have obtained the very information they seek. [FN19] Nor do we perceive any other "potential issues" that could bring respondents' request within the scope of legitimate discovery. In short, we do not think that the discovery rules are the right tool for this job. [FN20]

FN19. Until respondents obtain the information and send the class notice, no issue can arise as to whether it was sent "properly."

FN20. We do not hold that class members' names and addresses never can be obtained under the discovery rules. There may be instances where this information could be relevant to issues that arise under Rule 23, see n. 13, *supra*, or where a party has reason to believe that communication with some members of the class could yield information bearing on these or other issues. Respondents make no such claims of relevance, however, and none is apparent here. Moreover, it may be doubted whether any of these purposes would require compilation of the names and addresses of *all* members of a large class. See *Berland v. Mack*, 48 F.R.D. 121, 126 (S.D.N.Y.1969). There is a distinction in principle between requests for identification of class members that are made to enable a party to send notice and requests that are made for true discovery purposes. See n. 17, *supra*.

[10] Rule 23, on the other hand, deals comprehensively with class actions, and thus is the natural place to look for authority for orders regulating the sending of notice. It is clear that Rule 23(d) vests power in the district court to order one of the parties to perform the tasks necessary to send notice. [FN21] *355 Moreover, district courts sometimes have found it appropriate to order a defendant, rather than a representative plaintiff, to perform tasks other than identification that are necessary to the sending of notice. [FN22] Since identification simply is another task that must be performed in order to send notice, we agree with the Court of Appeals for the Fifth Circuit that Rule 23(d) also authorizes a **2392 district court in appropriate circumstances to require a defendant's cooperation in identifying the class members to whom notice must be sent. [FN23] We therefore turn to a consideration of the circumstances in which *356 such an order is appropriate and of how the cost of the defendant's complying with such an order should be allocated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                          Page 13

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470

**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

FN21. Although Rule 23(c)(2) states that "the court shall direct" notice to class members, it commonly is agreed that the court should order one of the parties to perform the necessary tasks. See Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 44 (1968); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 398 n. 157 (1967). Rule 23(d) provides that in the conduct of a class action, "the court may make appropriate orders: . . . (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct . . .; [and] (5) dealing with similar procedural matters."
The Advisory Committee apparently contemplated that the court would make orders drawing on the authority of either Rule 23(d)(2) or 23(d)(5) in order to provide the notice required by Rule 23(c)(2), for its note to Rule 23(d)(2) states THAT "UNDER SUBDIVISION (C)(2), NOTICE MUST *BE ORDERED* . . . ." adviSory Committee's Notes to Fed.Rule Civ.Proc. 23, 28 U.S.C. App., p. 7768 (emphasis supplied).

FN22. Thus, a number of courts have required defendants in Rule 23(b)(3) class actions to enclose class notices in their own periodic mailings to class members in order to reduce the expense of sending the notice, as respondents asked the District Court in this case to do. See, e. g., Ste. Marie v. Eastern R. Assn., 72 F.R.D. 443, 450 n. 2 (S.D.N.Y.1976); Gates v. Dalton, 67 F.R.D. 621, 633 (E.D.N.Y.1975); Popkin v. Wheelabrator-Frye. Inc., 20 Fed.Rules Serv.2d 125, 130 (E.D.N.Y.1975). See also Eisen IV, 417 U.S., at 180 n. 1, 94 S.Ct., at 2154 n. 1 (Douglas, J., dissenting in part).

FN23. Our conclusion that Rule 23(d), not the discovery rules, is the appropriate source of authority is supported by the fact that, although a number of courts have ordered defendants to help identify class members in the course of ordering notice, few have relied on the discovery rules. See In re Nissan Motor Corp. Antitrust Litigation, 552 F.2d 1088, 1101- 1102 (CA5 1977) (collecting cases).

**B**

Although the Fifth Circuit held that Rule 23(d), not the discovery rules, authorizes a district court to order a defendant to provide information needed to identify class members to whom notice must be sent, it also suggested that principles embodied in the discovery rules for allocating the performance of tasks and payment of costs might be relevant to a district court's exercise of discretion under Rule 23(d). See Nissan, 552 F.2d, at 1102. Petitioners and the en banc dissent, on the other hand, argue that *Eisen IV* always requires a representative plaintiff to pay all costs incident to sending notice, whether he or the defendant performs the required tasks. *Eisen IV* does not compel this latter conclusion, for it did not involve a situation where a defendant properly was ordered under Rule 23(d) to perform any of the tasks necessary to sending the notice.

[11][12] The first question that a district court must consider under Rule 23(d) is which party should perform particular tasks necessary to send the class notice. The general rule must be that the representative plaintiff should perform the tasks, for it is he who seeks to maintain the suit as a class action and to represent other members of his class. In *Eisen IV* we noted the general principle that a party must bear the "burden of financing his own suit," 417 U.S., at 179, 94 S.Ct., at 2153. Thus ordinarily there is no warrant for shifting the cost of the representative plaintiff's performance of these tasks to the defendant.

[13][14][15] In some instances, however, the defendant may be able to perform a necessary task with less difficulty or expense than could the representative plaintiff. In such cases, we think that the district court properly may exercise its discretion under Rule 23(d) to order the defendant to perform the task in question. As the Nissan court recognized, in identifying *357 the instances in which such an order may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                                        Page 14

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470

**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

be appropriate, a rough analogy might usefully be drawn to practice under Rule 33(c) of the discovery rules [FN24] Under that Rule, when one party directs an interrogatory to another party which can be answered by examination of the responding party's business records, "it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to" examine and copy the records, if the burden of deriving the answer would be "substantially the same" for either party. Not unlike *Eisen IV*, this provision is intended to place the "burden of discovery upon its potential benefitee." [FN25] The holding of *Nissan* represents application of a similar principle, for when the court concluded that the representative plaintiffs could derive the names and addresses of the class members from the defendants' records **2393 with substantially the same effort as the defendants, it required the representative plaintiffs to perform this task and hence to bear the cost. See *supra*, at 2388 But where the burden of deriving the answer would not be "substantially the same," and the task could be performed more efficiently by the responding party, the discovery rules normally require the responding party to derive the answer itself. [FN26]

>  FN24. The analogy to the discovery rules is not perfect, for those rules contemplate that discovery will proceed without judicial intervention unless a party moves for a protective order under Rule 26(c) or an order compelling discovery under Rule 37(a) Rule 23, on the other hand, contemplates that the district court routinely must approve the form of the class notice and order how it should be sent and who should perform the necessary tasks
>
>  FN25. Advisory Committee's Notes on 1970 Amendment to Fed.Rule Civ.Proc. 33(c), 28 U.S.C. App., p. 7793, quoting D. Louisell, Modern California Discovery 125 (1963).
>
>  FN26. See *Foster v Boise-Cascade, Inc*, 20 Fed Rules Serv.2d 466, 470 (S.D Tex 1975); *Chrapliwy v Uniroyal, Inc*, 17 Fed.Rules Serv.2d 719, 722 (N.D Ind.1973); Advisory

Committee's Notes, *supra*, at 7793.

**\*358** [16][17][18][19] In those cases where a district court properly decides under Rule 23(d) that a defendant rather than the representative plaintiff should perform a task necessary to send the class notice, the question that then will arise is which party should bear the expense. On one hand, it may be argued that this should be borne by the defendant because a party ordinarily must bear the expense of complying with orders properly issued by the district court; but *Eisen IV* strongly suggests that the representative plaintiff should bear this expense because it is he who seeks to maintain the suit as a class action. In this situation, the district court must exercise its discretion in deciding whether to leave the cost of complying with its order where it falls, on the defendant, or place it on the party that benefits, the representative plaintiff. Once again, a rough analogy might usefully be drawn to practice under the discovery rules. Under those rules, the presumption is that the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from "undue burden or expense" in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery. The analogy necessarily is imperfect, however, because in the Rule 23(d) context, the defendant's own case rarely will be advanced by his having performed the tasks. Cf. n. 30, *infra*. Thus, one of the reasons for declining to shift costs under Rule 26(c) usually will be absent in the Rule 23(d) context. [FN27] For this reason, a district court exercising its discretion under Rule 23(d) should be considerably more ready to place the cost of the defendant's performing an ordered task on the representative plaintiff, who derives the benefit, than under Rule 26(c). In **\*359** the usual case, the test should be whether the expense is substantial, rather than, as under Rule 26(c), whether it is "undue."

>  FN27. Cf., *e g*, *Hodgson v. Adams Drug Co*, 15 Fed Rules Serv.2d 828, 830 (R.I.1971); *Adelman v. Nordberg Mfg. Co.*, 6 F.R.D. 383, 384 (E.D.Wis.1947); 4A J. Moore, Federal Practice 57 33.20, pp. 33-113 to 33-114 (2d ed. 1975).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380
437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470
(Cite as: 437 U.S. 340, 98 S.Ct. 2380)

Page 15

[20][21]  Nevertheless, in some instances, the expense involved may be so insubstantial as not to warrant the effort required to calculate it and shift it to the representative plaintiff.  In *Nissan*, for example, the court did not find it necessary to direct the representative plaintiffs to reimburse the defendants for the expense of producing their files for inspection.  In other cases, it may be appropriate to leave the cost where it falls because the task ordered is one that the defendant must perform in any event in the ordinary course of its business. [FN28]  Although we do not attempt to catalogue the instances in which a district court might be justified in placing the expense on the defendant, we caution that courts must not stray too far from the principle underlying *Eisen IV* that the representative plaintiff should bear all costs relating to the sending of notice because it is he who seeks to maintain the suit as a class action.

> FN28.  Thus, where defendants have been directed to enclose class notices in their own periodic mailings and the additional expense has not been substantial, representative plaintiffs have not been required to reimburse the defendants for envelopes or postage.  See cases cited in n. 22, *supra*.

C

[22]  In this case, we think the District Court abused its discretion in requiring petitioners **2394 to bear the expense of identifying class members.  The records containing the needed information are kept by the transfer agent, not petitioners.  Since petitioners apparently have the right to control these records and since the class members can be identified only by reference to them, the District Court acted within its authority under Rule 23(d) in ordering petitioners to direct the transfer agent to make the records available to respondents.  The preparation of the desired list requires, as indicated above, the manual sorting out of names and addresses from old *360 records maintained on paper, the keypunching of up to 300,000 computer cards, and the creation of new computer programs for use with extant tapes and tapes that would have to be created from the paper records.  It appears that neither petitioners nor respondents can perform these tasks, for both sides assume that the list can be generated only by hiring the services of a

third party, the transfer agent, for a sum exceeding $16,000.  As the expense of hiring the transfer agent would be no greater for respondents, who seek the information, than for petitioners, respondents should bear the expense.  See *Nissan*, 552 F.2d, at 1102-1103. [FN29]

> FN29.  See also Note, Allocation of Identification Costs in Class Actions, 66 Calif.L.Rev. 105, 115 (1978).

[23][24]  The District Court offered two reasons why petitioners should pay the transfer agent, but neither is persuasive.  First, the court thought that petitioners should bear this cost because it was their opposition to respondents' proposed redefinition of the class and method of sending notice that made it necessary to incur the cost.  A district court necessarily has some discretion in deciding the composition of a proper class and how notice should be sent.  Nor is it improper for the court to consider the potential impact that rulings on these issues may have on the expense that the representative plaintiff must bear in order to send the notice.  See *Eisen IV*, 417 U.S., at 179 n. 16, 94 S.Ct., at 2153 n. 16; *id.*, at 179-181, 94 S.Ct., at 2153-2154 (Douglas, J., dissenting in part).  But it is neither fair nor good policy to penalize a defendant for prevailing on an argument against a representative plaintiff's proposals.  If a defendant's argument has merit, it should be accepted regardless of his willingness to bear the extra expense that its acceptance would require.  Otherwise, a defendant may be discouraged from advancing arguments entirely appropriate to the protection of his rights or the rights of absent class members.

The potential for inequity appears to have been realized *361 in this case.  The District Court seems to have agreed with petitioners that respondents' proposed redefinition of the class was improper. [FN30]  Otherwise its actions would be difficult to fathom, for its rejection of the proposed redefinition increased the cost to respondents as well as petitioners. [FN31]  By the same token, if the District Court believed that sending the notice to current Fund shareholders who were not class members might harm the Fund, it should not have required the Fund to buy protection from this threat.  Yet it must have believed that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380

Page 16

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470

**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

Fund would be harmed, for otherwise there was no reason to reject respondents' proposal and thus increase the cost that respondents themselves **\*\*2395** would have to bear. For these reasons, we hold that the District Court erred in linking the questions of class definition and method of notice to the cost-allocation question.

> FN30. The District Court characterized the proposal as "arbitrary," *Sanders v. Levy,* 20 Fed.Rules Serv.2d 1218, 1221 (S.D.N.Y.1975), and stated that it ruled "in favor of" petitioners on this issue, *id.,* at 1222. Although the court also suggested that petitioners opposed the redefinition because it would reduce the res judicata effect of the judgment, *id.* at 1221, petitioners themselves never made this argument. We also note that the representative plaintiff in *Eisen IV* argued, without success, that the defendants should pay part of the cost of notice because of the supposed res judicata benefits to them from class-action treatment. Reply Brief for Petitioner in *Eisen v. Carlisle & Jacquelin,* O.T.1973, No. 73-203, pp. 25-26. We did not think then, nor do we now, that an unwilling defendant should be force to purchase these "benefits."

> FN31. Respondents were required to bear the additional expense at least of envelopes and postage for notice to class members who no longer held shares in the Fund. See n. 7, *supra.*

[25] The second reason advanced by the District Court was that $16,000 is a "relatively modest" sum, presumably in comparison to the Fund's total assets, which exceed $500 million. Although in some circumstances the ability of a party to bear a burden may be a consideration, the test in this respect normally should be whether the cost is substantial; not whether **\*362** it is "modest" in relation to ability to pay. In the context of a lawsuit in which the defendants deny all liability, the imposition on them of a threshold expense of $16,000 to enable the plaintiffs to identify their own class hardly can be viewed as an insubstantial burden. Cf. *Eisen IV, supra,* at 176, 94

S.Ct., at 2151. As the expenditure would benefit only respondents, we think that the amount of money involved here would cut strongly against the District Court's holding, even if the principle of *Nissan* did not control.

[26][27] The panel dissent and the en banc majority suggested several additional reasons to justify the District Court's order, none of which we find persuasive. Both opinions suggested that the fact that part of these records are kept on computer tapes justifies imposing a greater burden on petitioners than might be imposed on a party whose records are kept in another form. Thus, the panel dissent warned that potential defendants may be tempted to use computers "irretrievably [to bury] information to immunize business activity from later scrutiny," 558 F.2d, at 645 n. 1, and the en banc majority argued that even where no bad motive is present, "complex electronic processes may be required to extract information which might have been obtainable through a minimum of effort had different systems been used." *Id., at 649.*

We do not think these reasons justify the order in this case. There is no indication or contention that these petitioners have acted in bad faith to conceal information from respondents. In addition, although it may be expensive to retrieve information stored in computers when no program yet exists for the particular job, there is no reason to think that the same information could be extracted any less expensively if the records were kept in less modern forms. Indeed, one might expect the reverse to be true, for otherwise computers would not have gained such widespread use in the storing and handling of information. Finally, the suggestion that petitioners should have used "different systems" to keep their records **\*363** borders on the frivolous. Apart from the fact that no one has suggested what "different systems" petitioners should have used, we do not think a defendant should be penalized for not maintaining his records in the form most convenient to some potential future litigants whose identity and perceived needs could not have been anticipated. See *id., at 654* (en banc dissent).

Respondents also contend that petitioners should be required to bear the identification expense because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 S.Ct. 2380                                                                                          Page 17

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470

**(Cite as: 437 U.S. 340, 98 S.Ct. 2380)**

they are alleged to have breached a fiduciary duty to respondents and their class. See also *id.*, at 645-646 (panel dissent). Although we had no occasion in *Eisen IV* to consider this argument, see 417 U.S., at 178, and n. 15, 94 S.Ct., at 2152, and n. 15, suggestions to this effect have met with trenchant criticism elsewhere. [FN32] A bare allegation of wrongdoing, whether by breach of fiduciary duty or otherwise, is not a fair reason for requiring a defendant to undertake financial burdens and risks to further a plaintiff's case. Nor would it be in the interests of the class of persons to whom a fiduciary duty is owed to require them, through the fiduciary, to help finance every suit by one of their number that alleges a breach of fiduciary duty, without regard to whether the suit has any merit.

> FN32. See, *e. g., 558 F.2d, at 640-641* (panel majority); *Popkin v. Wheelabrator-Frye, Inc.,* 20 Fed.Rules Serv.2d, at 129-130; *Berland v. Mack,* 48 F.R.D. 121, 131-132 (S.D.N.Y.1969); Note, 23 Kan.L.Rev. 309, 318-319 (1975).

### **2396 III

Given that respondents can obtain the information sought here by paying the transfer agent the same amount that petitioners would have to pay, that the information must be obtained to comply with respondents' obligation to provide notice to their class, and that no special circumstances have been shown to warrant requiring petitioners to bear the expense, *364 we hold that the District Court abused its discretion in not requiring respondents to pay the transfer agent to identify the members of their own class. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253, 25 Fed.R.Serv.2d 541, Fed. Sec. L. Rep. P 96,470

**Briefs and Other Related Documents (Back to top)**

• 1978 WL 207002 (Appellate Brief) Petitioners' Reply Brief (Feb. 24, 1978)

• 1978 WL 207000 (Appellate Brief) Respondents' Brief (Jan. 21, 1978)

• 1977 WL 189860 (Appellate Brief) Petitioners' Brief (Dec. 15, 1977)

• 1977 WL 189859 (Appellate Brief) Reply Brief in Support of Petition for A Writ of Certiorari (Oct. 07, 1977)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.