# EXHIBIT 20

H
Briefs and Other Related Documents
United Phosphorus, Ltd. v. Angus Chemical Co.C.A.7 (Ill.),2003.
United States Court of Appeals,Seventh Circuit.
UNITED PHOSPHORUS, LTD., an Indian corporation; Shroff's United Chemicals, Ltd., an Indian corporation; and J.C. Miller & Associates, Incorporated, an Illinois corporation, Plaintiffs-Appellants,
v.
ANGUS CHEMICAL COMPANY, a Delaware corporation; Angus Chemie GmbH, a German corporation; the Estate of Freeman Hughes through its representative Yvonne Hughes; Ollie W. Chandler; Lowell Pals; Gary W. Granzow; D.B. Gupta; and Lupin Laboratories, Ltd., an Indian corporation, Defendants-Appellees.
**No. 01-1693.**

Argued April 4, 2002.
Reargued En Banc Nov. 6, 2002.
Decided March 10, 2003 FN*.

FN* Chief Judge Flaum and Circuit Judge Williams did not participate in the consideration or decision of this case.

Chemical manufacturers based in India and American firm that was joint venturer of manufacturers sued American chemical company, its officers, and its subsidiaries for alleged antitrust violations. The United States District Court for the Northern District of Illinois, Ian H. Levin, United States Magistrate Judge, 131 F.Supp.2d 1003, granted defendants' motion to dismiss for lack of subject matter jurisdiction under Foreign Trade Antitrust Improvements Act (FTAIA). Plaintiffs appealed. The en banc Court of Appeals, Terence T. Evans, Circuit Judge, held that: (1) as a matter of first impression, FTAIA's limitation of Sherman Act's application to conduct affecting domestic commerce addressed subject matter jurisdiction, and (2) district court's factual findings, which were not clearly erroneous, supported determination that FTAIA applied to preclude subject matter jurisdiction over plaintiffs' antitrust claims.

Affirmed.

Diane P. Wood, Circuit Judge, dissented and filed a separate opinion in which Easterbrook, Manion, and Ilana Diamond Rovner, Circuit Judges, joined.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ⚿945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))

To come within scope of Foreign Trade Antitrust Improvements Act (FTAIA), which limits application of Sherman Act, conduct must have "a direct, substantial, and reasonably foreseeable effect" on trade or commerce within the United States, rather than just on foreign commerce. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

**[2] Federal Courts 170B ⚿30**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk30 k. Power and Duty of Court. Most Cited Cases

Subject matter jurisdiction is an issue that should be resolved early, but must be considered at any stage of the litigation.

**[3] Federal Civil Procedure 170A ⚿1832**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1832 k. Matters Considered in General. Most Cited Cases

**Federal Civil Procedure 170A ⚿1835**

170A Federal Civil Procedure
170AXI Dismissal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
If subject matter jurisdiction is not evident on the face of complaint, motion to dismiss is analyzed as any other motion to dismiss, by assuming for purposes of motion that allegations in complaint are true; however, if complaint is formally sufficient, but contention is that there is in fact no subject matter jurisdiction, movant may use affidavits and other material to support motion. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[4] Federal Courts 170B ⚷34**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk29 Objections to Jurisdiction, Determination and Waiver
170Bk34 k. Presumptions and Burden of Proof. Most Cited Cases
The burden of proof on issue raised by motion to dismiss for lack of subject matter jurisdiction is on the party asserting jurisdiction. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⚷1831**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1831 k. Fact Issues. Most Cited Cases
Court deciding motion to dismiss for lack of subject matter jurisdiction is free to weigh the evidence to determine whether jurisdiction has been established. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[6] Federal Courts 170B ⚷870.1**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)5 Questions of Fact, Verdicts and Findings
170Bk870 Particular Issues and Questions
170Bk870.1 k. In General. Most Cited Cases
Factual findings rendered in deciding motion to dismiss for lack of subject matter jurisdiction are reviewed for clear error. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[7] Federal Courts 170B ⚷242.1**

170B Federal Courts
170BIII Federal Question Jurisdiction
170BIII(D) Pleading
170Bk242 Sufficiency of Allegations
170Bk242.1 k. In General. Most Cited Cases
Although frivolous suit alleging violation of federal statute "arises under" federal law, subject matter jurisdiction over it is lacking because the suit is frivolous. 28 U.S.C.A. § 1331.

**[8] Federal Courts 170B ⚷1.1**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk1 Judicial Power of United States; Power of Congress
170Bk1.1 k. In General. Most Cited Cases
Congress has the power to limit the jurisdiction of the federal courts.

**[9] Federal Courts 170B ⚷1.1**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk1 Judicial Power of United States; Power of Congress
170Bk1.1 k. In General. Most Cited Cases

**Federal Courts 170B ⚷5**

170B Federal Courts
170BI Jurisdiction and Powers in General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170BI(A) In General
170Bk3 Jurisdiction in General; Nature and Source
170Bk5 k. Limited Jurisdiction; Dependent on Constitution or Statutes. Most Cited Cases
Every federal court, other than the Supreme Court, derives its jurisdiction from Congress, which, within constitutional bounds, may withhold or restrict jurisdiction.

**[10] Statutes 361 ⚷212.7**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k212 Presumptions to Aid Construction
361k212.7 k. Other Matters. Most Cited Cases
Court must presume that Congress expects statutes to be read to conform with Supreme Court precedent.

**[11] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))
Provision of Foreign Trade Antitrust Improvements Act (FTAIA) limiting Sherman Act's application to conduct with direct, substantial, and reasonably foreseeable effect on domestic commerce addressed court's subject matter jurisdiction over antitrust claims, and was not simply element of claims. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

**[12] Antitrust and Trade Regulation 29T ⚷969**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk969 k. Jurisdiction and Venue. Most Cited Cases
(Formerly 265k28(3))
Factual findings that chemical manufacturers based in India and American firm that was joint venturer of manufacturers would have made few, if any, United States sales of 2-Amino-1 Butanol (AB) were not clearly erroneous, and thus supported determination that, pursuant to Foreign Trade Antitrust Improvements Act (FTAIA), which restricted Sherman Act claims to those based on conduct substantially affecting domestic commerce, subject matter jurisdiction did not exist over antitrust claims asserted by manufacturers and firm against American chemical company and related entities, based on prior litigation in which company sought to enjoin former employee from misappropriating trade secrets regarding manufacture of AB and 1-Nitro-Propane (1-NP), used to make AB. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

*944 Peter M. Katsaros, Baum, Sigman, Auerbach, Pierson & Neuman, Chicago, IL, Frederick S. Rhine (Argued), Gessler Hughes Socol Piers Resnick & Dym, Chicago, IL, for Plaintiffs-Appellants.
Stephen M. Shapiro, T. Mark McLaughlin (Argued), Mayer, Brown, Rowe & Maw, Chicago, IL, Barrie L. Brejcha, Baker & McKenzie, Chicago, IL, for Defendants-Appellees.

Before POSNER, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.
TERENCE T. EVANS, Circuit Judge.
Today, for the first time in this court, we encounter the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a (FTAIA), a 1982 amendment to the Sherman Act, which affects its reach in foreign commerce. The primary issue involves whether the relevant provision of FTAIA is jurisdictional or whether it states an additional element of a Sherman Act claim. This in turn affects how a court deals with it and, in this case, what the outcome will be.

Plaintiffs United Phosphorus and Shroff's United Chemicals are chemical manufacturers based in India. J.C. Miller & Associates is an American firm, which was involved in a joint venture with the Indian plaintiffs. The defendants are Angus Chemical and its officers, Angus Chemie GmbH, and Lupin Laboratories-American companies or subsidiaries of American companies, which we will refer to collectively as Angus. The complaint alleges that Angus attempted to monopolize, did monopolize, and conspired to monopolize the market for certain chemicals, in violation of § 2 of the Sherman Act.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The issue of the court's subject matter jurisdiction was first raised soon after the case was filed in 1994. Angus' Rule 12(b)(1) motion was denied. Then, after considerable discovery (24 depositions and 8,000 pages of exhibits), Angus filed renewed motions to dismiss for lack of subject matter jurisdiction and for summary judgment in 2000. Angus contended that the court lacked subject matter jurisdiction under FTAIA, which, as relevant here, limits application of the Sherman Act ***945** to conduct with a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. After a thorough analysis of the facts, Magistrate Judge Ian H. Levin, sitting by consent, agreed with Angus and granted its motion to dismiss. *United Phosphorus, Ltd. v. Angus Chem. Co.,* 131 F.Supp.2d 1003 (N.D.Ill.2001).

Briefly, to the facts. In their original 1994 complaint, the plaintiffs alleged that India had the "greatest incidence of tuberculosis in the world." That allegation is consistent with a report from the Centers for Disease Control, dated March 22, 2002, which says that every year approximately 2 million people in India develop tuberculosis, accounting for 25 percent of the world's new cases. The parties tell us that "Ethambutol" is a primary pharmaceutical for the treatment of the disease. The chemicals involved in its production are the subject of this lawsuit.

2-Amino-1 Butanol (AB)is the key ingredient of Ethambutol, and 1-Nitro-Propane (1-NP) is the raw material from which AB is made. To make Ethambutol, defendant Lupin uses AB, which it buys from defendant Chemie, currently the world's only manufacturer of AB. Chemie is a German subsidiary, wholly owned by defendant Angus. The AB is manufactured in Germany. Angus manufactures 1-NP at a plant in Louisiana and is the world's only manufacturer of 1-NP.

This lawsuit stems from prior trade-secret litigation involving several of the parties. In the early 1990's, the Indian plaintiffs decided to acquire the technology for making AB and 1-NP. They went to Dr. John Miller (owner of J.C. Miller & Associates), who also had been the vice-president of research and development at Angus and supervised Angus' efforts to improve its AB processes. When Angus learned what was going on, it sued Miller and the Indian entities (who are the plaintiffs here) in an Illinois state court, seeking to enjoin Miller from misappropriating its trade secrets. Two years later, when Angus was faced with a discovery order which would have required it to disclose the details of the technology, Angus voluntarily dismissed the lawsuit.

The defendants in that case then filed this suit. As plaintiffs here, they claim that but for the Illinois action they would have sold AB for profit. They accuse Angus et al. of using anticompetitive means-the lawsuit-to thwart their plans.

[1] As we said, the case was dismissed for lack of subject matter jurisdiction under FTAIA, which amends the Sherman Act, stating:

This Act shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless-

(1) such conduct has a direct, substantial, and reasonably foreseeable effect-

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of this Act other than this section.

If this Act applies to such conduct only because of the operation of paragraph (1)(B), then this Act shall apply to such conduct only for injury to export business in the United States.

What is relevant here is that the conduct must have "a direct, substantial, and reasonably***946** foreseeable effect" on trade or commerce within the United States, rather than just on foreign commerce.

[2][3][4][5][6] If the requirement for a substantial effect on commerce in the United States goes to the court's subject matter jurisdiction, the case is analyzed under Federal Rule of Civil Procedure 12(b)(1), which provides for dismissal of an action for lack of subject matter jurisdiction. Subject matter jurisdiction is, as we know, an issue that should be resolved early but must be considered at any stage of the litigation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

If subject matter jurisdiction is not evident on the face of the complaint, the motion to dismiss pursuant to Rule 12(b)(1) would be analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true. However, as here, if the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction, the movant may use affidavits and other material to support the motion. The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884 (3d Cir.1977). And the court is free to weigh the evidence to determine whether jurisdiction has been established. *Capitol Leasing Co. v. FDIC,* 999 F.2d 188 (7th Cir.1993); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922 (2d Cir.1998); *Carpet Group Int'l v. Oriental Rug Importers Ass'n,* 227 F.3d 62 (3rd Cir.2000). Factual findings rendered during this process are reviewed for clear error. *Rexford Rand Corp. v. Ancel,* 58 F.3d 1215 (7th Cir.1995); *Kruman v. Christie's Int'l PLC,* 284 F.3d 384 (2d Cir.2002).

On the other hand, if the requirement for a substantial effect on U.S. commerce is an element of the claim, then the motion would be properly treated under Rule 56 summary judgment standards. Summary judgment on the merits can be granted if, construing the facts against the moving party, there is no genuine issue of material fact and that party is entitled to judgment as a matter of law. In short, at this stage of the litigation-that is, when the court is considering a motion-the analysis differs if the issue is one of jurisdiction or an issue on the merits. We think it is fair to say that in this case the procedure employed will dictate the result. The appellants have made little effort to demonstrate that the district court's findings of fact are clearly erroneous. They claim, however, that what we have here should be viewed as a motion for summary judgment on the merits. Under the summary judgment standard with the facts construed in their favor, they contend that the defendants' motion should have been denied. The defendants, of course, contend that they should win under either standard, a proposition on which we need pass no judgment.

Over the years, the difficult issue of limiting the extraterritorial reach of the United States laws in international trade and international relations has received a good deal of attention. Despite the fact that, using language borrowed from the Foreign Commerce Clause of the Constitution, the Sherman Act itself prohibits agreements restraining "trade or commerce ... with foreign nations," there has long been concern about overreaching under our antitrust laws. As far back as *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), Justice Holmes said that the almost universal rule is that the "character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." *American Banana* 's strict territorial test was moderated, if not rejected, in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945). Judge Learned Hand was ***947** writing for the Court of Appeals for the Second Circuit, sitting pursuant to 15 U.S.C. § 29, which at the time authorized the designation of a court of appeals as a court of last resort for certain antitrust cases. The issue was whether Congress intended to impose liability for conduct outside the United States and whether the Constitution permitted it to do so. The court recognized that it should not read the words of Congress "without regard to the limitations customarily observed by nations upon the exercise of their powers." At 443. Creating what became known as the "effects test," the court concluded that the Sherman Act must be limited to acts which were "intended to affect [U.S.] imports and did affect them." Rejected was the notion that Congress intended "to punish all whom its courts can catch, for conduct which has no consequences within the United States." At 443. The Supreme Court subsequently approved the effects test. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Then FTAIA was enacted in 1982. There is some debate over the extent to which the Act simply codifies the "general understanding of when American antitrust law should be concerned about restraints abroad ...." *See* 1A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 272 (2d ed.2000). In *Hartford Fire Insurance v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), the Court declined to decide whether FTAIA was a codification of prior

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law, but concluded that an agreement among foreign reinsurers and domestic insurers, under which the foreign reinsurers would refuse to cover certain American domestic insurance policies, met the effects test.

It is in *Hartford,* however, that Justice Scalia, in dissent, sets out the view that FTAIA does not go to subject matter jurisdiction at all. He perceived two distinct questions: whether the district court had jurisdiction, and whether the Sherman Act reaches the extraterritorial conduct alleged. His conclusion was that the district court had subject-matter jurisdiction, simply because the Sherman Act claim was not frivolous and 28 U.S.C. § 1331 gives the district court jurisdiction over cases "arising under" federal statutes. The second question, he said, "has nothing to do with the jurisdiction of the courts. It is a question of substantive law turning on regulatory power over the challenged conduct." At 813, 113 S.Ct. 2891. If the plaintiff were to fail to prevail on this question, the case would be dismissed not for lack of subject matter jurisdiction, but rather on the merits because the plaintiff had failed to state a cause of action. Justice Scalia explained that what is involved is "legislative jurisdiction" or "jurisdiction to prescribe," which refers to the authority of Congress to enact the law in the first place. The Sherman Act, tracking, as it does, the Commerce Clause, is well within legislative jurisdiction. Nevertheless, principles of international comity dictate how a statute will be interpreted: "Though it clearly has constitutional authority to do so, Congress is generally presumed not to have exceeded those customary international-law limits on jurisdiction to prescribe." At 815, 113 S.Ct. 2891.

The majority in *Hartford* carries out the debate with Justice Scalia in footnotes. As to Justice Scalia's contention that what is involved in the case is prescriptive, as opposed to subject-matter jurisdiction, Justice Souter says that the parties "for good reason" do not question prescriptive jurisdiction. He then quotes commentators who say that the Sherman Act is a "prime exampl[e] of the simultaneous exercise of prescriptive jurisdiction and grant of subject matter jurisdiction." At 796 n. 22, 113 S.Ct. 2891. In explaining the role of comity,***948** Justice Souter says that comity comes into play "if at all, only after a court has determined that the acts complained of are subject to Sherman Act jurisdiction." At 797 n. 24, 113 S.Ct. 2891. Principles of international comity did not prevent the exercise of jurisdiction in that case.

One could argue that in *Hartford* it is not entirely clear what the phrase "Sherman Act jurisdiction" means. After all, "Jurisdiction is a word of many, too many, meanings." *United States v. Vanness,* 85 F.3d 661, 663, n. 2 (D.C.Cir.1996), *quoted in* *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But it seems reasonable to conclude, especially in light of the footnotes, that what the *Hartford* Court refers to is the court's subject-matter jurisdiction for Sherman Act claims.

That reading receives some support in domestic Sherman Act cases, which do not implicate FTAIA, but may shed some light by analogy. *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), was a private antitrust action, alleging that real estate brokers in New Orleans engaged in a price-fixing conspiracy. The issue before the Court was whether the Sherman Act extended to such a conspiracy. The procedural history shows that the district court had dismissed the case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court of Appeals for the Fifth Circuit said that the appropriate designation of the dismissal was for lack of subject-matter jurisdiction under Rule 12(b)(1) but, nevertheless, affirmed. The Supreme Court disagreed with the court of appeals on what is required for jurisdiction to exist but implicitly agreed that the case presented an issue of jurisdiction. The Court said:

> To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity.

At 242, 100 S.Ct. 502. The Court also said that despite "the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified ...." At 242, 100 S.Ct. 502.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

More recently, in Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), the Court considered

whether the interstate commerce requirement of antitrust *jurisdiction* is satisfied by allegations that petitioners conspired to exclude respondent, a duly licensed and practicing physician and surgeon, from the market for ophthalmological services in Los Angeles because he refused to follow an unnecessarily costly surgical procedure. [Emphasis added.]

The Court again had trouble agreeing on the precise answer to that question, as its 5-4 split shows, but said that the conspiracy at issue "has a sufficient nexus with interstate commerce to support federal jurisdiction." At 333, 100 S.Ct. 502.

The Sherman Act and its FTAIA amendments are not the only statutes which present the dilemma regarding whether a statutory requirement is an element of a claim or a matter of subject-matter jurisdiction. In Gwaltney v. Chesapeake Bay Foundation, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the Court determined that for subject-matter jurisdiction to exist under the Clean Water Act, 33 U.S.C. § 1251 *et seq*. a plaintiff need only make a good-faith *allegation* of a continuous or intermittent violation of the Act. Justice Scalia dissented, this time not because all the subject-matter jurisdiction a court needs is provided under § 1331, ***949** but rather because "subject-matter jurisdiction can be called into question *either* by challenging the sufficiency of the allegation *or* by challenging the accuracy of the jurisdictional facts alleged." At 68, 108 S.Ct. 376 [emphasis in the original] A little over 10 years later, in *Steel Company*, the Court considered the Emergency Planning and Community Right-To-Know Act (EPCRA), 42 U.S.C. § 11046(a)(1). Justice Scalia, writing for the Court, and Justice Stevens, joined in part by Justices Souter and Ginsburg concurring in the judgment, debated, among other things, whether a provision of EPCRA was jurisdictional or an element of the claim. Looking to *Gwaltney*, Justice Stevens thought it was jurisdictional; Justice Scalia dismissed *Gwaltney* as a "drive by" jurisdictional ruling. In the Title VII context we have determined that the requirement that the definition of employer as "a person ... who has fifteen or more employees" was an element of the claim, not a matter of the subject matter jurisdiction of the court. The plaintiff had presented "a non-frivolous claim under federal law; no more is necessary for subject-matter jurisdiction." Sharpe v. Jefferson Distrib. Co., 148 F.3d 676, 677 (7th Cir.1998). The jurisdiction-versus-element-of-the-claim debate seems alive and well.

Turning back to FTAIA, we note that commentators tend to discuss FTAIA in terms of jurisdiction. *See. e.g.*, P. Areeda & H. Hovenkamp, ¶ 273; Herbert Hovenkamp, *Federal Antitrust Policy*, § 21.2 (2d ed.). Referring directly to subject-matter jurisdiction, the *ABA Section of Antitrust Law. Antitrust Law Developments* (5th ed.2002), at 1121, states that "to establish subject matter jurisdiction under the FTAIA, a plaintiff must also show that 'such effect'-i.e., the direct, substantial, and reasonably foreseeable anticompetitive domestic effect-'gives rise to' a Sherman Act claim." In addition, the Department of Justice and the Federal Trade Commission both consider the statute jurisdictional. Regarding jurisdiction over conduct involving foreign commerce, the guidelines for the agencies state "[T]he jurisdictional limits of the Sherman Act and the FTC Act are delineated in the FTAIA." *Antitrust, Unfairness, Deception Policies and Guidelines, reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13.107. The ABA explains that with "respect to subject matter jurisdiction, the *International Antitrust Guidelines* state that 'anticompetitive conduct that affects U.S. domestic or foreign commerce may violate the U.S. antitrust laws regardless of where such conduct occurs or the nationality of the parties involved.' " Antitrust Law Developments, at 1120.

As we have said, this is our first foray into FTAIA. We have, however, considered the reach of the Sherman Act into foreign commerce prior to the enactment of FTAIA. In *In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir.1980), we considered issues raised by the governments of Australia, Canada, South Africa, and Great Britain as to whether the district court could proceed in a case brought by Westinghouse Electric Corporation alleging antitrust violations against 26 foreign and domestic uranium producers. For our purposes, we need not delve into the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

weighty issues of that case beyond noting that we said at 1253:

We view the jurisdictional issue as two-pronged: (1) does subject matter jurisdiction exist; and (2) if so, should it be exercised?

However, we also determined in *United States v. Martin*, 147 F.3d 529 (7th Cir.1998), a criminal case involving the federal "bombing" statute, 18 U.S.C. § 844(I), that the requirement that the bombing have an effect on interstate commerce is not a matter of the court's jurisdiction over the crime or the defendant, but rather an element***950** of the crime. Relying on *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Martin wanted to set aside his guilty plea because, he said, it did not waive jurisdictional defenses, and the requirement for an effect on interstate commerce is jurisdictional. We rejected that claim, saying that although the requirement is often referred to as jurisdictional, it is "simply one of the essential elements of § 844(I)." It is, we said, simply a "shorthand sense that without that nexus, there can be no federal crime ...." At 532, 115 S.Ct. 1624. As we learned in *Lopez*, the nexus to the Commerce Clause is of considerable importance, as a matter of legislative jurisdiction, when Congress seeks to federalize street crimes-crimes which are otherwise the province of the states. In those instances, it seems to us, the requirement for interstate commerce is a hook on which the crime hangs. Once Congress has made the proper findings that, say, a certain crime implicates interstate commerce in some way, proof of the interstate commerce requirement has, at least traditionally, been rather perfunctory. Criminal statutes of this type are far less than compelling analogies to FTAIA.

[7] We see the purity of an argument that 28 U.S.C. § 1331 provides federal question jurisdiction for cases "arising under the Constitution, laws, or treaties of the United States" so that without more, the federal courts have jurisdiction over Sherman Act claims. It would follow, then, that any requirement for an effect on interstate commerce must be an element of the claim. We know, however, that nothing is quite that simple. For instance, a frivolous suit which charges a violation of a federal statute "arises under" federal law. Yet, because the suit is frivolous, subject matter jurisdiction over it is lacking. *Bell v. Hood*, 327 U.S. 678, 682-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[A] suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."). *See also Crowley Cutlery Co. v. United States*, 849 F.2d 273 (7th Cir.1988). On the other hand, it is also true that sometimes a reference to "jurisdiction" in statutes is merely, as we said in *Martin*, a shorthand way of referring to an element of the claim. Such references are a way of referring to that part of a statute which sets out the basis for legislative jurisdiction.

But with reference to FTAIA, the argument that the statute sets out an element of the claim or a basis for legislative jurisdiction has not gained approval. Even after the decision in *Steel Company*, the EPCRA case decided in 1998, courts of appeals continue to treat FTAIA as jurisdictional. Whatever their differences in interpretation of the Act or the effect it has on prior judge-made law, all have treated the issue as one of subject matter jurisdiction. *See Kruman* (review of the district court's dismissal for lack of subject matter jurisdiction under FTAIA); *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420 (5th Cir.2001), *cert. denied sub nom. Statoil ASA v. HeereMac v.o.f.*, 534 U.S. 1127, 122 S.Ct. 1059, 151 L.Ed.2d 967 (2002) (finding that the district court properly dismissed antitrust claim for lack of subject matter jurisdiction under FTAIA); *Carpet Group* (finding that FTAIA did not divest the court of subject matter jurisdiction on the claims presented); *Filetech S.A.* (finding that the district court should have looked to the factual matters presented to it regarding whether subject matter jurisdiction existed under FTAIA); ***951***Caribbean Broad. Sys., Ltd. v. Cable & Wireless, PLC*, 148 F.3d 1080 (D.C.Cir.1998) (stating that a court has subject matter jurisdiction only to the extent that the complaint alleges that the challenged conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce under FTAIA). The latter court has revisited the issue recently to define the "jurisdictional reach of the federal antitrust laws."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.,* 315 F.3d 338 (D.C.Cir.2003). The argument was whether *Den Norske* or *Kruman* set out the proper view of FTAIA's jurisdictional reach. The court rejected both approaches, saying that its view of the statute falls "somewhere between the views of the Fifth and Second Circuits ...." Holding that where the "anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce," the court found that "subject matter jurisdiction is proper" in the case before it. We simply cannot dismiss these cases as "drive-by" jurisdictional rulings.

In *Hartford,* as well, it is not likely that references to jurisdiction are really references to legislative, rather than subject-matter, jurisdiction. Justice Souter made it clear that he disagreed with Justice Scalia's contention that under FTAIA what is at issue is legislative jurisdiction. To reiterate, he said:

JUSTICE SCALIA believes that what is at issue in this litigation is prescriptive, as opposed to subject-matter, jurisdiction. . The parties do not question prescriptive jurisdiction, however, and for good reason: it is well established that Congress has exercised such jurisdiction under the Sherman Act. See G. Born & D. Westin, International Civil Litigation in United States Courts 542, n. 5 (2d ed. 1992) (Sherman Act is a "prime exampl[e] of the simultaneous exercise of prescriptive jurisdiction and grant of subject matter jurisdiction").

[8][9] So, while it might seem desirable to have no messy extra jurisdictional requirements under some acts of Congress, but not others, that is not how our system necessarily works. There is no question that Congress has the power to limit the jurisdiction of the federal courts. *Lauf v. E.G. Shinner & Co.,* 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938). Every federal court, other than the Supreme Court, derives its jurisdiction from Congress, which, within constitutional bounds, may withhold or restrict jurisdiction. *Kline v. Burke Constr. Co.,* 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922). The Court has visited the "jurisdiction stripping" issue recently in the context of the Telecommunications Act of 1996, in which it considered whether federal courts have jurisdiction over a carrier's claim that an order of a state utility commission violated federal law. The Court declined to consider whether 47 U.S.C. § 251(c) conferred jurisdiction, it "at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 ...." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 122 S.Ct. 1753, 1758, 152 L.Ed.2d 871 (2002). What is left unspoken is that Congress could divest the courts of jurisdiction if it chose to.

[10] As we have said, the legislative history shows that jurisdiction stripping is what Congress had in mind in enacting FTAIA. The statute was enacted against a backdrop of almost 60 years of precedent which characterized the application of the Sherman Act to the conduct of foreign markets as a matter of subject matter jurisdiction. We must presume that Congress expects statutes to be read to conform with Supreme Court precedent. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Also as we ***952** have said, the courts of appeals had applied the pre-FTAIA effects test as a limit on subject matter jurisdiction.[FN1] Nothing in FTAIA hints that Congress intended to dramatically change this approach. In fact, the legislative history indicates otherwise. The House Report says that satisfying FTAIA would be "the predicate for antitrust jurisdiction." It also says, "[t]his bill only establishes the standards necessary for assertion of United States Antitrust jurisdiction. The substantive antitrust issues on the merits of the plaintiffs' claim would remain unchanged." H.R.Rep. No. 97-686 at 11 (1982), U.S. Code Cong. & Admin. News at 2487, 2496. Perhaps that is why after FTAIA courts have continued to treat the issue as one of subject matter jurisdiction.

FN1. The dissent suggests, incorrectly we think, that our decision will move government prosecutors to avoid the Seventh Circuit when investigating criminal violations of the Sherman Act. We don't think so. But we add that if the dissent is correct, the government will not only have to avoid the Seventh Circuit, but also all the other circuits that say, as we do here, that the requirement of an effect on U.S. commerce relates to subject matter jurisdiction. Finally, we fail to see the harm to Sherman Act criminal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> prosecutions that concerns the dissent. If the government can't prove to a judge a minimum requirement that activity alleged to be in violation of U.S. criminal law had an effect on U.S. commerce, it shouldn't be bringing a Sherman Act case in the first place.

[11] There are good policy reasons for the prevailing approach. The extraterritorial scope of our antitrust laws touches our relations with foreign governments, and so, it seems, it is prudent to tread softly in this area. If FTAIA sets out an issue on the merits, resolution of the issue could be delayed until late in the case, and the potential for a lawsuit to have an effect on foreign markets would exist while the case remained pending. In contrast, if this important issue goes to subject matter jurisdiction, it can be resolved early in the litigation. If missed early on, it can be resolved whenever it becomes clear that the alleged anticompetitive activity does not have a substantial effect on United States commerce. If the parties do not raise the issue, a judge has an obligation to raise it. Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations. In short, FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong. And the power of the courts is precisely what subject matter jurisdiction is about. For all of these reasons, we find that the district court properly treated the issue as one of subject matter jurisdiction.

[12] That being the case, we must determine whether the court's findings of fact are clearly erroneous. In its analysis, the court examined thousands of pages of evidentiary materials which formed the basis for its findings of fact. The court found that there was virtually no evidence that the plaintiffs would have made any sales in the United States. They set out to produce a tuberculosis drug for India. Experts say that the main application for AB is to produce Ethambutol, which is primarily used in India. The Lederle division of American Home Products was at the relevant time the only company in the world that had FDA approval to sell Ethambutol in the United States. Lederle imported Ethambutol into the United States from Italy using a product that it buys in India. In fact, it appears that the very small amount of AB sold in the United States was used as an ingredient in a product for making rocket motors, not drugs. 3M used a very small amount for this purpose, purchasing less than 0.4 percent of the world's AB production-or *953 $25,000 in total volume. But 3M never conducted formal bidding for this small purchase and shows no signs of changing its supplier.

Other than saying that "there is ample evidence to support plaintiffs' allegations," plaintiffs do not tell us how the court's findings are clearly erroneous. True, the plaintiffs outline the evidence reflecting their plans to manufacture the products for sale in the United States. And, in fact, it may be that there was evidence to support that position. But the district court is allowed on this motion to weigh the facts, and when it did, it found that plaintiffs

> had no actual plans to sell AB in this country and that there would have been no significant AB sales opportunities for Plaintiffs in this country even if they had tried to sell AB here. For instance, Miller testified that he "had no conversation with any potential customers for AB in the United States." Miller Dep. 413. Moreover, Shroff testified that he and his "marketing man" spoke with ten to twelve potential AB customers, all of which were located in India. Shroff Dep. 144-45, 161-62.

At 1012. Plaintiffs' own liability expert testified that AB sales in the United States would be "less than substantial." Similar findings were made regarding the other chemicals involved. The plaintiffs do not point out how these findings were clearly erroneous, and our review leads us to conclude that they were not. With the dismissal of the federal claims, the dismissal of pendent state-law claims was also proper. Accordingly, the judgment of the district court is Affirmed.

DIANE P. WOOD, Circuit Judge, dissenting, with whom Circuit Judges EASTERBROOK, MANION, and ILANA DIAMOND ROVNER join.

In straightforward language, the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a, says that the Sherman Act "shall not apply" to conduct involving foreign trade or commerce unless that conduct has a "direct, substantial and reasonably foreseeable effect" on either U.S. domestic com-

merce, U.S. import commerce, or (for U.S. exporters only) on U.S. export commerce. The question before us today, which not only reaches this court as an issue of first impression, but which has also never been analyzed thoroughly by any other court, is whether these criteria for the statute's "applicability" strip federal district courts of their acknowledged subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over cases that do not meet the test, or if instead they describe an element of the plaintiff's claim. The majority has opted for the former approach, largely because the word "jurisdiction" appears in many prior decisions of lower courts and in certain materials published by the government's antitrust enforcement agencies and the American Bar Association. But neither the majority nor those earlier opinions have distinguished carefully between judicial and legislative jurisdiction-or, to put it differently, between jurisdiction to decide a case and jurisdiction to prescribe a rule of law. The central question now before us is whether the FTAIA affects the former or the latter power. Given the fact that "jurisdiction is a word of many, too many, meanings," *ante* at 947-48, quoting *United States v. Vanness,* 85 F.3d 661, 663 n. 2 (D.C.Cir.1996), which was quoted in *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), it is plain that the analysis cannot stop with the observation that the FTAIA somehow affects "jurisdiction."

In my view, there are at least four compelling reasons why we should not construe the FTAIA's test as one going to the ***954** subject matter jurisdiction of the court, and instead should adopt what I will call an "element" approach: first, the language of the statute supports the position that this is an element of the claim, especially when it is contrasted to true jurisdiction-stripping statutes; second, the "subject matter jurisdiction" characterization is inconsistent with the Supreme Court's decision in *Steel Co.* and with the law of this court; third, the procedural consequences of a "subject matter jurisdiction" reading would have perverse effects, measured against the policies the FTAIA and the federal antitrust laws were designed to further; and finally, to call this "subject matter jurisdiction" fails to take into account the long history of the application of the U.S. antitrust laws to foreign conduct.

I

Although the majority has set forth the relevant language of the FTAIA, it bears repeating here, both for ease of reference and for emphasis. It reads as follows (and there is equivalent language covering section 5 of the Federal Trade Commission Act):

Sections 1 to 7 of this title [Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless-

(1) such conduct has a direct, substantial and reasonably foreseeable effect-

A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

B) on export trade or export commerce with foreign nations, of a person engaged in such trade or in commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

One will search in vain in this brief passage for any hint that the Congress was attempting to strip federal courts of their competence to hear and decide antitrust cases with a foreign element. In my view, that alone should be enough to tip the balance toward the "element" characterization. To begin with, while one can find examples in Supreme Court decisions of the Court's treatment of statutes with jurisdictional language as non-jurisdictional (*e.g., Steel Co.*, discussed below; *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 950-51, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (False Claims Act)), there are no examples of the opposite approach-treating something as jurisdictional that is phrased in terms of the scope of application of a statute. Secondly, this court has recognized that jurisdiction-stripping rules must be expressed clearly. In *Czerkies v. U.S. Department of Labor,* 73 F.3d 1435 (7th Cir.1996) (*en banc* ), we held that the door-closing statute prohibiting judicial review of certain federal workers' compensation claims should not be construed to bar re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

view of constitutional claims in the absence of express language to that effect. Id. at 1439. The same approach is appropriate for other kinds of jurisdiction-stripping statutes. Naturally, when Congress does speak clearly, as it did in the statute that bars judicial review of certain immigration decisions, see 8 U.S.C. §§ 1252(a)(2)(B) and 1255, the courts do and should recognize that their competence to act has been withdrawn. See *McBrearty v. Perryman*, 212 F.3d 985 (7th Cir.2000) (dismissing suit attempting to avoid § 1252(a)(2)(B), which provides that "notwithstanding any other provision of law, no court shall have jurisdiction***955** to review ... any judgment regarding the granting of relief under" section 1255). Language like that of the FTAIA, stating that a law does not "apply" in certain circumstances, cannot be equated to language stating that the courts do not have fundamental competence to consider defined categories of cases.

II

The fact that the FTAIA does not contain a clear congressional statement that it is intended to restrict the subject matter jurisdiction of the federal courts (or for that matter even a brief mention of the term "jurisdiction") should be enough to resolve the question before us. If more is needed, then we must consider further how to determine whether a particular law affects the competence of a federal court to entertain the case at all, or if it simply outlines the scope of the statute and permits the court to issue a decision on the merits either upholding or rejecting a claim. Our starting point should be the Supreme Court's decision in *Steel Co., supra*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210. In *Steel Co.*, the Supreme Court held that the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11046(a)(1), which permitted a private action only if certain prerequisites were satisfied, did not affect the district court's subject matter jurisdiction. 523 U.S. at 89-90, 118 S.Ct. 1003. Although the EPCRA actually used the word "jurisdiction" to describe the permitted actions, the Court did not find that fact dispositive. Instead, it reaffirmed the long-standing rule that power to adjudicate a case does not depend on whether in the final analysis the plaintiff has a valid claim. "[T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." Id. at 89, 118 S.Ct. 1003 (internal quotations omitted). In the present case, the plaintiffs will have a right to recover if defendants' activities have the requisite effect on either U.S. domestic or import commerce (and they can prove the remainder of their federal antitrust claim), and they will lose if those effects are lacking.

It is worth noting that the extraterritorial reach of statutes varies widely. Some statutes, such as Title VII of the Civil Rights Act of 1964, have been interpreted by the Supreme Court as having no application at all beyond U.S. borders, even if both the employer and the employee are U.S. citizens. See *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). Other statutes, such as 18 U.S.C. § 2333, are virtually unlimited in their territorial reach. Section 2333 provides a private right of action for civil damages for any national of the United States injured "by reason of an act of international terrorism" (or the victim's estate) to sue those responsible for the act in a U.S. court for treble damages, no matter where in the world the act occurred, and no matter what the nationality of the perpetrator was. See *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir.2002). Still other statutes are like the FTAIA: they define a subset of actions and actors outside the United States whose actions fall within the scope of U.S. law. It is up to Congress to decide how broad or narrow a law it is enacting, and what the plaintiff must prove to be entitled to relief.

That is what Congress did in the FTAIA: it established the "direct, substantial, and reasonably foreseeable" effect on commerce test as an element of the plaintiff's claim. It did not disempower ***956** the federal courts from ruling on the merits for a defendant when the plaintiff is unable to make the requisite showing. The majority's suggestion that the Supreme Court held otherwise in *Hartford Fire Ins. v. California*, 509 U.S. 764, 812, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) is inaccurate. In fact, the *Hartford Fire* majority thought it unnecessary to address the FTAIA's effect on the case at all, see id. at 797 n. 23,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 S.Ct. 2891, and thus it had no need to engage the dissenters on the "element" versus "jurisdiction" point. It is true that Justice Scalia, writing for the four dissenters, observed that "[a] cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact." *Id.* at 812, 113 S.Ct. 2891. Even though this isolated statement was in a dissent and thus not authoritative at the time it was made, the more important point is that the legal principle it reflected was later adopted by a majority of the Court first in *Steel Co.*, and then later in *United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) ("[*Ex parte*] *Bain* 's [121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887)] elastic concept of jurisdiction is not what the term "jurisdiction" means today, *i.e.*, "the courts' statutory or constitutional *power* to adjudicate the case." ") (Emphasis in original, quoting from *Steel Co.*). The approach I am advocating is entirely consistent, therefore, with current Supreme Court doctrine.

This court has had occasion to consider the question whether effect-on-commerce elements analogous to those in the FTAIA affect subject matter jurisdiction or the statement of a claim, and we have concluded that they do not. See *United States v. Martin*, 147 F.3d 529 (7th Cir.1998), cited with approval in *United States v. Rayborn*, 312 F.3d 229, 231 (6th Cir.2002); *United States v. Carr*, 271 F.3d 172, 178 (4th Cir.2001); *United States v. Prentiss*, 256 F.3d 971, 982 (10th Cir.2001); *United States v. Beck*, 250 F.3d 1163, 1165 (8th Cir.2001); *Alikhani v. United States*, 200 F.3d 732, 734-35 (11th Cir.2000). While the statute at issue in *Martin* was a criminal law, 18 U.S.C. § 844(i), I agree with the First Circuit that there is no jurisdictional distinction in the Sherman Act between the civil and criminal reach of the statute. See *United States v. Nippon Paper Indus.*, 109 F.3d 1 (1st Cir.1997). (Indeed, I do not understand the majority to be taking issue with this aspect of the *Nippon Paper* holding.) The fact that the present case is civil, and *Martin* was criminal, therefore provides no reason not to follow *Martin* 's jurisdictional characterization. Nor do I see any other principled distinction that can be drawn between our analysis in *Martin* and the problem now before us.

## III

Yet another reason why the majority's rule is ill-advised comes from the nature of jurisdictional rules and the consequences of treating something as affecting the subject matter jurisdiction of the court. Rules about subject matter jurisdiction define the allocation of business between the federal and the state courts. The federal courts are courts of limited jurisdiction. Only if Article III of the Constitution confers power on them to hear the particular kind of case or controversy at issue, and if a statute of Congress has implemented that constitutional grant of power, can a case be heard in federal court.

The first point here is that a recognized issue of subject matter jurisdiction must be resolved before any other action is taken on the case. There is an important institutional interest in resolving jurisdictional questions quickly and simply. Congress recognized this in one of its classic ***957** jurisdiction-stripping rules: federal appellate courts have no jurisdiction to review district court decisions remanding cases to state court when the district court relies on a reason outlined in 28 U.S.C. § 1447(c). See 28 U.S.C. § 1447(d). Inquiries into whether a case "arises under" federal law, for purposes of § 1331 jurisdiction, can normally be completed by a review of the complaint. Inquiries into diversity jurisdiction are often just as straightforward, even though fact-finding might be necessary in the occasional case in which it is unclear where a person is domiciled, or what amount is in controversy, or which of several corporate facilities should count as the corporation's principal place of business.

The jurisdictional inquiries just described are well-defined and do not normally consume enormous judicial resources. In contrast, an inquiry into whether a particular course of conduct has a "direct, substantial, and reasonably foreseeable effect" on either the domestic commerce of the United States or its import commerce threatens to become a preliminary trial on the merits. Indeed, the record in one famous international antitrust case, *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, should give advocates of the "subject matter jurisdiction" approach serious pause. That case was originally filed in the district court in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1973. In 1974, the district court dismissed for want of "subject matter jurisdiction." The Ninth Circuit reversed in 1976. See 549 F.2d 597 (9th Cir.1976). Six years of discovery then took place, in which the parties explored the effects of the alleged conspiracy on U.S. commerce. In 1983, the district court again dismissed the action for want of jurisdiction. See 574 F.Supp. 1453 (N.D.Cal.1983). Up on appeal again to the Ninth Circuit, the case was affirmed, though on somewhat different grounds. 749 F.2d 1378 (9th Cir.1984). In 1985, the Supreme Court denied certiorari, see 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985), with a note indicating that Justices White and Blackmun would have granted review. Thus, at least 12 years after the case was filed, the "jurisdictional" issue was finally resolved. Had it been resolved in the affirmative, there is no telling how many more years would have passed before the litigation was over. This is no way to decide whether the federal courts are competent to hear a case.

The element approach, in contrast, has none of those defects. In some instances, it will be possible to resolve the FTAIA issue on the pleadings or on summary judgment, and appellate review from either kind of decision *de novo*. If the issue is not capable of resolution on summary judgment, that should be a red flag in any event. Effect on commerce issues will often be closely intertwined with the merits. Yet if the case reaches the merits, there is no reason why the court cannot resolve the most straightforward issue first. Many antitrust cases founder on the issue of market power, especially when world markets are at issue. But *Steel Co.* made it abundantly clear that courts are not entitled simply to assume jurisdiction and resolve an easy merits issue, if true subject matter jurisdiction is at stake.

If something affects the subject matter jurisdiction of the court, there are a number of other consequences which would be undesirable for the FTAIA. First, there is necessarily never a time when the question cannot be raised. As the Supreme Court has repeatedly emphasized, the fundamental competence of the court to act can be challenged at any time, up to and including at the Supreme Court level. See, *e.g.*, *Mansfield, C. & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); 20 Charles Alan Wright & Mary Kay Kane, Federal Courts § 7 at 28 ***958** (5th ed 1994). This would offer an irresistible invitation to the losing party in an international antitrust case to invite the Supreme Court to revisit the complex question whether there are direct, substantial, and reasonably foreseeable effects on U.S. commerce, whether or not that objection was preserved before the district court or the court of appeals. Indeed, the court will be required to raise the issue on its own, even if the parties have been content to stipulate to dollar amounts of commerce, destinations of goods, business plans tending to show foreseeability, and other pertinent facts. In many cases, the parties may be willing to stipulate that the necessary effects on U.S. commerce are present, so that they can get down to the business of resolving their dispute. All that is impossible if we are dealing with subject matter jurisdiction.

Second, characterization affects removal. Recall that the subject matter rules indicate whether the case falls within the limited jurisdiction of the federal courts. If it does not, then it presumptively can be heard by a state court of general jurisdiction. Although the federal antitrust laws are commonly held to fall within the exclusive jurisdiction of the federal courts, nothing requires Congress to keep things that way. If Congress indeed meant to strip the federal courts of subject matter jurisdiction over foreign commerce antitrust cases, then those cases revert to state courts. No one has suggested that we can also divine from the language of the FTAIA a congressional intent to deny any U.S. forum whatsoever for foreign commerce cases. (Indeed, serious constitutional questions would arise if we were to read the statute as purporting to define the jurisdiction of the state courts, given the degree of sovereignty the states retain under the federal Constitution.) Thus, state courts can and will hear foreign commerce antitrust cases where "direct, substantial, and reasonably foreseeable" effects are missing. Some of those state courts might dismiss on *forum non conveniens* grounds; some might apply their own test for whether a claim is stated and dismiss on the merits; some might keep the case and adjudicate it, creating far greater friction with foreign sovereigns than would result from exclusive federal jurisdiction and an ele-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ments-based test. Naturally, if this kind of case is filed in state court, it cannot be removed to federal court, because suits may be removed only if they could have been filed originally in a federal court. See 28 U.S.C. § 1441; *Syngenta Crop Protection, Inc. v. Henson,* 537 U.S. 28, 123 S.Ct. 366, 369-70, 154 L.Ed.2d 368 (2002). Furthermore, even if such a case is physically removed and is lodged in the federal court on an untenable claim of federal jurisdiction, the federal court (after potentially lengthy inquiries into the FTAIA test) will be required to remand it for lack of jurisdiction. See 28 U.S.C. § 1447(c). Such a decision is not a decision on the merits, and it will thus not block further proceedings in the state court.

There are also consequences for appellate review if this is a jurisdictional issue. As already noted, district courts resolve whatever jurisdictional facts are contested in advance of the trial. Appellate review of those fact-findings is deferential. Although the defendants argued that the policies behind the FTAIA-particularly the avoidance of diplomatic tensions with other countries-are better served by the jurisdictional characterization, that assumes that district courts will systematically reject jurisdiction. There is no reason at all to make such an assumption. If district courts find the FTAIA test satisfied, foreign parties will be stuck with deferential appellate review of those facts. This also means that appellate courts will not be ***959** free to give plenary consideration to the sensitive issues of international comity that can arise in these cases-issues better resolved at the level of the court of appeals or the Supreme Court than by a solitary district judge. For all these reasons as well, it is preferable to treat the FTAIA as establishing an element of the claim.

The subject matter jurisdiction characterization makes no sense, either from the point of view of the policies being furthered by the FTAIA, or from the standpoint of judicial administration. We should not adopt a perverse decision just because parties have chosen to file motions under Rule 12(b)(1) instead of Rule 12(b)(6) or Rule 56, or because courts have unquestioningly adopted the diction of "subject matter jurisdiction" without careful examination.

## IV

Finally, if all the rest of these reasons were not enough to compel an "element" reading, a review of the history of the application of the antitrust laws to persons and conduct beyond the borders of the United States also leads to that result. As the majority notes, the first time the Supreme Court had occasion to consider the question whether the Sherman Act applied to activities outside the United States occurred less than 20 years after the passage of the Act, in *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). There, writing for the Court, Justice Holmes rejected the plaintiff's argument that the Sherman Act penalized an elaborate arrangement by the defendant that affected banana imports into the United States. At the center of the case was a dispute between Panama and Costa Rica over which country had sovereign authority over a particular banana plantation; plaintiff claimed that the defendant had instigated the border war for purposes of controlling the banana trade. Using language that proved to be far broader than later courts were willing to accept, Justice Holmes wrote that "the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." *Id.* at 356, 29 S.Ct. 511. Moreover, he wrote, "in case of doubt, [one would be led to] ... a construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power." *Id.* at 357, 29 S.Ct. 511. Nothing in this language suggests that the Court thought it was addressing federal court subject matter jurisdiction in the sense of the competence of a court with limited powers to resolve the dispute. This was a topic with which the Justices were certainly familiar, having dismissed an action only one year earlier themselves for failure to satisfy the well-pleaded complaint rule, despite the fact that no one had noticed the problem before the case reached the high court. See *Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Instead, it was talking about how broad a statute Congress had enacted, and how much conduct Congress was trying to regulate. It was the legislative branch, in short, which the Court thought had not reached out to cover an intergovernmental dispute affecting international trade in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bananas. There was not a hint that the federal courts had no competence to decide that the Sherman Act did not reach that far.

Between the time *American Banana* was decided and the time when the Second Circuit rendered its *Alcoa* decision, the Court handed down at least two decisions that qualified the strict territorial view of the former case. See ***960***United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927). Both cases also talk in terms of the coverage of the antitrust statutes with respect to the foreign activities and actors. *American Tobacco* upheld the application of the statute to two English corporations, see 221 U.S. at 172, 184-85, 31 S.Ct. 632, and *Sisal Sales* upheld the application of the laws to a Mexican-based conspiracy to control the importation of sisal from Mexico into the United States and its subsequent sale.

The next major decision addressing the extent to which the U.S. antitrust laws reach foreign parties and conduct was *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) [hereinafter *Alcoa* ]. In that case, the court had to decide whether certain foreign parties, who had acted wholly outside the United States, had nonetheless violated the Sherman Act. As the court put it, "[d]id either [agreement] violate § 1 of the Act? ... [W]e are concerned only with whether Congress chose to attach liability to the conduct outside the United States of persons not in allegiance to it. That being so, the only question open is whether Congress intended to impose the liability ...." 148 F.2d at 443. Turning to the field of "conflict of laws" for guidance, the court concluded that "the Act does not cover agreements, even though intended to affect imports or exports, unless its performance is shown actually to have had some effect upon them." *Id.* at 444. In time, this became known as the "intended effects" test, which in various forms governed until the FTAIA was passed, and arguably still applies in import cases. See *Hartford Fire,* 509 U.S. at 796, 113 S.Ct. 2891 ("it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States") and at 797 n. 23, 113 S.Ct. 2891 (indicating that it was not necessary to address the question whether the FTAIA affected the case).

The *Alcoa* decision was not warmly received in other countries, which as of the mid-1940s did not as a rule have antitrust laws and which resented the apparent effort of the United States to act as the world's competition police officer. [FN1] See generally Spencer Weber Waller, Antitrust and American Business Abroad, vol. I, ch. 4. This led to an outpouring of scholarly writing on the general question of the way prescriptive jurisdictional lines should be drawn among nations from the perspective of public international law. The fruits of this effort appear today in the American Law Institute's influential Restatement (Third) of the Foreign Relations Law of the United States ("Restatement Third"), Part IV (1987), which addresses the subject of jurisdiction and judgments. The Restatement Third identifies three types of jurisdictional limitations recognized by international law: those on jurisdiction to prescribe ("*i.e.* to make [the state's] law applicable to the activities, relations, or status of persons, or the interests of persons in things, whether by legislation, by executive act or order, by administrative rule or regulation, or by determination of a ***961** court"), those on jurisdiction to adjudicate, and those on jurisdiction to enforce. Restatement Third, § 401. Section 415 of the Restatement Third is devoted specifically to jurisdiction to regulate anticompetitive activities.

> FN1. Today, over 90 countries have competition laws. See, *e.g.*, Diane P. Wood, "International Harmonization of Antitrust Law: The Tortoise or the Hare?" 3 Chicago J. Int'l L. 391, 392 n. 6 (2002). Interestingly, the number of disputes over so-called extraterritorial applications of national laws, whether by the United States, the European Union, or others, has dropped dramatically. Discussions today tend to focus on better ways of coordinating these many national-level regimes, and antitrust authorities around the world are eager to cooperate with one another within the confines established by national confidentiality laws.

The commentary to section 401 addresses exactly the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

problem now before us: that is, what is the relation between the various heads of jurisdiction identified in the Restatement and the domestic U.S. concept of "subject matter jurisdiction." Comment c reads as follows:

"Subject matter jurisdiction," in common usage in other contexts, is not used in this Restatement. This term sometimes refers to the constitutional authority of a governmental body, for example the authority of Congress under the United States Constitution to legislate on a subject (principally under Article I, Section 8), or the authority of a State of the United States to legislate within constitutional limitations on State authority (Article I, Section 10). The term is also often used in judicial decisions to describe other limitations on governmental authority, including those involving the reach of United States law, addressed in this Restatement as jurisdiction to prescribe. Jurisdiction to prescribe with respect to transnational activity depends not on a particular link, such as minimum contacts ("use of the mails," or "crossing state lines"), which have been used to define "subject matter jurisdiction" for constitutional purposes, but on a concept of reasonableness based on a number of factors to be considered and evaluated. §§ 402-403.

Thus, the domestic concept of subject matter jurisdiction has no bearing on the question whether the United States validly prescribed a certain rule of law. Section 415 offers detailed guidance on the scope of prescriptive jurisdiction in cases dealing with anticompetitive activities.FN2

FN2. The text and commentary of section 415 is also informative:

§ 415. Jurisdiction To Regulate Anti-Competitive Activities

(1) Any agreement in restraint of United States trade that is made in the United States, and any conduct or agreement in restraint of such trade that is carried out in significant measure in the United States, are subject to the jurisdiction to prescribe of the United States, regardless of the nationality or place of business of the parties to the agreement or of the participants in the conduct.

(2) Any agreement in restraint of United States trade that is made outside of the United States, and any conduct or agreement in restraint of such trade that is carried out predominantly outside of the United States, are subject to the jurisdiction to prescribe of the United States, if a principal purpose of the conduct or agreement is to interfere with the commerce of the United States, and the agreement or conduct has some effect on that commerce.

(3) Other agreements or conduct in restraint of United States trade are subject to the jurisdiction to prescribe of the United States if such agreements or conduct have substantial effect on the commerce of the United States and the exercise of jurisdiction is not unreasonable.

Comment b to this section quotes the FTAIA in full, and goes on to say that "Congress apparently believed that activity whose anti-competitive effects are felt only in foreign states should not be a concern of United States antitrust regulation, but that activities carried out abroad that have 'direct, substantial, and reasonably foreseeable' effect in the United States or on the import trade of the United States (as by limiting imports or fixing the price of imported products) should be subject to the Sherman and FTC Acts."

It is this topic of prescriptive jurisdiction, and how far the U.S. antitrust laws were actually reaching, that was before Congress when it enacted the FTAIA. (While it is true that the House Report on the FTAIA uses the word "jurisdiction" with some regularity, it also speaks repeatedly***962** about whether U.S. antitrust law should be applied to particular transactions. See H.R.Rep. No. 97-686, 97th Cong., 2d Sess. (1982), U.S. Code Cong. & Admin. News at 2487. It is therefore impossible to draw any firm conclusions from that brief document that will assist us in resolving the issue presently before us.) Congress was trying simultaneously to assure U.S. companies that they would not be subject to potentially stricter U.S. antitrust laws when they were conducting business wholly in foreign markets, and to assure foreign

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

countries and their citizens that they would not be swept into a U.S. court to answer under U.S. law for actions that were of no legitimate concern to the United States. Ronald W. Davis, *International Cartel and Monopolization Cases Expose a Gap in Foreign Trade Antitrust Improvements Act,* 15 Sum-Antitrust 53, 53-58 (2001). This much is fairly clear. What has not been clear has been the way in which the FTAIA itself has been handled in the federal courts.

At one level, virtually everyone concedes that federal subject matter jurisdiction exists in cases like United Phosphorus's. The claim certainly arises under a federal law-the Sherman Act-and thus falls within the scope of 28 U.S.C. § 1331 and 28 U.S.C. § 1337. Furthermore, typically no one claims that the claim presented is so frivolous that jurisdiction fails under the principle acknowledged in *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Nevertheless, as the majority has accurately noted, defendants who believe that their activities were too "foreign" to be swept under the U.S. antitrust laws have usually attacked the plaintiff's case with a motion under FED. R. CIV. P. 12(b)(1), which covers "lack of jurisdiction over the subject matter," and sometimes in the alternative with a motion under Rule 12(b)(6), which covers "failure to state a claim upon which relief can be granted."

Although several courts of appeals have decided dismissal motions based on the FTAIA under the rubric of "subject matter jurisdiction," see, *e.g., Empagran S.A. v. F. Hoffman-LaRoche, Ltd.,* 315 F.3d 338 (D.C.Cir.2003); *Kruman v. Christie's Int'l PLC,* 284 F.3d 384 (2d Cir.2002); *Den Norske Stats Oljeselskap AS v. HeereMac Vof,* 241 F.3d 420 (5th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1059, 151 L.Ed.2d 967 (U.S. Feb. 19, 2002) (00-1842); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080 (D.C.Cir.1998), most have focused on the merits of the FTAIA analysis rather than the precise procedural manner in which it was presented. None of them has given the sustained attention to the "jurisdiction vs. element" inquiry that this court has now done.

Indeed, in the most recent of these decisions, *Empagran,* the court was singularly unconcerned with the distinction between these two approaches. It certainly speaks of a lack of "subject matter jurisdiction" under the federal antitrust laws, 315 F.3d at 340-41, and the issue reached the court on a motion made under FED. R. CIV. P. 12(b)(1), but both the test the court adopted and its analysis are telling for our purposes. The test it chose to use for FTAIA cases was as follows:

We hold that where the anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce. The anticompetitive effect itself must violate the Sherman Act and the conduct's harmful effect on United States commerce must give rise to "a claim" by someone, even if not the foreign plaintiff who is before the court.

*Id.* at 341. In other words, if one is to take the "subject matter jurisdiction" characterization***963** seriously, the court is competent to decide the case only if it concludes (tentatively? conclusively?) that the statute has been violated and someone has standing to sue. With all due respect to my colleagues in the D.C. Circuit, I find such an approach to subject matter to be inconsistent with the Supreme Court's decisions in cases like *Steel Co.* and *Bell v. Hood.* (For the record, I am not necessarily expressing any disagreement with the ultimate result in *Empagran;* my concern is only with this implicit part of the court's rationale.)

Even more troublesome is the court's analysis of subject matter jurisdiction. It begins with the observation that its review is *de novo.* 315 F.3d at 343-44. This, of course, would be true if the dismissal were under Rule 12(b)(6) or Rule 56. If it is really under Rule 12(b)(1) and the district court has made findings of fact, then it is not accurate; the legal conclusion would be reviewed *de novo,* but the facts would be reviewed deferentially. In any event, the court continues with the following passage:

A complaint may be dismissed for lack of subject matter jurisdiction only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983) (quoting *Conley v. Gibson,* 355 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). In our review, this court assumes the truth of the allegations made and construes them favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

315 F.3d at 343. The problem with this passage is that almost all of it describes not the rule that applies to motions to dismiss for lack of subject matter jurisdiction, but instead motions to dismiss for failure to state a claim. In *Sinclair*, for example, the district court had dismissed the claim under Rule 12(b)(6), and the passage to which the *Empagran* court referred correctly quotes the governing standard from *Conley*. But the passage in *Conley* has nothing to do with subject matter jurisdiction dismissals. It says instead that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46, 78 S.Ct. 99. While *Scheuer* states that "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a claim, the allegations of the complaint should be construed favorably to the pleader," 416 U.S. at 236, 94 S.Ct. 1683, it made this comment in the context of its review of a dismissal based on the Eleventh Amendment, on its way to remanding the case to the lower courts for further fact-finding. It in no way purported to change the rule that when subject matter jurisdiction is contested, the district court itself must hold a hearing to resolve the jurisdictional facts, and that the ultimate decision is for the court, not for a jury. See generally 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1350 at 234-35 (2d ed.1990). Thus, to the extent that others should follow what the *Empagran* court did, rather than what it said in passing, one should take this as a case acknowledging that a dismissal for failure to meet the standards of the FTAIA is one for failure to state a claim.

The Second Circuit's *Kruman* decision also spoke in terms of a "subject matter jurisdiction" dismissal, see 284 F.3d at 390, and it correctly noted that the district court could "resolve disputed jurisdictional issues of fact through reference to evidence outside of the pleadings." *Id.* Nevertheless,*964 as in *Empagran*, the court paid no attention to the issue now before us; it was concerned instead about the type of effect on domestic (or import) commerce the FTAIA requires before conduct could be "regulated by the Sherman Act." *Id.* The same is true of the Fifth Circuit's decision in *Den Norske*, see 241 F.3d at 424-25, and the D.C. Circuit's earlier decision in *Caribbean Broadcasting*, see 148 F.3d at 1085. It is this court, sitting *en banc*, that will be the first one to give a fully considered answer to the question whether the FTAIA strips the federal courts of their competence to hear certain cases that lack sufficient connections to the United States, or if it affirmatively imposes on a plaintiff the burden of proving as an element of its case the existence of those connections.

V

For all these reasons, I believe that the FTAIA adds an element to an antitrust claim for cases, as the statute puts it, that present "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." It does not strip the federal courts of subject matter jurisdiction in those cases-a conclusion that would leave the court powerless to make a ruling on the merits of the case, and that would leave the defendants open to suit either in state courts or before other tribunals, judicial or arbitral. The majority's conclusion will also have significant effects on the government's criminal antitrust enforcement program. The Sherman Act, of course, makes it a serious felony to enter into an agreement in restraint of trade. The current Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division, R. Hewitt Pate, recently had the following comments about the Department's international criminal enforcement:

Since late 1996, the Division has prosecuted international cartels affecting over *$10 billion* in U.S. commerce. Well over 90 percent of the total criminal fines we have obtained in this time period were from international cartel cases.... The international cartels we have uncovered involved a wide range of industries, including the food and feed additives, graphite electrode, vitamins, construction, fine arts, and textile industries....

Recently, we have concentrated not just on prosecuting corporate cartel members but also on punishing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individuals who create and operate the cartels.... In the past fiscal year, defendants in Division cases were sentenced to more than 10,000 jail days-a record-with an average sentence of more than 18 months.... It is not just U.S. executives who are facing prison sentences, but foreign executives as well....
Turning to our current docket, we now have almost forty grand juries investigating suspected international cartel activity, representing almost half of the Division's criminal investigations.

R. Hewitt Pate, "The DOJ International Antitrust Program-Maintaining Momentum," Speech Before the American Bar Association Section of Antitrust Law, 2003 Forum on International Competition Law, New York City, February 6, 2003, available at http://www.usdoj.gov/atr/public /speeches/200736.pdf (emphasis in original). The government will not want to conduct these investigations in the Seventh Circuit. Defects going to the subject matter of the court can be raised at any time, even if a defendant has pleaded guilty (and guilty pleas play the same important role in antitrust prosecutions as they do in other fields of criminal law). See, *e.g.*, ***965***United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002) ("*Bain* 's elastic concept of jurisdiction is not what the term 'jurisdiction' means today, *i.e.* 'the courts' statutory or constitutional *power* to adjudicate the case, [citing *Steel Co.*]. This latter concept of subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."); *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). Indeed, even after direct appeals are over, a defect going to the subject-matter jurisdiction of the court can be raised in a motion under 28 U.S.C. § 2255. From this time forth, therefore, any defendant who believes that the prosecutor has failed to meet the standards of the FTAIA in an antitrust prosecution will be free to raise this point either for the first time on appeal, or in a § 2255 petition. Compare *United States v. Gonzalez*, 311 F.3d 440, 443-44 (1st Cir.2002) (rejecting a subject-matter-jurisdictional interpretation of a statute permitting drug prosecutions on stateless vessels).

It is important to recall, finally, that there is nothing unique about international antitrust cases. If effect-on-commerce rules are truly jurisdictional, then they are jurisdictional for every statute that contains commerce elements. Countless statutes do, particularly since the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), because that is what justifies congressional action whenever it legislates under its Article I, Section 8 Commerce Clause powers. The majority's approach therefore has the potential of upsetting far more than the small set of cases that present foreign trade antitrust issues.

I respectfully dissent.

C.A.7 (Ill.),2003.
United Phosphorus, Ltd. v. Angus Chemical Co.
322 F.3d 942, 2003-1 Trade Cases P 73,971

Briefs and Other Related Documents (Back to top)

- 2002 WL 32153856 (Appellate Brief) Corrected Supplemental Brief for Defendants-Appellees on En Banc Review (Oct. 08, 2002) Original Image of this Document (PDF)
- 2002 WL 32153852 (Appellate Brief) Supplemental Brief for Defendants-Appellees on En Banc Review (Sep. 23, 2002) Original Image of this Document (PDF)
- 2002 WL 32153853 (Appellate Brief) Supplemental Brief of Plaintiffs-Appellants for En Banc Review (Filed Pursuant to Court's August 16, 2002 and August 28, 2002 Orders) (Sep. 23, 2002) Original Image of this Document with Appendix (PDF)
- 2002 WL 32153854 (Appellate Brief) Brief of Amici Curiae Sumitomo Corporation, Sumitomo Corporation of America, Global Minerals and Metals Corporation, R. David Campbell and Carl Alm in Support of Affirmance (Sep. 23, 2002) Original Image of this Document (PDF)
- 2002 WL 32153855 (Appellate Brief) Brief of Amici Metallgesellschaft AG and MGT UK Holdings in Support of Reversal (Sep. 23, 2002) Original Image of this Document (PDF)
- 2001 WL 34134157 (Appellate Brief) Reply Brief of Plaintiffs-Appellants (Public, Redacted Version Pursuant to Court's May 4, 2001 and August 2, 2001 Orders) (Oct. 15, 2001) Original Image of this Document (PDF)
- 2001 WL 34134156 (Appellate Brief) Brief for De-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

322 F.3d 942
322 F.3d 942, 2003-1 Trade Cases P 73,971
**(Cite as: 322 F.3d 942)**

Page 21

fendants-Appellees (Sep. 17, 2001) Original Image of this Document (PDF)
• 2001 WL 34134155 (Appellate Brief) Brief and Short Appendix of Plaintiffs-Appellants (Public, Redacted Version Pursuant to Court's May 4, 2001 and August 2, 2001 Orders) (Aug. 15, 2001) Original Image of this Document with Appendix (PDF)
• 01-1693 (Docket) (Mar. 22, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 21

H
United Phosphorus, Ltd. v. Angus Chemical Co N.D.Ill.,2001.
United States District Court,N.D. Illinois,Eastern Division.
UNITED PHOSPHORUS, LTD., an Indian corporation; Shroff's United Chemicals, Ltd., an Indian corporation; and J.C. Miller & Associates, Inc., an Illinois corporation, Plaintiffs,
v.
ANGUS CHEMICAL COMPANY, a Delaware corporation; Angus Chemie GmbH, a German corporation; the Estate of Freeman Hughes through its representative Yvonne Hughes; Ollie W. Chandler; Lowell Pals; Gary W. Granzow; D.B. Gupta; and Lupin Laboratories, Ltd., an Indian corporation, Defendants.
**No. 94 C 2078.**

Feb. 16, 2001.

Prospective manufacturers of tuberculosis medicine ingredient 2-Amino-1 Butanol (AB), and former employee barred by his employer's trade secret action from disclosing technical information regarding AB manufacture, sued employer, alleging among other claims monopolization under Sherman Act. Following denial of motion to dismiss for lack of personal jurisdiction, 43 F. Supp.2d 904, Manning, J., employer moved to dismiss monopolization claim. The District Court, Ian H. Levin, United States Magistrate Judge, held that: (1) Foreign Trade Antitrust Improvements Act (FTAIA) barred suit, due to absence of necessary showing of effect on domestic commerce; (2) prospective manufacturers did not sustain damage in United States as result of suit, as required by FTAIA; (3) domestic commerce impact requirement was not satisfied through injury allegedly sustained by employee as result of disclosure bar; (4) filing of trade secret complaint did not constitute judicial admission that there was effect on domestic commerce; (5) FTAIA imposed jurisdiction requirements; and (6) exception to domestic commerce effect requirement, when import trade or import commerce was involved, applied only to American importers and not to prospective India exporters.

Motion to dismiss claims granted.
West Headnotes
**[1] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))
Under the Foreign Trade Antitrust Improvements Act (FTAIA), the proscriptions of the Sherman Act apply to trade or commerce with foreign nations, other than import transactions, only when the conduct providing the basis for the claim has a direct, substantial and reasonably foreseeable anticompetitive effect on United States domestic commerce. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

**[2] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))
The Foreign Trade Antitrust Improvements Act (FTAIA) exempts from United States antitrust law conduct that lacks the requisite domestic effect, even when the antitrust conduct originates in the United States or involves American-owned entities operating abroad. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

**[3] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))
Foreign Trade Antitrust Improvements Act (FTAIA) barred India-based prospective manufacturers of chemical 2-Amino-1 Butanol (AB), used in manufacture of tuberculosis medication, from bringing Sherman Act monopolization suit in United States against American company that had brought trade secret action in state court to prevent its employee from disclosing needed technology; there was no showing of required effect on domestic commerce, as India man-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ufacturers had no intent to sell AB in United States, and there would be no market if sales were attempted. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[4] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))

Foreign Trade Antitrust Improvements Act (FTAIA) barred India-based prospective manufacturers of chemical 2-Amino-1 Butanol (AB), used in manufacture of tuberculosis medication, from bringing Sherman Act monopolization suit in United States against American company that had brought trade secret action in state court to prevent its employee from disclosing needed technology, despite claim that exclusion of manufacturers as sources of AB resulting from trade secrets action would affect American market for tuberculosis medication; sole Food and Drug Administration (FDA) approved seller of tuberculosis medicine using AB would not be changing supplier, as recertification would be required. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[5] Antitrust and Trade Regulation 29T ⚷963(3)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular Cases. Most Cited Cases
(Formerly 265k28(1.4))

Causation element was lacking in claim, brought by prospective India manufacturers of 2-Amino-1 Butanol (AB), active ingredient of tuberculosis medication, that American company's trade secret suit, which kept manufacturers from obtaining critical manufacturing information from company's employee, had effect on domestic commerce required under Foreign Trade Antitrust Improvements Act (FTAIA), by precluding manufacturers from selling AB in United States; manufacturers ultimately began AB manufacture using information from other sources, showing that any delay in AB manufacturing was based on business rather than antitrust considerations. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[6] Antitrust and Trade Regulation 29T ⚷963(3)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular Cases. Most Cited Cases
(Formerly 265k28(1.4))

Foreign Trade Antitrust Improvements Act (FTAIA) requirement, that effect on domestic commerce be shown before antitrust claim may proceed under Sherman Act, was not satisfied through suit by India-based manufacturers claiming that American company's trade secret action, which precluded manufacturers from obtaining information from company's employee required to begin manufacture of 2-Amino-1 Butanol (AB), active ingredient in tuberculosis medication, restricted ability to sell chemical used in AB manufacture in United States. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[7] Antitrust and Trade Regulation 29T ⚷963(3)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular Cases. Most Cited Cases
(Formerly 265k28(1.4))

Impact on domestic commerce, required under For-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.Supp.2d 1003
131 F.Supp.2d 1003, 2001-2 Trade Cases P 73,336
**(Cite as: 131 F.Supp.2d 1003)**

Page 3

eign Trade Antitrust Improvements Act (FTAIA), was not shown by India-based prospective manufacturers of tuberculosis medicine ingredient 2-Amino-1 Butanol (AB), bringing monopolization claim against American company that brought trade secrets action to bar its employee from disclosing needed technology to manufacturers, based on claim that manufacturers would have produced related chemicals in United States if disclosure had been allowed, when there was no evidence of preparations to do any such manufacturing. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[8] Antitrust and Trade Regulation 29T ⚷ 963(3)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular Cases. Most Cited Cases
(Formerly 265k28(1.4))

Prospective manufacturers of tuberculosis medicine ingredient 2-Amino-1 Butanol (AB), based in India, did not sustain injury in United States, as required to maintain monopoly claim under Sherman Act and Foreign Trade Antitrust Improvements Act (FTAIA), when employee of American company was precluded by trade secrets lawsuit from disclosing needed technology to prospective manufacturers. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[9] Antitrust and Trade Regulation 29T ⚷ 963(3)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular Cases. Most Cited Cases
(Formerly 265k28(1.4))

Lack of proof of antitrust injury, on part of employee barred by his company's trade secret action from disclosing to India-based prospective manufacturers technology required for manufacture of tuberculosis medication ingredient 2-Amino-1 Butanol (AB), precluded claim that suppression of information had effect on domestic commerce, as required to satisfy Foreign Trade Antitrust Improvements Act (FTAIA) standards for Sherman Act monopolization suit by manufacturers against company; there was no showing that competition in market for chemical industry consulting services was harmed by lawsuit, as opposed to any harm to employee. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[10] Evidence 157 ⚷ 208(2)**

157 Evidence
157VII Admissions
157VII(A) Nature, Form, and Incidents in General
157k206 Judicial Admissions
157k208 Pleadings
157k208(2) k. Admissibility in Subsequent Proceedings in General. Most Cited Cases

**Evidence 157 ⚷ 265(8)**

157 Evidence
157VII Admissions
157VII(E) Proof and Effect
157k265 Conclusiveness and Effect
157k265(8) k. Pleadings. Most Cited Cases

Pleading from a different action is not a binding and conclusive "judicial admission."

**[11] Evidence 157 ⚷ 264**

157 Evidence
157VII Admissions
157VII(E) Proof and Effect
157k264 k. Construction. Most Cited Cases

Company's filing of trade secret complaint in state court, seeking injunction barring its employee from disclosing to India-based prospective manufacturers technology for producing tuberculosis medicine ingredient 2-Amino-1 Butanol (AB), did not constitute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judicial admission that disclosure would have adverse impact on domestic commerce, satisfying jurisdictional requirement imposed by Foreign Trade Antitrust Improvements Act (FTAIA) on prospective manufacturers' Sherman Act suit against company; there was concern that prospective manufacturer might produce AB for Asian market. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[12] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))

Foreign Trade Antitrust Improvements Act (FTAIA), requiring showing of effect on domestic commerce before Sherman Act suit could be brought involving trade or commerce with foreign nations, imposed subject matter requirements limiting jurisdiction of American courts in Sherman Act cases. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

**[13] Antitrust and Trade Regulation 29T ⚷945**

29T Antitrust and Trade Regulation
29TXVI Antitrust and Foreign Trade
29Tk945 k. In General. Most Cited Cases
(Formerly 265k12(7))

Foreign Trade Antitrust Improvements Act (FTAIA) requirement, that there be effect on domestic commerce when trade or commerce with foreign nations was involved, "other than import trade or import commerce," did not preclude application of FTAIA to bar suit by India-based prospective manufacturers of tuberculosis medicine ingredient 2-Amino-1 Butanol (AB), alleging that American company's trade secret suit to bar disclosure of critical manufacturing information prevented exportation of AB to United States; exclusionary provision was for benefit of American importers only. Sherman Act, §§ 2, 7, as amended, 15 U.S.C.A. §§ 2, 6a.

***1006** Peter Michael katsaros, Baum, Sigman, Auerbach, Pierson, Neumann & Katsaros, Ltd., Frederick Scott Rhine, Terence J. Moran, James Eric Vander Arend, Gessler, Hughes & Socol, Ltd., Chicago, IL, for United Phosphorus, Ltd., Shroff's United Chemicals, Ltd. and J.C. Miller & Associates, Inc.

T. Mark McLaughlin, Andrew Stanley Marovitz, Kaspar J. Stoffelmayr, Mayer, Brown & Platt, Stephen Novack, Patrick A. Fleming, Jennifer Lyn Friedes, Novack & Macey, Chicago, IL, for Angus Chemical Company, Angus Chemie GMBH, Freeman Hughes, Ollie W. Chandler, Lowell Pals and Gary W. Granzow.

Barrie Laine Brejcha, David G. Wix, Matthew G. Allison, Baker & McKenzie, Chicago, IL, for D.B. Gupta and Lupin Laboratories, Ltd.

***MEMORANDUM OPINION AND ORDER***

LEVIN, United States Magistrate Judge

Before the court are Defendants' motion(s) to dismiss for lack of subject matter jurisdiction (pursuant to Fed.R.Civ.P.12(b)(1)) as to Counts I and II of the second amended complaint.

**INTRODUCTION**

Plaintiffs are (a) an Indian chemical manufacturer called United Phosphorus, Ltd. ("UPL"), (b) an Indian company entitled Shroff's United Chemicals Ltd. ("SUCL") (Shroff Dep. 25), ("the Indian Plaintiffs") and (c) an American firm, J.C. Miller & Associates ("JCM"), which once had an interest in a joint venture that wanted to sell technology to the Indian Plaintiffs. Defendants are (a) Angus Chemical Corporation and its corporate officers, Freeman Hughes, Ollie Chandler, Lowell Pals, Gary W. Granzow (collectively "Angus"), (b) Angus Chemie GmbH ("Chemie"), and (c) Lupin Laboratories, Ltd. and its officer and owner D.B. Gupta (collectively "Lupin"). Counts I and II of the second amended complaint, essentially, allege that Defendants attempted to monopolize, monopolized and conspired to monopolize the market for certain chemicals in violation of § 2 of the Sherman Antitrust Act. 15 U.S.C. § 2.

Defendants threshold argument is that the court lacks subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA"), which limits application of the Sherman Act to conduct with a "direct, substantial, and reasonably foreseeable effect" on *domestic commerce*. 15 U.S.C. § 6a.

131 F.Supp.2d 1003
131 F.Supp.2d 1003, 2001-2 Trade Cases P 73,336
**(Cite as: 131 F.Supp.2d 1003)**

Page 5

### *1007 BACKGROUND FACTS

The following was expressed by the District Court in ruling on a motion under the original complaint herein:

India currently has the greatest incidence of tuberculosis in the world. The primary pharmaceutical drug used in India to cure this potentially fatal illness is Ethambutol. Two chemicals, 2-Amino-1 Butanol ("AB"), the key ingredient of Ethambutol, and 1-Nitro-Propane ("1-NP"), the raw material used to make AB, are the subjects of this litigation.

To make Ethambutol, Indian chemical laboratories, including Defendant Lupin, use AB, which they buy from Defendant Chemie, currently the world's only manufacturer of AB. Chemie, a German subsidiary wholly owned by Defendant Angus, uses 1-NP as raw material to manufacture AB at its plant in Germany. Angus, a Delaware Corporation in the business of manufacturing and selling chemical products, makes 1-NP at a plant in Sterlington, Louisiana, and is presently the world's only manufacturer of 1-NP. Mem. Op. & Order, 1994 WL 577246, *1 (N.D.Ill. Oct. 18, 1994).

The lawsuit in this case stems from prior trade secret litigation between several of the parties. In the early 1990's, the Indian Plaintiffs began to consider manufacturing AB. The Indian Plaintiffs planned to acquire the technology for making AB, and its raw material 1-NP, from Dr. John Miller (owner of JCM) who also was the former Vice President of Research and Development for Angus (makers of AB and 1-NP). While at Angus, Miller supervised Angus's propriety efforts to improve its AB processes and had ongoing access to the manufacturing process details for Angus's products.

Defendants position was as follows: While Rajju Shroff (the principal of Indian Plaintiffs) worked to acquire AB technology from Dr. Miller, he concealed Miller's identity and background from his own government by filing an official application to the Indian government falsely declaring that the technology for the AB process would be acquired from a different scientist, Dr. Phillip Adams. Adams Dep. 99-101, 133. Shroff, assertedly, withheld Miller's involvement in the project stating that Angus didn't "know that we [Shroff and Miller] are in touch." They still think it is Dr. Phil Adams. Letter from Shroff to Miller (July 30, 1991) (DX 41).

Avowedly, as soon as Angus learned that Shroff would be obtaining AB technology from Miller, Angus filed suit in the Circuit Court of Cook County ("the Cook County Action") to enjoin Miller from misappropriating its trade secrets. Two years later, when Angus was faced with a discovery ruling that would have required it to disclose the very details of the technology it sued to protect, Angus voluntarily dismissed its own suit.

The following year, in 1994, Plaintiffs initiated this action challenging Angus's pursuit of the Cook County Action. The Indian Plaintiffs allege that, but for Angus's initiation of the Cook County Action, Plaintiffs would have sold AB as well as other chemicals for profit. Moreover, JCM claims that it would have sold technology to the Indian Plaintiffs and others. Thus, in the second amended complaint, the Indian Plaintiffs alleged, *inter alia*, that they intended to manufacture AB, 1-NP and certain other specified chemicals and that Defendants used various anti-competitive means to thwart Plaintiffs' plans.

### RELEVANT STATUTE

The FTAIA, states:

Sections 1 to 7 of this title (Sherman Act) shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless-

(1) such conduct has a direct, substantial, and reasonably foreseeable effect-

***1008** (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States. 15 U.S.C. § 6a (1982).

**ANALYSIS**

Defendants move to dismiss Plaintiffs' second amended complaint for lack of subject matter jurisdiction.FN1

FN1. In this regard:
"The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir.1999) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993) (per curiam)).

**I. SUBJECT MATTER JURISDICTION**

**A. DIRECT, SUBSTANTIAL, AND REASONABLY FORESEEABLE EFFECT ON DOMESTIC COMMERCE.**

Defendants threshold argument is that the court lacks subject matter jurisdiction because Plaintiffs have failed to demonstrate that Defendants' alleged antitrust conduct has a "direct, substantial, and reasonably foreseeable effect" on United States commerce as required by the FTAIA.

Section 1 of the Sherman Act prohibits conspiracy "in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 of the Sherman Act prohibits monopolization and attempted monopolization "of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Section 6a, *supra*, which was added to the Sherman Act in 1982, sets forth the criteria for determining United States antitrust jurisdiction over international business transactions. 15 U.S.C. § 6a.

In 1982, Congress enacted the FTAIA as an amendment to the Sherman Act to clarify the extraterritorial reach of the federal antitrust laws. *O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 451 (2d Cir.1987); Roger P. Alford, "The Extraterritorial Application of Antitrust Laws: A Postscript on Hartford Fire Insurance Co. v. California," 34 Va.J.Int'l L. 213, 216 (1993). The purposes of the FTAIA, as set forth in its legislative history, are to "encourage the business community to engage in efficiency producing joint conduct in the export of American goods and services" and to amend the Sherman Act to create a unitary statutory test to determine whether American antitrust jurisdiction exists over certain international transactions. H.R.Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad. News 2487.

Congress enacted the FTAIA because it believed that American jurisdiction over international commerce should be limited to transactions that affect the American economy. *Hartford Fire Ins. v. California*, 509 U.S. 764, 796, n. 23, 113 S.Ct. 2891, 125 L.Ed.2d 612 (*citing* H.R.Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad. News 2487); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 236'a (Supp 1992). Congress believed that "the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not ***1009** foreign consumers or producers." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 272h2 (1997) (emphasis in original). With this in mind, Congress amended the Sherman Act by passing the FTAIA so that jurisdiction over foreign commercial conduct would not be exercised unless such conduct had a "direct, substantial, and reasonably foreseeable effect" on United States commerce. Moreover, Congress intended that the antitrust laws would not be "triggered ... by any minor impact," but only by "direct, substantial, and reasonably foreseeable" effects on United States commerce. Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272h2 (1997).

[1][2] Under the FTAIA, the proscriptions of the Sherman Act apply to trade or commerce with foreign nations, other than import transactions, only when the conduct providing the basis for the claim has a direct, substantial and reasonably foreseeable anticompetitive effect on United States domestic commerce. The amendment was clearly intended to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exempt from United States antitrust law conduct that lacks the requisite domestic effect, "even where the anti-trust conduct originates in the United States or involves American-owned entities operating abroad." *Optimum, S.A. v. Legent Corp.*, 926 F.Supp. 530, 532 (W.D.Pa.1996).

The FTAIA does not, however, preclude all persons or entities injured abroad from recovering under United States antitrust laws. When the activity complained of has a demonstrable effect on United States domestic commerce, foreign corporations injured abroad may seek recovery under the Sherman Act. As the House Report states, the FTAIA "preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business..." H.R.Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad. News 2487.

The effect on domestic commerce required by the FTAIA must be sufficient to "give[ ] rise to a claim" under the Sherman Act. 15 U.S.C. § 6a(2). A plaintiff's showing of domestic effects must include a demonstration of "antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 815 (9th Cir.1988); *see, e.g.*, *Blackburn v. Sweeney*, 53 F.3d 825, 830 (7th Cir.1995) (antitrust claim requires injury due to "effects ... on competition"); *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 486 (D.C.Cir.1996) (antitrust claim requires "anticompetitive impact on the market as a whole"). Moreover, conduct on American soil is not always sufficient to prove effect on domestic commerce because it is the situs of the effect, not the conduct, which is crucial. *Liamuiga Tours, Div. Of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd.*, 617 F.Supp. 920, 924 (E.D.N.Y.1985).

As discussed hereinafter, the court finds that the alleged conduct underlying Plaintiffs' claims can have had no effect on any United States commerce in the chemicals that Plaintiffs state they would have manufactured. Discovery has revealed that there is only one chemical as to which Plaintiffs took even preliminary steps-AB, which Plaintiffs did not intend to sell in the United States. Plaintiffs may have considered making 1-NP, but only for their own use in manufacturing AB. As for the other chemicals named in the second amended complaint, the record shows, at most, that Plaintiffs had a conclusory intent to think about making them at some point in the future. Respectfully, conjecture alone, however, cannot establish the necessary domestic effect under the FTAIA, as a matter of law. *McElderry v. Cathay Pacific Airways, Ltd.*, 678 F.Supp. 1071, 1078 (S.D.N.Y.1988) (FTAIA requires more than "speculative" domestic effects). Plaintiffs' "failure to establish any anticompetitive domestic effect [is] jurisdictional," implicitly fails to meet the requisite "direct, substantial, and reasonably foreseeable effect" test and requires dismissal of their antitrust claims. ***1010***Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1544 (9th Cir.1994).

### B. A SHOWING OF THE REQUISITE EFFECT ON DOMESTIC AB SALES HAS NOT BEEN MADE.

In late 1990 and early 1991 Plaintiffs decided to manufacture AB in Vapi, India.2d Am. Cmplt. ¶ 55. Plaintiffs planned to manufacture AB by using technology developed through a joint venture called Miller-Deltachem, in which JCM was one of the principals. *Id.* ¶¶ 57, 59.

Plaintiffs first allege that Defendants used various anticompetitive means to interfere with Plaintiffs' AB plans, including making threats against Plaintiffs' potential AB customers and initiating a "sham" state court lawsuit (the Cook County action) in 1991 to prevent JCM's principal, Miller, (Angus's former Vice President for Research and Development) from divulging Angus's trade secrets. 2d Am. Cmplt. ¶¶ 85-89, 97(b)-(e). Defendants maintain, however, that even if Plaintiffs' allegations of misconduct have merit, the evidence demonstrates that there could have been no effect on domestic commerce.

#### 1. Plaintiffs Would Not Have Sold AB In The United States.

[3] Plaintiffs threshold argument is that they would have sold AB in the United States if the Defendants had not intentionally interfered with their efforts to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

manufacture AB. Defendants, however, argue that Plaintiffs never intended to sell AB in the United States and that Plaintiffs, even if they had wanted to, could not have made any AB sales in the United States. Defendants further assert that even if their alleged scheme to prevent the Plaintiffs from manufacturing AB had been successful, it could have had no effect on domestic commerce, must less the required "direct, substantial, and reasonably foreseeable effect" sufficient to give rise to a cause of action under the Sherman Act. They assert that the FTAIA requires dismissal of Plaintiffs' claims.

**a. Plaintiffs Did Not Have An Intent (Or Ability) To Sell AB In The United States.**

The evidence in this case indicates that Shroff began to develop plans to manufacture AB after Phillip Adams (Shroff's consultant) told him that it was a "good project for India." Shroff Dep. 35-36. Moreover, Anant Thakore, a past president of the Indian Drug Manufacturer Association, who has been involved in the Indian AB business since the early 1970s and who is considered to be "the best authority in India" on the subject, testified that Indian buyers purchase 90-95% of the world's AB supply. Thakore Dep. 38, 285-86, 328, 390; *see also id* at 63 ("potential customers [for AB] were anyone who makes ethambutol in India").

The record demonstrates that Miller learned about Shroff's companies at a meeting with Adams and one of Shroff's chemical brokers, Eugene Klim. At the meeting, Miller told Adams and Klim that he "was interested in talking with [UPL] because he had business that would be very good in India," and that "he had a process for making [AB] whose market is in India." Klim Aff. ¶ 9 (DX 140); Klim Dep. 45-47. Moreover, Adams told Miller that he would pass on Miller's card to Shroff because "Miller said that the market was in India" and "we had no need for [AB] in this country." Adams Dep. 83; *see also id* at 81-82 (Miller said that "the AB product would be used in India.") Klim himself had "no interest" in AB because, as he swore in an affidavit submitted in the Cook County action, "the market for it is in India with no U.S. business." Klim Aff. ¶ 11 (DX 140); *see also* Klim Dep. 54, 56-57.

The day after the meeting with Miller, Klim alerted Shroff to an opportunity to license a "proven process" to manufacture a product for which there is "an ongoing requirement in India for 1.5 million lbs." ***1011** Letter from E. Klim to R. Shroff (Feb. 8, 1991) (DX 2); *see* Klim Dep. 71-72; Shroff Dep. 40-42. That product turned out to be AB and the source of the technology was Miller-Deltachem. Shroff Dep. 42; 2d Am. Cmplt. ¶ 59. Klim's report to Shroff on the Indian demand for AB was based on Miller's estimate of "the value of this whole thing." Klim Dep. 72. A subsequent letter to Shroff, which Miller drafted for Klim, stated that the demand for AB was "1.5 million lbs used in India" and [a]nother potential "1.5 million lbs in China," and that "this product would be used exclusively in Asia (especially India)." Letter from E. Klim to R. Shroff (Feb. 21, 1991) (DX 4); *see* Facsimile from J. Miller to E. Klim (undated) (DX 143); Miller Dep. 144; Klim Dep. 82; Shroff Dep. 52, 55. The Miller/Klim letter makes no mention of any possible use for AB in the United States.

Two months later, Shroff advised Miller that "there is [a] reasonably good market in India based upon his company's evaluation of "[p]ublished import figures" from the Indian government." Letter from R. Shroff to J. Miller (Apr. 18, 1991) (DX 6); Shroff Dep. 64, 67. Miller responded with a letter describing the "market for AB in India" and projecting annual sales and gross profits for UPL based on the assumption "that UPL pursues only the India AB potential" and not also "the Chinese AB market." Letter from J. Miller to R. Shroff (Apr. 22, 1991) (DX 7); *see* Shroff Dep. 71-72. Neither letter mentions any possibility of selling AB in the United States.

Shroff's plans for the size of his AB plant confirm that Plaintiffs' production and sale of AB was to be limited to India. The Indian Plaintiffs' Application for Foreign Collaboration submitted to the Indian government estimated the Indian Plaintiffs' annual production of AB in metric tons per year, assuming that the plant would not reach "full capacity" until its third year of operation. Application at 4 (DX 8); *see* Shroff Dep. 78, 132-33. "Full capacity" for Shroff meant 1000 metric tons of AB per year, which was precisely his estimate of the annual demand for AB in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

India:
Q: So your estimate was you planned to build a plant with an annual capacity of 1,000 metric tons of AB based upon your assessment that the demand in India for AB was approximately that?
A: Yeah.

Shroff Dep. 134.

The fact that Plaintiffs' AB plans were limited to non-United States markets is further demonstrated by Plaintiffs' intent to sell AB for use only in manufacturing ethambutol, which is not made in the United States.FN2 Moreover, Shroff knows of no "other uses for AB except for the manufacture of ethambutol." Shroff Dep 147; *see also id* at 773 ("AB that United Phosphorus might undertake to make would be used for the production of Ethambutol"). Miller also denied any knowledge that "Shroff or his companies planned to do anything with AB other than to sell it to ethambutol makers." Miller Dep. 405. Moreover, Plaintiffs' litigation consultant Peter Kizuik, who was formerly sales manager for nitroparaffins at Angus's competitor, W.R. Grace, knows of no application for AB other than the production of ethambutol. Kizuik Dep. 49, 51, 104.

FN2. It appears no company has manufactured ethambutol in the United States during the entire period covered by Plaintiffs' claims. Little Aff. ¶¶ 4, 7.

The record further demonstrates that Plaintiffs would not have sold AB to the Italian facility of American Cyanamid or its subsidiary Lederle. Angus DC Br. 12, 14-16. During the period covered by Plaintiffs' lawsuit, the Lederle division of the American Home Products (formerly a division of American Cyanamid), was the only company in the world, that had FDA approval to sell ethambutol domestically. Lederle imported ethambutol into the United States from Italy, where it made ***1012** ethambutol using an AB intermediate that it buys in India. *Id* ¶ 7; *see also* Gupta Dep 122-24; 430-31; 432-33; Leffler Dep. 492 (aside from Lederle, "[n]obody else sells" ethambutol in the United States). The record shows that the very small amount of AB that was sold in this country during the relevant time period was used solely as an ingredient in a product for making rocket motors which was unrelated to ethambutol (the only use of AB for which Plaintiffs were aware).

Plaintiffs allegation that they would have sold AB to American "laboratory supply houses" (Pls. DC Br. 11 n. 2, 12, 14-15) and that "there was every reason to think that" Miller eventually would have told Shroff about supply houses is not supported by the record. Pls. DC Br 12 n. 5. The record demonstrates that Shroff had no plans to sell AB to supply houses, did not know about this outlet for AB sales, and had no interest in it. Clearly Plaintiffs had no intention of selling AB to American supply houses because neither Miller nor Shroff ever had any discussions with a single American supply house. Miller Dep. 413; Shroff Dep. 144-45, 161-62. Rather, as of the documents and testimony reveal, Plaintiffs intended to sell AB to ethambutol makers abroad. The record in the case reveals only that Miller's former partner Burkholder "may have" talked to supply houses about AB (*see* Pl.'s DC Br. 27). Miller testified that Burkholder "may have mention [AB] ... [I]t's certainly a possibility. I don't know." Miller Dep 543-44.

The record further demonstrates that if Plaintiffs could have sold to supply houses, such sales would not amount to any kind of "substantial effect" on domestic commerce. Plaintiffs' catalogues indicate that supply houses sell AB in tiny volumes-offering AB in 1-gram to 500-gram quantities as effective prices ranging from $142 to $18,600 per kilogram. *See* Pls. Exs. A, B. In comparison, Angus sold AB to 3M in 1994 for $15.76 per kilogram. (DX 296) The record clearly indicates that AB is not purchased in significant quantities from supply houses.

This court finds that based on the record that Plaintiffs had no actual plans to sell AB in this country and that there would have been no significant AB sales opportunities for Plaintiffs in this country even if they had tried to sell AB here. For instance, Miller testified that he "had no conversation with any potential customers for AB in the United States." Miller Dep. 413. Moreover, Shroff testified that he and his "marketing man" spoke with ten to twelve potential AB customers, all of which were located in India.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Shroff Dep. 144-45, 161-62. Plaintiffs have put forth no evidence tending to show that, but for the claimed antitrust violations, they would have sold AB domestically.

It is clear that Plaintiffs cannot carry their burden of showing a "direct, substantial, and reasonably foreseeable effect" on domestic commerce under the FTAIA. As Plaintiffs' own liability expert agreed, "any effect upon United States commerce, based on what [he has] seen with respect to AB sales" would be "less than substantial." Leffler Dep. 475-76.

**b. The Only Domestic AB Buyer Would Not Have Purchased AB From Plaintiffs.**

While Plaintiffs assert that they would have sold AB in the United States, Defendants argue that they would have found no buyers.

The evidence indicates that during the time period covered by Plaintiffs' claims, 3M was the only customer in the United States that purchased AB. AB Customer Sales 1992-1994 (Ex. A); Littel Aff. ¶¶ 5-7 (Ex. L). Plaintiffs' expert acknowledged that "the only AB that's sold in the United States is to 3M." Leffler Dep. 443; *see also* Angus Off-Schedule Price Authorization (eff. Jan. 1, 1994) (DX 296) (all AB other than AB sold to 3M "is sold outside the United States").

***1013** Dr. Anthony Manzara, Division Scientist at 3M, testified that 3M purchases "very small amounts" of AB which is used by others in the manufacture of rocket motors. Manzara Dep. 25-26, 29. Between 1992 and 1994, 3M purchased less than 0.4% of the world's AB production manufactured for sale, with 1994 sales to 3M totaling under $25,000 (representing 0.16% of all sales and 0.14% of total volume.) AB Customer Sales 1992-1994 (Ex. A); Littel Aff. ¶ 5 (Ex L). Dr. Leffler characterized Angus's AB sales "in the United States [as] trivial." Leffler Dep. 467.

The record indicates that this small amount of AB business would not have been available to Angus's competitors. For example, 3M has never conducted any formal bidding for its AB purchases and it has never solicited offers from other AB suppliers, even when W.R. Grace, a well-know Angus competitor, offered AB for sale. Manzara Dep. 31, 45. Dr. Manzara explained that 3M purchases Angus's AB because of its "quality, purity and general reliability," that 3M is contractually bound to give its customers six-months notice of any change in its AB supplier, and that changing 3M's AB supplier entailed a risk of producing an inferior product, which could "jeopardize 3M's AB supplier relationship" with its customers. *Id.* at 32-35, 44-45.

As a result, 3M's AB purchases are "too small-and the risk and effort required to switch ... are too great-for 3M to change its AB supplier, as long as Angus supplies good quality product on a timely delivery schedule without unreasonable price increases." *Id.* at 46. Dr. Manzara testified that the risks and costs of changing AB supplier's "would overwhelm any possible savings." *Id.* at 46. He further stated that even if Angus "had doubled the price" of its AB, "it probably would not have been a major concern" to 3M. *Id.* at 114. Furthermore, even if a new supplier (like Plaintiffs) offered to cut Angus' AB prices in half, 3M "probably wouldn't be interested." *Id.* at 139.

This court finds that 3M would not have purchased AB from Plaintiffs and consequently, there would be no applicable "direct, substantial and reasonably foreseeable effect" on domestic commerce.

**c. Plaintiffs Cannot Bootstrap By Claiming Effects On Domestic Ethambutol Sales.**

[4] Defendants assert that Plaintiffs cannot claim domestic injury by supposing that their exclusion from the Indian AB business had an effect on domestic sales of ethambutol. Any alleged effect would not result in an injury to Plaintiffs because they have not claimed that they either (1) intended to make ethambutol, or (2) were prevented from making a single ethambutol sale. Moreover, during the relevant time period, Lederle had the required FDA authorization to provide ethambutol to domestic consumers.

The record indicates that there is no factual basis by which Plaintiffs can claim that there is a link between alleged misconduct in claimed foreign AB markets and the supply or price of Lederle's ethambutol in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States. Plaintiffs' expert Dr. Leffler has no opinion about whether domestic ethambutol sales are themselves "substantial," and he has conducted no analysis of how changes in overseas AB prices affect the price of ethambutol that Lederle sells here. Leffler Dep. 492-93, 495. Moreover, based on the record, there is no reason to suppose that Lederle, the only domestic ethambutol supplier, would have purchased AB from a new supplier like Plaintiffs. As Dr. Leffler noted, Lederle could lose its FDA approval by changing AB suppliers. *Id.* at 47. Furthermore, both Shroff and Miller testified that they never spoke to anyone at Lederle or American Cyanamid about the possibility of selling AB to Lederle. Shroff Dep. 163; Miller Dep. 405. Since the early 1990's, Lederle has satisfied its needs by purchasing an intermediate, D2AB, that its supplier Lupin Laboratories***1014** makes in India with AB from Angus. *See* Gupta Dep. 430-31.

The FTAIA explicitly bars antitrust actions alleging restraints in foreign markets for inputs (such as AB) that are used abroad to manufacture downstream products (like ethambutol) that may later be imported into the United States. Clearly, the domestic effects in such a case, if any, would obviously not be "direct," much less "substantial" and "reasonably foreseeable." *Papst Motoren GmbH v. Kanematsu-Goshu, Inc.*, 629 F.Supp. 864, 869 (S.D.N.Y.1986) ( "Papst's alleged restraint on STC in Japan cannot be said to have an anticompetitive effect upon United States commerce based upon [the] later sale of STC manufactured motors in the United States, since jurisdiction over Sherman Act claims 'is not supported by every conceivable repercussion of the action objected to on United States commerce.' "); *see also* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 364a (rev. ed.1995) ("radiating injuries through the economy are far beyond the ability or willingness of antitrust courts to trace and measure").

In *Eurim-Pharm*, the court rejected an attempt to establish jurisdiction by claiming that restraints abroad "had a spillover effect on domestic commerce" and noted that "[t]his is precisely the type of case Congress sought to eliminate from United States antitrust jurisdiction." *Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F.Supp. 1102, 1106-07 (S.D.N.Y.1984). When the court denied Plaintiffs' motion to compel discovery regarding the Lupin Defendants' sales to ethambutol manufacturers, it recognized that claimed effects on a domestic ethambutol market are insufficient to establish subject matter jurisdiction in a case alleging misconduct in overseas markets for products used to manufacture ethambutol. Tr. 40. (Nov. 30, 1999) (Ex. D) ("there is not subject matter jurisdiction, because it winds up with an end product that is different than was sold in Italy"). In view of the foregoing, the court finds that this claim of Plaintiffs' cannot stand.

**2. Defendants Have Not Stopped Plaintiffs From Making AB.**

[5] Plaintiffs claim that Defendants were the cause of Plaintiffs' failure to sell AB in the United States. Defendants counter that Plaintiffs now are making AB and that Plaintiffs' long delay in making AB was purely a matter of their own business choice.

The record shows that Shroff testified in 1996 that he was waiting for *this* litigation filed by *his* companies to conclude before going forward with AB production. *See, e.g.*, Shroff Dep. 481, 684, 708-09. By March 1999, however, Shroff had determined that his lawsuit was moving too slowly, and he decided to begin making AB. *Id.* at 756-57; *see also* Dave Dep. 92 (Shroff instructed his scientists to begin work on AB in mid-1998). The evidence indicates that UPL has "produced samples [of AB] and [is] working on pilot plant production," using a successful AB process that is "really simple and good" and that requires only "easily available" raw materials. Shroff Dep. 761-62, 767, 770-71; *see also* Dave Dep. 95-101 (raw materials and equipment necessary for UPL to make AB are easily available.) UPL, thus, was prepared to go into full production "as soon as possible." Shroff Dep. 761. Moreover, UPL's general manager of research and development testified that he was confident that UPL can manufacture and sell AB more cheaply than Angus can. Dave. Dep. 104.

Accordingly, this court finds that Plaintiffs' failure to sell AB in the United States was a consequence of Plaintiffs' own business decisions and thus, cannot be considered as an "effect" of any conduct of Defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

**C. A SHOWING OF THE REQUISITE EFFECT ON DOMESTIC 1-NP SALES HAS NOT BEEN MADE.**

[6] Plaintiffs claim that there is demand for 1-NP in the United States and ***1015** that Defendants prevented the Indian Plaintiffs from manufacturing 1-NP, which they allege would also have been made with technology provided by Miller-Deltachem. *See, e.g.*. 2d Am. Cmplt. ¶¶ 95, 117(b), 158(b). Defendants, aver, however, that Plaintiffs began to consider manufacturing 1-NP only to fulfill their own requirements for AB production and not for sale in the United States. *Id.* ¶¶ 92-95.

The record demonstrates that Plaintiffs' 1-NP plans were limited to 1-NP production for Plaintiffs' own use to make AB. Angus DC Br. 17-18. For instance, Shroff testified that he did not believe that any other market exists for 1-NP:

Q: And your intent at the time was to make 1-NP to use as a raw material for the manufacture of AB?
A: That's right.
Q: You had no intention of selling 1-NP anywhere else or doing anything with 1-NP other than making-
A: There's no market.
Q: There's no market for 1-NP?
A. I don't think so.

Shroff Dep. 215-16. As a result, Plaintiffs intended to manufacture 1-NP only for their own account to make AB. *Id.* at 445-46 (Shroff's plan "for the 1-NP that [he] planned to make" was "[t]o produce for our own requirements," and AB was the "only" product that Shroff "had in mind" for 1-NP). Moreover, Shroff never investigated any uses for 1-NP other than making AB. *Id.* at 907. Furthermore, because Plaintiffs had no plans for 1-NP other than for their own use, they never identified a single potential American consumer for 1-NP. Miller Dep. 368-69.

Shroff testified that in order to make 1-NP, Plaintiffs would need a new plant; however, they did not "draw up any plans or blueprints" or "have any discussions with contractors or construction companies." Shroff Dep. 444. Thus, there are no "written business plans or projections" of any kind involving 1-NP. *Id.* at 445. However, while the record shows that Plaintiffs did consider purchasing W.R. Grace's ("Grace") nitroparaffins plant in Deer Park, Texas, Shroff's $5 million offer was considered grossly inadequate because Grace had determined that $20 million was an appropriate sales price. Neeves Dep. 78, 83, 96; Kiziuk Dep. 192-93. In fact, Plaintiffs' litigation consultant Peter Kiziuk testified that a $5 million offer was "insufficient and that anyone who made such an offer [w]asn't a serious contender." Kiziuk Dep. 192-93.

As demonstrated by the record even though Plaintiffs claim they had no available source to purchase 1-NP (2d Am. Cmplt ¶ ¶ 92-95), it is unclear whether the Indian Plaintiffs would have manufactured 1-NP for their own use in the production of AB. There are three other methods for making AB that do not require 1-NP. Thakore Dep. 336-37; *see also* Dave Dep. 95, 98, 101-102, 106 (describing three ways to make AB without 1-NP). JCM had contracted with the Indian Plaintiffs to develop a process for making AB that did not require 1-NP. Miller Dep. 415-16, 420; Shroff Dep. 467. Moreover, UPL's general manager of research and development reports that UPL is working on two different methods for making AB that do not involve 1-NP, and it expects to undercut the price of the AB that Angus makes using 1-NP. Dave Dep. 95, 98, 101-02, 104; *see also* Shroff Dep. 766-67, 770-71. Because the Indian Plaintiffs have decided to make AB without 1-NP, Shroff states they have no plans to manufacture 1-NP. Shroff Dep. 773. The court also notes that Plaintiffs' damages expert has not opined that they are entitled to any damages for lost sales of 1-NP. *See* Zmijewski Report 8, 16-19 (DX 297).

This court finds that based upon the record that the Indian Plaintiffs did not have firm plans to manufacture 1-NP and that they intended to manufacture 1-NP only for the purpose of making AB in India and never considered selling it in the United States. Plaintiffs' own 1-NP needs ***1016** were also uncertain (and are now non-existent) given the alternative methods for producing AB.

Plaintiffs, therefore, cannot sustain their burden under the FTAIA by claiming anticompetitive effects in an alleged domestic 1-NP market. This court finds that it would be speculative to suppose that any al-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

leged conduct that prevented the Indian Plaintiffs from making 1-NP could have had any domestic 1-NP sales, far less a "direct, substantial, and reasonably foreseeable effect" sufficient to give rise to a Sherman Act claim. Such speculation cannot overcome the jurisdictional bar of the FTAIA. McElderry, 678 F.Supp. at 1078 (domestic effects that were "at best[ ] speculative" did not satisfy FTAIA); *Liamuiga Tours*, 617 F.Supp. at 925 (dismissing action because "[w]hile the effects in St. Kitts are substantial, at best domestic consequences are speculative").

Furthermore, it bears noting at this juncture that Plaintiffs' assertion that but for the actions of Angus, they would have purchased the Grace nitroparaffins plant, moved it to India, and then used it to manufacture chemicals there for sale in the United States is unavailing. The record evidence was that Angus played no role in this situation. Even more importantly, the record establishes that Plaintiffs' $5 million offer to purchase the nitroparaffins plant was clearly insufficient. Thus, Plaintiffs were not considered to be serious contenders.

**D. A SHOWING OF THE REQUISITE EFFECT ON DOMESTIC SALES OF OTHER CHEMICALS HAS NOT BEEN MADE.**

[7] Plaintiffs allege in their second amended complaint that Defendants prevented them from manufacturing (1) other basic nitroparaffins in addition to 1-NP *i.e.*, 2-nitropropane ("2-NP"), nitromethane ("NM"), and nitromethane ("NE"); (2) other nitroparaffin derivatives including tris amino, 2-amino-2-methyl-1-propanol ("AMP"), and bronopol; and (3) a variety of other chemicals, including tertiary butyl amine, guanidine carbonate, phosgene, an ester made from AB "bottoms," a gas scrubbing agent, chloropicrin, and sodium sulfate. *E.g.*, 2d Am. Cmplt. ¶ ¶ 98-100, 108, 116, 117(c)-(d), 158(d). Defendants, however, assert that Plaintiffs' had no specific plans to manufacture these additional chemicals (i.e., there was no agreement with Miller-Deltachem to develop the technology to manufacture the chemicals) and in fact, Plaintiffs' plans for manufacturing these chemicals were nothing more than speculative.

**1. Plaintiffs Had No Plans To Manufacture Or Sell Other Nitroparaffins.**

Plaintiffs contend that Defendants' scheme to prevent Plaintiffs from manufacturing 1-NP also prevented them from manufacturing other nitroparaffins because "[m]aking 1-NP necessarily entails making" all four of the basic nitroparaffins. Pl.s Br. in Opp'n 17 (filed July 7, 1994). However, as has already discussed, Defendants maintain that Plaintiffs would never have made 1-NP under any circumstances. Rather, the Indian Plaintiffs intended to make 1-NP only to supply their own needs for manufacturing AB, and there are a number of methods for making AB that do not require 1-NP, including ones the Indian Plaintiffs have used.

The record demonstrates that Plaintiffs would not have manufactured 1-NP by nitrating propane because it generates a large amount of waste material. Miller Dep. 251-52. If Plaintiffs had manufactured 1-NP for their own use, they would have done so using a method that produces no other chemicals. The record further shows that based on Plaintiffs' "production assumptions," they would not have nitrated propane to produce 1-NP. Plaintiffs would have satisfied any needs for other basic nitroparaffins (in particular, NM) on the open market. Zmijewski Report 9-10 (DX 297). Plaintiffs, thus, reached an agreement that Miller-Deltachem would ***1017** provide the Indian Plaintiffs with technology for manufacturing 1-NP without making other products. Shroff Dep. 394-95, 400.

**2. Plaintiffs Had No Plans To Manufacture Or Sell Other Nitroparaffin Derivatives.**

Plaintiffs allege that they intended to manufacture nitroparaffin derivatives which included, tris amino, bronopol and AMP because these chemicals would have been "natural business expansions" after making AB and 1-NP. Pls. DC Br. 26 n. 11. Defendants, contend, however, that Plaintiffs had no actual plan to manufacture these nitroparaffin derivatives.

The evidence demonstrates that Plaintiffs had no plan to manufacture bronopol. For instance, Miller has never done any work on bronopol, and he regards it as "[n]ot certain," but merely a "probability," that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs will ever make bronopol, even after AB production begins. Miller Dep. 92-93, 96; *see also* Adams Dep. 57, 69-71 (Shroff rejected bronopol technology offered by his consultant Adams in 1991). Moreover, Shroff completely lost interest in bronopol after discovering that two other Indian companies were already making it: "Usually we produce chemicals where there is hardly any competition." Shroff Dep 896-97; *see also* Adams Dep. 57, 69-71. Furthermore, Miller "never did any lab work regarding the commercialization" of any other nitroparaffin derivatives listed in the complaint, and he "never did any business plan type document" with respect to these chemicals. Miller Dep. 200, 202.

With regard to tris amino and AMP, the only steps the Indian Plaintiffs took towards manufacturing nitroparaffin derivatives includes a "literature survey," where they were not able to identify a single use or potential buyer for tris amino or AMP. Shroff Dep. 715-16, 718, 902-03. Moreover, a "very preliminary report" of lab work concerning bronopol was never completed. Dave Dep. 175-76; *see also id.* at 121-22 (no "research and development efforts" of any kind regarding other derivatives.) In addition, decisions at UPL about which products to pursue were made by a committee that kept written minutes, and UPL has a policy requiring its scientists to keep written records of any lab work. Dave Dep. 55-58, 61. The record reflects, however, that no documents were produced reflecting a plan to manufacture these chemicals. Furthermore, Miller never discussed his ideas for making AMP with Shroff. Miller Dep. 200, 202.

The evidence further shows that Shroff testified that Plaintiffs are waiting for the conclusion of this litigation before moving forward with their plans to make nitroparaffin derivatives. *See, e.g., id.* at 705-06 ("as soon as this litigation is over we will go ahead"); *id.* at 715-16 (Shroff's company decided to wait until litigation concludes before "mov[ing] forward with its consideration of making" tris amino, bronopol, and AMP); *id.* at 718-19 (AMP plans are on hold because Shroff is "[w]aiting for the litigation to be over"); *id.* at 773-74 (with respect to AMP, tris amino, and bronopol, "[w]e will make it after the litigation is over, but ... we may go earlier.") The record thus demonstrates that its Plaintiffs' own business decisions that have kept them from progressing towards making nitroparaffin derivatives.[FN3]

FN3. Plaintiffs reliance on *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964 (5th Cir.1977) is, respectfully, inapposite. *See* Pls. DC Br. 26 n. 11. In that case, a jury awarded damages to a manufacturer of automobile air conditioners for air conditioner models that it actually made and also for models that it did not make (having been unlawfully excluded from making those). The court held that this issue concerned the "growth ... of ongoing business" rather than "the expansion of a present business into a new [product] market," and that the plaintiff therefore was not required to show "the preparedness and intent to expand in these areas." *Heatransfer,* 553 F.2d at 986 n. 20. By contrast, Plaintiffs' contention here that they would have sold tris amino, bronopol and AMP in this country clearly involves the "expansion" of their business into new product markets. Thus, unlike the plaintiff in *Heatransfer,* Plaintiffs must show "preparedness and intent," which they cannot do.

***1018 3. Plaintiffs Had No Plans To Manufacture Or Sell The Other Chemicals Named In The Second Amended Complaint.**

Plaintiffs allege that they would have manufactured tertiary butyl amine, guanidine carbonate, phosgene, an ester made from AB "bottoms," a gas scrubbing agent, chloropicrin and sodium sulfate if Defendants had not interfered with their attempts to do so. In contrast, Defendants allege that the record clearly shows that Plaintiffs would never have manufactured these chemicals.

The record demonstrates that Plaintiffs engaged in preliminary discussions regarding the manufacturing of these chemicals. For instance, Plaintiffs engaged in some discussion regarding the possibility of manufacturing tertiary butyl amine and agreed to "follow up at a later date" but never did. Miller Dep. 283-84. Plaintiffs also discussed the possibility of making

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

guanidine carbonate in India although they did not discuss any timetable because they were "waiting to do AB first and then move on to other projects." *Id.* at 298. Guanidine carbonate was just "somewhere down the road." *Id.* at 622.

Plaintiffs had not engaged in research and development efforts with respect to most of the chemicals. For example, regarding phosgene, Plaintiffs have made no research and development efforts because their factory is located next to a plant that makes phosgene which allows them to receive it through a direct pipe. Shroff Dep. 859. Furthermore, in most instances, Plaintiffs had made no efforts to make or sell the chemicals (*see id.*) and had not identified customers for which the chemicals could be sold. *See, e.g.*, Miller Dep. 637-38.

This court finds that the record demonstrates that Plaintiffs had no plan to manufacture and sell other nitroparaffins, nitroparaffin derivatives and the other chemicals discussed, *supra,* listed in the second amended complaint. Plaintiffs cannot point to any evidence showing that they had developed a plan to manufacture and sell these chemicals in the United States in any quantity, much less quantities that constitute a "substantial effect" on domestic commerce.

The record is also undisputed that Plaintiffs' failure to pursue these manufacturing opportunities had nothing to do with Defendants actions. In fact, Shroff testified that the Angus Defendants had done nothing that would have an affect on whether the Indian Plaintiffs' made these chemicals. Shroff Dep. 857-63; *see also id.* at 863 (between 1992 and 1999, the Indian Plaintiffs introduced "20 new products, and ... are selling quite a lot in USA" without the Angus Defendants making "any attempt to interfere"). Clearly, Plaintiffs' decision to proceed with the manufacturing of these chemicals is based on their own business judgment. Therefore, Defendants' conduct had no effect on commerce, much less a "direct, substantial, and reasonably foreseeable" effect sufficient to give rise to a Sherman Act claim. *See* McElderry, 678 F.Supp. at 1078 ("speculative" domestic effects insufficient under FTAIA).

**E. JCM'S ALLEGED INJURIES**

Plaintiffs assert that Plaintiff JCM sustained injury as a result of Defendants' antitrust conduct. Defendants avow, however, that the FTAIA does not give the court jurisdiction over JCM's claims on the basis of alleged domestic injuries.

**1. The Indian Plaintiffs May Not "Piggy-Back" On JCM's Claims.**

[8] In this case, the record demonstrates that the Indian Plaintiffs would have only been injured abroad. First, JCM was not a competitor or a consumer ***1019** in the nitroparaffins and nitroparaffin derivatives markets which Plaintiffs allege Defendants have monopolized in violation of the Sherman Act. JCM's involvement was as one of two joint venturers in Miller-Deltachem that was allegedly going to sell technology to the Indian Plaintiffs so that they could manufacture chemicals. The contracts between Miller-Deltachem and the Indian Plaintiffs prevented Miller-Deltachem and JCM from using Miller-Deltachem's technology to manufacture the chemicals themselves. *See* AB Technology Sales Agreement ¶ 4.2 (DX 49) ("The Process Technology Package ... shall be and remain the property of SUCL."); *id.* ¶ 4.5 ("All Process Technology ... shall be the sole and exclusive property of SUCL. ... MDV will not sell any AB Process Technology to any third party."); 1-NP Technology Sales Agreement ¶ ¶ 4.2, 4.5 (DX 48) (same with respect to 1-NP). Furthermore, the alleged injury to JCM and Miller-Deltachem is that they did not receive payments that they would have earned for providing technology to the Indian Plaintiffs.

Under the FTAIA, when the court's jurisdiction over a Sherman Act claims rests on a claimed "effect ... on *export* trade or export commerce ... of a person engaged in such trade or commerce in the United States," the Sherman Act "shall apply to such conduct *only for injury to export business in the United States.*" 15 U.S.C. § 6a (emphasis added). In other words, "a foreign company cannot demonstrate the domestic injury requirement by 'piggy-backing' onto the injury of a United States exporter." Optimum, 926 F.Supp. at 532 (internal quotations omitted). The *Optimum* court thus held that an Argentine firm alleging anticompetitive conduct in an Argentine market "cannot maintain an action under the Sherman Act

based merely upon injury to United States exporters attempting to enter the Argentine ... market." *Id* at 533. Similarly, in *The 'In' Porters*, the court dismissed a suit brought by a French clothing distributor alleging that the defendants' anticompetitive conduct had caused it to "terminate[ ] its relationship with a number of United States clothing exporters." *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494, 499-500 (M.D.N.C.1987). This court, therefore, concludes that the Indian Plaintiffs cannot establish FTAIA jurisdiction over JCM's claimed export-related injuries because the FTAIA "requires an actual injury to plaintiff within the United States." *Id* at 500.

**2. The Alleged Effects On JCM Could Not "Give Rise" To A Sherman Act Claim.**

[9] Defendants allege that Plaintiffs have shown no effect on domestic sales of AB, 1-NP, or any other chemical, and there is no allegation that JCM suffered any domestic injury in the market. To the contrary, JCM's alleged injuries stem from business that Miller-Deltachem allegedly lost as a supplier of technology to chemical manufacturers and as an industry consultant. As the record shows any alleged domestic effects on JCM caused by Defendants' misconduct could not "give[ ] rise to a claim under the provisions of" the Sherman Act.

The record demonstrates that the effects of Defendants alleged conduct is insufficient to establish an antitrust claim. First, the only markets in which Plaintiffs accuse Defendants of committing monopolization offenses are markets for nitroparaffins and nitroparaffin derivatives. Defendants are not participants in any market for chemical industry consulting services, and Plaintiffs do not allege antitrust violations in any such market.

Second, the record contains no evidence concerning competitive conditions in the market for chemical industry consulting services, and there is no reason to believe that Miller-Deltachem's alleged injuries as a supplier of such services could reflect any injury to competition in that market, rather than simply injury to Miller-Deltachem itself. Moreover, Plaintiffs' liability ***1020** expert Dr. Leffler has no opinion "as to how competition has been affected" ' by Miller-Deltachem leaving the market altogether. Leffler Dep. 502. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.' " *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); *see also, e.g., Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir.1991) (because "the main purpose of the antitrust laws is to preserve and promote competition[,] ... [w]hether or not a practice violates the antitrust laws is determined by its effect on competition and not its effect on an individual competitor"). Accordingly, the FTAIA requires Plaintiffs to prove "antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms." *McGlinchy*, 845 F.2d at 815.

This court finds that when, as here, antitrust plaintiffs can show at most "injury to themselves, rather than to the relevant market," they have failed to show "the requisite domestic anticompetitive effect," and their claims fail under the FTAIA. *Id.*; *see also McElderry*, 678 F.Supp. at 1077-78 (plaintiff cannot overcome FTAIA with an "allegation of mere monetary injury," since a "Sherman Act plaintiff must 'show injury to a market or to competition in general, not merely injury to individuals' "). Here, Plaintiffs have not shown the requisite domestic anticompetitive effect regarding JCM's unsupported claims of domestic injury. Clearly, the lack of any "direct, substantial, and reasonably foreseeable" domestic effect sufficient to give rise to a Sherman Act claim bars Plaintiffs' antitrust claims.

**F. THE COOK COUNTY ACTION**

Plaintiffs contend that Defendants' (Angus) amended complaint filed in the Cook County Action operates as an "admission" on the impact on domestic commerce issue. *See* Pls DC Br. 16-17. Defendants, however, state that Plaintiffs' assertion is erroneous and merely an improper attempt to relieve Plaintiffs of their burden of establishing that Defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce.

[10][11] Plaintiffs' "admission" contention cannot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prevail. As Plaintiffs' own citations recognize, a pleading from a different action is "not a judicial admission, and thus not binding or conclusive." Enquip, Inc. v. Smith-McDonald Corp., 655 F.2d 115, 118 (7th Cir.1981); *see also* Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357, 364 (7th Cir.1990) (doubting that doctrine of "men the hold" has any force other than to "bar a contract party from changing his position in [the same] litigation" and declining "to determine ... whether it applies outside the contract area") (cited as Pls. DC Br. 16-17).

Furthermore, even assuming the admissibility of the Cook County pleading for some purpose(s), it does not show that Plaintiffs must prove that they intended to and were prepared to sell AB, 1-NP, bronopol, tris amino and AMP in the United States. At most, Angus's amended complaint shows that Angus believed their trade secrets were at risk because Plaintiffs intended to use those secrets to manufacture these chemicals abroad.FN4 Furthermore, with respect to the principal products at issue in the Cook County action, Angus believed and still believes that Plaintiffs intended to use Angus's trade secrets to manufacture AB in India for sale in India and to manufacture 1-NP for use in manufacturing AB in India. Furthermore, the Cook County amended complaint*1021 contains no allegations about sales of any chemicals in this country.

FN4. Additionally, following further discovery in the Cook County action, Angus filed a second amended complaint (Reply Ex. JJ) *withdrawing* its claims regarding bronopol, tris amino, and AMP. *See* Harbor Ins., 922 F.2d at 364-65 (cited by Plaintiffs at Pls. DC Br. 17) ("if pretrial discovery or other sources of new information justify a change in a contract party's litigating position," the change could not, under any circumstances, "be deemed a forbidden attempt to 'mend the hold' ").

As demonstrated by the record, it is clear that Plaintiffs never had any significant plan to make AB, 1-NP, bronopol, tris amino, or AMP for sale in the United States. And the subject Cook County pleading contains no suggestion to the contrary.

## G. PLAINTIFFS' FTAIA/NON-JURISDICTIONAL CONTENTION

[12] Plaintiffs allege that the FTAIA presents a question of substantive law rather than an issue of jurisdiction. Plaintiffs thus assert that their antitrust claims should go to a jury because there are disputed issues of fact concerning the FTAIA and that a reasonable jury could conclude that their claims satisfy the FTAIA. Defendants, however, correctly point out that satisfaction of the FTAIA's requirements is a matter of subject matter jurisdiction. Accordingly, the FTAIA's threshold subject matter jurisdiction issue must first be addressed by the court at this time, not by a jury at trial.

At its essence, the FTAIA concerns the very power of the Court to hear and decide antitrust claims. Case law, and other authorities, uniformly agree that the FTAIA limits the "jurisdiction" of American courts over antitrust claims involving foreign commerce.FN5 Stated differently, legal authorities are consistent in describing the FTAIA issue presented here as one of subject matter jurisdiction.FN6

FN5. *See, e.g.*, Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 931 (2d Cir.1998) ("FTAIA forbids the exercise of jurisdiction over [certain] Sherman Act violations"); Caribbean Broadcasting Sys. Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1085 (D.C.Cir.1998) ("a court has subject matter jurisdiction only to the extent that" the FTAIA is satisfied); Gushi Bros. Co. v. Bank of Guam, 28 F.3d 1535, 1544 (9th Cir.1994) (applying FTAIA standard to claim under the Bank Holding Company Act and holding that the plaintiffs' "failure to establish any anticompetitive domestic effect was jurisdictional"); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 813 (9th Cir.1988) (FTAIA "precluded subject matter jurisdiction"); Filetech S.A. v. France Telecom S.A., 1999 WL 92517, at *1 (S.D.N.Y.1999) ("Within the context of the Sherman Act and the FTAIA, to establish jurisdiction defendant's conduct complained of must" satisfy the FTAIA); S. Megga Telecoms. Ltd. v. Lucent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Technologies, Inc.*, 1997 WL 86413, at *9 (D.Del.1997) ("plaintiffs fail[ed] to establish subject matter jurisdiction under the FTAIA"); *Galavan Supplements, Ltd. v. Archer Daniels Midland Co.*, 1997 WL 732498, at *1 (N.D.Cal.1997) ( "Under the FTAIA, courts only have jurisdiction over 'conduct involving trade or commerce ... with foreign nations' if that conduct" satisfies the FTAIA); *Optimum, S.A. v. Legent Corp.*, 926 F.Supp. 530, 533 (W.D.Pa.1996) (dismissing antitrust claims "for lack of subject matter jurisdiction" under FTAIA); *McElderry v. Cathay Pacific Airways Ltd.*, 678 F.Supp. 1071, 1077 (S.D.N.Y.1988) ("Under the [FTAIA], federal courts do not have jurisdiction" over claims that do not meet its standards); *Papst Motoren GmbH v. Kanematsu-Goshu (U.S.A.) Inc.*, 629 F.Supp. 864, 869 (S.D.N.Y.1986) (granting "motion to dismiss for lack of subject matter jurisdiction" under FTAIA); *Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F.Supp. 920, 925 (E.D.N.Y.1985) (claims lacked the "jurisdictional nexus" required by FTAIA); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494, 499 (M.D.N.C.1987) (FTAIA "establishes three requirements that an antitrust plaintiff ... must prove to establish subject matter jurisdiction"); *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F.Supp. 1102, 1107 (S.D.N.Y.1984) (granting "motion to dismiss for lack of subject matter jurisdiction" under FTAIA). *See also In re Copper Antitrust Litigation*, 117 F.Supp.2d 875 (W.D.Wis.2000).

FN6. Plaintiffs' supplemental citation of *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358 (2nd Cir.2000), respectfully, is of no aid to Plaintiffs. As is pertinent here, that case merely recites general, generic principles regarding the analytical approach as to whether an issue affects subject matter jurisdiction or the merits. And, factually, *Da Silva.* is a Title VII not an antitrust case.

As the District Judge stated in his prior opinion in this case, "Congress ... passed the FTAIA to amend the Sherman Act so that *jurisdiction* over foreign commercial conduct would not be exercised unless such conduct had a 'direct, substantial, and reasonably foreseeable effect' on ***1022**United States commerce." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 1994 WL 577246, at *7, (N.D.Ill. Oct. 18, 1994) (emphasis added). The legislative history also compels the same conclusion: it was Congress's "intent ... to address only ... *subject matter jurisdiction* " in passing the FTAIA, which "does not affect the legal standards for determining whether conduct violates the antitrust laws." H.R.Rep. No. 686, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad. News 2487 (emphasis added).

The FTAIA, therefore, clearly presents a jurisdictional question that must be resolved by a court before a case may proceed to a determination regarding its merits. In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Supreme Court explained that " '[w]ithout jurisdiction the court cannot proceed at all in any cause.' ... The requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.' " *See also Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir.1999) ("jurisdictional issues should be addressed first and if they are resolved against jurisdiction the case is at an end and there is no occasion to address the merits"); *Cook v. Winfrey*, 141 F.3d 322, 325 (7th Cir.1998) ("a federal court must assure itself that it possesses jurisdiction over the subject matter ... before it can proceed to take any action respecting the merits.")

Plaintiffs have not cited any real authority to support their claim that the FTAIA "presents a question of substantive law." FN7 In fact, Plaintiffs' argument in support of their unprecedented position is to note that the FTAIA does not contain the word "jurisdiction." Plaintiffs further contention that a "reasonable jury could conclude" that their claims satisfy the FTAIA is unavailing because "[t]he court must decide whether jurisdiction exists, not whether there is sufficient evidence to have a trial on the jurisdictional issues." *In re W.L.*, 1999 WL 33878, at *2 n. 2 (N.D.Ill. Jan. 19, 1999). Moreover, "disputes over material facts will not preclude the district court from determining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.Supp.2d 1003
131 F.Supp.2d 1003, 2001-2 Trade Cases P 73,336
**(Cite as: 131 F.Supp.2d 1003)**

Page 19

the jurisdictional issues." *Lumpkin v. United States,* 791 F.Supp. 747, 749 (N.D.Ill.1992). Therefore, questions of jurisdiction must be determined by the court and not by a jury (*see, e.g., Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 537-38, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995)), and "no case can properly go to trial if the court is not satisfied that it has jurisdiction." *Crawford v. United States,* 796 F.2d 924, 928 (7th Cir.1986).

FN7. Plaintiffs' citation to *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) is misplaced. In explaining that the district court there "undoubtedly *had jurisdiction,*" the Court included a footnote describing the FTAIA and noted that "the conduct alleged plainly meets [the FTAIA's] requirements." *Hartford Fire,* 509 U.S. at 795-96, n. 23, 113 S.Ct. 2891 (emphasis added). The Supreme Court's reference to the FTAIA in its explanation that subject matter jurisdiction was uncontested firmly established that the FTAIA sets forth standards governing the jurisdiction of American courts over foreign antitrust actions. Like *every* other relevant authority, *Hartford Fire* demonstrates that the FTAIA is jurisdictional.
On a different *Hartford Fire* issue raised by Plaintiffs: Plaintiffs also claim that, under *Hartford Fire,* they need only show a "substantial effect in the United States" to pursue their antitrust claims, and not the "direct, substantial and reasonably foreseeable effect" required by the FTAIA. But as noted above, even *arguendo* if the *Hartford* standard is applied, for all the same reasons that the undisputed record shows no "direct, substantial, and reasonably foreseeable effect" on domestic commerce under the FTAIA, the record shows no "substantial effect" on domestic commerce under the test proposed.

This court finds that given the case law and legislative history that it is clear that the FTAIA is a matter of subject matter jurisdiction that limits the jurisdiction of American courts over antitrust claims involving foreign commerce. Thus, any disputed facts regarding the court's subject matter jurisdiction must be resolved by the court at this time. *See Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998) (district court erred in failing ***1023** to resolve factual disputes concerning jurisdiction under the FTAIA before reaching other issues).[FN8]

FN8. Relevantly, *see also* citation and quotation at Footnote 1 herein, p. 1008, *supra*

## II. FTAIA APPLICABILITY

[13] Plaintiffs argue that the FTAIA is not applicable in this case because they would have been involved in exporting chemicals from India into the United States but for the alleged antitrust violations. Pls. DC Br. 35-37. Defendants counter that Plaintiffs' argument is both incorrect and irrelevant.

In asserting their theory, Plaintiffs rely on the FTAIA's introductory language, which states that the FTAIA's requirement of a "direct, substantial, and reasonably foreseeable effect" on domestic commerce applies to claims "involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. § 6a. Based on this language, Plaintiffs assert that the parenthetical exclusion of "import trade or import commerce" means that a foreign antitrust claim need never satisfy the FTAIA as long as it involves products that might be shipped to the United States. It is therefore, Plaintiffs' contention that if a foreign antitrust plaintiff merely alleges that it would have exported goods to the United States, then the FTAIA requirement would not apply.

The court determines that Plaintiffs' position is not a correct statement of the law. The "main significance" of the FTAIA is to make[ ] clear that the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not foreign consumers or producers"-a concern that is "triggered by direct, substantial, and reasonably foreseeable effects on United States commerce, not by any minor impact." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272h2, at 362-63 (1997) (emphasis in ori-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ginal); *see also The 'In' Porters, S.A.*, 663 F.Supp. at 499. The antitrust laws' goal of protecting American consumers and producers cannot realistically be served by Plaintiffs' version of the FTAIA, which would permit foreign plaintiffs to bring treble damages suits based on conduct that has only indirect, insubstantial, and unforeseeable effects on commerce in this country.

Accordingly, Plaintiffs' theory has been consistently rejected by the courts, which have recognized that "the 'import trade or import commerce' exception to the FTAIA applies *only to domestic importers* " *S. Megga Telecomms. Ltd. v. Lucent Technologies, Inc.*, 1997 WL 86413, at *8 n. 22 (D.Del.1997) (Reply Ex. AAA) (emphasis added); *accord Coors Brewing Co. v. Miller Brewing Co.*, 889 F.Supp. 1394, 1398 (D.Colo.1995) (FTAIA applies to antitrust claims involving foreign markets "with the exception of claims brought by *domestic importers* ") (emphasis added); *The 'In' Porters*, 663 F.Supp. at 499 (FTAIA "establishes ... requirements that an antitrust plaintiff, other than a *domestic importer*, must prove to establish subject matter jurisdiction") (emphasis added); *see also Papst Motoren GmbH*, 629 F.Supp. at 869 (FTAIA required dismissal of antitrust claims alleging restraints abroad claimed to affect products shipped to the United States). These courts have, thus, held that the FTAIA exempts those claims that involve the business of United States firms that import goods into the United States and not all claims involving the export of goods to the United States from abroad or all claims involving goods may eventually be shipped to the United States.[FN9]

FN9. The legislative history that Plaintiffs cite is not inconsistent with all this case law. The legislative history does not describe the FTAIA as exempting from its coverage all claims involving goods shipped to the United States, but only claims involving import transactions (*see* Pls. DC Br. 36-37)-*i.e.*, the business of domestic firms importing goods into the United States.
The only case that even remotely supports Plaintiffs' position is *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81 (S.D.N.Y.1995). However, more recent decisions have declined to follow its flawed analysis, which conflicts with the great weight of authority. *See S. Megga*, 1997 WL 86413, at *8 n. 22. Plaintiffs' additional citations of *Hartford Fire and Eurim-Pharm* do not assist them. *See* Pls. DC Br. 37. *Hartford Fire* said nothing at all about the exception for import transactions. *Eurim-Pharm* also did not address the issue and, in any event, the *dicta* quoted by Plaintiffs refers, like the legislative history, only to "import transactions," which limits the exception's scope to claims brought by domestic importers. *See Eurim-Pharm*, 593 F.Supp. at 1106.

Plaintiffs' theory is further belied by the language of the FTAIA because one way ***1024** in which a plaintiff can show the requisite "direct, substantial, and reasonably foreseeable effect" on domestic commerce is by showing such an effect on "import trade or import commerce with foreign nations." 15 U.S.C. § 6a(1)(A). If Plaintiffs' theory were correct, this would mean that all import-related antitrust claims would be immune from the FTAIA and such a statutory interpretation is not permissible. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (statutes "must, if possible, be construed in such fashion that every word has some operative effect"); *United States v. Ranum*, 96 F.3d 1020, 1030 (7th Cir.1996). Furthermore, a leading treatise explains, while the FTAIA's language may be "cumbersome and inelegant," it plainly "means that the antitrust laws do not apply to domestic or foreign conduct affecting foreign markets, consumers or producers unless there is a direct, substantial, and reasonably foreseeable effect on the *domestic* market." Phillip Areeda & Herbert Hovemkamp, *Antitrust Law* ¶ 272h2 (1997) (emphasis in original).

In short, the court finds that the FTAIA is applicable to the case herein.

## CONCLUSION [FN10]

FN10. The court reviewed and considered all of the points raised by the Plaintiffs, including some that were found impracticable

and unnecessary to be addressed herein. The court is mindful, too, that Plaintiffs also addressed the subject motion to dismiss issues in Plaintiffs' motion for partial summary judgment brief and reply. The court did review and consider all of Plaintiffs' arguments as to the subject motions to dismiss that were contained in the described partial summary judgment briefs of the Plaintiffs. Also, the court has reviewed Plaintiffs' surreply memorandum in opposition and finds nothing therein that would impact on the count's motion decision here.

In view of the foregoing, Defendants' motion to dismiss Counts I and II of the second amended complaint for lack of subject matter jurisdiction is granted. FN11

FN11. In view of the court's ruling, it's unnecessary to consider the other motion argument(s) of the Defendants under Counts I and II of the second amended complaint.

Too, because the court does not have original subject matter jurisdiction over Plaintiffs' federal claim(s), the court has no (and thus declines to exercise) supplemental jurisdiction over Plaintiffs' state law tortious interference claim (Count III). 28 U.S.C. § 1367(a); *Pinney Dock and Transp. Co. v. Penn. Cent. Corp.*, 196 F.3d 617, 621 (6th Cir.1999); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2nd Cir.2000); *In re Copper Antitrust Litigation*, 117 F.Supp.2d 875, 877 (W.D.Wis.2000); *see Wellness Community Nat'l v. Wellness House*, 70 F.3d 46, 50 (7th Cir.1995).

N.D.Ill.,2001.
United Phosphorus, Ltd. v. Angus Chemical Co.
131 F.Supp.2d 1003, 2001-2 Trade Cases P 73,336

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 22

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents
U.S. v. Time Warner, Inc.D.D.C.,1997.
United States District Court,District of Columbia.
UNITED STATES of America, Petitioner,
v.
TIME WARNER INC., et al., Respondents.
**No. MISC.A. 94-338(HHG).**

Jan. 22, 1997.

*OPINION*

GREENE, J.
***1** Before the Court is the petition of the United States to enforce civil investigative demands (CIDs) issued by the Department of Justice under the Antitrust Civil Process Act (ACPA). 15 U.S.C. § 1312 (1994). The CIDs seek information located in the United States relating to "[r]estraints or monopolization of domestic and international markets for cable, wire and satellite-delivered music programming through price-fixing cartels and overbroad joint ventures." Respondents are the world's major producers of prerecorded music and music videos: Time Warner Inc., Sony Corporation of America, MCA, PolyGram Holding Inc., EMI Music Inc., and Bertelsmann, Inc. Time Warner is an American company; the other respondents are American subsidiaries of foreign parents.

The basic issue is whether under the circumstances here presented the United States is entitled to investigate the factual basis for possible antitrust claims. Under the ACPA, the Department of Justice has the authority to conduct such an investigation if it has "reason to believe" that the requested information is "relevant to a civil antitrust investigation." 15 U.S.C. § 1312.

Respondents seek to set aside the CIDs insofar as they relate to their foreign activities, contending that the Department lacks jurisdiction to investigate this conduct for three reasons: (1) respondents are exempt from the antitrust laws under the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a; (2) the transactions sought to be investigated are moot; and (3) principles of comity bar the Department's investigation.

I

*Factual Background*

The CIDs seek information related to an antitrust investigation of respondents' potentially anticompetitive conduct in the United States and abroad. The Justice Department claims that such an investigation might uncover possible violations of the Sherman Act in the form of a worldwide price-fixing conspiracy or a monopoly of music programming markets with respect to several areas, as follows.

First, the major focus of the antitrust investigation is on access to prerecorded music and music videos. Respondents control at least 80 per cent of the market for prerecorded music [FN1] and music videos. They market their music videos to music video programmers who broadcast the videos over cable and satellite television. The music companies control the intellectual property rights that attach to their prerecorded music and music videos. These property rights vary from country to country, but in many foreign countries it is not permitted to broadcast a music video without a license for the right to perform the video-the "public performance right"-typically held by the music company.

Respondents control various "performance rights societies," which act as collective licensing bodies for performance rights. At the time the government issued its civil investigative demands, respondents licensed the rights to their music and music videos exclusively through such societies, including both national performance right societies, such as Video Performance, Ltd. (VPL) in Britain, and umbrella international copyright societies, such as the International Federation of the Phonographic Industry, (IFPI). In order to broadcast any music videos produced by respondents on their networks outside of the United States, music programming services (such as MTV or Country Music Television) must pay a blanket licensing fee to the national performance rights society of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 2
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
**(Cite as: Not Reported in F.Supp.)**

the country in which the music videos would be broadcast (although such videos could be broadcast for free on networks in the United States). The Justice Department seeks to investigate whether these performance rights societies have impeded U.S. exporters of music videos and original non-music programming (*i.e.*. traditional television programming) from entering foreign markets.

*2 Respondents claim that VPL and several other performance rights societies in Europe have been restructured so that they no longer hold the exclusive rights to their members' music and music videos, and that foreign record companies may now negotiate individually with music programmers. However, because respondents have refused to produce documents related to their foreign conduct, the Department asserts that it is unable to determine precisely how the performance right societies have been restructured.FN2 Indeed, based upon an examination of some documents related to the restructuring of VPL, the Department claims to have reason to believe that the exclusivity may not have been terminated. It appears to be certain that access to the withheld documents would enable the Department to investigate "the existence, scope and likely permanence of such restructurings, the existence or likelihood of de facto exclusivity, and the possibility of continued collusion through participation in such societies." Petitioner's Memorandum in Support of Motion to Set a Hearing Date, at 5.

Second, the Department seeks to investigate the European performance rights society, Phonographic Performance, Ltd. (PPL), that collectively licenses broadcasting rights to digital radio programmers and digital radio programming joint ventures formed by respondents. The Department posits that these activities may have raised the price of foreign and domestic digital radio broadcasting rights and reduced United States exports of digital radio programming.FN3

Third, the Department also seeks to inquire into joint ventures for programming services. One such joint venture, formed to produce a United States music video channel, has been terminated since the CIDs were issued, and respondents argue that any such investigation into this venture therefore is moot. However, the Department seeks to investigate also whether respondents are likely to re-form a similar joint venture in the United States, as has apparently been reported in the music industry press, and whether respondents have agreed to provide exclusive licenses for music videos to this venture in order to boycott competitors such as MTV. *See e.g.*, Brett Atwood, *Majors Eye New Options for Vid Channel*, THE BILLBOARD, July 22, 1995. The Department also claims to be concerned that American programmers may have been denied access to music videos in an Asian venture formed by some of respondents.

Fourth, the Department seeks to investigate possible antitrust violations in various worldwide license agreements entered into by some of the respondents that may have extracted higher than competitive fees for such licenses from American programmers, and it has submitted to the Court one such worldwide agreement. *See* Exhibit 1B to United States' Reply in Support of Petition to Enforce CIDs, December 22, 1994 (filed under seal).

II

*General Legal Principles*

Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209 (1946), the seminal case on administrative subpoenas, held that, in contrast to the showing of probable cause required for issuance of a search warrant, a court may enforce an administrative subpoena upon a showing only that "the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." *Oklahoma Press* concerned the authority of the Administrator of the Wage and Hour Division of the Department of Labor to issue subpoenas duces tecum to secure evidence in an investigation of a possible violation of the Fair Labor Standards Act by a publishing company. The company refused to comply, but the Supreme Court held that "Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations." *Id.* at 214.

*3 Judge June Green of this Court previously held

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
**(Cite as: Not Reported in F.Supp.)**

Page 3

that there is "little, if any, difference between the standards that have been traditionally applied in subpoena enforcement cases such as *Oklahoma Press* ... and those that should be applied to CIDs under the APCA." *Australia/Eastern U.S.A. Shipping Conference v. United States,* 1982-1 Tr. Cas. (CCH) ¶ 64,721, at 74,063 (D.D.C.1981). The undersigned agrees with this statement of the principle.

Like this case, which involves an asserted exemption under the Foreign Trade Antitrust Improvements Act for foreign conduct that has no substantial effect on domestic commerce, *Australia/Eastern* involved a Justice Department investigation into alleged antitrust violations FN4 which had been given statutory exemption from the antitrust laws in some circumstances. The court ruled that because "it is possible that factual development proceeding from the investigation will uncover non-exempt conduct, the CIDs should be enforced." *Id.* at 74,063.

The short of it is that, barring a patent lack of jurisdiction, courts have not upheld jurisdictional challenges to CIDs. Respondents rely essentially only on an out-of-context snippet of the legislative history of the ACPA. The House Report on this statute indicates that "CID recipients may ... refuse to comply with any CID if the Division has no jurisdiction to conduct an investigation-which will be the case if the activities at issue enjoy a clear exemption for the antitrust laws." H.R.Rep. No. 1343, 94th Cong., 2d Sess. 11. However, the same House Report goes on to state: the "Committee stresse[s] that the scope of many antitrust exemptions is not precisely clear.... In these many cases, the applicability of an asserted exemption may well be a central issue in the case. If so, the mere assertion of the exemption should not be allowed to halt the investigation." *Id.* at n. 30. So, too, here, it would be premature to halt the investigation unless it is clear that the Antitrust Division has no jurisdiction to investigate this conduct. This, patently, is not the case.

Respondents argue that the government must affirmatively establish the basis for its subject matter jurisdiction in order to conduct an investigation. But this would rewrite *Oklahoma Press* and the legislative history of the ACPA, both of which suggest that the standard for enforcement of regulatory subpoenas is the same as that applied to grand jury investigations. *Oklahoma Press,* 327 U.S. at 216 (citing *Blair v. United States,* 250 U.S. 273, 282 (1919)); *Associated Container Transp. (Australia) Ltd. v. United States,* 705 F.2d 53, 58 (2d Cir.1983) ("the House report accompanying the 1976 amendments to the ACPA reveals a preference for the less stringent grand jury subpoena standard"). The grand jury historically has had the "authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within [its] jurisdiction." *Blair,* 250 U.S. at 283. And as the Court of Appeals for the Second Circuit has said, "the ACPA's legislative history indicates that the Justice Department is to be given wide latitude when issuing CIDs, ... [and] the unmistakable purpose of the ACPA was to facilitate the Justice Department's efforts to obtain evidence during the course of a civil investigation." *Associated Container,* 705 F.2d at 58.

*4 Although the *Oklahoma Press* doctrine does not require the Department to establish its ultimate subject matter jurisdiction at the outset of its investigation, respondents argue that the Department does not have the authority to conduct an unlimited fishing expedition. This is clearly true. However, for the reasons cited *supra,* this situation is far from that.

The Court now turns to the one issue which respondents have expressly identified as a possible exemption under the antitrust laws: respondents' foreign activities.

III

*Foreign Activities*

Under the FTAIA, conduct is exempt from the Sherman Act if it does not have a "direct, substantial, and reasonably foreseeable effect" on United States commerce. 15 U.S.C. § 6a. Respondents argue that even if one assumes the Department's assertions are true-that the performance right societies operate as price-fixing cartels-the Justice Department does not have jurisdiction to investigate this conduct because respondents' conduct abroad produces merely "ordinary" export effects. This argument is grounded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 4
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
**(Cite as: Not Reported in F.Supp.)**

in a reference in the House Report on the FTAIA: "[A] price-fixing conspiracy directed solely to exported products or services absent a spillover effect on the domestic marketplace .. would normally not have the requisite effects on domestic or import conduct." H.R.Rep. No. 686, 97th Cong.2d Sess. 10 (1982). Respondents argue that "normally" refers to the "ordinary" effects of price-fixing, and that accordingly, the FTAIA confers jurisdiction over foreign price-fixing only in the exceptional case when there is a "spillover effect" in domestic markets, such as was true with respect to the OPEC cartel.

However, neither the plain language of the FTAIA, which does not identify particular categories of exempted conduct, nor its legislative history considered in full supports respondents' argument about the restrictive scope of the FTAIA. The purportedly dispositive sentence about "spillover" effects appears in a section of the legislative history referring to the standing of injured foreign buyers, not injured U.S. exporters. Moreover, as the late Professor Areeda (formerly of counsel to respondent PolyGram Holding, Inc. in this matter) noted in his treatise:

... this conclusion [that "normally" excludes from the U.S. antitrust laws all "ordinary" export effects] is not absolutely certain, for the paragraph containing the "normally" quote is followed immediately by ...

"If such solely export-oriented conduct affects export commerce of another person doing business in the United States ... [jurisdiction is preserved] insofar as there is injury to that person. Thus a domestic exporter is assured a remedy under our antitrust laws for injury caused by a competing United States exporter. But a foreign firm whose non-domestic operations were [thus injured] ... would have no remedy under our antitrust laws."

Areeda & Hovenkamp, *Antitrust Law* ¶ 236', at 337 (1996 supp.) (quoting H.R.Rep. No. 686, 97th Cong., 2d Sess. at 10-11 (1982)).

***5** In short it is clear that respondents are not exempt from the Sherman Act if their export-oriented conduct had the direct effect of injuring competing U.S. exporters. This is the question that the Justice Department is in the midst of investigating: Did foreign price-fixing affect access to music videos and prerecorded music; and if so, did such price-fixing injure American exporters, such as Country Music Television, which provide music programming services abroad by beaming their signal unchanged from the United States to foreign countries?

This case is unlike *Eurim-Pharm GmbH v. Pfizer Inc.,* 593 F.Supp. 1102 (S.D.N.Y.1984), where the district court dismissed a complaint for failing to allege any effect on U.S. trade or commerce. The plaintiff in *Pfizer* argued that defendants' activities had a "spillover effect" on domestic commerce, but the plaintiff could not allege any facts causally linking a price increase in the United States with the defendants' foreign conduct. Here, as outlined above, the Justice Department has identified several possible effects on United States commerce from respondents' foreign activities: (1) by fixing prices and thereby increasing the price for music videos abroad, the copyright societies' collective licensing scheme may have delayed or deterred American exporters from entering foreign markets; (2) these copyright societies may have limited exports of non-music, traditional television programming (such as "Beavis and Butthead"); and (3) respondents may have extracted higher than competitive fees for world-wide licenses. The Department's conclusions are, of course, speculative at this stage because respondents have precluded them from examining documents related to these activities. The point of the CIDs is to determine whether the facts support the government's theory.

Even if this Court were to agree with respondents that the "ordinary" effects of foreign price-fixing are exempt from the Sherman Act, the FTAIA would still confer jurisdiction for boycott activity that excludes other United States exports. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 236', at 338. The Department alleges that these performance-rights societies engaged in boycott activity by collectively refusing to deal except through a common agent and collectively refusing to grant world-wide licenses. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 118 (1969) (conspiring to deny licenses to foreign intellectual property rights is a group boycott). Further, respondents allegedly formed downstream programming services in Europe and Asia, to which they may have agreed to grant exclusive music video rights-a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 5
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
**(Cite as: Not Reported in F.Supp.)**

group boycott that may violate the antitrust laws. *See United States v. Columbia Pictures Industries, Inc.,* 507 F.Supp. 412, 428 (S.D.N.Y.1980). Finally, although the Court recognizes that not every price-fix is a boycott, *Hartford Fire Ins. Co. v. California,* 509 U.S. 794, 800-811 (1993) (opinion of Scalia, J.), the fact that boycott activity implements a price-fixing arrangement does not preclude jurisdiction over such activity. *See F.T.C. v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 423 (1990).

*6 Interwoven with respondents' jurisdictional arguments is the claim that compliance with the CIDs would be burdensome. "[T]he question is whether the demand is *unduly* burdensome or *unreasonably* broad." *F.T.C. v. Texaco, Inc.,* 555 F.2d 862, 882 (D.C.Cir.) (emphasis in original), *cert. denied,* 431 U.S. 974 (1977). The burden of demonstrating that the CIDs are unreasonable is on the subpoenaed party. *United States v. Powell,* 379 U.S. 48, 58 (1964). Respondents have not met this standard for showing undue burden or unreasonable breadth. As to subsequent, more specific objections to burdensomeness and ambiguity, the Court encourages the parties to attempt to resolve such objections through negotiation.

IV

*Comity*

Finally, it is premature to consider the issue of international comity at this stage of the investigation. *See Associated Container,* 705 F.2d at 61 (declining to halt investigation under act of state doctrine where Justice Department had met *Oklahoma Press* standard of demonstrating reasonable basis to believe that requested information was relevant to a legitimate antitrust investigation). The Executive Branch, of which the Justice Department is a part, is charged with determining whether "the importance of antitrust enforcement outweighs any relevant foreign policy concerns: "It is not the Court's role to second-guess the executive branch's judgment as to the proper role of comity concerns under these circumstances." *United States v. Baker Hughes, Inc.,* 731 F.Supp. 3, 6 n. 5 (D.D.C.1990), *aff'd,* 908 F.2d 981 (D.C.Cir.1990). To that end, the Court defers to the executive branch's judgment as to comity and declines to halt an ongoing investigation.

The decision that the *Oklahoma Press* doctrine and the FTAIA do not bar enforcement of the challenged CIDs merely means that the investigation may go forward. The Court in no way indicates how it or any other court would rule on the merits after the investigation is completed, in the event that the Justice Department decides to charge respondents with antitrust violations.

The petition to enforce the civil investigative demands will be granted.

*ORDER*

For the reasons stated in the opinion issued on this same date, it is:

ORDERED that the petition of the United States to enforce the civil investigative demands issued by the Department of Justice is GRANTED.

FN1. Prerecorded music consists of records, tapes, and compact discs.

FN2. Of course, the Court is likewise unable to do so.

FN3. Since the Justice Department issued the CIDs at issue, Congress enacted a compulsory digital radio licensing system pursuant to which, in the absence of an agreement between a licensor and licensee, domestic licenses are set by arbitration. Digital Performance Right in Sound Recordings Act of 1995, (codified at 17 U.S.C. § 115). Accordingly, the Court is requiring that the CIDs shall be modified to preclude investigation into any effects, occurring after the effective date of this Act, of the digital radio performance rights society on the price of domestic digital radio broadcasting rights. However, for the reasons outlined *infra,* the Justice Department may investigate the effect of the digital radio-related activities on U.S. exports of digital radio programming.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
**(Cite as: Not Reported in F.Supp.)**

Page 6

FN4. Those violations involved the ocean shipping industry.

D.D.C.,1997.
U.S. v. Time Warner, Inc.
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702

Briefs and Other Related Documents (Back to top)

• 1:94mc00338 (Docket) (Nov. 03, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.