# EXHIBIT 26

Westlaw.

480 F.Supp. 1138                                                        Page 1
480 F.Supp. 1138, 29 Fed.R.Serv.2d 414, 1980-1 Trade Cases P 63,124
(Cite as: 480 F.Supp. 1138)

▷

In re Uranium Antitrust Litigation D.C.Ill., 1979.
  United States District Court, N.D. Illinois, Eastern Division.
  In re URANIUM ANTITRUST LITIGATION.
  WESTINGHOUSE ELECTRIC CORPORATION,
                   Plaintiff,
                      v.
  RIO ALGOM LIMITED, Rio Algom Corporation, Rio
  Tinto Zinc Corporation Limited, RTZ Services Limited,
  Rio Tinto Zinc Corporation, Conzinc Rio Tinto ofAus-
  tralia Limited, Mary Kathleen Uranium Limited, Pancon-
  tinental MiningLimited, Queensland MinesLimited, Nuc-
  lear Fuels Corporation, Anglo-American Corporation of
  South Africa,Limited, Engelhard Minerals and Chemicals
  Corporation, Denison Mines, Limited,Denison Mines
  (U.S.) Incorporated, Noranda Mines Limited, Gulf Oil
  Corporation,GulfMinerals Canada Limited, Kerr-McGee
  Corporation, the Anaconda Company, GettyOil Company,
  Utah International Inc., Phelps Dodge Corporation, West-
  ernNuclear, Inc., Homestake Mining Company, Atlas
  Corporation, Reserve Oil andMinerals Corporation,United
  Nuclear Corporation, Federal Resources Corporation, and
             Pioneer Nuclear,Inc., Defendants.
  In re TENNESSEE VALLEY AUTHORITY URANIUM
             ANTITRUST LITIGATION.
     TENNESSEE VALLEY AUTHORITY, Plaintiff,
                      v.
        RIO ALGOM CORPORATION, Defendant.
     TENNESSEE VALLEY AUTHORITY, Plaintiff,
                      v.
  RIO ALGOM LIMITED, Rio Tinto Zinc Corporation
  Limited, RTZ Services Limited, Gulf Minerals Canada
  Limited, Gulf Oil Corporation, Uranerz Canada Limited,
  Noranda Mines Limited, and Denison Mines Limited, De-
                   fendants.
     TENNESSEE VALLEY AUTHORITY, Plaintiff,
                      v.
  URANGESELLSCHAFT mbH & CO., Uranex, Engel-
  hard Minerals & Chemicals Corporation, Nuclear Fuels
  Corporation of South Africa (Proprietary) Limited, De-
                   fendants
  Nos. 76 C 3830, 78 C 3233, 78 C 3243 and 78 C 3280.
           MDL 342, MDL 342-A.

                       Nov. 7, 1979.

In antitrust suit alleging the existence of an international
marketing arrangement among uranium producers, the
parties filed discovery demands for documents located in
foreign countries. The District Court, Marshall, J., held,
inter alia, that with certain exceptions regarding two de-
fendants, the district court had the power to issue a pro-
duction order against the resisting defendants that were
the subjects of plaintiffs' discovery motions, since those
defendants were shown to be within the court's personal
jurisdiction and to have control over the requested docu-
ments; furthermore, it was appropriate for the court to ex-
ercise its discretionary power to issue production orders,
upon a weighing of the three factors enunciated by the Su-
preme Court in its Societe opinion.

Motions granted in part and denied in part.
West Headnotes
[1] International Law 221 ⬤➞1

221 International Law
    221k1 k. Nature and Authority in General. Most Cited
Cases
In the field of foreign relations law, two types of jurisdic-
tion have been defined: prescriptive jurisdiction refers to
the capacity of a state under international law to make a
rule of law, and it is exemplified by the enactment of the
Federal Rules of Civil Procedure, e. g., Rule 37; enforce-
ment jurisdiction, on the other hand, refers to the capacity
of a state under international law to enforce a rule of law.
Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

[2] Federal Civil Procedure 170A ⬤➞1624

170A Federal Civil Procedure
    170AX Depositions and Discovery
       170AX(E) Discovery and Production of Documents
and Other Tangible Things
          170AX(E)4 Proceedings
             170Ak1624 k. Order. Most Cited Cases
When a court enters an order compelling production of
documents under Rule 37, it exercises its enforcement jur-
isdiction. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

[3] Federal Civil Procedure 170A ⬤➞1624

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of Documents and Other Tangible Things
         170AX(E)4 Proceedings
            170Ak1624 k. Order. Most Cited Cases
Jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country, but jurisdiction is less certain when American courts order a defendant to produce documents located abroad, especially when the country in which the documents are situated prohibits their disclosure. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

[4] Courts 106 ⇐29

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106k29 k. Exercise of Jurisdiction Beyond Territorial Limits. Most Cited Cases
As a general rule, a court has the power to order a person subject to its jurisdiction to perform an act in another state, but there are two preconditions for the exercise of this power: first, the court must have personal jurisdiction over the person, and second, the person must have control over the documents; the location of the documents is irrelevant.

[5] Corporations 101 ⇐1.6(9)

101 Corporations
   101I Incorporation and Organization
      101k1.6 Particular Occasions for Determining Corporate Entity
         101k1.6(9) k. Remedies and Procedure; Parties. Most Cited Cases
Test for determining whether an American court can order an American parent corporation to produce the documents of its foreign subsidiary is this: if a corporation has power, either directly or indirectly, through another corporation or a series of corporations, to elect a majority of the directors of another corporation, such corporation may be deemed a parent corporation and in control of the corporation whose directors it has the power to elect to office.

[6] Corporations 101 ⇐1.7(2)

101 Corporations
   101I Incorporation and Organization
      101k1.7 Pleading and Procedure in Determining Corporate Entity
         101k1.7(2) k. Evidence and Fact Questions. Most Cited Cases
Issue of control, as between parent and subsidiary corporations, is more a question of fact than of law and rests on a determination of whether defendant has practical and actual managerial control over, or shares such control with, its affiliate, regardless of the formalities of corporate organization.

[7] Federal Civil Procedure 170A ⇐1624

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of Documents and Other Tangible Things
         170AX(E)4 Proceedings
            170Ak1624 k. Order. Most Cited Cases
Once personal jurisdiction over the person and control over the documents by the person are present, a United States court has the power to order production of the documents, and the existence of a conflicting foreign law which prohibits the disclosure of the requested documents does not prevent the exercise of this power.

[8] International Law 221 ⇐10.1

221 International Law
   221k10.1 k. Public Policy and Comity in General. Most Cited Cases
When two states, both having jurisdiction, prescribe inconsistent conduct, American courts have developed certain rules of self-restraint governing the appropriate exercise of their power.

[9] ⇐1636.1

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of Documents and Other Tangible Things
         170AX(E)5 Compliance; Failure to Comply
          170Ak1636 Failure to Comply; Sanctions
            170Ak1636.1 k. In General. Most Cited Cases
      (Formerly 265k25(6.1), 265k25(6))

In antitrust suit alleging the existence of an international marketing arrangement among uranium producers, the district court possessed power to enter an order against defendants compelling them to produce documents located abroad if the particular defendant was within the personal jurisdiction of the court and had control over the requested documents; furthermore, the decision whether to exercise that power was a discretionary one informed by three main factors, viz., the importance of the policies underlying the United States statute forming the basis for plaintiffs' claims, the importance of the requested documents in illuminating key elements of the claims, and the degree of flexibility in the foreign nation's application of its nondisclosure laws. Fed.Rules Civ.Proc. Rules 37, 37(a), 28 U.S.C.A.

**[10] International Law 221 ⊂⇒10.9**

221 International Law
    221k10.8 Domestic Effect of Foreign Acts and Laws
        221k10.9 k. In General. Most Cited Cases
        (Formerly 221k10 8)
Act of state doctrine bars an American court from questioning the validity of the act of a foreign sovereign when that act is done within the sovereign's territory.

**[11] ⊂⇒1636.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1636 Failure to Comply; Sanctions
                    170Ak1636.1 k. In General. Most Cited Cases
    (Formerly 265k25(6 1), 265k25(6))
In antitrust suit alleging the existence of an international marketing arrangement among uranium producers, communications from foreign governments to the United States State Department protesting the issuance of production orders by American courts in similar circumstances were relevant to the decision whether to issue an order to produce foreign documents only insofar as those communications indicated the degree of accommodation or adjustment which the particular foreign government might be willing to make in its nondisclosure laws.

**[12] ⊂⇒1558.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)1 In General
                170Ak1558 Objections and Grounds for Refusal
                    170Ak1558.1 k. In General. Most Cited Cases
    (Formerly 265k25(6.1), 265k25(6))
In antitrust suit alleging the existence of an international marketing arrangement among uranium producers, Canadian corporate defendant, because of its delinquency in asserting foreign law objections, waived all objections to production of foreign documents except those objections based on the Canadian nondisclosure laws; further, in respect to a codefendant Canadian corporation, all objections filed within the time limits of pretrial order were proper.

**[13] Judgment 228 ⊂⇒707**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(B) Persons Concluded
            228k706 Persons Not Parties or Privies
                228k707 k. In General. Most Cited Cases

**Judgment 228 ⊂⇒715(1)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k715 Identity of Issues, in General
                228k715(1) k. In General. Most Cited Cases
While two defendants contended that plaintiffs, in uranium antitrust suit, were collaterally estopped from litigating their present production motions because the Tenth Circuit had decided the same issues adversely to them in related litigation, the Tenth Circuit's decision did not constitute an estoppel to plaintiffs' present motions, since one plaintiff never appeared in the prior Utah proceedings and therefore never had a full fair opportunity to litigate the issues, and since, while another plaintiff did have full opportunity to litigate the issues, those issues were not the same as presently raised.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[14] Federal Courts 170B ☞30**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction, Determination and Waiver
                170Bk30 k. Power and Duty of Court. Most Cited Cases

**☞1269.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1269 Grounds and Objections
                170Ak1269.1 k. In General. Most Cited Cases
    (Formerly 265k25(6.1), 265k25(6))

While one defendant argued that no production order could be entered in uranium antitrust suit until the district court ruled on defendant's motions to dismiss the action for lack of personal jurisdiction, the district court, even in the absence of such a ruling, possessed jurisdiction to determine its jurisdiction over the parties, and in the exercise of that jurisdiction it could compel discovery to aid its resolution of the personal jurisdiction issues. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

**[15] ☞1636.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1636 Failure to Comply; Sanctions
                    170Ak1636.1 k. In General. Most Cited Cases
    (Formerly 265k25(6.1), 265k25(6))

Because, in uranium antitrust suit, the documents withheld pursuant to foreign law were peculiarly likely to impact on both jurisdictional and merits discovery, and because any segregation of documents would likely involve the unreviewable discretion of the party segregating and withholding them, an order requiring full production was necessary. Fed.Rules Civ.Proc. Rules 37, 37(a), 28 U.S.C.A.

**[16] Corporations 101 ☞1.6(9)**

101 Corporations
    101I Incorporation and Organization
        101k1.6 Particular Occasions for Determining Corporate Entity
            101k1.6(9) k. Remedies and Procedure; Parties. Most Cited Cases

A crucial distinction exists between ability to compel production of documents and liability for a subsidiary's acts.

**[17] Corporations 101 ☞1.6(9)**

101 Corporations
    101I Incorporation and Organization
        101k1.6 Particular Occasions for Determining Corporate Entity
            101k1.6(9) k. Remedies and Procedure; Parties. Most Cited Cases

In antitrust suit alleging the existence of an international marketing arrangement among uranium producers, United States corporation, which has or once had control over its directors, officers and employees who managed the uranium-related activities of that corporation alone or of both it and its Canadian parent, had to produce all responsive documents held by those employees or former employees, even if those documents had found their way into the Canadian parent's files; the formality separating the two corporations could not be used as a screen to disguise the coordinated nature of their uranium enterprise.

**[18] ☞1636.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1636 Failure to Comply; Sanctions
                    170Ak1636.1 k. In General. Most Cited Cases
    (Formerly 265k25(6.1), 265k25(6))

With certain exceptions regarding two defendants, the district court, in antitrust suit alleging the existence of an international marketing arrangement among uranium producers, had the power to issue a production order against the resisting defendants that were the subjects of plaintiffs' discovery motions, since those defendants were shown to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.Supp. 1138                                                              Page 5
480 F.Supp. 1138, 29 Fed.R.Serv.2d 414, 1980-1 Trade Cases P 63,124
(Cite as: 480 F.Supp. 1138)

be within the court's personal jurisdiction and to have control over the requested documents; furthermore, it was appropriate for the court to exercise its discretionary power to issue production orders, upon a weighing of the three factors enunciated by the Supreme Court in its *Societe* opinion. Fed.Rules Civ.Proc. Rules 37, 37(a), 28 U.S.C.A.

[19] ⚞⚟1571

170A Federal Civil Procedure
 170AX Depositions and Discovery
  170AX(E) Discovery and Production of Documents and Other Tangible Things
   170AX(E)2 Subject Matter in General
    170Ak1571 k. In General. Most Cited Cases
(Formerly 265k25(6.1), 265k25(6))
Heart of any American antitrust case is the discovery of business documents; without them, there is virtually no case; and that is especially true when plaintiffs allege an antitrust conspiracy which has taken deliberate and elaborate steps to cloak its activities.

*1141 Donovan, Leisure, Newton & Irvine, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, Freeman, Rothe, Freeman & Salzman, Chicago, Ill., Westinghouse Electric Corp., Raymond Scannell, Pittsburgh, Pa., for Westinghouse.

Arter & Hadden, Cleveland, Ohio, Jeffrey Neal Cole, Winston & Strawn, Chicago, Ill., Simpson, Thacher & Bartlett, New York City, for Atlas.

Schiff, Hardin & Waite, Chicago, Ill., for Anaconda Co.

Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Mudge, Rose, Guthrie & Alexander, New York City, for Denison Mines, Inc.

Cahill, Gordon & Reindel, New York City, Altheimer & Gray, Chicago, Ill., for Engelhard.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, Lord, Bissell & Brook, Chicago, Ill., for Federal Resources Corp.

McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., McDermott, Will & Emery, Chicago, Ill., for Homestake.

Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee.

Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda.

Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps & Western.

Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Pioneer.

McConnell & Campbell, Chicago, Ill., for Reserve.

O'Melveny & Myers, Los Angeles, Cal., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for RTZ.

*1142 Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N.M., for United.

Mayer, Brown & Platt, Chicago, Ill., for Utah.

Jenner & Block, Chicago, Ill., for Rio.

Arnold & Porter, Washington, D.C., for Urangesellschaft.

Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, Karon, Morrison & Savikas, Chicago, Ill., for Uranerz.

Weil, Gotshal & Manges, New York City, for Uranex.

Keck, Cushman, Mahin & Cate, Chicago, Ill., Howrey & Simon, Washington, D.C., Latham & Watkins, Los Angeles, Cal., Davis, Graham & Stubbs, Denver, Colo., for Gulf.

Burditt & Calkins, Chicago, Ill., Overton, Lyman & Prince, Los Angeles, Cal., for Getty.

Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for British Government.

MEMORANDUM DECISION [FN*]

 FN* We have delayed this ruling in the hope that the question here decided might be amicably resolved among the parties to these actions and the foreign governments involved (particularly Canada and Australia). See, Letter of Latham & Watkins to the Prime Minister and Minister of Energy, Mines and Resources of Canada, dated September 12, 1979. But our hope has turned to despair. This litigation must proceed. MARSHALL, District Judge.

On February 27, 1979, we entered Joint Pretrial Order No. 5 in an effort to narrow and ripen the issues surrounding the parties' discovery demands for documents located in foreign countries. We ordered that, by March 28, 1979, all parties should either comply with outstanding discovery demands for "foreign documents" or file restated objections to the production of such documents, including specific and particularized objections to demands for any such documents whose production was said to be forbidden by foreign law. The term "foreign documents" was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.Supp. 1138                                                                                          Page 6
480 F.Supp. 1138, 29 Fed.R.Serv.2d 414, 1980-1 Trade Cases P 63,124
(Cite as: 480 F.Supp. 1138)

defined to include all documents whose disclosure was in any way affected by foreign law.

The responses of the parties were varied. Plaintiffs Westinghouse Electric Corporation (Westinghouse) and the Tennessee Valley Authority (TVA) raised no foreign law objections and stated that they either had no foreign documents or were producing all of them. Of the twenty nondefaulting active defendants in the Westinghouse action, six apparently have no foreign documents not previously produced, since they neither produced documents nor stated objections. [FN1] Two other defendants, Kerr-McGee Corporation and the Anaconda Company, appear to have now produced all responsive foreign documents. Two more defendants, Western Nuclear, Inc. and Phelps Dodge Corporation, were seemingly able to comply with all material document demands. They invoked Australian nondisclosure legislation but frankly summarized the contents of the three Australian documents in such a manner as to convince Westinghouse that it does not need the documents. Ten other defendants have raised foreign law objections and have withheld foreign documents. Those defendants are Rio Algom Corporation (Rio U.S.), Engelhard Minerals and Chemicals Corporation (Engelhard), Denison Mines, Ltd. (Denison Canada), Denison Mines, Inc. (Denison U.S.), Gulf Oil Corporation (Gulf), Gulf Minerals Canada Limited (GMCL), Getty Oil Company (Getty), Utah International, Inc. (Utah), Noranda Mines, Ltd. (Noranda), and Federal Resources Corporation (Federal). In the three TVA actions, in which eight of the thirteen named defendants have appeared, seven of the active defendants have invoked foreign nondisclosure laws as a bar to production. [FN2] Only one of those defendants, Uranerz Canada*1143 Ltd. (Uranerz), is not a defendant in the Westinghouse action.

> FN1. The six are Rio Tinto Zinc Corporation of America, Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, and Pioneer Nuclear, Inc.

> FN2. The eighth TVA defendant, Urangesellschaft mbH & Co., has raised no foreign law objections.

Westinghouse has moved for production orders pursuant to Rule 37(a), F.R.Civ.P., against the ten non-producing

defendants listed above, and TVA has similarly moved against the seven non-producing defendants in its case. The following table connects each defendant with the country whose foreign law is invoked as a bar to production. Defendants who are named in both the Westinghouse and TVA motions are identified by an asterisk (*):

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.Supp. 1138
480 F.Supp. 1138, 29 Fed.R.Serv.2d 414, 1980-1 Trade Cases P 63,124
**(Cite as: 480 F.Supp. 1138)**

| Australia | Canada |
| --------- | ------ |
| Engelhard[*] | Denison Canada[*] |
| Getty | Denison U.S.[*] |
| Noranda[*] | Federal |
| Utah | Rio U.S.[*] |
| | Uranerz |
| South Africa | Noranda[*] |
| ------------ | Gulf[*] |
| | GMCL.[*] |
| Engelhard[*] | |
| Switzerland | |
| ----------- | |
| Gulf[*] | |
| GMCL.[*] | |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.Supp. 1138                                                                                                          Page 8
480 F.Supp. 1138, 29 Fed R Serv 2d 414, 1980-1 Trade Cases P 63,124
**(Cite as: 480 F.Supp. 1138)**

Five sets of foreign laws are involved. Three of those are regulations or statutes of Canada, Australia and South Africa which were enacted or modified during the period from 1976 to 1978 for the express purpose of frustrating the jurisdiction of the United States courts over the activities of the alleged international uranium cartel. Those laws generally prohibit the production of any document relating to uranium marketing activities from 1972 through 1975 and also prohibit communications that would result in the disclosure of the contents of such documents. The fourth statute is the Ontario Business Records Protection Act, which was enacted in Canada in 1947. That Act forbids the production of any business records requested by a foreign tribunal if a provincial court issues an order to that effect. Because no such order has been sought or issued to date, this Act has little or no applicability here. The final statutes are Articles 162 and 273 of the Swiss Penal Code, which prohibit the disclosure of a "business or manufacturing secret." Because a violation can be avoided if a person with a secrecy interest in some matter consents to its disclosure, and because Gulf and GMCL expect to secure all necessary consents within a short span of time, the Swiss statutes also have limited applicability here. All of these statutes impose criminal penalties for their violation, including fines and imprisonment.

In addition to plaintiffs' motions to compel, three of the defendants Getty, Gulf and Utah have filed motions to compel Westinghouse to produce documents located in Australia, Canada and South Africa. Because Westinghouse has raised no foreign law objections to the production of those documents, these defendants' complaint is that Westinghouse's purportedly complete production of documents is in fact only a partial one. This contention rests mainly on inferences drawn from an affidavit by one of Westinghouse's attorneys, James E. Daniels.

The Daniels affidavit states that Westinghouse documents responsive to defendants' document requests are located in Canada, Australia and South Africa, that the nondisclosure laws of those countries have not deterred Westinghouse's compliance with those requests, and that, based upon his own knowledge and on consultation with others, Daniels is satisfied that copies of all responsive

documents in those countries, together with any handwritten and margin notes, are now available for inspection at Westinghouse's Pittsburgh offices. Defendants claim these statements fail to meet the requirements of paragraph 5 of Joint Pretrial Order No. 5, which requires Westinghouse to specify "the procedures it followed in ascertaining that identical copies of such foreign documents, including handwritten notations, marginalia and attachments, have been produced from files maintained in the United States . . ." In addition, they contend that Westinghouse has ignored the additional requirement that a party must identify the foreign documents that were not produced if copies of those originals were produced from its U.S. files or state the circumstances that prevent such identification. In essence, then, these defendants suspect that Westinghouse's U.S. files are less complete than **\*1144** those in foreign countries, want more complete information to determine whether this is so, and then want access to any additional documents which are discovered.

Plaintiffs' and defendants' motions to compel thus rest on wholly different theories. With plaintiffs' motions, the main issue is whether defendants should be ordered to produce withheld documents despite the prohibitions of foreign nondisclosure laws. With defendants' motions, the main issue is whether Westinghouse has withheld foreign documents, and that question turns on the sufficiency of the Daniels affidavit. Assuming such documents have been withheld, Westinghouse seems to have raised no objection to their disclosure. Because plaintiffs' motions raise the more complex issues and occupy the bulk of the voluminous papers which have been submitted to us, we shall discuss them first.

The parties have offered differing views on the proper standards to be applied in deciding whether to issue a production order for documents located in a country which prohibits their removal or disclosure. Plaintiffs argue that Rule 37 requires a bifurcated two-step procedure for compelling production and imposing sanctions. They contend that the question of whether a discovery order should issue is solely a matter of American law; foreign nondisclosure laws are only relevant in deciding whether sanctions should be imposed for non-compliance. Defendants argue that we should instead use a balancing test to consider all circumstances, including foreign law, before en-

tering an order compelling discovery. We take a middle course between these opposing positions, finding that a number of factors must be considered before issuing a production order, but that the inquiry is not as comprehensive as defendants suggest.

[1][2][3] At the outset, we should identify the type of jurisdiction exercised by a court in issuing an order to produce foreign documents. In the field of foreign relations law, two types of jurisdiction have been defined. Prescriptive jurisdiction refers to the capacity of a state under international law to make a rule of law. It is exemplified by the enactment of the Federal Rules of Civil Procedure, e g., Rule 37. Enforcement jurisdiction, on the other hand, refers to the capacity of a state under international law to enforce a rule of law. When a court enters an order compelling production of documents under Rule 37, it exercises its enforcement jurisdiction. Restatement, Second, Foreign Relations Law of the United States, s 6 (1965); Onkelinx, Conflict of International Jurisdiction: Ordering the Production of Documents in Violation of the Law of the Situs, 64 Nw L. Rev. 487, 495 (1969). The jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country. But jurisdiction is less certain when American courts order a defendant to produce documents located abroad, especially when the country in which the documents are situated prohibits their disclosure.

[4] As a general rule, a court has the power to order a person subject to its jurisdiction to perform an act in another state. Restatement, Second, Conflict of Laws, s 53 (1971). There are two preconditions for the exercise of this power. First, the court must have personal jurisdiction over the person. Second, the person must have control over the documents United States v. First National City Bank, 396 F.2d 897, 900-01 (2d Cir. 1968); In re Grand Jury Subpoenas Duces Tecum Addressed to Canadian International Paper Co., 72 F.Supp. 1013 (S.D.N.Y.1947). The location of the documents is irrelevant. 72 F.Supp. at 1020.

[5] On the issue of control, there are certain corollary principles which apply to multinational corporations. The test for determining whether an American court can order an American parent corporation to produce the documents of its foreign subsidiary was stated in In Re Investigation of World Arrangements, 13 F.R.D. 280, 285

(D.D.C.1952):

(I)f a corporation has power, either directly or indirectly, through another corporation*1145 or series of corporations, to elect a majority of the directors of another corporation, such corporation may be deemed a parent corporation and in control of the corporation whose directors it has the power to elect to office.

Thus, for example, if the parent owns more than 50% Of the foreign subsidiary's stock, it possesses the necessary control. W. Fugate, Foreign Commerce and the Antitrust Laws, 116 (2d ed. 1973).

[6] The test is less clear in situations where an order is directed to the American subsidiary of a foreign corporation to produce documents from its head office located abroad. One court has held that a subpoena duces tecum was enforceable if it was served on the subsidiary's offices in the United States, even though the corporation's board of directors had passed a resolution prohibiting the removal of the requested records from Canada and even though all the board members were residents of Canada. In Re Grand Jury Subpoenas Duces Tecum, supra, 72 F.Supp. at 1020. The court's reasoning as to how the American officers had control over the withheld documents seems to rest on the theory that it was sufficient that the documents were in the possession of the corporation and that a subpoena had been served on some of its officers. See Onkelinx, Supra, 64 Nw L.Rev. at 505-06. More helpful guidance can be drawn from Societe Internationale v. McGranery, 111 F.Supp. 435, 440-42 (D.D.C.1953), in which the court held that plaintiff, a Swiss corporation, had control over the papers of its Swiss-based bank, H. Sturzenegger & Cie. [FN3] The court attached significance to the fact that Sturzenegger was a director and officer of plaintiff and was "perhaps" a dominant personality in plaintiff's affairs. After an extensive examination of the corporate affiliations of the two partners, the court concluded that "(t)hrough the interlocked web of corporate organization, management and finance there runs the thread of a fundamental identity of individuals in the pattern of control." 111 F.Supp. at 442. Thus, the issue of control is more a question of fact than of law, and it rests on a determination of whether the defendant has practical and actual managerial control over, or shares such control with, its affiliate, regardless of the formalities of corporate organization.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. The court's holding on the control issue was accepted both by the Court of Appeals, Societe Internationale v. Brownell, 96 U.S.App.D.C. 232, 236, 225 F.2d 532, 536 (D.C.Cir. 1955), and by the Supreme Court, Societe Internationale v. Rogers, 357 U.S. 197, 204, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

[7][8] Once personal jurisdiction over the person and control over the documents by the person are present, a United States court has power to order production of the documents. The existence of a conflicting foreign law which prohibits the disclosure of the requested documents does not prevent the exercise of this power. This proposition has been accepted by both the American Law Institute (Restatement, Second, Foreign Relations Law of the United States, s 39 [FN4]), and by the Supreme Court, Societe Internationale v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). However, American courts should not ignore the fact that such a law exists. When two states, both having jurisdiction, prescribe inconsistent conduct, American courts have developed certain rules of self-restraint governing the appropriate exercise of their power. United States v. First National City Bank, supra, 396 F.2d at 901. Because Societe Internationale dominates the field and sets forth the pertinent considerations to be weighed when such conflicts arise, we analyze it at length.

FN4. Section 39(1) states:
A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.

The procedural context of the Societe case is intricate. A Swiss company brought a civil suit under the Trading with the Enemy Act to recover assets which the United States Government had seized during World War II as enemy-owned property. *1146 The American government challenged plaintiff's claim of ownership and also asserted that plaintiff itself was an "enemy" and hence was barred from recovery under the Act. To prove its defenses, the government moved for an order requiring plaintiff to produce documents held by its bank in Switzerland. The dis-

trict court granted the motion. Plaintiff then sought to avoid production on the ground that disclosure of the bank records would violate Swiss penal laws and subject it to criminal sanctions. The defendant in turn moved to dismiss the complaint because of plaintiff's noncompliance with the production order.

The district court appointed a special master to consider plaintiff's claims. The master found that there was no evidence of collusion between plaintiff and the Swiss government to evade discovery, and that plaintiff had shown good faith in its efforts to secure waivers from the Swiss government and to comply with the order. The district court accepted these findings, but nevertheless dismissed the complaint with prejudice holding that plaintiff had control over the bank records, that the records "might prove to be a deciding factor in the outcome of this suit" (111 F.Supp. at 443), that Swiss law did not provide an adequate excuse for noncompliance, and that the court in these circumstances had the power to dismiss the complaint. Although plaintiff was given a grace period to continue its efforts to secure waivers from the Swiss government, and although it produced more than 190,000 documents over the next three years, plaintiff ultimately failed to achieve full compliance. Consequently, the district court directed a final dismissal of the action. The Court of Appeals affirmed.

On certiorari, the Supreme Court affirmed the issuance of the production order, but reversed the dismissal of the action. It is the first half of the Court's holding that is of primary concern to us here.

In deciding that the production order was justified, the Court first accepted the district court's finding that, apart from the effect of Swiss law, the documents were within plaintiff's control and possession. It then discussed the question of whether Swiss law barred the conclusion that plaintiff had "control" of the documents within the meaning of the Federal Rules of Civil Procedure governing discovery orders. The Court decided that Swiss laws did not create an insuperable obstacle to issuance of a production order.

The Court identified three salient factors which influenced its decision. First, in enacting the statute which formed the basis for plaintiff's action, Congress had expressed a "deep concern" with reaching property held by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corporations whose intricate financial structure disguised their ties to enemy interests. The Court stated that a failure to order the production of documents illuminating plaintiff's financial background would frustrate this Congressional policy. We infer that the Court would accept the obverse proposition that a court should generally order production to effectuate strong Congressional policies. In addition, because the Court gave no hint that the disclosure policies of the American statute should be balanced against the secrecy policies of the Swiss law, it appears that the only pertinent inquiry is the strength of the American interests. Second, the Court noted that the requested records were "vital" to a determination of the pivotal statutory inquiry, namely whether plaintiff was the captive of enemy interests. The Court thus suggested that the normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence does not apply, and should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation. Third, in apparent reliance on plaintiff's status as a Swiss national invoking the prohibitions of its own country's penal laws, the Court stated that plaintiff was in a favorable position to secure a waiver of those laws from its government or to explore alternative procedures for achieving compliance. The opinion thus suggests that the greater the chances for flexibility in a country's application of its nondisclosure laws, the greater the likelihood that a production order **\*1147** should issue. In conclusion, the Court stated that "United States courts should be free to require (persons such as plaintiff) . . . to make all such efforts (at compliance) to the maximum of their ability . . . ." 357 U.S. at 205, 78 S.Ct. at 1092.

In the next paragraph, however, the Court explicitly confined its ruling to the case before it, thus weakening the precedential value of its three-pronged analytical framework. The propriety of issuing a production order in other cases was said to depend not only on those three factors, but also on the "exigencies of particular litigation" and "the circumstances of a given case." 357 U.S. at 206, 78 S.Ct. at 1092. These circumstances and exigencies were not defined with any particularity.

Although the Court by this language seemingly endorsed a completely open-ended approach for deciding future cases, the overall tenor of the opinion and several additional comments lead us to conclude that the Court envisioned some limits on its inquiry. First, in summarizing its holding that the district court properly issued the production order, the Court mentioned only two interests which were to be factored into the decisionmaking process: a) the requirements of the procedural rule authorizing production orders, and b) the policies underlying the law which formed the basis for the action. 357 U.S. at 206, 78 S.Ct. 1087. The first of those interests encompasses the questions of defendant's control over the documents and plaintiff's need for them. The other is confined to the importance of the policies behind the American law. Second, the next section of the opinion contains language which reserves certain factors for consideration solely at the sanctions phase of the enforcement process. In that section, the Court explored the source of a federal court's power to dismiss a complaint because of noncompliance with a production order, and decided that it rested solely on Rule 37, F.R.Civ.P. The Court then found that a district court's Rule 37 power is invoked when a party "refuses to obey" such an order, and that refusal occurs whenever a party fails to comply with an order, regardless of its reasons for noncompliance. This analysis is followed by this sentence:

Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant Only to the path which the District Court might follow in dealing with (a party's) failure to comply. 357 U.S. at 208, 78 S.Ct. at 1094. (Emphasis supplied.)

Although this sentence does not explicitly remove defendant's reasons for noncompliance from consideration at the order-making stage of the proceedings, it impliedly has that effect, because we are told such reasons are relevant Only to the question of appropriate sanctions.

This conclusion is confirmed by the third section of the Societe opinion, in which the Court examined whether plaintiff's stated reasons for noncompliance were adequate to prevent dismissal of its complaint under Rule 37. The Court first determined that plaintiff "had in good faith made diligent efforts to execute the production order," then found that those efforts fell short of full compliance, and then analyzed the shortfall to see whether it was caused by plaintiff's "inability fostered neither by its own conduct nor by circumstances within its control."

In defining acceptable forms of inability, the Court discussed a number of issues that the parties in the present

case have attempted to raise prematurely at the order-making stage. One such issue is whether defendants "deliberately courted legal impediments" in a foreign country to evade discovery, such as by requesting a foreign government to adopt a nondisclosure law and then shipping its records to that jurisdiction. Another is the severity of the sanctions imposed for violation of the nondisclosure law and the resulting hardship to defendants. In this vein, the Court noted that "fear of criminal prosecution constitutes a weighty excuse for nonproduction ... " A further issue concerns the scope and applicability of the foreign laws, since a refusal to produce which rests on an overbroad and unjustified interpretation of *1148 the foreign laws will not be honored here. On this question the Supreme Court stated that "the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws."

The wisdom of deferring consideration of these factors until the sanctions phase of the proceedings is clear. In the present case, each defendant seeks to differentiate itself from its co-defendants on the basis of a variety of factors, including the volume of the documents it is withholding, the extent of its culpability in securing passage of the foreign laws, its good faith in seeking to comply with document requests, the amount of hardship it might suffer by disclosure, and the breadth of its interpretation of foreign laws. Each defendant asks for separate treatment and consideration. A decision to grant or withhold a production order under Rule 37(a) does not provide a means for tailoring relief to the individual circumstances of each defendant. On the other hand, Rule 37(b) is flexible and offers a variety of sanctions, if necessary, which the court may incorporate into such orders "as are just."

The Supreme Court in Societe recognized the validity of this approach. Although it found that the district court was unjustified in dismissing plaintiff's complaint, it remanded the case with instructions that the district court "possesse(d) wide discretion to proceed in whatever manner it deems most effective." That discretion included options to "explore plans looking towards fuller compliance," and even to "draw ( ) inferences unfavorable to (plaintiff) as to particular events." This language indicates that a production order is only the first step in the process of resolving discovery disputes, and that it should not be prematurely burdened by a comprehensive inquiry into all ramifications of the controversy.

[9] To summarize the preceding discussion, we have concluded that we possess the power to enter an order against defendants under Rule 37(a) compelling them to produce documents located abroad if the particular defendant is within the personal jurisdiction of this court and has control over the requested documents. Societe teaches that the decision whether to exercise that power is a discretionary one which is informed by three main factors: 1) the importance of the policies underlying the United States statute which forms the basis for the plaintiffs' claims; 2) the importance of the requested documents in illuminating key elements of the claims; and 3) the degree of flexibility in the foreign nation's application of its nondisclosure laws. Relying on the Court's additional suggestion that each case must depend upon its particular facts, several defendants urge that we consider several other factors that we have not yet discussed. However, in the circumstances of this case, we find that these other factors are of limited or no utility.

Several defendants cite the Restatement, Second, Foreign Relations Law of the United States, s 40(a) or rely on broad notions of "international comity" for the proposition that we should balance the vital national interests of the United States and the foreign countries to determine which interests predominate. Aside from the fact that the judiciary has little expertise, or perhaps even authority, to evaluate the economic and social policies of a foreign country, such a balancing test is inherently unworkable in this case. The competing interests here display an irreconcilable conflict on precisely the same plane of national policy. Westinghouse seeks to enforce this nation's antitrust laws against an alleged international marketing arrangement among uranium producers, and to that end has sought documents located in foreign countries where those producers conduct their business. In specific response to this and other related litigation in the American courts, three foreign governments have enacted nondisclosure legislation which is aimed at nullifying the impact of American antitrust legislation by prohibiting access to those same documents. It is simply impossible to judicially "balance" these totally contradictory and mutually negating actions.

All defendants rely on a line of Second Circuit cases which were decided after Societe and which suggest that a district court *1149 should not order production if the order would cause a party to violate a foreign law. First Na-

tional City Bank v. Internal Revenue Service, 271 F.2d 616 (2d Cir. 1959); Ings v. Ferguson, 282 F.2d 149 (2d Cir. 1960); Application of Chase Manhattan Bank, 297 F.2d 611 (2d Cir. 1962). Plaintiffs rely in turn on a Tenth Circuit decision which takes a contrary view. Arthur Andersen & Co. v. Finesilver, 546 F.2d 338 (10th Cir. 1976). We believe that the Tenth Circuit decision is more closely in harmony with the principles established in Societe.

[10] Gulf and Uranerz urge that the production orders sought by plaintiffs are barred by the act of state doctrine because they would interfere with the conduct of our foreign relations by the Executive Branch. However, the act of state doctrine is not applicable here. That doctrine bars an American court from questioning the validity of the act of a foreign sovereign when that act is done within the sovereign's territory. Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Plaintiffs have not challenged the validity of any of the foreign nondisclosure laws which are relied on by defendants. The issue is not whether those laws are valid, but rather, conceding their validity, whether they excuse defendants from complying with a production order.

[11] Many defendants ask us to consider communications from foreign governments to the U. S. State Department which have protested the issuance of production orders by American courts in similar circumstances. We believe those communications are relevant to the decision whether to issue a production order only insofar as they indicate the degree of accommodation or adjustment which the foreign government may be willing to make in its nondisclosure laws. We reserve any further consideration of these communications to the hearing on sanctions, if that becomes necessary.

Finally we have on this question as we have on another question [FN5] been benefitted with statements amici curiae from the Governments of Canada, Australia, South Africa and Switzerland. By far the most extensive of these is the Canadian statement which urges that we defer to the critical importance which Canada attaches to its national policies and regulations. But as we have earlier observed a balancing test is inherently unworkable in this case, and were it not we would be hard pressed not to accede to the strong national policy of this country to enforce vigor-

ously its anti-trust laws.

> FN5. Here the amici appear in support of the non-defaulting defendants. On the question of the timing of the hearing to prove up damages on the default judgment, which is now before the Court of Appeals, the amici have supported the defaulting defendants.

There are two procedural hurdles we must clear before we reach the merits of the various motions to compel. The issues are ones of waiver and collateral estoppel.

[12] TVA argues that Uranerz and Noranda have waived certain foreign law objections by failing to raise them in a timely manner. As to Uranerz, we previously ruled on January 29, 1979 that Uranerz, because of its delinquency in asserting objections, had waived all objections to production Except those objections based on the Canadian nondisclosure laws. We created this exception after learning that many other defendants had raised foreign law objections, that the issue was unusually sensitive and important, and that neither side had moved for a resolution of the issue. In those circumstances, we ruled that it would be unfair to deprive Uranerz of the opportunity to raise the foreign law objection.

Noranda's situation is somewhat different. Noranda initially objected to TVA's document requests on the basis of Canadian nondisclosure laws. However, when it later defined its foreign law objections in accordance with Pretrial Order No. 5, Noranda added a new objection based on Australian law. TVA challenges the Australian law objection as untimely, because it was not raised in response to the document requests and because the pretrial order did not expressly *1150 authorize new objections. We think TVA's interpretation of the pretrial order is too narrow. The order was drafted in response to the delays and difficulties in document production which first surfaced in the Uranerz situation, and was specifically intended to provide the final deadline for particularized foreign law objections to all prior and pending document requests. All objections filed within the time limits of the order are proper.

[13] Rio U.S., Noranda and Uranerz contend that plaintiffs are collaterally estopped from litigating their present motions because the Tenth Circuit decided the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

same issues adversely to them in In Re Westinghouse Electric Corporation Uranium Contract Proceedings, 563 F.2d 992 (10th Cir. 1977). That case was a by-product of the related Virginia contracts litigation, where Westinghouse was sued for breach of its uranium contracts by thirteen utility companies, including TVA. In an effort to prove its defense that the real cause of its inability to perform was a price-fixing conspiracy among uranium producers, Westinghouse served a subpoena on Rio U.S., a non-party, in Utah. The subpoena directed Rio U.S. to produce certain business records. Rio U.S. raised the Canadian nondisclosure laws as a bar to production and moved to quash the subpoena. The district court denied the motion and entered a production order. After Rio U.S. failed to comply, it was adjudged in contempt and was fined $10,000 per day until it complied with the order. The Tenth Circuit reversed, holding that "(a)ll things considered, on the basis of the record before it, the district court in our view abused its discretion in adjudging Rio (U.S.) to be in contempt of court, and in imposing the severe sanction in connection therewith." 563 F.2d at 996.

We do not believe that the court's decision constitutes an estoppel to plaintiffs' present motions. TVA never appeared in the Utah proceedings, and therefore never had a full and fair opportunity to litigate the issues. Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Its position as a party plaintiff in the Virginia litigation, in which it was Westinghouse's adversary, gave it no meaningful incentive to intervene in Westinghouse's efforts to secure discovery on Westinghouse's cartel-related defenses. Although Westinghouse did have a full opportunity to litigate the issues, those issues are not the same as those raised here. The only issue on appeal was the propriety of the sanctions imposed for noncompliance, not the validity of the production order. Therefore, that decision offers no conclusive guidance on the issue of whether a production order should issue here. Furthermore, the decision whether to impose sanctions rests on a variety of factors, and those factors have been restructured in this case by Rio U.S.'s status as a party rather than a witness, by the more crucial relevance of the requested documents to plaintiffs' antitrust claims, and by our opportunity to have a much more complete record on Westinghouse's charges of a collusive attempt to evade discovery and of overall bad faith [FN6]

FN6. Of course, a more complete record is of no consequence for collateral estoppel purposes if Westinghouse could have developed the same facts against Rio U.S. in the earlier litigation. It appears, however, that some additional facts have only recently been made available (e. g. the grand jury documents) or relate to subsequent events (e. g. later efforts to secure waivers from the foreign governments).

We now examine whether all defendants are within the personal jurisdiction of this court and have control over the requested documents, so that we possess the requisite power to issue an order under Rule 37(a) compelling production of their foreign documents. Only Noranda has raised an objection based on lack of In personam jurisdiction. Five defendants Engelhard, Noranda, Denison U.S., Rio U.S. and Uranerz deny that they control the requested documents.

[14] Noranda has moved to dismiss both the Westinghouse and the TVA actions for lack of personal jurisdiction. Both motions have been deferred pending discovery. Noranda*1151 argues that no production order can be entered until we rule upon the motions. We disagree, because even in the absence of such a ruling, we possess jurisdiction to determine our jurisdiction over the parties. In the exercise of that jurisdiction, we may compel discovery to aid our resolution of the personal jurisdiction issues.

Noranda admits that it has interposed foreign law objections to production of several documents which are directly relevant to its contacts with Illinois: 1) the content of a document regarding the seminar of the Atomic Industrial Forum in Oak Brook, Illinois in 1973, and 2) documents concerning contacts with two Illinois utilities. Noranda seeks to nullify the usefulness of these documents by making self-serving and uncorroborated assurances that they do not establish its contacts with this state. Plaintiffs are not required to accept these assurances, and are entitled to make their own inspection of the documents. Societe Internationale v. McGranery, supra, 111 F.Supp. at 442.

[15] Noranda makes the alternative contention that we should limit discovery to those documents relevant to the jurisdictional issues. While we agree with this statement as a general principle, that principle offers little assistance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

where, as here, the jurisdictional and merits discovery is intertwined. Because the documents withheld pursuant to foreign law are peculiarly likely to impact on both areas, and because any segregation of documents will likely involve the unreviewable discretion of the party segregating and withholding them, we believe an order requiring full production is necessary.

To resolve the issue of whether four defendants control the requested documents, we must delve into the details of their corporate affiliations. Rio U.S. and Denison U.S. are the American subsidiaries of foreign parents, Engelhard is an American parent with foreign subsidiaries, and Noranda is a foreign parent with foreign and domestic subsidiaries.

Engelhard is a Delaware corporation with its principal place of business in New York City. Although it does not mine or produce uranium, it has acted as a sales representative for Nuclear Fuels Corporation of South Africa (Nufcor, a defaulting defendant) in promoting its sales of uranium in North America. In carrying out that function, Engelhard has been assisted by three wholly owned subsidiaries located in Australia and South Africa. Derby and Co. (South Africa) Pty., Ltd. is a South African corporation which is a wholly owned subsidiary of Derby and Co., Ltd. (London), which in turn is a wholly owned subsidiary of Engelhard. Derby-South Africa transmitted information between Nufcor's offices in South Africa and Engelhard's offices in the United States. Philipp Brothers (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Engelhard. Derby and Co. (Australia) Pty., Ltd. is an Australian corporation which is a wholly owned subsidiary of Derby-London. The Australian subsidiaries have aided Engelhard in its unsuccessful attempt to act as a sales representative for a newly-developing Australian mining company, Queensland Mines, which is also a defaulting defendant. Engelhard states that "it is possible that one or more of these subsidiaries may have within its possession, custody or control documents or information responsive to portions of (plaintiffs') document requests . ." Engelhard has refused to produce those documents.

It is clear that Engelhard's total ownership of its Australian and South African subsidiaries gives it effective control over those corporations' documents. Engelhard's only argument to the contrary is that the normal inference of

control is rebutted here because Engelhard has no legal right to direct the officers and employees of its foreign subsidiaries to violate the nondisclosure laws of their countries. The Supreme Court specifically rejected that argument in Societe, after it weighed the argument in light of the three factors we have identified above. 357 U.S. at 204-06, 78 S.Ct. 1087. We reach the same conclusion, but postpone our analysis for a consolidated discussion of all defendants' arguments on this issue. See pp. 1154-1156 below.

*1152 Noranda is a Canadian corporation with its principal place of business in Ontario. Noranda itself does not own uranium or uranium-producing properties and has not sold uranium. However, it owns 43.8% Of the common shares of Kerr-Addison Mines, Ltd., a Canadian corporation which has a wholly owned subsidiary called Agnew Lake Mines, Ltd., which in turn owns a 90% Interest in a uranium-producing mine in Ontario, Canada. Kerr-Addison's shares are publicly traded on the Toronto Stock Exchange and are owned by more than 11,000 shareholders. While a minority of the directors of Kerr-Addison are also officers of Noranda, Kerr-Addison keeps its own books and records and holds its own corporate meetings separate and apart from any other company. Noranda also has wholly owned subsidiaries that own uranium prospects located in Canada, Australia and the United States. One of these is Noranda Australia, Ltd., which has an interest in undeveloped uranium deposits in Australia. In addition, personnel of Noranda Sales Corporation, Ltd., a wholly owned Canadian subsidiary, have consulted with purchasers or prospective purchasers of uranium at various times in an effort to sell uranium to be produced in the future. These facts, as disclosed by affidavits in support of Noranda's motion to dismiss, reveal that Noranda has control over responsive documents of Noranda Australia and Noranda Sales, but not over those of Kerr-Addison.

The situation with Rio Algom Corporation (Rio U.S.) is much more complex than either Noranda or Engelhard. Rio U.S. is a Delaware corporation with its principal place of business in Moab, Utah, where it owns and operates a uranium mining and milling facility. Rio U.S. is the wholly owned subsidiary of Atlas Alloys, Inc., an Ohio corporation, which in turn is the wholly owned subsidiary of Rio Algom, Ltd. (Rio Canada), a Canadian corporation which mines and sells uranium produced from its Elliott

Lake mine in Canada. Rio U.S. has appeared in this action and defended itself, but Rio Canada has defaulted.

Rio U.S. states that it has withheld no documents in its possession, custody and control, including documents from files located in Canada, on the ground that they are affected by foreign law. However, it has declined to produce certain other documents located in Canada because those documents are in the possession, custody and control of its parent once removed, Rio Canada, and because production of those documents would violate Canadian law. Westinghouse has sought to define an overlap or gray area of documents falling between these two statements. Westinghouse argues that Rio U.S. has unjustifiably refused to produce responsive documents concerning its uranium mining, marketing and exploration activities, because even though those documents are located in Canada in the files of Rio Canada's directors, officers and employees, those persons at all pertinent times acted in behalf of Rio U.S. and had responsibility for those uranium activities.

In support of this contention, Westinghouse has submitted extensive evidence that Rio U.S. and Rio Canada have operated as a single functional unit in all aspects of their uranium business. These two corporations have shared an interlocking structure of corporate directors, officers, and executive and administrative personnel who have managed the uranium-related activities of both corporations. The intervening ownership interest of Atlas Alloys is wholly collateral to the managerial unity of the two companies. Numerous officers of Rio U.S. have held dual positions with Rio Canada, enabling them to perform identical uranium-related functions for each corporation. For example, George Albino, in his capacity as principal operating officer of both corporations from 1971 to 1977, exercised direct managerial control over the daily uranium operations of both companies. Nine of Rio U.S.'s current officers and directors have offices at the corporate headquarters of Rio Canada in Toronto, Ontario. In January, 1976, A. G. Lowell, who is a Rio Canada Vice-President, stated that "Rio Algom Corporation is wholly owned by Rio Algom Ltd., and all marketing matters related to *1153 uranium and other mineral products are handled from our Toronto office." Other evidence demonstrates that Rio U.S. and Rio Canada have been treated as a single uranium business not only by themselves, but by other members of the uranium industry and by their ulti-

mate parent, Rio Tinto Zinc Corporation, Ltd.

[16][17] From the available evidence of coordinated uranium-related activities, we conclude that there is a strong likelihood that Rio U.S. is withholding responsive documents in the files of Rio Canada personnel who have had and/or continue to have responsibility for Rio U.S.'s mining and marketing of uranium. To defend this withholding, Rio U.S. relies on cases involving a corporation's liability for a related corporation's actions. However, there is a crucial distinction between ability to compel production of documents and liability for a subsidiary's acts. The latter may require Rio U.S. to actually control or manage Rio Canada's business, but the former does not. W. Fugate, Foreign Commerce and the Antitrust Laws, supra at 116. It is sufficient that Rio U.S. has, or once had, control over its directors, officers and employees who managed the uranium-related activities of Rio U.S. alone or of both corporations. Rio U.S. must produce all responsive documents held by those employees or former employees, even if those documents have found their way into Rio Canada files. The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise.

A similar situation may exist with respect to defendant Denison Mines, Inc. (Denison U.S.), but Westinghouse has provided insufficient documentation for us to conclude that Denison U.S. controls withheld documents in the files of its parent defendant Denison Mines, Ltd. (Denison Canada). Denison Canada is a Canadian corporation with its principal place of business in Toronto and engages in the mining, milling and sale of uranium. Denison U.S. is a Delaware corporation with its principal place of business in Denver, Colorado and is a wholly owned subsidiary of Denison Canada. Denison U.S. is and has been engaged in exploration for uranium and other minerals in the United States. Answer, PP 17, 18. Both corporations have appeared in this action.

Like Rio U.S., Denison U.S. states that it has raised no objections based on foreign law and has produced all documents within its control. Indeed, Denison U.S. allowed plaintiffs to walk through their entire files and select documents without regard to relevancy standards, with the exception of documents covered by the attorney-client privilege or work product immunity. However, Denison U.S. has been silent on the question of whether some of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its documents were generated in Canada and have been kept there. Westinghouse suggests that these documents have been and are now held by Denison Canada and that the close managerial connections between the two corporations justify the issuance of an order directing the production of all such documents reflecting management decisions of Denison U.S. But Westinghouse's exhibits on this issue (Nos. 61 and 62) are too scanty to support this inference. Consequently, Westinghouse's motion to compel Denison U.S. to produce documents from the files of its parent Denison Canada must be denied.

Uranerz raises a control issue of a completely different character. Its documents are located primarily in its corporate offices in Canada and West Germany, and Uranerz raises no control objections as to them. But an undisclosed volume of Uranerz documents is currently located in the offices of the Ministry of Energy, Mines and Resources of the Canadian government in Ottawa. Those documents were transferred in November, 1976, after the Canadian government directed Uranerz and other companies to deposit with the Ministry all documents covered by the Canadian nondisclosure laws which had been enacted in September of that year. When Uranerz's American counsel, Mr. Levitt, later asked the Ministry if he could review the documents, he was advised that no American counsel for any company has been permitted*1154 to inspect any documents in the Ottawa depository. Levitt was informed that his request would not even be considered unless he could furnish a written opinion that he could not be compelled by any American court to disclose what he had seen. In his view, American law did not provide such an airtight safeguard against disclosure that he could give such assurances. Therefore Mr. Levitt abandoned his efforts to seek access to these documents. Because these documents are in the actual possession of government officials, and because those officials have demonstrated that access is strictly limited and is to be granted on a discretionary basis, we agree with Uranerz that it has no control over those documents. Compare Societe Internationale, supra, 357 U.S. at 204, 78 S.Ct. 1087.

[18] We have now determined that, with certain exceptions regarding Denison U.S. and Uranerz, we have the power to issue a production order under Rule 37(a) against the eleven resisting defendants that are the subjects of plaintiffs' motions. The remaining question is whether we should exercise our discretionary power to is-

sue those orders, after weighing the three factors described earlier in this memorandum. We conclude that we should.

The first consideration is the strength of the Congressional policies underlying the statute which forms the basis for plaintiffs' action. Plaintiffs' complaint challenges activities by the defendants which, if true, would constitute massive violations of this nation's antitrust laws. "These laws have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court." United States v. First National City Bank, 396 F.2d 897, 903 (2d Cir. 1968) "They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972) More specifically, Congressional concern with the very practices at issue here, and with the antitrust implications of those practices, is evidenced by extensive subcommittee investigations into the alleged international uranium cartel. See Hearings Before the Subcommittee on Oversight and Investigation of the House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977). Governmental concern with this issue achieved choate form when the Justice Department convened a grand jury which eventually charged Gulf with criminal antitrust violations arising out of the same transactions identified by Westinghouse. United States v. Gulf Oil Corp., Cr. No. 78-123 (W.D.Pa 1978). The existence of this public enforcement action does not supplant plaintiffs' private civil action. Indeed, Congress specifically intended to encourage civil antitrust actions by allowing private litigants to gain certain estoppel advantages from government antitrust actions. Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). From these indicators, it is clear that the policies supporting an inquiry into corporate activities and structure are at least as weighty, and probably stronger, with the antitrust statutes here than they were with the Trading with the Enemy Act in Societe Internationale. See W. Fugate, Supra at 122.

The second consideration is whether the requested documents are crucial to the determination of a key issue in the litigation. Plaintiffs' showing on this factor is simply over-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whelming. All of the discovery requests now at issue are directly relevant to a number of fundamental issues in the complaint, answers, affirmative defenses and counter-claims in this litigation. Plaintiffs seek vital information relating to, among other things, the time period when the alleged conspiracy of uranium producers was carrying out its activities, defendants' alleged efforts to conceal their conspiracy, the impact of that alleged conspiracy on United States interstate and foreign commerce, the defendants' defenses of sovereign compulsion, and information on uranium sales and market conditions. Plaintiffs have submitted voluminous exhibits **1155** which give a sketchy picture strongly supporting their allegations in these areas but also suggesting that there are larger gaps in defendants' document production.

The strength of plaintiffs' need for these documents is perhaps best demonstrated by these facts. First, Gulf has admitted the "establishment of an international uranium cartel under which price controls and market allocations were established" for at least some sales of uranium. (Gulf Brief, p. 18). Second, the information which plaintiffs seek is of such exceptional significance that three foreign governments have sought to authorize defendants to withhold that information for the express purpose of frustrating United States judicial inquiries into the activities of this cartel. Third, ten defendants have withheld documents under their control which are said to be within the scope of the secrecy legislation. The inevitable inference is that the withheld information is likely to be the heart and soul of plaintiffs' case.

Several defendants counter that the unproduced documents are merely cumulative of presently available discovery (Gulf, pp. 56-57) or that their own examination of the documents has convinced them that they have little significance to the case (Federal, pp. 14-15). These arguments were persuasively rejected by the district court in the Societe Internationale litigation:

Under the rules of United States Courts a party is not required to accept the assurance of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers. 111 F.Supp. at 442.

Other defendants argue that they are equally prejudiced by the nondisclosure laws, since they may be prevented from using exculpatory documents which are covered by

those laws. (See, e.g. Noranda, pp. 24-25). However, the solution to this "problem" lies in the fullest possible disclosure, not in a mutual limitation on relevant information.

[19] Finally, we recognize that, as one commentator has put it, "the heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." Note, Discovery of Documents Located Abroad in U.S. Antitrust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non-Production, 14 Va.J.Int'l. L. 747 (1974). That is especially true when plaintiffs allege an antitrust conspiracy which has taken deliberate and elaborate steps to cloak its activities. "If true, the nature of the activities must be ferreted out of dark and obscure corners." Societe Internationale, supra, 111 F.Supp. at 443. The documents at issue here are crucial to plaintiffs' proof.

The third consideration involves an appraisal of the chances for flexibility in a country's application of its nondisclosure laws. The degree of leniency in the application of the nondisclosure laws varies from country to country. South Africa has taken the most flexible position. It has allowed Westinghouse to inspect Utah's uranium-related documents in that country, and is currently considering a request from Engelhard to allow a similar inspection of its documents. Australia has rejected all past requests for a waiver of its regulations, but interprets its laws as authorizing the Attorney General to grant such waivers. The Attorney General is presently considering requests for waivers from Engelhard, Getty and Utah. Canada has taken a completely inflexible position. It has consistently rejected all requests for waivers, stating that its government officials have no authority to grant them. It has opposed Westinghouse's unsuccessful efforts to secure letters rogatory from a Canadian court for production of uranium-related documents. It has rejected all requests to modify or amend the regulations and has refused to give any assurances of non-prosecution for any violations. Canada has also sent numerous diplomatic notes to the U.S. State Department in which it has expressed a firm position that any disclosure of documents covered by its regulations would be inimical to its national interests. Canada's position has not been relaxed by its amicus submission.

**1156** On balance, we have concluded the issuance of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rule 37(a) orders is required. The entry of such orders may lead to a further narrowing of the defendants' foreign law objections. That process has already been evidenced by the increased disclosures which have occurred since Westinghouse filed the present motions. Even if some defendants subsequently conclude, as they now suggest, that they have already done everything within their powers to comply with such an order, we do not think an order at this time would be a futile gesture. The order will serve to declare Westinghouse's right to the discovery it seeks, thereby framing the competing interests of the United States and the foreign governments on a plane where the potential moderation of the exercise of their conflicting enforcement jurisdictions can be meaningfully considered. We do not seek to force any defendant to violate foreign law. But we do seek to make each defendant feel the full measure of each sovereign's conflicting commands, so that, in the words of Chief Judge Kaufman of the Second Circuit, it now

"must confront . . . the need to 'surrender to one sovereign or the other the privileges received therefrom' or, alternatively a willingness to accept the consequences."

United States v. First National City Bank, 396 F.2d 897, 905 (2d Cir. 1968).

Accordingly, plaintiffs' motions to compel Utah, Gulf, GMCL, Noranda, Denison Canada, Engelhard, Getty, Federal, and Rio U.S. to produce foreign documents are granted in their entirety and are granted in part and denied in part as to Uranerz and are denied as to Denison U.S. Defendants' alternative objections to production of foreign documents on grounds such as attorney-client privilege and overbroad definitions are reserved for ruling at such time as defendants announce their ability to comply with this order. Production hereunder to be made on or before January 2, 1980.

The motions of defendants Getty, Gulf and Utah to compel Westinghouse to comply with Pretrial Order No. 5 are granted in part and Westinghouse is directed to provide defendants with a list identifying the foreign documents which it has produced from its domestic files.
D.C.Ill., 1979.
In re Uranium Antitrust Litigation
480 F.Supp. 1138, 29 Fed.R.Serv.2d 414, 1980-1 Trade Cases P 63,124

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 27

Westlaw.

124 S.Ct. 872                                                    Page 1

540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
**(Cite as: 540 U.S. 398, 124 S.Ct. 872)**

▷

Briefs and Other Related Documents

Verizon Communications Inc. v. Law Offices of
Curtis V. Trinko, LLP U.S.,2004.
          Supreme Court of the United States
  VERIZON COMMUNICATIONS INC., Petitioner,
                      v.
   LAW OFFICES OF CURTIS V. TRINKO, LLP.
                  No. 02-682.

                Argued Oct. 14, 2003.
                Decided Jan. 13, 2004.

**Background:** Customers who received local tele-
phone service from competing local exchange carrier
(LEC) brought action against incumbent LEC, al-
leging antitrust and Communications Act violations.
The United States District Court for the Southern
District of New York, 123 F.Supp.2d 738,Sidney H.
Stein, J., dismissed action, and customers appealed.
Superseding its prior opinion, 294 F.3d 307, the
Second Circuit Court of Appeals, 305 F.3d
89,Katzmann, Circuit Judge, affirmed in part, vacated
in part and remanded. Incumbent LEC's petition for
writ of certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held
that:

(1) Telecommunications Act of 1996 had no effect
upon application of traditional antitrust principles, in
light of antitrust-specific saving clause which barred
finding of implied immunity;

(2) complaint alleging breach of incumbent LEC's
duty to share its network with competitors did not
state monopolization claim under § 2 of Sherman
Act;

(3) traditional antitrust principles did not justify addi-
tion of case to few existing exceptions to proposition
that there was no duty to aid competitors; and

(4) disposition of case made it unnecessary to con-
sider alternative contention of lack of antitrust stand-
ing.

Reversed and remanded.

Justice Stevens filed opinion concurring in judgment
in which Justices Souter and Thomas joined.
West Headnotes
**[1] Antitrust and Trade Regulation 29T ☞525**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk522 Constitutional and Statutory Pro-
visions
                29Tk525 k. Validity. Most Cited Cases
    (Formerly 265k10)
Telecommunications Act of 1996 has no effect upon
application of traditional antitrust principles, in light
of antitrust-specific saving clause which bars finding
of implied immunity. Communications Act of 1934,
§ 2, as amended, 47 U.S.C.A. § 152 note.

**[2] Antitrust and Trade Regulation 29T ☞620**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(A) In General
            29Tk619 Elements in General
                29Tk620 k. In General. Most Cited
Cases
    (Formerly 265k12(1.3))

**Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited
Cases
    (Formerly 265k12(1.3))
Offense of monopolization or attempt to monopolize
requires, in addition to possession of monopoly
power in relevant market, willful acquisition or main-
tenance of that power as distinguished from growth
or development as consequence of superior product,
business acumen, or historic accident. Sherman Act,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 872                                                                                              Page 2
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
(Cite as: 540 U.S. 398, 124 S.Ct. 872)

§ 2, as amended, 15 U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation 29T ⬤═══592**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(E) Particular Industries or Businesses
            29Tk592 k. Manufacturers. Most Cited
Cases
    (Formerly 265k12(11/4))
As general matter, Sherman Act does not restrict long
recognized right of trader or manufacturer engaged in
entirely private business, freely to exercise his own
independent discretion as to parties with whom he
will deal. Sherman Act, § 1 et seq., as amended, 15
U.S.C.A. § 1 et seq.

**[4] Antitrust and Trade Regulation 29T ⬤═══658**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(D) Illegal Restraints or Other Miscon-
duct
            29Tk657 Refusals to Deal
                29Tk658 k. In General. Most Cited
Cases
    (Formerly 265k17(2.2))
High value placed on right to refuse to deal with oth-
er firms does not mean that right is unqualified; under
certain limited circumstances, refusal to cooperate
with rivals can constitute anticompetitive conduct.
Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[5] Antitrust and Trade Regulation 29T ⬤═══
972(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(3) k. In General. Most Cited
Cases
    (Formerly 265k28(6.3))
Complaint alleging breach of incumbent local ex-
change carrier's (LEC's) duty under Telecommunica-
tions Act of 1996 to share its network with competit-
ors did not state monopolization claim under Sher-

man Act; complaint did not allege that incumbent
LEC voluntarily engaged in course of dealing with its
rivals so its prior conduct shed no light on whether its
lapses from legally compelled dealing were anticom-
petitive, incumbent LEC's reluctance to connect at
cost-based rate of compensation was uninformative
as to future price or dreams of monopoly, and rather
than involving refusal to provide competitor with
product already sold at retail, unbundled elements
were not available to public but were provided to
rivals under compulsion and at considerable expense.
Sherman Act, § 2, as amended, 15 U.S.C.A. § 2;
Communications Act of 1934, § 251(c)(3), as
amended, 47 U.S.C.A. § 251(c)(3).

**[6] Antitrust and Trade Regulation 29T ⬤═══565**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Miscon-
duct
            29Tk562 Refusals to Deal
                29Tk565 k. Essential Facilities. Most
Cited Cases
    (Formerly 265k17(2.2))

**Antitrust and Trade Regulation 29T ⬤═══660**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(D) Illegal Restraints or Other Miscon-
duct
            29Tk657 Refusals to Deal
                29Tk660 k. Essential Facilities. Most
Cited Cases
    (Formerly 265k17(2.2))
Indispensable requirement for invoking "essential fa-
cilities doctrine" is unavailability of access to essen-
tial facilities; where access exists, doctrine serves no
purpose.

**[7] Antitrust and Trade Regulation 29T ⬤═══524**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk522 Constitutional and Statutory Pro-
visions
                29Tk524 k. Construction. Most Cited

124 S.Ct. 872                                                                                    Page 3
540 U.S. 398, 124 S.Ct. 872, 157 L. Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
(Cite as: 540 U.S. 398, 124 S.Ct. 872)

Cases
    (Formerly 265k10)
Antitrust analysis must always be attuned to particu-
lar structure and circumstances of industry at issue;
where there exists regulatory structure designed to
deter and remedy anticompetitive harm, additional
benefit to competition provided by antitrust enforce-
ment will tend to be small, and it will be less plaus-
ible that antitrust laws contemplate such additional
scrutiny.

**[8] Antitrust and Trade Regulation 29T ⟨⟩960**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled
to Sue; Standing; Parties
                29Tk960 k. In General. Most Cited
Cases
    (Formerly 265k28(1.6))
Conclusion that complaint failed to state claim under
Sherman Act made unnecessary consideration of al-
ternative contention of lack of antitrust standing.
Sherman Act, § 2, as amended, 15 U.S.C.A. § 2;
Clayton Act, § 4, 15 U.S.C.A. § 15.
**873 Syllabus FN*

> FN* The syllabus constitutes no part of the
> opinion of the Court but has been prepared
> by the Reporter of Decisions for the con-
> venience of the reader. See United States v.
> Detroit Timber & Lumber Co., 200 U.S.
> 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The Telecommunications Act of 1996 imposes upon
an incumbent local exchange carrier (LEC) the oblig-
ation to share its telephone network with competitors,
47 U.S.C. § 251(c), including the duty to provide ac-
cess to individual network elements on an
"unbundled" basis, see § 251(c)(3). New entrants, so-
called competitive LECs, combine and resell these
unbundled network elements (UNEs). Petitioner Ver-
izon Communications Inc., the incumbent LEC in
New York State, has signed interconnection agree-
ments with rivals such as AT & T, as § 252 obliges it
to do, detailing the terms on which it will make its

network elements available. Part of Verizon's §
251(c)(3) UNE obligation is the provision of access
to operations support systems (OSS), without which a
rival cannot fill its customers' orders. Verizon's inter-
connection agreement, approved by the New York
Public Service Commission (PSC), and its authoriza-
tion to provide long-distance service, approved by the
Federal Communications Commission (FCC), each
specified the mechanics by which its OSS obligation
would be met. When competitive LECs complained
that Verizon was violating that obligation, the PSC
and FCC opened parallel investigations, which led to
the imposition of financial penalties, remediation
measures, and additional reporting requirements on
Verizon. Respondent, a local telephone service cus-
tomer of AT & T, then filed this class action alleging,
inter alia, that Verizon had filled rivals' orders on a
discriminatory basis as part of an anticompetitive
scheme **874 to discourage customers from becom-
ing or remaining customers of competitive LECs in
violation of § 2 of the Sherman Act, 15 U.S.C. § 2.
The District Court dismissed the complaint, conclud-
ing that respondent's allegations of deficient assist-
ance to rivals failed to satisfy § 2's requirements. The
Second Circuit reinstated the antitrust claim.

Held. Respondent's complaint alleging breach of an
incumbent LEC's 1996 Act duty to share its network
with competitors does not state a claim under § 2 of
the Sherman Act. Pp. 877-884.

(a) The 1996 Act has no effect upon the application
of traditional antitrust principles. Its saving clause-
which provides that "nothing in this Act ... shall be
construed to modify, impair, or supersede the applic-
ability of any of the antitrust laws," 47 U.S.C. § 152,
note-preserves *399 claims that satisfy established
antitrust standards, but does not create new claims
that go beyond those standards. Pp. 877-878.

(b) The activity of which respondent complains does
not violate pre-existing antitrust standards. The lead-
ing case imposing § 2 liability for refusal to deal with
competitors is Aspen Skiing Co. v. Aspen Highlands
Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 86
L.Ed.2d 467, in which the Court concluded that the
defendant's termination of a voluntary agreement
with the plaintiff suggested a willingness to forsake

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 872                                                                                                     Page 4
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
(Cite as: 540 U.S. 398, 124 S.Ct. 872)

short-term profits to achieve an anticompetitive end. _Aspen_ is at or near the outer boundary of § 2 liability, and the present case does not fit within the limited exception it recognized. Because the complaint does not allege that Verizon ever engaged in a voluntary course of dealing with its rivals, its prior conduct sheds no light upon whether its lapses from the legally compelled dealing were anticompetitive. Moreover, the _Aspen_ defendant turned down its competitor's proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher, whereas Verizon's reluctance to interconnect at the cost-based rate of compensation available under § 251(c)(3) is uninformative. More fundamentally, the _Aspen_ defendant refused to provide its competitor with a product it already sold at retail, whereas here the unbundled elements offered pursuant to § 251(c)(3) are not available to the public, but are provided to rivals under compulsion and at considerable expense. The Court's conclusion would not change even if it considered to be established law the "essential facilities" doctrine crafted by some lower courts. The indispensable requirement for invoking that doctrine is the unavailability of access to the "essential facilities"; where access exists, as it does here by virtue of the 1996 Act, the doctrine serves no purpose. Pp. 878-881.

(c) Traditional antitrust principles do not justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors. Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. When there exists a regulatory structure designed to deter and remedy anticompetitive harm, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny. Here Verizon was subject to oversight by the FCC and the PSC, both of which agencies responded to the OSS failure raised in respondent's complaint by imposing fines and other burdens on Verizon. Against the slight benefits of antitrust intervention here must be weighed a realistic assessment of its costs. Allegations of violations of § 251(c)(3) duties are both technical and extremely numerous, and hence difficult **875 for antitrust courts

to evaluate. Applying § 2's requirements to this regime can result in "false positive" mistaken inferences that chill the very *400 conduct the antitrust laws are designed to protect. _Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538._ Pp. 881-884.

305 F.3d 89, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER and THOMAS, JJ., joined, _post_, p. 884.

Richard G. Taranto, Washington, DC, for petitioner.
Theodore B. Olson, for United States as amicus curiae, by special leave of the Court, supporting the petitioner.
Donald B. Verrilli, Jr., for respondent.
Michael K. Kellogg, Peter W. Huber, Mark C. Hansen, Aaron M. Panner, Kellogg, Huber, Hansen, Todd & Evans, PLLC, Washington, DC, Henry B. Gutman, Simpson, Thacher & Bartlett, New York City, John Thorne, Counsel of Record, Verizon Communications Inc., Arlington, VA, Richard G. Taranto, Farr & Taranto, Washington, DC, for Petitioner.
Donald B. Verrilli, Jr., Bruce V. Spiva, Ian Heath Gershengorn, Marc A. Goldman, Elaine J. Goldenberg, David Fagundes, Jenner & Block, LLC, Washington, DC, Chester T. Kamin, Eric A. Sacks, Jenner & Block, LLC, Chicago, IL, Alice McInerney, Counsel of Record, Peter S. Linden, Randall K. Berger, Kirby, McInerney & Squire, LLP, New York City, Joseph P. Garland, Klein & Solomon, LLP, New York City, Kenneth A. Elan, Law Office of Kenneth A. Elan, New York City, Phil Weiser, University of Colorado School of Law, UCB, Boulder, CO, Attorneys for Respondent. For U.S. Supreme Court briefs, see:2003 WL 21244083 (Pet.Brief)2003 WL 21767982 (Resp.Brief)2003 WL 22068099 (Reply.Brief)

Justice SCALIA delivered the opinion of the Court.
*401 The Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56, imposes certain duties upon incumbent local telephone companies in order to facilitate market entry by competitors, and establishes a

124 S.Ct. 872                                                                                          Page 5
540 U.S. 398, 124 S.Ct. 872, 157 L. Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
(Cite as: 540 U.S. 398, 124 S.Ct. 872)

complex regime for monitoring and enforcement. In this case we consider whether a complaint alleging breach of the incumbent's duty under the 1996 Act to share its network with competitors states a claim under § 2 of the Sherman Act, 26 Stat. 209.

### *402 I

Petitioner Verizon Communications Inc. is the incumbent local exchange carrier (LEC) serving New York State. Before the 1996 Act, Verizon,[FN1] like other incumbent LECs, enjoyed an exclusive franchise within its local service area. The 1996 Act sought to "uproo[t]" the incumbent LECs' monopoly and to introduce competition in its place *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 488, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002). Central to the scheme of the Act is the incumbent LEC's **876 obligation under 47 U.S.C. § 251(c) to share its network with competitors, see *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), including provision of access to individual elements of the network on an "unbundled" basis. § 251(c)(3). New entrants, so-called competitive LECs, resell these unbundled network elements (UNEs), recombined with each other or with elements belonging to the LECs.

> FN1. In 1996, NYNEX was the incumbent LEC for New York State. NYNEX subsequently merged with Bell Atlantic Corporation, and the merged entity retained the Bell Atlantic name; a further merger produced Verizon. We use "Verizon" to refer to NYNEX and Bell Atlantic as well.

Verizon, like other incumbent LECs, has taken two significant steps within the Act's framework in the direction of increased competition. First, Verizon has signed interconnection agreements with rivals such as AT & T, as it is obliged to do under § 252, detailing the terms on which it will make its network elements available. (Because Verizon and AT & T could not agree upon terms, the open issues were subjected to compulsory arbitration under §§ 252(b) and (c).) In 1997, the state regulator, New York's Public Service Commission (PSC), approved Verizon's interconnection agreement with AT & T.

Second, Verizon has taken advantage of the opportunity provided by the 1996 Act for incumbent LECs to enter the long-distance market (from which they had long been excluded). That required Verizon to satisfy, among other things, a 14-item checklist of statutory requirements, which *403 includes compliance with the Act's network-sharing duties. §§ 271(d)(3)(A) and (c)(2)(B). Checklist item two, for example, includes "[n]ondiscriminatory access to network elements in accordance with the requirements" of § 251(c)(3). § 271(c)(2)(B)(ii). Whereas the state regulator approves an interconnection agreement, for long-distance approval the incumbent LEC applies to the Federal Communications Commission (FCC). In December 1999, the FCC approved Verizon's § 271 application for New York.

Part of Verizon's UNE obligation under § 251(c)(3) is the provision of access to operations support systems (OSS), a set of systems used by incumbent LECs to provide services to customers and ensure quality. Verizon's interconnection agreement and long-distance authorization each specified the mechanics by which its OSS obligation would be met. As relevant here, a competitive LEC sends orders for service through an electronic interface with Verizon's ordering system, and as Verizon completes certain steps in filling the order, it sends confirmation back through the same interface. Without OSS access a rival cannot fill its customers' orders.

In late 1999, competitive LECs complained to regulators that many orders were going unfilled, in violation of Verizon's obligation to provide access to OSS functions. The PSC and FCC opened parallel investigations, which led to a series of orders by the PSC and a consent decree with the FCC.[FN2] Under the FCC consent decree, Verizon undertook *404 to make a "voluntary contribution" to the U.S. Treasury in the amount of $3 million, 15 FCC **877 Rcd. 5415, 5421, & ¶ 16 (2000); under the PSC orders, Verizon incurred liability to the competitive LECs in the amount of $10 million. Under the consent decree and orders, Verizon was subjected to new performance measurements and new reporting requirements to the FCC and PSC, with additional penalties for continued noncompliance. In June 2000, the FCC terminated the consent decree. Enforcement Bureau An-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 872                                                                    Page 6
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
**(Cite as: 540 U.S. 398, 124 S.Ct. 872)**

nounces that Bell Atlantic Has Satisfied Consent Decree Regarding Electronic Ordering Systems in New York (June 20, 2000), http://www.fcc.gov/eb/News_Releases/bellatlet.html (all Internet materials as visited Dec. 12, 2003, and available in Clerk of Court's case file). The next month the PSC relieved Verizon of the heightened reporting requirement. Order Addressing OSS Issues, *MCI WorldCom, Inc. v. Bell Atlantic-New York*, Nos. 00-C-0008, 00-C-0009, 99-C-0949, 2000 WL 1531916 (N.Y.P.S.C., July 27, 2000).

> FN2. Order Directing Improvements To Wholesale Service Performance, *MCI WorldCom, Inc. v. Bell Atlantic-New York*, Nos. 00-C-0008, 00-C-0009, 2000 WL 363378 (N.Y.P.S.C., Feb. 11, 2000); Order Directing Market Adjustments and Amending Performance Assurance Plan, *MCI WorldCom, Inc. v. Bell Atlantic-New York*, Nos. 00-C-0008, 00-C-0009, 99-C-0949, 2000 WL 517633 (N.Y.P.S.C., Mar. 23, 2000); Order Addressing OSS Issues, *MCI WorldCom, Inc. v. Bell Atlantic-New York*, Nos. 00-C-0008, 00-C-0009, 99-C-0949, 2000 WL 1531916 (N.Y.P.S.C., July 27, 2000); *In re Bell Atlantic-New York Authorization Under Section 271 of the Communications Act to Provide In-Region, InterLATA Service In the State of New York*, 15 FCC Rcd. 5413 (2000) (Order); *id.*, at 5415 (Consent Decree).

Respondent Law Offices of Curtis V. Trinko, LLP, a New York City law firm, was a local telephone service customer of AT&T. The day after Verizon entered its consent decree with the FCC, respondent filed a complaint in the District Court for the Southern District of New York, on behalf of itself and a class of similarly situated customers. See App. 12-33. The complaint, as later amended, *id.*, at 34-50, alleged that Verizon had filled rivals' orders on a discriminatory basis as part of an anticompetitive scheme to discourage customers from becoming or remaining customers of competitive LECs, thus impeding the competitive LECs' ability to enter and compete in the market for local telephone service. See, *e.g.*, *id.*, at 34-35, 46-47, ¶¶ 1, 2, 52, 54. According to the complaint, Verizon "has filled orders of [competitive LEC] customers after filling those for its own local phone service, has failed to fill in a timely manner, or not at all, a substantial number of orders for [competitive LEC] customers ..., and has systematically failed to inform [competitive***405** LECs] of the status of their customers' orders." *Id.*, at 39, ¶ 21. The complaint set forth a single example of the alleged "failure to provide adequate access to [competitive LECs]," namely, the OSS failure that resulted in the FCC consent decree and PSC orders. *Id.*, at 40, ¶ 22. It asserted that the result of Verizon's improper "behavior with respect to providing access to its local loop" was to "deter potential customers [of rivals] from switching" *Id.*, at 35, 47, ¶¶ 2, 57. The complaint sought damages and injunctive relief for violation of § 2 of the Sherman Act, 15 U.S.C. § 2, pursuant to the remedy provisions of §§ 4 and 16 of the Clayton Act, 38 Stat. 731, as amended, 15 U.S.C. §§ 15, 26. The complaint also alleged violations of the 1996 Act, § 202(a) of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U.S.C. § 151 *et seq.*, and state law.

The District Court dismissed the complaint in its entirety. As to the antitrust portion, it concluded that respondent's allegations of deficient assistance to rivals failed to satisfy the requirements of § 2. The Court of Appeals for the Second Circuit reinstated the complaint in part, including the antitrust claim. 305 F.3d 89, 113 (2002). We granted certiorari, limited to the question whether the Court of Appeals erred in reversing the District Court's dismissal of respondent's antitrust claims. 538 U.S. 905, 123 S.Ct. 1480, 155 L.Ed.2d 224 (2003).

## II

[1] To decide this case, we must first determine what effect (if any) the 1996 Act has upon the application of traditional antitrust principles. The Act imposes a large number of duties upon incumbent LECs-above and beyond those basic responsibilities**878** it imposes upon all carriers, such as assuring number portability and providing access to rights-of-way, see 47 U.S.C. §§ 251(b)(2), (4). Under the sharing duties of § 251(c), incumbent LECs are required to offer three kinds of access. Already noted, and perhaps most in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 872                                                                                                   Page 7
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
**(Cite as: 540 U.S. 398, 124 S.Ct. 872)**

trusive, is the duty to offer access to UNEs on "just, reasonable, and nondiscriminatory"*406 terms, § 251(c)(3), a phrase that the FCC has interpreted to mean a price reflecting long-run incremental cost. See *Verizon Communications Inc. v. FCC,* 535 U.S., at 495-496, 122 S.Ct. 1646. A rival can interconnect its own facilities with those of the incumbent LEC, or it can simply purchase services at wholesale from the incumbent and resell them to consumers. See §§ 251(c)(2), (4). The Act also imposes upon incumbents the duty to allow physical "collocation"-that is, to permit a competitor to locate and install its equipment on the incumbent's premises-which makes feasible interconnection and access to UNEs. See § 251(c)(6).

That Congress created these duties, however, does not automatically lead to the conclusion that they can be enforced by means of an antitrust claim. Indeed, a detailed regulatory scheme such as that created by the 1996 Act ordinarily raises the question whether the regulated entities are not shielded from antitrust scrutiny altogether by the doctrine of implied immunity. See, e.g., *United States v. National Assn. of Securities Dealers, Inc.,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). In some respects the enforcement scheme set up by the 1996 Act is a good candidate for implication of antitrust immunity, to avoid the real possibility of judgments conflicting with the agency's regulatory scheme "that might be voiced by courts exercising jurisdiction under the antitrust laws." *United States v. National Assn. of Securities Dealers, Inc., supra,* at 734, 95 S.Ct. 2427.

Congress, however, precluded that interpretation. Section 601(b)(1) of the 1996 Act is an antitrust-specific saving clause providing that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." 110 Stat. 143, 47 U.S.C. § 152, note. This bars a finding of implied immunity. As the FCC has put the point, the saving clause preserves those "claims that satisfy established antitrust standards." Brief for United States and the Federal *407 Communications Commission as *Amici Curiae* Supporting Neither Party in No. 02-7057, *Covad Communications Co. v. Bell Atlantic Corp.* (CADC), p. 8.

But just as the 1996 Act preserves claims that satisfy existing antitrust standards, it does not create new claims that go beyond existing antitrust standards; that would be equally inconsistent with the saving clause's mandate that nothing in the Act "modify, impair, or supersede the applicability" of the antitrust laws. We turn, then, to whether the activity of which respondent complains violates pre-existing antitrust standards.

III

[2] The complaint alleges that Verizon denied interconnection services to rivals in order to limit entry. If that allegation states an antitrust claim at all, it does so under § 2 of the Sherman Act, 15 U.S.C. § 2, which declares that a firm shall not "monopolize" or "attempt to monopolize." *Ibid.* It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior**879 product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices-at least for a short period-is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*

[3] Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose*408 of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also

124 S.Ct. 872                                                                                           Page 8
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
(Cite as: 540 U.S. 398, 124 S.Ct. 872)

requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing-a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).*

[4] However, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).* Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2. We have been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm. The question before us today is whether the allegations of respondent's complaint fit within existing exceptions or provide a basis, under traditional antitrust principles, for recognizing a new one.

[5] The leading case for § 2 liability based on refusal to cooperate with a rival, and the case upon which respondent understandably places greatest reliance, is *Aspen Skiing, supra.* The Aspen ski area consisted of four mountain areas. The defendant, who owned three of those areas, and the plaintiff, who owned the fourth, had cooperated for years in the issuance of a joint, multiple-day, all-area ski ticket. After repeatedly demanding an increased share of the proceeds, the defendant canceled the joint ticket. The plaintiff, concerned that skiers would bypass its mountain without some joint **\*409** offering, tried a variety of increasingly desperate measures to recreate the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price. *Id., at 593-594, 105 S.Ct. 2847.* The defendant refused even that. We upheld a jury verdict for the plaintiff, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these

short-run benefits because it was more interested in reducing competition ... over the long run by harming its smaller competitor." *Id., at 608, 105 S.Ct. 2847.*

*Aspen Skiing* is at or near the outer boundary of § 2 liability. The Court there found significance in the defendant's decision**\*880** to cease participation in a cooperative venture. See *id., at 608, 610-611, 105 S.Ct. 2847.* The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. *Ibid.* Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent.

The refusal to deal alleged in the present case does not fit within the limited exception recognized in *Aspen Skiing.* The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion. Here, therefore, the defendant's prior conduct sheds no light upon the motivation of its refusal to deal-upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice. The contrast between the cases is heightened by the difference in pricing behavior. In *Aspen Skiing,* the defendant turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher. Verizon's reluctance to interconnect at the cost-based rate of compensation available under § 251(c)(3) tells us nothing about dreams of monopoly.

The specific nature of what the 1996 Act compels makes this case different from *Aspen Skiing* in a more fundamental *\*410* way. In *Aspen Skiing,* what the defendant refused to provide to its competitor was a product that it already sold at retail-to oversimplify slightly, lift tickets representing a bundle of services to skiers. Similarly, in *Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973),* another case relied upon by respondent, the defendant was already in the business of providing a service to certain customers (power transmission over its network), and refused to provide the same service to certain other customers. *Id., at 370-371, 377-378, 93 S.Ct. 1022.* In the present case, by contrast, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 872                                                                                                                                              Page 9
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
**(Cite as: 540 U.S. 398, 124 S.Ct. 872)**

services allegedly withheld are not otherwise marketed or available to the public. The sharing obligation imposed by the 1996 Act created "something brand new"-"the wholesale market for leasing network elements." *Verizon Communications Inc. v. FCC,* 535 U.S., at 528, 122 S.Ct. 1646. The unbundled elements offered pursuant to § 251(c)(3) exist only deep within the bowels of Verizon; they are brought out on compulsion of the 1996 Act and offered not to consumers but to rivals, and at considerable expense and effort. New systems must be designed and implemented simply to make that access possible-indeed, it is the failure of one of those systems that prompted the present complaint.[FN3]

> FN3. Respondent also relies upon *United States v. Terminal Railroad Assn. of St. Louis,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), and *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). These cases involved *concerted* action, which presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces: simply requiring that the outsider be granted nondiscriminatory admission to the club.

[6] We conclude that Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents. This conclusion would be unchanged even if we considered to be established law the "essential facilities" doctrine crafted by some lower courts, under which the Court of Appeals concluded respondent's allegations might state a claim. See generally Areeda, *411**881Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust L.J. 841 (1989). We have never recognized such a doctrine, see *Aspen Skiing Co., supra,* at 611, n. 44, 105 S.Ct. 2847; *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S., at 428, 119 S.Ct. 721 (opinion of BREYER, J.), and we find no need either to recognize it or to repudiate it here. It suffices for present purposes to note that the indispensable requirement for invoking the doctrine is the unavailability of access to the "essential facilities"; where access exists, the doctrine serves no purpose. Thus, it is said that "essential fa-

cility claims should ... be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." P. Areeda & H. Hovenkamp, Antitrust Law, p. 150, ¶ 773e (2003 Supp.). Respondent believes that the existence of sharing duties under the 1996 Act supports its case. We think the opposite: The 1996 Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access. To the extent respondent's "essential facilities" argument is distinct from its general § 2 argument, we reject it.

                                    IV

[7] Finally, we do not believe that traditional antitrust principles justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors. Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation. As we have noted, "careful account must be taken of the pervasive federal and state regulation characteristic of the industry." *United States v. Citizens & Southern Nat. Bank,* 422 U.S. 86, 91, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); see also IA P. Areeda & H. Hovenkamp, Antitrust Law, p. 12, ¶ 240c3 (2d ed.2000). "[A]ntitrust analysis must sensitively recognize and reflect the distinctive economic and legal setting of the regulated industry to which it applies." *412*Concord v. Boston Edison Co.,* 915 F.2d 17, 22 (C.A.1 1990) (Breyer, C.J.) (internal quotation marks omitted).

One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny. Where, by contrast, "[t]here is nothing built into the regulatory scheme which performs the antitrust function," *Silver v. New York Stock Exchange,* 373 U.S. 341, 358, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the benefits of antitrust are worth its sometimes considerable disadvantages. Just as regulatory context may in other cases serve as a basis for implied immunity, see *e.g., United States v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*National Assn. of Securities Dealers, Inc., 422 U.S., at 730-735, 95 S.Ct. 2427,* it may also be a consideration in deciding whether to recognize an expansion of the contours of § 2.

The regulatory framework that exists in this case demonstrates how, in certain circumstances, "regulation significantly diminishes the likelihood of major antitrust harm." *Concord v. Boston Edison Co., supra,* at 25. Consider, for example, the statutory restrictions upon Verizon's entry into the potentially lucrative market for long-distance service. To be allowed to enter the long-distance market in the first place, an incumbent LEC must be on good behavior in its local market. Authorization by the FCC requires state-by-state satisfaction of § 271's competitive checklist, which as we have noted includes the nondiscriminatory provision of access to **882 UNEs. Section 271 applications to provide long-distance service have now been approved for incumbent LECs in 47 States and the District of Columbia. See FCC Authorizes SBC to Provide Long Distance Service in Illinois, Indiana, Ohio and Wisconsin (Oct. 15, 2003), http://hraunfoss. fcc.gov/edocs_public/attachmatch/DOC-239978A1.p df.

The FCC's § 271 authorization order for Verizon to provide long-distance service in New York discussed at great length Verizon's commitments to provide access to UNEs, including *413 the provision of OSS. *In re Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act To Provide In-Region, InterLATA Service in the State of New York, 15 FCC Rcd. 3953, 3989-4077, ¶¶ 82-228 (1999)* (Memorandum Opinion and Order) (hereinafter *In re Application*). Those commitments are enforceable by the FCC through continuing oversight; a failure to meet an authorization condition can result in an order that the deficiency be corrected, in the imposition of penalties, or in the suspension or revocation of long-distance approval. See 47 U.S.C. § 271(d)(6)(A). Verizon also subjected itself to oversight by the PSC under a so-called "Performance Assurance Plan" (PAP). See *In re New York Telephone Co., 197 P.U.R. 4th 266, 280-281 (N.Y.P.S.C. 1999)* (Order Adopting the Amended PAP). The PAP, which by its terms be-

came binding upon FCC approval, provides specific financial penalties in the event of Verizon's failure to achieve detailed performance requirements. The FCC described Verizon's having entered into a PAP as a significant factor in its § 271 authorization, because that provided "a strong financial incentive for post-entry compliance with the section 271 checklist," and prevented " 'backsliding.' " *In re Application* 3958-3959, ¶¶ 8, 12.

The regulatory response to the OSS failure complained of in respondent's suit provides a vivid example of how the regulatory regime operates. When several competitive LECs complained about deficiencies in Verizon's servicing of orders, the FCC and PSC responded. The FCC soon concluded that Verizon was in breach of its sharing duties under § 251(c), imposed a substantial fine, and set up sophisticated measurements to gauge remediation, with weekly reporting requirements and specific penalties for failure. The PSC found Verizon in violation of the PAP even earlier, and imposed additional financial penalties and measurements with *daily* reporting requirements. In short, the regime was an effective steward of the antitrust function.

*414 Against the slight benefits of antitrust intervention here, we must weigh a realistic assessment of its costs. Under the best of circumstances, applying the requirements of § 2 "can be difficult" because "the means of illicit exclusion, like the means of legitimate competition, are myriad." *United States v. Microsoft Corp., 253 F.3d 34, 58 (C.A.D.C.2001)* (en banc) *(per curiam).* Mistaken inferences and the resulting false condemnations "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* The cost of false positives counsels against an undue expansion of § 2 liability. One false-positive risk is that an incumbent LEC's failure to provide a service with sufficient alacrity might have nothing to do with exclusion. Allegations of violations of § 251(c)(3) duties are difficult for antitrust courts to evaluate, not only because they are highly technical, but also because they are likely to be extremely numerous, given the incessant, complex, and constantly **883 changing interaction

124 S.Ct. 872                                                                                Page 11
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
**(Cite as: 540 U.S. 398, 124 S.Ct. 872)**

of competitive and incumbent LECs implementing the sharing and interconnection obligations. *Amici* States have filed a brief asserting that competitive LECs are threatened with "death by a thousand cuts," Brief for New York et al. as *Amici Curiae* 10 (internal quotation marks omitted) the identification of which would surely be a daunting task for a generalist antitrust court. Judicial oversight under the Sherman Act would seem destined to distort investment and lead to a new layer of interminable litigation, atop the variety of litigation routes already available to and actively pursued by competitive LECs.

Even if the problem of false positives did not exist, conduct consisting of anticompetitive violations of § 251 may be, as we have concluded with respect to above-cost predatory pricing schemes, "beyond the practical ability of a judicial tribunal to control." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 223, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Effective *415 remediation of violations of regulatory sharing requirements will ordinarily require continuing supervision of a highly detailed decree. We think that Professor Areeda got it exactly right: "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." Areeda, 58 Antitrust L. J., at 853. In this case, respondent has requested an equitable decree to "[p]reliminarily and permanently enjoi[n] [Verizon] from providing access to the local loop market ... to [rivals] on terms and conditions that are not as favorable" as those that Verizon enjoys. App. 49-50. An antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations.[FN4]

> [FN4.] The Court of Appeals also thought that respondent's complaint might state a claim under a "monopoly leveraging" theory (a theory barely discussed by respondent, see Brief for Respondent 24, n. 10). We disagree. To the extent the Court of Appeals dispensed with a requirement that there be a "dangerous probability of success" in monopolizing a second market, it erred, *Spectrum*

*Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). In any event, leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected.

\* \* \*

[8] The 1996 Act is, in an important respect, much more ambitious than the antitrust laws. It attempts "*to eliminate the monopolies* enjoyed by the inheritors of AT & T's local franchises." *Verizon Communications Inc. v. FCC,* 535 U.S., at 476, 122 S.Ct. 1646 (emphasis added). Section 2 of the Sherman Act, by contrast, seeks merely to prevent *unlawful monopolization.* It would be a serious mistake to conflate the two goals. The Sherman Act is indeed the "Magna Carta of free enterprise," *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), but it does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some *416 other approach might yield greater competition. We conclude that respondent's complaint fails to state a claim under the Sherman Act.[FN5]

> FN5. Our disposition makes it unnecessary to consider petitioner's alternative contention that respondent lacks antitrust standing. See *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 97, and n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *National Railroad Passenger Corporation v. National Assn. of Railroad Passengers,* 414 U.S. 453, 456, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

**884 Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, with whom Justice SOUTER and Justice THOMAS join, concurring in the judgment.
In complex cases it is usually wise to begin by deciding whether the plaintiff has standing to maintain the action. Respondent, the plaintiff in this case, is a local telephone service customer of AT & T. Its com-

124 S.Ct. 872                                                                                    Page 12
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
(Cite as: 540 U.S. 398, 124 S.Ct. 872)

plaint alleges that it has received unsatisfactory service because Verizon has engaged in conduct that adversely affects AT & T's ability to serve its customers, in violation of § 2 of the Sherman Act. 15 U.S.C. § 2. Respondent seeks from Verizon treble damages, a remedy that § 4 of the Clayton Act makes available to "any person who shall be injured in his business or property." 15 U.S.C. § 15. The threshold question presented by the complaint is whether, assuming the truth of its allegations, respondent is a "person" within the meaning of § 4.

Respondent would unquestionably be such a "person" if we interpreted the text of the statute literally. But we have eschewed a literal reading of § 4, particularly in cases in which there is only an indirect relationship between the defendant's alleged misconduct and the plaintiff's asserted injury. _Associated Gen. Contractors of Cal., Inc. v. Carpenters_, 459 U.S. 519, 529-535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In such cases, "the importance of avoiding either the risk of duplicate recoveries *417 on the one hand, or the danger of complex apportionment of damages on the other," weighs heavily against a literal reading of § 4. _Id., at 543-544, 103 S.Ct. 897._ Our interpretation of § 4 has thus adhered to Justice Holmes' observation that the "general tendency of the law, in regard to damages at least, is not to go beyond the first step." _Southern Pacific Co. v. Darnell-Taenzer Lumber Co._, 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918).

I would not go beyond the first step in this case. Although respondent contends that its injuries were, like the plaintiff's injuries in _Blue Shield of Va. v. McCready_, 457 U.S. 465, 479, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), "the very means by which ... [Verizon] sought to achieve its illegal ends," it remains the case that whatever antitrust injury respondent suffered because of Verizon's conduct was purely derivative of the injury that AT & T suffered. And for that reason, respondent's suit, unlike _McCready_, runs both the risk of duplicative recoveries and the danger of complex apportionment of damages. The task of determining the monetary value of the harm caused to respondent by AT & T's inferior service, the portion of that harm attributable to Verizon's misconduct, whether all or just some of such possible mis-

conduct was prohibited by the Sherman Act, and what offset, if any, should be allowed to make room for a recovery that would make AT & T whole, is certain to be daunting. AT & T, as the direct victim of Verizon's alleged misconduct, is in a far better position than respondent to vindicate the public interest in enforcement of the antitrust laws. Denying a remedy to AT & T's customer is not likely to leave a significant antitrust violation undetected or unremedied, and will serve the strong interest "in keeping the scope of complex antitrust trials within judicially manageable limits." _Associated Gen. Contractors, 459 U.S., at 543, 103 S.Ct. 897._

In my judgment, our reasoning in _Associated General Contractors_ requires us to reverse the judgment of the Court of Appeals.**885 I would not decide the merits of the § 2 *418 claim unless and until such a claim is advanced by either AT & T or a similarly situated competitive local exchange carrier.

U.S.,2004.
Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP
540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op. Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91

Briefs and Other Related Documents (Back to top)

• 2003 WL 22364051, 72 USLW 3305 (Oral Argument) Oral Argument (Oct. 14, 2003)
• 2003 WL 22068099 (Appellate Brief) Reply Brief for Petitioner (Aug. 27, 2003)
• 2003 WL 21767982 (Appellate Brief) Brief for Respondent (Jul. 29, 2003)
• 2003 WL 21754952 (Appellate Brief) Brief Amicus Curiae of Consumers Union and Consumer Federation of America in Support of Respondent (Jul. 25, 2003)
• 2003 WL 21755935 (Appellate Brief) Brief for Allegiance Telecom, Inc., ATX Communications, Inc., Focal Communications Corp., ICG Communications, Inc., Pac-West Telecomm, Inc., and US LEC Corp. as Amici Curiae in Support of Respondent (Jul. 25, 2003)

540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823, 72 USLW 4114, 2004-1 Trade Cases P 74,241, 04 Cal. Daily Op.
Serv. 269, 2004 Daily Journal D.A.R. 346, 31 Communications Reg. (P&F) 542, 17 Fla. L. Weekly Fed. S 91
**(Cite as: 540 U.S. 398, 124 S.Ct. 872)**

• 2003 WL 21755938 (Appellate Brief) Brief for Covad Communications Company, Inc. as Amicus Curiae in Support of Respondent (Jul. 25, 2003)

• 2003 WL 21755944 (Appellate Brief) Brief for the States of New York, Arizona, Connecticut, District of Columbia, Maine, Maryland, Michigan, Minnesota, Missouri, Montana, Oregon, Puerto Rico, Vermont, West Virginia, and Wisconsin as Amici Curiae, in Support of Respondent (Jul. 25, 2003)

• 2003 WL 21755948 (Appellate Brief) Brief of Z-Tel Technologies, Inc. as Amicus Curiae Supporting Respondent (Jul. 25, 2003)

• 2003 WL 21767975 (Appellate Brief) Brief of AT&T Corp., Cavalier Telephone, and Competitive Telecommunications Association as Amici Curiae in Support of Respondent (Jul. 25, 2003)

• 2003 WL 21767976 (Appellate Brief) Brief of Amici Curiae Economics Professors in Support of Respondent (Jul. 25, 2003)

• 2003 WL 21767978 (Appellate Brief) Brief of Amicus Curiae National Association of State Utility Consumer Advocates in Support of Respondent (Jul. 25, 2003)

• 2003 WL 21751253 (Appellate Brief) Brief of Law Professors as Amici Curiae Supporting Respondent (Jul. 24, 2003)

• 2003 WL 21751250 (Appellate Brief) Brief for the Project to Promote Competition and Innovation in the Digital Age as Amicus Curiae in Support of Respondent to the Limited Extent of Clarifying Sherman Act Section 2 Analysis (Jul. 23, 2003)

• 2003 WL 21754956 (Appellate Brief) Brief of Amicus Curiae American Antitrust Institute in Support of Respondent (Jul. 23, 2003)

• 2003 WL 21243941 (Appellate Brief) Brief Amicus Curiae of BellSouth Corporation, SBC Communications Inc., and Qwest Communications International Inc. in Support of Petitioner (May 23, 2003)

• 2003 WL 21243959 (Appellate Brief) Brief Amicus Curiae of the Commonwealth of Virginia, the States of Alabama, Delaware, Indiana, Nebraska, New Hampshire, Oklahoma and Utah in Support of Petitioner (May 23, 2003)

• 2003 WL 21243975 (Appellate Brief) Brief for the Communications Workers of America as Amicus Curiae Supporting Petitioner (May 23, 2003)

• 2003 WL 21244000 (Appellate Brief) Brief of Tele-communications Industry Association as Amicus Curiae in Support of Petitioner (May 23, 2003)

• 2003 WL 21244041 (Appellate Brief) Brief for the United States Telecom Association as Amicus Curiae in Support of Petitioner (May 23, 2003)

• 2003 WL 21244076 (Appellate Brief) Brief for Amicus Curiae Washington Legal Foundation in Support of Petitioner (May 23, 2003)

• 2003 WL 21244083 (Appellate Brief) Brief for Petitioner (May 23, 2003)

• 2003 WL 21254257 (Appellate Brief) Brief of United Parcel Service, Inc., Honeywell International Inc., Visa U.S.A. Inc., and Eastman Kodak Company as Amici Curiae in Support of Petitioner (May 23, 2003)

• 2003 WL 21269559 (Appellate Brief) Brief for the United States and the Federal Trade Commission as Amici Curiae Supporting Petitioner (May 23, 2003)

• 2003 WL 21691987 (Joint Appendix) (May 23, 2003)

• 2002 WL 32354605 (Appellate Petition, Motion and Filing) Reply Brief for Petitioner (Dec. 19, 2002)

• 2002 WL 32354606 (Appellate Petition, Motion and Filing) Brief for the United States and the Federal Trade Commission as Amici Curiae (Dec. 13, 2002)

• 2002 WL 33006767 (Appellate Petition, Motion and Filing) Brief for United Parcel Service, Inc., Honeywell International Inc., Visa U.S.A. Inc., and Eastman Kodak Company, as Amici Curiae in Support of Petitioner (Dec. 13, 2002) Original Image of this Document (PDF)

• 2002 WL 33006768 (Appellate Petition, Motion and Filing) Brief Amicus Curiae of BellSouth Corporation, SBC Communications Inc., and United States Telecom Association in Support of Petitioner (Dec. 13, 2002) Original Image of this Document (PDF)

• 2002 WL 33006769 (Appellate Petition, Motion and Filing) Brief in Opposition (Dec. 13, 2002) Original Image of this Document (PDF)

• 02-682 (Docket) (Nov. 05, 2002)

• 2002 WL 32354607 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Nov. 01, 2002)

END OF DOCUMENT

# EXHIBIT 28

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

H

Briefs and Other Related Documents
In re Vitamins Antitrust LitigationD.D.C.,2001.
  United States District Court, District of Columbia.
  In re: VITAMINS ANTITRUST LITIGATION
              No. 99-197TFH.

                  June 20, 2001.

  *MEMORANDUM OPINION Re: Merits Discovery*
HOGAN, J.
**\*1** Pending before the Court are the plaintiffs' and the
foreign defendants' Rule 53 Objections to the Special
Master's April 23, 2001 Report and Recommendation
("4/23/01 R & R") regarding merits discovery. Upon
careful consideration of the parties' briefs, the Special
Master's 4/23/01 R & R, the arguments presented at
the June 14, 2001 hearing, and the entire record
herein, the Court will uphold the Special Master's re-
commendation that merits discovery proceed under
the Federal Rules of Civil Procedure ("Federal
Rules") and will grant plaintiffs' request for a date
certain for starting production of such discovery.
However, the Court will deny the Special Master's re-
commendation with regard to the geographic limita-
tion and instead will impose no such limitation on the
relevant discovery requests. Additionally, the Court
will adopt the first two prongs of the Special Master's
test with regard to the locations for defendants' search
but will not require defendants to comply with the
third prong of that test at this time. Furthermore, the
Court will uphold the Special Master's recommenda-
tion that the foreign defendants be required to identi-
fy all current and former officers, directors, employ-
ees and agents with contemporaneous knowledge of
the conspiracy. Finally, the Court will deny without
prejudice the Special Master's recommendation to
compel production of documents allegedly in viola-
tion of the Swiss and German privacy laws and grant
defendants' request that they be allowed to file a pri-
vacy log of documents implicated by those laws.

                I. BACKGROUND

On March 27, 2000, this Court issued a Memor-
andum Opinion and Order allowing plaintiffs to take

further jurisdictional discovery to determine whether
personal jurisdiction exists over the foreign defend-
ants. On September 20, 2000, the Court adopted the
Special Master's recommendations in his August 15,
2000 Report and Recommendation that jurisdictional
discovery proceed under the Federal Rules of Civil
Procedure rather than under the Hague Convention.
The Court also approved plaintiffs' discovery re-
quests as detailed in the Appendix to the Special
Master's August 15, 2000 Report & Recommenda-
tion, with the exception of Interrogatory 2, which was
stricken.

On January 26, 2001, the Court entered orders me-
morializing stipulations reached by and among cer-
tain plaintiffs and certain foreign defendants that re-
solved the personal jurisdiction issue for the stipulat-
ing parties. Under those orders, certain foreign de-
fendants agreed not to contest personal jurisdiction in
this Court and in exchange certain plaintiffs agreed to
withdraw their jurisdictional discovery requests.
Paragraph 9 of those orders established the proced-
ures for consideration and resolution of issues con-
cerning the applicability of the Hague Convention to
merits discovery. Under that paragraph, the stipulat-
ing parties agreed to an expedited briefing schedule
under which they would not "file additional affidavits
or other evidence regarding the effectiveness or inef-
fectiveness of procedures under the Hague Conven-
tion or Other Laws nor on sovereign interests that
may be implicated by those laws." 1/26/01 Personal
Jurisdiction Orders ¶ 9.

**\*2** On January 23, 2001, plaintiffs served the foreign
defendants with merits discovery requests. On March
2, 2001, the foreign defendants filed a motion for
protective order. Plaintiffs filed an opposition on
March 14, 2001; the foreign defendants filed their
reply on March 20, 2001; and plaintiffs filed a sur-
reply on March 27, 2001. On April 2, 2001, the Fed-
eral Republic of Germany moved for leave to file an
*amicus curiae* brief in support of the three German
movants. Plaintiffs subsequently filed an opposition
to this motion, asserting that the foreign defendants
had already raised all of the arguments advanced by
the *amicus curiae*. On April 5, 2001, the Special

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　Page 2
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

Master conducted a hearing on defendants' motion for a protective order and plaintiffs' opposition to that motion. On April 6, 2001, Degussa moved for leave to file an "Advisory Opinion" of the State Commissioner for Data Protection of Northrhine-Westphalia as Supplemental Authority in support of the German defendants. Plaintiffs opposed Degussa's motion. On April 13, 2001, plaintiffs filed a motion for leave to submit as supplemental authority the case, _United States v. Andreas,_ No. 96-CR-762, 1999 WL 299314 (N.D.Ill.1999), which they asserted was relevant to the geographic scope of their discovery requests. The foreign defendants objected to plaintiffs' motion on the grounds that _Andreas_ should not be admitted as supplemental authority since it was available at the time that the parties submitted their original briefs and because they believed that _Andreas_ was distinguishable.

On April 23, 2001, the Special Master issued his Report and Recommendation resolving all pending issues in the foreign defendants' Motion for a Protective Order and the plaintiffs' opposition thereto. Specifically, after weighing the factors required by the Supreme Court under _Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa,_ 482 U.S. 522 (1987) ("_Aerospatiale_"), the Special Master recommended that merits discovery should proceed under the Federal Rules of Civil Procedure rather than under the Hague Convention and the Laws of the Non-Hague States. In his ruling that merits discovery should proceed under the Federal Rules, the Special Master recommended that the geographic scope of plaintiffs' discovery requests respecting transactional, cost, financial and conspiracy information be limited to documents and information reflecting activities directed toward the United States, including the larger geographic regions that include the United States; in making this ruling, the Special Master acknowledged the right of defendants to withhold documents relating to regions wholly outside the United States and to redact portions of relevant documents that relate to wholly foreign activities and transactions. The Special Master also approved a three-prong test as to the physical locations where foreign defendants will be required to search for responsive documents.[FN1] Ad-

ditionally, the Special Master limited the time scope of plaintiffs' Interrogatory 5(B) to extend back to January 1, 1985 for all vitamins except choline chloride, and to January 1, 1983 for choline chloride.[FN2] However, the Special Master upheld plaintiffs' request for information on individuals who "had knowledge of the alleged conspiracy but who did not participate in a single conspiratorial meeting or take any other conspiratorial act and whose name did not appear on a single conspiratorial document produced by any defendant" as consistent with the language and intent of Fed.R.Civ.P. 26(b)(1) (allowing for the discovery of "the identity and location of persons having knowledge of any discoverable matter").

> FN1. Specifically, the Special Master recommended that the foreign defendants be required to search: (1) files maintained by or for the persons (a) identified in response to Interrogatory No. 5(B) who either participated in or had contemporaneous knowledge of the conspiracy, or (b) with primary decision-making authority and those with oversight responsibility for the production, pricing, sale, marketing, or distribution of vitamins, raw materials, or intermediates; (2) files maintained for specific vitamins or by vitamin producers to the extent that such files are maintained either at their headquarters or at facilities maintained by or for regional or area managers; and (3) any other area where each foreign defendant or its counsel reasonably believes responsive documents are likely to be found.

> FN2. Neither party filed an objection to the time scope articulated by the Special Master; therefore, this ruling will be affirmed by the Court.

**\*3** In addition to his recommendations for use of the Federal Rules and his limitations on plaintiffs' discovery requests, the Special Master also recommended that the German and Swiss defendants[FN3] be required to respond to documents requests 5(c) and 9 and Interrogatories 5 and 6, because, although they had not waived their privacy objections when they agreed to the Jurisdictional Stipulations, neither the

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

German nor the Swiss privacy laws applies to the discovery sought and that, in any event, the disputed requests fall within those laws' safe harbors. Moreover, the Special Master stated that even if compliance with the requested discovery would violate Swiss and German privacy laws, the Court should nonetheless order compliance because defendants have not met their burden of showing that the requests here are unimportant or unnecessary and because there is a strong United States interest in requiring these foreign defendants to comply with discovery due to the importance of upholding United States antitrust laws.

> FN3. The German defendants are Degussa, BASF, and Merck; and the Swiss defendants are Lonza and F. Hoffman-La Roche.

On May 8, 2001, the foreign defendants filed Rule 53 Objections to the Special Master's 4/23/01 R & R, arguing that: (1) merits discovery should proceed in accordance with the Hague Convention and the laws of the non-Hague countries; (2) the Special Master's three-prong test as to the physical locations where foreign defendants will be required to search for responsive documents is "both confusing and overly broad and would require time-consuming and expensive searches of the Foreign Defendants' non-U.S. foreign affiliates that are not named in this lawsuit"; (3) the Special Master improperly rejected certain of the foreign defendants' objections based on Swiss and German privacy laws; and (4) compliance with Interrogatory 5(B) would "put the Foreign Defendants in the entirely untenable position of implicating their own employees in criminal conduct based on a subjective second-guessing game of who had 'knowledge' " of the conspiracy. Def's Rule 53 Obj's at 1-3. On May 7, 2001, plaintiffs filed their Objections to the Special Master's 4/23/01 R & R. Specifically, plaintiffs request that the Court adopt the Special Master's Report and Appendix in all respects except for the geographic limitation imposed by the Special Master as set forth in Definition 10 of the Appendix.[FN4]

> FN4. Definition 10 defines the geographic scope of certain plaintiffs' merits discovery requests and states:
> "Geographically relevant" means documents

or information, as appropriate, discussing or concerning the United States or a portion of the United States, the world as a whole, or any geographic region of which the United States or a portion of the United States is a part, or documents or information, as appropriate, of general applicability that do not reference a geographic area.

## II. DISCUSSION

Pending before the Court are the foreign defendants' Rule 53 Objections to the Special Master's 4/23/01 R & R and the plaintiffs' objection to the geographic limitation imposed by the Special Master in that R & R. These objections require the Court to consider the following issues: (a) whether merits discovery should proceed in accordance with the Hague Convention or under the Federal Rules of Civil Procedure; (b) whether the Special Master's three-prong test detailing the scope of the foreign defendants' search for responsive documents is unreasonable and unduly burdensome; (c) whether the German and Swiss defendants should be excused from responding to document requests 5(c) and 9 and Interrogatories 5 and 6 on the grounds that production of this information would require them to violate the rights of their employees under the privacy laws of Germany and Switzerland; (d) whether plaintiffs' request in Interrogatory 5(B) that defendants identify all current and former officers, directors, employees, and agents with 'knowledge' of the alleged conspiracy is irrelevant and unduly burdensome; and (e) whether the Special Master erred in imposing the geographic limitation on the scope of plaintiffs' discovery requests seeking transactional, conspiratorial, and bid pricing and contract data.

### A. Merits Discovery Under Hague or Federal Rules

**\*4** The first issue presented by the foreign defendants' Rule 53 Objections is whether the Special Master erred in holding that plaintiffs should not be required to obtain merits discovery under the Hague Convention or the laws governing discovery in countries that have not signed the Convention.[FN5] The parties agree that this issue is controlled by the Supreme Court's opinion in *Aerospatiale.* Furthermore, there is no dispute that the *Aerospatiale* Court, in re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

jecting arguments that the Hague Convention required first-use of Convention procedures, did not set forth a bright-line rule for determining whether the Hague Convention or the Federal Rules should apply but instead left this decision to the discretion of trial courts, which it held should consider "the particular facts, sovereign interests, and likelihood that resort to [the Hague Convention's] procedures will prove effective." *Aerospatiale,* 482 U.S. at 544. However, the parties disagree about the conclusion that results from applying *Aerospatiale'* s three-part test. After balancing the *Aerospatiale* factors, the Special Master found: (1) plaintiffs' requests, as narrowed by the Special Master in his 4/23/01 R & R, were both necessary and relevant to plaintiffs' claims and were not so inordinately burdensome or intrusive as to warrant resort to Hague Convention procedures; (2) although the foreign defendants undoubtedly have significant and weighty sovereign interests in discovery proceeding according to the Hague Convention, the United States' interest in effective enforcement of its antitrust laws weighs in favor of Federal Rules discovery; and (3) it is "extremely unlikely" that resort to Hague Convention procedures would prove effective. 4/23/01 R & R at 6-21.

> FN5. Three of the foreign defendants-Takeda Chemical Industries, Ltd., Daiichi Pharmaceutical Co., Ltd., and Eisai Co., Ltd -are corporations domiciled in Japan, a nation that is not a signatory to the Hague Convention. These defendants have presented no argument-in the briefs or affidavits or in their Rule 53 Objections-as to why discovery should proceed under the laws of Japan rather than the Federal Rules. Therefore, following this Court's earlier analysis of the laws of Japan, the Court finds that discovery as to these foreign defendants should proceed under the Federal Rules. *See In Re Vitamins Antitrust Lit.,* 120 F.Supp.2d 45, 55-56 (D.D.C.2000).

The foreign defendants contend that the Special Master erred in relying exclusively on the relevance of plaintiffs' discovery requests to justify his findings under the first prong of the *Aerospatiale* test. These defendants appear to presume that because the Spe-

cial Master found the requests to be relevant, he believed that he did not have to separately consider whether they were unduly burdensome. However, this interpretation is not an accurate representation of the Special Master's analysis. The Special Master devoted considerable time and attention in his 4/23/01 R & R to the issue of undue burden. In fact, he significantly narrowed plaintiffs' discovery requests, both in regard to the geographic limitation, the locations where defendants are required to search for responsive documents, and the time scope of Interrogatory 5(B). Only after narrowing plaintiffs' discovery requests in this fashion did the Special Master conclude that the requests are not unduly burdensome. Therefore, defendants' suggestion that the Special Master did not adequately consider the burden of plaintiffs' discovery requests is without merit.

Defendants also suggest that the Special Master erred in finding that the Hague procedures would be less effective than the Federal Rules. Specifically, defendants contend that their prior submissions in response to the Hague issue with respect to jurisdictional discovery established the availability of alternate procedures under the Convention that would result in plaintiffs obtaining the evidence they require. However, both the Special Master and the Court considered these alternate procedures in ruling on defendants' Motion for a Protective Order with respect to jurisdictional discovery and found that despite these alleged alternate procedures, there was insufficient evidence to establish the likelihood that these procedures would be effective. Considering the length of time this litigation has already taken and the pretrial schedule currently in place which requires extremely timely and efficient responses to discovery, the fact that the Hague Convention procedures, including defendants' suggested alternative procedures under Hague, are unlikely to result in the timely and efficient discovery required in this case, the Court finds that the Special Master's analysis under the third prong of *Aerospatiale* is justified.

*5 Finally, defendants urge the Court to be sensitive to issues of international comity in analyzing the second prong of the *Aerospatiale* test. To support their argument, defendants quote from a recent law journal commentary on this Court's previous jurisdic-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
(Cite as: Not Reported in F.Supp.2d)

tional discovery ruling with respect to Hague:

[T]he reluctance to employ the Hague Convention produces significant negative consequences both for U.S.-foreign relations and for the international system as a whole. To outsiders, the interest "balancing" conducted by the Vitamins court appears more like the assertion of primacy of United States interests in the guise of applying an international jurisdictional rule of reason. While it purports to be balanced and fair, the Vitamins court sends quite a different message to the outside world: In a world with no supreme sovereign, we will take sovereignty by judicial fiat and assert it fully whenever pragmatic concerns motivate us and our power over a defendant with property or interests in the United States allows us. The court's balancing insinuates that sovereignty matters only insofar as it is American sovereignty.

Case Note, *Sovereignty On Our Terms,* 110 Yale L.J. 885, 890-91 (March 2001) While the Court does not believe that this article presents an accurate picture of the Court's previous ruling on the Hague issue,[FN6] the article does highlight the importance of seriously weighing the comity concerns in cases such as this one. However, if there was ever a case where the foreign defendants should be required to comply with our discovery rules, it would appear to be this one. Most of these foreign defendants have pled guilty to criminal liability for these alleged antitrust violations; in addition, these defendants have allegedly fraudulently concealed and destroyed much of the evidence against them. Therefore, given the fact that liability has already been established for most of these defendants, that the discovery requests have been narrowed to make them as unburdensome as possible under the circumstances, and that plaintiffs here are struggling not only with the typical constraints of antitrust cases-that the evidence is always largely in the hands of the defendants-but also with alleged overt behavior on the part of the defendants to destroy evidence and to transfer it to their foreign affiliates in the hopes of keeping it out of plaintiffs' hands; the interest of the United States in effective and timely enforcement of its antitrust laws outweighs the foreign countries' sovereign interests in compelling discovery under the Hague procedures.[FN7] Therefore, the Special Master's recommendation that defendants be re-

quired to proceed with merits discovery under the Federal Rules will be upheld.

> FN6. The Court did not merely pay lip service to foreign comity concerns and then proceed to elevate the interests of the United States over the interests of these foreign countries, as this article presumes. Instead, the Court analyzed the importance of the discovery to plaintiffs, as well as the United States' interest in enforcement of its antitrust laws, and weighed these interests against the burden and intrusiveness of the discovery requests on the foreign defendants.

> FN7. In fact, the Court found this to be a much harder question when ruling on jurisdictional discovery than on merits discovery, because the Court was concerned with requiring intrusive discovery over defendants whose jurisdiction in this Court had not yet been conclusively established. Now that this Court's jurisdiction over these defendants is no longer at issue, and given the facts of this case, the Court does not find it unreasonable to require these defendants to submit to the Federal Rules for purposes of discovery, as long as the discovery requests are relevant and not overly burdensome or unduly intrusive.

Plaintiffs request that the Court set a date certain for the foreign defendants to provide merits discovery. Specifically, plaintiffs suggest that this date certain be 14 days from the entry of this Court's order with respect to the Foreign Defendants' Rule 53 Objections to the April 23, 2001 R & R or June 29, 2001, whichever is sooner. Given that merits discovery requests were served on these foreign defendants in September of 1999 and that as of yet few, if any, of such requests have been answered and given that these cases are scheduled to be ready for trial or remand by the spring of next year, the Court finds that a date certain for production of this merits discovery is warranted. However, the Court also agrees with defendants that such discovery could proceed on a rolling basis. Therefore, the Court will order defendants to commence production of merits discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
(Cite as: Not Reported in F.Supp.2d)

within 14 days of the date of this Order [FN8] and pro-
ceed with such discovery as rapidly and efficiently as
possible, on a rolling basis. Should plaintiffs find that
they are not timely receiving such discovery, they
may bring an appropriate motion to the Special Mas-
ter.

> FN8. Since defendants have admitted that
> the core conspiracy documents have already
> been compiled, the Court will require these
> documents to be produced by the two-week
> deadline for the beginning of production.
> These core conspiracy documents are neces-
> sary for plaintiffs in the taking of defend-
> ants' depositions, many of which have
> already been scheduled; therefore, the Court
> will tolerate no delay in the production of
> these documents.

B. Locations of Defendants' Search

*6 In his 4/23/01 R & R, the Special Master limited
the locations of the search mandated by plaintiffs'
discovery requests to: (1) files maintained by or for
the persons (a) identified in response to Interrogatory
No. 5(B) who either participated in or had contem-
poraneous knowledge of the conspiracy, or (b) with
primary decision-making authority and those with
oversight responsibility for the production, pricing,
sale, marketing, or distribution of vitamins, raw ma-
terials, or intermediates; (2) files maintained for spe-
cific vitamins or by vitamin producers to the extent
that such files are maintained either at their headquar-
ters or at facilities maintained by or for regional or
area managers; and (3) any other area where each for-
eign defendant or its counsel reasonably believes re-
sponsive documents are likely to be found. 4/23/01 R
& R at 16-17. Defendants object to this three-part test
because, even as limited by the Special Master, [FN9] it
requires them to search for documents at some of
their non-U.S. affiliates. Defendants have produced
affidavits to show that such worldwide searches
would be extraordinarily burdensome and futile. See,
e.g., Heyl Decl. ¶¶ 2-5; Gervais Decl. ¶¶ 2-5;
Uchiyama Decl. ¶¶ 2-6; Sykora Decl. ¶¶ 2-3; Walker Aff.
¶¶ 2-3 (Exh. D to Def's Obj's). For example, de-
fendants explain that BASF has 94 affiliates located on
six continents and in 71 countries, that many of these

affiliates have multiple offices and production facilit-
ies, and that in addition to the travel and language
burdens, defendants would have to expend consider-
able time explaining American legal procedures to
these foreign affiliates and researching local disclos-
ure laws to be sure that they do not intentionally viol-
ate any foreign laws in the process. Def's Obj. at 9.
Moreover, defendants assert that the only additional
documents that plaintiffs would be likely to receive
from these third party non-U.S. affiliates would be
those relating solely to foreign locales and thus irrel-
evant to plaintiffs' claims in this action. Id. at 10
(citing Heyl Decl. ¶¶ 3-4, Gervais Decl. ¶¶ 3-4,
Uchiyama Decl. ¶¶ 5-6).

> FN9. Plaintiffs' proposed three-part test was
> more expansive than the Special Master's;
> plaintiffs' proposed prong 2 required defend-
> ants to search all "files maintained for spe-
> cific vitamins or by vitamin producers" and
> did not include the Special Master's limita-
> tion that defendants need only search these
> files to the extent that they "are maintained
> either at their headquarters or at facilities
> maintained by or for regional or area man-
> agers." The Court agrees with the Special
> Master's refinement of the second prong and
> will adopt the Special Master's version of
> this part of the test.

While this Court does not wish to impose any addi-
tional burden on these foreign defendants with re-
spect to discovery than is absolutely necessary; the
Court is concerned, given the allegations in the com-
plaints of defendants' fraudulent concealment and de-
struction of key conspiratorial documents, that these
foreign defendants may have transferred key docu-
ments to their unnamed foreign affiliates to prevent
plaintiffs' from discovering this information. [FN10]
Moreover, the Court cannot find that the first and
second prongs of this test, as limited by the Special
Master, will result in the production of irrelevant in-
formation. The fact that defendants contend that dis-
covery from these affiliates would be cumulative is
not dispositive. See Westinghouse Elec. Corp. v. Rio
Algam Ltd. (In re Uranium Litig.), 480 F.Supp. 1138,
1155 (N.D.Ill.1979) ("Under the rules of United
States Courts, a party is not required to accept the as-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 7
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

surance of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers").

> FN10. This concern was heightened at the June 14, 2001 hearing when plaintiffs produced to the Court a sealed document showing evidence that some documents at defendants' home offices have been destroyed.

*7 Defendants also argue that the third prong of the Special Master's proposed criteria for the scope of defendants' search is too vague and overbroad. Def's Obj's at 12. Plaintiffs contend that this third prong was intended to function as a limitation rather than an expansion of the scope of the search. However, the Special Master did not find it to be a limitation and this Court agrees. It is unclear how the third prong, which requires defendants to search "any other area where each foreign defendant or its counsel reasonably believes responsive documents are likely to be found"-would serve as a restriction on the locations of defendants' search. Given the specificity in the first two prongs, the third prong may be unnecessary. The Court can surmise that this prong was intended to target the concern that the foreign defendants may have moved documents to avoid discovery; to the extent that this is a legitimate concern, this catchall prong may be needed in order to ensure that plaintiffs get the desired documents. However, until plaintiffs receive discovery relating to the first two prongs, it is premature to determine whether or not discovery under this third prong will be necessary.

Therefore, at this point, the Court will limit the locations for defendants' search to the first two prongs of the Special Master's test, with the proviso that plaintiffs may later renew their motion to compel additional discovery relating to the third prong if they find defendants' production under the first two prongs to be inadequate.

C. Implications of German and Swiss Privacy Laws

The German and Swiss defendants objected on privacy grounds to document requests 5(c) and 9 and Interrogatories 5 and 6.[FN11] The Special Master rejected defendants' objections and recommended (1) that

production in response to these requests would not violate German and Swiss privacy laws; and (2) that the Court order production of this information even if production would violate these laws because of the compelling United States interest in enforcement of its antitrust statutes

> FN11. Briefly, these discovery requests seek information relating to the "discipline, discharge, suspension, termination, or retirement of individuals identified in Interrogatory 5(B)" [Document Request 5(c) ]; "all daytimers, diaries, appointment books, schedulers, calendars, credit card statements ..., and travel and expense logs and reports" for all persons identified in Interrogatory 5(B) [Document Request 9]; identification by name, position, time period, current employer, and/or last known address, business telephone and fax numbers and e-mail address of all current or former officers, directors, employees or agents who had primary decision-making authority or oversight responsibility for the production, pricing, sale, marketing, or distribution of vitamins for or to customers or potential customers in the United States who participated in and/or had knowledge gained during the course of, in connection with, or in furtherance of the conspiracy, of communications or meetings between or among vitamin manufacturers... [Interrogatory 5]; and for each person identified in Interrogatory 5(B), whether the individual had a personal computer, telephone or fax machine which was used in connection with this conspiracy and whether defendants reimbursed the person for any computer, telephone, or fax costs or charges and if so produce documents to show the costs or charges reimbursed [Interrogatory 6].

A foreign party seeking protection from discovery on a contention that transmission of the data sought is prohibited by the party's state of domicile has the burden of showing that the foreign law actually bars the production at issue. *In re Sealed Case,* 825 F.2d 494 (D.C.Cir.1987). In support of their position, the German defendants have submitted two declarations pre-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                     Page 8
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

pared by Dr. Christoph Crisolli ("Cristolli") and Professor Paul Schwartz ("Schwartz"), along with an English translation of the German Federal Data Protection Act ("BDSG"). The Swiss defendants have submitted two affidavits of Dr. Felix Iselin ("Iselin").

*1. German Defendants*

Citing the opinions of their declarants, the German defendants contend that the four disputed discovery requests describe employee data within the protections of the German Constitution [FN12] and the BDSG and that disclosure is thus prohibited unless the individual employees whose data would be produced consent or one of the exemptions stated in § 28 of the BDSG applies, which defendants contend they do not. The first exception, § 28(1)2, permits communication of data "in so far as this is necessary to safeguard justified interests of the controller of the data file and there is no reason to assume that the data subject has an overriding legitimate interest in his data being excluded from processing or use." Dr. Cristolli states that this provision would permit disclosure by defendants only if that was within the intended purpose of the employees' employment contracts, for example in a labor court trial, but not in a United States court for defending against antitrust charges. The second exception, § 28(2)1(a)-(b) of the BDSG authorizes disclosure of otherwise protected data "in so far as this is necessary to safeguard justified interests of a third party or public interests ... if there is no reason to assume that the data subject has a legitimate interest in his data being excluded from communication." Defendants contend that this exception is applicable only when "there is no objectively acceptable alternative" to production of the data, and they contend that production is unnecessary here because the defendants have already pled guilty to charges relating to the general conduct alleged by plaintiffs and have not objected to substantial conspiracy discovery. Moreover, defendants contend that the employees have legitimate interests in withholding the data from their attorneys and others who could see it despite this Court's Protective Order. On April 2, 2001, the Federal Republic of Germany ("FRG") submitted an *amicus curiae* brief [FN13] urging the Court to defer to Germany's privacy laws because they are central to its laws, policies and judicial

procedures; the FRG also contends that to justify production of data, there must be a showing that the data are necessary for the transferee's purpose and not just useful. On April 6, 2001, Degussa filed a March 26, 2001 "Advisory Opinion" of the State Commissioner for Data Protection of Northrhine-Westphalia. [FN14] The Advisory Opinion states that the State Commissioner was visited by Degussa on March 20, 2001 and that Degussa provided him with plaintiffs' First Discovery Request dated January 23, 2001, the Cristolli declaration, and a single-page "overview" of the requested information. Given this information, the Advisory Opinion concludes that "Degussa AG is forbidden due to the data protection law to give the requested information in the present case." Moreover, violation of the BDSG is a criminal offense that may result in the imposition of substantial fines and/or jail terms. *See* Cristoli Decl. ¶ 19; BDSG ¶ 43.

> FN12. Although defendants rely more heavily on the BDSG to support their privacy arguments, defendants maintain that the German Constitution protects the right to "informational self determination," which provides individuals with the right to control the collection and dissemination of their personal data. *See* Cristoli Decl. ¶ 5. However, the evidence suggests that the BDSG codified the German constitutional right of self-determination. *See* Ehmann Decl. ¶ 27; Cristolli Decl. ¶ 7; Schwartz Decl. ¶ 12. Therefore, the discussion of the BDSG here encompasses the discussion of Germany's constitutional right to informational self-determination.

> FN13. In his 4/23/01 R & R, the Special Master granted the motion for leave to file the amicus brief, because it was preferable to allow the FRG the opportunity to express its views and because plaintiffs had already submitted a substantive response to the brief. However, the Special Master discredited the FRG's conclusions by noting that the FRG relied on an outdated version of the BDSG in which the exceptions were more narrowly drawn; and instead of presenting an official interpretation from the Federal

Not Reported in F.Supp.2d                                                                                Page 9
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

Republic of Germany, FRG cites only defendants' two experts and the State Commissioner's Advisory Opinion for its conclusion that there is "a conflict between U.S. discovery provisions and German privacy law." *See* 4/23/01 R & R at 38 n. 49.

FN14. The Special Master granted Degussa's motion for leave to file and accepted the Advisory Opinion into the record. However, the Special Master distinguished this Advisory Opinion by noting that the materials presented to the Commissioner were incomplete and the reasons the Commissioner gave for rejecting transmission of the data requested by plaintiffs were conclusory, unsupported, and grounded on an inadequate record. *See* 4/23/01 R & R at 38 n. 49.

*8 The Special Master interpreted BDSG § 3(2), as does plaintiffs' expert Prof. Ehmann, to provide that only personal files that can be analyzed by automated procedures or, if not automated, are "similarly structured" so that "they can be rearranged and evaluated by means of automated procedures" are within the BDSG's prohibitions on transmission.FN15 The Special Master found that defendants had failed to meet their burden of establishing that the requested information are "data files" or "similarly structured" so as to be protected by the BDSG. In their Rule 53 Objections, defendants contend that "there is evidence in the record that most of the documents and other personal information requested by Plaintiffs in Document Requests 5(c) and 9 and Interrogatories 5 and 6 are kept in 'Electronic Databases' that may be accessed through 'Electronic' means." Def's Obj's at 17. Moreover, defendants point to the State Commissioner for Data Protection of Northrhine-Westphalia's statement that the relevant "person-specific data (BDSG § 3(1)) are obviously stored either in data files or are taken from them (BDSG § 27(1))." *See* Def's Exh. K (3/26/01 letter from State Commissioner for Data Protection of Northrhine-Westphalia to Data Protection Officer of Degussa AG) at 3.

FN15. Although it was originally the subject of some dispute, at the June 14, 2001 hear-

ing defendants conceded the accuracy of the Special Master's interpretation of the data file requirement in the BDSG.

However, even assuming that the requested information are stored in data files and thus within the protections of the BDSG, disclosure may still be warranted if plaintiffs can show (1) that the information at issue is "necessary" to protect public interests and/or the interests of plaintiffs; and (2) the data subjects have no "legitimate interest" in preventing disclosure of the information. Plaintiffs assert that the interrogatories are necessary to identify and question key conspirators and that the document requests are necessary to identify and elucidate the substance of meetings with competitors and to determine how defendants dealt with conspirator-employees. The Special Master accepted these explanations of necessity, and this Court is inclined to agree.FN16 Defendants' argument that this information is superfluous because they have already pled guilty to the underlying charges is without merit. Despite their guilty pleas, defendants have attempted to avoid liability in this case from the very beginning, from their early attempts to argue against this Court's jurisdiction until today when they admit that they have not yet responded to most of plaintiffs' merits discovery requests. Under these circumstances, the Special Master is right to conclude that defendants' assertion that other discovery requests to which they have not yet responded will satisfy plaintiffs' needs is insufficient. "Under the rules of United States Courts a party is not required to accept the assurances of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers." *Westinghouse Elec. Corp. v. Rio Algom Ltd. (In re Uranium Antitrust Litig.),* 480 F.Supp. 1138, 1155 (N.D.Ill.1979); *see also Advanced Internat'l Sys. Securities Litig.,* 1993 WL 331006, at *2 (C.D.Cal. May 17, 1993) (Pl's Opp. Exh. 7) ("Defendants do not possess the authority to determine what Plaintiffs need to pursue their claims." Rather, the Federal Rules of Civil Procedure govern whether plaintiffs are entitled to discover the requested information).

FN16. Defendants' expert, Schwartz, stated that "necessary" does not mean "absolutely

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

necessary," and that the term as used in the companion exception § 28(1)2, "involves consideration of the reasonableness and commensurability of an intended use as compared to other possible means, if any, of safeguarding a justified interest." Schwartz Decl. ¶ 13.

**\*9** As discussed above, the Court is inclined to agree with the Special Master that the requested information may be necessary to plaintiffs' claims in this case. However, even if the information is necessary, the Court must also consider whether the individuals have a legitimate interest in preventing the disclosure of this information. The data sought is certainly personal-daytimers, diaries, appointment books, schedulers, calendars, credit card statements, travel and expense logs and reports, telephone billing records, records of incoming and outgoing fax transmissions, employee home addresses, former employees' new employer identities, e-mail addresses, and employee discharge, discipline, suspension, termination, and retirement records. As noted by defendants, individuals have a presumptively legitimate interest under German law in the nondisclosure of their personal information to residents of countries with nonequivalent personal data protection standards. *See* Cristolli Decl. ¶ 17. Therefore, the crucial question here is whether the Protective Order in this case is "equivalent" to the protections afforded by the German BDSG. Here, plaintiffs may run into a problem, because the Protective Order is concededly not absolutely equivalent to the protections afforded by the BDSG. There is some concern by this Court that defendants not be allowed to withhold information based upon minor inequivalencies between the Protective Order in this case and the BDSG. After all, the Protective Order was proposed to the Court jointly by plaintiffs and defendants and no effort has been made by defendants to amend it to address any "equivalency" problems they perceive. However, the Court is also aware that the information affected by these privacy laws is a small subset of the total discovery requested in this case. Given that the German defendants do appear to have some legitimate privacy law concerns and that the Protective Order in this case may not be sufficiently detailed to shield them

for criminal liability in their own country, the Court is hesitant to order these defendants to violate their country's laws without a better understanding of exactly what information is protected and how necessary this small subset of information is to plaintiffs' claims in this case. Accordingly, the Court will allow defendants to file a privacy log detailing exactly what requested information would be covered by the German privacy laws. Plaintiffs may then determine whether that requested information is absolutely essential to their case and whether there is a way to amend the Protective Order to safeguard defendants from liability in the production of this information.

*2. Swiss Defendants*

The Swiss defendants similarly assert that the data at issue are protected by the right to privacy guaranteed by the Swiss Constitution and the nation's Federal Law on Data Protection ("FDPL") prohibition against transmission to the United States, where, according to defendants' affiant, data protection guarantees are not equivalent to those afforded by Swiss law. Specifically, Dr. Iselin concludes that transfer of the data at issue is "prohibited unless: (a) the protection provided to the personal data is equivalent to that provided under Swiss law (Art. 6, para 1); [FN17] or (b) the infringement of privacy is 'justified' (Art 13)." [FN18] Iselin 3/20/01 Aff. ¶ 7.

> FN17. Article 6 of the FDPL provides: "No personal data may be transferred abroad if the data subject's personal privacy could be jeopardised, in cases where there is a failure to provide protection equivalent under Swiss law." Dr. Iselin states that "the [Court's] Protective Order does not rise to the level of protection afforded by the Swiss Data Protection Law" because it would not prevent a party from disclosing its own information and because personal data could be available to "the broad range of persons listed in paragraph 8 " Iselin 3/20/01 Aff. ¶ 8.

> FN18. Article 13 of the FDPL provides: "An infringement of privacy is illegal unless it is justified by the consent of the victim, by an overriding public or private interest or by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
(Cite as: Not Reported in F.Supp.2d)

the law." Dr. Iselin states that a discovery order would not be a "law" justifying production. Iselin Aff. ¶ 9. However, plaintiffs' expert, Dr. Peter, disagreed and stated that "[c]ompliance with a judicial order rendered by a competent court after regular procedure should, in my opinion, constitute a justifying motive to transfer personal data...." Peter Aff. ¶ 35.

*10 The Special Master found the Protective Order here to be adequate, but in their Rule 53 Objections defendants contest this finding and assert that the core principles of the FDPL are not guaranteed by the Protective Order. Def's Obj's at 22. Specifically, defendants state that the FDPL prohibits the transfer of data abroad and that no such guarantee is imposed by the Protective Order; [FN19] the FDPL also establishes parameters of data security which are not assured by the Protective Order; finally, the FDPL gives a right of access, as well as rights of accuracy and rights of correction, to the data subject and no such rights are assured by the Protective Order. As with the German defendants, the Court will allow the Swiss defendants to file a privacy log detailing exactly what requested information is covered by the Swiss privacy laws. The parties will then have the opportunity to litigate issues concerning this log if necessary. [FN20]

> FN19. To illustrate this point, defendants point to the pending motion of the Canadian plaintiffs to intervene in this case for access to certain discovery.

> FN20. The Court is aware that a federal court may order a party to comply with discovery, even if such compliance may violate another sovereign's law. See, e.g. United State v. Vetco, Inc., 69 F.2d 1281, 1287 (9th Cir.1981) (requiring party to comply with discovery because U.S. interest in tax collection outweighs Swiss privacy laws); United States v. Field, 532 F.2d 404, 407 (5th Cir.1976); United States v. First Nat'l City Bank, 396 F.2d 897, 903 (2d Cir.1968) (requiring non-party to comply with discovery because importance of U.S. antitrust laws outweighs possible civil sanctions in

Germany); Alfadda v. Fenn, 149 F.R.D. 28, 33 (S.D.N.Y.1993); see also SEC v. Banca Della Svizzera Italiana, 92 F.R.D. 111, 119 (S.D.N.Y.1981) ("It would be a travesty of justice to permit a foreign company to invade American markets, violate American laws ... withdraw profits and resist accountability for itself and its principals by claiming their anonymity under foreign law"). However, given the significant comity concerns of requiring disclosure of information that could conceivable violate foreign countries' privacy laws, the Court is wary of ordering such discovery until it is clear that the requested discovery is necessary.

### D. Interrogatory 5(B)-Contemporaneous Knowledge Requirement

Defendants contend that Interrogatory 5(B) is inappropriate to the extent that it requires foreign defendants to identify all current and former officers, directors, employees, and agents with contemporaneous "knowledge" of the alleged conspiracy. Specifically, defendants argue that this Interrogatory's contemporaneous knowledge requirement is unlikely to lead to the discovery of any relevant information that would not be discovered through other discovery requests, is unduly burdensome, and is an improper topic for an interrogatory. Moreover, defendants argue that the question of whether a person has "knowledge" is subjective and requires defendants to draw a line that "simply cannot be drawn." Def's Obj's at 27. Defendants' arguments are without merit.

First, Fed.R.Civ.P. 26(b)(1) allows for discovery of "the identity and location of persons having knowledge of any discoverable matter." Defendants agree that "plaintiffs have the right to discover who has information relevant to the lawsuit," Def's Obj's at 27, but they contend that this information is otherwise available to plaintiffs and that the true intent behind Interrogatory 5(B) is to have defendants "investigate and inculpate individuals who have nothing more than indirect hearsay 'knowledge' of the alleged conspiracy. Defendants provide no explanation or basis for this assumption and the Court finds it to be unfounded. As the Special Master noted in his 4/23/01

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 12
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
(Cite as: Not Reported in F.Supp.2d)

R & R, "[l]earning the identity of all individuals who had knowledge of the conspiracy, regardless of whether they attended a meeting or were named in an incriminating document, will allow plaintiffs to gain a greater understanding of the ways in which the entire conspiracy operated and to test the knowledge and statements of individuals who did take an active role." 4/23/01 R & R at 18-19. For example, an individual in this category may have seen conspiracy documents that were subsequently destroyed. *Id* at 19, n. 20. This information is especially relevant in this case because defendants allegedly took steps to ensure that the conspiracy documents were destroyed or were never created and went to great lengths to hide their activities and meetings from others; therefore, the fact that someone is not mentioned in any of the documents would not necessarily mean that he or she was not involved in the conspiracy and plaintiffs are entitled to be able to identify the players in this alleged conspiracy.[FN21] Defendants' argument that "knowledge" is a subjective term and requires them to draw a line they cannot draw is hardly worthy of a response. The term "knowledge" in this context is self-explanatory and the Court does not believe that defendants are unclear regarding its meaning.

> FN21. In fact, at the June 14, 2001 hearing, plaintiffs produced to the Court a deposition transcript of an individual who was not named in any conspiracy document and had not attended any meeting but who obviously had important knowledge of this conspiracy that would not be discoverable in the absence of this contemporaneous knowledge requirement.

### E. Geographic Limitation

**\*11** Plaintiffs have filed an Objection to the Special Master's 4/23/01 R & R contesting the Special Master's geographic limitation on the scope of certain of plaintiffs' merits discovery. Specifically, the Special Master limited the scope of certain of plaintiffs' discovery requests seeking transactional data, information related to the alleged conspiracy, and information concerning bid prices and contracts, among other things, to require defendants to produce only "geographically relevant" material in response. In Definition 10 of the Appendix, the Special Master defined the term "geographically relevant" as follows:

"Geographically relevant" means documents or information, as appropriate, discussing or concerning the United States or a portion of the United States, the world as a whole, or any geographic region of which the United States or a portion of the United States is a part, or documents or information, as appropriate, of general applicability that do not reference a geographic area.

Plaintiffs request that the Court overrule this portion of the Special Master's R & R and order the foreign defendants to produce "(1) all the materials they already have compiled in connection with their own internal investigations or inquiries from law enforcement officials, including the Department of Justice, the European Commission and officials in Canada, Japan, Australia, and elsewhere, regarding their participation in a global conspiracy to allocate market shares, sales volumes, territories and customers and to rig bids and fix prices of vitamins;[FN22] and (2) the related transactional and financial data (limited to pre-existing data maintained electronically or pre-existing manual summaries) for their worldwide production and sale of vitamins." Pl's Obj's at 1. Plaintiffs contend that discovery of this information without any geographic limitation is necessary to show "the relationships among the documents, the breadth of conspiratorial communications, and the scope of participation by each vitamin producer to develop the evidence-both direct and circumstantial-that they will present at trial concerning the conspiracy's existence, when it actually started, how it expanded to include virtually all vitamins and all major vitamins producers, how the conspiracy was enforced and infractions or disagreements resolved, the affirmative acts defendants took to conceal the conspiracy, how the conspiracy affected vitamin prices generally, and to quantify the overcharges plaintiffs paid on the vitamins they purchased." *Id* at 1-2. In addition to asserting their right to discovery that is coextensive with the unprecedented size and complexity of this global conspiracy, plaintiffs also contest the Special Master's delegation to the foreign defendants of absolute and unreviewable discretion to determine which

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
(Cite as: Not Reported in F.Supp.2d)

acts in furtherance of the conspiracy "concern" the United States.

> FN22. Plaintiffs refer to these as the "core conspiracy" documents.

The Special Master's geographic limitation assumes that most conduct in furtherance of the alleged global vitamins conspiracy is relevant but that there is a small subsection of the overall conduct in furtherance of the conspiracy-acts or communications in furtherance of the conspiracy that occurred wholly outside the United States-that is irrelevant for purposes of discovery in this case, because plaintiffs can only recover for injuries that occurred in United States commerce.[FN23] However, there is a crucial difference between what is relevant for purposes of discovery and what actions will be admissible to prove damages at trial. It is well-established that parties are entitled to discover not only admissible evidence but also information that is "reasonably calculated to lead to the discovery of admissible evidence." Revised Rule 26(b)(1). Moreover, although defendants are correct that the revised Fed.R.Civ.P. 26(b)(1) attempts to further limit discovery by narrowing discovery to that related to the "claim or defense of any party" as opposed to the subject matter of the litigation, the amended rule does provide that "[f]or good cause shown, the court may order discovery of any matter relevant to the subject matter involved in the action." Here, plaintiffs have alleged a global conspiracy involving substantial fraudulent concealment and destruction of documents; given the nature of this case, the Court finds good cause for allowing discovery with respect to even the foreign actions that were taken in furtherance of this conspiracy. Although these actions may not be admissible to establish damages; because, as this Court has previously ruled, plaintiffs' claims are limited to those injuries with a sufficient United States nexus,[FN24] the information would be relevant to show the breadth of the conspiracy, the role that each defendants' executives played in implementing, expanding, enforcing and concealing the conspiracy, and how the conspiracy was maintained for the length of time alleged. See Continental Ore Corp. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) (In antitrust conspiracy cases, "plaintiffs should be given the full benefit of

their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each ... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole ..."); ES Development, Inc. v. RWM Enterprises, Inc., 939 F.2d 547, 553-554 (8th 1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must always be proved by 'inferences that may be drawn from the behavior of the alleged conspirators' ").[FN25] It could also lead to the discovery of other admissible information by allowing plaintiffs to discover "the identity and location of persons having knowledge of any discoverable matter," which is explicitly authorized by Revised Fed.R.Civ.P. 26(b)(1). Furthermore, this information could be extremely relevant for purposes of impeaching defendants' trial witnesses. As explained in the Advisory Committee Note to Revised Rule 26(b)(1):

> FN23. As this Court has previously ruled, relevance determinations by the Special Master are reviewed de novo. See 11/22/00 Mem. Op. Re: Downstream Data at 2-3

> FN24. See 6/7/01 Mem. Op. Re: Joint Motion to Dismiss; see also 6/7/01 Mem. Op. in Empagran. S.A., et al. v. F. Hoffman La-Roche, Ltd., et al.

> FN25. The Court agrees with the Special Master that United States v. Andreas, No. 96-CR-762, 1999 WL 299314 (N.D.Ill. May 5, 1999), does not significantly bolster plaintiffs' argument. First, Andreas involved sentencing issues arising out of a criminal conspiracy where the Court was concerned with "due process" and "fundamental fairness" and thus does not directly relate to the question of what is discoverable in a civil antitrust proceeding. Second, the court in Andreas did not have the international comity concerns facing this Court; that Court's decision was directed at the United States government, rather than at foreign companies. Thus, Andreas is not particularly instructive on the issue of the scope of dis-

Not Reported in F.Supp.2d                                                                    Page 14
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

covery that can be compelled directly from foreign parties.

**\*12** "The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.

Advisory Committee Note to 2000 Amendments to Fed.R.Civ.P. 26(b)(1). Therefore, the Court is satisfied as to the relevance of the core conspiracy documents, even those that do not mention the United States and purport to involve only foreign countries.

With respect to the transactional and financial data outside the geographic limitation, plaintiffs contend that they need discovery of this data outside the geographic limitation to establish: "(1) when the conspiracy actually began and terminated as to each vitamin; (2) the steps the Foreign Defendants took to affirmatively conceal their wrongdoing, by *inter alia,* falsely telling customers that price increases were the unavoidable response to international currency fluctuations, inflation, low profits, production cost increases or production capacity constraints; (3) the estimates of the prices plaintiff would have paid for vitamins "but for" the conspiracy; and (4) the fact that the Foreign Defendants could have sustained their operations at the "but for" price levels." Pls' Obj's at 20. The Court agrees. Unless defendants are willing to stipulate that their experts will not rely on this foreign transactional and financial data, which they thus far have been unwilling to do, restricting plaintiffs' access to this data could be unfairly prejudicial and

could impact their ability to prosecute their cases. *See Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746 (1976) (Where "the proof is largely in the hands of the alleged conspirators," antitrust plaintiffs must be given ample opportunity for discovery); *see also In re NASDAQ Market-Makers Antitrust Litig.,* 929 F.Supp. 723, 725 (S.D.N.Y.1996). Therefore, although the case for discovery of foreign financial and transactional data may be slightly weaker than for the core conspiracy documents, the Court cannot find that this information is irrelevant and unless defendants are willing to stipulate that they will not rely on this information, the Court will not bar plaintiffs from discovery of this data. *See Antitrust Law Developments (Fourth)* at 872-73 (Pl's Exh. 11) ("Courts are generally reluctant to limit discovery to a narrow geographic area: Where allegations of conspiracy to restrain trade and intent to monopolize are at issue, ... a broad scope of discovery is appropriate, because the conspiracy may involve actors outside of plaintiff's geographic market and the scheme of monopolization may involve an area larger than the plaintiff's own limited sphere of operations. In essence, the geographic range of discovery requests 'is subject only to a test of reasonableness.' Courts determine whether there are elements of regional, national, or international competition that would support discovery in a correspondingly broad geographic area rather than merely a local market").

**\*13** However, the fact that foreign core conspiracy and transactional and financial information is relevant to plaintiffs' claims does not end the matter. Given the Court's ruling that the foreign defendants will be compelled to produce this discovery in accordance with the Federal Rules rather than the Hague Convention, the Court must seriously consider the burden on defendants of responding to these discovery requests. The Special Master appeared to have been particularly concerned with the possibility that plaintiffs would use this discovery to bolster their claims in the *Empagran* case; since the foreign claims in that case have now been dismissed, this is no longer a problem. Defendants argue that plaintiffs may still be seeking this evidence for use in their foreign court proceedings, because discovery procedures in those countries will be more restrictive than the

Not Reported in F.Supp.2d                                                                                                      Page 15
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

discovery available under the Federal Rules. However, there is no evidence that plaintiffs are seeking this discovery for that purpose; the foreign core conspiracy and transactional and financial documents are relevant to plaintiffs' conspiracy, global price-fixing, and fraudulent concealment claims here and could potentially lead to the discovery of other admissible evidence with regard to the specifics of this conspiracy and the affirmative acts of fraudulent concealment. Moreover, defendants' concern that production of these documents could expose them to additional civil suits and government prosecutions in foreign countries is also unwarranted, because the Protective Order governing these actions provides that the discovery produced in these cases can only be used for the prosecution or defense of the MDL 1285 actions. *See* 11/3/99 Protective Ord. ¶¶ 1, 17. Therefore, the Court will not bar this discovery based on the hypothetical concern of defendants that plaintiffs could conceivably attempt to use this discovery in their foreign proceedings; the Court trusts that all parties will abide by the Protective Order governing this case.

Moreover, defendants have not sufficiently explained how producing these foreign core conspiracy documents would unduly burden them. In fact, this Court is inclined to agree with plaintiffs that the process of reviewing each document to determine whether it falls within the geographic limitation and then redacting any portions of documents that fall outside the proposed geographic limitation would seem to require much more work and expense than merely producing all documents responsive to plaintiffs' requests. Additionally, it is problematic to give defendants absolute discretion to withhold or redact documents they label as not "concerning the United States." As noted by the Special Master, courts have expressed serious reservations about the problems posed by giving a party the type of discretion proposed here. *See, e.g., In re Medeva Sec. Litig.*, No. 93-4376-Kn, 1995 WL 943468, 1995 U.S. Dist. LEXIS 21895, at *8 (C.D.Cal. May 30, 1995) ("The Court does not welcome unilateral editing of documents by the producing party. Even when implemented with restraint and in good faith, the practice frequently gives rise to suspicion that relevant material

harmful to the producing party has been obscured. It also tends to make documents confusing or difficult to use. All too often, the practice results in litigation of collateral issues and in camera review of documents by the Court, with the result that the time of both counsel and the Court is wasted").

**\*14** That being said, the Court must seriously consider the sovereign interests implicated by requiring this broader production on the part of the foreign defendants. The question is whether this information is so relevant and necessary to plaintiffs' cases that the prejudice in being restricted from these foreign conspiracy and financial and transactional documents would outweigh the encroachment on the foreign countries' sovereign interests in being required to respond to this discovery. *Aerospatiale* dictates that the burdensomeness and intrusiveness of discovery on foreign litigants is to be evaluated in the context of the court's "knowledge of the case and claims and interests of the parties and the governments whose statutes and policies they invoke." *Aerospatiale*, 482 U.S. at 546. Balancing the relevance and harm to plaintiffs in not having this information against the burden and intrusiveness on defendants of requiring this discovery, the Court finds that the geographic limitation is unwarranted and that plaintiffs are entitled to discovery of all requested core conspiracy and transactional and financial data. *See First American Corp. v. Price Waterhouse,* 988 F.Supp. 353, 364-66 (S.D.N.Y.1997), aff'd, 154 F.3d 16, 23 (2d Cir.1998) (ordering relevant discovery to proceed under Federal Rules rather than Hague Convention despite the fact that this discovery was admittedly burdensome, because the discovery was co-extensive with the "complicated misdoings" alleged in the complaint). Accordingly, the Court will decline to uphold the Special Master's geographic limitation on certain discovery and will order this relevant discovery to be produced without regard to any geographic limitation.

### III. CONCLUSION

In conclusion, the Special Master's 4/23/01 R & R will be affirmed in part. Specifically, the Court will (1) uphold the Special Master's ruling that merits discovery proceed under the Federal Rules, and addi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tionally the Court will set a date certain for the start
of production; (2) uphold the first two prongs of the
Special Master's three-prong test establishing the loc-
ations for defendants' search and decline to order dis-
covery based on the third prong at this time; (3) de-
cline the Special Master's recommendation that the
Court order immediate production of documents and
responses to interrogatories which the German and
Swiss defendants claim violate their privacy laws,
and instead order defendants to produce a privacy log
of these documents; (4) uphold the Special Master's
contemporaneous knowledge requirement in Inter-
rogatory 5(B); and (5) decline the Special Master's
recommendation with regard to the geographic limit-
ation. An order will accompany this Opinion.

### ORDER Re Merits Discovery

In accordance with the accompanying Memorandum
Opinion, it is hereby

ORDERED that the Special Master's April 23, 2001
Report and Recommendation will be AFFIRMED IN
PART. Specifically, it is hereby

ORDERED that the Special Master's ruling that mer-
its discovery proceed under the Federal Rules of
Civil Procedure is affirmed. It is further hereby

*15 ORDERED that the foreign defendants will be-
gin production of merits discovery in accordance
with the Federal Rules of Civil Procedure, and will
produce all core-conspiracy documents, within four-
teen days of this Order. It is further hereby

ORDERED that defendants will abide by the first
two prongs of the Special Master's three-prong test
establishing the locations for defendants' search at
this time; plaintiffs may renew their motion to com-
pel discovery based on the third prong at a later date
if they find the production under the first two prongs
to be inadequate. It is further hereby

ORDERED that, within thirty days of this Order, the
German and Swiss defendants produce a privacy log
detailing what information requested in Document
Requests 5(c) and 9 and Interrogatories 5 and 6
would be covered by the Swiss and German privacy
laws. It is further hereby

ORDERED that defendants produce the relevant dis-
covery in response to the Special Master's contem-
poraneous knowledge requirement in Interrogatory
5(B). And it is further hereby

ORDERED that defendants produce the relevant con-
spiracy, financial and transactional documents in re-
sponse to plaintiffs' discovery requests without regard
to any geographic limitation.

D.D.C.,2001.
In re Vitamins Antitrust Litigation
Not Reported in F.Supp.2d, 2001 WL 1049433
(D.D.C.), 2001-2 Trade Cases P 73,338

Briefs and Other Related Documents (Back to top)

• 2004 WL 3682686 (Trial Motion, Memorandum
and Affidavit) Reply Memorandum in Further Sup-
port of Certain Defendants' Motions to Dismiss or for
Judgment on the Pleadings (Aug. 25, 2004) Original
Image of this Document (PDF)
• 2004 WL 3682685 (Trial Motion, Memorandum
and Affidavit) Memorandum of Points and Authorit-
ies in Support of Certain Defendants' Motions to Dis-
miss or for Judgment on the Pleadings (Jul. 6, 2004)
Original Image of this Document (PDF)
• 2004 WL 3682684 (Trial Motion, Memorandum
and Affidavit) Class Plaintiffs' Memorandum in Sup-
port of Motion for Final Approval of Settlements
with the Sumitomo, Tanabe, Lonza, Degussa,
Nepera, and Reilly Defendants and for Entry of Final
Judgment (Jan. 16, 2004) Original Image of this Doc-
ument (PDF)
• 2003 WL 24251856 (Trial Motion, Memorandum
and Affidavit) Reply of Cargill and Tyson Plaintiffs
in Support of Their Motion to Intervene (Dec. 11,
2003) Original Image of this Document (PDF)
• 2003 WL 24251853 (Trial Motion, Memorandum
and Affidavit) Reply Memorandum in Support of
Class Plaintiffs' Motion for Preliminary Approval of
Settlement and form and Manner of Notice to the
Classes (Dec. 4, 2003) Original Image of this Docu-
ment (PDF)
• 2003 WL 24251854 (Trial Motion, Memorandum
and Affidavit) Class Plaintiffs' Opposition to Cargill
and Tyson Plaintiffs' Motion to Intervene (Dec. 4,
2003) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 17
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: Not Reported in F.Supp.2d)**

• 2003 WL 24251855 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement and form and Manner of Notice to the Classes (Dec. 4, 2003) Original Image of this Document (PDF)

• 2003 WL 24251871 (Trial Pleading) Answer of Defendant Mitsui & CO., Ltd. to Plaintiffs' Fourth Amended Complaint (Nov. 25, 2003) Original Image of this Document (PDF)

• 2003 WL 24251872 (Trial Pleading) Answer of Defendant Mitsui & Co. (U.S.A.), Inc. to Plaintiffs' Fourth Amended Complaint (Nov. 25, 2003) Original Image of this Document (PDF)

• 2003 WL 24251852 (Trial Motion, Memorandum and Affidavit) Motion of Cargill and Tyson Plaintiffs to Intervene (Nov. 21, 2003) Original Image of this Document (PDF)

• 2003 WL 21754739 (Verdict and Settlement Summary) (Jun. 13, 2003)

• 1:99mc00197 (Docket) (May 27, 1999)

• 1999 WL 33988058 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Opposition to Certain Defendants' Motions to Dismiss or for Judgment on the Pleadings (1999) Original Image of this Document (PDF)

• 1998 WL 34368140 (Trial Pleading) Class Action Antitrust Complaint (Sep. 30, 1998) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 29

Westlaw.

15 U.S.C.A. § 6a

C

**Effective: [See Text Amendments]**

United States Code Annotated Currentness
 Title 15. Commerce and Trade
  Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)

   → **§ 6a. Conduct involving trade or commerce with foreign nations**

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--

 **(1)** such conduct has a direct, substantial, and reasonably foreseeable effect--

  **(A)** on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

  **(B)** on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

 **(2)** such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

CREDIT(S)

(July 2, 1890, c. 647, § 7, as added Oct. 8, 1982, Pub.L. 97-290, Title IV, § 402, 96 Stat. 1246.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1982 Acts. House Report Nos. 97-637 and 97-629, and House Conference Report No. 97-924, see 1982 U.S. Code Cong. and Adm. News, p. 2431.

Prior Provisions

A prior section 7 of Act July 2, 1890, c. 647, 26 Stat. 210, related to suits by persons injured by acts in violation of sections 1 to 7 of this title, and was classified as a note under section 15 of this title, prior to repeal by Act July 7, 1955, c. 283, § 3, 69 Stat. 283.

LAW REVIEW COMMENTARIES

 An expanded presence in arena of international competition. Neal R. Stoll and Shepard Goldfein, 212 N.Y.L.J. 3 (Nov. 15, 1994).

 Closing the antitrust door on foreign injuries: U.S. jurisdiction over foreign antitrust injuries in the wake of Empagran. Comment, 38 Tex. Tech L. Rev. 395 (2006).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 6a

> Drawing the boundaries of the Sherman Act: Recent developments in the application of the antitrust laws to foreign conduct, Note, 61 N.Y.U. Ann. Surv. Am. L. 415 (2006)

> Federal judicial and legislative jurisdiction over entities abroad: Long-arm of U.S. antitrust law and viable solutions beyond the Timberlane/Restatement comity approach, 21 Pepp.L.Rev. 1219 (1994)

> The FTAIA and *Empagran*: What next? Edward D. Cavanagh, 58 SMU L. Rev. 1419 (2005)

> Supreme Court review of the Foreign Trade Antitrust Improvements Act: A case of a misleading question? Joshua P. Davis, 38 U.S.F. L. Rev. 431 (2004)

> United States v. Pilkington plc and Pilkington Holdings, Inc.: Expansion of international antitrust enforcement by the United States Justice Department, 20 N.C.J.Int'l L. & Com.Reg. 415 (1995)

LIBRARY REFERENCES

American Digest System

Trusts and other combinations in restraint of trade; importation or exportation, see Monopolies ☞15.

Corpus Juris Secundum

CJS Monopolies § 45, Interstate or Foreign Commerce.

CJS Monopolies § 46, Extraterritorial Operation.

CJS Monopolies § 209, Standing.

RESEARCH REFERENCES

ALR Library

1 ALR, Fed. 2nd Series 483, Construction and Application of Foreign Trade Antitrust Improvements Act (Ftaia), 15 U.S.C.A. Sec 6a

70 ALR, Fed. 637, "Target Area" Doctrine as Basis for Determining Standing to Sue Under § 4 of Clayton Act (15 U.S.C.A. § 15) Allowing Treble Damages for Violation of Antitrust Laws.

40 ALR, Fed. 343, Extraterritorial Application of Federal Antitrust Laws to Acts Occurring in Foreign Commerce.

108 ALR 5th 189, Validity of State and Local Statutes Allegedly Infringing on Federal Government's Exclusive Power Over Foreign Affairs--Nonalien Cases.

Encyclopedias

Am. Jur. 2d Monopolies, Restraints of Trade, etc. § 18, Restraints of Export Trade; Effect of Foreign Trade Antitrust Improvements Act.

Am. Jur. 2d Monopolies, Restraints of Trade, etc. § 352, Principles of Comity and Conflicts of Law.

Forms

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U S C A § 6a

Federal Procedural Forms § 48:56, Scope of Subdivision.

Federal Procedural Forms § 48:94, Scope of Division.

Treatises and Practice Aids

Callmann on Unfair Compet., TMs. & Monopolies § 4:4, Exemptions from the Antitrust Laws.

Callmann on Unfair Compet., TMs. & Monopolies § 4:38, the Rule of Reason -- Joint Ventures.

Callmann on Unfair Compet., TMs. & Monopolies § 27:30, Extraterritorial Application of United States Laws -- Jurisdictional Problems in Antitrust -- the "Effect" Test.

Callmann on Unfair Compet., TMs. & Monopolies App 5 § 5:19, Foreign Trade Antitrust Improvements Act of 1982.

Callmann on Unfair Compet., TMs. & Monopolies App 10 § 10:1, Antitrust Guide for International Operations.

Callmann on Unfair Compet., TMs. & Monopolies App 10 § 10:2, Department of Justice Policy Regarding Anti-competitive Conduct that Restricts U.S. Exports.

Eckstrom's Licensing in Foreign & Domestic Ops. App. 8B-I, Antitrust Enforcement Guidelines for International Operations Issued by the U.S. Department of Justice and the Federal Trade Commission (April 1995).

Eckstrom's Licensing in Foreign & Domestic Ops. § 8B:62.50, Foreign Trade Antitrust Improvements Act.

Eckstrom's Licensing Foreign & Domestic Ops Jt Vent App 4A, 1995 Antitrust Enforcement Guidelines for International Operations (Department of Justice and Federal Trade Commission).

Patent Law Fundamentals § 19:26, Antitrust Analysis and Critique -- Sherman Act § 1 (15 U.S.C.A. § 1).

Restatement (Third) of Foreign Relations § 415, Jurisdiction to Regulate Anti-Competitive Activities.

Trade Secrets Law App M, Appendix M. U.S. Department of Justice Licensing Guidelines: 1995 Antitrust Guidelines for the Licensing of Intellectual Property; 1988 Antitrust Enforcement Guidelines for International Operations.

West's Federal Administrative Practice § 3004, Federal Antitrust Laws-Sherman Antitrust Act.

Wright & Miller: Federal Prac. & Proc. § 3566, Determination from the Well-Pleaded Complaint.

Wright & Miller: Federal Prac. & Proc. § 3585, Miscellaneous Cases.

NOTES OF DECISIONS

   **Comity 9**
   **Domestic trade or commerce 4**
   **Export trade or commerce 6**
   **Foreign trade or commerce 4a**
   **Import trade or commerce 5**
   **International comity 7**
   **Persons entitled to maintain action 8**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 6a

**Purpose 1/2**
**Reasonably foreseeable effect 2**
**Speculative effects 3**
**Standing 8**
**Substantial effect 1**
1/2. Purpose

Language and history of Foreign Trade Antitrust Improvements Act (FTAIA) suggest that Congress designed FTAIA to clarify, perhaps to limit, but not to expand in any significant way, Sherman Act's scope as applied to foreign commerce. F. Hoffmann-La Roche Ltd. v. Empagran S.A., U.S.Dist.Col.2004, 124 S.Ct. 2359, 542 U.S. 155, 159 L.Ed.2d 226, on remand 2004 WL 1398217, on remand 388 F.3d 337, 363 U.S.App.D.C. 333, on remand 417 F.3d 1267, 368 U.S.App.D.C. 18. Monopolies ⛒ 12(7)

1. Substantial effect

On remand following vacatur by United States Supreme Court of decision reversing district court's dismissal, for lack of subject matter jurisdiction, of antitrust price-fixing conspiracy class action against vitamin manufacturers and distributors brought on behalf of foreign purchasers, Court of Appeals for Ninth Circuit could consider whether foreign purchasers properly preserved their alternative argument that foreign injury was not in fact independent of domestic effects and, if so, could consider and decide related claim. F. Hoffmann-La Roche Ltd. v. Empagran S.A., U.S.Dist.Col.2004, 124 S.Ct. 2359, 542 U.S. 155, 159 L.Ed.2d 226, on remand 2004 WL 1398217, on remand 388 F.3d 337, 363 U.S.App.D.C. 333, on remand 417 F.3d 1267, 368 U.S.App.D.C. 18. Federal Courts ⛒ 462

Traveler failed to state claim against European banks, under Foreign Trade Antitrust Improvements Act (FTAIA), for conspiracy to fix currency exchange fees on theory that his payment of excessive fees in Europe was dependent on conspiracy's effect on United States; complaint did not allege that currency exchange fees in United States reached supra-competitive levels, or that but for European conspiracy's effect on United States commerce, traveler was injured in Europe. Sniado v. Bank Austria AG, C.A.2 2004, 378 F.3d 210. Monopolies ⛒ 12(7)

In determining whether traveler asserting antitrust claims against European banks alleged conduct satisfying provision of Foreign Trade Antitrust Improvements Act (FTAIA) which required showing that alleged anticompetitive conduct had direct, substantial, and reasonably foreseeable effect on domestic commerce, relevant "conduct" was entire alleged conspiracy between banks to fix fees for exchanges of European currencies in Europe and United States, rather than merely those acts of charging supra-competitive fees in Europe that allegedly harmed traveler. Sniado v. Bank Austria AG, C.A.2 (N.Y.) 2003, 352 F.3d 73, vacated 124 S.Ct. 2870, 542 U.S. 917, 159 L.Ed.2d 774, on remand 378 F.3d 210. Monopolies ⛒ 12(7)

Remand was required to permit district court to decide, in the first instance, whether traveler asserting antitrust claims against European banks satisfied requirement for subject matter jurisdiction, under Foreign Trade Antitrust Improvements Act (FTAIA), that banks' alleged anticompetitive conduct had direct, substantial, and reasonably foreseeable effect on domestic commerce, given that district court improperly dismissed traveler's complaint under different provision of FTAIA and assumed, without deciding, that traveler would satisfy "direct, substantial, and reasonably foreseeable effect" requirement. Sniado v. Bank Austria AG, C.A.2 (N.Y.) 2003, 352 F.3d 73, vacated 124 S.Ct. 2870, 542 U.S. 917, 159 L.Ed.2d 774, on remand 378 F.3d 210. Federal Courts ⛒ 947

Provision of Foreign Trade Antitrust Improvements Act (FTAIA) limiting Sherman Act's application to conduct with direct, substantial, and reasonably foreseeable effect on domestic commerce addressed court's subject matter jurisdiction over antitrust claims, and was not simply element of claims. United Phosphorus, Ltd. v. Angus Chemical Co., C.A.7 (Ill.) 2003, 322 F.3d 942, certiorari denied 124 S.Ct. 533, 540 U.S. 1003, 157 L.Ed.2d 408. Monopol-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 6a

ies ⟳ 12(7)

District court did not have subject-matter jurisdiction over antitrust action arising out of transactions in Honduras although alleged restraint affected or was intended to affect foreign commerce of the United States and alleged restraint was of such type and magnitude as to be cognizable as a violation of sections 1-7 of this title, where enforcement of United States antitrust laws would lead to significant conflict with Honduran law and policy, and effect of potential restraint on United States foreign commerce was insubstantial. Timberlane Lumber Co. v. Bank of America Nat. Trust and Sav. Ass'n, C.A.9 (Cal.) 1984, 749 F.2d 1378, certiorari denied 105 S.Ct. 3514, 472 U.S. 1032, 87 L.Ed.2d 643. International Law ⟳ 10.19

If United States subsidiary of Australian insured was a target of foreign insurers' alleged conduct in engaging in conspiracy to collectively refuse to write new insurance contracts or renew longstanding insurance contracts unless insureds withdrew their previously filed asbestos-related claims, then insurers' conduct would have had a direct, substantial, and reasonably foreseeable effect on United States commerce within meaning of Foreign Trade Antitrust Improvements Act (FTAIA). CSR Ltd. v. CIGNA Corp., D.N.J.2005, 405 F.Supp.2d 526. Monopolies ⟳ 12(7)

Foreign Trade Antitrust Improvement Act (FTAIA) did not preclude exercise of subject matter jurisdiction in American purchaser's Sherman Act suit against foreign corporations, alleging conspiracy to fix prices and allocate market shares for monochloroacetic acid (MCAA) and sodium monochloroacetate (SMCA); price fixing conspiracy was alleged to have substantially affected United States market for those products. Crompton Corporation v. Clariant Corp., M.D.La.2002, 220 F.Supp.2d 569. Monopolies ⟳ 28(3)

2. Reasonably foreseeable effect

Foreign purchasers of vitamins stated Sherman Act price-fixing claim against manufacturers whose conduct allegedly had direct, substantial, and reasonably foreseeable effect on trade or commerce in United States, even though purchasers' own injuries did not arise from United States effects of defendants' conduct. Empagran S.A. v. F. Hoffman-LaRoche, Ltd., C.A.D.C.2003, 315 F.3d 338, 354 U.S.App.D.C. 257, rehearing and rehearing en banc denied, certiorari granted 124 S.Ct. 966, 540 U.S. 1088, 157 L.Ed.2d 793, vacated 124 S.Ct. 2359, 542 U.S. 155, 159 L.Ed.2d 226, on remand 2004 WL 1398217, on remand 388 F.3d 337, 363 U.S.App.D.C. 333, on remand 417 F.3d 1267, 368 U.S.App.D.C. 18. Monopolies ⟳ 28(6.7)

Alleged collusion by United States air carriers to fix commissions paid to foreign travel agents did not have "effect" on United States commerce, for purpose of agent's claim under Foreign Trade Antitrust Improvements Act (FTAIA); even though agents alleged that defendants' conduct substantially reduced their business values, forcing at least one member out of business, agent's failed to show that economic consequences of defendants allegedly illegal acts were felt in United States economy. Turicentro, S.A. v. American Airlines Inc., C.A.3 (Pa.) 2002, 303 F.3d 293. Monopolies ⟳ 12(7)

Foreign Trade Antitrust Improvements Act's (FTAIA) "direct, substantial, and reasonably foreseeable effect" on domestic commerce requirement for subject matter jurisdiction was not met by alleged antitrust conduct of a group of foreign insurers which conspired against an Australian insured to collectively refuse to write new insurance contracts or renew longstanding insurance contracts for insured and its affiliates unless they withdrew their previously filed asbestos-related claims; although insurers refused to cover certain United States risks, they did not restrict the market for insurance policies available in the United States. CSR Ltd. v. CIGNA Corp., D.N.J.2005, 405 F.Supp.2d 526. Monopolies ⟳ 12(7)

Necessity, intentionally imposed on retail tracking service by competitors' foreign and domestic activities, to devote the use of millions of dollars of its domestic funds to purposes other than its chosen ways of competing, was a dir-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ect, substantial and reasonably foreseeable effect on domestic trade or commerce and gave rise to a claim of attempted monopolization, such that the Foreign Trade Antitrust Improvements Act did not exempt the service's claim from the antitrust laws. Information Resources, Inc. v. Dun & Bradstreet Corp., S.D.N.Y.2003, 260 F.Supp.2d 659. Monopolies ⟜ 12(1.3)

Foreign Trade Antitrust Improvement Act (FTAIA) did not preclude exercise of subject matter jurisdiction in American brewer's antitrust action against its competitor and Canadian licensee, challenging competitor's acquisition of equity interest in licensee, which held right to market, distribute and sell all brewer's brands of beer in Canada; competitor's acquisition had reasonably foreseeable effect on brewer's export trade from Canada, and on United States beer market and consumers by forcing brewer to either share confidential information with rival or unwind its relationship with licensee. Coors Brewing Co. v. Miller Brewing Co., D.Colo.1995, 889 F.Supp. 1394. Monopolies ⟜ 28(3)

3. Speculative effects

Court lacked jurisdictional nexus to decide antitrust claim against bulk wholesale tour operator following its termination of contract with destination service operator which provided local services for tour customers on Caribbean island since consequences of termination on the United States were speculative, although effects in the foreign country were substantial. Liamuiga Tours, Div. of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd., E.D.N.Y.1985, 617 F.Supp. 920. Monopolies ⟜ 28(3)

4. Domestic trade or commerce

Defendant's participation in conspiracy to rig bids on Egyptian construction projects financed by USAID had substantial effect on domestic commerce, and thus Foreign Trade Antitrust Improvements Act (FTAIA) did not limit American court's jurisdiction over such transactions; scheme took money from federal treasury, depriving other projects and services of money, key decisions and agreements were made at corporate headquarters across United States, federal money was deposited in bank in Alabama, materials were purchased in United States, and equipment and materials were shipped from New Orleans on American freighters. U.S. v. Anderson, C.A.11 (Ala.) 2003, 326 F.3d 1319, rehearing and rehearing en banc denied 71 Fed.Appx. 824, 2003 WL 21432589, certiorari denied 124 S.Ct. 178, 540 U.S. 825, 157 L.Ed.2d 46. Monopolies ⟜ 31(.5)

Where price-fixing conduct significantly and adversely affects customers both outside and within United States, but adverse foreign effect is independent of any adverse domestic effect, Foreign Trade Antitrust Improvements Act (FTAIA) domestic injury exception does not apply, and thus, neither does Sherman Act, to claim based solely on foreign effect; abrogating Kruman v. Christie's Int'l PLC, 284 F.3d 384. F. Hoffmann-La Roche Ltd. v. Empagran S.A., U.S.Dist.Col.2004, 124 S.Ct. 2359, 542 U.S. 155, 159 L.Ed.2d 226, on remand 2004 WL 1398217, on remand 388 F.3d 337, 363 U.S.App.D.C. 333, on remand 417 F.3d 1267, 368 U.S.App.D.C. 18. Monopolies ⟜ 12(7)

Agreement between domestic corporation and foreign corporation to ban sale of modified tomato seeds in Mexico and the resulting fruit in the United States did not have direct effect on American commerce, as required for exercise of subject matter jurisdiction under Foreign Trade Antitrust Improvements Act (FTAIA) in government's action challenging the agreement as illegal restraint of trade; neither delay of possible "innovations" in development of tomato seeds nor agreement's possible impact on prices paid by American consumers were direct effects. U.S. v. LSL Biotechnologies, C.A.9 (Ariz.) 2004, 379 F.3d 672. Monopolies ⟜ 12(7); Monopolies ⟜ 28(3)

For Foreign Trade Antitrust Improvements Act (FTAIA) to apply to conduct involving trade or commerce of foreign nation, foreign conspiracy's effect on domestic commerce must give rise to plaintiff's claims, not a claim in general. Sniado v. Bank Austria AG, C.A.2 2004, 378 F.3d 210. Monopolies ⟜ 12(7)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Foreign Trade Antitrust Improvements Act (FTAIA) did not preclude extension of Sherman Act to alleged conspiracy to artificially increase price of copper and copper futures on London Metal Exchange (LME); complaint alleged that defendants engaged in conspiracy that had direct, substantial, and reasonably foreseeable effects in U.S. domestic commerce and that they suffered injury in United States as result of physical copper transactions that took place within United States or copper futures transactions on U.S. exchange. Metallgesellschaft AG v. Sumitomo Corp. of America, C.A.7 (Wis.) 2003, 325 F.3d 836, rehearing and rehearing en banc denied. Monopolies ☞ 12(7)

Adoption of Foreign Trade Antitrust Improvements Act (FTAIA) did not alter existing rule that antitrust laws apply to anticompetitive conduct directed at foreign markets only if such conduct injures domestic commerce by either (1) reducing the competitiveness of a domestic market, or (2) making possible anticompetitive conduct directed at domestic commerce, and did not add requirement that conduct directed at foreign markets is actionable only if it has an anticompetitive domestic effect that is the cause of injury for which recovery is sought. Kruman v. Christie's Intern. PLC, C.A.2 (N.Y.) 2002, 284 F.3d 384, certiorari dismissed 124 S.Ct. 27, 539 U.S. 978, 156 L.Ed.2d 690. Monopolies ☞ 12(7)

Antitrust laws did not apply to Norwegian oil corporation's claims that anticompetitive conspiracy inflated its North Sea operating costs; even if conspiracy resulted in higher oil prices in United States, corporation's injury did not arise from that domestic anticompetitive effect. Den Norske Stats Oljeselskap As v. HeereMac Vof, C.A.5 (Tex.) 2001, 241 F.3d 420, certiorari denied 122 S.Ct. 1059, 534 U.S. 1127, 151 L.Ed.2d 967, rehearing denied 122 S.Ct. 1597, 535 U.S. 1012, 152 L.Ed.2d 512. Monopolies ☞ 12(1)

Antitrust claims of former representatives commissioned to promote sale of chemical company's pipe resin related only to foreign commerce without requisite domestic anticompetitive effect, so that district court lacked subject matter jurisdiction over Sherman Act claim; former representatives alleged that their agreement with chemical company involved promotion and solicitation of orders for pipe resin in Hong Kong, India, Indonesia, Malaysia, the Philippines, Singapore, Taiwan, and Thailand, and that chemical companies alleged concerted and unilateral refusal to deal in various foreign markets resulted in termination of their agreement with chemical company. McGlinchy v. Shell Chemical Co., C.A.9 (Cal.) 1988, 845 F.2d 802, rehearing denied. Commerce ☞ 62.10(2)

Court had jurisdiction over manufacturer that allegedly forced buyers of its products for resale in India to sign resale price maintenance agreements, in violation of Sherman Act §§ 1, despite claim that the jurisdictional requirement imposed by Foreign Trade Antitrust Improvements Act (FTAIA), that manufacturer's misconduct give rise to antitrust effects in United States that injured resellers, was not satisfied; in present case maintenance of minimum resale price agreements in foreign countries had required effect in the United States, by keeping domestic prices high. MM Global Services, Inc. v. Dow Chemical Co., D.Conn.2004, 329 F.Supp.2d 337. Monopolies ☞ 28(3)

Indian distributor's allegation that American chemical manufacturer coerced it to fix resale price of its products in India was actionable under Sherman Act, notwithstanding Foreign Trade Antitrust Improvements Act's (FTAIA) requirement that conduct have direct, substantial, and reasonably foreseeable effect on domestic commerce, where purported purpose of price fixing was to ensure that prices in India would not cause erosion to prices for products charged by manufacturer to end-users in United States. MM Global Services, Inc. v. Dow Chemical Co., D.Conn.2003, 283 F.Supp.2d 689, adhered to on reconsideration 2004 WL 556577. Monopolies ☞ 12(7); Monopolies ☞ 17(1.12)

Foreign Trade Antitrust Improvements Act (FTAIA) barred India-based prospective manufacturers of chemical 2-Amino-1 Butanol (AB), used in manufacture of tuberculosis medication, from bringing Sherman Act monopolization suit in United States against American company that had brought trade secret action in state court to prevent its employee from disclosing needed technology; there was no showing of required effect on domestic commerce, as India manufacturers had no intent to sell AB in United States, and there would be no market if sales were attempted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 6a

United Phosphorus, Ltd. v. Angus Chemical Co., N.D.Ill.2001, 131 F.Supp.2d 1003, affirmed 322 F.3d 942, certiorari denied 124 S.Ct. 533, 540 U.S. 1003, 157 L.Ed.2d 408. Monopolies 🖙 12(7)

Foreign corporation which marketed and distributed computer software products in Argentina failed to establish that termination of its marketing contract by another foreign corporation resulted in anti-competitive effect on United States' domestic commerce, and thus district court lacked subject matter jurisdiction over corporate distributor's claim that termination of marketing contract violated Sherman Act; allegation that income flowed between corporations was insufficient to establish requisite domestic effect and distributor, a foreign corporation, could not maintain action under Sherman Act based merely upon injury to United States exporters attempting to enter Argentine computer software market. Optimum, S.A. v. Legent Corp., W.D.Pa.1996, 926 F.Supp. 530. Monopolies 🖙 28(3)

Consolidated antitrust actions filed by two groups which included foreign corporations engaged in production of steel and United States corporation that acted on behalf of foreign steel producers would be remanded to permit district court to reconsider ruling on defendants' motion to dismiss in light of United States Supreme Court decision in *F Hoffman-LaRoche Ltd v Empagran S A*, which held that where alleged anticompetitive conduct caused an adverse foreign effect that was independent of domestic effects of conduct, Foreign Trade Antitrust Improvement Act's (FTAIA) domestic-injury exception, and thus Sherman Act, did not apply. BHP New Zealand Ltd. v. UCAR Intern., Inc., C.A.3 (Pa.) 2004, 106 Fed.Appx. 138, 2004 WL 1771436, Unreported. Federal Courts 🖙 940

   4A. Foreign trade or commerce

The Foreign Trade Antitrust Improvements Act (FTAIA) general exclusionary rule does not apply only to conduct involving American exports and includes commerce that is wholly foreign. F. Hoffmann-La Roche Ltd. v. Empagran S.A., U.S.Dist.Col.2004, 124 S.Ct. 2359, 542 U.S. 155, 159 L.Ed.2d 226, on remand 2004 WL 1398217, on remand 388 F.3d 337, 363 U.S.App.D.C. 333, on remand 417 F.3d 1267, 368 U.S.App.D.C. 18. Monopolies 🖙 12(7)

Maintenance of super-competitive prices of vitamin products in United States by foreign manufacturers, which may have facilitated scheme of foreign manufacturers to charge comparable prices abroad, did not "give rise to" claimed injuries of foreign purchasers of vitamin products so as to bring their Sherman Act claim within Foreign Trade Antitrust Improvements Act (FTAIA) exception; claimed injuries did not establish that increased prices in United States proximately caused foreign purchasers' injuries and purchasers otherwise did not identify direct tie to United States commerce. Empagran S.A. v. F. Hoffmann-LaRoche, Ltd., C.A.D.C.2005, 417 F.3d 1267, 368 U.S.App.D.C. 18, certiorari denied 126 S.Ct. 1043, 163 L.Ed.2d 857. Monopolies 🖙 12(7)

   5. Import trade or commerce

Factual findings that chemical manufacturers based in India and American firm that was joint venturer of manufacturers would have made few, if any, United States sales of 2-Amino-1 Butanol (AB) were not clearly erroneous, and thus supported determination that, pursuant to Foreign Trade Antitrust Improvements Act (FTAIA), which restricted Sherman Act claims to those based on conduct substantially affecting domestic commerce, subject matter jurisdiction did not exist over antitrust claims asserted by manufacturers and firm against American chemical company and related entities, based on prior litigation in which company sought to enjoin former employee from misappropriating trade secrets regarding manufacture of AB and 1-Nitro-Propane (1-NP), used to make AB. United Phosphorus, Ltd. v. Angus Chemical Co., C.A.7 (Ill.) 2003, 322 F.3d 942, certiorari denied 124 S.Ct. 533, 540 U.S. 1003, 157 L.Ed.2d 408. Monopolies 🖙 28(3)

Domestic airlines and their trade association were not involved in "import trade or import commerce," for purpose of lawsuit brought under Foreign Trade Antitrust Improvements Act (FTAIA) by travel agents located in Latin

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 6a

America and Caribbean alleging that reduction of their commissions was form of horizontal price fixing, even though defendants paid commissions in United States dollars, agents had access to computer system based in United States, and some services agents offered were purchased by United States customers; agents actions did not directly increase or reduce imports into United States. Turicentro, S.A. v. American Airlines Inc., C.A.3 (Pa.) 2002, 303 F.3d 293. Monopolies ☞ 12(7)

Under section of Foreign Trade Antitrust Improvements Act (FTAIA) providing that antitrust law shall apply to conduct "involving" import trade or commerce, proper inquiry is whether alleged conduct by defendants involves import trade or commerce, not whether plaintiff's conduct involves import trade or commerce. Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., C.A.3 (N.J.) 2000, 227 F.3d 62, on remand 256 F.Supp.2d 249. Monopolies ☞ 10; Monopolies ☞ 12(7)

Foreign insurers' alleged antitrust conduct, which involved a group boycott, or threatened a group boycott, of new or renewal insurance for a company headquartered in Australia, did not amount to "import trade or import commerce" under Foreign Trade Antitrust Improvements Act (FTAIA); facts that insurers sold insurance that covered global risks, including United States risks, and that insurers' insurance coverage might have required the employment of various attorneys and others in the United States and the purchase of services in support of those employees, did not mean that insurers directly imported a service or product into the United States. CSR Ltd. v. CIGNA Corp., D.N.J.2005, 405 F.Supp.2d 526. Monopolies ☞ 12(7)

Plaintiff failed to establish that defendants' alleged foreign price-fixing and market allocation scheme resulted in an anticompetitive effect on United States domestic or import commerce, and thus district court lacked jurisdiction over claim that defendants maintained a substantial share of the world market for antibiotic products by actions which violated sections 1–7 of this title. Eurim-Pharm GmbH v. Pfizer Inc., S.D.N.Y.1984, 593 F.Supp. 1102. Monopolies ☞ 12(7)

   6. Export trade or commerce

Foreign Trade Antitrust Improvements Act (FTAIA), rather than common law "effects test," applied in determining whether District Court had subject matter jurisdiction over antitrust claim arising from alleged foreign restraint of trade. U.S. v. LSL Biotechnologies, C.A.9 (Ariz.) 2004, 379 F.3d 672. Monopolies ☞ 28(3)

Activities of Texas company that exported United States telephone "reorigination" services to customers in Mexico and resold Mexican telephone services were legal under Mexican law during the relevant time, for purposes of company's establishing a prima facie showing of satisfying the export trade exception for antitrust liability; although Mexican law required government concession or permit in order to provide telecommunications services in Mexico and company had no such permit, company did not own, install, operate, and exploit telecommunications infrastructure in Mexico, and so was not a "provider" whose business was within the scope of the law. Access Telecom, Inc. v. MCI Telecommunications Corp., C.A.5 (Tex.) 1999, 197 F.3d 694, rehearing and suggestion for rehearing en banc denied 210 F.3d 365, certiorari denied 121 S.Ct. 275, 531 U.S. 917, 148 L.Ed.2d 200, certiorari denied 121 S.Ct. 292, 531 U.S. 917, 148 L.Ed.2d 200. Monopolies ☞ 12(1.16)

District court lacked subject matter jurisdiction over Sherman Act claim by French corporation which accepted exclusive distributorship for United States manufacturer; actual injury to plaintiff within United States was required, and fact that other United States exporters would be ultimately injured through plaintiff's termination of relationship with them due to acceptance of that distributorship was insufficient. The In Porters, S.A. v. Hanes Printables, Inc., M.D.N.C.1987, 663 F.Supp. 494. Monopolies ☞ 15

   7. International comity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 6a

District court should not have declined to exercise jurisdiction, on grounds of international comity, over plaintiffs' Sherman Act claims against foreign reinsurers for successfully conspiring to limit kinds of insurance available in the United States, notwithstanding that reinsurers' activity may have been perfectly legal under British law, where reinsurers did not contend that British law required them to act in fashion prohibited by law of United States. Hartford Fire Ins. Co. v. California, U.S.Cal.1993, 113 S.Ct. 2891, 509 U.S. 764, 125 L.Ed.2d 612, on remand 5 F.3d 1556. Federal Courts ⟾ 47.1

In order for United States antitrust laws to apply to anticompetitive conduct taking place outside of country, under Foreign Trade Antitrust Improvement Act, Sherman Act claim alleged by claimant and Sherman Act claim arising out of effect of actions on an American market must be same. In re Copper Antitrust Litigation, W.D.Wis.2000, 117 F.Supp.2d 875, affirmed as modified 306 F.3d 469, rehearing and rehearing en banc denied, certiorari denied 123 S.Ct. 2247, 539 U.S. 903, 156 L.Ed.2d 111, certiorari denied 123 S.Ct. 2248, 539 U.S. 903, 156 L.Ed.2d 111, certiorari denied 123 S.Ct. 2251, 539 U.S. 903, 156 L.Ed.2d 111, reversed 325 F.3d 836. Monopolies ⟾ 12(7)

  8. Persons entitled to maintain action

Foreign purchasers of vitamins from manufacturers had standing to assert Sherman Act price-fixing claim against them; purchasers were injured in fact, and inflated price purchasers were forced to pay due to alleged global conspiracy was type of injury antitrust laws were intended to prevent. Empagran S.A. v. F. Hoffman-LaRoche, Ltd., C.A.D.C.2003, 315 F.3d 338, 354 U.S.App.D.C. 257, rehearing and rehearing en banc denied, certiorari granted 124 S.Ct. 966, 540 U.S. 1088, 157 L.Ed.2d 793, vacated 124 S.Ct. 2359, 542 U.S. 155, 159 L.Ed.2d 226, on remand 2004 WL 1398217, on remand 388 F.3d 337, 363 U.S.App.D.C. 333, on remand 417 F.3d 1267, 368 U.S.App.D.C. 18. Monopolies ⟾ 28(1.6)

Foreign Trade Antitrust Improvements Act (FTAIA) acted as bar to proposed Sherman Antitrust Act class action against airline trade association and United States airline members brought by travel agents located in Latin America and Caribbean, who alleged that reduction of their commissions was form of horizontal price fixing, since defendants were not involved in "import trade or import commerce" and alleged collusion did not have "effect" on United States commerce. Turicentro, S.A. v. American Airlines Inc., C.A.3 (Pa.) 2002, 303 F.3d 293. Monopolies ⟾ 28(3)

Appliance corporation's distributor engaged in export trade, and was therefore within the specified class of exporters under the Federal Trade Antitrust Improvements Act (FTAIA) able to bring action against corporation related to antitrust violations involving export trade; corporation delivered products to distributor "FOB factory," which caused distributor to bear risk and cost of inland shipment of product to Peru. General Elec. Co. v. Latin American Imports, S.A., W.D.Ky.2001, 187 F.Supp.2d 749, reconsideration denied 2002 WL 1832030. Monopolies ⟾ 28(1.6)

Buyers of graphite electrodes, making purchases which had no connection with United States, were precluded by Foreign Trade Antitrust Improvement Act (FTAIA) from seeking relief under United States antitrust law, based upon existence of alleged conspiracy to fix prices charged for electrodes in United States. Ferromin Intern. Trade v. UCAR Intern., Inc., E.D.Pa.2001, 153 F.Supp.2d 700, vacated and remanded 106 Fed.Appx. 138, 2004 WL 1771436. Monopolies ⟾ 12(7)

Sherman Act did not protect foreigners who purchased computer software abroad and did not otherwise participate in United States market, despite claim that software manufacturer's anticompetitive conduct abroad was essential to maintenance of its monopoly in United States. In re Microsoft Corp. Antitrust Litigation, D.Md.2001, 127 F.Supp.2d 702, supplemented 2001 WL 137254, issued 2001 WL 137255, affirmed 444 F.3d 312. Monopolies ⟾ 10

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U S C A. § 6a

Foreign Trade Antitrust Improvements Act (FTAIA), permitting suit challenging antitrust violations in foreign coun-
tries when actions had effect on domestic trade or commerce that was direct, substantial and reasonably foreseeable,
did not allow foreign subsidiaries and joint venture partners of Illinois company which provided them with retail
tracking information to sue competitors in United States for antitrust damages inflicted upon them in their respective
countries; no antitrust damages were directly sustained by Illinois company, and consequently necessary effect on
domestic trade and commerce was missing. Information Resources, Inc. v. Dun & Bradstreet Corp., S.D.N.Y.2000,
127 F.Supp.2d 411, appeal dismissed 294 F.3d 447, reconsideration denied 260 F.Supp.2d 659. Monopolies ⬅➡
28(1.4); Monopolies ⬅➡ 28(1.6)

Under Export Trading Company Act, antitrust plaintiff other than domestic importer must prove that defendant's
conduct has direct, substantial, and reasonably foreseeable effect on plaintiff's continuing ability to export products
from the United States, and foreign company that demonstrates requisite effect on United States export trade but
fails to establish that it is within class of injured United States exporters lacks jurisdictional basis to sue under Sher-
man Act, i.e., foreign company cannot demonstrate domestic injury requirement by "piggybacking" onto injury of
United States exporter. The In Porters, S.A. v. Hanes Printables, Inc., M.D.N.C.1987, 663 F.Supp. 494. Monopolies
⬅➡ 15

   9. Comity

Foreign Trade Anti-Trust Improvements Act (FTAIA)did not put end to use of *Timberlane* international comity
factors to decide whether to dismiss Sherman Act case involving foreign trade or commerce. Filetech S.A.R.L. v.
France Telecom, S.D.N.Y.1997, 978 F.Supp. 464, vacated 157 F.3d 922, on remand 212 F.Supp.2d 183. Monopol-
ies ⬅➡ 28(1.3)

15 U S C A. § 6a, **15 USCA § 6a**

Current through P.L. 109-363 (excluding P.L. 109-295, P.L. 109-304,
P.L. 109-347, P.L. 109-351) approved 10-17-06

   Copr. © 2006 Thomson/West. No. Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT