# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: ) <br> INTEL CORP. MICROPROCESSOR ) <br> ANTITRUST LITIGATION ) <br> ) <br> ) <br> ) | MDL No. 05-1717-JJF |
| PHIL PAUL, *on behalf of himself* ) <br> *and all others similarly situated,* ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> INTEL CORPORATION, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 05-485-JJF <br><br> CONSOLIDATED ACTION <br><br> Discovery Matter No. 2 |

## CLASS PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO COMPEL INTEL'S PRODUCTION OF DOCUMENTS

OF COUNSEL:

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD
  & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

PRICKETT JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
Telephone: (302) 888-6500
Facsimile: (302) 658-8111

*Interim Liaison Counsel for the Class Plaintiffs*

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone:  (415) 433-2070
Facsimile:  (415) 982-2076

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
    SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

*Interim Co-Lead Counsel*

Dated: November 21, 2006

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 2

I.  INTEL SHOULD BE COMPELLED TO PRODUCE ITS FOREIGN CONDUCT
DOCUMENTS EVEN IF THE FTAIA APPLIES TO PLAINTIFFS' STATE
LAW CLAIMS BECAUSE INTEL'S FOREIGN EXCLUSIONARY CONDUCT
SATISFIES THE STATUTE'S DOMESTIC-COMMERCE EXCEPTION. ................... 2

    A.  Intel's Foreign Exclusionary Conduct Had a Direct Effect on
United States Commerce ................................................................................... 3

        1.  The FTAIA Looks to the Effect of Foreign Conduct on
U.S. Commerce, Not on a Particular Plaintiff. ............................... 4

        2.  Cases Applying the FTAIA Show That Directness Should
Not be Determined by Parsing Causation. ..................................... 5

        3.  The FTAIA's Legislative History Confirms that Domestic
Effects Can Be Direct Though Causation Involves Multiple
Steps. ........................................................................................ 11

    B.  The Domestic Effect Of Intel's Foreign Conduct Gives Rise To
Class Plaintiffs' Antitrust Claims. ............................................................... 12

    C.  Comity Concerns Do Not Warrant a Narrow Application of the
FTAIA's Domestic-Commerce Exception in Cases for
Monopolization of World Markets, Because the Anticompetitive
Effects are Equally Direct in All Countries. ............................................... 13

II.  Intel Should Be Compelled Now To Produce Its Foreign Conduct
Documents. .......................................................................................................... 14

CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

CASES

*Advanced Micro Devices, Inc. v. Intel,*
    Civ. No. 05-441. AMD D.I. 218 ..................................................................................1

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.,*
    148 F.3d 1080 (D.C. Cir. 1998) ............................................................................ 4-6, 9

*Den Norske Stats Oljeselskap As v. HeereMac Vof,*
    241 F.3d 420 (5th Cir. 2001) ................................................................................. 4, 7-9

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
    542 U.S. 155 (2004) ............................................................................................ Passim

*Information Resources, Inc. v. Dun & Bradstreet Corp.,*
    260 F.Supp.2d 659 (S.D.N.Y. 2003) ...................................................................... 4, 8-9

*MM Global Services, Inc. v. Dow Chemical Co.,*
    No. Civ. 3:02 CV 1107 (AVC), 2004 WL 556577 (D. Conn. 2004) ...........................4, 10, 12

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961) ....................................................................................................14

STATUTES

15 U.S.C. 6a ............................................................................................................................3

15 U.S.C. § 6a(2) ...............................................................................................................3, 12

OTHER AUTHORITIES

H.R Rep. No. 97-686 (1982) (Conf. Rep.) ..........................................................................11

Rule 12(b)(1) .................................................................................................................. 1-2, 14-15

Rule 12(b)(6) ..........................................................................................................................15

## INTRODUCTION

In their opening brief, Class Plaintiffs showed that the extraterritorial reach of the state laws on which their claims are based is not limited by the Foreign Trade Antitrust Improvements Act ("FTAIA"), a statute that defines only the reach of the Sherman Act. *See* Class Plaintiffs' Brief at 8-10, D.I. 302[1] ("Class Pls.' Br."). Class Plaintiffs further demonstrated that these state laws are not otherwise limited by any statutory provisions comparable to the FTAIA. *See id.* at 9. While Class Plaintiffs dispute Intel's assertion, made in its recently-filed Rule 12(b)(1) motion to dismiss, that application of these state laws to Intel's foreign conduct would be unconstitutional, they need not address that argument here because, even if the state laws were subject to the FTAIA, the FTAIA would afford no basis for Intel to withhold evidence of its foreign anticompetitive conduct.

The FTAIA does not justify the withholding of such documents because, as Class Plaintiffs demonstrate below, Intel's foreign conduct satisfies the statute's requirement that such conduct have a direct, substantial and reasonably foreseeable effect on United States commerce.[2] Cases applying the FTAIA to monopolization claims and other claims not involving the fixing of

---

[1] References to "D.I.___" are to docket items in C.A. No. 05-MD-1717 unless otherwise noted.

[2] The Court addressed this issue in its September 26, 2006 Memorandum Opinion on Intel's motion to dismiss in *Advanced Micro Devices, Inc. v. Intel*, Civ. No. 05-441, D.I. 218 in 05-CV-441 ("September 26 Order"). Importantly, however, Class Plaintiffs did not have an opportunity to participate in the briefing of that motion. They discuss the issue here because it is raised by Intel's objection to producing its foreign conduct documents and Intel's explicit reliance on the September 26, 2006 decision for its objection. The issue also is raised by Intel's motion to dismiss under the FTAIA filed in these consolidated class actions on November 3, 2006, which Intel incorporates by reference in its opposition to this motion to compel. Class Plaintiffs will oppose Intel's motion in due course.

U.S. prices are instructive.[3] They teach that simply counting each step in the causation path from foreign conduct to domestic effect does not answer the question of whether the foreign conduct had a direct effect on domestic commerce. Because causation can always be parsed finely, creating the appearance of many steps along the way, courts have not engaged in such parsing to determine directness. These cases also reveal that Intel's foreign conduct in this case did have a direct effect on U.S. commerce. Significantly, the effect of Intel's foreign conduct on domestic commerce was at least as direct as was the domestic effect of other defendants' foreign conduct in these other cases.

Furthermore, because it is clear that the FTAIA, even if it applied in this case, would not bar discovery of Intel's foreign conduct, Intel should be compelled now to produce its foreign conduct documents. Granting the motion now would allow Intel time to complete review of such documents before the Court's document production deadline. If Intel is not told until after its Rule 12(b)(1) motion to dismiss is decided that it must produce those documents, then in all likelihood, Class Plaintiffs will not receive them timely.

## ARGUMENT

I.    **Intel Should Be Compelled To Produce Its Foreign Conduct Documents Even If The FTAIA Applies to Plaintiffs' State Law Claims Because Intel's Foreign Exclusionary Conduct Satisfies the Statute's Domestic-Commerce Exception.**

The FTAIA places all (non-import) conduct involving foreign commerce outside the Sherman Act's reach unless the conduct satisfies one of the statute's exceptions. *See*

---

[3] The direct effect on U.S. commerce of foreign price-fixing conduct that includes the fixing of U.S. prices is easy to see. Class Plaintiffs focus herein on other types of claims -- for monopolization, non-price-fixing conspiracies, and conspiracies to fix prices only outside the U.S.

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).  Assuming the FTAIA applies to the state laws underlying Class Plaintiffs' claims, it does not prevent those claims from reaching Intel's foreign anticompetitive conduct because that conduct falls within a statutory exception.  Specifically, an exception is satisfied here because Intel's challenged foreign conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, 15 USC § 6a(1), and the domestic effect "gives rise to a [Sherman Act] claim," 15 USC § 6a(2).  In addition, comity considerations do not warrant a narrow application of this exception in this case, as no country can lay claim to being the primary victim of Intel's monopolization of a world market.

> **A.     Intel's Foreign Exclusionary Conduct Had a Direct Effect on United States Commerce.**

There is no doubt that Intel's foreign conduct had a "substantial" and "reasonably foreseeable" effect on U.S. commerce, and Intel has not argued otherwise in either its motion to dismiss in this case or its dismissal motion in the *AMD* case.[4]  Thus, the key issue for the first prong of the exception is whether Intel's foreign conduct had a direct effect on United States commerce.

Intel's directness analysis is flawed in three important ways.  First, Intel incorrectly assumes that its foreign conduct must have a direct effect on *Class Plaintiffs*, when the statute states that the direct effect must be on *domestic commerce*.  *See* 15 U.S.C. 6a (1)(A); *Empagran*,

---

[4] Clearly, the effect on U.S. commerce was substantial.  For example, Intel has sold billions of dollars worth of x86 microprocessors to customers based in the United States.  Class Plaintiffs allege that as a result of Intel's foreign (and domestic) anticompetitive conduct, these microprocessors were sold in this country at artificially inflated prices.  *See* Plaintiffs' First Amended Consolidated Complaint, D.I.108 ("Complaint") ¶ 52. There also is no doubt that it was reasonably foreseeable that Intel's foreign anticompetitive conduct would impact U.S. commerce because the United States is a part of the world market in which Intel has sold its chips, suppressed competition and raised prices.

542 U.S. at 161.  Second, Intel's arguments ignore the lessons of four cases applying the FTAIA to claims, like Class Plaintiffs' claims, that do not involve the fixing of U.S. prices.  These cases reveal that:  (1) the directness of the foreign conduct's effect on U.S. commerce should not be determined by how finely the causal chain can be parsed; and (2) the domestic effect from Intel's foreign conduct in this case is no less direct than the domestic effect from the defendants' foreign conduct in these other cases.  *See Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998); *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 426-27 (5th Cir. 2001); *Information Resources, Inc. v. Dun & Bradstreet Corp.*, 260 F.Supp.2d 659, 669-70 (S.D.N.Y. 2003); *MM Global Services, Inc. v. Dow Chemical Co.*, No. Civ. 3:02 CV 1107 (AVC), 2004 WL 556577 (D. Conn. March 18, 2004) (Exhibit A hereto).  Third, Intel's argument is undermined by the legislative history of the FTAIA.

### 1.    The FTAIA Looks to the Effect of Foreign Conduct on U.S. Commerce, Not on a Particular Plaintiff.

In its motion to dismiss Class Plaintiffs' foreign conduct claims, Intel argues that Class Plaintiffs' purchaser claims are more indirect than AMD's competitor claim.  Defendants' Motion To Dismiss at 1, D.I. 307 ("Mot. To Dismiss") ("Class Plaintiffs tack on even more twists and turns to AMD's already attenuated foreign conduct story.").  Intel's argument is misdirected.  The FTAIA does not ask the Court to evaluate the foreign conduct's effect on a particular *plaintiff*.  Rather, the statute asks a different question:  whether the foreign conduct "has a 'direct, substantial and reasonably foreseeable effect' on American domestic, import, or (certain) export *commerce*."  *Empagran*, 542 U.S. at 162 (emphasis added).   Whether the foreign conduct's effect on a particular plaintiff is direct is irrelevant; only the effect on U.S. commerce must be direct.

2.    **Cases Applying the FTAIA Show That Directness Should Not be Determined by Parsing Causation.**

A review of four cases that, like this case, do not involve fixing U.S. prices, but do involve foreign anticompetitive conduct, makes it clear that it is always possible to look at the chain of causation from foreign conduct to domestic effect link by link. But if such parsing were enough to conclude that the domestic effect was indirect, then this effect would always be indirect. Parsing causation thus sheds little light on whether the domestic effect should be considered direct. Moreover, while these cases have not established a "test" for directness, the absence of such a test is not a problem here because it is clear that the domestic effect in this case is at least as direct as in the other cases, each of which holds that the domestic effect was direct.

a.    *Caribbean Broadcasting*

In *Caribbean Broadcasting*, the plaintiff, Caribbean Broadcasting System ("CBS"), and one of the defendants, Caribbean Communications Co. ("CCC"), owned competing FM radio stations in the Eastern Caribbean. *Caribbean Broadcasting,* 148 F.3d at 1082. For years, CBS tried unsuccessfully to sell advertising on its radio station based in the British Virgin Islands. *Id.* at 1082-1083. Eventually it sued CCC and Cable & Wireless ("C&W")[5] for monopolizing the market for English-language radio broadcast advertising in the Eastern Caribbean. *Id.* at 1085-1087. It alleged that CCC misrepresented to advertisers that they could reach the entire Caribbean over CCC's station, and that they therefore did not need to advertise with CBS. *Id.* at 1082. CBS further alleged that C&W, in conspiracy with CCC, had made sham technical

_____

[5] C&W operated a worldwide telecommunications system and had a joint venture with CCC for CCC to develop a Caribbean-wide FM broadcasting system that C&W would use to offer an FM paging service. *Id.* at 1082.

objections to CBS's application for a broadcast license, delaying CBS's entry into broadcasting for more than two years. *Id.* According to the complaint, many of the companies that advertised in the relevant market were based in the United States, and they paid excessive prices for advertising because of the defendants' unlawful monopolization. *Id.* at 1087.

The district court had dismissed the complaint for, among other reasons, lack of subject matter jurisdiction under the FTAIA. The District of Columbia Circuit reversed. It construed the complaint to allege that "CCC and C&W intentionally and successfully, by means of fraud and deceit, secured monopoly power in the relevant market, used this power to raise prices, and thereby hurt U.S. advertisers." *Id.* The court observed that "antitrust injury to CBS is ultimately a harm to U.S. purchasers of radio advertising." *Id.* It held that this harm to U.S. consumers was "direct," and sufficient to establish subject matter jurisdiction. *Id.*

The parallels between this case and *Caribbean Broadcasting* are substantial. Both involve a relevant market that includes both U.S. and foreign customers. Both involve foreign anticompetitive conduct by the defendant. And both involve allegations that the conduct harmed a competitor and permitted the defendant to monopolize the relevant market, charge higher prices in that market and harm U.S. purchasers who paid the inflated prices. The D.C. Circuit, however, found that harm to be a direct effect on U.S. commerce. Because the harm to U.S. commerce in this case is no less direct, this Court should reach the same conclusion.

The D.C. Circuit could have parsed the causal chain connecting the defendants' foreign conduct and the higher prices paid by U.S. advertisers, but it did not. It could have described a series of steps from the false representations of the defendants, to the decision of advertisers to advertise only on CCC's station, to CBS's inability – for financial or other reasons – to disseminate the truth about the reach of CCC's broadcast signal, to the inability of advertisers to

discover the truth themselves, to CBS's inability – for financial or other reasons -- to convince

advertisers in any event to use its radio station, to the lessening of competition for the sale of

radio advertising in the Eastern Caribbean, to CCC's ability to raise its prices, to U.S.

advertisers' payment of inflated prices.  Importantly, however, the D.C. Circuit did not parse the

causal chain in this manner.[6]

### b. *Den Norske*

*Den Norske* is another case not involving the fixing of U.S. prices in which the court

found the domestic effect to be direct.  The plaintiff in that case was a Norwegian oil company

that owned and operated oil and gas drilling platforms in the North Sea. *Den Norske,* 241 F.3d at

421.  The defendants controlled the world's only heavy-lift barges, which were used by offshore

oil drilling companies to transport oil drilling platforms.  *Id.* at 422.  The defendants were

headquartered in the Netherlands, Great Britain and the United States.  *Id.* at 422 n.2.  The

plaintiff alleged that they conspired, among other things, to give two defendants exclusive access

to heavy-lift projects in the Gulf of Mexico, while the third would receive a higher allocation of

the North Sea projects in return for staying out of the Gulf.  *Id.* at 422.  In addition to alleging

that the conspiracy caused it to pay inflated prices for heavy-lift services in the North Sea, the

plaintiff alleged that these overpayments compelled it to charge higher prices for crude oil it

exported to the U.S., and that the conspiracy also caused purchasers of heavy-lift services in the

---

[6] In granting Intel's motion to dismiss in the *AMD* case, this Court distinguished *Caribbean Broadcast* on the ground that the foreign conduct there "had simultaneous, direct foreign and domestic effects, with the plaintiffs' antitrust claim arising from those direct domestic effects," whereas for Intel's foreign conduct "there is no simultaneous direct domestic effect." Sept. 26 Order at 13-14.  But the question remains:  how can it be said that the foreign conduct of the *Caribbean Broad* defendants had a direct domestic effect but Intel's did not?  Both diminished competition in the relevant market, thereby causing higher prices in that market that were paid by U.S. customers.

Gulf of Mexico to pay inflated prices.  *Id.*  The Fifth Circuit found these allegations sufficient to satisfy the domestic effect prong of the FTAIA:

> We accept the contention that [plaintiff] Statoil has sufficiently alleged that the defendants' conduct-that is, the agreement among heavy-lift service providers to divide territory, rig bids, and fix prices-had a direct, substantial, and reasonably foreseeable effect on the United States market.  Statoil alleges that the conspiracy not only forced purchasers of heavy-lift services in the Gulf of Mexico to pay inflated prices, but also that the agreement compelled Americans to pay supra-competitive prices for oil.  These allegations are sufficient to satisfy the first requirement of the FTAIA.

*Id.* at 426-27.

In *Den Norske*, the chain of causation between foreign conduct and domestic effect could be parsed easily.  The allocation of territories caused diminished competition in the provision of heavy-lift services in the North Sea, which caused higher prices for such services, which caused oil-drilling companies like Statoil to incur higher costs, which caused them to charge higher prices for crude oil, which caused their U.S. customers to pay higher oil prices.  Yet, the Fifth Circuit found the domestic effect to be direct.

Here, the effect of Intel's foreign conduct on U.S. commerce is more direct.  In *Den Norske*, the effect on U.S. commerce was in an entirely different market (crude oil) from the market (heavy-lift services) in which the foreign anticompetitive conduct occurred.  In this case, Intel's exclusionary foreign conduct in the worldwide x86 microprocessor market caused U.S. companies such as Dell and Hewlett-Packard to pay Intel inflated prices for microprocessors sold in that same market.

### c.  *Information Resources*

In *Information Resources*, the plaintiff, IRI, alleged that Nielsen engaged in anticompetitive conduct in the United States and foreign countries in an effort to destroy IRI as a

competitor in the retail tracking services industry. *Information Resources,* 260 F.Supp.2d 659 at 661. The alleged foreign conduct had directly injured IRI's foreign subsidiaries, and the district court had ruled earlier that the alleged harm to IRI was derivative and indirect, as it arose only in IRI's capacity as an owner and supplier of its subsidiaries. *Id.* at 661-662. On a motion for reconsideration, IRI argued that it was suing for injuries arising from its impaired ability to compete in the United States due to losses of its foreign subsidiaries that it had to fund. *Id.* at 662. IRI further argued that "Defendants fully appreciated that IRI could not afford to fend off an anticompetitive attack on its domestic business, while covering large, unanticipated losses in other geographic markets." *Id.* at 663. The court accepted IRI's argument, holding that "[t]he necessity, intentionally imposed on IRI by defendants' foreign and domestic activities, to devote the use of millions of dollars of its domestic funds to purposes other than its chosen ways of competing, was a 'direct, substantial and reasonably foreseeable effect' on domestic trade or commerce and gave rise to a claim of attempted monopolization." *Id.* at 669.

As in *Caribbean Broadcasting* and *Den Norske,* the causal chain in *Information Resources* readily could be parsed. Defendants' foreign conduct reduced the sales and profitability of IRI's foreign subsidiaries, which required IRI to cover its subsidiaries' losses, which deprived IRI of funds to compete effectively in the United States, which diminished competition in the retail tracking services market in the United States. Despite this multi-step causation, the court in *Information Resources* concluded that the defendants' foreign conduct had a direct effect on domestic commerce.

This chain of causation, moreover, is quite similar to the causation path in this case. Intel's exclusionary foreign conduct limited AMD's foreign sales, which weakened AMD's ability to compete in the United States, which restricted competition in the United States portion

of the global x86 microprocessor market.  As in *Information Resources*, therefore, the Court

should conclude that the foreign conduct in this case had a direct effect on U.S. commerce.

### d.     *MM Global Services*

In *MM Global Services*, the plaintiffs had distributed chemicals for Union Carbide Corp.

(and then for its successor, a Dow Chemical Co. affiliate) in India.  When they were terminated

as Dow's distributor, they brought suit, alleging that various Union Carbide and Dow companies

had coerced them into agreeing to fix the resale price of Union Carbide products in India.  They

further alleged that the defendants had engaged in such price-fixing to "'ensure that prices

charged by the plaintiffs to end-users in India for products would not cause erosion to prices for

the products charged by Union Carbide and Dow to end-users … in the United States ….'"

*MM Global Services*, 2004 WL 556577 at *5 (quoting amended complaint) (supplied brackets

omitted).  The court denied the defendants' motion to dismiss the plaintiffs' antitrust claim under

the FTAIA, as well as the defendants' motion for reconsideration.  The court found that "it is not

a stretch in logic, and quite foreseeable, to conclude that a conspiracy to fix prices in the Indian

market might reasonably cause direct and substantial effects on the prices charged for the same

products in the United States."  *Id.* at *6.

In *MM Global Services*, the first effect of the defendants' alleged price fixing was felt in

India, the market in which the alleged price-fixing occurred.  Only a secondary effect was visited

upon the U.S. market.  The alleged conspiracy helped to keep prices up in the United States by

avoiding lower prices in India that would have put downward pressure on U.S. prices.  Thus, the

causation chain in *MM Global Services* could be parsed too, as one moves from the price-

fixing's primary effects in India to its secondary effects in the United States.  Nonetheless, the

court in that case found the price-fixing's domestic effect to be direct.  The same conclusion

should be reached in this case because Intel's foreign anticompetitive conduct had a more direct effect on U.S. commerce. Intel's foreign conduct suppressed competition and inflated prices for Intel's x86 microprocessors throughout the world market, thereby affecting U.S. commerce in the same manner, at the same time, and as directly as it affected Indian commerce or the commerce of any other nation.

### 3. The FTAIA's Legislative History Confirms that Domestic Effects Can Be Direct Though Causation Involves Multiple Steps.

That the effect of foreign conduct on U.S. commerce can have multiple causation steps and still be direct is confirmed by the legislative history of the FTAIA. The House Judiciary Committee report on the bill that became the FTAIA, H.R Rep. No. 97-686, at *13-14 (1982) (Conf. Rep.), considered whether the bill would result in a revival of international cartels. The report gave short shrift to that concern, asserting that "[a]ny major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction." *Id.* at *13. The report then provided an example of how that domestic impact would occur:

> For example, if a domestic export cartel were so strong as to have a 'spillover' effect on commerce within this country -- by creating a world-wide shortage or artificially inflated world-wide price that had the effect of raising domestic prices -- the cartel's conduct would fall within the reach of our antitrust laws. Such an impact would, at least over time, meet the test of a direct, substantial and reasonably foreseeable effect on domestic commerce.

*Id.*

Thus, the committee with jurisdiction over the bill that became the FTAIA specifically devised a hypothetical with more twists and turns than exist in this case. In the Judiciary

Committee's example, the conspiracy targeted foreign markets – the markets importing the products or services from the United States -- which in turn caused a shortage or higher prices (or both) in those foreign markets, which in turn caused a world-wide shortage or price inflation world-wide, including in the United States. There is no doubt that in the Committee's example, like in *MM Global Services*, the primary effect of the cartel was felt in the foreign countries importing the U.S. goods or services, and only a secondary effect reverberated into the U.S. market. But the Committee nonetheless thought that the secondary effect was a direct effect under the bill that became the FTAIA.

The conclusion from a review of these cases and this legislative history is clear: (1) the mere ability to parse the causation chain does not mean that the foreign conduct's effect on U.S. commerce is indirect; and (2) Intel's foreign conduct in this case had a direct effect on U.S. commerce.

### B.    The Domestic Effect Of Intel's Foreign Conduct Gives Rise To Class Plaintiffs' Antitrust Claims.

The second prong of the FTAIA's domestic-commerce exception requires that the effect on domestic commerce "give(s) rise to" the plaintiff's antitrust claim. *See* 15 U.S.C. § 6a(2); *Empagran*, 542 U.S. at 162, 173-74. Here, there can be no doubt that the domestic effect of Intel's foreign anticompetitive conduct gives rise to Class Plaintiffs' antitrust claims. Class Plaintiffs allege that the domestic effect of Intel's foreign anticompetitive conduct was reduced competition and increased prices for Intel's x86 microprocessors sold in the United States. Complaint ¶ 232. Their claim arises from those higher prices, which they allege were passed on to them. *See, e.g., id.* at 253.

C.     **Comity Concerns Do Not Warrant a Narrow Application of the FTAIA's Domestic-Commerce Exception in Cases for Monopolization of World Markets, Because the Anticompetitive Effects are Equally Direct in All Countries.**

The Supreme Court has made clear that whether the FTAIA should be applied broadly or narrowly to a particular factual situation depends in part on comity considerations. *Empagran*, 542 U.S. at 164. ("[T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations."). The Court explained that:

> This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world.

*Id.* at 164-65. The Court then explained that comity does not prohibit application of our antitrust laws to foreign conduct in all events—that there are times when interference with a country's regulation of its own commerce is justified:

> No one denies that America's antitrust laws, when applied to foreign conduct can interfere with a foreign nation's ability independently to regulate its own commercial affairs. But our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused.

*Id.* at 165.

But in a case alleging monopolization of a world market, no country can claim that comity favors it. In a world market, anticompetitive conduct, wherever it occurs, restrains competition throughout the relevant market, diminishing competition in all countries and making

application of U.S. antitrust laws (as well as other countries' competition laws) reasonable and consistent with principles of comity.  In this case, therefore, comity does not counsel a restrictive application of the FTAIA's domestic-commerce exception.  Intel's foreign anticompetitive conduct affected United States commerce no less, and no less directly, than it impacted the commerce of any other country.

The very concept of a relevant geographic market makes it abundantly clear that anticompetitive conduct in a world market, no matter where it occurs, suppresses competition throughout the market, generating simultaneous and equally direct anticompetitive effects in all countries within the market.  The geographic scope of a relevant market is the area in which sellers of the product effectively compete.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 331-32 (1961).  If competition among sellers is reduced, it necessarily is reduced throughout the area in which they compete.  When, as in this case, that area is worldwide, the reduction in competition is worldwide, and certainly includes the United States no less than any other country.  For that reason, comity does not counsel a restrictive application of the FTAIA's domestic-commerce exception in this case.

## II.    Intel Should Be Compelled Now To Produce Its Foreign Conduct Documents.

Intel argues that Class Plaintiffs' motion is premature, contending that common sense dictates that its Rule 12(b)(1) motion to dismiss be resolved first.  Defendant's Opposition Memorandum at 5, D.I. 243 ("Opp. Mem").  However, common sense also demands that Class Plaintiffs not wait months for Intel's production of foreign conduct documents if it is clear now that Intel will not prevail on its motion to dismiss.  Class Plaintiffs respectfully submit that for the reasons discussed above and in their opening brief, it indeed is clear that Intel's motion will be denied.

Intel also asserts that it can meet the Court's document production deadline even if the Court defers ruling on this motion until after it decides the motion to dismiss under the FTAIA, claiming that Class Plaintiffs' contrary argument rests on conjecture. Opp. Mem. at 7. To be sure, the parties, including Intel, do not know when Intel's motion to dismiss will be decided. But a reasonable estimate of that timetable, *see* Class Pls.' Br. at 14, raises substantial concern that Intel, if it does not begin to review its foreign conduct documents until after a ruling on its motion to dismiss, will not meet the Court's document production deadline.[7] Given that the current deadline is more than 21 months after this case was filed, Class Plaintiffs should not be faced with a substantial risk that Intel will not meet that deadline or a reasonable extension thereof.

---

[7] Intel, of course, knows whether it already has reviewed much or all of its foreign conduct documents, but does not disclose the status of its review to the Court. If it has reviewed most or all of those documents, then it has no burden argument for not producing them before its motion to dismiss is decided. If it has not substantially reviewed them, Intel has failed to divulge whether it is prepared to do so before the Court rules on its motion to dismiss, to ensure that it can meet the Court's document production deadline. If it is not prepared to begin that review until after the dismissal motion is decided, then it has failed to give any reason to believe that it can meet the Court's deadline.

Intel tries to blame Class Plaintiffs for allegedly delaying resolution of its motion to dismiss under the FTAIA, pointing to the fact that they asked for and received an extension until January 5, 2007 to oppose the motion. Intel fails to tell the Court, however, that Class Plaintiffs specifically proposed to Intel that their opposition to the Rule 12(b)(1) motion have an earlier deadline (December 21) than their opposition to the Rule 12(b)(6) motion, and that Class Plaintiffs advised Intel that they would file their 12(b)(1) opposition even earlier if they reasonably could do so. Intel, however, requested that the 12(b)(1) deadline be the same as the later 12(b)(6) deadline. Class Plaintiffs acceded to Intel's request only with the clear understanding that they were free to file their 12(b)(1) opposition before the January 5 deadline, which they intend to do. Class Plaintiffs will oppose the 12(b)(1) motion expeditiously.

## CONCLUSION

For the above reasons, and those set forth in their opening brief, Class Plaintiffs' motion

to compel should be granted, and Intel should be ordered to produce its foreign conduct

documents by the Court's document production deadline.

Dated: November 21, 2006

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD
   & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone:  (415) 433-2070

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
   SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:  (415) 217-6810

*Interim Co-Lead Counsel*

PRICKETT JONES & ELLIOTT, P.A.

By: _____
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
1310 King Street
P.O. Box 1328
Wilmington, DE  19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
Telephone:  (302) 888-6500

*Interim Liaison Counsel for the Class
Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Clayton Athey, hereby certify that on this 21st day of November, 2006, I caused the foregoing **CLASS PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO COMPEL INTEL'S PRODUCTION OF DOCUMENTS** to be served on the following counsel via electronic filing:

Frederick L. Cottrell, III, Esquire
Chad Michael Shandler, Esquire
Steven J. Fineman, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Charles P. Diamond, Esquire
Mark A. Samuels, Esquire
Linda J. Smith, Esquire
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
CDiamond@omm.com
MSamuels@omm.com
lsmith@omm.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Adam L. Balick, Esquire
Bifferato Gentilotti Biden & Balick
711 North King Street
Wilmington, DE 19801-3503
abalick@bgbblaw.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Laurin Grollman, Esquire
Salem M. Katsh, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
lgrollman@kasowitz.com
skatsh@kasowitz.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Richard L. Horwitz, Esquire
W. Harding Drane, Jr., Esquire
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
rhorwitz@potteranderson.com
wdrane@potteranderson.com
*Counsel for Intel Corporation and Intel Kabushiki Kaisha*

David Mark Balabanian, Esquire
Joy K. Fuyuno, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
david.balabanian@bingham.com
joy.fuyuno@bingham.com
*Counsel for Intel Corporation*

Christopher B. Hockett, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111
chris.hockett@bingham.com
*Counsel for Intel Corporation*

Darren B. Bernhard, Esquire
Peter E. Moll, Esquire
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Bernhardd@howrey.com
*Counsel for Intel Corporation and Intel*
*Kabushiki Kaisha*

Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
dfloyd@gibsondunn.com
*Counsel for Intel Corporation*

B.J. Wade, Esquire
Glassman Edwards Wade & Wyatt, P.C.
26 N. Second Street
Memphis, TN 38103
bwade@gewwlaw.com
*Counsel for Cory Wiles*

Robert E. Cooper, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
rcooper@gibsondunn.com
*Counsel for Intel Corporation*

Nancy L. Fineman, Esquire
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA 94010
nfineman@cpsmlaw.com
*Counsel for Trotter-Vogel Realty Inc.*

Donald F. Drummond, Esquire
Drummond & Associates
One California Street, Suite 300
San Francisco, CA 94111
ballen@drummondlaw.net
*Counsel for Dressed to Kill Custom Draperies*
*LLC, Jose Juan, Tracy Kinder and Edward*
*Rush*

Robert D. Goldberg, Esquire
Biggs and Battaglia
921 North Orange Street, P.O. Box 1489
Wilmington, DE 19899
goldberg@batlaw.com
*Counsel for Charles Dupraz, Vanessa Z.*
*DeGeorge, Melissa Goeke, Nancy Bjork,*
*James R. Conley, Jeff Vaught, Jim Kidwell*
*Richard Caplan, Virginia Deering, Ficor*
*Acquisition Co. LLC, Tom Hobbs, David*
*Kurzman, Leslie March, Andrew Marcus,*
*Paula Nardella, Bill Richards, Maria Pilar*
*Salgado, Ron Terranova, Nancy Wolft Ryan*
*James Volden and Carl Yamaguchi*

Donald Chidi Amamgbo, Esquire
Amamgbo & Associates, APC
1940 Embarcadero Cove
Oakland, CA 94606
donaldamamgbo@citycom.com
*Counsel for Athan Uwakwe*

Jeffrey F. Keller, Esquire
Jade Butman, Esquire
Law Offices of Jeffrey F. Keller
425 Second Street, Suite 500
San Francisco, CA 94107
jkeller@jfkellerlaw.com
jbutman@kellergrover.com
*Counsel for David E. Lipton, Maria I. Prohias, Patricia M. Niehaus, Peter Jon Naigow, Ronld Konieczka, Steve J. Hamilton, Susan Baxley and Kevin Stoltz*

Gordon Ball, Esquire
Ball & Scott
550 W. Main Ave., Suite 750
Knoxville, TN 37902
gball@ballandscott.com
*Counsel for Andrew Armbrister and Melissa Armbrister*

Joseph M. Patane, Esquire
Law Offices of Joseph M. Patane
2280 Union Street
San Francisco, CA 94123
jpatane@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

James Gordon McMillan, III, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue,
Suite 1400
Wilmington, DE 19801
jmcmillan@bmf-law.com
*Counsel for Raphael Allison and Matthew Kravitz*

Michele C. Jackson, Esquire
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West, 275 Battery Street,
30th Floor
San Francisco, CA 94111
mjackson@lchb.com
*Counsel for Huston Frazier, Jeanne Cook Frazier and Brian Weiner*

A. Zachary Naylor, Esquire
Robert Kriner, Jr., Esquire
Robert R. Davis, Esquire
James R. Malone, Jr., Esquire
Chimicles & Tikellis, LLP
One Rodney Square,  P.O. Box 1035
Wilmington, DE 19899
zacharynaylor@chimicles.com
robertkriner@chimicles.com
robertdavis@chimicles.com
jamesmalone@chimicles.com
*Counsel for Gideon Elliott, Angel Genese, Nir Goldman, Paul C. Czysz, Elizabeth Bruderle Baran, Carrol Cowan, Russell Dennis, Damon DiMarco, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Leonard Lorenzo, Michael E. Ludt, John Maita, Chrystal Moeller, Robert J. Rainwater, Mary Reeder, Stuart Schupler and Sonia Yaco*

Harry Shulman, Esquire
Robert Mills, Esquire
The Mills Law Firm
145 Marina Boulevard
San Rafeal, CA  94901
harry@millslawfirm.com
deepbluesky341@hotmail.com
*Counsel for Stuart Munson*

Ali Oromchian, Esquire
Finkelstein, Thompson & Loughran
601 Montgomery Street, Suite 665
San Francisco, CA 94111
ao@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco, Carrol Cowan, Leonard Lorenzo and Russell Dennis*

Douglas A. Millen, Esquire
Steven A. Kanner, Esquire
Much Shelist Freed Denenberg Ament & Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL  60606
dmillen@muchshelist.com
skanner@muchshelist.com
*Counsel for HP Consulting Services Inc. and Phillip Boeding*

Vincent J. Esades, Esquire
Muria J. Kruger, Esquire
Marguerite E. O'Brien, Esquire
Heins Mills & Olson, P.L.C.
3550 I.D.S. Center
80 S. Eight Street
Minneapolis, MN  55402
vesades@heinsmills.com
mkruger@heinsmills.com
mobrien@heinsmills.com
*Counsel for Bergerson & Associates Inc.*

Garrett D. Blanchfield, Jr., Esquire
Mark Reinhardt, Esquire
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite E-1250
St. Paul, MN  55101
g.blanchfield@rwblawfirm.com
mreinhardt@comcast.net
*Counsel for Susan Baxley*

Hollis L. Salzman, Esquire
Kellie Safar, Esquire
Goodking Labaton Rudoff & Sucharow, LLP
100 Park Avenue
New York, NY 10017
hsalzman@labaton.com
ksafar@labaton.com
*Counsel for Angel Genese, Gideon Elliott and Nir Goldman*

R. Bruce McNew, Esquire
Taylor & McNew, LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
mcnew@taylormcnew.com
*Counsel for Robert Marshall*

Jason S. Kilene, Esquire
Daniel E. Gustafson, Esquire
Gustafson Gluek PLLC
650 Northstar East, 608 Second Avenue South
Minneapolis, MN 55402
jkilene@gustafsongluek.com
dgustafson@gustafsongluek.com
*Counsel for Fiarmont Orthopedics & Sports Medicine PA*

Ian Otto, Esquire
Nathan Cihlar, Esquire
Straus & Boies, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
dboies@straus-boies.com
*Counsel for Dressed to Kill Custom Draperies LLC, Jose Juan, Edward Rush and Tracy Kinder*

Lance A. Harke, Esquire
Harke & Clasby
155 S. Miami Avenue
Miami, FL 33130
lharke@harkeclasby.com
*Counsel for Nathaniel Schwartz and Maria I. Prohias*

Allan Steyer, Esquire
Steyer Lowenthal Boodrookas Alvarez & Smith LLP
One California Street, Third Floor
San Francisco, CA 94111
asteyer@steyerlaw.com
*Counsel for Cheryl Glick-Salpeter, Jay Salpeter, Jodi Salpeter and Michael H. Roach*

Bruce J. Wecker, Esquire
Hosie McArthur LLP
One Market Street
Spear Street Tower #2200
San Francisco, CA 94105
bwecker@hosielaw.com
*Counsel for Dwight E. Dickerson*

Mario Nunzio Alioto, Esquire
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123
malioto@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

Francis O. Scarpulla, Esquire
Law Offices of Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
foslaw@pacbell.net
*Counsel for Lazio Family Products, Law Offices of Laurel Stanley, William F. Cronin, Michael Brauch and Andrew Meimes*

Steven A. Asher, Esquire
Robert S. Kitchenoff, Esquire
Weinstein Kitchenoff & Asher, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
asher@wka-law.com kitchenoff@wka-law.com
*Counsel for Joseph Samuel Cone*

Francis A. Bottini, Jr., Esquire
Wolf Haldenstein Adler Freeman & Herz
750 B Street, Suite2770
San Diego, CA 92101
bottini@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Fred Taylor Isquith, Esquire
Adam J. Levitt, Esquire
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave., 11th Floor
New York, NY 10016
isquith@whafh.com
levitt@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Edward A. Wallace, Esquire
The Wexler Firm LLP
One N. LaSalle Street, Suite 2000
Chicago, IL 60602
eawallace@wexlerfirm.com
*Counsel for Peter Jon Naigow*

Jeffrey S. Goddess, Esquire
Rosenthal, Monhait, Gross & Goddess
Mellon Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
jgoddess@rmgglaw.com
*Counsel for Ludy A. Chacon, Joseph Samuel Cone, Darice Russ and Michael K. Simon*

Jason S. Hartley, Esquire
Ross, Dixon & Bell LLP
550 West B Street, Suite 400
San Diego, CA 92101
jhartley@rdblaw.com
*Counsel for Gabriella Herroeder-Perras*

Craig C. Corbitt, Esquire
Zelle, Hofmann, Voelbel, Mason & Gette LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
ccorbitt@zelle.com
*Counsel for William F. Cronin, Law Offices of Laurel Stanley and Lazio Family Products*

Scott E. Chambers, Esquire
Schmittinger & Rodriguez, P.A.
414 S. State Street
P.O. Box 497
Dover, DE  19903
schambers@scbmittrod.com
*Counsel for David Arnold, Andrew S. Cohn, Jason Craig, Maria Griffin, Lena K. Manyin, Paul Ramos and Michael Ruccolo*

Juden Justice Reed, Esquire
Schubert & Reed LLP
Two Embarcadero Center, Suite 1600
San Francisco, CA  94111
jreed@schubert-reed.com
*Counsel for Patrick J. Hewson*

Russell M. Aoki, Esquire
Aoki Sakamoto Grant LLP
One Convention Place
701 Pike Street, Suite 1525
Seattle, WA  98101
russ@aoki-sakamoto.com
*Counsel for Kevin Stoltz*

Richard A. Ripley, Esquire
Bingham McCutchen
1120 20th Street, NW, Suite 800
Washington, DC 20036
richard.ripley@bingham.com
*Counsel for Intel Corporation*

Donald L. Perelman, Esquire
Fine Kaplan & Black, RPC
1835 Market Street, 28th Flr
Philadelphia, PA  19103
dperelman@finekaplan.com
*Counsel for Kevin Stoltz*

Reginald Von Terrell, Esquire
The Terrell Law Group
223 25th Street
Richmond, CA 94804
REGGIET2@aol.com
*Counsel for Athan Uwakwe*

Natalie Finkelman Bennett, Esquire
Shepherd, Finkelman, Miller & Shah
65 Main Street
Chester, CT  06412-1311
nfinkelman@classactioncounsel.com
*Counsel for Ludy A. Chacon*

Michael L. Kirby, Esquire
Kirby Noonan Lance & Hoge LLP
One America Plaza
600 West Broadway, Suite 1100
San Diego, CA  92101
mkirby@knlh.com
*Counsel for Justin Suarez*

Jeffrey A. Bartos, Esquire
Guerrieri, Edmond, Clayman & Bartos, PC
1625 Massachusetts Avenue, NW
Washington, DC  20036
jbartos@geclaw.com
*Counsel for Jose Juan, Dressed to Kill Custom Draperies, LLC, Tracy Kinder and Edward Rush*

Randy R. Renick, Esquire
Law Offices of Randy Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA  91103
rrr@renicklaw.com
*Counsel for Shanghai 1930 Restaurant Partners L.P. and Major League Softball Inc.*

Daniel Hume, Esquire
Kirby McInerney & Squire LLP
830 Third Avenue, 10th Floor
New York, NY 10022
dhume@kmslaw.com
*Counsel for Raphael Allison and Matthew Kravitz*

Scott Ames, Esquire
Serratore & Ames
9595 Wilshire Blvd., Suite 201
Los Angeles, CA 90212
scott@serratoreames.com
*Counsel for Major League Softball, Inc.*

Douglas G. Thompson, Jr., Esquire
Finkelstein, Thompson & Loughran
1050 30th Street N.W.
Washington, DC 20007
dgt@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco, Carrol Cowan, Leonard Lorenzo and Russell Dennis*

Daniel B. Allanoff, Esquire
Steven Greenfogel, Esquire
Meredith Cohen Greenfogel & Skirnick, P.C.
22nd Floor, Architects Building
117 S. 17th Street
Philadelphia, PA 19103
dallanoff@mcgslaw.com
sgreenfogel@mcgslaw.com
*Counsel for Benjamin Allanoff*

Harvey W. Gurland, Jr., Esquire
Duane Morris
200 S. Biscayne Blvd., Suite 3400
Miami, FL 33131
HWGurland@duanemorris.com
*Counsel for Intel Corporation*

Barbara C. Frankland, Esquire
Rex A. Sharp, Esquire
Gunderson Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
bfrankland@midwest-law.com
rsharp@midwest-law.com
*Counsel for Marvin D. Chance, Jr.*

VIA U.S. MAIL

Clerk Michael J. Beck
Clerk, MDL Judicial Panel
One Columbus Circle, N.E.
Room G-255, Federal Judiciary Bldg.
Washington, DC 20002-8004
*Pro Se*

J. Clayton Athey (Bar ID #4378)