EXHIBIT 6

955 F.2d 1373
955 F.2d 1373, 60 USLW 2529, 1992-1 Trade Cases P 69,716
**(Cite as: 955 F.2d 1373)**
**H**

Page    1

United States Court of Appeals,
Ninth Circuit.
CITY OF ANAHEIM, City of Riverside, City of
Banning, City of Colton, City of
Azusa, Plaintiffs-Appellants,
v.
SOUTHERN CALIFORNIA EDISON COMPANY,
Defendant-Appellee.
No. 90-56375.

Argued and Submitted Oct. 11, 1991.
Decided Feb. 7, 1992.

Cities brought action against electric utility alleging violation of Sherman Act by engaging in regulatory price squeeze and denying access to essential facility. The United States District Court for the Central District of California, Mariana R. Pfaelzer, J., found in favor of utility. Cities appealed. The Court of Appeals, Fernandez, Circuit Judge, held that: (1) public utility's price squeeze did not cause antitrust liability, and (2) even if high-powered transmission lines to which utility had access were essential facility, utility proffered legitimate business reasons for denying access to those lines to cities and there was thus no Sherman Act violation.

Affirmed.

West Headnotes

[1] Federal Courts ☞ 776
170Bk776 Most Cited Cases
District court's determinations of whether specific conduct was anticompetitive in violation of Sherman Act are questions of law reviewed de novo. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[2] Antitrust and Trade Regulation ☞ 645
29Tk645 Most Cited Cases
    (Formerly 265k12(1.3))

[2] Antitrust and Trade Regulation ☞ 621
29Tk621 Most Cited Cases
    (Formerly 265k12(1.3))
To prove monopoly in violation of Sherman Act, plaintiff must show that defendant possessed monopoly power in relevant market; that it willfully acquired or maintained that power; and that plaintiff suffered causal antitrust injury.

Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[3] Antitrust and Trade Regulation ☞ 695
29Tk695 Most Cited Cases
    (Formerly 265k12(16))
In particular circumstances of regulated utility struggling with dual regulation, bearing in mind that utility is entitled to recover costs of service and provide investors with reasonable rate of return, something more than general intent is required to establish Sherman Act violation; rather, specific intent is required. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[4] Antitrust and Trade Regulation ☞ 977(3)
29Tk977(3) Most Cited Cases
    (Formerly 265k12(16))
Specific intent of utility required to show violation of Sherman Act need not be proved by direct admissions of wrongdoing; rather, actions of utility, taken as a whole, can and should be considered. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[5] Antitrust and Trade Regulation ☞ 890
29Tk890 Most Cited Cases
    (Formerly 265k12(16))
Public utility's seeking rate orders it considered to be just and reasonable from both California Public Utility Commission (CPUC) and Federal Energy Regulatory Commission (FERC) with knowledge that rate deferential was likely to develop as well as a price squeeze which would affect cities' ability to compete with utility was legitimate business justification for its decision and did not violate Sherman Act. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[6] Antitrust and Trade Regulation ☞ 660
29Tk660 Most Cited Cases
    (Formerly 265k17(2.2))
Company which has monopoly power over essential facility may not refuse to make facility available to others where there is no legitimate business reason for refusal; wrong perpetrated by that misuse of facility is that monopolist can extend monopoly power from one stage of production to another and from one market into another.

[7] Antitrust and Trade Regulation ☞ 565

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

955 F.2d 1373
(Cite as: 955 F.2d 1373)

29Tk565 Most Cited Cases
(Formerly 265k17(2.2))

[7] Antitrust and Trade Regulation ⚖➡ 660
29Tk660 Most Cited Cases
(Formerly 265k17(2.2))
A facility controlled by single firm will be considered "essential" under essential facility doctrine only if control of facility carries with it power to eliminate competition in downstream market.

[8] Antitrust and Trade Regulation ⚖➡ 660
29Tk660 Most Cited Cases
(Formerly 265k17(2.2))
Once it is decided that a facility is essential, for purposes of essential facility doctrine, it still must be determined whether monopolist is liable for refusing to allow use of facility.

[9] Antitrust and Trade Regulation ⚖➡ 695
29Tk695 Most Cited Cases
(Formerly 265k17(2.2))
Even if certain high-powered transmission lines to which electric utility had access were an essential facility, utility proffered legitimate business reasons for denying access to those lines to cities; utility had limited right to use capacity of those power lines and desired to use that capacity to the limit when it could get inexpensive power to keep its rates as low as possible. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

*1374 Maxwell M. Blecher and Ann I. Jones, Blecher, Collins & Wienstein, Los Angeles, Cal., Bonnie S. Blair, Spiegel & McDiarmid, Washington, D.C., and Alan R. Watts, Orange, Cal., for plaintiffs-appellants.

*1375 Paul G. Bower, Arthur L. Sherwood, Richard D. Hall, Daniel G. Swanson, and Suzanne S. La Pierre, Gibson, Dunn & Crutcher, Los Angeles, Cal., and David N. Barry III, Stephen E. Pickett, Thomas E. Taber, and Janet K. Lohmann, Southern California Edison Co., Rosemead, Cal., for defendant-appellee.

Appeal from the United States District Court for the Central District of California.

Before SCHROEDER, LEAVY and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

The Cities of Anaheim, Riverside, Banning, Colton and Azusa (the Cities) brought this action against Southern California Edison Company (Edison) and alleged that Edison had violated section 2 of the Sherman Act, 15 U.S.C. § 2 (§ 2) by engaging in a regulatory price squeeze and by denying access to an essential facility. After a court trial, the district court found in favor of Edison and entered judgment accordingly. The Cities appeal. We affirm.

BACKGROUND
Edison is an investor-owned fully integrated public utility, which generates, transmits, and distributes electric power within its service area, an area which includes much of Central and Southern California. [FN1] The Cities are located in Edison's service area, but each has its own electrical distribution system and is the sole provider of retail electric service within its own boundaries. Edison provides retail service to all customers who are within its area and not within the boundaries of the Cities.

> FN1. Throughout this opinion we rely upon the factual findings of the district court, which are not contested on this appeal.

Although the Cities distribute power at retail within their boundaries, they do not generate their own electricity. Thus, they obtain their power in bulk elsewhere and receive it over Edison's transmission lines. That wholesale power is purchased from Edison or from other electrical utilities. It is Edison's responsibility to see to it that the Cities receive all of the power that they need. Edison also purchases power from and sells it to other utilities.

Because Edison is a regulated utility, its charges are controlled by regulatory agencies. Its retail rates are regulated by the California Public Utilities Commission (CPUC). Cal. Pub. Util. Code §§ 701-703. Its wholesale rates are regulated by the Federal Energy Regulatory Commission (FERC). 16 U.S.C. § 824. Historically, the wholesale rate (R-2) and the retail rate charged to Edison's large industrial retail customers (A-8) had been the same, and each provided for a lower rate of return than that obtained from other classes of customers. That changed in 1974.

In June of 1974, Edison asked the CPUC for an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

increase in the A-8 rate which it charged to its industrial customers. It also asked for an interim partial rate increase. On December 30, 1975, the CPUC granted an interim increase and on December 21, 1976 it issued a final decision which granted Edison about one third of the increase originally requested. That became effective January 13, 1977.

Meanwhile, in October of 1975 Edison asked FERC for an increase in its R-2 rate. FERC allowed the whole of the rate to become effective on February 1, 1976. [FN2] That rate was then higher than the A-8 rate and it remained so even after the CPUC issued its final decision. As a result, the Cities actually had to pay a higher rate for electric power than Edison's own industrial retail customers. The differential was not justified during the period from February 1, 1976 through January 12, 1977. The Cities claim that a price squeeze resulted, which improperly affected their ability to compete with Edison. That, they say, violated § 2.

FN2. FERC may suspend the implementation of a wholesale rate increase for a maximum of five months and the rate then becomes automatically effective. 16 U.S.C. § 824d(e). Here Edison asked for a mere one-day suspension and FERC set the suspension at one month. By contrast, the CPUC does not allow any increase, interim or otherwise, without its approval.

*1376 Among the facilities which Edison has access to are certain high-power transmission lines (the Pacific Intertie) which bring hydroelectric power to Edison's control area from the Pacific Northwest. [FN3] That power is generated by various entities in the Pacific Northwest, including the Bonneville Power Administration (BPA). When conditions are favorable, that power becomes available for export and is significantly cheaper than bulk power generated in California and the other Western states. Edison shares access to the Pacific Intertie with certain other utilities, which means that it is entitled to only a portion of the lines' total capacity.

FN3. The lines consist of two 500 kV AC lines. and one 800 kV DC line

Two of the cities, Anaheim and Riverside, asked for firm access [FN4] to the Pacific Intertie, but Edison rejected that on grounds that it expected to use its full capacity rights in the Intertie to bring power into its service area for the benefit of all of its customers. It did offer interruptible access, however. The Cities assert that they cannot purchase the BPA and other Pacific Northwest power if access is interruptible. They assign this as another § 2 violation.

FN4. Firm access is guaranteed access to the transmission lines for the importation of power from other sources.

JURISDICTION AND STANDARD OF
REVIEW
The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15. We have jurisdiction pursuant to 28 U.S.C. § 1291.

[1] Since the district court's factual determinations are not disputed, we need only decide if Edison's conduct violated § 2. The district court's determinations of whether "specific conduct was anticompetitive in violation of the Sherman Act are questions of law that we review *de novo*." *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).

DISCUSSION
[2] In order to prove a violation of § 2, the Cities must show (1) that Edison possessed monopoly power in the relevant market; (2) that it willfully acquired or maintained that power; and (3) that the Cities suffered a causal antitrust injury. *Oahu*, 838 F.2d at 363. The district court found that Edison does have monopoly power in the bulk power or wholesale market, the geographic scope of which is its control area. The court also found that the Cities were both customers and competitors of Edison. Those findings are not contested before us. We, therefore, turn to the Cities' claims that the price squeeze and essential facilities doctrines require a finding that Edison has violated § 2.

In so doing, we agree that it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

955 F.2d 1373
(Cite as: 955 F.2d 1373, *1376)

up to a violation. We are not dealing with a mathematical equation. We are dealing with what has been called the "synergistic effect" of the mixture of the elements. *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.1981). Thus, while our discussion will speak to the specific claims, we emphasize that we have also ruminated upon the effect of combining those claims, but the result of that rumination makes no difference in our ultimate conclusion.

A. *The Price Squeeze Claim.*

1. The Theory.

The vice that a price squeeze has is that it can be used to cause severe damage to competitors by unjustifiably raising their costs of doing business. In ordinary commercial transactions, for example, if a firm *1377 has a wholesale monopoly and wishes to extend that to the retail level, where it has competition, it might raise its wholesale prices to the point that others cannot compete with it at retail. *See City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1176 n. 4 (8th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983). Those concerns are attenuated in the electrical industry whose rates are regulated at both the wholesale and retail levels. Nevertheless, because the regulatory systems do not work in perfect harmony, it is possible for a utility to manipulate its filings and requests in a manner that causes a, at least temporary, squeeze which might be just as effective as one perpetrated by an unregulated actor. *See* John E. Lopatka, *The Electric Utility Price Squeeze as an Antitrust Cause of Action*, 31 UCLA L.Rev. 563 (1984).

While we have not previously applied the price squeeze theory to the electrical industry, other circuits have. *See City of Kirkwood*, 671 F.2d at 1176-77; *City of Groton*, 662 F.2d at 934-35; *City of Mishawaka v. American Elec. Power Co., Inc.*, 616 F.2d 976, 983-85 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981) (*Mishawaka II* ). Those courts have recognized the difficulties presented by the theory in this area, but have also seen that the regulatory context should not give utilities carte blanche to behave in anticompetitive ways. As the court said in *Mishawaka II*

There is some substance to the utility regulatory

argument. As we have already noted, the wholesale rates under federal control go into effect automatically without agency approval, but the state retail rates must await state approval. Behind the rate applications there are differing regulatory procedures, differing tests and standards to be applied, and differing accounting principles to be used in the computations. At best, a utility may find itself in a legal and practical maze, but for price squeezing the dual system also offers an obvious, ready made illegal opportunity with a legitimate gloss.
616 F.2d at 983-84.

The problems are even more forcefully pointed out in *Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). There the court outlined the various arguments against using price squeeze theory in this area. *Id.* at 25-28. It rejected the general use of price squeeze theory but did not reject the theory entirely. It stated:
In sum, the relevant antitrust considerations differ significantly, in degree and in kind, when a price squeeze occurs in a fully regulated as opposed to an unregulated industry. Indeed, these considerations, which are closely balanced in the ordinary price squeeze, change so significantly when the squeeze takes place in a fully regulated industry that, in our opinion, the legal consequences of the squeeze change as well. That is to say, a price squeeze in a fully regulated industry such as electricity will not normally constitute "exclusionary conduct" under Sherman Act § 2.
We are aware that reported opinions in three circuit courts of appeal and several district courts suggest that a price squeeze may be unlawful in the regulated electricity industry. . . . In only one of those cases, however, did the court actually enter, or affirm, a judgment against the defendant; thus, there is extremely little case law *holding* that a public utility price squeeze is exclusionary. Moreover, in all of the cases we have cited, the price squeeze allegation was but one of several allegations of several different kinds of "exclusionary conduct," and the one court that affirmed a Sherman Act 2 judgment against a utility stressed that it might well *not* have done so had the price squeeze stood alone (as it does in the case before us). *See Mishawaka II*, 616 F.2d at 986 (suggesting that "no one aspect [of the defendant's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

955 F.2d 1373
(Cite as: 955 F.2d 1373, *1377)

conduct] standing alone is illegal"). Further, in every case, the price squeeze allegation involved wholesale prices that *exceeded* *1378 retail prices, (a matter here in doubt), thereby eliminating some of the "administrative" problems we have found surrounding a jury's efforts to determine the reasonableness of the price "gap."
915 F.2d at 28 (citations omitted) (emphasis in original).

We, too, would be reluctant to hold that a mere showing that a squeeze developed would suffice to cause antitrust liability. However, we do not think that one must react as forcefully against the theory as the court did in *Town of Concord* in order to prevent that result. As that court pointed out, other courts have insisted on something more than the squeeze itself. *Id.* at 28.

Given the fact that the parties operate in an area where much monopoly is legal, and, indeed, each is a monopolist in its own way, courts should tread carefully. In the context of patent law, we have done just that. There we have recognized, as we do here, that there is a "complex interaction between two conflicting bodies of law ..." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 992 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980). We said that:
"[T]he patent law, is concerned with the creation and commercial exploitation of a statutory grant of monopoly power; ... the antitrust law, is concerned with proscribing various kinds of monopoly power. Reconciling the interrelationship between the patent and antitrust laws has long been a topic of concern to courts as well as to commentators."
*Id.* Our solution there was to hold that, absent other evidence of bad faith or abuse of the patent law, "the jury should be instructed that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." *Id.* at 996.

[3] In this area, too, something more is required. *Town of Concord* said that it must be a case with "exceptional circumstances." 915 F.2d at 29. We think that is too restrictive. Rather, we think that the approach of *Mishawaka II* is more promising. There the court said:
In the particular circumstances, however, of a regulated utility struggling with dual regulation,

bearing in mind that the utility is entitled to recover its costs of service and to provide its investors with a reasonable rate of return, we believe that something more than general intent should be required to establish a Sherman Act violation. The utility charges that the trial court in fact read the requirement of any intent out of the Sherman Act. We disagree. The trial court discerned from a consideration of all the evidence of the utility's activities, not only a general intent which it considered to be adequate, but also a specific utility intent to serve its monopolistic purposes at municipal expense. We concur in that assessment of the evidence as a whole.
616 F.2d at 985.

In *Mishawaka II*, the court pointed to a number of factors that supported a finding of specific intent. The court found a series of improper filings for rate increases, threats to discontinue power supplies to the Cities, an aggressive policy of acquiring faltering municipal systems, and other activities, all mixed in a "monopoly broth" that produced an "unsavory flavor." *Id.* at 986.

[4] We agree with the district court and with *Mishawaka II* that the requirement of specific intent is an appropriate way to erect a dike which is sufficient to prevent an untoward invasion of the land of legal monopolies by the sea of antitrust law. Of course, in so holding we emphasize that the specific intent need not be proved by direct admissions of wrongdoing. Rather, the actions of the utility, taken as a whole, can and should be considered.

2. Application of the Theory.

[5] In the case at hand, there can be little doubt that the district court did not err in determining that Edison applied for its rate increases at both the CPUC and the FERC with the knowledge that a rate differential was likely to develop. That was almost certain to happen since the CPUC *1379 does not allow rates to go into effect immediately, but FERC does, comparatively speaking, allow immediate rate increases. Exactly that happened here.

Edison's protestations aside, the result was predictable if not ineluctable. Moreover, if Edison had truly wished to avoid that result, it could have taken steps toward that end. Instead, as the district

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

955 F.2d 1373
(Cite as: 955 F.2d 1373, *1379)

court said, "Edison was interested only in its own rate of return on its investment" and "may have been somewhat ruthless in seeking to secure what it considered [to be] a satisfactory rate of return." That alone may show a general intent, but that alone should not suffice for a finding of liability.

It can hardly be argued that monopolistic acts have taken place simply because a company seeks what it actually believes is a fair rate of return from two separate administrative agencies. Of course, that is not a complete answer if other motivations are shown. *See Mishawaka II*, 616 F.2d at 984. We are well aware of a monopolist's special duties regarding its competitors, but those are only applicable "when there is no justification for refusing to aid a competitor." *Oahu*, 838 F.2d at 368. In fact, even if the monopolist does refuse aid partially because it wishes to restrict competition, "we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct." *Id. See also Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir.1990), *cert. granted*, 501 U.S. 1216, 111 S.Ct. 2823, 115 L.Ed.2d 994 (1991).

Here the district court found that Edison did have a legitimate business justification for its decision. The court decided that Edison simply sought rate orders that it considered to be just and reasonable from both agencies. It is clear that the district court found that to be an accurate description of Edison's conduct--in other words, it found Edison to be honest and credible in that respect. We cannot say that the district court erred.

B. *The Essential Facility Claim*.

In order to consider the Cities' claim that the Pacific Intertie is an essential facility to which they have improperly been denied access, we must first consider the scope of that doctrine. We will then apply it to the facts found by the district court.

1. The Theory.

The essential facility doctrine has a long history, although its contours are still far from clear. In *United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), the Court found an antitrust violation where virtually all terminal facilities through which railroad traffic could enter

the City of St. Louis were controlled by a monopolist. The Court required that access to the terminal be allowed to others on nondiscriminatory terms. Stated thus, in the simplest and rawest of terms, it would seem that a company in a monopoly position is required to aid its competitors at all costs. That is not true. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-01, 105 S.Ct. 2847, 2856, 86 L.Ed.2d 467 (1985); *Oahu*, 838 F.2d at 368. Neither is it true that a refusal to deal can be issued for no good business reason whatever. *Aspen*, 472 U.S. at 608-11, 105 S.Ct. at 2860-62; *Oahu*, 838 F.2d at 368.

[6] The essential facility doctrine is a facet of this overarching concept. A company which has monopoly power over an essential facility may not refuse to make the facility available to others where there is no legitimate business reason for the refusal. The wrong perpetrated by that misuse of the facility is that a monopolist "can extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). In *MCI*, for example, AT & T refused to allow MCI use of AT & T's local facilities and did so for no good reason. *Id.* at 1133. Similarly, in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 378, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973), the Court had this to say about *1380 Otter Tail's refusal to wheel power over its lines to hungry cities:

When a community serviced by Otter Tail decides not to renew Otter Tail's retail franchise when it expires, it may generate, transmit, and distribute its own electric power. We recently described the difficulties and problems of those isolated electric power systems.... Interconnection with other utilities is frequently the only solution.... That is what Elbow Lake in the present case did. There were no engineering factors that prevented Otter Tail from selling power at wholesale to those towns that wanted municipal plants or wheeling the power. The District Court found--and its findings are supported--that Otter Tail's refusals to sell at wholesale or to wheel were solely to prevent municipal power systems from eroding its monopolistic position.
(Citations omitted.)

In each of these cases it is easy to intuit the reasons

955 F.2d 1373
(Cite as: 955 F.2d 1373, *1380)

for the action taken by the courts, but intuition may not always be enough. The district court opined that what makes a facility essential is not the nature of the facility itself, but the effect upon competition that withholding the facility might have.

[7] We are not satisfied that the district court's opinion is entirely accurate. It is surely true that one might be the sole and monopolistic owner of an item without affecting competition in any manner whatever. The owner of a unique piece of art who keeps it hidden in his own adytum might be an example of that. On the other hand, it is often, if not always, the nature of the item itself that allows its possible misuse. Thus, while it is not sufficient to say that a facility is unique, it would be a mistake to overlook that aspect when one is attempting to determine whether it is also essential. Nevertheless, unless it can be and is used to improperly interfere with competition, [FN5] it cannot be called essential. For example, it seems clear that Edison's local transmission system, without which the Cities cannot feasibly obtain power at all, is essential. See Otter Tail, 410 U.S. at 378, 93 S.Ct. at 1030. As the district court recognized, the Pacific Intertie is a different matter entirely.

> FN5. We recognize that a facility "controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines, Inc v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir.1991). We do not reach that issue in this case.

[8] Once it is decided that a facility is essential, we must still determine whether the monopolist is liable for refusing to allow use of the facility. In *MCI*, the court identified four necessary elements:
(1) control of the essential facility by a monopolist;
(2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.
708 F.2d at 1132-33 (citations omitted).

We do not disagree with that listing, but must point out that the second element is effectively part of the definition of what is an essential facility in the first place. That is to say, if the facility can be reasonably or practically duplicated it is highly unlikely, even impossible, that it will be found to be essential at all. See *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1482-83 (7th Cir.1991).

It should also be pointed out that the fourth element basically raises the familiar question of whether there is a legitimate business justification for the refusal to provide the facility, as application of the doctrine in *MCI* itself demonstrates. *Id.* at 1133. See also *Panhandle Eastern*, 935 F.2d at 1483; *Image Technical* 903 F.2d at 620.

2. Application of the Theory.

[9] The district court found that the Pacific Intertie is not, standing alone, an essential facility at all. It so held because, as a matter of fact, the Cities could obtain power from many other sources. One of those sources was Edison itself. If they obtained power from that source, they *1381 would have ready access to a fair proportion of all power that could be brought in over the Pacific Intertie. That is so because Edison's reason for denying firm access was simply that when Northwest Power was available and inexpensive Edison was fully using its capacity to import that power into its whole system. Furthermore, if the Cities wished to obtain power elsewhere, Edison would still wheel it to them.

In short, there was no dearth of available power. Nor, as a matter of fact, did inability to obtain Pacific Northwest Power preclude the Cities from obtaining power at reasonable rates to meet their needs and the needs of their customers. As the district judge recognized, "the Cities' whole argument asks the Court to turn the essential facility doctrine on its head. Rather than seeking to impose a duty to deal based on the harm that would result to competition from the monopolist's refusal, the Cities seek to impose a duty to deal based on the extent to which a competitor might benefit if it had unlimited access to the monopolist's facility." In short, the fact that the Cities could achieve savings at the expense of Edison and its other customers is not enough to turn the Pacific Intertie into an essential facility. That being so, the district court did not err.

If the Pacific Intertie were an essential facility, Edison could still deny access if it had legitimate business reasons for that denial. The district court properly found that Edison did.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

955 F.2d 1373
(Cite as: 955 F.2d 1373, *1381)

As we have already stated, Edison had a limited right to use the capacity of the Pacific Intertie, and it desired to use that capacity to the limit when it could get inexpensive power from the Pacific Northwest. Thus, it refused to give the Cities firm access because it could not transmit all of the power it wanted if a portion of its capacity rights were being used by the Cities at the same time.

When Edison obtains less expensive power, that is rolled into its other costs and results in a savings to all of its customers. In this sort of regulated industry, it is certainly to the benefit of the monopolist's customers if its rates are kept as low as possible. Indeed, that is a major reason for the existence of regulatory commissions such as CPUC and FERC. In other words, the public interest is well served when that happens, and that gives even more weight to the propriety of the refusal. *See Southern Pac. Communications Co. v. American Tel. & Tel. Co.*, 740 F.2d 980, 1009-10 (D.C.Cir 1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985).

This is not a situation where the capacity is not being used (*MCI* ) or the sole reason for the denial of access is to maintain a monopoly (*Otter Tail* ). It is a situation where Edison can use its own facility in full to obtain the inexpensive power. The Cities seem to contend that Edison has to disable itself so that they can get cheap power. The law requires no such thing.

Put bluntly, the Cities desired to benefit their customers at the expense of all of the other customers of Edison. We cannot express surprise at the Cities' single-minded desire to benefit their own- -it is much like Edison's single-minded attention to its rate demands. However, we also cannot say that Edison's refusal lacked a reasonable business justification.

## CONCLUSION
Each of the combatants in this case has with purblind single-mindedness sought to maximize its own benefits. Edison sought to obtain the best return it could manage from CPUC and FERC with no real concern for the effect that might have upon the Cities. The Cities for their part have sought to force Edison to enable them to obtain power at the lowest rate possible and with no real concern for Edison's other ratepayers.

We do not sit to judge the morality of those attempts. We only sit to determine whether Edison violated § 2 of the Sherman Act when it requested the former and denied the latter. The district court found that Edison was not at fault. We agree.

AFFIRMED.

955 F.2d 1373, 60 USLW 2529, 1992-1 Trade Cases P 69,716

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.