# EXHIBIT 9

100 F.3d 462                                                                                                  Page 1
100 F.3d 462, 1996-2 Trade Cases P 71,623, 1996 Fed App. 0362P
**(Cite as: 100 F.3d 462)**
▷

United States Court of Appeals,
Sixth Circuit.
DXS, INC., a Michigan Corporation, f/k/a Flint X-Ray, Inc., Plaintiff-Appellant,
v.
SIEMENS MEDICAL SYSTEMS, INC., a Foreign Corporation, Defendant-Appellee.
No. 94-1763.

Argued Nov. 13, 1995.
Decided Nov. 15, 1996.

Supplier of x-ray equipment sued manufacturer of equipment, alleging antitrust violations and tortious interference with business relationship. The United States District Court for the Eastern District of Michigan, Nancy G. Edmunds, J., granted summary judgment for manufacturer on antitrust claims and granted judgment as matter of law for manufacturer on claims for tortious interference. Supplier appealed. The Court of Appeals, Engel, Circuit Judge, held that: (1) material issues of fact as to whether manufacturer's statements to clients were continuing violations precluded summary judgment on antitrust claims on statute of limitations grounds; (2) supplier failed to show that any misrepresentations caused it injury on tortious interference claims as to two buyers; (3) whether manufacturer made statements to another buyer within statute of limitation was question for jury on tortious interference claim; (4) evidence of supplier's lost net profits was question for jury on tortious interference claim; and (5) district court's error which precluded plaintiff from adequately presenting its evidence of damages resulted in substantial injustice.

Affirmed in part, reversed in part, and remanded.

West Headnotes

[1] Limitation of Actions ⊂⇒ 58(1)
241k58(1) Most Cited Cases
Antitrust cause of action accrues and limitation period commences each time defendant commits act that injures plaintiff's business; focus is on timing of causes of injury, which are defendant's overt acts, rather than effects of overt acts.

[2] Limitation of Actions ⊂⇒ 58(1)
241k58(1) Most Cited Cases
Continuing antitrust violation is one in which plaintiff's interests are repeatedly invaded, and cause of action accrues each time plaintiff is injured by act of defendants.

[3] Limitation of Actions ⊂⇒ 58(1)
241k58(1) Most Cited Cases
Even when plaintiff alleges continuing antitrust violation, overt act by defendant is required to restart statute of limitations, and statute runs from last overt act.

[4] Federal Civil Procedure ⊂⇒ 2484
170Ak2484 Most Cited Cases
Material issues of fact existed as to whether defendant's statements to clients were continuing antitrust violations or whether statements were merely affirmation of final policy, precluding summary judgment for defendant on plaintiff's antitrust claims on statute of limitations grounds.

[5] Limitation of Actions ⊂⇒ 58(1)
241k58(1) Most Cited Cases
Overt act that restarts antitrust statute of limitations must be new and independent act that is not merely reaffirmation of previous act, and it must inflict new and accumulating injury on plaintiff.

[6] Limitation of Actions ⊂⇒ 58(1)
241k58(1) Most Cited Cases
Acts that simply reflect or implement prior refusal to deal or acts that are merely unabated inertial consequences of single act do not restart antitrust statute of limitations.

[7] Federal Civil Procedure ⊂⇒ 2111
170Ak2111 Most Cited Cases
Federal court sitting in diversity must apply standard for judgments as a matter of law of state whose substantive law governs.

[8] Trial ⊂⇒ 139.1(13)
388k139.1(13) Most Cited Cases

[8] Trial ⊂⇒ 178
388k178 Most Cited Cases
Under Michigan law on motion for judgment as matter of law, all evidence and legitimate inferences



100 F.3d 462
(Cite as: 100 F.3d 462)

Page 2

that may be drawn from that evidence must be viewed in light most favorable to the nonmoving party; if that evidence is insufficient to establish prima facie case against defendant, motion should be granted.

[9] Appeal and Error ⇐ 973
30k973 Most Cited Cases
Under Michigan law, standard of review of judgment as a matter of law is abuse of discretion.

[10] Torts ⇐ 211
379k211 Most Cited Cases
   (Formerly 379k10(1))

[10] Torts ⇐ 213
379k213 Most Cited Cases
   (Formerly 379k10(1))
To establish a prima facie case of tortious interference with a business relationship under Michigan law, plaintiff must show existence of valid business relationship or expectancy, knowledge of relationship or expectancy on part of interferer, intentional or improper interference with relationship that induces or causes breach or termination of relationship or expectancy, and resultant damage to party whose relationship or expectancy has been disrupted.

[11] Torts ⇐ 241
379k241 Most Cited Cases
   (Formerly 379k10(3))
Although x-ray equipment manufacturer may have misrepresented to buyers of x-ray tubes the effect on its warranties if supplier installed tubes, supplier failed to show that misrepresentations caused it injury and thus did not establish tortious interference with business relationship, where buyers testified that they wanted broadest possible warranties and manufacturer's warranties were in fact broader if manufacturer rather than supplier installed equipment.

[12] Fraud ⇐ 13(1)
184k13(1) Most Cited Cases
Neither general character of representation as to warranty nor written documentation that accompany it necessarily precludes representation from being misleading.

[13] Torts ⇐ 253
379k253 Most Cited Cases
   (Formerly 241k32(1))
Applicable statute of limitations for actions for tortious interference with business relationship is three-year limit governing actions for damages for injury to person or property. M.C.L.A. § 600.5805(8).

[14] Limitation of Actions ⇐ 199(1)
241k199(1) Most Cited Cases
Whether manufacturer of x-ray equipment made statements to buyer within statute of limitation was question for jury under Michigan law on supplier's claim that manufacturer tortiously interfered with business relationship between supplier and buyer.

[15] Limitation of Actions ⇐ 199(1)
241k199(1) Most Cited Cases
Under Michigan law, whether plaintiff presented sufficient evidence to show that cause of action accrued within statute of limitations is question of law.

[16] Limitation of Actions ⇐ 199(1)
241k199(1) Most Cited Cases
Date of accrual of cause of action for statute of limitations purposes is question of fact for jury under Michigan law.

[17] Limitation of Actions ⇐ 199(1)
241k199(1) Most Cited Cases
In determining, under Michigan law, whether plaintiff presented sufficient evidence to show that cause of action accrued within statute of limitations, court should determine not merely whether there is literally no evidence, but whether there is competent evidence showing, or from which reasonable inference may be drawn, that improper conduct occurred within statute of limitations.

[18] Damages ⇐ 190
115k190 Most Cited Cases
Under Michigan law, lost profits must be subject to reasonable degree of certainty and cannot be based solely on conjecture and speculation.

[19] Damages ⇐ 190
115k190 Most Cited Cases
Mathematical certainty is not required to prove lost profits under Michigan law, but amount of profit lost must be shown with such reasonable degree of certainty as situation permits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462
(Cite as: 100 F.3d 462)

Page 3

[20] Damages ⇐ 190
115k190 Most Cited Cases
Any uncertainty about lost profits damages should be resolved against the defendant, who, as the wrongdoer, bears the risk of uncertainty.

[21] Damages ⇐ 40(1)
115k40(1) Most Cited Cases
Damages for lost profits under Michigan law must be based on loss of net profits rather than gross profits.

[22] Damages ⇐ 114
115k114 Most Cited Cases
Where plaintiff seeks recovery under theory of tortious interference under Michigan law, net profits represent amount plaintiff would have received in revenue if defendant had not interfered with plaintiff's business expectancy, less cost of securing that revenue; thus, expenses saved because of wrongful act of defendant must be subtracted from any recovery.

[23] Damages ⇐ 208(1)
115k208(1) Most Cited Cases
Evidence of lost net profits of supplier of x-ray equipment presented question for jury on supplier's claim for alleged tortious interference with business relationship by manufacturer of x-ray equipment under Michigan law.

[24] Damages ⇐ 114
115k114 Most Cited Cases
In calculating its but-for condition to prove lost profits resulting from tortious interference with a business relationship, plaintiff must deduct any costs that it avoided as result of being illegally excluded for profitable opportunity, but it need not deduct all costs incurred in association with that revenue, such as fixed costs.

[25] Evidence ⇐ 99
157k99 Most Cited Cases

[25] Federal Courts ⇐ 823
170Bk823 Most Cited Cases
District court has broad discretion in determining whether evidence is relevant, and appellate court may only reverse ruling if district court has abused its discretion.

[26] Federal Courts ⇐ 823
170Bk823 Most Cited Cases
Trial court's discretion is not disturbed on appeal if reviewing court is able to say that ruling excluding the evidence, even if erroneous, did not result in substantial injustice.

[27] Evidence ⇐ 143
157k143 Most Cited Cases
Even if district court believes evidence is insufficient to prove ultimate
point for which it is offered, court may not exclude evidence if it has slightest probative worth.

[28] Federal Courts ⇐ 901.1
170Bk901.1 Most Cited Cases
District court's error, misconstruing its prior ruling in excluding plaintiff's evidence of lost parts sales, precluded plaintiff from adequately presenting its evidence of damages and resulted in substantial injustice; prior ruling excluded only particular exhibit summarizing evidence, not all evidence on issue.
*464 Neill T. Peters (argued and briefed), Metamora, MI, for Plaintiff-Appellant.

Ronald S. Katz (argued and briefed), Barbara E. Biagas, Paul S. Schmidtberger, Coudert Brothers, San Francisco, CA, Rodger D. Young, Young & Associates, Southfield, MI, for Defendant-Appellee.

Before ENGEL, MILBURN, and NORRIS, Circuit Judges.

ENGEL, Circuit Judge.

Plaintiff-Appellant DXS, Inc. ("DXS") appeals the district court's orders granting summary judgment against DXS on its antitrust claims, granting judgment as a matter of law against DXS on its claims for tortious interference, and declining to admit DXS's evidence of lost parts sales. At issue is whether (1) DXS's antitrust claims were time-barred; (2) DXS adduced evidence sufficient to sustain its tortious interference claims; and (3) DXS's evidence of lost parts sales should have been admitted. We affirm in part and reverse in part.

*465 FACTS
Siemens Medical Systems, Inc. ("Siemens"), a foreign corporation, manufactures and sells x-ray equipment. Siemens also services that equipment under both its warranty and post-warranty service

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462  
(Cite as: 100 F.3d 462, *465)

Page 4

contracts. DXS, a Michigan corporation, is an independent service organization that services medical equipment, including Siemens's x-ray equipment.

In 1975, DXS's predecessor in interest, Flint X-Ray, Inc. ("Flint X-Ray"), signed a contract to act as an authorized sales and warranty service agent for Siemens in the lower peninsula of Michigan. [FN1] Siemens lawfully terminated that relationship in December 1985. Thereafter, Siemens sold and serviced its own equipment, and Siemens and DXS competed in servicing Siemens's equipment.

> FN1. DXS is a wholly owned subsidiary of Flint X-Ray. Flint X-Ray assigned its maintenance business to DXS in April 1986. The company was also known for a time as Diagnostic X-Ray Services, but changed its name to DXS, Inc. in 1989. For purposes of this appeal, the company is referred to as DXS.

On October 1, 1986, Siemens adopted a series of policies regarding its maintenance services. Those policies were sampled in a few districts, including Michigan, and distributed to local field offices for inclusion in Siemens's office manuals. On January 12, 1987, Siemens notified DXS of the policies by registered letter (the "Notification").

Specifically, Siemens informed DXS that Siemens would no longer service equipment previously serviced by an unauthorized third party without first conducting a safety and inspection check. Siemens also informed DXS that it would not provide a warranty on equipment that was not sold by Siemens or by an authorized dealership. Finally, Siemens informed DXS that Siemens would sell replacement parts only to authorized dealers or directly to Siemens's customers.

According to Siemens, these three policies were well justified. The policy on safety checks was designed to ensure that equipment was installed and serviced in compliance with Siemens's high standards of quality. The policies on parts and warranties were designed to reduce Siemens's liability for improper installation by others.

According to DXS, on the other hand, Siemens adopted these policies with the intent to diminish DXS's ability to compete for the maintenance service business of Siemens's medical equipment. The obvious impact of the policies, DXS says and the court below found, was to diminish or eliminate DXS's ability to service Siemens's medical x-ray equipment.

The Notification indicated that the sales and service policies were effective immediately. However, because DXS had been permitted to purchase Siemens's replacement parts up to that time, the Notification provided that the policy of not selling spare parts to DXS would not be effective until April 13, 1987.

DXS did not contact Siemens about the change in policy. Nor did it attempt to purchase any parts from Siemens after January 12, 1987. Instead, DXS developed alternative sources for Siemens's parts and continued to offer maintenance service and to repair parts for Siemens's medical x-ray equipment in competition with Siemens.

Other than notifying DXS of its new policies, Siemens took no action to implement the new policies. Instead, it continued to sell parts to third parties and to warranty equipment installed by third parties. In February 1987, Siemens decided not to enforce the new policies as written. It opted instead to continue business as usual.

In 1988, Siemens made representations to hospitals that were customers of DXS, including Diagnostic Radiology Associates ("DRA") and St. Luke's Hospital ("St. Luke's"), regarding Siemens's warranties. According to DXS, Siemens misrepresented its warranties to DRA and St. Luke's to the detriment of DXS. DXS claims that Siemens made similar misrepresentations to Saginaw General Hospital ("Saginaw"), also a customer of DXS, in 1988 or 1989. Siemens contends that it did not misrepresent its warranties to these hospitals and that any representations it made to Saginaw occurred in 1986, not in 1988 or 1989.

*466 On April 12, 1991--more than four years after the Notification--DXS filed suit against Siemens alleging (1) monopolization in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) tying in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (3) violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.772-.773; (4) tortious interference with contractual and business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462  
(Cite as: 100 F.3d 462, *466)

Page 5

relationships; and (5) conspiracy. DXS voluntarily dismissed the conspiracy claim at the First Case Management Conference on July 18, 1991. On April 30, 1992, DXS amended its complaint to add a claim for fraud.

Siemens moved for summary judgment on the antitrust claims on grounds that they were untimely filed. On the recommendation of a magistrate judge, the district court granted the motion and dismissed DXS's antitrust claims. Siemens later moved for summary judgment on DXS's fraud and tortious interference claims. The district court dismissed DXS's fraud claims in their entirety and DXS's tortious interference claims as to six of the nine customer hospitals originally at issue. The court left pending claims of tortious interference relating to DRA, St. Luke's, and Saginaw, which proceeded to trial commencing on April 18, 1994.

On the fourth day of trial, Siemens moved for a mistrial on grounds that DXS had violated the court's pretrial rulings on Siemens's motions in limine. The court granted Siemens's motion and began a new trial on April 24, 1994. At the close of DXS's case at the second trial, Siemens moved for judgment as a matter of law. The court granted the motion as to all of DXS's claims, dismissing the action (with prejudice).

The court first dismissed DXS's tortious interference claims as to DRA and St. Luke's on grounds that DXS had failed to prove that Siemens misrepresented its warranties to the hospitals and that, even if it had, those misrepresentations were not a causative factor in severing the relationship between DXS and its customers. Next, the court dismissed the claim as to Saginaw on grounds that DXS failed to carry its burden to show that the alleged misrepresentations occurred within the period of the statute of limitations. Finally, the Court dismissed DXS's tortious interference claims as to all three hospitals on grounds that DXS had failed to produce adequate evidence of damages. [FN2] DXS timely appealed.

FN2 The court granted judgment as a matter of law on DXS's disparagement claim as it related to Saginaw on two grounds. The court reasoned "that there his [sic] no evidence that any statements were made which would constitute disparagement" and that "there's no evidence whatsoever that any decision was made based on those statements."

## DISCUSSION

### I

DXS first claims that the district court erred in granting summary judgment against DXS on its antitrust claims. According to DXS, the court erred because (1) "the notice of an impending but unimplemented policy of a refusal to deal and tying of parts and services not resulting in concurrent competitive damage does not accrue an anti-trust cause of action," and (2) "the series of overt acts by Siemens resulting in the actual successive loss of DXS's customers constitutes continuing anti-trust violations within the statutory period."

We review a district court's grant of summary judgment de novo. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 250 (6th Cir.1994). When reviewing a motion for summary judgment, all facts and any inferences that may be permissibly drawn from those facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)).

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *LaPointe v. United Autoworkers, Local 600*, 8 F.3d 376, 378 (6th Cir.1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an *467 otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if, under the governing law, its resolution might affect the action's outcome. *Id.* at 248, 106 S.Ct at 2510. A factual dispute is "genuine" if a reasonable factfinder could return a verdict for the nonmoving party. *Id.*

The statute of limitations for federal antitrust actions is four years from the date of the accrual of the action. 15 U.S.C. § 15b. The statute of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462 Page 6
(Cite as: 100 F.3d 462, *467)

limitations for actions to recover damages under the Michigan Antitrust Reform Act is also four years. Mich. Comp. Laws § 445.781.

[1] An antitrust cause of action accrues and the limitation period commences each time a defendant commits an act that injures the plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). "For statute of limitations purposes, ... the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir.1990) (per curiam).

[2][3] A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded. *Id.* at 849 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir.1987)). "When a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants." *Barnosky Oils, Inc. v. Union Oil Co. of California*, 665 F.2d 74, 81 (6th Cir.1981). " '[E]ven when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.' " *Peck*, 894 F.2d at 849 (quoting *Pace Industries*, 813 F.2d at 237).

The district court held that DXS's antitrust claims accrued from the date of the Notification, when Siemens notified DXS of Siemens's new policies on January 12, 1987, more than four years before DXS filed its complaint. According to the court, the date of the Notification was the accrual date for the antitrust causes of action, because the Notification was the act that injured DXS. The court rejected DXS's claim that Siemens's subsequent statements to DRA, St. Luke's, and Saginaw constituted a continuing antitrust violation. The court reasoned that the Notification was Siemens's only overt act and that subsequently DXS felt only the effects of that act. According to the court, DXS suffered no new or additional injury from Siemens's statements to DRA, St. Luke's, and Saginaw.

[4] We agree with DXS that the district court erred in granting summary judgment against it on grounds that its antitrust claims were time-barred. In our view, Siemens's statements to DRA, St. Luke's, and Saginaw constituted a continuing antitrust violation. Because we find a continuing antitrust violation, we need not decide whether the act of Notification itself gave rise to a cause of action. [FN3]

FN3. A court usually looks first to determine whether the first chronological act alleged gives rise to an antitrust violation. Once it is determined whether an antitrust violation accrues from that act, a court may more readily assess whether subsequent acts constitute new and independent acts that inflict new and accumulating injury on the plaintiff (and thus constitute a continuing antitrust violation), or acts that merely reaffirm the initial act (and thus do not represent a continuing antitrust violation). However, where, as here, the first chronological act is not final, it may not be said to control the acts that follow, and a court may simply analyze whether a continuing antitrust violation accrues from those acts without determining whether the first chronological act itself gives rise to an antitrust violation.

[5][6] An overt act that restarts the statute of limitations is characterized by two elements: (1) it must "be a new and independent act that is not merely a reaffirmation of a previous act"; and (2) it must "inflict new and accumulating injury on the plaintiff." *Pace Industries*, 813 F.2d at 238. Acts that simply reflect or implement a prior refusal to deal, *Garelick v. Goerlich's, Inc.*, 323 F.2d 854, 856 (6th Cir.1963), or acts that are merely "unabated inertial consequences" (of a single act), *Barnosky Oils*, 665 F.2d at 82 (quoting *468 Poster Exchange, Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)); *cf. Peck*, 894 F.2d at 849 (holding that conduct causing injuries that have a rippling effect into the future does not constitute a continuing violation), do not restart the statute of limitations.

If, as the district court assumed, Siemens had implemented its new policies from the date of the Notification, then the court might have been correct in concluding that Siemens's statements were merely effects of the Notification that caused no new injury to DXS. If the Notification had been a final statement of Siemens's policy, then its subsequent statements to DRA, St. Luke's, and Saginaw would probably have represented mere reaffirmations of the policy and inflicted no new and accumulating injury on DXS.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462  
(Cite as: 100 F.3d 462, *468)

Page 7

However, viewed in the light most favorable to DXS, the record reflects that Siemens did not immediately implement the policies announced in the Notification. On the contrary, it decided not to enforce any of the new policies as written and to continue business as usual.

Inasmuch as the policies announced in the Notification were not enforced, Siemens's statements to DRA, St. Luke's, and Saginaw cannot be said to be compelled by the Notification. *LaSalvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1117-18 (9th Cir.1986) (placing on defendants the burden of showing that their initial refusal to deal was in fact final and that the finality of the refusal was conveyed to the plaintiff), cert. denied, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987). Nor can they be said to be merely "unabated inertial consequences" of the Notification. *Barnosky Oils*, 665 F.2d at 82 (quoting *Poster Exchange*, 517 F.2d at 128). The Notification was abated. Because Siemens did not implement the policies announced in the Notification, its statements to DRA, St. Luke's, and Saginaw were new and independent acts that inflicted new and accumulating injury on DXS, not merely reaffirmations of the Notification. *Kaw Valley Elec. Coop. Co. v. Kansas Elec Power Coop., Inc.*, 872 F.2d 931, 934 (10th Cir.1989).

It is this circumstance which compels us to hold that the district court erred in finding that Siemens's statements to DRA, St. Luke's, and Saginaw did not constitute a continuing antitrust violation and in granting summary judgement in favor of Siemens. The decision of the district court on these claims is reversed.

II

Next, DXS claims that the district court erred in granting judgment as a matter of law against DXS on its tortious interference claims regarding DRA, St. Luke's, and Saginaw. The thrust of DXS's argument is that the court erred because DXS did adduce evidence sufficient to make out its claims against Siemens as to each of these hospitals.

[7] In this Circuit, a federal court sitting in diversity must apply the standard for judgments as a matter of law of the state whose substantive law governs. [FN4] *Brooks v. American Broadcasting Co.*, 999 F.2d 167, 170 (6th Cir.), cert. denied, 510 U.S. 1015, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993); *Arms v. State Farm Fire & Casualty Co.*, 731 F.2d 1245, 1248 (6th Cir.1984). As the parties acknowledge, Michigan law controls.

FN4. Pursuant to the 1991 Amendment to Federal Rule of Civil Procedure 50(a), a motion for directed verdict is now referred to as a motion for judgment as a matter of law.

[8] Under Michigan law, all evidence and legitimate inferences that may be drawn from that evidence must be viewed in the light most favorable to the nonmoving party. *Feaheny v. Caldwell*, 175 Mich.App. 291, 437 N.W.2d 358, 361 (1989). If that evidence is insufficient to establish a prima facie case against the defendant, a motion for judgment as a matter of law should be granted, because "reasonable persons would agree that there is an essential failure of proof." *Johnson v. Honeywell Info. Sys., Inc.*, 955 F.2d 409, 415 (6th Cir.1992).

[9] The standard of review of a judgment as a matter of law is abuse of discretion. *Howard v. Canteen Corp.*, 192 Mich.App. 427, 481 N.W.2d 718, 721-22 (1991) (per curiam). While that standard generally contemplates *469 deferential review, see, e.g., *Poet v. Traverse City Osteopathic Hosp.*, 433 Mich. 228, 445 N.W.2d 115, 126 (1989) (quoting *Spalding v. Spalding*, 355 Mich. 382, 94 N.W.2d 810 (1959)), in the context and posture of this case, it requires that we examine whether, viewing the trial testimony and all legitimate inferences that may be drawn in the light most favorable to DXS, it adduced evidence sufficient to establish a prima facie case of tortious interference against Siemens. *Mulholland v. DEC Int'l Corp*, 432 Mich. 395, 443 N.W.2d 340, 349 (1989); see *Charles L. Bowman & Co. v. Erwin*, 468 F.2d 1293, 1294-96 (5th Cir.1972) (applying Michigan law).

[10] To establish a prima facie case of tortious interference with a business relationship, a plaintiff must show (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional or improper interference with the relationship that induces or causes a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462  
(Cite as: 100 F.3d 462, *469)

Page 8

disrupted. *Michigan Podiatric Medical Ass'n v. Nat'l Foot Care Program, Inc.*, 175 Mich.App 723, 438 N.W.2d 349, 354 (1989); *Trepel v Pontiac Osteopathic Hosp.*, 135 Mich.App. 361, 354 N.W.2d 341, 346 (1984).

A

At trial, DXS claimed that Siemens interfered with its business expectancy with DRA and St. Luke's by misrepresenting to them the terms of its warranties on x-ray tubes. [FN5] Specifically, DXS claimed that Siemens falsely informed DRA and St. Luke's that they would have no warranty against manufacturing defects if DXS installed Siemens's x-ray tubes.

> FN5. DXS also alleged that Siemens interfered with DXS's relationship with St. Luke's by refusing to sell DXS parts necessary for the service of equipment at St. Luke's. However, at trial DXS presented no evidence as to this claim. The district court granted Siemens judgment as a matter of law on the claim, and DXS does not raise it on appeal.

Only two sections of the applicable warranty are at issue, sections 10.1 and 10.2. Section 10.1 of Siemens's warranty offered a standard manufacturer's warranty against defects in materials and workmanship. [FN6] Section 10.2 provided that Siemens's warranties were void in the event a part was modified, altered, or repaired by anyone other than Siemens or an authorized agent of Siemens. [FN7] As Siemens interpreted these provisions, if an x-ray tube were installed by a party other than Siemens or its authorized agent, Siemens provided a manufacturer's warranty for parts and workmanship for the tube, but did not warrant the proper installation of the x-ray tube. [FN8] (J.A. at 723, 726.)

> FN6. The relevant portion of section 10.1 provides that
> Siemens warrants that the products sold hereunder shall be free from defects in material or workmanship under normal use and service for the period set forth in the attached or accompanying Siemens Warranty covering the applicable product category....

> FN7. Section 10.2 provides, in pertinent part, as follows:
> No warranty extended by Siemens shall apply to any products which have been modified, altered, or repaired by persons other than those authorized or approved by Siemens or to products sold as used

> FN8. This warranty was in effect from January 1985 to July 1989 and was printed on the back of Siemens's invoices. In July 1989, the warranty was changed to render the manufacturer's warranty against defects in parts and services nonexistent unless the part was installed by Siemens. In May 1990, the warranty was changed back to the essential terms of the 1985 warranty.

In support of its claim that Siemens misrepresented its warranties to DRA and St. Luke's, DXS relied primarily on the testimony of Sharlene Thrall, a chief technologist at DRA, Daniel Staszak, Siemens's district service manager, and Robert Kin, the administrative director of radiology at St. Luke's.

Thrall testified that in April 1988, she contacted Siemens about replacing an x-ray tube and inquired about applicable warranties for the tube. Thrall was informed "[t]hat in order for [Siemens] to provide a warranty on a tube, Siemens had to install it." (J.A. at 636.) Thrall further testified that she understood that if Siemens installed the tube, the warranty she would receive would insure *470 "[t]hat the tube would be free from defects. That it would function." (*Id.* at 637.)

Based on this conversation, Thrall testified, she arranged for Siemens to install a tube at DRA. On two subsequent occasions, Thrall also ordered tubes from Siemens based on her April 1988 conversation with Siemens. On cross-examination, Thrall stated that she did not discuss the differences between sections 10.1 and 10.2 of the warranty policy during her conversation with Siemens. She also indicated, however, that in purchasing an x-ray tube, she wanted to obtain the broadest possible coverage in the event that the tube failed.

In June 1988, Staszak told Kin that "he would not have a warranty for the tube if someone other than Siemens installed it." (J.A. at 709.) "[I]f we installed it, he had a warranty. If someone else installed it, he did not," Staszak said. (*Id.*) According to Kin, Staszak led him to believe that Siemens would not provide a warranty against defects in the materials and workmanship of the x-



100 F.3d 462  
(Cite as: 100 F.3d 462, *470)

Page 9

ray tube, unless Siemens installed the tube.

Following Kin's conversation with Staszak, Kin testified, he requested that Siemens install the x-ray tube at St. Luke's. However, Kin further testified that he would have requested Siemens to install the x-ray tube even if he had believed that Siemens's warranty policy excluded only a warranty for the installation of the x-ray tube.

As noted above, the district court entered judgment as a matter of law against DXS on its claims as to DRA and St. Luke's on grounds that DXS's evidence had not established that Siemens misrepresented its warranty policies to DRA or St Luke's and that even if it had, DXS's evidence had not established that the alleged misrepresentations caused injury to DXS The court declined to find any misrepresentation, because it found that Siemens's statements about its warranties were merely general statements in response to general questions and because Siemens provided the hospitals written documentation of its warranties. The court found that DXS's evidence as to causation was insufficient, because Thrall and Kin testified that they wanted the broadest possible warranty, which would have included a warranty for installation as well as a manufacturer's warranty.

[11] We cannot agree with the district court that DXS failed to meet its burden to show that Siemens misrepresented its warranties to DRA and St. Luke's. However, we agree with the district court that DXS failed to carry its burden to show that the alleged misrepresentations caused it injury.

[12] While the general nature of Siemens's representations about its warranties and the fact that it provided DRA and St. Luke's with written documentation about the warranties may yield some support for Siemens's position, they do not foreclose a finding of misrepresentation. Neither the general character of a representation nor the written documentation that accompany it necessarily precludes a representation from being misleading. In our view, a reasonable jury could conclude that Siemens's statements to DRA and St. Luke's misrepresented its warranties. By its own interpretation, Siemens's warranties provided a manufacturing warranty against defects in material or workmanship regardless of who installed the tube. Yet, as discussed above, Siemens's statements to DRA and St. Luke's represent otherwise.

Although we find adequate evidence that Siemens misrepresented its warranties, the evidence is altogether lacking that these misrepresentations caused injury to DXS. Both Kin and Thrall testified that they wanted the broadest possible warranty for the tubes they purchased. Kin stated that "if--if DXS came in and installed the tube and the warranty excluded installation by DXS, that that would be enough for [him] to turn to Siemens to bring in--to bring in Siemens to install the tube." (J A. at 689-90.) Although expressed in more general terms, Thrall offered testimony to the same effect; she stated that she "wanted to obtain the most possible coverage [she] could in case of a failure for [her] tube." [FN9] (*Id.* at 646.) There is no dispute *471 that the broadest possible warranty was available from Siemens but not from DXS. The conclusion is inescapable that even if Siemens had not misrepresented its warranties, DRA and St. Luke's would have contracted with Siemens instead of with DXS, because the broadest possible warranty was available only through Siemens. [FN10]

> FN9. It stands to reason that Thrall made this statement subject to commonsense limitations such as that DRA would not have paid an unlimited price for the broadest possible warranty. However, the burden fell to DXS as the plaintiff to bring out such limitations, as well as their applicability here, in order to make out its case and permit a reasonable jury to find that DRA would have purchased tubes from DXS without an installation warranty.

> FN10. Although the parties and the district court frame this issue as one of causation, it might alternatively be characterized as a question of damages, i.e., whether DXS failed to show that Siemens's misrepresentations caused DXS any damage, because even if Siemens had not misrepresented its warranty, DRA and St. Luke's would have purchased x-ray tubes from Siemens instead of from DXS.

Siemens was properly entitled to judgment as a matter of law as to DXS's tortious interference claims relating to DRA and St. Luke's, and the district court's decision on these claims is therefore affirmed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462  
(Cite as: 100 F.3d 462, *471)

Page 10

### B

Next, DXS claims that the district court erred in entering judgment as a matter of law against DXS on its claim of tortious inference as to Saginaw. DXS claimed at trial that Siemens interfered with its business expectancy with Saginaw by representing to Saginaw that DXS could no longer service Siemens's equipment because Siemens would no longer sell parts to DXS. [FN11] According to DXS, the court erred in finding that the alleged misrepresentations occurred outside the statutory period.

> FN11. DXS also alleged that Siemens interfered with DXS's relationship with St. Luke's by disparaging DXS's service work. However, at trial DXS failed to present evidence of untrue statements by Siemens or of causation on DXS's disparagement-based interference claim. The district court granted judgment as a matter of law on the claim in favor of Siemens, and DXS does not raise it on appeal.

[13] The statute of limitations for a claim of tortious interference with business relationships is three years. *See* Mich. Comp. Laws § 600.5805(8); *James v. Logee,* 150 Mich.App. 35, 388 N.W.2d 294, 295-96 (1986) (per curiam). The parties agree that to be within the statute of limitations, the alleged misrepresentations must have occurred on or after April 12, 1988.

[14] To prove its claim, DXS presented the testimony of Gilbert Decker, administrative director of radiology at Saginaw during the relevant period. Decker testified that he had two conversations with Staszak (of Siemens) within a three-week period in which Staszak told him that DXS could not service Siemens's equipment any longer because Siemens would no longer sell parts to DXS. [FN12] According to Decker, Saginaw began using Siemens to service its equipment shortly after the second conversation. Decker testified on direct examination that the conversations occurred in late 1988 or early 1989, within the three-year statute of limitations.

> FN12. In the first conversation, Staszak informed Decker that DXS's franchise for Siemens equipment had been terminated. In the second conversation, Staszak informed him that Siemens would not sell parts to DXS.

On cross-examination, counsel for Siemens reminded Decker that DXS's franchise for Siemens's equipment had been terminated in 1985 and asked him if this refreshed his recollection as to when his first conversation with Staszak, in which Staszak informed Decker of the termination of DXS's franchise, took place. Decker testified that he was not aware of the franchise termination in 1985 and reiterated that his conversations with Staszak took place in 1988 or 1989.

Counsel for Siemens then showed Decker a letter from Staszak to Decker dated February 24, 1986. Decker acknowledged that the letter showed that Staszak contacted Decker about Siemens's servicing its equipment in 1986. Decker then testified that, in light of the letter, his conversations with Staszak must have occurred in 1985 or 1986, outside the three-year statutory period. Subsequently, however, Decker restated that both conversations with Staszak occurred in 1988 or 1989.

*472 The district court held that DXS failed to present sufficient evidence that Siemens's alleged misconduct took place within the statutory period. The court acknowledged that Decker testified emphatically that his conversations with Staszak occurred in late 1988 or 1989. However, the court concluded that Decker was "not a very persuasive witness for the plaintiff" and that his testimony could not carry DXS's burden of proof to show that the conversations occurred within the statutory period. (J.A. at 991, 994.)

The district court indicated that although he was competent to testify, Decker "couldn't remember much of anything at all." (*Id.* at 991.) Although Decker "was quite emphatic that the believed his conversation with Mr. Staszak ... occurred in late 1988 or 1989," the court said,

> he also tied that event very specifically to his awareness of the termination of the agency agreement, which again he originally he placed it in 1988 but upon cross-examination acknowledged that he must have had conversations with Mr. Staszak about the termination of the agency agreement in 1986 because there was a 1986 proposed service contract which he did discuss with Mr. Staszak.
> Again, he didn't have any specific recollection of it but the document bears the date 1986 and clearly was for service on the CT. And just as he was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works



100 F.3d 462
(Cite as: 100 F.3d 462, *472)

Page 11

dogmatic about the conversation having occurred in 1988 or 1989 he was equally dogmatic about the fact that his second conversation with Mr. Staszak, that would have been the conversation which Mr. Staszak told him that Flint X-ray could not get parts to do the service work, occurred within three or four weeks of his awareness of the termination of the service contract. Which he acknowledged on cross-examination must have been sometime in 1986.

And faced with a witness who can't recall and who is unsure whether he learned of a termination in 1986 and therefore a subsequent conversation must have been within three weeks of that knowledge in 1986 or 1988 or '89, I am simply left with a case where the plaintiff has not established by a preponderance of the evidence that this claim accrued prior to the operative date, the statute of limitations date.
(J.A. 991-93.)

We agree with the district court that Decker was a difficult witness. We also agree with the court that the evidence as to when Decker's conversations with Staszak occurred is in conflict. However, we cannot agree that DXS failed to adduce enough evidence to permit a reasonable jury to find that the alleged misrepresentations occurred within the statutory period.

[15][16][17] Under Michigan law, whether a plaintiff presented sufficient evidence to show that a cause of action accrued within the statute of limitations is a question of law. [FN13] *See Meier v. Holt*, 347 Mich. 430, 80 N.W.2d 207, 212 (1956) (Dethmers, C.J., concurring); *Potts v. Potts (In re Potts' Estate)*, 304 Mich. 47, 7 N.W.2d 217 (1942). In addressing this question, a court should determine not "merely whether there is literally no evidence," but whether there is competent evidence showing, or from which a reasonable inference may be drawn, that the improper conduct occurred within the statute of limitations. *Meier*, 80 N.W.2d at 212.

FN13. The date of accrual of a cause of action for statute of limitations purposes is a question of fact for the jury. *Waltzer v. Transidyne Gen. Corp.*, 697 F.2d 130, 133 (6th Cir 1983); *Tumey v. City of Detroit*, 316 Mich. 400, 25 N.W.2d 571, 576 (1947)

Although it was not without internal conflict, in our view, Decker's testimony sufficed to make out DXS's claim. Arising, as the record suggests that it does, from nothing other than confusion incidental to a fading memory, [FN14] the conflict in Decker's testimony went more to the weight of his testimony than to its sufficiency. Decker was adamant that his conversation with Staszak occurred in 1988 or 1989. Viewing Decker's testimony in the light most favorable to DXS, we believe *473 that reasonable jurors could reach different conclusions about the date that the conversation took place. [FN15] *See Feaheny*, 437 N.W.2d at 362.

FN14. We have no reason to believe that as a witness Decker was in any way self-serving or untruthful. The district court was in the best position to observe Decker's demeanor, and nowhere in its opinion does the court indicate, or even hint that Decker was anything but confused.

FN15. In opposition to this conclusion, Siemens not only echoes the failings the trial court found in DXS's evidence, but also raises the additional arguments that DXS cannot prove causation on its parts-based inference claim as to Saginaw and that Decker was an incompetent witness. Both are without merit.

Accordingly, we hold that the district court erred in granting Siemens's motion for judgment as a matter of law on this claim on grounds that DXS failed to show that Siemens's misrepresentations occurred within the statutory period.

C

DXS also claims that the district court erred in granting judgment as a matter of law against DXS on its tortious interference claims on grounds that it failed to adduce adequate evidence of damages. According to DXS, the district court erred, because DXS's evidence of lost service revenue from a technical service staff, subject only to fixed costs, was sufficient to sustain its burden of proof as to damages.

To support the amount of damages claimed, DXS introduced into evidence Siemens's invoices for service performed by Siemens at DRA, St. Luke's, and Saginaw, which service DXS claims it would have performed but for Siemens's alleged improper conduct. Gordon Swapp, president of DXS,



100 F.3d 462                                                                 Page 12
(Cite as: 100 F.3d 462, *473)

analyzed each of Siemens's invoices, identifying the number of regular and overtime hours expended by Siemens personnel. Swapp then multiplied the number of hours on each invoice by the appropriate DXS service rate to arrive at the amount of revenue lost by DXS as a result of Siemens's performing the repair service.

Swapp further testified that DXS was entitled to the full amount of revenue because DXS had no incremental costs attributable to the performance of the repair work. He explained that all costs of establishing and maintaining DXS's technical service staff were fixed and thus were not affected by the quantity of work performed by its staff. Swapp testified that any incremental costs attributable to the service work, such as mileage expenses, were not included in his computation or DXS's damage claim.

The district court held that DXS failed to adequately prove damages because it had failed to submit evidence of net losses or net profits. The court reasoned that "[t]he jury is entitled to have proofs submitted of net numbers which take into account the variable costs, which the plaintiff would have had to incur...." (J.A. at 995.)

[18][19][20] Under Michigan law, "lost profits must be subject to a reasonable degree of certainty and cannot be based solely on conjecture and speculation." *Lorenz Supply Co. v. American Standard, Inc.*, 100 Mich.App. 600, 300 N.W.2d 335, 340 (1980) (per curiam), *aff'd*, 419 Mich. 610, 358 N.W.2d 845 (1984). Mathematical certainty is not required, but "the amount of profit lost [must] be shown with such reasonable degree of certainty as the situation permits." *Stimac v. Wissman*, 342 Mich. 20, 69 N.W.2d 151, 155 (1955). Any uncertainty about lost profits damages should be resolved against the defendant, who, as the wrongdoer, bears the risk of uncertainty. *Bonelli v. Volkswagen of America, Inc.*, 166 Mich.App. 483, 421 N.W.2d 213, 227 (1988) (citing *Lorenz*, 300 N.W.2d at 340).

[21] Damages for lost profits must be based on the loss of net profits rather than gross profits. *German v. Mathews*, 125 Mich.App. 245, 335 N.W.2d 671, 673 (1983); *Lawton v. Gorman Furniture Corp.*, 90 Mich.App. 258, 282 N.W.2d 797, 801 (1979). "Any other rule would obviously grant the offended litigant a greater sum than he would have earned had the breach not occurred." *Lawton*, 282 N.W.2d at 801.

[22] Where a plaintiff seeks recovery under a theory of tortious interference, net profits represent the amount a plaintiff would have received in revenue if the defendant had not interfered with the plaintiff's business expectancy, less the cost of securing that revenue. *Peter Bill & Assoc., Inc. v. Michigan Dep't of Natural Resources*, 93 Mich.App. 724, 287 N.W.2d 334, 338 (1979); *474 see Callender v. Myers Regulator Co.*, 250 Mich. 298, 230 N.W. 154, 155 (1930); 22 Am.Jur.2d *Damages* § 624 (1988). Thus, in computing net profits, the expenses saved because of the wrongful act of the defendant must be subtracted from any recovery. *Benfield v. H.K. Porter Co.*, 1 Mich.App. 543, 137 N.W.2d 273, 275 (1965); 22 Am.Jur.2d *Damages* § 642 (1988).

[23] To carry its burden of proof as to damages, then, DXS was required to present evidence of its lost net profits for the alleged interference. It was required to adduce evidence of the amount it would have received from DRA, St. Luke's, and Saginaw for servicing Siemens's equipment and the amount it would have expended to generate that revenue. Contrary to the conclusion of the district court, we find that DXS presented sufficient evidence of its lost profits, if by a narrow margin.

As discussed above, Swapp testified as to the adjusted gross revenue lost by DXS as a result of Siemens's performing the repair service. He then indicated both that DXS incurred no incremental costs attributable to the performance of the repair work and that any incremental costs attributable to the service work, such as mileage expenses, were not included in his computation or DXS's damage claim. Thus, in this case, DXS's adjusted gross profits were equivalent to either its net profits or its computation of net profits. At all events, DXS presented sufficient evidence of its lost net profits. Swapp's failure to invoke the term "net profits" is not fatal to DXS's claim.

In opposition to this conclusion, Siemens advances essentially three arguments. First, Siemens contends that Swapp's testimony that DXS had no variable or incremental costs is not clear. Next, Siemens disputes DXS's claim that it would not



100 F.3d 462
(Cite as: 100 F.3d 462, *474)

Page 13

have incurred variable costs attributable to repair work at DRA, St. Luke's, and Saginaw. Finally, and most notably, Siemens maintains that DXS's theory of damages is flawed.

Siemens's first and second objections are easily rejected. As discussed above, Swapp's testimony that DXS had no variable or incremental costs is not unclear. Tension inheres between Swapp's statement that DXS incurred no incremental costs attributable to the performance of the repair work and his statement that any incremental costs attributable to the service work were not included in his computation of DXS's damages claim. However, these statements make the basis of DXS's damages no less clear: at bottom incremental costs were not included in Swapp's computation of damages, either because DXS had none or, more likely, because Swapp properly omitted them. The district court did not perceive in this testimony a contradiction sufficient to render Swapp incredible, and judging these statements in view of Swapp's entire, unrebutted testimony, neither do we. Siemens' attack on DXS's claim that it would not have incurred variable costs attributable to repair work at DRA, St. Luke's, and Saginaw is similarly unpersuasive. The claim stood unrebutted at the close of DXS's case-in-chief.

Siemens's third argument requires more discussion, but is also without merit. While not altogether clear in its objection to DXS's theory of damages, Siemens's complaint appears to be that DXS's method of computation excludes fixed costs. Siemens appears to contend that DXS's evidence is not reflective of net profits, because DXS did not attribute any of its fixed costs to the production of the adjusted gross revenue lost by DXS as a result of Siemens's performing the repair service.

The flaw in this objection is easily exposed. The method that Siemens appears to advocate contemplates calculating net profits based on DXS's overall economic performance instead of on the basis of the transactions lost to Siemens. The damages available under this theory would not place DXS in as good a position as it would have been if the alleged tort had not occurred.

[24] In calculating its but-for condition, a plaintiff must deduct any costs that it avoided as a result of being illegally excluded for a profitable opportunity.

*Peter Bill*, 287 N.W.2d at 338. However, it need not deduct all costs incurred in association with that revenue, such as fixed costs.

Accordingly, the district court erred in granting judgment as a matter of law on *475 DXS's tortious interference claims on grounds that it failed to adduce adequate evidence of damages. For this reason, and because, as discussed above, the court erred in concluding that DXS failed to show that the alleged misrepresentations occurred within the statutory period, the court's decision as to Saginaw is reversed.

III

Finally, DXS claims that the district court erred in declining to admit evidence of its profit on lost parts sales. According to DXS, one of the measures of the damages that it suffered was the loss of the markup on the sale of repair parts to DRA, St. Luke's, and Saginaw. If this evidence had been admitted, DXS claims, the district court may not have "directed out" DXS's damage count. DXS maintains that the court excluded this evidence because it misunderstood the evidence.

Siemens answers that DXS was not precluded from introducing evidence of its profit on lost parts sales. Siemens represents that DXS was merely precluded from offering prepared summaries of its damages that differed from the damages submitted in the Joint Pre-Trial Statement. According to Siemens, the court did not misunderstand DXS's theory of damages, but excluded its summary because it differed from the damages listed on the Joint Pre-Trial Statement and because its admission would have been prejudicial to Siemens. Siemens further contends that the court's ruling was proper because DXS's theory was nonsensical and without factual basis.

[25][26] A district court has "broad discretion in determining whether evidence is relevant, and [an appellate court] may only reverse the ruling if the district court has abused its discretion." *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir.1992). A trial court's discretion "is not disturbed on appeal if the reviewing court is able to say that the ruling excluding the evidence, even if erroneous, did not result in a substantial injustice...." *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1271 (6th Cir.1988).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



100 F.3d 462
(Cite as: 100 F.3d 462, *475)

Page 14

[27] This Court has explained that when determining whether evidence is relevant, the district court must not consider the weight or sufficiency of the evidence. *Douglass*, 956 F.2d at 1344. Thus, "[e]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth." *Id.*

At the first trial in this case, DXS attempted to introduce an exhibit that summarized Siemens's invoices to support its proof of damages. The summary listed the prices of parts charged incidental to service to DRA, St. Luke's, and Saginaw and included a column representing the lost markup for each part based on DXS's discount for that part. The district court excluded the summary on grounds that it was substantially different from the summary that DXS had attached to the final pre-trial order, which speaks to DXS's alleged markup. However, the court made plain that DXS could present evidence regarding its lost markup by presenting individually the invoices summarized in its exhibit. [FN16]

> FN16. The court stated:
> I am going to permit the plaintiff to use these invoices if they appear on the summary sheet. You may use them as separate exhibits.
> I am not commenting on their relevance or admissibility in the context in which they are presented. I'm just saying that I am not going to disallow them because they weren't attached to the final pretrial order, because you do indicate work orders and/or purchase orders of Saginaw General Hospital of which these are representative copies.
> (J.A. at 457-58.)

At the second trial, DXS referred to its theory of damages relating to the list markup of parts in its opening statement. Siemens objected and argued that the court had held in the first trial that all evidence relating to lost markup on parts was inadmissible. The court then excluded all evidence relating to this theory of damages. The court stated, "I'm still going to exclude, as I did in the first trial, the evidence of the thirty percent markup and any damages flowing from the markup on the sale of parts." (J.A. at 544.)

[28] Thus, the district court misconstrued its prior ruling in excluding DXS's evidence of lost parts sales. Contrary to its recollection (at the second trial) of the ruling, the *476 court's ruling at the first trial on lost parts sales did not exclude all evidence of lost parts sales. Rather, it allowed evidence of damages flowing from the markup of the sale of parts on a part-by-part basis and excluded an exhibit that summarized the lost markup from the sale of parts. Accordingly, the court erred in excluding DXS's evidence of its profit on lost parts sales.

Because this error precluded DXS from adequately presenting its evidence of damages, we find that the error resulted in substantial injustice. The court's decision on this point is reversed.

## CONCLUSION

For the reasons set out above, the decisions of the district court are affirmed in part and reversed in part. The decision of the district court granting summary judgment in favor of Siemens on DXS's antitrust claims is reversed. The decision of the court entering judgment as a matter of law on DXS's tortious interference claims is affirmed as to the claims regarding DRA and St. Luke's and reversed as to the claim regarding Saginaw. The decision of the court declining to admit evidence of DXS's profit on lost parts sales is reversed. The case is remanded for proceedings consistent with this opinion.

100 F.3d 462, 1996-2 Trade Cases P 71,623, 1996 Fed.App. 0362P

END OF DOCUMENT

