EXHIBIT 13

124 S.Ct. 2359                                                                                             Page 1
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448,
04 Cal. Daily Op. Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**
▷

Briefs and Other Related Documents

Supreme Court of the United States
F. HOFFMAN-LA ROCHE LTD. et al.,
Petitioners,
v.
EMPAGRAN S.A. et al.
No. 03-724.

Argued April 26, 2004.
Decided June 14, 2004.

Background: Antitrust class action was brought on behalf of foreign and domestic purchasers of vitamins, alleging international price-fixing conspiracy by manufacturers and distributors. The United States District Court for the District of Columbia, Thomas F. Hogan, J., 2001 WL 761360, dismissed suit as to foreign purchasers for lack of subject matter jurisdiction. On appeal, the United States Court of Appeals for the District of Columbia Circuit, Harry T. Edwards, Circuit Judge, 315 F.3d 338, reversed and remanded. Certiorari was granted.

Holdings: The Supreme Court, Justice Breyer, held that:
(1) Foreign Trade Antitrust Improvements Act (FTAIA) exclusionary rule was not limited only to conduct involving exports;
(2) where price-fixing conduct significantly and adversely affected customers both outside and within United States, but adverse foreign effect was independent of any adverse domestic effect, Foreign Trade Antitrust Improvements Act (FTAIA) domestic injury exception did not apply, and thus, neither did Sherman Act, to claim based solely on foreign effect; abrogating *Kruman v. Christie's Int'l PLC*, 284 F.3d 384; and
(3) on remand, Court of Appeals could consider whether foreign purchasers properly preserved their alternative argument that foreign injury was not in fact independent of domestic effects and, if so, could consider and decide related claim.
Vacated and remanded.

Justice Scalia filed opinion concurring in judgment in which Justice Thomas joined.

Justice O'Connor did not participate.

West Headnotes

[1] Antitrust and Trade Regulation ⬌ 945
29Tk945 Most Cited Cases
   (Formerly 265k12(7))
The Foreign Trade Antitrust Improvements Act (FTAIA) general exclusionary rule does not apply only to conduct involving American exports and includes commerce that is wholly foreign. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

[2] Antitrust and Trade Regulation ⬌ 945
29Tk945 Most Cited Cases
   (Formerly 265k12(7))
Where price-fixing conduct significantly and adversely affects customers both outside and within United States, but adverse foreign effect is independent of any adverse domestic effect, Foreign Trade Antitrust Improvements Act (FTAIA) domestic injury exception does not apply, and thus, neither does Sherman Act, to claim based solely on foreign effect; abrogating *Kruman v. Christie's Int'l PLC*, 284 F.3d 384. Sherman Act, §§ 1 et seq., 7, as amended, 15 U.S.C.A. §§ 1 et seq., 6a.

[3] International Law ⬌ 10.1
221k10.1 Most Cited Cases
Supreme Court ordinarily construes ambiguous statutes to avoid unreasonable interference with sovereign authority of other nations.

[4] International Law ⬌ 10.1
221k10.1 Most Cited Cases
Rule of statutory construction derived from principle of "prescriptive comity" cautions courts to assume that legislators take account of legitimate sovereign interests of other nations when they write American laws and thereby helps potentially conflicting laws of different nations work together in harmony.

[5] Antitrust and Trade Regulation ⬌ 945
29Tk945 Most Cited Cases
   (Formerly 265k12(7))
Application of United States antitrust laws to foreign anticompetitive conduct is reasonable and consistent with principles of prescriptive comity insofar as they reflect legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359 \
(Cite as: 542 U.S. 155, 124 S.Ct. 2359)

Page    2

**[6] Antitrust and Trade Regulation** ⟶ 945 \
29Tk945 Most Cited Cases \
    (Formerly 265k12(7)) \
Language and history of Foreign Trade Antitrust Improvements Act (FTAIA) suggest that Congress designed FTAIA to clarify, perhaps to limit, but not to expand in any significant way, Sherman Act's scope as applied to foreign commerce. Sherman Act, §§ 1 et seq., 7, as amended, 15 U.S.C.A. §§ 1 et seq., 6a.

**[7] Antitrust and Trade Regulation** ⟶ 960 \
29Tk960 Most Cited Cases \
    (Formerly 265k28(1.6)) \
Unlike private antitrust plaintiff, government plaintiff must seek to obtain relief necessary to protect public from further anticompetitive conduct and to redress anticompetitive harm and has legal authority broad enough to allow it to carry out this mission. Clayton Act, § 15, 15 U.S.C.A. § 25.

**[8] Federal Courts** ⟶ 462 \
170Bk462 Most Cited Cases \
On remand following vacatur by United States Supreme Court of decision reversing district court's dismissal, for lack of subject matter jurisdiction, of antitrust price-fixing conspiracy class action against vitamin manufacturers and distributors brought on behalf of foreign purchasers, Court of Appeals for Ninth Circuit could consider whether foreign purchasers properly preserved their alternative argument that foreign injury was not in fact independent of domestic effects and, if so, could consider and decide related claim. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a.

**\*\*2360 \*155** *llabus* [FN\*]

   FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA or Act) provides that the Sherman Act "shall not apply to conduct involving trade or commerce .... with foreign nations," 15 U.S.C. § 6a, but creates exceptions for conduct that significantly harms imports, domestic commerce, or American exporters. In this case, vitamin purchasers filed a class action alleging that vitamin manufacturers and distributors had engaged in a price-fixing conspiracy, raising vitamin prices in the United States and foreign countries, in violation of the Sherman and Clayton Acts. As relevant here, defendants (petitioners) moved to dismiss the suit as to the *foreign* purchasers (respondents), foreign companies located abroad, who had purchased vitamins only outside United States commerce. **\*\*2361** In dismissing respondents' claims, the District Court applied the FTAIA and found none of its exceptions applicable. The Court of Appeals reversed, concluding that the FTAIA's exclusionary rule applied, but so did its exception for conduct that has a "direct, substantial and reasonably foreseeable effect" on domestic commerce that "gives rise to a [Sherman Act] claim," §§ 6a(1)(A), (2). Assuming that the foreign effect, *i.e.*, higher foreign prices, was independent of the domestic effect, *i.e.*, higher domestic prices, the court nonetheless concluded that the Act's text, legislative history, and policy goal of deterring harmful price-fixing activity made the lack of connection between the two effects inconsequential.

*Held:* Where the price-fixing conduct significantly and adversely affects both customers outside and within the United States, but the adverse foreign effect is independent of any adverse domestic effect, the FTAIA exception does not apply, and thus, neither does the Sherman Act, to a claim based solely on the foreign effect. Pp. 2364-2372.

(a) Respondents' threshold argument that the transactions fall outside the FTAIA because its general exclusionary rule applies only to conduct involving exports is rejected. The House Judiciary Committee changed the bill's original language from "export trade or export commerce," H.R. 5235, to "trade or commerce (other than import trade or import commerce)" deliberately to include commerce that did not involve American exports but was wholly foreign. Pp. 2365-2366.

**\*156** (b) The FTAIA exception does not apply here for two reasons. *First,* this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with other nations' sovereign authority. This rule of construction reflects customary international law principles and cautions courts to assume that legislators take account of other nations' legitimate sovereign interests when writing American laws. It thereby helps the potentially conflicting laws of different nations work together



124 S.Ct. 2359                                                                                          Page 3
(Cite as: 542 U.S. 155, *156, 124 S.Ct. 2359, **2361)

in harmony. While applying America's antitrust laws to foreign conduct can interfere with a foreign nation's ability to regulate its own commercial affairs, courts have long held such application nonetheless reasonable, and hence consistent with prescriptive comity principles, insofar as the laws reflect a legislative effort to redress domestic antitrust injury caused by foreign anticompetitive conduct. However, it is not reasonable to apply American laws to foreign conduct insofar as that conduct causes independent foreign harm that alone gives rise to a plaintiff's claim. The risk of interference is the same, but the justification for the interference seems insubstantial. While some of the anticompetitive conduct alleged here took place in America, the higher foreign prices are not the consequence of any domestic anticompetitive conduct sought to be forbidden by Congress, which rather wanted to release domestic (and foreign) anticompetitive conduct from Sherman Act constraint when that conduct causes foreign harm. Contrary to respondents' claim, the comity concerns remain real as other nations have not in all areas adopted antitrust laws similar to this country's and, in any event, disagree dramatically about appropriate remedies. Respondents' alternative argument that case-by-case comity analysis is preferable to an across the board exclusion of foreign injury cases is too complex to prove workable. *Second*, the FTAIA's language and history suggest that Congress designed the Act to clarify, perhaps to limit, but not to expand, the Sherman Act's scope as applied to foreign commerce. There is no significant indication that at the time Congress wrote the FTAIA courts would have thought the **2362 Sherman Act applicable in these circumstances, nor do the six cases on which respondents rely warrant a different conclusion. Pp. 2365-2371.

(c) Respondents' additional linguistic arguments might show a natural reading of the statute, but the comity and history considerations previously discussed make clear that respondents' reading is not consistent with the FTAIA's basic intent. Their deterrence-based policy argument is also unavailing in light of the contrary arguments by the antitrust enforcement agencies. Pp. 2371-2372.

(d) On remand, the Court of Appeals may consider whether respondents properly preserved their alternative argument that the foreign *157 injury here was not in fact independent of the domestic effects; and, if so, it may consider and decide the related claim. P. 2372.

315 F.3d 338, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, post, p. 2373. O'CONNOR, J., took no part in the consideration or decision of the case.

Stephen M. Shapiro, Chicago, IL, for petitioners.

R. Hewitt Pate, for the United States as amicus curiae, by special leave of the Court.

Thomas C. Goldstein, Washington, D.C., for respondents.

Stephen M. Shapiro, Tyrone C. Fahner, Andrew S. Marovitz, Jeffrey W. Sarles, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, Arthur F. Golden, Counsel of Record, Lawrence Portnoy, Charles S. Duggan, William J. Fenrich, Davis, Polk & Wardwell, New York, NY, John M. Majoras, Daniel H. Bromberg, Washington, DC, Kenneth Prince, Stephen Fishbein, Richard Schwed, Shearman & Sterling LLP, New York, NY, Lawrence Byrne, Joseph P. Armao, White & Case LLP, New York, NY, Robert Pitofsky, Bruce L. Montgomery, Franklin R. Liss, Arnold & Porter LLP, Washington, DC, D. Stuart Meiklejohn, Stacey R. Firedman, Sullivan & Cromwell LLP, New York, NY, Michael L. Denger, Miguel A. Estrada, Gibson, Dunn & Crutcher LLP, Washington, DC, Laurence T. Sorkin, Roy L. Regozin, Cahill, Gordon & Reindel LLP, New York, NY, Donald I. Baker, W. Todd Miller, Baker & Miller PLLC, Washington, DC, Alice G. Glass, Special Counsel, Baker & Miller PLLC, Lyme, NH, Donald C. Klawiter, Peter E. Halle, J. Clayton Everett, Jr. Morgan, Lewis & Bockius, LLP, Washington, DC, Paul P. Eyre, Ernest E. Vargo, Baker & Hostetler LLP, Cleveland, OH, James R. Weiss, Preston, Gates & Ellis LLP, Washington, DC, Jim J. Shoemake, Kurt S. Odenwald, Mary Ann Ohms, Guilfoil, Petzall & Shoemake, LLC, St. Louis, MO, Thomas M. Mueller, Michael O. Ware, Mayer, Brown, Rowe & Maw LLP, New York,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359                                                                                        Page 4
(Cite as: 542 U.S. 155, *157, 124 S.Ct. 2359, **2362)

NY, Aileen Meyer, Pillsbury Winthrop LLP, Washington, DC, Sutton Keany, Bryan Dunlap, Pillsbury Winthrop LLP, New York, NY, Gary W. Kubek, Debevoise & Plimpton, New York, NY, Kenneth W. Starr, Karen N. Walker, Kannon K. Shanmugam, Kirkland & Ellis LLP, Washington, DC, Moses Silverman, Aidan Synnott, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, Mark Riera Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA, Kevin R. Sullivan, Grace M. Rodriguez, Peter M. Todaro, King & Spalding LLP, Washington, DC, Jeffrey S. Cashdan, King & Spalding LLP, Atlanta, GA, William J. Kolasky, Edward DuMont Wilmer, Cutler & **2363 Pickering, Washington, DC, for Petitioners.

Michael D. Hausfeld, Paul T. Gallagher, Brian A. Ratner, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Thomas C. Goldstein, Counsel of Record, Amy Howe, Goldstein & Howe, P.C., Washington, DC, Michael H. Gottesman, Washington, DC, for respondents.

*158 Justice BREYER delivered the opinion of the Court.

The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA) excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations." 96 Stat. 1246, 15 U.S.C. § 6a. It then creates exceptions to the general rule, applicable where (roughly speaking) that conduct significantly harms imports, domestic commerce, or American exporters.

We here focus upon anticompetitive price-fixing activity that is in significant part foreign, that causes some domestic antitrust injury, and that independently causes separate foreign injury. We ask two questions about the price-fixing conduct and the foreign injury that it causes. First, does that conduct fall within the FTAIA's general rule excluding the Sherman Act's application? That is to say, does the price-fixing activity constitute "conduct involving trade or commerce ... with foreign nations"? We conclude that it does.

*159 Second, we ask whether the conduct nonetheless falls within a domestic-injury exception to the general rule, an exception that applies (and makes the Sherman Act nonetheless applicable) where the conduct (1) has a " direct, substantial, and reasonably foreseeable effect" on domestic commerce, and (2) "such effect gives rise to a [Sherman Act] claim." §§ 6a(1)(A), (2). We conclude that the exception does not apply where the plaintiff's claim rests solely on the independent foreign harm.

To clarify: The issue before us concerns (1) significant foreign anticompetitive conduct with (2) an adverse domestic effect and (3) an independent foreign effect giving rise to the claim. In more concrete terms, this case involves vitamin sellers around the world that agreed to fix prices, leading to higher vitamin prices in the United States and independently leading to higher vitamin prices in other countries such as Ecuador. We conclude that, in this scenario, a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm.

I

The plaintiffs in this case originally filed a class-action suit on behalf of foreign and domestic purchasers of vitamins under, *inter alia,* § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 1, and §§ 4 and 16 of the Clayton Act, 38 Stat. 731, 737, as amended, 15 U.S.C. §§ 15, 26. Their complaint alleged that petitioners, foreign and domestic vitamin manufacturers and distributors, had engaged in a price-fixing conspiracy, raising the price of vitamin products to customers in the United States and to customers in foreign countries.

As relevant here, petitioners moved to dismiss the suit as to the *foreign* purchasers (**2364 the respondents here), five foreign vitamin distributors located in Ukraine, Australia, Ecuador, and Panama, each of which bought vitamins from petitioners *160 for delivery outside the United States. No. Civ. 001686TFH, 2001 WL 761360, *4 (D.D.C., June 7, 2001) (describing the relevant transactions as "wholly foreign"). Respondents have never asserted that they purchased any vitamins in the United States or in transactions in United States commerce, and the question presented assumes that the relevant "transactions occurr[ed] entirely outside U.S. commerce, Pet. for Cert. (i)."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359  
(Cite as: 542 U.S. 155, *160, 124 S.Ct. 2359, **2364)

Page 5

The District Court dismissed their claims. 2001 WL 761360, at *4. It applied the FTAIA and found none of the exceptions applicable. *Id.*, at *3-*4. Thereafter, the *domestic* purchasers transferred their claims to another pending suit and did not take part in the subsequent appeal. 315 F.3d 338, 343 (C.A.D.C.2003).

A divided panel of the Court of Appeals reversed. 315 F.3d 338. The panel concluded that the FTAIA's general exclusionary rule applied to the case, but that its domestic-injury exception also applied. It basically read the plaintiffs' complaint to allege that the vitamin manufacturers' price-fixing conspiracy (1) had "a direct, substantial, and reasonably foreseeable effect" on ordinary domestic trade or commerce, *i.e.*, the conspiracy brought about higher domestic vitamin prices, and (2) "such effect" gave "rise to a [Sherman Act] claim," *i.e.*, an injured *domestic* customer could have brought a Sherman Act suit, 15 U.S.C. §§ 6a(1), (2). Those allegations, the court held, are sufficient to meet the exception's requirements. 315 F.3d, at 341.

The court assumed that the foreign effect, *i.e.*, higher prices in Ukraine, Panama, Australia, and Ecuador, was independent of the domestic effect, *i.e.*, higher domestic prices. *Ibid.* But it concluded that, in light of the FTAIA's text, legislative history, and the policy goal of deterring harmful price-fixing activity, this lack of connection does not matter. *Ibid.* The District of Columbia Circuit denied rehearing *en banc* by a 4-to-3 vote. App. to Pet. for Cert. 44a.

We granted certiorari to resolve a split among the Courts of Appeals about the exception's application. Compare *Den *161 Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 427 (C.A.5 2001) (exception does not apply where foreign injury independent of domestic harm), with *Kruman v. Christie's Int'l PLC,* 284 F.3d 384, 400 (C.A.2 2002) (exception does apply even where foreign injury independent); 315 F.3d, at 341 (similar).

II

The FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets. See H.R.Rep. No. 97-686, pp. 1-3, 9-10 (1982), U.S.Code Cong. & Admin.News 1982, 2487, 2487-2488, 2494-2495 (hereinafter House Report). It does so by removing from the Sherman Act's reach, (1) export activities and (2) other commercial activities taking place abroad, *unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States.

The FTAIA says:  
"Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--  
**2365 "(1) such conduct has a direct, substantial, and reasonably foreseeable effect--  
"(A) on trade or commerce which is not trade or commerce with foreign nations [*i.e.*, domestic trade or commerce], or on import trade or import commerce with foreign nations; or  
"(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States [*i.e.*, on an American export competitor]; and  
*162 (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.  
"If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States." 15 U.S.C. § 6a.

This technical language initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim." §§ 6a(1), (2).

We ask here how this language applies to price-fixing activity that is in significant part foreign, that has the requisite domestic effect, and that also has independent foreign effects giving rise to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



plaintiff's claim.

### III

[1] Respondents make a threshold argument. They say that the transactions here at issue fall outside the FTAIA because the FTAIA's general exclusionary rule applies only to conduct involving exports. The rule says that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) *with* foreign nations." § 6a (emphasis added). The word "with" means *between* the United States and foreign nations. And, they contend, commerce between the United States and foreign nations that is not import commerce must consist of export commerce--a kind of commerce irrelevant to the case at hand.

*163 The difficulty with respondents' argument is that the FTAIA originated in a bill that initially referred only to "export trade or export commerce." H.R. 5235, 97th Cong., 1st Sess., § 1 (1981). But the House Judiciary Committee subsequently changed that language to "trade or commerce (other than import trade or import commerce)." 15 U.S.C. § 6a. And it did so deliberately to include commerce that did not involve American exports but which was wholly foreign.

The House Report says in relevant part:
"The Subcommittee's 'export' commerce limitation appeared to make the amendments inapplicable to transactions that were neither import nor export, *i.e.*, transactions within, between, or among other nations .... *Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions*--that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor. The Committee Amendment therefore deletes references to 'export' trade, **2366 and substitutes phrases such as 'other than import' trade. *It is thus clear that wholly foreign transactions as well as export transactions are covered by the amendment,* but that import transactions are not." House Report 9-10, U.S. Code Cong. & Admin.News 1982, 2487, 2494-2495 (emphases added).

For those who find legislative history useful, the House Report's account should end the matter. Others, by considering carefully the amendment itself and the lack of any other plausible purpose, may reach the same conclusion, namely that the FTAIA's general rule applies where the anticompetitive conduct at issue is foreign.

### IV

[2] We turn now to the basic question presented, that of the exception's application. Because the underlying antitrust *164 action is complex, potentially raising questions not directly at issue here, we reemphasize that we base our decision upon the following: The price-fixing conduct significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect. In these circumstances, we find that the FTAIA exception does not apply (and thus the Sherman Act does not apply) for two main reasons.

[3] *First,* this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations. See, *e.g., McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20-22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (application of National Labor Relations Act to foreign-flag vessels); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382-383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (application of Jones Act in maritime case); *Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (same). This rule of construction reflects principles of customary international law--law that (we must assume) Congress ordinarily seeks to follow. See Restatement (Third) of Foreign Relations Law of the United States §§ 403(1), 403(2) (1986) (hereinafter Restatement) (limiting the unreasonable exercise of prescriptive jurisdiction with respect to a person or activity having connections with another State); *Murray v. Schooner Charming Betsy,* 2 Cranch 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *Hartford Fire Insurance Co. v. California,* 509 U.S. 764, 817, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (SCALIA, J., dissenting) (identifying rule of construction as derived from the principle of "prescriptive comity").

[4] This rule of statutory construction cautions courts to assume that legislators take account of the



124 S.Ct. 2359                                                                      Page   7
(Cite as: 542 U.S. 155, *164, 124 S.Ct. 2359, **2366)

legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony--a harmony particularly *165 needed in today's highly interdependent commercial world.

[5] No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs. But our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused. See *United States v. Aluminum Co. of **2367 America,* 148 F.2d 416, 443-444 (C.A.2 1945) (L.Hand, J.); 1 P. Areeda & D. Turner, Antitrust Law ¶ 236 (1978).

But why is it reasonable to apply those laws to foreign conduct *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?* Like the former case, application of those laws creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs. But, unlike the former case, the justification for that interference seems insubstantial. See Restatement § 403(2) (determining reasonableness on basis of such factors as connections with regulating nation, harm to that nation's interests, extent to which other nations regulate, and the potential for conflict). Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?

We recognize that principles of comity provide Congress greater leeway when it seeks to control through legislation the actions of *American* companies, see Restatement § 402; and some of the anticompetitive price-fixing conduct alleged here took place in *America.* But the higher foreign prices of which the foreign plaintiffs here complain are not the consequence*166 of any domestic anticompetitive conduct *that Congress sought to forbid,* for Congress did not seek to forbid any such conduct insofar as it is here relevant, *i.e.,* insofar as it is intertwined with foreign conduct that causes independent foreign harm. Rather Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm. Congress, of course, did make an exception where that conduct also causes domestic harm. See House Report 13, U.S.Code Cong. & Admin.News 1982, 2487, 2498 (concerns about American firms' participation in international cartels addressed through " domestic injury" exception). But any independent domestic harm the foreign conduct causes here has, by definition, little or nothing to do with the matter.

We thus repeat the basic question: Why is it reasonable to apply this law to conduct that is significantly foreign *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?* We can find no good answer to the question.

The Areeda and Hovenkamp treatise notes that under the Court of Appeals' interpretation of the statute
"a Malaysian customer could .... maintain an action under United States law in a United States court against its own Malaysian supplier, another cartel member, simply by noting that unnamed third parties injured [in the United States] by the American [cartel member's] conduct would also have a cause of action. Effectively, the United States courts would provide worldwide subject matter jurisdiction to any foreign suitor wishing to sue its own local supplier, but unhappy with its own sovereign's provisions for private antitrust enforcement, provided that a different plaintiff had a cause of action against a different firm for injuries that were within U.S. [other-than-import] commerce. It does not seem excessively rigid to infer that Congress would not have *167 intended that result." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 273, pp. 51-52 (Supp.2003).
We agree with the comment. We can find no convincing justification for the extension **2368 of the Sherman Act's scope that it describes.

Respondents reply that many nations have adopted antitrust laws similar to our own, to the point where the practical likelihood of interference with the relevant interests of other nations is minimal.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359    Page 8
(Cite as: 542 U.S. 155, *167, 124 S.Ct. 2359, **2368)

Leaving price fixing to the side, however, this Court has found to the contrary. See, e.g., *Hartford Fire,* 509 U.S. at 797-799, 113 S.Ct. 2891 (noting that the alleged conduct in the London reinsurance market, while illegal under United States antitrust laws, was assumed to be perfectly consistent with British law and policy); see also, e.g., 2 W. Fugate, Foreign Commerce and the Antitrust Laws § 16.6 (5th ed. 1996) (noting differences between European Union and United States law on vertical restraints).

Regardless, even where nations agree about primary conduct, say price fixing, they disagree dramatically about appropriate remedies. The application, for example, of American private treble-damages remedies to anticompetitive conduct taking place abroad has generated considerable controversy. See, e.g., 2 ABA Section of Antitrust Law, Antitrust Law Developments 1208-1209 (5th ed. 2002). And several foreign nations have filed briefs here arguing that to apply our remedies would unjustifiably permit their citizens to bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic antitrust laws embody. E.g., Brief for Federal Republic of Germany et al. as *Amici Curiae* 2 (setting forth German interest "in seeing that German companies are not subject to the extraterritorial reach of the United States' antitrust laws by private foreign plaintiffs--whose injuries were sustained in transactions entirely outside United States commerce--seeking treble damages in private lawsuits against German companies"); Brief for Government *168 of Canada as *Amicus Curiae* 14 ("treble damages remedy would supersede" Canada's "national policy decision"); Brief for Government of Japan as *Amicus Curiae* 10 (finding " particularly troublesome" the potential "interfere[nce] with Japanese governmental regulation of the Japanese market")

These briefs add that a decision permitting independently injured foreign plaintiffs to pursue private treble-damages remedies would undermine foreign nations' own antitrust enforcement policies by diminishing foreign firms' incentive to cooperate with antitrust authorities in return for prosecutorial amnesty. Brief for Government of Federal Republic of Germany et al. as *Amici Curiae* 28-30; Brief for Government of Canada as *Amicus Curiae* 11-14. See also Brief for United States as *Amicus Curiae* 19-21 (arguing the same in respect to American antitrust enforcement).

Respondents alternatively argue that comity does not demand an interpretation of the FTAIA that would exclude independent foreign injury cases *across the board.* Rather, courts can take (and sometimes have taken) account of comity considerations case by case, abstaining where comity considerations so dictate. Cf., e.g., *Hartford Fire,* supra, at 797, n. 24, 113 S.Ct. 2891; *United States v. Nippon Paper Industries Co.,* 109 F.3d 1, 8 (C.A.1 1997); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1294-1295 (C.A.3 1979).

In our view, however, this approach is too complex to prove workable. The Sherman Act covers many different kinds of anticompetitive agreements. Courts would have to examine how foreign law, compared with American law, treats not only price fixing but also, say, information-sharing agreements, patent-licensing price conditions, territorial product resale limitations,**2369 and various forms of joint venture, in respect to both primary conduct and remedy. The legally and economically technical nature of that enterprise means lengthier proceedings, appeals, and more proceedings--to the point where procedural costs and delays could *169 themselves threaten interference with a foreign nation's ability to maintain the integrity of its own antitrust enforcement system. Even in this relatively simple price-fixing case, for example, competing briefs tell us (1) that potential treble-damage liability would help enforce widespread anti-price-fixing norms (through added deterrence) and (2) the opposite, namely that such liability would hinder antitrust enforcement (by reducing incentives to enter amnesty programs). Compare, e.g., Brief for Certain Professors of Economics as *Amici Curiae* 2-4 with Brief for United States as *Amicus Curiae* 19-21. How could a court seriously interested in resolving so empirical a matter--a matter potentially related to impact on foreign interests--do so simply and expeditiously?

We conclude that principles of prescriptive comity counsel against the Court of Appeals' interpretation of the FTAIA. Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, Congress might have hoped that America's antitrust laws, so



124 S.Ct. 2359  
(Cite as: 542 U.S. 155, *169, 124 S.Ct. 2359, **2369)

Page 9

fundamental a component of our own economic system, would commend themselves to other nations as well. But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.

[6] *Second,* the FTAIA's language and history suggest that Congress designed the FTAIA to clarify, perhaps to limit, but not *to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce. See House Report 2-3, U.S.Code Cong. & Admin.News 1982, 2487, 2487-2488. And we have found no significant indication that at the time Congress wrote this statute courts would have thought the Sherman Act applicable in these circumstances.

The Solicitor General and petitioners tell us that they have found no case in which any court applied the Sherman Act to redress foreign injury in such circumstances. Tr. of Oral Arg. 21; Brief for United States as *Amicus Curiae* 13; Brief *170 for Petitioners 13; see also *Den Norske,* 241 F.3d, at 429 ("[W]e have found no case in which jurisdiction was found in a case like this--where a foreign plaintiff is injured in a foreign market with no injuries arising from the anticompetitive effect on a United States market"). And respondents themselves apparently conceded as much at a May 23, 2001, hearing before the District Court below. 2001 WL 761360, at *4.

Nevertheless, respondents now have called to our attention six cases, three decided by this Court and three decided by lower courts. In the first three cases the defendants included both American companies and foreign companies jointly engaged in anticompetitive behavior having both foreign and domestic effects. See *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 595, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (agreements among American, British, and French corporations to eliminate competition in the manufacture and sale of anti-friction bearings in world, including United States, markets); *United States v. National Lead Co.,* 332 U.S. 319, 325-328, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947) (international cartels with American and foreign members, restraining international commerce, including United States commerce, in titanium pigments); *United States v. American Tobacco Co.,* 221 U.S. 106, 171-**2370 172, 31 S.Ct. 632, 55 L.Ed. 663 (1911) (American tobacco corporations agreed in England with British company to divide world markets). In all three cases the plaintiff sought relief, including relief that might have helped to protect those injured abroad.

[7] In all three cases, however, the plaintiff was the Government of the United States. A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out this mission. 15 U.S.C. § 25; see also, *e.g., United States v. E.I. du Pont de Nemours & Co.,* 366 U.S. 316, 334, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961) ("[I]t is well settled that once the Government has *171 successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor"). Private plaintiffs, by way of contrast, are far less likely to be able to secure broad relief. See *California v. American Stores Co.,* 495 U.S. 271, 295, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) ("Our conclusion that a district court has the power to order divestiture in appropriate cases brought [by private plaintiffs] does not, of course, mean that such power should be exercised in every situation in which the Government would be entitled to such relief"); 2 P. Areeda, H. Hovenkamp, & R. Blair, Antitrust Law ¶¶ 303d-303e, pp. 40-45 (2d ed.2000) (distinguishing between private and government suits in terms of availability, public interest motives, and remedial scope); Griffin, Extraterritoriality in U.S. and EU Antitrust Enforcement, 67 Antitrust L.J. 159, 194 (1999) ("[P]rivate plaintiffs often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government"). This difference means that the Government's ability, in these three cases, to obtain relief helpful to those injured abroad tells us little or nothing about whether this Court would have awarded similar relief at the request of private plaintiffs.

Neither did the Court focus explicitly in its opinions on a claim that the remedies sought to cure only independently caused foreign harm. Thus the three cases tell us even less about whether this Court then thought that foreign private plaintiffs could

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359  
(Cite as: 542 U.S. 155, *171, 124 S.Ct. 2359, **2370)

Page 10

have obtained foreign relief based solely upon such independently caused foreign injury.

Respondents also refer to three lower court cases brought by private plaintiffs. In the first, *Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*, No. 75 Civ. 5828-CSH, 1977 WL 1353 (S.D.N.Y., Jan. 18, 1977), a District Court permitted an Italian firm to proceed against an American firm with a Sherman Act claim based upon a purely foreign injury, *i.e.*, an injury suffered in Italy. The court made clear, however, that the foreign injury was *"inextricably *172 bound up with ... domestic restraints of trade,"* and that the plaintiff *"was injured ... by reason of an alleged restraint of our domestic trade,"* *id.*, at *11, *12 (emphasis added), *i.e.*, the foreign injury was dependent upon, *not independent of,* domestic harm. See Part VI, *infra.*

In the second case, *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680 (S.D.N.Y. 1979), a District Court permitted Dominican and American firms to proceed against a competing American firm and the Dominican Tourist Information Center with a Sherman Act claim based upon injury apparently suffered in the Dominican Republic. The court, in finding the Sherman Act **2371 applicable, weighed several different factors, including the participation of American firms in the unlawful conduct, the partly domestic nature of both conduct and harm (to American tourists, a kind of "export"), and the fact that the domestic harm depended in part upon the foreign injury. *Id.*, at 688. The court did not separately analyze the legal problem before it in terms of independently caused foreign injury. Its opinion simply does not discuss the matter. It consequently cannot be taken as significant support for application of the Sherman Act here.

The third case, *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 72 (C.A.2 1977), involved a claim by Hunt, an independent oil producer with reserves in Libya, that other major oil producers in Libya and the Persian Gulf (the "seven majors") had conspired in New York and elsewhere to make it more difficult for Hunt to reach agreement with the Libyan government on production terms and thereby eliminate him as a competitor. The case can be seen as involving a primarily foreign conspiracy designed to bring about foreign injury in Libya. But, as in *Dominicus*, the court nowhere considered the problem of independently caused foreign harm. Rather, the case was about the "act of state" doctrine, and the sole discussion of Sherman Act applicability--one brief paragraph--refers to other matters. 550 F.2d, at 72, and n. 2. *173 We do not see how Congress could have taken this case as significant support for the proposition that the Sherman Act applies in present circumstances.

The upshot is that no pre-1982 case provides significant authority for application of the Sherman Act in the circumstances we here assume. Indeed, a leading contemporaneous lower court case contains language suggesting the contrary. See *Timberlane Lumber Co. v. Bank of America, N. T. & S. A.*, 549 F.2d 597, 613 (C.A.9 1976) (insisting that the foreign conduct's domestic effect be "sufficiently large to present a cognizable injury *to the plaintiffs*" (emphasis added)).

Taken together, these two sets of considerations, the one derived from comity and the other reflecting history, convince us that Congress would not have intended the FTAIA's exception to bring independently caused foreign injury within the Sherman Act's reach.

V

Respondents point to several considerations that point the other way. For one thing, the FTAIA's language speaks in terms of the Sherman Act's *applicability* to certain kinds of *conduct*. The FTAIA says that the Sherman Act applies to foreign "conduct" with a certain kind of harmful domestic effect. Why isn't that the end of the matter? How can the Sherman Act both *apply to the conduct* when one person sues but *not apply to the same conduct* when another person sues? The question of who can or cannot sue is a matter for other statutes (namely, the Clayton Act) to determine.

Moreover, the exception says that it applies if the conduct's domestic effect gives rise to "*a* claim," not to "*the plaintiff's* claim" or "*the* claim *at issue.*" 15 U.S.C. § 6a(2) (emphasis added). The alleged conduct here did have domestic effects, and those effects were harmful enough to give rise to "a" claim. Respondents concede that this claim is not their own claim; it is someone else's claim. But, linguistically *174 speaking, they say, that is beside the point. Nor did Congress place the relevant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359
(Cite as: 542 U.S. 155, *174, 124 S.Ct. 2359, **2371)

Page 11

words "gives rise to a claim" in the FTAIA to suggest any geographical limitation; rather it did so for a here neutral reason, namely, in order to make clear that the domestic effect must be an *adverse* (as opposed to a beneficial) effect. See House **2372 Report 11, U.S.Code Cong. & Admin.News 1982, 2487, 2496 (citing *National Bank of Canada v. Interbank Card Assn.*, 666 F.2d 6, 8 (C.A.2 1981)).

Despite their linguistic logic, these arguments are not convincing. Linguistically speaking, a statute can apply and not apply to the same conduct, depending upon other circumstances; and those other circumstances may include the nature of the lawsuit (or of the related underlying harm). It also makes linguistic sense to read the words "a claim" as if they refer to the "plaintiff's claim" or "the claim at issue."

At most, respondents' linguistic arguments might show that respondents' reading is the more natural reading of the statutory language. But those arguments do not show that we *must* accept that reading. And that is the critical point. The considerations previously mentioned--those of comity and history--make clear that the respondents' reading is not consistent with the FTAIA's basic intent. If the statute's language reasonably permits an interpretation consistent with that intent, we should adopt it. And, for the reasons stated, we believe that the statute's language permits the reading that we give it.

Finally, respondents point to policy considerations that we have previously discussed, *supra*, at 2368, namely, that application of the Sherman Act in present circumstances will (through increased deterrence) help protect Americans against foreign-caused anticompetitive injury. As we have explained, however, the plaintiffs and supporting enforcement-agency *amici* have made important experience-backed arguments (based upon amnesty-seeking incentives) to the contrary. We cannot say whether, on balance, respondents' side of this empirically based argument or the enforcement agencies' side is correct. But we can say that the answer to the dispute is neither *175 clear enough, nor of such likely empirical significance, that it could overcome the considerations we have previously discussed and change our conclusion.

For these reasons, we conclude that petitioners' reading of the statute's language is correct. That reading furthers the statute's basic purposes, it properly reflects considerations of comity, and it is consistent with Sherman Act history.

VI

[8] We have assumed that the anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury. Respondents argue, in the alternative, that the foreign injury was not independent. Rather, they say, the anticompetitive conduct's domestic effects were linked to that foreign harm. Respondents contend that, because vitamins are fungible and readily transportable, without an adverse domestic effect (*i.e.*, higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury. They add that this "but for" condition is sufficient to bring the price-fixing conduct within the scope of the FTAIA's exception.

The Court of Appeals, however, did not address this argument, 315 F.3d, at 341, and, for that reason, neither shall we. Respondents remain free to ask the Court of Appeals to consider the claim. The Court of Appeals may determine whether respondents properly preserved the argument, and, if so, it may consider it and decide the related claim.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

**2373 *It is so ordered.*

Justice O'CONNOR took no part in the consideration or decision of this case.

*176 Justice SCALIA, with whom Justice THOMAS joins, concurring in the judgment.

I concur in the judgment of the Court because the language of the statute is readily susceptible of the interpretation the Court provides and because only that interpretation is consistent with the principle that statutes should be read in accord with the customary deference to the application of foreign countries' laws within their own territories.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359  
(Cite as: 542 U.S. 155, *176, 124 S.Ct. 2359, **2373)

Page 12

542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op. Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374

Briefs and Other Related Documents (Back to top)

2004 WL 1047902, 41 USLW 3686 (Oral Argument) Oral Argument (Apr. 26, 2004)

2004 WL 791686 (Appellate Brief) Reply Brief for Petitioners (Apr. 09, 2004)

2004 WL 533930 (Appellate Brief) Brief for Certain Professors of Economics as Amici Curiae in Support of Respondents (Mar. 15, 2004)

2004 WL 533931 (Appellate Brief) Brief of Amici Curiae Legal Scholars in Support of Respondents (Mar. 15, 2004)

2004 WL 533932 (Appellate Brief) Brief for Amici Curiae Committee to Support the Antitrust Laws and National Association of Securities and Consumer Attorneys in Support of Respondents (Mar. 15, 2004)

2004 WL 533933 (Appellate Brief) Brief Amici Curiae of Professors Darren Bush, John M. Connor, John J. Flynn, Shubha Ghosh, Warren Grimes, Joseph E. Harrington, Jr., Norman Hawker, Robert Lande, William G. Shepherd and Steven Semeraro in Support of Respondents (Mar. 15, 2004)

2004 WL 533934 (Appellate Brief) Brief of Amici Curiae Economists Joseph E. Stiglitz and Peter R. Orszag in Support of Respondents (Mar. 15, 2004)

2004 WL 533935 (Appellate Brief) Brief for Respondents (Mar 15, 2004)

2004 WL 542780 (Appellate Brief) Brief of Amici Curiae Law Professors Ralf Michaels, Hannah Buxbaum and Horatia Muir Watt in Support of Respondents (Mar. 15, 2004)

2004 WL 531749 (Appellate Brief) Brief of Amicus Curiae Public Citizen in Support of Respondents (Mar. 12, 2004)

2004 WL 220706 (Appellate Brief) Brief of the Chamber of Commerce of the United States and the Organization for International Investment as Amici Curiae in Support of Petitioner (Feb. 03, 2004)

2004 WL 226388 (Appellate Brief) Brief of the Governments of the Federal Republic of Germany and Belgium as Amici Curiae in Support of Petitioners (Feb. 03, 2004)

2004 WL 226389 (Appellate Brief) Brief for the Government of Canada as Amicus Curiae Supporting Reversal (Feb. 03, 2004)

2004 WL 226390 (Appellate Brief) Brief of the Government of Japan as Amicus Curiae in Support of Petitioners (Feb. 03, 2004)

2004 WL 226391 (Appellate Brief) Brief for Petitioners (Feb. 03, 2004)

2004 WL 226597 (Appellate Brief) Brief of the United Kingdom of Great Britain and Northern Ireland, Ireland and the Kingdom of the Netherlands as Amici Curiae in Support of Petitioners (Feb. 03, 2004)

2004 WL 234124 (Appellate Brief) Brief Amicus Curiae of European Banks in Support of Petitioners (Feb. 03, 2004)

2004 WL 234125 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioners (Feb 03, 2004)

2004 WL 239505 (Appellate Brief) Brief for Amicus Curiae the International Chamber of Commerce in Support of Petitioners (Feb. 03, 2004)

2004 WL 385670 (Joint Appendix) (Feb. 03, 2004)

2004 WL 214307 (Appellate Brief) Brief for Amicus Curiae the Business Roundtable in Support of Petitioners (Jan. 30, 2004)

2003 WL 22896686 (Appellate Petition, Motion and Filing) Brief of the Federal Republic of Germany as Amicus Curiae in Support of Petition for a Writ of Certiorari (Dec. 01, 2003)Original Image of this Document (PDF)

2003 WL 22879683 (Appellate Petition, Motion and Filing) Motion for Leave to File Brief as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 2359  
(Cite as: 542 U.S. 155, *176, 124 S.Ct. 2359, **2373)

Page 13

Amicus Curiae and Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Petitioners (Nov. 26, 2003)Original Image of this Document (PDF)

. 2003 WL 22879682 (Appellate Petition, Motion and Filing) Reply to Brief in Opposition (Nov. 24, 2003)Original Image of this Document (PDF)

. 03-724 (Docket) (Nov. 18, 2003)

. 2003 WL 22793763 (Appellate Petition, Motion and Filing) Respondents Brief in Opposition (Nov. 14, 2003)Original Image of this Document (PDF)

. 2003 WL 22762741 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Nov. 13, 2003)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.