EXHIBIT 23

356 F.Supp. 872
356 F.Supp. 872, 1973-2 Trade Cases P 74,658
(Cite as: 356 F.Supp. 872)
c

United States District Court,
E. D. Pennsylvania.
POWER REPLACEMENTS CORP.
v.
AIR PREHEATER COMPANY, INC. and
Combustion Engineering, Inc.
POWER REPLACEMENTS, INC
v.
AIR PREHEATER COMPANY, INC. and
Combustion Engineering, Inc.
Civ. A. Nos. 43604, 70-3481.

Feb. 27, 1973.

Two antitrust actions were consolidated for trial.
The District Court, Masterson, J., held, inter alia,
that, though there was no proof that defendant's
monopoly in air preheater market was acquired or
maintained in an illegal manner, evidence that
defendant formed an intent to limit plaintiffs' market
penetration with respect to replacement parts to a
certain percentage of the market and succeeded in
such limitation through discriminatory price
discounts and other commercially unfair acts,
including product disparagement, established wilful
maintenance of monopoly power in violation of the
Sherman Act.

Judgment for plaintiffs.

West Headnotes

[1] Antitrust and Trade Regulation ⬅ 977(5)
29Tk977(5) Most Cited Cases
   (Formerly 382k929 Trade Regulation)
Evidence as to selective price cuts made after
competitor entered market, submission of revised
bids on specific jobs after competitor had made
substantially lower bids, and absence of cost
justifications for discrimination made out a prima
facie case of price discrimination in violation of the
Robinson-Patman Act. Clayton Act, § 2(a) as
amended by Robinson-Patman Price Discrimination
Act, 15 U.S.C.A. § 13(a).

[2] Antitrust and Trade Regulation ⬅ 977(2)
29Tk977(2) Most Cited Cases
   (Formerly 265k28(7.5), 265k28(7.4))
Evidence that, prior to date of release agreement in
prior antitrust suit, sales personnel of defendant

competitor and its parent had discussed plaintiff, but
that after such date parent, in spite of protests from
defendant competitor, had continued to accept
advertising from plaintiff in magazines circulated to
consumers failed to establish any conspiracy in
restraint of trade between defendant competitor and
its parent. Sherman Anti-Trust Act, § 1, 15
U.S.C.A. § 1.

[3] Antitrust and Trade Regulation ⬅ 983
29Tk983 Most Cited Cases
   (Formerly 265k28(7.6))
While document prepared by defendant's sales
manager projecting expected degree of plaintiff's
market penetration in absence of countermeasures
was probative as to defendant's illegal intent, it
furnished no basis for calculating damages,
particularly where plaintiff's profits increased and
where there was no evidentiary basis for
extrapolation of the projections beyond the limited
period covered. Sherman Anti-Trust Act, § 2, 15
U.S.C.A. § 2.

[4] Antitrust and Trade Regulation ⬅ 641
29Tk641 Most Cited Cases
   (Formerly 265k29)
The elements of the offense of monopoly are: (1)
the possession of monopoly power in the relevant
market, and (2) the wilful acquisition or
maintenance of that power as distinguished from
growth or development as a consequence of a
superior product, business acumen, or historical
accident. Sherman Anti-Trust Act, § 2, 15
U.S.C.A. § 2.

[5] Antitrust and Trade Regulation ⬅ 977(3)
29Tk977(3) Most Cited Cases
   (Formerly 265k28(7.5))
Though there was no proof that defendant's
monopoly in air preheater market was acquired or
maintained in an illegal manner, evidence that
defendant formed an intent to limit plaintiffs' market
penetration with respect to replacement parts to a
certain percentage of the market and succeeded in
such limitation through discriminatory price
discounts and other commercially unfair acts,
including product disparagement, established wilful
maintenance of monopoly power in violation of the
Sherman Act. Sherman Anti-Trust Act, § 2, 15
U.S.C.A. § 2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt Works.

Westlaw.

356 F.Supp. 872                                                           Page 2
**(Cite as: 356 F.Supp. 872)**

[6] Antitrust and Trade Regulation ⇐ 687
29Tk687 Most Cited Cases
    (Formerly 265k12(1.3))
Where plaintiffs chose to compete with manufacturer of air preheaters for fossil-fueled steam generating boilers only in the replacement element market and disavowed any claim that defendant had interfered with entry into the original element market, the relevant market, for purposes of determining whether defendant had monopoly power, was the market for the replacement element in the air preheaters and not for both original and replacements. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[7] Antitrust and Trade Regulation ⇐ 646
29Tk646 Most Cited Cases
    (Formerly 265k12(1.3))
Relevant market for purposes of determining whether defendant had monopoly power was the national market, though organizer of plaintiff corporations formed two regional companies rather than one company to permit employees of the two different operations to own stock in the business for which they were working, where defendant had always operated its business on a national level and regarded such plaintiffs as a single defendant. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[8] Antitrust and Trade Regulation ⇐ 641
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
Ordinarily, the existence of "monopoly power" may be inferred from the predominant share of the market. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[9] Antitrust and Trade Regulation ⇐ 977(3)
29Tk977(3) Most Cited Cases
    (Formerly 265k28(7.5), 265k28(7.4))
Where defendant's power to exclude the competition of plaintiff had been proven directly by, inter alia, proof that defendant had obtained specific orders after making discriminatory price cuts in response to plaintiffs' bids, no inference from a market share percentage was necessary. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[10] Antitrust and Trade Regulation ⇐ 650
29Tk650 Most Cited Cases
    (Formerly 265k17(1.3))
Though no conspiracy was present, disparagement

of plaintiffs' products was illegal under the Sherman Act when coupled with defendant's power to control prices or exclude competition, even if action based on disparagement alone would not be permissible. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[11] Antitrust and Trade Regulation ⇐ 653
29Tk653 Most Cited Cases
    (Formerly 265k17(1.3))
Defendant's stamping of drawings of its devices to discourage the customer from turning to plaintiff for replacement parts constituted unlawful retention of control over a sold product, in violation of the Sherman Act. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[12] Antitrust and Trade Regulation ⇐ 977(3)
29Tk977(3) Most Cited Cases
    (Formerly 265k28(7.5))
Proof that defendant, while possessing a significant degree of market power, engaged in a course of conduct which was likely to achieve monopoly power, and that defendant committed certain commercially unfair acts with the specific intent to injure plaintiffs and eliminate competition, proved attempted monopolization, even absent showing that success rewarded such attempt. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[13] Antitrust and Trade Regulation ⇐ 977(5)
29Tk977(5) Most Cited Cases
    (Formerly 382k929 Trade Regulation)
Evidence that defendant, in making discriminatory price cuts, quoted a price nominally higher than plaintiffs' but at a figure which was regarded by customer as substantially equal to plaintiffs' price when taken in conjunction with defendant's preferred position as original equipment manufacturer, that discount level was a pricing system intended to yield for defendant a profit-maximizing 75% share of the known market, and that some of defendant's documentations for its pricing were not prepared in good faith failed to sustain defendant's burden of proving that it had been meeting competition in good faith by offering price discounts and freight allowances to selected customers. Clayton Act, §§ 2, 2(b) as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. §§ 13, 13(b).

[14] Antitrust and Trade Regulation ⇐ 882
29Tk882 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872)

(Formerly 382k914 Trade Regulation)
Where original equipment manufacturer's products commanded a premium in the replacement part market, pricing practice could constitute an illegal beating of the price levels of competitors even if defendant were careful to quote prices nominally higher than those of competitors. Clayton Act, § 2 as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13.

[15] Antitrust and Trade Regulation ⟶ 984
29Tk984 Most Cited Cases
    (Formerly 265k28(9))
Monopolist is obliged to bear the risk of uncertainty of damage which his own wrong had created, and in such circumstances juries are allowed to act upon probable and inferential, as well as direct and positive proof.

[16] Antitrust and Trade Regulation ⟶ 984
29Tk984 Most Cited Cases
    (Formerly 382k931 Trade Regulation)
While plaintiffs' figures as to incremental costs of making additional sales were not precise or mathematically certain, such constituted a reasonable basis for calculation of damages for transactions in which plaintiffs lost sales because of defendant's violations of the Robinson-Patman Act. Clayton Act, § 2(a) as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[17] Antitrust and Trade Regulation ⟶ 976
29Tk976 Most Cited Cases
    (Formerly 382k929 Trade Regulation)
Where plaintiffs made out prima facie case of illegal price discrimination as to certain transactions, it was defendant's burden to establish that plaintiffs' loss of sales to defendant was the result of a cause unrelated to the illegal price discount, but with respect to transactions as to which plaintiffs did not submit a bid, it was plaintiffs' burden to show that defendant was responsible for failure of customer to request a bid from plaintiffs. Clayton Act, § 2(a) as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[18] Antitrust and Trade Regulation ⟶ 995
29Tk995 Most Cited Cases
    (Formerly 265k24(7.1), 265k24(7))
In addition to damages for antitrust violations, equitable relief was appropriate and necessary where there was significant threat of injury from

impending violations or from contemporary violation likely to continue or recur. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2; Clayton Act, § 2(a) as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[19] Antitrust and Trade Regulation ⟶ 989
29Tk989 Most Cited Cases
    (Formerly 265k28(9))
Establishment of antitrust violations by defendant and award of damages to plaintiffs required that there also be awarded to plaintiffs the cost of the suit, including a reasonable attorney's fee. Clayton Act, § 4, 15 U.S.C.A. § 15.
*875 Henry Kolowrat, Arthur E. Newbold, IV, Philadelphia, Pa., for plaintiffs.

Charles C. Parlin, Jr., New York City, Arthur H. Kahn, Philadelphia, Pa., for defendants.

FINDINGS OF FACT, DISCUSSION,
CONCLUSIONS OF LAW AND ORDER.

MASTERSON, District Judge.

FINDINGS OF FACT
*The Parties and the Court's Jurisdiction.*
1.  These are two separate antitrust actions which were consolidated for trial pursuant to F.R.Civ.P. 42(a) by order dated December 8, 1970.

2.  The plaintiff in Civil Action No. 70-3481 is Power Replacements, Inc., a California corporation incorporated in 1963 (hereafter "PRI"). PRI's production facilities have at all times been located in Costa Mesa, California. (Stipulation of Uncontested Facts in Final Pretrial Order (hereafter "Stip.") ¶¶ 2, 15).

3.  The plaintiff in Civil Action No. 43604 is Power Replacements Corp., a Pennsylvania corporation incorporated in 1966 (hereafter "PRC"). PRC's production facilities have at all times been located in Montgomeryville, Pennsylvania. (Stip. ¶ ¶ 1, 15).

4.  PRC was incorporated when the decision was made by PRI to build a plant in Pennsylvania to service the business in the East. The reason for having two separate corporations was to permit employees of the two different operations to own stock in the business for which they were working.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(Wheeler N.T. 182).

5. From the time when PRC was incorporated in 1966 PRI and PRC have had separate production facilities, separate books and records, different officers and employees, they have generally operated in different parts of the country and they have filed separate tax returns. The two plaintiff corporations have used different internal pricing sheets in figuring out their bids and the costs of production and selling costs of the two corporations are different. Jamieson N.T. 95-97; Def. Exs. 105-108, 200-206, 220; Pl. Ex. 148).

6. Defendant The Air Preheater Company, Inc. (hereafter "Air Preheater") is a Delaware corporation which manufactures and sells throughout the United States, among other products, a device known as an air preheater, together with replacement parts for the air preheater including a replacement part referred to as replacement element (Stip. ¶ 3).

7. Defendant Combustion Engineering, Inc. is a Delaware corporation which owns all of the stock of defendant Air Preheater. (Stip. ¶ 3).

8. All of the parties are engaged in commerce among the several states. (Stip. ¶ 5).

9. This Court has jurisdiction over both of the consolidated actions by virtue of 15 U.S.C. §§ 15 and 26, the court has jurisdiction over both defendants and venue is proper in this Court. (Stip. ¶ 6).

*The Product involved.*

10. The two plaintiffs have alleged that the defendants violated Sections 1 and 2 of the Sherman Act (15 U.S.C. Sections 1 and 2) and Section 2(a) of the Robinson-Patman Act (15 U.S.C. Section 13(a), in connection with the sales of replacement element for installation in air preheaters. Neither complaint herein makes any allegations of unlawful activity in the manufacture or sale of air preheaters themselves.

*876 11. The parties have stipulated that the actions involve a controversy arising out of plaintiffs' sales of replacement element in competition with Air Preheater. (Stip. ¶ 11).

12. For an understanding of the issues involved in this case, however, a description of the air preheater is necessary. An air preheater is an auxilliary device used in connection with a fossil-fueled steam generating boiler-i. e., one which uses coal, natural gas or oil as its fuel. The basic function of an air preheater is to reclaim a portion of the heat which would otherwise be lost up the boiler exhaust stack and utilize that heat to raise the temperature of the air entering the boiler for the combustion process. (Stip. ¶ 7, Def. Ex. 312).

13. The original air preheater was a tubular device, of a type generically referred to as a recuperative air preheater. The hot exhaust gasses passed through a huge bundle of stationary tubes and the cold incoming air passed over these tubes and absorbed the heat transmitted through the wall of the tubes. (Kelley Dep. 35-37; Jamieson N.T. 36).

14. A different type of air preheater, the Ljungstrom, was invented in 1925 and was patented. It was generically a regenerative air preheater. (McKee N.T. 202).

15. The Ljungstrom air preheater is manufactured and sold in various sizes and with various specifications. Its main parts are a rotor which contains the heating element, the rotor housing, the rotor drive mechanism, and various supporting and connecting structures. The heating element itself consists of corrugated strips of steel, welded in honeycomb fashion and built into pie-shaped sections for insertion into the rotor, where they are arranged in several layers. The honeycomb arrangement provides a very large surface within a relatively small space for the efficient transfer of heat. (Stip. ¶ 9).

16. In the Ljungstrom air preheater the rotor, containing the heating elements, rotates slowly first through the exhaust gas and then through the incoming air. The heating element absorbs heat from the exhaust gas as it passes through that field and then the incoming air is heated when it passes over the hot heating element as the element rotates slowly through the incoming air field. (Def. Ex. 312; McKee N.T. 251).

17. Defendant Air Preheater acquired the U. S. patent rights for this Ljungstrom air preheater, but those basic patents expired several decades ago.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F. Supp. 872
(Cite as: 356 F.Supp. 872, *876)

(N T. 4-5)

18. Over the years the regenerative type air preheater has increasingly replaced the recuperative type air preheater in customer preference to the point where the regenerative type now accounts for around 90% of the preheater business. This is apparently the result of a greater efficiency of the regenerative type. This greater efficiency results in a greater saving of fuel over the life of the boiler. (McKee N.T. 225-228).

19. Air Preheater is still the only company in the U. S. making and selling the Ljungstrom regenerative-type air preheater. Other substantial companies with extensive experience in the boiler business, including Babcock & Wilcox and Foster Wheeler, have tried to market regenerative-type air preheaters, but Air Preheater nevertheless sells around 90% of all the regenerative-type air preheaters sold in the U. S. (McKee N.T. 237-238).

20. Plaintiffs have specifically disclaimed having any evidence that the commanding position of Air Preheater in the air preheater market was unlawfully achieved. (N.T. 4).

21. The focal point of these consolidated lawsuits is competition in the sale of replacement element for use in Ljungstrom air preheaters. The heating element of a preheater has to be replaced after some years of operation. The service life of the element depends on a variety of factors. Among these are the design and workmanship of the *877 units, the degree of corrosiveness of the fuel being used in the boiler, and the durability of the material used in the element. (Stip ¶¶ 10, 11).

22. Replacement element is essentially steel sheet corrugated to certain configurations and cut to fit into the many pie-shaped frames (called "baskets") which are contained in the rotor part of the Ljungstrom air preheater. (Wheeler N.T. 154-156; Def. Ex. 312, pp. 10-13).

23. Given the configuration of the corrugation of the steel and the dimensions of the elements in the original air preheater, any skillful metal fabricator can manufacture replacement element. (Wheeler N.T. 168).

24. Moreover, the capital investment required to manufacture replacement element is not large. (Wheeler N.T. 168-169).

25. On the average, the heating element represents about 60% of the total weight of a Ljungstrom and somewhat less than 50% of the cost of manufacture. (Jamieson N.T. 37).

*The Relevant Markets.*

26. The two largest fossil-fueled boiler manufacturers are defendant Combustion Engineering and Babcock & Wilcox, with Foster Wheeler and Riley Stoker the next in size. Each of these purchases Ljungstrom air preheaters for installation with various boilers sold by it (Stip. ¶ 12).

27. The principal purchasers of boilers equipped with a Ljungstrom air preheater are the utilities, but large industrial concerns which operate their own power plants (which are typically smaller than the power plants of utilities) also sometimes purchase boilers equipped with a Ljungstrom air preheater. From time to time these boiler users purchase replacement elements. (Stip. ¶ 13).

28. In the first 10 months of 1971, the four major boiler manufacturing companies had the following percentages of the boiler business booked: Combustion had 39%, B & W had 37.4% Foster Wheeler had 13.2% and Riley Stoker had 10.4%. (Pl. Ex. 174).

29. In recent years, Air Preheater's Ljungstrom has had about 90% of the preheater business in the utility market. The tubular heater, the lamiflow, and the Rothemuhle have the remaining 10%. The utilities use about 95% of these preheaters with the remainder used in large industrial boilers. (Pl. Ex. 162, McKee N.T. 237-38, Jamieson N.T. 35-36).

30. There is a nationwide market, which also includes Puerto Rico, for the Ljungstrom air heater and its replacement elements. (E. g. Pl. Exs. 231, 21, 28).

31. There is no factual basis for plaintiffs' claim that original element and replacement element constitute a single product market. The relevant product market to be used in testing the plaintiffs' claim in this lawsuit is replacement element for use

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



in Ljungstrom air preheaters.

*Description of the Parties and their Personnel.*
32.  Defendant Combustion Engineering in 1971 had assets of approximately $721,500,000 and sales of approximately $1,066,000,000.    It has 7 divisions, among them its Combustion Division which fabricates nuclear and conventional steam equipment and marine boilers.    Defendant Air Preheater is a wholly-owned subsidiary of Combustion, and it is primarily in the business of manufacturing and selling Ljungstrom air preheaters and associated equipment. (Stip. ¶ 14).

33.  Max Wheeler was a skilled machinist who had started his own machine shop in 1954.  He had had no prior experience with either air preheaters or replacement element when he organized PRI in 1963 and entered the replacement element business with a capital investment of $35,000.  (Wheeler N.T. 168-169).

34.  Plaintiff PRI in 1963 started to manufacture and sell replacement element *878 in competition with Air Preheater from a plant in Costa Mesa, California, near Los Angeles.  Plaintiff PRC was started in 1966.    It manufactures and sells replacement elements in competition with Air Preheater from a plant in Montgomeryville, Pennsylvania.  Max Wheeler is the president and chief stockholder of both companies.  He works out of Costa Mesa.  James D. Jamieson, an ex-employee of Air Preheater, heads up the Montgomeryville operation. (Stip. ¶ 15).

35.  The Air Preheater executive who from before 1963 to date has had the most immediate responsibility for Air Preheater sales of replacement elements is John E. Baker, Manager of Air Preheater's Maintenance Sales Department.  He has held that job since 1952.  As of 1/1/64, Baker reported to E. G. Devine, Manager of Marketing, who in turn reported to T. R. Halstead, Vice President of Sales, who reported to J. L. Kelehan, President of Air Preheater.    Also reporting to Halstead was B. S. Kelley, who was then General Sales Manager in charge of field sales.  Effective September 1965 Baker began to report to General Sales Manager Kelley, who in turn reported to J. W. Garrick, Director of Sales (later named Vice President of Sales), who had replaced Halstead. Garrick in turn reported to W. R. McKeen,

President, who had replaced Kelehan. Beginning January 1969, Baker began to report to I. R. Eldridge, in charge of staff functions (later Manager of Marketing), who in turn reported to Kelley (General Sales Manager and then Vice President of Sales) who had replaced Garrick.  Kelley reported to McKee.  In August 1970 T. L. Woolard replaced McKee as President of Air Preheater, and McKee moved up to Combustion Engineering.  In that position 5 subsidiaries, including Air Preheater, report to him. (Stip. ¶ 16).

36.  Halstead left Air Preheater on December 13, 1964.  He was employed by Power Replacements on March 29, 1965, as their sales manager and midwest representative and remained with Power Replacements about 11 months. (Stip. ¶ 17).

*Development of Competition Between Plaintiffs and Defendants.*
37.  In 1963, Air Preheater had a complete monopoly of the replacement element business, and enjoyed very high profits.  It was making around 60% gross profit [FN1] on hot and intermediate element and around 50% on cold.  (Pl. Ex. 67). The gross profit on all its spare parts business was around 51%. (Pl. Ex. 65).  The high profitability of this business created conditions for competitive entry, particularly on the West Coast where the freight charged by Air Preheater for shipment from its plant in Wellsville, New York, added close to an extra 10% to the price that the customer had to pay. (Pl. Ex. 67).  And the spare parts business was a rapidly growing one. (Pl. Ex. 17, McKee Dep. 34-22 to 36-8).

> FN1. Air Preheater has measured the profitability of its business in terms of gross profit, considering it the most meaningful index of its performance.  The gross profit figure includes labor and material costs, and direct overhead, but not other overhead. Kelley, APH Vice President of Sales, estimates that such overhead is about 10-12%. (Kelley Dep. 41-12 to 44-2, Baker Dep. 42-10 to 43-6).

38.  Thus on May 17, 1963, Devine, Manager of Marketing, in commissioning a review of spare part pricing wrote:
"There are a number of factors that are involved. Of particular interest is recent correspondence from the West Coast reporting on independent shops pirating our spare parts seal replacements.  This



356 F.Supp. 872
**(Cite as: 356 F.Supp. 872, \*878)**

happens to be one of the items that carries fairly high profit margin." (Pl. Ex. 64).

39.    Some customers, among them Southern California Edison, West Penn Power, and American Electric Power, criticized Air Preheater for the prices it was charging. (Pl. Exs. 3, 65, 66). But Air Preheater continued as the only manufacturer, and everybody who needed **\*879** replacement element had to pay Air Preheater's list price plus freight from Wellsville to the customer's plant.

40.    In late 1963, Southern California Edison, the biggest user of heating element on the West Coast, began to look for an alternate source of supply of replacement elements. It turned to Max Wheeler, who operated Clark & Wheeler Engineering, a custom machining operation. Wheeler went into the replacement element business, using initially the facilities of Clark & Wheeler. Shortly after this operation got onstream, plaintiff Power Replacements, Inc. was set up separately for this purpose. (Pl. Ex. 21, 11/68; Pl. Ex. 151; Wheeler N.T. 154-56).

41.    In reporting on the activities of Power Replacements to headquarters in Wellsville, Brow, the Air Preheater regional sales manager in Los Angeles, whose sales were most immediately affected by Power Replacements competition, reported as follows:
"Mr. Wheeler has recently formed a new company, to be known as Power Replacements, Inc. He is confident that he will be doing much business with utilities in the areas of Arizona, Nevada, and California in supplying spare parts for major plant items. For example; air heater surfaces, boiler burner parts, pulverizer castings, and many other items. His general attitude is that the utilities are free to buy spare parts wherever they please, and that the original manufacturers have had this lucrative business to themselves for many years at the expense of the customers."
Brow also noted that Combustion itself had already felt directly the results of Wheeler's efforts in making burner box castings for Combustion tangential burners, which orders had previously gone to Combustion, and Brow reported that he had discussed this with Combustion. (Pl. Ex. 24). There were also internal discussions in Air Preheater around 1963 to the effect that Wheeler's competition would hurt boiler manufacturers, especially

Combustion, on boiler parts. (Baker Dep. 37-13 to 39-6).

42.    With Power Replacement's entry, Air Preheater began to give immediate attention to pricing strategy. For example, on December 13, 1963, Devine wrote:
"In addition to correspondence we have had conversations concerning pricing of maintenance sales items. This is an item that bears regular review. However, the need for a review at this time has a certain urgency attached to it due to reports from our Los Angeles Office of competition for both heating element and seal." (Pl. Ex. 3).

43.    On January 17, 1964, Baker completed a thorough study of Air Preheater's pricing structure on various maintenance sales items. (Pl. Ex. 67, Baker Dep. 39-11 to 39-17). And the pros and cons of various pricing policies, including freight allowance, were debated in this period. (Pl. Exs. 67, 4, 5, 6, 7, 8).

44.    On February 20, 1964, Baker wrote:
"I have been constantly thinking about ways and means that we can beat our friend, Max Wheeler, on the West Coast, and prevent him from spreading his operations throughout the country." (Pl. Ex. 68).
Then after discussing the possibility of buying out Power Replacements, Baker wrote in the same document:
"If Wheeler is not willing to sell or if we do not desire to approach him on this basis, I still think we can beat him on replacement element orders. It is my suggestion along these lines that on the next heating element inquiry received from the West, that we reduce the price by ten percent and in addition, allow freight. We would still realize what we might term a fairly good margin of profit, and perhaps take the order away from Wheeler. If this did not work what can't (sic) we go even further and bid fifteen percent or perhaps twenty percent under our present list, which **\*880** might be just what is required to take the order from Wheeler...... I believe that we are a big enough operation so that we could beat this competition and whatever other competition might develop in other areas." (Pl. Ex. 68)

45.    And on May 28, 1964, upon seeing a Power Replacements advertisement in the magazine *Power*



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *880)

*Engineering,* Baker wrote:

"Apparently, Clark & Wheeler is trying to spread his operations, and I feel this is all the more reason we should take whatever action we feel necessary to under bid him on every job we can." (Pl. Ex. 9).

46.  The desire to stop Power Replacements continued.  For example, on August 28, 1964, Devine put into his file a manuscript note that Hammond, Manager of Manufacturing and a member of the management committee, had asked him to get certain information on Max Wheeler:

"a) Relative price levels

b) APX sales be (sic) geographical areas and product

c) ideas I (?) had about how to stop him

d) What we knew of Max's plans about penetrating the market

e) This was stuff he wanted available because he wanted to take to Godelius about licensing them to fabricate for us in Japan and sell it in Western states-to cut prices & stop Max 'cold'" (Pl. Ex. 10).

47.  During the first half of 1964, Baker was fearful of losing a considerable amount of business and this resulted in his bidding some jobs under list and giving freight allowances.  (Baker Dep. 59-6 to 59-24).

48.  In the early stages of the competition, Air Preheater decided to allow freight on a selective basis in instances where Power Replacements was bidding against Air Preheater.  In addition, Air Preheater gave price concessions in a number of instances on top of the freight allowance as a way of competing against Power Replacements.  (Baker Dep. 43-11 to 44-18, Halstead Dep. 70-4 to 70-20, Pl. Ex. 281).  This price cutting was on a trial and error basis to establish what price Air Preheater would have to quote to get business. (Halstead Dep. 76-18 to 78-5).

49.  In April 1965 PRI commenced a lawsuit in California against Air Preheater and Combustion Engineering, in which PRI charged that the defendants had violated the Sherman Act and the Robinson-Patman Act by, among other alleged activities, selectively cutting prices when bidding against PRI; selling below cost in competing against PRI; determining the prices bid by PRI on particular jobs before submitting their own bids on those same

jobs; and disparaging PRI's product. (Stip. ¶¶ 16-25).

50.  At an early stage in that litigation, before defendants had filed their answers, the case was settled by a payment of $32,500.00 to PRI and its attorneys and mutual undertakings by PRI on the one hand and Air Preheater on the other to forego any illegal competitive activities.  There was no testimony taken in that lawsuit and no determination on the factual accuracy of PRI's charges.  Mutual releases were executed under date of August 2, 1965.  (Def. Ex. 3, N.T. 8). [FN2]  As a result of this earlier litigation, plaintiffs are not claiming damages for any causes of action accruing prior to August 4, 1965.  They have offered evidence of events prior to *881 that date, however, to attempt to establish liability for certain later events. (Stip. ¶ 20).

> FN2. In the release agreement the parties agreed to arbitrate any anti-trust disputes arising during the ensuing two years.  This agreement as to future disputes was held to be void as against public policy by the United States Court of Appeals for the Ninth Circuit in Civil Action No. 70-3481 (the PRI case) before it was transferred to this District for consolidation with Civil Action No. 43604 (the PRC case).

51. As a result of the 1965 lawsuit Air Preheater consulted legal counsel and was advised that the following groundrules should be followed in competing against PRI:

i) Air Preheater should never sell below cost;

ii) Air Preheater should not attempt prior to submitting its own quotation to learn what PRI was actually quoting on that particular job;

iii) When it believed it was quoting in competition with PRI Air Preheater could quote "off-book", but it should endeavor to quote higher than the bid it anticipated PRI would make; and

iv) Air Preheater was not to malign PRI's product.

The Air Preheater management arranged for seminars where these competitive groundrules were explained to Air Preheater's head office and field personnel. (McKee N.T. 214-216, Baker N.T. 262-263).

The question as to whether this advice of legal counsel was followed is a vital area of dispute.  See Findings of Fact Nos. 82 to 96.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F. Supp. 872
(Cite as: 356 F.Supp. 872, *881)

52. PRC started competing with Air Preheater in the sale of replacement element in the spring of 1966. Since that time PRI and PRC have never bid competitively against each other and on some jobs their respective officers have conferred as to which of the two companies should bid for the job. (Jamieson N.T. 97, Wheeler N.T. 173-174).

53. PRI, the California plaintiff, generally serves a market territory covering the states of California, Arizona, Oregon, Washington, Idaho, Montana, Wyoming, Nevada, Utah, Colorado, New Mexico, Texas and Oklahoma and Hawaii. PRC, the Pennsylvania plaintiff, generally serves a market territory comprising the rest of the country and Puerto Rico. (Wheeler N.T. 172-174, 176-179)

54. The replacement element business in the PRI territory is concentrated in the area of Southern California and Arizona. In the Northwest electricity is largely generated by hydro-electric facilities and air preheaters are not used in this type of facility. In parts of the Southwest-particularly Texas and Oklahoma-natural gas is a commonly-used boiler fuel, and air preheater elements seldom have to be replaced when the boiler fuel is natural gas. (Wheeler N.T. 176-179).

### Defendants' Maintenance of Profit-Maximizing Monopolistic Market Share.

55. Throughout the history of competition between Air Preheater and Power Replacements, Air Preheater has paid considerable attention to the way business is split between Power Replacements and Air Preheater. Baker has maintained a detailed bidding summary (Pl. Ex. 29) showing the results of jobs where he believed Air Preheater was in competition with Power Replacements. (Baker Dep. 17-17 to 19-4, 20-11 to 21-16). In addition, early in 1965, a monthly report was started and has been maintained to date, prepared by Baker for his superiors, commenting in detail on individual jobs when Air Preheater faced Power Replacements competition (Baker Dep. 13-16 to 13-20, 17-10 to 17-16, Garrick Dep. 24-6 to 25-5), developments in the market, how much of the market Air Preheater has obtained, and reporting on how Air Preheater is doing in competition with Power Replacements. (Pl. Ex. 21).

56. In June 1965, Baker, the person acknowledged to be most knowledgeable about Power

Replacements in the Air Preheater organization (Kelly Dep. 87-18 to 88-15), came up with a forecast in which he formulated an "educated guess" as to the share of the replacement element business Power Replacements would get in the future. He predicted that Power Replacements would obtain 25% of the business in 1965, and 30% in 1966. In predicting that Power *882 Replacements would obtain 35% in 1967, Baker wrote:
"They might obtain more of this business but with our stepped up selling campaign we should be able to hold them to not more than 35%."
He then stated that for 1968, "I think we should use same forecast as for 1967". (Pl. Ex. 15).

57. In coming up with Pl. Ex. 15, Baker formed his conclusions as to Power Replacements' likely market penetration by taking into account that "they were well established, were producing a quality product," and were "an acceptable bidder at a lower price." (Baker Dep. 79-17 to 79-24. It was Baker's impression that had it not been for Air Preheater's "stepped up selling campaign" referred to in Pl. Ex. 15 (See Finding of Fact No. 56), Power Replacements would have achieved at least 50% of the market in replacement element. (Baker Dep. 80-5 to 80-17).

58. In January 1966, Garrick, Air Preheater's Vice President of Sales, in reporting to McKee, President of the company, noted the assumption that Power Replacements had obtained about 25% of the available business for 1965 and added:
"Approximately three months ago, our figures indicated that Power Replacements had obtained about 34% of the total available business; so the trend as far as we are concerned is in the proper direction." (Pl. Ex. 53).

And in June 1966, Garrick wrote to McKee:
"We continue to receive reports from the field that the quality of Power Replacements' product has definitely improved and that it is, most of the time, very acceptable. In addition, they have been delivering element in four days from receipt of order." (Pl. Ex. 55).

59. On September 22, 1966, Baker prepared a "Forecast of Maintenance Sales" which predicted Air Preheater's share of the replacement element market for the years 1966 to 1970. He predicted that this share would remain at a constant 75% of an



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *882)

increasing level of available business. (Pl. Ex. 16).

60. In light of Power Replacements' acknowledged success as an acceptable bidder which would have achieved at least 50% of the market absent a concerted effort on the part of Air Preheater to prevent this increased penetration (see Findings of Fact Nos. 56 to 58), we find that Pl. Ex. 16 demonstrates a clear intent on the part of Air Preheater to limit Power Replacements to 25% of the market over a five year period.

This conclusion is supported by Findings of Fact Nos. 61 to 63 which describe why Air Preheater wished to maintain this particular division of the market, and by Nos. 64 to 81 which describe how this percentage was successfully maintained.

61. Air Preheater was able to maximize its profits at about 75% penetration of the market. To obtain a greater percentage, Air Preheater would have had to lower its prices to "unattractive" levels which would have lowered its return in the overall picture. (Pl. Ex. 73). For example, on December 9, 1968, Baker wrote to Garrick and Kelley:
"We are now obtaining approx. 75% of the market which is better (profit-wise), than 100% of the market which would be obtainable only by reducing current element prices." (Pl. Ex. 227).
Baker testified that it was his recommendation "that we maintain a lesser share than 100% at a better pricing level so that we would have more profit generation." (Baker Dep. 87-2 to 87-4; see also 87-25 to 89-7, Garrick Dep. 44-10 to 45-19).

62. The pricing study prepared by Baker on December 9, 1968, demonstrated, *inter alia,* that:
a. It would take Air Preheater quotes at 30% off book on hot and intermediate end element and 20% on cold to obtain 100% of the market, thereby eliminating the competition of Power Replacements.
*883 b. Air Preheater was making about $500,000 more gross profit per year by making "competitive quotes" of about 15% off book on hot and intermediate and 10% on cold and keeping 75% of the replacement element business than if it obtained 100% of the market thereby eliminating the competition of Power Replacements. (Pl. Ex. 227, Baker, N.T. 316-317).

63. In addition to this profit maximization motive,

Air Preheater did not wish to cut prices too much on open bids because this would expose its prices so that they would be learned by the other purchasers. They also did not wish to create too wide a disparity in prices offered to private utilities because such utilities tend to exchange information with each other and there would be complaints from the disfavored customers. (Baker Dep. 89-20 to 90-4). More importantly, Air Preheater was afraid that if some of the larger customers saw the price differential between Air Preheater's prices for spare parts and those being quoted by Power Replacements, they would soon begin to question the price of the entire original preheater. (Pl. Exs. 46, 45).

64. Air Preheater's forecast of 75% of the market was not just a prediction, but the percentage it set for itself as a goal. (Garrick Dep. 30-7 to 31-18; Baker Dep. 83-9 to 83-14, 84-2 to 84-19; Kelley Dep. 90-18 to 91-12). We find that Air Preheater did its best to achieve and maintain 75% of the market, rather than to obtain as much of the replacement element business as they lawfully could, as defendants would have us believe. (See Defendants' Proposed Findings of Fact No. 81).

65. Between June 1965 and September 1966, Garrick discussed with Baker the limiting of Power Replacements' market penetration, and the conclusion was that Air Preheater would be more competitive in bidding. (Garrick Dep. 31-19 to 34-13).

66. Garrick discussed with Baker in 1967, 1968 and 1969 holding Power Replacements to 25% of the market. (Garrick Dep. 42-23 to 44-7)

67. In discussions Baker had with Garrick it was recognized that customers were becoming increasingly price conscious, that Power Replacements was making a quality product, that Power Replacements was becoming an acceptable bidder with more and more customers, and that price concessions had to be made to more people. (Baker Dep. 106-3 to 106-21).

68. On February 13, 1967, Garrick reported to McKee:
"Our final figures indicate that Power Replacements obtained an estimated total of $950,000 for heating element representing 28.75%



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *883)

of the total available business. Our heating element bookings amounted to $2,352,000 or 71.25% of the total  About April of last year Power Replacements' effectiveness stood at 44% and we managed to reduce this as the year progressed to the 28.75% stated above." (Pl. Ex. 156).

69. Garrick reported to McKee in May 1968: "The value of orders received during the month amounted to approximately $232,000 and for the year to date $1,228,000. Again, based on our pricing, Power Replacements are maintaining approximately 27% as their share of the total available element business. Maintenance Sales was the subject of some discussion at the recent Sales Meeting and the proper emphasis was placed upon this phase of the business. Further plans are being developed to keep Power Replacements' penetration to an absolute minimum." (Pl. Ex. 52).

This was the same month that Baker noted that "Power Replacements has become an acceptable bidder to particularly (sic-practically?) all our customers." (Pl. Ex. 80).

70. On July 11, 1968, Garrick reported to McKee:

"The value of orders received during the month amounted to approximately *884 $138,000 and for the year to date $1,900,000. Power Replacements continues to capture a good proportion of the business. Up to the end of June we have booked about 67% of the total available business and Power Replacements has booked the remainder. There is no doubt that Power Replacements is being accepted by a wider group of utilities and it is becoming firmly entrenched." (Pl. Ex. 160).

71. A concerted sales campaign was precipitated in September 1968 by a concern that Air Preheater would not meet its forecasted percentage of the maintenance sales business including the replacement elements business. (Kelley Dep. 89-8 to 89-24, 90-18 to 91-12, 98-3 to 100-10; McKee N.T. 220).

72. On September 11, 1968, Garrick reported to McKee:
"The value of orders received during the period amounted to approximately $150,000 and for the year to date $2,136,000. Up to the end of August it appears that we have booked about 65% of the

available business and Power Replacements the remaining 35%. As previously discussed, there is no doubt that Power Replacements are receiving wider acceptance and this is reflected in the above figures. The four million dollar figure forecasted is still achievable but only if we give it significantly more attention at the sacrifice of some other products. As discussed with you, we have implemented a campaign to stimulate and increase the sale of maintenance items and we expect to see positive results from it in the last quarter of this year." (Pl. Ex. 161).

73. In addition to getting people out to sell, Air Preheater came in with competitive bids where Baker thought he had to make a competitive bid, and in doing so there was a greater emphasis on larger jobs than on the smaller ones. (Baker Dep. 107-3 to 109-4).

74. Air Preheater went after big jobs and, with price-conscious customers, of which there was a substantial number, this meant price concessions. Lower prices were quoted especially on such large jobs. (Garrick Dep. 36-25 to 38- 18, 39-24 to 40-20; Kelley Dep. 79-2 to 83-9).

75. On August 11, 1969, Kelley reported to McKee:
"During July we noted that Power Replacements booked approximately 30 percent of the element business that we know of, making this period average out a little higher than their normal one-quarter of the business." (Pl. Ex. 164).

76. In October 1969, Baker reported to Kelley that, to date, Air Preheater had obtained 69% of the business and Power Replacements had obtained 31%, noted that this was about the same percentage that had prevailed most of the year and added:
"I would like to see their share brought back to not more than 25 percent, if possible, by year end." (Pl. Ex. 23).

77. On March 10, 1970, Kelley reported to McKee:
"The Power Replacements/Air Preheater split of the business shows that we have booked 75 1/2 percent of the known available business so far this year. While February was a very large month for us, it was also a good month for Power Replacements; and we showed only a slight

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *884)

Page 12

increase in our percentage of business over them."
"I do not foresee the level of bookins to continue
this year and therefore feel that we should continue
our concerted sales campaign on elements
throughout the country" (Pl. Ex. 167).

78.    On February 3, 1971, Kelley reported to
McKee's successor Woolard:
  "For the first time that anyone can recollect, Power
  Replacements actually received more orders than
  we did during the month for heating element. Our
  bookings ran to $146,000 while theirs amounted to
  $292,000, which is in the ratio of 34/66 in their
  favor. This imbalance, as we have known it, *885
  consisted principally of three very large jobs for
  Southern California Edison, T.V.A., and
  Consolidated Edison  I would not think that this is
  typical of the long haul by any manner of means,
  but it is disturbing even for a one-month period."
  (Pl. Ex. 173).

79.    And when Air Preheater learned of the
possibility that Power Replacements might sell
*original* element to Babcock & Wilcox, Kelley
reported to Woolard:
  "The fact that B. & W. will utilize Power
  Replacements elements in their new vertically
  oriented Ljungstrom-type preheaters may ultimately
  give some sort of tacet (sic) blessing to Power
  Replacements elements. However, it is our
  intention to do a significant amount of campaigning
  against such an eventuality beginning as of now."
  (Pl. Ex. 173).

80.    The following tabulation (drawn from Baker's
records here identified as Pl. Ex. 50 and Pl. Ex. 21)
shows how successful Air Preheater has been in
limiting Power Replacements to a predetermined
share of the element business *known to Air
Preheater*: [FN3]

  FN3  The table shows Baker's recorded impressions
  as to Air Preheater's success in achieving and
  maintaining the desired share of the business using
  all the information available to him. In fact, Power
  Replacements obtained more business than Air
  Preheater knew about. As Baker correctly noted:
  "Power Repl. sales are probably higher than we
  know because without a doubt they have obtained
  element jobs unknown to us Additionally they also
  mfg. seals & it is not known the volume of seal
  business they do but it could be substantial." (Pl.

Ex. 78) Neither side has furnished the Court with
replacement element share-of-market figures nor is it
possible to construct accurate share-of-market figures
from the above sales figures for the following
reasons:  i) the fiscal year of each of the three
companies is different.  Air Preheater uses a
calendar-year basis. PRI has a March 30 fiscal year.
(Stip. ¶¶ 21- 23); ii) The PRI and PRC sales figures
include all products and not just replacement
element, and we are not satisfied with the sufficiency
of plaintiffs' evidence as to how Power
Replacements' sales figures can be broken down into
replacement element and other products.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *885)

Page 13

| YEAR | AVAILABLE BUSINESS | APCO | P.R. |
|------|--------------------|------|------|
| 1964 | $2,982,736. | $2,578,477.(86.4%) | $  404,259.(13.6%) |
| 1965 | 3,029,572. | 2,257,933.(74.5%) | 771,739.(25.5%) |
| 1966 | 3,300,961. | 2,351,453.(71.25%) | 949,508.(28.75%) |
| 1967 | 3,689,840. | 2,759,918.(74.8%) | 929,922.(25.2%) |
| 1968 | 3,757,655. | 2,434,351.(65.0%) | 1,323,305.(35.0%) |
| 1969 | 3,587,781. | 2,587,780.(72.2%) | 1,000,004.(27.8%) |
| 1970 | 5,688,596. | 4,399,069.(77.0%) | 1,289,527.(23.0%) |
| 1971 | 5,935,050. | 4,419,030.(74.5%) | 1,130,995.(20.0%) |
| | | | [FN4] |

FN4. 6.5% of the total represents business taken by Ce-rrey in Puerto Rico.
P-21 (10/71). Ce-rrey is a subsidiary of Combustion and is Air Preheater's
licensee in Mexico and elsewhere. By agreement of the parties, the Ce-rrey
transaction, which took place in the fall of 1971 is not included in the
transactions through 1971 which are being submitted for determination. Final
Pretrial Order. Along with post-1971 transactions, it is being left for later
determination. The significance of this for the above table is that the
Ce-rrey business is not treated as business taken away from Power
Replacements by Air Preheater.

81. Air Preheater accomplished what it had set out to do intentionally achieving and maintaining 75% of the business of which it was aware and holding Power Replacements down to the remaining 25%. Baker's monthly sales report for December, 1969, succinctly records the successful result of Air Preheater's effort to hold Power Replacements down in that year:

"Please note we have exceeded our forecast by a little over $120,000.00. *886 Also of interest is the fact, we have held the competition to my forecast of $1,000,000." (Pl. Ex. 21).

*Discriminatory Pricing Among Replacment Element Jobs.*

82. The principal purchasers of boilers equipped with a Ljungstrom air preheater are the utilities, but large industrial concerns which operate their own power plants (which are typically smaller than the power plants of utilities) also sometimes purchase boilers equipped with a Ljungstrom air preheater. From time to time these boiler users purchase replacement elements. (Stip. ¶ 13)

83. It is usually the customer (usually a utility but occasionally a large industrial concern) who initiates the transaction by placing an order for or requesting a quotation for replacement element of certain sizes and specifications. Sometimes; but not always, the customer asks both Air Preheater and one of the plaintiffs for a quotation on the same order. Other

times the customer may place the order with Air Preheater without asking PRC (or PRI) for a quotation-or the order may be placed with PRI (or PRC without asking Air Preheater for a quotation.) (Stip. ¶¶ 24, 25; Pl. Ex. 28).

84. The practices of utilities vary widely in the purchase of replacement element. Certain publicly-owned utilities such as T.V.A. and the City of Los Angeles are generally required by law to award contracts to the lowest bidder. Most customers are not subject to this requirement, however. (Stip. ¶ 28).

85. Air Preheater, for many years antedating this controversy as well as throughout the controversy, has had detailed price lists containing the book (or "list" or "standard" or "normal") prices of its replacement elements, f. o. b. point of manufacture. These lists set forth the book prices for elements of countless combinations of size, configuration, and material, so that, with the possible exceptions of some very special jobs, it is possible to find in these lists the book price for any particular type of element being ordered by the customer. (Pl. Ex 86) These book prices essentially reflect Air Preheater's cost experience and profit expectation. (Kelley Dep 40-22 to 41-11)

86. Before Power Replacements came on the scene, all of Air Preheater's customers paid the list price

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *886)

Page 14

plus freight from Air Preheater's plant to the customer's plant. After Power Replacements came in, Air Preheater adopted a strategy of selective price cutting, (i. e. discounting from book) and freight allowance in those instances where the customer was interested in considering Power Replacements as a possible source. However, those customers believed by Air Preheater to be its "loyal customers" and not inclined to deal with Power Replacements have been charged and are being charged Air Preheater's list price plus freight. Of course, list price plus freight has also been charged in the instances where Air Preheater believes that Power Replacements is not bidding sufficiently below Air Preheater to overcome any preference which the customer has for Air Preheater. (Baker Dep. 23-21 to 24-13, Garrick Dep. 19-21 to 21- 20, Kelley Dep. 32-22 to 33-5).

87. Throughout the time that Power Replacements has competed with Air Preheater, Baker has kept a bidding summary (Pl. Ex. 28) where, with minor exceptions, he has recorded the results of competition in those instances where he thought the customer was at least inclined to consider buying from Power Replacements. These transactions amount to less than half of the annual sales volume of replacement element. With minor exceptions, any purchases of replacement element which do not appear on that tabulation were made from Air Preheater by its "loyal customers" and were paid for at Air Preheater's list price plus freight. (Baker Dep. 23-21 to 24-13).

88. Pl. Ex. 28 discloses most of the specific instances where Air Preheater discriminated in price by submitting "competitive" quotations off book while **887 making the quotations at book which appear on the exhibit and while also making quotations at book on jobs for "loyal customers" which do not so appear. (Compare Pl. Ex. 28 and Pl. Ex. 21).

89. Pl. Ex. 150 and Pl. Ex. 150-A contain the details of transactions in which Air Preheater was awarded a job while quoting a price less than its book plus freight. Almost all of such transactions appear on Pl. Ex. 150, and the parties have stipulated to the accuracy of the details appearing thereon. (N.T. 194). Pl. Ex. 150-A contains the details of three transactions which have not been included in Pl. Ex. 150 because the defendants were

not satisfied with plaintiffs' documentation evidence. (N.T. 197). However, the defendants' only concern with the documentation on these three transactions appears to be that no indication as to how the bids were computed is provided. (N.T. 198). We have examined the evidence which supports Pl. Ex. 150-A, and we find that we can accept the accuracy of the figures provided thereon in the sense that these were the bids which were actually made, accurately computed or not. (Pl. Exs. 28, 197, 198-A, 209).

90. There is no evidence of any cost justification for the discrimination in price between one customer and another by Air Preheater. [FN5]

> FN5. Therefore, the legality of each transaction must be determined by assessing the evidence. and determining whether defendants have met their burden or proving that the price differential was the result of a good faith effort to meet but not beat the competition of Power Replacements. Plaintiffs have agreed to our initial inspection of the following five transactions since they conceded that no illegality is present if none can be found here.

91. *Atlantic City Electric Co.*

a. Late in 1966, bids were submitted on two sets of cold end replacement elements. Power Replacements' bid in the amount of $10,160.00 was submitted on December 8, 1966. (Pl. Ex. 175). Air Preheater's bid in the amount of $11,250 was also submitted on December 29, 1966. (Def. Ex. 150-1a).

b. On February 13, 1967, an Air Preheater Sales Representative met with a Mr. Korbely, plant engineer of Atlantic City Electric Co., and was told that the price differential between the two bids was "not too great" and received the suggestion that a second quote be made, "if this is possible". (Def. Ex. 150- 1C).

c. Baker received the report which related these new developments, (see Def. Ex. 150-1d), and on February 28, 1967, a second bid was submitted on the same job in the amount of $10,470).

d. On September 7, 1927, Baker reported to Garrick as follows:
"ATLANTIC CITY ELECTRIC COMPANY,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



DEEPWATER STATION, AP-1512-In December 1966, we submitted a quotation for two (2) sets of cold end Corten element in the total amount of $11,250. representing standard pricing. Pete Smith followed the job closely and was later learned that it was hard for Atlantic City to justify the difference between our quote and the competition's. Consequently, we submitted a new competitive quotation in the total amount of $10,470. which is approximately 7 percent below the former quote. We received the order for the material this month." (Pl. Ex. 21, August 1967).

92.  *Cleveland Electric Illuminating Co.*

a. In November 1968, Air Preheater had submitted a quotation of $100,400 (15% below book) on a replacement element. The quote remained outstanding until the fall of 1969 when Baker was invited to come to Cleveland to discuss it. In this discussion, Baker offered a $35,000 (10% off-book) quotation on two (2) sets of cold end baskets. He was given the entire order on the spot, helped the plant engineer and the superintendent write out the requisition, and personally took the requisition to the company's engineering department where *888 approval was made. (Pl. Ex. 21, October 1969).

b. While Baker or one of his assistants has always prepared a documentation which explains the off-book discounts in connection with competitive quotations (N.T. 264), no documentation has been offered on this particular job. (Def. Ex. 150-8a).

c. Similarly, no documentation is offered to justify the 10% and 15% off-book bids made to this company on November 14, 1969. (Pl. Ex. 150; Def. Ex. 150-9a through 9e). Air Preheater was awarded this job despite the fact that its bid was 6% higher than that of Power Replacements.

93.  *Duke Power (Mill Power Supply Co.)*

a. On August 10, 1966, Air Preheater submitted a bid at $24,968 on several replacement items. (Pl. Ex. 261). Power Replacements bid $21,352. (Pl. Ex. 186).

b. At some time between August 10, 1968 and November 21, 1968, Baker learned that Power Replacements had bid about $3,700 (or 15% below the Air Preheater quote. (Pl. Ex. 261, Baker N.T.

301).

c. On November 21, 1966, Baker submitted a revised quotation to supersede the prior bid. (Def. Ex. 150-14b). Not including freight, the new Air Preheater bid was only $122. above that of Power Replacements, and Air Preheater was awarded the job.

d. Although Baker knowingly submitted a requote at a level higher than that of Power Replacements, Baker knew that the lower price coupled with the company's preference for Air Preheater probably would be sufficient to obtain the job. (As to Duke Power's obvious preference for Air Preheater, see Pl. Ex. 155, pp. 3-4; Pl. Ex. 21, November 1966; Baker N.T. 300; Baker Dep. 391-15 to 393-7). In fact, Power Replacements has never won a job at Duke Power. (Pl. Ex. 28).

94.  *City of Jacksonville.*

a. Air Preheater had a very close relationship with those who were responsible for making purchasing decisions at this utility (See e. g. Pl. Ex. 115 and Baker Dep. 301-23 to 303-14). In fact, Air Preheater and the customer collaborated to write specifications which would favor Air Preheater. (Pl. Ex. 113).

b. In 1965, Air Preheater bid $11,490 on a complete set of basketed cold and replacement element. (Def. Ex. 150-26a). Baker assumed that Power Replacements would bid about $230 below this quote, and he believed that his bid was low enough to beat out Power Replacements when coupled with the customer's known preference for Air Preheater. (Baker Dep. 301-16 to 301-22).

c. On May 24, 1971, Baker submitted a quote of $67,250 for a hot end basketed heating element and seals which was Air Preheater's standard price. (Def. Ex. 150-27a). In fact, Air Preheater had been selling this company regularly at standard pricing levels (See Pl. Ex. 21, March 1971, April 1970, September 1968, October 1966), but Power Replacements' lower prices had been putting this customer in an "awkward position" for some time. (Pl. Ex. 112).

d. Shortly before August 23, 1971, the customer called Air Preheater and asked for an up-dated bid,



while informing Air Preheater that Power Replacements bid was quite a few thousand dollars below the original bid. (Def. Ex. 150-27a). Baker's new bid was under Power Replacements' bid, and Air Preheater was awarded the job. Although Power Replacements' bid might have been erroneously calculated, we find that the second quote was made by Air Preheater with the intention of beating Power Replacements on a combination of price and customer preference.

### 95. Florida Power and Light

a. Early in 1965, Air Preheater was advised of a high level conference held by the customer at which a unanimous decision had been reached to stick with *889 Air Preheater despite the lower prices being offered by Power Replacements. (Pl. Ex. 101). Air Preheater was told again in November, 1966 by the customer that it would not purchase from Power Replacements as long as Air Preheater did quality work and met delivery requirements. (Pl. Ex. 21, November 1966).

b. At least through 1966 and into the early part of 1967, the customer awarded a number of jobs to Air Preheater. (Pl. Ex. 21). Baker began to feel that Air Preheater was violating the anti-trust laws by giving the customer freight allowances. On March 28, 1967, Baker reported to Garrick as follows:
"As you know on a few jobs in the past, we have told Florida Power & Light that we would pay the freight on their heating element. We did this because they were such a loyal customer, and we never had to make any concession on our price to retain their business. The more I thought about this, the more I felt that we were violating the anti-trust laws in coming out and giving one customer the freight and not others. [At this point, privileged material was withheld by defendant]. However, we can get around this by assuming that the competition is bidding and on the last two jobs, I have documented each quotation submitted to FP & L. I think it is safe to assume the competition is trying to sell all customers and I also feel that the majority of customers have obtained pricing from Power Replacements; even if for only curiosity's sake. If the customer has not requested such information, I have given the competition has volunteered pricing in an effort to obtain more business. Therefore, we must assume the competition is trying to obtain each job that comes

along. Based on this, we can prepare a competitive bid to Florida Power & Light Company and quote the job freight allowed." (Pl. Ex. 106).

c. Air Preheater discontinued these freight allowances to this loyal customer after May, 1968. Up until this time, Baker prepared "documentations" for his file to justify the off book quotations which were designed to show that Air Preheater was "meeting competition." (Def. Exs. 150-18 through 150-23). However, Baker's deposition testimony makes it clear that these "documentations" were fabricated to provide a false cloak of legality to what he believed to be illegal price discrimination:
"Q. The only possible heads or tails that I can make out of your observations in P-106 is that, while your putting documentation in these files on Florida Power & Light at the times referred to in Pl. Ex. 106, it was just paper documentation and did not have any substance to it? Is that a fair inference, a fair reading of P-106?
A. I will have to answer in the affirmative."
(Baker Dep. 278-12 to 278- 19). [FN6]

> FN6. Since Florida Power & Light bought from Air Preheater regardless of price. Power Replacements concedes that these jobs cannot be included in the claim for damages. However, it is clear to us from the above that Baker's "documentations" cannot be taken at face value.

[1] 96. After carefully examining the evidence as to all of the seventy-one (71) transactions which have been submitted to us for review, we have concluded that plaintiffs have made out a *prima facie* case of price discrimination in violation of 15 U.S.C. § 13(a) in the following twenty-nine (29) bidding situations which include the representative examples described in detail in Findings of Fact Nos. 91-95: [FN7] Job Nos. 1, 2, 3, 5, 9, 10, 11, 12, 14, 26, 27, 28, 29, 32, 34, 36, 43, 44, 46, 48, 49, 50, 52, 57, 59, 60, 63, 64, 71.

> FN7. The numbering of the transactions is adopted from that utilized by the parties in the proposed findings. The numbers are arranged and keyed to Pl. Exs. 150 and 150-A.

97. As to these twenty-nine (29) transactions, we find that defendants *890 have failed to meet their burden of proving that these discriminatory price discounts were made in a good faith effort to meet

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
**(Cite as: 356 F.Supp. 872, \*890)**

competition for the following reasons:

(a) The pattern of bidding in the above cases clearly discloses that Air Preheater quoted a price nominally higher than Power Replacements for the sake of appearance but at a figure which, for practical purposes, was regarded by the customer as substantially equal to Power Replacements' price and when taken in conjunction with Air Preheater's preferred position as the Original Equipment Manufacturer (McKee N.T. 216-17), its net economic impact on the customer was substantially the same as if Air Preheater had bid lower than Power Replacements.

(b) Since the settlement of the prior lawsuit in 1965, Air Preheater has tried not to go below 15% off-book on hot end and intermediate and not below 10% on cold end in bidding against Power Replacements, and the difference was because the margin of profit on cold end is less than it is on hot end. (Pl. Ex. 227; Baker Dep. 52-13 to 54-24). This is the discount level which is intended to yield for Air Preheater the profit-maximizing 75% share of the business known to them. (Pl. Ex. 227). We find that Air Preheater's price discrimination has been shown to be a pricing system rather than a bona fide response to its competitor's lower prices in each particular situation.

c.    Since Baker has admitted that some of his "documentations" were not prepared in good faith (see above Finding No. 95) it is impossible for the court to determine which ones were.  We are, therefore, unable to give much weight to these documents in assessing defendants' meeting competition defense. [FN8] Further, on certain jobs, defendants have failed to supply us with any documentation justifying the discounts, despite Baker's testimony that such a documentation was always prepared.

> FN8. It is unnecessary for us to decide, therefore, whether the documentations are inadmissible under Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943) as plaintiffs allege.

98.  In the twenty-seven (27) transactions in which neither plaintiff submitted a bid, we find that no *prima-facie* case of price discrimination resulting in loss of the job to Air Preheater has been proven. There is no evidence that Air Preheater was

responsible for plaintiffs' failure to bid on these jobs, and in the absence of testimony from the customer, we cannot draw any such conclusion.

99.  In Job Nos. 13, 56, and 65, plaintiffs claim no damage because their own bids were erroneously calculated.  We find that the following four (4) jobs are also in this category: Nos. 4, 61, 69 and 70. We also find that plaintiffs' bids in Job Nos. 7 and 41 were submitted too late for consideration by the customer. Plaintiffs make no claim on Job Nos. 18-23 because it is conceded that Florida Power & Light purchased from Air Preheater regardless of price.

100.  While plaintiffs had received some complaints of product quality in the past, during the time period relevant to this case, plaintiffs were offering an acceptable product of like grade and quality to that offered by Air Preheater. (See e. g., Pl. Ex. 55).

### *Other Commercially Unfair Acts Affecting Competition.*

101.  A manufacturer of spare parts attempting to sell in competition with the original equipment manufacturer is at some disadvantage in trying to convince a utility to deal with him rather than to get all its spare parts and service from the original equipment manufacturer.  As a general proposition, investor-owned utilities are a conservative group of business people and, in general, tend to look to the original equipment manufacturer to furnish whatever replacements are necessary.  \*891 (Jamieson N.T. 38, 121; Halstead Dep. 29- 25 to 30-24).

102.  There are some customers who feel that if they buy element from somebody else, they will have no recourse against Air Preheater on the rest of the equipment.  (Garrick Dep. 49-8 to 50-5).

103.  There is evidence that Air Preheater has benefitted from its position as the only original equipment manufacturer even where its product has given the customer trouble. For example, Baltimore Gas & Electric has had trouble with the Ljungstrom at its Crane station since the early 60's. (Jamieson N.T. 41). After Power Replacements tried to sell element to Baltimore G & E, Baker reported to Garrick:
"We recently submitted a bid to Baltimore Gas & Electric Company for approximately $70,000.00 worth of element for their Charles P. Crane

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872                                                    Page 18
(Cite as: 356 F.Supp. 872, *891)

Station. Power Replacements also submitted a bid.
Pete Smith [Air Preheater salesman] attended a
meeting with the officials of Baltimore Gas to
discuss heating element in general, and our
quotation in particular. Even though our quote was
higher than the compeition (sic), we quote the
customer as follows:
'We cannot change "horses in the middle of the
stream". We are afraid if something went wrong,
APCO would blame it on the heating element, and
do nothing about the problem."' (Pl. Ex. 21,
August 1965).

104.    Similarly, in September, 1965, Baker
reported to Garrick that the Union Electric Company
had taken a bid on an additional element after Air
Preheater had performed an engineering study to
help the customer solve a plugging problem and had
offered a solution. When the company's purchasing
agent approached Air Preheater's representative,
asking how he could justify buying from Air
Preheater in light of Power Replacements' lower
price, his answer was:
"if he brought (sic) from the competition, we
would walk off the job and wash our hands of the
entire situation. The purchasing agent replied by
asking him if he would like to take the verbal order
over the phone." (Pl. Ex. 21, August 1965).

105.    However, the preference for the original
equipment manufacturer can be, and has been
overcome, as Power Replacements' acceptance has
increased to the point where it does business with
many utilities. But except for customers who buy
exclusively on price, Air Preheater commands a
price premium in terms of customer acceptance.
(McKee N.T. 217).

106.    Shortly after Power Replacements entered the
business, Air Preheater embarked on a campaign of
informing customers of Air Preheater's supposed
advantages and Power Replacements' supposed
drawbacks. One such example is the letter sent July
2, 1964, to Pacific Gas & Electric. (Pl. Ex. 37).
Among other things, this implies that if PG & E
deals with Power Replacements, PG & E might
experience "variation in quality of material or
performance of equipment" and receive
unsatisfactory service. And, given the fact that Air
Preheater was making 60% gross profit on hot end
and 50% on cold end, the letter winds up with the
following misrepresentation concerning Air

Preheater's profit picture and the false implication
that Power Replacements could not do the job for
the customer at the prices it was charging:
"We submit that the job-shop type of
manufacturing company cannot fill the above
needs. This is reflected by their lower price to
you. We find it impossible to meet their price and
still maintain the integrity of the Ljungstrom name
of which we are proud. Your repeated new
business to us indicates that you expect us to
maintain this level of service."
Pl. Ex. 37 represents the kind of approach made
practically across the board to all customers.
(McKee Dep. 38-10 to 38-20)

*892 107.    In early 1965, Power Replacements did in fact have
trouble at the Clifty Creek Station of the American
Electric Power System. Welling, one of the Air
Preheater area managers, had an uncle who worked
at Clifty Creek and, through him, obtained some
alleged readings comparing the performance of
Power Replacements' element with Air Preheater's
element.    These results were put into "general
distribution" to all salesmen so that the salesmen
might use them in dealing with other potential
customers of Power Replacements. (Pl. Ex. 89, 90,
94).

108.    On April 1, 1965, Mooney, Garrick's
assistant made a note for Garrick and Kelley:
"I may have been neglectful here-shouldn't we be
passing on to SE's [Sales Engineers] the adverse
comments we've received, e. g. Clifty Creek and
the need for 5" more element."
And Garrick endorsed this by saying:
"Yes, I think we should apprise them of all
developments on P.R." (Pl. Ex. 91).

109.    Baker never made any effort to find out
whether it was Welling or Welling's uncle or
somebody else at Clifty Creek who had taken the
readings, and he sent a copy to West Coast manager
Brow, who, Baker knew, was emotionally affected
by Power Replacements' competition. Baker could
not on deposition answer the question why Pl. Ex.
90 was sent to all area managers. On the other
hand, there were no communications to advise a
customer that Power Replacements had scored a plus
for itself. And, although Air Preheater knew that
Clifty Creek did buy again from Power
Replacements and that Power Replacements had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *892)

Page 19

offered to stand behind equipment which they had sold Clifty Creek, this information was not communicated to the field sales force to counteract the previous information which had been shipped out to the salesmen. (Baker Dep. 236-4 to 246-12).

110. In January, 1965, Air Preheater received a memorandum from one of its servicemen reporting on a job Power Replacements had done for Pacific Gas & Electric, and stating that Power Replacements had not offered to correct a problem with its element. Baker took the report at face value (it happened to be less than correct) (Wheeler N.T. 157-58), and sent it out to all area managers with the following instructions:
"Information of this nature, we believe should be useful to everyone in their discussions concerning a customer's possible intention of purchasing replacement element from the competition." (Pl. Ex. 93).

111. At the time that information adverse to Power Replacements was going out, Air Preheater sales people in the field were not furnished with the names of Power Replacements' jobs that turned out satisfactorily so that they could advise their customers. (Baker Dep. 248-13 to 250-12).

112. On September 13, 1965, area manager Welling wrote concerning a call on Central Illinois Light Company:
"He [customer's General Superintendent of Electric Production and Transmission] also pointed out that our sale of spare parts was a good example where our prices are so high that it makes it very favorable for a competitor to come in and under sell us. At that time he said that Thane [Halstead] had been through and called on them. I defended our spare parts prices with the usual replies, such as Engineering costs, Research & Development costs, and reminded him of our free service." (Pl. Ex. 87).

113. The "usual replies" are false. The fact is that no "Research & Development" is included by Air Preheater in the replacement element price. (Baker Dep. 228-20 to 230-8). And the only engineering cost Air Preheater incurs when it manufactures a replacement element is that the drawings for the original element are reduced to provide a little more clearance to compensate for the *893 distortion of the heater over a number of years' operation. No

new drawings have to be made up for the second replacement. (Baker Dep. 212-17 to 214-23).

114. And this is what happened at Arkansas Power & Light in 1971:
"We were told that our competition had also submitted a bid which was approximately $5,000 under our price. Howard went into great detail concerning the advantages in purchasing from Air Preheater, even though our price was higher. Both Howard and the writer [Baker] and another APH salesman told Mr. Solomon that we were not about to play any pricing game with him and explained in great detail the various reasons why we could not be expected to meet the competition's pricing. I am pleased to report that we received the order from Arkansas Power & Light in August." (Pl. Ex. 21, August 1971).

115. On 10/26/68 Air Preheater called on Omaha Public Power District "to discuss Preheater maintenance, recommended replacement parts, and the advantages from buying those parts from Air Preheater Company, Inc." The report of the meeting then notes:
"We feel the meeting was mutually satisfactorily (sic) and doubt very much that this customer would ever purchase equipment from Power Replacements." (Pl. Ex. 233).

116. In early 1966, Public Service of New Hampshire, a price conscious, alert customer, which had previously purchased from Power Replacements, gave the April, 1966 job to Air Preheater because, as a result of an Air Preheater sales presentation, they were afraid "they might not get the proper material" from Power Replacements. (Pl. Ex. 21, March 1966, April 1966).

117. Air Preheater's intent toward Power Replacements is also shown by its treatment of the drawings which it delivers to its customer. Before Power Replacements came on to the scene, Air Preheater routinely delivered to the customer as part of the sale of a Ljungstrom preheater a set of the drawings, much in the same way that a wiring diagram is delivered with an electrical appliance as a guide to service work. But after Power Replacements came in, the utility sometimes turned over these drawings to Power Replacements for its use in fabricating replacement element. Noting that Air Preheater had been "quite indiscriminate" in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *893)

Page  20

supplying drawings to customers, Los Angeles area manager Brow in December 1963 recommended that the drawings be stamped to state that they are Air Preheater's property. (Pl. Ex. 234). Such a recommendation was also made by Baker (Baker Dep. 252-20 to 255-17) and was carried into effect sometime in the first part of 1964. As McKee noted on October 18, 1966:

"... over the past two plus years all drawings leaving Wellsville have been stamped in such a manner to prohibit their use by someone like Wheeler in competing with us." (Pl. Ex. 44).

118. Recently, Air Preheater has started to code its element in lieu of the previous simple description, and this handicaps Power Replacements in working up a bid for a potential customer. (Jamieson N.T. 47-48).

*The Conspiracy Allegation.*

[2]  119.  The conspiracy complained of was allegedly between Air Preheater and Combustion Engineering-and is not claimed to have involved any third persons.

120.  Combustion Engineering at all times relevant owned 100% of the stock of Air Preheater. There is no claim that Combustion Engineering and Air Preheater were ever competitors in the sale of replacement element.

121.  There is no proof to sustain the charge of an illegal conspiracy between Air Preheater and its parent Combustion Engineering. There was proof that the respective maintenance sales personnel of Air Preheater and Combustion Engineering had discussed PRI in 1964 *894 and 1965 prior to the date of the August 1965 Release Agreement. The only evidence concerning Combustion Engineering's activities after that date showed that in spite of protests from Air Preheater, Combustion Engineering had continued to accept advertising from Power Replacements in the magazines which Combustion Engineering publishes and circulates to the utility industry. (Pl. Exs. 24, 81, 82, 83, 84; McKeen's N.T. 228-315).

*Damages*

122.  Despite our findings that defendant Air Preheater has violated both   Section 2 of the Sherman Act and the Robinson-Patman Act, we have concluded that damages must be limited to the

loss of profits for those transactions which are enumerated in Finding No. 96. Beyond that, plaintiffs have failed to meet their burden to prove loss of profits, and to adduce evidence from which an amount representing loss of profits can reasonably be ascertained.

[3]  123.  In suggesting to the court a basis for calculation of damages, plaintiffs place primary reliance on Baker's projections as to the expected degree of Power Replacements' market penetration (See Plaintiffs' Request for Findings of Fact No. 114 et seq.). For example, while we have agreed with plaintiffs' allegation that Pl. Ex. 15 is probative as to defendants' illegal intent (See Findings Nos. 56-64), we find that such evidence furnishes no basis for calculating damages:

a.  In June, 1965, Baker made estimates as to Power Replacements' share of the market for 1965 through 1969. There is no evidentiary basis for the extrapolation of these projections to arrive at share of the market figures for any time after 1969. (See Plaintiffs' Request for Findings of Fact No. 116).

b.  While the documents from defendants' files provide glaring evidence of Air Preheater's intention to preserve a predetermined split of the replacement element market and its success in achieving that result, we fail to see how these documents are probative as to what percentage of the market Power Replacements would have achieved absent Air Preheater's intervention.

c.  It is especially difficult to determine the extent to which Air Preheater's activities reduced the level of plaintiffs' profits when these profits have risen dramatically during the years in question. For example, the net sales for PRC have grown from $610,514 in 1967 to $1,513,138 in 1972. The *combined* net sales for PRC and PRI have grown from $1,053,670 in 1967 to $1,169,215 in 1971. The combined net profits before taxes have increased from $42,517 to $71,605 during the same period. (Stip. ¶¶ 21, 23).

124.  The total sales lost to Air Preheater in the transactions enumerated in Finding No. 96 was $1,321,319. We have broken these down for each plaintiff as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *894)

Page 21

```
          Power Replacements Corp.
-------------------------------------
Fiscal Year            Total Lost Sales
------------------     ----------------
March 31, 1967               $165,041
March 31, 1968                 86,500
March 31, 1969                 67,845
March 31, 1970                382,923
March 31, 1971                125,655
March 31, 1972                 61,330
                       ----------------
                             $889,294
          Power Replacements, Inc.
-------------------------------------
Fiscal Year            Total Lost Sales
------------------     ----------------
September 30, 1965          $ 76,698
September 30, 1966            35,000
September 30, 1967           116,166
September 30, 1968              none
September 30, 1969           151,861
September 30, 1970            52,300
September 30, 1971              none
                       ----------------
                             $432,025
```

125. After examining the trial evidence as to the
incremental cost of making additional sales (N.T.
58-75, 159, 168), and the worksheets attached to
Plaintiffs' Requests for Findings of Fact As Exhibit
A, we have concluded that the following figures
provide a reasonable estimate of the profit
percentages applicable to total lost sales which *895
are less than $500,000 for any given year:

```
          Power Replacement Corp.
-------------------------------------
Fiscal Year            Profit Percentage
------------------     -----------------
March 31, 1967               27%
March 31, 1968               41%
March 31, 1969               46%
March 31, 1970               39%
March 31, 1971               45%
March 31, 1972               41%
          Power Replacements, Inc.
-------------------------------------
Fiscal Year            Profit Percentage
------------------     -----------------
September 30, 1965            8%
September 30, 1966           39%
September 30, 1967           26%
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



| September 30, 1968 | 35% |
|---|---|
| September 30, 1969 | 31% |
| September 30, 1970 | 33% |
| September 30, 1971 | 40% |

126.   Applying these percentages to the lost sales totals in Finding No 124, we arrive at the following figures for lost profits:

### Power Replacements Corp.

| Fiscal Year | Total Lost Profits |
|---|---|
| March 31, 1967 | $ 44,561 |
| March 31, 1968 | 35,465 |
| March 31, 1969 | 31,209 |
| March 31, 1970 | 149,340 |
| March 31, 1971 | 56,545 |
| March 31, 1972 | 25,145 |
|  | $342,265 |

### Power Replacements, Inc.

| Fiscal Year | Total Lost Profits |
|---|---|
| September 30, 1965 | $  6,136 |
| September 30, 1966 | 13,650 |
| September 30, 1967 | 30,203 |
| September 30, 1968 | none |
| September 30, 1969 | 47,077 |
| September 30, 1970 | 17,259 |
| September 30, 1971 | none |
|  | $114,325 |
| Total Lost Profits ...... | $456,590 |

127.   While defendants have shown that plaintiffs may have lost jobs as a result of causes unrelated to Air Preheater's illegal price discrimination such as complaints of quality defects on prior jobs (Jamieson N.T. 128-134), lack of engineering capability (Jamieson N.T. 76-77) and lack of a field sales force (Jamieson N.T. 139-140), defendants have failed to produce any evidence from the customers or purchasers involved to rebut the *prima-facie* case in the transactions enumerated in Finding No. 96, or to establish that the illegal discount did not motivate the award of a particular job.

### DISCUSSION
*Section Two of the Sherman Act* [FN9]

FN9.   "§ 2 Monopolizing trade a misdemeanor; penalty.
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." (July 2, 1890. ch. 647, § 2, 26 Stat 209; July 7, 1955. ch. 281. 69 Stat. 282)

[4][5]   The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *895)

Page 23

of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Without restating the evidence contained in this voluminous record, the sum and substance of our Findings of Fact Nos. 55 to 81 is that since the latter part of 1965, Air Preheater has willfully attempted to monopolize the replacement element market, and that Air Preheater has successfully maintained that monopoly power.

[6] The parties have argued at length as to what is the relevant market in this context. Understandably, the plaintiffs have tried to convince us that the relevant market is broader than that for merely replacement element; that is, a broader market consisting of the Ljungstrom air preheater, original and *896 replacement element for the Ljungstrom, and various other parts. Throughout the period covered by this action, Air Preheater has been an unchallenged monopolist [FN10] in the manufacture and supply of the Ljungstrom and its original element. However, plaintiffs have chosen to compete with Air Preheater only in the replacement element market, and have expressly disavowed any claim that Air Preheater has interfered with their entry into the original element market. (N.T. December 1, 1972, p. 27.)

> FN10. Plaintiffs have not attempted to prove that Air Preheater's monopoly in the air preheater market was acquired or maintained in an illegal manner.

In the *Grinnell* case, the court held that the several types of services offered by the central station protection companies constituted a single market where the protection of property was really the only basic service, and where the central station had to offer all or nearly all types of service to compete effectively. 384 U.S. at 572, 86 S.Ct. 1698, 16 L.Ed.2d 778. That case certainly does not compel our consideration of any market wider than that in which plaintiffs have chosen to compete, since they obviously have felt that effective competition is possible in offering the replacement element alone.

[7] However, *Grinnell* does support our conclusion that the relevant market for determining whether the defendants have monopoly power is "the broader

national market that reflects the reality of the way in which they built and conduct their business." 384 U.S. at 576, 86 S.Ct. at 1706. Air Preheater, while serving its local customers, has always operated its business on a national level. The record is clear that John Baker, while serving as Air Preheater's Maintenance Sales Department, has projected and evaluated the company's sales performance on a national basis, and since Power Replacements entered the scene, it has always been regarded as a single competitor whose encroachment on Air Preheater's position in the replacement element market was watched closely. The legal expediency which prompted Max Wheeler to form two companies rather than one (see Finding No. 4) cannot be used to divert our attention from Air Preheater's success in limiting the plaintiffs' total combined market share to a desired level.

[8][9] We have concluded from the evidence that Air Preheater has continued to possess monopoly power in the national replacement element market since 1965. [FN11] In United States v. duPont & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), the Supreme Court defined monopoly power as "the power to control prices or exclude competition." Ordinarily, the existence of such power may be inferred from the predominant share of the market. See e. g. American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (over two-thirds of domestic cigarette market and 80% of the field of comparable cigarettes constituted substantial monopoly); United States v. Aluminum Co. of America, 148 F.2d 416 (2nd Cir. 1946). (90% of market constituted a monopoly power). In the present case, while it has been established that defendants have managed to maintain approximately 75% of *the business known to them,* we have not been provided with sufficient evidence to compute precise percentages as to the actual share of the market for each company during each year. (See Finding No. 80 and footnote 3). This is no comfort to the defendants, however, since we have concluded that Air Preheater's power to exclude the competition of Power Replacements has been proven directly, so that no inference from a market share percentage is necessary.

> FN11. See Findings Nos. 49-51 as to the relevant dates in the present controversy.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *896)

Page 24

The evidence shows that Air Preheater had the power to exclude the competition of Power Replacements. Air Preheater *897 was successful in limiting Power Replacements to no more than 25% of the replacement element business known to them and the record leaves us with the impression that this defendant had the power to reduce that market share to a far greater extent. Its motive in not doing so has been amply documented by the remarkable evidence which shows that Air Preheater believed it would maximize its profits by allowing Power Replacements to remain a viable competitor with no more and no less than 25% of the market.

[10][11]    It is clear that Air Preheater willfully maintained this monopoly power, thereby violating Section 2 of the Sherman Act through discriminatory price discounts among its customers [FN12] and the other commercially unfair acts including product disparagement which are detailed in Findings Nos. 97-114. We have concluded that, although we have found no conspiracy present, the disparagement of plaintiffs' products is illegal under Section 2 when coupled with the power to control prices or exclude competition, even if an action based on disparagement alone is not permissible. See Keco Industries, Inc. v. Borg-Warner Corporation, 334 F.Supp. 1240 W.D.Pa.1971). Further, the stamping of drawings to discourage the customer from turning to Power Replacements is also illegal under Section 2. In United States v. United Shoe Machinery Corp., 1 Cir., 110 F.Supp. 295, 340, the complex of obligations and rights accruing under United's leasing system was struck down by Judge Wyzanski because "they deter a shoe manufacturer from disposing of a United Machine and acquiring a competitor's machine." We also hold that stamping the drawings in this manner constitutes unlawful retention of control over a sold product which was proscribed in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

FN12. The illegal price discrimination is discussed in detail in the section which follows. Because we have decided that defendants have not met their burden of proof as to the meeting competition defense under the Robinson-Patman Act, it is unnecessary for use to decide whether that defense is available under Section 2.

[12]    It is important to note that plaintiffs would

have proven a violation of Section 2 even if they had not shown that success rewarded defendant's *attempt* to monopolize. Plaintiffs have had no difficulty in establishing that Air Preheater, while possessing a significant degree of market power, engaged in a course of conduct which was likely to achieve monopoly power, and also that Air Preheater committed certain commercially unfair acts with the specific intent to injure plaintiffs and eliminate competition, thereby proving attempted monopolization. See Times Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

*The Robinson-Patman Act [FN13]*

FN13. "§ 13 Discrimination in price, services, or facilities.
(a) Price: selection of customers.
It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: PROVIDED, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered:    PROVIDED, HOWEVER, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *897)

of monopoly in any line of commerce; and the foregoing shall not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade; *And provided further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

(b) Burden of rebutting prima-facie case of discrimination.

Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

[13]  The only question which we are asked to resolve under the Robinson-Patman *898 Act is whether defendants have met their burden of proving that they have been meeting competition in good faith by offering price discounts and freight allowances to selected customers. [FN14]  We have concluded that defendants have not met their burden for the reasons stated in Finding No. 97.

FN14.  That the meeting competition defense is defendants' burden is specifically written into Section 2(b) of the Act. Standard Oil Co. v. FTC, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951).

[14]  Defendants have placed great reliance on the

fact that after plaintiffs accused them of illegal price discrimination in 1965, "competitive ground rules" were established by Air Preheater's counsel which encouraged Baker to always bid above the competition. Apparently, it was felt that such a practice would preclude a later judicial determination that Air Preheater had been trying to undercut or beat the competitor's price. However, in judging whether the seller has met rather than beaten his competition, we must do more than make a superficial dollar and cents comparison between the discriminatory price and the assumed competitive price. Since Air Preheater's product commands a premium in the replacement element market, it can illegally beat the price levels of Power Replacements even if it studiously obeyed the instructions of its attorneys. See Callaway Mills Company v. F. T. C., 362 F.2d 435, 443 (5th Cir. 1966).

After finding that Baker admittedly fabricated "documentations" on several Florida Power and Light jobs (See Finding No. 95), it was impossible to determine whether any of the other documentations were bona fide. Further, on several jobs involving "loyal customers" of Air Preheater, we questioned how Air Preheater could be said to have been meeting competition where there was little likelihood that Power Replacements had been asked to bid (and, in fact, did not bid). But without pointing to any single factor as determinative, defendants' evidence failed to satisfy us that Air Preheater was meeting competition in good faith since 1965 when making discriminatory price discounts and freight allowances.

*899 RELIEF

[15]  In awarding damages to plaintiffs but limiting the amount to the lost profits in the transactions enumerated in Finding No. 96, we are mindful of the instructions of the Supreme Court that "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created ..." and "in such circumstances juries are allowed to act upon probable and inferential, as well as direct and positive proof." Bigelow v. RKO Pictures, 327 U.S. 251, 264-265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1945). More recently, the Court declared that:

"Trial and appellate courts alike must also observe the practical limits of the burden of proof which



may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, *not shown to be attributable to other causes,* that defendants' wrongful acts had caused damage to the plaintiffs.' Bigelow v. RKO Pictures, Inc., *supra.*" (Emphasis added). Zenith Corp. v. Hazeltine, 395 U.S. 100, 89 S.Ct. 1562, 23 L. Ed.2d 129 (1969).

[16] We are satisfied that plaintiffs' evidence as to the profit percentages for increased sales provides a reasonable basis for the calculation of damages for the transactions in which defendants have violated the Robinson-Patman Act. While these figures are by no means precise or mathematically certain, we have found that they are sufficient under the liberal standard of proof which the Supreme Court has delineated in this area. However, we have concluded that plaintiffs' alternative method of calculation of lost sales for the years in question requires us to engage in the type of conjecture the Court has warned us to avoid or "to base a judgment on speculation or guesswork," Zenith Corp. v. Hazeltine, *supra* at 124, 89 S Ct. at 1577. (See Findings Nos. 12, 123).

[17] As in any case, it was plaintiffs' burden to prove that its damages were in fact caused by Air Preheater's illegal actions, and the lack of any testimony from the individual customers has raised an interesting question in this regard. We have concluded that since plaintiffs have made out a *prima-facie* case as to the transactions enumerated in Finding No. 96, it was *defendants'* burden to establish that the loss of the sale to Air Preheater was the result of a cause unrelated to the illegal price discount. [FN15] We agree with the court in American Cooperative Serum Ass'n v. Anchor Serum Co., 153 F.2d 907, 912 (7th Cir. 1946), cert. denied, 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625 (1946), rehearing denied, 329 U.S. 826, 67 S.Ct. 182, 91 L.Ed. 701 (1946) which held as follows:

FN15 We have also concluded that where plaintiffs did not submit a bid, no *prima-facie* case of price discrimination resulting in loss of the job to Air Preheater has been proven. In these cases, we hold it was plaintiffs' burden to adduce evidence from which we could conclude that defendants were responsible for the failure of the customer to request a bid from PRC or PRI. (See Finding No 98).

"It is further contended that the evidence does not disclose that the defendants' price cutting was the cause of plaintiff's inability to sell its product. We can conceive of no fact which would more surely cause such inability than a cut in price by one's competitor. Here the parties stipulate that the serum produced by plaintiff and Anchor was of like grade and quality. Under these circumstances, coupled with the facts that the defendants*900 did indirectly cut their price, regardless of the Marketing Agreement, a prima facie case was made and plaintiff was not required in the first instance to prove the absence of all other conceivable causes. Under this statute when a prima facie case is made, the burden shifts to the defendant, if it can do so, to show that the damage, if any, was otherwise caused. 15 U.S.C.A. § 13(b)."
See also Fontana Aviation, Inc. v. Beech Aircraft Corporation, 432 F.2d 1080, 1087 (7th Cir. 1970).

[18] In addition to damages, we have also concluded that equitable relief is appropriate and necessary. In Zenith Corp. v. Hazeltine, *supra,* the Court indicated that the injunctive remedy shall be freely available where the plaintiffs have demonstrated
"A significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur
....
Moreover, the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws4)4B"B" 395 U.S. at 130-131, 89 S.Ct. at 1580.

We agree with plaintiffs' suggestion that counsel can be helpful to the court in framing the decree, having a realistic view of the commercial realities involved. (N.T. December 1, 1972, pp. 33-35). Therefore we will instruct counsel to submit a proposed form of Order no later than fifteen (15)

© 2006 Thomson/West. No Claim to Orig. U.S Govt. Works.

356 F.Supp. 872
(Cite as: 356 F.Supp. 872, *900)

days from the date of this Opinion.

[19]    Our conclusions as to Air Preheater's violations of the antitrust laws and our awarding of damages also require our awarding to plaintiffs the cost of this suit, including a reasonable attorney's fee. 15 U.S.C. § 15. Therefore, we shall expect counsel to submit a detailed accounting of the information we will need to impose such costs.

## CONCLUSIONS OF LAW

1.   The court has jurisdiction of the parties and of the subject matter in these consolidated actions.

2.   Since August 4, 1965, the date of a prior release, Air Preheater has violated Section 2 of the Sherman Act by monopolizing and by attempting to monopolize the market for replacement element.

3.   Since August 4, 1965, Air Preheater has violated the Robinson-Patman Act and Section 2 of the Sherman Act by discriminating in price between replacement element of like grade and quality.

4.   Plaintiffs are entitled to treble damages in the amount of $1,369,770    (456,590 x 3) and are entitled to costs, a reasonable attorneys' fee and an injunction to restrain the continuing violations.

356 F.Supp. 872, 1973-2 Trade Cases P 74,658

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

