EXHIBIT 25

124 S.Ct. 892

**Page   1**

540 U.S. 389, 124 S.Ct. 892, 157 L.Ed.2d 813, 72 USLW 4111, Fed. Sec. L. Rep. P 92,656,
04 Cal. Daily Op. Serv. 267, 2004 Daily Journal D.A.R. 343, 17 Fla. L. Weekly Fed. S 98
**(Cite as: 540 U.S. 389, 124 S.Ct. 892)**
H

Supreme Court of the United States
SECURITIES AND EXCHANGE COMMISSION,
Petitioner,
v.
Charles E. EDWARDS.
No. 02-1196.

Argued Nov. 4, 2003.
Decided Jan. 13, 2004.

Background: Securities and Exchange Commission
(SEC) brought civil fraud enforcement action against
promoter of arrangement in which investors bought
pay phones and then leased them back to promoter
in exchange for monthly payment. The United States
District Court for the Northern District of Georgia,
Jack T. Camp, J., 123 F.Supp.2d 1349, granted
preliminary injunction against promoter. The United
States Court of Appeals for the Eleventh Circuit
reversed, 300 F.3d 1281. Certiorari was granted.

Holding:   The United States Supreme Court,
Justice O'Connor, held that investment scheme
offering contractual entitlement to fixed rate of
return can be an "investment contract" and thus a
"security" subject to federal securities laws.
Reversed and remanded.

West Headnotes

[1] Securities Regulation ⟸ 5.10
349Bk5.10 Most Cited Cases
In determining whether particular scheme is
"investment contract" and thus within federal
securities statutes' definition of "security," court
looks to whether scheme involves investment of
money in common enterprise, with profits, i.e.
return on investors' investment as opposed to profits
of scheme in which they invest, to come solely from
efforts of others. Securities Act of 1933, § 2(a)(1),
15 U.S.C.A. § 77b(a)(1); Securities Exchange Act
of 1934, § 3(a)(10), 15 U.S.C.A. §78c(a)(10).

[2] Securities Regulation ⟸ 5.10
349Bk5.10 Most Cited Cases
Investment scheme offering contractual entitlement
to fixed rate of return can be an "investment
contract" and thus a "security" subject to federal
securities laws. Securities Act of 1933, § 2(a)(1),

15 U.S.C.A. § 77b(a)(1); Securities Exchange Act
of 1934, § 3(a)(10), 15 U.S.C.A. §78c(a)(10).

[3] Securities Regulation ⟸ 5.11
349Bk5.11 Most Cited Cases
Promise of fixed rather than variable return to
investors who bought pay phones and then leased
them back to promoter in exchange for monthly
payment   did   not   preclude   arrangement's
classification as investment contract within federal
securities   statutes'   definition   of   "security."
Securities Act of 1933, § 2(a)(1), 15 U.S.C.A. §
77b(a)(1); Securities Exchange Act of 1934, §
3(a)(10), 15 U.S.C.A. §78c(a)(10).

[4] Securities Regulation ⟸ 5.11
349Bk5.11 Most Cited Cases
Fact that investors who bought pay phones and then
leased them back to promoter in exchange for
monthly payment had contractual entitlement to
return did not mean that such return was not derived
solely from efforts of others, so as to preclude
arrangement's classification as "investment contract"
within federal securities statutes' definition of
"security."   Securities Act of 1933, § 2(a)(1), 15
U.S.C.A. § 77b(a)(1); Securities Exchange Act of
1934, § 3(a)(10), 15 U.S.C.A. §78c(a)(10).
**\*\*893** *Syllabus* [FN*]

FN* The syllabus constitutes no part of the opinion
of the Court but has been prepared by the Reporter
of Decisions for the convenience of the reader.   See
*United States v. Detroit Timber & Lumber Co.*, 200
U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.
Respondent was the chairman, chief executive
officer, and sole shareholder of ETS Payphones,
Inc., which sold payphones to the public via
independent distributors.   The payphones were
offered with an agreement under which ETS leased
back the payphone from the purchaser for a fixed
monthly payment, thereby giving purchasers a fixed
14% annual return on their investment.   Although
ETS'   marketing   materials   trumpeted   the
"incomparable pay phone" as "an exciting business
opportunity,"   the   payphones   did   not   generate
enough revenue for ETS to make the payments
required by the leaseback agreements, so the
company depended on funds from new investors to
meet its obligations.   After ETS filed for bankruptcy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 892
(Cite as: 540 U.S. 389, 124 S.Ct. 892, **893)

protection, the Securities and Exchange Commission (SEC) brought this civil enforcement action, alleging, among other things, that respondent and ETS had violated registration requirements and antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, and Rule 10b-5 thereunder. The District Court concluded that the sale-and-**894 leaseback arrangement was an "investment contract" within the meaning of, and therefore subject to, the federal securities laws. The Eleventh Circuit reversed, holding that (1) this Court's opinions require an "investment contract" to offer either capital appreciation or a participation in an enterprise's earnings, and thus exclude schemes offering a fixed rate of return; and (2) those opinions' requirement that the return on the investment be derived solely from the efforts of others was not satisfied when the purchasers had a contractual entitlement to the return.

*Held:* An investment scheme promising a fixed rate of return can be an "investment contract" and thus a "security" subject to the federal securities laws. Section 2(a)(1) of the 1933 Act and § 3(a)(10) of the 1934 Act define "security" to include an "investment contract," but do not define "investment contract." This Court has established that the test for determining whether a particular scheme is an investment contract is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1100. This definition embodies a flexible, rather than a static, principle that is capable of adaptation to meet *390 the countless and variable schemes devised by those seeking to use others' money on the promise of profits. *Id.,* at 299, 66 S.Ct. 1100. The profits this Court was speaking of in *Howey* are profits--in the sense of the income or return--that investors seek on their investment, not the profits of the scheme in which they invest, and may include, for example, dividends, other periodic payments, or the increased value of the investment. There is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the test, so understood. In both cases, the investing public is attracted by representations of investment income. Moreover, investments pitched as low risk (such as those offering a "guaranteed" fixed return) are particularly attractive to individuals more vulnerable to investment fraud, including older and less

sophisticated investors. Under the reading respondent advances, unscrupulous marketers of investments could evade the securities laws by picking a rate of return to promise. This Court will not read into the securities laws a limitation not compelled by the language that would so undermine the laws' purposes. Respondent's claim that including investment schemes promising a fixed return among investment contracts conflicts with precedent is mistaken, as no distinction between fixed and variable returns was drawn in the blue sky law cases that the *Howey* Court relied on, and no post-*Howey* decision is to the contrary, see *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852-853, 95 S.Ct. 2051, 44 L.Ed.2d 621. Dictum suggesting otherwise in *Reves v. Ernst & Young,* 494 U.S. 56, 68, n. 4, 110 S.Ct. 945, 108 L.Ed.2d 47, was incorrect. The SEC has consistently maintained that a promise of a fixed return does not preclude a scheme from being an investment contract. The Eleventh Circuit's alternative holding, that respondent's scheme falls outside the definition because purchasers had a contractual entitlement to a return, is incorrect and inconsistent with this Court's precedent. Pp. 896-899.

300 F.3d 1281, reversed and remanded.

O'CONNOR, J., delivered the opinion for a unanimous Court.

Theodore B. Olson, Washington, DC, for petitioner.

Michael K. Wolensky, for respondent.

**895 Michael K. Wolensky, Ethan H. Cohen, Laura J. Sauriol, Kutak Rock LLP, Atlanta, GA, for respondent.

Giovanni P. Prezioso, General Counsel, Meyer Eisenberg, Deputy General Counsel, Jacob H. Stillman, Solicitor, Susan S. McDonald, Senior Litigation Counsel, Catherine A. Broderick, Counsel to the Assistant General Counsel, Washington, D.C., Theodore B. Olson, Solicitor General, Edwin S. Kneedler, Deputy Solicitor General, Matthew D. Roberts, Assistant to the Solicitor General Department of Justice Washington, D.C., for Securities and Exchange Commission

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Justice O'CONNOR delivered the opinion of the Court.

*391 "Opportunity doesn't always knock ... sometimes it rings." App. 113 (ETS Payphones promotional brochure). And sometimes it hangs up. So it did for the 10,000 people who invested a total of $300 million in the payphone sale-and-leaseback arrangements touted by respondent under that slogan. The Securities and Exchange Commission (SEC) argues that the arrangements were investment contracts, and thus were subject to regulation under the federal securities laws. In this case, we must decide whether a moneymaking scheme is excluded from the term "investment contract" simply because the scheme offered a contractual entitlement to a fixed, rather than a variable, return.

I

Respondent Charles Edwards was the chairman, chief executive officer, and sole shareholder of ETS Payphones, Inc. (ETS). [FN*] ETS, acting partly through a subsidiary also controlled by respondent, sold payphones to the public via independent distributors. The payphones were offered packaged with a site lease, a 5-year leaseback and management agreement, and a buyback agreement. All but a tiny fraction of purchasers chose this package, although other management options were offered. The purchase price for the payphone packages was approximately $7,000. Under the leaseback and management agreement, purchasers received $82 per month, a 14% annual return. Purchasers were not involved in the day-to-day operation of the payphones they owned. ETS selected the site for the phone, installed the *392 equipment, arranged for connection and long-distance service, collected coin revenues, and maintained and repaired the phones. Under the buyback agreement, ETS promised to refund the full purchase price of the package at the end of the lease or within 180 days of a purchaser's request.

FN* Because the Court of Appeals ordered the complaint dismissed, we treat the case as we would an appeal from a successful motion to dismiss and accept as true the allegations in the complaint. *SEC v. Zandford,* 535 U.S. 813, 818, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002); *Saudi Arabia v. Nelson,* 507 U.S. 349, 351, 354, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

In its marketing materials and on its Web site, ETS trumpeted the "incomparable pay phone" as "an exciting business opportunity," in which recent deregulation had "open[ed] the door for profits for individual pay phone owners and operators." According to ETS, "[v]ery few business opportunities can offer the potential for ongoing revenue generation that is available in today's pay telephone industry." App. 114-115 (ETS brochure); *id.,* at 227 **896 (ETS Web site); see *id.,* at 13 (Complaint ¶¶ 37-38).

The payphones did not generate enough revenue for ETS to make the payments required by the leaseback agreements, so the company depended on funds from new investors to meet its obligations. In September 2000, ETS filed for bankruptcy protection. The SEC brought this civil enforcement action the same month. It alleged that respondent and ETS had violated the registration requirements of §§ 5(a) and (c) of the Securities Act of 1933, 68 Stat. 684, 15 U.S.C. §§ 77e(a), (c), the antifraud provisions of both § 17(a) of the Securities Act of 1933, 114 Stat. 2763A-452, 15 U.S.C. § 77q(a), and § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 114 Stat. 2763A-454, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 CFR § 240.10b-5 (2003). The District Court concluded that the payphone sale-and-leaseback arrangement was an investment contract within the meaning of, and therefore was subject to, the federal securities laws. *SEC v. ETS Payphones, Inc.,* 123 F.Supp.2d 1349 (N.D.Ga.2000). The Court of Appeals reversed. 300 F.3d 1281 (C.A.11 2002) *(per curiam).* It held that respondent's scheme was not an investment contract, on two grounds. First, it read this Court's opinions to require that an investment contract offer either capital appreciation *393 or a participation in the earnings of the enterprise, and thus to exclude schemes, such as respondent's, offering a fixed rate of return. *Id.,* at 1284-1285. Second, it held that our opinions' requirement that the return on the investment be "derived solely from the efforts of others" was not satisfied when the purchasers had a contractual entitlement to the return. *Id.,* at 1285. We conclude that it erred on both grounds.

II

"Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Reves v. Ernst & Young,* 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). To that end, it enacted a broad definition of "security," sufficient "to encompass virtually any instrument that might be sold as an investment." *Ibid.* Section 2(a)(1) of the 1933 Act, 15 U.S.C. § 77b(a)(1), and § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), in slightly different formulations which we have treated as essentially identical in meaning, *Reves, supra,* at 61, n. 1, 110 S.Ct. 945, define "security" to include "any note, stock, treasury stock, security future, bond, debenture, ... investment contract, ... [or any] instrument commonly known as a 'security.' " "Investment contract" is not itself defined.

[1] The test for whether a particular scheme is an investment contract was established in our decision in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). We look to "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.,* at 301, 66 S.Ct. 1100. This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.,* at 299, 66 S.Ct. 1100.

In reaching that result, we first observed that when Congress included "investment contract" in the definition of security, it "was using a term the meaning of which had been *394 crystallized" by the state courts' interpretation of their " 'blue sky' " laws. *Id.,* at 298, 66 S.Ct. 1100. (Those laws were the precursors to federal securities regulation and were so named, it **897 seems, because they were "aimed at promoters who 'would sell building lots in the blue sky in fee simple.' " 1 L. Loss & J. Seligman, Securities Regulation 36, 31-43 (3d ed.1998) (quoting Mulvey, Blue Sky Law, 36 Can. L. Times 37 (1916)).) The state courts had defined an investment contract as "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment,' " and had "uniformly applied" that definition to "a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or [a third party]." *Howey, supra,* at 298, 66 S.Ct. 1100 (quoting *State v. Gopher Tire & Rubber Co.,* 146 Minn. 52, 56, 177 N.W. 937, 938 (1920)).

Thus, when we held that "profits" must "come solely from the efforts of others," we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. We used "profits" in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment.

[2][3] There is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the test, so understood. In both cases, the investing public is attracted by representations of investment income, as purchasers were in this case by ETS' invitation to " 'watch the profits add up.' " App. 13 (Complaint ¶ 38). Moreover, investments pitched as low-risk (such as those offering a "guaranteed" fixed return) are particularly attractive to individuals more vulnerable to investment fraud, including older and less sophisticated investors. See 2 S.Rep. No. 102-261, App., p. 326 (1992) (Staff Summary of Federal Trade Commission Activities Affecting Older Consumers). Under the reading respondent advances, unscrupulous marketers of investmentscould*395 evade the securities laws by picking a rate of return to promise. We will not read into the securities laws a limitation not compelled by the language that would so undermine the laws' purposes.

Respondent protests that including investment schemes promising a fixed return among investment contracts conflicts with our precedent. We disagree. No distinction between fixed and variable returns was drawn in the blue sky law cases that the *Howey* Court used, in formulating the test, as its evidence of Congress' understanding of the term. 328 U.S., at 298, and n. 4, 66 S.Ct. 1100. Indeed, two of those cases involved an investment contract in which a fixed return was promised. *People v. White,* 124 Cal.App. 548, 550-551, 12 P.2d 1078, 1079 (1932) (agreement between defendant and investors stated that investor would give defendant $5,000, and would receive $7,500 from defendant one year later); *Stevens v. Liberty Packing Corp.,* 111 N.J.Eq. 61, 62-63, 161 A. 193, 193-194 (1932) ("ironclad contract" offered by defendant to investors entitled investors to $56 per year for 10 years on initial investment of $175, ostensibly in sale and leaseback of breeding rabbits).

None of our post-*Howey* decisions is to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



contrary. In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), we considered whether "shares" in a nonprofit housing cooperative were investment contracts under the securities laws. We identified the "touchstone" of an investment contract as "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others," and then laid out two examples of investor interests that we had **898 previously found to be "profits." *Id.,* at 852, 95 S.Ct. 2051. Those were "capital appreciation resulting from the development of the initial investment" and "participation in earnings resulting from the use of investors' funds." *Ibid.* We contrasted those examples, in which "the investor is 'attracted solely by the prospects of a return' " on the investment, with *396 housing cooperative shares, regarding which the purchaser "is motivated by a desire to use or consume the item purchased." *Id.,* at 852-853, 95 S.Ct. 2051 (quoting *Howey, supra,* at 300, 66 S.Ct. 1100). Thus, *Forman* supports the commonsense understanding of "profits" in the *Howey* test as simply "financial returns on ... investments." 421 U.S., at 853, 95 S.Ct. 2051.

Concededly, *Forman's* illustrative description of prior decisions on "profits" appears to have been mistaken for an exclusive list in a case considering the scope of a different term in the definition of a security, "note." See *Reves,* 494 U.S., at 68, n. 4, 110 S.Ct. 945. But that was a misreading of *Forman,* and we will not bind ourselves unnecessarily to passing dictum that would frustrate Congress' intent to regulate all of the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey, supra,* at 299, 66 S.Ct. 1100.

Given that respondent's position is supported neither by the purposes of the securities laws nor by our precedents, it is no surprise that the SEC has consistently taken the opposite position, and maintained that a promise of a fixed return does not preclude a scheme from being an investment contract. It has done so in formal adjudications, *e.g., In re Abbett, Sommer & Co.,* 44 S.E.C. 104, 1969 WL 95359 (1969) (holding that mortgage notes, sold with a package of management services and a promise to repurchase the notes in the event of default, were investment contracts); see also *In re*

*Union Home Loans* (Dec. 16, 1982), 26 S.E.C. Docket 1517, 1519 (report and order regarding settlement, stating that sale of promissory notes secured by deeds of trust, coupled with management services and providing investors "a specified percentage return on their investment," were investment contracts), and in enforcement actions, *e.g., SEC v. Universal Service Assn.,* 106 F.2d 232, 234, 237 (C.A.7 1939) (accepting SEC's position that an investment scheme promising "assured profit of 30% per annum with no chance of risk or loss to the contributor" was a security because it satisfied the pertinent *397 substance of the *Howey* test, " '[t]he investment of money with the expectation of profit through the efforts of other persons' "); see also *SEC v. American Trailer Rentals Co.,* 379 U.S. 594, 598, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965) (noting that "the SEC advised" the respondent that its "sale and lease-back arrangements," in which investors received "a set 2% of their investment per month for 10 years," "were investment contracts and therefore securities" under the 1933 Act).

[4] The Eleventh Circuit's perfunctory alternative holding, that respondent's scheme falls outside the definition because purchasers had a contractual entitlement to a return, is incorrect and inconsistent with our precedent. We are considering investment *contracts.* The fact that investors have bargained for a return on their investment does not mean that the return is not also expected to come solely from the efforts of others. Any other conclusion would conflict with our holding that an investment contract was offered in *Howey* itself. 328 U.S., at 295-296, 66 S.Ct. 1100 (service contract entitled investors to allocation of net profits).

We hold that an investment scheme promising a fixed rate of return can be an **899 "investment contract" and thus a "security" subject to the federal securities laws. The judgment of the United States Court of Appeals for the Eleventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

540 U.S. 389, 124 S.Ct. 892, 157 L.Ed.2d 813, 72 USLW 4111, Fed. Sec. L. Rep. P 92,656, 04 Cal. Daily Op. Serv. 267, 2004 Daily Journal D.A.R. 343, 17 Fla. L. Weekly Fed. S 98

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



124 S.Ct. 892
(Cite as: 540 U.S. 389, *397, 124 S.Ct. 892, **899)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.