**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and | ) | |
| AMD INTERNATIONAL SALES & SERVICE, | ) | |
| LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 05-441 (JJF) |
| v. | ) | |
| | ) | DM No. 1 |
| INTEL CORPORATION and | ) | |
| INTEL KABUSHIKI KAISHA, | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| IN RE INTEL CORPORATION | ) | |
| MICROPROCESSOR ANTITRUST | ) | C.A. No. 05-MD-1717 (JJF) |
| LITIGATION | ) | |

<u>**AMD'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS
MOTION TO COMPEL**</u>

Of Counsel:
Charles P. Diamond
Linda J. Smith
O'Melveny & Myers, LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067-6035
(310) 553-6700

Mark A. Samuels
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, 90071
(213) 430-6340

Jesse A. Finkelstein (#1090)
Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Finkelstein@rlf.com
Cottrell@rlf.com
Shandler@rlf.com
Fineman@rlf.com
Attorneys for Plaintiffs Advanced Micro
Devices, Inc. and AMD International Sales &
Service, Ltd.

Dated: November 21, 2006

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

I.      NEITHER JUDGE FARNAN'S DECISION NOR THE FTAIA STAND
        AS A BAR TO AMD'S FOREIGN CONDUCT DISCOVERY ........................... 6

II.     AMD IS ENTITLED TO FOREIGN CONDUCT DISCOVERY TO
        SHOW THAT INTEL WRONGFULLY PREVENTED IT FROM
        SELLING DOMESTICALLY -MADE MICROPROCESSORS TO
        FOREIGN CUSTOMERS ..................................................................................... 8

        A.      By Preventing Foreign Customers From Freely Dealing with
                AMD, Intel Caused "Direct" Antitrust Injury To AMD's Export
                Trade ........................................................................................................... 9

        B.      AMD's Export Claims are Not Barred by the Statute of Limitations ...... 14

        C.      The FTAIA Was Not Intended to Bar Export Claims from Rivals
                Driven Out of Business By Anticompetitive Conduct ............................ 16

III.    EVIDENCE OF FOREIGN EXCLUSIONARY CONDUCT IS
        DISCOVERABLE AND ADMISSIBLE TO PROVE
        MONOPOLIZATION IN THE UNITED STATES ........................................... 17

        A.      Foreign Conduct Discovery is Relevant to Proving Intel's Market
                Power ......................................................................................................... 17

        B.      Foreign Conduct Discovery is Essential to Proving That Intel's
                Anticompetitive Conduct Within the United States is Actionable
                Under Section 2 ......................................................................................... 19

        C.      Courts Construe Relevance Broadly in Antitrust Cases ......................... 24

CONCLUSION ........................................................................................................ 25

i

# TABLE OF AUTHORITIES

## CASES

*Access Telecom, Inc. v. MCI Telecommunications Corp.*,
  197 F.3d 694 (5th Cir. 1999) ........................................................................11, 17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)..........................................................................................19

*Baker v. United States*,
  255 F.2d 619 (9th Cir. 1958) ............................................................................22

*Beazer E., Inc. v. Mead Corp.*,
  412 F.3d 429 (3rd. Cir. 2005), cert. denied, --- U.S. ---, 126 S.Ct. 1040
  (2006)...................................................................................................................9

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  2005-1 Trade Cas. (CCH) ¶ 74,769 (E.D. Pa. Mar. 30, 2005) ............................19

*Brunswick Corp. v. Riegel Textile Corp.*,
  752 F.2d 261 (7th Cir. 1984) ............................................................................14

*City of Anaheim v. Southern California Edison*,
  955 F.2d 1373 (9th Cir. 1992) ..........................................................................25

*Coors Brewing Co. v. Miller Brewing Co.*,
  889 F. Supp. 1394 (D. Colo. 1995)....................................................................17

*Crompton Corp. v. Clarion Corp.*,
  220 F. Supp. 2d 569 (M.D. La. 2002)................................................................16

*DXS, Inc. v. Siemens Medical Systems, Inc.*,
  100 F.3d 462 (6th Cir. 1996) ............................................................................15

*Ellis v. United States*,
  138 F.2d 612 (8th Cir. 1943) .......................................................................22, 23

*F. Hoffman-LaRoche Ltd. v. Empagran S.A.*,
  542 U.S. 155 ......................................................................................................23

*Gottlieb v. Carnival Corp.*,
  436 F.3d 335 (2d Cir. 2006)................................................................................7

*Hanover Shoe v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968)...........................................................................................15

*Invacare Corp. v. Respironics, Inc.*,
  2006-1 Trade Cas. (CCH) ¶ 75,311 (N.D. Ohio 2006)........................................16

ii

*Kellam Energy, Inc. v. Duncan,*
    616 F. Supp. 215 (D. Del. 1985)......................................................................16

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997)......................................................................................15

*La Buy v. Howes Leather Co.,*
    352 U.S. 249 (1957)........................................................................................9

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003)..............................................................19, 20, 25

*Lewis v. ACB Bus. Serv., Inc.,*
    135 F.3d 389 (6th Cir. 1998) ......................................................................16, 19

*Los Angeles Land Co. v. Brunswick Corp.,*
    6 F.3d 1422 (9th Cir. 1993) ...........................................................................18

*In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retire-*
    *ment Accounts) II, L.P. Sec. Litig.,*
    151 F.R.D. 37 (D. Del. 1993) ........................................................................16

*MM Global Services, Inc. v. Dow Chemical Co.,*
    329 F. Supp. 2d 337 (D. Conn. 2004)............................................................11

*Martin v. El Paso Natural Gas Co.,*
    92 Lab. Cas. (CCH) P 34,116, at 1-3 (W.D. Tex. 1981) .........................16

*Oppenheimer Fund, Inc. v. Sanders,*
    437 U.S. 340 (1978).......................................................................................16

*In re PE Corp. Securities Litigation,*
    221 F.R.D. 20 (D. Conn. 2003).......................................................................8

*Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.,*
    517 F.2d 117 (5th Cir. 1975) ........................................................................15

*Power Replacements Corp. v. Air Preheater Co., Inc.,*
    356 F. Supp. 872 (E.D. Pa. 1973) ................................................................18

*Prudential Ins. Co. of Amer. v. U.S. Gypsum Co.,*
    991 F.2d 1080 (3d Cir. 1993)..........................................................................9

*SEC v. Edwards,*
    540 U.S. 389 (2004).......................................................................................23

*Stauble v. Warrob,*
    977 F.2d 690 (1st Cir. 1992).............................................................................9

RLF1-3085081-1

*Swift & Co. v. United States,*
    196 U.S. 375 (1905)........................................................................................24, 25

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961)..............................................................................................20

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 ........................................................................................................20

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956)..............................................................................................18

*United States v. Time Warner, Inc.,*
    1997-1 Trade Cas. (CCH) ¶ 71,702 (D.D.C. Jan. 22, 1997)............................16, 17

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 12(b) ......................................................................................................1

Fed. R. Civ. P. 53 ..........................................................................................................9

Fed. R. Civ. P. 56 ..........................................................................................................1

U.S. Code Cong. & Admin. News
    H.R. Rep. No. 97-868 (1982).........................................................................*passim*

U.S. Const. Art. I, Sec. 8.............................................................................................22

6 Moore's Federal Practice (3d Ed. 2002) ......................................................................9

2 P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶ 338b, at 145 (rev. ed. 1995) .............15, 16

RLF1-3085081-1

## INTRODUCTION

Discovery of the full record of Intel's exclusionary practices, not just the piece that re-lates to U.S. conduct, is essential if AMD is to have a fair chance to prove its Section 2 claims. To be sure, no barrier to discovery of Intel's foreign conduct arises from either Judge Farnan's order, which is silent on discovery, or the FTAIA, which was intended to preserve a plaintiff's right "**to the extraterritorial pursuit of evidence in appropriate cases**" even where the requisite domestic effects do not exist.[1]

Foreign exclusionary conduct is unquestionably relevant to AMD's export commerce claim — how would a seller ever prove harm to an *export* business other than by showing that it was prevented from selling to *foreign* buyers?  So having no legitimate relevancy defense, Intel mounts an assault on the merits of the claim itself, calling it deficient both under the FTAIA and the statute of limitations.  But this is a discovery dispute, not a Rule 12(b) dismissal motion or Rule 56 motion for summary judgment.  The only issue properly before the Special Master — in-deed, the only issue he can lawfully decide given a charter limited by both the Order of Reference and Article III of the Constitution — is whether the discovery AMD seeks is relevant to a well-pleaded claim in the complaint.  AMD alleges in paragraph 129 of its complaint, which Judge Farnan did not strike, that Intel has caused it substantial harm

> in the form of artificially constrained market share, lost profits and increased costs of capital [and that this] conduct has had, and will continue to have, a direct, substantial and reasonably fore-seeable effect on AMD's ability to sell its goods to foreign cus-tomers in restraint of its U.S.-based and directed business, in-cluding its U.S. export business.

It is entitled under the Federal Rules to discover facts that would support its claims.

In any event, Intel's legal assault on the merits of AMD's export claim is as misguided as it is misdirected.  First, Intel astoundingly maintains that though its exclusionary conduct may have prevented foreign customers from buying domestically manufactured AMD microprocessors,

---

[1] H.R. Rep. No. 97-686, at 13 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487 , 2498 (emphasis added).

1

its customer lockup did not "directly" affect AMD's export business as the FTAIA uses that term. In support, it invokes Judge Farnan's assessment that AMD's loss of sales to U.S. customers was too remote from foreign misconduct since, in his opinion, a half dozen causal links were necessary to tie one to the other. But as demonstrated in Part II(A), AMD's export injury flows directly from Intel's foreign exclusionary practices. From 2001 through 2002, AMD lost sales of additional microprocessors its Austin fab could and would have supplied to export customers had Intel not erected roadblocks to their business. Through 2004, AMD was similarly prevented from exporting Austin-made processors in "current-technology," higher-value transactions and forced to hold them in inventory for later depreciated sale in "older technology" transactions. Intel cannot and does not attempt to portray either foreclosure as too remote under the FTAIA; it largely ignores them.

Most of Intel's opposition is devoted to arguing that its conduct did not proximately cause Fab 25 to go out of business and thus it cannot be held responsible for AMD exiting the export trade and its lost export sales thereafter. Instead, Intel maintains, AMD ceased exporting because it chose not to make the technology investments necessary to keep its Austin fab open, a decision it suggests might have been driven by confidence that AMD could supply all conceivable requirements from its new Dresden fab. But AMD's unopposed declaration states just the opposite. Mr. Siegle explains that AMD decided against further investments in Fab 25 because the level of AMD's business would not justify them, and the studies he mentions (attached here) show that both Fab 25 and Fab 30 would have been necessary to attain the market share AMD was targeting. While Intel is free to argue at trial that other reasons were at work as well, at most its opposition raises a triable issue of fact to be decided in the future.

Equally unpersuasive is Intel's assertion that AMD's export claim is barred by the statute of limitations. That, too, is a defense properly heard in district court, not here, but we show in Part II(B), it is not well-taken anyway. This is not a case where an aggrieved former rival shuts down operations and then sues more than four years later after the limitations period has expired.

Rather AMD continued to manufacture chips in Austin throughout 2001 and 2002 that could have been sold to foreign customers during the limitations period had Intel not prevented it by its continuing misconduct.  AMD then continued to sell domestically manufactured chips for another year and a half (through April 2004) in transactions that were less beneficial to AMD than would have been the case had Intel not prevented AMD's free access to its foreign customers.  Moreover, Intel's essential premise is wrong.  The decision to abandon Fab 25 for microprocessor manufacturing was not made until 2004, just a year and a half before this suit commenced.  As Mr. Siegle explains, had demand warranted it, AMD could and would have upgraded Fab 25 at any time before its dedication to lower-margin flash memory became irreversible.  (Siegle Decl. in Support of AMD's Mot. to Compel ("Siegle Decl.") ¶ 18).

Even if AMD had not pleaded an export claim, evidence of Intel's exclusionary practices would still be relevant and essential to establish predicate facts necessary to show domestic effects actionable under Section 2.  As demonstrated in AMD's opening brief, and as demonstrated again in Part III, foreign conduct is relevant to proving Intel's monopoly power in the worldwide x86 market and essential to proving that its exclusionary conduct within U.S. domestic commerce is actionable under the Sherman Act.  Construing the FTAIA in the manner Intel seeks, so as to preclude foreign conduct discovery in the 70% of the relevant market lying outside the U.S., would effectively nullify application of Section 2 to those who monopolize worldwide markets.  Where, as here, transactions are dispersed throughout the world such that no single country possesses a dominant share, such an interpretation would render U.S. plaintiffs, the U.S. government, and the U.S. courts powerless to redress the domestic harm caused by global monopolists.

AMD's foreign conduct discovery is no fishing expedition.  To the contrary, it is an effort to gather admissible evidence of documented attempts by Intel to prevent AMD's customers worldwide from doing business with it — attempts that, at a minimum, significantly impacted AMD's export business.  As just one example, after an intensive, year-long investigation that included dawn raids on Intel's offices, last year the Japanese Fair Trade Commission ("JFTC")

charged Intel with coercing the major Japanese OEM's into dropping AMD as a supplier.  (Ex. A).

In the words of the JFTC, "By making commitments to provide . . . rebates and/or certain [other]

funds," (id. at 1), Intel paid Sony and Toshiba ― two of AMD's largest export customers ― to

boycott AMD entirely while eliciting commitments from three other OEMs, Fujitsu, NEC and

Hitachi to limit their AMD purchases to 10% or less of their requirements and/or remove AMD

processors from popular lines of computers.  (Ex. A).  According to the JFTC, this was done in

response to AMD's growing acceptance by the Japanese OEMs, raising an Intel concern "that the

sales volume of AMD's [chips] would continuously increase thereafter."  (Ex. A at 5).  Intel did

not contest the JFTC charges.

By its motion, AMD seeks to collect admissible evidence of this and similar exclusionary

conduct, misconduct that had a profound effect on AMD's business.  For example, as shown here,

Intel's lockout of AMD from the Japanese OEMs pulled the rug out from under AMD's Japanese

sales ― which at the time amounted to over a third of the worldwide mobile microprocessor vol-

ume and more than ten percent overall.[2]  A business that took AMD nearly four years to build as

decimated in less than two.



The extremely limited third-party discovery that AMD has conducted so far shows that

the misconduct for which the JFTC cited Intel is only the beginning, and that Intel's practices

abroad affect not only AMD's sales to foreign customers but also its sales *in domestic U.S. com-*

---

[2] As reported by Gartner 4Q04 Japan QStats.

*merce* as well.

REDACTED                           REDACTED

AMD's limited discovery also confirms Intel's worldwide effort to disrupt AMD customer relationships on a worldwide basis.

REDACTED

---

3

4

REDACTED

5

# REDACTED

With Intel's foreign discovery vault still sealed, this is just a taste of what is likely to be found.  And while Intel makes sweeping representations as to the expansive discovery it still plans to make respecting plans, forecasts and pricing in foreign markets, Intel does not dispute that it has pulled off the table all customer-related material that would corroborate AMD's charge that it has bullied or bought agreements from foreign microprocessor purchasers not to do business with its only competitor — the guts of this case.[5]

## I.    NEITHER JUDGE FARNAN'S DECISION NOR THE FTAIA STAND AS A BAR TO AMD'S FOREIGN CONDUCT DISCOVERY

The Special Master writes on a clean slate with respect to AMD's right to foreign conduct discovery.  Although Judge Farnan construed the FTAIA to prohibit AMD from stating a claim for "lost sales of AMD's German-made microprocessors to foreign customers" (Mem. Op. D.I. 279 in MDL Docket No. 05-1717 ("Mem. Op.") at 7), that decision addressed the *claims* AMD may pursue, not the *discovery* it may seek.  *See also id.* at 11 ("[AMD] cannot demonstrate than any such domestic effect gives rise to its claim"); *id.* at 15 ("In sum, the Court concludes that it lacks subject matter jurisdiction under the FTAIA over AMD's *claims, to the extent those claims are based* on foreign conduct *and foreign harm*.") (emphasis added); *id* at 17 ("the Court concludes that AMD lacks standing to pursue its *claims based on foreign injury*") (emphasis

---

[5] Intel's feigned cries of outrage notwithstanding, its production of foreign conduct evidence will not be burdensome.  Intel complains that AMD has sought "every piece of paper and bit of data" regarding its dealings with customers.  (Intel's Opp. to AMD's Mot. to Compel ("Intel Opp.") at 6).  But in negotiations prior to Judge Farnan's decision, the parties agreed to appropriate reciprocal limitations on the scope of discovery, both foreign and domestic, and those limitations will protect Intel from any inappropriate burden if it is ordered to produce the foreign conduct discovery AMD has requested.  Similarly, although Intel gratuitously presumes to invoke the interests of the Japanese OEMs in avoiding what it says is equally burdensome discovery, as the Special Master knows AMD has agreed to a stepped production by them to avoid an undue burden, and has thus far compensated most of them for their out-of-pocket production costs.  In short, burden is not an issue here.

6

added); *id*. ("the Court will dismiss AMD's *claims for foreign injuries* arising as a result of Intel's alleged foreign conduct") (emphasis added). Nowhere does Judge Farnan's opinion discuss whether foreign discovery might be relevant to proving claims he did not strike; indeed, the word "discovery" does not appear in his decision. And Intel gets no mileage from his striking of allegations of foreign misconduct that had insufficient direct effects on U.S. sales. For as Intel concedes in its opposition, quoting Supreme Court precedent, while it can be proper to deny discovery that is "relevant only to claims or defenses that have been stricken" it is not proper where "the information sought is otherwise relevant to issues in the case." (Intel's Opp. to AMD's Mot. to Compel ("Intel Opp." at 4). As discussed below, that is the situation here.

Nor does the FTAIA itself stand as an obstacle to AMD's foreign conduct discovery. Tellingly, Intel does not cite a *single case* in which a court has held that the FTAIA bars discovery of foreign conduct relevant to a U.S. claim. And for good reason: like Judge Farnan's decision, the statute concerns itself with foreign commerce claims to which the foreign anticompetitive conduct may give rise. Like the decision, the FTAIA cannot be read as a barrier to otherwise relevant discovery. The House Report could not be clearer: "The bill [FTAIA] is not intended to restrict . . . *the extraterritorial pursuit of evidence in appropriate cases*." H.R. Rep. 97-686 at 13 (emphasis added). Moreover, as is discussed in more detail below, courts have long held that evidence of conduct that would fall outside a court's jurisdiction to prohibit or punish is nonetheless admissible as proof in support of a claim properly before the court. *See infra* Part III(B). There is nothing in the FTAIA that even hints at any intent to override this basic jurisprudential rule. *Cf. Gottlieb v. Carnival Corp*., 436 F.3d 335, 338 (2d Cir. 2006) (statutes to be read in light of background legal principles in effect at the time of their enactment). Thus, even if, as Judge Farnan held, the FTAIA precludes this Court from asserting jurisdiction over so much of AMD's claim as arises from lost sales of foreign-made microprocessors to foreign customers, it emphatically does not affect this Court's power to order discovery of foreign conduct where, as here, it is relevant to the remaining claims lying within the Court's jurisdiction.

7

II.   **AMD IS ENTITLED TO FOREIGN CONDUCT DISCOVERY TO SHOW THAT INTEL WRONGFULLY PREVENTED IT FROM SELLING DOMESTICALLY-MADE MICROPROCESSORS TO FOREIGN CUSTOMERS**

It follows as the day does the night that proving harm to a rival's ***export*** business requires a showing of interference with the rival's actual or prospective ***foreign*** customers (since sales to those living here hardly qualifies as part of the U.S. export trade). And even Intel cannot conjure a way for AMD to prove interference with its foreign customers other than by engaging in foreign conduct discovery.

Instead of challenging the discovery's relevance to AMD's export claim, Intel invites the Special Master to take Judge Farnan's place and decide whether AMD has a viable export commerce claim at all, an issue that Judge Farnan never considered or addressed.[6] It observes that Judge Farnan has already provided the "framework" for such a decision, and that the Special Master may appropriately make it because without a viable claim, no discovery should proceed. (*See* Intel Opp. at 19 & n.23).

Intel has it all backwards. As shown in our opening brief, discovery disputes are resolved on the basis of the operative pleadings. *See e.g.*, *In re PE Corp. Securities Litigation*, 221 F.R.D. 20, 24 (D. Conn. 2003) (citing 6 Moore's Federal Practice § 26.41[6][c] (3d ed. 2002)) (facts germane to claim or defense alleged in pleadings are the proper subject of discovery). AMD has alleged, in language quoted earlier, a claim for harm to its microprocessor export business that satisfies Rule 8's notice pleading requirements. As a precondition to pursuing discovery on its

---

[6] Intel concedes that the impact of its foreign conduct on AMD's export activities "were not part of the argument to Judge Farnan during the briefing on jurisdictional issues." (Opp. at 2). Indeed, other than acknowledging that AMD made processors domestically as well as abroad, its motion assiduously avoided the export issue. (*E.g.*, Mem. in Support of Defs. Mot. to Dismiss AMD's Foreign Commerce Claims ("Defs.' Mot.") at 5 n.2 ("The present motion is not addressed to AMD's federal or state allegations of lost sales of its German-made microprocessors to U.S. customers. ***Nor does Intel move to dismiss for jurisdictional deficiencies AMD's allegations related to microprocessors that AMD actually manufactured in the United States*** . . .") (emphasis added). Intel conceded that "AMD may seek relief in this action for alleged domestic injury to its U.S. export and import commerce under the FTAIA . . . ." (Defs.' Mot. at 29).

claim, that is all the rules require.

In any event, the Special Master lacks the power to accept Intel's invitation to rule on the merits. Judge Farnan authorized the Special Master "to hear, resolve and make rulings on all disputes regarding discovery and, when appropriate, enter orders setting forth his rulings." (Order Appointing Spec. Master D.I. 73 in MDL Docket No. 05-1717 at 2). He did not appoint the Special Master to determine whether AMD's export claim passed muster under the FTAIA or whether the statute of limitations barred it. Indeed, such a reference would have violated Rule 53. Decisions going to the merits are matters for Article III judges, as the Third Circuit held in *Prudential Ins. Co. of Amer. v. U.S. Gypsum Co.*, 991 F.2d 1080, 1086-87 (3d Cir. 1993) (holding that a Special Master could not decide statute of limitations defenses and that complexity did not justify an exception).[7] This alone disposes of Intel's justification for refusing to provide discovery plainly relevant to AMD's export claim.

A.    **By Preventing Foreign Customers From Freely Dealing with AMD, Intel Caused "Direct" Antitrust Injury To AMD's Export Trade**

In any event, Intel advances no colorable defenses to AMD's export claim. As to its FTAIA argument, the harms AMD alleges to its export business resulted ***directly*** from Intel's foreign misconduct. That renders wholly inapplicable Judge Farnan's September ruling, which held that Intel's interference with AMD's ability to sell microprocessors to foreign customers did not "directly" harm AMD's domestic business with U.S. customers because the causation chain had too many links to satisfy the FTAIA's "directness" requirement. (Intel Opp. at 9) (characterizing the chain as alleging that reduced foreign revenues made AMD a less profitable company which

---

[7] *Prudential* relied on *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (holding no exceptional circumstances presented by two complicated antitrust cases involving ninety-three plaintiffs and twelve defendants that would justify a district court "delegat[ing] its adjudicatory responsibility in favor of a decision maker who has not been appointed by the President and confirmed by the Senate"); *see also Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429 (3d. Cir. 2005), cert. denied, --- U.S. ---, 126 S.Ct. 1040 (2006) (following *Prudential* to hold that a magistrate judge (acting as a special master) did not have authority to supplant a district judge). *See generally Stauble v. Warrob*, 977 F.2d 690, 696-97 (1st Cir. 1992) ("Because Rule 53 cannot retreat from what Article III requires, a master cannot supplant the district judge. Determining bottom-line legal questions is the responsibility of the court itself.").

9

in turn made it less able to price-compete in the U.S. market which in turn made its products less attractive in the U.S. which in turn made U.S. customers less willing to buy them).

Intel's attempt to apply that reasoning to AMD's export trade claims is, in a word, absurd. Nothing could be more directly connected than interference with a competitor's ability to deal with its foreign customers and the resulting loss of export sales to those customers. In three forms, this is what AMD alleges.

First, even after the Dresden fab came on line in 2000, AMD continued to manufacture microprocessors in Austin, selling over two thirds of the output in the U.S. export trade. For the next three years, it operated with capacity to spare: 2001 production was roughly 25% less than what it was in 2000, and 2002 production was just a third of that in 2001. AMD alleges that in the absence of Intel's foreign misconduct, in 2001 and 2002 (both within the four-year limitations period) it could and would have manufactured and sold significantly more microprocessors than it did, the lion's share for export.[8]

It is impossible to imagine a more direct connection between foreign misconduct (coercing customers to refrain from buying) and an effect on the U.S. export commerce (lost sales). Indeed, redressing a monopolist's market foreclosure of a firm otherwise able to supply is what Section 2 is all about, and the FTAIA allows recovery for precisely this type of "lost export sales." *See, e.g.*, *MM Global Services, Inc. v. Dow Chemical Co.,* 329 F.Supp.2d 337 (D. Conn. 2004) (finding subject matter jurisdiction under the FTAIA where plaintiff, a foreign corporation who purchased defendant's products in the U.S. for sale in India, was "precluded from effectively and fully competing and maximizing their sales" of defendant's products because of defendant's

---

[8] Intel challenges Mr. Siegle's unequivocal statement that Fab 25 could have made and sold more microprocessors in 2001 and 2002 by characterizing Fab 25 as "outdated." (Intel Opp. at 16). But as Mr. Siegle explains, Fab 25 had all the technology necessary to continue producing the K7 (Athlon) generation of chips, which remained AMD's flagship client processor until September 2003 (indeed, it was the only K7 source until Dresden came on stream). While "reinvestment [in the fab] is generally required for each new generation" (Siegle Decl. ¶ 6), the Athlon's successor (the Athlon64) did not become available until Fall 2003, and it did not completely replace the K7 until several years later.

price-fixing scheme); *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694 (5th Cir. 1999) (finding jurisdiction to exist where defendant's foreign actions, aimed at shutting down the market, resulted in plaintiff's "inability to sell its U.S. telephone switching services to all Mexican customers").

Second, by the time Fab 25 suspended microprocessor production at the end of 2002, AMD had built up a substantial inventory of unsold product. (Overholser Decl. in Support of AMD's Mot. to Compel ("Overholser Decl.") ¶¶ 3-4). Had Intel not wrongfully prevented foreign customers from dealing with AMD, AMD would have sold this inventory as current, high-end, high-margin premium product, in large measure to its export customers,[9] rather than carrying it for eighteen months and unloading it after the introduction of newer parts had depreciated its value. Again, it is difficult to imagine a more direct connection between foreign misconduct (coercing customers to refrain from buying) and injury to AMD's export business (lost high-value sales), and Intel makes no effort to show otherwise.[10]

Third, AMD alleges that in the absence of Intel's chokehold on foreign customers, and the consequent reduction in orders for AMD chips, AMD would have continued manufacturing operations at Fab 25 in Austin and remained in the export trade. Intel claims this is not sufficiently "direct" since its foreign misconduct did not cause the plant's closure; it resulted instead from AMD's decision to forego investing in Fab 25.

This is utter sophistry. Preventing foreign customers from buying the microprocessors Fab 25 would have produced was central to AMD's decision not to make the investment neces-

---

[9] Historically, 70% of Fab 25's shipments went to foreign customers (Overholser Decl. ¶ 4), and there is no reason to believe that the percentage would have changed had AMD received more orders.

[10] Instead, Intel claims that AMD waived any export claim relating to microprocessors it actually made at Fab 25 by the statement in its opening brief that its "export claim arises 'not from sales it consummated, but from sales Intel's misconduct prevented.'" (Intel Opp. at 10). Intel's argument is word-play: the lost opportunity to sell at a premium to customers such as Toshiba and Sony from current production (which must then be disposed of in lower value transactions) is as much a "prevented sale" as is the microprocessor AMD never produced because of the absence of a customer to buy it.

11

sary to keep the plant running.  After all, what rational business person would spend large sums of money to build capacity for products that no one will buy?  To accept Intel's "indirectness" argument would give every monopolist license to force its rivals to suspend operations by locking up all the customers.  The monopolist could always argue that its competitor closed up shop not because of the absence of sales but because of its unilateral decision to discontinue spending money on employees, raw materials, overhead and the other necessities of business.[11]  Intel's misconduct, which eliminated any incentive for AMD to continue investing in its export factory, affected "the export opportunities of a domestic person," which the drafters of the FTAIA defined to be an actionable "direct" effect.  *See* H.R. Rep. at 3 and discussion *infra*, at Part II(C).

In addition to its "directness" challenge, Intel claims that Mr. Siegle doesn't know what he is talking about when he states unequivocally in his declaration that had there been greater demand for AMD microprocessors, "we would not have closed Fab 25 [in Austin, Texas] but instead continued to use it for microprocessors."  (Siegle Decl. ¶ 20).  Intel first quotes an off-hand remark of an AMD finance officer not involved in microprocessor fabrication to the effect that by the end of 2002, Fab 30 alone could have supplied 30% of the total worldwide demand.  Whatever the origins of that statement ▬ and they appear to address the hypothetical question of how many very small Athlon chips the fab was capable of manufacturing per year[12] ▬ the actual manufacturing data on which Mr. Siegle and others relied to make manufacturing decisions tell a very different story.  Standing alone, Fab 30 would have been able to support less than 15% of worldwide requirements in 2002, a percentage that would only decline as worldwide demand in-

---

[11] Moreover, the distinction Intel urges would inject foolishness into the antitrust laws.  In order to preserve the right to sue, an exporter wrongfully separated from its customers would nonetheless have to make the investments necessary to keep its doors open and its plant modern, only for the futile purpose of having product that no one will buy.

[12] According to the transcript, Mr. Rivet's 2001 remarks about Fab 30 capacity followed on the heels of a statement by Mr. Ruiz, AMD's CEO, that the Athlon chip, just one of the microprocessors to be produced at Fab 30, had a die size of only 80 square millimeters when produced using a 130 nm process.  Its very small die size (AMD's Opteron chip was twice as large) introduced the theoretical possibility of manufacturing 50 million processors a year but, of course, Fab 30 was built to manufacture a variety of processors, many larger than the Athlon.  In fact, Fab 30's record production was in 2005 when it produced 48.8 million, but this was after two plant expansions.

creased.[13]  To reach a 30% marketshare, AMD needed both fabs.[14]

Intel also argues that the absence of an actual decision to retain Fab 25 for microprocessor production and actual steps to implement it is evidence "that AMD was not going to upgrade Fab 25 . . . as Mr. Siegle speculates."  (Intel Opp. at 15).  The assertion is both untrue[15] and irrelevant.  AMD's decision not to proceed with an upgrade was the result of Intel's market-foreclosing conduct.  What rational businessman invests in capacity to produce products he can't sell?[16]

At most, Intel's showing raises a litigable issue of whether Intel's foreign misconduct led to the demise of AMD's export business, an issue that a jury will one day have to resolve.  But key to the resolution will be the amount of foreign business Intel wrongfully diverted from AMD by its exclusionary practices.  The greater the business those practices diverted, the greater the demand there would have been for AMD products in the absence of those practices and, in turn, the greater the likelihood that AMD would have retained its Austin microprocessor fab.  AMD can only prove the extent to which foreign customers were prevented from dealing with it by hav-

---

[13] Mr. Siegle refers to this analysis in paragraph 13 of his declaration, and it is attached as Exhibit G.  The spreadsheet entitled "Case 037 Maximum+," which assumed that AMD attained a 30% marketshare in 2002, shows that Fab 30 alone would only be able to supply 230,500 of the 474,500 wafers needed in 2002 to reach the 30% level and a declining percentage thereafter.  The remainder, according to the analysis would necessarily have to come from Fab 25. (Ex. G at 12).

[14] Those same documents show that foundry supply was not an alternative to Fab 25, particularly since Intel's patent cross-license prevents AMD from sourcing anything more that a very small fraction of its x86 requirements from fabs that it does not own.  As Intel notes, AMD began exploring a supply relationship with a Singapore foundry to supplement Fab 30 production once Fab 25 became unavailable.  But the UMC relationship ended without a supply contract and without UMC ever supplying commercial quantities of AMD chips for resale.

[15] The December 2000 AMD Wafer Fab Group 2001 Budget and 3-Year Plan, referred to in Mr. Siegle's declaration at paragraph 15, budgeted $366.5 million for a three year investment in Fab 25's "Copper Conversion."  (Ex. H at 14 of indicies).

[16] Intel further suggests that an economic downturn in the semiconductor industry that AMD acknowledged in SEC filings beginning in mid-2001 contributed to the decision to shelve the Fab 25 modernization.  (Intel Opp. at 14 n.17).  But those same SEC filings reflect AMD frustration in the marketplace due to Intel's exclusionary conduct.  *See e.g.*, AMD's Form 10-Q at 28 (Mar. 31, 2002) ("In addition, the financial strength of Intel allows it to market its product aggressively, target our customers and our channel partners with special incentives and discipline customers who do business with us. . . .  Intel also exerts substantial influence over PC manufacturers and their channels of distribution through the 'Intel Inside' brand program and other marketing programs") (Ex. I).

13

ing access to the relevant evidence.

### B.    AMD's Export Claims are Not Barred by the Statute of Limitations

Intel's argument that the statute of limitations bars AMD's export claim is both factually and legally wrong.  AMD neither departed nor decided to depart the microprocessor export market before the limitations period.  Rather, as Mr. Siegle has testified, in early 2001 it tabled plans for a future Fab 25 expansion but continued to compete in the export market for another two years (through 2002) as a manufacturer and for another four years (through April 2004) as an export seller — *i.e.,* well into the limitations period.  For its part, Intel continued its exclusionary conduct and thereby caused AMD ongoing antitrust injury in the form of lost export business.

This is therefore not a case like *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984), the only case on which Intel relies.  There, Riegel blocked Brunswick's entry into the "antistatic yarn" business in 1972 by patenting Brunswick's invention as its own, but Brunswick waited another ten years to sue.  The court held that the statute of limitations began to run when the U.S. Patent Office issued Riegel its fraudulent patent, which caused Brunswick's "exclusion from the market" — in the sense that it permanently barred Brunswick from competing.  The court reasoned that after that date, the defendant committed no subsequent unlawful acts, the plaintiffs' harm had been suffered and future losses were simply a matter of calculation (*i.e.,* by reference to the defendant's unjustified profits).

Unlike *Brunswick*, AMD continued actively to participate in the microprocessor export market well into the limitations period and it continued to confront Intel's ongoing anticompetitive practices and suffer additional antitrust injury.  As the *Brunswick* court recognized, a defendant's continuing misconduct during the limitations period which produces consequent antitrust injury is not barred even if the course of conduct began many years earlier.[17]  *See Klehr v. A.O.*

---

[17] The *Brunswick* court acknowledged that the case before it would have been very different had Riegel committed anticompetitive acts causing Brunswick contemporaneous antitrust harm within the limitations period.  *See* 752 F.2d at 271 ("If the complaint can fairly be read to charge misconduct after 1972, when Riegel got its patent, this could provide another and better ground

*Smith Corp.*, 521 U.S. 179, 189 (1997) ("each overt act that is part of the violation and that in-
jures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowl-
edge of the alleged illegality at much earlier times"), quoting 2 P. Areeda & H. Hovenkamp, *Anti-
trust Law*, ¶ 338b, at 145 (rev. ed. 1995) (hereinafter "Antitrust Law").

  Intel's long-running campaign of anticompetitive conduct, intended and designed to per-
petuate its worldwide microprocessor monopoly, is a classic example of a "continuing viola-
tion." *See, e.g., Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (de-
fendant's practice of refusing to sell its shoe machinery and entering into leases instead consti-
tuted a continuing violation of the Sherman Act that restarted the running of the statute of limita-
tions); *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6th Cir. 1996) (defendant's re-
peated misrepresentations to the plaintiff's customers constituted continuing violations designed
to maintain defendant's monopoly); *see also* Antitrust Law. at ¶ 320(c)(4)(2005) ("When the mo-
nopolist creates its monopoly by a series of repeated or re-asserted acts designed to maintain its
monopoly, the statute of limitation is restarted . . . ."). Throughout the limitations period, Intel
continued to commit anticompetitive acts which injured AMD's export business, which is all the
law requires. *See Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 126-29 (5th
Cir. 1975). AMD suffered "exclusion," in the *Brunswick* sense, only in April 2004, when it
ceased participating in the export market, and it sued just fourteen months thereafter.[18]

---

for . . . finding in the later conduct some indication that a genuine antitrust violation, occurring
with the limitations period, is being charged.").

[18] Intel is also wrong when it says AMD is not entitled to discovery of pre-limitations period con-
duct. (Intel Opp. at 19). Indeed, the principal case it cites states clearly that post-limitations pe-
riod discovery is permissible if "the information sought is otherwise relevant to issues in the
case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978). The other cases Intel cites
refused pre-limitations period discovery not because it was time barred but on relevancy grounds.
*See In Re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts)
II, L.P. Sec. Litig.*, 151 F.R.D. 37, 41 (D. Del. 1993) (discovery denied because plaintiffs failed to
demonstrate a sufficient degree of factual relevance to plaintiffs' claims); *Lewis v. ACB Bus.
Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) (discovery denied because document was only rele-
vant to a claim not enumerated in plaintiff's pleadings and barred by the statute of limitations);
*Invacare Corp. v. Respironics, Inc.*, 2006-1 Trade Cas. (CCH) ¶ 75,311 at ¶ 105,182-184 (N.D.

C.    **The FTAIA Was Not Intended to Bar Export Claims from Rivals Driven Out of Business By Anticompetitive Conduct**

In a desperate, last-ditch argument, Intel urges that since the FTAIA only applies to "a person **engaged** in [export] trade or commerce," Congress did not intend to afford a remedy to those driven from the export business by unlawful conduct. (Intel Opp. at 20). Hence, it says that no discovery should be permitted after 2002 when AMD stopped manufacturing for export (or early 2004 when it ceased selling domestically-made chips).

But the law is just the opposite. The FTAIA allows claims based on foreign conduct that forecloses "opportunities to export" from the United States. *See Crompton Corp. v. Clarion Corp.*, 220 F. Supp. 2d 569, 573 (M.D. La. 2002) (finding FTAIA "export opportunity" exception applicable where alleged foreign conduct has direct, substantial and reasonably foreseeable impact on "an export opportunity of a person doing business in the United States"); *United States v. Time Warner, Inc.*, 1997-1 Trade Cas. (CCH) ¶ 71,702, 78,991 (D.D.C. Jan. 22, 1997)[19] (finding jurisdiction to exist under FTAIA over claim that foreign misconduct "may have delayed or de-

---

Ohio 2006) (discovery of pre-limitations conduct denied because plaintiff had not shown how that information would produce non-cumulative, relevant evidence); *Martin v. El Paso Natural Gas Co.*, 92 Lab. Cas. (CCH) P 34,116, at *1-3 (W.D. Tex. 1981) (same).

Rather than barring pre-limitations period discovery, the courts ordinarily permit it in antitrust cases. "The cases clearly establish that the temporal scope of discovery in antitrust suits should not be confined to the limitations period of the antitrust statutes." *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215 (D. Del. 1985) (because the party's 1984 antitrust counterclaim alleged a scheme of monopolization that may have begun in 1975, it could obtain documents originating as early as that year); 2 *Antitrust Law*, ¶ 320(c)(4)(2005) ("When a § 2 action is filed in a timely fashion, the customer [injured during the limitations period]. . . will be able to rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim.). Why else would Intel have agreed to produce documents bearing on AMD's domestic commerce claim going back as early as January 1, 1997? *See, e.g.*, Defs.' Am. Resp. to Pls.' First Req. for Produc. Nos. 66, 121 (documents dating back to Jan. 1, 1997)(Ex. J at 42, 68-69).

[19] Intel attempts to distinguish *Time Warner* by urging that the court did not seriously consider the FTAIA issue because, under the *Oklahoma Press* doctrine, the government did not need to establish subject matter jurisdiction to conduct its investigation. This is not true. Although the *Time Warner* court noted that the government need not affirmatively establish subject matter jurisdiction, it conducted a thorough analysis of the application of the FTAIA *as an exemption from the application of antitrust laws to defendant. Time Warner*, 1997-1 Trade Cas. (CCH) at 78,991. The court then held that neither the *Oklahoma Press* doctrine nor the FTAIA provided a basis for an exemption. *Id*. at *6.

16

terred American exporters from entering foreign markets"); *Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394, 1397-98 (D. Colo. 1995) (exercising jurisdiction under FTAIA where Canadian brewer's foreign misconduct denied American brewer opportunities to export from the United States); *see also* H.R. Rep. , at 3 (retaining antitrust jurisdiction under the FTAIA where conduct affects "the export opportunities of a domestic person"). A domestic corporation's forced exit from the business of export trade constitutes such an effect on its "opportunities to export." *See Access Telecom*, 197 F.3d at 712 (finding "substantial effect" on export opportunities to exist under FTAIA where American exporter of telephone "reorigination" services was forced to exit export business because of Mexican telecommunications monopoly's exclusionary conduct).

## III.  EVIDENCE OF FOREIGN EXCLUSIONARY CONDUCT IS DISCOVERABLE AND ADMISSIBLE TO PROVE MONOPOLIZATION IN THE UNITED STATES

### A.  Foreign Conduct Discovery is Relevant to Proving Intel's Market Power

As AMD explained in its opening brief, evidence of Intel's power to exclude AMD throughout the world is likewise relevant, because it constitutes direct evidence of Intel's monopoly power in the only x-86 microprocessor market that exists – the worldwide market. (*See* Mot. to Compel at 13-14). In its Opposition, Intel does not dispute that proof of monopoly power in that market is a key element of AMD's U.S.-based Section 2 claim. (*See* Intel Opp. at 24-25). Nor does it dispute that evidence of the power to exclude competition in the worldwide market constitutes direct evidence of monopoly power. *See id.* at 25 (quoting *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426-27 (9th Cir. 1993)).[20] Instead, Intel asserts that evidence of its foreign exclusionary conduct is not discoverable because Intel's "individual acts of purported

---

[20] In a later part of its brief, Intel implies that direct evidence of market power is limited to evidence of "restricted output and supracompetitive prices." (Intel Opp. at 26-27). But as Intel's own quotation from *Los Angeles Land* explains, direct evidence of monopoly power can also consist of direct evidence of the power to exclude competition. *See also, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("Monopoly power is the power to control prices *or exclude competition*."); ABA Section of Antitrust Law, Antitrust Law Developments (5th ed. 2002) 233 ("direct evidence of . . . the actual exclusion from the relevant market" can be used to demonstrate market power).

17

anticompetitive conduct . . . do not tend to establish the monopoly power itself, which must be established with different evidence."  (Intel Opp. at 25).

Intel is simply wrong.  To be sure, as Intel notes, a Section 2 plaintiff must show that a defendant has "the power to exclude *competition* from the relevant market generally, not just to exclude a particular *competitor*."  (Intel Opp. at 25)(quoting *Los Angeles Land*, 6 F.3d at 1426-27).  Accordingly, in cases involving markets with numerous competitors, or in which a plaintiff fails to establish that there are significant barriers to entry – such as the *Los Angeles Land* case on which Intel relies – mere proof that a defendant has excluded a single competitor will not suffice to show market power.  *See, e.g., Los Angeles Land*, 6 F.3d at 1427 (holding that a plaintiff failed to establish market power when it failed to establish substantial barriers to entry, and its evidence of exclusion was limited to exclusion of a single competitor, rather than evidence of the defendant's "ability to impair competition generally").

But where – as here – a defendant has only one competitor and the barriers to entry are high, evidence that the defendant has successfully excluded that single rival constitutes evidence of the power to exclude "competition."  Thus, for example, in *Power Replacements Corp. v. Air Preheater Co., Inc.*, 356 F.Supp. 872 (E.D. Pa. 1973), a court considered a Section 2 claim involving a monopolist and its sole competitor.  The evidence in the case did not disclose the "precise percentages as to the actual share of the market for each company" during the relevant time period.  *Id*. at 896.  Nonetheless, the court determined that the defendant possessed monopoly power, because its "power to exclude the competition of [the plaintiff] has been proven *directly*, so that no inference from a market share percentage is necessary."  *Id*. (emphasis added).  Because the evidence showed that the defendant "had the power to exclude" its only rival, the court held that the power to exclude *competition* had likewise been proven.  *Id*.; *see also Bradburn Parent Teacher Store, Inc. v. 3M*, 2005-1 Trade Cas. (CCH) ¶ 74,769, 101,885-887 (E.D. Pa. Mar.

18

30, 2005); [21] *cf. Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (defendant that controlled three-fourths of a relevant ski-facility market held liable for monopolization when it engaged in exclusionary conduct directed at its lone rival).

Here, similarly, AMD is Intel's only competitor in the relevant worldwide market for x86 microprocessors, and the barriers to entry are indisputably high. Accordingly, evidence of Intel's power to exclude AMD constitutes evidence of the power to exclude "competition," not merely a particular competitor. Such evidence is therefore *directly* relevant to proving that Intel actually possesses monopoly power, and thus must be available for discovery.

   B.    **Foreign Conduct Discovery is Essential to Proving That Intel's Anticompetitive Conduct Within the United States is Actionable Under Section 2**

Evidence of Intel's foreign exclusionary conduct is also discoverable because such evidence is necessary to prove that AMD's U.S. commerce damages – its exclusion from domestic and export-related sales – are recoverable under the Sherman Act. Judge Farnan's Order prevents AMD from seeking damages based on lost sales of foreign-made microprocessors to foreign customers. Nonetheless, to prove that it is entitled to its U.S. damages, AMD must prove that Intel engaged in unlawful monopolization under Section 2 of the Sherman Act. This claim can only be proved in relation to the ***entire*** relevant market, even if damages are restricted to those incurred in only a part of that market. (*See* Mot. to Compel at 16-17) (citing *LePage's, Inc. v. 3M*, 324 F.3d

---

[21] Contrary to Intel's assertions, (*see* Intel Opp. at 28), the court in *Bradburn* did recognize that evidence of exclusion of a competitor can be relevant to a finding of monopoly power, and more specifically that evidence of the power to exclude a competitor can function as evidence of the power to exclude competition. The plaintiffs in *Bradburn* sought to use the findings in *LePage's* to establish via collateral estoppel that "3M possessed monopoly power in the relevant market, including the power to control prices and exclude competition." *Bradburn*, 2005-1 Trade Cas. (CCH) at 101,885. The court agreed that "the jury in *LePage's* necessarily determined that 3M had the power to exclude competition," citing, among other things, the Third Circuit's observation that "3M's exclusionary conduct . . . impeded" its main rival's "ability to compete," *id.* at *31-32, and the jury's finding that "3M's maintenance of monopoly power had injured [the *LePage's*] plaintiff, a competitor," *id.* at *33. Even if, as Intel asserts, the Third Circuit and the jury made these findings under the rubric of anticompetitive effect, rather than monopoly power, *see* Intel Opp. at 28; *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003), the district court in *Bradburn* nonetheless relied on them in support of its findings of monopoly power and the power to exclude competition. *See Bradburn*, 2005-1 Trade Cas. (CCH) at 101,887.

141, 157-59 (3d Cir. 2003), *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 330-33 (1961), and *United States v. Dentsply Int'l, Inc.*, 399 F.3d at 188-90 (3d Cir. 2005)).

In particular, because AMD has alleged that Intel violated Section 2 by engaging in exclusionary conduct, it must show that Intel's exclusion of AMD in U.S. commerce, aggregated with its exclusion of AMD from the rest of the worldwide market, constituted sufficiently material foreclosure *in the overall relevant market* to give rise to a violation. *See LePage's*, 324 F.3d at 157-59; *Tampa Electric*, 365 U.S. at 330-33; *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188-90. Demonstrating foreclosure within the United States alone is not enough. As AMD noted in its opening brief, 70% of sales in the relevant worldwide market occur outside U.S. borders. (*See* Mot. to Compel at 17). Even if AMD proved *total* exclusion from the 30% of the worldwide market located within the U.S., Intel would likely file a motion for summary judgment arguing that wrongful exclusion from 30% of a market is insufficiently material to constitute monopolization under Section 2. Thus, to deny AMD the opportunity to discover and introduce foreign *evidence* in support of its claim for U.S. damages is, in effect, to deny it a fair opportunity to prove its claim at all.

In its opposition, Intel never disputes the foregoing. It concedes that proof of improper maintenance of a monopoly is an element of Section 2. (*See* Intel Opp. at 24-25). It does not deny that claims of monopolization must be proved in relation to the entirety of the relevant market. And it pointedly fails to stipulate that exclusion from a U.S. sales opportunity in and of itself constitutes material, exclusion under Section 2. (*Cf.* Mot. to Compel at 17). Instead, Intel relies squarely on the remarkable assertion that the FTAIA and the Court's Order require AMD to prove its Section 2 claim in a concededly worldwide market without any ability to take account of Intel's exclusion of competition in the dominant part of that market. (*See, e.g.*, Intel Opp. at 23). ("In short, because the FTAIA prevents the Sherman Act from reaching Intel's foreign conduct, AMD cannot admit evidence of that conduct to prove a violation of the Sherman Act.").

That argument is flatly incorrect, and startling in its implications. In effect, Intel is claim-

20

ing that, under the FTAIA, defendants who monopolize a global market are *immune* from Section 2 liability – including liability to U.S. consumers, the U.S. government, and anyone else injured by the monopolist *within the United States* – so long as the United States does not form a dominant share of the global market.[22]

That is not the law. As noted earlier, Intel does not cite a *single case* in which a court has held that the FTAIA bars discovery of foreign conduct relevant to a U.S. claim. And there is no evidence whatsoever that either the FTAIA or the Court's Order were intended to decimate the Sherman Act in the manner Intel proposes – rendering U.S. plaintiffs, the U.S. government, and U.S. courts powerless to redress the domestic harm caused by global monopolists. Initially, neither the Court's Order nor the FTAIA addresses evidentiary issues or purports to alter the elements of proof of a Section 2 claim. As was also noted earlier, the Court's Order, simply addresses the question whether AMD can seek *damages* based on sales of foreign-made microprocessors to foreign customers – not the question of the breadth of evidence available (or necessary) to prove AMD's claims for U.S. domestic and export-related damages.[23] The FTAIA likewise does not address discovery or the scope of evidence available to prove antitrust claims, and the statute's legislative history makes clear not only that the FTAIA "is not intended to restrict . . . the extraterritorial pursuit of evidence in appropriate cases" "but also "does not affect the legal standards for determining whether conduct violates the antitrust laws." H.R. Rep. 97-686 at 13. Given that, under black letter antitrust law, proof of AMD's ability to recover its U.S. commerce damages within the global market will require evidence of Intel's conduct throughout that world-

---

[22] In such a global market, no plaintiff – including the U.S. Department of Justice – could normally prove that a monopolist's exclusionary conduct foreclosed a sufficiently material part of the relevant market to constitute an antitrust violation without introducing evidence of exclusion outside the United States.

[23] *See, e.g.*, Mem. Op. at 15 ("In sum, the Court concludes that it lacks subject matter jurisdiction under the FTAIA over AMD's claims, to the extent those claims are based on foreign conduct *and foreign harm*.") (emphasis added); *id*. at 17 ("the Court concludes that AMD lacks standing to pursue its claims *based on foreign injury*") (emphasis added); *id*. ("the court will dismiss AMD's claims *for foreign injuries* arising as a result of Intel's alleged foreign conduct") (emphasis added).

wide market; AMD must accordingly be permitted a full opportunity to pursue the foreign evidence relevant to its U.S. commerce claim.

Equally important, the fact that Intel's foreign conduct may fall outside the Court's Sherman Act jurisdiction to prohibit or punish does not mean that such conduct is inadmissible as proof in support of a claim properly before the Court.  Indeed, in analogous contexts, the courts have held just the opposite.  In *Ellis v. United States*, 138 F.2d 612 (8th Cir. 1943), for example, the Eighth Circuit held that evidence of illicit *intra*state transactions was admissible in a prosecution for violation of a federal statute prohibiting certain *inter*state transportation for illicit purposes.  The court recognized that the "strictly intrastate transactions" at issue involved "no violation of a federal statute," because they did not involve interstate commerce.  *Id*. at 614.  They would thus have fallen outside the district court's jurisdiction.  *See* U.S. Const. Art. I, Sec. 8.  Nonetheless, evidence of those intrastate transactions was "properly received" as evidence "upon the element of intent" with respect to the interstate transaction in issue.  *Ellis,* 138 F.2d at 614.[24]  Similarly here, even if the Court lacks jurisdiction to award damages based on AMD's loss of foreign sales resulting from Intel's foreign conduct (*i.e*., lost sales of foreign-made microprocessors to foreign customers), it can and must nonetheless take Intel's foreign conduct into account insofar as that conduct forms a part of the proof necessary to establish that Intel's *domestic* conduct constitutes a Sherman Act violation.

In support of its radical FTAIA interpretation, Intel relies on a linguistic sleight of hand, asserting that discovery of foreign conduct is not appropriate because "the language of the FTAIA . . . provides that 'the [Sherman Act] ***shall not apply*** to conduct [involving] trade or commerce [. . .] with foreign nations' unless it has the requisite direct, substantial, and reasonably

---

[24] Likewise, in *Baker v. United States*, 255 F.2d 619 (9th Cir. 1958), evidence of a pattern of illicit *intra*state conduct was admitted in a federal prosecution for illicit interstate transportation.  This intrastate pattern of conduct plainly "was not commerce among states," and thus did not constitute a "federal crime" that fell within the court's jurisdiction.  *Id*. at 620.  But the intrastate conduct was nonetheless "admissible as bearing on [the defendant's] later intent in" engaging in illicit activity "across the California line."  *Id*.

foreseeable effect on U.S. commerce." (Intel Opp. at 21)(emphasis in original). This reading of "apply," so as to bar courts from considering foreign conduct even where it constitutes evidence relevant to a claim for *domestic* liability and damages under Section 2 of the Sherman Act, is unsupported by any case law or other authority, and should be rejected out of hand. Such a reading conflicts squarely not only with *Ellis* and similar case law, but also with the legislative history's clear statement that the FTAIA was not intended to "affect the legal standards" under Section 2 or "to restrict . . . the extraterritorial pursuit" of relevant evidence. H.R. Rep. 97-686 at 13. Further, Intel's reading would undermine the purposes of the FTAIA and the Sherman Act itself by immunizing most international monopolists from Section 2 liability, even as to conduct and damages occurring within the United States. Such a nonsensical reading cannot be accepted. *See, e.g.*, *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 174 (rejecting even a "more natural reading of the statutory language" because that reading "is not consistent with the FTAIA's basic intent," and concluding that "[i]f the statute's language reasonably permits an interpretation consistent with that intent, we should adopt it"); *cf. SEC v. Edwards*, 540 U.S. 389, 395 (2004) ("We will not read into the securities laws a limitation not compelled by the language that would so undermine the laws' purpose.").

Under a proper reading of the FTAIA, "apply" simply refers to the scope of the conduct a court has jurisdiction to prohibit or punish directly. Under this reading, AMD is not seeking to "apply" the Sherman Act to Intel's foreign conduct, because it has (for purposes of this motion) accepted the Court's decision that it cannot seek damages for its lost sales of foreign-manufactured microprocessors to foreign customers. Instead, it is merely seeking to take account of Intel's foreign conduct to the extent that it is relevant to the "appl[ication]" of the Sherman Act to Intel's U.S. conduct and U.S. exclusion.

Intel further implies that permitting discovery of Intel's foreign conduct would defeat the purpose of the FTAIA, which (according to Intel) is to permit American companies to engage in anticompetitive business arrangements in foreign countries. (Intel Opp. at 22). But that is incor-

23

rect: for purposes of this motion, AMD concedes that Intel's foreign conduct is only relevant and

discoverable because it relates to AMD's U.S. commerce claims. If Intel had not excluded AMD

from U.S. import, domestic, or export sales, AMD would not (under the Court's order) be entitled

to seek damages at all, no matter how much exclusionary conduct Intel engaged in abroad.[25]

### C.       Courts Construe Relevance Broadly in Antitrust Cases

The propriety of AMD's discovery requests is confirmed by the fact that courts construe

relevance broadly in antitrust cases, and routinely permit discovery of foreign conduct even

where that conduct has no effect in the U.S. market, and (unlike here) does not even form part of

the proof of a U.S. claim. (*See* Mot. to Compel at 5, 17-20 and cases cited therein). Intel dis-

counts the significance of this case law, claiming that "unlike conspiracy cases," "this case in-

volves a series of different transactions, involving different customers, with different mixes of

products at different times." (Intel Opp. at 23); *see also id*. at 24 n.28 (contrasting AMD's alleg-

edly "disparate instances of competitive conduct" with a "unified conspiracy claim"). But this is

incorrect. As is plain from its complaint, AMD is not seeking recovery for a series of isolated

instances of anticompetitive conduct – indeed, the isolated instances of conduct that make up a

Section 2 claim are not always (and need not be) actionable by themselves. *See, e.g.*, *Swift & Co.*

*v. United States*, 196 U.S. 375, 396 (1905) (a series of actions which, standing alone, would not

be unlawful can, in combination, violate the Sherman Act). Rather, it is the cumulative effect of

all of Intel's conduct that renders its U.S. exclusionary conduct a violation of Section 2. As the

Third Circuit has explicitly recognized, "[t]he relevant inquiry" in a monopolization case "is the

anticompetitive effect of [the defendant's] exclusionary practices considered together. . . . [T]he

---

[25] There is therefore no merit to Intel's insinuation that conducting foreign discovery would "'risk . . . interference with a foreign nation's ability to independently regulate its own commercial affairs.'" (Intel Opp. at 4) (quoting *Empagran*, 542 U.S. at 165). As the Supreme Court expressly noted in *Empagran*, "[U.S.] courts have long held that application of our antitrust laws to foreign anticompetitive conduct is . . . reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused." 542 U.S. at 165. Here, of course, the Court would not even be "appl[ying]" the Sherman Act to foreign conduct, but rather simply taking account of that conduct as it relates to a U.S. claim.

courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's*, 324 F.3d at 162 (3d Cir. 2003); *see City of Anaheim v. Southern California Edison*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect").

Accordingly, just as in the conspiracy cases, Intel's foreign conduct forms an integral part of the proof of the unitary worldwide monopolization that gives rise to domestic Sherman Act liability. As in the conspiracy cases, even if liability attaches only to the U.S. commerce part of that monopolization, foreign evidence that is relevant to proving that liability is and must be available for discovery.

## CONCLUSION

For the reasons set forth above, evidence of Intel's foreign exclusionary conduct is directly relevant to proof of AMD's claims for damages based on lost sales to U.S. customers and in the export trade. AMD's motion to compel Intel to produce foreign conduct documents and to strike Intel's FTAIA objections should accordingly be granted.

Of Counsel:
Charles P. Diamond
Linda J. Smith
O'Melveny & Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Mark A. Samuels
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, 90071

Dated: November 21, 2006

*/s/Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Cottrell@rlf.com
Attorneys for Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd.

25

RLF1-3085081-1