# EXHIBIT 2

82 S.Ct. 1404                                                                 Page   1
370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777
(Cite as: 370 U.S. 690, 82 S.Ct. 1404)
▷

Briefs and Other Related Documents

Supreme Court of the United States
CONTINENTAL ORE COMPANY et al.,
Petitioners,
v.
UNION CARBIDE AND CARBON
CORPORATION et al.
No. 304.

Argued April 16 and 17, 1962.
Decided June 25, 1962.

Private treble damage action under antitrust laws. The United States District Court for the Northern District of California, Southern Division, entered judgment for defendants, and plaintiffs appealed. The United States Court of Appeals, Ninth Circuit, 289 F.2d 86, affirmed, and certiorari was granted. The Supreme Court, Mr. Justice White, held that whether plaintiff partnership engaged in production and distribution of vanadium was damaged by alleged monopolistic elimination of its independent suppliers by defendants, who were engaged in mining vanadium ore, processing vanadium and selling vanadium products, whether defendants refused to deal with partnership and whether partnership failed to take advantage of independent sources of supplies were jury questions.

Judgment of Court of Appeals vacated and case remanded to the District Court for further proceedings.

West Headnotes

[1] Federal Courts ⇔ 456
170Bk456 Most Cited Cases
   (Formerly 106k383(1))
Certiorari was granted as to issues requiring examination in light of previous decisions of Supreme Court and presenting important questions under antitrust laws. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2.

[2] Antitrust and Trade Regulation ⇔ 979
29Tk979 Most Cited Cases
   (Formerly 265k28(8))
Rule that, upon motion for directed verdict, evidence must be viewed in light most favorable to party against whom motion is made and that party must be given benefit of all inferences which evidence fairly supports, even though contrary inferences might reasonably be drawn, governs ruling upon motions for directed verdict in treble damage suits under antitrust laws. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2, as amended 15 U.S.C.A. §§ 1, 2.

[3] Antitrust and Trade Regulation ⇔ 968
29Tk968 Most Cited Cases
   (Formerly 265k28(1.7))
Plaintiff's claims against five corporations for treble damages under antitrust laws should not have been approached as if they were completely separate and unrelated lawsuits. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[4] Antitrust and Trade Regulation ⇔ 977(1)
29Tk977(1) Most Cited Cases
   (Formerly 265k28(7.5), 265k28(7.4))
In private treble damage action under antitrust laws based upon alleged conspiracy to violate Sherman Act, plaintiffs should be given full benefit of their proof without tightly compartmentalizing various factual components and wiping slate clean after scrutiny of each. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[5] Antitrust and Trade Regulation ⇔ 980
29Tk980 Most Cited Cases
   (Formerly 265k28(8))
Whether partnership engaged in production and distribution of vanadium was damaged by alleged monopolistic elimination of its independent suppliers by defendants engaged in mining vanadium ore, processing vanadium and selling vanadium products, whether defendants refused to deal with partnership, and whether partnership failed to take advantage of independent sources of supplies were jury questions.

[6] Federal Civil Procedure ⇔ 2151
170Ak2151 Most Cited Cases

[6] Federal Civil Procedure ⇔ 2152
170Ak2152 Most Cited Cases
If there is sufficient evidence to go to jury, it is for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

82 S.Ct. 1404
(Cite as: 370 U.S. 690, 82 S.Ct. 1404)

jury to weigh contradictory evidence and inferences and to draw ultimate conclusions as to facts

[7] Antitrust and Trade Regulation 980
29Tk980 Most Cited Cases
    (Formerly 265k28(8))
Whether allegedly monopolistic conduct of defendants engaged in mining vanadium ore, processing vanadium and selling vanadium products materially contributed to failure of venture whereby plaintiff partnership contracted with corporation for processing of vanadium oxide and ferro-vanadium, in that corporation concluded that it could not go into production in absence of reliable, long-range sources of oxide was jury question.

[8] Antitrust and Trade Regulation 975
29Tk975 Most Cited Cases
    (Formerly 265k28(7.3))
Even though agency of foreign government delegated to subsidiary of one defendant discretionary power to purchase and allocate to foreign government's industries all vanadium products required by them, plaintiff was entitled to have admitted evidence that its former share of foreign market was divided by subsidiary between defendant parent corporation and another producer of vanadium. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[9] Antitrust and Trade Regulation 945
29Tk945 Most Cited Cases
    (Formerly 265k12(7))
Conspiracy to monopolize or restrain domestic or foreign commerce of United States it not outside reach of Sherman Act just because part of conduct complained of occurs in foreign countries. Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[10] Antitrust and Trade Regulation 902
29Tk902 Most Cited Cases
    (Formerly 265k28(1.5))
Corporations charged with conspiracy to restrain trade were not insulated from treble damage action under anti-trust laws by fact that their conspiracy involved some acts by agents of foreign government. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[11] Conspiracy 4
91k4 Most Cited Cases
Acts which are in themselves legal lose that character when they become constituent elements of unlawful scheme.

[12] Antitrust and Trade Regulation 902
29Tk902 Most Cited Cases
    (Formerly 265k28(1.5))
That foreign subsidiary of United States corporation was granted, by foreign government, discretionary power to allocate to foreign country's industries all vanadium products required by them would not relieve parent corporation from liability for treble damages under antitrust laws if, in carrying out act of purchasing, it eliminated competitor from foreign market. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[13] Antitrust and Trade Regulation 981
29Tk981 Most Cited Cases
    (Formerly 265k28(8))
"Public injury" charge to effect that conspiracy which was reasonably calculated to prejudice public interest by restraining trade must be proved was improper, where petitioners pleaded concerted refusal to deal with them by respondents, price-fixing conspiracy, and allocation of customers, all per se violations of Sherman Act. Sherman Anti-Trust Act, § 1 as amended 15 U.S.C.A. § 1.

[14] Federal Courts 460.1
170Bk460.1 Most Cited Cases
    (Formerly 170Bk460, 30k1064.1(2), 30k1064(1))
Charge defining monopolization and attempted monopolization in terms of conspiracy to monopolize misinterpreted law and misinterpretation was prejudicial rather than harmless where petitioners' complaint did not preclude reliance on unilateral monopolization and evidence offered was relevant and material to such issue. Clayton Act, § 4, 15 U.S.C.A. § 15; Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[15] Antitrust and Trade Regulation 975
29Tk975 Most Cited Cases
    (Formerly 265k28(7.3))
Although principal party in partnership did not come to United States to build business for production and sale of vanadium until 1938, evidence that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

82 S.Ct. 1404  
(Cite as: 370 U.S. 690, 82 S.Ct. 1404)

Page 3

conspiracy and monopolization by defendants of vanadium production and sale began in early 1930's and that overt acts in furtherance thereof occurred in 1930's and that it was pursuant to that anticompetitive scheme that defendants sought to and did eliminate partnership from vanadium industry after 1938 was admissible if it was not to remote to have sufficient probative value to justify burdening record with it. Clayton Act, § 4, 15 U.S.C.A. § 15;  
Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

**1406 *691 Joseph L. Alioto, San Francisco, Cal., for petitioners.

Josiah G. Holland, Denver, Colo., for respondent Vanadium Corp. of America.

Richard J. Archer, San Francisco, Cal., for respondents Union Carbide Corp. and United States Vanadium Corp.

Mr. Justice WHITE delivered the opinion of the Court.

This is a private treble damage action under the anti-trust laws. [FN1] Continental **1407 Ore Company, a partnership, *692 and its individual partners, who were plaintiffs in the trial court, are petitioners here. [FN2] Henry J. Leir, the principal party in Continental, had engaged in the buying and selling of metals, including vanadium products, in Europe prior to 1938, in which year he immigrated to the United States. This case concerns his subsequent efforts in this country to build a successful business in the production and sale of vanadium.

> FN1. The action was brought under s 4 of the Clayton Act, 15 U.S.C. s 15, 15 U.S.C.A. s 15:
> 'Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.'

> FN2. The partnership is the successor in interest to Continental Ore Corporation, organized in 1938 but later dissolved.

Vanadium is a metal obtained from certain ores which, in this country, are mined principally on the Colorado plateau. The ore is processed at mills near the mines into a substance commonly known as vanadium oxide. The oxide is then transported to the East and converted into ferrovanadium, [FN3] which is purchased chiefly by steel companies for use as an alloy in hardening steels.

> FN3. During the years in question here the conversion was accomplished by respondents in electric furnaces. Continental sought to introduce the making of ferrovanadium by the aluminothermic process, which it claimed was more efficient and economical than respondents' method.

The defendants named in the complaint were Vanadium Corporation of America (VCA), a fully integrated miner and manufacturer of vanadium products, Union Carbide and Carbon Corporation (Carbide), and the following four wholly owned subsidiary corporations of the latter company: United States Vanadium Corporation (USV), engaged in mining vanadium ore and processing vanadium oxide; Electro Metallurgical Company (Electro Met), engaged in making ferrovanadium; Electro Metallurgical Sales Corporation (Electro Met Sales), engaged in the sale of vanadium oxide and ferrovanadium; and Electro Metallurgical Company of Canada, Ltd. (Electro Met of Canada), engaged in selling vanadium products in Canada. The complaint was filed on November 15, *693 1949, and service was had on VCA, Carbide and USV. There was no service on Electro Met, Electro Met Sales or Electro Met of Canada. Carbide acquired the assets of Electro Met and Electro Met Sales by dissolution or merger during the year 1949, prior to the filing of the complaint herein.

The complaint alleged that, beginning in about 1933, the defendants and others acting in concert with them violated ss 1 and 2 of the Sherman Act [FN4] by conspiring to restrain, by monopolizing, and by attempting and conspiring to monopolize, trade and commerce in ferrovanadium and vanadium oxide. The defendants were charged with purchasing and acquiring control over substantially all accessible vanadium-bearing ore deposits in the United States and substantially all vanadium oxide produced by others in the United States, with refusing to sell vanadium oxide to other potential producers of ferrovanadium, including Continental and its associates, with apportioning and dividing

82 S.Ct. 1404 Page 4
(Cite as: 370 U.S. 690, *693, 82 S.Ct. 1404, **1407)

sales of ferrovanadium and vanadium oxide among themselves in certain proportions, with fixing identical prices for the sale of ferrovanadium **1408 and vanadium oxide and for the purchase of ore, and with making certain mutual arrangements whereby one or more Carbide subsidiaries supplied VCA with substantial quantities of vanadium oxide at preferential prices to VCA. The complaint stated that between 1933 and 1949 the defendants produced over *694 99% of all ferrovanadium and over 90% of all vanadium oxide produced in the United States and that during the same period the defendants sold over 99% of the ferrovanadium and vanadium oxide sold in this country. [FN5]

> FN4. The Sherman Act ss 1--2, 15 U.S.C. ss 1--2, 15 U.S.C.A. ss 1, 2, provide in pertinent part:
> 'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *.
> 'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *.'
>
> FN5. The complaint alleged that VCA sold approximately two-thirds of all ferrovanadium and vanadium oxide sold by defendants (which was said to amount to approximately 99% of all ferrovanadium and vanadium oxide sold and consumed in the United States), while Electro Met Sales (a Carbide subsidiary) sold approximately one-third. According to petitioners' evidence, the Carbide group produced approximately 77% of domestic vanadium oxide, while VCA produced about 65% of ferrovanadium.

According to the complaint, as a proximate consequence of defendants' monopolistic and restrictive practices, independent producers and distributors of ferrovanadium and vanadium oxide, including Continental, were eliminated from the business. Specifically, the complaint detailed several efforts which Continental made to enter and maintain itself in the vanadium business, all of which were allegedly frustrated by defendants' Sherman Act violations: (1) In 1938, Continental negotiated a contract with Apex Smelting Company of Chicago whereby Apex was to build and operate a plant for the conversion of oxide to ferrovanadium by use of the aluminothermic process. Continental and Apex were to share the profits of this venture. On its part, Continental agreed to obtain raw materials for Apex and to sell the finished product. Operations under this contract began in the spring of 1940, but Apex terminated the agreement in 1942 allegedly because the illegal activities of defendants prevented the obtaining of a sufficient supply of vanadium oxide. (2) Meanwhile, Continental itself had begun to produce a compound called 'Van-Ex,' composed of vanadium oxide and other materials, which was designed for direct introduction into the steel-making process without prior conversion to ferrovanadium. This venture was allegedly *695 terminated in 1944 because of the difficulty of securing raw materials caused by defendants' unlawful practices, including the efforts of defendants to obtain ownership or control of the mines and mills of Continental's suppliers. (3) Continental had developed a business with a Canadian customer during 1942. When Electro Met Sales of Canada was appointed by the Canadian Government as the exclusive wartime agent to purchase and allocate vanadium for Canadian industries, that company, it is alleged, acting under the control and direction of its parent, Carbide, eliminated Continental entirely from the Canadian market and divided Continental's business solely between defendants. (4) Defendants in 1943, by open threats of reprisals, allegedly frustrated certain arrangements which Continental had with the Climax Molybdenum Corporation for the manufacture of ferrovanadium. (5) In January 1944, Continental contracted with Imperial Paper & Color Corporation for the processing by the latter of vanadium oxide and ferrovanadium. Continental agreed to act as sales agent for the output. The complaint charged that Imperial abandoned the contract at the end of 1944 because of the inability to secure raw materials and that Continental then left the vanadium business altogether, all as a result of the restrictive and monopolistic practices of the defendants.

[1] Trial was to a jury and a verdict was returned for defendants. Continental appealed, asserting error in the trial court's exclusion of various evidentiary items, in certain of the instructions **1409 given to the jury, in the refusal to give other instructions, and in other rulings of the trial court. The Court of Appeals for the Ninth Circuit announced that its task

82 S.Ct. 1404
(Cite as: 370 U.S. 690, *695, 82 S.Ct. 1404, **1409)

Page 5

was to review the correctness of the judgment below, not the reasons therefor, and on that basis affirmed the judgment, 289 F.2d 86, holding that there was insufficient evidence to justify a jury finding *696 that defendants' illegal acts were in fact the cause of Continental's failure in the vanadium business, and hence, that a verdict for defendants should have been directed. In reaching its decision, the court stated that it had considered not only all the evidence admitted by the trial judge, but also all the evidence offered by the plaintiffs which the trial judge excluded. The court did not deal with or rule upon any of the alleged trial errors relied upon by Continental, except for the issue relating to Continental's alleged exclusion from the Canadian market. Certiorari was granted, limited to issues which required examination in the light of previous decisions of this Court and which presented important questions under the antitrust laws. 368 U.S. 886, 82 S.Ct. 141, 7 L.Ed.2d 87. We have concluded, for the reasons discussed hereafter, that the Court of Appeals' decision must be reversed and the case remanded for a new trial.

I.

[2] The Court of Appeals was, of course, bound to view the evidence in the light most favorable to Continental and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn. [FN6] From our examination of the *697 rather extensive record, we have concluded that the Court of Appeals departed from this rule and erred in holding that there was insufficient evidence to support a finding that respondents' conduct in fact caused injury to Continental's business.

FN6. As Professor Moore has indicated, 'In ruling on the motion (for directed verdict) the trial court views the evidence in the light most favorable to the party against whom the motion is made. On appeal, likewise, the appellate court must consider the evidence in its strongest light in favor of the party against whom the motion for directed verdict was made, and must give him the advantage of every fair and reasonable intendment that the evidence can justify.' 5 Moore's Federal Practice 2316 (2d ed., 1951) See Pawling v. United States, 4 Cranch 219, 2 L.Ed. 601; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Tennant v. Peoria & P.U.R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. Cf. Smith v. Reinauer Oil Transport, 256 F.2d 646, 649 (C.A.1st Cir.)

The same rule governs in ruling upon motions for directed verdict in treble damage suits under the antitrust laws. Schad v. Twentieth Century-Fox Film Corp., 136 F.2d 991, 993 (C.A.3d Cir.); Wisconsin Liquor Co. v. Park & Tilford Distillers Corp., 267 F.2d 928, 930 (C.A.7th Cir.). Cf. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993; Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458.

Continental's fundamental claim throughout was that inadequate supplies of vanadium oxide were available to it and its associates, and that respondents' alleged Sherman Act violations caused or contributed to this shortage. The Court of Appeals acknowledged the principle in antitrust cases that 'where the plaintiff proves a loss, and a violation by defendant of the antitrust laws of such a nature as to be likely to cause that type of loss, there are cases which say that the jury, as the trier of the facts, must be permitted to draw from this circumstantial evidence the inference that the necessary causal relation exists.' [FN7] The court also assumed that the evidence was *698 adequate to support a jury finding **1410 that respondents committed the alleged violations of the Sherman Act and that the specific acts charged to have been done by respondents were performed as part of the basic plan to monopolize the vanadium market. Nor did the court take express issue with the averments that adequate supplies of vanadium oxide were unavailable to Continental during certain periods or with the argument that a shortage of vanadium oxide was the type of consequence that would reasonably be expected to flow from a conspiratorial and monopolistic arrangement controlling 99% of the ferrovanadium and vanadium oxide sold in this country. The court nevertheless concluded, in effect, that before there could be a sufficient showing of any shortage of vanadium oxide, or at least before the jury could be permitted to infer that any such lack of material was chargeable to respondents, Continental was required to demonstrate both that it made timely demands for oxide from respondents and that it exhausted all other possible sources of that material.

FN7. 289 F.2d at 90. For this statement, the Court of Appeals relied upon Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Eastman Kodak Co. of New York v. Southern

82 S.Ct. 1404                                                                  Page   6
(Cite as: 370 U.S. 690, *698, 82 S.Ct. 1404, **1410)

Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Martin v. Herzog, 228 N.Y. 164, 170--171, 126 N.E. 814, 816. Thus in Bigelow this Court stated: '(I)n the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.' 327 U.S. at 264, 66 S.Ct. at 579. 'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' Id., at 265, 66 S.Ct. at 580. See Bordonaro Bros. Theatres v. Paramount Pictures, 176 F.2d 594, 597 (C.A.2d Cir.); Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 269 F.2d 950, 957--959 (C.A.10th Cir.).

The court then examined seriatim the Apex, Van-Ex, Climax, Canadian and Imperial ventures and ruled separately upon the respondents' alleged damage to Continental in connection with each of these episodes. As to Apex and Imperial, it was said that Continental's demands for oxide from respondents were not sufficiently contemporaneous with the failure of these ventures to subject respondents to liability. As to the Van-Ex period, respondents were blameless not because oxide had not been requested from them but because Continental failed, in the court's view, to exhaust at least one other available source. The Canadian and Climax issues were disposed of on different grounds.

[3][4] It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits. We *699 think this was improper. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. '* * * (T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 * * *; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.' American Tobacco Co. v. United States, 147 F.2d 93, 106 (C.A.6th Cir.). See Montague & Co. v. Lowry, 193 U.S. 38, 45--46, 24 S.Ct. 307, 309, 48 L.Ed. 608.

[5] Furthermore, we do not believe that respondents' liability under the antitrust laws can be measured by any rigid or mechanical formula requiring Continental both to demand materials from respondents and to exhaust all other sources of supply. The Court of Appeals appears to have accorded no weight to Continental's evidence which was **1411 offered to show that respondents had interferred with, acquired, or destroyed the several small independent sources of vanadium oxide relied upon by Continental. Under the criteria used by the Court of Appeals, respondents could, with impunity, concertedly refuse to deal with Continental while the latter was able to obtain some oxide from independent sources, then proceed at their leisure to dry up those other sources, and finally insist that Continental make repeated demands for respondents' oxide before incurring antitrust liability. The cases relied upon by the Court of Appeals [FN8] clearly do not support any such formula and we cannot deem the injury *700 alleged to flow from a monopolist's elimination of one's independent suppliers to be so 'remote' as to justify refusing to let the damages issue go to the jury. [FN9]

   FN8. Royster Drive-In Theatres Inc., v American Broadcasting-Paramount Theatres, Inc. 2 Cir., 268 F.2d 246, 251; Standard Oil Co. of California v. Moore, 9 Cir., 251 F.2d 188, 198; Congress Bldg. Corp. v. Loew's, Inc., 7 Cir., 246 F.2d 587, 596--598; Milwaukee Towne Corp. v Loew's, Inc., 7 Cir., 190 F.2d 561, 568.

   FN9 Cf. Klor's Inc., v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741.

Our review of the record discloses sufficient evidence for a jury to infer the necessary causal connection between respondents' antitrust violations and petitioners' injury. In concluding that Continental and Apex had not made sufficient efforts to obtain vanadium oxide from respondents, the Court of Appeals either overlooked or interpreted into insignificance the repeated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

82 S.Ct. 1404                              Page 7
(Cite as: 370 U.S. 690, *700, 82 S.Ct. 1404, **1411)

approaches made to respondents by Continental and Apex in July and October of 1939, in March and October of 1940 and in June and July of 1941. The court also failed to notice certain communications from Apex in September and December 1941, saying that it could operate at only partial capacity due to the lack of raw materials. Nor did the court mention the testimony of an officer of Apex to the effect that Apex's supply of oxide was irregular and intermittent and that the unavailability of oxide was one of the reasons that Apex did not operate at full capacity. According to the Court of Appeals, the 'critical period' during which Continental and Apex should have demanded materials from the respondents was the year preceding the termination of the Apex contract, which the court placed in June 1942. But it is quite plain from the record that Apex notified Continental of its determination to terminate the contract in January and February of 1942, which followed much more closely the previous refusals of respondents to deal with Continental and Apex.

[6] Undoubtedly, all of the evidence during this period does not point in one direction and different inferences might reasonably be drawn from it. There was, however, sufficient evidence to go to the jury and it is the jury *701 which 'weighs the contradictory evidence and inferences' and draws 'the ultimate conclusion as to the facts.' Tennant v. Peoria & P.U.R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520.

During the so-called Van-Ex period, the court did not exculpate respondents because of petitioners' failure to request oxide from them but because petitioners supposedly failed to take advantage of an independent source of supplies. But the evidence relied upon by the court can just as reasonably be read in a manner favorable to Continental and it appears that the court may have misapprehended significant parts of this record. [FN10] In any event, the interpretation **1412 and significance of this evidence were for the jury.

> FN10. The Court of Appeals' interpretation of the evidence was that in 1943 Continental declined to deal with Nisley & Wilson, an independent producer of vanadium oxide, particularly in October 1943, when Continental supposedly failed to make any effort to procure Nisley & Wilson's flaked vanadium oxide and in January 1944 when, according to the court, Continental refused to buy some 300,000 pounds of 'oxide' offered by Nisley & Wilson at the time the latter went out of business. But in October 1943, Nisley & Wilson was entirely engaged in processing ore furnished by the Government and its vanadium oxide product was obtainable only through allocation by the War Production Board. The correspondence between Nisley & Wilson and Continental was looking toward a postwar relationship, and Continental's letter might well be interpreted by a jury not as a refusal to buy but as a statement of intention by Continental to cooperate with Nisley & Wilson to keep the latter's mill running during peacetime. As for the 300,000 pounds of 'oxide' which the court said was offered to Continental, the material actually was ore, not oxide. Furthermore, Nisley & Wilson did not own the ore and failed in its effort to buy it from the Government.

[7] The Court of Appeals also concluded that the respondents did not contribute to the failure of Imperial to produce ferrovanadium under its contract with Continental. The court acknowledged, and there appears to be substantial evidence to this effect, that Imperial's decision was based upon its concern about a steady and reliable *702 source of raw materials. Continental had requested VCA and USV to provide sizable monthly supplies of oxide in November of 1943, but the Court of Appeals bracketed this evidence with the Van-Ex period even though the testimony clearly was that the supplies then sought were for the Imperial arrangement which was then being negotiated. Imperial, after signing the contract, carefully surveyed foreign sources of vanadium, concluded they were inadequate and determined not to go into production because a reliable, long-range source of oxide was not available. In spite of the refusal of respondents to deal with Continental in November 1943 and in previous months and years, and in spite of the assumed monopolistic control of almost all of the vanadium oxide in the United States, the court ruled that Continental must have requested oxide from respondents after the contract with Imperial was signed in January of 1944. We think the jury should be allowed to determine whether respondents' conduct materially contributed to the failure of the Imperial venture, to Continental's damage.

II.

82 S.Ct. 1404

Page 8

(Cite as: 370 U.S. 690, *702, 82 S.Ct. 1404, **1412)

Continental's alleged elimination from the Canadian market raises different issues. At the trial Continental introduced evidence to show that beginning in March 1942, it had shipped Van-Ex to a Canadian customer each month during the remainder of that year. There was then received in evidence a letter dated January 19, 1943, from Continental to Electro Met in New York City reciting that the new allocation system in Canada [FN11] had eliminated *703 Continental from the Canadian market in January, that Continental had inquired about the matter from the Metals Controller for the Canadian Government and that the latter had referred Continental to Electro Met. The court then struck this letter from the record and rejected petitioners' offer to prove that Continental was excluded from the Canadian market by Electro Met of Canada, a wholly owned **1413 subsidiary corporation of Carbide, acting as exclusive purchasing agent for the Metals Controller but allegedly operating in this connection under the control and direction of Carbide for the purpose of carrying out the overall conspiracy to restrain and monopolize the vanadium industry. To that end, Continental offered to prove that its former share of the Canadian market was divided between Carbide and VCA. Continental offered various correspondence with Electro Met of Canada and a memorandum and proposed testimony by Continental's vice president concerning his conversations with an employee of Electro Met who had communicated with Continental in response to Continental's letter of January 19, 1943, to Electro Met. The court denied the entire offer of proof 'for the reason that this is a transaction wholly in the hands of the Canadian Government and that whether or not this plaintiff was permitted to sell his material to a customer in Canada was a matter wholly within the control of the Canadian Government.'

FN11. Canada's entry into World War II prompted the Canadian Government to take extraordinary measures to assure optimum availability of strategic materials to Canadian private industries engaged in the war effort. Pursuant to these measures, the Office of Metals Controller was established and given broad powers to regulate the procurement of the materials and to allocate them to industrial users. See Order of the Governor General in Council, P.C. 3187, July 15, 1940. The Metals Controller enlisted the aid of Electro Met of Canada in early 1943, delegating to it the discretionary agency power to purchase and allocate to Canadian industries all vanadium products required by them. The validity of these wartime measures and delegations under Canadian law is not here contested. Cf. Reference Re Regulations (Chemicals) Under War Measures Act, 1 D.L.R. (1943) 248.

*704 [8] The Court of Appeals agreed with the trial court and concluded that Continental was not legally entitled to recover from respondents for the destruction of its Canadian business. The court said that no vanadium oxide could be imported into Canada by anyone other than the Canadian Government's agent, Electro Met of Canada, which refused to purchase from the petitioners. Thus, according to the court, 'even if we assume that Electro Metallurgical Company of Canada, Ltd., acted for the purpose of entrenching the monopoly position of the defendants in the United States, it was acting as an arm of the Canadian Government, and we do not see how such efforts as appellants claim defendants took to persuade and influence the Canadian Government through its agent are within the purview of the Sherman Act.' 289 F.2d, at 94. This ruling was erroneous and we hold that Continental's offer of proof was relevant evidence of a violation of the Sherman Act as charged in the complaint and was not inadmissible on the grounds stated by the courts below.

[9] Respondents say that American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, shields them from liability. This Court there held that an antitrust plaintiff could not collect damages from a defendant who had allegedly influenced a foreign government to seize plaintiff's properties. But in the light of later cases in this Court respondents' reliance upon American Banana is misplaced. A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries. United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; United States v. Pacific & Arctic R. & Navigation Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742; Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597; United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042. Cf. Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252; Branch v. Federal Trade Comm'n, 141 F. *705 2d 31 (C.A. 7th

82 S.Ct. 1404
(Cite as: 370 U.S. 690, *705, 82 S.Ct. 1404, **1413)

Page 9

Cir.). See United States v. Aluminum Co. of America, 148 F.2d 416 (C.A.2d Cir.); United States v. National Lead Co., 63 F.Supp. 513 (D.C.S.D.N.Y.), aff'd 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077. [FN12]

> FN12. See also Brewster, Antitrust and American Business Abroad 65–75 (1958); Fugate, Foreign Commerce and the Antitrust Laws 20–55 (1958); Atty.Gen.Nat. Comm. Antitrust Rep. 66–77 (1955); Kramer, Application of the Sherman Act to Foreign Commerce, 3 Antitrust Bull. 387 (1958); Carlston, Antitrust Policy Abroad, 49 N.W.U.L.Rev. 569 (1954).

Furthermore, in the Sisal case, supra, a combination entered into within the United States to monopolize an article **1414 of commerce produced abroad was held to violate the Sherman Act even though the defendants' control of that production was aided by discriminatory legislation of the foreign country which established an official agency as the sole buyer of the product from the producers and even though one of the defendants became the exclusive selling agent of that governmental authority. Since the activities of the defendants had an impact within the United States and upon its foreign trade, American Banana was expressly held not to be controlling. [FN13]

> FN13. 'The circumstances of the present controversy are radically different from those presented in American Banana Co. v. United Fruit Co., supra, and the doctrine there approved is not controlling here. * * *
> 'Here we have a contract, combination and conspiracy entered into by parties within the United States and made effective by acts done therein. The fundamental object was control of both importation and sales of sisal and complete monopoly of both internal and external trade and commerce therein. The United States complain of a violation of their laws within their own territory by parties subject to their jurisdiction, not merely of something done by another government at the instigation of private parties. True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States. They are within the jurisdiction of our courts and may be punished for offenses against our laws.' 274 U.S. at 275–276, 47 S.Ct. at 593.

*706 [10] Olsen v. Smith, 195 U.S. 332, 25 S.Ct. 52, 49 L.Ed. 224; United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; and Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, do not help respondents. These decisions, each of which sustained the validity of mandatory state or federal governmental regulations against a claim of antitrust illegality, are wide of the mark. In the present case petitioners do not question the validity of any action taken by the Canadian Government or by its Metals Controller. Nor is there left in the case any question of the liability of the Canadian Government's agent, for Electro Met of Canada was not served. What the petitioners here contend is that the respondents are liable for actions which they themselves jointly took, as part of their unlawful conspiracy, to influence or to direct the elimination of Continental from the Canadian market. As in Sisal, the conspiracy was laid in the United States, was effectuated both here and abroad, and respondents are not insulated by the fact that their conspiracy involved some acts by the agent of a foreign government.

[11][12] From the evidence which petitioners offered it appears that Continental complained to the Canadian Metals Controller that Continental had lost its Canadian business. The Controller referred Continental to one of the respondents. But there is no indication that the Controller or any other official within the structure of the Canadian Government approved or would have approved of joint efforts to monopolize the production and sale of vanadium or directed that purchases from Continental be stopped. The exclusion, Continental claims, resulted from the action of Electro Met of Canada, taken within the area of its discretionary powers granted by the Metals Controller and in concert with or under the direction of the respondents. The offer of proof at least presented an issue for the jury's resolution as to whether the loss of Continental's Canadian business was occasioned by respondents' activities. Respondents are afforded no *707 defense from the fact that Electro Met of Canada, in carrying out the bare act of purchasing vanadium from respondents rather than Continental, was acting in a manner permitted by Canadian law. There is nothing to indicate that such law in any way compelled discriminatory purchasing, and it is well settled that acts which are in themselves legal lose **1415 that character when they become constituent elements of

82 S.Ct. 1404
(Cite as: 370 U.S. 690, *707, 82 S.Ct. 1404, **1415)

Page 10

an unlawful scheme. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518; American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575; Steele v. Bulova Watch Co., 344 U.S. 280, 287, 73 S.Ct. 252, 256, 97 L.Ed. 252. See Georgia v. Pennsylvania R. Co., 324 U.S. 439, 457--458, 65 S.Ct. 716, 726, 89 L.Ed. 1051; Slick Airways v. American Airlines, 107 F.Supp. 199, 207 (D.C.N.J.).

The case of Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, cited by the court below and much relied upon by respondents here, is plainly inapposite. The Court there held not cognizable under the Sherman Act a complaint charging, in essence, that the defendants had engaged in a concerted publicity campaign to foster the adoption of laws and law enforcement practices inimical to plaintiffs' business. Finding no basis for imputing to the Sherman Act a purpose to regulate political activity, a purpose which would have encountered serious constitutional barriers, the Court ruled the defendants' activities to be outside the ban of the Act 'at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws.' 365 U.S., at 138, 81 S.Ct., at 530. In this case, respondents' conduct is wholly dissimilar to that of the defendants in Noerr. Respondents were engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws. To subject them to liability under the Sherman Act for eliminating a competitor from the Canadian market by exercise of the discretionary power *708 conferred upon Electro Met of Canada by the Canadian Government would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in Noerr.

III.

Since our decision concerning the alleged loss of Continental's Canadian business will in any event require a new trial of the entire case in view of the close interconnection between the Canadian and domestic issues, we shall remand the case to the District Court for further proceedings. We therefore deem it appropriate to pass upon certain of the alleged trial errors raised by Continental in the Court of Appeals but not considered by that court. In passing upon these issues, we are not to be understood as expressing any views on the merits of those matters raised by Continental before the Court of Appeals but not discussed here.

[13] An error committed by the trial court, perhaps understandable because the trial preceded this Court's decision in Klor's, Inc., v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, was the 'public injury' charge. Although petitioners pleaded a concerted refusal to deal with them by respondents, a price-fixing conspiracy, and an allocation of customers, all per se violations under s 1 of the Sherman Act, the court charged the jury that a conspiracy must be proved 'which was reasonably calculated to prejudice the public interest by unduly' restraining trade, and which was intended 'to injure the general public by' restraining trade. Under the rule stated in Klor's, this charge was error.

[14] The trial court also erred in its treatment of monopolization. Initially, in its charge to the jury, the court defined 'monopolize' as referring to 'the joint acquisition or maintenance by the members of the conspiracy formed for that purpose, of the power to control and dominate *709 interstate trade and commerce in a commodity to such an extent that they are able, as a group, to exclude actual or potential competitors from the field, accompanied with the intention and purpose to exercise such power.' The court **1416 also related its definition of 'attempt to monopolize' to action taken by a combination or conspiracy. The jury was further instructed that 'an essential element of the illegal monopoly or monopolization is the existence of a combination or conspiracy to acquire and maintain the power' and that a verdict must be returned for the defendants 'if you find that the plaintiffs have not proved that there was * * * a conspiracy.' Petitioners duly excepted to the charge on the ground that they were entitled to prevail if they could prove that either respondent monopolized unilaterally.

Petitioners' complaint did not preclude reliance on unilateral monopolization and the evidence offered was relevant and material to such a charge. The trial court's misinterpretation of the law in defining 'monopolization' and attempted monopolization' in terms of 'conspiracy to monopolize' was therefore

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

82 S.Ct. 1404
(Cite as: 370 U.S. 690, *709, 82 S.Ct. 1404, **1416)

Page 11

prejudicial rather than harmless. This error should not be repeated in a new trial. [FN14]

> FN14. Among the cases in which this Court has condemned unilateral monopolization are Maryland & Virginia Milk Producers Ass'n v. United States, 362 U.S. 458, 468, 80 S.Ct. 847, 854, 4 L.Ed.2d 880; Lorain Journal v. United States, 342 U.S. 143, 154, 72 S.Ct. 181, 186, 96 L.Ed. 162. See also United States v. Aluminum Co., 148 F.2d 416 (C.A.2d Cir.); United States v. United Shoe Mach. Co., 110 F.Supp. 295 (D.Mass.), aff'd, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.

[15] The trial court further erred in its persistent exclusion of evidence relating to the pre-1938 period, on the ground that since Mr. Leir came to this country in 1938 nothing which transpired earlier could be relevant to his suit. Petitioners sought to introduce evidence that the conspiracy and monopolization alleged began in the early 1930's, that overt acts in furtherance thereof *710 occurred in the 1930's, and that it was pursuant to this anticompetitive scheme that respondents sought to and did eliminate petitioners from the vanadium industry after 1938. This evidence was clearly material to petitioners' charge that there was a conspiracy and monopolization in existence when they came into the industry, and that they were eliminated in furtherance thereof. [FN15] We do not mean that a trial court may not place reasonable limits upon such evidence or set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it. [FN16] But that was not the basis for this exclusionary ruling.

> FN15. Thus in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 75--76, 31 S.Ct. 502, 55 L.Ed. 619, this Court considered evidence as to defendants' acts in 1879--1882, prior to the Sherman Act's passage in 1890, in order to ascertain the monopolistic intent or purpose of the founders of the Standard Oil Trust. And in Kansas City Star Co. v. United States, 240 F.2d 643, 650--651 (C.A.8th Cir.), evidence from the period preceding the criminal statute of limitations was allowed into consideration to show that defendants' course of conduct over a period of years indicated that they retain an unlawful intent during the immediate pre-indictment period.

> FN16. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 228--231, 60 S.Ct. 811, 848, 84 L.Ed. 1129.

We conclude that the judgment of the Court of Appeals must be vacated and the case remanded to the District Court for further proceedings consistent with this opinion. It is so ordered.

Judgment of Court of Appeals vacated and case remanded.

Mr. Justice FRANKFURTER took no part in the consideration or decision of this case.

370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777

Briefs and Other Related Documents (Back to top)

· 1962 WL 115350 (Appellate Brief) Brief of Respondents Union Carbide Corporation and United States Vanadium Corporation (Apr. 2, 1962)

· 1962 WL 115351 (Appellate Brief) Brief for Respondent Vanadium Corporation of America (Apr. 2, 1962)

· 1962 WL 115349 (Appellate Brief) Petitioners' Opening Brief (Mar. 2, 1962)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.