EXHIBIT 3

Page 1

290 F.3d 768
290 F.3d 768, 2002-1 Trade Cases P 73,675, 58 Fed. R. Evid. Serv. 1566, 2002 Fed.App. 0171P
(Cite as: 290 F.3d 768)
▷

Briefs and Other Related Documents

United States Court of Appeals,
Sixth Circuit
CONWOOD COMPANY, L.P.; Conwood Sales
Company, L.P., Plaintiffs-Appellees,
v.
UNITED STATES TOBACCO COMPANY;
United States Tobacco Sales and Marketing
Company, Inc.; United States Tobacco
Manufacturing Company, Inc.; UST, Inc.,
Defendants-Appellants.
No. 00-6267

Argued: Nov. 27, 2001.
Decided and Filed: May 15, 2002.
Rehearing and Suggestion for Rehearing En Banc
Denied: July 19, 2002.

Manufacturer of moist snuff brought suit alleging that another manufacturer had used its monopoly position to exclude competitors from moist snuff market. The United States District Court for the Western District of Kentucky, Thomas B. Russell, J., rendered judgment on jury verdict for plaintiff, and defendant appealed. The Court of Appeals, Clay, Circuit Judge, held that: (1) there was sufficient evidence for jury to find willful maintenance of monopoly power; (2) there was sufficient evidence showing that plaintiff's injury flowed from defendant's anti-competitive activity; (3) district court did not abuse its discretion in determining that plaintiff's expert's methodology was sufficiently reliable or relevant; and (4) there was sufficient evidence to support jury's award of damages.

Affirmed.

West Headnotes

[1] Federal Courts ⟨⟩ 776
170Bk776 Most Cited Cases
Court of Appeals reviews district court's denial of motion for judgment as a matter of law de novo. Fed.Rules Evid.Rule 50(b), 28 U.S.C.A.

[2] Federal Civil Procedure ⟨⟩ 2127
170Ak2127 Most Cited Cases

[2] Federal Civil Procedure ⟨⟩ 2609

170Ak2609 Most Cited Cases
On motion for judgment as a matter of law, evidence is viewed in light most favorable to non-movant, and all reasonable inferences are drawn in that party's favor. Fed.Rules Evid.Rule 50(b), 28 U.S.C.A.

[3] Federal Courts ⟨⟩ 765
170Bk765 Most Cited Cases
On review of motion for judgment as a matter of law, Court of Appeals must assure that district court indulged all presumptions in favor of validity of jury's verdict and refrained from interfering with verdict unless it was clear that jury reached seriously erroneous result. Fed.Rules Evid.Rule 50(b), 28 U.S.C.A.

[4] Federal Courts ⟨⟩ 823
170Bk823 Most Cited Cases
Court of Appeals considers district court's decision to admit or exclude expert testimony for abuse of discretion, recognizing that such review calls for deference to district court's decision.

[5] Federal Courts ⟨⟩ 823
170Bk823 Most Cited Cases
Court of Appeals will reverse district court's decision to admit or exclude expert testimony only where it is left with definite and firm conviction that district court committed clear error of judgment.

[6] Antitrust and Trade Regulation ⟨⟩ 621
29Tk621 Most Cited Cases
    (Formerly 265k12(1.3))

[6] Antitrust and Trade Regulation ⟨⟩ 644
29Tk644 Most Cited Cases
    (Formerly 265k12(1.3))
Claim of unlawful monopolization requires proof of: (1) possession of monopoly power in relevant market, and (2) willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to growth or development resulting from superior product, business acumen, or historic accident. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[7] Antitrust and Trade Regulation ⟨⟩ 641
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
**(Cite as: 290 F.3d 768)**

To establish offense of monopolization, plaintiff must demonstrate that defendant either unfairly attained or maintained monopoly power; "monopoly power" consists of power to control prices or exclude competition. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[8] Antitrust and Trade Regulation ☞ 713
29Tk713 Most Cited Cases
    (Formerly 265k12(1.3))

[8] Antitrust and Trade Regulation ☞ 714
29Tk714 Most Cited Cases
    (Formerly 265k12(1.3))

[8] Antitrust and Trade Regulation ☞ 715
29Tk715 Most Cited Cases
    (Formerly 265k12(1.3))
"Attempted    monopolization"    occurs    when competitor, with dangerous probability of success, engages in anti-competitive practices the specific design of which are. to build monopoly or exclude or destroy competition. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[9] Antitrust and Trade Regulation ☞ 621
29Tk621 Most Cited Cases
    (Formerly 265k12(1.6), 265k12(1.3))

[9] Antitrust and Trade Regulation ☞ 715
29Tk715 Most Cited Cases
    (Formerly 265k12(1.6))
In order for "completed" monopolization claim to succeed, plaintiff must prove general intent on part of monopolist to exclude; by contrast. to prevail on "mere" attempt claim, plaintiff must prove specific intent to destroy
competition or build monopoly. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[10] Antitrust and Trade Regulation ☞ 645
29Tk645 Most Cited Cases
    (Formerly 265k12(1.3))

[10] Antitrust and Trade Regulation ☞ 646
29Tk646 Most Cited Cases
    (Formerly 265k12(1.3))
First step in any action alleging unlawful monopolization is for plaintiff to define relevant product and geographic markets in which it competes with alleged monopolizer, and to show that defendant, in fact. possesses monopoly power:

for these purposes, "geographic market" is defined as area of effective competition, the locale in which consumers of product or service can turn for alternative sources of supply. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[11] Antitrust and Trade Regulation ☞ 620
29Tk620 Most Cited Cases
    (Formerly 265k12(1.4))

[11] Antitrust and Trade Regulation ☞ 650
29Tk650 Most Cited Cases
    (Formerly 265k12(1.3))
In determining whether conduct of alleged monopolist may be characterized as exclusionary, it is relevant to consider its impact on consumers and whether it has impaired competition in unnecessarily restrictive way. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[12] Antitrust and Trade Regulation ☞ 620
29Tk620 Most Cited Cases
    (Formerly 265k12(1.4))

[12] Antitrust and Trade Regulation ☞ 650
29Tk650 Most Cited Cases
    (Formerly 265k12(1.3))
If alleged monopolist has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory or exclusionary; however, merely because entity has monopoly power does not bar it from taking advantage of its scale of economies because of its size, since such advantages are consequence of size and not exercise of monopoly power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[13] Antitrust and Trade Regulation ☞ 641
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
Monopoly or market power may be proven directly by evidence of control of prices or exclusion of competition, or it may be inferred from one firm's large percentage share of relevant market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2

[14] Antitrust and Trade Regulation ☞ 641
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
Material consideration in determining whether monopoly exists is not that prices are raised and that competition is excluded, but that power exists to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768)

raise prices or to exclude competition when it is desired to do so.

[15] Antitrust and Trade Regulation ⬤➡ 977(3)
29Tk977(3) Most Cited Cases
    (Formerly 265k28(7.5))
Evidence was sufficient to support jury's finding that manufacturer of moist snuff unlawfully monopolized the market, despite manufacturer's contention that complained of practices amounted to no more than isolated sporadic torts; there was evidence that defendant's representatives continuously removed and discarded plaintiff's racks and point of sale (POS) advertising from stores, and that defendant misused its position as category manager by providing misleading information to retailers in order to dupe retailers into believing, among other things, that its products were better selling so that retailers would carry its products and discontinue carrying plaintiff's products. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[16] Antitrust and Trade Regulation ⬤➡ 620
29Tk620 Most Cited Cases
    (Formerly 265k12(1.4))

[16] Antitrust and Trade Regulation ⬤➡ 650
29Tk650 Most Cited Cases
    (Formerly 265k12(1.4))
Isolated tortious activity alone does not constitute exclusionary conduct for purposes of monopolization claim, absent significant and more than temporary effect on competition, and not merely on competitor or customer. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[17] Antitrust and Trade Regulation ⬤➡ 560
29Tk560 Most Cited Cases
    (Formerly 265k12(1.8))
Fact that particular practice might be actionable under tort law does not preclude action under antitrust laws as well.

[18] Antitrust and Trade Regulation ⬤➡ 984
29Tk984 Most Cited Cases
    (Formerly 265k28(9))
In antitrust action, plaintiff is not limited to recover only for specific items of damage which he can prove with reasonable certainty; rather, trier of fact may make just and reasonable estimate based on relevant data and may act upon probable and inferential proof. Sherman Act, § 2, as amended,

15 U.S.C.A. § 2.

[19] Evidence ⬤➡ 555.4(3)
157k555.4(3) Most Cited Cases
Experts are entitled to rely on documents, even hearsay documents that are otherwise inadmissible.

[20] Antitrust and Trade Regulation ⬤➡ 963(2)
29Tk963(2) Most Cited Cases
    (Formerly 265k28(9))
To recover damages, antitrust plaintiff must show (1) that alleged violation tends to reduce competition in some market and (2) that plaintiff's injury would result from decrease in that competition rather than from some other consequence of defendant's actions.

[21] Antitrust and Trade Regulation ⬤➡ 963(2)
29Tk963(2) Most Cited Cases
    (Formerly 265k28(7.1))
Antitrust plaintiff bears burden of showing that alleged violation was material cause of its injury, a substantial factor in occurrence of damage or that violation was proximate cause of the damage.

[22] Antitrust and Trade Regulation ⬤➡ 977(3)
29Tk977(3) Most Cited Cases
    (Formerly 265k28(7.5))
There was sufficient evidence that competition was harmed in the national moist snuff sales market to support finding that snuff manufacturer unlawfully monopolized the market; although output in the market grew, there was evidence showing that defendant's actions caused higher prices and reduced consumer choice, that growth of two of the three other manufacturers of moist snuff aside from defendant slowed, and that restricted growth resulted from defendant's conduct. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[23] Antitrust and Trade Regulation ⬤➡ 977(3)
29Tk977(3) Most Cited Cases
    (Formerly 265k28(7.6))
There was sufficient evidence that plaintiff moist snuff manufacturer's injury flowed from defendant's anti-competitive activity to support monopolization claim; there was evidence that defendant removed and discarded plaintiff's racks and point of sale (POS) advertising from stores, that defendant and not retailers controlled facing decisions and that in making those decisions, defendant's sales representatives purposely attempted to bury plaintiff's products in defendant's racks, and that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768)

defendant misrepresented sales activity of its own products to retailers in order to increase the number of facings of its slower moving products despite fact that other brands by its competitors, including plaintiff's, were better selling.  Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[24] Antitrust and Trade Regulation ☞ 963(2)
29Tk963(2) Most Cited Cases
        (Formerly 265k28(7.6))

[24] Antitrust and Trade Regulation ☞ 977(1)
29Tk977(1) Most Cited Cases
        (Formerly 265k28(7.6))
While link between antitrust injury and violation must be proved as a matter of fact and with fair degree of certainty, it need not be the sole proximate cause.

[25] Federal Courts ☞ 612.1
170Bk612.1 Most Cited Cases
Appellant's claims that expert's regression model could not be tested, was not subject to ascertainable rate of error and had no basis in the literature could not be asserted on appeal, where issues were not raised below.

[26] Federal Courts ☞ 628
170Bk628 Most Cited Cases
Where defendant had challenged admissibility of expert's testimony by motion in limine, and court had allowed testimony on preliminary basis, defendant did not waive challenge by not objecting at trial.

[27] Federal Courts ☞ 611
170Bk611 Most Cited Cases
Appellant is entitled to relief from plain error only if its "substantial rights" were affected.

[28] Evidence ☞ 508
157k508 Most Cited Cases

[28] Evidence ☞ 555.2
157k555.2 Most Cited Cases
In determining whether expert's proposed testimony rests on reliable foundation and is relevant to task at hand, district court examines whether expert is proposing to testify to (1) scientific knowledge that (2) will assist trier of fact to understand or determine fact in issue; this involves preliminary inquiry as to whether reasoning or methodology

underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to facts in issue.  Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[29] Evidence ☞ 555.2
157k555.2 Most Cited Cases
Factors that may be used in preliminary inquiry whether reasoning or methodology underlying proposed expert testimony is scientifically valid and whether that reasoning or methodology properly can be applied to facts in issue include:  (1) whether theory or technique has been tested and subjected to peer review and publication, (2) whether potential rate of error is known, and (3) its general acceptance.  Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[30] Evidence ☞ 555.9
157k555.9 Most Cited Cases
In antitrust action, district court did not abuse its discretion in determining that plaintiff's expert's methodology was sufficiently reliable or relevant to allow admission of his study and testimony; regression analysis, yardstick test and before-and-after test used by expert were generally accepted methods for proving antitrust damages, and expert related plaintiff's loss to specific bad acts by defendant and accounted for all other market variables that could have caused plaintiff's harm. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[31] Federal Courts ☞ 796
170Bk796 Most Cited Cases
Jury in antitrust case was presumed to have followed instruction that it could not award damages for injuries caused by factors other than antitrust violation.

[32] Antitrust and Trade Regulation ☞ 985
29Tk985 Most Cited Cases
        (Formerly 265k28(7.6))
In antitrust case, damages may be awarded on plaintiff's estimate of sales it could have made absent the violation.

[33] Antitrust and Trade Regulation ☞ 985
29Tk985 Most Cited Cases
        (Formerly 265k28(7.6))
There was sufficient evidence to support jury's award of damages of    $350,000,000 against manufacturer of moist snuff for unlawfully monopolizing the market; there was testimony that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768)

absent defendant's unlawful conduct, plaintiff would have achieved market share in the mid-20s, that drop in plaintiff's market share was largely due to defendant's tactics, and that in those stores where defendant practiced rack exclusivity, plaintiff's market share was well below its national average. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.
*772 L. Clifford Craig (briefed), Taft, Stettinius & Hollister, Cincinnati, OH, Richard C. Roberts (briefed), Whitlow, Roberts, Houston & Straub, Paducah, KY, Neil M. Gorsuch (briefed), Mark C. Hansen (argued and briefed), Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Plaintiffs-Appellees.

Neal R. Stoll (briefed), James A. Keyte (briefed), Skadden, Arps, Slate, Meagher & Flom, New York, NY, John S. Reed (briefed), Ridley M. Sandidge, Jr. (briefed), Lynn K. Fieldhouse (briefed), Reed, Weitkamp, Schell & Vice, Louisville, KY, Ernest Gellhorn (argued and briefed), Law Office of Ernest Gellhorn, Washington, DC, for Defendants-Appellants.

John D. Harkrider, Axinn, Veltrop & Harkrider, New York, NY, for Amicus Curiae.

Before: CLAY and GILMAN, Circuit Judges; EDGAR, Chief District Judge. [FN*]

FN* The Honorable R. Allan Edgar, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

OPINION

CLAY, Circuit Judge.

Defendants-Appellants, United States Tobacco Company, United States Tobacco Sales and Marketing Company, Inc., United States Tobacco Manufacturing Company, Inc., and UST, Inc. (herein collectively referred to as "USTC") appeal from the March 29, 2000 order, after trial by jury, entering judgment in favor of Plaintiffs, Conwood Company, L.P. and Conwood Sales Company, L.P. ("Conwood") for Defendants' violations of the Sherman Anti-Trust Act, 15 U.S.C. § 2. Conwood alleged that USTC violated the Act by using its monopoly position to exclude competitors from the moist snuff market. We AFFIRM.

BACKGROUND
Procedural History
On April 22, 1998, Conwood filed an eight-count complaint against USTC alleging *773 the following causes of action: (1) Unlawful Monopolization, in violation of § 2 of the Sherman Act; (2) Violations of § 43(a) of the Lanham Act; (3) Tortious Interference with contract; (4) Tortious Interference with prospective advantage; (5) Violations of the Kentucky Revised Statute, § 365.050; (6) Product Defamation; (7) Unjust Enrichment; and (8) Conversion/Trover. USTC filed counterclaims for conversion and violations of the Lanham Act and Sherman Act.

In November 1999, USTC moved for summary judgment as to Conwood's federal claims and dismissal without prejudice as to the pendent state law claims. USTC also filed a motion in limine to exclude the testimony of Conwood's expert witness, Dr. Richard Leftwich, and moved separately to exclude Leftwich's damages study and future testimony during trial. The district court denied USTC's summary judgment motion on February 17, 2000. On February 23, 2000, the district court also denied USTC's motions with respect to Leftwich.

In February 2000, the case proceeded to trial. Before the case went to the jury, Conwood agreed to dismiss the state law claims and both parties agreed to dismiss their respective Lanham Act claims asserted against one another. The jury deliberated for four hours, returning a $350 million verdict in favor of Conwood. The district court entered judgment on March 29, 2000, and therein trebled the amount of the award to $1.05 billion, pursuant to 15 U.S.C. § 15(a). The jury also ruled in favor of Conwood on USTC's conversion and Sherman Act claims.

Conwood moved for a permanent injunction, pursuant to 15 U.S.C. § 26, to prevent USTC from, among other things, removing or eliminating any competitors' advertising material in retail stores, without the prior consent of the retailer. The district court granted the motion on August 10, 2000. USTC moved for judgment as a matter of law, or for a new trial or reduction in damages, arguing that its conduct was not exclusionary, competition was not harmed and that Conwood had not established causation and damages. The district court denied the motion on August 10, 2000. On

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *773)

September 11, 2000, USTC filed this timely notice of appeal challenging the district court's (1) February 17, 2000 denial of its motion for summary judgment; (2) February 23, 2000 order denying its motion to exclude the damages study and testimony of Leftwich; (3) March 29. 2000 judgment on the jury verdict; (4) August 10, 2000 order denying its motion for judgment as a matter of law, or in the alternative for a new trial or reduction of damages; and (5) August 10, 2000 order granting Conwood's motion for permanent injunctive relief.

Facts

Both Conwood and USTC are manufacturers of moist snuff, a finely chopped smokeless tobacco that the user consumes by placing a small amount between the gum and cheek. The product is sold in small round cans, at a price of between $1.50 and $3. USTC produces the industry staples "Skoal" and "Copenhagen." Conwood's brands include "Kodiak" and "Cougar."

USTC's predecessor, Duke Trust, started the moist snuff industry in 1822, with its Copenhagen brand. In 1911, a judicial decree broke up the Duke Trust monopoly, which spawned three companies: American Snuff Company (Conwood's predecessor); USTC; and "Helme" (which is now known as Swisher International Group, hereinafter, "Swisher"). American Snuff Company changed its name to Conwood sometime during the 1950s. Conwood and Swisher were involved for many years in the "dry snuff" market. For sixty years, *774 USTC was the sole manufacturer of moist snuff. Swisher and Conwood entered the moist snuff market in the late 1970s. The only other competitor in the moist snuff market is Swedish Match ("Swedish"). Thus, there are only four competitors in the moist snuff market in the United States.

After Conwood, Swisher, and Swedish entered the market, USTC's market share, which at one point was virtually 100 percent, declined. By 1990, the four manufacturers sold 28 different brands of moist snuff and USTC's market share was approximately 87 percent. During the 1990s, market growth accelerated in the moist snuff industry, and USTC's market share continued to drop. At trial, one of Conwood's expert witnesses, Morton Kamien, a professor at Northwestern University's Kellogg Graduate School of Business, testified that USTC

currently controls 77 percent of the moist snuff market; Conwood controls approximately 13 1/2 percent of the market and Swedish and Swisher comprise approximately 6 percent and 4 percent of the market, respectively.

In 1999, total moist snuff sales amounted to $1.68 billion. Also, in 1999, USTC earned approximately $813 million in revenues before taxes, interest and amortization. The company has the highest profit margin of any public company in the country. Kamien testified that because USTC is one of the most profitable companies in the country, and because of the amount of profit at stake in the moist snuff market, it "would be a ripe opportunity for other firms to come in and try to get into the market ...." However, there have been no new entrants in the market since 1990. In addition, although USTC declined in market share about 1 percent per year between 1979 and 1999, Kamien testified that had there been true competition in the moist snuff industry, the decline would have gone much faster. He found it remarkable that while USTC's market share decreased, the company raised its prices. Testimony revealed that USTC had raised its prices approximately 8 to 10 percent per year between 1979 and 1998.

The Importance of In-store Advertising

Moist snuff is generally sold from racks. The racks have gravity fed slots or facings, from which consumers may select a can of the product. Each facing is filled with cans of a single brand of moist snuff. In addition to dispensing cans, the racks also provide "point of sale" ("POS") advertising, generally carried out by a "header card"--a cardboard sign attached to the front of the rack. The header card may contain such information as the name of the brand of moist snuff, any promotions running with the product, and a picture of the product.

The parties agree that POS in-store advertising is critical in the moist snuff industry because unlike with other products, such as soft drinks or snacks, tobacco advertising is restricted. Tobacco products cannot be advertised on TV or radio, and some places have restrictions on other forms of advertising outside of a retail store, such as on billboards. Further, the number of people who use smokeless tobacco products is relatively small in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *774)

relation to those who consume other tobacco products    Thus, according to Harold Price, Swedish's vice president of sales and marketing, the point at which the buyer makes his purchase decision is the optimal time to convince the buyer to purchase a particular brand of moist snuff   Price testified that the "single most important" tool for advertising is the merchandise rack, "because that's where we have the greatest opportunity and the last point to reach the consumer before [the consumer] makes [his or her] purchase decision."

*775 Exclusive Racks, Category Management and CAP

Conwood showed at trial that beginning in 1990, USTC pursued strategies, emanating from high-level management, to exclude competition in the moist snuff market

According to trial testimony, USTC had been able to convince "a number of major retailers" to allow it to have "exclusive racks" in their stores    An "exclusive rack" refers to one manufacturer supplying a rack to display its moist snuff products and those of all other manufacturers   Kroger's Steven Luckett testified that while his store permits each moist snuff company to have its own rack, an advantage of allowing only one rack to store all similar products is uniformity    It also allows retailers to stack products in a manner that looks more attractive and neat    According to Alan Hart, a former USTC salesman, less than 10 percent of stores carried USTC racks exclusively, and of those that did "most all of them" did so because the store authorized it    Several retailers testified that they requested exclusive racks    In fact, Mary Stevens, who managed a Kiwi store in Billings, Montana, testified that she used only a Conwood rack. [FN1]

> FN1  USTC also points out that in 1996, Wal-Mart asked it and other moist snuff manufacturers to design a rack for the store to use for its moist snuff products   (J A  at 492 )  Conwood decided not to participate in the contest   Id  USTC's design won  Id  Swisher also won similar competitions for exclusive rack systems in K-Mart and Tom Thumb stores. (J A  at 2859, 518-19. 1447-48.)

During the 1990s, many retailers adopted the practice of category management   This practice varies from store to store, and involves managing

product groups and business units and customizing them on a store-by-store basis to satisfy customer demands    The process can determine the quantity of items a store sells    For instance, it allows retailers, based on such data as sales volume, to determine which items should be allocated more shelf space    Manufacturers support the efforts of retailers by presenting to them products or a combination of products that are more profitable and "plan-o-grams" describing how, and which, products should be displayed    At Wal-Mart, Swedish and USTC were involved with category management, which entailed suggesting which items should be on the racks    Swisher at one point was also involved in the process

As part of the category management process, retailers review plan-o-gram information provided by the manufacturer and compare the products they suggest be sold to the retailer's own independent analysis   The process is designed to ensure the best selling products are included in the plan-o-gram   Larry Luckett, who decides which moist snuff products will be sold at Kroger Company, testified that any supplier trying to use category management practices to control competition, in his store anyway, would be "committing suicide."   USTC points out that no retailer testified that the company required shelf space allocations equal to its market share.   Apparently, Wal-Mart rejected such a request from USTC.

However, according to Conwood, around 1990, USTC perceived it as a threat in the moist snuff market and took steps to eliminate it as a competitor and to "reject competition on the merits "   USTC's president, Vincent Gierer, testified that around that time his company was losing market share and Conwood's volume was increasing.   In the mid-1990s Conwood and Swedish introduced "price value" or half-priced brands of moist snuff.   To show that USTC believed that such "price valued" products would erode its profits, Conwood *776 points to a 1996 internal USTC report in which the company stated that one of its goals was to "[m]inimze the growth in [price value] we have been experiencing over the past five years to the point where USTC can still grow the market and achieve desired growth for USTC " The report stated that USTC would "need to be more aggressive where [price value] has a higher share of the segment and will actively pursue strategies to limit the growth of

290 F.3d 768
(Cite as: 290 F.3d 768, *776)

the price value market segment."

Conwood also claims that USTC, in its role as category manager, deliberately provided false information to stores to exclude competitors from the market. For instance, David Waller, a wholesale distributor, testified that USTC has provided "skewed" national sales figures to retailers that do not always represent local product movement in stores. A report drafted by a division manager in Houston also shows that USTC sometimes provided false information to retailers to get them to maintain USTC's poor selling items while dropping competitors' products. Conwood employees also testified that USTC provided false information to retailers, such as by inflating actual sales data.

According to Conwood expert witness Robert Blattberg, an expert on category management and a professor of retailing at Northwestern's Kellogg Graduate Business School, many retailers consider moist snuff a small category and give it little attention. By "small," Blattberg explained that it is only consumed by about seven percent of the population, almost all male. However, it is a highly profitable item on a linear foot basis because it takes up so little space. He testified that no store, not even Wal-Mart, according to him the largest retailer in the world, has anyone solely devoted to the management of moist snuff. From reviewing USTC documents, he testified that USTC employees understood that retail category managers did not know as much as USTC did about pricing, product knowledge and profitability of the products. He stated that manufacturers often have access to data that retailers do not, such as Nielsen data, which tracks product movement. He stated that because of their time constraints, retailers are more likely to delegate the task of category management with respect to such items as moist snuff. He testified that when a retailer does delegate category management responsibilities to a manufacturer, the latter has significant responsibility. The retailer will look to the manufacturer to provide such information as assortment recommendations for which items to stock, consumer information, sales, and which stores are stocking what items. He further testified that a retailer will rely on a large manufacturer to be its category captain because if a manufacturer controls 75 or 80 percent of the market many retailers will assume that the manufacturer will and can devote the resources to the category to

help build it. For instance, Blattberg pointed to documents in which a USTC representative stated that "most retailers want the top dog running things because the dominant share of market customers will look to us for leadership."

Swedish's McClure also testified that "[t]here's only one category manager in the moist snuff business"--USTC. He also stated that while he would like to compete for the job of category manager, his company does not have shelf presence, consumer base or money. He also testified that USTC had not used its position fairly, had used its power "to keep [Swedish's] products off the shelf, and once it's there to get rid of it...."

Terry Williams, Conwood's national sales manager, testified that in 1997 he was informed by one retailer that in order *777 to obtain extra facings or a facing for a new item, the retailer first would have to consult with USTC. He also testified that before 1997, Conwood's market share in Wal-Mart was approximately 12 percent, but by the time of trial it was 6.5 percent. He explained that USTC's exclusive racks and its restrictions on Conwood's distribution began in Wal-Mart around 1997.

There is also documentary evidence that USTC sought to use its position as category manager to control and limit the number of price value products introduced in stores and to control the merchandising and POS placements in stores. In one 1997 report, a USTC regional vice president stated that "[i]t is imperative that we continue with this Category Management action plan to eliminate competitive products." In another document, a 1998 letter to David Untiedt, USTC national accounts director, a USTC employee stated that his biggest competitive concern with several stores in the Washington state area was the "availability of [Swedish's] Timberwolf [brand] and price differential between" that product and USTC's. The letter went on to state that "[a]lthough we control the merchandising and the POS placements, which will make the consumer awareness of the price differential difficult, some of the Circle K shoppers are always looking for a bargain." After reviewing this document, Blattberg testified that USTC apparently realized that customers were looking for a bargain, and that limiting the amount of POS and information makes it more difficult for the consumer to find price value brands. In yet

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *777)

another document Blattberg discussed, a USTC chain accounts manager in North Carolina wrote "Our objective with exclusive vending rights with this and other chains is to control expanded competitive distribution and competitive POS ... we will continue to focus on merchandising rights to promote the growth of our product line and inhibit competitive growth ... to the best of our ability." Blattberg testified that the obvious objective in having exclusive vending rights, according to the letter, is to reduce the amount of competitive items that can be offered.

According to Blattberg, documentary evidence showed that USTC intended to use its position as category captain to "control the number of price value product introductions." Blattberg testified that after reviewing numerous documents drafted by USTC staff, he saw instances where USTC provided misleading information to retailers, including falsely reporting that some of their products were selling better than their competitors in an effort to thwart competition. He testified that by limiting the availability of the price value brands, USTC limits the choices for consumers. He also testified that it limits the ability of competitors to enter the market because it limits what the consumer can see. He stated that USTC's practices were inconsistent with the concept of category management.

Kamien also testified that USTC's conduct harmed consumers by limiting variety and raising prices. He produced a chart showing that for every 10 percent increase in USTC facings, retail prices for moist snuff rose by $.07. A Wal-Mart manager testified that after USTC eliminated competitors' POS and facings, the number of other moist snuff items available to the store's customers declined.

Conwood introduced numerous documents drafted over several years by various USTC personnel, including chain accounts managers and others, that indicate USTC may have used its exclusive vending rights to hurt competition. *See e.g.*, J.A. at 2182 ("objective with exclusive vending rights with this and other chains is to control expanded competitive distribution and competitive P.O.S. Department ... We will continue to focus on merchandising *778 rights to ... inhibit competitive growth (to the best of our ability));" J.A. at 2185 ("We stressed in our Department Meeting the importance of cutting competitive distribution. In many stores, especially

supermarkets, distribution of competitive brands is much too high ..."); J.A. at 2375 ("Even though Conwood does not like the fact that we sometimes house their product in our vending, I have encountered more and more retailers that are surprised when I include the comp[etitions'] products. I feel it is better for them to be lost in our vending th[a]n to have their own and no point of sale on the vendor."); J.A. at 2401 ("Our objective is to control the smokeless home, ... provide facings for competitive, control facings and positioning, and make our presence larger via P.O.S."); J.A. at 2523 ("With arrogance and grace, I have taken a personal vendetta against the Conwood Reps. in my areas. I am devoting an extra effort toward eliminating as many laggard Conwood brands at retail as possible ... Since I am offering a cash counter payment for exclusive UST vending on our 2908 displays, I am giving Kodiak ... [a Conwood brand] one facing....").

In 1998, USTC introduced its Consumer Alliance Program ("CAP"), which entails granting retailers a maximum discount of .3% for providing USTC with sales data, and participating in USTC promotion programs, and/or giving the best placement to USTC racks and POS. According to Conwood, however, CAP is another means by which USTC excludes competition. For example, in "a monthly competitive letter" dated March 27, 1998, a USTC employee stated that the CAP "has become a great incentive in securing space for our vendors and for the elimination of competition products."

There was testimony that the CAP can be used to exclude competitive POS advertising, and that USTC was extremely successful in signing up retailers to enter into these agreements. In the first couple of months of the program, USTC was able to sign 37,000 retailers to the CAP, which represents 80 percent of its overall volume in moist snuff sales.

Unauthorized Removal of Conwood Racks

According to Conwood, when USTC sales representatives restocked or rearranged their own displays, they would routinely discard hundreds of thousands of Conwood racks and their accompanying POS William Rosson, Conwood's Chairman, testified that after 1990, Conwood spent $100,000 a month on replacement racks. Rosson testified that the company had "monumental

290 F.3d 768
(Cite as: 290 F.3d 768, *778)

problems" keeping their moist snuff on the shelf. A Conwood sales representative testified that when displays were removed, Conwood was successful in restoring them about 95 percent of the time. Rosson testified that about 50 percent of sales representative's staff time was spent repairing racks destroyed by USTC representatives. Because two to three months would sometimes pass before a sales representative could return to the same store, Conwood lost sales even when it was able to restore racks.

Conwood also asserts that USTC would remove its POS and racks under the guise that retailers had given it permission to do so. Conwood argues that any permission to remove its products was done under a ruse of organizing or straightening stores. It argues that USTC supervisors trained their staff to take advantage of inattentive store clerks, apparently so that they could destroy Conwood's racks and headers in retail stores. For instance, Shawn Ulizio, a former USTC employee testified that most clerks did not understand or care that there were different manufacturers of snuff products. Another former USTC sales representative testified that after he *779 got permission from a store manager, he would remove Conwood racks and put Conwood's products in USTC racks. Former USTC representative Lawrence Borrowdale testified that he was instructed, apparently by his supervisor, that if a competitor's rack was in the way, he should remove it. Borrowdale testified that on occasion he would remove competitors' racks and bag up their fresh products and place them under a counter. Several other former USTC employees gave similar testimony. Kamien testified that the documentary evidence showed that the problem of USTC removing competitors' racks was widespread over a period of time.

One Conwood employee testified that except for moist snuff, he never encountered problems with his displays regarding any Conwood product. He testified that he would place moist snuff racks in stores only to return later to have the displays gone and any remaining Conwood brands stuffed in USTC's rack. Another Conwood employee gave similar testimony. He also stated that once the USTC representative in his area told him that he intended to "bury" him. Later, he witnessed that same representative breaking down his rack one day, while USTC's regional vice president, then a USTC

department manager, observed. Conwood did not encounter this problem with its displays of smokeless tobacco products in markets in which USTC did not compete.

Gayleen Rusk, who manages an Amoco Pronto Express, testified that she had experienced a USTC sales representative removing Conwood's racks and putting the products in the USTC rack. She testified that when she first started working at the store and did not know any better, she would allow it. Upon learning that the USTC representative was not supposed to bother competitors' racks, she would tell him not to do so when he visited the store. She stated that he would then come when she was not on duty and remove Conwood's rack anyway. Regarding the effect of not having Conwood brands in her store, Amoco manager Rusk stated that when customers request the items, they do not have them to sell. According to Conwood representative Brett Jeffery, when he told the USTC representative to stop removing his racks, Conwood's sales "dramatically increased." One former USTC representative, who witnessed the removal and destruction of Conwood's POS and racks stated that it had an effect on sales. According to him, no exposure meant no sale. Three other store witnesses also testified that they had seen or experienced USTC representatives removing Conwood racks.

According to USTC, however, retailers rely on manufacturers and wholesaler representatives to perform certain merchandising tasks for them, such as cleaning and rearranging items where a retailer may require more space to add or expand a section. USTC claims that during the 1990s, its more than 600 sales personnel visited 8 to 10 retail stores per day, totaling more than 7 million sales calls. These visits may involve, among other things, removing a competitor's products. racks, or POS, but only at the retailer's direction. USTC also points out that three of the former USTC employees that said that they removed Conwood racks and/or displays at the direction of their supervisors testified that they did so with the retailer's permission. Further, one had not worked for USTC since 1987, before the challenged conduct began. USTC concedes, however, that four witnesses testified that they removed racks and POS materials without retailer authorization. Further, Conwood sales representatives testified that their USTC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

290 F.3d 768
(Cite as: 290 F.3d 768, *779)

counterparts told them they had orders from their supervisors to eliminate Conwood racks or facings, and in *780 some cases, their compensation or bonuses depended on such rack destruction.

Damages

Rosson testified that had Conwood not been subjected to USTC tactics, it would have had a national market share of approximately 22 to 23 percent. Rosson testified that he had carefully tracked Conwood's market share over the past 20 years. Conwood's actual market share in its first 10 years in the moist snuff industry was 11 percent. In the next decade, starting from 1990, that figure increased by roughly 2.5 percent. Rosson testified that the lack of growth that occurred during the second decade largely resulted from USTC's tactics. He testified that his numbers are based on his studying markets where the company had a foothold and those in which it did not. In places where the company had a "foothold," i.e., a relatively high market share in a given area, it saw its market share increase during the 1990s to a market share above 20 percent. Rosson testified that each additional point (one percent) of market share translates into approximately $10 million in annual profits.

Williams testified concerning Conwood's market share with respect to the ten retail locations for which USTC offered evidence at trial. In those locations where USTC did not have rack exclusivity, Conwood's moist brands market share was well above its national average. For those locations where USTC had rack exclusivity, Conwood's market share was below its national average. Conwood argues that from these figures, a jury could have concluded that in unimpeded competition, Conwood's market share would have been approximately 25 percent instead of 13.5 percent nationally.

Finally, to prove damages, Conwood relied on the expert testimony of Professor Richard Leftwich of the University of Chicago Graduate School of Business, who is recognized as an expert on business valuation and lost profits. Leftwich apparently tested Rosson's hypothesis that Conwood's market share increased in areas in which it did not face USTC exclusivity.

Using a regression analysis, Leftwich found a

statistically significant difference between states in which Conwood had a foothold and those in which it did not. Under Leftwich's model, in states where Conwood had a market share in 1990 of 20 percent or more, the market share grew on average an additional 8.1 percent from 1990 to 1997. In states where Conwood's market share in 1990 was at least 15 percent, it grew an additional 6.5 percent. In states below these thresholds, Conwood's growth was considerably lower. As the district court noted:

Leftwich applied a regression analysis to test Conwood's hypotheses. He determined that Conwood's share in a state in 1990 is statistically related to the change in Conwood's market share between 1990 and 1997. The regression model predicts that where Conwood had a higher market share (e.g. 15-20%) in 1990, Conwood's market share grew during the period 1990 to 1997. In contrast, in states where Conwood had a lower market share, the regression predicts that its share would grow very little.
(J.A. at 87-88.)

Leftwich then determined that Conwood's low market growth was due to USTC's behavior. Leftwich's model also found that increases in USTC's exclusionary behavior in a state reduced Conwood's share of sales by a statistically significant amount. He found that Conwood's damages as a result of USTC's actions amounted to a figure between $313 million and $488 million, depending on whether Conwood's market share would have grown by 6.5 or 8.1 percent. The jury awarded damages of $350 million.

*781 DISCUSSION
I.

[1][2][3] This Court reviews a district court's denial of a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) *de novo*. *Williams v. Nashville Network*, 132 F.3d 1123, 1130 (6th Cir.1997) (citing *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir 1996)). "In a federal question case, the standard of review for a Rule 50 motion based on sufficiency of the evidence is identical to that used by the district court. The evidence should not be weighed, and the credibility of the witnesses should not be questioned." *Williams*, 132 F.3d at 1130-31. Further, the evidence is viewed in the light most favorable to the non-movant, and all reasonable inferences are drawn

290 F.3d 768
(Cite as: 290 F.3d 768, *781)

in that party's favor. *Id.* at 1131   This Court should grant the motion only if "reasonable minds could not come to a conclusion other than one favoring the movant." *Id.* Our task also embodies assuring that the district court "indulge[d] all presumptions in favor of the validity of the jury's verdict," and "refrain[ed] from interfering with [the] jury's verdict unless it [was] clear that the jury reached a seriously erroneous result." *Id.* (citing *Brooks v. Toyotomi Co.,* 86 F.3d 582, 588 (6th Cir 1996))

[4][5] This court considers the district court's decision to admit or exclude expert testimony for abuse of discretion, recognizing, of course, that such review calls for deference to the district court's decision.  *See Clay v. Ford Motor Co.,* 215 F.3d 663, 666 (6th Cir 2000) (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 138-139, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).  Thus, we will reverse a district court only where we are left with a definite and firm conviction that it committed a clear error of judgment *Singleton v. United States,* 277 F.3d 864, 870 (2002) (citing *Trepel v. Roadway Express, Inc.,* 194 F.3d 708, 716 (6th Cir.1999))

## II.

USTC argues that the evidence presented at trial amounted to no more than "insignificant" tortious behavior and acts of ordinary marketing services. It contends that tortious activity cannot form the basis for liability under the Sherman Act unless "that activity is pervasive and accompanied by other anti-competitive conduct."  USTC also argues that Conwood failed to show that it was foreclosed from the market, was unable to compete for shelf space, that competition among moist snuff suppliers was injured, or, generally, that any harm alleged was caused by anything other than competition itself.  It contends that its category management services and promotional programs are common marketing practices.   These services, among other things, (1) enhance demand for USTC's products and help to ensure that retailers use shelf space efficiently, (2) build consumer loyalty, and (3) improve presentation of the products. USTC states that trial testimony showed that, during the relevant period, retailers retained control of shelf space allocation, and which racks and POS materials were used. Further, during the relevant period (1990-1998), it argues that market output increased, its competitors' market shares doubled, and Conwood's sales and

profits grew.

Conwood argues that the evidence in this case was sufficient to support the jury's verdict.   Conwood contends that the jury heard and rejected USTC's argument that its conduct was ordinary "demand enhancing" business behavior. It argues that the evidence showed an "orchestrated USTC campaign to eliminate rival distribution and promotion with no competitive justification."   Conwood argues that while *782 USTC points to increased sales in the moist snuff market, it ignores the fact that in the "but for world of unimpeded competition, consumers and Conwood would have done substantially better." We agree with Conwood, and despite USTC's arguments in support of its position, we believe there was sufficient evidence to support the jury's verdict.

## III.

[6][7][8][9] A claim under § 2 of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market;  and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to "growth or development resulting from a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595-96, 105 S.Ct 2847, 86 L.Ed.2d 467 (1985); *Re/Max Int'l, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1016 (6th Cir.1999) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).   "To establish the offense of monopolization a plaintiff must demonstrate that a defendant either unfairly attained or maintained monopoly power." *Potters Med. Ctr. v. City Hosp Ass'n,* 800 F.2d 568, 574 (6th Cir.1986) (citation omitted); *Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.,* 653 F.Supp. 1144, 1151 (S.D.Ohio 1986). "Monopoly power consists of 'the power to control prices or exclude competition.'" *Potters,* 800 F.2d at 574 (citing *Grinnell,* 384 U.S. at 571, 86 S.Ct. 1698).   "An attempted monopolization [under § 2] occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition." *Smith v. N. Michigan Hosps., Inc.,* 703 F.2d 942, 954 (6th Cir.1983) (citations and internal quotation marks omitted). In a § 2 case, "only a thorough analysis of each fact situation will

290 F.3d 768
(Cite as: 290 F.3d 768, *782)

reveal whether the monopolist's conduct is unreasonably anti-competitive and thus unlawful." *Byars v. Bluff City News Co.*, 609 F.2d 843, 860 (6th Cir.1979) (citations omitted); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record.") (citations and internal quotation marks omitted). Moreover, in order for a "completed" monopolization claim to succeed, the plaintiff must prove a general intent on the part of the monopolist to exclude; while by contrast, to prevail on a "mere" attempt claim, the plaintiff must prove a specific intent to "destroy competition or build a monopoly." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir.1998). However, "no monopolist monopolizes unconscious of what he is doing." *Aspen*, 472 U.S. at 602, 105 S.Ct. 2847. Thus, "[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Id.* at 603, 105 S.Ct. 2847 (citation omitted).

[10] The first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact, possesses monopoly power. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268- 69 (2d Cir.1979). "A geographic market is defined as an area of effective competition." *Re/Max*, 173 F.3d at 1016 (citation omitted). "[I]t is the locale in which consumers of a product or service can turn for alternative sources of supply." *Id.*

[11][12][13][14] In the instant case, USTC does not challenge that it has monopoly power; nor is there an issue as to the *783 relevant product (moist snuff) and geographic markets (nationwide). [FN2] On appeal, USTC contends that Conwood has failed to establish whether USTC's power was acquired or maintained by exclusionary practices as opposed to its legitimate business practices, and a superior product. *Aspen*, 472 U.S. at 595-97, 105 S.Ct. 2847. In determining whether conduct may be characterized as exclusionary, "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive

way." *Aspen*, 472 U.S. at 605, 105 S.Ct. 2847. "If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary.]" *Id.* However, merely because an entity has monopoly power, does not bar it from taking advantage of its scale of economies because of its size. *Id.* at 597, 105 S.Ct. 2847. Such advantages "are a consequence of size and not the exercise of monopoly power." *Id.*

> FN2. Whether a company has monopoly or market power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Tops Markets*, 142 F.3d at 97-98 (citation omitted); *see also Re/Max*, 173 F.3d at 1016 (citation omitted). "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so." *Byars*, 609 F.2d 843, 850 (citations omitted). Courts have increasingly leaned toward using circumstantial evidence as a shortcut to determine whether monopoly power exists. *Re/Max*, 173 F.3d at 1018. Such circumstantial evidence may encompass a high market share within a defined market. *Id.* at 1018. At trial there was evidence that USTC enjoyed 74 to 77 percent market power nationwide in the moist snuff industry. As previously stated, USTC neither challenges this finding nor argues that it does not possess monopoly power. To that end, we agree with USTC that the monopolization and attempt to monopolize claims are coterminous inasmuch as USTC concedes monopoly power. *See Northeastern Tel. Co. v. American Tel. and Tel. Co.*, 651 F.2d 76, 85 (2d Cir.1981) (explaining that where *ability* to exclude entry and control prices is present, the two offenses are coterminous).

[15] USTC contends that none of the practices Conwood complains of amount to antitrust violations, but are no more than isolated sporadic torts. We disagree. Conwood presented evidence that beginning in 1990 USTC began a systematic effort to exclude competition from the moist snuff market. Conwood presented sufficient evidence that USTC sought to achieve its goals of excluding competition and competitors' products by numerous avenues. Conwood principally complains that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *783)

USTC (1) removed racks from stores without the permission of store management and discarded and/or destroyed these racks, while placing Conwood products in USTC racks in an effort to bury Conwood's products and reduce their facings; (2) trained their "operatives to take advantage of inattentive store clerks with various 'ruses' such as obtaining nominal permission to reorganize or neaten the moist snuff section," in an effort to destroy Conwood racks; (3) misused its position as category manager by providing misleading information to retailers in an effort to dupe retailers into believing, among other things, that USTC products were better selling so that retailers would carry USTC products and discontinue carrying Conwood products; and (4) entered into exclusive agreements with retailers in an effort to exclude rivals' products.

[16][17] Isolated tortious activity alone does not constitute exclusionary conduct for purposes of a § 2 violation, absent a significant and more than a temporary effect on competition, and not merely on a competitor or customer.  *See* 3A Areeda & Turner, Antitrust Law, ¶ 782(a), at 272 **784 (2002). Business torts will be violative of § 2 only in "rare gross cases." *Id.* As USTC recognizes, however, this is not to say that tortious conduct may never violate the antitrust laws.  *See e.g., Byars,* 609 F.2d at 854 n. 30 (holding that acts by defendant, a wholesale periodical distributor, against a smaller company attempting to compete against it, may be deemed exclusionary, including removing plaintiff's periodicals from sales racks at various retail outlets, covering up plaintiff's periodicals on racks so that prospective buyers could not see them, and disparaging plaintiff, his financial condition and the magazine's financial condition); 3A Areeda & Turner, *supra,* ¶ 782(a) at 272. Moreover, merely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well. *Id.* at 271. "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1087 (D.C.Cir.1998) (reversing district court's dismissal of complaint and holding that radio station owner stated § 2 Sherman Act claim where defendants' anti-competitive conduct consisted of making misrepresentations to advertisers and the

government in order to protect their monopoly).

USTC contends that the rack and POS removal activity was isolated and sporadic. It contends that the record identifies a *de minimis* number of improper incidents. USTC points out that it has 600 sales personnel which made approximately 8 to 9 million sales calls during the 1990s. It argues that the district court "disregarded the fact that conduct and circumstances differed greatly from chain to chain and store to store." *See In re Airport Car Rental Antitrust Lit.,* 474 F.Supp. 1072 (N.D.Cal.1979) (holding that rental car company would be required to prove damages on airport by airport basis for each airport for which plaintiff sought damages by reason of its exclusion).

[18] In the instant case, the district court rejected USTC's argument, essentially describing it as impractical. At issue in this case are 300,000 separate retail establishments across the country. We believe the district court correctly determined that to have required the parties to investigate activity at specific retail establishments would have been so costly as to have effectively ended this suit, despite substantial evidence of anti-competitive activity. In addition, "in an action for damages for violation of the antitrust laws plaintiff is [not] limited to recover only for specific items of damage which he can prove with reasonable certainty. On the contrary, the trier of the facts may make a just and reasonable estimate . . based on relevant data and may act upon probable and inferential . . proof." *Elyria-Lorain Broad. Co. v. Lorain Journal Co.,* 358 F.2d 790, 793 (6th Cir.1966) (citation omitted).

It is undisputed that POS advertising and a manufacturer's ability to sell its moist snuff from its own racks are critical to success in the moist snuff market.  *See Byars,* 609 F.2d at 860 (explaining that only a case-by-case analysis of each fact situation will determine whether the monopolist's conduct is anti-competitive). Because of restrictions on advertising in the tobacco industry, and the critical nature of POS advertising in the relevant market, efforts by USTC, a conceded monopolist, to exclude Conwood's racks and POS advertising from retail locations through any means other than legitimate competition could certainly support Conwood's § 2 Sherman Act claim. *See Aspen,* 472 U.S. at 605, 105 S.Ct. 2847. Conwood

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *784)

presented evidence that USTC sales representatives continuously removed and discarded Conwood POS and racks after 1990 without *785 store authorization. While the number of witnesses who actually testified was limited, the acts testified to were widespread. Douglas Hyaneck, a Conwood district manager, testified that when he served as a sales representative, he had trouble with rack removals in his stores in the northern Michigan area. He also stated that from the time he became a district manager until 1998, 40 to 50 percent of his sales staff's time was spent replacing racks. Gary Ryan, another Conwood sales representative in the Sikeston, Missouri area, says that about 1,200 of his racks were removed. He stated that the problem continued even after a new USTC sales representative was hired in his area. Both men testified that their racks were removed by USTC sales representatives. John Falevsky, a Conwood sales representative in the Milwaukee, Wisconsin and Southeastern Wisconsin area, and Sales Representative Jeffrey Dring also testified about rampant incidents of rack removal by USTC representatives in their areas. Falevsky testified that he once approached his USTC counterpart about the matter and was told that the latter's bonus depended on how many Conwood racks he could get out of the stores. There is no indication that any of these acts were authorized by the stores at which they occurred. Morever, Rosson, Conwood's Chairman, testified that he would receive estimates that as much as 50 percent of his employees' time was being spent on repairing damaged or discarded racks. He stated that some months, beginning in 1990, Conwood was spending as much as $100,000 a month to replace racks, which constituted as many as 20,000 racks a month being replaced. USTC did not challenge any of this evidence at trial. Construing the evidence in the light most favorable to Conwood, these incidents were neither sporadic nor isolated. *Cf. Abcor Corp. v. AM Int'l, Inc.,* 916 F.2d 924, 931 (4th Cir.1990) (holding that " 'sporadic activity' identified by the plaintiffs does not amount to an antitrust violation").

In terms of retailer testimony, Gayleen Rusk, who manages an Amoco Pronto Express, testified that she had experienced a USTC sales representative removing Conwood's racks and putting its products in the USTC rack. She testified that she allowed it to happen when she first started working at the store because she did not know any better. Upon

learning that the USTC representative was not supposed to bother competitors' racks, she would tell him not to do so when he visited the store. She stated that he would then come when she was not on duty and remove Conwood's rack. Three other store witnesses also testified that they had seen or experienced USTC representatives removing Conwood racks.

Conwood also alleged that USTC used its role as category captain and/or manager to exclude competition. USTC points out that retailers testified that they alone, not USTC, determined and controlled what racks and POS were used in their stores. Conwood's Rosson admitted that he could not name one store that gives final decision-making power over its snuff section to his company's competitors. Other retailers verified this assertion. Kroger's Luckett testified that USTC did not receive all the facings in the plan-o-grams that it requested and that Kroger's retains ultimate authority about product placement. Retailer Paul McGuire also testified that he welcomed input from suppliers but retained final authority about product placement.

[19] However, there was other evidence, which USTC ignores, that USTC used its position as category manager to exclude competition by suggesting that retailers carry fewer products, particularly competitor's products; by attempting to control the number of price value brands *786 introduced in stores; and by suggesting that stores carry its slower moving products instead of better selling competitor products. Much of the evidence Conwood highlights was documentary, interpreted by experts. However, that evidence is nevertheless probative of USTC's intent to exclude competition [FN3]

> FN3  USTC complains that Conwood was allowed to rely on numerous hearsay documents that detailed conduct that is routinely rejected as not being very probative of anti-competitive intent and that showed nothing more than statements about competitive objectives. However, experts are entitled to rely on documents, even hearsay documents that are otherwise inadmissible. *Kingsley Associates, Inc. v. Del-Met, Inc.,* 918 F.2d 1277, 1286-87 (6th Cir 1990) (holding that Federal Rules allow experts to base their opinions on hearsay and other evidence otherwise inadmissible at trial).

290 F.3d 768
(Cite as: 290 F.3d 768, *786)

In one such instance, Blattberg opined that an e-mail sent by a USTC regional vice president and USTC director of national accounts showed that the company abused its position of category manager. The e-mail stated that USTC believed it could continue to be the category captain in certain stores in the Texas area, and "we may be able to control the number of price value product introductions and their pursuit of a private label brand." (J.A. at 1610.) Blattberg testified that the significance of this document is that it shows that USTC planned to control competition. It shows USTC intended to control the number of price value brands and other products, which he stated meant that if USTC could convince retailers not to stock those items, the result would be to prevent rapidly growing or lower priced items from entering the marketplace. He testified that this is not consistent with the concept of category management, which is based on trust.

As for other abuses, Blattberg noted that the 1997 weekly activity report from a USTC division manager in Houston to a department manager stated that the company was receiving pressure from retailers to drop "Flavor Packs" in accounts where USTC was discontinuing competitive brands due to slow movement. (J.A. at 2559.) The report states:

Last week at Fiesta Supermarkets, I was able to get them to drop all competitive brands (12 total) and keep only Redwood and Kodiak. The buyer argued with me that we should be dropping Flavor Packs too because FP are selling less than most of the products we discontinued despite our counter displays. We were able to maintain our counter display and the product, but he makes a very valid point that we are not being total [sic] honest with our partners when we sell them on share for space concept if we don't include our poor selling brands in the mix. I am afraid that we are using up our partnerships and good will when we talk about partnerships and sell our concept only to turn right around and ask them to go against what we just convinced them was in their best interest just to keep Flavor Packs in account.

*Id.* Blattberg testified that this document shows that USTC tried to gerrymander the data to this retailer. (J.A. at 1614.) Again, he opined that such practices violate the trust central to a category management relationship. Further, such evidence counters USTC's argument that only retailers controlled facing decisions.

Conwood does not appear to challenge USTC's role as category manager *per se*, but rather the manner in which it used its position as a monopolist providing category management services, i.e., to exclude it from competition. *See Aspen*, 472 U.S. at 605, 105 S.Ct. 2847 (explaining that excluding rivals on a basis other than efficiency may be characterized as predatory or anti-competitive); *see also Eastman Kodak*, *787 504 U.S. at 483, 112 S.Ct. 2072 (holding that under the willful-maintenance-of-monopoly power prong, defendant's liability in § 2 Sherman Antitrust claim turned on whether defendant could present a "valid business reason[ ] for its exclusionary conduct"). [FN4] As explained above, Conwood presented evidence that the category management program was used to place USTC racks exclusively in retail stores and hide competitor products in its racks. *See e.g.*, J.A. at 2375 ("Even though Conwood does not like the fact that we sometimes house their product in our vending, I have encountered more and more retailers that are surprised when I include the competition's products. I feel it is better for them to be lost in our vending then to have their own and no point of sale on the vendor.").

FN4. To the extent that USTC complains that evidence of its unlawful anti-competitive conduct and its lawful conduct to take advantage of scale of economies, offer category management services or engage in other promotional activity in general were commingled, the district court properly instructed the jury that USTC could not be held liable for conduct that was part of the normal competitive process. The jury is deemed to have followed these instructions. *Aspen*, 472 U.S. at 604-05, 105 S.Ct. 2847. In addition to that argument, USTC also contends that Conwood has failed to show that its practices foreclosed competition. It further contends that its exclusive dealing arrangements with retailers cannot be invalid, absent a "particularized showing of unreasonableness." *See e.g., Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1080 (1st Cir.1993) (explaining that a complaint that alleges, *inter alia*, no more than exclusive dealing arrangements may be susceptible to dismissal for failure to state a claim). However, Conwood's claim is broader than merely challenging the exclusive agreements USTC entered into with retailers for exclusive racks. As explained in the text of this opinion, among other things, Conwood presented evidence that USTC pervasively destroyed

290 F.3d 768
(Cite as: 290 F.3d 768, *787)

Conwood's racks, and used its monopoly power to misrepresent sales activity of moist snuff products for purposes of obtaining exclusive racks and to bury competitors' products therein, all of which affected competition in the moist snuff market. Moreover, Conwood's claims are distinguishable from those asserted in several of the cases USTC cites, wherein plaintiffs alleged that exclusive arrangements violated § 3 of the Clayton Act, 15 U.S.C. § 14 or other sections of the antitrust statutes. *See e.g., Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1162 (9th Cir 1997) (holding that "[o]nly those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3")

USTC's chairman Gierer testified that if his company's "goal ... was to go into a store and reduce ... competitive facings, then that shouldn't have happened. That's not a legitimate goal." Yet, Gierer later admitted that his company had endorsed a "strategy of eliminating competitive distribution." (J.A. at 2024.) Despite USTC's claims that its actions amounted to no more than competition and that "everybody does it," Gierer admitted that he was embarrassed by some of the testimony presented at trial, especially the testimony of Mr. Untiedt, USTC's director of national accounts, who apparently could not answer whether it was appropriate to mislead retailers. Gierer further testified that as a result of the evidence presented at trial, he was going to conduct an investigation into his company's practices. Gierer essentially admitted that the activities about which Conwood complains, particularly the misrepresentations to retailers to obtain exclusive vending, was not competitive conduct spurred by efficiency. Moreover, USTC has failed to offer any valid business reason for its representatives' pervasive destruction of Conwood racks. Instead, it merely has chosen to argue that such destruction can never form the basis for an antitrust claim.

The evidence Conwood presented in this case regarding USTC's exclusionary conduct must be considered in the context of Conwood's theory. *See Caribbean Broad. *788 Sys.,* 148 F.3d at 1087. The theory Conwood advanced at trial is that USTC engaged in a concerted effort, directed from the highest levels of a national monopoly, to shut Conwood out from effective competition through the elimination of its racks and POS advertising, all in

the unusual moist snuff market, where POS is the central marketplace battleground. *See e.g., R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,* 60 F.Supp.2d 502 (M.D.N.C.1999) (granting preliminary injunction barring cigarette manufacturer in § 2 action from implementing program with retailers that would allow its product to hold most visible position in sales racks; and noting that in cigarette market product visibility and advertising at the point of purchase are essential to remaining competitive). There was ample documentary and testimonial evidence supporting this theory. The jury could have found, and apparently did find, that USTC's pervasive practice of destroying Conwood's racks and POS materials and reducing the number of Conwood facings through exclusive agreements with and misrepresentations to retailers was exclusionary conduct without a sufficient justification, and that USTC maintained its monopoly power by engaging in such conduct. Therefore, the district court did not err in holding that there was sufficient evidence for a jury to find willful maintenance of monopoly power.

### IV.

USTC argues that Conwood has failed to show that it or competition was harmed in the national moist snuff sales market. It argues that there was no injury to competition because the number of moist snuff brands actually increased during the 1990s, including the price-value products. It also argues that no injury to competition in the moist snuff market is shown because during the same period, other tobacco products decreased. USTC argues that where the market has actually expanded, there can be no showing of injury to competition. Further, USTC argues that Conwood has failed to show injury. It argues that during the relevant period, Conwood's market share actually increased. It also argues that there were other factors in the market, such as retailers' choices not to display Conwood's racks and POS, that caused Conwood's injury.

Conwood counters that it produced expert testimony showing that USTC's exclusion of rivals' POS racks and facings caused an increase in prices, reduced sales and limited choice. It also claims that but for USTC's actions, the market would have grown more. Finally, it argues that the fact that its own profits increased during the relevant period is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *788)

not dispositive of the issue of injury.

[20][21] The antitrust laws are intended to protect competition, not competitors. *See Andrx Pharmaceuticals, Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 812 (D.C.Cir.2001) (citation omitted); *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir.1989) (citations and internal quotation marks omitted). To prevail, a "[p]laintiff[ ] must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Valley Prods. Co., Inc. v. Landmark, a Division of Hospitality Franchise Sys., Inc.*, 128 F.3d 398, 402 (6th Cir.1997) (citation omitted). Specifically, to recover damages, an "antitrust plaintiff must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Id.* An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence *789 of damage or that the violation was the proximate cause of the damage. *See Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir.2001). As this Court stated,

[a]lthough a plaintiff need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be provided as a matter of fact and with a fair degree of certainty. To be one of several causes is not enough. The evidence linking the violation to the injury must be more precise than that needed to establish the amount of damages.

*Id.*

USTC first argues that Conwood failed to show harm to competition in the market because output increased and new products were introduced into the market. There was evidence at trial that total market output increased in the moist snuff industry during the relevant period. Between 1990 and 1999, overall sales volume of moist snuff increased 16 million pounds. Also, during this period, new products entered the market, and by 1999, there were 40 brands of moist snuff, 24 of which came from USTC competitors. (J.A. at 474-76.) In *Omega Envtl., Inc. v. Gilbarco. Inc.*, 127 F.3d 1157 (9th Cir.1997), the Ninth Circuit held that

antitrust plaintiffs had failed to produce "credible evidence to support their contention" that the defendant's actions had "deterred entry into this market," because during the relevant period industry output in the relevant market had substantially expanded. *Id.* at 1164; *see also Campus Ctr. Discount Den, Inc. v. Miami Univ.*, No. 96-4002, 1997 WL 271742, at *2 (6th Cir. May 21, 1997) (holding that convenience store plaintiff failed to state a claim under the antitrust laws because it failed to show that any alleged anti-competitive conduct on behalf of the defendant reduced overall demand for convenience store market).

[22] Conwood, however. argues that the issue is whether the market would have grown more absent USTC's antitrust violation. In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), the evidence showed that following the defendant's alleged predation, output in the relevant market and market shares for others grew. *Id.* at 233-34, 113 S.Ct. 2578. The Court stated, however, that the fact that the defendant's entry in the market did not restrict output was not dispositive. *Id.* at 234, 113 S.Ct. 2578. "One could speculate ... that the rate of growth would have tripled, instead of doubled [absent the] alleged predation." *Id.* at 234, 113 S.Ct. 2578. However, the Court stated that there was no evidence that this was so. *Id.*

In the instant case, Kamien, Conwood's expert, testified that as a result of USTC's exclusionary conduct, the consumer suffered by having to pay higher prices, and that there was less variety in the market. (J.A. at 525.) The district court noted that much of the evidence regarding injury to competition was based, in part, on Kamien's testimony, which the jury obviously believed. Thus, although output in the moist snuff market grew, there was evidence showing that USTC's actions caused higher prices and reduced consumer choice, both of which are harmful to competition. *See Brooke Group*, 509 U.S. at 234, 113 S.Ct. 2578. Conwood's market share did grow slightly between 1990 and 1998; however, growth during that period, which was about 2.5 percent, stands in stark contrast to the growth in market share of approximately 11 percent that Conwood experienced in the ten years prior to 1990. In addition, Swedish's chairman also testified that USTC's activity restricted its growth. He testified that USTC

290 F.3d 768
(Cite as: 290 F.3d 768, *789)

used its power "to keep [Swedish's] products off the shelf, and once it's there *790 to get rid of it...." Thus, there was sufficient evidence that during the relevant period, the growth of two of the three other manufacturers of moist snuff aside from USTC slowed, and that the restricted growth resulted from USTC's conduct. In addition, Kamien testified that since 1990, no new firm had entered the moist snuff market, which he found odd because of the high amount of potential profit at stake in that market and the fact that USTC was the most profitable company in the country. He further testified that had there been true competition in the moist snuff market, USTC's market share, which dropped approximately 1 percent per year between 1979 and 1990, would have fallen much faster. We believe that construing the evidence in the light most favorable to Conwood, as we must, it was sufficient to show that competition suffered during the relevant period. *Williams.* 132 F.3d at 1131.

[23] USTC also argues that its conduct was not the "necessary predicate" of any injury Conwood suffered, and thus Conwood cannot recover under the antitrust laws. USTC argues that any injury Conwood suffered was the result of retailers' decisions to enter into contracts with it and others to serve as category managers. For support, USTC primarily relies on *Valley Products,* 128 F.3d 398. In that case, a plaintiff who made and sold soap for use in hotels and motels under franchises granted by defendants brought suit under the Clayton Act, 15 U.S.C. § 15, when plaintiff was denied permission to continue using on its items logos owned by the defendants. *Id.* at 400-01. The defendants had ended their agreement with plaintiff after it granted two other manufacturers "preferred supplier status," which meant they alone could place the trademarks owned by one of the defendants on their amenities. *Id.* This Court affirmed the district court, which found that the plaintiff had not shown an antitrust injury. *Id.* at 400. This Court noted that to show antitrust injury, the plaintiff must show more than economic injury. *Id.* at 402. The Court stated that an analysis of the "the directness or indirectness of the injury was appropriate." *Id.* at 403. The Court noted that an injury does not exist for purposes of antitrust suits if it does not flow directly from the antitrust violation. *Id.* The Court found no injury because the violation alleged was not the "necessary predicate" of the plaintiff's injury. *Id.* at 404. The injury did not flow directly from the defendants'

actions, but rather, the plaintiff's loss of sales resulted from the cancellation of the agreement to use the trademarks, which defendants had a right to do, and not from any anti-competitive activity.

[24] USTC argues in this case that Conwood's injury flowed from the retail agreements that granted exclusive rights to USTC and to others at the expense of Conwood. This argument is unconvincing because there was evidence that Conwood's injury flowed directly from USTC's unauthorized removal and destruction of its racks and POS. Conwood's Rosson also testified that USTC's activity restricted its growth. There was evidence that USTC and not retailers controlled facing decisions and that in making those decisions, USTC sales representatives purposely attempted to bury Conwood's products in USTC racks. (*See e.g.,* J.A. at 2375.) Further, there was evidence that USTC misrepresented the sales activity of its own products to retailers in order to increase the number of facings of its slower moving products despite the fact that other brands by its competitors, including those of Conwood, were better selling. Such activity encompasses the anti-competitive acts about which Conwood complains. Thus, there was sufficient evidence showing that Conwood's injury did flow from USTC's *791 anti-competitive activity. *Valley Products,* 128 F.3d at 404. Further, while the link between the injury and violation must be "proved as a matter of fact and with a fair degree of certainty," it need not be the "sole proximate cause." *See Ezzo's,* 243 F.3d at 990. In sum, there was sufficient evidence for a jury to find that USTC's anti-competitive activity harmed competition in the moist snuff market and Conwood; and USTC is not entitled to judgment as a matter of law on this ground

V.

USTC challenges the district court's decision to allow Leftwich to testify as to the damages sustained by USTC's conduct. USTC argues that the district court made no findings regarding the admissibility of Leftwich's report under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). USTC argues that Leftwich's methodology fails because it was constructed solely for this case. USTC also argues that Leftwich's study did not attempt to segregate the effects of other factors that could have contributed to Conwood's low sales in some states, and it made no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *791)

attempt to test whether the slow growth in certain states was causally linked to any of USTC's conduct. Thus, USTC argues the study did not and could not fit the case at hand.

[25] As a preliminary matter, Conwood argues that USTC waived any challenge to Leftwich's testimony because after the district court ruled that Leftwich's testimony was admissible on a preliminary basis, the court explained that USTC could contest Leftwich's testimony at trial. Conwood asserts that because USTC failed to object to Leftwich's testimony at trial, it has waived our review of the district court's decision to allow Leftwich to testify. We disagree. [FN5]

> FN5 However, apparently for the first time on appeal, USTC argues that Leftwich's regression model cannot be tested, is not subject to ascertainable rate of error and has no basis in the literature. These arguments were not raised below and may not be asserted now on appeal. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) (noting that this Court reviews the case presented to the district court, and not a better one fashioned on appeal, and will not decide issues the parties failed to litigate before the district court).

[26][27] USTC filed a motion in limine challenging the admissibility of Leftwich's testimony, and the district court correctly concluded that its admissibility was governed by the Supreme Court's opinion in *Daubert*. *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir 2001). The district court considered USTC's arguments regarding admissibility under Fed.R.Evid. 702, pertaining to the admissibility of expert witnesses, and found that "Leftwich's testimony satisfies *Daubert*." (J.A. at 90.) USTC also argued that Leftwich's testimony should be excluded under Rule 403 because it lacked probative value and would mislead the jury. [FN6] Specifically, USTC challenged the factual assumptions that Leftwich tested. The district court held that it could not at that time say that Leftwich's assumptions had no basis in fact, but that USTC might prove differently at trial. In *United States v. Brawner*, 173 F.3d 966 (6th Cir. 1999), we held that where a trial court has made a definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is subject to other circumstances or evidence, then *792 counsel need

not renew the objection at the time the evidence is offered at trial to preserve the error for appeal. *Id* at 970; *see also* Fed.R.Evid. 103(a)(2) (holding that once a court makes a *definitive* ruling on the record to either admit or exclude evidence, at or before trial, a party need not renew an objection at trial to preserve any alleged error for appeal). In the instance case, the district court's opinion unequivocally stated that "Leftwich's testimony satisfies *Daubert*." Moreover, after Conwood rested its case, USTC moved for judgment as a matter of law challenging the assumptions of Leftwich's damages theory. We therefore do not believe that USTC waived appellate review of Leftwich's damages theory. [FN7]

> FN6. Fed.R.Evid. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

> FN7. We also note that even if USTC had failed to adequately preserve this issue, we would still review it for plain error and USTC would only be entitled to relief if we determined that its "substantial rights" had been affected. *Brawner*, 173 F.3d at 970 (citations omitted). Regardless of whether we review the issue for plain error or for abuse of discretion, as we explain in the text of this opinion, we believe that the district court did not err in allowing Leftwich to testify regarding the damages Conwood sustained.

[28][29] USTC does not challenge Leftwich's qualifications as an expert, but only his testimony and damages study. Pursuant to Rule 702 of the Federal Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise...." Fed.R.Evid. 702. In *Daubert*, the Supreme Court "established a general gatekeeping [or screening] obligation for trial courts" to exclude from trial expert testimony that is unreliable and irrelevant. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir 2001) (citation and internal quotation marks omitted). The district court must determine whether the

290 F.3d 768
(Cite as: 290 F.3d 768, *792)

evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id.* (citation omitted). In assessing relevance and reliability, the district court must examine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir.2000) (citations omitted). This involves a preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* (citation and internal quotation marks omitted). Some of the factors that may be used in such an inquiry include: (1) whether the theory or technique has been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance. *Hardyman*, 243 F.3d at 260. "This inquiry is a flexible one, with an overarching goal of assessing the 'scientific validity and thus the evidentiary relevance and reliability' of the principles and methodology underlying the proposed expert testimony." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir.2001) (citation omitted). "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *see also Jahn*, 233 F.3d at 388 (explaining that *Daubert* made clear that Rule 702 relaxes the "traditional barriers" to admitting opinion testimony).

[30] USTC presents no reasoned basis for us to find that the district court abused its discretion in determining that Leftwich's methodology was sufficiently *793 reliable or relevant to survive a *Daubert* challenge. USTC asserts two principal challenges to Leftwich's study and testimony. USTC claims that Leftwich did not relate any of Conwood's loss to specific bad acts by USTC and failed to account for other factors that could have had a negative effect on Conwood's sales. Leftwich used a regression analysis to test Rosson's hypothesis that Conwood's growth was suppressed most in states where it had only a small market share when USTC began its exclusionary practices. He also tested whether the intensity of USTC's misconduct increased in or around 1990. Rosson testified that once his company reached a 15 percent

market share, USTC's exclusive vending practices were not as effective.

Leftwich employed three methods to test Conwood's claims: regression analyses, a yardstick test and a before-and-after test. All three are generally accepted methods for proving antitrust damages. *See e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1238 (3d Cir.1993) (explaining that if performed properly multiple regression analysis is a reliable means by which economists may prove antitrust damages); *Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir.2000) (noting that the two most common methods of quantifying antitrust damages are the "before and after" and "yardstick" measures of lost profits). [FN8]

FN8. "The before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it [and] the yardstick test ... consists of a study of the profits of business operations that are closely comparable to the plaintiff's." *Eleven Line, Inc.*, 213 F.3d at 207 n. 17. A regression analysis looks at the relationship between two variables. *Rollins v. Fort Bend Independent School Dist.*, 89 F.3d 1205, 1210 n. 6 (5th Cir.1996). The point of a regression analysis is to determine whether the relationship between the two variables is statistically meaningful. *Engineering Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County*, 122 F.3d 895, 917 (11th Cir.1997).

Leftwich found a statistically significant difference in Conwood's market share between those states in which Conwood had a foothold and those in which it did not. In those states in which Conwood enjoyed a market share of 15 and 20 percent or more, Conwood grew in share, between 1990 and 1997, on an average of 6.5 percent and 8.1 percent, respectively. He concluded that but for USTC's exclusionary acts, Plaintiff's market share would have grown by these same amounts in non-foothold states. Contrary to USTC's arguments, the record indicates that Leftwich ruled out the possibility that the statistical relationship was caused by factors other than USTC's conduct. We find particularly relevant the undisputed evidence that Leftwich examined the possible explanations that USTC's own expert suggested as possible explanations for Conwood's low market share. Leftwich testified that he tested all "plausible explanations" for his

290 F.3d 768
(Cite as: 290 F.3d 768, *793)

results for which he had data. Employing a regression analysis, Leftwich analyzed whether these other factors could explain Conwood's laggard growth in non-foothold states and concluded that they could not.

Leftwich also employed a before-and-after test to investigate Conwood's claims. Specifically, he tested whether the relationship between Conwood's share of moist snuff sales in a state and the rate of growth in Conwood's share of sales in that same state was the same or different for the seven year period before 1990 as it was for the seven year period after 1990. He found that Conwood's moist snuff market share did not grow significantly more in foothold states in the seven year period before 1990. Thus, there was no correlation in the pre-1990 period between Conwood's *794 foothold status and market share growth rate.

Further, Leftwich employed a yardstick test to examine whether in the related loose leaf tobacco market, in which USTC does not participate, Conwood would always grow more in states where they started out with a high market share. He did not find a statistically significant relationship in Conwood's increase in market share in the loose leaf market between 1990 and 1997 and its share in 1990. In other words, where Conwood enjoyed a high market share or foothold in 1990 in the loose leaf market, it did not necessarily grow more in the period between 1990 and 1997.

USTC complains that Leftwich failed to take into account any USTC "bad act." However, this is not completely accurate. Using USTC's expert's own regression model, Leftwich used sworn affidavits compiled from 241 Conwood sales representatives detailing USTC's unethical activity in their areas. He used this information to construct three alternate measures of USTC's bad acts by state. (J.A. at 4415.) Thus, his damages study was relevant to the issues of this case. See Jahn v. Equine Servs, PSC, 233 F.3d 382, 388 (6th Cir.2000) (testimony is relevant where there is a valid connection to the pertinent inquiry).

USTC also complains that Leftwich's regression analysis ignored other market variables that could have caused Conwood's harm. However, as explained above, Leftwich ruled out all plausible alternatives for which he had data. Moreover, he

accounted for all variables raised by USTC's own expert. In any event, "[i]n order to be *admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Jahn,* 233 F.3d at 390 (emphasis added); *see also Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (failure to include variables will normally affect the analysis' probativeness, not its admissibility). In sum, after reviewing the record and giving due deference to the district court's decision, we believe that the district court did not abuse its discretion in concluding that Leftwich's study satisfied *Daubert* and allowing him to testify, subject to vigorous cross examination and an opportunity for Defendant to introduce countervailing evidence of its own. *See Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 (holding that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (citation omitted).

[31] Finally, USTC contends that Rosson's testimony regarding damages and Leftwich's study were speculative and failed to support the damages awarded. We disagree. USTC essentially argues that a more rigorous standard of proof of damages was warranted. However, it is undisputed that USTC did not object to the jury instructions regarding damages. The jury was instructed that it could not award damages for injuries caused by other factors. As juries are presumed to follow the instructions given, we reject USTC's argument that Conwood failed to disaggregate the injury caused by USTC as opposed to that caused by other factors. *See Aspen,* 472 U.S. at 604-05, 105 S.Ct. 2847.

[32] In addition, an award of damages may be awarded on a plaintiff's estimate of sales it could have made absent the antitrust violation. *J. Truett Payne Co., v. Chrysler Motors Corp.,* 451 U.S. 557, 565, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). While USTC demands a more exacting standard, "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been *795 in the absence of the defendant's antitrust violation." *Id* at 566, 101 S.Ct. 1923 "The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *South-East Coal Co. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

290 F.3d 768
(Cite as: 290 F.3d 768, *795)

*Consolidation Coal Co.*, 434 F.2d 767, 794 (6th Cir. 1970) (citation omitted).

[33] We believe that there was sufficient evidence to support the jury's award of damages in this case. There was testimony that absent USTC's unlawful conduct, Conwood would have achieved market share in the mid-20s. For instance, Rosson testified that had Conwood not been subjected to USTC tactics, it would have had a national market share of approximately 22 to 23 percent. Rosson testified that he had carefully tracked the growth of Conwood's market share over the past 20 years, and its sharp decline in the 1990s was largely due to USTC's tactics. Williams, Conwood's national sales manager, also testified that in those stores where USTC practiced rack exclusivity, Conwood's market share was well below its national average. Such evidence supported Leftwich's damages analysis, and he estimated that Conwood's damages ranged between $313 million and $488 million. The jury awarded damages well within that range. Although USTC argues that there was evidence that undermined Rosson's testimony regarding whether USTC's conduct caused Conwood's injury, the jury heard all of the evidence presented to it, and apparently found other testimony supporting the award of damages more credible. *South East-Coal Co.*, 434 F.2d at 794 (explaining that whether plaintiff's losses resulted from defendants' conduct or other market factors was for the jury to determine, as was witness credibility). In sum, we believe that there was sufficient evidence to sustain the award in this case.

## CONCLUSION

The district court did not err in submitting this case to the jury and denying USTC's motion for judgment as a matter of law. Conwood presented sufficient evidence that USTC's conduct rose above isolated tortious activity and was exclusionary without a legitimate business justification. The evidence also sufficiently showed that USTC's actions injured Conwood and competition in the moist snuff market. Finally, the district court did not abuse its discretion in admitting the testimony of Conwood's damages expert, subject to cross examination and presentation of countervailing evidence. Therefore, we AFFIRM.

290 F.3d 768, 2002-1 Trade Cases P 73,675, 58 Fed. R. Evid. Serv. 1566, 2002 Fed.App. 0171P

Briefs and Other Related Documents (Back to top)

. 2002 WL 32843563 (Appellate Petition, Motion and Filing) Defendants'-Appellants' Petition for Rehearing and Suggestion for Rehearing En Banc (May. 29, 2002)Original Image of this Document with Appendix (PDF)

. 2001 WL 34664112 (Appellate Brief) Final Brief for Appellants (Mar. 21, 2001)Original Image of this Document (PDF)

. 2001 WL 34787089 (Appellate Brief) Final Brief of Appellants (Mar. 21, 2001)Original Image of this Document with Appendix (PDF)

. 2001 WL 34624906 (Appellate Brief) Final Reply Brief for Appellants (Feb. 15, 2001)Original Image of this Document (PDF)

. 2001 WL 34787090 (Appellate Brief) Final Reply Brief for Appellants (Feb. 15, 2001)Original Image of this Document (PDF)

. 2001 WL 34624907 (Appellate Brief) Final Brief for Appellees (Feb. 14, 2001)Original Image of this Document with Appendix (PDF)

. 2001 WL 34787091 (Appellate Brief) Final Brief For Appellees (Feb. 14, 2001)Original Image of this Document with Appendix (PDF)

. 2000 WL 34514259 (Appellate Brief) Amicus Curiae Brief Of Dr-Daniel L. McFadden In Support of Defendants-Appellants United States Tobacco Company. et al (Dec. 11, 2000)Original Image of this Document with Appendix (PDF)

. 00-6267 (Docket) (Sep. 26, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.