EXHIBIT 11

324 F.3d 141
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**
▷

Page **1**

Briefs and Other Related Documents

United States Court of Appeals,
Third Circuit.
LEPAGE'S INCORPORATED; LePage's
Management Company, L.L.C., Appellees/Cross-
Appellants
v
3M (MINNESOTA MINING AND
MANUFACTURING COMPANY); Kroll
Associates. Inc.
Minnesota Mining and Manufacturing Company,
Appellant/Cross-Appellee.
Nos. 00-1368, 00-1473.

Argued July 12, 2001.
Reargued En Banc Oct. 30, 2002.
Filed March 25, 2003.

Competitor brought antitrust action against
manufacturer of transparent tape. The United States
District Court for the Eastern District of
Pennsylvania, John R. Padova, J., 2000 WL
280350, entered judgment in favor of competitor on
monopolization claim, and manufacturer appealed.
The Court of Appeals, 277 F.3d 365, reversed, and
rehearing en banc was granted. On rehearing, the
Court of Appeals, Sloviter, Circuit Judge, held that:
(1) manufacturer's exclusionary conduct could
violate Sherman Act's monopolization provision,
even if manufacturer never priced its transparent
tape below its cost; (2) manufacturer's conduct had
anticompetitive effect; (3) manufacturer's conduct
did not have legitimate business justification; and
(4) competitor's damages expert was not required to
disaggregate damages caused by manufacturer's
unlawful activity from those caused by its lawful
activity when estimating damages.

Affirmed.

Greenberg, Circuit Judge, filed dissenting opinion
in which Circuit Judges Scirica and Alito joined.

West Headnotes

[1] Antitrust and Trade Regulation ☞ 641
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
A monopolist willfully acquires or maintains

monopoly power in violation of Sherman Act when
it competes on some basis other than the merits.
Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[2] Antitrust and Trade Regulation ☞ 687
29Tk687 Most Cited Cases
    (Formerly 265k17(1.8))

[2] Antitrust and Trade Regulation ☞ 882
29Tk882 Most Cited Cases
    (Formerly 265k17(1.12), 265k17(1.8))
Exclusionary conduct of manufacturer with
monopoly power in transparent tape market, such as
offering bundled rebates and entering into exclusive
dealing contracts, could violate Sherman Act's
monopolization provision, even if manufacturer
never priced its transparent tape below its cost.
Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[3] Antitrust and Trade Regulation ☞ 656
29Tk656 Most Cited Cases
    (Formerly 265k12(1.3))
Monopolist will be found to violate Sherman Act's
monopolization provision if it engages in
exclusionary or predatory conduct without a valid
business justification. Sherman Act, § 2, as
amended, 15 U.S.C.A. § 2.

[4] Antitrust and Trade Regulation ☞ 882
29Tk882 Most Cited Cases
    (Formerly 265k17(1.12))
Bundled rebates offered to retailers by manufacturer
with monopoly power in transparent tape market
was exclusionary conduct under Sherman Act's
monopolization provision, even if manufacturer's
prices remained above its costs; rebates were offered
to many of competitor's major customers and were
conditioned on purchases spanning six of
manufacturer's diverse product lines, and size of the
rebates was linked to number of product lines in
which sales targets were met. Sherman Act, § 2, as
amended, 15 U.S.C.A. § 2.

[5] Antitrust and Trade Regulation ☞ 592
29Tk592 Most Cited Cases
    (Formerly 265k17(2.2))
Exclusive dealing contracts entered into with large
customers by manufacturer with monopoly power in
transparent tape market, and its payments to other
large customers that were designed to achieve sole-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

324 F.3d 141
(Cite as: 324 F.3d 141)

source supplier status was exclusionary conduct in violation of Sherman Act's monopolization provision. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[6] Antitrust and Trade Regulation ⬤⟱ 659
29Tk659 Most Cited Cases
(Formerly 265k17(2.3))
Exclusivity arrangements may be an element in a monopolization claim. Sherman
Act, § 2, as amended, 15 U.S.C.A. § 2.

[7] Antitrust and Trade Regulation ⬤⟱ 687
29Tk687 Most Cited Cases
(Formerly 265k17(2.3))
Exclusionary conduct of manufacturer with monopoly power in transparent tape market, such as offering bundled rebates and entering into exclusive dealing contracts, had anticompetitive effect, as required to support monopolization claim under Sherman Act; demand for competitor's private-label tape decreased significantly following the introduction of manufacturer's rebates, and significant entry barriers prevent competitors from entering the tape market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[8] Antitrust and Trade Regulation ⬤⟱ 558
29Tk558 Most Cited Cases
(Formerly 265k12(1.3))
Courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation in determining whether the conduct had an anticompetitive effect. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[9] Antitrust and Trade Regulation ⬤⟱ 687
29Tk687 Most Cited Cases
(Formerly 265k17(2.3))
Exclusionary conduct of manufacturer with monopoly power in transparent tape market, such as offering bundled rebates and entering into exclusive dealing contracts, did not have legitimate business justification, as defense to monopolization claim; acting to further manufacturer's economic interests was not a valid business justification, and savings resulting from having single shipments and invoices did not approach millions of dollars manufacturer paid to its customers in rebates. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[10] Antitrust and Trade Regulation ⬤⟱ 558

[11] Federal Courts ⬤⟱ 823
170Bk823 Most Cited Cases
Court of Appeals reviews district court's decision to admit or exclude expert testimony for abuse of discretion.

[12] Antitrust and Trade Regulation ⬤⟱ 983
29Tk983 Most Cited Cases
(Formerly 265k28(9))
Damages expert in monopolization action may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened "but for" the defendant's unlawful activities. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[13] Antitrust and Trade Regulation ⬤⟱ 977(3)
29Tk977(3) Most Cited Cases
(Formerly 265k28(8))
Credibility of transparent tape manufacturer's and it competitor's damages experts was for the jury to determine in competitor's monopolization action against manufacturer. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2

[14] Antitrust and Trade Regulation ⬤⟱ 985
29Tk985 Most Cited Cases
(Formerly 265k28(7.6))
Competitor's damages expert was not required to disaggregate damages caused by transparent tape manufacturer's unlawful activity from those caused by manufacturer's lawful activity when estimating damages in competitor's monopolization action; manufacturer's actions, taken as a whole, were found to violate Sherman Act's monopolization provision, making such disaggregation unnecessary, if not impossible. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[15] Antitrust and Trade Regulation ⬤⟱ 981
29Tk981 Most Cited Cases
(Formerly 265k28(8))
Jury instructions in competitor's monopolization action against transparent tape manufacturer

[11] Antitrust and Trade Regulation ⬤⟱ 558
29Tk558 Most Cited Cases
(Formerly 265k12(1.3))
Defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to a monopolization claim. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

324 F.3d 141
(Cite as: 324 F.3d 141)

provided jury with adequate guidance of how to distinguish between unlawful predation and lawful conduct; district court told jury that to find for competitor. it had to find by preponderance of the evidence that manufacturer willfully maintained its monopoly power through exclusionary or predatory conduct, summarized actions that competitor contended were unlawfully exclusionary or predatory, and provided list of factors to determine whether manufacturer's conduct was exclusionary or predatory.   Sherman Act. § 2, as amended, 15 U.S.C.A. § 2.

[16] Federal Courts ☞ 822
170Bk822 Most Cited Cases
In the absence of a misstatement of law, jury instructions are reviewed for abuse of discretion.
*143 Barbara W. Mather, Jeremy Heep, Pepper Hamilton LLP, Philadelphia, PA, Peter Hearn, Peter Hearn, P.C., Philadelphia, PA, Mark W. Ryan, Kerry Lynn Edwards, Donald M. Falk, Robert L. Bronston, David A.J. Goldfine, Mayer, Brown, Rowe & Maw, Washington, DC, Roy T. Englert, Jr. (Argued), Robbins, Russell, Englert, Orseck & Untereiner, Washington, DC, for Appellees/Cross-Appellants.

M. Laurence Popofsky (Argued), Stephen V. Bomse; Paul Alexander, Marie L. Fiala, Heller Ehrman White & McAuliffe, San Francisco, CA, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, for Appellant/Cross-Appellee.

Argued July 12, 2001.

BEFORE: SLOVITER, ALITO, and GREENBERG, Circuit Judges.

Reargued En Banc Oct. 30, 2002.

BEFORE: BECKER. Chief Judge, SLOVITER, SCIRICA, NYGAARD, ALITO, McKEE, AMBRO, FUENTES, SMITH and GREENBERG, Circuit Judges

Filed March 25, 2003

*144 OPINION OF THE COURT

SLOVITER, Circuit Judge

SLOVITER, Circuit Judge, with whom Becker,

Chief Judge, Nygaard, McKee, Ambro, Fuentes, and Smith, Circuit Judges, join:

Minnesota Mining and Manufacturing Company ("3M") appeals from the District Court's order entered March 14, 2000, declining to overturn the jury's verdict for LePage's in its suit against 3M under Section 2 of the Sherman Act ("§ 2"). 3M raises various objections to the trial court's decision but essentially its position is a legal one: it contends that a plaintiff cannot succeed in a § 2 monopolization case unless it shows that the conceded monopolist sold its product below cost. Because we conclude that exclusionary conduct. such as the exclusive dealing and bundled rebates proven here, can sustain a verdict under § 2 against a monopolist and because we find no other reversible error, we will affirm.

I.
FACTUAL BACKGROUND
3M, which manufactures Scotch tape for home and office use, dominated the United States transparent tape market with a market share above 90% until the early 1990s. It has conceded that it has a monopoly in that market. LePage's, [FN1] founded in 1876, has sold a variety of office products and, around 1980, decided to sell "second brand" and private label transparent tape, i.e., tape sold under the retailer's name rather than under the name of the manufacturer.   By 1992, LePage's sold 88% of private label tape sales in the United States, which represented but a small portion of the transparent tape market.  Private label tape sold at a lower price to the retailer and the customer than branded tape.

FN1. The plaintiffs in this action are LePage's Incorporated and LePage's Management Company. L.L.C. Inasmuch as we can discern no distinction between their interests. we refer to them jointly as LePage's.

Distribution patterns and consumer acceptance accounted for a shift of some tape sales from branded tape to private label tape.   With the rapid growth of office superstores, such as Staples and Office Depot, and mass merchandisers, such as Wal-Mart and Kmart, distribution patterns for second brand and private label tape changed as many of the large retailers wanted to use their "brand names" to sell stationery products, including transparent tape. 3M also entered the private label business during the

324 F.3d 141
(Cite as: 324 F.3d 141, *144)

early 1990s and sold its own second brand under the name "Highland."

LePage's claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. It also claims that 3M devised programs that prevented LePage's and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high. [FN2] LePage's claims that it barely was surviving at the time of trial and that it *145 suffered large operating losses from 1996 through 1999.

> FN2  It appears that at least at the times material to this action there were no other domestic manufacturers of transparent tape.  There were, however, foreign manufacturers but they did not play a significant role in the domestic market and 3M does not contend otherwise.

LePage's brought this antitrust action asserting that 3M used its monopoly over its Scotch tape brand to gain a competitive advantage in the private label tape portion of the transparent tape market in the United States through the use of 3M's multi-tiered "bundled rebate" structure, which offered higher rebates when customers purchased products in a number of 3M's different product lines. LePage's also alleges that 3M offered to some of LePage's customers large lump-sum cash payments, promotional allowances and other cash incentives to encourage them to enter into exclusive dealing arrangements with 3M.

LePage's asserted claims for unlawful agreements in restraint of trade under § 1 of the Sherman Act, monopolization and attempted monopolization under § 2 of the Sherman Act, and exclusive dealing under § 3 of the Clayton Act. After a nine week trial, the jury returned its verdict for LePage's on both its monopolization and attempted monopolization claims under § 2 of the Sherman Act, and assessed damages of $22,828,899 on each. It found in 3M's favor on LePage's claims under § 1 of the Sherman Act and § 3 of the Clayton Act. 3M filed its motions for judgment as a matter of law and for a new trial,

arguing that its rebate and discount programs and the other conduct of which LePage's complained did not constitute the basis for a valid antitrust claim as a matter of law and that, in any event, the court's charge to the jury was insufficiently specific and LePage's damages proof was speculative. [FN3] The District Court granted 3M's motion for judgment as a matter of law on LePage's "attempted maintenance of monopoly power" claim but denied 3M's motion for judgment as a matter of law in all other respects and denied its motion for new trial. Le Page's Inc. v. 3M, No. CIV. A.97-3983, 2000 WL 280350 (E.D.Pa. Mar. 14, 2000). The Court subsequently entered a judgment for trebled damages of $68,486,697 to which interest was to be added. LePage's filed a cross appeal on the District Court's judgment dismissing its attempted maintenance of monopoly power claim.

> FN3  3M unsuccessfully had moved for a judgment as a matter of law at the close of LePage's case and after the close of the entire case.

On appeal, the panel of this court before which this case was originally argued reversed the District Court's judgment on LePage's § 2 claim by a divided vote. LePage's Inc. v. 3M, Nos. 00-1368 and 00-1473, 2002 WL 46961 (3d Cir. Jan. 14, 2002). This court granted LePage's motion for rehearing en banc and, pursuant to its practice, vacated the panel opinion. LePage's Inc. v. 3M, Nos. 00-1368 and 00-1473 (3d Cir. Feb. 25, 2002) (order vacating panel opinion). The appeal was then orally argued before the court en banc.

## II
## JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337(a) because LePage's brought these claims under the Sherman and Clayton Acts. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

We exercise plenary review over an order granting or denying a motion for judgment as a matter of law. Shade v. Great Lakes Dredge & Dock Co., 154 F.3d 143, 149 (3d Cir.1998). When, as here, a defendant makes such a motion, a court should grant it "only if, viewing the evidence in the light most favorable to the nonmovant *146 and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *146)

reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993). Thus, we review the evidence on the appeal in the light most favorable to LePage's. As the historical facts are not in sharp dispute, and our opinion turns largely on legal determinations, we review questions of law underlying the jury verdict on a plenary basis *Bloom v. Consolidated Rail Corp.*, 41 F.3d 911, 913 (3d Cir.1994).

Our review of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict. *See Swineford v. Snyder County*, 15 F.3d 1258, 1265 (3d Cir.1994) ("A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.")

### III.
### MONOPOLIZATION -- APPLICABLE LEGAL PRINCIPLES

Section 2 of the Sherman Act provides:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 2 (2002). A private party may sue for damages for violation of this provision and recover threefold the damages and counsel fees *Id.* § 15.

Because this section is in sweeping language, suggesting the breadth of its coverage, we look to the Supreme Court decisions for elucidation of the standard to be used in cases alleging monopolization. Elucidation came in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), where the Court declared that a defendant company which possesses monopoly power in the relevant market will be found in violation of § 2 of the Sherman Act if the defendant willfully acquired or maintained that power. *Id.* at 570-71, 86 S.Ct. 1698.

In this case, the parties agreed that the relevant

product market is transparent tape and the relevant geographic market is the United States. [FN4] Moreover, as to the issue of monopoly power, as we noted above, 3M concedes it possesses monopoly power in the United States transparent tape market, with a 90% market share. In fact, the evidence showed that the household penetration of 3M's Scotch-brand tape is virtually 100%. Therefore we need not dwell on the oft-contested issue of market power. *See* Robert Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust*, 90 Colum. L.Rev. 1805, 1807 (1990) ("In monopoly enforcement under section 2 of the Sherman Act, the pivotal inquiry is almost always whether the challenged party has substantial market power in its relevant market.").

> FN4. Although 3M originally challenged LePage's selection of the United States as the relevant geographic market, the District Court held that LePage's had introduced sufficient evidence from which the jury could properly find that the relevant geographic market is the United States and 3M does not challenge that market definition on appeal.

[1] The sole remaining issue and our focus on this appeal is whether 3M took steps to maintain that power in a manner *147 that violated § 2 of the Sherman Act. A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

[2] LePage's argues that 3M willfully maintained its monopoly in the transparent tape market through exclusionary conduct, primarily by bundling its rebates and entering into contracts that expressly or effectively required dealing virtually exclusively with 3M, which LePage's characterizes as *de facto* exclusive. 3M does not argue that it did not engage in this conduct. It agrees that it offered bundled rebates and entered into some exclusive dealing contracts, although it argues that only the few contracts that are expressly exclusive may be considered as such. Instead, 3M argues that its conduct was legal as a matter of law because it never priced its transparent tape below its cost. [FN5]

> FN5. 3M states that its pricing was above its costs however costs are calculated and LePage's has not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *147)

contested 3M's assertion.

This is the most significant legal issue in this case because it underlies 3M's argument. In its brief, 3M states "[a]bove-cost pricing cannot give rise to an antitrust offense as a matter of law, since it is the very conduct that the antitrust laws wish to promote in the interest of making consumers better off." Appellant's Br. at 30. For this proposition it relies on the Supreme Court's decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). It is an argument 3M repeated frequently during its oral argument before the *en banc* court. Counsel stated, "if the big guy is selling above cost, it has done nothing which offends the Sherman Act..." Tr. of Oral Argument, Oct. 30, 2002, at 11. This was the theory upon which 3M's counsel responded to all the questions from the court. When asked whether its theory is that because no one contended that 3M sold below its cost, that is "the end of the story," its counsel responded, "[w]ith the exception of the inconsequential express contract, absolutely." *Id.*

It is therefore necessary for us, at the outset, to examine whether we must accept 3M's legal theory that after *Brooke Group*, no conduct by a monopolist who sells its product above cost -- no matter how exclusionary the conduct -- can constitute monopolization in violation of § 2 of the Sherman Act. The history of the interpretation of § 2 of the Sherman Act demonstrates the lack of foundation for 3M's premise.

Although § 2 of the Sherman Act may have received less judicial and scholarly attention than several of the other more frequently invoked antitrust provisions, the Supreme Court, in a series of decisions, has made clear the type of conduct that will be held to constitute monopolization in violation of § 2.

The modern era begins with the decision by Judge Learned Hand in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945) (*"Alcoa"*). Because four members of the Supreme Court were disqualified, the Supreme Court was required to apply the provision of the Expediting Act, Section 29 of Title 15, U.S.C., 1940 ed., currently 28 U.S.C. § 2109, to certify the case to the three most senior judges of the relevant circuit. [FN6] Under

the statute, *148 the decision of that court was "final and conclusive," thus equating it to a decision of the Supreme Court.

> FN6. The three most senior judges of the circuit were, fortuitously, the legendary panel of Judges Learned Hand, Thomas Swan, and Augustus Hand.

At the time in question, Alcoa was the sole domestic producer of aluminum and thus had a monopoly that the Government sought to disband. In the opinion on liability, the court enunciated certain principles that remain fully applicable today. One such principle is that it does not follow that a company that has a monopoly has "monopolized" the market because "it may not have achieved monopoly; monopoly may have been thrust upon it." *Id.* at 429. As the court explained, "persons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended either to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolists by force of accident." *Id.* at 429-30. On the other hand, the court then quoted Justice Cardozo's statement in *United States v. Swift & Co.*, 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999 (1932), that "size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *Alcoa*, 148 F.2d at 430.

The court determined that Alcoa, which controlled over 90% of the aluminum market, had utilized its size for abuse. The court, noting that there had been at least "one or two abortive attempts" by others to enter the industry, concluded that Alcoa "effectively anticipated and forestalled all competition, and succeeded in holding the field alone." *Id.* at 430. Finding Alcoa in violation of § 2, the court continued:
Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel.
*Id.* at 431.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *148)

One year later, in *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed 1575 (1946), the Supreme Court endorsed the *Alcoa* decision when upholding a jury verdict finding a § 2 violation. The government brought a criminal action against various tobacco companies that between 1931 and 1939 accounted at all times for more than 68%, and usually for more than 75%, of the nation's domestic cigarette production. Defendants were convicted and fined after the jury found they had violated §§ 1 and 2 of the Sherman Act by conspiring to control the price of leaf tobacco, to acquire less expensive supplies of tobacco they did not need in order to deprive rival manufacturers of cheaper brands, to control cigarette prices, and to force cigarette distributors to treat rival brands less favorably.

The court of appeals affirmed, finding the verdicts to be supported by sufficient evidence. The Supreme Court granted the tobacco companies' petitions for certiorari only as to their § 2 claims, seeking to answer the specific question "whether actual exclusion of competitors is necessary to the crime of monopolization under § 2 of the Sherman Act." *Id.* at 784, 66 S.Ct 1125. Answering that question in the negative, the Court stated that "[n]either proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act." *Id.* at 810, 66 S.Ct. 1125. Furthermore, and importantly, the Court explicitly "welcome[d] this opportunity to endorse" certain passages from Judge Hand's opinion. *Id.* at 813, 66 S.Ct. 1125.

*149 Of particular relevance, the *American Tobacco* Court endorsed Judge Hand's understanding of the Sherman Act, namely that the Act contemplated the notion that " 'unchallenged economic power deadens initiative' " and " 'that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress.' " *Id.* (quoting *Alcoa*, 148 F.2d at 427) It further quoted *Alcoa* for the previously mentioned propositions that monopolies can be "thrust" upon entities rather than achieved and that specific intent under § 2 was not required " 'for no monopolist monopolizes unconscious of what he is doing ' " *Id.* at 813-14, 66 S.Ct. 1125 (quoting *Alcoa*, 148 F.2d at 432).

Section 2 of the Sherman Act was next considered

by the Supreme Court in *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). The United States had brought a civil suit against the publisher of the Lorain Journal, the only business disseminating news and advertising in the town of Lorain, Ohio, alleging that it attempted to monopolize in violation of § 2 of the Sherman Act because it refused to sell advertising to persons that patronized the small radio station that was established in a nearby community. The Supreme Court held that although a trader has discretion as to the parties with whom he will deal "[i]n the absence of any *purpose* to create or maintain a monopoly," *id.* at 155, 72 S.Ct. 181 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919)), the action of the Journal constituted a purposeful means of regaining its previous monopoly over the mass dissemination of news and advertising. *Id.* Because this was an attempt to monopolize in violation of § 2, the Court approved the entry of an injunction ordering the Journal to print the advertisements of the customers of the radio station.

Thereafter, in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Supreme Court reiterated that monopoly power alone is not necessarily unlawful. The Court summarized its prior cases, stating that § 2 of the Sherman Act required two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 384 U.S. at 570-71, 86 S.Ct. 1698.

In *Grinnell*, the United States filed a civil suit against several companies that offered central station protective services, such as fire and burglary protective devices, alleging violations of §§ 1 and 2 of the Sherman Act. Referring to the two-pronged test under § 2, the Court found that both prongs had been satisfied. Not only did the companies have monopoly power (87% of the accredited central station service business), but also they largely achieved this power through the aid of pricing practices, acquisitions of competitors, and noncompetition covenants, all of which were deemed to be "unlawful and exclusionary practices." *Id.* at 576, 86 S.Ct. 1698.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *149)

The Court's later decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), is even more pertinent to the case before us. In *Aspen Skiing*, a case that also reached the Court only on the § 2 violation, Ski Co., the owner of three of the four major downhill skiing facilities in Aspen, Colorado, discontinued its prior practice of cooperating with the owner of the fourth facility by issuing an interchangeable 6-day pass that could be used on any of the four facilities. It replaced that pass with a 3-area, 6-day ticket featuring only its mountains. It offered the *150 plaintiff, Highlands, owner of the fourth facility, reinstatement of the 4-area ticket only if Highlands would accept a fixed percentage of the revenue that was considerably below Highlands' historical average based on usage. Ski Co. took additional actions that made it extremely difficult for Highlands to market its own multiarea package to replace the joint offering, and Highlands' share of the market declined along with its revenues from associated skiing services. The jury found that Ski Co. possessed monopoly power and awarded Highlands a substantial money judgment as treble damages. The court of appeals affirmed, holding there was sufficient basis in Ski Co.'s actions to demonstrate an abuse of its monopoly power.

In the Supreme Court, Ski Co. argued "that even a firm with monopoly power has no duty to engage in joint marketing with a competitor, that a violation of § 2 cannot be established without evidence of substantial exclusionary conduct, and that none of its activities can be characterized as exclusionary." *Aspen Skiing*, 472 U.S. at 600, 105 S.Ct. 2847. The Supreme Court agreed with the legal proposition, but referred to its earlier opinion in *Lorain Journal* where it held that a monopolist's right to refuse to deal was not unqualified. *Id.* at 600-01, 105 S.Ct. 2847. After reviewing all the circumstances, it affirmed the judgment for Highlands in a unanimous opinion. It held that the jury had ample basis to reject Ski Co.'s business justification defense and noted that Ski Co. failed to offer any efficiency justification whatever for its pattern of conduct. *Id.* at 608, 105 S.Ct. 2847. The Court stated, "[a]lthough Ski Co.'s pattern of conduct may not have been as 'bold, relentless, and predatory' as the publisher's actions in *Lorain Journal,* the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Id.* at 610, 105 S.Ct. 2847 (quoting *Lorain Journal,* 342 U.S. at 149, 72 S.Ct. 181 (citation omitted)).

In a significant passage about the conduct that constitutes monopolization in violation of § 2, the Court stated that when the issue is monopolization rather than an attempt to monopolize, "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' -- to use the words in the trial court's instructions -- or 'predatory,' to use a word that scholars seem to favor." *Id.* at 602, 105 S.Ct. 2847. The Court continued, "[w]hichever label is used, there is agreement on the proposition that 'no monopolist monopolizes unconscious of what he is doing.' " *Id.* (quoting *Alcoa,* 148 F.2d at 432).

In *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265(1992), 18 independent service organizations ("ISO's") that serviced Kodak copying and micrographic equipment brought an antitrust action against Kodak for its policies that sought to limit the availability of Kodak parts to ISO's. They alleged Kodak's policies were unlawful under both §§ 1 and 2 of the Sherman Act. The Supreme Court considered the issues under the two provisions separately. In its analysis under § 2, the Court first held that Kodak's control of nearly 100% of the parts market and 80% to 95% of the service market was sufficient to support a claim of monopoly power (an issue that is conceded here). As to the issue whether Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, the Court stated that there was evidence that Kodak "took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen *151 its monopoly share of the Kodak service market." *Id.* at 483, 112 S.Ct. 2072. Thus, Kodak could escape liability under § 2 only if it could explain its actions on the basis of valid business reasons, an issue as to which there were factual questions which made the district court's grant of summary judgment for Kodak inappropriate. *Id.*

This extensive review of the Supreme Court's § 2 decisions is set forth to provide the background under which we must evaluate 3M's contention that it was entitled to judgment as a matter of law on the

324 F.3d 141
(Cite as: 324 F.3d 141, *151)

basis of the decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), a decision that was primarily concerned with the Robinson-Patman Act, not § 2 of the Sherman Act. In *Brooke Group,* Liggett, a cigarette manufacturer responsible for the "innovative development" of generic cigarettes, claimed that Brown & Williamson, which introduced its own line of generic cigarettes, "cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force Liggett to raise its own generic cigarette prices and introduce oligopoly pricing in the economy segment [of the national cigarette market]." *Brooke Group,* 509 U.S. at 212, 113 S.Ct. 2578. It filed a Robinson-Patman action on the basis of these allegations. Brown & Williamson's deep price discounts or rebates were concededly discriminatory, not cost justified, and resulted in substantial loss to it. The Supreme Court majority held that the defendant was entitled to judgment as a matter of law because there was no evidence of injury to competition. *Id.* at 243, 113 S.Ct. 2578. The Court also held that the evidence did not show that Brown & Williamson's alleged scheme "was likely to result in oligopolistic price coordination and sustained supracompetitive pricing in the generic segment of the national cigarette market. Without this, Brown & Williamson had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit." *Id.* [FN7]

FN7. In contrast, the District Court here noted that 3M had conceded that it " 'could later recoup the profits it has forsaken on Scotch tape and private label tape by selling more higher priced Scotch tape ... if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape.' " *Le Page's,* 2000 WL 280350, at *7 (quoting Defendant's Mem. at 30).

Unlike 3M, Brown & Williamson was part of an oligopoly, six manufacturers whose prices for cigarettes "increased in lockstep" and who "reaped the benefits of prices above a competitive level." *Id.* at 213, 113 S.Ct. 2578. Brown & Williamson had 12% of the oligopolistic market. Its conduct and pricing were at all times necessarily constrained by the presence of competitors who could, and did, react to its conduct by undertaking similar price cuts

or pricing behavior. [FN8]

FN8. The *Brooke Group* opinions, both for the majority and the dissent, discuss the responses by members of the oligopoly to the introduction of discounted cigarettes. *Id.* at 239-40, 113 S.Ct. 2578; *id.* at 247-48, 113 S.Ct. 2578 (Stevens, J., dissenting).

Assuming *arguendo* that *Brooke Group* should be read for the proposition that a company's pricing action is legal if its prices are not below its costs, nothing in the decision suggests that its discussion of the issue is applicable to a monopolist with its unconstrained market power. Moreover, LePage's, unlike the plaintiff in *Brooke Group,* does not make a predatory pricing claim. 3M is a monopolist; a monopolist is not free to take certain actions that a company in a competitive (or even *152 oligopolistic) market may take, because there is no market constraint on a monopolist's behavior. *See, e.g., Aspen Skiing,* 472 U.S at 601-04, 105 S.Ct. 2847.

[3] Nothing in any of the Supreme Court's opinions in the decade since the *Brooke Group* decision suggested that the opinion overturned decades of Supreme Court precedent that evaluated a monopolist's liability under § 2 by examining its exclusionary, i.e., predatory, conduct. *Brooke Group* has been cited only four times by the Supreme Court, three times in cases that were not even antitrust cases for propositions patently inapplicable here. [FN9] In the only antitrust case of the four, *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998), the Court considered whether the *per se* rule applicable to group boycotts under § 1 of the Sherman Act should be applied "where a single buyer favors one seller over another, albeit for an improper reason." *Id.* at 133, 119 S.Ct. 493. Holding that the rule of reason applies, the Court quoted *Brooke Group* for the proposition that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal anti-trust laws." *Id.* at 137, 119 S.Ct. 493 (quoting *Brooke Group,* 509 U.S at 225, 113 S.Ct. 2578). The opinion does not discuss, much less adopt, the proposition that a monopolist does not violate § 2 unless it sells below cost. Thus, nothing that the Supreme Court has written since *Brooke Group* dilutes the Court's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

324 F.3d 141
(Cite as: 324 F.3d 141, *152)

consistent holdings that a monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification.

> FN9. *Brooke Group* is cited in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), for the statutory construction rule that identical words used in different parts of the same act are intended to have the same meaning; in *Strickler v. Greene*, 527 U.S. 263, 300 n. 3, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), a federal habeas case, by Justice Souter in his partial concurrence/partial dissent, in discussing the term "reasonable probability;" and in *Weisgram v. Marley Co.*, 528 U.S. 440, 454, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000), in connection with discussing the weight to be given an expert opinion.

### IV.
### MONOPOLIZATION -- EXCLUSIONARY CONDUCT
#### A.
#### *Illustrative Cases*

Before turning to consider LePage's allegation that 3M engaged in exclusionary or anticompetitive conduct and the evidence it produced, we consider the type of conduct § 2 encompasses.

As one court of appeals has stated: " 'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998) (reversing in part the district court's dismissal of complaint and holding that radio station's claim that defendants made misrepresentations to advertisers and the government in order to protect its monopoly stated § 2 Sherman Act claim).

Numerous cases hold that the enforcement of the legal monopoly provided by a patent procured through fraud may violate § 2. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *see also Medtronic Ave, Inc. v. Boston Scientific*153 Corp.*, No. CIV.A. 98-478-SLR, 2001 WL 652016 (D.Del. Mar.30, 2001) (patentee could have violated § 2 by bringing infringement action on patent procured by fraud). Predatory

pricing by a monopolist can provide a basis for § 2 liability. *See U.S. Philips Corp. v. Windmere Corp.*, 861 F.2d 695 (Fed.Cir.1988) (reversing district court's directed verdict and ordering new trial on § 2 claims due to evidence that company had 90% of rotary electric shaver market, existence of substantial entry barriers, and company had drastically reduced prices to eliminate potential competitors). A monopolist's denial to competitors of access to its "essential" goods, services or resources has been held to violate § 2. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (finding § 2 violation where monopolist utility company refused to sell wholesale to municipalities and refused to transfer competitors' power over its lines); *see also Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir.1986) (finding corporation liable under § 2 for refusing to lease Chicago Stadium to plaintiff, a potential buyer of the Chicago Bulls basketball team, after determining Stadium to be essential to professional basketball in Chicago area). An arbitrary refusal to deal by a monopolist may constitute a § 2 violation. *See Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (6th Cir.1979) (remanding case to district court for fact-finding to determine whether defendant possessed monopoly power and unlawfully refused to deal in violation of § 2). Even unfair tortious conduct unrelated to a monopolist's pricing policies has been held to violate § 2. *See Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir.1980) (upholding treble damages antitrust award against airline with monopoly power after finding sufficient evidence that airline placed false, deceptive, and misleading advertisements discouraging public patronage of travel group charters).

A recent decision of the United States Court of Appeals for the Sixth Circuit, *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir.2002), *cert. denied*, 537 U.S. 1148, 123 S.Ct. 876, 154 L.Ed.2d 850 (2003), presents a good illustration of the type of exclusionary conduct that will support a § 2 violation. That court upheld the jury's award to plaintiff Conwood of $350 million, which trebled was $1.05 billion, against United States Tobacco Company ("USTC") because of USTC's monopolization. USTC was the sole manufacturer of moist snuff until the 1970's when Conwood, Swisher, and Swedish Match, other moist snuff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *153)

manufacturers, entered the moist snuff market. Not unexpectedly, USTC's 100% market share declined and it took the action that formed the basis of Conwood's complaint against USTC alleging, *inter alia*, unlawful monopolization in violation of § 2 of the Sherman Act.

The evidence that the district court and the court of appeals held proved that USTC systematically tried to exclude competition from the moist snuff market included the following:   USTC (1) removed and destroyed or discarded racks that displayed moist snuff products in the stores while placing Conwood products in USTC racks in an attempt to bury Conwood's products;   (2) trained its "operatives to take advantage of inattentive store clerks with various 'ruses' such as obtaining nominal permission to reorganize or neaten the moist snuff section" in an effort to destroy Conwood racks;   (3) misused its position as category manager (manages product groups and business units and customizes them on a store by store basis) by providing misleading information to retailers in an effort to dupe them into carrying USTC products and to discontinue carrying Conwood *154 products;   and (4) entered into exclusive agreements with retailers in an effort to exclude rivals' products. *Id.* at 783.

On appeal, USTC -- like 3M -- did not challenge that it had monopoly power and agreed that the relevant product was moist snuff and the geographic market was nationwide. *Id.* at 782-83.   Instead, USTC contended that Conwood had failed to establish that USTC's power was acquired or maintained by exclusionary practices rather than by its legitimate business practices and superior product. *Id.* at 783.   Both the district court and the court of appeals rejected USTC's argument, finding that there was sufficient evidence for a jury to find willful maintenance by USTC of monopoly power by engaging in exclusionary practices in violation of § 2 of the Sherman Act. *Id.* at 788.

Similarly, 3M sought to meet the competition that LePage's threatened by exclusionary conduct that consisted of rebate programs and exclusive dealing arrangements designed to drive LePage's and any other viable competitor from the transparent tape market.

### B.
### *Bundled Rebates*

[4] In considering LePage's conduct that led to the jury's ultimate verdict, we note that the jury had before it evidence of the full panoply of 3M's exclusionary conduct, including both the exclusive dealing arrangements and the bundled rebates which could reasonably have been viewed as effectuating exclusive dealing arrangements because of the way in which they were structured.

Through a program denominated Executive Growth Fund ("EGF") and thereafter Partnership Growth Fund ("PGF"), 3M offered many of LePage's major customers substantial rebates to induce them to eliminate or reduce their purchases of tape from LePage's.   Rather than competing by offering volume discounts which are concededly legal and often reflect cost savings, 3M's rebate programs offered discounts to certain customers conditioned on purchases spanning six of 3M's diverse product lines.   The product lines covered by the rebate program were:   Health Care Products, Home Care Products, Home Improvement Products, Stationery Products (including transparent tape), Retail Auto Products, and Leisure Time. Sealed App. at 2979. In addition to bundling the rebates, both of 3M's rebate programs set customer-specific target growth rates in each product line.   The size of the rebate was linked to the number of product lines in which targets were met, and the number of targets met by the buyer determined the rebate it would receive on all of its purchases.   If a customer failed to meet the target for any one product, its failure would cause it to lose the rebate across the line.   This created a substantial incentive for each customer to meet the targets across all product lines to maximize its rebates.

The rebates were considerable, not "modest" as 3M states. Appellant's Br. at 15.   For example, Kmart, which had constituted 10% of LePage's business, received $926,287 in 1997, Sealed App. at 2980, and in 1996 Wal-Mart received more than $1.5 million, Sam's Club received $666,620, and Target received $482,001.   Sealed App. at 2773.   Just as significant as the amounts received is the powerful incentive they provided to customers to purchase 3M tape rather than LePage's in order not to forego the maximum rebate 3M offered.   The penalty would have been $264,000 for Sam's Club, $450,000 for Kmart, and $200,000 to $310,000 for American Stores.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *155)

*155 3M does not deny that it offered these programs although it gives different reasons for the discounts to each customer. Instead it argues that they were no more exclusive than procompetitive lawful discount programs. And, as it responds to each of LePage's allegations, it returns to its central premise "that it is not unlawful to lower one's prices so long as they remain above cost." Appellant's Br. at 36 (citing *Brooke Group*, 509 U.S. at 222, 113 S.Ct. 2578).

However, one of the leading treatises discussing the inherent anticompetitive effect of bundled rebates, even if they are priced above cost, notes that "the great majority of bundled rebate programs yield aggregate prices above cost. Rather than analogizing them to predatory pricing, they are best compared with tying, whose foreclosure effects are similar. Indeed, the 'package discount' is often a close analogy." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 794, at 83 (Supp.2002).

The treatise then discusses the anticompetitive effect as follows:

The anticompetitive feature of package discounting is the strong incentive it gives buyers to take increasing amounts or even all of a product in order to take advantage of a discount aggregated across multiple products. In the anticompetitive case, which we presume is in the minority, the defendant rewards the customer for buying its product *B* rather than the plaintiff's *B*, not because defendant's *B* is better or even cheaper. Rather, the customer buys the defendant's *B* in order to receive a greater discount on *A*, which the plaintiff does not produce. In that case the rival can compete in *B* only by giving the customer a price that compensates it for the foregone *A* discount. *Id*

The authors then conclude:

Depending on the number of products that are aggregated and the customer's relative purchases of each, even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce.
*Id.* at 83-84.

The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the

market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer. We recognized this in our decision in *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.1978), where we held that conduct substantially identical to 3M's was anticompetitive and sustained the finding of a violation of § 2. *SmithKline* is of interest not because the panel decision is binding on the *en banc* court but because the reasoning regarding the practice of bundled rebates is equally applicable here. The defendant in *SmithKline*, Eli Lilly & Company, the pharmaceutical manufacturer, sold three of its cephalosporins to hospitals under the trade names Kefzol, Keflin and Keflex. Cephalosporins are broad spectrum antibiotics that were at that time indispensable to hospital pharmacies. Lilly had a monopoly on both Keflin and Keflex because of its patents. However, those drugs faced competition from the generic drug cefazolin which Lilly sold under the trade name Kefzol and which plaintiff SmithKline sold under the trade name Ancef.

Lilly's profits on the patented Keflin were far higher than those it received from its sales of Kefzol where its pricing was constrained by the existence of SmithKline. To preserve its market position in Keflin and discourage sales of Ancef and *156 even of its own Kefzol, *id.* at 1061, Lilly instituted a rebate program that provided a 3% bonus rebate for hospitals that purchased specified quantities of any three of Lilly's five cephalosporins. SmithKline brought a § 2 monopolization claim, alleging that Lilly used these multi-line volume rebates to maintain its monopoly over the hospital market for cephalosporins.

The district court (Judge A. Leon Higginbotham, later a member of this court) found that Lilly's pricing policy violated § 2. *SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089 (E.D.Pa.1976). We affirmed by a unanimous decision. Although customers were not forced to select which cephalosporins they purchased from Lilly, we recognized that the effect of the rebate program was to induce hospitals to conjoin their purchases of Kefzol with Keflin and Keflex, Lilly's "leading sellers." *SmithKline*, 575 F.2d at 1061. As we stated, "[a]lthough eligibility for the 3% bonus rebate was based on the purchase of specified quantities of any three of Lilly's cephalosporins, in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F 3d 141
(Cite as: 324 F.3d 141, *156)

reality it meant the combined purchases of Kefzol and the leading sellers. Keflin and Keflex." *Id* The gravamen of Lilly's § 2 violation was that Lilly linked a product on which it faced competition with products on which it faced no competition. *Id* at 1065

The effect of the 3% bundled rebate was magnified by the volume of Lilly products sold, so that "in order to offer a rebate of the same net dollar amount as Lilly's, SmithKline had to offer purchasers of Ancef rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals." *Id.* at 1062. Lilly's rebate structure combining Kefzol with Keflin and Keflex "insulat[ed] Kefzol from true price competition with [its competitor] Ancef." *Id.* at 1065

LePage's private-label and second-tier tapes are, as Kefzol and Ancef were in relation to Keflin, less expensive but otherwise of similar quality to Scotch-brand tape. Indeed, before 3M instituted its rebate program, LePage's had begun to enjoy a small but rapidly expanding toehold in the transparent tape market. 3M's incentive was thus the same as Lilly's in *SmithKline*: to preserve the market position of Scotch-brand tape by discouraging widespread acceptance of the cheaper, but substantially similar, tape produced by LePage's.

3M bundled its rebates for Scotch-brand tape with other products it sold in much the same way that Lilly bundled its rebates for Kefzol with Keflin and Keflex. In both cases, the bundled rebates reflected an exploitation of the seller's monopoly power. Just as "[cephalosporins] [were] carried in ... virtually every general hospital in the country," *SmithKline*, 575 F.2d at 1062, the evidence in this case shows that Scotch-brand tape is indispensable to any retailer in the transparent tape market.

Our analysis of § 2 of the Sherman Act in *SmithKline* is instructive here where the facts are comparable. Speaking through Judge Aldisert, we said:

With Lilly's cephalosporins subject to no serious price competition from other sellers, with the barriers to entering the market substantial, and with the prospects of new competition extremely uncertain, we are confronted with a factual complex in which Lilly has the awesome power of a monopolist. Although it enjoyed the status of a

legal monopolist when it was engaged in the manufacture and sale of its original patented products, that status changed when it instituted its [bundled rebate program]. The goal of that plan was to associate Lilly's legal monopolistic practices with an illegal activity that directly affected the price, supply, and demand of Kefzol *157 and Ancef. Were it not for the [bundled rebate program], the price, supply, and demand of Kefzol and Ancef would have been determined by the economic laws of a competitive market. [Lilly's bundled rebate program] blatantly revised those economic laws and made Lilly a transgressor under § 2 of the Sherman Act.
*Id* at 1065.

The effect of 3M's rebates were even more powerfully magnified than those in *SmithKline* because 3M's rebates required purchases bridging 3M's extensive product lines. In some cases, these magnified rebates to a particular customer were as much as half of LePage's entire prior tape sales to that customer. For example, LePage's sales to Sam's Club in 1993 totaled $1,078,484, while 3M's 1996 rebate to Sam's Club was $666,620. Similarly, LePage's 1992 sales to Kmart were $2,482,756; 3M's 1997 rebate to Kmart was $926,287. The jury could reasonably find that 3M used its monopoly in transparent tape, backed by its considerable catalog of products, to squeeze out LePage's. 3M's conduct was at least as anticompetitive as the conduct which this court held violated § 2 in *SmithKline*.

### C.
#### *Exclusive Dealing*
[5] The second prong of LePage's claim of exclusionary conduct by 3M was its actions in entering into exclusive dealing contracts with large customers. 3M acknowledges only the expressly exclusive dealing contracts with Venture and Pamida which conditioned discounts on exclusivity. It minimizes these because they represent only a small portion of the market. However, LePage's claims that 3M made payments to many of the larger customers that were designed to achieve sole-source supplier status.

[6] 3M argues that because the jury found for it on LePage's claims under § 1 of the Sherman Act and § 3 of the Clayton Act, these payments should not be relevant to the § 2 analysis. The law is to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *157)

contrary [FN10]. Even though exclusivity arrangements are often analyzed under § 1, such exclusionary conduct may also be an element in a § 2 claim. *U.S. Healthcare, Inc v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993) (observing that exclusivity may also "play a role ... as an element in attempted or actual monopolization").

FN10. The jury's finding against LePage's on its exclusive dealing claim under § 1 of the Sherman Act and § 3 of the Clayton Act does not preclude the application of evidence of 3M's exclusive dealing to support LePage's § 2 claim. *See. e g . Barr Labs., Inc. v. Abbott Labs*, 978 F.2d 98, 110-12 (3d Cir.1992) (considering § 2 of the Sherman Act claims after rejecting claims based on the same evidence under § 1 of the Sherman Act and § 3 of the Clayton Act); *SmithKline*, 427 F.Supp. at 1092. *aff'd*, 575 F.2d 1056 (imposing § 2 Sherman Act liability for exclusionary conduct, after rejecting an exclusive dealing claim under § 3 of the Clayton Act).

3M also disclaims as exclusive dealing any arrangement that contained no express exclusivity requirement. Once again the law is to the contrary. No less an authority than the United States Supreme Court has so stated. In *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), a case that dealt with § 3 of the Clayton Act rather than § 2 of the Sherman Act, the Court took cognizance of arrangements which, although not expressly exclusive, effectively foreclosed the business of competitors [FN11]

FN11. If the dissent's citation to *FTC v. Motion Picture Advertising Serv. Co*, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953), suggests that a one year exclusive dealing contract should be considered as per se legal under § 2, that is not supported by a reading of the decision. In that case, the FTC had appealed from a decision of the Fifth Circuit holding that exclusive contracts are not unfair methods of competition. The Supreme Court reversed, supporting the FTC's decision that the exclusive contracts of the respondent (a producer and distributor of advertising motion pictures), unreasonably restrain competition and tend to monopoly. It was the respondent who argued that exclusive contracts of a duration in excess of a year are necessary for the conduct of the business of the distributors. This argument was rejected by the

Supreme Court. The Supreme Court's decision did not suggest that exclusive dealing arrangements entered into by a monopolist (which the respondent in that case was not), together with other exclusionary action, did not violate § 2 of the Sherman Act.

*158 LePage's introduced powerful evidence that could have led the jury to believe that rebates and discounts to Kmart, Staples, Sam's Club, National Office Buyers and "UDI" were designed to induce them to award business to 3M to the exclusion of LePage's. Many of LePage's former customers refused even to meet with LePage's sales representatives. A buyer for Kmart, LePage's largest customer which accounted for 10% of its business, told LePage's: "I can't talk to you about tape products for the next three years" and "don't bring me anything 3M makes." App. at 302-03, 964. Kmart switched to 3M following 3M's offer of a $1 million "growth" reward which the jury could have understood to require that 3M be its sole supplier. Similarly, Staples was offered an extra 1% bonus rebate if it gave LePage's business to 3M. 3M argues that LePage's did not try hard enough to retain Kmart, its customer for 20 years, but there was evidence to the contrary. [FN12] In any event, the purpose and effect of 3M's payments to the retailers were issues for the jury which, by its verdict, rejected 3M's arguments.

FN12. At trial, LePage's presented the testimony of James Kowieski, its former senior vice president of sales, who described LePage's efforts following Kmart's rejection of its bid. LePage's made a desperate second sales presentation attended by its president. App. at 957 ("I felt it was very critical to our company's success or failure, so I insured that Mr. Les Baggett, our president, attended the meeting with me "), where LePage's vainly offered additional price concessions. App. at 959 ("We went through the cost savings, the benefits, and we came up with some, again, price concessions, and some programs of a special buy once a year, because, I mean, as far as we were concerned, we were on our last leg ")

The foreclosure of markets through exclusive dealing contracts is of concern under the antitrust laws. As one of the leading treatises states: unilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing

324 F.3d 141
(Cite as: 324 F.3d 141, *158)

exclusively with the dominant firm  For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result

3A  Phillip  E.  Areeda  &  Herbert  Hovenkamp, *Antitrust Law* ¶ 768b2, at 148 (2d Ed. 2002); *see also* 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1807a, at 115-16 (1998) (quantity discounts may foreclose a substantial  portion  of  the  market).   Discounts conditioned on exclusivity are "problematic" "when the defendant is a dominant firm in a position to force manufacturers to make an all-or-nothing choice." *Id.* at 117 n. 7 (citing *LePage's*, 1997 WL 734005 (E.D.Pa. 1997)).

The Court of Appeals for the District of Columbia relied on the evidence of foreclosure of markets in reaching its decision on liability in *United States v. Microsoft Corp.*, 253 F.3d 34. 69 (D.C Cir 2001) In that case, the court of appeals concluded that Microsoft, a monopolist in the operating system market, foreclosed rivals in the *159 browser market  from  a  "substantial  percentage  of  the available  opportunities  for  browser  distribution" through the use of exclusive contracts with key distributors. *Id.* at 70-71  Microsoft kept usage of its competitor's browser below "the critical level necessary for [its rival] to pose a real threat to Microsoft's monopoly." *Id.* at 71. The *Microsoft* opinion does not specify what percentage of the browser market Microsoft locked up -- merely that, in one of the two primary distribution channels for browsers, Microsoft had exclusive arrangements with most of the top distributors.  *Id.* at 70-71 Significantly, the *Microsoft* court observed that Microsoft's exclusionary conduct violated § 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Id.* at 70.

One noted antitrust scholar has written:
We might thus interpret the *Microsoft* holding as follows: Conduct that intentionally, significantly, and without business justification excludes a potential competitor from outlets (even though not in the relevant market), where access to those outlets is a necessary though not sufficient condition to waging a challenge to a monopolist and fear of the challenge prompts the conduct, is "anticompetitive."
Eleanor M. Fox, *What Is Harm to Competition? Exclusionary Practices and Anticompetitive Effect*,

70 Antitrust L.J. 371, 390 (2002).

LePage's produced evidence that the foreclosure caused by exclusive dealing practices was magnified by 3M's discount practices, as some of 3M's rebates were "all-or-nothing" discounts, leading customers to maximize their discounts by dealing exclusively with the dominant market player, 3M, to avoid being severely penalized financially for failing to meet their quota in a single product line.  Only by dealing exclusively with 3M in as many product lines  as  possible  could  customers  enjoy  the substantial discounts.  Accordingly, the jury could reasonably find that 3M's exclusionary conduct violated § 2.

### V.
### ANTICOMPETITIVE EFFECT
[7] It has been LePage's position in pursuing its § 2 claim that 3M's exclusionary "tactics foreclosed the competitive process by preventing rivals from competing to gain (or maintain) a presence in the market."   Appellee's Br. at 45-46.   When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold  in  the  market  by  exclusionary,  i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.  It has been recognized, albeit in a somewhat different context, that even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

The *Microsoft* court treated exclusionary conduct by a monopolist as more likely to be anticompetitive than ordinary § 1 exclusionary conduct. The inquiry in *Microsoft* was whether the monopolist's conduct excluded a competitor (Netscape) from the essential facilities  that  would  permit  it  to  achieve  the efficiencies  of  scale  necessary  to  threaten  the monopoly.   253  F.3d  at  70-71.   [FN13]   In *Microsoft*, the court of *160 appeals determined that Microsoft had foreclosed enough distribution links to undermine the survival of Netscape as a viable competitor. *Id.* at 71.

FN13  In one of the two distribution channels available for browsers. Microsoft had locked up almost all the high volume distributors *Microsoft*, 253 F.3d at 70-71  In the seminal *Terminal Railroad*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
**(Cite as: 324 F.3d 141, \*160)**

case, an association of railroad operators locked up
the cheapest route across the Mississippi river, the
sole railroad bridge crossing at St. Louis. *United
States v. Terminal R.R. Ass'n.* 224 U.S. 383, 32
S.Ct. 507, 56 L.Ed. 810 (1912). The Supreme
Court determined that the defendant's agreement to
provide access to the bridge to other railroads on
discriminatory terms violated § 1 of the Sherman
Act.

Similarly, in this case, the jury could have
reasonably found that 3M's exclusionary conduct cut
LePage's off from key retail pipelines necessary to
permit it to compete profitably. [FN14] It was only
after LePage's entry into the market that 3M
introduced the bundled rebates programs. If 3M
were successful in eliminating competition from
LePage's second-tier or private-label tape, 3M could
exercise its monopoly power unchallenged, as Tesa
Tuck was no longer in the market.

> FN14. In the transparent tape market, superstores
> like Kmart and Wal-Mart provide a crucial facility to
> any manufacturer-they supply high volume sales with
> the concomitant substantially reduced distribution
> costs. By wielding its monopoly power in
> transparent tape and its vast array of product lines,
> 3M foreclosed LePage's from that critical bridge to
> consumers that superstores provide, namely, cheap,
> high volume supply lines.

The District Court, recognizing that "this case
presents a unique bundled rebate program that the
jury found had an anti-competitive effect," *Le
Page's,* 2000 WL 280350, at \*5, denied 3M's
motion for judgment as a matter of law ("JMOL"),
stating:

Plaintiff introduced evidence that Scotch is a
monopoly product, and that 3M's bundled rebate
programs caused distributors to displace Le Page's
entirely, or in some cases, drastically reduce
purchases from Le Page's. Tr. Vol. 30 at 105-106;
Vol. 27 at 30. Under 3M's rebate programs, 3M
set overall growth targets for unrelated product
lines. *In the distributors' view, 3M set these
targets in a manner which forced the distributor to
either drop any non-Scotch products, or lose the
maximum rebate.* PX 24 at 3M 48136. Thus, in
order to qualify for the maximum rebate under the
EGF/PGF programs, the record shows that most
customers diverted private label business to 3M at
3M's suggestion. Tr. Vol. 28 at 74-75; PX23, 28,

32, 34, 715. Similarly, under the newer Brand
Mix rebate program, 3M set higher rebates for tape
sales which produced a shift from private label tape
to branded tape. Tr. Vol. 31 at 79. PX 393 at
534906
*Furthermore, Plaintiff introduced evidence of
customized rebate programs that similarly caused
distributors to forego purchasing from Le Page's if
they wished to obtain rebates on 3M's products.*
Specifically, the trial record establishes that 3M
offered Kmart a customized growth rebate and
Market Development Funds payment. In order to
reach the $15 million sales target and qualify for
the $1 million rebate, however, Kmart had to
increase its consumer stationary purchases by $5.5
million. Kmart substantially achieved this
"growth" by dropping Le Page's and another
private label manufacturer, Tesa. PX 51 at 3M
102175, PX 121 at 156838. Likewise, 3M
customized a program with Staples that provided
for an extra 1% bonus rebate on Scotch tape sales
"if Le Page's business is given to 3M." PX 98 at
3M 149794. Finally, 3M provided a similar
discount on Scotch tape to Venture Stores "based
on the contingency of Venture dropping private
label." PX 712 at 3M 450738. Thus, \*161 the
jury could have reasonably concluded that 3M's
customers were forced to forego purchasing Le
Page's private label tape in order to obtain the
rebates on Scotch tape
*Id.* (emphasis added)

In the same opinion, the District Court found that
"[LePage's] introduced substantial evidence that the
anticompetitive effects of 3M's rebate programs
caused Le Page's losses." *Id.* at \*7. The jury was
capable of calculating from the evidence the amount
of rebate a customer of 3M would lose if it failed to
meet 3M's quota of sales in even one of the bundled
products. The discount that LePage's would have
had to provide to match the discounts offered by 3M
through its bundled rebates can be measured by the
discounts 3M gave or offered. For example,
LePage's points out that in 1993 Sam's Club would
have stood to lose $264,900, Sealed App. at 1166,
and Kmart $450,000 for failure to meet one of 3M's
growth targets in a single product line. Sealed App.
at 1110. Moreover, the effect of 3M's rebates on
LePage's earnings, if LePage's had attempted to
match 3M's discounts, can be calculated by
comparing the discount that LePage's would have
been required to provide. That amount would

324 F.3d 141
(Cite as: 324 F.3d 141, *161)

represent the impact of 3M's bundled rebates on LePage's ability to compete, and that is what is relevant under § 2 of the Sherman Act.

The impact of 3M's discounts was apparent from the chart introduced by LePage's showing that LePage's earnings as a percentage of sales plummeted to below zero-to negative 10%-during 3M's rebate program. App at 7037; see also App. at 7044 (documenting LePage's healthy operating income from 1990 to 1993, rapidly declining operating income from 1993 to 1995, and large operating losses suffered from 1996 through 1999). Demand for LePage's tape, especially its private-label tape, decreased significantly following the introduction of 3M's rebates. Although 3M claims that customers participating in its rebate programs continued to purchase tape from LePage's, the evidence does not support this contention. Many distributors dropped LePage's entirely.

Prior to the introduction of 3M's rebate program, LePage's sales had been skyrocketing. Its sales to Staples increased by 440% from 1990 to 1993. Following the introduction of 3M's rebate program which bundled its private-label tape with its other products, 3M's private-label tape sales increased 478% from 1992 to 1997 [FN15] LePage's in turn lost a proportional amount of sales. It lost key large volume customers, such as Kmart, Staples, American Drugstores, Office Max, and Sam's Club. Other large customers, like Wal-Mart, drastically cut back their purchases.

FN15. In 1992, 3M's private-label tape sales were $1,142,000. By 1997, its private-label tape sales had increased to $5,464,222. Sealed App. at 489

As a result, LePage's manufacturing process became less efficient and its profit margins declined. In transparent tape manufacturing, large volume customers are essential to achieving efficiencies of scale. As 3M concedes, " 'large customers were extremely important to [LePage's], to everyone.' ... Large volumes ... permitted 'long runs,' making the manufacturing process more economical and predictable." Appellant Br. at 10 (quoting trial testimony of Les Baggett, LePage's former president and CEO) (citation omitted).

There was a comparable effect on LePage's share of the transparent tape market. In the agreed upon

relevant market for transparent tape in the United States, LePage's market share dropped 35% from 1992 to 1997. In 1992, LePage's net sales constituted 14.44% of the total transparent *162 tape market. By 1997, LePage's sales had fallen to 9.35%. Sealed App. at 489. Finally, in March of 1997, LePage's was forced to close one of its two plants. That same year, the only other domestic transparent tape manufacturer, Tesa Tuck, Inc., bowed out of the transparent tape business entirely in the United States. Had 3M continued with its program it could have eventually forced LePage's out of the market.

[8] The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together. As the Supreme Court recognized in Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation. The Court stated, " 'in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it.' " Id. (citation omitted). See also City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1376 (9th Cir.1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect ... We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.") (emphasis added). This court, when considering the anticompetitive effect of a defendant's conduct under the Sherman Act, has looked to the increase in the defendant's market share, the effects of foreclosure on the market, benefits to customers and the defendant, and the extent to which customers felt they were precluded from dealing with other manufacturers. Barr, 978 F.2d at 110-11.

The effect of 3M's conduct in strengthening its monopoly position by destroying competition by LePage's in second-tier tape is most apparent when 3M's various activities are considered as a whole. The anticompetitive effect of 3M's exclusive dealing arrangements, whether explicit or inferred, cannot be separated from the effect of its bundled rebates. 3M's bundling of its products via its rebate programs reinforced the exclusionary effect of those programs.

324 F.3d 141
(Cite as: 324 F.3d 141, *162)

3M's exclusionary conduct not only impeded LePage's ability to compete, but also it harmed competition itself, a *sine qua non* for a § 2 violation. LePage's presented powerful evidence that competition itself was harmed by 3M's actions. The District Court recognized this in its opinion, when it said:

> The jury could reasonably infer that 3M's planned elimination of the lower priced private label tape, as well as the lower priced Highland brand, would channel consumer selection to the higher priced Scotch brand and lead to higher profits for 3M. Indeed, Defendant concedes that "3M could later recoup the profits it has forsaken on Scotch tape and private label tape by selling more higher priced Scotch tape ... if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape."

*Le Page's*, 2000 WL 280350, at *7.

3M could effectuate such a plan because there was no ease of entry. *See Advo, Inc v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1200 (3d Cir.1995) (commenting that ease of entry would prevent monopolist's predatory pricing scheme from succeeding); *see also* Edward A. Snyder & Thomas E. Kauper, *Misuses of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich. L.Rev. 551, 564 (1991) (finding "barriers to entry" to be one of two necessary conditions for exclusionary conduct, the other being "market power").

**\*163** The District Court found that there was "substantial evidence at trial that significant entry barriers prevent competitors from entering the ... tape market in the United States. Thus, this case presents a situation in which a monopolist remains unchecked in the market." *Le Page's*, 2000 WL 280350, at *7. In the time period at issue here, there has never been a competitor that has genuinely challenged 3M's monopoly and it never lost a significant transparent tape account to a foreign competitor.

There was evidence from which the jury could have determined that 3M intended to force LePage's from the market, and then cease or severely curtail its own private-label and second-tier tape lines. For example, by 1996, 3M had begun to offer incentives to some customers to increase purchases of its higher priced Scotch-brand tapes over its own

second-tier brand. The Supreme Court has made clear that intent is relevant to proving monopolization, *Aspen Skiing*, 472 U.S. at 602, 105 S.Ct. 2847, and attempt to monopolize, *Lorain Journal*, 342 U.S. at 154-55, 72 S.Ct. 181.

3M's interest in raising prices is well-documented in the record. In internal memoranda introduced into evidence by LePage's, 3M executives boasted that the large retailers like Office Max and Staples had no choice but to adhere to 3M's demands. *See* Sealed App. at 2585 ("Either they take the [price] increase ... or we hold orders ...."); *see also* Sealed App. at 2571 (3M's directive when Staples objected to price increase was "orders will be held if pricing is not up to date on 1/1/98"). LePage's expert testified that the price of Scotch-brand tape increased since 1994, after 3M instituted its rebate program. App. at 3246-47. In its opinion, the District Court cited the deposition testimony of a 3M employee acknowledging that the payment of the rebates after the end of the year discouraged passing the rebate on to the ultimate customers. App. at 2092. The District Court thus observed, "the record amply reflects that 3M's rebate programs did not benefit the ultimate consumer." *Le Page's*, 2000 WL 280350, at *7.

As the foregoing review of the evidence makes clear, there was sufficient evidence for the jury to conclude the long-term effects of 3M's conduct were anticompetitive. We must therefore uphold its verdict on liability unless 3M has shown adequate business justification for its practices.

## VI.
## BUSINESS REASONS JUSTIFICATION

**[9][10]** It remains to consider whether defendant's actions were carried out for "valid business reasons," the only recognized justification for monopolizing. *See, e.g., Eastman Kodak*, 504 U.S. at 483, 112 S.Ct. 2072. However, a defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to § 2 monopolization. Paraphrasing one corporate executive's well publicized statement, whatever is good for 3M is not necessarily permissible under § 2 of the Sherman Act. As one court of appeals has explained:

> In general, a business justification is valid if it relates directly or indirectly to the enhancement of

324 F 3d 141
(Cite as: 324 F.3d 141, *163)

consumer welfare. Thus. pursuit of efficiency and quality control might be legitimate competitive reasons ..., while the desire to maintain a monopoly market share or thwart the entry of competitors would not

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1183 (1st Cir.1994) (citing *Eastman Kodak*, 504 U.S. at *164 483, 112 S.Ct. 2072; *Aspen Skiing*, 472 U.S. at 608-11, 105 S.Ct. 2847).

It can be assumed that a monopolist seeks to further its economic interests and does so when it engages in exclusionary practice. Thus, for example, exclusionary practice has been defined as "a method by which a firm ... trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it." Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976). Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws. The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated § 2 of the Sherman Act.

The defendant bears the burden of "persuad[ing] the jury that its conduct was justified by any normal business purpose." *Aspen Skiing*, 472 U.S. at 608, 105 S.Ct. 2847. Although 3M alludes to its customers' desire to have single invoices and single shipments in defense of its bundled rebates, 3M cites to no testimony or evidence in the 55 volume appendix that would support any actual economic efficiencies in having single invoices and/or single shipments. It is highly unlikely that 3M shipped transparent tape along with retail auto products or home improvement products to customers such as Staples or that, if it did, the savings stemming from the joint shipment approaches the millions of dollars 3M returned to customers in bundled rebates.

There is considerable evidence in the record that 3M entered the private-label market only to "kill it." *See, e.g.*, Sealed App. at 809 (statement by 3M executive in internal memorandum that "I don't want private label 3M products to be successful in the office supply business, its distribution or our

consumers/end users"). That is precisely what § 2 of the Sherman Act prohibits by covering conduct that maintains a monopoly. Maintaining a monopoly is not the type of valid business reason that will excuse exclusionary conduct. 3M's business justification defense was presented to the jury, and it rejected the claim. The jury's verdict reflects its view that 3M's exclusionary conduct, which made it difficult for LePage's to compete on the merits, had no legitimate business justification.

## VII.
### DAMAGES

As an alternative to its argument that it is entitled to JMOL on liability, 3M claims that it is entitled to a new trial due to the District Court's error in sustaining LePage's damages award. It gives two reasons. First, it contends that the damage theory proffered by Terry Musika, LePage's damages expert, was based on improper assumptions and should have been excluded. [FN16] Second, 3M argues that Musika's theory failed to disaggregate the damages *165 based on lawful versus unlawful conduct by 3M.

> FN16 3M does not challenge Musika's expert qualifications. Nonetheless, we note that he holds a master's degree in public finance, is a former partner at a major accounting firm, and at the time of trial was President and CEO of a business consulting firm. Furthermore, Musika frequently has served as a court-appointed bankruptcy trustee, as an expert for various government agencies, including the Department of Justice and Securities and Exchange Commission, and as an expert witness in complex cases, including five antitrust cases.

[11] We review the District Court's decision to admit or exclude expert testimony for abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Furthermore, we review *de novo* LePage's damages evidence to determine whether as a matter of law it can support the jury's verdict. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir.1995).

To determine the amount of profits LePage's lost between 1993 and 2000 due to 3M's antitrust violations, Musika constructed a "lost market share" model. Appellant's Br. at 72. Musika first calculated the total United States transparent tape

324 F.3d 141
(Cite as: 324 F.3d 141, *165)

sales during the damages period, using actual financial data from 1992 to 1997 and projecting total sales from 1998 to 2000. Next, he determined how those sales would be divided between branded and private-label parts of the market, projecting a 1% shift each year from branded to private-label tape sales. In arriving at 1%, Musika considered the actual growth in private-label tape sales, the actual growth rate of all private-label products (i.e. not just tape), the growth rate of large customers, and 3M's internal projections.

After determining the size of both segments of the market, Musika estimated LePage's share of the market, predicting that LePage's would have retained its 3.5% share of the branded-label segment and its 88% share of the private-label segment. He opined that LePage's share of the overall market for transparent tape would have increased from 14.44% in 1992 to 21.2% in 2000 but for 3M's unlawful conduct. Finally, Musika subtracted LePage's actual sales from his projected sales to determine LePage's lost sales due to 3M's unlawful conduct. He calculated LePage's projected profit margin by looking at LePage's actual profit margin for each year and adjusting it to show declining prices and LePage's consequential decreasing efficiency due to decreasing sales. Based on those adjustments, LePage's profit margin decreased every year during the damages period. Musika concluded that but for 3M's unlawful conduct, LePage's would have earned an extra $36 million dollars.

[12] Importantly, 3M does not challenge Musika's basic approach to calculating damages, conceding that "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." Appellant's Reply Br. at 37(citing *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 254-58 (3d Cir.1999); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 484-87 (3d Cir 1998) ).

Instead, 3M's motion for judgment as a matter of law attacked Musika's underlying assumptions, the primary assumption being that 3M did not want to succeed in the private-label segment as it did not want to harm its high-margin sales of Scotch brand. The District Court rejected 3M's objections to LePage's damages claims, stating that "the record ... demonstrates that Mr. Musika's assumptions were

grounded in the past performances of Scotch, Highland and Le Page's tapes, as well as 3M's own internal projections for future growth." *Le Page's.* 2000 WL 280350, at *8.

[13] The credibility of LePage's and 3M's experts was for the jury to determine. *Inter Med. Supplies. Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 462-63 (3d Cir.1999). Musika was extensively cross-examined and 3M presented testimony from its own damages expert who predicted more conservative losses to LePage's. In the end, the jury found Musika to be *166 credible. 3M's disappointment as to the jury's finding of credibility does not constitute an abuse of discretion by the District Court in allowing Musika's testimony.

[14] 3M next argues that Musika improperly failed to disaggregate damages, thereby providing the jury with no mechanism to discern damages arising from 3M's lawful conduct or other facts from damages arising from 3M's unlawful conduct. According to 3M, this resulted in impermissible guesswork and speculation on the part of the jury.

In *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir.1984), this court stated that "[i]n constructing a hypothetical world free of the defendants' exclusionary activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative." *Id.* Once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork. *Id.* at 813. The *Bonjorno* court noted that it would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act as the theory was not that any one act in itself was unlawful, but that all the acts taken together showed a § 2 violation. *Id.*

Similarly, 3M's actions, taken as a whole, were found to violate § 2, thus making the disaggregation that 3M speaks of to be unnecessary, if not impossible. In any event, we fail to see how the jury engaged in speculation or guesswork. The District Court clearly charged the jury to disregard losses not caused by 3M: "You may not calculate damages based only on speculation or guessing.... You may not award damages for injuries or losses

324 F.3d 141
(Cite as: 324 F.3d 141, *166)

caused by other factors." App. at 5689. We find no evidence that the jury failed reasonably to follow these instructions.

For the foregoing reasons, we will not disturb the jury's damages award to LePage's.

## VIII.
## JURY INSTRUCTIONS

[15][16] 3M also argues that it should be awarded a new trial because of allegedly improper jury instructions. In the absence of a misstatement of law, jury instructions are reviewed for abuse of discretion. *Bhaya v. Westinghouse Electric Corp.*, 922 F.2d 184, 191 (3d Cir. 1990). Because the District Court provided the jury with meticulous instructions, methodically explaining this area of the law in a manner understandable to lay persons, we conclude that it did not abuse its discretion.

The District Court, in instructing the jury on Count I, which encompassed LePage's claim of unlawful maintenance of monopoly power under § 2, explained:

Count I in this case is unlawful maintenance of monopoly power.
LePage's alleges that it was injured by 3M's unlawful monopolization in the United States market for invisible and transparent tape for home and office use.
To win on their claim of monopolization, LePage's must prove each of the following elements by a preponderance of the evidence.
First, that 3M had monopoly power in the relevant market.
Secondly, that 3M willfully maintained that power through predatory or exclusionary conduct. ...
And thirdly, that LePage's was injured in its business or property because *167 of 3M's restrictive or exclusionary conduct.
App. at 5663-64.

3M complains that the District Court failed to provide guidance that would instruct the jury how to distinguish between unlawful predation and lawful conduct. However, in explaining LePage's maintenance of monopoly claim, the District Court told the jury that in order to find for LePage's, it would have to find by a preponderance of the evidence that 3M willfully maintained its monopoly power through exclusionary or predatory conduct. App. at 5663. It then summarized those of 3M's

actions that LePage's contended were unlawfully exclusionary or predatory, including 3M's rebate program, market development fund, its efforts to control, reduce or eliminate private-label tape, and its efforts to raise the price consumers pay for Scotch tape. Thereafter, the judge provided the jury with the following factors to determine whether 3M's conduct was either exclusionary or predatory: "its effect on its competitors, such as LePage's, its impact on consumers, and whether it has impaired competition, in an unnecessarily restrictive way." App. at 5670.

Relevant portions of the charge were as follows:
The law directs itself not against conduct which is competitive, even severely so, but rather against conduct which tends to destroy competition itself. App. at 5655.
LePage's must prove that 3M willfully maintained monopoly power by predatory or exclusionary conduct, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance. So willful maintenance of monopoly power, that's an element LePage's has to prove.
App. at 5668.
To prove that 3M acted willfully, LePage's must prove either that 3M engaged in predatory or exclusionary acts or practices, with the conscious objective of furthering the dominance of 3M in the relevant market, or that this was the necessary direct consequence of 3M's conduct or business arrangement.
App. at 5668.
I'm now giving you what LePage's contentions are as to what 3M did or did not do, that constituted predatory or exclusionary conduct. Number one, 3M's rebate program, such as the EGF, executive growth fund, or the PGF, the partnership growth fund, and the brand mix program. Number two, 3M's market development fund called the MDS in some of the testimony, and other payments to customers conditioned on customers achieving certain sales goals or growth targets. Third, 3M's efforts to control, or reduce, or eliminate private label tape. Four, 3M's efforts to switch customers to 3M's more expensive branded tape, and Five, 3M's efforts to raise the price consumers pay for Scotch tape. LePage's claims that all of these things that I've just gone through was predatory or exclusionary conduct. Now, 3M denies in every respect that these actions were predatory or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *167)

exclusionary. 3M contends that these actions were, in fact, pro-competitive.
App. at 5668-69.
Exclusionary conduct and predatory conduct comprehends, at the most, behavior that not only, one, tends to impair the opportunities of its rivals, but also. number two. either does not further competition on the merits, or does so in an unnecessarily restrictive way  If 3M has been attempting to exclude rivals on *168 some basis other than efficiency, you may characterize the behavior as predatory.
App. at 5670.
However, you may not find that a competent, willfully maintained monopoly power, if that company has maintained that power, solely through the exercise of superior foresight or skill in industry, or because of economic or technological efficiencies, or because of size, or because of changes in customer and consumer preferences, or simply because the market is so limited that it is impossible to efficiently produce the product, except by a plan large enough to supply the whole demand.
App. at 5670-71.
Now with respect to Count 1, unlawfully maintaining monopoly power, mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.
App. at 5671.
In determining whether there has been an unlawful exercise of monopoly power, you must bear in mind that a company has not acted unlawfully simply because it has engaged in ordinary competitive behavior that would have been an effective means of competition if it were engaged in by a firm without monopoly power, or simply because it is a large company and a very efficient one.
App. at 5672.

The trial court further noted that if the jury found the evidence to be insufficient to prove any of the elements, it had to find for 3M and against LePage's  It was careful to note that intense business competition was not considered predatory or exclusionary, explaining:
The acts or practices that result in the maintenance of monopoly power must represent something other than the conduct of business that is part of the normal competitive process or even extraordinary commercial success. [3M] must represent conduct

that has made it very difficult or impossible for competitors to engage in fair competition.
App. at 5671

The District Court closely followed the ABA sample instructions when instructing the jury as to predatory and exclusionary conduct, including its instructions distinguishing between procompetitive and anticompetitive conduct.  See ABA, *Sample Jury Instructions in Civil Antitrust Cases* C-20 to C-21 (1999 Ed.).  Furthermore, the jury instructions were a modified version of those given in *Aspen Skiing*, which the Supreme Court did not find objectionable. 472 U.S. at 596-97, 105 S.Ct. 2847

3M contends that the District Court was obligated to take into account the decision in *Brooke Group* when crafting its jury instructions  As we have explained, *Brooke Group* involved claims of predatory pricing, a claim LePage's never alleged against 3M. It follows that the District Court need not have, indeed should not have, instructed the jury as to claims not at issue in the case

The jury was given the following questions on Count I:
(1) Do you find that LePage's has proven, by a preponderance of the evidence, that the relevant market is invisible and transparent tape for home and office use in the United States?
(2) Do you find that LePage's has proven, by a preponderance of the evidence, that 3M unlawfully maintained monopoly power as defined under the instructions for Count I?;  [and]
(2.1) Do you find that LePage's has proven, as a matter of fact and with a fair degree of certainty, that 3M's unlawful maintenance of monopoly power *169 injured LePage's business or property as defined in these instructions?
App. at 6523.  The jury answered "yes" to each of the three questions.  It awarded LePage's more than $22 million before trebling.

The District Court gave the jury a thorough, clear charge as to the § 2 claim  Based on its sound instructions, the jury decided that LePage's had met its evidentiary burden as to its § 2 claim  Nothing in the jury charge constitutes reversible error.

IX.
CROSS APPEAL
ATTEMPTED MONOPOLIZATION

324 F.3d 141
(Cite as: 324 F.3d 141, *169)

LePage's cross appeals from the District Court's order granting judgment as a matter of law to 3M on LePage's claim that 3M illegally attempted to maintain its monopoly. In overturning the jury's verdict for LePage's on this claim, the District Court stated that " 'an attempted maintenance of monopoly power' " is "inherently illogical." *Le Page's,* 2000 WL 280350, at *2.

LePage's argues that the courts and commentators have repeatedly found that defendants can be guilty of both monopolization and attempted monopolization claims arising out of the same conduct. *See, e.g., Am. Tobacco Co.,* 328 U.S. at 783, 66 S.Ct. 1125 (affirming judgment that defendants were guilty of monopolization and attempted monopolization); Earl Kintner, 2 *Federal Antitrust Law* § 13.1 n.5 (1980). It emphasizes that in *Lorain Journal,* the Supreme Court upheld a § 2 attempted monopolization judgment against the defendant newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." 342 U.S. at 154, 72 S.Ct. 181.

We need not consider the correctness of the District Court's ruling on the attempted monopolization claim because we uphold its decision on the monopolization claim. The jury returned the same amount of damages on both claims and LePage's concedes that under those circumstances discussion of the attempted monopolization is unnecessary.

## X.
## CONCLUSION

Section 2, the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists, is the equivalent in our economic sphere of the guarantees of free and unhampered elections in the political sphere. Just as democracy can thrive only in a free political system unhindered by outside forces, so also can market capitalism survive only if those with market power are kept in check. That is the goal of the antitrust laws.

The jury heard the evidence and the contentions of the parties, accepting some and rejecting others. There was ample evidence that 3M used its market power over transparent tape, backed by its considerable catalog of products, to entrench its monopoly to the detriment of LePage's, its only serious competitor, in violation of § 2 of the Sherman Act. We find no reversible error. Accordingly, we will affirm the judgment of the District Court.

GREENBERG, Circuit Judge, dissenting.

I respectfully dissent as I would reverse the district court's order denying the motion for judgment as a matter of law on the monopolization claim but affirm on LePage's's cross-appeal from the motion *170 granting 3M a judgment as a matter of law on the attempted maintenance of monopoly claim. While I recognize that the majority opinion describes the factual background of this case, I nevertheless also will set forth its background as I believe that a more specific exposition of the facts leads to a conclusion that LePage's's case should not have survived 3M's motion for a judgment as a matter of law.

As the majority indicates, 3M dominated the United States transparent tape market with a market share above 90% until the early 1990s. LePage's around 1980 decided to sell "second brand" and private label tape, *i.e.,* tape sold under the retailer's, rather than the manufacturer's name, an endeavor successful to the extent that LePage's captured 88% of private label tape sales in the United States by 1992. Moreover, growth of "second brand" and private label tape accounted for a shift of some tape sales from branded tape to private label tape so the size of the private label tape business expanded. In the circumstances, not surprisingly, during the early 1990s, 3M also entered the private label tape business.

As the majority notes, LePage's claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. In particular, it asserts that 3M devised programs that prevented LePage's and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high. LePage's barely was surviving at the time of trial and suffered large operating losses from

324 F.3d 141
**(Cite as: 324 F.3d 141, \*170)**

1996 through 1999.

This case centers on 3M's rebate programs that, beginning in 1993, involved offers by 3M of "package" or "bundled" discounts for various items ranging from home care and leisure products to audio/visual and stationery products. Customers could earn rebates by purchasing, in addition to transparent tape, a variety of products sold by 3M's stationery division, such as Post-It Notes and packaging products. There is no doubt but that these programs created incentives for retailers to purchase more 3M products and enabled them to have single invoices, single shipments and uniform pricing programs for various 3M products. 3M linked the size of the rebates to the number of product lines in which the customers met the targets, an aggregate number that determined the rebate percentage the customer would receive on all of its 3M purchases across all product lines. Therefore, if customers failed to meet growth targets in multiple categories, they did not receive any rebate, and if they failed to meet the target in one product line, 3M reduced their rebates substantially. These requirements are at the crux of the controversy here, as LePage's claims that customers could not meet these growth targets without eliminating it as a supplier of transparent tape.

In practice, as 3M's rebate program evolved, it offered three different types of rebates: Executive Growth Fund, Partnership Growth Fund and Brand Mix Rebates. 3M developed a "test program" called Executive Growth Fund ("EGF") for a small number of retailers, 11 in 1993 and 15 in 1994. Under EGF, 3M negotiated volume and growth targets for each customer's purchases from the six 3M consumer product divisions involved in the EGF program. A customer meeting the target in three or more divisions earned a volume rebate of between 0.2-1.25% of total sales.

\*171 Beginning in 1995, 3M undertook to end the EGF test program and institute a rebate program called Partnership Growth Fund ("PGF") for the same six 3M consumer products divisions. Under this program, 3M established uniform growth targets applicable to all participants. Customers who increased their purchases from at least two divisions by $1.00 and increased their total purchases by at least 12% over the previous year qualified for the rebate, which ranged from 0.5% to 2%, depending

on the number of divisions (between two to five divisions) in which the customer increased its purchases and the total volume of purchases.

In 1996 and 1997, 3M offered price incentives called Brand Mix Rebates to two tape customers, Office Depot and Staples, to increase purchases of Scotch brand tapes. 3M imposed a minimum purchase level for tape set at the level of Office Depot's and Staples's purchases the previous year with "growth" factored in. To obtain a higher rebate, these two customers could increase their percentage of Scotch purchases relative to certain lower-priced orders.

The evidence at trial focused on the parties' dealings with a limited number of customers and demonstrated that LePage's problems were attributed to a number of factors, not merely 3M's rebate programs. Thus, I describe this evidence at length.

### Wal-Mart
Before 1992, Wal-Mart bought private label tape only from LePage's but, in August 1992, decided to buy private label tape from 3M as well. In response, LePage's lowered its prices and increased its sales to Wal-Mart. In 1997, Wal-Mart stopped buying private label tape but offered LePage's's branded tape as its "second tier" offering. In 1998, however, Wal-Mart told LePage's that it was going to switch to a tape program from 3M. LePage's's president then visited Wal-Mart following which it changed its plans and retained LePage's as a supplier. Afterwards, Wal-Mart designed a test comparing LePage's's brand against a 3M Scotch utility tape to determine who would win Wal-Mart's "second tier" tape business. LePage's added more inches (approximately 20% more) to its rolls of tape and won the test. 3M continued, however, to sell Scotch brand tapes to Wal-Mart, and LePage's saw its sales to Wal-Mart decline to approximately $2,000,000 annually by the time of trial. LePage's claims that Wal-Mart cut back on its tape purchases to qualify for 3M's bundled rebate of $1,468,835 in 1995.

### Kmart
Kmart accounted for 10% of LePage's's annual tape sales when LePage's lost its business to 3M in 1993. Kmart asked its suppliers, including 3M, to provide a single bid on its entire private label tape business

324 F.3d 141
(Cite as: 324 F.3d 141, *171)

for the following year. LePage's's president believed, however, that Kmart was "too lazy to make a change." and that it would "never put their eggs in one basket" by giving all its business to 3M. LePage's offered the same price it had offered the previous year but also offered a volume rebate. 3M offered a lower price and won the bid. Kmart asked for rebates and "market development" funds as part of the private label tape bid process. 3M offered $200,000 for promotional activities and a $300,000 volume rebate if Kmart purchased $10,000,000 of 3M's Stationery Division products.

LePage's claims that 3M offered Kmart $1,000,000 to eliminate LePage's and Tesa as suppliers and to make 3M its sole tape supplier. LePage's points to a 3M document outlining 3M's goal for Kmart to *172 exceed $15,000,000 in 3M purchases with the reward being that Kmart would receive $75,000 in each of the first two quarters and $100,000 in the last two quarters for promotional activities and would receive $650,000 as a volume rebate if the sales exceeded $15,000,000. If the sales were less, 3M would decrease the rebate accordingly, e.g., a $400,000 rebate for $13,000,000 of sales. LePage's claims that, as a practical matter, Kmart had to eliminate LePage's and Tesa to reach the growth 3M required in order to qualify for the rebate. LePage's asserts that, despite its efforts to regain the private label business from Kmart, one Kmart buyer told it that he could not talk to LePage's about tape products for the next three years.

### Staples

Staples had been a LePage's customer for several years. From 1990 to 1993, LePage's increased its sales to Staples by 440%, growing from $357,000 to $1,954,000. In 1994. Staples considered reducing suppliers and asked LePage's and 3M for their best offers in 1994. LePage's assumed that if 3M did make a good offer, LePage's would have a chance to make a better proposal. LePage's did not make its lowest offer, and 3M won the account. When LePage's went back to Staples with a new price, it was told that the decision had been made. LePage's claims that 3M offered an extra 1% bonus rebate on Scotch products if Staples eliminated LePage's as a supplier (a "growth" rebate that only could be met by converting all of Staple's private label business to 3M). 3M paid Staples an advertising allowance in four payments totalling $1,000,000 in 1995 and gave it $500,000 in free

merchandise delivered during Staples's fiscal year 1994. 3M refers to a "$1.5 million settlement" with Staples and refers to multiple payments for different purposes. LePage's, however, implies that these payments bore some connection to Staples's award of its second-tier tape business to 3M.

### Office Max

In 1998, after a dispute between Office Max and LePage's, Office Max accepted 3M's offer that matched but did not beat LePage's's price. LePage's objected to 3M's matching whatever price LePage's offered, and also objected to 3M's "clout" payment. Office Max required its suppliers to make payments to help advertise the Office Max name, and LePage's had paid this "clout" payment in the years previous to 1998 when it refused to pay it because of its dispute with Office Max. Nevertheless, the buyer for Office Max testified that its decision to give its business to 3M was not related to its pricing and rebate program but rather to the consistency of its service.

### Walgreens

Walgreens had purchased private label tape from LePage's from 1992 until 1998, when it decided to import tape from Taiwan. LePage's's chief executive officer acknowledged that LePage's did not lose the account due to 3M's activities.

### American Stores

Until 1995, LePage's's sales of private label tape to American Stores exceeded $1,000,000 annually. According to LePage's, a month after American Stores decided that it would try to maximize 3M's PGF rebate, it shifted its tape business to 3M. In 1995, American Stores decided to stop buying LePage's tape, principally because of quality concerns. In a letter to James Kowieski. Senior Vice President of Sales at LePage's, Kevin Winsauer, the manager of the private label department at American, wrote: "After much deliberation comparing the pros and cons of LePage's *173 program and 3M's program, I have decided to award the business to 3M. 3M's proposal was very competitive and I am sure LePage's would meet their costs to retain the business. *However, the decision to move to 3M is primarily based on Quality."* SJA 2050-51 (emphasis in original) When American Stores decided to purchase from 3M, it was not participating in any rebate programs, and Winsauer testified that he was not aware that

324 F.3d 141
(Cite as: 324 F.3d 141, *173)

there were rebate programs  He also testified that even without the volume incentive programs, 3M's price was still slightly lower than LePage's's

*Dollar General, CVS, and Sam's Club*
LePage's lost Dollar General's private label business to a foreign supplier but later won the business back. According to LePage's's president, Dollar General used the bid for imported tape to leverage a price reduction from LePage's  3M bid on the CVS account, but LePage's retained CVS as a customer by lowering its prices and increasing its rebate.  At Sam's Club, LePage's tape had been selling well when its buyers were directed by senior management to "maximize" all purchases from 3M to maximize the EGF/PGF rebate. Subsequently, Sam's Club stopped purchasing from LePage's

*Other distributors and buying groups*
LePage's claimed that 3M's pricing practices prevented or hindered it from selling private label tape to certain companies: (1) Costco  Costco, however, never has sold private label tape.  (2) Office Depot. Office Depot also never has sold private label tape.  LePage's tried to convince Office Depot to buy private label tape in 1991 or 1992 (before 3M implemented the rebate programs), but Office Depot decided to continue purchasing 3M brand tape.  (3) Pamida and Venture Stores. LePage's claimed that 3M offered these stores discounts conditioned on exclusivity, thereby preventing LePage's from selling private label tape to them  LePage's lost Venture Stores' business in 1989, five years before 3M provided the discount at issue.  (4) Office Buying Groups  3M offered an optional 0.3% price discount to certain buying groups if they exclusively promoted certain 3M products in their catalogs  If the buying group carried a lower value brand alternative to 3M's main brand (its second line), then the group would receive a lower annual volume rebate.  LePage's viewed these kind of contract provisions as a "penalty" that coerced buying group members to purchase tape only from 3M. For example. if a buying group promoted the products of a competitor, it lost rebates for purchases in three categories of products. 3M argues that LePage's could have offered its own discount or rebate but instead refused in one instance to pay the standard promotional fee charged suppliers for inclusion in a catalog.

Notwithstanding the evidence which demonstrates

that LePage's lost business for reasons that could not possibly be attributable to any unlawful conduct by 3M, it argues that 3M willfully maintained its monopoly through a "monopoly broth" of anticompetitive and predatory conduct.  I would reject LePage's's argument as I agree with 3M that LePage's simply did not establish that 3M's conduct was illegal, as LePage's did not demonstrate that 3M's pricing was below cost (a point that is not in dispute) and, in the absence of such proof, the record does not supply any other basis on which we can uphold the judgment

There are two elements of a monopolization claim under section 2 of the Sherman Act:  "(1) the possession of monopoly power in the relevant market and (2) the *174 willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563. 570-71, 86 S Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966)  Willful maintenance involves using anticompetitive conduct to "foreclose competition, to gain a competitive advantage, or to destroy a competitor."  *Eastman Kodak Co. v. Image Technical Servs.*  504 U.S. 451, 482-83, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) (internal quotation marks omitted). LePage's contends that 3M's bundled rebates were anticompetitive and predatory  It also argues that 3M's other practices, such as exclusionary contracts and the timing of its rebates, were also anticompetitive and predatory  I discuss these claims in the order I have stated them

LePage's primarily complains of 3M's use of bundled rebates. While, as the majority recognizes. we have held that rebates on volume purchases are lawful, *see Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1203 (3d Cir. 1995), LePage's seeks to avoid that principle by pointing out that 3M offered higher rebates if customers met their target growth rate in different product categories, in effect linking the sale of private label tape with the sale of other products, such as Scotch tape. which customers had to buy from 3M. Thus. LePage's explains:
3M understood that, as a practical matter, every retailer in the country had to carry Scotch-brand tape. .. It therefore decided to structure its rebates into bundles that linked that product with the product segment in which it did face competition

324 F.3d 141
(Cite as: 324 F.3d 141, *174)

from LePage's (second-line tape).... To increase the leverage on the targeted segment, 3M further linked rebates on transparent tape with those for many other products.... The rival would have to 'compensate' the customer for the amount of rebate it would lose not only on the large volume of Scotch-brand tape it had to buy, but also for rebates on many other products purchased from 3M.
Br. of Appellee at 40.

In making its argument LePage's relies in part on *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.1978), which, as the majority notes, does not bind this en banc court but nevertheless can have precedential value. In *SmithKline*, Eli Lilly & Co. had two products, Keflin and Keflex, on which it faced no competition, and one product, Kefzol, on which it faced competition from SmithKline's product, Ancef. *See id.* at 1061. Lilly offered a higher rebate of 3% to companies that purchased specified quantities of any three (which, practically speaking, meant combined purchases of Kefzol, Keflin and Keflex) of Lilly's cephalosporin products. *See id.* "Although hospitals were free to purchase SmithKline's Ancef with their Keflin and Keflex orders with Lilly, thus avoiding the penalties of a tie-in sale, [FN1] the practical effect of that decision would be to deny the Ancef purchaser the 3% bonus rebate on all its cephalosporin products." *Id.* at 1061-62 (internal footnote added). Because of Lilly's volume advantage, to offer a rebate of the same net dollar amount as Lilly's, SmithKline would have had to offer *175 companies rebates ranging from 16% for average size hospitals to 35% for larger volume hospitals for their purchase of Ancef. *See id.* at 1062.

FN1. 3M also avoids the penalties of a tie-in sale, because its customers were free to purchase its Scotch tape by itself. To prove an illegal tie-in, a plaintiff must establish that the agreement to sell one product was conditioned on the purchase of a different or tied product; the seller "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)

We concluded that Lilly willfully acquired and maintained monopoly power by linking products on

which it faced no competition (Keflin and Keflex) with a competitive product, resulting in the sale of all three products on a non-competitive basis in what otherwise would have been a competitive market between Ancef and Kefzol. *See id.* at 1065. Moreover, this arrangement would force SmithKline to pay rebates on one product equal to rebates paid by Lilly based on sales volume of three products. *See id.* Expert testimony and the evidence on pricing showed that in the circumstances SmithKline's prospects for continuing in the Ancef market were poor.

LePage's argues that it does not have to show that 3M's package discounts could prevent an equally efficient firm from matching or beating 3M's package discounts. In its brief, LePage's contends that its expert economist explained that 3M's programs and cash payments have the same anticompetitive impact regardless of the cost structure of the rival suppliers or their efficiency relative to that of 3M. *See* Br. of Appellee at 43. LePage's alleges that the relative efficiency or cost structure of the competitor simply affects how long it would take 3M to foreclose the rival from obtaining the volume of business necessary to survive. *See id.* "Competition is harmed just the same by the loss of the only existing competitive constraints on 3M in a market with high entry barriers." *Id.* The district court stated that LePage's introduced substantial evidence that the anticompetitive effects of 3M's rebate program caused its losses. *See LePage's Inc. v. 3M*, No. Civ. A. 97-3983, 2000 WL 280350, at *7-*8 (E.D.Pa. Mar.14, 2000). The majority finds that "3M's conduct was at least as anticompetitive as the conduct which [we] held violated § 2 in SmithKline." Maj. Op. at 157.

I disagree with the majority's use of *SmithKline*. SmithKline *showed* that it could not compete by explaining how much it would have had to lower prices for both small and big customers to do so. SmithKline ascertained the rebates that Lilly was giving to customers on all three products and calculated how much it would have had to lower the price of its product if the rebates were all attributed to the one competitive product. In contrast, LePage's did not even attempt to show that it could not compete by calculating the discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates, and thus

324 F 3d 141
(Cite as: 324 F.3d 141, *175)

its brief does not point to evidence along such lines.

While I recognize that it is obvious from the size of 3M's rebates as compared to LePage's's sales that LePage's would have had to make substantial reductions in prices to match the rebates 3M paid to particular customers, LePage's did not show the amount by which it lowered its prices in actual monetary figures or by percentage to compete with 3M and how its profitability thus was decreased. Rather, LePage's merely maintains, through the use of an expert, that it would have had to cut its prices drastically to compete and thus would have gone out of business. Furthermore, it is critically important to recognize that LePage's had 67% of the private label business at the time of the trial. Thus, notwithstanding 3M's rebates, LePage's was able to retain most of the private label business. In the circumstances, it is ironical that LePage's complains of 3M's use of monopoly power as the undisputed fact is that LePage's, not 3M, was the dominant supplier of private label tape both before and after 3M initiated *176 its rebate programs. Indeed, the record suggests that inasmuch as LePage's could not make a profit with a 67% share of the private label sales, it must have needed to be essentially the exclusive supplier of such tape for its business to be profitable as it in fact was when it had an 88% share of the private label tape sales business.

Although I am not evaluating the expert's method of calculating damages as I would not reach the damages issue, I emphasize that simply pointing to an expert to support the contention that the company would have gone out of business, without providing even the most basic pricing information, is insufficient. "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n. 19, 106 S.Ct. 1348, 1360 n. 19, 89 L.Ed.2d 538 (1986); *Advo*, 51 F.3d at 1198-99; *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 69 F.Supp.2d 571, 579 (S.D.N.Y.1999) ("[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case."), *aff'd*, 257 F.3d 256 (2d Cir.2001). Without such pricing information, it is difficult even to begin to estimate how much of

the market share LePage's lost was due to 3M's bundled rebates. In fact, the evidence that I described above conclusively demonstrates that LePage's lost private sale tape business for reasons not related to 3M's rebates. Furthermore, some experts have questioned the validity of attributing all the rebates to the one competitive product in situations such as these. [FN2] I do not need, however, to decide the validity of that method of calculation, as LePage's does not even attempt to meet that less strict test by calculating how much it would have had to lower its prices to match the rebates, even if they all were aggregated and attributed to private label tape. [FN3]

FN2 One court has mentioned a hypothetical situation where a low-cost shampoo maker could not match a competitor's package discount for shampoo and conditioner even though both products were priced above their respective costs. *See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F.Supp. 455, 467 (S.D.N.Y.1996). In that case, the court suggested that the bundled price could be unlawful under section 2 even though neither item in the package was priced below cost. If the entire package discount were attributed to the one product where the two parties compete, the low-cost shampoo maker could not lower its prices on the product enough to match the total discount without selling below its cost. *See id.* at 467-69. Commentators, however, suggests that this analysis is incorrect. *See* III PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 749, at 467 n.6 (rev. ed.1996).

One aspect of this method of calculation worth noting is that the volume of the products ordered has a drastic effect on how much the competitor would have to lower its prices to compete. For example, suppose in a similar rebate program, a company was the only producer of products A and B but faced competition in C. If a customer orders 100 units each of A, B, and C at a price of $1.00 each, a 3% rebate would be $9.00 (3% of the total of $300.00). If the rebate on all three products were attributed to product C, then the competitor would have to lower its price to $0.91 in order to compete with it. The results would be starkly different, however, if a customer orders 100 units of A and B but only needs 10 units of C. Then the 3% rebate on the total purchase amount of $210.00 would be $6.30. If the

324 F 3d 141
(Cite as: 324 F.3d 141, *176)

rebate was attributed solely to product C, then a
competitor would have to lower its price to $.37 on
product C in order to match the company's price

FN3. The closest LePage's comes to supplying such
information in its brief is its statement that "LePage's
made repeated efforts to save its tape business with
Staples, reducing its prices to 1990 levels, and then
reducing them again, to keep its plant open and
people working." Br. of Appellee at 11. This is not
close enough. Of course, Lepage's's prices overall
were low enough for it to have 67% of the private
label business

*177 LePage's also has not satisfied the stricter
tests devised by other courts considering bundled
rebates in situations such as that here. In a case
brought by a manufacturer of products used in
screening blood supply for viruses, *Ortho
Diagnostic Systems, Inc. v. Abbott Laboratories,
Inc.*, 920 F.Supp. 455 (S D.N.Y.1996), the district
court held, *inter alia,* that the defendant's discount
pricing of products in packages did not violate the
Sherman Act. The defendant, Abbott Laboratories,
manufactured all five of the commonly used tests to
screen the blood supply for viruses. Ortho claimed
that Abbott violated sections 1 and 2 of the Sherman
Act by contracting with the Council of Community
Blood Centers to give those members advantageous
pricing if they purchased a package of four or five
tests from Abbott, thereby using its monopoly
position in some of the tests to foreclose or impair
competition by Ortho in the sale of those tests
available from both companies. *See id.* at 458. The
district court stated that to prevail in "a case in which a
monopolization claim in "a case in which a
monopolist (1) faces competition on only part of a
complementary group of products, (2) offers the
products both as a package and individually, and (3)
effectively forces its competitors to absorb the
differential between the bundled and unbundled
prices of the product in which the monopolist has
market power," the plaintiff must allege and prove
"either that (a) the monopolist has priced below its
average variable cost or (b) the plaintiff is at least as
efficient a producer of the competitive product as the
defendant, but that the defendant's pricing makes it
unprofitable for the plaintiff to continue to
produce." *Id.* at 469

Holding that the discount package pricing did not
violate the Sherman Act, the *Ortho* court explained

that any other rule would involve too substantial a
risk that the antitrust laws would be used to protect
an inefficient competitor against price competition
that would benefit consumers. *See id.* at 469-70
("The antitrust laws were not intended, and may not
be used, to require businesses to price their products
at unreasonably high prices (which penalize the
consumer) so that less efficient competitors can stay
in business.") (internal quotation marks omitted).

In this case, as the majority acknowledges,
LePage's now does not contend that 3M priced its
products below average variable cost, an allegation
which, if made, in any event would be difficult to
prove. *See Adv̇o,* 51 F.3d at 1198- 99. Moreover,
LePage's's economist conceded that LePage's is not
as efficient a tape producer as 3M. Thus, in this case
section 2 of the Sherman Act is being used to protect
an inefficient producer from a competitor not using
predatory pricing but rather selling above cost.
While the majority contends that *Brooke Group,* a
case on which 3M heavily relies, is distinguishable
as none of the defendants there had a monopoly in
the market, the fact remains that the Court in
describing section 2 of the Sherman Act said flat out
in *Brooke Group* that "a plaintiff seeking to establish
competitive injury from a rival's low prices must
prove that the prices complained of are below an
appropriate measure of its rival's costs." *Brooke
Group,* 509 U.S. at 222, 113 S Ct. at 2587.
LePage's simply did not do this

I realize that the majority indicates that "LePage's
unlike the plaintiff in *Brooke Group,* does not make
a predatory pricing *178 claim." Maj. Op at 151.
But that circumstance weakens rather than
strengthens LePage's's position as it merely
confirms the lawfulness of 3M's conduct.
Furthermore, the circumstance that 3M is not
dealing in an oligopolistic market should not matter
as the harm that LePage's claims to have suffered
from the bundled rebates would be no less if
inflicted by multiple competitors. Moreover,
monopolist or not. 3M, even in the absence of
LePage's and Tesa from the private label business,
would not be the only supplier of private label tape
for there are foreign suppliers as is demonstrated
plainly by the evidence that both Walgreens and
Dollar General dealt with such suppliers.

Contrary to the majority's view, this is not a
situation in which there is no business justification

© 2006 Thomson/West. No Claim to Orig. U.S Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *178)

for 3M's actions. This point is important inasmuch as it is difficult to distinguish legitimate competition from exclusionary conduct that harms competition, *see United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C.Cir.), *cert. denied.* 534 U.S. 952, 122 S.Ct. 350, 151 L.Ed.2d 264 (2001), and some cases suggest that when a company acts against its economic interests and there is no valid business justification for its actions, then it is a good sign that its acts were intended to eliminate competition.

For example, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L.Ed.2d 467 (1985), discussed by the majority, sets forth the lack of a valid business reason as a basis for finding liability. In that case, the Court affirmed a jury verdict for the plaintiff under section 2 of the Sherman Act where the defendant monopolist had stopped cooperating with the plaintiff to offer a multi-venue skiing package for Aspen skiers. The Court held that because the defendant had acted contrary to its economic interests, by losing business and customers, there was no other rationale for its conduct except that it wished to eliminate the plaintiff as a competitor. *See id.* at 608, 105 S.Ct. at 2860; *see also Eastman Kodak,* 504 U.S. at 483, 112 S.Ct. at 2091 (exclusionary conduct properly is condemned if valid business reasons do not justify conduct that tends to impair the opportunities of a monopolist's rivals or if a valid asserted purpose would be served fully by less restrictive means).

On the other hand, in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1043, 1063 (8th Cir.), *cert. denied,* 531 U.S. 979, 121 S.Ct. 428, 148 L.Ed.2d 436 (2000), where boat builders brought an antitrust action against a stern drive engine manufacturer, the court held, *inter alia,* that the evidence was insufficient to find that the engine manufacturer's discount programs restrained trade and monopolized the market. Brunswick offered a higher percentage discount when boat builders bought a higher percentage of their engines from it, but there was no allegation that its pricing was below cost. *See id.* at 1044, 1062. In *Concord Boat* the district court cited the district court opinion in this case when 3M filed its motion to dismiss. *See LePage's Inc. v. 3M,* No. Civ. A. 97-3983, 1997 WL 734005 (E.D.Pa. Nov 14, 1997). The *Concord Boat* district court agreed with the plaintiff that it was not the price (above cost or not) that was

relevant but the "strings" attached to the price and that the district court here was correct to distinguish *Brooke Group* since there were no "strings" attached (bundled rebates) in *Brooke Group.* In *Concord Boat,* the "strings" attached were the exclusivity provisions. *See Concord Boat Corp. v. Brunswick Corp.,* 21 F.Supp.2d 923, 930 (E.D.Ark.1998)

The Court of Appeals for the Eighth Circuit, however, disagreed with the district *179 court in *Concord Boat.* The court of appeals opinion reflected an application of *Brooke Group's* strong stance favoring vigorous price competition and expressing skepticism of the ability of a court to separate anticompetitive from procompetitive actions when it comes to above-cost strategic pricing. *See Concord Boat,* 207 F.3d at 1061. More importantly, the court perceived that *Brooke Group* should be considered even with claims based on pricing with strings. *See id.* "If a firm has discounted prices to a level that remains above the firm's average variable cost, the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive." *Id.* (citing *Morgan v. Ponder,* 892 F.2d 1355, 1360 (8th Cir.1989)) (internal quotation marks omitted). The court stated that a section 2 defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits. *See id.* at 1062. The court distinguished cases such as *SmithKline* and *Ortho* where products were bundled since they involved two markets. *See id.* Of course, here we are dealing with a single market.

Unlike the situation of the defendant in *Aspen,* 3M's pricing structure and bundled rebates were not contrary to its economic interests, as they likely increased its sales. In fact, that is exactly what LePage's is complaining about. Furthermore, other than the obvious reasons such as increasing bulk sales, market share and customer loyalty, there are several other potential "procompetitive" or valid business reasons for 3M's pricing structure and bundled rebates: efficiency in having single invoices, single shipments and uniform pricing programs for various products. Moreover, the record demonstrates that, with the biggest customers, 3M's rebates were not eliminating the competitive process, as LePage's still was able to retain some customers through negotiation, and even

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *179)

though it lost other customers, the losses were attributable to their switching to foreign suppliers or changing suppliers because of quality or service without regard to the rebates. Furthermore, overall LePage's was quite successful in holding its share of the private label sales as it had 67% of the business at the time of the trial.

In sum, I conclude that as a matter of law 3M did not violate section 2 of the Sherman Act by reason of its bundled rebates even though its practices harmed its competitors.    The majority decision which upholds the contrary verdict risks curtailing price competition and a method of pricing beneficial to customers because the bundled rebates effectively lowered their costs    I regard this result as a significant mistake which cannot be justified by a fear that somehow 3M will raise prices unreasonably later. In this regard I reiterate that in addition to LePage's there are foreign suppliers of transparent tape so that with or without LePage's there will be constraints on 3M's pricing.

LePage's also claims that, through a variety of other allegedly anticompetitive actions, 3M prevented LePage's from competing.  LePage's asserts that 3M foreclosed competition by directly purchasing sole-supplier status.  There was some dispute as to whether the contracts were conditioned on 3M being the sole supplier, and 3M claims that there are only two customers for which there is any evidence of a sole supplier agreement. I recognize, however, that although most of 3M's contracts with customers were not conditioned on exclusivity, practically speaking some customers dropped LePage's as a supplier to maximize the rebates that 3M was offering. Moreover, *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 458, 42 S.Ct. 363, *180 365, 66 L.Ed. 708 (1922), explained that a contract that does not contain specific agreements not to use the products of a competitor still will come within the Clayton Act as to exclusivity if its practical effect is to prevent such use.

Even assuming, however, that 3M did have exclusive contracts with some of the customers, LePage's has not demonstrated that 3M acted illegally, as one-year exclusive contracts have been held to be reasonable and not unduly restrictive. *See Fed. Trade Comm'n v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 395-96, 73 S.Ct. 361,

363-64, 97 L.Ed. 426 (1953) (holding that evidence sustained the Commission's finding that the distributor's exclusive screening agreements with theater operators unreasonably restrained competition, but stating that the Commission had found that the term of one-year exclusive contracts had become a standard practice and would not be an undue restraint on competition). *See also Advo*, 51 F.3d at 1204. In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627-28, 5 L.Ed.2d 580 (1961), the Court stated that even if in practical application a contract is found to be an exclusive-dealing arrangement, it does not violate section 3 of the Clayton Act unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.  Using that standard, although LePage's's market share in private label tape has fallen from 88% to 67%, it has not been established that, as a result of the allegedly exclusive contracts, competition was foreclosed in a substantial share of the line of commerce affected. Indeed, in view of LePage's's two-thirds share of the private label business, its attack on exclusivity agreements is attenuated.

There appear to be very few cases supporting liability based on section 2 of the Sherman Act for exclusive dealing, as some cases suggest that if, as is the case here under the jury's findings, there is no liability under section 3 of the Clayton Act, it is more difficult to find liability under the Sherman Act since its scope is more restricted. [FN4] In any event, the record shows only two allegedly exclusive contracts (with the Venture and Pamida stores), and "[b]ecause an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function "  *Microsoft*, 253 F.3d at 69 The *Microsoft* court explained that although exclusive contracts are commonplace, particularly in the field of distribution, in certain circumstances the use of exclusive contracts may give rise to a section 2 violation even though the contracts foreclose less than the roughly 40 to 50% share usually required to establish a section 1 violation. *See id.* at 69-70. In this case, it cannot be concluded that the two contracts with Venture and Pamida were responsible for the total drop in LePage's's market share. Furthermore, even if all 3M's contracts were considered exclusive, LePage's's total drop in

324 F.3d 141
**(Cite as: 324 F.3d 141, \*180)**

market share was only 21%, and some of this loss was shown in the record to be due to quality or service consistency concerns, as well as foreign competition, rather than to 3M's tactics. Therefore, there was not enough foreclosure of the market to have an anticompetitive effect.

> FN4. It is more common for charges of exclusive dealing to be brought under section 1 of the Sherman Act or the Clayton Act, which the jury found that 3M did not violate. *See, e.g., Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 110 (3d Cir 1992).

LePage's also claims that by calculating the rebates only once a year, 3M made it \*181 more difficult for a purchaser to pass on the savings to its customers, thereby making it harder for companies to switch suppliers and keeping retail prices and margins high. As I discussed above, one-year contracts may be considered standard, and even if they make it more unlikely that rebates are passed on in the form of lower retail prices, the discounts could be applied towards lowering retail prices the following year or towards other costs by companies that are factored into the retail prices (such as advertising). In the circumstances, I am satisfied that this conduct does not qualify as predatory or anticompetitive so as to establish liability under section 2 of the Sherman Act.

LePage's also alleges that 3M entered the retail private label tape portion of the market to destroy the market and thereby increase its sales of branded tape, but the case law does not support liability under section 2 for this type of action. In *Brooke Group,* 509 U.S. at 215, 113 S.Ct. at 2584, Liggett/Brooke Group alleged that Brown & Williamson Tobacco Corporation ("B & W") sold generic cigarettes in order to decrease losses of sales in its branded cigarettes. B & W sold generic cigarettes at the same list price as Liggett but also offered large volume rebates to certain wholesalers so they would buy their generic cigarettes from B & W. *See id* at 216, 113 S.Ct. at 2584. B & W wanted to take a larger part of the generic market from Liggett and drive Liggett to raise prices on generic cigarettes, which B & W would match, thereby encouraging consumers to switch back to branded cigarettes. *See id.* at 216-17, 113 S.Ct. at 2584. The Court held that because B & W had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition that antitrust laws prohibit,

it did not violate the Robinson-Patman Act or the Sherman Act. *See id.* at 243, 113 S.Ct. at 2598. In this case, however, 3M did not use below average variable cost pricing (LePage's does not charge predatory pricing) and therefore 3M did not have predatory costs to recoup.

I recognize that LePage's attempts to distinguish *Brooke Group* on the ground that "3M used other techniques [*i.e.,* techniques other than predatory pricing] to extinguish the private-label category subjecting itself to different legal standards." Br. of Appellee at 55, but I nevertheless cannot accept LePage's's argument on this point. While LePage's does not contend that 3M engaged in predatory pricing, it does contend that the goal of 3M's other conduct was "to extinguish the private-label category, subjecting itself to different legal standards" than those applicable in *Brooke Group. See id.* Moreover, though 3M denies that it was attempting to eliminate the private label category of transparent tape, the record supports a finding that it had that intent. I am satisfied, however, that its efforts to eliminate the private label aspect of the transparent tape market are not unlawful as, "examined without reference to its effects on competitors," it is evident that in view of 3M's dominance in brand tape, that it was rational for it to want the sale of tape to be concentrated in that category of the market. *See Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 523 (5th Cir.1999). Thus, we should not uphold the verdict on that basis.

Accordingly, I conclude that 3M's actions in the record, including the bundled rebates and other elements of the "monopoly broth," were not anticompetitive and predatory as to violate section 2 of the Sherman Act. [FN5] Thus, I would reverse the \*182 judgment of the district court and remand the case for entry of judgment in favor of 3M. Judge Scirica and Judge Alito join in this opinion.

> FN5. While I do not discuss the point I agree with the district court's disposition of the attempted maintenance of monopoly claim.

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
(Cite as: 324 F.3d 141, *182)

. 2002 WL 32157026 (Appellate Brief) Brief for
Appellees/Cross-Appellants (Jan. 14, 2002)

. 2001 WL 34774659 (Appellate Brief) Reply Brief
for  Appelledes  Cross-Appellants  (Apr.  10,
2001)Original Image of this Document (PDF)

. 2001 WL 34774660 (Appellate Brief) Brief for
Appellees Cross-Appellants (Apr. 02, 2001)Original
Image of this Document with Appendix (PDF)

. 2001 WL 34136386 (Appellate Brief) Brief of
Appellant/Cross-Appellee (Mar. 30. 2001)

. 2001 WL 34774661 (Appellate Brief) Brief of
Appellant/Cross-Appellee (Mar. 30, 2001)Original
Image of this Document with Appendix (PDF)

. 00-1473 (Docket) (May. 10, 2000)

. 00-1368 (Docket) (Apr. 28, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2932 (Mem)
542 U.S. 953, 124 S.Ct. 2932 (Mem), 159 L.Ed.2d 835, 72 USLW 3777, 72 USLW 3779
(Cite as: 542 U.S. 953, 124 S.Ct. 2932)

H

Briefs and Other Related Documents

Supreme Court of the United States
3M COMPANY, fka Minnesota Mining and
Manufacturing Company, petitioner,
v.
LePAGE'S INCORPORATED, et al
No 02-1865.

June 30, 2004.

Case below, 324 F.3d 141.

Petition for writ of certiorari to the United States
Court of Appeals for the Third Circuit denied.

542 U.S. 953, 124 S.Ct. 2932 (Mem), 159
L.Ed 2d 835, 72 USLW 3777, 72 USLW 3779

Briefs and Other Related Documents (Back to top)

. 2004 WL. 1283785 (Appellate Petition, Motion
and Filing) Supplemental Brief for Petitioner (Jun.
07, 2004)

. 2004 WL. 1205191 (Appellate Petition, Motion
and Filing) Brief for the United States as Amicus
Curiae (May. 28, 2004)

. 2003 WL. 22428383 (Appellate Petition, Motion
and Filing) Reply Brief for Petitioner (Aug. 08,
2003)Original Image of this Document (PDF)

. 2003 WL. 22428376 (Appellate Petition, Motion
and Filing) Brief for the Respondents in Opposition
(Jul. 28, 2003)Original Image of this Document
(PDF)

. 2003 WL. 22428377 (Appellate Petition, Motion
and Filing) Brief for the Boeing Company;
Brunswick Corp.; Caterpillar Inc.; Honeywell
International Inc.; Northwest Airlines, Inc.; Staples,
Inc.; and Xerox Corp. as Amici Curiae in Support
of Petitioner (Jul. 28, 2003)Original Image of this
Document (PDF)

. 2003 WL. 22428378 (Appellate Petition, Motion
and Filing) Brief for Amici Curiae Morgan Stanley,
the Procter & Gamble Company, and the Coca-Cola
Company in Support of Petition for Certiorari (Jul.
28, 2003)Original Image of this Document (PDF)

. 2003 WL. 22428379 (Appellate Petition, Motion
and Filing) Brief of Washington Legal Foundation
and National Association of Manufacturers as Amici
Curiae in Support of Petitioner (Jul. 28,
2003)Original Image of this Document (PDF)

. 2003 WL. 22428381 (Appellate Petition, Motion
and Filing) Brief for Amici Curiae Bellsouth
Corporation, Eastman Kodak Company, Hormel
Foods Corporation, Intel Corporation, Johnson &
Johnson, Kimberly-Clark Corporation, Nokia Inc.,
Schering-Plough Corporation, and Verizon
Communications in Support of Petitioner (Jul. 28,
2003)Original Image of this Document (PDF)

. 2003 WL. 22428382 (Appellate Petition, Motion
and Filing) Brief for Amicus Curiae the Business
Roundtable in Support of Petitioner (Jul. 28,
2003)Original Image of this Document (PDF)

. 02-1865 (Docket) (Jun. 26, 2003)

. 2003 WL. 22428375 (Appellate Petition, Motion
and Filing) Petition for a Writ of Certiorari (Jun.
20, 2003)Original Image of this Document with
Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

