Case 1:05-md-01717-JJF    Document 335-17    Filed 11/22/2006    Page 1 of 18

# EXHIBIT 16

86 S.Ct. 1698                                                                                                         Page 1
384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778
(Cite as: 384 U.S. 563, 86 S.Ct. 1698)
▷

Supreme Court of the United States
UNITED STATES, Appellant,
v.
GRINNELL CORPORATION et al.
GRINNELL CORPORATION, Appellant,
v.
UNITED STATES.
AMERICAN DISTRICT TELEGRAPH CO.,
Appellant,
v.
UNITED STATES.
HOLMES ELECTRIC PROTECTIVE CO.,
Appellant,
v.
UNITED STATES.
AUTOMATIC FIRE ALARM CO., Appellant,
v.
UNITED STATES
Nos. 73--77.

Argued March 28 and 29, 1966.
Decided June 13, 1966.

Civil antitrust suit. The United States District Court for the District of Rhode Island, entered a decree for the government, 236 F.Supp. 244, and all parties appealed. The Supreme Court, Mr. Justice Douglas, held that the entire accredited central station service business, including such services as automatic burglar alarms, automatic fire alarms, sprinkler supervisory service, and watch signal service, was properly treated as a single 'relevant market' in determining existence of monopolization, warranting judgment against defendants who exercised monopoly power over 87% of the business.

Affirmed in part, and remanded for further hearing on nature of the relief to be awarded.

Mr. Justice Harlan dissented. Mr. Justice Fortas and Mr. Justice Stewart dissented in part.

West Headnotes

[1] Antitrust and Trade Regulation ⚖ 641
29Tk641 Most Cited Cases
   (Formerly 265k12(1.3))
"Monopoly" under section 2 of Sherman Act has two elements: possession of monopoly power in relevant market and willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[2] Antitrust and Trade Regulation ⚖ 641
29Tk641 Most Cited Cases
   (Formerly 265k12(1.3))
Existence of "monopoly power," defined as power to control prices or exclude competition, may be inferred from predominant share of market. Sherman Anti-Trust Act, §§ 1, 2 as amended 15 U.S.C.A. §§ 1, 2.

[3] Antitrust and Trade Regulation ⚖ 670
29Tk670 Most Cited Cases
   (Formerly 265k12(1.3))
The entire accredited central station service business including such services as automatic burglar alarms, automatic fire alarms, sprinkler supervisory service, and watch signal service, was properly treated as a single "relevant market" in determining existence of monopolization, warranting judgment against defendants who exercised monopoly power over 87% of the business. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

[4] Antitrust and Trade Regulation ⚖ 645
29Tk645 Most Cited Cases
   (Formerly 265k12(1.3))
In case of a product, "relevant market" may be such that substitute products must also be considered, as customers may turn to them if there is a slight increase in price of main product. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

[5] Antitrust and Trade Regulation ⚖ 645
29Tk645 Most Cited Cases
   (Formerly 265k12(1.3))
A number of different products or services may be combined in a single market in determining existence of monopoly power where that combination reflects commercial realities. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86 S.Ct. 1698
(Cite as: 384 U.S. 563, 86 S.Ct. 1698)

Page 2

**[6] Antitrust and Trade Regulation ⇐ 670**
29Tk670 Most Cited Cases
    (Formerly 265k12(17))
There may be submarkets that are separate economic entities for anti-trust purposes, but this possibility need not be considered with regard to accredited central station services, which made up a relevant market so that domination or control thereof made out a monopoly of a "part" of trade or commerce within meaning of statute. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2.

**[7] Antitrust and Trade Regulation ⇐ 678**
29Tk678 Most Cited Cases
    (Formerly 265k12(17))
Central station service which is accredited by insurance underwriters, as distinguished from nonaccredited service, is a relevant part of commerce for antitrust purposes. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

**[8] Antitrust and Trade Regulation ⇐ 670**
29Tk670 Most Cited Cases
    (Formerly 265k12(17))
The geographic market for accredited central station service, for antitrust purposes, is national rather than local in view of manner in which the business was built and conducted. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18

**[9] Antitrust and Trade Regulation ⇐ 977(3)**
29Tk977(3) Most Cited Cases
    (Formerly 265k24(13))

**[9] Antitrust and Trade Regulation ⇐ 977(5)**
29Tk977(5) Most Cited Cases
    (Formerly 265k24(13))
Evidence authorized determination that monopoly in accredited central station service business was achieved by unlawful and exclusionary practices, including restrictive agreements that preempted for each of cooperating companies a segment of market where it was free of competition of the others, pricing practices that contained competitors, and acquisition of corporations. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

**[10] Antitrust and Trade Regulation ⇐ 983**
29Tk983 Most Cited Cases
    (Formerly 265k24(15))

**[10] Antitrust and Trade Regulation ⇐ 995**
29Tk995 Most Cited Cases
    (Formerly 265k24(15))
Adequate relief in a monopolization case should put an end to the combination and deprive defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly found to be in violation of statute. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

**[11] Antitrust and Trade Regulation ⇐ 993**
29Tk993 Most Cited Cases
    (Formerly 265k24(15))
Mere dissolution of monopolistic combination in accredited central station service business, through divestiture of one company's interests in other companies, was inadequate relief and divestiture on part of other company which operated in 115 cities of which 92 had no other accredited central stations was necessary

**[12] Federal Courts ⇐ 480**
170Bk480 Most Cited Cases
    (Formerly 265k24(17))
The United States Supreme Court could not resolve on record exact extent of divestiture to be required in monopolization case, but left details to be determined by district court on remand.

**[13] Antitrust and Trade Regulation ⇐ 977(3)**
29Tk977(3) Most Cited Cases
    (Formerly 265k24(13))

**[13] Federal Courts ⇐ 947**
170Bk947 Most Cited Cases
    (Formerly 265k24(17))
Record established that practices in central station service business, of requiring subscribers to sign five-year contracts and of retaining title to equipment installed on subscriber's premises constituted substantial barriers to competition and that relief against them was appropriate, but exact extent of relief should be determined by district court on remand. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

**[14] Federal Courts ⇐ 480**
170Bk480 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Formerly 265k24(17))
Concession in pretrial discussion by defendants in antitrust case, that certain relief would be appropriate if antitrust violations were found, could be taken into account by district judge on remand.

[15] Antitrust and Trade Regulation ⇐ 983
29Tk983 Most Cited Cases
    (Formerly 265k24(15))

[15] Antitrust and Trade Regulation ⇐ 995
29Tk995 Most Cited Cases
    (Formerly 265k24(15))
Appropriate relief in antitrust case should include requiring defendants to sell, on nondiscriminatory terms, any devices manufactured by them for use in furnishing central station service, so as to assure potential competitors of replacement parts to maintain systems. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

[16] Antitrust and Trade Regulation ⇐ 995
29Tk995 Most Cited Cases
    (Formerly 265k24(15))
Visitation rights, including requiring reports, examining documents and interviewing company personnel to determine whether defendant has complied with an antitrust decree, constitute an important and customary provision in antitrust decree, which district court should consider. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18

[17] Antitrust and Trade Regulation ⇐ 995
29Tk995 Most Cited Cases
    (Formerly 265k24(15))
Record did not establish such predatory conduct by president and board chairman of defendant in antitrust case as to warrant decree barring him from employment by any of the defendants. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18.

[18] Antitrust and Trade Regulation ⇐ 995
29Tk995 Most Cited Cases
    (Formerly 265k24(15))
Antitrust decree should specifically enjoin the precise practices found to have violated the act. Sherman Anti-Trust Act, § 2 as amended 15 U.S.C.A. § 2; Clayton Act, § 7, 15 U.S.C.A. § 18

[19] Antitrust and Trade Regulation ⇐ 993
29Tk993 Most Cited Cases
    (Formerly 265k24(15))

[19] Antitrust and Trade Regulation ⇐ 995
29Tk995 Most Cited Cases
    (Formerly 265k24(15))
Relief in antitrust case, of requiring dominating company to divest itself of holdings in three other defendant companies, and barring them from future acquisition of interest in firms in monopolized business, was justified.

[20] Federal Courts ⇐ 480
170Bk480 Most Cited Cases
    (Formerly 265k24(17))
In remanding antitrust case to district court, United States Supreme Court would leave question of requiring reports to Department of Justice to discretion of district court, in view of other extensive changes in decree which might make such relief unnecessary.

[21] Judges ⇐ 49(1)
227k49(1) Most Cited Cases
Where any adverse attitudes evinced by trial judge in antitrust case toward defendants were based on his study of depositions and briefs which parties had requested him to make, and reflected only view that if facts were as government alleged, stringent relief was called for, they did not manifest disqualifying bias and prejudice. 28 U.S.C.A. § 144.

[22] Judges ⇐ 49(1)
227k49(1) Most Cited Cases
Alleged bias and prejudice, claimed to disqualify judge, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. 28 U.S.C.A. § 144.

[23] Judges ⇐ 49(2)
227k49(2) Most Cited Cases
Remarks of trial judge when lawyer persisted in offering evidence which had previously been ruled irrelevant did not manifest closed mind on merits of case, so as to disqualify judge. 28 U.S.C.A. § 144.

[24] Judges ⇐ 49(1)
227k49(1) Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Record did not establish bias and prejudice of trial judge in antitrust case. 28 U.S.C.A. § 144.

**1701 *565 Daniel M. Friedman, Washington, D.C., for appellant in No. 73 and appellee in Nos. 74--77.

John F. Sonnett, New York City, for appellant in No. 74 and appellees in No. 73.

Macdonald Flinn, New York City, for appellant in No. 75 and appellees in No. 73.

John W. Drye, Jr., New York City, for appellant in No. 76 and appellees in No. 73.

*566 J. Francis Hayden, New York City, for appellant in No. 77.

Mr. Justice DOUGLAS delivered the opinion of the Court.

This case presents an important question under s 2 of the Sherman Act. [FN1] which makes it an offense for any person to 'monopolize * * * any part of the trade or commerce among the several States.' This is a civil suit brought by the United States against Grinnell Corporation (Grinnell), American District Telegraph Co. (ADT), Holmes Electric Protective Co. (Holmes) and Automatic Fire Alarm Co. of Delaware (AFA). The District Court held for the Government and entered a decree. All parties appeal, [FN2] the United States because it deems the relief inadequate and the defendants both on the merits and on the relief and on the ground that the District Court denied them a fair trial. We noted probable jurisdiction. 381 U.S. 910, 85 S.Ct. 1538, 14 L.Ed.2d 432.

> FN1. 26 Stat. 209, as amended, 15 U.S.C. s 2 (1964 ed.)
>
> FN2. Expediting Act s 2, 32 Stat. 823, as amended, 15 U.S.C. s 29 (1964 ed.); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11.

Grinnell manufactures plumbing supplies and fire sprinkler systems. It also owns 76% of the stock of ADT, 89% of the stock of AFA, and 100% of the stock of Holmes. [FN3] ADT provides both burglary and fire protection services; Holmes **1702 provides burglary services alone; AFA supplies only fire protection service. Each offers a central station service under which hazard-detecting devices installed on the protected premises automatically *567 transmit an electric signal to a central station. [FN4] The central station is manned 24 hours a day. Upon receipt of a signal, the central station, where appropriate, dispatches guards to the protected premises and notifies the police or fire department direct. There are other forms of protective services. But the record shows that subscribers to accredited central station service (i.e., that approved by the insurance underwriters) receive reductions in their insurance premiums that are substantially greater than the reduction received by the users of other kinds of protection service. In 1961 accredited companies in the central station service business grossed $65,000,000. ADT, Holmes, and AFA are the three largest companies in the business in terms of revenue: ADT (with 121 central stations in 115 cities) has 73% of the business; Holmes (with 12 central stations in three large cities) has 12.5%; AFA (with three central stations in three large cities) has 2%. Thus the three companies that Grinnell controls have over 87% of the business.

> FN3. These are the record figures. Since the time of the trial, Grinnell's holdings have increased. Counsel for Grinnell has advised this Court that Grinnell now holds 80% of ADT's stock and 90% of the stock of AFA.
>
> FN4. Among the various central station services offered are the following:
> (1) automatic burglar alarms; (2) automatic fire alarms;
> (3) sprinkler supervisory service (any malfunctions in the fire sprinkler system--e.g., changes in water pressure, dangerously low water temperatures, etc.--are reported to the central station); and
> (4) watch signal service (night watchmen, by operating a key-triggered device on the protected premises, indicate to the central station that they are making their rounds and that all is well; the failure of a watchman to make his electrical report alerts the central station that something may be amiss).

Over the years ADT purchased the stock or assets of 27 companies engaged in the business of providing burglar or fire alarm services. Holmes acquired the stock or assets of three burglar alarm companies in New York City using a central station. Of these 30, the officials *568 of seven agreed not

86 S.Ct. 1698
(Cite as: 384 U.S. 563, *568, 86 S.Ct. 1698, **1702)

to engage in the protective service business in the area for periods ranging from five years to permanently. After Grinnell acquired control of the other defendants, the latter continued in their attempts to acquire central station companies--offers being made to at least eight companies between the years 1955 and 1961, including four of the five largest nondefendant companies in the business. When the present suit was filed, each of those defendants had outstanding an offer to purchase one of the four largest nondefendant companies.

In 1906, prior to the affiliation of ADT and Holmes, they made a written agreement whereby ADT transferred to Holmes its burglar alarm business in a major part of the Middle Atlantic States and agreed to refrain forever from engaging in that business in that area, while Holmes transferred to ADT its watch signal business and agreed to limit its activities to burglar alarm service and night watch service for financial institutions. While this agreement was modified several times and terminated in 1947, in 1961 Holmes still restricted its business to burglar alarm service and operated only in those areas which had been allocated to it under the 1906 agreement. Similarly, ADT continued to refrain from supplying burglar alarm service in those areas earlier allocated to Holmes.

In 1907 Grinnell entered into a series of agreements with the other defendant companies and with Automatic Fire Protection Co. to the following effect:

AFA received the exclusive right to provide central station sprinkler supervisory and waterflow alarm and automatic fire alarm service in New York City, Boston and Philadelphia, and agreed not to provide burglar alarm service **1703 in those cities or central station service elsewhere in the United States.

*569 Automatic Fire Protection Co. obtained the exclusive right to provide central station sprinkler supervisory and waterflow alarm service everywhere else in the United States except for the three cities in which AFA received that exclusive right, and agreed not to engage in burglar alarm service.

ADT received the exclusive right to render burglar alarm and nightwatch service throughout the United States. (Under ADT's 1906 agreement with Holmes, however, it could not provide burglar alarm services in the areas for which it had given Holmes the exclusive right to do so.) It agreed not to furnish sprinkler supervisory and waterflow alarm service anywhere in the country and not to furnish automatic fire alarm service in New York City, Boston or Philadelphia (the three cities allocated to AFA). ADT agreed to connect to its central stations the systems installed by AFA and Automatic.

Grinnell agreed to furnish and install all sprinkler supervisory and waterflow alarm actuating devices used in systems that AFA and Automatic would install, and otherwise not to engage in the central station protection business.

AFA and Automatic received 25% of the revenue produced by the sprinkler supervisory waterflow alarm service which they provided in their respective territories; ADT and Grinnell received 50% and 25%, respectively, of the revenue which resulted from such service. The agreements were to continue until February 1954.

The agreements remained substantially unchanged until 1949 when ADT purchased all of Automatic Fire Protection Co.'s rights under it for $13,500,000. After these 1907 agreements expired in 1954, AFA continued to honor the prior division of territories; and ADT and AFA entered into a new contract providing for the continued sharing of revenues on substantially the same *570 basis as before. [FN5] In 1954 Grinnell and ADT renewed an agreement with a Rhode Island company which received the exclusive right to render central station service within Rhode Island at prices no lower than those of ADT and which agreed to use certain equipment supplied by Grinnell and ADT and to share its revenues with those companies. ADT had an informal agreement with a competing central station company in Washington, D.C., 'that we would not solicit each other's accounts.'

FN5 In 1959, ADT complained that AFA's share of the revenues was excessive. AFA replied, in a letter to the president of Grinnell (which by that time controlled both ADT and AFA), that its share was just compensation for its continued observance of the service and territorial restrictions: '(T)he geographic restrictions placed upon us plus the requirement that we confine our activities to sprinkler and fire alarm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

86 S.Ct. 1698  
(Cite as: 384 U.S. 563, *570, 86 S.Ct. 1698, **1703)

services exclusively, since 1907 and presumably into the future, has definitely retarded our expansion in the past to the benefit of ADT growth. * * * (AFA's) contribution must also include the many things that helped make ADT big.' (Emphasis added.)

ADT over the years reduced its minimum basic rates to meet competition and renewed contracts at substantially increased rates in cities where it had a monopoly of accredited central station service. ADT threatened retaliation against firms that contemplated inaugurating central station service. And the record indicates that, in contemplating opening a new central station, ADT officials frequently stressed that such action would deter their competitors from opening a new station in that area.

The District Court found that the defendant companies had committed per se violations of s 1 of the Sherman Act as well as s 2 and entered a decree. 236 F.Supp. 244.

**1704 I.  
[1][2][3] The offense of monopoly under s 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition *571 or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. We shall see that this second ingredient presents no major problem here, as what was done in building the empire was done plainly and explicitly for a single purpose. In United States v. E. I. du Pont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264, we defined monopoly power as 'the power to control prices or exclude competition.' The existence of such power ordinarily may be inferred from the predominant share of the market. In American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575, we said that 'over two-thirds of the entire domestic field of cigarettes, and * * * over 80% of the field of comparable cigarettes' constituted 'a substantial monopoly.' In United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 429, 90% of the market constituted monopoly power. In the present case, 87% of the accredited central station service business leaves no doubt that the congeries of these defendants have monopoly power--power which, as our discussion of the record indicates, they did not hesitate to wield--if that business is the relevant market. The only remaining question therefore is, what is the relevant market?

[4] In case of a product it may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product. That is the teaching of the du Pont case (supra, 351 U.S. at 395, 404, 76 S.Ct. at 1007, 1012), viz., that commodities reasonably interchangeable make up that 'part' of trade or commerce which s 2 protects against monopoly power.

The District Court treated the entire accredited central station service business as a single market and we think it was justified in so doing. Defendants argue that the different central station services offered are so diverse that they cannot under du Pont be lumped together to *572 make up the relevant market. For example, burglar alarm services are not interchangeable with fire alarm services. They further urge that du Pont requires that protective services other than those of the central station variety be included in the market definition.

[5] But there is here a single use, i.e., the protection of property, through a central station that receives signals. It is that service, accredited, that is unique and that competes with all the other forms of property protection. We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities. To repeat, there is here a single basic service--the protection of property through use of a central service station--that must be compared with all other forms of property protection.

[6] In s 2 cases under the Sherman Act, as in s 7 cases under the Clayton Act (Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510) there may be submarkets that are separate economic entities. We do not pursue that question here. First, we deal with services, not with products; and second, we conclude that the accredited central station is a type of service that makes up a relevant market and that domination or control of it makes out a monopoly of a 'part' of trade or commerce within the meaning of s 2 of the Sherman Act. The defendants have not made out a case for fragmentizing the types of services into lesser units.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86 S Ct. 1698
(Cite as: 384 U.S. 563, *572, 86 S.Ct. 1698, **1704)

Page 7

**1705 Burglar alarm service is in a sense different from fire alarm service; from waterflow alarms; and so on. But it would be unrealistic on this record to break down the market into the various kinds of central station protective services that are available. Central station companies recognize that to compete effectively, they must offer all or nearly all types of service. [FN6] The different *573 forms of accredited central station service are provided from a single office and customers utilize different services in combination. We held in United States v. Philadelphia Nat. Bank, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915, that 'the cluster' of services donoted by the term 'commercial banking' is 'a distinct line of commerce.' There is, in our view, a comparable cluster of services here. That bank case arose under s 7 of the Clayton Act where the question was whether the effect of a merger 'in any line of commerce' may be 'substantially to lessen competition.' We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act. See United States v. First Nat Bank & Trust Co., 376 U.S. 665, 667--668, 84 S.Ct. 1033, 1034, 12 L.Ed.2d 1. In the s 7 national bank case just mentioned, services, not products in the mercantile sense, were involved. In our view the lumping together of various kinds of services makes for the appropriate market here as it did in the s 7 case

FN6. Thus, of the 38 nondefendant firms operating a central service station protective service in the United States in 1961 24 offered all of the following services: automatic fire alarm; waterflow alarm and sprinkler supervision; watchman's reporting and manual fire alarm; and burglar alarm. Of the other firms, 11 provided no watchman's reporting and manual fire alarm service; six provided no automatic fire alarm service; and two offered no sprinkler supervisory and waterflow alarm service. Moreover, of the 14 firms not providing the full panoply of services, 10 lacked only one of the above-described services. Appellant ADT's assertion that 'very few accredited central stations furnish the full variety of services' is flatly contradicted by the record.

There are, to be sure, substitutes for the accredited central station service. But none of them appears to operate on the same level as the central station service so as to meet the interchangeability test of the du Pont case. Nonautomatic and automatic local alarm systems appear on this record to have marked differences, not the low degree of differentiation required of substitute services as well as substitute articles

*574 Watchman service is far more costly and less reliable. Systems that set off an audible alarm at the site of a fire or burglary are cheaper but often less reliable. They may be inoperable without anyone's knowing it. Moreover, there is a risk that the local ringing of an alarm will not attract the needed attention and help. Proprietary systems that a customer purchases and operates are available; but they can be used only by a very large business or by government and are not realistic alternatives for most concerns. There are also protective services connected directly to a municipal police or fire department. But most cities with an accredited central station do not permit direct, connected service for private businesses. These alternate services and devices differ, we are told, in utility, efficiency, reliability, responsiveness, and continuity, and the record sustains that position. And, as noted, insurance companies generally allow a greater reduction in premiums for accredited central station service than for other types of protection.

Defendants earnestly urge that despite these differences, they face competition from these other modes of protection. They seem to us seriously to overstate the degree of competition, but we recognize that (as the District Court found) they 'do not have unfettered power to **1706 control the price of their services * * * due to the fringe competition of other alarm or watchmen services.' 236 F.Supp., at 254. What defendants overlook is that the high degree of differentiation between central station protection and the other forms means that for many customers, only central station protection will do. Though some customers may be willing to accept higher insurance rates in favor of cheaper forms of protection, others will not be willing or able to risk serious interruption to their businesses, even though covered by insurance, and will thus be unwilling to consider anything but central station protection.

*575 [7] The accredited, as distinguished from nonaccredited service, is a relevant part of commerce. Virtually the only central station

86 S.Ct. 1698
(Cite as: 384 U.S. 563, *575, 86 S.Ct. 1698, **1706)

Page 8

companies in the status of the nonaccredited are those that have not yet been able to meet the standards of the rating bureau. The accredited ones are indeed those that have achieved, in the eyes of underwriters, superiorities that other central stations do not have. The accredited central station is located in a building of approved design, provided with an emergency lighting system and two alternate main power sources, manned constantly by at least a required minimum of operators, provided with a direct line to fire headquarters and, where possible, a direct line to a police station; and equipped with all the devices, circuits and equipment meeting the requirements of the underwriters. These standards are important as insurance carriers often require accredited central station service as a condition to writing insurance. There is indeed evidence that customers consider the unaccredited service as inferior.

[8] We also agree with the District Court that the geographic market for the accredited central station service is national. The activities of an individual station are in a sense local as it serves, ordinarily, only that area which is within a radius of 25 miles. But the record amply supports the conclusion that the business of providing such a service is operated on a national level. There is national planning. The agreements we have discussed covered activities in many States. The inspection, certification and rate-making is largely by national insurers. The appellant ADT has a national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions. It deals with multistate businesses on the basis of nationwide contracts. The manufacturing business of ADT is interstate. The fact that Holmes is more nearly local than the others does not *576 save it, for it is part and parcel of the combine presided over and controlled by Grinnell.

As the District Court found, the relevant market for determining whether the defendants have monopoly power is not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business.

[9] We have said enough about the great hold that the defendants have on this market. The percentage is so high as to justify the finding of monopoly. And, as the facts already related indicate, this monopoly was achieved in large part by unlawful and exclusionary practices. The restrictive agreements that pre-empted for each company a segment of the market where it was free of competition of the others were one device. Pricing practices that contained competitors were another. The acquisitions by Grinnell of ADT, AFA, and Holmes were still another. Grinnell long faced a problem of competing with ADT. That was one reason it acquired AFA and Holmes. Prior to settlement of its dispute and controversy with ADT, Grinnell prepared to go into the central station service business. By acquiring ADT in 1953, Grinnell eliminated that alternative. Its control of the three other defendants eliminated any possibility of an outbreak of competition that might have occurred **1707 when the 1907 agreements terminated. By those acquisitions it perfected the monopoly power to exclude competitors and fix prices. [FN7]

> FN7. Since the record clearly shows that this monopoly power was consciously acquired, we have no reason to reach the further position of the District Court that once monopoly power is shown to exist, the burden is on the defendants to show that their dominance is due to skill, acumen, and the like.

*577 II.

The final decree enjoins the defendants in general terms from restraining trade or attempting or conspiring to restrain trade in this particular market, from further monopolizing, and attempting or conspiring to monopolize. The court ordered the alarm companies to file with the Department of Justice standard lists of prices and terms and every quotation to customers that deviated from those lists and enjoined the defendants from acquiring stock, assets, or business of any enterprise in the market. Grinnell was ordered to file, not later than April 1, 1966, a plan of divestiture of its stock in each of the other defendant companies. It was given the option either to sell the stock or distribute it to its stockholders or combine or vary those methods. [FN8] The court further enjoined any of the defendants from employing in any capacity the President and Chairman of the Board of Grinnell, James D. Fleming. Both the Government and the defendants challenge aspects of the decree.

> FN8. Although the Government originally urged that the decree was inadequate as to divestiture in that it permitted Grinnell to distribute the stock of the other

86 S.Ct. 1698
(Cite as: 384 U.S. 563, *577, 86 S.Ct. 1698, **1707)

Page 9

companies to Grinnell's shareholders, it has abandoned that point in this Court.

[10] We start from the premise that adequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Act. That is the teaching of our cases, notably Schine Chain Theatres v. United States, 334 U.S. 110, 128--129, 68 S.Ct. 947, 957, 92 L.Ed. 1245.

[11][12] We largely agree with the Government's views on the relief aspect of the case. We start with ADT, which presently does 73% of the business done by accredited central stations throughout the country. It is indeed the keystone of the defendants' monopoly power. The mere *578 dissolution of the combination through the divestiture by Grinnell of its interests in the other companies does not reach the root of the evil. In 92 of the 115 cities in which ADT operates there are no other accredited central stations. Perhaps some cities could not support more than one. Defendants recognized prior to trial that at least 13 cities can; the Government urged divestiture in 48 cities. That there should be some divestiture on the part of ADT seems clear; but the details of such divestiture must be determined by the District Court as the matter cannot be resolved on this record.

[13][14] Two of the means by which ADT acquired and maintained its large share of the market are the requirement that subscribers sign five-year contracts and the retention by ADT of title to the protective services equipment installed on a subscriber's premises. On this record it appears that these practices constitute substantial barriers to competition and that relief against them is appropriate. The pros and cons are argued with considerable vehemence here. [FN9] **1708 Again, we cannot resolve them on this record. The various aspects of this controversy must be explored by the District Court and suitable protective provisions included in the decree that deprive these two devices of the coercive power that they apparently have had towards restraining competition and creating a monopoly.

> FN9. Specifically, the areas of disagreement are: (1) Defendants urge that barring them from offering five-year contracts would put them at a competitive disadvantage vis-a-vis nondefendant firms; the Government responds that since they violated the law, they may properly be subjected to restrictions not borne by others. See United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 723--724, 64 S.Ct. 805, 813--814, 88 L.Ed. 1024. (2) Some customers of defendants may wish to have long-term contracts; the Government responds that this may be explored on remand. (3) There is some dispute as to whether, if the central station company cannot retain title to the equipment it installs, the insurance companies will accredit the system. This, too, is a proper subject for inquiry on remand.

*579 [15] The Government proposed that the defendants be required to sell, on nondiscriminatory terms, any devices manufactured by them for use in furnishing central station service. It seems clear that if the competitors are to be able to compete effectively for the existing customers of the defendants when the present service contracts expire, they must be assured of replacement parts to maintain those systems. [FN10]

> FN10. Prior to trial, the defendants agreed that this would be an appropriate provision in a decree were the Government to prevail in all its claims of antitrust violations. Although defendants now maintain that this pretrial discussion was 'settlement talk,' that earlier concession is a relevant factor that the District Judge can properly take into account on remand.

[16] The Government urges visitation rights, that is, requiring reports, examining documents, and interviewing company personnel, a relief commonly granted for the purpose of determining whether a defendant has complied with an antitrust decree. See United States v. United States Gypsum Co., 340 U.S. 76, 95, 71 S.Ct. 160, 172, 95 L.Ed. 89. The District Court gave no explanation for its refusal to grant this relief. [FN11] It is so important and customary a provision that the District Court should reconsider it.

> FN11. This provision, too, gained pretrial acceptance. See n. 10, supra.

[17][18] Defendants urge and the Government concedes that the barring of Mr. Fleming from the employment of any of the defendants is unduly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

harsh and quite unnecessary on this record. While relief of that kind may be appropriate where the predatory conduct is conspicuous, we cannot see that any such case was made out on this record.

The Government objects, as do the defendants, to the broad and generalized terms of the restraining order. They properly point out, as we emphasized in Schine Chain Theatres v. United States, supra, 334 U.S. at 125--126, 68 S.Ct. at 955--956, that the precise practices found to have violated the Act should *580 be specifically enjoined. On remand we suggest that that course be taken.

[19][20] The defendants object to the requirements that Grinnell divest itself of its holdings in the three alarm company defendants, but we think that provision is wholly justified. Dissolution of the combination is essential as indicated by many of our cases, starting with Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 78, 31 S.Ct. 502, 523, 55 L.Ed. 619. The defendants object to that portion of the decree that bars them from acquiring interests in firms in the accredited central station business. But since acquisition was one of the methods by which the defendants acquired their market power and was the method by which Grinnell put the combination together, an injunction against the repetition of the practice seems fully warranted. The defendants further object to the requirement in the decree that the alarm company defendants report to the Department of Justice any deviation they make from their list prices. We make no comment on that because in view of the other extensive changes necessary in the decree, the District Court might well **1709 deem it to be unnecessary in the fashioning of the new decree. In other words, we leave that matter open, to rest finally in the discretion of the District Court.

III.
[21] The defendants contend that Judge Wyzanski, who tried the case, was personally biased and prejudiced and should have been disqualified from sitting in the case, and that he denied them a fair trial. We think this point is without merit.

The complaint was filed in April 1961, the answers in July 1961. Shortly thereafter extensive taking of depositions began. The District Court in January 1963 directed that no depositions be taken after September 1, 1963. In response to an inquiry from the court both sides suggested that the trial be set no earlier than January 1964.

*581 At a pretrial conference in December 1963, government counsel told the court that the parties had been trying to reach agreement on a consent decree but were far apart and asked how the court would like to handle the presentation of the evidence in the event a settlement was not reached. Grinnell's lawyer suggested that the next appropriate procedure would be a pretrial on the question of relief--a suggestion that the District Court construed as an invitation to the court to discuss the relief apart from the merits. The Government objected. The court then asked for a brief from each side setting forth its views on relief if the Government prevailed on the merits. In response to the court's statement that 'as I understand it, you want to find out what kind of relief I would be likely to allow if the government's case stood virtually uncontradicted,' Grinnell's counsel replied: 'That is what I had in mind, your Honor, yes.'

Thereupon the court set a day for such a hearing. At the next pretrial conference Grinnell's counsel stated that 'if your Honor would indicate the relief that might be appropriate in this case that would help both sides to come to a better understanding.'

Then the following colloquy occurred:
'THE COURT. I don't think it would help very much.
'MR. MCINERNEY. Well, your Honor, I think it would help both the plaintiff and the defendants to know what is really at stake here in this trial.
'THE COURT. I assure you that you would not be helped by anything I would say. You would do better to get together with the government rather than run the risk of what I would say from what I have seen. Let me just assure you of that. * * *'

The case was then set for trial on June 15, 1964. When Grinnell's counsel sought to argue further, the court stated: 'There is no use in discussing it with me. I have *582 read enough to know that if I have to decide this case on what I have seen from the government you will not be in a position at this stage to agree to it.'

On June 3, 1964, defendants argued for a postponement of the trial, saying they needed more time. The court denied the motion. Then they

86 S.Ct. 1698                                                                                     Page 11
(Cite as: 384 U.S. 563, *582, 86 S.Ct. 1698, **1709)

argued that the relief issues to be tried be limited to those raised by the pleadings so as to eliminate what they considered to be extraneous issues raised by the Government. To that the court replied:

'I can't understand frankly why you don't realize that you have forced me to look at the documents in this case, which I dislike doing in advance of trial. You have invited me, therefore, into what I regard as, from your point of view, a rather undesirable situation. I think I made that clear at the beginning. I have told you that, forced by you to look, my views are more extreme than those of the government; and I have also made you realize that if I am required to make Findings and reach Conclusions I am opening up **1710 third-party suits that will make, in view of the size of the industry, the percentage of people involved higher than in the electrical cases.'

Shortly thereafter defendants filed a motion [FN12] for the disqualification of Judge Wyzanski on the grounds of personal bias and prejudice [FN13]

> FN12. 28 U.S.C. s 144 (1964 ed.) provides in relevant part:
> 'Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.'

> FN13. Judge Wyzanski referred the question of his disqualification to Chief Judge Woodbury of the Court of Appeals for the First Circuit who after hearing oral argument held that no case of bias and prejudice had been made out under s 144

*583 [22] The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. Berger v. United States, 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481. Any adverse attitudes that Judge Wyzanski evinced toward the defendants were based on his study of the depositions and briefs which the parties had requested him to make. What he said reflected no more than his view that, if the facts were as the Government alleged, stringent relief was called for.

[23] During the trial he repeatedly stated that he had not made up his mind on the merits. During the trial he ruled certain evidence to be irrelevant to the issues and when the lawyer persisted in offering it Judge Wyzanski said, 'Maybe you will persuade somebody else. And if you think so, all right I just assure you it is a great ceremonial act, as far as I am concerned.' We do not read this statement as manifesting a closed mind on the merits of the case but consider it merely a terse way of repeating the previously stated ruling that this particular evidence was irrelevant.

[24] We have examined all the other claims of the defendants made against Judge Wyzanski and find that the claim of bias and prejudice is not made out. Our discussion of the relief which he granted shows indeed that he was in several critical respects, too lenient with those who now charge him with bias and prejudice.

The judgment below is affirmed except as to the decree. We remand for further hearings on the nature of the relief consistent with the views expressed herein. It is so ordered.

Affirmed in part and remanded

Mr. Justice HARLAN, dissenting in Nos. 73--77.

I cannot agree with the Court that the relevant market has been adequately proved. I do not dispute that a *584 national market may be found even though immediate competition takes place only within individual communities, some of which are themselves natural monopolies. For a national monopoly of such local enterprises may still have serious long-term impact on competition and be vulnerable on its own plane to the antitrust laws. In the product market also the Court seems to me to make out a good enough case for lumping together the different kinds of central station protective service (CSPS). But I cannot agree that the facts so far developed warrant restricting the product market to accredited CSPS.

Because the ultimate issue is the effective power to control price and competition, this Court has always recognized that the market must include products or services 'reasonably interchangeable' with those of the alleged monopolist. **1711 United States v. E. I. du Pont De Nemours & Co., 351 U.S. 377, 395,

86 S.Ct. 1698
(Cite as: 384 U.S. 563, *584, 86 S.Ct. 1698, **1711)

Page 12

76 S.Ct. 994, 1007, 100 L.Ed. 1264. In this instance, there is no doubt that the accredited CSPS business does compete in some measure with many other forms of hazard protection: watchmen, local alarms, proprietary systems, telephone-connected services, unaccredited CSPS, direct-connected (to police and fire stations) systems, and so forth. The critical question, then, is the extent of competition from these rivals.

The Government and the majority have stressed that differences in cost, reliability and insurance discounts may disqualify a competing form of protection for a particular customer. For example, it is said that proprietary systems are too expensive for any but large companies and local alarms may go unanswered in some neighborhoods. But if in general a CSPS customer has a feasible alternative to CSPS, it does not much matter that other ones are foreclosed to him, nor that other CSPS customers have different second choices. From this record, it may well be that other forms of protection are each competitive enough with segments of the CSPS *585 market so that in sum CSPS rarely has a monopoly position.

From the defense standpoint, there is substantial evidence showing that the defendants do feel themselves under pressure from other forms of protection, that they do compete for customers, and that they do lower prices even in areas where no CSPS competition is present. This concrete evidence of market behavior seems to me to rank higher than the kind of inference proof heavily relied on by the Government--physical differences between competing forms of protection, self-advertising claims of CSPS companies that they represent a superior service and varying insurance discounts. Given that the burden of proof rests upon the Government, the record leaves me with such misgivings as to the validity of the District Court's findings on this score that I am not prepared to agree that the Government has made the showing of market domination that the law demands before a business is sundered.

At the same time the case must be recognized as a close one, and I am not ready to say at this stage that the findings and conclusions of the District Court might not be supportable. All things considered, I join with my Brothers Fortas and Stewart to the extent of voting to remand the case for further proceedings so that new findings can be made as to the relevant product market. This course seems to me the more appropriate in light of the fact that because of the Expediting Act, 15 U.S.C. s 29 (1964 ed.), we have not had the benefit of any intermediate appellate sifting of this record. In view of the disposition I propose, I do not consider any of the other questions in the case.

Mr. Justice FORTAS, with whom Mr. Justice STEWART joins, dissenting in Nos. 73 and 77.

I agree that the judgment below should be remanded, but I do not agree that the remand should be limited to *586 reshaping the decree. Because I believe that the definition of the relevant market here cannot be sustained, I would reverse and remand for a new determination of this basic issue, subject to proper standards.

We have here a case under both s 1 and s 2 of the Sherman Act, which proscribe combinations in restraint of trade, and monopolies and attempts to monopolize. The judicial task is not difficult to state: Does the record show a combination in restraint of trade or a monopoly or attempt to monopolize? If so, what are its characteristics, scope and effect? And, finally, what is the appropriate remedy for a court of equity to decree?

Each of these inquires depends upon two basic referents: definition of the geographical area of trade or commerce restrained or monopolized, and of the products or services involved. In s 1 **1712 cases this problem ordinarily presents little difficulty because the combination in restraint of trade itself delineates the 'market' with sufficient clarity to support the usual injunctive form of relief in those cases. See, e.g., United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. In the present case, however, the essence of the offense is monopolization, achieved or attempted, and the major relief is divestiture. For these purposes, 'market' definition is of the essence, just as in s 7 cases [FN1] the kindred definition of the 'line of commerce' is fundamental. We must define the area of commerce that is allegedly engrossed before we can determine its engrossment; and we must define it before a decree can be shaped to deal with the consequences of the monopoly, and to restore or produce competition. See United States v. E. I du Pont De Nemours & Co (the Cellophane Case), 351

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

86 S Ct. 1698
(Cite as: 384 U.S. 563, *587, 86 S.Ct. 1698, **1712)

Page 13

U.S. 377, *587 389--396, 76 S.Ct. 994, 1003--1008, 100 L.Ed. 1264; United States v. Aluminum Co. of America, 148 F.2d 416 (C.A.2d Cir. 1945).

> FN1. United States v. Continental Can Co., 378 U.S. 441, 447--458, 84 S.Ct. 1738, 1741--1747, 12 L.Ed.2d 953; United States v. Alcoa, 377 U.S. 271, 273--277, 84 S.Ct. 1283, 1285--1287, 12 L.Ed.2d 314; United States v. Philadelphia Nat. Bank, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915; Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510.

In s 2 cases, the search for 'the relevant market' must be undertaken and pursued with relentless clarity. It is, in essence, an economic task put to the uses of the law. Unless this task is well done, the results will be distorted in terms of the conclusion as to whether the law has been violated and what the decree should contain.

In this case, the relevant geographical and product markets have not been defined on the basis of the economic facts of the industry concerned. They have been tailored precisely to fit defendants' business. The Government proposed and the trial court concluded that the relevant market is not the business of fire protection, or burglary protection, or protection against waterflow, etc., or all of these together. It is not even the business of furnishing these from a central location. It is the business, viewed nationally, of supplying 'insurance accredited central station protection services.' (CSPS)--that is, fire, burglary and other kinds of protection furnished from a central station which is accredited by insurance companies. The business of defendants fits neatly into the product and geographic market so defined. In fact, it comes close to filling the market so defined. [FN2] This Court has now approved this Procrustean definition.

> FN2. The defendants constitute 87% of the market as defined. One of the defendants alone, ADT, has 73%.

The geographical market is defined as nationwide. But the need and the service are intensely local-- more local by far, for example, than the market which this Court found to be local in United States v. Philadelphia Nat. Bank, 374 U.S. 321, 357--362, 83 S.Ct. 1715, 1738--1740, 10 L.Ed.2d 915 [FN3]. The premises protected *588 do not travel. They are fixed locations. They must be protected where they are. Protection must be provided on the spot. It must be furnished by local personnel able to bring help to the scene within minutes. Even the central stations can provide service only within a 25-mile radius. Where the tenants of the premises turn to central stations for this service, they must make their contracts locally with the central station and purchase their services from it on the basis of local conditions.

> FN3. See also United States v. First Nat. Bank, 376 U.S. 665, 668, 84 S.Ct. 1033, 1034, 12 L.Ed.2d 1 (per Douglas, J.); American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387, 398 (D.C.S.D.N.Y.1957), aff'd, 259 F.2d 524 (C.A.2d Cir. 1958).

**1713 But because these defendants, the trial court found, are connected by stock ownership, interlocking management and some degree of national corporate direction, and because there is some national participation in selling as well as national financing, advertising, purchasing of equipment, and the like, [FN4] the court concluded that the competitive area to be considered is national. This Court now affirms that conclusion.

> FN4. There is a danger that this Court's opinion, ante, at 1706, will be read as somewhat overstating the case. There is neither finding nor record to support the implication that rates are to any substantial extent fixed on a nationwide basis, or that there are nationwide contracts with multi-state businesses in any significant degree, or that insurers inspect or certify central stations on a nationwide basis.

This is a non sequitur. It is not permissible to seize upon the nationwide scope of defendants' operation and to bootstrap a geographical definition of the market from this. The purpose of the search for the relevant geographical market is to find the area or areas to which a potential buyer may rationally look for the goods or services that he seeks. The test, as this Court said in United States v. Philadelphia Nat. Bank, is 'the geographic structure of supplier-customer relations,' 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, quoting Kaysen & Turner, Antitrust Policy 102 (1959). And, as Mr. Justice Clark put it in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580,

86 S.Ct. 1698    Page 14
(Cite as: 384 U.S. 563, *589, 86 S.Ct. 1698, **1713)

the definition of the relevant market requires *589 'CAREFUL SELECTION OF THE MARKET AREA IN which the seller operates, and to which the purchaser can practicably turn for supplies.' [FN5] The central issue is where does a potential buyer look for potential suppliers of the service-- what is the geographical area in which the buyer has, or, in the absence of monopoly, would have, a real choice as to price and alternative facilities? This depends upon the facts of the market place, taking into account such economic factors as the distance over which supplies and services may be feasibly furnished, consistently with cost and functional efficiency

> FN5. See also Brown Shoe Co. v. United States, 370 U.S. 294, 336-- 337, 82 S.Ct. 1502, 8 L.Ed.2d 510

The incidental aspects of defendants' business which the court uses cannot control the outcome of this inquiry. They do not measure the market area in which buyer and sellers meet. They have little impact upon the ascertainment of the geographical areas in which the economic and legal questions must be answered: have defendants 'monopolized' or 'restrained' trade; have they eliminated or can they eliminate competitors or prevent or obstruct new entries into the business; have they controlled or can they control price for the services? These are the issues; and, in defendants' business, a finding that the 'relevant market' is national is nothing less than a studied failure to assess the effect of defendants' position and practices in the light of the competition which exists, or could exist, in economically defined areas--in the real world.

Here, there can be no doubt that the correct geographic market is local. The services at issue are intensely local: they can be furnished only locally. The business as it is done is local--not nationwide. If, as might well be the case on this record, defendants were found to have violated the Sherman Act in a number of these local areas, a proper decree, directed to those markets, as well as to *590 general corporate features relevant to the condemned practices, could be fashioned. On the other hand, a gross definition of the market as nationwide leads to a gross, nationwide decree which does not address itself to the realities of the market place. That is what happened here: The District Court's finding that the market was nationwide logically led it to a decree which operated on the only national aspect of the situation, the parent company nexus. instead of on the economically realistic areas--the local situations. This **1714 Court now directs the trial court to require 'some (unspecified) divestiture' locally by the alarm companies. This is a recognition of the economic reality that the relevant competitive areas are local. In plain terms, the Court's direction to the trial court means a 'market-by-market' analysis for the purpose of breaking up defendants' monopoly position and creating competitors and competition wherever feasible in particular cities. In my view, however, by so directing, the Court implies that which it does not command: that the case should be reconsidered at the trial court level because of the improper standard it used to define the relevant geographic markets.

The trial court's definition of the 'product' market even more dramatically demonstrates that its action has been Procrustean--that it has tailored the market to the dimensions of the defendants. It recognizes that a person seeking protective services has many alternative sources. It lists 'watchmen, watchdogs, automatic proprietary systems confined to one site, (often, but not always), alarm systems connected with some local police or fire station, often unaccredited CSPS (central station protective services), and often accredited CSPS.' The court finds that even in the same city a single customer seeking protection for several premises may 'exercise its option' differently for different locations. It may choose *591 accredited CSPS for one of its locations and a different type of service for another.

But the court isolates from all of these alternatives only those services in which defendants engage. It eliminates all of the alternative sources despite its conscientious enumeration of them. Its definition of the 'relevant market' is not merely confined to 'central station' protective services, but to those central station protective services which are 'accredited' by insurance companies.

There is no pretense that these furnish peculiar services for which there is no alternative in the market place, on either a price or a functional basis. The court relies solely upon its finding that the services offered by accredited central stations are of better quality, and upon its conclusion that the insurance companies tend to give 'noticeably larger' discounts to policyholders who use accredited

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86 S.Ct. 1698
(Cite as: 384 U.S. 563, *591, 86 S.Ct. 1698, **1714)

Page 15

central station protective services. This Court now approves this strange red-haired, bearded, one-eyed man-with-a-limp classification.

The unreality of the trial court's market definition may best be illustrated by an example. Consider the situation of a retail merchant in Pittsburgh who wishes to protect his store against burglary. The Holmes Electric Protective Company, a subsidiary of Grinnell, operates an accredited central station service in Pittsburgh. It provides only burglary protection.

The gerrymandered market definition approved today totally excludes from the market consideration of the availability in Pittsburgh of cheaper but somewhat less reliable local alarm systems, or of more expensive (although the expense is reduced by greater insurance discounts) watchman service, or even of unaccredited central station service which virtually duplicates the Holmes service.

Instead, and in the name of 'commercial realities,' we are instructed that the 'relevant market'--which totally *592 excludes these locally available alternatives--requires us to look only to accredited central station service, and that we are to include in the 'market' central stations which do not furnish burglary protection and even those which serve such places as Boston and Honolulu. [FN6]

> FN6. None of the stations operated by defendant Automatic Fire Alarm Company offers burglary protection, just as none of Holmes' stations protects against the risk of fire.

Moreover, we are told that the 'relevant market' must assume this strange and curious configuration despite evidence **1715 in the record and a finding of the trial court that 'fringe competition' from such locally available alternatives as watchmen, local alarm systems, proprietary systems, and unaccredited central stations has, in at least 20 cities, forced the defendants to operate at a 'loss' even though defendants have a total monopoly in these cities of the 'market'--namely, the 'accredited central station protective services.' And we are led to this odd result even though there is in the record abundant evidence that customers switch from one form of property protection to another, and not always in the direction of accredited central station service.

I believe this approach has no justification in economics, reason or law. It might be supportable if it were found that the accredited central stations offer services which are unique in the sense that potential buyers--or at least a substantial, identifiable part of the trade--look only to them for the services in question, and that neither cost, type, quality of service nor other factors bring competing services into the market. The findings here and the record do not permit this conclusion.

The Government's market definition, accepted by the trial court, is a distortion which inevitably leads to a superficial and distorted results even in the hands of a highly skilled judge. As this Court held in Brown Shoe, supra, the 'reasonable interchangeability of use or the *593 cross-elasticity of demand,' determines the boundaries of a product market. 370 U.S., at 325, 82 S.Ct., at 1523. See also the Cellophane Case, 351 U.S., at 380, 76 S.Ct., at 998. In plain language, this means that the court should have defined the relevant market here to include all services which, in light of geographic availability, price and use characteristics, are in realistic rivalry for all or some part of the business of furnishing protective services to premises. In the present situation, however, the court's own findings show that practical alternatives are available to potential users--although they vary from market to market and possibly from user to user. These have been arbitrarily excluded from the court's definition.

I do not suggest that wide disparities in quality, price and customer appeal could never affect the definition of the market. But this follows only where the disparities are so great that they create separate and distinct categories of buyers and sellers. The record here and the findings do not approach this standard. They fall far short of justifying the narrowing of the market as practiced here. I need refer only to the exclusion of non-accredited central stations, which the court seeks to justify by reference to differentials in insurance discounts. These differentials may indeed affect the relative cost to the consumer of the competing modes of protection. But, in the absence of proof that they result in eliminating the competing services from the category of those to which the purchaser 'can practicably turn' for supplies, [FN7] they do not justify such total exclusion. This sort of exclusion of the supposedly not-quite-so-attractive service from the basic definition of the kinds of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86 S.Ct. 1698
(Cite as: 384 U.S. 563, *593, 86 S.Ct. 1698, **1715)

Page 16

business and service against which defendants' activity will be measured, is entirely unjustified on this record. [FN8]

FN7. Tampa Electric Co. v. Nashville Coal Co., 365 U.S., at 327, 81 S.Ct., at 627.

FN8. The example used by the court in its findings is illuminating and disturbing. In explanation of its narrow market definition, the court says that the diference between the accredited central station protective services and all others 'could be compared' to the difference between a compact six-cylinder car and a chauffeur-driven sedan. It is probably true that the degree of direct competition between luxury automobiles and compacts is slight, but it is by no means as clear-cut as the trial court seems to suggest. The question would require careful analysis in light of the total facts and issues. For example, if the antitrust problem at hand involved an acquisition of the business of a manufacturer of compacts by a maker of luxury cars, it is by no means inconceivable that sufficient competitive overlap would be found to place both products in the 'relevant market.'

**1716 *594 The importance of this kind of truncated market definition vividly appears if we are to say, as the trial court here held, that if defendant has so large a fraction of the market as to constitute a 'predominant' share, a rebuttable presumption of monopolization follows. The fraction depends upon the denominator (the 'market') as well as the numerator (the defendants' volume). Clearly, this 'presumption' is unwarranted unless the 'market' is defined to include all competitors. The contrary is not supported by this Court's decisions in either the Cellophane Case, supra, or United States v. E. I. du Pont De Nemours & Co. (General Motors), 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057. The latter case defined the market in terms of the total products which could be used for the defined purposes: automobile fabrics and finishes. This embraces the total range of options for customers seeking these products. On the contrary, as the record here shows and as the findings, candidly read, imply, substantial options exist for services other than through accredited central stations providing protective services. Those options, whether for all or a part of the services in issue, must be included in the assessment of the market.

In the opinion which this Court hands down today, there is considerable discussion of defendants' argument that the market should be 'broken down' by different *595 type of service: e.g., Burglar protection, fire protection, etc. The Court rejects this on the ground that it is appropriate to evaluate a 'cluster' of services as such. It points to Philadelphia Nat. Bank, supra, for support for its approach. In that case, Mr. Justice Brennan's opinion for the Court carefully set out the distinctive characteristics of banking services: that some of these services (e.g., checking accounts) are virtually free of competition from other types of institutions, and that other services are distinctive in cost or other characteristics. 374 U.S., at 356--357, 83 S.Ct., at 1737--1738. See also United States v. First Nat. Bank, 376 U.S. 665, 668, 84 S.Ct. 1033, 1034, 12 L.Ed.2d 1 (per Douglas, J.). Similarly, in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and International Boxing Club of N.Y. v. United States, 358 U.S. 242, 249--252, 79 S.Ct. 245, 249--251, 3 L.Ed.2d 270, 'first-run' moving pictures and championship boxing matches were held sufficiently distinctive in terms of demand in the market place to warrant consideration as separate markets.

But no such distinctiveness exists here. As I have discussed, neither this record nor the trial court's findings show either a distinctive demand or a separable market for 'insurance accredited central station protective services.' The contrary is evident. None of the services furnished by accredited central stations is unique, as I have discussed. Nor is there even a common or predominant 'cluster' of services offered by the central stations. One of the defendants, Holmes, is engaged only in the burglary alarm business. Another, AFA, furnishes only fire and waterflow service. Only ADT among the defendants makes available to its customers the full 'cluster.'

I do not mean to suggest that the Government must prove its case, service by service. But in defining the market, individual services, even if furnished in isolation, ought to be specified and here, as distinguished from the conclusion impelled by the circumstances in *596 Philadelphia Nat. Bank, supra, competitors for individual services ought to be taken into account.

I do not intend by any of the foregoing to suggest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86 S.Ct. 1698  
(Cite as: 384 U.S. 563, *596, 86 S.Ct. 1698, **1716)

Page 17

that, on this record, the relief granted by the trial court and the substantially more drastic relief ordered by this Court would necessarily be unjustified. It is entirely possible that monopoly or attempt to monopolize may be found--and perhaps found with greater force--in local situations. Relief on a pervasive, system-wide, national basis might **1717 follow, as decreed by the trial court, as well as divestiture in appropriate local situations, as directed by this Court. It is impossible, I submit, to make these judgments on the findings before us because of the distortion due to an incorrect and unreal definition of the 'relevant market.' Now, because of this Court's mandate, the market-by-market inquiry must begin for purposes of the decree. But this should have been the foundation of judgment, not its superimposed conclusion. This inquiry should-- in my opinion, it must--take into account the total economic situation--all of the options available to one seeking protection services. It should not be limited to central stations, and certainly not to 'insurance accredited central station protective services' which this Court sanctions as the relevant market. Since I am of the opinion that defendants and the courts are entitled to a reappraisal of the liability consequences as well as the appropriate provisions of the decree on the basis of a sound definition of the market, I would reverse and remand for these purposes.

384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.