# EXHIBIT B
# Part 4

116

What is the future for American manufacturing as we stand today? Anybody want to comment on that? Mr. O'Shaughnessy?

Mr. O'SHAUGHNESSY. I would, because Revere Copper prospered from Revere and Son to Revere Cooper Products over 200 years because the country had low-cost energy. And one of the solutions that we need is, in my opinion, nuclear energy. France uses—80 percent of it is nuclear; Sweden is about 35; South Korea, I was told the other evening by a South Korean businessmen, is about 40 percent. China is building 20 new nuclear plants in the next 20 years. We need to do the same.

What we ought to do is the Federal Government ought to pre-certify site selections. Pick out five sites and then use a BRAC-type process to get it done. Because nobody wants any kind of a facility in their backyard, nuclear or otherwise. I mean, there are cows, citizens opposed to windmills. So I think the Federal Government has to step in with site selection, get energy right, make it cheap. The fundamental way you raise a country up is to provide it with good, low-cost energy; and we can do it.

Chairman TOM DAVIS. We get a crowd out in Fairfax to oppose cell towers going up. You get better cell phone service, so I can talk to my kids on the bullet train in Japan faster than I can driving through Bethesda or Vienna.

Mr. Van Hollen.

Mr. VAN HOLLEN. Thank you, Mr. Chairman.

Let me thank all of you for your testimony and just really pick up where Chairman Davis left off.

We, in this country, have been able to keep ahead in many ways because of our technological edge, our innovation. Despite the fact that other countries have been able to produce products at lower wages, we have been able to keep that edge through productivity gains and other issues.

Now, Mr. McCurdy referred in his testimony to the fact that there comes a point where simply the cost of manufacturing a product overseas is cheaper. And as you have these others—you know, we don't have a monopoly on innovation. We have been a leader, and we need to invest to keep ahead, but we don't have a monopoly. As you know, the population in India and China and others sort of adopt our model and invest in education. That is why we are here today, is to talk about that loss of edge, which means that the actual cost of economics is obviously a big issue.

You mentioned different corporate tax rates. Another big issue we well know is the question of health care. We haven't talked about it a lot this morning, but we all know and we have heard the figures. When GM rolls a car off the plant, the first $1,500 whatever goes to provide health care. We recently saw that IBM decided to discontinue some of its pension benefits.

We, for historical reasons, have had a system where we have an employer-based health care, and yet at the same time we spend more as a percentage of GDP on health care than any other country in the world. And at the same time we have 40 million Americans unemployed.

How do we deal with this issue going forward? It seems to me that many of our competitors, as the employers, don't have to pay that cost to health care; and yet, at the same time, I think we all

117

agree that one of the things we want to do in this country is to provide health care universally as possible that is our goal. How do we deal with this very important issue as a Nation?

Dr. RUIZ. If I could, you know, I am the farthest thing from an expert on the health care, but I do understand the cost of health care in our business. And the one thing that seems apparent to me in not only health care but many other issues similar to that is that we have not put technology to its fullest use to solve those issues.

I happen to know, for example, Mr. Paul O'Neill, who used to be in the government here, a Secretary, who has done some research and found that—and I have seen the work—he is very compelling that through the use of IT technology as we know it today, without making any improvements to the technology, that health care costs could be reduced by 40 percent. And I think one of the things perhaps we could find a way to collectively encourage and embrace is the use of technology to solve these issues.

IT, information technology, is very powerful; and I believe that it could go a long way to address health care rather rapidly. But it would take a very concerted effort between industry, government and just the population at large.

Mr. MCCURDY. Mr. Van Hollen, I spent a good deal of my career working on health care issues. I am married to a physician. I have a daughter in medical school, and my wife sometimes wonders why my daughter wants to go into medical school, considering the changing nature of health care and litigation and some of the costs.

It is an interesting fact that we in the United States pay more on litigation than China spends on R&D as a nation. I would love to sometime talk about just China, because there is a great deal of reaction to what China is doing. I think the thing that we need to realize is with China physics it is really not the mass right now that is the issue. It is the velocity of their growth. It is the velocity of growth, pace of change which is so dramatic. They have mass with the potential for this huge market and the labor force. But we have some advantages, but I am not sure we are maximizing that advantage.

In America, we are going to grow—we have grown rich before we are growing old as a Nation, but our baby boom generation is approaching the older age, and we have this savings mismatch in the world. There is a world imbalance with regard to national savings. We are the richest nation in the world, and yet we have negative savings. And you go to China, one of the poorer nations of the world, believe it or not, and they have a huge savings rate. Why? Because they haven't had the institutions of Social Security, Medicare and others. They are going to hit a wall there, and I will tell you this is not going to be 10 percent annualized growth indefinitely. I had a CEO tell me the other day that he believes that right after the Olympics you are going to see some really major problems. Experts have told me in 6 to 8 years you are going to see huge roadblocks in China's development. Now there are international implications of that and potential nationalism and all the rest, but I think we have to be very mindful of what is happening there.

118

We have to look at—and someone earlier in the committee talked about the trade deficit meaning more than the national deficit. Much of my background is in international economics; and, quite frankly, I would reverse that and say the way you start dealing with trade deficits is you get the national savings rate and the deficits here under control, because that has a huge impact on the cost of money and the potential cost of money over time.

So, actually, I spend most of my time dealing with China; and I would like to get on that at some point.

But I think the point you raised about the cost of health care, our industry is not going to remain competitive if they are strapped with this huge cost. The question is where they shift it to. If the Federal Government is where we see it currently—and I don't care about halving the deficit. I am talking about the need to have true savings and the ability, flexibility to deal with this burgeoning crisis which—it doesn't effect just individual consumers and the elderly. These businesses cannot compete. Our industry cannot remain the best if all of a sudden they become a pension manager, an insurer of last resort and the provider of health care.

Ms. WINCE-SMITH. I'd just like to take the Chinese analogy a little bit and carry it into health care, because it's ironic that our system is really like a Chinese rice bowl. If the rice bowl is broken, you don't have health care.

So the whole portability issue I think is absolutely critical. And, this is one of a few sectors in our economy that is not consumer driven. It's almost an inverse relationship between—as more innovation comes, the costs go up, and there is a specter of rationing and quality.

So clearly when we think of innovation, we need a lot of innovation in the design of this health care system to meet some of the realities that we're talking about and really bring it back to a patient-controlled system, which it is not right now.

And the other link into manufacturing with this is that there are very advanced sectors of manufacturing where nobody can beat us in the world. And when you look at those, there are a number of reasons why. I mean, Proctor & Gamble, they are producing what you would think of as low-value consumer products, toothpaste, potato chips, diapers. Here in the United States, competitive throughout the world, they're using high performance computing to completely change the cycle, and the value of a lot of their manufacturing is in the design; it's in the logistics supply chain.

And also we have to factor in what's going on in labor. Timkin has, I'm told, I have not seen it, one of the most advanced facilities in North Carolina for this T to T sense manufacturing where within minutes or hours they can move from very, very complex fabrication. And then we have the other situation in Ohio with the real hostile relationship between business and labor.

So there are a lot of things going on in manufacturing. But if Brazilian companies can be competitive in the United States, owning steel mini-mills, there's some things that are going on here.

But back to the health care, I think looking at this sector and the productivity that will come from some innovative design I think we have to really do, and that's a big, big challenge.

Chairman TOM DAVIS. Mr. Issa.

119

Mr. Issa. Thank you, Mr. Chairman.

Dave, a little bit like Europe, not using the whole bucket of balls. I notice I'm last over on this side of the dais. I'd like to wrap up a couple of things I heard here today and make sure that we are all as unified as I think this panel has been. I would like to congratulate you. Often we have an A-B panel in which one side is saying one side and the other side is talking completely past, and that doesn't seem to be the case today. I think I have heard far more similarities. Matter of fact, I haven't heard any real differences in any subjects, which is good. Of course it also isn't very bright. It's kind of gloomy, all your predictions, but at least we're on the same sheet of music.

Mr. O'Shaughnessy, I don't have a question for you, but I do have a comment. I really believe that when the trademark dispute that was—had your company in bankruptcy for so many years, hoping to be able to preserve the identity, the unique identity of your—formally your copper clad product, I wish that had been decided in the opposite way in which Revere Wear's unique look would have been recognized by the courts.

Having said that though, the question I have is, do you think if they had, if you were still in that business, or let me rephrase, if whoever was still in it had that protection, intellectual property protection, do you think those pans and pots would be made here in the United States or would they have gone to China regardless?

Mr. O'Shaughnessy. First, when I acquired the company, Revere Wear had already been sold, and they had the use of that logo, and I could use it for our type of products but not for cookwear for 5 years. So we could have gone into cookwear.

What happened is Corning bought the company, and after producing the cookwear in the United States for an additional 5 or 7 years, they moved the facilities to, I believe, Thailand, and then they sold them.

In their case—I think you make a good point in general, and I agree with it, but in their case, in that particular product line, technology passed them by. Copper is still the best conductor of heat that there is, but all of those beautiful ceramic dishes and new cookwear, that's what did them in.

Mr. Issa. I see. I always wanted to because I still believe it's a fine product.

Mr. O'Shaughnessy. Thank you.

Mr. Issa. And, besides, I thought it was the best example of a secondary meaning; when you said Revere Wear, it really meant a particular product.

Dr. Ruiz, I asked the Secretary, and this question is open to all of you, but I asked the Secretary earlier if a change in immigration policy—and I think your testimony is very on point, you were among the best and the brightest and most ambitious to cross the border each day to seek out an education and relentlessly try to better yourself, and today you're at the pinnacle of the corporate ladder.

However, our immigration policy today, I'm talking about legal immigration, is a business, a family reunification. It does not in any way, except for the H1B and some other limited areas, it does not promote a best of X type competition.

120

If you have a Ph.D., or even a lesser degree, but if you are incredibly skilled through whatever process, including a U.S. education, you're not at a particular advantage in getting that 500,000 or so opportunities to become an American on a permanent basis.

In your opinion, particularly with a technology company like this, if we were, during our debate on immigration reform, to provide either new, significantly new, several hundred thousand, large quantity, or take a different approach to the existing amount and increase a net, let's say 200,000 highly skilled, highly educated as a preferential class in immigration in this country, what would that do to your business and to your ability to recruit and succeed against global competition?

Dr. RUIZ. Well, we have a near-term problem, in industry, particularly in high tech, is we are short of talent in this country. Any immigration reform that allows us to fill that stop gap problem or stop gap the challenge that we have would be very helpful to high tech and I believe that, without a doubt, would have a very positive impact on industries such as ours. There's no question about that.

One of the reasons, whether you call it an H1 visa or whatever, there is a method by which you can get a Ph.D. from India or China or Germany to come work in this country in our industry, that would be a welcome immigration reform that would certainly help our industry. However, I would like to emphasize that our whole industry is also strongly encouraging the fact that while that may be a short-term solution, that the long-term view of this problem, which is we still have minorities and women in this country not being able to go to get the kind of education that they need, that we could make a huge impact in the shortage of the people that we need over the long run if we just could address our own deficiencies in our education system.

Mr. ISSA. I certainly agree with the latter, but I asked my question narrowly, recognizing even half a million immigrants with high skills would pale in comparison to a shift in U.S. education. But because immigration reform is at the top of the President's agenda and it's high on the agenda of the House, I was hoping to get a comment from each of you. Go right down the line.

Mr. O'SHAUGHNESSY. I absolutely agree with you. Revere has taken immigrants and run them through the process to get electrical engineers and so on. I'm Canadian originally; maybe you're aware, with the experience Canada did out of Hong Kong.

Mr. ISSA. I actually—my suppliers from Hong Kong are now some of the Vancouver residents.

Mr. O'SHAUGHNESSY. I totally agree with you. It's so logical.

Mr. GARNICK. For our business, it's paramount. I think it's critical we create ease of access to find talented people. I fully support that endeavor, but I would reiterate Dr. Ruiz's comment about long term. We've got to build a foundation to tap into our vast untapped community that needs to migrate to a technology community. It's interesting from a standpoint of what we do graduate here in North America. We promote an environment that is rewarding areas of industry and other facets that are just not producing long-term productivity results to the economy, including litigation. We produce more lawyers than many other countries in their entirety. Nothing negative about lawyers, but we need to repartition a large

121

portion of that population seeking that career into the technology community to improve the outlook long term.

Ms. WINCE-SMITH. I would support what my colleagues have said but I would add to that one of the very powerful pieces of our network for retraining our workers as these jobs change, which we should not ignore investing in, are our community colleges. We know people are going to have many jobs and many skills over their life. It's hard to think of someone who's 50 or 55 in a displaced manufacturing environment moving into one of these, but we certainly should be targeting our young people in their 20's and 30's.

One of our proposals at the council that was a little extreme, but we had a lot of support for it, even inside the administration in talking with people, was when we invest in the education and our colleges and universities, the best and brightest from all over the world, we are investing in these people as taxpayers. And when they receive their degrees, we think they should be given an automatic green card. And everything that's done on the security checks should be done up front when they apply.

And so when they come in, it's as if a business person, you invest in an asset, and you're ready now to reap the reward, and you say that's gone. So I think that would be something that would really kind of be very, very transformational, and, again, it's a bold thing to address a bold need.

Mr. ISSA. Only in this body could someone be forced to say something was extreme when it was clearly common sense.

Dave.

Mr. MCCURDY. I want to commend and associate myself with Deborah's statement with regard to the green card. There is an interesting statistic, though, and this is where you all have jurisdiction and probably could help some, too. We cannot find a Federal agency that can tell you how many and where the students are in graduate schools around the country, especially in the areas of math, science, physics and others.

The one person who has that is at Oak Ridge National Labs, and there is a group there, and the statistic is that 58 percent of foreign born postgraduate students remain in the United States. Now that's still a fairly significant number, and so that's a good investment because that is the best and brightest from around the world, but we should be able to raise that number, notwithstanding all the other issues, long term, improving our own supply here.

Another interesting fact is that a lot of these H1B caps are used by family members of the person with the special skills, and they should not be counting against—why have a family of four count for really the one person who is the Ph.D. That needs to be the attracted person here. We don't want to be separating families.

Mr. ISSA. If I can, just one small followup. Dave, with your intelligence background and following up on the chairman's statement, you know the predator system was an earmark. And I would certainly say that we need to find a way to make sure that those of us who look at so many more projects do preserve certain rights to look for innovative products in some well thought out way even if it's not 14,000 well thought out ways a year—for good earmarks and against bad earmarks.

122

Mr. McCurdy. You need to change the term earmarks. I think there is a misperception about the ability of committees to do its constitutional right in the Armed Services Committee or wherever, and Predator was one.

Let me just put one bug in your ear before we wrap up for perhaps a future hearing. I keep coming back to this because this is my favorite topic, but with regard to China, the single biggest issue that the technology industry faces vis-a-vis China is intellectual property. And we as an association—and our industry is working and will soon release similar to this play book we did on innovation, which was broadly embraced by Congress and many people, we're doing one on intellectual property protection and working with some experts that have great experience in the trade world and China. And I think that at some point it would be worthwhile for this committee perhaps to spend some specific time on that issue because I think it has great leverage for us.

Chairman Tom Davis. Let me just say, Tom Friedman has been a leader in writing about observing what globalization has done, but if you go back a generation to when I was in college, Toffler wrote about the third wave and basically talked about how this would be similar to the Industrial Revolution, that every major institution would end up changing. And from hearing you today, our tax system has to be overhauled to keep us competitive, immigration system, educational system. That's where we're going.

The sooner we do it, probably the better. Because they get closer and closer and closer. These aren't ifs, it's whens. And, hopefully, the parties can come together on this. We've had some arguments over trade that were needless, in my opinion, but we had them. But on some of these other areas, we need to work together as Americans or the American economy as we know it is going to be running third or fourth place.

Mr. Garnick. If I could just add a comment on that. We see, as we consult with many companies on IT and business processes, there's a fundamental shift with many companies transforming themselves. And I think much to your point, the government and our systems need a full transformation to compete on this new global landscape. Not to throw, as somebody said, the baby out with the bath water. We're doing so many good things. But you can't wait until, in a business or an economy in a country, we can't wait until the problem is beyond us and we'd have to do it in a period of weakness. It's better to transform in a period of strength. And we recommend corporations that we help transform to take decisive action to recognize the facts, to not stick your head in the sand and deal with the issues on a fact-based environment, and transform in a period of strength versus waiting until you're in a period of weakness.

So think through that and if we can as an organization, as a corporation and as an association help the process, we would be glad to participate in any way we can.

Chairman Tom Davis. Let me just add, I mean from my own experience, January 1, 1992, I took over as the head of the county government in Fairfax County, VA, which is across the river. We were in desperate shape. We didn't have enough money in the bank to make our payroll the next month. Our commercial tax base had

123

dropped over 30 percent in 1 year. We had, from a real estate perspective, a depression.

The thing I asked in every decision we made, are these decisions going to attract capital or chase capital away from the county? When Tony Williams took over as a mayor, I said, you need to ask that fundamental question. You have all these issues coming at you that are unrelated; social issues, justice issues. But fundamentally, you have to ask these questions, either attract capital or chase it away?

We just can't be making decisions as a government that's going to chase it somewhere else. Because once it migrates there, it stays there and gets a hold, and those are just fundamental issues we ought to ask. We can disagree on social issues or we can disagree on some other issues, but on those issues, we need a competitive policy that is going to continue to attract capital, keep our dollar where it is and everything else.

I think this has been very helpful toward that. I would just add, in Fairfax now I think our economy is the envy of the world. Succeeding boards have continued to ask those kind of questions. It doesn't mean no regulation or no taxes, because you have to invest. We've asked intelligent questions, and ultimately, we asked, is this going to attract capital? That's what we need to continue ask here because our competitors are doing that around the globe. They're doing some innovative things we wouldn't even think of doing.

Mr. Ruiz, as you said, competition is good. We're going to get better as a result of this. But competition isn't just among companies; it's among nations. And we need to stay on top. And this has been very, very helpful, and I appreciate everybody being here today.

The hearing is adjourned.

[Whereupon, at 12:10 p.m., the committee was adjourned.]

[The prepared statement of Hon. Elijah E. Cummings and additional information submitted for the hearing record follow:]

124

Opening Statement

Representative Elijah E. Cummings, D-Maryland

Full Committee Hearing Entitled:

"Sharpening Our Edge - Staying Competitive in the 21st Century Marketplace"

Committee on Government Reform
U.S. House of Representatives
109th Congress

February 9, 2006

Mr. Chairman,

Thank you for calling today's critically important hearing to examine how America can best meet the challenges of increased global competition.

Today, Americans routinely encounter the dual realities of the 21st Century marketplace, where the promise of new markets and low-cost imports coexists with the devastating hardships of job loss and wage contraction. The American people, government, and business interests, have grown justifiably concerned about our nation's ability to withstand intensifying foreign competition.

1

125

Our long term economic health is imperiled by a record trade deficit totaling an expected $725 billion, a budget deficit totaling approximately $423 billion, and the disappearance of millions of American jobs to overseas labor markets.

In response to this gathering storm, the National Academies reported that "this nation must prepare with great urgency to preserve its strategic and economic security." I firmly believe that any effort to increase America's competitive edge must include a rededication by the federal government to scientific, mathematic, and engineering innovation.

For that very reason, the President's competitive initiative is in principle a step in the right direction because it attempts to increase vital funding for research and development and strengthen K-12 math and science education.

However, the President's commitment to address the competitiveness deficit would seem less contradictory if

2

126

this very Administration had not in recent years failed to support programs essential to American competitiveness. For instance, as part of the American Competitiveness Initiative, the President's FY07 budget calls for doubling National Science Foundation (NSF) funding. Ironically, however, just last year, the President's budget cut NSF funding 34% below the authorized level.

Further, while the President proposes to expand K-12 programs in math and science as part of his American Competitiveness Initiative, his FY07 budget proposed an overall cut in education funding by 3.8%, representing the most significant cut in a decade.

Although the National Academies recommended the creation of a program capable of creating 10,000 science and math teachers a year by awarding four-year merit-based scholarships, the Congress with the full support of the President recently helped close the door to college for many Americans by passing as part of budget reconciliation

127

the most draconian cut to the federal financial aid program since its inception.

Make no mistake, while we are struggling to invest the necessary funds to provide our citizens with a quality and affordable education, our economy suffers. All the while, countries like China and India are utilizing every resource necessary to develop the human capital of their citizens.

In closing, federal policymakers would do well to remember that our long term economic competitiveness is in large measure dependent not only on our resolve to spur innovation, but the strength of our commitments to education, healthcare, transportation, the environment, fair trade, and regulatory safeguards.

For example, the inadequacy of our healthcare system is a burden blunting the competitive edge of American business, as evidenced in recent plant closures and layoffs in the automobile industry. Although a comprehensive effort to bring down healthcare costs and to expand access

4

128

to meaningful healthcare coverage offers positive human and economic benefits, the President's budget fails to address our healthcare crisis comprehensively.

Mr. Chairman, let us embrace the calls of the American people to develop a robust and comprehensive plan to ensure our nation remains a preeminent global competitor. I look forward to the testimony of today's witnesses and yield back the balance of my time.

129



# Statement
## of the
## U.S. Chamber
## of Commerce

**ON:**    Sharpening Our Edge – Staying Competitive in the
21st Century Marketplace

**TO:**    THE HOUSE COMMITTEE ON GOVERNMENT
REFORM

**DATE:**   FEBRUARY 9, 2006

The Chamber's mission is to advance human progress through an economic,
political and social system based on individual freedom,
incentive, initiative, opportunity and responsibility.

1

130

The U.S. Chamber of Commerce is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region.

More than 96 percent of the Chamber's members are small businesses with 100 or fewer employees, 71 percent of which have 10 or fewer employees. Yet, virtually all of the nation's largest companies are also active members. We are particularly cognizant of the problems of smaller businesses, as well as issues facing the business community at large.

Besides representing a cross-section of the American business community in terms of number of employees, the Chamber represents a wide management spectrum by type of business and location. Chamber membership in each major classification of American business – manufacturing, retailing, services, construction, wholesaling, and finance – numbers more than 10,000 members. Also, the Chamber has substantial membership in all 50 states.

The Chamber's international reach is substantial as well. We believe that global interdependence provides an opportunity, not a threat. In addition to the U.S. Chamber of Commerce's 104 American Chambers of Commerce abroad, an increasing number of members are engaged in the export and import of both goods and services and have ongoing investment activities. The Chamber favors strengthened international competitiveness and opposes artificial U.S. and foreign barriers to international business.

Positions on national issues are developed by a cross-section of Chamber members serving on committees, subcommittees, and task forces. Currently, some 1,800 business people participate in this process.

131

**Statement for the record**
**Sharpening Our Edge – Staying Competitive in the 21st Century**
**Hearing before the**
**HOUSE COMMITTEE ON GOVERNMENT REFORM**
**On behalf of the**
**U.S. CHAMBER OF COMMERCE**
**By**
**Dr. Martin Regalia**
**Vice President for Economic and Tax Policy & Chief Economist**
**U.S. Chamber of Commerce**
**FEBRUARY 9, 2006**

Chairman Davis, Ranking Member Waxman, and members of the Committee, I am Dr. Martin A. Regalia, Vice President for Economic and Tax Policy and Chief Economist of the United States Chamber of Commerce. It is my pleasure to submit the following testimony for the record on behalf of the U.S. Chamber of Commerce. The U.S. Chamber of Commerce is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region.  Over ninety-six percent of Chamber members are small businesses with fewer than 100 employees, yet a large percentage of the nation's largest companies are active members.

Mr. Chairman, you are to be commended for holding hearings on such an important topic as the competitiveness of American businesses and the U.S. economy in the 21st century. You have specifically requested that I comment on the competitive challenges facing American businesses, what changes American businesses must make to meet those challenges and what changes must be made in federal policies to maintain America's pre-eminence in the world economy.

Clearly, in the post WWII period, the U.S. economy has been the model for virtually all other economies to emulate.  We have generally exhibited strong growth, mostly stable prices, low interest rates and high levels of employment. In the relatively few instances when we have experienced problems such as low growth or recession, high inflation and interest rates, and weak employment, we have been able to institute policies that limited the duration and scope of these episodes. As a result, we have experienced positive productivity growth and a rising standard of living.

3

132

Our pre-eminent position has not gone unchallenged. In the 1950s and 1960s, the Russian space program threatened our technological leadership, and in the 1970s and 1980s, Germany and Japan threatened to eclipse our production and manufacturing capabilities, but in each case we met the challenge and remained out in front.

Today, our economy is still leading the world. In 2005, our real Gross Domestic Product (GDP) grew 3.5 percent, outstripping that of the European area, Canada, Japan and Mexico. Our economy created over 2 million new jobs and the unemployment rate ended the year below 5 percent – lower than the average of the last three decades. Inflation and interest rates, while up from a few years ago, are still low by historical standards. Almost 70 percent of Americans own their own homes and household wealth hit an all-time record level of over $51 trillion.

While we clearly have a strong economy today, our prosperity and our leadership are being challenged by two fundamental realities growing daily in scope and urgency – the rise of global competition and changing demographics at home. How we address these challenges will determine whether we maintain and enhance our position of world leadership or finally succumb to the challenge and adopt the role of follower.

The face of global competition is changing dramatically. For decades, America has effectively dealt with competition from cheaper foreign labor by creating and employing a more productive labor force, better educated and better trained than our competitors. Even though our hourly wages were higher than many of our competitors, we produced more per hour of work and thus were able to provide a competitively-priced product. American innovation and capital formation fostered this productivity growth and kept us one step ahead of the competition. Some less-skilled jobs were shifted abroad but the higher-skilled and higher paying jobs remained at home.

Now we are faced not only with cheaper foreign labor but with foreign labor that is better educated and more skilled than in the past. At the same time, the American education system is not keeping pace. As a result, more of the innovation which is so vital to our productivity growth is taking place abroad.

Our competitors are opening their economies, embracing free markets, encouraging entrepreneurs, building critical infrastructure, competing for energy and natural resources, and challenging us in third country markets – in

4

133

other words doing all the things that we encouraged them to do for the past 50 years. A recent report of the National Academy of Sciences included a number of anecdotes and indicators highlighting this troubling trend.

In the last 20 years, the U.S. share of the world's high technology exports has fallen from 30% to 17% and the U. S. has become a net importer of high-technology products.

In a recent year, chemical companies closed or marked for closing 110 facilities in the U.S. and of the 120 chemical plants costing $1 billion or more being built around the world only one is in the U.S. and 50 are in China. Only three American companies ranked among the top ten in patents granted by the U.S. Patent Office in 2003. And, the most recent data available indicated that U.S. companies spent more on tort litigation than on R&D.

Less than a third of 4th and 8th graders in the U.S. were "proficient" in mathematics and U.S. 12th graders scored below the average of 21 other countries in their knowledge of mathematics and science. In the United States, 32% of undergraduates receive their degree in science and engineering – in Germany the figure is 36%, in China 59% and in Japan 66%. China graduates more than eight times as many engineering students than the U.S. … India five times as many.

The United States ranks only 12th in the world in broadband penetration. One in four South Koreans has high-speed internet access, double the percentage of Americans.

At the same time, 77 million baby boomers are preparing to retire. This population shift will swell already exploding health care costs and frustrate attempts to control federal deficits.

If we are to once again rise to the occasion and successfully meet these challenges, we must do so with a renewed sense of purpose and urgency. We must realize that our place in the world was not a birthright but was earned with hard work, sacrifice, and risk-taking. The path to success cannot be gained by protectionist policies that seek to wall-off the rest of the world but rather by embracing the competitive environment and renewing our commitment to efficiency, excellence and innovation. We must create a more flexible, more open, and less bureaucratic economy.

5

134

There are a number of areas where Congress can play a key role in securing our economic future.

## Legal and Regulatory Reform

Today, many Americans are losing faith in the legal system. They are tired of seeing people using it as lottery to get rich quick. A recent poll found that 83% of Americans believe that our legal system makes it too easy to make invalid claims and over half don't believe that the system will protect them from baseless claims.

Nearly 90% of U.S. corporations are faced with some type of litigation and the average company balances a docket of 37 U.S. lawsuits. Companies with $1 billion or more in annual revenues face 147 lawsuits at any given time. The national cost of the tort liability system is estimated at $246 billion – more than 2% of GDP. By comparison, costs in Canada, Japan, France and the United Kingdom average less than 1% of GDP. Put another way, tort costs in the U.S. amounted to more than 8 times what the federal government spends on homeland security and 4 times more than it spends on education.

Abuse of the tort system is going international with the trial bar not only forum shopping abroad but also attempting to open the U.S. system to foreign plaintiffs under the Alien Tort Claims Act.

Not only do these costs divert money from investment and job creation, they stymie innovation, research, and development. These costs also place U.S. companies at a competitive disadvantage.

Congress should halt this global forum shopping and stop gratuitous legal assaults on companies and entire industry segments such as the food industry. The Congress should pass legislation that sets standards for medical screening to stop fraudulent practices in mass tort litigation and reduce the number of questionable claims. Congress should enact a comprehensive and rational solution to the burgeoning asbestos-related liability crisis.

American employers must comply with labor laws and workplace regulations such as the Occupational Safety and Health Act, the Fair Labor Standards Act (minimum wage and overtime), and the Family and Medical Leave Act, to name but a few. In 1994, the GAO listed nearly 30 labor laws as being the most significant that affect American employers. Among them were: Age Discrimination in Employment Act, Americans with Disabilities Act,

6

135

Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Contract Work Hours and Safety Standards Act, Davis-Bacon Act, Drug-Free Workplace Act, Employee Polygraph Protection Act, ERISA, Equal Pay Act (amendments to the Fair Labor Standards Act), Immigration Reform and Control Act, Labor-Management Reporting and Disclosure Act,  National Labor Relations Act, Service Contract Act, Title VII of the Civil Rights Act, and Workers' Adjustment and Retraining Act.  Since then, others have been added such as the Uniformed Services Employment and Reemployment Rights Act.  Similar levels of workplace regulation are not associated with countries such as China or India which are often cited as the primary threats to the competitiveness of American companies.  These requirements are not going away and American employers have been extraordinarily resourceful over the years in absorbing these burdens.  However, as new requirements are added the gulf between the obligations American companies face and the level of burden their competitors face grows ever wider.

Accordingly, the goal for workplace regulations should be to minimize the impact so that American employers are able to make the necessary adjustments with minimal disruption and commitment of resources.  To achieve this, a number of changes are needed.  Legislation and regulations must be as narrowly tailored as possible.  Agencies charged with implementing laws and issuing regulations must provide useful and easily accessed compliance assistance to make sure companies with limited resources are able to comply without hiring expensive outside consultants or additional staff.  Enforcement of regulations must be limited to those cases where legitimate violations have occurred and employers should not be harassed by agencies merely for the sake of creating the impression that a regulatory mission is being satisfied, nor should the federal government use its superior resources to extract one-sided settlements from employers.  Small employers should have the opportunity to recover their attorneys' fees when they are successful in challenging a government citation and frivolous private litigation based on open-ended laws must be deterred so that employers are not faced with a perpetual threat of being "one lawsuit away" from being put out of business.

## Health Care and Pension Issues

Some of the best health care in the world is delivered in the United States, but the cost of providing it is severely impairing the competitiveness of U.S. companies and putting coverage out of reach of many American workers.

7

136

U.S. companies provide health care coverage to 136 million Americans but the cost places these companies at a distinct disadvantage when compared to their foreign counterparts. For example, General Motors spends more than $1,500 on health care for every vehicle it produces, more than it spends on steel. Ford is experiencing similar costs.

Here again, Congress can help. Congress should pass legislation allowing small businesses to pool risk and access health coverage without regard to state mandates and make it easier for small businesses to participate in Health Savings Accounts. Congress should modify the existing "use or lose it" rules for Flexible Savings Accounts. Congress should also provide a comprehensive reform of the health care liability system, including placing caps on non-economic damages and limits on attorneys, and ensuring that liability for employers and health plan sponsors is not expanded.

As businesses compete in a global market, it is important that employee benefit plans remain a viable tool for American employers to attract and retain high-quality workers. For this to continue, employers must have the necessary flexibility to respond to the needs of a changing workforce and of a more volatile market. It is also imperative that employers maintain the flexibility necessary to fulfill promises that have been made to workers. For example, pension funding rules that allow employers to contribute more in good economic times and less in bad economic times are vital, as is the ability to offer a variety of options for providing employees assistance with meeting their health care needs. In addition, burdensome rules and regulations hinder the effectiveness of such tools and mandates of any sort are anathema to the current voluntary benefit system.

**Energy**

The U.S. economy runs on energy. If businesses cannot get a stable supply of affordable energy in this country, they will be forced to go where they can.

The global energy markets have undergone a dramatic change in the past decade. We are no longer **the** major purchaser of oil; we must compete with China, India and the rest of the developing world. China is now the second biggest energy consumer after the United States. Moreover, in the next twenty years, China and the rest of Asia will need 129% more energy than today and the U.S. demand will rise by a third – even with continued improvements in efficiency.

8

137

We cannot continue to depend on the fickle supplies and uncertain politics of the Middle East, Venezuela, Africa and Russia. We must develop additional traditional energy supplies in our own country, pursue alternative sources of energy, and promote the development of new technologies and greater efficiency.

The energy plan that was signed into law last year was an important step, but we need additional legislation to increase refinery capacity, open up more federal land to energy exploration, and increase incentives to expand nuclear power plants.

### Workforce, Education and Immigration

With the current unemployment rate below 5%, American businesses face a growing crisis in finding enough qualified workers. Moreover, this labor market squeeze is coming from both ends – our workforce is aging and our education system is not producing sufficient numbers of qualified replacements.

Many of the jobs becoming available today look much different and require a different skill set than they did yesterday. They demand greater technical skill and a greater understanding of mathematics and science. Other countries are producing students better suited to the demands of today's economy - engineers, for example - in greater numbers than we are.

We support the goals of the President's "No Child Left Behind" program and we want to work with Congress, local chambers, local businesses, and education and training institutions to ensure that federal education and training programs authorized under the Workforce Investment Act focus on the elements necessary to help American workers obtain high-wage, high-skilled jobs. We also urge Congress to reauthorize the Higher Education Act with provisions that recognize the needs of adult workers and ensure that there is equitable treatment for - and expanded access to - proprietary postsecondary education companies. Also, the President has recently unveiled a program designed specifically to address education in mathematics and science, and we urge Congress to move quickly and work with the Administration to push this initiative forward.

While we grapple with the problems in education and training, we must also reform our dysfunctional immigration laws. We urge Congress to pass comprehensive, fair immigration reform that, along with improved border security, will meet the labor demands of today's economy.

9

138

Such reform must provide an earned pathway to legalization for undocumented workers already contributing to our economy, provided that they are law-abiding and prepared to embrace the obligations and values of our society. We must create a carefully monitored guest worker program to fill the growing gaps in America's workforce, recognizing that, in some cases, permanent immigrants will be needed to fill these gaps.

We must also refrain from unduly burdening employers with worker verification systems that are underfunded or unworkable, and address delays, backlogs, and disruptions in our immigration and border management systems that impede the movement of legitimate cargo and travelers across U.S. borders.

Finally, reform must ensure the continuity and expansion of H-1B and L-1 visas for professionals and highly valued workers.

## Telecommunications, Infrastructure, and Taxes

Telecommunications is the central nervous system of the U.S. economy. It allows the distribution of voice, video and data for almost every business in the U.S. as well as providing communication with others around the world. Presently, we have a system in which the government determines the competition not consumers or technology. As a result, we have a telecommunications industry that is still losing jobs and is unable to bring new technology to the marketplace.

Meanwhile, India and China are using cell phones in lieu of computers for broadband connections at much greater speeds than we have. This fosters the transmission of voice, data and video instantaneously. If we cannot deregulate the present system, we will be at a vast disadvantage to our foreign competitors.

To address our nation's decline as a leader in telecommunications, the Chamber urges Congress to reform the 1996 telecommunications law that was written before the Internet was in common use or broadband was even a term in our vocabulary and replace it with a law that fosters innovation and investment in the telecommunications industry.

Specifically, Congress should repeal the 1996 Act by deregulating the industry and allowing consumers and technology to decide economic winners and

139

losers, not the government. Such reform should address the extraordinary taxes now imposed on telecommunications which are now three times higher than taxes imposed on business in general. Finally, Congress should release to the private sector, for innovative wireless uses, the large amount of spectrum now owned by the federal government.

The new role of the Federal Communications Commission should be to ensure an open and fair market for telecommunications services. This new role would be modeled after the Federal Trade Commission, which has been an excellent model for maintaining competition for almost a century.

Other forms of infrastructure are also in need of repair. Now that Congress has reauthorized SAFETEA-LU, it should fully fund the nation's waterways programs; support increased investments in the Federal Aviation Administration and the Air Traffic Control System; and protect the Aviation Trust Fund so that the necessary funds are dedicated to the aviation infrastructure.

Finally, Congress should address inequities in the tax code. U.S.-based companies generally face higher tax rates than their foreign-based competitors. While some help has come courtesy of recent changes to the tax code, including lowered corporate income tax rates, reduced double taxation on dividends and capital gains, a deduction for income from U.S. production activities, and several items of simplification and reform in the areas of interest expense allocation rules, foreign tax credits, and temporary incentives to reinvest foreign profits in the U.S., more needs to be done.

In order to ensure our companies' competitiveness in the global marketplace, Congress should: make permanent the recent tax cuts; accelerate cost recovery for business assets; consider movement to a system that taxes revenue on a territorial basis, based on where it is earned (as many foreign tax systems do for their residents); refrain from hobbling our businesses' ability to restructure themselves internationally; and press for rapid modernization and updating of vital tax and trade treaties.

**Trade Issues**

With 96% of potential future markets outside the United States, it is clear that trade will play a large role in our future. It is vital that we continue to knock down trade barriers abroad while simultaneously keeping our markets open at home. This is especially challenging when viewed against the backdrop of our

11

140

need to maintain homeland security during a global war on terror. We must also protect our intellectual property and stop the pirating and counterfeiting of our products.

We must build support among government and business leaders for an ambitious outcome in the WTO's Doha Development Agenda negotiations, with the goal of new market access around the globe for agricultural products, manufactured goods, and services. At the same time, we advocate the negotiation of ambitious and comprehensive free trade agreements (FTAs) with commercially significant markets overseas and urge their timely approval by Congress and their effective implementation at home and abroad. We also urge the renewal of the generalized system of preferences program as well as approval of legislation granting Russia NTR and entry into the WTO when Russia demonstrates progress towards securing intellectual property rights. We support an amendment to the atomic energy act of 1954 enabling the sharing of civilian nuclear technology with India. The U.S. Chamber of Commerce has formed the coalition for partnership with India to support this effort.

We must promote regulatory compatability between U.S. and foreign regulatory bodies with respect to product standards and competition policy. At the same time, we oppose barriers to international business that needlessly curtail global sourcing, deny U.S. firms access to foreign markets through ineffective unilateral sanctions, limit inward foreign investment, and bar U.S. exports of widely available technology products.

**Strengthen U.S. Capital Markets**

Today, nearly half of all American households – 57 million in all – own stock either directly or through mutual funds. That's nearly double what it was just 16 years ago. Since the corporate scandals and the passage of Sarbanes-Oxley, we have imposed many serious changes on our public markets and our public companies – some of them needed reforms but others that threaten the competitiveness and innovative spirit of business. Moreover, the SEC, state attorneys general, and other prosecutors have at times disregarded the due process rights guaranteed to all Americans.

The Chamber continues to speak out against these abuses as well as the regulatory overreach that has unduly burdened honest companies and caused many to flee or avoid our public capital markets altogether.

12

141

Specifically, Section 404 of Sarbanes-Oxley has had unintended impacts on corporate leadership and the use of company resources. It has discouraged participation on corporate boards and audit committees, and has damaged relationships between auditors and their clients. The Chamber has issued detailed suggestions for improvements in the application of Section 404 rules and we advocate their acceptance.

**Conclusion**

American business and the U.S. economy have faced challenges before and always overcome them. Innovation has been the key to our success in the past and can be again. But, if we are to succeed, we must remove the shackles of costly unnecessary regulation, eliminate legal impediments, unlock our reserves of human capital, embrace competition that drives efficiency and engage our international competitors. Complacency is tantamount to defeat.

142

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

## tax analysts | viewpoints

## The Urgency of Border-Adjusted Federal Taxation

### By David A. Hartman

David A. Hartman, an economist and retired banker, chairs both the Lone Star Foundation, Austin, Texas, and the Rockford Institute, Rockford, Illinois, and is a frequent contributor of articles on economics and public finance to their respective publications. He recently served as editor and a contributing author for the Institute for Policy Innovation's "Road Map to Tax Reform" project. His special report, "The Strategic Steps to Tax Reform" appeared in Tax Notes, Mar. 31, 2003, p. 2033.

In this article, Hartman writes that the urgency of adopting border-adjusted supply-side reform of federal taxation as proposed in "Strategic Steps to Tax Reform" has been made evident by the crisis in the manufacturing sector. That crisis, he says, has been primarily caused by every OECD country, except the United States, employing border-adjusted taxation in the form of value added consumption taxes on manufactured goods that are rebated on exports and levied on imports at an average rate of 17.7 percent ad valorem. Those VATs, Hartman argues, are a sufficiently insurmountable barrier to U.S. competitiveness to be the primary cause of the negative U.S. balance of trade deficit in manufactured goods with every other major country. The consequences he sees have been a precipitous decline in manufacturing as a share of U.S. value added and employment, a declining "blue-collar labor" share of national income, and transition of the United States from the world's largest creditor to the world's largest debtor, which in turn threatens

future U.S. prosperity and security. Hartman exposes what he calls the naïveté of those who claim that the seriousness of the problem is imagined or that the crisis will be self-remediating.

The border-adjusted tax reform, Hartman proposes, would, he argues, be best achieved via the business transfer tax, a subtraction-method VAT that credits employer FICA, exempts investment and exports, and taxes imports. Hartman's first step toward reform would create a 5.5 percent BTT that would replace the corporate income tax and credit employer FICA. The second step would increase the BTT to 10 percent, allowing the imposition of a single 14 percent consumed income tax, and elimination of all discriminatory elements of the federal tax code. In the final step, the BTT would be increased to 20 percent and replace the entire federal tax code other than individual FICA, with rebates to all taxpayers of the equivalent of BTT on poverty-level income.

The border-adjusted tax reform proposed in this article, Hartman concludes, would meet the goals of supply-side federal tax reform: it would be neutral, transparent, and impose a single rate of taxation on consumption at the lowest possible marginal rate. But at least as important, he says, is that tax reform using the border-adjusted BTT would level the playing field for U.S. manufacturing and therefore help to close the trade deficit, increase labor incomes, and restore long-term prospects for U.S. competitiveness, prosperity, and security.

### Crisis in U.S. Manufacturing

Despite the deep plunge in the stock market, the recent U.S. recession was the shortest and mildest of the post-WWII period when judged by the effect on total U.S. employment. From the peak in July 1998 to the low in January 1999, just six months later, employment declined by only 1.43 million workers. By May 2004, 7.5 million additional people were employed.[1]

But for the U.S. manufacturing sector the employment recession has been the longest and most severe since the Great Depression. Employment in manufacturing jobs fell 3.5 million workers, 19.7 percent of peak payroll in June 1998. As of May 2004, only 187,000 were re-employed, just 1 out of every 19 laid-off employees.[2]

Manufacturing's dollar share of the U.S. economy has been in a relentless decline to less than 50 percent of what its share of Gross Domestic Product was in the 1950s and employment

---

[1]Employment Level (Unadj.), Series ID: LN 002000000, U.S. Department of Labor, http://www.bls.gov, July 2004.

Total U.S. Employment Level, Thousands

| | |
|---|---|
| July 1998 | 132,769 (peak) |
| January 1999 | 131,339 (trough) |

(Footnote continued in next column.)

---

[2]Manufacturing: All Employees (Unadj.), Series ID CEU3000000001, U.S. Department of Labor, http://www.bls.gov, July 2004.

| | | |
|---|---|---|
| Decrease | 1,430 | (7/98 to 1/99) |
| May 2004 | 138,867 | (most current) |
| Increase | 7,528 | (1/99 to 5/04) |

(Footnote continued on next page.)

143

## COMMENTARY / VIEWPOINTS

*in manufacturing as a share of total U.S. employment has fallen proportionately,*[3] as shown in Exhibit 1 (Appendix).

This trend originated because of relatively greater productivity in manufacturing than in the rest of the U.S. economy, and relatively higher growth of consumption of services and government. However, starting in the 1970s an additional factor has exacerbated this trend: The growing relative competitive advantage of foreign competitors due to border-adjusted taxation not afforded U.S. manufacturers under the federal tax code. As a consequence, a trade deficit in goods began in 1971 and has increased ever since (Exhibit II). Today, when U.S.-produced manufactures for consumption and export are compared to imports, U.S. companies are producing the equivalent of only $4 worth of every $5 of manufactured goods consumed in the United States.[4] The U.S. trade deficit in goods for the past full year (2003) was $547 billion, the bulk of which was due to the $469 billion manufacturing trade deficit.[5]

The United States has a sizable negative trade balance in goods with every principal nation and region (Exhibit III). A substantial offset provided by U.S. services exports has leveled out, while the merchandise deficit is predicted to continue to grow through at least 2005, *despite the recent devaluation of the dollar.*[6] The deficit on trade is currently approaching $600 billion per year, more than 5 percent of GDP, and the net amount of U.S. assets now owned by foreigners is currently estimated to total $3.7 trillion,[7] roughly comparable in scale to the total pri-

---

All Manufacturing Employees, Thousands

| | |
|---|---|
| June 1998 | 17,708 (peak) |
| January 2004 | 14,213 (trough) |
| Decrease | 3,495 (6/98 to 1/04) |
| May 2004 | 14,400 (most current) |
| Increase | 187 (1/04 to 5/04) |

[2]*Statistics for All Manufacturing Establishments: 2001 and Earlier Years,* and *Exports and Imports of Goods by Principal SITC Commodities,* U.S. Department of Commerce, http://www.census.gov (hereafter *Statistics for All*).

Value Added in Manufacturing % GDP

| | |
|---|---|
| 1953 | 29.66% |
| 2003 | 12.7% |
| % Decline | (57.2%) |

[3]*Id.*

% Manufactured Goods Consumed U.S. Produced, 2001

| | |
|---|---|
| GDP in Manufacturing | $1,423.0 billion |
| Net Imported Manufactures | 368.9 |
| U.S. Consumption Manufactures | $1,791.9 billion |
| % Consumption Manufactures | |

U.S. Produced (Line 1 divided by Line 3) = 79.4%

[4]*Survey of Current Business, June 2004,* U.S. Department of Commerce, BEA, Table F, p. D-62, and *Statistics for All,* note 3 supra.

[5]*USA Inc., 2004 Annual Report,* BCA Research Montreal, Quebec, Canada, June 2004, p. 14.

[6]*Survey of Current Business,* note 5 supra, Table F.1 and Table G.1

U.S. Investment Position Y.E. 2002 (@Mkt.)    ($2,861 bil.)
(footnote continued in next column.)

vately owned portion of the U.S. federal debt. The United States, which was the world's largest creditor in 1982, has since become the world's largest debtor as a consequence of the relentless growth of the trade deficit (Exhibit II).

The National Association of Manufacturers (NAM) warned earlier this year that "the country may be dropping below critical mass in manufacturing."[8] That is not hard to believe as depressed manufacturing centers lose vital supporting services and declining output of traditional industries provide neither the volume nor financing required for the new factories and equipment that employ newer and most productive technology. The United States is the leader in high-tech product innovation, yet the value of current exports is only one-third the value of imports in EDP and office products.[9]

Many optimists look to our strong improvement in manufacturing productivity as the source for restoration of U.S. competitiveness. However, a recent *Business Week* article, "U.S. Factories Falling Behind," showed that even higher increases in manufacturing productivity than current U.S. rates of increase are being achieved by many of our principal foreign trading partners, raising serious doubt that productivity alone can reverse the decline of the manufacturing sector.[10] Claims that devaluation of the dollar will right the trade balance have not proved reliable in the past either.

Others see no problem, because foreigners must reinvest their dollars in the United States if they do not buy our merchandise. However, those dollars invested in U.S. debt and equity securities or productive assets by foreigners have a price tag — the interest, dividends, and rentals that will increasingly leave the United States even more indebted.

How, then, is the United States to "balance the books" in foreign trade? The answer is obvious, but has been subject to censure by ideological commitment to the dominant "prevailing wisdom" of the internationalists.

*The removal of tariff barriers has been nullified by their equivalent in the form of border-adjusted taxation of merchandise adopted by every one of the United States's principal trade partners. As will be shown in the following, U.S. manufacturers cannot realistically be expected to compete effectively until this foreign tax advantage is remediated by replacing current U.S. income taxation with comparable border-adjusted taxation as an urgent requirement for federal tax reform.*

---

| | |
|---|---|
| Add: Deficit Balance on Current Account 2003: | (541.8) |
| Deficit Balance on Current Account mid-2004 est.: | (300.0) |
| Est. U.S. Investment Position @mid-yr. 2004 | $3,701.8 |

[8]"Group (NAM) Warns Factory Weakness Could Hurt U.S.," *The Wall Street Journal,* June 11, 2003, pp. 2-4.

[9]*Exhibit III: Exports and Imports by Principal SITC Commodities,* U.S. Department of Commerce, http://www.census.gov. foreigntrade.

ADP Equipment; Office Machines (2004 YTD)

| | |
|---|---|
| Exports | $13.51 billion |
| Imports | $35.21 |
| Exports % Imports | 32.7% |

[10]"U.S. Factories Falling Behind," *Business Week,* May 14, 2004, p. 44.

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

144

COMMENTARY / VIEWPOINTS

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

Note: "Internationalists" are defined for the purposes of this statement as those who give international interests primacy over national interests, as compared to nationalists who value international interests to the extent they serve their national interests. Rational nationalists need not be isolationists or protectionists; free trade is in the best interests of all nations if afforded equal terms of trade.

## Foreign Taxation vs. the U.S. Tax Code

As a consequence of the horrors of two World Wars, over the course of the 20th century a consensus emerged rejecting mercantilism, colonialism, and ideology in favor of free trade as the basis for worldwide peace and prosperity. The "invisible hand" of free markets, "comparative advantage," plus mobility of capital, technology, and labor, would disperse the means and fruits of free enterprise worldwide. To enable such a transformation, protectionism in the form of quotas, "red tape," and high tariffs would be progressively reduced and ultimately abandoned as barriers to free trade.

The United States, as the dominant economic and military superpower of the "Free World," led the movement to dismantle trade barriers by example and by support for a "New World Order," characterized by international trade regulation (the General Agreement on Tariffs and Trade and the World Trade Organization), economic cooperation (Organization for Economic Cooperation and Development), and customs unions (such as the European Union and North American Free Trade Agreement). According to the OECD, its members had average tariff rates of 40 percent at the end of WWII; tariffs have since been reduced to an average of 4 percent.[11] The U.S. average import duty on goods is currently 1.7 percent.[12]

However, the decline of tariffs masked a trend that started in Europe toward adoption of "border-adjusted taxation" in the form of value added taxes. Those taxes were purportedly adopted to "level the playing field" for the cost of government welfare spending by destination taxation of consumption expenditures and were principally levied on manufactured goods. VATs were determined to be "indirect taxation" qualified by the WTO to be rebated on exports, and levied on imports. Led by France, which first adopted a VAT in 1968, European Common Market countries added VATs over the next five years, although Germany and Italy did not so abruptly go to current levels of VAT rates as did France, Belgium, and the Netherlands.[13] Today the EU 15 have an average "standard" VAT of 19 percent, and the average OECD "standard VAT" is 17.7 percent.[14] During the 1990s, Mexico and Canada increased composite VAT rates to 15

percent from 10 percent and 7 percent, respectively,[15] and China adopted a 17 percent VAT in 1994.[16]

U.S. corporate income taxation poses an additional difficulty for U.S. corporations in general, and manufacturers in particular. As foreign governments have increased VATs, they have been reducing effective corporate income taxes.[17] Also, U.S. taxation of resident corporations' foreign income is causing flight of corporations' headquarters to countries that exempt taxation of overseas income, which is not allowed by the U.S. tax code.

The OECD's summary of its members' tax trends in "Revenue Statistics 1965 — 2002"[18] clearly identifies the role of VATs:

Despite a small recent fall, the share of taxes on consumption (general consumption taxes plus specific consumption taxes) hardly changed between 1975 and 1995. But the mix of taxes on goods and services has fundamentally changed. A fast growing revenue source has been general consumption taxes, especially *the value-added tax (VAT) which is now found in twenty-nine of the thirty OECD countries.* General consumption taxes presently produce 18 percent of total tax revenue, compared with only 12 percent in the mid-1960's. *In fact, the substantially increased importance of the value added tax has everywhere served to counteract the diminishing share of specific consumption taxes such as excises and custom duties.* (Emphasis added.)

The only nation of the 30 OECD countries without equalizing border adjustments in its federal tax code is, of course, the United States.

While the objectives of internationalists are commendable, and without question have promoted prosperity worldwide, particularly in the less developed countries of Asia and Latin America, there are limits to the extent the United States should sacrifice the long-term best interests of its citizens as a whole in pursuit of world prosperity and those who profit overseas. It would be shown that the United States is unnecessarily endangering its security and prosperity, and particularly the economic well-being of blue-collar workers and their families, by failing to construct a level playing field for U.S. manufacturers and corporations through adoption of destination principle consumption taxation, more commonly referred to as "border-adjusted taxes" such as a VAT.

## Denying Reality of the U.S. Manufacturing Crisis

A U.S. Department of Commerce report released in January, entitled "Manufacturing in America,"[19] sets

---

[11]*Manufacturing in America,* U.S. Commerce Department, Washington, D.C., January 2004, p. 25.
[12]*Statistics for All,* note 3 supra.
[13]*VAT Rates Applied in the Member Accession States of the European Community,* European Commission, Brussels, Belgium, October, 2003, p. 3, 31.
[14]*Consumption Tax Trends,* OECD Publications, Paris, France, 2001, Table 3.5, p. 16.

[15]*Id.*
[16]*Turnover Taxes,* Lipsher Accounting Service, Los Angeles, February 25, 2004, p. 1.
[17]Engen, Eric and Hassett, Kevin A., "Does the U.S. Corporate Tax Have a Future?" *Tax Notes,* 30th Anniversary Issue, p. 15 (2002).
[18]*Revenue Statistics 1965-2002,* OECD Publications, Paris, France, 2003, p. 22.
[19]*Manufacturing in America,* note 11 supra.

145

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

**COMMENTARY / VIEWPOINTS**

forth the Bush administration's plan for meeting the challenges of U.S. manufacturers. It notes the efforts of the United States to reduce tariffs as trade barriers but fails to address the problems of the VATs adopted by all major U.S. competitors that replaced those tariffs. Its six-point plan mentions neither the competitive disadvantages for U.S. manufacturers because the U.S. lacks border tax adjustments nor the need for territorial corporate taxation. In short, the plan is positive but naïve, failing to identify or commit to the most necessary element of the very "level playing field" it prescribes.

The "prevailing wisdom" of neocon and libertarian economists is just as muddled regarding the plight of U.S. manufacturing; its causes, cures, and potential consequences. Most consider manufacturing's problems resolvable by tax reform providing greater savings for investment and lower composite marginal rates of taxation. But neither greater investment in manufacturing productivity in the 1990s,[20] nor lower marginal rates in the 1980s[21] reversed the downslide. And most of those economists are "joined at the hip" in proposing the Hall-Rabuska tax reforms centered on a "flat tax" that is *not* border-adjusted.

The House Ways and Means Committee held hearings on extraterritorial income in 2002 in which prominent tax policy experts, economists, and tax attorneys testified on the international implications of tax reform.[22] The witnesses were divided on the question of whether border adjustability was necessary or not. Eric Engen called for corporate tax reform and proposed alternatives, including reducing AMT, reduction of the doubling of taxes on dividends, or replacing the AMT with a national sales tax, a VAT, or the X-tax, a combination of a corporate VAT and a compensation tax; he also emphasized the importance of promoting saving and investment. Herman Cain recommended adoption of the Fair Tax, a retail sales tax. Ernest Christian outlined the steps to the business transfer tax, a VAT that would replace the corporate income tax. Michael Graetz observed that the United States taxes income too heavily and consumption insufficiently, recommending reform based on a VAT with an upper-income surtax. Steve Entin spoke to tax reform via the single-rate consumed income tax. William Gale proposed that the issue is whether or not to replace the corporate income tax with a VAT, not a sweeping tax reform. Dale Jorgensen outlined fundamental tax reform consisting of a capital income tax that equalizes before tax rate of return, and a proportional tax on equal income. Overall the hearings were useful as a general discourse on tax reform, but did not focus specifically on the crisis in the manufacturing sector.

A sampling of prominent opinions regarding the manufacturing sector's problems is depressing at best.

NAM presents in "Facts About Modern Manufacturing" (6th edition 2004) a graph of "real" (physical) output share of manufacturing in U.S. GDP showing that it has been relatively *constant* since WWII.[23] However, *actual* manufacturing share of U.S. GDP in dollars has declined to below one-half its mid-50s level. Are not the *dollars* that employers can take to the bank, or employees can take to the grocery store what matters, not *units* of output? The report also states that U.S. manufacturing employment "has remained fairly constant at around 16.5 million,"[24] whereas the number of employees has declined 60 percent since 1953, and 27 percent since 1979 to 14.4 million; 3.5 million manufacturing employees lost their jobs only since June 1998.[25] The NAM/MAPI report on structural costs targets improvements of U.S. competitiveness similar to the U.S. Commerce Department plan,[26] but does not address remedy of the federal tax code to compete with either VAT taxes or corporate territorial taxation.

In a *Wall Street Journal* op-ed "Don't Blame the Yuan,"[27] the Bush administration's former Chair of the Council of Economic Advisors, Glenn Hubbard, also emphasizes the comforting but misleading "constant 'real' goods physical product share of U.S. GDP in manufacturing," ignoring the plummeting *actual* dollar share of GDP. He then proceeds to compare manufacturing to agriculture, where jobs have also plummeted due to high productivity gains, but fails to note that the U.S. agriculture sector shows robust ability to be a *net exporter* despite excessive federal regulation, whereas the U.S. manufacturing sector is a *net importer*. The U.S. Department of Commerce's *Survey of Current Business* joined the purveyors of misleading data on U.S. manufacturing with its June 2004 issue's "Improved Annual Accounts for 1998-2003." Discussion and exhibits likewise centered on the relatively irrelevant *real* (physical) output share of manufacturing in GDP, which declined only in 2001, then made only casual reference to the fact that *actual* manufacturing share of GDP declined in all five years, which is what *really* matters.[28]

The Cato Institute's "Job Losses & Trade: A Reality Check," by Brink Lindsey, claims that "Deindustrialization is a myth," also stating "... the absolute number of manufacturing jobs has been quite stable."[29] He also uses the inappropriate comparison of U.S. manufacturing to U.S. agriculture. A "POLICYWIRE" from The Heritage Foundation headlining "Manufacturing Rebounds" states, "the numbers are: manufacturing employment

---

[20]Note 4 supra, p. D-56.

[21]Facts and Figures on Government Finance, 37th Edition, Tax Foundation, Washington, D.C., 2003, p. 125-128, 138, 140, 146.

[22]*Second in Series on the Extraterritorial Income Tax Regime*, Committee on Ways and Means, House of Representatives, Washington, D.C., May 2002.

[23]*The Facts About Modern Manufacturing* (6th Edition) National Association of Manufacturing, Washington, D.C., 2004, p. 7.

[24]*Id.*

[25]*Manufacturing: All Employees*, note 2 supra.

[26]Leonard, Jeremy A., *How Structural Costs Imposed on U.S. Manufacturers Harm Workers and Threaten Competitiveness*, NAM/MAPI, Washington, D.C., 2003 (hereafter *How Structural Costs*).

[27]Hubbard, Glenn, "Don't Blame the Yuan," op-ed, *The Wall Street Journal*, Sept. 9, 2003, p. A22.

[28]*Survey of Current Business*, note 5 supra at 23, 24.

[29]Lindsey, Brink, *Job Losses and Trade, A Reality Check*, Cato Institute, Washington, D.C., March 2004.

146

is expanding again and payroll jobs are growing at the fastest pace since 1990."[30] Is the return of 187,000 workers in the first five months of 2004 of the 3.5 million laid off from June 1998 to January 2004 a cause for celebration?

Paul Craig Roberts, a prominent economist in the Reagan administration, recently questioned whether the condition can be met for free trade on mutually beneficial terms, given mobility of factors of production to cheap labor countries.[31] The intrepid investor Warren Buffett cites deterioration of the U.S. balance of trade and resultant net foreign investment balance as serious enough to warrant "managed" trade.[32]

"Revitalizing American Manufacturing," published by the Industrial Council of the AFL-CIO,[33] makes a clear and accurate statement of the seriousness of the manufacturing crisis. It then cites unfair trade practices, an overvalued dollar, and tax policies favoring moving manufacturing offshore. But its proposals for dollar devaluation, making corporations pay taxes on offshore profits, government incentives, healthcare reform (more public dollars), and labor law "reforms" do not add up to an effective remedy.

To summarize, there is a serious crisis in manufacturing that is being obfuscated by those of the internationalist persuasion and those who are profiting from the unfair trade advantage of foreign goods in competition with those produced by U.S. manufacturers. The federal government has gratuitously negotiated bilateral trade agreements that have exposed U.S. manufacturers and their workers while receiving no commensurate concessions in return, which is not in America's national interest. Yet all who have profited from or gave their blessings to this folly are joined in a chorus of denying reality. That includes the politically powerful U.S. financial services sector, which plays the leading role in international finance but incurs no such border-adjusted tax disadvantages. Perhaps the apologists not directly profiting from foreign competition perceive a legitimate role in representing the interests of the information economy workers enjoying cheap foreign imports along with low-wage services of discharged production workers and excessive immigration of the unskilled; nonetheless, they too will join their compatriots in sharing a diminished future for America.

### Predictable Consequences of the Crisis

The deterioration of the U.S. manufacturing sector threatens future progress and prosperity of the U.S. economy, and risks loss of a vital source of military security. Manufacturing has perennially been the leading sector in the provision of technological progress that drives productivity across all sectors of the U.S. economy. The growing U.S. dependency on foreign manufacturers and service of the growing accumulation of foreign indebtedness and productive assets owned by foreigners will lower the prospective relative standard of living of the average American. That accumulation of overseas obligations is irresponsible public policy for a nation facing multitrillion-dollar unfunded welfare liabilities by the end of this decade. The defensive military capability of the United States has been substantially created by its manufacturers' leadership in new technology and the ability to apply this technology to the manufacturing of defensive weaponry; thus U.S. military capabilities are dependent in large measure on preserving our world leadership in the manufacturing sector.

The declining employment and earnings in U.S. manufacturing is a principal root cause for the declining share of U.S. income earned by blue-collar workers. The average factory wage per hour in real dollars declined 11.3 percent from 1978 to 2001,[34] despite an increase in productivity by one-half in the business sector, and a doubling of productivity in manufacturing.[35] The laid-off workers from manufacturing seeking re-employment in highly priced elastic service markets has added further negative pressure on blue-collar workers' incomes in general. The often-cited increasing share of income enjoyed by the top 10 percent of incomes is not because of excessive growth of returns to physical and intellectual capital;[36] it is because of the stagnation of labor income, and the principal causes are the stagnant demand for manufacturing employment joined by excessive immigration of unskilled labor. Perhaps during the early post-WWII period, at the zenith of organized labor, labor was receiving an excessive share of income. But today the opposite is the case, when it takes two workers to provide the bare essentials of a living income for a sizable number of families. The United States, which adopted the 40-hour work week in the 20th Century, enters the 21st Century with a generally adopted 80-hour family work week, of necessity more often than not.

On being apprised of the accelerating loss of manufacturing jobs, a prominent libertarian shrugged and said, " . . . maybe they will have to find something else to do. . . . " It was reminiscent of Marie Antoinette's famous comment "let them eat cake," and unless this crisis is remedied may similarly lead to more serious consequences.

### The Vital Need for Border-Adjusted Taxation

The principal problem that lies at the roots of the U.S. manufacturing crisis is the inept and outmoded U.S. tax code compared to those of our foreign competitors; most particularly, the advantage provided foreign competitors

---

[30]*Manufacturing Rebounds,* Policywire, The Heritage Foundation, http://www.heritage.org, May 11, 2004.
[31]Roberts, Paul Craig, *Clarifications on the Case for Free Trade,* Ludwig Von Mises Institute, http://www.mises.org, January 12, 2004.
[32]Buffett, Warren E., "America's Growing Trade Deficit in Selling the Nation," *Fortune,* McGraw-Hill, New York, November 10, 2003.
[33]*Revitalizing American Manufacturing,* Industrial Council, AFL-CIO, Washington, D.C., 2004.

[34]*Statistics for All,* note 3 supra.
[35]Industry Analytical Ratios for the Manufacturing Sector, U.S. Labor Department, BLS

| | 1980 | 2002 | % Change |
|---|---|---|---|
| All Business Output/hour | 79.0 | 124.0 | 57.0% |
| Manufacturing Output/hour | 70.1 | 146.3 | 108.7% |

[36]Hartman, David A., *Does Progressive Taxation Redistribute Income?* Institute for Policy Innovation, Lewisville, Texas, 2001.

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

147

## COMMENTARY / VIEWPOINTS

by border-adjusted taxes in the form of value added taxation. Comparison of relative cost factors of the United States versus its principal competitors makes clear both the overwhelming importance of the problem caused by foreign border-adjusted taxation not matched by the United States, and how unlikely will be the achievement of U.S. cost parity without effective tax reform.

The study of how structural costs threaten U.S. manufacturing competitiveness prepared by the Manufacturing Alliance/MAPI for NAM published in December 2003[37] provides a useful format for comparison of manufacturing costs for the United States versus its principal trade competitors. That study, using labor "raw cost index" per labor hour, shows the U.S. cost of $24.30 per labor hour exceeds the $19.30-per-hour average of nine principal trade partners by $5 per hour. The study goes further to show that cost disadvantages targeted for remediation by NAM — added costs of regulation, energy, employee benefits (particularly health insurance), and the difference in effective corporate income tax rates — together add an additional equivalent of $4.45-per-labor-hour burden. The total disadvantage as determined by NAM is the $9.45-per-labor-hour equivalent.

What is not considered by the NAM study is the effect of border-adjusted VATs imposed by U.S. competitors on imports from the United States, and rebated on exports to the United States that *exceed the total* of the average U.S. disadvantage in labor and burden costs identified by MAPI. The average VAT imposed on U.S. exports by OECD trade competitors is 17.7 percent ad valorem, which expressed as MAPI's labor "raw cost" index is the equivalent of $14.71 per hour, over *half again more* than the *total* MAPI-determined labor and burden cost disadvantages. A conservative estimate of the average VAT rebated on OECD exports to the U.S. is $13.04 per hour in labor "raw cost" equivalent, nearly 40 percent more than the *total* of all MAPI adverse cost factors (Exhibit IV).

The 1990s showed how serious the dilemma is, unaddressed by the federal tax code, that foreign border-adjusted VATs pose for U.S. manufacturers. Despite a 50 percent increase in manufacturing productivity for the decade, the United States has been experiencing merchandise trade deficits now exceeding 5 percent of GDP, and exports of goods whose value is only 56 percent the value of imports.[38] China, which currently is the largest trade competitor of the United States, has added substantially to its huge labor cost advantage by adopting a 17 percent VAT in 1994. Amazingly, the United States has continued to dismantle its trade barriers by reducing its average tariff on goods from 7 percent to 1.7 percent since

1967 without addressing the offsetting effect of VATs.[39] As a consequence, U.S. trade deficits in goods are projected for the currently envisionable future in excess of one-half trillion dollars annually.

As the only OECD nation without border-adjusted taxation, the United States is the most profitable market for foreign competitors, including their home markets. In effect, their exports to the United States are incentivized to the extent of their VAT rebate (on average 17.7 percent) for either higher profit, unfair competitive advantage, or a combination of the two. At the same time, they enjoy the same advantage in their home markets versus U.S. competition as a consequence of the VAT added to U.S. income taxes contained in imports. As an added bonus, they can accumulate dollars awaiting the next devaluation to buy a U.S. competitor to aid their technical capabilities and acquire an established market. The same advantages are available to a U.S. manufacturer that moves its production abroad but retains its U.S. marketing capability.

The composite cost disadvantage facing U.S. manufacturers is unlikely to be remediable without federal tax reform effectively addressing the huge price advantage enjoyed by foreign competitors because of border-adjusted VATs. Often cited as the potential remedy is the remarkable ability of U.S. manufacturers to innovate new or improved products, processes, and *forms* of enterprise. But this "intellectual capital" is just as mobile and exportable today as physical capital and as *Business Week* soberly noted recently, despite currently high rates of improvement in manufacturing productivity in the United States, foreign competitors in Asia and Europe are increasing productivity even faster. Foreign countries' schools better educate workers in math and science, and teach English as a required second language, which enables American-designed high-tech products and processes to be proficiently produced abroad (often without first being produced in the United States, as with electronic and EDP products), and it is those new plants that incorporate the newest and most productive technology. The current edition of endless ineffective "reforms" of U.S. public education has to face a real *external* problem: Why should students take tough math and science curricula to prepare for nonexistent job openings in manufacturing? The more mature U.S. industries are lagging in the productivity race in obsolete plants while Asian countries assault U.S. markets with new, high-productivity facilities, and that is where the jobs are going.

Contrary to popular economic dogma of the internationalists, devaluation of the dollar offers only limited

---

[37]*How Structural Costs*, note 27 supra.

[38]*Survey of Current Business*, note 5 supra. Table F-1, p. D-62; Table 1-1-6, p. D-3.

1st qtr. 2004: Trade Balance on Goods $603 bil./yr.
÷ Gross Domestic Product 11.45
5.26%

1st qtr. 2004: Exports of Goods $776 bil./yr.
÷ Imports of Goods 1,379
56.37%

---

[39]*Statistics for All*, note 3 supra.

Labor Share of Manufacturing Value Added, 2004

| | |
|---|---|
| Labor Wages | $343.0 bil. |
| Ratio, Total Comp | × 26.02/hr. |
| to Wages | ÷ 17.43/hr. |
| Labor Compensation | $512.0 bil. |
| ÷ Value Added in Mfg. | ÷ 1,853.9 bil. |
| Labor Share Mfg. VA | = 27.6% |

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

148

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

short-term relief, and even more limited remedial prospects for enabling competitive U.S. manufacturing. In an open world economy, the parity achieved by devaluation is temporary, given world commodity pricing and the mobility of intellectual and physical capital in pursuit of prevailing world returns to capital and compensation. What devaluation *does* achieve is recurrent "bargain basement" prices for the most strategic and productive American economic assets, which is the sorry price of "America for sale." When adjustment to the new exchange rates is effected, the principal burden of lower real prices is forced onto labor, which in the U.S. manufacturing sector averages slightly above one-quarter of value added.[40] Arnold Harberger arrives at the same conclusion — that the "wedge" of the corporate taxation has incidence primarily on labor — in *ABCs of Corporate Taxation*.[41] If governments at the federal, state, and local levels raise taxes that are not border-adjusted to augment depressed revenues and rising welfare costs, they only pour fuel on the fire. The experience of the United Kingdom during the post-WWII period, when it opted for "quick fixes" by devaluation, was prolonging, rather than remediating, uncompetitive manufacturing until competitive VAT taxation and supply-side income tax reductions were finally adopted.

Supply-side economic prescriptions — lower government spending, lower marginal income tax rates, and deferred taxation of saving for investment — will definitely be helpful, but will not be sufficient to overcome VAT tax advantages of 17.7 percent on average for OECD competitors rebated on exports to the United States, and added to imports from the United States. Consider the impact of a 17.7 percent selling price advantage for a foreign competitor when the average U.S. manufacturer had a pretax operating profit of 5.4 percent of sales in 2003.[42] That is particularly true given foreign competition simultaneously lowering effective corporate income taxes relative to U.S. levels and increasingly undertaking fundamental tax reform as well. Witness expensing of fixed investment in the Netherlands and Russia's adoption of the flat tax. As Enger and Hassett observed in their recent review of international corporate taxation " . . . if current EU trends continue, the corporate income tax may virtually disappear and be replaced by revenue from the VAT in just a few decades."[43]

An additional taxation disadvantage of U.S.-based international corporations is U.S. taxation of foreign earnings. This has added to incentives to move U.S. corporate headquarters abroad, which eventually results in sourcing corporate services abroad as well, reducing U.S. ability to help partially finance its merchandise

deficit from its services trade surplus. The adoption of territorial taxation for U.S. corporations would restore the United States as the preferred location for corporate headquarters.

**The Strategic Steps to Border-Adjusted Tax Reform**

The time has come for the United States to afford its manufacturers relief by replacing the corporate income tax with a border-adjusted and territorial tax code that levels the economic playing field with foreign competitors. The tax selected should also meet the requirements of supply-side tax reform, including neutrality of taxation of savings versus consumption, reduction of marginal rates, equitable assessment, and transparency.

There are four principal candidates for supply-side tax reform:

1. The Hall-Rabuska "flat tax," which is a single-rate tax on wages and an equal-rate tax on origin-based corporate cash flow tax that exempts returns to capital at the personal level.

2. The "consumed income tax," (CIT) which taxes all income once only at the personal level after exemption of saving for investment.

3. The "Fair Tax" (RST), which is a flat-rate retail sales tax on consumption that replaces all federal taxation, including social insurance taxes, and abates the tax on the equivalent of poverty-level income to all taxpayers via rebates.

4. the business transfer tax (BTT) as proposed is a subtraction-method VAT levied on value added determined as the difference between revenues and purchased goods and services for all enterprises and employers. It exempts fixed investment and exports but includes imports and credits employer-paid social insurance taxes. Rebates would be used to remit tax on "necessities," as with the "Fair Tax," which is the principal difference between the BTT and the "USA Tax."

Each of these candidates has distinctive characteristics regarding suitability for destination (border-adjusted) taxation and supply-side tax reform.

The flat tax, being a "direct tax," is not border-adjusted by WTO standards, which effectively excludes it as basis for relief for U.S. manufacturing. Although it is promoted as a simple tax, as a political reality it would be subject to continuing redefinition of income, and is potentially susceptible to return to a progressive rate schedule. It would also prove to be politically difficult to convince the majority of wage-earning taxpayers of the equity of returns on capital previously taxed being exempt at the personal level, making it a dubious political prospect for successful tax reform.

The CIT shares with the flat tax the problem of WTO classification as a "direct tax," making it ineligible for border adjustment. While it has the perceptual advantage of taxing all income the same when received after exempting saving for investment, it still depends on future definition of income and is potentially susceptible to progressive taxation, resulting in higher-than-necessary marginal rates.

This leaves only two border-adjusted tax reform candidates, the retail sales tax and the business transfer tax.

[40]*Statistics for All*, note 3 *supra*, and *Statistical Abstract of the U.S. 2003*, U.S. Department of Commerce, U.S. Govt. Printing Office, No. 646, p. 426.

[41]Harberger, Arnold C., *The ABCs of Corporate Taxation*, Tax Policy and Economic Growth, American Council for Capital Formation, April 1995, p. 61.

[42]Table 1.0, Income Statement for Corporations in the NAICS Manufacturing Sector, U.S. Department of Commerce, U.S. Census Bureau.

[43]Note 17 *supra* at 29.

149

COMMENTARY / VIEWPOINTS

The RST and the BTT are both consumption taxes, but would likely differ as to tax base and therefore the required tax rate for tax revenue neutrality. The retail sales tax has as its base all personal consumption expenditures *in theory* — but experience with state retail sales taxes shows that it is very difficult politically to directly tax "necessities." So a large portion of consumption — housing, medical care, food, legal fees, hair care, and so forth — is exempt from state retail taxes. Even without exemption of certain necessities justified by tax rebates the RST would have a smaller potential base, requiring a higher rate than the BTT and incentivizing tax evasion. Were an RST to replace *all* federal taxation as the "Fair Tax" proposes, then it would either have a smaller base than the proposed BTT or it would have to introduce a companion tax suitable for taxing payroll and consumption expenditures of government and not-for-profits to provide as broad a base as the BTT.

The business transfer tax offers many advantages as the principal levy for federal taxation besides border adjustability and territoriality as corporate taxation. As proposed, the base for the BTT would include all commerce and employers, eventually including employment and purchases of both the government sector and employment of the currently ballooning not-for-profit sector. That would provide the most equitable and efficient tax neutrality and the lowest possible marginal tax rate. Although in effect it would be primarily incident at the consumption level, the BTT would be collected uniformly at the employer level with little justification for allowing exemption, and would also provide equitable rebates on the equivalent of income for necessities as replacement for exemptions, deductions, and credits if adopted as a single flat tax for the complete elimination of income taxation. Perhaps the BTT is not as transparent as the RST; however, the BTT could be shown on invoices and would be well-recognized as present in all consumption prices. Citizens in Europe certainly know their prevailing VAT tax rates.

Protests by economists that value added taxation has been the *cause* of the runaway growth of government in Europe are misguided. VATs may have provided the means, but were not the cause; the culprit was the adoption of VATs in *addition* to rather than in *replacement* of income taxation.

In summary, as the most efficient and effective of the alternatives considered for federal tax reform, the BTT provides the following benefits:

1. As a WTO-approvable border-adjusted direct tax, the BTT would exempt taxation of U.S. exports and tax imports, "leveling the playing field" for U.S. manufacturers with foreign competitors.

2. As territorial taxation replacing corporate income taxation, the BTT would eliminate the double taxation of income earned abroad, restoring the United States as the preferred domicile for corporate headquarters.

3. By replacing the corporate income tax, the BTT would tax all forms of commercial income at one flat and far lower rate and eliminate double taxation of corporate income and expense physical

capital, thereby meeting the principal objectives of supply-side corporate tax reform.

4. As a further replacement for the personal income tax, the BTT would tax all personal income at one flat rate after exemption of saving for investment, and eliminate all preferences and discrimination by rebates of tax on the equivalent of poverty-level income as a proxy for "necessities" returned to *all* taxpayers.

5. By levy on the broadest possible base, the BTT would provide the lowest possible tax-neutral rate and the most substantial reduction in *composite marginal tax rates* to provide the lowest cost of capital for justification of new investment.

6. By crediting employer share of social insurance taxes against the BTT tax levied, the burden would be shared proportionately by all consumption and the regressive "bubble" caused by the FICA income limit would be removed from the employer share of FICA.

7. By its widespread recognition of rate and the requirement of showing the BTT rate on all invoices, the BTT can meet the test of "transparency" (visibility).

8. By being levied on employers, the BTT would be the most collectable and most difficult to evade of tax reform alternatives.

The BTT also provides the most direct and acceptable politically strategic steps to supply-side tax reform. For purposes of demonstrating the steps for tax reform and rates for the BTT, economic data for fiscal year 2000 was used as the last year of a balanced budget for assurance that the revenue-neutral steps proposed would provide ample revenue yield.

*Step 1: A 5.5 percent BTT would replace the corporate income tax, plus allow credit of employer's share of Social Security taxes against the BTT (Exhibit V-A).*

This step would replace the 35 percent corporate income tax with border-adjusted and territorial taxation, neutralizing one-third of foreign VATs' tax advantage (averaging 17.7 percent) by exemption of exports and levy on imports, and would end U.S. taxation of foreign corporate income, expense investment, and equalize the burden of employers' social insurance subsidization proportionate to all consumption. Governments and not-for-profits would not be taxed on payroll at this step, but purchases would not be exempted. It is proposed that all "corporate welfare"[44] expenditures be terminated concurrent with BTT adoption. Replacement of the corporate income tax would reduce composite marginal federal tax rates by 9.5 percent compared to current taxation.

---

[44]"*Corporate Welfare*" Update, Cato Institute, Washington, D.C., Tax & Budget Bulletin #7, May 2002.

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

150

*Step II. Increase the BTT rate to 10 percent and use the additional revenue to eliminate all discriminatory taxation of personal income, and flatten the personal income tax under the current code to either a single 14 percent consumed income tax, or alternatively a dual 10 percent/20 percent moderately progressive schedule (Exhibit V-B, C).*

This step would eliminate the estate and gift taxes, the alternative minimum tax, the dividend and capital gains tax preferences, the phaseouts of exemptions and deductions, and the so-called marriage tax penalties, would convert the earned income credit to healthcare vouchers, and would exempt saving for investment until consumed. Payrolls of governments and not-for-profits would be subject to VAT tax commencing with Step II. For those who insist on some continuing progressivity of the tax code the 10 percent/20 percent alternative dual personal income tax rate would be levied with the upper 20 percent rate commencing at the maximum FICA income level. This step would reduce composite marginal tax rates to 24 percent with the 14 percent flat personal rate, and 30 percent with the 10/20 alternative, versus current composite marginal rates of 50 percent or more.

*Step III: Complete reform of the federal tax code to a single consumption tax by increasing the BTT rate to a single 20 percent rate or alternatively a 15 percent BTT with a 10 percent income surtax and replace all income tax credits, exemptions, and deductions with a voucher rebating tax on necessities (Exhibit V-D, E).*

Under this final step the reform of the federal tax code to a single consumption tax would be completed, other than the retained personal portion of Social Security taxes, achieving comparable parity of U.S. federal taxation with foreign VAT taxation, tariffs, and excises regarding border adjustability, given elimination of all federal excises and tariffs. The rebate on necessities would be determined as the BTT-equivalent taxation on federal poverty-level income. The recommended 20 percent VAT rate would be the only marginal federal tax rate; the progressive dual tax alternative would result in a 25 percent composite marginal rate. For a more detailed description of the BTT consult "The Strategic Steps to Tax Reform," *Tax Notes*, Mar. 31, 2003, p. 2033.

The consequences of federal tax reform according to the proposed steps above would be an equitable, neutral, transparent, and above all, *politically feasible* supply-side and border-adjusted reform of the federal tax code for dramatic remediation of perennial trade deficits on manufactured goods, and optimal growth in *all* sectors of the U.S. economy. What is most important is the "leveling of the playing field" for U.S. corporations in general and manufacturing in particular, and for U.S. blue-collar workers, whose earnings have been increasingly depressed for the past three decades. That would result in a return to more equitable sharing of increased rate of growth and prosperity of the U.S. economy, not only for

those in manufacturing, but in all sectors of the U.S. economy as well.

### Summation of Observations and Recommendations

It is indisputable that the severity of the ongoing decline of the U.S. manufacturing sector endangers the national interests regarding future growth, prosperity, and security. The burden of the crisis has most particularly fallen on blue-collar workers' incomes and employment.

The principal cause of this crisis is the federal tax code. It is generally recognized that multiple layers of progressive taxation result in double taxation of savings for investment and excessive marginal rates, requiring "supply-side" tax reform. But of even greater disadvantage to U.S. manufacturing has been mutual tariff elimination, supposedly in the interests of international free trade, replaced by comparably high border-adjusted VATs adopted by all of America's principal trade partners, but not provided to U.S. manufacturers. At average levels of 19 percent for the EU 15, and 17.7 percent for the OECD, those levies on U.S. exported goods and abated tax on goods exported to the United States pose barriers to U.S. competitiveness in manufacturing that are insurmountable given the mobility of capital, technology, and management in today's open world economy.

It is urgent for the survival of U.S. manufacturing and its role as the leader of U.S. technology, productivity, and military security that the United States convert its income-tax-based federal revenue code to a border-adjusted and territorial-based code, with low marginal rates, exemption of saving for investment, and transparency, based on consumption taxation.

The business transfer tax proposed in this article best meets all those criteria and should be implemented by the strategic steps of first replacing the corporate income tax with a 5.5 percent BTT; then flattening the income tax to a 14 percent consumed income tax with a 10 percent BTT; and finally replacing the entire tax code other than personal FICA taxes with a 20 percent BTT. For those determined to retain progressivity, dual rate alternatives are offered.

A final consideration for governing representatives of the U.S. taxpayers is equitable taxation as defined by a majority of U.S. citizens, not by a clique of self-appointed statists. A *Readers' Digest* poll[46] addressed the question "What is the highest rate of taxes Americans should pay regardless of income level?" A statistically sound sample of Americans across races, gender, creeds, incomes, and political affiliations indefinitively answered: "Twenty-five percent." The proposed changes to the federal code meet this criterion.

The irrational opposition to a U.S. VAT, the denial of a U.S. manufacturing crisis, and the obfuscation of the extent and seriousness of current reality serve only the interests of the few who currently profit at the expense of all Americans' prospects for the future,

---

[46]Wildavsky, Rachel, "How Fair Are Our Taxes?" *Reader's Digest*, February 1996, pp. 57-61.

(c) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

151

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



**Exhibit I**

A. From: Unadulterated U.S. Department of Commerce
And Department of Labor Statistics

**Manufacturing's Share of
Total U.S. GDP and Employment**

B. From: NAM/Manufacturing Institute Statistics Presented in
'The Facts About Modern Manufacturing'

**Manufacturing's Share of Real GDP Has Remained
Constant While Its Share of Employment Has Declined**

152

(c) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



**Exhibit II**

All figures except INVESTMENT POSITION are quarterly rates; to annualize = x 4

THE U.S. IN THE INTERNATIONAL ECONOMY

Source: U.S. Bureau of Economic Analysis, *Survey of Current Business*, June 2004.

153

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

COMMENTARY / VIEWPOINTS

**Exhibit III**
**U.S. Trade in Goods With Selected Countries and Areas**
**(For 2003 in Billions of $)**

| Country/Area | Exports | Imports | Trade Balance |
|---|---|---|---|
| Canada | 169.8 | 225.9 | (56.10) |
| Mexico | 97.2 | 139.0 | (41.80) |
| Latin America | 137.4 | 206.0 | (68.60) |
| United Kingdom | 32.9 | 42.4 | (9.50) |
| Germany | 28.3 | 62.5 | (34.20) |
| Western Europe | 161.4 | 266.3 | (104.90) |
| China | 28.3 | 162.4 | (134.10) |
| Japan | 50.3 | 118.0 | (67.70) |
| Asia | 203.3 | 494.9 | (291.60) |
| Source: Survey of Current Business, April 2004, U.S. Department of Commerce, BEA, Washington, D.C. | | | |

**Exhibit IV**
**Relative Effect of VATs vs. MAPI Cost Factors on U.S. Manufacturing Competitiveness**

| MAPI Cost Factors* | | | |
|---|---|---|---|
| Labor Cost Differential | | | |
| U.S. Raw Labor Cost | | $24.30/hr | |
| less: Avg. 9 Trading Partners Labor Cost | | $19.30/hr | |
| | | | $5.00/hr |
| Cost Pressures @% U.S. Raw Labor Cost | | | |
| Corporate Tax Rates | @ 5.6% | $1.36/hr | |
| Employee Benefits | @ 5.5% | 1.34/hr | |
| Litigation Costs | @ 3.2% | 0.78/hr | |
| Pollution Abatement | @ 3.5% | 0.85/hr | |
| Natural Gas Prices | @ 0.5% | 0.12/hr | |
| | | | $4.45/hr |
| Total MAPI Cost Factor Differential | | | $9.45/hr |
| VAT Cost on Exports From U.S.** | | | |
| Value Added by U.S. Manufacturing | | $1853.9 bil | |
| ÷ Total Production Labor Hours | ÷ | 22.3 bil | |
| Value Added Per Labor Hour | | $83.13/hr | |
| x Average OECD VAT Rate | x | 17.7% | |
| Equivalent VAT Cost to Manufacturing | | | $14.71/hr |
| VAT Abated on Imports of U.S.** | | | |
| Value Added Per Production Hour | | $83.13/hr | |
| less: Foreign Cost Advantage | | (9.45/hr) | |
| Estimated Avg. Foreign Cost | | 73.68 | |
| x VAT Abated Per Labor Hour | x | 17.7% | |
| VAT Rebate Cost Reduction | | | $13.04/hr |
| *Data From: Leonard, Jeremy A., *Structural Costs Imposed Upon U.S. Manufacturers Harm Workers*, MAPI, Washington, D.C., 2003. | | | |
| **Data From: *Annual Survey of Manufacturers*, U.S. Department of Commerce, Census Bureau, 2002. | | | |

154

| Exhibit V | | |
|---|---|---|
| BTT Steps to Border-Adjusted Taxation | | |
| *A. STEP I: 5.5 Percent BTT Replaces Corporate Income Tax and Credits Employer-Paid Social Insurance* | | |
| 1. BTT Receipts Required | | |
| Corporate Income Tax | | $207.3 bil |
| Private Employer Health Insurance | | |
| OASI | 411.7 | |
| DI | 68.9 | |
| HI | 135.5 | |
| Total | 616.1 | |
| Employer Share | 308.1 | |
| Private Share | x 88.65 % | |
| | | 273.1 |
| less: Corporate Welfare | | (87.0) |
| | | $393.4 bil |
| 2. BTT Base for STEP I (Excludes Government Payrolls) | | |
| Final Domestic Sales | $10,126.6 bil | |
| less: Gross Private Investment | (1,755.4) | |
| plus: Owner-Occupied Residences | 333.4 | |
| less: Owner-Occupied Imputed Rent | (712.5) | |
| less: Government Payrolls | (548.8) | |
| | | $7443.3 bil |
| 3. BTT Rate, STEP I | | |
| BTT Receipts Required | 393.4 | |
| ÷ BTT Base | ÷ 7,443.3 | |
| | | 5.3% |
| *B. STEP II: 10 Percent BTT Ends Preferences and Discrimination and Exempts Savings for 14 Percent Consumed Income Tax* | | |
| 1. BTT Receipts Required | | |
| STEP I Receipts | | $393.4 bil |
| Eliminate Preferences and Discrimination | | |
| Estate and Gift Tax | 29.0 | |
| AMT (absorbed) | -0- | |
| Phaseouts | 5.5 | |
| Custom Duties | 21.1 | |
| Marriage Tax Penalties (absorbed) | -0- | |
| | | 55.6 |
| FIT Required for 14 Percent Flat Rate | | 378.2 |
| Convert EIC to Health Care Vouchers | | (39.0) |
| Tax "Other" NIPA Income 544.2 @ 14 Percent | | (76.2) |
| Exempt Savings | | |
| Current Saving | 201.5 | |
| Increased Saving (to 6% PI) | 302.9 | |
| Deferred Savings @ 14% PIT | 504.4 | 70.6 |
| | | $782.7 bil |
| 2. BTT Base for STEP II | | |
| BTT Base for STEP I | | $7,443.3 bil |
| add: Government Payrolls | | 548.8 |
| | | $7,992.1 bil |
| 3. BTT Rate for STEP II | | |
| BTT Receipts Required | 782.6 | |
| ÷ BTT Base | ÷ 7,992.1 | |
| | | 9.8% |

(C) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

155

**Exhibit V**
**BTT Steps to Border-Adjusted Taxation**

| | | |
|---|---|---|
| *C. Alternative STEP II: 10 Percent and Dual 10 Percent/20 Percent FIT* | | |
| 1. BTT Receipts Required | | |
| BTT Receipts STEP II: | $782.6 bil | |
| FIT Required 10/20 vs. 14 Percent | (8.2) | |
| | 774.5 | |
| 2. BTT | ÷ 7,992.1 | |
| 3. BTT Rate for STEP II 10/20 Alternative | | 9.7% |
| *D. STEP III: 20 Percent BTT Rate to Replace Current Code Other Than Personal Share Social Insurance* | | |
| 1. BTT Receipts Required | | |
| Total Federal Receipts | $2,033.9 bil | |
| less: On Budget Surplus | (88.9) | |
| Pers. Social Security Contributions | (358.4) | |
| Corporate Welfare | (87.0) | |
| EIC as Health Care Vouchers | (39.0) | |
| 2. BTT Base | | 1,460.6 |
| BTT Base STEP II | $7,992.1 bil | |
| less: Rebated Poverty Level Income | (1,357.0) | |
| | | $6,635.1 bil |
| 3. BTT Rate Required | | 22.0% |
| less: 10% Increased Growth | | (2.2) |
| | | 19.8% |
| *E. Alternative STEP III: 15 Percent BTT Plus 15 Percent FIT Sur-tax* | | |
| 1. BTT Revenue Required STEP III | | $1,460.6 bil |
| 2. BTT Base STEP III | 7,992.1 | |
| less: Rebated Income | (1,357.0) | |
| | 6635.1 | |
| 3. BTT Revenue @ 15 Percent | | 995.3 |
| 4. Balance to 15% FIT Surtax | | 465.3 |
| 5. Surtax Yield @ 15 Percent | | (283.3) |
| 6. Balance to Finance | | 182.0 |
| 7. Growth Dividend @ 10 Percent | | (146.1) |
| 8. Deficit Remaining | | 35.9 |

(c) Tax Analysts 2004. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.