

LEXSEE 2006 US DIST LEXIS 61828

**D.R. WARD CONSTRUCTION CO., et al., Plaintiffs v. ROHM AND HAAS CO., et al., Defendants.**

**MDL Docket No. 1684, Case No. 2:05-cv-4157-LDD**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 61828*

**May 30, 2006, Decided**
**May 31, 2006, Filed**

**COUNSEL:** [*1] For D.R. WARD CONSTRUCTION CO., ANNA C. FURNEY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, DAVID PEARMAN, Plaintiffs: KRISHNA B. NARINE, LAW OFFICE OF KRISHNA B. NARINE, ELKINS PARK, PA.

For MELINDA FRIEDMAN, Plaintiff: Pro se.

For JAMES LEVENTHAL, Plaintiff: Pro se.

For ROHM & HAAS COMPANY, Defendant: LATHROP B. NELSON, III, PETER BRESLAUER, RICHARD L. SCHEFF, STEPHEN W. ARMSTRONG, MONTGOMERY MCCRACKEN WALKER AND RHOADS, L.L.P., PHILADELPHIA, PA.

For ATOFINA CHEMICALS, INC., formerly known as ELF ATOCHEM NORTH AMERICA, INC., Defendant: FRANCIS X. TANEY, JR., HOWARD D. SCHER, STEVEN E. BIZAR, BUCHANAN INGERSOLL PC, PHILADELPHIA, PA.

For CROMPTON CORPORATION, Defendant: THOMAS J. MCGARRIGLE, PHILADELPHIA, PA; VALERIE BRAND PIPANO, REED SMITH LLP, PHILADELPHIA, PA.

For FERRO CORPORATION, Defendant: BRIAN E. ROOF, FRANTZ WARD LLP, CLEVELAND, OH.

For MITSUBISHI RAYON AMERICA, INC., Defendant: CATHERINE N. WALTO, RAWLE & HENDERSON LLP, PHILADELPHIA, PA.

For KREHA CORPORATION OF AMERICA, Defendant: JEREMY J. CALSYN, CLEARY GOTTLIEB STEEN & HAMILTON, LLP, WASHINGTON, DC; WAYNE A. MACK, DUANE MORRIS LLP, PHILADELPHIA, PA.

For AKCROS [*2] CHEMICALS AMERICA, AKZO NOBEL, INC., Defendant: NANCY J. GELLMAN, CONRAD O'BRIEN GELLMAN & ROHN PC, PHILA, PA.

For BARELOCHER USA, L.L.C., Defendant: ALAN KANZER, ALSTON & BIRD LLP (NY), NEW YORK, NY; ANDRE L. DENNIS, STRADLEY, RONON, STEVENS & YOUNG LLP, PHILADELPHIA, PA; TORSTEN M. KRACHT, ALSTON & BIRD LLP, NEW YORK, NY.

**JUDGES:** Legrome D. Davis, J.

**OPINION BY:** Legrome D. Davis

**OPINION:**

### MEMORANDUM OPINION

J. Davis

Presently before the Court are defendants' joint motion to dismiss the second amended indirect purchaser complaint (Doc. No. 16), plaintiffs' brief in opposition (Doc. No. 28), and defendants' response thereto (Doc. No. 33). For the following reasons, this Court grants defendants' motion in part and denies defendants' motion in part.

### I. Factual and Procedural History

This action was commenced by complaint on August 4, 2005. (Doc. No. 1). On March 1, 2006, plaintiffs

D.R. Ward Construction, Anna C. Furney, and David Pearman ("plaintiffs"), indirect purchasers of products containing plastics additives, filed a second amended complaint on behalf of an alleged class of Arizona, Tennessee, and Vermont entities that indirectly purchased plastics additives [*3] from defendants, various manufacturers and distributors of plastics additives, between January 1990 and January 2003. ( See Second Am. Compl., Doc. No. 24, at PP 1, 34). Plaintiffs allege that defendants conspired to fix, maintain, or stabilize the price of plastics additives and to allocate markets in Arizona, Tennessee, and Vermont for the sale of plastics additives. ( See Second Am. Compl., at PP 2, 25-27, 48, 55, 67). Plaintiffs assert causes of action under the antitrust statutes of Arizona, n1 Tennessee, n2 and Vermont ("state antitrust claims"), n3 and under the common law theory of unjust enrichment. ( Id., at PP 47-75).

n1 Plaintiffs' Arizona antitrust claim arises under the Arizona Antitrust Act ("AAA"), *Ariz. Rev. Stat. § § 44-1401, et seq.*.

n2 Plaintiffs' Tennessee antitrust claim arises under the Tennessee Trade Practices Act ("TTPA"), *Tenn. Code Ann. § § 47-25-101, et seq.*.

n3 Plaintiffs' Vermont antitrust claim arises under the Vermont Consumer Fraud Act ("VCFA"), *9 Vt. Stat. Ann. § § 2451 et seq.*.

[*4]

## II. Discussion

Defendants' motion to dismiss consists of three primary arguments. First, defendants argue that plaintiffs lack standing to bring their state antitrust claims; defendants reason that the Supreme Court's standing analysis in *Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* (hereafter " *AGC*"), applies to plaintiffs' state antitrust claims, and that the injury suffered by plaintiffs, as indirect purchasers, is to remote to satisfy this standing analysis. ( See Def. Br., at 4-15). Second, defendants argue that plaintiffs' antitrust claim under Tennessee law fails as a matter of law because plaintiffs' second amended complaint lacks factual allegations to indicate that Tennessee commerce was substantially impacted by defendants' conduct. ( Id., at 15-17). Third, defendants argue that plaintiffs fail to state a claim for unjust enrichment under Arizona, Tennessee, and Vermont law for a variety of reasons, including the failure to allege a direct benefit, the failure to allege a causal relationship between the conferral of the benefit and the detriment to plaintiffs, [*5] and the derivative (if not parasitic) relationship between an unjust enrichment claim based upon antitrust conduct and a state antitrust claim. ( Id., at 18-22).

### A. Characterization of Motion

Defendants' motion to dismiss is properly styled a Rule 12(b)(6) motion to dismiss. See, e.g., *Maio v. Aetna, Inc., 221 F.3d 472, n. 7 (3d Cir. 2000)* (treating motion to dismiss for lack of antitrust standing as Rule 12(b)(6) motion); *In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-399 (3d Cir. 2000)* (evaluating antitrust standing under *Rule 12(b)(6)* rubric). Under *Rule 12(b)(6)*, defendants bear the burden of showing that no claim has been stated. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*. Thus, a Rule 12(b)(6) motion may be granted only when it is clear, after allocating the burden of proof, that plaintiff can prove no set of facts in support of the claim which would entitle her to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *Robb v. City of Philadelphia, 733 F.2d 286, 290 (3d Cir. 1984)*. In applying this standard, [*6] this Court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988)*. However, this Court need not credit bald assertions or legal conclusions in deciding a motion to dismiss. See, e.g., *Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997)*.

### B. State Antitrust Claims

Defendants contend that plaintiffs' claims under the AAA, the TTPA, and the VCFA fail as a matter of law for lack of prudential antitrust standing, based upon the Supreme Court's analysis in *AGC v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. See Def. Br., at 4-15). Defendants also argue that plaintiffs' claim under the TTPA must be dismissed for the additional reason of failing to allege a substantial effect on Tennessee trade or commerce. ( Id., at 15-18).

#### 1. Standing

The question of whether a plaintiff has standing to bring a cause of action in federal court is a jurisdictional issue, a "threshold question [*7] in every federal case." *Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*. Standing to sue in federal court is a "federal question." *Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)*.

The resolution of this federal question presents a different analysis than the question of whether a party has standing to sue in state court. Id. Thus, even when a federal court sits in diversity jurisdiction, a plaintiff must meet the federal standing requirement. See, e.g., *Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537 (3d Cir. 1994); Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 352 (3d Cir. 1987)* (noting that "question of justiciability" of claim under state law "is a federal issue to be determined only by federal law").

The concept of standing is composed of constitutional and prudential considerations. To achieve standing, a plaintiff "must satisfy both the case and controversy requirements of Article III of the [United States] Constitution and certain prudential requirements." See, e.g., *Wheeler, 22 F.3d at 537.*

### a. Constitutional Standing [*8]

The constitutional dimension of the standing doctrine ensures that a party has an actual "case or controversy" to meet the justiciability demands of Article III. To satisfy the constitutional requirements for standing, a plaintiff must allege: (1) injury in fact; (2) a causal nexus between the injury and the challenged conduct; and (3) the likelihood that a favorable judicial decision will redress the injury. See, e.g. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); Joint Stock Society v. UDV North America, Inc., 266 F.3d 164, 175 (3d Cir. 2001).* These requirements ensure that a plaintiff has a "personal stake" in the outcome of the proceedings. See, e.g., *Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38-40, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976).*

This Court finds that, when read in a light most favorable to plaintiffs, the allegations in plaintiffs' amended complaint meet the standard for constitutional standing, the "'irreducible constitutional minimum' of standing." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 484 (3d Cir. 1998).* Plaintiffs allege [*9] that they paid inflated prices for products with plastics additives due to an overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain, that plaintiffs' overpayment for products containing plastics additives was caused by the conspiracy among defendants to charge inflated prices for plastics additives, and that judicial relief will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were in prior to the price-fixing scheme. See Second Am. Compl., at PP 1-2, 25-28, 47-72); see, e.g., *AGC, 459 U.S. at 535 n. 31* (distinguishing between prudential and constitutional standing requirements and noting that any harm to the antitrust plaintiff "is sufficient to satisfy the constitutional standing requirement of injury in fact"). Tellingly,

defendants do not assert that plaintiffs lack constitutional standing, but, instead, limit their argument in favor of dismissal to plaintiffs' failure to meet prudential standing considerations.

### b. Prudential Standing

The doctrine of prudential standing augments the constitutional dimensions of standing in federal court. Prudential [*10] standing consists of "'a set of judge-made rules forming an integral part of judicial self-government.'" See, e.g., *Joint Stock Soc'y v. UDV North America, Inc., 266 F.3d 164, 179 (3d Cir. 2001).* These rules are indented to "avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Shutts, 472 U.S. at 804.*

Of paramount importance in performing a prudential standing analysis is the source of the plaintiff's claim to relief, as the "standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin, 422 U.S. 490, 500-501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).* Indicative of this interconnectedness between the source of plaintiff's cause of action and principles of prudential standing, the Supreme Court has acknowledged that a particular statutory enactment may abrogate these principles by prescribing an express right of action for certain persons. [*11] *Id. at 501.* In other words, prudential standing considerations, which serve to limit a court's role in resolving public disputes, determine whether a particular plaintiff can sue under a particular statutory or constitutional provision, based in part upon the language of this provision. *Id. at 500-501.*

**i. Background** In order to determine the appropriate standard to apply to determine whether federal prudential standing considerations permit plaintiffs to sue in federal court under the state antitrust statutes, the Court must briefly discuss the test for prudential antitrust standing under the federal antitrust statutes, the Sherman Act, *15 U.S.C. § § 1-7,* and the Clayton Act, *15 U.S.C. § § 12-27.*

In Illinois Brick v. Illinois, the Supreme Court concluded that, as a matter of law, indirect purchasers of price-fixed products do not suffer "injury" within the meaning of *§ 4 of the Clayton Act,* which gives district courts jurisdiction to "prevent and restrain violations of [the Sherman Act]," including agreements among competitors to restrain trade. *431 U.S. 720, 728-729, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977).* The [*12] Supreme Court decision was based primarily upon policy considerations. Id.; see *AGC, 459 U.S. at 529* (noting that literal reading of *§ 4 of Clayton Act* "is broad enough to en-

compass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation"). The Illinois Brick Court reasoned that permitting indirect purchasers to assert a cause of action under federal antitrust statutes based upon the passing-on of the overcharge to each link in the chain of manufacture or distribution would create an array of administrative, procedural, and substantive burdens, including, *inter alia,* a risk of multiple liability for defendants, hopelessly complex damages calculations requiring the apportionment of the overcharge among all potential plaintiffs--from wholesalers to middlemen to retailers to the ultimate purchaser--within the various distribution chains, and an increase in the costs of antitrust litigation with a concomitant reduction in the amount of recovery to each plaintiff. *Id. at 730-732, 737-744.* These consequences, according to the Supreme Court, would deter the effective enforcement of federal antitrust laws. [*13] *Id. at 741.*

Following Illinois Brick, the Supreme Court further limited the class of persons who can sue under federal antitrust law by crafting a test to determine prudential standing for those plaintiffs, now limited (with respect to monetary damages) to direct purchasers, n4 whose allegations fall within the literal scope of the federal antitrust statutes. In AGC, the Supreme Court identified an array of factors that courts must consider in determining whether a party has suffered an injury *too remote* to bring a cause of action for damages under the Sherman Act and the Clayton Act: (1) the causal connection between the antitrust violation and the harm to the plaintiff, and the defendant's intent to cause the harm; (2) whether the nature of plaintiff s alleged injury is of the type that the antitrust statutes were intended to remedy; (3) the directness or indirectness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust violations; (5) the potential for duplicative recovery; and (6) the danger of complex and/or speculative apportionment of damages. *AGC, 459 U.S. at 537-45; City of Pittsburgh v. West Penn Power Comp., 147 F.3d 256, 264 (3d Cir. 1998)* [*14] (applying ACG factors and characterizing ACG test as "prudential" standing analysis). The AGC test has been "regularly and consistently applied as the passageway through which [federal] antitrust plaintiffs must advance." *West Penn Power Comp., 147 F.3d at 264.*

n4 Indirect purchasers may sue for injunctive relief under § 16 of the Clayton Act, *15 U.S.C. § 26. See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 399-400 (3d Cir. 2000); Mid-West Paper Products Co. v. Cont'l Group, Inc., 596 F.2d 573, 594 (3d Cir. 1979).*

### ii. Relevance of AGC Factors to Existence of Prudential Standing for State Antitrust Claims

This Court finds that a court sitting in diversity jurisdiction need not apply federal case law concerning prudential antitrust standing to determine whether a party has standing to assert a cause of action under a state antitrust statute. Instead, to determine whether a diversity plaintiff possesses federal [*15] prudential standing to bring a claim under a state antitrust statute, this Court looks to the treatment of standing under the relevant state antitrust statutes.

Several reasons support this approach. First, because the concept of prudential standing in the antitrust context is intertwined with the substantive content and intent behind the particular statute authorizing the cause of action, the standing requirements of the Vermont, Tennessee, and Arizona antitrust statutes, which recognize indirect purchaser claims, should be the guide for determining whether prudential considerations permit a plaintiff to sue under these statutes, as opposed to those requirements engrafted by federal case law onto federal antitrust statutes, which do not recognize indirect purchaser claims. See, e.g., *Warth, 422 U.S. at 500* (prudential standing "often turns on the nature and source of claim asserted"). Indeed, the opposite approach carries the potential to disrupt the governmental power equilibrium upon which the federal system operates; the federal judiciary would be entitled to disregard the intent of the state legislature, as reflected in the literal language of the state [*16] antitrust statute, by applying federal, judicially-fashioned principles of practicality, now detached from their federal statutory moorings, to determine whether a particular plaintiff is a "worthy" or "proper" candidate to sue under state law in a diversity action. n5 See, e.g., *California v. ARC America Corp., 490 U.S. 93, 103, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989)* (noting that it is inappropriate to consider congressional policies that defined remedies available under federal antitrust law in determining "what federal law allows States to do under their own antitrust law," including who may recover under state antitrust statutes). This approach of deferring to state standing principles as the basis for federal prudential standing under a state antitrust statute appears consistent with the methodology of the majority of courts addressing this issue. See, e.g., *Joint Stock Society, 266 F.3d at 179* (looking to Delaware case law to determine whether standing exists under the Delaware Uniform Trade Practices Act, rather than automatically applying AGC factors); *Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000)* [*17] (applying state law principles of antitrust standing, which is broader than antitrust standing under federal law, to determine whether plaintiff milk producers could bring claim under California antitrust statute against cheese makers for

depressing prices for milk); *Metropolitan Express Servs. v. City of Kansas City, 23 F.3d 1367, 1369 (8th Cir. 1994)* (holding that in a diversity case, court will not address plaintiff's claims unless plaintiff has standing to sue under state law and meets Article III case or controversy requirement); *In re Napster Copyright Litig. v. Hummer Winblad Venture Partners, 354 F. Supp. 2d 1113, 1125 (N.D. Cal. 2005)* (looking to California case law to determine whether standing exists for indirect purchaser under California's Cartwright Act, which prohibits agreements in restraint of trade). It also comports with critical commentary. See, e.g., 13A Charles Wright & Arthur Miller, Federal Practice and Procedure § 3531.14, at 90-91 (2d ed. 1984) ("federal courts have stated that state law of standing should be applied as to state rights . . ., whether the state question arises in an original diversity action, on removal from state court, [*18] or as a matter of ancillary jurisdiction"). n6 Finally, the Court notes that defendants do not argue that the Court is required, through the doctrine of *stare decisis,* to apply the AGC factors as the standard for federal prudential standing in all antitrust cases, whether brought under a state or federal statute; instead, defendants argue that the AGC analysis applies to "state law standing" in part because the three alleged class jurisdictions have adopted this analysis for their state antitrust statutes. See Def. Br., at 6).

n5 Although a plaintiff could still bring a claim in state court under the state antitrust statute, the possible foreclosure of access to federal courts for plaintiffs bringing state antitrust claims defeats the goals of diversity jurisdiction in the antitrust context.

n6 Charles Wright and Arthur Miller emphasize the possible tension between prudential considerations of standing under federal law and the conceptualization of standing to enforce a state right under state law:

If a clear case should appear in which standing would be recognized by state rules but denied by prudential federal rules, the federal court would have to choose between the general obligation to exercise diversity jurisdiction and its doubts as to the wisdom of enforcing this state claim of this particular plaintiff. It does not seem likely that the same choice should be made for all cases. It might be

appropriate to deny standing on the basis of strong prudential objections, particularly if the interests pursued by the plaintiff seem remote and the substantive issues are sensitive. On the other hand, state standing might well be honored if there is a reasonable ground for seeking decision and the prudential objections are relatively weak.

Id. at 90-91.

[*19]

In summary, the Court finds that it need not use the AGC factors as the framework for analyzing whether federal prudential considerations permit standing under the Vermont, Tennessee, and Arizona antitrust statutes, unless relevant state law adopts these factors. Phrased differently, the state rules of antitrust standing determine whether a plaintiff suing under a state antitrust statute enjoys federal prudential standing in a diversity action.

### iii. Standing Under Tennessee, Arizona, and Vermont Antitrust Statutes

Defendants present the following syllogistic logic to justify dismissal. First, although defendants properly acknowledge that the Supreme Courts of Tennessee, Arizona, and Vermont have interpreted their respective antitrust statutes as permitting antitrust claims by indirect purchasers of goods or services, defendants nonetheless argue that the question of whether an indirect purchaser may bring a claim under the text of a relevant antitrust statute, which examines whether indirect purchasers can ever suffer a statutorily cognizable injury, is distinct from the question of whether the alleged injury is too remote to confer prudential antitrust standing, which [*20] examines the relationship between the injury and the cause of action. See Def. Br., at 2-6). n7 Defendants then contend that Tennessee, Arizona, and Vermont law require application of the AGC test to determine whether an indirect purchaser plaintiff has standing to pursue an antitrust claim under state law. (Id., at 6, 11, 14-15). Finally, applying the AGC analysis, defendants contend that each AGC factor militates in favor of denying standing to the instant plaintiffs. ( Id., at 8-11).

n7 This distinction is explicit under federal law. See *Blue Shield of Virginia v. McCready, 457 U.S. 465, 476, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982); Illinois Brick, 431 U.S. at 728 n. 7.* There is nonetheless considerable overlap between these two issues, as both help define the

question of who may sue under federal antitrust law and as similar considerations guide their resolution.

To determine the validity of defendants' logic, the Court must evaluate the standing limitations associated [*21] with each state antitrust statute. This requires an inquiry into the text of the relevant state antitrust statute, the judicial decisions determining who may sue under these statutes, including the treatment of federal precedent regarding standing for violations of the Sherman Act and the Clayton Act, and the reasoning behind these decisions.

**(a) Arizona Antitrust Act**

**(i) Standard**

The Arizona Antitrust Act ("AAA") permits any "person threatened with injury or injured in his business or property" to sue for redress of a violation of the statute. *A.R.S. § 44-1408(B)*. The statute defines "person" as an "individual, corporation, business trust, partnership, association or any other legal entity." Id. *§ 44-1401*. The statute contains a federal guidance clause, which states that it is "the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." Id. *§ 44-1412*.

The Arizona Supreme Court recently analyzed the issue of standing to sue under the AAA. In Bunker's Glass Co. v. Pilkington, PLC, the Arizona Supreme Court rejected the logic of [*22] Illinois Brick and concluded that an indirect purchaser of goods and services has standing to sue under the AAA. *206 Ariz. 9, 75 P.3d 99, 102 (Ariz. 2003)*. The Court reasoned that the broad language of the statute permits an indirect purchaser suit, and noted that the Court must defer to the legislature, not the federal courts, to create limitations on the scope of a statutory right of action. *Id. at 103, 107*. The Court also reasoned that *§ 44-1412* renders the use of federal precedent permissive, rather than mandatory, and that, to the extent uniformity is desired, this uniformity extends only to the standard of conduct required, rather than "procedural matters such as who may bring an action for injuries caused by violations of the standard of conduct." *Id. at 103, 106*. Furthermore, the Court rejected as unsubstantiated the fears that motivated the Supreme Court's decision in Illinois Brick to limit antitrust actions under federal law to direct purchasers, including the complexity of proving damages, the risk of multiple liability, and the evisceration of the incentive for direct purchasers and victims in general to bring antitrust suits. *Id. at 107, 109*. [*23] Finally, while noting that a plaintiff must be able to prove actual or threatened injury that is not too remote to generate prudential standing to pro-

ceed on a federal antitrust claim in federal court, n8 Pilkington Court never expressed an intention to adopt this federal standing analysis for the AAA, and, in fact, appeared to distance Arizona law from federal considerations of standing in the antitrust context, expressly deciding to "follow the command of our constitution and afford greater protection to Arizona citizens by allowing them to attempt to prove" their antitrust claims through litigation rather than being "barred at the courthouse door." *Id. at 110*.

> n8 The Pilkington Court acknowledged that although federal law treats the question of whether a particular class of plaintiffs can be deemed, at the outset of litigation, not to suffer an antitrust injury as analytically distinct from the question of the remoteness of a particular injury, both questions implicate principles of standing. See *Pilkington, 75 P.3d at 106 n. 8, 110*.

[*24]

Despite the Arizona Supreme Court's liberalization of standing principles for plaintiffs suing under the AAA, an unpublished Arizona Superior Court decision recently applied a virtually unmodified version of the AGC test to determine whether an antitrust plaintiff's injuries were too remote to confer standing under the AAA. See Luscher v. Bayer AG, No. CV-2004-014835 (Ariz. Super. Ct. Maricopa Cty. Sept. 14, 2005). The Luscher Court cited the federal guidance clause in the AAA as its lone justification for relying upon the AGC analysis. Id.

Notwithstanding the Luscher decision, this Court predicts that the Arizona Supreme Court would apply its traditional standing approach, rather than an AGC analysis, to determine whether an indirect purchaser has standing to pursue a claim under the AAA. Several reasons support this conclusion. First, Pilkington clearly represents the Arizona Supreme Court's hostile view not only towards the judicial erection of insurmountable standing barriers to claims under the AAA, in derogation of the legislative intent of the statute, but also towards the adoption of federal precedent to craft such barriers. See *Pilkington, 75 P.3d at 107*. [*25] Second, the AAA does not possess a mandatory harmonization clause requiring uniformity between federal and state antitrust precedent, and, furthermore, the permissive harmonization clause in the AAA has been interpreted as applying to substantive issues, rather than to procedural questions of standing. See *A.R.S. § 44-1412; Pilkington, 75 P.3d at 106*. Third, defendants fail to provide this Court with any decision from an intermediate appellate court in Arizona suggesting that the Arizona Supreme Court would apply an AGC analysis to determine standing under the AAA.

See, e.g., *Paolella v. Browning-Ferris, 158 F.3d 183, 189 (3d Cir. 1998)* (federal court sitting in diversity must predict how state's highest court would resolve issue and, in absence of definitive statement from highest court, district court may consider decisions from state appellate courts). Fourth, many of the considerations which motivated the Supreme Court to adopt the AGC analysis, including, *inter alia,* the avoidance of speculative and complex damages calculations, the prevention of duplicative recoveries, and the remediation of antitrust violations by [*26] those persons with the strongest motivation to pursue such claims, were rejected by the Pilkington Court as exaggerated, or at the very least, as subordinate to the more important objective of courthouse access for indirect purchasers of price-fixed products.

Under Arizona law, the question of standing involves only principles of "judicial restraint," as there is no counterpart to the "case or controversy" requirement of the federal constitution. See, e.g., *State v. B Bar Enters., 133 Ariz. 99, 649 P.2d 978, 980 n.2 (Ariz. 1982).* A litigant suing under a state statute possesses standing when the plaintiff sustains an injury in fact that is distinct and palpable, thereby giving the plaintiff a personal interest in the outcome of the controversy. See, e.g., *Armory Park Neighborhood Ass'n v. Episcopal Community Servs., 148 Ariz. 1, 712 P.2d 914, 919 (Ariz. 1985); Aegis of Ariz., L.L.C. v. Town of Marana, 206 Ariz. 557, 81 P.3d 1016, 1021-1022 (Ariz. Ct. App. 2004).* This requirement is not rigorous; it is only meant to guarantee that courts "do not issue mere advisory opinions, that the case is not moot and that the [*27] issues will be fully developed by true adversaries." *Armory Park Neighborhood Assoc., 712 P.2d at 919.*

**(ii) Application**

This Court finds that, accepting the allegations in the amended complaint as true, plaintiffs satisfy federal prudential considerations of standing because they would have standing to pursue their claim under the AAA in state court. For instance, as purchasers of products containing plastics additives, plaintiffs clearly possess an interest in the outcome of the litigation. See Second Am. Compl., at PP 1, 34). Furthermore, plaintiffs have alleged an injury that is distinct and palpable, the amount of the overcharge that was passed-on to plaintiffs due to defendants' alleged price-fixing conspiracy. ( Id., at PP 49, 61, 68). These allegations comport with the standing requirements of Arizona law, and, in accordance with the teachings of *Pilkington,* plaintiffs satisfy federal prudential requirements of standing to bring a claim in federal court under the AAA.

**(b) Tennessee Trade Practices Act**

**(i) Standard**

The Tennessee Trade Practices Act ("TTPA") prohibits anti-competitive arrangements which tend to [*28] lessen "full and free competition in the importation or sale of articles imported into this state ... or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product ...." *Tenn. Code Ann. § 47-25-101.* The TTPA provides a civil remedy to "any person who is injured of damaged by any such arrangement." Id. *§ 47-25-106.* The TTPA does not contain a clause requiring or permitting courts to interpret the TTPA consistent with federal law.

The Supreme Court of Tennessee recently declared that indirect purchasers of articles may bring a private action under the TTPA. See, e.g., *Freeman Indus. v. Eastman Chemical Co., 172 S.W.3d 512, 520 (Tenn. 2005).* The Freeman Court first reasoned that the plain language of the statute provides a private right of action to indirect purchasers. *Id. at 517-518.* The Court then reasoned that, unlike other state antitrust statutes, the TTPA lacks a mandatory harmonization clause requiring consistency between interpretations of the TTPA and interpretations of federal antitrust statutes. *Id. at 519.* Finally, the Court rejected the concerns [*29] that motivated the United States Supreme Court to interpret the Clayton Act and Sherman Act as precluding all indirect purchaser claims, explaining that indirect purchasers are frequently the "real victims of the antitrust violations," that courts are competent to handle the risk of multiple liability and recovery under the TTPA, and that justice should not be defeated by the speculative risk of complex damages assessments. *Id. at 520.*

This Court predicts that the Supreme Court of Tennessee, based upon the *Freeman* decision, would apply traditional standing requirements rather than the AGC analysis to determine whether the injuries suffered by an indirect purchaser are too remote to confer standing under the TTPA. Several reasons support this conclusion. First, the TTPA does not contain a harmonization clause requiring cohesion between federal and state law. See *Freeman, 172 S.W.3d at 519.* Second, imposing a strict standing requirement would undermine many of the goals that the TTPA sought to achieve, including affording a remedy to indirect purchasers, that class of persons the Tennessee Supreme Court has deemed the "real victims" of antitrust [*30] conduct. *Id. at 520.* Third, the Freeman Court rejected as unfounded many of the fears that motivated the Supreme Court in AGC and Illinois Brick to craft judicial standing limitations on who may sue under federal antitrust law. Id. Fourth, defendants present no Tennessee decision suggesting that the standing analysis of AGC would be superimposed upon the TTPA to determine whether an indirect purchaser can proceed with litigation.

A party has standing to sue under Tennessee law when she meets the minimum constitutional requirements of standing under federal law. See, e.g., *In re Petition of Youngblood, 895 S.W.2d 322, 326 (Tenn. 1995)* (adopting federal constitutional standard); *Cox v. Shell Oil Co., 2005 Tenn. App. LEXIS 683, 2005 WL 2860249, at \*9 (Tenn. Ct. App. Oct. 31, 2005)* (state law standing "parallels the constitutional restriction on federal court jurisdiction to 'cases and controversies'"). In other words, a party suing under a Tennessee statute must demonstrate that she has sustained a distinct and palpable injury, that the injury was caused by the challenged conduct, and that the injury is capable of being redressed [*31] by a judicial remedy. See, e.g., *Metropolitan Air Research Testing Authority, Inc. v. Metropolitan Government of Nashville & Davidson County, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992)*.

**(ii) Application**

Because this Court has already determined that plaintiffs satisfy principles of constitutional standing, plaintiffs also satisfy principles of standing under Tennessee law, including, absent direction from a Tennessee appellate court otherwise, under the TTPA. Principles of federal prudential standing therefore do not bar this Court from hearing plaintiffs' claim under the TTPA.

**(c) Vermont Consumer Fraud Act**

**(i) Standard**

The Vermont Consumer Fraud Act ("VCFA") prohibits unfair and deceptive methods of competition in commerce. *9 V.S.A. § 2453(a)*. The VCFA provides a private remedy for "any consumer who ... sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by *section 2453* of this title." Id. *§ 2461(b)*. In 2000, the Vermont legislature passed an amendment to the VCFA clarifying the right of any "person" to recover for damages or injury sustained as a result of any violation of state antitrust laws, including *§ 2453(a)*, regardless [*32] of whether the person dealt directly with the defendants. Id. *§ 2465(b)*. The purpose behind *§ 2465(b)* is to clarify the right of an indirect purchaser to obtain recovery for a violation of the state antitrust law. See, e.g., *Elkins v. Microsoft Corp., 174 Vt. 328, 817 A.2d 9, 17 (Vt. 2001)*. Construction of *§ 2453(a)* must be guided by the "construction of similar terms contained in *section 5(a)(1) of the Federal Trade Commission Act* as from time to time amended by the Federal Trade Commission and the courts of the United States." Id. *§ 2453(b)*.

Although the 2000 amendment to the VCFA expressly authorized indirect purchaser antitrust actions, the Vermont Supreme Court has interpreted the VCFA as providing a cause of action for indirect purchasers of products subject to unfair competition prior to the 2000 amendment. See *Elkins v. Microsoft Corp., 817 A.2d at 20*. In reaching this conclusion, the Elkins Court privileged the clear language of the statute, which allows suits by "any consumer" against any "violator" without an interpolative privity requirement. *Id. at 13*. The Elkins Court then found that the legislative intent [*33] behind the VCFA, which confers "as broad as reach as possible in order to best protect consumers against unfair trade practices," elides any distinction between direct and indirect purchasers. Id. Moreover, the Elkins Court interpreted the 2000 amendment not as prescribing a new cause of action, but as clarifying the preexisting right of indirect purchasers to recover for a violation of the VCFA. *Id. at 17*. Finally, the Elkins Court provided a detailed analysis of why the harmony clause in *§ 2453(b)* renders inapplicable federal court decisions interpreting federal antitrust statutes, including the Clayton Act and Sherman Act, to the construction of the VCFA. *Id. at 16-17*.

Two decisions by the Superior Court of Chittenden County, Vermont recently applied the AGC factors to determine whether an antitrust defendant possesses standing to bring a claim under the VCFA, at least to the extent that these factors are consistent with allowing indirect purchaser standing. See, e.g., *Fucile v. VISA U.S.A. Inc., 2004 WL 3030037, at \*2 (Vt. Super. Ct. Dec. 27, 2004)*; *Investors Corp. of Vermont v. Bayer AG, Doc. No. S1011-04-CnC (June 1, 2005)*. [*34] The Fucile Court reasoned that because the AGC factors help determine whether a case or controversy exists under Article III of the Constitution, and that because the Vermont Supreme Court has adopted constitutional principles of standing in other contexts, the Vermont Supreme Court would apply the AGC factors to determine a party's standing under the VCFA. *Fucile, 2004 WL 3030037, at \*3*. The Bayer Court relied without scrutiny upon the methodology in Fucile. See *Bayer, Doc. No. S1011-04-CnC, at \*3* (applying AGC analysis based upon Fucile precedent).

This Court cannot conclude as a matter of law that the Vermont Supreme Court would adopt the AGC factors for determining standing under the VCFA. Several reasons support this analysis. First, the harmonization clause in the VCFA does not require consistency between construction of the VCFA and construction of the Clayton Act and Sherman Act. See *Elkins, 817 A.2d at 17*. In fact, the Vermont Supreme Court expressly rejected the argument "that the definition of who may sue under the Act [VCFA] must be consistent with the definition of who may sue under federal [*35] antitrust law." Id. Second, imposing an AGC analysis on the VCFA would severely limit the number of indirect purchasers who can bring suit under the statutory scheme,

thereby rewriting the language of the 2000 amendment to the VCFA and undermining the VCFA's overarching remedial goal of reaching as broadly as possible to best protect consumers against antitrust violations. *Id. at 13.* Third, defendants present no appellate court decision applying the AGC test to determine antitrust standing under the VCFA. Finally, the Court rejects as flawed the rationale provided by the Fucile Court for applying the AGC antitrust standing analysis: the AGC analysis, a gauge for determining prudential standing under federal antitrust statutes, is distinct from the inquiry into standing under Article III of the Constitution; and, although the Vermont Supreme Court applies the test for constitutional standing in other contexts, it has yet to apply the AGC factors to determine prudential standing under any state statute.

Because this Court cannot determine as a matter of law that the Vermont Supreme Court would conduct an AGC analysis to determine standing under the [*36] VCFA, the Court applies traditional Vermont standing principles. The Vermont Supreme Court has adopted, in general, the constitutional and prudential components of the federal standing doctrine. See *Schievella v. Dep't of Taxes, 171 Vt. 591, 765 A.2d 479, 481 (Vt. 2000).* The first prong of this test is identical to the case-or-controversy analysis under the federal Constitution. See, e.g., *Brigham v. State, 2005 VT 105, 889 A.2d 715, 719, 721 (Vt. 2005)* ("Vermont has adopted the case-or-controversy requirement"); *Agency of Natural Resources v. United States Fire Ins. Co., 173 Vt. 302, 796 A.2d 476, 479 (2001)* (noting that Vermont has adopted case-or-controversy requirement in which plaintiffs, to have standing, must have suffered particular injury that is attributable to defendant and court must be capable of redressing injury). The second prong of this test--the prudential element of standing--evaluates whether plaintiff is raising another person's legal rights, whether plaintiff asserts a general grievance, and whether plaintiff's claims fall within the "zone of interest" protected by the invoked law. See *Hinesburg Sand & Gravel Co., Inc. v. State, 166 Vt. 337, 693 A.2d 1045, 1048 (Vt. 1997).* [*37]

**(ii) Application**

Plaintiffs satisfy the constitutional elements of standing. Furthermore, it is clear that plaintiffs' indirect purchaser claim falls within the "zone of interest" protected by the VCFA, which was amended in 2000 to permit such causes of action, and that plaintiffs' desire for damages based upon passed-on overcharges is not a general grievance. Accordingly, this Court finds that plaintiffs meet general standing requirements under Vermont law to bring a claim under the VCFA, and, therefore, that plaintiffs satisfy prudential federal standing considerations for the VCFA claim in this diversity action.

**iii. AGC Analysis**

Assuming *arguendo* that the *AGC* factors applied to determine federal prudential standing for plaintiffs' state antitrust claims, this Court finds that defendants have failed to meet their burden of demonstrating at the motion to dismiss phase that these factors do not confer standing as a matter of law.

**( a) Causal Connection and Improper Motive**

Plaintiffs allege that they purchased and paid significantly more for products containing plastic additives as a result of defendants' price-fixing conspiracy. See Second [*38] Am. Compl., at PP 1, 25, 40, 49, 53, 61, 70, 72). Plaintiffs further allege an improper motive on the part of defendants in engaging in price-fixing activities and in concealing these activities. ( Id., at PP 25-27, 32-33). Furthermore, although facts external to the complaint, such as the percentage of plastic additives in the products plaintiffs purchased, carry the potential to impact the causation analysis, these facts are irrelevant to the resolution of defendants' motion to dismiss, which relies entirely upon what the complaint states. See *In re Warfarin Sodium Antitrust Litig., 214 F.3d at 399* (reversing district court's finding of no antitrust standing for indirect purchaser at motion to dismiss stage because district court improperly relied upon facts outside allegations); Bayer AG, Doc. No. S 1011-04 CnC, at *4 (causation factor of standing analysis for claim under VCFA satisfied at motion to dismiss phase because external facts render court better suited to assess causation at class certification and summary judgment stages); *Crouch v. Crompton Corp., 2004 NCBC 7, 2004 WL 2414027, at *24 (N.C Super. Ct. Oct. 28, 2004)* (identifying facts [*39] relevant to resolution of AGC causation analysis for indirect purchasers under state antitrust statute). Accordingly, the Court finds at this juncture that a sufficient causal nexus exists between the injury and defendants' allegedly anti-competitive behavior. See, e.g., *Kraft Foods, Inc., 232 F.3d at 989* (finding sufficient causation and direct injury to confer antitrust standing under state antitrust statute in part because "disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion").

**(b) Nature of Injury in Relation to Purpose of Antitrust Statutes**

Although plaintiffs allege that they purchased products containing plastics additives, and, by implication, that they are members of a secondary market of products indirectly influenced by the artificial pricing of the plastics additives market, the Supreme Courts of Arizona, Vermont, and Tennessee have declared respectively that the intent of the AAA, the TTPA, and the VCFA was to provide redress to indirect purchasers who purchase from retailers a product subject to a price-fixing conspiracy.

See, e.g., *Pilkington, 75 P.3d at 102, 105 n.3* (noting Arizona [*40] legislature's intent to allow indirect purchasers to sue and refusing to distinguish between forms of indirect purchaser suits allowed); *Freeman, 172 S.W.3d at 518* (reading TTPA as permitting an indirect purchaser to "recover from the antitrust violator the amount of the overcharge that the direct purchaser passed on to the indirect purchaser"); *Elkins, 817 A.2d at 13* ("The Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices."). There is no indication that the AAA, the TTPA, and the VCFA were enacted to provide remedies to certain types of indirect purchasers, such as those who participate in the immediate market subject to the price-fixing conspiracy, but not to other categories of indirect purchasers which function at a lower level in the distribution chain, such as end consumers who purchase products containing an ingredient subject to the price-fixing conspiracy. In other words, if plaintiffs can show that the unlawful increase in the price of plastics additives affected the cost of the products they purchased, regardless of whether plaintiffs participated [*41] in the immediate market for plastics additives or the secondary market for products with plastics additives, the AAA, the TTPA, and the VCFA would appear to contemplate recovery. See, e.g., Bayer AG, Doc. No. SlOl 1-04 CnC, at *5. This factor therefore weighs in favor of standing.

### (c) Directness of Injury

Although plaintiffs are purchasers of products containing plastic additives, which is the subject of the antitrust restraint, plaintiffs' amended complaint, when read in a light most favorable to plaintiffs, suggests that plaintiffs have suffered the greatest, if not the most direct, injury of the alleged antitrust conspiracy. See Second Am. Compl., at PP 49, 51, 53, 60, 70). For instance, plaintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives. See *Pilkington, 75 P.3d at 109 n.9* (indirect purchasers are often "the truly injured party" due to passage of overcharges along chain of distribution); *Freeman, 172 S.W.3d at 520* [*42] (indirect purchaser who ultimately paid overcharge is "real" victim of antitrust violation). Indeed, defendants concede that plaintiffs allege that they were harmed when direct purchasers of plastic additives "passed on, in the form of increased prices for unspecified goods manufactured with or containing Plastic Additives,' some or *all* of the increase in their costs of doing business." See Def. Br., at 9) (emphasis added). To the extent that defendants challenge the veracity of these allegations, the discovery process is necessary to develop

an array of factual issues that bear upon the directness of the plaintiffs' injury, such as plaintiffs' positioning within the chain of distribution of plastics additives, the structure of the distribution chain, the degree to which the artificially increased portion of the price of plastics additives was passed along the distribution chain or absorbed by more direct purchasers, and the impact of intra- or extra-market factors on the price of products containing plastics additives. See *Crouch, 2004 NCBC 7, 2004 WL 2414027, at *19, 24*; see also *In re Warfarin Sodium Antitrust Litig., 214 F.3d at 398* (reversing [*43] dismissal of federal antitrust claims for lack of antitrust standing because district court impermissibly relied upon facts beyond allegations in complaints). Accordingly, accepting the allegations in the complaint as true, the Court finds that the directness of the injury prong weighs in favor of standing.

### (d) More Direct Purchasers

There are clearly more direct victims of the alleged price-fixing conspiracy. However, this factor loses relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers. Put differently, the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of Illinois Brick repealer statutes, like the AAA, TTPA, and the VCFA. Furthermore, to the extent that this factor should be modified to evaluate the existence of other indirect purchasers with a more direct link to the price-fixing conspiracy, this Court lacks the necessary facts to perform this evaluation, such as information regarding the various chains of distribution of plastics additives, the [*44] links that comprise these chains, plaintiffs' positioning within this network, the absorption and passing-on pattern for each entity in this network, and the range of other possible influences on the price of plastics additives. See *Couch, 2004 NCBC 7, 2004 WL 2414027, at *19*. This factor therefore does not mandate dismissal at this procedural stage in this litigation.

### (e) Speculative Nature and Complexity of Damages

This Court, following the respective analytical underpinnings of the *Pilkington, Freeman*, and *Elkins* decisions, refuses to find as a matter of law that damages to indirect purchasers under the AAA, the TTPA, and the VCFA are *per se* too speculative or too tenuously connected to the alleged wrongdoing to confer antitrust standing. Nor is this Court able to conclude as a matter of law at the motion to dismiss stage that a determination of the existence and amount of any overcharge suffered by the instant plaintiffs requires inappropriate guesswork or unmanageably complex analyses, particularly without

the benefit of any discovery or expert testimony. See, e.g., *Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1171 (9th Cir. 2002)* [*45] (refusing to find damages too speculative at motion to dismiss stage because antitrust plaintiffs must be afforded opportunity to evidence to support allegation at later stage in proceedings); *Crouch, 2004 NCBC 7, 2004 WL 2414027, at *25* (noting that there "may well be occasions on which the Court should defer a standing determination until there has been far ranging discovery and expert evidence produced on pass through and allocation"). The Court also notes that defendants have failed to articulate, with specificity, why the measurement of plaintiffs' damages would be unascertainable and why this Court would lack the capacity to scrutinize the evidence and resolve complex issues of damages apportionment. Accordingly, this factor does not weigh in favor of dismissal for lack of antitrust standing at this point in the proceedings.

### (f) Duplicate Recovery

Defendants argue that any damages awarded to indirect purchasers of plastics additives would duplicate the recovery by direct purchasers of plastics additives, which are currently pursuing class action litigation against defendants under the Sherman Act. See Def. Br., at 10). Again, this factor proves inapposite when [*46] used to determine standing under state antitrust statutes that permit indirect purchaser claims, which necessarily presuppose the possibility of recovery, and the apportionment of damages for injuries actually incurred, among direct purchasers and a range of indirect purchasers based upon proof of the passage of the artificially inflated cost of plastics additives. Nor have defendants presented any argument as to why the existence of a direct purchaser claim against defendants under the Sherman Act should influence whether indirect purchasers have antitrust standing under state antitrust claims. See, e.g., *ARC America Corp., 490 U.S. at 105* (finding that states may adopt state antitrust statutes with broader scope than federal counterparts in part because absence of federal policy against states imposing liability through state antitrust statutes in addition to that imposed by federal law through federal antitrust statutes and because state statutes cannot affect remedies available under federal law); *Crouch, 2004 NCBC 7, 2004 WL 2414027, at * 19, 24* (suggesting relevant inquiry with respect to this factor should be existence of double recovery on state [*47] claim). Moreover, it would be presumptive for this Court to find at this early stage in the proceedings, prior to discovery, that plaintiffs will be unable to present a reliable method of identifying the effects of the price fixing, including the degree of absorption of the price increase, among those participants in the distribution chain or chains. Accordingly, at this juncture, this factor weighs in favor of standing.

### (g) Conclusion

In summary, assuming *arguendo* the applicability of the AGC factors to claims under the AAA, the TTPA, and the VCFA, the Court finds that the allegations in the complaint satisfy each of the *AGC* factors at the motion to dismiss stage. An antithetical ruling not only would require the Court to impermissibly rely on facts external to the pleadings, but also would deprive plaintiffs of the opportunity to discover and to confirm such facts through the discovery process.

### 2. Allegations of TTPA Violation

Defendants also argue that plaintiffs' claim under the TTPA should be dismissed for failing to allege that defendants' anti-competitive behavior produced a substantial effect on Tennessee commerce. ( See Def. Br., at 15-18). [*48]

To state a claim under the TTPA, a plaintiff must allege, *inter alia,* that the "alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree." See *Freeman, 172 S.W. 3d at 523.* In Freeman, the Tennessee Supreme Court held that an out-of-state plaintiff which purchased food products containing sorbates, the subject of the price-fixing conspiracy, failed to allege facts to suggest a substantial effect on Tennessee commerce. *Id. at 524.* Although plaintiff alleged that a co-defendant, from its principal place of business in Tennessee, conspired to fix the price of sorbates and to take orders and implement sales of sorbates to direct customers at supra-competitive prices, plaintiff never alleged that it purchased sorbates from this co-defendant, the lone defendant with ties to Tennessee. Id. The Freeman Court therefore affirmed the trial court's dismissal of plaintiff's TTPA claim. Id.

In contrast to the situation in Freeman, the allegations in plaintiffs' second amended complaint clearly meet the "substantial effects" standard. Plaintiff David Pearlman, unlike the out-of-state plaintiff in [*49] *Freeman,* is a Tennessee resident who indirectly purchased plastics additives. ( Id., at P 5). Each defendant is alleged to have manufactured, marketed, and sold plastics additives in Tennessee during the proposed class period. ( Id., at PP 6-14). Plaintiffs further allege that defendants conspired to fix the price of plastics additives sold in Tennessee, that plaintiff Pearlman and other Tennesseans paid higher prices in Tennessee for products containing plastics additives as a result of the price-fixing conspiracy, and that the alleged price- fixing conspiracy injured the businesses and property of plaintiff Pearlman and other Tennesseans. ( Id., at PP 60-65); see *In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 173 (D. Me. 2004)* (denying motion to dismiss indirect purchaser claim under TTPA for failure to allege substantial effects on Tennessee commerce

because factual allegations generated inference that defendant-manufacturers wholesaled their vehicles to dealers in Tennessee and made significant profits from Tennessee transactions); *Freeman, 172 S.W.3d at 523* (suggesting by negative implication that [*50] allegation of influence of anti-competitive conduct on market prices within Tennessee substantially affects intrastate commerce). Simply put, if these allegations do not satisfy the "substantial effects" test, the Court is unable to envision allegations which would.

### C. Unjust Enrichment Claims

Defendants argue that plaintiffs' unjust enrichment claims fails for two independent reasons. First, defendants argue that plaintiffs' unjust enrichment theory of liability is an inappropriate attempt to circumvent the limitations of plaintiffs' statutory antitrust claims. See Def. Br., at 19-21). Second, defendants argue that plaintiffs' allegations are factually insufficient to state a cause of action for unjust enrichment under Tennessee, Vermont, or Arizona state law. (Id.).

#### 1. Availability

Defendants argue that, in jurisdictions which possess antitrust statutes conferring standing on indirect purchasers, an indirect purchaser may only bring a statutory claim for alleged anti-competitive behavior. See Def. Br., at 18-19). Defendants further contend that, if plaintiffs' state antitrust claims are defective, plaintiffs may not recover restitution through an unjust [*51] enrichment claim based upon the predicate wrong of the antitrust violation; indeed, according to defendants' logic, plaintiffs should not be permitted to make an "end run" around the standing limitations of antitrust laws. ( Id., at 19).

This Court rejects defendants' arguments, finding instead that plaintiffs may bring independent unjust enrichment claims under Arizona, Tennessee, and Vermont law and that the viability of these claims does not hinge upon the success of the state statutory antitrust claims. The following reasons buttress this conclusion. First, the Tennessee Supreme Court expressly permits independent unjust enrichment claims by indirect purchasers, and defendants cite no cases under Arizona or Vermont law that preclude indirect purchasers from bringing unjust enrichment claims against the manufacturers of products subject to an alleged price-fixing conspiracy. See *Freeman, 172 S.W.3d at 524-526*. Second, the success of plaintiffs' common law unjust enrichment claims should not necessarily depend upon the success of their state antitrust claims, particularly because the Federal Rules of Civil Procedure permit parties to plead claims in the [*52] alternative and because, in practice, equitable remedies for unjust enrichment claims are often awarded when state statutory claims prove unsuccessful. See, e.g.,

*In re Cardizem Antitrust Litig., 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000)* (denying motion to dismiss unjust enrichment claims for amount of overpayment by indirect purchasers allegedly subject to overcharge in part because unjust enrichment claims are not contingent upon success of statutory antitrust violation). Third, even if an antitrust plaintiff's unjust enrichment claim under state law is tied to the remedies available under the state antitrust claim, defendants fail to analyze the statutory language of the AAA, the TTPA, and the VCFA to determine whether these antitrust statutes permit equitable remedies, such as the recovery of restitution. See *In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 209-212 (D. Me. 2004)* (denying defendants' motion to dismiss indirect purchasers' restitution claim under state law for each of fifty states, which is based upon wrongful conduct in violating state antitrust laws, because defendants failed to argue [*53] that state statues permitting indirect purchaser claims fail to authorize restitutionary relief). n9 Finally, and perhaps most importantly, assuming *arguendo* the validity of the logic underlying defendants' argument, that an "indirect purchaser can only state a claim for unjust enrichment if the jurisdiction in question recognizes a statutory antitrust claim on behalf of indirect purchasers," defendants' argument actually supports the viability of plaintiffs' unjust enrichment claims: Tennessee, Arizona, and Vermont all permit indirect purchasers to pursue antitrust claims; thus, an unjust enrichment claim would not circumvent the procedural and substantive limitations of these antitrust statutes. See Def. Br., at 19); see *In re Terzosin Hydrochloride Antitrust Litig., 160 F. Supp. 2d 1365, 1380 (S.D. Fl. 2001)* (permitting unjust enrichment claims by indirect purchasers to be pled under the common law of jurisdiction that allows indirect purchasers to recover "passed on" overcharges).

> n9 For instance, the AAA expressly permits a person "injured in his business or property" to "bring an action for appropriate injunctive or other equitable relief. . ." *Ariz. Rev. Stat. § 44-1408(B).*

[*54]

#### 2. Adequacy of Allegations a. Arizona law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Arizona law because it fails to allege that plaintiffs conferred a direct benefit on defendants. See Def. Br., at 20-21).

To succeed on a claim for unjust enrichment under Arizona law, a plaintiff must establish the following five elements: (1) an enrichment; (2) an impoverishment; (3)

a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a remedy provided by law. See, e.g., *Community Guardian Bank v. Hamlin, 182 Ariz. 627, 898 P.2d 1005, 1008 (Az. Ct. App. 1995)*. Despite defendants' contentions otherwise, Arizona law does not require either a direct causal connection between the enrichment and the impoverishment, or the transference of a direct enrichment from the plaintiff to the defendant. See, c.f., *In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d at 671* (finding that common law unjust enrichment of liability does not require passing of direct benefit from [*55] plaintiff to defendant and permitting indirect purchasers of heart medication subject to antitrade conspiracy to sue manufacturers of heart medication for unjust enrichment); see also Daniel R. Karon, *Undoing The Otherwise Perfect Crime Applying Unjust Enrichment To Consumer Price-Fixing Claims, 108 W. L. Rev. 395, 421 (2005)* (no state's unjust enrichment law requires conferral of direct benefit from plaintiff to defendant). Nor do the cases cited by defendants stand for this proposition. n10

n10 The analyses in these cases hinge on the absence of any impoverishment, as compared to the lack of a direct enrichment. See, e.g., *Stapley v. American Bathtub Liners, 162 Ariz. 564, 785 P.2d 84, 88 (Ariz. App. Ct. 1989)* (reversing jury verdict for vendor of property on unjust enrichment claim against purchaser who possessed property prior to closing with legal consent of vendors, but who never paid rent, because no showing of impoverishment and because whatever benefit attached to purchaser was presumably included in purchaser price of property); *Sierra Vista v. Cochise Enters., 144 Ariz. 375, 697 P.2d 1125, 1131 (Ariz. App. Ct. 1984)* (finding *quantum meruit* claim waived because appellants' never raised theory of liability prior to or during trial and noting in dicta that *quantum meruit* claim would fail because no impoverishment).

[*56]

Plaintiffs' amended complaint states a claim under Arizona law. Plaintiffs allege facts to suggest that defendants were enriched by inflating in collusive fashion the price of plastics additives, a practice driven by recognition of the demand of end-use consumers for products with plastics additives; n11 that plaintiffs were impoverished by paying the inflated price; that plaintiffs' overpayment flowed up the distribution chain to inure to defendants' financial benefit; and that principles of equity demand disgorgement of this benefit. See Second Am. Compl., at PP 25, 53, 61, 72, 74-75). Although this Court

makes no determination as to whether plaintiffs will ultimately prevail on their unjust enrichment claim under Arizona law, they have alleged facts that survive a motion to dismiss. See Karon, *108 W. Va. L. Rev. at 428.*

n11 The Third Circuit has noted that a price-fixing conspiracy among manufacturers of a product would not exist if there was no ultimate consumer of the product, regardless of the various links of middlemen. See *In re Warfarin Sodium Antitrust Litig., 214 F.3d at 401.*

[*57]

**b. Vermont law**

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Vermont law because it fails to allege that plaintiffs conferred a direct benefit on defendants. See Def. Br., at 20-21).

Under Vermont law, a claim for unjust enrichment lies when a party confers a benefit upon another party and retention of the benefit would be inequitable. See, e g, *Brookside Mem'l, Inc. v. Barre City, 167 Vt. 558, 702 A.2d 47, 49 (Vt. 1997)*. Again, in contrast to defendants' assertions, none of the cases cited by defendants stands for the proposition that a plaintiff must confer a "direct benefit" upon a defendant to succeed on an unjust enrichment claim under Vermont law. n12 In fact, a least one Vermont court has permitted an indirect purchaser to proceed on an unjust enrichment claim against the manufacturers of a product subject to a price-fixing conspiracy, holding that "Vermont law does not require that the enrichment be directly conferred from one party to another in order for the latter party to have a colorable claim for unjust enrichment" See, e.g., Bayer AG, Doc No. S1011-04 CnC, at *6 (denying [*58] motion to dismiss unjust enrichment claim by indirect purchaser of products with chemical ingredient subject to price-fixing conspiracy against manufacturers of chemical ingredient); Karon, *108 W. VA. L. Rev. at 421.*

n12 These cases simply do not address this issue. See *In re Estate of Elliott, 149 Vt. 248, 542 A.2d 282, 285 (Vt. 1988)* (affirming denial of unjust enrichment claim due to creditors' failure to introduce evidence of estate's receipt of "any benefit" of creditors' services); *Land Inv., Inc. v. Battleground Assoc., 138 Vt. 316, 415 A.2d 753, 759 (Vt. 1980)* (denying unjust enrichment claim without analysis because claim premised on impermissible legal contention that "one who borrows money to purchase real estate and defaults

in the loan obligation unjustly enriches the seller at the expense of the lender").

Plaintiffs' amended complaint, when read in a light most favorable to plaintiffs, states a cause of action for unjust enrichment under Vermont [*59] law. Plaintiffs' factual allegations suggest that they conferred a benefit on defendants in the form of overpayments for the plastics additives component of the products plaintiffs purchased, an overpayment that defendants should have anticipated at the time of the consummation of the alleged price-fixing conspiracy. See Second Am. Compl., at PP 25, 32, 53, 61, 72, 74-75). Plaintiffs further allege that, by virtue of defendants anti-competitive conduct, the retention of such overpayments would be inequitable. (Id.). Accordingly, plaintiffs have adequately pled a cause of action for unjust enrichment.

### C. Tennessee law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Tennessee law because it fails to allege that plaintiffs pursued remedies against the parties from whom plaintiffs purchased products or that this pursuit would be futile. See Def. Br., at 21).

The elements of an unjust enrichment claim under Tennessee law include: (1) any benefit, whether direct or indirect, conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; (3) acceptance of the benefit under [*60] circumstances that render inequitable or unjust the receipt of the benefit without corresponding payment of its value; and (4) exhaustion of all remedies against the person with whom plaintiff enjoyed privity of contract, unless exhaustion would be futile. See, e.g., *Freeman, 172 S.W. 3d at 525*.

Plaintiffs do not allege that, prior to filing suit against defendants, plaintiffs pursued remedies against the parties from which plaintiffs purchased products containing plastics additives (i.e., more direct purchasers of plastics additives). n13 Nor do plaintiffs allege that the pursuit of claims against these entities would be futile. See, e.g, *Freeman, 172 S.W.3d at 526* (finding error in denial of defendants' motion for summary judgment on unjust enrichment claim when indirect purchaser fails to provide facts in support of bare allegation that attempt to pursue remedies against downstream seller of product would be futile). Moreover, plaintiffs fail to address defendants' exhaustion of remedies argument in their brief, let alone to provide affidavits identifying either the measures plaintiffs took to seek relief from intervening links in the [*61] chain of distribution of plastics additives and/or the futility of such measures. Accordingly, without such allegations, plaintiffs' unjust enrichment

claim is premature and the Court grants without prejudice defendants' motion to dismiss plaintiffs' unjust enrichment claim under Tennessee law.

### D. Conclusion

n13 The Court finds that the "exhaustion of remedies" requirement to an unjust enrichment claim under Tennessee law makes little sense in this context unless a party is required to take such remedial steps prior to filing suit against the parties with whom the prospective plaintiff lacks a direct relationship. See, e.g., *AmSouth Erectors, L.L.C. v. Skaggs Iron Works, Inc., 2003 Tenn. App. LEXIS 551 at *19, 2003 WL 21878640, at *6 (Tenn. Super. Ct. Aug. 5, 2003)* (purpose of exhaustion of remedies requirement is to "winnow out claims that are not ripe for adjudication"); *Window Gallery v. Davis, 1999 Tenn. App. LEXIS 775, 1999 WL 1068730, at *4 (Tenn. Super. Ct. Nov. 24, 1999)* (retail seller of windows must exhaust remedies against defendant contractor, to whom seller furnished windows, before "proceed[ing]" against homeowner under theory of unjust enrichment).

[*62]

For the preceding reasons, this Court grants with prejudice defendants' motion to dismiss plaintiffs' claim for unjust enrichment under Tennessee law and denies defendants' motion to dismiss in all other respects. An appropriate Order follows. **ORDER**

AND NOW, this 30th day of May 2006, upon consideration of defendants' joint motion to dismiss the second amended indirect purchaser complaint (Doc. No. 26), plaintiffs' brief in opposition (Doc. No. 28), and defendants' response thereto (Doc. No. 33), it is hereby

ORDERED as follows:

1. Defendants' motion (Doc. No. 26) is GRANTED in part and DENIED in part.

2. Plaintiffs' unjust enrichment claim under Tennessee law is DISMISSED without prejudice.

3. Plaintiffs may proceed on all remaining claims in the second amended indirect purchaser complaint.

BY THE COURT:

/S/ LEGROME D. DAVIS

J.

14

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000                                    CLERK OF THE COURT
                                              FORM V000

HON. MICHAEL J. O'MELIA                       A. Beery
                                              Deputy

CV2000-000722

                              FILED: _____

CHARLES I. FRIEDMAN, P.C., ET AL.    ANDREW S. FRIEDMAN

v.

MICROSOFT CORPORATION                 LEONARD B SIMON
                                      MILBERG WEISS BERSHAD
                                      HYNES & LERACH LLP
                                      600 W BROADWAY
                                      STE 1800
                                      SAN DIEGO CA 92101


                                      DAVID J BERSHAD
                                      ONE PENNSYLVANIA PLAZA
                                      NEW YORK NY 10119-0165


                                      KENNETH J VIANALE
                                      MILBERG WEISS BERSHAD HYNES &
                                      LERACH LLP
                                      THE PLAZA   STE 900
                                      5355 TOWN CENTER RD
                                      BOCA RATON FL 33486


                                      MARK D BOGEN
                                      1761 W HILLSBORO BLVD
                                      STE 328
                                      DEERFIELD BEACH FL 33442


                                      BRIAN MICHAEL GOODWIN

Docket Code 019                                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000                                CLERK OF THE COURT
                                              FORM V000

HON. MICHAEL J. O'MELIA                        A. Beery
                                               Deputy

CV2000-000722


                                        JOHN J. BOUMA

                                        CHRISTOPHER A. O'HARA


                                        STEVE W BERMAN
                                        HAGENS BERMAN
                                        1301 FIFTH AVE
                                        STE 2900
                                        SEATTLE WA  98101



                          MINUTE ENTRY

        The Court has considered all of the memoranda and cases
submitted by both parties.   The Court will not give an
appellate-type ruling, as I would only be repeating what is set
forth in the moving papers.   The Court therefore makes the
following rulings:

        1.   Microsoft's Motion to Dismiss is denied.   The Court
             finds that Arizona residents can bring this action,
             and *Illinois Brick* does not apply.

        2.   The Plaintiff's Motion to Certify the Class is
             granted.

        3.   Microsoft's Motion to Stay is denied.



Docket Code 019                                        Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000                                    CLERK OF THE COURT
                                                  FORM V000

HON. MICHAEL J. O'MELIA                          A. Beery
                                                 Deputy

CV2000-000722

    The Court will rule on Microsoft's Motion to Consolidate
and Lucero's Motion to Intervene when the pleadings are
complete.

15

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: Not Reported in A.2d)**

Fucile v. Visa U.S.A., Inc.Vt.Super.,2004.Only the
Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Vermont, Chittenden County.
Anthony J. FUCILE
v.
VISA U.S.A. INC. and Mastercard International, Inc.
**No. S1560-03 CNC.**

Dec. 27, 2004.

John T. Sartore of Paul Frank & Collins, P.C.,
Burlington, VT; Stephen V. Bomse and David M.
Goldstein of Heller Ehrman White & McAuliffe
LLP, San Francisco, CA; Robert C. Mason of Arnold
& Porter LLP, New York, NY, for Defendant Visa
U.S.A. Inc.
Samuel Hoar, Jr. of Dinse, Knapp & McAndrew,
Burlington, VT; Kenneth A. Gallo and Patricia C.
Crowley of Paul, Weiss, Rifkind, Wharton &
Garrison LLP, Washington, DC; Gary R. Carney and
Randi D. Adelstein of Paul, Weiss, Rifkind, Wharton
& Garrison LLP, New York, NY, for Defendant
MasterCard International Incorporated.
Robert A. Mello of Mello & Klesch, LLP, South
Burlington, VT; David Markun, Edward S. Zusman
and Kevin Eng of Markun Zusman Compton &
David, LLP, San Francisco, CA, for Plaintiffs.

## ENTRY
NORTON, J.
**\*1** The plaintiff, Anthony J. Fucile, sues Visa and
Mastercard on behalf of himself and all similarly
situated individuals for damages incurred by
purchasing products sold by merchants who used the
defendants' debit card services. Mr. Fucile claims that
because of the defendants' antitrust violations,
merchants were forced to pay higher costs for the use
of debit cards. The merchants, in turn, passed these
costs along to consumers through the price of the
goods they sold. Mr. Fucile brings this action under
the Vermont Consumer Fraud Act. The defendants
move to dismiss for failure to state a claim upon
which relief can be granted, pursuant to Rule 12(b)(6)
of the Vermont Rules of Civil Procedure. Because
Mr. Fucile lacks standing under the Consumer Fraud
Act, the court dismisses his complaint.

This action stems from a class action in the U.S.

District Court for the Eastern District of New York.
In that action, a class of retailers sued Visa and
Mastercard for antitrust violations, claiming that the
two defendants illegally required retailers to accept
debit card services along with credit card services.
The parties settled before trial, resulting in more than
$3 billion in damages and injunctive relief worth
between $25 billion to $87 billion. See generally In
re Visa Check/Mastermoney Antitrust Litig., 297
F.Supp.2d 503 (E.D.N.Y.2003).

Mr. Fucile now seeks damages as a consumer from
merchants affected by the antitrust violations at issue
in the prior class action litigation, claiming that these
violations constituted an unfair method of
competition within the meaning of 9 V.S.A. §
2453(a). Mr. Fucile claims standing to bring this
claim not as a purchaser, because he did not actually
purchase the financial services from the defendants,
but as an "indirect purchaser."

The defendants, however, argue that Mr. Fucile is
neither a direct purchaser nor an indirect purchaser.
Rather, he is a "non-purchaser," because he did not
actually receive the financial services that were
affected by the defendants' antitrust violation. Mr.
Fucile merely complains about prices of goods that
may or may not have been affected by the price of the
defendants' financial services. Therefore, the
defendants argue, he lacks standing.

A motion to dismiss for failure to state a claim upon
which relief can be granted will issue only if it is
beyond doubt that there exists no facts or
circumstances that entitle a plaintiff to relief. Powers
v. Office of Child Support, 173 Vt. 390, 395 (2002).
In a motion to dismiss, the court assumes all facts
that a plaintiff pleads are true and disregards all of a
defendant's contrary assertions. Id. Here, the
dispositive issue is whether a person in Mr. Fucile's
position, having not actually acquired the product or
service that is alleged to be tainted by unlawful trade,
can seek damages under the Consumer Fraud Act.
Because this standing issue is one of law, it is
appropriate for disposition on a motion to dismiss for
failure to state a claim upon which relief can be
granted. See, e.g., Parker v. Town of Milton, 169 Vt.
74, 76-79 (1998).

**\*2** The Consumer Fraud Act, literally read, provides
limitless standing to any consumer. See 9 V.S.A. §
2451a(a) (defining consumer as "any person who
purchases, leases, contracts for, or otherwise agrees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
(Cite as: Not Reported in A.2d)

to pay consideration for goods or services"). Courts will not, however, interpret statutes in a manner that leads to "absurd results manifestly unintended by the Legislature." *In re G.T.,* 170 Vt. 507, 517 (2000). Although courts should interpret the Consumer Fraud Act liberally in order to serve its remedial purpose, courts should not "so freely stretch its meaning as to evade the Legislature's intent." *Wilder v. Aetna Life & Cas. Ins. Co.,* 140 Vt. 16, 19 (1981). Thus, the court must define some limits to who may have standing to sue under the Consumer Fraud Act.

Although federal courts have limited antitrust actions to "direct purchasers" of goods or services, see *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977),* Vermont has expressly disagreed with this limitation and allowed indirect purchaser suits under state law. See *9 V.S.A. § 2465(b); Elkins v. Microsoft Corp.,* 174 Vt. 328, 337-38. (2002). But the standing issue in the instant case is a separate matter from the indirect purchaser issue. Indeed, the *Illinois Brick* Court did not address standing, stating that the indirect purchaser issue "is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages." *Illinois Brick,* 431 U.S. at 728 n. 7. Despite his claim that he qualifies as an "indirect purchaser," Mr. Fucile is far more remote than the plaintiff in *Elkins.* In *Elkins,* the plaintiff had actually acquired the product that was allegedly tainted by unfair methods of competition. See *Elkins,* 174 Vt. at 333. Here, Mr. Fucile never actually purchased the tainted financial services, but merely claims damages through the purchase of other products, the price of which may or may not have been affected by the financial services. Therefore, despite Vermont's indirect purchaser rule, the court must still determine if Mr. Fucile has standing given his remote relationship to the alleged wrongdoing.

Federal courts have generally split into two camps with respect to antitrust standing. Some courts have opted for the "direct injury" test, which focuses on the relationship between the parties. Under this test, if the plaintiff is separated by intermediate victims, courts usually deny standing. See Annotation, *"Target Area" Doctrine as Basis For Determining Standing to Sue Under § 4 of Clayton Act (15 U.S.C.A. § 15) Allowing Treble Damages For Violation of Antitrust Laws,* 70 A.L.R. Fed. 637, § 2[a]. Other courts have used the "target area" test, which focuses on the general area of the economy injured by the antitrust violator. See *id.*

The Supreme Court has not endorsed either test, but

it has provided factors that lower courts should consider in determining standing. *Associated Gen. Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519, 537 n. 33 (1983). These factors include (1) whether there is a causal connection between the antitrust violation and the alleged harm, *id.* at 537; (2) the directness of the injury, considering the "chain of causation," *id.* at 540; (3) whether the violator had an improper motive, *id.* at 537 and n. 35; (4) whether the plaintiff's injury was of a type that Congress sought to redress by providing a private remedy, *id.* at 538; (5) whether the alleged damages are speculative, *id.* at 542; and (6) whether the nature of the action will keep "the scope of complex antitrust trials within judicially manageable limits," *id.* at 543.

**\*3** Simply by glancing at these factors, one can see that the Court did not pull them from thin air. Rather, they reflect the Court's standing factors to determine whether a case or controversy exists, pursuant to Article III of the Constitution.[FN1] The three primary factors in this context are (1) injury, (2) causation, and (3) redressibility. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). The Vermont Supreme Court has expressly adopted these factors in other contexts. See, e.g., *Agency of Natural Resources v. U.S. Fire Ins. Co.,* 173 Vt. 302, 306 (2001). Although the Vermont Consumer Fraud Act has broader remedial purposes than federal statutes, the court nevertheless believes that the Vermont Supreme Court would also draw upon the standing factors in *Associated General Contractors* for guidance, at least to the extent that these factors are consistent with allowing "indirect purchaser" standing.

> FN1. The Court has noted that antitrust standing is somewhat different from constitutional standing because it requires additional considerations, but both share the same basic requirements. See *Associated Gen. Contractors,* 459 U.S. at 535 n .31.

Therefore, in applying the general factors of *Associated General Contractors,* the court holds that Mr. Fucile does not have standing in this case. First, the causal chain here is simply too long. Mr. Fucile's damages are through an alleged inflated cost of goods sold by merchants who were injured by the defendants' inflated cost of financial services. He would have to demonstrate that the merchants actually passed their costs along to consumers through the price of their goods, rather than absorbing them by other means. The court would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: Not Reported in A.2d)**

need to consider all other potential causes of inflated costs, such as any number of supply problems that affected the price of each different product the plaintiff class bought in Vermont during the relevant time period. This exercise in speculation extends far beyond a court's abilities. Because causation may be indirect, given the indirect purchaser rule in Vermont, it cannot extend beyond a reasonable length, as it does here. Thus, factors (1) and (2) weigh against standing.

Second, the defendants' intent in this case weighs in favor of standing. Although the complaint is unclear as to the defendants' intent to violate antitrust law, the extent of money that the defendants allegedly made because of their tying arrangement demonstrates that their actions were intentional. Moreover, the defendants are associations providing financial services to thousands of banks. One cannot imagine that they lack familiarity with antitrust laws in conducting their business, so inferring intent here is appropriate. Therefore, factor (3) weighs in favor of standing for Mr. Fucile.

Third, the injury here does not appear to be a type that the Legislature intended to redress through the Consumer Fraud Act. Although, as the Vermont Supreme Court has stated many times, courts should construe the Act liberally to effectuate its remedial purpose, the court cannot imagine that the Legislature intended the Act to redress injuries to all consumers, even those whose contact to the goods or services tainted by unfair competition is remote and tangential. One could divine any number of hypothetical scenarios analogous to this case that highlight the absurdity of allowing standing under these circumstances.

*4 For instance, assume the plaintiff in *Elkins* was not a computer purchaser, but a client whose attorney provided legal services using Microsoft software. The client could claim that her bill was slightly higher because the attorney was forced to pay a higher price for the software because of Microsoft's antitrust violations. Whether or not the client's alleged injury is accurate, the court cannot reasonably assume that the Legislature intended the Consumer Fraud Act to extend limitlessly. As Justice Brennan acknowledged in his *Illinois Brick* dissent, "[t]here is, of course, a point beyond which antitrust defendants should not be held responsible for the remote consequences of their actions." <u>431 U.S. at 749 n. 2</u>. The plaintiff here extends far beyond this point. Thus, factor (4) weighs against standing.

Finally, the alleged damages are highly speculative. Assuming that the merchants actually passed along added expenses in the price of goods sold, the court would need to determine the degree to which these expenses were passed along. This degree may vary from one good to another. For instance, merchants may pass on greater costs in product markets that are relatively inelastic and fewer costs in product markets that are relatively elastic. See <u>*Illinois Brick*, 431 U.S. at 750 n. 3</u> (Brennan, J., dissenting). The court would then have to determine actual sales of goods to the plaintiff class during the relevant time period. Consumer fraud cases typically venture into the field of approximation, see <u>*id.* at 758-59</u> (Brennan, J., dissenting), but these alleged damages venture into uncharted territories of sheer guesswork. Factors (5) and (6) therefore weigh against standing.

Tallying the above analysis, the court grants the defendants' motion to dismiss. The court also notes that even should the Vermont Supreme Court ultimately adopt a different standard than that in *Associated General Contractors,* such as the "target area" test as it existed prior to *Associated General Contractors,* this court would still dismiss. In its most liberal manifestation, the target area test considered not only whether an antitrust violator's actions were aimed at a particular sector of the market, but whether the violator could have foreseen that its actions would affect the sector. See, e.g., <u>*Mulvey v. Samuel Goldwyn Prod.,* 433 F.2d 1073, 1076 (9th Cir.1970)</u>; see also *Illinois Brick,* 431 U.S. at 760 and n. 18 (Brennan, J., dissenting) (discussing "more liberal" target area test). Even under this test, Mr. Fucile lacks standing. The defendants could not be expected to foresee an antitrust violation affecting merchants to result in increased cost of goods throughout the entire consumer base and to so injure that consumer base as to result in liability to every consumer in the country. General consumers were not the target area of the defendants' actions; merchants were. Therefore, the court would grant the defendants' motion using this test, as well.

*5 Finally, the court briefly addresses Mr. Fucile's request that the court permit an amended answer to allow a narrower class, defined as those consumers who used debit cards in their transactions. The court denies this request, as it would not result in a different ruling. Mr. Fucile lacks standing because his injury-as a general consumer of products that are not directly related to the defendants' financial services-is too remote. Whether he used a debit card, a credit card, a check, or cash is irrelevant. His injury would still be that of a general consumer, and he would lack

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: Not Reported in A.2d)**

standing.


ORDER

For the foregoing reasons, the defendant's motion to
dismiss is GRANTED.


JUDGMENT FOR DEFENDANTS

The court having

granted the defense motion for
dismissal

judgment is entered for defendants, this action is
dismissed.

Vt.Super.,2004.
Fucile v. Visa U.S.A., Inc.
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2006 US DIST LEXIS 62672

Caution
As of: Jan 05, 2007

**GLABERSON et al. v. COMCAST CORPORATION et al.**

**CIVIL ACTION NO. 03-6604**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 62672*

**August 31, 2006, Decided**

**PRIOR HISTORY:** *Dambrosio v. Comcast Corp., 2006 U.S. Dist. LEXIS 48163 (E.D. Pa., Apr. 12, 2006)*

**COUNSEL:** [*1] For ANDREW BEHREND, Plaintiff: CAROL A. MAGER, MAGER & GOLDSTEIN LLP, PHILADELPHIA, PA.

MARC DAMBROSIO, Plaintiff, Pro se.

For MARC WEINBERG, Plaintiff: CAROL A. MAGER, MAGER & GOLDSTEIN LLP, PHILADELPHIA, PA.

KENNETH SAFFREN, Plaintiff, Pro se.

For STANFORD GLABERSON, Plaintiff: ALAN I. GILBERT, HEINS MILLS & OLSEN PLC, MINNEAPOLIS, MN; ANN D. WHITE, ANN D. WHITE LAW OFFICES, P.C., JENKINTOWN, PA; ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; BERRY C. BARNETT, SUSMAN GODFREY LLP, DALLAS, TX; DAVID WOODWARD, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; JASON P. FULTON, SUSMAN GODFREY, L.L.P., DALLAS, TX US; JESSICA N. SERVAIS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN US; JOHN W. TURNER, SUSMAN GODFREY LLP, DALLAS, TX; JOSHUA G. GRABAR, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; RYAN L. NELSON, SUSMAN GODFREY LLP, DALLAS, TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; CAROL A. MAGER, MAGER & GOLDSTEIN, LLP, PHILADELPHIA, PA.

For ERIC BRISLAWN, Plaintiff: ALAN I. GILBERT, HEINS MILLS & OLSEN PLC, MINNEAPOLIS, MN; ANN D. WHITE, ANN D. WHITE LAW OFFICES, P.C., JENKINTOWN, PA; BERRY C. BARNETT, SUSMAN GODFREY LLP, DALLAS, TX; [*2] DAVID WOODWARD, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; GARY L. SPECKS, KAPLAN FOX & KILSHEIMER LLP, HIGHLAND PARK, IL,JASON P. FULTON SUSMAN GODFREY, L.L.P., DALLAS, TX US; JESSICA N. SERVAIS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN US; JOHN W. TURNER, SUSMAN GODFREY LLP, DALLAS, TX; JOSHUA G. GRABAR, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; RYAN L. NELSON, SUSMAN GODFREY LLP, DALLAS, TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; CAROL A. MAGER, MAGER & GOLDSTEIN, LLP, PHILADELPHIA, PA; ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA.

For JOAN EVANCHUK-KIND, Plaintiff: ALAN I. GILBERT, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; ANN D. WHITE, ANN D. WHITE LAW OFFICES, P.C., JENKINTOWN, PA; BERRY C. BARNETT, SUSMAN GODFREY LLP, DALLAS, TX; DAVID WOODWARD, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; GARY L. SPECKS, KAPLAN FOX & KILSHEIMER LLP, HIGHLAND PARK, IL, JASON P. FULTON, SUSMAN GODFREY, L.L.P., DALLAS, TX US; JESSICA N. SERVAIS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN US; JOHN W. TURNER, SUSMAN GODFREY LLP, DALLAS, TX; JOSHUA G. GRABAR, BOLOGNESE

2006 U.S. Dist. LEXIS 62672, *

& ASSOCIATES, LLC, PHILADELPHIA, PA; RYAN L. NELSON SUSMAN GODFREY LLP, DALLAS, [*3] TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; CAROL A. MAGER, MAGER & GOLDSTEIN, LLP, PHILADELPHIA, PA; ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA.

For LAWRENCE RUDMAN, Plaintiff: ALAN I. GILBERT, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; ANN D. WHITE, ANN D. WHITE LAW OFFICES, P.C., JENKINTOWN, PA; BERRY C. BARNETT, SUSMAN GODFREY LLP, DALLAS, TX; DAVID WOODWARD, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; GARY L. SPECKS, KAPLAN FOX & KILSHEIMER LLP, HIGHLAND PARK, IL,JASON P. FULTON, SUSMAN GODFREY, L.L.P., DALLAS, TX US; JESSICA N. SERVAIS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN US; JOHN W. TURNER, SUSMAN GODFREY LLP, DALLAS, TX; JOSHUA G. GRABAR, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; RYAN L. NELSON, SUSMAN GODFREY LLP, DALLAS, TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; CAROL A. MAGER, MAGER & GOLDSTEIN, LLP, PHILADELPHIA, PA; ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA.

BARBI J. WEINBERG, Plaintiff, Pro se.

For MICHAEL KELLMAN, Plaintiff: ALAN I. GILBERT, HEINS MILLS & OLSEN PLC, MINNEAPOLIS, MN; ANN D. WHITE, ANN D. WHITE LAW OFFICES, P.C., JENKINTOWN, PA; BERRY C. BARNETT, [*4] SUSMAN GODFREY LLP, DALLAS, TX; DAVID WOODWARD, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; GARY L. SPECKS, KAPLAN FOX & KILSHEIMER LLP, HIGHLAND PARK, IL,JASON P. FULTON, SUSMAN GODFREY, L.L.P., DALLAS, TX US; JESSICA N. SERVAIS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN US; JOHN W. TURNER, SUSMAN GODFREY LLP, DALLAS, TX; JOSHUA G. GRABAR, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; RYAN L. NELSON, SUSMAN GODFREY LLP, DALLAS, TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN; CAROL A. MAGER, MAGER & GOLDSTEIN, LLP, PHILADELPHIA, PA;ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA.

For CAROLINE CUTLER, Plaintiff: BERRY C. BARNETT, SUSMAN GODFREY LLP, DALLAS, TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN.

For CAROLINE BEHREND, Plaintiff: ANN D. WHITE, ANN D. WHITE LAW OFFICES, P.C., JENKINTOWN, PA; ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA. BERRY C. BARNETT, SUSMAN GODFREY LLP, DALLAS, TX; CAROL A. MAGER, MAGER & GOLDSTEIN, LLP, PHILADELPHIA, PA; DAVID WOODWARD, HEINS MILLS & OLSON, PLC, MINNEAPOLIS, MN; JASON P. FULTON, SUSMAN GODFREY, L.L.P., DALLAS, TX US; JESSICA N. SERVAIS, HEINS MILLS & OLSON [*5] PLC, MINNEAPOLIS, MN US; JOHN W. TURNER, SUSMAN GODFREY LLP, DALLAS, TX; JOSHUA G. GRABAR, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; RYAN L. NELSON, SUSMAN GODFREY LLP, DALLAS, TX; SAMUEL D. HEINS, HEINS MILLS & OLSON PLC, MINNEAPOLIS, MN.

For COMCAST CORPORATION, COMCAST CABLE HOLDINGS, LLC, COMCAST CABLE COMMUNICATIONS HOLDINGS, INC., COMCAST CABLE COMMUNICATIONS, INC., COMCAST HOLDINGS CORPORATION, Defendants: DARRYL J. MAY, BALLARD SPAHR ANDREWS & INGERSOLL, LLP, PHILADELPHIA, PA; JAMES T. CAIN, KASOWITZ BENSON TORRES & FRIEDMAN LLP, NEW YORK, NY US; MELONIE S. JURGENS, KASOWITZ BENSON TORRES & FRIEDMAN LLP, NEW YORK, NY US; MICHAEL S. SHUSTER, KASOWITZ BENSON TORRES & FRIEDMAN LLP, NEW YORK, NY US; SHERON KORPUS, KASOWITZ BENSON TORRES & FRIEDMAN LLP, NEW YORK, NY US; JASON A. LECKERMAN, BALLARD SPAHR ANDREWS & INGERSOLL, PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION:**

   **MEMORANDUM**

**Padova, J.**

   Plaintiffs, cable television services customers of Defendants in the Philadelphia and Chicago regions, have brought this antitrust action against Defendants for damages arising out of Defendants' alleged imposition of horizontal restraints [*6] in the relevant cable television markets and unlawful monopolization and attempted monopolization of those markets. Presently before the Court is Defendants' Motion to Dismiss the Third

Amended Class Action Complaint (Docket No. 138), pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons stated below, Defendants' Motion to Dismiss is denied.

## I. BACKGROUND

Plaintiffs, six non-basic cable television programming services customers of Defendants in the Philadelphia, Pennsylvania and Chicago, Illinois regions, have brought this antitrust suit on behalf of themselves and all those similarly situated, pursuant to Sections 4 and 16 of the Clayton Act, *15 U.S.C. § § 15, 26*, for violations of Sections 1 (Count One) and 2 (Counts Two and Three) of the Sherman Act, *15 U.S.C. § § 1, 2*. The Third Amended Complaint alleges that Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications Holdings, Inc., and Comcast Cable Holdings, LLC (collectively "Comcast") acquired cable systems and cable [*7] subscribers from their competitors in the Philadelphia and Chicago cable markets until the number of competing cable providers in those markets was substantially reduced. (3d Am. Compl. PP 3, 49, 51-53.) The remaining competitors were primarily very large businesses who owned pockets of cable systems and cable subscribers throughout the country. (Id. P 3.) Comcast then entered into agreements with those companies to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers. (Id. P 4.) Comcast received competitors' cable systems and cable subscribers in the Philadelphia and Chicago cable markets in exchange for Comcast's cable systems and cable subscribers in other parts of the country. (Id. PP 4, 10, 50, 54- 56.) One swap agreement allocated markets and customers between Comcast and AT&T Broadband ("AT&T"); Comcast swapped its Chicago-area subscribers for AT&T's Philadelphia-area subscribers. (Id. PP 4, 56.) Then, as part of the November 18, 2002, merger between Comcast and AT&T, Comcast acquired AT&T's cable monopoly and cable subscribers in the Chicago area. (Id. [*8] PP 5, 57.) The result of all the swap agreements was that Comcast willfully obtained and maintained monopoly power in the relevant geographic markets, defined as Comcast's cable franchises located in Philadelphia and Chicago and geographically contiguous areas and areas in close geographic proximity to Philadelphia and Chicago in designated counties (hereinafter the Philadelphia and Chicago "clusters"). (Id. PP 6, 31.) The Third Amended Complaint alleges that Comcast currently controls ninety-four percent and ninety-two percent of the cable market in the Philadelphia and Chicago clusters, respectively, and that Comcast has used its monopoly power to raise cable prices in the Philadelphia

and Chicago clusters to artificially high, supra-competitive levels. (Id. PP 7, 80-81, 99.)

Count One of the Third Amended Complaint maintains that Comcast has conspired with its competitors and engaged with them in a strategy of allocating markets through swap agreements that exchanged their respective cable assets, including subscribers, and that such horizontal market restraints constitute per se violations of *§ 1* of the Sherman Act. n1 (Id. P 73.) Plaintiffs also maintain that Comcast's [*9] acquisitions of competing cable companies in the Philadelphia and Chicago clusters through asset purchases and mergers amount to contracts and conduct in restraint of trade in further violation of *§ 1*. (Id. P 74.) Count Two alleges that Comcast has monopolized, and Count Three alleges that Comcast has attempted to monopolize, the product market for multichannel video programming services ("MVPS") within the Philadelphia and Chicago clusters in violation of *§ 2* of the Sherman Act. (Id. PP 102, 107.) Comcast's anti-competitive conduct purportedly entails not only its swap agreements and acquisitions of competing cable companies, but also Comcast's refusal to provide Philadelphia-area competitor RCN Telecomm Services, Inc. ("RCN") with long-term, nondiscriminatory access to local sports programming controlled by Comcast ("Sportsnet"), which Plaintiffs contend RCN requires in order to compete effectively against Comcast. (Id. PP 11-12, 97.) In addition, Comcast has substantially interfered with RCN's access to the contractors needed to build competing cable systems in Comcast's Philadelphia franchise areas, and Comcast has engaged in pricing campaigns designed to prevent or [*10] destroy competition from RCN. (Id.) Plaintiffs contend that they have been injured by Comcast's activities because they have been forced to pay higher cable prices than they would have paid absent Comcast's unlawful conduct, and they seek treble damages, injunctive relief, and their costs of suit, including attorneys' fees. (Id. PP 11, 28, 67, 103,

---

n1 A horizontal restraint is defined as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition."*United States v. Topco Assocs., Inc., 405 U.S. 596, 608, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972).*

---

108.) Comcast has moved to dismiss Plaintiffs' Third Amended Complaint in its entirety.

## II. LEGAL STANDARD

When deciding a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, a court may look only to the facts alleged in the complaint and its attach-

ments. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).* [*11] The court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).* The court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" *Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004)* (citing *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*). A *Rule 12(b)(6)* motion will be granted when a plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).* The dismissal standard is higher in antitrust cases than generally. *Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc., 2004 U.S. Dist. LEXIS 11552, Civ. A. No. 03-232, 2004 WL 1427136, at *3 (E.D. Pa. June 21, 2004)* (citation omitted); *see also Lum v. Bank of Am., 361 F.3d 217, 228 (3d Cir. 2004)* ("[I]n antitrust cases, . . . dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. [*12] " (quoting *Hosp. Bldg. Co. v. Trustees of the Rex Hosp.,425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976))*). Nonetheless, the facts underlying the elements of an antitrust claim must be pled with specificity. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 528 n.17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*; *Brotech Corp., 2004 U.S. Dist. LEXIS 11552, 2004 WL 1427136, at *3* (citation omitted).

## III. DISCUSSION

Comcast argues that Plaintiffs' Third Amended Complaint should be dismissed because it does not allege facts indicating that Plaintiffs have antitrust standing to challenge Comcast's transactions with other cable companies or Comcast's conduct towards RCN. n2 Comcast further asserts that Count One should be dismissed for failure to state a claim under § 1 of the Sherman Act, and that Counts Two and Three should be dismissed for failure to state a claim under § 2 of the Sherman Act. Comcast also contends that Plaintiffs' claims are time-barred to the extent that they depend on three acquisitions that occurred outside the Clayton Act's four-year statute of limitations for bringing private antitrust actions.

n2 While motions to dismiss that implicate constitutional standing principles are generally predicated on *Federal Rule of Civil Procedure 12(b)(1)*, the United States Court of Appeals for the Third Circuit has considered motions to dismiss that raise issues of antitrust standing under

*Rule 12(b)(6). Maio v. Aetna, Inc., 221 F.3d 472, 481 n.7 (3d Cir. 2000).*

[*13]

### A. Plaintiffs' Antitrust Standing

Whether a plaintiff has standing to raise antitrust claims is a threshold inquiry. *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998)*; *Baglio v. Baska, 940 F. Supp. 819, 828 (W.D. Pa. 1996)* (citing *Associated Gen. Contractors, 459 U.S. at 519*), aff'd, *116 F.3d 467 (3d Cir. 1997)*. The burden on a plaintiff in a private antitrust action to demonstrate that he has antitrust standing arises from § 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. See *15 U.S.C. § 15.* "[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine." *Associated Gen. Contractors, 459 U.S. at 535 n.31.* While "'[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . [the doctrine of antitrust standing requires] [*14] the court [to] make a further determination [as to] whether the plaintiff is a proper party to bring a private antitrust action." *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co., 826 F.2d 1235, 1239 (3d Cir. 1987)* (quoting *Associated Gen. Contractors, 459 U.S. at 535 n.31*); *see also West Penn Power, 147 F.3d at 264.*

The United States Court of Appeals for the Third Circuit uses the following five-factor balancing test to evaluate antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740-41 (3d Cir. 2004) [*15] (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997)). The first step in determining whether a plaintiff has antitrust standing begins with the second factor in the balancing test, commonly known as the antitrust injury requirement. *West Penn Power*, 147 F.3d at 264 n.14, 265. If there is no antitrust injury, that is the end of the inquiry, and the claim should be dismissed. *Id.* at 265 (citing *Barton & Pittinos, Inc.*, 118 F.3d at 182). An antitrust injury is an "injury of 'the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)). The concept of antitrust injury overlaps with the first factor in the balancing test because the injury must be causally related to the defendant's allegedly anticompetitive [*16] activity. See *West Penn Power*, 147 F.3d at 265.

Comcast argues that Count One of the Third Amended Complaint should be dismissed because Plaintiffs lack antitrust standing to challenge the swaps and acquisitions of cable systems in the Philadelphia and Chicago clusters that form the basis for Count One. Comcast also argues that Counts Two and Three should be dismissed to the extent that they depend upon those transactions. Comcast then contends that Counts Two and Three should be dismissed in their entirety because Plaintiffs do not have antitrust standing to challenge the remaining conduct underlying those claims, namely Comcast's treatment of RCN.

### 1. The cable system transactions

Comcast asserts that Plaintiffs lack antitrust standing to challenge its swap agreements and acquisitions because Plaintiffs are unable to demonstrate a direct causal connection between those transactions and Plaintiffs' alleged injury of higher cable prices. According to Comcast, Plaintiffs have failed to allege any facts suggesting that there was actual or likely future competition between Comcast and the transacting cable companies in the relevant markets. Comcast contends [*17] that the Third Amended Complaint acknowledges that price competition for cable programming services only arises when an over builder operates in a given franchise area alongside the incumbent cable provider. Comcast argues that the Third Amended Complaint must, therefore, plead facts showing that the challenged transactions specifically removed over builders from Comcast's franchise areas or prohibited over builders from entering Comcast's

franchise areas. n3 Comcast maintains that the Third Amended Complaint instead makes clear that all that the challenged transactions accomplished was the substitution of Comcast as the exclusive provider of cable services in a given franchise area for another exclusive provider. Comcast asserts that the challenged transactions were, therefore, "competition-neutral," and that Plaintiffs cannot show that Comcast's actions had anticompetitive effects that could give rise to an antitrust injury.

> n3 Overbuilders are wireline cable providers that install cable systems along the same rights-of-way as the incumbent cable franchisee.

[*18]

We need not consider whether Comcast's actions should be considered "competition-neutral" absent allegations specifically concerning the elimination of overbuilders since, for the purposes of assessing antitrust standing, we assume as true the statements in the Third Amended Complaint that Comcast's conduct threatened competition in the relevant markets. See *Angelico, M.D. v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n.2 (3d Cir. 1999) (noting that the district court "erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section one of the Sherman Act, 15 U.S.C. § 1, which prohibits 'contracts, combinations or conspiracies in restraint of trade'" (quoting 15 U.S.C. § 1)). As a leading treatise explains:

> "[T]he antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition . . . may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. [*19] Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government - which enjoys automatic standing - must be dismissed. . . . To test standing in a private suit, therefore, the court should assume the existence of a violation and then ask whether the [standing elements] are shown."

2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law P 335f (2d ed. 2002). It would thus be improper for

us, as part of our standing analysis, to conclude that the challenged swap agreements and acquisitions cannot constitute antitrust violations because the Third Amended Complaint does not specifically allege that the cable companies transacting with Comcast were over-builders. See *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 925 n.7 (3d Cir. 1999)* ("While we do not decide whether an agreement among competitors to withhold a new product from a market would constitute an antitrust violation, we assume for the sake of assessing plaintiffs' antitrust standing that the conduct in which defendants allegedly engaged would constitute such a violation. [*20] ").

We find that the Third Amended Complaint pleads a reduction of actual and prospective competition in the Philadelphia and Chicago clusters that was the intended result of the challenged swap agreements and acquisitions. (3d Am. Compl. PP 3-4, 10-12, 25, 61, 99(b).) The Third Amended Complaint provides examples of how the transactions were structured to achieve the removal of competitors from the relevant markets. (Id. PP 50-57.) It alleges, for instance, that in a swap agreement between Comcast and Adelphia Communications Corp. ("Adelphia"), which closed on or about January 1, 2001, Comcast obtained Adelphia's cable systems and cable subscribers located in Philadelphia and adjacent New Jersey areas in exchange for Comcast's cable systems and cable subscribers in and around Palm Beach, Florida and Los Angeles, California and that this agreement eliminated competition from Adelphia in the Philadelphia market. (Id. P 55(b).) We also find that Plaintiffs' alleged injury, "an increase in price resulting from the dampening of competitive market forces[,] is assuredly one type of injury for which § 4 [of the Clayton Act] potentially offers redress." *Blue Shield of Va. v. McCready, 457 U.S. 465, 482-83, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982).* [*21] The injury is one that flows from the challenged swap agreements and acquisitions, in that Comcast's ability to raise its cable prices stemmed from the purported deliberate lessening of competition achieved through those transactions. Accordingly, with respect to the challenged swap agreements and acquisitions, the Third Amended Complaint sufficiently pleads the antitrust injury and causal connection/defendant intent elements required to satisfy factors one and two of the five-factor balancing test governing antitrust standing. n4

n4 The authority upon which Comcast relies is inapposite. Comcast, for example, cites *West Penn Power, 147 F.3d at 265,* for the proposition that where a private plaintiff alleges it has suffered injury due to the suppression or elimination of competition via horizontal transactions but fails to plead facts establishing the existence of

actual or likely future competition between the transacting parties in the relevant market, the plaintiff's claims should be dismissed for lack of antitrust standing. In *West Penn Power*, the plaintiff, the City of Pittsburgh, brought suit against two electric companies seeking damages and an injunction precluding the merger of the companies, claiming that the merger would void the possibility of lower-priced electric service charged to city residents. The Third Circuit held that the plaintiff's claim did not meet standing requirements because of the absence of antitrust injury and a lack of causal connection between the plaintiff's injuries and the alleged harm. Id. The Third Circuit agreed with the district court's conclusion that there was no antitrust injury, as the proposed merger had not "brought about the lessening of competition in a 'marketplace' where there was no competition." *Id. at 266-67.* West Penn Power is distinguishable from the instant case. As the Third Circuit has explained, it arrived at the conclusion in West Penn Power because

an intervening regulatory scheme precluded the companies from competing, i.e., the merger was not the cause of the injury. No significant antitrust injury inquiry was required to reach this conclusion and none was undertaken. We can reasonably posit, however, that if not for this regulatory quirk, the City would have been entitled to . . . relief because the proposed merger would have eradicated competition, a result prohibited under the Clayton Act, and detrimental to the City's electrical customers.

*In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 401 (3d Cir. 2000).* Unlike *West Penn Power*, the instant case does not involve a regulatory scheme that authorizes territorial monopolies and hence, the "quirk" that justified the denial of antitrust standing in West Penn Power is not present here. Comcast also relies upon *Mathews v. Lancaster Gen. Hosp., 883 F. Supp. 1016 (E.D. Pa. 1995)*, aff'd, *87 F.3d 624 (3d Cir. 1996)*, a case in which the court held that defendants were entitled to summary judgment based on the plaintiff's lack of antitrust standing where "[f]rom the

long

standpoint of the consumer, there has been no meaningful change in the market" as a result of the defendants' conduct. *Id.at 1045. Mathews* is distinguishable because the plaintiff in that case only alleged harm to himself, as a provider of orthopedic services whose privileges had been restricted at hospitals, and not harm to competition. Id. In Mathews, the "undisputed evidence show[ed] that orthopedic services are still readily available from a large and ever-increasing number of providers." Id.

[*22]

In addition, we hold that the Third Amended Complaint adequately pleads antitrust standing requirements three through five. Plaintiffs' injury of higher cable prices is allegedly directly traceable to Comcast's success in dampening competitive market forces for the provision of cable services. Plaintiffs are direct victims because they purchased cable services straight from Comcast at the inflated prices generated through Comcast's purported antitrust violations. There is little likelihood of duplicative recovery because Plaintiffs are not seeking to recover damages passed onto them by other entities and complex apportionment of damages is not an issue because each Plaintiff suffered overcharges that are separate and distinct. We conclude that, regarding the challenged swap agreements and acquisitions that form the basis for Count One and parts of Counts Two and Three, the Third Amended Complaint satisfactorily alleges the elements of antitrust standing.

2. Conduct affecting RCN

Comcast argues that Plaintiffs lack antitrust standing to challenge Comcast's conduct towards RCN, and that the portions of Counts Two and Three that depend on such conduct should be dismissed. As discussed [*23] above, Counts Two and Three allege that Comcast deprived RCN of a long-term contract for Sportsnet, denied RCN access to the key contractors in the Philadelphia area, and made RCN the target of pricing schemes. (3d Am. Compl. PP 85-90, 105.) Comcast asserts that Plaintiffs' theory of injury - that Comcast was able to charge supra-competitive cable prices as a result of its suppression of competition from RCN - founders on paragraphs ninety and ninety-three of the Third Amended Complaint, which, Comcast contends, serve as an acknowledgment that RCN was able to enter and compete with Comcast in the Philadelphia cluster. Paragraph ninety states that RCN obtained short-term access to Sportsnet programming in Philadelphia, and paragraph ninety-three states that, in the summer of 2000, RCN began offering cable service in Delaware County, Pennsylvania communities served by Comcast. Comcast maintains that its alleged ability to charge Plaintiffs inflated cable prices

cannot be attributed to the purported exclusion of RCN from the Philadelphia cluster, and that Counts Two and Three fail to plead facts showing a direct causal connection between Comcast's treatment of RCN and Plaintiffs' claimed [*24] injury. Comcast also argues that Plaintiffs lack antitrust standing because RCN is a more direct victim of the alleged antitrust violations. See *Associated Gen. Contractors, 459 U.S. at 542* (stating that "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general").

We find that Counts Two and Three adequately plead the first and second factors, i.e., the causal connection/defendant intent element and the antitrust injury element, of the antitrust standing analysis with respect to Comcast's treatment of RCN. Counts Two and Three allege that Comcast deliberately acted with anticompetitive intent towards RCN by suppressing competition from RCN in the portion of the Philadelphia cluster in which RCN offered services and by preventing competition from RCN in the portions of the cluster it might have entered. (3d Am. Compl. PP 82, 86.) Counts Two and Three further allege that Comcast's success in reducing competition from RCN enabled it to charge the [*25] inflated prices that injured Plaintiffs. (Id. PP 92, 94.) As discussed, supra Part III.A.1, such prices are the type of injury for which the antitrust laws were intended to provide redress. *McCready, 457 U.S. at 482-83.* Counts Two and Three need not contend that Comcast completely eliminated all competition from RCN in order to demonstrate a link between Comcast's treatment of RCN and Plaintiffs' injury. Under § 2 of the Sherman Act, "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005)* (citation omitted).

We additionally find that Counts Two and Three sufficiently plead the three remaining elements of antitrust standing with respect to Comcast's conduct towards RCN. Plaintiffs' own cable bills were higher because Comcast acted to restrain RCN, and Plaintiffs' injury is thus directly traceable to Comcast's anticompetitive behavior. n5 The fact that Comcast's conduct harmed RCN and potentially RCN's customers, [*26] as well as Plaintiffs, does not deprive Plaintiffs of their antitrust standing. "[O]ther direct victims exist, but their presence does not diminish the directness of the [Plaintiffs'] injury." *In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1168-70 (3d Cir. 1993)* (finding that plaintiff steel companies had antitrust standing to recover inflated dock

handling charges resulting from defendant railroads' conspiracy preventing plaintiffs from using private docks and that the presence of dock companies as another direct victim did not dilute the causal connection between the inflated charges paid by plaintiffs and defendants' conspiracy); see also *U.S. Horticultural Supply, Inc. v. Scotts Co., 2004 U.S. Dist. LEXIS 11859, Civ. A. No. 03-733, 2004 WL 1529185, at *6 (E.D. Pa. Feb. 18, 2004)* (noting that there may be more than one proper plaintiff of an alleged antitrust violation). Permitting Plaintiffs to proceed in this case does not pose the risk of duplicative damages even if RCN litigates its rights; Plaintiffs' injuries, which consist of overcharges, are distinct from RCN's injuries, which likely consist of lost profits. See *McCready, 457 U.S. at 469 n.4,474-75* [*27] (allowing a purchaser of health insurance to challenge a boycott by the insurer and psychiatrists directed at psychologists even though the psychologists had maintained their own successful suit, where the psychologists suffered one kind of injury - lost profits in selling their services - and plaintiff suffered another kind of injury - reduced coverage on her health insurance policy). Nor is there a risk of complex apportionment of damages since Comcast overcharged each Plaintiff through separate monthly bills and Comcast's billing records are easily recoverable.

    n5 Defendants argue in the alternative that Plaintiffs do not have antitrust standing with respect to Comcast's RCN-related conduct because they do not live in the counties where RCN operates, and they do not specifically allege that RCN ever competed in their counties or applied or intended to apply for franchise licenses covering their counties. Comcast relies upon *Brotech Corp, 2004 U.S. Dist. LEXIS 11552, 2004 WL 1427136,* a case in which this Court noted that a competitor who seeks entry to a market can state an antitrust injury stemming from the defendant's violation of antitrust laws only if that prospective competitor can demonstrate "'both its intention to enter the market and its preparedness to do so.'" *2004 U.S. Dist. LEXIS 11552, [WL] at *5* (quoting *Andrx Pharms., Inc. v. Biovail Corp. Int'l, 347 U.S. App. D.C. 178, 256 F.3d 799, 806 (D.C. Cir. 2001)).* Plaintiffs are not competitors of Comcast and the standards that courts impose on competitors to ensure that their injury is not speculative are not applicable to the determination of Plaintiffs' antitrust standing.

[*28]

    RCN is not the more direct or "superior" plaintiff to vindicate the public interest. In general, "[t]he antitrust laws . . . were enacted for the protection of competition, not competitors" and "basic economic theory teaches us that the chief benefit of competition is lower prices to consumers." *Brunswick Corp., 429 U.S. at 488* (quotation omitted); *Barr Laboratories, Inc. v. Abbott Laboratories, 978 F.2d 98, 109 (3d Cir. 1992).* Comcast allegedly acted to restrain competition from RCN in order to gain the ability to charge consumers inflated prices. Plaintiffs were, therefore, the ultimate target of Comcast's anticompetitive conduct towards RCN. As the Supreme Court found in McCready, where the injury to the consumer is "inextricably intertwined" with the injury the defendant sought to inflict on the relevant market, standing under § 4 of the Clayton Act is present. *McCready, 457 U.S. at 479, 483-84* (holding that plaintiff's injury was not rendered remote merely because the alleged goal of the defendant was to halt encroachment by competitors and noting that the § 4 "remedy cannot reasonably be restricted to those competitors whom [defendants] [*29] hoped to eliminate from the market"); see also *Goldwasser v. Ameritech Corp., 222 F.3d 390 (7th Cir. 2000)* (finding that consumers had antitrust standing to claim defendant had engaged in practices leading to anticompetitively high prices where those practices were aimed at preventing competitors from entering local markets); n6 *N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc., 651 F. Supp. 802, 811 (S.D.N.Y. 1986)* ("Consumers have standing when they are injured as a result of a defendant's improper exclusion of competitors from the market." (citing *McCready, 457 U.S. at 465*)). We hold that Counts Two and Three of the Third Amended Complaint sufficiently allege the elements of antitrust standing with respect to Plaintiffs' injuries stemming from Comcast's conduct towards RCN. We deny the instant Motion to Dismiss to the extent the Motion disputes Plaintiffs' antitrust standing.

    n6 The United States Court of Appeals for the Seventh Circuit in Goldwasser explained:

        [W]e think [the defendant] is wrong to claim that the plaintiffs lack standing because they are attempting to raise third-party rights - the rights of the competitors. It is true that the reason the plaintiffs have been injured (allegedly, of course) implicates the rights of the competitors not to be excluded from the local markets through anticompetitive actions of [the defendant], but that does not make this a *jus tertii* case. These plain-

tiffs want lower prices and more choice, and they claim that [the defendant] (a monopolist) is doing things to prevent that from happening. Their theory is a classic exclusionary acts theory, and in all such cases, the monopolist's alleged sin is the exclusion of other competitors from the market. One assumes that those other competitors are grateful for the help from the consumer litigation, but that is incidental. The [plaintiffs] do not care in principle which competitors enter their markets; they just want a competitively structured local telephone market that will prevent [the defendant] from inflicting antitrust injury on them. We are satisfied that they are asserting their own rights, and thus that they have standing.

*Goldwasser, 222 F.3d at 398-99.*

[*30]

B. Plaintiffs' Claim Under Section One of the Sherman Act

In Count One of the Third Amended Complaint, Plaintiffs assert that Comcast has violated *§ 1* of the Sherman Act. *Section 1* provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." *15 U.S.C. § 1.* Courts have long recognized that *§ 1* only prohibits unreasonable restraints of trade. *Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723, 108 S. Ct. 1515, 99 L. Ed. 2d 808 (1988).* Certain restraints of trade are per se unreasonable, while others require more rigorous analysis under the "rule of reason." *In re Flat Glass Antitrust Litig., 385 F.3d 350, 356 (3d Cir. 2004)* (citing *Inter Vest Inc. v. Bloomberg, L.P., 340 F.3d 144, 158-59 (3d Cir. 2003)).*

Generally, to establish a § 1 violation, a plaintiff must prove: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff [*31] was injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997)* (citations omitted); *Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991).* However, when a per se violation of § 1 is al-

leged, a plaintiff need only prove concerted action that was the proximate cause of the plaintiff's injuries. See *Flat Glass, 385 F.3d at 356.* Per se treatment is reserved for a small category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985)* (quotation omitted); see also *Texaco Inc. v. Dagher, U.S. , 126 S. Ct. 1276, 1279, 164 L. Ed. 2d 1 (2006)* ("Per se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate [*32] study of the industry is needed to establish their illegality." (quotation omitted)). Accordingly, courts "have expressed reluctance to adopt per se rules . . . 'where the economic impact of certain practices is not immediately obvious.'" *Texaco, 126 S. Ct. at 1279* (quoting *State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S. Ct. 275, 139 L. Ed. 2d 199 (1997)).* "For those activities not within the per se invalidity category, courts employ the rule of reason test." *Eichorn, 248 F.3d at 138.* "Under this test, plaintiffs have the burden of establishing that, under all the circumstances, 'the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market." Id. (quoting *Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 28, 31 S. Ct. 502, 55 L. Ed. 619 (1911)).* Comcast argues that Count One of the Third Amended Complaint does not allege a per se violation of *§ 1* of the Sherman Act, and that Plaintiffs must proceed under the rule of reason and plead additional facts, which, if true, could demonstrate an anticompetitive effect within the relevant markets.

Count One alleges that Comcast engaged in the horizontal division [*33] of cable markets by entering into swap agreements with its competitors and that those agreements prevented competitors from entering or reentering the Philadelphia and Chicago clusters to challenge Comcast. (3d Am. Compl. PP 63-65, 70-74.) Comcast acknowledges that the agreed upon division of markets between competitors in order to suppress competition is the type of conduct courts have traditionally afforded per se treatment. See *Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49, 111 S. Ct. 401, 112 L. Ed. 2d 349 (1990)* ("'One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.. . . This Court has reiterated time and time again that [h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling competition.'" (quoting *United States v. Topco Assocs., Inc., 405 U.S. 596, 608, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972))).*

Comcast contends, however, that we should not accept Count One's characterization of the swap agreements as horizontal market allocations. n7 Comcast invokes *Jetro Cash & Carry Enters., Inc. v. Food Distrib. Ctr., 569 F. Supp. 1404 (E.D. Pa. 1983),* [*34] for the proposition that the "talismanic invocation of the word 'horizontal' does not automatically mandate application of the fatal per se rule." *Id. at 1414.* In Jetro, the court did not have to accept as true all well-pleaded allegations in the complaint because the court was not considering a motion to dismiss; rather, the court had conducted a bench trial and was making findings of fact and law. *Id.at 1406.* While courts should not credit "bald allegations" even at the motion to dismiss stage, *Cal. Pub. Employees' Ret. Sys, 394 F.3d at 143,* we find that Count One's allegations that the swap agreements constitute horizontal market allocations are buttressed by descriptions in the Third Amended Complaint of the parties to the swap agreements, when the agreements were completed, and how the terms of the agreements served to eliminate competitors from the Philadelphia and Chicago clusters and effectively preclude opportunities for entry and reentry. n8 (3d Am. Compl. PP 10, 54-56, 63-64.)

n7 Comcast emphasizes that the conduct Plaintiffs challenge under § 1 of the Sherman Act includes Comcast's acquisitions. Count One only alleges that Comcast's swap agreements with horizontal competitors constitute per se violations of § 1. (3d Am. Compl. P 73.) Count One separately alleges that Comcast's acquisitions of competing cable companies and their cable subscribers in the Philadelphia and Chicago clusters constitute contracts and conduct in restraint of trade in violation of § 1 under the applicable rule of reason analysis. (Id. P 74.) Thus, Comcast's assertions that acquisitions hold the promise of increasing a firm's efficiency, *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984),* and, thus, are not manifestly anticompetitive business practices are irrelevant to the assessment of whether Count One has alleged per se violations of § 1.

[*35]

n8 Comcast has submitted excerpts from its swap agreements with AT&T and Adelphia to argue that, irrespective of the specificity of Count One's allegations, we should find as a matter of law that none of the swap agreements amount to horizontal market allocations. (James T. Cain Decl. Ex. A(7), A(8).) According to Comcast, the excerpts demonstrate that the swap agreements did not impose restrictions on the ability of any counter party to reenter or compete directly in the affected markets. We decline to consider these excerpts on a motion to dismiss, as they go beyond the facts alleged in the Third Amended Complaint and do not warrant the exceptions made for documents that are "integral to or explicitly relied upon in the complaint" or "undisputedly authentic" and the basis for plaintiffs' claims. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)* (quotation omitted); *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).* Moreover, the excerpts are not sufficient for us to draw conclusions as a matter of law, even with respect to Comcast's arrangements with AT&T and Adelphia, because Count One does not necessarily depend upon the presence, or absence, of express covenants-not-to-compete.

[*36]

Comcast further argues that Plaintiffs cannot show that Comcast engaged in conduct that was per se unlawful because the transactions challenged in Count One were approved by government authorities at the federal, state, and local levels. Comcast relies upon *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004),* in which the Supreme Court, considering the dismissal of antitrust claims, noted that "[o]ne factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny." *Id. at 412.*

The mere fact that regulatory and law enforcement agencies may have reviewed and approved the challenged transactions is not ground for dismissal of Plaintiffs' claims. See *Otter Tail Power Co. v. United States, 410 U.S. 366, 372, 93 S. Ct. 1022, 35 L. Ed. 2d 359 (1973)* (explaining that "[a]ctivities which come under the jurisdiction [*37] of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws"); *Cableamerica Corp. v. Fed. Trade Comm'n, 795 F. Supp. 1082, 1092 (N.D. Ala. 1992)* (stating that "'[a]ntitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct'" and that "'[t]here is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry'" (quoting

2006 U.S. Dist. LEXIS 62672, *

*Phonetele, Inc. v. Am. Tel. & Tel. Co., 664 F.2d 716, 729 (9th Cir. 1981)))*. "Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal [of the antitrust provisions] be implied." *Gordon v. New York Stock Exch., Inc., 422 U.S. 659, 682, 95 S. Ct. 2598, 45 L. Ed. 2d 463 (1975)* (citing *United States v. Phila. Nat'l Bank, 374 U.S. 321, 350-351, 83 S. Ct. 1715, 10 L. Ed. 2d 915 (1963))*. Comcast does not contend that the antitrust laws and the regulatory provisions under which the challenged transactions were approved are repugnant to each other, but simply argues that we should refrain [*38] from "substitut[ing] [our] judgment for that of the countless federal, state, and local authorities who approved the Cable System Transactions as being in the public interest." (Def. Rep. Mem. at 22.)

*Trinko, 540 U.S. 398, 124 S. Ct. 872, 157 L. Ed. 2d 823*, the case upon which Comcast primarily relies, does not support the proposition that Comcast's conduct should be shielded from antitrust scrutiny. In Trinko, the Supreme Court analyzed the 1996 Telecommunications Act and found that it expressly preserves claims that satisfy existing antitrust standards. *Id. at 407*. The Court's focus on the telephone industry's regulatory regime was in the context of deciding whether to recognize an expansion of the contours of § 2 of the Sherman Act to create additional exceptions to the established proposition that there is no duty to aid competitors. *Id. at 412*. Trinko does not provide a basis for insulating claims based on well-established examples of anticompetitive conduct, such as horizontal market allocations, from judicial review.

We conclude that Count One of the Third Amended Complaint sufficiently alleges that the swap agreements are horizontal [*39] market allocations subject to the per se rule. Count One further alleges that the swap agreements were the result of concerted action and a proximate cause of Plaintiffs' injuries. (3d Am. Compl. PP 10, 75.) Accordingly, we find that Count One states a claim under § 1 of the Sherman Act. Comcast's Motion to Dismiss is denied to the extent that it asserts otherwise. We need not consider Comcast's arguments that Count One fails to plead an anticompetitive effect in a relevant product or geographic market under the rule of reason. See *Flat Glass, 385 F.3d at 356*; see also *CSR Ltd. v. Fed. Ins. Co., 40 F. Supp. 2d 559, 564 (D.N.J. 1998)* ("At this early [motion to dismiss] stage of the proceeding, the court does not find it necessary to determine which mode of analysis [per se or rule of reason]it will ultimately employ in evaluating the defendants' activities."); *Swarthmore Radiation Oncology v. Lapes, 812 F. Supp. 517, 520 (E.D. Pa. 1992)* ("[The court] need not decide, at this stage of the proceedings, whether a per se rule or a 'rule of reason' applies.").

**C.** Plaintiffs' Claim Under Section Two of the Sherman Act [*40]

In Counts Two and Three of the Third Amended Complaint, Plaintiffs assert that Comcast has violated § 2 of the Sherman Act by monopolizing and attempting to monopolize the market for MVPS in the Philadelphia and Chicago clusters. *Section 2* of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" is guilty of an offense and subject to penalties. *15 U.S.C. § 2*. In order to state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must plead facts indicating "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 412-13 (3d Cir. 1997)* (quoting *Fineman v. Armstrong World Indus., 980 F.2d 171, 197 (3d Cir. 1992))*. The possession of monopoly power "will not be found unlawful [*41] unless it is accompanied by an element of anticompetitive conduct." *Trinko, 540 U.S. at 407* (emphasis deleted). In order to state a claim for attempted monopolization, a plaintiff must allege that the defendant has "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.'" *Queen City Pizza, 124 F.3d at 442* (quotations omitted). To determine whether there exists a viable claim of monopolization or attempted monopolization, "a court must inquire 'into the relevant product and geographic market.'" *Id.* (quoting*Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993))*; *Syncsort Inc. v. Sequential Software, Inc., 50 F. Supp. 2d 318, 327 (D.N.J. 1999)* (citation omitted).

Counts Two and Three propose that the relevant geographic market is Comcast's Philadelphia and Chicago clusters, i.e., "those areas covered by Comcast's cable franchises or any of its subsidiaries or affiliates, located in Philadelphia, Pennsylvania [and Chicago, Illinois]and geographically contiguous areas, or areas in close [*42] geographic proximity to Philadelphia, Pennsylvania [and Chicago, Illinois]" in designated counties. (3d Am. Compl. PP 31, 78, 107.) Comcast argues that Counts Two and Three must be dismissed because they do not adequately plead a relevant geographic market. Comcast contends that Plaintiffs' geographic market definition is carefully but artificially gerrymandered to include Comcast's franchise areas and leave out neighboring areas covered by rival cable providers. Comcast asserts that Plaintiffs' attempt to delineate the

2006 U.S. Dist. LEXIS 62672, *

relevant geographic market solely by reference to the places where Comcast has subscribers is improper as a matter of law. See *Eichorn*, 248 F.3d at 147 ("By defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic.").

The viability of claims of monopolization and attempted monopolization under § 2 of the Sherman Act is dependent upon "demonstration by a plaintiff of why a proposed market is the relevant market." *Syncsort, 50 F. Supp. 2d at 330* (citing *Schuylkill Energy Res., 113 F.3d at 415*). "The relevant geographic market is the area [*43] in which a potential buyer may rationally look for the goods or services he or she seeks[.]'" *Tunis Bros., 952 F.2d at 726* (alteration in original) (quoting *Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa.,745 F.2d 248, 260 (3d Cir. 1984)).* "Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." Id. "The definition of the relevant geographic market, therefore, is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration." *Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982);* see also *Brown Shoe Co. v. United States, 370 U.S. 294, 336-37, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962);* but cf. *Queen City Pizza, 124 F.3d at 436* (noting that there is no per se prohibition against dismissal of antitrust claims for failure to plead a relevant market.) The relevant geographic market may be local, regional, national, or international in origin. See *Brown Shoe, 370 U.S. at 337*. [*44] However, "[t]he mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." *Tunis Bros., 952 F.2d at 727;* see also *Gordon v. Lewistown Hosp., 272 F. Supp. 2d 393, 432 (M.D. Pa. 2003)* ("There is voluminous case law holding that a firm's service area, alone, does not equate to a market's geographic scope."). n9

relevant geographic market is the "area of effective competition,"see e.g.,*Jetro, 569 F. Supp. at 1412*, what is meant is the area where the buyer can practicably and feasibly turn to make its purchases. Id.; *Tunis Bros., 952 F.2d at 726.* Plaintiffs need not define the relevant market based upon where Comcast competes. See *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir. 1991)* ("[A] company may compete in many markets or in only part of a market. Where it competes does not define the market.").

[*45]

"To survive a *Rule 12(b)(6)* motion to dismiss," Plaintiffs' alleged market must be "plausible." *Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)* (discussing product markets) (quotation omitted); cf. *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 479 n.12 (3rd Cir. 1992).* Counts Two and Three of the Third Amended Complaint not only identify the geographic areas that constitute the proposed relevant geographic market but also allege that subscribers living within the Philadelphia and Chicago clusters cannot look beyond Comcast for their cable services. (3d Am. Compl. PP 31, 41-42, 78, 107.) As Defense Counsel acknowledged at Oral Argument, the commercial realities of the cable market mean that it is particularly local in nature and that consumers chose their cable providers based on the options available to them at their residences. (08/07/06 Tr. at 64.) We find that deciding whether Plaintiffs' proposed relevant geographic market appropriately tracks Comcast's franchise territories requires a fact-intensive inquiry not appropriately conducted on a motion to dismiss, and that the geographic market pled in Counts Two and Three [*46] of the Third Amended Complaint is sufficient to set forth valid claims under § 2 of the Sherman Act. Accordingly, we conclude that Comcast's Motion to Dismiss is denied to the extent that it asserts that Counts Two and Three fail to state a claim under § 2 of the Sherman Act. n10

---

n9 Comcast asserts that "Plaintiffs' proposed geographic market (a miscellany of 30 counties spread across five states) is an arbitrary construct which cannot be explained or justified by reference to (i) the areas in which Plaintiffs allege that Comcast faces actual competition from RCN (i.e., Delaware County, Pennsylvania), or (ii) the areas in which Comcast faces actual competition for the relevant product (i.e., everywhere in the United States that Comcast offers MVPS)." (Def. Rep. Mem. at 31.) While numerous cases say that for the purposes of § 2 of the Sherman Act, the

n10 Comcast also argues that Plaintiffs cannot show that its conduct produced anticompetitive effects in the relevant markets as required to maintain a § 2 claim. We have found, supra Part III.B, that Count One states a claim under § 1 of the Sherman Act with respect to Comcast's alleged horizontal market allocations. That same manifestly anticompetitive conduct also underlies Plaintiffs' § 2 claims in Counts Two and Three. Comcast maintains that we should nonetheless dismiss Counts Two and Three to the extent that they rely on Comcast's other conduct, namely

2006 U.S. Dist. LEXIS 62672, *

Comcast's acquisitions of competing cable companies and Comcast's treatment of RCN. We will not, at this stage, take such a piecemeal approach to Counts Two and Three. See *LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003)* ("The relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together."). Moreover, Comcast's contention that its acquisitions cannot be considered anticompetitive unless they involved overbuilders clearly implicates questions of fact regarding, for example, the sources of competition in the relevant product market.

[*47]

D. Statute of Limitations

Comcast argues that Counts One through Three are time-barred under the applicable statute of limitations to the extent that they depend on transactions which were consummated more than four years before Plaintiffs filed their original Complaint in this action on December 8, 2003. The Third Amended Complaint alleges three such transactions: an acquisition of Marcus Cable Communication's ("MCC") cable systems and approximately 27,000 cable subscribers in Harrington, Delaware that closed on April 1, 1998 (3d Am. Compl. P 52(a)); an acquisition of Greater Philadelphia Cablevision, Inc's ("GPC") cable systems and approximately 79,000 cable subscribers in Philadelphia, Pennsylvania that closed in June 1999 (Id. P 52(b)); and an acquisition of Tele-Communications, Inc.'s ("TCI") 1.6 million cable subscribers in and around Chicago, Illinois that closed on March 9, 1999 (Id. P 53(a)). n11

n11 The TCI acquisition was made by AT&T. The Third Amended Complaint alleges that, as part of the merger between AT&T and Comcast, Comcast assumed liability for AT&T's violations of antitrust law. (3d Am. Compl. P 5.)

[*48]

The statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant. *Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 487 (3d Cir. 1985)* (citation omitted). When considering a motion to dismiss pursuant to *Rule 12(b)(6)* on statute of limitations grounds, courts "'must determine whether the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Davis v. Grusemeyer, 996 F.2d 617, 623 (3d Cir. 1993)* (quoting *Cito v. Bridgewater Twp. Police Dept., 892 F.2d 23, 25 (3d Cir. 1989))*. The defendant

bears a heavy burden in seeking to establish that the challenged claims are barred as a matter of law. *Davis, 996 F.2d at 623 n.10* (citing *Van Buskirk, 760 F.2d at 498*). The Clayton Act provides that "[a]ny action to enforce any cause of action under *section 15, 15a,* or *15c* of this title shall be forever barred unless commenced within four years after the cause of action accrued." *15 U.S.C. § 15b.* Generally, a cause of [*49] action accrues, and the statute begins to run, when the defendant commits an act that injures the plaintiff. See *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971)*. Plaintiffs, who limit their claims for damages to the four years preceding the filing of their original complaint, do not dispute the applicability of the Clayton Act's four-year statute of limitations. Plaintiffs argue, however, that their claims may be based on conduct occurring prior to the four-year period under the continuing violation exception to the accrual rule.

"The Supreme Court has considered and rejected the argument that, in the context of a defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest impact on a plaintiff." *Lower Lake Erie Iron Ore, 998 F.2d at 1171* (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968))*. The four-year statute of limitations does not bar later recovery for private antitrust actions if the defendant's conduct "constituted a continuing violation of the Sherman Act and . . . inflicted [*50] continuing and accumulating harm." *Hanover Shoe, 392 U.S. at 502 n.15.* Antitrust law provides that, in the case of a continuing antitrust violation, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." *Klehr v. A.O. Smith Corp., 521 U.S. 179, 189, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997)* (quotation omitted). Plaintiffs contend that the continuing violation exception should be applied to the MCC, GPC, and TCI acquisitions because the Third Amended Complaint alleges that those transactions are part of an ongoing program of acquisitions, which furthered Comcast's unlawful restraints on trade and monopolization and which extended into the limitations period. (3d Am. Compl. P 68.) See Areeda, supra, P 320c4 ("When the monopolist creates its monopoly by a series of repeated or re-asserted acts designed to maintain its monopoly, the statute of limitation is restarted, provided that the subsequent acts fall within the definition of independent predicate acts . . . ."). Plaintiffs further contend that, since the Third Amended Complaint alleges that the MCC, GPC, and TCI acquisitions resulted [*51] in continuing and accumulating harm to them within the limitations period in the form of overcharges, they are not barred by the statute of limitations from making claims based on those acquisitions. (3d Am. Compl. PP 51-53, 62.) See *In re*

*Buspirone Patent Litig., 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002)* ("[I]f a party commits an initial unlawful act that allows it to maintain market control and over-charge customers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings."); *Meijer, Inc. v. 3M, 2005 U.S. Dist. LEXIS 13995, Civ. A. No. 04-5871, 2005 WL 1660188, at \*4 (E.D. Pa. July 13, 2005).*

Comcast argues that Plaintiffs' injuries accrued from the MCC, GPC, and TCI acquisitions on the dates that the acquisitions closed and beyond the applicable statute of limitations. Comcast maintains that acquisitions are single, discrete acts and that they cannot be appraised collectively as part of a continuing acquisitions program. Cf. *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1050 (8th Cir. 2000)* (stating that the statute of limitations on a merger or acquisition [*52] of another company's assets being challenged under § 7 of the Clayton Act, *15 U.S.C. § 7*, presumptively begins to run at the time the merger or acquisition occurs). Comcast further maintains that making post-acquisition charges the basis for a continuing violation exception would ef-fectively abolish the statute of limitation for acquisitions because combined corporations would necessarily be exposed to damages each time they made a sale. See Areeda, supra, P 320c5 ("[A]ny 'continuing violation' rule to the effect that each sale by the post-merger firm restarts the statute of limitations would leave mergers open to perpetual challenge. Clearly, Congress did not intend to exempt mergers from the antitrust statute of limitation. . . . Limiting merger challenges to four years following acquisition would thus seem to be a foregone conclusion . . . .").

We find that the conceptualization of the MCC, GPC, and TCI acquisitions for statute of limitations pur-poses implicates questions of fact - such as whether the acquisitions were part of a continuing course of conduct or whether they were discrete transactions - which are not properly considered on this Motion [*53] to Dis-miss. Moreover, we note that Counts One through Three of the Third Amended Complaint are based primarily upon conduct occurring within the statute of limitations period. For example, all of the challenged swap agree-ments, four of the challenged acquisitions, and the merger between AT&T and Comcast occurred within the

four-year period preceding the filing of the initial Com-plaint, as did the pricing campaign allegedly designed to prevent competition from RCN. (Compl. PP 52-53, 55-57, 93.) The MCC, GPC, and TCI acquisitions are merely alleged to have contributed to the damages asso-ciated with limitations period acts. Comcast is thus ask-ing us to dismiss portions of Plaintiffs' § 1 and § 2 claims. "Such a piecemeal approach to an antitrust claim is improper." *Del. & Hudson Ry. Co. v. Consol. Rail Corp., 654 F. Supp. 1195, 1204 (N.D.N.Y. 1987)* (refus-ing to dismiss portions of defendant's antitrust claim on statute of limitations grounds)(citation omitted); see also *LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003)*("As the Supreme Court recognized in *Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962),* [*54] the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."). Accordingly, we hold that Comcast's Motion to Dismiss is denied to the extent that it is based on the statute of limitations.

## IV. CONCLUSION

We conclude that Comcast has not demonstrated that Plaintiffs cannot prove any set of facts, consistent with the Third Amended Complaint, which would entitle them to relief. The Third Amended Complaint alleges the elements of antitrust standing and Comcast's arguments that Count One has not timely stated a claim under § 1 of the Sherman Act and that Counts Two and Three have not timely stated claims under § 2 of the Sherman Act are unavailing. Accordingly, Comcast's Motion to Dis-miss is denied. An appropriate order follows.

**ORDER**

**AND NOW,** this 31st day of August, 2006, upon consideration of Defendants' Motion to Dismiss Plain-tiffs' Third Amended Class Action Complaint (Docket No. 138), and all submissions filed in connection therewith, **IT IS HEREBY ORDERED** that said Mo-tion is **DENIED.**

BY THE COURT:

John R. Padova, J.