26

LEXSEE 1979 US DIST LEXIS 11611

**Levi Strauss & Co. v. Federal Pants Co., Inc., et al.**

**No. CV 75-3642-JWC.**

**United States District Court, Central District of California.**

*1979 U.S. Dist. LEXIS 11611; 1979-2 Trade Cas. (CCH) P62,728*

**June 19, 1979, Filed**

**OPINION BY:** [*1]

    CURTIS

**OPINION:**

    Memorandum and Order

    I. Pre-Termination Retailing Claims

    CURTIS, D.J.: Levi Strauss has brought this motion for summary judgment regarding a number of issues relating to the damages claims of counter-claimants General Pants, Federal Pants and Jeans Unlimited. For purposes of the motion, Levi concedes liability for price-fixing violations under the Sherman Act. As the issues involved are somewhat complex, the court will address them in terms of the time periods indicated and the specific counter-claimant to which they relate.

    The first species of damages which Levi asserts are unprovable are those characterized as "pre-termination retailing claims", asserted by Jeans Unlimited and General Pants. In the case of Federal Pants this issue involves a wholesaler-retailer distinction discussed infra. The gist of counter-claimants' argument as to this first type of damages is that they were injured as a result of Levi's price-fixing policies during that period in which Levi dealt with them as customers prior to their termination as Levi accounts in May, 1975. Briefly, the damages alleged flow from lost profits which the counter-claimants would have realced had they [*2] been permitted to discount Levi "basics" at the figure they chose.

    Levi argues that such damages cannot be proved for primarily two reasons. First, since the damages must be assessed in a "violation-free environment", counter-claimants can argue only for profits which they would have realized in the absence of the price-fixing scheme. Thus, had Levi permitted all accounts to lower prices (a violation-free environment) competing stores would have done likewise, the result being that no net gain in profits would have been achieved by the discounting.

    This first argument is attacked on the basis that it depends not upon undisputed facts in evidence but rather upon the supposition of Levi Strauss as to the operation of the marketplace in the absence of retail price controls. Counter-claimants point to the reluctance of some major stores to compete in a "price war" market after Levi's suggested price policy was lifted in 1977 and to the success some discounters experienced notwithstanding. Levi's first contention therefore as to the absence of "pre-termination" retailing damages falls far short of the showing required to support a summary judgment on this issue.

    The second [*3] argument advanced by Levi regarding "pre-termination" claims is the "allocation" theory. Levi asserts that during the relevant time period its goods were in great demand and also in short supply due to a shortage of denim. For this reason, even if counter-claimants could have sold more Levis by discounting, they cannot claim damages for these lost sales since they cannot show they could have obtained the necessary increases in their inventories from Levi Strauss. The argument necessarily rests upon Levi's own analysis of what quantities would have been "allocated" to counter-claimants during the years in question and it is attacked on this basis.

    Counter-claimants argue the existence of significant factual dispute as to what lines of Levi jeanswear were on "allocation" during exactly what time periods. In addition, it is asserted that the reality of a denim shortage which Levi used to justify the "allocation" program is itself called into question by deposition testimony to the effect that certain preferred accounts, such as the May Co., were totally unaware of any scarcity of Levi prod-

Case 1:05-md-01717-JJF     Document 376-8     Filed 01/05/2007     Page 3 of 26

Page 2

1979 U.S. Dist. LEXIS 11611, *; 1979-2 Trade Cas. (CCH) P62,728

ucts and received goods in any quantities ordered. Finally, Levi itself concedes, in this [*4] motion, that the counter-claimants might have been able to increase their allocations to some extent had their sales dramatically increased. Of course, when it comes to trial, there must be proof of the availability of merchandise, but this is a disputed fact which cannot be resolved on a motion for summary judgment.

The third proposition offered by Levi regarding "pre-termination" damages turns on a point of law rather than a factual finding. Levi cites *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)* for the proposition that recoverable damage must stem from "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." Levi argues that counter-claimants cannot assert damages for price-fixing policies from which they benefitted. Since the ultimate loser in the scheme was the consumer rather than the retailer, it is the consumer who alone has a right to claim injury for damage which "flows from that which makes defendant's acts unlawful."

Levi's reliance upon Brunswick Corp. is misplaced. In that case plaintiff claimed damages based upon the market shares it lost by Brunswick's [*5] entering the market. But the Court correctly held that Brunswick's entry into the market increased rather than decreased competition. Consequently, plaintiff's loss was not the result of a Sherman Act violation and therefore not allowable.

Here, Levi is accused of price-fixing, a per se antitrust violation. Specifically, it is charged with manipulating the retail market for its products in such a way that competition was virtually eliminated. The damages alleged by the counter-claimants, if proved, would, by necessity, flow from this per se violation.

At this point, Levi argues that the counter-claimants actually benefitted from the price maintenance program. On its face, this argument goes to the absence of provable damages, an issue not here resolvable in light of a material facts in dispute.

In light of the foregoing, the motion of Levi Strauss must be denied as regards the "pre-termination" retailing claims.

II. Post-Termination Retailing Claims

The second category of damages addressed involves the "post-termination" retailing claims. Counter-claimants' assertions as regards these damages are fairly straight-forward. As a result of Levi terminating them as [*6] customers, they lost the retail profits they would have otherwise realized had they not been deprived of

the Levi Strauss line. Since the terminations were unlawful, these damages are compensable.

Levi takes the position that these damages are unprovable for two reasons. First, in order for a plaintiff to establish the "fact of damages" resulting from termination, it must demonstrate a lack of "alternative comparable substitutes" for the items which it could no longer acquire. Levi asserts that the absence of such comparable substitutes is impossible to prove in light of the numerous brands of jean wear on the market. Second, Levi argues that it offered to enter into post-termination interim sales agreements with the counter-claimants which would have furnished Levi products in amounts equal to their retailing needs. Thus, to the extent these agreements were refused, no claim may now lie due to lost profits resulting from diminished sales of Levi apparel.

"As to the "comparable substitute" argument, counter-claimants assert that, in light of the unparalleled dominance which Levi enjoys in the jeanwear market, no "comparable substitutes" could be obtained to replace the line. [*7] They point to admissions by Levi personnel that the "501" is "unique" and cite the experience of the May Co. which attempted to substitute the Wrangler line of jeanwear for Levis in its Budget Store. Although, in the opinion of the May Co. executives, Wrangler was Levi's nearest competitor in terms of customer interest, and a great deal of promotion was undertaken to create consumer demand, the Wrangler line lacked the drawing power which Levi commands.

As regards the counter-claimants' duty to seek comparable substitutes for Levi jeans, this court is in agreement with the movant to the extent that a duty to mitigate damages does exist in the context of the posttermination claim. However, in light of probable market share which Levi enjoyed during the period in question (approximately 30% nationwide) and the unquestionable drawing power of the Levi trademark, significant facts remain to be resolved as to whether there existed a "comparable substitute" for the goods in question, and to what extent such substitution permitted mitigation of damages.

As to Levi's assertion that the interim sales agreements would have satisfied counterclaimants' retailing needs, there appears to [*8] be "raging dispute" regarding when and under what terms such agreements were offered, entered into or honored by Levi Strauss. As regards Jeans Unlimited and Federal Pants, both entered into such agreements at some point since the filing of this suit. General Pants apparently rejected such offer.

In the case of Jeans U limited, the record clearly reveals a series of "misunderstandings" which delayed shipment of Levis in the proper amounts to that retailer. General Pants and Federal Pants assert that a significant disparity existed between their perception of what

Case 1:05-md-01717-JJF     Document 376-8     Filed 01/05/2007     Page 4 of 26

Page 3

1979 U.S. Dist. LEXIS 11611, *; 1979-2 Trade Cas. (CCH) P62,728

amounts would satisfy their retailing needs and the perception of Levi Strauss. In addition, there are factual disagreements relating to the product mix which counter-claimants would have been forced to accept pursuant to the interim contracts and the extent to which amounts owed on prior sales precluded the expeditious execution of these agreements by Levi.

In light of the above, it would be inappropriate for this court to grant summary judgment as regards the post-termination claims based upon the allegation that Levis were available to the counter-claimants pursuant to interim sales agreements during the period [*9] in question.

III. Post-Termination Wholesaling Claims

The third classification of damages involved in the instant motion is characterized as the "post-termination wholesaling claims." Jeans Unlimited makes no such claims, therefore our inquiry is limited to General and Federal Pants. Both claim that, had they not been unlawfully terminated by Levi Strauss, they would have realized significant profits through their wholesaling of Levis to retailers who could not obtain sufficient quantities of such merchandise from Levi.

Levi offers three arguments relating to post-termination wholesaling claims. First, Levi asserts that it had the right, within certain limitations, to establish whatever marketing system it deemed most advantageous to its business interests. The distribution chain selected by Levi was two-tiered, including only Levi Strauss and retail accounts. Under its "rule of reason" approach, Levi argues that the mere exclusion of wholesalers from this system is not, in itself, violative of the antitrust laws. Thus counter-claimants' prayer for damages as to post-termination wholesaling profits must fail since Levi had and has no legal duty to deal with wholesalers. [*10]

Levi takes this argument one step further. Even if Levi's rule against wholesaling was found violative of the Sherman Act, Levi could still lawfully refuse to sell counterclaimants more merchandise than was required to meet their legitimate retailing needs. Thus, since damages must be assessed in a "violation-free" environment, counter-claimants sustained no compensable damage because, in such an environment, Levi would still retain the right to lawfully refuse to sell them sufficient quantities of Levi goods to permit their continued wholesaling.

Counter-claimants attack this first argument on the following basis. Levi's employment of its "no wholesaling" policy was specifically designed to enable it to unlawfully fix prices at the retail level. They point to evidence in the record which undercuts Levi's assertion that the policy was established due to consideration unrelated to price maintenance. Specifically, counter-claimants argue supportable inferences to the effect that wholesaling accounts were terminated only when they had dealt with discounters who sold Levis at below suggested prices and where such discounting had resulted in complaints from Levi accounts adhering [*11] to the suggested prices. In addition, certain testimony in the record supports the contention that Levi was not so much opposed to wholesaling in principle, but rather objected to the practice where it resulted in Levi jeanwear reaching the public at prices beneath those which Levi endeavored to maintain.

Since, according to counter-claimants, the "no wholesaling" policy was an integral component of an unlawful price-maintenance scheme, Levi's refusal to supply wholesalers with merchandise was itself violative of the Sherman Act. Hence, Levi's argument that it would retain the right to decline to deal with wholesalers in a true "violation-free" environment must fail in the context of the instant case and therefore counter-claimants wholesaling damages resulting from their termination are compensable.

The court is in agreement with Levi as to the considerable discretion which it possessed, within the law, regarding the distribution system it sought to maintain. It is apparent that, absent practices violative of the antitrust laws, Levi had the right to refuse to deal with wholesalers and therefore, in one sense, counter-claimants have no "legally protectible" interest in this [*12] regard. However, the violation here alleged, if proved, could render Levi's "no wholesaling" policy unlawful under the Sherman Act, given the motivation and context in which it was established and maintained. For this reason, significant questions remain as to whether, in a true "violation-free" environment, Levi could lawfully persist overtly in this policy or even tacitly enforce it by restricting the quantities of merchandise which it supplied to known wholesalers. For this reason, Levi's first argument as regards the post-termination wholesaling claims cannot form the basis for summary judgment at this stage of the proceeding.

Levi's second contention regarding these claims relates to the market conditions which would have prevailed in a "violation-free" environment. Levi argues that the counter-claimants realized profits from wholesaling only because of Levi's refusal to deal with discounters. In the absence of these restrictions, here challenged under the Sherman Act, counter-claimants' function as wholesalers would have become obsolete in that Levi itself would have dealt with the accounts which depended upon counterclaimants for Levi goods. Since these outlets would [*13] have been able to obtain merchandise from Levi at a price lower than that at which the counter-claimants could provide, they would have

Case 1:05-md-01717-JJF    Document 376-8    Filed 01/05/2007    Page 5 of 26

Page 4

1979 U.S. Dist. LEXIS 11611, *; 1979-2 Trade Cas. (CCH) P62,728

preferred to deal directly with the manufacturer and avoid the middleman markup. Therefore, the post-termination wholesaling claims cannot be awarded since no lost profits can be proven.

Counter-claimants argue that Levi's hypothesis as to the elimination of the wholesaling function in its entirety in a "violation-free" environment must be supported by a factual showing that Levi would have undertaken to service the needs of every potential customer of the counter-claimants in this capacity. A mere assertion to this effect does not eliminate the substantial questions remaining as to whether Levi's distribution system would have operated so effectively as to deliver the goods desired by every retailer when they were needed. In addition, it appears possible that even in a "violation-free" environment there may have existed a number of potential accounts with which, for reasons unrelated to price-fixing, Levi simply would have chosen not to deal, for example those with poor credit ratings. As the moving party, Levi cannot shift this burden of proof [*14] to the counter-claimants on the basis of the above hypothesis.

The final argument regarding the wholesaling claims finds its support in the reading of Brunswick Corp. urged by Levi in this case and discussed above. For the same reasons that the reasoning in Brunswick is inapposite to the retailing claims, it also fails at this juncture.

As regards the damage claims, a final question remains concerning the standing of Federal Pants to bring suit for lost wholesaling profits. Levi asserts and Federal concedes that at all times Federal Pants was a wholesaler, rather than a retailer, of Levi apparel. Levi asserts that, since the action is brought for violations stemming from price-fixing at the retail level, it is retailers who alone have standing under the controlling test in the Ninth Circuit since they are the only businesses within the "target area", "the area of the economy in which the elimination of competition occurred." In re Multidistrict Vehicle Air Pollution, 481 F. 2d 122, 128 (9th Cir. 1973).

In adopting the "target area" test for standing, the Ninth Circuit expressly rejected the more narrow "direct injury" standard noting that the latter test "engendered... a [*15] regrettable tendency to deny standing to any plaintiff who happens to fall within certain talismanic labels: 'creditor,' 'landlord,' 'lessor,' franchisor,' 'supplier.'" Multidistrict Vehicle Air Pollution, at 127. This liberal standing test is designed to permit recovery by those plaintiffs who can demonstrate that their "affected operation was actually in the area which it could have reasonably been foreseen would be affected by the conspiracy." 20th Century Fox Film Corp. v. Goldwyn, 328 F. 2d 190 (9th Cir.), cert. denied, 379 U.S. 880 (1964).

Levi argues that even under this more liberal test, Federal lacks standing since its damages, if any, are indirect or incidental to the injury which may have been sustained due to lost sales by its "house accounts" to whom it was the sole supplier of Levi goods. The relationship between Federal and its customers, Levi asserts, was no more than the conventional wholesaler/retailer arrangement, which in itself should preclude Federal from claiming damages which must of necessity flow from lost retail sales of its accounts. Cited for this proposition are three cases which are arguably applicable to the facts of the instant case. Contreras [*16] v. Grower Shipper Vegetable Association of Central California, 484 F. 2d 1346 (9th Cir. 1973) (employees lack standing to sue for lost wages where antitrust violation reduced consumer demand for goods which their employer manufactured). Volasco Products Co. v. Lloyd A. Fry Co., 308 F. 2d 383 (6th Cir. 1962); Snow Crest Beverages v. Recipe Foods, 147 F. Supp. 907 (D. Mass. 1956) (makers of ingredients lack standing to sue for antitrust injury sustained by purchasers who used these raw materials to manufacture their products).

The closest decision on point appears to be Blankenship v. Hearst Corp., 519 F. 2d 418 (9th Cir. 1975) where standing was permitted a wholesaler who claimed antitrust injury as a result of lost retail sales of its customers. Levi distinguishes Blankenship on the basis that, in that case, defendant had chosen to sell through the wholesaler, who thus was clearly the foreseeable target of the effects of the violation from the standpoint of the defendant. Here, Levi made no such commitment but rather expressly refused to deal with those it knew were wholesalers.

The court finds these arguments unpersuasive. First, the relationship between Federal and its [*17] "house accounts" was something more than the conventional wholesaler/retailer arrangement, e.g., in payment for its exclusive merchandising functions and wholesaling activities, Federal received between 50% and 70% of the gross retail sales of each outlet. More important, Levi's formulation of the "target test" for standing is much narrower than the cases on point indicate. The test is, and was intended to be, liberal in application and rather broad in scope as compared with the "direct injury" test, which is, in essence, what Levi urges here.

In light of the foregoing, the court finds that Federal Pants retains standing to bring the instant action for damages which may have resulted from lost wholesaling profits on Levi apparel.

IV. The Fair Trade Defense

As an additional ground for its motion for summary judgment, Levi Strauss argues that its alleged price-fixing activities, if proved, fell within the purview of the

1979 U.S. Dist. LEXIS 11611, *; 1979-2 Trade Cas. (CCH) P62,728

California Fair Trade Act and thus are immune from Sherman Act prohibitions.

The California Fair Trade Act, *Cal. Bus. & Prof. Code, § § 16,*900, et seq., operating in conjunction with the pertinent provisions of the Miller-Tydings and McGuire Acts, *15 U.S.C.* [*18] *§ § 1 &* 45(a), immunizes potential antitrust offenders from certain violations which might otherwise constitute price-fixing under the Sherman Act. It is this immunity which Levi here seeks.Although the California Act was repealed, as of January 1, 1976, it was in effect during the relevant period with which the instant suit is concerned.

It is Levi's position that it engaged in no price-fixing activities in California violative of the Sherman Act during this period but if, as counter-claimants allege, it did, such aggrements fell squarely within the purview of the Fair Trade Act then in force in California. This being the case, Levi asserts that counter-claimants suit must fail in light of this statutory affirmative defense here raised by Levi in their motion for summary judgment.

Counter-claimants General and Federal Pants vigorously resist the assertion of this defense at this point in the proceeding on the basis that Levi Strauss expressly waived the right to raise it through conduct prior to the commencement of this litigation and representations through the course of this suit.

It is uncontroverted that at all times during which the statute was in effect in California, [*19] Levi Strauss unequivocally disclaimed that it was distributing its goods under the price-maintenance program countenanced by the Fair Trade Act. It is equally clear that since the instigation of the suit, Levi Strauss has on many occasions, through deposition testimony of its employees and officers, denied that it ever sought to utilize a distribution system conforming to the Fair Trade laws enacted in California. In light of these express disclaimers on the part of Levi Strauss regarding their intention to claim any rights under the Act, the counter-claimants take the position that Levi must now be estopped from claiming the immunity which it now seeks, an immunity conferred for the very laws to which it disclaimed adherance. * A crucial question remains as to whether this statement on the part of Levi Strauss and its other representations during the course of this suit justifiably led the counter-claimants to believe that Levi in no way intended to claim immunity under the statute. Levi takes the position that it was not required to raise the defense in the pleadings with specificity. Rather it asserts that their general denial of the allegation of illegal price-fixing included, [*20] by implication, any immunity which the Fair Trade Act may provide.

* Levi has at all times denied that it traded its goods under the provisions of the Fair Trade Laws in California. The most pertinent of these many denials is to be found in the earliest pleadings in this case. In paragraph 19 of their counterclaim filed on December 9, 1975, Federal Pants included the following assertion:
"Products sold by Levi Strauss, which are distributed under the trade name 'LEVIS' do not qualify as 'fair trade' items as defined in *California Business and Professions Code Sections 16,*900, et seq."
In response to this specific assertion, Levi Strauss, in their reply to the Counter-claim filed January 27, 1976, made the following admission:
"... LEVI STRAUSS admits that it distributes certain products under the trade name 'Levi Strauss & Co." and under the trademark 'Levis' and that these items are not distributed under the provisions of the California Fair Trade Laws." (Emphasis added.)

The statute essentially achieves two functions in its operation. First, it provides that Sherman Act immunity noted above; second, it gives to a manufacturer the right to enforce a price maintenance [*21] agreement against those of its customers who fail to comply.

Were Levi Strauss to now attempt to bring suit against counter-claimants for their failure to comply with a price-maintenance agreement, it would surely be estopped due to its previous denials that it sought to preserve its rights under the statute in this respect. However, it is less clear whether Levi, in forfeiting its rights to enforce agreements under the Fair Trade laws, simultaneously sacrificed the immunity which the laws provide. The court is reluctant to find such a dual waiver on the basis of the record in this case since, as Levi has argued, its renunciation of a Fair Trade distribution system is perfectly consistent with its assertion that it never fixed prices in California.

However, regardless of Levi's contention that it never expressly waived the statutory immunity, inferences may be drawn from the record tha counterclaimants were justified in their belief that Levi had in fact waived any possible defense which the Fair Trade Act might provide for purposes of this case. Were the counter-claimants to present evidence of an unequivocal nature supporting their argument of a specific waiver of the [*22] immunity on the part of Levi, the court would be inclined to exclude the defense from the suit since to permit its introduction at this time would unfairly prejudice the counter-claimants who thus would have litigated for over three years in justifiable reliance that the defense had been waived.

1979 U.S. Dist. LEXIS 11611, *; 1979-2 Trade Cas. (CCH) P62,728

There is an additional policy reason which mandates the enforcement of the rules of pleading regarding waiver of defenses. Were the possibility of waiver not ever present, a defendant possessing substantial economic assets, when confronted by a suit brought by comparatively impecunious plaintiffs, could deliberately refrain from asserting an absolute defense at the outset of the case. Then, by hotly contesting the law suit over a lengthy period, it could drain the financial resources of the plaintiffs until such time as it determined that the case had reached a posture where it served defendant's purposes to assert the defense; for example, when trial date approached. Thus, enforcement of a waiver serves to deter this species of abuse, promoting early resolution of key issues of law and therefore expediting litigation and encouraging settlement.

For the foregoing reasons, the court [*23] declines to resolve this issue at this time in favor of either party. However, the court will entertain further motions on the question if additional evidence is produced which will adequately resolve the factual issues which precludes a ruling at this point.

For the foregoing reasons, Levi's motion for summary judgment is denied.

27

LEXSEE 2005 US DIST LEXIS 13995

Analysis
As of: Jan 05, 2007

### MEIJER, INC., et al. On Behalf of Itself and Others Similarly Situated v. 3M (MINNESOTA MINING AND MANUFACTURING COMPANY)

### CIVIL ACTION NO. 04-5871

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2005 U.S. Dist. LEXIS 13995; 2005-2 Trade Cas. (CCH) P74,882

### July 13, 2005, Decided

**SUBSEQUENT HISTORY:** Settled by, Motion granted by *Meijer, Inc. v. 3M, 2006 U.S. Dist. LEXIS 56744 (E.D. Pa., Aug. 14, 2006)*

**COUNSEL:** [*1] For MEIJER, INC., MEIJER DISTRIBUTION, INC., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, Plaintiffs: BRENT W. LANDAU, DANIEL A. SMALL, COHEN, MILSTEIN, HAUSFELD & TOOL, PLLC, WASHINGTON, DC; DAVID P. GERMAINE, JOSEPH M. VANEK, THOMAS A. VICKERS, DAAR & VANEK PC, CHICAGO, IL; IRA NEIL RICHARDS, KATHRYN C. HARR, TRUJILLO RODRIQUEZ & RICHARDS, PHILADELPHIA, PA.

For 3M COMPANY, formerly known as MINNESOTA MINING AND MANUFACTURING COMPANY, Defendant: BRENT N. RUSHFORTH, KATHERINE E. WOOD, KIT A. PIERSON, PAUL ALEXANDER, HELLER EHRMAN LLP, WASHINGTON, DC; DAVID W. ENGSTROM, ELEANOR ILLOWAY, JOHN G. HARKINS, JR., HARKINS CUNNINGHAM, PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION:**

#### MEMORANDUM

**Padova, J.**

Plaintiffs, Meijer, Inc. and Meijer Distribution, Inc. (collectively "Meijer"), have brought this antitrust action against Defendant 3M for damages arising out of 3M's anticompetitive conduct during the time period from October 2, 1998, through the present. Presently before the Court is 3M's Motion to Dismiss the Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons that [*2] follow, this Motion is denied.

### I. BACKGROUND

The conduct of 3M which forms the basis of this class action lawsuit was the subject of a prior lawsuit in this Court, *LePage's, Inc. v. 3M, 1997 U.S. Dist. LEXIS 18501, Civ. A. No. 97-3983 (E.D. Pa.)*. In that suit, LePage's, Inc., a competing supplier of transparent tape, sued 3M alleging, inter alia, unlawful maintenance of monopoly power in violation of Section 2 of the Sherman Act, *15 U.S.C. § 2*. After a nine-week trial, the jury found in favor of LePage's on its unlawful maintenance of monopoly power claim. The jury awarded damages in the amount of $ 22,828,899.00, which were subsequently trebled to $ 68,486,697.00. See LePage's, Inc. v. 3M, Civ. A. No. 97-3983, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000). 3M filed a Motion for Judgment as a Matter of Law, which this Court denied on March 14, 2000. See id. 3M thereafter appealed this Court's denial of its Motion for Judgment as a Matter of Law to the United States Court of Appeals for the Third Circuit ("Third Circuit"). A Third Circuit panel initially reversed this Court's Order upholding the jury's verdict and directed the Court to enter judgment for 3M on LePage's [*3] 'unlawful maintenance of monopoly power claim. LePage's, Inc. v. 3M, *277 F.3d 365 (3d Cir. 2002)*

Case 1:05-md-01717-JJF     Document 376-8     Filed 01/05/2007     Page 10 of 26

Page 2

2005 U.S. Dist. LEXIS 13995, *; 2005-2 Trade Cas. (CCH) P74,882

("LePage's I"). Upon rehearing en banc, the Third Circuit vacated the panel decision and reinstated the original jury verdict against 3M. *LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003)* ("LePage's II"), cert. denied *542 U.S. 953, 124 S. Ct. 2932, 159 L. Ed. 2d 835 (2004).*

Thereafter, Bradburn Parent/Teacher Store, Inc. brought a class action lawsuit against 3M on the basis of the conduct litigated in LePage's. Bradburn Parent/Teacher Store, Inc. v. 3M, Civ. A. No. 02-7676 (E.D. Pa.). Bradburn, who originally had sought to represent a class which included Meijer, was ultimately granted class certification on a modified class that excluded purchasers of private label tape, such as Meijer. *Bradburn Parent/Teacher Store v. 3M, 2004 U.S. Dist. LEXIS 16193, Civ. A. No. 02-7676, 2004 WL 1842987 (E.D. Pa. Aug. 18, 2004).* Having been excluded from the class in Bradburn, Meijer first attempted to intervene in that lawsuit as an additional class representative. In denying Meijer's motion to intervene, the Court noted that "there is nothing which would prevent Meijer [*4] from filing its own individual or class action lawsuit against [3M] and presenting its claims in that forum." *Bradburn Parent/Teacher Store, Inc. v. 3M, 2004 U.S. Dist. LEXIS 25246, Civ. A. No. 02-7676, 2004 WL 2900810, at *6 (E.D. Pa. Dec. 10, 2004).* On December 16, 2004, Meijer filed the instant Complaint.

Meijer brings this action on behalf of itself and other members of a proposed class, which includes "all persons and entities who purchased invisible or transparent tape directly from 3M . . . at any time during the period from October 2, 1998 to the present . . . ." (Compl. P 18.) The Complaint sets forth one count of monopolization in violation of *Section 2 of the Sherman Act.* The Complaint alleges that 3M unlawfully maintained monopoly power in the transparent tape market through its bundled rebate programs n1 and through exclusive dealing arrangements with various retailers. (Id. P 27.) The Complaint further alleges that "3M has used its unlawful monopoly power . . . to harm Plaintiffs and the other Class members in their business or property by increasing, maintaining, or stabilizing the prices they paid for invisible and transparent tape above competitive levels." (Id. P 34.) [*5] The damages period in this case runs from October 2, 1998, to the present. (Id. P 18.) In the instant Motion, 3M moves to dismiss the Complaint in its entirety pursuant to *Federal Rule of Civil Procedure 12(b)(6).*

n1 As described at length in the LePage's litigation, 3M's bundled rebate programs provided purchasers with significant discounts on 3M's products. However, the availability and size of the rebates were dependant upon purchasers

buying products from 3M from multiple product lines. See *LePage's II, 324 F.3d at 154-55.*

## II. LEGAL STANDARD

When determining a motion to dismiss pursuant to *Rule 12(b)(6),* the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).* The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff. *Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).* [*6] A *Rule 12(b)(6)* motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).* Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).*

## III. DISCUSSION

3M argues that the Complaint should be dismissed pursuant to *Rule 12(b)(6)* because (1) Meijer's claim is barred by the applicable statute of limitations; and (2) the Complaint fails to state a valid claim of antitrust injury.

### A. Statute of Limitations

3M first argues that this case is time-barred under the applicable statute of limitations. The statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant. *Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 487 (3d Cir. 1985).* When considering a motion to dismiss pursuant to *Rule 12(b)(6)* on statute of limitations grounds, "'[courts] must [*7] determine whether the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Davis v. Grusemeyer, 996 F.2d 617, 623 (3d Cir. 1993)* (quoting *Cito v. Bridgewater Twp. Police Dept., 892 F.2d 23, 25 (3d Cir. 1989)).* The defendant bears a heavy burden in seeking to establish that the challenged claims are barred as a matter of law. *Davis, 996 F.2d at 623, n.10* (citing *Buskirk, 760 F.2d at 498).*

The Clayton Act, *15 U.S.C. § 15b,* which governs private antitrust actions, provides that "any action to enforce any cause of action under *section 15, 15a,* or *15c* of this title shall be forever barred unless commenced within four years after the cause of action accrued." *15*

Case 1:05-md-01717-JJF    Document 376-8    Filed 01/05/2007    Page 11 of 26

Page 3

2005 U.S. Dist. LEXIS 13995, *; 2005-2 Trade Cas. (CCH) P74,882

*U.S.C. § 15b.* "Generally, a cause of action accrues, and the statute begins to run, when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 28 L. Ed. 2d 77, 91 S. Ct. 795 (1971).* Meijer, which seeks damages for the period from October 2, 1998 through the present [*8] based on conduct by 3M which began as early as 1993, does not dispute the applicability of the Clayton Act's four year statute of limitations. Meijer argues, however, that the instant action is timely under the continuing violation and speculative damages exceptions to the four-year accrual rule.

### 1. Continuing violation exception

Meijer argues that the instant action is timely because 3M's conduct constitutes a continuing violation of the Sherman Act. "The Supreme Court has considered and rejected the argument that, in the context of a defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest impact on a plaintiff." *In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1171 (3d Cir. 1993).* The four year statute of limitations does not bar recovery for later private antitrust actions if the defendant's conduct "constituted a continuing violation of the Sherman Act and . . . inflicted continuing and accumulating harm." *Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502, n.15, 20 L. Ed. 2d 1231, 88 S. Ct. 2224 (1968).* In such situations, even if the overt act which demonstrates [*9] the antitrust violation occurs outside the statute of limitations period, an injurious act within the limitations period may serve as the basis for a timely antitrust suit. *Lower Lake Erie Iron Ore, 998 F.2d at 1172.*

Here, Meijer argues that the continuous violation exception should be applied because the predatory and exclusionary practices 3M engaged in outside the limitations period have resulted in continuing and accumulating harm to Meijer within the limitations period by allowing 3M to continue to charge supracompetitive prices for its invisible and transparent tape. Generally, a subsequent act will only preserve an antitrust claim if that act is an "injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequence[] of some pre-limitations action." *Al George, Inc. v. Envirotech Corp., 939 F.2d 1271, 1275 (5th Cir. 1991)* (quoting *Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 238 (9th Cir. 1987)*) (emphasis deleted); *see also Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004); Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999);* [*10] *see generally* Phillip E. Areeda et al., Antitrust Law, P 320 at 208-211 (2d ed. 2000). While a leading commentator has noted that "it should seem that high prices fol-

lowing . . . the creation of a monopoly are mere inertial consequences one naturally expects to flow from such acts," Areeda P 320 at 210, it has long been held that "a purchaser suing a monopolist for overcharges paid to recovery by pointing to anticompetitive actions taken before the limitations period." *Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 296 (2d Cir. 1979).* This principle is based on the recognition that

> although the business of a monopolist may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. The case of predatory pricing illustrates the point clearly. As soon as the dominant firm commences such a policy, other producers, who may be driven out of the market, are injured. But, clearly, purchasers are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having devoured its smaller [*11] rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser feels the adverse impact of the violation. And if the monopolist never consummates its scheme by taking this final step, the purchaser has no cause of action.

*Id. at 295* (quoting *Zenith, 401 U.S. at 339*).

The United States Court of Appeals for the Third Circuit ("Third Circuit") has similarly differentiated between "on the one hand, an 'overt act' necessary to show the existence of a [continuing violation], and, on the other hand, an injurious act causing damages within the limitations period." *Lower Lake Erie Iron Ore, 998 F.2d at 1172.* Accordingly, courts have held that, in purchaser antitrust actions, the requisite injurious act within the limitations period can include being overcharged as the result of an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control. *See In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 551 (D.N.J. 2004)* (purchasers' antitrust claims "are not barred by the statute of limitations to the extent that they bought [*12] and overpaid for [defendant's] products within the applicable time limitations"); *see also In re Buspirone Patent & Antitrust Litig., 185 F. Supp. 2d 363 at 365, 378 (S.D.N.Y. 2002)* ("if a party commits an initial unlawful act that allows it to maintain market control and overcharge cus-

tomers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.").

Here, the Complaint alleges that "as found in LePage's or otherwise, 3M's unlawful maintenance of its tape monopoly has suppressed competition and has maintained prices paid by direct purchasers to 3M above competitive levels, even after any 3M rebates attributable to tape purchases." (Compl. P 32.) The Complaint further alleges that "the issues regarding 3M's violation of *Section 2 of the Sherman Act* in LePage's v. 3M are identical to those in the case at bar," (id. P 37), and that "3M has used it unlawful monopoly power . . . to harm Plaintiffs and other Class members in their business or property by increasing maintaining, or stabilizing the prices they paid for invisible and transparent tape above competitive levels." (Id. [*13] P 34.) The Complaint, therefore, alleges a cause of action on the basis of an initial overt act of unlawful maintenance of monopoly power that occurred more than four years ago, but which continues to allow 3M to commit the injurious act of overcharging Meijer and other purchasers. See *Lower Lake Erie Iron Ore, 998 F.2d at 1172*; see also *In re K-Dur, 338 F. Supp. 2d at 551*; *In re Buspirone, 185 F. Supp. 2d at 378*. Accordingly, the Court concludes that Meijer's claims are not barred by the statute of limitations to the extent that Meijer seeks to recover for any overcharges paid within the four years prior to the filing of the instant Complaint, plus any additional time period during which the statute of limitations may be tolled. n2

> n2 Although the parties have made some arguments with respect to the possible tolling of the statute of limitations in this case, which would extend the damages time period in this case. The Court notes, however, that it need not decide what the applicable period for the calculation of damages may ultimately be in ruling on the instant Motion. *In re K-Dur, 338 F. Supp. 2d at 551.* Moreover, Meijer has advised the Court that "there are additional arguments for further tolling," which it did not develop in the submission currently before the Court. (04/04/2005 Tr. at 40.) Accordingly, the Court will defer ruling on the propriety of tolling the statute of limitations at this time.

[*14]

2. Speculative damages exception

Meijer also argues that the statute of limitations does not bar the instant action because Meijer's damages were speculative prior to the filing of the instant lawsuit. The general rule of accrual in antitrust actions provides that "if a plaintiff feels the adverse impact of an antitrust [violation] on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future." *Zenith, 401 U.S. at 339.* The mere fact that damages may continue to accrue "in the future, as opposed to at the from accruing." *Astoria Entm't, Inc. v. Edwards, 159 F. Supp. 2d 303, 316 (E.D. La. 2001)* (quoting *8 Julian O. van Kalinowski et al., Antitrust Laws and Trade Regulation § 162.02[1] at 162-5*). However,

> it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. [*15]

*Zenith, 401 U.S. at 339.* In these instances, antitrust causes of action for future damages "will accrue only on the date [the damages] are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted." Id.

In purchaser antitrust actions, damages from future overcharges necessarily fall into the speculative damages exception to the four year statute of limitations. See *Berkey Photo, 603 F.2d at 295-96.* The United States Court of Appeals for the Second Circuit has explained that

> plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future. Indeed, some of the buyers who will later feel the brunt of the violation may not even be in existence at the time. Not until the monopolist actually sets an inflated price and its customers determine the amount of their purchases can a reasonable estimate be made. The purchaser's cause of action, therefore, accrues only on the date damages are 'suffered.'

*Berkey Photo, 603 F.2d at 295-96* (internal quotations [*16] omitted.) To hold otherwise would require a pur-

Case 1:05-md-01717-JJF      Document 376-8      Filed 01/05/2007      Page 13 of 26

Page 5

2005 U.S. Dist. LEXIS 13995, *; 2005-2 Trade Cas. (CCH) P74,882

chaser to predict and prove, within four years of the time it was first injured by antitcompetitive conduct, the amount of future overcharges, the quantity of future product purchases, the level of future competition in the relevant market, and the availability of substitutes and new suppliers over time. Resolution of these issues depends on overall changes in consumer demand for tape, developments in the purchaser's overall business, variations in the cost of producing the product over time, and the future prices which the supplier ultimately decides to charge. These considerations are too speculative and remote to properly predict a purchaser's future damages. The Court, therefore, finds that Meijer's antitrust claim against 3M could not accrue until it actually payed the overcharge. See *Berkey Photo, 603 F.2d at 295.*

3M argues that the Court should nonetheless find that Meijer's claims are barred by the statute of limitations, because

repose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers [*17] but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened.

Areeda, P 320a at 205. The Court notes, however, that "there can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price," because "the . ." *Berkey Photo, 603 F.2d at 296.* The Court, therefore, concludes that because Meijer's future damages were speculative in 1993, when Meijer was first injured, a new cause of action accrued to Meijer each time it payed an overcharge. See *Berkey Photo, 603 F.2d at 295.* Accordingly, this action is not barred by the statute of limitations to the extent that Meijer seeks to recover for overcharges during the four years prior to the filing of the instant Complaint, plus any additional time period during which the statute of limitations may be tolled.

B. Failure to State a Valid Claim of Antitrust Injury

3M also argues that the Complaint should be dismissed pursuant to *Rule 12(b)(6)* [*18] because it fails to state a valid claim of antitrust injury.

To state a claim for monopolization [in violation of *Section 2*], a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 412-13 (3d Cir. 1997)* (quoting *Fineman v. Armstrong World Indus., 980 F.2d 171, 197 (3d Cir. 1992)).* The right to maintain a private cause of action for damages arising under *Section 2* flows from Section 4 of the Clayton Act, *15 U.S.C. § 15(a)*, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the Accordingly, plaintiffs bringing a private cause of action under *Section 2*

must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and [*19] that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977).* The Court notes that "the existence of antitrust injury is not typically resolved through motions to dismiss." *Schuylkill Energy, 113 F.3d at 417* (citing *Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995)).* Moreover, "there are no special pleading requirements for an antitrust claim. Rather, 'notice pleading is all that is required for a valid antitrust complaint." *Bradburn Parent/Teacher Store, Inc. v. 3M, 2003 U.S. Dist. LEXIS 13273, Civ. A. No. 02-7676, 2000 WL 34003597, at *2 (E.D. Pa. July 25, 2003)* (quoting *Mun. Utils. Bd. of Albertville v. Ala. Power Co., 934 F.2d 1493, 1501 (11th Cir. 1991)).* Courts, therefore, "must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them." *Schuylkill Energy, 113 F.3d at 417.* Courts "are not, however, required to accept [*20] as true unsupported conclusions and unwarranted inferences." *Id.*

2005 U.S. Dist. LEXIS 13995, *; 2005-2 Trade Cas. (CCH) P74,882

Here, 3M argues that the Complaint fails to state a valid claim for antitrust injury because, although the Complaint alleges rebate programs and exclusive dealing arrangements with retailers, "it does not necessarily follow . . . that Meijer or the class it seeks to represent suffered any injury at all because such retailers benefitted directly and significantly from those rebates." (Def. at 18.) The Complaint alleges as follows:

> As found in LePage's or otherwise, 3M's unlawful maintenance of its tape monopoly has suppressed competition and has maintained tape prices paid by direct purchasers to 3M above competitive levels, even after any 3M rebates attributable to tape purchases. . . . 3M has used its unlawful monopoly power described herein to harm [Meijer] and other Class members in their business or property by increasing, maintaining, or stabilizing the prices they paid for invisible and transparent tape above competitive levels.

(Compl. PP 32, 34.) (emphasis added). Moreover, the Complaint alleges that 3M "intended to use, did use, and continues to use" its "anitcompetitive and monopolistic [*21] practices in the conduct of trade or commerce." (Compl. P 1.) The Court has previously held that these allegations, "if proven, could establish that, were it not for [3M's] anti-competitive conduct, [Meijer] would have paid less for transparent tape than it actually paid during the damages period, even when any bundled rebates or other discounts are taken into account." *Bradburn, 2003 U.S. Dist. LEXIS 13273, 2000 WL 34003597, at *4.* The Court, therefore, concludes that Meijer has properly alleged injury of the type the antitrust laws were designed to prevent. n3 Accordingly, 3M's Motion is denied in this respect.

n3 The Court notes that it is "not in a position to predict whether [Meijer] will ultimately be able to sustain [its] burden of proof on this issue since [Meijer] has not yet had an opportunity to obtain evidence." *Brader, 64 F.3d at 876.* Accordingly, the sufficiency of Meijer's contentions regarding the effect of 3M's conduct on prices will be resolved "after discovery, either on summary judgment or after trial." Id.

[*22]

## ORDER

**AND NOW,** this 13th day of July, 2005, upon consideration of Defendant 3M's Motion to Dismiss (Doc. No. 9), all documents submitted in response thereto, and the Argument held on April 25, 2005, **IT IS HEREBY ORDERED** that said Motion is **DENIED.**

BY THE COURT:

John R. Padova, J.



supported by the trial testimony of plaintiffs' expert, as well as economic theory and factors regarding the efficient administration of the settlement fund. Any attempt to further refine the method of allocation would unduly diminish and delay the payments to individual class members with no material improvement in the fairness of the plan. Accordingly, the Court approves the revised plan of allocation.

**IT IS THEREFORE ORDERED** that settlement counsel's *Motion For Approval Of Revised Plan Of Allocation* (Doc. #1040) filed May 26, 2000 be and hereby is SUSTAINED.

**IT IS FURTHER ORDERED** that the *Motion For Attorney's Fees* (Doc. #1027) filed by Gerald H. Abrams on April 25, 2000 be and hereby is OVERRULED.

---

**[¶ 73,013]  Microsoft I-V Cases, Coordination Proceedings Special Title (Rule 1550(b)).**

California Superior Court, City and County of San Francisco. No. J.C.C.P. No. 4106. Filed August 29, 2000.

### California Cartwright Act

**Class Actions—State Laws—Class Certification—Standard—Computers, Computer Software.**—Two purported classes of California indirect purchasers of software products produced by a computer software company (purchasers of the company's operating system software and purchasers of the company's word processing or spreadsheet software) were certified to proceed with California state law claims against the company. The plaintiffs alleged that the company harmed consumers by establishing and maintaining a monopoly of the Intel-compatible personal computer markets for operating systems software and for word processing and spreadsheet applications software. The matter was suitable for resolution on a classwide basis. The proposed classes were ascertainable; the classes were sufficiently numerous; the named representatives' claims were typical of those of the classes and the interests of the classes would be fairly and adequately represented. In addition, common questions of fact or law predominated, and a class action was the superior method for adjudicating the matter.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Monopolization—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, plaintiffs made a sufficient threshold showing that issues of law and fact regarding the company's antitrust violations were subject to common proof by pointing to findings of fact and conclusions of law against the company in a federal/state enforcement action. Issues as to whether the company violated the Cartwright Act were not differentiated among individual consumers.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Fact of Injury—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, the plaintiffs established that the harm suffered by consumers as a result of the company's anticompetitive practices—or fact of injury—was capable of proof on a classwide basis. While the task was formidable, it was not impossible. The plaintiffs proposed several methodologies shown to be widely accepted within the profession and submitted published empirical analyses to demonstrate general harm to consumers as a result of the company's conduct. The plaintiffs did not have to prove that each and every plaintiff paid a supracompetitive price for the relevant software products.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Damages Calculation—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, the plaintiffs demonstrated that the amount of damages resulting from the company's alleged overcharges was susceptible to classwide proof. Damages could be calculated in the aggregate for the class. Summing of all individual claims was not required.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Superiority of Class Action Methodology—Computers, Computer Software.**—A class action was the superior method for adjudicating a state law monopolization action by California indirect purchasers of software products produced by a computer software company against that company. The case involved a very large number of claimants with relatively small amounts at stake. Most consumers had little incentive to

litigate independently, since the costs of litigation would have overwhelmed their potential recovery. Moreover, the potential recovery was not so insignificant to warrant the assumption that individual consumers would not be motivated to claim any recovery to which they were entitled or that a favorable outcome would only benefit attorneys. The denial of class treatment could result in repetitious litigation and inconsistent judgments to the extent that purchasers of large quantities of the company's software elected to pursue individual claims.

See ¶ 9410.05.

**For plaintiffs:** Eugene Crew, Danièle J. Gurniss, Richard L. Grossman, and Theodore T. Herhold of Townsend & Townsend & Crew, San Francisco, Cal., R. Stephen Berry, J. Daniel Leftwich, Michael J. Quinn, and Gregory Baruch of Berry & Leftwich, Washington, D.C., Michael K. Kellogg, Mark C. Hansen, and Steven F. Benz of Kellogg, Huber, Hansen, Todd & Evans, Washington, D.C., Craig C. Corbitt of Zelle, Hofmann, Voelbel & Gette, San Francisco, Cal., William Bernstein, Joseph R. Saveri, and Steven M. Tindall of Lieff, Cabraser, Heimann & Bernstein, San Francisco, Cal., Leonard B. Simon of Milberg, Weiss, Bershad, Hynes & Lerach, New York, Daniel J. Mogin, San Diego, Cal., Guido Saveri and R. Alexander Saveri of Saveri & Saveri, Inc., San Francisco, Cal., Josef D. Cooper and Tracy R. Kirkham of Cooper & Kirkham, San Francisco, Cal., Lingel H. Winters, San Francisco, Cal., Jeffreyi J. Parish, Oakland, Cal., and Francis O. Scarpulla, San Francisco, Cal. **For defendant:** Robert A. Rosenfeld and Stephen V. Bomse of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., David Tulchin and Michael Lacovara of Sullivan & Cromwell, New York, N.Y., Steve W. Berman of Hagens & Berman, Seattle, Wash., Thomas W. Burt, Richard J. Wallis, and Steven J. Aeschbacher, Redmond, Wash.

## ORDER RE CLASS CERTIFICATION

POLLAK, J.: This is a coordinated proceeding brought by plaintiffs as representatives of two purported classes of California indirect purchasers of software products produced by defendant Microsoft Corporation.

The operative complaint for all of the coordinated actions[1] alleges causes of action under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.). Plaintiffs allege that defendant engaged in numerous violations of these Acts in establishing and maintaining an illegal monopoly of the Intel-compatible personal computer markets for operating systems software and for word processing and spreadsheet applications software. Plaintiffs allege that Microsoft harmed California consumers by overcharging for its software as a result of the abuse of its monopoly power and by depriving consumers of other benefits that would have been derived from competition in those markets.

Plaintiffs seek to bring this action on behalf of California individuals and entities that purchased software programs indirectly from Microsoft. Specifically, plaintiffs request that two classes be certified:

(1) The *"Windows and MS-DOS Operating System Software Class."* All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

(2) The *"Word and Excel Software Class."* All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased Microsoft "Word" word processing software and/or "Excel" spreadsheet software compatible with "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

Excluded from the class[es] are government entities, Microsoft officers and directors, subsidiaries in which Microsoft has greater than a 50 percent ownership interest and any judges or justices assigned to hear any aspect of this litigation. Also excluded are persons or entities who make their purchases after the date of notice to the class.[2]

Microsoft contends that the complexities of this case preclude common proof of the key issue of whether any illegal practices adversely impacted California consumers, and that certification is therefore inappropriate. "[S]hort of making an individual inquiry as to each proposed class member, [there is] no way of proving the key 'fact of injury' or 'impact' element in an antitrust class action: that the alleged monopolistic 'overcharge' actually worked a discernible,

---

[1] The Amended Complaint for Violations of California Business and Professions Code §§ 16720 and 17200 Seeking Damages, Restitution and Injunctive Relief; Class Action, filed March 19, 1999 in *Lingo v. Microsoft Corporation,* San Francisco Superior Court No. 301357 (hereafter "Complaint").

[2] Microsoft notes that because it does not actually "sell" its software to anyone (rather, it "licenses" its products), it is technically incorrect to refer to putative class members as indirect "purchasers." However, for the sake of simplicity, the court will also adopt plaintiffs' use of the widely recognized terminology. However, the term "licensed" should be inserted in the definition of the classes to be certified.

    ©2000, CCH INCORPORATED

tangible impact on the vast majority of end-users in the proposed class. Nor could the amount of the alleged overcharge, if any, passed on to an end-user be estimated without individual investigation." (Microsoft Corporation's Memorandum of Points and Authorities in Support of Its Opposition to Plaintiffs' Renewed Motion for Class Certification ("Opp.") at p. 3.)

While plaintiffs urge that "[t]here is nothing extraordinary about [this] motion" (Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Class Certification ("Motion") at p. 1), the application for certification of a class in this case is hardly run of the mill. Unlike virtually all reported decisions in antitrust cases in which classes of indirect purchasers have been certified, plaintiffs do not base their claim for recovery on allegations that defendant committed a *per se* violation—a critical factor that would permit a classwide presumption of injury. Moreover, there undoubtedly is a basis for Microsoft's emphasis on the number of software programs it has marketed over the purported class period, the pricing differences that have existed over this period of more than six years, the rapid pace of change in the computer industry over this period, the varied channels through which its software has been distributed, and the critical fact that its software was frequently incorporated into personal computers and represented only a small fraction of the consumers' purchase price. These factors require the court to consider with utmost care the particular issues raised by the allegations and the way in which plaintiffs intend to meet their burden of proof. The question at this point, however, is not whether plaintiffs will be able to prove their case, but only whether their contentions can be evaluated in a manner that does not require consideration of so many individualized circumstances as to be completely impracticable.

## A. Standard for Class Certification.

Class suits are authorized in California when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., § 382.) A class should be certified when the party seeking certification has demonstrated the existence of an ascertainable class and a well-defined community of interest among the class members. (*Richmond v. Dart Indus., Inc.* (1981) 29 Cal.3d 462, 470; *see also Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 704.) The community

of interest requirement embodies three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (citing *Richmond v. Dart Indus., Inc.*, *supra*, 29 Cal.3d at p. 470.) In addition, the party seeking certification must establish that the class action is a superior method of adjudicating the matter. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1279-1280.) In the absence of controlling state authority, California courts look to Rule 23 of the Federal Rules of Civil Procedure and to the federal case law interpreting this rule. (*Richmond v. Dart Indus., Inc.*, *supra*, 29 Cal.3d at pp. 469470.)[3]

The party seeking certification of the class carries the burden of establishing that the requirements for certification are met. (*Richmond v. Dart Indus., Inc.*, *supra*, 29 Cal.3d at p. 470.) Courts encourage the use of the class action to "prevent a failure of justice in our judicial system." (*Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at p. 434.) Consumers' individual damages frequently are insufficient to justify the costs of litigation, so that in the absence of class treatment, violations of law inflicting substantial damages in the aggregate would go unremedied. But to ensure that no party suffers a failure of justice, it is necessary to "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." (*Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at p. 435.)

In considering a class certification motion, the court accepts the facts alleged in the complaint as true. (See *Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at p. 443; *Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 901, fn. 17.) The Supreme Court has recently emphasized that certification of a class is a procedural question that should not be conditioned upon a showing that the class claims are likely to succeed on the merits. (*Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at pp. 439-440, 443.) The Supreme Court also has repeated that courts should resolve any doubt as to whether to certify a class in favor of certification. (See, e.g., *Richmond v. Dart Indus., Inc.*, *supra*, 29 Cal.3d at pp. 473-475; *La Sala v. American Savings & Loan Ass'n* (1971) 5 Cal.3d 864, 883; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807.)

---

[3] Rule 23 of the Federal Rules of Civil Procedure requires that plaintiff show common questions of fact or law, numerosity of the class, typicality of the named plaintiff's claim and adequacy of representation. In addition, plaintiff must show that the common questions of law or fact predominate over questions affecting only individual class members and

that the class action is superior to other methods for fairly and efficiently resolving the dispute. (Fed. Rules Civ. Proc., Rule 23(a), (b)(3), 28 U.S.C.; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* [1988-1 TRADE CASES ¶ 68,053], (1987) 191 Cal.App.3d 1341, 1347, fn. 5.)

While issues affecting the merits may be enmeshed with class action requirements, the issue at this stage of the proceedings is only whether the matter is suitable for resolution on a class-wide basis. (*Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at p. 443.) Plaintiffs are not now required to prove their case. (*See id.*, at p. 438-39, 443; *Eisen v. Carlisle & Jacquelin* [1974-1 TRADE CASES ¶ 75,082] (1974) 417 U.S. 156, 177; *In re Catfish Antitrust Litigation* [1993-2 TRADE CASES ¶ 70,395] (N.D. Miss. 1993) 826 F.Supp. 1019, 1038-1039.) Rather, they are required to make a ''threshold showing'' that the antitrust violations, if proven, have had a common impact on the class. (*In re Catfish Antitrust Litigation*, *supra*, at pp. 1041-1042.) Plaintiffs are also required to advance a method for proving generalized damages on a classwide basis ''not so insubstantial that it amount[s] to no method at all.'' (*Id.*, at p. 1042.) In response to plaintiffs' showing that all of the requirements for class certification have been met, Microsoft disputes only whether common questions of law or fact predominate.[4]

### B. Indirect Purchaser Suits for Damages in California.

California is one of a minority of states that permits indirect purchasers to maintain antitrust suits for damages. Rejecting *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶ 61,460] (1977) 431 U.S. 720, in which the United States Supreme Court held that such suits could not be maintained under the federal Sherman Act, the California Legislature amended the Cartwright Act specifically to permit indirect purchaser actions under California law. (Bus. & Prof. Code, § 16750(a).) The California Supreme Court noted that this legislative action constituted an

endorsement of Justice Brennan's dissenting opinion in *Illinois Brick* and ''a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits.'' (*Union Carbide v. Superior Court* (1984) 36 Cal.3d 15, 21-22.)

### C. Common Questions of Law or Fact Predominate over Individual Questions.

Plaintiffs' burden is to establish that common questions of law or fact predominate over individual issues. This inquiry ''turns on an interpretation of substantive issues of antitrust law.'' (*Rosack v. Volvo of America Corp.* [1982-83 TRADE CASES ¶ 65,145] (1982) 131 Cal.App.3d 741, 751 (*Rosack*).) Federal case law interpreting the Sherman and Clayton Acts is applicable to interpretation of California's antitrust law. (*Ibid.*) To establish liability, plaintiffs must prove an antitrust violation and demonstrate that the class suffered injury or impact as a result of the violation. (*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* [1988-1 TRADE CASES ¶ 68,053] (1987) 191 Cal.App.3d 1341, 1350 (*B.W.I. Custom Kitchen*).) For class certification purposes, plaintiffs may satisfy this requirement by making a ''threshold showing that the antitrust violation, if proven, had a common impact on the class members.'' (*In re Catfish Antitrust Litigation*, *supra*, 826 F.Supp. at pp. 1038-1039.) ''If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable.'' (*Rosack*, *supra*, 131 Cal.App.3d at p. 752.) Plaintiffs' proposed method for generalized proof of dam-

---

[4] Microsoft does not seem to contest that the proposed classes are ascertainable. Whether a class is ascertainable depends on the clarity of the class definition, the numerosity of the putative class and the means available to identify potential class members. (*Reyes v. Board of Supervisors*, *supra*, 196 Cal.App.3d at p. 1974.) The class definitions make clear that any California consumer of the software at issue who purchased the product(s) for his, her or its own use and not for resale within the class period is a member of the class. The definitions also make clear who is excluded from the classes. Moreover, according to declarations submitted with the moving papers, the named plaintiffs who seek to represent one or both classes are themselves members of one or both of the classes.

The numerosity requirement also is not disputed and is satisfied because the class members are so numerous that it is ''impracticable to bring them all before the court.'' (Code Civ. Proc., § 382.) There is no predetermined number of class members necessary as a matter of law for the maintenance of a class action. (*Hebbard v. Colgrove* (1972) 28 Cal.App.3d 1017 (not inappropriate to certify class involving a minimum of 28 members); *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605 (mere size of proposed class numbering over one million members did not make proposed class action unmanageable).) Here plaintiffs allege

there are ''clearly millions of class members.'' (Motion at p. 19.)

The typicality requirement is satisfied if the representative plaintiff's claim ''has the essential characteristics common to the claims of the class.'' (*In re Flat Glass Antitrust Litigation* [1999-2 TRADE CASES ¶ 72,713] (1999) 191 F.R.D. 472, 479.) The named plaintiffs' claims here, that they paid illegal overcharges due to defendant's antitrust violations, are identical to those of the class, and are, therefore, typical of those of the class.

Again, the parties do not take issue with the adequacy of representation requirement, which is met by (1) retaining class counsel competent to handle the litigation; and (2) ensuring that the class representatives' interests are not antagonistic to those of the class. In approving plaintiffs' proposed organization of counsel, this court found plaintiffs' counsel to be well qualified to conduct this litigation. (See Pretrial Order No.1, filed Mar. 9, 2000, and supporting documentation filed by plaintiffs in support thereof.) The named plaintiffs' claims arise through the same set of facts as do those of the class and their claimed injuries are the same. Through declarations, the named plaintiffs attest to their ability and willingness to prosecute the litigation and protect the interests of the class.

¶ 73,013

©2000, CCH INCORPORATED

ages must not be "so insubstantial that it amount[s] to no method at all." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.)

Plaintiffs frame the common questions presented by this action as follows:

(1) whether Microsoft possesses monopoly power in the relevant computer software markets; (2) whether Microsoft has acquired, maintained and increased its market power through violations of the Cartwright Act and the Unfair Competition Act (Bus. & Prof. Code §§ 16720, 16727 and 17200); (3) whether Microsoft exploited its illegal monopoly to cause substantial harm to competition in the relevant markets; (4) whether Microsoft exploited its illegal monopoly to cause substantial harm to consumers by overcharging them for inferior products, suppressing innovation and denying consumers their freedom of choice in a competitive market; (5) whether Microsoft should be required to make full restitution for the harm it unlawfully inflicted upon consumers and the profit it unlawfully reaped from consumers; and (6) whether Microsoft should be enjoined from continuing its violations of law.

(Plaintiffs' Reply in Support of Renewed Motion for Class Certification ("Reply") at pp. 10-11.) The issues presented fall into three categories: (1) whether Microsoft violated California's antitrust law; (2) whether any such violation caused harm to the classes; and (3) what relief is appropriate.

**1. Violation.**

Plaintiffs allege numerous antitrust violations by Microsoft that had the purpose and effect of establishing and maintaining an illegal monopoly of the personal computer operating systems, word processing and spreadsheet software markets. (Compl. at ¶¶ 37, 38, 104-107.) Plaintiffs allege that Microsoft exploited its monopoly power[5] to cause substantial harm to competition and to the ultimate consumers of Microsoft's products in California, including overcharges for the software programs at issue. (Compl. at ¶¶ 104, 105, 107.) Such conduct, if proven, violates the Cartwright Act, which prohibits combinations or conspiracies in restraint of trade. (Bus. & Prof. Code, § 16720 et seq.)

As evidence of the substantiality of their claims and the susceptibility of these claims to classwide analysis, plaintiffs point to the Find-

ings of Fact in the antitrust action brought by the United States against Microsoft. (*United States v. Microsoft Corp.* [2000-1 TRADE CASES ¶ 72,839] (D.D.C. 1999) 65 F.Supp.2d 1 [hereafter "Findings of Fact"]; *see also United States v. Microsoft Corp.* [2000-1 TRADE CASES ¶ 72,839] (D.D.C. 2000) 87 F.Supp.2d 30 [hereafter "Conclusions of Law"].) There, the District Court made detailed findings of various forms of anticompetitive conduct by Microsoft. Judge Jackson found that Microsoft engaged in anticompetitive conduct to protect Windows, its core asset, from competition (*e.g.* Findings of Fact ¶¶ 132, 194, 409-412; *see also* Conclusions of Law § I.2), including restrictions on personal computer manufacturers, internet access providers and internet content providers. (*E.g.* Findings of Fact ¶¶ 155, 203, 215, 221, 234, 235, 237, 242-336.) Judge Jackson found that Microsoft charged higher prices than it would have in a competitive environment, consistent with monopoly power (Findings of Fact ¶¶ 62, 63),[6] and concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.)

Such Sherman Act violations also constitute violations of the Cartwright Act and violations of the Unfair Competition Act (*Quelimane Co. v. Stewart Title Guaranty Co.* [1998-2 TRADE CASES ¶ 72,285] (1998) 19 Cal.4th 26, 42-43), and will entail proof of the same conduct by Microsoft as to each class member. (*Rosack, supra,* 131 Cal.App.3d at p. 752; *In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1039.) Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members. Thus, the proof required to demonstrate the "existence, implementation and effect" of the alleged unlawful conduct will require "a common thread of evidence" which will "correspond to evidence which otherwise would be introduced by absentee class members." (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1349 [quoting *In re Sugar Indus. Antitrust Litigation* [1976-2 TRADE CASES ¶ 61,215] (E.D. Pa. 1976) 73 F.R.D. 322, 345]; *In re Flat Glass Antitrust Litigation* [1999-2 TRADE CASES ¶ 72,713] (W.D. Pa. 1999) 191 F.R.D. 472, 484.) Plaintiffs have made a sufficient "threshold showing" that the issues of fact and law regarding Microsoft's alleged violations of the Cartwright Act and the Unfair Competition Act are subject to common proof.

---

[5] Plaintiffs allege that Microsoft controls approximately 90% of the operating systems, word processing and spreadsheet software markets. (Compl. ¶¶ 31, 34, 36.)

[6] In further support of their motion, plaintiffs submitted the opinion of Professor David J. Farber describing the nature of the competition that would have existed absent

Microsoft's alleged anticompetitive conduct (the "but for" world) and opining that pricing for operating systems and applications software would have been lower had Microsoft not engaged in such conduct. (Declaration of David J. Farber in Support of Plaintiffs' Renewed Motion for Class Certification ("Farber Decl.") ¶¶ 34, 57.)

### 2. Fact of Injury.

Plaintiffs must also demonstrate that whether consumers suffered harm as a result of Microsoft's anticompetitive conduct is also capable of proof on a classwide basis. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1350.)[7] "[A]n antitrust plaintiff's 'burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.' " (*Ibid.* [citing *Zenith Corp. v. Hazeltine* (1969) 395 U.S. 100, 114, fn. 9].) Plaintiffs contend that Microsoft harmed the class by charging supracompetitive prices for its software. Plaintiffs must, therefore, make a "threshold showing" that proof of the overcharge is common to the class.

There is considerable authority for the proposition that in a case alleging price fixing the fact of injury may be determined on a classwide basis. (*See, e.g., B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d 1341; *Rosack, supra,* 131 Cal.App.3d 741; *In re Catfish Antitrust Litigation, supra,* 826 F.Supp. 1019; *In re Sugar Antitrust Litigation, supra,* 73 F.R.D. 322.) Because price fixing is a *per se* violation of antitrust law, a presumption of harm arises from proof of such a violation. (*B.W.I. Custom Kitchen, supra,* at pp. 1350-1353; *Rosack, supra,* at pp. 753-754.) "It has been held that impact will be presumed once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra,* at p. 347.) A *per se* violation raises a presumption of harm because conduct such as a conspiracy to fix prices has the sole purpose of artificially raising the price of the item. It follows that consumers of the product pay more than they would in a competitive market even if the prices charged to direct purchasers vary. (*B.W.I. Custom Kitchen, supra,* at pp. 1350-1351.) Thus, a plaintiff need not provide evidence of harm to direct purchasers above and beyond establishing "the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining, or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra,* at p. 347.)

Holding monopoly power, however, is not itself a violation of any antitrust provision. Whether particular practices engaged in to acquire, maintain or extend such power constitute violations must be evaluated under the rule of reason. (*Bert G. Gianelli Distrib. Co. v. Beck &*

*Co.* [1985-2 TRADE CASES ¶ 66,851] (1985) 172 Cal.App.3d 1020, 1047-1048; *Standard Oil Co. v. United States* (1910) 221 U.S. 1, 61-62.) Some practices that flow from the existence of monopoly power may benefit rather than harm consumers, so that injury may not be presumed simply from proof that the defendant engaged in the conduct in question. (*Standard Oil Co. v. United States, supra,* 221 U.S. at pp. 61-62.) Here, Microsoft makes exactly that contention: that the various practices that are challenged— such as preventing other products from being used with its operating systems and bundling its internet browser with its operating system— have been of great benefit to the public by enhancing product standardization and increasing the ease of computer use and internet access.

But while the presence of these additional issues in a monopolization case such as this may preclude any presumption of harm, as in a price-fixing case, the existence of these issues does not necessarily mean that common issues do not predominate. Without regard to the possibility that some of the relevant issues in this case may be conclusively determined by the final outcome in the Government's action against Microsoft, remaining issues concerning the legality of defendant's practices are issues common to all members of the classes plaintiffs seek to certify. As discussed in section C.1 above, the fundamental and predicate issues as to whether defendant violated the Cartwright Act are not differentiated among individual consumers. In this respect, the situation is no different from a case involving an alleged conspiracy that would constitute a *per se* violation of the statute.

If it should be determined that defendant's practices unlawfully elevated prices to direct purchasers of Microsoft's software, the complexities of the marketplace to which defendant refers will affect the ability to analyze whether, and the extent to which, these higher prices were passed on to consumers. However, once the existence of unlawfully inflated prices at the direct purchaser level has been established, the difficulties of determining whether the price increase was absorbed by those direct purchasers or passed on to successive purchasers in the chain of distribution are no greater in a monopolization case than in a *per se* price-fixing case. There is no ascertainable difference between the analysis of the impact of the abuse of a monopoly and of price fixing once the overcharge to direct purchasers has been established, and in response to the court's inquiry at oral argument Microsoft offered none. The starting point in both situations is artificially high prices set in an anticompetitive market. The same economic

---

[7] The parties acknowledge the distinction between the fact of harm or impact, on the one hand, and actual damages, on the other. "Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve

the quantum of injury, and relate to the appropriate measure of individual relief." (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1350, fn. 7 [citation omitted].)

models and analyses that have been accepted for purposes of tracing a supracompetitive price that results from a price fixing conspiracy are relevant and applicable to trace the pass-through resulting from monopoly abuse.

Unlike the conclusion reached by the Supreme Court in *Illinois Brick* and by the courts of some other states, the California courts have made clear that the difficulties in tracing the pass-through of artificially inflated prices do not necessarily create insuperable obstacles to classwide analysis and to class certification. "In certifying a plaintiff class, the courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anticompetitive behavior embracing all of the various products and distribution patterns have been credibly pleaded. [Citation omitted.] Identical products, uniform prices, and unitary distribution patterns are not indispensable for class certification in this context." (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1350 [quoting *Shelter Realty Corp. v. Allied Maintenance Corp.* [1977-2 TRADE CASES ¶ 61,691] (S.D.N.Y. 1977) 75 F.R.D. 34, 37]; *Rosack, supra,* 131 Cal.App.3d at p. 757 [same].) "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." (*Rosack, supra,* 131 Cal.App.3d at p. 755 [quoting *In re Folding Carton Antitrust Litigation* [1977-2 TRADE CASES ¶ 61,596] (N.D. Ill. 1977) 75 F.R.D. 727, 734].) "It should also be emphasized that courts have applied these principles to markets, such as this one, characterized by individually negotiated prices, varying profit margins, and intense competition." (*B.W.I. Custom Kitchen, supra,* at p. 1351.)

Nonetheless, defendant argues that the complexity and changing nature of the software markets over the past six years have been so great as to render classwide analysis "impossible" in this case. (Opp. at p. 1.) Focusing almost exclusively on the market for operating systems software, defendant emphasizes that over the class period it marketed a progression of product "families"—from MS DOS to the most current Windows NT Workstation system. The variety of illegal practices in which defendant allegedly engaged necessarily affected the price defendant was able to and did charge at different times and for different products. If defendant engaged in predatory pricing, the price to some purchasers presumably would have been less than a competitively determined price, so that some class members may have benefited from the practice, rather than having been damaged by it. Because of the high level of competition among computer manufacturers ("original equipment manufacturers" or "OEMs"), each OEM that purchased software directly from

Microsoft made its own pricing decisions and therefore each may have absorbed rather than passed on a different portion of any excess in the price paid to Microsoft. Because the software represents only a small percentage of the cost of the computer, and because there are many other factors which may inhibit passing on price changes (such as "focal point" pricing and "menu costs"), whether, and the extent to which, any given OEM passed on the excess will differ from case to case. The amount passed through by distributors or retailers purchasing from the OEMs, or purchasing directly from Microsoft, may also vary, so that the fact, much less the amount, of any overcharge reaching a consumer will be a function of so many variables, defendant argues, that the impact of any violation cannot possibly be considered collectively. In the words of Microsoft's economist, Professor Jerry A. Hausman, "any analysis of whether an overcharge may have been passed on to an eventual final purchaser would require an evaluation of a large number of individual-specific facts that essentially will amount to an individualized inquiry for each final purchaser." (Declaration of Jerry A. Hausman ("Hausman Decl.") ¶ 32.)

Such a broad statement proves too much. If true, it would invalidate the entire study of microeconomics. In his Findings of Fact, Judge Jackson concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.) To demonstrate that impact on consumers can be proven on a non-individualized and classwide basis, plaintiffs rely heavily on the expert opinion of Professor Jeffrey K. MacKie-Mason, an economist. Accepting the allegations in the Complaint and the Findings of Fact, and based upon his knowledge of the industry, Professor MacKie-Mason opined that plaintiffs could demonstrate common impact on the classes "by showing that, as a result of Microsoft's monopoly power (derived from or maintained by the anticompetitive conduct alleged) consumers (1) were charged supra-competitive prices for [the relevant software] and (2) experienced less choice and innovation in [the relevant software markets] than they would have enjoyed in a competitive market." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Renewed Motion for Class Certification ("MacKie-Mason Decl.") ¶ 6(a), (c).) "When a monopolist sets prices above competitive levels to its distributors, it generally results that all customers suffer harm." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Reply re Renewed Motion for Class Certification ("MacKie-Mason Reply Decl.") ¶ 5.) Summarizing his conclusions, Professor MacKie-Mason stated:

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly all of the overcharge will be passed through to ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust law and economics as well."

(MacKie-Mason Reply Decl. ¶ 6.)

Professor MacKie-Mason described several recognized methods to estimate what Microsoft's prices to its direct purchasers would have been in a hypothetical "but for" world in which Microsoft had not engaged in the allegedly anticompetitive conduct. These include the use of "yardstick" prices based on the prices of products when the markets were more competitive or the prices of similar goods sold in more competitive markets; the comparative margin method (calculating the price at which Microsoft's margin on a product would equal the average margin of other software manufacturers); and constructing models of equilibrium in the relevant markets. (MacKie-Mason Decl. ¶¶ 28-36.) He further described two methods to measure the extent to which particular increased costs were passed on to final purchasers, both based on equilibrium models of distribution channels. (Mackie-Mason Decl. ¶¶ 38-40.)

Professor MacKie-Mason did not commit himself to the use of any one or more of these approaches, nor did he make the necessary calculations or attempt to prove that any of these methods ultimately will be able to support plaintiffs' burden of proof at trial. Nonetheless, his declarations contain a good bit more than a plea to "trust me," as the defendant would characterize his testimony. (Opp. at p. 3.)

In addition to proposing several methodologies shown to be widely accepted within the profession, plaintiffs submitted several published works by prominent economists and consumer groups that have conducted empirical analyses to demonstrate general harm to consumers as a result of Microsoft's conduct. (Hall, *Toward A Quantification of the Effects of Microsoft's Conduct* (2000) American Economic Review 90; Fisher & Rubinfeld, *United States v. Microsoft: An Economic Analysis in Did Microsoft Harm Consumers? Two Opposing Views* (AEI-Brookings Joint Center for Regulatory Studies 2000); Fisher & Rubinfeld, *Misconceptions, Misdirection, and Mistakes* in *Did Microsoft Harm Consumers? Two Opposing Views* (AEI-Brookings Joint Center for Regulatory Studies 2000); Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, The Consumer Cost of the Microsoft Monopoly: $10 Billion of Overcharges and Counting (Jan. 1999).) Moreover, the opposing experts agree that equilibrium economic models can be used to calculate damages in antitrust cases. According to the defense expert, Professor Hausman:

> Economists have developed various theoretical models of competition in markets with limited numbers of sellers. These models are based on a series of strong simplifying assumptions. They can provide useful bases for suggestive theoretical analyses, but they do not provide reliable bases for calculating damages *unless carefully designed and calibrated to fit the actual conditions of the market in question.*

(Hausman Decl. ¶ 125 (emphasis added).)

Professor Hausman asserts that none of the methods proposed by Professor MacKie-Mason will work because none of them "accounts for the real world complexities of the products and the distribution chains at issue." (Hausman Decl. ¶ 113.) However, the experts agree on the importance of product differentiation in reaching dependable conclusions (Hausman Decl. ¶ 126; MacKie-Mason Decl. ¶ 108.), but, not surprisingly, disagree on the extent to which Professor MacKie-Mason's anticipated models will reflect reality. (See, e.g., Hausman Decl. at pp. 43-52; MacKie-Mason Decl. at pp. 38-52.) The question at this stage is not whether plaintiffs will be able to carry their burden of proving that their experts' analyses are reliable, but whether it appears that the differences between the experts can be intelligently presented and evaluated within the framework of a class action. On a motion for class certification, it is inappropriate to resolve a "battle of the experts." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.) "Whether or not [plaintiff's expert] is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time. [Citations omitted.] For now, the court is persuaded that for the purposes of a class certification motion, plaintiffs have made [the required] threshold showing . . . . " (*Ibid.*) The court is similarly persuaded here.

It may be, as defendant has argued, that closer examination of the facts will disclose that not all class members were harmed by Microsoft's practices.[8] However, plaintiffs need not prove that each and every class member

---

[8] Some skepticism is warranted as to the extent to which defendant will be able to prove its assertion in this regard. Microsoft contends, for example, that its conduct benefited rather than harmed consumers because consumers received Microsoft's Web browser, Internet Explorer, at "no charge." Judge Jackson found that Microsoft's practice of bundling its Web browser with Windows was designed to harm the ability of Netscape's Navigator Web browser to compete

©2000, CCH INCORPORATED

paid a supracompetitive price for the relevant software products. As explained in *Rosack*, "[t]he courts have rejected the notion that each member of the purported class must prove that he or she absorbed at least some portion of the overcharges in order to establish liability. [Citations omitted] '[C]lass certification does not require that common questions be completely dispositive . . . as to all potential members of the class. [Citations omitted.] The fact that certain members of the class may not have been injured at all does not defeat class certification. [Citations omitted.]'" (*Rosack, supra*, 131 Cal.App.3d at pp. 753-754.) Similarly, the *B.W.I. Custom Kitchen* court pointed out that "'[e]ven if it were shown that certain class members escaped having to pay any of the overcharge . . . , the fact remains that in the vast majority of cases at least a portion of the illegal overcharge was passed on by the independent distributors to class members in the form of higher prices.'" (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1353.) Whether that is true in this case will depend upon an evaluation of the evidence at trial.

Defendant is correct that the multiple products embraced within each of the two proposed classes, the multiple distribution channels, and the extraordinary rate at which changes have occurred in the relevant markets over the six-year class period will complicate the analysis of the impact of any illegal practices in which Microsoft is found to have engaged. The trier of fact undoubtedly will be required to do more than make a single determination of whether any damages were incurred by the respective classes over the six-year period. However, plaintiffs advise that their evidence and expert studies will be presented in a manner that will permit, at a minimum, annual comparisons of prices paid by consumers for particular software products with the prices that would have prevailed in the hypothetical "but for" world in the absence of the unlawful practices. Moreover, since the relevant comparison is not between actual prices and prices in a perfectly competitive market, or even between actual prices and prices lawfully obtained in a monopoly market, plaintiffs' evidence will need to establish "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market." (*Berkey Photo, Inc. v. Eastman Kodak Co.* [1979-1 TRADE CASES ¶ 62,718] (2d Cir. 1979) 603 F.2d 263, 297.) The task is formidable, but not impossible. As the case proceeds towards trial, careful consideration will have to be given to the possibility of creating subclasses, bifurcating issues,

making special findings, or using other techniques that may facilitate the presentation and consideration of the relevant evidence. At this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings.

### 3. Calculation of Damages.

Plaintiffs must also meet their burden of demonstrating that the amount of damages is susceptible to classwide proof. With respect to calculating damages once liability has been established, individual issues will not bar certification of a class. (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1354; *Rosack, supra*, 131 Cal.App.3d at p. 761.) "[I]t has been recognized consistently that differences among potential class members concerning damages do not preclude class treatment so long as common questions regarding conspiracy and impact allegations predominate." (*Rosack, supra*, at p. 761.) Courts recognize a somewhat relaxed standard of proof once the antitrust violation and resulting injury have been proven. (*In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1042.) This is the logical result of an inability to ascertain exactly what "plaintiff's position would have been in the absence of defendant's antitrust violation." (*Ibid.*) "Hence, the willingness to accept some uncertainty stems from a simple, equitable notion that the wrongdoer should not be allowed to profit by an insistence upon an unattainable standard of proof." (*Id.*, at pp. 10421043; *see also Bigelow v. RKO Radio Pictures, Inc.* [1946-1947 TRADE CASES ¶ 57,445] (1946) 327 U.S. 251, 264.)

The basic measure of damages for overcharges resulting from Microsoft's alleged anticompetitive conduct is the difference between the price paid by a class member for a particular product and the price that would have been paid absent the alleged anticompetitive conduct. (*See In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; MacKie-Mason Decl. ¶¶ 25, 40.) To determine this amount, as discussed in section C.2 above, it is of course necessary to determine both the amount of the overcharge by Microsoft and the amount of such overcharge passed through to the consumer. Total classwide damages are the sum of the overcharges on all software programs sold to class members during the class period. (MacKie-Mason Decl. ¶ 40.)

Plaintiffs need not present a method to calculate each class member's damage individually. California courts permit calculation of damages in the aggregate for a class and do not require

---

(Footnote Continued)

and caused harm to consumers. (Findings of Fact ¶¶ 143, 155-160, 166-168, 171-177; Conclusions of Law at pp. 38-40, 42-43.) Moreover, as Professor Mackie-Mason explained, the

effect of an overcharge is not cured by the marketing strategy: "buy three tires, get the fourth tire free." (MacKie-Mason Reply Decl. ¶ 23.)

summing all individual claims. (*Daar v. Yellow Cab Co., supra*, 67 Cal.2d at pp. 706, 714, 716; *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 128-129 & fn. 4.) A reasonable basis for computing damages is permissible, even if it involves approximation or estimation. (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* [1980-1 TRADE CASES ¶ 63,040] (1980) 101 Cal.App.3d 532, 545; *Bigelow, supra*, 327 U.S. at pp. 264-265.) Other courts in antitrust proceedings have found similar approaches to be sufficiently viable for purposes of class certification. (See, e.g., *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; *In re Domestic Air Transportation Antitrust Litigation* [1991-2 TRADE CASES ¶ 69,518] (N.D. Ga. 1991) 137 F.R.D. 677, 692; *In re Corrugated Container Antitrust Litigation* [1978-2 TRADE CASES ¶ 62,220] (S.D. Tex. 1978) 80 F.R.D. 244, 251.) Moreover, it is not necessary that plaintiffs demonstrate to a certainty that their proposed methods will succeed, and it would be improper for the court to make a determination as to the likely success of plaintiffs' proposed methods. (*In re Domestic Air Transportation Antitrust Litigation, supra*, at p. 693; *In re Flat Glass Antitrust Litigation, supra*, 191 F.R.D. at p. 487.)

The method of calculating the amount of any recovery that will be received by each class member and the method of distributing damages to class members are different questions altogether that need not be addressed at this point, and which the parties have not argued. Suffice it to say that there is no reason to presume that conventional techniques for notifying class members of their right to submit claims and for submitting and processing claims will not be feasible in this litigation. Nor is there any reason to assume that the amounts to which individual class members may be entitled will be insufficient to justify the effort and expense of a claim procedure. Moreover, as noted by plaintiffs, fluid class recovery is also a possibility. (*Bruno, supra*, 127 Cal.App.3d at p. 135; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 119-120.) Should problems in calculating damages appear to outweigh the benefits of class treatment, the court may reconsider its certification order and vacate or amend the certification. (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1348 [citations omitted].)

### D. A Class Action Is a Superior Method of Adjudicating the Matter.

Finally, plaintiffs must demonstrate that a class action would be of substantial benefit to the litigants and the court. (See *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 385.) This requirement incorporates the superiority standard of Rule 23 of the Federal Rules of Civil Procedure. (*Schneider v. Vennard* (1986) 183 Cal.App.3d 1340, 1347.) The matters pertinent to this determination include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(Fed. Rules Civ. Proc.; Rule 23(b)(3); 28 U.S.C.) The various indirect purchaser claims filed in California against Microsoft already have been consolidated in this court, which is specifically called upon to utilize innovative methods to manage complex cases as part of the Judicial Council's Complex Civil Litigation pilot program. (See also *B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1355 [calling upon courts to adopt innovative methods for handling indirect purchaser class actions].)

This case involves a very large number of claimants with relatively small amounts at stake. Most consumers have little incentive to litigate independently since the costs of litigation undoubtedly would overwhelm their potential recovery. "The problems which arise in the management of a class action involving numerous small claims do not justify a judicial policy that would permit the defendant to retain the benefits of its wrongful conduct and to continue that conduct with impunity." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 446.) Moreover, the potential recovery here is not so insignificant to warrant the assumption that individual consumers will not be motivated to claim any recovery to which they may be entitled, or that a favorable outcome would benefit only the attorneys involved. And, to the extent that purchasers of large quantities of Microsoft software should elect to pursue their individual claims, denying class treatment could result in repetitious litigation and inconsistent adjudication of similar issues and claims. (*Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at p. 469.) Under the circumstances, the superiority of a class action is apparent.

### CONCLUSION

In keeping with the Supreme Court's mandate, this court must "avoid interpreting procedural requirements in such a way as 'would thwart the legislative intent . . . to retain the availability of indirect-purchaser suits as a viable and effective means of enforcing California's antitrust laws.'" (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1355 [quoting *Union Carbide Corp. v. Superior Court, supra*, 36 Cal.3d at p. 21].) The court finds that the proposed classes are ascertainable, that the classes are suffi-

**¶ 73,013**                                    ©2000, CCH INCORPORATED

**88,565**

## Cited 2000-2 Trade Cases
*Nutting v. RAM Southwest, Inc.*

647.  9-13-2000

ciently numerous, that the named representatives' claims are typical of those of the classes and that the interests of the classes will be fairly and adequately represented. In addition, common questions of fact or law predominate, and a class action is the superior method for adjudicating the matter. Accordingly, the two proposed classes will be certified, and the litigation will proceed as a class action. Counsel should confer concerning the method of giving notice to the classes and the content of the notice, and be prepared to discuss these issues at the status conference scheduled for October 4, 2000.