35

IN THE CIRCUIT COURT OF OHIO COUNTY, WEST VIRGINIA

State of West Virginia,
ex rel. Darrell V. McGraw, Jr.,
Attorney General,
Plaintiff,

v.

Civil Action No. 03-C-551

Visa U.S.A., Inc., and MasterCard
International, Inc.,
Defendants.

## Memorandum Order Denying Defendants' Motion for Summary Judgment

The Defendants seek Summary Judgment in this civil action. After considering the motion, the briefs, and the applicable case law, the Defendants' Motion for Summary Judgment is denied for the reasons discussed in this Memorandum Order.

In this civil action the Attorney General alleges that the Defendants violated the West Virginia Antitrust Act, W.Va.Code 47-18-1, et seq., and the West Virginia Consumer Credit and Protection Act, W.Va.Code 46A-6-101, et seq. This Memorandum Order only considers the claim made under the Antitrust Act.

The antitrust claims are that the Defendants have violated the West Virginia Antitrust Act, W.Va. Code 47-18-3, by engaging in a "tying arrangement" of credit and debit cards that produces artificially inflated prices for consumer goods and that the "tying" constituted monopolization and an attempt to monopolize in violation of W.Va.Code 47-18-4.

The suit was filed by the Attorney General on behalf of all West Virginia consumers who purchased or leased goods or services from businesses that accepted Visa or MasterCard credit cards from October 25, 1992, through June 21, 2003.

This case involves issues with the same Defendants and the same conduct litigated in prior federal and state cases. Nevertheless, it is one of first impression in West Virginia.

Trial judges have a duty to weed out meritless litigation when the facts and the law clearly entitle a litigant to a pre-jury determination. In this case of first impression in West Virginia, the Court has reviewed the related precedent of other states for guidance, applied the law that is available and made what is believed to be the decision mandated by the precedent available to the Court.

The legal reasoning set forth in this Memorandum Order will, for all practical purposes, be of limited value. The Supreme Court of Appeals of West Virginia will review de novo a lower court's interpretation or application of the law. State v. Paynter, 206 W.Va.521, 526, 526 S.E.2d 43,48(1999). See also Syl.Pt.1, Burks v. McNeel, 164 W.Va.654, 264 S.E.2d 651(1980), "In reviewing the judgment of a lower court this Court does not accord special weight to the lower court's conclusions of law

2

and will reverse the judgment below when it is based on an incorrect conclusion of law."

That is the reason this Memorandum Order does not contain a detailed analysis of the facts or the history of this litigation and its relationship to the class action in federal court. This information is detailed in Counsels' briefs. The Court cannot improve on the high quality of the briefs, which detail the allegations in the lawsuit and the applicable law, filed by both sides in this litigation.

There are interesting and complicated questions of law presented in this case, but the standing issue is the real dispute presented to the Court in the Summary Judgment Motion, and it is the only issue decided in this Memorandum Order. Our Supreme Court of Appeals has indicated that "[g]enerally, standing is defined as '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.'" Findley v. State Farm Mut. Auto. Ins. Co., 213 W.Va. 80, 94, 576 S.E.2d 807, 821 (2002) (quoting Black's Law Dictionary 1413 (7th ed. 1999)). Ultimately, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)...

3

After reviewing well over 400 pages of counsels' arguments and cases it is the opinion of the Court that the standing issue in this case and in the related cases is answered in almost all of the litigation by one decisive question: Has the state adopted an Illinois Brick repealer statute? If the state has a repealer statute or rule then there is standing. If not, then The Associated General Contractors of Cal., Inc. v. State Council of Carpenters, 459 U.S. 519 (1983) antitrust standing analysis is applicable and determinative of the issue.

After a complete and thorough review of the law, the Court concludes that the determinative facts and law in this case are as follows:

(1) The Attorney General seeks antitrust damages on behalf of West Virginia citizens in their capacities as purchasers or lessees of goods or services from businesses that accepted Visa and/or MasterCard credit cards from October 25, 1992, through June 21, 2003. It is also clear that the injury to the Plaintiff was not a direct, first-hand impact of the restraint alleged because that injury fell on the merchants. The Plaintiff can only claim derivative and second-hand injuries from those that the merchants incurred.

(2) The West Virginia Antitrust Act provides

4

that "Any person who shall be injured in his business or property by reason of a violation of the provisions of this article may bring an action therefor and shall recover threefold the damages sustained by him." W. Va. Code 47-18-9. Person is defined: "Person" shall mean any natural person or persons, or any corporation, partnership, company, trust or association of persons." W.Va. Code 47-18-2.

(3) The West Virginia Antitrust Act requires that the "article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes." W.Va.Code 47-18-16.

(4) Federal decisional law interpreting the Sherman Anti-Trust Act is to be applied in interpreting the parallel West Virginia Antitrust Statute. W.Va.Code 47-18-3(a), 47-18-16; Sherman Anti-Trust Act, 15 U.S.C.A. § 1. Gray v. Marshall County Bd. of Educ.,179 W.Va. 282, 367 S.E.2d 751 (1988).

(5) In Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707,reh'g denied, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977), the United States Supreme Court held that indirect purchasers, such as the Plaintiffs in the instant case, are not injured in their business within the meaning of section 4 of the Clayton Act, and thus, with certain exceptions, lack standing to pursue a claim under the federal antitrust laws. Id. at 728-29, 97 S.Ct. at 2065-66, 52 L.Ed.2d at 714. The Court

found this holding to be required by Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Illinois Brick held that direct purchasers suffer the entire injury, which follows from a violation of the federal antitrust laws, and are the only private parties allowed to sue for federal antitrust violations. Illinois Brick, 431 U.S. at 728-29, S.Ct. at 2065-66, 52 L.Ed.2d at 714. Consequently, the Plaintiff in the instant case could not pursue this action under the federal antitrust laws without demonstrating that the facts fit within an exception to Illinois Brick.

(6) After Illinois Brick, the West Virginia Legislature and twenty-two other states and the District of Columbia adopted Illinois Brick repealer statutes and rules allowing people who have been injured indirectly by reason of violations of antitrust acts to recover damages. This rule is identified in Counsels' briefs as the West Virginia "Repealer Rule." 142 C.S.R 9, effective April 2,1990 (W.Va. Code St. R. 142-9-1 and 2). The stated purpose of this rule is to allow persons who are indirectly injured by violations of the West Virginia Antitrust Act to maintain an action for damages; to allow the Attorney General, as parens patriae, to maintain an action on behalf of such persons who have suffered indirect injury under W.Va. Code 47-18-17; and to bring the application of the West Virginia

6

Antitrust Act into conformity with the laws of other jurisdictions. W.Va. Code 47-18-17 permits the Attorney General to bring an action as parens patriae of natural persons who are citizens and residents of West Virginia in federal court for violations of the federal antitrust laws or for violations of both the West Virginia Antitrust Act and the federal antitrust laws.

(7) In California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), the United States Supreme Court held that a state may, consistent with the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 2, allow an indirect purchaser to sue under the state's own antitrust laws. Id. at 105-06, 109 S.Ct. at 1667, 104 L.Ed.2d. at 97. The Supreme Court upheld the right of states to allow suits by indirect purchasers under their own antitrust statutes, notwithstanding the federal rule limiting federal antitrust recoveries to direct purchasers: "Given the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States." Id. at 101, 490 U.S.93, 109 S.Ct. 1661, 104 L.Ed.2d at 94-95(footnote omitted). In concluding that state indirect purchaser statutes were not pre-empted by federal law, the Court stated, "nothing in Illinois Brick suggests that it would be contrary to congressional

7

purposes for States to allow indirect purchasers to recover under their own antitrust laws." Id. at 103, 109 S.Ct. at 1666, 104 L.Ed.2d at 96.

(8) When challenged these indirect purchaser statutes have been upheld and indirect purchasers have been permitted to maintain antitrust lawsuits. See, e.g., Union Carbide Corp. v. Superior Court, 36 Cal.3d 15, 679 P.2d 14, 17, 201 Cal. Rptr. 580 (Cal.1984) (observing that "California's 1978 amendment ... in effect incorporates into the Cartwright Act the view of the dissenting opinion in Illinois Brick that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution"); Comes v. Microsoft Corp., 646 N.W. 2d 440, 448 (Iowa 2002)(stating that nineteen states, the District of Columbia, and Puerto Rico have adopted statutes expressly authorizing suits by indirect purchasers, and citing statutes from California, Hawaii, Illinois, Kansas, Maryland, Michigan, Minnesota, New Mexico, New York, South Dakota, Wisconsin, and the District of Columbia); A&M Supply Co. v. Microsoft Corp., 252 Mich.App. 580, 654 N.W. 2d 572, 595 (Mich.Ct.App. 2002)(holding that Michigan's adoption of an Illinois Brick repealer law incorporating "directly or indirectly" language to describe the injury allowed suit by direct or indirect purchasers).

Therefore, for the reasons stated, it is hereby ORDERED that Defendants' Motion for Summary Judgment is DENIED.

Copies of this Order have been sent Barry Hill, Esq., Frances A. Hughes, Esq., Rebecca A.Betts, Esq., and William J.Cooper, Esq.

ENTER this 14th day of October 2005:

Ronald E. Wilson Judge
First Judicial Circuit

36

Not Reported in S.W.2d                                                                                    Page 1
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
(Cite as: Not Reported in S.W.2d)

Tennessee ex rel. Leech v. Levi Strauss & Co.ZYTN
Chancery Court of Tennessee, Davidson County.
State of Tennessee ex rel. William M. **Leech**, Jr.,
Attorney General & Reporter
v.
**Levi Strauss & Co.**
No. 79-722-III

Filed September 25, 1980
BRANDT, Chanc.

**Memorandum**

**\*1** This is an action by the Tennessee Attorney
General charging that Levi Strauss violated
Tennessee's anti-trust statutes.[FN1]

> FN1. T. C. A. § 69-101 provides:
> 'Trusts and combinations lessening competition or
> controlling prices unlawful and void.-All
> arrangements, contracts, agreements, trusts, or
> combinations between persons or corporations made
> with a view to lessen, or which tend to lessen full and
> free competition in the importation or sale of articles
> imported into this state, or in the manufacture or sale
> of articles of domestic growth or of domestic raw
> material, and all arrangements, contracts, agreements,
> trusts, or combinations between persons or
> corporations designed, or which tend, to advance,
> reduce, or control the price or the cost to the producer
> or the consumer of any such product or article, are
> declared to be against public policy, unlawful, and
> void.'

The suit is before the Court upon the State's motion
to strike certain defenses and Levi Strauss's motion
for a judgment on the pleadings or in the alternative
for partial summary judgment. The three issues
raised by the motions are (1) the statute of limitation
to be applied to the actions under Tennessee's anti-
trust laws, (2) the authority of the State to maintain a
damage suit on behalf of its citizens under the
common law theory of *parens patriae*, and (3) the
effect of the now-repealed Tennessee Fair Trade Law
upon the fixing of retail prices by a manufacturer.
These are all questions of first impression in
Tennessee.

The complaint alleges that beginning in 1969 and
thereafter for several years, Levi Strauss conspired

and combined with others to arbitrarily and illegally
fix and control the prices at which Levi Strauss
wearing apparel was retailed in Tennessee. The State
has sued for damages in two capacities, first as a
purchaser itself of Levi Strauss products and second
as *parens patriae* on behalf of all Tennessee citizens
who were damaged by the alleged price-fixing. Class
certification is sought, the proposed class being
everyone in Tennessee who purchased Levi Strauss
goods at prices fixed by the alleged unlawful
conduct.

*Statute of Limitation*

Tennessee's anti-trust laws do not contain a statute of
limitation so the Court must look to other statutes to
determine which is applicable. The alternatives are
(1) the one year limitation for actions for statutory
penalties, T. C. A. § 28-304, (2) the three year period
for property tort actions, T. C. A. § 28-305, or (3) the
ten year limitation for 'all other cases not expressly
provided for', T. C. A. § 28-310. The Court
concludes that this civil damage suit brought by the
State is subject to the three year statute of limitation
in T. C. A. § 28-305.

A threshold issue is whether the suit is subject to any
statute of limitation at all. Section 28-115 of the
Code provides that the various statutes of limitation
'do not apply to actions brought by the State of
Tennessee, unless otherwise expressly provided.' In
State v. Standard Oil Company, 120 Tenn. 86 (1907),
a suit to enjoin conduct prohibited by the anti-trust
statute, the Supreme Court stated that 'there is no
statute of limitation applicable to the State in civil
actions.' *Id.* at 144.

**\*2** That sweeping pronouncement is not absolute. It
may be correct in many contexts, but not in the
context of the damage claim in the instant suit. In its
claim for damages the State is suing as a purchaser of
Levi Strauss products. In that respect the State is not
acting as a sovereign but rather as an ordinary
consumer. The State exemption from statutes of
limitation does not apply to the damage claim.

In deciding which statute of limitation to apply, it is
necessary to determine the character of the State's
price-fixing claim. Tennessee's anti-trust statutes
prohibit combinations which control the price to the
consumer of any product. T. C. A. § 69-101. A
private cause of action for damages is given to 'any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

person who may be injured or damaged by any such . . . combination.'  T. C. A. § 69-106.  Although anti-trust actions are based upon statutes, it has been universally held that private anti-trust suits are actions sounding in tort.  See _Wilson P. Abraham Construction Corp. v. Texas Industries, Inc._ [1979-2 TRADE CASES ¶ 62,929], 604 F. 2d 897 (5th Cir. 1979) and the authorities cited in footnote 7, page 901.[FN2]

> FN2. The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890.  15 U. S. C. § 1.  Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive.

The tortious injury to property statute of limitation obviously applies to cases of physical property damage.  Tennessee courts are also applying the three year property damage limitation to suits for monetary loss which do not involve physical damage.  The most significant case is _Vance v. Schulder_, 547 S. W. 2d 927 (Tn. 1977).  There, the Supreme Court was faced with deciding which statute of limitation applied to a suit charging that fraudulent representations induced the sale of stock for less than its value.  After a reasoned analysis of the nature of the cause of action, the Court concluded that a loss sustained from fraud and deceit is included in the phrase 'injuries to personal property' contained in T. C. A. § 28-305, the three year limitation.  _Id._ at 932.  The Court rejected the notion that the injury must be physical injury to property.

Relying upon _Vance_ in a diversity suit, the Sixth Circuit Court of Appeals concluded that the three year limitation in § 28-305 is applicable to a suit charging fraud, misrepresentation and deceit.  _Edwards v. Travelers Insurance of Hartford, Conn._, 563 F. 2d 105 (6th Cir. 1977).

In urging that the Court apply the ten year 'all other cases' limitation of § 28-310, the State relies upon the United States Supreme Court's 1906 decision in _Chattanooga Foundry & Pipe Works v. City of Atlanta_, 203 U. S. 390 (1906).  That was a private civil anti-trust action in which damages were awarded to the City of Atlanta because of collusive price-fixing.  The cause of action arose in Tennessee and the case was tried in the United States District Court in Tennessee.  The Sherman Anti-Trust Act did not provide a statute of limitation and the applicable

limitation was a matter of state law.[FN3]  The Supreme Court was given the same three alternatives presented in the instant suit-the one year statutory penalty limitation (§ 28-304), the three year tortious injury to property limitation (§ 28-305) or the ten year 'all other cases' limitation (§ 28-310).  The Supreme Court upheld the Sixth Circuit's decision that the ten year limitation applied.

> FN3. In 1955 Congress enacted a four year statute of limitation for  civil suits filed under the Clayton Act, 15 U. S. C. § 15b.

*3  The Sixth Circuit was faced with the task of deciding whether an injury to one's 'business or property' in the Sherman Act was an injury to personal property in the Tennessee statute of limitation.  In reaching its decision the Court noted that:

While the precise question has not been decided by the Supreme Court of Tennessee, we do find an indisposition to give to the section [28-305] any such broad and indeterminate meaning as would include a suit which does not involve any actual injury to property.

127 F. at 31.

That statement concerning the absence of Tennessee authority is crucial to an understanding of the Supreme Court's decision.  What the Sixth Circuit essentially did was attempt to decide the issue based upon what it perceived the Tennessee Supreme Court would have held on the same issue.  The federal appeals court was saying that Tennessee had not extended the concept of injury to property beyond cases involving actual physical injury.[FN4]

> FN4.  The Supreme Court's decision to uphold the Sixth Circuit was influenced by the fact that the author of the Sixth Circuit opinion, Judge Lurton, had been a justice on the Tennessee Supreme Court.  Judge Lurton went on to become an associate justice on the United States Supreme Court.

If the Sixth Circuit and United States Supreme Court were called upon to decide the same issue today-that is, whether a tortious injury to property not involving physical damage falls within the injury to property limitation in § 28-305-the result would no doubt be different.  The Tennessee Supreme Court decision in _Vance v. Schulder_ and the cases which preceded it

Not Reported in S.W.2d
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases P 63,558
**(Cite as: Not Reported in S.W.2d)**

could not be disregarded by the federal courts.

Indeed, they have not been disregarded. As noted, the Sixth Circuit, relying upon *Vance*, held the three year statute to apply to suits for fraud and misrepresentation. *Edwards v. Travelers Insurance of Hartford, Conn., supra*. In another Sixth Circuit case decided slightly before *Edwards*, the Court, again relying upon *Vance*, held that the ten year 'all other cases' limitation did not apply to suits arising under the Securities Exchange Act of 1934[FN5] and Securities Exchange Commission Rule 10b-5.[FN6] *Clarke v. Wilson*, (Unreported Order, March 28, 1977).

FN5. 15 U. S. C. § 78a, et seq.

FN6. 17 C. F. R. § 240.10b-5.

This Court can perceive of no reason why the principles stated by the Tennessee Supreme Court in *Vance v. Schulder* are not applicable to this suit. This private anti-trust suit for injury or damage sounds in tort. It is an action for injuries to personal property and is subject to the three year statute of limitation in T. C. A. § 28-305.

**\*4** The decision on the statute of limitation does not at this stage of the litigation result in any action by the Court other than a declaration that the three year limitation applies. Under T. C. A. § 28-305 suits are barred unless commenced within three years 'from the accruing of the cause of action.' The question of when the cause of action accrued in this case has not been addressed by the parties.

*Parens Patriae*

The State's posture as a plaintiff in this case is somewhat unusual. It has sued as a direct purchaser of Levi Strauss products as would any other consumer and has also sued to recover on behalf of Tennessee citizens under the *parens patriae* theory.[FN7] Levi Strauss challenges the State's authority to sue *parens patriae*.

FN7. Private damage suits are authorized by T. C. A. § 69-106 which provides that:
'Any person who may be injured or damaged by any such arrangement, contract, agreement, trust, or combination, described in this chapter may sue for and recover, in any court of competent jurisdiction,

of any person operating such trust or combination, the full consideration or sum paid by him for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.'

The concept of *parens patriae* has its origin in English common law where the King was the guardian of 'infants, idiots and lunatics'-this is, persons suffering under a disability. In the United States that responsibility has passed to the states and is manifested in various laws and practices which protect persons under disabilities.

Relying on *parens patriae*, states can maintain anti-trust actions to protect the interests of their citizens, such as suits to enjoin unlawful activities which injure the state's economy.[FN8] Such injury is perceived as injury to the quasi-sovereign interest of the State itself. Utilization of *parens patriae* is dependent upon a showing that the state is asserting an interest separate from the claims of its citizens.

FN8. *Georgia v. Pennsylvania R. R. Co.* [1944-45 TRADE CASES ¶ 57, 344], 324 U. S. 439 (1945).

In the case at bar the State seeks to extend the concept to include an action by the State for injury to individual citizens. As has been noted in the leading case on the issue, 'Judicial recognition of such authority would be a substantial departure from the scope of *parens patriae* authority as it has been recognized in this country to date. * * * *Parens patriae* has received no judicial recognition in this country as a basis for recovery of money damages for injuries suffered by individuals.' *California v. Frito-Lay, Inc.* [1973-1 TRADE CASES ¶ 74,364], 474 F. 2d 774 (9th Cir. 1973), cert. denied 412 U. S. 908 (1973).

The question of a state's authority to suit *parens patriae* for damages to individual citizens was squarely faced by the Ninth Circuit in *Frito-Lay*. There the State of California filed a federal anti-trust suit *parens patriae* as representative of its citizens who were the victims of alleged resale price-fixing by the snack food industry. The State urged that it was impossible or impractical for the consumers to bring individual suits. After examining the historical origins and legal authorities on *parens patriae*, the Court concluded that California could not maintain the suit. The holding in *Frito-Lay* is compelling.

**\*5** The response of Congress to the *Frito-Lay*

Not Reported in S.W.2d                                                                                      Page 4
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases P 63,558
**(Cite as: Not Reported in S.W.2d)**

decision is instructive. In 1976 it passed the Hart-Scott-Rodino Anti-Trust Improvements Act, 15 U. S. C. § 15c. The act specifically authorizes states to maintain federal anti-trust suits such as the instant suit. The act establishes precise procedures which are to be followed in *parens patriae* damage suits.

It is also significant that the Tennessee Legislature has granted the Attorney General authority to sue on behalf of injured citizens in the Consumer Protection Act. T. C. A. § 47-18-108(a)(b). The Legislature can pass similar legislation in the anti-trust field.

The State is asking this Court to do what every other court, with one exception[FN9] has declined to do-extent the concept of *parens patriae* to permit suits by the State to collect damages for individual citizens. The object of the attempted broadening of *parens patriae*-the recovery of damages to injured consumers-is certainly worthwhile. And, considering the small amount of loss to each consumer, such an action by the State may be the only practical way the individual purchaser will recover. Nevertheless, this Court concludes that such a drastic departure from accepted practice must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established. The portion of the complaint seeking damages as *parens patriae* should be dismissed.

> FN9. The State's power to sue for damages *parens patriae* was upheld by a trial court in *State of Michigan v. Detroit Lumbermans Association* [1979-2 TRADE CASES ¶ 62,990], (Circuit Court for Wayne County, October 26, 1979). The damage claim was coupled with a claim for injunctive relief to prohibit further violations. The Court noted that the case was not one 'in which the State is seeking to prosecute the purely personal claims of its citizens, but rather it is seeking to protect the public interest in preserving a fair and open lumber market.' p. 10. In the 1978 Federal Trade Commission consent decree, Levi Strauss agreed not to engage in any prohibited practices in the future. Although the instant suit contains a prayer for injunctive relief, the F. T. C. consent decree leads to the conclusion that this is in all respects a damage suit.

*Fair Trade Law Impact*

Levi Strauss argues that, even if it did conspire or combine with others to fix retail prices, such conduct was legal under Tennessee's Fair Trade Law. [FN10] That law was repealed in 1975,[FN11] but was in effect during most of the period during which the State alleges Levi Strauss unlawfully maintained retail prices.

> FN10. The Fair Trade Law was codified at T. C. A. § 69-201-69-205.

> FN11. Chapter 25, Public Acts of 1975.

The Fair Trade Law was in essence an exemption from the anti-trust laws. It legalized price-fixing by permitting a manufacturer and its vendee to enter into a contract which required the vendee to sell a commodity at the price dictated by the manufacturer.[FN12] Whether Levi Strauss had a price-fixing contract with its retailers is an issue of fact which cannot be resolved on motion for summary judgment. Resolution of the question must await trial.

> FN12. The law provided in pertinent part that:
> 'No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade-mark, brand, or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of this state by reason of any of the following provisions which may be contained in such contract: 1. That the vendee will not resell such commodity except at the price stipulated by the vendor. 2. That a producer making sale, or a vendee making resale, of any commodity required that his vendee will not resell except at the price stipulated by such producer or reselling vendee as the case may be.'

*Conclusion*

*6 An order will be entered (1) declaring that this suit is subject to the three year statute of limitation of T. C. A. § 28-305, (2) dismissing the damage claim brought *parens patriae*, an (3) overruling the defendant's motion based upon the Fair Trade Law defense.

The Court's decision on the defendant's motion resolves the issues raised by the State's motion to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                          Page 5
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
**(Cite as: Not Reported in S.W.2d)**

strike certain defenses.  The order will accordingly
deny the State's motion to strike.

Counsel for both parties will agree upon an order for
submission to the Court.  If unable to agree the
defendant should submit a proposed order to which
the plaintiff can respond in accordance with the local
rules.

ZYTN
State ex rel. Leech v. Levi Strauss & Co.
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.),
1980-2 Trade Cases  P 63,558

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

37

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
U.S. v. Dentsply Intern., Inc.D.Del.,2001.
        United States District Court, D. Delaware.
        UNITED STATES of America, Plaintiff,
                                v.
DENTSPLY INTERNATIONAL, INC., Defendant.
HOWARD HESS DENTAL LABORATORIES
    INCORPORATED and Philip Guttierez d/b/a
Dentures Plus, on behalf of themselves and all others
                similarly situated, Plaintiffs,
                                v.
DENTSPLY INTERNATIONAL, INC., Defendant.
Amnon KAMINER, Frieda Simon and Lorraine
Goldsmith, individually and on behalf of all others
                similarly situated, Plaintiffs,
                                v.
DENTSPLY INTERNATIONAL, INC., Defendant.
    **No. CIV. A. 99-005-SLR, CIV .A. 99-255-SLR,**
              **CIV. A. 99-854-SLR.**


                       March 30, 2001.


Carl Schnee, United States Attorney and Judith M.
Kinney, Assistant United States Attorney, United
States Attorney's Office, Wilmington, Delaware.
William E. Berlin, Esquire and Jon B. Jacobs,
Esquire of the United States Department of Justice,
Antitrust Division, Washington, D.C.
Pamela S. Tikellis, Esquire and Robert J. Kriner,
Esquire of Chimicles & Tikellis, Wilmington,
Delaware. Counsel for plaintiffs Howard Hess Dental
Laboratories et al. Thomas A. Dubbs, Esquire and
Hollis L. Salzman, Esquire of Goodkind Labaton
Rudoff & Sucharow, New York, New York. Of
counsel for plaintiffs Howard Hess Dental
Laboratories et al.
Neal J. Levitsky, Esquire of Agostini, Levitsky,
Isaacs & Kulesza, Wilmington, Delaware. Counsel
for plaintiffs Amnon Kaminer et al. Sigmund S.
Wissner-Gross, Esquire, May Orenstein, Esquire, and
Allen M. Eisenberg, Esquire of Heller, Horowitz &
Feit, New York, New York. Of counsel for plaintiffs
Amnon Kaminer et al.
James P. Hughes, Esquire and John W. Shaw,
Esquire of Young, Conaway, Stargatt & Taylor,
Wilmington, Delaware. Counsel for defendant
Dentsply International, Inc. Margaret M. Zwisler,
Esquire, Richard A. Ripley, Esquire, Kelly A.
Clement, Esquire, Eric J. McCarthy, Esquire, and
David P. Burns, Esquire of Howrey Simon Arnold &

White, Washington, D.C. Of counsel for defendant
Dentsply International, Inc.

            MEMORANDUM OPINION
ROBINSON, Chief J.

               I. INTRODUCTION

**\*1** Plaintiff United States of America ("the
government") filed an antitrust action against
Dentsply International Inc. ("Dentsply") on January
5, 1999. Dentsply makes and sells artificial teeth and
other dental merchandise. The government generally
alleges that Dentsply uses anticompetitive tactics to
keep its competitors from entering the artificial tooth
market.

Plaintiff Howard Hess Dental Laboratories, Inc. and
Philip Guittierez d/b/a Dentures Plus (hereinafter
referred to collectively as "the Hess plaintiffs") filed
an antitrust class action against Dentsply on April 21,
1999. The Hess plaintiffs are dental laboratories.
Plaintiffs Amnon Kaminer, Frieda Simon, and
Lorraine Goldsmith (hereinafter referred to
collectively as "the Kaminer plaintiffs") filed another
class action against Dentsply in the Supreme Court of
the State of New York on behalf of a consumer class
.[FN1] Dentsply removed that action on diversity
grounds to the United States District Court for the
Southern District of New York, which transferred the
action to this court on November 29, 1999 pursuant
to 28 U.S.C. § 1404(a).

> FN1. The Kaminer plaintiffs' counsel
> indicated that Amnon Kaminer will be
> withdrawing his claim against Dentsply.
> (C.A. No. 99-854, D.I. 63 at 1 n. 1.)

In its suit, the government specifically alleges that
Dentsply 1) acted unlawfully to maintain a monopoly
in violation of § 2 of the Sherman Act, 15 U.S.C. §
2; 2) entered into unlawful restrictive dealing
agreements that substantially lessen competition in
violation of § 3 of the Clayton Act, 15 U.S.C. § 14;
and 3) entered into unlawful agreements in
unreasonable restraint of interstate trade and
commerce in violation of § 1 of the Sherman Act, 15
U.S.C. § 1. As a result, the government seeks
injunctive relief and costs.

The Hess plaintiffs in their case allege the same three
antitrust violations as the government. In addition to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: Not Reported in F.Supp.2d)

injunctive relief, the Hess plaintiffs seek compensatory and treble damages for the alleged violations.

The Kaminer plaintiffs in their suit seek compensatory and treble damages for alleged violations of the antitrust laws of sixteen states and the District of Columbia.

Dentsply is a Delaware corporation with its principal place of business in York, Pennsylvania. Dentsply transacts business in and is found within this district. Thus, this court has jurisdiction pursuant to 15 U.S.C. § 22.

Currently before the court are Dentsply's motions for summary judgment on the merits of the antitrust causes of action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45) [FN2] Also before the court are Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs based on standing and statute of limitations grounds. (C.A. No. 99-255, D.I. 133, 135; C.A. No. 99-854, D.I. 48, 51)

> FN2. Unless otherwise noted, docket entries refer to submissions made in C.A. No. 99-005.

## II. BACKGROUND

This case focuses on the manufacture and sale of artificial teeth in the United States. Artificial teeth are marketed to dentists and dental laboratories for use in the fabrication of dentures. As a result of the need to match variances in the teeth in a human mouth, artificial teeth are manufactured in thousands of shade and mould [FN3] combinations. They are sold on a card of six anterior or eight posterior teeth of the same shade and mould. Thus, a full denture (one that replaces all natural teeth) requires 28 teeth and four cards. Partial dentures are constructed when only a few teeth need replacement. (D.I. 231 at 3)

> FN3. A review of the artificial teeth trade literature had found that the preferred spelling of this word is "mould" instead of "mold."

*2 Generally, the process of constructing a denture begins with the dentist, who writes a denture "prescription" that specifies size, shape, and color requirements for the teeth in the denture appliance

and sends it to a dental laboratory for fabrication. The dental laboratories purchase artificial teeth from dental product dealers, from artificial teeth manufacturers, or from other dental laboratories. (Id. at 3-4) The dental product dealers purchase artificial teeth from manufacturers such as Dentsply, Vita Zahnfabrik H. Rauter GmbH & Co. KG ("Vita"), and Ivoclar AG ("Ivoclar")). (D.I. 244 at 3)

### A. The Relevant Market and its Participants

The relevant market for purposes of this action is the sale of prefabricated, artificial teeth in the United States. [FN4] (D.I.1, ¶ 5) Dentsply is the world's leading manufacturer of dental prosthetics and other dental products. Its Trubyte Division sells, among other things, the artificial teeth used by dental laboratories to make dentures and other removable dental prosthetics. (Id.) Dentsply distributes its teeth exclusively through dental laboratory dealers. (D.I. 231 at 7)

> FN4. Dentsply accepts the government's market definition for the purposes of this summary judgment motion. (D.I. 231 at 23 n. 41)

The government alleges that Dentsply has maintained a market share in the artificial tooth market of 70% to 80% for the past ten years. (D.I.1, ¶ 7) Dentsply distributes its artificial teeth through approximately 30 dental laboratory dealers ("Trubyte dealers") with 200 branch outlets. Dentsply and the Trubyte dealers are not bound by a written contractual agreement. Trubyte dealers purchase teeth on a purchase order basis.

In 1995, Dentsply distributed its teeth through approximately 37 dental laboratory dealers with 238 branch outlets. (D.I. 233 at A-276-79). At that time, there were 344 "dental dealers" according to the Twenty-third Annual Directory of U.S. Dental Dealers. (Id. at A-280-311) Five years later, Dentsply distributed Trubyte teeth to only 30 dealers with 200 branch outlets. (Id. at A-312-27; D.I. 234 at A-534)

Dentsply's biggest competitors are Vita and Ivoclar. Vita is a German company that manufactures and sells premium teeth throughout the world. Vita distributes its teeth in the United States through Vident, Inc. ("Vident"). Vident uses approximately 15 non-Trubyte subdealers to distribute Vita teeth. (D.I. 236 at A-1014-15) Ivoclar is a Liechtenstein

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: Not Reported in F.Supp.2d)

company that manufactures and sells artificial tooth lines throughout the world. In the United States, Ivoclar promotes, sells, and distributes teeth through Ivoclar NA, its wholly-owned subsidiary. (D.I. 231 at 11) Ivoclar distributes its teeth directly to dental laboratories and has attempted to sell teeth through dental laboratory dealers. (D.I. 245 at B-1129) Other smaller competitors include Universal Dental Company, Austenal, Inc., and Heraeus Kulzer GmbH. (D.I. 231 at 16-18)

### 1. The Hess Plaintiffs

The Hess plaintiffs represent a putative class of dental laboratories seeking money damages and injunctive relief. In their complaint, the Hess plaintiffs allege that they purchased Trubyte teeth from a Dentsply dental laboratory dealer at artificially high prices caused by Dentsply's unlawful restraint of trade and monopolization. (C.A. No. 99-255, D.I.1, ¶ 4) The Hess plaintiffs purport to represent "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply dealers .... Excluded from the Plaintiff Class are ... any co-conspirator[s] of the defendant ...." (*Id.*, ¶ 10)

*3 The named Hess plaintiffs purchased artificial teeth from dental laboratory dealers and, therefore, are indirect purchasers. The dental laboratory dealers, on the other hand, are the direct purchasers. In their opposition to Dentsply's motions for summary judgment, the Hess plaintiffs claim that some dental laboratories purchase artificial teeth from Dentsply. (C.A. No. 99-255, D.I. 151 at 44) This is done in one of two ways. First, Dentsply "drop ships" teeth to laboratories at the request of its dealers. Drop shipping occurs when a laboratory places an order with its dealer, which the dealer cannot fill out of its existing inventory. (D.I. 256 at C-13) The dealer sends the order, along with its dealer purchase order number, to Dentsply and directs Dentsply to ship the teeth directly to the laboratory. (*Id.*) Dentsply then charges the dealer for the shipment. (*Id.*) The second way that laboratories "directly" purchase teeth from Dentsply is through the Dentsply Order Network ("DON"). The DON is an internet-based system that allows laboratories to order products by scanning a bar code of the product it wants. (*Id.* at C-139) That information goes to a network communications company who sends the order to the dealer selected by the laboratory.FN5 (*Id.* at C-148) The laboratory then fills the order just as if it received it on the telephone.

FN5. The system also allows customers to order directly from Dentsply. (D.I. 256 at C-148) The Hess plaintiffs have not offered evidence that they or anyone else has used the DON to order directly from Dentsply.

### 2. The Kaminer Plaintiffs

The Kaminer plaintiffs represent a putative class comprised of
[a]ll individuals and entities who purchased false teeth manufactured by [Dentsply], from entities or persons other than [Dentsply] in New York, Alabama, California, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia.

(C.A. No. 99-854, D.I.1, Ex. A, ¶ 40) Although the class covers all indirect purchasers FN6, the named plaintiffs are residents of New York who purchased dentures in New York from New York dentists. (C.A. No. 99-854, D.I. 64, Ex. C at 6; Ex. D at 6) The Kaminer plaintiffs allege that Dentsply has restrained trade in the United States market for prefabricated artificial teeth in violation of New York Gen. Bus. Law § 340 and the indirect antitrust laws of fifteen states and the District of Columbia.

FN6. The court notes that since the Kaminer class purports to cover all indirect purchasers, the Hess plaintiffs would also be included in that class.

### B. Dentsply's Dealer Criteria

The focal point of this antitrust suit is Dentsply's "Dealer Criteria." Dentsply published its Dealer Criteria in 1993. The Dealer Criteria lists requirements for becoming and remaining an authorized Dentsply Trubyte dealer. (D.I. 245 at B-272) Among other things, the Dealer Criteria provides that "dealers that are recognized as authorized distributors may not add further tooth lines to their product offerings." (*Id.* at B-273) There is no contractual agreement between Dentsply and its Trubyte dealers. Thus, although Trubyte dealers may not add a competing line of teeth, they can switch to a rival manufacturer at any time. (D.I. 231 at 21)

*4 All of the plaintiffs in these cases (collectively,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: Not Reported in F.Supp.2d)**

"plaintiffs") allege that this exclusive dealing policy was designed to and has thwarted competitors' attempts to build a dealer network and thus compete effectively in the United States. (D.I.1, ¶ 30) Plaintiffs further allege that Dentsply, through its exclusive dealing policy, has undermined the efforts of competitors to maintain or recruit dental laboratory dealers and has induced some dealers to stop distributing competitors' teeth. (D.I.1, ¶ 31) For example, in 1987, Frink Dental ("Frink"), a Trubyte dealer, agreed to start selling a competing tooth line. Dentsply terminated Frink as both a tooth and merchandise dealer. Dentsply also threatened to terminate other dealers that were supplying Frink with Trubyte teeth. Frink eventually agreed to stop selling the competing tooth line, and Dentsply reinstated Frink as a Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1493; D.I. 245 at 1540-48)

Atlanta Dental Supply ("ADS") is another example of a Trubyte dealer whom Dentsply allegedly intimidated into foregoing a competitive tooth line. Sometime after 1993, ADS became interested in selling a competitive tooth line because it received a number of requests for them. ADS reached a tentative agreement with the competitor, but backed off the deal after Dentsply threatened to drop ADS as an authorized Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1737-58)

In 1994, Pearson Dental Supply ("Pearson"), an authorized Trubyte dealer, took on a consignment of Vita teeth and began advertising them in its product catalog. Dentsply threatened to terminate Pearson. Pearson dropped Vita and then decided not to add a different competitor's line. (D.I. 244 at 6; D.I. 245 at B-1827-48)

In 1995, Dentsply permitted one of its former dealers, Dental Technicians Supply ("DTS"), to resume selling Trubyte teeth only after DTS agreed to stop selling Vita, Ivoclar, and Justi teeth in its Kansas City, Denver, and Orlando locations. Dentsply placed different restrictions on DTS's New York location that allowed DTS to continue selling Vita. (D.I. 244 at 6; D.I. 245 at B-2048-80; 333-40; 236-44)

In November 1998, DTS was acquired by Darby Dental ("Darby"), a Trubyte dealer that was not permitted to sell Vita in any location. When Darby acquired DTS's New York office, Darby management wanted to retain the Vita line in order to satisfy existing New York DTS customers. Dentsply insisted that if Darby were to sell Vita in its newly acquired New York office, Darby would be violating the

Dealer Criteria. Dentsply gave Darby six months to exhaust DTS's Vita supply and offered to buy the remaining Vita inventory so that Darby would be in compliance. (C.A. No. 99-854, D.I. 64 at DPLY-A-018242-43)

### C. Alleged Anticompetitive Effects of Dentsply's Restrictive Dealing Agreements

Plaintiffs allege that Dentsply, through its Dealer Criteria and other conduct, has entered into restrictive dealing arrangements with dental laboratory dealers, and sold teeth to them, on the condition that those dealers not deal with rival manufacturers. Plaintiffs allege that independent dental laboratory dealers have been, and continue to be, the primary channel of distribution of artificial teeth to dental laboratories. (D.I.1, ¶ 14) Dentsply's Trubyte Division distributes its teeth through a network of these independent dental laboratory dealers who collectively constitute approximately 80% of the outlets distributing artificial teeth and other dental laboratory products in the United States. (D.I.1, ¶ 16) Because Dentsply has a substantial market share, many dental laboratories currently use Dentsply Trubyte teeth and expect local dental laboratory dealers to have the Trubyte line available. By requiring the dental laboratory dealers to carry only the Trubyte line of teeth, plaintiffs allege that competitors are not able to effectively compete in the United States. (D.I.1, ¶ 24, 30) Plaintiffs further allege that Dentsply's conduct has undermined the efforts of small domestic competitors of Dentsply in the United States to maintain or recruit dental laboratory dealers. (D.I.1, ¶ 31)

**\*5** Dentsply contends that because its exclusive dealing policy does not foreclose its competitors from the market for artificial teeth in the United States, the policy is not forbidden under the Sherman or Clayton Acts. Dentsply argues that rather than being foreclosed from the relevant market, alternative channels of distribution exist for Dentsply's rivals. For example, Ivoclar and Vita sell teeth directly to dental laboratories without going through an intermediary-a dental laboratory dealer. Thus, even if Dentsply's restrictive dealing arrangement has the effect of foreclosing access to dental laboratory dealers, Ivoclar, Vita, and other manufacturers can reach the end users-the dental laboratories-without hindrance. Trubyte dealers are free to stop selling Dentsply teeth and switch to a rival at any time. Dentsply further supports its restrictive dealing policy by arguing that it has procompetitive benefits.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: Not Reported in F.Supp.2d)**

D. Standing

Dentsply filed motions for summary judgment on standing grounds against the Hess and Kaminer plaintiffs. Dentsply's standing arguments against the Hess plaintiffs center around the Supreme Court's decision in *Illinois Brick,* [FN7] while the standing arguments against the Kaminer plaintiffs relate to the named plaintiffs' ability to maintain a class action antitrust suit.

FN7. *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

E. Statutes of Limitations

Dentsply filed motions for summary judgment on statute of limitations grounds against the Hess and Kaminer plaintiffs. The allegations against both sets of plaintiffs are essentially the same .[FN8]

FN8. Because the statute of limitations for antitrust actions in Maine and Wisconsin is six years, Dentsply does not seek summary judgment on statute of limitations grounds for claims arising under those laws. The federal antitrust laws and the antitrust laws of all other states involved here provide a limitations period of four years or less. *See* discussion *infra* Section IV.D.

Dentsply argues that the Hess and Kaminer plaintiffs' claimed injuries are derived from Dentsply's Dealer Criteria which was announced in February 1993. The Hess and Kaminer plaintiffs filed their suits in 1999, more than four years after Dentsply announced the policy. As a final, binding version of an allegedly anticompetitive policy, Dentsply argues that the suits are time-barred because they were not filed within four years after February 1993.

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION

**\*6** Plaintiffs charge that by agreeing with some dental laboratory dealers that the dealers would not carry competitive tooth lines, Dentsply willfully maintained and abused a monopoly in the United States market for prefabricated artificial teeth in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. (D.I.1, ¶ 41) Plaintiffs allege that by entering into, maintaining, and enforcing these restrictive dealing agreements, Dentsply causes a substantial lessening of competition in the relevant market in violation of § 3 of the Clayton Act, 15 U.S.C. § 14, and unreasonably restrains trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

A. Antitrust Claims

1. The Legal Standard

Plaintiffs' first cause of action is Dentsply's alleged violation of § 2 of the Sherman Act. Section 2

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: Not Reported in F.Supp.2d)

prohibits a business with monopoly power from maintaining that monopoly power through means that go beyond competition on the merits.[FN9] To prove a claim under § 2, the plaintiffs must show that 1) Dentsply has a monopoly and 2) Dentsply maintained that monopoly through anticompetitive conduct as opposed to accident or superior business acumen. *See United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966).

> FN9. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

Plaintiffs' second cause of action alleges violations of § 1 of the Sherman Act and § 3 of the Clayton Act. Section 1 of the Sherman Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Only unreasonable restraints of trade are prohibited. *See Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988). Thus, to establish a claim under § 1 the Sherman Act, plaintiffs must show that 1) there was a contract, combination, or conspiracy; 2) that unreasonably restrained trade; and 3) affected interstate commerce. *See Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.,* 185 F.3d 154, 157 (3d Cir.1999). All exclusive dealing agreements must comply with § 1 of the Sherman Act. *Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 110 (3d Cir.1992), citing *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1239 (3d Cir.1975).

Section 3 of the Clayton Act makes it unlawful for a person to sell goods on the condition, agreement, or understanding that the purchaser shall not deal in the goods of a competitor where the effects of such conditions, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 14. In order to prove a claim under § 3 of the Clayton Act, plaintiffs must prove that the probable effect of Dentsply's restrictive dealing agreements is to decrease competition. *See Standard Fashion Co. v. Magrane-Houston Co.,* 258 U.S. 346, 356 (1922). Exclusive dealing contracts are unlawful where they significantly foreclose the opportunity for rivals to enter or remain in the

market. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327-29 (1961). *See also,* Stephen F. Ross, *Principles of Antitrust Law,* 304-05 (1993). If an exclusive dealing policy "does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of [§ 1 and § 2 of the Sherman Act.]" *Tampa Electric,* 365 U.S. at 335.

2. Analysis

*7 Dentsply argues in support of its motions for summary judgment that its exclusive dealing agreements do not foreclose its rivals from reaching the end users-the dental laboratories. Dentsply points to four factors identified in the caselaw that preclude a claim of foreclosure:

• Competitors use other dealers;
• Competitors sell directly to end users;
• Competitors can pursue new dealers; and
• Dealers can switch to the defendant's competitors.

In this regard, Dentsply contends that where the record demonstrates the above factors, exclusion from the dealers of the defendant has been held not to constitute a substantial lessening of competition.

Dentsply is correct in its assertion that, in the cases it cites, no antitrust violations were found. Of the five cases cited, however, three were decided after trial on the merits. One was decided on a preliminary injunction record.[FN10] Only one was decided on a summary judgment record. *See CDC Techs. v. IDEXX Labs .,* 186 F.3d 74 (2d Cir.1999).[FN11] In that case, plaintiff CDC Technologies ("CDC") sold blood analysis machines to veterinarians. It filed suit against its competitor, IDEXX Laboratories ("IDEXX"), and alleged, among other things, unlawful restraint of trade in violation of § 3 of the Clayton Act and monopolization and conspiracy to monopolize in violation of § 1 of the Sherman Act. In particular, CDC alleged that IDEXX illegally entered into exclusive dealing arrangements with CDC's former distributors. The distributors' role with CDC had been to provide CDC with the names of veterinarians potentially interested in purchasing blood analysis machines. IDEXX, a later entrant in the market, signed up CDC's distributors to play the same role in furnishing the names of likely veterinarians. The distributors did not purchase or resell the machines; rather, they merely located prospective customers.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: Not Reported in F.Supp.2d)

Page 7

FN10. In that case, _Roland Machinery Co. v. Dresser Industries, Inc.,_ 749 F.2d 380 (7th Cir.1984), the court specifically held that, "although we have concluded that the district judge should not have granted Roland's motion for a preliminary injunction, our discussion of the probable merits of Roland's antitrust claim is tentative. We do not exclude the possibility that on the fuller record made in the trial on the merits Roland will succeed in establishing its claim." _Id._ at 395-96.

FN11. Therefore, while some general principles may be distilled from these decisions, all but one are distinguishable based upon the procedural posture of this case.

The district court granted IDEXX's motion for summary judgment, concluding that CDC could not prove that the exclusive dealing arrangements had anticompetitive effects because: 1) the role of the distributors was so limited; 2) CDC had successfully used other techniques to reach end users; and 3) the exclusive dealing arrangements were of short duration and easily terminable. _Id._ at 75. On appeal, the Second Circuit affirmed the grant of summary judgment, finding that CDC's Clayton Act claim failed on a threshold level because the Clayton Act "does not regulate an arrangement with a distributor or middleman unless it involves actual sales." _Id._ at 75-76.

Of the three remaining cases, none have facts comparable to those at bar. For instance, in _U.S. Healthcare v. Healthsource,_ 986 F.2d 589 (1st Cir.1993), the court found no antitrust violations where defendants controlled only 4% to 5% of the relevant market and the doctors who had signed the exclusivity contracts at issue were not prohibited from seeing patients from the plaintiff HMOs; the only consequence of their doing so was that the doctors would lose the pay differential for being an exclusive service provider. In the district court's opinion, such an "exclusive clause [was] simply not 'an exclusive dealing arrangement' cognizable under antitrust laws." ' _U.S. Healthcare v. Healthsource,_ 1992 U.S. Dist. LEXIS 5826 at * 26 (citing _Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,_ 663 F.Supp. 1360, 1478 (D.Kan.1987)). The appellate court affirmed.

**8** The defendant in _Ryko Mfg. Co. v. Eden Servs.,_ 823 F.2d 1215 (8th Cir.1987), had been one of

plaintiff Ryko's distributors. Under its distributor contract, Eden had an exclusive geographic territory and was prohibited from selling competitive car-wash equipment, including a water reclaim device developed by Eden. In examining the exclusive dealing provisions of the distributor contract under § 1 of the Sherman Act and § 3 of the Clayton Act, the court declared that exclusive dealing should be evaluated under an analysis "which takes into account not only the market share of the firm but the dynamic nature of the market in which the foreclosure occurs."

_Id._ at 1234. With Ryko's market share of 8% to 10%, the court concluded that Eden had not shown that the restraint had a probable adverse effect on interbrand competition.Eden has produced no evidence suggesting that Ryko's exclusive dealing provisions generally prevent Ryko's competitors from finding effective distributors for (or other means of promoting and selling) their products. Rather, Eden charges that these provisions foreclose competition by preventing Eden from marketing its own water reclaim unit. The short answer to Eden's argument is that the concern of the antitrust law is the protection of competition, not individual competitors; the law is not designed to relieve a particular business of the burden of making the difficult choice between manufacturing its own product or distributing the product of another concern.

_Id._

Finally, the court in _Omega Envtl. v. Gilbarco, Inc.,_ 127 F.3d 1157 (9th Cir.1997), concluded that Omega had not shown at trial that Gilbarco's exclusive dealing policy foreclosed competition in the market under the Clayton Act. In so concluding, the court noted that Gilbarco's policy foreclosed roughly 38% of the relevant market for sales, a "significant" foreclosure rate. Nevertheless, the court recognized under the rule of reason that other factors weighed against a finding of unreasonable restraint of trade.
First, exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern.... The record contains undisputed evidence that direct sales to end-users are an alternative channel of distribution in this market.... The record also contains undisputed evidence of potential alternative sources of distribution.
Second, the short duration and easy termination of these agreements negate substantially their potential to foreclose competition.

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: Not Reported in F.Supp.2d)

*Id.* at 1163-64.

Based upon its reading of the above caselaw, Dentsply asserts that its Dealer Criteria satisfies each of the four factors considered by courts in evaluating the competitive effects of exclusive dealing policies. First, Dentsply's competitors use different dental laboratory dealers to sell to dental laboratories. For example, Vita sells its teeth through Vident and Vident's subdealers. Second, some of Dentsply's competitors sell directly to the end users. For example, Ivoclar distributes its artificial teeth directly to dental laboratories in the United States. Third, its competitors could pursue new dealers. Dentsply claims there are 344 "dental dealers" in the United States, of which only approximately 30 are Trubyte dealers. Finally, the Trubyte dealers can switch to competing tooth lines at any time. No contract binds a Trubyte dealer to Dentsply. Dealers are free to switch to Vita, Ivoclar, or any other tooth manufacturer at any time.

**\*9** While the court agrees that the existence of alternative channels of distribution to end users lessens the likelihood that an exclusive dealing policy forecloses competition in the relevant market, Dentsply has not met its burden of showing that it is entitled to judgment as a matter of law. A genuine issue of material fact still exists as to whether selling directly to the end users is a viable option for manufacturers of artificial teeth.

Moreover, a genuine issue of material fact exists with respect to the foreclosure rate. Dentsply claims that the foreclosure rate in this case is approximately 10% because it only controls 30 of the over 300 "dental dealers." The government claims, however, that the number of available dental laboratory dealers is far less than what Dentsply claims. Dentsply relies on the figure of "dental dealers" listed in the Directory of U.S. Dental Dealers. That number, according to the government, includes "operatory" dealers. These operatory dealers sell various merchandise and equipment to dentist offices as opposed to the dental laboratories who purchase teeth. Dentsply has not convinced the court that these "operatory" dealers "have actual or potential ability to deprive existing dental laboratory dealers of significant levels of business." *Id.* at 1163, citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989).

Dentsply also argues that because its exclusive dealing policy has procompetitive benefits, plaintiffs must prove that rivals are foreclosed from the market

to maintain their claims. For example, Dentsply markets and promotes its teeth to dental laboratories, dentists, and dental students through national advertising, sales calls by its representatives, and through training and education programs. (D.I. 231 at 35) Dentsply claims that its ability to recoup its investment in these promotional efforts necessarily depends upon its ability to restrict its dealers from distributing rival tooth products. (*Id.*) Dentsply is correct that the plaintiffs have the ultimate burden of proving that the probable effect of the Dealer Criteria is to "foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric,* 365 U.S. at 327. However, even if Dentsply creates demand for its Trubyte teeth, Dentsply has not presented enough evidence to demonstrate as a matter of law that its business justifications prevent the plaintiffs from meeting their burdens.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on the merits of the antitrust action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45)

B. Standing Under Federal Antitrust Laws

1. The Legal Standard

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Although the Clayton Act provides relief to anyone injured, the Supreme Court limited the scope of injured plaintiffs in *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

**\*10** In *Illinois Brick,* the State of Illinois and 700 local government entities sought treble damages from defendant concrete block manufacturers under § 4 of the Clayton Act for an alleged price-fixing conspiracy. Plaintiffs alleged that the defendants had passed on overcharges resulting from the price-fixing conspiracy to masonry contractors who then passed on the overcharges to general contractors who then passed the overcharges to plaintiffs who purchased buildings made from concrete block. The plaintiffs, therefore, were indirect purchasers of concrete block. *Id.* at 726-27.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 9
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: Not Reported in F.Supp.2d)

The issue before the Supreme Court was whether indirect purchaser plaintiffs could use the "pass on" theory to state a damage claim against an alleged antitrust violator. Previously, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Court held that antitrust defendants could not argue that plaintiffs seeking treble damages were not injured because the plaintiffs had "passed on" the illegal overcharge to their own customers. *Id.* at 489. Maintaining consistency, the *Illinois Brick* Court held that antitrust plaintiffs could not claim an injury resulting from overcharges passed on to them through those who purchased directly from the defendant. *Illinois Brick*, 431 U .S. at 724-26, 735. The Court gave three reasons why the *Hanover Shoe* rule should apply to both plaintiffs and defendants. First, symmetry was necessary to avoid multiple liability. Without symmetry, both the brick masons and the state could sue the defendants and recover the full amount of the overcharge. *Id.* at 730. Second, the Court was concerned that judicial analysis of pass-on arguments would increase the complexity of antitrust litigation. *Id.* at 731-32. Finally, the majority argued that the private attorney general rationale underlying § 4 is best served by keeping all relief in the hands of the direct purchaser. *Id.* at 737-47. *See generally,* Ross, *supra,* at 218-19.

The Supreme Court has identified some exceptions to the indirect purchaser rule. In *Illinois Brick* itself, the Court noted that exceptions to the indirect purchaser rule would include situations where the indirect purchaser acquired goods through a preexisting cost-plus contract or "where the direct purchaser is owned or controlled by its customer." *Illinois Brick,* 431 U.S. at 736 & n. 16.

Since *Illinois Brick,* the Court has issued two notable opinions regarding antitrust standing. In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC* "), the Supreme Court synthesized its previous rulings on antitrust standing by analyzing five factors to resolve the standing issue before it. As the Third Circuit explained in *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850 (3d Cir.1996), the Supreme Court considered 1) the causal connection between the antitrust violation and the harm to the plaintiff, 2) whether the antitrust injury is "of the type that the antitrust statute was intended to forestall," 3) the directness or indirectness of the asserted injury, 4) the existence of more direct victims of the alleged violation, and 5) the potential for duplicative recovery or complex apportionment of damages. *See id.* at 850 (citing *AGC,* 459 U.S. at 537-44).

*11 In *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), plaintiffs, state attorneys general representing residential users of natural gas, sued various producers of natural gas who allegedly conspired to fix prices. The indirect purchaser plaintiffs argued that *Illinois Brick* did not apply because the concerns regarding risk of multiple recovery and difficulty in apportionment would not be implicated where the regulated utilities passed on one hundred per cent of their costs to customers. *Id.* at 208. The Court rejected the plaintiffs' theory, holding that the absence of a particular *Illinois Brick* predicate in an individual case does not change the bar against indirect purchaser suits. "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217.

In addition to *Illinois Brick* 's "control exception," several courts have recognized a "co-conspirator exception." *See, e.g., McCarthy,* 80 F.3d at 855. Under this exception, indirect buyers have standing to bring an antitrust claim against defendants who are co-conspirators in a vertical antitrust conspiracy. *Id.* at 854. The Third Circuit, however, has "refused to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants." *Id.*

## 2. Analysis

The Hess plaintiffs attack the standing issue with several theories. First, they assert that some dental laboratories are "direct" purchasers from Dentsply for purposes of *Illinois Brick* .[FN12] The Hess plaintiffs claim that when Dentsply drop ships teeth directly to a dental laboratory or when the laboratory orders teeth through the internet-based DON, the Hess plaintiffs are direct purchasers, and, thus, are entitled to pursue a damage claim under § 4 of the Clayton Act. When teeth are drop shipped or ordered through the DON, the shipment may go directly from Dentsply's York, Pennsylvania plant to the dental laboratory. According to § 2-103(d) of the Uniform Commercial Code, Dentsply is the "seller" of the goods. Section 2-106(1) defines a "sale" as "consist [ing] of the passing of title from the seller to the buyer for a price." Finally, § 2-401(2) dictates that such title passes to the buyer at the time and place for physical delivery of the goods. The Hess plaintiffs argue that since the Trubyte dealers never have physical custody of the teeth, title never passes to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
(Cite as: Not Reported in F.Supp.2d)

them. Since title passes directly from Dentsply to the dental laboratory, the Hess plaintiffs claim they are direct purchasers.

> FN12. The Hess plaintiffs' complaint specifically limits the class to "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply Dealers ...." (C.A. No. 99-255, D.I.1, ¶ 10) (emphasis added). In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs claimed that "discovery has revealed that a substantial portion of Dentsply's sales are made directly to labs." (C.A. No. 99-255, D.I. 151 at 44 n. 21) The Hess plaintiffs offered to amend the complaint to allege that some laboratories purchased teeth directly from Dentsply. (Id.)

The court rejects this theory foremost because the complaint specifically alleges that the Hess plaintiffs are not direct purchasers. The named plaintiffs do not claim to have themselves purchased teeth directly from Dentsply. The court is likewise not convinced that this creative title theory is sufficient to overcome Illinois Brick. When a dental laboratory places an order through the DON or the teeth are drop shipped, the Trubyte dealer is still involved in the transaction. The dental laboratory pays the Trubyte dealer for the teeth and the Trubyte dealer in turn pays Dentsply. Because the Trubyte dealer acts as an intermediary between the dental laboratory and Dentsply, the court finds that the Hess plaintiffs are not direct purchasers under this theory.

*12 The Hess plaintiffs next argue that even if they are indirect purchasers, they have standing because the Trubyte dealers are co-conspirators of Dentsply and, therefore, Illinois Brick does not apply. The Hess plaintiffs did not join the dental laboratory dealers as co-conspirators. Instead, the named Hess plaintiffs signed stipulations with 22 of the 26 Trubyte dealers. (C.A. No. 99-255, D.I.175) The stipulations provide that the Trubyte dealers will release Dentsply from all claims for antitrust violations in exchange for the named plaintiffs agreeing not to file suit against the Trubyte dealers. According to the Hess plaintiffs' expert, Raymond S. Hartman, that group of 22 Trubyte dealers represents approximately 95% of the gross sales of Dentsply's Trubyte tooth products. (Id., ¶ 3) The Hess plaintiffs argue that the stipulations alleviate the concerns of duplicative recovery and difficulty in apportionment.

Without addressing the merit of that claim,[FN13] the court declines to make a new exception to Illinois Brick in light of 1) the Third Circuit's "refus[al] to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants," McCarthy, 80 F.3d at 854, and 2) the Supreme Court's ruling in Utilicorp whereby the Court invoked Illinois Brick to deny indirect purchaser standing even though the same economic assumptions in Illinois Brick were not present. 497 U.S. at 217.

> FN13. The court is not convinced that the stipulations will have the purported effects of eliminating duplicative recovery or difficulty in apportionment. The stipulations are only between the named plaintiffs and the 22 individual Trubyte dealers. Even if this court were to certify the class of dental laboratory dealers, the stipulations would not bind those class members who opt out of the class.

Next, the Hess plaintiffs argue that Dentsply exerts virtual control over its Trubyte dealers and, therefore, Illinois Brick does not apply. The co-conspirator exception has been recognized in the Third Circuit when an antitrust defendant actually owns the direct purchaser. See In re Sugar Indus. Antitrust Litig., 579 F .2d 13, 18-19 (3d Cir.1978) (permitting indirect purchasers to maintain damage claims against defendant even though the plaintiffs actually purchased goods from divisions or subsidiaries of defendant). Since Dentsply does not own its authorized dental laboratory dealers, the Hess plaintiffs have failed to show that they fit within the "control exception" in its current form. The Hess plaintiffs recognize that "the Third Circuit has [not] yet extended the 'control exception' to Illinois Brick beyond the scope of the parent-subsidiary relationship." The Hess plaintiffs nevertheless invite the court to expand the law to situations in which the manufacturer's control over its dealers is sufficiently strong enough to eliminate any possibility that the dealers might sue. In the absence of Third Circuit precedent, the court declines to expand the law.

The Hess plaintiffs argue further that they have standing because they also seek non-overcharge damages arising out of Dentsply's monopolistic and other conduct. In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs indicate that if they are barred by Illinois Brick from proving overcharge damages, they

Not Reported in F.Supp.2d                                                                      Page 11
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: Not Reported in F.Supp.2d)

wish to retain the option of proving damages that, from their point of view, do not involve the difficulties of proof outlined in *Illinois Brick.* For example, the Hess plaintiffs claim that after discovery, they may be able to articulate a lost profits or other damages theory. Because the Hess plaintiffs have failed to articulate any theory of damages that would be anything other than the overcharges they incurred, the court holds that the Hess plaintiffs are barred by *Illinois Brick* from seeking money damages against Dentsply.

**\*13** The court must still decide, however, whether the Hess plaintiffs can seek injunctive relief. Section 16 of the Clayton Act provides that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. *Illinois Brick* 's indirect purchaser rule is not applicable to claims for injunctive relief. *McCarthy,* 80 F.3d at 856. In order to seek injunctive relief, the Hess plaintiffs must show 1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury. *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 400 (3d Cir.2000).

The Hess plaintiffs argue that they have been damaged in the form of over-payments for artificial teeth and will continue to be damaged as long as the conspiracy between Dentsply and its Trubyte dealers is allowed to remain in place. Dentsply argues that the Hess plaintiffs' claims for injunctive relief are essentially moot because the government's case also seeks injunctive relief. Dentsply suggests that the government can obtain the same relief for the Hess plaintiffs without tackling the procedural hurdles of Rule 23. Although Dentsply ultimately may be correct in its assertion, the court will reserve judgment on this issue until further argument on whether the interests of the Hess plaintiffs and those of the government are sufficiently identical to preclude the Hess plaintiffs from pursuing their claims for injunctive relief.

For the foregoing reasons, the court shall grant in part and deny in part Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99-255, D.I.133) The motion is granted to the extent that the Hess plaintiffs seek damages. The motion is denied to the extent that they seek injunctive relief.

### C. Standing Under State Antitrust Laws

#### 1. The Legal Standard

Several states have enacted statutes known as *Illinois Brick* repealers. These statutes provide that indirect purchasers may recover damages for violations of state antitrust laws where overcharges were passed on to them by direct purchasers. In *California v. ARC America Corp.,* 490 U.S. 93 (1989), the Supreme Court upheld the legality of such statutes.

Although the state laws involved here do not follow the indirect purchaser rule, most of them nevertheless look to cases construing the federal antitrust laws for guidance in interpreting their statutes.[FN14] Thus, the court will look to federal antitrust cases to determine the general standing requirements under the state antitrust laws.

> FN14. *See* D.C.Code Ann. § 28-4515 (1981); Fla. Stat. Ann. § 501.204(2) (West 1997 & Supp.1998); Mich. Comp. Laws Ann. § 445.784(2) (West 1989); N.M. Stat. Ann. § 57-1-15 (Michie 1995); S.D. Codified Laws § 37-1-22 (Michie 1994); W. Va.Code § 47-18-16 (1995); *Marshall v. Planz,* 13 F.Supp.2d 1231, 1246 (M.D.Ala.1998); *Vinci v. Waste Mgmt., Inc.,* 43 Cal.Rptr.2d 337, 338 n. 1 (Cal.Ct.App., 1st Dist.1995); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.,* 875 F.Supp. 8, 14 (D.Me.1994); *Keeting v. Philip Morris, Inc.,* 417 N.W.2d 132, 136 (Minn Ct.App.1987); *NAACP v. Claiborne Hardware Co.,* 393 So.2d 1290, 1301 (Miss.1980), *rev'd on other grounds,* 458 U.S. 886 (1982); *Chow v. Union Central Life Ins. Co,* 457 F.Supp. 1303, 1308 (E.D.N.Y.1978); *Rose v. Vulcan Materials Co.,* 194 S.E.2d 521, 530 (N.C.1973); *State ex rel. Leech v. Levi Straus & Co.,* 1980 WL 4696 at \*2 n. 2 (Tenn. Ch. Ct.1980); *Grams v. Boss,* 294 N.W.2d 473 (Wis.1980). It is not clear whether Kansas and North Dakota use the federal antitrust laws for guidance in interpreting their own antitrust statutes.

#### 2. Analysis

The Kaminer plaintiffs maintain they have standing to seek damages under the antitrust laws of sixteen states and the District of Columbia. Dentsply attacks their standing on several grounds. First, Dentsply argues that the Kaminer plaintiffs suffered no injury under the antitrust statutes of the fifteen states other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: Not Reported in F.Supp.2d)

than New York and the District of Columbia. Since the Kaminer plaintiffs are New York residents who purchased dentures from a New York dentist in New York, the Kaminer plaintiffs suffered no antitrust injury in, for example, Minnesota. The Kaminer plaintiffs maintain that they only need individual standing to assert the claims of the absent class members. If the court certifies the class of indirect purchasers from the various states, the Kaminer plaintiffs contend that they will be a representative member of that class. The Kaminer plaintiffs argue that Dentsply's argument on this point is more appropriately made in opposition to class certification, not individual standing. The court agrees.

*14 Dentsply next argues that the Kaminer plaintiffs do not have standing because they did not participate in the relevant market. The Kaminer plaintiffs' complaint defines the relevant product market as "the sale of prefabricated artificial teeth in the United States." (C.A. No. 99-854, D.I.1, ¶ 10) The Kaminer plaintiffs purchased dentures rather than prefabricated artificial teeth. Dentsply contends that only about 6% of the price that dentists charge for dentures is attributable to the raw materials of the dentures, including the artificial teeth. (C.A. No. 99-854, D.I. 52 at 4) Despite the lack of complete identity between dentures and prefabricated artificial teeth, the court finds a sufficient nexus on the record presented between the Kaminer plaintiffs' purchases and the relevant product market. At this stage of the proceedings, the Kaminer plaintiffs are participants in the artificial tooth market because they arguably are unable to fill their need for dentures without becoming indirect purchasers of prefabricated artificial teeth.

Dentsply argues that the Kaminer plaintiffs' alleged injury is too remote and speculative to confer upon them antitrust standing. While the *Illinois Brick* repealers allow indirect purchasers to recover for their antitrust injuries, Dentsply argues that they do not confer automatic standing upon indirect purchasers. Instead, Dentsply asserts that the court should apply the *AGC* factors in determining standing under the state indirect purchaser statutes. The Kaminer plaintiffs argue that the purpose of the *AGC* factors is to guide the court's exercise of judgment in deciding standing in the absence of explicit statutory directives. The Kaminer plaintiffs contend that the states have issued an explicit legislative conferral of standing on indirect purchasers.

The Supreme Court in *Illinois Brick* discussed what

class of persons could sue for treble damages in an antitrust action and concluded that only direct purchasers could sue. In *AGC,* however, the Court discussed the "conceptually more difficult question of 'which persons have sustained injuries too remote from an antitrust violation to give him standing to sue for damages." ' *Merican Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 964 (3d Cir.1983). Thus, although the various states may have "repealed" *Illinois Brick* under their state schemes, that alone does not mean that they rejected the requirement that a plaintiff demonstrate injury sufficient to confer individual standing. *See, e.g., Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc.,* 1998 U.S. Dist. LEXIS 8302, *17 n. 2, 27 (N.D.Cal.1998)(stating that although *Illinois Brick* does not apply to California antitrust statute, plaintiff must still allege a direct injury to sustain a claim).

In this regard, Dentsply argues that the Kaminer plaintiffs' theory requires proof that 1) Dentsply's Dealer Criteria and its other alleged anticompetitive behavior excluded competitive artificial tooth manufacturers from the market and limited competition in the sale of artificial teeth to dental laboratories; 2) the limited competition enabled Dentsply to exact monopoly profits from dental laboratory dealers; 3) Dentsply in fact charged supracompetitive prices for teeth; 4) all dealers, in turn, increased the prices they charged to dental laboratories; 5) when dental laboratories used Dentsply teeth in a denture, they increased the price that they charged the dentists for the denture and the price increase was attributable to the higher cost of the teeth; and 6) when the dentist sold the denature to the plaintiffs, all dentists independently chose to increase the price that they charged for the dentures.

*15 Regardless of whether Dentsply is correct in its analysis of plaintiffs' burden of proof, the court concludes that there are genuine issues of material fact relating to the Kaminer plaintiffs' antitrust injury that preclude the entry of summary judgment in favor of Dentsply as a matter of law under *AGC.*

As its final argument, Dentsply contends that New York law prohibits the Kaminer plaintiffs from maintaining their state law claims as a class action. When the Kaminer plaintiffs filed their complaint, they sought to maintain their various state claims, including New York's Donnelly Act, as a class action pursuant to Section 901(b) of the New York Civil Practice Law. Section 901(b) provides:
Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes

Not Reported in F.Supp.2d                                                                  Page 13
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: Not Reported in F.Supp.2d)**

the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action.

New York State case law characterizes the Donnelly Act's treble damages remedy as penal. *See, e.g., Rubin v. Nine West Group, Inc.,* 1999 N.Y. Misc. LEXIS 655, (Sup.Ct.N.Y.Co.1999). *See also, In re Microsoft Antitrust Litig.,* 127 F.Supp.2d 702, 727 (D.Md.2001) (dismissing antitrust class action claims under New York law because class actions cannot be maintained if the remedy is penal).

The Kaminer plaintiffs argue that since Dentsply removed this case to federal court, Fed.R.Civ.P. 23 governs this action rather than N.Y. C.P.L.R. § 901(b). The court must determine which law to apply.

The Third Circuit has recently reiterated the steps of analysis in choosing between a substantive state law and a potentially conflicting federal procedural rule. *See Chamberlain v. Giampapa,* 210 F.3d 154, 158-59 (3d Cir.2000). A federal court sitting in diversity must apply state substantive law and federal procedural law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). This substantive/procedural dichotomy of the *"Erie* rule" must be applied with the objective that "in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109 (1945). This focus on whether application of a state rule will or may affect the outcome is intended to serve "twin aims": "discouragement of forum shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U .S. 460, 468 (1965). Erie and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

**\*16** *Id.* at 468 n. 9.

The Supreme Court has added two caveats to these *Erie* principles. First, even though application of the state rule may hold some potential for affecting the outcome, a strong countervailing federal interest will dictate recourse to the federal rule. *Byrd v. Blue Ridge Rural Electric Coop, Inc.,* 356 U.S. 525 (1958). Second, the *Erie* rule may not be "invoked to void a Federal Rule" of Civil Procedure. *Hanna,* 380 U.S. at 470. Where a Federal Rule of Civil Procedure provides a resolution of an issue, that rule must be applied by a federal court sitting in diversity to the exclusion of a conflicting state rule so long as the federal rule is authorized by the Rules Enabling Act and consistent with the Constitution. *Id.*

Under *Hanna,* a federal court sitting in diversity first must determine whether a Federal Rule directly "collides" with the state law it is being urged to apply. *See id.* at 470-74. If there is such a direct conflict, the Federal Rule must be applied if it is constitutional and within the scope of the Rules Enabling Act. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 n. 7 (1996). If a "direct collision" does not exist, then the court applies the Erie rule to determine if state law should be applied. *Hanna,* 380 U.S. at 470.

The court finds no conflict between Fed.R.Civ.P. 23 and N.Y. C .P.L.R. § 901(b). Rule 23 of the Federal Rules of Civil Procedure governs the manner of determining whether class certification is appropriate in federal courts; § 901(b) establishes a bar to certain claims being considered for class action treatment on a threshold level. Given that Rule 23 and § 901(b) coexist without conflict, the court shall consider traditional *Erie* principles to determine which rule applies.

In order to ensure that the outcome of the litigation at bar will be substantially the same, "so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court," *Guaranty Trust,* 326 U.S. at 109, the court shall apply N.Y. C.P.L.R. § 901(b), which precludes these New York State residents from maintaining a class action under the Donnelly Act.

For the foregoing reasons, the court shall grant Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99-854, D .I. 51)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases  P 73,247
**(Cite as: Not Reported in F.Supp.2d)**

### D. Statute of Limitations

#### 1. The Legal Standard

Claims for monetary and injunctive relief under the Clayton Act are governed by a four-year statute of limitations. 15 U.S.C. § 15b; *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 815 F.2d 270, 277-78 (3d Cir.1987)(assuming that four-year limitation period in § 15b applies to injunctive relief). When the government files suit seeking to enforce the federal antitrust laws, however, the statute of limitations for private rights of action is tolled while the government's suit is pending and for one year afterwards. 15 U.S.C. § 16(i). The government filed its antitrust action against Dentsply on January 7, 1999. Thus, in order for the Hess plaintiffs' claims under the federal antitrust statutes to be timely, their causes of action must have accrued after January 7, 1995.

*17 Ten of the state laws at issue also follow the four-year statute of limitations.[FN15] Five states have a limitations period shorter than four years.[FN16] Maine and Wisconsin have six-year statutes of limitations. [FN17] Although the Hess and Kaminer plaintiffs have different theories as to why their claims are timely, the underlying factual inquiries are the same.

FN15. Cal. Bus. & Prof.Code § 16750.1 (West 1997); D.C.Code Ann. § 28-4511(b)(1981); Mich. Comp. Laws Ann. § 445.781(1) (West 1997); Minn.Stat. Ann. § 325D.64 (West 1997); N.M. Stat. Ann. § 57-1-12 (Michie 1995); N.Y. Gen. Bus. Laws § 340(5)(McKinney 1997); N.C. Stat. Ann. § 75-16.2 (1996); N.D. Cent.Code § 51-08.1-10 (1997); S.D. Codified Laws Ann. § 37-1-14.4 (1994); W. Va.Code Ann. § 47-18-11 (1997).

FN16. Kan. Stat. Ann. § 60-512 (1997)(three years); Miss.Code. Ann. § 15-1-49 (1991)(three years); Ala.Code § 6-2-38(1)(two years); *State ex rel. Leech v. Levi Straus & Co.,* 1980 WL 4696 at *1 (Tenn. Ch. Ct.1980)(stating that antitrust actions in Tennessee are subject to the three-year statute of limitations in Tenn.Code. Ann. § 28-305); Fla. Stat. Ann. § 501.204(2) (stating that Florida's Deceptive and Unfair Trade Practices Act is to be construed in light of federal precedent interpreting the

Federal Trade Commission Act which has a three-year limitations period under 15 U.S.C. § 57b).

FN17. Wis. Stat. Ann. § 133.18 (West 1997); Me.Rev.Stat. Ann. tit. 14 § 752 (West 1980). Dentsply concedes that the Kaminer plaintiffs' claims under Wisconsin and Maine law are timely because the statutes of limitations encompass the time that Dentsply announced its Dealer Criteria for the first time.

#### 2. Analysis

Dentsply argues that the Hess and Kaminer plaintiffs' claims are barred because neither of the plaintiff groups alleges an overt act by Dentsply during the limitations period. Dentsply admits that it issued its Dealer Criteria in February 1993 and has enforced the policy since that time. The issue for the court is whether the statute of limitations starts anew each time Dentsply enforces its Dealer Criteria or whether the enactment of the Dealer Criteria was a final act in itself.

Generally a cause of action accrues when the defendant 1) commits an act that 2) injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). In the context of a continuing conspiracy to violate the antitrust laws, this is understood to mean that each time the plaintiff is injured by an act of the defendant, a cause of action accrues to him. *Id.*

The Hess and Kaminer plaintiffs urge the court to apply the continuing violations rule to the various statutes of limitations. They allege that the overt acts could include charging monopolistic prices or enforcing the Dealer Criteria. The injuries they allege include having a lack of choice in the market and paying supracompetitive prices for prefabricated artificial teeth or dentures.

The court finds that the continuing violations rule should apply to the facts at bar and that the single event of Dentsply's announcing its Dealer Criteria does not constitute the sole overt act permissibly alleged in this litigation. The court further finds, however, that the overt act alleged by a plaintiff must be causally related to the plaintiff's claimed injury. *See In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1163 (3d Cir.1993). Under this standard, there are genuine issues of material fact as to the application of the statutes of limitations to the

Not Reported in F.Supp.2d                                                                                                Page 15
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: Not Reported in F.Supp.2d)

various plaintiffs.[FN18]

> FN18. A jury, for instance, could find that by terminating a particular dealer or forcing a dealer to give up a competitive tooth line, Dentsply committed an overt act that caused the Hess or Kaminer plaintiffs to pay higher prices or face a limited selection during the limitations period. The court notes that since the Hess plaintiffs are now only seeking injunctive relief, they only need to allege a threatened loss or injury. *Warfarin,* 214 F.3d at 400. On the other hand, if the Kaminer plaintiffs were allowed to pursue their claims, each such plaintiff would have to show that he purchased dentures sometime after January 7, 1995.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on statute of limitations grounds. (C.A. No. 99-255, D.I. 135; C.A. No. 99-854, D.I. 48)

## V. CONCLUSION

For the foregoing reasons, the court denies Dentsply's motions for summary judgment on the merits of the antitrust causes of action. The court grants Dentsply's motion for summary judgment against the Hess plaintiffs on standing grounds to the extent that the Hess plaintiffs seek money damages. The court denies that motion to the extent that the Hess plaintiffs seek injunctive relief. The court grants Dentsply's motion for summary judgment against the Kaminer plaintiffs on standing grounds. The court denies Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs on statute of limitations grounds. An appropriate order shall issue.

D.Del.,2001.
U.S. v. Dentsply Intern., Inc.
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

Briefs and Other Related Documents (Back to top)

• 2006 WL 1205325 (Trial Motion, Memorandum and Affidavit) United States' Brief in Support of its Renewed Motion to Enter Final Judgment (Mar. 21, 2006) Original Image of this Document (PDF)
• 2004 WL 4908445 (Trial Motion, Memorandum and Affidavit) Renewed Motion for Entry of Final Judgment (Mar. 21, 2004) Original Image of this

Document (PDF)
• 1:99cv00255 (Docket) (Apr. 21, 1999)
• 1:99cv00005 (Docket) (Jan. 05, 1999)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

38

Not Reported in F.Supp.2d                                                           Page 1
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

<u>Briefs and Other Related Documents</u>
Villager Franchise Systems, Inc. v. Dhami, Dhami &
VirkE.D.Cal.,2006.Only the Westlaw citation is
currently available.
United States District Court,E.D. California.
VILLAGER FRANCHISE SYSTEMS, INC.,
Plaintiff and Counter-Defendant,
v.
DHAMI, DHAMI & VIRK, a general partnership,
Maluk Dhami, an individual, and Kuldip S. Dhami,
an individual, Defendants and Counter-Claimants.
**No. CVF046393RECSMS.**

Jan. 26, 2006.

<u>Sabrina Layne Youdim</u>, Jenkens and Gilchrist LLP,
Los Angeles, CA, for Plaintiff.
<u>Henry O. Boaten</u>, Law Office of Henry O Beaten,
Topeka, CA, for Defendant.

ORDER GRANTING IN PART AND DENYING IN
PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT OR ALTERNATIVELY FOR
PARTIAL SUMMARY JUDGMENT AND
DIRECTING PLAINTIFF TO SUBMIT
ADDITIONAL BRIEFING AND DECLARATIONS
REGARDING ATTORNEY FEES AND
INTEREST.
<u>COYLE</u>, J.

(Doc. 21)

**\*1** On December 5, 2005, the Court heard Plaintiff's
Motion for Summary Judgment or Alternatively For
Partial Summary Judgment (the "Motion"). Upon due
consideration of the written and oral arguments of the
parties and the record herein, the Court GRANTS the
Motion in part and DENIES it in part as set forth
herein.


I. Factual Background

Defendant Dhami, Dhami & Virk ("DDV") operated
a 100-room guest lodging facility (the "Facility") in
Turlock, California. DDV is a partnership consisting
of three general partners: Malvinder Virk, who is not
a party to this action, Defendant Kuldip S. Dhami
("Kuldip Dhami" or "Kuldip"), and Defendant Maluk
S. Dhami ("Maluk Dhami" or "Maluk"). Maluk

Dhami Dep. at 22:4-5.

On July 14, 2000, Plaintiff Villager Franchise
Systems ("Plaintiff") entered a franchise agreement
(the "Franchise Agreement" or the "Agreement")
with DDV. Maluk Dhami signed the Agreement on
behalf of DDV. The Agreement features a blank
labeled "Kuldip Dhami" that contains a signature.
The parties dispute whether Kuldip signed the
Agreement.

The Agreement contained terms obligating the
franchisee to operate a Villager guest lodging facility
for a 15-year term. The Agreement required the
franchisee to pay certain recurring fees. It also
required the franchisee to maintain financial records
and make them available to Plaintiff. The franchisee
also was obligated to operate the Facility according
to System Standards that Plaintiff had established.

Along with the Franchise Agreement, DDV, Maluk
Dhami, and Kuldip Dhami (collectively
"Defendants") executed an Initial Fee Note
obligating them to pay $5,500 by April 2, 2001.
Defendants also executed a document guaranteeing
DDV's obligations under the Franchise Agreement.

On February 14, 2001, Defendants collectively made
a promissory note in the amount of $40,000. It
extended Defendants $40,000 in credit and required
them to repay Plaintiff $1,180.96 per month for 36
months.

Defendants failed to pay the recurring fees due under
the Agreement. They also failed to perform other
duties that the Agreement required. Defendants did
not repay the Initial Fee Note or the Promissory Note.
Defendants claim that "certain developments have
caused defendants to lose possession of the
[P]roperty" at some point. Opp'n at 5.

Plaintiff sent a Notice of Default to Defendants on
October 9, 2002. On December 16, Plaintiff sent
Defendants a Notice of Termination of the Franchise
Agreement. Some of the communications that
Plaintiff sent to the Facility were signed for by third
parties.

Following the termination of the Agreement,
Defendants did not de-identify the Facility as a
Villager franchise and continued to use the Villager
name in conjunction with the operation of the
Facility. Defendants claim that they were unaware

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                            Page 2
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

that Villager signs were displayed at the Facility.

Plaintiff has the exclusive right to sublicense various trade names and service marks, logos, and derivations thereof (collectively the "Villager Marks"). Plaintiff also has the right to license the Villager System, which consists of certain services for hotel patrons and services for franchisees. Through substantial effort and the expenditure of millions of dollars, Plaintiff has developed goodwill in the Villager Marks. Consumers throughout the United States recognize Villager Marks as designating the origin of Plaintiff's lodging services. The parties do not dispute that the Villager Marks are famous in the United States and that the value of Plaintiff's goodwill is substantial.

## II. Procedural History

**\*2** On October 12, 2004, Plaintiff filed this action. Its complaint features five causes of action: Breach of Contract, Breach of Promissory Note, Unjust Enrichment, Breach of Guaranty, and Lanham Act Violations. Plaintiff filed this motion (the "Motion"), along with supporting declarations and exhibits and a statement of undisputed material facts ("UMF"), on September 19, 2005. Defendants' opposition to the motion was due October 3, 2005. On October 6, 2005, Plaintiff filed a Notice of Non-Receipt of Opposition to Motion for Summary Judgment. On October 7, 2005, Defendants filed a response to Plaintiff's UMF. Also on October 7, 2005, the Court continued the hearing on the Motion from October 17, 2005, to December 5, 2005. On October 11, 2005, Defendants filed their own "Statement of Undisputed Facts" ("Defendants' UMF"). On October 12, 2005, Defendants filed a memorandum of points and authorities in opposition to Plaintiff's Motion. On November 28, 2005, Plaintiff filed a reply brief and evidentiary objections.

## III. Discussion

### A. Legal Standard

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

*Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Materiality is determined by the substantive law governing a claim or a defense. *Id.* The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party. *Id.*

The initial burden in a motion for summary judgment is on the moving party. The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to defeat summary judgment. *T.W. Elec.*, 809 F.2d at 630.

The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *T.W. Elec.*, 809 F.2d at 630 (citing Fed.R.Civ.P. 56(e)). The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id.* (citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

A plaintiff who is the moving party must set forth admissible evidence on all matters as to which he or she bears the burden of proof. *Zands v. Nelson*, 797 F.Supp. 805, 808 (S.D.Cal.1992). The showing by a moving party that bears the burden of proof " 'must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." ' *Calderone v. United States*, 799 F.2d 254, 258-59 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under The Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).

### B. Failure to Respond to Requests for Admission

**\*3** Plaintiff contends that Defendants' failure to respond to its Requests for Admission ("RFAs") results in admission of the matters requested. "Failure to timely respond to requests for admissions results in automatic admission of the matters requested." *FTC v. Medicor, LLC*, 217 F.Supp.2d 1048, 1053 (C.D.Cal.2002); *see* Fed. R. Civ. P. 36(a). Unanswered RFAs are automatically admitted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

without a motion because Federal Rule of Civil Procedure 36(a) is self executing. *Medicor,* 217 F. Supp.2d at 1053; Fed. R. Civ. P. 36(a). Default admissions under Rule 36 can "serve as the factual predicate for summary judgment." *United States v. Kasuboski,* 834 F.2d 1345, 1350 (7th Cir.1987). Under Rule 36(b), matters admitted, by default or otherwise, are "conclusively established." Fed.R.Civ.P. 36(b); *Kasuboski,* 834 F.2d at 1350. The trial court has discretion to interpret the scope of the admission. *Johnson v. DeSoto County Bd. of Comm'rs,* 204 F.3d 1335, 1339-40 (11th Cir.2000).

The defaulting party cannot attack issues of fact established in admissions with affidavits or depositions in opposition to a motion for summary judgment. *Kasuboski,* 834 F.2d 1345 at 1350. This rule is based on sound policy considerations. *Id.* The binding effect of Rule 36 "allows parties to narrow the issues to be resolved at trial by effectively identifying and eliminating those matters on which the parties agree." *Id.*

Defendants' responses to Plaintiff's RFAs were due July 11, 2005. Shadi Decl. at ¶ 2. Plaintiff had not received any response as of September 19, 2005. *Id.* Defendants' opposition does not claim that they have responded to the RFAs, or dispute that the matters requested are automatically admitted. The Court deems the RFAs admitted. Therefore, the contents of the RFAs are conclusively established.

### C. First Cause of Action: Breach of Contract

Plaintiff claims it is entitled to summary judgement on its breach of contract claim because Defendants' breached the Franchise Agreement as a matter of law. California contract law entitles a franchisor to recover under a contract theory if the franchisee breaches the franchise contract. *Postal Instant Press, Inc. v. Sealy,* 43 Cal.App.4th 1704, 1710, 51 Cal.Rptr.2d 365 (1996).

### 1. Formation

Plaintiff contends that, on July 14, 2000, Defendants entered the Franchise Agreement. *See* Cox Decl. Ex. A. The Agreement obligated Defendants to operate a Villager guest lodging facility for a 15-year term. *Id.* at 8, 51 Cal.Rptr.2d 365.

Defendants argue that there is a genuine issue as to whether they are bound by the Agreement.

Defendants admit that Maluk Dhami signed the Agreement, but deny that the other partners of DDV also signed. Opp'n at 4. Defendants support this contention by claiming that Kuldip Dhami "denies signing any of plaintiff's documents." Opp'n at 2. Kuldip denies that the signature that appears on the Guaranty above his printed name is his own. *See* Kuldip Dhami Dep. at 16:19-17:7. Kuldip states in his deposition, however, that he signed the Initial Fee Note. *Id.* at 17:8-15, 51 Cal.Rptr.2d 365; *see* Cox Decl. Ex. C. Defendants do not present evidence other than the self-interested deposition testimony to support their claim that they did not enter the Agreement. Moreover, Defendants provide no explanation of how the absence of Kuldip's signature could affect their liability under the contract.

*\*4* In any event, these assertions are insufficient to create a genuine issue as to contract formation. Defendants concede that "it is clear from the evidence that Maluk Dhami signed a franchise agreement with [Plaintiff]." Opp'n at 4. Defendants do not contend that Maluk lacked the authority to bind DDV. In fact, Defendants admit that "[o]n July 14, 2000, VFS entered into a franchise (the 'Franchise Agreement') with Dhami, Dhami & Virk ('DDV') for the operation of" the Facility. Pl.'s UMF No. 8; Defs.' Resp. to UMF No. 8. These two admissions establish that Maluk bound the partnership when he signed the agreement. *See* *Tsakos Shipping & Trading, S .A. v. Juniper Garden Town Homes, Ltd.,* 12 Cal.App.4th 74, 91, 15 Cal.Rptr.2d 585 (1993) (partner acting within his authority may bind the partnership).

Defendants also claim that Al Mendoza, a representative of Plaintiff, said that physical defects of the Facility would prevent its acquiring franchise status.[FN1] Maluk Dhami Dep. at 62:21-63:15. Defendants apparently ask the Court to infer from this statement that the parties did not eventually enter the Franchise Agreement. Even taken as true, this evidence does not create an issue as to whether the Agreement was eventually formed. Plaintiff's alleged preference that Defendants first improve the Facility does not indicate that the parties did not ultimately form a contract when they signed the Agreement. Defendants have not created a genuine issue as to whether the parties formed a franchise contract.

FN1. Plaintiff objects that this testimony is excludable on a hearsay ground. Because this evidence does not create a genuine issue as to a material fact, the Court need not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

decide its admissibility.

Defendants argue against the existence of a contract by claiming that "[t]he franchise agreement was never implemented or performed between the contracting parties." Defs.' Resp. to UMF No. 17. Defendants do not point to any of Plaintiff's obligations under the Franchise Agreement that it did not perform. In fact, Defendants concede that Plaintiff "proceeded to fulfill some of its obligations under the contract with third parties who were not authorized and not known to defendants." Opp'n at 2. Defendants' conclusory claim that Plaintiff failed to perform under the contract does not create an issue as to whether the parties formed a contract.

### 2. Defendants' Breach

Section 11.2 of the Franchise Agreement allows Plaintiff to terminate the Agreement for a variety of reasons, including Defendants' failure to cure a default for nonpayment or other breach the Agreement, loss of possession of the Facility, or receipt of two or more notices of default in a one year period, regardless of whether the defaults were cured. Cox Decl. Ex. A at 12. Upon termination, Plaintiff is entitled to seek liquidated damages pursuant to section 12.1 of the Agreement. *Id.* at 12-13, 15 Cal.Rptr.2d 585.

Pursuant to the Agreement, Defendants undertook a variety of obligations. Plaintiff claims that Defendants breached the Agreement in several respects. The Agreement required Defendants to pay certain recurring fees.[FN2] *Id.* at 9, 37, 15 Cal.Rptr.2d 585. Plaintiff claims, and Defendants admit, that Defendants failed to pay certain of the recurring fees that it owed under the Agreement. RFA to DDV, Maluk Dhami, and Kuldip Dhami (collectively "RFA to Defs.")[FN3] No. 2; Cox Decl. Ex. H. Plaintiff argues that Defendants failed to maintain financial records as required under Section 3.8.1 of the Agreement. *Id.* at 4, 15 Cal.Rptr.2d 585. Plaintiff also claims that Defendants breached the Agreement by failing to operate the Facility according to Plaintiff's System Standards, failing to modify the Facility as required, failing to report the Facility's revenues to Plaintiff, failing to provide Plaintiff proof of insurance coverage, and transferring ownership of the Facility without notifying Plaintiff.

FN2. The recurring fees, detailed in section 7 and Schedule C of the Agreement,

included royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees. *See* Cox Decl. Ex. A at 9, 37.

FN3. The requests for admissions sent to these three entities appear to be identical. *See* Shadi Decl. Ex. A. None of the parties responded to the requests. Shadi Decl. at ¶ 2.

*5 Defendants claim that they did not breach the Agreement because they lost possession of the Facility. They allege that Plaintiff has not shown that "defendants did perform[ ] under the contract and caused those defaults." Opp'n at 5. Defendants contend that they are not responsible for "breach and default of third parties" unless Plaintiff can show that Defendants authorized or "aided and abett[ed]" the third party actions. *Id.* Defendants claim in support that mail sent to Defendants was signed for by third parties. Defendants also claim that Plaintiff "was dealing with Gary Baron" because he was "listed as partner" on a Quality Assurance and Trademark Evaluation Report. Opp'n at 5; Opp'n Ex. 10. The report lists "GARY BARON" with a title of "PARTNER" as the individual who should sign the report to acknowledge its receipt. Opp'n Ex. 10.

Defendants do not indicate a sound legal basis on which Plaintiff's reference that incorrectly attributes partnership to a third party creates an issue as to whether Defendants breached the Agreement. Defendants claim that Plaintiff's dealings with third parties indicate that it "made a unilateral mistake as to the parties they were dealing with during the performance stage of the agreement." Opp'n at 5. Defendants then cite *Morta v. Korea Ins. Corp.,* 840 F.2d 1452 (9th Cir.1988), for the proposition that a party may not benefit from its unilateral mistake. In *Morta,* the court enforced a contract against a party who failed to read an important part of the document before signing it. *Id.* at 1457-58. This holding does not support Defendants' claim that their liability is ameliorated by Plaintiff's contact with third parties.

The Agreement seems to explicitly preclude arguments like Defendants' that a third party assumed responsibility for the franchise obligations after the transfer of the Facility. Section 9.5 of the Agreement states that, following unauthorized transfer of the Facility, "[y]ou will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

System identification is removed from the Facility." Cox Decl. Ex. A at 11. By the terms of the Agreement, Defendants' liability transcends their possession of the Facility.

Defendants have not contended, on a novation theory for instance, that Plaintiff intended to relieve Defendants of liability under the contract and to look only to a third party for performance. *See Paykar Constr., Inc. v. Spilat Construction Corp.,* 92 Cal.App.4th 488, 494, 111 Cal.Rptr.2d 863 (2001) (no novation where parties lacked an intent to extinguish previous obligation). A reasonable factfinder could not imply an intent to release the Defendants of liability because of a passing reference to a third party in a Quality Assurance report. To the extent Plaintiff can establish that Defendants had obligations under the Franchise Agreement, the failure to meet those obligations establishes that the Defendants, not someone else, are responsible for the breach.

**\*6** Defendants' alleged nonreceipt of communications from Plaintiff also does not mitigate their liability on a contract theory. For the reasons above, this argument does not create a genuine issue by implying that someone other than Defendants is responsible for meeting Defendants' contract obligations.[FN4]

> FN4. Nor does evidence that Defendants did not receive the communications create an issue as to whether Plaintiff properly terminated the contract. Defendants do not enunciate such an argument. In any event, sections 11.1 and 11.2 of the Franchise Agreement allow Plaintiff to inform Defendants of default and to terminate the franchise relationship by "written notice." Cox Decl. Ex. A at 12. Plaintiff points out that, the Agreement, section 17.3, provides, "Notices will be effective if in writing and delivered ... to the appropriate party at its address stated below or as may be otherwise designated by notice." *Id.* at 18. Section 17.3 lists the address of the Facility for delivery of notices. *Id.* Plaintiff attaches Notices of Default it claims it sent to the Facility on December 28, 2001, April 5, 2002, July 25, 2002, and October 9, 2002. See Cox Decl. ¶ ¶ 17-20, Ex. E, F, G, H. Defendants do not contend that Plaintiff failed to deliver the notices to the designated address. Defendants admitted that they received a default notice, a termination notice, and

cease and desist letters from Plaintiff. RFAs to Defs. Nos. 1, 3, 4, 5.

In any event, Defendants' breaches of the Franchise Agreement are "conclusively established" by their failure to respond to the RFAs. Fed.R.Civ.P. 36(b). One of the RFAs that Plaintiff propounded states, "Admit that YOU have failed to make any payment or perform or cause Dhami, Dhami & Virk to perform each obligation required under the Franchise Agreement." RFA to Defs. No 11. Defendants' failure to answer this request operates to conclusively establish that they breached "each obligation" that the Agreement requires of them. While this may seem to be a harsh result, the important policy interests in using RFAs to expedite litigation and narrow the issues in dispute justifies this treatment of failure to respond. *See Kasuboski,* 834 F.2d at 1350 (upholding grant of summary judgment for plaintiff based on defendants' default admissions for failure to respond to RFAs, despite defendants' attempt to refute admissions with other evidence). No genuine issue exists as to whether Defendants breached the Franchise Agreement.

Accordingly, Plaintiff's motion for summary judgment on this cause of action is GRANTED.

### D. Second Cause of Action: Breach of Notes

Plaintiff seeks to recover amounts due under the Initial Fee Note and the Promissory Note. Plaintiff claims the Initial Fee Note obligated Defendants to pay $5,500 by April 2, 2001. *See* Cox Decl. Ex. C. The Initial Fee Note bears simple interest at a rate equal to the lesser of 18 percent per annum or the highest rate allowed by law. *Id.* Defendants did not dispute Plaintiff's UMF that stated, "In connection with entering into the Franchise Agreement, the Defendants also co-made an Initial Fee Note in the amount of $5,500 (the 'Note')." Pl.'s UMF No. 10; Defs.' Resp. to UMF No. 10. Despite Defendants' denials that Kuldip Dhami signed any of the Franchise documents, he has admitted that he signed the Initial Fee Note. *Id.* at 17:8-15; *see* Cox Decl. Ex. C. Defendants admit that they did not pay the amount due under the Initial Fee Note prior to its due date. RFA to Defs. No. 6. Defendants do not contend that they have ever made such a payment. Accordingly, Plaintiff is entitled to recover the amount due under the Initial Fee Note as a matter of law.

Under the terms of the Promissory Note, Plaintiff extended Defendants a $40,000 line of credit. *See*

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Cox Decl. Ex. D. The Promissory Note purportedly requires Defendants to repay Plaintiff $1,180.96 per month for 36 months. *Id.* at 1. Defendants admit that they "co-made a promissory note in the amount of $40,000 (the 'Promissory Note')." Pl.'s UMF No. 11; Defs.' Resp. to UMF No. 11. Defendants failed to make the monthly payments required under the Promissory Note. RFA to Defs. No. 7. Defendants do not contend that they have made any payments on the Promissory Note.

**\*7** Defendants claim that Plaintiff has failed to present evidence that DDV and the other Defendants executed these agreements. Defendants concede that Maluk Dhami signed the promissory note. Opp'n at 2. Defendants do not contend that Maluk lacked the authority to bind the DDV partnership to the terms of the promissory note. Rather, its admission that Defendants "co-made" the promissory note establishes that Maluk's signature bound DDV. Pl.'s UMF No. 11. Defendants further assert that Plaintiff must show that Defendants, not someone else, actually made, consented to, or authorized purchases with the credit Plaintiff extended them. Defendants do not cite any provision of the Agreement that predicates liability under the contract on the manner in which the payments were spent. Defendants do not deny that Plaintiff extended them the credit. There exists no genuine issue as to whether Defendants are liable under the Promissory Note.

Accordingly, summary judgment for Plaintiff on this cause of action is GRANTED.

### E. Third Cause of Action: Unjust Enrichment

California law recognizes a cause of action for unjust enrichment:
Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another. A person is enriched if he receives a benefit at another's expense. The term "benefit" "denotes any form of advantage." ... Even when a person has received a benefit from another, he is required to make restitution "only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it."

*Ghirardo v. Antonioli,* 14 Cal.4th 39, 51, 57 Cal.Rptr.2d 687, 924 P.2d 996 (1996) (internal citations omitted). Plaintiff claims that Defendants were unjustly enriched because they failed to pay the recurring fees required to remain a franchise.

Nevertheless, Plaintiff argues, during the term of the Franchise Agreement they used the Villager Marks and name and the franchise services Plaintiff provides. Following termination of the Agreement, Defendants were further enriched by continued use of the Villager Marks.

"However, as a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights." *Cal. Med. Ass'n v. Aetna U .S. Healthcare of Cal.,* 94 Cal.App.4th 151, 172, 114 Cal.Rptr.2d 109 (2001). Where the parties have entered a contract that covers a subject, the Court cannot substitute its own notions of fairness for the terms that the contract establishes. *Id.* (citing *Hedging Concepts, Inc. v. First Alliance Mortgage Co.,* 41 Cal.App.4th 1410, 1420, 49 Cal.Rptr.2d 191 (1996)).

The Court has held that Plaintiff and Defendants formed a contract consisting of the terms of the Franchise Agreement. The Agreement called for Defendants to pay the recurring fees and set forth the remedies for default. The Agreement also contains terms that governed Defendants' use of the Villager Marks. Plaintiff is not entitled to an equitable remedy for any unjust enrichment of Defendants where a contractual remedy is available.

**\*8** Accordingly, summary judgment on this cause of action is DENIED.

### F. Fourth Cause of Action: Breach of Guaranty

Plaintiff seeks to recover for the breaches of the Franchise Agreement through enforcement of a Guaranty signed by Maluk and Kuldip Dhami. Cox Decl. Ex. B. The Guaranty purports to bind the guarantors to "guaranty that [Defendants'] obligations under the agreement, including any amendments, will be punctually paid and performed." *Id.* The Guaranty requires the guarantors to "immediately make each payment and perform or cause the Franchise to perform, each unpaid or unperformed obligation of Franchisee under the Agreement." *Id.*

Each of the Defendants failed to answer an RFA stating, "Admit that YOU provided [Plaintiff] with a Guaranty of Dhami, Dhami & Virk's obligations under the Franchise Agreement, a copy of which is attached to the COMPLAINT as Exhibit 'B.' " RFA to Defs. No. 10. Defendants argue that Kuldip Dhami denies signing this document, creating a triable issue

as to its enforceability. This denial cannot rebut Defendants' admission, which is now "conclusively established," that it provided a Guaranty of DDV's obligations. *See Kasuboski,* 834 F.2d at 1350. Defendants also admit that they have breached "each obligation" required under the Franchise Agreement. RFA to Defs. No 11.

Accordingly, summary judgment for Plaintiff on this cause of action is GRANTED.


G. Fifth Cause of Action: Lanham Act Violations

Plaintiff seeks to recover under Lanham Act Sections 32 [FN5] and 43 [FN6] on the basis that Defendants used the Villager Marks at the Facility without Plaintiff's authorization. To defeat summary judgment on a claim under Sections 32 and 43, Defendants "must raise a genuine issue of fact as to (1) whether their use of the [Villager Marks] was without the registered owner's consent, or (2) whether their unauthorized use was likely to cause confusion in the marketplace as to the origin or sponsorship of the product." *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1188-89 (6th Cir.1997).


> FN5. Lanham Act Section 32, or 15 U.S.C. section 1114(1), provides, in pertinent part:
> Any person who shall, without the consent of the registrant-
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

> FN6. Section 43, or 15 U.S.C. § 1125(a)(1), provides:
> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another

person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Defendants admit that, after termination of the Franchise Agreement, they failed to "de-identify" the Facility as a Villager franchise and "used the Villager name in connection with the operation of" the Facility. RFA to Defs. Nos. 8, 9. Defendants do not attempt to controvert Plaintiff's claim that its consent to use the Villager Marks ended when Plaintiff terminated the Agreement. *See* Cox Decl. at ¶ 39. Nor do Defendants attempt to raise an issue as to whether use of the Villager Marks were likely to confuse consumers.

Defendants' only argument in opposition to summary judgment on this issue is that Plaintiff has failed to show Defendants' "actual knowledge, intent or reckless disregard that plaintiff's rights are being infringed upon." Opp'n at 6. Defendants point to Kuldip and Maluk Dhami's testimony in their depositions that they were not aware that the Villager Marks were displayed on the Facility. *See* Kuldip Dhami Dep. at 21:1-20; Maluk Dhami Dep. at 80:9-19. Defendants claim that they are entitled to an "innocent infringer" defense, citing in support *World Wrestling Fed'n Inc. v. Posters, Inc.,* 58 U.S.P.Q.2d (BNA) 1783, 2000 U.S. Dist. LEXIS 20357 (N.D.Ill. Sept.25, 2000).

**\*9** The defendant in *World Wrestling* had allegedly printed certain trademarked materials at the request of a third party. *Id.* at \*11-12. The *World Wrestling* defendant faced liability under Lanham Act Section 32(1)(b). *Id.* at \*4. Section 32(1)(b) establishes liability for "[a]ny person who shall ... reproduce, counterfeit, copy, or colorably imitate a registered mark ... intended to be used in commerce...." 15 U.S.C. § 1114(b). A defendant alleged to have violated that section may limit relief to an injunction against future printing by establishing that "he or she is an innocent infringer or innocent violator." 15 U.S.C. § 1114(2)(A); *World Wrestling,* 2000 U.S. Dist. LEXIS 20357, at \*4-5.

Here, Plaintiff claims that Defendants violated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Section 32(1)(a) by virtue of its firsthand "use in commerce" of the Villager Marks, not merely for a reproduction of a mark "intended to be used in commerce." *See* 15 U.S.C. § 1114(1)(a), (b). Section 32(1)(a) does not provide for an innocent infringer defense as subsection (b) does. See 15 U.S.C. § 1114(1) ("Under *subsection (b)* hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive." (emphasis added)). Plaintiff need not show Defendants' "knowledge, intent, or reckless disregard" of Plaintiff's rights to establish liability under 32(1)(a). Defendants' claims that they were unaware of the display of the Villager Marks at the Facility, even if true, do not present a basis for mitigating their liability. The Court finds that there is no genuine issue as to Defendants' Lanham Act violations.

Accordingly, Plaintiff's motion for summary judgment on this cause of action is GRANTED.

### H. Defendants' Counterclaim

Defendants' counterclaim alleges that Plaintiff is liable for breach of contract because it "failed to comply with any of the operating and service obligations contained in the franchise agreement more specifically the provisions of 4.1 thru 4.7." Answer at 2. In its opposition, Defendants devote one sentence to support of their counterclaim: "Defendants paid $11,000 to plaintiff VFS (See Maluk Dhami's deposition, Exhibit 6) and the defendants did not get anything for it an[d] therefore are entitled to get their money back as a matter of law." Opp'n at 6. Maluk Dhami claimed in his deposition that he understood that Plaintiff would provide a computer system and training in exchange for Defendants' $11,000 payment.[FN7] Dep. Kuldip Dhami at 41:19-24. Maluk Dhami's deposition testimony indicates that they did not receive the franchise nor the computer system.[FN8] *Id.* at 67:12-13. Defendants do not claim that Plaintiff did not meet its obligation provide training or omit any other obligation under section 4 of the agreement. *See* Cox Decl. Ex. A at 6-8.

FN7. The testimony, in relevant part, was as follows:
Q. Okay. And do you recall what the purpose was for the payment of $11,000?

Did you understand that to be your-
A. Yeah, they are going to sell me computer system for that thing, training and computer system, bring in for that.
Dep. Kuldip Dhami at 41:19-24.

FN8. The testimony, in relevant part, was as follows:
Q. Do you recall ever submitting any reports to Villager Inn that reflected the amount of revenue that was generated during a particular month from the rental of rooms?
A. No, we never got franchise. We never got franchise. We never got computer system.
Dep. Kuldip Dhami at 67:8-13.

**\*10** Defendants' showing is inadequate to support a cause of action for breach of contract. Defendants do not present any evidence to support, and do not even allege, that Plaintiff promised to supply them a computer system. Defendants' mere belief that the $11,000 entitled them to receive a computer system does not suffice to support a breach of contract cause of action. Defendants do not claim that any provision of the Franchise Agreement, any provision of any other document, or any representation by Plaintiff or its agents obligated Plaintiff to provide a computer system.

Nor does Defendants' conclusory claim that they did not receive the franchise create a genuine issue as to whether Plaintiff performed under the terms of the Franchise Agreement. Defendants do not point to any provision of the Agreement that Plaintiff breached. Defendants' broad claim that Plaintiff failed to perform does not meet its burden to produce "significant probative evidence tending to support the complaint." *See* T.W. Elec., 809 F.2d at 630. The Court is not obligated to search the record for an affidavit or other document that supports Defendants' vague counterclaim. *See* Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1029 (9th Cir.2001). No genuine issue exists as to whether Plaintiff breached the Franchise Agreement or any contract with Defendants.

Accordingly, summary judgment for Plaintiff on Defendants' counterclaim is GRANTED.

### I. Damages

On the First Cause of Action for breach of contract, Plaintiff provides an affidavit stating that the contract entitles it to recurring fees in the amount of

Not Reported in F.Supp.2d                                                         Page 9
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

$45,862.73 (Cox Decl. at ¶ 26). Defendants do not dispute the amounts of recurring fees. As the record contains no factual controversy regarding the amount of recurring fees, the Court finds that Plaintiff is entitled to recover $45,862.73 in recurring fees under the Agreement. _Garcy Corp. v. Home Ins. Co.,_ 496 F.2d 479, 484 (7th Cir.1974) (uncontroverted affidavits are sufficient to establish damages on plaintiff's motion for summary judgment).

The Sections 12 and 19.3 of the Agreement provide for liquidated damages in the amount of $100,000. Cox Decl. Ex. A at 13-14, 20; Cox Decl. at ¶ ¶ 27-34. Defendants do not dispute this amount or the appropriateness of liquidated damages. A liquidated damages clause will be considered "unreasonable," and hence unenforceable under California Civil Code section 1671(b), "if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." _Ridgley v. Topa Thrift & Loan Ass'n,_ 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378, 953 P.2d 484 (1998). The parties expressly acknowledged that the liquidated damages provision "is a reasonable pre-estimate of the damages that will be incurred and is not a penalty." Cox Decl. Ex. A at 25. Furthermore, an uncontroverted affidavit establishes that the amount of liquidated damages in the Agreement is based on how long Plaintiff typically takes to replace a terminated hotel property. Cox Decl. at ¶ 29. The Court finds that Plaintiffs are entitled to recover $100,000 in liquidated damages under the contract.

**\*11** The breach of notes cause of action entitles Plaintiffs to recover $40,000 for the promissory note and $5,500 for the initial fee note. RFA to Defs. Nos. 6, 7; Cox Decl. Ex. D at 1. The Court finds Plaintiff is entitled to recover $45,500 on the breach of notes cause of action.

Plaintiff has also requested attorney fees and interest in connection with its claims for recovery under the Agreement and the Notes. _See_ Cox Decl. Ex. A at 18 ("The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this agreement."); Cox Decl. Ex. C at 2 ("If this Note is collected by or through an attorney at law, the Holder shall be entitled to collect reasonable attorney's fees and all costs of collection."); Cox Decl. Ex. D at 2. Defendants have not disputed that they are liable for attorney fees incurred collecting on under the Agreement and the Notes and for interest that has accrued under these debts. As a matter of law,

Plaintiff is entitled to attorney fees and interest pursuant to the terms of these instruments.

Plaintiff claims that it is entitled to recover $27,767.13 under the Lanham Act. Cox Decl. at ¶ 41. This figure represents the average monthly Recurring Fee payment during the franchise relationship times the number of months of infringement. _Id._ Defendants do not dispute the length of the infringement or the manner of calculating damages. Franchise fees normally received for use of a mark are a proper measure of damages under the Lanham Act. _Ramada Inns, Inc. v. Gadsden Motel Co.,_ 804 F.2d 1562, 1565 (11th Cir.1986). Awarding Lanham Act damages and liquidated damages where a hotel franchisee breaches a franchise agreement does not amount to impermissible "double recovery." _Id._ at 1566. This is because each set of damages attaches to a different violation: "Liquidated damages were awarded because the partners breached the franchise agreement; trademark infringement damages were awarded because they held over ... after the agreement was terminated." _Id._ The Court finds that Plaintiff is entitled to $27,767.13 in damages under the Lanham Act.

Plaintiff claims Defendants' infringement was willful, entitling them to treble damages. _See_ 15 U.S.C. § 1117(b); _Nintendo of Am. v. Dragon Pac. Int'l,_ 40 F.3d 1007, 1010 (9th Cir.1994) (court shall treble the damages for a finding that defendant was "intentionally using a mark or designation"). Plaintiffs also request attorney's fees for the Lanham Act violation. Attorney fees are available where infringer's conduct is "malicious, fraudulent, deliberate or willful." _Nintendo,_ 40 F.3d at 1010. Defendants claim that they were unaware that Plaintiff's trademark rights had been infringed. A genuine issue exists as whether Defendants willfully infringed, triggering treble damages or attorney fees for the Lanham Act violation.

**\*12** Defendants' liability for attorney fees and interest under the Agreement and Notes are undetermined and an issue exists as to whether treble damages or attorney fees are appropriate for the Lanham Act Violation. Consequently, the Court defers final determination of the total amount of damages, attorney fees, and interest in which judgment for Plaintiff should be entered.

ACCORDINGLY:
1. Plaintiff's motion for partial summary judgment is GRANTED with respect to its First, Second, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 10
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Fourth Causes of Action and Defendants' Counterclaim.

2. Plaintiff's motion for partial summary judgment is GRANTED with respect to its Fifth Cause of Action, except for Plaintiff's claim for treble damages and attorney fees.

3. Plaintiff's motion is DENIED with respect to its Third Cause of Action and with respect to its claim for treble damages and attorney fees under its Fifth Cause of Action.

4. Within 30 days of the filing date of this order, Plaintiff shall file further briefing and declarations regarding the amounts of attorney fees and interest due under the Agreement and the Promissory and Initial Fee Notes. Defendants shall file any response to Plaintiff's further briefing on the issue of attorney fees and interest within 15 days thereafter.


IT IS SO ORDERED.


E.D.Cal.,2006.
Villager Franchise Systems, Inc. v. Dhami, Dhami & Virk
Not Reported in F.Supp.2d, 2006 WL 224425 (E.D.Cal.)


Briefs and Other Related Documents (Back to top)

• 2005 WL 3242098 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff Villager Franchise Systems Inc Motion for Summary Judgment (Oct. 12, 2005) Original Image of this Document (PDF)
• 2004 WL 3780149 (Trial Pleading) Verified Complaint 1. Breach of Contract 2. Breach of Promissory Note 3. Unjust Enrichment 4. Breach of Guaranty 5. Lanham Act Violations (Oct. 12, 2004) Original Image of this Document (PDF)
• 1:04cv06393 (Docket) (Oct. 12, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.