# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>INTEL CORP. MICROPROCESSOR<br>ANTITRUST LITIGATION | )<br>)<br>) MDL Docket No. 05-1717 (JJF)<br>)<br>) |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated,<br><br>             Plaintiffs,<br><br>      v.<br><br>INTEL CORPORATION,<br><br>           Defendant. | )<br>)<br>) C.A. No. 05-485-JJF<br>)<br>) CONSOLIDATED ACTION<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT INTEL CORPORATION'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT

OF COUNSEL:
David M. Balabanian
James L. Hunt
Christopher B. Hockett
Nora C. Cregan
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
(415) 393-2000

Richard A. Ripley
BINGHAM McCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C. 20006
(202) 373-6000

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

Dated: February 28, 2007

TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     THE COMPLAINT MUST ALLEGE FACTS THAT STATE A CLAIM ...........4

        A.      Antitrust Claims Are Not Exempt From Dismissal ....................................4

        B.      Plaintiffs' Request For Judicial Notice Cannot Save Their Claims............5

III.    THE COMPLAINT DOES NOT ALLEGE ANY INJURY
        COGNIZABLE UNDER FEDERAL OR STATE ANTITRUST LAWS.............6

        A.      The Price Level Of Intel's Microprocessors Is Immaterial To The
                Antitrust Injury Analysis............................................................................7

        B.      The Alleged Structure Of Intel's Discounts And Rebates Does Not
                Give Rise To Any Antitrust Injury ..........................................................10

IV.     PLAINTIFFS DO NOT HAVE ANTITRUST STANDING TO BRING
        THEIR ANTITRUST CLAIMS ........................................................................12

        A.      Under AGC Plaintiffs Lack Standing To Bring Their Antitrust
                Claims .......................................................................................................12

                1.      The Purported Causal Connection Is Too Attenuated .................13

                2.      Plaintiffs' Purported Injuries Are Too Remote And
                        Speculative..................................................................................14

                3.      There Are More Direct Victims Of Intel's Alleged Conduct .......15

        B.      Plaintiffs' Alleged Non-Price Injuries Cannot Confer Antitrust
                Standing ....................................................................................................18

        C.      Plaintiffs' State Law Claims Require Antitrust Standing ........................20

                1.      California Law Imposes The AGC Test ......................................20

                2.      The AGC Test Applies To The Alternatively Pled State
                        Antitrust Laws............................................................................22

V.      CALIFORNIA LAW DOES NOT APPLY NATIONWIDE ..............................24

        A.      The "Most Significant" Relationship Test Governs The Choice Of
                Law Analysis For Most Plaintiffs ............................................................25

                1.      Under "Most Significant Relationship" Test, California
                        Law Does Not Apply To Non-California Plaintiffs.....................27

                2.      For The Few Plaintiffs For Whom The California Choice
                        Of Law Test Is Proper, California Substantive Law Does
                        Not Apply....................................................................................30

                        a.      California's interests are already protected......................30

i

TABLE OF CONTENTS
(continued)

Page

        b.    Applying California law undermines other states' antitrust policies ................................................................31

VI.    OTHER LEGAL DEFECTS BAR PLAINTIFFS' STATE ANTITRUST CLAIMS ......................................................................................34

    A.    Plaintiffs Fail To Assert Sufficient Intrastate Conduct To State A Claim Under Certain State's Antitrust Laws ............................34

    B.    Plaintiffs Cannot Assert Donnelly Act Claims On Behalf Of A Class....................................................................................36

VII.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER STATE CONSUMER PROTECTION STATUTES ........................................37

    A.    Plaintiffs Lack Standing To Bring Consumer Protection Claims............37

    B.    Certain States Bar Consumer Protection Class Actions ..........................37

    C.    Plaintiffs Have Not Alleged Facts To State A Claim For Fraudulent, Deceptive Or Unconscionable Conduct ................................39

        1.    Plaintiffs Have Not Alleged That Intel Specifically Aimed Fraudulent Or Deceptive Conduct Against Them ........................39

        2.    Plaintiffs Fail To Identify Any Unconscionable Acts Or To Allege That Intel Took Advantage Of Plaintiffs..........................41

    D.    Plaintiffs' California UCL Claims Fails For The Same Reasons As Their Cartwright Act Claim ......................................................................42

VIII.    PLAINTIFFS' REMAINING SO-CALLED TORT CLAIMS ALSO FAIL .......44

    A.    There Is No Cognizable Claim For Damages Under California Law Based Upon A "Tort" Of Monopolization..................................................44

    B.    Plaintiffs' Claim For "Unjust Enrichment" Also Fails ............................45

        1.    There Is No Unjust Enrichment Claim Under California Law ......................................................................................45

        2.    Plaintiffs Cannot Avoid Limits To Indirect Purchaser Standing By Pleading A Claim For Unjust Enrichment Or Restitution ................................................................................46

        3.    All Of Plaintiffs' Restitution Claims Fail As A Matter Of Law ......................................................................................47

IX.    CONCLUSION..........................................................................................49

ii

## TABLE OF AUTHORITIES

Page

**Cases**

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.,*
369 F.3d 732 (3d Cir. 2004)..................................................................13

*A.D.M. Club Mgmt. Sys. v. Gary Jonas Computing, Ltd.,*
No. 05-3943 (HAA), 2006 WL 2689400 (D.N.J. Sept. 19, 2006)...............4

*Abram v. UPS, Inc.,*
200 F.R.D. 424 (E.D. Wis. 2001) .............................................................10

*ADVO, Inc. v. Philadelphia Newspapers, Inc.,*
51 F.3d 1191 (3d Cir. 1995)......................................................................9

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.,*
826 F.2d 1235 (3d Cir. 1987)....................................................................9

*Alfred M. Lewis, Inc. v. Warehousemen, Teamsters, Chauffeurs
and Helpers Local Union No. 542,*
163 Cal. App. 2d 771 (Ca. Ct. App. 1958) ..............................................31

*Alleghany Gen. Hosp. v. Phillip Morris, Inc.,*
228 F.3d 429 (3d Cir. 2000)............................................................4, 9, 48

*Allegheny Gen. Hosp. v. Philip Morris, Inc.,*
116 F. Supp. 2d 610 (W.D. Pa. 1999 .......................................................48

*Amarel v. Connell,*
102 F.3d 1494 (9th Cir. 1996) ...................................................................7

*American Ad Mgmt., Inc. v. General Tel. Co. Of Cal.,*
190 F.3d 1051 (9th Cir. 1999) .................................................................13

*Arthur v. Microsoft,*
676 N.W.2d 29 (Neb. 2004)......................................................................17

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters,*
459 U.S. 519 (1983)......................................................................... passim

*Atl. Richfield v. U.S. Petroleum Co.,*
495 U.S. 328 (1990)...............................................................................7, 8

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,*
118 F.3d 178 (3d Cir. 1997)...............................................................12, 16

*Bellevue Drug Co. v. Advance PCS,*
No. 03-4731, 2004 WL 724490 (E.D. Pa. Mar. 2, 2004) ...........................8

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005) ...................................................................10

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982)..................................................................................22

*Bradburn Parent/Teacher Store, Inc. v. 3M,*
No. 02-7676, 2000 WL 34003597 (E.D. Pa. July 25, 2003) .......................9

TABLE OF AUTHORITIES

Page

*Branning v. Apple Computer, Inc.,*
No. 1-05-CV-045719 (Cal. Super. Ct. May 9, 2006) ................................................44

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993)............................................................................................8, 10

*Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.,*
No. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004)...........................................4

*Brunson Commc'ns, Inc. v. Arbitron, Inc.,*
239 F. Supp. 2d 550 (E.D. Pa. 2002).........................................................................4

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)........................................................................................5, 6, 7, 12

*Bunkers Glass Co. v. Pilkington PLC,*
75 P.3d 99 (Ariz. 2003)..........................................................................................23

*Burdell v. Grandi,*
152 Cal. 376 (1907) ...............................................................................................45

*Cellular Plus, Inc. v. Super. Ct.,*
14 Cal. App. 4th 1224 (Cal. Ct. App. 1993) .............................................................20

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tele. Co.,*
20 Cal. 4th 163 (Cal. 1999).................................................................................42, 43

*Chavez v. Whirlpool Corp.,*
93 Cal. App. 4th 363 (Cal. Ct. App. 2002) ...........................................................43, 44

*Cianci v. Super. Ct.,*
40 Cal. 3d 903 (Cal. 1985)......................................................................................20

*City and County of San Francisco v. Philip Morris, Inc.,*
957 F. Supp. 1130 (N.D. Cal. 1997) ........................................................................48

*Clothesrigger, Inc. v. GTE Corp.,*
191 Cal. App. 3d 605 (Cal. Ct. App. 1987) ...........................................................32, 33

*Comes v. Microsoft Corp.,*
646 N.W.2d 440 (Iowa 2002) ..................................................................................23

*Crouch v. Crompton Corp.,*
No. 02 CVS 4375, 2004 WL 2414027
(N.C. Super. Ct. Oct. 28, 2004) ...............................................................................21

*D.R. Ward Constr. Co. v. Rohm & Haas Co.,*
__ F. Supp. 2d __, 2006 WL 3921865 (E.D. Pa. May 30, 2006)..............23, 24, 37, 46

*Dexterity Surgical, Inc. v. Tyco Int'l,*
No. 00-5789, 2001 WL 1003207 (E.D. Pa. Aug. 22, 2001) .........................................4

*Diamond Multimedia Sys., Inc. v. Super. Ct.,*
19 Cal. 4th 1036 (Cal. 1999)...................................................................................33

*Dimidowich v. Bell & Howell,*
803 F.2d 1473 (9th Cir. 1986), *modified on other grounds,*
810 F.2d 1517 (9th Cir. 1987) ................................................................................44

TABLE OF AUTHORITIES

Page

*EEOC v. Dan Lepore & Sons Co.,*
 No. 03-CV-5462, 2004 U.S. Dist. LEXIS 1943
 (E.D. Pa. Feb. 9, 2004)....................................................................................4

*Express, LLC v. Fetish Group, Inc.,*
 464 F. Supp. 2d 965 (C.D. Cal. 2006) ........................................................43

*Exxon Corp. v. Superior Court,*
 51 Cal. App. 4th 1672 (Cal. Ct. App. 1997) ..............................................45

*Fallick v. Nationwide Mut. Ins. Co.,*
 162 F.3d 410 (6th Cir. 1998) .......................................................................15

*Fenn v. Noah,*
 133 P.3d 1240 (Idaho 2006)..........................................................................40

*FTC v. Mylan Labs., Inc.,*
 62 F. Supp. 2d 25 (D.D.C. 1999)..................................................................46

*Gasperini v. Ctr. for Humanities, Inc.,*
 518 U.S. 415 (1996)........................................................................................37

*Gen. Ceramics, Inc. v. Firemen's Fund Ins. Co.,*
 66 F.3d 647 (3d Cir. 1995).............................................................................32

*Ghirardo v. Antonioli,*
 14 Cal. 4th 39 (Cal. 1996).............................................................................45

*Glaberson v. Comcast Corp.,*
 No. 03-6604, 2006 WL 2559479 (E.D. Pa. Aug. 31, 2006) .........................9

*Goldwasser v. Ameritech Corp.,*
 222 F.3d 390 (7th Cir. 2000) ...................................................................9, 12

*Goshen v. Mutual Life Ins. Co. Of N.Y.,*
 98 N.Y.2d 314 (N.Y. 2002)...........................................................................40

*Graduate Cardialogy Consultants, P.C. v. Vivra,*
 No. 2827, 2000 WL 33711050 (Pa. Ct. Com. Pl. Oct. 20, 2000) .........48, 49

*Gruber v. Price Waterhouse,*
 117 F.R.D. 75 (E.D. Pa. 1987)......................................................................29

*GTE New Media Servs., Inc. v. Ameritech Corp.,*
 21 F. Supp. 2d 27 (D.D.C. 1998)..................................................................35

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.,*
 No. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003) ...........27

*Hirsch v. Bank of America,*
 107 Cal. App. 4th 708 (Cal. Ct. App. 2003) ...............................................45

*Iberia Credit Bureau, Inc. v. Cingular Wireless LLC,*
 379 F.3d 159 (5th Cir. 2004) ........................................................................39

*IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l,*
 No. 03-4113 (JAG), 2005 WL 3447615 (D.N.J. Dec. 15, 2005)...................4

TABLE OF AUTHORITIES

Page

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977)..............................................................................passim

*In re Bridgestone/Firestone Inc. Tires Prods. Liability Litig.,*
   205 F.R.D. 503 (S.D. Ind. 2001)...................................................................36, 38

*In re Burlington Coat Factory Securities Litigation,*
   114 F.3d 1410 (3d Cir. 1997)................................................................................6

*In re Cardizem CD Antitrust Litig.,*
   105 F. Supp. 2d 618 (E.D. Mich. 2000)..............................................................46

*In re Cipro Cases I & II,*
   121 Cal. App. 4th 402 (Cal. Ct. App. 2004) ..................................................44, 45

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee
Second Mortg. Loan Litig.,*
   418 F.3d 277 (3d Cir. 2005)................................................................................25

*In re Credit/Debit Card Tying Cases,*
   No. JCCP 4335, 2004 WL 2475287 (Cal. Super. Ct. Oct. 14, 2004) ................21

*In re First Alliance Mortgage Co.,*
   269 B.R. 428 (C.D. Cal. 2001) ...........................................................................33

*In re K-Dur Antitrust Litig.,*
   338 F. Supp. 2d 517 (D.N.J. 2004) ...............................................................46, 47

*In re Linerboard Antitrust Litig.,*
   305 F.3d 145 (3d Cir. 2002)................................................................................16

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   295 F. Supp. 2d 30 (D.D.C. 2003) .....................................................................46

*In re Napster, Inc. Copyright Litig.,*
   354 F. Supp. 2d 1113 (N.D. Cal. 2005) .............................................................16

*In re Natural Gas Anti-Trust Cases I-IV,*
   Nos. 4221, 4224, 4226, 4228, 2002 WL 31570296
   (Cal. Super. Ct., Oct. 16, 2002) ....................................................................44, 45

*In re New Motor Vehicles Can. Export Antitrust Litig.,*
   350 F. Supp. 2d 160 (D. Me. 2004) ............................................................passim

*In re Oot,*
   112 B.R. 497, 502 (Bankr. N.D.N.Y. 1989) ......................................................36

*In re ORFA Sec. Litig.,*
   654 F. Supp. 1449 (D.N.J. 1987) ........................................................................29

*In re OSB Antitrust Litig.,*
   No. 06-826 (PD), slip op. at 2 (E.D. Pa. Sept. 25, 2006)........................34. 35, 37

*In re Peters,*
   90 B.R. 588 (Bankr. N.D.N.Y. 1988) .................................................................36

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   230 F.R.D. 61 (D. Mass. 2005)...........................................................................38

TABLE OF AUTHORITIES

Page

*In re Pizza Time Theatre Sec. Litig.,*
  112 F.R.D. 15 (N.D. Cal. 1986)........................................................................33

*In re Relafen Antitrust Litig.,*
  221 F.R.D. 260 (D. Mass. 2004)..................................................................36, 48

*In re Seagate Techs. Sec. Litig.,*
  115 F.R.D. 264 (N.D. Cal. 1987).......................................................................33

*In re Sugar Indus. Antitrust Litig,*
  579 F.2d 13 (3d Cir. 1978)............................................................................14, 16

*In re Terazosin Hydrochloride Antitrust Litig.,*
  160 F. Supp. 2d 1365 (S. D. Fla. 2001) ...........................................................37

*In re Warfarin Sodium Antitrust Litig.,*
  212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516
  (3d Cir. 2004)............................................................................................28, 29

*In re Wellbutrin SR Antitrust Litig.,*
  Nos. 04-5525, 04-5898, 05-0396, 2006 WL 616292
  (E.D. Pa. March 9, 2006) ...................................................................................4

*In re Worlds of Wonder Sec. Litig.,*
  No. C 87 5491 SC, 1990 WL 61951 (N.D. Cal. Mar. 23, 1990) ................33

*In re Wright,*
  355 B.R. 192 (Bankr. C.D. Cal. 2006).............................................................45

*Johnson v. Manhattan Ry. Co.,*
  289 U.S. 479 (1933)............................................................................................25

*Johnson v. Microsoft,*
  834 N.E.2d 791 (Ohio 2005)..............................................................................48

*Kanne v. Visa U.S.A., Inc.,*
  723 N.W. 2d 293 (Neb. 2006)................................................................17, 23, 24

*Kearney v. Salomon Smith Barney, Inc.,*
  39 Cal. 4th 95 (Cal. 2006)............................................................................30, 33

*Keogh v. Chicago & Nw. Ry. Co.,*
  260 U.S. 156 (1922)............................................................................................20

*Kloth v. Microsoft Corp.,*
  444 F.3d 312 (4th Cir. 2006) ............................................................................19

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
  232 F.3d 979 (9th Cir. 2000) ..................................................................16, 20, 21

*Knowles v. Visa U.S.A., Inc.,*
  No. Civ. A. CV-03-707, 2004 WL 2475284
  (Me. Super. Ct. Oct. 20, 2004)...................................................................21, 22

*Kochert v. Greater Lafayette Health Servs., Inc.,*
  463 F.3d 710 (7th Cir. 2006) ...........................................................................11

## TABLE OF AUTHORITIES

Page

*Koenig v. Automatic Data Processing,*
No. 99-5816, 2003 U.S. Dist. LEXIS 26812 (D.N.J. June 23,
2003), *aff'd*, No. 03-3112, 2005 WL 2891740
(3d Cir. Nov. 3, 2005) ................................................................................. 4

*Kolling v. Dow Jones & Co.,*
137 Cal. App. 3d 709 (Cal. Ct. App. 1982) ...................................... 6, 13, 14

*Kristiansen v. John Mullins & Sons, Inc.,*
59 F.R.D. 99 (E.D.N.Y. 1973) ................................................................... 38

*Leider v. Ralfe,*
387 F. Supp. 2d 283 (S.D.N.Y. 2005) ....................................................... 36

*Lorix v. Crompton Corp.,*
720 N.W.2d 15 (Minn. 2006) ....................................................... 17, 18, 23, 24

*Lum v. Bank of Am.,*
361 F.3d 217 (3d Cir. 2004) ......................................................................... 4

*Luscher v. Bayer AG,*
No. CV-2004-014835 (Ariz. Super. Ct. Sept. 14, 2005) ......................... 23

*Marsh v. San Diego County,*
432 F. Supp. 2d 1035 (S.D. Cal. 2006) ........................................................ 4

*Martoramo v. PP&L Energy Plus, LLC.,*
334 F. Supp. 2d 796 (E.D. Pa. 2004), *aff'd*,
No. 04-3751, 2005 WL 1488382 (3d Cir. June 23, 2005) ........................... 4

*McBride v. Boughton,*
123 Cal. App. 4th 379 (Cal. Ct. App. 2004) .............................................. 46

*McKell v. Wash. Mut., Inc.,*
142 Cal. App. 4th 1457 (Cal. Ct. App. 2006) ........................................... 42

*Meehan v. Cheltenham Township,*
189 A.2d 593, 596 (Pa. 1963) ................................................................... 49

*Melchior v. New Line Prods., Inc.,*
106 Cal. App. 4th 779 (Cal. Ct. App. 2003) .............................................. 45

*Meridian Project Sys., Inc. v. Hardin Constr. Co.,*
404 F. Supp. 2d 1214 (E.D. Cal. 2005) ..................................................... 30

*MGM Studios, Inc. v. Grokster, Ltd.,*
269 F. Supp. 2d 1213 (C.D. Cal. 2003) ............................................... 20, 21

*N.Y. Citizens Comm. On Cable TV v. Manhattan Cable TV, Inc.,*
651 F. Supp. 802 (S.D.N.Y. 1986) .............................................................. 9

*New York v. Feldman,*
210 F. Supp. 2d 294 (S.D.N.Y. 2002) ....................................................... 40

*Norwest Mortgage, Inc. v. Super. Ct.,*
72 Cal. App. 4th 214 (Cal. Ct. App. 1999) ................................................ 31

*O'Quin v. Verizon Wireless,*
256 F. Supp. 2d 512 (M.D. La. 2003) ....................................................... 39

TABLE OF AUTHORITIES

Page

*Only v. Ascent Media Group, LLC,*
No. 06-2123 (FSH), 2006 WL 2865492 (D.N.J. Oct. 5, 2006) ...................................4

*Pennsylvania v. PepsiCo, Inc.,*
836 F.2d 173 (3d Cir. 1988).....................................................................................4

*People's Choice Wireless, Inc. v. Verizon Wireless,*
131 Cal. App. 4th 656 (Cal. Ct. App. 2005) ...............................................................43

*Peterson v. Visa U.S.A., Inc.,*
No. Civ. A. 03-8080, 2005 WL 1403761
(D.C. Super. Ct. Apr. 22, 2005)................................................................................23

*Pfizer, Inc. v. Super. Ct.,*
141 Cal. App. 4th 290 (Cal. Ct. App. 2006) ...............................................................31

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985)..................................................................................................25

*Pooler v. R.J. Reynolds,*
No. CV00-2674, 2001 WL 403167 (Nev. Dist. Ct. Apr. 4, 2001).............................34

*Precision Surgical, Inc. v. Tyco Int'l, Ltd.,*
111 F. Supp. 2d 586 (E.D. Pa. 2000) ........................................................................4

*Progressive West Ins. Co. v. Yolo County Super. Ct.,*
135 Cal. App. 4th 263 (Cal. Ct. App. 2005) ...............................................................42

Reiter v. Sonotone Corp.,
442 U.S. 330 (1979)..................................................................................................37

*Rey-Willis v. Citibank, N.A.,*
No. 03 Civ 2006 (SAS), 2004 WL 315267
(S.D.N.Y. Feb. 18, 2004) ..........................................................................................40

*RLH Inds., Inc. v. SBC Comms., Inc.,*
133 Cal. App. 4th 1277 (2005) .................................................................................43

*Robertson v. Dean Witter Reynolds, Inc.,*
749 F.2d 530 (9th Cir. 1984) ....................................................................................4

*Sanner v. Bd. of Trade of City of Chicago,*
62 F.3d 918 (7th Cir. 1995) .....................................................................................13

*Smokeless Tobacco Cases I-IV,*
J.C.C.P. Nos. 4250, 4258, 4259 & 4262
(Cal. Super. Ct. June 20, 2003).......................................................................44, 45

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.,*
72 Cal. App. 4th 861 (Cal. Ct. App. 1999) ................................................................43

*Southard v. Visa U.S.A., Inc.,*
No. LACV 031729, 2004 WL 3030028
(Iowa Dist. Ct. Nov. 17, 2004)..................................................................................24

*Sperry v. Crompton Corp.,*
__ N.E.2d __, 2007 WL 527726 (N.Y. 2007)...........................................................36

## TABLE OF AUTHORITIES

Page

*Square D Co. v. Niagra Frontier Tariff Bureau,*
   476 U.S. 409 (1986)............................................................................................20

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris,*
   *Inc.,* 171 F.3d 912 (3d Cir. 1999) ...................................................................48

*Strang v. Visa U.S.A., Inc.,*
   No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8,
   2005) ..................................................................................................................23

*Stutzle v. Rhone Poulenc S.A.,*
   No. 002768, 2003 WL 22250424 (Pa. Ct. Com. Pl. Sept. 26, 2003)..........................48

*Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Ctrs., Inc.,*
   237 F. Supp. 2d 606 (D.V.I. 2002) ....................................................................4

*Theme Promotions, Inc. v. News Am. FSI,*
   35 Fed. Appx 463 (9th Cir. 2002)......................................................................20

*United States v. Crescent Amusement Co.,*
   323 U.S. 173 (1944)............................................................................................19

*United States v. Dentsply,*
   399 F.3d 181 (3d Cir. 2005)................................................................................8

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966)............................................................................................19

*United States v. Microsoft,*
   253 F.3d 34 (D.C. Cir. 2001) .........................................................................8, 19

*Van Dusen v. Barrack,*
   376 U.S. 612 (1964)............................................................................................26

*Vinci v. Waste Mgmt., Inc.,*
   36 Cal. App. 4th 1811 (Cal. Ct. App. 1995) ......................................................20

*Walker v. Armco Steel Corp.,*
   446 U.S. 740 (1980)............................................................................................37

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.,*
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) .............................................................43

*Wershba v. Apple Computer, Inc.,*
   91 Cal. App. 4th 224 (Cal. Ct. App. 2001) .......................................................32

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.,*
   __ U.S. __, 2007 WL 505794 (Feb. 20, 2007)...............................................8, 10

### Statutes

CAL. BUS. & PROFS. CODE § 17200, *et seq.* ...............................................42, 43

D.C. CODE § 28-4502 (2005) ........................................................................36

N.Y. GEN. BUS. LAW § 349..............................................................................40

<u>TABLE OF AUTHORITIES</u>

Page

### Other Authorities

2 Phillip E. Areeda, et al., ANTITRUST LAW: AN ANALYSIS OF
  ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 337a (2005)..................................5

19 Charles Alan Wright, *et al.*, FEDERAL PRACTICE & PROCEDURE:
  JURISDICTION 2D § 4513 (2d ed. 1996) .....................................................38

Assembly Comm. On Bus. & Profs., 2001-2002 Reg. Session,
  analysis of Senate Bill 1814 (June 25, 2002)................................................44

Comments to RESTATEMENT (SECOND) OF CONFLICT OF LAWS
  (1971).............................................................................................27, 28

Paul J. Stancil, *Atomism and the Private Merger Challenge*, 78
  TEMPLE L. REV. 949, 994 (Winter 2005) ...............................................22

RESTATEMENT (FIRST) OF RESTITUTION § 107(1) ...........................................47

### Rules

Fed. R. Civ. P. 12(b) .............................................................................6

FED. R. CIV. P. 17(b) ...........................................................................38

FED. R. CIV. P. 23................................................................................36

FED. R. EVID. 201(b) ...........................................................................6

## I.    INTRODUCTION

In our opening brief, we called this action an "upside down case." We noted that, after copying AMD's allegations that Intel's discounting had driven chip prices *down* — to AMD's detriment — plaintiffs had simply added conclusory allegations that the same Intel conduct had somehow driven chip prices *up* — to their detriment.

Nothing in plaintiffs' Opposition, not the new allegations that appear there (but not in their Complaint[1]), nor the "facts" for which plaintiffs improperly seek judicial notice, resolves this paradox. On the contrary, plaintiffs' concessions demonstrate that they have no actionable theory to explain how Intel could have harmed them in violation of the antitrust laws.

Importantly plaintiffs admit that they "do not allege a period of recoupment during which Intel discontinued its rebates and increased its prices." Opp'n at 37. Plaintiffs instead contend that Intel's average prices were "high" all along rather than low (in spite of the alleged aggressive discounts that AMD could not match). That is so, plaintiffs argue, because the *structure* of Intel's discounts set in motion a complex chain of events that resulted, on average, in higher priced computers with Intel chips. Plaintiffs' claimed sequence goes as follows: Intel's aggressive discounts made it difficult for AMD to contend for incremental shares of business from particular large OEMs or retailers trying to qualify for Intel's volume discounts; which in turn caused AMD not to capture as much of this business as it wanted to; which in turn caused AMD to grow more slowly than it otherwise would have; which in turn caused AMD not to invest in additional capacity that would have made it more efficient and better able to compete with Intel for business; which in turn meant Intel faced less intense competition

---

[1]    The operative complaint is plaintiffs' First Amended Consolidated Complaint (D.I. 108); we refer to it as the "Complaint" or "FACC." For the court's convenience, all unreported cases cited herein appear in the accompanying appendix.

from AMD than it otherwise would have; which in turn allowed Intel to charge more for its microprocessors than it otherwise would have; which in turn led Intel's customers who made computers that included Intel's chips to price them higher than they otherwise would have. Opp'n at 16-18. Finally, plaintiffs say there is evidence that Intel's *average* microprocessor prices were supracompetitive merely because they were higher than AMD's prices. *Id.* at 5 n.2, 15 (seeking judicial notice of AMD's pricing study).

Plaintiffs' theories suffer from numerous flaws, each of which is fatal to their case.

First, the elaborate chain of events plaintiffs describe, purportedly showing how Intel's microprocessor discounts ultimately led to high PC prices, is so full of twists and turns as to be untenable. By further complicating and attenuating the causal chain on which plaintiffs' claim rests, their Opposition provides further grounds for questioning plaintiffs' antitrust injury and standing to assert any antitrust claim, or to assert claims under any of the other state laws they attempt to invoke.

Second, it is fundamental that even monopolists are encouraged to compete vigorously. That is no less true if the result of vigorous competition is that weaker, less efficient rivals do not do as well as they might have with less competition. Intel's discount arrangements, as alleged, could have been matched by any competitor that was as efficient as Intel. It is not Intel's duty — or any firm's duty — to soften the competitive environment to allow its competitors to blossom, or to forego sales to leave room for a less efficient rival.

Plaintiffs cite no authority for the proposition that a manufacturer is legally obliged to keep some or all of its prices *high* enough to enable competitors to become so "effective" that prices are driven *down.* Nor do they explain how any manufacturer, even one possessed of monopoly power, could ever know what price level it had to maintain to achieve this supposedly salutary result. Pricing one's product to encourage its purchase and thereby discourage the purchase of others' products is the very essence of

2

competition. Consumers like plaintiffs are the beneficiaries of that competition, not its victims. Without an allegation that Intel, having purportedly hamstrung AMD through predatory prices, later raised prices — an allegation that plaintiffs expressly disavow — they lack antitrust injury.

Third, that *average* prices for Intel chips are allegedly higher than plaintiffs say they should have been does not give the named plaintiffs here an overcharge claim. Even if plaintiffs could show that Intel's average microprocessor prices were higher than AMD's prices, it would not prove anything, let alone demonstrate that Intel is guilty of monopolization. Moreover, nothing in the pleadings ties a particular plaintiff to a particular price, high or low, supracompetitive or not. Even accepting as true all of plaintiffs' arguments about average prices, the named plaintiffs may nevertheless have individually *benefited* from Intel's discounts, depending, *inter alia*, on what they bought, when, and from whom. No plaintiff can state a claim without showing that he himself was injured. Alleging that consumers overall paid higher "average" prices is no substitute for the specific, individualized allegations of antitrust injury that the law requires.

The remainder of plaintiffs' Opposition follows a similar tack, glossing over differences among themselves and ignoring the requirement that each plaintiff state a valid claim. For example, plaintiffs attempt to place themselves and all the class members they represent under the protection of California law, even though many of them do not live in California and did not buy their product in California, and none of them has any relationship with Intel. A proper choice of law analysis reveals that California has no interest in regulating nationwide purchases of products incorporating Intel chips; rather, the place of purchase of each product applies. Finally, plaintiffs must allege facts to satisfy the standing requirements and elements of each of the many state law causes of action they allege. As Intel described in its motion, plaintiffs have failed to do so, and their Opposition confirms that they cannot.

Whether because they have not alleged standing, or because their theory does not support a claim of individual injury, or because they have not alleged facts necessary to their claims, plaintiffs have not stated any claim on which relief can be granted. The Court should dismiss their Complaint.

## II.    THE COMPLAINT MUST ALLEGE FACTS THAT STATE A CLAIM

### A.    Antitrust Claims Are Not Exempt From Dismissal

Plaintiffs' difficulty in fashioning a claim for themselves out of AMD's allegations is reflected in their plea for the Court to apply a "liberal" pleading standard to their Complaint. *See, e.g.*, Opp'n at 6. However, even antitrust claims must past muster under the federal rules: "'[W]hile antitrust complaints are not subject to especially stringent pleadings . . . neither are they exempt from the federal rules.'" *Lum v. Bank of Am.*, 361 F.3d 217, 228 (3d Cir. 2004) (affirming dismissal of antitrust claims) (quoting *Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988) (affirming dismissal of antitrust claims)) (internal citations omitted). A case should be dismissed under Rule 12(b)(6) where, as here, the complaint "lacks a cognizable legal theory." *Marsh v. San Diego County*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984)).

Nor is it premature to examine the sufficiency of plaintiffs' allegations until after discovery and expert economic analysis.[2] *See* Opp'n at 12-14. Plaintiffs still need to

---

[2]    Since 2000, courts in this Circuit have granted motions to dismiss antitrust claims on standing grounds at least 13 times. *See A.D.M. Club Mgmt. Sys. v. Gary Jonas Computing, Ltd.*, No. 05-3943 (HAA), 2006 WL 2689400 (D.N.J. Sept. 19, 2006); *IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*, No. 03-4113 (JAG), 2005 WL 3447615 (D.N.J. Dec. 15, 2005); *Martoramo v. PP&L Energy Plus, LLC.*, 334 F. Supp. 2d 796 (E.D. Pa. 2004), *aff'd*, No. 04-3751, 2005 WL 1488382 (3d Cir. June 23, 2005); *Only v. Ascent Media Group, LLC*, No. 06-2123 (FSH), 2006 WL 2865492 (D.N.J. Oct. 5, 2006); *Alleghany Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000); *In re Wellbutrin SR Antitrust Litig.*, Nos. 04-5525, 04-5898, 05-0396, 2006 WL 616292 (E.D. Pa. Mar. 9, 2006); *Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, No. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004); *EEOC v. Dan Lepore & Sons Co.*, No. 03-

4

allege facts which, if proven, would establish the elements of an antitrust claim, including antitrust injury. Indeed, a motion to dismiss "enables antitrust courts to dispose of more claims at an early stage of litigation by simply examining the logic of the plaintiff's theory of injury, as in *Brunswick* or *Cargill*." 2 Phillip E. Areeda, et al., ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 337a, at 309 (2005) (citing cases dismissed at 12(b)(6) stage). If, despite its length — 57 pages, comprising 321 paragraphs — the Complaint does not state a logical and legally cognizable theory, there is no reason to assume that discovery or expert analysis would yield one.

### B.    Plaintiffs' Request For Judicial Notice Cannot Save Their Claims

Plaintiffs seek to shore up their claims by asking the Court to take judicial notice of many facts that are not only absent from the Complaint but which also do not qualify for judicial notice. They include such things as a federal procurement study funded by AMD, the congressional testimony of AMD's Chief Executive Officer repeating conclusions from that procurement study and certain prices referenced in it, and declarations filed by AMD in connection with a dispute over foreign discovery. Opp'n at 5 n.2, 15. None of these supposed "facts" comes close to meeting the required evidentiary standard, *viz.*, that the "judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources

---

(Footnote Continued from Previous Page)
CV-5462, 2004 U.S. Dist. LEXIS 1943 (E.D. Pa. Feb. 9, 2004); *Koenig v. Automatic Data Processing*, No. 99-5816, 2003 U.S. Dist. LEXIS 26812 (D.N.J. June 23, 2003), *aff'd*, No. 03-3112, 2005 WL 2891740 (3d Cir. Nov. 3, 2005); *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 550 (E.D. Pa. 2002); *Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Ctrs., Inc.*, 237 F. Supp. 2d 606 (D.V.I. 2002); *Dexterity Surgical, Inc. v. Tyco Int'l*, No. 00-5789, 2001 WL 1003207 (E.D. Pa. Aug. 22, 2001); *Precision Surgical, Inc.* v. *Tyco Int'l, Ltd.*, 111 F. Supp. 2d 586 (E.D. Pa. 2000).

whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

Judicial notice is not available at the 12(b)(6) stage to insert new, much less disputed, facts for the Court's consideration.[3] Because plaintiffs' proffered "facts" do not meet the Federal Rules' standards, the Court should ignore them.[4]

## III.    THE COMPLAINT DOES NOT ALLEGE ANY INJURY COGNIZABLE UNDER FEDERAL OR STATE ANTITRUST LAWS

Whether under federal, California, or other state law, plaintiffs must plead an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723-724 (Cal. Ct. App. 1982) ("An 'antitrust injury' must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful.") (quoting *Brunswick*).[5] "An injury 'will not

---

[3]    A district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. *See* FED. R. CIV. P. 12(b). However, a "document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted).

[4]    Plaintiffs do not request judicial notice of other facts that directly contradict their claims, including facts showing that AMD has experienced unprecedented growth and prosperity in recent years, and has won key business and market share from the OEMs that plaintiffs' complaint claims were locked up by Intel's discount arrangements. For example, in an investor call discussing AMD's Quarter Four Earnings, AMD CEO Hector Ruiz stated:  "In our microprocessor business we experienced almost 80% year on year growth in what continues to be the largest quarter of the fiscal cycle. . . . Platform adoption has never been stronger, particularly among the world's most respected OEMs and industry partners . . .. A year ago we had 9.6% [market share], a quarter ago we had 11.9%, and it looks like we have 15.3%." Q4 2005 Earnings Call, Advanced Micro Devices, Inc., CallStreet, Jan. 18, 2006 (Ex. A hereto). AMD's 2005 Form 10-K filed with the SEC (Ex. B hereto) shows that AMD's total net sales increased by 66% between 2003 and 2005, and it is expecting to "augment production at [its] manufacturing facilities" and plans to "add production output on a steady year-to-year basis." *Id.* at 14.

[5]    *Kolling* refutes plaintiffs' argument that antitrust injury under California law is defined more liberally than under federal law. Opp'n at 6 n.3. This "liberality" is

qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to [the antitrust laws] to award damages for losses stemming from continued competition.'" *Amarel v. Connell*, 102 F.3d 1494, 1508 (9th Cir. 1996) (quoting *Atl. Richfield v. U.S. Petroleum Co.*, 495 U.S. 328, 334 (1990); citing *Brunswick*). This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." *Atl. Richfield*, 495 U.S. at 342.

Plaintiffs make two arguments regarding this burden:[6] (1) despite the discounts and rebates alleged in the Complaint, Intel's *average prices* for microprocessors were not "low," especially when compared to AMD's prices, Opp'n at 8; and (2) the allegedly illegal structures of the discounts and rebates caused the prices that plaintiffs paid for their computers to be higher than they otherwise would have been. *Id.* at 9, 16-18. As explained below, neither argument is sufficient to demonstrate an antitrust injury.

### A.    The Price Level Of Intel's Microprocessors Is Immaterial To The Antitrust Injury Analysis

The Supreme Court has said that "low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence they cannot give rise to antitrust injury. We have adhered to this

---

(Footnote Continued from Previous Page)
confined to the fact that California does not bar indirect purchasers from seeking antitrust damages. *See, infra,* at section VI.C.1. Further, plaintiffs cite no case holding that the other state antitrust claims that they assert have rejected the *Brunswick* test.

[6]    Plaintiffs also claim that Intel has "misread" the Complaint, "ignores" key allegations, or "assumes erroneously" what plaintiffs are alleging. Opp'n at 7, 8, 9. But neither Intel nor the Court can be expected to find something in the Complaint that is not there. Intel has not ignored allegations in the Complaint; rather, the plaintiffs have attempted to rely on allegations that do not appear in the Complaint. *See, supra,* at section II.B.

principle regardless of the type of antitrust claim involved." *Atl. Richfield*, 495 U.S. at

340. This term, the Court confirmed that it is "particularly wary of allowing recovery for

above-cost price cutting because allowing such claims could, perversely, 'chil[l]

legitimate price cutting,' which directly benefits consumers." *Weyerhaeuser Co. v. Ross-

Simmons Hardwood Lumber Co., Inc.*, __ U.S. __, 2007 WL 505794, at *5 (Feb. 20,

2007) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209,

223-24 (1993); *Atl. Richfield*, 495 U.S. at 340). Plaintiffs seek to evade this legal

obstacle by arguing that, on average, Intel's prices were not "low." Opp'n at 8.[7]

But the absolute value of Intel's prices is immaterial to whether the plaintiffs can

allege antitrust injury; if that were not so, then any price more than a penny over a firm's

costs would be vulnerable to a supra-competitive pricing claim by consumer. The

operative question is how the Complaint characterizes Intel's unilateral pricing conduct

in the market. Plaintiffs do not allege that Intel set its prices without considering rivals'

prices, *see, e.g., United States v. Microsoft*, 253 F.3d 34, 57-58 (D.C. Cir. 2001); or that

Intel did not react to price competition by its rival. *See e.g., United States v. Dentsply*,

399 F.3d 181, 191 (3d Cir. 2005). To the contrary, the bedrock of plaintiffs' claims is

that Intel aggressively discounted and otherwise reduced transactional prices for its

microprocessors to win business for which AMD was competing. FACC, ¶¶ 145-51.[8]

---

[7]    Plaintiffs assert that *Atlantic Richfield* is inapposite because in that case the
overall prices were "low." Opp'n at 15 n.8. But the claim in *Atlantic Richfield*, was
simply that the defendant illegally set gasoline prices low enough to take business away
from the plaintiff. 495 U.S. at 332. That is no different than what plaintiffs and AMD
allege here. Nor does *Bellevue Drug Co. v. Advance PCS*, No. 03-4731, 2004 WL
724490 (E.D. Pa. Mar. 2, 2004) support plaintiffs' position. *Bellevue* involved
allegations that the defendants illegally suppressed the prices they paid to suppliers, not
the prices the defendants charged to their customers. *Id*. at *4.

[8]    That Intel's prices were higher than AMD's prices (*on average*) is similarly
irrelevant to plaintiffs' antitrust injury analysis. Plaintiffs concede that Intel's price
reductions were sufficient to win the contested business. *See, e.g.*, FACC, ¶¶ 145-51.

This extensive discounting, some of which plaintiffs claim was greater than AMD could match, *id.* ¶¶ 163-67, sets plaintiffs' claims apart from the cases they cite as support for their antitrust injury argument.

*Bradburn Parent/Teacher Store, Inc. v. 3M*, No. 02-7676, 2000 WL 34003597 (E.D. Pa. July 25, 2003), upon which plaintiffs rely heavily, provides no refuge. Although the conduct challenged in *Bradburn* involved discount and rebate bundles, the plaintiffs there specifically alleged that at some point 3M "began implementing one or more increases in its monopoly prices," *id.* at *3, and that these monopoly price increases exceeded the rebates that the plaintiffs enjoyed during the predatory rebate period. *Id.*

Plaintiffs here allege no such thing. In fact, they assert that they do not need to allege "recoupment." Opp'n at 37. But this Circuit has explicitly stated that price increases are a prerequisite for antitrust injury where the alleged discounting is below cost. *ADVO, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995) ("Predatory pricing schemes that fail at the recoupment stage . . . do not injure competition (*i.e.*, they do not injure consumers) and so produce no antitrust injury."). Plaintiffs have articulated no sound argument why this principal does not apply to consumer claims where the conduct at issue is discounting to purchasers, however structured.[9] To the contrary, "discouraging a price cut . . . and depriving consumers of

---

[9]     None of the other cases plaintiffs cite involved reduced pricing. *See Allegheny Gen. Hosp. v. Phillip Morris Inc.*, 228 F.3d 429 (3d Cir. 2000) (claim to recover unreimbursed costs of health care attributable to conspiracy to conceal effects of smoking); *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1236 (3d Cir. 1987) (competitor's acquisition of another corporation deprived plaintiff of business); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000) (supra-competitive prices resulted from defendant's refusal to deal with its rivals); *Glaberson v. Comcast Corp.*, No. 03-6604, 2006 WL 2559479 (E.D. Pa. Aug. 31, 2006) (alleging illegal market allocation among competitors that led to higher prices); *N.Y. Citizens Comm. On Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802 (S.D.N.Y. 1986) (defendants' refusal to deal excluded competitors from market).

the benefits of lower prices . . . does not constitute sound antitrust policy."
*Weyerhaeuser*, 2007 WL 505794, at *5 (quoting *Brooke Group*, 509 U.S. at 224).

Even if the relationship between Intel and AMD prices was material to plaintiffs'
claim, that claim would be further undermined by the fact that plaintiffs have limited
their allegations to Intel's "average prices overall." *See* Opp'n at 8; *see also id.* at 15, 17,
18 n. 11. Plaintiffs have not alleged (nor could they) how the industry-wide *average*
price of Intel chips affected the transactional prices of the products they *actually*
*purchased.* An allegation that consumers overall paid higher prices is no substitute for a
specific, individualized allegation of antitrust injury. *Cf. Abram v. UPS, Inc.*, 200 F.R.D.
424, 431 (E.D. Wis. 2001) (using an "*average disguises enormous variety*"; if "Bill Gates
and nine monks are together in a room, it is accurate to say that on average the people in
the room are *extremely* well-to-do, but this kind of aggregate analysis obscures the fact
that 90% of the people in the room have taken a vow of poverty."); *see also Blades v.*
*Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005) (finding no commonality where market
for product was "highly individualized," and wide variation in prices among product
would require purchasers of some to prove injury through evidence that would vary
according to individualized market conditions and thus would not be shared in common
with rest of proposed classes).

**B.      The Alleged Structure Of Intel's Discounts And Rebates Does Not**
**Give Rise To Any Antitrust Injury**

Plaintiffs' argument that the "structure" of the Intel discounts and rebates is the
culprit fares no better. Plaintiffs claim that the discount structure was harmful because it
"was tailored to prevent an incremental shift in share from Intel to its competitors."
Opp'n at 16. In other words, plaintiffs' theory seems to be that Intel should have kept its
prices *high* enough to lose share to and empower its rivals. "[H]ad Intel allowed AMD
and others to compete fairly, and thereby expand their businesses," plaintiffs allege,

10

"Intel would have faced more efficient competitors" which "would have forced Intel to lower its prices." *Id.* at 9-10.

This conclusory contention depends on the following chain of events: (1) Intel's discounts and rebates were offers that direct customers could not refuse; (2) by accepting these discounts and rebates, the direct customers chose Intel products instead of allegedly lower-priced AMD products; [10] (3) those lost sales stunted AMD's growth; (4) but for that stunted growth, AMD would have eventually expanded its position in the x86 microprocessor market at some point in the future, after which (5) Intel would have faced increased competition from AMD; (6) this increased competition would have compelled Intel to lower its microprocessor prices; (7) those but-for prices would have been even lower than the discounts that the direct purchasers enjoyed in the real world; and (8) those savings would have been passed on to plaintiffs through one or more intermediaries in the form of lower priced PCs and other products containing Intel chips. This theory relies on even more implausible suppositions and twisted causal chains than did AMD's allegations of domestic injury from Intel's foreign conduct — allegations this Court found too indirect to satisfy proximate causation. D.I. 279 at 12. This not only renders their claim too remote to support antitrust standing, *see, infra,* at section IV, but also too speculative to establish that their alleged injury proximately flowed from this purportedly illegal discount structure. *Kochert v. Greater Lafayette Health Servs., Inc.,* 463 F.3d 710, 718 (7th Cir. 2006) (affirming entry of summary judgment against plaintiff who failed to show that her alleged "antitrust injury" flowed from the defendant's acts).

---

[10]    Plaintiffs assert that Intel's direct customers did not "benefit" because the structure "coerced" those customers to buy Intel microprocessors even though those customers supposedly would have preferred to buy allegedly lower-cost, higher-quality AMD microprocessors. Opp'n at 16. However, that allegation is immaterial to these plaintiffs' claims, which relate to their indirect purchase of *Intel* microprocessors; plaintiffs do not contend that they would have bought AMD-based computers but for Intel's conduct.

Moreover, plaintiffs do not explain how a manufacturer could ever know how *high* it had to keep its prices to enable its competitors to become sufficiently "efficient" that their competitors would someday cause it to *lower* them. "Even a monopolist is entitled to compete . . . ." *Goldwasser*, 222 F.3d at 397. In reality, Intel discounted the amount necessary to win incremental business, and downstream customers, including plaintiffs, were beneficiaries of the discounts. Without allegations that Intel was pricing at a predatory level, stopped discounting, and has now raised its prices to a supra-competitive level, the plaintiffs, as indirect beneficiaries of the discounts, cannot establish antitrust injury.

## IV.    PLAINTIFFS DO NOT HAVE ANTITRUST STANDING TO BRING THEIR ANTITRUST CLAIMS

Plaintiffs' inability to state a viable claim under the antitrust laws does not end with their inability to establish antitrust injury. Plaintiffs also fail to demonstrate that they have standing to sue for the alleged antitrust violations. The antitrust standing inquiry — as articulated by the Supreme Court in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), and later applied by state courts to their respective antitrust laws — requires the court to consider several factors to determine whether plaintiffs have antitrust standing. An analysis of these *AGC* factors demonstrates that plaintiffs lack standing.

### A.    Under *AGC* Plaintiffs Lack Standing To Bring Their Antitrust Claims[11]

Alleging antitrust injury "is a necessary but insufficient condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997). The court still must independently consider plaintiffs' allegations in light of

---

[11]    Plaintiffs suggest that *AGC* does not apply to state antitrust laws. None of the cases they cite support this argument, but nevertheless we address it in section C, *infra*.

12

the *AGC* factors. The plaintiffs' failure to satisfy the first factor — antitrust injury — is discussed above. The plaintiffs fare no better with respect to the remaining elements.

### 1.    The Purported Causal Connection Is Too Attenuated

Plaintiffs' alleged "causal connection" between the alleged antitrust violation and their purported injury is too remote to support standing. The "causal connection" factor requires plaintiff to "allege some credible injury caused by the unlawful conduct." *American Ad Mgmt., Inc. v. General Tel. Co. Of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999). To meet this factor, the plaintiffs must establish this causal connection between Intel's alleged conduct and plaintiffs' alleged injury, not AMD's alleged injury or purported injuries to Intel customers who are not before the court.

Plaintiffs' own characterization of their causation theory demonstrates its inadequacy: "But for Intel's conduct, its customers would have been free to buy more of AMD's lower-cost microprocessors, which would have compelled Intel to lower its prices in response." Opp'n at 36. But-for causation is not, as a matter of law, the proper standard for assessing whether plaintiffs have alleged a sufficient causal connection. Instead, plaintiffs must allege that the defendants' conduct was the proximate cause of its injury. *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740 (3d Cir. 2004); *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 926-27 (7th Cir. 1995); *Kolling*, 137 Cal. App. 3d at 723 ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries.").

Plaintiffs' tenuous and convoluted allegations of causation are not sufficient to show proximate causation. Plaintiffs' causation theory in this case begins with the already-complicated AMD story (including those claims that the Court previously dismissed due to their remote connection to U.S. commerce) and tacks on multiple additional links in the chain. Plaintiffs try to dismiss the implications of this Court's FTAIA decision by arguing that they are not required to allege that their injuries were

13

"direct." But antitrust standing requires a plaintiff to demonstrate "a direct link between the antitrust violation and the antitrust injury" consistent with the "common-law tort limitation of proximate cause." *Sanner*, 62 F.3d at 926-27 (7th Cir. 1995) (internal citations omitted). At best, the plaintiffs have alleged that they are at the far end of a long chain of causation, with multiple independent actors — including foreign and domestic OEMs, distributors, and resellers — intervening between Intel's alleged conduct and plaintiffs' alleged harm. This complicated chain of causation is too attenuated to show the required proximate cause.

**2.    Plaintiffs' Purported Injuries Are Too Remote And Speculative**

Plaintiffs claim that their injuries are "no more remote than in any indirect purchaser case, which by definition involves proof that an overcharge has been passed on through the chain of distribution." Opp'n at 48. But this is not a case, such as the typical price-fixing cases that plaintiffs cite repeatedly in their Opposition, where plaintiffs allege that, absent the anticompetitive scheme, the same defendants would have sold the same product to the same plaintiffs in the same form and in the same quantities, only at a lower price. *See id.* at 49 (citing *In re Sugar Indus. Antitrust Litig*, 579 F.2d 13 (3d Cir. 1978)). Instead, before even positing an overcharge, plaintiffs here are forced to rely on hypothetical conduct of many independent actors, including AMD, various computer manufacturers, retailers and distributors, and consumers. As discussed above, the Court has already recognized the inherent difficulty in speculating about what would have happened to AMD. *See* D.I. 279 at 12.

But the inherently speculative nature of plaintiffs' claim does not end with that difficult prediction. It is even more speculative that Intel would have, as plaintiffs say, uniformly responded to AMD's hypothesized success by lowering prices, rather than engaging in additional R&D, marketing, or myriad other possible competitive reactions. Moreover, the same speculation inheres in predicting what would have occurred along

14

the distribution chain. This chain of contingencies makes the alleged link between Intel's microprocessor sales and plaintiffs' PC purchases fatally attenuated.

### 3.    There Are More Direct Victims Of Intel's Alleged Conduct

Plaintiffs do not dispute that they do not themselves participate in an x86 microprocessor market. Nor do plaintiffs dispute that there are other entities that would have been more directly affected by the alleged conduct, including AMD, direct microprocessor purchasers, and computer distributors or resellers. Instead, by citing to direct purchaser cases and factually distinct indirect purchaser cases, the plaintiffs attempt, but fail, to make the case that they are "market participants" and, therefore, direct victims of Intel's alleged conduct.

Plaintiffs first claim that Intel has "misread" the Complaint as limited to those who allege overcharges for purchases of "personal computers, workstations, and servers containing Intel x86 microprocessors" and now claim that, despite the plain language of FACC ¶ 200, they also assert claims on behalf of those who purchased stand-alone microprocessors as well. The plaintiffs have not explicitly said that any of the named plaintiffs purchased a stand-alone microprocessor. Instead, according to the plaintiffs, the source for this purported allegation is not one of the factual averments in the Complaint, but instead is the proposed class definition. *See* Opp'n at 39 & n.33. Because no class has been certified in this case, however, named plaintiffs cannot base their individual standing on any rights that may rest with an absent class member. *See, e.g.,* *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) ("A potential class representative must demonstrate individual standing vis-a-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action."). For standing purposes, the Court must consider the allegations made by the named plaintiffs, and the allegations concerning the plaintiffs' purported injuries are limited to purchases of

15

"personal computers, workstations, and servers containing Intel x86 microprocessors."
*See* FACC, ¶ 200.

Thus, the question properly before the Court is whether indirect purchasers of computers, multiple steps removed from Intel's alleged discounting conduct, can properly allege that they are participants in a market for x86 microprocessors that is the subject of the alleged anticompetitive conduct. *See, e.g., Barton & Pittnos, Inc.*, 118 F.3d at 184 (finding plaintiff was "not a competitor or consumer in the market in which trade was allegedly restrained by the antitrust violations . . . [and thus plaintiff's] alleged injury is not "antitrust injury.").[12] They cannot.

Each of plaintiffs' cases on this point is distinguishable on the facts. In both *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 150-151 (3d Cir. 2002), and *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 15 (3d Cir. 1978), the defendants themselves manufactured the products (boxes and candy, respectively) that incorporated other price-fixed products (linerboard and sugar, respectively) and sold those products directly to the complaining plaintiffs. Thus, unlike the plaintiffs here, those plaintiffs were direct participants in the market subject to price-fixing based on their relationship with the defendants.[13]

---

[12]    Plaintiffs do not deny that *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), applied the market participant rule to Cartwright Act standing. *See* Opp'n at 40 & n. 34. Instead, plaintiffs argue that *Knevelbaard* "rejected an argument similar to the one now advanced by Intel" by finding that milk producers who sold to defendant cheese makers were participants in the milk market." *Id.* Plaintiffs' argument is unpersuasive — the *Knevelbaard* court found that all of the parties were in the milk market because the plaintiffs sold milk directly to the defendants, and there was a statutorily fixed, formulaic price relationship between the milk market and cheese market. 232 F.3d at 989-90. There is no direct customer-supplier relationship between the plaintiffs and Intel in this case, nor is there a formulaic relationship between the price of x86 microprocessors and the computers manufactured and sold by third parties.

[13]    Similarly, plaintiffs quote *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1125-26 (N.D. Cal. 2005) out-of-context for the proposition that indirect purchasers may suffer a cognizable antitrust injury. The quoted language relates to the court's discussion of California's repeal of *Illinois Brick*, and does not apply to the "analytically distinct" requirement that the plaintiff have antitrust standing.

16

The plaintiffs' reliance on the consumer litigation against Microsoft is similarly unhelpful. *See* Opp'n at 24-25. As an initial matter, Microsoft's standing arguments were limited to whether certain states would recognize the bar on indirect purchaser standing from *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which is not at issue in this case. *See, e.g., Kanne v. Visa U.S.A., Inc.*, 723 N.W. 2d 293, 300 (Neb. 2006) (noting that, in *Arthur v. Microsoft*, 676 N.W.2d 29 (Neb. 2004), court had addressed only whether indirect purchaser may bring civil action).

Moreover, the Microsoft cases do not create a blanket rule that any self-identified indirect purchaser has standing. The Nebraska example is illuminating. In *Arthur v. Microsoft*, the Nebraska Supreme Court confirmed that indirect purchasers had standing to sue for antitrust violations under the Nebraska Consumer Protection Act, as the state had declined to adopt *Illinois Brick.* 676 N.W.2d at 38. Soon thereafter, the Nebraska Supreme Court confirmed that *Arthur* did not grant standing to anyone who alleges that they are an indirect purchaser. In *Kanne,* the plaintiffs sought damages that they alleged were caused by the defendants imposing a monopoly overcharge. 723 N.W.2d at 295. When defendants moved to dismiss for lack of standing, the plaintiffs argued that *Arthur* eliminated the requirement that plaintiffs meet the *AGC* standing test under the state antitrust and consumer protection statute. *Id.* at 299. As noted, the Nebraska court disagreed, confirming that all plaintiffs must satisfy the *AGC* factors to have standing to pursue an antitrust claim. *Id.* at 300-301. Plaintiffs here cannot make that showing.

The plaintiffs in this case are instead similar to the plaintiff who was found to lack standing in *Lorix v. Crompton Corp.*, 720 N.W.2d 15 (Minn. 2006). The *Lorix* plaintiff did not purchase illegally priced rubber-processing chemicals; rather, she alleged that the chemical manufacturers sold those chemicals to third parties who then manufactured the tires that the plaintiff purchased. *Id.* at 18. Like the plaintiffs here, the *Lorix* plaintiff lacked standing, as she purchased a product in a different market that was manufactured

by third parties (not the defendants) and sold through multiple levels of distribution.[14]  *Id.* at 19.

Given plaintiffs' position — on the fringes of a separate and distinct market than the market allegedly subject to the anticompetitive overcharge — it is not surprising that there are other entities more directly affected by Intel's alleged conduct, not least of which is AMD.  In light of the existence of these other entities, and plaintiffs' remote relationship to the conduct at issue, plaintiffs lack standing to maintain an antitrust lawsuit.  Thus, the four relevant *AGC* factors — antitrust injury, a causal connection, remoteness and speculative nature of the injury, and the existence of a more direct victim[15] — weigh against the plaintiffs' standing to pursue claims against Intel on the basis of plaintiffs' buying a derivative product that was purchased several levels down the distribution chain.

### B.    Plaintiffs' Alleged Non-Price Injuries Cannot Confer Antitrust Standing

Plaintiffs concede that they "do not allege that they are injured by Intel's technological misconduct in and of itself," yet they nevertheless rely on allegations of ineffectual alleged threats against Intel customers and unsuccessful efforts to influence industry standards, as sources for their alleged injury:  higher computer prices.  These purported actions could not logically have given rise to the plaintiffs' alleged injury and,

---

[14]    Plaintiffs attempt to distinguish *Lorix* on the basis that the rubber processing chemicals that were allegedly subject to the illegal price-fixing "would have been consumed or altered in the chain of distribution."  Opp'n at 44.  But the plaintiff in *Lorix* alleged that the rubber processing chemicals were a component in the tires that she purchased and that she claimed were subject to an anticompetitive overcharge.  *See* Appellants' Reply Br. and Supplemental App., *Lorix v. Crompton Corp.*, No. A05-2148, 2006 WL 2838374, at *5-6 (Minn. Ct. App. Jan. 30, 2006).

[15]    The parties agree that the last factor — the risk of duplicative recovery and complexity in apportioning damages — is neutral.  *Compare* Intel Mem. at 16 & n.19 *with* Opp'n at 35 & n.29.

because they are even further removed from plaintiffs' computer purchases than Intel's alleged discounting conduct, cannot form the basis for the plaintiffs' antitrust standing.

To bolster this claim, plaintiffs cite several cases for the proposition that non-enforced threats can establish injury, but these cases are taken out of context and do not hold that such threats alone are sufficient to establish injury to a remote purchaser. *See United States v. Grinnell Corp.*, 384 U.S. 563, 567-70, 576 (1966) (court made no finding regarding unsubstantiated threats since the government had introduced extensive evidence regarding illegal contractual arrangements and other activities); *United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944) (court found that threats by monopolist against independent distributors successfully caused distributors to sell out to monopolist, thereby reducing competition).

Plaintiffs' discussion of Intel's experience with Microsoft also fails to support their argument that mere threats can create an anticompetitive effect. In *Microsoft*, the government alleged that Microsoft harmed competition by convincing Intel to stop supporting Sun Microsystems' Java programming language. *Microsoft*, 253 F.3d at 77. But there the court found that Microsoft's threat, unlike those alleged in this case, produced its desired effect. It was that effect, not the threat, that was responsible for any anticompetitive impact.

Plaintiffs' claim that *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006), is inapplicable because (1) they seek damages for overcharges under state indirect purchaser statutes rather than federal law (and, therefore, are not subject to *Illinois Brick*), and (2) they disclaim any independent injury from non-price conduct. But *Kloth* held that plaintiffs could not satisfy the *AGC* standing factors, not because they were indirect purchasers, but because any injury from the non-price conduct was too speculative to support antitrust standing. *Id.* at 324. This is true whether that conduct is semantically characterized as a direct injury or as causing higher prices. Therefore, like the plaintiffs

in *Kloth*, plaintiffs here do not have antitrust standing to pursue claims based on the alleged non-price conduct.

### C.    Plaintiffs' State Law Claims Require Antitrust Standing

Plaintiffs deny that the *AGC* factors apply under the laws of California and the other states they invoke. Nothing in the cases they cite supports this illogical argument, but we distinguish them below.

### 1.    California Law Imposes The *AGC* Test

Plaintiffs do not dispute that the published decisions on standing under the Cartwright Act have uniformly looked to the *AGC* factors. *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 (Cal. Ct. App. 1995); *Knevelbaard*, 232 F.3d at 987-92 (applying *AGC* factors to Cartwright Act standing); *MGM Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224-25 (C.D. Cal. 2003) ("[W]hile the scope of actionable injury is slightly different under the Cartwright Act, the standing analysis is nonetheless informed by many of the same factors[.]"). The cases plaintiffs cite to argue that California would not import the *AGC* standing analysis either support the use of federal precedent to interpret the Cartwright Act, or otherwise do not apply. *See Cianci v. Super. Ct.,* 40 Cal. 3d 903, 920 (1985) (finding Supreme Court Sherman Act case reasoning to be "applicable to the Cartwright Act and persuasive."); *Cellular Plus, Inc. v. Super. Ct.*, 14 Cal. App. 4th 1224, 1241-42 (Cal. Ct. App. 1993) (finding that the Cartwright Act did not encompass the federal *Keogh* doctrine[16] when even the U.S. Supreme Court had determined that *Keogh* "was unwise as a matter of policy" in *Square D Co. v. Niagra Frontier Tariff Bureau*, 476 U.S. 409, 420, 423-24 (1986)); *Theme Promotions, Inc. v.*

---

[16]    The *Keogh* doctrine holds that a purchaser cannot seek treble damages under the federal antitrust laws by challenging rates that are filed with and approved by a federal agency pursuant to statute. *See Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922).

*News Am. FSI*, 35 Fed. Appx 463, 467 (9th Cir. 2002) (finding that the plaintiff had standing under federal law and, therefore, had standing under the Cartwright Act).

The only case plaintiffs cite that actually discusses Cartwright Act standing requirements is one that explicitly relied on the *AGC* factors for its analysis. *See Knevelbaard,* 232 F.3d at 987-92.[17] Plaintiffs cite an out-of-context statement in *Knevelbaard* that "California law affords standing more liberally than does federal law." Opp'n at 30 n.22 (citing *Knevelbaard,* 232 F.3d at 987). However, this statement is related to California's decision not to follow *Illinois Brick*, which means that the Cartwright Act, unlike federal law, permits monetary claims by indirect purchasers. *See Knevelbaard*, 232 F.3d at 991 (noting that the "more restrictive definition of 'antitrust injury' under federal law [prohibiting indirect purchasers from suing] does not apply to the Cartwright Act." (internal citations omitted)); *see also Grokster*, 269 F. Supp. 2d at 1224 (noting that "the broader California definition resulted from the United States Supreme Court's restrictive decision in *Illinois Brick*"). This expansion does not, however, mean that indirect purchasers automatically have standing no matter what the facts of their case. *See, e.g., In re Credit/Debit Card Tying Cases,* No. JCCP 4335, 2004 WL 2475287 (Cal. Super. Ct. Oct. 14, 2004) (dismissing indirect purchases case for lack of standing); *see also, Knowles v. Visa U.S.A., Inc.*, No. Civ. A. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004) (dismissing indirect purchasers for lack of standing); *Crouch v. Crompton Corp.*, No. 02 CVS 4375, 2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004) (same and citing cases). Instead, when confronted with a non-*Illinois Brick* standing issue like the one present in this case, the *Knevelbaard* court —

---

[17]     *Knevelbaard* also confirms that the principle of states being guided by federal precedent to interpret their state antitrust laws is not, as plaintiffs argue, limited to substantive statutory provisions, but extends to procedural requirements, including the antitrust standing prerequisite.

like the courts in all reported decisions on this issue — employed the *AGC* factors to limit Cartwright Act standing.

> **2.    The *AGC* Test Applies To The Alternatively Pled State Antitrust Laws**

The same result holds under the mosaic of state antitrust laws under which plaintiffs alternatively seek relief. In arguing against application of the *AGC* standing factors to these state laws, plaintiffs have contorted the fact that several states have chosen to reject the *Illinois Brick* indirect purchaser bar into a general rejection of the use of federal antitrust precedent. This approach is undermined by both state and federal authority. No state has adopted that blanket approach, and the United States Supreme Court has made clear that the question of whether indirect purchasers are allowed a damages remedy is "analytically distinct" from the question of whether a particular plaintiff's claimed injuries are too remote to support antitrust standing. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982); *Illinois Brick*, 431 U.S. at 728 & n.7 ("[T]he question of which persons have been injured by an illegal overcharge . . . is analytically distinct from the question of which persons have sustained injuries too remote to give them standing[.]"); *see also Knowles*, 2004 WL 2475284 at *3 ("that the Maine legislature decided to overrule *Illinois Brick* on the issue of whether indirect purchasers may assert a remedy does not necessarily resolve the issue of standing").[18]

Two of the three cases that plaintiffs cite to bolster their argument that the *AGC* factors should not apply to state law claims deal only with the question of whether a state

---

[18]    It is not surprising that, as a matter of policy, some state courts have not found the *Illinois Brick* precedent persuasive, as roughly one-half of the states, either through legislative or judicial action, have concluded that *Illinois Brick* is unsound policy. *See* Paul J. Stancil, *Atomism and the Private Merger Challenge*, 78 TEMPLE L. REV. 949, 994 (Winter 2005). No such controversy exists about using the *AGC* factors to eliminate claims by plaintiffs who are insufficiently connected to an alleged antitrust violation, as plaintiffs can point to no case by a state's highest court considering and rejecting use of the *AGC* factors to assess antitrust standing.

should adopt the *Illinois Brick* indirect purchaser bar. *See Bunkers Glass Co. v.
Pilkington PLC*, 75 P.3d 99, 101 (Ariz. 2003) ("This case continues the debate over
whether indirect purchasers should be allowed to sue for injury resulting from antitrust
violations, or whether such suits should be restricted to direct purchasers of goods.");
*Comes v. Microsoft Corp.*, 646 N.W.2d 440, 451 (Iowa 2002). Given the "analytical
distinction" between *Illinois Brick* and antitrust standing issues, these cases are not
helpful to the plaintiffs.

The only case that plaintiffs cite that actually considers the application of the
*AGC* factors to state law claims is *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, __
F. Supp. 2d __, 2006 WL 3921865 (E.D. Pa. May 30, 2006). The *D.R. Ward* court
attempted to predict, in the absence of direct precedent,[19] the antitrust standing tests the
highest courts in Arizona, Tennessee, and Vermont would apply to indirect purchaser
claims. *D.R. Ward* relied primarily, as plaintiffs do here, on the fact that the states at
issue had rejected *Illinois Brick*, and opined that, if presented with the issue, the highest
courts of those states would not apply the *AGC* factors to their state antitrust laws. *Id*. at
**5-9.

However, *D.R. Ward* expressly conflicts with the vast majority of state court
decisions that have found that the *AGC* standing test applies under state antitrust law. *See
Lorix*, 720 N.W.2d at 18; *Peterson v. Visa U.S.A., Inc.*, No. Civ. A. 03-8080, 2005 WL
1403761, at **3-6 (D.C. Super. Ct. Apr. 22, 2005) (applying *AGC* factors to deny
standing to purported indirect purchaser); *Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323,
2005 WL 1403769, at **3-5 (Wis. Cir. Ct. Feb. 8, 2005) ("I suspect that if faced with this
issue, our appellate courts would look to these [*AGC*] factors in assessing an indirect or

---

[19]     Inexplicably, the *D.R. Ward* court gave no weight to the fact that the only Arizona
state court to consider the issue had found that the *AGC* factors were properly applied to
claims under the Arizona antitrust laws. *See D.R. Ward*, 2006 WL 3921865, at * 6
(citing *Luscher v. Bayer AG*, No. CV-2004-014835 (Ariz. Super. Ct. Sept. 14, 2005)).

remote purchaser's standing."); *Southard v. Visa U.S.A., Inc.*, No. LACV 031729, 2004
WL 3030028, at **3-4 (Iowa Dist. Ct. Nov. 17, 2004). Moreover, the only state high
court ever to consider the issue recently came to the opposite conclusion from *D.R. Ward*.
*See Kanne*, 723 N.W.2d at 301 (proper to apply *AGC* factors notwithstanding state's
rejection of *Illinois Brick*).[20]

In arguing that California and the other class states would not follow the *AGC*
factors to determine standing, plaintiffs have not identified any case adopting any other
standard. Instead, plaintiffs are apparently arguing that the scope of standing under these
state laws is limitless. This same argument was wisely rejected in *Lorix* as inconsistent
with legislative intent. *Lorix*, 720 N.W.2d at 18. Standing under state antitrust law must
have some limit, and the overwhelming majority of reported decisions to consider the
issue, under California law and otherwise, have looked to the *AGC* factors to determine
that limit. There is no reason for this Court to depart from that body of well-established
precedent.

## V.    CALIFORNIA LAW DOES NOT APPLY NATIONWIDE

In rushing to assure the Court that it can apply California law to every one of the
potential millions of class members in these cases, the named plaintiffs forget that they
did not meld into a monolith when they filed their complaint. Neither having their claims

---

[20]    Plaintiffs highlight that the state antitrust laws they invoke have variations in their
harmonization statutes: Some have "permissive" harmonization statutes, others have
"mandatory" harmonization provisions, while still others do not have harmonization
provisions at all. Opp'n at 30-31. None of the antitrust statutes at issue in *D.R. Ward*
contains a so-called "mandatory" harmonization provision. 2006 WL 3921865, at **6-8.
Thus, for the four states that have such harmonization provisions — Iowa, Nebraska,
New Mexico, and West Virginia — the *D.R. Ward* analysis is entirely inapplicable.
Moreover, even in the absence of a harmonization provision, plaintiffs have not provided
any authority that precludes the court — as the majority of courts to consider the issue
before it have — from using the *AGC* factors to guide its standing analysis.

consolidated for pretrial proceedings nor purporting to represent a class changes the duty of each named plaintiff, individually, to state a claim under the laws he or she invokes.

Consolidation in multi-district litigation is a purely procedural device, designed to centralize management of pretrial proceedings, not to change the rights of the parties. *See In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 298 (3d Cir. 2005) (citing *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933) (interpreting the predecessor rule to Rule 42(a)). MDL rules are not, as plaintiffs would have it, an excuse to manipulate the choice of law determination, select their favorite substantive law, or alter the potential outcome of these cases. *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823 (1985) (holding courts must analyze contacts of each plaintiff, not consolidated case as a whole). Plaintiffs may not collectively shelter themselves under a class-wide umbrella of California claims based on the residence of the few Californians who originally filed claims in California. *See* Intel Mem. at 33; *cf. Shutts*, 472 U.S. at 820 ("plaintiff's desire for forum law is rarely, if ever controlling" because the "invitation to forum shopping would be irresistible") (citations omitted). Instead, the Court must apply a standard choice of law analysis, focusing on the forum in which each class plaintiff filed his complaint. Properly applying this method, the non-Californian named plaintiffs cannot state a claim under either California's Cartwright Act or its unfair competition law, and those claims must be dismissed as to those 76 non-California plaintiffs.

### A.    The "Most Significant" Relationship Test Governs The Choice Of Law Analysis For Most Plaintiffs

Plaintiffs contort the method by which this Court must decide which choice of law test to apply. The Supreme Court has made clear that a court must apply the choice of law test imposed by the state where the claim was first brought. *See* Intel Mem. at 32. This is a claim by claim process; there is no "majority rules" approach. Thus, the

plaintiffs' argument that most of the cases transferred by the JPML to this Court came from California is immaterial.

Of the 96 named plaintiffs in FACC,[21] 76 never filed complaints in California; they filed in Delaware, Tennessee, or Florida. California's choice of law rule — the "governmental interest" test — applies only to the ten non-California plaintiffs whose California claims were transferred from California.[22] For the remaining 66 plaintiffs, the Court must apply the Restatement's "most significant relationship" test. *See* Intel Mem. at 33[23]; *see also Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). But in fact the test matters little here: Under either test, the non-California plaintiffs' claims under California law should be dismissed.

Plaintiffs misinterpret both the "most significant relationship" test and the "governmental interest test," tossing irrelevant factors onto the scales to give the appearance that the numbers favor them. These are not by-the-numbers analyses. They require courts to consider comity, the states' interests in enforcing their own laws, and the relationship of the states' policies to the particular issues of the case. Most of the factors that plaintiffs highlight here have no bearing on states' interests in regulating the conduct alleged, and the Court should ignore them under either test.

---

[21]    Plaintiff Brian Weiner subsequently withdrew as a named class plaintiff on November 30, 2006.

[22]    Those named plaintiffs are listed at Intel Mem. at 36 n.37.

[23]    Intel does not challenge the right of the 20 California plaintiffs who invoke California law: Allanoff, Baxley, Brauch, Dickerson, Feitelberg, H. Frazier, J. Frazier, Goldman, Herrolder-Perras, Munson, Press, Juskiewicz, Lang, Lipton, Law Offices of Laurel Stanley, Suarez, Trotter-Vegel Realty, Law Offices of Kwasi Asiedu, Marshall and Walker.

### 1.    Under "Most Significant Relationship" Test, California Law Does Not Apply To Non-California Plaintiffs

The "most significant relationship" choice of law test rejects the argument that California law applies to the non-California plaintiffs. This test is a straightforward test that focuses on four factors. *See* Intel Mem. at 33-34. The applicable law is usually the law of the state of injury, and the fact that plaintiffs allege injury in the states where they reside weighs heavily in applying the law of plaintiffs' states of residence. *See generally* Comments to RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971); *Id.* at § 156 ("applicable law will usually be the local law of the state where the injury occurred").

The Complaint alleges that 66 of the 96 named plaintiffs who brought their claims in non-California courts reside outside of California and purchased the equipment containing Intel microprocessors outside California. FACC, ¶¶ 10-105. Per their allegations, plaintiffs who do not live in California purchased computers that were part of a global market, were often fabricated outside the United States, *id.,* ¶¶ 129, 134, 141, 145-151, and contained many components besides Intel microprocessors, *Id.,* ¶¶ 133-37. No plaintiff residing outside California alleges that they purchased a computer in California or from a California seller. Therefore, the law of plaintiffs' place of purchase applies. *See* Intel Mem. at 34 (citing cases)*; see also Gyarmathy & Assoc., Inc. v. TIG Ins. Co.,* No. 3:02-CV-1245, 2003 WL 21339279, *2 (N.D. Tex. June 3, 2003) (declining to apply law of defendant's state of business and noting that "[a]pplication of the class member's state's law is also consistent with the more general analysis of . . . the Restatement").

The other facts that plaintiffs reference are not implicated here or do not favor the application of California law, or both. For example, the location of AMD's headquarters, the location of AMD's litigation, where AMD sent third-party subpoenas in that litigation, and the fact that census data shows that Californians "have more households

27

with computers . . . than any other state"[24] do not implicate any policy or interest of California in adjudicating the claims of indirect purchasers nationwide. According to the Complaint, Intel's alleged illegal conduct took place, and allegedly had effects, worldwide.

Plaintiffs are left only with the fact that Intel is headquartered in California, a factor that carries very little weight on its own. *See generally* Comments to RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). Plaintiffs allege no relationship between themselves and Intel or even with Intel's business activities in California. Nor do plaintiffs allege facts supporting that the conduct causing the injury occurred in California. In fact, plaintiffs specifically allege otherwise, acknowledging a long chain of intervening events causing plaintiffs' alleged injury, and alleging dealings between Intel and its direct customers and retailers located in many places around the world, far from California. *See, e.g.*, FACC, ¶¶ 129, 141, 143-62, 177-79, 204-205.

Nor do plaintiffs' authorities support application of California law to non-California residents under the "most significant relationship" test. Plaintiffs cite *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004), for the proposition that the law of the state of a defendant's headquarters and the place where "alleged deceptive acts originated" applies under this test. *See* Opp'n at 53. *Warfarin* actually supports Intel's position. There, the district court was considering the propriety of a nationwide settlement class that had brought claims under the laws of 50 states. The only state law claim brought by all the named plaintiffs was one under the Delaware Fraud Act, 6 Del. C. §§ 2511 *et seq. See Warfarin*, 212 F.R.D. at 248. The

---

[24]     Not only does this statistic have nothing to do with Intel, but plaintiffs' implication that no state other than California has a right to apply laws governing computer sales to its own citizens contradicts choice of law principles and would make California the national arbiter of virtually all technology law.

district court noted that because the Act applied to non-residents where the

misrepresentations emanated from Delaware

> [C]lass members from other states can assert Delaware law
> in this case, *so long as the members' own state consumer*
> *fraud statutes do not have material conflicts with the*
> *Delaware statute* and Delaware has significant contacts
> with the asserted claims of these plaintiffs."

*Id.* at 248 n.15 (emphasis added).[25]  Plaintiffs here cannot use California law to avoid

their own conflicting home states' remedies.

Plaintiffs also imply that because "the injury [here] occurred in two or more states

. . . the place of injury cannot be ascertained or is fortuitous." *See* Opp'n at 54 (quoting

comments to Restatement Section 145).  Plaintiffs' Complaint is to the contrary:  They

allege that they were injured where they lived and purchased computers containing Intel

microprocessors. *See* FACC ¶¶ 10-105.

Finally, plaintiffs' citation to inapposite New Jersey law fails.[26]  *See* Opp'n at 54

n.48.  In none of these cases did New Jersey apply the "most significant relationship"

test. *See, e.g., In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1455 (D.N.J. 1987) ("New

Jersey conflicts of law questions are resolved under the 'interest analysis' which weighs

the interests and contacts of the states involved.").

---

[25]     The choice of law issue was not before the Third Circuit on its review of the
district court's certification of a settlement class.  Moreover, the Third Circuit
acknowledged "that there may be variations in the rights and remedies available to
injured class members under the various laws of the fifty states." *In re Warfarin*, 391
F.3d at 530.  The Third Circuit held those variations did not preclude the certification of a
settlement class under the particular circumstances of that case, although it recognized
that "there may be situations where variations in state laws are so significant so as to
defeat commonality and predominance even in a settlement class certification" *Id.* at
529-30.

[26]     In the one non-New Jersey case plaintiffs cite, the defendant failed to articulate
how the applicable law of other states differed from that of the forum state, or how those
states interests or policies would be thwarted by application of forum state law. *See*
*Gruber v. Price Waterhouse*, 117 F.R.D. 75, 82 (E.D. Pa. 1987).

> 2.   **For The Few Plaintiffs For Whom The California Choice Of Law Test Is Proper, California Substantive Law Does Not Apply**

For the 10 non-California plaintiffs who asserted claims under California law in transferred California actions, California's governmental interest choice of law analysis applies. *See* Intel Mem. at 36-37 (describing test).

Plaintiffs contend that because *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal. 4th 95 (2006), involved the claims of California residents against a non-California defendant and concluded that California law would apply to the California plaintiffs' claims, it has no application here. *See* Opp'n at 60. To the contrary, *Kearney*, the California Supreme Court's most recent and definitive statement on California's choice of law test, expressly demands a detailed factual and statutory analysis for the application of California law beyond the State's borders. *See Kearney*, 39 Cal. 4th at 117-26.

Plaintiffs here allege that they purchased computers and so were injured in their home states. *See* FACC, ¶¶ 10-105. They have no direct relationship with Intel, let alone a relationship centered in California. The Complaint alleges that Intel's alleged anticompetitive conduct took place, and had its effects, worldwide. *Id.* at ¶¶ 129, 134, 141, 145-151. These factors militate against the application of California law. *See, e.g., Meridian Project Sys., Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225-26 & n.14 (E.D. Cal. 2005) (dismissing UCL claim based on conduct occurring outside of California where complaint fails to allege specific "intra-state conduct" or injury).

> a.   **California's interests are already protected.**

Although California has an undeniable interest in protecting its citizens and in policing its resident corporations, these interests are already being vindicated three times over: *(i)* through the claims of the California named plaintiffs here, *(ii)* in the coordinated California state Court proceedings in which an alleged class of California indirect purchasers is suing Intel, and *(iii)* through AMD's suit against Intel. California statutes — invoked here the UCL and Cartwright Act — are designed to protect California's *own*

citizens, not residents of other states. *See* Proposition 64 § 1(a)[27] (Section 17200 "is intended to protect California businesses and consumers . . ."); *Alfred M. Lewis, Inc. v. Warehousemen, Teamsters, Chauffeurs and Helpers Local Union No. 542*, 163 Cal. App. 2d 771, 790 (Cal. Ct. App. 1958) (California's Cartwright Act "seeks to protect its citizens" from unlawful activity); *Norwest Mortgage, Inc. v. Super. Ct.*, 72 Cal. App. 4th 214, 223-224 (Cal. Ct. App. 1999) (UCL not intended to encompass claims for injuries suffered by non-California residents caused by conduct occurring outside of California).[28] California's interest in using its consumer protection laws to police its resident corporations on behalf of non-Californians is negligible.

In contrast, the interests of plaintiffs' home states in protecting their residents in the manner they see fit and in regulating commercial transactions in their own states will go unprotected should California law apply to all plaintiffs. As shown below, these interests would be impaired here (unlike California's, which are vindicated in other suits), if the Court were to apply California law as plaintiffs suggest.

>            **b.    Applying California law undermines other states'
>                    antitrust policies.**

Plaintiffs' contention that states without indirect purchaser statutes have "no interest that conflicts with their citizens invoking the Cartwright Act against Intel" is wrong, and misapprehends the fundamental policy decision behind states' determinations

---

[27]    Proposition 64 aside, the UCL was not intended to protect plaintiffs nationwide. But Proposition 64 has further restricted the scope of California's UCL. *See* Intel Mem. at 38. The California Supreme Court's grant of review in *Pfizer, Inc. v. Super. Ct.*, 141 Cal. App. 4th 290, 306-07 (Cal. Ct. App. 2006), does not somehow undo the restrictions California voters placed upon the UCL through Proposition 64.

[28]    Contrary to plaintiffs' assertion, *Norwest* does not state that the "UCL protects *all* consumers." Opp'n at 61. *Norwest* did not even engage in a choice of law analysis. Rather, the court held that application of California law to claims of nonresidents for whom defendant purchased insurance outside of California would violate due process. 72 Cal. App. 4th at 226-27.

to preclude indirect purchaser claims. Opp'n at 55. States that chose to follow *Illinois Brick* have determined that prohibiting indirect purchaser claims is the best way to enforce state antitrust law. Intel Mem. at 29-30. A number of states, California among them, made a different policy choice. But choice of law analysis does not turn on which state's law is more generous to plaintiffs. It turns on the interests of the states in having their law enforced by a particular party in a particular case. *See, e.g., Gen. Ceramics, Inc. v. Firemen's Fund Ins. Co.*, 66 F.3d 647, 656 (3d Cir. 1995) (choice of law analysis requires court to focus on purposes and policies behind each of the competing rules of law and interests of each respective state in having its rules govern). Applying California law to purchases made in pro-*Illinois Brick* states would impair those states' interest in providing adequate incentives to direct purchasers.

Ignoring their home states' interests, plaintiffs instead cite to a series of cases for the proposition that courts routinely apply California law to non-residents where the defendant resides or does business in California. *See* Opp'n at 57-58. This misrepresents the law: These cases all involved plaintiffs with a direct relationship with the defendant; none involves a long chain of intervening actors and events as exists in this case. For example, in *Wershba v. Apple Computer, Inc.,* 91 Cal. App. 4th 224 (Cal. Ct. App. 2001), objectors to a settlement class argued that it was improper to certify a nationwide class bound only by California law because "class members in other states had different rights and remedies under their state laws." *Id.* at 237. The court rejected the objector's choice of law argument because the conduct that formed the core of the Section 17200 and Consumer Legal Remedies Act claims were statements that Apple made from California directly to the plaintiffs. *Id.* at 242. Similarly, in *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (Cal. Ct. App. 1987), because plaintiffs were direct subscribers of the defendant's long distance telephone services, the court remanded the case for choice of

law analysis, noting that California's interest "may be minimal and outweighed by other states' interests." *Id.* at 615. The other cases that plaintiffs cite are similarly inapposite.[29]

These cases also predate *Kearney*, which affirmatively directs courts ***not*** to tip the scale in favor of California law and makes clear that California's role is not to police, impair, or trump the laws of other states, regardless of which is more consumer-friendly. *See* 39 Cal. 4th at 101 (goal of analysis is maximum attainment of underlying purpose by *all* states; indicating that balanced analysis of interests, rather than a presumption against foreign law, is proper). Finally, even if the scales were tipped and the foreign law proponent did "bear[] the burden of establishing that the foreign law does apply," as plaintiffs claim, Intel is not the party proposing foreign law here. *See* Opp'n at 54 (citing *In re First Alliance Mortgage Co.*, 269 B.R. 428, 448 (C.D. Cal. 2001)). Rather, it is plaintiffs who are seeking to apply foreign — i.e., California — law to the vast majority of non-California plaintiffs who never even filed California claims in that state.

Accordingly, under each test, the outcome is the same: Plaintiffs must sue under their own states' laws. California law does not universally apply.

---

[29] *Diamond Multimedia Sys., Inc. v. Super. Ct.*, 19 Cal. 4th 1036 (1999) (class action brought by direct purchasers of California company's common stock); *In re Worlds of Wonder Sec. Litig.*, No. C 87 5491 SC, 1990 WL 61951, *5 (N.D. Cal. Mar. 23, 1990) (declining to make choice of law ruling on plaintiff securities purchasers' motion for a class certification due to insufficient information regarding putative class members' residences); *In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264, 271 (N.D. Cal. 1987) (noting only that foreign state law might govern pendent securities law claims of plaintiffs who were direct stockholders in a securities fraud class action); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 18-21 (N.D. Cal. 1986) (where defendants objected to certification in securities fraud class action, court found it likely that California law would be applied to common law claims where alleged misrepresentations emanated from California, but failed to analyze the interests of other states' common laws).

VI.    **OTHER LEGAL DEFECTS BAR PLAINTIFFS' STATE ANTITRUST CLAIMS**

A.    **Plaintiffs Fail To Assert Sufficient Intrastate Conduct To State A Claim Under Certain State's Antitrust Laws**

The Complaint alleges no state-specific anticompetitive conduct. Plaintiffs nevertheless argue that asserting injury throughout the United States is sufficient to plead claims in states that limit the reach of their antitrust laws to intrastate conduct, specifically the antitrust laws of Mississippi, Nevada, New York, South Dakota, West Virginia, and the District of Columbia. Opp'n at 64-67. Those jurisdictions say otherwise.

Plaintiffs say the Court should infer that at least some sales of Intel products could have occurred "wholly" within the states at issue, even if their Complaint does not say so, and even though they do not suggest which of the named plaintiffs this might affect. Opp'n at 65. However, none of the cases to which plaintiffs cite holds that allegedly national, much less global, conduct that happens to have an ancillary intrastate impact is sufficient to give rise to an antitrust claim under the states at issue. Indeed, plaintiffs' cases focus on the converse — i.e., "wholly" intrastate commerce that had an incidental affect upon interstate commerce.[30]

With regard to plaintiffs' claims under Mississippi, Nevada, South Dakota, and West Virginia law, plaintiffs heavily rely on *New Motor Vehicles*, where the court found

---

[30]    *See, e.g., In re New Motor Vehicles Can. Export Antitrust Litig.*, 350 F. Supp. 2d 160, 170-72, (D. Me. 2004) (inferring from complaint that manufacturers intended for state dealers to charge state consumers higher prices as a result of anti-competitive conduct, and thus "some of those sales would occur wholly within the [state], even if there was some *additional or incidental* interstate conduct") (citations omitted) (emphasis added); *Pooler v. R.J. Reynolds*, No. CV00-2674, 2001 WL 403167, *2 (Nev. Dist. Ct. Apr. 4, 2001) (finding sufficient intrastate activity to bring a claim in the context of other allegations of a conspiracy in domestic and foreign markets); *In re OSB Antitrust Litig.*, No. 06-826, slip op. at 2 (E.D. Pa. Sept. 25, 2006) (plaintiff must allege "at least some conduct performed wholly intrastate").

that because the alleged conspiracy contemplated sales of vehicles by non-defendant state dealers to state consumers, "some of those sales would occur wholly within the [state]" sufficient to bring the antitrust claims within the state statute. *New Motor Vehicles*, 350 F. Supp. 2d at 170-72. On this basis, plaintiffs claim that "the same is true here." Opp'n at 65. Not so. Here plaintiffs have not alleged any conduct in particular states. Nor have plaintiffs alleged that Intel directed its purported anticompetitive conduct toward the commerce of any particular state. More importantly, Intel is a component maker and plaintiffs are indirect purchasers of downstream products. No part of Intel's conduct can be construed as "wholly" intrastate in character. Any sales to consumers that may occur in Mississippi,[31] Nevada, New York, South Dakota, West Virginia, or the District of Columbia[32] are several links down the manufacturing and distribution chain from Intel's alleged conduct.

---

[31]     Plaintiffs cite *In re OSB Antitrust Litig.* for the proposition that the Court should infer wholly intrastate conduct from allegations of a national conspiracy with respect to Mississippi law. *OSB* offers no support. First, plaintiffs in *OSB* alleged that defendants "[acted] in restraint of trade by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels the prices at which OSB was sold, distributed or obtained *in Mississippi*" and as a result, Mississippi class members were injured because "price competition was restrained, suppressed, and eliminated *throughout Mississippi*" and "OSB prices were raised, fixed, maintained, and stabilized at artificially high levels *throughout Mississippi*." *See In re OSB Antitrust Litig.*, No. 06-826, Consolidated Am. Class Action Compl., at 70-71 (June 15, 2006) (emphasis added). Based on these allegations, the *OSB* court declined to dismiss the claim because it "cannot say that Plaintiffs' allegations do not indicate sufficient intrastate conduct to survive a motion to dismiss." In contrast, plaintiffs have not asserted state-specific activities nor alleged that Intel directed its purported anticompetitive conduct toward Mississippi commerce.

[32]     With respect to the claims under D.C.'s antitrust statute, plaintiffs cite irrelevant case law analyzing sufficient contacts to establish personal jurisdiction. Opp'n at 64 (citing *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27 (D.D.C. 1998)). Nor does *GTE New Media* support Plaintiffs' generic assertion that injury occurring throughout the United States is sufficient to satisfy the intrastate limitation of the District's antitrust statute. In fact, *GTE New Media* actually acknowledges that the District's antitrust statute contained a "separate requirement" which required plaintiffs to demonstrate a "connection within this jurisdiction." *GTE New Media*, 21 F. Supp. 2d at 45. That connection is conduct by Intel that occurred wholly within the District of

### B.     Plaintiffs Cannot Assert Donnelly Act Claims On Behalf Of A Class

Plaintiffs' assertion that they may bring a class claim under the Donnelly Act "because CPLR §901(b) is a procedural rule and therefore does not apply in federal court, where class action procedures are governed by Federal Rule of Civil Procedure 23" conflicts with existing law.[33]  Opp'n at 67.  In fact, this same argument has been considered and rejected by other courts.  In *Leider v. Ralfe,* 387 F. Supp. 2d 283 (S.D.N.Y. 2005), for example, the court held that Section 901(b) applied "notwithstanding plaintiffs' arguments that it should be displaced by Fed. R. Civ. P. 23 because this suit is litigated in a federal forum."  *Id.* at 289.  The court reasoned that there was "no collision" between the statutes because Rule 23 "merely establishes the procedures for pursuing a class action in the federal courts" whereas Section 901(b) "prohibits class actions for certain categories of litigation absent specific statutory authorization."  *Id.* at 290 (internal citations omitted).  Because the two statutes address different issues and may co-exist, Section 901(b) has been deemed a substantive rule and "New York courts consistently apply [Section] 901(b) to bar class actions brought under the Donnelly Act."  *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 284-85 (D. Mass. 2004).  On February 22, 2007, the New York Court of Appeals affirmed that plaintiffs may not bring a class action claim under the Donnelly Act.  *See Sperry v. Crompton Corp.*, __ N.E.2d __, 2007 WL 527726 (N.Y. 2007).

---

(Footnote Continued from Previous Page)
Columbia.  *See* D.C. CODE § 28-4502 (2005).  These plaintiffs have asserted no such conduct by Intel.

[33]     None of plaintiffs' cases addresses the Donnelly Act.  *See* Opp'n at 67 (citing *In re Oot*, 112 B.R. 497, 502 (Bankr. N.D.N.Y. 1989) (case involving state bankruptcy statutes and provisions); *In re Peters*, 90 B.R. 588, 594 (Bankr. N.D.N.Y. 1988) (case involving an action to enforce a trust); *In re Bridgestone/Firestone Inc. Tires Prods. Liability Litig.*, 205 F.R.D. 503, 515 (S.D. Ind. 2001) (construing Michigan and Tennessee's Consumer Protection Acts)).

## VII.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER STATE CONSUMER PROTECTION STATUTES

### A.  Plaintiffs Lack Standing To Bring Consumer Protection Claims

As set forth above, plaintiffs lack standing to assert antitrust claims because they have suffered no cognizable injury. Lacking any proof of injury, plaintiffs also cannot make the requisite showing of standing necessary to maintain a claim under state consumer protection law. Intel Mem. at 42-43. Plaintiffs' authorities do not hold otherwise, but instead stand for the unremarkable proposition that injury to property confers standing. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 340 (1979). Moreover, as discussed above, *D.R. Ward* and *OSB* are inapposite.[34] Because plaintiffs have not alleged facts sufficient to establish injury, they lack standing to pursue their state law consumer protection claims.

### B.  Certain States Bar Consumer Protection Class Actions

Despite the express language of the states' consumer protection statutes prohibiting class actions, plaintiffs nevertheless assert that Rule 23 should trump these state determinations. This blanket assertion contravenes the principle that federal courts should interpret the Federal Rules "with sensitivity to important state interest and regulatory policies." *See, e.g., Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 n.7 (1996); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 753 (1980) ("[T]here is simply no reason why, in the absence of controlling federal rule, an action based on state law which concededly would be barred in the state courts . . . should proceed through litigation to judgment in federal court solely because of the fortuity that there is diversity

---

[34] In *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S. D. Fla. 2001), the defendants conceded that the plaintiffs pled sufficient facts for Article III standing, but instead argued that the plaintiffs lacked prudential standing to assert class claims for residents in states in which the plaintiffs did not reside. *Id.* at 1370-71. Thus, *Terazosin* never adjudicated the issue presented here — whether plaintiffs have alleged sufficient facts to plead a cognizable injury.

of citizenship between the litigants.").

The consumer protection statutes of Alaska, Georgia, Louisiana, and Montana unambiguously prohibit plaintiffs from pursuing claims on behalf of a class. Thus, to obtain results that would be substantially similar to those reached by a state court considering the same cause of action, and to discourage forum shopping, plaintiffs' class action claims under the these statutes must be dismissed. *See* FED. R. CIV. P. 17(b) (Federal Rules require federal courts to defer to state law in determining whether an individual has a capacity to "sue or be sued" as part of a class action); 19 Charles Alan Wright, *et al.*, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2D § 4513, at 442 n.63 (2d ed. 1996) ("[A] specific state policy denying class action enforcement of a particular state-created right should be honored by a federal court.").

Plaintiffs' reliance on several cases interpreting statutes which they allege are "nearly identical" is unpersuasive. First, some statutes involved do not explicitly bar class actions.[35] Second, plaintiffs' case law interpreting the consumer protection statutes of states other than Alaska, Georgia, Louisiana, or Montana does not provide guidance in interpreting these particular state statutes. *See* Opp'n at 70. This is especially true where federal courts have already analyzed and determined identical issues. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 84 (D. Mass. 2005) (excluding consumers from Alaska, Georgia and Montana from class because consumer protection

---

[35]        For example, in *Bridgestone/Firestone Inc. Tires*, 205 F.R.D. 503, the court addressed the Michigan and Tennessee consumer protection statutes. Far from "nearly identical" to those at issue here, Tennessee's statute is silent, and Michigan's clearly allows for class actions. *Kristiansen v. John Mullins & Sons, Inc.*, 59 F.R.D. 99 (E.D.N.Y. 1973), is likewise distinguishable. There, the court refused to read into the Truth-in-Lending Act an *implicit* intent from Congress that class actions were prohibited based on the Act's language limiting the award of damages. Unlike *Kristiansen*, the Court here need not make an implicit interpretation or draw inferences from ambiguous statutory language; rather, it need only read the plain language of the Alaska, Georgia, Louisiana, and Montana consumer statutes, which explicitly prohibit class actions.

statutes prohibit class actions); *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379

F.3d 159, 174-75 (5th Cir. 2004) (Louisiana's consumer protection act does not allow

class action claims); *see also O'Quin v. Verizon Wireless*, 256 F. Supp. 2d 512, 519

(M.D. La. 2003) (prohibition to class action under Louisiana's consumer protection

statute meant plaintiff "could not get a class certified under that particular law in either

state or federal court").

> **C.      Plaintiffs Have Not Alleged Facts To State A Claim For Fraudulent, Deceptive Or Unconscionable Conduct**
>
> > **1.      Plaintiffs Have Not Alleged That Intel Specifically Aimed Fraudulent Or Deceptive Conduct Against Them**

Plaintiffs concede that the consumer protection statutes of Arkansas, Idaho,

Kansas, Maine, New Mexico, New York, and Utah prohibit only fraudulent, deceptive, or

unconscionable conduct, but they argue that their allegations are sufficient to meet those

pleading requirements. Opp'n at 70-72. That is not so. First, all of the conduct alleged

in the Complaint is aimed at AMD; no facts support a theory that Intel deceived or

defrauded *plaintiffs*. Because the Complaint provides no facts to support the conclusory

allegation of "fraudulent practices," plaintiffs' claims under the consumer protection

statutes of Arkansas, Idaho,[36] Kansas, Maine,[37] New Mexico, New York,[38] and Utah must

---

[36]      Idaho limits recovery to only prohibited "unfair methods of competition and unfair or deceptive acts of practices" enumerated in the statute. Plaintiffs have not asserted that any conduct falls within the enumerated acts in the Idaho Consumer Protect Act, and consequently, their claim must be dismissed.

[37]      Plaintiffs argue that "similar allegations in *NMV* resulted in the denial of a motion to dismiss," and therefore, they argue that Intel's conduct constitutes an unfair trade practice under Maine's consumer protection statute. Opp'n at 75 (citing *New Motor Vehicles*, 350 F. Supp. 2d at 195-96). However, the allegations in *New Motor Vehicles* are not similar. Plaintiffs in that case alleged that defendants conspired among themselves and with dealers to prevent less-expensive Canadian vehicles from entering the United States market, which caused new vehicle prices in the United States to rise to artificially high levels. *New Motor Vehicles,* 350 F. Supp. 2d at 167. Based on these allegations, the court held that the conspiracy, if found to be a group boycott, could

be dismissed. *See New Motor Vehicles*, 350 F. Supp. 2d at 176-77; *see also Fenn v. Noah*, 133 P.3d 1240, 1245 (Idaho 2006) ("the [Idaho Consumer Protection Act] requires the [defendants] to have acted in an unlawful manner towards [plaintiffs] personally"); *Goshen v. Mutual Life Ins. Co. Of N.Y.*, 98 N.Y.2d 314, 326 (N.Y. 2002) (an element of Section 349 requires that defendant's acts are directed to consumers).

Plaintiffs further argue that Intel's conduct was "inherently deceptive and self concealing" and tantamount to fraudulent concealment. Opp'n at 71. This makes no sense. Plaintiffs have not alleged any concealment from or deception of themselves, there are no facts from which the Court may infer plaintiffs have been deceived. Moreover, the cases cited by plaintiffs' relate only to the tolling of the applicable statute of limitations based on fraudulent concealment, Opp'n at 71, and do not support plaintiff's demand that their bare legal assertion of "fraudulent practices" suffice to avoid dismissal.

---

(Footnote Continued from Previous Page)
constitute an unfair method of competition. In contrast, plaintiffs here allege unilateral discounting conduct; in fact, they concede that Intel's conduct "leads, in some cases, to below-cost pricing on incremental sales." FACC, ¶ 172. Plaintiffs cannot claim that a benefit conferred is an unfair method of competition.

[38]    In addition, to state a claim under New York's consumer protection statute, N.Y. GEN. BUS. LAW § 349, plaintiffs must allege, among other things, that the deceptive or fraudulent conduct affected the public interest in New York. *See New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) ("The critical question, then, is whether the matter affects the public interest *in New York*, not whether the suit is brought by a consumer") (internal citations omitted) (emphasis added). New York's consumer protection statute limits claims to intrastate conduct and does not reach the interstate and international acts alleged in plaintiffs' Complaint, and plaintiffs allege no New York-specific conduct. *See Rey-Willis v. Citibank, N.A.*, No. 03 Civ 2006 (SAS), 2004 WL 315267, *1 (S.D.N.Y. Feb. 18, 2004) (alleged deceptive conduct occurring between Citibank representatives in Florida and plaintiff who resided in Argentina fails as a matter of law to state a claim under Section 349, which requires that the act of deception take place in New York).

Plaintiffs also propose that their claims should move forward because a "trier of fact could deem the conduct of Intel alleged here to be deceptive." Opp'n at 74. Courts have held that in the absence of any allegations of fraudulent or deceptive conduct, the court may dismiss a plaintiff's claim for failure to state a claim. *See e.g., New Motor Vehicles,* 350 F. Supp. 2d at 176-77 (dismissing several of plaintiffs' claims arising under various state consumer protection laws because "[n]owhere [did] the Second Amended Complaint specifically assert fraudulent or deceptive conduct"). Because the Complaint contains nothing more than a bare assertion of "fraudulent practices," plaintiffs' claims under the consumer protection laws of Arkansas, Idaho, Kansas, Maine, New Mexico, New York and Utah must be dismissed.

### 2. Plaintiffs Fail To Identify Any Unconscionable Acts Or To Allege That Intel Took Advantage Of Plaintiffs

Plaintiffs try to save their consumer protection claims by suggesting that, despite the dearth of facts, the Court should find that Intel's conduct resulting in "highly inflated prices for Intel x86 microprocessors" is unconscionable, and thus, their claims under Arkansas, Idaho, New Mexico and Utah should move forward. Opp'n at 72, 75-77. Plaintiffs again mistakenly rely on *New Motor Vehicles. Id.* at 75. *New Motor Vehicles* held that plaintiffs' allegations of a conspiracy to keep Canadian cars out of the United States were sufficient to state a claim under Arkansas' consumer protection statute based on the court's definition of unconscionable as "showing no regard for conscience; affronting the sense of justice, decency, or reasonableness." *New Motor Vehicles*, 350 F. Supp. 2d at 178. The court also found that under Idaho's consumer protection statute, it was reasonable to infer that allegations of a conspiracy that resulted in a ten to thirty percent price differential for new motor vehicles in the United States "would outrage or offend the public conscience. *Id.* at 184. As to New Mexico, the court likewise held that a thirty percent differential in price constituted a gross disparity sufficient to allege an unconscionable business practice under New Mexico's consumer protection statute. *Id.*

41

at 195-96. The court found that it could not on the face of the complaint determine as a matter of law that defendants' conduct could not be defined as unconscionable under Utah's consumer protection law. *Id.* at 204-05.

Plaintiffs' allegations here are far from those in *New Motor Vehicles*. Not only do plaintiffs fail to allege how Intel took advantage of them, they concede that Intel's conduct "leads, in some cases, to below-cost pricing on incremental sales." FACC, ¶ 172. Thus, given that Plaintiffs are indirect purchasers with no direct contact with Intel, that they have failed to allege that Intel took advantage of them, and that they actually stood to benefit from discounts on Intel microprocessors, Intel's conduct is not unconscionable as a matter of law. Therefore, plaintiffs' claims under the consumer protection laws of Arkansas, Idaho, New Mexico and Utah should be dismissed.

### D.    Plaintiffs' California UCL Claims Fails For The Same Reasons As Their Cartwright Act Claim

California's Unfair Competition Law prohibits "unfair, unlawful or deceptive" practices. Intel's alleged conduct is none of those things. CAL. BUS. & PROFS. CODE § 17200, *et seq.* Plaintiffs' authority does not hold otherwise.

As set forth above, plaintiffs lack standing to assert that Intel's conduct violates either the Sherman Act or the Cartwright Act. Plaintiffs are therefore not entitled to pursue a claim that Intel's conduct is "unlawful" for purposes of section 17200.

In the context of alleged anticompetitive conduct, "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as the violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999).[39] Intel's conduct does not

---

[39]    Plaintiffs' cases are inapposite as they do not involve anticompetitive conduct as a basis of a § 17200 claim. Rather, *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457 (2006), and *Progressive West Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263 (Cal. Ct. App.

meet this test. Where a section 17200 claim is premised upon the same conduct and theory of causation as a Cartwright Act claim, the failure to state the latter forecloses the former. *See, e.g., Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal. Ct. App. 2002) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason — because it unreasonably restrains competition and harms consumers — the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.").[40]

Lastly, as discussed above, plaintiffs allege no facts indicating that any of Intel's conduct was directed at consumers, so that alleged conduct cannot be "fraudulent" for purposes of section 17200. *See, e.g., South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 878, 888-89 (Cal. Ct. App. 1999) (plaintiff failed to satisfy burden that defendant engaged in a business practice "likely to deceive" the "reasonable consumer to whom the practice was directed."); *Express, LLC v. Fetish Group, Inc.*, 464 F. Supp. 2d 965, 980 (C.D. Cal. 2006) (plaintiff failed to point to any evidence that defendant's representations were disseminated to public or were likely to deceive public if viewed); *see also Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001) (finding "under the fraudulent prong [of section 17200, it is necessary] to show deception to some members of the public, or harm to the public

---

(Footnote Continued from Previous Page)
2005), dealt with alleged unfair consumer lending practices and insurance business torts, respectively. The rule from *Cel-Tech* — specifically fashioned for Section 17200 claims premised upon anticompetitive conduct — applies here.

[40]    *See also People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005) ("[A]llegations here are simply too far removed from cognizable antitrust evils to warrant intervention by a California court [under section 17200]."); *RLH Inds., Inc. v. SBC Comms., Inc.*, 133 Cal. App. 4th 1277, 1286 (Cal. Ct. App. 2005) (because no violation of Cartwright Act, conduct not "unfair" under section 17200).

interest, and not merely to the direct competitor or other non-consumer party to a

contract."). Accordingly, Plaintiffs' California UCL claim fails as a matter of law.[41]

## VIII.    PLAINTIFFS' REMAINING SO-CALLED TORT CLAIMS ALSO FAIL

### A.    There Is No Cognizable Claim For Damages Under California Law Based Upon A "Tort" Of Monopolization

There is no definitive California appellate court or Supreme Court case

recognizing a claim for damages based upon a common law "tort" of actual or attempted

monopolization. *Cf. Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986)

(plaintiffs' monopolization and attempted monopolization theories "fail to state a

cognizable claim under California law"), *modified on other grounds*, 810 F.2d 1517 (9th

Cir. 1987). Indeed, the California State Assembly in 2002 attempted and failed to add a

Section 2 analog to the Cartwright Act. The California Attorney General, charged with

analysis of the proposed law, opined that "the remedies for illegal monopolization are

limited under current [California] law to relief in a federal court." Assembly Comm. On

Bus. & Profs., 2001-2002 Reg. Session, analysis of Senate Bill 1814, at 3 (June 25,

2002). Citing these authorities, a California superior court recently found that "there is

no cause of action for common law monopolization under California law . . . ." *Branning

v. Apple Computer, Inc.*, Case No. 1-05-CV-045719, at 3 (Cal. Super. Ct. May 9, 2006).

Plaintiffs' reliance upon *In re Natural Gas Anti-Trust Cases I-IV*, JCCP Nos.

4221, 4224, 4226 & 4228, 2002 WL 31570296 (Cal. Super. Ct., Oct. 16, 2002),

*Smokeless Tobacco Cases I-IV*, J.C.C.P. Nos. 4250, 4258, 4259 & 4262 (Cal. Super. Ct.

June 20, 2003), and *In re Cipro Cases I & II*, 121 Cal. App. 4th 402 (Cal. Ct. App. 2004),

for an opposite conclusion is misplaced. The superior court in *Natural Gas*

---

[41]    Contrary to plaintiffs' argument, Opp'n at 79, a challenge to a Section 17200 claim based upon anticompetitive conduct is perfectly appropriate at the pleading stage. *See, e.g., Chavez*, 93 Cal. App. 4th at 375 (dismissing section 17200 "unfair" claims at pleading stage).

misinterpreted prior case law in finding that there was a cognizable claim for monopolization under California law. In particular, neither of the cases cited in *Natural Gas* actually addressed whether there was a cognizable monopolization claim.[42] Similarly, in *In re Cipro*, the propriety or availability of a common law claim for monopolization was never analyzed by the court. Rather, the only issue on appeal was whether a class could be certified for claims, which included one for monopolization. And the *Smokeless Tobacco Cases* only involve a pro forma order that provides no analysis or citation to authority in support of the superior court's finding that a cause of action for common law monopoly is cognizable under California law.[43] Given that there is no California appellate or Supreme Court precedent finding that a claim for damages for monopolization or attempted monopolization exists under California law, this Court should not create one here.

### B.     Plaintiffs' Claim For "Unjust Enrichment" Also Fails

#### 1.     There Is No Unjust Enrichment Claim Under California Law

California does not recognize a "claim" for "unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003); *see also In re Wright*, 355 B.R. 192, 208 (Bankr. C.D. Cal. 2006) ("Unjust enrichment is not a cause of action under California law."). At best, "unjust enrichment" is a basis for seeking restitution.[44]

---

[42]     For example, *Burdell v. Grandi*, 152 Cal. 376 (1907), cited by the superior court, merely found that a restrictive covenant in a lease that was intended to create a monopoly was void. It made no statement as to the availability of a claim for damages arising from an attempted monopoly. In *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672 (Cal. Ct. App. 1997), also cited in *Natural Gas*, the defendant apparently made no challenge to the existence of plaintiffs' "monopolization cause of action" for the appellate court to resolve. *Id.* at 1687. Rather, the issue was whether the plaintiffs' monopolization claim could survive summary judgment (which it did not). *Id.*

[43]     *See* Intel's Appendix of Unpublished Authorities in Support of Reply. Plaintiffs failed to attach a copy of this case to their Opposition.

[44]     Plaintiffs' cases do not hold otherwise. *See, e.g., Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51-52 (Cal. 1996) (explaining that plaintiff might seek redress under claim of

45

*McBride v. Boughton*, 123 Cal. App. 4th 379, 387-88 (2004). Moreover, even if plaintiffs had properly pled a claim for restitution — which they did not — such a claim would fail for the same reasons as plaintiffs' claims for unjust enrichment under other states' laws, as discussed below.

### 2. Plaintiffs Cannot Avoid Limits To Indirect Purchaser Standing By Pleading A Claim For Unjust Enrichment Or Restitution

Indirect purchasers cannot plead a claim for unjust enrichment or restitution where their antitrust claim premised upon the same conduct is barred. Intel Mem. at 49-51. *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000), cited by plaintiffs for the opposite conclusion, is unpersuasive.[45] In that case, the district court found that because unjust enrichment sounds in equity and contains different elements of proof than antitrust claims, a restitution claim is separately and independently cognizable from an antitrust claim. *Id.* at 668-71. It is uncertain whether the court meant to address the specific point raised here — i.e., whether an indirect purchaser who is otherwise barred from seeking relief under antitrust or other statutory law is nonetheless permitted to seek unjust enrichment relief. To the extent the court meant such a sweeping pronouncement, it is against the weight of the well-reasoned authority to the contrary. Intel Mem. at 50 & n.48. Moreover, such a finding would negate the public policy

---

(Footnote Continued from Previous Page)
restitution based upon theory of unjust enrichment); *Hirsch v. Bank of America*, 107 Cal. App. 4th 708, 722 (2003) (same).

[45] Plaintiffs' other cases are inapposite. In *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004), the district court did not address the issue presented here — i.e., can an indirect purchaser seek restitution premised upon anticompetitive conduct where an antitrust claim would be barred. Rather, the district court found the issue "premature" for resolution. *Id.* at 544; *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50-51 (D.D.C. 2003) (no analysis of whether unjust enrichment claim available for indirect purchasers whose antitrust claims would be barred); *D.R. Ward*, 2006 WL 3921865 (not involving states where indirect purchasers lacked standing to seek antitrust damages); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999) (not indirect purchaser case).

decisions of those states that follow *Illinois Brick*. Plaintiffs cannot end-run the substantive limitations under antitrust or consumer protection laws by pleading a claim of restitution.

### 3.     All Of Plaintiffs' Restitution Claims Fail As A Matter Of Law

Finally, plaintiffs' claims for restitution fail as a matter of law. The district court in *New Motor Vehicles* addressed a similar omnibus or "free-standing" common law claim for "unjust enrichment" in an indirect purchaser class action and, citing to well-established principles, found that it failed as a matter of law. 350 F. Supp. 2d at 210. The court recognized that if a plaintiff voluntarily agrees to enter into a contract, and receives the benefit of that bargain, restitution or unjust enrichment will not lie. *Id.* (citing RESTATEMENT (FIRST) OF RESTITUTION § 107(1)). As in *New Motor Vehicles*, plaintiffs here do not seek rescission of their purchase, nor do they allege that they did not receive the benefit for which they bargained — i.e., a computer containing an x86 microprocessor.[46] As such, plaintiffs' free-standing restitution claims should be dismissed.

---

[46]     Plaintiffs' reliance upon *K-Dur* for an opposite conclusion is misplaced. There, the district court rejected the defendants' argument that a conferral of "any" benefit defeated an unjust enrichment claim. The district court went on to conclude that determination of relative values of the benefit received and amount paid were fact-intensive and not suitable for resolution at the pleading stage. *K-Dur*, 338 F. Supp. 2d at 545-46. It is unclear whether *K-Dur* was merely commenting on the facts as alleged in that case or was proposing a rule of general application. If the former, then it is inapposite as plaintiffs do not allege that they failed to receive the benefit of their bargain. If the later, the rationale of *K-Dur* is unpersuasive. The district court in *New Motor Vehicles* (which recognized *K-Dur*'s contrary result) relied upon the black-letter law of the Restatement in finding that the fact that plaintiffs received the cars that they bargained for (and did not seek rescission) precluded a claim of restitution regardless of the fact that the plaintiffs asserted that the price of their vehicles was somehow inflated due to the defendants' alleged anticompetitive conduct. 350 F. Supp. 2d 160 at 210 (citing RESTATEMENT (FIRST) OF RESTITUTION § 107(1)). The same situation exists here.

Additionally, at least in some jurisdictions, a claim for restitution is appropriate only if the plaintiff confers a direct benefit to the defendant. *See, e.g., Johnson v. Microsoft*, 834 N.E.2d 791, 799 (Ohio 2005) (holding that indirect purchasers could not pursue unjust enrichment claim under Ohio law, which precludes indirect purchaser claims under the Valentine Act and Ohio's consumer protection law); *Stutzle v. Rhone Poulenc S.A.*, No. 002768, 2003 WL 22250424, *1 (Pa. Ct. Com. Pl. Sept. 26, 2003) (same for Pennsylvania); *Relafen Antitrust Litig.*, 221 F.R.D. at 286-87 (same for North Carolina). Thus, for at least those states, no unjust enrichment claim may lie as plaintiffs do not allege that they directly conferred a benefit to Intel.

Finally, Third Circuit law holds that because plaintiffs' causation is too remote to support its antitrust and consumer protection claims, its restitution claims must also fail. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936-37 (3d Cir. 1999) (stating that in tort setting, there is "no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims"); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 116 F. Supp. 2d 610, 621 (W.D. Pa. 1999) (granting motion to dismiss plaintiff's restitution claims after court found plaintiff's alleged injury too remote from defendant's alleged conduct to support antitrust and tort claims), *aff'd,* 228 F.3d 429, 446-47 (3d Cir. 2000); *see also City and County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1144 (N.D. Cal. 1997) (dismissing restitution claims under California law where causation chain too circuitous and no benefit conferred directly by plaintiffs to defendant).[47] Thus, all of plaintiffs' restitution or unjust enrichment claims fail for want of causation.

---

[47]    Plaintiffs' argument to the contrary lacks merit. First, plaintiffs curiously cite to *Allegheny General Hospital*, in which, as noted, the district court *dismissed* unjust enrichment claims because plaintiffs' alleged injuries were too remote. Second, although the unpublished Pennsylvania case, *Graduate Cardiology Consultants, P.C. v. Vivra*,

## IX.    CONCLUSION

For the reasons stated above and in Intel's opening brief, Intel respectfully

requests that the Court dismiss Plaintiffs' First Amended Consolidated Complaint.

Respectfully submitted,

OF COUNSEL:                                         POTTER ANDERSON & CORROON LLP
David M. Balabanian
James L. Hunt
Christopher B. Hockett                              By:    */s/ Richard L. Horwitz*
Nora C. Cregan                                             Richard L. Horwitz (#2246)
BINGHAM McCUTCHEN LLP                                      W. Harding Drane, Jr. (#1023)
Three Embarcadero Center                                   Hercules Plaza, 6th Floor
San Francisco, CA  94111-4067                              1313 North Market Street
(415) 393-2000                                             P.O. Box 951
                                                           Wilmington, DE 19899-0951
Richard A. Ripley                                          (302) 984-6000
BINGHAM McCUTCHEN LLP                                      rhorwitz@potteranderson.com
2020 K Street, N.W.                                        wdrane@potteranderson.com
Washington, D.C.  20006
(202) 373-6000                                      *Attorneys for Defendant*
                                                    *Intel Corporation*

Dated:  February 28, 2007

780394 / 29282

---

(Footnote Continued from Previous Page)
No. 2827, 2000 WL 33711050 (Pa. Ct. Com. Pl. Oct. 20, 2000), questioned whether
causation was an element of an unjust enrichment case in Pennsylvania, that same court
noted that this differed from other jurisdictions which require a plaintiff prove causation.
*Id.* at *6. Moreover, given that Pennsylvania courts generally turn to the Restatements in
determining state law on unjust enrichment, *see, e.g., Meehan v. Cheltenham Township*,
189 A.2d 593, 596 (Pa. 1963) (applying Restatement to unjust enrichment claim), the
*Graduate Cardiology* court erred in failing to find a causation requirement as set forth
under the Restatement (Second) of Torts.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on February 28, 2007, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on February 28, 2007, I have Electronically Mailed the

attached document to the following non-registered participants:

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld
  &amp; Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

By:   */s/ Richard L. Horwitz*
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      POTTER ANDERSON & CORROON LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com