# TAB 1



Slip Copy                                                                                                                    Page 1
Slip Copy, 2006 WL 2689400 (D.N.J.), 2006-2 Trade Cases P 75,460
(Cite as: Slip Copy)

Briefs and Other Related Documents
A.D.M. Club Management Systems, Inc. v. **Gary Jonas** Computing, Ltd.D.N.J.,2006.
United States District Court,D. New Jersey.
A.D.M. CLUB MANAGEMENT SYSTEMS, INC.,
Club Solutions, LLC, Jonas Mid-Atlantic, Inc.,
Clubsoft, Inc., Plaintiffs,
v.
**GARY JONAS** COMPUTING, LTD., CSI USA
Distribution, Inc., Defendants.
**No. Civ.A.05-3943 (HAA).**

Sept. 19, 2006.

Richard Marcickiewicz, Sears, Sweeney & Marcickiewicz, Denville, NJ, for Plaintiffs.
Robert A. Assuncao, DLA Piper Rudnick Gray Gary U.S. LLP, Edison, NJ, for Defendants.

*OPINION AND ORDER*
ACKERMAN, Senior District Judge:
**\*1** This matter comes before the Court on a motion to dismiss on behalf of Defendants **Gary Jonas** Computing, Ltd. and CSI USA Distribution, Inc. ("Jonas"). For the following reasons, Defendants' motion is GRANTED.

*Background*

**\*1** Defendant **Gary Jonas** Computing, Ltd. is a Canadian corporation with its principal place of business in Jenkintown, Pennsylvania. Defendant CSI USA Distribution, Inc. ("CSI") is a Delaware corporation with its principal place of business in Canada. CSI is a corporate affiliate of **Gary Jonas** Computing, Ltd. Hereinafter Defendants are collectively and interchangeably referred to as "Jonas." The Plaintiffs are four companies: A.D.M. Club Management Systems, Inc. ("ADM"); Club Solutions, LLC. ("Club Solutions"); Jonas Mid-Atlantic, Inc. ("Mid-Atlantic"); and Clubsoft, Inc. ("Clubsoft").

**\*1** Jonas is engaged in the business of developing and selling specialized computer software that is utilized in various membership clubs, e.g., country clubs, tennis clubs and yacht clubs, throughout North America. Jonas marketed, sold and distributed its software to private clubs through independent sales representatives referred to as JSTARs (Jonas Sales Team Authorized Representatives). Each of the four Plaintiffs was, at all relevant times, a JSTAR, which integrated, distributed and developed technology solutions to private clubs in an assigned, exclusive territory. The Plaintiff companies are each organized under a different state's laws, i.e., New Jersey (ADM), South Carolina (Club Solutions), North Carolina (Mid-Atlantic), and Kansas (Clubsoft).

**\*1** Each JSTAR served two primary functions. First, each acted as a distributor of Jonas Software by purchasing the software, at a discounted price, directly from Jonas. Each JSTAR then resold the software at a retail price to individual private clubs. Second, each JSTAR sold, on behalf of Jonas, certain "Support and Enhancement" packages to the same private clubs. These packages provided the private clubs with ongoing support of the Jonas software they purchased. The packages also provided updates to the software such that the private clubs would not have to purchase a whole new version of the Jonas software. In return for selling the Support and Enhancement packages, each JSTAR was to receive sales commissions.

**\*1** In early January 2005, Jonas sought to make certain amendments to each JSTAR's respective agreement with Jonas. Allegedly, the amendments sought to eliminate the commissions previously earned for selling Support and Enhancement packages and to make future commissions valid for two years following such sales. When three of the four Plaintiffs notified Jonas of their disagreement with the amendments, Jonas terminated them as authorized sales representatives. One of the Plaintiffs, A.D.M, signed and returned the letter of amendments, but included some of its own proposed changes. When Jonas failed to return a countersigned copy, ADM sent another letter attempting to withdraw the letter it had sent with the proposed changes. Shortly thereafter, Jonas sent a countersigned copy of A.D.M's letter with proposed changes, despite having already received ADM's withdrawal letter.

**\*2** Finally, between December 2003 and October 2005, Jonas acquired three of its competitors, which also developed and sold specialized software to private clubs. As a result of these acquisitions, Jonas

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allegedly controls approximately two-thirds (2/3) of the private club software market in North America.

**\*2** Count 1 of Plaintiffs' 13-count Complaint alleges that Jonas violated the Sherman Antitrust Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the private club software market. Count 2 seeks a Declaratory Judgment that each Plaintiff be paid commissions for the Support and Enhancement packages each of them sold. Count 3 seeks a Declaratory Judgment in ADM's favor that the amendments never became part of its agreement with Jonas. Counts 4-7 allege breach of contract on behalf of each of the four Plaintiffs. Similarly, counts 8-11 allege wrongful termination and breach of the agreement's implied covenant of good faith and fair dealing on behalf of each of the four Plaintiffs. Count 12 seeks statutory damages under North Carolina law on behalf of Club Solutions (the South Carolina company) and Count 13 seeks statutory damages under Illinois law on behalf of Mid-Atlantic (the North Carolina company).

**\*2** Defendants bring this motion to dismiss Counts 1, 12, and 13 for failure to state a claim under _Federal Rule of Civil Procedure 12(b)(6)_. In addition, Defendants move to dismiss the other counts, 2-11, under _Rule 12(b)(2)_ for lack of personal jurisdiction. Defendants also move to dismiss Counts 2-11 based upon _Rule 12(b)(3)_ for improper venue. Finally, Defendants assert that Counts 2-11 should also be dismissed based upon a forum selection clause in the respective agreements between Jonas and each Plaintiff and for _forum non conveniens_.

_Analysis_

_A. Antitrust Claim_

**\*2** _Federal Rule of Civil Procedure 12(b)(6)_ provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." _Fed.R.Civ.P. 12(b)(6)_. Under _Rule 12(b)(6)_, the Court is required to accept as true the facts and allegations contained in the complaint and all reasonable inferences drawn therefrom, and to view the facts in the light most favorable to the non-moving party. _Sadruddin v. City of Newark, 34 F.Supp.2d 923, 925 (D.N.J.1999); see also Gen. Motors Corp. v. New A Chevrolet, Inc., 263 F.3d 296, 325 (3d Cir.2001)_. While the Court will accept as true all reasonable inferences and well-pleaded allegations, it will not accept "unsupported

conclusions and unwarranted inferences" or legal conclusions cast in the form of factual allegations. _Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir.2002)_. In the complaint, the claimant must set forth sufficient information to provide defendant with notice of the plaintiff's claims, such as the elements of the claims. _Id; see also Fed.R.Civ.P. 8(a)(2)_. A "complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiff['s] cause of action." _Nami v. Fauver, 82 F.3d 63, 65 (3d Cir.1996)_. The Supreme Court has explained:
**\*3** The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

**\*3** _Conley v. Gibson, 355 U.S. 41, 47-48 (1957)_. "The court may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." _Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)_.

**\*3** In seeking to dismiss Plaintiffs' antitrust claim under _Rule 12(b)(6)_, Jonas focuses on whether the Plaintiffs have antitrust standing. Assessing whether a party has antitrust standing involves the question of whether the alleged injury "is of the type that the antitrust statute was intended to forestall." _Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 538 (1983)_. As the Third Circuit has articulated, "[i]f the injury is not of the requisite type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it." _Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir.1997)_. In _Barton & Pittinos_, the Third Circuit amalgamated the Supreme Court's analysis in _Associated General Contractors_ into a formulation of factors that are relevant for this Court to consider in this antitrust standing challenge:
**\*3** (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

**\*3** *Barton & Pittinos,* 118 F.3d at 181.

**\*3** The crux of Jonas's argument against Plaintiffs' antitrust standing focuses on the second and fourth factor. The second factor asks whether the plaintiff has an antitrust injury. " 'A plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury." ' *Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.,* 113 F.3d 405, 415 (3d Cir.1997) (quoting *Vinci v. Waste Mgmt., Inc.,* 80 F.3d 1372, 1376 (9th Cir.1996)). "[A] commercial intermediary, such as a distributor or sales representative, generally lacks standing because its antitrust injury is too remote." The *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 11 (1st Cir.1999); *see also Gregory Mktg. Corp. v. Wakefern Food Corp.,* 787 F.2d 92, 96 (3d Cir.1986). "[M]arket definition is not determined by formal labels, but rather takes into account 'the realities of competition." ' *Barton & Pittinos,* 118 F.3d at 183 (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 826 (3d Cir.1984)).

**\*4** Plaintiffs, in their Amended Complaint, declare that they each served as one of Jonas's " 'Authorized Representatives' in an exclusive assigned territory, in which each of them marketed Jonas Software, as well as Support and Enhancement packages." (Am.Compl.¶ 10.) Moreover, "[i]n that capacity, each Plaintiff ... acted as a distributor of Jonas Software, who bought Jonas Software directly from **Gary Jonas** at a discounted price, and who then resold the same to Private Club customers at a retail price ... and each acted as a sales representative in the sale of Support and Enhancement packages ." (*Id.*)

**\*4** Plaintiffs declare in their brief that they are consumers and/or competitors in the marketplace alongside Jonas and therefore that they have proper standing. Plaintiffs point to the allegation in their complaint, that they bought software directly from Jonas and resold it, as sufficient proof that they were consumers. (Pls.' Br. at 13.) Similarly, Plaintiffs argue that because Jonas allegedly violated the respective exclusive agreements by selling directly to the private clubs, such violation makes Plaintiffs competitors of Jonas. (*Id.*)

**\*4** In *Gregory Marketing,* the Third Circuit upheld this Court's grant of a motion to dismiss under similar circumstances. *See Gregory Mktg.,* 787 F.2d at 92. In *Gregory Marketing,* the Third Circuit agreed with this Court that the broker in that case was not a proper party to bring suit under the antitrust laws. *Id.* The plaintiff in *Gregory Marketing* sold products to commercial distributors and retailers on behalf of an apple juice manufacturer. The plaintiff received compensation in the form of a percentage of gross sales of the manufacturer's products. *Id.* When the plaintiff discovered that the manufacturer was offering special discounts to one bulk purchaser, but not others, the plaintiff complained to the manufacturer that he thought the discounts were unlawful. *Id.* at 93. After further dispute over this alleged unlawful activity, the manufacturer terminated its brokerage agreement with the plaintiff. *Id.* The plaintiff thereafter brought suit against the manufacturer for violating the Robinson-Patman Act, 15 U.S.C. § 13(a). *Id.* The plaintiff filed its complaint pursuant to 15 U.S.C. § 15 (1985), the same section giving Plaintiffs in the instant suit a private right of action in antitrust violation lawsuits.

**\*4** The court of appeals, in *Gregory Marketing,* found that although the manufacturer's actions appeared to be anticompetitive, the plaintiff's "injury did not result from the anticompetitive nature of these practices." *Id.* at 95. The court did find that certain factors supported allowing the plaintiff to maintain the suit, such as a causal connection between the alleged antitrust violation and the harm to the broker. *Id.* But the court concluded that such causation or improper motive was not sufficient to withstand a motion to dismiss. *Id.*

**\*5** Instead, the court focused on the injury suffered by the plaintiff and asked whether it was of the kind intended to be forestalled by the antitrust statutes. Focusing on the violation alleged by the plaintiff, the court found that it grew out of the pricing agreement between the retailer and the manufacturer, not the plaintiff-broker. *Id.* The court also found that the plaintiff was "neither a consumer nor a competitor in the apple juice market." *Id.* As such, the plaintiff was not " 'within that area of the economy ... endangered by [the] breakdown of competitive conditions." ' *Id.* (quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 481 (1982)).

**\*5** Analogously, the Plaintiffs in the instant litigation are similarly situated to the plaintiff-broker in *Gregory Marketing* in that Plaintiffs here were simply the intermediary through which Jonas distributed its product. The only facts Plaintiffs allege that are relevant to antitrust standing are that they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 4
Slip Copy, 2006 WL 2689400 (D.N.J.), 2006-2 Trade Cases P 75,460
(Cite as: Slip Copy)

purchased Jonas's software, thereby making them consumers, and that Jonas tried to sell directly to the private clubs, thereby making the Plaintiffs competitors of Jonas. Even at the motion to dismiss stage of litigation, this is insufficient.

**\*5** As the *Gregory Marketing* Court noted, the plaintiff-broker's injury was wholly inflicted by the manufacturer's termination of its contract. *Id.* at 96. Similarly, Plaintiffs here appear to have suffered an injury wholly dependent upon Jonas's alleged violation of their respective exclusive distributorship agreements. If Plaintiffs' allegations are accurate, and this Court must take them as such on this motion to dismiss, then Plaintiffs have standing with respect to breach of contract and the like, but those claims do not also give rise to standing to assert anticompetitive injury under the antitrust laws. *See The Serpa Corp.,* 199 F.3d at 12 (affirming the district court's Rule 12(b)(6) dismissal based upon a finding that plaintiff-distributor's "injuries flow[ed] from the termination of its distributorship, and not from any anticompetitive effects of defendants" ' actions); *see also Precision Surgical, Inc. v. Tyco Int'l, Ltd.,* 111 F. Supp 2d 586, 590 (E.D.Pa.2000) (granting motion to dismiss based on a finding that plaintiff-distributor's injuries resulted from defendant-manufacturer's termination of distribution contracts).

**\*5** In *Schuylkill Energy,* the Third Circuit addressed an antitrust suit in which the *supplier* of electric energy asserted an antitrust violation against the *purchaser* it supplied, which in turn sold electricity to end users. *Schuylkill Energy Res.,* 113 F.3d at 415. The plaintiff-supplier in that action argued that it was the purchaser's competitor for antitrust standing purposes. *Id.* The Third Circuit ultimately concluded, affirming the district court's Rule 12(b)(6) dismissal, that "[a] supplier of a product does not become a competitor of the purchaser merely because the purchaser in turn sells the product to the ultimate user." *Id* . By the same token, Jonas does not automatically become the competitor of Plaintiffs simply because it sells its software directly to the private clubs. Again, Plaintiffs may have a cause of action against Jonas for this direct selling, but that action does not lie in antitrust.

**\*6** Moreover, based upon the fourth *Barton & Pittinos* factor, directness of injury, this Court finds that there are more direct victims of any alleged antitrust violation by Jonas. That is, the private club market is more directly affected by Jonas's acquisition of its competitors, allegedly yielding a two-thirds control of the market. In the alternative,

Jonas's direct competitors, i.e., software providers to the other one-third of the market that Jonas does not control, are more directly affected by any market consolidation. In sum, the private clubs and the other software manufacturers are far more directly affected by any alleged antitrust violation by Jonas than the Plaintiffs-distributors in this action. Because the Plaintiffs have not suffered an antitrust injury, as defined in this Circuit and others, and because there are more direct victims of any alleged antitrust violation by Jonas, Plaintiffs lack antitrust standing. As a result, this Court finds that Count 1 of Plaintiffs' Amended Complaint should be dismissed with prejudice.

*B. Forum Selection Clause*

**\*6** Regarding the counts in Plaintiffs' Amended Complaint pertaining to the respective contracts each Plaintiff had with Jonas, Jonas moves to dismiss such counts under Rule 12(b)(3) for improper venue. Specifically, Jonas asserts that the forum selection clause in the contracts clearly states that Canada is the proper and exclusive venue in which such claims should be brought.

**\*6** "In federal court, the effect to be given a contractual forum selection clause in diversity cases is determined by federal not state law." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir.1995). "Although the parties' agreement as to the most proper forum should not receive dispositive weight ... it is entitled to substantial consideration." *Id* at 880. "Thus, while courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue." *Id.* So long as the forum selection clause is not the result of fraud or some imbalance of bargaining power, "the plaintiffs bear the burden of demonstrating why they should not be bound by their contractual choice of forum." *Id.* If a federal district court determines that a forum selection clause should be enforced, then, pursuant to 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). "Transfer is not available, however, when a forum selection clause specifies a non-federal forum." *Salovaara v. Jackson Nat'l Life Ins. Co.,* 246 F.3d 289, 298 (3d Cir.2001). If the forum selection clause specifies a non-federal forum, then the court should dismiss, pursuant to 28 U.S.C. § 1406(a), because transfer is impossible. *See Salovaara,* 246 F.3d at 298; *see also* 28 U.S.C. § 1406(a).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*6** In the instant matter, Jonas moves to dismiss the remaining claims as to ADM, Clubsoft, and Mid-Atlantic, based upon a forum selection clause. Jonas admits in its brief that it has been unable to locate a written contract between Jonas and the fourth plaintiff, Club Solutions. Similarly, there is a dispute between the parties as to whether the contract put forth by Jonas as being signed by Plaintiff Mid-Atlantic actually is a contract between the Plaintiff in this case by that name. That is, Plaintiff Mid-Atlantic asserts that the company named in the contract put forth by Jonas has a similar name, but is not the same Mid-Atlantic to this dispute. Therefore, the Court's forum selection clause analysis only applies to the claims asserted by ADM and Clubsoft.

**\*7** While submitted by Jonas as exhibits to its motion to dismiss, Plaintiffs do not deny the validity of the contracts as to ADM and Clubsoft. The forum selection clause in the ADM and Clubsoft contracts reads:
**\*7** This Agreement shall be construed and enforced in accordance with the laws of the Province of Ontario and of Canada an[d] any actions relating to the enforcement or interpretation of this Agreement shall be brought in the Courts of the Province of Ontario. The parties hereto attorn to the jurisdiction of the Court of the Province of Ontario.

**\*7** (Assuncao Certif. Exs. A & C ¶ 12(b).) Plaintiffs' only response to Jonas's motion to dismiss based upon this forum selection clause is to assert that "[a]lthough ADM and Clubsoft each purportedly executed a form contract with **Gary Jonas** that contain forum selection clauses, Mid-Atlantic and Club Solutions did not." (Pls.' Br. at 28.) Plaintiffs then declare in a footnote that "[n]otably, Defendants cite no cases for the proposition that a forum selection clause should be enforced when the claims it allegedly encompasses are properly before the court under its supplemental jurisdiction." (*Id.*)

**\*7** Unfortunately for Plaintiffs, it is also notable that they have failed to cite any cases that would support their position, which is, presumably, that the forum selection clauses, while valid as to ADM and Clubsoft, should not be enforced. Plaintiffs' reasoning on this point escapes this Court because Plaintiffs have failed to make any argument as to why the forum selection clauses should not be enforced. The only argument Plaintiffs marshal depends on the assumption that this Court will not dismiss their antitrust claim. That is, Plaintiffs appear to be arguing that because the antitrust claim is supposedly

validly before this Court, then the other contractual claims based upon the same facts and circumstances are also properly before this court, despite the forum selection clause. Plaintiffs do not, however, argue in the alternative with respect to what this Court should do if it dismisses the antitrust claim, which this Court must do here. As a result, the Court is left speculating as to why ADM and Clubsoft should not be bound by their valid forum selection clauses.

**\*7** As the *Jumara* Court held, the Plaintiff bears the burden to demonstrate to the court why a forum selection clause should not be enforced. *Jumara,* 55 F.3d at 880. Plaintiffs here have not met that burden. On the contrary, it appears that the federal antitrust claim was intended to be the shoehorn that got this entire case heard in this country, so as to avoid the forum selection clause. Similarly, *Jumara* also recognizes a general deference to a plaintiff's choice of forum, but the Third Circuit tempered that deference where it is clear that a plaintiff has already made his choice of forum contractually. *Id.* This Court finds that the forum selection clauses are enforceable despite according the apparently valid forum selection clauses substantial consideration. As to ADM and Clubsoft, Counts 3, 6, 7, 8, and 11 should be dismissed, without prejudice, pursuant to 28 U.S.C. § 1406(a).

*C. Improper Venue*

**\*8** The Court now considers the remaining claims of Club Solutions and Mid-Atlantic. In their Amended Complaint, Plaintiffs allege that venue is proper in this District pursuant to 28 U.S.C. § § 1391(a), (b) and (d). Section 1391(a) [FN1] declares that a civil action founded only on diversity of citizenship may only be brought in a district (1) where any defendant resides or (2) in which a substantial part of the events giving rise to the claim occurred. There is no allegation that Defendants Jonas or CSI reside in New Jersey, as they are incorporated in Canada and Delaware, with a principal place of business in Pennsylvania and Canada, respectively. Moreover, because this Court must dismiss claims by the only New Jersey litigant, ADM, there is nothing in the Amended Complaint or Plaintiffs' brief to demonstrate that any part of the events giving rise to the remaining claims occurred in the District of New Jersey.

> FN1. Section 1391(b) is similar to § 1391(a), but applies to cases founded not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

solely on diversity. Because this Court dismissed the federal question cause of action, this Court's subject matter jurisdiction over the remaining claims is founded solely on diversity of citizenship. As such, the following analysis addresses only § 1391(a) venue.

**\*8** While Plaintiffs' Amended Complaint generally asserts that venue is proper here "because a substantial portion of the events giving rise to this Complaint occurred in this judicial district," (Am.Compl.¶ 7), nowhere else in the thirty-two page Amended Complaint is New Jersey even mentioned, but for reference to ADM's place of incorporation, which is, of course, irrelevant to the current analysis. The only inference the Court could reasonably draw as to venue being properly laid in this judicial district is that one of the parties, ADM, is a New Jersey corporation. But because ADM's claims have been dismissed due to the forum selection clause, the remaining claims involve a South Carolina and North Carolina company suing companies that are only connected to Delaware, Pennsylvania and Canada. If this were not enough reason to dismiss for improper venue, two of the claims by the remaining plaintiffs involve interpretation of North Carolina and Illinois statutory law.

**\*8** Finally, Plaintiffs, in their Amended Complaint, allege that venue is proper pursuant to § 1391(d), which simply states that "[a]n alien may be sued in any district." 28 U.S.C. § 1391(d). It is not clear to the Court which, if either, of the Defendants is an alien. That is, both named Defendants are either incorporated in the United States or have their principal place of business in the United States. Either way, even assuming that at least one of the Defendants is an alien, "[w]hen an alien and a non-alien are joined as defendants, venue for the entire action is proper in any district where it is correct as to the non-alien defendant." *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F.Supp. 219, 225 (D.N.J.1966). As such, venue might be proper in the Eastern District of Pennsylvania, the District of Delaware, the District of South Carolina, a district in North Carolina, or possibly Ontario, Canada, but it clearly is not proper in the District of New Jersey. Therefore, this Court finds that the remaining Counts (2, 4, 5, 9, 10, 12, and 13) should likewise be dismissed, without prejudice, for improper venue, pursuant to 28 U.S.C. § 1406(a).

**\*9** For the foregoing reasons, Defendants' motion to dismiss is hereby GRANTED. Count 1 is dismissed WITH prejudice as to all Plaintiffs and Counts 2-13 are dismissed WITHOUT prejudice as to all Plaintiffs. The Clerk shall mark this case CLOSED.

D.N.J.,2006.
A.D.M. Club Management Systems, Inc. v. Gary Jonas Computing, Ltd.
Slip Copy, 2006 WL 2689400 (D.N.J.), 2006-2 Trade Cases P 75,460

Briefs and Other Related Documents (Back to top)

• 2006 WL 1042905 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendants' Motion to Dismiss Amended Complaint (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 367515 (Trial Pleading) Corrections to Amended Complaint (Jan. 20, 2006)
• 2006 WL 385181 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Complaint (Jan. 20, 2006)
• 2005 WL 2899376 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint (Sep. 30, 2005)
• 2005 WL 3673318 (Trial Pleading) Complaint (Aug. 9, 2005) Original Image of this Document (PDF)
• 2:05cv03943 (Docket) (Aug. 9, 2005)
• 2005 WL 3863232 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum In Opposition to Defendants' Motion to Dismiss Amended Complaint (2005)

END OF DOCUMENT

*Conclusion*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 724490 (E.D.Pa.), 2004-1 Trade Cases P 74,329
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Bellevue Drug Co. v. Advance PCSE.D.Pa.,2004.
    United States District Court,E.D. Pennsylvania.
    BELLEVUE DRUG CO., Robert Schreiber, Inc.,
    d/b/a Burns Pharmacy, and Rehn-Huerbinger Drug
    Co., d/b/a Parkway Drugs # 4, on behalf of
    themselves and all others similarly situated, and the
    Pharmacy Freedom Fund and the Nat'l Community
             Pharmacists Ass'n, Plaintiffs,
                         v.
             ADVANCE PCS, Defendant.
                 No. Civ.A. 03-4731.

                    March 2, 2004.

H. Laddie Montague, Jr., Jerome M. Marcus, Berger
& Montague PC, Philadelphia, PA, for Plaintiffs.
E. Marcellus Williamson, Stephen J. Spiegelhalter,
Washington, DC, J. Thomas Rosch, Latham &
Watkins LLP, San Francisco, CA, Steven E. Bizar,
Eliot G. Long, Buchanan Ingersoll, P.C.,
Philadelphia, PA, for Defendant.

                   MEMORANDUM
ROBRENO, J.
*1 Bellevue Drug Co., Robert Schreiber, Inc., d/b/a
Burns Pharmacy, and Rehn-Huerbinger Drug Co.,
d/b/a Parkway Drugs # 4, on behalf of themselves
and others similarly situated (collectively
"plaintiffs"),[FN1] along with the Pharmacy Freedom
Fund and the National Pharmacists Associations
bring this action against Advance PCS under section
1 of the Sherman Act, 15 U.S.C. § 1, based on
allegations of a horizontal agreement among
competitors having the effect of restraining trade in
the drug dispensing industry. Based on the
defendant's allegedly illegal activities, plaintiffs seek
treble damages and injunctive relief under sections 4
and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

>    FN1. Bellevue Drug Co. owns and operates
>    a pharmacy located in Hammonton, New
>    Jersey. Robert Schreiber, Inc., d/b/a Burns
>    Pharmacy, owns and operates a pharmacy
>    located in Morrisville, Pennsylvania. Rehn-
>    Huerbinger Drug Co., d/b/a Parkway Drugs
>    # 4, owns and operates a pharmacy located
>    in Glencoe, Illinois. Pharmacy Freedom

Fund ("PFF") is a not-for-profit organization
of several thousand independent community
pharmacy owners headquartered in Fort
Worth, Texas. National Community
Pharmacists Association ("NCPA") is a not-
for-profit organization representing
approximately 24,000 pharmacies
nationwide and is headquartered in
Alexandria, Virginia. Both PFF and NCPA
seek injunctive relief on behalf of its
members and do not seek status as a
representative plaintiff or class member
under Fed.R.Civ.P. 23.

*1 Presently before the Court is defendant's motion to
dismiss the complaint for failure to state a claim upon
which relief can be granted. For the reasons that
follow, the motion shall be denied.

                I. BACKGROUND [FN2]

>    FN2. The following facts are taken from the
>    complaint and are cast in a light most
>    favorable to the non-moving party.

*1 As a prescription benefit manager ("PBM"),
Advance PCS contracts individually with various
plan sponsors to provide a variety of services related
to the prescription drug industry, including
purchasing brand name and generic prescription
drugs and dispensing services from retail pharmacies;
managing networks of retail pharmacies; and
processing and adjudicating claims made by retail
pharmacies for prescriptions they fill for members of
prescription plans ("plan members") that Advance
PCS administers.[FN3]

>    FN3. Advance PCS maintains principal
>    executive offices in Irving, Texas.
>    According to plaintiffs, Advance PCS is the
>    largest PBM in the United States. It
>    administers prescription drug benefits for
>    over 75 million people or one in every four
>    Americans. It handles some 540 million
>    prescriptions a year amounting to over $28
>    million billion in prescription drug spending.

*1 In its role as a plan administrator, Advance PCS is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not itself the real purchaser of dispensing services or prescription drugs from network retail pharmacies. Instead, it acts as a purchasing agent on behalf of the plan sponsors that individually contract with Advance PCS. Specifically, the complaint alleges that "by jointly conferring their pharmacy purchase decisions upon Advance PCS" the plan sponsors accomplish a horizontal agreement. Further, the complaint alleges that the arrangement that the individual plan sponsors have with Advance PCS eliminates competition because they no longer actively compete with one another for the dispensing services and prescription drugs sold by the retail pharmacies. The arrangement-alleged by plaintiffs to have the effect of a "horizontal price fixing" agreement-enables the participants to agree not to bid up the price or bid against each other, thereby reducing the apparent demand for filling prescriptions, and concomitantly reducing the market price for prescription drugs and dispensing services provided by retail pharmacies.[FN4]

> FN4. According to the complaint, the plan sponsors delegate price-setting authority to Advance PCS. For example, plaintiffs allege that the plan sponsors have given Advance PCS the authority to set reimbursement rates for generic drugs, i.e., the "Maximum Allowable Cost" or "MAC," for the plans that Advance PCS administers.

*1 As alleged by plaintiffs, the "aggregated economic power" that Advance PCS yields enables it to set reimbursement rates for retail pharmacies' brand name and prescription drugs and dispensing services below that which would prevail in a competitive marketplace .[FN5] Although plaintiffs do not allege that the plan sponsors conspire with each other directly to effect this arrangement, the complaint does allege that each plan sponsor is aware of and understands the involvement of other plan sponsors and the role of Advance PCS as a common agent for these plan sponsors.

> FN5. The complaints asserts that the relevant market consists of the dispensing and sale of brand name and generic prescription drugs in the United States.
>
> As alleged in the complaint, Advance PCS and its affiliates have a contract with virtually all of the approximately 60,000 pharmacies in the United States. The complaint alleges that every year or so, Advance PCS modifies the contractual terms unilaterally by sending plaintiffs and members of the class amendments or revised pages to the agreement. These terms, among other things, set the amount Advance PCS will pay as reimbursement for the cost of drugs and the amount the contracting pharmacies are permitted to charge plan members for co-payments.

*2 Advance PCS, in addition to administering prescription drug benefit plans, operates its own mail-order pharmacy business. On top of the horizontal price-fixing agreement discussed above, plaintiffs allege that Advance PCS engages in anti-competitive conduct by using its aggregated market power derived from the combination of plan sponsors to create artificial vertical advantages for its own dispensing activities. More specifically, plaintiffs allege that Advance PCS contractually prohibits retail pharmacies from dispensing more than a 30-day supply of drugs. Meanwhile, mail-order pharmacies operated by Advance PCS are permitted to dispense a 90-day supply. Using information provided by the retail pharmacies it deals with, Advance PCS contacts plan members and advertises that the plan member can purchase a 90-day supply of a drug from Advance PCS's mail-order operation for one co-payment. This co-payment is advertised to be less than the total of three co-payments which would be paid for three, 30-day supplies of the same drug from a competing retail pharmacy subject to Advance PCS's co-payment and drug distribution restrictions. This activity diverts the refill and follow-on prescription business, alleged to be the most profitable part of the prescription drug dispensing business, from the retail pharmacies to Advance PCS's mail-order operation.

*2 Finally, plaintiffs allege that Advance PCS uses its aggregated power to unilaterally impose "onerous" contract terms on retail pharmacies that choose to participate in the Advance PCS network. These terms include co-payment restrictions and limitations on the fees plaintiffs are permitted to charge for the submission of claims, checks on patient eligibility, drug checks, and plan-member use of a particular pharmacy.

## II. DISCUSSION

### A. *Standard for Motion to Dismiss.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 724490 (E.D.Pa.), 2004-1 Trade Cases P 74,329
(Cite as: Not Reported in F.Supp.2d)

**\*2** A motion to dismiss for failure to state a claim serves to test the sufficiency of a complaint. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). A plaintiff's allegations are considered true and are construed in the light most favorable to him, *see Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989), and his complaint should not be dismissed "unless it appears beyond doubt that [he] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**\*2** Under Fed.R.Civ.P. 8(a)(2), the complaint "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The main purpose behind Rule 8(a)(2) is to give the defendant adequate notice of the claim asserted against him in order for him to adequately respond. *Loftus v. SEPTA,* 843 F.Supp. 981, 986 (E.D.Pa.1994) (*citing Conley,* 355 U.S. at 47)). A plaintiff need not anticipate probable defenses and respond to them in his complaint. *Campbell v. D'Agostino,* No. 03-5328, U.S. Dist. LEXIS 24520, at \*9 (E.D.Pa. Dec. 11, 2003). There is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply. *See In re Mercedes-Benz Antitrust Litig.,* 157 F.Supp.2d 355, 359 (D.N.J.2001) (*citing MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,* 62 F.3d 967, 976 (7th Cir.1995)).

**\*3** It has long been the rule in this Circuit that a complaint alleging a conspiracy "must contain sufficient information for the Court to determine whether or not a valid claim for relief has been stated and to enable the opposing side to prepare an adequate pleading." *Rose v. Bartle,* 871 F.2d 331, 366 n. 60 (3d Cir.1989). What this means is that **\*3** the plaintiffs must plead with particularity the "circumstances" of the alleged wrongdoing in order to place the defendants on notice of the precise misconduct with which they are charged. Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient.... An inference [of conspiracy] ... from the Complaint ... [is] no substitute for the requirement that the circumstances of the conspiracy be pleaded with specificity.

**\*3** *Rose,* 871 F.2d at 366 (*quoting Kalmanovitz v. G. Heilman Brewing Co.,* 595 F.Supp. 1385, 1401 (D.Del.1984)).

*B. Standing to Sue: "Antitrust Injury".*

**\*3** Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may maintain a private action for treble damages. 15 U.S.C. § 15(b). "A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *see also Barton & Pittinos v. Smithkline Beecham Corp.,* 118 F.3d 178, 181 (3d Cir.1997). "[I]njury, although casually related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, 'since it is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." *Atlantic Richfield Co., v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (*quoting Cargill,* 479 U.S. at 109-110)). If the injury is not of the recognized type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it. *Smithkline Beecham Corp.,* 118 F.3d at 181.

**\*3** Advance PCS argues that the complaint should be dismissed because plaintiffs have not alleged an "antitrust injury ... that is of the type the antitrust laws were intended to protect." [FN6] Although defendant argues that this injury is necessary to state a cause of action under the Sherman Act, as discussed above, antitrust injury is more accurately analyzed as an issue of standing for private plaintiffs bringing suit under the Clayton Act and is separate and distinct from the factual allegations necessary to state a cause of action under the antitrust laws.

> FN6. The "antitrust injury" argument asserted by defendant is directed at the alleged price suppression practices. Defendant does not raise this argument with respect to the other alleged restraints of trade, i.e., the 30-day drug dispensing limitation or the fee charge and co-payment restrictions.

**\*4** In attacking plaintiffs' complaint for failure to plead an "antitrust injury," Advance PCS argues that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

price-suppression generally benefits consumers.[FN7] Advance PCS relies primarily on the Supreme Court's decision in *Atlantic Richfield Co., v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)*, where the Court discussed at length what constitutes "antitrust injury" for the purposes of the Sherman Act.

> FN7. Defendant also advances the argument that price-suppression on the buy side cannot constitute antitrust injury unless there is supra-competitive pricing on the sell side. In support of this proposition, the defendant cites *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 240-243, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)*; *American Tobacco Co.,* 328 U.S. at 803-806; *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 219-20, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The Court does not read any of these cases to require, as a *condition precedent* to a finding of "antitrust injury," the coupling of supra-competitive pricing on the sell side and price-suppression on the buy side, as suggested by defendant.

**\*4** In *ARCO,* defendant ARCO was an integrated oil company that sold gasoline to consumers through its own stations and through independent retailers, such as the plaintiff in that case, USA Petroleum, 495 U.S. at 331. At some point, ARCO enacted a marketing strategy enabling its own dealers to lower prices. *Id.* at 331-32. USA Petroleum's complaint alleged that the marketing strategy was a conspiracy to fix prices below market levels and reduce competition among gas retailers. *Id.* at 332. The Supreme Court held that USA Petroleum failed to meet the antitrust injury requirement because its losses did "not flow from the aspects of a vertical, maximum price-fixing that render it illegal." *Id.* at 337. In dictum, which Advance PCS now relies on, the Supreme Court stated that "[l]ow prices benefit consumers regardless of how those prices are set, and as long as they are above predatory levels, they do not threaten competition." *Id.* at 339.

**\*4** The Court finds ARCO distinguishable from the present case. In contrast to the vertical price-fixing agreement alleged in *ARCO* (where the distributor was charging lower prices to the consumer), the situation alleged here is horizontal price-fixing agreement, where distributors are alleged to be colluding with one another to artificially suppress,

not the prices *charged* to consumers, but the prices *paid* to their suppliers. Clearly, the potential anti-competitive effects of the latter are more pernicious than the former. While the vertical price-fixing agreement discussed by the Supreme Court may give rise to price competition between distributors, *see ARCO*, 495 U.S. at 341, the same cannot be said with the horizontal agreement alleged here because the distributors, instead of competitively bidding with the seller, act in concert with one another. The "low prices" favorably referred to in *ARCO* are not the same "low prices" at issue in the instant case. Indeed, when all reasonable inferences are drawn in favor of the plaintiffs, competition as between the distributors, is decreased and not increased in the case at bar. Thus, an antitrust injury of the type stemming from the reduction of competition has been alleged. *Id.* at 334.

**\*4** Despite defendant's arguments to the contrary, injury to sellers inflicted through a horizontal price-fixing conspiracy of buyers constitutes an antitrust injury which is actionable by the seller. *See Mandeville Island Farms,* 334 U.S. at 235. As framed by the Supreme Court in considering a dismissal of a plaintiff's complaint by the district court, the issue presented in *Mandeville* was "whether, in the circumstances pleaded, California sugar refiners who sell sugar in interstate commerce [the purchasers] may agree among themselves to pay a uniform price for sugar beets grown in California without incurring liability to the local beet growers [the sellers] under the Act." *Id.* at 221. The Court concluded that sugar refiners could not escape liability under the Sherman Act and found it "clear that the agreement is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers." *Id.*

**\*5** In view of the above, the Court finds that plaintiffs have sufficiently pled a restraint in trade resulting in "antitrust injury" that is actionable by plaintiff under the antitrust laws. The "existence of an 'antitrust injury' is not typically resolved through motions to dismiss," *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir.1995), and defendant has provided an insufficient basis for the Court to find the instant case to be an exception.

**\*5** Having found that an injury of the type protected by the antitrust laws has been pled, the Court turns to the elements necessary to establish a cause of action under the Sherman Act.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 724490 (E.D.Pa.), 2004-1 Trade Cases P 74,329
(Cite as: Not Reported in F.Supp.2d)

C. *Section 1 Violations.*

**\*5** Section 1 of Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is hereby declared illegal." 15 U.S.C. § 1. In this Circuit, three elements must be alleged to sustain a cause of action under section 1 of the Sherman Act: a contract, combination or conspiracy; a restraint of trade; and an effect on interstate commerce. *See Fuentes v. South Hills Cardiology,* 946 F.2d 196, 199 (3d Cir.1990) (*citing Weiss v. York Hospital,* 745 F.2d 786, 812 (3d Cir.1984), *cert. denied,* 470 U.S. 1060 (1985)). Because the effects of defendant's alleged activities on interstate commerce are not disputed by the parties, the Court will determine if the first two elements have been sufficiently pled to state a cause of action.

   1. *Contract, Combination or Conspiracy.*[FN8]

> **FN8.** Although Advance PCS argues that the complaint does not state a claim flowing from a vertical price-fixing agreement, plaintiffs have made clear in their memorandum in opposition to the motion to dismiss that the antitrust claim is grounded on a horizontal agreement. *See* Plaint. Mem. Opp., at 2, 4, 5-6.

**\*5** Advance PCS argues that the dismissal of the complaint is warranted because the plaintiffs have failed to plead the existence of a horizontal conspiracy. In its view, "[a] horizontal price-fixing agreement is an agreement among competitors fixing their prices ... [but] the Complaint does not allege the existence of any agreement here." The Court disagrees.

**\*5** According to the Supreme Court, the "fixing of prices by one member of a group pursuant to express delegation, acquiescence, or understanding is just as illegal as the fixing of prices by direct, joint action." *United States v. Masonite Corp.* 316 U.S. 265, 276, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). Here, plaintiffs' complaint alleges that Advance PCS markets the number and size of the plan sponsors it represents and that each plan sponsor is fully aware that Advance PCS negotiates with network retail pharmacies on behalf of many other plan sponsors. Further, plaintiffs allege in their complaint that the aggregate market power possessed by Advance PCS through its representation of numerous plan sponsors allows it to set prices for prescription drugs and drug dispensing services below that which would have existed in a freely competitive market and allows it to unilaterally impose unreasonable and anti-competitive contract terms on plaintiffs. These lower prices, of course, provide an economic benefit to the plan sponsors as do the 30-day drug supply limitation when coupled with a co-payment limitation. These allegations, if accepted as true, may give rise to the inference that Advance PCS acted with the acquiescence and understanding of the plan sponsors it represented and that each plan sponsor "had an awareness of the general scope and purpose of the undertaking." *Id.* at 275.

**\*6** "No formal agreement is necessary to constitute an unlawful conspiracy.... The essential combination or conspiracy may be found in course of dealings or other circumstances as well as in any exchange of words." *American Tobacco Co. v. United States,* 328 U.S. 781, 809-810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).[FN] Based on the allegations made in the complaint, the Court finds that plaintiff has sets forth facts which establish the existence of a contract, combination, or conspiracy. Moreover, the Court finds that the facts pled-including, but not limited to, the object of the alleged agreements between defendant and the PBMs and actions taken to effect the object of the alleged agreements-are particularized enough to place defendants "on notice of the precise misconduct with which they are charged." *Rose,* 871 F.2d at 366. Thus, the Court will not dismiss the complaint for failure to sufficiently plead a horizontal agreement.

> **FN9.** The Third Circuit teaches that consciously parallel action provides circumstantial evidence of a conspiracy in antitrust cases where the (1) defendants' behavior is parallel; (2) the defendants were conscious of each other's conduct and this awareness was an element of their decision-making process; and (3) there is a motivation to enter into such an agreement. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1242-43 (3d Cir.1993). All of these factors have been pled by the plaintiff in the complaint.

   2. *Restraint of Trade.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 6
Not Reported in F.Supp.2d, 2004 WL 724490 (E.D.Pa.), 2004-1 Trade Cases P 74,329
(Cite as: Not Reported in F.Supp.2d)

**\*6** In view of _Mandeville, 334 U.S. at 222, 234-35_, discussed above, the Court finds that a price-suppression scheme effected by a group of buyers, who would otherwise compete with one another for goods sold by a seller, constitutes a restraint on trade.

**\*6** As for the contract provisions relating to fee charges, co-payment prices, and drug dispensing practices, which the plaintiffs claim curtail their ability to distribute their products and limit their ability to set prices, the Court finds that plaintiffs have sufficiently pled a restraint of trade cognizable under section 1 of the Sherman Act.

### III. CONCLUSION

**\*6** In view of the above, defendant's motion to dismiss shall be denied.

**\*6** An appropriate order follows.

### ORDER

**\*6** AND NOW, this day of March 2004, for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that defendant's motion to dismiss (doc. no. 3) shall be DENIED.

**\*6** AND IT IS SO ORDERED.

E.D.Pa.,2004.
Bellevue Drug Co. v. Advance PCS
Not Reported in F.Supp.2d, 2004 WL 724490 (E.D.Pa.), 2004-1 Trade Cases P 74,329

Briefs and Other Related Documents (Back to top)

• 2006 WL 3825120 (Trial Motion, Memorandum and Affidavit) Response of Defendant Advancepcs to Plaintiffs' Motion to Lift Stay and Dismiss Case (Jun. 5, 2006)
• 2006 WL 3825119 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Lift Stay and Dismiss Case (May 19, 2006)
• 2004 WL 2716568 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Motion for Reconsideration or in the Alternative for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. | 1292(b) (Oct. 15, 2004) Original Image of this Document (PDF)
• 2004 WL 2716573 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Advance PCS's Motion to Strike Affidavit of H. Edward Heckman (Oct. 2004) Original Image of this Document (PDF)
• 2004 WL 2716558 (Trial Motion, Memorandum and Affidavit) Advance Pcs's Response in Opposition to Plaintiffs' Motion for Reconsideration or in the Alternative for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. |1292(b) (Sep. 24, 2004) Original Image of this Document (PDF)
• 2004 WL 2716565 (Trial Motion, Memorandum and Affidavit) Advance Pcs's Motion to Strike Affidavit of H. Edward Heckman (Sep. 24, 2004) Original Image of this Document (PDF)
• 2004 WL 2716555 (Trial Motion, Memorandum and Affidavit) Advance Pcs's Reply in Support of Motion to Compel Arbitration (Jul. 23, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 2716552 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response Opposing Defendant Advance Pcs's Motion to Compel Arbitration (Jul. 12, 2004) Original Image of this Document (PDF)
• 2004 WL 2716547 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response in Opposition to Advancepcs' Motion to Postpone July 6, 2004 Pretrial Conference (Jun. 23, 2004) Original Image of this Document (PDF)
• 2004 WL 2716540 (Trial Motion, Memorandum and Affidavit) Advance Pcs' Memorandum in Support of Motion to Postpone July 6, 2004 Pretrial Conference (Jun. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 2716534 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Advance Pcs's Motion to Compel Arbitration (Jun. 21, 2004) Original Image of this Document (PDF)
• 2004 WL 2716527 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant's Motion for Reconsideration, or in the Alternative, Certification of the Court's Order Denying Defendant's Motion to Dismiss (Apr. 9, 2004) Original Image of this Document (PDF)
• 2004 WL 2716515 (Trial Motion, Memorandum and Affidavit) Motion of Defendant Advance Pcs for Reconsideration, or in the Alternative Certification, of the Court's Order Denying Defendant's Motion to Dismiss (Mar. 16, 2004) Original Image of this Document (PDF)
• 2004 WL 2716522 (Trial Pleading) Answer and Affirmative Defenses of Defendant Advancepcs (Mar. 16, 2004) Original Image of this Document (PDF)
• 2003 WL 23902859 (Trial Motion, Memorandum and Affidavit) Reply of Defendant Advance PCS in Support of Its Motion to Dismiss for Failure to State

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 724490 (E.D.Pa.), 2004-1 Trade Cases  P 74,329
**(Cite as: Not Reported in F.Supp.2d)**

A Claim Upon Which Relief Can Be Granted (Nov.
22, 2003) Original Image of this Document (PDF)
• 2003 WL 23902854 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum in Opposition
to Defendant's Motion to Dismiss (Nov. 10, 2003)
Original Image of this Document (PDF)
• 2003 WL 23902848 (Trial Motion, Memorandum
and Affidavit) Motion (Sep. 25, 2003) Original
Image of this Document (PDF)
• 2:03cv04731 (Docket) (Aug. 15, 2003)
• 2003 WL 23902839 (Trial Pleading) Class Action
Complaint (2003) Original Image of this Document
with Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3



Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2000 WL 34003597 (E.D.Pa.), 2003-2 Trade Cases P 74,105
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Briefs and Other Related Documents
Bradburn Parent/Teacher Store, Inc. v. 3M
(Minnesota Mining and Mfg. Co.)E.D.Pa.,2003.
United States District Court, E.D. Pennsylvania.
BRADBURN PARENT/TEACHER STORE, INC.
v.
3M (MINNESOTA MINING AND
MANUFACTURING COMPANY)
**No. CIV.A. 02-7676.**

July 25, 2003.

*MEMORANDUM*

PADOVA.Defendant 3M (Minnesota Mining and
Manufacturing Company) (hereinafter 3M") has filed
a motion to dismiss Plaintiff's Complaint in its
entirety pursuant to Federal Rule of Civil Procedure
12(b)(6). For the reasons that follow, the Court grants
Defendant's Motion in part and denies Defendant's
Motion in part.

### I. PRIOR HISTORY

**\*1** The conduct of Defendant which forms the basis
of this lawsuit was the subject of a prior lawsuit in
this Court, *LePage's v. 3M,* Civ. A. No. 97-3983,
2000 U.S. Dist. Lexis 3087 (E.D. Pa.)(the "Lepage's
litigation"). In that suit, a competing retailer of
transparent tape, LePage's, Inc., sued Defendant
alleging, *inter alia,* unlawful maintenance of
monopoly power in violation of Section 2 of the
Sherman Act, 15 U.S.C. § 2. After a nine-week trial,
the jury found in favor of LePage's on its unlawful
maintenance of monopoly power claim, and awarded
damages of $22,828,899.00, which were
subsequently trebled to $68,486,697.00. *See id.* This
Court subsequently denied Defendant's Motion for
Judgment as a Matter of Law with respect to this
claim. *See id.* A panel of the United States Court of
Appeals for the Third Circuit ("Third Circuit")
initially reversed this Court's Order upholding the
jury's verdict and directed this Court to enter
judgment for Defendant on LePage's's unlawful
maintenance of monopoly power claim. *LePage's,
Inc. v. 3M,* 277 F.3d 365 (3d Cir.2002) ( "*LePage's I*
"). Upon rehearing *en banc,* the Third Circuit vacated
the panel decision and reinstated the jury verdict
against Defendant on LePage's's unlawful
maintenance of monopoly power claim. *LePage's,*

*Inc. v. 3M,* 324 F.3d 141 (3d Cir.2003) ("*LePage's II*
").

### II. THE COMPLAINT

**\*1** The Complaint alleges one count of
monopolization in violation of the Sherman Act, 15
U.S.C. § 2. The Complaint alleges that Defendant
unlawfully maintained its monopoly in the
transparent tape market through its bundled rebate
programs [FN1] and through exclusive dealing
arrangements with various retailers. The Complaint
asserts that, as a result of Defendant's conduct,
Plaintiff and other members of the proposed Class
have "suffered antitrust injury." (Compl.¶ 27). The
damages period in this case runs from October 2,
1998 until the present. (Compl.¶ 2).

> FN1. As discussed at length in the LePage's
> litigation, Defendant's bundled rebate
> programs provided purchasers with
> significant discounts on Defendant's
> products. However, the availability and size
> of the rebates were dependant upon
> purchasers buying products from Defendant
> from multiple product lines. *See LePage's II,*
> 324 F.3d at 154-55.

**\*1** Plaintiff seeks declatory relief, permanent
injunctive relief, treble compensatory damages,
attorney's fees, costs and interest. (*See* Compl. ¶ ¶ A-
F).

**\*1** Plaintiff seeks to join other direct purchasers of
Defendant's transparent tape from October 2, 1998,
and the present as a class under Rule 23 of the
Federal Rules of Civil Procedure.

**\*1** Plaintiff seeks offensive collateral estoppel as to
four issues decided in the LePage's litigation. First,
Plaintiff seeks offensive collateral estoppel as to the
definition of the relevant market for transparent
tape.[FN2] (Compl.¶ 17). Second, Plaintiff seeks
offensive collateral estoppel as to Defendant's
monopoly power in this market.[FN3] (*Id.*) Third,
Plaintiff seeks offensive collateral estoppel as to the
"exclusionary and unlawful nature" of Defendant's
bundled rebate programs. (*Id.*) Fourth, Plaintiff seeks
offensive collateral estoppel as to the harm to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 34003597 (E.D.Pa.), 2003-2 Trade Cases P 74,105
(Cite as: Not Reported in F.Supp.2d)

competition caused by and resulting from Defendant's violation of Section 2 of the Sherman Act. (*Id.*)

> FN2. On appeal in the Lepage's litigation, "the parties agreed that the relevant product market is transparent tape and the relevant geographic market is the United States." *LePage's II.* 324 F.3d at 146.

> FN3. Defendant conceded in the LePage's litigation that it possessed monopoly power in this market, with a 90% market share. *LePage's II.* 324 F.3d at 146.

### III. LEGAL STANDARD

**\*2** A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) only if the plaintiff can prove no set of facts in support of the claim that would entitle her to relief. *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994). The reviewing court must consider only those facts alleged in the complaint and accept all of the allegations as true. *Id.*

### IV. MOTION TO DISMISS

A. Failure to Allege Injury Causally Linked to A Violation *of The Antitrust Laws*

**\*2** Defendant argues that Plaintiff has failed to allege facts which could establish a causal link between the anti-competitive conduct that Defendant was found responsible for in the LePage's litigation and the supra-competitive prices that Plaintiff and other class members have allegedly paid for transparent tape during the damages period in this case. The Third Circuit has held that the following five factors must be considered in determining whether a plaintiff has standing to challenge an alleged antitrust violation: **\*2** 1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

**\*2** *Angelico v. Lehigh Valley Hospital,* 184 F.3d 268, 274 (3d Cir.1999). Thus, a causal link between the antitrust violation and the harm that Plaintiff suffers is a necessary (though not sufficient) component to establishing standing.

**\*2** There are no special pleading requirements for an antitrust claim. Rather, "Notice pleading is all that is required for a valid antitrust complaint." *Municipal Utilities Bd. of Albertville v. Alabama Power Co.,* 934 F.2d 1493, 1501 (11th Cir.1991). Furthermore, "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir.1995). (citations omitted). On the other hand, to survive a Motion to Dismiss, Plaintiff's Complaint must contain more than conclusory allegations of "harm to competition." *Microsoft Corp. v. Computer Support Services of Carolina,* 123 F.Supp.2d 945, 951 (W.D.N.C.2000). Rather, Plaintiff must allege that it has suffered an actual injury "causally linked to a violation of the antitrust laws." *Pace Electronics, Inc. v. Cannon Computer Systems, Inc.,* 213 F.3d 118, 120 (3d Cir.2000). Thus, "reasonable particularity in pleading" is required under the antitrust laws. *Garshman v. Universal Res. Holding, Inc.,* 625 F.Supp. 737, 741 (D.N.J.1986). Furthermore, "The pleader will not be allowed to evade this requirement by attaching a bare legal conclusion to the facts that he narrates: if he claims an antitrust violation, but the facts he narrates do not at least outline or adumbrate such a violation, he will get nowhere merely by dressing them up in the language of antitrust." *Id.* at 742.

**\*2** Plaintiff's allegations concerning injury and causation are found in Paragraph 27 of the Complaint, in which Plaintiff alleges as follows:
**\*3** As found in LePage's or otherwise, 3M's unlawful maintenance of its tape monopoly has suppressed competition and *has maintained prices paid by direct purchasers to 3M well above competitive levels after any 3M rebates (if any) attributable to tape purchases. By 1997, and before the damage period in this action commenced,* 3M began implementing one or more increases in its monopoly pricing. These increases were facilitated and maintained by virtue of its exclusionary practices. As a consequence, members of the alleged class purchasing at these prices have all suffered antitrust injury.

**\*3** (Compl.¶ 27)(emphasis added). According to Defendant, the Complaint is defective because it**\*3**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 34003597 (E.D.Pa.), 2003-2 Trade Cases P 74,105
(Cite as: Not Reported in F.Supp.2d)

fails to allege that any price increase for transparent or invisible tape by 3M after October 1998 was anything other than a response to the standard market phenomena of cost increases and inflationary pressure. If [Plaintiff] is saying that, because of *LePage's,* years later 3M cannot respond to cost increases by adjusting its prices, then the theory is invalid as a matter of law.

**\*3** (Def. Mot. Dismiss at 6). According to Defendant, in order to survive a Motion to Dismiss, the allegations in Plaintiff's Complaint must support some theory which could explain how price increases, if any, implemented during the damages period were caused by the anti-competitive conduct of Defendant that was at issue in the LePage's Litigation. Defendant asserts that "[t]here is in fact no causal link between any price adjustment that [Defendant] might make in transparent tape today in response to, for example, cost increases and any of the events at issue in *LePage's.*" (Def's Mot. Dismiss at 2). Defendant points out that the conduct of Defendant which the jury in the LePage's Litigation found to be in violation of the Sherman Act (bundled rebates and exclusive dealing contracts with certain high volume retailers) resulted in *decreased prices* for the products Defendant sold (Def's Reply Mem. at 5). Thus, while this conduct undoubtedly harmed LePage's, *see LePage's II,* 324 F.3d at 160-62, Defendant argues that retailers, who bore the benefit of these lower prices, cannot claim anti-trust injury because of this conduct. See *Atlantic Richfield Co. v. U.S.A. Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (noting that a plaintiff does not suffer antitrust injury if he is benefitted, and not harmed, by anti-competitive conduct.)

**\*3** Defendant further notes the failure of Plaintiff's Complaint to assert a "recoupment" theory under *Brooke Group, Ltd. v. Brown and Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). In *Brooke Group,* the United States Supreme Court held that the practice of pricing goods below cost in order to remove competitors from the relevant market, and then subsequently raising prices in order to recoup the losses sustained because of the below-cost pricing, was illegal under the antitrust laws. See *id.* at 226. Plaintiff's Complaint, however, contains no allegations which would support a "recoupment" theory. This is not surprising, considering that there was no evidence in the LePage's Litigation that Defendant priced its transparent tape below its cost. Indeed, Plaintiff appears to specifically disclaim any reliance upon a theory of "recoupment" under *Brooke Group.* (Pl's

Opp. Mot. Dismiss at 11-12).

**\*3** However, the allegations in Plaintiff's Complaint do support at least one theory of causation which could entitle Plaintiff to relief. Plaintiff alleges in the Complaint that Defendant "has maintained prices paid by direct purchasers to 3M well above competitive levels after any 3M rebates (if any) attributable to tape purchases." (Compl.¶ 27.) Plaintiff's response to the Motion to Dismiss elaborates that "3M, from the start maintained its prices at monopoly levels prevailing before it began its illicit and exclusionary scheme in 1992, which was intended to protect and maintain those anti-competitive prices." (Pl's Opp. Mot. Dismiss at 12). Plaintiff further asserts that "whatever the size of rebates given to the largest class members, they were still rebates off a monopoly price." (Pl's Opp. Mot. Dismiss at 13). Thus, the allegations in the Complaint appear to assert that the bundled rebates and exclusive dealing that Defendant engaged in allowed Defendant to maintain its monopoly in the transparent tape market and stifled competition from Lepage's (and possibly other competitors), which in turn allowed Defendant to maintain supra-competitive prices for transparent tape.

**\*4** According to Defendant, Plaintiff's claims cannot be reconciled with the fact that, at least while the bundled rebate program was being instituted, retailers that received the bundled rebates paid *less* for the total amount of goods they received from Defendant than they would have paid had they bought these products from other suppliers. (Def's Reply Mem. at 5). However, Plaintiff does allege in the Complaint that Defendant "has maintained prices paid by direct purchasers to 3M well above competitive levels *after any 3M rebates (if any) attributable to tape purchases.*" (Compl.¶ 27.)(emphasis added). Thus, Plaintiff's allegations, if proven, could establish that, were it not for Defendant's anti-competitive conduct, Plaintiff would have paid less for transparent tape than it actually paid during the damages period, even when any bundled rebates or other discounts are taken into account. Under this theory of damages, it is not necessary for Plaintiff to allege the existence of price increases during the damages period for it to survive a Motion to Dismiss.

**\*4** This theory of the case is supported by the Third Circuit's en banc decision in *LePage's II.* The opinion in *LePage's II* exhaustively details the plummeting demand for LePage's's tape following the introduction of Defendant's bundled rebate programs, which in turn drastically decreased LePage's's market

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 34003597 (E.D.Pa.), 2003-2 Trade Cases P 74,105
(Cite as: Not Reported in F.Supp.2d)

share during the period from 1992 to 1997. *See
Lepage's II,* 324 F.3d at 161-62. The court noted that,
"Had 3M continued with its program it could have
eventually forced LePage's out of the market." *Id.* at
162. The court also noted that "3M's exclusionary
conduct not only impeded LePage's ability to
compete, but it also harmed competition itself...."
*LePage's II,* 314 F.3d at 162. Plaintiff's allegations, in
turn, could establish that, had Defendant's conduct
not drastically reduced the market power of LePage's,
the prices that plaintiff paid for transparent tape
would have decreased to the point where they were
less than the price Plaintiff actually paid for
transparent tape during the damages period, even
after any rebates or discounts provided by Defendant
are taken into account.

**\*4** The cases Defendant cites do not alter the Court's
conclusion. Defendant cites to *Schuylkill Energy
Resources v. Pennsylvania Power and Light Co.,* 113
F.3d 405 (3d Cir.1997), for the proposition that
dismissal under Rule 12(b)(6) is proper where the
claim of antitrust injury rests upon "unsupported
conclusions" or "unwarranted inferences". However,
the court in *Schuylkill* was faced with a plaintiff who
was at the current time legally barred from competing
with the defendant in the relevant market. The court
held that the plaintiff's potential entry into the market
at a later point in time (based upon planned de-
regulation of the electricity market) was too
speculative to allow it to recover for antitrust injury.
*Id.* at 418. Here, there is no dispute that Plaintiff was
a direct purchaser in the market for transparent tape
from October 2, 1998 until December, 2000.
Furthermore, as discussed, *supra,* the allegations in
Plaintiff's Complaint, if proven, do support at least
one theory of causation which could entitle Plaintiff
to relief.

B. Dismissal of Indirect Purchaser Damages Claims
Based Upon *Illinois Brick*

**\*5** Defendant seeks to dismiss any claims for
damages based upon conduct that occurred after
December, 2000. Plaintiff concedes that at this time it
ceased to be a direct purchaser of transparent tape
from Defendant, and, therefore, that it has no
standing to obtain money damages on its own behalf
for alleged overcharges which occurred after this
date. (Pl's Opp. Mot. Dismiss at 10); *see also Illinois
Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52
L.Ed.2d 707 (1977). Thus, to the extent that
Plaintiff's Complaint can be read to seek money
damages on its own behalf based upon damages

incurred after December, 2000, this portion of
Plaintiff's Complaint will be dismissed by agreement
of the parties.[FN4]

> FN4. The parties dispute whether Plaintiff
> can represent a class of purchasers who
> directly purchased transparent tape after
> December, 2000. This issue is properly
> decided on a motion for class certification,
> and the Court expresses no opinion on this
> question at this time.

V. CONCLUSION

**\*5** For the reasons discussed above, to the extent that
Plaintiff's Complaint can be read to seek money
damages on its own behalf for damages incurred after
December, 2000, this portion of Plaintiff's Complaint
will be dismissed by agreement of the parties.
Defendant's Motion to Dismiss is denied in all other
respects. An appropriate order follows.

*ORDER*

**\*5** AND NOW, this 22nd day of July, 2003, upon
consideration of Defendant's Motion to Dismiss
Plaintiff's Complaint (Document # 41), Plaintiff's
Response (Document # 43), and all related
submissions, IT IS HEREBY ORDERED as follows:
**\*5** A) By agreement of the parties, to the extent that
Plaintiff's Complaint can be read to seek money
damages on its own behalf for the period after
December, 2000, this portion of Plaintiff's Complaint
is DISMISSED; and
**\*5** B) Defendant's Motion to Dismiss Plaintiff's
Complaint is DENIED in all other respects.

E.D.Pa.,2003.
Bradburn Parent/Teacher Store, Inc. v. 3M
(Minnesota Mining and Mfg. Co.)
Not Reported in F.Supp.2d, 2000 WL 34003597
(E.D.Pa.), 2003-2 Trade Cases P 74,105

Briefs and Other Related Documents (Back to top)

• 2007 WL 444660 () Declaration of Charles G.
Hunter in Support of Plaintiff Bradburn Parent
Teacher Store, Inc.'s Motion for Preliminary
Approval of Settlement (Jan. 18, 2007) Original
Image of this Document (PDF)
• 2007 WL 444661 () Declaration of Geoffrey C.
Hazard, Jr. in Support of Application for Attorneys'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 34003597 (E.D.Pa.), 2003-2 Trade Cases P 74,105
**(Cite as: Not Reported in F.Supp.2d)**

Fees (Jan. 18, 2007) Original Image of this Document (PDF)
• 2007 WL 444833 (Trial Motion, Memorandum and Affidavit) Plaintiff Bradburn Parent Teacher Store, Inc.'s Memorandum In Support of Motion for Final Approval of Settlement (Jan. 18, 2007)
• 2006 WL 1357783 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 1760137 (Trial Motion, Memorandum and Affidavit) Motion in Limine to Preclude Bradburn from Introducing Videotape Reenactments of Testimony (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 2067718 (Verdict, Agreement and Settlement) Plaintiffs' Submission of Stipulated Facts (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 2068019 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Objections and Counter-Designations to Defendant's Designation of Deposition Testimony (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 2068020 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Objections to Defendant's Exhibits (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 2068021 (Trial Motion, Memorandum and Affidavit) Defendant 3M's Counter Designations and Objections to Plaintiff's Designations (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 2068022 (Trial Motion, Memorandum and Affidavit) Defendant 3M's Counter Designations and Objections to Plaintiff's Designations from Lepage's Inc. v. 3M (Apr. 28, 2006) Original Image of this Document (PDF)
• 2005 WL 2682789 (Trial Motion, Memorandum and Affidavit) Third Parties Henkel Corporation and Henkel Consumer Adhesives Inc.'s Consolidated Memorandum in Opposition to 3m's Motion to Modify Protective Order (Aug. 2, 2005) Original Image of this Document (PDF)
• 2005 WL 2682792 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of 3M's Motion for Certification of the Court's June 9, 2005 Collateral Estoppel Order Pursuant to 28 U.S.C. | 1292(b) (Aug. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 4428917 (Trial Motion, Memorandum and Affidavit) Class's Opposition to 3M's Motion for Certification of the Court's June 9, 2005 Collateral Estoppel Order (Jul. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 4428915 (Trial Motion, Memorandum and Affidavit) Class' Reply in Support of Proposed

Scheduling Order and in Opposition to 3M Proposed Scheduling Order (Jun. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 4428916 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of 3M's Motion for Reconsideration of March 30, 2005 Order or Certification of Interlocutory Appeal (May 10, 2005) Original Image of this Document (PDF)
• 2005 WL 4428914 (Trial Motion, Memorandum and Affidavit) 3M'S Memorandum in Opposition to the Motion to Quash of Henkel Corporation and Henkel Consumer Adhesives, Inc. and in Support of its Motion to Compel (Jan. 20, 2005) Original Image of this Document (PDF)
• 2004 WL 3770562 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Meijer, Inc. and Meijer Distribution Inc.'s Motion for Reconsideration (Nov. 5, 2004) Original Image of this Document (PDF)
• 2004 WL 4443219 (Trial Motion, Memorandum and Affidavit) Class Representative's Opposition to Meijer's Motion to Intervene (Oct. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 4443222 (Trial Motion, Memorandum and Affidavit) 3M'S Memorandum in Opposition to Meijer, Inc. and Meijer Distribution Inc.'s Motion to Intervene (Oct. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 2250213 (Trial Pleading) Complaint (Sep. 17, 2004) Original Image of this Document (PDF)
• 2004 WL 3770561 (Trial Pleading) Complaint-Class Action Tury Trial Demanded (Feb. 23, 2004) Original Image of this Document (PDF)
• 2003 WL 24309663 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply in Support of Motion for Partial Summary Judgment (Sep. 30, 2003) Original Image of this Document (PDF)
• 2003 WL 24309662 (Trial Pleading) Defendant 3M Company's Answer to Plaintiff Bradburn Parent/Teacher Store, Inc.'s Complaint (Aug. 28, 2003) Original Image of this Document (PDF)
• 2003 WL 25150748 () Hearing Before the Honorable John R. Padova United States District Court Judge (Aug. 13, 2003) Original Image of this Document (PDF)
• 2003 WL 25151055 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment (Aug. 11, 2003) Original Image of this Document (PDF)
• 2003 WL 25151054 (Trial Motion, Memorandum and Affidavit) Defendant 3M Company's Reply Memorandum (Jun. 13, 2003) Original Image of this Document (PDF)
• 2003 WL 24309661 (Trial Motion, Memorandum and Affidavit) Opposition to Motion to Dismiss (May

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 34003597 (E.D.Pa.), 2003-2 Trade Cases P 74,105
**(Cite as: Not Reported in F.Supp.2d)**

29, 2003) Original Image of this Document (PDF)
• 2003 WL 24309660 (Trial Motion, Memorandum
and Affidavit) Memorandum of Points and
Authorities in Support of 3M Company's Motion to
Dismiss Plaintiff's Complaint (Apr. 29, 2003)
Original Image of this Document (PDF)
• 2003 WL 25151052 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Memorandum Regarding
Need for Discovery Regarding Competitive
Benchmark Information (Feb. 14, 2003) Original
Image of this Document (PDF)
• 2002 WL 33849125 (Trial Motion, Memorandum
and Affidavit) Reply Memorandum in Support of
3M'S Motion to Transfer Venue (Dec. 2, 2002)
Original Image of this Document (PDF)
• 2002 WL 33849124 (Trial Motion, Memorandum
and Affidavit) Complaint-Class Action (Nov. 27,
2002) Original Image of this Document (PDF)
• 2002 WL 33849123 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Opposition to Defendant
3M'S Motion to Transfer Venue (Nov. 22, 2002)
Original Image of this Document (PDF)
• 2:02cv07676 (Docket) (Oct. 02, 2002)
• 2002 WL 33009233 (Trial Pleading) Complaint-
Class Action (Oct. 1, 2002) Original Image of this
Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4



**H**

Briefs and Other Related Documents
Brotech Corp. v. White Eagle Intern. Technologies
Group, Inc.E.D.Pa.,2004.
    United States District Court,E.D. Pennsylvania.
    BROTECH CORPORATION and Purolite
                International, Ltd.
                       v.
       WHITE EAGLE INTERNATIONAL
    TECHNOLOGIES GROUP, INC., et al.
             No. Civ.A.03-232.

                June 21, 2004.

                 *MEMORANDUM*
PADOVA, J.
**\*1** Before the Court is Plaintiffs **Brotech**
Corporation's and Purolite International, Ltd.'s
Motion to Dismiss Defendant RenalTech
International, LLC's Amended Counterclaim. For the
reasons that follow, the Motion is granted and the
Amended Counterclaim is dismissed in its entirety,
without prejudice.


               I. BACKGROUND

**\*1** Plaintiffs have brought this action to correct the
name of the inventor on patents relating to inventions
of certain Russian scientists and for a declaration of
joint co-ownership and joint equitable title to those
patents. They have also brought claims for
misappropriation of trade secrets, tortious
interference with contract and other common law
claims arising from Defendants' alleged interference
with the relationship between Plaintiffs and those
Russian scientists. The Second Amended Complaint
alleges that, for the last ten years, Plaintiffs'
employees have engaged in a cooperative research
and development program with several Russian
scientists led by Professor Vadim A. Davankov of the
Russian Academy of Science. (2d Am.Compl.¶ 2.)
As a result of that research, Plaintiffs' employees and
the Russian scientists have developed unique
macronet and micronet copolymer resins for a variety
of adsorpitve uses and methods to produce these
resins in a commercially viable manner, including
their use in renal dialysis. (*Id.* ¶ 4.) The Second
Amended Complaint further alleges that Defendants
procured eleven United States patents on these

inventions, misrepresenting their ownership and
failing to acknowledge Plaintiffs' property rights. (*Id.*
¶ 73-74.) The disputed patents are: U.S. Patent
5,773,384 issued June 30, 1998; U.S. Patent
5,904,663 issued May 18, 1999; U.S. Patent
6,087,300 issued July 11, 2000; U.S. Patent
6,114,466 issued September 5, 2000; U.S. Patent
6,127,311 issued October 3, 2000; U.S. Patent
6,133,393 issued October 17, 2000; U.S. Patent
6,136,424 issued October 24, 2000; U.S. Patent
6,153,707 issued November 28, 2000; U.S. Patent
6,156,851 issued December 5, 2000; U.S. Patent
6,159,377 issued December 12, 2000; U.S. Patent
6,303,702 issued October 16, 2001. (*Id.* ¶ 74.)

**\*1** Defendant RenalTech International, LLC
("RenalTech") has asserted the instant Amended
Counterclaim against both Plaintiffs asserting that
Plaintiffs are using their superior economic resources
and this litigation to gain control of Defendants'
pioneering technology. The Amended Counterclaim
alleges that RenalTech is developing new technology
to assist chronic renal failure patients by removing
middle molecular weight toxins, which are not
efficiently removed by renal dialysis, from the blood.
(Am.Countercl.¶ 15-16.) RenalTech's chemists
have developed this technology, a biocompatible
adsorbent polymer and a device incorporating this
polymer, trademarked BetaSorb, which has been
designed to be used in conjunction with
hemodialysis. (*Id.* ¶ 16.) A human clinical trial of
BetaSorb is currently underway in the United States.
(*Id.*) RenalTech is also studying the use of its
polymer technology to treat severe sepsis. (*Id.* ¶ ¶
23-24.) RenalTech claims to be the only organization
currently conducting human clinical trials for such
products and the only organization at an advanced
stage of seeking regulatory approval from the Food
and Drug Administration ("FDA"). (*Id.* ¶ 32.)
RenalTech acknowledges that such products cannot
be sold or used in the treatment of individuals unless
they have received FDA approval. (*Id.*)

**\*2** The Amended Counterclaim alleges that Plaintiffs
have brought this action in order to coerce RenalTech
into ceding control of its intellectual property to
Plaintiffs so that Plaintiffs can unlawfully
monopolize the market for its products. (*Id.* ¶ 33.)
The Amended Counterclaim alleges claims against
Plaintiffs for attempted monopolization pursuant to
Section 2 of the Sherman Act, 15 U.S.C. § 2;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
(Cite as: Not Reported in F.Supp.2d)

incipient conspiracy to monpolize pursuant to Section 2 of the Sherman Act; and conspiracy to restrain trade pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

**\*2** This is not RenalTech's first attempt to assert antitrust claims against Plaintiffs in this action. RenalTech previously asserted a Counterclaim against Plaintiffs asserting causes of action for attempted monopolization pursuant to Section 2 of the Sherman Act; conspiracy to restrain trade pursuant to Section 1 of the Sherman Act; and for tortious interference with existing and prospective business relations. Plaintiffs filed a motion to dismiss. On November 18, 2003, the Court granted the motion to dismiss RenalTech's counterclaim for attempted monopolization pursuant to 15 U.S.C. § 2 because the market proposed in the Counterclaim did not "encompass any interchangeable substitute products and [did] not allege that there are no substitute products." (Nov. 18, 2003 Memorandum and Order at 11.) The Court granted the Motion to Dismiss RenalTech's counterclaim for conspiracy to restrain trade pursuant to 15 U.S.C. § 1 because the Counterclaim did not allege an antitrust injury and did not sufficiently allege the relevant product market. (*Id.* at 16.) The Motion to Dismiss was also granted with respect to RenalTech's claims for tortious interference with existing and prospective business relations. The Order dismissed the Counterclaim without prejudice and with leave to file an amended counterclaim. Defendants subsequently filed the instant Amended Counterclaim.

**\*2** The Amended Counterclaim attempts to correct the deficiencies in the original Counterclaim by adding allegations relating to the relevant markets and antitrust injury. The Amended Counterclaim alleges that there are two markets relevant to Plaintiffs' anticompetitive conduct. (Am.Countercl.¶ 33.) The first is the "supplier market in the United States for the manufacture and supply of RenalTech's proprietary polymeric resin to RenalTech." (*Id.* ¶ 33.) The Amended Counterclaim alleges that Plaintiffs' anticompetitive conduct is intended to coerce RenalTech into an exclusive manufacturing agreement, which would foreclose competition in the supplier market. (*Id.*) The second market is "the market in the United States for the finished product incorporating RenalTech's patented, proprietary hemocompatible or biocompatible polymeric resins designed to remove middle molecular weight compounds or toxins from physiological fluids, including human blood ." (*Id.* ¶ 34.) RenalTech states that it is "unaware of any existing or

development stage product or service targeted toward or capable of removing the middle molecular weight toxins from physiological fluids as RenalTech's polymeric resin does" and that "there is no known substitute at any price for RenalTech's polymeric resin for the removal of middle molecular weight toxins." (*Id.*) The Amended Counterclaim further alleges that if Plaintiffs' anticompetitive conduct is successful, they will be able to control the price and output of this polymeric resin and consumers will "have no practical or available substitute for a product or service that removes middle molecular weight toxins." (*Id.*)

**\*3** The Amended Counterclaim also alleges that Plaintiffs' anticompetitive litigation tactics have damaged RenalTech in two ways. RenalTech claims to have suffered recognizable antitrust injury in the form of "the costs and expenses that RenalTech has incurred and will incur in defending this predatory, anticompetitive sham litigation." (*Id.* ¶ 39.) It further alleges that Plaintiffs' "coercion of an anticompetitive supply agreement will increase RenalTech's costs in producing finished products incorporating its patented polymeric resin, thereby increasing the price which will ultimately be charged to the consumer." (*Id.* ¶ 40.) In addition, the increased cost will reduce demand for the product, limiting sales and injuring RenalTech. (*Id.*)

## II. LEGAL STANDARD

**\*3** When deciding a Motion to Dismiss pursuant to Rule 12(b)(6), the court must accept as true all well pleaded facts in the complaint, or counterclaim, and any reasonable inferences derived from those facts, and view them in the light most favorable to the Plaintiff. *FTC v. Commonwealth Marketing Group, Inc.,* 72 F.Supp.2d 530, 535 (W.D.Pa.1999) (citations omitted). However, the Court need not accept "bald assertions or legal conclusions." *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997). The dismissal standard is higher in antitrust cases than generally. *Rolite, Inc. v. Wheelabrator Envir. Systems, Inc.,* 958 F.Supp. 992, 995 (E.D.Pa.1997). The facts underlying the elements of an antitrust claim must be pled with specificity. *Syncsort Incorporated v. Sequential Software, Inc.,* 50 F.Supp.2d 318, 328 (D.N.J.1999) (dismissing antitrust counterclaim brought pursuant to Section 2 of the Sherman Act for failure to allege specific facts setting forth the elements of a claim for monopolization or attempted monopolization); *see also Com. of Pennsylvania ex. rel. Zimmerman v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
**(Cite as: Not Reported in F.Supp.2d)**

*PepsiCo., Inc., 836 F.2d 173, 182 (3d Cir.1988)*
("When the requisite elements are lacking, the costs
of modern federal antitrust litigation and the
increasing caseload of the federal courts counsel
against sending the parties into discovery when there
is no reasonable likelihood that the plaintiffs can
construct a claim from the events related in the
complaint.") (quoting *Car Carriers, Inc. v. Ford
Motor Co.,* 734 F.2d 1101, 1106 (7th Cir.1984)).

### III. DISCUSSION

*3 Plaintiffs argue that the Amended Counterclaims
should be dismissed because RenalTech has failed to
cure the defects in its original Counterclaim.
Plaintiffs maintain that the Amended Counterclaim's
allegations of product market and antitrust injury
remain insufficient to support claims under the
antitrust laws.

#### A. *Product Market*

*3 Plaintiffs argue that the Amended Counterclaim
should be dismissed because the allegations
describing the relevant product market do not
establish the reasonable interchangeability of use or
the cross-elasticity of demand between the product
and substitutes for it.[FN1] The United States Court of
Appeals for the Third Circuit ("Third Circuit") has
recognized that the failure to plead the relevant
product market is a sufficient basis for dismissal of
an antitrust claim. *Queen City Pizza, Inc. v. Domino's
Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997); *see
also, Syncsort,* 50 F.Supp.2d at 331. The Third
Circuit has explained that " '[t]he outer boundaries of
a product market are determined by the reasonable
interchangeability of use or the cross-elasticity of
demand between the product itself and substitutes for
it.' " *Id.* (quoting *Brown Shoe Co. v. U.S.,* 370 U.S.
294, 325 (1962); *Tunis Bros. Co., Inc. v. Ford Motor
Co.,* 952 F.2d 715, 722 (3d Cir.1991)). In *Queen City
Pizza,* the Third Circuit defined cross-elasticity as "a
measure of the substitutability of products from the
point of view of buyers," i.e., the measure of "the
responsiveness of the demand for one product to
changes in the price of a different product." *Id.* at 438
n. 6 (citation omitted). A complaint which fails to
define the relevant market with reference to the rule
of reasonable interchangeability and cross-elasticity
of demand, or which alleges a proposed relevant
market that clearly does not encompass all
interchangeable substitute products, is legally
insufficient. *Id.* at 436.

FN1. In order to state a claim for attempted
monopolization, conspiracy to monopolize,
or conspiracy to restrain trade pursuant to
the Sherman Act, the Amended
Counterclaim must allege the relevant
product market. *See Spectrum Sports, Inc. v.
McQuillan,* 506 U.S. 447, 456 (1993); *Farr
v. HealthEast, Inc.,* Civ.A.No. 91-6960,
1993 WL 220680, at *11 (E.D.Pa.1993);
*Petruzzi's IGA v. Darling-Delaware,* 998
F.2d 1224, 1229 (3d Cir.1993).

*4 The Amended Counterclaim defines the relevant
product market as follows:
*4 the market in the United States for the finished
product incorporating RenalTech's patented,
proprietary hemocompatible or biocompatible
polymeric resins designed to remove middle
molecular weight compounds or toxins from
physiological fluids, including human blood.
RenalTech is unaware of any existing or development
stage product or service targeted toward or capable of
removing the middle molecular weight toxins from
physiological fluids as RenalTech's polymeric resin
does. Thus, there is no known substitute at any price
for RenalTech's polymeric resin for the removal of
middle molecular weight toxins. If **BroTech** and
RenalTech succeed in their anticompetitive conduct
through this sham litigation, they will be able to
control the price and output of the polymeric resin,
and consumers will have no practical or available
substitute for a product or service that removes
middle molecular weight toxins.

*4 (Am.Countercl.¶ 34.) Although the Amended
Counterclaim fails to allege the cross-elasticity of
demand for interchangeable substitute products, that
failure is not fatal in this case because the Amended
Counterclaim alleges that RenalTech's polymeric
resin is unique and does not have any substitutes. *See
Mitel Corporation v. A & A Connections, Inc.,* No.
Civ. A. 97-cv-4205, 1998 WL 136529, at *4 (E.D.Pa.
Mar. 20, 1998) (recognizing that "in circumstances
where the product or service is unique and therefore
not interchangeable with other products or services,
the single brand can constitute the relevant market")
(citing *Eastman Kodak Co. v. Image Technical
Services, Inc.,* 504 U.S. 451, 482 (1992); *Queen City
Pizza,* 124 F.3d at 439). Accordingly, the Court finds
that the Amended Counterclaim's allegation that
RenalTech's polymeric resin does not have any
substitutes is sufficient to allege a unique product and
that the Amended Counterclaim sufficiently alleges a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
(Cite as: Not Reported in F.Supp.2d)

product market made up of just that unique product.

## B. *Antitrust Injury*

**\*4** Plaintiffs also argue that the Amended Counterclaim should be dismissed because RenalTech has failed to cure the deficiency in the Counterclaim's allegation of antitrust injury. Sections 4 and 16 of the Clayton Act, 15 U.S.C. § § 15 and 26 respectively, provide a private right of action for violations of Sections 1 and 2 of the Sherman Act. *See* 15 U.S.C. § §. 15, 26. In order to recover damages or seek injunctive relief in an antitrust suit brought pursuant to Sections 4 or 16 of the Clayton Act, a private plaintiff must prove the existence of an antitrust injury, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)* (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)*). The Third Circuit has recognized that, because the purpose of the antitrust laws is to protect competition, the court must examine "the antitrust injury question from the viewpoint of the consumer. 'An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." *Mathews v. Lancaster General Hosp., 87 F .3d 624, 641 (3d Cir.1996)* (quoting *Tunis Bros., 952 F.2d at 728)*. The Amended Counterclaim contains the following allegations of antitrust injury:

**\*5** 39. And although they have not yet succeeded, **BroTech's** and Purolite International's predatory litigation tactics are having their intended effect, and RenalTech has suffered antitrust injury. RenalTech has suffered and will suffer antitrust injury in at least two ways. First, the costs and expenses that RenalTech has incurred and will incur in defending this predatory, anticompetitive sham litigation are themselves a recognized form of antitrust injury, such costs and expenses reflecting the anticompetitive effect of the wrongful acts undertaken with an anticompetitive intent.

**\*5** 40. Second, **BroTech's** and Purolite International's ability to control the price of the polymeric resin supplied by them to RenalTech (if their anticompetitive scheme succeeds) will cause further antitrust injury directly to RenalTech and to consumers. **BroTech's** and Purolite International's coercion of an anticompetitive supply agreement will increase RenalTech's costs in producing finished products incorporating its patented polymeric resin, thereby increasing the price which will ultimately be

charged to the consumer. Moreover, the excessive price charged to the consumer as a result of **BroTech's** and Purolite International's anticompetitive conduct is likely to reduce demand for the product, thereby limiting RenalTech's sales and injuring RenalTech. **BroTech** and Purolite International still profit, even with reduced sales, because their anticompetitive conduct allows them to charge excessive prices to RenalTech, whereas RenalTech is faced both with excessive prices charged by **BroTech** and Purolite International and with reduced demand from consumers.

**\*5** (Am.Countercl.¶ ¶ 39-40.)

**\*5** Plaintiffs have moved to dismiss the Amended Counterclaim on the grounds that these allegations are insufficient to allege an antitrust injury. Plaintiffs maintain that these paragraphs are insufficient to allege antitrust injury for two reasons: (1) the potential effect on consumers and RenalTech of Plaintiffs' future behavior, as alleged in paragraph 40 of the Amended Counterclaim, is too hypothetical to state an injury under the antitrust laws because RenalTech's polymeric resin products have not been approved by the FDA and (2) the costs of defending this litigation, as alleged in paragraph 39 of the Amended Counterclaim, do not constitute an antitrust injury.

### 1. *Future antitrust injury*

**\*5** Plaintiffs argue that the Amended Counterclaim should be dismissed because the potential injury to competition alleged in paragraph 40 of the Amended Counterclaim is insufficient to state an antitrust injury where unsurmounted statutory or regulatory hurdles preclude the antitrust plaintiff from entering the market. (Pls.' Supp. Mem. at 3.) RenalTech has not yet entered the market for its polymeric resin. "When competitors violate the antitrust laws and another competitor is forced from a market, the latter suffers an injury-in-fact." *Andrx Pharmaceuticals, Inc. v. Biovail Corp. International, 256 F.3d 799, 806 (D.C.Cir.2001)*. A competitor such as RenalTech "that has not yet entered the market may also suffer injury but courts require a 'potential' competitor to demonstrate both its intention to enter the market and its preparedness to do so." *Id.* (citing *Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C.Cir.1977)*). The following factors are considered to be sufficient indicia of preparedness to enter the market: "adequate background and experience in the new field, sufficient financial capability to enter it, and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
(Cite as: Not Reported in F.Supp.2d)

taking of actual and substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and procurement of necessary facilities and equipment." ' *Hecht,* 570 F.2d at 994 (footnote and citation omitted); *see also Out Front Productions v. Magid,* 748 F.2d 166, 170 (3d Cir.1984) ("a company ... beginning business ... must show not only that it had the background, experience, and financial ability to make a viable entrance, but even more important, that it took affirmative actions to pursue the new line of business.") (citations omitted). Consequently, in determining whether RenalTech has sufficiently pled an injury, or threatened injury, resulting from the filing of the instant lawsuit, the Court must examine its intent and preparedness to enter the market for its polymeric resin. *Andrx,* 256 F.3d at 807.

**\*6** The Amended Counterclaim acknowledges that RenalTech must obtain FDA approval for products utilizing its polymeric resin before these products can be "sold or used in the treatment of individuals." (Am.Countercl.¶ 32.) Regulation of medical devices [FN2] is governed by the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, as amended by the Medical Device Amendments of 1976, 90 Stat. 39, 21 U.S.C. § 301 (West 1999). *See Buckman Company v. Plaintiffs' Legal Committee,* 531 U.S. 341, 343 (2001). The degree of regulation by the FDA depends upon whether the medical device in question is a Class I, II or III device. *Id.; see also* 21 U.S.C. § 360c(a). Class I devices are subject only to general manufacturing controls, Class II devices are subject to more stringent controls, and Class III devices must complete a premarket approval (PMA) process before they may be marketed. *Id.* at 343-44. The PMA process requires the applicant to demonstrate a "reasonable assurance" that the device is both safe and effective. *Id.* at 344 (citing 21 U.S.C. § § 360e(d)(2)(A), (B)). The FDA's process for review of a Class III device requires "an average of 1200 hours [for] each submission." *Id.* at 344-45 (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 477 (1996)).

> FN2. Device is defined by the Food, Drug and Cosmetic Act as:
> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is-(1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure,

> mitigation, treatment, or prevention of disease, in man or other animals, or
> (3) intended to affect the structure or any function of the body of man or other animals, and
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.
> 21 U.S.C. § 321(h).

**\*6** The Amended Counterclaim contains no allegations with respect to the classification of products incorporating RenalTech's polymeric resin, or the degree of FDA review which must be completed before those products may be marketed. The Amended Counterclaim similarly fails to include any allegations regarding how far RenalTech has gone in the process of obtaining FDA approval of products incorporating its polymeric resin, when such approval may be anticipated, or whether it will be prepared to enter the product market as soon as such approval has been received. The Amended Complaint simply alleges that such approval must be obtained and that RenalTech is seeking such regulatory approval from the FDA. (Am.Countercl.¶ 32.) As the Amended Complaint does not allege facts establishing RenalTech's intent and preparedness to enter the market for its polymeric resin product, that it would be prepared to enter the market for said product in the absence of the instant lawsuit, or that FDA approval of said products is probable, the Court finds that paragraph 40 of the Amended Counterclaim is insufficient to state an antitrust injury. *See Andrx* 256 F.3d at 807-08 (determining that district court correctly dismissed generic drug manufacturer's antitrust counterclaim in patent infringement action where the generic drug manufacturer failed to allege that it was prepared to enter the market or that it anticipated FDA approval for its generic drug; also finding that district court erred in dismissing said counterclaim with prejudice where the generic drug manufacturer might be able to cure its pleading deficiency).

### C. Defense Costs

**\*6** Plaintiffs argue that the Amended Complaint should be dismissed because RenalTech's payment of costs and expenses of litigation in defense of the instant litigation does not constitute an antitrust injury. RenalTech maintains, however, that legal fees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and other costs and expenses incurred in defending sham, anticompetitive litigation are recognized elements of antitrust injury. RenalTech relies on a line of cases originating with the opinion of the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") in *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir.1979). In *Handgards,* the Ninth Circuit found that the costs of defending a patent infringement suit which had been brought in bad faith constituted an antitrust injury: "In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong." 601 F.2d at 997. However, the Third Circuit has not adopted the *Handgards* determination that litigation costs alone qualify as antitrust injury.

*7 The Third Circuit requires that an allegation of antitrust injury reflect the challenged activity's "anti-competitive effect on the competitive market." *Eichorn v. AT & T Corp.,* 248 F.3d 131, 140 (3d Cir.2001). An antitrust plaintiff must show that the allegedly anticompetitive conduct harmed "the competitive landscape." *Tunis Bros.,* 952 F.2d at 728 (citation omitted). While the Amended Counterclaim alleges that RenalTech's payment of defense costs in this litigation flows from Plaintiffs' allegedly anticompetitive conduct, there is no allegation that said payment had any effect on competition, on the price, quantity or quality of RenalTech's products, or prevented RenalTech from pursuing its entry into the market for its polymeric resin. *See Mathews,* 87 F.3d at 641; *Eichorn,* 248 F.3d at 140 ("we have consistently held an individual plaintiff personally aggrieved by an alleged anticompetitive agreement has not suffered injury unless the activity has a wider impact on the competitive market.") (citation omitted).

*7 Accordingly, the Court finds that the Amended Counterclaim fails to allege antitrust injury arising from the filing of this action and Plaintiffs' Motion to Dismiss is, therefore, granted. Since RenalTech may be able to amend its counterclaim to cure the remaining deficiencies in its allegation of antitrust injury, the dismissal is without prejudice.

*7 An appropriate order follows.

## ORDER

*7 AND NOW, this 21st day of June, 2004, upon consideration of Plaintiffs' Motion to Dismiss

Defendant RenalTech's Amended Counterclaim (Docket No. 45), Defendant RenalTech's response thereto, the argument held in open court on February 26, 2004, and the parties' supplemental memoranda, IT IS HEREBY ORDERED that the Motion is GRANTED without prejudice and with leave to file an amended counterclaim within twenty (20) days of the date of this Order.

E.D.Pa.,2004.
Brotech Corp. v. White Eagle Intern. Technologies Group, Inc.
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474

Briefs and Other Related Documents (Back to top)

• 2005 WL 2849083 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Strike Jury Trial Demand (Sep. 26, 2005) Original Image of this Document (PDF)
• 2005 WL 2849082 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answer to Defendants' Motion to Introduce Prior Felony Convictions (Sep. 21, 2005) Original Image of this Document (PDF)
• 2005 WL 2849081 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answer in Opposition to Defendants' Motion to Preclude Extrinsic Evidence and Limit the Scope of Testimony About Andrew Braverman's Past Conduct (Sep. 20, 2005) Original Image of this Document (PDF)
• 2005 WL 2849080 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion in Limine No. 4 to Strike the Expert Report and Preclude the Testimony of John W. Dewhirst (Sep. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2849079 (Trial Motion, Memorandum and Affidavit) MOTION TO STRIKE PLAINTIFFS' JURY TRIAL DEMAND (Sep. 16, 2005) Original Image of this Document (PDF)
• 2005 WL 2849076 (Trial Motion, Memorandum and Affidavit) Defendants' Motion in Limine No. 1 to Preclude Extrinsic Evidence and Limit the Scope of Questions About Witness Andrew Braverman's Past Conduct (Sep. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 2849077 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to the Motion of Plaintiffs for a Separate Trial on Their State Law Claims (Sep. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 2849078 (Trial Motion, Memorandum and Affidavit) Defendants' Motion in Limine No. 2 to Introduce Prior Felony Convictions of Donald

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
(Cite as: Not Reported in F.Supp.2d)

Page 7

Brodie, Stefan Brodie and Brotech for Impeachment of Donald and Stefan Brodie's Credibility (Sep. 12, 2005) Original Image of this Document (PDF)

• 2005 WL 2682869 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment Dismissing this Action (Aug. 12, 2005) Original Image of this Document (PDF)

• 2004 WL 2718242 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answer to Defendants' Motion to Compel Certain Redeposition Testimony of Stefan Brodie (Sep. 17, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718234 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Certain Deposition Testimony of Stefan Brodie (Sep. 3, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718226 (Trial Motion, Memorandum and Affidavit) Response of Plaintiffs to Defendants' Motion for Entry of Amended Pretrial Scheduling Order (Aug. 27, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718216 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Plaintiffs in Support of their Motion for an Order Compelilng Discovery of Laboratory Notebooks of Russian Scientists and for their Depositions (Aug. 19, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718221 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Their Motion for an Order Compelling Defendants' Production of Polymer and Specifications (Aug. 19, 2004) Original Image of this Document (PDF)

• 2004 WL 2718171 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiff's Motion for an Order Compelling Discovery of Braverman Documents, Renaltech Minutes and Agendas, and Antitrust Documents, and a Rule 30(b)(6) Deposition (Aug. 16, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718178 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for an Order Compelling Discovery of Laboratory Notebooks of Russian Scientists and for Their Redepositions (Aug. 16, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718189 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for an Order Compelling Defendants' Production of Polymer and Specifications (Aug. 16, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718162 (Trial Pleading) Answer to

Third Third Amended Complaint (Aug. 6, 2004) Original Image of this Document (PDF)

• 2004 WL 2718154 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for an Order Compelling Discovery of Laboratory Notebooks of Russian Scientists and for Their Redepositions (Jul. 16, 2004) Original Image of this Document (PDF)

• 2004 WL 2718150 (Trial Motion, Memorandum and Affidavit) Motion of Plaintiffs for an Order Compelling Discovery of Braverman Documents, Renaltech Minutes and Agendas, and Antitrust Documents, and a Rule 30(b)(6) Deposition (Jul. 15, 2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 2718146 (Trial Pleading) Answer to Second Amended Complaint (Mar. 25, 2004) Original Image of this Document (PDF)

• 2004 WL 2718142 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplemental Memorandum in Support of Their Motion to Dismiss Defendants' Amended Counterclaims (Mar. 22, 2004) Original Image of this Document (PDF)

• 2004 WL 2718137 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum in Opposition to Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims (Mar. 18, 2004) Original Image of this Document (PDF)

• 2004 WL 2718133 (Trial Pleading) Second Amended Complaint (Mar. 10, 2004) Original Image of this Document (PDF)

• 2003 WL 23905571 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims (Dec. 31, 2003) Original Image of this Document (PDF)

• 2003 WL 23905550 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion To Dismiss Defendants' Amended Counterclaim (Dec. 15, 2003) Original Image of this Document with Appendix (PDF)

• 2003 WL 23905531 (Trial Pleading) Amended Counterclaim (Dec. 8, 2003) Original Image of this Document (PDF)

• 2003 WL 23905512 (Trial Motion, Memorandum and Affidavit) Memorandum In Support of Plaintiffs' Motion To Execute Requests For Letters Rogatory And Hague Convention Discovery (Sep. 15, 2003) Original Image of this Document (PDF)

• 2003 WL 23905494 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum In Opposition to Plaintiffs' Motion to Dismiss Defendants' Counter-Claims (Aug. 14, 2003) Original Image of this Document (PDF)

• 2003 WL 23905473 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
(Cite as: Not Reported in F.Supp.2d)

Defendants' Counter-Claims (Jul. 28, 2003) Original Image of this Document (PDF)

• 2003 WL 23905453 (Trial Pleading) Answer and Counterclaim (Jul. 14, 2003) Original Image of this Document (PDF)

• 2003 WL 23905437 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum In Support of Their Motion To Dismiss The Amended Complaint Under Fed. R. Civ. P. 12(b)(6) (Jun. 13, 2003) Original Image of this Document (PDF)

• 2003 WL 23905417 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss Complaint (May 30, 2003) Original Image of this Document (PDF)

• 2003 WL 23905394 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum In Support of Their Motion To Dismiss The Amended Complaint Under Fed. R. Civ. P. 12(b)(6) (Apr. 11, 2003) Original Image of this Document (PDF)

• 2003 WL 23905373 (Trial Pleading) Amended Complaint (Mar. 10, 2003) Original Image of this Document (PDF)

• 2003 WL 23905348 (Trial Pleading) Complaint for Declaratory Judgment (Jan. 16, 2003) Original Image of this Document (PDF)

• 2:03cv00232 (Docket) (Jan. 16, 2003)

• 2003 WL 23905676 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Purolite in Support of Its Motion for an Order Compelling Discovery of Braverman Documents, Renaltech Minutes, Agendas and Antitrust Documents, Together with a Rule 30(b)(6) Deposition (2003) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5



Not Reported in S.E.2d                                                                                    Page 1

Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

C

**Motions, Pleadings and Filings**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of North Carolina,
New Hanover County and Harnett County,
Business Court.
Auley M. CROUCH, III, on behalf of himself and all
others similarly situated,
Plaintiff,
v.
CROMPTON CORPORATION, Crompton Manu-
facturing Company, Inc., formerly named in
North Carolina as Uniroyal Chemical Company, Inc.,
Uniroyal Chemical Company
Limited, Flexsys NV, Flexsys America Limited Part-
nership of North Carolina,
Bayer Ag, Bayer Corporation, and Rhein Chemie
Rheinau GMBH, Defendants.
Timothy J. Morris, on behalf of himself and all others
similarly situated,
Plaintiff,
v.
Visa U.S.A. Inc. and Mastercard International, Inc.,
Defendants.
**Nos. 02 CVS 4375, 03 CVS 2514.**

Oct. 28, 2004.

{1} The above captioned cases are before the Court
on motions to dismiss pursuant to Rule 12(b)(6) of
the North Carolina Rules of Civil Procedure. They
are treated together because they both present the
same legal issues. The first issue is whether indirect
purchasers have standing under N.C.G.S. § 75-16 to
sue for violations of the state antitrust laws. The
Court holds, as it has before, that the decision of the
Court of Appeals in Hyde v. Abbott Laboratories,
Inc., 123 N.C.App. 572, 473 S.E.2d 680 (1996), disc.
rev. denied, 344 N.C. 734, 478 S.E.2d 5 (1996), is
controlling, and indirect purchasers do have standing
to sue under North Carolina's antitrust laws. If indir-
ect purchasers have standing, the question becomes

whether there are applicable limitations on that stand-
ing. The Court holds that indirect purchaser standing
is not limitless; that there are standing requirements
that apply to indirect purchasers. Application of those
standards to the pleadings in each of these cases res-
ults in dismissal.

Lea, Rhine & Associates, PLLC by Christopher A.
Chleborowicz and Joel R. Rhine; Lerach Coughlin
Stoia Geller Rudman & Robbins LLP by Robert J.
Gralewski, Jr. and Bonny E. Sweeney; The David
Danis Law Firm by Alexander E. Barnett, Michael J.
Flannery and James J. Rosemergy for Plaintiff
Crouch.

Moore & Van Allen, PLLC by Joseph W. Eason;
O'Melveny & Myers, LLP by Benjamin G.
Bradshaw, Richard G. Parker and Ian Simmons for
Defendants Crompton Corporation, Crompton Manu-
facturing Company, Inc. and Uniroyal Chemical
Company Limited.

Womble Carlyle Sandridge & Rice by Pressley M.
Millen; Gibson, Dunn & Crutcher, LLP by D. Jarrett
Arp, James Slear and Daniel G. Swanson; Covington
& Burling by Michael J. Fanelli, William D. Iverson
and Vijay Shanker for Defendants Flexsys America,
LP, Flexsys America Limited Partnership of North
Carolina, and Flexsys NV.

Helms, Mulliss & Wicker, PLLC by Henry L. Kit-
chin, Jr. and Bradley R. Kutrow; Jones Day by
Thomas Demitrack, William V. O'Reilly and J. An-
drew Read for Defendants Bayer Corporation and
Rhein Chemie Corporation.

Hardison & Leone, L.L.P. by Kenneth L. Hardison,
Elizabeth A. Leone and Joseph W. Osman; Susman
Godfrey, L.L.P. by Mark A. Evetts, Drew D. Hansen
and Neal S. Manne; Markun Zusman Compton &
David, L.L .P. by Kevin Eng, David S. Markun, Ed-
ward S. Zusman; Friedman & Shube by Noah Shube
for Plaintiff Morris.

Ellis & Winters, LLP by Richard W. Ellis, Stephen
C. Keadey, and Matthew W. Sawchak; Robinson,
Bradshaw & Hinson, PA by Everett J. Bowman,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                              Page 2
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

Mark W. Merritt and John R. Wester; Heller Ehrman White & McAuliffe LLP by Stephen V. Bomse, David M. Goldstein and Rachel M. Jones; Arnold & Porter LLP by Robert C. Mason for Defendant Visa U.S.A., Inc.

Womble Carlyle Sandridge & Rice by Pressley M. Millen; Paul Weiss Rifkind Wharton & Garrison, L.L.P. by Gary R. Carney, Patricia C. Crowley and Kenneth A. Gallo for Defendant MasterCard International, Inc.

### CORRECTED OPINION, ORDER AND JUDGMENT
#### I.
### FACTUAL BACKGROUND IN *CROUCH*

*1 {2} Plaintiff Crouch is an individual residing in New Hanover County, North Carolina. Plaintiff purchased four B.F. Goodrich tires (Advantage GT model # P195-70R14 90SM+S) for his automobile on October 19, 2002 from Sam's Club of Wilmington. Plaintiff brings this claim individually and on behalf of all other persons who purchased tires, other than for resale, that were manufactured using the rubber-processing chemicals sold by Defendants since 1994. [FN1]

> FN1. Am. Compl. ¶ 20. At oral argument the Court understood plaintiff's counsel to say that the class would be limited to retail consumers, excluding, for example, customers who purchased used cars with new tires.

{3} Defendant Crompton Corporation ("Crompton") is a Connecticut corporation with its principal place of business in Greenwich, Connecticut. Crompton is a global marketer and manufacturer of specialty chemicals, polymer products and processing equipment, which includes chemicals used for the processing of rubber and tires. Crompton's actions have affected commerce within the State of North Carolina.

{4} Defendant Uniroyal Chemical Company Limited ("Uniroyal") is a Delaware corporation with its principal place of business in Akron, Ohio. It is a wholly-owned subsidiary of Crompton and is responsible either independently or jointly with Crompton Manu-

facturing Company, Inc. for the manufacture, sale and/or distribution of rubber-processing products as part of its ordinary and customary business. Uniroyal manufactures several rubber-processing products including specialty products for tires and industrial rubber goods. Uniroyal's actions have affected commerce within the State of North Carolina.

{5} Defendant Crompton Manufacturing Company, Inc., formerly legally named in North Carolina as Uniroyal Chemical Company, Inc. ("Crompton Manufacturing"), is a New Jersey corporation with its principal place of business in Greenwich, Connecticut. It is a wholly-owned subsidiary of Crompton and is responsible either independently or jointly with Uniroyal for the manufacture, sale and/or distribution of rubber-processing products as part of its ordinary and customary business. Crompton Manufacturing's rubber-processing products include specialty products for tires and industrial rubber goods. Crompton Manufacturing's actions have affected commerce within the State of North Carolina.

{6} Defendant Flexsys NV is a joint venture between Solutia, a United States company, and Akzo Nobel, a Netherlands company. Flexsys NV has its headquarters in Woluwe, Belgium.

{7} Defendant Flexsys America LP ("Flexsys") is the United States subsidiary of Flexsys NV. Flexsys is a Delaware corporation with its headquarters located in Akron, Ohio. Flexsys NV is the world's leading supplier of chemicals to the rubber industry. Flexsys' actions have affected commerce within the State of North Carolina.

{8} Defendant Flexsys America Limited Partnership of North Carolina ("Flexsys NC"), the legal name in North Carolina of Flexsys America LP, is the United States subsidiary of Flexsys NV. Flexsys NC is a Delaware corporation with its headquarters located in Akron, Ohio.

*2 {9} Defendant Bayer AG is a corporation organized and existing under the law of the Federal Republic of Germany and maintains its principal place of business in Leverkusen, Federal Republic of Germany. Bayer AG is the parent company of Bayer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                     Page 3
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

Corporation, the wholly-owned subsidiary that sells and markets rubber-processing chemicals in the United States.

{10} Defendant Bayer Corporation ("Bayer") is a wholly-owned subsidiary of Bayer AG. Bayer has its principal place of business in Pittsburg, Pennsylvania, and is incorporated under the laws of Pennsylvania. Bayer develops, manufactures, sells and distributes a variety of pharmaceutical and chemical products, including rubber-processing products.

{11} Bayer develops, manufactures, sells and distributes its rubber-processing products through its Fibers, Additives and Rubbers Division. The Division is headquartered in Akron, Ohio. The Division manufactures rubber-processing chemical products which have a variety of differing roles in rubber-processing.

{12} Defendant Rhein Chemie Rheinau GmbH ("Rhein GmbH") is a business organized under the laws of the Federal Republic of Germany with its principal place of business located in Mannheim, Federal Republic of Germany. Rhein GmbH, a subsidiary or affiliate of Bayer AG, manufactures, sells and distributes the relevant rubber-processing chemicals throughout the global market, including the United States.

{13} Defendant Rhein Chemie Corporation ("Rhein"), a New Jersey corporation and a wholly-owned subsidiary and/or affiliate of Rhein GmbH, is responsible for the manufacture, sale and/or distribution of the relevant rubber-processing products throughout the United States, including North Carolina.

{14} On September 26, 2002, inspectors from the European Commission's Competition Division, assisted by officials from the Commission's member states, carried out unannounced inspections at defendants' European offices. According to a memorandum issued by the Commission on October 10, 2002, the stated purpose of the inspections was to "ascertain whether there is evidence of a cartel agreement and related illegal practices concerning price fixing for rubber chemicals." (Am.Compl.¶ 43.) On October 14, 2002, the Associated Press reported that

Crompton, Bayer and Flexsys made press releases verifying that their respective companies were under investigation for alleged price collusion in rubber chemicals both by U.S. and European Union authorities. [FN2] On May 27, 2004, Crompton pled guilty to participating in a conspiracy to suppress and eliminate competition by maintaining and increasing the price of certain rubber chemicals sold in the United States and elsewhere during the period between July 1995 to 2001. The U.S. federal court imposed a fine of $50 million. On May 28, 2004, Crompton pled guilty to one count of conspiring to lessen competition unduly in the sale and marketing of certain rubber chemicals in Canada. The Canadian federal court imposed a sentence requiring Crompton to pay a fine of $7 million. On July 14, 2004, Bayer pled guilty to charges filed by the U.S. Department of Justice in Federal District Court in the Northern District of California and agreed to a $66 million fine for participating in an international conspiracy to fix prices in the rubber chemicals market.

> FN2. Miles Moore, *U.S., EU Probing Rubber Chemical Suppliers,* RUBBER & PLASTICS NEWS, Oct. 14, 2002, at 1.

*3 {15} Plaintiff filed this action on November 5, 2002, only thirty days after the European investigation was announced, alleging violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), including N.C.G.S. §§ 75-1.1, 75-2, 75-5, 75-16, 75-16.1. Plaintiff alleges that defendants "entered into an agreement, arrangement, contract, combination, conspiracy and/or understanding that was intended to and which did have the effect of fixing, raising, stabilizing and maintaining the price for the relevant rubber-processing chemicals." (Am.Compl.¶ 40.) Plaintiff alleges that defendants' "supracompetitive pricing" was reflected in the prices of automobile tires manufactured using these rubber-processing chemicals. (Am.Compl.¶ 41.) Therefore, plaintiff alleges that consumers who purchased these automobile tires, not directly from defendants but rather from tire retailers, paid more than they would have in the absence of the alleged anticompetitive agreement. (Am.Compl.¶ 55.) Similar suits have been filed in other jurisdictions that recognize indirect purchaser standing. Plaintiff seeks to represent only per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                 Page 4
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

sons who purchased tires at retail.

{16} Direct purchasers have filed a nationwide class action lawsuit seeking to recover the alleged overcharge that is the subject of the state litigation. *In re Rubber Chemicals Antitrust Litig.,* Master Docket No. C-03-1496 (N.D. Cal. (Judge Martin J. Jenkins)).

{17} Defendants have responded by moving to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted based upon plaintiff's lack of standing to sue under North Carolina's antitrust laws.

{18} The case was assigned to this Court by Order dated April 19, 2004.

## II.

### FACTUAL BACKGROUND IN *MORRIS*

{19} Plaintiff, Timothy Morris, is a resident of North Carolina. Plaintiff brings this contemplated class action on behalf of all North Carolina consumers who purchased goods from merchants who accepted Visa and/or MasterCard credit cards and debit cards during the four years preceding the filing of the Complaint.

{20} Defendant Visa U.S.A. Inc. ("Visa") is a Delaware corporation. Visa's principal place of business is San Francisco, California. Visa transacts business within the State of North Carolina. At all relevant times, Visa was a national bankcard association whose members included more than 6,000 banks.

{21} Defendant MasterCard International, Inc. ("MasterCard") is a Delaware corporation. MasterCard's principal place of business is Purchase, New York. MasterCard transacts business within the State of North Carolina. At all relevant times, MasterCard was a national bankcard association whose members included more than 6,000 banks.

{22} In October 1996, Wal-Mart Stores, The Limited, Sears Roebuck, Safeway, Circuit City, the International Mass Retail Association, the National Retail Federation, the Food Marketing Institute, Bernie's Army-Navy Store, Auto-Lab of Farmington Hills, Burlington Coat Factory Warehouse, Sportstop, Payless Shoesource Shoes, Etc., the Coffee Stop, UCC Kwik Doc, Computer Supplies Unlimited, Denture Specialist, Inc./Geneva White D.M.D., Shark 3 Audio, 53, Inc., and Scrub Shop collectively filed a claim challenging the "Honor All Cards" rules of Visa and MasterCard that require all merchants accepting Visa and MasterCard credit cards to also accept their debit cards. The plaintiffs alleged that this requirement was a tying arrangement violating section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiffs further asserted that Visa and MasterCard attempted and conspired to monopolize the debit card market in violation of section 2 of the Sherman Act, 15 U .S.C. § 2. Plaintiffs alleged that the defendants' actions resulted in excessive fees to merchants for the debit card processing services. *See In re Visa Check/ MasterMoney Antitrust Litig.,* 192 F.R.D. 68 (E.D.N.Y.2000) *aff'd,* 280 F.3d 124 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002).

*\*4 {23}* In February 2000, a plaintiff class of approximately four million merchants who have accepted Visa and/or MasterCard credit cards and therefore were required to accept VisaCheck and/or Master-Money debit cards under the "Honor All Cards" rule was certified. *Id.* Oral arguments on motions for summary judgment were heard on January 10, 2003. On April 1, 2003, the federal court granted the merchants' motion for summary judgment in part and denied it in part. The defendants' motions for summary judgment were denied in their entirety. In addition, MasterCard's motion for a severance was denied. *See In re Visa Check/MasterMoney Antitrust Litig.,* 2003 U.S. Dist. LEXIS 4965, at \*27 (E.D.N.Y. Apr. 1, 2003).

{24} On the day that opening statements were to occur, April 28, 2003, MasterCard agreed to settle with the plaintiff class. *In re Visa Check/ MasterMoney Antitrust Litig.,* 297 F.Supp.2d 503, 508 (E.D.N.Y.2003). Visa agreed to settlement two days later, April 30, 2003. On December 19, 2003, the federal court issued an order providing final approval of the settlements. Pursuant to the settlement, merchants who accept Visa and MasterCard credit cards were free to reject Visa and MasterCard debit cards. In addition, Visa and MasterCard will pay more than $3 billion into a settlement fund to be distributed to the merchant class. *Id.* at 506-08.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                      Page 5
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

{25} Plaintiff filed this action on December 31, 2003, alleging violations of North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75. Plaintiff asserts consumer antitrust claims that attack the manner in which the "Honor All Cards" rules of the MasterCard and Visa national payment systems are applied to merchants across the country. Plaintiff's claim in this action is founded upon the same alleged "tying" conduct by Visa and Master-Card that was at issue in the federal merchant class antitrust action. (*Compare* Compl. ¶¶ 2-6, 27(m), 28-57, *with In re Visa Check/MasterMoney Antitrust Litig.,* 192 F.R.D. at 71-73.) Plaintiff alleges that con-sumers paid higher prices for goods sold by the mer-chants bringing the claim in the federal action. Plaintiff alleges that because merchants were "com-pelled to pay supracompetitive prices," merchants, in turn, passed along their extra costs to consumers by raising the price of goods. (Compl.¶¶ 57-58.)

{26} Defendants have responded by moving to dis-miss under Rule 12(b)(6) based on two grounds: first, that plaintiff lacks standing to sue under North Caro-lina's antitrust laws; and second, that plaintiff seeks relief that would violate the Commerce Clause of the United States Constitution, which forbids states from regulating interstate commerce that requires uniform national regulation.

{27} The case was assigned to this Court by Order dated May 11, 2004.

### III.
### LEGAL STANDARD

{28} When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint ... are sufficient to state a claim upon which relief may be granted." *Harris v. NCNB,* 85 N.C.App. 669, 670, 355 S.E.2d 838, 840 (1987). In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true. *See Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 575, 473 S.E.2d 680, 682 (1996). The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a cer-tainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. *See id.*

### IV.

**\*5** {29} An understanding of the issues in these two cases necessarily begins with examination of the standing requirements under federal antitrust law. That examination begins with the study of two cases, *Hanover Shoe Co. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The in-terrelationship of those two cases is best described by William Landes and Richard Posner in their seminal article: *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick.

In *Illinois Brick Co. v. Illinois,* the Supreme Court held that indirect purchasers do not have standing to sue for violations of the antitrust laws under sec-tion 4 of the Clayton Act, which authorized private treble-damage suits by individuals or firms injured in their business or property by a violation of those laws. To understand this decision, one must go back to *Hanover Shoe Co. v. United Shoe Ma-chinery Corp.,* a suit by a shoe manufacturer against a manufacturer of shoe machinery who had earlier been found to have monopolized the shoe machinery industry in violation of section 2 of the Sherman Act. The defendant argued that it should be allowed to show that its customer had not in fact been injured by the antitrust violation because the customer had passed on the costs of the violation to its customers, the purchasers of shoes. The Su-preme Court rejected this argument, holding that there is no "passing on" defense to a suit by a direct purchaser; the direct purchaser is entitled to get the overcharge back, trebled, whether or not he was really injured to that extent.
*Illinois Brick* is the mirror image of *Hanover Shoe.* The plaintiffs in *Illinois Brick,* represented by the state of Illinois suing on behalf of itself and some 700 local government entities in the Chicago area, claimed overcharges in connection with various construction projects. The defendants, manufactur-ers and distributors of concrete block alleged to be in collusion, sold the block to masonry contractors who submitted bids to general contractors who in turn submitted bids to customers such as the plaintiffs. The *Illinois Brick* plaintiffs were there-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                      Page 6
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

fore indirect purchasers of concrete block, standing in the same relation to the defendants as the buyers of shoes at retail stood to United Shoe Machinery Corporation. The predicate of the *Illinois Brick* suit was the passing on of all or part of the overcharge by the direct purchaser; without passing on, there could be no injury to indirect purchasers.

Unless they are willing to countenance multiple liability, the courts cannot allow suits by indirect purchasers without also permitting the defendant to assert a "passing-on defense" against direct purchaser plaintiffs. As the Court recognized in *Illinois Brick,* there are only two ways of avoiding unacceptable multiple liability: (1) allow indirect purchasers to sue but overrule *Hanover Shoe* or (2) retain Hanover Shoe and preclude indirect purchasers from suing.

**\*6** 46 U. CHI. L.REV. 602, 602-03 (1979) (footnotes omitted).

{30} The rule governing indirect purchaser standing in federal antitrust cases has not changed since *Illinois Brick.* The fact that there has been no congressional or judicial repeal of the rule indicates that the policy behind it has proven effective. That policy holds that the direct purchaser suit is on balance a more effective instrument for enforcement of the antitrust rule prohibiting price fixing than the indirect purchaser suit. [FN3] Under the federal scheme, where avoidance of a double recovery is favored, the federal government has chosen the direct purchaser suit as the most effective means of enforcing the antitrust laws, particularly in price fixing cases.

> FN3. William Landes and Richard Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick. 46 U. CHI. L.REV. 602, 634-35 (1979). The authors stated: Our analysis has suggested that the rule of *Illinois Brick,* which bars indirect purchasers from bringing private antitrust damage actions, is probably the soundest rule from the standpoint of maximizing the effectiveness of antitrust enforcement. We anticipate the argument that, however abstractly desirable it may seem to confine enforcement to direct purchasers, to do so is

to alter the fundamental character of the private antitrust action in a way that cannot be squared with the intent of Congress in creating private damage remedies for antitrust violations. One way of characterizing our position is that it allows someone who may not be injured (or not injured much)--the direct purchaser--to recover (treble) damages while denying the right to recover any damages to other people-- indirect purchasers--who may in fact be injured. There is an element of paradox in this result, but it is dispelled by careful analysis. As we have shown, even if indirect purchasers were given the nominal right to sue, they would often fail to receive significant compensation. And anyone troubled by the windfall element in the judgment received by the direct purchaser must in logic reexamine the entire structure of private antitrust enforcement. Two-thirds of *every* private antitrust damage judgment (the punitive component of the judgment) is a windfall to the purchaser. In a class action, much of even the compensatory portion of the judgment may end up in the pockets of lawyers or in state treasuries, rather than in the pockets of the people who were actually harmed by the antitrust violation. The windfall element cannot be purged by the private antitrust suit without a complete reworking of antitrust enforcement. Until that is done, society will be well-advised to allow some direct purchasers to enjoy windfalls if, as we have argued, the direct purchaser suit is on balance a more effective instrument for enforcing the antitrust rule prohibiting price fixing than the indirect-purchaser suit.

> *Id.* (footnote omitted).

{31} The choice made in the federal system had the effect of preventing indirect purchasers who were actually injured by a price fixing scheme from recovering their damages. It was a policy decision that was not well received in some states. There were rational arguments that the decision was wrong from a policy standpoint. Those arguments were made effectively

Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

by Justice Brennan in a well-reasoned dissent in *Illinois Brick*. A minority of states chose to alleviate the problems created for indirect purchasers by *Illinois Brick* by either passing statutes (*Illinois Brick* repealer statutes) or interpreting their existing statutes as permitting indirect purchaser standing under the state antitrust law based upon some differentiation in language between the state and federal statutes. For example, the District of Columbia passed a statute [FN4] which was modeled directly on Justice Brennan's dissent in *Illinois Brick*. It specifically provides for indirect purchaser standing and it adopts the "target area" test for standing mentioned by Justice Brennan in his dissent . [FN5] It is a model for states desiring to create a clear statutory framework for indirect purchaser cases.

> FN4. *See* D.C.Code Ann. § 28-4509(a) (1981).
>
> FN5. Justice Brennan suggested a target area test as one possible approach to standing, but did not actually endorse it as a test to be adopted. It is worthy of note that Justice Brennan was among the majority in its holding in *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC* "), which was decided subsequent to *Illinois Brick* and prior to the 1996 amendments to the North Carolina statute.

{32} The recognition of indirect purchaser standing by this minority of states created an unusual situation. In federal price fixing cases, direct purchasers were permitted to recover the artificially inflated price and treble damages even though they may have passed on the artificially inflated price to someone else in the distribution chain. They receive a windfall in some instances; but that windfall is predicated upon the policies that the federal scheme was (a) the most effective deterrent, (b) eliminated double recovery, (c) eliminated extraordinarily difficult damage proof [FN6] and (d) was economically rational. [FN7] When the minority states reacted by repealing *Illinois Brick,* they created a situation which (a) restored the ability of indirect purchasers to recover for injuries

actually sustained as a result of anticompetitive behavior, (b) added a redundant and less effective deterrent, (c) condoned double recovery (trebled) against violators and (d) created the potential for extremely difficult damage proof issues.

> FN6. *See* Landes and Posner, *supra* note 3, at 609, 615, 619-20.
>
> FN7. *See* Landes and Posner, *supra* note 3, at 611-12, 617-18, 620, 625.

*7 {33} Not surprisingly, the state efforts to restore indirect purchasers' ability to recover for injuries sustained as a result of antitrust violations were challenged, primarily on the ground that state statutes were preempted by the federal scheme. That challenge was directly rejected by the United States Supreme Court in *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). The Supreme Court held that states may allow an indirect purchaser to sue under state antitrust laws.

> When viewed properly, *Illinois Brick* was a decision construing the federal antitrust laws, not a decision defining the interrelationship between the federal and state antitrust laws. The congressional purposes on which *Illinois Brick* was based provide no support for a finding that state indirect purchaser statutes are pre-empted by federal law.

*California v. ARC Am. Corp.,* 490 U.S. 93, 105-06, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

This Court has previously noted the problems created by this dual enforcement in *Adams v. Aventis, S.A.,* 2003 NCBC 7, at ¶ 23 (No. 01CVS2119, Craven County Super. Ct. August 26, 2003)(Tennille, J.). The Court stated:

> In 1995, the Section of Antitrust Law of the American Bar Association published a Report of the Indirect Purchaser Task Force outlining proposed legislative changes to address the "indirect purchaser problem." *Report of the Indirect Purchaser Task Force: Section of Antitrust Law American Bar Association,* 63 ANTITRUST L.J. 993 (Spring 1995). The report stated that the results of state *Illinois Brick* repealer laws are that:
> (1) The full amount of the overcharge, trebled, can be recovered by (i) direct purchasers who sue un-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d    Page 8
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
(Cite as: 2004 WL 2414027 (N.C.Super.))

der federal law; (ii) the customers of those direct purchasers who sue under state law; and (iii) under most state *Illinois Brick* repealers, by indirect purchasers at every other stage of distribution down the line.

(2) The overcharge that an indirect purchaser can have trebled may be a multiple of the overcharge to the direct purchaser because indirect purchasers can claim that their seller's markups on the original overcharge are also inflated because of that overcharge.

(3) The direct purchaser cases can be prosecuted in federal court and the indirect purchaser cases can be prosecuted in state court(s). Indeed, the Supreme Court seemed to encourage that kind of multiple litigation in *ARC America* by broadly hinting to federal courts that they utilize pendent jurisdiction principles for state law indirect purchaser claims.

(4) The results in the direct and indirect purchaser cases need not be consistent. The overcharge which is treated as the direct purchaser's in the federal court can be treated as the indirect purchaser's in the state court. In fact, if indirect purchaser cases are brought in several state courts, there may be inconsistencies in those decisions.

Thus, defendants in horizontal price-fixing cases face not only the burden and expense of multiple treble-damage lawsuits, but also enormous potential liability--not just three, but multiples of three times the overcharge, if a lay jury finds liability. Few companies can afford to "roll the dice" on a jury verdict when the exposure is that high, no matter how innocent they believe they are.

*8 Additionally, the current law turns judicial economy--the principal reason for the decisions in *Hanover Shoe* and *Illinois Brick*--on its head. Federal *and* state judicial resources are finite and precious. It makes little sense to permit, much less encourage, multiple litigation in federal and state courts. It makes even less sense to permit inconsistent judgments as to who bore the overcharge.

2003 NCBC 7, at ¶ 23.

{34} Thus, states may provide indirect purchaser recovery based upon state antitrust laws even though (1) the result may and almost assuredly will be a double recovery and (2) a preferable deterrent exists under federal law. It is clear then that the primary rational for enforcement of the state antitrust laws is to provide a recovery for indirect purchasers *actually* injured by antitrust violations. That goal should be kept in mind when interpreting and applying the statute.

{35} The inquiry into standing in federal antitrust cases does not end with *Hanover Shoe* and *Illinois Brick.* Those cases dealt only with apportionment of damages in price fixing situations.

{36} The Supreme Court specifically noted that its decision was not directed to standing. It said:

Because we find Hanover Shoe dispositive here, we do not address the standing issue, except to note, as did the Court of Appeals below, that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4.

*Illinois Brick,* 431 U.S. at 728 n. 7 (citation omitted).

{37} Since *Illinois Brick,* the federal courts have addressed standing in other situations involving indirect purchasers or persons indirectly injured by alleged antitrust activity. The leading federal case on standing in situations not involving price fixing is *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC* "). [FN8] In that case, the Unions sought damages under section 4 of the Clayton Act. [FN9] They alleged that the employer group defendant had coerced some of its members to enter into business relationships with nonunion contractors and subcontractors, thus adversely affecting the trade of the unionized firms and consequently the unions themselves.

FN8. The application of the *AGC* standing requirements was not originally argued in *Crouch,* but was argued in *Morris.* Subsequent to the oral argument in *Morris,* counsel in *Crouch* were afforded the opportunity to address the application of the *AGC* requirements as well as the application of a target area test to the fact situation in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Crouch*. Each side filed supplemental briefs on those questions.

FN9. 15 U.S.C. § 15 (2004). That provision is the model after which the North Carolina statute is patterned. *See infra* ¶ 46.

{38} In holding that the Union was not a person injured by reason of a violation of the antitrust laws within the meaning of section 4 of the Clayton Act, the Supreme Court adopted a five factor standing test which it derived in part by looking at the standard applied in common law damage actions when the Clayton Act's predecessor was originally passed in 1890.

{39} Significantly, the Supreme Court rejected the argument made by both plaintiffs in these cases (section 4 of the Clayton Act and Chapter 75) is broad and unrestricted, it covers any and every arguable injury flowing from an antitrust violation. [FN10] In rejecting a limitless interpretation of the language the Supreme Court said:

FN10. *See* Pl.'s Opp'n Defs.' Mot. Dismiss at 8-9 in *Morris;* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss at 4-9 in *Crouch.*

*9 A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Some of our prior cases have paraphrased the statute in an equally expansive way. But before we hold that the statute is as broad as its words suggest, we must consider whether Congress intended such an open-ended meaning.
*AGC,* 459 U.S. at 530 (footnote omitted).

{40} The Court then went on to hold:
As this Court has observed, the lower federal courts have been "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Just last Term we stated:
An antitrust violation may be expected to cause

ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." [*Illinois Brick Co. v. Illinois,* 431 U.S.], at 760 (BRENNAN, J. dissenting). It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476-477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).
*Id.* at 534-35.

{41} The Supreme Court found that there was no single bright line test that could be applied in determining standing. Rather, it required federal judges to evaluate the plaintiff's harm, the alleged wrongdoing by the defendant and the relationship between the two according to five factors. The five factors to be used by federal courts in determining standing as set forth in *AGC* are: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market, (2) whether the injury alleged is direct and a first hand product of the restraint alleged, (3) whether there exists more directly injured parties with motivation to sue, (4) whether the damage claims are speculative and (5) whether the claims (a) risk duplicative recovery and (b) would require a complex apportionment of damages.

{42} The holding in *AGC* has been followed consistently in the federal courts. *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 219 (4th Cir.1987) (affirming dismissal because "though there obviously is a causal relation between the conduct and harm as alleged, it is remote rather than direct"); *Eagle v. Star-Kist Foods, Inc.,* 812 F.2d 538, 539-43 (9th Cir.1987) (affirming dismissal because plaintiffs "were neither consumers nor competitors in the relevant market," who alleged injuries derivative of others who also had sued defendants); *Henke Enters., Inc. v. Hy-Vee Food Stores, Inc.,* 749 F.2d 488, 489-90 (8th Cir.1984) (affirming dismissal because plaintiff "was neither a competitor, participant, nor consumer within the [allegedly restrained] market" and its alleged injury was "an incidental by-product of the conspirators' claimed anticompetitive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                    Page 10
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

action"). Viewed in the broader context of standing enunciated in *AGC*, *Illinois Brick* appears as a per se disqualification of indirect purchasers in price fixing cases under application of factors 2, 3 and 5. *Illinois Brick* and *AGC* are logically consistent.

**\*10 {43}** If *Hyde* is correct that the North Carolina statute created indirect purchaser standing and if the courts of this state are required to interpret our antitrust statutes consistently with federal law [FN11], reconciling *Illinois Brick* and *AGC* in this state requires that factor 3 be modified and that the application of factors 2 and 5 be limited by the statutory recognition of indirect purchaser claims. The courts of this state may not deny standing based upon *Illinois Brick* but must still determine standing based upon relevant factors.

> FN11. *See infra* ¶ 49; N.C.G.S. § 75-1 (1999); Act of June 3, 1996, ch. 550, 1995 N.C. Sess. Laws 550 (titled "An Act to Revise the Statutes Regarding Antitrust Law to Ensure That These Provisions are Internally Consistent and Consistent with Federal Antitrust Laws").

**{44}** "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Neuse River Found., Inc. v. Smithfield Foods, Inc.,* 115 N.C.App. 110, 113, 574 S.E.2d 48, 51 (2002) (*quoting Aubin v. Susi,* 149 N.C.App. 320, 324, 560 S.E.2d 875, 878 (2002)). "The term ['standing'] refers to whether a party has a sufficient stake in an otherwise justiciable controversy so as to properly seek adjudication of the matter." *Neuse River Found.,* 115 N.C.App. at 114, 574 S.E.2d at 51-52 (*quoting Sierra Club v. Morton,* 405 U.S. 727, 731-32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Standing consists of three elements:

> (1) "injury in fact"--an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is *fairly traceable* to the challenged action of the defendant; and (3) it is *likely, as opposed to merely speculative,* that the injury will be redressed by a favorable decision.
> *Neuse River Found.,* 155 N.C.App. at 114, 574 S.E.2d at 52 (*quoting Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (emphasis added).

"The gist of standing is whether there is a justiciable controversy being litigated among adverse parties with substantial interest affected so as to bring forth a clear articulation of the issues before the court." *Street v. Smart Corp.,* 157 N.C.App. 303, 305-06, 578 S.E.2d 695, 698 (2003) (*quoting Texfi Industries v. City of Fayetteville,* 44 N.C.App. 268, 269-70, 261 S.E.2d 21, 23 (1979), *aff'd,* 301 N.C. 1, 269 S.E.2d 142 (1980)). "Standing most often turns on whether the party has alleged 'injury in fact' in light of the applicable statutes or caselaw." *Neuse River Found.,* 115 N.C.App. at 114, 574 S.E.2d at 52.

## V.

**{45}** The federal law and the issue of preemption of state antitrust laws by federal law being clear, the Court turns to a review of the North Carolina experience in indirect purchaser cases.

### A.

**{46}** That review begins with the statute and its history. The only appellate decision interpreting the statute is *Hyde v. Abbott Laboratories, Inc.,* 123 N.C.App. 572, 473 S.E.2d 680 (1996), *disc. rev. denied,* 344 N.C. 734, 478 S.E.2d 5 (1996). As this Court has previously noted:

> The *Hyde* decision is the only North Carolina appellate decision dealing with indirect purchaser standing. That case was settled after the Court of Appeal's decision and before review by the North Carolina Supreme Court. In *Hyde,* plaintiffs filed a class action against manufacturers of infant formula, alleging violations of North Carolina's antitrust laws. 123 N.C.App. at 573, 473 S.E.2d at 681. The purported class consisted of ultimate consumers who purchased infant formula from parties other than the manufacturer. *Id.* at 574, 473 S.E.2d at 681-82. The defendants filed a motion to dismiss alleging that plaintiffs were indirect purchasers and therefore lacked standing to sue under N.C.G.S. § 75-16. *Id.* The Superior Court granted the motion to dismiss, and plaintiffs appealed. *Id.*
> **\*11** The Court of Appeals reversed the Superior Court and found that under North Carolina's antitrust statute, an indirect purchaser may sue a manu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facturer for antitrust violations. The Court of Appeals based this finding upon a review of the plain language of N.C.G.S. § 75-16. North Carolina's antitrust statute provides:

If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed, or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict. N .C.G.S. § 75-16 (1999).

The current version of N.C.G.S. § 75-16 was amended in 1969. Prior to the amendment, the first sentence of the provision began: "If the business of any person, firm, or corporation shall be broken up...." 1913 N.C. Sess. L. 66, 70. The *Hyde* court found it significant that, in amending the statute, the legislature decided to add the phrase "if *any person* shall be injured" to the beginning of the provision. 123 N.C.App. at 578, 473 S.E.2d at 684. The court found that this evidenced an intent to expand the class of persons with standing to sue under Chapter 75, and thus provide a recovery "for all consumers," including indirect purchasers. *Id.* at 577-78, 473 S.E.2d at 684. A review of the legislative history also leads to the conclusion that the General Assembly intended to create indirect purchaser standing to sue under the state antitrust laws when it amended the statute. There is simply no logical reason for the amendment other than the creation of indirect purchaser standing.

In holding that indirect purchasers have standing to sue under North Carolina antitrust law, the Court of Appeals specifically declined to interpret the statute consistent with federal antitrust law. As originally enacted in 1913, the North Carolina antitrust statute was modeled after federal antitrust law, codified as Section 7 of the Sherman Act. *See* An Act to Declare Illegal Trusts and Combinations in Restraint of Trade, Ch. 41, § 14, 1913 Sess. Laws 66. Section 7 of the Sherman Act was recodified as Section 4 of the Clayton Act. Both federal and state law have been amended throughout the years;

however, the language of the North Carolina statute has remained similar to the language of the Clayton Act. *Bruggers v. Eastman Kodak Co.,* 2000 NCBC 3, at ¶¶ 5-8 (No. 97CVS11278, Wake County Super. Ct. March 17, 2000) (Tennille, J.).

{47} This Court has previously held that unless and until *Hyde* is overruled by the Supreme Court or new legislation is passed, this Court is bound by the decision in *Hyde* to the extent that it holds that indirect purchasers have standing under the North Carolina antitrust laws. *See, Bruggers,* 2000 NCBC 3, at ¶ 17; *Adams,* 2003 NCBC 7, at ¶ 8; *MJM Investigations, Inc. v. Microsoft Corp.* (No. 00CVS4073, Wake County Super. Ct.; No. 00CVS1246, Lincoln County Super. Ct., N.C. Aug. 2, 2004) (Tennille, J.) (Order Approving Settlement). In *Hyde,* the Court of Appeals was only asked to consider the question of whether the statute provided indirect purchaser standing. It was not called upon to delineate the scope and breadth of standing under the statute.

**\*12** {48} Since *Hyde* was briefed and argued there have been several developments which might have impacted the scope, if not the actual outcome, of that decision. Those developments demonstrate that the landscape upon which these types of claims are viewed has changed significantly since *Hyde* was decided.

{49} First, in June 1996 the General Assembly ratified a bill entitled "An Act to Revise the Statutes Regarding Antitrust Law to Ensure That These Provisions Are Internally Consistent and Consistent With Federal Antitrust Laws." Act of June 3, 1996, ch. 550, 1995 N.C. Sess. Laws 550 ("1996 amendments"). That legislative history is important for two reasons. First, if the General Assembly had desired to change the statute to provide for an *Illinois Brick/ Hanover Shoe* limitation, it could have done so then. It did not, and it has done nothing to change the law since the *Hyde* decision. Second, and equally important, the General Assembly signaled a clear intent for the state courts to follow federal decisional guidance in interpreting and enforcing state antitrust laws. Clearly, counsel for the parties did not bring the 1996 amendments to the attention of the *Hyde* court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                                    Page 12
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

[FN12] The statutory direction to follow federal guidance has a bearing on this Court's decisions in these two cases, requiring the Court to reconcile the indirect purchaser standing statute with the federal standing requirements enunciated in *AGC.*

> FN12. The *Hyde* court held: "Unlike Texas, our General Assembly has not mandated that our antitrust laws be construed in harmony with federal antitrust law." 123 N.C.App. at 581, 473 S.E.2d at 686.

{50} Second, a track record is available which provides information not available to the *Hyde* court. [FN13] The track record to date establishes that state indirect purchaser cases are generally parasitic. They are not self-generating or supporting but almost always are dependent on some triggering federal action for their genesis. The track record also establishes that these cases pose significantly complex proof issues both as to damages and liability. [FN14] The track record establishes that they can in fact result in double recovery. [FN15] That same track record discloses that these types of cases are difficult to administer from a settlement standpoint and that the complexities and administrative costs and difficulties result in settlements that are something less than sterling from the consumer's point of view. [FN16] None of that information was available to the court in *Hyde.* This Court has previously pointed out the problems with settlement of these kinds of cases. In approving the *Microsoft* indirect purchaser class action settlement, the Court noted:

> FN13. *See* discussion *infra* Part V.B (describing the indirect purchaser litigation since *Hyde* was decided).

> FN14. The *Hyde* court specifically found that there were no complex damage or proof issues before it and further held that there was nothing in the record in that case to establish that other cases would pose difficult damage and administrative issues. The *Hyde* court said:
> It is clear that a suit by indirect purchasers under our antitrust laws will be complex. However, when asked at oral argument

whether "chaos reigned" in states which have allowed indirect purchaser suits, defendants were unable to cite a single example. This failure to cite a single indirect purchaser case in which a court has been faced with an impossible complex situation counsels us that a fear of complexity is not a sufficient reason to disallow a suit by an indirect purchaser....
123 N.C.App. at 584, 473 S.E.2d at 687-88.
The facts in *Hyde* presented a fairly simple case. The product was a commodity which was not altered or incorporated in another product in the distribution chain, and the price fixing took place at the wholesale level, only one level removed from the consumer. Direct impact on the consumer and pass through were not difficult issues to prove. The question of whether the fixed price was absorbed by the consumer was not difficult. The complexity presented by *Morris* and *Crouch* differs dramatically from *Hyde.*

> FN15. The *Hyde* court found: "However, there are few, if any, reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation." 123 N.C.App. at 583, 473 S.E.2d at 687. In *Crouch,* plaintiffs seek to recover the same damages for which direct purchasers such as tire companies may seek treble damages. In *Morris,* defendants have already agreed to a multibillion dollar settlement with the direct purchaser class. In *Bruggers,* the class recovered for the same offenses which were the subject of federal direct purchaser actions. Likewise, in *Microsoft,* the plaintiffs recovered on the same claims which were asserted by direct purchasers. The problems recognized with possible double recovery are obvious.

> FN16. The settlements in *Long v. Abbott Laboratories,* 1999 NCBC 10 (No. 97CVS8289, Mecklenburg County Super. Ct. July 30, 1999) (Tennille, J.), *Bruggers* and *Microsoft* demonstrate the difficulties

Not Reported in S.E.2d                                                            Page 13
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

inherent in consumer class action cases. *Long* was a *cy pres* settlement that provided no benefit to the class. *Bruggers* resulted in a settlement that went to class members under a cumbersome administrative process which did not likely reach anything more than a small minority of the class. *Microsoft* is a classic example of the complex administrative problems that can be created. It will likely result in primarily a *cy pres* settlement. All of these cases fit the forecast of difficulties made by Landes and Posner in their article. *See supra* note 3.

There is no definitive decision from the North Carolina Supreme Court ruling upon the issue of indirect purchaser standing in North Carolina, nor is there a clear legislative history. Accordingly, every plaintiff argues that there is indirect purchaser standing, and every defendant argues that there is no standing under North Carolina law. The stakes are almost always too high for either side to risk trial and an appeal. Further, numerous issues flowing from indirect purchaser standing remain unanswered. For example, who has the burden of proof on pass-through issues, and what must be shown? How indirect can the purchaser be? Who has the burden of showing that an indirect purchaser did not pass through the price increase to another consumer? Are there reliable means to determine pass through and the amount thereof? The answers to these questions dramatically affect liability and the potential for recovery. It is no surprise that neither plaintiffs lawyers nor defendants have wished to incur the expense of trial and appeal which would be necessarily incurred in getting the answers to these questions. It is likely that more than one trial would be required to get all the required answers.

*13 Additionally, there were significant questions concerning the application of the law of damages and how damages were to be determined in this case. The federal case which spawned this and other indirect purchaser cases was not a price fixing case. It involved anticompetitive behavior and not price fixing. The cost of Microsoft products at issue had decreased relatively speaking over the time in question. While there had been a determination in the federal action that Microsoft had a monopoly, there was no finding that it had used that monopoly to artificially increase prices. Proving damages by pass through of artificially inflated prices would have raised numerous novel questions of law. Proving damages to indirect purchasers by anticompetitive actions (which may have included artificially deflated prices) would raise a whole host of other issues for which there is no statutory or case law guidance.

In short, the process of trying this case and going through an appeal and possible retrial meant that the case would not be finally resolved for at least four or five years. Final judgment would have been entered some ten years after the alleged damages were incurred. For reasons explained more fully below, that time lag was a significant issue.

While there is a possible philosophical argument that this uncertainty has a salutary effect in promoting settlement of cases, this court does not believe it is the function of the law to create ambiguity and uncertainty. If consumers have a cause of action they should be entitled to full recovery, not a compromise amount. On the other hand, if no cause of action exists or damages are limited to direct pass through of artificially inflated prices, businesses ought not to have to pay for unfounded claims even if they are compromised. Under the present system, only the lawyers really benefit from the uncertainty. One of their clients is paying an unnecessary price.

....

Two factors are critical to the Court's decision to approve the terms of this settlement affecting purchasers of Microsoft products--timing and purchaser identification. Most indirect purchaser cases involve common problems--how to identify the class members and distribute small amounts of money to them. This case is no different. Plaintiff's counsel and Microsoft have represented to the Court that a means of identifying all consumers who purchased the software at issue does not exist and cannot be created. Thus, there will be a claim process of some sort no matter the outcome of settlement or trial. As counsel for one of the interveners has suggested, even in cash refund cases,

Not Reported in S.E.2d                                                                          Page 14
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
(Cite as: 2004 WL 2414027 (N.C.Super.))

the claims process is abysmally ineffective, with only single-digit percentages of potential beneficiaries making claims. It thus appears to the Court that there will have to be a claims process no matter the outcome. If the case were tried and some amount awarded for damages to purchasers of specific products, a mechanism would have to be put in place for identification of products purchased, claims and payment. If that process were to be put in place three to five years from now and it covered products purchased in the late 1990s, it is unlikely that the claims process would result in any significant payout. Most of these technology products will have been replaced well before any claims process begins. If the funds were not paid out, Microsoft would get to keep the money. Purchasers would be required to prove purchases which occurred many years before the claim process begins. That will be difficult enough now, and perhaps impossible years from now. Settlement now, while there is some prospect that purchasers will have records of their purchases, is far more beneficial to the class. Here, most of the purchasers are businesses that arguably have better records of their purchases. For consumers, the settlement has the benefit of not requiring proof of purchase for smaller claims. The combination of the more current claim process and the *cy pres* component of the settlement make acceptance of the coupon aspect of the settlement acceptable, even if it is not the most desirable process. Given the rapid advancements in technology, it is also likely that computer owners will make purchases of new hardware and software, making the coupons more valuable than they would be for products not likely to be replaced.

***14** *MJM Investigations, Inc. v. Microsoft Corp.* (No. 00CVS4073, Wake County Super. Ct.; No. 00CVS1246, Lincoln County Super. Ct., N.C. Aug. 2, 2004) (Tennille, J.) (Order Approving Settlement).

{51} Third, there are cases from other indirect purchaser states which provide some guidance with respect to limitations on standing. The case law has evolved from interpretations of state statutes to determine if they provide for indirect purchaser standing (as happened in *Hyde* ) to a more detailed examination of standing requirements. Not unexpectedly, the far reaches of the claims against Visa and MasterCard in the various indirect purchaser states have prompted some of that evolution.

{52} At least eight other courts have rejected standing for plaintiffs with claims identical to those presented in the *Morris* case. Each of those states recognizes indirect purchaser claims. In South Dakota the court simply dismissed the case without detailed explanation. [FN17] In North Dakota the plaintiff's case was dismissed with the holding: "As 'non-purchasers' of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote." [FN18]

> FN17. *Cornelison v. Visa U.S.A., Inc.,* Civ. No. 03-1350 (Pennington County Cir. Ct., S.D. Sept. 29, 2004).

> FN18. *Beckler v. Visa U.S.A., Inc.,* Civ. No. 09-04-C-00030, at 5 (Cass County Dist. Ct., N.D. Aug. 23, 2004).

{53} In Michigan [FN19] the trial court applied the five *AGC* factors directly in dismissing similar claims, finding that each failed to support standing. Significantly, the Michigan court rejected an argument similar to that made by plaintiffs in these two cases that the broad language of the state statute trumped application of the *AGC* factors. In addition, the court found that plaintiff was not an indirect purchaser under the statute.

> FN19. *Stark v. Visa U.S.A., Inc.,* No. 03-055030-CZ (Oakland County Cir. Ct., Mich. July 23, 2004).

{54} In Minnesota the courts have also applied *AGC* factors in determining standing for indirect purchasers even though *Illinois Brick* was not applied to preclude indirect purchaser claims. In a well-reasoned opinion in the *Gutzmiller* [FN20] case, the court applied factors 1, 4 and 5 under *AGC* in denying standing to plaintiffs under the Minnesota statute, which is similar to North Carolina's antitrust law.

> FN20. *Gutzwiller v. Visa U.S.A., Inc.,* No.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                    Page 15
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

14-C4-04-000058 (Clay County Dist. Ct., Minn. Sept. 15, 2004).

{55} In New York, the Commercial Court in *Ho* [FN21] rejected standing for plaintiffs under circumstances identical to the *Morris* case. The court applied several of the *AGC* factors in determining that the plaintiffs lacked standing under New York antitrust laws.

> FN21. *Ho v. Visa U.S.A., Inc.,* No. 112316/00, 2004 N.Y. Misc. LEXIS 577 (New York County Super. Ct., N.Y. Apr. 21, 2004).

{56} In California the trial judge hearing the consolidated cases against Visa and MasterCard dismissed all the claims arising under the Cartwright Act, Cal. Bus. & . Prof.Code § 16720, *et seq.,* applying the *AGC* factors to find no standing. The court also held that plaintiffs were neither direct nor indirect purchasers of card services. [FN22]

> FN22. Credit/Debit Card Tying Cases, No. CJC-03-004335 (City and County of San Francisco Super. Ct., Cal. Oct. 14, 2004).

{57} In Nebraska, the trial court applied the five *AGC* factors in dismissing the identical claims by plaintiff. Specifically, the court held that the plaintiff failed to satisfy factors 2 and 3 under *AGC.* The court also held that the plaintiff was not an indirect purchaser within the scope of the state statute, which expressly grants standing to indirect purchasers. [FN23]

> FN23. *Tackitt v. Visa U.S.A., Inc.,* No. C103-740 (Lincoln County Dist. Ct., Neb. Oct. 19, 2004).

**\*15** {58} In Maine the trial court rejected standing for the plaintiffs under an application of the *AGC* factors. The court held that factors 3, 4 and 5 particularly weighed against standing. [FN24]

> FN24. *Knowles v. Visa U.S.A. Inc.,* No. CV-03-707 (Cumberland County Super. Ct., Me. Oct. 20, 2004).

{59} In Superior Court in Buncombe County, North Carolina, Judge Dennis Winner dismissed the plaintiff's indirect purchaser claim, which was virtually identical to the claim in *Crouch,* stating:

> It is the opinion of the undersigned that notwithstanding the enactment of the amendment in 1996, the *Hyde* decision is still the law of this State with respect to the issue of suit by an indirect purchaser. Nevertheless, this Court believes that the General Assembly never intended that the antitrust laws of this State be used in the manner in which the Plaintiff has attempted in this case, and that this case is therefore distinguishable from the *Hyde* case. To rule otherwise would put this Court in an impossible position of attempting to determine whether the alleged price-fixing by an oligopoly of an ingredient used to make tires had anything to do with the price paid by the Plaintiff when he bought the tires. This Court believes that without some allegation and proof that the tire manufacturers themselves were an oligopoly and were fixing prices, that it would be impossible to show the price the Plaintiff paid was not set by the normal laws of supply and demand in our open economic system, and that even if it were possible to show that, there would be no way for the Court to, in any fair or just way, determine an amount the Plaintiff was damaged.
>
> Therefore, it is the opinion of this Court that the General Assembly could not have intended that our Antitrust Statue be used by an indirect purchaser of tires against the manufacturers of an ingredient placed in those tires.

*Weaver v. Cabot Corp.,* No. 03CVS04760 (Buncombe County Super. Ct., N.C. Mar. 29, 2004) (Winner, J).

### B.

{60} A review of indirect purchaser cases in North Carolina is informative. The Court does not believe the North Carolina experience differs substantially from the national experience. State indirect purchaser cases have common characteristics. They are seldom *sui generis.* More commonly they originate after a federal triggering event. Those triggering events include a guilty plea to federal price fixing, a class action suit by direct purchasers, or notice of a settlement of antitrust claims with private plaintiffs or the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                    Page 16
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

Department of Justice. *Morris* is an excellent example. Sometimes only the announcement in an SEC filing that there is an investigation underway will trigger suit. The *Crouch* case is an excellent example. Almost all of the cases are brought as class actions. [FN25] Discovery tracks the federal action permitting class counsel to piggyback on the work of the government or counsel for the direct purchasers. Both plaintiffs and defendants have a vested interest in seeing the federal action proceed first. Cases are filed in most if not all states having indirect purchaser standing, frequently by the same lawyers. The cases are seldom, if ever, tried. They get settled far short of trial. [FN26] Often and not unexpectedly, the settlements in the various indirect purchaser standing states track each other closely. The *Microsoft* case is an excellent example. Sometimes the state and federal actions are settled together. [FN27] The Court is unaware of any case in which the settlement reflected treble damages. Rather, most settlements are less than a whole recovery of the alleged overcharge and are not particularly satisfying from the perspective of the consumer class member. *Cy pres* settlements are not uncommon since the difficulties inherent in distributing tiny amounts among large numbers of consumers are daunting and expensive. The settlement in *Long v. Abbott Laboratories,* 1999 NCBC 10 (No. 97CVS8289, Mecklenburg County Super. Ct. July 30, 1999)(Tennille, J.) is an excellent example. The North Carolina cases mirror the national characteristics.

> FN25. The *Adams* case is an exception. In that case the plaintiffs were individual hog farmers who opted out of a class action settlement that they believed was disadvantageous.

> FN26. The reasons for settlement are aptly described in the ABA Report of Indirect Purchaser Cases at *supra* ¶ 33.

> FN27. See the settlements in *Adams,* and *Thai Holding v. Archer Daniels Midland Co.* (No. 03CVS15096, Mecklenburg County Super. Ct ., N.C. Aug. 24, 2004) (Tennille, J.) (Order Staying Action).

*16 {61} This Court has presided over a number of class action settlements involving indirect purchaser claims, beginning with *Long v. Abbott Laboratories.* That case is instructive for a number of reasons. It was parasitic in the sense that it was filed after a federal direct purchaser antitrust case was filed and discovery consisted of following discovery in the federal case. Similar cases were filed in ten other states by the same counsel appearing in North Carolina. Fortunately for the plaintiffs, a class action settlement of the various state claims was reached prior to trial of the federal action. The federal case was decided adverse to the plaintiffs, and no antitrust violations were found. Since a settlement agreement had been reached, it was enforced. The agreement provided for a settlement fund of approximately $9 million for North Carolina residents of which class counsel sought approximately twenty-five percent. [FN28] Since the settlement could not be distributed to the class, which consisted of all North Carolinians who purchased a prescription drug at a retail drugstore, a *cy pres* fund for people who could not afford their medications was created. Class members received nothing, and the defendants [FN29] paid a cost of litigation settlement although no underlying claim was ever proved.

> FN28. The court reduced the request to approximately ten percent based on the poor results for the class.

> FN29. Twenty three of the largest drug companies in the world.

{62} In *Bruggers,* the state claim was filed after federal triggering events, including a federal action. 2000 NCBC 3, at ¶ 15. Claims were filed in other indirect purchaser states. [FN30] The defendants were alleged to have fixed the price of x-ray film. The class consisted of all consumers of x-ray film in North Carolina. The problems created by the great variety of purchasers and the number of distribution chains made settlement difficult. In the end, a settlement fund of approximately $200,000 was created and divided among claimants on a two fund basis. One fund went to purchasers based upon the pro rata amount of film they purchased and the other fund provided one lump sum payment to anyone who filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                          Page 17
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

a claim, determined per capita based on the number of claims. In total, 116 claimants sought recovery through the settlement fund. However, only 100 claims were found valid. Potential claimants numbered in the thousands. In this instance, money actually went to class members although the payment was small and the cost of administration high. Class counsel sought and obtained a reasonable fee based upon the amount recovered for the class. Counsel for both sides urged the Court to approve the settlement based upon the uncertain state of the law in North Carolina and the difficulty of proof involving so many different purchasers and distribution methods. The pass through issues were extremely difficult, including questions of whether hospitals absorbed the cost or passed it on to patients and insurance companies and whether the dentist or patient ended up paying the cost for dental x-ray film. The Court is convinced that the vast majority of class members declined to take advantage of the settlement because the dollar amount was not worth the effort required by the claims process.

> FN30. The original complaint sought a nationwide class consisting of residents of all states which had indirect purchaser standing. The complaint was amended to limit the claims to North Carolina.

**\*17** {63} The Court's most recent experience has been in the settlement of indirect purchaser claims against Microsoft. [FN31] Again, the action was filed after a federal triggering event, the determination in the government's federal case of abuse of monopoly power by Microsoft. Lawsuits were filed in numerous states and discovery coordinated with federal actions by direct purchasers. The direct purchasers recovered little in the federal action, and their counsel intervened in the state actions to try to obtain some of the attorney fees in the state actions even though they had no agreements with local counsel and had made no appearances in the cases. The settlement was complicated and had a significant *cy pres* component. [FN32] Counsel for the plaintiffs and Microsoft urged approval of the settlement over significant objections based in part on the complicated proof of damages and the uncertain state of the North Carolina law. Like *Morris,* that case did not involve allega-

tions of price fixing among competitors.

> FN31. *MJM Investigations, Inc. v. Microsoft Corp.* (No. 00CVS4073, Wake County Super. Ct.; No. 00CVS1246, Lincoln County Super. Ct., N.C. Aug. 2, 2004) (Tennille, J.) (Order Approving Settlement).

> FN32. See the description at *supra* ¶ 50.

{64} The Court is aware of other cases in this state. A class action settlement was approved in an alleged price fixing scheme involving vitamins. Those cases followed guilty pleas to federal criminal charges. That case was not before this Court, but a number of large hog farmers opted out of what they believed was an inadequate class settlement and filed their own indirect purchaser actions. This Court ruled that they had standing. [FN33] The defendants declined the Court's suggestion to seek appellate review of that decision, and those cases have settled without necessity of court approval since they were individual and not class actions. Another case involving price fixing of monosodium glutamate products has been stayed in this Court pending a global settlement covering the federal claims and all state indirect purchaser claims. [FN34] Such settlements are preferable, but rare. They produce a more rational allocation of the liability fund.

> FN33. *Adams,* 2003 NCBC 7, at ¶ 31.

> FN34. *Thai Holding v. Archer Daniels Midland Co.* (No. 03CVS15096, Mecklenburg County Super. Ct., N.C. Aug. 24, 2004) (Tennille, J.) (Order Staying Action).

{65} The Court is not aware of any North Carolina class action that did not have a federal triggering event. The Court is not aware of any indirect purchaser case in North Carolina that has proceeded to trial, presumably because there is a federal triggering event establishing liability. In each case before this Court, the argument is made that the case must be compromised because the proof of damages is difficult and uncertain. Such arguments lead to a question of whether standing is appropriate. Settlements are to be encouraged, but they should have some basis in reality, and class counsel should be prepared to show

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                                Page 18
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

the court more than the simple fact that the issues are difficult. That preparation undoubtedly requires some time and expense on the part of class counsel. Some investigation before rushing to the courthouse after a federal triggering event might generate better results or prevent dismissal on a challenge to standing.

## VI.

{66} The following policy considerations are relevant in deciding the standing requirements in indirect purchaser cases in North Carolina.

**\*18** {67} If *Hyde* is correct, the General Assembly intended for persons *actually* injured to be able to recover for injuries resulting from violations of the state antitrust laws.

{68} The General Assembly has directed the state courts to follow federal guidelines in determining standing.

{69} There is already an adequate deterrent to violation of the antitrust laws in the federal system. Accordingly, the focus of state law should be recovery for those *actually* injured: i.e., victim compensation.

{70} State indirect purchaser standing creates the prospect of double recovery, both as between direct and indirect purchasers and between indirect purchasers at different levels in the distribution chain. Double recovery is not favored, and where, as here, it is permitted between direct and indirect purchasers, it should be narrowly construed to ameliorate the adverse consequences.

{71} Indirect purchaser cases are expensive, inefficient and low-yield for consumers. The cost of obtaining information relevant to pass through of added costs from antitrust violations and investigating the pricing decisions made in the distribution chain is high. Apportionment among various tiers in the distribution chain involves extremely difficult problems of economic analysis and measurement. The practical difficulties of estimating both supply and demand elasticity at any one level and then over and among multiple tiers in the distribution chain results in speculative damage estimates. From an economics perspective, indirect purchasers face negligible price increases in comparison to direct purchasers. [FN35]

Apportionment results in added cost of litigation and uncertainty. The actual recovery for class members in consumer class actions is relatively small and is frequently outweighed by the cost of administration and attorney fees. The yield is low given the potential expense of litigation. That is one explanation for the settlements which do not reflect actual injury as much as the costs of litigation.

> FN35. *See* Landes and Posner, *supra* note 3, at 617.

{72} There is no single bright line test that works in every case. Each standing case must be decided based on its own factual situation.

{73} Given those policy considerations, the decision of the Court of Appeals in *Hyde,* the developments since *Hyde,* the history of the amendment of the statute and the subsequent directions from the General Assembly to follow federal guidelines, and the clear federal approach to standing, the Court believes that the North Carolina courts would apply a multifactor test to determine standing in indirect purchaser cases. The requirements would recognize indirect purchaser standing, but engraft upon the statute the requirements of standing enunciated in *AGC,* modified to recognize the right to recover for injury created by statute for indirect purchasers. The factors would include:

> 1. *Whether the plaintiff is a consumer or competitor in the allegedly restrained market.* This inquiry focuses on the market the alleged restraint was designed to impact and the intent of the actor in engaging in the restraint. One key question is whether the plaintiff claims injury in a market collateral to the market in which the alleged restraint took place. This factor recognizes that the antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. This factor would have supported standing in *Hyde.*
>
> **\*19** 2. *The directness of the impact on the plaintiff.* This factor is modified to eliminate the restriction of *Illinois Brick* against indirect purchaser standing. Being an indirect purchaser does not preclude standing. However, the causal connection between the act and the claimed injury cannot be too remote. Purchasers in the direct chain of distribution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                    Page 19
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

are more likely to be able to show sufficiently direct injury than those outside the chain of distribution. Purchasers who buy the product which is the subject of the restraint are more likely to be able to show sufficiently direct injury than those who purchase a product with a component which is the subject of the restraint. Purchasers of products whose manufacture was impacted by the restraint face significant hurdles showing sufficiently direct impact. Within the chain of distribution, the relative positions of the purchaser and the actor can be significant, depending on the length and complexity of the distribution chain. Even though a purchaser is removed from the direct restraint, he or she may still show direct injury. *See Blue Shield of Va. v. Mc-Cready, 457 U.S. 465, 478-81, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).* This factor would have supported standing in *Hyde.*

3. *Whether there exist other indirect purchasers in the distribution chain who are more directly impacted by the alleged violation.* The nature of the market is significant here. Courts must look at the nature of the product and the market for the product as well as the chain of distribution to determine the likelihood of direct pass through of the cost of the restraint or inflated price. The nature of the restraint must also be considered. Double recovery among indirect purchasers should be avoided. This factor would have supported standing in *Hyde* where the distribution chain was short.

4. *The speculative nature of the damage claims.* As damage claims move from direct to indirect and the distribution chain becomes more complex, the possibility of factors intervening to affect causation and price multiplies, and claims become more speculative. It is appropriate for purposes of determining indirect purchaser standing "to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm." *Mc-Cready, 457 U.S. at 475 n. 11.* In *McGready* the Court noted that the courts were required to be cautious when dealing with speculative, abstract and impractical damage theories. *Id.* This factor would not have prevented standing in *Hyde.* This factor focuses on sound economic analysis. Important factors would include reliable demand and supply curve studies and sufficient regression analysis to eliminate other factors in pricing.

5. *The risk of duplicative recovery and danger of complex apportionment of damages.* While these factors are limited by the General Assembly's creation of indirect purchaser standing, they should not be totally eliminated when considering the state claims. The courts still have the same interest in keeping the scope of a complex antitrust trial within judicially manageable limits. *AGC, 459 U.S. at 543.* The factors are simply taken down a level and the *Hanover Shoe/Illinois Brick* restrictions eliminated. State cases may present apportionment issues which are simply too complex and for which there exists no measure of recovery which is not speculative. It is clear that the General Assembly did not intend that every purchaser in the distribution chain have a right of recovery or that there be duplicative recovery among indirect purchasers. Such an interpretation would be contrary to the clear guidance to follow federal precedent and harmonize state antitrust law with federal law. Rather, it should be clear that the General Assembly intended that those who can show with some degree of certainty that they were directly impacted by the alleged acts in restraint of trade should be able to recover even though they are indirect purchasers. The courts must be cognizant that the problems between direct and indirect purchaser cases replicate themselves in state indirect purchaser cases where there are multiple levels in the distribution chain and multiple distribution chains. There should only be one fund constituting the amount of the alleged overcharge to North Carolina residents, and the courts must guard against multiple liability for the fund and prejudice to absent victims or non-class members. The complexity of the distribution chain and the variety of consumers in *Bruggers* highlight the issues this factor would implicate. As the Supreme Court noted in *AGC* and *Illinois Brick,* massive and complex damages litigation undermines the effectiveness of treble damage suits. The poor results obtained in settlement in the North Carolina cases confirms this view.

**\*20** {74} There is no bright line test: each situation must be considered on its facts and the factors applied. Different factors might be important in different cases. Accordingly, the Court turns to the applica-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                    Page 20
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

tion of those factors to these two cases.

## VII.

### A. The *Crouch* Case

{75} The Court's analysis is premised on the underlying proposition that defendants have engaged in illegal price fixing in the market for rubber chemicals.

{76} Both Crompton and Bayer have pled guilty to conspiring to fix prices and suppress competition in the sale of certain rubber compounds and chemicals. On October 13, 2004, the Associated Press reported that Bayer pled guilty to a criminal charge involving a rubber compound used in hoses, belts, seals, adhesives and sealants. Crompton pled guilty in Canada to fixing prices on chemicals used in the manufacture of tire-quality rubber and non-tire applications such as automobile parts, conveyor belts, weather stripping and rubber latex gloves from July 1995 to 2001. Certain of the findings in the Agreed Statements of Facts in the *Crompton* plea agreement are instructive. It states:

> On a commercial basis, rubber chemicals are produced synthetically through highly sophisticated processes. It is apparent that rubber chemicals are now a commodity product and over capacity in the industry has been a constant restraint upon profitable operation and re-investment. Rubber chemicals are significant in the production of useable modern rubber products, principally tires. There are no practical or reasonable economic substitutes to certain rubber chemicals which are the subject of this proceeding, although innovation in both application and production does from time to time cause some products to be superseded. The accused and its co-conspirators are best situated from the perspective of size, experience and incentive to participate in such developments. Based upon facts obtained by the Commissioner, which Crompton is not aware of but does not contest for the purposes of this proceeding, rubber chemicals are said to constitute about 1% of the value of finished tires, they are a practical sine qua non to the manufacture of over $2 billion worth of tires produced in Canada annually. An additional approximately 30% of rubber chemical sales are devoted to non-tire uses in various automobile parts, surgical gloves and other commercial, industrial and health

applications.

> The rubber chemical producers identified above manufactured and/or sold the substantial majority of the rubber chemicals that were sold or distributed in Canada during the period of the offence for use in the tire, automobile parts, industrial applications and health industries. Indeed a significant amount (approaching 50% in some instances) of the rubber chemicals manufactured in Canada are exported. Each of the above referred to entities participate, to varying degrees, in the globally organized tire manufacturing industry. The principal Tire Producers buy centrally (not in Canada) for delivery to their regional production facilities. The rubber chemical producers in turn organize their delivery logistics to best meet customer demands and their own production facilities. There is a significant buyer power within the tire-destined rubber chemical business.

*21 ....

> It is a matter of some debate between Crompton and the Commissioner as to the quantum of commerce affected by the illegal activity herein referred to. This requires specifically a consideration of the "lasting effect" of various price increases on certain specific rubber chemicals. This analysis however, given the prevailing conditions in the market, does not give credit to the fact that price increases may not have been appropriate at all and one or more producers may have had to exit the market, in the absence of such restraints upon the normal market processes. If Crompton's analysis is correct the gap between the opposing views of affected commerce may be measured in hundreds of millions of dollars. In any event it is agreed that the assessment of competitive injury is largely one of judgment in all of the relevant circumstances.

*The Queen v. Crompton Corp.,* [May 2004] F.C. ---- (Can.) (Agreed Statement of Facts).

{77} The Canadian plea agreement highlights two problems significant to the standing determination. First, the calculation of the impact on prices of the conspiracy will be difficult to determine. As noted, "In any event, it is agreed that the assessment of competitive injury is largely one of judgment in all of the relevant circumstances." That factor is complicated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                    Page 21
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

by the significant buyer power within the tire-destined rubber chemical business. Second, the impact on the retail consumer will be minimal. The example in paragraph 79 below highlights the degree of impact on the retail purchaser.

{78} The problems inherent in the *Crouch* claims are the same alluded to by Judge Posner in his noted article on pass through economic analysis. [FN36] First, the price-fixed item is a product consumed or altered in the manufacturing process. Accordingly, its use will vary with the type of rubber product being made. It may also vary with the nature of the product (chemical) being used and how it is used in the manufacturing process. Different direct purchasers (here, tire manufacturers) might use the various chemicals in various ways in differing products.

> FN36. *See* Landes and Posner, *supra* note 3, at 615-21.

{79} The price today for a set of four BF Goodrich® Touring T/A SR4-P195/70R14 90S tires, which are similar in size and quality to those purchased by Crouch, is $222.64 at Sam's Club's posted price on the Internet. If the value of the chemicals represents 1% of the value of the tires, [FN37] the chemicals in the tires have a total value of $2.23 or $0.56 per tire. If we assume that in an industry with overcapacity and strong buyer power the conspirators were able to artificially inflate prices by as much as 20 % [FN38] and assume that all of that can be proven to be passed through to retail consumers, Crouch's injury can be calculated to be $0.44 for the set of tires or $0.11 per tire. Bigger tires will cost more, smaller tires less. Thus, it is likely that the recovery per tire sold in North Carolina will be in the range of $0.01 to $0.11. That number represents a remote impact on its face. Certainly it would not represent a meaningful recovery for consumers. In any event, the costs associated with litigation and administration of any settlement would far outweigh the benefits to consumers. Few consumers are likely to fill out a claim form for $0.44 or even $1.32 (trebled damages). While the above calculations would affect class certification, they also are relevant to a determination of the remoteness of injury.

> FN37. One percent was the actual number used by Canadian authorities in their case against Crompton. *See supra* ¶ 76.

> FN38. The calculation of this number will be difficult, but it is difficult to conceive of prices being artificially inflated at a higher level in a market with strong buyer power and overcapacity. It is also unlikely that 100% of the inflated cost was passed through to consumers or that it affected consumer prices.

*22 {80} In this instance, Crouch would be required to establish tire prices in North Carolina by manufacturer both before and after the alleged conspiracy period. Because this case involves a product used in the manufacturing process, regression analysis would be required to disaggregate any effect of other changes in the manufacturing process for each manufacturer for each product category. Further regression analyses would be required to disaggregate the impact on price, if any (by product category and by manufacturers), of other influences on the manufacturer's price. As the product moved down the distribution chain into various avenues of distribution, each step would require additional regression studies to disaggregate other impacts on prices until the final price paid by a consumer for different products purchased in different markets is determined. To perform such studies the economists will require enormous amounts of information, parts of which will constitute trade secrets or confidential information of nonparties, principally tire manufacturers. Many manufacturers are foreign companies. Determining a price differential per tire for tires sold in North Carolina which were manufactured using price-fixed chemicals during the relevant time period would be a Herculean task and one which the Court believes would not be free from speculation given the enormous number of disaggregating factors to be considered in the process.

{81} Clearly, the tires made for SUVs will differ from those made for compact cars. The market for these tires will vary. There is a range in quality and price of the products made using the price-fixed chemicals. If, as is usually the case, there is cheating

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                                              Page 22
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

among the price fixers, additional variations are created. [FN39] In this situation there are a small number of large producers, some or all of which could exert great pressure on price. Thus, at the outset the multiple of variations in pass through analysis is daunting. The discovery involved in ascertaining the production methods, costs and pricing strategies of tire manufacturers would intrude into their most fundamental confidential business information and trade secrets, insuring a long and difficult battle over access. If that information is available, the demand and supply curves must then be calculated for this myriad of products and suppliers and the prices determined by the intersections of those curves tested against rigorous regression analysis to insure that no external factors affected the pricing and pass through at the manufacturer level.

> FN39. Price fixing schemes frequently fall apart because the temptation to cheat to get market share is great.

{82} Then the process of determining the subsequent pass through begins. Demand and supply curves and regression analysis must be created for the various lines of distribution and for the various companies and for the various products. Here, it is significant that consumers are at least three steps removed from the original offense. That makes apportionment of damages/pass through extremely difficult and raises a greater risk of double recovery.

**\*23** {83} Again, the distribution processes may vary with producers and products. Are there tires on the market which were made with non-price-fixed chemicals? If so, how do they affect price? What is the effect of foreign competition? Do company owned stores or franchises sell at different prices than Sam's Club or Wal-Mart? Does the corner gas station price yet another way? Must the pass through expense be determined with reference to the customer base? These are but a sampling of the difficulties inherent in determining pass through in this case. [FN40]

> FN40. *See,* Michele Molyneaux, Comment, *Quality Control of Economic Expert Testimony: The Fundamental Methods of Proving Antitrust Damages,* 35 ARIZ. ST. L.J.

1049, 1074-75 (2003).

{84} Each case must be analyzed individually. There will be cases where the economic analysis is not difficult. *Hyde* may have been one of those cases. There could be other examples where a component, such as a computer chip, is price fixed, and its costs passed through directly to purchasers of the product in which it is incorporated. [FN41] Individual cases will vary, and the factors must be considered in each case. The relevant reliability of economic analysis is a key factor in applying those factors. The economic analysis cannot be oversimplified. *See In re Aluminum Phosphide Antitrust Litig.,* 893 F.Supp. 1497, 1503 (D.Kan.1995). There, the court rejected an expert report which failed to apply standard economic methodology to test the conclusions reached. In ruling on a motion *in limine* the court said:

> FN41. The Court notes that certain manufacturers of DRAM chips used in a variety of computer products have been accused of price fixing. *See,* Stephen Labaton, *Infineon To Pay a Fine In the Fixing Of Chip Prices,* N.Y. TIMES, Sept. 16, 2004, at C6. The Court expresses no opinion on standing in that situation. Each case must be judged on its own merits, and that case is not before the Court. The Court simply notes that the nature of the component can make a difference.

The goal of a prudent economist in performing the "before and after" analysis is to determine the hypothetical or "counter-factual" prices that would have prevailed during the conspiracy period, but for the conspiracy. In applying the "before and after" model of damages, it is fundamentally necessary to explain the pattern of forces outside the violation period using factors that might have changed (i.e., supply, demand, and the differences in competition) to predict the prices during the conspiratorial period. In this context, as in most economic problems, failure to keep "other things equal" is one of the known "pitfalls ... in the path of the serious economist." Samuelson, P. and Nordhaus, W.D., *Economics* (13th ed.) at p. 7. This case presents two potential normative periods, a "be-

Not Reported in S.E.2d                                                                 Page 23
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: 2004 WL 2414027 (N.C.Super.))**

fore" period and an "after" period that have distinctly different price levels. One therefore must identify the reasons for the disparate price levels. According to Dr. Siegfried, the field of economics supplies a statistical methodology for making this determination on a scientific basis, and the generally accepted means of predicting the prices that would have prevailed absent the conspiracy is regression analysis. At a minimum, regression analysis addresses supply and demand factors by looking at price trends over time. A prudent economist must account for these differences and would perform a minimum regression analysis if utilizing the "before and after" model.

*Id.* at 1503-04 (footnotes omitted).

{85} The five key factors are analyzed with respect to *Crouch* below.

*24 1. *The relevant market.* The chemical manufacturers accused of price fixing sold to rubber manufacturers. Because the number of sellers and the number of buyers was relatively small, the price fixing scheme had to have at its core an effort to affect price pressure from the oligopolists in the tire manufacturing business. The antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. This is a mixed case, as there are two relevant markets: the first is the market for chemicals, and the second is the market for rubber products indirectly affected by the artificial influence in the chemical market. As a purchaser at retail of a rubber product, Crouch is in a market secondarily affected by the restraint in the original chemical market. That is a complicating factor for standing. This factor weighs slightly against standing, as the alleged price fixing was directed at the market for chemicals, not the market for tires. Prices were allegedly fixed for chemicals used to manufacture other rubber products. However, the plaintiff purchased a product the price of which *may* have been influenced by the illegal restraint.

2. *Directness of impact on plaintiff.* The fact that the artificially restrained price impacts the manufacturing process removes it at least one level of directness. Unlike a component that remains unchanged when incorporated in the final product, manufacturing costs are less directly passed through and may be affected by differing manufacturing processes used by producers. While it is clear that in most instances some portion of a price-fixed cost gets passed along, the directness can be impacted by the nature of the item subject to price fixing, be it a component, labor cost, or something used in the manufacturing process.

The nature of the item can influence the directness of the impact on the price of the end product at retail. Because these chemicals are products used in a manufacturing process, the direct impact at retail is less clear and subject to variation among manufacturers using the chemicals. The smaller the component, the less likely there will be impact on the final price. Here the chemicals only comprise 1% of the value of a tire, reducing the likelihood that total final price was significantly affected.

There is also an additional question of the length of the distribution chain. While plaintiff purchased from Sam's Club, which may have purchased directly from a manufacturer, other class members may have purchased through other lengthier distribution chains.

This factor weighs against standing.

3. *Other indirect purchasers.* This is the factor which gets most confusing when *Illinois Brick* is eliminated. State courts should focus this inquiry on whether or not the existence of other indirect purchasers in the chain of distribution gives rise to other claims against the fund representing the amount by which the price of the retail item has been artificially inflated. It becomes more of an examination of whether there will be double recovery on the state claim (eliminating the concern about double recovery created by standing holdings in *Hanover Shoe/Illinois Brick* ). Here the other indirect purchaser claimants may be distributors and retailers who claim to have absorbed some of the price increase. No claims have been filed on their behalf. This factor would adversely impact standing in *Crouch* based on this record.

*25 4. & 5. *Speculative nature of damage claims and complexity.* These items sometimes overlap. That is the case with *Crouch*. In this case there are multiple factors which render valid economic analysis either impossible or unmanageably complex.

While the number of manufacturers is not great, each will have different manufacturing processes. Those processes and the use of alleged price-fixed chemicals will vary from product to product. Products will vary in size, quality and costs. There will be different markets for the products-- retailers like Wal-Mart, Sam's Club, K-Mart and Sears, local tire stores, gas stations, company franchise stores and Internet sales. In a typical price fixing scenario, some, if not a substantial portion, of the price increase is absorbed at the earliest stages in the distribution chains. Some retailers will buy direct; some will buy from distributors. Foreign competition, not insignificant in the tire industry, can affect price. Tracing the price of the processing chemicals through foreign manufacturers provides other problems. The price of tires may be affected by external factors such as high gas prices, which could lower demand. Each variation in manufacturer's process, price, size, quality, market, distribution method and changes in applicable externalities requires individual supply and demand analysis and may require multiple regression analyses in order to eliminate the speculative nature of any damage calculation. Given the many variables, the issues surrounding allocation of the alleged price fixing fund in this case would be exceptionally complex and the results of economic analysis speculative.

Unlike direct purchasers who may recover for costs which they do not incur, state indirect purchasers may recover only for injury actually incurred. Thus, they must prove pass through of the artificially inflated cost. To prevent double recovery for the same alleged injury there must be a reliable means of allocating the effects of the price fixing among the various participants in the distribution chain. It must take into account other externalities. For example, how would purchasers of tires that were recalled and replaced be treated? Factor 5 takes this complexity into account when drawing the line on remoteness of claims. The size of the impact on tire prices is relevant here. As demonstrated in paragraph 78 above, any increase in tire prices will be relatively insignificant. In *Crouch*, factors 4 and 5 dictate heavily against standing.

There may well be occasions on which the Court should defer a standing determination until there

has been far ranging discovery and expert evidence produced on pass through and allocation. The problem inherent in delay is the enormous cost involved in getting the information and expert analysis. If it proves insufficient, substantial resources will be wasted. Where, as here, it is apparent from the pleadings that any analysis will either be speculative or allocations enormously complex, the Court should rule on standing early in the process. Where, as here, counsel have not made any attempt to ascertain facts relating to standing prior to filing suit, the court's job is made more difficult. The rush to file in indirect purchaser states works against adequate investigation prior to filing.

*26 {86} Considering all five factors, Crouch lacks standing to pursue indirect purchaser claims.

### B. The *Morris* Case

{87} The *Morris* case presents a far easier analysis. It is not a price fixing case.

{88} In *Morris,* the underlying antitrust claim is for illegal tying of credit and debit cards under the "Honor All Cards" policy. For purposes of analysis here, the Court assumes the tying arrangement was illegal. Tying cases present unique damages issues.

> In tying cases, the measure of damages to an injured purchaser is described as "the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market." However, several courts have held that damages can be recovered only if the combined fair market value of both the tying and tied products is exceeded by the amount actually paid for both.

*Private Antitrust Suits,* A.B.A. SEC. ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 875 (5th ed.2002) (footnotes omitted).

{89} Here, not only would Plaintiff be required to show the underlying complicated damage to merchants, [FN42] but also how those damages got passed on in each and every consumer transaction by the merchant. In the case of a hot product which sells on its label (Calvin Klein jeans, for example) so that the price is unrelated to costs of sale, manufacture or distribution of the product, how could plaintiff possibly show what part of the price included a pass

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

through cost resulting from the tying arrangement which would not have been included in the absence of the tying arrangement? [FN43] How could the Court administer a trial where every consumer transaction might be subject to that proof for every merchant? It cannot be done. More compelling is the fact that a determination would have to be made for every product since price elasticity varies between products. [FN44]

> FN42. For cases discussing the difficulty of proof in tying cases see, *Will v. Comprehensive Acctg. Corp.,* 776 F.2d 665 (7th Cir.1985); *Kypta v. McDonald's,* 671 F.2d 1282 (11th Cir.1982); *Siegel v. Chicken Delight,* 448 F.2d 43 (9th Cir.1971).

> FN43. *Gutzwiller v. Visa U.S.A., Inc.,* No. 14-C4-04-000058 (Clay County Dist. Ct., Minn. Sept. 15, 2004). Judge Vaa presented an illustrative example:
>
> Assume that Plaintiff purchased an item at a K-Mart store which accepted Visa and MasterCards, on March 1, 2003. To recover damages, Plaintiff would first need to prove that as a result of Defendants' alleged restraint of trade in providing debit card services to that K-Mart store, K-Mart paid excessive debit fees. Plaintiff would then need to prove that K-Mart did not absorb any such excess debit fees by making less profit, or in some other non-monetary way, such as by hiring fewer employees and/or not making major repairs to its building, but instead passed on the excess debit fees in the price of the items sold to consumers. Plaintiff would then need to prove that some identifiable portion of the item was not attributable to any factors which might affect the price of that item on that specific date. Plaintiff would then need to make the same offer of proof for any item sold by the K-Mart store not only on March 1, 2003, but for every other day in issue, and would have to make the same offer of proof relative to every other merchant involved in his claim. *Id.* at 16.

> FN44. This fact alone would render class certification impossible since each customer would have different damages depending on each individual purchase they made.

{90} The five key factors with respect to *Morris* are analyzed below.

1. *The relevant market.* Defendants refer to plaintiff as a "non-purchaser." That is shorthand for not being a purchaser in a relevant market. The relevant market in *Morris* is the sale of credit and debit card services. Morris did not make a purchase in that market. Morris simply made purchases of consumer goods. Antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. In this case the customers in the relevant market would be the retailers who purchase debit and credit card services, not all consumers of retail products. This factor alone would strongly support a finding of no standing in *Morris.*

2. *Directness of impact.* The underlying restraint alleged in *Morris* was a tying arrangement, not price fixing. It is founded on the proposition that retailers paid more for debit card services than necessary without the tying arrangement. Morris does not even allege he is a debit card holder. He seeks to represent a class consisting of consumers who paid by a credit card, paid cash, paid by check, bought on credit or used a debit card. The impact of the alleged tying arrangement (which applied only to retailers using debit card services) on consumers is as remote as this Court can conceive.

*27 3. *Other indirect purchasers.* Since consumers are not a part of the relevant market for credit/debit card services, there are no other indirect purchasers. This is a situation where the impact, if any, of the tying arrangement falls directly on the direct purchaser.

4. *Speculative nature of damage claims.* This is not a price fixing case. It is at bottom a tying case which carries additional proof problems affecting the speculative nature of damages to indirect purchasers. Indirect purchasers would first have to prove what the damages were to retailers. Retailers would be required to show that the tied price of debit and credit cards was higher than the price of each sold separately in competitive markets. Indir-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ect purchasers would then be required to show how those damages got passed through or had a direct impact on each consumer purchase they made in North Carolina, whether by cash, check, credit card or debit card. Two examples come to mind. When a teenager pays $100 cash for a pair of designer label jeans that cost $10 to make because they are the hot fashion item, are they paying more than they would have paid had there been no tying arrangement involving debit or credit cards? How could that be proven? What about the item that is put on sale below cost because it is outdated and needs to be cleared from inventory?

Assuming that injury at the retailer level could be quantified somehow, that injury would be attributable only to the increased use of debit cards, a minor part of the market. According to plaintiff, that cost is then spread over every consumer product sold by every retailer. If plaintiff is correct, the recovery per product will be infinitesimal. In addition, the manageability of the litigation and the administration of any settlement present insurmountable barriers. If the Court of Appeals asked today if there is an example of "an impossible complex situation," the *Morris* case would provide such an example. The Court cannot conceive of an economically feasible way to administer a trial which would require inquiry into how every retailer set the price for every consumer good sold in this state. Nor is it conceivable that any judgment would be in any amount which could be economically *allocated* and *paid* to *every* consumer in North Carolina.

5. *Complexity.* It is difficult to imagine a more complex damage case. Plaintiff's case would require an analysis of pricing of virtually every product sold at retail in North Carolina. The litigation could last an interminable period, and it is difficult to conceive of how a claims process would work. It is likely the price increases attributable to the excess cost to the retailer of using debit cards would be such a small measure that there would be no cost effective way to administer a claims process that would compensate consumers directly.

{91} Each *AGC* factor in *Morris* supports dismissal of the claims. Morris asserts remote claims outside the relevant market which involve speculative and

complex damages. Eight other jurisdictions have agreed and thus placed limits on indirect purchaser standing. Plaintiff's counsel urged the Court to permit amendment to the pleadings to assert only claims for debit card holders. Such an amendment would make no difference in the outcome on this motion.

**\*28** {92} Having found that the complaint is subject to dismissal, the Court does not need to address defendants' argument that plaintiff seeks relief that would violate the Commerce Clause of the United States Constitution.

### CONCLUSION

{93} If state antitrust laws are to have any impact, they must work. Compromise *cy pres* settlements that provide no payments to consumers have little deterrent effect and no benefit for those actually injured. Where actual injury can be shown with reasonable certainty, defendants should pay those damages to the injured parties and be subject to statutory penalties. That is a real deterrent, and it benefits those injured.

{94} Part of the problem in dealing with indirect purchaser cases is the race to the courthouse which follows a triggering event at the federal level. Despite the fact that the case was two years old, when asked at oral argument, plaintiff's counsel in *Crouch* had no idea what the pass through per tire would be, either in cents or in dollars. His suggestion was for the Court to wait until class certification and address the issues in that context. Where, as here, it is apparent from the pleadings that either (1) sound economic analysis can only produce speculative damages or (2) the complexity of the required sound economic analysis is staggering and virtually impossible to accomplish given the inability to get at all the required information, deferral to class certification is unnecessary. The Court is not required to nor should it defer standing determinations to class certification. While there may be some overlap in the factors considered in each determination, the tests are different.

{95} As Justice Brennan noted in his dissent in *Illinois Brick,* the complexity of damage proof should not foreclose a claim . [FN45] That policy must be balanced with the need to control the manageability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of litigation. Judge Posner has correctly noted that in-direct consumer class actions frequently do little to provide redress for injury in indirect purchaser cases, [FN46] and the North Carolina cases support this con-clusion. [FN47] The proper focus should be on insur-ing that those cases in which there is non-speculative proof of direct impact on consumers at something other than a negligible level get tried and those cases which fall outside the limits of rational accepted eco-nomic analysis are dismissed. The modified *AGC* factors provide guidelines for making those determin-ations at the trial level. Applying those factors to these two cases results in their dismissal. Other cases may come out differently or may require some dis-covery before ruling. Class actions which provide no redress to those actually injured do not fulfill the pur-pose of the state statute which is to redress injury to those directly impacted by the price fixing.

FN45. 431 U.S. at 758-60.

FN46. *See* Landes and Posner, *supra* note 3, at 607.

FN47. *See* discussion *supra* ¶¶ 60-65.

{96} State statutes do not provide as effective a de-terrent as the federal scheme. There is an adequate and more effective deterrent to antitrust violations at the federal level. State indirect purchaser cases should be designed to provide relief to those directly injured by antitrust violations. Since they permit double recovery they should be narrowly construed. Similar to the judgments the legal system makes on "foreseeability" in negligence cases, judgments on "standing" are designed to place limits on what would otherwise be limitless claims. The two concepts are similar in that they set a boundary beyond which claims are determined to be too remote. Where a class action will provide no actual benefit or an insig-nificant benefit to class members, there exists a strong inference that the class claims are too remote or speculative to withstand scrutiny under the modi-fied *AGC* factors. Sometimes, as here, the standing determination can be made early in the process and save significant resources. Other times the determina-tion should await further discovery before decision. In either case, the five factors set out above should be applied and each case determined on its own facts. Applying the factors to the claims in *Crouch* and *Morris* results in dismissal.

**\*29** It is hereby ORDERED, ADJUDGED and DE-CREED:

1. Defendants' Motion to Dismiss in *Crouch* is granted, and plaintiffs' claims are hereby dis-missed.

2. Defendants' Motion to Dismiss in *Morris* is granted, and plaintiffs' claims are hereby dis-missed.

3. Each party shall bear its own costs.
This the 26th day of October 2004.

Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3313262 (Trial Motion, Memorandum and Affidavit) DEfendants' Brief in Response to the Court's Order of August 27, 2004 Other (Sep. 15, 2004)

• 2004 WL 3313263 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Response to Judge Tenille's August 27,2004 Order (Sep. 15, 2004)

• 2003 WL 24045466 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Reply Memorandum Of Law In Support Of Defendants' Motion To Dis-miss othr (Mar. 28, 2003)

• 2003 WL 24045467 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Memorandum Of Law In Support Of Defendants' Motion To Dismiss (Mar. 28, 2003)

END OF DOCUMENT