# TAB 12



Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
IDT Corp. v. Building Owners and Managers Ass'n
Intern.D.N.J.,2005.
United States District Court,D. New Jersey.
IDT CORPORATION, Winstar Communications,
L.L.C., and Winstar of New Jersey, L.L.C., Plaintiffs,
v.
BUILDING OWNERS AND MANAGERS
ASSOCIATION INTERNATIONAL, Building
Owners and Managers Association of New Jersey,
Trizec Properties, Inc., Trizecchahn Newport, L.L.C.,
and Trizec Realty, Inc., Defendants.
**No. Civ.A. 03-4113(JAG).**

Dec. 15, 2005.

Donald A. Robinson, Robinson & Livelli, Esqs.,
Newark, NJ, Joseph A. Boyle, Paul L. Kattas, Kelley
Drye & Warren LLP, Parsippany, NJ, for Plaintiffs.
David J. Antczak, Drinker Biddle & Reath, LLP,
Philadelphia, PA, Joseph Jacob Fleischman, Norris,
McLaughlin & Marcus, PC, Bridgewater, NJ,
Clifford Brian Kornbrek, Greenbaum, Rowe, Smith
& Davis, Roseland, NJ, Arthur S. Goldstein, Wolff &
Samson, PC, West Orange, NJ, Kevin N. Ainsworth,
Mintz Levin Cohn Ferris Glovsky & Popeo PC, Gary
M. Butter, Baker & Botts, L.L.P, New York, NY,
William J. O'Shaughnessy, McCarter & English,
Esqs., Newark, NJ, for Defendants.

*OPINION*

GREENAWAY, J.
**\*1** This matter comes before the Court on the
reinstated motion of Defendants Trizec Properties,
Inc., TrizecHahn Newport, L.L.C., and Trizec Realty,
Inc. (collectively "Trizec") [FN1] to dismiss the
Complaint, pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure. For the reasons set forth
below, Defendants' motion is granted; the Complaint
is dismissed without prejudice as to Counts 1, 2, 4,
and 5, and dismissed with prejudice as to Count 3.

> FN1. Defendants CarrAmerica Realty Corp.,
> CarrAmerica Development, Inc., Trammel
> Crow Company, CB Richard Ellis, Inc.,
> Hines Corporate Properties, L.L.C., and
> Hines Interest, L.P. originally joined in
> Trizec's motion to dismiss. Subsequently,

these parties were terminated from the
litigation.

*BACKGROUND*

**\*1** Plaintiff IDT Corporation, and its wholly-owned
subsidiaries Winstar Communications, L.L.C. and
Winstar of New Jersey, L.L.C. (collectively
"Winstar"), provide telecommunications services to
residential and business customers, as well as other
telecommunications carriers, throughout the United
States. (Complaint ("Compl."), at ¶¶ 13-14.)

**\*1** Winstar's Complaint names two categories of
defendants: trade associations Building Owners and
Managers Association International ("BOMA") and
Building Owners and Managers Association of New
Jersey ("BOMA-NJ"), and building owner-managers
("Building Defendants"), including Trizec.

**\*1** Defendant BOMA is a non-profit trade association
for the commercial real estate industry that provides
advice, research, and legal and legislative advocacy
for its members. BOMA's members own and manage
roughly eighty percent of the commercial office
space in the United States. (Compl.¶ 3.) Defendant
BOMA-NJ is a separate non-profit corporation that
provides research, advisory, and advocacy services
related to the New Jersey commercial real estate
market. (BOMA Br. at 5.)

**\*1** Defendant Trizec owns, manages or provides real
estate services for commercial real estate properties
throughout the United States. (Building Defs.' Br. in
Supp. of Mot. to Dismiss ("Building Defs.' Br.") at
3.) Trizec Properties, Inc. is a real estate investment
trust ("REIT") that owns and leases commercial real
estate properties and is a member of BOMA.
(Compl.¶ 20.) TrizecHahn Newport, L.L.C. and
Trizec Realty, Inc. are subsidiaries of Trizec
Properties, Inc. (Com pl.¶¶ 21-22.)

**\*1** Parties like Winstar are relatively new. With the
passage of the Telecommunications Act of 1996 ("the
Act"), Congress enacted provisions designed to
promote competition in the local telecommunications
markets, which traditionally had been served by one
incumbent local exchange carrier ("ILEC"). [FN2]
(Compl.¶ 36) (citing 47 U.S.C. § 151 et seq.).
Pursuant to the Act, competitive local
telecommunications providers like Winstar (also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

known as competitive local exchange carriers or "CLECs") began to enter local markets and offer the ILECs' customers a choice in telecommunications services. (Compl. ¶ 36.)

> FN2. The parties use several different acronyms in their briefs: ILEC (incumbent local exchange carrier, such as Verizon); CLEC (competitive local exchange carrier, such as Winstar); MTE (multiple tenant environment, i.e., an office building accommodating both ILECs and CLECs); REIT (real estate investment trust); RBOC (regional bell operating company, such as Verizon or other ILECs that historically served local telecommunications markets before the 1996 amendments to the Communications Act opened such markets to competition from CLECs). (Compl.¶ 36.)

**\*1** Since the passage of the Act, the Federal Communications Commission ("FCC") has continued to monitor the development of competition in the market for the provision of telecommunications services. (BOMA Br. at 9.) In 2000, the FCC adopted a measure prohibiting telecommunications carriers from entering into contracts that restrict owners and managers of commercial buildings from granting access to competing carriers. (BOMA Br. at 9.) Without access to the building rooftops and to the internal ducts and conduits of these buildings, companies like Winstar cannot deliver telecommunications services to tenants in those buildings. (Compl.¶ 3.) At the same time, however, the FCC declined to adopt a rule prohibiting owners and managers from entering into contracts with various telecommunications providers that may contain different terms and fees for building access. (BOMA Br. at 9.)

**\*2** Winstar alleges that, beginning in 1997 and continuing through the present, the Building Defendants, through and with their trade associations (BOMA and BOMA-NJ), have used their "collective control of the commercial real estate market to deny Winstar access to their tenants and, when granted, to condition building access by Winstar on exclusionary and anticompetitive terms and conditions, including price." (Compl.¶ 3.) Winstar claims that, as a result of Defendants' conduct, it has been:
**\*2** unable to serve many customers that have requested service, has been impeded in its entry into the telecommunications market, and has been harmed in its ability to compete with Verizon and other

ILECs. Competition in the commercial telecommunications market has accordingly been eliminated or restrained, injuring Winstar in its business and harming commercial office building tenants by limiting their choices in communications services.

**\*2** (Compl.¶ 7.) On August 29, 2003, Winstar filed a five-count complaint, [FN3] seeking relief for: (1) violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (2004), based on allegations of horizontal price fixing, concerted refusals to deal (group boycott), and conspiracy to impose discriminatory prices in violation of the rule of reason; (2) violation of the New Jersey Antitrust Act, N.J. Stat. Ann., § § 56:9-1 to 56:9-18 (1970); (3) violation of § § 201(b) and 202(a) of the 1934 Communications Act, as amended, 47 U.S . C. § § 201(b) and (202)(a); (4) tortious interference with prospective business relations; and (5) breach of duty of good faith and fair dealing. (Compl.¶ ¶ 50-89.) On April 12, 2004, both BOMA and the Building Defendants filed the instant motions to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(6).

> FN3. Counts 3 and 5 are against the Building Defendants only.

**\*2** On April 23, 2004, Winstar filed a complaint in the District Court for the Southern District of New York ("New York"), naming as defendants several building owners and managers, together with their trade association, BOMA-NY, and alleging that the defendants conspired in violation of § 1 of the Sherman Act to disadvantage Winstar in favor of ILECs. (Defs.' Joint Supplemental Mem. of Law in Supp. of Their Mot. to Dismiss, dated Feb. 4, 2005 ("Defs.' Mem."), at 3); *Winstar Communications, LLC v. Equity Office Properties Inc.,* No. 04-3139 (S.D.N.Y. Jan. 24, 2005) (order granting motion to dismiss, at 1) [hereinafter "J. Wood's order"]. The defendants in the New York action also filed a motion to dismiss.

**\*2** On December 1, 2004, Judge Wood conducted oral argument regarding the motion to dismiss in the New York action. On December 21, 2004, oral argument was held before this Court regarding Defendants' Motions to Dismiss in the instant action. On January 24, 2005, the New York action was dismissed with prejudice, on the ground that Winstar did not have standing to bring the suit under the antitrust laws. (J. Wood's order at 3.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 3
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

**\*2** In light of the dismissal of the New York action, Trizec, with other defendants, submitted a Joint Supplemental Memorandum of Law in Support of Their Motions to Dismiss. Trizec argued that Winstar's antitrust claims in this action are "substantially identical" to those dismissed by Judge Wood in the New York action, and that Winstar lacks standing to raise Sherman Act claims before this Court. More specifically, Trizec asserts that, as in the New York action, Winstar's Complaint is likewise deficient here because "Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition." (Defs.' Mem. at 2.) Thus, Trizek seeks dismissal of the Complaint, or alternatively, a stay of all proceedings pending resolution of Winstar's appeal to the Second Circuit Court of Appeals. (Defs.' Mem. at 2.)

**\*3** Winstar argues in opposition that Defendants' Motion to Dismiss, and alternative plea for a stay, should be denied because Judge Wood's opinion is irrelevant and not dispositive. (Pls.' Supplemental Mem. of Points and Authorities on Antitrust Injury, dated Feb. 22, 2005 ("Pls.' Mem."), at 2.) Winstar contends that: (1) the actions do not present substantially identical antitrust claims, as the instant action includes a group boycott claim in addition to price fixing; (2) "Judge Wood's opinion is mistaken and poorly reasoned"; (3) Judge Wood's opinion is not binding precedent and has no collateral estoppel effect; and (4) Judge Wood did not permit Winstar an opportunity to amend its complaint to cure the antitrust injury pleading deficiencies. (Pls.' Mem. at 2-6.)

**\*3** On June 30, 2005, Trizec and Plaintiffs stipulated to the withdrawal without prejudice of Trizec's motion to dismiss, subject to the condition that Trizec could reinstate the motion at any time, to be then decided by this Court upon the record as it existed as of June 28, 2005. On October 20, 2005, Trizec filed a request that the motion to dismiss be reinstated.

### STANDARD OF REVIEW

**\*3** On a motion to dismiss for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the nonmoving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a

claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir.2000).

**\*3** While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost v. Kozakewicz,* 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1357). It is not proper for a court to "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

### DISCUSSION

**\*4** In its Complaint, Winstar makes no specific statements about any Trizec entity, beyond naming Trizec as a defendant. The Complaint includes Trizec when referring either to all defendants, or to the building owner-manager defendants (hereinafter, "Defendants").

#### A. Standing-Counts 1 & 2-Federal and State Antitrust Claims

**\*4** As a preliminary matter, this Court must determine whether Winstar has standing to sue under the antitrust laws, which are, along with the alleged Communications Act violations, the basis for this Court's subject matter jurisdiction over this action. Trizec, largely relying on Judge Wood's dismissal of the New York action for lack of antitrust standing, argues that Winstar lacks standing to raise its antitrust claims because it has failed to allege antitrust injury. (Defs.' Mem. at 1.) More specifically, Trizec asserts that Plaintiffs cannot establish antitrust standing because "just as in [the] New York [action],

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
**(Cite as: Not Reported in F.Supp.2d)**

Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition; thus, here just as in New York, Winstar's antitrust complaint should be dismissed for failure to state a claim." (Defs.' Mem. at 2.)

**\*4** Winstar disagrees in several respects. First, Winstar counters that Defendants' reliance on the New York action is misplaced because this action is not similar to the New York action. (Pls.' Mem. at 3.) For example, Winstar argues that, unlike the New York action, this case involves a *per se* group boycott claim in addition to a *per se* price fixing claim, whereas the New York action raised only price fixing claims. (Pls.' Mem. at 3.) Therefore, Winstar disputes Defendants' contention that the instant action presents antitrust claims that are " 'substantially identical' ' " to those raised in the New York action. (Pls.' Mem. at 2) (quoting Defs.' Mem. at 1, 3). Winstar contends that it "has suffered antitrust injury for purposes of its group boycott claim without regard to Judge Wood's ruling on standing with respect to price fixing." (Pls.' Mem. at 3.) Winstar further maintains that Judge Wood's ruling is not controlling because it is "mistaken and poorly reasoned" in its conclusion that Winstar has only alleged injury to itself, and not harm to competition in the marketplace. (Pls.' Mem. at 3-5.) Finally, Winstar asserts that Judge Wood's ruling is not binding precedent upon this Court, and that Judge Wood erred by declining Winstar's express request for an opportunity to amend its complaint. (Pls.' Mem. at 5-7.)

### 1. *Applicable Law*

**\*4** The burden of a plaintiff in a private antitrust action to demonstrate that it has antitrust standing arises from Section 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. *See* 15 U.S.C. § 15 (1982).

**\*4** It is an understatement to state that, "[i]n many ways the standing question is the most difficult issue in [a] case." *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.,* 398 F.3d 56, 72 (1st Cir.2005). To begin with, the term "standing" has "caused confusion when used in the antitrust context as opposed to the constitutional sense." *Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours and Co.,* 826 F.2d 1235, 1239 (3d Cir.1987). The focus of antitrust standing is different from constitutional standing. In the

constitutional context, standing is concerned with whether "a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy" and, among other things, requires a plaintiff to show that it has suffered an "injury in fact." *See Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). While "harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact ... [the doctrine of antitrust standing requires] the court [to] make a further determination [as to] whether the plaintiff is a proper party to bring a private antitrust action." *Alberta,* 826 F.2d at 1239 (quoting *Associated Gen. Contractors,* 459 U.S. at 535 n. 31).

**\*5** In *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), widely regarded as the leading case on antitrust standing, the Supreme Court observed that "the mere fact that the claim is literally encompassed by the Clayton Act does not end the [standing] inquiry." *Id.* at 537. A court must consider, along with a number of other factors, "the nature of the plaintiff's alleged injury" in order to determine whether it is "of the type that the antitrust statute was intended to forestall." *Id.* at 538, 540.

**\*5** In defining antitrust injury, the Supreme Court has explained that:
**\*5** Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.

**\*5** *Id.* at 343-44.

**\*5** The Third Circuit Court of Appeals echoed this notion in *Eichorn v. AT & T Corp.,* 248 F.3d 131 (3d Cir.2001), where it stated that "[i]t is well established that an antitrust injury reflects an activity's anticompetitive effect on the competitive market." *Eichorn,* 248 F.3d at 140 (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). A plaintiff's personal grievance cannot be deemed an antitrust injury "unless the activity has a wider impact on the competitive market." *Id.* (citing *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 266-67 (3d Cir.1998)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 5
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

**\*5** The Third Circuit Court of Appeals has interpreted *Brunswick* and *Associated Gen. Contractors* to require a plaintiff to satisfy the antitrust injury requirement and also be the appropriate "person" to bring suit under the standing requirements. Antitrust injury is a threshold inquiry to be satisfied before the matter may proceed. *See Alberta,* 826 F.2d at 1240 (stating that "[o]nce antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss"). In *Angelico v. Lehigh Valley Hospital, Inc.,* 184 F.3d 268, 274 (3d Cir.1998), the Third Circuit Court of Appeals enumerated the factors to be considered in an antitrust standing analysis:
**\*5** (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

**\*6** *Id.* at 274 (citations omitted).

### 2. *Analysis*

**\*6** For the purposes of the instant motions, this Court assumes the truth of Winstar's factual allegations, although this Court does not accept as true any conclusory or legal assertions. *See Morse,* 132 F.3d at 906. For the reasons set forth below, this Court concludes that Winstar has established standing to bring suit under the antitrust laws.

**\*6** Generally, Winstar claims that as a result of the unlawful conspiracy and agreements among Defendants to deny or restrict building access, it is being anticompetitively forced out of the market for the provision of telecommunications services. (Compl.¶ 7.) Winstar also alleges that commercial office building tenants have been harmed because their choice of telecommunications carriers has been limited. (Compl.¶ 7.) Thus, Winstar alleges that "[c]ompetition in the commercial

telecommunications market has accordingly been eliminated or restrained." (Compl.¶ 7.)

**\*6** Specifically, Winstar claims that Defendants have conspired "to fix the rental price of building access for the provision of telecommunications services to commercial office building tenants." (Compl.¶ 51.) Winstar asserts that these horizontal price-fixing agreements "have severely restrained and diminished competition in the relevant market." (Compl.¶ 51.) Winstar also contends that Defendants have conspired not to deal with Winstar "by denying it access to the buildings they own or manage"-a horizontal agreement that constitutes an unlawful group boycott. (Compl.¶ ¶ 58, 63.) Finally, Winstar argues that Defendants have conspired to impose discriminatory prices, terms, and conditions on Winstar's building access, thereby "substantially restrain[ing] and imped[ing] competition in the relevant market." (Compl.¶ 64.)

**\*6** The threshold issue in the *Angelico* analysis is one of antitrust injury. Trizec argues solely that Winstar has failed to establish standing because it has not articulated antitrust injury.[FN4] (Defs'. Mem. at 1-2.) This Court disagrees: Winstar has alleged an injury "of the type for which the antitrust laws were intended to provide redress." *Angelico,* 184 F.3d at 274. Assuming the truth of Winstar's allegations that Defendants have combined in a horizontal agreement to disadvantage Winstar intentionally and impede its competition in the market, as this Court must at the motion to dismiss stage, this Court finds that Winstar has sufficiently alleged, for standing purposes, that Defendants' purported agreement has a market-wide impact on the competitive market. *Eichorn,* 248 F.3d at 140 (citing *West Penn Power Co.,* 147 F.3d at 266-67).

> FN4. In their joint supplemental memorandum, Defendants argue that Winstar lacks standing because it has not alleged a cognizable antitrust injury. (Defs.' Mem. at 4.) Defendants do not argue that Winstar has failed to establish any other factor of antitrust standing.

**\*6** Mindful of *Angelico'* s admonition not to confuse the issue of anticompetitive market effect with the antitrust injury requirement of the standing inquiry, *Angelico,* 184 F.3d at 275 n. 2, but also noting *Eichorn'* s requirement that "antitrust injury reflect[ ] an activity's anticompetitive effect on the competitive market," *Eichorn,* 248 F.3d at 140, it appears to this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

Page 6

Court that Winstar has alleged, at a minimum, that Defendants conspired to restrict or deny access to Winstar, as part of a larger campaign against other similarly-situated CLECs, and that this conduct resulted in a wide impact on the competitive telecommunications market. (Compl.¶ ¶ 2-7, 37, 41, 47-48.) Thus, this Court concludes that Winstar has standing to sue under the antitrust laws. [FN5]

> FN5. In the New York action, Judge Wood concluded that Winstar had merely alleged harm to itself as an individual competitor, and had not "alleged how Defendants' conduct has reduced competition among telecommunication services providers." (J. Wood's order at 8.) Judge Wood's decision is governed by a Second Circuit case, _Balaklaw v. Lovell_, 14 F.3d 793 (2d Cir.1994). In _Balaklaw_, the court concluded that the plaintiff anesthesiologist who competed for an exclusive contract, and lost it to another anesthesiology group, had not suffered an antitrust injury sufficient to confer standing upon him. _Balaklaw_, 14 F.3d at 802. The court noted that, since the market for anesthesiology services for hospitals was multi-state, if not national, the plaintiff had not provided any evidence to suggest that he was excluded from or substantially limited in the broader market for employment, and thus, had failed to demonstrate antitrust injury. _Id._ at 799. The court also relied in part on the lack of impact of the alleged unlawful restraint on the consumer, regardless of whether there had been an impact on the plaintiff competitor. _Id._ at 798 (noting that "[f]rom the consumers' point of view, nothing about the market has changed"). Judge Wood was persuaded further by the notion that this type of exclusive contract actually might foster competition, rather than restrain it, in that the competing anesthesiology groups would have strong incentives to offer competitive and improved care and prices in order to obtain exclusive contracts. _Id._ at 799. Judge Wood's decision emphasizes the _Balaklaw_ court's observation that Dr. Balaklaw had "only established harm as an individual competitor." (J. Wood's order at 9 n. 8) (citing _Balaklaw_, 14 F.3d at 797). While _Balaklaw_ may be persuasive, it is not binding in this Circuit.

*7 Furthermore, the Supreme Court has stated that "a § 4 plaintiff need not 'prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." ' _Blue Shield of Virginia v. McCready_, 457 U.S. 465, 482, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). To the extent that Winstar is claiming that Defendants have conspired to drive it (and other CLECs) from the market, thereby resulting in a future reduction in competition, this Court finds that Winstar has alleged successfully antitrust injury sufficient to obtain standing. Although Winstar is not a direct competitor of Defendants, it appears that its alleged injury is sufficiently related to the injury Defendants allegedly sought to inflict on the market such that this Court may conclude that Winstar's alleged injury "flows from that which makes [D]efendants' acts unlawful" within the meaning of _Brunswick. See McCready._ 457 U.S. at 483-84.

*7 Finally, this Court considers persuasive the notion that, assuming Defendants indeed have conspired to restrain trade in a manner in which the antitrust laws are designed to prevent, denying standing to Winstar might be " 'likely to leave a significant antitrust violation undetected or unremedied." ' _Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp._, 951 F.2d 1158, 1164 (9th Cir.1991). Winstar has alleged that it, along with other CLECs, is the specific target of Defendants' alleged anticompetitive conspiracy to disadvantage it within the market. (Compl.¶ ¶ 2-7, 37, 41, 47-48.) Thus, Winstar has established that, if an anticompetitive practice does in fact exist, Winstar is the most direct victim. Based on Winstar's allegations, this Court cannot speculate that there exists a more appropriate antitrust plaintiff in this context who is "better poised to vindicate the public interest in antitrust enforcement." _Yellow Pages_, 951 F.2d at 1163. Winstar has established sufficient antitrust injury to give it antitrust standing.

### B. _Failure to State a Claim_

#### 1. _Counts 1 & 2-Federal and State Antitrust Claims_ [FN6]

> FN6. Winstar admits in its Complaint that "[t]he New Jersey Antitrust Act parallels the Sherman Act and is to 'be construed in harmony with judicial rulings' under the Sherman Act." (Compl., at ¶ 69 (citing N.J.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
**(Cite as: Not Reported in F.Supp.2d)**

Stat. Ann.. § 56:9-18).) Thus, Winstar's federal and state antitrust claims shall be treated together and dismissed on the same grounds.

**\*7** "To establish a section 1 violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." _Queen City Pizza, Inc. v. Domino's Pizza, Inc._, 124 F.3d 430, 442 (3d Cir.1997). Winstar has alleged three distinct violations of § 1 of the Sherman Act: (1) a discriminatory pricing scheme in violation of the rule of reason; (2) a _per se_ price fixing violation; and (3) a _per se_ group boycott. (Compl.¶ ¶ 51-67.)

a. _Rule of Reason Violation (Price Discrimination)_

**\*7** Winstar claims that "Defendants have colluded, conspired and agreed, among themselves and with Verizon and other ILECs, to impose discriminatory and less favorable prices, terms and conditions on Winstar's access to their commercial properties than those applied to Verizon and other ILECs." (Compl.¶ 64.) For antitrust violations not within the _per se_ category of invalidity, courts employ a rule of reason test.[FN7] _Eichorn_, 248 F.3d at 138. This Court finds that Winstar has failed to allege a rule of reason violation adequately.

> FN7. "Under the per se test, agreements whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality are found to be antitrust violations ... Under [the rule of reason] test, plaintiffs have the burden of establishing that, under all the circumstances, the challenged acts are unreasonably restrictive of competitive conditions in the relevant market." _Eichorn_, 248 F.3d at 138.

**\*8** Under a rule of reason analysis, a valid claim must allege facts which, if true, are sufficient to establish the four elements of the § 1 analysis. In order to establish the second element, that the Defendants' actions produced anticompetitive effects within the relevant product and geographic markets, the plaintiff must allege that particular, actual anticompetitive

effects occurred within these markets, such as price increases or output reduction. See _F.T.C. v. Indiana Fed'n of Dentists_, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Because "[s]uch proof is often impossible to make ... due to the difficulty of isolating the market effects of challenged conduct ..., courts typically allow proof of the defendant's 'market power' instead. Market power [is] the ability to raise prices above those that would prevail in a competitive market." _United States v. Brown Univ._, 5 F.3d 658, 668 (3d Cir.1993) (internal citations omitted). As with actual anticompetitive effects, market power must be shown in the relevant product and geographic markets.

**\*8** Here, Winstar has not alleged sufficiently that Trizec's conduct has been "unreasonably restrictive of competitive conditions" to state a § 1 claim under either the actual competitive effects or market power approaches. Actual anticompetitive effects are typically measured by price increase or output reduction, but Winstar has not alleged that these effects occurred in the market for provision of telecommunications services. Winstar does allege that Defendants increased the price of building access for Winstar, (Compl.¶ 37), but to the extent that Winstar is asserting that the increased prices in building access are evidence of actual anticompetitive effects, this effort fails for two reasons.

**\*8** First, Winstar claims a restraint on competition in the telecommunications services market, but has not alleged an increase in the price of telecommunications services that could evidence actual anticompetitive effects in that market.

**\*8** Second, and more importantly, Winstar is claiming that a restraint of trade has occurred in the market for the _provision_ of telecommunications services, not in the market for building _access._ (Compl.¶ 7) (emphasis added). Therefore, even if there has been a market-wide rise in price for building access, this Court cannot infer reasonably that price increases in building access have resulted in price increases for telecommunications services, evidencing actual anticompetitive effects.

**\*8** Winstar also fails to state a claim for anticompetitive effects using the market power approach. To state a valid claim under this approach, Winstar must, _inter alia,_ define the relevant product and geographic markets in which market power is alleged. "[T]he proper definition of the market is a 'necessary predicate' to an examination of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

competition that may be affected." *Brown Shoe Co. v. United States,* 370 U.S. 294, 335, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). A plaintiff may also define a sub-market as the area in which market power may be found. "The boundaries of such a sub-market may be determined by examining such practical indicia as industry or public recognition of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325.

**\*9** Winstar alleges that the relevant product market is "the provision of telecommunications services to tenants in commercial office buildings." (Compl. ¶ 28.) Winstar alleges that the relevant geographic market is "the United States and includes sub-markets, such as the State of New Jersey, because *access* for telecommunications purposes to commercial office buildings in one city or location is not a good substitute for *access* to commercial office buildings in other cities or locations." (Compl.¶ 28) (emphasis added). Winstar's market definitions suffer from several fatal defects.

**\*9** First, to the extent that Winstar defines the geographic market as the entire United States, it has not alleged facts sufficient for a conclusion that Defendants have market power over the national market for provision of telecommunications services. Second, to the extent that Winstar defines the relevant geographic market as "includ[ing] sub-markets," this is simply too undefined to state a claim of anticompetitive power in a specific sub-market. Third, to the extent that Winstar defines the relevant geographic market as the sub-market of the State of New Jersey, Winstar has not stated sufficient facts to support this sub-market definition.

**\*9** Lastly, Winstar's market definition incorporates two different kinds of markets: "provision of telecommunications services" and "access for telecommunications purposes to commercial office buildings." (Compl.¶ 28.) Winstar justifies its claim of market power in the sub-market of the State of New Jersey by connecting the two: "landlords enjoy locational market power in the sale of building access." (Compl.¶ 30.) This, however, is the wrong market power: it is not power in the relevant product market, defined by Winstar as the provision of telecommunications services. (Compl.¶ 28.) Winstar does not explain how power in the market for building access produces power in the market for telecommunications services, nor does it allege facts sufficient to support such an argument, had it made it.

**\*9** Defendants do not compete in the market for provision of telecommunications services. Even if this Court assumes the truth of Winstar's allegation that Defendants have conspired to impose discriminatory prices upon Winstar for building access, in order for the Court to find that Winstar has alleged sufficiently a restraint on competition in the telecommunications services market, the Court would have to assume further that, through this discriminatory pricing in the building access market, Defendants aimed to restrain competition in the market for provision of telecommunications services-a market in which Defendants do not compete.

**\*9** Winstar has not alleged sufficient facts to permit this Court to find that a restraint in the market for building access has resulted in a restraint in the product market for telecommunications services. This Court is not required, nor would it be "proper to assume that [Winstar] can prove facts that it has not alleged or that [D]efendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors,* 459 U.S. at 526.

**\*10** For all the reasons cited, Winstar's market definitions are insufficient to state a valid claim for anticompetitive market power. As dictated by the Supreme Court, "in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 528 n. 17.

**\*10** Because Winstar has failed to allege sufficient facts concerning the anticompetitive effects of Defendants' conduct in the relevant product and geographic markets in which Winstar alleges that trade has been restrained, under either the actual anticompetitive effects or market power approaches, this Court cannot conclude that Winstar has stated a claim for a rule of reason violation. Thus, Winstar's rule of reason price discrimination claim will be dismissed.

### b. *Price Fixing*

**\*10** Winstar alleges in Counts 1 and 2 that Defendants "have colluded, conspired and agreed ... to fix the rental price of building access for the provision of telecommunications services to commercial office building tenants. This horizontal conspiracy ... constitutes a *per se* violation of Section 1 of the Sherman Act." (Compl.¶ ¶ 51, 54.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*10** Although most restraints are analyzed under the traditional "rule of reason," *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Such practices are deemed to be "illegal *per se.*" *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). The *per se* rule of illegality, however, is "based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition." *Brown Univ.,* 5 F.3d at 670; *see also Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable"); *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) ("Th[e] *per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive"); *NCAA v. Bd. of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 103-04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("*Per se* rules are invoked when the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct"). For the following reasons, this Court determines that Winstar's claim of price fixing, as currently alleged, should not be subject to the *per se* rule of illegality, and rather, should be subject to a rule of reason analysis.

**\*11** Winstar's price fixing claim centers upon action allegedly taken by BOMA and BOMA-NJ to encourage their members "to offer uniform and less favorable terms to Winstar than to Verizon or other ILECs." (Compl.¶ 52.) Winstar refers to model agreements, "best practices," and other related materials distributed to BOMA's members by their trade association. (Compl.¶ 52.) Defendants argue, however, that "BOMA's development of model agreements and 'best practices' for building access was a lawful trade association activity that was specifically encouraged by the FCC." (BOMA Br. at 17.)

**\*11** This Court cannot conclude with confidence that

the price fixing conspiracy alleged in this case presents an unreasonable restraint on competition in the telecommunications service market such that it should be conclusively presumed *per se* illegal, and that further examination of the facts and circumstances would be unjustified. First, it is only very recently that Congress and the FCC have begun to scrutinize the issue of competition in the local telecommunications markets, and the issues arising out of the passage of the Telecommunications Act of 1996 are still being addressed. (BOMA Br. at 6.) In addition, the courts have not yet begun to publish consistent pronouncements on the issue.[FN8] Because this is not the type of circumstance where this Court can easily ascertain the great likelihood of anticompetitive effects, *see California Dental Ass'n v. FTC,* 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999), this Court holds that, as currently alleged, Winstar's claim of price fixing should not be analyzed under the *per se* rule, but rather under the full rule of reason. Because of Winstar's failure to state a claim for anticompetitive effects, delineated above (failing to specify particular adverse effects on competition in particular markets), Winstar's price fixing claim, analyzed under the rule of reason, also must fail. Therefore, this Court will dismiss Winstar's claim of price fixing.

> FN8. Notably, the Third Circuit has stated that:
> ... concerted action does not exist every time a trade association member speaks or acts. Instead, in assessing whether a trade association (or any other group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members of the association.
> *Alvord-Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1007-08 (3d Cir.1994).

#### c. *Group Boycott*

**\*11** In Counts 1 and 2, Winstar claims that "Defendants have colluded, conspired and agreed not to deal with Winstar by denying it access to the buildings they own or manage," constituting "*per se* unlawful group boycotts in violation of Section 1 of the Sherman Act." (Compl.¶ ¶ 58, 63.)

**\*11** In certain instances, concerted refusals to deal or group boycotts are "so likely to restrict competition

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

Page 10

without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Northwest Wholesale,* 472 U.S. at 290. Generally, the *per se* approach to boycotts is applied in cases where there are "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." ' *Id.* at 294 (quoting L. Sullivan, Law of Antitrust 261-62 (1977)). The Third Circuit has echoed that narrow construction of the *per se* rule for boycotts. *See Eichorn,* 248 F.3d at 143 (citing *Northwest Wholesale,* 472 U.S. at 289-90 (*per se* rule confined to limited types of anti-competitive practices); *Larry Muko, Inc. v. Southwestern Pa. Bldg. and Const. Trades Council,* 670 F.2d 421, 429 (3d Cir.) ("Generally the application of the per se rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace"), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982)).

**\*12** As a general matter, "[t]he Supreme Court has been cautious in extending the *per se* approach to claims that fall outside certain previously enumerated categories of liability." *Eichorn,* 248 F.3d at 143 (citations omitted). Thus, "claims not within established categories of antitrust liability are more appropriately analyzed under the rule of reason where courts can balance the effect of the alleged anticompetitive activity against its competitive purposes within the relevant product and geographic markets." *Id.*

**\*12** Based on the judicial reluctance to analyze boycott claims under the *per se* rule, as well as upon this Court's review of the Complaint, it appears that the circumstances of the alleged boycott in this case do not fall within the narrow scenario detailed by the Court in *Northwest Wholesale.* In this case, Winstar alleges that the Building Defendants conspired with each other and BOMA to engage in a group boycott of Winstar. (Compl.¶ ¶ 58, 63.) However, Winstar is not a competitor of either BOMA or the Building Defendants. Winstar is in competition with other CLECs, Verizon, and other ILECs. This case does not fall within the *Northwest Wholesale per se* rule, which applies only to boycotts by competitors against competitors.[FN9] Therefore, this Court holds that, as currently alleged, Winstar's group boycott claim should not be analyzed under the *per se* rule, but rather under the full rule of reason.

FN9. Winstar specifically alleges that: Through and with BOMA, the Owner-Manager Defendants, together with other co-conspirator real estate owners and managers not parties to this action, have entered into exclusive arrangements for building access pursuant to which they receive equity and/or revenue-sharing compensation from their preferred telecommunications provider. In light of these exclusivity provisions, Defendants' [sic] have refused to execute building access arrangements with Winstar for certain of their commercial properties. (Compl.¶  58.) Winstar has not implicated Verizon or other ILECs in the concerted refusal to deal beyond alleging that Defendants have chosen Verizon and other ILECs to be their exclusive "preferred providers." (Compl.¶ 58, 61.) Winstar also has not alleged or intimated that Verizon or other ILECs are at all involved in the conspiracy to boycott Winstar.

**\*12** Because of Winstar's failure to state a claim for anticompetitive effects, Winstar's group boycott claim, analyzed under the rule of reason, must also fail. Therefore, this Court will dismiss Winstar's group boycott claim.

**\*12** Because this Court has determined that Winstar has failed to state a claim upon which relief may be granted for violations of section 1 of the Sherman Act, this Court dismisses Counts 1 and 2 of the Complaint, without prejudice, allowing Winstar to re-plead to address its present deficiencies.

### 2. Count 3-The Communications Act of 1934, as amended

**\*12** Winstar asserts this claim against the Building Defendants only.[FN10] This claim arises from the Communications Act of 1934 ("the Act"). *See* 47 U.S.C. § § 201(b) and 202(a). The Act makes it unlawful for any "common carrier" of telecommunications services to discriminate in prices or practices. *See* 47 U.S.C. § § 201(b)[FN11] and 202(a).[FN12]

FN10. Of the Building Defendants, Trizec is the only remaining defendant.

FN11. Section 201(b) declares that, for

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

"common carriers," "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b).

FN12. Section 202(a) makes it unlawful for any "common carrier":
to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage. 47 U.S.C. § 202(a).

*12 Winstar alleges that the Building Defendants are "common carriers" subject to the Act because the Building Defendants have entered into arrangements with "preferred" telecommunications carriers wherein the carriers were given exclusive access to the properties in exchange for the Building Defendants' equity interests in the carriers or revenue-sharing with the carriers. (Compl. ¶ 73.) Winstar claims that, based upon the revenue-sharing agreements between the Building Defendants and the "preferred carriers," the Building Defendants are de facto "common carriers" of telecommunications services. (Compl.¶ 74.) Winstar then claims that these exclusive agreements deny access to Winstar, and amount to discriminatory practices and pricing proscribed by the Act. (Compl.¶ 77.)

*13 The Building Defendants argue that this claim cannot survive because §§ 201 and 202 only apply to "common carriers," which they are not. (Building Defs.' Br. at 38-46.) This Court agrees. Because Winstar has not alleged facts to support the theory that the Building Defendants are "common carriers" of telecommunications services, this Count is dismissed with prejudice.

*13 The text of the Act defines and describes "common carrier" as an entity that is "engaged in providing telecommunications services." 47 U.S.C. § 153(44). To determine whether an entity is a "common carrier," see FCC v. Midwest Video Corp., 440 U.S. 689, 700-01, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), courts should examine: (1) whether the carrier "undertakes to carry for all people indifferently," see Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 641 (D.C.Cir.1976) (internal quotation marks and citation omitted); and (2) whether the system is such that customers transmit intelligence of their own design and choosing, see Nat'l Ass'n of Regulatory Util. Comm'rs, 533 F.2d at 609. The Building Defendants are not "engaged in providing telecommunications services," 47 U.S.C. § 153(44), nor do the factual allegations support the finding that the Building Defendants satisfy the first prong of the test articulated above.

*13 Winstar claims that the Building Defendants should be deemed "common carriers" because they are resellers of telecommunications services who are subject to "common carrier" duties under the Act. According to Winstar, "common carrier duties apply to any entity that: (1) independently or jointly through a resale or joint service provider arrangement, (Pls.' Br. in Opp'n to the Building Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 36 (citations omitted)); (2) offers 'transmission, between or among points specified by the user, of information of the user's choosing.' ' (Pls.' Opp'n at 36) (quoting 47 U.S.C. § 153(43)).

*13 Defendants argue that Winstar's characterization of them as "resellers" that are subject to §§ 201(b) and 202(a) of the Act as "common carriers" is flawed, and thus, must fail. (Building Defs.' Br. at 44.) This Court agrees.

*13 Resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public ... for profit." Resale and Shared Use Order, 60 F.C.C.2d 261, 261 ¶ 17 (1976). The Third Circuit Court of Appeals described the resale market as follows:
*13 Resellers ... subscribe to AT & T programs which provide large discounts for high volume purchases of AT & T telecommunications services. The resellers then sell the services to individual businesses that do not generate sufficient volume to qualify individually for the high-volume discounts. Thus, by providing the services to these end-users, resellers make a profit while end-users receive access to the AT & T network at a significantly lower cost than if they purchased services from AT & T directly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

... in the resale business, only the reseller is a customer of AT & T; the end-users are customers of the reseller and not AT & T.

**\*14** *AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1423 (3d Cir.1994).

**\*14** The Building Defendants are not customers of the telecommunications providers, i.e., they do not purchase the telecommunications services from the providers. (Building Defs.' Br. at 23.) The end-users of the telecommunications services, the tenants, are direct customers of the telecommunications providers, not the Building Defendants. Winstar has not alleged facts to show that the Building Defendants act as the sort of intermediaries or intermediate providers of telecommunications services intended to be captured by the term "resellers" that are subject to "common carrier" duties under the Communications Act. Thus, its attempt to seek relief against the Building Defendants under this theory must fail.

**\*14** Finally, Winstar attempts to argue that it has pled adequately a claim for relief under the Communications Act "regardless of whether the Defendants are common carriers," because Winstar claims that "Defendants violated Sections 202(a) and 201(b) of the Act, which prohibit discrimination and unreasonable practices 'in connection with' telecommunications services." (Pls.' Opp'n at 47.) This basis for relief also fails.

**\*14** In asserting this theory of relief, Winstar appears to have overlooked the fact that the Act's prohibition against unjust or unreasonable practices expressly applies to "any common carrier." *See* 47 U.S.C. § 202(a). Indeed, the Act states: "It shall be unlawful *for any common carrier* to make any unjust or unreasonable determination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service." 47 U.S.C. § 202(a) (emphasis added). Furthermore, Section 201 expressly provides that the chapter applies to "common carriers." 47 U.S.C. § § 201(a) and (b). In fact, the relevant subchapter of the statute containing both § § 201 and 202 is entitled "Common Carriers," and the relevant part is entitled "Common Carrier Regulation." Winstar cannot seek relief under § § 201 and 202 against parties who are not common carriers.

**\*14** Winstar has not alleged facts to support its assertion that the Building Defendants are "common carriers," subject to liability under the

Communications Act. Thus, Count 3 is dismissed with prejudice.

### 3. *Counts 4 & 5-State Common Law Claims*

**\*14** Count 4 asserts tortious interference with prospective business relations on the part of all Defendants, and Count 5 asserts breach of the duty of good faith and fair dealing on the part of the Building Defendants. These are claims under state law.

**\*14** Based upon this Court's dismissal of all other counts of the Complaint, this Court declines to exercise supplemental jurisdiction over these state law claims, pursuant to 28 U.S.C. § 1367. This Court dismisses these claims without prejudice because this Court cannot conclude that Winstar's amendment of its antitrust claims would be futile. Thus, if Winstar successfully re-pleads its Sherman Act claims, satisfying federal question jurisdiction under 28 U.S.C. § 1331, this Court may exercise supplemental jurisdiction over any state or common law claims under 28 U.S.C. § 1367.

### *CONCLUSION*

**\*15** For the reasons set forth above, Trizec's motion to dismiss is granted. Accordingly, Counts 1, 2, 4, and 5 are dismissed without prejudice and Count 3 is dismissed with prejudice. Winstar, if it so chooses, may file an amended complaint within forty-five (45) days of the entry of this Court's order.

D.N.J.,2005.
IDT Corp. v. Building Owners and Managers Ass'n Intern.
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151

Briefs and Other Related Documents (Back to top)

• 2005 WL 1585212 (Trial Motion, Memorandum and Affidavit) Memorandum of Law In Support of Trizec's Appeal of an Order of Magistrate Judge G. Donald Haneke, Dated May 10, 2005 (May 24, 2005)
• 2005 WL 1363311 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Supplemental Memorandum of Law in Support of Their Motions to Dismiss (Feb. 4, 2005)
• 2004 WL 3374114 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants in Opposition to Plaintiffs' Appeal from Order Denying Motion to Compel Discovery (Oct. 25,

Not Reported in F.Supp.2d                                                        Page 13
Not Reported in F.Supp.2d, 2005 WL 3447615 (D.N.J.), 2006-1 Trade Cases P 75,151
(Cite as: Not Reported in F.Supp.2d)

2004) Original Image of this Document with Appendix (PDF)

• 2004 WL 3374111 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion to Compel Discovery (Sep. 1, 2004)

• 2004 WL 3374092 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants Carramerica Realty Corporation's and Carramerica Development, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Apr. 12, 2004)

• 2004 WL 3374106 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law of Defendants Building Owners and Managers Association International and Building Owners and Managers Association of New Jersey in Further Support of Their Motion to Dismiss (Apr. 12, 2004) Original Image of this Document (PDF)

• 2004 WL 3374101 (Trial Motion, Memorandum and Affidavit) Hines Corporate Properties, LLC's Reply to IDT's Opposition to its Motion to Dismiss for Improper Venue and for Lack of Personal Jurisdiction (Apr. 8, 2004)

• 2004 WL 3374098 (Trial Motion, Memorandum and Affidavit) Opposition to Hines Corporate Properties LLC's Motion to Dismiss for Improper Venue and for Lack of Personal Jurisdiction (Mar. 10, 2004)

• 2004 WL 3374110 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to the Building Defendants' Motion to Dismiss for Failure to State A Claim for Relief (Mar. 10, 2004)

• 2004 WL 3374086 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendant Shorenstein Company LLC's Motion to Dismiss for Improper Venue and Lack of Personal Jurisdiction (Mar. 5, 2004)

• 2004 WL 3374090 (Trial Motion, Memorandum and Affidavit) Opposition to Shorenstein Company LLC Motion to Dismiss for Improper Venue and Lack of Personal Jurisdiction (Feb. 20, 2004)

• 2004 WL 3374093 (Trial Motion, Memorandum and Affidavit) Hines Corporate Properties, LLC's Memorandum of Points and Authorities in Support of its Motion to Dismiss for Improper Venue and for Lack of Personal Jurisdiction (Jan. 30, 2004)

• 2004 WL 3374104 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Building Owners and Managers Association International and Building Owners and Managers Association of New Jersey in Support of Their Motion to Dismiss (Jan. 30, 2004)

• 2004 WL 3374108 (Trial Motion, Memorandum and Affidavit) Brief in Support of Motion to Dismiss (Jan. 30, 2004)

• 2003 WL 24094032 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Defendant Shorenstein Company LLC's Motion to Dismiss for Improper Venue and Lack of Personal Jurisdiction (2003)

• 2003 WL 24094039 (Trial Motion, Memorandum and Affidavit) Reply in Support of Motion to Dismiss (2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 13



Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2004 WL 2475287 (Cal.Super.)
(Cite as: Not Reported in Cal.Rptr.3d)

Page 1

☞

In re Credit/Debit Card Tying
CasesCal.Super.,2004.Only the Westlaw citation is
currently available.CREDIT/DEBIT CARD TYING
CASES
No. J.C.C.P. NO. 4335.

Filed July 9, 2004
Oct. 14, 2004.

Stephen V. Bomse, David M. Goldstein, Rachel M.
Jones and Jennifer R. Conners of Heller Ehrman
White & McAuliffe LLP, San Francisco, CA; Robert
C. Mason of Arnold & Porter LLP, New York, NY;
Eugene Crew, Richard L. Grossman and Maureen A.
Sheehy of Townsend and Townsend and Crew LLP,
San Francisco, CA; Robert J. Vizas of Holme,
Roberts & Owen, San Francisco, CA, for Defendant
Visa U.S.A. Inc.

Jackie Redin Klein and Sandeep Motwani of Lord
Bissell & Brook LLP, Los Angeles, CA; Joseph E.
Coughlin and Timothy M. Maggio of Lord Bissell &
Brook LLP, Chicago, IL, for Defendant Visa
International Service Association.

Gary L. Halling and Michael W. Scarborough of
Sheppard, Mullin, Richter & Hampton LLP, San
Francisco, CA; Kenneth A. Gallo and Patricia C.
Crowley of Paul, Weiss, Rifkind, Wharton &
Garrison LLP, Washington, DC; Gary R. Carney of
Paul, Weiss, Rifkind, Wharton & Garrison LLP, New
York, NY; Noah J. Hanft, Eileen S. Simon and James
P. Masterson, Purchase, NY, for Defendant
MasterCard International Incorporated.

Craig C. Corbitt and Judith A. Shimm of Zelle,
Hofmann, Voelbel, Mason & Gette LLP, San
Francisco, CA, for Plaintiffs.

Stephen V. Bomse, San Francisco, CA, for
Defendant, Visa U.S.A. Inc.

Lord Bissell & Brook LLP, Joseph E. Coughlin,
Chicago, IL, for Defendant, Visa International
Service Association.

Cooper & Kirkham, San Francisco, California, By:
Josef D. Cooper, Attorney at Law, for Plaintiff
Millar.

The Furth Firm, San Francisco, California, By:
Michael P. Lehmann, Attorney at Law, Kathleen
Styles Rogers, Attorney at Law, for Plaintiffs Amy
Miller, Bonnie Leonard, Henry Siu, Richard Johns.

The Scarpulla Law Firm, San Francisco, California,
By: Francis O. Scarpulla, Attorney at Law, for

Plaintiffs Bonnie Leonard, Henry Siu, Richard Johns.
Zelle, Hoffman, Voelbel, Mason & Gette, San
Francisco, California, By: Judith A. Shimm, Attorney
at Law, Craig C. Corbitt, Attorney at Law, for
Plaintiff Richard Johns.

Saveri & Saveri, San Francisco, California, By: Rick
Saveri, Attorney at Law, Glancy, Binkow &
Goldberg, San Francisco, California, By: Susan G.
Kupfer, Attorney at Law, for Plaintiffs Class.

Sheppard, Mullin, Richter & Hampton, San
Francisco, California, By: Gary L. Halling, Attorney
at Law, Michael W. Scarborough, Attorney at Law,
Paul, Weiss, Rifkind, Wharton & Garrison, New
York, New York, By: Gary Carney, Attorney at Law,
for MasterCard International, Inc.

Honorable Richard A. Kramer, Coordination Trial
Judge.

CLASS ACTION

KRAMER, J.
*1 COORDINATION PROCEEDING SPECIAL
TITLE (Rule 1550(b))

*1 This Document Relates To: ALL ACTIONS

ORDER SUSTAINING IN PART AND
OVERRULING IN PART DEFENDANTS'
DEMURRERS TO PLAINTIFFS' COMPLAINT
AND SCHEDULING FURTHER CASE
MANAGEMENT CONFERENCE

Consolidated Amended Complaint

*1 Defendants' joint demurrer to plaintiffs'
Consolidated Amended Complaint and the separate
Demurrer of Visa International Service Association
came on regularly for hearing on October 6, 2004,
before the Honorable Richard A. Kramer, in
Department 304 of the above-entitled Court. Craig C.
Corbitt of Zelle, Hofmann, Voelbel, Mason & Gette
LLP, Michael P. Lehmann of The Furth Firm LLP,
and R. Alexander Saveri of Saveri & Saveri, Inc.
appeared as counsel on behalf of plaintiffs. Stephen
V. Bomse of Heller Ehrman White & McAuliffe LLP
and Eugene Crew of Townsend and Townsend and
Crew LLP appeared on behalf of defendant Visa
U.S.A. Inc. Gary L. Halling of Sheppard, Mullin,
Richter & Hampton LLP and Gary R. Carney of Paul,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                      Page 2
Not Reported in Cal.Rptr.3d, 2004 WL 2475287 (Cal.Super.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

Weiss, Rifkind, Wharton & Garrison LLP appeared on behalf of defendant MasterCard International Incorporated. Joseph E. Coughlin of Lord Bissell & Brook LLP appeared on behalf of defendant Visa International Service Association.

**\*1** After considering the pleadings and papers filed herein and the arguments of counsel, and for the reasons set forth by the Court during the hearing on October 6, 2004, as reflected in the partial transcript of the hearing attached hereto as Exhibit A, IT IS HEREBY ORDERED as follows:

**\*1** 1. Defendants' joint demurrer to plaintiffs' first, second, and third causes of action for violations of the **Cartwright** Act, <u>Cal. Bus. & Prof.Code § 16720</u> and <u>§ 16727</u> is sustained without leave to amend.

**\*1** 2. Defendants' joint demurrer to plaintiffs' fourth, fifth, and sixth causes of action for violations of the Unfair Competition Act, <u>Cal. Bus. & Prof.Code § 17200</u>, is overruled. Defendants' oral request that the Court strike selected allegations and portions of plaintiffs' prayer for relief under the Unfair Competition Act pursuant to <u>Cal.Civ.Proc.Code § 436</u> also is denied.

**\*1** 3. The separate demurrer of Visa International Service Association is overruled.

**\*1** 4. A further case management conference is scheduled for December 7, 2004 at 3:30 p.m.

**\*1** IT IS SO ORDERED.

EXHIBIT A

Reporter's Transcript of Proceedings

**\*1** PLEASE NOTE <u>GOVERNMENT CODE SECTION 69954(d)</u>:

**\*1** "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR PERSON."

**\*1** plaintiffs. I'll be very brief on that to respond.

**\*1** The first point is, Your Honor, that we sued Visa International Corporation, but yet Visa International Service Association responded, so we referenced that in our opposition, but yet the reply didn't indicate whether it's a different company or what, they are **standing** in the shoes.

**\*2** So, one, we were sort of interested in who is the Visa International Service Association.

**\*2** Second of all, that the charging allegations in the complaint are against both Visa and-International as well as Visa U.S.A. That is why we combined the terms and used "Visa," as the Court pointed out.

**\*2** Second [sic] of all, paragraph 29 specifically says, "The acts charged in this complaint having been done by each of the defendants." That means Visa U.S.A. and Visa International.

**\*2** Each of the causes of action, Your Honor, sets forth the defendants did all the acts as alleged in the complaint, so each cause of action goes through and sets forth our form of relief against all the defendants.

**\*2** Therefore, we believe that Visa International is properly alleged in the complaint.

**\*2** THE COURT: All right. Is everything submitted now?

**\*2** MR. BOMSE: Yes, Your Honor.

**\*2** THE COURT: As to this last point, as a matter of pleading the starting point is that, indeed, the way the pleading is written it alleges Visa International in and of itself separate from Visa U.S.A. committed the acts in question here.

**\*2** Visa's counsel did a great job, I thought, of saying, yeah, but look at what the other allegations are here. If you read all that together, Visa International couldn't have done these things independently because they're also saying we're simply, as a higher level, controlling U.S.A. operations.

**\*2** Maybe so, but I'm supposed to read the complaint in the most advantageous way and with an eye toward saving a cause of action, as opposed to interpreting it narrowly. I see the inconsistency there, but I think as a matter of pleading, since the Visa entities are lumped together and since paragraph 29 talks about defendants and each of them, each did the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2004 WL 2475287 (Cal.Super.)
(Cite as: Not Reported in Cal.Rptr.3d)

Page 3

following things, as a matter of pleading it's acceptable and that demurrer is overruled.

**\*2** I do, however, urge Visa International and Visa whatever to meet and confer with plaintiffs' counsel, and if you can straighten out the entities and figure out perhaps who belongs and who doesn't, it may be that you can narrow this to the appropriate parties. I can't force you to do that, but if you don't, then the next thing that will happen will be interrogatories to you saying, "Tell me everything Visa International did and why."

**\*2** If you want to avoid that exercise, then maybe the meet and confer would be a more prudent way to do it, especially if the outcome of all that doesn't really impact the case.

**\*2** MR. COUGHLIN: Your Honor, we didn't find that response about they sued Visa International Corporation to be that weighty, so we did not respond. The correct name is what we appeared under and moved under. They can look it up.

**\*2** THE COURT: Why don't you meet with them.

**\*2** MR. SAVERI: Visa International Corporation, Your Honor, came from the Department of Justice in the complaint, and that's who was named in that complaint.

**\*2** THE COURT: You just gave him an opportunity to tell me about the Department of Justice. Take this one outside, okay?

**\*3** All right, back to the demurrers, first regarding the **Cartwright** Act claims, the tentative ruling stands. The demurrers are sustained without leave to amend. I believe that the standards in Associated General Contractors, while perhaps flexible, while perhaps guidelines, still exist and still clearly establish minimum requirements for **standing** to file a lawsuit of this kind. And no matter how you cut any of them, despite what I thought was a creative analysis, they don't exist here.

**\*3** If you think about it, if such were the case then we would be greatly expanding 17200 claims into antitrust **Cartwright** Act claims, and thereby creating damages, and treble damages, and things like that into areas which I do not believe were intended by the legislature by the **Cartwright** Act.

**\*3** I also think that the plaintiffs here are neither direct purchasers nor **indirect purchasers** of any

good or service from the defendants here, and to the extent there are exceptions to that requirement, they're inapplicable here.

**\*3** Regarding the 17200 claims, I am mindful of this proceeding being a demurrer, and I have no intention of establishing rules regarding the extent of available restitution, the measure of available restitution, the appropriateness of available restitution, or anything of the like. My job is to read the complaint and see if, under a most favorable reading, a cause of action exists, and as to the three causes of action regarding 17200, I think it does.

**\*3** I am aware we will be having further festivities regarding many of the matters Mr. Bomse argued here, but as to a demurrer, the combination of paragraph 29 plus 21, 22 and 23, and others is sufficient to indicate the possibility of the existence of remedies, including restitution so as to defeat a demurrer.

**\*3** Regarding the injunction, I believe that the scope of the ruling in the Federal Court is for another day, and whether it precludes an injunction here or not is for another day.

**\*3** And the existence then of the viability, the potential viability of that remedy by itself requires the overruling of a general demurrer. Then if part of what's asked for is not available, so long as there is a cause of action there, then a general demurrer has to be overruled. That's the rule.

**\*3** So even if I am incorrect about the restitution thing, which I don't believe I am, the existence of the possibility at this stage in the festivities of an injunction defeats the demurrer.

**\*3** I do have the authority under <u>CCP Section 436</u> to strike portions of the complaint, actually read that as being more appropriate to strike things that are not drawn in accordance with California law, or scandalous material, or wildly superfluous material, as opposed to using it as a substitute for a motion to strike, or for a motion for summary judgment, or for something else.

**\*3** I don't think I should use my discretion under <u>CCP Section 436</u> to make an important legal determination, which is what I would be doing if I were to go to the level that Mr. Bomse argued regarding the scope of available restitution and how that might apply to the facts here. We'll be doing that perhaps another day in a more appropriate procedural

Not Reported in Cal.Rptr.3d                                                                                Page 4
Not Reported in Cal.Rptr.3d, 2004 WL 2475287 (Cal.Super.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

context. If for no other reason, fundamental fairness would preclude me from whacking away at the complaint now without the plaintiffs having an opportunity to speak to the matters in that context.

\*4 Those are my rulings. Who wants to prepare the order?

\*4 MR. BOMSE: We'll be happy to do it, Your Honor.

\*4 THE COURT: You were slower than you usually are, Mr. Bomse. I thought you would be up much quicker.

\*4 MR. BOMSE: It's been a long week.

\*4 THE COURT: Defendants will prepare the order and run it by the plaintiffs to approve it as to form.

\*4 MR. BOMSE: Of course.

\*4 THE COURT: Anything further from the plaintiffs for today?

\*4 MR. LEHMANN: No, Your Honor.

\*4 THE COURT: Defense?

\*4 MR. BOMSE: No, Your Honor.

\*4 THE COURT: Nice to see you all again. Take care.
\*4 (Pause in the proceedings.)

\*4 THE COURT: Back on the record, let's have a case management conference. I should give you enough time to get an answer on file. Do you want

enough time to go up on a writ so we can see what the case is about?

\*4 MR. BOMSE: Your Honor, I doubt very much that we intend to take a writ. I mean obviously I can't speak for MasterCard, and I would need to talk to my client, but I can't imagine that we would intend to seek any relief at this point.

\*4 THE COURT: The question isn't whether you want to. Do you want me to give you enough time so you can think about it and get it going?

\*4 MR. BOMSE: Of course, of course.

\*4 THE COURT: The same thing with the plaintiffs?

\*4 MR. CORBITT: I would give the same response as Mr. Bomse.

\*4 THE COURT: Let's go off the record for a minute.
\*4 (Discussion off the record.)

\*4 THE COURT: Back on the record, the case management conference, December 7, 2004, at 3:30. Give me a joint case management conference statement answering the question what do you want to do next and what do you want me to do about it. Okay?

\*4 MR. BOMSE: Yes.

\*4 THE COURT: All right. See you then. Take care.

\*4 (Whereupon, the proceedings were adjourned at 3:47 p.m.)
KAREN, J.

State of California    )

                       )

County of San Francisco    )

\*4 I, Carol A. Karen, Official Reporter for the Superior Court of California, County of San Francisco, do hereby certify:

\*4 That I was present at the time of the above proceedings;

\*4 That I took down in machine shorthand notes all proceedings had and testimony given;

\*4 That I thereafter transcribed said shorthand notes with the aid of a computer;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
Not Reported in Cal.Rptr.3d, 2004 WL 2475287 (Cal.Super.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

Page 5

\*4 That the above and foregoing is a full, true, and correct transcription of said shorthand notes, and a full, true and correct transcript of all proceedings had and testimony taken;

\*4 That I am not a party to the action or related to a party or counsel;

\*4 That I have no financial or other interest in the outcome of the action.

Cal.Super.,2004.
In re Credit/Debit Card Tying Cases
Not Reported in Cal.Rptr.3d, 2004 WL 2475287 (Cal.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 14

*Westlaw.*

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31570296 (Cal.Superior), 2003-1 Trade Cases P 73,959
**(Cite as: Not Reported in Cal.Rptr.2d)**

In re Natural Gas Anti-Trust Cases, Cases I, II, III, & IVCal.Superior,2002.
Superior Court, San Diego County, California.
NATURAL GAS ANTI-TRUST CASES CASES I, II, III, & IV
**Nos. 4221, 4224, 4226, 4228.**

Oct. 16, 2002.

RULING ON MOTIONS

HADEN, J.
**\*1** Coordination Proceeding Special Title (Rule 1550(b))

**\*1** This Document Relates to: ALL ACTIONS.

JUDICIAL COUNCIL

RULING ON MOTIONS

**\*1** The Court takes judicial notice of each item requested to be so noticed by each party, pursuant to Ev.Code sections 451 and/or 452.

Southern California Case

I. Sempra Defendants' Demurrer

**\*1** The Sempra Defendants' demurrer to the Southern California Master Complaint is overruled. The allegations of a conspiracy involving the El Paso Defendants, which violated the state antitrust laws and unfair competition laws are adequately pled. These actions are neither barred by the Supremacy Clause nor the Filed Rate Doctrine. These causes of action are neither completely preempted by the U.S. Constitution nor any federal law. Congress has not shown an intent to preempt the field and state antitrust and unfair competition causes of action do not conflict with federal law. Application of state antitrust laws has been neither expressly repealed nor implicitly pre-empted. *California v. Federal Power Commission* 369 U.S. 482, 485 (1962); *Otter Tail Power Co. v. United States* 410 U.S. 366, 373-74.

Additionally, the Filed-Rate Doctrine, which is essentially another form of pre-emption, is not applicable here because there are no tariffs concerning the spot-market. Even if such rates could be considered tariffed, the Filed Rate Doctrine is inapplicable where there are no available alternative sellers. *Columbia Steel Casting Co. v. Portland General Electric Co.* 111 F.3d 1427 (9th Cir.1997), cert. Denied, 523 U.S. 1112 (1998); *In re Lower Lake Erie Iron Ore Antitrust Litigation* 998 F.2d 1144, 1159 (3rd Cir.), cert. Dismissed, 510 U.S. 1021 (1993). County of *Stanislaus v. Pacific Gas & Electric Co.,* 114 F.3d 1042, 1045 (9th Cir.1997), is not applicable because it truly was an attack on an approved tariff. Further, it is unnecessary for the Court to stay the action under the Doctrine of Primary Jurisdiction. The FERC does not have jurisdiction over state antitrust and unfair competition claims. Simply put, FERC cannot adjudicate this claim. This Court will hear this matter pending FERC's proceedings.

II. Sempra Defendants' Motion to Strike

**\*1** The Sempra Defendants' motion to strike references to damages is denied. Disgorgement may be appropriate should classes be certified. To the extent Plaintiffs can prove their allegations, they may be entitled to treble damages under the state antitrust causes of action. Moreover, it is premature to eliminate any possible restitution.

III. Sempra Defendants' Motion to Stay

**\*1** The Sempra Defendants' Motion to stay this state court action under the Doctrine of Primary Jurisdiction while certain FERC proceedings occur is overruled. FERC has no jurisdiction over state antitrust or unfair competition causes of action.

IV. Defendant El Paso Corporation's Motion to Quash Service

**\*1** El Paso Corporation's (EPC) Motion to Quash Service is denied. Plaintiffs have alleged sufficient facts and produced adequate evidence to demonstrate both special and general jurisdiction is proper over El Paso Corporation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                                     Page 2
Not Reported in Cal.Rptr.2d, 2002 WL 31570296 (Cal.Superior), 2003-1 Trade Cases P 73,959
**(Cite as: Not Reported in Cal.Rptr.2d)**

**\*2** The Court can exercise personal jurisdiction over El Paso Corporation, fka as El Paso Energy Corporation (EPEC), under the doctrine of "specific personal jurisdiction", even if EPEC had no physical presence in California. See *Pedus Building Services, Inc. v. Allen* 96 Cal.App.4th 152, 163; *Gordy v. The Daily News, L .P. 95 F.3d 829, 832.* EPC is the successor to El Paso Natural Gas, which allegedly participated in forming the conspiracy in Phoenix.

**\*2** The Court can also exercise personal jurisdiction over EPC under the doctrine of "general" jurisdiction because EPC has been directly and continuously involved in the operation of electricity generation facilities in California since approximately 1998 and has admitted doing business in California for over fifty (50) years. (Handler declaration, Ex. at 1). Further, Plaintiffs argue the sworn testimony of Ralph Eads and William Wise (Ex. C and D to declaration of Carol Handler) before the FERC reveals El Paso Merchant, which manages El Paso Merchant-Gas, is a division of EPC, not a separate company. Therefore, any actions of El Paso Merchant are direct actions of EPC. As an act in furtherance of the 1996 conspiracy, EPC caused El Paso Merchant-Gas to enter into an intra-corporate transaction with EPNG to acquire 35-40% of the capacity on the EPNG pipeline, the principal transporter of natural gas to Southern California (Complaint at para 159-166). *Vons Companies v. Seabest Foods,* 14 Cal.4th 434 (1996).

**\*2** Additionally, jurisdiction over a non-resident parent corporation is properly asserted here due to personal availment and agency. *Sonora Diamond Corp. v. Superior Court* 83 Cal.App.4th 523 (2000)

### Northern California Case

**\*2** The Court takes judicial notice of each item requested to be so noticed by each party, pursuant to Ev.Code sections 451 and/or 452.

### V. The El Paso Defendants' Demurrer

**\*2** El Paso's demurrer to each cause of action of the Northern California Complaint is overruled. The causes of action are properly alleged and none of them is barred by either the Supremacy Clause, the Filed Rate Doctrine, or the *Copperweld* Doctrine. Nor should the Court abstain at this time under the

Primary Jurisdiction Doctrine.

**\*2** These causes of action are neither completely preempted by the U.S. Constitution nor any federal law. Congress has not shown an intent to preempt the field and the state antitrust and unfair competition causes of action do not conflict with federal law.

**\*2** The Filed Rate Doctrine does not pertain. Plaintiffs do not challenge a Filed Rate approved by the FERC but rather allege a conspiracy by Defendants which violated state antitrust and unfair competition laws, thereby causing damages to Plaintiffs through exorbitant rates charged California consumers.

**\*2** The *Copperweld* doctrine *(Copperweld v. Independence Tube Corp. (1984) 467 U.S. 752)* is not applicable at the demurrer stage. Whether or not there exists a complete unity of interest among the alleged conspirators is a factual question. Additionally, Plaintiffs have not alleged the conspiracy occurred solely within the El Paso corporate family. The complaint contains allegations certain Plaintiffs are coerced innocent parties who may be considered part of the combination. *McManus v. A.E. Realty Partners* 119 Cal.App.3d 1106 (4th App.Dist.1987). Finally, because El Paso Pipeline and El Paso Merchant are required by law to vigorously compete, any combination to restrain trade would not be immunized by *Copperweld.*

### VI. El Paso Defendants' Motion to Strike

**\*3** The El Paso Defendants' Motion to Strike is denied for the same reasons their motion in the Southern California case was denied. To the extent Plaintiffs can prove their allegations they may be entitled to damages, restitution or disgorgement. Additionally, the monopolization cause of action is not stricken because California courts have recognized that monopolization and attempted monopolization are against public policy and prohibited at common law. *Burdell v. Grandi 152 Cal. 376 (1907).* California also recognizes the existence of the common law "business tort" of monopolization, separate and apart from statutory claims arising under the Cartwright Act. *Exxon Corp. v. Superior Court* 51 Cal.App.4th 1672 (1997). Finally, the tying allegation is not stricken because such a claim may be based on allegations of bundling a commodity and a service. *Marin County Bd. of Realtors v.. Palsson* 16 Cal.3d 920 (1976).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31570296 (Cal.Superior), 2003-1 Trade Cases P 73,959
**(Cite as: Not Reported in Cal.Rptr.2d)**

VII. El Paso Defendants' Motion to Quash Service

**\*3** El Paso Corporation's Motion to Quash Service is denied. Plaintiffs have alleged sufficient facts and produced adequate evidence to demonstrate both special and general jurisdiction is proper over El Paso Corporation.

VIII. Defendant Coral Energy Resources, L.P.'s demurrer

**\*3** Defendant Coral Energy's demurrer to the Complaint is sustained with fifteen (15) days leave to amend, if able, to allege a viable cause of action. CCP 430.10(e). At present, Dry Creek has no standing and is not the real party in interest to assert either a breach of contract cause of action, or breach of the implied covenant of good faith and fair dealing, concerning the Agreement, Ex. A to the Complaint, between Gallo Glass and Coral Energy Resources L.P.. Additionally, no predicate acts are alleged by Coral Energy in the 7th c/a, violation of section 17200.

IX. DEFENDANT CORAL ENERGY RESOURCES, L.P.'S MOTION TO STRIKE

**\*3** The ruling sustaining Defendant Coral Energy's demurrer to the complaint with leave to amend moots the motion to strike.

X. Defendant Coral Energy Resources, L.P.'s Motion to Transfer/Bifurcate

**\*3** Coral's unopposed motion to bifurcate is granted. Both Plaintiffs and Coral have agreed bifurcation is appropriate. Provided a new complaint is filed alleging viable causes of action, the Court retains jurisdiction over them to determine issues regarding transfer and timing of any trial. CRC 1541(b)(1), (2), and/or (3); 1543(a) and (b).

Cal.Superior,2002.
In re Natural Gas Anti-Trust Cases, Cases I, II, III, & IV
Not Reported in Cal.Rptr.2d, 2002 WL 31570296 (Cal.Superior), 2003-1 Trade Cases P 73,959

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.