# TAB 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**



IN RE OSB ANTITRUST LITIGATION          )
                                        )
                                        )
                                        )    Master File No.  06-826 (PSD)
                                        )
THIS DOCUMENT RELATES TO:               )
ALL ACTIONS                             )
                                        )
                                        )    JURY TRIAL DEMANDED
                                        )

## O R D E R

AND NOW, this 25th day of September, 2006, upon consideration of Defendants'

Motion to Dismiss The Consolidated Class Action Complaint (Doc. No. 127), Indirect Purchaser

Plaintiffs' Response to Defendants' Motions to Dismiss and for Summary Judgment (Doc. No.

146-1), Defendants' Reply Memorandum in Support of Defendants' Motion to Dismiss The

Consolidated Amended Class Action Complaint (Doc. No. 156), and any related submissions, it

is Ordered as follows:

**State Law Claims**

1.      The parties have failed to cite any clear authority respecting whether California,

the District of Columbia, or New Mexico permit claims by indirect purchaser plaintiffs.

Accordingly, Defendants' motion to dismiss the following state law claims is **DENIED without**

**prejudice**: California Business and Professions Code §17200, *et seq.* (2006); D.C. Code §28-

3904 (2006); N.M.S.A. Stat. §57-12-3 (2006). Defendants may renew their motion at summary

judgment.

100754
Electronically Received
ZHVMG

September 26 2006
File No. #: 3-360-0001

2.      In their motion to dismiss Plaintiffs' claim under Massachusetts Consumer Protection Act, G.L.C. 93A (2006), Defendants address §11 of the Act. Plaintiffs have brought their claim under §9 of the Act, however. Defendants' arguments and citations are therefore inapposite. Accordingly, Defendants' motion to dismiss this claim is **DENIED**.

3.      In their motion to dismiss, Defendants address Plaintiffs' claim under New York General Business Law addresses §340, the Donnelly Act. Plaintiffs have brought their claim not under the Donnelly Act, however, but under §349. NY CLS Gen. Bus. §349 (2006). Defendants' arguments and citations are therefore inapposite. Accordingly, Defendants' motion to dismiss this claim is **DENIED**.

4.      Defendants have moved to dismiss Plaintiffs' claim brought under Mississippi Code §75-21-3 (2006), arguing that the statute requires that conspiratorial conduct be carried out entirely within the state of Mississippi. The authority cited in the parties' briefs is less than clear. The only Court to address the issue in any substantial way held that plaintiffs in a Mississippi antitrust action must allege "at least *some* conduct by [the defendants] which was performed wholly intrastate." In re Microsoft Corp. Antitrust Litigation, 2003 WL 22070561, at *2 (D. Md. 2003). The court did not, however, specify the extent of the conduct necessary to satisfy this standard. In the absence of clear authority, I cannot say that Plaintiffs' allegations do not indicate sufficient intrastate conduct to survive a motion to dismiss. Accordingly, Defendants' motion to dismiss this claim is **DENIED**.

5.      Defendants have moved to dismiss Plaintiffs' claim under the "catch-all" provision of Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-2(4)(xxi) (UTPCPL). Defendants argue that the statute requires Plaintiffs to plead all the

-2-

elements of fraud, including justifiable reliance. Plaintiffs contend that recent Pennsylvania state court decisions have dispensed with the requirement to plead justifiable reliance as part of a fraud claim.

6.    The Third Circuit recently held that Pennsylvania state court decisions require plaintiffs to plead justifiable reliance in connection with UTPCPL claims. See Tran v. Metropolitan Life Insurance Co., 408 F.3d 130, 141 (3d Cir. 2005). Plaintiffs have not done so. Accordingly, Defendants' motion to dismiss this claim is **GRANTED**. Plaintiffs' claim under the UTPCPL is **DISMISSED with prejudice**.

**Standing**

7.    Defendants argue that the named Plaintiffs lack standing to assert claims based on state laws if they are not residents of those particular states. To establish standing, Plaintiffs must allege actual injury, traceable to Defendants' allegedly wrongful action, that will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Plaintiffs have satisfied the elements of standing: they have alleged a concrete economic injury, traceable to Defendants' alleged conspiracy, that may be remedied by a judgment in Plaintiffs' favor. The remaining issue is whether named plaintiffs who do not reside in the challenged states, but who nonetheless were injured by Defendants' alleged conduct, may bring claims on behalf of residents of those states. This is a question of whether named Plaintiffs may properly represent the purported class, not whether they have standing to bring their claims in the first instance. Accordingly, Defendants' motion to dismiss on this basis is **DENIED**. Defendants may renew their standing arguments at the class certification stage.

**Unjust Enrichment**

8.    Defendants have moved to dismiss Plaintiffs' unjust enrichment claims brought under the laws of "all" jurisdictions except Iowa. *See Defendants' Reply Memorandum, at 12.* In their briefs, however, both parties offer coherent argument respecting only the case law of Florida, New York, North Carolina, and Pennsylvania. Accordingly, I will consider only these claims.

9.    Florida law does not permit indirect purchaser plaintiffs to recover under a theory of unjust enrichment. See Nova Information Systems, Inc. v. Greenwich Ins. Co., 2002 WL 32075792, at *10 (M.D. Fla. 2002) ("Plaintiff's claim of unjust enrichment fails because Plaintiff did not confer any direct benefit upon Defendants."). Accordingly, Plaintiffs' claim for unjust enrichment under Florida law is **DISMISSED with prejudice.**

10.    The parties have failed to cite any clear authority respecting whether New York law permits indirect purchaser plaintiffs to recover in unjust enrichment. Compare Jet Star Enterprises, Ltd. v. Soros, 2006 WL 2270375, at *5 (S.D.N.Y. 2006) ("To succeed on a claim for unjust enrichment ... plaintiff must have had direct dealings or some sort of quasi-contractual relationship with each defendant) with Cox v. Microsoft Corp., 8 A.D.3d 39, 40-41 (N.Y. App. Div. 2004) ("[Indirect purchaser] plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment.") and Manufacturers Hanover Trust Co. v. Chemical Bank, 160 A.D.2d 113, 117 (N.Y. App. Div. 1990) ("It does not matter whether the benefit is directly or indirectly conveyed."). Accordingly, Defendants' motion to dismiss Plaintiffs' claim for unjust enrichment under New York law is **DENIED.**

11.     North Carolina law permits indirect purchaser plaintiffs to recover on a theory of unjust enrichment. See Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 Fed.Appx. 916, 921 (4th Cir. 2003) ("Under North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction."). Accordingly, Defendants' motion to dismiss Plaintiffs' unjust enrichment claim under North Carolina law is DENIED.

12.     Under Pennsylvania law, indirect purchaser plaintiffs may not recover on a theory of unjust enrichment. Stutzle v. Rhone-Poulenc S.A., 2003 WL 22250424, at *1 (Pa. Com. Pl. 2003) ("To state a claim for unjust enrichment, the plaintiffs must allege that they conferred a benefit on the defendant, that defendant appreciated the benefit under the circumstances and that the defendant accepted and retained the benefit without payment for value."). Because indirect purchaser plaintiffs by definition have "no direct dealings with defendants ... any unjust enrichment claim would belong to the direct purchasers, not to indirect purchasers." Id. Accordingly, Plaintiffs' unjust enrichment claim under Pennsylvania law is DISMISSED with prejudice.

**Fraudulent Concealment**

13.     Defendants have moved to dismiss Plaintiffs' claims under the laws of the District of Columbia, Kansas, Mississippi, North Carolina, Tennessee, and Wisconsin, on the ground that Plaintiffs have not adequately pled fraudulent concealment under Fed. R. Civ. P. 9(b) to toll the statute of limitations in these jurisdictions. The Third Circuit requires plaintiffs to plead fraudulent concealment with particularity, except where "factual information is peculiarly within

the defendant's knowledge or control." In re Craftmatic Securities Litigation, 890 F.2d 628, 645 (3d Cir. 1989). The Craftmatic Court did not specify what type of factual information is generally regarded as "peculiarly within the defendant's knowledge or control," nor the degree of particularity required under Rule 9(b). Plaintiffs have not alleged that information that would have alerted them to Defendants' allegedly conspiratorial actions was "peculiarly within the defendant's knowledge or control."

14.     Nevertheless, other courts in this Circuit addressing this issue have held that "the fraud may be self-concealing or the conspiracy of such a character that its successful operation conceals itself." Pennsylvania v. Milk Industry Mgm't Corp., 812 F.Supp. 500, 504 (E.D.Pa. 1992). See also Bethlehem Steel Corp. v. Fischbach & Moore, Inc., 641 F.Supp. 271, 274 (E.D.Pa. 1986); In re Mercedes-Benz Anti-Trust Litigation, 157 F. Supp. 2d 355, 369 (D.NJ. 2001) (finding a single allegation of an affirmative act of concealment sufficiently particular to survive a Rule 12(b)(6) motion to dismiss). Plaintiffs have alleged that Defendants entered into a "successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing." *Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint, at ¶ 185.* Plaintiffs have further alleged that Defendants employed "secret and surreptitious communications by use of the telephone or in-person meetings, covert signals, intentional avoidance of written records and misrepresentations to customers falsely attributing price increases to competitive factors." *Id., at ¶ 188.* Construing these factual allegations in the light most favorable to Plaintiffs, I cannot say that Plaintiffs' claim does not survive a Rule 12(b)(6) motion under the Craftmatic standard. Accordingly, Defendants' motion to dismiss Plaintiffs' fraudulent concealment claim is **DENIED without prejudice.** Defendants may renew the

motion at summary judgment.

AND IT IS SO ORDERED.

Paul S. Diamond, J.

# TAB 17



Not Reported in F.Supp.2d                                                                                            Page 1
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
In re Wellbutrin SR Antitrust LitigationE.D.Pa.,2006.
United States District Court,E.D. Pennsylvania.
In re WELLBUTRIN SR ANTITRUST
LITIGATION
SHEET METAL WORKERS LOCAL 441 Health
and Welfare Plan, et al.
v.
GLAXOSMITHKLINE, PLC, et al.
MEDICAL MUTUAL OF OHIO, INC.
v.
GLAXOSMITHKLINE PLC and Smithkline
Beecham Corp.
**No. Civ.A. 04-5525, Civ.A. 04-5898, Civ.A. 05-396.**

March 9, 2006.

Daniel E. Gustafson, Heins Mills & Olson,
Minneapolis, MN, Dianne M. Nast, Roda & Nast,
PC, Lancaster, PA, Arnold Levin, Fred S. Longer,
Levin, Fishbein, Sedran & Berman, Philadelphia, PA,
Joseph H. Meltzer, Schiffrin and Barroway, L.L.P.,
Radnor, PA, Joshua H. Grabar, Bolognese &
Associates, LLC, Philadelphia, PA, Ann D. White,
Ann D. White Law Offices, P.C., Jenkintown, PA, E.
McCord Clayton, Philadelphia, PA, John W. Turner,
Neal S. Manne, Susman Godfrey LLP, Dallas, TX,
Mark D. Fischer, Mark M. Sandmann, Rawlings &
Assoc., Louisville, KY, Shawn Jonathan Rabin,
Dallas, TX, William C. Carmody, William
Christopher Carmody, P.C., Dallas, TX, for
Plaintiffs.
Amy R. Mudge, Cathy A. Hoffman, David P. Gersch,
Kenneth A. Letzler, William J. Baer, Arnold & Porter
LLP, Washington, DC, Timothy A. Thelen, Triangle
Park, NC, Angela Kweon, Leslie E. John, Mark
Steven Stewart, Ballard Spahr Andrews & Ingersoll
LLP, Philadelphia, PA, for Defendants.
H. Holden Brooks, Arnold & Porter, Washington,
DC, for Plaintiffs and Defendants.

*MEMORANDUM AND ORDER*
KAUFFMAN, J.
**\*1** THIS DOCUMENT RELATES TO: ALL
ACTIONS

**\*1** The Motion to Dismiss now before the Court
concerns four distinct actions: *SAJ Distributors, Inc.
v. Smithkline Beecham* (04-Cv-5525), *Meijer, Inc. v.*

*Glaxosmithkline PLC* (04-Cv-5643), *Sheet Metal
Workers Local 441 Health & Welfare Plan v.
Glaxosmithkline PLC* (04-Cv-5898) and *Medical
Mutual of Ohio, Inc. v. Glaxosmithkline PLC* (05-Cv-
396). In each of those actions, Plaintiffs allege that
Defendants Glaxosmithkline and its subsidiary
Smithkline Beecham Corporation (together "GSK")
have acted unlawfully to block the marketing of
generic versions of GSK's depression drug
Wellbutrin SR, in violation of federal antitrust laws.

**\*1** *SAJ Distributors, Inc. v. Smithkline Beecham* and
*Meijer, Inc. v. Glaxosmithkline PLC* [FN1] are putative
class actions, both brought on behalf of a class of
direct purchasers, a term which the complaints define
as "all persons or entities in the United States that
purchased Wellbutrin SR directly from GSK during
the period of January 24, 2002 to a date to be
determined." *See* Class Action Complaint (04-Cv-
5525) ("the Saj Complaint") ¶ 108. *Sheet Metal
Workers Local 441 Health & Welfare Plan v.
Glaxosmithkline PLC* is also a putative class action;
the plaintiffs therein, however, seek to represent the
class of "indirect purchasers," which is defined as
"all persons and entities in the United States who, at
any time from July 1, 2001 to the present purchased
Wellbutrin SR, Zyban and/or their generic
equivalents in the United States for purposes other
than resale." *See* Class Action Complaint (04-Cv-
5898) (the "Sheet Metal Complaint") ¶ 21. In the
final action, *Medical Mutual of Ohio, Inc. v.
Glaxosmithkline PLC,* the plaintiff is a "third-party
payor for Wellbutrin SR." *See* Plaintiff's Original
Complaint (05-Cv-396) (the "Medical Mutual
Complaint") ¶¶ 7-8.

> FN1. These actions have been consolidated.
> *See SAJ Distributors, Inc. v. Smithkline
> Beecham,* No. 04-5525 (E.D.Pa. Jan. 27,
> 2005).

**\*1** Now before the Court is GSK's Motion to Dismiss
the Complaints. For the reasons that follow, the
Motion will be granted in part and denied in part.

I. BACKGROUND

**\*1** These actions arise from GSK's efforts to use
certain patents it has obtained to prevent its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

competitors from marketing generic versions of the depression drug <u>Wellbutrin</u>. Accepting the allegations of the Complaints as true, the pertinent facts are as follows.

### A. GSK's <u>Bupropion</u> Patents

**\*1** GSK's predecessor secured the first of the <u>Wellbutrin</u> patents, which was issued as <u>U.S. Patent No. 3,819,706 (the " '706 Patent")</u>, in 1974. That patent was for a substance known as <u>bupropion</u> hydrochloride ("<u>bupropion</u>"), which was known to act as an antidepressant. Sheet Metal Complaint ¶ 45. Medical Mutual Complaint ¶ 25. In the mid-1980's, the United States Food & Drug Administration ("FDA") granted GSK's predecessor <sup>FN2</sup> approval to manufacture, market and sell <u>bupropion</u> under the brand name <u>Wellbutrin</u>. Sheet Metal Complaint ¶ 46. <u>Wellbutrin</u> was designed to release more than 75 percent of the <u>bupropion</u> contained in each tablet within approximately forty-five minutes of ingestion. For that reason, it was generally prescribed to be taken three to four times per day. <u>Id.</u> ¶ 47.

> FN2. The Court will refer to GSK' predecessor and GSK interchangeably.

**\*2** The <u>'706 Patent</u> expired in mid-1991. Soon thereafter, GSK developed a sustained release version of <u>bupropion</u>, which uses an excipient known as hydroxypropyl methylcellulose ("HPMC") to issue the <u>bupropion</u> into the gastrointestinal tract at sustained intervals <sup>FN3</sup> This sustained release mechanism reduces the number of doses necessary, such that a typical user of the sustained release <u>bupropion</u> need only take one or two doses per day. <u>Id.</u> ¶ 49.

> FN3. An excipient is a usually inert substance used as a vehicle for a drug.

**\*2** In August 1993, GSK filed an application with the United States Patent and Trademark Office ("PTO") seeking patent protection for the sustained release bupropion tablets it had developed. <u>Id.</u> ¶ 50. The application was rejected. The patent examiner found that the claim for patent protection was overly broad insofar as it would have covered any sustained release mechanism for <u>bupropion</u>. The patent claims, he wrote, needed to be limited to the specific sustained release agent GSK's predecessor had

developed: HPMC. <u>Id.</u> ¶ 52. In response to the PTO's objections, GSK amended its claims "to recite that the tablet required HPMC." <u>Id.</u> ¶ 53. Once these amendments were made, the PTO issued a Notice of Allowability indicating that "the PTO's previous rejection of the claims would be withdrawn based on the addition of the HPMC limitation." <u>Id.</u> ¶ 57.

**\*2** On June 27, 1995, the PTO issued to GSK <u>Patent No. 5,427,798 (the " '798 Patent")</u> which was entitled "Controlled sustained release tablets containing <u>bupropion</u>." <u>Id.</u> ¶ 58. Plaintiffs allege that at the time the limiting amendments to the patent claims were made, GSK was aware of the existence of other excipients capable of administering <u>bupropion</u> on a sustained release basis, including <u>hydroxypropyl cellulose</u> ("HPC") and polyvinyl alcohol ("PVA"). <u>Id.</u> ¶ 64.

**\*2** In October 1996, the FDA granted final approval for <u>Wellbutrin</u> SR, the sustained release version of <u>Wellbutrin</u>. <u>Id.</u> ¶ 66. In mid-1997, GSK brought <u>Wellbutrin</u> SR to market. Several months later, GSK also began marketing <u>Zyban</u>, which is chemically identical to <u>Wellbutrin</u> SR, but marketed for smoking cessation rather than depression.<sup>FN4</sup> <u>Id.</u> ¶¶ 2, 67.

> FN4. Defendant has assigned the two drugs different names purely for marketing purposes. For the twelve months ending June 30, 2002, domestic sales of Wellbutrin SR generated revenues in excess of $1.3 billion. Domestic sales of Zyban were $83 million for the same period.

### B. Attempts to Bring Generic Versions of <u>Wellbutrin</u> to Market

**\*2** Ordinarily, a company wishing to market a new drug must seek the approval of the FDA by completing a New Drug Application ("NDA"). However, the enactment of the Drug Price Competition and Patent Term Restoration Act in 1984 (the "Hatch-Waxman Act" or the "Act") carved out an exception to that general rule for manufacturers seeking to market generic drugs. Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, codified at <u>21 U.S.C. § 355(j)</u>. Under <u>21 U.S.C. § 355(j)</u>, a generic company may file an Abbreviated New Drug Application ("ANDA") which relies on the FDA's previous findings of safety and efficacy. The applicant must include in the ANDA a certification that the proposed generic drug would not infringe existing valid patents

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by its manufacture, use, or sale. 21 U.S.C. § 355(j)(2)(A)(vii). If the generic applicant claims that a relevant patent is invalid or will not be infringed by its product, it must so certify to the FDA and notify the patent-holder. 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (commonly known as "paragraph IV certification"); 21 U.S.C. § 355(j)(2)(B)(I). The patent-holder then has forty-five days within which to bring a patent infringement suit against the applicant. If the patent-holder brings such a suit, the FDA's approval of the ANDA is automatically delayed for thirty months or until the patent is declared invalid or not infringed ("30-month stay"). 21 U.S.C. § 355(j)(5)(B)(iii).

**\*3** Additionally, the Act provides a significant incentive to generic-drug manufacturers who file the first ANDA ("first filer"): a 180-day period of market exclusivity before subsequent ANDA filers can enter the market. 21 U.S.C. § 355(j)(5)(B)(iv). The 180-day period begins to run when the first filer commercially markets the generic drug or when the court declares the existing patent invalid. *Id.*

**\*3** Beginning in August 1999, several generic-drug manufacturers, including Andrx Pharmaceuticals ("Andrx"), Eon Labs ("Eon"), Impax Laboratories ("Impax"), Excel Pharmaceuticals ("Excel") and Watson Laboratories ("Watson") sought approval to market generic versions of Wellbutrin SR. Each company filed an ANDA pursuant to 21 U.S.C. § 355(j) and gave GSK notice of its intention to introduce a generic version of Wellbutrin SR. GSK's response was the same in each case: it filed a patent infringement suit, thus triggering the 30-month stay of the FDA's approval of the ANDAs. The effect of that stay was to allow GSK to maintain its monopoly over Wellbutrin SR until either the 30 month period had expired or the generic drug manufacturer obtained a judgment of non-infringement.

### C. The Underlying Infringement Suits

**\*3** GSK pursued the Eon and Impax infringement suits simultaneously.[FN5] The issues in the two cases were virtually identical, as both the Eon and Impax drugs used the same excipient-HPC-as a release mechanism. Both Eon and Impax filed summary judgment motions in their respective cases. Eon's motion was decided first: on August 13, 2002, the district court issued a memorandum and order denying summary judgment on the grounds that GSK had raised a genuine issue of fact as to "the foreseeability of HPC as a sustained release agent." *Glaxo Wellcome. Inc. v. Eon Labs Mfg., 2002 WL*

1874831, at \*5 (S.D.N.Y. Aug.13, 2002). Just over a week later, the district court hearing the Impax case reached the opposite result-that Impax was entitled to summary judgment. *Glaxo Wellcome, Inc. v. Impax Laboratories. Inc.,* 220 F.Supp.2d 1089 (N.D.Cal.2002). GSK subsequently appealed the adverse judgment to the Federal Circuit.

> FN5. For standing reasons, Plaintiffs' claims are based only on the Eon and Impax actions.

**\*3** In November 2003, while the Impax appeal was pending before the Federal Circuit, Eon announced that it was taking steps to bring its generic version of Wellbutrin SR to market, a move which was now possible because the thirty-month stay triggered by GSK infringement action had expired. GSK responded by moving for a Temporary Restraining Order ("TRO"), which was granted on November 26, 2003, and then extended on December 12, 2003. *See Glaxo v. Eon,* No. 00-9089 (S.D.N.Y. Nov. 26, 2003) and (S.D.N.Y. Dec. 12, 2003) (attached as Exhs. 24 and 25 to GSK's Memorandum in Support of Motion to Dismiss ("GSK's Memo")). While the TRO was still in place, the district court held a bench trial. At the conclusion of the trial, the district court converted the TRO into a preliminary injunction. *Id.* No. 00-9089 (S.D.N.Y. Dec. 29, 2004). Several days later, Eon moved to stay the injunction, which the district court denied on January 7, 2004. The court explained that it was keeping the injunction in place in order to "preserve the status quo," i.e., GSK's monopoly over Wellbutrin SR, until the court was able to render a final decision on the merits. *See Id.,* No. 00-9089 (S.D.N.Y.) (trial tr. Jan. 7, 2004 at 17-19).

**\*4** Eon immediately appealed the preliminary junction to the Federal Circuit. The turnaround was short. On January 12, 2004, the Federal Circuit entered an Order staying the preliminary injunction. *Eon,* App. No. 04-1169 (Fed.Cir. Jan. 12, 2004) (attached as Exh. 28 to GSK's Memo). Eon promptly began shipping its product.

**\*4** On January 29, 2004, the Federal Circuit decided GSK's appeal in the Impax case. As noted above, the district court in that case had granted Impax summary judgment. The Federal Circuit affirmed that decision. *See Glaxo Wellcome, Inc. v. Impax Labs., Inc., 356 F.3d 1348 (Fed.Cir.2004).* The Federal Circuit's decision against GSK in *Impax* had an obvious bearing on proceedings in the Eon matter, where the issues were nearly identical. Recognizing this, GSK

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
**(Cite as: Not Reported in F.Supp.2d)**

voluntarily dismissed the Eon action. The dismissal took place before the trial judge rendered a decision on the merits.

### D. *The '994 Patent*

**\*4** GSK obtained U.S. Patent No. 4,687,660 (the " '660 patent") on August 18, 1987. Saj Complaint ¶ 28. At some point thereafter, the '660 patent was "being reexamined in response to the discovery of two prior art patents that, when combined" rendered the '660 patent unpatentable. *Id.* ¶ 80. In order to preserve its monopoly over the subject matter of the '660 patent, GSK applied to have the patent reissued.[FN5] It succeeded and on July 14, 1992, the '660 patent was reissued as U.S. Patent No. RE33,994 ("the '994 patent"). *Id.* ¶ 28. The reissued patent "was drawn to pharmaceutical compositions that resulted in a controlled release of bupropion in a simulated gastric buffer. The Saj complaint alleges that GSK fraudulently misrepresented facts material to patentability to obtain the '994 patent." *Id.* ¶ 76.

> FN6. A reissue patent examination is conducted when requested by the patent holder to remedy a defect in the patent that makes it fully or partially inoperative or invalid. Saj Complaint ¶ 78.

### E. *The Present Lawsuit*

**\*4** The gravamen of Plaintiffs' Complaints is that GSK's infringement lawsuits constituted sham litigation in violation of state and federal antitrust laws. They contend that the lawsuits were frivolous, that GSK knew they were frivolous, and that GSK used the litigation to unlawfully extend its monopoly for the period of the stay.[FN7] To that end, Plaintiffs have brought an assortment of federal and state law claims. The Saj Complaint alleges violations of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (the "Sherman Act"). The Sheet Metal Complaint seeks injunctive and declaratory relief under § 16 of the Clayton Antitrust Act, 15 U.S.C. § 26 (the "Clayton Act") for violations of § 2 of the Sherman Act (count one); in addition, it claims violations of state antitrust laws (count two), that GSK is liable for unfair and deceptive trade practices (count three), and unjust enrichment (count four). Finally, like the Sheet Metal Complaint, the Medical Mutual Complaint seeks injunctive relief under § 16 of the Clayton Act based on violations of § 2 of the Sherman Act (count one); it also claims violations of state antitrust laws (count

two) and state consumer fraud and unjust enrichment laws (count three).

> FN7. The Saj Complaint alone seeks relief based on GSK's allegedly fraudulent prosecution of the '994 patent.

**\*5** Defendants have moved to dismiss all the Complaints under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

### II. LEGAL STANDARD

**\*5** When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

### III. GSK'S IMMUNITY UNDER NOERR-PENNINGTON

**\*5** The central issue in this Motion to Dismiss is the applicability of the *Noerr-Pennington* doctrine (*"Noerr-Pennington"* ), which generally provides immunity from antitrust liability to those who petition the government for redress. This immunity serves to protect "from the Sherman [Antitrust] Act a concerted effort to influence public officials regardless of intent or purpose." *Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). GSK argues that its infringement suits qualify for *Noerr-Pennington* immunity and that Plaintiffs' antitrust claims, both state and federal, should be dismissed.

### A. *The Sham Exception to Noerr-Pennington*

**\*5** Plaintiffs acknowledge that lawsuits are ordinarily protected activity under *Noerr-Pennington,* but argue that the infringement actions at issue here are subject to an exception. The Supreme Court has established a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

"sham exception" to *Noerr-Pennington* immunity. "Activity 'ostensibly directed toward influencing government action' does not qualify for ... immunity if it 'is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor." ' *Professional Real Estate Investors. Inc. v. Columbia Pictures Industry, Inc.,* 508 U.S. 49, 51, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). Plaintiffs contend that the GSK patent infringement suits constitute "sham litigation" and thus fall under the exception.

**\*5** Accordingly, the Court must determine whether the GSK infringement suits were "protected activity" under *Noerr-Pennington* or whether, as Plaintiffs claim, they are subject to the "sham litigation" exception. *Professional Real Estate* is the key case discussing that exception. There, the Supreme Court set out a two-part test: the antitrust defendant's immunity gives way only if the plaintiff demonstrates that (1) the underlying lawsuit on which the antitrust suit is based is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits[;]" and (2) "the lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental *process*-as opposed to the outcome of that process-as an anticompetitive weapon[.]" 508 U.S. at 60-61 (emphasis in original) (quoting *Noerr,* 365 U.S. at 144 and *Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991)).

**\*6** The Court analogized the "objectively baseless" standard in the first prong of the test to the concept of "probable cause as understood and applied in the commonlaw tort of wrongful civil proceedings[.]" *Id.* at 62. "Probable cause to institute civil proceedings," the Court explained, "requires no more than a 'reasonable belief that there is a chance that a claim may be held valid upon adjudication[.]" ' *Id.* (quoting *Hubbard v. Beatty & Hyde, Inc.,* 343 Mass. 258, 262, 178 N.E.2d 485, 488 (1961)). Conversely, in order to overcome *Noerr-Pennington* immunity, the antitrust plaintiff must demonstrate that the defendant who brought the underlying suit could not have held such a belief. Thus, the first prong of the test, with its emphasis on the *reasonable* litigant, is concerned with the objective merits of the lawsuit at issue. The second prong, in contrast, focuses on the antitrust defendant's subjective intentions.

**\*6** GSK contends that Plaintiffs are unable to satisfy

the first prong of the test-that, in other words, they cannot establish that the Eon and Impax suits were objectively baseless. The question before the Court is thus whether GSK had probable cause to bring the infringement actions, i.e., whether it could reasonably have believed that its infringement claims might have been "held valid upon adjudication." *Id.*

### B. *The Probable Cause Determination*

**\*6** The answer to that question plainly depends on (1) the facts GSK faced when it filed the suits, (2) the governing legal principles, and (3) how those principles apply to the facts. *See Professional Real Estate,* 508 U.S. at 67 (Souter, J., concurring) (stating that the standard is whether "on the undisputed facts and the law as it stood when Columbia filed its suit, a reasonable litigant could realistically have expected success on the merits."); *Restatement (Second) of Torts § 675,* cmt. a (1977) ("[T]he claimant's mistaken belief in the possible validity of his claim may be a mistake as to the facts upon which the claim is based or a mistake as to the possible validity of his claim under the facts reasonably believed to exist.").

**\*6** Because this is a Motion to Dismiss, the Court must base the probable cause determination on the facts alleged in Plaintiffs' Complaints. That is, the Court must assume that the facts GSK confronted when it initiated the Eon and Impax cases are those Plaintiffs have alleged in the Complaints. GSK contends that the Court need not accept the allegations in the Complaints as true at this stage. It urges the Court to make factual findings that deviate from the allegations in the Complaints based on trial transcripts and opinions from the underlying infringement actions, of which, it argues, the Court may take judicial notice. *See* GSK's Memo at 24.

**\*6** GSK is correct that the Court may take judicial notice of the opinions filed in the underlying actions; however, the scope of that notice is subject to important limitations. The Court may take judicial notice only of the "existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426 (3d Cir.1999). The Court may *not,* however, make factual findings in this case based on the facts recited in the opinions of other courts. *Id.*

**\*7** It follows that for the purposes of this Motion to Dismiss, GSK cannot invoke the record in the underlying infringement actions to challenge factual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

allegations in the Complaints. The Court's probable cause analysis must therefore be based exclusively on the allegations in Plaintiffs' Complaints, regardless of whether those allegations are consistent with the factual findings of other courts. *Jarrow Formulas, Inc. v. Int'l Nutrition Co., 175 F.Supp.2d 296, 311 (D.Conn.2001)* ("Here, all that is required is that the complaint allege facts, which, if proven, show that the defendant is not entitled to *Noerr-Pennington* immunity under the sham litigation exception."); *Skinder-Strauss Assocs. v. Mass. Continuing Legal Educ., Inc., 870 F.Supp. 8, 10 (D.Mass.1994)* ("Because [the defendant's] counterclaims allege that the lawsuit filed by [the plaintiff] is objectively baseless and conceals an attempt to interfere directly with the business relationships of a competitor, the counterclaims adequately state a claim and should not be dismissed under Fed.R.Civ.P. 12(b)(6).")

**\*7** The next question in the probable cause inquiry is how those facts would have been analyzed under the governing law. The Court must, in other words, consider whether GSK could reasonably have believed that the facts as Plaintiffs have alleged them gave rise to a claim for infringement against Eon and Impax.

**\*7** It is thus necessary to examine GSK's theory of infringement. As noted above, GSK argued in the lawsuits that the Eon and Impax drugs infringed on the '798 patent. The '798 patent was limited to drugs that used the excipient HPMC as a release agent for bupropion. Because the Eon and Impax drugs employ a different excipient, HPC, as a release agent, GSK was foreclosed from claiming literal infringement. Instead, it was forced to rely on the doctrine of equivalents.

**\*7** The doctrine of equivalents is essentially an expansion of the intellectual property rights of a patent holder; it allows a claim not only for those ideas described by the literal terms of the patent, but any "equivalents" as well. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kbushiki Co., 535 U.S. 722, 732, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002)* ("Festo VIII"). An equivalent is a product or process developed by a would-be competitor of the patent-holder which makes "unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and [absent the doctrine of equivalents] outside the reach of law." *Graver Tank & Mfg. Co. V. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).*[FN8]

[FN8.] The Supreme Court has explained that estoppel doctrine is essential if patents are to serve their purpose of providing an incentive for innovation: "If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying." *Festo VIII, 535 U.S. at 732.*

**\*7** GSK argues that its infringement suits against Eon and Impax were not a sham because it had a good faith argument based on the doctrine of equivalents: namely, that while the Eon and Impax drugs do not literally infringe the '798 patent, they are equivalents to the claimed subject matter, and consequently infringe by equivalence.

**\*7** Plaintiffs, on the other hand, contend that GSK's reliance on the doctrine of equivalents is "objectively baseless." Their argument is rooted in a limitation to equivalence protection which courts have termed "the doctrine of prosecution history estoppel." The doctrine of prosecution history estoppel becomes relevant when a patent application fails to meet a statutory requirement for patentability, and is consequently rejected by the PTO. If "the patentee responds to the rejection by narrowing his claims, this prosecution history estops him from later arguing that the subject matter covered by the original, broader claim was nothing more than an equivalent." *Festo VIII, 535 U.S. at 727.* Here, Plaintiffs contend that GSK's decision to amend its original formulation of the '798 patent so as to narrow the claim to a drug that used HPMC as its sustained release mechanism estopped GSK from arguing for the "equivalence" of drugs like Eon's and Impax's, which deploy other sustained release agents. Accordingly, they argue, the doctrine of prosecution history estoppel would have proven an insuperable barrier to the Eon and Impax suits.

**\*8** GSK responds that the law governing prosecution history estoppel was unsettled at the time it filed the suits. The resulting ambiguity, it argues, left open the possibility that the narrowing amendments did not bar GSK from claiming the Eon and Impax drugs as equivalents. In order to test that assertion, the Court must examine the state of the law at the time GSK filed the infringement suits. During the 1980's and 1990's, the Federal Circuit articulated two competing and inconsistent rules as to the scope of the doctrine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

of prosecution history estoppel. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki,* 234 F.3d 558, 574 (Fed.Cir.2000) ("Festo VII") (acknowledging inconsistency). The more prevalent of the two was known as the flexible bar rule, according to which the doctrine of prosecution history estoppel extends only to subject matter the patent holder relinquished during the prosecution. Under that approach, a court would determine whether a patent holder is estopped from claiming his competitor's product as an equivalent by looking to the subject matter the patent holder surrendered when it adopted the narrowing amendments. If the competitor's product falls within the surrendered subject matter, estoppel applies. *See Litton Sys., Inc. v. Honywell, Inc.,* 140 F.3d 1449, 1455-57 (Fed.Cir.1998) (holding that "an estoppel only bars recapture of that subject matter actually surrendered during prosecution."); *Hughes Aircraft Co. v. United States,* 140 F.3d 1470, 1476-77 (Fed.Cir.1998) (holding that in order to determine the scope of the estoppel, there must be a determination as to the exact "subject matter the patentee actually surrendered.").

**\*8** The second approach, known as the "complete bar rule," treated a narrowing amendment adopted by the patent holder to act as a complete bar to claiming equivalents. *See, e.g., Kinzenbaw v. Deere Co.,* 741 F.2d 383, 391 (Fed.Cir.1984). That is, once the patent holder adopts the narrowing amendments, the patent is effectively limited to its literal terms and the patent holder may no longer claim infringement by equivalence.

**\*8** The Federal Circuit attempted to resolve the uncertainty with its decision in *Festo VII,* which expressly adopted the complete bar rule. *Festo VII,* 234 F.3d at 574. The flexible bar rule, it explained, was not workable and could not be consistently applied. The bright-line approach represented by the complete bar rule was the only feasible option. *Id.* The matter did not end there, however. The Supreme Court granted *certiorari,* and, on May 28, 2002, in a unanimous decision, reversed, holding that, despite the Federal Circuit's misgivings, the flexible bar rule is the correct approach. *See Festo VIII,* 535 U.S. 722, 737, 122 S.Ct. 1831, 152 L.Ed.2d 944 (holding that the estoppel doctrine's "reach requires an examination of the subject matter surrendered by the narrowing amendments."). Thus, held the Court, so long as the competitor's product falls within "the territory between the original claim and the amended claim[,]" the patent-holder is barred from bringing an infringement claim. *Id.* at 740.

**\*9** The law governing the application of the flexible bar rule, i.e., how a court determines what subject matter the patent holder's amendments surrender, has also undergone important changes. At the time GSK filed its infringement suits, "the standard for determining whether subject matter has been relinquished is whether one of ordinary skill in the art would objectively conclude from the prosecution history that an applicant surrendered it." *Litton Sys., Inc. v. Honywell, Inc.,* 140 F.3d 1449, 1462 (Fed.Cir.1998) (citing *Marl 1 Mktg. Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291 (Fed.Cir.1995)). Then, in *Festo VIII,* the Supreme Court provided new guidance on the question. It held that "the patentee bears the burden of showing that the amendment does not surrender the particular equivalent in question." 535 U.S. at 740. However, the patentee can rebut that presumption by establishing that one of the following situations applies: "The equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [is] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* at 740-41.

**\*9** As noted above, GSK's argument is that the changes in the law governing prosecution history estoppel show that at the time it filed the infringement suits, the law had not yet solidified to the point that it was clear that GSK was estopped from claiming the Eon and Impax drugs as equivalents. Uncertainty in the law by itself, however, is not sufficient to create probable cause. Rather, for probable cause to exist, the range of the uncertainty must extend far enough to render viable a legal rule that would allow the plaintiff to prevail. That is not the case here.

**\*9** GSK filed its infringement suit against Impax on September 28, 2000. Its suit against Eon was filed two months later on November 29, 2000, the same day that the *Festo VII* decision was announced. At that point, there was still some uncertainty as to whether the flexible bar rule or the complete bar rule was the governing law. Nevertheless, it was clear that, *at the very least,* the doctrine applied to all subject matter the patent holder had relinquished via narrowing amendments during prosecution. The only outstanding question was whether the scope of estoppel would reach further.

**\*9** Thus, at the time the suits were filed, any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

reasonable litigant would have understood that if the Eon and Impax drugs fell within the subject matter GSK relinquished by adopting the narrowing amendments, GSK would not be able to claim them as equivalents. The only remaining question therefore is whether by narrowing its claim in response to the patent examiner's objections, GSK surrendered the right to claim as equivalents tablets that used excipients other than HPMC to administer the <u>bupropion</u> over time.

**\*10** The facts Plaintiffs have alleged, which the Court must assume to be true for the purposes of this Motion, compel an affirmative answer to that question. According to the Complaints, GSK's initial patent application for sustained release bupropion was rejected for lack of enablement. The PTO examiner found that HPMC was "critical for the controlled and/or sustained release and should be incorporated into the independent claims. The disclosure of a single species does not provide a basis for disclosing a generic concept." *See* Sheet Metal Complaint at ¶ 52; Saj Complaint at ¶ 35; Medical Mutual Complaint at ¶ 33. The examiner's conclusion thus was that GSK was entitled to protection only for the specific means of achieving the sustained release bupropion that it had devised, namely the excipient HPMC. Sheet Metal Complaint ¶ 56. In response to the examiner's findings, GSK "submitted narrowing amendments to the patent examiner. These amendments narrowed the scope of the claims from covering all pharmaceutical means for achieving a specified release rate of bupropion to covering only HPMC, the single controlled release means divulged in the patent disclosure." *See* Saj Complaint at ¶ 37; Sheet Metal Complaint at ¶ ¶ 53-55.

**\*10** HPC, the excipient that the Eon and Impax generic drugs use to achieve sustained release, "had been recognized as a release controlling substitute excipient for HPMC since before the prosecution of the application that would issue as the ʼ798 patent." *See* Saj Complaint at ¶ 38. "GSK knew that HPC was a substitute for HPMC" when it agreed to the narrowing amendments. *See* Saj Complaint at ¶ 43; Sheet Metal Complaint at ¶ 64.

**\*10** These facts render immaterial the changes in the law governing how a court determines what subject matter a patent holder has surrendered during patent prosecution. Under both the Federal Circuit test that governed when the infringement suits were filed and the three factor test announced in *Festo VIII* that succeeded it, the allegations in the Complaints place the Eon and Impax drugs squarely within the relinquished subject matter.

**\*10** Accordingly, the Court finds that any reasonable litigant confronting the facts Plaintiffs have alleged at the time the infringement suits were filed would have concluded that GSK would be estopped from claiming infringement by equivalence. Without a viable argument for infringement by equivalence, GSK could not reasonably have expected success on the merits. Thus, for the purposes of this Motion to Dismiss, GSK's infringement actions against Eon and Impax must be considered objectively baseless.

### C. *The Effect of GSK's Limited Success in the Eon Suit*

**\*10** GSK also argues that regardless of whether the underlying infringement suits are objectively baseless under the facts Plaintiffs have alleged, the success GSK enjoyed in the Eon action precludes a finding that the infringement suits were objectively baseless. In effect, GSK is asking the Court to adopt a *per se* rule that any action which achieves a certain "measure of success"-in this case, surviving summary judgment motion and securing a preliminary injunction-is, as a matter of law, *not* "objectively baseless."

**\*11** To be sure, several courts appear to have adopted the rule GSK is proposing. *See, e.g., Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag,* 207 F.Supp.2d 221, 224 (S.D.N.Y.2002) (summary judgment denied and claims found not baseless because claims went unchallenged until trial); *Harris v. Custom Builkders, Inc. v. Hoffmeyer,* 834 F.Supp. 256, 261-62 (N.D.Ill.1993) (finding that an "action that is well enough grounded, factually and legally, to survive a motion for summary judgment is sufficiently meritorious to lead a reasonable litigant to conclude that they had some chance of success on the merits.")

**\*11** However, the controlling authority is the Federal Circuit, whose decisions govern "all antitrust claims premised on the bringing of a patent infringement suit." *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1069 (Fed.Cir.1998). Thus, it is to the Federal Circuit that the Court must look for guidance as to the merits of GSK's proposed *per se* rule, and the Federal Circuit has explicitly rejected it. In *Filmtec Corp. v. Hydranautics,* the panel held that the "court hearing the antitrust claim must make its own assessment of the objective merits of the predicate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

suit," regardless of how the case fared before the previous court. 67 F.3d 931, 937 (Fed.Cir.1995) (quoting *Boulware v. Nevada Dep't of Human Resources,* 960 F.2d 793, 799 (9th Cir.1992)). Thus, "preliminary success on the merits does not necessarily preclude a court from concluding that litigation was baseless." *Id.* at 938. *See also In re Relafen Antitrust Lit.,* 346 F.Supp.2d 349, 362-65 (D.Mass.2004) (holding that a plaintiff's surviving summary judgment does not prove as a matter of law that his case was not objectively baseless).

*11 Furthermore, the *per se* rule GSK proposes is inconsistent with *Professional Real Estate,* where the Court made clear that the "objectively baseless" determination depends on the reasonable expectations of the party alleged to have brought the frivolous suit. By employing the language of "expectations" the Court was indicating that the analysis should focus on what the litigant knew or reasonably could have known *at the time the suits were filed, not* on the results of the suits. *Professional Real Estate,* 508 U.S. at 61 n. 5. The analysis, in other words, must be prospective not retrospective, and therefore should be limited to the law and the facts as they existed when the decision to file suit was made. *Id.* at 67 (Souter, J., concurring) (stating that the standard is whether "on the undisputed facts and the law as it stood when Columbia filed its suit, a reasonable litigant could realistically have expected success on the merits."). Accordingly, the Court rejects GSK's proposed *per se* rule that the success it enjoyed in the Eon case precludes a finding that the action was objectively baseless.

### D. *Conclusion*

*12 Accepting the allegations of the Complaints as true, which the Court must do at this stage of the proceedings, GSK's Motion to Dismiss based on *Noerr-Pennington* immunity will be denied.

### IV. THE WALKER PROCESS CLAIMS

*12 The Saj Complaint claims an additional violation of the Sherman Act based on GSK's allegedly fraudulent prosecution of patent '994 (*"Walker Process* claim"). *See Walker Process Equip., Inc. v. Food Mach. And Chem. Corp.,* 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) ("[T]he enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2

are present."). GSK argues that that claim should be dismissed (1) because the Saj Complaint failed to plead the alleged fraud with the requisite particularity; and (2) for lack of standing.

*12 Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). In the Third Circuit, a plaintiff's complaint must set out the circumstances of the fraud with enough particularity to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984); *In re: Rockefeller Ctr. Prop., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir.2002). While providing allegations of "date, place or time" is one means of giving the defendant adequate notice, it is not exclusive. "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

*12 At oral argument, the Saj Plaintiffs conceded that in its current state, the Walker Process claim did not satisfy the requirements of Fed.R.Civ.P. 9(b). Accordingly, that claim will be dismissed without prejudice.

### V. INJUNCTIVE RELIEF

*12 The Medical Mutual and Sheet Metal Complaints do not seek damages for GSK's alleged violations of the Sherman Act, but only injunctive relief under § 16 of the Clayton Antitrust Act. They request that the Court enjoin Defendants from "engaging in future anticompetitive practices concerning the manufacture, distribution or sale of Wellbutrin SR and Zyban." *See* Medical Mutual Complaint ¶ 99; Sheet Metal Complaint ¶ 131.

*12 GSK argues that these claims should be dismissed because the Complaints fail to allege an antitrust injury cognizable under § 16 the Clayton Act. The Court agrees. "In order to seek injunctive relief under § 16 [of the Clayton Act], a private plaintiff must allege *threatened loss or damage* 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." ' *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158
(Cite as: Not Reported in F.Supp.2d)

*Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (emphasis added). Now that all the infringement suits have terminated in the generic companies' favor, there is no unlawful conduct to be enjoined. Accordingly, the Court finds that the Medical Mutual and Sheet Metal Plaintiffs have failed to allege a claim cognizable under § 16 of the Clayton Act. *See In re Relafen Antitrust Lit. .,* 221 F.R.D. 260, 274 (D.Mass.2004) (holding that antitrust plaintiffs were not entitled to injunctive relief for antitrust claim based on frivolous lawsuits where the suits had already been resolved since "it is difficult to imagine how [the alleged] violation might recur.").

### VI. CONCLUSION

**\*13** For the foregoing reasons, the Court will grant GSK's Motion to Dismiss with respect to the Walker Process Claims in the Saj Complaint and the claims under § 16 of the Clayton Act in the Sheet Metal and Medical Mutual Complaints, all without prejudice.[FN9] With respect to the remaining claims, GSK's Motion will be denied.

> FN9. Plaintiffs should generally be given an opportunity to amend claims dismissed pursuant to a 12(b)(6) motion unless such amendment would be "inequitable, futile, or untimely." *Alston v. Parker,* 363 F.3d 229, 236 (3d Cir.2004).

### *ORDER*

**\*13** AND NOW, this 9th day of March, 2006, upon consideration of Defendants' Motion to Dismiss (docket no. 23 in 04-Cv-5525, docket no. 8 in 04-Cv-5898, docket no. 16 in 05-Cv-396) and the responses thereto and for the reasons stated in the accompanying memorandum, it is ORDERED that the Motion is GRANTED in part and DENIED in part. It is FURTHER ORDERED that
**\*13** (1) The Walker Process claim in the Saj Complaint (04-5525) is DISMISSED WITHOUT PREJUDICE.
**\*13** (2) Count one in the Sheet Metal Complaint (04-5898) is DISMISSED WITHOUT PREJUDICE.
**\*13** (3) Count one in the Medical Mutual Complaint (05-396) is DISMISSED WITHOUT PREJUDICE.
**\*13** (4) GSK's Motion to Dismiss is DENIED as to all other counts.

E.D.Pa.,2006.
In re Wellbutrin SR Antitrust Litigation
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases P 75,158

Briefs and Other Related Documents (Back to top)

• 2006 WL 1760263 (Trial Pleading) Defendant's Answer to Plaintiffs' Consolidated and Amended Class Action Complaint (May 19, 2006) Original Image of this Document (PDF)
• 2006 WL 1760270 (Trial Pleading) Defendants' Answer to Plaintiffs' Class Action Complaint (May 19, 2006) Original Image of this Document (PDF)
• 2006 WL 1765476 (Trial Pleading) Defendants' Answer to Plaintiffs Original Complaint (May 19, 2006) Original Image of this Document (PDF)
• 2006 WL 1760262 (Trial Motion, Memorandum and Affidavit) Defendant Glaxosmithkline's Reply Memorandum of Law in Support of its Motion to Certify Order for Interlocutory Appeal and for Stay of Proceedings (May 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1760269 (Trial Motion, Memorandum and Affidavit) Defendant Glaxosmithkline's Reply Memorandum of Law in Support of its Motion to Certify Order for Interlocutory Appeal and for Stay of Proceedings (May 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1765472 (Trial Motion, Memorandum and Affidavit) Defendant Glaxosmithkline's Reply Memorandum of Law in Support of Its Motion to Certify Order for Interlocutory Appeal and for Stay of Proceedings (May 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1358151 (Trial Motion, Memorandum and Affidavit) Plaintiff Medical Mutual of Ohio's Memorandum in Opposition to Defendant's GlaxoSmithKline's Motion to Certify Order for Interlocutory Appeal and for Stay of Proceedings (Apr. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 1358213 (Trial Motion, Memorandum and Affidavit) Direct Purchaser Plaintiffs' Memorandum in Opposition to Defendant GlaxoSmithKline's Motion to Certify Order for Interlocutory Appeal and for Stay of Proceedings (Apr. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 1354840 (Trial Pleading) Consolidated and Amended Class Action Complaint (Apr. 6, 2006) Original Image of this Document (PDF)
• 2:05cv00396 (Docket) (Jan. 28, 2005)
• 2:04cv05898 (Docket) (Dec. 17, 2004)
• 2:04cv05525 (Docket) (Nov. 30, 2004)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 616292 (E.D.Pa.), 2006-1 Trade Cases  P 75,158
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

• <u>2004 WL 3122728</u> (Trial Pleading) Class Action Complaint (2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 18



Not Reported in F.Supp.                                                              Page 1

Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

▷

**Motions, Pleadings and Filings**

United States District Court, N.D. California.
In re WORLDS OF WONDER SECURITIES LIT-
IGATION.
**No. C 87 5491 SC.**

March 23, 1990.

Opinion

CONTI, Senior District Judge.

I. Introduction

**\*1** Plaintiffs move this court for a class certification
pursuant to Fed.R.Civ.P. 23 in this action for federal
securities laws violations and state law claims.
Plaintiffs seek certification of a plaintiff class, ex-
clusive of Defendants, comprising persons who pur-
chased securities of Worlds of Wonder, Inc.
("WOW"), during the period from June 20, 1986,
through November 9, 1987, inclusive (the "Class
Period"). Within this primary class, Plaintiffs seek
certification of two subclasses: Subclass One to
comprise class members who purchased WOW com-
mon stock; and Subclass Two to comprise class
members who purchased WOW 9% convertible sub-
ordinated debentures due in the year 2012
("Debentures").

Plaintiffs [FN1] Third Amended and Consolidated
Complaint (the "Complaint") pleads claims against
WOW, its directors and certain of its senior officers
[FN2] its venture capitalists, [FN3] its auditor, [FN4]
its underwriters, [FN5] and its investment banker.
[FN6] The Complaint alleges that Defendants pur-
sued a common course of conduct in knowingly or
recklessly making false and misleading statements,
while omitting material adverse facts, about WOW's
earnings, assets, revenues, inventories, financial con-
dition, and business prospects in public financial
statements and prospectuses disseminated during the
Class Period. [FN7]

II. Background

On June 20, 1986, WOW offered 6,000,000 shares of
common stock in a Initial Public Offering ("IPO")
which was underwritten by defendants Smith Barney
and Dean Witter. Complaint ¶ 35. WOW made
several post IPO public statements regarding its fin-
ancial condition and prospects. Complaint ¶¶ 40,
46(a), 52(a), 46(c), 51(a), 66. On June 4, 1987,
WOW offered $80 million of the Debentures pursu-
ant to a registration statement and a prospectus.
Complaint ¶ 53. [FN8] On November 9, 1987,
WOW announced that it had suffered a net loss of
$53.5 million for the prior six months. Complaint ¶
77. In December WOW defaulted on its first interest
payment to the Debenture holders and on December
21, 1987, WOW filed for bankruptcy. Complaint ¶¶
78, 79.

III. Discussion

Before discussing the merits of this motion, two pre-
liminary comments are in order. First, the court
notes that class actions commonly arise in securities
fraud cases as the claims of separate investors are of-
ten too small to justify individual lawsuits, making
class actions the only efficient deterrent against se-
curities fraud. *Harris v. Palm Springs Alpine Estates*
*Inc.*, 329 F.2d 909, 913 (9th Cir.1964). Accordingly,
the Ninth Circuit and courts in this district hold a lib-
eral view towards class actions in securities litigation.
*See In Re Activision Securities Litigation,* 621
F.Supp. 415, 428 (N.D.Cal.1985). Second, the is-
sues in a class certification motion are of a limited
and transient nature. A district court must not con-
sider the merits of the action when determining
whether class certification is appropriate. *Eisen v.*
*Carlisle-Jacquelin,* 417 U.S. 156, 178 (1974); *Blackie*
*v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975). [FN9]
Additionally, class certification under Rule 23 is a
preliminary ruling and is subject to modification.
*Weinberger v. Jackson,* 102 F.R.D. 839, 843
(N.D.Cal.1984). A district court, however, should de-
termine that the proposed class representatives are
part of the class and suffered the same injury as the
putative class members. *General Telephone Co. of*
*the Southwest v. Falcon,* 457 U.S. 147; 156 (1982).
With these preliminary comments in mind, the court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 2
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

turns to Rule 23 and the merits of Plaintiffs' motion.

A. Rule 23

**\*2** Rule 23(a) requires that a court to consider four prerequisites when determining whether a class should be certified. It provides as follows:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The four prerequisites are commonly called (1) Numerosity, (2) Commonality, (3) Typicality, and (4) Adequacy. See *Weinberger,* 102 F.R.D. at 844. If a court finds that Rule 23(a)'s prerequisites are satisfied it then should consider if the conditions for the requested form of class action under Rule 23(b) are satisfied. Plaintiffs' request a class certification under Rule 23(b)(3) [FN10] which requires the court to find

that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The court will now apply Rule 23 to this case.

B. Rule 23(a)

The court will first determine if the prerequisites of Rule 23(a) are satisfied in this case.

1. Numerosity

Plaintiffs' proposed class would comprise thousands of purchasers of 6,000,000 shares of WOW stock and at least $80 million of the Debentures. The proposed Debenture Subclass would comprise at least 71 investors. Declarations of Ray Condon ¶ 3 and Carl Doerge ¶ 3. Under these circumstances, the court finds that the proposed class is so numerous that joinder of all class members is impracticable. [FN11]

2. Commonality

The gravamen of Plaintiffs' complaint is that Defendants, over a 18 month period, disseminated misrepresentative information or omitted to state material facts in public statements and prospectuses, all of which artificially inflated the price of WOW's securities and consequently caused harm to the purchasers of the securities. The court finds that Plaintiffs' allegations give rise to common questions sufficient to satisfy Rule 23.

In *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975), the Ninth Circuit commented:

Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken a common sense approach that the class is united by a common interest in determining whether a defendants' course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class member's positions, and that the issue may profitably be tried in one suit.

**\*3** Thus, it is not necessary that all members of Plaintiffs' proposed class be identically situated; it is only necessary that they were all harmed through Defendants' alleged course of fraudulent conduct over the Class Period. [FN12]

3. Typicality

Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought. Accordingly, differences in the amount of damage, the size or manner of [stock] purchase, the nature of the

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

purchaser, and even the specific document influencing the purchase will not render a claim atypical in most securities cases.

*Weinberger, 102 F.R.D. at 844* (*quoting* 5 Newberg on Class Actions, § 8816, at 850 (1977)). The court finds that Plaintiffs' claims are typical of the putative class in that the claims all arise out of the same alleged misrepresentations and omissions. Contrary to Defendants' arguments, it is of no consequence that the named Plaintiffs purchased their securities at a different time and price than the putative class members or that the named Plaintiffs purchased a lesser amount of securities than other class members. *Id.; see also Cameron v. E.M. Adams & Co., 547 F.2d 473, 476-77 (9th Cir.1976).* If the court were to follow Defendants' reasoning it would be nearly impossible to ever certify a class action in a securities fraud case involving any significant period of time as the putative class would always comprise investors who purchased securities at different times and prices. [FN13]

**4. Adequacy**

There are two criteria for determining adequacy of representation: (1) the named plaintiffs must appear to be represented by qualified counsel and able to prosecute the class action vigorously, and (2) the named plaintiffs must not have antagonistic or conflicting interests with the putative class members. *Leverill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir.1978); Weinberger, 102 F.R.D. at 844-45.* The court finds that this test is satisfied. Defendants' argument that the named Plaintiffs are not adequate because they do not possess enough personal knowledge of the facts underlying this action is unconvincing. The named Plaintiffs all appear familiar with the basic outline of this action in that they understand the gravamen of the claims in the Complaint. It is not necessary that they be intimately familiar with every factual and legal issue in the case. "A complex securities action cannot be founded upon an investigation of a litigant." *Weinberger, 102 F.R.D. at 845.* The reality of complex cases of this type is that clients must defer a great amount of discretion to their lawyers. *Id.* Accordingly, the named Plaintiffs are adequate representatives of the putative class.

The court therefore finds that the Numerosity, Commonality, Typicality, and Adequacy prerequisite requirements of Rule 23(a) are satisfied.

**C. Rule 23(b)(3)**

Rule 23(b)(3) requires that the common issues of law or fact predominate over individual issues and that a class action be the superior means to resolve the litigation. "The mere presence of potential individual issues does not defeat the predominance of common questions." *McFarland v. Memorex, 96 F.R.D. 357, 363 (N.D.Cal.1982).* The court finds that the common issues of law and fact predominate over any individual issues and that, given the large number of WOW investors, a class action is the superior means of adjudicating this litigation. The bulk of Defendants' arguments concern the extent to which individual issues will make Plaintiffs' proposed class action unmanageable; they will be addressed below.

**1. The Rule 10b-5 Claim Involving the IPO (Count I).**

**\*4** Defendants contend that individual issues of reliance will predominate the common issues in Plaintiffs' Rule 10b-5 claim because reliance must be proven for each individual plaintiff. Defendants concede that under *Basic v. Levinson, 485 U.S. 224 (1988),* reliance on misrepresentations may be presumed for Rule 10b-5 claims based on purchases on a free and open market. They contend, however, that this "fraud-on-the-market" reliance cannot be presumed for purchases made during an IPO and that therefore each member of the putative class would have to prove actual reliance on the prospectus. Regardless of the merits of Defendants' argument, it is incomplete.

In *Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972),* the Supreme Court held that individual proof of reliance is presumed where an action is based on material *omissions.* This presumption remains even where a complaint alleges a mixture of omissions and misrepresentations. *Weinberger, 102 F.R.D. at 846; Cameron v. E.M. Adams & Co., 547 F.2d 473, 477 n. 3 (9th Cir.1976).*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 4
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
(Cite as: 1990 WL 61951 (N.D.Cal.))

Plaintiffs' complaint alleges a course of conduct involving both misrepresentations and omissions and thus, under *Ute Citizens,* reliance on the alleged omissions in the prospectuses can be presumed. Accordingly, individual issues of reliance regarding the IPO will not predominate the common issues.

2. The Pendant State Law Claims

Defendants argue that because it is likely that the putative class members reside in many different states, the necessity of applying California's choice-of-law rule renders class treatment of the state law claims unmanageable. Further, even in the event that the court were to undertake this burden, Defendants argue, California's choice-of-law rules would require the court to apply the substantive state law of the state in which each class member resides, again rendering a class action unmanageable. Moreover, even if the court undertook the burden of applying the substantive law of several states. Defendants contend that individual issues of reliance, causation, and defenses would predominate over the common issues.

The court shares Defendants' concerns over the difficulty of applying various states' substantive laws, but this concern does not militate against class certification at this juncture. Courts in this district generally presume in class certification motions that California law will apply unless the defendants demonstrate conclusively that the laws of other states will apply. *Robert v. Heim,* 670 F.Supp. 1466, 1494 (N.D.Cal.1987). In this motion, Defendants have not overcome this "substantial burden." *In Re Activision Securities Litigation,* 621 F.Supp. 415, 430 (N.D.Cal.1985).

A court in this district is required to apply California choice-of-law rules to a conflict of law question. *Harmsen v. Smith,* 693 F.2d 932, 946-47 (9th Cir.1982). Under *Harmsen,* the burden is on the defendant to show: (1) that a true conflict exists; (2) that each state has an interest in applying its own law; and (3) if each state has an interest, which state's interest would be more impaired if its law were not applied. *Heim,* 670 F.Supp. at 1493. Defendants argue that under this test the other states' interests would be more impaired than California's interest because California does not have an interest in deterring California defendants from injuring non-resident plaintiffs. [FN14]

*5 The court finds that Defendants have not met their burden. At this juncture, there is insufficient information regarding the putative class members' residences for the court to make an informed choice-of-law ruling. At this point, the conflicts problem is only a possibility and it would be premature for the court to consider it in this initial class certification motion. *Weinberger,* 102 F.R.D. at 847.

The court notes that it does not believe applying California law to this class action would violate due process. In *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985), the Supreme Court formulated a two-step test for determining whether a state may constitutionally apply its law to all of the claims of a nationwide class. First, a court must determine if a conflict exists; second, if there is a conflict, the court must determine whether the state has "a 'significant contact or aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests in order to ensure that the choice of law is not arbitrary or unfair.' " *Id.* at 821- 822. Given that Plaintiffs have alleged that WOW has its principal place of business in California, that the corporate officers are all residents of California, and that the alleged misrepresentations emanated from California, there appears to be significant contact between Plaintiffs' claims and California such that application of California law would not be arbitrary or fundamentally unfair. *See Heim,* 670 F.Supp. at 1494.

The court also notes that at least one court in this district found California law to be applicable under facts similar to the facts in this action. In *In Re Pizza Time Theatre Securities Litigation,* 112 F.R.D. 15, 20 (N.D.Cal.1986), the court found, after applying the *Harmsen* test, that California law should be applied to pendant state law claims in a class action involving class members from many states. The court found that the various states shared the goals of deterring fraudulent conduct and providing a remedy for those who are injured by fraudulent conduct. It also found that all the states would prefer that their citizens' claims be litigated under California law than not at

Not Reported in F.Supp.                                                                Page 5
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

all. *Id.* The court then found that the realities of complex litigation and class actions made it unlikely that nonresident plaintiffs could afford to litigate their individual state claims except in the class action. Consequently, the court ruled that "defendants cannot show that any jurisdiction has a greater interest in applying its own law than in assuring the maintenance of a class action" ... and that "no state's interest would be more impaired by the blanket application of another state's law than by its own." *Id.*

Defendants also argue that even if California law were applied, the individual issues would predominate the common issues. The court does not agree. The evidence necessary to prove the federal securities law claims is similar to that needed to prove the state law claims. *Cameron*, 547 F.2d at 479. Moreover, under California law "if the trial court finds that material misrepresentations were made to the class members, at least a inference of reliance ... arise[s] as to the entire class." *Vasquez v. Superior Court*, 4 Cal.3d 800, 814, 94 Cal.Rptr. 796, 484 P.2d 964 (1971).

**\*6** If at a later time it appears that the choice-of-law issues are too cumbersome for class action treatment, the court can modify this Order accordingly.

3. Debenture Class

Defendants argue that a class action is not the most superior method for the fair and efficient adjudication of the Debenture related claims because the Debenture investors are mostly large-scale purchasers [FN15] who do not need a class action to press their claims. In support of this contention, Defendants refer the court to a lawsuit pending before this court in which the plaintiff is a WOW Debenture purchaser and alleges similar claims against virtually the same parties as the defendants in this action. *See Steinhart Partners v. Smith Barney, et. al.*, No. C 89-1566 SC.

At this juncture the court believes that a class action is the best way for the Debenture related issues to be adjudicated. Defendants only argue that the size and number of most of the Debenture purchasers militate against certifying a class action because they can afford to maintain independent suits. There is not a

specific class size at which a class action becomes better than a group of individual actions. *See Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D.Ill.1986) (class of 29 certified); *see* C. Wright, A. Miller, M. Kane, Federal Practice and Procedure: Civil 2d § 1762 (1986). Although Defendants aver that most of the Debenture investors are large institutions, they do not aver that *all* the proposed Debenture subclass members can maintain independent law suits. Defendants have not identified any other reasons why a class action would not be appropriate for the Debenture claims. The court has already found that the Numerosity requirement of Rule 23(a) is satisfied and, thus, will not now find that a class action is not the best method to adjudicate the Debenture claims without some showing that a class action will prejudice the parties or be too cumbersome to manage.

If at a future time it becomes apparent that a significant number of the Debenture purchasers have opted-out of the class then the court can decertify the Debenture subclass.

D. Plaintiffs' Standing Under Section 12(2)

Defendants argue that none of the named Plaintiffs have standing to represent the proposed class of plaintiffs under section 12(2) because section 12(2) only applies to an initial distribution of securities and none of the named plaintiffs purchased WOW shares in the IPO. Defendants' argument would be best considered in a motion to dismiss as they essentially contend that Plaintiffs have not stated a claim for which relief can be granted. Accordingly, the court will not rule on this issue in this motion. Instead, defendants should file a motion to dismiss at which time the parties and the court can give fuller consideration to the issue. For the benefit of the court and the parties, however, the court will note some preliminary observations on this issue.

Apparently, the original 4 million shares were underwritten by Smith Barney and Dean Witter and were sold at $18 a share to various subunderwriters. Defendants contend that plaintiff Wind purchased her shares on the same day as the IPO at $28.25 from one of the sub-underwriters who brought the shares to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 6
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
(Cite as: 1990 WL 61951 (N.D.Cal.))

market. [FN16] On the factual record before the court, the court is unable to determine conclusively from whom plaintiff Wind purchased her WOW shares.

*7 There is a split in the case law on the issue of the scope of section 12(2) liability. Some courts have found that section 12(2) applies to only an initial distribution of securities. *See e.g. Strong v. Paine Webber, Inc., 700 F.Supp. 4, 5 (S.D.N.Y.1988).* Others have ruled that section 12(2) also applies to fraud occurring in secondary markets. *See e.g. Elysian Fed. Sav. v. First Interregional Equity, 713 F.Supp. 737, 747-51 (D.N.J.1989).* These latter courts have emphasized that section 12(2) refers to a person who "sells a security ... by means of a[n] ... oral communication" and that this language indicates that Congress intended section 12(2) to be applied to sales by means of oral communications in secondary markets as well as "offers" to sell a security "by means of a prospectus" in initial public offerings. *Id.* at 750. Plaintiffs' section 12(2) claim, however, does not allege any oral communication in connection with the WOW stock sale; they allege only that the prospectus contained material misrepresentations and omissions. Complaint ¶ 139. Thus, even if section 12(2) should be applied to sales in secondary markets, Plaintiffs' section 12(2) claim, even under an expansive reading of section 12(2) seems limited to sales in the IPO.

The issue now becomes whether defendants Smith Barney and Dean Witter were persons who sold WOW shares by means of a prospectus to plaintiff Wind. It is well settled that section 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter v. Dahl, 486 U.S. 622, 644 n. 21 (1989).* The court already has determined that Smith Barney and Dean Witter were "sellers" under section 12(2). Order Re: Motions to Dismiss Second Amended Consolidated Complaint, p. 19. Although Wind may not have purchased her WOW shares directly from these defendants, it is unnecessary for title to pass to establish liability under section 12. *Pinter, 486 U.S. at 644.* In *Pinter,* the Supreme Court ruled that section 12 "liability ex-

tends, to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter, 486 U.S. at 647.* [FN17] Plaintiffs allege that Smith Barney and Dean Witter prepared the prospectus and actively promoted the WOW stock before the IPO in "road shows" and "direct meetings" with members of the putative class in addition to orchestrating the sale of the WOW shares to the investing public. Complaint ¶ 138. Plaintiff Wind purchased her WOW shares on the same day as the IPO. Under these circumstances, it is plausible that Smith Barney and Dean Witter were "sellers" of the WOW shares which plaintiff Wind purchased. [FN18]

If Plaintiffs are able to state a section 12(2) claim then plaintiff Wind would have standing to represent a class of WOW investors who purchased WOW shares in connection with the IPO. The factual record is simply too undeveloped for the court to determine conclusively when and from whom plaintiff Wind purchased her shares. If the court ultimately finds that she and other class members similarly situated purchased their WOW shares in connection with the IPO and that they are able to state a section 12(2) claim then an appropriate sub-class can be certified assuming the Rule 23 requirements remain satisfied.

E. Insider Trading Claims

*8 Defendants Abercrombie, WSP, and Robinson argue that none of the named Plaintiffs has standing to allege insider trading claims because none traded "contemporaneously" with their alleged violative sales. Under rule 10b-5, a seller who possesses "inside" information has a duty to disclose that information before trading, or abstain from trading all together. *Wilson v. Comtech Telecommunications Corp., 648 F.2d 88, 94 (2d Cir.1981).* The duty of disclosure, however, "is owed only to those investors trading contemporaneously with the insider; noncontemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Id.* at 94-95. A review of the case law demonstrates that the length of time constituting "contemporaneous trading" is not a fixed period but must

Not Reported in F.Supp.                                                                    Page 7
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

be determined on a case by case basis. *See* W. Wang, *The "Contemporaneous" Traders Who Can Sue an Inside Trader,* 38 Hastings L.J. 1175, 1179-84 (August 1987).

Given the unclear status of the law on this issue and the undeveloped factual record in this action, it would be premature for the court to determine conclusively the parameters of the "contemporaneous trading" window. *See In Re McDonnell Douglas Securities Litigation,* [1982 Transfer Binder] FED.SEC.L.REP. (CCH) ¶ 98,737, at p. 93,721 (E.D.Mo.1982). Plaintiffs' allegations demonstrate that some of the named Plaintiffs purchased WOW shares shortly after some of the Defendants sold their WOW shares. Complaint ¶¶ 4- 12, 80. Whether these transactions constitute "contemporaneous trading" does not need to be determined now.

At this stage of the litigation, the common question of whether Defendants possessed inside information which required then to 'disclose or abstain' predominates over the individual issues. *See Backman v. Polaroid,* [1983-84 Transfer Binder] FED.SEC.L.REP. (CCH) ¶ 99,631, at p. 97,487 (D.Mass.1982). If Plaintiffs establish that Defendants violated the insider trading laws then the issue concerning the "contemporaneousness" of the individual class members' purchases and individual questions of damages can be addressed separately. [FN19]

The parties also dispute whether plaintiff Miller, who only purchased Debentures, has standing to state an insider trading claim against Defendants. The law is unclear whether a debenture purchaser has standing to sue an inside trader who traded in stock. *See* Wang, 38 Hastings L.Rev. at 1187-91. As Plaintiffs concede, there is no case law which holds that a debenture trader has standing to sue a stock trader; there is, however, case law permitting option holders to sue stock traders. *Id.*

As with the section 12(2) claim, the court believes that this issue would be better addressed in a motion to dismiss. The parties have not addressed this issue thoroughly so it would be premature for the court to rule on this issue in this Order.

### F. Deloitte's Class Period Shortening Argument

**\*9** Defendant Deloitte argues that any class certified against it should be limited to investors who purchased common stock after May 14, 1987 because that was the earliest date at which Deloitte's audit work could have been released to the public. Plaintiffs' complaint, however, seems to allege violative conduct by Deloitte throughout the Class Period. [FN20] Because resolving this issue goes to the merits of Plaintiffs' action the court will not shorten the class period as to Defendant Deloitte at this juncture. *See Weinberger v. Thorton,* 114 F.R.D. 599, 606 (S.D.Cal.1986). Deloitte, however, is free to attack Plaintiffs' complaint in a motion to dismiss.

### G. Section 11 Standing

Defendants argue that plaintiffs Nisselson and Untermeyer do not have standing to assert a section 11 claim because they cannot "trace" their WOW stock to the alleged misleading registration statement. Defendants concede, however, that plaintiffs Wind and Greenstein have standing to bring the section 11 claim. Thus, because there are named Plaintiffs with uncontested standing it is not necessary for the court to determine whether Nisselson and Untermeyer also have standing. Whether Nisselson and Untermeyer can "trace" their shares goes to the merits of their claims and should not be addressed in a class certification motion. *See In Re LILCO Securities Litigation,* 111 F.R.D. 663, 671 (E.D.N.Y.1986).

### IV. Conclusion

All parties should bear in mind the tentative nature of this class certification Order. Rule 23 provides this court with much flexibility in managing this class action and adapting it to changed circumstances. A class or subclass can be decertified for a particular claim if it appears that Rule 23's requirements are not satisfied; new subclasses can be certified if it appears that they are necessary and appropriate. Also, Defendants are always free to challenge the merits of the class action through appropriate pretrial motions.

In accordance with the foregoing, it is hereby ORDERED that

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

(1) a plaintiff class be certified in this action consisting of all persons who purchased the securities of Worlds of Wonder, Inc. ("WOW"), during the period June 20, 1986, through November 9, 1987, both dates inclusive (the "Class Period");

(2) the overall Class Period shall include two subclasses, defined as follows:

(a) *Subclass One:* All persons who purchased WOW common stock during the Class Period;

(b) *Subclass Two:* All persons who purchases WOW 9% convertible debentures due 2012 during the Class Period;

Excluded from the overall class and the subclasses are the defendants herein, members of their families and the subsidiaries, affiliates, successors and assigns of any of the defendants. As used herein, the term "person" includes any individual, corporation, partnership, association, joint stock company, trust, unincorporated association, entity, government and any political subdivision thereof.

(3) the attorneys of record for the named Plaintiffs are hereby designated as counsel for the above defined class;

**\*10** (4) a trial setting conference be scheduled on June 1, 1990, at 10:00 a.m., in Courtroom 1;

(5) Plaintiffs file within 45 days of the filing date of this Order their proposed forms of notice for the pendency of this class action.

IT IS SO ORDERED.

> FN1. The plaintiffs named in the complaint are Walter Untermeyer, Helena Gottleib, Verico S.A., Alan Nisselson, Trudy Whitman, Rosetta Miller, Nathan and Ann B. Regal, Paul Greenstein, Howard H. Weston, and Sylvia Wind. All the plaintiffs purchased either WOW common stock or Debentures during the Class Period. Relevant information regarding each plaintiff will be provided when necessary.

> FN2. The "Individual Defendants" are Don-

ald D. Kingsborough, Angelo M. Pezzani, Richard B. Stein, Barry H. Margolis, and John B. Howenstine.

> FN3. The "Venture Capitalist Defendants" are Josephine E. Abercrombie Interests, Inc. ("Abercrombie"), Robinson Interests Inc. ("Robinson"), and WOW Shares Partnership of Houston ("WSP").

> FN4. The "Auditor Defendant" is Deloitte Haskins & Sells ("Deloitte").

> FN5. The "Underwriter Defendants" are Smith Barney, Harris Upham & Co. ("Smith Barney") and Dean Witter Reynolds ("Dean Witter").

> FN6. Smith Barney is named also as the "Investment Banker Defendant."

> FN7. Plaintiffs' specific claims are as follows:
> Count I: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants. Count II: Violations of section 20 of the Exchange Act against all defendants. Count III: Fraud against all defendants. Count IV: Negligent Misrepresentation against all defendants except the Venture Capitalist Defendants. Count V: Violations of section 11 of the Securities Act against the Underwriter Defendants involving the initial public offer ("IPO"). Count VI: Violations of section 11 of the Securities Act against the Underwriter Defendants involving the Debentures. Count VII: Violations of section 12(2) of the Securities Act against the Underwriter Defendants involving the IPO. Count VIII: Violations of section 12(2) of the Securities Act against the Underwriter Defendants involving the Debentures. Count IX: Violations of section 15 of the Securities Act against the Individual Defendants.

> FN8. Defendants aver that Smith Barney actually sold $89,621,000 of Debentures by making purchases on the open market and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 9
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
(Cite as: 1990 WL 61951 (N.D.Cal.))

then reselling them. Declaration of Carl Doerge ¶ 2.

FN9. Accordingly, the court will only rule on issues which need to be resolved to reach a determination regarding class certification.

FN10. In a class action certified under Rule 23(b)(3), a class member may choose to "opt-out" of the class and not be included in the judgment. *See* Rule 23(c).

FN11. Defendants contend that Plaintiffs have not satisfied the Numerosity requirement with respect to the insider trading claims because they have not demonstrated that Plaintiffs or any putative class members traded "contemporaneously" with Defendants' alleged violative trades. Thus, according to Defendants, Plaintiffs have offered no proof as to how many class members would be able to state an insider trading claim. The court concedes that Defendants argument has some merit, but under the circumstances of this case the court finds that the Numerosity requirement is satisfied with respect to the insider trading claims. There were millions of WOW shares sold on the National Over the Counter Market during the Class Period, so with respect to any particular alleged violative trade it is likely that there are a large number of putative class members who purchased shares contemporaneously. *See* III.E.

FN12. Defendants argue that there is no pattern of WOW announcements which gives rise to a common course of conduct. The court disagrees. Plaintiffs' complaint alleges that Defendants continually misrepresented the financial health of WOW and omitted to state facts which would cast doubt on Defendants' optimistic reports throughout the Class Period. The fact that the stock price fluctuated over this period does not vitiate this allegation because even if the prices were changing the fluctuations could have been in response to other factors. If, as

Plaintiffs contend, Defendants had disseminated the truth, the stock prices, though possibly still fluctuating, indubitably would have been lower or, perhaps, many investors would have decided not to buy WOW stock in the first place. Under these circumstances, Plaintiffs have shown that the alleged misrepresentations and omissions were common to all investors during the Class Period. *See* Clark v. Watchie, 513 F.2d 994, 1000 (9th Cir.1975).

FN13. The court finds that plaintiff Untermeyer is not subject to a unique defense and that his status as a sophisticated investor does not make him atypical. Although Untermeyer may have had doubts about WOW's managements' credibility, it appears that at the time he purchased his shares he relied on the veracity of statements made by WOW management. Declaration of Earnest Kaufmann, Exhibit A, pp. 93-94.

FN14. Defendants base this contention on a ruling in an order signed by Judge Dowds in Los Angeles County Superior Court. Defendants' Exhibit 1.

FN15. Defendants assert that 71 sophisticated investors purchased $84 million of the Debentures which constitutes 94% of the Debentures sold by Smith Barney. Opposition Memorandum, p. 37.

FN16. Plaintiffs contend that plaintiff Wind purchases her shares directly from Smith Barney but the evidence before the court does not establish this.

FN17. The court notes that *Pinter* involved only section 12(1) and that the Court explicitly stated that the holding did not cover section 12(2). *Pinter*, 486 U.S. at 642 n. 20.

FN18. It appears that on the day of the IPO the lowest bid price for the WOW stock was $24.75 and the lowest ask price was $25.75. Supplemental Declaration of Daniel J. Bergenson, Exhibit H. Plaintiffs explain

Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004
**(Cite as: 1990 WL 61951 (N.D.Cal.))**

that the shares sold for more than $18, the originally contemplated price, because the demand outstripped the supply and the dealers were able to raise the asking price. Thus, despite the difference in price, there appears to be a direct link between Smith Barney and Dean Witter's solicitation efforts and plaintiff Winds' ultimate purchase of WOW shares.

FN19. The court is aware that certifying a class of Plaintiffs for the insider trading claims is problematic because an insider trading claim must be based on a particular inside trade. Wang, 38 Hastings L.Rev. at 1178. Thus, it appears that sub-classes may eventually need to be certified; each sub-class would comprise all class members who traded WOW shares contemporaneously with a particular trade. As Plaintiffs have alleged that Defendants collectively made approximately 48 violative trades, the court ultimately may have to certify 48 separate subclasses corresponding to each of the trades. Of course, if this becomes too cumbersome to manage the court may decertify the class with respect to the insider trading claims.

FN20. The Complaint alleges that "Deloitte participated in the conspiracy, *inter alia,* through its acquiescence in the violations of sound accounting principles perpetrated by WOW," but it does not provide a corresponding date. Complaint ¶ 31(d). Additionally, the complaint alleges that "[t]hroughout the class period, Deloitte was aware that WOW was disseminating to the public corporate reports and financial statements reporting on WOW's sales, revenues, earnings and liquidity...." Complaint ¶ 85.

Not Reported in F.Supp., 1990 WL 61951 (N.D.Cal.), Fed. Sec. L. Rep. P 95,004

**Motions, Pleadings and Filings (Back to top)**

• 3:87cv05491 (Docket) (Oct. 29, 1987)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 19



In re WrightBkrtcy.C.D.Cal.,2006.In re Scott
William WRIGHT, Debtor.
Choice Hotels International, Inc., Plaintiff,
v.
Scott William Wright, Defendant.
**Bankruptcy No. RS 05-13967 PC.
Adversary No. RS 05-01301 PC.**

Oct. 24, 2006.

**Background:** Hotel franchisor that had previously obtained judgment against Chapter 7 debtor for his service mark infringement, unfair competition, service mark dilution, and violation of provision of the Anticybersquatting Consumer Protection Act (ACPA) brought adversary proceeding to except judgment debt from discharge as one for debtor's "willful and malicious injury."

**Holdings:** On plaintiff's motion for summary judgment, the Bankruptcy Court, Peter H. Carroll, J., held that:

(1) federal district court judgment previously entered debtor on infringement, unfair competition and dilution claims, for using mark which was deceptively similar to registered marks of hotel franchisor to promote its reservation hotline and websites, was not entitled to issue preclusive effect in nondischargeability proceeding; but

(2) debtor's cybersquatting in violation of provision of the ACPA, in registering Internet domain name that was the same or confusingly similar to well-known brand name of hotel franchisor in attempt to force debtor to pay debtor for right of engaging in electronic commerce under that name, constituted a categorically harmful activity which necessarily caused injury to franchisor and which, given evidence that debtor knew of franchisor's rights and acquired the domain name with specific intent of diverting consumer traffic from franchisor's authorized websites and of profiting therefrom, precluded discharge of resulting debt as one for debtor's "willful and malicious injury."

Motion granted.

West Headnotes

**[1] Bankruptcy 51 ⟡3403(12)**

51 Bankruptcy
    51X Discharge
        51X(D) Determination of Dischargeability
            51k3401 Evidence
                51k3403 Presumptions and Burden of Proof
                    51k3403(12) k. Willful or Malicious Injury. Most Cited Cases
Burden of proof is on creditor seeking to except debt from discharge as one for debtor's "willful and malicious injury." 11 U.S.C.A. § 523(a)(6).

**[2] Bankruptcy 51 ⟡3405(14)**

51 Bankruptcy
    51X Discharge
        51X(D) Determination of Dischargeability
            51k3401 Evidence
                51k3405 Weight and Sufficiency
                    51k3405(12) Degree of Proof Required
                    51k3405(14) k. Particular Cases. Most Cited Cases
Standard of proof, in proceeding to except debt from discharge as one for debtor's "willful and malicious injury," is proof by preponderance of evidence. 11 U.S.C.A. § 523(a)(6).

**[3] Bankruptcy 51 ⟡3341**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)1 In General
                51k3341 k. In General. Most Cited Cases
Objections to dischargeability of debt are to be literally and strictly construed against the objector and liberally construed in favor of debtor. 11 U.S.C.A. § 523(a).

**[4] Bankruptcy 51 ⟡3374(2)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(2) k. Willful, Deliberate, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
(Cite as: 355 B.R. 192)

Page 2

Intentional Injury. <u>Most Cited Cases</u>
Statutory exception to discharge for debts for debtor's "willful and malicious injury" requires a deliberate or intentional injury, not merely a deliberate or intentional act leading to injury. <u>11 U.S.C.A. § 523(a)(6)</u>.

**[5] Bankruptcy 51 <img>3374(2)**

<u>51</u> Bankruptcy
  <u>51X</u> Discharge
    <u>51X(C)</u> Debts and Liabilities Discharged
      <u>51X(C)5</u> Torts and Crimes
        <u>51k3374</u> Willful or Malicious Injury
          <u>51k3374(2)</u> k. Willful, Deliberate, or Intentional Injury. <u>Most Cited Cases</u>

**Bankruptcy 51 <img>3374(4)**

<u>51</u> Bankruptcy
  <u>51X</u> Discharge
    <u>51X(C)</u> Debts and Liabilities Discharged
      <u>51X(C)5</u> Torts and Crimes
        <u>51k3374</u> Willful or Malicious Injury
          <u>51k3374(4)</u> k. Knowledge; Knowing Disregard. <u>Most Cited Cases</u>
Injury is "willful," within meaning of dischargeability exception, where it is shown either that debtor had a subjective motive to inflict injury, or that debtor believed that injury was substantially certain to occur as result of his conduct. <u>11 U.S.C.A. § 523(a)(6)</u>.

**[6] Bankruptcy 51 <img>3374(2)**

<u>51</u> Bankruptcy
  <u>51X</u> Discharge
    <u>51X(C)</u> Debts and Liabilities Discharged
      <u>51X(C)5</u> Torts and Crimes
        <u>51k3374</u> Willful or Malicious Injury
          <u>51k3374(2)</u> k. Willful, Deliberate, or Intentional Injury. <u>Most Cited Cases</u>

**Bankruptcy 51 <img>3374(5)**

<u>51</u> Bankruptcy
  <u>51X</u> Discharge
    <u>51X(C)</u> Debts and Liabilities Discharged
      <u>51X(C)5</u> Torts and Crimes
        <u>51k3374</u> Willful or Malicious Injury
          <u>51k3374(5)</u> k. Malice; Malicious Injury. <u>Most Cited Cases</u>

**Bankruptcy 51 <img>3374(7)**

<u>51</u> Bankruptcy
  <u>51X</u> Discharge
    <u>51X(C)</u> Debts and Liabilities Discharged
      <u>51X(C)5</u> Torts and Crimes
        <u>51k3374</u> Willful or Malicious Injury
          <u>51k3374(7)</u> k. Just Cause or Excuse. <u>Most Cited Cases</u>
"Malicious" injury, within meaning of dischargeability exception, involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) which is done without just cause or excuse. <u>11 U.S.C.A. § 523(a)(6)</u>.

**[7] Judgment 228 <img>636**

<u>228</u> Judgment
  <u>228XIV</u> Conclusiveness of Adjudication
    <u>228XIV(A)</u> Judgments Conclusive in General
      <u>228k635</u> Courts or Other Tribunals Rendering Judgment
        <u>228k636</u> k. In General. <u>Most Cited Cases</u>
Collateral estoppel, or issue preclusion, applies in nondischargeability proceedings in bankruptcy court. <u>11 U.S.C.A. § 523(a)</u>.

**[8] Judgment 228 <img>713(1)**

<u>228</u> Judgment
  <u>228XIV</u> Conclusiveness of Adjudication
    <u>228XIV(C)</u> Matters Concluded
      <u>228k713</u> Scope and Extent of Estoppel in General
        <u>228k713(1)</u> k. In General. <u>Most Cited Cases</u>
Collateral estoppel, or issue preclusion, prevents party from relitigating an issue that party has actually litigated and lost in prior proceeding.

**[9] Judgment 228 <img>634**

<u>228</u> Judgment
  <u>228XIV</u> Conclusiveness of Adjudication
    <u>228XIV(A)</u> Judgments Conclusive in General
      <u>228k634</u> k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. <u>Most Cited Cases</u>
Collateral estoppel, or issue preclusion, serves to protect litigants from multiple lawsuits, to conserve judicial resources, and to encourage reliance on adjudication by reducing likelihood of inconsistent decisions.

**[10] Bankruptcy 51 <img>2002**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
(Cite as: 355 B.R. 192)

Page 3

51 Bankruptcy
   51I In General
     51I(A) In General
      51k2002 k. Application of State or Federal
Law in General. Most Cited Cases
Preclusive effect of prior federal district court
judgment is determined by federal law.

**[11] Judgment 228 ☞632**

228 Judgment
   228XIII Merger and Bar of Causes of Action and
Defenses
     228XIII(C) Persons Who May Take Advantage
of the Bar
      228k632 k. Persons Not Parties or Privies.
Most Cited Cases

**Judgment 228 ☞713(1)**

228 Judgment
   228XIV Conclusiveness of Adjudication
     228XIV(C) Matters Concluded
      228k713 Scope and Extent of Estoppel in
General
       228k713(1) k. In General. Most Cited
Cases
Under federal law, issue preclusion may be raised
offensively where: (1) there was full and fair
opportunity to litigate issue in previous action; (2)
issue was actually litigated in that action; (3) issue
was lost as result of final judgment in that action; and
(4) person against whom issue preclusion is asserted
was a party, or in privity with party, to prior action.

**[12] Judgment 228 ☞653**

228 Judgment
   228XIV Conclusiveness of Adjudication
     228XIV(A) Judgments Conclusive in General
      228k653 k. Judgment on Motion or
Summary Proceedings in General. Most Cited Cases
Under federal law, issue preclusion may apply
despite fact that prior determination was based on
unopposed motion for summary judgment; in such a
case, the "actual litigation" requirement is satisfied if
the party to be precluded had full and fair opportunity
to litigate issue in prior proceeding and, despite
substantial participation in action, chose not to do so.

**[13] Trademarks 382T ☞1024**

382T Trademarks

   382TII Marks Protected
     382Tk1022 Subject Matter Underlying
Trademarks
      382Tk1024 k. Services and Service Marks
in General. Most Cited Cases
"Service mark" is distinctive mark used in connection
with sale or advertising of services, while
"trademark" is typically used to identify and
distinguish tangible goods.

**[14] Trademarks 382T ☞1024**

382T Trademarks
   382TII Marks Protected
     382Tk1022 Subject Matter Underlying
Trademarks
      382Tk1024 k. Services and Service Marks
in General. Most Cited Cases
Service marks are registerable and entitled to
protection in same manner as trademarks. Lanham
Trade-Mark Act, § 3, 15 U.S.C.A. § 1053.

**[15] Trademarks 382T ☞1000**

382T Trademarks
   382TI In General
     382Tk1000 k. In General. Most Cited Cases
Federal trademark law seeks to protect both an
owner's investment in mark and consumers who have
formed an association with mark.

**[16] Trademarks 382T ☞1421**

382T Trademarks
   382TVIII Violations of Rights
     382TVIII(A) In General
      382Tk1418 Practices or Conduct Prohibited
in General; Elements
       382Tk1421 k. Infringement. Most Cited
Cases
Trademark infringement is established if plaintiff
demonstrates: (1) ownership of valid, protectable
mark; and (2) likelihood of confusion, mistake or
deception in defendant's use of mark.

**[17] Trademarks 382T ☞1084**

382T Trademarks
   382TIII Similarity Between Marks; Likelihood of
Confusion
     382Tk1083 Nature of Confusion
      382Tk1084 k. In General. Most Cited Cases

**Trademarks 382T ☞1421**

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
**(Cite as: 355 B.R. 192)**

Page 4

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(A) In General
      382Tk1418 Practices or Conduct Prohibited
in General;  Elements
        382Tk1421 k. Infringement. Most Cited
Cases
Core element of trademark infringement is
"likelihood of confusion," i.e., whether similarity of
marks is likely to confuse customers about source of
products.

**[18] Trademarks 382T 🗝1084**

382T Trademarks
  382TIII Similarity Between Marks;  Likelihood of
Confusion
    382Tk1083 Nature of Confusion
      382Tk1084 k. In General. Most Cited Cases
"Likelihood of confusion" exists, as required for
infringement claim, when customers viewing mark
would probably assume that product or service it
represents is associated with the source of a different
product or service identified by similar mark.

**[19] Judgment 228 🗝715(3)**

228 Judgment
  228XIV Conclusiveness of Adjudication
    228XIV(C) Matters Concluded
      228k715 Identity of Issues, in General
        228k715(3) k. What Constitutes
Diversity of Issues. Most Cited Cases

**Judgment 228 🗝724**

228 Judgment
  228XIV Conclusiveness of Adjudication
    228XIV(C) Matters Concluded
      228k723 Essentials of Adjudication
        228k724 k. In General. Most Cited Cases
Federal district court judgment previously entered
against Chapter 7 debtor on service mark
infringement, unfair competition, and service mark
dilution claims for using mark which was deceptively
similar to registered marks of hotel franchisor to
promote its reservation hotline and websites was not
entitled to issue preclusive effect in subsequent
proceeding to except judgment debt from discharge
as one for debtor's "willful and malicious injury";
that debtor had actual knowledge of infringement and
willful intent to siphon off goodwill associated with
franchisor's marks were not necessary elements of

these infringement, unfair competition, or dilution
claims, and these issues were neither actually
litigated, nor necessary to judgment entered, in
district court action. 11 U.S.C.A. § 523(a)(6).

**[20] Antitrust and Trade Regulation 29T 🗝18**

29T Antitrust and Trade Regulation
  29TII Unfair Competition
    29TII(A) In General
      29Tk15 Practices Prohibited or Required in
General;  Elements
        29Tk18 k. Intent. Most Cited Cases

**Trademarks 382T 🗝1437**

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(A) In General
      382Tk1437 k. Knowledge, Intent, and
Motives;  Bad Faith. Most Cited Cases
Actual knowledge and wrongful intent are not
essential elements of either direct service mark
infringement or unfair competition claim.

**[21] Trademarks 382T 🗝1463**

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(B) Dilution
      382Tk1462 Reduction of Mark's Capacity
to Identify;  Blurring
        382Tk1463 k. In General. Most Cited
Cases
To prevail on federal trademark dilution claim,
plaintiff must demonstrate: (1) that mark is famous;
(2) that defendant is making commercial use of mark
in commerce; (3) that defendant's use began after
mark became famous; and (4) that defendant's use of
mark dilutes quality of mark by diminishing capacity
of mark to identify and distinguish plaintiff's goods
and services.

**[22] Implied and Constructive Contracts 205H
🗝3**

205H Implied and Constructive Contracts
  205HI Nature and Grounds of Obligation
    205HI(A) In General
      205Hk2 Constructive or Quasi Contracts
        205Hk3 k. Unjust Enrichment. Most
Cited Cases
California law does not recognize cause of action for
unjust enrichment;  rather, unjust enrichment is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
**(Cite as: 355 B.R. 192)**

Page 5

general principle, underlying various legal doctrines and remedies, that one person should not be permitted to unjustly enrich himself at expense of another, but should be required to make restitution of or for property or benefits received, retained or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.

**[23]** Implied and Constructive Contracts 205H
🔑3

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk3 k. Unjust Enrichment. Most Cited Cases

  **Implied and Constructive Contracts 205H** 🔑4

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk4 k. Restitution. Most Cited Cases
Under California law, unjust enrichment is synonymous with restitution.

**[24]** Implied and Constructive Contracts 205H
🔑4

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk4 k. Restitution. Most Cited Cases
Under California law, person is required to make restitution if he or she is unjustly enriched at expense of another. Restatement (First) of Restitution, § 1.

**[25]** Implied and Constructive Contracts 205H
🔑3

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk3 k. Unjust Enrichment. Most Cited Cases
Under California law of unjust enrichment, "enrichment" occurs when one person receives "benefit," which includes any form of advantage, at

another's expense. Restatement (First) of Restitution, § 1.

**[26]** Implied and Constructive Contracts 205H
🔑4

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk4 k. Restitution. Most Cited Cases
Under California law, restitution may be appropriate, where there has been partial performance of express contract, or fraud, accident or mistake in formation of contract.

**[27]** Implied and Constructive Contracts 205H
🔑4

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk4 k. Restitution. Most Cited Cases
Under California law, restitution may be awarded where the benefit received resulted from defendant's fraud, conversion or other tortious conduct; in such cases, court implies contract, notwithstanding intention of parties, to prevent unjust enrichment.

**[28]** Judgment 228 🔑724

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(C) Matters Concluded
         228k723 Essentials of Adjudication
            228k724 k. In General. Most Cited Cases
Prior determination by federal district court in service mark infringement action, that Chapter 7 debtor had been unjustly enriched by using mark which was deceptively similar to registered marks of hotel franchisor to promote its reservation hotline and websites, was not entitled to issue preclusive effect in subsequent proceeding to except judgment debt from discharge as one for debtor's "willful and malicious injury"; district court ordered restitution to franchisor to compensate it for the benefit received by debtor at its expense, with no finding by district court that debtor had deliberately and intentionally injured franchisor. 11 U.S.C.A. § 523(a)(6).

**[29]** Trademarks 382T 🔑1498

382T Trademarks

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

382TVIII Violations of Rights
382TVIII(C) Misuse of Internet Domain Names; Cyberpiracy and Cybersquatting
382Tk1498 k. Nature and Elements in General. Most Cited Cases

**Trademarks 382T ☞1502**

382T Trademarks
382TVIII Violations of Rights
382TVIII(C) Misuse of Internet Domain Names; Cyberpiracy and Cybersquatting
382Tk1502 k. Knowledge, Intent, and Motives; Bad Faith. Most Cited Cases
"Cybersquatting" is deliberate, bad faith, and abusive registration of Internet domain names in violation of rights of trademark owners.

**[30] Trademarks 382T ☞1502**

382T Trademarks
382TVIII Violations of Rights
382TVIII(C) Misuse of Internet Domain Names; Cyberpiracy and Cybersquatting
382Tk1502 k. Knowledge, Intent, and Motives; Bad Faith. Most Cited Cases
Finding of bad faith is essential element of any cause of action under the Anticybersquatting Consumer Protection Act (ACPA). Lanham Trade-Mark Act, § 43(d), 15 U.S.C.A. § 1125(d).

**[31] Bankruptcy 51 ☞3374(9)**

51 Bankruptcy
51X Discharge
51X(C) Debts and Liabilities Discharged
51X(C)5 Torts and Crimes
51k3374 Willful or Malicious Injury
51k3374(8) Particular Injuries
51k3374(9) k. In General; Fraud. Most Cited Cases

**Bankruptcy 51 ☞3403(12)**

51 Bankruptcy
51X Discharge
51X(D) Determination of Dischargeability
51k3401 Evidence
51k3403 Presumptions and Burden of Proof
51k3403(12) k. Willful or Malicious Injury. Most Cited Cases
Chapter 7 debtor's cybersquatting in violation of provision of the Anticybersquatting Consumer

Protection Act (ACPA), in registering Internet domain name that was the same or confusingly similar to well-known brand name of hotel franchisor in attempt to force franchisor to pay debtor for right of engaging in electronic commerce under that name, constituted a categorically harmful activity which necessarily caused injury to franchisor and which, given evidence that debtor knew of franchisor's rights in that name at time that he acquired the infringing domain name and acquired that name with specific intent of diverting consumer traffic from franchisor's authorized websites and of profiting therefrom, precluded discharge of resulting debt as one for debtor's "willful and malicious injury"; court could infer malice from debtor's admitted willful violation of the ACPA. 11 U.S.C.A. § 523(a)(6); Lanham Trade-Mark Act, § 43(d), 15 U.S.C.A. § 1125(d).

**[32] Bankruptcy 51 ☞3403(12)**

51 Bankruptcy
51X Discharge
51X(D) Determination of Dischargeability
51k3401 Evidence
51k3403 Presumptions and Burden of Proof
51k3403(12) k. Willful or Malicious Injury. Most Cited Cases
In proceeding to except debt from discharge as debt for debtor's "willful and malicious injury," court may infer subjective intent to harm or substantial certainty of harm from facts and circumstances surrounding debtor's conduct. 11 U.S.C.A. § 523(a)(6).

**Trademarks 382T ☞1800**

382T Trademarks
382TXI Trademarks and Trade Names Adjudicated
382Tk1800 k. Alphabetical Listing. Most Cited Cases
1-800-COMFORT.

**Trademarks 382T ☞1800**

382T Trademarks
382TXI Trademarks and Trade Names Adjudicated
382Tk1800 k. Alphabetical Listing. Most Cited Cases
1-800-comfort.com.

**Trademarks 382T ☞1800**

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
**(Cite as: 355 B.R. 192)**

Page 7

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
1-888-comfort.com.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
COMFORT.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
COMFORT INN.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
COMFORT INNS.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
COMFORT INNS & SUITES.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
COMFORT SUITES.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
comfortbronzecard.com.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
comfortcallcenter.com.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
comfortgoldcard.com.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
comfortowners.com.

**Trademarks 382T 1800**

382T Trademarks
    382TXI    Trademarks    and    Trade    Names
Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited
Cases
comfortsilvercard.com.

*196 Jim Husen, Riverside, CA, for Debtor.

**MEMORANDUM DECISION**

PETER H. CARROLL, Bankruptcy Judge.
Plaintiff, Choice Hotels International, Inc. ("Choice
Hotels") seeks a summary judgment against
Defendant, Scott William Wright ("Wright")
declaring its debt non-dischargeable under §
523(a)(6) of the Code.[FN1] The court, having
considered the pleadings, evidentiary record, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
**(Cite as: 355 B.R. 192)**

Page 8

arguments of counsel, makes the following findings of fact and conclusions of law [FN2] pursuant to Fed.R.Civ.P. 52, as incorporated *197 into adversary proceedings in bankruptcy cases by Fed. R. Bankr.P. 7052.

FN1. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. § § 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

FN2. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

### I. STATEMENT OF FACTS

Choice Hotels, a Delaware corporation, is one of largest hotel franchise companies in the world. Choice Hotels' franchisees own and operate over 4,500 hotels, inns and resorts in 45 countries under various names, including COMFORT INN® , COMFORT SUITES® , QUALITY INN® , CLARION® , SLEEP INN® , RODEWAY INN® , ECONO LODGE® and MAINSTAY SUITES® . With respect to its COMFORT® inns, hotels and suites, Choice Hotels owns certain trademarks (collectively, "the COMFORT® marks") which are registered with the United States Patent and Trademark Office and used by Choice Hotels in advertising and marketing its COMFORT® accommodations and services.[FN3] Choice Hotels provides its franchisees with reservation services. COMFORT® customers can make a reservation with any of Choice Hotels' franchisees either on the Internet [FN4] or by using one of Choice Hotels' toll-free telephone numbers.[FN5]

FN3. The COMFORT® marks include: (1) COMFORT INNS® , No. 1265290,

registered on January 24, 1984; (2) COMFORT INN® , No. 1315180, registered on January 15, 1985; (3) COMFORT INN® , No. 1448467, registered on July 21, 1987; (4) COMFORT INN & Design® , No. 1316274, registered on January 22, 1985; (5) COMFORT INN & Design® , No. 1516053, registered on December 9, 1988; (6) COMFORT SUITES & Design® , No. 1405351, registered on August 12, 1986; (7) COMFORT & Design® , No. 1522980, registered on January 31, 1989; (8) COMFORT SUITES® , No. 1712482, registered on September 1, 1992; (9) COMFORT HOTEL & Design® , No. 1707467, registered on August 11, 1992; (10) COMFORT HOTEL® , No. 1712481, registered on September 1, 1992; (11) COMFORT® , No. 1788677, registered on August 17, 1993; (12) COMFORT INN & SUITES® , No. 2264702, registered on July 27, 1999, and (13) CS COMFORT SUITES & Design® , No. 2665525, registered on December 24, 2002.

FN4. Choice Hotels owns the following internet domain names which incorporate the COMFORT® marks: comfortinn.com, comfortinns.com, comfortsuite.com, comfortsuites.com, comforthotel.com, comforthotels.com and choicehotels.com.

FN5. Choice Hotels provides the following toll-free numbers for direct access to COMFORT INN® and COMFORT SUITES® reservation and information services: 1-800-4-CHOICE and 1-800-228-5150.

Sometime in 1988, Wright began working with his father, Elmer Clifford Wright, manufacturing and selling footwear under the name "Happy Feet-The World's Most Comfortable Shoe" ("Happy Feet"). At the time, Happy Feet was operated by Dreamco International, d/b/a Dreamco International, Inc. ("Dreamco"), a California corporation, with its principal place of business in Corona, California.[FN6] In 1990, Dreamco acquired the right to use the toll-free number 1-800-266-3678, or "1-800-COMFORT," in conjunction with Happy Feet. Wright boasted that the telephone number was placed on "every pair of shoes we made and every piece of literature" concerning their business.[FN7] Immediately after acquiring the toll-free number, Wright began

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
(Cite as: 355 B.R. 192)

receiving telephone calls from COMFORT® customers seeking hotel reservations.[FN6] Initially, Wright simply *198 advised the COMFORT® customers that they had reached an incorrect number. As the volume of calls increased, however, Wright decided to diversify his business interests and seek opportunities in the travel service industry.

> FN6. Between 1988 and 1996, Dreamco's sole shareholder was Elmer Clifford Wright. Wright became the sole shareholder of Dreamco in 1996.

> FN7. Declaration of Scott Wright in Opposition to Plaintiff's Motion for Summary Judgment, p. 1, l.29 to p. 2, l.1.

> FN8. Wright admits that "[w]e were getting **thousands** of phone calls requesting Comfort products and services with a majority requesting the Comfort Inn for hotel reservations." Declaration of Scott Wright in Opposition to Plaintiff's Motion for Summary Judgment, p. 2, l.3-4.

In 1996, Wright struck a deal with ANZ Travel ("ANZ"), an independent travel agent, pursuant to which ANZ would make reservations for COMFORT® customers calling the "1-800-COMFORT" number. In consideration therefor, Wright was paid a portion of the 10% commission received by ANZ under an existing travel service agreement with Choice Hotels. Wright contends that ANZ booked approximately $1.2 million in room reservations with Choice Hotels for COMFORT INN® and COMFORT SUITES® properties by September 1997, using the "1-800-COMFORT" number.

On September 12, 1997, Choice Hotels terminated its travel service agreement with ANZ for "unauthorized use of the Choice COMFORT® trademark" in the telephone number "1-800-COMFORT" used to promote ANZ's travel services. [FN9] On October 27, 1997, Choice Hotels learned directly from Wright that Dreamco, not ANZ, owned the "1-800-COMFORT" telephone number. On December 2, 1997, Choice Hotels rejected Wright's overtures concerning use of the "1-800-COMFORT" number under an independent travel service agreement between Choice Hotels and Dreamco, and demanded that Wright, Dreamco and ANZ permanently cease using the 1-800-COMFORT number for travel industry related services.

> FN9. Declaration of Paul C. Jorgensen in Support of Plaintiff's Motion for Summary Judgment, p. 1, l. 12-16.

For the next fourteen months, Wright continued to pursue an agreement with Choice Hotels for use of Dreamco's 1-800-COMFORT telephone number in conjunction with Choice Hotels' COMFORT® reservation services. During such period, Wright limited his use of Dreamco's 1-800-COMFORT number to shoe sales through Happy Feet.[FN10] Wright persisted despite the fact that his efforts to negotiate a deal were repeatedly rejected by Choice Hotels.

> FN10. Happy Feet ultimately ceased doing business in 2000.

Between October 2001 and April 2002, Wright registered the domain names "comfortcallcenter.com" and "1-800-comfort.com." On August 7, 2002, Wright incorporated Comfort Call Center, Inc. ("CCC") under the laws of the State of Nevada,[FN11] and drafted a business plan for CCC aimed at profiting from the COMFORT® marks through his new websites and reservation hotline. CCC's business plan provided, in pertinent part:

> FN11. On November 11, 2003, CCC was registered to do business in the State of California.

Paragraph 1.0, under the heading "Executive Summary:" "The Comfort Call Center will be a full service Contact and Reservation center.... Our primary focus will be the hotel industry with Comfort Inns and Comfort Inns & Suites."
Paragraph 1.2, under the heading "Mission:" "Comfort Call Center ... will function primarily as a Contact/Reservation center for the owners and sole proprietors of Comfort Inns and Comfort Inns & Suites...." CCC's "[m]ain objective is to build our brand name 1-800-COMFORT."
Paragraph 1.3, under the heading "Keys to Success" and subheading "Solid Customer Base:" Choice Hotels has "1,800 *199 hotels in full operation and another 400 under construction" under the COMFORT INN® and COMFORT INN & SUITES® marks.
Paragraph 1.3, under the subheading "Online Presence:" CCC states its intent to use the "1-800-COMFORT.COM" mark and domain name "to direct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

thousands of people to our website...."
Paragraph 4.0, under the heading "Market Analysis Summary:" 'COMFORT INN® and COMFORT INNS & SUITES® ' are "our primary target." [FN12]

> [FN12]. Statement of Uncontroverted Facts in Support of Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 5, l.21 to p. 6, l.11.

In December 2002, CCC registered the following domain names: "1-888-comfort.com," "comfortgoldcard.com," "comfortsilvercard.com," "comfortbronzecard.com" and "comfortowners.com." The domain names registered by Wright and CCC provided access to two websites authored and designed by Wright which specifically referred to Choice Hotels' COMFORT® marks, COMFORT INNS® and COMFORT INNS & SUITES® . By 2003, Wright and CCC were soliciting business directly from Choice Hotels' franchisees for the call center and websites. Wright admits sending approximately 2,000 facsimile solicitations to owners of COMFORT INNS® and COMFORT INNS & SUITES® , asking that they visit his websites and utilize CCC's call center and reservation services using the 1-800-COMFORT number and CCC domain names and marks (collectively, the "Infringing marks" or "Infringing domain names"). At no time did Choice Hotels consent to use of the COMFORT® marks or the Infringing marks by either Wright, Dreamco or CCC.

On May 29, 2003, Choice Hotels filed a complaint against Wright, Dreamco and CCC in Case No. CV-03-3785-RGK, styled *Choice Hotels International, Inc. v. Scott Wright, et. al.,* in the United States District Court, Central District of California, seeking an injunction and damages for their unauthorized use of its Comfort® marks. Wright, who was represented by counsel, filed an answer to the complaint on June 19, 2003. On August 19, 2003, the district court entered a preliminary injunction enjoining Wright, Dreamco and CCC from using the COMFORT® marks and advertising or marketing the 1-800-COMFORT number. On August 27, 2003, the court set the matter for a jury trial to begin on May 11, 2004.

On February 25, 2004, after a discovery period of approximately seven months, [FN13] Choice Hotels filed a motion for summary judgment. On April 6, 2004, Choice Hotel's motion was taken under submission

by the court. Wright waited until April 9, 2004, to file a response and supporting declaration in opposition to Choice Hotels' motion for summary judgment. Choice Hotels objected to Wright's response as untimely, but its motion to strike was denied on April 14, 2004. On April 20, 2004, the district court entered an order granting Choice Hotels' motion for summary judgment. On May 11, 2004, the district court entered a judgment against Wright, Dreamco and CCC, jointly and severally, permanently enjoining the defendants from using the COMFORT® marks and *200 the Infringing marks, and awarding Choice Hotels the sum of $45,720 in royalty fees for their unauthorized use of the COMFORT® marks and statutory damages totaling $525,000 pursuant to the Anticybersquatting Consumer Protection Act ("ACPA"). [FN14]

> [FN13]. Prior to expiration of the discovery deadline on February 5, 2004, Choice Hotels served Wright with requests for admission pursuant to Rule 36 of the Federal Rules of Civil Procedure and took his testimony by oral deposition pursuant to Rule 30 of the Federal Rules of Civil Procedure. Choice Hotels also obtained the oral deposition of Wright's father, Elmer Clifford Wright, on January 6, 2004.

> [FN14]. Pub.L. No. 106-113, 113 Stat. 1536 (1999), codified at 15 U.S.C. § 1125(d).

On April 21, 2005, Wright filed a voluntary petition under chapter 7 of the Code. Choice Hotels was listed in Schedule F as the holder of an unsecured, non-priority claim in the amount of $570,720 by virtue of the judgment entered in the district court. On July 25, 2005, Choice Hotels timely commenced this adversary proceeding seeking a determination that the federal district court judgment for $570,720, plus interest, is excepted from discharge pursuant to § 523(a)(6) of the Code.

## II. DISCUSSION

[1][2][3] This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § § 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is appropriate in this court. 28 U.S.C. § 1409(a). To prevail under § 523(a)(6), the plaintiff must establish the allegations of the complaint by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1106 (9th Cir.2005).* Objections to the dischargeability of a debt are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. *See Quarre v. Saylor (In re Saylor), 108 F.3d 219, 221 (9th Cir.1997); Havhoe v. Cole (In re Cole), 226 B.R. 647, 653 (9th Cir.BAP1998).*

### A. *Standard for Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[FN15] The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir.1994).*

> FN15. Rule 56 of the Federal Rules of Civil Procedure, applicable to adversary proceedings by virtue of Rule 7056, provides for the summary adjudication of issues:
>
> **(c) Motion and Proceedings Thereon** ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...
> ...
>
> **(e) Form of Affidavits; Further Testimony; Defense Required** ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
> Fed.R.Civ.P. 56(c) & (e).

Under Rule 56(c), the moving party bears the initial burden of establishing that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);* **\*201***Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* "A 'material fact' is one that is relevant to an element of a claim or defense or whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987).* Genuine issues of material fact are those "factual issues that make a difference to the potential outcome and 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Svob. v. Bryan (In re Bryan), 261 B.R. 240, 243 (9th Cir.BAP2001)* (quoting *Anderson, 477 U.S. at 250, 106 S.Ct. 2505).* In other words, a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248, 106 S.Ct. 2505.*

Choice Hotels, as the movant, has the initial burden of production to establish that there is no genuine issue as to any material fact and that it is entitled to a summary judgment as a matter of law. Choice Hotels' burden of production is also affected by its burden of persuasion. When the movant has the ultimate burden of persuasion, the movant must submit evidence establishing that it is entitled to judgment as a matter of law even in the absence of an adequate response by the nonmovant. *See, e.g., N. Slope Borough v. Rogstad (In re Rogstad), 126 F.3d 1224, 1227 (9th Cir.1997)* (stating that it is error to grant a motion for summary judgment simply because there is no opposition); *Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir.1993)* (observing that summary judgment is improper where the moving papers are insufficient to support the motion or on their face reveal a genuine issue of material fact); *Hoover v. Switlik Parachute Co., 663 F.2d 964, 967 (9th Cir.1981)* (stating that even in the absence of evidence in support of the opposition, summary judgment should not be granted if the evidence in support of the motion is insufficient).

Once the moving party's burden is met by presenting evidence which, if uncontroverted, would entitle the moving party to a directed verdict at trial, the burden then shifts to the respondent to produce "significantly probative evidence" of specific facts showing there is a genuine issue of material fact requiring a trial. *T.W. Elec. Serv., 809 F.2d at 630, citing First Nat'l Bank v.*

355 B.R. 192                                                    Page 12
355 B.R. 192, 45 Bankr.Ct.Dec. 163
(Cite as: 355 B.R. 192)

_Cities Serv. Co._, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The respondent "will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." _In re Ikon Office Solutions, Inc._, 277 F.3d 658, 666 (3d Cir.2002). A mere "scintilla" of evidence supporting the respondent's position will not be sufficient. _Anderson_, 477 U.S. at 247-48, 106 S.Ct. 2505.

In deciding whether a fact issue has been created, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the nonmoving party. _See Jonas v. Resolution Trust Corp. (In re Comark)_, 971 F.2d 322, 324 (9th Cir.1992). All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. _Anderson_, 477 U.S. at 248, 106 S.Ct. 2505. Inferences may also be drawn from underlying facts that are not in dispute. _T.W. Elec. Serv._, 809 F.2d at 631. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is not 'genuine' issue for trial." _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### *202 B. _Willful and Malicious Injury_

[4] Section 523(a)(6) of the Code excepts from discharge debts resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A "deliberate or intentional injury" is required before § 523(a)(6) will render a debt nondischargeable. _See Kawaauhau v. Geiger_, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (stating that nondischargeability under § 523(a)(6) "takes a deliberate or intentional _injury_, not merely a deliberate or intentional _act_ that leads to injury").

[5][6] Section 523(a)(6) requires separate findings on the issues of "willful" and "malicious." The "willful" injury requirement of § 523(a)(6) is met "when it is shown either that the debtor had a subjective motive to inflict injury _or_ that the debtor believed that injury was substantially certain to occur as a result of his conduct." _Carrillo v. Su (In re Su)_, 290 F.3d 1140, 1144 (9th Cir.2002) (quoting _Petralia v. Jercich (In re Jercich)_, 238 F.3d 1202, 1208 (9th Cir.), _cert. denied_, 533 U.S. 930, 121 S.Ct. 2552, 150

L.Ed.2d 718 (2001)). A "malicious injury" involves "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." _Id._ at 1146-47 (quoting _Jercich_, 238 F.3d at 1209). _See, e.g., Diamond v. Kolcum (In re Diamond)_, 285 F.3d 822, 829 (9th Cir.2002) (holding that a state court jury finding that the debtors "intentionally caused injury" to the creditor "without just cause" was entitled to preclusive effect for purposes of § 523(a)(6)); _Murray v. Bammer (In re Bammer)_, 131 F.3d 788, 791 (9th Cir.1997) (en banc) (stating that malice under § 523(a)(6) "does not require a showing of biblical malice, _i.e._, personal hatred, spite or ill-will").

### C. _Issue Preclusion_

Choice Hotels asserts that it is entitled to a summary judgment on its § 523(a)(6) claim given the preclusive effect of the summary judgment entered by the district court in the prior lawsuit between the parties. While conceding that bad faith or intent were not essential elements of its causes of action in the district court,[FN16] Choice Hotels claims that the district court's findings with respect to Wright's violation of the ACPA satisfy the "willfulness" and "maliciousness" requirements of § 523(a)(6). Wright disagrees, arguing that the issues of "willfulness" and "maliciousness" were not "raised, actually litigated or necessary" to either Choice Hotels' claims in the prior action *203 or the judgment entered in the case. Wright also reasons that none of the issues were "actually litigated" in the previous suit because he neither conducted discovery nor timely opposed Choice Hotels' motion for summary judgment.

FN16. Fraudulent or wrongful intent is not an essential element of unfair competition or infringement of a registered trademark. _See, e.g., Dreamwerks Prod. Group, Inc. v. SKG Studio_, 142 F.3d 1127, 1132 n. 12 (9th Cir.1998) (stating that "[a]bsence of malice is no defense to trademark infringement"); _E. & J. Gallo Winery v. Gallo Cattle Co._, 967 F.2d 1280, 1293 (9th Cir.1993) (observing that "[a] party claiming trademark infringement need not demonstrate that the alleged infringer intended to deceive consumers"); _U-Haul Int'l, Inc. v. Jartran, Inc._, 522 F.Supp. 1238, 1254 (D.Ariz.1981), _aff'd_, 681 F.2d 1159 (9th Cir.1982) (stating that "[i]ntent to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

confuse or mislead is not an element of a cause of action under the Lanham Act"). In *S.C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129 (6th Cir.1959),* the Sixth Circuit observed:

> While fraudulent intent is not an essential element of infringement of a trademark, it is entitled to consideration. Motivation is an important factor in the determination of such an issue. Trademark infringement does not depend upon a fraudulent intent; and good faith is no defense, if the mark used is likely to result in confusion or mistake. But the court has the right, in determining the likelihood of confusion, to consider the motive of the party who adopts the mark.
> *Id.* at 142 (citations omitted).

[7][8][9] Collateral estoppel, or issue preclusion,[FN17] applies to nondischargeability proceedings in bankruptcy court. *Grogan,* 498 U.S. at 284 n. 11, 111 S.Ct. 654; *Cal-Micro, Inc. v. Cantrell (In re Cantrell),* 329 F.3d 1119, 1123 (9th Cir.2003); *Khaligh v. Hadaegh (In re Khaligh),* 338 B.R. 817, 824 (9th Cir.BAP2006). Issue preclusion prevents a party from relitigating an issue that the party has actually litigated and lost in a prior proceeding. *See R.T.C. v. Keating,* 186 F.3d 1110, 1114 (9th Cir.1999); *Roussos v. Michaelides (In re Roussos),* 251 B.R. 86, 92 (9th Cir.BAP2000). Issue preclusion serves to protect litigants from multiple lawsuits, conserve judicial resources, and encourage reliance on adjudication by reducing the likelihood of inconsistent decisions. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Montana v. United States,* 440 U.S. 147, 153-54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). *See generally,* C. Klein, *et. al., Principles of Preclusion and Estoppel in Bankruptcy Cases,* 79 Am. Bankr.L.J. 839, 852-58 (2005).

> FN17. In *Robi v. Five Platters, Inc.,* 838 F.2d 318 (9th Cir.1988), the Ninth Circuit explained the concepts of issue preclusion and claim preclusion, stating:
> Generally, the preclusive effect of a former adjudication is referred to as "*res judicata.*" The doctrine of *res judicata* includes two distinct types of preclusion, claim preclusion and issue preclusion. Claim preclusion treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same claim or cause of action. Claim preclusion prevents litigation

of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in a prior proceeding.

The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding. In both the offensive and defensive use situations the party against whom estoppel [issue preclusion] is asserted has litigated and lost in an earlier action. The issue must have been actually decided after a full and fair opportunity for litigation.

*Id.* at 321-22 (citations and quotations omitted).

[10][11] The preclusive effect of a prior federal district court judgment is determined by federal law. *See, e.g., Fed. Deposit Ins. Corp. v. Daily (In re Daily),* 47 F.3d 365, 368 (9th Cir.1995) (applying federal law to determine the preclusive effect of a prior federal judgment in an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO")); *Robi,* 838 F.2d at 322 (stating that "we apply California law of *res judicata* to the California judgment, New York law to the New York judgment, and federal law to the federal judgments"); *Genel Co. v. Bowen (In re Bowen),* 198 B.R. 551, 555 (9th Cir.BAP1996) (stating that "we apply federal law to determine the preclusive effect of a prior federal diversity judgment"). Under federal law, issue preclusion may be raised offensively[FN18] when "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party *204 or in privity with a party in the previous action." *U.S. Internal Revenue Serv. v. Palmer (In re Palmer),* 207 F.3d 566, 568 (9th Cir.2000); *Pena v. Gardner,* 976 F.2d 469, 472 (9th Cir.1992).

> FN18. "[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

[12] Issue preclusion may apply despite the fact that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
(Cite as: 355 B.R. 192)

Page 14

the prior determination is based upon an unopposed motion for summary judgment rather than a trial. *Stevenson v. Sears, Roebuck & Co.,* 713 F.2d 705, 712 (Fed.Cir.1983); *U.S. v. Gottheiner (In re Gottheiner),* 703 F.2d 1136, 1140 (9th Cir.1983). In such a case, the "actual litigation" requirement is satisfied if the party had a full and fair opportunity to litigate the issue in the prior proceeding, and, despite substantial participation in the action, chose not to do so. *See, e.g., Palmer,* 207 F.3d at 569 (holding that a summary judgment obtained by the IRS against the debtor in a prior Tax Court proceeding, which had been abandoned at the outset by the debtor, had no preclusive effect in a subsequent action under § 523(a)(1)(C)); *Daily,* 47 F.3d at 368 (holding that a default judgment entered against the debtor as a discovery sanction, after two years of active participation in the litigation, was entitled to preclusive effect in a subsequent dischargeability proceeding between the parties); *Gottheiner,* 703 F.2d at 1140 (holding that collateral estoppel was available to a creditor who obtained an unopposed summary judgment after sixteen months of active participation by the debtor).

There is no dispute that some of the essential elements of issue preclusion under federal law are present in this case. Choice Hotels and Wright were parties to the prior district court action. The issues litigated in the district court, which form the basis for Choice Hotels' § 523(a)(6) claim against Wright in this proceeding, involved Wright's liability, if any, to Choice Hotels for alleged service mark infringement, unfair competition, service mark dilution, and registration of the Infringing domain names in violation of the ACPA. Wright actively participated in the lawsuit, and had a full and fair opportunity to litigate these issues in the prior action. [FN19] Wright lost in the prior action, and the summary judgment entered by the district court against Wright is a final judgment on the merits. To have issue preclusion, however, the issue determined in the prior action must be *identical* to the issue presented in the current action. *Cantrell,* 329 F.3d at 1123 (quoting *Harmon v. Kobrin (In re Harmon),* 250 F.3d 1240, 1245 (9th Cir.2001)) (emphasis added).

FN19. Wright's contention that the district court did not consider his untimely opposition to Choice Hotels' motion for summary judgment is belied by the record. Wright filed his untimely opposition to Choice Hotels' motion for summary judgment on April 9, 2004. On April 14,

2004, the district court denied Choice Hotels' motion to strike Wright's untimely opposition. An order granting Choice Hotels' motion for summary judgment was not entered until April 20, 2004. Nor is there merit to Wright's assertion that his own failure to conduct discovery before expiration of the court-imposed deadline of February 5, 2004, deprived him of a full and fair opportunity to litigate the issues before the district court.

D. *Choice Hotels' Summary Judgment*

1. *Service Mark Infringement and Unfair Competition*

[13][14] A service mark is "a distinctive mark used in connection with the sale or advertising of services, such as insurance, while a trademark is typically used to identify and distinguish tangible goods." *Am. Int'l Group, Inc. v. Am. Int'l Bank,* 926 F.2d 829, 830 n. 1 (9th Cir.1991). Service marks are registrable and entitled to protection in the same manner as are trademarks.*205 *Id.; see* 15 U.S.C. § 1053. Choice Hotels sought relief against Wright in the district court for alleged service mark infringement and unfair competition in violation of §§ 32(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a), respectively, and state law.[FN20]

FN20. Choice Hotels' state law claims included: (a) service mark infringement in violation of Cal. Bus. & Prof.Code § 14340; (b) unfair competition in violation of Cal. Bus. & Prof.Code § 17200; (c) service mark dilution in violation of Cal. Bus. & Prof.Code § 14330; (d) trademark infringement and unfair competition under common law, and (e) unjust enrichment. The liability analysis for trademark infringement and unfair competition is essentially the same under federal, state and common law. *See, e.g., M2 Software, Inc. v. Madacy Entm't,* 421 F.3d 1073, 1080 (9th Cir.2005) (stating that "[t]he test for trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion"); *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 874 (9th Cir.1999) (discussing the substantial similarity between California's dilution statute and the Federal Trademark Dilution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Act); *Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th Cir.1994) (stating that the Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act").

[15] Federal trademark law seeks to protect both an owner's investment in a mark as well as consumers who have formed an association with the mark. *See Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 163-64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Avery Dennison,* 189 F.3d at 873. Liability for trademark or service mark infringement occurs when a person "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

[16][17][18] Trademark infringement is established if the plaintiff demonstrates (1) ownership of a valid, protectable mark, and (2) a likelihood of confusion, mistake or deception in the defendant's use of the mark. *See New West Corp. v. NYM Co.,* 595 F.2d 1194, 1198-1202 (9th Cir.1979); *Charles Schwab & Co. v. Hibernia Bank,* 665 F.Supp. 800, 803 (N.D.Cal.1987). "The core element of trademark infringement is the likelihood of confusion, *i.e.,* whether the similarity of the marks is likely to confuse customers about the source of the products." *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1391 (9th Cir.1993) (quoting *E. & J. Gallo Winery,* 967 F.2d at 1290). Likelihood of confusion "exists when customers viewing [a] mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 845 (9th Cir.1987) (quoting *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1243 (9th Cir.1984)).

[19] In holding that Wright's actions constituted service mark infringement and unfair competition, the district court found that the COMFORT® marks, as federally registered trademarks, were valid, protectable marks owned by Choice Hotels. *See Brookfield Commc'ns., Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1047 (9th Cir.1999) (stating that "registration of the mark on the Principal Register in the Patent and Trademark Office

constitutes prima facie evidence of the validity of the registered mark and of [plaintiff's] exclusive right to use the mark on the goods and services specified in the registration"); *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1219 (9th Cir.1996) (noting that **\*206** "federal registration of the mark is prima facie evidence that the registrant is the owner of the mark"). Wright offered no evidence to the contrary. Indeed, it was undisputed that Choice Hotels "began using the marks COMFORT® , COMFORT INN® and COMFORT INNS® as early as June 1, 1981, and COMFORT SUITES® at least as early as October 17, 1985, for hotel/motel services, hotel/motel reservation services and related goods and services." [FN21] After applying the eight factor test promulgated by the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979),[FN22] the district court further held that a likelihood of confusion existed between the COMFORT® marks and the Infringing marks because:

> FN21. Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 4, l.7-11.

> FN22. In *Sleekcraft,* the Ninth Circuit identified the following eight nonexclusive factors as relevant in determining likelihood of confusion:
> 1. strength of the mark;
> 2. proximity of the goods;
> 3. similarity of the marks;
> 4. evidence of actual confusion;
> 5. marketing channels used;
> 6. type of goods and the degree of care likely to be exercised by the purchaser;
> 7. defendant's intent in selecting the mark; and
> 8. likelihood of expansion of the product.
> *Id.* at 348-49. *See, e.g., Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1076 (9th Cir.2006) (stating that the *Sleekcraft* factors "are not applied mechanically; courts may examine some or all of the factors, depending on their relevance and importance"); *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 631 (9th Cir.2005) (explaining that "[t]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them"); *Brookfield Commc'ns.,* 174 F.3d at 1054 (opining that some *Sleekcraft* factors "are much more important than

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
**(Cite as: 355 B.R. 192)**

Page 16

others, and the relative importance of each individual factor will be case-specific").

1. The Infringing marks incorporated the word "comfort" as their dominant term, and the addition of the domain indicator ".COM" or the prefix "1-8-" or "1-888" did nothing to differentiate the Infringing marks from the COMFORT® marks.

2. Choice Hotels and Wright each offered travel reservation services.

3. Choice Hotels and Wright each used the Internet and toll-free numbers to market their services.

4. Choice Hotels had used its COMFORT® mark for over twenty years and had devoted millions of dollars in advertising to make it a prominent name, and research on consumer awareness showed that there was a 97% awareness for the COMFORT INN® brand since 1999 and that awareness for COMFORT SUITES® had arisen from 69% in 1999 to 81% by 2002.

5. Wright admitted to having adopted the Infringing marks for the purpose of trading on the association with the COMFORT® marks.

6. Wright conceded that he received in excess of 330,000 calls annually by consumers looking for COMFORT® hotel information, indicating that consumer confusion existed.

7. Wright intended to create a hotel/motel reservation call center for Choice Hotels' COMFORT® -brand franchisees and to provide services via the Internet and telephone, substantially identical to the travel services offered to COMFORT® customers by Choice Hotels.

Based on the foregoing findings, the district court determined that Wright was liable to Choice Hotels on its claims for *207 service mark infringement and unfair competition.

[20] Despite Wright's admission that he "adopted the Infringing marks for the purpose of trading on the association with the COMFORT® marks," the district court made no specific finding that Wright's infringement of the COMFORT® marks was either willful or intentional.[FN23] It was not necessary to do so. Actual knowledge and wrongful intent are not essential elements of either direct service mark infringement or unfair competition. [FN24] Whether Wright had actual knowledge of his infringement or the specific intent to siphon off the goodwill of Choice Hotels' COMFORT® marks were issues that were neither actually litigated nor necessary to the district court's summary judgment. Therefore, the judgment in favor of Choice Hotels on such claims in the prior action does not merit issue preclusion in this

adversary proceeding. *See Atlantic Recording Corp. v. Chin-Liang Chan (In re Chin-Liang Chan), 325 B.R. 432, 438 (Bankr.N.D.Cal.2005).*

FN23. Wright's admission was relevant to the issue of likelihood of confusion. Under the *Sleekcraft* test, Wright's intent in selecting the mark was a factor to be considered by the district court in determining likelihood of confusion. If a defendant knowingly adopts a mark similar to another's, a court "must presume that the public will be deceived." *M2 Software, Inc., 421 F.3d at 1079; Official Airline Guides, 6 F.3d at 1394.*

FN24. *See* Footnote # 16, *supra. See also Rolex Watch U.S.A., Inc. v. Meece (In re Meece), 261 B.R. 403, 409 (Bankr.N.D.Tex.2001)* (observing that "[t]he statutory scheme focuses on the probable reaction of buyers, without a requirement of the subjective state of mind of the defendant").

2. *Service Mark Dilution*

[21] Under the Federal Trademark Dilution Act of 1995 ("FTDA"), [FN25] the owner of a famous mark is entitled to an injunction "against another person's use in commerce of a mark or trade name, if such use begins after the mark becomes famous [FN26] and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c)(1). "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. Anti-dilution statutes are intended to prevent "the gradual 'whittling away' of a trademark's value." *Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1457 (9th Cir.1991)* (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 24:13 (2d ed.1984)). Dilution is actionable because it impermissibly creates an association in the minds of consumers between a famous mark and a different *208 good or service. *Playboy Enters., Inc. v. Welles, 279 F.3d 796, 805 (9th Cir.2002).* To prevail on a federal trademark dilution claim, a plaintiff must demonstrate that (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish plaintiff's goods and services. *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998).

FN25. Pub.L. No. 104-98, 109 Stat. 985 (1995), codified at 15 U.S.C. § § 1125, 1127.

FN26. The FTDA prescribes the following eight non-exclusive factors for consideration in determining whether or not a mark is "famous:"
(A) the degree of inherent or acquired distinctiveness to the mark;
(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
(D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods or services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;
(G) the nature and extent of use of the same or similar marks by third parties; and
(H) whether the mark was registered ... on the principal register.
15 U.S.C. § 1125(c)(1).

In the district court action, Wright admitted that the COMFORT® marks were "well-known and famous throughout California [and the United States]." [FN27] Wright further admitted that "[w]hen other companies used any form of 'comfort' in their advertising, it will always point to Comfort Inn in the minds of consumers." [FN28] Moreover, Choice Hotels established through regular consumer awareness studies that "consumer awareness was at 98% for the COMFORT INN® brand and 81% for the COMFORT SUITES® brand" in 2002. Based on these facts, the district court concluded that Choice Hotels' COMFORT® marks were famous, and that the Infringing marks diluted the COMFORT® marks by causing a likelihood of confusion which reduced the ability of the COMFORT® marks to identify only Choice Hotels' goods or services.

FN27. Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 5, l.29-30.

FN28. *Id.* at p. 5, l.31-33.

In holding that Wright's Infringing marks diluted the COMFORT® marks in violation of the FTDA, the district court made no specific finding that Wright's actions were either willful or intentional. Again, it was not necessary for the district court to do so because the FTDA focuses on the likelihood of confusion through the "blurring and tarnishment" of famous marks, [FN29] not the subjective intent of the defendant. Had the district court found "willful intent," Choice Hotels would have been entitled to a further recovery of actual damages and attorneys fees under the FTDA. 11 U.S.C. § 1125(c)(2). Because the district court was not required to find that Wright acted either intentionally or willfully in holding that Wright's actions diluted the COMFORT marks in violation of the FTDA, issue preclusion does not apply.

FN29. "Blurring" occurs when another's use of a mark creates "the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Panavision, Int'l, L.P.,* 141 F.3d at 1326 n. 7. "Tarnishment" occurs "when a famous mark is improperly associated with an inferior or offensive product or service." *Id.*

### 3. Unjust Enrichment

[22][23] Unjust enrichment is not a cause of action under California law. *McBride v. Boughton,* 123 Cal.App.4th 379, 387, 20 Cal.Rptr.3d 115 (2004); *Melchior v. New Line Prods., Inc.,* 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003). It is, in fact, "a general principle, underlying various legal doctrines and remedies, that one person should not be permitted to unjustly enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly." *Dinosaur Dev., Inc. v. White,* 216 Cal.App.3d 1310, 1315, 265 Cal.Rptr. 525 (1989). Unjust enrichment is *209 synonymous with restitution. *McBride,* 123 Cal.App.4th at 387, 20 Cal.Rptr.3d 115; *Melchior,*

106 Cal.App.4th at 793, 131 Cal.Rptr.2d 347.

[24][25][26][27] A person is required to make restitution if he or she is unjustly enriched at the expense of another. Restatement (First) Restitution § 1 (1937); *Ghirardo v. Antonioli,* 14 Cal.4th 39, 51, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1003 (1996). Enrichment occurs when a person receives a benefit at another's expense. Restatement, *supra,* § 1, cmt. a; *Ghirardo,* 14 Cal.4th at 51, 57 Cal.Rptr.2d 687, 924 P.2d at 1003. "Benefit" includes any form of advantage. Restatement, *supra,* § 1, cmt. b; *Ghirardo,* 14 Cal.4th at 51, 57 Cal.Rptr.2d 687, 924 P.2d at 1003. Restitution may be appropriate where there has been partial performance of an express contract, or fraud, accident or mistake in the formation of a contract. *See McBride,* 123 Cal.App.4th at 388, 20 Cal.Rptr.3d 115. Alternatively, restitution may be awarded where the benefit received resulted from a defendant's fraud, conversion or other tortious conduct. In such a case, the court implies a contract, notwithstanding the intention of the parties, to prevent unjust enrichment. *Id.*

[28] The district court granted summary judgment to Choice Hotels on its claim against Wright for unjust enrichment, holding that Choice Hotels was entitled to "[p]ayment of a $47,500 royalty fee by Defendants for the use of the COMFORT MARKS® ." [FN30] In so holding, the district court found only that Choice Hotels "restricts the use of the COMFORT MARKS® by others and requires a licensing fee to be paid for such use." [FN31] The district court made no other findings in support of its unjust enrichment award, including any finding that Wright violated an independent duty to Choice Hotels arising from principles of tort law. Restitution was awarded to compensate Choice Hotels for the benefit received by Wright at its expense, *i.e.,* Wright's unauthorized use of the COMFORT® marks. Because restitution does not necessarily require a finding of a deliberate and intentional injury, the district court's ruling on Choice Hotels' unjust enrichment theory has no preclusive effect in this § 523(a)(6) action.

FN30. Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 7, l.27-28.

FN31. *Id.* at p. 7, l.15-16.

### 4. Cybersquatting

[29] Cybersquatting is the "deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." *Virtual Works, Inc. v. Volkswagen of Am., Inc.,* 238 F.3d 264, 267 (4th Cir.2001) (quoting S.Rep. No. 106-140, at 4 (1999)). Cybersquatters register " 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.' " *Id.* (quoting S.Rep. No. 106-140, at 5). Cybersquatting has been described as "the Internet version of a land grab." *Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 946 (9th Cir.2002); *Virtual Works,* 238 F.3d at 267.

[30] On November 29, 1999, Congress passed the ACPA making it illegal to register or use with the bad faith intent to profit an Internet domain name that is "identical or confusingly similar" to the trademark or domain name of another person or company. 15 U.S.C. § 1125(d)(1)(A). [FN32] Under the ACPA, a *210 person is a cybersquatter and is liable to the owner of a protected mark if that person:

> FN32. "A number of cybersquatting problems prompted Congressional action. There was concern about individuals registering domain names that are similar to famous marks for the purpose of profiting by selling them to the legitimate owners of the marks. Congress was also aware of individuals attaching obscene or pornographic material to an infringing domain name in order to tarnish the mark. Others attempted to divert unsuspecting consumers to their sites in order to engage in unfair competition.... The legislative history of the APCA includes findings that cybersquatters were engaged in consumer fraud and creating public confusion as to the true source and sponsorship of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable intellectual property." *Coca-Cola Co. v. Purdy,* 382 F.3d 774, 778 (8th Cir.2004) (citations omitted).

(i) has a *bad faith intent* to profit from [a mark]; and
(ii) registers, traffics in or uses a domain name that-
(I) in the case of a mark that is distinctive at the time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 192
355 B.R. 192, 45 Bankr.Ct.Dec. 163
**(Cite as: 355 B.R. 192)**

of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar or dilutive of that mark....

15 U.S.C. § 1125(d)(1)(A) (emphasis added). A finding of "bad faith" is an essential element to any cause of action under the ACPA. *Interstellar Starship,* 304 F.3d at 946. In determining whether a person has "bad faith intent," Congress directed the courts to consider the following nine nonexclusive factors: 1. The trademark or other intellectual property rights of the person, if any, in the domain name;

2. The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

3. The person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

4. The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

5. The parties intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

6. The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

7. The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

8. The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, *211 or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

9. The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous....

15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX). In addition to the nine enumerated factors, a court may rely on other indicia of bad faith intent to profit. *Sporty's Farm, L.L.C. v. Sportman's Mkt., Inc.,* 202 F.3d 489, 499 (2d Cir.2000) (stating that "[t]he most important grounds for [a finding of bad faith intent] are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute"). The ACPA also contains a safe harbor provision explaining that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

With regard to Choice Hotels' ACPA cause of action, the district court found that Wright had a "bad faith intent to profit" from the Infringing domain names in using the COMFORT® marks. Specifically, the district court determined that:

1. Wright's " 'late registration [of the domain names], without any prior bona fide use, demonstrates a bad faith intent to profit parasitically from Choice's advertisement and reputation;' " [FN33]

> FN33. Order Re Plaintiff Choice Hotels International, Inc.'s Motion for Summary Judgment, p. 6, l.18-20 (quoting Order Granting Preliminary Injunction entered on August 18, 2003).

2. Wright had no federal, state or common law trademark rights in the Infringing domain names;

3. None of the Infringing domain names were previously used by Wright as a business name;

4. Choice Hotels' rights in the COMFORT® marks dated back to 1981, while the Infringing domain names were registered in 2001;

5. The Infringing domain names provided access to commercial hotel/motel services;

6. There was no evidence of any bona fide noncommercial use by Wright, and

7. Wright created the Infringing domain names with the intent to divert consumer traffic from Choice Hotels' authorized websites. [FN34]

> FN34. *Id.* at p. 6, l.18 to p. 7, l.3.

The district court further found that Wright's

Infringing domain names diluted and were confusingly similar to the COMFORT® marks.[FN35] Based on these findings, the district court held that Wright's attempts to profit in bad faith from Choice Hotels' famous COMFORT® marks violated the ACPA. Choice Hotels was granted injunctive relief and awarded statutory damages under the ACPA of $525,000 ($75,000 for each of the seven Infringing domain names).

FN35. *Id.* at p. 7, l.4-8.

### E. *Wright's Liability for Statutory Damages Under the ACPA is Nondischargeable*

[31] Notwithstanding the district court's specific finding of a "bad faith intent to profit" from the COMFORT® marks, Wright denies that his use of the COMFORT® marks was either willful or malicious. Wright claims that his actions *212 were motivated, not by a specific intent to harm Choice, but simply by a desire to benefit Choice Hotels as well as himself, describing his efforts to build a relationship with Choice Hotels as "a 'win-win' situation." [FN36] Wright reasons that an intent to profit, whether in good faith or bad faith, "does not, either expressly or impliedly, carry with it any harm or injury to another." [FN37] Wright also contends that, despite the district court's award of statutory damages, Choice Hotels was not truly injured by his conduct because there is no evidence of actual damages. According to Wright, "[t]here is no evidence that [Choice Hotels] was ever harmed by [Wright's] use of any of its marks." [FN38]

FN36. Wright's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, p. 5, l.13-15.

FN37. *Id.* at p. 4, l.19-21.

FN38. *Id.* at p. 4, l.24-25.

An award of statutory damages, which satisfies the criteria for a "willful and malicious injury," constitutes a nondischargeable debt under § 523(a)(6). *Albarran v. New Form, Inc. (In re Albarran),* 347 B.R. 369, 383 (9th Cir.BAP2006); *Star's Edge, Inc. v. Braun (In re Braun),* 327 B.R. 447, 452 (Bankr.N.D.Cal.2005). Before the trial court renders a final judgment, the victim of cybersquatting in violation of the ACPA may elect

"to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 11 U.S.C. § 1117(d). ACPA statutory damages serve "to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court." *See Pinehurst, Inc. v. Wick,* 256 F.Supp.2d 424, 432 (M.D.N.C.2003) (quoting S.Rep. No. 106-140, at 8 (1999)).

Because a finding of "bad faith intent" is an essential element of an ACPA cause of action, the court concludes that Wright's cybersquatting in violation of the ACPA constituted a categorically harmful activity which necessarily caused injury to Choice Hotels within the scope of § 523(a)(6). *See, e.g., Sicroff,* 401 F.3d at 1106-07 (holding that libel necessarily caused harm to a person's reputation and was a "malicious" injury where the debtor had conceded "willfulness"); *Albarran,* 347 B.R. 369, 383 (9th Cir.BAP2006) (concluding that "intentional copyright infringement is a categorically harmful activity and thus is an 'injury,' as that term is used in § 523(a)(6)"); *Braun,* 327 B.R. at 451 (concluding that "if conduct necessarily causes harm, an independent finding of injury is unnecessary").

[32] For purposes of the "willfulness" requirement of § 523(a)(6), the court may infer subjective intent or substantial certainty from the facts and circumstances surrounding the defendant's conduct. *See, e.g., Su,* 290 F.3d at 1146 n. 6 (stating that "[t]he bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action"); *Albarran,* 347 B.R. at 384 (stating that "[s]ubjective intent or substantial certainty may be inferred from all of the facts and circumstances established"). Wright was aware of Choice Hotels' rights in the COMFORT® marks at the time of his infringement. On December 2, 1997, Choice Hotels instructed Wright and Dreamco to cease their unauthorized use of the COMFORT® marks in the telephone number, 1-800-COMFORT, to promote travel industry related services. After exhausting his efforts to obtain a license from Choice Hotels to use *213 the COMFORT® marks legitimately, Wright incorporated the CCC and devised a plan to "parasitically" profit from the COMFORT® marks without the consent of Choice Hotels. Wright admits acquiring the Infringing domain names with the specific intent to divert COMFORT® customers and consumer traffic from the Choice Hotels' authorized websites and to profit therefrom. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

district court found that the Infringing domain names were designed to provide access to commercial hotel/motel services, and that there was no evidence of a bona fide noncommercial use by Wright. Furthermore, Wright was no longer using the 1-800-COMFORT telephone number to sell shoes when the Infringing domain names were registered in 2001. Happy Feet had already ceased doing business. Simply put, when Wright illegally used the Choice Hotels' COMFORT® marks to boost his own Internet traffic, he had actual knowledge that harm to Choice Hotels was substantially certain to occur. *See Su,* 290 F.3d at 1146 (stating that debtor must have "actual knowledge that harm to the creditor was substantially certain").

Having established that Wright's violation of the ACPA was willful and necessarily caused injury to Choice Hotels, the court can imply malice. *Thiara v. Spycher Bros. (In re Thiara),* 285 B.R. 420, 434 (9th Cir.BAP2002) (observing that "the 'done intentionally' element of a 'malicious' injury brings into play the same subjective standard of intent which focuses on the [defendant's] knowledge of harm to the creditor"). Finally, the summary judgment evidence supports a finding that Wright had no just cause or excuse for his actions. Wright acquired the Infringing domain names with the specific intent to divert consumer traffic from Choice Hotels' authorized websites despite having been informed repeatedly by Choice Hotels to cease and desist his infringement. Wright offered no evidence in the prior action to establish a "safe harbor" defense to his violation of the ACPA, *i.e.,* that he believed, or had reasonable grounds to believe, that use of the Infringing domain names constituted fair use or was otherwise lawful. Nor has Wright produced significantly probative evidence of specific facts in response to Choice Hotels' motion showing there is a genuine issue of material fact requiring a trial on this issue.

Accordingly, the court finds that Wright's violation of the ACPA was malicious in that it was wrongful, done intentionally, necessarily caused injury to Choice Hotels, and was done without just cause or excuse. Furthermore, the evidence supports a finding that Wright's violation of the ACPA was willful because he had actual knowledge that harm to Choice Hotels was substantially certain to occur as a result of his actions.

III. CONCLUSION

There being no genuine issue as to any material fact for trial, the court finds that Choice Hotels is entitled to a summary judgment as a matter of law. For the foregoing reasons, Choice Hotels' judgment for statutory damages against Wright in the amount of $525,000, plus interest from May 11, 2004, is excepted from discharge under 11 U.S.C. § 523(a)(6).

A separate judgment will be entered consistent with this opinion.

Bkrtcy.C.D.Cal.,2006.
In re Wright
355 B.R. 192, 45 Bankr.Ct.Dec. 163

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 20



Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642
(Cite as: Not Reported in A.2d)

Knowles v. Visa U.S.A., Inc.Me.Super.,2004.
Superior Court of Maine.
Catherine J. KNOWLES, et al, Plaintiffs
v.
VISA U.S.A. INC., et al, Defendants
**No. Civ.A. CV-03-707.**

Oct. 20, 2004.

ORDER

WARREN, J.
**\*1** This action is brought by plaintiffs Catherine J. Knowles and Diane Roberts, suing on behalf of themselves and a proposed class of all similarly situated Maine consumers, against defendants Visa U.S.A. Inc. and MasterCard International Inc. alleging violations of Maine's antitrust statutes, 10 M.R.S.A. § § 1101, 1104 (1996). Before the court is defendants' motion to dismiss on the ground that plaintiffs lack standing for purposes of the antitrust laws.

*1. The Wal-Mart Class Actions*

**\*1** This action follows on the heels of the settlement of a group of antitrust class actions brought in the U.S. District Court for the Eastern District of New York styled *In re Visa Check/MasterMoney Antitrust Litigation,* No. 96-CV-5238 (JG) (E.D.N.Y.) also known as *Wal-Mart Stores, Inc., et al v. Visa U.S.A. Inc., et al.* (the *"Wal-Mart* class actions")

**\*1** The *Wal-Mart* class actions were brought by merchants who asserted that they had been harmed by defendants' requirement that merchants had to accept Visa and MasterCard debit cards in order to be allowed to accept Visa and MasterCard credit cards. The merchants alleged that this constituted an illegal tying arrangement in violation of the antitrust laws.

**\*1** In February 2000 the federal district court granted class certification to a national class consisting of all merchants who accepted Visa or MasterCard credit cards and consequently had been required to accept Visa or MasterCard debit cards. *In re Visa Check/MasterMoney Antitrust Litigation,* 192 F.R.D. 68, 90 (E.D.N.Y.2000). In October 2001 the district court's class certification order was affirmed by the

U.S. Court of Appeals for the Second Circuit. 280 F.3d 124 (2d Cir.2001), *cert. denied,* 536 U.S. 917 (2002).

**\*1** On April 11, 2003 the federal district court denied a motion for summary judgment by Visa and MasterCard and granted partial summary judgment to the class plaintiffs on a number of specific issues. *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 U.S. Dist. LEXIS 4965, 7-12 (E.D.N.Y.2003). The court concluded, however, that issues of disputed fact remained, *inter alia,* on issues "that lie at the heart of the merchants' [Sherman Act] claims: whether Visa and MasterCard's Honor All Cards rules harmed competition in the debit card services market, and whether the defendants acted together to produce that result." *Id.* at 19.

**\*1** On April 30, 2003, on the eve of trial, the parties reached a settlement of the *Wal-Mart* class actions. This settlement was ultimately approved by the district court in December 2003. *In re Visa Check/MasterMoney Antitrust Litigation,* 297 F.Supp.2d 503 (E.D.N.Y.2003). The settlement involved a payment to the class of more than $3 billion plus injunctive relief preventing Visa and MasterCard from tying debit and credit cards in the future. In approving the settlement and awarding $220 million in attorneys fees, the district court noted that this constituted "the largest antitrust settlement in history," 297 F.Supp.2d at 508, and further noted that in addition to the $3 billion to be paid in settlement, the injunctive relief that had been agreed to was estimated to result in future savings of $25 billion to $87 billion. *Id.* at 511.[FN1]

> FN1. With respect to the merits, the district court noted that the *Wal-Mart* plaintiffs did not have an open and shut case as to liability. *See* 297 F.Supp.2d at 511 (plaintiffs' ability to prove that the "honor all cards" rule was anticompetitive was "no sure thing"). This was particularly true in light of the difficult questions of law involved. *See* 297 F.Supp.2d at 510, *quoting* Hovencamp, *Tying Arrangements and Class Actions,* 36 Vand.L.Rev. 213, 213 (1983) to the effect that "[f]ew areas of federal antitrust law are more confusing than the law that governs tying arrangements."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                     Page 2
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642
(Cite as: Not Reported in A.2d)

### 2. The Consumer Class Actions

**\*2** Once the merchants' class had been settled, consumer class actions began to be filed. It is the court's understanding that the case at bar is one of approximately 20 consumer class actions filed against Visa and MasterCard in state courts around the country.

**\*2** Like their counterparts in other states, Knowles and Roberts allege that the unlawful tying of Visa and MasterCard credit and debit cards harmed consumers because the merchants subjected to the allegedly illegal tying arrangement passed the increased costs on to consumers. Neither the class nor plaintiffs' theory of the case is limited to Maine consumers who actually used Visa or MasterCard debit or credit cards. Instead, plaintiffs' theory is that because merchants had to pay artificially inflated amounts as a result of defendants' unlawful tying agreement, the merchants passed those amounts on to all their customers by increasing the price of *all* retail goods they sold-regardless of whether payment was made by cash, check, credit card, debit card or otherwise. Thus the proposed class in this case consists of all consumers who purchased any item from any Maine merchant who accepted Visa or MasterCard during the period from December 1999 to December 2003.

**\*2** Specifically, the class plaintiffs allege that because Visa and MasterCard credit cards are dominant and ubiquitous, acceptance of these cards is critical to the business success of all or most retail merchants. As a result, plaintiffs contend, Visa and MasterCard were able to require that retail merchants accept Visa or MasterCard debit cards if they wanted to accept Visa or MasterCard credit cards, and were able to impose artificially inflated costs and fees upon the merchants, who then passed on those costs to consumers. Complaint ¶ ¶ 32, 38-40, 54, 56-58. Plaintiffs allege that Visa and MasterCard were able to set the same fees for their debit cards as for their credit cards even though, in an unrestrained market, debit cards would have commanded lower fees. Complaint ¶ ¶ 40, 44. Moreover, according to plaintiffs, the particular kind of debit cards which Visa and MasterCard required merchants to accept involved a higher level of credit risk for merchants than other kinds of debit cards offered by entities other than Visa and MasterCard.[FN2] *Id.* ¶ 43.

FN2. The Visa and MasterCard debit cards

complained of by the class plaintiffs are off-line debit cards, as opposed to on-line debit cards offered by other entities.

**\*2** Plaintiffs further allege that Visa and MasterCard were able to impose a "no discount, no surcharge" policy on retailers. This prevented retailers from either adding a surcharge for the riskier off-line debit cards offered by Visa and MasterCard or giving consumers a discount for paying through a less expensive means, such as cash or an on-line debit card. Complaint ¶ 7.

**\*2** One of the named plaintiffs in the case at bar, Diane Roberts, is also a plaintiff in a class action brought in the District of Columbia. *Peterson, et al v. Visa U.S.A. Inc., et al.,* Civil Action No. 03-008080 (D.C. Superior Court, filed Dec. 1, 2003). That action includes claims under the laws of the District of Columbia and seventeen states (including Maine) and seeks to have the District of Columbia court certify a multi-state class action on behalf of consumers from Maine and the 16 other states. In the District of Columbia action, plaintiffs are seeking monetary damages and injunctive relief against Visa and MasterCard's "no discount, no surcharge" policy. D.C. Complaint ¶ ¶ 187-92. Only monetary damages are sought in the case before this court. [FN3]

FN3. Because of the pendency of the District of Columbia action, plaintiffs originally sought to have this action stayed to await developments in the District of Columbia. Plaintiffs thereafter withdrew their request for a stay. The court agrees that this case should proceed. There is an undoubted benefit in having Maine courts construe Maine's antitrust laws and determine what relief, if any, should be available to Maine consumers.

### 3. The Contentions of the Parties with respect to Standing

**\*3** Visa and MasterCard contend that plaintiffs lack standing to pursue their antitrust claims under the rationale of the U.S. Supreme Court's decision in *Associated General Contractors v. California State Counsel of Carpenters,* 459 U.S. 519 (1983). That decision sets forth various factors to be considered, including the directness of the injury, when determining whether a plaintiff has standing for antitrust purposes. Visa and MasterCard argue that the direct victims of their allegedly unlawful tying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642
(Cite as: Not Reported in A.2d)

scheme (the merchants) have already settled their claims and that an allegation of indirect injury to consumers is insufficient to provide consumers with standing for antitrust purposes.

**\*3** Plaintiffs have a simple response. They point out that while the U.S. Supreme Court has ruled that under federal antitrust law only direct victims of anti-competitive practices may sue for treble damages, *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729 (1977), Maine and a number of other states have passed legislation rejecting the *Illinois Brick* rule for purposes of their state antitrust laws. Specifically, the Maine legislature amended 10 M.R.S .A. § 1104(1) in 1989 to provide a private antitrust treble damage remedy for any person injured "directly *or indirectly* in its business or property." *See* Laws 1989, ch. 367 (emphasis added). The legislative history of this provision demonstrates that the legislature intended to allow "indirect purchasers" to sue manufacturers who had engaged in price-fixing. L.D. 1653, 114th Legis., 1st Sess. (1989). Given this so-called *Illinois Brick* repealer, plaintiffs argue, federal precedent limiting standing for antitrust purposes is inapplicable in Maine.

**\*3** The threshold issue on this motion, therefore, involves the legal effect of Maine's *Illinois Brick* repealer on the issue of antitrust standing.

### 4. *The Effect of the Illinois Brick Repealer*

**\*3** In considering a motion to dismiss, the court must accept the allegations in the complaint as true. Given their allegations in this case, plaintiffs' argument on standing is straightforward. They argue that the language of 10 M.R.S.A. § 1104(1) as amended by Laws 1989, ch. 367, is unambiguous and expressly permits suits by indirect victims. Under these circumstances, they contend, the court should not go beyond the statutory wording and should conclude that the issue of standing has been legislatively resolved.

**\*3** In most other contexts, the court would be inclined to agree that the plain wording of the statute would control. However, the court does not agree that it should limit its analysis to the statutory wording in this case for several reasons. First, the U.S. Supreme Court expressly stated that it did not base its ruling in *Illinois Brick* on standing and observed that the issue of standing and the indirect purchaser rule were "analytically distinct." 431 U.S. at 728 n. 7. As a result, the fact that the Maine legislature decided to

overrule *Illinois Brick* on the issue of whether indirect purchasers may assert a remedy does not necessarily resolve the issue of standing.

**\*4** Second, it is well established that the antitrust laws set forth broad general principles and leave the application and elaboration of those principles to the courts. As the U.S. Supreme Court noted in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 687-88 (1978):

**\*4** One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says....

**\*4** Congress ... did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common law tradition. [FN4]

> FN4. The specific statutory language referred to in the above-quoted citation, section 1 of the Sherman Act, is mirrored by 10 M.R.S.A. § 1101, the provision of Maine antitrust law which plaintiffs allege Visa and MasterCard violated in this case.

**\*4** This same language was quoted by the U.S. Supreme Court when it was faced with the task of defining standing for antitrust purposes in *Associated General Contractors,* 459 U.S. at 531.

**\*4** Thus, the antitrust laws constitute a broad grant of authority to the courts to fashion a common law of antitrust in furtherance of a general principle to prevent anticompetitive restraints of trade. *See, e.g., SAS of Puerto Rico v. Puerto Rico Telephone Co.,* 48 F.3d 39, 43 (1st Cir.1995) ("Despite its statutory framework, antitrust law is largely the handiwork of federal judges and antitrust enforcers...."). In this context, the rule that a court should not look beyond the wording of a statute does not have its usual force. Although the court must heed the legislature's intent in enacting the *Illinois Brick* repealer, it must recognize that in the particular context of antitrust, statutory wording is only the beginning and not the end of any inquiry.

**\*4** Notably, when asked at the hearing what standing principles plaintiffs would apply in this case, counsel for plaintiffs directed the court's attention to Justice Brennan's dissent in *Illinois Brick. See* Tr. of June 17, 2004 hearing at 36. In that dissent Justice Brennan

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conceded that "despite the broad wording of [the statute] there is a point beyond which the wrongdoer should not be held liable." 431 U.S. at 760 (Brennan, J., dissenting). See id. at 748 n. 2. Although Justice Brennan went on to argue for a liberal rule of standing defined in terms of the "target area" of the violation, id. at 760-61, what is important for present purposes is that he did not dispute that some limits have to be placed on the standing of indirect victims. The wording of the statute, therefore, does not resolve the issue of standing.

*5. Standing under Associated General Contractors*

**\*4** The court is accordingly faced with a choice between the "target area" test for standing espoused by Justice Brennan in *Illinois Brick* and the *Associated General Contractors* test adopted by the U.S. Supreme Court in 1983. As the Supreme Court noted in *Associated General Contractors,* the target area test poses the prospect of "contradictory and inconsistent results." 459 U.S. at 536 n. 33. Moreover, the target area test does not take account of prudential concerns that may significantly affect whether specific plaintiffs are proper parties to enforce the antitrust laws. "Although the law is written broadly, the Superior Court's doctrine of antitrust standing has significantly narrowed the number of persons entitled to bring suit." *RSA Media, Inc. v. AK Media Group, Inc.,* 260 F.3d 10, 13 (1st Cir.2001) (footnote and citations omitted).

**\*5** *Associated General Contractors* has remained the template for determining standing under the federal antitrust laws for the past 20 years. *See, e.g., Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP,* 124 S.Ct. 872, 884-85 (2004) (Stevens, J., concurring); *RSA Media Inc. v. AK Media Group Inc.,* 260 F.3d at 13-14. It is probable that the Maine Law Court, if presented with this issue, would look to the *Associated General Contractors* factors in determining standing under Maine's antitrust laws and would apply those factors except to the extent that those factors cannot be reconciled with the legislature's adoption of the *Illinois Brick* repealer.

**\*5** In *Associated General Contractors,* the U.S. Supreme Court began by observing that standing in an antitrust case is not limited to the requirement of injury in fact but requires a further inquiry to determine whether the plaintiff is a proper party to bring a private antitrust action. 459 U.S. at 535 n. 31. The Court then set forth the following specific factors that must be considered as part of that inquiry:

**\*5** (1) the causal connection between the plaintiffs' alleged injury and defendants' claimed violation of the antitrust laws. 459 U.S. at 537.
**\*5** (2) the alleged improper motive of the defendant. 459 U.S. at 537 and n. 35.
**\*5** (3) the nature of plaintiffs' alleged injury, including whether it is the type Congress sought to redress in the antitrust laws and whether the plaintiff was a consumer or competitor in the market in which trade was restrained. 459 U.S. at 538-39.
**\*5** (4) the directness or indirectness of the alleged injury. 459 U.S. at 540.
**\*5** (5) whether there exists a more immediate class of potential plaintiffs whose self-interest could be expected to motivate them to enforce the antitrust laws. 459 U.S. at 541-42.
**\*5** (6) whether the damages or injuries claimed are speculative. 459 U.S. at 542-43.
**\*5** (7) whether the complexity of the case can be kept "within judicially manageable limits", avoiding the risk of duplicative recoveries and the danger of complex apportionment of damages. 459 U.S. at 543-44.[FN5]

> FN5. There are some minor variations in the manner in which courts have summarized the factors set forth in *Associated General Contractors.* The above represents this court's own distillation of those factors.

**\*5** Looking at these factors in the instant case, it is evident that plaintiffs have adequately pleaded a causal connection and an improper motive. As *Associated General Contractors* demonstrates, however, those factors alone do not confirm standing if they are outweighed by other factors. See 459 U.S. at 537.

**\*5** Inquiry with respect to the nature of the alleged injury presents a somewhat closer case. As noted above, *Associated General Contractors* suggests that one of the subsidiary issues in this inquiry is whether plaintiffs are consumers or competitors in the relevant market. 459 U.S. at 539. The plaintiffs before the court are neither consumers nor competitors in the specific market in which trade was allegedly restrained, which is the market among retail merchants' debit and credit card services. See *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 U.S. Dist. LEXIS 4965, 8-10 (E.D.N.Y.2003) (relevant market is among merchants, not consumers). Nevertheless, plaintiffs have adequately alleged an injury of the type that Congress sought to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642
**(Cite as: Not Reported in A.2d)**

redress. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 483 (1982). Moreover, Maine's adoption of an *Illinois Brick* repealer further suggests that the court should not deny standing just because plaintiffs are not participants in the actual market where trade was allegedly restrained. This factor weighs in favor of standing.

**\*6** In light of Maine's *Illinois Brick* repealer, the next factor-directness or remoteness of the asserted injury-should be disregarded entirely in any inquiry as to standing under Maine's antitrust laws.

**\*6** The remaining factors are whether there exist more immediate plaintiffs, whether the damages or the injuries are speculative, whether there is a danger of duplicative recoveries, and whether there is a need for complex apportionment. *See* 459 U.S. at 541-44. These factors are the prudential concerns that have caused federal courts to limit the right of private parties to sue even when a violation exists and the plaintiff has been damaged. *See SAS of Puerto Rico v. Puerto Rico Telephone Co.,* 48 F.3d at 43. In the court's view, all these factors weigh against standing in this case.

**\*6** First, there is indisputably a more immediate class of potential plaintiffs motivated to enforce the antitrust laws in this case-namely, the merchants who have already sued and obtained a settlement of more than $3 billion as well as injunctive relief putting an end to the allegedly illegal tying arrangement. *See* 297 F.Supp.2d 503. This injunctive relief benefits consumers as well as merchants and puts to rest any concern that unless merchants plaintiffs are allowed to sue, the antitrust laws will remain unenforced in this case. *See Associated General Contractors,* 459 U.S. at 542; *SAS of Puerto Rico,* 147 F.3d at 45. In contrast, if this case presented a situation where potential antitrust violations would remain unredressed unless the parties bringing suit were found to have standing, the case for standing would be immeasurably improved.

**\*6** Second, both the asserted damages and the chain of causation in this case are speculative. Plaintiffs' contention is that merchants subjected to overcharges as a result of defendants' illegal tying arrangement passed those overcharges on to consumers. To determine what portion of any overcharge was passed on by any given merchant, with respect to which products, and to which consumers is a task of monumental uncertainty and complexity. Depending on their other costs, their competitive position in the market, their profit margins, and the specific products

they sold, some merchants could have absorbed a substantial portion of any overcharge instead of passing it on. To a significant extent, whether an overcharge was passed on would depend on the elasticity of demand in the various product markets in which the merchant sells.[FN6]

> FN6. *See, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. at 750 n. 3 (Brennan, J, dissenting) ("If the market is relatively inelastic, he may pass on a relatively large portion [of any overcharge]. If demand is relatively elastic, he may not be able to raise his price and will have to absorb the increase, making it up by decreasing other costs or increasing sales volume. It is extremely unlikely that a middleman could pass on the entire cost increase. But rarely would he have to absorb the entire increase.").

**\*6** In this case, where plaintiffs are alleging that retailers raised prices generally and that plaintiffs therefore paid overcharges on every single purchase, *see* Complaint ¶ ¶ 7, 46-47, 58, 66, the extent to which damages were incurred by the class would depend on the specific elasticity of demand for any given product sold at retail in the State of Maine by any retailer who accepted Visa or MasterCard credit cards-essentially every product of any kind sold to anyone in the State. While this might be a manageable inquiry if only one product were involved, the complexity of inquiry is geometrically increased when all of the different pricing variables applicable to each and every retail product sold in the state must be considered. For any given consumer, the issue is even more complicated and speculative because the inquiry would involve what items that particular consumer purchased, what that consumer paid for each item, and what percentage of overcharge, if any, was contained in that price.

**\*7** For example, if plaintiff Diane Roberts purchased a number of items at a Shaw's Supermarket on a specific date during the relevant time period and paid $2.49 for a carton of orange juice, her right to damages would depend on what portion of that $2.49 was attributable to defendants' alleged restraint of trade with respect in providing debit card services to Shaws-as opposed to such factors as competitive pricing by other supermarkets, the wholesale cost of orange juice, labor costs and other overhead, the elasticity of demand for orange juice, and strategic pricing decisions made by Shaw's.[FN7] Moreover, the same issues would arise for every other item in Ms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 6
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642
(Cite as: Not Reported in A.2d)

Roberts' grocery cart and for every other item that she purchased from any other retailer that day. This process would then need to be repeated for every single day of the alleged four-year damages period.

> FN7. This is a modified version of an example offered by defendants in their memorandum of law.

*7 It might be argued that such an inquiry is not necessary for each consumer because relief can be afforded on a generalized basis once the damage to the class has been determined. But even if no inquiry were required as to the specific damages incurred by each consumer, determination of the damage incurred by the class as a whole would require determining what portion of any overcharge had been passed on to consumers with respect to every item sold in Maine over a four year period by every supermarket, every large retailer, every gas station, every restaurant, and every other merchant that accepted Visa or MasterCard. To say that such an inquiry would be highly speculative and problematic is an understatement.

*7 The remaining *Associated General Contractors* factors are the danger of duplicative recovery and the problem of complex apportionment. Duplicative recovery is a major issue in this case in light of the more than $3 billion already recovered by the merchants in settlement of the *Wal-Mart* class actions. If double recovery is to be avoided, a complex apportionment between the damages already recovered by merchants and the damage recoverable by the class will be necessary. As noted above, there would also be a complex apportionment necessary to determine the relief that should be afforded to individual class members. Both those issues have a significant effect on the ability of this case to be kept within "judicially manageable limits." *Associated General Contractors,* 459 U.S. at 741.

*7 Plaintiffs argue that in light of the *Illinois Brick* repealer, the court should conclude that the Maine legislature has expressly authorized duplicative recoveries and this factor should therefore not be weighed against them on the issue of standing. The court does not agree. The 1989 amendment to 10 M.R.S.A. § 1104 expressly authorizes indirect purchasers to sue but it does not expressly authorize duplicative recoveries. One of the major arguments for allowing indirect purchasers to sue is that in many cases the direct victims of a restraint of trade are reluctant to bring suit and antitrust violations would

therefore otherwise go unremedied. Although this rationale justifies eliminating the *Illinois Brick* bar against suits by indirect purchasers, it does not answer the question of what should happen when the direct victims have in fact already brought suit.

*8 The most forceful opponent of the *Illinois Brick* ruling-Justice Brennan-believed that double recovery was only a theoretical possibility. Thus in his *Illinois Brick* dissent, he expressed the view that while arguments based on the potential dangers of double recovery had "some abstract merit", those concerns were unrealistic "as a practical matter." 431 U.S. at 761. *See id.* at 762-64. To the extent those concerns actually materialized, however, Justice Brennan's dissent makes it clear that he contemplated that duplicative recoveries should be prevented and that apportionment between the direct and indirect victims could and should be made. *See* 431 U.S. at 761-63. He specifically approved the Ninth Circuit's discussion of the procedural mechanisms available to prevent duplicative recovery in *In re Western Liquid Asphalt Cases,* 487 F.2d 191, 201 (9th Cir.1973), *cert. denied,* 415 U.S. 919 (1974), and he noted that those mechanisms could be used to require antitrust plaintiffs to litigate among themselves "their appropriate shares of the total recovery" in the event that a problem of double recovery was actually presented. 431 U.S. at 763. Thus, if the dissenters had prevailed in *Illinois Brick,* indirect victims would be able to sue but would not necessarily be entitled to subject defendants to duplicative recoveries.

*8 Other states that have enacted *Illinois Brick* repealers have provided statutory mechanisms to deal with the problem of duplicative recoveries, in some cases expressly authorizing their courts to take appropriate steps to avoid such recoveries. *See Bunkers Glass Co. v. Pilkington PLC,* 75 P.3d 99, 108 (Ariz.2003); *Ciardi v. F. Hoffman-LaRoche Ltd.,* 762 N.E.2d 303, 321 (Mass.2002) (Sosman, J., dissenting). While the treatment of potential duplicative recovery when direct and indirect antitrust victims have both brought suit is an unresolved issue under Maine law, the guidance from Justice Brennan's *Illinois Brick* dissent is that duplicative recovery should at least be prevented to the extent possible. In the court's view, the danger of duplicative recovery and the complex apportionment that may be necessary to avoid such recovery are legitimate factors that must be considered for purposes of antitrust standing. These factors, like the other prudential considerations discussed above, weigh against the standing of the plaintiffs in this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642
(Cite as: Not Reported in A.2d)

**\*8** In the final analysis, the court has weighed the *Associated General Contractors* factors and has concluded that notwithstanding Maine's enactment of an *Illinois Brick* repealer, the factors that militate against standing outweigh those in favor of standing. Accordingly, defendants' motion to dismiss for lack of standing is granted.

**\*8** In light of its decision that plaintiffs lack standing under *Associated General Contractors* the court does not have to reach defendants' alternative argument that even if plaintiffs have standing, 10 M.R.S.A. § 1104 is only intended to create a remedy for "indirect purchasers" and that the class members here are not indirect purchasers of debit card services. Nor does it have to consider plaintiffs' response that if defendants are correct as to their indirect purchaser argument, plaintiffs should be allowed to redefine their proposed class to consumers who made purchases with a Visa or MasterCard debit card.[FN8]

> FN8. As of the writing of this decision, the court is aware that seven other state trial courts have dismissed consumer antitrust claims brought against Visa and MasterCard based on allegations similar to those asserted in this case. *Tackitt v. Visa U.S.A. Inc .,* No. C103-740, Nebraska District Court, Lincoln County, order filed October 19, 2004; *In re Credit/Debit Card Tying Cases,* J.C .C.P. No. 4355, California Superior Court, San Francisco County; order filed October 14, 2004; *Cornelison v. Visa U.S.A. Inc.,* Civil No. 03-1350, South Dakota Circuit Court, Pennington County, order filed September 29, 2004; *Gutzwiller v. Visa U.S.A. Inc.,* No C4-04-58, Minnesota District Court, Clay County, order filed September 15, 2004; *Beckler v. Visa U.S.A. Inc.,* Civil No. 09-04-C-00030, North Dakota District Court, Cass County, opinion filed August 23, 2004; *Stark v. Visa U.S.A. Inc.,* No. 03-055030-CZ, Michigan Circuit Court, Oakland County, opinion and order filed July 23, 2004; *Ho v. Visa U.S.A. Inc.,* No. 1123166/00, New York Supreme Court, New York County, order filed April 26, 2004. All of the states in question, like Maine, have enacted *Illinois Brick* repealers. Some of these decisions have been based on standing, others have been based on the view that the consumers bringing suit did not qualify as indirect purchasers, and some

have been based on both grounds.
Plaintiffs have also directed the court's attention to a preliminary ruling by a trial court in New Mexico expressing the view that the *Associated General Contractors* test per se is not applicable in New Mexico but that some of the *Associated General Contractors* factors may nevertheless be relevant to standing under the New Mexico antitrust statute. *Nass-Romero v. Visa U.S.A. Inc.,* No. D0101-CV-200400413, New Mexico District Court, Santa Fe County, transcript of proceedings on September 17, 2004. The New Mexico court invited further briefing on the issue.

**\*9** The entry shall be:

**\*9** Defendants' motion to dismiss the complaint for lack of standing is granted. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

**\*9** Since the court heard oral argument on defendants' motion to dismiss and took that motion under advisement, counsel for defendants have sent a number of letters to the court submitting various decisions from other state trial courts. Plaintiffs' counsel have not objected to any of these submissions. On October 15, 2004 plaintiffs' counsel filed a motion for leave to submit supplemental authorities, enclosing materials from pending cases in New Mexico and Minnesota. Defendants do not object to this motion but have submitted a response commenting on plaintiffs' submissions.

**\*9** Plaintiffs' motion for leave to submit supplemental authorities is granted. For the record, the court's view is that parties should be permitted to submit copies of decisions from other courts that they contend are relevant to the issues pending before this court. However, to avoid any perceived need for responsive filings, all parties submitting decisions from other courts should limit themselves to directing the court's attention to the portions of the decisions that they contend are relevant and should refrain from any argument or commentary on the import of those decisions.

Me.Super.,2004.
Knowles v. Visa U.S.A., Inc.
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases P 74,642

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8
Not Reported in A.2d, 2004 WL 2475284 (Me.Super.), 2004-2 Trade Cases  P 74,642
**(Cite as: Not Reported in A.2d)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.