# TAB 29

Westlaw.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
(Cite as: Not Reported in N.W.2d)

C

Southard v. Visa U.S.A., Inc.Iowa Dist.,2004.Only the Westlaw citation is currently available.
Iowa District Court.
Jeff SOUTHARD, Trish Southard, Jeffrey Stickel and Heather Stickel, Mel Lint, Keith Goodyk, and Greg Dana, on behalf of themselves and all others similarly situated in the State of Iowa, Plaintiffs,
v.
VISA U.S.A. INC. and Mastercard International, Inc., Defendants.
Betty Jo WINTER, on behalf of herself and all others similarly situated, Plaintiff,
v.
VISA U.S.A. INC. and Mastercard International, Inc., Defendants.
No. LACV 031729, 94491.

Nov. 17, 2004.

Edward Remsburg of Ahlers & Cooney, Des Moines, IA; Stepher V. Bomse and David M. Goldstein of Heller Ehrman White & McAuliffe LLP, San Francisco, CA, Robert C. Mason of Arnold & Porter LLP, New York, NY, for Defendant Visa U.S.A. Inc. Kim J. Walker of Faegre & Benson LLP, Des Moines, IA; Kenneth A. Gallo of Clifford Chance U.S. LLP, Washington, DC; Keila D. Ravelo, Gary R. Carney and Wesley R. Powell of Clifford Chance U.S. LLP, New York, NY, for Defendant MasterCard International Incorporated.
Michael P. Mallaney and J. Barton Goplerud of Hudson, Mallaney & Shindler, PC, Des Moines, IA; Gordon Ball of Ball & Scott, Knoxville, TN; Jonathan W. Cuneo and Daniel M. Cohen of Cuneo Waldman & Gilbert, LLP, Washington, DC; Michael D. Hausfeld of Cohen, Milstein, Hausfeld & Toll, Washington, DC; Steve W. Berman and George W. Sampson of Hagens Berman, LLP, Seattle, WA; Maxwell M. Blecher and Don Pepperman of Blecher & Collins, Los Angeles, CA, for Plaintiffs.

RULING
GOODHUE, J.
*1 The defendants have filed a motion to dismiss as to each of the entitled cases which have been consolidated by prior court order. A motion to dismiss admits the allegation of the petition and must stand or fall on the contents of the petition and matters of which the Court can take judicial notice.

(See Leuchtemmacher v. Farm Bureau Mutual, Inc., 460 N.W.2d 858 and Curtis v. Board of Supervisors, 220 NW 2d 44.) The petition itself becomes the statement of facts and need not be reiterated at length. A brief statement of the salient facts will suffice.

*1 (1) The defendants, for purpose of this proceeding, are considered a single entity and any theory of recovery or amendment offered by either plaintiff will be afforded to both.

*1 (2) Together, the two defendants dominate the credit card industry.

*1 (3) During the relevant period the defendants issued both credit cards and debit cards.

*1 (4) The defendants forced merchants to use their debit card services if in fact they were to have the right to use their credit card services and then charged the same for both services. Requiring merchants to use both services is called "tying."

*1 (5) Debit cards involve an immediate or almost immediate withdrawal of funds from the purchaser's account instead of an advancement of credit as when a credit card is used. Accordingly, the risk of loss is significantly less when a debit card is used.

*1 (6) Frequently merchants were unable to tell whether a credit card or debit card was being used.

*1 (7) A merchant who honors the defendants' cards pays an interchange fee in the form of a discount on each sale made using one of the defendants' cards. A portion of the interchange fee goes to the defendants, a portion to the bank issuing the card, and a portion to the acquiring institution or bank who services the merchants.

*1 (8) The tying together of the credit cards and debit cards and the identical charge for both uses for purposes of this motion result in the assessment of excessive and unjustified fees in violation of the Iowa Competition Law (Iowa Code Chapter 553.)

*1 (9) The merchants who paid the excessive fees have passed those costs on to the citizens of Iowa who have done business with the merchants using the defendants' services. The plaintiffs are representative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
(Cite as: Not Reported in N.W.2d)

Page 2

of that class of Iowa citizens.

**\*1** (10) The Court believes it can and, accordingly, does take judicial notice of _In re Visa Check/MasterMoney Antitrust Litigation, 297 F.Supp.2d 503_ and the facts it chronicles regarding the successful litigation by merchants against these same defendants predicated on these same tying acts alleged in the plaintiffs' petition as being violations of federal competition statutes.

**\*1** Based on the facts alleged in the petition and as briefly summarized above, the plaintiffs have brought this class action on the behalf of Iowa consumers, alleging they are entitled to relief under Chapter 553 of the Code of Iowa or, alternatively, by way of an action for unjust enrichment.

**\*2** Motions to dismiss are not favored and have been said to be virtually emasculated. (See _Unertl v. Benzanson, 414 N.W.2d 321_.) Nevertheless, such motions continue to be used and recognized where the issue is standing or capacity to sue. (See _Comes v. Microsoft, 646 N.W.2d 440_ and _Troester v. Sisters of Mercy Health Corp., 328 N.W.2d 308_.) Although motions for summary judgment are preferred, the motion to dismiss seems particularly appropriate when, as in this case, the petition contains an exhaustive statement of the pertinent facts. The thrust of the defendants' motion is a challenge to the plaintiffs' standing to bring action as to the violation of the Iowa Competition Law. That there has been such a violation as alleged in the petition may be assumed.

**\*2** It is not disputed that under federal law "indirect purchasers" cannot recover damages for violations of competition statutes. (See _Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707_.) The _Comes_ decision rendered by the Iowa Supreme Court and cited above specifically held that "indirect purchasers" can sue for damages under the Iowa Competition Law. The inclusion of "indirect purchasers" by the _Comes_ court was primarily made to turn on _Iowa Code Sect. 553.12_ which provides in part that "(a) person who is injured ... by conduct prohibited under this chapter may bring suit." Plaintiffs' claim to be "indirect purchasers" within the meaning of _Comes_ and therefore afforded standing and the ability to bring this action. Nevertheless, even the plaintiffs in oral argument admit that some line must necessarily be drawn beyond which an injured party may not recover because of remoteness or lack of standing. The defendants, relying in part on _Iowa Code Sect. 557.2_ which mandates "uniform

application of state and federal laws prohibiting restraints of economic activity and monopolistic practices," contend that the issue of remoteness or standing should be determined by the guidelines set out by the federal court in _General Contractors of Calif., Inc. v. Calif. State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723_. Plaintiffs contend that remoteness and standing should be determined by tests used in other areas of Iowa law such as "foreseeability" or "proximate cause."

**\*2** Several other state trial courts have been confronted with nearly identical issue which this Court faces. These are primarily states where the bright line rule excluding "indirect purchasers" from competition cases as set out in _Illinois Brick_ has been abrogated by statute or prior court decision. Counsel has made several of these state court cases available to this Court. Almost universally, motions to dismiss have been sustained and the factors set out in _Associated Contractors_, supra, have been considered applicable in determining standing. The General Court of Justice Superior Court Division in the County of Harnett, North Carolina in _Morris v. Visa USA, Inc. and Mastercard International, Inc._, 03 CVS 2514 filed a particularly instructive ruling which is nearly as exhaustive as a law review article. That ruling enumerates eight other states which recognize indirect purchaser claims but their trial courts have held that consumers such as these plaintiffs with derivative claims have no standing. Apparently no state appellate court has addressed the issue at this time.

**\*3** Plaintiffs contend that _Comes_ places Iowa in a unique position which differentiates it from other states. _Comes_ does in fact include some rather broad language, but the instant factual situation is distinctly different than what existed in _Comes_. In _Comes_ the plaintiffs were in fact "indirect purchasers" of a product that the defendant Microsoft produced. In _Comes_ the plaintiffs ended up with the software the defendant produced, in their computers. The cost of the Microsoft product was directly reflected in the price of the hardware the plaintiffs purchased from the third party who was the "direct purchaser" from Microsoft. The plaintiffs in the instant case are not really "indirect purchasers." Their claims against these defendants could more accurately be termed "derivative." These plaintiffs have not ended up with a product the defendant supplied. Instead, they dealt with a merchant who was charged a fee by a bank who in turn paid a fee to the defendant. Their contention is that the cost of the service that the defendants supplied to the banks and was paid for by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
(Cite as: Not Reported in N.W.2d)

the banks was transferred to and paid by the merchants and ultimately shifted to the plaintiffs as the final consumer.

**\*3** Since the plaintiffs are not "indirect purchasers" in the sense that the plaintiffs in *Comes* were, *Comes* is helpful only by analogy or by use of some of the broad language the *Comes* court employed in interpreting the Iowa Competition Law. That the bright line excluding indirect purchasers as announced in *Illinois Brick* has been abrogated does not answer the remoteness or standing issue.

**\*3** The remoteness doctrine is not a simple application of a "but for" test or "foreseeability" or "proximate cause" but is instead dependent on public policy considerations applicable to the many facets of the law where damage awards are sought. (See *State ex rel. Miller v. Phillip Morris, Inc.,* 577 N.W.2d 401, *Beyond the Garden Gate, Inc. v. Northstar Freezer Dry Mfg., Inc.,* 526 N.W.2d 305 and *Virden v. Betts and Beer Const. Co., Inc.,* 656 N.W.2d 805.) The issue then that emerges is what is the test of standing or remoteness that is to be applied under the Iowa Competition Law.

**\*3** It is noteworthy that the *Comes* court, although relying on the broad sweep of the statutory language as to those protected, devoted appreciable consideration to the announced policies and reasoning employed in *Illinois Brick*. The *Comes* case specifically points out the factual differences between the *Comes* case and *Illinois Brick*. This discussion leads this Court to the conclusion that the Iowa Supreme Court is quite sensitive to the legislative direction for uniform application of the state and federal statutes. Furthermore, a fair reading of *Comes* suggests that the trial court is being directed to weigh the policy considerations as set out in *Illinois Brick* as refined by *Associated General Contractors* in determining whether or not a plaintiff has standing or his damage is too remote to bring an action under the Iowa Competition Law.

**\*4** The five factors set out in *Associated General Contractors* which the Court believes it must consider are:

**\*4** (1) The nature of the plaintiffs' claim.

**\*4** (2) The directness of the injury.

**\*4** (3) The specific intent of the defendants.

**\*4** (4) The character of the alleged damages,

including the risk of duplicative recovery, the complexity of the apportionment, and their speculative nature.

**\*4** (5) The existence of other more appropriate plaintiffs.

**\*4** To begin with, the nature of the plaintiffs' action is derivative and not simply indirect, as previously noted. As opposed to the factual situation in *Comes,* there are more appropriate plaintiffs to bring action and they have successfully done so. Any recovery made would be duplicative. The damages incurred are substantially more indirect than in *Comes* and, as noted, are more accurately termed "derivative." Apportionment would be complex, speculative, and arbitrary. The willingness of the *Winters* plaintiffs to redefine the plaintiff class is illustrative of the complexity and arbitrary nature of the apportionment that would be required. Even defining the class is arbitrary. The North Carolina trial court in Morris as previously cited sets out in detail the complexity and speculative and arbitrary nature of the decisions that would be involved in any apportionment. The criteria set out in *Associated General Contractors* are simply not met.

**\*4** In summary, the Court concludes that the thrust of the *Comes* case is that although the bright line exclusion of indirect purchasers as set out in *Illinois Brick* has been abrogated under the Iowa Competition Law, an analysis of standing and remoteness is still appropriate and must be made. That the guidelines announced in *Associated General Contractors* are appropriate to consider in resolving the issues of standing and remoteness. Applying those standards as per the prior discussion, the plaintiffs do not have standing under the Iowa Competition Law and to the extent the plaintiffs have pled a cause of action pursuant to Chapter 553 of the Code of Iowa, the defendants' motion to dismiss is sustained and the plaintiffs' action dismissed.

**\*4** The Southard plaintiffs have also made a claim based on unjust enrichment and for money had and received. In reality, the two concepts pled constitute the same cause of action. (See *State Dept. of Human Services, ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142.)

**\*4** Plaintiffs rely on the asserted breadth of unjust enrichment as it exists as a cause of action in Iowa. In the *Palmer* case cited above it is stated that "We recognize unjust enrichment is a broad principle with few limitations. We have never limited the principle

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
**(Cite as: Not Reported in N.W.2d)**

Page 4

to require benefits to be conferred directly by the plaintiff." *Palmer v. Unisys,* supra p. 155.) In referring to Iowa law, the federal court in *Iconco v. Jensen Const. Co.,* 622 F.2d 1291 at page 1302 stated "We are impressed with the simplicity of the rule echoed by the Iowa unjust enrichment cases. It is essential merely to prove that a defendant has received money which in equity and good conscience belongs to plaintiff," quoting *In Re Estate of Shatman,* 231 Iowa 480, 1 N.W.2d 636, 642.

**\*5** However, *Iconco* proceeds to state that "Unjust enrichment does not occur in the abstract. One is unjustly enriched only by reference to some standard of justice and fairness. Iowa would, of course, be free to look to the provisions of state statute defining legal rights and responsibilities to discern whether one's enrichment at the expense of another has been unjust." *Iconco* at p. 1296, 1 N.W.2d 636. There is nothing "unjust" in Iowa law about the charges the defendants made to the banks and the banks in turn to the merchants, absent the Iowa Competition Law. To allow the plaintiffs to proceed based on a theory of unjust enrichment would require the reinfusion of the Iowa Competition Law which is unavailable to them because of a lack of standing.

**\*5** The plaintiffs cite *Palmer* and, in particular, the language set out above for their contention that privity has no application in unjust enrichment cases. The *Palmer* case did not turn on the language cited above, and in that sense it is dicta. In *Palmer,* Heritage, the party receiving the ultimate benefit, was potentially primarily liable to the plaintiff. There is no primary liability between these plaintiffs and defendants. Furthermore, *Palmer* at page 155 states that "We also agree a plaintiff who has an independent obligation to a third person cannot maintain an action for unjust enrichment against a defendant who is incidentally benefited by the performance of that obligation to the third person." The prohibition cited is exactly the type of derivative lawsuit which the plaintiffs in this case are bringing. These plaintiffs had an independent obligation to the merchants and any benefit conferred on the defendants by reason of that obligation is incidental. The defendants approached the deficiency in a different way by contending that no direct benefit was conferred upon them by the act in question. In other factual situations involving a claim of unjust enrichment, recovery has been denied because of a lack of "privity." See *Commercial Federal Bank v. Quest Corp.,* 2004 WL 22 96370 (Iowa App.). In essence, the plaintiffs' problem is the same under the unjust enrichment claim as it was under the Iowa

Competition Law. In addition to an inability to utilize the unfairness standard set out by the Iowa Competition Law, the plaintiffs' damages are too remote and derivative to allow the plaintiffs to make recovery. The plaintiffs have no cause of action under the theory of unjust enrichment.

**\*5** It would be illogical and a strange application of the law to rule that the plaintiffs' cause of action is too remote to confer standing under the Iowa Competition Law but to use the same acts and the Iowa Competition Law as a predicate for recovery under a theory of unjust enrichment.

**\*5** Finally, it appears that because of the merchants' previous recovery in the *In re Visa Check/MasterMoney Antitrust Litigation,* supra, that the defendants have been stripped of their ill-gotten gains and that no "unjust enrichment" remains.

**\*6** Defendants' motion to dismiss as to the plaintiffs' claim of unjust enrichment is granted and the plaintiffs' cause of action is dismissed.

**\*6** Costs are assessed to the plaintiffs.

Iowa Dist.,2004.
Southard v. Visa U.S.A., Inc.
Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 30



**H**

THIS DECISION IS UNCORRECTED AND SUB-
JECT TO REVISION BEFORE PUBLICATION IN
THE NEW YORK REPORTS.

Court of Appeals of New York.
Paul SPERRY & c., Appellant,
v.
CROMPTON CORPORATION, et al., Respondents,
et al., Defendants.

Feb. 22, 2007.
J. Douglas Richards, for appellant.

Ian Simmons, for respondents.

State of New York; American Antitrust Institute;
Chamber of Commerce of the United States of Amer-
ica; AARP, amici curiae.

GRAFFEO, J.

Because we conclude that the treble damages provi-
sion in General Business Law § 340 serves as a pen-
alty for purposes of CPLR 901(b), such damages are
not recoverable in a class action. We therefore affirm
the order of the Appellate Division so holding.

Defendants Crompton Corporation, Uniroyal Chem-
ical Company, Inc., Uniroyal Chemical Company,
Ltd., Flexsys NV, Flexsys America LP, Bayer AG,
Bayer Corporation, Rhein Chemie Rheinau GBMH
and Rhein Chemie Corporation produce and sell rub-
ber-processing chemicals that improve the durability,
color control and heat resistence of rubber products,
including tires, belts, hoses and footwear. [FN1] De-
fendants do not manufacture or sell these end-
products.

> FN1. Uniroyal Chemical Company, Inc. and
> Uniroyal Chemical Company, Ltd. are
> wholly owned subsidiaries of Crompton Cor-
> poration, now known as Chemtura Cor-
> poration. Bayer AG and its associated com-
> panies, Bayer Corporation, Rhein Chemie
> Rheinau GBMH and Rhein Chemie Corpor-
> ation are no longer parties to this appeal.

In 2002, plaintiff Paul Sperry commenced this pur-
ported class action against defendants seeking dam-
ages on behalf of himself and all other consumers
"who purchased tires, other than for resale, that were
manufactured using rubber-processing chemicals
sold by defendants since 1994." [FN2] Sperry alleged that
defendants entered into a price-fixing agreement,
overcharging tire manufacturers for the chemicals,
and that the overcharges trickled down the distribu-
tion chain to consumers.

> FN2. The lawsuit has not yet been certified
> as a class action under CPLR article 9.

The complaint set forth three causes of action. First,
Sperry claimed that defendants violated New York's
antitrust statute (General Business Law § 340 et
seq.)--commonly known as the Donnelly Act--by en-
gaging in an arrangement that restrained
"[c]ompetition or the free exercise of any activity in
the conduct of any business, trade or commerce"
(General Business Law § 340 [1] ). Relying on the in-
direct purchaser provision of the Donnelly Act (Gen-
eral Business Law § 340[6] ), Sperry sought "three-
fold the actual damages," costs and attorneys' fees
pursuant to General Business Law § 340(5). Second,
Sperry asserted that defendants' arrangement consti-
tuted a deceptive practice in violation of General
Business Law § 349. Third, Sperry requested recov-
ery on an unjust enrichment theory. Defendants
moved to dismiss the complaint under CPLR 3211.

Supreme Court granted the motion and dismissed the
complaint in its entirety. The court held that CPLR
901(b), which precludes a class action to collect a
penalty unless specifically authorized by statute,
barred the Donnelly Act claim. The court determined
that the General Business Law § 349 cause of action
failed to state a claim because the allegations in the
complaint did not come within the scope of that stat-
ute. [FN3] It also dismissed the unjust enrichment
claim because the parties lacked a sufficient relation-
ship. The Appellate Division affirmed and we gran-
ted Sperry leave to appeal.

> FN3. Sperry no longer seeks recovery under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----, 2007 WL 527726 (N.Y.), 2007 N.Y. Slip Op. 01425
**(Publication page references are not available for this document.)**

General Business Law § 349.

Relying on our decisions in Cox v. Lykes Bros. (237 N.Y. 376 [1924] ), Bogartz v. Astor (293 N.Y. 563 [1944] ) and Sicolo v. Prudential Sav. Bank of Brooklyn, N.Y. (5 N.Y.2d 254 [1959] ), Sperry argues that the Donnelly Act's treble damages provision is not a penalty under CPLR 901(b). He also cites to federal precedents indicating that federal antitrust treble damages are primarily remedial in nature. Defendants counter that the courts below properly concluded that state antitrust treble damages are a penalty within the meaning of CPLR 901(b).

General Business Law § 340(5) provides that a successful antitrust plaintiff "shall recover three-fold the actual damages sustained thereby, as well as costs not exceeding ten thousand dollars, and reasonable attorneys' fees." The Donnelly Act, however, does not address private class actions. The main issue here is whether treble damages relief is available to class action plaintiffs or is barred by the application of CPLR 901(b).

The Legislature enacted CPLR article 9 (sections 901 to 909) in 1975 to replace CPLR 1005, the former class action statute. The prior class action provision, which remained largely unchanged through its various incarnations dating back to the Field Code of Procedure (see L 1849, ch 438), had been judicially restricted over the years and was subject to inconsistent results (see generally Moore v. Metropolitan Life Ins. Co., 33 N.Y.2d 304, 313 [1973] [noting "the general and judicial dissatisfaction with the existing restrictions on class action"] ). Consequently, in 1975, the Judicial Conference proposed a new class action statute that was designed "to set up a flexible, functional scheme whereby class actions could qualify without the present undesirable and socially detrimental restrictions" (13th Ann Report of Jud Conf on CPLR, 1975 McKinney's Session Laws of NY, at 1493). To that end, the Judicial Conference recommended the enactment of CPLR 901(a), which specified the five prerequisites of numerosity, predominance, typicality, adequacy of representation and superiority.

While the Legislature considered the Judicial Confer-

ence report, various groups advocated for the addition of a provision that would prohibit class action plaintiffs from being awarded a statutorily-created penalty or minimum measure of recovery, except when expressly authorized in the pertinent statute (see Legislation Report No. 15 of Banking Law Comm, Business Law Comm and Comm on CPLR of N.Y. State Bar Assn, Bill Jacket, L 1975, ch 207; Legislation Report No. 1 of Banking Law Comm of N.Y. State Bar Assn, Bill Jacket, L 1975, ch 207; Mem in Opposition of Empire State Chamber of Commerce, Feb. 14, 1975, Bill Jacket, L 1975, ch 207). These groups feared that recoveries beyond actual damages could lead to excessively harsh results, particularly where large numbers of plaintiffs were involved. They also argued that there was no need to permit class actions in order to encourage litigation by aggregating damages when statutory penalties and minimum measures of recovery provided an aggrieved party with a sufficient economic incentive to pursue a claim. Responding to these concerns, the Legislature amended the legislation to include a new subdivision--CPLR 901(b), which reads:

"Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action."

Assemblyman Stanley Fink, the bill's sponsor, explained the purpose of section 901(b):

"The bill, however, precludes a class action based on a statute creating or imposing a penalty or minimum measure of recovery unless the specific statute allows for a class action. These penalties or 'minimum damages' are provided as a means of encouraging suits where the amounts involved might otherwise be too small. Where a class action is brought, this additional encouragement is not necessary. A statutory class action for actual damages would still be permissible" (Sponsor's Mem, Bill Jacket, L 1975, ch 207).

Hence, the final bill, which was passed by the Legislature and approved by the Governor on June 17, 1975, was the result of a compromise among competing interests.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----, 2007 WL 527726 (N.Y.), 2007 N.Y. Slip Op. 01425
**(Publication page references are not available for this document.)**

Within weeks of passage of the class action statute, the Legislature undertook to amend the Donnelly Act. Before 1975, General Business Law § 340(5) permitted only the recovery of actual damages. After a report was issued by a special grand jury investigating the anticompetitive practices of the petroleum industry in the early 1970's, the Attorney General recommended a bill increasing penalties for violations of the Donnelly Act (*see* Mem of Dept of Law, Bill Jacket, L 1975, ch 333). Specifically, the bill added the treble damages provision and provided for costs and attorneys' fees in General Business Law § 340(5), while increasing the fines and criminal punishment measures contained in General Business Law § 341. [FN4] According to the Attorney General:

> FN4. Before the 1975 amendment, General Business Law § 341 provided that an individual convicted of violating the Donnelly Act was guilty of a misdemeanor, punishable by a fine not exceeding $20,000 and/or imprisonment for not longer than one year. A corporation was punishable by a fine of not more than $50,000. Under the amendment, convicted individuals would be guilty of a class E felony and punished by a fine not exceeding $100,000 and/or imprisonment for up to four years. A corporation would face a fine of up to $1 million. While these fines are clearly penalties, they are not the types of penalties contemplated by CPLR 901(b) because they are not recoverable in a private civil action.

"The provision for the recovery of treble damages in civil actions will not only serve as an additional deterrent to violations, and increase recoveries by public agencies, but will also eliminate the additional expense and cumbersome duplication of effort involved in bringing separate actions under the federal antitrust laws after a violation of the Donnelly Antitrust Act has been established (for example, by a criminal conviction)" (*id.*) . [FN5]

> FN5. Federal antitrust provisions, since their inception in 1890, have always provided for the recovery of threefold damages in civil lawsuits (*see* Clayton Act § 4 [15 USC §

; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 486 n10 [1977] ). In contrast, although the Donnelly Act dates back to 1899, treble damages were not added until much later.

The legislation amending sections 340(5) and 341 was enacted on July 1, 1975.

Although we have never construed the term "penalty" within the meaning of CPLR 901(b), nor have we had occasion to characterize the treble damages provision of the Donnelly Act, we have articulated various rules regarding the identification of penalties in other contexts. For example, this Court has stated that, where a statute expressly denominates an enhanced damages provision to be compensatory in nature, it will not be deemed a penalty (*see Bogartz v. Astor,* 293 N.Y. 563, 565 [1944] [double payment recoverable under Workmen's Compensation Law § 14-a not a penalty because the statute referred to "double compensation"]; *Cox v. Lykes Bros.,* 237 N.Y. 376, 379 [1924] [double payment available to seamen for late wages under federal statute not a penalty because the statute expressly provided that such compensation "shall be recoverable as wages"] ). Furthermore, we have found that when used in a statute of limitations, "[t]he words 'penalty or forfeiture' ... refer to something imposed in a punitive way for an infraction of a public law and do not include a liability created for the purpose of redressing a private injury, even though the wrongful act be a public wrong and punishable as such" (*Sicolo v. Prudential Sav. Bank of Brooklyn, N.Y.,* 5 N.Y.2d 254, 258 [1959] ). [FN6]

> FN6. Former Civil Practice Act § 49(3) provided a three-year statute of limitations for penalties or forfeitures.

We have also indicated that the determination of whether a certain provision constitutes a penalty may vary depending on the context. In *Cox*, then-Judge Cardozo wrote: "We are to remember that the same provision may be penal as to the offender and remedial as to the sufferer. The nature of the problem will determine whether we are to take one viewpoint or the other" (*Cox,* 237 N.Y. at 380 [citations omitted]; *see also Life & Cas. Ins. Co. of Tennessee v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*McCray,* 291 U.S. 566, 574 [1934] [Cardozo, J.] [" 'Penalty' is a term of varying and uncertain meaning."] ).

Judge Cardozo's observations in *Cox* are particularly relevant to this case. It is evident that by including the penalty exception in CPLR 901(b), the Legislature declined to make class actions available where individual plaintiffs were afforded sufficient economic encouragement to institute actions (through statutory provisions awarding something beyond or unrelated to actual damages), unless a statute expressly authorized the option of class action status. This makes sense, given that class actions are designed in large part to incentivize plaintiffs to sue when the economic benefit would otherwise be too small, particularly when taking into account the court costs and attorneys' fees typically incurred. Therefore, the term "penalty," as used for purposes of the class action scheme, has broader application than that given in *Sicolo* for statute of limitations purposes.

The antitrust treble damages statute also does not state that such damages are compensatory (*compare Bogartz,* 293 N.Y. at 565). Nor does its legislative history clearly indicate a compensatory purpose. Read together, we conclude that Donnelly Act threefold damages should be regarded as a penalty insofar as class actions are concerned. Although one third of the award unquestionably compensates a plaintiff for actual damages, the remainder necessarily punishes antitrust violations, deters such behavior (the traditional purposes of penalties) or encourages plaintiffs to commence litigation--or some combination of the three. But we need not break down the remaining damages into specific categories for purposes of determining whether it is a penalty under CPLR 901(b). Where a statute is already designed to foster litigation through an enhanced award, CPLR 901(b) acts to restrict recoveries in class actions absent statutory authorization.

It is notable that the Legislature added the treble damages provision to the Donnelly Act shortly after having adopted CPLR 901(b). Clearly, the Legislature was aware of the requirement of making express provision for a class action when drafting penalty statutes, and could have included such authoriza-

tion in General Business Law § 340. [FN7] In sum, it lies with the Legislature to decide whether class action suits are an appropriate vehicle for the award of antitrust treble damages. Indeed, the Legislature has contemplated adding such authorization on a number of occasions. [FN8]

> FN7. Although General Business Law § 342-b contemplates that the Attorney General may bring class actions on behalf of governmental entities, General Business Law § 340, in contrast, makes no reference to class actions for private litigants.

> FN8. In 1973 and 1974, bills died in committee that would have permitted class actions for the recovery of treble damages (*see* 1973 N.Y. Senate-Assembly Bill S 3544, A 4832; 1974 N.Y. Senate-Assembly S 3544, A 4832). Similarly, in 1975, while the Legislature was considering the treble damages bill that was eventually enacted, a separate proposal (1975 N.Y. Assembly Bill A 1215) would have expressly permitted class actions. More recently, bills to amend the Donnelly Act to create a class action provision in General Business Law § 340(7) have been considered a number of times (*see* 2002 N.Y. Assembly Bill A 11124; 2003 N.Y. Assembly Bill A 5158; 2005 N.Y. Assembly Bill A 663). The same proposal is currently pending (*see* 2007 N.Y. Assembly Bill A 396). Under the proposed amendment, General Business Law § 340(7) would provide: "Any damages recoverable pursuant to this section may be recovered in any action which a court may authorize to be brought as a class action pursuant to article nine of the civil practice law and rules."

We are not persuaded that the outcome of this case is controlled by statements in United States Supreme Court decisions describing the federal antitrust treble damages counterpart as being remedial in nature (*see e.g. American Socy. of Mech. Engrs., Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575 [1982]; *Brunswick v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 485-486 [1977]; *but see Texas Indus., Inc. v. Radcliff Materi-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_als, Inc., 451 U.S. 630, 639 [1981]_ ["The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."] ). Although we generally construe the Donnelly Act in light of federal antitrust case law, it is also well settled that we will interpret our statute differently "where State policy, differences in the statutory language or the legislative history justify such a result" (_Anheuser-Busch, Inc. v. Abrams, 71 N.Y.2d 327, 335 [1988]_ ). To the extent there is any conflict, this case highlights such distinctions.

As an initial matter, none of these United States Supreme Court decisions considered whether treble damages should be considered a "penalty" for purposes of a particular statute. More importantly, Federal Rules of Civil Procedure rule 23, the federal class action provision, does not contain a limitation similar to that found in CPLR 901(b). Since this appeal requires us to view General Business Law § 340(5)'s treble damages provision in light of the limitation in CPLR 901(b), we are presented with a state law question that federal precedent is not very helpful in resolving.

Finally, we decline to reach the issue of whether Sperry may maintain a class action under the Donnelly Act by forgoing treble damages in favor of actual damages. This issue is not properly before us because Sperry has consistently sought treble damages throughout this litigation and has not previously attempted to waive them to pursue only actual damages.

Turning to the unjust enrichment cause of action, Sperry argues that the courts below erred in dismissing this cause of action on the basis that no privity existed between Sperry and defendants. It is well settled that "[t]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" (_Paramount Film Distrib. Corp. v. State of New York, 30 N.Y.2d 415, 421 [1972]_, cert denied 414 U.S. 829 [1973] ). While we agree with Sperry that a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, we nevertheless con-

clude that such a claim does not lie under the circumstances of this case. Here, the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated to support such a claim. Additionally, in this situation it is not appropriate to substitute unjust enrichment to avoid the statutory limitations on the cause of action created by the Legislature.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

\* \* \*

Order affirmed, with costs.

Chief Judge KAYE and Judges CIPARICK, READ, SMITH and PIGOTT concur.

Judge JONES took no part.

--- N.E.2d ----, 2007 WL 527726 (N.Y.), 2007 N.Y. Slip Op. 01425

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 31

Westlaw.

Not Reported in N.W.2d                                                    Page 1
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
**(Cite as: Not Reported in N.W.2d)**

C

Strang v. Visa U.S.A., Inc.Wis.Cir.,2005.Only the
Westlaw citation is currently available.
Circuit Court of Wisconsin, Milwaukee County..
Mary STRANG, individually and on behalf of all
others similarly situated Plaintiff.
v.
VISA U.S.A. INC., et. al. Defendants
**No. 03 CV 011323.**

Feb. 8, 2005.

John S. Skilton and Gabrielle E. Bina of Heller
Ehrman White & McAuliffe LLP, Madison, WI;
Stephen V. Bomse and David M. Goldstein of Heller
Ehrman White & McAuliffe LLP, San Francisco,
CA; Robert C. Mason of Arnold & Porter LLP, New
York, NY, for Defendant Visa U.S.A. Inc.
Jeffrey Morris of Quarles & Brady LLP, Milwaukee,
WI; Kenneth A. Gallo and Patricia C. Crowley of
Paul, Weiss, Rifkind, Wharton & Garrison LLP,
Washington, DC; Gary R. Carney and Randi D.
Adelstein of Paul, Weiss, Rifkind, Wharton &
Garrison LLP, New York, NY, for Defendant
MasterCard International Incorporated.
John M. Swietlik, Jr. and Jane M. Cuthbert of
Kasdorf, Lewis & Swietlik, S.C., Milwaukee, WI, for
Plaintiffs.

DECISION AND ORDER
FOLEY, J.

FACTS AND PROCEDURAL POSTURE

**\*1** This matter is before me on the Visa U.S.A. and
MasterCard International's (Defendants') motion to
dismiss. They maintain that Ms. Strang lacks
standing to bring this lawsuit, as her claimed injuries
are derivative and too remote.[FN1] In addressing a
motion to dismiss, all properly plead facts are taken
as true. Wis. Stat. sec. 802.06(2)(a)(6) and *Tietsworth
v. Harley-Davidson, Inc.,* 2004 WI 32, par. 11, 677
N.W.2d 233, 238 (2004). After careful consideration,
I have decided that I must join the chorus [FN2] and
grant the motion to dismiss. As a general consumer
or debit card consumer, Ms. Strang's claimed injuries
are derivative and too remote; they are also highly
speculative, potentially duplicative and would clearly
involve daunting and overwhelming evidentiary
concerns.

FN1. Standing requires that a party have "a
sufficient stake in an otherwise justiciable
controversy to obtain judicial resolution of
that controversy." *Sierra Club v. Morton,*
472 U.S. 727, 731 (1972). The *Sierra Club*
standard has been recognized by the
Wisconsin Supreme Court and requires a
two-step analysis: whether the plaintiff has
suffered a threatened or actual injury and
whether the interest asserted is recognized
by law. *Norquist v. Zeuske,* 211 Wis.2d 241,
247, 564 N.W.2d 748 (1997). As noted
below, there is little question that Ms. Strang
alleges she suffered injury in regard to an
interest recognized by law in Wis. Stats. ch.
133. The critical issue is whether judicially
imposed limitations nevertheless deprive her
of standing to maintain this lawsuit.

FN2. With the latest submission of
authorities by the Defendants, *Kanne v.
Visa, U.S.A., Inc., et. al,* Neb. Dist. Ct.,
Douglas County, Doc. 1033, No. 469,
arriving today, I am advised that fourteen
state trial courts have granted motions to
dismiss in parallel state court proceedings
concluding that consumers like Ms. Strang
lack standing to maintain state antitrust
claims based upon virtually identical factual
allegations under statutes similar to Wis.
Stats. ch. 133..

**\*1** Ms. Strang's complaint, seeking relief under
Wisconsin's antitrust statutes, Wis. Stats. ch.. 133, is
a "follow on" action [FN3] to *In re Visa Check/Master
Money Antitrust Litigation,* No. CV-96-5238
(E.D.N.Y.). In that litigation, it was determined that
the defendants illegally tied their credit and debit
card services, i.e. merchants were forced to accept
Visa and MasterCard debit cards if they wished
accept defendants' credit cards. This practice was
commonly referred to as an "honor all cards" rule.
This tying, according to the complaint, resulted in
merchants paying excessive debit card service
(discount) fees. In the settlement of that merchant-
initiated federal litigation, the defendants agreed to
pay $3 billion in damages and to cease the tying
requirement. A series of "follow on" actions have
been filed in a number of states affording state

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

antitrust protection to those harmed directly or indirectly by actions that violate relevant state statutes.

> FN3. The Honorable Ben Tenille, of the Superior Court, Hanover County, North Carolina, who wrote a scholarly decision in regard to this same issue in the parallel proceedings in that state, *Morris v. Visa, et. al.,* No. 03 CVS 2514, characterized this and similar state antitrust claims as "generally parasitic" in that they almost invariably piggyback on some triggering federal antitrust claim. Given our relatively recent experience with parasites in the water in our community, I'll constrain myself to the "follow on" characterization.

**\*1** Ms. Strang proposes to bring suit individually and on behalf of a proposed class of all persons who made purchases in Wisconsin from any retailer utilizing Visa and MasterCard credit card and debit card services during the proposed class period, December, 1999 to December, 2003. Ms. Strang, a Wisconsin consumer, alleges the tying practices of the defendants' violated Wis. Stat. ch. 133 as a contract or conspiracy in restraint of trade. Pursuant to Wis. Stats. sec. 133.18(1) "any person injured, directly or indirectly," by prohibited practices is entitled to recover treble damages, the costs of suit and reasonable attorney fees. Ms. Strang claims she was indirectly injured by the defendants' practices because the merchants using their debit card services passed through the excessive fees merchants were forced to pay.[FN4] She reasons that she, and all other Wisconsin consumers who made purchases from merchants paying Visa and Master Card debit card service fees, incurred indirect injury in each purchase made when those excessive fees were passed through to the consumer in the form of increased prices of all items sold by the merchant. Anticipating potential standing concerns related to the manageability of the size of this proposed class and the potential volume of claims, leave is sought to plead an alternative class comprised only of debit card users. *Plaintiff's Brief in Opposition,* p. 34.

> FN4. The complaint alleges that the fees were as much as 1500% higher than those incurred by merchants for competitive debit card services. See, par. 45.

**\*2** In my view, only a brief summary of the

intricacies of the business relationships and transactions underlying this lawsuit is necessary. Visa and MasterCard are alleged to be an association of thousands of member banks operating a national bank card network. Individual banks that are members of the association issue Visa or MasterCard branded payment cards to consumers and enter into agreements with merchants allowing them to accept these cards. Credit cards allow consumers to buy on credit, using the bank's funds and repaying the debt later. Debit cards are utilized to make payments directly from funds the consumer has on deposit with the bank. The merchant pays a fee to the bank providing debit card services for each transaction involving a Visa or MasterCard branded card.[FN5] According to the complaint, the defendants are able to extract excessive debit card fees due to their dominant position in the credit card market and the imposition of the "honor all cards" policy. More succinctly stated, they assert that merchants cannot survive without Visa and MasterCard credit card services and therefore accede to the excessive fees for their debit card services.

> FN5. Fees paid by merchants (discount fees) are actually split between the bank providing debit card services to the merchant and the bank that issues the Visa or MasterCard debit card to the consumer.

### PRECEDENTIAL CONTEXT

**\*2** The positions taken by the parties in this litigation cannot be properly understood without a basic understanding of the United States Supreme Court's decisions relating to standing of "indirect purchasers" in antitrust litigation. This is true, in primary part, because Wis. Stat. ch. 133 and similar statutes in other states are acknowledged to be a direct response to denial of standing to indirect purchasers in federal antitrust litigation as a result of those decisions.

**\*2** In *Hanover Shoe Co. v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968), the Supreme Court rejected the "pass on" theory of an antitrust violator, rejecting the proffered defense that the direct purchaser of the affected product was not actually injured in that they had "passed on" the excessive costs to a succeeding (indirect) purchaser in the chain of distribution. Nine years later, the Court held that an indirect purchaser did not have standing to maintain a federal antitrust claim. *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). In response, Wisconsin and a significant number of other states (twenty two)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enacted "*Illinois Brick* repealer" legislation, granting standing to indirect purchasers.[FN6] The U.S. Supreme Court subsequently rejected a challenge to the validity of state "*Illinois Brick* repealer" (indirect purchaser standing) statutes. *California v. ARC Am. Corp.,* 490 U.S. 93 (1989).

FN6. See, *Bunker's Glass Comp. v. Pilkington. PLC, 75 P.3d 99, 105, fn. 4 (Ariz., 2003).*

STANDING IN WISCONSIN ANTITRUST CASES

**\*2** As noted, Wisconsin enacted an "*Illinois Brick* repealer" statute in response to the dramatic standing limitations of that decision. Wis. Stat. sec 133.18(1)(b) provides in pertinent part: "Any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefore...." The breadth of the language is emphasized in the legislative expression of intent in Wis. Stat. 133.01: "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition."

**\*3** Defendants correctly and emphatically assert however that the breadth of this statutory standard would grant standing to even the most remote of purchasers in the chain of distribution of an affected commodity. A literal application of the language would grant standing to the purchaser of a used bicycle asserting that the purchase price of the twice-sold bicycle was inflated due to a price fixing conspiracy of a rubber manufacturer whose product was used to manufacture the tires of the bike. In direct response to those concerns, courts have refused to grant standing to those remotely and derivatively injured based on policy considerations. The most notable case in this regard is *Associated General Contractors of Cal. Inc. v. Cal. State Council of Carpenters,* 459 U.S. 529, 534 (1983) (hereinafter *AGC* ) in which the Court noted that a literal reading of the federal antitrust statute "was broad enough to encompass every harm that can be attributed directly or indirectly to ... an antitrust violation," but noting that "federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." ' (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262, fn. 14 (1972)). *AGC* went on to enumerate various factors to be considered in determining whether a claimed antitrust injury was too remote to accord standing to bring the claim.

Given then that the literal language of the Wisconsin statute specifically rejects the federal ban on standing for indirect purchasers [FN7] and would clearly grant standing to Ms. Strang to bring her claim, the critical issue becomes what, if any, policy limitations attend the Wisconsin statute. The parties agree that this is an issue of first impression in Wisconsin.[FN8]

FN7. As indicated at fn. 9, *infra,* I agree that Ms. Strang and other debit card (or general) consumers are not "indirect purchasers" of defendants' debit card services. However, she does allege indirect injury from restraint of trade conduct. This is all that Wis. Stats. secs. 133.03 and 133.18, by their literal terms, require. The critical issue then is not whether she is or is not an indirect purchaser; it is whether she lacks standing based upon an analysis of the *AGC* factors set forth below.

FN8. The process of "judicial line drawing" based upon concerns that an injury is too remotely related to a wrongdoing is, of course, not unprecedented. Tort liability in Wisconsin is cut off, based upon six judicially crafted public policy considerations, if "the cause in fact of injury is legally insufficient to allow recovery." *Fandrev v. American Family. 04 Wi. 62, par. 15, 272 Wis.2d 46, 680 N.W.2d 345.* The *AGC* court noted the similarity of this "proximate cause" analysis in tort law to the standing analysis in antitrust law. *AGC, supra* at 532-535.

**\*3** Defendants argue that I should embrace the policy considerations set forth in *AGC.* I read that case to set forth the following factors to be considered in determining whether an antitrust claimant has standing to maintain an antitrust claim.
**\*3** 1. Is there a causal connection between the antitrust violation and the harm to the plaintiff?
**\*3** 2. Did the defendant intend to cause the particular harm?
**\*3** 3. The nature of the claimant's injuries, most specifically the directness or indirectness of those injuries. Included in this consideration is whether there is another class of affected individuals who are more directly injured.
**\*3** 4. Is the injury claimed highly speculative in nature? At bottom, does the claimed injury rest on an abstract conception or speculative measure of harm.
**\*3** 5. The risk of duplicative recovery as well as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
**(Cite as: Not Reported in N.W.2d)**

Page 4

danger and judicial manageability of complex apportionment of damages.

**\*3** While I share the concern of the plaintiff that these factors could be read to simply reinstate the rule of *Illinois Brick* as law in Wisconsin, i.e. no indirect purchaser standing, I suspect that if faced with this issue, our appellate courts would look to these factors for guidance in assessing an indirect or remote purchaser's standing. Numerous state courts have analyzed these factors and concluded that injuries identical to those claimed by Ms. Strang are too remote and speculative and granted motions to dismiss for lack of standing. See, fn. 2. After a careful analysis of those factors, and while noting that the first two factors support a conclusion that Ms. Strang should be accorded standing, I have concluded that the remaining factors clearly dictate the conclusion the motion should be granted.

## CAUSAL CONNECTION

**\*4** Ms. Strang does allege causally related injury. She maintains that the tying of debit card services to credit card services violated <u>Wis. Stat. sec. 133.03</u>. As a result, according to her allegations, merchants paid excessive fees for defendants' debit card services and those costs were passed on to her in the form of inflated prices for goods that she purchased. This is sufficient to establish an "inference of causation" <u>FN9</u> to support her antitrust claim pursuant to <u>Wis. Stat. secs. 133.03</u> and <u>133.18</u>.

> <u>FN9.</u> *Perkins v. Standard Oil Co.,* <u>395 U.S. 642, 648 (1969),</u>

## INTENT TO CAUSE HARM

**\*4** Clearly the strongest inference from the facts alleged in the complaint is that the defendants most directly intended to harm the merchants. However, it would be disingenuous to argue or conclude that no inference of intent to harm consumers is supported by those same facts. It has long been recognized in antitrust litigation that the ultimate purchaser/consumer is saddled with some or all of the antitrust related costs of products. *Hanover Shoe, supra* at 492.<u>FN10</u> Quite clearly, the facts as plead support a reasonable inference that the defendants intended, or foresaw, their conduct in restraint of trade would injure the consumer as well as the merchant.

> <u>FN10.</u> This fact was also noted in the legislative history of amendments to the Sherman Antitrust Act. "[T]he economic burden of most antitrust violations is borne by the consumer in the form of higher prices for goods and services." Hart-Scott-Rondino Antitrust Improvements Act of 1976, S.Rep. No. 94-808.

## NATURE OF INJURY

**\*4** This factor looks initially to the directness or indirectness of the injury. There is no question that the plaintiff alleges injuries that are indirect. The excessive fees were paid initially by the merchants and, according to the plaintiff's allegations, then passed through to the consumer/purchaser in the form of higher purchase prices for all goods. As in *AGC,* "such injuries were the indirect result" of injuries suffered by the merchants. *AGC, supra* at 541.

**\*4** The *AGC* court also directed attention to whether a claimant was a consumer or competitor in the restrained market. The restrained market in the context of the plaintiff's claims is the debit card service market. Ms. Strang and consumer/purchasers are hardly competitors in the debit card services market. They are also not consumers of debit card services. Merchants are consumers of those services.<u>FN11</u>

> <u>FN11.</u> As I noted at oral arguments on this motion, unquestionably merchants consume these services because consumers demand the convenience of cashless transactions. However, this does not transform ultimate purchasers into consumers of debit card services in the legal or economic sense.

**\*4** An additional consideration in regard to this factor is whether a more directly affected class exists who would be likely to address the violation. *Id.* at 542. Succinctly stated, merchants are the class of individuals who are more directly injured by the antitrust activities and in a better position to prosecute a claim based upon that activity; in fact, they have done so. While the plaintiff alleges that the damages assessed fall far short of the damages actually incurred, a "significant antitrust violation [has not been] undetected or unremedied." *Id.* at 543. Given that their claimed injuries were direct, they entailed none of the "conceptual difficulties" that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                 Page 5
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
**(Cite as: Not Reported in N.W.2d)**

encumber indirectly injured parties claims. Most specifically, as noted below, they encounter none of the daunting evidentiary problems of proving any marginal effect of the excessive debit card fees vis a vis the multitude of other pricing factors that impact the ultimate purchase price of any and all products that a Visa or MasterCard merchant sells.

SPECULATIVE DAMAGES, RISK OF
DUPLICATIVE RECOVERY AND COMPLEX
APPORTIONMENT OF DAMAGES

**\*5** Dovetailing with the directness of injury consideration, antitrust courts have looked to the speculative nature of claimed injuries in assessing antitrust standing. As discussed above, direct purchasers are immediately impacted by the antitrust violation. Proof of damages is often complicated, but given their immediate proximity in the chain of distribution, there is far less likelihood that a multitude of other pricing factors will at the very best cloud, if not obliterate, the connection between the prohibited conduct and the claimed injury. Simply stated, with indirect purchasers, their most significant "conceptual difficulty" is that the causal connection, if in fact one exists, often times will be obliterated in the intervening steps in the chain of distribution. They are faced with the daunting task of proving the effect of the prohibited conduct on the price at any and all levels above them and then at their removed position in the chain of distribution, and disproving, or at least quantifying, the effects of a multitude of other pricing considerations which clearly did or could have intervened at any relevant level.[FN12] In the context of the proposed class, they bear this burden with respect to every product purchase made at a Visa or MasterCard merchants store during the proposed class period. As Judge Tenille stated in *Morris*, one cannot "conceive of an economically feasible way to administer a trial which would require inquiry into how every retailer set the price for every consumer good sold in this state. Nor is it conceivable that any judgment would be in any amount which could be economically allocated and paid to every consumer in North Carolina." Paragraph 90.

> FN12. I am not unmindful that the consumer is closer to the wrongdoer in this chain of distribution than, for instance, the purchaser of the fictional bicycle in the scenario cited earlier in this decision. However, the difficulty of proof attends nevertheless as

the intervening party considers a multitude of factors in pricing decisions. In addition, depending upon the elasticity of the product, the prohibited conduct could have a major, minor or no effect on the ultimate purchase price of a good. Landes and Posner, *An Economic Analysis of the Rule of Illinois Brick,* 46 U. Chi. L.Rev., 602, 619-620; *Morris, supra, par. 89.* Suffice it to say that the damage claim in this case is fairly characterized as "highly speculative." *AGC, supra* at 544.

**\*5** The risk of duplicative recovery could not be more acute. Merchants have sued and recovered. Assuming the plaintiff can overcome the daunting task of proving a causal connection and quantifying the overarching injury caused by the prohibited conduct, there remains the difficult process of determining a nonduplicative measure of damages between the ultimate consumers and the merchants. As the Supreme Court noted in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 475, fn. 11, "the task of disentangling overlapping damage claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system," in that doing so "would be to discourage vigorous enforcement of antitrust laws by private suit." This is, of course, the antithesis of the legislative purpose of Wis. Stats. sec. 133.18.

CONCLUSION

**\*5** Ms. Strang alleges a recognizable claim under Wis. Stats. ch. 133 and resultant injuries. She also alleges facts to support an inference that the defendants intended, or foresaw, ultimate purchasers would be injured as a result of the tying arrangement and pass through of excessive debit card fees paid by merchants. However, her claimed injuries, as a general Wisconsin consumer or as a debit card purchaser, are derivative, remote, and highly speculative. The direct purchaser victims of the prohibited conduct have sued and recovered, redressing the prohibited conduct. Overwhelming concerns exist as to the speculative nature of the injuries and the manageability of the litigation in which she would endeavor to overcome those conceptual and evidentiary concerns. In my view, the analysis of the *AGC* factors overwhelmingly supports the conclusion that Ms. Strang lacks standing to maintain this action. For that reason, the motion to dismiss is granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 6
Not Reported in N.W.2d, 2005 WL 1403769 (Wis.Cir.)
**(Cite as: Not Reported in N.W.2d)**

Wis.Cir.,2005.
Strang v. Visa U.S.A., Inc.
Not Reported in N.W.2d, 2005 WL 1403769
(Wis.Cir.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 32

Westlaw.

127 S.Ct. 1069                                          Page 1
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

H

**Briefs and Other Related Documents**

Supreme Court of the United States
WEYERHAEUSER COMPANY, Petitioner,
v.
ROSS-SIMMONS HARDWOOD LUMBER CO.,
INC.
**No. 05-381.**

Argued Nov. 28, 2006.
Decided Feb. 20, 2007.

**Background:** Sawmill operator brought action under
§ 2 of the Sherman Act alleging that competitor
monopolized and attempted to monopolize Pacific
Northwest input market for alder sawlogs through its
purchases of sawlogs. The United States District
Court for the District of Oregon, Owen M. Panner,
Senior Judge, 2003 WL 23715982, entered judgment
on jury verdict in plaintiff's favor, denied defendant's
motion for judgment as matter of law or new trial,
and awarded attorney fees and costs. Defendant ap-
pealed. The United States Court of Appeals for the
Ninth Circuit, 411 F.3d 1030, affirmed. Certiorari
was granted.

**Holding:** The Supreme Court, Justice Thomas, held
that test which applied to claims of predatory pricing
also applied to claims of predatory bidding.
Vacated and remanded.

West Headnotes

**[1] Antitrust and Trade Regulation ☜═◻832**
29Tk832 Most Cited Cases
Test which applied to claims of predatory pricing
also applied to claims of predatory bidding, so that a
plaintiff in a claim of predatory-bidding under § 2 of
the Sherman Act must prove that predatory bidding
led to below-cost pricing of predator's outputs and
that predator had dangerous probability of recouping
losses incurred in bidding up input prices through ex-
ercise of monopsony power; both claims involved de-
liberate use of unilateral pricing measures for anti-
competitive purposes and both claims required pred-

ator to incur short-term losses on chance they might
reap supracompetitive profits in future. Sherman Act,
§ 2, 15 U.S.C.A. § 2.

**[2] Antitrust and Trade Regulation ☜═◻832**
29Tk832 Most Cited Cases

**[2] Antitrust and Trade Regulation ☜═◻847**
29Tk847 Most Cited Cases
Primary-line competitive injury under the Robinson-
Patman Act is of the same general character as the in-
jury inflicted by predatory pricing schemes action-
able under § 2 of the Sherman Act. Sherman Act, § 2,
15 U.S.C.A. § 2; Robinson-Patman Price Discrimina-
tion Act, § 2 et seq., 15 U.S.C.A. § 13 et seq.

**[3] Antitrust and Trade Regulation ☜═◻833**
29Tk833 Most Cited Cases

**[3] Antitrust and Trade Regulation ☜═◻838**
29Tk838 Most Cited Cases
To recover on a claim of predatory pricing, the
plaintiff seeking to establish competitive injury res-
ulting from a rival's low prices must prove that the
prices complained of are below an appropriate meas-
ure of its rival's costs and that the competitor had a
dangerous probability of recouping its investment in
below-cost prices.

**[4] Antitrust and Trade Regulation ☜═◻832**
29Tk832 Most Cited Cases
Predatory-pricing plaintiffs must demonstrate that
there is a likelihood that the predatory scheme al-
leged would cause a rise in prices above a competit-
ive level that would be sufficient to compensate for
the amounts expended on the predation, including the
time value of the money invested in it.
                **\*1070** *Syllabus* [FN*]

        FN* The syllabus constitutes no part of the
        opinion of the Court but has been prepared
        by the Reporter of Decisions for the con-
        venience of the reader. See *United States v.
        Detroit Timber & Lumber Co.,* 200 U.S.
        321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*\*1** Respondent Ross-Simmons, a sawmill, filed suit
under § 2 of the Sherman Act, alleging that petitioner

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 1069                                                                 Page 2
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

Weyerhaeuser drove it out of business by bidding up the price of sawlogs to a level that prevented Ross-Simmons from being profitable. The District Court, *inter alia,* rejected Weyerhaeuser's proposed predatory-bidding jury instructions that incorporated elements of the test applied to predatory-pricing claims in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168. The jury returned a verdict against Weyerhaeuser. The Ninth Circuit affirmed, rejecting Weyerhaeuser's argument that *Brooke Group's* standard should apply to predatory-bidding claims.

*Held:* The test this Court applied to predatory-pricing claims in *Brooke Group* also applies to predatory-bidding claims. Pp. 1072-1078.

(a) Predatory pricing is a scheme in which the predator reduces the sale price of its product hoping to drive competitors out of business and, once competition has been vanquished, raises prices to a supracompetitive level. *Brooke Group* established two prerequisites to recovery on a predatory-pricing claim: First, a plaintiff must show that the prices complained of are below cost, 509 U.S., at 222, 113 S.Ct. 2578, because allowing recovery for above-cost price cutting could chill conduct--price cutting--that directly benefits consumers. Second, a plaintiff must show that the alleged predator had "a dangerous probability of recouping its investment in below-cost pricing," *id.,* at 224, 113 S.Ct. 2578, because without such a probability, it is highly unlikely that a firm would engage in predatory pricing. The costs of erroneous findings of predatory-pricing liability are quite high because " '[t]he mechanism by which a firm engages in predatory pricing--lowering prices--is the same mechanism *1071 by which a firm stimulates competition,' " and therefore, mistaken liability findings would " ' "chill the very conduct the antitrust laws are designed to protect." ' " *Id.,* at 226, 113 S.Ct. 2578. Pp. 1073-1075.

(b) Predatory bidding involves the exercise of market power on the market's buy, or input, side. To engage in predatory bidding, a purchaser bids up the market price of an input so high that rival buyers cannot survive, thus acquiring monopsony power, which is market power on the buy side of the market. Once a predatory bidder causes competing buyers to exit the market, it will attempt to drive down input prices to reap supracompetitive profits that will at least offset the losses it suffered in bidding up input prices. Pp. 1075-1076.

(c) Predatory-pricing and predatory-bidding claims are analytically similar. And the close theoretical connection between monopoly and monopsony suggests that similar legal standards should apply to both sorts of claims. Both involve the deliberate use of unilateral pricing measures for anticompetitive purposes and both require firms to incur certain short-term losses on the chance that they might later make supracompetitive profits. More importantly, predatory bidding mirrors predatory pricing in respects deemed significant in *Brooke Group.* Because rational businesses will rarely suffer short-term losses in hopes of reaping supracompetitive profits, *Brooke Group's* conclusion that " 'predatory pricing schemes are rarely tried, and even more rarely successful,' " 509 U.S., at 226, 113 S.Ct. 2578, applies with equal force to predatory-bidding schemes. And like the predatory conduct in *Brooke Group,* actions taken in a predatory-bidding scheme are often " ' "the very essence of competition," ' " *ibid.,* because a failed predatory-bidding scheme can be a "boon to consumers," see *id.* at 224, 113 S.Ct. 2578. Predatory bidding also presents less of a direct threat of consumer harm than predatory pricing, which achieves ultimate success by charging higher prices to consumers, because a predatory bidder does not necessarily rely on raising prices in the output market to recoup its losses. Pp. 1076-1078.

(d) Given these similarities, *Brooke Group's* two-pronged test should apply to predatory-bidding claims. A predatory-bidding plaintiff must prove that the predator's bidding on the buy side caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs. Because the risk of chilling procompetitive behavior with too lax a liability standard is as serious here as it was in *Brooke Group,* only higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for predatory-bidding liability. A predatory-bidding plaintiff also must prove that the defendant has a dangerous probability of recouping the losses in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 1069                                                                                               Page 3
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))

curred in bidding up input prices through the exercise of monopsony power. Making such a showing will require "a close analysis of both the scheme alleged by the plaintiff and the [relevant market's] structure and conditions," 509 U.S., at 226, 113 S.Ct. 2578. P. 1078.

**2 (e) Because Ross-Simmons has conceded that it has not satisfied the *Brooke Group* standard, its predatory-bidding theory of liability cannot support the jury's verdict. P. 1078.

411 F.3d 1030, vacated and remanded.

THOMAS, J., delivered the opinion for a unanimous Court.

Andrew J. Pincus, Washington, DC, for petitioner.

*1072 Kannon K. Shanmugam, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.

Michael E. Haglund, Portland, OR, for respondent.

Stephen V. Bomse, M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe LLP, San Francisco, CA, Kevin J. Arquit, Joseph F. Tringali, Simpson, Thacher & Bartlett LLP, New York, NY, Andrew J. Pincus, Counsel of Record, Charles A. Rothfeld, Nickolai G. Levin, Mayer, Brown, Rowe & Maw LLP, Washington, DC, Sandy McDade, Guy C. Stephenson, Weyerhaeuser Company, Federal Way, WA, for Petitioner.

Roy Pulvers, Lindsay, Hart, Neil & Weigler, LLP, Portland, OR, Michael E. Haglund, Counsel of Record, Michael K. Kelley, Shay S. Scott, Haglund, Kelley, Horngren, Jones & Wilder LLP, Portland, OR, for Respondent.

Justice THOMAS delivered the opinion of the Court.

[1] Respondent Ross-Simmons, a sawmill, sued petitioner Weyerhaeuser, alleging that Weyerhaeuser drove it out of business by bidding up the price of sawlogs to a level that prevented Ross-Simmons from being profitable. A jury returned a verdict in favor of Ross-Simmons on its monopolization claim, and the Ninth Circuit affirmed. We granted certiorari to de-

cide whether the test we applied to claims of predatory pricing in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), also applies to claims of predatory bidding. We hold that it does. Accordingly, we vacate the judgment of the Court of Appeals.

I

**3 This antitrust case concerns the acquisition of red alder sawlogs by the mills that process those logs in the Pacific Northwest. These hardwood-lumber mills usually acquire logs in one of three ways. Some logs are purchased on the open bidding market. Some come to the mill through standing short- and long-term agreements with timberland owners. And others are harvested from timberland owned by the sawmills themselves. The allegations relevant to our decision in this case relate to the bidding market.

Ross-Simmons began operating a hardwood-lumber sawmill in Longview, Washington, in 1962. Weyerhaeuser entered the Northwestern hardwood-lumber market in 1980 by acquiring an existing lumber company. Weyerhaeuser gradually increased the scope of its hardwood-lumber operation, and it now owns six hardwood sawmills in the region. By 2001, Weyerhaeuser's mills were acquiring approximately 65 percent of the alder logs available for sale in the region. App. 754a, 341a.

From 1990 to 2000, Weyerhaeuser made more than $75 million in capital investments in its hardwood mills in the Pacific Northwest. *Id.,* at 159a. During this period, production increased at every Northwestern hardwood mill that Weyerhaeuser owned. *Id.,* at 160a. In addition to increasing production, Weyerhaeuser used "state-of-the-art technology," *id.,* at 500a, including sawing equipment, to increase the amount of lumber recovered from every log, *id.,* at 500a, 549a. By contrast, Ross-Simmons appears to have engaged in little efficiency-enhancing investment. See *id.,* at 438a-441a.

*1073 Logs represent up to 75 percent of a sawmill's total costs. See *id.,* at 169a. And from 1998 to 2001, the price of alder sawlogs increased while prices for finished hardwood lumber fell. These divergent trends in input and output prices cut into the mills'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

profit margins, and Ross-Simmons suffered heavy losses during this time. See *id.,* at 155a (showing a negative net income from 1998 to 2000). Saddled with several million dollars in debt, Ross-Simmons shut down its mill completely in May 2001. *Id.,* at 156a.

Ross-Simmons blamed Weyerhaeuser for driving it out of business by bidding up input costs, and it filed an antitrust suit against Weyerhaeuser for monopolization and attempted monopolization under § 2 of the Sherman Act. See 26 Stat. 209, as amended, 15 U.S.C. § 2 (2000 ed., Supp. IV). Ross-Simmons alleged that, among other anticompetitive acts, Weyerhaeuser had used "its dominant position in the alder sawlog market to drive up the prices for alder sawlogs to levels that severely reduced or eliminated the profit margins of Weyerhaeuser's alder sawmill competition." App. 135a. Proceeding in part on this "predatory-bidding" theory, Ross-Simmons argued that Weyerhaeuser had overpaid for alder sawlogs to cause sawlog prices to rise to artificially high levels as part of a plan to drive Ross-Simmons out of business. As proof that this practice had occurred, Ross-Simmons pointed to Weyerhaeuser's large share of the alder purchasing market, rising alder sawlog prices during the alleged predation period, and Weyerhaeuser's declining profits during that same period.

Prior to trial, Weyerhaeuser moved for summary judgment on Ross-Simmons' predatory-bidding theory. *Id.,* at 6a–24a. The District Court denied the motion. *Id.,* at 58a–69a. At the close of the 9-day trial, Weyerhaeuser moved for judgment as a matter of law, or alternatively, for a new trial. The motions were based in part on Weyerhaeuser's argument that Ross-Simmons had not satisfied the standard this Court set forth in *Brooke Group, supra.* App. 940a–942a. The District Court denied Weyerhaeuser's motion. *Id.,* at 720a, App. to Pet. for Cert. 46a. The District Court also rejected proposed predatory-bidding jury instructions that incorporated elements of the *Brooke Group* test. App. 725a–730a, 978a. Ultimately, the District Court instructed the jury that Ross-Simmons could prove that Weyerhaeuser's bidding practices were anticompetitive acts if the jury concluded that Weyerhaeuser "purchased more logs than it needed, or paid a higher price for logs than ne-

cessary, in order to prevent [Ross-Simmons] from obtaining the logs they needed at a fair price." *Id.,* at 978a. Finding that Ross-Simmons had proved its claim for monopolization, the jury returned a $26 million verdict against Weyerhaeuser. *Id.,* at 967a. The verdict was trebled to approximately $79 million.

**\*\*4** Weyerhaeuser appealed to the Court of Appeals for the Ninth Circuit. There, Weyerhaeuser argued that *Brooke Group's* standard for claims of predatory pricing should also apply to claims of predatory bidding. The Ninth Circuit disagreed and affirmed the verdict against Weyerhaeuser. *Confederated Tribes of Siletz Indians of Ore. v. Weyerhaeuser Co.,* 411 F.3d 1030, 1035–1036 (2005).

The Court of Appeals reasoned that "buy-side predatory bidding" and "sell-side predatory pricing," though similar, are materially different in that predatory bidding does not necessarily benefit consumers or stimulate competition in the way that predatory pricing does. *Id.,* at 1037. Concluding that "the concerns that led the *Brooke Group* Court to establish a high standard of liability in the predatory-pricing **\*1074** context do not carry over to this predatory bidding context with the same force," the Court of Appeals declined to apply *Brooke Group* to Ross-Simmons' claims of predatory bidding. 411 F.3d, at 1038. The Court of Appeals went on to conclude that substantial evidence supported a finding of liability on the predatory-bidding theory. *Id.,* at 1045. We granted certiorari to decide whether *Brooke Group* applies to claims of predatory bidding. 548 U.S. ––––, 126 S.Ct. 2965, 165 L.Ed.2d 948 (2006). We hold that it does, and we vacate the Court of Appeals' judgment.

II

**\*\*5** [2][3] In *Brooke Group,* we considered what a plaintiff must show in order to succeed on a claim of predatory pricing under § 2 of the Sherman Act. [FN1] In a typical predatory-pricing scheme, the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business. Then, with competition vanquished, the predator raises output prices to a supracompetitive level. See *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584–585, n. 8, 106 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 1069                                                                          Page 5
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

1348, 89 L.Ed.2d 538 (1986) (describing predatory pricing). For the scheme to make economic sense, the losses suffered from pricing goods below cost must be recouped (with interest) during the supracompetitive-pricing stage of the scheme. *Id.* at 588-589, 106 S.Ct. 1348; *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 121-122, n. 17, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); see also R. Bork, The Antitrust Paradox 145 (1978). Recognizing this economic reality, we established two prerequisites to recovery on claims of predatory pricing. "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *Brooke Group,* 509 U.S., at 222, 113 S.Ct. 2578. Second, a plaintiff must demonstrate that "the competitor had ... a dangerous probabilit[y] of recouping its investment in below-cost prices." *Id.* at 224, 113 S.Ct. 2578.

> FN1. *Brooke Group* dealt with a claim under the Robinson-Patman Act, but as we observed, "primary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act." 509 U.S., at 221, 113 S.Ct. 2578. Because of this similarity, the standard adopted in *Brooke Group* applies to predatory-pricing claims under § 2 of the Sherman Act. *Id.* at 222, 113 S.Ct. 2578.

The first prong of the test--requiring that prices be below cost--is necessary because "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control." *Id.* at 223, 113 S.Ct. 2578. We were particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, "chil[l] legitimate price cutting," which directly benefits consumers. See *id.* at 223-224, 113 S.Ct. 2578; *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 340, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("Low prices benefit consumers regardless of how those prices are set, and

so long as they are above predatory levels, they do not threaten competition"). Thus, we specifically declined to allow plaintiffs to recover for above-cost price cutting, concluding that "discouraging a price cut and ... depriving consumers of the benefits of lower prices ... does not constitute **\*1075** sound antitrust policy." *Brooke Group, supra,* at 224, 113 S.Ct. 2578.

[4] The second prong of the *Brooke Group* test--requiring that there be a dangerous probability of recoupment of losses--is necessary because, without a dangerous probability of recoupment, it is highly unlikely that a firm would engage in predatory pricing. As the Court explained in *Matsushita,* a firm engaged in a predatory-pricing scheme makes an investment--the losses suffered plus the profits that would have been realized absent the scheme--at the initial, below-cost-selling phase. 475 U.S., at 588-589, 106 S.Ct. 1348. For that investment to be rational, a firm must reasonably expect to recoup in the long run at least its original investment with supracompetitive profits. *Ibid.; Brooke Group,* 509 U.S., at 224, 113 S.Ct. 2578. Without such a reasonable expectation, a rational firm would not willingly suffer definite, short-run losses. Recognizing the centrality of recoupment to a predatory-pricing scheme, we required predatory-pricing plaintiffs to "demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id.* at 225, 113 S.Ct. 2578.

We described the two parts of the *Brooke Group* test as "essential components of real market injury" that were "not easy to establish." *Id.* at 226, 113 S.Ct. 2578. We also reiterated that the costs of erroneous findings of predatory-pricing liability were quite high because " '[t]he mechanism by which a firm engages in predatory pricing--lowering prices--is the same mechanism by which a firm stimulates competition,' " and therefore, mistaken findings of liability would " ' "chill the very conduct the antitrust laws are designed to protect." ' " *Ibid.* (quoting *Cargill, supra,* at 122, n. 17, 107 S.Ct. 484).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 1069
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

### III

**\*\*6** Predatory bidding, which Ross-Simmons alleges in this case, involves the exercise of market power on the buy side or input side of a market. In a predatory-bidding scheme, a purchaser of inputs "bids up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously) and, as a result, the predating buyer acquires (or maintains or increases its) monopsony power." Kirkwood, Buyer Power and Exclusionary Conduct, 72 Antitrust L.J. 625, 652 (2005) (hereinafter Kirkwood). Monopsony power is market power on the buy side of the market. Blair & Harrison, Antitrust Policy and Monopsony, 76 Cornell L.Rev. 297 (1991). As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a "buyer's monopoly." See id., at 301, 320; Piraino, A Proposed Antitrust Approach to Buyers' Competitive Conduct, 56 Hastings L.J. 1121, 1125 (2005).

A predatory bidder ultimately aims to exercise the monopsony power gained from bidding up input prices. To that end, once the predatory bidder has caused competing buyers to exit the market for purchasing inputs, it will seek to "restrict its input purchases below the competitive level," thus "reduc[ing] the unit price for the remaining input[s] it purchases." Salop, Anticompetitive Overbuying by Power Buyers, 72 Antitrust L.J. 669, 672 (2005) (hereinafter Salop). The reduction in input prices will lead to "a significant cost saving that more than offsets the profit[s] that would have been earned on the output." Ibid. If all goes as planned, the predatory bidder will reap monopsonistic profits that will offset any losses suffered \*1076 in bidding up input prices. [FN2] (In this case, the plaintiff was the defendant's competitor in the input-purchasing market. Thus, this case does not present a situation of suppliers suing a monopsonist buyer under § 2 of the Sherman Act, nor does it present a risk of significantly increased concentration in the market in which the monopsonist sells, i.e., the market for finished lumber.)

> FN2. If the predatory firm's competitors in the input market and the output market are the same, then predatory bidding can also lead to the bidder's acquisition of monopoly

power in the output market. In that case, which does not appear to be present here, the monopsonist could, under certain market conditions, also recoup its losses by raising output prices to monopolistic levels. See Salop 679-682 (describing a monopsonist's predatory strategy that depends upon raising prices in the output market).

### IV
#### A

Predatory-pricing and predatory-bidding claims are analytically similar. See Hovenkamp, The Law of Exclusionary Pricing, 2 Competition Policy Int'l, No. 1, pp. 21, 35 (Spring 2006). This similarity results from the close theoretical connection between monopoly and monopsony. See Kirkwood 653 (describing monopsony as the "mirror image" of monopoly); Khan v. State Oil Co., 93 F.3d 1358, 1361 (C.A.7 1996) ("[M]onopsony pricing ... is analytically the same as monopoly or cartel pricing and [is] so treated by the law"), vacated and remanded on other grounds, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); Vogel v. American Soc. of Appraisers, 744 F.2d 598, 601 (C.A.7 1984) ("[M]onopoly and monopsony are symmetrical distortions of competition from an economic standpoint"); see also Hearing on Monopsony Issues in Agriculture: Buying Power of Processors in Our Nation's Agricultural Markets before the Senate Committee on the Judiciary, 108th Cong., 1st Sess., 3 (2004). The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization. Cf. Noll, "Buyer Power" and Economic Policy, 72 Antitrust L.J. 589, 591 (2005) ("[A]symmetric treatment of monopoly and monopsony has no basis in economic analysis").

Tracking the economic similarity between monopoly and monopsony, predatory-pricing plaintiffs and predatory-bidding plaintiffs make strikingly similar allegations. A predatory-pricing plaintiff alleges that a predator cut prices to drive the plaintiff out of business and, thereby, to reap monopoly profits from the output market. In parallel fashion, a predatory-bidding plaintiff alleges that a predator raised prices for a key input to drive the plaintiff out of business and, thereby, to reap monopsony profits in the input mar-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ket. Both claims involve the deliberate use of unilateral pricing measures for anticompetitive purposes. [FN3] And both claims logically require firms to incur short-term losses on the chance that they might reap supracompetitive profits in the future.

> FN3. Predatory bidding on inputs is not analytically different from predatory overbuying of inputs. Both practices fall under the rubric of monopsony predation and involve an input purchaser's use of input prices in an attempt to exclude rival input purchasers. The economic effect of the practices is identical: input prices rise. In a predatory-bidding scheme, the purchaser causes prices to rise by offering to pay more for inputs. In a predatory-overbuying scheme, the purchaser causes prices to rise by demanding more of the input. Either way, input prices increase. Our use of the term "predatory bidding" is not meant to suggest that different legal treatment is appropriate for the economically identical practice of "predatory overbuying."

### *1077 B

**\*\*7** More importantly, predatory bidding mirrors predatory pricing in respects that we deemed significant to our analysis in _Brooke Group._ In _Brooke Group,_ we noted that " 'predatory pricing schemes are rarely tried, and even more rarely successful.' " 509 U.S., at 226, 113 S.Ct. 2578 (quoting _Matsushita, 475 U.S., at 589, 106 S.Ct. 1348_). Predatory pricing requires a firm to suffer certain losses in the short term on the chance of reaping supracompetitive profits in the future. _Id., at 588-589, 106 S.Ct. 1348._ A rational business will rarely make this sacrifice. _Ibid._ The same reasoning applies to predatory bidding. A predatory-bidding scheme requires a buyer of inputs to suffer losses today on the chance that it will reap supracompetitive profits in the future. For this reason, "[s]uccessful monopsony predation is probably as unlikely as successful monopoly predation." R. Blair & J. Harrison, Monopsony 66 (1993).

And like the predatory conduct alleged in _Brooke Group,_ actions taken in a predatory-bidding scheme are often " ' "the very essence of competition." ' " 509

U.S., at 226, 113 S.Ct. 2578 (quoting _Cargill, 479 U.S., at 122, n. 17, 107 S.Ct. 484_, in turn quoting _Matsushita, supra, at 594, 106 S.Ct. 1348_). Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs. There are myriad legitimate reasons-- ranging from benign to affirmatively procompetitive--why a buyer might bid up input prices. A firm might bid up inputs as a result of miscalculation of its input needs or as a response to increased consumer demand for its outputs. A more efficient firm might bid up input prices to acquire more inputs as a part of a procompetitive strategy to gain market share in the output market. A firm that has adopted an input-intensive production process might bid up inputs to acquire the inputs necessary for its process. Or a firm might bid up input prices to acquire excess inputs as a hedge against the risk of future rises in input costs or future input shortages. See Salop 682-683; Kirkwood 655. There is nothing illicit about these bidding decisions. Indeed, this sort of high bidding is essential to competition and innovation on the buy side of the market. [FN4]

> FN4. Higher prices for inputs obviously benefit existing sellers of inputs and encourage new firms to enter the market for input sales as well.

_Brooke Group_ also noted that a failed predatory-pricing scheme may benefit consumers. 509 U.S., at 224, 113 S.Ct. 2578. The potential benefit results from the difficulty an aspiring predator faces in recouping losses suffered from below-cost pricing. Without successful recoupment, "predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." _Ibid._ Failed predatory-bidding schemes can also, but will not necessarily, benefit consumers. See Salop 677-678. In the first stage of a predatory-bidding scheme, the predator's high bidding will likely lead to its acquisition of more inputs. Usually, the acquisition of more inputs leads to the manufacture of more outputs. And increases in output generally result in lower prices to consumers. [FN5] _Id.,_ at 677; R. Blair & J. Harrison, _supra,_ at 66-67. Thus, a failed predatory-bidding scheme can be a "boon to consumers" *1078 in the same way that we considered a predatory-pricing scheme to be. See _Brooke Group, supra, at 224, 113 S.Ct. 2578._

127 S.Ct. 1069                                                                        Page 8
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

FN5. Consumer benefit does not necessarily result at the first stage because the predator might not use its excess inputs to manufacture additional outputs. It might instead destroy the excess inputs. See Salop 677, n. 22. Also, if the same firms compete in the input and output markets, any increase in outputs by the predator could be offset by decreases in outputs from the predator's struggling competitors.

**8 In addition, predatory bidding presents less of a direct threat of consumer harm than predatory pricing. A predatory-pricing scheme ultimately achieves success by charging higher prices to consumers. By contrast, a predatory-bidding scheme could succeed with little or no effect on consumer prices because a predatory bidder does not necessarily rely on raising prices in the output market to recoup its losses. Salop 676. Even if output prices remain constant, a predatory bidder can use its power as the predominant buyer of inputs to force down input prices and capture monopsony profits. *Ibid.*

                              C
The general theoretical similarities of monopoly and monopsony combined with the theoretical and practical similarities of predatory pricing and predatory bidding convince us that our two-pronged *Brooke Group* test should apply to predatory-bidding claims.

The first prong of *Brooke Group's* test requires little adaptation for the predatory-bidding context. A plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator's outputs. That is, the predator's bidding on the buy side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs. As with predatory pricing, the exclusionary effect of higher bidding that does not result in below-cost output pricing "is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate" procompetitive conduct. 509 U.S., at 223, 113 S.Ct. 2578. Given the multitude of procompetitive ends served by higher bidding for inputs, the risk of chilling procompetitive behavior with too lax a liability standard is as serious here as it was in *Brooke Group.* Consequently, only

higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability for predatory bidding.

A predatory-bidding plaintiff also must prove that the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power. Absent proof of likely recoupment, a strategy of predatory bidding makes no economic sense because it would involve short-term losses with no likelihood of offsetting long-term gains. Cf. *id.,* at 224, 113 S.Ct. 2578 (citing *Matsushita,* 475 U.S., at 588-589, 106 S.Ct. 1348). As with predatory pricing, making a showing on the recoupment prong will require "a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market." *Brooke Group, supra,* at 226, 113 S.Ct. 2578.

**9 Ross-Simmons has conceded that it has not satisfied the *Brooke Group* standard. Brief for Respondent 49; Tr. of Oral Arg. 49. Therefore, its predatory-bidding theory of liability cannot support the jury's verdict.

                              V
For these reasons, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

127 S.Ct. 1069, 2007 WL 505794 (U.S.)

**Briefs and Other Related Documents (Back to top)**

• 2006 WL 3422209, 75 USLW 3311 (Oral Argument) Oral Argument (Nov. 28, 2006)

• 2006 WL 3309500 (Appellate Brief) Petitioner's Reply Brief (Nov. 13, 2006)

• 2006 WL 2927060 (Appellate Brief) Brief of Amici Curiae Forest Industry Participants Supporting Respondent (Oct. 12, 2006)

• 2006 WL 2950593 (Appellate Brief) Brief for the American Antitrust Institute as Amicus Curiae in Support of Respondent (Oct. 12, 2006)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 1069                                                                    Page 9
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

• 2006 WL 2950594 (Appellate Brief) Brief for Respondent (Oct. 12, 2006)

• 2006 WL 2966603 (Appellate Brief) Brief of Amicus Curiae States of California, Oregon, Arizona, Iowa, Louisiana, Montana, West Virginia and Wisconsin in Support of Respondent (Oct. 12, 2006)

• 2006 WL 2452373 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioner (Aug. 24, 2006)

• 2006 WL 2459516 (Appellate Brief) Brief Amici Curiae of Law Professors in Support of Petitioner (Aug. 24, 2006)

• 2006 WL 2459522 (Appellate Brief) Brief of Economists as Amici Curiae in Support of Petitioner (Aug. 24, 2006)

• 2006 WL 2459523 (Appellate Brief) Brief for Amici Curiae Business Roundtable and National Association of Manufacturers in Support of Petitioner (Aug. 24, 2006)

• 2006 WL 2472652 (Joint Appendix) JOINT APPENDIX, VOL. I (Aug. 24, 2006)

• 2006 WL 2472653 (Joint Appendix) JOINT APPENDIX, VOL. II (Aug. 24, 2006)

• 2006 WL 2474081 (Appellate Brief) Brief of the Chamber of Commerce of the United States of America and the American Forest and Paper Association as Amici Curiae Supporting Petitioner (Aug. 24, 2006)

• 2006 WL 2506635 (Appellate Brief) Brief for Amici Curiae AT&T Inc., Bellsouth Corporation, General Electric Company, Qwest Communications International Inc., and Verizon Communications Inc. in Support of Petitioner (Aug. 24, 2006)

• 2006 WL 2516086 (Appellate Brief) Brief for the Petitioner (Aug. 24, 2006)

• 2006 WL 2610989 (Appellate Brief) Brief of Amici Curiae Timberland Owners and Managers Supporting Petitioner (Aug. 24, 2006)

• 2006 WL 1662256 (Appellate Petition, Motion and Filing) Second Supplemental Brief for Respondent (Jun. 13, 2006)

• 2006 WL 1594039 (Appellate Petition, Motion and Filing) Petitioner's Supplemental Brief (Jun. 8, 2006)

• 2006 WL 1580860 (Appellate Petition, Motion and Filing) Supplemental Brief for Respondent (Jun. 6, 2006)

• 2006 WL 1491286 (Appellate Petition, Motion and Filing) Brief for the United States as Amicus Curiae (May 26, 2006)

• 2005 WL 2997418 (Appellate Petition, Motion and Filing) Petitioner's Reply Brief (Nov. 9, 2005)

• 2005 WL 2822908 (Appellate Petition, Motion and Filing) Brief for Amici Curiae the Business Roundtable and the National Association of Manufacturers in Support of Petitioner (Oct. 26, 2005)

• 2005 WL 2822909 (Appellate Petition, Motion and Filing) Brief of the Chamber of Commerce of the United States of America and the American Forest and Paper Association as Amici Curiae Supporting Petitioner (Oct. 26, 2005)

• 2005 WL 2844935 (Appellate Petition, Motion and Filing) Brief of Amicus Curiae American Meat Institute in Support of Weyerhaeuser Company's Petition for a Writ of Certiorari (Oct. 26, 2005)

• 2005 WL 2844936 (Appellate Petition, Motion and Filing) Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioner (Oct. 26, 2005)

• 2005 WL 2844938 (Appellate Petition, Motion and Filing) Brief for Amici Curiae BellSouth Corporation, Dow Chemical Co., Dunn Lumber Co., Inc., Microsoft Corporation, SBC Communications Inc., and Verizon Communications Inc. in Support of Petitioner (Oct. 26, 2005)

• 2005 WL 2844939 (Appellate Petition, Motion and Filing) Brief of Amici Curiae The Campbell Group; Forest Systems, LLC; Global Forest Partners LP; Hancock Natural Resource Group, Inc.; Menasha Forest Products Corp.; Plum Creek Timber Com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 1069                                                          Page 10
127 S.Ct. 1069, 2007 WL 505794 (U.S.)
**(Cite as: 127 S.Ct. 1069, 2007 WL 505794 (U.S.))**

pany, Inc.; and Resource Management Service, LLC, Supporting Petitione r (Oct. 26, 2005)

• 2005 WL 2844967 (Appellate Petition, Motion and Filing) Opposition to Petition for a Writ of Certiorari (Oct. 26, 2005)

• 2005 WL 2875031 (Appellate Petition, Motion and Filing) Brief of The Coca-Cola Company, Caterpillar Inc., Apple Computer Inc., and The Black & Decker Corporation as Amici Curiae Supporting Petitioner (Oct. 26, 2005)

• 05-381 (Docket) (Sep. 26, 2005)

• 2005 WL 4142931 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Sep. 23, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 33

SB 1814 Senate Bill - Bill Analysis

Date of Hearing:    June 25, 2002

ASSEMBLY COMMITTEE ON BUSINESS AND PROFESSIONS
Lou Correa, Chair
SB 1814 (Dunn) - As Amended:  June 20, 2002
(As proposed to be amended)

SENATE VOTE  :   21-15

SUBJECT  :   Business regulation.

SUMMARY  :   Prohibits any person to monopolize, attempt to
monopolize, or to combine or conspire with any person or persons
to monopolize any part of trade or commerce.  Various penalties
would subsequently apply.

EXISTING LAW  , the federal Sherman Antitrust Act and California's
Cartwright Act, both seek to regulate corporate market behavior
by creating civil and criminal liability for anti-competitive
conduct, such as conspiracies to fix prices and divide market
share. Section 2 of the Sherman Act expressly prohibits
monopolization or attempts to monopolize any part of the trade
or commerce among the several states, or with foreign nations.
(15 U.S.C. Section 2.)  The statutory language of both the state
and federal acts is intentionally general, and specific
implementation of the acts has generally been left to the
courts, where a large body of case law interpreting each act has
developed.

FISCAL EFFECT  :   Unknown.  This bill is keyed fiscal but was
referred to the Senate Floor from Senate Appropriations without
a vote, based on the opinion of the chair that this bill had no
significant costs, and will not require an appropriation or
cause a significant reduction in revenues. (S.R. 28.8)

COMMENTS  :

1)Purpose of this bill  :  This bill is sponsored by the Office of
the Attorney General, and is intended to give state
prosecutors and consumers a more powerful tool against
anti-competitive monopoly practices.  This bill conforms
California law to federal law by outlawing monopolization.
However, application of state and federal law will differ in
that existing California law allows for suit by those
indirectly harmed by the monopolistic action, while Federal

SB 1814 Senate Bill - Bill Analysis

law does not.

Supporters believe this bill will improve the ability of the
state to protect consumers from anti-competitive practices,
while bringing California antitrust law up-to-date with the
rest of the country.  Opponents of this bill fear an expansion
of liability and the potential pool of litigants for a crime
already policed under federal law.

 2)A state prohibition on monopoly - definition and context:  This
bill would add monopolization to the list of prohibited
behaviors under California's Cartwright Act. Monopolists by
virtue of their size or influence have the power to
unreasonably increase prices and to keep new competitors out
of the market.  The language of this bill is modeled closely
after the federal Sherman Antitrust Act, part of which made
monopolistic behavior illegal.  The statutes of 45 states and
territories currently prohibit monopolization, 20 of which
have language which closely parallels or mirrors the language
proposed in this bill.

It is important to note that while conspiracy by two or more
entities to restrict competition is illegal, such behavior by
a single entity is not.  Only the willful acquisition,
maintenance, or anti-competitive exercise of monopoly power is
illegal; the development of monopoly power through superior
product, business acumen, or historical accident is permitted.
 For example, the current anti-monopoly lawsuit against
Microsoft is not based on its sheer size and market share;
rather, the suit is based upon how Microsoft allegedly used
that market power to unfairly disadvantage its competitors.

Monopolies are subjected to a lower level of scrutiny than
individual companies conspiring together to restrain
competition because the original intent of federal antitrust
laws was to ensure competition, not necessarily to deter the
accumulation of market power.  A seminal 1984 U.S. Supreme
Court case,  Copperweld Corporation v. Independence Tube
Corporation  (467 U.S. 752, 104 S.Ct. 2731), pointed out that
"[i]t is not enough that a single firm appears to 'restrain
trade' unreasonably, for even a vigorous competitor may leave
that impression? Congress authorized Sherman Act scrutiny of
single firms only when they pose a danger of monopolization.
Judging unilateral conduct in this manner reduces the risk
that the antitrust laws will dampen the competitive zeal of a

                                                     SB 1814
                                                    Page   3

single aggressive entrepreneur."  A valid federal
anti-monopoly suit should demonstrate a "dangerous
probability" of monopoly, not just "unreasonable restraint of
trade."

 3)State monopoly remedies under current law :  According to the
Attorney General's Office, the remedies for illegal

monopolization are limited under current law to relief in a
federal court. The major difference between reliance on a
federal court and use of a state court for anti-monopoly suits
are that a federal case could be heard out of state, the
Attorney General's rights and powers are significantly
diminished, and "indirect purchasers" seeking damages are
excluded.

In practice, suit under federal anti-monopoly statute will limit
where a plaintiff can pursue a case, and the designated
federal court may be in a distant region or even a different
state. More importantly, when the state Attorney General
appears in federal court on behalf of the state (a parens
patriae suit), he or she is required to waive the protections
of the 11th Amendment (state immunity from individual suit) to
recover any damages. As such, "the Attorney General is
treated as a private party under federal law. This means
that, like all private plaintiffs, the Attorney General must
show causation, injury-in-fact, antitrust injury, proof of any
damages to be collected, 'threatened loss or damage' for an
equity action, and so on." Supporters argue that "[t]hese
limits make it harder for the state to enforce the antitrust
laws."

More germane to the opposition of this bill, a federal suit does
not permit action on behalf of "indirect purchasers" harmed by
the monopoly action. This is discussed in detail below.

4) How California law would differ from federal law - the
   "indirect purchaser" issue : Monopolization cases represent a
   very small (but high-profile) portion of anti-trust
   litigation. The most significant difference between the
   proposed language and federal law is that existing California
   law permits antitrust suits by any person harmed by a
   violation, while federal law limits recovery only to "direct
   purchasers" - those who directly purchased a good or service
   from a monopolistic actor and were directly damaged by that
   monopolistic conduct.

                                              SB 1814
                                              Page  4

For example, if a widget producer monopolistically raised prices
and sold those unfairly priced widgets to a wholesaler, the
wholesaler could seek antitrust damages in federal court.
However, if those unfairly priced widgets had been sold to
retailers and then to consumers, neither group could seek
damages, because they are only "indirect purchasers."

According to the Civil Justice Association of California, this
distinction evolved out of a 1977 U.S. Supreme Court case:
Illinois Brick Co. v Illinois , 431 U.S. 720). The Court ruled
that an indirect purchaser of a product did not suffer
"antitrust injury" and, therefore, could not sue the product's
manufacturer for any alleged overcharge. A year later, the

California Legislature repealed Illinois Brick by
incorporating a provision into the Cartwright Act that allows
any purchaser who suffered antitrust injury to bring suit
regardless of whether the consumer dealt directly or
indirectly with the manufacturer.

Under existing state law, any person is now entitled under the
Cartwright act to bring suit for any prohibited
anti-competitive behavior in any court with jurisdiction in
the plaintiff's county, and may recover three times the
damages caused by the monopolistic action, as well as interest
on damages, preliminary or injunctive relief, and reasonable
attorney's fees (see Business and Professions Code 16750).
According to the California Chamber of Commerce, 16 other
states have passed laws permitting indirect purchasers to sue
for antitrust violations.

This bill would add monopoly to the list of prohibited
anti-competitive behaviors, and therefore these Cartwright
entitlements would apply as well.  The practical effect would
be to permit any California individual or corporation to bring
suit and seek damages against alleged monopolists, regardless
of whether or not they did direct business with the defendant.

 5)Arguments in support : According to the sponsor, this bill is
intended to "ensure that we have the appropriate legal tools
to deal with the modern economy."  In general, supporters
argue for a state prohibition against monopoly on the grounds
that it will: align California with the laws adopted by the
U.S. Congress and most states; allow the state to seek its own
remedies that will be accessible and responsive; protect a

                                                        SB 1814
                                                        Page  5

larger share of citizens by allowing suits by "indirect
purchasers;" and generally ensure that the benefits of fair
competition are maintained for the people of California.

The Office of the Attorney General argues that "?45 other states
and territories have their own law forbidding monopolistic
practices.  California has no such law, requiring the Attorney
General, essentially in the same status as a private citizen,
to seek the limited relief available in federal court.
Relying solely on federal law deprives California courts and
citizens of the ability to shape our own law."

The Attorney General goes on to state: "?remedies for illegal
monopolization are limited.  First, victims who are indirect
purchasers cannot recover damages under Federal law.  Second,
victims of acts of illegal monopolization can seek relief only
in federal court, not in the local Superior Court?[which] may
be in a distant state? our courts would not be bound by
interpretations of the Sherman [Act].  We assume that
California courts would ultimately determine the meaning of
our own law in light of our other laws?"

In response to criticism of this bill, the sponsor argues that "[h]istorically, businesses have complained that various applications of the antitrust laws will wreak havoc on our industries. Those dire predictions have not come to pass, because the courts distinguish between anticompetitive conduct and normal business behavior." In closing, the Attorney General argues "[this bill] closes a major loophole in California's antitrust laws. Monopolies offend the competitive policies on which our economy is based. California citizens and public officials ought to have a remedy in state courts, using state law."

UC Berkeley Law School Professor Mark Lemley, an antitrust and intellectual property teacher, comments that "the absence of a monopolization claim in the Cartwright Act hamstrings the state's enforcement efforts. While it is true that the Attorney General can bring a?claim under federal law, the Attorney General is treated as a private party under federal law. These limits make it harder for the state to enforce the antitrust laws."

The Center for Public Interest Law also points out that a federal court may be far less responsive to a suit than a

---

SB 1814
Page  6

state court: "Monopoly offenses are not usually nationwide, but are more often intra-state in scope, and are often local?While the federal jurisdiction on many of these cases may have theoretical jurisdiction, its field offices are limited in staff and it understandably will not give priority to such local cases where interstate cases compete for its attention. This statutory adjustment will allow state prosecutors to assure compliance with the law, and the result will be open competition for the benefit of us all."

 6)Arguments in opposition : The opponents of this bill generally have directed their comments against the expansion of anti-trust liability that were found in this bill prior to that section's recent deletion. However, a number of opponents also argued specifically against the state prohibition on monopoly, generally holding that this bill would run counter to an established U.S. Supreme Court decision, make California law different from federal law, and increase liability and litigation for businesses.

The Civil Justice Association of California argues "[a]t first glance, conforming state law to federal law in this area appears to make sense. The reality of this amendment, however, would mean far more serious consequences for California businesses than appears. This is because California law permits so-called indirect purchaser lawsuits, including indirect purchaser class actions...Thus, by allowing a state cause of action for monopoly, indirect purchasers of

products can bring actions for monopoly. As mentioned above,
this is not allowed in federal court and thus, there would be
a lack of uniformity between state and federal court in this
area?We fear it would only lead to increased litigation."

The American Electronics Association (AeA) observed: "?adding
the anti-monopoly provisions to the state law, would extend
the reach of the Cartwright Act far beyond that of the federal
law. It would allow indirect purchasers to bring
treble-damage claims in California state courts, making it
even more difficult for businesses to operate in this state."

The California Chamber of Commerce similarly argues that this
"?bill will put California at odds with federal law and
tremendously increase the exposure faced by companies doing
business in California. Although numerous states have adopted
the federal monopoly law, the majority of them do not permit

SB 1814
Page 7

indirect purchasers to sue. Thus, companies in other states
would face far less antitrust liability than in California if
the bill were adopted. The proponents of this bill have
presented no evidence that increasing liability under
California law above the levels provided for under federal law
and the laws of most other states is justified or would be
good for consumers."

 7)Recent substantial amendments  : The author has proposed to
substantially amend this bill in committee by removing
Sections 1 & 3 from the June 20, 2002 version. Section 1
proposed to "not preclude" Cartwright Act antitrust liability
because a conspiracy to restrain trade is between persons
related by common ownership. This would have exposed
corporations and their wholly owned subsidiaries to action
under state and federal antitrust statutes, from which they
may be protected under current U.S. Supreme Court case law.
Section 3 would have made Section 1 declaratory of existing
law, and in practice, retroactive.

These two sections were prominent among the concerns expressed
by many of the opponents listed below, but it is not known to
what degree any support or opposition has or will be changed
by these latest amendments.

 8)Related legislation  : AB 671 (Connelly) from the 1989-1990
Session would have included an explicit prohibition on
monopolies as part of a broader set of anti-competitive
measures. According to this bill's author, "[a]lthough the
anti-monopoly provision was not controversial, opposition to
the merger and divestiture provisions resulted in amendments,
and ultimately the bill's failure in the Senate."

  REGISTERED SUPPORT / OPPOSITION  :

 Support

Office of the Attorney General (sponsor)
California District Attorney's Association
California Teamsters Public Affairs Council
Center for Public Interest Law - University of San Diego
Congress of California Seniors
Consumers Union
Los Angeles County District Attorney's Office
United Food & Commercial Workers (UFCW) - Region 8 States

SB 1814<br>Page 8

---

Council
Yolo County District Attorney

 Opposition

21st Century Insurance Company
Alliance of American Insurers
American Electronics Association (AeA)
American Insurance Association
American International Group (AIG)
Amylin Pharmaceuticals
Anheuser-Busch Companies, Inc.
AOL Time Warner
Association of California Insurance Companies (ACIC)
Bank of America
Baxter Bioscience
Bayer Corporation
Blesch & Associates - GMAC Real Estate
Boeing Company
Bristol-Myers Squibb
Caldwell Banker Realty Center
California Association of Realtors
California Bankers Association
California Building Industry Association
California Business Properties Association
California Business Roundtable (59 members)
California Chamber of Commerce
California Financial Services Association
California Grocers' Association
California Health Care Association (CHA)
California Healthcare Institute
California Manufacturing & Technology Association (CMTA)
California Mortgage Bankers Association
California Restaurant Association
California Retailers Association
Charles Schwab & Co.
Cisco Systems
Citigroup, Inc.
Civil Justice Association of California
E*Trade Group, Inc.
East Bay Association of Realtors
Farmers Insurance Group

First Data Corporation
Flamingo Real Estate
FOX Entertainment Group, Inc.

Goodrich Aerostructures
Granite Construction
Hewlett Packard
Hoffman La Roche
Honeywell International
Household International
Independent Energy Producers
Independent Energy Producers Association (IEP)
Infinity Realty
Information Technology Association of America (ITAA)
Inland Valleys Association of REALTORS
Insurance Agents & Brokers Legislative Council
Intel Corporation
International Technology Association of America
John D. Dumas Real Estate
Johnson & Johnson
Liberty Mutual Insurance Company
Morgan Stanley
Motion Picture Association of America (MPAA)
Nationwide Financial
Nationwide Insurance Company
One Stop Realty
Orange County Business Council
Pacific Gas and Electric Company (PG&E)
Personal Insurance Federation of California (PIF)
Pfizer, Inc.
Pharmaceutical Research & Manufacturers of America
Pharmacia
Recording Industry Association of America
Redlands Association of Realtors
Russ L. Huston & Associates Real Estate
SBC Pacific Bell
Securities Industry Association
Shamrock Realtors
State Farm Insurance Companies
Sutter Health
TechNet
The First American Corporation
Wells Fargo Bank
Western States Petroleum Association
Wine Institute
Eleven individuals

 Analysis Prepared by :    Hank Dempsey / B. & P. / (916) 319-3301

SB 1814
Page 10

# TAB 34



1   LATHAM & WATKINS LLP
    Gregory P. Lindstrom (Bar No. 82334)
2       Christopher S. Yates (Bar No. 161273)
    Timothy L. O'Mara (Bar No. 212731)
3       Adrian F. Davis (Bar No. 215827)
    505 Montgomery Street, Suite 2000
4   San Francisco, California 94111-2562
    Telephone:  (415) 391-0600
5   Facsimile:  (415) 395-8095

6   Attorneys for Defendant
    APPLE COMPUTER, INC.

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         COUNTY OF SANTA CLARA

10

11  JACK BRANNING, JAMES SEYBERT,          CASE NO. 1-05-CV-045719
    STACEY BLEVINS, JACK CASSIN, TOM
12  SIECHERT, JOE WEINGARTEN, RICK         RELATED CASE NOS.
    ZUEHLKE, ROBERT ALLEN, DOMINGO         1-02-CV-812583;   1-02-CV-813373
13  VASQUEZ, and KURT BRUNEMAN,            1-03-CV-814293;   1-03-CV-815532
    individually and on behalf of all others   1-03-CV-815967;   1-05-CV-036122
14  similarly situated,                    Action Filed:   February 17, 2005

15                      Plaintiffs,         [PROPOSED] ORDER SUSTAINING
                                            DEFENDANT APPLE COMPUTER, INC.'S
16        v.                                DEMURRER TO PLAINTIFFS' SECOND
                                            AMENDED COMPLAINT
17
    APPLE COMPUTER, INC., and DOES 1-25,   Date:       March 3, 2006
18  inclusive,                             Time:       1:30 p.m.
                                           Place:      Department 4
19                      Defendants.
                                           The Honorable Jamie Jacobs-May
20
                                           [SIGNATURE BY FACSIMILE]
21

22  AND RELATED CASES.

23

24

25

26

27

28

ENDORSED

2006 MAY -9 P 1: 43

U.S. DIST. CLERK & THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY _____ DEPUTY CLERK
        Clark Sakai

1    Defendant Apple Computer Inc.'s Demurrer to Plaintiffs' Second Amended

2  Complaint, came before this Court for hearing on March 3, 2006. All parties were represented

3  by counsel as noted on the record.

4    The Court having considered the briefs and arguments of the parties, and good

5  cause appearing, finds for the reasons stated on the record:

6    1.    The First Cause of Action (Business & Professions Code § 17200 on

7  behalf of consumers) fails to state facts sufficient to constitute a cause of action.

8    2.    The Second Cause of Action (Business & Professions Code § 17200 on

9  behalf of consumers) fails to state facts sufficient to constitute a cause of action.

10    3.    The Third Cause of Action (Business & Professions Code § 17200 on

11  behalf of consumers) fails to state facts sufficient to constitute a cause of action.

12    4.    The Fourth Cause of Action (Civil Code § 1750 on behalf of consumers)

13  fails to state facts sufficient to constitute a cause of action.

14    5.    The Fifth Cause of Action (fraud on behalf of consumers) fails to state

15  facts sufficient to constitute a cause of action.

16    6.    The Sixth Cause of Action (conversion on behalf of consumers) fails to

17  state facts sufficient to constitute a cause of action.

18    7.    The Seventh Cause of Action (breach of contract on behalf of consumers)

19  fails to state facts sufficient to constitute a cause of action.

20    8.    The Eighth Cause of Action (Business & Professions Code § 17500 on

21  behalf of consumers) fails to state facts sufficient to constitute a cause of action.

22    9.    The Ninth Cause of Action (breach of contract on behalf of resellers) fails

23  to state facts sufficient to constitute a cause of action.

24    10.    The Tenth Cause of Action (Business & Professions Code § 17200 on

25  behalf of resellers) fails to state facts sufficient to constitute a cause of action.

26    11.    The Eleventh Cause of Action (Business & Professions Code § 17200 on

27  behalf of resellers) fails to state facts sufficient to constitute a cause of action.

28

1         12.     The Thirteenth Cause of Action (fraud on behalf of resellers) fails to state

2  facts sufficient to constitute a cause of action.

3         13.     The Fourteenth Cause of Action (implied covenant of good faith and fair

4  dealing on behalf of resellers) fails to state facts sufficient to constitute a cause of action.

5         14.     The Fifteenth Cause of Action (Cartwright Act on behalf of resellers) fails

6  to state facts sufficient to constitute a cause of action.

7         15.     The Sixteenth Cause of Action (Cartwright Act on behalf of resellers)

8  fails to state facts sufficient to constitute a cause of action.

9         16.     The Seventeenth Cause of Action (common law monopoly on behalf of

10  resellers) fails to state facts sufficient to constitute a cause of action; the Court finds that there is

11  no cause of action for common law monopoly under California law because:

12      (a)     During efforts to amend the Cartwright Act in 2002, Attorney General Lockyer

13  reported to the State Senate (in a statement subject to judicial notice) that there is no California

14  law governing monopolization;

15      (b)     The California Supreme Court's opinion in *State of California ex rel. Van de*

16  *Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1167 (1988), confirms that at common law there was no

17  claim for damages for monopolization and that the drafters of the Cartwright Act chose not to

18  provide a cause of action for monopolization;

19      (c)     *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), and cases following

20  it find that there is no California law addressing monopolization;

21      (d)     All reported cases involving claims for a common law monopoly under California

22  law involve both public service enterprises and requests for injunctive relief only; and

23      (e)     Professor Areeda's treatise entitled, "Antitrust Law: An Analysis of Antitrust

24  Principles and their Application," the leading treatise on antitrust law, states that there was no

25  civil action for damages for monopolization at common law.

26         17.     The Eighteenth Cause of Action (Unfair Practices Act) states facts

27  sufficient to constitute a cause of action.

28

3

1    **IT IS HEREBY ORDERED** that Apple's Demurrer to the First through Eleventh, and

2    Thirteenth through Seventeenth Causes of Action of Plaintiffs' Second Amended Complaint is

3    **SUSTAINED WITH LEAVE TO AMEND.**

4    **IT IS HEREBY FURTHER ORDERED** that Apple's Demurrer to the Eighteenth

5    Cause of Action in Plaintiffs' Second Amended Complaint is **OVERRULED.**

6    **IT IS HEREBY FURTHER ORDERED** that Plaintiffs shall file a Third Amended

7    Complaint within twenty (20) days of Notice of Entry of this Order.  The Third Amended

8    Complaint shall comply with the Court's ruling and directions given to counsel including by: (1)

9    providing the specific "match up" of plaintiffs, products and injury detailed by the Court; (2)

10   attaching the contracts governing the relationship between the reseller plaintiffs and Apple; and

11   (3) providing a specification of what products are at issue in the consumer plaintiffs' breach of

12   contract cause of action, who purchased them, and where and when the products were purchased.

13   **IT IS HEREBY FURTHER ORDERED** that Apple shall respond to the Third

14   Amended Complaint within thirty (30) days from service of the Third Amended Complaint by

15   plaintiffs.

16   **IT IS SO ORDERED.**

17

18   Dated:  5/4/06

19                                                    **THE HONORABLE JAMIE JACOBS-MAY**
                                                      Judge of the Superior Court

20

21   ///

22

23

24

25

26

27

28

**4**

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

1   Submitted By:

2   LATHAM & WATKINS LLP
        Gregory P. Lindstrom
3       Christopher S. Yates
        Timothy L. O'Mara
4       Adrian F. Davis

5

6   By: _Christopher S. Yates /mo_
        Christopher S. Yates
7       Attorneys for Defendant
        APPLE COMPUTER, INC.
8

9   Approved As To Form:

10  FRANKLIN & FRANKLIN
        J. David Franklin
11

12

13  By: _J. David Franklin_
        J. David Franklin
14      Attorneys for Plaintiffs

15  SF\547883.3

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS
  ATTORNEYS AT LAW
   SAN FRANCISCO

ORDER SUSTAINING DEMURRER
CASE NUMBER 1-05-CV-04518 AND RELATED CASES