IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORP. MICROPROCESSOR<br>ANTITRUST LITIGATION | MDL Docket No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC., a Delaware corporation, and AMD INTERNATIONAL SALES & SERVICE LTD, a Delaware corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>INTEL CORPORATION, a Delaware corporation, and INTEL KABUSHIKI KAISHA, a Japanese corporation,<br><br>    Defendants. | Civil Action No. 05-441-JJF |

## AMD'S STATUS CONFERENCE STATEMENT

Since the last status conference, there have been troubling developments in this case. Through what appears to be a combination of gross communication failures, an ill-conceived plan of document retention and lackluster oversight by outside counsel, Intel has apparently allowed evidence to be destroyed. Though all the facts are not in, potentially massive amounts of email correspondence generated and received by Intel executives and employees since the filing of the lawsuit may be irretrievably lost, as may other relevant electronic documents. The damage does not appear confined to low-level or marginally important witnesses; to the contrary, Intel executives at the highest level failed to receive or to heed instructions essential for the preservation of their records, and Intel and its counsel failed to institute and police a reliable backup system as a failsafe against human error.

RLF1-3122594-1

Intel has not yet fully assessed the magnitude of its problem, but what it has disclosed thus far demonstrates systemic evidence preservation breaches of troubling breadth and depth. Under the best of circumstances, Intel is a company that shuns creating a record of what goes on within its walls. When not under a litigation cloud, Intel automatically purges all e-mail sent or received by its employees every thirty-five days (or in the case of senior executives, every forty-five to sixty days). What backups are made are immediately overwritten the very next cycle.

Disturbingly, even after it was sued, Intel allowed this periodic destruction of its records to continue. In a half-hearted attempt at preservation, Intel instead imposed an "honor system" on selected employees, who were asked voluntarily to identify and move relevant materials to off-network storage on their personal computers. Intel also was supposed to create and retain weekly backups to deal with the inevitable lapses that infect a user-driven preservation system.

Everything that could have gone wrong did go wrong. As discussed in greater detail in the balance of this memorandum, until *two weeks ago,* Intel failed to deliver any retention instructions to more than *one-third* of its 1,027 "custodians," who by definition are employees possessing "appreciable quantities" of "non-duplicative" evidence. The two-thirds who were placed on retention received faulty instructions that failed to admonish them, among other things, to save "Sent" e-mail. Other instructions were not clearly conveyed and compliance only cavalierly monitored, with the result that over half of custodians preserved incorrectly, including some of Intel's highest ranking executives who mistakenly thought "IT" would discharge their preservation obligations for them. Intel's thirty-five day e-mail "grim reaper" has relegated to the electronic dust bin the messages and attachments that custodians

failed to segregate and move off-line, and for as many of half of Intel's custodians, the back-up systems that were supposed to prevent against this type of loss were never even turned on.

AMD first learned about a document preservation "problem" three weeks ago, though we understand Intel's counsel discovered the breakdown late last year. Intel's counsel now seem to be working diligently to attempt to assess and address the data loss and to keep AMD and the Class Plaintiffs informed. But the problems should never have arisen in the first place, and they may have case-impacting significance. So that the Court and parties can take stock with the benefit of all the facts in hand, AMD respectfully requests that Intel be required to supply an immediate, full accounting of its preservation failures and proposals for rectifying these failures to the parties and the Special Master. Judge Poppiti should then be authorized to investigate what went wrong and why, to assess the probable impact on AMD's and Class Plaintiffs' ability to fairly prosecute the case, and to fashion an appropriate action plan and remedial order for the Court's consideration.

## I. INTEL'S DUTY TO PRESERVE VITAL POST-COMPLAINT EVIDENCE

This case is as much about Intel's current exclusionary conduct as it is Intel's practices during the years that preceded the filing of AMD's complaint. That is because Intel's exclusion continues. In just the past few weeks, Intel was charged by Dell investors with secretly kicking back through 2006 as much as *one billion dollars per year* in order to buy Dell's exclusivity, payoffs Intel's spokesperson Chuck Mulloy styled as "a normal business practice."[1] Days later, Lenovo admitted receiving from Intel proportionately huge payments to not do

---

[1] David Koenig, *Dell Accused of Hiding Intel Payments* (Associated Press, February 5, 2007).

business with AMD. Based on third- party documents produced to AMD to date, this may be the tip of the iceberg.[2]

Given the continuing nature of the tort with which it was charged, Intel had a duty to be especially vigilant in safeguarding irreplaceable post-filing evidence from intentional or inadvertent destruction. At the outset of the case, this obligated Intel to "suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). Indeed, suspending "auto delete" functions to prevent electronic data loss is, at minimum, an advisable precaution that may be required in the absence of adequate alternatives.[3] *See, e.g., DaimlerChrysler Motors v. Bill Davis Racing, Inc.*, 2005 U.S. Dist. LEXIS 38162 (E.D. Mich. Dec. 22, 2005) (defendants' failure to suspend auto-delete policy justified sanctions, including a special jury instruction).

Immediately after AMD filed its complaint, Intel also was required to issue "litigation hold" instructions to its employee-custodians likely to possess relevant information. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432-34 (S.D.N.Y. 2004). This required Intel both to select and to effectively and clearly communicate proper preservation mandates. *Id.* at 432. Intel's legal counsel had the affirmative duty thereafter to "monitor compliance" with the litigation hold to assure preservation, rather than merely trust that preservation instructions once

---

[2] Intel's electronic purge and tape recycling systems in place at the time AMD commenced suit made it unlikely that AMD would be able to discover a full record of Intel's pre-litigation misconduct. AMD always believed -- and for good reason, still believes -- that the most probative evidence of Intel exclusion would reside in the electronic files and documents Intel created after the lawsuit started, evidence that Intel would be obligated to preserve.

[3] Newly-enacted changes to Federal Rule of Civil Procedure 37(f) do not relieve a party from the obligation to preserve relevant e-mail or other electronic documents, including by suspending automatic deletion functions. As the Committee Notes to Rule 37(f) state: "Good faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information, if that information is subject to a preservation obligation. . . . [I]ntervention in the routine operation of an information system is one aspect of what is often called a 'litigation hold.'"

given would result in full compliance "without the active supervision of counsel." *Id.* at 432-33. These duties to instruct clearly and to maintain vigilant oversight are especially vital when, as in this case, the parties are relying heavily on "custodian-based" productions to serve as the principal component of overall document production.

Regrettably, as discussed next, Intel and its counsel appear to have shirked their preservation responsibilities.

## II.  THE FAILURE OF INTEL'S PRESERVATION "HONOR SYSTEM"

Intel chose to adopt and rely on a highly-risky system of document preservation. Although it has provided ever-changing descriptions of both its "normal" practices and its retention system, from that AMD can tell, Intel's preservation strategy:

- Allowed the continued, automatic purge on a 35-day (or longer) schedule of all e-mail communications to, from and within the company;

- Relied exclusively on a move-it-or-lose-it "honor system" that required individual custodians to correctly identify, segregate and proactively move relevant evidence to media on their local computers before that data was destroyed by a network purge;

- Backstopped this "honor system" beginning in October 2005 with a weekly back-up of e-mail that required Intel's IT personnel to identify and correctly migrate custodians' data to dedicated e-mail servers subject to the backup.

As noted above, this "honor system" was defeated by a combination of apparently erroneous, unclear or incomplete "litigation hold" instructions,[4] lack of adequate monitoring to

---

[4] So far, Intel has declined AMD's requests to produce an exemplar of the litigation hold instructions it issued.

ensure those instructions were understood and followed, and a wholesale failure timely to deliver any preservation instructions to a third of the employee-custodians Intel itself identified.

Here are some of the important lapses AMD knows about now: (1) of the 1,027 officers and employees Intel has identified under this Court's Order Regarding Document Production as possessing an "appreciable quantity" of responsive "non-duplicative documents," 384 custodians did not receive any litigation hold instructions until two weeks ago on February 21, 2007 -- and, therefore, likely have retained little to no relevant evidence in the 18 months since AMD filed its complaint; (2) an unknown number -- but presumably most -- Intel custodians failed to retain any "Sent" e-mail because Intel did not instruct them to do so; and (3) a survey of 239 employees, including those identified by Intel as its most important custodians, indicates that almost 50% have failed in one way or another to follow preservation instructions.

Intel's implementation of an effective backup system designed to save what its custodians did not know they should preserve -- or were not told to preserve -- could have stemmed some of the damage. Intel informs us that, in October and November 2005, it attempted to migrate approximately 900 of its document custodians to a dedicated e-mail server that was backed up weekly. But human error also corrupted this system. Indeed, between 130 to 151 Intel custodians slated for migration to the dedicated e-mail server in late 2005 were overlooked for over a year; Intel says it corrected that "oversight" in January 2007. Likewise, until two weeks ago, Intel neglected to begin backing up any e-mail for the 384 custodians who were never instructed to preserve evidence. Further, Intel failed to safeguard some of the backups it made. Intel's European IT Department began overwriting certain backup tapes after they became a year old, and, in Munich, it erased backup tapes of custodian data that were made immediately after AMD filed this lawsuit.

While the consequences cannot be known for certain, this series of Intel "errors" are likely to have combined to assure that there is no reliable repository of post-complaint e-mail and other electronic documents for over half of Intel's custodians, and likely as much as 60% to 70%. Although Intel has agreed to restore all data captured in the thousands of backup tapes it made and preserved, no one can say with any degree of confidence that this will put Humpty-Dumpty back together again, particularly as to the documents of the one-third of custodians who were never placed on any type of retention until last month.

## III. THE SPECIAL MASTER SHOULD BE AUTHORIZED TO INVESTIGATE INTEL'S PRESERVATION DEFICIENCIES AND RECOMMEND A REMEDIATION PLAN

The first step in trying to resolve Intel's preservation issues is understanding thoroughly what they are and what can be done about them. On February 15 and February 23, 2007, AMD requested that Intel supply, among other necessary data, the following:

- A spreadsheet listing each of Intel's 1027 custodians with the following information for each: (1) the custodian's name; (2) whether that custodian has been designated by Intel on its "20% list" or, alternately, adversely designated by AMD; (3) the "harvest" date, i.e., date that the custodian's data was collected (if applicable); (4) the date upon which the custodian's email was migrated to the dedicated server, if it was; (5) a useful description of the exact nature of any retention deficiency or data loss; (6) the date that Intel discovered the retention deficiency or data loss; and (7) the time period during which these problems persisted.

- An inventory of the backup tapes that exist with respect to each of the custodians. This would include an inventory of backups for each of the custodians who were migrated to dedicated email servers and whether those backups have successfully been restored. For the custodians who were never migrated, Intel should identify any disaster recovery or similar backups (not limited to email) that may exist and whether those have been successfully restored.

Intel is in the process of complying. But it predicts that it may take until early April 2007 to identify the evidence "holes" that exist and to determine what backups it has to fill

them. While AMD acknowledges that Intel's task is significant, Intel has known of at least some of its preservation problems for at least several months now.

AMD therefore proposes that Intel be required with all deliberate speed, but no later than March 21, 2007, to provide the Special Master and the parties with a complete accounting of its preservation problems, a custodian-by-custodian tally of issues and identification of data that appears to have been lost, and an inventory of backup tapes that exist and can be successfully restored. With the participation of AMD and the Class Plaintiffs, the Special Master should be authorized to investigate Intel's culpability and to fashion an appropriate action plan and remediation order. This process should include Intel proposing or the Special Master imposing changes to Intel's preservation methods that will prevent further loss of evidence. In addition, the Court should schedule a further status conference six to eight weeks from now to consider the Special Master's recommendations or, at minimum, to be briefed on status.

The Court is expecting the parties to propose a final cut-off date for the custodian document exchange prescribed by the parties' stipulation and the Court's order at hearing on September 27, 2006. The parties are in agreement that, in light of the preservation issues that have arisen, it is premature to set a final extended date for the exchange of party documents. Intel is not in any position to estimate when it will be able to complete production without knowing what remediation or restoration it will be able or required to undertake. AMD is not prepared, nor can it be, adversely to designate additional Intel custodians for document production until it knows which custodians have suffered a data loss, what remedial steps Intel will be required to take (and when) to supplement its production or data repository, and which data losses are irretrievable such that no amount of remediation will suffice. Thus, we

respectfully submit that the cut-off date be tabled and that the Court address it again at the next status conference.

| | |
|---|---|
| | /s/ Frederick L. Cottrell, III |
| | Jesse A. Finkelstein (#1090) |
| | Frederick L. Cottrell, III (#2555) |
| | Chad M. Shandler (#3796) |
| Of Counsel: | Steven J. Fineman (#4025) |
| Charles P. Diamond | Richards, Layton & Finger, P.A. |
| Linda J. Smith | One Rodney Square |
| O'Melveny & Myers, LLP | P.O. Box 551 |
| 1999 Avenue of the Stars | Wilmington, DE  19899 |
| 7th Floor | (302) 651-7700 |
| Los Angeles, CA 90067-6035 | Finkelstein@rlf.com |
| (310) 553-6700 | Cottrell@rlf.com |
| | Shandler@rlf.com |
| | Fineman@rlf.com |
| Mark A. Samuels | Attorneys for Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. |
| O'Melveny & Myers, LLP | |
| 400 South Hope Street | |
| Los Angeles, CA  90071 | |
| (213) 430-6340 | |

Dated:  March 5, 2007

# **CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2007, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and have sent by Hand Delivery to the following:

Richard L. Horwitz, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899

James L. Holzman, Esquire
Prickett, Jones & Eliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899-1328

and have sent by Federal Express to the following non-registered participants:

Darren B. Bernhard, Esquire
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Robert E. Cooper, Esquire
Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com

RLF1-3122594-1