

# EXHIBIT A

## DESCRIPTION OF MATTERS ON WHICH EXAMINATION IS REQUESTED

### I.

### DEFINITIONS

1. "Intel" shall mean and refer to defendant Intel Corporation, including its past and present officers, directors, agents, attorneys, employees, consultants, or other persons acting on its behalf.

2. This "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

3. "Intel Custodians" means and refers to the approximately 1,027 individuals identified by Intel on its Custodian List served on June 1, 2006, pursuant to the Stipulation and Order Regarding Document Production entered by the Court in this Litigation.

4. The "Special Master's Order" means and refers to the March 16, 2007 Order Regarding Intel's Evidence Preservation Issues entered by Special Master Vincent J. Poppiti.

5. "Litigation Hold Notices" means and refers to the means by which Intel communicated its preservation obligations to Intel employees, including all oral, written or electronic notices, reminders, or other communications by Intel to Intel Custodians or other Intel employees.

6. "Weekly Backup Tapes" means and refers to the backup tapes described by Intel in its March 5, 2007 Letter Brief filed with the Court.

.\331505v1

7.  "Complaint Freeze Tapes" means and refers to tapes generated by the "one time company-wide snapshot of email and other electronic documents that were stored on Intel's servers, including Exchange servers that store emails" as described by Intel in its March 5, 2007 Letter Brief filed with the Court.

8.  "Intel's Remediation Plan" refers to the plan that Intel is required to submit on April 17, 2007, pursuant to the Special Master's Order.

## II.

## SUBJECT MATTER

1.  The existence, nature and details of any standard Intel corporate evidence preservation policies and practices applied in connection with actual or threatened litigation, or governmental or internal investigations, including the development and implementation of such policies and practices, the identity of those persons involved in the creation of such policies and practices, the reasons and rationale for such policies and practices, and any suspension or deviation from such policies and practices in connection with this Litigation or other litigations, or governmental or internal investigations, over the past ten years.

2.  The existence, details and application of all Intel corporate "auto-deletion" policies and practices applied to email or other electronic data, including the development and implementation of such policies and practices, the identity of those persons involved in the creation of such policies and practices, the reasons and rationale for such policies and practices, and any suspension or deviation from such policies and practices in connection with this Litigation or other litigations or investigations over the past ten years.

3.  The development and details of the "tiered process to identify and preserve potentially relevant paper and electronic records" referred to in Intel's March 5, 2007 letter to the Court, and any other overall Intel plan to preserve electronic and other data and documents relevant to this Litigation, including the design, implementation and monitoring of that process or plan and its execution, and the identity of those persons involved in the design, development or monitoring of Intel's compliance with or execution of that process or plan.

4.  The nature and details of any Intel efforts to ensure that information relevant to this Litigation was not subject to, or being deleted by, the "auto-delete" functions of any computer system or storage device operating with respect to or containing any Intel Custodian data, including the timing of those efforts and the persons involved in directing or carrying out those efforts.

5. The preparation, timing, contents, and distribution of all Litigation Hold Notices issued by Intel in connection with this Litigation, including the identity of those persons involved in preparing, communicating or distributing such Litigation Hold Notices.

6. Details concerning the discovery of any defects, deficiencies, errors or ambiguities in Litigation Hold Notices issued by Intel in connection with this Litigation, the identity of those persons discovering them, and the timing and nature of all steps taken following such discovery.

7. The facts surrounding Intel's failure to timely issue Litigation Hold Notices to any Intel Custodian, the facts surrounding and timing of Intel's discovery of such failure, the identity of those persons discovering such failure, and the timing and nature of all steps taken following such discovery.

8. The details and timing of all Intel efforts to monitor and ensure compliance with Litigation Hold Notices issued by Intel in connection with this Litigation, including the identity of those persons involved in such monitoring efforts.

9. The details and circumstances concerning any known or suspected non-compliance with Litigation Hold Notices issued by Intel in connection with this Litigation, the facts and timing of Intel's discovery of such non-compliance, the identity of those persons discovering such non-compliance, and the timing and nature of all steps taken following such discovery.

10. Any differences, deviations or discrepancies between Intel's Litigation Hold Notice activities and monitoring efforts in connection with this Litigation and its standard or customary practices and protocols.

11. The details of Intel's "$10 million discovery management program" referenced in the March 16, 2007 article entitled *Intel Worker's Error Led to Lost E-Mail, Company Lawyer Says* (Bloomberg, New York, 2007-03-16 16:12), a copy of which is attached hereto as Attachment 1.

12. Intel's harvest of Intel Custodians' data in this Litigation, including the harvest instructions and protocols employed and the identity of those persons involved in developing and executing such instructions and protocols.

13. The operation, functionality, capabilities and implementation of Intel's Exchange journaling system and EMC-based archive, as described in letters dated March 20 and 28, 2007, from Intel attorney Robert E. Cooper.

14. The nature and timing of Intel's efforts to migrate Intel Custodians' email accounts to dedicated servers, including the IT protocols used to migrate the data, the existence of records reflecting those migration efforts, and the specific dates of migration.

15. The operation and functionality of, and internal Intel operational management responsibility for, dedicated servers operating with respect to or containing any Intel Custodian data.

16. The facts and circumstances of any failure by Intel to migrate Intel Custodians' electronic data to dedicated servers, including the failure to migrate Intel

      Custodians to dedicated servers in October or November 2005 as disclosed by Intel to the Court, AMD or Class Plaintiffs, the facts and timing surrounding Intel's discovery of such failures, the identity of those persons discovering such failures, and the timing and nature of all steps taken following such discovery.

17. The operation and content of Intel's Weekly Backup Tapes, including Intel's practices and procedures for cataloguing and preserving Weekly Backup Tapes.

18. The facts and circumstances concerning Intel's European IT Department's recycling of Weekly Backup Tapes (as described in the February 8, 2007 email from Intel attorney Robert E. Cooper to AMD attorney Charles P. Diamond, and in Intel's March 5, 2007 letter to the Court at page 2, footnote 1), as well as any other known or suspected recycling of backup tapes containing any Intel Custodian data.

19. The facts and timing surrounding Intel's discovery of any actual or suspected recycling of Weekly Backup Tapes or other backup tapes containing any Intel Custodian data, the identity of those persons discovering such recycling, and the timing and nature of all steps taken following such discovery.

20. The facts and circumstances concerning the preparation and transmission of the Excel spreadsheet relating to migration of Intel Custodians and/or their electronic data to dedicated exchange servers as described in Intel's March 5, 2007 letter to the Court, including the identity of those persons involved the creation and transmission of the spreadsheet, the facts, circumstances and timing surrounding Intel's discovery of the failure to migrate Intel Custodians identified on such spreadsheet, and the timing and nature of all steps taken following such discovery.

21. The operation, content, preservation, maintenance, and restoration of, and internal Intel operational management responsibility for, Complaint Freeze Tapes containing any Intel Custodian data.

22. The details of any disaster recovery backup systems, protocols or procedures in place at Intel since January 1, 2000, including backup tape system structure and design, backup tape rotation schedules and protocols, backup tape retention policies and practices, and backup tape restoration protocols.

23. The facts and timing surrounding Intel's discovery of any actual or suspected loss or recycling of Complaint Freeze Tapes containing any Intel Custodian data (including without limitation those relevant to Intel's Munich, Germany operations), the identity of those persons discovering such loss or recycling, and the timing and nature of all steps taken following such discovery.

24. The details of any steps, policies, practices or other measures undertaken by Intel to preserve the electronic data and other documents of departing Intel Custodians, including the details and timing of any Intel efforts to monitor or otherwise ensure compliance with such steps, policies, practices or measures.

25. The facts surrounding any Intel failure or suspected failure to preserve the electronic data or other documents of departing Intel Custodians, the facts and timing surrounding Intel's discovery of such failures or suspected failures, the

        identity of those persons discovering such failures, and the timing and nature of all steps taken following such discovery.

26.     The accuracy of, and basis for, the representations made by Intel attorney John Rosenthal in his October 14, 2005 letter to AMD concerning Intel's evidence preservation.

27.     The facts and circumstances underlying the disclosures and representations made by Intel to the Court regarding Intel's evidence preservation issues, including those contained in Intel's March 5, 2007 letter to the Court.

28.     The facts and circumstances underlying the disclosures and representations made in Intel's disclosures to AMD and Class Plaintiffs pursuant to the Special Master's Order, including without limitation Intel's March 16, March 20, March 28, March 29, April 5, April 17, and April 27, 2007 letters and disclosures.

29.     Intel's Remediation Plan submitted pursuant to the Special Master's Order, including the basis, rationale, and justifications for, and assumptions underlying, the terms and proposals set forth in Intel's Remediation Plan.

30.     Intel's IT infrastructure relevant to the support, storage (including email storage conventions), maintenance and backup of electronic data relevant to this Litigation, including data residing on hard drives or other off-network media.

31.     Intel's remediation and backup data restoration efforts, including volumes and nature of data restored and vendors and processes used.

# Attachment 1

## ATTACHMENT 1

```
Intel Worker's Error Led to Lost E-Mail, Company Lawyer Says
2007-03-16 16:12 (New York)

By Phil Milford and Carlyn Kolker
     March 16 (Bloomberg) -- Intel Corp. e-mail sought for an
antitrust lawsuit with Advanced Micro Devices Inc. was wiped out
because of a computer technician's error, Intel's top lawyer told
a group of attorneys.
     About 150 of 400 Intel employees who were supposed to be
told to keep their e-mail didn't get the message, General Counsel
D. Bruce Sewell told a March 14 gathering of corporate lawyers.
Intel officials sent ``a two-page spreadsheet'' to information
technology technicians, and one ``didn't recognize the second
tab'' and omitted the 150 names, Sewell said.
     ``We've got a $10 million discovery-management program, and
yet that human interface can often be overlooked,'' Sewell told
the lawyers. His advice: ``Talk to your IT department.''
     The missing-mail problem arose during evidence-gathering in
Advanced Micro's 2005 suit against Intel, the world's largest
maker of microprocessors. Santa Clara, California-based Intel
informed the trial judge this month that ``human error'' caused
``some document retention lapses.'' Advanced Micro countered that
``massive amounts'' of e-mail ``may be irretrievably lost.''
     Sewell didn't name Intel executives who didn't get the
message to save the mail.
```

Antitrust Claim

Intel Chairman Craig Barrett and Chief Executive Officer Paul Otellini apparently weren't warned to retain documents, Advanced Micro lawyer Linda Smith said in a March 12 conference in Wilmington, Delaware. The meeting was before court Special Master Vincent Poppiti, who is investigating the document problem for U.S. District Judge Joseph J. Farnan Jr.

Advanced Micro, based in Sunnyvale, California, the second-largest microprocessor-maker, sued Intel in 2005 claiming the larger company created a monopoly by coercing computer-makers to buy its products.

Sewell talked to the lawyers at a meeting of the Argyle Executive Forum in New York.

``It's not accurate to say information is never destroyed'' on a computer, Sewell told the lawyers' gathering. Data on a server can be overwritten, ``and that data is gone,'' he said.

Each of Intel's 90,000 employees generates as many as 100 e-mail messages a day, ``a staggering number of gigabytes,'' Sewell said. Intel is now going to ``a fully automated system'' to back up e-mail and avoid future losses, he said.

Chuck Mulloy, an Intel spokesman, declined to comment further. Drew Prairie, an Advanced Micro spokesman, didn't immediately return phone and e-mail messages.

Shares of Intel, with $35.3 billion in 2006 sales, rose 1 cent to $19.15 at 4 p.m. in Nasdaq Stock Market composite trading. Advanced Micro, with $5.64 billion in sales last year, rose 8 cents to $14.01 on the New York Stock Exchange.

The case is Advanced Micro Devices Inc. v. Intel Corp., CA 05CV441, U.S. District Court, District of Delaware (Wilmington).

--With reporting by Ian King in San Francisco. Editor: Carter.

Story illustration: For a Bloomberg link to the case docket and documents, see {NXTW BBLS DD X1OQVL4TDRRK <GO>}. For a graph of Intel's sales and earnings, see {INTC US <Equity> DES5 <GO>}. For a menu of Bloomberg legal resources, see {BLAW <GO>}. To read today's top legal news, see {TLAW <GO>}.

To contact the reporters on this story:
Phil Milford in Wilmington, Delaware,
at +1-302-661-7615 or pmilford@bloomberg.net;
Carlyn Kolker in New York
at +1-212-617-4056 or ckolker@bloomberg.net.

To contact the editor responsible for this story:
Patrick Oster at +1-212-617-4088 or poster@bloomberg.net.

LA3:1131706.1