IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br>INTEL CORP. MICROPROCESSSOR<br>ANTITRUST LITIGATION | MDL Docket No. 05-1717 (JJF) |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>        Plaintiffs,<br>v.<br><br>INTEL CORPORATION,<br><br>        Defendant. | C.A. No. 05-485 (JJF)<br><br>CONSOLIDATED |

**LETTER TO SPECIAL MASTER VINCENT J. POPPITI FROM MARY B. GRAHAM**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Richard J. Bauer (#4828)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
302.658.9200

*Attorneys for Nonparty Fry's Electronics, Inc.*

OF COUNSEL:

Robert W. Stone
Michael D. Powell
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA  94065
650.801.5000

Dated: May 9, 2007

Dear Judge Poppiti:

We ask that the Special Master accept this letter in response to the letters of Intel (May 4) and Class Plaintiffs (May 7) which raise new arguments that warrant response. Intel has agreed that we may have a response; Class Plaintiffs have not. We also ask for this opportunity to respond to the comments at the May 1 hearing relating to the Special Master's understanding of the history of the protective order and its consequences, which we have now had an opportunity to investigate.

      1.      **The earlier process resulting in the general protective order.**

Intel and Class Plaintiffs imply that Fry's is the proverbial "fly in the ointment." They characterize the existing Protective Order as the product of a "massive and arguably unprecedented negotiation process where multiple third parties – including Fry's – were allowed to provide input on the Protective Order, which was ultimately approved by the Court." (Intel ltr. at 1.) They go on to emphasize that the Court "expended significant time and effort on the current protective order." (*Id.*) Because of all that work, according to Intel and Class Plaintiffs, Fry's should be content with the outcome of this process, as are other third parties, and not be heard to complain.

We respect the laudable and successful efforts by the Court to manage an obviously large case and develop a workable general protective order. But we take issue with the notion that somehow the parties' earlier negotiation efforts, however extensive, and the efforts then expended by the Court to turn the parties' product into a general protective order, somehow foreclose Fry's, as a third party, from now having its day in Court to seek certain additional protections sufficient to protect its specific trade secrets, protections that are warranted under the law and routinely accorded trade secrets of parties, as well as third parties.

Intel admits that the original Protective Order was the product of negotiation among the parties, and that the role of third parties was to give "input" after that negotiation had occurred. While that model from a practical standpoint makes sense as a way to lead to a general protective order, it cannot be argued that, as a practical matter, third party Fry's stands in the shoes of the parties to the case who negotiated the order. It is plainly harder to alter the product of a negotiation after the fact, than to affect the outcome as a full participant throughout.

Moreover, from a legal standpoint, while Fry's was, as Intel says, invited to give "input," it was not an actual party to any ripe dispute then before the Court. Indeed, prior to the May 1, 2007 hearing, there was no specific ruling that this Court had jurisdiction to hear disputes regarding documents-only subpoenas to Fry's or other third parties. Furthermore, although AMD and Intel had outstanding subpoenas to Fry's, their subpoenas were not identical to Class Plaintiffs' (as Fry's discussed at the May 1 hearing) and the extent to which those parties would pursue their subpoenas, and the scope of any ultimate production by Fry's, was unclear. Neither those parties nor Fry's had invoked the mechanisms of the Court in a way that would have made Fry's a party to a dispute over its specific documents, whether through a motion to quash, a motion for protective order or a motion to compel. Indeed, the parties cite no legal authority to support the notion that Fry's should be treated as though it were a party to the earlier proceedings.

Because Fry's was not a party, it was not formally served with papers filed in the case. For that reason alone, it cannot be held to be bound to the earlier proceedings.[1] Moreover, Fry's was not in fact aware of all events relating to protective order issues. This is significant because at the recent hearing the Special Master reviewed and relied on the history of paragraphs 6(b) and 11 relating to experts (May 1, 2007 tr. at 42-46, citing p. 81 of the Report). This history, seemingly suggesting that Fry's had supported the current protective order provisions relating to experts, led the Special Master to say that he was not "inclined to propose a change to the protective order." (*Id.* at 45-46). More particularly, as the Special Master recounted the history, a lawyer for certain third parties, Mr. Holston, argued at the hearing on June 12, 2006 that third parties had a right to learn the identities of the experts. Following his argument at the June 12 hearing, the parties stated that they were "willing to accommodate the third parties' concerns in the spirit of compromise." (*Id.* at 45). Thereafter, "by submission dated June 15th, 2006, the parties agreed to revise the language" to the form which the Special Master's Report found "acceptable" (*Id.* at 45; Report at 82). That provision provided that third parties would be informed of the identity of the experts, but did not include explicitly that the notice be in advance of disclosure with a right to object.

We have now spent considerable effort to investigate. Fry's did not attend the June 12, 2006 hearing, and Mr. Holston, who spoke on behalf of only nine of the third parties, was not retained to represent Fry's interests. Although his client Hewlett Packard had objected prior to the hearing "to granting an expert access to Confidential Discovery Material without first identifying the proposed expert to the Producing Party and affording Third Parties an opportunity to object to [that] access" (6/27/06 Report at 38-39), Mr. Holston did not argue for that position at the hearing (6/12/06 tr. at 87-90). Fry's did not receive a transcript of the hearing until last week, and it was not made aware at the time of the hearing of any negotiation over the expert (or any other) provisions. Further, Fry's did not play any part in the June 15 submission and, moreover, believes that it was not aware of it at the time.[2] Thus, Fry's cannot be viewed as bound by the particular "accommodation" on the experts provision of the parties' submission. Nor can Fry's be viewed as having participated in any negotiations leading to the Court's finding acceptable any other provisions, including the one relating to access by in-house counsel.

---

[1] Class Plaintiffs argue that the e-discovery order is a red herring. That Order in fact "interfaces" with the general Protective Order as the parties themselves have admitted (D.I. 132 at 2, C.A. No. 05-1717), and shows that even the parties who negotiated away the right to exclude in-house counsel otherwise, retained that right under certain circumstances for certain electronic information, presumably in recognition of the ease with which such information can inadvertently be disclosed.

[2] Counsel for Fry's has been unable to locate in any of the court's dockets a submission by the parties on the expert provisions following the hearing, including on June 15, 2006, and so we cannot comment on the contents of that submission beyond the above. However, Fry's in-house counsel has no recollection of being aware of any compromise being considered in advance of the hearing or of one being negotiated following the hearing and has not found any indication in his emails that he was consulted. If any third parties signed off on this "accommodation," presumably it was the nine clients of Mr. Holston or possibly other third parties who attended the hearing. We also note that Fry's could not as a practical matter participate in the hearing, as it would have required travel to Delaware which was not practical under the circumstances (and it had had no reason to retain Delaware counsel).

Notably, neither Intel nor Class Plaintiffs cite any authority for the remarkable proposition that Fry's, having been invited to give "input" before an actual specific dispute relating to Fry's information was framed, should be foreclosed from later seeking protections when an actual dispute has developed. The "law of the case" doctrine cited by Class Plaintiffs has no relevance to the present dispute, because among other reasons, it does not apply to interlocutory orders. *Hudson United Bank v. Progressive Cas. Ins. Co.*, 284 F. Supp. 2d 249, 252 n. 4 (E.D. Pa. 2003) ("The law of the case doctrine does not limit the power of a trial judge to revisit issues addressed in interlocutory orders."); *see also Martin v. Port Auth. Transit*, 115 Fed. Appx. 556, 560 (3d Cir. Oct. 21, 2004) (unpublished) ("Interlocutory orders remain open to reconsideration and do not constitute the law of the case.").[3] Indeed, the Protective Order itself recognizes in paragraph 28 that it was entered **"without prejudice to the right of . . . any Third Party, for good cause shown, to move for modification of this Protective Order"** (emphasis added)

The authority cited in Fry's May 2 letter makes clear that the Court always has the discretion to modify a protective order to provide for additional protections. Now that there is an actual dispute and a motion to compel has been filed that involves specific information of Fry's, Fry's has come forward with declarations that, until Class Plaintiffs' May 7 letter, were unchallenged. Those declarations establish that Fry's specific, subpoenaed information involves trade secrets that warrant full protection by the provisions that Fry's seeks.

2.   **Intel's "parade of horribles."**

Intel raises the specter of a "parade of horribles," that if the Special Master were to entertain Fry's request and grant the protective measures Fry's seeks for its trade secrets, then 70 other third parties might also seek modifications to the protective order and create havoc. Whether or not others might seek additional protections is not a justification for shutting the doors of the courthouse to Fry's. Intel cites no authority for the proposition that a nonparty should be denied consideration by the Court simply because others might also seek the protection of the Court.

Moreover, Fry's positions, i.e. that an "outside-counsels'-eyes-only" tier and a provision for notification and objection with respect to experts is warranted for financial and sales information such as Fry's constituting actual trade secrets, were not argued at the hearing, and apparently others do not have the same need as Fry's to ensure, for example, that in-house counsel for AMD and Intel do not have access to their information. As the Report and Recommendation explains, the parties and third parties in attendance at the hearing were content with a negotiated provision that allowed AMD's and Intel's in-house counsel to see those third parties' information, as long as counsel were not involved in certain kind of activities for a period of time (although that period of time was in dispute). (*See* Report at 86-87; 6/12/07 tr. at 136-137.) Similarly, as noted above, those at the hearing apparently worked out a compromise provision relating to experts during or after the hearing that did not include an explicit right on

---

[3]   The case Class Plaintiffs cite, *Max's Seafood Cafe*, does not even address the law of the case doctrine.

- 3 -

the part of the third parties to have advance notice and to object.[4] The Report and Recommendation found these negotiated provisions "acceptable." (Report at 82, 87.) However, the Report did not discuss or make findings as to whether the further, standard additional protections that Fry's is requesting were warranted to protect its trade secrets. Thus, Class Plaintiffs' assertion that "Fry's arguments were fully considered prior to entry of the protective order" (p. 4) is simply not correct.

Finally, the concern over potential havoc is vastly overblown. Apparently, as Intel notes, other third parties do not have concerns like Fry's, perhaps because they were involved in the negotiations and so negotiated their own interests as they saw fit, because they do not have trade secrets that may be produced, or because no ripe dispute has yet been framed over their information. But whatever the reason, if a third party were now to come forward to protect any trade secrets, the provisions that Fry's seeks – which are routinely granted in litigation in this district – could readily be employed for the benefit of others, and so the Court would be able efficiently to deal with those applications. The Court can take further comfort in knowing that, given the considerable cost of having to fight a battle in this case over the protective order, no third party is going to undertake the effort unless it has a genuine concern not met by the general Protective Order.

### 3. Interference with Intel's litigation needs.

Class Plaintiffs make no specific arguments that the provisions Fry's seeks are unworkable, burdensome, or otherwise problematic. Intel argues, however, that it should not have to identify its experts, with an opportunity for Fry's to object before those experts see Fry's trade secrets, because such a requirement would effectively empower Fry's to have a "veto" over Intel's choice of experts. This argument ignores that this provision is not a veto, but a right of objection subject to court review. This is a standard provision in protective orders which recognizes that companies should have the right to ensure that experts who might be in a position, even inadvertently, to misuse or disclose information, do not receive trade secret information. The cases in Delaware are legion in which such provisions, including with a right by third parties to object, appear in protective orders. (*See, e.g.,* Exh. A at 1, 12-13 and Exh. A to Fry's 5/2/07 ltr. at 11.) The one case Intel cites, *Telular*, is inapposite; it did not hold that an objection provision is improper. In fact, it shows that, where there is an objection to an expert, the Court can address the issue applying the appropriate legal standards.

Intel also argues that its in-house counsel should have access to Fry's trade secret information, but does not identify any specific reason why its in-house counsel *needs* access. Instead, Intel focuses on the risk of injury portion of the good cause inquiry, and argues that its in-house counsel are officers of the court who can be expected to comply with protective orders. But it is hard to conceive of a reason why in-house counsel would *need* to see Fry's actual data, which from Class Plaintiffs' submission will apparently be analyzed by experts. Moreover, by Intel's logic, no protective Order need ever be adopted that excludes in-house counsel. Yet many protective orders in this district have been entered that exclude in-house counsel because,

---

[4] At the hearing, no one pressed the point, for example, that numerous protective orders have been entered in this district, some with court rulings directly on these issues, which show that the provisions that Fry's seeks are fully justified, workable and customary.

regardless of good intentions, a risk of disclosure for in-house personnel exists that is greater than the risk for outside counsel, as Judge Jordan recognized in the TriCor antitrust litigation. In fact, Judge Farnan has held, in denying access by in-house counsel to highly confidential information, that: "In this district, highly confidential [information], assuming the information is properly designated, we assume it's competitive unless there is some cause shown that it's not, is limited to outside counsel, experts and consultants." (Exh. B, tr. at 5 and signed order.)

In a related vein, Intel questions Fry's request that the number of outside counsel who see Fry's information be limited. Again, Intel recites that outside counsel are officers of the court who should be expected to adhere to their obligations. But the sheer number of outside counsel in this case is "unprecedented," and, accordingly, restrictions taking into account that circumstance are appropriate. It cannot reasonably be denied that the risks of disclosure are proportional to the number of persons with access, and that the current protective order provides Fry's with no ability to monitor for breaches of the protective order or even to be informed of such breaches, a provision that is often found in protective orders entered in Delaware (*See, e.g.,* TriCor Protective Order at 18, Exh. A to Fry's 5/2/07 ltr.) Notably, the parties themselves have already acknowledged that limiting the number of outside counsel is important for certain information – the parties' e-discovery order limits the number of outside counsel who may see their native document databases. (D.I. 396 at 11.) If the parties' information warrants such measures, certainly Fry's trade secrets warrant at least as great a degree of protection. *See U.S. v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 160 (D. Del. 1999).

### 4. The status of Fry's trade secrets.

Although Class Plaintiffs did not dispute the trade secret status of Fry's information in their earlier reply in support of their motion to compel, they make the new argument that Fry's data "is not confidential, not known only to Fry's" and that Fry's declarations fail to demonstrate that it has a trade secret interest in its actual data (ltr. at 3.) This argument is erroneous and should be rejected as too late. Fry's submitted its declarations in its April 17 response to the motion to compel, and if Class Plaintiffs had wanted to argue that the declarations were insufficient, it should have done so in its reply and before the hearing, so that Fry's could have responded then, and if appropriate, adduce evidence at the hearing.

Their argument also ignores well established trade secret law. The fact that information consists of an aggregation of many pieces of information, each of which individually might be public, does not negate trade secret status if the aggregation is not readily ascertainable. The Federal Circuit, for example, has noted that, "Ninth Circuit law upholds trade secret status even had the same information been obtainable from other sources" and that "trade secrecy is not negated because defendant by an expenditure of effort might have collected the same information from sources available to the public." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1243-44 (Fed. Cir. 1989) (citing *Clark v. Bunker*, 453 F.2d 1006, 1010 (9th Cir. 1972)). *See also, Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.*, No. 12782, 1997 WL 153825 (Del. Ch. Mar. 26, 1997) (observing that, because "it took years for plaintiff to acquire this information [relating to customer purchasing needs and the prices customers paid]," it could reasonably be inferred that the information "could not easily be obtained by random 'cold calling.'") Class Plaintiffs do not say how all the individual sales data could be transformed in any readily ascertainable way into the aggregation in Fry's possession.

Moreover, Class Plaintiffs put in no record support for the notion that all of the individual pieces of underlying data that Fry's has are public. Their mere attorney argument cannot counter the actual evidence that Fry's put in the record. The declaration of Rajesh Seth avers that Fry's information about "pricing, profit margins, inventories, marketing development funds" is not publicly known (and its disclosure to Fry's competitors or to manufacturers would cause Fry's serious harm, for example, from loss of bargaining power). He also avers that "Fry's methodologies regarding pricing, inventories, marketing, profitability" are not public and that the disclosure of this information would allow its competitors more effectively to compete against Fry's. The trade secret status of this information cannot seriously be contested. This is precisely the sort of information that Judge Farnan in *Igen* (Exhibit B) and Judge Jordan in the TriCor antitrust litigation, have held is not required to be shown to in-house counsel.

Respectfully,

*Mary Graham* (signature)

Mary B. Graham (#2256)

MBG/dam
cc:  Clerk of the Court (via e-filing and hand delivery)
     J. Clayton Athey, Esq. (via e-mail)
     James L. Holzman, Esq. (via e-mail)
     Frederick L. Cottrell, III, Esq. (via e-mail)
     Richard L. Horwitz, Esq. (via e-mail)
     Dale R. Dube (via e-mail)
     Carrie David (via e-mail)
     Mary Levan (via e-mail)
820769