IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| INTEL CORP. MICROPROCESSSOR | ) | MDL Docket No. 05-1717 (JJF) |
| ANTITRUST LITIGATION | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| PHIL PAUL, on behalf of himself and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 05-485 (JJF) |
| | ) | |
| INTEL CORPORATION, | ) | CONSOLIDATED |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

## CITED DECISIONS IN LETTER TO SPECIAL MASTER VINCENT J. POPPITI FROM MARY B. GRAHAM

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Mary B. Graham (#2256)
Richard J. Bauer (#4828)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
302.658.9200

*Attorneys for Nonparty Fry's Electronics, Inc.*

*OF COUNSEL:*

Robert W. Stone
Michael D. Powell
Quinn Emanuel Urquhart Oliver
& Hedges, LLP
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA  94065
650.801.5000

May 9, 2007

# TABLE OF CITED DECISIONS

| CITATION | TAB |
|---|---|
| *Clark v. Bunker*, 453 F.2d 1006 (9th Cir. 1972) | 1 |
| *Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.¸* No. 12782, 1997 WL 153825 (Del. Ch. Mar. 26, 1997) | 2 |
| *Hudson United Bank v. Progressive Cas. Ins. Co.*, 284 F. Supp. 2d 249 (E.D. Pa. 2003) | 3 |
| *Martin v. Port Auth. Transit*, 115 Fed. Appx. 556, (3d Cir. Oct. 21, 2004) (unpublished) | 4 |
| *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226 (Fed. Cir. 1989) | 5 |
| *United States of America v. Dentsply International, 1*87 F.R.D. 152 (D. Del. June 11, 1999) | 6 |

823562.1

Tab 1

Westlaw.

453 F.2d 1006                                                                                                          Page 1
453 F.2d 1006, 172 U.S.P.Q. 420
**(Cite as: 453 F.2d 1006)**

▷
Clark v. Bunker
C.A.9, 1972.

United States Court of Appeals,Ninth Circuit.
Larry E. CLARK, Plaintiff-Appellee,
v.
Berkeley L. BUNKER et al., Defendants-Appellants.
**No. 25224.**

Jan. 14, 1972.

Action for damages for misappropriation of trade secret consisting of detailed plan for creation, promotion, financing, and sale of contracts for "prepaid" funeral services. The United States District Court for the District of Nevada, Roger D. Foley, Chief Judge, rendered judgment for plaintiff and defendants appealed. The Court of Appeal, Browning, Circuit Judge, held, inter alia, that evidence supported finding that requisite secrecy existed, despite disclosure to mortuary association director and publication of general outline of plan in association's special bulletin and authorization to corporations to use plan.

Affirmed.
West Headnotes
**[1]** **Antitrust and Trade Regulation 29T** ☞**413**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
       29Tk413 k. What Are "Trade Secrets" or Other Protected Proprietary Information, in General.
Most Cited Cases
   (Formerly 382k984 Trade Regulation, 379k10(5))
Except for information as to single or ephemeral events in conduct of business, no category of information is excluded from protection as trade secret because of its inherent qualities.

**[2]** **Antitrust and Trade Regulation 29T** ☞**420**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
       29Tk420 k. Particular Cases, in General.

Most Cited Cases
   (Formerly 382k990 Trade Regulation, 379k10(5))
Plaintiff's plan encompassing all forms, information, and techniques for formulating, promoting, financing, and selling contract for "prepaid" funeral services in continuous operation of mortician's business, giving users marked advantage over competitors, satisfied requirements for trade secret protection so far as subject matter is concerned.

**[3]** **Antitrust and Trade Regulation 29T** ☞**413**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
       29Tk413 k. What Are "Trade Secrets" or Other Protected Proprietary Information, in General.
Most Cited Cases
   (Formerly 382k984 Trade Regulation, 379k10(5))

**Antitrust and Trade Regulation 29T** ☞**417**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
       29Tk417 k. Necessity That Information Be Secret. Most Cited Cases
   (Formerly 382k987 Trade Regulation, 379k10(5))
Novelty and invention are not required for trade secret and no more is required than that information possess qualified secrecy.

**[4]** **Antitrust and Trade Regulation 29T** ☞**412**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
       29Tk412 k. Purpose and Scope of Trade Secret Protection, in General. Most Cited Cases
   (Formerly 382k983 Trade Regulation, 379k10(5))

**Antitrust and Trade Regulation 29T** ☞**417**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
       29Tk417 k. Necessity That Information Be

Secret. Most Cited Cases

   (Formerly 382k987 Trade Regulation, 379k10(5))
Interest protected by trade secrecy law is not secrecy as such and protection is merely against breach of faith and reprehensible means of learning another's secret; substantial element of secrecy must exist so that, except by use of improper means, there would be difficulty in acquiring information.

**[5] Antitrust and Trade Regulation 29T ☜433**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(B) Actions
         29Tk433 k. Questions of Law or Fact. Most Cited Cases

   (Formerly 382k1003 Trade Regulation, 379k28)
Whether degree of secrecy necessary to trade secret exists in particular case is question of fact.

**[6] Antitrust and Trade Regulation 29T ☜417**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk417 k. Necessity That Information Be Secret. Most Cited Cases

   (Formerly 382k987 Trade Regulation, 379k10(5))
Secrecy necessary to trade secret is not negated because defendant by expenditure of effort might have collected same information from sources available to public and may be present despite publication of general descriptions or sales where details are not readily apparent from inspection of what is sold or purchasers do not disclose those details.

**[7] Antitrust and Trade Regulation 29T ☜432**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(B) Actions
         29Tk429 Evidence
            29Tk432 k. Weight and Sufficiency of Evidence. Most Cited Cases

   (Formerly 382k1002 Trade Regulation, 379k27)
Evidence in action for damages for misappropriation of trade secret consisting of detailed plan for creation, promotion, financing, and sale of contracts for "prepaid" funeral services supported finding that re-

quisite secrecy existed, despite disclosure to mortuary association director and publication of general outline of plan in association's special bulletin and authorization to corporations to use plan.

**[8] Antitrust and Trade Regulation 29T ☜423**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk423 k. Persons Liable. Most Cited Cases

   (Formerly 382k993 Trade Regulation, 379k22)
Award of compensatory damages, for misappropriation of trade secret, could be made against defendants other than corporation which alone was shown to have received profits from misappropriation, where defendants were joint tort-feasors.

**[9] Damages 115 ☜114**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k114 k. Injuries Affecting Limited or Special Rights or Interests. Most Cited Cases
Plaintiff's recovery for damages for misappropriation and use of trade secret was not limited to defendant's profits and plaintiff could be awarded income on trust funds which he would have received but for the tort.

**[10] Damages 115 ☜114**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k114 k. Injuries Affecting Limited or Special Rights or Interests. Most Cited Cases
Plaintiff in action for misappropriation of trade secret could recover defendants' profits whether or not they represented losses to plaintiff.

**[11] Damages 115 ☜59**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss

453 F.2d 1006, 172 U.S.P.Q. 420
**(Cite as: 453 F.2d 1006)**

115k59 k. Matter of Mitigation; Collateral Source Rule in General. Most Cited Cases

In action for misappropriation of trade secret, absent some ground for arriving at different result, it was reasonable for court to conclude that if defendants had not appropriated secret plaintiff would have made all of sales in area, and it was not necessary that plaintiff's profits be proven and considered in mitigation.

**[12] Damages 115 ⚖══114**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k114 k. Injuries Affecting Limited or Special Rights or Interests. Most Cited Cases

Plaintiff in action for misappropriation of trade secret could recover defendant's profits during period of reference for determination of profits, although injunctive relief after determination of liability had been denied.

**[13] Damages 115 ⚖══87(1)**

115 Damages
   115V Exemplary Damages
      115k87 Nature and Theory of Damages Additional to Compensation
         115k87(1) k. In General. Most Cited Cases

Where compensatory damages are sought and awarded, court has power to award punitive damages as well.

**[14] Damages 115 ⚖══205**

115 Damages
   115X Proceedings for Assessment
      115k205 k. Assessment at Trial of Issues in General. Most Cited Cases

It was not necessary that defendant's total wealth be assessed before award of punitive damages against him.

**[15] Damages 115 ⚖══94.3**

115 Damages
   115V Exemplary Damages
      115k94 Measure and Amount of Exemplary Damages
         115k94.3 k. Wealth of Defendant. Most Cited Cases
    (Formerly 115k94)

Award of punitive damages was not excessive where there was substantial evidence of defendant's ability to pay and it did not appear likely that amount would destroy defendant financially.

John Peter Lee (argued), Rulon A. Earl, Las Vegas, Nev., for defendants-appellants.

Douglas Stripp (argued), Russell W. Baker, James F. Duncan, of Watson, Ess, Marshall & Enggas, Kansas City, Mo., Lee R. Rose, of Morse, Graves, Parraguirre & Rose, Las Vegas, Nev., for plaintiff-appellee.

Before KOELSCH, BROWNING, and TRASK, Circuit Judges.

BROWNING, Circuit Judge:

This is an appeal from a judgment in a diversity action awarding damages against appellants for the misappropriation of appellee's trade secret, consisting of a detailed plan for the creation, promotion, financing, and sale of contracts for "prepaid" or "pre-need" funeral services.

The trial court[FN1] rested liability upon the legal conclusion that "[s]ince Defendant, Berkeley L. Bunker, appropriated and put to use Plaintiff's plan in breach of the confidential relationship existing between the parties, Plaintiff is entitled to an accounting of profits and to damages." Appellants concede that use of the trade secret of another, conveyed in confidence, may be actionable,[FN2] but raise a number of objections to the application of this principle to the present case, and to the award of damages.

   FN1. The case was tried to the court.

   FN2. E. I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917); Dekar Industries, Inc. v. Bissett-Berman Corp., 434 F.2d 1304, 1306 (9th Cir. 1970); Restatement of Torts, § 757; 2 R. Callman, Unfair Competition and Monopolies, § 51, p. 346 (3d ed. 1968, 1971 Supp.); R. Milgrim, Trade Secrets

[Vol.12 of Business Organizations], Ch. 4 (1971 Supp.); A. Turner, The Law of Trade Secrets, Part IV (1962); R. Ellis, Trade Secrets, Chs. 4, 5, 11 (1953).

Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), do not bar an action for misappropriation of trade secrets in breach of a confidential relationship. *See* Dekar Industries, Inc. v. Bissett-Berman Corp., *supra,* 434 F.2d at 1306; Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163, 171-172 (5th Cir. 1969); Winston Research Corp. v. Minnesota Mining & Manufacturing Co., 350 F.2d 134, 138 n. 2 (9th Cir. 1965); Servo Corp. of America v. General Electric Co., 337 F.2d 716, 724-725 (4th Cir. 1964); Callman, supra, at 346; Trade Secrets Law After Sears and Compco, 53 Va.L.Rev. 356, 368 (1967). Liability is predicated on communication of the secret to the defendant in confidence and disclosure or unauthorized use of the information by the defendant. The finding of the court below that the defendants obtained the appellee's plan in confidence and improperly utilized it in its entirety for their own advantage is clearly correct.

1. Appellants contend that appellee's plan consisted of legal forms, advertising methods, and sales techniques not protectable as a trade secret under Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841 (1879); Reynolds & Reynolds Co. v. Norick, 114 F.2d 278 (10th Cir. 1940); Hamilton Manufacturing Co. v. Tubbs Manufacturing Co., 216 F. 401 (W.D.Mich.1908); **\*1009**Continental Casualty Co. v. Beardsley, 151 F.Supp. 28 (S.D.N.Y.1957); and American Institute of Architects v. Fenichel, 41 F.Supp. 146 (D.C.N.Y.1941).

[1] "A trade secret is a process or device for continuous use in the operation of the business." Restatement of Torts, § 757, Comment b, p. 5. It therefore does not include "simply information as to single or ephemeral events in the conduct of the business, as, for example, the . . . date fixed for the announcement of a new policy or for bringing out a new model or the like." *Id.* With this exception, no category of information is excluded from protection as a trade secret be-

cause of its inherent qualities. "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* "Generally it relates to the production of goods. . . . It may, however, relate to the sale of goods or to other operations in the business. . . ." *Id.*

[2] The plan developed by appellee, as detailed in the district court findings, encompassed all of the forms, information, and techniques, for formulating, promoting, financing, and selling contracts for "prepaid" funeral services in the continuous operation of a mortician's business. The district court found, on ample evidence, that the plan gave its users a marked advantage over competitors. The plan therefore satisfied the requirements for trade secret protection so far as subject matter is concerned.

The cases relied upon by appellants are not in point. *Beardsley, Hamilton, Fenichel,* and *Baker* dealt with the *Copyrightability* of widely published forms and advertisements, not with their protectability as trade secrets. *Reynolds* was a trademark and unfair competition suit involving unpatented and uncopyrighted business forms; no secrecy was alleged.

[3] 2. Appellants argue that the plan was not "novel." The selling of "pre-need" funerals was common; and appellee took many of the elements of his plan from the plans of others. However, "[n]ovelty and invention are not requisite for a trade secret." Restatement of Torts, § 757, Comment b, pp. 6-7. No more is required than that the information possess a qualified secrecy, next discussed.

3. Appellants contend that the plan was not "secret" because appellee had authorized seven other corporations to use it; he had discussed it with the managing director of a national association of morticians; the plan was described in a trade publication issued by this association; the files of another such association contained some forms used in the plan; and some of the forms used were necessarily disclosed to the members of the public who purchased "pre-need" funerals.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[4] "The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. *Id.* at 5-6.[FN3] However, the interest protected by this branch of the law is not secrecy as such. "The protection is merely against breach of faith and reprehensible means of learning another's secret." *Id.* at 7.[FN4] Accordingly, "a substantial element of secrecy must exist, so that, except by the use of improper means, there would be **\*1010** difficulty in acquiring the information." *Id.* at 6.[FN5]

> FN3. *See also* Bowser, Inc. v. Filters, Inc., 398 F.2d 7, 9 (9th Cir. 1968); Smith v. Dravo Corp., 203 F.2d 369, 373 (7th Cir. 1953); Milgrim, *supra* note 2, at 2-13.

> FN4. Winston Research Corp. v. Minnesota Mining & Manufacturing Co., 350 F.2d 134, 138 & n. 2 (9th Cir. 1965); Dekar Industries, Inc. v. Bissett-Berman Corp., 434 F.2d 1304, 1306 (9th Cir. 1970); Smith v. Dravo Corp., 203 F.2d 369, 374-375 (7th Cir. 1953).

> FN5. *See also* A. H. Emery Co. v. Marcan Products Corp., 389 F.2d 11, 16 (2d Cir. 1968); Smith v. Dravo Corp., 203 F.2d 369, 373-375 (7th Cir. 1953); Milgrim, *supra* note 2 at 2-46; Callman, *supra* note 2 at 403.

Logically it might seem that if a breach of confidential relationship occurs it should be irrelevant that the information used or disclosed is readily available. The rule is to the contrary. *See* Wilkin v. Sunbeam Corp., 377 F.2d 344 (10th Cir. 1967). A suggested rationale is that when the information is a matter of public knowledge it could not have been imparted in confidence. Servo Corp. of America v. General Electric Co., 393 F.2d 551, 555 (4th Cir. 1968). This explanation will suffice only when confidentiality was exacted by an implied agreement rather than an express one. In any event, it is difficult to conceive of any case in which the confider would be damaged or the confidant benefited by the confidant's use or disclosure of information known to all.

[5][6] Whether such a degree of secrecy existed in a particular case is a question of fact.[FN6] It is not neg-

ated because defendant by an expenditure of effort might have collected the same information from sources available to the public.[FN7] Obviously it may be present despite the publication of general descriptions in advertisements, sales brochures, and similar material;[FN8] or by sales where the details are not readily apparent from inspection of what is sold, or the purchasers do not disclose those details.[FN9]

> FN6. Callman, *supra* note 2 at 390, 403; Milgrim, *supra* note 2 at 2-43, 2-44.

> FN7. Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590-91 (2d Cir. 1963); Franke v. Wiltschek, 209 F.2d 493, 495 (2d Cir. 1953); Smith v. Dravo Corp., 203 F.2d 369, 374-375 (7th Cir. 1953).

> FN8. Milgrim, *supra* note 2 at 2-21, 2-25.

> FN9. *See* Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163, 173 (5th Cir. 1969). Public sales were also involved in Franke v. Wiltschek, 209 F.2d 493, 495 (2d Cir. 1953). *See also* Callman, *supra* note 2 at § 53.3(d), pp. 401-03. Milgrim, *supra* note 2 at 2-21, 2-25.

[7] The district court found the requisite secrecy here by clear implication, though not expressly. That finding is supported by the evidence. Appellee invested substantial time, thought, and money in collecting and testing the data, and creating and perfecting the forms, processes, and techniques that provide the substance and detail of appellee's plan. Substantial effort would be required to assemble the detailed elements of the plan from publicly available sources. Disclosure to the mortuary association's director did not result in general publication. The association's special bulletin contained only a general outline of the plan, and, in any event, was published after appellants had obtained the information by breach of confidence and put it to use. The corporations previously authorized to use the plan as a whole did not make the details of the plan available. Those details were not amenable to discovery by an outsider's analysis of the documents disclosed to purchasers of "pre-need" contracts. The difficulty of securing the necessary de-

tails except by unlawful means is evidenced by the substantial sum ($55,000) paid to appellee for a corporation which appellee had formed to use the plan; and by the extreme and unlawful means appellants employed to secure those details-including concealment, affirmative misrepresentation, and commercial espionage. *See* A. H. Emery Co. v. Marcan Products Corp., 389 F.2d 11, 16 (2d Cir. 1968).

4. Appellants' remaining contentions challenging liability[FN10] do not merit separate discussion. Assuming they have a basis in law, all rest upon factual assumptions that were rejected by the district court on adequate evidence.

> FN10. That the plan was not "concrete"; that it was not conceived by appellee; that it was not owned by appellee; that it was not communicated to appellants in usable detail; that it was not communicated in expectation of compensation.

[8] 5. Turning to damages, appellants' first argument is that no award of compensatory damages could be made *1011 against appellants other than Memorial Guardian Plans, Inc., because no other appellant was shown to have received any profits from the misappropriation and use of appellee's plan. It is sufficient to say that the trial court found appellants to be joint tortfeasors and hence jointly and severally liable for the damage sustained by appellee, and the record supports that finding.

[9] 6. Appellants contend that the trial court erred in awarding appellee not only the profits appellants earned but also certain income on trust funds which appellee would have received but for the tort, because the proper measure of damages for misappropriation and use of a trade secret is not what the plaintiff lost but what the defendant gained, citing International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696, 697 (3d Cir. 1967).

The rule to which appellants refer is not a *limitation* upon the damages due appellee for willful misappropriation of his trade secret. In such cases "damages should not be restricted to defendant's actual profits from his improper uses of the secret; the plaintiff is entitled to the profit he would have made had his secret not been unlawfully used, but not less than the monetary gain which the defendant reaped from his improper acts." 2 R. Callman, Unfair Competition and Monopolies, § 51, pp. 495-96 (3d ed. 1968, 1971 Supp.). Appellants' confusion may arise from the rule antedating the unification of law and equity, that on a bill in equity a wrongdoer would be required to account for profits on a theory of unjust enrichment, but damages could be recovered only in an action at law. *See* Tilghman v. Proctor, 125 U.S. 136, 143-144, 8 S.Ct. 894, 31 L.Ed. 664 (1888).

7. Under the general heading, "Did the Court Err in Setting the Amount of Damages?," appellants raise a number of miscellaneous issues, two of which we mention.

[10][11] Appellants make the general assertion that the court should have received additional evidence on the question of damages, but their only specific suggestion is that appellee's profits should have been proven and considered in mitigation. Absent some ground for arriving at a different result, it was reasonable for the court to conclude, as it did, that if appellants had not appropriated appellee's plan, appellee would have made all of the "prepaid" plan sales in the area. In any event, appellee was entitled to recover appellants' profits whether or not they represented losses to appellee.

[12] Appellants object to the award of damages for the period from June 30, 1965, when the court referred the case to a special master for a determination of appellants' profits, through June 30, 1967, when the master's report was filed. The objection appears to rest ultimately on the premise that it was unfair for the court to deny injunctive relief, thus allowing appellants to continue their business unchanged for the extended period required to compute damages, and then to require appellants to disgorge the profits earned during this period. But appellee was entitled either to an injunction or to damages. Winston Research Corp. v. Minnesota Mining & Manufacturing Co., 350 F.2d 134, 144 (9th Cir. 1965). The court's denial of injunctive relief after a determination of liability should have put appellants on notice that they must respond in damages for any continued wrongful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

use of appellee's trade secrets. Appellants could limit their liability only by abandoning the use of ap-pellee's plan, or by showing that it ceased to be secret. Callman, *supra*, at 404, n. 77, 406.

8. Finally, appellants object to the award of punitive damages against appellant Berkeley L. Bunker, on two basic grounds.

[13] The first is that absent express statutory author-ity the district court, sitting as a court of equity, had no power to assess punitive damages, citing Coca Cola v. Dixie Cola Laboratories, 155 F.2d 59 (4th Cir. 1946). The short answer is that where compens-atory damages are sought and awarded, as in this **1012** case, the court has power, on a proper record, to award punitive damages as well. *See generally,* El Ranco, Inc. v. First National Bank, 406 F.2d 1205, 1218-1219 (9th Cir. 1968); Davenport v. Mutual Be-nefit Health & Accident Ass'n, 325 F.2d 785 (9th Cir. 1963).

[14][15] Second, Bunker argues that the punitive damages award was excessive, citing Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962). But in that case the trial court assessed the defendant's total net worth at $51,000, and then awarded punitive damages of $50,000. The danger of financial ruina-tion was obvious. 371 P.2d at 829. In this case, there was substantial evidence in the record of Bunker's ability to pay.FN11 He has been co-owner of a large mortuary in southern Nevada since 1944. The master reported that his $800 investment in forming "pre-need" corporations was alone worth $85,592 by November 30, 1965. We cannot say on these facts that the award was excessive.

> FN11. It was not necessary for the total wealth of Bunker to be assessed prior to an award of punitive damages against him. Hotel Riviera, Inc. v. Short, 80 Nev. 505, 396 P.2d 855, 863 (1964). The award was proper in the absence of evidence showing the likelihood that the specified amount would destroy Bunker financially. *See* El Rancho, Inc. v. First National Bank, 406 F.2d 1205, 1218-1219 (9th Cir. 1968).

Affirmed.

C.A.9, 1972.
Clark v. Bunker
453 F.2d 1006, 172 U.S.P.Q. 420

END OF DOCUMENT

TAB 2

Westlaw.

Not Reported in A.2d                                                                                        Page 1
Not Reported in A.2d, 1997 WL 153825 (Del.Ch.), 23 Del. J. Corp. L. 199
(Cite as: Not Reported in A.2d)

C

Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.
Del.Ch.,1997.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
**FRANKLIN FIBRE-LAMITEX** CORPORATION,
a Delaware Corporation, Plaintiff,
v.
MARVEC MANUFACTURING, INC., a
Pennsylvania Corporation, and Carl McElfresh,
Defendants.
**Civil Action No. 12782.**

Submitted Dec. 4, 1996.
Decided March 26, 1997.

Laurence V. Cronin of Smith, Katzenstein & Furlow,
Wilmington, Delaware, for Plaintiff.
Brian P. Glancy of Hughes, Sisk & Glancy, P.A.,
Wilmington, for Defendant Carl McElfresh.
Kevin William Gibson of Kassab Archbold &
O'Brien, L.L.P., Media, Pennsylvania, for Defendant
Marvec Manufacturing Inc.

MEMORANDUM OPINION
JACOBS, Vice Chancellor.
*1 Pending are motions for summary judgment by
the defendants, Carl McElfresh ("McElfresh") and
Marvec Manufacturing, Inc., a Pennsylvania
corporation ("Marvec), seeking the dismissal of
Count III of the complaint and an of award attorney's
fees incurred in prosecuting those motions. Count III
is a claim by the plaintiff, Franklin Fibre-Lamitex
Corp., a Delaware corporation ("Franklin Fibre"),
that the defendants solicited its customers in violation
of the Delaware Trade Secrets Act, 6 *Del. C.* § 2000,
*et seq.* (the "Act").

After oral argument on these motions on August 19,
1996, the Court entered an Order on October 23,
1996 granting summary judgment as to Counts I and
II of the Complaint.[FN1] With respect to Count III, the
Court requested additional briefing. This is the
Opinion of the Court, after supplemental briefing,
with respect to Count III and the defendants'
application for attorney's fees.

FN1. Count I of the Complaint alleges that
Marvec and McElfresh breached covenants
not to compete contained in certain contracts
between McElfresh and Franklin Fibre.
Count II alleges that Marvec tortiously
interfered with those contracts.

I. *FACTS*

This dispute arises out Franklin Fibre's termination of
McElfresh and his subsequent employment by
Marvec. In 1971, Franklin Fibre purchased the assets
of Kaufman Glass, which was McElfresh's employer.
Although the two companies shared common
management, they remained legally separate
corporations. In September 1973, McElfresh resigned
from Kaufman Glass, but approximately one year
later, sought re-employment. Because no positions
were available at Kaufman Glass at that time,
McElfresh was offered a position as a salesman at
Franklin Fibre, which he accepted on July 17, 1974.
In connection with that position, McElfresh signed an
Agreement for Use and Protection of Confidential
Information. Four years later, McElfresh signed an
Employee Agreement that provided for the use and
protection of Franklin Fibre's confidential
information.[FN2] McElfresh rose through the ranks at
Franklin Fibre, eventually becoming the head of
procurement, and in that position, was Franklin
Fibre's primary contact with its vendors.

FN2. In its October 23, 1996 Order, the
Court dismissed with prejudice all Counts
relating to the breach of these Agreements.

In October 1991, Franklin Fibre terminated
McElfresh's employment. At that time, Franklin Fibre
had in place policies that prescribed what kinds of
documents and other materials departing employees
could (and could not) take with them. Franklin Fibre's
policy permitted departing employees to take with
them personal notes concerning Franklin Fibre's
customers and vendors (*e.g.,* a contact's birthday or
wife's name), but it did not permit departing
employees to take customer or vendor lists or
information relating to product price quotes.

On June 8, 1992, McElfresh began employment at
Marvec, where he continued until he was discharged
by Marvec in November 1994. It is undisputed that

Not Reported in A.2d                                                                 Page 2
Not Reported in A.2d, 1997 WL 153825 (Del.Ch.), 23 Del. J. Corp. L. 199
(Cite as: Not Reported in A.2d)

while in Marvec's employ, McElfresh solicited Franklin Fibre customers and vendors. What the parties dispute is whether McElfresh's solicitation of those persons was legally proper. This Opinion addresses whether there should be a trial on that issue.

## II. STANDARD OF REVIEW

Court of Chancery Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the burden of proving the absence of any genuine issue as to material facts, and any doubt must be resolved against that party. *Brown v. Ocean Drilling & Exploration Co.,* Del. Supr., 403 A.2d 1114, 1115 (1979).

## III. *THE MISAPPROPRIATION OF TRADE SECRETS CLAIM*

**\*2** The subject of the summary judgment motion is Franklin Fibre's claim that the information McElfresh obtained during his employment at Franklin Fibre constituted a trade secret within the meaning of the Act, and that while employed at Marvec, McElfresh improperly used such information for Marvec's benefit. More specifically, Franklin Fibre alleges that, while employed by Marvec, McElfresh violated the Act by (i) contacting Franklin Fibre's customers, whose identities he learned while at Franklin Fibre, and (ii) using detailed historical information regarding those customers' purchasing habits, including the prices they paid for Franklin Fibre products.

Defendants respond that this information does not fall within the statutory definition of a "trade secret" because (a) any information concerning the identities and locations of Franklin Fibre's customers was readily ascertainable from trade publications, and (b) any information concerning these customers' purchasing habits was readily ascertainable by simply telephoning the customers and asking them.

The parties agree that where, as here, there is no contractual covenant not to compete, the applicable law is as set forth in the Act, as explicated by *Wilmington Trust Co. v. Consistent Asset*

*Management Co., Inc.,* Del. Ch., C.A. No. 8867, Allen, C. (March 25, 1987).

The Act defines a trade secret as:
information, including a formula, pattern, compilation, program, device, method, technique or process, that:
a. Derives its independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. § 2001(4).

As previously noted, the dispute concerns whether the information McElfresh derived from his employment at Franklin Fibre was a trade secret, *i.e.,* whether "the statutory elements -- commercial utility arising from secrecy and reasonable steps to maintain secrecy -- [have] been shown; ..." *Wilmington Trust Co., supra,* at 8. Because the defendants do not contend otherwise, [FN3] the Court assumes, for the purpose of this motion, that the other statutory elements of the trade secrets claim -- economic value and efforts to maintain secrecy -- have been established. Therefore, the sole question becomes whether that information was readily ascertainable by proper means, *i.e.,* from publicly available information. For the reasons next discussed, I conclude that this issue involves material fact disputes that cannot be resolved without a trial.

FN3. *See* Letter from Brian P. Glancy, Esquire to the Court dated Nov. 21, 1996, at 1.

A. *The Identity of Franklin Fibre's Customers*

Where customers in a particular industry can be easily identified, their identity is less likely to be a trade secret, even if the seller makes efforts to maintain the confidentiality of the information relating to their identity. *Wilmington Trust Co.,* at 19. But where the customers' identities as potential buyers of the defendant's products is not readily ascertainable from publicly available information, their identity may constitute a trade secret within the meaning of the Act. *Id.* at 21.

**\*3** *Town & Country House & Home Service, Inc. v. Newberry,* N.Y. Ct. App., 147 N.E.2d 724 (1958),

Not Reported in A.2d                                                                                      Page 3
Not Reported in A.2d, 1997 WL 153825 (Del.Ch.), 23 Del. J. Corp. L. 199
**(Cite as: Not Reported in A.2d)**

cited in *Wilmington Trust Co., supra,* is instructive. There, trade secret status was accorded a customer list that had been developed through "cold calls" made from the "white pages" of the telephone directory, because the identity of the persons listed as potential purchasers of the plaintiff's product was not readily ascertainable. The defendants argue that this case is unlike *Town & Country House & Home,* because here, potential purchasers of plastics are limited and easily identifiable. By way of contrast, in *Town & Country House & Home,* the potential buyers of domestic services were obtained from the telephone directory through random cold calls. Franklin Fibre argues the contrary, contending that here, as in *Town & Country House & Home,* its customers were not all identifiable from the "pool" of potential buyers listed in industry trade publications.

In this Court's view, that issue involves a fact question. Some of Franklin Fibre's customers chose not to advertise in industry trade publications such as the Thomas Register. Also, other companies, whose individual departments are the only purchasers of products from Franklin Fibre, did not list the locations of those departments in the Thomas Register. (Vachris Aff. ¶¶ 14, 23, 29.) Because the record does not establish that that information was readily ascertainable through other sources, I cannot conclude as a matter of law on this record that all of Franklin Fibre's customers to whom Marvec is alleged to have sold products were identifiable from publicly available sources. Thus, which Franklin Fibre customers were (and were not) readily ascertainable by proper means involves an issue of material fact. *See Wilmington Trust Co., supra,* at 21. Summary judgment must, therefore, be denied as to claims concerning the identity of Franklin Fibre's customers.

#### B. *The Purchasing and Price Information*

The defendants also argue that the information relating to Franklin Fibre's customers' purchasing needs and requirements, and that the prices those customers paid for Franklin Fibre products could be obtained by simply telephoning potential customers. Franklin Fibre responds that it took years for it to learn its customers' specific needs and requirements, and that from this fact, the Court may infer that such information was not readily available. (*See* Vachris Aff. ¶ 11.)

The issue is whether information regarding the purchasing habits of Franklin Fibre's customers was

readily ascertainable from publicly available sources. *See Wilmington Trust Co., supra,* at 8. While trade publications, such as the Thomas Register, did contain the names and locations of many potential customers of both Franklin Fibre and Marvec, those publications did not list what types of plastics the potential customers would be inclined to purchase, or what price they were willing to pay. (Vachris Aff. ¶¶ 11, 12.) Moreover, it may be reasonably inferred from the fact that it took years for Franklin Fibre to acquire this information, that it could not easily be obtained by random "cold calling." A genuine issue of material fact exists as to how readily this information was ascertainable. Summary judgment must, therefore, be denied as to the claims involving the defendants' use of that information.

### IV. ATTORNEY'S FEES

**\*4** 6 Del. C. § 2004 permits the Court to award attorney's fees to the prevailing party if a claim of misappropriation is made in bad faith. Because Marvec and McElfresh are not the prevailing parties on this motion for summary judgment, and because there is no showing of bad faith on the part of Franklin Fibre, the defendants have not established their entitlement to a statutory award of attorney's fees.

### V. CONCLUSION

For the reasons stated above, the Court denies the defendants' motion for summary judgment and their application for attorney's fees. IT IS SO ORDERED.

Del.Ch.,1997.
Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.
Not Reported in A.2d, 1997 WL 153825 (Del.Ch.), 23 Del. J. Corp. L. 199

END OF DOCUMENT

TAB 3

Westlaw.

284 F.Supp.2d 249                                                                                    Page 1
284 F.Supp.2d 249
**(Cite as: 284 F.Supp.2d 249)**

H

Hudson United Bank v. Progressive Casualty Ins. Co.
E.D.Pa.,2003.

United States District Court,E.D. Pennsylvania.
HUDSON UNITED BANK,
v.
PROGRESSIVE CASUALTY INSURANCE COM-
PANY.
**No. 00-CV-4135.**

Sept. 29, 2003.

Insured bank sued fidelity insurer seeking indemni-
fication for losses sustained in automobile insurance
premium finance (IPF) business. The District Court,
152 F.Supp.2d 751,Yohn, J., denied insurer's motion
to dismiss, and subsequently denied motion for sum-
mary judgment. Following presentation of insured's
case in chief, insurer moved for judgment as matter
of law. The District Court, Rufe, J., held that lack of
showing of fraud rendered loan loss exclusion applic-
able.

Motion granted.
West Headnotes
**[1] Federal Civil Procedure 170A ⟊2127**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from
Jury
            170AXV(F)1 In General
                170Ak2126 Determination
                    170Ak2127 k. Construction of Evid-
ence. Most Cited Cases
On pre-verdict motion for judgment as matter of law,
district court views all of evidence, and all reasonable
inferences drawn therefrom, in light most favorable
to nonmovant. Fed.Rules Civ.Proc.Rule 50(a), 28
U.S.C.A.

**[2] Insurance 217 ⟊2405**

217 Insurance
    217XVIII Coverage--Fidelity and Guaranty Insur-
ance

        217k2404 Risks Covered and Exclusions
            217k2405 k. In General. Most Cited Cases
Under Pennsylvania law, lack of showing of fraud
rendered applicable loan loss exclusion of bank's fi-
delity bond insuring agreement, precluding indemni-
fication for losses sustained in automobile insurance
premium finance (IPF) business arising from in-
sured's profit-sharing partner's failure to timely track
or report loan defaults and failure to close out ac-
counts on timely basis; agreement expressly required
showing of collusion between partner and another
party to IPF transaction, as well as evidence of finan-
cial gain of at least $2,500, neither of which was
shown, compelling conclusion that losses in question
were typical losses from nonpayment of loans.

**\*249** Anthony J. Costantini,Duane, Morris and
Heckscher, LLP, New York, NY, **\*250** Gregory B.
Lare,James H. Steigerwald, Matthew A. Taylor,
Wayne J. Martorelli, Duane Morris LLP, Phil-
adelphia, PA, for Hudson United Bank.

Melvin R. Shuster, Harry R. Blackburn & Associates,
Philadelphia, PA, for Progressive Casualty Insurance
Company.

***MEMORANDUM OPINION AND ORDER***
RUFE, District Judge.
The Court hereby submits the following Memor-
andum Opinion and Order in support of its July 28,
2003 ruling which granted Defendant Progressive
Casualty Insurance Company's Motion for Judgment
as a Matter of Law pursuant to Fed.R.Civ.P.
50(a).FN1

> FN1. In *Sowell v. Butcher & Singer, Inc.,*
> 926 F.2d 289, 295 (3d Cir.1991), the Third
> Circuit Court of Appeals established a su-
> pervisory rule requiring district courts that
> enter directed verdicts pursuant to Rule 50
> to provide the appellate court with explana-
> tions of the legal premises of their rulings.
> This Memorandum Opinion is submitted in
> accordance with *Sowell.*

**RELEVANT FACTUAL AND PROCEDURAL
HISTORY**

In July of 1994, Regent National Bank, predecessor to Hudson United Bank (hereinafter collectively refered to as "Regent" or "Plaintiff"), entered into a profit-sharing arrangement with K-C Insurance Premium Finance Company (hereinafter "K-C"). Under the terms of the agreement, K-C was to operate and market an automobile Insurance Premium Finance ("IPF") business that would loan funds for insurance premiums to high risk automobile drivers. K-C was responsible for administering the program, and Plaintiff supplied the funding. The unused portions of the premiums were to serve as Plaintiff's collateral. Under the terms of the agreement, K-C charged a transaction-based servicing fee and was entitled to 50 percent of all net profits.

The program proved to be unprofitable. K-C's computer system generated incomplete and inaccurate data, which it then supplied to Plaintiff. For example, K-C failed to timely track or report loan defaults, thereby preventing Plaintiff from timely cancelling defaulted policies and recovering unused portions of the paid premiums. Additionally, K-C's data was inaccurate in that the computer program failed to close out accounts on a timely basis, resulting in overpayment to K-C under the profit-sharing agreement. Consequently, in October of 1997 Plaintiff submitted a proof of loss statement to Defendant seeking coverage for losses from the IPF business under the fidelity bond insuring agreement. Following substantial discussion between the parties, coverage was denied.

On August 15, 2000, Plaintiff commenced this action against Defendant in the United States District Court for the Eastern District of Pennsylvania. Counts I and II of the Amended Complaint advance breach of contract claims under the Computer System Rider and Fidelity Bond, respectively. Count III pleads a bad faith claim pursuant to 42 Pa. Cons.Stat. § 8371.

Plaintiff argues that its evidence shows that Antimo Cesaro, the person who ran K-C operations but had no ownership interest therein, intentionally defrauded Regent when K-C failed to properly report defaults. Plaintiff presented the testimony of Alvin M. Chanin, the owner of K-C. Chanin testified that he formed K-C in 1994 and that Cesaro was hired to run the operations because he had successfully headed up the oper-

ations of Universal Premium Finance Company ("UPFC"), another **251** premium finance company. N.T. 7/22/03 at 13. The computer software program used by K-C was similar to the program used at UPFC so there were expectations that it would work properly. N.T. 7/22/03 at 26. There was no indication that the program had not been fully tested. N.T. 7/22/03 at 26.

Chanin testified that he was subsequently advised of K-C's deficient practice of mailing cancellation notices as well as its computer programming omission that required K-C to manually enter charge offs instead of automatically tracking them through the computer system. After financial losses associated with these deficiencies became apparent to Regent, both internal and external audits were conducted. The auditors noted deficiencies in internal controls, and suggested improvements to the system. Plaintiff and K-C collaborated to make both the suggested improvements and the program work. N.T. 7/22/03 at 92. K-C committed to Plaintiff that it would enhance the computer system to provide for a charge-off journal before the end of 1995,FN2 as well as would address certain staffing issues. In light of the increased risk of the operations revealed by the audits, the auditors recommended that Regent substantially increase its reserves on the venture. As a result, Regent required Chanin, Cesaro and their wives to sign promissory notes in the total amount of $1,800,000.00 as security for the IPF business. The losses, however, continued, and in September of 1996 Regent closed down the business.

> FN2. While the computer enhancement never occurred, there was testimony that it was the intent of K-C to do so at the time. N.T. 7/22/03 at 93.

At trial, Plaintiff presented evidence that K-C failed to properly account for delinquencies and failed to advise Regent what portions of receivables were uncollectible, an act that if properly docketed would allow insurance premiums to pay for loan losses. From the inception of the IPF business, the particular computer program utilized by K-C was never capable of processing all of the necessary information regarding income, profits and other calculations. It is also clear

that Chanin, Cesaro, other K-C employees, as well as Regent bank personnel, failed to adequately address these problems. While incomplete and even inflated results of the IFP business may have been reported to Regent, there was no evidence that Chanin, Cesaro or any K-C employee committed any act in a dishonest or fraudulent manner.

At the conclusion of Plaintiff's case in chief, Defendant moved for judgment as a matter of law on numerous grounds, including that Plaintiff's claims were barred by the loan loss exclusion contained in Section 2(e) of the Fidelity Bond Insuring Agreement.[FN3] After the parties submitted briefs and presented oral argument, the Court granted Defendant's Motion on the basis that coverage was excluded by the "loan loss" provision in Section 2(e) and that Plaintiff had not established, as required by the bond in order to circumvent the loan loss exclusion, that both collusion and financial benefit in excess of $2,500.00 had occurred. Accordingly, the Court granted judgment in favor of Defendant and against Plaintiff on Counts I and II.[FN4] *252 At that time the Court also ruled that Plaintiff had failed to present sufficient evidence in support of its bad faith claim pleaded in Count III, which was dependent upon the breach of contract claims. The Court announced its ruling in open court on July 28, 2003 but noted that it would file a written opinion after the proceedings were transcribed. Upon Plaintiff's request, the Court granted Plaintiff an extension of 30 days from the filing of the memorandum opinion to perfect an appeal. However, because judgment is formally being entered at this time only, that extension proved unnecessary.

> FN3. In addition to raising the Section 2(e) loan loss exclusion, Defendant also asserted that it was entitled to judgment because Plaintiff admitted that it presented no evidence of collusion or justifiable reliance.

> FN4. On September 30, 2002, the Court denied Defendant's Motion for Summary Judgment on the ground that material facts were in dispute. Although Defendant's Motion for Summary Judgment raised many of the same issues that were subsequently raised in the Rule 50(a) Motion, those issues

were considered in a different factual context. The Court refused to summarily decide those issues in order to afford Plaintiff the opportunity to circumstantially prove that fraud was present. After conclusion of Plaintiff's case in chief, however, it became apparent that on the trial record no reasonable jury could find for Plaintiff since the damages incurred by Regent were nothing more than typical loan losses due to mismanagement by both K-C and Regent. The purported fraud was utterly lacking. The law of the case doctrine does not limit the power of a trial judge to revisit issues addressed in interlocutory orders. See Comm. Workers of Am. v. Ector County Hosp. Dist., 241 F.Supp.2d 617, 623-24 (W.D.Tex.2002).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 50 provides, in relevant part, as follows:
If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1).

[1] In considering a motion under Rule 50(a), a district court is required to view all of the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993). The motion should be granted only "if there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.1996).

## DISCUSSION

A financial institution bond is essentially an insurance policy that indemnifies a bank for losses caused

by dishonest acts. It is not intended to guarantee against bad business operations or judgment or, as in this case, against bad loans made by the insured. Therefore, coverage for loan losses is limited to instances where there is evidence of collusion *and* financial benefit of at least $2,500.00 to an employee. *See* Insuring Agreement (A). Exclusion 2(e) of the Fidelity Bond precludes coverage for any:
*loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender* or a borrower, or extension of credit, including the purchase, discounting or another acquisition of false or genuine accounts, invoices, notes, agreements, or Evidence of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, *except when covered under Insuring Agreement (A), (D) or (E).*

Financial Institution Bond at § 2(e). (Emphasis added.)

Insuring Agreement (A) [FN5] provides indemnification*253 for:

> [FN5.] Insuring Agreements (D) and (E) relate to forgery and securities, respectively, and accordingly are irrelevant to any facts or issues in the case at bar. It is therefore necessary for the Court to examine Insuring Agreement (A) only.

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee with the manifest intent:
(a) to cause the Insured to sustain such loss; and
(b) to obtain financial benefit for the Employee or another person or entity.
However, *if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.*

(Emphasis added). As used in the Insuring Agreement, *financial benefit* "does not include any employee benefits earned in the normal course of employ-

ment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions." *Id.*

In support of its [Rule 50(a)] Motion, Defendant maintained that the exclusion in Section 2(e) and the controlling Fidelity Bond language with respect to coverage barred Plaintiff's right to recover under both the Computer Systems Rider and the Fidelity Insuring Agreement.

The parties do not appear to dispute that Pennsylvania law applies to the instant action. It is well settled that a federal court sitting in diversity must apply the substantive law of the forum state. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This Court's decisions, therefore, are controlled by Pennsylvania law, namely applicable decisions of the Pennsylvania Supreme Court. *McKenna v. Pacific Rail Serv.,* 32 F.3d 820, 825 (3d Cir.1994). In the absence of guidance from the state supreme court, district courts are to look to the decisions of the state's intermediate appellate courts. *Id.* (citing *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 113 (3d Cir.1992)). The only Pennsylvania appellate court to have addressed the application of the "loan loss" exclusion in a fidelity bond is *First Philson Bank, N.A. v. Hartford Fire Insurance Co.,* 727 A.2d 584 (Pa.Super.1999), *appeal denied,* 561 Pa. 658, 747 A.2d 901 (1999). [FN6]

> [FN6.] In a diversity case, the law of the forum presumptively applies. Regent's principal address was in Philadelphia, Pennsylvania. *See* Exhibit P-69. In an insurance dispute based upon diversity where the insured is from Pennsylvania, a district court applies the laws of the state where the insurance policy was contracted, which is where it was delivered. *Frog, Switch & Mfg. Co., Inc v. Traveler's Ins. Co.,* 193 F.3d 742, 746 (3d Cir.1999). If proof as to place of delivery is lacking, there is a presumption that delivery took place at the insured's residence. *See Carosella & Ferry, P.C. v. TIG Ins. Co.,* 189 F.Supp.2d 249, 252 (E.D.Pa.2001); *Fed. Kemper Ins. Co. v. Ward,* 679 F.Supp. 489, 491 (E.D.Pa.1988),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*aff'd*, [860 F.2d 1074 (3d Cir.1988)](#).

[2] In *First Philson Bank,* the insured bank brought an action against its fidelity insurer seeking to recover for losses incurred as the result of an employee's alleged fraudulent activities in connection with a "floor plan" financing system set up between a bank employee and an automobile dealer. The plan involved a complex system of drawing checks on a zero balance account at the insured bank, and thereafter depositing those drafts into the business account of the car dealership at another bank in order to pay for the car dealership's purchase of non-existent cars. [727 A.2d at 585-86](#). A copy of the draft was also forwarded to the insured, which would then place the necessary funds into the car dealership's zero balance account and the vehicle would be assigned to the **\*254** car dealership's floor plan. The car dealership would then issue drafts on its other account to the insured bank to pay off the fictitious floor planned vehicles. This payment was not derived from the sale of vehicles but rather from the funds transferred from the car dealership's zero balance account to its other account. *Id.*

Affirming summary judgment for the insurer, the Pennsylvania Superior Court found that the scheme was actually a series of fraudulent loans, but also ruled that the exclusionary clause under the fidelity bond applied since the resultant losses would not be recoverable absent proof of collusion between a bank employee and a third party, and proof that the employee received at least a $2,500.00 benefit. The *First Philson Bank* court found the loan loss exclusion to apply, even though the bank had a relationship with the car dealership and had deposited funds into the account under false pretenses.

In opposition to Defendant's [Rule 50](#) Motion, Plaintiff asserted authority in an unpublished Fourth Circuit Court of Appeals opinion regarding the applicability of a loan loss exclusion and specifically that it is a question of fact to be decided by a jury. *See [First Savings Bank, FSB v. American Casualty Co. of Reading, Pennsylvania,](#)* No. 92-1320, 1993 WL 27403, 1993 U.S.App. LEXIS 2049 (4th Cir.1993). In *First Savings Bank,* a lender made second mortgage loans and then sold the mortgages

to savings and loans and other large investors by making misrepresentations in a *Ponzi* scheme. *Id.* at *1. The district court let the issue of a loan loss exclusion go to the jury, and the jury ultimately concluded that the exclusion applied. *Id.* at *3-4. The savings and loan appealed. On appeal, the Fourth Circuit noted that while it would not have been persuaded by the insurance company's argument that the exclusion applied, it saw no error in submitting the issue to the jury. *Id.* at *5-6.

Plaintiff also relied upon *[Peoples State Bank v. American Casualty Co. of Reading,](#)* 818 F.Supp. 1073 (E.D.Mich.1993). In that case, the United States District Court for the Eastern District of Michigan ruled as a matter of law that the loan loss exclusion did not apply to instances where the vice-president of installment loans filled out false loan applications and forged the signatures of unsuspecting persons by signing promissory notes. Over the course of five years, the vice-president created approximately 623 false loan accounts and embezzled more than $5,000,000.00. *Id.* at 1075. In ruling upon summary judgment motions, the district court held as a matter of law that the fraudulent transactions did not constitute "loans" under the loan loss exclusion because the loans were not made at the request of customers.

Unlike the transactions in *Peoples State Bank,* the loan premium financing transactions in the case at bar were, at their core, loans. Whatever losses Regent may have sustained, those losses obviously resulted directly, or at least indirectly, from loans made by Regent under the IPF program. The so-called "collateral deterioration" resulted from the failure to recover unearned premiums on defaulted policies on a timely basis, the security that Regent relied on in the IPF loan program.[FN7] Moreover, while it is true that the court in *First Savings Bank* submitted the loan **\*255** loss exclusion issue to the jury, that case involved a series of fraudulent transactions. The lack of fraud in the case bar distinguishes it from *First Savings Bank.*

FN7. Defendant also relied upon *[Liberty Savings Bank, FSB v. American Casualty,](#)* 754 F.Supp. 559 (S.D.Ohio 1990) in support of its position that the loan loss exclusion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applies. There the court held that, while there was fraud involved in the particular banking transactions at issue, that fraud did not take the bank's loss outside of the loan loss exclusion clause.

Upon considering all of the evidence adduced at trial, and drawing all reasonable inferences in favor of Plaintiff, any reasonable trier of fact would have been compelled to find that Plaintiff failed to establish that the losses in question were anything other than typical losses resulting from the non-payment of loans.FN8 Moreover, the record is devoid of any evidence that any Regent or K-C employee obtained any financial benefit (other than remuneration for services rendered in conjunction with employment) or that any K-C personnel acted in collusion with one or more parties to the IPF transactions. Because Plaintiff sought damages stemming from the defaults in delinquent accounts in the IPF program and failed to present evidence showing either financial benefit or collusion, Plaintiff failed to establish a *prima facie* case under any of its theories of recovery upon which the case was tried. Accordingly, this Court was constrained to enter judgment in Defendant's favor.FN9

> FN8. Under the terms of the Bond, the term "loan" is defined as "all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by with the Insured assumes an existing creditor relationship." *See* Section 1(m) Definitions.

> FN9. While the Honorable William H. Yohn previously considered the loan loss exclusion, he considered the Defendant's argument in the context of a motion to dismiss, and assumed for purposes of deciding that motion that Plaintiff could prove that K-C fraudulently concealed data. In a Memorandum, dated May 22, 2001, Judge Yohn wrote:
>
> Here the complaint, when read in the light most favorable to Hudson, shows that Hudson is not claiming that the defaults caused Regent's losses. Rather, Hudson alleges that because K-C concealed data, Regent could

not timely cancel defaulters' insurance policies, seek refunds on the unused portions of the premiums, and consequently suffered losses. Hence, but for the concealment, Regent would not have suffered losses, and accordingly the concealment, not the default itself, caused the loss. The exclusion, therefore, does not warrant dismissal in view of Hudson's allegations.
> *Hudson United Bank v. Progressive Cas. Ins. Co.,* 152 F.Supp.2d 751, 754 (2001).

## CONCLUSION

The case was removed from the jury's consideration because the evidence, when drawn in the light most favorable to Plaintiff, failed to establish that it had sustained losses "resulting directly" from dishonest or fraudulent conduct by an employee. Instead, the evidence adduced at trial showed clearly and unequivocally that the losses in question resulted "directly or indirectly" from the non-payment of loans. Because there was no factual issue for the jury to determine and inferences pointed so strongly and overwhelmingly in favor of Defendant, the Court granted the Rule 50(a) Motion for Judgment as a Matter of Law.

An appropriate Order follows.

AND NOW, this ---- day of September, 2003, upon consideration of Defendant Progressive Casualty Insurance Company's Motion for Judgment as a Matter of Law, and Plaintiff Hudson United Bank's response thereto, after briefing by the parties and oral argument thereon, it is ORDERED that the Motion is GRANTED. Judgment is hereby entered in favor of Defendant Progressive Casualty Insurance Company and against Plaintiff Hudson United Bank on Counts I, II, and III.

The Clerk is directed to close this case for statistical purposes.

E.D.Pa.,2003.
Hudson United Bank v. Progressive Casualty Ins. Co.
284 F.Supp.2d 249

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

115 Fed.Appx. 556                                                                                                    Page 1
115 Fed.Appx. 556, 2004 WL 2361461 (C.A.3 (Pa.))
**(Cite as: 115 Fed.Appx. 556)**

**C**

Martin v. Port Authority Transit of Allegheny County
C.A.3 (Pa.),2004.
This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
Bobby MARTIN, Appellant,

v.

PORT AUTHORITY TRANSIT OF ALLEGHENY COUNTY.
No. 03-3252.

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 13, 2004.
Decided Oct. 21, 2004.

**Background:** African-American former employee sued his former employer under Title VII, charging racial discrimination. The United States District Court for the Western District of Pennsylvania, Ila Jeanne Sensenich, United States Magistrate Judge, entered judgment for the employer, and the employee appealed.

**Holdings:** The Court of Appeals, Mckee, Circuit Judge, held that:

(1) refusal to admit evidence of statement by father of employee's supervisor was not an abuse of discretion;

(2) conclusion that poster depicting an African-American female slave was not probative of racial bias was not an abuse of discretion; and

(3) law of the case doctrine was inapplicable to magistrate judge's pre-trial evidentiary ruling.

Affirmed.
West Headnotes
**[1] Civil Rights 78 ⚖══1542**

78 Civil Rights

78IV Remedies Under Federal Employment Discrimination Statutes

78k1542 k. Admissibility of Evidence; Statistical Evidence. Most Cited Cases
Refusal to admit evidence that former employee's supervisor had related a statement by her father regarding her move from the south, that he had "been waiting 79 years to get even with the damn Yankees and this ought to just about do it," was not an abuse of discretion in a Title VII race discrimination suit, despite claim that the comment was relevant because it tended to demonstrate that the supervisor condoned her father's notion that the South should have been permitted to keep slaves without interference from the North; the statement did not contain any reference to slaves, nor did it contain any disparaging references to African-Americans, and moreover, the statement was not probative of the supervisor's own views. Civil Rights Act of 1964, 42 U.S.C.A. §2000e et seq.; Fed.Rules Evid.Rules 401, 402, 28 U.S.C.A.

**[2] Civil Rights 78 ⚖══1542**

78 Civil Rights

78IV Remedies Under Federal Employment Discrimination Statutes

78k1542 k. Admissibility of Evidence; Statistical Evidence. Most Cited Cases
Conclusion that poster depicting an African-American female slave, standing erect, with scars on her back, and the fact that employee's supervisor had hung the poster in her office, were not probative of racial bias so as to warrant admission as evidence in the employee's Title VII suit was not an abuse of discretion; there was nothing in the record to suggest that the supervisor condoned the physical abuse of African-Americans, or that the poster suggested that she did. Civil Rights Act of 1964, 42 U.S.C.A. §2000e et seq.; Fed.Rules Evid.Rules 401, 402, 28 U.S.C.A.

**[3] Courts 106 ⚖══99(1)**

106 Courts

106II Establishment, Organization, and Procedure

106II(G) Rules of Decision

115 Fed.Appx. 556                                                                 Page 2
115 Fed.Appx. 556, 2004 WL 2361461 (C.A.3 (Pa.))
**(Cite as: 115 Fed.Appx. 556)**

106k99 Previous Decisions in Same Case as Law of the Case

      106k99(1) k. In General. Most Cited Cases

Law of the case doctrine was inapplicable to magistrate judge's pre-trial evidentiary ruling.

Appeal from the United States District Court for the Western District of Pennsylvania. (No. 00-cv-02440). District Court: Hon. Ila Jeanne Sensenich, Magistrate.

Joshua M. Bloom, Koerner, Colarusso & Bloom, Pittsburgh, PA, for Appellant.

Louis C. Long, Marie M. Jones, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, for Appellee.

Before NYGAARD, McKEE, and CHERTOFF, Circuit Judges.

OPINION

MCKEE, Circuit Judge.

**\*1** Bobby Martin, an African-American male who was terminated from his employment with the Port Authority Transit of Allegheny County, appeals from the jury's verdict in favor of his employer in the action he brought under Title VII charging racial discrimination. He argues the magistrate judge erred in excluding evidence of a poster his supervisor had in her office as well as statements that supervisor made which purportedly established her racial bias. For the reasons discussed below, we will affirm.

I

Since we write only for the parties, it is not necessary to recite the facts of this case except insofar as may be helpful to our brief discussion.

Martin first argues that the court erred in excluding certain statements of Deborah Cooper. Cooper, a white female, became Martin's supervisor after moving to Pittsburgh from Orlando, Florida, to work for the Port Authority. On several occasions, Cooper made comments about her move from the South, stating: "I told my father that I was moving to Pittsburgh, and my father said, 'I have been waiting 79 years to get even with the damn Yankees and this ought to just about do it' " (hereafter referred to as the "Yankee comment").

Martin's second evidentiary challenge addresses a poster in Cooper's office. After she began working at the Port Authority, Cooper hung a poster that featured a photograph of a sculpture titled, "Defiance." It depicted an African-American female slave, standing erect, with scars on her back. Cooper had purchased the artwork at an Urban League function in Orlando. After displaying the poster, Cooper discovered several hundred copies of an anonymous letter in the stairwell of her office building. The letters made reference to the poster and described Cooper as "a racist." Cooper's supervisor initially met with her to request that she take the poster down. However, after discussing the matter with Cooper, he changed his mind and told her that she did not need to remove it. Ultimately, Cooper did take the poster down on her own.

Martin had a history of tardiness and attendance problems. He had received poor job evaluations that included a written reprimand. Martin's supervisors met with him prior to his termination to discuss his job performance, but he was eventually dismissed after an incident on March 2, 1999. Martin thereafter brought this action in the Western District of Pennsylvania, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* The Port Authority thereafter filed a motion for summary judgment which was denied by the magistrate judge. The magistrate judge based her decision on the two pieces **\*558** of evidence that form the crux of Martin's appeal: the poster and the Yankee comment.

In denying the motion for summary judgment, the magistrate judge commented that both pieces of evidence were ambiguous but could suggest Cooper was biased against African-Americans. However, prior to trial, the Port Authority filed a motion *in limine* to exclude evidence of the poster and the Yankee comment. The magistrate judge initially granted the motion with respect to the comment, but ruled that evidence of the poster was admissible. On the first day of trial, the judge reversed herself and ruled that the

poster was also inadmissible. After a two day trial, the jury returned a verdict in favor of the Port Authority, and Martin filed this appeal.

II

A. Evidentiary Rulings

**\*\*2** Unless otherwise precluded, "[a]ll relevant evidence is admissible." Fed.R.Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Conversely, irrelevant evidence is not admissible. Fed.R.Evid. 402. We review evidentiary rulings for abuse of discretion. *Glass v. Phila. Elec. Co.,* 34 F.3d 188, 191 (3d Cir.1994).

[1] Martin argues that the magistrate judge abused her discretion when she determined that the "Yankee" comment was not probative of racial discrimination. Martin cites *Robinson v. Runyon,* 149 F.3d 507 (6th Cir.1998), for the proposition that evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to establishing racial animus in a discriminatory-termination case. Appellant's Br. at 24-5. In *Robinson,* a Postal Service employee, who alleged that she was treated differently because of her race and that the Postal Service condoned a racially hostile atmosphere, sought to introduce evidence of a fake employment application containing crude racial stereotypes that had repeatedly circulated throughout her office. *Robinson,* 149 F.3d. Appellant's Br. at 511. The district court excluded the evidence. *Id.* On appeal, the Court of Appeals for the Sixth Circuit reversed because the racist employment application, which circulated to employees without condemnation or rebuke, made the existence of racially motivated actions by the employee's supervisors more probable. *Id.* at 512.

*Robinson* is clearly distinguishable from this case. *Robinson* involved a claim of a hostile work environment. Martin raises no such claim. In addition, unlike the fake postal service application at issue there, Cooper's Yankee comment did not contain any derogatory racial epithets; in fact, Cooper did not even

mention race. We realize that one could arguably infer racial animus from the sectional antagonism arguably evidenced by the remark. However, that would suggest something about Cooper's father, not Cooper.

Martin also cites our decision in *Abrams v. Lightolier Inc.,* 50 F.3d 1204 (3d Cir.1995), to support his assertion that the magistrate judge abused her discretion when she precluded evidence of Cooper's Yankee comment. In *Abrams,* an employee claimed that he was terminated based on his age. In assessing his claim, the district court had permitted evidence of two instances in which a supervisor had referred to older plant employees as "old fogies" and "dinosaurs." *Id.* On appeal, we held that the age-related comments were probative of the supervisor's attitude toward older workers. *Id.* at 1214-15. **\*559** However, Cooper was simply repeating a rather oblique comment of her father. The comments made by the supervisor in *Abrams* were related directly to age, and the supervisor had been accused of harboring a discriminatory attitude towards older workers.

**\*\*3** Martin also suggests that the Yankee comment is relevant because it tends to demonstrate that Cooper condoned her father's notion that the South should have been permitted to keep slaves without interference from the North. However, Cooper's comment is far more ambiguous than Martin admits. It does not contain any reference to slaves, nor does it contain any disparaging references to African-Americans. Moreover, as we have just noted, the statement is not probative of Cooper's own views. Therefore, the magistrate judge did not abuse her discretion in refusing to admit evidence of the Yankee comment.

[2] The Port Authority also argued that the poster was not probative of any racial discrimination on the part of Cooper. As noted above, initially, the magistrate judge denied the motion *in limine* stating that while the effect of the artwork was ambiguous, Cooper's objections to removing the poster after being advised that the poster was offensive to African-Americans could suggest insensitivity to the feelings of African-Americans under her supervision and could therefore constitute evidence of bias toward African-Americans. However, after reviewing Cooper's deposition testimony, the magistrate judge rescinded her order

115 Fed.Appx. 556, 2004 WL 2361461 (C.A.3 (Pa.))

**(Cite as: 115 Fed.Appx. 556)**

and decided to grant the Port Authority's motion *in limine* because evidence of the poster is not probative of racial discrimination.

Martin asserts that the poster demonstrates Cooper's lack of sensitivity to the feelings of African-Americans, and could also establish that Cooper condoned the physical abuse of African-Americans. Martin also argues that the poster is relevant because Cooper did not take it down after she read the anonymous complaint describing her as a racist and because she did not acquiesce to her supervisor's initial request to remove it. However, the sculptor whose work is depicted in the poster explained that it portrays "a beautiful young woman trying desperately to hold on to her dignity.... She stands erect, not bowed. The expression on her face is resolve ... the scars on her back testify to her spirit." App. 87. The artist describes the work as an expression of anger at the institution of slavery, and that is consistent with the fact that Cooper purchased it from the Urban League. We realize that "beauty resides in the eyes of the beholder." Moreover, Aesop reminds us that "one man's meat is another man's poison." Therefore, we recognize that not everyone will view the poster in the same way or attach the same significance to it that the sculptor did. That does not, however, mean that it reflects Cooper's insensitivity or racism. The magistrate judge properly exercised her discretion in heading off a debate about a work of art that doesn't appear very probative of the point Martin seeks to wrench from it. There is nothing in the record to suggest that Cooper condoned the physical abuse of African-Americans, or that the poster suggests that she does.

Martin's attempt to use Cooper's meeting with her supervisor to paint the poster and Cooper as racist is also unavailing. At the outset of that meeting, Cooper's supervisor did request that Cooper remove the poster because of the anonymous letter that had surfaced in the office in response to it, and Cooper stated that she would not take it down. However, during that conversation the supervisor changed his mind, and ultimately agreed that Cooper would **\*560** not have to remove the poster. Thus, Cooper was not acting in defiance of her supervisors in allowing the poster to remain. The magistrate judge concluded that

neither the poster nor the fact that Cooper had hung it in her office was probative of racial bias. Based on this record, that was not an abuse of discretion.

### C. The "Law of the Case" doctrine

**\*\*4** [3] Finally, Martin contends that the magistrate judge erred because she failed to follow the "law of the case" doctrine. The "law of the case" doctrine has developed to maintain consistency and avoid reconsideration of matters once decided during the course of a lawsuit. *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d. Cir.1997). The doctrine is intended to promote finality and judicial economy. *Id.*

Martin argues that when the magistrate judge denied a defense motion for summary judgment, she stated that the evidence of the poster and the Yankee comment, while ambiguous, could be considered by a jury as evidence that Cooper had a discriminatory reason for firing Martin. Martin contends that when the magistrate judge subsequently granted the Port Authority's motion *in limine,* she therefore violated the law of the case doctrine.

Martin's reliance on the law of the case doctrine is not only misplaced, it approaches frivolity. The doctrine does not preclude all reconsideration of an issue, nor prevent a trial court from reconsidering the relevance or admissibility of evidence as a law suit proceeds or a trial unfolds. *Tang v. State of R.I., Dep't. of Elderly Affairs,* 163 F.3d 7, 11 (1st Cir.1998). Interlocutory orders remain open to reconsideration and do not constitute the law of the case. *Perez-Ruiz v. Crespo-Guillen,* 25 F.3d 40, 42 (1st Cir.1994). The pre-trial rulings of a trial court may be reconsidered not only during pre-trial proceedings, but even after trial. 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.1 (2d ed.2002). Thus, the law of the case doctrine is inapplicable to the magistrate judge's pre-trial evidentiary ruling.

### III

For the reasons stated above, we will affirm the district court.

115 Fed.Appx. 556, 2004 WL 2361461 (C.A.3 (Pa.))
**(Cite as: 115 Fed.Appx. 556)**

C.A.3 (Pa.),2004.
Martin v. Port Authority Transit of Allegheny County
115 Fed.Appx. 556, 2004 WL 2361461 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

868 F.2d 1226                                       Page 1
868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

▷

Richardson v. Suzuki Motor Co., Ltd.
C.A.Fed. (Cal.),1989.

United States Court of Appeals,Federal Circuit.
Donald G. RICHARDSON, Plaintiff/Appellant,
v.
SUZUKI MOTOR CO., LTD. and U.S. Suzuki Motor Corporation, Defendants/Cross-Appellants,
Kawasaki Heavy Indust. Ltd., Kawasaki Motors
Corp., Yamaha Motor Co., Ltd., Yamaha Motor
Corp., U.S.A., Kayaba Industry Co., Ltd. and Kayaba
Industry Co., Defendants.
**Nos. 87-1497, 87-1498, 87-1502, 88-1083 and
88-1084.**

Feb. 16, 1989.
Rehearing Denied March 29, 1989.
Suggestion for Rehearing In Banc Declined May 4,
1989.

Appeals were taken from order of the United States District Court for the Central District of California, William P. Gray, J., entered following jury verdict in action for patent infringement, breach of contract, fraud, and misappropriation of trade secrets. The Court of Appeals, Pauline Newman, Circuit Judge, held that: (1) evidence sustained finding of validity; (2) evidence sustained finding of infringement; (3) evidence sustained finding of fraud; (4) evidence sustained finding of misappropriation of trade secrets; but (5) court's instruction on damages was improper.

Affirmed in part, reversed in part, vacated in part, and remanded.
West Headnotes
**[1] Patents 291 ☞314(5)**

291 Patents
    291XII Infringement
       291XII(C) Suits in Equity
          291k314 Hearing
             291k314(5) k. Questions of Law or Fact.
Most Cited Cases
Jury may decide the questions of anticipation and obviousness, either as separate special verdicts or en

route to a verdict on the question of validity, which may also be decided by the jury. 35 U.S.C.A. §§ 102, 103.

**[2] Federal Courts 170B ☞846**

170B Federal Courts
    170BVIII Courts of Appeals
       170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)5 Questions of Fact, Verdicts
and Findings
             170Bk846 k. Substantial Evidence. Most
Cited Cases

**Federal Courts 170B ☞847**

170B Federal Courts
    170BVIII Courts of Appeals
       170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)5 Questions of Fact, Verdicts
and Findings
             170Bk847 k. Verdicts in General. Most
Cited Cases
When judgment arises from jury verdict, reviewing court applies the reasonable jury and substantial evidence standard, a standard which gives greater deference to the judgment simply because appellate review is more limited, compared with review of the trial judge's decision.

**[3] Patents 291 ☞72(1)**

291 Patents
    291II Patentability
       291II(D) Anticipation
          291k72 Identity of Invention
             291k72(1) k. In General. Most Cited
Cases
Invention is anticipated if the same device, including all the claim limitations, is shown in a single prior art reference; every element of the claimed invention must be literally present, arranged as in the claim. 35 U.S.C.A. § 102.

**[4] Patents 291 ☞72(1)**

291 Patents

868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

291II Patentability
  291II(D) Anticipation
    291k72 Identity of Invention
      291k72(1) k. In General. Most Cited
Cases
In order for there to be anticipation, the identical invention must be shown in as complete detail as is contained in the patent claim. 35 U.S.C.A. § 102.

**[5]** Patents 291 &#8578;72(1)

291 Patents
  291II Patentability
    291II(D) Anticipation
      291k72 Identity of Invention
        291k72(1) k. In General. Most Cited
Cases
It was error to instruct the jury that anticipation can be shown by equivalents, a legal theory that is pertinent to obviousness, not to anticipation. 35 U.S.C.A. §§ 102, 103.

**[6]** Patents 291 &#8578;312(6)

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k312 Evidence
        291k312(3) Weight and Sufficiency
          291k312(6) k. Particular Matters, Sufficiency as To. Most Cited Cases
Evidence sustained finding that patent covering rear wheel suspension system for motorcycle to smooth the ride over rough terrain was not invalid for anticipation. 35 U.S.C.A. § 102.

**[7]** Patents 291 &#8578;324.55(3.1)

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k324 Appeal
        291k324.55 Questions of Fact, Verdicts, and Findings
          291k324.55(3) Issues of Validity
            291k324.55(3.1) k. In General.
Most Cited Cases
    (Formerly 291k324.55(3))
Review of jury determination as to whether chal-

lenger has proven invalidity by clear and convincing evidence is whether reasonable jurors could have concluded that the challenger failed to meet the burden.

**[8]** Patents 291 &#8578;36(3)

291 Patents
  291II Patentability
    291II(A) Invention; Obviousness
      291k36 Weight and Sufficiency
        291k36(3) k. Particular Methods, Devices, or Products. Most Cited Cases
Evidence sustained jury finding that patent on rear wheel suspension for motorcycles intended for off-road use was not invalid for obviousness. 35 U.S.C.A. § 103.

**[9]** Patents 291 &#8578;324.56

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k324 Appeal
        291k324.56 k. Harmless Error. Most Cited Cases
Although district court erred in its belief that obviousness could only be presented to the jury for an advisory verdict, reviewing court could view the trial court's agreement with the jury verdict of validity as supporting the court's denial of posttrial motions for judgment n.o.v. and for new trial on the issue of obviousness.

**[10]** Patents 291 &#8578;312(6)

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k312 Evidence
        291k312(3) Weight and Sufficiency
          291k312(6) k. Particular Matters, Sufficiency as To. Most Cited Cases
Patent holder bore the burden of proving infringement by preponderance of the evidence.

**[11]** Patents 291 &#8578;314(5)

291 Patents

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291XII Infringement
  291XII(C) Suits in Equity
    291k314 Hearing
      291k314(5) k. Questions of Law or Fact.
Most Cited Cases
Jury was the finder of fact of infringement.

**[12] Patents 291 ⬥314(6)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k314 Hearing
        291k314(6) k. Findings and Determination. Most Cited Cases
Jury special verdict as to whether defendant's motorcycle rear wheel suspension infringed the plaintiff's patent which stated "yes, with the rising rate" was not a limitation of the finding of infringement to the rising rate claim but, rather, was a response to the defendant's argument that the two suspensions were not the same because of a different rising rate.

**[13] Patents 291 ⬥324.56**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k324 Appeal
        291k324.56 k. Harmless Error. Most Cited Cases
It was highly prejudicial to instruct the jury on the differences between linkages involved in patented device and allegedly infringing device while remaining silent on the similarities and to give the dictionary definition of equivalent as meaning "corresponding or virtually identical, especially in effect or function.".

**[14] Patents 291 ⬥324.56**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k324 Appeal
        291k324.56 k. Harmless Error. Most Cited Cases
It was prejudicial to give special verdicts in patent case which isolated specific claim elements so that it

was removed from the perspective that is obtained only when the claimed invention is viewed in its entirety.

**[15] Patents 291 ⬥240**

291 Patents
  291XII Infringement
    291XII(A) What Constitutes Infringement
      291k233 Patents for Machines or Manufactures
        291k240 k. Improvements. Most Cited Cases
Device which embodies improvements on a claimed structure does not automatically avoid the reach of the claim.

**[16] Patents 291 ⬥312(5)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k312 Evidence
        291k312(3) Weight and Sufficiency
        291k312(5) k. Particular Patents.
Most Cited Cases
Evidence sustained finding that patent on rear wheel suspension for motorcycles intended for off-road riding was infringed.

**[17] Patents 291 ⬥324.55(1)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k324 Appeal
        291k324.55 Questions of Fact, Verdicts, and Findings
          291k324.55(1) k. In General. Most Cited Cases
Court reviews award of damages for patent infringement on the reasonable jury/substantial evidence standard.

**[18] Patents 291 ⬥324.56**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity

868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

291k324 Appeal
291k324.56 k. Harmless Error. Most Cited Cases

Court's error in instructing jury that it had found a minor infringement required reversal of award of damages.

**[19] Contracts 95 ☞353(8)**

95 Contracts
   95VI Actions for Breach
     95k351 Trial
      95k353 Instructions
       95k353(8) k. As to Performance or Breach in General. Most Cited Cases

It was error to instruct jury in breach of contract action in a manner which limited the scope of information which the defendant had agreed to protect more narrowly than that set forth in the contract and to instruct the jury accordingly as to the defendant's obligations under the contract.

**[20] Antitrust and Trade Regulation 29T ☞431**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(B) Actions
      29Tk429 Evidence
       29Tk431 k. Presumptions and Burden of Proof. Most Cited Cases

(Formerly 382k1001 Trade Regulation, 379k27)
Burden of proof was on plaintiff to prove that his information met legal requirements of protectible trade secret.

**[21] Antitrust and Trade Regulation 29T ☞432**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(B) Actions
      29Tk429 Evidence
       29Tk432 k. Weight and Sufficiency of Evidence. Most Cited Cases

(Formerly 382k1002 Trade Regulation, 379k27)
Evidence that contract between inventor and manufacturer stated that manufacturer agreed not to use or disclose technical information, know how, inventions, use data, and design specifications which it received from the inventor demonstrated that the in-

formation provided to the manufacturer was protectible trade secrets.

**[22] Antitrust and Trade Regulation 29T ☞423**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
      29Tk423 k. Persons Liable. Most Cited Cases

(Formerly 382k984 Trade Regulation, 379k10(5))
Under California law, manufacturer which received trade secrets from inventor was not entitled to use as its own any information which it could have independently discovered and fact that it could have accomplished on its own whatever the inventor contributed to it did not eliminate its liability for misappropriation of trade secrets.

**[23] Antitrust and Trade Regulation 29T ☞414**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
      29Tk414 k. Elements of Misappropriation. Most Cited Cases

(Formerly 382k984 Trade Regulation, 379k10(5))
Under California law, slavish copying is not necessary for misappropriation of a trade secret and independent judgment does not remove the information from protection.

**[24] Patents 291 ☞1**

291 Patents
   291I Subjects of Patents
     291k1 k. Nature of Patent Rights. Most Cited Cases

**Antitrust and Trade Regulation 29T ☞413**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
     29TIV(A) In General
      29Tk413 k. What Are "Trade Secrets" or Other Protected Proprietary Information, in General. Most Cited Cases

(Formerly 382k984 Trade Regulation, 379k10(5))
Legal status of information and improvements made

868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

to an invention after patent application has been filed is independent of the presence, or absence, of the patent application or ensuing patent; information and improvements may be separately patentable, they may be preserved in confidence and disclosed only in accordance with the agreement, and they are protected against misappropriation in accordance with the laws of the contract and tort.

**[25] Copyrights and Intellectual Property 99 ☞ 104**

99 Copyrights and Intellectual Property
   99II Intellectual Property
      99k104 k. Right to Control Disposition or Use.
Most Cited Cases
Information that manufacturer sought from inventor and as to which it agreed to respect confidentiality was intellectual property in the eyes of the law and protected in accordance with the law.

**[26] Antitrust and Trade Regulation 29T ☞ 420**

29T Antitrust and Trade Regulation
   29TIV Trade Secrets and Proprietary Information
      29TIV(A) In General
         29Tk420 k. Particular Cases, in General.
Most Cited Cases
   (Formerly 382k990 Trade Regulation, 379k10(5))
Inventor's design modifications to rear wheel suspension for off-road motorcycle which would extend the rear wheel travel over earlier rising-rate designs and design of an alternate mount were trade secrets.

**[27] Labor and Employment 231H ☞ 309**

231H Labor and Employment
   231HV Intellectual Property Rights and Duties
      231Hk308 Inventions, Discoveries, or Creations of Employees
         231Hk309 k. In General. Most Cited Cases
   (Formerly 291k93)
Commercial arrangement wherein inventor agreed to facilitate manufacturer's testing and evaluation of the inventor's invention did not convert the inventor's work in adapting his invention to the manufacturer's product into the work of a hired technician whose work product was automatically owned by the manufacturer.

**[28] Federal Courts 170B ☞ 644**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
         170BVIII(D)2 Objections and Exceptions
            170Bk644 k. Motions for New Trial.
Most Cited Cases
Although there was a hint in posttrial colloquy that court intended or was willing to retry all trade secret issues, that was not sufficient to excuse plaintiff from requesting, through posttrial motion, a new trial or judgment n.o.v. on certain trade secret issues when defendant sought new trial or judgment n.o.v. with respect to other trade secrets.

**[29] Federal Courts 170B ☞ 759.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk759 Theory and Grounds of Decision of Lower Court
               170Bk759.1 k. In General. Most Cited Cases
   (Formerly 170Bk759)
Appellate tribunal is abjured to determine whether jury verdict can be sustained on any reasonable theory.

**[30] Damages 115 ☞ 137**

115 Damages
   115VII Amount Awarded
      115VII(C) Injuries to Property
         115k137 k. In General. Most Cited Cases
Evidence sustained jury's award of $104,000 for motorcycle manufacturer's misappropriation of trade secrets of inventor of rear wheel suspension system.

**[31] Patents 291 ☞ 317**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k317 k. Permanent Injunction. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

868 F.2d 1226
868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

Injunction will generally issue when any patent infringement has been adjudged, absent sound reason for denying the injunction.

**[32] Patents 291 ⟜317**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
           291k317 k. Permanent Injunction. Most Cited Cases

Injunction against future patent infringement was proper where the patent would expire in less than four years, litigation had started over eight years earlier, and further proceedings could consume "several years.".

**[33] Injunction 212 ⟜56**

212 Injunction
    212II Subjects of Protection and Relief
        212II(B) Matters Relating to Property
           212k56 k. Disclosure or Use of Trade Secrets. Most Cited Cases

Misappropriator of trade secrets has no authorization right to continue to reap the benefits of its wrongful acts, and owner of the trade secrets is entitled to injunction against continued use of the secrets by the misappropriator.

**[34] Fraud 184 ⟜58(1)**

184 Fraud
    184II Actions
        184II(D) Evidence
           184k58 Weight and Sufficiency
               184k58(1) k. In General. Most Cited Cases

Evidence sustained finding of fraud on the part of manufacturer which misappropriated inventor's trade secrets and infringed his patent.

**[35] Federal Civil Procedure 170A ⟜2338.1**

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
           170Ak2338 Verdict or Findings Contrary to Law or Evidence

               170Ak2338.1 k. In General. Most Cited Cases
    (Formerly 170Ak2338)

New trial is not warranted simply because the district court would have reached different verdict.

**[36] Fraud 184 ⟜61**

184 Fraud
    184II Actions
        184II(E) Damages
           184k61 k. Exemplary. Most Cited Cases

Jury's assessment of punitive damages is not excluded in patent and trade secret cases where the jury expressly finds fraud.

**[37] Patents 291 ⟜312(7)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
           291k312 Evidence
               291k312(3) Weight and Sufficiency
                   291k312(7) k. Ownership of Patent. Most Cited Cases

Evidence sustained finding that plaintiff in patent infringement action was not the "real inventor" of the patent in view of evidence that he invented the patent with another and in view of contribution of third parties.

**[38] Patents 291 ⟜312(7)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
           291k312 Evidence
               291k312(3) Weight and Sufficiency
               291k312(7) k. Ownership of Patent. Most Cited Cases

Fact that plaintiff in patent infringement action might have been only a joint inventor rather than a sole inventor did not affect issue of whether he was entitled to assignment of patent obtained by infringer of inventor's patent, as the correction of inventorship would be an administrative step, and was not before the court.

**[39] Patents 291 ⟜323.1**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k323 Final Judgment or Decree
            291k323.1 k. In General. Most Cited Cases

Inventor claiming that he was entitled to patent obtained by infringer of his patent was not limited to remedy of interference in the United States Patent and Trademark Office and in other countries, and could obtain court order assigning him the infringer's patent.

**[40] Patents 291 ⊘══312(6)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k312 Evidence
            291k312(3) Weight and Sufficiency
               291k312(6) k. Particular Matters, Sufficiency as To. Most Cited Cases

Jury could have found that manufacturer's infringement of inventor's patent was willful. 35 U.S.C.A. §§ 284, 285.

**Patents 291 ⊘══328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases

4,457,393. Cited.

**Patents 291 ⊘══328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases

3,907,332. Valid and Infringed.

Theresa A. Middlebrook, Wagner & Middlebrook, Glendale, Cal., and Robert W. Driscoll, Driscoll & Tomich, San Marino, Cal., argued for plaintiff/appellant. With them on the brief was John E. Wagner. John A. Fogarty, Kenyon & Kenyon, New York City, argued for defendants/cross-appellants. With him on the brief were Richard S. Gresalfi and Dawn M. DiStefano. Also on the brief were Richard S. Rockwell, Tustin, Cal., Duffern H. Helsing and Halina F. Osinski, Santa Ana, Cal., of counsel.

Before SMITH, Circuit Judge, SKELTON, Senior Circuit Judge, and NEWMAN, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

This appeal and cross-appeal are from the judgment of the United States District Court for the Central District of California, and involve issues of patent validity, infringement, breach of contract, fraud, misappropriation**1230** of trade secrets, and several related issues. FN1 We affirm in part, reverse in part, vacate in part, and remand.

> FN1. *Richardson v. Suzuki Motors Co. and Suzuki U.S. Motors Corp.,* Nos. CV 80-2589-WPG and CV 82-3826-WPG (C.D.Cal. June 29, 1987 and July 13, 1987).

*The Invention*

The invention that led to this litigation is a motorcycle rear-wheel suspension system that smooths the ride over rough terrain, of interest particularly in off-road motorcycle riding. The roughness of the ride is due to bumps and dips in the terrain, transmitted from the wheels to the frame. An optimum rear-wheel suspension will maintain tire contact with the ground despite deflection by irregularities, will avoid "bottoming out" (an unsafe rising of the suspension), yet will achieve a smooth ride without reduction in safety. In 1974 even the best available suspensions did not maintain adequate tire contact with the ground in conjunction with attempts to eliminate bottoming out.

In mid-1974 Donald G. Richardson, a young mechanic in California, devised a solution to the problem, a modified suspension system that he installed in his own motocross motorcycle. Richardson replaced the conventional two-spring shock absorber suspension system with a system consisting of a single shock absorber plus a linkage consisting of a bell crank and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

connecting rod. This linkage generated a "rising rate" FN2-a characteristic critical to the issue-and produced a far superior ride, even as it eliminated the dangerous bottoming out. Richardson testified about his first ride, at a hilly construction site near his house, as "utopia. I mean it was incredible"; over hard bumps it was "uncanny because it was so smooth"; "[t]he rear end didn't kick up. It just didn't bottom out and stayed down"; an "unbelievable feeling".

> FN2. "Rising rate" was described by witnesses as follows: "as the suspension travels upward, the resistance to upward travel will increase"; and it "gets stiffer as the wheel moves up the vehicle or moves upward in the frame."

On November 25, 1974 Richardson filed a United States patent application on his invention, and on September 23, 1975 the application issued as United States Patent No. 3,907,332 (hereinafter the '332 or Richardson patent). Patent claim 9, which incorporates claim 1, is the only claim in suit. Claims 1 and 9 follow:

1. A suspension for two wheeled vehicles comprising:

a frame for the vehicle comprising a generally closed shape including upper and lower portions and

a swing arm pivotally connected to the lower portion of said frame;

said swing arm comprising a pair of arms rotatably supporting a wheel about a horizontal axis generally at the end of said swing arm;

the pivotal mounting of said arm to said frame being about a generally horizontal axis whereby said wheel is both rotatable about its own horizontal axis and deflectable in a generally vertical direction about the axis of said swing arm;

spring means having a first end pivotally secured to said frame;

a link member including an intermediate point pivotally mounted on said frame about an axis, parallel to the axis of said swing arm at a point spaced therefrom;

pivotal connection means between said link member and the second end of said spring;

a bar pivotally connected at one end to said swing

arm and at the opposite end to said link member at a position spaced from said spring connection;

said spring, bar, swing arm and link connected whereby deflection of said swing arm displaces said bar and rotates said link member to compress said spring.

9. The combination in accordance with claim 1 wherein said assembly provides a rising spring rate as a function of deflection of said swing arm.

Figure 2 of the '332 patent specification is illustrative:

**\*1231**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

868 F.2d 1226
868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

Page 9



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As the rear wheel is deflected upward by bumps in
the terrain, the swing arm (32) that is pivotally con-
nected at (34) to the motorcycle frame (21) rotates
upward, pushing the compression rod (41) into the
bell crank (42) that is pivotally secured (31) at its in-
termediate point to the motorcycle frame. The bell
crank rotates on its pivot (31) and compresses, down-
ward against the frame, a spring (46) that is pivotally
connected at one end (45) to the bell crank, and at its
other end (52) to the motorcycle frame. The interac-
tion of these interconnected parts increases the force
on the spring, increasing the rate of resistance to de-
flection of the wheel with increased movement of the
wheel. This varying resistance is the "rising spring
rate" of claim 9, and is illustrated in Figure 5 of the
'332 patent:

**\*1232**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*The Contract with Suzuki*

In October 1978 Richardson entered into a one year Option and License Agreement with the Suzuki Motor Co., Ltd. of Japan ("Suzuki").

The Agreement gave Suzuki the exclusive right to test and evaluate Richardson's suspension, and the exclusive option to acquire an exclusive license to the '332 patent and Richardson's "proprietary technical information, know-how, inventions, and use data", collectively defined in the Agreement as the "Licensed Rights."

The Agreement required Richardson to disclose to Suzuki all technical information, know-how, inventions, use data and design specifications for his suspension, that he possessed or that he acquired during the option period. Suzuki agreed to preserve all such information in confidence, and not to use any of it "for any purpose other than to evaluate for commercial feasibility of manufacture and marketing during the Option Period." Suzuki agreed that this obligation of confidence continued if Suzuki did not exercise the option. Excepted from the confidentiality obligation was all information previously known to Suzuki or at any time generally known to the public.

The Agreement required Richardson to make prototypes of his suspension system for Suzuki's evaluation. Richardson installed his suspension in Suzuki's sample 1978 and 1979 model production motorcycles, and disclosed to Suzuki the technical information and know-how that he possessed, including improvements and other information that he developed during this period. He met frequently with Suzuki engineers and other Suzuki personnel in the United States and in Japan to communicate this information and generally to improve performance and to facilitate testing and evaluation.

There was testimony at trial of initial incredulity on the part of Suzuki engineers concerning Richardson's suspension, of Suzuki's past failures in designing a suspension with the desired characteristics, and of Suzuki's favorable response to the performance of Richardson's suspension. The evidence included internal Suzuki documents made while Suzuki was testing Richardson's suspension, stating that it would "take a long time", perhaps three years, for Suzuki to develop a satisfactory suspension.

In early 1979 Richardson and a colleague Cazort conceived an improvement in the linkage-generated rising rate suspension, which they called the "Alternate Shock Mount" and which they disclosed to Suzuki, accompanied by drawings and blueprints **1233** made by Cazort. The difference from the structure described in the '332 patent is that in the Alternate Shock Mount the lower end of the spring is pivotally secured to the swing arm which is pivotally secured to the frame, instead of being pivotally secured directly to the frame, resulting in increased strength.

In May 1979 Richardson's first prototype for Suzuki, wherein Richardson, aided by Cazort, installed his suspension in a Suzuki 1978 production model, was successfully tested in Japan. Testimony at trial included statements attributed to Suzuki's test riders that they could see the bumps but not feel them, and other commentary evidencing a highly favorable reaction to Richardson's suspension.

It was a stipulated fact that after these tests Suzuki made the decision to place the linkage-generated rising rate suspension system into production, and started development work for this purpose.

On October 16, 1979 Suzuki filed a patent application in Japan. The corresponding United States patent, filed on October 8, 1980, claims the Alternate Shock Mount suspension as disclosed by Richardson, and also claims a modification made by Suzuki called the "criss-cross". Suzuki named two of its engineers, Hirohide Tamaki and Manabu Suzuki, as the inventors.

Suzuki twice requested and was granted one-month extensions of its Option and License Agreement with Richardson. In December 1979 Suzuki informed Richardson that it would not exercise the option.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In March 1980 Suzuki began competitive racing in the United States of Suzuki motorcycles using the Alternate Shock Mount suspension, which Suzuki named the "Full Floater". Suzuki met with marked racing success, the Full Floater receiving favorable publicity and high acclaim from the public. Extensive advertising was directed to the Full Floater rising rate suspension. The product achieved widespread commercial success.

Suzuki denied any obligation to Richardson.

*Litigation*

Richardson brought suit against Suzuki (Japan) and the U.S. Suzuki Motor Corporation in California state court, and was granted a preliminary injunction restraining the Suzuki companies from breach of the Option and License Agreement and requiring them to comply with the confidentiality terms thereof. At Suzuki's request the state court declined to enforce the injunction after U.S. Suzuki sued Richardson in federal court, seeking a declaratory judgment of invalidity and non-infringement of Richardson's '332 patent.

In 1982 Richardson filed a patent infringement action against the Suzuki companies and others. (Only the Suzuki companies remain as parties.) Richardson reasserted the state claims of breach of contract, breach of implied covenant of good faith and fair dealing, misappropriation of trade secrets, and fraud, and among other relief requested assignment of the patents obtained by Suzuki on the Alternate Shock Mount. Suzuki counterclaimed for fraud and breach of contract by Richardson, based on asserted invalidity of the '332 patent.

The federal actions were consolidated and tried to a jury. After forty-seven days of a two-part trial the jury gave special verdicts on issues of liability and damages. The district court entered final judgment under Fed.R.Civ.P. 54(b) on the jury verdicts that the '332 patent was not invalid and was infringed by Suzuki, that nine of Richardson's eleven asserted trade secrets were not trade secrets, and that Richardson was not entitled to assignment of the Tamaki/Suzuki patents on the Alternate Shock Mount. The court also entered final judgment on the jury verdicts of dam-

ages for patent infringement and for Suzuki's use of certain of Richardson's information that the jury found were not trade secrets. The court denied prejudgment interest and attorney fees, and refused to grant an injunction.

The district court denied most of the parties' post-trial motions, but granted Suzuki's motion for a new trial on three issues that the jury had decided in favor of **1234** Richardson, upholding two of the eleven asserted trade secrets, finding fraud on the part of Suzuki, and assessing damages for fraud. The district court then entered a supplemental final judgment for immediate appeal of the issues that the court intended to retry, and certified three specific questions on these and related issues.

I

*Validity of Richardson's '332 Patent*

Suzuki asserts on appeal the invalidity of claim 9 on grounds of anticipation (35 U.S.C. § 102) and obviousness (35 U.S.C. § 103).[FN3] The district court, stating that questions of patent validity must be decided by the court, told the jury that its verdicts on this issue were advisory. Nevertheless the court duly entered the jury verdicts, including the answer YES to the question: "Under the facts and law as you believe that you understand them, do you find Claim 9 of the Richardson Patent to be valid?" The court entertained, and denied, post-trial motions for judgment n.o.v. and for a new trial on the question of validity. The court also independently decided the question, upholding validity of the '332 patent.

> FN3. The additional aspects of adequacy of disclosure (35 U.S.C. § 112) and unenforceability for inequitable conduct, both decided in favor of Richardson, have not been appealed.

The record provided to us doesn't show the origin of this discredited procedure of advisory verdicts, or whether either party objected. In *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 895 n. 5, 221 USPQ 669, 674 n. 5, (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984), we observed that:

The view suggested in *Sarkisian [v. Winn-Proof Corp., 688 F.2d 647, 651, (9th Cir.1982),* cert. denied, 460 U.S. 1052 [103 S.Ct. 1499, 75 L.Ed.2d 930] (1983)* ], that a jury verdict on nonobviousness is at best advisory, would make charades of motions for directed verdict or JNOV under Fed.R.Civ.P. 50 in patent cases. These motions apply only to *binding* jury verdicts....

Moreover, use of an advisory jury is limited to actions not triable of right by a jury.

(emphasis in original, citations omitted). In a similar circumstance wherein the trial court and the jury independently decided the same jury question (in that case the question of willfulness of infringement) we remarked that "[a]ll fact findings of a jury are non-advisory, unless made in an area expressly removed from jury verdict." *Shiley, Inc. v. Bentley Laboratories, Inc., 794 F.2d 1561, 1568, 230 USPQ 112, 115 (Fed.Cir.1986),* cert. denied, 479 U.S. 1087, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987).

[1] It is established that the jury may decide the questions of anticipation and obviousness, either as separate special verdicts or en route to a verdict on the question of validity, which may also be decided by the jury. *Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1547, 220 USPQ 193, 197 (Fed.Cir.1983):*

No warrant appears for distinguishing the submission of legal questions to a jury in patent cases from such submissions routinely made in other types of cases. So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases.

*See also, e.g., Vieau v. Japax, Inc., 823 F.2d 1510, 1515, 3 USPQ2d 1094, 1098 (Fed.Cir.1987); Verdegaal Brothers Inc. v. Union Oil Co. of California, 814 F.2d 628, 631, 2 USPQ2d 1051, 1052 (Fed.Cir.), cert. denied, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); Data Line Corp. v. Micro Technologies, Inc., 813 F.2d 1196, 1200, 1 USPQ2d 2052, 2054 (Fed.Cir.1987); Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1571, 1 USPQ2d 1081, 1085 (Fed.Cir.1986); DMI, Inc. v. Deere & Co., 802 F.2d 421, 425-27, 231 USPQ 276, 279-80 (Fed.Cir.1986); Mainland Industries, Inc. v. Standal's Patents Ltd., 799 F.2d 746, 747-48, 230 USPQ 772, 773 (Fed.Cir.1986);* *1235*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1560, 224 USPQ 259, 263 (Fed.Cir.1984); Quaker City Gear Works, Inc. v. Skil Corp., 747 F.2d 1446, 1454-55, 223 USPQ 1161, 1165-66 (Fed.Cir.1984),* cert. denied, 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985); *Weinar v. Rollform Inc., 744 F.2d 797, 805, 223 USPQ 369, 372 (Fed.Cir.1984),* cert. denied, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985); *Perkin-Elmer Corp., 732 F.2d at 894-95, 221 USPQ at 674; Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 758, 221 USPQ 473, 477 (Fed.Cir.1984); Railroad Dynamics, Inc. v. A. Stucki Company, 727 F.2d 1506, 1512-13, 220 USPQ 929, 935 (Fed.Cir.),* cert. denied, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *White v. Jeffrey Mining Mach. Co., 723 F.2d 1553, 1558, 220 USPQ 703, 705 (Fed.Cir.1983)* ("Submission of such a question of law [obviousness] to a jury, accompanied by appropriate instructions, is proper."), cert. denied, 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984). *See generally* H.T. Markey in *On Simplifying Patent Trials, 116 F.R.D. 369, 370 (1987)* ("There is neither reason nor authority for employing in a patent trial procedures and practices different from those employed in any other civil trial. Indeed, reason and authority mandate the contrary.")

[2] Although the district court and the jury reached the same result, the standards by which appellate courts review the judgment differ, depending on whether it arose from a jury or a bench trial. *District of Columbia v. Pace, 320 U.S. 698, 701, 64 S.Ct. 406, 408, 88 L.Ed. 408 (1944)* ("findings of fact by an equity court and the verdict of a jury have from time immemorial been subject to different rules of finality"). When the judgment arises from a jury verdict, the reviewing court applies the reasonable jury/substantial evidence standard: a standard that gives greater deference to the judgment simply because appellate review is more limited, compared with review of a trial judge's decision. *Id. at 702, 64 S.Ct. at 408.* As summarized in *Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946),* "the appellate court's function is exhausted when that evidentiary basis [of the jury's verdict] becomes apparent,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." *See generally* M.B. Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, The Judge/Jury Question, and Procedural Discretion,* 64 N.C.L.Rev. 993 (1986).

The parties do not take a position on the district court's procedure, but appear to recognize that the issue of validity was properly for jury determination, for neither party refers to the district court's explanation of its independent determination of the question of obviousness.

In the interest of reaching an end to this protracted litigation, we have reviewed the judgment on the terms on which it reaches us. We have determined first whether Suzuki met its burden of showing on appeal that no reasonable jury could have reached the verdict of "valid" on the evidence before it. *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1566, 5 USPQ2d 1769, 1777 (Fed.Cir.), *cert. denied,* 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988); *DMI, Inc. v. Deere & Co.,* 802 F.2d 421, 425, 231 USPQ 276, 278 (Fed.Cir.1986); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,* 758 F.2d 613, 618-19, 225 USPQ 634, 636 (Fed.Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). Then, on the premise that the parties may have waived their right to a jury trial on this question by failure to object to the district court's procedure, we have considered whether the district court's independent judgment of validity may be sustained, on the standards applicable thereto. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566-68, 1 USPQ2d 1593, 1595-97 (Fed.Cir.) (obviousness determination in bench trial reviewed as a question of law based on underlying facts), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

The court correctly instructed the jury that invalidity must be proved by clear and convincing evidence, referring to the presumption of validity. **\*1236** *Perkin-Elmer Corp.,* 732 F.2d at 894, 221 USPQ at 674; *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 756 F.2d 1556, 1559, 225 USPQ 253, 255 (Fed.Cir.1985); *American Hoist & Derrick Co. v.*

*Sowa & Sons, Inc.,* 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

A. Anticipation

[3][4] The district court correctly instructed the jury that an invention is anticipated if the same device, including all the claim limitations, is shown in a single prior art reference. Every element of the claimed invention must be literally present, arranged as in the claim. *Perkin-Elmer Corp.,* 732 F.2d at 894, 221 USPQ at 673; *Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 771-72, 218 USPQ 781, 789 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The identical invention must be shown in as complete detail as is contained in the patent claim. *Jamesbury Corp.,* 756 F.2d at 1560, 225 USPQ at 256; *Connell,* 722 F.2d at 1548, 220 USPQ at 198.

As prior art, Suzuki relied on the motorcycle suspensions described in certain patents to Downs and Warner, and on the race car wheel suspensions described for Tyrrell and McLaren race cars in two Road and Track magazine articles. Witnesses explained to the jury the similarities and differences between the invention of the '332 patent and each prior art reference. For example, the Downs suspension has a spring element that is rigidly attached to the motorcycle frame and does not pivot as is required by claim 9 of the '332 patent. The Warner reference shows a suspension having a bell crank that is pivotally mounted to the motorcycle frame but not at an intermediate point, whereas Richardson requires a mid-point pivot of the bell crank to the frame. Neither Downs nor Warner describes a rising rate. The magazine articles describe a four wheel racing car suspension system having a linkage-generated variable rising rate incorporating a bell crank, but instead of the swing arm of Richardson's motorcycle suspension, the race car systems use an A-shaped arm mounted to the side of an upright wheel; and the bell crank and linkage in the race car system is located beside the wheel, rather than in front of the wheel as in Richardson's motorcycle system.

Witnesses testified that rising rate in motorcycles had

previously been obtained only by progressively wound springs and gas operated shock absorbers. Suzuki argued that rising rate is inherent in the Downs and Warner motorcycle suspensions and expressly described for race cars in the magazine articles, and also that rising rate is merely a statement of function, and thus should not be a basis for distinction from the prior art.

The jury found that Downs did not "disclose each and every element of the Richardson Claims 1 and 9 or their equivalent". For the Warner reference, the jury could not reach a unanimous verdict on this same question, but answered NO to the question whether "the respective elements of Warner function in substantially the same way as the corresponding elements in Richardson to produce substantially the same results". The jury found that the race car suspensions did "disclose each and every element of the Richardson Claims 1 and 9 or their equivalent", but did not reach a unanimous verdict as to whether they "function in substantially the same way as the corresponding elements in Richardson to produce substantially the same results."

[5] The jury had erroneously been instructed that anticipation may be shown by equivalents, a legal theory that is pertinent to obviousness under Section 103, not to anticipation under Section 102. *Lewmar Marine, Inc. v. Barient, Inc., 827 F.2d 744, 747-48, 3 USPQ2d 1766, 1768 (Fed.Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988); Connell, 722 F.2d at 1548, 220 USPQ at 198.* The jury requested a definition of "equivalent" during its deliberations, and was given the Webster's dictionary definition "corresponding or virtually identical, especially in effect or function." This narrow definition, which does not accord with that of **\*1237**Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), may have minimized the legal error in the instructions. In any event, the erroneous inclusion of equivalents in the anticipation inquiry favored Suzuki. The jury nonetheless answered YES to the special verdict: "Under the facts and law as you believe that you understand them, do you find Claim 9 of the Richardson Patent to be valid?"

[6] On the totality of the evidence and in light of the jury instructions and answers, we conclude that a reasonable jury could have found that the patent was not invalid on grounds of anticipation. *Perkin-Elmer Corp., 732 F.2d at 894, 221 USPQ at 673-74* (review of presumed jury finding that anticipation not proved, based on jury verdict of validity).

Reviewing the analysis and decision of the district court, based on the same prior art, we discern no clear error in the court's conclusion that claim 9 was not invalid.

We affirm that claim 9 was not proved invalid on the ground of anticipation.

B. Obviousness

The issue of obviousness was vigorously litigated, Suzuki relying on the same Downs and Warner patents and magazine articles. The record shows that there was extensive testimony concerning the differences between Richardson's suspension and the prior art. Suzuki argued at trial, and repeats on this appeal, that these differences are trivial mechanical expedients.

The jury, among its special verdicts on the *Graham* factors, found that a person of ordinary skill in the pertinent art could be any of: (1) a motorcycle mechanic without formal technical education, (2) a person with experience in working on suspension systems for racing automobiles, but without formal technical training, (3) suspension system instructors, (4) professional motorcycle riders, and (5) someone possessing above-average mechanical skills. Suzuki argues that such a person is of generally high mechanical skill, and to such a person Richardson's rising rate motorcycle suspension would have been an obvious "adaption" of the race car suspension systems, which "suggests itself quite plainly, since Downs and Warner incorporate bell cranks in their respective suspensions."

The jury was unable to reach a unanimous verdict on the question of whether a person of the level of skill found by the jury, presented with the problem and being familiar with all the prior art including these four specific references, but unaware of Richardson's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

device, would be "led to do" what Richardson did. In response to the ultimate question, as we have observed, the jury reached the unanimous verdict that "Under the facts and law as you believe that you understand them", claim 9 was "valid". The district court entered judgment on the jury verdicts, independently held the patent valid, and denied Suzuki's motions for judgment n.o.v. and for a new trial on the issue of validity.

[7] The question for the jury was whether the challenger met the burden of proving invalidity by clear and convincing evidence; and the question on review is whether reasonable jurors could have concluded that the challenger failed to meet that burden. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1571, 1 USPQ2d 1081, 1085 (Fed.Cir.1986); Perkin-Elmer Corp., 732 F.2d at 894-95, 221 USPQ at 674.* The jury's lack of unanimity on certain special verdicts can reasonably be taken to mean, as the district court held, that invalidity had not been proved by clear and convincing evidence.

[8][9] Our review shows that there was substantial evidence on which reasonable jurors could have concluded that claim 9 had not been proved invalid for obviousness, and thus reached the verdict of "valid". Although the district court erred in its belief that obviousness could only be presented to the jury for an advisory verdict, we may view the court's agreement with the jury verdict of validity as supporting the court's denial of Suzuki's post-trial motions for judgment n.o.v. and for a new trial. *Perkin-Elmer Corp., 732 F.2d at 895, 221 USPQ at 674-75.* However it is viewed procedurally, no reversible error **1238** has been shown in the court's conclusion that obviousness had not been proved and that claim 9 was not invalid.

The judgment of validity is affirmed.

## II

### Infringement

[10][11] Richardson bore the burden of proving infringement by a preponderance of the evidence. The district court correctly stated that the jury was the finder of the fact of infringement.

[12] The jury rendered special verdicts as to the Suzuki motorcycles before it, Model M having the Richardson/Cazort Alternate Shock Mount and Model C having the "criss-cross" connection added by Suzuki, as follows:

9(a). Do defendant Suzuki's motorcycles of the Model M type ... infringe Claim 9 of the plaintiff's patent?
Answer: YES, WITH THE RISING RATE
9(b). Do defendant Suzuki's motorcycles of the Model C type ... infringe Claim 9 of the plaintiff's patent?
Answer: YES, WITH THE RISING RATE

In subparts 9(a)(2) and 9(b)(2) of the special verdict the jury answered YES to the question whether the Suzuki motorcycles produce substantially the same rising rate as taught in Richardson's patent.

The principal question on appeal is the meaning and effect of the jury answers to subparts (1) of the special verdict, which were directed "in particular" to the Alternate Shock Mount and the criss-cross modifications:
9(a)(1). In particular, is the defendant's linkage equivalent to the plaintiff's, bearing in mind that the bottom of the spring in the former is affixed to the swing arm rather than to the frame?
Answer: NO
9(b)(1). In particular, is the defendant's linkage equivalent to the plaintiff's, in light of the "criss-cross" of the connecting rods and the bell crank in the defendant's model, as well as the spring attachment to the swing arm, as compared with the plaintiff's Claim 9?
Answer: NO

The district court entered judgment of infringement in favor of Richardson and denied post-trial motions by both sides, including a motion by Richardson to reopen the record in order to present evidence on the doctrine of equivalents. The district court stated that the jury verdicts mean that "infringement is limited to 'rising rate' " and that the Suzuki and Richardson linkages are not equivalent.

Suzuki argues that special verdicts 9(a)(1) and 9(b)(1) require judgment of non-infringement; or, as a minimum, that these verdicts are inconsistent with the verdicts of infringement in 9(a) and 9(b), such that a new trial is required of the entire issue.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

868 F.2d 1226, 9 U.S.P.Q.2d 1913
**(Cite as: 868 F.2d 1226)**

Richardson states that the verdicts can be understood, when viewed in light of the jury instructions, in a way that supports the judgments of infringement. Suzuki did not request a new trial on the basis of inconsistent verdicts at the time the judgments were entered, while Richardson moved, unsuccessfully, to amend or delete verdicts 9(a)(1) and 9(b)(1). Each party asserts that any inconsistency should be resolved in its favor.

The Ninth Circuit, in accordance with the general rule, requires trial and appellate courts to seek reconciliation of apparently inconsistent verdicts:
When faced with a claim that verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to disregard the jury's verdict and remand the case for a new trial.

*Toner v. Lederle Laboratories,* 828 F.2d 510, 512 (9th Cir.1987), *cert. denied,* 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988) (citing *Gallick v. Baltimore & Ohio R.R.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963), also citing *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) and *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1213, (9th Cir.1983), *cert. denied,* *1239471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985)).
*See also Allen Organ Co.,* 839 F.2d at 1563, 5 USPQ2d at 1775 (the appellate court must make every effort to harmonize the jury's answers).

The district court did not find the special verdicts inconsistent, apparently in the belief that the jury limited infringement to the rising rate provision of claim 9 but not the other claim clauses. This accords with the court's statement to the jury that the infringement was "minor" because it was limited to the rising rate. This interpretation pleased neither party. If we have correctly understood it, it is incorrect as a matter of law.

"We are bound to find the special verdicts consistent if we can do so under a fair reading of them." *Toner,* 828 F.2d at 512. A fair reading of the special verdicts results from simply applying the rule that "[t]he con-

sistency of the jury verdicts must be considered in light of the judge's instructions to the jury". *Toner,* 828 F.2d at 512. The instructions on infringement, and the specific questions asked by special verdict, were designed to resolve the issues raised at trial. There was testimony on both sides of Suzuki's assertion that its suspension was not the same as Richardson's because it produced a different rising rate. We referred *supra* to special verdicts 9(a)(2) and 9(b)(2):
9(a)(2). Does defendant's Model M produce rising rate substantially the same as the rising rate produced under the teachings of the plaintiff's patent?
Answer: YES
9(b)(2). Does defendant's Model C produce rising rate substantially the same as the rising rate produced under the teachings of the plaintiff's patent?
Answer: YES

Another special verdict in the infringement section asked the jury:11. Does claim 9 of the Richardson Patent describe the invention of a rising rate in terms of what the invention will do rather than in terms of physical arrangement?
Answer: NO

We conclude that the answer "yes, with the rising rate" in verdicts 9(a) and 9(b) is the jury's response to Suzuki's argument, rather than as a finding that only the rising rate claim limitation, and no other, is embodied in the Suzuki suspensions.

We discern no support in the record for the district court's conclusion that verdicts 9(a) and 9(b) meant that the rising rate was the only area of infringement. Structure corresponding to every element of every clause of claims 1 and 9 was identified by witnesses as embodied in the accused motorcycles. There was no real dispute that of the nine or eleven elements in these claims (depending on how counted), all but one were literally present. The dispute centered on one element, the attachment of the spring in the claim clause "spring means having a first end pivotally secured to said frame", since this was the clause affected by the modifications of the Alternate Shock Mount and the criss-cross. In the Alternate Shock Mount, as we have discussed, the spring is pivotally secured to a swing arm that in turn is pivotally secured to the frame, instead of being pivotally secured

directly to the frame as is shown in the '332 specification.

Richardson argues that the spring can be either directly or indirectly pivotally secured to the frame, without avoiding literal infringement of the claim. Richardson alternatively argues that on a correct definition of the doctrine of equivalents, citing *Graver Tank, 339 U.S. at 608, 70 S.Ct. at 856,* these securements are equivalent because the structures are substantially the same and perform substantially the same function in the same way.

The jury had been given the dictionary definition that "equivalent" means "corresponding or virtually identical, especially in effect or function". This definition was reinforced by the phrasing of verdicts 9(a)(1) and 9(b)(1), wherein the question itself instructed the jury on the difference between the linkages, while remaining silent on the similarities.

[13] This presentation was highly prejudicial. Indeed, these verdicts well illustrate the truism that the way a question is **\*1240** asked can direct the answer. "The decision to submit interrogatories, and the precise language in which they are couched, can have an untoward effect on a verdict, if certain elements of the trial or the evidence are thereby overly emphasized in the jury's mind." *Weinar v. Rollform Inc., 744 F.2d 797, 809, 223 USPQ 369, 376 (Fed.Cir.1984),cert. denied, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985).*

[14] Further, and equally prejudicial, special verdicts 9(a)(1) and 9(b)(1) isolated this specific claim element so that it was removed from the perspective that is obtained only when the claimed invention is viewed in its entirety. *See, e.g., Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1363, 219 USPQ 473, 482 (Fed.Cir.1983).* We recently reemphasized in *United States Steel Corp. v. Phillips Petroleum Co., 865 F.2d 1247, 1253 (Fed.Cir.1989),* in discussing *Graver Tank,* that there is no error in considering "the principle of the claimed invention".

[15] A device that embodies improvements on a claimed structure does not automatically avoid the reach of the claim. *See, e.g., Atlas Powder Co. v. E.I.*

*du Pont de Nemours & Co., 750 F.2d 1569, 1580, 224 USPQ 409, 417 (Fed.Cir.1984)* (separately patentable improvement may also be an equivalent under the doctrine of equivalents); *A.B. Dick Co. v. Burroughs Corp., 713 F.2d 700, 703, 218 USPQ 965, 967-68 (Fed.Cir.1983)* (infringement not avoided "merely by adding elements"), *cert. denied, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984).* Each case must be decided on its particular facts, viewing the changes in the accused structure in light of the claimed invention. *See generally Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934-35, 4 USPQ2d 1737, 1739 (Fed.Cir.1987), cert. denied, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988),* and *cert. denied, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988); Texas Instruments, Inc. v. United States Int'l Trade Comm'n, 805 F.2d 1558, 1569-70, 231 USPQ 833, 840 (Fed.Cir.1986), reh'g denied, 846 F.2d 1369, 6 USPQ2d 1886 (Fed.Cir.1988).*

[16] We conclude that the jury verdicts, viewed in light of the instructions, held that the Suzuki motorcycles with a rising rate infringed claim 9. We also conclude that on correct instructions no reasonable jury could have found that the claimed invention and the accused structures are not equivalent, on the established facts of record, applying the correct law of *Graver Tank. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)* ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Pullman-Standard v. Swint, 456 U.S. 273, 291-92, 102 S.Ct. 1781, 1791-92, 72 L.Ed.2d 66 (1982)* ("where findings [by the district court] are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue"); *Dana Corp. v. IPC Limited Partnership, 860 F.2d 415, 419, 8 USPQ2d 1692, 1696 (Fed.Cir.1988)* (when there are sufficient established facts of record, appellate court has discretion to determine the merits of JNOV motion.)

The jury verdicts of infringement are supported by substantial evidence, and are upheld. The judgment of infringement is affirmed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

III

*Damages for Patent Infringement*

[17] As damages for patent infringement the jury assessed a royalty of fifty cents per motorcycle. Richardson states that this royalty is unreasonably low, and resulted from erroneous and prejudicial jury instructions. We review the award on the reasonable jury/substantial evidence standard. *Shatterproof Glass Corp., 758 F.2d at 627-28, 225 USPQ at 643-44*.

[18] The court told the jury: "Now, I will sustain, I will uphold your verdict [of infringement], but in determining damages and determining any royalty, it seems to me that you must consider that the infringement was a relatively minor infringement."*1241 This instruction derived, as we have discussed, from the erroneous interpretation of the verdicts as limited to the "rising rate" clause. We must determine whether this erroneous instruction was prejudicial to the jury's assessment of damages. The Ninth Circuit has stated that "we will reverse a judgment because of a mistake in jury instructions only if the error was prejudicial." *Smiddy v. Varney, 665 F.2d 261, 265 (9th Cir.1981)*, *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

35 U.S.C. § 284 provides that damages shall be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer". *Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568, 1574, 7 USPQ2d 1606, 1612 (Fed.Cir.1988)*. The jury was told that a royalty of $2.00 per motorcycle with an annual minimum of $70,000 had been agreed to by Suzuki and Richardson in the Option and License Agreement. There was testimony of much higher royalties paid by others for similar contributions to motorcycles. Suzuki presented testimony that the $2.00 in the agreement does not apply, but should be the starting point for reducing the royalty because the infringement was minor.

We must assume that the jury followed the court's instruction that the infringement was minor. That instruction was a misinterpretation of the jury verdict

of infringement, and it usurped the role of the jury. Absent this prejudicial instruction there was no reasonable basis on which reasonable jury could have found that fifty cents was a reasonable royalty.

The judgment of damages for patent infringement is vacated. We remand for retrial of the question.

IV

*Richardson's Technical Information*

Issues relating to Richardson's technical information were presented at trial on the legal theories of breach of contract and the tort of misappropriation of trade secrets. The district court concentrated the tort issues in presentation to the jury, apparently accepting Suzuki's position that it had complied with its contractual obligations to Richardson. The court thus required that Richardson prove the existence of legally protectible trade secrets and their misappropriation by Suzuki.

In the only special verdict on the contract issues, the jury found that Suzuki did not violate its duty of good faith and fair dealing in its relationship with Richardson. The jury instructions on the contractual relationship, however, are pertinent to, and intertwined with, the trade secret issues.

A. The Contractual Relationship

[19] In matters of contract law and interpretation we apply the discernable law of the state of California. *Universal Gym Equipment, Inc. v. ERWA Exercise Equipment Ltd., 827 F.2d 1542, 1550, 4 USPQ2d 1035, 1040 (Fed.Cir.1987)*. At trial Richardson pressed, unsuccessfully, the California law that a covenant of good faith and fair dealing is implied between parties to a contract. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 36 Cal.3d 752, 768, 686 P.2d 1158, 1166, 206 Cal.Rptr. 354, 363 (1984)* ("It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing." (Emphasis in original)).

The contract between Richardson and Suzuki was explained at trial, including the clause wherein Suzuki agreed not to use or disclose the "technical informa-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion, know-how, inventions, use data, and design specifications" that it received from Richardson. In discussing whether Suzuki was restrained in its post-contract use of Richardson's information, the district court at first instructed the jury that Suzuki was entitled by law "to use the most efficient means, even though they got it from plaintiff", stating that only "valid trade secrets" were subject to the contractual restraints:

And then after Suzuki's election not to take a license, of course, they were not supposed to use the plaintiff's trade secrets. That's what the contract says. And once again, you're going to have to determine whether these eleven were val**1242 id trade secrets. To what extent did the defendant use them, to what extent would the defendant otherwise have developed them.

Now, some of these trade secrets refer to the best alignments and designs. Well, it seems incongruous to say to the defendant they cannot use the best because the best was intentionally disclosed by the plaintiff, and even though experimentation by the defendant surely would have revealed the best as the patent says that it would.

Were the defendants precluded from using the best or were they obliged to use something less efficient. I can't conceive of the defendants not being entitled to use the most efficient means, even though they got it from plaintiff.

The court later qualified this position by referring to reverse engineering as being improper-although it is far from clear what a reasonable jury would have understood from the court's instructions:But on further reflection, I have to acknowledge that if you find there was a confidential relationship or contract that prohibited Suzuki from using the plaintiff's trade secrets, technical information or know-how, inventions or use data that the plaintiff gave them, unless it exercised the option, if you find those things to be true, I suppose it would be improper for Suzuki to reverse engineer from Richardson's prototypes, or from trade secrets or other information that he gave them.

The defense of reverse engineering does not apply to information received in confidence or whereas here the information is given under a contract.

Reviewing these instructions in the context of the contract and trade secret questions that were before the jury, we conclude that the jury was incorrectly instructed on the law. See *Bulgo v. Munoz,* 853 F.2d 710, 714 (9th Cir.1988) (quoting *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1398 (9th Cir.), cert. denied, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984)) (instructions reviewed to determine "whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to ensure that the jury fully understood the issues.")

In *Universal Gym Equipment,* 827 F.2d at 1549, 4 USPQ2d at 1040, we affirmed liability under California law based on breach of contract, when the parties contracted to limit the use by the recipient of "features, designs, technical information, or know-how" disclosed under the contract. We also affirmed that such a contractual arrangement is not incompatible with the patent law, *id. at 1550,* 4 USPQ at 1041, an issue on which the district court in Richardson's case appears to have been misled, and to have misled the jury. See *Components for Research, Inc. v. Isolation Products, Inc.,* 241 Cal.App.2d 726, 730, 50 Cal.Rptr. 829, 832 (1966) ("The judgment here but affords protection against the use of plaintiff's trade secrets by those to whom they had been disclosed in confidence. Whether the idea was patented or not, plaintiff is entitled to such protection").

The district court erred in law, in limiting the scope of protected information beyond that set forth in the contract, and in its instructions to the jury as to Suzuki's obligations. These errors are reflected in the trade secret issues.

### B. The trade secret issues

The jury, despite the excessively restrictive instructions on what were trade secrets, found that certain items that Suzuki had received from Richardson were trade secrets and had been misappropriated, and assessed damages therefor. The jury also assessed damages for use by Suzuki of certain other items that did not "rise to the dignity of trade secrets", in the words of the special verdicts.

Richardson specified eleven items that he had disclosed to Suzuki under the contract, and that he asserted to be trade secrets; to wit: (1) the optimal characteristics of a motorcycle rear-wheel suspension shock absorber, showing three external adjustments, (2) engineering drawings of his proposed and furnished suspension systems, **\*1243** (3) 1978 and 1979 Suzuki motorcycles modified by Richardson with his rising rate suspension, (4) specific force-velocity curves needed to obtain the advantages of Richardson's invention in Suzuki's motorcycles, (5) design modifications to extend rear wheel travel over earlier rising-rate designs, (6) design of the Alternate Shock Mount including drawings and knowhow, (7) the optimum use and types of certain bearings in the suspension, (8) motorcycle testing and tuning criteria, (9) his bell crank designs and design criteria, (10) adjustments in the angles and dimensions of the parts of the suspension and their effect on performance, and (11) the straight line tubular motorcycle frame.

The California law of trade secrets follows the Restatement definition:
A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.... Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article.

By-*Buk Co. v. Printed Cellophane Tape Co., 163 Cal.App.2d 157 at 166, 329 P.2d 147 at 152, 118 US-PQ 550 at 553, (1958)* citing Restatement (First) of Torts, § 757 comment b (1939). The court in *By-Buk Co.* reaffirmed "plaintiff's right not to have its [trade secret] processes wrongfully disclosed to others and used to its detriment." *Id. at 167, 329 P.2d at 153, 118 USPQ at 553.*

[20][21] The burden of proof was placed on Richardson to prove that his information met the legal requirements of a protectible trade secret. *Forro Precision, Inc. v. International Business Machines Corp., 673 F.2d 1045, 1056-57, 215 USPQ 299, 305-6 (9th Cir.1982).* This in turn required "either a covenant or a confidential relationship" as a premise of relief. *Futurecraft Corp. v. Clary Corp., 205 Cal.App.2d 279,*

*283, 23 Cal.Rptr. 198, 207-08 (1962)* (discussing elements of trade secret protection). Richardson met this requirement through his contractual covenant.

[22] The district court told the jury, several times, that because Suzuki might have developed or could have developed on its own the information it received from Richardson, such information can not be protected as a trade secret. The court said: "Now I think we must assume that the defendant could have accomplished whatever the plaintiff may have contributed toward the development of Models M and C." Whatever the validity of the proposed assumption as to Suzuki's abilities, the court's conclusion is contrary to California law:
It is not necessary in order that a process of manufacture be a trade secret that it be patentable or be something that could not be discovered by others by their own labor and ingenuity.

By-*Buk Co., 163 Cal.App.2d at 166, 329 P.2d at 152, 118 USPQ at 553.* Nor does the possibility of independent discovery relieve Suzuki of liability:"[S]ecret formulas and processes * * * are property rights which will be protected by injunction, not only as against those who attempt to disclose or use them in violation of confidential relations or contracts express or implied, but as against those who are participating in such attempt with knowledge of such confidential relations or contract, though they might in time have reached the same result by their own independent experiments or efforts."

*Id. at 167, 329 P.2d at 153, 118 USPQ at 553-54* (quoting *Herold v. Herold China & Pottery Co., 257 F. 911, 913 (6th Cir.1919)*). Indeed, Suzuki did not argue that it had actually developed on its own the information that it first received from Richardson. Although Richardson adduced evidence that Suzuki had been unable to solve this problem, it is not relevant what Suzuki might have been able to do on its own. Ninth Circuit law upholds trade secret status even had the same information been obtainable from other sources. *Clark v. Bunker, 453 F.2d 1006, 1010, 172 USPQ 420, 423 (9th Cir.1972)* (trade secrecy "is not negated because defendant by an expenditure of effort might have collected the **\*1244** same information from sources available to the public.") (footnote

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

omitted).

[23] The court also erroneously instructed the jury that "slavish" copying is necessary for misappropriation, and that an exercise of independent judgment would remove the information from protection. The court instructed the jury to consider: "Were they secrets. And, second, did the defendants slavishly use them or did they make up their own minds." These views are contrary to California law. "[D]efendants cannot escape responsibility by showing that they have improved upon or modified the plaintiff's process." *By* *Buk Co., 163 Cal.App.2d at 169, 329 P.2d at 154, 118 USPQ at 554.* The court observed in *Sinclair v. Aquarius Electronics, Inc., 42 Cal.App.3d 216, 222, 116 Cal.Rptr. 654, 659, 184 USPQ 682, 684 (1974)* that minor variations are to be expected.

Suzuki argued to the jury, and repeats on appeal, that information that Richardson developed after issuance of the '332 patent, including the Alternate Shock Mount, is barred from trade secret status because it was generally disclosed in Richardson's patent or known to the general public, or because it merely implements the patented invention.

[24][25] The legal status of information and improvements made after a patent application has been filed is independent of the presence, or absence, of the patent application or ensuing patent. The information and improvements may be separately patentable; they may be preserved in confidence and disclosed only in accordance with agreement; and they are protected against misappropriation in accordance with the laws of contract and tort. The court misstated the law in telling the jury that the jury could decide whether Richardson could have both a valid patent and legal protection for later-developed information on the patented invention:

So on the one hand [Richardson] says the ordinary person skilled in the art can take this patent and use it and make a machine based upon it. But, on the other hand, he says, however, the experimentation and the ability to do this constitutes trade secrets for which you must pay me. Now, that constitutes a dilemma and it's up to you to determine the extent to which Mr. Richardson may claim as trade secrets things that the ordinarily prudent person skilled in the art should

be able to do on his own.

The district court's phrase "should be able to do on his own" may explain its misperception of the law. It is not known what Suzuki was able to do on its own, for Suzuki not only sought Richardson's knowhow, improvements, data, and information, but also agreed to respect the confidentiality thereof. This information is intellectual property in the eyes of the law, and is protected in accordance with law. *See generally Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 493, 94 S.Ct. 1879, 1892, 40 L.Ed.2d 315 (1974). See also Components for Research, Inc., 241 Cal.App.2d at 730, 50 Cal.Rptr. at 832* (whether the product design was patented or not, plaintiff is entitled to trade secret protection for manufacturing process); *Sinclair, 42 Cal.App.3d at 225, 116 Cal.Rptr. at 660, 184 USPQ at 686* ("Trade secret law encourages invention in areas where patent law does not reach"). *Accord Thermotics, Inc. v. Bat-Jac Tool Co., Inc., 541 S.W.2d 255, 261, 193 USPQ 249, 253 (Tex.Civ.App.1976)* (post-patent improvement protectable under trade secret law); *Franke v. Wiltschek, 209 F.2d 493, 495, 99 USPQ 431, 433 (2d Cir.1953)* (immaterial that defendants could have derived trade secrets from expired patent).

It is apparent that the court imposed a higher standard for trade secret status than is contained in California law. The court's instructions, commentary, and phrasing of the special verdicts not only placed a prejudicially heavy burden on Richardson, but also demeaned the information itself.

Despite this prejudicial environment, the jury found that items 5 and 6 were trade secrets and had been misappropriated by Suzuki, and assessed damages therefore. The jury also found that items 1-4 and 7-11 were not trade secrets, and that for some but not all of these items compensation**1245** should be awarded based on "benefit from the plaintiff's knowledge and from the time and effort expended by him".

The district court granted Suzuki's motion for a new trial with respect to items 5 and 6, and upheld the jury verdicts with respect to items 1-4 and 7-11.

C. The new trial of items 5 and 6

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[26] The grant of a new trial is ordinarily not reviewable, but on this issue the district court entered final judgment for purposes of appeal, and certified three questions. The first certified question is:

1. Were the plaintiff's asserted trade secrets Nos. 5 and 6: (a) Actually valid proprietary trade secrets, as the jury found and awarded very substantial royalties; or (b) Did the plaintiff's contributions in these respects represent no more than the services of a skilled mechanic, which readily could have been duplicated by the defendant, and which entitled the plaintiff only to quantum meruit compensation, as the court believes; or (c) Were the plaintiff's contributions no more than those contemplated under the option agreement and paid for by the defendant, as the defendant contends?

We respond to this question: From the record before us the jury verdict that items 5 and 6 met the requirements for trade secret protection was supported by the great weight of the evidence. Richardson and Cazort testified about the design modifications that were the subject of item No. 5 and the Alternate Shock Mount subject of item No. 6. The Alternate Shock Mount was considered sufficiently novel and valuable that Suzuki included it in a patent application filed in Japan and later in the United States. The record does not negate the jury's determination of the value of this information. According to California law it is immaterial what Suzuki could have done, for it chose to use Richardson's information, which it obtained under restraint.

[27] In further response, we remark that the relation between the parties, set by contract, was a routine commercial arrangement wherein Richardson agreed to facilitate Suzuki's testing and evaluation of Richardson's invention. This did not convert Richardson's work in adapting his invention to Suzuki's motorcycle into the work of a hired technician whose work product was automatically owned by Suzuki. The proprietary nature of the work done and information provided by Richardson was established by agreement, as was the agreement that Suzuki would not use this information if it did not exercise its option.

There was substantial evidence before the jury that the information on items 5 and 6 was not publicly known, that Suzuki agreed to receive and preserve it in confidence, and that the information fully satisfies the statutory and jurisprudential requirements for protectible trade secrets.

In order to vacate the jury's verdict upholding items 5 and 6 as trade secrets and grant a new trial thereon, the trial court must find that the jury's verdict "is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir.1976)*, cert. denied, *429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)* (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246, 256, 115 USPQ 160, 168-69 (9th Cir.1957)*, cert. denied, *356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958)*); *William Inglis & Sons Baking Co. v ITT Continental Baking Co., Inc., 668 F.2d 1014, 1027 (9th Cir.1981)*, cert. denied, *459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)*. It is insufficient that the district court would simply have reached a different verdict.

Our review requires determination of whether the district court abused its discretion in its decision to grant the new trial. *Id. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014, 227 USPQ 598, 602 (9th Cir.1985)*, cert. denied, *474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986)* ("the grant or denial of either a motion for a new trial or a motion to amend the judgment must be reviewed on the basis of a determination of whether the district court abused its discretion.") **1246** See generally *Seattle Box Co. v. Industrial Crating & Packing, Inc., 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985)* ("Abuse of discretion may be established by showing that the district court either made an error of law, or a clear error of judgment, or made findings which were clearly erroneous.") The district court's statements, for example with respect to item 5, "I simply cannot conclude that that is a trade secret. It was an attempt to help Suzuki adapt the Richardson concept to the Suzuki machine ...", reflect an error of law.

Despite the legal error in the instructions, as we have discussed, any prejudice resulting therefrom favored

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Suzuki, not Richardson. We conclude that the district court exceeded its discretionary authority in vacating the jury verdict and ordering a new trial. That action is reversed, and the jury verdict is reinstated as to items Nos. 5 and 6, including the damages assessed for items Nos. 5 and 6.

### D. Items 1-4 and 7-11

[28] For asserted trade secrets Nos. 1-4 and 7-11, the jury may well have been led by erroneous instructions into applying an incorrect legal standard, in finding that these items were not trade secrets. It appears, however, that Richardson did not move for judgment n.o.v. or a new trial on these verdicts. Although there is a hint in the post-trial colloquy that the court intended or was willing to retry all the trade secret issues along with items 5 and 6, this does not satisfy the rule, supported by logic, that the formalities of post-trial motions be respected. *Snellman v. Ricoh Co., 836 F.2d 528, 534, 5 USPQ2d 1341, 1346 (Fed.Cir.1987)* (applying Ninth Circuit law in holding that motions for judgment n.o.v. and for a new trial must be made). Thus we have no authority to review these verdicts.

By special verdict the jury was also asked to assess damages for Suzuki's use of the information encompassed in each of items 1-4 and 7-11, even if the information did not "rise to the dignity of trade secrets". The jury determined this sum for each item, some at $0, the highest at $25,000, for a total of $104,000. The district court sustained this award, on a theory of "quantum meruit compensation". Both parties appeal this award, Richardson asserting its inadequacy, and Suzuki arguing that Richardson was fully paid for his information in the option agreement, and is not entitled to damages for Suzuki's use of any information received from Richardson.

We have rejected, as a matter of law, Suzuki's theory that it is entitled to use, free, the information disclosed by Richardson under the option agreement. Richardson's disclosures were made under terms that prohibited their use by Suzuki if the option was not exercised. This contract provision does not depend on whether the information is a trade secret, but only on whether it was previously known to Suzuki or generally known to the public, as discussed *ante*.

[29] An appellate tribunal is abjured to determine whether a jury verdict can be sustained, on any reasonable theory. *Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957)* ("A successful party in the District Court may sustain its judgment on any ground that finds support in the record.")

[30] There was substantial evidence at trial whereby a reasonable jury could have determined the sums awarded by this jury. Indeed, Suzuki does not challenge the valuations of the damage awards for items 1-11, arguing instead that nothing at all is owing.

The judgment as to items 1-4 and 7-11 is affirmed, including damages assessed for these items in the total amount of $104,000.

### V

### *Injunction*

The district court, having entered final judgment that the Suzuki Full Floater suspension infringed claim 9 of the '332 patent, denied Richardson's motion for injunction.

Infringement having been established, it is contrary to the laws of property, of **\*1247** which the patent law partakes, to deny the patentee's right to exclude others from use of his property. 35 U.S.C. § 261. "[T]he right to exclude recognized in a patent is but the essence of the concept of property". *Connell, 722 F.2d at 1548, 220 USPQ at 198* (citing *Schenck v. Nortron Corp., 713 F.2d 782, 218 USPQ 698 (Fed.Cir.1983)*).

[31][32] It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it. *W.L. Gore & Associates, Inc. v. Garlock, Inc., 842 F.2d 1275, 1281, 6 USPQ2d 1277, 1283 (Fed.Cir.1988)*. Suzuki has presented no such reason. This court stated in *H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 390, 2 USPQ2d 1926, 1929-30 (Fed.Cir.1987)*, when reviewing an injunction granted *pendente lite*:

In matters involving patent rights, irreparable harm

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

has been presumed when a clear showing has been made of patent validity and infringement. *Smith International, 718 F.2d at 1581, 219 USPQ at 692*. This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.

We observe that the '332 patent will expire in less than four years, that litigation started over eight years ago, and that the district court remarked that further proceedings could consume "several years".

[33] Further, a misappropriator of trade secrets has no authorization of right to continue to reap the benefits of its wrongful acts. Richardson is entitled to an injunction against Suzuki's continuing use of trade secrets Nos. 5 and 6. *By-Buk Co., 163 Cal.App.2d at 167, 329 P.2d at 153, 118 USPQ at 553-54; Components for Research, Inc., 241 Cal.App.2d at 730, 50 Cal.Rptr. at 832.*

The denial of Richardson's request for injunction is reversed. On remand the district court shall enter appropriate injunctive relief.

## VI

### *Fraud*

The jury found by special verdicts that Suzuki fraudulently induced Richardson to reveal his trade secrets by concealing its intention not to exercise its option or take a license, and that Suzuki fraudulently concealed from Richardson the fact that it was developing the Full Floater "with the intention of declining to exercise the option and then nevertheless to utilize the plaintiff's trade secrets in the full floater". The jury also found fraud in that Suzuki filed the Tamaki patent application "in the knowledge that the invention asserted therein (the spring/swing arm connection) was first disclosed to them by Richardson". The jury awarded Richardson $20,000 in compensatory and $100,000 in punitive damages.

The district court vacated the judgment and ordered a new trial. Suzuki asserts that the court should have granted Suzuki's motion for judgment n.o.v. instead of ordering a new trial, while Richardson asserts that

the court should have upheld the jury verdicts.

The district court certified the question of how to treat its belief that Suzuki did not commit the offenses of fraud and concealment found by the jury, including the question of punitive damages. We first must consider whether a reasonable jury could have reached the verdicts here reached. *Lavender v. Kurn, 327 U.S. at 653, 66 S.Ct. at 744*. Apt is the statement of the Ninth Circuit in *Crocker-Citizens Nat'l Bank v. Control Metals Corp., 566 F.2d 631, 635 (9th Cir.1977)*: "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable", quoting *Cockrum v. Whitney, 479 F.2d 84, 86 (9th Cir.1973)*, in turn quoting *Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944)*.

[34][35] The record shows that there was testimony, based on certain of Suzuki's documents, on which a reasonable jury **\*1248** could have supported these verdicts. There were issues of credibility, and inferences that could reasonably have been drawn in a manner adverse to Suzuki. "The credibility of witnesses and the weight of the evidence are issues for the jury and are generally not subject to appellate review." *Benigni*, 853 F.2d at 1525. While the district court may have believed that Suzuki did not commit fraud, review shows that the requirements for vacating the jury verdicts and relitigating the issue were not met. *Hanson, 541 F.2d at 1359; William Inglis, 668 F.2d at 1027*. A fresh trial is not warranted simply because the district court would have reached a different verdict.

[36] A jury assessment of punitive damages is not excluded in circumstances such as those here presented, where the jury expressly found fraud. *Tri-Tron Int'l v. Velto, 525 F.2d 432, 437, 188 USPQ 177, 181 (9th Cir.1975)* ("where compensatory damages are sought and awarded, the court has power, on a proper record, to award punitive damages"), citing *Clark v. Bunker, 453 F.2d 1006, 1012, 172 USPQ 420, 424 (9th Cir.1972)*, in turn citing *El Rancho, Inc. v. First Nat'l Bank, 406 F.2d 1205, 1218 (9th Cir.1968), cert. denied, 396 U.S. 875, 90 S.Ct. 150, 24 L.Ed.2d 133*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 27

(1969) (jury verdict awarding punitive damages was supported by evidence of malice) and *Davenport v. Mutual Benefit Health & Accident Ass'n,* 325 F.2d 785, 787 (9th Cir.1963) (remand for trial to allow evidence of fraud to support claim of punitive damages.)

The district court correctly instructed the jury as to the law, stating that "it's only if you find that the defendants' conduct stem from malice, oppression, fraud or bad faith that you can find any punitive damage at all." As stated in *In re Innovative Construction Systems, Inc.,* 793 F.2d 875, 889, 230 USPQ 94, 104 (7th Cir.1986):

[A] breach of faith underlies every trade secret claim. However, establishing that breach alone is insufficient to warrant an award of punitive damages; one must also demonstrate that the defendant acted wantonly, willfully, or in reckless disregard of the plaintiff's rights. (Citations omitted)

*See also Neal v. Farmers Insurance Exchange,* 21 Cal.3d 910, 928, 582 P.2d 980, 986, 148 Cal.Rptr. 389, 395 (1978) ("In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ.Code § 3294.) He must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights") (quoting *Silberg v. California Life Insurance Co.,* 11 Cal.3d 452, 462, 521 P.2d 1103, 1110, 113 Cal.Rptr. 711, 718 (1974)); *Reynolds Metals Co. v. Lampert,* 316 F.2d 272, 275 (9th Cir.1963), *cert. denied,* 376 U.S. 910, 84 S.Ct. 664, 11 L.Ed.2d 608 (1964) (in jury trial, evidence to justify punitive damages must show injury was done maliciously or willfully and wantonly or committed with bad motive or recklessly); *Transgo, Inc.,* 768 F.2d at 1024 (The determination to award punitive damages was "within the exclusive province of the jury") (quoting *Runge v. Lee,* 441 F.2d 579, 584, 169 USPQ 388, 392 (9th Cir.), *cert. denied,* 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971)).

The jury having found by special verdicts that Suzuki acted fraudulently, the requisite intent was established. "We give the trial judge and jury wide discretion in assessing punitive damages." *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 772 (9th

Cir.1984). The jury's award was not "so disproportionate to the damages sustained as to be the result of passion or prejudice". *Id.* (citing *Neal,* 21 Cal.3d at 928, 582 P.2d at 990, 148 Cal.Rptr. at 399), *Transgo, Inc.,* 768 F.2d at 1024 ("We will not overturn such an award unless it appears that the jury was influenced by passion or prejudice.") (citing *Harmsen v. Smith,* 693 F.2d 932, 947 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)).

We answer the certified question that, in this case, neither a new trial nor judgment n.o.v. was warranted. The order of a new trial on this issue is vacated. The judgment on the jury verdicts of fraud and the award of compensatory and punitive damages is reinstated.

## *1249 VII

### *The Tamaki Patent*

Richardson states that Suzuki fraudulently patented the Alternate Shock Mount that had been disclosed to Suzuki by Richardson and Cazort, in a patent that also described the "criss-cross" modification developed at Suzuki. There was evidence and argument on the factual premises, including the absence of supporting documentation on the part of the named inventors Hirohide Tamaki and Manabu Suzuki, the earliest record on their behalf being dated October 1979. The corresponding Japanese patent application was filed on October 16, 1979.

The jury rendered the following special verdicts:
C-3. Did Suzuki and/or Mr. Tamaki file the Tamaki patent application in the knowledge that the invention asserted therein (the spring/swing arm connection) was first disclosed to them by Richardson:
Answer: YES
H-1. Do you find that the Plaintiff, Richardson, is the real inventor of the invention shown in the Tamaki patents and patent applications?
Answer: NO

It was not significantly disputed at trial that claims 1 through 8 of the Tamaki corresponding United States Patent No. 4,457,393 cover the Alternate Shock Mount of Richardson and Cazort, and that claim 9 includes the criss-cross embodiment of Tamaki and Su-

zuki. (The scope of claim 5 is raised, but is not material to our conclusion.)

[37] The district court denied Richardson's post-trial motion that the Tamaki patent be assigned to Richardson. In colloquy with counsel the court explained that it could not do so because "the jury said Richardson wasn't the inventor". Indeed it was conceded, and discussed at trial, that Richardson and Cazort, not Richardson alone, invented the Alternate Shock Mount. Cazort, as well as Richardson, testified at length on this structure. Special verdict H-1 that Richardson is not "the real inventor" is in accord with the co-inventor status of Cazort, and also with the Japanese contribution of the criss-cross embodiment.

The force of special verdict C-3 is not diminished. This verdict was not challenged on appeal. "It was further the duty of the court to direct the appropriate judgment to be entered upon the special verdict." *Traders and General Insurance Co. v. Mallitz,* 315 F.2d 171, 175 (5th Cir.1963). The district court having failed to implement this verdict, Richardson's motion for judgment and for assignment of the Tamaki patents was not out of order.

[38] The remedy of assignment of the Tamaki patents is a different question from whether Richardson is a sole or joint inventor. The correction of inventorship is an administrative step, and is not before the court. Similarly, the presence of a further modification in one or two claims of the patent directed to the Alternate Shock Mount does not negate the imposition of an equitable remedy. To hold otherwise would ratify and indeed reward the wrongdoing.

Based on the jury verdict, Richardson is entitled to ownership of the patents as against Suzuki. Such remedy is appropriate under the circumstances; *see, e.g., Colgate-Palmolive Co. v. Carter Products, Inc.,* 230 F.2d 855, 865, 108 USPQ 383, 391 (4th Cir.), *cert. denied,* 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956) (corporate assignee of patent application ordered to assign to original holder of trade secrets all rights to patent applications based thereon); *De Long Corp. v. Lucas,* 176 F.Supp. 104, 134 (S.D.N.Y.1959), *aff'd,* 278 F.2d 804 (2nd Cir.), *cert. denied,* 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58

(1960) (when an employee has acquired patents on inventions developed by his former employer, "the courts will hold the wrongdoer to be a constructive trustee of the property misappropriated and will order a conveyance by the wrongdoer to the former employer"); *Becher v. Contoure Laboratories, Inc.,* 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed.2d 752 (1929) (same); *Saco-Lowell Shops v. Reynolds,* 141 F.2d 587, 598, 61 USPQ 3, 13 (4th Cir.1944) (requiring assignment of patent **1250** based on ideas received by licensee from licensor in confidence during development of invention for market).

[39] Suzuki argues that Richardson has no remedy other than by seeking an interference in the United States Patent and Trademark Office with his own invention, and presumably by taking similar actions, if such are available, in other countries. We do not agree. The courts are not powerless to redress wrongful appropriation of intellectual property by those subject to the courts' jurisdiction.

The denial of Richardson's motion for judgment is reversed. Suzuki shall assign to Richardson the patents filed by Suzuki that include the Richardson/Cazort invention of the Alternate Shock Mount, in all countries. We remand to the district court for the purpose of implementing compliance.

VIII

*Prejudgment Interest*

The district court denied Richardson's request for prejudgment interest on both the patent infringement and the trade secret damage awards. Prejudgment interest is the rule governing this class of award. *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983); *Lummus Industries, Inc. v. D.M. & E. Corp.,* 862 F.2d 267, 274, 8 USPQ2d 1983, 1988 (Fed.Cir.1988); *Fromson,* 853 F.2d at 1573-74, 7 USPQ2d at 1611; *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.,* 807 F.2d 964, 967, 1 USPQ2d 1191, 1193 (Fed.Cir.1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987).

No exceptional circumstances having been shown, and no reason why damages for misappropriated

trade secrets should be treated differently from damages for patent infringement, the denial of prejudgment interest is reversed.

IX

*Willful Infringement and Exceptional Case*

The district court refused to submit the question of willful infringement to the jury, stating that Richardson had not provided sufficient evidence to go to the jury.

To refuse to give an issue to the jury is to direct a verdict in favor of the opposing party. Thus we review the district court's ruling on the standard of "whether the evidence permits only one reasonable conclusion after viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in favor of that party." *Bulgo v. Munoz, 853 F.2d 710, 714 (9th Cir.1988)* (citing *Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986)). See also Connell, 722 F.2d at 1546, 220 USPQ at 197.*

[40] Richardson refers to the evidence adduced in connection with the jury verdicts of fraud, to the verdicts of misappropriation of trade secrets 5 and 6, to the absence of any opinion of United States counsel concerning validity of the '332 patent when Suzuki started its infringing activity, and to evidence from Suzuki's records tending to show bad faith. Viewing this evidence in the light most favorable to Richardson, and drawing all reasonable inferences in his favor, there was sufficient evidence to take to the jury, for the evidence does not require a verdict in favor of Suzuki. Absent sufficient basis for directing the verdict, Richardson has the right of jury determination of this factual question. Willfulness of behavior is a classical jury question of intent. *Shiley, 794 F.2d at 1568, 230 USPQ at 115; Hammerquist v. Clarke's Sheet Metal, Inc., 658 F.2d 1319, 1325-26, 212 USPQ 481, 486 (9th Cir.1981), cert. denied, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).* When trial is had to a jury, the issue should be decided by the jury.

We remand for this purpose. The jury's findings on the issue of willfulness will be pertinent not only to the question of multiplication of damages under 35 U.S.C. § 284, but also to determination of whether this is an exceptional case in terms of 35 U.S.C. § 285. Entitlement under **1251** California Civil Code § 3426 et seq. may also be considered.

X

*Other Arguments*

Both sides have raised many points in their briefs, disputing most aspects of the proceedings. We have considered all arguments in reaching our conclusions.

*Costs*

The award by the trial court of only one third costs to Richardson, in view of the judgments in his favor on the major substantive issues, exceeded the trial court's discretionary authority. Richardson is entitled to his statutory costs incurred before the district court. The reduction thereof is reversed.

Costs on this appeal are taxed in favor of Richardson.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED

C.A.Fed. (Cal.),1989.
Richardson v. Suzuki Motor Co., Ltd.
868 F.2d 1226, 9 U.S.P.Q.2d 1913

END OF DOCUMENT

TAB 6

LEXSEE 187 FRD 152

**UNITED STATES OF AMERICA, Plaintiff, v. DENTSPLY INTERNATIONAL, INC., Defendant. HENRY SCHEIN, INC., Movant.**

**Civil Action No. 99-5 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*187 F.R.D. 152; 1999 U.S. Dist. LEXIS 10072*

**May 28, 1999, Argued, Wilmington, Delaware
June 11, 1999, Decided**

**DISPOSITION:** [**1] Schein's motion to intervene granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff United States filed against defendant in an antitrust action, and defendant filed a motion for discovery of the Civil Investigative Demands (CID) plaintiff made upon 184 witnesses regarding defendant's business practices, and confidential and propriety information. Movant, third-party respondent filed a motion for a protective order, to prohibit plaintiff from releasing the CID's to defendant.

**OVERVIEW:** Plaintiff United States filed an antitrust action against defendant, and defendant filed a motion for discovery on an interrogatory sent to plaintiff. Plaintiff refused to answer the interrogatory on work product privilege, and movant, third-party respondent filed a motion to intervene, and for a protective order, to prohibit plaintiff from releasing any confidential and propriety information movant gave to plaintiff as per a Civil Investigative Demand (CID). The court held that defendant's interrogatory did not violate plaintiff's work privilege, and order plaintiff to answer it. The court also granted movant's motion to intervene in the proceedings, and granted it and plaintiff a protective order for the release of any confidential information to defendant that would work a clearly defined and serious injury. However the court refused to prohibit defendant from limiting its outside counsel's employment. The court finally ordered that the parties agree to a third-party binding arbitrator to decide whether information to be

discovered would violate the protective order, in order to not tax judicial resources.

**OUTCOME:** The court granted defendant's motion for plaintiff to answer defendant's interrogatory, and for plaintiff's and movant's motion for a protective order to prohibit the release of any confidential information that would work a clearly defined and serious injury. The court also ordered the parties to agree to binding arbitration over whether information to be discovered was confidential and protected under the court's order.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN1] The work product doctrine protects from disclosure, inter alia, the legal strategies and mental impressions of an attorney formed in anticipation of or preparation for litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN2] The general rule is that one party may discover relevant facts known or available to the other party, even though such facts are contained in documents that are not discoverable. Counsel or litigants cannot use the work product doctrine to hide facts underlying the litigation from discovery.

*Civil Procedure > Class Actions > General Overview*

187 F.R.D. 152, *; 1999 U.S. Dist. LEXIS 10072, **1

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
[HN3] *Fed. R. Civ. P. 26(b)(3)* does not serve as a basis for a refusal to respond to discovery requests seeking the disclosure of facts by deposition or interrogatories. By its plain language, *Fed. R. Civ. P. 23(b)(3)* applies only to the production of documents and tangible things.

*Civil Procedure > Parties > Intervention > General Overview*
[HN4] The court should relax the requirement of a common question of law or fact when the intervenors are not seeking to become parties to the litigation. There is no reason to require such a strong nexus of fact or law when a party seeks to intervene only for the purpose of modifying a protective order.

*Civil Procedure > Parties > Intervention > General Overview*
*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
[HN5] Intervention is appropriate to enable a litigant who was not an original party to an action to challenge protective or confidentiality orders entered in that action.

*Civil Procedure > Discovery > Protective Orders*
*Trade Secrets Law > Civil Actions > Discovery*
*Trade Secrets Law > Civil Actions > Protection Orders*
[HN6] Under *Fed. R. Civ. P. 26(c)(7)*, a court may, upon a showing of good cause, issue an order protecting a trade secret or other confidential research, development, or commercial information from disclosure. The court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN7] A prerequisite to the issuance of a protective order governing discovery is a showing of good cause. *Fed. R. Civ. P. 26(c)*. Good cause exists when disclosure will

result in a clearly defined and serious injury to the party seeking the protective order. The litigant seeking the protective order must articulate the injury with specificity. Broad allegations of harm, unsubstantiated by specific examples, do not support a showing of good case. The burden of justifying a protective order remains on the litigant seeking the order. In determining good cause, the court must balance the risk of injury without the protective order and the requesting party's need for the information. The court has wide discretion in determining the scope of a protective order.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN8] Under *Fed. R. Civ. P. 26(c)* of the Federal Rules of Civil Procedure, the court may only grant a protective order where there is good cause shown. The appropriate standard for the confidential information designation in a protective order is information, the disclosure, or further disclosure, of which will work a clearly defined and serious injury.

*Civil Procedure > Discovery > Protective Orders*
*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
[HN9] Status as in house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access. A district court must examine the particular counsel's relationship and activities to determine an appropriate protective order. Prohibiting disclosure of confidential information to in-house counsel may be appropriate when in-house counsel is involved in competitive decision making activities in which counsel participates and advises in any or all of the client's decisions made in light of similar or corresponding information about a competitor. The critical inquiry is whether in-house counsel is involved in competitive decision making such that the attorney would have a difficult time compartmentalizing his knowledge.

*Civil Procedure > Judicial Officers > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN10] While the Federal Rules of Civil Procedure obligate a judge to handle legitimate discovery disputes, the Federal Rules do not require a judge to process disagreements between party litigants, much less

Case 1:05-md-01717-JJF    Document 468    Filed 05/09/2007    Page 61 of 73

Page 3
187 F.R.D. 152, *; 1999 U.S. Dist. LEXIS 10072, **1

nonparty differences arising from lawyer crafted protective orders.

**COUNSEL:** For plaintiff: Carl Schnee, Esquire, United States Attorney, Judith M. Kinney, Esquire, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware.

For plaintiff: Mark J. Botti, Esquire, Michael S. Spector, Esquire, Michael D. Farber, Esquire, Of Counsel, United States Department of Justice, Washington, D.C.

For defendant: James P. Hughes, Jr., Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware.

For defendant: Margaret M. Zwisler, Esquire, Richard A. Ripley, Esquire, Of Counsel, Howrey & Simon, Washington, D.C.

For Henry Schein, Inc., Movant: John E. James, Esquire, W. Harding Drane, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware.

For Henry Schein, Inc., Movant: Martha E. Gifford, Esquire, Heather Martinez, Esquire, Of Counsel, Proskauer Rose LLP, New York, New York.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINION BY:** Murray M. Schwartz

**OPINION:**

[*154] **OPINION**

Argued: May 28, 1999
Dated: June 11, 1999
Wilmington, Delaware

**SCHWARTZ, Senior District Judge**

The United States Department of Justice ("Justice" or the "Government") has filed an antitrust [**2] action against Dentsply International, Inc. ("Dentsply") after a three-year investigation of Dentsply's business practices. That investigation included interviews of 184 witnesses and Civil Investigative Demands ("CIDs") on numerous companies, thereby allowing Justice to obtain confidential and proprietary information. Two matters, both of which stem from Justice's three-year

investigation, are presently before the Court.

[*155] First, pursuant to *Rule 37(a) of the Federal Rules of Civil Procedure*, Dentsply has filed a motion to compel the Government to answer an interrogatory seeking facts learned by the Government during its witness interviews in the course of its investigation of Dentsply. n1

> n1 While two document requests were also the subjects of the motion to compel, at oral argument counsel for Dentsply withdrew as moot its motion to compel production of the documents at issue in those requests.

Second, pursuant to *Federal Rule of Civil Procedure 26(c)*, the Government and Henry Schein, Inc. ("Schein"), a third-party [**3] respondent to a CID, have each filed a motion for protective a order. Schein both competes with and distributes for Dentsply, depending on the particular line of Dentsply's dental product. Schein has moved to intervene solely to urge the Court to adopt a protective order with provisions protecting it and other third-parties who have responded to the CIDs. Dentsply, the Government and Schein all agree, in principle, that a protective order is necessary to protect proprietary information but disagree on its scope and content. Both the Government's and Schein's motions request, among other things, a protective order provision denying Brian Addison, Dentsply's General Counsel, access to third-party confidential information obtained pursuant to the CIDs. Schein also seeks a provision in the protective order restraining outside counsel's representation of Dentsply for a defined future period.

For reasons which follow the Court will grant Dentsply's motion to compel as well as Schein's motion to intervene. The Government's and Schein's motions for protective orders will also be granted with respect to shielding third-party proprietary information from Dentsply's general counsel subject to [**4] a safety valve which would allow Addison to see the information in what would have to be very unusual circumstances. The Court will deny Schein's motion to the extent it seeks to limit Dentsply's outside counsel's representation of Dentsply. Finally, the Court will make several rulings regarding its role in the proposed protective orders.

Case 1:05-md-01717-JJF    Document 468    Filed 05/09/2007    Page 62 of 73

Page 4

187 F.R.D. 152, *155; 1999 U.S. Dist. LEXIS 10072, **4

**I. Motion to Compel**

Dentsply's motion to compel arises because of the Government's refusal to answer the following interrogatory:

> With regard to the 184 individuals and entities who were interviewed by the DOJ pursuant to its CID investigation of Dentsply and subsequently identified in Plaintiff's Rule 26(a)(1) Initial Disclosures, please identify in detail all facts known to these individuals and entities that are relevant to the DOJ's claims against Dentsply in this matter.

The Government contends that because the three-year Dentsply investigation, including issuance of the CIDs, was initiated and supervised by Department of Justice attorneys in anticipation of litigation, all facts learned during that investigation constitute work product.

Indeed, [HN1] the "work product doctrine" protects from disclosure, *inter alia*, [**5] the legal strategies and mental impressions of an attorney formed in anticipation of or preparation for litigation. *Hickman v. Taylor, 329 U.S. 495, 510, 91 L. Ed. 451, 67 S. Ct. 385 (1947); see also 6 Moore's Federal Practice § 26.70*[2][c] (3d ed. 1998) ("Courts have continued to apply Hickman to prevent parties from circumventing the work product doctrine by attempting to elicit an attorney's thought process through depositions or interrogatories.") Despite its protestations to the contrary, the Government is attempting here to extend work product protection to the facts which form the basis of its antitrust lawsuit. Justice is clearly not required to turn over its attorneys' memoranda resulting from the interviews, and Dentsply does not contend otherwise since this type of information involves the mental impressions protected by the work product doctrine. Rather, Dentsply seeks only the facts that form the basis of the lawsuit -- the interrogatory does not require the Government to supply its counsel's view of the case, identify the facts which counsel considered significant or reveal the specific questions asked by the Government attorneys.

[HN2] The general rule is [**6] that one party may discover relevant facts known or available [*156] to the other party, even though such facts are contained in documents that are not discoverable. *Bogosian v. Gulf Oil Corp., 738 F.2d 587, 595 (3d Cir. 1984)* ("Of course, where the same document contains both facts and legal theories of the attorney, the adversary party is entitled to discovery of the facts. It would represent a retreat from the philosophy underlying the Federal Rules of Civil Procedure if a party could shield facts from disclosure by the expedient of combining them or interlacing them with core work product."); *Farran v. Johnston Equip., Inc., 1995 U.S. Dist. LEXIS 13402, Civ. A. No. 93-6148, 1995 WL 549005,* at *3 (E.D. Pa. Sept. 12, 1995) ("The work product doctrine furnishes no shield against discovery by interrogatories or by depositions of the facts that the adverse party has learned of the persons from whom such facts were learned."); *Eoppolo v. National R.R. Passenger Corp., 108 F.R.D. 292, 294 (E.D. Pa. 1985); In re Dayco Corp. Derivative Sec. Litig., 99 F.R.D. 616, 624 (S.D. Ohio 1983)* (ordering plaintiff to answer defendants' interrogatory because "defendants may discover the facts upon which Plaintiffs, and/or [**7] their counsel, base their allegations"); *Fed. R. Civ. P. 26(b)(3)* advisory committee's note to 1970 amendments; 9 Charles Alan Wright et al., Federal Practice and Procedure § 2023, at 330 (2d ed. 1994) ("The work product concept furnishe[s] no shield against discovery, by interrogatories . . . of the facts that the adverse party's lawyer has learned"); *6 Moore's Federal Practice § 26.70*[2][a] (stating that work product doctrine does not protect facts contained within work product). Counsel or litigants cannot use the work product doctrine to hide facts underlying the litigation from discovery. *Hickman, 329 U.S. at 507* ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession."); *Musko v. McCandless, 1995 U.S. Dist. LEXIS 14477, Civ. A. No. 94-3938, 1995 WL 580275,* at *1 n.2 (E.D. Pa. Sept. 29, 1995) ("Facts that attorneys witness or discover through their investigative efforts, as opposed to the impressions and conclusions drawn from them, are not protected by the work product doctrine."); *In re Convergent Technologies Second Half 1984 Sec.* [**8] *Litig.,* 122 F.R.D. 555, 558 (N.D. Cal. 1988) ("Counsel can learn those facts . . . by posing interrogatories to [opposing] counsel that would compel disclosure of the substance of relevant information [opposing] counsel has learned from non-party witnesses."); *Laxalt v. McClatchy, 116 F.R.D. 438, 442 (D. Nev. 1987)* (holding that party must reveal all relevant facts in the case regardless of whether the facts were discovered in an investigation in anticipation of litigation).

187 F.R.D. 152, *156; 1999 U.S. Dist. LEXIS 10072, **8

The weakness of the Government's position is perhaps best exposed by its necessary concession at oral argument that at some point before trial it would have to reveal the facts upon which it would rely to prove its case against Dentsply. But, if facts developed during the three-year investigation were truly work product, the facts sought by Dentsply would never have to be disclosed. n2 The Government, therefore, under the guise of the work product doctrine, seeks to manipulate the timing of the revelation of facts it has gathered and upon which it intends to rely to suit its purposes. This was never the intent of the work product doctrine, and the Court declines the Government's invitation to extend **[**9]** the scope of that doctrine.

> n2 While an attorney's mental impressions or legal strategies might become apparent to opposing counsel in the course of discovery or trial, the attorney does not have to disclose them.

The Government also asserts its position is supported by *Federal Rule of Civil Procedure 26(b)(3)* which provides in pertinent part:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has **[*157]** been made, the court shall protect against disclosures of the mental impressions, conclusions, **[**10]** opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The Government, seizing upon the language "the court shall protect against disclosures of mental impressions,

conclusions, opinions, or legal theories of an attorney" insists the Dentsply interrogatory is designed to obtain disclosures prohibited by Rule 26(b)(3). That argument, however, is misplaced because [HN3] Rule 26(b)(3) does not serve as a basis for a refusal to respond to discovery requests seeking the disclosure of facts by deposition or interrogatories. By its plain language, Rule 23(b)(3) applies only to the production of documents and tangible things. *Eoppolo, 108 F.R.D. at 294.*

The Government's position is against the overwhelming weight of authority. Therefore, the Government will be required answer the interrogatory.

## II. Motion to Intervene

Schein has moved to intervene solely for a protective order guarding confidential business information. The Government served CIDs on several companies that Schein has since acquired. In response to the CIDs, those companies produced material and information, some of which was confidential -- sales and marketing **[**11]** plans, strategic plans, financial forecasts, margin information, customer information, pricing information, and information concerning distribution agreements with vendors other than the defendant Dentsply. Dentsply has served a request for documents on the Government, seeking disclosure of the material containing this confidential information. Further, Dentsply acknowledges that "it appears likely that during the course of this litigation, the parties will take [additional] third party discovery of Schein."

In response to the CID, Schein has provided "sales and marketing plans, strategic plans, financial forecasts and margin information, customer information, pricing information and information concerning Zahn's distribution and other agreements with manufacturers[,] [and] amounts spent on particular product areas, plans for expansion into particular markets, and deals struck with other manufacturers." n3 Affidavit of Norman Weinstock ["Weinstock Aff."], Docket Item ("D.I.") 22, P 12. According to Schein, allowing Dentsply access to the materials would give Dentsply competitive advantage in multiple ways which were spelled out explicitly and with great detail in the affidavit. **[**12]** Weinstock Aff., D.I. 22, PP 14-18. n4

> n3 Zahn Dental, Inc. was acquired by Schein in 1995 and continues to operate as

Case 1:05-md-01717-JJF    Document 468    Filed 05/09/2007    Page 64 of 73

Page 6

187 F.R.D. 152, *157; 1999 U.S. Dist. LEXIS 10072, **12

a division of Schein. Weinstock Aff., D.I. 22, P 3.

n4 *See also infra* note 6.

Understandably motivated by a desire to protect its confidential information, Schein seeks to share its views on the provisions of any protective order governing this litigation. *Rule 24(b) of the Federal Rules of Civil Procedure* governs intervention. The Rule provides in part:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

However, *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 778 (3d Cir. 1994)*, teaches that [HN4] the Court should relax the requirement of a common question of law or fact when the intervenors are not seeking to become parties to the litigation. "There is no reason to require [**13] such a strong nexus of fact or law when a party seeks to intervene only for the purpose of modifying a protective order." *Id.* (citing *Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 474 (9th Cir. 1992)).*

Thus, [HN5] intervention is appropriate "to enable a litigant who was not an original party to an action to challenge protective or confidentiality orders entered in that action." *Pansy, 23 F.3d at 778* (citations omitted). As of this date, no protective or confidentiality order has been entered because the parties were unable to agree upon one. Schein will be permitted to intervene for purposes of bringing to the Court's attention its view [*158] with respect to what should be contained in the protective order.

## III. Motions for Protective Order

Both Schein and the Government move for a protective order. [HN6] Under *Rule 26(c)(7) of the Federal Rules of Civil Procedure*, a court may, upon a showing of good cause, issue an order protecting a trade secret or other confidential research, development, or commercial information from disclosure. *Smith v. Bic Corp., 869 F.2d 194, 199 (3d Cir. 1989); C.A. Muer*

*Corp. v. Big River Fish Co., 1998 U.S. Dist. LEXIS 12639, Nos. Civ.A. 97-5402, 97-6073, [**14] 97-7154, 1998 WL 488007,* at *2 (E.D. Pa. Aug. 10, 1998). The court may "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." *Fed. R. Civ. P. 26(c)(7).*

[HN7] A prerequisite to the issuance of a protective order governing discovery is a showing of "good cause." *Fed. R. Civ. P. 26(c); Pansy, 23 F.3d at 786; 6 Moore's Federal Practice § 26.105*[8][a]. Good cause exists when disclosure will result in a clearly defined and serious injury to the party seeking the protective order. *Pansy, 23 F.3d at 786.* The litigant seeking the protective order must articulate the injury with specificity. *Id.; Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984).* "Broad allegations of harm, unsubstantiated by specific examples," do not support a showing of good cause. *Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).* The burden of justifying a protective order remains on the litigant seeking the order. [**15] *Id.* In determining good cause, the court must balance the risk of injury without the protective order and the requesting party's need for the information. *Pansy, 23 F.3d at 787; 6 Moore's Federal Practice § 26.105*[8][a]. The court has wide discretion in determining the scope of a protective order. n5 *Pansy, 23 F.3d at 787.*

> n5 The most common kind of protective order is an order limiting the persons who have access to the information disclosed and the purpose for which these persons may use the information. 8 Charles Alan Wright, et al., Federal Practice and Procedure § 2043 at 566 (2d ed. 1994); see 6 *Moore's Federal Practice § 26.105*[8][b].

The litigants agree that at least some of the information acquired pursuant to the CIDs or to be gathered in the future should be protected by a protective order. Indeed, the parties are in substantial agreement with respect to the majority of the content of a protective order. Because the parties have already reached such a degree of agreement, [**16] the Court will only rule on

three issues on which the parties could not agree along with a fourth concern raised by the Court *sua sponte*. They may then draft a proposed protective order incorporating the decisions explained in this Opinion and the accompanying Order. While the differences in the parties' positions are narrow, they are nonetheless significant. The parties disagree in three areas: 1) the standard governing when confidential status is conferred; 2) whether Brian Addison, General Counsel for Dentsply, may have access to confidential information; and 3) whether the Court should restrict outside counsel's future representation of Dentsply. In addition, the Court raises *sua sponte* the issue of whether the numerous proposed provisions for Court resolution of confidentiality designation and use at trial are manageable.

### A. Standard Governing Whether Documents Are To Be Designated Confidential

The proposed protective orders vary, in the first instance, in the standard upon which the "confidential" designation is based. In their proposed protective orders, Justice and Schein both agree that "confidential information" means "any trade secret or other confidential **[**17]** research, development, or commercial information, as such terms are used in *Fed. R. Civ. P. 26(c)(7)* . . . the disclosure, or further disclosure, of which would result in a clearly defined and serious injury." D.I. 19, Exh. A; D.I. 31, Exh. A. Dentsply, on the other hand, has proposed a protective order defining as "confidential" "information of a type contemplated by *Rule 26(c)(7)* **[*159]** *of the Federal Rules of Civil Procedure*, and which has not been made public and which a provider regards as proprietary financial information, or other confidential business or technical information." The real point of difference, then, is whether confidential information should be defined as information the disclosure of which would result in a clearly defined and serious injury or whether the "confidential" designation should be based on the information provider's regard for the information as proprietary or confidential.

While Dentsply has proposed an arguably more inclusive standard for confidentiality, [HN8] under *Rule 26(c) of the Federal Rules of Civil Procedure*, the Court may only grant a protective order where there is "good cause shown." *Fed. R. Civ. P. 26(c)*; *Smith v. Bic Corp., 869 F.2d at 199.* **[**18]** It follows the standard for confidentiality must be drawn such that Schein and

Justice can show "good cause" for protecting every document which falls within the ambit of that standard. As already rehearsed, the Third Circuit Court of Appeals has explained that "good cause is established on a showing that disclosure will work a clearly defined and serious injury . . . ." *Pansy, 23 F.3d at 786* (quoting *Publicker, 733 F.2d 1059 at 1071).* In the Third Circuit, the appropriate standard for the "confidential information" designation in a protective order is information, the disclosure, or further disclosure, of which will work a "clearly defined and serious injury." n6

n6 Schein has already demonstrated the potential for such injury should Dentsply have access to some of the information at issue. For example, Schein notes access to Schein's strategies, sales plans, pricing and other sensitive information would, *inter alia*, allow Dentsply to anticipate Schein's marketing plans in the areas in which they compete and would give Dentsply an unfair advantage in negotiating contracts in areas where Schein distributes for Dentsply. Weinstock Aff. D.I. 22, PP 14-18. Similarly, providing customer information including customer contacts and customer lists to Dentsply could allow Dentsply to take clients away from Schein or allow Dentsply to go directly to Schein customers to obtain comprehensive margin information to the detriment of Schein in its negotiations with Dentsply. *Id.* at P 17. Finally, in the artificial tooth area, access by Dentsply to confidential sales and marketing plans, customer lists and financial information would allow Dentsply to interfere with Schein's operations. *Id.* at P 18.

**[**19]**

### B. Access To Confidential Information By General Counsel of Dentsply

Schein and Justice seek a protective order provision prohibiting Brian Addison, Vice President, Secretary and General Counsel of Dentsply, from access to documents designated confidential. Dentsply urges that Addison should have access to all information disclosed or

187 F.R.D. 152, *159; 1999 U.S. Dist. LEXIS 10072, **19

produced, even if it is correctly designated as confidential -- that is so sensitive its disclosure or further disclosure would work a "clearly defined and serious injury."

Disclosure to employees of Dentsply generally of a nonparty competitors' sales and marketing plans, financial forecasts, margin, pricing, cost and customer information, etc., would obviously constitute a clearly defined and serious injury to all nonparties. The issue is whether the Government and Schein have carried their burden that access to confidential information by Dentsply's General Counsel, Addison, would also constitute a disclosure which would work a "clearly defined and serious injury."

The Government, Schein and Dentsply uniformly agree that the law and standard applied in *U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984),* should control. In [**20] that case, the Federal Circuit Court of Appeals first held "that [HN9] status as in house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access." *Id. at 1469.* It then instructed that a district court must examine the particular counsel's relationship and activities to determine an appropriate protective order. *Id. at 1468.* The Federal Circuit Court of Appeals concluded that prohibiting disclosure of confidential information to in-house counsel may be appropriate when in-house counsel is involved in "competitive decision making" -- activities in which counsel participates and advises "in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id. at 1468 & n.3.* This Court has similarly stated that the critical inquiry is whether in-house counsel is involved [*160] in competitive decision making such that the attorney "would have a difficult time compartmentalizing his knowledge." *Motorola, Inc. v. Interdigital Technology Corp., 1994 U.S. Dist. LEXIS 20714,* at *10, Civ.A. No. 93-488- LON (D. Del. Dec. 19, [**21] 1994) (citations omitted).

Typically, the "competitive decision making" standard for determining access to confidential competitive information has been applied to party-litigants. Counsel have not cited any case in which the "competitive decision making" standard has been applied, where, as here, proprietary information is that of a nonparty produced under governmental compulsion. The Court is concerned about applying the competitive

decision making standard to confidential information to hapless nonparties. While some nonparties may rejoice in the Justice Department's antitrust investigation, others doubtless consider the risk inherent in sharing extremely sensitive information too high a price to pay for curing the alleged unlawful anticompetitive activity. These nonparties have produced or will produce information because they are law-abiding entities with severely limited options. Their information will be shared not because they are a litigant seeking redress or an accused wrongdoer defending a lawsuit, but because they have valuable information which may or may not shed light on whether Dentsply has engaged in proscribed anticompetitive activity. Because the litigants have [**22] agreed to the "competitive decision making" standard, the Court accepts the standard as applicable to nonparties only for purposes of the instant motions. The Court follows this course because it has not had the benefit of adversary briefing. However, in making its "good cause" determination, the Court will factor the nonparty status of Dentsply's competitors and distributors whose confidential information is at issue in balancing the risk of injury that might result without the protective order against Addison's need for the information. n7

n7 The risk of injury to the owner of confidential information is presumably greater where the owner was never in a position to accept or reject the risk of disclosure of confidential information. Indeed, when a private plaintiff decides to bring a lawsuit, or when a private defendant develops strategy for defending a lawsuit, they accept the inherent risk that they will be required to disclose confidential information and may be injured by that disclosure. A nonparty, on the other hand, is in precisely the opposite situation; the nonparty has never undertaken the risks of disclosure.

[**23]

Dentsply argues its general counsel is not involved in competitive decision making. Dentsply offers the affidavit of Addison, stating he does not provide business advice or participate in Dentsply's nonlegal matters. D.I. 34, Ex. 1, at P 4. According to the affidavit, Addison has no involvement with the development of Dentsply's

Case 1:05-md-01717-JJF    Document 468    Filed 05/09/2007    Page 67 of 73

Page 9

187 F.R.D. 152, *160; 1999 U.S. Dist. LEXIS 10072, **23

marketing or distribution strategies or in the formulation of Dentsply's pricing and rebate plans, other than to review such matters for legal compliance. *Id.*

Dentsply further urges it will be prejudiced if Addison cannot have access to confidential information. It maintains that barring access to any confidential information is unfair because Dentsply relies on its general counsel to direct the litigation, devise legal strategy, and provide assistance to outside counsel. *See* D.I. 34, Ex. 1, Addison Aff. at P 8; *see also Carpenter Tech. Corp v. Armco, Inc.,, 132 F.R.D. 24, 28 (E.D. Pa. 1990)* (allowing in-house counsel access to confidential information because "given the technical nature of this case, the advice of in-house counsel with specialized knowledge of the steel industry could be essential to the proper handling of this litigation by [**24] outside counsel"); *Boehringer Ingelheim Pharmaceuticals, Inc. v. Hercon Laboratories Corporation, 1990 U.S. Dist. LEXIS 14075,* Civ.A. No. 89-484- *CMW, 1990 WL 160666,* at *2 (D.Del. Oct. 12, 1990)* (allowing in-house counsel already involved in the case to receive confidential information because the members of the in-house counsel staff could avoid conflicting work in the future and in-house counsel were responsible for major decisions concerning the instant litigation). Further, Dentsply's in-house counsel has been supervising the litigation from the beginning of the plaintiff's CID investigation approximately four years ago. D.I. 34, Ex. 1, Addison Aff. at P 8.

In answer, Schein and the Government point to several factors counseling against [*161] Addison having access to this confidential information. Both assert that Addison, as an officer of Dentsply, could base future business decisions on information learned during discovery. Both Schein and the Government also assert giving Addison access to the confidential information increases the risk of its inadvertent disclosure. In addition, Justice argues that allowing defendant's in-house counsel to have access to the confidential information is likely to impede discovery [**25] in this and other litigation because nonparties may be less willing to cooperate.

Additionally, Schein and Justice argue that Addison is, in fact, involved in business decisions. In making this assertion, they rely on the affidavits of Norman Weinstock, formerly a regional sales manager for Dentsply and now President of the Zahn Dental, Inc.

Division of Schein, D.I. 22, Weinstock Aff., of Vern E. Hale, a Senior Vice President of Vident, a distributor of teeth manufactured by Dentsply competitor Vita Zahnfabrik, D.I. 49, Hale Aff., and of Monte M.F. Cooper, engaged as counsel for Vident with respect to matters involved in this litigation, D.I. 49, Cooper Aff. While, as developed below, the Weinstock and Hale affidavits are not particularly useful for clarifying these facts, the Cooper affidavit pinpoints an important deficiency in the Addison affidavit.

One need look no further than the carefully crafted Addison affidavit to conclude that the Government and Schein have carried their burden of demonstrating that the risk of injury which might result to third parties outweighs Addison's need for the information. Indeed, that affidavit demonstrates the reality of a situation in which [**26] Addison has a very real involvement in competitive decision making.

After asserting he does not participate in nonlegal operating business matters of Dentsply, D.I. 34, Exh. 1, n8 Addison goes on to state:

> 5. The one area where my responsibilities may be viewed as crossing over into the competitive, business environment is the area of Dentsply's acquisitions of other commercial entities or entering of contractual transactions. For certain of these transactions, I have become involved in shaping the operational structure of the newly acquired enterprise; however, I do not get involved in marketing and sales strategies or decisions. Other than the instances described above, I have no involvement in Dentsply's competitive decision-making.

D.I. 34, Exh. 1, P 5. Addison is thus involved in: (1) Dentsply's acquisition of companies; and (2) entering into contractual transactions. If Addison had access to information regarding a competitor's (i) marginal cost of production, (ii) long-term and short-term financial forecasts, (iii) strategic plans, and/or (iv) alliances with distributors and suppliers, he could make use of this information to augment Dentsply's efforts in making [**27] or implementing strategic acquisitions. This is particularly troublesome since Dentsply's efforts could be turned on acquiring a nonparty which has produced

Case 1:05-md-01717-JJF      Document 468      Filed 05/09/2007      Page 68 of 73

Page 10

187 F.R.D. 152, *161; 1999 U.S. Dist. LEXIS 10072, **27

confidential information. This alone would be enough to tip the balance in favor of nondisclosure to Addison. However, there is more.

n8 Paragraph 4 of the Addison affidavit reads:

4. As General Counsel, I do not participate in the non-legal operating business matters of the company, nor provide non-legal advice concerning competitive business issues. Nor do I have any such involvement in any other capacity that I serve at Dentsply. To be specific, other than providing review for legal compliance, I have no involvement in the development or formulation of pricing and rebate plans, the creation of marketing or distribution policies, or in the shaping of any sales strategies for any of Dentsply's divisions.

D.I. 34, Exh. 1.

Addison also states he is involved in entering contractual transactions. The affidavit is ambiguous as to whether these contractual [**28] transactions relate only to acquisitions or to contractual transactions independent of any acquisition. Either possibility entails an unacceptably high risk of either utilization or inadvertent disclosure of confidential information to the severe detriment of nonparties. n9

n9 For example, a declaration filed on behalf of a competitor recites:

. . . Presumably, the 'contractual transactions' referenced by . . . Addison include Dentsply's entering

into agreements with dental laboratory dealers and other customers for the distribution and sale of Dentsply products (including premium artificial teeth). Such agreements may contain a variety of provisions, including indemnity agreements, production requirements, and similar sections which are negotiated without full knowledge by parties like Dentsply of the profit margins of its competitors . . ., or of the volumes of sales of products offered by its competitors. . . .

D.I. 49, Decl. of Cooper, P 6.

[*162] Weighing the interests of the Government and Schein against [**29] that of Dentsply dictates that the balance favors the Government and Schein. Accordingly, the protective order shall not provide for disclosure of confidential information to Addison, General Counsel for Dentsply.

Some factual matrix may evolve which would require that Addison have access to the specified detailed confidential information to allow Dentsply to defend itself. The protective order shall therefore include a provision providing for disclosure to Addison upon the making of a pre-defined requisite showing. At a minimum that requisite showing should include: 1) extraordinary detailing of the circumstances warranting disclosure; 2) an explanation of why employment of any and all filtering devices would not suffice; and 3) an explanation of why reliance on the representations and opinions of outside counsel would not be adequate. In addition, the provision will allow for notice and right to be heard by the affected nonparty and resolution by the Court. The above minimum mandatory conditions erect a very high barrier to Addison ever seeing the confidential information, but at the same time provide a safeguard against the unknown.

187 F.R.D. 152, *162; 1999 U.S. Dist. LEXIS 10072, **29

## IV. Outside Counsel's Future Representation [**30] of Dentsply

A provision in Schein's proposed protective order provides:

> . . . outside counsel have not been, are not, and for the earlier of four (4) years from the date of this order or two (2) years from the conclusion of trial in this action, will not be, without prior approval of the Court, involved in any other matters on behalf of defendant relating to its competitors, distributors, or customers, with the exception of matters related to this action; . . .

D.I. 19, Exh. A, at 7. In its Reply Memorandum, Schein narrowed the wide scope of its proposed limitation to apply only "if the law firm is now or may be in the future advising Dentsply on non-litigation legal issues involving distribution, pricing or similar matters . . . ." D.I. 41 at 11. In that event, "Henry Schein's proposed order reasonably requires the firm to select lawyers other than this trial team for that work for a period of time." *Id.* Schein has also made clear it does not seek to preclude Dentsply's outside law firm from future representation of Dentsply. Rather, it seeks in the proposed order a provision that "reasonably requires the firm (Howery & Simon) to select lawyers other than [**31] this trial team." *Id.* n10

> n10 The Government's proposed protective order does not contain a restriction on outside counsel similar to that requested by Schein. At best the Justice position may be characterized as giving the concept lukewarm support presumably because "Henry Schein's proposal might force a choice on Dentsply to replace counsel on this matter or on some other pending matters." D.I. 32 at 17.

Schein cannot demonstrate "good cause" for the proposed draconian measures because it has not shown it would be injured unless the Court limited outside counsel's relationship to Dentsply. *See Pansy, 23 F.3d at 786* ("'Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning,' do not

support a good cause showing." (quoting *Cipollone, 785 F.2d at 1121)).* Schein only speculates that Dentsply's outside counsel may advise Dentsply on business matters, including those involving Dentsply's competitors and distributors, while Dentsply unequivocally states that its outside [**32] counsel does not advise Dentsply on competitive business decisions, a position which Schein accepts in its reply brief. *See* D.I. 41 at 10. The Court concludes the proposed restrictions on outside counsel shall not be contained in the protective order.

## V. Protective Order Provisions Which Might Tax Court Resources

The Court raises *sua sponte* a concern arising out of similar provisions found in the various proposed protective orders. The [*163] Government and Schein have essentially three parallel provisions: first, the Court shall resolve any dispute as to whether information is properly classified as confidential; n11 second, a party must give a set of number of days notice to a nonparty before disclosure of its confidential information to prospective trial witnesses and, should the nonparty object, the party litigant must file a motion demonstrating good cause why the disclosure should be granted despite the objection, with the Court determining the motion; n12 and third, the Court is to resolve disputes between a party and nonparty over the former's desire to disclose the latter's proprietary information to experts and consultants. n13 In addition to the above projected [**33] Court involvement in confidentiality disputes, Dentsply would confer on a nonparty the right to file at any time for a separate protective order as to a particular document or information, including restrictions on use differing from those in any protective order adopted by the Court. n14 Finally, Dentsply [*164] would have the Court countenance unlimited successive applications for modification of any protective order it adopts.

> n11 Dentsply proposes a similar provision.

> n12 Although there are differences in language and time periods between the Government's and Schein's motion, the concept is the same. For illustrative purposes there is set out the pertinent provisions from the Government's proposed protective order:

10. Except as otherwise authorized by this Order, information designated as confidential shall be used only in connection with this action, shall not be disclosed to any person other than the individuals set forth below, may be disclosed only as necessary in connection with this action to the individuals set forth below, and may be used by those individuals only as necessary in connection with this action:

. . .

(g) subject to the provisions of Paragraph 13, other persons not included in the above Subparagraphs who testify, or who, trial counsel believes in good faith, may testify, at trial of this action, solely to disclose to them confidential materials relating to matters about which trial counsel believes in good faith they are likely to testify at trial of this action.

. . .

13. Before disclosure of confidential information is made to any person or persons specified in Subparagraph 10(g), the party wishing to make such a disclosure shall give notice in writing, via facsimile or hand delivery, at least five (5) business days before such disclosure, to the producing party or protected person,

stating the names, addresses, and employers of the person(s) to whom the disclosure will be made. The notice shall identify with particularity the documents or specific parts thereof to be disclosed and the substance of the information to be disclosed. If, within the five-business-day period, an objection is made regarding the proposed disclosure, disclosure of the confidential information shall not be made unless the party seeking to make such disclosure obtains permission to do so by motion to the Court. The Court will deny the motion and access to the documents or confidential information, unless the party seeking to make such disclosure shows good cause why the proposed disclosure should be permitted despite the objection.

D.I. 31, Exh. A, PP 10 and 13.

[**34]

n13 Illustrative is paragraph 15 of the Government's proposed protective order:

15. If a party wishes to disclose confidential information, pursuant to paragraph 10(d), to an expert or consultant employed or affiliated with defendant or with any of its competitors, the executed agreement included as Appendix A hereto shall be

187 F.R.D. 152, *164; 1999 U.S. Dist. LEXIS 10072, **34

transmitted, no later than ten (10) days prior to the disclosure of the confidential information, to the other party and, if applicable, to counsel for the protected person that had designated the information as confidential, along with a curriculum vita or resume of the person to whom the disclosure is to be made. If the party or protected person receiving such notice believes that disclosure of confidential information that it has produced to such person would result in a clearly defined and serious injury, it may object in writing within five (5) days of receipt of the executed agreement included as Appendix A hereto. If the party wishing to disclose information and the party or protected person receiving such notice cannot resolve their dispute, the party wishing to disclose confidential information may apply to the Court for an Order permitting disclosure of confidential information to such person. No disclosure of confidential information may be made by a party to any such person with respect to whom the objection has been made unless so ordered by the Court.

D.I. 31, Exh. A, P 15.

[**35]

n14 Paragraph 10 of Dentsply's proposed protective order provides:

10. This Protective Order shall be without prejudice to the right (a) of the parties to bring before the Court at any time (subject to, unless impractical, the procedural requirements of paragraph 7) the question of whether any particular document or information constitutes Confidential Information hereunder or whether its use should be so restricted or (b) of a Producing Party to present a motion to the Court under *Fed. R. Civ. P. 26(c)* for a separate protective order as to any particular document or information, including restrictions differing from those specified herein. This Protective Order shall not be deemed to prejudice the parties of Producing Parties in any way in any future application for its modification.

D.I. 34, Tab 2, P 10.

These myriad provisions calling for the Court refereeing confidentiality disputes have enormous potential for overwhelming scarce judicial resources. This nationwide antitrust action was filed after a three-year investigation involving over one hundred eighty witnesses and a staggering [**36] number of documents with an unknown percentage to be designated as confidential. Severe logistical problems could arise if an unknown number of nonparties had conferred upon them the right to obtain court rulings protecting their proprietary information. The only person available to handle this potential onslaught is one district judge n15 who, not surprisingly, has other cases on his docket.

n15 Magistrate Judge Thynge is totally occupied conducting extremely valuable alternative dispute resolution for all of the judges in this district. Mediating and settling cases for all nature of people (and entities) are arguably more important than presiding over classification and other disputes arising out of any protective order that is entered.

[HN10] While the Federal Rules of Civil Procedure obligate a judge to handle legitimate discovery disputes, the Federal Rules do not require a judge to process disagreements between party litigants, much less nonparty differences arising from lawyer crafted protective orders.

Judges [**37] sign off on protective orders obligingly, both as a convenience to party litigants and to assure administrative control of a case. Given the daunting potential for disputes built into the proffered protective orders, the Court has no alternative but to require the parties to include in their protective order a "back-up" private-sector mechanism, paid for by the parties, to issue binding resolution of confidentiality classification disputes if the Court, because of the press of other judicial business, cannot entertain the disputes.

While P 10 of the Government's proposed order providing for disclosure of confidential information to prospective witnesses is satisfactory, P 13, which requires the parties to move the Court for permission upon objection by a nonparty to release of the information, is not. n16 Inclusion of P 13 carries with it the very real possibility of interrupting the orderly flow of what might be a lengthy trial. Indeed, the proposed procedure would not allow the Court to make the decision with the benefit of the appropriate background context developed during the taking of evidence so that the requisite balancing of the competing interest can be done in an informed [**38] manner. In addition, it carries with it conferral of limited party status, upon nonparties, without benefit of intervention under *Rule 24 of the Federal Rules of Civil Procedure.* This is impermissible. n17

n16 To the extent P 15 contains similar provisions for the parties to move the Court for permission to disclose confidential information to experts or

consultants upon objection by a nonparty it is unsatisfactory for the same reasons.

n17 At trial yet another interest is implicated, the interest of the public flowing from the First Amendment.

The Court recognizes disallowance of P 13 carries with it some limited potential for abusive disclosure of confidential information. The Court is confident the Government and Dentsply's outside counsel will not allow this to happen. Moreover, the Government has demonstrated its intent to zealously protect the confidentiality of third-party proprietary information as evidenced by its strong opposition to disclosing confidential information to Addison. Finally, to the [**39] extent the Government's burden in inducing voluntary cooperation from nonparties is increased by reason of the deletion of the highly unusual P 13, it is a condition with which it will have to live.

Notwithstanding the Court's rejection of P 13 or any similar protective order provisions, the Court is not unmindful of the concerns of nonparties. Prudent use of a filtering mechanism can go a long way in protecting third parties when their confidential information is shown to witnesses. If an objection is made to showing a witness unfiltered [*165] confidential information, counsel should be prepared to demonstrate that showing the witness the unfiltered information is essential to the proponent's case. The Court will honor such an objection if a filtering mechanism is or was available and not employed.

There is left only Dentsply's provisions which would permit unlimited successive applications for modification of the protective order which will govern this case. It is rejected out of hand for obvious reasons.

The parties have advised they were in substantial agreement with respect to other provisions in the competing protective orders. Hopefully this Opinion and accompanying Order will [**40] enable the Government and Dentsply to submit a proposed protective order agreed to as to form, if not in substance.

## VI. Conclusion

In conclusion, therefore, the Court will order the Government to answer Interrogatory No. 1 and will grant

187 F.R.D. 152, *165; 1999 U.S. Dist. LEXIS 10072, **40

Schein's motion to intervene for the limited purpose of presenting its views on a protective order to protect its confidential information. The Court also makes the following rulings regarding the proposed protective orders to allow the parties to complete their preparation of a protective order to govern this case for submission to the Court: 1) confidential information shall be defined as information of the type described in Rule 26(c)(7) of the Federal Rules of Evidence, the disclosure, or further disclosure, of which would result in clearly defined and serious injury; 2) Addison may not, as a general rule, have access to documents designated confidential; 3) any protective order shall contain a "safety valve" which allows Addison access to confidential documents upon the showing described above; 4) the protective order may not purport to limit outside counsel's ability to represent Dentsply; and 5) the parties shall draft the protective [**41] order in light of the Court's rulings pertaining to its resources.

An appropriate order will issue.