## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                                          )
                                                )
INTEL CORP. MICROPROCESSOR                      )      MDL Docket No. 05-1717-JJF
ANTITRUST LITIGATION                            )      (Re: D.I. 300)
                                                )
_____             )
                                                )
PHIL PAUL, on behalf of himself and all         )
others similarly situated,                      )
                                                )
            Plaintiffs,                          )
                                                )
            v.                                   )      C.A. No. 05-485-JJF
                                                )
INTEL CORPORATION,                              )
                                                )
            Defendant.                           )

### DM 5

### SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
### REGARDING THRESHOLD ISSUE RAISED BY
### CLASS PLAINTIFFS' MOTION TO COMPEL AND OTHER ISSUES

### RECOMMENDATION CONCERNING JURISDICTION AND PROTECTIVE ORDER

## INTRODUCTION

The captioned cases are antitrust actions brought against Intel Corporation ("Intel") as the manufacturer of microprocessors that run the Microsoft Windows and Linux families of operating systems (the "x86 Microprocessor Market"), a market in which Intel is alleged to hold worldwide market share measured as 80% of the market in units and 90% of the market in revenues.

The 05-485 action is brought on behalf of a class of consumers who allege economic injury resulting from Intel's alleged anticompetitive and monopolistic practices. The 05-485 action has been consolidated with over 70 other consumer-related actions by the Judicial Panel on Multidistrict Litigation and assigned to this Court, where it is docketed as MDL Docket No. 05-1717 (collectively, the "Class Litigation"). As used herein, the term "Class Plaintiffs" refers to the plaintiffs in the Class Litigation.

The matter *sub judice* comes before me, as Special Master,[1] on the motion of the Class Plaintiffs (D.I. 422 in Case No. 05-1717)[2] to compel Fry's Electronics, Inc. ("Fry's") to produce certain transactional data pursuant to a documents-only subpoena. Fry's initially questions the jurisdiction of this Court, the transferee court in a multidistrict litigation ("MDL"), to enforce a documents-only subpoena issued from a transferring court in the MDL and directed to a non-party litigant. Further, Fry's seeks to amend the existing Protective Order entered in the Class Litigation (D.I. 277)[3] to address its concerns regarding any production of its transactional data. Fry's other objections can be summarized as follows: (i) the Class Plaintiffs have failed to adequately identify the transactional data sought; (ii) the meet and confer process was

---

[1] The Order appointing Special Master is docketed at D.I. 60 in the 05-1717 MDL docket, and at D.I. 21 in Case No. 05-485.

[2] Unless otherwise specified, the docket items cited hereinafter refer only to the docket in Case No. 05-1717.

2

insufficient; (iii) the data sought from Fry's is available from other sources; (iv) the Class Plaintiffs have failed to establish their need for the financial data; (v) to the extent Fry's is required to produce transactional data, the Protective Order should be amended to protect such information; and (vi) the Class Plaintiffs should pay Fry's reasonable expenses in producing documents. Since the Class Plaintiffs and Fry's are continuing to meet and confer on various of these enumerated objections, the Special Master defers addressing any of them at this time.

For the reasons discussed further herein, the Special Master concludes that 28 U. S. C. § 1407 provides this Court, as the transferee court, with the power to enforce a documents-only subpoena issued from a transferring court in MDL and directed to a non-party. Further, while the Special Master acknowledges that the Protective Order allows any "Party" or "Third Party" (as such terms are defined in the Protective Order), for good cause shown, to move for modification of the Protective Order (D.I. 277, ¶ 28), the Special Master concludes that Fry's has failed to establish good cause in this matter to modify the Protective Order.

## BACKGROUND

On June 23, 2006, the Class Plaintiffs served Fry's with a documents-only subpoena issued from the United States District Court for the Northern District of California (the "Subpoena"). While the Subpoena seeks the production of documents in addition to data, the motion to compel filed by the Class Plaintiffs on March 29, 2007 (the "Motion to Compel"), is limited to the production of certain transactional data.[4] D.I. 422 at 1, fn 1.

On April 17, 2007, Fry's filed its objection to the Motion to Compel (the "Objection"). D.I. 323, Case No. 05-485.

---

[3]  The Protective Order was also entered in <u>Advanced Micro Devices, Inc. v. Intel Corporation</u>, Case No. 05-441.

[4]  The Class Plaintiffs contend that the data needs to be produced "soon" because of its relevance to the upcoming class certification motion. D.I. 422 at 1, footnote 1, which must be filed on September 7, 2007. D.I. 410.

3

On April 23, 2007, the Class Plaintiffs filed their reply in support of the Motion to Compel (the "Reply"). D.I. 440. In the Reply, the Class Plaintiffs make clear that they seek production of Fry's transactional data as such data exists in the ordinary course of business. D.I. 440 at 1. Further, Class Plaintiffs acquiesce to receiving only a "statistically relevant sample" of such transactional data for class certification purposes at this time, but maintain that a full production of data will be required for the merits of their action. D.I. 440 at 3.

On May 1, 2007, the Special Master conducted a hearing on the Motion to Compel (the "May 1 Hearing"), at which counsel for the Class Plaintiffs and counsel for Fry's argued their respective positions. At the outset of the hearing, the Special Master addressed Fry's threshold issue concerning this Court's authority to entertain the Motion to Compel and expressed his intention to issue a report and recommendation concerning the same. Transcript of May 1 Hearing (hereinafter referred to as Tr.) at 7:1 – 9:14.[5] Thereafter, the Special Master reviewed the process behind the formulation and entry of the Protective Order and Fry's participation in such process to establish a backdrop for the parties' respective arguments. Tr. at 9:22 – 15:19.

At the conclusion of the May 1 Hearing, it became apparent that the record was not fully developed as to whether the transactional data, as kept in the ordinary course of Fry's business, would be in a form useable and useful to the Class Plaintiffs, and, thus, necessary. Tr. at 93:18 – 95:20. To enable the Class Plaintiffs an opportunity to complete the record on this issue, the parties stipulated to an informal review process which is expected to continue as necessary through May 23, 2007. D.I. 459.

---

[5] Since Fry's has requested that a portion of the transcript be docketed under seal, the transcript has not yet been

4

## DISCUSSION

### A.    Jurisdiction

The federal statute governing multidistrict litigation or MDL, 28 U.S.C. § 1407 ("Section 1407"), provides in pertinent part that: "[t]he judge or judges to whom [MDL] actions are assigned ... may exercise the powers of a district judge *in any district* for the purpose of conducting pretrial *depositions* in such coordinated or consolidated pretrial proceedings."    In re Automotive Refinishing Paint Antitrust Litigation, 229 F.R.D. 482, 485 (E. D. Pa. 2005) (citing 28 U. S. C. § 1407(b)) (emphasis added).  The purpose of Section 1407 is to create an expedited procedure for the handling of multidistrict litigation, In re Factor VIII, 174 F.R.D. 412, 415 (N. D. Ill. 1997) ("Factor VIII"), and to provide for a unified concept of pretrial proceedings, United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc., 238 F. Supp. 2d 270, 274 (D.D.C. 2002) ("Pogue") (citing In re San Juan Dupont Plaza Hotel Fire Litigation, 117 F.R.D. 30, 32 (D.P.R. 1987)).

The overwhelming majority of courts that have considered the issue of whether Section 1407(b) authorizes a transferee judge the power to act as any judge of any district for pretrial depositions as well as subpoenas *duces tecum*, have found that it does.  See, e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc., 444 F.3d 462, 469 n. 4 (6th Cir. 2006) ("Pogue Circuit Decision") ("[T]he rationale underlying the MDL statute of 'just and efficient' resolution of pretrial proceedings requires the conclusion that Section 1407(b)'s grant of authority applies to both deposition subpoenas and documents-only subpoenas."); Factor VIII, 174 F.R.D. at 415 ("It would make no sense for [Section] 1407(b) to confer authority to conduct depositions but not the authority to require productions of documents at a deposition."); Pogue,

docketed.

5

238 F. Supp. 2d at 274; In re San Juan Dupont Plaza Hotel Fire Litigation, 117 F.R.D. 30, 32 (D.P.R. 1987) ("San Juan Hotel Fire"); In re Sunrise Sec. Litig., 130 F.R.D. 560, 586 (E.D. Pa. 1989); but see VISX, Inc. v. Nidek Co., 208 F.R.D. 615, 616 (N. D. Cal. 2002) ("VISX") (narrowly reading Section 1407(b) to limit it to strictly deposition disputes and finding that Fed. R. Civ. P. 45 trumps Section 1407 where a documents-only subpoena is at issue).

Similar to the circumstances in the instant matter, in Factor VIII, the plaintiffs moved for an order compelling a non-party, The Marketing Research Bureau, Inc. ("MRB"), to comply with a subpoena *duces tecum*. Factor VIII, 174 F.R.D. at 413. The subpoena *duces tecum* issued out of the United States District Court for the District of Connecticut; the MDL transferee court was the United States District Court for the Northern District of Illinois. Id. MRB refused to comply and the plaintiffs moved the MDL transferee court for an order compelling compliance. Id. MRB challenged the jurisdiction of the MDL transferee court. Id. In reliance upon prior authorities, including San Juan Hotel Fire, 117 F.R.D. 30, In re Corrugated Container Antitrust Litigation, 620 F.2d 1086 (5th Cir. 1980), In re Corrugated Container Antitrust Litigation, 644 F.2d 70 (2d Cir. 1981), In re Sunrise Sec. Litig., 130 F.R.D. 560 (E.D. Pa. 1989), the Factor VIII MDL transferee court held that Section 1407(b) gave it authority to rule, as transferee judge, on the motion to compel compliance with the subpoena issued in the District of Connecticut. Factor VIII, 174 F.R.D. at 415. "This conclusion is not only consistent with the cases, it is consistent with the purpose of § 1407, which is to create an expedited procedure for the handling of multidistrict litigation. Requiring a transferee judge to travel from district to district to hold hearings and rule on discovery matters would hardly be an efficient way of managing consolidated pretrial proceedings." Id.[6]

---

[6] One court has taken a quixotic approach by construing the term "*in* any district" of Section 1407(b) to require the judge to "journey to another district to hear a discovery dispute in that district." In re Uranium Antitrust Litigation,

In Pogue, relator moved to enforce subpoenas *duces tecum* issued to non-parties that owned the defendants. Pogue, 238 F. Supp. 2d at 272. The subpoenas *duces tecum* issued out of the United States District Court for the Middle District of Tennessee; the MDL transferee court was the United States District Court for the District of Columbia. Id. The non-parties subject to the subpoenas moved to quash the subpoenas, arguing that the MDL transferee court had no jurisdiction to enforce a subpoena *duces tecum* issued by another district court. Id. at 272-73. While noting that "it is not entirely a settled question whether an MDL court may enforce a subpoena *duces tecum* issued by another court" under the grant of Section 1407, the Pogue court held that the "weight of authority and effectuation of the purposes of multi-district litigation support a finding of jurisdiction." Id. at 273. The "weight of authority" cited by Pogue includes the following decisions, San Juan Hotel Fire, 117 F.R.D. 30, In re Corrugated Container Antitrust Litigation, 662 F.2d 875 (D.C. Cir. 1981), In re Corrugated Container Antitrust Litigation, 644 F.2d 70 (2d Cir. 1981), In re Sunrise Sec. Litig., 130 F.R.D. 560 (E.D. Pa. 1989), and Factor VIII, 174 F.R.D. 412. The Pogue court reasoned as follows:

> The language of § 1407 allows a judge to act as another district judge 'for the purpose of conduction pretrial depositions.' A subpoena *duces tecum* is an order to appear at a specific place on a specific date with certain documents. A deposition is also an order to appear. A subpoena *duces tecum* can be issued as an incident to a deposition.... The laws and rules governing federal courts strive to minimize elaborate formality and needless procedure. To effectuate those goals and to avoid placing on parties and nonparties from whom documents are sought the burden of holding a pro forma deposition in order to come under the aegis of § 1407, the Court holds that the power to act as the judge of any district for pretrial depositions includes as an incident the power to enforce subpoenas *duces tecum*.

Pogue, 238 F. Supp. 2d at 274-75 (citations omitted).

---

503 F. Supp. 33, 35 (N.D. Ill. 1980). A subsequent decision from the United States District Court for the Northern District of Illinois declined to follow the Uranium Antitrust interpretation of Section 1407 as compelling the MDL transferee judge to travel to the issuing jurisdiction to resolve disputes. See Factor VIII, 174 F.R.D. at 415.

7

Similarly, the court in <u>San Juan Hotel Fire</u> considered the interplay between a motion to enforce a subpoena duces tecum issued to a non-party and Section 1407. <u>San Juan Hotel Fire,</u> 117 F.R.D. 30. The court began its analysis with the purpose and policy of multidistrict litigation, which is to "provide for a unified concept of pretrial proceedings." <u>Id.</u> at 32. The court concluded that to enable the MDL judge fully to exercise the power to act as a judge of any district for pretrial depositions, "it is necessary to append to the transferee judge enforcement powers in relation to subpoenas issued in the deposition district, including depositions and subpoenas addressed to nonparties." <u>Id.</u> (citation omitted).

Likewise, in <u>In re Sunrise Sec. Litig.</u>, 130 F.R.D. 560 (E.D. Pa. 1989), the court held that it had the power to enforce subpoenas *duces tecum* issued from another district court incident to depositions. The court concluded that under Section 1407, "a multidistrict judge may decide a motion to compel a non-party in other districts even if he or she is not physically situated in those districts." <u>Id.</u> at 586.

More recently, in <u>In re Automotive Refinishing Paint Antitrust Litigation</u>, 229 F.R.D. 482, 487 (E.D. Pa. 2005), plaintiffs moved to compel a non-party foreign witness, CEPE, to respond to plaintiffs' request for production of documents. The <u>Automotive Refinishing</u> court held that under Section 1407(b) it could adjudicate the motion to compel pursuant to its authority as the MDL transferee court. <u>Id.</u> at 486. In support of its conclusion, the court cited to <u>In re Sunrise Sec. Litig.</u>, 130 F.R.D. at 586, for the proposition that Section 1407 authorizes a transferee court judge to sit as the court in "other districts to hear and decide motions to compel discovery from non-parties" and that "a multidistrict judge may decide a motion to compel a non-party in other districts even if he or she is not physically situated in those districts." <u>Id.</u> at

8

486. See also id. (citing 17 James Wm. Moore et al., Moore's Federal Practice § 112.07[1] [b] (3d ed. 2004) ("[T]he [MDL] judge has jurisdiction to order nonparties to comply with a subpoena *duces tecum* issued by another district judge. There is no requirement that the [MDL] court or judge be physically present in the other district to decide a motion to compel production pursuant to a subpoena issued by another district." (footnotes omitted)). The Automotive Refinishing court also noted that the Third Circuit has stated *in dicta* that Section 1407(b) "empowers the transferee judge in multidistrict cases to act not only on behalf of the transferee district, but also with 'the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings.'" Id. at 486 (citing In re Flat Glass Antitrust Litig., 288 F.3d 83, 90 n.12 (3d Cir. 2002) (internal citations omitted)).

Here, the only case cited by Fry's to support its contest to the jurisdiction of this Court to adjudicate the present dispute is VISX, 208 F.R.D. 615. In VISX, the United States District Court for the Northern District of California was called upon to adjudicate plaintiff's motion to enforce documents-only subpoenas issued to non-parties outside the Northern District of California. Id. at 616. In VISX, the court refused to enforce the documents-only subpoenas at issue, reasoning that: (i) Fed. R. Civ. P. 45(e) provided the only procedure for enforcing a subpoena *duces tecum* is to institute contempt proceedings before the district court that issued the subpoena, and (ii) Section 1407(b) only expands a transferee court's discovery powers only to pretrial depositions, not documents-only subpoenas. Id.

Neither Fry's nor the Class Plaintiffs advised the Court that, in a subsequent decision, the United States District Court for the Northern District of California declined to follow VISX, concluding instead that Section 1407(b) applied to documents-only subpoenas. See In re Welding Rod Products Liability Litigation, 406 F. Supp. 2d 1064 (N.D. Cal. 2005). More

9

recently, the <u>Pogue Circuit Decision</u> rejected the <u>VISX</u> decision that Section 1407(b)'s authority did not extend to enforcement of documents-only subpoenas. <u>Pogue Circuit Decision</u>, 444 F.3d at 469 n.4. Specifically, the Sixth Circuit concluded "that the rationale underlying the MDL statute of 'just and efficient' resolution of pretrial proceedings requires the conclusion that Section 1407(b)'s grant of authority applies to both deposition subpoenas and documents-only subpoenas." <u>Id.</u>

Given the United States District Court for the Northern District of California's determination not to follow its earlier <u>VISX</u> decision, the <u>Pogue Circuit Decision</u>'s rejection of <u>VISX</u>, and the fact that the <u>VISX</u> decision is at odds with the rationale underlying the MDL statute, the Special Master declines to accord the <u>VISX</u> decision any weight.

Based on the foregoing analysis of the relevant case law, the Special Master concludes that the majority view is the better reasoned view, as it is consistent with the underlying purpose of multidistrict litigation—to provide for a unified concept of pretrial proceedings. Further, the Special Master believes that the Third Circuit would likely adopt the better-reasoned majority view based upon its dicta that Section 1407(b) "empowers the transferee judge in multidistrict cases to act not only on behalf of the transferee district, but also with 'the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings.'" <u>In re Flat Glass Antitrust Litig.</u>, 288 F. 3d 83, 90 n.12 (3d Cir. 2002). Accordingly, the Special Master recommends that this Court conclude that, under the grant of Section 1407, this Court, as the transferee court in multidistrict litigation, has the authority to adjudicate discovery disputes concerning documents-only subpoenas directed to non-parties and issued from a transferring court.

10

**B.    The Protective Order**

1.    The Process Employed to Finalize the Protective Order.

As set forth at the May 1 Hearing, the formulation and entry of the Protective Order was the result of extensive proceedings, whereby non-parties to the litigation were provided with notice of the proposed protective order and an opportunity to provide written comments to the same and argue as to the propriety of the proposed language.[7] Tr. at 9:22 – 15:19.

An explication of the "process" is important. The first phase of the process, mandated in part by the Court's Case Management Order No. 1 (D.I. 79), is generally set forth as follows:

> The parties with Court approval, have implemented *a process to obtain third party input on a Protective Order, and the Proposed Protective Order*, as well as the positions of the Parties and third parties will be provided to the Court on or before May 31, 2006.

Case Management Order No. 1. at ¶ 5(b), D.I. 79 (emphasis added).

a.    Solicitation of Input From Non-Parties

The first step of the process was to solicit input of non-parties on the proposed protective order. As a result of this process, objections and comments (the "Third Party Objections") were filed by Fry's and the following entities: Hewlett-Packard Company; Egenera, Inc.; Best Buy Company, Inc.; Fujitsu Limited; NEC Corporation; Sony Corporation; Sony Electronics, Inc.; Toshiba Corporation; Circuit City Stores, Inc.; Acer America Corporation; ASI Computer Technologies, Inc.; Avnet, Inc.; Ingram Micro Inc.; Synnex Corporation; Tech Data Corporation; Microsoft Corporation; International Business Machine Corporation; Dell Inc.; Lenova Group Ltd.; Hitachi, Ltd.. D.I. 221 at 2-3.

---

[7]  The process may well have been unprecedented, as counsel for the Class Plaintiffs noted, "I have never been involved where the Court proactively invited third parties to look at a concrete proposal formulated by the parties for a protective order, where they had an opportunity to look at a concrete draft and give written comments as well as to argue as to the propriety of the language. That kind of a proceeding I've never seen." Tr. at 18:3 – 18:10; see also D.I. 461 (suggesting process was unprecedented).

b.     Negotiations to Resolve Third Party Objections

The second step in the process was for the parties to engage in discussions with non-parties in an effort to resolve the issues raised in the Third Party Objections and informal responses. This is set forth more fully in the Special Master's Report and Recommendations Regarding Proposed Protective Order (the "Protective Order Report and Recommendations") (D.I. 221) as follows:

### Parties' Responses to Objections/Comments

Following the filing of the Third Party Objections, AMD and Intel filed their respective responses and objections to the Third Party Objections. D.I. 148-49. The Parties' responses addressed some, but not all, of the Third Party Objections by voluntary revisions to certain language of the Proposed Protective Order. The Parties, however, were not in complete agreement with respect to the extent to which the Third Party Objections should be accommodated, as well as with respect to the working of the revisions to effect certain of the accommodations. This resulted in competing versions of the Proposed Protective Order pending approval before the Court, as well as outstanding issues with respect to those objections raised by the Third Parties that went largely unaddressed. With the Court's agreement, the Special Master scheduled a hearing on the terms of the Proposed Protective Order and directed the parties to provide appropriate notice to the Third Parties of the hearing.

D.I. 221 at 78.

c.     Hearing on Open Disputes Concerning the Protective Order

The issues still in dispute after negotiations were brought before the Special Master at a hearing during which non-parties had an opportunity to argue their respective positions. This step in the process is described in the Protective Order Report and Recommendations as follows:

### Hearing re: Proposed Protective Order

On June 9, 2005, prior to the scheduled hearing, the Parties distributed to the Third Parties a revised version of the Proposed Protective Order identifying the changes the parties were willing to make to accommodate certain of the objections posed by the Third Parties, to better allow the scheduled hearing to focus on the provisions remaining in

12

contention.

On June 12, 2006, the Special Master conducted a hearing at which the parties and Third Parties were afforded an opportunity to be heard with respect to those provisions of the Proposed Protective Order still in dispute. *See* D.I. 143 (Transcript of June 12, 2006 Hearing, docketed in 05-1717). For the sake of efficiency, the Third Parties agreed – without waiving the objections they had previously submitted in written form – to allow counsel for one Third Party to speak as a representative for all Third Parties with respect to issues on which they shared similar views. *Id.* at 44:10-46:12.

At the hearing, the major issue in dispute was whether discovery materials obtained through the captioned litigations before this Court – especially Confidential Discovery Materials – can be used for purposes of the Japan Litigation and the California Class Litigation. The Parties and Third Parties also represented that Definitions J, R, S and U of the "Definitions" section of the Proposed Protective Order contained provisions still in dispute. They also identified Paragraphs 1, 4, 5, 6, 7, 8, 10, 14, 15, 16 and 31 of the "Terms and Conditions" section as containing provisions still in dispute.

During the course of the hearing, the remaining disputes were either (a) resolved by revisions agreed to by both the Parties and the Third Parties; (b) resolved by determinations reached by the Special Master, or (c) taken under advisement for further consideration and recommendation by the Special Master.[8]

D.I. 221 at 78-79.

Fry's, while choosing to file a Third Party Objection in connection with the Proposed Protective Order on May 22, 2006 (D.I. 98), did not participate in the Special Master's June 12, 2006 hearing, claiming that it did not have a realistic opportunity to participate, as it did not receive adequate notice of the hearing. D.I. 451 at 5, n.4. Fry's reiterates this position in its May 9, 2007 submittal, stating that it "could not as a practical matter participate in the hearing, as it would have required travel to Delaware which was not practical under the circumstances (and it had no reason to retain Delaware counsel)." D.I. 467 at 2, n.2. The Special Master finds

---

[8]    The hearing was conducted pursuant to the Special Master's authority to manage discovery and to conduct hearings. See Fed. R. Civ. P. 53 (b) and (c) and Order Appointing Special Master (D.I. 73 at ¶ 3).

13

Fry's explanation to be unpersuasive given the participation of other Third Parties. In any event, it should be noted that Fry's objections were duly accepted and considered.

        d.      The Protective Order Report and Recommendations

The Protective Order Report and Recommendations itself was part of the process, spanning 117 pages described: (a) the Third Party Objections, (b) revisions made to the Protective Order in light of the Third Party Objections and ensuing discussions to resolve such objections, (c) unresolved disputes, and (d) recommendations with respect to such unresolved disputes and the bases supporting the same.

        e.      Objections to the Protective Order Report and Recommendations

Pursuant to Fed. R. Civ. P. 53(g)(2), parties and non-parties were afforded a twenty-day period within which to file any objection to the Special Master's Protective Order Report and Recommendations. Neither Fry's nor any third party filed any objection. Only Intel and Advanced Micro Devices, Inc. ("AMD") availed themselves of this opportunity, filing their respective objections. D.I. 111 and 112.

        f.      Entry of the Protective Order

Ultimately, on September 26, 2006, this Court, after considering objections filed pursuant to Fed. R. Civ. P. 53(g)(2) by both Intel (D.I. 111) and AMD (D.I. 112), adopted the Protective Order proposed by the Special Master (D.I. 275) and entered the Protective Order as proposed by the Special Master (D.I. 277). There was no D. Del. L.R. 7.1.5 Motion for Reargument filed by any party or third party.

        g.      Fry's Participation in the Process

The Class Plaintiffs take the position that the Protective Order is the law of the case, and, regardless, Fry's has not met its good cause burden to effect its change. D.I. 464. Fry's on the

14

other hand, while asserting that it has shown good cause, attempts to characterize the process

leading up to entry of the Protective Order as, in essence, a meet and confer among the parties,

the Third Parties and ultimately with the Special Master, and suggesting that Fry's participation

or lack thereof in such process should have no consequence. D.I. 467. The Special Master

concludes that the participation or lack thereof of Fry's in the established process is a factor that

is appropriate to consider in the good cause analysis as to whether the Protective Order should be

modified.

      2.     Fry's Present Concerns Regarding the Protective Order Were Raised Previously

      Fry's present concerns with respect to the existing Protective Order were previously

raised in the context of Third Party Objections. These concerns were specifically considered in

the Protective Order Report and Recommendations and were addressed either through revision or

rejected. See D.I. 221, pp. 39-40, 44, 48-49, 81-82, 90, 96-97.

      a.     Experts/Consultants

      Fry's suggests that prior to the disclosure of highly confidential information to any expert

or consultant, the party seeking such disclosure should provide Fry's with not less than ten days

advance notice of such disclosure, which notice shall identify the expert or consultant, identify

the person's title, job responsibilities and affiliations with any party, and include a copy of the

person's most recent curriculum vitae that identifies all of such person's past and present

employment and/or consulting relationships. D.I. 328 at Ex. E, Case No. 05-485. Further, Fry's

suggests that each party should be limited to designate only one expert or consultant who is

authorized to receive such highly confidential material. Id.

      With respect to seeking the disclosure of the experts/consultants that may have access to

its highly confidential information, Fry's did not object to paragraph 11 of the Proposed

Protective Order in its Third Party Objection. D.I. 221 at 44-45; 92-96.

Regardless, a number of third parties did object to paragraph 11 of the Proposed Protective Order. The Protective Order Report and Recommendations described the objections to paragraphs 6(b) and 11 and the resolution of same as follows:

> ### C.    **Paragraph 6(b) and 11 (revised)**
>
> Paragraph 6(b) and 11 address disclosure of Confidential Discovery Materials to Experts/Consultants. The Third Parties objected to the original language of these paragraphs on the basis that it would permit disclosure of their Confidential Discovery Materials to such professionals, without notification to the Third Parties. As argued by the Third Parties:
>
>> The technology world is small and getting smaller every day. And who the parties are selecting, and my guess is there's going to be quite a number of experts and consultants in this case, and who they're using may very well be relevant to the non-parties in the context of the ordinary course of their business. . . [T]heir is clearly a legitimate business interest for the non-parties to know who's getting access to their incredibly sensitive information.
>
> D.I. 143 at 88:12-89:6.
>
> The Parties initially argued against the change sought by the Third Parties "simply because there's going to be a lot of experts, a lot of consultants. Many of them are non-testimonial. And both Intel and AMD view that as work product that we wouldn't, in the ordinary course, be disclosing to anybody, nor would we have any obligation to do so." D.I. 143 at 89:13-20. The Parties, however, went on to offer that they would be willing to accommodate the Third Parties' concerns in the spirit of compromise, and agreed to work with the Third Parties to come up with mutually acceptable language.
>
> Following the hearing, by submission dated June 15, 2006, the Parties agreed to revise the concluding paragraph of Paragraph 11 to add the following language:
>
>> Except with the consent of the Producing Party, however, Confidential Discovery Material shall not be disclosed to an expert or consultant who at the time of the intended disclosure is an officer or employee of a party. The

16

> Acknowledge of Protective Order signed and executed by a
> Party's or Class Party's Expert/Consultant [   ] shall be
> made available to Third Parties whose confidential
> Discovery Material is disclosed to that Expert/Consultant,
> under the express agreement that such Third Parties
> maintain the information contained in the
> Acknowledgement in absolute confidence.

> Based upon this record, the Special Master concludes that Paragraphs 6(b)
> and 11 of the Proposed Protective Order, including certain of the proposed
> revisions agreed to by both the Parties and the Third Parties, is acceptable
> and recommends that the proposed revision to Paragraph 11 should be
> reworded as set forth above.

Protective Order Report and Recommendations D.I. 221, pp. 81-82.

While the revisions set forth above do not provide Fry's with 10 days advance notice and

the extensive work history in the form of a curriculum vitae that it now seeks, the Protective

Order does strike a balance between the interest of non-parties in knowing who will have access

to their confidential information and protecting a party's ability to retain its own expert of

choice. Accordingly, the Special Master concludes that Fry's has not shown good cause to

disrupt this balance and modify the Protective Order in this regard.

        b.    In-House Counsel and a Two-Tier System

In its proposed revisions to the Protective Order, Fry's suggests a two-tier system – one

tier for outside counsel's eyes only in connection with discovery material believed to be

extremely confidential and/or sensitive in nature or a "trade secret" (as defined in Fed. R. Civ. P.

26(c) and 45(c)(3)(B)(i)) and a second tier for less sensitive material that would contemplate in-

house counsel review. D.I. 328 at Ex. E, Case No. 05-485.

In its Third Party Objection, Fry's also argued for this two-tier approach to protect its

highly confidential information from in-house counsel. See D.I. 221 at 39-40 and 48-49. Fry's

was not alone with its concern regarding in-house counsel of the parties having access to

17

Confidential Discovery Material. Id.

The concerns with respect to in-house counsel's access to Confidential Discovery Material were primarily addressed in the revision to Definition G of the Protective Order defining "In-House Litigation Counsel." D.I. 221 at 86-87.[9] Specifically, the revisions to the definition of In-House Litigation Counsel were designed to expand the categories that would prohibit the disclosure of Confidential Discovery Material to include in-house counsel who are engaged in: (a) the review or negotiation of any contract with a producing party related to the sale of microprocessors, (b) counseling in connection with PC or server manufacturing or operating system or software design or development, and (c) the licensing of Microsoft software or technology. D.I. 221 at 86.

The Proposed Protective Order had already carved out in-house counsel that were engaged in the review and approval of competitive pricing or marketing programs which is, among others, one of Fry's primary concerns. Id.

Further, in response to the concerns raised by the Third Party Objections, the parties proposed to limit the number of in-house lawyers who would receive access to third parties' discovery materials to two lawyers at Intel and two lawyers at AMD. D.I. 221 at 86; D.I. 277 ¶ 6(c). Additionally, the parties proposed to revise paragraph 6(c) of the Protective Order to require notice to the producing parties of the identity of the in-house lawyers who will have access to the discovery materials. D.I. 221 at 48-49 and 86; D.I. 277 ¶ 6(c).

Finally, with respect to Fry's concern regarding where and how in-house counsel have access to Confidential Discovery Material, paragraph 9 of the Protective Order already limited the way in which in-house counsel could view and access Confidential Discovery Material. D.I.

---

[9] Although the Protective Order Report and Recommendations refers to Definition J in this regard, it is Definition G of the final version of the Protective Order (D.I. 277) that contains the definition of In-House Litigation Counsel.

221 at 48-49 and D.I. 277 at ¶ 9.

Despite the existing protections in the Protective Order regarding In House Litigation Counsel having access to highly confidential information, Fry's persists in arguing for a two-tier form of Protective Order. At the May 1 Hearing, the Special Master permitted Fry's to supplement its filings with a post-hearing submittal that focused on a protective order entered by Judge Kent A. Jordan in In re Tricor Direct Purchaser Antitrust Litigation, No. 1:05-cv-00340-KAJ and 1:05-cv-00360-KAJ (D. Del.). On May 2, 2007, Fry's submitted its letter and supporting materials, which materials included letter briefs previously submitted to Judge Jordan by counsel for the parties in In re Tricor Direct Purchaser Antitrust Litigation, D.I. 451 through D.I. 453.

The Special Master did not find the protective order entered by Judge Jordan to be particularly instructive to the matter *sub judice*, as every protective order has its own unique history involving the negotiations and concerns of the interested parties that went into its crafting.

Similarly, Fry's directs the Special Master to statements made by Judge Farnan over six years ago in F. Hoffman-La Roche, Ltd. v. Igen International, Inc., Case No. 98-318-JJF, whereby Judge Farnan states: "In this district, highly confidential, assuming the information is properly designated, … is limited to outside counsel, experts and consultants." D.I. 467, Ex. B.10 At the same time, Fry's in its May 2, 2007 submittal included correspondence from Chief Judge Sue L. Robinson dated March 14, 2006, and an Order dated January 25, 2005, that appear to be directly at odds with the foregoing statement of Judge Farnan. D.I. 452, Ex. C. Specifically, in the March 14, 2006 letter, Judge Robinson writes, "I allow in every case one in-

---

10 Notwithstanding the earlier statement, Judge Farnan did, of course, adopt the Protective Order Report and Recommendations in its entirety and entered the Protective Order as proposed.

house representative to view the most confidential of documents." Id.; January 25, 2005 Order (same) at id.

Interestingly, neither Fry's nor the Class Plaintiffs in their written responses direct the Special Master to any relevant case law on the subject. Fry's, however, in its May 2, 2007 submittal included correspondence to Judge Jordan dated November 24, 2006, that sets forth relevant case law regarding whether and when it is appropriate to exclude in-house from having access to confidential information. D.I. 452, Ex. C. The Special Master believes that a review of the relevant case law is both instructive and compelling.

The seminal case on the subject is U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984). U.S. Steel provides that a party's designation as in-house counsel cannot serve to automatically deny that party access to information deemed confidential. Id. at 1467. See also R.R. Donnelley & Sons Co. v. Quark, Inc., C.A. No. 06-032-JJF, 2007 WL 61885, at *1 (D. Del. Jan. 4, 2007); Affymetrix, Inc. v. Illumina, Inc., C.A. No. 04-901-JJF, 2005 WL 1801683, at *2 (D. Del. July 28, 2006); United States v. Dentsply International, Inc., 187 F.R.D. 152, 159 (D. Del. 1999)[11]; Motorola, Inc. v. Interdigital Technology Corp., C.A. No. 93-488-LON, 1994 WL 16189689, at *3 (D. Del. Dec. 19, 1994). U.S. Steel further provides that courts must look to the factual circumstances surrounding each individual counsel's activities, associations and relationships with a party, with a focus as to whether in-house counsel are involved in the competitive decision making process. Id. at 1468. This District has consistently followed U.S. Steel and its "competitive decision making standard" when considering whether in-house counsel should be denied access to highly confidential information.[12] See, e.g., R.R. Donnelley,

---

[11]  While court applied the "competitive decision making standard" to the motion at issue because the litigants agreed on such standard, the court acknowledged that non-parties to litigation are situated differently than parties, not having undertaken the risks of disclosure. Id. at 160, n. 7.

[12]  It should be noted that a line of cases exists recognizing that courts often afford fuller protection to technological

20

2007 WL 61885, *1; <u>Affymetrix</u>, 2005 WL 1801683, at *2; <u>Commissariat A L'Energie</u>

<u>Atomique v. Dell Computer Corp.</u>, C.A. No. 03-484-KAJ, 2004 WL 1196965, at *2 (D. Del.

May 25, 2004); <u>Dentsply</u>, 187 F.R.D. at 159-60; <u>Motorola</u>, 1994 WL 16189689, at *3. <u>See also</u>

<u>Carpenter Technology Corp. v. Armco, Inc.</u>, 132 F.R.D. 24, 27 (E.D. Pa. 1990); <u>Sullivan</u>

<u>Marketing, Inc. v. Valassis Communications, Inc.</u>, C.A. No. 93-6350, 1994 WL 177795, at *2

(S.D.N.Y. May 5, 1994).

Where in-house counsel are not involved in competitive decision making, courts have

routinely refused to bar in-house counsel access to confidential discovery materials. <u>See, e.g., In</u>

<u>re Plastics Additives Antitrust Litigation</u>, C.A. No. 03-2038, 2005 U.S. Dist. LEXIS 23771, at

*11-12 (E.D. Pa. Aug. 24, 2005)) (granting in-house counsel access to confidential discovery

materials where no involvement in "competitive decision making"); <u>Carpenter Technology</u>

<u>Corp.</u>, 132 F.R.D. at 27-28 (allowing senior staff attorney access to confidential information

where his affidavit indicated that he had no involvement in decisions regarding pricing of

products or services sold, nor did he participate in marketing decisions or product design or

production).

While the Special Master did not conduct a hearing focused on named in-house counsel

and their precise duties, the Protective Order at issue essentially accomplishes the same result by

defining in-house counsel in such a way as to exclude persons who engage in competitive

decision making.[13] The restrictions contemplated by the referenced case law are built into the

definition of "In-House Litigation Counsel" which provides as follows:

> "In-House Litigation Counsel" means any attorney who is an employee in the
> legal department of a Party whose responsibilities consist of overseeing the AMD
> Litigation or the Class Litigation, and who shall not from the date of entry of this

---

cases (e.g., patent and design information). <u>See, e.g.</u>, <u>Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.</u>,
682 F. Supp. 20, 22 (D. Del. 1988).

[13] No third party requested such a hearing.

Protective Order through a period of one (1) year following the conclusion of the AMD Litigation or the Class Litigation, whichever occurs later, be engaged in: (a) the review and approval of competitive pricing or marketing programs; (b) the review of any aspect of microprocessor or chipset manufacturing, (c) the filing or prosecution of patent applications, (d) the review or negotiation of any contract with a Producing Party related to the sale or marketing of microprocessors, (e) counseling in connection with PC or server manufacturing or operating system or software design or development, and (f) the licensing of Microsoft software or technology.

D.I. 277 at Definition G.

The Special Master concludes that Fry's has not met its burden to show good cause in light of the developed case law. Moreover, the Special Master concludes that Fry's commercial or trade secrets are adequately protected under the Protective Order.

3.    Fry's Should Not Have A Second Bite of the Apple.

As set forth above, Fry's present concerns with respect to the existing Protective Order were previously raised in the context of Third Party Objections. These concerns were specifically considered in the Protective Order Report and Recommendations and were either addressed in some fashion through revision or rejected. See D.I. 221, pp. 39-40, 44, 48-49, 81-82, 90, 96-97.

Fry's unconvincingly argues that the concerns it previously raised in connection with its Third Party Objection should now be revisited, as warranted by the different landscape confronting Fry's at the present. Tr. 19:6 – 23:13. Specifically, Fry's argues in essence for a second bite at the apple because first, it was not served with the Subpoena until approximately one month after it had filed its Third Party Objection and, therefore, did not have notice with respect to the precise information being presently sought; and second there are now "tens and tens of law firms representing class plaintiffs that want to have access to Fry's data." Tr. 23:8-13.

22

The Special Master concluded that the timeline in this case belies Fry's arguments:

- July 12, 2005 – Class Plaintiffs filed their class action complaint (D.I. 1, Case No. 05-485);
- October 4, 2005, AMD served Fry's with a documents-only subpoena seeking, among other things, documents sufficient to show (a) financial inducements in connection with the purchase of computer systems, and (b) "retail sell-through of computer systems on a monthly basis since January 1, 2001" (D.I. 440, Ex. F of Volin Decl.);
- May 22, 2006 – Fry's filed its Third Party Objection in connection with the Proposed Protective Order (D.I. 98); .
- June 2, 2006 – Fry's was provided notice of the opportunity to participate in the hearing regarding the Proposed Protective Order prior to its entry, and chose not to avail itself of the opportunity to participate in such hearing (D.I. 122);
- June 23, 2006 – Fry's was served with Class Plaintiffs' documents-only subpoena seeking, among other things, transactional data which is considered a "commercial or technical trade secret" as contemplated by the Proposed Protective Order. (D.I. 206);[14]
- June 27, 2006 – The Protective Order Report and Recommendations issued, which included the following language:

  * * *

  > WHEREAS, the preparation for trial of these actions may require the discovery and use of documents and other information which constitute or contain commercial or technical trade secrets, or other confidential information the disclosure of which would be competitively harmful to the producing party … (D.I. 221, p. 4).

- July 17, 2007, the deadline to file an objection to the Protective Order Report and Recommendations expires pursuant to Fed. R. Civ. P. 53(g)(2) and Fry's does not file any objection to the Protective Order Report and Recommendations;
- September 26, 2007 – The Honorable Joseph J. Farnan, Jr. adopted the Protective Order Report and Recommendations (D.I. 275) and entered the Protective Order (D.I. 277); and
- October 6, 2006 – the time to file a motion for reargument in connection with the entry of the Protective Order expires and Fry's does not file any such motion.

The Special Master concludes that Fry's should not now be heard to complain.

---

[14] The AMD documents and subpoena and the Fry's documents-only subpoena are in large measure the same. They both seek data which should be considered commercial or trade secret.

23

## C.    Fry's Miscellaneous Objections

The Special Master defers consideration on all the objections, pending the on-going meet and confer process that the Class Plaintiffs and Fry's are presently engaged in.

## CONCLUSION

For the reasons set forth above, the Special Master concludes as follows:

1.    The Court has authority, as the transferee court in multidistrict litigation, to adjudicate discovery disputes concerning documents-only subpoenas directed to non-parties and issued by transferring courts;

2.    Fry's has failed to demonstrate good cause to amend the Protective Order;

3.    Other Fry's objections are not ripe for consideration.

**In accordance with the Court's Order dated May 7, 2007 (D.I. 465), a party may file objections to, or a motion to adopt or modify, the Special Master's Order, Report or Recommendation on any issues related to the Motion to Compel no later than 5 days from the time the Special Master's Order, Report or Recommendation is served.**

ENTERED this
18 th day of May, 2007

_____
Vincent J. Poppiti (DSBA No. 100614)
Special Master

24