EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                          )
                                                )
INTEL CORP. MICROPROCESSOR                      )        MDL Docket No. 05-1717-JJF
ANTITRUST LITIGATION                            )        (Re: D.I. 300)
                                                )
—————————————————————                           )
                                                )
PHIL PAUL, on behalf of himself and all         )
others similarly situated,                      )
                                                )
                    Plaintiffs,                 )
                                                )
          v.                                    )        C.A. No. 05-485-JJF
                                                )
INTEL CORPORATION,                              )
                                                )
                    Defendant.                  )


**DM 5**

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
REGARDING THRESHOLD ISSUE RAISED BY
CLASS PLAINTIFFS' MOTION TO COMPEL AND OTHER ISSUES**


**RECOMMENDATION CONCERNING JURISDICTION AND PROTECTIVE ORDER**

**INTRODUCTION**

The captioned cases are antitrust actions brought against Intel Corporation ("Intel") as the manufacturer of microprocessors that run the Microsoft Windows and Linux families of operating systems (the "x86 Microprocessor Market"), a market in which Intel is alleged to hold worldwide market share measured as 80% of the market in units and 90% of the market in revenues.

The 05-485 action is brought on behalf of a class of consumers who allege economic injury resulting from Intel's alleged anticompetitive and monopolistic practices. The 05-485 action has been consolidated with over 70 other consumer-related actions by the Judicial Panel on Multidistrict Litigation and assigned to this Court, where it is docketed as MDL Docket No. 05-1717 (collectively, the "Class Litigation"). As used herein, the term "Class Plaintiffs" refers to the plaintiffs in the Class Litigation.

The matter *sub judice* comes before me, as Special Master,[1] on the motion of the Class Plaintiffs (D.I. 422 in Case No. 05-1717)[2] to compel Fry's Electronics, Inc. ("Fry's") to produce certain transactional data pursuant to a documents-only subpoena. Fry's initially questions the jurisdiction of this Court, the transferee court in a multidistrict litigation ("MDL"), to enforce a documents-only subpoena issued from a transferring court in the MDL and directed to a non-party litigant. Further, Fry's seeks to amend the existing Protective Order entered in the Class Litigation (D.I. 277)[3] to address its concerns regarding any production of its transactional data. Fry's other objections can be summarized as follows: (i) the Class Plaintiffs have failed to adequately identify the transactional data sought; (ii) the meet and confer process was

---

[1] The Order appointing Special Master is docketed at D.I. 60 in the 05-1717 MDL docket, and at D.I. 21 in Case No. 05-485.

[2] Unless otherwise specified, the docket items cited hereinafter refer only to the docket in Case No. 05-1717.

2

insufficient; (iii) the data sought from Fry's is available from other sources; (iv) the Class

Plaintiffs have failed to establish their need for the financial data; (v) to the extent Fry's is

required to produce transactional data, the Protective Order should be amended to protect such

information; and (vi) the Class Plaintiffs should pay Fry's reasonable expenses in producing

documents. Since the Class Plaintiffs and Fry's are continuing to meet and confer on various of

these enumerated objections, the Special Master defers addressing any of them at this time.

For the reasons discussed further herein, the Special Master concludes that 28 U. S. C. §

1407 provides this Court, as the transferee court, with the power to enforce a documents-only

subpoena issued from a transferring court in MDL and directed to a non-party. Further, while

the Special Master acknowledges that the Protective Order allows any "Party" or "Third Party"

(as such terms are defined in the Protective Order), for good cause shown, to move for

modification of the Protective Order (D.I. 277, ¶ 28), the Special Master concludes that Fry's has

failed to establish good cause in this matter to modify the Protective Order.

## BACKGROUND

On June 23, 2006, the Class Plaintiffs served Fry's with a documents-only subpoena

issued from the United States District Court for the Northern District of California (the

"Subpoena"). While the Subpoena seeks the production of documents in addition to data, the

motion to compel filed by the Class Plaintiffs on March 29, 2007 (the "Motion to Compel"), is

limited to the production of certain transactional data.[4]  D.I. 422 at 1, fn 1.

On April 17, 2007, Fry's filed its objection to the Motion to Compel (the "Objection").

D.I. 323, Case No. 05-485.

---

[3]  The Protective Order was also entered in Advanced Micro Devices, Inc. v. Intel Corporation, Case No. 05-441.

[4]  The Class Plaintiffs contend that the data needs to be produced "soon" because of its relevance to the upcoming class certification motion. D.I. 422 at 1, footnote 1, which must be filed on September 7, 2007. D.I. 410.

3

On April 23, 2007, the Class Plaintiffs filed their reply in support of the Motion to Compel (the "Reply"). D.I. 440. In the Reply, the Class Plaintiffs make clear that they seek production of Fry's transactional data as such data exists in the ordinary course of business. D.I. 440 at 1. Further, Class Plaintiffs acquiesce to receiving only a "statistically relevant sample" of such transactional data for class certification purposes at this time, but maintain that a full production of data will be required for the merits of their action. D.I. 440 at 3.

On May 1, 2007, the Special Master conducted a hearing on the Motion to Compel (the "May 1 Hearing"), at which counsel for the Class Plaintiffs and counsel for Fry's argued their respective positions. At the outset of the hearing, the Special Master addressed Fry's threshold issue concerning this Court's authority to entertain the Motion to Compel and expressed his intention to issue a report and recommendation concerning the same. Transcript of May 1 Hearing (hereinafter referred to as Tr.) at 7:1 – 9:14.[5] Thereafter, the Special Master reviewed the process behind the formulation and entry of the Protective Order and Fry's participation in such process to establish a backdrop for the parties' respective arguments. Tr. at 9:22 – 15:19.

At the conclusion of the May 1 Hearing, it became apparent that the record was not fully developed as to whether the transactional data, as kept in the ordinary course of Fry's business, would be in a form useable and useful to the Class Plaintiffs, and, thus, necessary. Tr. at 93:18 – 95:20. To enable the Class Plaintiffs an opportunity to complete the record on this issue, the parties stipulated to an informal review process which is expected to continue as necessary through May 23, 2007. D.I. 459.

---

[5] Since Fry's has requested that a portion of the transcript be docketed under seal, the transcript has not yet been

4

## DISCUSSION

**A.**    **Jurisdiction**

The federal statute governing multidistrict litigation or MDL, 28 U.S.C. § 1407 ("Section 1407"), provides in pertinent part that: "[t]he judge or judges to whom [MDL] actions are assigned ... may exercise the powers of a district judge *in any district* for the purpose of conducting pretrial *depositions* in such coordinated or consolidated pretrial proceedings." In re Automotive Refinishing Paint Antitrust Litigation, 229 F.R.D. 482, 485 (E. D. Pa. 2005) (citing 28 U. S. C. § 1407(b)) (emphasis added). The purpose of Section 1407 is to create an expedited procedure for the handling of multidistrict litigation, In re Factor VIII, 174 F.R.D. 412, 415 (N. D. Ill. 1997) ("Factor VIII"), and to provide for a unified concept of pretrial proceedings, United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc., 238 F. Supp. 2d 270, 274 (D.D.C. 2002) ("Pogue") (citing In re San Juan Dupont Plaza Hotel Fire Litigation, 117 F.R.D. 30, 32 (D.P.R. 1987)).

The overwhelming majority of courts that have considered the issue of whether Section 1407(b) authorizes a transferee judge the power to act as any judge of any district for pretrial depositions as well as subpoenas *duces tecum*, have found that it does. See, e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc., 444 F.3d 462, 469 n. 4 (6th Cir. 2006) ("Pogue Circuit Decision") ("[T]he rationale underlying the MDL statute of 'just and efficient' resolution of pretrial proceedings requires the conclusion that Section 1407(b)'s grant of authority applies to both deposition subpoenas and documents-only subpoenas."); Factor VIII, 174 F.R.D. at 415 ("It would make no sense for [Section] 1407(b) to confer authority to conduct depositions but not the authority to require productions of documents at a deposition."); Pogue,

docketed.

5

062038.00615/40168815v.4

238 F. Supp. 2d at 274; In re San Juan Dupont Plaza Hotel Fire Litigation, 117 F.R.D. 30, 32

(D.P.R. 1987) ("San Juan Hotel Fire"); In re Sunrise Sec. Litig., 130 F.R.D. 560, 586 (E.D. Pa.

1989); but see VISX, Inc. v. Nidek Co., 208 F.R.D. 615, 616 (N. D. Cal. 2002) ("VISX")

(narrowly reading Section 1407(b) to limit it to strictly deposition disputes and finding that Fed.

R. Civ. P. 45 trumps Section 1407 where a documents-only subpoena is at issue).

Similar to the circumstances in the instant matter, in Factor VIII, the plaintiffs moved for

an order compelling a non-party, The Marketing Research Bureau, Inc. ("MRB"), to comply

with a subpoena duces tecum. Factor VIII, 174 F.R.D. at 413. The subpoena duces tecum issued

out of the United States District Court for the District of Connecticut; the MDL transferee court

was the United States District Court for the Northern District of Illinois. Id. MRB refused to

comply and the plaintiffs moved the MDL transferee court for an order compelling compliance.

Id. MRB challenged the jurisdiction of the MDL transferee court. Id. In reliance upon prior

authorities, including San Juan Hotel Fire, 117 F.R.D. 30, In re Corrugated Container Antitrust

Litigation, 620 F.2d 1086 (5th Cir. 1980), In re Corrugated Container Antitrust Litigation, 644

F.2d 70 (2d Cir. 1981), In re Sunrise Sec. Litig., 130 F.R.D. 560 (E.D. Pa. 1989), the Factor VIII

MDL transferee court held that Section 1407(b) gave it authority to rule, as transferee judge, on

the motion to compel compliance with the subpoena issued in the District of Connecticut. Factor

VIII, 174 F.R.D. at 415. "This conclusion is not only consistent with the cases, it is consistent

with the purpose of § 1407, which is to create an expedited procedure for the handling of

multidistrict litigation. Requiring a transferee judge to travel from district to district to hold

hearings and rule on discovery matters would hardly be an efficient way of managing

consolidated pretrial proceedings." Id.[6]

---

6 One court has taken a quixotic approach by construing the term "in any district" of Section 1407(b) to require the judge to "journey to another district to hear a discovery dispute in that district." In re Uranium Antitrust Litigation,

6

In Pogue, relator moved to enforce subpoenas *duces tecum* issued to non-parties that owned the defendants. Pogue, 238 F. Supp. 2d at 272. The subpoenas *duces tecum* issued out of the United States District Court for the Middle District of Tennessee; the MDL transferee court was the United States District Court for the District of Columbia. Id. The non-parties subject to the subpoenas moved to quash the subpoenas, arguing that the MDL transferee court had no jurisdiction to enforce a subpoena *duces tecum* issued by another district court. Id. at 272-73. While noting that "it is not entirely a settled question whether an MDL court may enforce a subpoena *duces tecum* issued by another court" under the grant of Section 1407, the Pogue court held that the "weight of authority and effectuation of the purposes of multi-district litigation support a finding of jurisdiction." Id. at 273. The "weight of authority" cited by Pogue includes the following decisions, San Juan Hotel Fire, 117 F.R.D. 30, In re Corrugated Container Antitrust Litigation, 662 F.2d 875 (D.C. Cir. 1981), In re Corrugated Container Antitrust Litigation, 644 F.2d 70 (2d Cir. 1981), In re Sunrise Sec. Litig., 130 F.R.D. 560 (E.D. Pa. 1989), and Factor VIII, 174 F.R.D. 412. The Pogue court reasoned as follows:

> The language of § 1407 allows a judge to act as another district judge 'for the purpose of conduction pretrial depositions.' A subpoena *duces tecum* is an order to appear at a specific place on a specific date with certain documents. A deposition is also an order to appear. A subpoena *duces tecum* can be issued as an incident to a deposition.... The laws and rules governing federal courts strive to minimize elaborate formality and needless procedure. To effectuate those goals and to avoid placing on parties and nonparties from whom documents are sought the burden of holding a pro forma deposition in order to come under the aegis of § 1407, the Court holds that the power to act as the judge of any district for pretrial depositions includes as an incident the power to enforce subpoenas *duces tecum*.

Pogue, 238 F. Supp. 2d at 274-75 (citations omitted).

---

503 F. Supp. 33, 35 (N.D. Ill. 1980). A subsequent decision from the United States District Court for the Northern District of Illinois declined to follow the Uranium Antitrust interpretation of Section 1407 as compelling the MDL transferee judge to travel to the issuing jurisdiction to resolve disputes. See Factor VIII, 174 F.R.D. at 415.

Similarly, the court in San Juan Hotel Fire considered the interplay between a motion to enforce a subpoena duces tecum issued to a non-party and Section 1407. San Juan Hotel Fire, 117 F.R.D. 30. The court began its analysis with the purpose and policy of multidistrict litigation, which is to "provide for a unified concept of pretrial proceedings." Id. at 32. The court concluded that to enable the MDL judge fully to exercise the power to act as a judge of any district for pretrial depositions, "it is necessary to append to the transferee judge enforcement powers in relation to subpoenas issued in the deposition district, including depositions and subpoenas addressed to nonparties." Id. (citation omitted).

Likewise, in In re Sunrise Sec. Litig., 130 F.R.D. 560 (E.D. Pa. 1989), the court held that it had the power to enforce subpoenas *duces tecum* issued from another district court incident to depositions. The court concluded that under Section 1407, "a multidistrict judge may decide a motion to compel a non-party in other districts even if he or she is not physically situated in those districts." Id. at 586.

More recently, in In re Automotive Refinishing Paint Antitrust Litigation, 229 F.R.D. 482, 487 (E.D. Pa. 2005), plaintiffs moved to compel a non-party foreign witness, CEPE, to respond to plaintiffs' request for production of documents. The Automotive Refinishing court held that under Section 1407(b) it could adjudicate the motion to compel pursuant to its authority as the MDL transferee court. Id. at 486. In support of its conclusion, the court cited to In re Sunrise Sec. Litig., 130 F.R.D. at 586, for the proposition that Section 1407 authorizes a transferee court judge to sit as the court in "other districts to hear and decide motions to compel discovery from non-parties" and that "a multidistrict judge may decide a motion to compel a non-party in other districts even if he or she is not physically situated in those districts." Id. at

8

486. See also id. (citing 17 James Wm. Moore et al., Moore's Federal Practice § 112.07[1] [b] (3d ed. 2004) ("[T]he [MDL] judge has jurisdiction to order nonparties to comply with a subpoena *duces tecum* issued by another district judge. There is no requirement that the [MDL] court or judge be physically present in the other district to decide a motion to compel production pursuant to a subpoena issued by another district." (footnotes omitted)). The Automotive Refinishing court also noted that the Third Circuit has stated *in dicta* that Section 1407(b) "empowers the transferee judge in multidistrict cases to act not only on behalf of the transferee district, but also with 'the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings.'" Id. at 486 (citing In re Flat Glass Antitrust Litig., 288 F.3d 83, 90 n.12 (3d Cir. 2002) (internal citations omitted)).

Here, the only case cited by Fry's to support its contest to the jurisdiction of this Court to adjudicate the present dispute is VISX, 208 F.R.D. 615. In VISX, the United States District Court for the Northern District of California was called upon to adjudicate plaintiff's motion to enforce documents-only subpoenas issued to non-parties outside the Northern District of California. Id. at 616. In VISX, the court refused to enforce the documents-only subpoenas at issue, reasoning that: (i) Fed. R. Civ. P. 45(e) provided the only procedure for enforcing a subpoena *duces tecum* is to institute contempt proceedings before the district court that issued the subpoena, and (ii) Section 1407(b) only expands a transferee court's discovery powers only to pretrial depositions, not documents-only subpoenas. Id.

Neither Fry's nor the Class Plaintiffs advised the Court that, in a subsequent decision, the United States District Court for the Northern District of California declined to follow VISX, concluding instead that Section 1407(b) applied to documents-only subpoenas. See In re Welding Rod Products Liability Litigation, 406 F. Supp. 2d 1064 (N.D. Cal. 2005). More

9

recently, the <u>Pogue Circuit Decision</u> rejected the <u>VISX</u> decision that Section 1407(b)'s authority did not extend to enforcement of documents-only subpoenas. <u>Pogue Circuit Decision</u>, 444 F.3d at 469 n.4. Specifically, the Sixth Circuit concluded "that the rationale underlying the MDL statute of 'just and efficient' resolution of pretrial proceedings requires the conclusion that Section 1407(b)'s grant of authority applies to both deposition subpoenas and documents-only subpoenas." <u>Id.</u>

Given the United States District Court for the Northern District of California's determination not to follow its earlier <u>VISX</u> decision, the <u>Pogue Circuit Decision</u>'s rejection of <u>VISX</u>, and the fact that the <u>VISX</u> decision is at odds with the rationale underlying the MDL statute, the Special Master declines to accord the <u>VISX</u> decision any weight.

Based on the foregoing analysis of the relevant case law, the Special Master concludes that the majority view is the better reasoned view, as it is consistent with the underlying purpose of multidistrict litigation—to provide for a unified concept of pretrial proceedings. Further, the Special Master believes that the Third Circuit would likely adopt the better-reasoned majority view based upon its dicta that Section 1407(b) "empowers the transferee judge in multidistrict cases to act not only on behalf of the transferee district, but also with 'the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings.'" <u>In re Flat Glass Antitrust Litig.</u>, 288 F. 3d 83, 90 n.12 (3d Cir. 2002). Accordingly, the Special Master recommends that this Court conclude that, under the grant of Section 1407, this Court, as the transferee court in multidistrict litigation, has the authority to adjudicate discovery disputes concerning documents-only subpoenas directed to non-parties and issued from a transferring court.

10

**B.**     **The Protective Order**

    1.     The Process Employed to Finalize the Protective Order.

    As set forth at the May 1 Hearing, the formulation and entry of the Protective Order was the result of extensive proceedings, whereby non-parties to the litigation were provided with notice of the proposed protective order and an opportunity to provide written comments to the same and argue as to the propriety of the proposed language.[7] Tr. at 9:22 – 15:19.

    An explication of the "process" is important. The first phase of the process, mandated in part by the Court's Case Management Order No. 1 (D.I. 79), is generally set forth as follows:

> The parties with Court approval, have implemented *a process to obtain third party input on a Protective Order, and the Proposed Protective Order*, as well as the positions of the Parties and third parties will be provided to the Court on or before May 31, 2006.

Case Management Order No. 1. at ¶ 5(b), D.I. 79 (emphasis added).

    a.     Solicitation of Input From Non-Parties

    The first step of the process was to solicit input of non-parties on the proposed protective order. As a result of this process, objections and comments (the "Third Party Objections") were filed by Fry's and the following entities: Hewlett-Packard Company; Egenera, Inc.; Best Buy Company, Inc.; Fujitsu Limited; NEC Corporation; Sony Corporation; Sony Electronics, Inc.; Toshiba Corporation; Circuit City Stores, Inc.; Acer America Corporation; ASI Computer Technologies, Inc.; Avnet, Inc.; Ingram Micro Inc.; Synnex Corporation; Tech Data Corporation; Microsoft Corporation; International Business Machine Corporation; Dell Inc.; Lenova Group Ltd.; Hitachi, Ltd.. D.I. 221 at 2-3.

---

[7] The process may well have been unprecedented, as counsel for the Class Plaintiffs noted, "I have never been involved where the Court proactively invited third parties to look at a concrete proposal formulated by the parties for a protective order, where they had an opportunity to look at a concrete draft and give written comments as well as to argue as to the propriety of the language. That kind of a proceeding I've never seen." Tr. at 18:3 – 18:10; see also D.I. 461 (suggesting process was unprecedented).

b.    <u>Negotiations to Resolve Third Party Objections</u>

The second step in the process was for the parties to engage in discussions with non-

parties in an effort to resolve the issues raised in the Third Party Objections and informal

responses. This is set forth more fully in the Special Master's Report and Recommendations

Regarding Proposed Protective Order (the "Protective Order Report and Recommendations")

(D.I. 221) as follows:

### Parties' Responses to Objections/Comments

> Following the filing of the Third Party Objections, AMD and Intel
> filed their respective responses and objections to the Third Party
> Objections. D.I. 148-49. The Parties' responses addressed some, but not
> all, of the Third Party Objections by voluntary revisions to certain
> language of the Proposed Protective Order. The Parties, however, were
> not in complete agreement with respect to the extent to which the Third
> Party Objections should be accommodated, as well as with respect to the
> working of the revisions to effect certain of the accommodations. This
> resulted in competing versions of the Proposed Protective Order pending
> approval before the Court, as well as outstanding issues with respect to
> those objections raised by the Third Parties that went largely unaddressed.
> With the Court's agreement, the Special Master scheduled a hearing on
> the terms of the Proposed Protective Order and directed the parties to
> provide appropriate notice to the Third Parties of the hearing.

D.I. 221 at 78.

c,    <u>Hearing on Open Disputes Concerning the Protective Order</u>

The issues still in dispute after negotiations were brought before the Special Master at a

hearing during which non-parties had an opportunity to argue their respective positions. This

step in the process is described in the Protective Order Report and Recommendations as follows:

### Hearing re: Proposed Protective Order

> On June 9, 2005, prior to the scheduled hearing, the Parties
> distributed to the Third Parties a revised version of the Proposed
> Protective Order identifying the changes the parties were willing to make
> to accommodate certain of the objections posed by the Third Parties, to
> better allow the scheduled hearing to focus on the provisions remaining in

12

contention.

On June 12, 2006, the Special Master conducted a hearing at which the parties and Third Parties were afforded an opportunity to be heard with respect to those provisions of the Proposed Protective Order still in dispute. *See* D.I. 143 (Transcript of June 12, 2006 Hearing, docketed in 05-1717). For the sake of efficiency, the Third Parties agreed – without waiving the objections they had previously submitted in written form – to allow counsel for one Third Party to speak as a representative for all Third Parties with respect to issues on which they shared similar views. *Id.* at 44:10-46:12.

At the hearing, the major issue in dispute was whether discovery materials obtained through the captioned litigations before this Court – especially Confidential Discovery Materials – can be used for purposes of the Japan Litigation and the California Class Litigation. The Parties and Third Parties also represented that Definitions J, R, S and U of the "Definitions" section of the Proposed Protective Order contained provisions still in dispute. They also identified Paragraphs 1, 4, 5, 6, 7, 8, 10, 14, 15, 16 and 31 of the "Terms and Conditions" section as containing provisions still in dispute.

During the course of the hearing, the remaining disputes were either (a) resolved by revisions agreed to by both the Parties and the Third Parties; (b) resolved by determinations reached by the Special Master, or (c) taken under advisement for further consideration and recommendation by the Special Master.[8]

D.I. 221 at 78-79.

Fry's, while choosing to file a Third Party Objection in connection with the Proposed Protective Order on May 22, 2006 (D.I. 98), did not participate in the Special Master's June 12, 2006 hearing, claiming that it did not have a realistic opportunity to participate, as it did not receive adequate notice of the hearing. D.I. 451 at 5, n.4. Fry's reiterates this position in its May 9, 2007 submittal, stating that it "could not as a practical matter participate in the hearing, as it would have required travel to Delaware which was not practical under the circumstances (and it had no reason to retain Delaware counsel)." D.I. 467 at 2, n.2. The Special Master finds

---

[8] The hearing was conducted pursuant to the Special Master's authority to manage discovery and to conduct hearings. <u>See</u> Fed. R. Civ. P. 53 (b) and (c) and Order Appointing Special Master (D.I. 73 at ¶ 3).

062038.00615/40168815v.4

Fry's explanation to be unpersuasive given the participation of other Third Parties. In any event, it should be noted that Fry's objections were duly accepted and considered.

      d.    The Protective Order Report and Recommendations

The Protective Order Report and Recommendations itself was part of the process, spanning 117 pages described: (a) the Third Party Objections, (b) revisions made to the Protective Order in light of the Third Party Objections and ensuing discussions to resolve such objections, (c) unresolved disputes, and (d) recommendations with respect to such unresolved disputes and the bases supporting the same.

      e.    Objections to the Protective Order Report and Recommendations

Pursuant to Fed. R. Civ. P. 53(g)(2), parties and non-parties were afforded a twenty-day period within which to file any objection to the Special Master's Protective Order Report and Recommendations. Neither Fry's nor any third party filed any objection. Only Intel and Advanced Micro Devices, Inc. ("AMD") availed themselves of this opportunity, filing their respective objections. D.I. 111 and 112.

      f.    Entry of the Protective Order

Ultimately, on September 26, 2006, this Court, after considering objections filed pursuant to Fed. R. Civ. P. 53(g)(2) by both Intel (D.I. 111) and AMD (D.I. 112), adopted the Protective Order proposed by the Special Master (D.I. 275) and entered the Protective Order as proposed by the Special Master (D.I. 277). There was no D. Del. L.R. 7.1.5 Motion for Reargument filed by any party or third party.

      g.    Fry's Participation in the Process

The Class Plaintiffs take the position that the Protective Order is the law of the case, and, regardless, Fry's has not met its good cause burden to effect its change. D.I. 464. Fry's on the

14

other hand, while asserting that it has shown good cause, attempts to characterize the process leading up to entry of the Protective Order as, in essence, a meet and confer among the parties, the Third Parties and ultimately with the Special Master, and suggesting that Fry's participation or lack thereof in such process should have no consequence. D.I. 467. The Special Master concludes that the participation or lack thereof of Fry's in the established process is a factor that is appropriate to consider in the good cause analysis as to whether the Protective Order should be modified.

 2. <u>Fry's Present Concerns Regarding the Protective Order Were Raised Previously</u>

Fry's present concerns with respect to the existing Protective Order were previously raised in the context of Third Party Objections. These concerns were specifically considered in the Protective Order Report and Recommendations and were addressed either through revision or rejected. <u>See</u> D.I. 221, pp. 39-40, 44, 48-49, 81-82, 90, 96-97.

 a. <u>Experts/Consultants</u>

Fry's suggests that prior to the disclosure of highly confidential information to any expert or consultant, the party seeking such disclosure should provide Fry's with not less than ten days advance notice of such disclosure, which notice shall identify the expert or consultant, identify the person's title, job responsibilities and affiliations with any party, and include a copy of the person's most recent curriculum vitae that identifies all of such person's past and present employment and/or consulting relationships. D.I. 328 at Ex. E, Case No. 05-485. Further, Fry's suggests that each party should be limited to designate only one expert or consultant who is authorized to receive such highly confidential material. <u>Id.</u>

With respect to seeking the disclosure of the experts/consultants that may have access to its highly confidential information, Fry's did not object to paragraph 11 of the Proposed

15

Protective Order in its Third Party Objection. D.I. 221 at 44-45; 92-96.

Regardless, a number of third parties did object to paragraph 11 of the Proposed Protective Order. The Protective Order Report and Recommendations described the objections to paragraphs 6(b) and 11 and the resolution of same as follows:

### C.    **Paragraph 6(b) and 11 (revised)**

Paragraph 6(b) and 11 address disclosure of Confidential Discovery Materials to Experts/Consultants. The Third Parties objected to the original language of these paragraphs on the basis that it would permit disclosure of their Confidential Discovery Materials to such professionals, without notification to the Third Parties. As argued by the Third Parties:

> The technology world is small and getting smaller every day. And who the parties are selecting, and my guess is there's going to be quite a number of experts and consultants in this case, and who they're using may very well be relevant to the non-parties in the context of the ordinary course of their business... [T]heir is clearly a legitimate business interest for the non-parties to know who's getting access to their incredibly sensitive information.

D.I. 143 at 88:12-89:6.

> The Parties initially argued against the change sought by the Third Parties "simply because there's going to be a lot of experts, a lot of consultants. Many of them are non-testimonial. And both Intel and AMD view that as work product that we wouldn't, in the ordinary course, be disclosing to anybody, nor would we have any obligation to do so." D.I. 143 at 89:13-20. The Parties, however, went on to offer that they would be willing to accommodate the Third Parties' concerns in the spirit of compromise, and agreed to work with the Third Parties to come up with mutually acceptable language.

> Following the hearing, by submission dated June 15, 2006, the Parties agreed to revise the concluding paragraph of Paragraph 11 to add the following language:

> > Except with the consent of the Producing Party, however, Confidential Discovery Material shall not be disclosed to an expert or consultant who at the time of the intended disclosure is an officer or employee of a party. The

16

> Acknowledge of Protective Order signed and executed by a
> Party's or Class Party's Expert/Consultant [   ] shall be
> made available to Third Parties whose confidential
> Discovery Material is disclosed to that Expert/Consultant,
> under the express agreement that such Third Parties
> maintain the information contained in the
> Acknowledgement in absolute confidence.

Based upon this record, the Special Master concludes that Paragraphs 6(b) and 11 of the Proposed Protective Order, including certain of the proposed revisions agreed to by both the Parties and the Third Parties, is acceptable and recommends that the proposed revision to Paragraph 11 should be reworded as set forth above.

Protective Order Report and Recommendations D.I. 221, pp. 81-82.

While the revisions set forth above do not provide Fry's with 10 days advance notice and the extensive work history in the form of a curriculum vitae that it now seeks, the Protective Order does strike a balance between the interest of non-parties in knowing who will have access to their confidential information and protecting a party's ability to retain its own expert of choice. Accordingly, the Special Master concludes that Fry's has not shown good cause to disrupt this balance and modify the Protective Order in this regard.

b.    In-House Counsel and a Two-Tier System

In its proposed revisions to the Protective Order, Fry's suggests a two-tier system – one tier for outside counsel's eyes only in connection with discovery material believed to be extremely confidential and/or sensitive in nature or a "trade secret" (as defined in Fed. R. Civ. P. 26(c) and 45(c)(3)(B)(i)) and a second tier for less sensitive material that would contemplate in-house counsel review. D.I. 328 at Ex. E, Case No. 05-485.

In its Third Party Objection, Fry's also argued for this two-tier approach to protect its highly confidential information from in-house counsel. See D.I. 221 at 39-40 and 48-49. Fry's was not alone with its concern regarding in-house counsel of the parties having access to

17

Confidential Discovery Material. Id.

The concerns with respect to in-house counsel's access to Confidential Discovery Material were primarily addressed in the revision to Definition G of the Protective Order defining "In-House Litigation Counsel." D.I. 221 at 86-87.[9] Specifically, the revisions to the definition of In-House Litigation Counsel were designed to expand the categories that would prohibit the disclosure of Confidential Discovery Material to include in-house counsel who are engaged in: (a) the review or negotiation of any contract with a producing party related to the sale of microprocessors, (b) counseling in connection with PC or server manufacturing or operating system or software design or development, and (c) the licensing of Microsoft software or technology. D.I. 221 at 86.

The Proposed Protective Order had already carved out in-house counsel that were engaged in the review and approval of competitive pricing or marketing programs which is, among others, one of Fry's primary concerns. Id.

Further, in response to the concerns raised by the Third Party Objections, the parties proposed to limit the number of in-house lawyers who would receive access to third parties' discovery materials to two lawyers at Intel and two lawyers at AMD. D.I. 221 at 86; D.I. 277 ¶ 6(c). Additionally, the parties proposed to revise paragraph 6(c) of the Protective Order to require notice to the producing parties of the identity of the in-house lawyers who will have access to the discovery materials. D.I. 221 at 48-49 and 86; D.I. 277 ¶ 6(c).

Finally, with respect to Fry's concern regarding where and how in-house counsel have access to Confidential Discovery Material, paragraph 9 of the Protective Order already limited the way in which in-house counsel could view and access Confidential Discovery Material. D.I.

---

[9] Although the Protective Order Report and Recommendations refers to Definition J in this regard, it is Definition G of the final version of the Protective Order (D.I. 277) that contains the definition of In-House Litigation Counsel.

221 at 48-49 and D.I. 277 at ¶ 9.

Despite the existing protections in the Protective Order regarding In House Litigation Counsel having access to highly confidential information, Fry's persists in arguing for a two-tier form of Protective Order. At the May 1 Hearing, the Special Master permitted Fry's to supplement its filings with a post-hearing submittal that focused on a protective order entered by Judge Kent A. Jordan in In re Tricor Direct Purchaser Antitrust Litigation, No. 1:05-cv-00340-KAJ and 1:05-cv-00360-KAJ (D. Del.). On May 2, 2007, Fry's submitted its letter and supporting materials, which materials included letter briefs previously submitted to Judge Jordan by counsel for the parties in In re Tricor Direct Purchaser Antitrust Litigation, D.I. 451 through D.I. 453.

The Special Master did not find the protective order entered by Judge Jordan to be particularly instructive to the matter *sub judice*, as every protective order has its own unique history involving the negotiations and concerns of the interested parties that went into its crafting.

Similarly, Fry's directs the Special Master to statements made by Judge Farnan over six years ago in F. Hoffman-La Roche, Ltd. v. Igen International, Inc., Case No. 98-318-JJF, whereby Judge Farnan states: "In this district, highly confidential, assuming the information is properly designated, ... is limited to outside counsel, experts and consultants." D.I. 467, Ex. B.10 At the same time, Fry's in its May 2, 2007 submittal included correspondence from Chief Judge Sue L. Robinson dated March 14, 2006, and an Order dated January 25, 2005, that appear to be directly at odds with the foregoing statement of Judge Farnan. D.I. 452, Ex. C. Specifically, in the March 14, 2006 letter, Judge Robinson writes, "I allow in every case one in-

---

10 Notwithstanding the earlier statement, Judge Farnan did, of course, adopt the Protective Order Report and Recommendations in its entirety and entered the Protective Order as proposed.

house representative to view the most confidential of documents." Id.; January 25, 2005 Order (same) at id.

Interestingly, neither Fry's nor the Class Plaintiffs in their written responses direct the Special Master to any relevant case law on the subject. Fry's, however, in its May 2, 2007 submittal included correspondence to Judge Jordan dated November 24, 2006, that sets forth relevant case law regarding whether and when it is appropriate to exclude in-house from having access to confidential information. D.I. 452, Ex. C. The Special Master believes that a review of the relevant case law is both instructive and compelling.

The seminal case on the subject is U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed. Cir. 1984). U.S. Steel provides that a party's designation as in-house counsel cannot serve to automatically deny that party access to information deemed confidential. Id. at 1467. See also R.R. Donnelley & Sons Co. v. Quark, Inc., C.A. No. 06-032-JJF, 2007 WL 61885, at *1 (D. Del. Jan. 4, 2007); Affymetrix, Inc. v. Illumina, Inc., C.A. No. 04-901-JJF, 2005 WL 1801683, at *2 (D. Del. July 28, 2006); United States v. Dentsply International, Inc., 187 F.R.D. 152, 159 (D. Del. 1999)[11]; Motorola, Inc. v. Interdigital Technology Corp., C.A. No. 93-488-LON, 1994 WL 16189689, at *3 (D. Del. Dec. 19, 1994). U.S. Steel further provides that courts must look to the factual circumstances surrounding each individual counsel's activities, associations and relationships with a party, with a focus as to whether in-house counsel are involved in the competitive decision making process. Id. at 1468. This District has consistently followed U.S. Steel and its "competitive decision making standard" when considering whether in-house counsel should be denied access to highly confidential information.[12] See, e.g., R.R. Donnelley,

---

[11]  While court applied the "competitive decision making standard" to the motion at issue because the litigants agreed on such standard, the court acknowledged that non-parties to litigation are situated differently than parties, not having undertaken the risks of disclosure. Id. at 160, n. 7.

[12]  It should be noted that a line of cases exists recognizing that courts often afford fuller protection to technological

20

2007 WL 61885, *1; Affymetrix, 2005 WL 1801683, at *2; Commissariat A L'Energie Atomique v. Dell Computer Corp., C.A. No. 03-484-KAJ, 2004 WL 1196965, at *2 (D. Del. May 25, 2004); Dentsply, 187 F.R.D. at 159-60; Motorola, 1994 WL 16189689, at *3. See also Carpenter Technology Corp. v. Armco, Inc., 132 F.R.D. 24, 27 (E.D. Pa. 1990); Sullivan Marketing, Inc. v. Valassis Communications, Inc., C.A. No. 93-6350, 1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994).

Where in-house counsel are not involved in competitive decision making, courts have routinely refused to bar in-house counsel access to confidential discovery materials. See, e.g., In re Plastics Additives Antitrust Litigation, C.A. No. 03-2038, 2005 U.S. Dist. LEXIS 23771, at *11-12 (E.D. Pa. Aug. 24, 2005)) (granting in-house counsel access to confidential discovery materials where no involvement in "competitive decision making"); Carpenter Technology Corp., 132 F.R.D. at 27-28 (allowing senior staff attorney access to confidential information where his affidavit indicated that he had no involvement in decisions regarding pricing of products or services sold, nor did he participate in marketing decisions or product design or production).

While the Special Master did not conduct a hearing focused on named in-house counsel and their precise duties, the Protective Order at issue essentially accomplishes the same result by defining in-house counsel in such a way as to exclude persons who engage in competitive decision making.[13] The restrictions contemplated by the referenced case law are built into the definition of "In-House Litigation Counsel" which provides as follows:

> "In-House Litigation Counsel" means any attorney who is an employee in the
> legal department of a Party whose responsibilities consist of overseeing the AMD
> Litigation or the Class Litigation, and who shall not from the date of entry of this

---

cases (e.g., patent and design information). See, e.g., Safe Flight Instrument Corp. v. Sundstrand Data Control Inc., 682 F. Supp. 20, 22 (D. Del. 1988).
[13] No third party requested such a hearing.

Protective Order through a period of one (1) year following the conclusion of the AMD Litigation or the Class Litigation, whichever occurs later, be engaged in: (a) the review and approval of competitive pricing or marketing programs; (b) the review of any aspect of microprocessor or chipset manufacturing, (c) the filing or prosecution of patent applications, (d) the review or negotiation of any contract with a Producing Party related to the sale or marketing of microprocessors, (e) counseling in connection with PC or server manufacturing or operating system or software design or development, and (f) the licensing of Microsoft software or technology.

D.I. 277 at Definition G.

The Special Master concludes that Fry's has not met its burden to show good cause in light of the developed case law. Moreover, the Special Master concludes that Fry's commercial or trade secrets are adequately protected under the Protective Order.

       3.     Fry's Should Not Have A Second Bite of the Apple.

As set forth above, Fry's present concerns with respect to the existing Protective Order were previously raised in the context of Third Party Objections. These concerns were specifically considered in the Protective Order Report and Recommendations and were either addressed in some fashion through revision or rejected. See D.I. 221, pp. 39-40, 44, 48-49, 81-82, 90, 96-97.

Fry's unconvincingly argues that the concerns it previously raised in connection with its Third Party Objection should now be revisited, as warranted by the different landscape confronting Fry's at the present. Tr. 19:6 – 23:13. Specifically, Fry's argues in essence for a second bite at the apple because first, it was not served with the Subpoena until approximately one month after it had filed its Third Party Objection and, therefore, did not have notice with respect to the precise information being presently sought; and second there are now "tens and tens of law firms representing class plaintiffs that want to have access to Fry's data." Tr. 23:8-13.

The Special Master concluded that the timeline in this case belies Fry's arguments:

- July 12, 2005 – Class Plaintiffs filed their class action complaint (D.I. 1, Case No. 05-485);
- October 4, 2005, AMD served Fry's with a documents-only subpoena seeking, among other things, documents sufficient to show (a) financial inducements in connection with the purchase of computer systems, and (b) "retail sell-through of computer systems on a monthly basis since January 1, 2001" (D.I. 440, Ex. F of Volin Decl.);
- May 22, 2006 – Fry's filed its Third Party Objection in connection with the Proposed Protective Order (D.I. 98); .
- June 2, 2006 – Fry's was provided notice of the opportunity to participate in the hearing regarding the Proposed Protective Order prior to its entry, and chose not to avail itself of the opportunity to participate in such hearing (D.I. 122);
- June 23, 2006 – Fry's was served with Class Plaintiffs' documents-only subpoena seeking, among other things, transactional data which is considered a "commercial or technical trade secret" as contemplated by the Proposed Protective Order. (D.I. 206);[14]
- June 27, 2006 – The Protective Order Report and Recommendations issued, which included the following language:

\* \* \*

> WHEREAS, the preparation for trial of these actions may require the discovery and use of documents and other information which constitute or contain commercial or technical trade secrets, or other confidential information the disclosure of which would be competitively harmful to the producing party … (D.I. 221, p. 4).

- July 17, 2007, the deadline to file an objection to the Protective Order Report and Recommendations expires pursuant to Fed. R. Civ. P. 53(g)(2) and Fry's does not file any objection to the Protective Order Report and Recommendations;
- September 26, 2007 – The Honorable Joseph J. Farnan, Jr. adopted the Protective Order Report and Recommendations (D.I. 275) and entered the Protective Order (D.I. 277); and
- October 6, 2006 – the time to file a motion for reargument in connection with the entry of the Protective Order expires and Fry's does not file any such motion.

The Special Master concludes that Fry's should not now be heard to complain.

---

[14] The AMD documents and subpoena and the Fry's documents-only subpoena are in large measure the same. They both seek data which should be considered commercial or trade secret.

23

C.    **Fry's Miscellaneous Objections**

The Special Master defers consideration on all the objections, pending the on-going meet and confer process that the Class Plaintiffs and Fry's are presently engaged in.

### CONCLUSION

For the reasons set forth above, the Special Master concludes as follows:

1.    The Court has authority, as the transferee court in multidistrict litigation, to adjudicate discovery disputes concerning documents-only subpoenas directed to non-parties and issued by transferring courts;

2.    Fry's has failed to demonstrate good cause to amend the Protective Order;

3.    Other Fry's objections are not ripe for consideration.

**In accordance with the Court's Order dated May 7, 2007 (D.I. 465), a party may file objections to, or a motion to adopt or modify, the Special Master's Order, Report or Recommendation on any issues related to the Motion to Compel no later than 5 days from the time the Special Master's Order, Report or Recommendation is served.**

ENTERED this
18ᵗʰ day of May, 2007

_____
Vincent J. Poppiti (DSBA No. 100614)
Special Master

24

EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) Civil Action No. 05-MD-1717-JJF ) |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 05-485-JJF ) |
| v. | ) CONSOLIDATED ACTION ) |
| INTEL CORPORATION, | ) ) |
| Defendant. | ) |

## STIPULATION & ORDER

WHEREAS, on March 29, 2007, Class Plaintiffs filed a motion to compel in the form of a letter brief to the Special Master requesting that Fry's Electronics, Inc. ("Fry's") be compelled to produce certain purchase and sales data in response to the subpoena served by Class Plaintiffs on Fry's on June 23, 2006;

WHEREAS, Class Plaintiffs and Fry's have met and conferred before and after the motion in an attempt to agree upon the data that Fry's would produce in response to the subpoena. These negotiations have included a series of proposals and counter-proposals from Fry's and Class Plaintiffs; and

WHEREAS, the Special Master held a teleconference on July 31, 2007 in which Fry's and Class Plaintiffs agreed that a briefing schedule should be entered to complete briefing of the motion to compel. Class Plaintiffs proposed and Fry's agreed that the additional briefing would be limited to the issue of whether (a) the latest data production proposal from Fry's or (b) the

latest data production proposal from Class Plaintiffs should be accepted by the Court as the more appropriate resolution of the motion to compel;

NOW, THEREFORE, Class Plaintiffs and Fry's, by and through their undersigned counsel, and subject to the approval of the Special Master, hereby stipulate and agree as follows:

1.    A further hearing on Class Plaintiffs' motion to compel production of documents shall be set for September 7, 2007 at 3:30 p.m.  Any party may appear telephonically or in person, provided that any party electing to appear in person shall notify the Court and all other parties of its intention to do so on or before September 3, 2007.  Should any party choose to appear in person, the other parties shall have the option of appearing in person or telephonically.

2.    On August 10, 2007, Class Plaintiffs shall serve and file an opening letter brief not to exceed five single-spaced pages.  On August 20, 2007, Fry's shall serve and file its letter response not to exceed five single-spaced pages.  On August 27, 2007, Class Plaintiffs shall serve and file a letter reply to Fry's response not to exceed three single-spaced pages.

3.    The supplemental briefing shall address solely the issue of whether (a) the latest proposal from Fry's, (b) the latest proposal from Class Plaintiffs, or (c) a new position that Fry's or Class Plaintiffs believes in good faith falls between the latest proposals from Fry's and Class Plaintiffs should be accepted by the Court as the most appropriate resolution of the motion to compel.  The Special Master may choose either proposal, the new "middle" position, or a variation of any of these as the appropriate resolution of the motion to compel.

4.    Any future negotiations between Fry's and Class Plaintiffs in an effort to reach a negotiated resolution of the motion to compel will be conducted off the record and neither the substance nor the fact of such negotiations may be disclosed to the Special Master.

5.    Notwithstanding the provisions of the May 4, 2007 Stipulation and Order that imposes certain confidentiality restrictions on information provided by Fry's to Class Plaintiffs, the Undertakings signed by Class Counsel and their experts pursuant to paragraph 1 of the May 4, 2007 Stipulation and Order, and agreements between Class Plaintiffs and Fry's to keep their negotiations off the record, the supplemental briefs may contain any information provided by Fry's or Class Counsel in the course of their negotiations and meet and confer sessions, including but not limited to their May 14, 2007 meet and confer; provided, however, that any brief containing any such information shall be filed with the Court under seal and shall remain under seal pending further order of the Court.

DATED: August 6, 2007

**PRICKETT JONES & ELLIOTT, P.A.**

By: ___ /s/ J. Clayton Athey ___
    James L. Holzman (#663)
    J. Clayton Athey (#4378)
    1310 King Street
    P.O. Box 1328
    Wilmington, DE  19899
    (302) 888-6500
    jlholzman@prickett.com
    jcathey@prickett.com
    *Interim Liaison Counsel for Class Plaintiffs*

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

By: ___ /s/ Mary B. Graham ___
    Mary B. Graham (#2256)
    1201 North Market Street
    P.O. Box 1347
    Wilmington, DE  19899
    (302) 658-9200
    mgraham@mnat.com
    *Attorneys for Fry's Electronics, Inc.*

SO ORDERED.

ENTERED this _6th_ day of August, 2007.

Vincent J. Poppiti (DSBA No. 100614)
Special Master

EXHIBIT 9

CONFIDENTIAL EXHIBIT

# EXHIBIT 10

CONFIDENTIAL EXHIBIT

EXHIBIT 11

CONFIDENTIAL EXHIBIT

# EXHIBIT 12

Teleconference

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. |
| | ) | 05-441-JJF |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Teleconference in above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the offices of Blank Rome, LLP, 1201 North Market Street, Wilmington, Delaware, on Tuesday, September 11, 2007, beginning at approximately 2:30 p.m., there being present:


BEFORE:

THE HONOROABLE VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

        O'MELVENY & MYERS
        LINDA SMITH, ESQ.
        JENNIFER LASER, ESQ.
            1999 Avenue of the Stars
            Los Angeles, California  90067
        for AMD


CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street     Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
With Wilcox & Fetzer, Court Reporters

Teleconference

2 (Pages 2 to 5)

## Page 2

1  APPEARANCES (Continued):
2    RICHARDS, LAYTON & FINGER
     FREDERICK L. COTTRELL, III, ESQ.
3    One Rodney Square
     Wilmington, DE 19899
4    for AMD
5    POTTER, ANDERSON & CORROON
     RICHARD L. HORWITZ, ESQ.
6    1313 North Market Street, 6th Floor
     Wilmington, DE 19899
7    for Intel
8
9    PRICKETT, JONES & ELLIOTT
     CLAYTON J. ATHEY, ESQ.
10   1310 King Street
     Wilmington, DE 19801
11   for Class
12   COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
     DANIEL SMALL, ESQ.
     1100 New York Avenue, N.W
13   Suite 500, West Tower
     Washington, D.C. 20005
14   for Class
15   FINKELSTEIN THOMPSON & LOUGHRAN
     RICHARD VOLEN, ESQ.
16   235 Pine Street, 15th Floor
     San Francisco, California 94104
17   for Class
18   MORRIS, NICHOLS, ARSHT & TUNNELL
     MARY GRAHAM, ESQ.
19   1201 North Market Street
     Wilmington, Delaware 19899
20   for Frys Electronics
21   QUINN EMANUEL
     MICHAEL POWELL, ESQ.
22   ROBERT STONE, ESQ
     865 S. Figueroa Street, 10th Floor
23   Los Angeles, California 90017
     for Frys Electronics
24

## Page 3

1      SPECIAL MASTER POPPITI:  Start with the
2  Class plaintiffs, please.
3      MR. ATHEY:  Your Honor, this is Clayton
4  Athey for Class plaintiffs.
5      SPECIAL MASTER POPPITI:  Thank you.
6      MR. SMALL:  Your Honor, Dan Small with
7  Cohen, Milstein for the Class plaintiffs.
8      SPECIAL MASTER POPPITI:  Thank you.
9      MR. VOLEN:  Richard Volen with Finkelstein
10 Thompson also for the Class plaintiffs.
11     SPECIAL MASTER POPPITI:  Thank you.
12     And from Frys?
13     MS. GRAHAM:  Mary Graham.
14     SPECIAL MASTER POPPITI:  Thank you.
15     MR. STONE:  Robert Stone, Your Honor, from
16 Quinn Emanuel.
17     SPECIAL MASTER POPPITI:  Thank you, sir.
18     Anyone else for Frys?
19     MR. POWELL:  Also Mike Powell from Quinn
20 Emanuel.
21     SPECIAL MASTER POPPITI:  Thank you.
22     And if others are joining the call and would
23 like to be noted for the record, please do that as well
24 even if you don't intend to speak.  If you don't need to

## Page 4

1  be noted for the record, that's fine as well.
2      MR. COTTRELL:  Your Honor, in Wilmington,
3  Fred Cottrell for AMD.
4      SPECIAL MASTER POPPITI:  Thank you.
5      MS. LASER:  Your Honor, Jennifer Laser and
6  Linda Smith for AMD from O'Melveny.
7      SPECIAL MASTER POPPITI:  Thank you very
8  much.
9      MR. HORWITZ:  Good afternoon, Your Honor.
10 It's Rich Horwitz at Potter Anderson for Intel.
11     SPECIAL MASTER POPPITI:  Thank you, sir.
12 Anyone else from Intel?  Okay.
13     Mr. Horwitz, do you expect anyone else to be
14 joining us and should we wait?
15     MR. HORWITZ:  I think we can go ahead.
16     SPECIAL MASTER POPPITI:  Okay, good.
17     Let me, and maybe helping to frame what I'd
18 like discussion to be this afternoon to focus on what I
19 expected was some degree of confusion in terms of what I
20 was being asked to look at for purposes of making a
21 finding and recommendation today.  And in that regard,
22 I, earlier, in the, I guess it was last week, I had an
23 off-the-record conversation with local counsel, and was,
24 in fact, then directed to correspondence from Frys dated

## Page 5

1  August the 20th, and was told that my review of the
2  materials that you submitted to me was for the purpose
3  of making a determination as between the proposals
4  outlined in that correspondence, proposals No. 1 from
5  the Class and proposal No. 3 from Frys.  They are
6  located respectively at pages 1 and 2 of that document.
7      In doing that, one of the things that I am
8  sure is clear to everyone is that, with respect to the
9  declaration filed on behalf of the Class of Jonathan M.
10 Orszag, O-r-s-z-u-g, I hope I am pronouncing that
11 correctly, the date of his declaration, and it is his
12 second declaration, is August the 10th, 2007, I would
13 note, for the record, that Mr. Orszag's declaration is
14 against the backdrop of him understanding, if I am
15 reading this correctly, that Frys was proposing to only
16 provide information with respect to HP, and I think it
17 would have required Compac as well; am I correct so far?
18     MR. SMALL:  Your Honor, this is Dan Small
19 for the Class.
20     SPECIAL MASTER POPPITI:  Yes.
21     MR. SMALL:  If you look at Mr. Orszag's
22 second declaration, he does address the issue of whether
23 Frys offered to produce just data for HP is sufficient,
24 but he also effectively addresses the question of

Teleconference

### Page 6

1  whether a production of Compac, HP, and Toshiba, without
2  -- I am sorry; let me try that again -- Compac, Toshiba,
3  and Gateway, without HP, would be sufficient.
4        SPECIAL MASTER POPPITI:  And I know he did
5  that.  I am going to want you to discuss that with me
6  because, certainly, when you filed his declaration with
7  me, although he may have intended to do that, I am going
8  to want to make sure that I understand it in light of
9  the fact that we are no longer talking about the
10  proposal that he felt was on the table.  So, that's one
11  thing --
12        MR. SMALL:  It is true, Your Honor --
13        SPECIAL MASTER POPPITI:  -- I want you to
14  help me with.
15        MR. SMALL:  Mr. Orszag never specifically
16  addressed the latest proposal from Frys.
17        SPECIAL MASTER POPPITI:  Right.
18        MR. SMALL:  Or Toshiba, eMachines, and
19  Gateway Computers.
20        SPECIAL MASTER POPPITI:  Right.
21        MR. SMALL:  I think the principles --
22        SPECIAL MASTER POPPITI:  Mr. Small, let me
23  just help with a few other observations, if I might.
24  Just hold your thoughts, but I do want you to discuss

### Page 7

1  that with me.
2        MR. SMALL:  Okay.
3        SPECIAL MASTER POPPITI:  The second
4  observation is this:  I have certainly been aware of
5  discussions, and you have better informed me of those,
6  that focused on what the Class expected that it needed
7  at this stage of the litigation, for purposes of Class
8  certification, and I understand that when you translated
9  that into your meet and confers, that, early on, both in
10  correspondence to Frys, and I believe I have seen that
11  as well even in some of the earlier correspondence to me
12  with respect to the matter that's before me, there was a
13  representation that what was needed was a sampling to
14  fit whatever formula your expert or experts come up with
15  that represented ten percent, if you will.  And I am
16  certainly mindful of that, No. 1.
17        No. 2, in preparing me for our discussion
18  today, I understand that Frys' position is that you
19  don't need as much of the information that you are
20  currently asking for.  And that even though I am not
21  going to be examining it against questions of whether or
22  not the information constitutes trade secret -- because
23  we are a little bit beyond that in light of what you
24  have asked me to do -- it is important for me to make

### Page 8

1  some determination, because we are not in the context of
2  a Special Master assisting with a meet and confer.  You
3  have asked me to make a finding, if you will, for
4  purposes of grounding a recommendation and a proposal to
5  the Court.  What you are asking me to do is to make some
6  determination, at this stage of the proceeding, in the
7  discovery stage -- and I think it's worthy of note that
8  counsel hasn't provided me with any case law that
9  directly focuses on the discovery issues, nor have I
10  found any, and, yet, at the same time, I have been
11  informed of some of the case law that says, in so many
12  words, from Frys' perspective, you don't need much to
13  get you over the hump.  You need some methodology that,
14  if you will, I am not going to use the precise language
15  of the cases, but some methodology that makes some
16  sense.  It does not have to be with the -- and the
17  methodology is informed by either facts that you have or
18  facts that you expect exist.
19        And the reason why I say it that way, in
20  looking at the one case that Frys brought to my
21  attention, that is, the -- the Romero case, it's Romero
22  versus Phillip Morris, Inc., I noted that Romero, in its
23  discussion of that very view, referenced a Third Circuit
24  case by the name of Bogosia, and that's B-o-g-o-s-i-a,

### Page 9

1  versus Gulf Oil Corp., that's at 561 F 2nd 434, and that
2  was a 1977 case, what Romero says that Bogosia says was
3  just what I referenced to you.
4        The other thing that I think is important to
5  note, that, following on Bogosia, the Third Circuit
6  again took the opportunity to look at the issue at the
7  Class -- or after the Class certification stage, on
8  review, in the case of Linerboard, L-i-n-e-r-b-o-a-r-d,
9  Antitrust Litigation versus Stone Container Corporation,
10  and, in my view, I read Linerboard to say the same thing
11  that Bogosia said and to say the same thing that Romero
12  said.
13        I think it's important, therefore, at this
14  stage of this conversation with me, I need to be focused
15  on whether the proposal, either coming from the Class or
16  coming from Frys, meets the immediate need of what you
17  expect you need for Class certification.
18        I do understand that part of your discussion
19  in meet and confers was to say to each other, If we are
20  able to resolve this, then we are, in fact, at
21  resolution, at least I think I understood this
22  correctly, with respect to anything we need from Frys.
23  What we get, by agreement, we get, and we will look for
24  nothing more from Frys.

Teleconference

4 (Pages 10 to 13)

## Page 10

1    Am I correct at least with respect to that
2  last statement?
3    MR. SMALL:  Yes, Your Honor.  And that's
4  true as to the Class plaintiffs.
5    SPECIAL MASTER POPPITI:  Right.
6    MR. SMALL:  I guess the other parties would
7  you have to address that to them.
8    SPECIAL MASTER POPPITI:  I understand that.
9    MR. SMALL:  Yeah.
10    SPECIAL MASTER POPPITI:  But from Frys'
11  perspective, was that not true, at least with respect to
12  the negotiations, had you reached resolution?
13    MR. STONE:  Yes, Your Honor.
14    SPECIAL MASTER POPPITI:  So, part of the
15  predicament I am in, if you will, is I am not in a
16  position to give that to you because I am not here to
17  say, Let's see how these meet and confers are going and
18  maybe we can get some assist or guidance from the
19  Special Master for purposes of resolving our dispute.
20  So I am really not in a position to say, Okay, here is
21  what I am going to be recommending to Judge Farnan, and
22  in addition to that, I am going to be recommending that
23  this be all that Frys is required to do, and that's, of
24  course, with an assumption that the certification --

## Page 11

1  that the Class is certified, and then the Class is in
2  the position of having to do literal fact discovery for
3  purposes of proving up its case.
4    So I feel I am in somewhat of a sling here
5  that I can't work beyond with.
6    I mean, I hope those comments help you frame
7  the discussion that I know I want you to have with me,
8  and then I will have some questions.
9    MR. SMALL:  Okay.  Your Honor, this is Dan
10  Small for the Class.
11    Would you like me to proceed?
12    SPECIAL MASTER POPPITI:  Yes, please.
13    MR. SMALL:  If I could start, Your Honor,
14  with just making sure I understand some of the import of
15  your comments?  Are you asking us to address
16  specifically what would be the data that the Class
17  believes it needs for Class certification purposes with
18  the understanding that this would be in the nature of an
19  interim ruling by Your Honor that would preserve the
20  right of the Class plaintiffs and others to seek
21  additional data after Class certification from Frys?
22    SPECIAL MASTER POPPITI:  It seems to me
23  that's where we are.  I mean, I'd like you to -- let's
24  take a few minutes and discuss that with me, but it

## Page 12

1  seems to me that's where we are because if I were
2  looking at this from the perspective of what does the
3  Class need to prove its case, we are talking about a
4  different universe of -- a different bucket of
5  information because I think what I have seen, through
6  the cases that either you have brought to my attention
7  or the ones that I just brought to your attention, even
8  at the Class -- at the stage when a question about the
9  Class certification was raised, and that's the context
10  in which these cases that you brought to my attention
11  and that I have reviewed and that I have shared with
12  you, that's the stage of those proceedings, it's either
13  a Class that was certified or Class that was not
14  certified, and the Third Circuit, in the two cases that
15  I referenced to you, talking about what was needed.
16    So, yeah, we are at the stage pre-Class
17  certification, and it just seems to me that unless you
18  can show me something to the contrary, that I am
19  reluctant to require that a third party -- and I only
20  say "third party" because it's not any party, it is a
21  third party -- what information that third party should
22  be required to give at this stage of the proceedings,
23  knowing what I expect is the requirement in the Third
24  Circuit and not knowing, however, whether the Class is

## Page 13

1  going to be successful in achieving Class certification.
2    If it's not successful in achieving Class
3  certification, my sense is that even if the Class
4  plaintiffs were willing to assume 100 percent of the
5  actual dollar burden, if you will, of gathering this
6  information, I am not sure that it has contemplated that
7  everything within the universe, as you have described
8  it, is fair and just.
9    MR. SMALL:  Your Honor, even if we look at
10  this just from a Class certification perspective, I
11  think there are a couple things to point out.
12    First of all, of course, discovery has not
13  been bifurcated in this case, and it would certainly,
14  given that, be the normal situation that a third party
15  would make a single production of its data for all
16  purposes in the case.
17    Now, I understand Your Honor thinking of it
18  differently from that, but recall that the way this is
19  now presented to Your Honor, there are just two
20  proposals, both of which, themselves, are small parts of
21  the total volume of data that was subpoenaed by the
22  Class plaintiffs.
23    SPECIAL MASTER POPPITI:  They are, indeed.
24  And I completely understand that.

Teleconference

### Page 14

1    MR. SMALL: So we are beginning with the
2  question of, you know, which sample is adequate for the
3  Class plaintiffs' need.
4        SPECIAL MASTER POPPITI: Focus on that for
5  me, then, if you will, because I want you to focus on
6  what I understand Frys' position to be.
7        You asked for ten percent. They are giving
8  you something that does represent more than ten percent
9  even with the 2/3 OEMs that they have data for.
10       MR. SMALL: Your Honor, as we pointed out to
11  Frys before, and we have said in our brief to Your
12  Honor, I believe it was our reply brief, ten percent is
13  not a number alone that has any significance to our
14  economists.
15       SPECIAL MASTER POPPITI: Right.
16       MR. SMALL: It's only one sort of threshold
17  requirement that Frys data must satisfy for it to be a
18  sufficient sample. We have pointed out that, in
19  addition to having at least ten percent of their sales
20  covered by the data, we also need to have adequate
21  diversity across several dimensions, and we have listed
22  those.
23       SPECIAL MASTER POPPITI: Right.
24       MR. SMALL: We need to know, you know, such

### Page 15

1  things as whether we have a small, medium, and large OEM
2  that they are producing the data for. We need to know
3  whether we have adequate diversity by product type, by
4  product position, low end, mid range, and high end
5  computers, for example. There may be other factors
6  about time period and seasonality that have relevance to
7  the adequacy of the data.
8        So it's not a simple question of the volume
9  of the data produced. There are many other factors
10  relating to diversity that our economists tell us that
11  we need to satisfy in order to have an adequate sample.
12  And we have serious concerns, as we have set out in our
13  brief, about whether this latest proposal by Frys
14  provides that diversity.
15       For example, there is no indication in the
16  information that Frys has disclosed about its latest
17  proposal whether the three brands that they offer were
18  even carried by Frys in each of the years of the
19  relevant time periods.
20       If there isn't that kind of coverage, then
21  we would be missing diversity for particular years in
22  which not all three brands were carried by Frys.
23       In addition, the only thing that Frys has
24  told us about Toshiba computers is that Toshiba

### Page 16

1  accounted for more than ten percent of Frys' lap top
2  sales each year during the relevant time period, but we
3  don't know how significant that is because we don't know
4  what portion of Frys' sales lap tops constitute.
5        If Frys sells mostly desk tops, then ten
6  percent of a very small percentage of their overall
7  computer sales may be too little or it may show that
8  Toshiba is simply a very small supplier of Frys
9  computers, and we may not have, therefore, adequate
10  diversity by size among the three brands.
11       It may be, for instance, that both Toshiba
12  and Gateway are small suppliers of Frys and that we
13  don't have either a midsize or a large size supplier.
14       SPECIAL MASTER POPPITI: Let me ask this
15  question, then: If I understand what you are telling
16  me, and I understand that you use the phrase your
17  experts are telling you, and I have seen some of that, I
18  gather, in the declaration from Mr. Orszag.
19       MR. SMALL: Orszag.
20       SPECIAL MASTER POPPITI: Thank you, Orszag.
21  You have a methodology, and what I expect you have is an
22  understanding of how to -- what information you need to
23  be plugging in to whatever methodology you have; is that
24  a fair statement?

### Page 17

1        MR. SMALL: Your Honor, the problem with
2  that basic premise is that it's very hard, in the
3  abstract, to determine what's a representative sample.
4  And we have told Frys this very thing, that we can
5  suggest criteria that will be helpful to Frys in
6  determining what might be representative sample, but
7  until you have either seen the universe of data or seen
8  a sufficient sample of the data or have sufficient
9  information about the data, such as what are the
10  different sizes of the different brands that Frys
11  carries, meaning, you know, is one brand ten percent of
12  their sales, another brand 30 percent, you have to have
13  information about the universe before you can pick out
14  what is an appropriate subset for a sample.
15       Another way to do it would be to get a
16  random sample of universe of available data where Frys
17  would give us, you know, it could be as little as every
18  10th transaction if it's truly a random sample. But for
19  any of those approaches to work, we have to have much
20  more cooperation from Frys than we have been able to get
21  to date. They would have to disclose lots of
22  information to us about the universe of information they
23  have so that we could then draft an appropriate sample
24  that could be as little at ten percent, but those kind

Teleconference

6  (Pages 18 to 21)

Page 18

1    of ten percent numbers assume very important other
2    factors, like either it's a random sample or that we
3    know we have covered the different dimensions of
4    diversity that are important.
5         SPECIAL MASTER POPPITI:  And I think what
6    you have just said is certainly helpful to me because I
7    think you are measuring what I see to be what the Court
8    did in Linerboard antitrust litigation where the experts
9    were in a position to say, Here is our methodology, and
10   they were able to say, We have the data, the data is
11   available to plug into that methodology.  And I think
12   what you are telling me is, although you know certain
13   data exists, I think what you are saying is you don't
14   know, with any degree of specificity, that the data that
15   your experts say you need is available even with the
16   three that you are proposing; is that fair?
17        MR. SMALL:  I think our latest proposal,
18   Your Honor, is not without risk.  Because of our
19   inability to get further information from Frys, we can't
20   say for sure whether we have covered every dimension of
21   diversity that's important, but we were willing to, you
22   know, because of what we do know about Frys' sales and
23   purchases of computers, to assume, given a fairly
24   comprehensive sample that would include HP, Compac,

Page 19

1    Gateway, and Toshiba, that we would have sufficient
2    coverage of the variables.
3         But when you ask to trim it so finely as
4    Frys is seeking to have us do, without sufficient
5    information about the universe, then we are truly in a
6    precarious position where we would really have no idea
7    whether that sample would be appropriate and
8    representative and adequate.
9         SPECIAL MASTER POPPITI:  Okay.  Thank you.
10        MR. SMALL:  Sure.
11        MR. STONE:  Robert Stone for Frys.
12        SPECIAL MASTER POPPITI:  Yes, please,
13   Mr. Stone.
14        MR. STONE:  The first issue I want to
15   address is the scope of what we have asked Your Honor to
16   do today, which was by agreement of the parties.
17        And, essentially, we are in a baseball
18   arbitration situation where we have asked you to choose
19   between the two proposals, proposal one and proposal
20   three.
21        SPECIAL MASTER POPPITI:  Right.
22        MR. STONE:  And, you know, listening to Dan,
23   I think he agrees with this, that does resolve this
24   dispute between the parties with respect to the Class

Page 20

1    subpoena.
2         SPECIAL MASTER POPPITI:  I believe that's
3    the case.  And if you are saying to me, We want to be
4    bound by what you do for purposes of the subpoena, then
5    I think it is appropriate for me to say, You are bound
6    by agreement.
7         MR. STONE:  That was what the parties had
8    put on the table.
9         SPECIAL MASTER POPPITI:  Okay.
10        MR. STONE:  That we wanted you to make a
11   decision with respect to those two proposals, and that
12   this was not a situation where Class could later come
13   back and seek more information.
14        And, Dan, I take it you agree with that?
15        SPECIAL MASTER POPPITI:  In light of the way
16   you have just posed it, I do agree, Mr. Small, unless
17   you have any other comment?
18        MR. SMALL:  No.  That is our suggestion,
19   that if Your Honor is going to pick one of the two
20   proposals, that that would be a final resolution of the
21   dispute with Frys.
22        SPECIAL MASTER POPPITI:  That's fine.  Thank
23   you.
24        MR. STONE:  Now, with respect to what is

Page 21

1    exactly at issue here, I think you can really, given the
2    concept that the Class has used, boil this dispute down
3    to two key questions.  One:  Is the volume of
4    information that Frys' proposal contains sufficient?
5    And, two:  Is the information offered by Frys
6    sufficiently diverse?
7         And I think that, based on the record before
8    Your Honor, both of those questions can be answered in
9    the affirmative.  And I take it, from Dan's discussion,
10   that there really isn't a dispute that Class has said
11   that ten percent volume is the threshold for statistical
12   significance, and the volume of data that Frys is
13   offering in proposal three represents 13 percent of
14   Frys' total computer sales for the period 2000 to 2007.
15        So, I think in terms of volume, there really
16   isn't an issue anymore.
17        With respect to diversity, I think that the
18   information that Frys has submitted to Your Honor
19   demonstrates that we have also satisfied the diversity
20   criteria.  If you look at Mr. Orszag's declaration --
21        SPECIAL MASTER POPPITI:  I have it right in
22   my hand because I suspected you wanted to be talking
23   about that and I assume we are talking about the August
24   10th?

Teleconference

Page 22

1    MR. STONE: We are, indeed, Your Honor, the
2    second declaration of Jonathan Orszag. No where does he
3    say that, for diversity, you need to have some magic
4    number of multiple vendors. In this case, there are
5    multiple vendors. There are three vendors that Frys has
6    identified as being willing to produce data concerning.
7    Mr. Orszag does talk about there needing to
8    be some diversity in terms of product offerings, and I
9    think there was a concern that he had expressed in
10    connection with his declaration about not having
11    sufficient desktop sales.
12    Well, with the proposal that Frys has on the
13    table, there is a diversity between product offerings
14    because the vendors identified sell both lap tops and
15    desk tops. Toshiba has substantial lap top sales
16    throughout the period, and eMachines -- and we have
17    identified this in our submission, Your Honor --
18    eMachines had substantial desktop sales, and, in fact,
19    for two of the years, it was the No. 1 vendor in terms
20    of total volume.
21    SPECIAL MASTER POPPITI: Well, let me ask
22    you to pause there for a moment because the language of
23    the declaration refers to, and you referred to some of
24    these, desktop, lap top, notebooks, and tablets. Are

Page 23

1    you telling me that, with respect to the proposal
2    numbered three --
3    MR. STONE: Yes.
4    SPECIAL MASTER POPPITI: -- that, by virtue
5    of that proposal, each of those categories would be
6    representative?
7    MR. STONE: Certainly desktop and notebook.
8    Tablet, I think, is a much smaller percentage of the
9    total sales.
10    SPECIAL MASTER POPPITI: Okay.
11    MR. STONE: So, in terms of, you know, the
12    question of what is needed and the need that Class
13    plaintiffs has demonstrated and acknowledged repeatedly,
14    I think that Frys, with its current offering, satisfies
15    all of the conditions that Class plaintiffs has
16    identified.
17    MR. SMALL: Your Honor, may I respond?
18    SPECIAL MASTER POPPITI: Yes, please. And,
19    if you will, direct me, if I will, I don't know whether
20    it was -- I should remember this, just give me one
21    moment, please -- I am looking for the reference in the
22    declaration to OEMs that would represent small, medium,
23    and large --
24    MR. SMALL: Your Honor, that's at paragraph

Page 24

1    five of the second declaration of Mr. Orszag.
2    SPECIAL MASTER POPPITI: Thank you. Why
3    don't you talk to me about that a bit, please.
4    MR. SMALL: Sure. In the last sentence of
5    that paragraph, it says, "I understand the sample of
6    three OEMs was selected to encompass Fry's largest
7    computer supplier and a medium and small supplier so
8    that Class plaintiffs would be able to capture economic
9    differences, if any, due to firm size that may affect
10    the results of their Class certification and damages
11    analysis."
12    SPECIAL MASTER POPPITI: Yes.
13    MR. SMALL: So there is a clear statement by
14    our expert that it's not just any three OEMs, that it's
15    important that the three OEMs be a large, and we are
16    suggesting the largest computer supplier of Frys, and
17    the medium and small supplier so that we can capture the
18    economic differences that may result from differences in
19    firm size, and that those differences are important not
20    just for the ultimate damages question but also for the
21    Class certification analysis.
22    Your Honor, if I can back up for a second,
23    I do want to come back to this issue of whether the
24    latest proposal by Frys meets even the minimum needs

Page 25

1    that we have for data for Class certification purposes
2    let alone the merits.
3    The whole question of what the minimum
4    needed in this case is by Class plaintiffs is a very
5    different question from whether Frys' data are relevant.
6    And we have sort of been -- we have been
7    discussing this issue based on the assumption that
8    plaintiffs are not entitled to what's relevant but only
9    to what is the minimum that they need for some
10    particular purpose.
11    SPECIAL MASTER POPPITI: And I understand
12    that as well.
13    MR. SMALL: Yes. And we get there because
14    Frys throws out this term "trade secret," and I would
15    suggest very strongly, Your Honor, that it's not enough
16    just for Frys to invoke that term to then convert this
17    from what is ordinarily the discussion, which is: Are
18    these data relevant, and if they are, is it unduly
19    burdensome to produce them?
20    SPECIAL MASTER POPPITI: I think, at this
21    stage of where we are, and that was part of the reason
22    for my call to your colleagues here at the local Bar,
23    was to assure myself that I wasn't going to be looking
24    at three issues like that. So I am not focused on the

Teleconference

8 (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|

Page 26

1 issue of whether the information, as you are presently
2 seeking it, is a trade secret. In my comments teeing up
3 our conversation, I hope I didn't suggest that. If I
4 did, I didn't intend to. And I understand your comment.
5        MR. SMALL: What I was saying is the reason
6 that the issue of what the standard is to be applied
7 here is important to the discussion Your Honor is
8 focusing us on is because our -- we should not, in my
9 view, be required to even explain what the minimum needs
10 of the Class are; in other words --
11        SPECIAL MASTER POPPITI: I do understand
12 that.
13        MR. SMALL: Yes. And, so, that's our reason
14 for saying that even the small sample that we seek
15 through our last proposal is easily justified as being
16 relevant to our case and not unduly burdensome to Frys.
17 In fact, they don't argue otherwise. So, the standard
18 to be applied here is very important.
19        But let me get back to what Your Honor was
20 focusing on.
21        MR. STONE: Could I just address the trade
22 secret issue briefly?
23        MR. SMALL: Your Honor, I'd like to be able
24 to finish without Mr. Stone jumping into what I thought

Page 27

1 was going to be argued here with plaintiff's motion.
2        SPECIAL MASTER POPPITI: Please do.
3        MR. STONE: I apologize.
4        SPECIAL MASTER POPPITI: Mr. Small, go
5 ahead, please.
6        MR. SMALL: Thank you, Your Honor.
7        So, on the issue that Your Honor was
8 focusing on, it is Frys' burden, at a minimum, if it is
9 going to come forward with the new proposal, which it
10 did in its brief, to establish that it meets even the
11 minimum requirements that the plaintiffs need, assuming
12 that's appropriate standard here, and when I was first
13 talking with Your Honor on this call, I pointed out
14 three specific problems with the lack of disclosure that
15 Frys has made about its latest proposal.
16        It has still not represented to the
17 plaintiffs or to this Court whether the three brands
18 that it's now proposing to produce were carried each
19 year by Frys during the relevant time period.
20        If they can't make that representation or
21 it's not the case that they were carried in each of
22 those years, then there is an obvious and clear problem
23 with their proposal, which is that we will not have
24 three OEMs for each of the years in question. So,

Page 28

1 that's one basic piece of information they have not
2 provided to the Court.
3        The second is they have never advised the
4 Court as to how their lap top sales compare to their
5 desktop sales. That is a very important piece of
6 information that the only thing that they have told the
7 Court about the volume of their Toshiba sales is that
8 it's at least ten percent of their lap top sales.
9 Unless we know whether their lap top sales are a
10 significant portion of their overall computer sales, we
11 don't know whether they carry a significant amount of
12 Toshiba computers.
13        And, lastly, and maybe most fundamentally,
14 they never tell us, anywhere, whether the three brands
15 that they were proposing to produce, Toshiba, Gateway,
16 and eMachines, constitute sellers to Frys that are a
17 large, and, preferably, their largest supplier, a medium
18 supplier, and a small supplier. We could not have made
19 it more clear and our economist could not have made it
20 more clear that it's important to have that kind of
21 diversity in size. And we don't know whether this
22 latest proposal provides that.
23        SPECIAL MASTER POPPITI: Okay.
24        MR. SMALL: Thank you, Your Honor.

Page 29

1        SPECIAL MASTER POPPITI: Thank you.
2 Mr. Stone, please.
3        MR. STONE: Thank you, Your Honor. Just
4 briefly on the trade secret point, frankly, we were
5 surprised by the way Class had raised the issue just
6 because we thought it was an issue that had already been
7 resolved and that Your Honor had previously addressed in
8 the context of a protective order.
9        SPECIAL MASTER POPPITI: Exactly.
10        MR. STONE: And, so, for us, you know, we
11 just viewed it as a dead issue, although one that, you
12 know, in some respects still has some bearing on the
13 decision here today, Frys' non-party status also has
14 some bearing on the standard for how much information
15 should be produced, and I think, again, that spins on
16 Class plaintiffs' demonstrated need, and what we have
17 tried to do, through our opposition brief, is meet the
18 need which is called out for in Class plaintiffs'
19 opening brief and the declaration of Mr. Orszag.
20        SPECIAL MASTER POPPITI: Okay. Thank you.
21 This really -- it certainly has been helpful to me to
22 hear your comments. At this juncture, I am provided
23 with a first view and a second view of what either the
24 or one of the plaintiffs' experts says that the Class

Teleconference

Page 30

1  plaintiffs need for purposes of both Class certification
2  and for facts that they would need to develop to prove
3  their ultimate case were they to be certified. And
4  focusing not necessarily on each of the three areas that
5  Mr. Small opened his comments with to me, or the ones he
6  just finished with, I simply want to focus on what
7  Mr. Orszag says at paragraph five of his second
8  declaration, and, that is, from his perspective, a
9  sample of three OEMs representing what he understood to
10  be Frys' largest computer supplier, a medium supplier,
11  and/or a small supplier, he is saying that that is
12  important, I don't think he has to go so far as to say
13  "necessary," but he says, "would be able to capture
14  economic differences, if any, due to firm size, and that
15  may affect the results of their Class certification and
16  damage analysis."
17      I am satisfied that the standard is one of
18  relevance. I understand that Frys is a third party. I
19  understand that when it comes to any consideration of
20  burden to a third party, I don't think this record
21  focuses on burden other than to say, We are a third
22  party and there is a burden. I don't mean that to
23  slight what you have said to me thus far, but I don't
24  see that this record supports the burden.

Page 31

1      I am also satisfied, for the other reasons
2  that Mr. Small suggests, that the -- it is appropriate
3  to pick the alternative that the Class plaintiffs
4  offered on July the 18th of 2007.
5      Having done that, I think it's important to
6  discuss what, if anything, you want me to be doing with
7  respect to the burden of it all, whether you still
8  intend to have your own discussion about what
9  responsibility the Class will either assume -- will
10  assume by agreement or whether there is going to be
11  further application to me to make that judgment?
12      I am hoping that you can resolve that
13  yourselves, but I am also certainly -- I won't shy away
14  from making some judgment with respect to that.
15      MR. SMALL: Your Honor, I do think it would
16  be a good idea for us to sit down with Frys, in light of
17  your ruling, and discuss the cost sharing issue. And I
18  think we could then either propose a proposed order that
19  addressed that, in addition to the other aspects of your
20  ruling, or, if we can't reach agreement, we could, I
21  guess, deal with the issue before Your Honor at an
22  appropriate time.
23      SPECIAL MASTER POPPITI: Mr. Stone.
24      MR. STONE: We don't have any objection to

Page 32

1  that.
2      SPECIAL MASTER POPPITI: Okay. Then let me
3  see if I can --
4      MR. STONE: And this would be in the form,
5  then, of something you would then have the
6  recommendation for the --
7      SPECIAL MASTER POPPITI: What I'd like you
8  to do is I am going to ask the Class to prepare the
9  draft for your review. If you can approve to the form,
10  that's great; if you can't, then give me your concerns
11  via a red-lined and/or a document describing what the
12  concerns are with the form that's proposed by the Class.
13  I am expecting that there will be discussions with
14  respect to costs and burden, and, hopefully, that will
15  be part of what you forward to me. If it's not, I would
16  expect that there would be a further application for me
17  to consider.
18      Let me talk about time frame of getting the
19  document to me and propose also when you would expect
20  that Frys would comply, in terms of the number of days
21  from when my order is either a final order or when Judge
22  Farnan has the opportunity to do anything that you
23  request him to do and it becomes his final order.
24      MR. STONE: I propose that we have an

Page 33

1  opportunity to discuss this issue with our client before
2  we propose a date.
3      SPECIAL MASTER POPPITI: That's fine. I am
4  happy to permit that to occur. I do want some idea of
5  closure so I can have some sense as to when I am going
6  to be seeing your work with respect to the form of order
7  at least.
8      MR. SMALL: Your Honor, I have no problem
9  with Mr. Stone conferring with his client. What I do
10  think makes sense, to make sure we keep on a good
11  schedule here, is at least set a date for us to get back
12  to you about a schedule for completing this process.
13      SPECIAL MASTER POPPITI: Okay. And any
14  proposal with respect to that date?
15      MR. SMALL: It seems like we could do it in
16  a couple of days. I don't know if that's a problem --
17      SPECIAL MASTER POPPITI: There is a holiday
18  that may interfere with, not interfere, but there is a
19  holiday that may impact on some work schedules this week
20  on Thursday, so I would -- Mr. Stone, any problem with
21  Monday, close of business?
22      MR. STONE: No. I think that's fine, Your
23  Honor.
24      SPECIAL MASTER POPPITI: Okay. Then I will

Teleconference

1O (Pages 34 to 35)

Page 34

1  look for something from you Monday, close of business.
2       I don't think there is a need to schedule a
3  further teleconference. Does anyone disagree at this
4  time?
5       MR. SMALL: No, Your Honor.
6       MR. STONE: No, Your Honor.
7       SPECIAL MASTER POPPITI: Then I will look
8  for something close of business on Monday. Thank you
9  all very much.
10      (The teleconference was concluded at 3:21
11  p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 35

1           C E R T I F I C A T E
2  STATE OF DELAWARE:
                    :
3  NEW CASTLE COUNTY:
4       I, Renee A. Meyers, a Registered Professional
5  Reporter, within and for the County and State aforesaid,
6  do hereby certify that the foregoing teleconference was
7  taken before me, pursuant to notice, at the time and
8  place indicated; that the teleconference was correctly
9  recorded in machine shorthand by me and thereafter
10 transcribed under my supervision with computer-aided
11 transcription; that the foregoing teleconference is a
12 true record; and that I am neither of counsel nor kin to
13 any party in said action, nor interested in the outcome
14 thereof.
15      WITNESS my hand this 11th day of September A.D.
16 2007.
17
18
   _____
19 RENEE A. MEYERS
        REGISTERED PROFESSIONAL REPORTER
20      CERTIFICATION NO. 106-RPR
   (Expires January 31, 2008)
21
22
23
24

Teleconference

**A**

able 9:20 17:20 18:10 24:8 26:23 30:13
abstract 17:3
accounted 16:1
achieving 13:1,2
acknowledged 23:13
action 1:5 35:13
actual 13:5
addition 10:22 14:19 15:23 31:19
additional 11:21
address 5:22 10:7 11:15 19:15 26:21
addressed 6:16 29:7 31:19
addresses 5:24
adequacy 15:7
adequate 14:2 14:20 15:3,11 16:9 19:8
ADVANCED 1:4
advised 28:3
affect 24:9 30:15
affiliated 1:23
affirmative 21:9
aforesaid 35:5
afternoon 4:9,18
agree 20:14,16
agreement 9:23 19:16 20:6 31:10,20
agrees 19:23
ahead 4:15 27:5
alternative 31:3
AMD 1:19 2:4 4:3,6
amount 28:11
analysis 24:11 24:21 30:16
Anderson 2:5

4:10
and/or 32:11
Angeles 1:18 2:23
answered 21:8
antitrust 9:9 18:8
anymore 21:16
apologize 27:3
APPEARANC... 1:15 2:1
application 31:11 32:16
applied 26:6,18
approaches 17:19
appropriate 17:14,23 19:7 20:5 27:12 31:2,22
approve 32:9
approximately 1:12
arbitration 19:18
areas 30:4
argue 26:17
argued 27:1
ARSHT 2:18
asked 4:20 7:24 8:3 14:7 19:15 19:18
asking 7:20 8:5 11:15
aspects 31:19
assist 10:18
assisting 8:2
assume 13:4 18:1,23 21:23 31:9,10
assuming 27:11
assumption 10:24 25:7
assure 25:23
Athey 2:9 3:3,4
attention 8:21

12:6,7,10
August 5:1,12 21:23
available 17:16 18:11,15
Avenue 1:18 2:12
aware 7:4
A.D 35:15

**B**

back 20:13 24:22,23 26:19 33:11
backdrop 5:14
Bar 25:22
baseball 19:17
based 21:7 25:7
basic 17:2 28:1
bearing 29:12 29:14
beginning 1:11 14:1
behalf 5:9
believe 7:10 14:12 20:2
believes 11:17
better 7:5
beyond 7:23 11:5
bifurcated 13:13
bit 7:23 24:3
Blank 1:10
Bogosia 8:24 9:2 9:5,11
boil 21:2
bound 20:4,5
brand 17:11,12
brands 15:17,22 16:10 17:10 27:17 28:14
brief 14:11,12 15:13 27:10 29:17,19
briefly 26:22 29:4

brought 8:20 12:6,7,10
bucket 12:4
burden 13:5 27:8 30:20,21 30:22,24 31:7 32:14
burdensome 25:19 26:16
business 33:21 34:1,8
B-o-g-o-s-i-a 8:24

**C**

C 35:1,1
California 1:18 2:16,23
call 3:22 25:22 27:13
called 29:18
capture 24:8,17 30:13
carried 15:18,22 27:18,21
carries 17:11
carry 28:11
case 8:8,11,20 8:21,24 9:2,8 11:3 12:3 13:13,16 20:3 22:4 25:4 26:16 27:21 30:3
cases 8:15 12:6 12:10,14
CASTLE 35:3
categories 23:5
certain 18:12
certainly 6:6 7:4 7:16 13:13 18:6 23:7
certification 7:8 9:7,17 10:24 11:17,21 12:9

12:17 13:1,3 13:10 24:10,21 25:1 30:1,15 35:20
certified 11:1 12:13,14 30:3
certify 35:6
choose 19:18
Circuit 8:23 9:5 12:14,24
Civil 1:5
Class 2:10,14,17 3:2,4,7,10 5:5 5:9,19 7:6,7 9:7,7,15,17 10:4 11:1,1,10 11:16,17,20,21 12:3,8,9,13,13 12:24 13:1,2,3 13:10,22 14:3 19:24 20:12 21:2,10 23:12 23:15 24:8,10 24:21 25:1,4 26:10 29:5,16 29:18,24 30:1 30:15 31:3,9 32:8,12
Clayton 2:9 3:3
clear 5:8 24:13 27:22 28:19,20
client 33:1,9
close 33:21 34:1 34:8
closure 33:5
Cohen 2:11 3:7
colleagues 25:22
come 7:14 20:12 24:23 27:9
comes 30:19
coming 9:15,16
comment 20:17 26:4
comments 11:6 11:15 26:2 29:22 30:5

Teleconference

Page 2

| | | | | |
|---|---|---|---|---|
| Compac 5:17 | Continued 2:1 | Dan 3:6 5:18 | 5:3 8:1,6 | 21:17,19 22:3 |
| 6:1,2 18:24 | contrary 12:18 | 11:9 19:22 | determine 17:3 | 22:8,13 28:21 |
| compare 28:4 | conversation | 20:14 | determining | document 5:6 |
| completely | 4:23 9:14 26:3 | DANIEL 2:12 | 17:6 | 32:11,19 |
| 13:24 | convert 25:16 | Dan's 21:9 | develop 30:2 | doing 5:7 31:6 |
| completing | cooperation | data 5:23 11:16 | DEVICES 1:4 | dollar 13:5 |
| 33:12 | 17:20 | 11:21 13:15,21 | differences 24:9 | draft 17:23 32:9 |
| comply 32:20 | Corbett 1:21,23 | 14:9,17,20 | 24:18,18,19 | due 24:9 30:14 |
| comprehensive | Corp 9:1 | 15:2,7,9 17:7,8 | 30:14 | D.C 2:13 |
| 18:24 | Corporation 1:7 | 17:9,16 18:10 | different 12:4,4 | E |
| computer 16:7 | 9:9 | 18:10,13,14 | 17:10,10 18:3 | E 35:1,1 |
| 21:14 24:7,16 | correct 5:17 | 21:12 22:6 | 25:5 | earlier 4:22 7:11 |
| 28:10 30:10 | 10:1 | 25:1,5,18 | differently | early 7:9 |
| computers 6:19 | correctly 5:11 | date 5:11 17:21 | 13:18 | easily 26:15 |
| 15:5,24 16:9 | 5:15 9:22 35:8 | 33:2,11,14 | dimension 18:20 | economic 24:8 |
| 18:23 28:12 | correspondence | dated 4:24 | dimensions | 24:18 30:14 |
| computer-aided | 4:24 5:4 7:10 | day 35:15 | 14:21 18:3 | economist 28:19 |
| 35:10 | 7:11 | days 32:20 33:16 | direct 23:19 | economists |
| concept 21:2 | CORROON 2:5 | DE 1:22 2:3,6,10 | directed 4:24 | 14:14 15:10 |
| concern 22:9 | cost 31:17 | dead 29:11 | directly 8:9 | effectively 5:24 |
| concerning 22:6 | costs 32:14 | deal 31:21 | disagree 34:3 | either 8:17 9:15 |
| concerns 15:12 | Cottrell 2:2 4:2 | decision 20:11 | disclose 17:21 | 12:6,12 16:13 |
| 32:10,12 | 4:3 | 29:13 | disclosed 15:16 | 17:7 18:2 |
| concluded 34:10 | counsel 4:23 8:8 | declaration 5:9 | disclosure 27:14 | 29:23 31:9,18 |
| conditions 23:15 | 35:12 | 5:11,12,13,22 | discovery 8:7,9 | 32:21 |
| confer 8:2 | County 35:3,5 | 6:6 16:18 | 11:2 13:12 | Electronics 2:20 |
| conferring 33:9 | couple 13:11 | 21:20 22:2,10 | discuss 6:5,24 | 2:23 |
| confers 7:9 9:19 | 33:16 | 22:23 23:22 | 11:24 31:6,17 | ELLIOTT 2:8 |
| 10:17 | course 10:24 | 24:1 29:19 | 33:1 | eMachines 6:18 |
| CONFIDENT... | 13:12 | 30:8 | discussing 25:7 | 22:16,18 28:16 |
| 1:1 | Court 1:2,24 8:5 | Defendant 1:8 | discussion 4:18 | Emanuel 2:21 |
| confusion 4:19 | 18:7 27:17 | degree 4:19 | 7:17 8:23 9:18 | 3:16,20 |
| connection | 28:2,4,7 | 18:14 | 11:7 21:9 | encompass 24:6 |
| 22:10 | coverage 15:20 | Delaware 1:3,11 | 25:17 26:7 | entitled 25:8 |
| consider 32:17 | 19:2 | 2:19 35:2 | 31:8 | ESQ 1:17,17 2:2 |
| consideration | covered 14:20 | demonstrated | discussions 7:5 | 2:5,9,12,15,18 |
| 30:19 | 18:3,20 | 23:13 29:16 | 32:13 | 2:21,22 |
| constitute 16:4 | criteria 17:5 | demonstrates | dispute 10:19 | essentially 19:17 |
| 28:16 | 21:20 | 21:19 | 19:24 20:21 | establish 27:10 |
| constitutes 7:22 | current 23:14 | described 13:7 | 21:2,10 | exactly 21:1 |
| Container 9:9 | currently 7:20 | describing 32:11 | DISTRICT 1:2 | 29:9 |
| contains 21:4 | D | desk 16:5 22:15 | 1:3 | examining 7:21 |
| contemplated | damage 30:16 | desktop 22:11 | diverse 21:6 | example 15:5,15 |
| 13:6 | damages 24:10 | 22:18,24 23:7 | diversity 14:21 | exist 8:18 |
| context 8:1 12:9 | 24:20 | 28:5 | 15:3,10,14,21 | exists 18:13 |
| 29:8 | | determination | 16:10 18:4,21 | |

Teleconference

expect 4:13 8:18
  9:17 12:23
  16:21 32:16,19
expected 4:19
  7:6
expecting 32:13
expert 7:14
  24:14
experts 7:14
  16:17 18:8,15
  29:24
Expires 35:20
explain 26:9
expressed 22:9

**F**
F 9:1 35:1
fact 4:24 6:9
  9:20 11:2
  22:18 26:17
factors 15:5,9
  18:2
facts 8:17,18
  30:2
fair 13:8 16:24
  18:16
fairly 18:23
far 5:17 30:12
  30:23
Farnan 10:21
  32:22
feel 11:4
felt 6:10
Fetzer 1:24
Figueroa 2:22
filed 5:9 6:6
final 20:20 32:21
  32:23
finding 4:21 8:3
fine 4:1 20:22
  33:3,22
finely 19:3
FINGER 2:2
finish 26:24
finished 30:6
Finkelstein 2:15

3:9
firm 24:9,19
  30:14
first 13:12 19:14
  27:12 29:23
fit 7:14
five 24:1 30:7
Floor 2:6,16,22
focus 4:18 14:4
  14:5 30:6
focused 7:6 9:14
  25:24
focuses 8:9
  30:21
focusing 26:8,20
  27:8 30:4
following 9:5
foregoing 35:6
  35:11
form 32:4,9,12
  33:6
formula 7:14
forward 27:9
  32:15
found 8:10
frame 4:17 11:6
  32:18
Francisco 2:16
frankly 29:4
Fred 4:3
FREDERICK
  2:2
Frys 2:20,23
  3:12,18 4:24
  5:5,15,23 6:16
  7:10,18 8:12
  8:20 9:16,22
  9:24 10:10,23
  11:21 14:6,11
  14:17 15:13,16
  15:18,22,23
  16:1,4,5,8,12
  17:4,5,10,16
  17:20 18:19,22
  19:4,11 20:21
  21:4,5,12,14

21:18 22:5,12
  23:14 24:6,16
  24:24 25:5,14
  25:16 26:16
  27:8,15,19
  28:16 29:13
  30:10,18 31:16
  32:20
fundamentally
  28:13
further 18:19
  31:11 32:16
  34:3

**G**
Gateway 6:3,19
  16:12 19:1
  28:15
gather 16:18
gathering 13:5
getting 32:18
give 10:16 12:22
  17:17 23:20
  32:10
given 13:14
  18:23 21:1
giving 14:7
go 4:15 27:4
going 6:5,7 7:21
  8:14 10:17,21
  10:22 19:1
  20:19 25:23
  27:1,9 31:10
  32:8 33:5
good 4:9,16
  31:16 33:10
Graham 2:18
  3:13,13
great 32:10
grounding 8:4
guess 4:22 10:6
  31:21
guidance 10:18
Gulf 9:1

**H**

hand 21:22
  35:15
happy 33:4
hard 17:2
HAUSFELD
  2:11
hear 29:22
help 6:14,23
  11:6
helpful 17:5
  18:6 29:21
helping 4:17
high 15:4
hold 6:24
holiday 33:17,19
Honor 3:3,6,15
  4:2,5,9 5:18
  6:12 10:3,13
  11:9,13,19
  13:9,17,19
  14:10,12 17:1
  18:18 19:15
  20:19 21:8,18
  22:1,17 23:17
  23:24 24:22
  25:15 26:7,19
  26:23 27:6,7
  27:13 28:24
  29:3,7 31:15
  31:21 33:8,23
  34:5,6
HONORAB...
  1:14
hope 5:10 11:6
  26:3
hopefully 32:14
hoping 31:12
Horwitz 2:5 4:9
  4:10,13,15
HP 5:16,23 6:1,3
  18:24
hump 8:13

**I**
idea 19:6 31:16
  33:4

identified 22:6
  22:14,17 23:16
III 2:2
immediate 9:16
impact 33:19
import 11:14
important 7:24
  9:4,13 18:1,4
  18:21 24:15,19
  26:7,18 28:5
  28:20 30:12
  31:5
inability 18:19
include 18:24
indicated 35:8
indication 15:15
information
  5:16 7:19,22
  12:5,21 13:6
  15:16 16:22
  17:9,13,22,22
  18:19 19:5
  20:13 21:4,5
  21:18 26:1
  28:1,6 29:14
informed 7:5
  8:11,17
instance 16:11
Intel 1:7 2:7
  4:10,12
intend 3:24 26:4
  31:8
intended 6:7
interested 35:13
interfere 33:18
  33:18
interim 11:19
invoke 25:16
issue 5:22 9:6
  19:14 21:1,16
  24:23 25:7
  26:1,6,22 27:7
  29:5,6,11
  31:17,21 33:1
issues 8:9 25:24

Teleconference

Page 4

**J**

J 1:14 2:9
January 35:20
Jennifer 1:17
  4:5
joining 3:22
  4:14
Jonathan 5:9
  22:2
JONES 2:8
Judge 10:21
  32:21
judgment 31:11
  31:14
July 31:4
jumping 26:24
juncture 29:22
justified 26:15

**K**

keep 33:10
key 21:3
kin 35:12
kind 15:20 17:24
  28:20
King 2:9
know 6:4 11:7
  14:2,24,24
  15:2 16:3,3
  17:11,17 18:3
  18:12,14,22,22
  19:22 23:11,19
  28:9,11,21
  29:10,12 33:16
knowing 12:23
  12:24

**L**

L 2:2,5
lack 27:14
language 8:14
  22:22
lap 16:1,4 22:14
  22:15,24 28:4
  28:8,9
large 15:1 16:13

23:23 24:15
  28:17
largest 24:6,16
  28:17 30:10
Laser 1:17 4:5,5
lastly 28:13
latest 6:16 15:13
  15:16 18:17
  24:24 27:15
  28:22
law 8:8,11
LAYTON 2:2
let's 10:17 11:23
light 6:8 7:23
  20:15 31:16
Linda 1:17 4:6
Linerboard 9:8
  9:10 18:8
listed 14:21
listening 19:22
literal 11:2
litigation 7:7 9:9
  18:8
little 7:23 16:7
  17:17,24
LLP 1:11
local 4:23 25:22
located 5:6
longer 6:9
look 4:20 5:21
  9:6,23 13:9
  21:20 34:1,7
looking 8:20
  12:2 23:21
  25:23
Los 1:18 2:23
lots 17:21
LOUGHRAN
  2:15
low 15:4
L-i-n-e-r-b-o-...
  9:8

**M**

M 5:9
machine 35:9

magic 22:3
making 4:20 5:3
  11:14 31:14
Market 1:11,22
  2:6,19
Mary 2:18 3:13
Master 1:14 3:1
  3:5,8,11,14,17
  3:21 4:4,7,11
  4:16 5:20 6:4
  6:13,17,20,22
  7:3 8:2 10:5,8
  10:10,14,19
  11:12,22 13:23
  14:4,15,23
  16:14,20 18:5
  19:9,12,21
  20:2,9,15,22
  21:21 22:21
  23:4,10,18
  24:2,12 25:11
  25:20 26:11
  27:2,4 28:23
  29:1,9,20
  31:23 32:2,7
  33:3,13,17,24
  34:7
materials 5:2
matter 1:9 7:12
mean 11:6,23
  30:22
meaning 17:11
measuring 18:7
medium 15:1
  23:22 24:7,17
  28:17 30:10
meet 7:9 8:2
  9:19 10:17
  29:17
meets 9:16 24:24
  27:10
merits 25:2
methodology
  8:13,15,17
  16:21,23 18:9
  18:11

Meyers 1:10
  35:4,19
MICHAEL 2:21
MICRO 1:4
mid 15:4
midsize 16:13
Mike 3:19
Milstein 2:11
  3:7
mindful 7:16
minimum 24:24
  25:3,9 26:9
  27:8,11
minutes 11:24
missing 15:21
moment 22:22
  23:21
Monday 33:21
  34:1,8
Morris 2:18
  8:22
motion 27:1
multiple 22:4,5
MYERS 1:16

**N**

name 8:24
nature 11:18
necessarily 30:4
necessary 30:13
need 3:24 7:19
  8:12,13 9:14
  9:16,17,22
  12:3 14:3,20
  14:24 15:2,11
  16:22 18:15
  22:3 23:12
  25:9 27:11
  29:16,18 30:1
  30:2 34:2
needed 7:6,13
  12:15 23:12
  25:4
needing 22:7
needs 11:17
  24:24 26:9

negotiations
  10:12
neither 35:12
never 6:15 28:3
  28:14
new 2:12 27:9
  35:3
NICHOLS 2:18
non-party 29:13
normal 13:14
North 1:11,22
  2:6,19
Notary 1:10
note 5:13 8:7 9:5
notebook 23:7
notebooks 22:24
noted 3:23 4:1
  8:22
notice 1:10 35:7
number 14:13
  22:4 32:20
numbered 23:2
numbers 18:1
N.W 2:12

**O**

objection 31:24
observation 7:4
observations
  6:23
obvious 27:22
occur 33:4
OEM 15:1
OEMs 14:9
  23:22 24:6,14
  24:15 27:24
  30:9
offer 15:17
offered 5:23
  21:5 31:4
offering 21:13
  23:14
offerings 22:8
  22:13
offices 1:10
off-the-record

Teleconference

4:23
Oil 9:1
Okay 4:12,16
  7:2 10:20 11:9
  19:9 20:9
  23:10 28:23
  29:20 32:2
  33:13,24
ones 12:7 30:5
opened 30:5
opening 29:19
opportunity 9:6
  32:22 33:1
opposition 29:17
order 15:11 29:8
  31:18 32:21,21
  32:23 33:6
ordinarily 25:17
Orszag 5:10
  6:15 16:18,19
  16:20 22:2,7
  24:1 29:19
  30:7
Orszag's 5:13,21
  21:20
outcome 35:13
outlined 5:4
overall 16:6
  28:10
O'Melveny 1:16
  4:6
O-r-s-z-a-g 5:10

**P**

pages 5:6
paragraph
  23:24 24:5
  30:7
part 9:18 10:14
  25:21 32:15
particular 15:21
  25:10
parties 10:6
  19:16,24 20:7
parts 13:20
party 12:19,20

12:20,21,21
13:14 30:18,20
30:22 35:13
pause 22:22
percent 7:15
  13:4 14:7,8,12
  14:19 16:1,6
  17:11,12,24
  18:1 21:11,13
  28:8
percentage 16:6
  23:8
period 15:6 16:2
  21:14 22:16
  27:19
periods 15:19
permit 33:4
perspective 8:12
  10:11 12:2
  13:10 30:8
Phillip 8:22
phrase 16:16
pick 17:13 20:19
  31:3
piece 28:1,5
Pine 2:16
place 35:8
plaintiffs 1:5 3:2
  3:4,7,10 10:4
  11:20 13:4,22
  14:3 23:13,15
  24:8 25:4,8
  27:11,17 29:16
  29:18,24 30:1
  31:3
plaintiff's 27:1
please 3:2,23
  11:12 19:12
  23:18,21 24:3
  27:2,5 29:2
plug 18:11
plugging 16:23
point 13:11 29:4
pointed 14:10,18
  27:13
POPPITI 1:14

3:1,5,8,11,14
3:17,21 4:4,7
4:11,16 5:20
6:4,13,17,20
6:22 7:3 10:5,8
10:10,14 11:12
11:22 13:23
14:4,15,23
16:14,20 18:5
19:9,12,21
20:2,9,15,22
21:21 22:21
23:4,10,18
24:2,12 25:11
25:20 26:11
27:2,4 28:23
29:1,9,20
31:23 32:2,7
33:3,13,17,24
34:7
portion 16:4
  28:10
posed 20:16
position 7:18
  10:16,20 11:2
  14:6 15:4 18:9
  19:6
Potter 2:5 4:10
Powell 2:21 3:19
  3:19
precarious 19:6
precise 8:14
predicament
  10:15
preferably 28:17
premise 17:2
prepare 32:8
preparing 7:17
present 1:12
presented 13:19
presently 26:1
preserve 11:19
previously 29:7
pre-Class 12:16
PRICKETT 2:8
principles 6:21

problem 17:1
  27:22 33:8,16
  33:20
problems 27:14
proceed 11:11
proceeding 8:6
proceedings
  12:12,22
process 33:12
produce 5:23
  22:6 25:19
  27:18 28:15
produced 15:9
  29:15
producing 15:2
product 15:3,4
  22:8,13
production 6:1
  13:15
Professional
  1:10,21 35:4
  35:19
pronouncing
  5:10
proposal 5:5
  6:10,16 8:4
  9:15 15:13,17
  18:17 19:19,19
  21:4,13 22:12
  23:1,5 24:24
  26:15 27:9,15
  27:23 28:22
  33:14
proposals 5:3,4
  13:20 19:19
  20:11,20
propose 31:18
  32:19,24 33:2
proposed 31:18
  32:12
proposing 5:15
  18:16 27:18
  28:15
protective 29:8
prove 12:3 30:2
provide 5:16

provided 8:8
  28:2 29:22
provides 15:14
  28:22
proving 11:3
Public 1:10
purchases 18:23
purpose 5:2
  25:10
purposes 4:20
  7:7 8:4 10:19
  11:3,17 13:16
  20:4 25:1 30:1
pursuant 1:9
  35:7
put 20:8
P.L.L.C 2:11
p.m 1:12 34:11

**Q**

question 5:24
  12:8 14:2 15:8
  16:15 23:12
  24:20 25:3,5
  27:24
questions 7:21
  11:8 21:3,8
Quinn 2:21 3:16
  3:19

**R**

R 35:11
raised 12:9 29:5
random 17:16
  17:18 18:2
range 15:4
reach 31:20
reached 10:12
read 9:10
reading 5:15
really 10:20 19:6
  21:1,10,15
  29:21
reason 8:19
  25:21 26:5,13
reasons 31:1
recall 13:18

Teleconference

Page 6

| | | | | |
|---|---|---|---|---|
| recommendati... 4:21 8:4 32:6 | require 12:19 | ruling 11:19 | 26:14 | 16:19 17:1 |
| recommending 10:21,22 | required 5:17 10:23 12:22 | 31:17,20 | seeking 19:4 26:2 | 18:17 19:10 20:16,18 23:17 |
| record 3:23 4:1 | 26:9 | **S** | seen 7:10 12:5 | 23:22,24 24:4 |
| 5:13 21:7 | requirement | S 2:22 | 16:17 17:7,7 | 24:7,13,17 |
| 30:20,24 35:12 | 12:23 14:17 | sales 14:19 16:2 | selected 24:6 | 25:13 26:5,13 |
| recorded 35:9 | requirements | 16:4,7 17:12 | sell 22:14 | 26:14,23 27:4 |
| red-lined 32:11 | 27:11 | 18:22 21:14 | sellers 28:16 | 27:6 28:18,24 |
| reference 23:21 | resolution 9:21 | 22:11,15,18 | sells 16:5 | 30:5,11 31:2 |
| referenced 8:23 | 10:12 20:20 | 23:9 28:4,5,7,8 | sense 8:16 13:3 | 31:15 33:8,15 |
| 9:3 12:15 | resolve 9:20 | 28:9,10 | 33:5,10 | 34:5 |
| referred 22:23 | 19:23 31:12 | sample 14:2,18 | sentence 24:4 | smaller 23:8 |
| refers 22:23 | resolved 29:7 | 15:11 17:3,6,8 | September 1:11 | Smith 1:17 4:6 |
| regard 4:21 | resolving 10:19 | 17:14,16,18,23 | 35:15 | somewhat 11:4 |
| Registered 1:10 | respect 5:8,16 | 18:2,24 19:7 | serious 15:12 | sorry 6:2 |
| 1:21 35:4,19 | 7:12 9:22 10:1 | 24:5 26:14 | set 15:12 33:11 | sort 14:16 25:6 |
| relating 15:10 | 10:11 19:24 | 30:9 | shared 12:11 | speak 3:24 |
| relevance 15:6 | 20:11,24 21:17 | sampling 7:13 | sharing 31:17 | Special 1:14 3:1 |
| 30:18 | 23:1 31:7,14 | San 2:16 | shorthand 35:9 | 3:5,8,11,14,17 |
| relevant 15:19 | 32:14 33:6,14 | satisfied 21:19 | show 12:18 16:7 | 3:21 4:4,7,11 |
| 16:2 25:5,8,18 | respectively 5:6 | 30:17 31:1 | shy 31:13 | 4:16 5:20 6:4 |
| 26:16 27:19 | respects 29:12 | satisfies 23:14 | significance | 6:13,17,20,22 |
| reluctant 12:19 | respond 23:17 | satisfy 14:17 | 14:13 21:12 | 7:3 8:2 10:5,8 |
| remember 23:20 | responsibility | 15:11 | significant 16:3 | 10:10,14,19 |
| Renee 1:10 35:4 | 31:9 | saying 18:13 | 28:10,11 | 11:12,22 13:23 |
| 35:19 | result 24:18 | 20:3 26:5,14 | simple 15:8 | 14:4,15,23 |
| repeatedly 23:13 | results 24:10 | 30:11 | simply 16:8 30:6 | 16:14,20 18:5 |
| reply 14:12 | 30:15 | says 8:11 9:2,2 | single 13:15 | 19:9,12,21 |
| Reporter 1:10 | review 5:1 9:8 | 24:5 29:24 | sir 3:17 4:11 | 20:2,9,15,22 |
| 35:5,19 | 32:9 | 30:7,13 | sit 31:16 | 21:21 22:21 |
| Reporters 1:21 | reviewed 12:11 | schedule 33:11 | situation 13:14 | 23:4,10,18 |
| 1:24 | Rich 4:10 | 33:12 34:2 | 19:18 20:12 | 24:2,12 25:11 |
| represent 14:8 | Richard 2:5,15 | schedules 33:19 | size 16:10,13 | 25:20 26:11 |
| 23:22 | 3:9 | scope 19:15 | 24:9,19 28:21 | 27:2,4 28:23 |
| representation | RICHARDS 2:2 | seasonality 15:6 | 30:14 | 29:1,9,20 |
| 7:13 27:20 | right 6:17,20 | second 5:12,22 | sizes 17:10 | 31:23 32:2,7 |
| representative | 10:5 11:20 | 7:3 22:2 24:1 | slight 30:23 | 33:3,13,17,24 |
| 17:3,6 19:8 | 14:15,23 19:21 | 24:22 28:3 | sling 11:4 | 34:7 |
| 23:6 | 21:21 | 29:23 30:7 | small 2:12 3:6,6 | specific 27:14 |
| represented | risk 18:18 | secret 7:22 | 5:18,18,21 | specifically 6:15 |
| 7:15 27:16 | Robert 2:22 | 25:14 26:2,22 | 6:12,15,18,21 | 11:16 |
| representing | 3:15 19:11 | 29:4 | 6:22 7:2 10:3,6 | specificity 18:14 |
| 30:9 | Rodney 2:3 | see 10:17 18:7 | 10:9 11:9,10 | spins 29:15 |
| represents 21:13 | Rome 1:11 | 30:24 32:3 | 11:13 13:9,20 | Square 2:3 |
| request 32:23 | Romero 8:21,21 | seeing 33:6 | 14:1,10,16,24 | stage 7:7 8:6,7 |
| | 8:22 9:2,11 | seek 11:20 20:13 | 15:1 16:6,8,12 | 9:7,14 12:8,12 |

Teleconference

12:16,22 25:21
standard 26:6
  26:17 27:12
  29:14 30:17
Stars 1:18
start 3:1 11:13
State 35:2,5
statement 10:2
  16:24 24:13
STATES 1:2
statistical 21:11
status 29:13
Stone 2:22 3:15
  3:15 9:9 10:13
  19:11,11,13,14
  19:22 20:7,10
  20:24 22:1
  23:3,7,11
  26:21,24 27:3
  29:2,3,10
  31:23,24 32:4
  32:24 33:9,20
  33:22 34:6
Street 1:11,22
  2:6,9,16,19,22
strongly 25:15
submission
  22:17
submitted 5:2
  21:18
subpoena 20:1,4
subpoenaed
  13:21
subset 17:14
substantial
  22:15,18
successful 13:1,2
sufficient 5:23
  6:3 14:18 17:8
  17:8 19:1,4
  21:4 22:11
sufficiently 21:6
suggest 17:5
  25:15 26:3
suggesting 24:16
suggestion 20:18

suggests 31:2
Suite 2:13
supervision
  35:10
supplier 16:8,13
  24:7,7,16,17
  28:17,18,18
  30:10,10,11
suppliers 16:12
supports 30:24
sure 5:8 6:8
  11:14 13:6
  18:20 19:10
  24:4 33:10
surprised 29:5
suspected 21:22

      T
T 35:1,1
table 6:10 20:8
  22:13
Tablet 23:8
tablets 22:24
take 11:24 20:14
  21:9
taken 1:9 35:7
talk 22:7 24:3
  32:18
talking 6:9 12:3
  12:15 21:22,23
  27:13
teeing 26:2
teleconference
  1:9 34:3,10
  35:6,8,11
tell 15:10 28:14
telling 16:15,17
  18:12 23:1
ten 7:15 14:7,8
  14:12,19 16:1
  16:5 17:11,24
  18:1 21:11
  28:8
term 25:14,16
terms 4:19 21:15
  22:8,19 23:11

32:20
Thank 3:5,8,11
  3:14,17,21 4:4
  4:7,11 16:20
  19:9 20:22
  24:2 27:6
  28:24 29:1,3
  29:20 34:8
thereof 35:14
thing 6:11 9:4
  9:10,11 15:23
  17:4 28:6
things 5:7 13:11
  15:1
think 4:15 5:16
  6:21 8:7 9:4,13
  9:21 12:5
  13:11 18:5,7
  18:11,13,17
  19:23 20:5
  21:1,7,15,17
  22:9 23:8,14
  25:20 29:15
  30:12,20 31:5
  31:15,18 33:10
  33:22 34:2
thinking 13:17
third 8:23 9:5
  12:14,19,20,21
  12:21,23 13:14
  30:18,20,21
Thompson 2:15
  3:10
thought 26:24
  29:6
thoughts 6:24
three 15:17,22
  16:10 18:16
  19:20 21:13
  22:5 23:2 24:6
  24:14,15 25:24
  27:14,17,24
  28:14 30:4,9
threshold 14:16
  21:11
throws 25:14

Thursday 33:20
time 8:10 15:6
  15:19 16:2
  27:19 31:22
  32:18 34:4
  35:7
today 4:21 7:18
  19:16 29:13
told 5:1 15:24
  17:4 28:6
TOLL 2:11
top 16:1 22:15
  22:24 28:4,8,9
tops 16:4,5
  22:14,15
Toshiba 6:1,2,18
  15:24,24 16:8
  16:11 19:1
  22:15 28:7,12
  28:15
total 13:21 21:14
  22:20 23:9
Tower 2:13
trade 7:22 25:14
  26:2,21 29:4
transaction
  17:18
transcribed
  35:10
transcription
  35:11
translated 7:8
tried 29:17
trim 19:3
true 6:12 10:4
  10:11 35:12
truly 17:18 19:5
try 6:2
Tuesday 1:11
TUNNELL 2:18
two 12:14 13:19
  19:19 20:11,19
  21:3,5 22:19
type 15:3

      U

ultimate 24:20
  30:3
understand 6:8
  7:8,18 9:18
  10:8 11:14
  13:17,24 14:6
  16:15,16 24:5
  25:11 26:4,11
  30:18,19
understanding
  5:14 11:18
  16:22
understood 9:21
  30:9
unduly 25:18
  26:16
UNITED 1:2
universe 12:4
  13:7 17:7,13
  17:16,22 19:5
use 8:14 16:16

      V

v 1:6
variables 19:2
vendor 22:19
vendors 22:4,5,5
  22:14
versus 8:22 9:1,9
view 8:23 9:10
  26:9 29:23,23
viewed 29:11
VINCENT 1:14
virtue 23:4
Volen 2:15 3:9,9
volume 13:21
  15:8 21:3,11
  21:12,15 22:20
  28:7

      W

wait 4:14
want 6:5,8,13,24
  11:7 14:5
  19:14 20:3
  24:23 30:6
  31:6 33:4

Teleconference

Page 8

| | | 9 |
|---|---|---|
| wanted 20:10 21:22 | 1201 1:11 2:19 13 21:13 | 90017 2:23 |
| Washington 2:13 | 1310 2:9 1313 2:6 | 90067 1:18 94104 2:16 |
| wasn't 25:23 | 15th 2:16 | |
| way 8:19 13:18 17:15 20:15 29:5 | 18th 31:4 1977 9:2 19801 2:10 | |
| week 4:22 33:19 | 19899 1:22 2:3,6 | |
| West 2:13 | 2:19 | |
| Wilcox 1:21,23 1:24 | 1999 1:18 | |
| willing 13:4 18:21 22:6 | **2** | |
| Wilmington 1:11,22 2:3,6 2:10,19 4:2 | 2 5:6 7:17 2nd 9:1 2/3 14:9 2:30 1:12 | |
| WITNESS 35:15 | 20th 5:1 2000 21:14 | |
| words 8:12 26:10 | 20005 2:13 2007 1:11 5:12 | |
| work 11:5 17:19 33:6,19 | 21:14 31:4 35:16 | |
| worthy 8:7 | 2008 35:20 | |
| www.corbettr... 1:23 | 230 1:22 235 2:16 | |
| **Y** | **3** | |
| yeah 10:9 12:16 | 3 5:5 | |
| year 16:2 27:19 | 3:21 34:10 | |
| years 15:18,21 22:19 27:22,24 | 30 17:12 302 1:22 | |
| York 2:12 | 31 35:20 | |
| **0** | **4** | |
| 05-441-JJF 1:6 | 434 9:1 | |
| **1** | **5** | |
| 1 5:4,6 7:16 22:19 | 500 2:13 561 9:1 | |
| 10th 2:22 5:12 17:18 21:24 | 571-0510 1:22 | |
| 100 13:4 | **6** | |
| 106-RPR 35:20 | 6th 2:6 | |
| 11 1:11 | | |
| 11th 35:10 | **8** | |
| 1100 2:12 | 865 2:22 | |

# EXHIBIT 13

CONFIDENTIAL EXHIBIT

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE:<br>INTEL CORP. MICROPROCESSSOR<br>ANTITRUST LITIGATION | ) ) ) ) | MDL Docket No. 05-1717 (JJF) |
|  | ) |  |
| PHIL PAUL, on behalf of himself and all<br>others similarly situated, | ) ) ) |  |
| Plaintiffs,<br>v. | ) ) ) ) | C.A. No. 05-485 (JJF) |
| INTEL CORPORATION, | ) ) | CONSOLIDATED |
| Defendant. | ) ) ) |  |

## LETTER TO SPECIAL MASTER VINCENT J. POPPITI FROM MARY B. GRAHAM

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Richard J. Bauer (#4828)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
302.658.9200

*Attorneys for Nonparty Fry's Electronics, Inc.*

OF COUNSEL:

Robert W. Stone
Michael D. Powell
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
650.801.5000

Dated: May 9, 2007

Dear Judge Poppiti:

We ask that the Special Master accept this letter in response to the letters of Intel (May 4) and Class Plaintiffs (May 7) which raise new arguments that warrant response. Intel has agreed that we may have a response; Class Plaintiffs have not. We also ask for this opportunity to respond to the comments at the May 1 hearing relating to the Special Master's understanding of the history of the protective order and its consequences, which we have now had an opportunity to investigate.

## 1.    The earlier process resulting in the general protective order.

Intel and Class Plaintiffs imply that Fry's is the proverbial "fly in the ointment." They characterize the existing Protective Order as the product of a "massive and arguably unprecedented negotiation process where multiple third parties – including Fry's – were allowed to provide input on the Protective Order, which was ultimately approved by the Court." (Intel ltr. at 1.) They go on to emphasize that the Court "expended significant time and effort on the current protective order." (*Id.*) Because of all that work, according to Intel and Class Plaintiffs, Fry's should be content with the outcome of this process, as are other third parties, and not be heard to complain.

We respect the laudable and successful efforts by the Court to manage an obviously large case and develop a workable general protective order. But we take issue with the notion that somehow the parties' earlier negotiation efforts, however extensive, and the efforts then expended by the Court to turn the parties' product into a general protective order, somehow foreclose Fry's, as a third party, from now having its day in Court to seek certain additional protections sufficient to protect its specific trade secrets, protections that are warranted under the law and routinely accorded trade secrets of parties, as well as third parties.

Intel admits that the original Protective Order was the product of negotiation among the parties, and that the role of third parties was to give "input" after that negotiation had occurred. While that model from a practical standpoint makes sense as a way to lead to a general protective order, it cannot be argued that, as a practical matter, third party Fry's stands in the shoes of the parties to the case who negotiated the order. It is plainly harder to alter the product of a negotiation after the fact, than to affect the outcome as a full participant throughout.

Moreover, from a legal standpoint, while Fry's was, as Intel says, invited to give "input," it was not an actual party to any ripe dispute then before the Court. Indeed, prior to the May 1, 2007 hearing, there was no specific ruling that this Court had jurisdiction to hear disputes regarding documents-only subpoenas to Fry's or other third parties. Furthermore, although AMD and Intel had outstanding subpoenas to Fry's, their subpoenas were not identical to Class Plaintiffs' (as Fry's discussed at the May 1 hearing) and the extent to which those parties would pursue their subpoenas, and the scope of any ultimate production by Fry's, was unclear. Neither those parties nor Fry's had invoked the mechanisms of the Court in a way that would have made Fry's a party to a dispute over its specific documents, whether through a motion to quash, a motion for protective order or a motion to compel. Indeed, the parties cite no legal authority to support the notion that Fry's should be treated as though it were a party to the earlier proceedings.

Because Fry's was not a party, it was not formally served with papers filed in the case. For that reason alone, it cannot be held to be bound to the earlier proceedings.[1] Moreover, Fry's was not in fact aware of all events relating to protective order issues. This is significant because at the recent hearing the Special Master reviewed and relied on the history of paragraphs 6(b) and 11 relating to experts (May 1, 2007 tr. at 42-46, citing p. 81 of the Report). This history, seemingly suggesting that Fry's had supported the current protective order provisions relating to experts, led the Special Master to say that he was not "inclined to propose a change to the protective order." (*Id.* at 45-46). More particularly, as the Special Master recounted the history, a lawyer for certain third parties, Mr. Holston, argued at the hearing on June 12, 2006 that third parties had a right to learn the identities of the experts. Following his argument at the June 12 hearing, the parties stated that they were "willing to accommodate the third parties' concerns in the spirit of compromise." (*Id.* at 45). Thereafter, "by submission dated June 15th, 2006, the parties agreed to revise the language" to the form which the Special Master's Report found "acceptable" (*Id.* at 45; Report at 82). That provision provided that third parties would be informed of the identity of the experts, but did not include explicitly that the notice be in advance of disclosure with a right to object.

We have now spent considerable effort to investigate. Fry's did not attend the June 12, 2006 hearing, and Mr. Holston, who spoke on behalf of only nine of the third parties, was not retained to represent Fry's interests. Although his client Hewlett Packard had objected prior to the hearing "to granting an expert access to Confidential Discovery Material without first identifying the proposed expert to the Producing Party and affording Third Parties an opportunity to object to [that] access" (6/27/06 Report at 38-39), Mr. Holston did not argue for that position at the hearing (6/12/06 tr. at 87-90). Fry's did not receive a transcript of the hearing until last week, and it was not made aware at the time of the hearing of any negotiation over the expert (or any other) provisions. Further, Fry's did not play any part in the June 15 submission and, moreover, believes that it was not aware of it at the time.[2] Thus, Fry's cannot be viewed as bound by the particular "accommodation" on the experts provision of the parties' submission. Nor can Fry's be viewed as having participated in any negotiations leading to the Court's finding acceptable any other provisions, including the one relating to access by in-house counsel.

---

[1]   Class Plaintiffs argue that the e-discovery order is a red herring. That Order in fact "interfaces" with the general Protective Order as the parties themselves have admitted (D.I. 132 at 2, C.A. No. 05-1717), and shows that even the parties who negotiated away the right to exclude in-house counsel otherwise, retained that right under certain circumstances for certain electronic information, presumably in recognition of the ease with which such information can inadvertently be disclosed.

[2]   Counsel for Fry's has been unable to locate in any of the court's dockets a submission by the parties on the expert provisions following the hearing, including on June 15, 2006, and so we cannot comment on the contents of that submission beyond the above. However, Fry's in-house counsel has no recollection of being aware of any compromise being considered in advance of the hearing or of one being negotiated following the hearing and has not found any indication in his emails that he was consulted. If any third parties signed off on this "accommodation," presumably it was the nine clients of Mr. Holston or possibly other third parties who attended the hearing. We also note that Fry's could not as a practical matter participate in the hearing, as it would have required travel to Delaware which was not practical under the circumstances (and it had had no reason to retain Delaware counsel).

Notably, neither Intel nor Class Plaintiffs cite any authority for the remarkable proposition that Fry's, having been invited to give "input" before an actual specific dispute relating to Fry's information was framed, should be foreclosed from later seeking protections when an actual dispute has developed. The "law of the case" doctrine cited by Class Plaintiffs has no relevance to the present dispute, because among other reasons, it does not apply to interlocutory orders. *Hudson United Bank v. Progressive Cas. Ins. Co.*, 284 F. Supp. 2d 249, 252 n. 4 (E.D. Pa. 2003) ("The law of the case doctrine does not limit the power of a trial judge to revisit issues addressed in interlocutory orders."); *see also Martin v. Port Auth. Transit*, 115 Fed. Appx. 556, 560 (3d Cir. Oct. 21, 2004) (unpublished) ("Interlocutory orders remain open to reconsideration and do not constitute the law of the case.").[3] Indeed, the Protective Order itself recognizes in paragraph 28 that it was entered **"without prejudice to the right of . . . any Third Party, for good cause shown, to move for modification of this Protective Order"** (emphasis added)

The authority cited in Fry's May 2 letter makes clear that the Court always has the discretion to modify a protective order to provide for additional protections. Now that there is an actual dispute and a motion to compel has been filed that involves specific information of Fry's, Fry's has come forward with declarations that, until Class Plaintiffs' May 7 letter, were unchallenged. Those declarations establish that Fry's specific, subpoenaed information involves trade secrets that warrant full protection by the provisions that Fry's seeks.

2.    Intel's "parade of horribles."

Intel raises the specter of a "parade of horribles," that if the Special Master were to entertain Fry's request and grant the protective measures Fry's seeks for its trade secrets, then 70 other third parties might also seek modifications to the protective order and create havoc. Whether or not others might seek additional protections is not a justification for shutting the doors of the courthouse to Fry's. Intel cites no authority for the proposition that a nonparty should be denied consideration by the Court simply because others might also seek the protection of the Court.

Moreover, Fry's positions, i.e. that an "outside-counsels'-eyes-only" tier and a provision for notification and objection with respect to experts is warranted for financial and sales information such as Fry's constituting actual trade secrets, were not argued at the hearing, and apparently others do not have the same need as Fry's to ensure, for example, that in-house counsel for AMD and Intel do not have access to their information. As the Report and Recommendation explains, the parties and third parties in attendance at the hearing were content with a negotiated provision that allowed AMD's and Intel's in-house counsel to see those third parties' information, as long as counsel were not involved in certain kind of activities for a period of time (although that period of time was in dispute). (*See* Report at 86-87; 6/12/07 tr. at 136-137.) Similarly, as noted above, those at the hearing apparently worked out a compromise provision relating to experts during or after the hearing that did not include an explicit right on

---

[3]    The case Class Plaintiffs cite, *Max's Seafood Cafe*, does not even address the law of the case doctrine.

the part of the third parties to have advance notice and to object.[4]  The Report and Recommendation found these negotiated provisions "acceptable." (Report at 82, 87.)  However, the Report did not discuss or make findings as to whether the further, standard additional protections that Fry's is requesting were warranted to protect its trade secrets.  Thus, Class Plaintiffs' assertion that "Fry's arguments were fully considered prior to entry of the protective order" (p. 4) is simply not correct.

Finally, the concern over potential havoc is vastly overblown.  Apparently, as Intel notes, other third parties do not have concerns like Fry's, perhaps because they were involved in the negotiations and so negotiated their own interests as they saw fit, because they do not have trade secrets that may be produced, or because no ripe dispute has yet been framed over their information.  But whatever the reason, if a third party were now to come forward to protect any trade secrets, the provisions that Fry's seeks – which are routinely granted in litigation in this district – could readily be employed for the benefit of others, and so the Court would be able efficiently to deal with those applications.  The Court can take further comfort in knowing that, given the considerable cost of having to fight a battle in this case over the protective order, no third party is going to undertake the effort unless it has a genuine concern not met by the general Protective Order.

**3.    Interference with Intel's litigation needs.**

Class Plaintiffs make no specific arguments that the provisions Fry's seeks are unworkable, burdensome, or otherwise problematic.  Intel argues, however, that it should not have to identify its experts, with an opportunity for Fry's to object before those experts see Fry's trade secrets, because such a requirement would effectively empower Fry's to have a "veto" over Intel's choice of experts.  This argument ignores that this provision is not a veto, but a right of objection subject to court review.  This is a standard provision in protective orders which recognizes that companies should have the right to ensure that experts who might be in a position, even inadvertently, to misuse or disclose information, do not receive trade secret information.  The cases in Delaware are legion in which such provisions, including with a right by third parties to object, appear in protective orders.  (*See, e.g.,* Exh. A at 1, 12-13 and Exh. A to Fry's 5/2/07 ltr. at 11.)  The one case Intel cites, *Telular*, is inapposite; it did not hold that an objection provision is improper.  In fact, it shows that, where there is an objection to an expert, the Court can address the issue applying the appropriate legal standards.

Intel also argues that its in-house counsel should have access to Fry's trade secret information, but does not identify any specific reason why its in-house counsel *needs* access.  Instead, Intel focuses on the risk of injury portion of the good cause inquiry, and argues that its in-house counsel are officers of the court who can be expected to comply with protective orders.  But it is hard to conceive of a reason why in-house counsel would *need* to see Fry's actual data, which from Class Plaintiffs' submission will apparently be analyzed by experts.  Moreover, by Intel's logic, no protective Order need ever be adopted that excludes in-house counsel.  Yet many protective orders in this district have been entered that exclude in-house counsel because,

---

[4]    At the hearing, no one pressed the point, for example, that numerous protective orders have been entered in this district, some with court rulings directly on these issues, which show that the provisions that Fry's seeks are fully justified, workable and customary.

regardless of good intentions, a risk of disclosure for in-house personnel exists that is greater than the risk for outside counsel, as Judge Jordan recognized in the TriCor antitrust litigation. In fact, Judge Farnan has held, in denying access by in-house counsel to highly confidential information, that: "In this district, highly confidential [information], assuming the information is properly designated, we assume it's competitive unless there is some cause shown that it's not, is limited to outside counsel, experts and consultants." (Exh. B, tr. at 5 and signed order.)

In a related vein, Intel questions Fry's request that the number of outside counsel who see Fry's information be limited. Again, Intel recites that outside counsel are officers of the court who should be expected to adhere to their obligations. But the sheer number of outside counsel in this case is "unprecedented," and, accordingly, restrictions taking into account that circumstance are appropriate. It cannot reasonably be denied that the risks of disclosure are proportional to the number of persons with access, and that the current protective order provides Fry's with no ability to monitor for breaches of the protective order or even to be informed of such breaches, a provision that is often found in protective orders entered in Delaware (*See, e.g.,* TriCor Protective Order at 18, Exh. A to Fry's 5/2/07 ltr.) Notably, the parties themselves have already acknowledged that limiting the number of outside counsel is important for certain information – the parties' e-discovery order limits the number of outside counsel who may see their native document databases. (D.I. 396 at 11.) If the parties' information warrants such measures, certainly Fry's trade secrets warrant at least as great a degree of protection. *See U.S. v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 160 (D. Del. 1999).

4.  **The status of Fry's trade secrets.**

Although Class Plaintiffs did not dispute the trade secret status of Fry's information in their earlier reply in support of their motion to compel, they make the new argument that Fry's data "is not confidential, not known only to Fry's" and that Fry's declarations fail to demonstrate that it has a trade secret interest in its actual data (ltr. at 3.) This argument is erroneous and should be rejected as too late. Fry's submitted its declarations in its April 17 response to the motion to compel, and if Class Plaintiffs had wanted to argue that the declarations were insufficient, it should have done so in its reply and before the hearing, so that Fry's could have responded then, and if appropriate, adduce evidence at the hearing.

Their argument also ignores well established trade secret law. The fact that information consists of an aggregation of many pieces of information, each of which individually might be public, does not negate trade secret status if the aggregation is not readily ascertainable. The Federal Circuit, for example, has noted that, "Ninth Circuit law upholds trade secret status even had the same information been obtainable from other sources" and that "trade secrecy is not negated because defendant by an expenditure of effort might have collected the same information from sources available to the public." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1243-44 (Fed. Cir. 1989) (citing *Clark v. Bunker*, 453 F.2d 1006, 1010 (9th Cir. 1972)). *See also, Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.*, No. 12782, 1997 WL 153825 (Del. Ch. Mar. 26, 1997) (observing that, because "it took years for plaintiff to acquire this information [relating to customer purchasing needs and the prices customers paid]," it could reasonably be inferred that the information "could not easily be obtained by random 'cold calling.'") Class Plaintiffs do not say how all the individual sales data could be transformed in any readily ascertainable way into the aggregation in Fry's possession.

-5-

Moreover, Class Plaintiffs put in no record support for the notion that all of the individual pieces of underlying data that Fry's has are public. Their mere attorney argument cannot counter the actual evidence that Fry's put in the record. The declaration of Rajesh Seth avers that Fry's information about "pricing, profit margins, inventories, marketing development funds" is not publicly known (and its disclosure to Fry's competitors or to manufacturers would cause Fry's serious harm, for example, from loss of bargaining power). He also avers that "Fry's methodologies regarding pricing, inventories, marketing, profitability" are not public and that the disclosure of this information would allow its competitors more effectively to compete against Fry's. The trade secret status of this information cannot seriously be contested. This is precisely the sort of information that Judge Farnan in *Igen* (Exhibit B) and Judge Jordan in the TriCor antitrust litigation, have held is not required to be shown to in-house counsel.

Respectfully,

*Mary Graham*

Mary B. Graham (#2256)

MBG/dam

cc:    Clerk of the Court (via e-filing and hand delivery)
       J. Clayton Athey, Esq. (via e-mail)
       James L. Holzman, Esq. (via e-mail)
       Frederick L. Cottrell, III, Esq. (via e-mail)
       Richard L. Horwitz, Esq. (via e-mail)
       Dale R. Dube (via e-mail)
       Carrie David (via e-mail)
       Mary Levan (via e-mail)

820769

- 6 -

# EXHIBIT 15

CONFIDENTIAL EXHIBIT

# EXHIBIT 16

CONFIDENTIAL EXHIBIT

# EXHIBIT 17

| SEARCH BLOG| |  FLAG BLOG|  Next Blog»                     Create Blog | Sign In

| **Data Analysis Procedures** | **Statistical** |
| Multi dimensional analysis of data. Zero user training. View demo/paper | Leading Statistical Software Makes Stat Analysis Easy. Free Demo! |
| | Ads by Google |

Google™ [_____]  [ Search ]

○ Web  ● Parkin's Lot

### Thursday, December 04, 2003

## Sample size and statistical significance

How many people do you need to survey to get a significant result?

For statistical significance (in statistics, "significant" has a very specific meaning), you need to use a valid sample size. You also need to use a valid methodology for selecting who goes into your sample.

As a rough rule of thumb, your sample should be about 10% of your universe, but not smaller than 30 and not greater than 350. If you are doing multivariate analysis, the sample should be ten times the number of variables you are testing.

If you want to be more pedantic, you should define what confidence level you want and what margin of error is acceptable to you. A confidence level of 95% and an error margin of 5% tell you that your result will be within 5% of the true answer 95% of the time you run the survey. So if you tested 100 samples, 95 of them would return a result that was within 5% of the truth.

The correct sample size is a function of those three elements-- your universe (how many people make up the group whose behavior you are trying to represent), your desired error margin, and your preferred confidence level. It's a simple

### About

Improving perfor building strategi emerging interne in e-business, Ol project manager and sales.

### About me



Name: Godfre
Location: Was
More about me
E-mail Me
My Blogger pro

### Current P

Course licensir
RoboDemo v.
Graphics
Critique of E-l
Consortium's r
E-learning as
E-learning evo
E-learning is n
Resistance to
Freedom, dem
working envirc
Mission, vision



formula (well, not so simple). For most purposes, I'd go for a 10% error margin at 95% confidence. For varying numbers of learners in your universe here are the ideal sample sizes (the first at a 10% error margin, the second at 5%):

50 in the universe, sample 33 or 44
100 in the universe, sample 49 or 80
200 in the universe, sample 65 or 132
500 in the universe, sample 81 or 217
1000 in the universe, sample 88 or 278
and so it goes till you find that an ideal sample for a 10% error margin hardly moves above 350 no matter how big the universe (it's 500 for 5%).

posted by Godfrey Parkin at 11:42 AM Trackback

## 0 Comments:

Post a Comment

<< Home

## Links

trdev listserv
Parkin Space

## Papers an

E-competent
Pragmatism a
Cutting Throu
Hype
Outsourcing E
Using blended
sustained pro
results at Ame
Motor



EXHIBIT 18

CONFIDENTIAL EXHIBIT

EXHIBIT 19

CONFIDENTIAL EXHIBIT

EXHIBIT 20

CONFIDENTIAL EXHIBIT

EXHIBIT 21

CONFIDENTIAL EXHIBIT

# EXHIBIT 22

CONFIDENTIAL EXHIBIT