

Potter
Anderson
& Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

November 2, 2007

**W. Harding Drane, Jr.**
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6019 Direct Phone
302 658-1192 Fax

**BY ELECTRONIC MAIL AND HAND DELIVERY**

Vincent J. Poppiti, Esquire
Blank Rome LLP
Chase Manhattan Centre, Suite 800
1201 North Market Street
Wilmington, DE  19801

Re:   *Advanced Micro Devices, Inc., et al. v. Intel Corporation, et al.,*
      *C. A. No. 05-441-JJF; In re Intel Corp., C.A. No. 05-1717-JJF*

Dear Judge Poppiti:

     Intel Corporation and Intel Kabushiki Kaisha (collectively "Intel") hereby move for an Order requiring ERS Group ("ERS") and Advanced Micro Devices, Inc. and AMD International Sales and Services, Ltd. (collectively "AMD") to produce a report generated by Michael A. Williams, an economic consultant affiliated with ERS, and the documents Williams used to prepare it. The existence of the report ("Williams Report") and a detailed summary of Williams' findings were announced in an August 2, 2007 AMD press release. Jointly with AMD, ERS has refused to produce the Report and all related documents in response to Intel's subpoena *duces tecum*.[1]

    **I.  Statement of Facts.**  Since this case was filed, AMD has engaged in an intense public relations campaign aimed at tarnishing Intel's reputation and promoting its theory of the case.[2] In its latest salvo, AMD issued a press release on August 2, 2007 announcing the existence of the Williams Report and attaching a detailed summary of its methodology, findings, and conclusions.[3] The press release quoted AMD's executive vice president of legal affairs, who proclaimed that "this study shows that billions of dollars have moved straight from consumers' pockets to Intel's monopoly coffers" and that Intel's "$60 billion in monopoly profits [the figure Williams apparently arrived at in his Report]. . . helps explains why the European Commission brought antitrust charges against Intel." *Id.*  Williams, who is also quoted, states that "[i]n light of the recent European Commission decision[4] and prior JFTC actions," his analysis asks "how

---

[1] A copy of Intel's subpoena is attached as Exhibit 1, and the joint objections as Exhibit 2.
[2] AMD has issued numerous inflammatory press releases, some of which are attached as Exhibits 3 through 8, and taken out full-page advertisements in major publications accusing Intel of unfair business practices.
[3] The press release and accompanying summary are attached as Exhibit 9.
[4] In July 2007, the European Commission charged Intel with violating applicable EU antitrust laws.  No decision has been issued.

Vincent J. Poppiti, Esquire
Page 2
November 2, 2007

much Intel has gained from the alleged conduct." *Id.* AMD has since referenced the Williams Report to the media on a number of occasions.[5]

Intel served a subpoena on ERS on August 3, 2007.[6] On August 17, 2007, ERS and AMD responded jointly, refusing to produce any of the requested documents. They claim, among other things, that all of the documents—including the Williams Report—are protected by the attorney-client privilege and the attorney work product doctrine.[7] Because neither AMD nor ERS has provided any factual basis for their privilege claims, Intel requested, by letter, some general information so that Intel could assess the validity of their privilege claims. In response, counsel stated that Dr. Williams and ERS were "retained by O'Melveny & Myers to assist counsel in understanding certain economic matters, including Intel's economic profitability," and that AMD's public references to Dr. Williams' findings had not waived any protection from discovery."

**II. Discussion.** The request for the Williams Report is reasonably calculated to lead to the discovery of admissible evidence. The Report was created for the express purpose of determining the economic effects of Intel's alleged "illegal" monopoly. AMD's primary claim in the present lawsuit is that Intel has illegally maintained a monopoly in a worldwide market for x86 microprocessors, and it is using the Williams Report publicly to support its claim and influence both the public and government regulators.

The Williams study reportedly makes the argument that only a portion of Intel's profits can be attributed to legitimate competitive advantages, and therefore that the earning of additional profits itself establishes unlawful maintenance of monopoly. The summary of the study that has been made public arrives at sweeping conclusions while supplying little underlying analysis. The limited analysis that is revealed, however, points to serious analytical flaws in multiple respects, ranging from a gross overstatement of Intel's actual rate of return to a paltry understatement of Intel's required rate of return, given the risk inherent in the volatile high-technology arena in which Intel competes. Williams outlines his methodology in the most general way in an apparent attempt to impart respectability to his conclusions, yet reveals nothing about his underlying calculations that would expose his work to critical scrutiny. To debunk the study fully, Intel needs access to the Report and the underlying materials.

---

[5] For example, on September 10, 2007, AMD's CEO, in a clear reference to the Williams Report, was quoted in a news article as saying that "Intel's practices have created what he calls a 'monopoly tax' costing businesses and consumers an extra $60 billion in revenue they shouldn't have had to pay." *CNBC*, September 10, 2007. The Williams Report was also discussed in a September 21, 2007 *Competition 360* article which noted that AMD had commissioned the Williams Report and released its results "to make its point" that Intel had made $60 billion in illegal monopoly profits over the past ten years. Copies of these articles are attached as Exhibits 10 and 11, respectively.

[6] Intel also served document requests, identically worded to the ERS subpoena, on AMD on September 5, 2007.

[7] ERS and AMD also object on the grounds that discovery from experts is premature, and that the parties had agreed to exempt non-testifying expert materials from discovery. It is AMD, however, that decided now was the time to make its expert's findings public. Moreover, the parties' stipulation regarding expert discovery is not applicable here, as AMD has placed Williams' testimony in the middle of its very *public* relations campaign against Intel.

Vincent J. Poppiti, Esquire
Page 3
November 2, 2007

AMD's suggestion that it can have "expert" reports generated and distributed to the press arguing the merits of its case while simultaneously shielding them from discovery is untenable.[8] Indeed, it is far from clear that the subpoenaed materials were ever entitled to protection. While respondents claim that Williams and ERS were hired to help counsel "understand certain economic matters," the facts establish that at least one purpose was to assist with the public relations juggernaut by publicly opining on issues directly related to AMD's claims. Regardless of the purpose of the retention, any immunity from discovery was waived when AMD publicly trumpeted Dr. Williams' findings.

"[W]hen a client voluntarily discloses privileged communications to a third party, the privilege is waived." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991). Waiver results from disclosure because it is contrary to the purpose of the privilege, which is "to foster disclosure and communication between the attorney and the client." *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979). Because the privilege "protects only those disclosures necessary to encourage clients to seek informed legal advice," it is waived when disclosures are made to a third party—particularly when such disclosures are made for some other purpose. *Westinghouse, 951 F.2d at 1426*.

"Partial" waivers—those whereby a party discloses one portion of privileged materials while refusing to disclose the rest—can sometimes result in a waiver with respect to all communications on the same subject. "If partial disclosure does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject." *Id at 1426, n.13*; *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D. Del. 1977) ("The underlying rationale is one of fairness. A party cannot disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts adverse to its position").

Work product protection can also be waived. Disclosure that evidences a "conscious disregard" of the possibility that an adversary might gain access to the information waives work product protection. *Westinghouse, 951 F.2d at 1430*. "A party who discloses documents protected by the work-product doctrine may continue to assert the doctrine's protection *only* when the disclosure furthers the doctrine's underlying goal," which is to afford a zone of privacy within which a lawyer can prepare his case and develop strategies without fear of discovery by the adversary. *Id*. at 1429 (emphasis added).

Thus, the fundamental purpose of both the attorney-client privilege and the work product doctrine is to maintain confidentiality. AMD's disclosure of an extensive summary of the Williams Report to the press and repeated broadcasts of its findings are directly contrary to this purpose. Neither AMD nor ERS treated the Report as an internal matter created for the purpose of facilitating counsel's representation of AMD. Instead, the disclosure was deliberate and plainly calculated to promote AMD's position in the lawsuit.

---

[8] Moreover, the Williams Report purports to calculate overcharges to consumers. These are likely to be relevant to the claims in the class actions that are pending against Intel.

Vincent J. Poppiti, Esquire
Page 4
November 2, 2007

Courts have not hesitated to find waiver under similar circumstances. In *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109 (N.D.N.Y. 2007), the court held that plaintiff had waived privilege with respect to a report prepared by an investigative consultant when it was given to the client's public relations firm. The court found that providing the report to the public relations firm was "a deliberate, affirmative and selective strategic decision to disclose this information for another benefit other than aiding the lawyer pitched in the battle of litigation." *Id.* at 142. The court reasoned that because the "benefit was for control of the airwaves and print media," and "the longitudinal expectation was to make the content of the Report fodder for grander public discourse," the report had lost work product protection. *See also Westmoreland v. CBS, Inc.*, 97 F.R.D. 703, 706 (S.D.N.Y. 1983) (self-evaluative privilege waived where summary of investigative report was held out to the public "as substantiating its accusations").

The fact that AMD and ERS did not disclose the Report in its entirety does not change the result. While some courts have declined to require production of an expert's report when disclosure was limited to a brief disclosure of its findings, others have found waiver where the press release summarized evidence contained in the report. *Compare Westmoreland, supra* (ordering disclosure of full report when press announced conclusion and summarized evidence) *with In re Dayco Corp. Derivative Sec. Litig.*, 99 F.R.D. 616 (S.D. Ohio 1983) (distinguishing *Westmoreland* when press release merely announced findings).

AMD has also waived any privilege that might have attached to the underlying documents. In *Granite Partners, L.P. v. Bear, Stearns & Co.*, 184 F.R.D. 49 (S.D.N.Y. 1999), the court found that defendants had a substantial need for the documents underlying an expert report that had been publicly released on the ground that "the analyses performed by the Trustee's experts allegedly provide the underlying basis for [plaintiffs'] primary claim." *Id.* The court reasoned that "without access to the data and analyses used by the Trustee's experts, no expert retained by the Moving Defendants will be able to reconstruct the methodology used and assumptions made" by plaintiffs' expert.

This case is no different. AMD has repeatedly and explicitly made reference to Williams' findings in the press. It may not simultaneously invoke privilege to deny Intel access to information that would permit Intel to challenge Williams' methodology and analysis. And it is imperative that Intel obtain this information now, rather than later when expert reports are produced. While testifying experts' reports are not scheduled to be produced until likely late in 2008, AMD has elected to make its expert's findings part of its current public relations campaign. Even if Williams is not ultimately designated, the public damage has been done. Without access to the Report and the documents used to prepare it, Intel has no way to rebut its findings and conclusions. Fairness requires that AMD and ERS be ordered to produce the Report and underlying documents.

Respectfully submitted,

W. Harding Drane, Jr. (#1023)

Vincent J. Poppiti, Esquire
Page 5
November 2, 2007

WHD/mho

cc:     Clerk of the Court (By Electronic Filing)
        Frederick L. Cottrell, III, Esq. (Via Electronic Mail)
        James L. Holzman, Esq. (Via Electronic Mail)


#829500/29282