## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br>INTEL CORP. MICROPROCESSOR<br>ANTITRUST LITIGATION<br><br>PHIL PAUL, *on behalf of himself*<br>*and all others similarly situated,*<br><br>                    Plaintiffs,<br>      v.<br><br>INTEL CORPORATION,<br><br>                 Defendant. | MDL Docket No. 05-1717-JJF<br><br><br><br><br><br>Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

### *REDACTED PUBLIC VERSION*

## CLASS PLAINTIFFS' OPPOSITION TO FRY'S OBJECTION TO AND
## REQUEST TO MODIFY SPECIAL MASTER'S SEPTEMBER 27, 2007 REPORT
## IN DISCOVERY MATTER 5

PRICKETT, JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jlholzman @prickett.com
jcathey@prickett.com
lmherbert@prickett.com
*Interim Liaison Counsel for the Class Plaintiffs*

Originally Filed: November 6, 2007
Public Version Filed: November 13, 2007

Of Counsel:

Michael D. Hausfeld
Daniel A. Small
Michael P. Lehmann
Brent W. Landau
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.

1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699

Thomas P. Dove
Alex C. Turan
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone:    (415) 433-2070
Facsimile:    (415) 982-2076

Steven W. Berman
Anthony Shapiro
HAGENS BERMAN SOBOL
SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:    (415) 217-6810
Facsimile:    (415) 217-6813

*Interim Co-Lead Counsel for the Class Plaintiffs*

## Table of Contents

Page

TABLE OF AUTHORITIES .......................................................................................................... *ii*

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 3

ARGUMENT ............................................................................................................................... 9

I.    FRY'S MAY NOT LIMIT ITS PRODUCTION BASED ON CONFIDENTIALITY

CONCERNS ................................................................................................................................ 9

II.   FRY'S HAS NOT DEMONSTRATED THAT THE DATA TO BE PRODUCED ARE

TRADE SECRETS ..................................................................................................................... 12

III.  FRY'S PROPOSED MODIFICATIONS WOULD DEPRIVE CLASS PLAINTIFFS OF

EVEN THE MINIMUM DATA THEY NEED.......................................................................... 15

    A.    HP and Compaq Data Should Not Be Replaced by eMachines Data ...................... 15

    B.    OEM Incentive Data Should Be Produced With Proper Allocation......................... 17

CONCLUSION........................................................................................................................... 20

# Table of Authorities

Cases

*Cash Today of Texas v. Greenberg*,
 2002 WL 31414138 (D. Del. Oct. 23, 2002) ............................................................... 10

*Coca-Cola Bottling Company of Shreveport v. Coca-Cola*,
 107 F.R.D. 288 (D. Del. 1985) ........................................................................ 10, 15

*Fischer v. Cirrus Design Corp.*,
 2005 WL 3159658 (N.D.N.Y. Nov. 23, 2005) ......................................................... 10

*In re Indep. Serv. Orgs. Antitrust Litig.*,
 162 F.R.D. 355 (D. Kan. 1995).......................................................................... 10, 12

*In re Mercury Finance Co. of Ill.*,
 1999 WL 495903 (N.D. Ill. July 12, 1999).............................................................. 10

*Mannington Mills, Inc. v. Armstrong World Indus., Inc.*,
 206 F.R.D. 525 (D. Del. 2002) ............................................................................. 12

*Medtronic Ave., Inc. v. Advanced Cardiovascular Sys. Inc.*,
 2004 WL 115594 (D. Del. Jan. 13, 2004)................................................................ 10

*SRS Technologies, Inc. v. Physitron, Inc.*,
 216 F.R.D. 525 (N.D. Ala. 2003)........................................................................... 10

Class Plaintiffs oppose Fry's Electronics, Inc.'s ("Fry's") objection to and request to modify the Special Master's September 27, 2007 Report and Recommendation on Motion to Compel Fry's Electronics, Inc. (DM No. 5) ("September 27 Report").[1]

## INTRODUCTION

The genesis of this dispute was a subpoena served by Class Plaintiffs on Fry's back in June 2006. The subpoena includes two routine requests for Fry's purchase and sales data – data whose relevance Fry's has never disputed. Nonetheless, because of Fry's fierce opposition to producing any data, and subsequent opposition to producing sufficient data for Class Plaintiffs' needs in this litigation, what began as a routine request became a battle of attrition before the Special Master, with three rounds of briefing, two hearings and two opinions issued by the Special Master. At the end of the day, the Special Master recommended that Fry's be compelled to produce just a sample of the data responsive to Class Plaintiffs' subpoena, a sample that consists of monthly and yearly aggregated data. Despite the substantial limits on the data Fry's must produce under the Special Master's report, Fry's continues to oppose production of even the minimum data that would satisfy Class Plaintiffs' needs in this case.

Fry's opposition has centered on its concern that its data will not be adequately protected by the Protective Order entered in this case on September 26, 2006. D.I. 277.[2] However, the Special Master has specifically found that Fry's data are adequately protected by the Protective Order. Indeed, the Protective Order was written to provide appropriate protection to trade secrets and other highly sensitive information, including specifically purchase and sales data like those at issue here. The Protective Order thus takes Fry's confidentiality concerns off the table, leaving only privilege, relevance and burden as possible grounds to resist production. These

---

[1] Fry's objection refers to the Special Master's report as the "September 28, 2007 Report," even though the Report was signed and filed on September 27.

[2] All references to "D.I. ___" are to docket items in MDL No. 05-1717-JJF.

other grounds, however, provide no basis for Fry's to oppose production – a point which Fry's essentially concedes.

Fry's seeks to limit its production to the minimum that Class Plaintiffs need for this litigation arguing that its data are a trade secret. Again, the Protective Order moots Fry's confidentiality concerns, but even if it did not, Fry's position should be rejected. Fry's has not established that the limited production of aggregated data contains trade secrets, and the record is clear that the Special Master made no such finding. Moreover, even if Class Plaintiffs were entitled to no more than a minimum production of Fry's data on trade secret grounds, the Special Master's September 27 Report should still be adopted as is. The alternative production sought by Fry's provides less than the minimum.

For the reasons expressed herein, the Court should reject Fry's objection, deny its motion and adopt the Special Master's September 27 Report without modification.

## STATEMENT OF FACTS

Class Plaintiffs served their subpoena on Fry's over 16 months ago, on June 23, 2006. Most of the subpoena's requests seek production of documents; just two call for production of data. The two requests for data seek routine data concerning Fry's purchases and sales of computers – data whose relevance has never been disputed. From the outset, Class Plaintiffs (like Intel and AMD) chose to pursue production of Fry's data only, deferring any effort to obtain Fry's documents to a later time.[3] Despite seeking production of just routine purchase and sales data, Class Plaintiffs, due to Fry's intransigence and strenuous opposition to producing any data (its position at first) or sufficient data (its position later), have had to spend untold hours attempting to obtain a proper production through negotiations and a motion to compel. The motion, which was filed on March 29, 2007 (D.I. 422), was briefed to the Special Master three times, heard by the Special Master twice, including one hearing that lasted nearly four hours, and was addressed by the Special Master in multiple opinions and orders.[4]

The first round of briefing and the four-hour hearing that followed on May 1, 2007 achieved two results. First, the Special Master entered a stipulated order on May 4, 2007 that required Fry's to make available its personnel most knowledgeable about its potentially responsive databases and datasets to use his or her best efforts to assist Class Plaintiffs in understanding such data. This court-ordered meet and confer was designed to remedy Fry's pre-motion refusal to adequately describe its data to the parties, and the consequent uncertainty at the May 1 hearing as to whether Fry's even maintained responsive data. *See* Special Master's Report

---

[3] Subsequently, Class Plaintiffs agreed to permanently forego enforcing any of the subpoena's requests for documents.
[4] The proceedings and materials filed before the Special Master in Discovery Matter 5 are hereby incorporated by reference.

and Recommendations Regarding Threshold Issue Raised by Class Plaintiffs' Motion to Compel and Other Issues, dated May 18, 2007 ("May 18 Report," D.I. 482) at 4.

Second, the Special Master issued the May 18 Report on two discrete issues: whether this Court has jurisdiction to enforce the subpoena served on Fry's, which was issued by the United States District Court for the Northern District of California, and whether Fry's request for additional confidentiality protections beyond those afforded by the existing Protective Order was supported by good cause. The May 18 Report held that the Court had jurisdiction to enforce the subpoena and that Fry's had not shown good cause to modify the Protective Order. Fry's did not object to the report and it was adopted by the Court on June 14, 2007. D.I. 510.

In recommending that Fry's request to modify the Protective Order be denied, the Special Master found that "Fry's commercial or trade secrets are adequately protected under the Protective Order." May 18 Report at 22. The Special Master rejected Fry's attempt to get a "second bite at the apple," noting that the Protective Order already was intended to protect confidential information of the most sensitive nature, including specifically trade secrets. In this regard, the Special Master quoted one of the Protective Order's whereas clauses, which states:

> WHEREAS, the preparation for trial of these actions may require the discovery and use of documents and other information which constitute or contain commercial or technical *trade secrets*, or other confidential information the disclosure of which *would be competitively harmful* to the producing party …."

May 18 Report at 23 (emphasis added) (*quoting* D.I. 277 at 4).

In addition, Fry's requested and received permission at the May 1 hearing to submit a five-page, single spaced post-hearing brief to address a protective order issue decided by Judge Jordan in *In re Tricor Antitrust Litigations* (D.I. 451), which it followed with a six-page, single spaced reply brief (D.I. 467).

Fry's and Class Plaintiffs resumed their negotiations during the May 14, 2007 meet and confer and during the ensuing three months. They made progress, in large part because of the very substantial compromises Class Plaintiffs were willing to make. However, despite many weeks of negotiations, during which further litigation of the motion to compel was held in abeyance, agreement could not be reached. So in late July, Fry's and Class Plaintiffs agreed to resume litigation before the Special Master. They also agreed to narrow the issue to be decided by the Special Master to the following: which of their respective most recent negotiating positions should be adopted by the Court as the better resolution of the motion to compel. This agreement was memorialized in a stipulation and order dated August 6, 2007. ("August 6 Stipulation & Order," D.I. 549). Fry's and Class Plaintiffs' briefed this narrower issue and the Special Master heard argument on September 11, 2007.

At the time of this agreement, Class Plaintiffs' most recent negotiating position was reflected in a proposal made to Fry's on July 16, 18 and 19, 2007 ("Class Plaintiffs' July 18 Proposal"). This proposal sought just a sample of the data responsive to Class Plaintiffs' subpoena, and permitted some of the sample transactions to be aggregated by month and some by year. This proposal is described in full in Exhibit 3 to Class Plaintiffs' August 10, 2007 letter brief to the Special Master (D.I. 560), which is attached hereto as Exhibit A. Fry's most recent position was set out in its July 26, 2007 proposal, but that proposal was later superseded by a new proposal on August 20, 2007 ("Fry's August 20 Proposal"). The August 20 proposal called for production of a considerably smaller sample than did Class Plaintiffs' proposal.

The differences between Class Plaintiffs' July 18 Proposal and Fry's August 20 Proposal can be summarized as follows:

| Nature of Provision | Class Plaintiffs' July 18 Proposal | Fry's August 20 Proposal |
|---|---|---|
| Monthly purchase and sales data | Fry's to produce such data for its purchases and sales of *HP, Compaq, Toshiba and Gateway* computers | Fry's to produce such data for its purchases and sales of *Toshiba, Gateway, and eMachines* computers |
| Data reflecting annual incentive payments received from computer vendors | Fry's to produce such data for all incentive payments received from *HP, Compaq, Toshiba and Gateway.* Incentive data must be *specific to computers of the brand in question and must not include any incentives for other brands or non-computer products.* | Fry's to produce such data for all incentive payments received from *Toshiba, Gateway and eMachines.* |

Fry's, like most retailers, receives payments and credits from its vendors as incentives to buy, promote or place on the shelf in an advantageous position, the vendor's products. These payments normally are considered offsets to the price paid for the vendor's product. To determine the net price Fry's paid for computers, therefore, Class Plaintiffs need to know both the amount of the incentive payments Fry's received and Fry's purchases against which the payments are an offset.

Here, the offset of incentive payments against purchases is more difficult because HP acquired Compaq in 2002 and Gateway acquired eMachines in 2004. Since those acquisitions, Fry's has received combined incentive payments from HP based on Fry's purchases of both HP-brand and Compaq-brand computers, and combined incentive payments from Gateway for Fry's purchases of both Gateway-brand and eMachines-brand computers. Yet, Fry's may have earned those payments through one incentive program applicable to its purchases of HP-brand computers and an entirely different incentive program for its purchases of Compaq-brand computers. To determine the net price Fry's paid for HP and Compaq computers, Class Plaintiffs need to apply the incentive payments to the particular computer purchases that generated them. That is why Class Plaintiffs' proposal calls for Fry's to produce incentives data

specific to computers of the brand in question, and not to mix in data for incentives earned on purchases of other brands or non-computer products. For example, the proposal requires Fry's to separately produce data for incentives payments received from HP for purchases of HP-brand computers, and not to combine such data with data for incentives received from HP for purchases of Compaq-brand computers.

On September 27, 2007, the Special Master issued a report and recommendation (D.I. 608) in which he recommended that Fry's be compelled to produce the data described in Class Plaintiffs' July 18 Proposal. With respect to the incentives data, the Special Master ruled:

> The incentives data must be specific to computers of the brand in question, and not include any incentives for other brands or non-computer products. Thus, as to incentive payments received from HP after its acquisition of Compaq in 2002, Fry's must produce either data based on a proper allocation of the incentive payments to Fry's purchases of HP-brand computers alone, or documents and/or data sufficient for Class Plaintiffs to perform such allocation; and as to incentive payments received from Gateway, Inc. after its acquisition of eMachines in 2004, Fry's must produce either data based on a proper allocation of the incentive payments to Fry's purchases of Gateway-brand computers alone, or documents and/or data sufficient for Class Plaintiffs to perform such allocation ....

September 27 Report at 4. In support of these rulings, the Special Master found: "(a) that the data are subject to production in this litigation if they are relevant and not unduly burdensome to produce; (b) that this standard applies here regardless of whether, as Fry's contends, the data are a trade secret; and (c) that because Fry's data are adequately protected by the Protective Order, the stricter standard that can govern whether trade secrets must be produced does not apply here ...." *Id.* at 3. He further found that "Class Plaintiffs, through the declarations of Jonathan M. Orszag submitted in support of their motion, have established the relevance of the data specified

in Class Plaintiffs' July 18 Proposal, and Fry's has not established that production of such data

would be unduly burdensome ...." *Id.*

## ARGUMENT

### I.    Fry's May Not Limit Its Production Based on Confidentiality Concerns

According to Fry's, its data are trade secrets that must be produced only to the extent that Class Plaintiffs show that the data are "necessary" for their case.  The Special Master, however, rejected this necessity standard, concluding that the data must be produced as long as they are relevant and not unduly burdensome to produce.  The Special Master reasoned that the stricter standard that can apply to discovery of trade secrets did not apply here because Fry's data were adequately protected by the Protective Order.

The Special Master's reasoning is sound.  The Protective Order was entered by the Court with the understanding that trade secrets would be produced in this litigation.  *See* Protective Order at 4 (acknowledging that preparation of these actions for trial may require discovery of trade secrets).  Indeed, the Court expected that data just like Fry's would be produced in this case.  Among the documents and data that the Protective Order specifically permits to be designated confidential, and thus to receive its protections, are:  "Non-public pricing information," "Non-public data concerning sales, revenues, profits, margin and variances," "Non-public customer lists," and "Non-public data concerning costs ...."  Protective Order, Definition M(1), (3), (6), (9).

The Court also understood that improper disclosure of trade secrets "would be competitively harmful to the producing party ...."  *Id.* at 4.  Indeed, the entire purpose of the Protective Order is to provide appropriate protections to avoid the competitive harm that the Court foresaw would otherwise occur.  Thus, the Protective Order takes confidentiality concerns off the table, leaving only privilege, lack of relevance and undue burden as grounds for resisting production of discovery.  In short, in light of the Protective Order's protections, Fry's cannot

assert confidentiality concerns as a basis for resisting or limiting its data production. *See In re Mercury Finance Co. of Ill.*, 1999 WL 495903, at \*6 (N.D. Ill. July 12, 1999) (rejecting effort to withhold documents on trade secret grounds because "the court ha[d] already approved a protective order which prevents the disclosure of 'trade secrets' outside the context of th[e] litigation."); *Fischer v. Cirrus Design Corp.*, 2005 WL 3159658, at \*7 (N.D.N.Y. Nov. 23, 2005) ("With the entry of a Rule 26(c) protective order in this case ... any confidential or trade secret information disclosed by the agency to the plaintiffs in this case will be amply protected."); *SRS Technologies, Inc. v. Physitron, Inc.*, 216 F.R.D. 525, 530 (N.D. Ala. 2003) (observing that defendants' objections to producing trade secret information had been rejected because "the Defendants were insulated by the protective order.").

The result is the same when one considers that for the necessity standard to apply, Fry's must do more than show that its data are a trade secret. It must also demonstrate that production of the data in this case would cause it harm. *See In re Indep. Serv. Orgs. Antitrust Litig.*, 162 F.R.D. 355, 356 (D. Kan. 1995) (cited in Objection at 5); *see also Cash Today of Texas v. Greenberg*, 2002 WL 31414138, at \*2 (D. Del. Oct. 23, 2002) (finding third party bears burden of "demonstrat[ing] by competent evidence that the information sought is a trade secret and that disclosure of the secret might be harmful" before necessary and proper standard applies); *Medtronic Ave., Inc. v. Advanced Cardiovascular Sys. Inc.*, 2004 WL 115594, at \*2 (D. Del. Jan. 13, 2004); *Coca-Cola Bottling Company of Shreveport v. Coca-Cola*, 107 F.R.D. 288, 292 (D. Del. 1985). For the reasons discussed above, Fry's has not demonstrated that production of the data under the circumstances here – namely, its ability to designate the data confidential under the Protective Order – would cause it harm.

Fry's conveniently overlooks the injury requirement when it suggests that a stricter standard applies whenever "a non-party objects to disclosure of its information on the basis that the information is trade secret, confidential, and protected by the right of privacy." Objection at 5 (citations omitted). However, only when the resisting party makes a specific, threshold showing of injury caused by disclosure does "the burden shift[] to the party seeking discovery to establish that disclosure of the trade secret is relevant and necessary to the litigation." *Cash Today*, 2002 WL 31414138, at *3 (applying injury requirement to nonparty).

In making a threshold showing of injury, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning" are insufficient; the specific injury to be suffered if disclosure is ordered must be articulated. *Medtronic*, 2004 WL 115594, at *2. Significantly, "[i]n determining if disclosure would be harmful, the court must consider 'not the injury that would be caused by public disclosure, *but the injury that would result from disclosure under an appropriate protective order.*'" *Cash Today*, 2002 WL 31414138, at *2. (quotations omitted; emphasis added). If the resisting party fails to make this showing, only the relevance standard applies. *See id.* at *3 (ordering non-party to produce purported trade secrets when nonparty failed to meet burden of showing "harm that [would] flow from disclosure of such information."). Fry's cannot make a showing of harm in light of the Special Master's finding that its data are adequately protected by the Protective Order.

Fry's does not argue otherwise. Indeed, Fry's makes no attempt to explain how it can have any confidentiality concerns, or how it can be injured by production of its data, when a protective order is in place specifically crafted to protect trade secrets and other highly sensitive information produced in discovery.

Fry's cases do not hold otherwise. *In re Indep. Service Orgs. Antitrust Litig.*, 162 F.R.D. 355 (D. Kan. 1995) and *Mannington Mills, Inc. v. Armstrong World Indus., Inc.,* 206 F.R.D. 525 (D. Del. 2002) are distinguishable. In both cases, the court determined that the protective order did not afford adequate protection for the discovery at issue. *See Indep. Service Orgs.*,162 F.R.D. at 358; *Mannington Mills*, 206 F.R.D. at 530. Here, the Court has found the opposite – that the Protective Order adequately protects trade secrets including specifically sales, purchase and incentives data.

Thus, Fry's argument that confidentiality concerns entitle it to produce even less than the data described in Class Plaintiffs' July 18 Proposal should be rejected.

## II.   **Fry's Has Not Demonstrated That the Data To Be Produced Are Trade Secrets**

Fry's has neither established that its data contain trade secrets nor demonstrated that the Special Master has made such a determination. During the September 11, 2007 hearing, the Special Master made clear: "I am not going to be examining [the issues] against questions of whether or not the information constitutes trade secret." September 11 Transcript at 7:21-22. He later reiterated: "I am not focused on the issue of whether the information, as you are presently seeking it, is a trade secret." *Id.* at 25:24-26:2. Indeed, the September 27 Report carefully avoids endorsing Fry's position that its data are a trade secret, concluding that the relevance standard applies "*regardless of whether, as Fry's contends*, the data are a trade secret." September 27 Report at 3 (emphasis added).

Nevertheless, Fry's argues that such a determination has already been made, relying on the Special Master's statement in the May 18 Report that "Fry's commercial or trade secrets are adequately protected under the Protective Order." May 18 Report at 22 (quoted in September 27 Report at 3). This is far from a finding that Fry's data are a trade secret. Indeed, the

characterization of Fry's data is mere dicta, as the point being made is that the Protective Order

adequately protects the data, and that is true, and dispositive, *whether or not* the data are deemed

a trade secret. Moreover, the appropriate characterization of Fry's data as of the May 18 Report

is irrelevant, as at that time Class Plaintiffs were seeking *transaction level* data for *all* computers

purchased and sold by Fry's. The data at issue now – described by Class Plaintiffs' July 18

Proposal and Fry's August 20 Proposal – (a) were defined through weeks of negotiations post-

dating the May 18 Report, (b) are aggregated by month and year, and (c) concern just a subset of

Fry's computer purchases and sales. Whether a broader set of disaggregated data is a trade

secret does not answer the question of whether a narrower set of aggregated data – which,

because of aggregation, do not reveal a single price actually paid or received by Fry's – is a trade

secret.[5]

Furthermore, Fry's cannot show that its data are trade secrets. Delaware law defines a

trade secret as:

> Information … that: a) Derives independent economic value, actual or potential,
> from not being generally known to, and not being readily ascertainable by proper
> means by, other persons who can obtain economic value from its disclosure or
> use; and b) is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

6 *Del. C.* § 2001(4). Fry's claim that the production described in the September 27 Report meets

this definition, and that Fry's will lose competitive advantage if compelled to produce such data

*(see* Objection at 6, 8), is flawed in several respects.

First, Fry's data described by Class Plaintiffs' July 18 Proposal almost entirely concerns

competitively obsolete transactions that occurred as early as 2000. With regard to vendor

---

[5] For the same reasons, Fry's reliance on an exchange during the September 11, 2007 hearing is misplaced. There
the Special Master merely agreed with Fry's statement that "the trade secret point" "had already been resolved and
that Your Honor had previously addressed in the context of the protective order." Objections at 8-9 (quoting
September 11 Transcript at 29:3-9).

incentives, the data relate to payments Fry's received from 2000 through 2006 – old news in the ever-changing computer world. *See* September 27 Report at ¶ 1. Fry's admits that "the average lifecycle for computers is approximately 13 weeks" and that, as a result, "new models are constantly replacing old models." Declaration of Rajesh Seth, April 17, 2007, ¶ 2. Thus, only a tiny fraction of the data produced by Fry's will pertain to computer models on which it currently competes.

Second, Fry's position from the outset has been that the purchase data Class Plaintiffs seek from Fry's are "identical" to the data they have subpoenaed from various computer manufacturers that sell to Fry's.[6] *See* February 9, 2007 letter from Brian Henri, attached as Exhibit G to Volin Cert. (Ex. 2 to D.I. 422). Fry's does not explain how it can simultaneously argue that such data are a trade secret and that identical data are in the possession of other entities. *See* Objection at 7. Similarly, Fry's retail prices cannot be a trade secret because they have been available at all times to anyone who visits its retail stores or its website, including any competitors that do in-store surveys of Fry's retail prices.

Third, the particular production Fry's must make here – the one described by the Special Master's September 27 Report – is a far cry from a full production of all responsive data in Fry's possession. Fry's production in this case will be just a sample of its data and will be aggregated by month and year. Such a production, because it is a sample, will not, as Fry's contends, reveal "what volume of sales Fry's has at any given point in time." Objection at 6. Because the data are aggregated, the production will not, as Fry's fears, disclose "what pricing and incentives

---

[6] Fry's took this position in a misconceived effort to convince Class Plaintiffs that they should seek data on Fry's computer purchases from its suppliers rather than from Fry's.

Fry's is able to negotiate from the computer manufacturers." *Id.* The aggregated data can only be used to calculate average, not actual, prices and incentive payments.[7]

In short, Fry's fails to "demonstrate by competent evidence that the information sought through discovery is a trade secret and that disclosure of the secret might be harmful." *Coca Cola Bottling Co.*, 107 F.R.D. at 292.

## III.    Fry's Proposed Modifications Would Deprive Class Plaintiffs of Even the Minimum Data They Need

Even if Fry's were right that a necessity standard applies here, Fry's proposed modifications of the September 27 Report should still be rejected. The modifications would result in a production that does not meet even the minimum needs of Class Plaintiffs in this litigation.

### A.    HP and Compaq Data Should Not Be Replaced by eMachines Data

The adequacy of a sample of Fry's data cannot be determined in the abstract. The sample must be representative of the whole, and to determine whether the data sample is representative requires knowledge of the full dataset. *See* Second Declaration of Jonathan M. Orszag, Aug. 10, 2007, ¶ 8, Ex. 2 to D.I. 560; September 11 Transcript at 17:1-14. But Fry's has steadfastly refused to provide adequate information about its data, making it difficult to determine with

---

[7] Fry's wrongly claims that its privately-held status gives it an advantage over publicly traded retailers, and that it would lose that advantage if it were compelled to produce the data at issue here. *See* Objection at 6. Fry's asserts without substantiation that publicly traded retailers, unlike Fry's, must disclose detailed data about their computer purchases and sales to the investing public. Publicly traded retailers, however, make no such disclosures. For example, CDW Corp. – a publicly traded third party subpoenaed in this action – discloses to the public very little about the financial incentives it receives, stating only that it "receive[s] incentives from vendors related to cooperative advertising allowances, volume rebates, bid programs, price protection and other programs," and providing no details about those incentives. CDW Corp. 2006 10-K at 17, attached hereto as Exhibit B. Moreover, even if Fry's enjoyed a competitive advantage through not being required to publicly disclose its purchase and sales data, it would not lose that advantage by making the production at issue here. Such data can be produced under the protections of the Protective Order, so that they will not be seen by Fry's competitors. Further, the data are aggregated and a mere sample; there would be little or no competitive consequence to Fry's if they were seen by Fry's competitors in that form. Finally, Fry's does not explain how it would be hurt competitively if it produces the data described by the September 27 Report, but not hurt if it produces the data described by its August 20 Proposal. Fry's purported concern for the competitive impact of producing its data here provides no basis for favoring its proposed production over the production the Special Master has recommended that it make.

certainty whether even Class Plaintiffs' July 18 Proposal provides an adequate sample. *See* Volin Cert. Ex. B, Ex. G at 2, Ex. H at 1-2, Ex. J at 2; Declaration of Daniel A. Small, Aug. 10, 2007, ¶ 11, Ex. 1 to D.I. 560. For Fry's August 20 Proposal, this problem is compounded by the fact that Fry's has not provided sufficient information about the sample itself, precluding any possibility that this Court could determine its adequacy.

Fry's only discloses three facts regarding its August 20 Proposal: (1) that during the relevant time period,

**REDACTED**

. Objection

at 10. Fry's omits basic information needed to assess the proposal's adequacy.

For example, Fry's does not disclose whether it sold each brand in each year. If Fry's data do not reflect such information, Class Plaintiffs would not be getting adequate diversity each year. *See* Second Declaration of Jonathan M. Orszag, ¶¶ 8-9. Fry's also does not reveal how its laptop and desktop sales have compared over the years. Thus, we do not know the significance of

**REDACTED**

. This could mean that the Toshiba data are too few to be meaningful. Or it could mean, for example, that the sample includes two small volume brands and no medium volume brand. Fry's also does not even say whether the three brands are small, medium and large volume, and if they are, whether, for example, one brand is both the large and medium volume brand, with both of the others being small volume brands. If Fry's seeks to use only one brand to satisfy two size categories, the sample would not provide adequate

volume diversity across brands. See *id.* For these reasons, among others, Fry's has not demonstrated the adequacy of its proposal, and the Court should reject it for that reason alone.

### B.    OEM Incentive Data Should Be Produced With Proper Allocation

Class Plaintiffs have explained the importance of accurate financial incentives data in determining Fry's net costs and conducting a pass through damages analysis. *See, e.g.* Orszag Decl., Ex. 2 to D.I. 440 at ¶ 4. Specifically, in discussing how incentives reduce net purchase costs, Mr. Orszag explains:

> Since a reasonably accurate measurement of this net cost is essential for Class Plaintiffs to carry out a reliable analysis of the extent to which Fry's and other intermediaries pass through changes in microprocessor or computer costs to their customers, the financial incentives data requested by Class Plaintiffs from Fry's and other third parties are an important part of Class Plaintiffs' class certification and damages analysis.

*Id.*

Here, three of the four OEMs relevant to Fry's production were involved in an acquisition during the Class Period – HP acquired Compaq in 2002 and Gateway acquired eMachines in 2004. The utility of the data regarding Fry's purchases of HP, Compaq and Gateway computers depends on the proper allocation of the incentive payments Fry's received from HP and Gateway post-acquisition. Because HP and Gateway likely offered incentives programs that were specific to a computer brand, their incentive payments must be allocated to Fry's purchases of the brand that generated the payments. Thus, for example, rebates earned by Fry's on purchases of Compaq-brand computers are an offset to the cost of those computers, but are not an offset to the price Fry's paid for HP-brand computers. It is essential, therefore, that Fry's produce its incentives data segregated according to the computer purchases that generated the incentives payments.

Fry's does not attack the merits of the Special Master's decision to require allocation of incentives information, but rather seeks to overturn the decision on the grounds that such allocation is "in excess of what was requested" by Class Plaintiffs' July 18 Proposal. *See* Objection at 11-13. Fry's is wrong.

As the Special Master found, the requirement to allocate the incentives data "is consistent with the Class Plaintiffs' proposal of July 16, 2007 as modified on July 19, 2007 [referred to herein as the July 18 Proposal] and as ultimately described in Class Plaintiffs' August 10, 2007 letter brief at Exhibit 3." September 27 Report at 1 n.1. The Special Master's finding is easily supported by the record. Exhibit 3 to Class Plaintiffs' August 10, 2007 letter brief was included to provide a full and definitive description of Class Plaintiffs' July 18 Proposal. With respect to the financial incentives data to be produced under that proposal, Exhibit 3 states:

> Fry's to provide, by OEM, yearly totals of all incentive payments received from HP, Compaq, Toshiba and Gateway for the years 2000-2006. *The incentives data must be specific to computers of the brand in question, and not include any incentives for other brands or non-computer products.* [Emphasis added.]

This language could not more clearly show that Class Plaintiffs' July 18 Proposal did in fact seek allocation of Fry's incentives data by computer brand.

In any event, Fry's protest on this issue is pointless. The August 6, 2007 stipulation and order, to which Fry's agreed, expressly authorized the Special Master to "choose either [Class Plaintiffs' or Fry's] proposal, the new 'middle' position [that either Fry's or Class Plaintiffs' could offer], or a *variation* of any of these as the appropriate resolution of the motion to compel." August 6 Stipulation & Order at 2 (emphasis added). Even if the incentives data allocation provision of the September 27 Report were a variation of Class Plaintiffs' July 27 Proposal, the Court's authority to make that variation was agreed to by Fry's and authorized by

the August 6 Stipulation and Order. Moreover, even if the Special Master could not recommend this variation, the Court could under its Rule 53(g)(1) authority to modify the Special Master's recommendations. Fry's "scope of authority" argument – the only basis it offers to challenge production of properly-allocated incentives data – is without merit.

## CONCLUSION

For the above reasons, the Special Master's well-supported and well-reasoned September 27 Report, entered after extensive proceedings before the Special Master, should be adopted, Fry's Objection thereto should be overruled, and its motion to modify the report should be denied.

November 6, 2007

PRICKETT, JONES & ELLIOTT, P.A.

By:   /s/ James L. Holzman
      James L. Holzman (#663)
      J. Clayton Athey (#4378)
      Laina M. Herbert (#4717)
      1310 King Street
      P.O. Box 1328
      Wilmington, DE  19899
      (302) 888-6500
      jlholzman @prickett.com
      jcathey@prickett.com
      lmherbert@prickett.com

*Interim Liaison Counsel for the Class Plaintiffs*

Of Counsel:

Michael D. Hausfeld
Daniel A. Small
Michael P. Lehmann
Brent W. Landau
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

Thomas P. Dove
Alex C. Turan
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone:    (415) 433-2070
Facsimile:    (415) 982-2076

Steven W. Berman
Anthony Shapiro
HAGENS BERMAN SOBOL
SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:    (415) 217-6810
Facsimile:    (415) 217-6813

*Interim Co-Lead Counsel for the Class Plaintiffs*