**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) )    MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION and INTEL KABUSHIKI KAISHA,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    Civil Action No. 05-441-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) )    Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF VINCENT NEIL SMITH IN SUPPORT OF PROPOSED
INTERVENOR UNION FEDERALE DES CONSOMMATEURS – QUE CHOISIR'S
LETTER BRIEF RE ESTABLISHING BRIEFING SCHEDULE FOR:**

**1)  MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF SEEKING
MODIFICATION TO PROTECTIVE ORDERS; AND**

**2)  APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER REQUIRING
INTEL AND THIRD PARTIES TO PROVIDE ACCESS TO DOCUMENTS AND
DEPOSITION TESTIMONY FOR USE IN FOREIGN PROCEEDINGS**

368572.1 1

I, Vincent Neil Smith, make the following declaration pursuant to 28 U.S.C. § 1746:

1. Except where otherwise stated, I make this declaration upon personal knowledge and I am competent to testify to the facts set forth herein.

2. I am a partner in the law firm of Cohen Milstein Hausfeld & Toll LLP. That firm is the London, England affiliate of the United States law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., counsel for the proposed intervenor Union Federale des Consommateurs – Que Choisir ("QC") in this matter. Until 30 April 2007 I was Senior Director for Competition and Director of the Competition Enforcement Division at the Office of Fair Trading (OFT), the United Kingdom's ("UK") principal public competition authority. In that capacity I led the OFT's first phase merger control, cartel enforcement and anti-trust enforcement and policy formation under the UK Competition Act of 1998 and Articles 81 and 82 of the EC Treaty and related legislation (the nearest US comparator to my former position is Director of the Bureau of Competition at the Federal Trade Commission).

3. Before this I was deputy divisional Director and head of competition policy at the OFT from 2002-2003 where I had overall responsibility (amongst other things) for the OFT's policy on the negotiations leading up to the adoption of Regulation 1/2003 (the principal procedural legislation governing EU public competition procedure). From 2000 to 2002 I was Director of Legal Services for competition matters at the UK Office of Telecommunications.

4. I qualified as a solicitor of the Supreme Court of England and Wales in November 1990 and from then until joining the government service in 2000 was in private legal practice, primarily in the City of London and in Brussels working on a wide variety of European and English law matters – including mergers and joint ventures in the UK and elsewhere, defending cartel proceedings (notably in the cement and carton board industries) and advising on a wide range of competition and trade law related issues.

5. I make this declaration in support of QC following the hearing before Special Master Poppiti in this matter on 22 April 2008, in which submissions were requested on the time-sensitivity of QC's motion to intervene and the application to provide access to documents (collectively,

"QC's Motion"). I address herein the status of the European Commission proceedings, and the timing of QC's participation in same.

6. The European Commission's Competition Directorate General ("DG Comp") sent a Statement of Objections ("SO") to Intel in this case on 26 July 2007 (A true and correct copy of the European Commission's press release announcing this is attached hereto as Exhibit 1). However, I am advised by QC that it was not shown to Advanced Micro Devices until December 2007 due to the need to redact from it information in respect of which Intel asserted the protection of confidentiality under Article 16 of Commission Regulation 773/2004 (the "Commission Regulation"). QC did not receive a summary of the (redacted) SO from the Commission until 7 March 2008 shortly before the hearing held in this case in Brussels on 11 and 12 March 2008.

7. With respect to the timing of the beginning of QC's involvement in the European Commission proceedings, DG Comp announced on 12 February 2008 that it had conducted unannounced inspections at the premises of a manufacturer of CPUs and a number of retailers of consumer computers in connection with this case. A true and correct copy of the Commission's press release is attached hereto as Exhibit 7. As pointed out in QC's Motion, Intel confirmed that its facilities in Germany were raided. *See* QC's Motion, at 7. Additionally, as also pointed out in QC's Motion, the French retailing group PPR was among those raided. *See id.* It was only after QC learned of the 12 February 2008 raid in France and the accompanying Intel raid, that it felt that a sufficient critical mass of information was in the public record (in particular regarding potential harm to consumers) so as to require of it an effort to participate in the EC proceedings. As discussed in the QC Motion, within approximately two weeks, and after consultation with internal and external legal counsel, on 26 February 2008 QC applied to the EC Hearing Officer to be heard as an interested party in the EC proceedings. *See id.*. On 06 March 2008, QC received permission to appear at the EC hearing. *See id.*

8. The hearings required under Article 12 of the Commission Regulation in respect of this case took place in Brussels at DG Comp premises on 11 and 12 March 2008. QC attended that hearing as a third party and made an oral submission. QC subsequently had a brief E-mail correspondence with the European Commission which confirmed that any further written

submission which related to matters raised at the hearing should be received by DG Comp by 26 March 2008. A true and correct copy of that French-language E-mail is attached hereto as Exhibit 2. I am fluent in French, and a true and correct translated copy of that E-mail prepared by me is attached hereto as Exhibit 3.

9. In this present US case in which QC seeks to intervene, the motion for class certification is due to be filed on 16 May, along with, as I understand is customary with such motions, an expert report from plaintiffs' economist that will be filed under seal, and is based in part on documents that have been marked as confidential in this case. I further understand that this report, as is customary, may address impact on consumers based on the assumption that Intel has in fact engaged in monopolization (which in Europe, is the equivalent to the prohibited "abuse of a dominant position"). QC anticipates that this report may be helpful to the Commission.

10. The next step in the European Commission proceedings will be for DG Comp to prepare a draft Decision on the basis of the evidence it has gathered and taking into account the representations from the parties and others which it has received. There is nothing in European law which prevents the European Commission from considering and sending fresh documentary evidence to the parties after it has issued the SO and on which it wishes to rely in its draft Decision, provided that the proposed addressees of the Decision have an adequate opportunity to submit their observations on the new documentation[1]. Where the new evidence requires a substantial change to the European Commission's case, the Commission may need to send a further SO supplementing its original SO, so as to set out fully the new case against the parties. However, where the new evidence tends to support the European Commission's existing case and the proposed addressees of the Decision have had a sufficient opportunity to comment, it is not necessary to restart the procedure by sending a supplementary SO.

11. The European Commission is not required to set any timetable for the procedure following the hearing, it would be rare for it to do so and it has not done so in this case. However (and

---

[1] *See* European Court of First Instance judgment in <u>Sarrio</u> – Case T 334/94 at 40-41 and <u>LRAF</u> – Case T 23/99 at 190. True and correct copies of both of these are attached hereto as Exhibits 4 and 5, respectively. Also, more generally on the issue of the Commission's ability to consider further evidence throughout the proceedings, see *Bellamy & Child, European Community Law of Competition*, 6 ed, OUP 2008 at para 13.106. A true and correct copy of this paragraph is attached hereto as Exhibit 6.

4

unless the Commission decides to issue a further SO) a Decision is normally issued by the European Commission (on recommendation from DG Comp) six to nine months after the hearing has taken place (so, in this case in the window September – December of this year).

12. Before making a final Decision the European Commission is required[2] to send a copy of the final draft Decision to the competition authorities of the 27 Member States of the EU ("NCAs") for their comment. Where there is significant disagreement among DG Comp and the NCAs a formal meeting of the Advisory Committee on Restrictive Practices and Dominant Positions, comprised of representatives of the NCAs, will be called and will issue an opinion of the Committee which will be put to the meeting of the European Commission at which the Decision is to be adopted. None of this procedure is public or open to the parties or to third parties. In practice this means that the draft decision which is put to the NCAs will be in a final form taking account of all the evidence the DG Comp has in its possession at that time. DG Comp will therefore normally allow 4-6 weeks before the date it wishes to publish the Decision to send the draft Decision to the NCAs for comment. In this case this could be as early as September 2008. It is therefore unlikely in my opinion that the Commission would wish to consider any evidence put to it after approximately mid-July of this year.

13. It is not currently clear how DG Comp will proceed following its recent raids in February of this year of, among other companies, Intel's premises in Germany and the French retailer PPR. DG Comp may open a new file solely against the retailers concerned, it may use any evidence it has found during the inspections to change its objections against Intel in the current proceeding, or it may combine these approaches. If DG Comp decides to change significantly the objections raised against Intel in this case, it would issue a further SO setting out the European Commission's revised case. Were this to happen, the timing outlined in paragraphs 9 and 10 above would be extended significantly. However, DG Comp would be in a significantly better position to consider further evidence from QC as well as from the parties. It is not DG Comp's usual practice to inform the parties or third parties of its exact approach to an investigation until the time it announces that the European Commission has sent a (further) SO.

---

[2] *See* Article 14 of Regulation 1/2003, a true and correct copy of which is attached hereto as Exhibit 8.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 28th day of April, 2008, at London, England.

Vincent Neil Smith
Solicitor, Supreme Court of England & Wales
Cohen, Milstein, Hausfeld & Toll LLP
25 Southampton Buildings
LONDON WC2A 1AL
UK
Phone:        +44 20 3170 7725
Facsimile:    +44 20 3170 7729