its obligation to respect the undertakings' right to be heard. In doing so, it provides them with the necessary means to defend themselves not only against the finding of an infringement but also against the imposition of fines (Joined Cases 100/80 to 103/80 *Musique diffusion française and Others* v *Commission* [1983] ECR 1825, paragraph 61).

200.  It follows that, so far as concerns the determination of the amount of the fines, the rights of defence of the undertakings concerned are guaranteed before the Commission by virtue of the fact that they have the opportunity to make their submissions on the duration, the gravity and the anti-competitive nature of the matters of which they are accused. Moreover, the undertakings have an additional guarantee, as regards the setting of that amount, in that the Court of First Instance has unlimited jurisdiction and may in particular cancel or reduce the fine pursuant to Article 17 of Regulation No 17 (Case T-83/91 *Tetra Pak* v *Commission* [1994] ECR II-755, paragraph 235).

201.  In that regard, the Commission explained, on pages 53 and 54 of the statement of objections sent to the applicant, the duration of the infringement which it proposed to find in the applicant's case.

202.  Then, on pages 57 and 58 of the statement of objections, the Commission set out its reasons for considering that the present infringement was a very serious infringement and also the factors constituting aggravating circumstances, namely the manipulation of the procedures for submitting tenders; the aggressive implementation of the cartel in order to ensure the compliance of all the participants in the agreements and to exclude the only competitor of any importance which did not participate in the agreements; and the fact that the infringement continued after the investigations had been carried out.

203.  At the same place, the Commission stated that, in assessing the fine to be imposed on each individual undertaking, it would take into account, *inter alia*, the role played by each of them in the anti-competitive practices, all the substantial differences as regards the duration of their participation, their importance in the district heating sector, their turnover in the district heating sector, their total turnover, if appropriate, in order to take account of the level and economic power of the undertaking in question and to ensure a sufficiently deterrent effect and, last, all the mitigating circumstances.

204.  Then, on page 58 of the statement of objections, the Commission observed, as regards the applicant, that it had played a leading role in the cartel, that it was the second largest producer of district heating pipes and that it played an active role in all the activities of the cartel, even though that role was minor compared with ABB's.

205.  In doing so, the Commission set out in the statement of objections the elements of fact and of law on which it would base the calculation of the fine to be imposed on the applicant, so that, in that regard, the applicant's right to be heard was duly observed.

206.  Since it had indicated the elements of fact and of law on which it was to base its calculation of the fines, the Commission was under no obligation to explain the way in which it would use each of those elements in determining the level of the fine. To give indications as regards the level of the fines envisaged, before the undertaking has been invited to submit its observations on the allegations against it, would be to anticipate the Commission's decision and would thus be inappropriate (*Musique diffusion française and Others* v *Commission*, cited above, paragraph 21, and Case 322/81 *Michelin* v *Commission* [1983] ECR 3461, paragraph 19).

207.  Nor, consequently, was the Commission bound to inform the undertakings concerned, during the administrative procedure, that it intended to use a new method to calculate the amount of the fines.

208.  In particular, the Commission was not bound to mention, in the statement of objections, the possibility of a change in its policy as regards the level of the fines, a possibility which depended on general considerations of competition policy having no direct relationship with the particular circumstances of these cases (*Musique diffusion française* v *Commission*, cited above, paragraph 22). The Commission is not under an obligation to put undertakings on notice by warning them of its intention to increase the general level of fines (Case T-12/89 *Solvay* v *Commission*, cited above, paragraph 311).

209.  It follows that the applicant's right to be heard did not place the Commission under an obligation to

inform it of its intention to apply the new guidelines in its case.

210.    For all those reasons, the complaint relating to a breach of the right to be heard must also be rejected in so far as it concerns the application of the guidelines on the method of setting fines.

III - *Third plea in law, alleging infringement of general principles and errors of fact in assessing the fine*

A - *Infringement of the principle of non-retroactivity*

1. Arguments of the parties

211.    The applicant complains that the Commission infringed the principle of non-retroactivity by applying the new guidelines in its case, when it had cooperated with the Commission without being aware of the Commission's intention to change fundamentally its policy on fines.

212.    The applicant states that the fines provided for in Article 15 of Regulation No 17 are of a criminal-law nature and are therefore covered by Article 7 paragraph 1 of the European Convention for the Protection of Human Rights and Fundamental Freedoms (the Convention), which prohibits the imposition of penalties more severe than those applicable when the offence in question was committed. It is therefore contrary to Article 7 paragraph 1 of the Convention to apply retroactively the new legal rules which the Commission imposed on itself as concerns the determination of the amount of the fine, which are of a normative character and binding on the Commission. Even if these new rules were not regarded as being of a normative character, but merely as being a change in the Commission's practice, the application of the norms resulting from such a change is contrary to the principles contained in Article 7 paragraph 1 of the Convention. It follows, in particular, from the case-law of the European Court of Human Rights that these principles also apply to changes in case-law.

213.    The applicant accepts that, normally, the Commission is entitled to increase the general level of the fines without prior warning. In the present case, however, the Commission fundamentally changed its policy and practice on fines and was therefore obliged to give prior warning, particularly where, as in the applicant's case, an undertaking has voluntarily submitted self-incriminating evidence without being aware of that fundamental change.

214.    The guidelines actually lead, for undertakings in the applicant's position, to a systematic increase in the level of fines. Because the fines are calculated on the basis of absolute amounts, the guidelines impose a method of calculation which affects small and medium-sized undertakings much more severely than a system under which the fine is wholly or partly dependent on the turnover of the undertaking concerned.

215.    The defendant replies that the new guidelines merely set out the framework within which the Commission proposes to apply Article 15 of Regulation No 17 and do not alter that framework. The Commission could have imposed precisely the same fine on the applicant without ever adopting the new guidelines.

216.    Furthermore, the guidelines represent a change in the Commission's general approach to setting fines and do not necessarily entail an increase in the level of the fine in a specific case. Even if the purpose of the guidelines were to impose higher penalties, that would be entirely compatible with the case-law.

2. Findings of the Court

217.    It is settled case-law that fundamental rights form an integral part of the general principles of Community law whose observance is ensured by the Community judicature (see, in particular, Opinion 2/94 of the Court of Justice of 28 March 1996 [1996] ECR I-1759, paragraph 33, and Case C-299/95 *Kremzow* [1997] ECR I-2629, paragraph 14). For that purpose, the Court of Justice and the Court of First Instance draw inspiration from the constitutional traditions common to the Member States and from the guidelines supplied by international treaties for the protection of human rights on which the Member States have collaborated and to which they are signatories. The Convention has special significance in that respect (*Kremzow*, cited above, paragraph 14, and Case T-112/98

*Mannesmannröhren-Werke* v *Commission* [2001] ECR II-729, paragraph 60). Furthermore, paragraph 2 of Article F of the Treaty on European Union (now, after amendment, Article 6(2) EU) provides that the Union shall respect fundamental rights, as guaranteed by the [Convention] and as they result from the constitutional traditions common to the Member States, as general principles of Community law.

218.  Article 7 paragraph 1 of the Convention provides that [n]o one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence under national or international law at the time when it was committed and that a heavier penalty [shall not] be imposed than the one that was applicable at the time the criminal offence was committed.

219.  The principle that penal provisions may not have retroactive effect is one which is common to all the legal orders of the Member States and is enshrined in Article 7 of the Convention as a fundamental right; it takes its place among the general principles of law whose observance is ensured by the Community judicature (Case 63/83 *Kirk* [1984] ECR 2689, paragraph 22).

220.  Although Article 15(4) of Regulation No 17 provides that Commission decisions imposing fines for infringement of competition law are not of a criminal nature (*Tetra Pak*, cited above, paragraph 235), the Commission is none the less required to observe the general principles of Community law, and in particular the principle of non-retroactivity, in any administrative procedure capable of leading to fines under the Treaty rules on competition (see, by analogy, *Michelin* v *Commission*, cited above, paragraph 7).

221.  Such observance requires that the fines imposed on an undertaking for infringing the competition rules correspond with those laid down at the time when the infringement was committed.

222.  In that regard, the fines which the Commission is able to impose for infringement of the Community rules on competition are defined in Article 15 of Regulation No 17, which was adopted before the date on which the infringement was committed. The Commission is not empowered to amend Regulation No 17 or to depart from it, even by rules of a general nature which it imposes on itself. Although it is common ground that the Commission assessed the fine imposed on the applicant in accordance with the general method for setting fines set out in the guidelines, in doing so it remained within the framework of the fines set out in Article 15 of Regulation No 17.

223.  Article 15(2) of Regulation No 17 provides that [t]he Commission may by decision impose on undertakings or associations of undertakings fines of from 1 000 to 1 000 000 units of account, or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently[,] ... they infringe Article 85(1) ... of the Treaty; and that [i]n fixing the amount of the fine, regard shall be had both to the gravity and to the duration of the infringement.

224.  The first paragraph of Section 1 of the guidelines provides that, in setting fines, the basic amount is to be determined according to the gravity and duration of the infringement, which are the only criteria referred to in Article 15(2) of Regulation No 17.

225.  According to the guidelines, the Commission is to take as the starting point in calculating the amount of the fines an amount determined according to the gravity of the infringement (the general starting point). In assessing the gravity of the infringement, account must be taken of its nature, its actual impact on the market, where this can be measured, and the size of the relevant geographic market (first paragraph of Section 1.A). Within that framework, infringements are to be put into one of three categories: minor infringements, for which the likely fines are between ECU 1 000 and ECU 1 000 000, serious infringements, for which the likely fines are between ECU 1 million and ECU 20 million, and very serious infringements, for which the likely fines are above ECU 20 million (first to third indents of the second paragraph of Section 1.A). Within each of these categories, and in particular as far as serious and very serious infringements are concerned, the proposed scale of fines is to make it possible to apply differential treatment to undertakings according to the nature of the infringement committed (third paragraph of Section 1.A). It is also necessary to take account of the effective economic capacity of offenders to cause significant damage to other operators, in particular consumers, and to set the fine at a level which ensures that it has a sufficiently deterrent effect (fourth paragraph of Section 1.A).

226. Account may also be taken of the fact that large undertakings usually have legal and economic knowledge and infrastructures which enable them more easily to recognise that their conduct constitutes an infringement and be aware of the consequences stemming from it under competition law (fifth paragraph of Section 1.A).

227. It may be necessary in some cases to apply weightings to the amounts determined within each of the three categories in order to take account of the specific weight and, therefore, the real impact of the offending conduct of each undertaking on competition, particularly where there is considerable disparity between the sizes of the undertakings committing infringements of the same type. Consequently, it may be necessary to adapt the general starting point according to the specific nature of each undertaking (the specific starting point) (sixth paragraph of Section 1.A).

228. As regards the factor relating to the duration of the infringement, the guidelines draw a distinction between infringements of short duration (in general, less than one year), for which the amount determined for gravity should not be increased, infringements of medium duration (in general, one to five years), for which the amount determined for gravity may be increased by up to 50%, and infringements of long duration (in general, more than five years), for which the amount determined for gravity may be increased by 10% per year (first to third indents of the first paragraph of Section 1.B).

229. The guidelines then set out, by way of example, a list of aggravating and attenuating circumstances which may be taken into consideration in order to increase or reduce the basic amount and refer to the Commission notice of 18 July 1996 on the non-imposition or reduction of fines in cartel cases (OJ 1996 C 207, p. 4) (the leniency notice).

230. By way of general comment, it is stated that the final amount calculated according to this method (basic amount increased or reduced on a percentage basis) may not in any case exceed 10% of the worldwide turnover of the undertakings, as laid down by Article 15(2) of Regulation No 17 (Section 5 (a)). The guidelines further provide that, depending on the circumstances, account should be taken, once the above calculations have been made, of certain objective factors such as a specific economic context, any economic or financial benefit derived by the offenders, the specific characteristics of the undertakings in question and their real ability to pay in a specific social context, and that the fines should be adjusted accordingly (Section 5(b)).

231. It follows that, under the method laid down in the guidelines, the fines continue to be calculated according to the two criteria referred to in Article 15(2) of Regulation No 17, namely the gravity of the infringement and its duration, and the maximum percentage of turnover of each undertaking as laid down in that provision is observed.

232. Consequently, the guidelines cannot be regarded as going beyond the legal framework of the fines set out in that provision.

233. Nor, contrary to what the applicant claims, does the change brought about by the guidelines, compared with the Commission's existing administrative practice, constitute an alteration of the legal framework determining the fines which can be imposed and it is not, therefore, contrary to the principles contained in Article 7 paragraph 1 of the Convention.

234. First, the Commission's practice in previous decisions does not itself serve as a legal framework for the fines imposed in competition matters, since that framework is defined solely in Regulation No 17.

235. Second, having regard to the wide discretion which Regulation No 17 leaves to the Commission, the fact that the latter introduces a new method of calculating fines, which may, in certain cases, lead to increased fines, but does not exceed the maximum level established by that regulation, cannot be regarded as an aggravation, with retroactive effect, of the fines as legally provided for by Article 15 of Regulation No 17, which infringes the principles of legality and legal certainty.

236. It is of no avail to argue that if fines are set according to the method described in the guidelines, in particular on the basis of an amount determined, in principle, according to the gravity of the infringement, the Commission will then impose higher fines than previously. It is settled case-law that the gravity of infringements has to be determined by reference to numerous factors, such as the

particular circumstances of the case, its context and the dissuasive effect of fines; moreover, no binding or exhaustive list of the criteria which must be applied has been drawn up (order in Case C-137/95 P *SPO and Others* v *Commission* [1996] ECR I-1611, paragraph 54; judgment in Case C-219/95 P *Ferriere Nord* v *Commission* [1997] ECR I-4411, paragraph 33; see also Case T-295/94 *Buchmann* v *Commission* [1998] ECR II-813, paragraph 163). It is also settled case-law that under Regulation No 17 the Commission has a margin of discretion when fixing fines, in order that it may direct the conduct of undertakings towards compliance with the competition rules (Case T-150/89 *Martinelli* v *Commission* [1995] ECR II-1165, paragraph 59, Case T-49/95 *Van Megen Sports* v *Commission* [1996] ECR II-1799, paragraph 53, and Case T-229/94 *Deutsche Bahn* v *Commission* [1997] ECR II-1689, paragraph 127).

237.    Furthermore, according to the case-law, the fact that in the past the Commission imposed fines of a certain level for certain types of infringement does not mean that it is estopped from raising that level within the limits indicated in Regulation No 17 if that is necessary to ensure the implementation of Community competition policy (*Musique diffusion française and Others* v *Commission*, paragraph 109, Case T-12/89 *Solvay* v *Commission*, paragraph 309, and Case T-304/94 *Europa Carton* v *Commission* [1998] ECR II-869, paragraph 89). The proper application of the Community competition rules in fact requires that the Commission may at any time adjust the level of fines to the needs of that policy (*Musique diffusion française and Others* v *Commission*, paragraph 109).

238.    For all those reasons, the complaint alleging infringement of the principle of non-retroactivity must be rejected.

   B - *Infringement of the principle of protection of legitimate expectations*

   1. Arguments of the parties

239.    The applicant maintains that the application of a new policy in calculating the fines, after it had voluntarily submitted self-incriminating evidence, is contrary to the principle of legitimate expectations. It is, it alleges, entitled to rely on the Commission's practice with regard to the setting of fines which was applicable at the time when it approached the Commission. The Commission's discretion was circumscribed, in these circumstances, by the fact that the applicant cooperated with it on the basis of the method of setting fines set out in Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 - Cartonboard), and in the Draft Commission notice on the non-imposition or the mitigation of fines in cartel cases (OJ 1995 C 341, p. 13, hereinafter the draft leniency notice), upon which both the applicant and the Commission relied at the time.

240.    The defendant contends that it follows from the case-law that offenders against the competition rules have no right to a particular level of fines. Nor can the applicant maintain that, when it decided to submit documents, it relied on the leniency notice, only to find that the fining policy had been changed by the new guidelines. The Commission complied in full with the letter and the spirit of that notice by reducing the fine by 30%. Since the notice does not deal with the calculation of the basic fine, it could not give the undertakings concerned an expectation as to the level of the fine prior to its reduction under that notice.

   2. Findings of the Court

241.    As regards the setting of fines for infringements of the competition rules, the Commission exercises its powers within the limits of the discretion conferred on it by Regulation No 17. It is settled case-law that traders cannot have a legitimate expectation that an existing situation which is capable of being altered by the Community institutions in the exercise of their discretion will be maintained (see Case 245/81 *Edeka* [1982] ECR 2745, paragraph 27, and Case C-350/88 *Delacre and Others* v *Commission* [1990] ECR I-395, paragraph 33).

242.    On the contrary, the Commission is entitled to raise the general level of fines, within the limits laid down in Regulation No 17, if that is necessary to ensure the implementation of the Community competition policy (see the case-law cited in paragraph 237 above).

243.    It follows that undertakings involved in an administrative procedure which may lead to a fine cannot

acquire a legitimate expectation that the Commission will not exceed the level of fines previously applied.

244. As regards the expectation which the applicant allegedly derived from the Cartonboard decision, in particular as concerns the reduction for cooperating during the administrative procedure, the mere fact that the Commission has in its previous decisions granted a certain rate of reduction for specific conduct does not imply that it is required to grant the same proportionate reduction when assessing similar conduct in a subsequent administrative procedure (see, in relation to attenuating circumstances, Case T-374/94 *Mayr-Melnhof* v *Commission* [1998] ECR II-1751, paragraph 368).

245. In any event, the Commission could not apply in the present case the policy current at the time of the adoption of the Cartonboard decision, as it had since adopted its leniency notice, published on 18 July 1996. Since that date, the Commission has created a legitimate expectation amongst undertakings that the criteria set out in that notice will be applied, and is now therefore bound to apply them.

246. In that regard, it should be emphasised that when the applicant approached the Commission it had no reason to believe that the Commission would apply to its case the method described in its draft leniency notice, since it was quite clear from that document, which was published in the Official Journal, that it was a draft. The draft was accompanied by a statement in which the Commission announced that it intended to issue a notice concerning the non-imposition or mitigation of fines in cases where undertakings cooperated in the preliminary investigation or proceedings in respect of an infringement, and that, before adopting the notice, it invited all interested persons to submit their written observations on the draft. The only effect of that such a draft could have was to warn the undertakings concerned that the Commission intended to issue a notice on the subject.

247. In so far as the applicant's reasoning is based on the hypothesis that the Commission did not comply with the leniency notice, its arguments are the same as those based on a misapplication of the notice.

248. It follows that the complaint must be rejected in so far as it alleges infringement of the principle of protection of legitimate expectations.

C - *Infringement of the principles of equal treatment and proportionality, and legality of the guidelines*

1. Arguments of the parties

249. The applicant puts forward a number of arguments to substantiate its contention that the Commission imposed an excessive and discriminatory fine on it, thus infringing both the principle of equal treatment and the principle of proportionality.

250. First, in taking as the starting point for setting the fine abstract amounts based solely on the gravity of the infringement, the Commission discriminated against small and medium-sized undertakings. The Commission classified the undertakings concerned in four categories, according to size. As the specific starting point which it fixed for ABB, an undertaking in the first category, was less than 10% of its turnover, the method of calculation made it possible to give full effect to all the relevant factors for the determination of the final amount of the fine. For the applicant and the other undertakings belonging to the second and third categories, however, which were smaller than ABB, the specific starting points were so high that the effects of those factors were absorbed by the need to go below the limit of 10% of turnover imposed by Regulation No 17.

251. Consequently, the Commission has discriminated against small and medium-sized undertakings, contrary to its general policy to treat companies which are active essentially in the field covered by the infringement less severely than multinationals active simultaneously in numerous sectors. The Commission's conduct is also contrary to Article 130(1) of the EC Treaty (now Article 157(1) EC), which provides that the Commission is to encourage an environment favourable to initiative and the development of, in particular, small and medium-sized undertakings.

252. Second, the calculation method used by the Commission meant that the undertakings in the second and third categories were fined basic amounts higher than the limit of 10% of turnover laid down in Article 15(2) of Regulation No 17. The applicant submits that that limit cannot be exceeded at any point in the

calculation. If the Commission were at liberty to calculate the fine on basic amounts exceeding the 10% limit, any adjustment which it made to the amount of the fine would be purely illusory and devoid of any impact on the final amount of the fine, which in any event is equal to 10% of total turnover.

253.   In its reply, the applicant adds that Section 5(a) of the guidelines states that the final amount calculated according to [the] method (basic amount increased or reduced on a percentage basis) may not in any case exceed 10% of the turnover of the undertakings. The guidelines themselves do not therefore permit a calculation giving a result in excess of the limit of 10% of turnover.

254.   The applicant observes that, in order to take account of the limit of 10% of turnover, when it calculated the fine after taking the mitigating circumstances into account but before it reduced the amount to make allowance for cooperation, the Commission reduced the fines, for the undertakings in the second and third categories, to the highest legally permissible level. In the applicant's case, the fine which had been set before the reduction for cooperation was applied was ECU 12 700 000, or exactly 10% of its turnover.

255.   Third, the Commission set the fines at a level which does not reflect the individual size of the undertakings. Although the Commission's previous practice had been to base fines on turnover from the products to which the infringement related, in the present case it reduced the applicant's fine to 10% of its total turnover. The Commission is obliged, when setting the fine, to take into account each of those turnover figures in order to take account of the size and presence of the undertakings concerned on the various markets.

256.   On this point, the applicant further observes that the Commission ignored the reality of the applicant's situation by classifying it as an undertaking essentially specialising in the product in question, whereas, in reality, its turnover on the relevant market represents only 36.8% of its overall turnover. Owing to that incorrect assessment of the applicant's situation, the fine was disproportionate to its turnover on the relevant market. The method employed to set the fine had the effect of discriminating against the applicant by comparison with undertakings in the third category, since the difference between the fines imposed on those undertakings and that imposed on the applicant is disproportionate to the differences in their size.

257.   Fourth, by calculating the amounts of the fines on the basis of amounts above the legally permissible ceiling, the Commission deprived itself of the possibility of taking into consideration the other factors which are to be taken into account in assessing the gravity of the infringement. Thus, the Commission did not calculate the amount of the fines according to the profit each of the undertakings concerned had made on the relevant market, although the need to take that factor into account has been recognised in the case-law of the Court of Justice and also in the Commission's own practice set out in the *XXIst Report on Competition Policy*. The Commission did not take into consideration the fact that the applicant did not make excessive profits during the period of the alleged infringement. The applicant cannot understand how the other factors on which the Commission relied in order to set the fine could, as it claims, reflect the notional profits made by each undertaking.

258.   Last, the fine is disproportionate in that the Commission failed to take into account the applicant's ability to pay the fine and thus set it at a level that threatens its survival. The Commission's previous practice has frequently been to impose lower fines than normal when the undertakings concerned were in financial difficulties. In the guidelines, moreover, the Commission expressed its intention to take account of undertakings' real ability to pay in a specific social context and to adjust the fines accordingly. Undertakings derive legitimate expectations from that intention. In that regard, the applicant states that it suffered heavy losses in 1997 and 1998, which, combined with the fine, have caused a loss in excess of the net value of its own equity. In order to avoid insolvency and to obtain the funds to pay the fine, the applicant had to sell the majority of its industrial and commercial activities and also the name Løgstør Rør. Even though the applicant still exists as a legal person, it has therefore been eliminated from the relevant market.

259.   The applicant states that the Commission's aim in setting the amount of fines should be deterrent and not be liable to eliminate undertakings from the relevant market, thus damaging competition in the relevant sector. Fixing the fines at such a high level may lead to the disappearance from the market of ABB's two main competitors, the applicant and Tarco.

260. In so far as the Commission, in order to fix the excessive and discriminatory amount of the fine, based itself on its new guidelines when calculating the amount of the fines, the applicant claims that the guidelines are illegal under Article 184 of the EC Treaty (now Article 241 EC). The Commission, it alleges, determined in the guidelines basic amounts for the calculation of the fine which are so high that they deprive it of its discretion under Article 15(2) of Regulation No 17 to take into account all relevant factors, including any mitigating circumstances.

261. The Commission observes, first, that the allegation that it discriminated against the applicant in determining the amounts used to calculate the fines is unfounded.

262. Its use of a single figure of ECU 20 million as a starting point for all the offenders cannot be regarded as discriminatory, since that amount was subsequently adjusted, depending on the offender and the gravity of its participation in the infringement. The Commission explicitly took account of the difference in size and economic capacity of the undertakings concerned, in particular by raising the initial amount to be imposed on ABB. The fine of ECU 8.9 million imposed on the applicant, instead of being fixed at the highest permissible level, is below the maximum limit authorised by Regulation No 17.

263. Furthermore, even if ABB had received unduly favourable treatment compared with the applicant, that should not lead to a reduction of the fine imposed on the applicant, since a person may not rely, in support of his claim, on an unlawful act committed in favour of a third party. In any event, the applicant cannot claim to be a medium-sized undertaking. As regards Article 130 of the Treaty, in view of its general nature, it seems scarcely conceivable that a measure could ever be annulled on the ground that it was incompatible with that provision.

264. The defendant further denies that the amounts used in calculating the fines cannot at any time be more than 10% of turnover. What matters for the purpose of the limit laid down in Article 15(2) of Regulation No 17 is only the final result of the calculation of the fine, not the amounts used when calculating it. The Commission could have used a starting point lower than 10% of turnover which would have resulted in a fine of the same amount. Where the application of the criteria in the guidelines leads to a figure above the maximum limit, there is nothing to prevent the Commission from reducing the amount to a sum corresponding precisely to that limit before applying the criteria in the leniency notice. In so far as the applicant relies it its reply on the wording of Section 5(a) of the guidelines, it is submitting a new argument which is inadmissible under Article 48(2) of the Rules of Procedure of the Court of First Instance.

265. Furthermore, the interpretation of the limit of 10% of turnover advocated by the applicant is unfounded, since it would mean that the Commission was required to begin the calculation at an abnormally low level in order to ensure that that limit was not exceeded at any point in the calculation, with the result that a starting point might be fixed that was not consistent with the criteria set out in the guidelines. Using that method, the entire calculation would have to be made backwards and the starting point would only become clear at the end of the operation. Such a method would be arbitrary and would lead the Commission to disregard the circumstances of each individual case.

266. The Commission is entitled to impose a fine which does not exceed 10% of an undertaking's world-wide turnover. Although it has often taken into consideration the turnover on the relevant market as the starting point for the calculation of the fines, it was under no obligation to follow its former practice. In calculating the amount of fines, it must take a large number of factors into account and not attach disproportionate importance to a single turnover figure. In any event, the Commission's previous practice was not invariable, since fines have also been determined by reference to turnover other than that on the relevant market or to the profits made by the parties to the infringement.

267. The decision stated that the applicant specialised in a single product, but did not say that it only manufactured one product. The description of the applicant as essentially a single-product company is not incorrect since, according to the information provided by the applicant itself, pre-insulated pipes accounted for approximately 80% of its world-wide turnover at the time of the investigation. Furthermore, the Commission relied on that factor solely in order to distinguish the applicant from ABB and to reduce the starting point for the fine from ECU 20 million to ECU 10 million.

268. The Commission is under no obligation to take into account the profits derived from the infringement. It is generally difficult to determine what profits each undertaking has derived from its participation in the

infringement, and that would have been so particularly in the present case. In any event, the other factors relied on by the Commission are deemed to reflect the theoretical profits made by each undertaking. Where there has been a serious and deliberate infringement of Article 85 of the Treaty, that infringement may be considered to be sufficiently important for the Commission not to attach particular importance to the actual profits.

269. Nor is the Commission required to take account of an undertaking's poor financial situation when fixing the amount of the fine, provided that it remains below the maximum limit laid down in Regulation No 17. In the present case, the applicant has not shown that its existence was threatened by the fine or that the sale of its business was necessary because of the obligation to pay the fine. Such a step may have been taken for various reasons and cannot therefore be tantamount to the elimination of the undertaking from the relevant market.

270. As the fine is neither excessive nor discriminatory, the applicant has no reason to challenge the legality of the guidelines. Nor is it true to claim that, by adopting the guidelines, the Commission bound itself in such a way that it no longer took account of any attenuating circumstances or of the role played by the various participants in the cartel.

2. Findings of the Court

271. It should be observed that, together with its arguments alleging infringement of the principles of equal treatment and of proportionality, the applicant has submitted an objection of illegality, under Article 184 of the Treaty, in respect of the guidelines, in so far as the Commission, in adopting those guidelines, deprived itself of its discretion under Regulation No 17 to take account of the size of the individual undertakings and the role which each of them played in an infringement. That objection of illegality must be examined first.

- The objection of illegality in respect of the guidelines

272. It is settled case-law that Article 184 of the Treaty expresses a general principle conferring upon any party to proceedings the right to challenge, for the purpose of obtaining the annulment of a decision of direct and individual concern to that party, the validity of previous acts of the institutions which, although they are not in the form of a regulation, form the legal basis of the decision under challenge, if that party was not entitled under Article 173 of the Treaty to bring a direct action challenging those acts by which it was thus affected without having been in a position to ask that they be declared void (Case 92/78 *Simmenthal* v *Commission* [1979] ECR 777, paragraphs 39 and 40).

273. Since Article 184 of the Treaty is not intended to enable a party to contest the applicability of any measure of general application in support of any action whatsoever, the general measure claimed to be illegal must be applicable, directly or indirectly, to the issue with which the action is concerned and there must be a direct legal connection between the contested individual decision and the general measure in question (Case 21/64 *Macchiorlati Dalmas e Figli* v *High Authority* [1965] ECR 175, at 187 and 188; Case 32/65 *Italy* v *Council and Commission* [1966] ECR 389, at 409; Joined Cases T-6/92 and T-52/92 *Reinarz* v *Commission* [1993] ECR II-1047, paragraph 57).

274. As regards the guidelines, it should be noted that the Commission stated, in the opening paragraphs: The principles outlined here should ensure the transparency and impartiality of the Commission's decisions, in the eyes of the undertakings and of the Court of Justice alike, while upholding the discretion which the Commission is granted under the relevant legislation to set fines within the limit of 10% of ... turnover [and] ...[t]he new method of determining the amount of a fine will adhere to the following rules. It follows that, although the guidelines do not constitute the legal basis of the contested decision, which is based on Articles 3 and 15(2) of Regulation No 17, they determine, generally and abstractly, the method which the Commission has bound itself to use in assessing the fines imposed by the decision and, consequently, ensure legal certainty on the part of the undertakings.

275. Furthermore, it is common ground that the Commission assessed the fine imposed on the applicant in accordance with the general method which it laid down for itself in the guidelines (see paragraph 222 above).

276. In the present case, therefore, there is a direct legal connection between the contested individual decision and the general measure represented by the guidelines. Since the applicant was not in a position to ask that the guidelines be declared void, as a general measure, the guidelines may form the subject-matter of an objection of illegality.

277. In that context, it should be observed that, as stated in paragraphs 223 to 232 above, the Commission, in publishing in the guidelines the method which it proposed to apply in setting the fines imposed under Article 15(2) of Regulation No 17, remained within the legal framework laid down by that provision.

278. Contrary to what the applicant claims, the Commission is not required, when assessing fines in accordance with the gravity and duration of the infringement in question, to calculate the fines on the basis of the turnover of the undertakings concerned, or to ensure, where fines are imposed on a number of undertakings involved in the same infringement, that the final amounts of the fines resulting from its calculations for the undertakings concerned reflect any distinction between them in terms of their overall turnover or their turnover in the relevant product market.

279. In that regard, it is settled case-law that the gravity of the infringements must be established in accordance with numerous factors, such as, *inter alia*, the particular circumstances of the case, its context and the deterrent nature of the fines, although no binding or exhaustive list of criteria which must necessarily be taken into account has been drawn up (see the case-law cited in paragraph 236 above).

280. The criteria for assessing the gravity of the infringement may include the volume and value of the goods in respect of which the infringement was committed, the size and economic power of the undertaking and, consequently, the influence which it was able to exert on the market. It follows that, on the one hand, it is permissible, for the purpose of fixing the fine, to have regard both to the total turnover of the undertaking, which gives an indication, albeit approximate and imperfect, of the size of the undertaking and of its economic power, and to the proportion of that turnover accounted for by the goods in respect of which the infringement was committed, which gives an indication of the scale of the infringement. On the other hand, it follows that it is important not to confer on one or the other of those figures an importance which is disproportionate in relation to the other factors and that the fixing of the fine cannot be the result of a simple calculation based on total turnover (see *Musique Diffusion Française and Others v Commission*, cited above, paragraphs 120 and 121, Case T-77/92 *Parker Pen v Commission* [1994] ECR II-549, paragraph 94, and T-327/94 *SCA Holding v Commission* [1998] ECR II-1373, paragraph 176).

281. It follows from the case-law that the Commission is entitled to calculate a fine according to the gravity of the infringement and without taking account of the various turnover figures of the undertakings concerned. Thus, the Community judicature has upheld the lawfulness of a calculation method whereby the Commission first determines the overall amount of the fines to be imposed and then divides that total among the undertakings concerned according to their activities in the sector concerned (Joined Cases 96/82 to 102/82, 104/82, 105/82, 108/82 and 110/82 *IAZ and Others v Commission* [1983] ECR 3369, paragraphs 48 to 53) or according to the level of their participation, their role in the cartel and their size on the market, calculated on the basis of average market share during a reference period.

282. It follows that by setting out in its guidelines a method of setting the fines which is not based on the turnover of the undertakings concerned the Commission did not depart from the Community judicature's interpretation of Article 15 of Regulation No 17.

283. In that regard, although the guidelines do not provide that the fines are to be calculated according to the overall turnover of the undertakings concerned or their turnover on the relevant product market, they do not preclude such turnover from being taken into account in determining the amount of the fine in order to comply with the general principles of Community law and where circumstances demand it.

284. It so happens that, under the guidelines, the turnover of the undertakings concerned may be relevant when the actual economic capacity of the offenders to cause significant harm to other traders and the need to ensure that the fine has sufficient deterrent effect is taken into consideration, or when account is taken of the fact that large undertakings usually have legal and economic knowledge and infrastructures which enable them more easily to recognise that their conduct constitutes an infringement and be aware of the consequences stemming from it under competition law (see

paragraph 226 above). The turnover of the undertakings concerned may also be relevant when the specific weight and, therefore, the real impact of the offending conduct of each undertaking on competition is determined, particularly where there is considerable disparity between the sizes of the undertakings committing infringements of the same type (see paragraph 227 above). Likewise, the turnover of the undertakings may give an indication of any economic or financial benefit acquired by the offenders or of other specific characteristics which, depending on the circumstances, may need to be taken into consideration (see paragraph 230 above).

285. Furthermore, the guidelines state that the principle of equal punishment for the same conduct may, if the circumstances so warrant, lead to different fines being imposed on the undertakings concerned without this differentiation being governed by arithmetical calculation (seventh paragraph of Section 1 (A)).

286. Contrary to what the applicant claims, the guidelines do not go beyond what is provided for in Regulation No 17. The applicant alleges that the guidelines allow the Commission to impose, depending on the gravity of the infringement, a starting point for setting the fine which is so high that, having regard to the fact that, according to Article 15(2) of Regulation No 17, the amount of the fine cannot in any event exceed the maximum of 10% of turnover of the undertaking concerned, it is no longer possible, in certain cases, for other factors, such as duration or mitigating or aggravating circumstances, to still have an effect on the level of the fine.

287. In that regard, it should be observed that Article 15(2) of Regulation No 17, in providing that the Commission may impose fines of up to 10% of turnover during the preceding business year for each undertaking which participated in the infringement, requires that the fine eventually imposed on an undertaking be reduced if it should exceed 10% of its turnover, independently of the intermediate stages in the calculation intended to take the gravity and duration of the infringement into account.

288. Consequently, Article 15(2) of Regulation No 17 does not prohibit the Commission from referring, during its calculation, to an intermediate amount exceeding 10% of the turnover of the undertaking concerned, provided that the amount of the fine eventually imposed on the undertaking does not exceed that maximum limit.

289. The guidelines make similar provision, moreover, where they state that the final amount calculated according to this method (basic amount increased or reduced on a percentage basis) may not in any case exceed 10% of the worldwide turnover of the undertakings, as laid down by Article 15(2) of Regulation No 17 (Section 5(a)).

290. In a case where the Commission refers in the course of its calculation to an intermediate amount in excess of 10% of the turnover of the undertakings concerned, it cannot be criticised because certain factors taken into consideration in its calculation do not affect the final amount of the fine, since that is the consequence of the prohibition laid down in Article 15(2) of Regulation No 17 on exceeding 10% of the turnover of the undertaking concerned.

291. In so far as the applicant submits that the guidelines are unlawful in the light of Regulation No 17, its objection must therefore be rejected.

- Infringement of the principle of equal treatment

292. The applicant complains that the Commission imposed on it, as on the other small and medium-sized undertakings, a fine which, compared with the fine imposed on ABB, did not take sufficient account of its turnover or its size.

293. In that regard, it is settled case-law that the principle of equal treatment is infringed only where comparable situations are treated differently or different situations are treated in the same way, unless such difference in treatment is objectively justified (Case 106/83 *Sermide* [1984] ECR 4209, paragraph 28, Case C-174/89 *Hoche* [1990] ECR I-2681, paragraph 25, and Case T-311/94 *BPB de Eendracht* v *Commission* [1998] ECR II-1129, paragraph 309).

294. In the present case, the Commission considered that the present infringement constituted a very

serious infringement for which the likely fine would be at least ECU 20 million (point 165 of the decision).

295.  In order to take account of the difference in size of the undertakings which took part in the infringement, the Commission divided the undertakings into four categories according to their relative importance in the market in the Community, subject to adjustment where appropriate to take account of the need to ensure effective deterrence (second to fourth paragraphs of point 166 of the decision). It follows from points 168 to 183 of the decision that the specific starting points for the calculation of the fines imposed on the four categories were, in order of size, ECU 20 million, ECU 10 million, ECU 5 million and ECU 1 million.

296.  As regards the determination of the starting points for each category, the Commission stated, following a question put by the Court, that these amounts reflect the importance of each undertaking in the pre-insulated pipe sector, having regard to its size and weight compared with ABB and in the context of the cartel. For that purpose, the Commission took into account not only their turnover on the relevant market but also the relative importance which the members of the cartel ascribed to each of them, as evidenced by the quotas allocated within the cartel, set out in annex 60 to the statement of objections, and by the results obtained and forecast in 1995, set out in annexes 169 to 171 of the statement of objections.

297.  In addition, the Commission made a further upward adjustment of the starting point for the calculation of the fine to be imposed on ABB, to ECU 50 million, to take account of its position as one of Europe's largest industrial combines (point 168 of the decision).

298.  In that context, it must be held, having regard to all the relevant factors taken into consideration in fixing the specific starting points, that the difference between the starting point chosen for the applicant and that chosen for ABB is objectively justified. Since the Commission is not required to ensure that the final amounts of the fines for the undertakings concerned to which its calculations lead reflect every difference between them in terms of turnover, the applicant cannot criticise the Commission because the starting point taken for it resulted in a fine higher, in percentage of total turnover, than the fine imposed on ABB.

299.  Furthermore, the Court has already held that the Commission, in so far as, in determining the amount of the fines, it relied in the present case on the turnover of an undertaking on the relevant market, is not obliged to take into account, in assessing the gravity of the infringement, the relationship between the total turnover of an undertaking and the turnover produced by the goods which are the subject-matter of the infringement (*SCA Holding* v *Commission*, cited above, paragraph 184). *A fortiori*, therefore, the Commission is not obliged to set the fines according to the total turnover of the undertakings concerned in a situation such as the present case, where it chose to take a series of relevant factors into account in assessing the gravity and duration of the infringement and, in particular, in determining the starting points for the calculation of the fines.

300.  In so far as the starting point chosen for the applicant is objectively distinguished from that chosen for ABB, the Commission cannot be criticised because certain factors taken into consideration in its calculation do not affect the final amount of the fine imposed on ABB, since that is the consequence of the prohibition laid down in Article 15(2) of Regulation No 17 on exceeding 10% of the turnover of the undertaking concerned (see paragraph 290 above). Moreover, as regards the lesser gravity of the role played by the applicant in the infringement by comparison with ABB, it is clear from point 171 of the decision that the particular role of ABB was taken into account as an aggravating circumstance in order to increase the amount of the fine to be imposed on it.

301.  It follows that the applicant has not established that the Commission imposed a discriminatory fine on it by comparison with the fine imposed on ABB or that the Commission discriminated generally against small and medium-sized undertakings compared with a large undertaking such as ABB.

- Infringement of the principle of proportionality

302.  As regards infringement of the principle of proportionality, the applicant complains that the Commission, first, did not take sufficient account of its turnover on the relevant market, and

consequently imposed a discriminatory fine on the applicant compared with the fines imposed on undertakings in the third category.

303. In that regard, it is sufficient to observe that it is apparent from the decision and from the explanation provided by the Commission following a written question put by the Court that the Commission took account, in setting the specific starting points for the calculation of the fines, of a series of factors reflecting the size of each undertaking in the pre-insulated pipe sector, including turnover on the relevant market. The mere fact that the Commission did not, in that context, take as a basis solely the turnover on the relevant market of each of the undertakings, but took into consideration other factors relating to the importance of the undertakings on that market, cannot lead to the conclusion that the Commission imposed a disproportionate fine. It follows from the case-law that it is important not to confer on an undertaking's total turnover or on its turnover accounted for by the goods in respect of which the infringement was committed an importance which is disproportionate in relation to the other factors (see paragraph 280 above).

304. In that context, it cannot be concluded that the fine imposed on the applicant is disproportionate, since the starting point for its fine is justified in the light of the criteria which the Commission used in assessing the importance of each of the undertakings on the relevant market. Having regard to the quota allocated to the applicant within the cartel and to the forecast results, as set out in annexes 60 and 169 to 171 of the statement of objections, the Commission was justified in imposing on it at least a starting point twice as high as that imposed on undertakings in the third category.

305. The applicant cannot find support in the fact that the Commission, in point 175 of the decision, classified it as a single-product company. It is clear from that passage that such a classification was intended solely to distinguish the lower starting point for the applicant's fine in relation to the starting point chosen for ABB. The applicant has not succeeded in explaining how such a classification, assuming that it is incorrect, can have harmed it.

306. In so far as the applicant complains that the Commission did not take its turnover on the relevant market into consideration when applying the limit of 10% of turnover laid down in Article 15(2) of Regulation No 17, it is settled case-law that the turnover referred to in Article 15(2) of Regulation No 17 must be understood as referring to the total turnover of the undertaking concerned, which alone gives an approximate indication of its size and influence on the market (see *Musique diffusion française and Others* v *Commission*, cited above, paragraph 119, Case T-144/89 *Cockerill-Sambre* v *Commission* [1995] ECR II-947, paragraph 98, and Case T-43/92 *Dunlop Slazenger* v *Commission* [1994] ECR II-441, paragraph 160). Provided that it complies with the limit laid down in Article 15(2) of Regulation No 17, the Commission may set the fine on the basis of the turnover of its choice, in terms of geographical area and relevant products.

307. Nor, second, can the applicant plead infringement of the principle of proportionality on the ground that the Commission did not calculate its fine according to the profit it had made on the relevant market. Although the profit which undertakings have been able to derive from their practices is among the factors which may count in the assessment of the gravity of the infringement (*Musique diffusion française and Others* v *Commission*, cited above, paragraph 129, and *Deutsche Bahn* v *Commission*, cited above, paragraph 127), and even though the Commission, to the extent to which it is capable of estimating that unlawful profit, can set the fines at such a level that they exceed such a profit, it follows from a well-established line of decisions that the gravity of infringements must be established in accordance with numerous factors such as, in particular, the particular circumstances of the case, its context and the deterrent nature of the fines, although no binding and exhaustive list of the criteria that must be taken into account has been drawn up (see paragraph 236 above). The Commission has likewise stated in its guidelines that any economic or financial advantage acquired by the offenders is among the objective factors that must depending on the circumstances be taken into consideration in order to adjust the amount of the fines envisaged (see paragraph 230 above). In any event, since the Commission set the starting point for the fine to be imposed on the applicant on the basis of a series of factors reflecting the applicant's importance on the market, it cannot be maintained that it ignored the advantages which the applicant was able to derive from the infringement in question.

308. As regards the applicant's ability to pay the fine, it is sufficient to observe that, according to a consistent line of decisions, the Commission is not required, when determining the amount of the fine, to take into account the poor financial situation of an undertaking concerned, since recognition of such

an obligation would be tantamount to giving an unjustified competitive advantage to undertakings least well adapted to the market conditions (*IAZ and Others* v *Commission*, cited above, paragraphs 54 and 55, Case T-319/94 *Fiskeby Board* v *Commission* [1998] ECR II-1331, paragraphs 75 and 76, and Case T-348/94 *Enso Española* v *Commission* [1998] ECR II-1875, paragraph 316). Likewise, where the guidelines state that account should be taken of the real ability to pay in a specific social context, and the fines adjusted accordingly, this is subject to the proviso [d]epending on the circumstances (see paragraph 230 above).

309.  In so far as the applicant relies on an infringement of the principle of proportionality, its arguments must therefore also be rejected.

310.  Accordingly, the complaint alleging infringement of the principles of equal treatment and proportionality and unlawfulness of the guidelines must be rejected in its entirety.

   D - *Incorrect assessment of the duration of the infringement*

   1. Arguments of the parties

311.  The applicant maintains that the Commission is not entitled to multiply the intermediate amount of the fine by 1.4 on the ground that the cartel allegedly lasted for five years, since the applicant only participated in one relatively brief cartel in Denmark, which it left in 1993, and in a short-lived, wider cartel which lasted only a few months before cooperation within it completely broke down. The fact that ABB recognised the existence of a continuous infringement is of no relevance to the calculation of the infringement in respect of the applicant.

312.  Furthermore, the fact that in the early period the arrangements were incomplete and of limited effect outside the Danish market should also have been taken into account in assessing the duration of the infringement.

313.  The defendant observes that the applicant's argument is tantamount to disputing its participation in a continuous cartel. In any event, by fixing the duration of the infringement at five years in point 170 of the decision, the Commission took account of the incomplete nature of the arrangements outside Denmark in the early days.

   2. Findings of the Court

314.  As stated in paragraphs 99 to 109 above, the Commission correctly calculated the duration of the infringement in respect of which the applicant is accused.

315.  As regards the fact that the arrangements within the cartel were incomplete in the early days and of limited effect outside the Danish market, the Commission took sufficient account of those factors when assessing the duration of the infringement in respect of which the applicant is accused.

316.  The complaint must therefore be rejected.

   E - *Incorrect application of the aggravating circumstances*

   1. Arguments of the parties

317.  The applicant takes issue with the fact that the Commission increased the basic fine by 30% to take into account the aggravating factors which it identified, in particular the fact that the applicant deliberately continued to participate in the infringement after the investigations carried out by the Commission and the active role which the applicant allegedly played in the sanctions against Powerpipe. In doing so, the Commission also failed to demonstrate the existence of any of the aggravating circumstances listed in Section 2 of its own guidelines.

318.  The Commission was wrong to increase the fine on the ground that the infringement continued after the

investigations. The continuation of the practices in question after the investigation has begun is inherent in any infringement and cannot therefore be regarded as an aggravating circumstance. That is confirmed by the Commission's practice in previous decisions and by the fact that its own guidelines show that non-continuation of an infringement is to be taken into account as a mitigating circumstance. If early termination of an infringement may be regarded as a mitigating circumstance, there is no reason to treat continuation of the infringement after the beginning of the investigation as an aggravating circumstance.

319.  As regards the concerted measures taken against Powerpipe, the applicant reiterates that it did not participate in any punitive action against Powerpipe.

320.  The defendant observes that the list of aggravating circumstances in the guidelines is not exhaustive. It was therefore entitled to regard continuation of the infringement as an aggravating circumstance, especially where the infringements were so serious that no right-minded person could possibly believe the conduct to be lawful. It concludes by stating that the applicant's responsibility for the concerted action against Powerpipe was demonstrated in the decision.

2. Findings of the Court

321.  First of all, as regards the list of aggravating circumstances set out in the guidelines, the guidelines clearly state that the list is given purely by way of example.

322.  As regards the active role which the applicant played in the reprisals against Powerpipe, it is sufficient to recall that, as stated in paragraphs 139 to 164 above, it is established that the applicant approached ABB in July 1992 with a view to harming Powerpipe's activities, that it agreed with ABB in 1993 to lure away one of ABB's key employees and that, following the meeting of 24 March 1995, it endeavoured, by approaching one of its suppliers, to delay deliveries to Powerpipe by that supplier. In those circumstances, the Commission was entitled to find that its active role in the reprisals against Powerpipe constituted an aggravating circumstance, while the major role played by ABB in that regard was also recognised.

323.  Second, the applicant does not deny having continued the infringement after the Commission had carried out its investigation.

324.  Contrary to what the applicant claims, the fact that terminating an infringement after the Commission has first intervened may be regarded as a mitigating circumstance does not mean that continuing an infringement in such a situation cannot be regarded as an aggravating circumstance. An undertaking's reaction to the opening of an investigation into its activities can be assessed only by taking account of the particular context of the case. Since the Commission cannot therefore be required, as a general rule, either to regard a continuation of the infringement as an aggravating circumstance or to regard the termination of an infringement as a mitigating circumstance, the fact that it may classify such termination as a mitigating circumstance in one particular case cannot deprive it of its power to find that such continuation constitutes an aggravating circumstance in another case.

325.  Accordingly, the complaint cannot be upheld.

F - *Failure to take mitigating circumstances into account*

1. Arguments of the parties

326.  The applicant criticises the Commission for not having taken into account certain factors which in the past were systematically regarded as mitigating circumstances, in particular the existence of pressure brought to bear on one undertaking by another or the fact that an undertaking introduced a policy of compliance with Community law.

327.  First, the Commission should have taken into consideration that fact that the applicant is a medium-sized family undertaking without the resources of an undertaking forming part of a group, which reduced its ability to pay the fine.

328. Second, the applicant was subject to constant pressure from ABB, which had the power and resources to dominate the sector. ABB never concealed the fact that its long-term objective was to acquire control of the applicant or to harm it because of the threat posed by its cheaper technology. The applicant's purpose was therefore to avoid antagonising ABB rather than to comply with a cartel imposed by it. The pressure brought to bear by ABB must therefore be taken into consideration as a mitigating circumstance in the applicant's case.

329. On this point, the applicant disputes the defendant's argument that it is sufficient to take those circumstances into consideration when assessing the gravity of ABB's behaviour. When making a separate assessment of each undertaking, the Commission was bound to consider the actual effect that ABB's pressure strategy had had on the conduct of the undertakings and thus on the applicant's conduct. In any event, the decision should have taken into account the relatively less serious role played by the applicant compared with that of ABB, the leader of the cartel.

330. Third, the Commission should have considered the fact that the applicant had a more efficient technology which allowed it to exercise downward pressure on costs. It thus had at all times a greater interest in gaining market shares than in freezing its position on the market. Within the EuHP, it was the victim of opposition to the use of its new cheaper technology.

331. The defendant's argument that the applicant's failure to lodge a complaint prevented that situation from being taken into account as a mitigating circumstance is contradicted by the very wording of the leniency notice.

332. Fourth, the applicant's participation in the cartel had only limited effects on the market, since in 1991 and 1992 it had achieved significantly higher market shares in Denmark than the shares allocated to it. Thus, the applicant did distance itself, to the extent required by the case-law, from the quota practices employed by the other undertakings. Furthermore, it was the applicant that terminated the first cartel in Denmark in April 1993.

333. Fifth, the applicant left EuHP at the end of 1997. The applicant points out that the cooperation within the EuHP was part of the conduct sanctioned by the decision. The Commission should have taken the facts surrounding its departure from the EuHP into consideration when setting the fine.

334. Last, in the spring of 1997 the applicant introduced an internal programme in order to comply with Community law, involving the distribution of a compliance manual and lectures to and discussions with its Danish and German personnel.

335. The defendant contends that none of the circumstances set out in the application should have been taken into consideration as a mitigating circumstance.

    2. Findings of the Court

336. In the present case the Commission was entitled to take the view that no mitigating circumstances applied to the applicant.

337. First of all, the mere fact that the Commission considered in previous decisions that certain factors constituted mitigating circumstances for the purposes of determining the amount of the fine does not mean that it is obliged to make the same assessment in a subsequent decision (*Mayr-Melnhof* v *Commission*, cited above, paragraph 368).

338. Furthermore, the fact that the applicant is a medium-sized family undertaking does not constitute a mitigating circumstance. Even assuming that there is a link between the family nature of the members of an undertaking and its solvency, which is not established, it is settled case-law that the Commission is not obliged to take into account the poor financial situation of an undertaking, since recognition of such an obligation would be tantamount to giving an unjustified competitive advantage to undertakings least well adapted to the market conditions (see paragraph 308 above).

339. Next, as regards the pressure which ABB brought to bear on the applicant, the applicant could have

reported the pressure to the competent authorities and lodged a complaint with the Commission under Article 3 of Regulation No 17 rather than participate in the cartel (see paragraph 142 above). In any event, the Commission cannot be criticised for having disregarded such pressure, because, when it assessed the fine to be imposed on ABB, the pressure which ABB had brought to bear on the other undertakings in order to persuade them to enter the cartel was regarded as a factor leading to an increase in its fine.

340. The same applies to the pressure brought to bear on the applicant by the other undertakings participating in the EuHP concerning the use of its new technology. Because the applicant had cost-saving technology at its disposal, it was actually in a stronger position to oppose the activities of the cartel and, in the event that the cartel prevented it from using its technology, to lodge a complaint with the Commission.

341. Nor is there anything in the wording of the leniency notice or the guidelines to prevent a finding that the existence of pressure on the part of competing undertakings is not to be regarded as a mitigating circumstance where the undertaking concerned has not lodged a complaint in respect of such pressure.

342. Last, the applicant cannot derive an argument from the fact that, within the framework of the Danish cartel, it did not always comply with the quotas allocated within the cartel. As stated in points 36 and 37 of the decision, even though the applicant threatened to leave the cartel, it did not terminate its participation therein, but rather sought, by its threats, to obtain an increased quota. The applicant admits having itself at that time submitted proposals for a review of the division of market shares (applicant's reply to the statement of objections). As regards its withdrawal from the Danish cartel in April 1993, it must be observed that, as stated in paragraphs 75 to 77 above, after the Danish cartel became weaker, the applicant was still involved in negotiations on sharing the German market.

343. In those circumstances, the Commission was entitled to take the view that the applicant's conduct within the cartel could not give rise to any mitigating circumstance.

344. As regards the applicant's withdrawal from the EuHP early in 1997, it is sufficient to observe that, since the Commission did not find in the applicant's case that cooperation within the EuHP was a constituent element of the infringement, and since it found that the infringement was terminated in the spring of 1996, it was not required to accept the applicant's withdrawal from the EuHP, which, furthermore, was after the infringement period, as a mitigating circumstance for the applicant.

345. Last, the Commission cannot be criticised for not having regarded the applicant's implementation of an internal compliance programme as a mitigating circumstance. Although it is indeed important that the applicant took measures to prevent future infringements of Community competition law by its personnel, that fact does not alter the reality of the infringement found in the present case (Case T-7/89 *Hercules Chemicals* v *Commission*, paragraph 357). Furthermore, it follows from the case-law that, although the implementation of a compliance programme demonstrates the intention of the undertaking in question to prevent future infringements and therefore constitutes a factor which better enables the Commission to accomplish its task of applying the principles laid down by the Treaty in competition matters and of influencing undertakings in that direction, the mere fact that in certain of its previous decisions the Commission took the implementation of a compliance programme into consideration as a mitigating factor does not mean that it is obliged to act in the same manner in a specific case (*Fiskeby Board* v *Commission*, cited above, paragraph 83, and *Mo och Domsjö* v *Commission* [1998] ECR II-1989, paragraph 417). That is all the more so when, as here, the infringement in question constitutes a manifest violation of Article 85(1)(a) and (c) of the Treaty.

346. For all those reasons, therefore, the complaint must be rejected.

   G - *Incorrect application of the leniency notice*

   1. Arguments of the parties

347. The applicant submits, first, that the reduction of 30% of the fine granted under Section D of the leniency notice does not sufficiently reflect the value of its cooperation with the Commission. Second, it maintains that the Commission should have applied to it the principles set out in its draft leniency

notice rather than the provisions of the final version of that notice. Third, it should not have been fined in respect of events after the date of the investigations.

348.  First, the Commission should have taken into account the fact that the applicant was the first undertaking to inform the press that it would cooperate with the Commission in its investigation. It was the first undertaking to give the Commission substantial evidence and information, including evidence of the continuation of the cartel activities after the investigations, of which the Commission was unaware. In its systematic cooperation with the Commission, the applicant proved to be flexible by waiving its right of access to the file and its right not to incriminate itself. The Commission cannot base its refusal to award a larger reduction on the sole fact that the applicant did not begin to cooperate until well after the investigations had begun, since Section D of the notice requires only that the undertaking concerned cooperate before the statement of objections is sent.

349.  The applicant maintains that its cooperation should have led to its fine being reduced by more than 30% since its cooperation went far beyond merely not contesting the facts, which, in the *Cartonboard* decision for example, led to a reduction of 33% of the fine. In the present case, a mere failure to contest the facts led to a 20% reduction of the fine imposed on Ke Kelit.

350.  The applicant could have expected a similar reduction to the one granted in the *Cartonboard* decision, to which the Commission had also made reference when the applicant first approached it. In Commission Decision 98/247/ECSC of 21 January 1998 relating to a proceeding pursuant to Article 65 of the ECSC Treaty (Case IV/35.814 - Alloy surcharge) (OJ 1998 L 100, p. 55, hereinafter the *Alloy surcharge* decision), reductions of 40% of the fine were granted for producing evidence, while no fine at all was imposed on the undertaking which had been the first to adduce evidence.

351.  Second, the Commission should have applied the principles set out in its draft leniency notice, not those set out in the final version of the leniency notice. As the final version had not yet been published, the applicant took the decision to cooperate with the Commission on the basis of the draft leniency notice and the Commission's previous practice. In the draft leniency notice, moreover, the Commission stated that it was aware that the notice would create legitimate expectations on which companies might rely when disclosing the existence of a cartel to the Commission.

352.  Under the draft leniency notice, a reduction of at least 50% should be granted if, after the Commission has carried out investigations, the undertaking satisfies three criteria, namely, first, that it is the first undertaking to cooperate, second, that it provides the Commission with extensive information and maintains continuing cooperation and, third, that it has not forced any other undertaking to participate in the cartel or been a ringleader in the illegal activity. The draft leniency notice therefore does not contain the condition, found in the final version, that the investigations should have failed to provide sufficient grounds for initiating the procedure leading to a decision. The draft leniency notice reflected in this regard the then existing practice of the Commission, illustrated *inter alia* by the *Cartonboard* decision, in which the undertakings were granted reductions of two thirds of their fines for having provided evidence which had reduced the need for the Commission to rely on circumstantial evidence and for having influenced other undertakings which might otherwise have continued to deny the wrongdoing.

353.  Even if the Commission had been entitled to apply its notice in the final version and had been correct in its conclusion that the applicant fell within category D of that notice, the applicant is unable to see why it was not given the maximum possible reduction of 50%.

354.  Third, the applicant should not have been fined for illegal activities during the period following the investigations, since it was the applicant that had informed the Commission of those activities, of which the Commission acknowledges it was unaware at the time. Both the draft leniency notice and the final version state in Section B that an undertaking which informs the Commission of a cartel of which it was not aware is entitled to a considerable reduction, or better still, according to the draft notice, not to be fined at all.

355.  In the present case the reduction in the fine imposed on the applicant was very limited, since the facts disclosed to the Commission had already led to an increase in the fine, first because they increased the duration of the infringement and, second, essentially, because the fine was increased by 30% to reflect the gravity of the infringement.

356. The Commission contends that the discretion which it enjoys in applying its leniency notice was exercised lawfully and reasonably. Under Section D of the notice, the assistance provided by the applicant did not merit a reduction of more than 30%, since the applicant did not begin to cooperate until it received a request for information. Nor has the applicant advanced any argument to show that Section B or Section C of that notice was applicable. In any event, the Commission cannot depart from its final notice, since it must observe its publicly-announced policy.

357. As the Commission enjoys a wide margin of discretion in that regard, in view of the large number of factors to be taken into consideration, the applicant cannot have had any legitimate expectation of a particular reduction granted in previous cases, such as the *Cartonboard* decision. Nor can the applicant's case be compared to the cases of the undertakings whose fines were reduced by 40% in the *Alloy surcharges* decision. Furthermore, the argument which the applicant bases on the 20% reduction granted to Ke Kelit could only lead to an increase in the fine imposed on Ke Kelit.

358. In any event, the applicant cannot rely on Section B of the leniency notice to claim immunity in respect of the facts committed after the investigation had been initiated. On the contrary, the fact that the applicant continued the infringement in those circumstances was sufficiently objectionable to induce the Commission to increase the fine as a deterrent.

   2. Findings of the Court

359. It should be observed at the outset that in the leniency notice the Commission defined the conditions in which undertakings which cooperate with it during the investigation into a cartel may be exempt from a fine or receive a reduction in the fine which they would otherwise have had to pay (see Section A 3 of the leniency notice).

360. As stated in Section E 3 of the leniency notice, the notice has created legitimate expectations on which undertakings wishing to inform the Commission of the existence of a cartel rely. Having regard to the legitimate expectation which undertakings wishing to cooperate with the Commission were able to derive from that notice, the Commission was therefore obliged to comply with it when assessing the applicant's cooperation for the purpose of setting the fine.

361. However, the applicant cannot maintain that the Commission should have applied the criteria set out in the draft notice in its case. As held in paragraph 246 above, the draft notice, by warning undertakings that the Commission proposed to adopt a leniency notice concerning cooperation by undertakings in the investigation or prosecution of infringements, could not in itself give rise to any expectation that the criteria in it would be definitely adopted and then applied. If the position were not so, it would have the undesirable effect of discouraging the Commission from publishing draft notices in order to obtain the observations of the traders concerned.

362. As regards the application of the leniency notice to the applicant's case, it should be observed that the applicant does not fall within the scope of Section B of that notice, which refers to cases where an undertaking has informed the Commission about a secret cartel before the Commission has undertaken an investigation (in which case the fine may be reduced by at least 75%), or within that of Section C, which concerns an undertaking which has disclosed the secret cartel after the Commission has undertaken an investigation which has failed to provide sufficient grounds for initiating the procedure leading to a decision (in which case the fine may be reduced by between 50% and 75%).

363. Point D of the leniency notice states that [w]here an enterprise cooperates without having met all the conditions set out in Sections B or C, it will benefit from a reduction of 10% to 50% of the fine that would had been imposed if it had not cooperated. The notice specifies that:

   Such cases may include the following:

   - before a statement of objections is sent, an enterprise provides the Commission with information, documents or other evidence which materially contribute to establishing the existence of the infringement;

   - after receiving a statement of objections, an enterprise informs the Commission that it does not

substantially contest the facts on which the Commission bases its allegations.

364.    The applicant has failed to prove that the Commission, having recognised that the applicant voluntarily provided it with documentary evidence which contributed substantially to establishing important aspects of the case, in particular the fact that the members of the cartel had decided to continue its operation after the investigation, which the Commission suspected but of which it possessed no proof (point 177 of the decision), should have granted it a reduction higher than the 30% accorded to it.

365.    The Commission observed in point 177 of the decision that the requests for information provided the applicant with the occasion to communicate evidence of the infringement. In that regard, it follows from the decision that, in respect of ABB's cooperation, the Commission considered that that undertaking could not be accorded the full 50% reduction available under Section D, as it had been necessary to wait until the detailed requests for information had been sent out before it cooperated (third and fourth paragraphs of point 174). It follows that the Commission was not prepared to reduce the fine by 50% when the undertaking concerned did not provide information before receiving a request for information. It is common ground that the applicant sent the documents to the Commission only after it received a request for information from the Commission.

366.    As regards a comparison between the present case and the Commission's previous practice, the mere fact that the Commission has in its previous decisions granted a certain rate of reduction for specific conduct does not imply that it is required to grant the same proportionate reduction when assessing similar conduct in a subsequent administrative procedure (see paragraph 244 above).

367.    Nor can the applicant derive an argument from the fact that Ke Kelit's fine was reduced by 20% because it did not contest the alleged facts. Even supposing that the Commission granted too high a reduction of the fine to that other undertaking, respect for the principle of equal treatment must be reconciled with the principle of legality, according to which a person may not rely, in support of his claim, on an unlawful act committed in favour of a third party (*SCA Holding* v *Commission*, cited above, paragraph 160, and *Mayr-Melnhof* v *Commission*, cited above, paragraph 334).

368.    Nor can the applicant claim a higher reduction for the period commencing after the initiation of the investigation, during which the infringement continued and in respect of which the applicant provided evidence to the Commission. Since continuation of the cartel constitutes an aspect that cannot be dissociated from the infringement, the infringement could only be considered as a whole when the leniency notice was applied. Since the applicant did not satisfy the conditions for the application of either Section B or Section C of the notice, its conduct had to be assessed under Section D.

369.    Last, the Commission was entitled to take account of the fact that the infringement continued after the investigations not only when it calculated the duration of the infringement, but also as a further aggravating circumstance, since such conduct showed that the parties to the cartel were particularly determined to continue their infringement in spite of the risk of fines.

370.    In those circumstances, the Commission did not err in law or in fact in applying its leniency notice and the complaint must therefore be rejected.

    IV - *The fourth plea in law, alleging breach of the obligation to state reasons when setting the fine*

    A - Arguments of the parties

371.    The applicant complains that the Commission breached the obligation to state reasons by failing to ensure the transparency of the method used to set the fine. The Commission has not provided an explanation of the fact that the fine was fixed on the basis of starting points expressed in absolute amounts, unrelated to the turnover of the undertakings and higher than the maximum legally permissible level. It has not explained how it assessed the gravity of the infringement with regard to the small and medium-sized undertakings involved. In particular, it has not explained how it could depart from its previous practice of determining the amount of the fines in proportion to turnover on the relevant market.

372.    The applicant alleges that the defendant also breached the obligation to state reasons by retroactively

applying its new guidelines on the method of setting fines without any justification.

373. There was a further breach of that obligation in that the Commission departed from its previous leniency practice and from its draft leniency notice, which expressed precisely that practice, and instead applied a different policy set out in the final version of the leniency notice.

374. Furthermore, the Commission breached its obligation to state reasons by ignoring all the mitigating circumstances put forward by the applicant. Even if the Commission was not required to take into consideration the circumstances listed by the applicant, it should have explained why it had ignored them.

375. The defendant observes that the applicant, in its plea regarding the obligation to state reasons, is merely presenting, under another guise, the arguments which it has already put forward in relation to alleged discrimination.

376. In any event, the applicant's argument in relation to the alleged failure to state reasons is unfounded, as regards both the retroactive application of the new guidelines and the fact that the Commission departed from its draft leniency notice. Last, since the Commission was under no obligation to treat certain circumstances as mitigating circumstances, it was not required to state reasons in that regard.

    B - Findings of the Court

377. It is settled case-law that the statement of reasons required by Article 190 of the EC Treaty (now Article 253 EC) must disclose in a clear and unequivocal fashion the reasoning followed by the Community authority which adopted the measure in question in such a way as to enable the persons concerned to ascertain the reasons for the measure and to enable the competent Community Court to exercise its power of review. The requirements to be satisfied by the statement of reasons depend on the circumstances of each case, in particular the content of the measure in question, the nature of the reasons given and the interest which the addressees of the measure, or other parties to whom it is of direct and individual concern, may have in obtaining explanations (Case C-367/95 P *Commission* v *Sytraval and Brink's France* [1998] ECR I-1719, paragraph 63).

378. Where a decision imposes fines on a number of undertakings for an infringement of the Community competition rules, the scope of the obligation to state reasons must be determined, *inter alia*, in the light of the fact that the gravity of infringements must be determined by reference to numerous factors such as, in particular, the particular circumstances of the case, its context and the dissuasive element of fines; moreover, no binding or exhaustive list of the criteria which must be applied has been drawn up (order in *SPO and Others* v *Commission*, cited above, paragraph 54).

379. In the present case, the Commission first of all sets out in its decision its general findings concerning the gravity of the infringement in question and also the particular elements of the cartel on which it based its conclusion that the present case constituted a very grave infringement for which the fine would normally be at least ECU 20 million (points 164 and 165 of the decision). It then states that this amount must be adjusted to take account of the actual economic capacity of the offending undertakings to cause significant damage to competition and of the need to ensure that the fines were sufficiently deterrent (point 166 of the decision). The Commission then states that in determining the level of the fines, it took into account any aggravating or mitigating circumstances and also the position of each undertaking in relation to the leniency notice (point 167 of the decision).

380. As regards the fine to be imposed on the applicant, the Commission then states that, in view of the applicant's importance as the second-largest European producer of pre-insulated pipes and in order to reflect its situation as essentially a single-product company, the starting point for its fine will be adjusted to ECU 10 million owing to the gravity of the infringement in its case (first and second paragraphs of point 175 of the decision). The Commission then states that the fine to be imposed on the applicant will be weighted to reflect the duration of the infringement (third paragraph of point 175 of the decision).

381. The Commission goes on to state that the basis of the applicant's fine must be increased because of the particularly aggravating circumstance of its deliberate continuation of the infringement after the

investigations and the further aggravating circumstance represented by the applicant's active role in the retaliatory measures against Powerpipe, although it was not on a par with ABB (first and second paragraphs of point 176 of the decision). The Commission also states that there are no extenuating circumstances; although the applicant may have come under pressure from ABB at various times it greatly exaggerates the extent of that pressure in claiming that it was dragged unwillingly into the cartel by ABB (third paragraph of point 176 of the decision). The Commission further states that, since the final amount calculated according to that method may not in any case exceed 10% of the applicant's worldwide turnover, as laid down in Article 15(2) of Regulation No 17, the fine will be set at ECU 12 700 000 so as not to exceed the permissible limit (fourth paragraph of point 176 of the decision).

382.   Last, the Commission states that under the leniency notice, the applicant's fine will be reduced by 30% because it voluntarily provided documentary evidence which contributed to establishing important aspects of the case, in particular the fact that the members of the cartel decided to continue it after the investigation, which the Commission suspected but of which it possessed no proof (point 177 of the decision).

383.   Interpreted in the light of the detailed statement in the decision of the allegations of fact against each of its addressees, points 164 to 167 and 175 to 177 contain a relevant and sufficient statement of the criteria taken into account in order to determine the gravity and duration of the infringement committed by the applicant (Case C-248/98 P *KNP BT* v *Commission* [2000] ECR I-9641, paragraph 43).

384.   In those circumstances, the Commission cannot be criticised for not having given more precise reasons for the levels of the basic amount and the final amount of the fine imposed on the applicant or of the rate of reduction accorded for its cooperation, particularly since, as regards the last point, the decision classified its cooperation, in terms of importance, as falling under Section D of the leniency notice.

385.   Even supposing that, as regards the level of the fine, the decision constitutes a significant increase compared with previous decisions, the Commission quite explicitly stated its reasons for fixing the amount of the applicant's fine at such a level (see Case 73/74 *Groupement des fabricants de papiers peints de Belgique and Others* v *Commission* [1975] ECR 1491, paragraph 31).

386.   Nor can the applicant criticise the Commission for not having given reasons for its calculation of the fine which dealt with the matters which it put forward as mitigating circumstances.

387.   Since the Commission stated in the decision that it was not taking into account any mitigating circumstance in relation to the applicant, it provided all the information which the applicant needed to know whether the decision was well founded or whether it might be vitiated by an error allowing the applicant to challenge its validity.

388.   Although Article 190 of the Treaty requires the Commission to state reasons for its decisions with reference to the facts forming the basis of the decision and the considerations which led it to adopt the decision, it does not require the Commission to discuss all the points of fact and of law dealt with during the administrative procedure (*Michelin* v *Commission*, cited above, paragraphs 14 and 15, and *Fiskeby Board* v *Commission*, cited above, paragraph 127).

389.   In any event, as regards the pressure experienced by the applicant, in the third paragraph of point 176 of the decision the Commission explained its reasons for not taking that pressure into account as a circumstance which justified a reduction of the fine.

390.   Last, the Commission cannot be criticised for not having explained the legal framework applying to the present case, in particular the application of the new guidelines or of the leniency notice. It is not necessary for the reasoning to go into all the relevant facts and points of law, since the question whether the statement of reasons for a measure meets the requirements of Article 190 of the Treaty must be assessed with regard not only to its wording but also to its context and to all the legal rules governing the matter in question (*Commission* v *Sytraval and Brink's France*, cited above, paragraph 63). Having regard to the Commission's undertaking, when publishing the guidelines and the leniency notice, to adhere to them when determining the amount of a fine for an infringement of the competition rules (see paragraphs 245 and 274 above), it was not required to state whether and on what grounds it

was applying them when determining the amount of the fine imposed on the applicant.

391.    Consequently, the plea alleging breach of the obligation to state reasons must be rejected.

        V - *The fifth plea in law, alleging that the rate of interest on the fine is excessive*

        A - Arguments of the parties

392.    The applicant states that the rate of default interest, fixed in Article 4 of the decision at 7.5%, the rate charged by the European Central Bank on its ECU transactions on the first working day of the month in which the decision was adopted plus 3.5 percentage points, is abnormally high. It places unreasonable pressure on the applicant to pay the fines quickly although the applicant believes that it has good legal grounds for challenging the decision. Accordingly, the interest rate should be reduced to a reasonable level.

393.    In that regard, the applicant refers to the Opinion of Advocate General Fennelly in Joined Cases C-395/96 P and C-396/96 P *Compagnie Maritime Belge and Others* v *Commission* [2000] ECR I-1365, at I-1371, where the Advocate General states that the interest rate must not be so high as to oblige undertakings to pay fines and that the addition of three and a half percentage points to an already high rate, without any explanation, is not acceptable.

394.    The defendant observes that it was entitled to fix a rate sufficiently high to dissuade the undertakings from defaulting on the fine. Having regard to current commercial bank rates, a rate of 7.5% was wholly reasonable and well within the limits of its discretion.

        B - Findings of the Court

395.    The charging of default interest on fines imposed on undertakings which, deliberately or negligently, infringe Article 85 of the Treaty ensures that the Treaty is effective. Default interest increases the Commission's power when it carries out its task under Article 89 of the EC Treaty (now Article 85 EC) of ensuring that the rules on competition are applied and ensures that the rules of the Treaty are not rendered ineffective by practices applied unilaterally by undertakings which delay paying fines imposed on them. If the Commission did not have the power to charge default interest on fines, undertakings which delayed paying their fines would enjoy an advantage over those which paid their fines within the period laid down (Case T-275/94 *CB* v *Commission* [1995] ECR II-2169, paragraphs 48 and 49).

396.    If Community law did not permit measures designed to offset the advantage that an undertaking might derive from delaying payment of a fine, that would encourage manifestly unfounded actions brought with the sole object of delaying payment (*AEG* v *Commission*, cited above, paragraph 141).

397.    In that context, by charging a rate of interest of 7.5%, fixed at the rate charged by the European Central Bank on its ECU transactions on the first working day of the month in which the decision was adopted plus 3.5 percentage points, the Commission clearly did not exceed the discretion which it enjoys when fixing a rate for default interest.

398.    In that regard, it is to be noted that, although the interest rate must not be so high as to oblige undertakings to pay fines even though they consider that they have good grounds for challenging the validity of the Commission decision, the Commission may none the less adopt a point of reference higher than the applicable market rate offered to the average borrower, to an extent necessary to discourage dilatory behaviour (Opinion of Advocate General Fennelly in *Compagnie Maritime Belge and Others* v *Commission*, cited above, paragraph 190).

399.    As the Commission did not commit any error of assessment in setting the rate of default interest, the plea alleging that the rate was excessive must be rejected.

400.    It follows from all the foregoing that the application must be dismissed in its entirety.

        **Costs**

401. Under Article 87(2) of the Rules of Procedure of the Court of First Instance, the unsuccessful party is to be ordered to pay the costs if they have been applied for. Since the applicant has been unsuccessful, it must be ordered to pay the costs, in accordance with the form of order sought by the Commission.

On those grounds,

THE COURT OF FIRST INSTANCE (Fourth Chamber)

hereby:

**1. Dismisses the application;**

**2. Orders the applicant to pay the costs.**

Mengozzi
Tilli
Moura Ramos

Delivered in open court in Luxembourg on 20 March 2002.

H. Jung

P. Mengozzi

Registrar

President

Table of contents

Facts of the case

II - 2

Procedure and forms of order sought by the parties

II - 6

Substance

II - 6

I - First plea in law, alleging factual errors in applying Article 85(1) of the Treaty

II - 7

A - The compensation scheme in the framework of the Danish cartel

II - 7

1. Arguments of the parties

II - 7

2. Findings of the Court

II - 7

B - The existence of a continuous cartel from 1990 until 1996

II - 8

1. The applicant's participation in the cartel outside the Danish market during the period 1990-1993

II - 8

- Arguments of the parties

II - 8

- Findings of the Court

II - 10

2. The suspension of participation in the cartel in 1993 and participation in the cartel from 1994

II - 16

- Arguments of the parties

II - 16

- Findings of the Court

II - 17

3. The duration and continuous nature of the infringement of which the applicant is accused

II - 22

- Arguments of the parties

II - 22

- Findings of the Court

II - 22

C - Participation in the European cartel as regards the Italian market

II - 24

1. Arguments of the parties

II - 24

2. Findings of the Court

II - 25

D - Cooperation on quality norms

II - 25

1. Arguments of the parties

II - 25

2. Findings of the Court

II - 26

E - Concerted action against Powerpipe

II - 27

1. Arguments of the parties

II - 27

2. Findings of the Court

II - 29

F - The pressure brought to bear by ABB

II - 34

1. Arguments of the parties

II - 34

2. Findings of the Court

II - 34

II - Second plea in law, alleging infringement of the rights of defence

II - 35

A - Access to the file

II - 35

1. Arguments of the parties

II - 35

2. Findings of the Court

II - 35

B - Infringement of the right to be heard in relation to the production of fresh evidence

II - 39

1. Arguments of the parties

II - 39

2. Findings of the Court

II - 39

C - Infringement of the right to be heard as concerns the application of the guidelines for calculating fines

II - 40

1. Arguments of the parties

II - 40

2. Findings of the Court

II - 41

III - Third plea in law, alleging infringement of general principles and errors of fact in assessing the fine

II - 43

A - Infringement of the principle of non-retroactivity

II - 43

1. Arguments of the parties

II - 43

2. Findings of the Court

II - 44

B - Infringement of the principle of protection of legitimate expectations

II - 48

1. Arguments of the parties

II - 48

2. Findings of the Court

II - 48

C - Infringement of the principles of equal treatment and proportionality, and legality of the guidelines

II - 49

1. Arguments of the parties

II - 50

2. Findings of the Court

II - 54

- The objection of illegality in respect of the guidelines

II - 54

- Infringement of the principle of equal treatment

II - 58

- Infringement of the principle of proportionality

II - 59

D - Incorrect assessment of the duration of the infringement

II - 61

1. Arguments of the parties

II - 61

2. Findings of the Court

II - 62

E - Incorrect application of the aggravating circumstances

II - 62

1. Arguments of the parties

II - 62

2. Findings of the Court

II - 63

F - Failure to take mitigating circumstances into account

II - 64

1. Arguments of the parties

II - 64

2. Findings of the Court

II - 65

G - Incorrect application of the leniency notice

II - 67

1. Arguments of the parties

II - 67

2. Findings of the Court

II - 69

IV - The fourth plea in law, alleging breach of the obligation to state reasons when setting the fine

II - 71

A - Arguments of the parties

II - 71

B - Findings of the Court

         II - 72

V - The fifth plea in law, alleging that the rate of interest on the fine is excessive

         II - 75

A - Arguments of the parties

         II - 75

B - Findings of the Court

         II - 75

Costs

         II - 76

---

1: Language of the case: English. </HTML