**Tab 9**

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

NO. D-0101-CV-2000-1697

ENDORSED
First Judicial District Court

OCT 0 2 2002

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

IN RE: NEW MEXICO INDIRECT PURCHASERS
MICROSOFT CORPORATION ANTITRUST LITIGATION

## DECISION AND ORDER ON MOTION FOR CLASS CERTIFICATION

THIS MATTER came on for hearing on the 1st and 2nd day of July 2002 on a

MOTION FOR CLASS CERTIFICATION before the HONORABLE DANIEL A, SANCEZ,

Judge of the First Judicial District, State of New Mexico, Division VII.

The Plaintiffs, NEW MEXICO INDIRECT PURCHASERS, appeared by Counsel of

Record, THOMAS M. HNASKO, Attorney at Law, JOSEPH ARSHAWSKY, Attorney at Law,

DANIEL A SMALL, Attorney at Law, and WILLIAM MARKOVITS, Attorney at Law.

The Defendant, MICROSOFT CORPORATION, appeared by Counsel of Record,

LESLIE MCCARTHY APODACA and THOMAS A. OUTLER, Attorneys at Law, CHARLES

B. CASPER and PETER BRESLAUER,  Attorneys at Law.

This Motion was brought before this Court for Class Certification pursuant to

NMRCP 1-023 NMSA 2002, and more specifically Sections A and B (3) which provide, inter

alia:

A.     Prerequisites to a Class Action.  One or more members of a class may

sue or be sued as representative parties on behalf of all only if:

(1)  the class is so numerous that joinder of all members is impracticable;

(2)  there are questions of law or fact common to the class;



(3)   the claims of defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class.

B.    Class Actions Maintainable.   An action may be maintained as a class action if the prerequisites of Paragraph A of this rule are satisfied, and in addition: . . .

(3)   the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include:

(a)   the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b)   the extent and nature of any litigation concerning the controversy already commenced by or against member of the class;

(c)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d)   the difficulties likely to be encountered in the management of a class action.

The Court deems that before allowing a case to proceed as a class action, the Court needs to make the necessary factual and legal inquiries under this rule.

The Court agrees with the Plaintiffs' that the appropriate inquiry here is whether or not the Plaintiffs' can show a plausible method to prove impact and damages on a class wide basis and liability is not an issue in this class certification proceeding.

In considering class certification, once damage in fact or impact is shown, New Mexico law does not require the amount of damages be proven at the class certification stage of the proceedings.

The fact that the measure of damages is the subject of disputed and conflicting expert testimony, does not diminish the fact that common impact has occurred and this is not a basis for denying certification at this stage.

A class action suit is the only affective method of providing relief under the New Mexico antitrust laws for purchasers with relatively small damages such as here.

The Court has employed the "rigorous analysis" that it must employ.

The Court, at this stage of the proceedings, is to determine only if Plaintiffs' methodology is plausible.

It is the Court's opinion that In Re Potash Antitrust Litigation 159F.R.D. 882, states the proper standard by which this Court should determine the appropriateness of certification of the class:

> Plaintiffs' do not need to supply a precise damage formula at the certification stage of antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all . . . .The fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis.

Plaintiffs' have put forward a plausible method for determing damages on a class-wide basis.

Dr. Leffler, the Plaintiff's expert, acknowledged that it may be time-consuming to apply, on a class-wide basis his method for proving impact and damages in this case, but as Dr. Leffler testified, the fact that the method is difficult, requiring significant time

and effort, does not mean that the methodology is not workable. Dr. Leffler demonstrated that there are plausible methods for measuring the overcharge.

Plaintiffs' have offered a standard and accepted economic methodology for estimating the amount of pass-on of any Microsoft overcharges. The record before the court shows that Plaintiffs' have proposed standard accepted economic techniques for estimating pass-on changes and while they agree on the difficulty of performing such a regression analysis, there is no disagreement as to the validity of the proposed methodology. Dr. Leffler testified that in his opinion the Plaintiffs have the data sufficient to calculate an aggregate damages amount at trial.

The Court has options available should Plaintiffs' ultimately not be able to prove impact and damages on a class-wide basis. The Court can alter or amend the class certification order at any time or even decertify the class if Plaintiffs' are ultimately unable to prove impact and damages. The Court also retains the ability to grant a motion for directed verdict following Plaintiffs' case-in-chief if Plaintiffs' fail to prove their case.

Defendant Edward's, has shown his interest in this case to the court's satisfaction. The loss of his option is a sufficient interest to warrant a claim as a class representative.

Windows NT purchasers should be excluded from the operating system class definition, and the starting date for the Word and Excel class should be adjusted forward to August, 1995.

The Court concludes that Certification of a Class of New Mexico Indirect Purchases of Microsoft Products is proper and the request to dismiss Defendant Edward's as a class representative is denied.

IT IS SO ORDERED.

Dated this 30th day of September 2002.

DANIEL A. SANCHEZ

DANIEL A. SANCHEZ, District Judge

Notices sent on date of filing:

Leslie McCarthy Apodaca, Esq..
Thomas Outler, Esq.
RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
201 Third Street NW, Suite 2200
Albuquerque, NM 87102

David B. Tulchin
Michael Lacovara
SULLIVAN & CROMWELL
125 Broad Street
New York, NY 10003

Charles Casper, Esq.
MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109

Steve W. Berman, Esq.
HAGENS BERMAN
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Thomas W. Burt, Esq.
Richard Wallis, Esq.
Steven J. Aeschbacher, Esq.
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052

Thomas Hnasko, Esq.
Jeffrey L. Fornaciari, Esq.
HINKLE, HENSLEY, SHANOR & MARTIN, LLP
P.O. Box 2068
Santa Fe, NM 87504-2068

Marshall G. Martin, Esq.
HINKLE, HENSLEY, SHANOR & MARTIN, LLP
500 Marquette Avenue, NW, Suite 800
Albuquerque, NM 87102

David A. Freedman, Esq.
Joseph Goldsberg, Esq.
Susan G. White, Esq.
FREEDMAN, BOYD, DANIELS,
HOLLANDER, GOLDBERG & CLINE
20 First Plaza, Suite 700
Albuquerque, NM 87102

Leonard B. Simon, Esq..
Robert J. Gralewski, Jr.Esq.
MILBERG, WEISS BERSHAD HYNES & LERACHLLP
600 West Broadway, Suite 1800
San Diego, CA 92101

Joseph Arshawsky, Esq.
PROVOST, UMPHREY, L.L.P.
YOUNGDAHL, SADIN, P.C.
9621 Fourth Street, N.W.
Albuquerque, NM 87114

**Tab 10**

IN THE FIFTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

FILED

2002 DEC 20 PM 4:28

RICHARD R. ROOKER, CLERK

____D.C.

| | |
|---|---|
| DANIEL SHERWOOD, ET AL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) |
| | ) |
| MICROSOFT CORPORATION, ET AL, | ) |
| | ) |
| Defendants. | ) |

NO. 99C-3562
(CLASS ACTION)

RECD DEC 27 2002

## MEMORANDUM AND ORDER

This case is before the Court for the second time on plaintiffs' motion for class certification. More specifically, the plaintiffs have moved this Court for an order allowing this case to proceed as a class action pursuant to T.R.C.P. 23.01 and 23.02(3) on behalf of the following class:

> All persons or entitles in the State of Tennessee who purchased for purposes other than resale or distribution during the last four years, Intel comparable PC operating systems licenced by Microsoft. The class excludes defendants and their coconspirators, their subsidiaries, affiliates, officers and employees, and governmental entities.

The plaintiffs contend that the class is sufficiently numerous to make joinder impractical, there are questions of law and fact common to the class, the claims and defenses of plaintiffs are typical of the class and plaintiffs will fairly and adequately represent the class. T.R.C.P. 23.01. The plaintiffs also assert that the proposed class is maintainable because questions of law and fact common to the class predominate over any issues affecting

individual class members.    T.R.C.P. 23.02(3).    Opposing class certification, the defendant, Microsoft, asserts that because of the number of different Microsoft operating systems distributed through varying distribution channels, and the fact that price increases, even if they exist, often are not passed on to the ultimate customer, it is impossible to prove a detrimental impact to the class, or measure of damage to the individual consumer. According to Microsoft, the plaintiffs have failed to show this Court that common questions predominate over individual ones and therefore this Court cannot find that a class action is superior to other available methods for the fair and efficient adjudication of this controversy.    T.R.C.P. 23.02(3).

The complaint in this case alleges illegal monopolization of the computer systems market and unfair and anti competitive conduct in violation of the Tennessee Trade Practices Act (TTPA), T.C.A. § 47-25-101 et seq. and the Tennessee Consumer Protection Act (TCPA), T.C.A. § 47-18-101 et seq.    While this case alleges only state causes of action it is one of a number of cases which may be said to ride piggy back on United States v. Microsoft Corporation and where, the plaintiffs remind this Court, Judge Jackson found Microsoft's conduct had "harmed consumers in ways that were immediate and discernible."    84 F.Supp.2d 1, 111 (D.C. 2000). Affirmed in part, reversed in part 253 F.3d 34 (D.C. Cir. 2001).

By prior order this Court has concluded that these state causes of action can only be asserted by indirect purchasers. (See Order of July 5, 2000 - presently on appeal). Tennessee is among the thirty seven (37) states which apply its trade practices act to indirect purchasers. See Blake v. Abbott Laboratories, Inc., 1996 WL 134947 (Tenn. App. March 27, 1996). See also Comes v. Microsoft Corporation, 646 N.W.2d 440 (Iowa, 2002)(Iowa law allows for suit by indirect purchasers) and Bunker's Glass Company v. Pilkington, 47 P.3d 1119 (Ariz. App. 2002)(complexity no bar to indirect purchaser action).

The motion for class certification was first argued before this Court in September 2000. However, subsequent to the first hearing and before the Court ruled on the motion, the Court ordered the case stayed. See Order of October 23, 2000. The stay was ultimately lifted by Order of September 11, 2002 and the motion for class certification was set for reargument on December 6, 2002. The parties have filed additional briefs which include reference to a number of cases decided since September 2000 in which courts have granted or denied class certification in state antitrust cases. The plaintiff has further filed the testimony of one of its expert witnesses given in similar cases in Florida and New Mexico.

To be properly certified the class must meet all four of the requirements of Rule 23.01: numerosity, commonality, typicality and adequacy. Microsoft asserts no challenge to these four. In

3

addition, the class must meet one of the sub parts of Rule 23.03. Because indirect purchaser actions are for damages, they are brought under Rule 23.02(3), which requires that questions common to the class predominate over individual questions, and that a class action is superior to other methods of resolving the dispute. The question of whether the common issues predominate over individual issues is critical in indirect purchaser cases.

The parties have filed numerous affidavits and other materials supporting their respective positions. Extensive briefs with a myriad of supporting cases have been filed and oral argument was held before the Court both in September 2000 and again in December 2002.

At the December 2002 hearing the parties pointed out to the Court that a number of courts have now ruled on the class certification issue which now confronts this Court. The plaintiffs cite nine (9) cases in which trial courts have certified an indirect purchaser class against Microsoft. The allegations against Microsoft in all those cases are very similar to the plaintiffs' allegations in this case. Plaintiffs highlight that six (6) of the nine (9) cases base their certification decisions on the testimony of Dr. Keith Leffler, the same expert that plaintiffs have proffered here in support of class certification.[1]  See  In re

---

[1] In California, Arizona, and Wisconsin plaintiff's relied on a different expert, Dr. Jeffery Mackie-Mason.

4

<u>Florida Microsoft Antitrust Litigation</u>, No. 99-27340 (Fla. Cir.,
August 26, 2002); <u>In re New Mexico Indirect Purchasers Microsoft
Antitrust Litigation</u>, No. D-0101-CV-2000-1697 (N.M. Dist. Ct.,
September 30, 2002)[2]; <u>Bellinder v. Microsoft Corp.</u>, 2001 WL 1397995
(Kans. Dist. Ct., September 7, 2001); <u>Gordon v. Microsoft Corp.</u>,
2001 WL 366432 (Minn. Dist. Ct., March 30, 2001); <u>In re South
Dakota Microsoft Antitrust Litigation</u>, No. 00-235 (S.D. Cir. Ct.,
October 3, 2001); <u>Howe v. Microsoft Corp.</u>, 2002 WL 199130 (N.D.
Dist., January 16, 2002); <u>Capp v. Microsoft Corp.</u>, No. 00-CV-0637
(Wis. Cir., July 25, 2001); <u>Friedman v. Microsoft Corp.</u>, NO.
CV2000-000722 (Ariz. Sup. Ct., November 15, 2000); <u>Microsoft I-V
Cases</u>, J.C.C.P. No. 4106 (Calif. Sup. Ct., August 29, 2000).

Microsoft, on the other hand, points to several cases in which
courts have refused to certify the class, including the only
appellate decision to address the issue.

Microsoft places emphasis on <u>A & M Supply Co. v. Microsoft
Corp.</u>, 2002 WL 1974137 (Mich. Ct. App. August 27, 2002) in which
the court reversed the trial court which had granted class
certification. The Michigan Court of Appeals found that the case
"involve[d] no less than six [operating system] products sold over
a number of years through numerous retailers," and that "this
proliferation of factors expands the possibility that the over-

---

[2]The testimony in the Florida and New Mexico class
certification hearing were filed with this court.

5

charge for each product varied over time, varied at a different rate from the other products, and was passed-on at different rates to indirect purchasers." A & M Supply Co., Id. at *23. Having concluded that plaintiffs' expert, Professor Leffler, failed to "bridge the gap between economic theory and the reality of economic damages" the court reversed the grant of class certification. Id. The court held that plaintiffs' pass-through contentions could not address the "substantial variation across Michigan retailers in the prices quoted for the same computer model on any given date" and that the "overcharge for each product ... was passed-on at different rates to indirect purchasers." Id, at *23.

A trial court in Maine also denied class certification in an analogous case against Microsoft. See Melnick v. Microsoft Corp., 2001 WL 1012261 (Me. Super., August 24, 2001). The Maine court found that Professor Leffler's theories were insufficient to satisfy plaintiffs' burden of proof, because they were no more than "general, untried economic theory" that had not been shown to be "workable with real world facts" from the PC and software markets. Id. at *16.

Plaintiffs counter by arguing that the Michigan and Maine cases are inapposite because those states, unlike Tennessee, require individualized damage determination for each class member and the establishment of damages with absolute precision. The plaintiffs also maintain that the expert affidavits provided to the

Michigan and Maine courts were substantially less detailed and thorough than the factual information now available in support of this motion.

The Court obviously cannot add up the cases on each side and go with the weight of numbers. Nor can the Court decide this matter based upon an appellate court's decision in another state. The Court has read the cited cases with interest and has especially considered the opposing, but well reasoned, decisions from Michigan and Florida. The Court, however, while not ignoring the decisions in other cases, has set out to decide this case giving exclusive consideration to the requirements of Tennessee law and this judge's view of the law.

Ultimately, this Court must determine whether this case is appropriate for class certification under Tennessee law. This determination turns on whether the plaintiffs can show harm to all members of the class by generalized rather than individualized proof. Courts must conduct "rigorous analysis" to determine if the requirements for certification are satisfied. See General Telephone Company v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 2372 (1982). The Court cannot make this decision based solely on the plaintiffs' allegations, but must determine if the plaintiffs have a rational methodology to prove impact[3] and damages in order to

---

[3]Proof of a detrimental impact on the consumer is a necessary ingredient of a private antitrust claim. See Elder-Beerman Stores Corp. v. Federated Dept. Stores, 459 F.2d 138, 148 (6th Cir.

7

carry its burden under Rule 23.02(3). This often includes consideration of expert testimony. The courts have often struggled with walking a fine line between determining whether the plaintiffs have a rational methodology to show class injury and the inappropriate delving into an assessment of the merits of the case. See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 2152-53 (1974), In re Polypropylene Carpet Anti-Trust Litigation, 998 F.Supp. 18, 26 (N.D. Ga. 1997) and Transamerican Ref. Corporation v. Dravco Corporation, 130 F.R.D. 70, 74-76 (S.D. Tex. 1990). If the plaintiffs are unable to show a rational method of proving impact to the class caused by Microsoft's alleged illegal actions and of demonstrating that the amount of damages is susceptible to class wide proof, then the motion must be denied.

No extended discussion is necessary to recognize that proof of impact and damages is difficult in an antitrust case brought by an indirect purchaser. See Page, The Limits of State Indirect Purchaser Suits: Class Certification, 67 Antitrust L.J. 1 (1999). The decision in Illinois Brick v. Illinois, 431 U.S. 720, 97 S.Ct. 2061 (1977) limiting federal antitrust actions to direct purchaser

_____

1972)("The private litigant must not only show the violation of the antitrust laws, but show also the impact of the violations upon him and damages to him resulting from violations of the antitrust laws"). There is a difference between impact and actual damages. "Fact of damage pertains to the existence of injury, as a predicate to liability, actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief." B.W.I. Custom Kitchen v. Owens-Illinois, 191 Cal.App.3d 1341, 1350 n7 (1987).

was, in part, based on the practical difficulty of proving damages by an indirect purchaser. Woven throughout that decision are comments of "uncertainties and difficulties" in the "real economic world." (Id. at 2067); "whole new dimensions of complexity" (Id. at 2070) and "massive evidence and complicated theories" (Id. at 2072). The dissent, authored by Justice Brennan, acknowledged the difficulty, but instead focused on the trend in court decisions "to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proven invasion of the plaintiff's rights." 97 S.Ct. at 2080 citing Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 580 (1946).

Justice Brennan further observed:

Admittedly, there will be many cases in which plaintiff will be unable to prove that the overcharge was passed on. In others, the portion of the overcharge passed on may be only approximately determinable. But again, this problem hardly distinguishes this case from other antitrust cases. Reasoned estimation is required in all antitrust cases, but "while damages [in such cases] may not be determined by mere speculation or guess, it will be enough if the evidence shows the extend of the damages as a matter of just and reasonable inference, although the result by only approximate."

Illinois Brick, 97 S.Ct. 2081-82 citing Story Parchment Co. v. Paterson, 282 U.S. 555, 51 S.Ct. 248, 250 (1931). In allowing indirect purchaser lawsuits for damages to enforce the Iowa Competition Law, the Iowa Supreme Court commented that "we should not defeat the ends of justice because the litigation may be

complicated" and "we note there is an absence of cases in which the court was faced with the impossible task of apportioning damages." Comes, supra 646 N.W.2d at 451.

Several principles, perhaps unique to Tennessee, command recognition. Assuming that the plaintiffs can prove a violation of the state antitrust law, the court must keep in mind that the intractability of proving damages must be measured against the principle of ubi jus, ibi remedium (wherever there is a right, there is a remedy for a violation of that right). See Inman, Gibson's Suits in Chancery, §11 (7th ed 1988). Secondly, Tennessee does recognize an action by indirect purchasers. See Blake v. Abbott Laboratories, Inc., supra. Therefore, Tennessee has rejected the rationale of the majority in Illinois Brick. Implicit in the rejection of Illinois Brick is the recognition that the problems recognized in Illinois Brick do not bar recovery. Furthermore, to the extent it is discussed, proof of damages - or problems in ascertaining damages - do not inhibit class certification. See Meighan v. U.S. Sprint Communications, 924 S.W.2d 632, 637 (Tenn. 1996). If common issues of law and fact predominate on the issue of liability then "while separate factual issues of individual damages remains" class certification is still appropriate. Id. Further, "certification serves to provide access to courts to individual claimants whose small claims would not otherwise justify their seeking relief." Id. at 638. In addition,

10

Tennessee recognizes the rule that while the fact of damages must be proved with certainty, the amount of damages is not governed by certainty, but by a rule of reasonableness.  See, e.g., Overstreet v. Shoney's Inc., 4 S.W.3d 694, 703 (Tenn. App. 1999).

This Court recognizes that proof of damages remain separate from liability and proof of impact is a necessary part of liability, albeit overlapping with proof of damages to individual indirect purchasers.  At least one court has found, however, that the alleged actions of Microsoft in this lawsuit have "harmed consumers in ways that were immediate and discernible."  United States v. Microsoft Corporation, 84 F.Supp.2d at 111.

Microsoft argues that antitrust injury (impact) and/or damages cannot be determined on a class wide basis.  Proof of damages in an indirect purchaser case is not easy.  First the plaintiff must prove an overcharge to the direct purchaser.  Then, and this is often difficult, it must prove that the overcharge, or some portion of it, was passed through the chain of distribution to the indirect purchaser (often called the "pass-on" requirement).  The affidavits filed by Microsoft of Professor Jerry Hausman of MIT and Professor Malcolm Getz of Vanderbilt contend that the variables in pricing, method of distribution, number of systems, giving free web browser, the time span and the fact that Microsoft only supplies a small component to the assembled P.C. cause an almost infinite variation in impact on any individual indirect purchaser and this would

11

include the probably of benefit in purchase price to some consum-
ers. Microsoft terms this as a "dizzying array of circumstances"
making proof of impact and/or damages of a product that has
"traveled through the hands of so many intermediaries" impossible.
Microsoft cites the Page article cited above:

> The more heterogeneous the product, the more difficult it
> will be to establish impact by general proof .... In
> addition, it is more difficult to show harm by common
> proof if the product was resold by more than one level of
> intermediate sellers .... The consistency of markups also
> varies to the extent the product is altered in the chain
> of distribution. Virtually all of the cases decided so
> far have involved resales of virtually unaltered products
> .... Even resales without packaging involve some addition
> of value by advertising and other services in the chain
> of distribution. These additional services make showing
> generalized harm difficult. Still more problematic are
> cases, like prescription drugs, thermal fax paper, and
> chlorine, in which the product is repackaged in different
> sizes in the chain of distribution. In such cases, the
> changes in packaging may add significant value and
> individual characteristics to the final product, thus
> multiplying the factors that affect the final price.
>
> Most difficult of all are cases which the monopolized
> product is used as an input in another product. In such
> cases, the overcharge on the price-fixed product may be
> a trivial part of the price of the end product, and
> easily lost in various other factors affecting the price
> of the product.

Page, supra at 29-31. Microsoft contends that "this case
exemplifies, on an unprecedented scale, every one of the impedi-
ments to class certification identified by Professor Page."

Plaintiffs counter with their own experts. They file
affidavits of Associate Professor Keith Leffler of the University
of Washington and Professor Reuben Kyle of Middle Tennessee State

University.    Plaintiffs have also filed the recent testimony of Professor Leffler given in other cases.

Leffler contends that standard economic theory provides numerous methodologies that will prove on a class wide basis that all members were injured by Microsoft's monopolistic conduct. Leffler listed three different yard stick methods that could be used to calculate overcharge on a class wide basis: (1) Compare Microsoft's operating system prices to the prices of software products in a competitive market, where the products in question have revenue opportunities comparable to operating system products; (2) compare Microsoft's operating system profits to the profits earned by software products in competitive markets; and (3) derive competitive prices from the prices that Microsoft charges for its operating system during the period in which Microsoft competed in the operating system market with digital research.    Dr. Leffler gives little weight to the assertion that the giving of a free web browser has actually benefitted consumers.    He questions Microsoft's assertions as "speculative" and says this has to be measured against a market already inflated by Microsoft's activities.    He does concede that a separate analysis may be required for different distribution channels, but that no significant difficulties arise from the multiplicity of the distribution alternatives

13

and that overcharges can be estimated for each appropriate distribution channel.[4]

What of the pass-on requirement? One defense attorney described the pass-on requirement to be the "heart" of the matter. The Court agrees. The Court is of the opinion after reading the Leffler affidavits, and especially considering his testimony in the Florida and New Mexico hearings, that Dr. Leffler has presented methods which a reasonable fact finder could accept for estimating the amount of overcharge that was passed on to indirect purchasers.[5] He suggests that this can be done by a regression analysis. As Dr. Leffler explained "I simply mean a methodology that allows one to estimate the relationship between variables, and that analysis includes a host of particular and specific techniques. But generally what those techniques have in common is that they are attempting to and do estimate the relationship between one variable or many more than one variable and another variable." Dr. Leffler conceded that obtaining the data was sometimes problematic, but he believed that by the time of the trial this analysis would be available. By using regression analysis, he believed that he

---

[4]Even the Michigan Court of Appeals which denied class certification conceded that Dr. Leffler's methodology of proving overcharge was "sufficiently probative" to carry the burden on this issue. A & M Supply Company, supra at *21.

[5]Dr. Leffler's testimony in New Mexico is the most recent. He testified on two (2) days, July 1-2, 2002, and his testimony takes 268 transcript pages. He was followed on the stand by Professor Hausman. Leffler gave a short rebuttal testimony (17 pages).

could show how much of a price increase on the direct purchaser would be passed on to the indirect purchaser. When asked whether regression analysis had been used for the purposes of measuring a pass-on he stated:

> Economists have done for years analysis of pass-on, not in the litigation sense of trying to figure out how an overcharge effects end users, but something that has been of interest to economists for decades, many decades, is how various government taxes effect prices, so that economists have dealt in detail with the issue of what happens to prices to consumers when producers pay higher prices and those higher prices can be in the form of excise taxes in some cases, sales taxes in other cases, so there is a long and rich history of the use of regression analysis in analyzing what is really a pass-on issue in far more complex settings than at issue in this case.

When asked about the complexity of the distribution system and whether that would effect his analysis, Dr. Leffler was of the opinion that economic rules governing competition would apply to eliminate the complexity in the distribution system from interfering with his ability to reasonably estimate the over charge to the class. As to the availability of data, he opined that the data could be recovered from manufacturers such as Gateway, IBM, and Dell, and that there was national retailer data available. In concluding his testimony in the New Mexico hearing, Dr. Leffler stated "I believe as I presume my testimony made clear, that a formulaic method or methods exist to estimate the Microsoft over charges; that a formulaic method exists to estimate how much that

over charge is then passed on to end users; and that, in fact, the data does exist to implement these methodologies."

In his New Mexico testimony, Dr. Leffler was probed on cross examination about elasticities of supply and demand, feed back, brand name power, pricing decisions, the unavailability of the needed data for the regression analysis and a number of other elements in determining the sales price of computers. He continued to acknowledge the difficulty in the process, but not the impossibility.

The affidavit of Dr. Ruben Kyle is entirely rebuttal in nature. He contends that the Court should give Professor Getz's affidavit little weight as it is based upon insufficient information and inadequate sampling techniques.

Microsoft filed a reply affidavit of Dr. Getz and a response affidavit of Dr. Hausman. Dr. Getz defends in detail his prior conclusions related to the complexity of the distribution system in his reply affidavit. Dr. Hausman also explained in considerable detail why Dr. Leffler's assumptions and conclusions are overly simplistic and incorrect. He also explains why Dr. Leffler's proposed methods of determining damages "make no economic sense" and are "highly speculative" and "unreliable." His testimony in Florida and New Mexico is consistent with his affidavits. There is no doubt that Dr. Hausman has a different view and he explains why it is doubtful that Microsoft's illegal actions caused any price

16

increase, and even if it did, it would not be possible to determine the pass-on to the indirect purchasers. As he did in his affidavits, he again questioned Dr. Leffler's methodology and opined that Dr. Leffler would "end up with biased and inconsistent results." For Dr. Hausman, the problems of proving damages are so intractable that he was of the opinion that it was practically impossible to prove damages for any individual consumer, no less a class of consumers.

This Court is of the opinion that there is support for Dr. Leffler's methodology in the economic community sufficient to give his testimony the credibility necessary to sustain the plaintiffs' burden for class certification. The discussion of this authority is set out in detail in the Florida Microsoft case and the Court adopts the economic authority cited therein. See In re Florida Microsoft Antitrust Litigation, supra at *18-20.

Microsoft argues that there is no authority in Tennessee to aggregate damages in a class action case. Microsoft correctly points out that in order for an individual to recover under the Consumer Protection Act, the plaintiff must prove "an ascertainable loss of money or property." See T.C.A. § 47-18-109(a)(1). To recover under the Trade Practices Act, the plaintiff must show that he was "injured or damaged" by the anti-competitive activity. See T.C.A. § 47-25-106. Microsoft then asserts that the aggregation of damages is inappropriate since the statutes require specificity.

The plaintiffs counter this argument with a citation to Meighan v. U.S. Sprint Communications Co., 924 S.W.2d 632 (Tenn. 1996). Meighan involved an inverse condemnation case where U.S. Sprint ran fiber optic cable over hundreds of miles without obtaining the property owner's consent. In holding the action to be an appropriate class action, but in recognizing that the claims of each individual class member might be small, the court stated:

> While we recognize that the issue of compensatory damages may require some individual consideration, we disagree with plaintiffs position that each owner will be entitled to present detailed damages evidence.
>
> In a class action, courts are not required to conduct separate damage inquiries for each class member. Instead, the court may determine an aggregate damage amount for the class as a whole. Newberg, supra § 4.26 at 321. The trial court may simply choose to divide the award among members or may allow each plaintiff to recover by proving his or her claim against the entire judgment . See Boeing Company v. VanGemert, 444 U.S. 472, 100 S.Ct. 745. This case is particularly amenable to the aggregate damage approach.

Id. at 638. The plaintiffs place great stock in this quote and contend that this shows that Tennessee allows "aggregate" damages in a class action.

The Court is of the opinion that the plaintiffs' approach is the correct one and that aggregate damages are allowed. Class actions to enforce antitrust laws have always faced the difficulty of the complexity of proof of damages. If the Court adopts the defendant's argument, class actions would be precluded in all but the simplest cases, and the ability of indirect purchasers to

18

recover damages would for all practical purposes be nonexistent. The Court returns to where it started and agrees with Justice Brennan's dissent in <u>Illinois Brick</u> that almost all antitrust cases are characterized by "long and complicated proceedings involving massive evidence and complicated theories." <u>Id.</u>, 97 S.Ct. at 2081.

> Non-uniformity of the prices at which plaintiffs pur-chased their goods is not fatal to certification. As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement .... To prove injury, plaintiffs need only demonstrate they have suffered some damage from the unlawful conspiracy .... Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.
>
> 'Common proof of impact is possible even though prices are individually negotiated .... Proof of impact typi-cally follows proof of a price-fixing conspiracy where the defendants are shown to have sufficient market power'.... Although damage amounts may vary among plaintiffs, this fact alone, particularly in antitrust actions, will not defeat certification.... Individual questions of damages are often a problem encountered in an antitrust action and are rarely a barrier to certification. [emphasis added].

<u>See In re Workers Compensation</u>, 130 F.R.D. 99, 108-110 (D. Minn. 1990):

> Defendants argue that the damages or fact of damage issue is too complicated for class treatment .... The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool from plaintiffs' hands .... If it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most efficient and effective tool for resolving the issues.

19

Little Caesar Enterprises Inc. v. Smith, 172 F.R.D. 236, 246 (E.D. Mich. 1997).

The Court repeats: it must resist the temptation to decide this lawsuit on the expert affidavits. The opinions of Microsoft's experts have much to commend them. They do not, however, convince the Court that the plaintiffs' expert opinions are to be disregarded. See McDaniel v. CSX Transportation, 955 S.W.2d 257 (Tenn. 1997). Therefore, it is the opinion of the Court that the plaintiffs have made a sufficient showing for this case to go forward as a class action. "The invitation to pre-try the case through the vehicle of this motion [class certification] must be respectfully declined ...." Siegle v. Chicken Delight Inc., 271 F.Supp. 722, 726 (N.D. Cal. 1967).

The defendant here may well prevail on the merits of this case, whether at trial or on summary judgment, and the plaintiffs may fail to carry their burden on damages. Furthermore, as this case develops, the Court has discretion to decertify the class, if appropriate, or to create subclasses, if necessary.

The Court acknowledges that it is troubled by the daunting administrative task before it, as well as the question of whether the plaintiffs' theories can be transformed to real numbers from which a jury can make a reasonable decision. The Court finds this, however, to be of lesser concern than holding that complexity denies indirect purchasers an opportunity to try and prove that

20

they were damaged by the alleged conduct, which at least one court has found to violate federal antitrust law. See United States v. Microsoft, 253 F.3d 34 (D.C. Cir. 2001). The Court is convinced that it can successfully manage this case to its resolution with the aid of competent and imaginative counsel.

It is therefore ORDERED:

1. This case is certified as a class action. The class defined as:

> All persons or entities in the State of Tennessee who purchased for purposes other than resale or distribution during the last four years, Intel comparable PC operating systems licenced by Microsoft. The class excludes defendants and their coconspirators, their subsidiaries, affiliates, officers and employees, and governmental entities.

The Court reads the class definition to set the time limit as December 21, 1995, which is four (4) years prior to the filing of the complaint.

2. The Court will hold a hearing on the 9th day of January, 2003, at 9:30 a.m. to determine the appropriate notice to the class. The parties shall submit written proposals on the notice issue to be filed seventy two (72) hours before the hearing.

3. The parties shall also address at the hearing ordered above whether the class needs to be modified in any way to avoid conflict with the class in the MDL.

4. At the hearing set in paragraph 2 above, the Court will determine counsel to represent the class. The Court has every

21

intention of appointing local counsel who have already participated in this case, but the Court will limit the number of out-of-state counsel who represent the class.

5.  The previously set scheduling conference will still be held in chambers at 8:30 a.m. on January 9, 2003. Counsel shall please meet prior to the conference and make every effort to agree upon a scheduling order. If no agreement is reached counsel for each side shall file by noon on January 8, 2003 a proposed scheduling order for consideration by the Court.

This the 20 day of Dec , 2002.

WALTER C. KURTZ, JUDGE

xc:  George E. Barrett
Douglas S. Johnston, Jr.
Edmund L. Carey, Jr.
Timothy L. Miles
Attorneys at Law
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201

James G. Stranch, III
C. Dewey Branstetter
Attorneys at Law
BRANSTETTER, KILGORE, STRANCH
& JENNINGS
227 Second Avenue, North
Nashville, TN 37201

22

Alice McInerney
Daniel Hume
Attorneys at Law
KIRBY, McINERNEY & SQUIRE, LLP
830 Third Avenue
New York, NY 10022

Leonard B. Simon
Dennis Stewart
Robert J. Gralewski
Attorneys at Law
MILBERG WEISS BERSHAD
HAYNES & LERACH, LLP
600 West Broadway, Suite 1800
San Diego, CA 92101

David S. Stellings
LEIFF, CABRASER, HEIMANN BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017

Robert L. Leiff
Joseph R. Saveri
Michele C. Jackson
David Stellings
LEIFF, CABRASER, HEIMANN BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111

David J. Bershad
Robert A. Wallner
Joseph Opper
Douglas Richards
MILBERG WEISS BERSHAD
HAYNES & LERACH, LLP
One Pennsylvania Place
New York, NY 10119-0165

John W. "Don" Barrett
BARRETT LAW OFFICE
P.O. Box 987
Lexington, MS 39095

23

Jerry D. Kizer, Jr.
D. Scott Portch, IV
Attorneys at Law
RAINEY, KIZER, BUTLER, REVIERE &
BELL, PLC
105 S. Highland Avenue
Jackson, TN 38301

Mark D. Bogen
Attorney at Law
LAW OFFICES OF MARK D. BOGEN
1761 West Hillsboro Blvd., Suite 328
Deerfield Beach, FL 33442

Sam Rosen
Attorney at Law
WECSHLER, HARWOOD, HALEBRIAN &
FEFFER, LLP
488 Madison Avenue
New York, NY 10022

James A. DeLanis
Attorney at Law
BAKER, DONELSON, BEARMAN &
CALDWELL, P.C.
Commerce Center, Suite 1000
211 Commerce Street
Nashville, TN 37201

Leo Bearman, Jr.
Attorney at Law
BAKER, DONELSON, BEARMAN &
CALDWELL, P.C.
165 Madison Avenue, 20th Floor
Memphis, TN 38103

Richard C. Pepperman, II
David B. Tulchin
Attorneys at Law
SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004

24

Thomas W. Burt
Richard Wallis
Steven J. Aeschbacher
Attorneys at Law
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052

Charles B. Casper
Attorney at Law
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109

Tab 11



1  William Bernstein (State Bar No. 065200)
   Joseph R. Saveri (State Bar No. 130064)
2  LIEFF, CABRASER & HEIMANN
   275 Battery Street, 30th Floor
3  San Francisco, California 94111-3339
   Telephone:  (415) 956-1000
4
   Plaintiffs' Co-Lead and Co-Liaison Counsel
5

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

10

11 Coordination Proceeding          )  J.C.C.P. Nos. 2969, 2971 & 2972
   Special Title (Rule 1550(b))     )
12                                   )  Hon. Alfred G. Chiantelli
                                     )  Coordination Trial Judge
13 PHARMACEUTICAL CASES I, II,       )
   and III                          )
14                                   )
                                     )
15 ─────────────────────────────    )  San Francisco Sup. Ct. No.
                                     )  962294
16                                   )
   THIS DOCUMENT RELATES TO:         )  ORDER CERTIFYING
17                                   )  CONSUMER CLASS
   Preciado v. Abbott               )
18 Laboratories                     )
                                     )
19 ─────────────────────────────    )

20

21        The motion of plaintiffs Reyna Preciado (Barrero), Alan

22 Cutler, and Cynthia Alexis for class certification of the consumer

23 class came on regularly for hearing before this Court on June 23,

24 1995. The Court has considered the memoranda of the parties,

25 reviewed the evidence submitted, and has considered the oral

26 argument of counsel. For good cause appearing therefor, the

27 motion for class certification of the consumer class is GRANTED on

28 the terms and conditions set forth in this Order.

                                           -1-

                                                    EXHIBIT A

1        1.    The class sought by the plaintiffs in these

2 coordinated actions satisfies the numerosity requirement in that

3 there are at least many thousands of individuals who purchased

4 brand name prescription drugs ("Brand Name Prescription Drugs")

5 manufactured and/or sold by the defendants.

6        2.    The class is ascertainable and its members possess

7 a commonality of interest in determining defendants' liability, if

8 any, for the course of conduct alleged in the Complaint.

9        3.    Common questions of law or fact, including the

10 claimed existence, nature, scope and extent of the alleged

11 conspiracy, as well as the claimed fact of injury, exist and

12 predominate over any individual questions that may arise.

13        4.    The plaintiffs' claims are typical of the claims of

14 absent class members, as all such claims arise out of their

15 indirect purchase of Brand Name Prescription Drugs from the

16 defendants.

17        5.    Plaintiffs will fairly and adequately represent the

18 class, and plaintiffs' counsel are skilled in prosecuting such

19 class actions.

20        6.    The following plaintiffs shall serve as class

21 representatives: Reyna Barrero, Alan Cutler, and Cynthia Alexis.

22        7.    The following law firms are qualified to and shall

23 serve as class counsel: Lieff, Cabraser, Heimann & Bernstein; Law

24 Offices of Francis O. Scarpulla; and the Law Offices of Sherman

25 Kassof.

26        8.    This action is manageable as a class action.

27        Therefore, pursuant to Rules 23(a)(1)-(4) and 23(b)(3)

28 of the Federal Rules of Civil Procedure, adopted for use by

1  California courts and California Code of Civil Procedure section

2  382 the following plaintiff class is certified:

3      All natural persons who, at the time notice is
       published, reside in the State of California
       and who, beginning four years prior to
4      July 12, 1994 through the present, indirectly
       purchased Brand-Name Prescription Drugs
5      through Independent Retail Pharmacies in the
       State of California from any of the defendants
6      for consumption by their families and/or
       themselves and not for resale. For purposes
7      of this order, "Independent Retail Pharmacies"
       shall mean retail pharmacies or retail
8      pharmacy chains with ten locations or less.
       Independent Retail Pharmacies shall not
9      include pharmacies which are owned, operated,
       controlled or managed by health maintenance
10     organizations or hospitals.

11     Excluded from the class are all natural
       persons who purchased Brand-Name Prescription
12     Drugs other than through Independent Retail
       Pharmacies; all natural persons who obtained
13     Brand-Name Prescription Drugs through the
       MediCal Prescription Drug Program; and all
14     natural persons who made no payment directly
       to an Independent Retail Pharmacy for the
15     purchase of a Brand Name Prescription Drug.

16

17     Counsel for the parties shall meet and confer on the

18  form of notice to be submitted to the class.

19     Further, the parties have stipulated and the Court

20  orders as follows:

21         (a)  The action captioned _Lazio v. Abbott_

22  _Laboratories_ S.F. Superior Court No. 969870 is hereby dismissed.

23         (b)  The Complaint in the _Preciado_ action shall be

24  amended to add Lawrence Lazio as an additional party plaintiff and

25  proposed class representative.    Defendants shall have until

26  September 15, 1995 to inform plaintiffs' counsel of their intent

27  to depose Mr. Lazio and/or to propound written discovery upon Mr.

28  Lazio pertaining to his proposed designation as a class

-3-

1   representative. This order shall not otherwise limit defendants'

2   ability to take future discovery of Mr. Lazio in accordance with

3   the Code of Civil Procedure. Unless Defendants file a motion by

4   October 15, 1995 objecting to Mr. Lazio's designation as a class

5   representative, Mr. Lazio shall become on that date an additional

6   class representative without further order of this Court.

7           (c)   The law offices of Saveri & Saveri and Eric B.

8   Freed are skilled in prosecuting class actions and shall also

9   serve as class counsel in this action.

10          IT IS SO ORDERED.                    ALFRED G. CHIANTELLI

11                            AUG 16 1995

12                                        Honorable Alfred G. Chiantelli
                                          Judge of the Superior Court

13  Approved as to form:

14

15                  (B.H.)

16  Leonard R. Stein
    STEEFEL, LEVITT & WEISS
17  One Embarcadero Center, 30th Floor
    San Francisco, California 94111

18

19  Terrence A. Callan
    PILLSBURY, MADISON & SUTRO
20  225 Bush Street
    San Francisco, California 94104

21

22

23

24

25

26

27

28

                            -4-

**Tab 12**





# InformationWeek
**BUSINESS INNOVATION POWERED BY TECHNOLOGY**

## The PC Replacement Decision

More companies are replacing all their PCs at once, rather than in staggered cycles; benefits include reduced maintenance costs

By Darrell Dunn, InformationWeek
June 20, 2005
URL: http://www.informationweek.com/story/showArticle.jhtml?articleID=164900387

It's inevitable. Those sparkling, high-performance PCs you purchased to help run your business more efficiently a few years ago have become less productive and must be replaced with new systems providing the latest in technology advancements. The question for CIOs and system administrators is how much of their aging PC inventories should be replaced in any given cycle.

According to a recent survey that research firm Gartner conducted with 177 large businesses, the average life span of a desktop PC is 43 months, and only 36 months for mobile PCs. More than a third of respondents said the main reason for replacement of PCs is to improve user productivity, while more than a quarter cited escalating support costs with older machines. More than 20% said new software requirements led to the need for new computing systems.

Traditionally, many businesses have employed a strategy of replacing their PC inventories in staggered, one-third-per-year increments over a three-year cycle. In fact, the Gartner survey found that businesses often redeploy, or "cascade," about a third of all used PCs to other employees. More recently, large companies have moved to a policy of replacing their entire PC inventories once every two to three years, but some small and midsize business still regard that practice as cost-prohibitive.

"The reason many companies have used the one-third replacement model has been to spread the cost out over the lifetime of the computers," says Doug Hafford, VP of consulting services and co-founder of technology integrator Afinety Inc. "Unfortunately, what they're doing is robbing Peter to pay Paul. They're focusing on the cost of the hardware and software, which is really focusing on the wrong thing."

The cost of PCs and associated software remains relatively stable from one year to the next, allowing businesses to build a consistent understanding of their infrastructure costs. Leasing programs also let businesses extend the cost of a replacement cycle over the lifetime of the equipment. While the cost of equipment and software remains constant whether a company uses a staggered replacement cycle or a



**Reasons For Replacements**
What's the main reason your company has replaced its PCs?

- 1% OTHER
- 3% MOBILITY REQUIREMENTS
- 36% IMPROVE USER PRODUCTIVITY

single enterprisewide deployment, the maintenance costs associated with a staggered cycle can be 30% to 45% greater than a single-cycle approach, Hafford says.

When companies upgrade only portions of their PC inventories over a multiyear schedule, they often end up with workforces that are using multiple and inconsistent computing platforms, operating systems, and applications, Hafford says. Maintenance costs begin to skyrocket as technology staffs attempt to work with a variety of systems and software. When a company wants to deploy a new software application, technicians often will be forced to install it individually across the varying platforms, rather than completing a single systemwide deployment that's much more achievable if all systems are consistent.



Data: Gartner Large U.S. Business PC Market survey of 177 PC decision makers

By more consistently managing its total PC network, a company doesn't run into as many surprises and can avoid spikes in IT budgets, says Christina Garcia, technical training manager and computer application specialist at law firm Brown, Winfield & Canzoneri Inc. A staggered replacement cycle "makes about as much sense as replacing the tires on your car one at a time," Garcia says. "The different tires aren't going to perform the same. The tread wear is going to be different, and they're each going to handle differently. You need to buy all four tires at the same time."

Garcia learned the hard way how difficult it can be to manage a PC inventory and associated applications that are built up over a period of years. Her law firm provides legal input on real-estate transactions and has about 80 lawyers on staff. The lawyers used desktop computers that had been purchased and installed over a five-year period. "What we ended up with was a patch-quilt inventory, which brought no end to problems as far as support," she says.

These problems were compounded as the company combined old and new servers. "It was nothing short of a nightmare," Garcia says. "We were having increasing problems with document saving, software freezing, and it was affecting the productivity of the firm."

Last summer Brown, Winfield & Canzoneri decided to upgrade its server infrastructure and, after much debate, brought in Afinety to perform a companywide upgrade of its PC inventory. By October, the integrator had completed the installation of 80 Hewlett-Packard desktop PCs and four laptop systems.

Time dedicated to scheduled maintenance is now around 15 minutes a day, Garcia says, affording her the flexibility to create training sessions for the firm's attorneys. "That's really the other half of the equation that's improving our overall performance," she says. "You can have all the best and latest equipment and software, but if users don't understand how to use it, they'd be just as well off with an Etch A Sketch." ParadigmHealth Inc., a provider of health-care-management services, eventually may move to a single-cycle PC upgrade schedule, says Tom Hagan, executive VP and CIO. But he doesn't believe the advantages of that approach warrant significant changes to his operations in the short term.

ParadigmHealth has grown quickly over the past few years with two acquisitions that have divided the company into three divisions that are rotated yearly for PC replacement. The company, which originally specialized in providing on-site nursing support to acutely ill patients, three years ago acquired Padios Health Management Services Inc., a provider of similar services to premature and other newborns that need intensive treatment, and last year acquired PersonalPath Systems Inc., a provider of disease-management

services. ParadigmHealth employs about 250 nurses, most of whom work out of home offices and perform their actual services in either patients' homes or hospitals. In all, the company has a workforce of about 450 employees.



Because of the acquisitions, ParadigmHealth has yet to synchronize on a single replacement cycle. Last year, it took what Hagan says may be the first step when it decided to standardize on IBM PCs. IBM has since sold its PC business to Lenovo Group Ltd., although the new company continues to use the IBM brand name.

"Because we have three separate divisions that have slightly different business requirements, there's a logical segmentation," Hagan says. "They do have slightly different footprints from an application perspective, but we have standardized on the hardware and operating system."

ParadigmHealth isn't rushing to one replacement cycle, Tom Hagan, executive VP and CIO, says.

Hagan says he can see advantages to getting the entire company on a single replacement cycle, and he's evaluating how it might be best accomplished by either accelerating or delaying a divisional cycle. "I really don't see where we sit today to be a major problem," he says. "There can also be an advantage to not having to time all your expenditures in one year. [The staggered cycle] can smooth things out."

And other factors are just as important as the PC replacement cycle. Says Hagan, "It's more important to have a single manufacturer for our desktops, operating system, and service packs, and to keep the platforms on the same release levels."


Legendary Reliability®



Is your IT power bill out of control?


Efficiency Quotient
DATA CENTER

Copyright © 2007 CMP Media LLC

**Tab 13**

1

2

3

4

5

6

7    UNITED STATES  DISTRICT COURT

8    NORTHERN DISTRICT OF CALIFORNIA

9

10   IN WELLS FARGO HOME MORTGAGE
     OVERTIME PAY LITIGATION

11   ————————————————————————    No. MDL 06-1770 MHP

12   This Document Relates To:    **MEMORANDUM & ORDER**
                                  **Re: Nationwide Plaintiffs' Motion to**
13   ALL ACTIONS                  **Certify a Class and Collective Action**

     ————————————————————————/

14

15

16        This multidistrict litigation arises from three putative collective actions and one putative

     class action against defendant Wells Fargo Home Mortgage ("defendant" or "Wells Fargo") on

17   behalf of defendant's Home Mortgage Consultants ("HMCs").  Now before the court is the

18   nationwide[1] plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23,

19   and for collective action certification pursuant to the Fair Labor Standards Act ("FLSA").  After

20   considering the parties' arguments and submissions and for the reasons set forth below, the court

21   rules as follows.

22

23   BACKGROUND

24        Plaintiffs in this MDL proceeding are current and former HMCs employed by Wells Fargo

25   from February 2001 to the present.  The nationwide plaintiffs seek certification of two classes.  First,

26   plaintiffs seek to certify a class of Home Mortgage Consultants who worked nationwide, but not in

27   California, pursuant to Federal Rule of Civil Procedure 23 to pursue claims for restitution under

28   California's Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200 et seq. ("UCL").

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Second, plaintiffs seek to certify a nationwide collective action of non-California HMCs who affirmatively opt in to this case to pursue claims for damages under the Fair Labor Standards Act, 29 U.S.C. section 216(b) ("FLSA"). The UCL provides a vehicle for recovery of restitution predicated on an alleged violation of the FLSA.

Wells Fargo is a world-wide financial services company, with its headquarters in San Francisco, California. Hanson Dec., Exh. 1; Strother Dep. at 32:18–33:10; Meuers Dep. at 168:19–170:2. Wells Fargo is subject to the requirements of the FLSA. Cahalan Dep. at 81:9–20. The exemption status of each position within Wells Fargo is determined by the Corporate Compensation department and the in-house legal department based on the duties and responsibilities of the position. Hanson Dec., Exhs. 6 & 7.

"Home Mortgage Consultant" is the title given to Wells Fargo employees who sell mortgages. Wells Fargo employs approximately 10,000 HMCs nationwide, and may have employed as many as 25,000 total over the past five years. Blackwell Dep. at 38:9; Heiden Dep. at 25:8–26:11. Approximately 20% of HMCs are employed in California. HMCs are classified according to specialty. Approximately 90–95% of HMCs are designated as "prime" or "sub-prime," while the remaining HMCs are classified as "reverse," "emerging markets," "renovation" and "builder." Cahalan Dep. at 34:25–35:16. Plaintiffs claim that regardless of any variations among HMC classifications, all Wells Fargo HMCs have the same basic job duties and share virtually identical job descriptions. Hanson Dec., Exhs. 10–13; Heiden Dep. at 62:24–63:1.

The primary duty of all HMCs is to sell mortgage loan products. Plaintiffs claim that HMCs spend virtually all of their time in a Wells Fargo office while performing their sales duties, primarily through the use of office telephones and computers. Additionally, plaintiffs claim that HMCs spend considerable time engaged in clerical tasks associated with loan processing. Ashworth Dec. ¶¶ 3–5, 8–9; Bowne Dec. ¶¶ 3–5, 8–9; Dees Dec. ¶¶ 3–5, 7–8; Duncan Dec. ¶¶ 3–5, 8–9; Fitzgerald Dec. ¶¶ 3–5, 8–9; Grabow Dec. ¶¶ 3–5, 8–9; Hardy Dec. ¶¶ 3–5, 8–9; Hayes Dec. ¶¶ 3–5, 8–9; Lee Dec. ¶¶ 3–5, 8–9; Lovrien Dec. ¶¶ 3–5, 8–9; Lunde Dec. ¶¶ 3–5, 8 & 10; Madsen Dec. ¶¶ 3–5, 8–9; Magott Dec. ¶¶ 3–5, 8–9; Pejoves Dec. ¶¶ 3–5, 8–9; Sykes Dec. ¶¶ 3–5, 8–9; Tugel Dec. ¶¶ 3–5, 8–9;

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Valdez Dec. ¶¶ 3–5, 8–9.  The court notes that each of plaintiffs' seventeen declarations are

2   substantially identical in format and wording.

3        All HMCs are paid pursuant to the same basic compensation policy, whereby they receive

4   commissions on the mortgage loans they sell.  Cahalan Dep. at 39:16–17; 168:2–170:1.  On January

5   1, 2005, Wells Fargo began paying HMCs a minimum "draw" of at least $2,000 per month.  Cahalan

6   Dep. at 39:23–41:16.  Prior to that time, there was no guaranteed minimum compensation for HMCs.

7   Id. at 41:2–6.  Wells Fargo classifies all HMCs as "exempt" from the overtime requirements of the

8   FLSA, and no records are kept of the amount of hours HMCs work.  Cahalan Dep. at 57:22–58:13,

9   90:9–11; Blackwell Dep. at 86:12–20.  Plaintiffs claim that HMCs commonly work more than forty

10  hours per week without additional overtime compensation.  Ashworth Dec. ¶¶ 7–11; Dees Dec. ¶¶

11  6–8, 10–11; Duncan Dec. ¶¶ 7–11; Fitzgerald Dec. ¶¶ 7–11; Grabow Dec. ¶¶ 7–11; Hardy Dec. ¶¶

12  7–11; Hayes Dec. ¶¶ 7–11; Lee Dec. ¶¶ 7–11; Lovrien Dec. ¶¶ 7–11; Lunde Dec. ¶¶ 7–11; Madsen

13  Dec. ¶¶ 7–11; Magott Dec. ¶¶ 7–11; Pejoves Dec. ¶¶ 7–11; Sykes Dec. ¶¶ 7–11; Tugel Dec. ¶¶

14  7–11; Valdez Dec. ¶¶ 7–11.

15       In response to plaintiffs' seventeen HMC declarations, defendant has submitted sixty-seven

16  declarations from other HMCs purporting to show a wide variety in employment experiences.

17  Among defendant's declarants, the time spent working outside a Wells Fargo office ranges from

18  5–10% to nearly 100% of total time worked, depending upon a variety of factors related to each

19  individual HMC.  Carrello Dec. ¶ 3; Chatraw Dec. ¶ 3; Hailey Dec. ¶ 9; Lesch Dec. ¶ 3; Maggio

20  Dec. ¶ 4; Meirick Dec. ¶ 4; Pareigis Dec. ¶ 4; Ponzo Dec. ¶ 3; Reynolds Dec. ¶ 5; Schroeder Dec. ¶

21  3; Sierra Dec. ¶ 3; Skalicky Dec. ¶ 5; Smith Dec. ¶ 3.  A similar range appears regarding the

22  frequency with which HMCs are able to meet with their clients in person, and the amount of time

23  spent meeting with clients.  Drover Dec. ¶ 9; Elliott Dec. ¶ 7; Gallet Dec. ¶ 5; George Dec. ¶ 6;

24  Horton Dec. ¶ 5; Hanson Dec. ¶ 3; Lopez Dec. ¶ 4; Muir Dec. ¶ 6; Reynolds Dec. ¶ 3; Shaffer Dec. ¶

25  5.  Additionally, defendant disputes plaintiffs' claim that HMCs spend a considerable amount of

26  time on clerical tasks, asserting that HMCs who handle a high volume of loans have clerical

27  assistants and that any office tasks performed by HMCs are performed directly in connection with

28

3

UNITED STATES DISTRICT COURT
For the Northern District of California

1  loan originations.  Bennett Dec. ¶ 4; Boyd Dec. ¶ 6; Chatraw Dec. ¶ 11; Clark Dec. ¶ 4; Cook Dec. ¶

2  4; Corey Dec. ¶ 10; Gerhardt Dec. ¶ 17; Hanson Dec. ¶ 10; Nunez Dec. ¶ 4; Roppa Dec. ¶ 11;

3  Sprague Dec. ¶ 4; Steiger Dec. ¶ 2; Westman Dec. ¶ 13; Zeller Dec. ¶ 4.  In terms of total hours

4  worked, defendant's declarations show a range of thirty to sixty-five hours per week, in contrast to

5  plaintiffs' assertion that HMCs commonly work more than forty hours per week.  Redfern Dec. ¶ 10;

6  Scripter Dec. ¶ 9; O'Brien Dec. ¶ 12; Person Dec. ¶ 13; Smith Dec. ¶ 3.  As with the California

7  HMCs, defendant asserts that these variations in job experiences arise from the varying product

8  specializations among nationwide HMCs.  Blackwell Dec. ¶¶ 4–15.  Additional factors affecting

9  work experience include geographic location, work style preferences, compensation objectives,

10  experience, target market and market forces.

11        Defendant also attacks the reliability of plaintiffs' declarations on a number of grounds.

12  First, defendant cites the similarities and uniformity in the language among the seventeen

13  declarations, suggesting that they are "cookie-cutter" declarations that do not reveal the true

14  experiences of the purported declarants.  Second, defendant asserts that nearly all of the declarations

15  come from two offices in the Midwest, and therefore do not represent the 1,600 nationwide offices.

16  Defendant additionally asserts that the declarants lack foundation to opine on the job duties of loan

17  originators other than themselves.  Finally, defendant notes that six of the seventeen declarants

18  worked most or all of their time in a refinance center in Des Moines that was established to take

19  advantage of a temporary refinance market, and therefore plaintiffs' declarations are not

20  representative of Midwest HMCs either.

21        Defendant further claims that current HMCs prefer their current commission-based

22  compensation system, regardless of specialization, and therefore would not benefit from a class

23  action.  Ford Dec. ¶ 4.  In response to this, plaintiffs assert that the aim of this litigation is not to do

24  away with Wells Fargo's current commission system, but only to bring the commission system in

25  line with the requirements of the FLSA by establishing record-keeping practices and overtime

26  compensation.

27        Additionally, plaintiffs attack the reliability of defendant's declarations, claiming that

28

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1  declarations from current employees of a defendant are inherently unreliable and possibly coerced.

2  In a previous order in this litigation, this court noted the "heightened potential for coercion because

3  where the absent class member and the defendant are involved in an ongoing business relationship,

4  such as employer-employee, any communications are more likely to be coercive." Mevorah v.

5  Wells Fargo Home Mortg., Inc., No. C 05-1175 MHP, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005)

6  (Patel, J.) (quoting Belt v. Emcare Inc., 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003)).

7      Reviewing the declarations as a whole, there are glaring reliability concerns on both sides.

8  Plaintiffs' declarations represent a very small portion of the full range of HMCs and Wells Fargo

9  locations, and are nearly identical in terms of language and substance. Defendant's declarations,

10  though drawn from a wider sample of Wells Fargo employees and offices, are likewise selectively

11  presented and carry within them possible pressure arising from ongoing employment relationships.

12  It is unremarkable to conclude that both sets of declarations are litigation-driven, and drafted and

13  selected to advance a preferred characterization of the facts. All declarations have therefore been

14  carefully scrutinized.

15      Even taking these credibility concerns into consideration, however, certain key undisputed

16  and undeniable facts arise. First, it is clear that, from Wells Fargo's perspective, all HMCs are

17  treated exactly the same way in terms of exemption status and compensation. Additionally, the

18  basic function and job description of each HMC is substantively identical—each HMC is charged

19  with selling home mortgages to consumers, with certain differences arising based on the target

20  customer base. Thus, from the perspective of Wells Fargo, there are substantial similarities in the

21  manner in which HMCs are treated, and the manner in which their duties are designated.

22      From the perspective of individual HMCs, however, there are differences in day-to-day

23  activities and overall employment experiences that cannot be ignored. Within the basic HMC

24  framework, HMCs are given a great deal of flexibility and autonomy in terms of work style and the

25  amount of time they spend working. Though selectively chosen, defendants' declarations indicate a

26  certain degree of variability from one HMC to the next that the court must take into account when

27  determining whether class certification or collective action certification is appropriate.

28

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1 LEGAL STANDARD

2 I.    Motion for Class Certification

3      A party seeking to certify a class must satisfy the four prerequisites enumerated in Rule

4 23(a), as well as at least one of the requirements of Rule 23(b). Under Rule 23(a), the party seeking

5 class certification must establish: (1) that the class is so large that joinder of all members is

6 impracticable (i.e., numerosity); (2) that there are one or more questions of law or fact common to

7 the class (i.e., commonality); (3) that the named parties' claims are typical of the class (i.e.,

8 typicality); and (4) that the class representatives will fairly and adequately protect the interests of

9 other members of the class (i.e., adequacy of representation). Fed. R. Civ. P. 23(a). In addition to

10 satisfying these prerequisites, parties seeking class certification must show that the action is

11 maintainable under Rule 23(b)(1), (2) or (3). See Rule 23(b); Amchem Products, Inc. v. Windsor,

12 521 U.S. 591, 614 (1997). Rule 23(b)(3) permits class actions for declaratory or injunctive relief

13 where "the court finds that the questions of law or fact common to the members of the class

14 predominate over any questions affecting only individual members, and that a class action is

15 superior to other available methods for the fair and efficient adjudication of the controversy."

16      The party seeking class certification bears the burden of establishing that the requirements of

17 Rules 23(a) and 23(b) have been met. See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180,

18 1188 (9th Cir. 2001), amended by 273 F.3d 1266 (9th Cir. 2001); Hanon v. Dataproducts Corp., 976

19 F.2d 497, 508 (9th Cir. 1992). However, in adjudicating a motion for class certification, the court

20 accepts the allegations in the complaint as true so long as those allegations are sufficiently specific

21 to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied.

22 See Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975). The merits of the class members'

23 substantive claims are generally irrelevant to this inquiry. Eisen v. Carlisle & Jacquelin, 417 U.S.

24 156, 177–78 (1974); Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983).

25 However, courts are "at liberty to consider evidence which goes to the requirements of Rule 23 even

26 though the evidence may also relate to the underlying merits of the case," and a court may only

27 certify a class after a "rigorous analysis" as to whether the requirements have been satisfied. Hanon,

28

1   976 F.2d at 509 (internal quotations omitted).

2

3   II.    Motion for Certification of Collective Action

4          Employees may bring a collective action under the FLSA on behalf of similarly situated

5   employees. 29 U.S.C. § 216(b); see also Leuthold v. Destination America, Inc., 224 F.R.D. 462, 466

6   (N.D. Cal. 2004) (Walker, J.). The court "may authorize the named FLSA plaintiffs to send notice

7   to all potential plaintiffs and may set a deadline for those potential plaintiffs to join the suit." Id.;

8   see also Hoffmann-La Roche v. Sperling, 493 U.S. 165 (1989). Potential plaintiffs may file a

9   written consent with the court to opt in to the suit. 29 U.S.C. § 216(b). Potential plaintiffs who do

10  not opt in are not bound by the judgment and may bring a subsequent private action. Leuthold, 224

11  F.R.D. at 466 (citing EEOC v. Pan Am. World Airways, Inc., 897 F.2d 1499, 1508 n.11 (9th Cir.

12  1990)).

13

14  DISCUSSION

15  I.     Rule 23 Class Certification

16         Plaintiffs seek to certify the following class: "all persons who worked as Home Mortgage

17  Consultants outside the state of California for Wells Fargo Bank, N.A. at any time between July 1,

18  2001 and the present." Plaintiffs bear the burden of showing that the proposed class satisfies all of

19  the requirements of Rule 23(a) and at least one requirement of Rule 23(b).

20

21         A.    Rule 23(a) Requirements

22         A party seeking class certification must establish that the numerosity, commonality,

23  typicality and adequacy of representation requirements of Rule 23(a) have been met. The court

24  addresses each of these requirements below.

25

26              1.    Numerosity

27         Pursuant to Rule 23, the class must be "so numerous that joinder of all members is

28

*(left margin, vertical text)* UNITED STATES DISTRICT COURT For the Northern District of California

1  impracticable." Fed. R. Civ. P. 23(a)(1).  Defendant acknowledges that the purported class includes
2  approximately 15,000 persons.  Accordingly, plaintiffs have satisfied the numerosity requirement.

3

4                    2.    Commonality

5        To fulfill the commonality prerequisite of Rule 23(a)(2), plaintiff must establish that there
6  are questions of law or fact common to the class as a whole.  Rule 23(a)(2) does not mandate that
7  each member of the class be identically situated, but only that there be substantial questions of law
8  or fact common to all.  See Harris v. Palm Spring Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir.
9  1964).  Individual variation among plaintiffs' questions of law and fact does not defeat underlying
10  legal commonality, because "the existence of shared legal issues with divergent factual predicates is
11  sufficient" to satisfy Rule 23.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

12        Plaintiffs identify at least four common questions: (1) whether HMCs were properly
13  classified as "exempt" from federal overtime and time-recording statutes; (2) whether Wells Fargo's
14  conduct emanated from California, and thus whether the UCL may be appropriately applied to the
15  class of nationwide plaintiffs; (3) whether Wells Fargo willfully failed to comply with the FLSA;
16  and (4) whether Wells Fargo acted in good faith in classifying HMCs as exempt.  Plaintiffs
17  additionally claim that the affirmative defenses raised by defendant—exemption pursuant to the
18  "outside sales" exemption and exemption pursuant to the administrative exemption—involve the
19  common factual question of the HMCs' primary duty.  The administrative exemption defense further
20  raises the common question of whether HMCs are paid a salary pursuant to 29 C.F.R. section
21  541.200(a)(1).  The outside sales exemption likewise raises the common factual issue of how certain
22  kinds of work are classified, for example, whether interacting with real estate agents and title
23  company employees outside the office constitutes sales activity.

24        Defendant argues that plaintiffs lack the requisite commonality due to the assertedly
25  individualized and factual nature of the inquiries regarding the experience of each particular HMC.
26  Apart from this general assertion, defendant largely conflates the commonality inquiry with the more
27  exacting predominance inquiry under Rule 23(b)(3).  Accordingly, the court will discuss these issues

28

8

UNITED STATES DISTRICT COURT
For the Northern District of California

1   in conjunction with the Rule 23(b)(3) analysis below.

2

3               3.    Typicality

4        Under Rule 23(a)(3), the claims of the representative plaintiff must be typical of the claims

5   of the class.  To be considered typical for purposes of class certification, the named plaintiff need

6   not have suffered an identical wrong.  See Hanlon, 150 F.3d at 1020.  Rather, the claims of the

7   putative class must be "fairly encompassed by the named plaintiff's claims."  General Tel. Co. of the

8   Southwest v. Falcon, 457 U.S. 147, 156 (1982) (internal quotation omitted).

9        Regarding typicality, named plaintiffs Perez and Perry both purportedly had the same job,

10  same job duties, and were subject to the same company practices, policies and decisions that

11  affected their ability to earn overtime wages.  Defendants argue that plaintiffs have presented

12  insufficient facts to establish that they adequately represent the 15,000 HMCs from the 1,600 Wells

13  Fargo locations at issue in the nationwide class.  Paul v. WinCo Foods, Inc., No. CV 02-381-S-EJL,

14  2007 WL 1381794, at *4 (D. Idaho Feb. 16, 2007) (finding no typicality where the named plaintiffs

15  "represented only one of the eight Idaho stores and only two the eighteen California locations"

16  and had made only conclusory factual arguments in favor of typicality).  Although "[t]he hurdle

17  imposed by the typicality requirement is not great," named plaintiffs must show more than common

18  issues among themselves and the absent classmembers.  Palmer v. Stassinos, 233 F.R.D. 546, 550

19  (N.D. Cal. 2006) (Whyte, J.).

20       Defendants additionally cite testimony from the named plaintiffs indicating their lack of

21  knowledge about the practices of other HMCs.  Perez testified that he did not observe the comings

22  and goings of the prime HMCs in his office, and never visited any other Wells Fargo office.  Perez

23  Dep. at 62:7–10, 64:18–65:8.  Perry testified that he did not know what the other HMCs in his office

24  were doing based on the independent nature of each HMC's business practice.  Perry Dep. at

25  54:1–14.

26       In sum, the named plaintiffs are typical of the absent classmembers to the extent that they are

27  subject to the uniform compensation and employment policies that Wells Fargo applies to all HMCs.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

9

1  However, they have not shown that they are typical to the extent that such typicality depends on

2  substantial similarities in day-to-day activities. In light of the fact that plaintiffs are challenging a

3  company-wide policy, however, the fact that the named plaintiffs and the absent class members

4  shared the same job title and were subject to the same policies at issue satisfies the typicality

5  requirement.

6

7              3.    Adequacy

8         Rule 23(a)(4) dictates that the representative plaintiff must fairly and adequately protect the

9  interests of the class. To satisfy constitutional due process concerns, unnamed class members must

10 be afforded adequate representation before entry of a judgment which binds them. See Hanlon, 150

11 F.3d at 1020 (citing Hansberry v. Lee, 311 U.S. 32, 42–43 (1940)). "Adequate representation

12 'depends on the qualifications of counsel for the representatives, an absence of antagonism, a

13 sharing of interests between representatives and absentees, and the unlikelihood that the suit is

14 collusive.'" Crawford v. Honig, 37 F.3d 485, 487 (9th Cir. 1994) (quoting Brown v. Ticor Title Ins.

15 Co., 982 F.2d 386, 390 (9th Cir. 1992)).

16        Plaintiffs assert that the named plaintiffs have no known conflicts with members of the class

17 of HMCs and will fairly and adequately protect the interests of the class. Plaintiffs further claim that

18 their counsel is sufficiently experienced in class and collective actions nationwide regarding wage

19 and hour disputes to provide adequate legal representation to the class.

20        In response, defendant claims that the nationwide plaintiffs are inadequate representatives

21 because, as former employees, their interests are antagonistic to those of current HMCs. See

22 Southern Snack Foods, Inc. v. J & J Snack Foods Corp., 79 F.R.D. 678, 680 (D.N.J. 1978); Van

23 Allen v. Circle K Corp., 58 F.R.D. 562, 564 (C.D. Cal. 1972); Matarazzo v. Friendly Ice Cream

24 Corp., 62 F.R.D. 65, 68 (E.D.N.Y. 1974). Defendant has cited declarations from several non-

25 California HMCs stating that they prefer the commission-based system due to increased flexibility,

26 control over individual work responsibilities, and the direct correlation between amount of work and

27 compensation level. Allison Dec. ¶ 11; Bennet Dec. ¶ 12; Hailey Dec. ¶ 11; House Dec. ¶ 12; Logan

28

UNITED STATES DISTRICT COURT
For the Northern District of California

10

1    Dec. ¶ 9; Ugan Dec. ¶ 14. As noted above, plaintiffs strenuously deny that the end result of a

2    successful class action lawsuit will be to eliminate Wells Fargo's commission-based compensation

3    structure, and therefore assert that these objections are irrelevant.

4    　　　While courts have held that a former employee may not represent the best interests of current

5    employees where the relief sought may strain the employment relationship between current

6    employees and a defendant employer, defendant has identified no authority stating that former

7    employees are inadequate *per se*. Although the named plaintiffs in this action are primarily

8    concerned with a maximum financial recovery, a determination that current and former employees

9    are entitled to overtime compensation would likely lead to changes within Wells Fargo that would

10   benefit current employees going forward. In other words, defendants have not shown that current

11   employees would be harmed by a successful class action. Accordingly, the named plaintiffs satisfy

12   the adequacy requirement of Rule 23(a).

13

14   　　　B.　　　Rule 23(b)(3) Requirements

15   　　　Class certification pursuant to Rule 23(b)(3) requires the plaintiff to establish that "the

16   questions of law or fact common to the members of the class predominate over any questions

17   affecting only individual members, and that a class action is superior to other available methods for

18   the fair and efficient adjudication of the controversy." The court will address each of these two

19   requirements separately.

20

21   　　　1.　　　Predominance

22   　　　The predominance inquiry "focuses on the relationship between the common and individual

23   issues." Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244

24   F.3d 1152, 1162 (9th Cir. 2001). Consequently, the presence of common issues of fact or law

25   sufficient to satisfy the requirements of Rule 23(a)(2) is not by itself sufficient to show that those

26   common issues predominate. Hanlon, 150 F.3d at 1022. Nonetheless, "[w]hen common questions

27   present a significant aspect of the case and they can be resolved for all members of the class in a

28

UNITED STATES DISTRICT COURT
For the Northern District of California

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1    single adjudication, there is clear justification for handling the dispute on a representative rather than

2    on an individual basis." Id. (internal quotations omitted); see also Culinary/Bartender Trust Fund,

3    244 F.3d at 1162. To establish predominance of common issues, a party seeking class certification

4    is not required to show that the legal and factual issues raised by the claims of each class member

5    are identical. Rather, the predominance inquiry focuses on whether the proposed class is

6    "sufficiently cohesive to warrant adjudication by representation." Culinary/Bartender Trust Fund,

7    244 F.3d at 1162 (quoting Amchem, 521 U.S. at 623). Among the considerations that are central to

8    this inquiry is "the notion that the adjudication of common issues will help achieve judicial

9    economy." Zinser, 253 F.3d at 1189 (quoting Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234

10   (9th Cir. 1996)).

11          Plaintiffs assert that the two main questions in this litigation are common to the class. It is

12   clear that the question of whether Wells Fargo's conduct regarding exemption classifications

13   emanated from California is a common question, focusing only on the practices of a handful of

14   individuals within the company. However, plaintiffs further claim that the question of whether

15   HMCs are properly classified as exempt is common as well. Plaintiffs' main point in support of this

16   contention is the fact that Wells Fargo uniformly treats all HMCs as exempt, regardless of any

17   purported variations in duties or work activities. Defendant does not deny that its HMC

18   compensation policy is uniform for all HMCs, and has confirmed that it does not maintain records of

19   hours worked by HMCs.

20          In the context of overtime pay litigation, courts have often found that common issues

21   predominate where an employer treats the putavute classmembers uniformly with respect to

22   compensation, even where the party opposing class certification presents evidence of individualized

23   variations. For example, in Wang v. Chinese Daily News, 231 F.R.D. 602, 613 (C.D. Cal. 2005), the

24   court held that the defendant "cannot, on the one hand, argue that all [putative classmembers] are

25   exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job

26   duties of each [putative classmember] in order to determine whether that individual is 'exempt.'"

27   Two recent decisions from this district are in accord. In Tierno v. Rite Aid Corp., No. C 05-02520

28

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1  THE, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) (Henderson, J.), an overtime class action
2  brought by store managers at Rite Aid, the court held that, given the fact that Rite Aid had
3  historically "treated all Store Managers as a homogenous group for the purposes of" the applicable
4  labor laws and "always categorically classified all Store Managers as exempt employees without
5  exception . . . Rite-Aid's [sic] contention that each Store Manager position must now be individually
6  assessed to determine whether the position can be categorized as exempt or non-exempt rings
7  hollow."  Similarly, in Krzesniak v. Cendant Corp., No. C 05-05156 MEJ, 2007 WL 1795703 (N.D.
8  Cal. June 20, 2007) (Jenkins, J.), another manager overtime case, the court held that where a
9  putative class action plaintiff challenges a policy of classifying all employees of a given title as
10  exempt, the defendant cannot then argue that individualized inquiries into the job duties of each
11  employee are necessary to determine whether each employee is exempt.

12      It is undisputed that Wells Fargo's compensation and exemption policy is uniform among all
13  HMCs.  Plaintiffs have submitted evidence of other uniform polices regarding HMCs, such as
14  training, recruiting and job descriptions.  Accordingly, plaintiffs have made a strong showing that, as
15  a general matter, common questions related to HMC experiences predominate over individual
16  variations.  However, courts have recognized that the application of certain specific statutory
17  exemptions requires a highly individualized inquiry, and have resisted class certification on that
18  basis.  See, e.g., Perry v. U.S. Bank, No. C-00-1799-PJH, 2001 WL 34920473 (N.D. Cal. Oct. 16,
19  2001) (Hamilton, J.).  In Perry, the court denied certification of a class of personal bankers seeking
20  overtime compensation, based on the individual nature of the exemptions.  Accordingly, the court
21  will consider the specific exemptions identified by defendant in order to determine whether these
22  exemptions raise predominant individual factual and legal issues.

23

24          2.      Exemptions

25      Defendant identifies four federal exemptions in its opposition brief: (1) the outside sales
26  exemption, (2) the commissioned sales exemption, (3) the administrative exemption, and (4) the
27  highly paid exemption.  The court will consider each exemption in turn.

28

13

a.    Outside Sales Exemption

Under federal law, employees classified as "outside salespersons" are exempt from overtime requirements. 29 U.S.C. § 213(a)(1). An "outside salesman" is defined as an employee whose primary duty is "(I) making sales . . ., or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. 541.500(a). Additionally, "work performed incidental to and in conjunction with the employee's own outside sales or solicitations . . . shall be regarded as exempt outside sales work." 29 C.F.R. § 541.500(b). The United States Department of Labor has stated that the outside sales exemption may apply to "employees of finance companies who obtain and solicit mortgages." Porter Dec., Exh. C.

Courts have acknowledged that "where liability to each plaintiff will depend on whether that plaintiff was correctly classified as an 'outside salesman,' the Court will be required to make a fact-intensive inquiry into each potential plaintiff's employment situation" and that class certification may therefore be inappropriate. Clausman v. Nortel Networks, Inc., No. IP 02-0400-C-M/S, 2003 WL 21314065, at *4 (S.D. Ill. May 1, 2003). Defendant's declarations suggest a wide variation among HMCs in terms of the amount of time spent on outside sales activities, depending on personal preference, experience, efficiency and reliance on support staff.

b.    Commissioned Sales Exemption[2]

Federal law provides an exemption for any employee of a "retail or service establishment" where the employee's regular pay rate exceeds one and one half times the minimum wage and "more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(I). It is unclear whether Wells Fargo would qualify as a "retail or service establishment" for the purposes of this exemption. See Barnett v. Wa. Mut. Bank, FA, No. C 03-00753 CRB, 2004 WL 1753400, at *6 (N.D. Cal. Aug. 5, 2004) (Breyer,

14

1    J.) (holding that credit companies are not "retail or service establishments"); <u>Gatto,</u> 442 F. Supp. 2d

2    at 541–42 (holding that a mortgage broker fit within the definition); <u>see also</u> <u>Martin v.</u>

3    <u>Refridgeration School, Inc.,</u> 968 F.2d 3, 5 (9th Cir. 1992) ("The meaning of the term 'retail

4    establishment' is not obvious without further definition, and the statutory definition is of little

5    assistance."). In any case, the question of whether Wells Fargo is a "retail or service establishment"

6    is common to the entire class and does not defeat class certification.

7          As with the outside sales exemption, a determination of liability pursuant to the

8    commissioned sales exemption will require an individualized inquiry as to the amount and break-

9    down of each class member's compensation, as well as the amount of time worked by each HMC.

10

11                    c.       Administrative Exemption

12         The FLSA additionally exempts employees employed in an administrative capacity from

13   overtime requirements. 29 U.S.C. § 213(a). An administrative employee is defined as any

14   employee

15             "(1) Compensated on a salary or fee basis at a rate of not less than
               $455 per week (or $380 per week, if employed in American Samoa by
16             employers other than the Federal Government), exclusive of board,
               lodging or other facilities; (2) Whose primary duty is the performance
17             of office or non-manual work directly related to the management or
               general business operations of the employer or the employer's
18             customers; and (3) Whose primary duty includes the exercise of
               discretion and independent judgment with respect to matters of
19             significance."

20   29 C.F.R. § 541.200. The Department of Labor has stated that employees who service their

21   employer's financial services business by marketing, servicing and promoting financial products,

22   advising customers and recommending products may fall within this exemption. Porter Dec., Exh.

23   D. "However, an employee whose primary duty is *selling* financial products does not qualify for the

24   administrative exemption." 29 C.F.R. § 541.203 (emphasis added). In light of this authority,

25   plaintiff has made a strong showing that the administrative exemption may be categorically

26   inapplicable and therefore resolved on a class-wide basis. This favors class certification.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

                                    15

1

d.    Highly Paid Exemption

2    As a final exemption, Wells Fargo claims that the HMCs are exempt under the federal statute

3    exempting highly compensated employees from overtime laws.  Under federal law, "An employee

4    with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the

5    Act if the employee customarily and regularly performs any one or more of the exempt duties or

6    responsibilities of an executive, administrative or professional employee identified in subparts B, C

7    or D of this part."  29 C.F.R. 541.601.  This, again, will involve an individualized analysis not only

8    of job duties but of the dollar amount of each HMC's compensation.

9

10

3.    Conclusion as to Predominance

11    Taken together, defendants' declarations have raised serious issues regarding individual

12    variations among HMC job duties and experiences.  However, the common factual and legal issues

13    nonetheless predominate.  Wells Fargo's uniform policies regarding HMCs weighs heavily in favor

14    of class certification.  As numerous courts have recognized, it is manifestly disingenuous for a

15    company to treat a class of employees as a homogenous group for the purposes of internal policies

16    and compensation, and then assert that the same group is too diverse for class treatment in overtime

17    litigation.  This is particularly true in a situation such as this, where the difficulty of proving hours

18    worked and compensation received is exacerbated by defendant's complete failure to maintain

19    pertinent records.  Accordingly, plaintiffs have satisfied their burden and demonstrated that common

20    issues predominate.

21

22

4.    Superiority

23    The final prerequisite for certification of a class under Rule 23(b)(3) requires the plaintiff to

24    show that a class action is superior to other methods available for the adjudication of the parties'

25    dispute.  "Where classwide litigation of common issues will reduce litigation costs and promote

26    greater efficiency, a class action may be superior to other methods of litigation."  Valentino, 97 F.3d

27    at 1234.  In considering whether a class action is superior, the court must focus on whether the

28

16

UNITED STATES DISTRICT COURT
For the Northern District of California

interests of "efficiency and economy" would be advanced by class treatment. <u>Zinser</u>, 253 F.3d at

1189 (internal quotations omitted).  Relevant factors include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

a.    Case Management

Plaintiffs contend that a class action would be superior to individual actions because representative litigation is particularly useful in suits by employees against an employer, and because the various actions that have been previously filed against Wells Fargo regarding HMC overtime compensation have already been consolidated as an MDL action.  Defendant claims that the myriad factual issues pertaining to each of the HMCs at each of the numerous Wells Fargo locations throughout the country would make class action case management impracticable and therefore inferior.  Defendant further claims that it would be denied due process if the court made determinations regarding a small number of HMCs and then extrapolated those results to the thousands of class members, in light of the individualized analysis required before liability may be determined.  Additionally, defendant asserts that the "level of discord" among the putative class members militates against certification.  Plaintiffs were also given the names and contact information of 500 putative class members, and have submitted only seventeen declarations in support of their motion.  Furthermore, at least one plaintiff is pursuing an FLSA claim individually.  Supp. Porter Dec., Exh. 4.  Finally, at least some HMCs are content with the present arrangement and would not support a lawsuit geared at altering Wells Fargo's HMC compensation system.  However, plaintiffs insist that the current compensation arrangement would not be unduly disturbed by a successful outcome for the plaintiffs, and this purported "discord" is therefore overstated.

As discussed above, many of the issues in this litigation focus on Wells Fargo's policies and

UNITED STATES DISTRICT COURT
For the Northern District of California

17

1   practices, including whether any improper classifications were made willfully. Because individual
2   classmembers have little bearing on these issues, efficiency would be better served by trying these
3   issues on a class-wide basis. Furthermore, although many of the purported exemptions involve
4   individual factual inquiries, plaintiffs have raised categorical challenges to the application of these
5   exemptions which may be resolved on a class-wide basis. In light of the predominance of these
6   common issues over any individualized factual issues, considerations of case management favor
7   class treatment.

8

9                          b.    Alternative Remedies

10      Plaintiffs additionally claim that the existence of parallel "opt-in" claims under the FLSA do
11  not alter the desirability of class treatment for the UCL claims, as courts often certify concurrent
12  FLSA collective actions and UCL class actions at the same time. See, e.g., Romero v. Producers
13  Dairy Foods, Inc., 235 F.R.D. 474, 491 (E.D. Cal. 2006). Plaintiffs acknowledge, however, that
14  courts are hesitant to certify concurrent actions in this manner where there is substantial opposition
15  among potential class members to class treatment. Leuthold, 224 F.R.D. at 469–70. Although
16  defendant's declarants have stated that they prefer a commission-based compensation system,
17  defendant has not shown that a successful class action would necessarily prevent commission-based
18  compensation, and therefore has not shown substantial opposition among potential class members.

19      Defendant claims that pendent state law claims, to the extent they are present in this action,
20  can be litigated as a separate FLSA opt-in action, and therefore class certification of the UCL claim
21  is unnecessary. See id.. Defendant further claims that the individual potential recoveries are
22  sufficiently large that HMCs would pursue individual claims if desired.

23      While the existence of alternative remedies is a factor weighing against class certification,
24  the substantial predominance of common issues coupled with case management techniques tip the
25  balance in favor of class treatment. Plaintiffs have therefore shown that a class action is a superior
26  means of resolving this dispute.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1    C.    Alternative Rule 23 Arguments

2        In the alternative to a Rule 23(b)(3) action, plaintiffs seek certification pursuant to Rule

3    23(b)(2) or Rule 23(c)(4)(A).

4

5        1.    Rule 23(b)(2)

6        A party seeking certification of a class under Rule 23(b)(2) also bears the burden of

7    establishing that "the party opposing the class has acted or refused to act on grounds generally

8    applicable to the class, thereby making" injunctive relief appropriate.  Fed. R. Civ. P. 23(b)(2).

9    Class actions certified under Rule 23(b)(2) are "not limited to actions requesting only injunctive or

10   declaratory relief, but may include cases that also seek monetary damages" where the claim for

11   injunctive relief is the primary claim.  Probe v. State Teachers' Ret. Sys., 780 F.2d 776, 780 (9th

12   Cir. 1986).  Rule 23(b)(2) certification of a class seeking both injunctive relief and damages is

13   proper only where the claim for injunctive relief is the predominant form of relief sought by the

14   class.  See Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439, 450–51 (N.D. Cal. 1994)

15   (Henderson, J.).

16       Plaintiff asserts that this action is suitable for Rule 23(b)(2) certification because a ruling that

17   defendants have improperly classified HMCs as exempt would amount to an injunction forcing

18   Wells Fargo to change its policies and practices, and that Wells Fargo could not continue to classify

19   its HMCs as exempt after such a contrary ruling.

20       In the employment context, courts routinely deny class certification under Rule 23(b)(2)

21   where the named plaintiffs are former employees and therefore will not benefit from any injunctive

22   relief.  See, e.g., Jimenez v. Domino's Pizza, Inc., 238 F.R.D. 241, 250 (C.D. Cal. 2006) (holding

23   that claims for monetary relief predominated where plaintiffs were "former employees and thus an

24   injunction as to Domino's behavior to current employees cannot be Plaintiffs' primary concern");

25   Lanzarone v. Guardsmark Holdings, Inc., No. CV06-1136 RPLAX, 2006 WL 4393465, at *3 (C.D.

26   Cal. 2006) (holding that "certification cannot be granted under Rule 23(b)(2) because Plaintiff, a

27   former employee, lacks standing to pursue injunctive relief"); Sepulveda v. Wal-Mart Stores, Inc.,

28

19

237 F.R.D. 229, 245 (C.D. Cal. 2006) (holding that certification under Rule 23(b)(2) was not available where approximately 1,200 out of roughly 2,750 class members, as well as the named plaintiff, were former employees who would "derive no benefit from the injunction"). Here, plaintiff is a former employee, and the proposed class definition explicitly envisions a certain proportion of former employees. Accordingly, the predominant claims in this action are monetary, and certification under Rule 23(b)(2) is not available.

### 2.    Rule 23(c)(4)(A)

Rule 23(c)(4)(A) provides that, where appropriate, "an action may be brought or maintained as a class action with respect to particular issues." "The question of whether partial certification is appropriate under Rule 23(c)(4)(A) is closely linked to the question of whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Sepulveda, 237 F.R.D. at 250 (internal quotations omitted). Plaintiffs assert that, if class certification is unavailable under Rule 23(b)(2) or 23(b)(3), the court may certify a class for the purpose of resolving any class-wide issues. Because the court has found that common issues predominate over individual issues for the purposes of Rule 23(b)(3), certification under Rule 23(c)(4)(A) is inappropriate.

## II.    FLSA Collective Action

In addition to certification of a Rule 23 class, plaintiffs request a conditional certification of the action as a representative collective action. Plaintiffs propose to bring a collective action on behalf of "All persons who worked as Home Mortgage Consultants outside the state of California for Wells Fargo Bank, N.A. at any time between February 17, 2003 and the present."

The court's determination of whether a collective action is appropriate is discretionary. Leuthold, 224 F.R.D. at 466; see also Lusardi v. Lechner, 855 F.2d 1062, 1074–75 (3rd Cir. 1988). Plaintiffs bear the burden of showing that they and the proposed class are similarly situated for purposes of section 216(b). 29 U.S.C. § 216(b); see also Romero, 235 F.R.D. at 481. The term

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    "similarly situated" is not defined under the FLSA and the Ninth Circuit has yet to address the issue.

2    Id. District courts have taken three different approaches in interpreting the term "similarly situated"

3    for purposes of section 216(b): "(1) a two-tiered case-by-case approach, (2) the incorporation of the

4    requirements of Rule 23 of the current Federal Rules of Civil Procedure, or (3) the incorporation of

5    the requirements of the pre-1966 version of Rule 23 for 'spurious' class actions." Id. This court

6    will follow the first approach adopted by the majority of courts, including three circuit courts.

7    Leuthold, 224 F.R.D. at 467; see, e.g., Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102-03

8    (10th Cir. 2001).[3]

9        The first step under the two-tiered approach considers whether the proposed class should be

10   given notice of the action. Leuthold, 224 F.R.D. at 467. This decision is based on the pleadings and

11   affidavits submitted by the parties. Id. The court makes this determination under a fairly lenient

12   standard due to the limited amount of evidence before it. Id. The usual result is conditional class

13   certification. Id. In the second step, the party opposing the certification may move to decertify the

14   class once discovery is complete and the case is ready to be tried. Id. If the court finds that the

15   plaintiffs are not similarly situated at that step, "the court may decertify the class and dismiss opt-in

16   plaintiffs without prejudice." Id. The court addresses the first tier in this order.

17        Courts have held that conditional certification requires only that "plaintiffs make substantial

18   allegations that the putative class members were subject to a single illegal policy, plan or decision."

19   Id. at 468; see also Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 406 (D.N.J. 1988). Under

20   this lenient standard, "the plaintiffs must show that there is some factual basis beyond the mere

21   averments in their complaint for the class allegations." West v. Border Foods, Inc., No. 05-2525,

22   2006 WL 1892527, at *2 (D. Minn. July 10, 2006). Here, plaintiffs have shown that Wells Fargo's

23   policy and practice related to HMC compensation is uniform for all putative classmembers.

24   Plaintiffs have also submitted declarations indicating a significant degree of commonality among the

25   experiences of HMCs. Although defendants raise substantial issues regarding the reliability of these

26   declarations, plaintiffs' factual showing satisfies the lenient standard warranting conditional

27   certification of this collective action.

28

1    III.    Concurrent Certification

2         In the event that this court certifies a collective action pursuant to the FLSA, defendant

3    asserts that the court should not certify a Rule 23 class action on that basis. Courts are hesitant to

4    certify concurrent actions where there is substantial opposition among potential class members to

5    class treatment. Leuthold, 224 F.R.D. at 469–70. However, defendant has not shown substantial

6    opposition to class treatment. Accordingly, the court sees no reason not to certify both actions.

7

8    CONCLUSION

9         For the foregoing reasons, plaintiffs' motion for class certification is GRANTED IN PART

10    and DENIED IN PART. Plaintiffs' motion to certify pursuant to Rule 23(b)(2) and Rule 23(c)(A)(4)

11    is DENIED. Plaintiffs' motion to certify pursuant to Rule 23(b)(3) is GRANTED. Plaintiffs'

12    motion to certify a collective action is GRANTED.

13         Within thirty (30) days of the date of this order the parties shall submit a form or forms of

14    class notice and other appropriate papers to facilitate this order. The Clerk of Court shall set a

15    further Case Management Conference within forty-five (45) days of this order.

16

17

18    Dated: October 17, 2007

19

20                                          MARILYN HALL PATEL
                                            United States District Court Judge
21                                          Northern District of California

22

23

24

25

26

27

28

22

1

ENDNOTES

2

3

4

1. A putative class of California plaintiffs is being represented by a separate lead plaintiff and counsel, and has moved separately for class certification. The putative class in the instant motion consists of plaintiffs from all states other than California, and will be referred to as "the nationwide plaintiffs."

5

6

7

8

2. Defendant appears to raise this exemption in its opposition brief, but refers to it as the "inside sales exemption." Defendant cites only one case in its cursory discussion of the "inside sales exemption," a case dealing with the commissioned sales exemption. Gatto v. Specialists of Ill., Inc., 442 F. Supp. 2d 529 (N.D. Ill. 2006). The court will assume that defendant is referring to the commissioned sales exemption.

9

3. See also Hipp v. Liberty Nat. Life. Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001); Mooney v. Aramco Serv. Co., 54 F.3d 1207, 1213–14 (5th Cir. 1995).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

23