## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) ) |

| | |
|---|---|
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| INTEL CORPORATION, | ) ) |
| Defendant. | ) ) |

MDL No. 05-1717-JJF

Civil Action No. 05-485-JJF

CONSOLIDATED ACTION

**PUBLIC VERSION**

## MEMORANDUM IN SUPPORT OF CLASS PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

**PRICKETT JONES & ELLIOTT, P.A.**
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Melissa N. Donimirski (#4701)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
mndonimirski@prickett.com
*Interim Liaison Counsel and Attorneys for*
*Phil Paul, on behalf of himself and all others*
*similarly situated*

Date: May 16, 2008

Of Counsel:

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
COHEN, MILSTEIN, HAUSFELD
    & TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC  20005

Michael P. Lehmann
Jon T. King
COHEN, MILSTEIN, HAUSFELD
    & TOLL, P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA 94111

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111

Craig Corbitt
Judith A. Zahid
ZELLE, HOFMANN, VOELBEL, MASON
    & GETTE LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................... ii

I.     INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................ 2

III.   CLASS CERTIFICATION IS APPROPRIATE IN THIS CASE ............. 9

A. Standard for Class Certification ............................................................... 9

B. Other Courts Have Certified Classes in Similar Cases ........................... 11

C. Certification of a Nationwide Class Is Appropriate ................................ 12

    1.   Class Plaintiffs Satisfy the Rule 23(a) Prerequisites .................... 13

    2.   Class Plaintiffs Meet the Requirements of Rule 23(b)(2) for
        Certification of a Nationwide Class for Injunctive Relief ........... 18

    3.   Class Plaintiffs Meet the Requirements of Rule 23(b)(3) for
        Certification of a Nationwide Class for Damages And
        Restitutionary Relief Under California Law ................................. 21

D. As An Alternative, Certification of a 26-State Subclass Under
    Rule 23(b)(3) Is Appropriate .................................................................. 43

    1.   A 26-State Subclass Satisfies the Requirements of Rule 23(a) ..... 46

    2.   A 26-State Subclass Satisfies the Requirements of Rule 23(b)(3) .............. 48

E. As A Second Alternative, Certification of 26 Individual State
    Subclasses Under Rule 23(b)(3) Is Appropriate ..................................... 50

IV.    THE COURT SHOULD APPOINT CLASS COUNSEL ...................... 53

A. Standard for Appointing Class Counsel .................................................. 54

B. Interim Class Counsel Should Be Appointed Class Counsel .................. 55

V.     CONCLUSION ....................................................................................... 57

i

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Atlantic Richfield Co.,*
  1998-1 Trade Cas. (CCH) ¶72,080
  at 81,497 (San Diego Super. Ct., May 1, 1997) ....................................................... 35

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ............................................................................................ 31, 44

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.,*
  191 Cal. App. 3d 1341 (Cal. Ct. App. 1987) ................................................... 11, 36

*Baby Neal v. Casey,*
  43 F.3d 48 (3d Cir. 1994) ................................................................................. passim

*Barnes v. Am. Tobacco Co.,*
  161 F.3d 127 (3d Cir. 1998) .............................................................................. 15, 20

*Behrend v. Comcast Corp.,*
  245 F.R.D. 195 (E.D. Pa. 2007) ........................................................................ 11, 14

*Bellinder v. Microsoft Corp.,*
  No. 00-C-0855, 2001 WL 1397995
  (Kan. Dist. Ct. Sept. 7, 2001) ..................................................................... 12, 28, 52

*Bernhard v. Harrah's Club,*
  546 P.2d 719 (Cal. 1976) ......................................................................................... 26

*Bradburn Parent/Teacher Store, Inc. v. 3M,*
  Civ. A. No. 02-7676, 2004 WL 1842987
  (E.D. Pa. Aug. 18, 2004) .................................................................................. 11, 17

Cal. Bus. & Prof. Code, § 17200 ................................................................................. 34

*Carnegie v. Household Int'l, Inc.,*
  376 F.3d 656 (7th Cir. 2004) .................................................................................... 42

*Cel-Tech Commc'ns, Inc. v. Los Angeles*
  *Cellular Tel. Co.,*
  20 Cal.4th 163(1999) ............................................................................................... 34

*Chance v. United States Tobacco Co.,*
  No. 02-C-12, Journal Entry
  (Kan. Dist. Ct. July 29, 2003) .................................................................................. 11

*Chiang v. Veneman,*
  385 F.3d 256 (3d Cir. 2004) ........................................................................ 10, 14, 32

*Clark v. TAP Pharm. Prods., Inc.,*
  798 N.E.2d 123 (Ill. Ct. App. 2003) ........................................................................ 30

*Clothesrigger, Inc. v. GTE Corp.,*
  191 Cal. App. 3d 605
  (Cal. Ct. App. 1987) .......................................................................................... 24, 27

*Cohen v. Chi. Title Ins. Co.*,
    242 F.R.D. 295 (E.D. Pa. 2007) ...................................................................................... passim

*Comes v. Microsoft Corp.*,
    696 N.W.2d 318 (Iowa 2005) .............................................................................................. 12

*Cox v. Microsoft Corp.*,
    809 N.Y.S.2d 480
    (N.Y. Sup. Ct. 2005) ........................................................................................................... 12

*David B. Lilly Co., Inc. v. Fisher*,
    18 F.3d 1112 (3d Cir. 1994) ................................................................................................ 29

*Davis v. S. Bell Tel. & Tel. Co.*,
    1993 WL 593999
    (S.D. Fla. Dec. 23, 1993) ..................................................................................................... 11

*DeLoach v. Philip Morris Cos., Inc.*,
    206 F.R.D. 551 (M.D.N.C. 2002) ........................................................................................ 17

*Diamond Multimedia Sys. v. Superior Ct.*,
    968 P.2d 539 (Cal. 1999),
    *cert. denied*, 527 U.S. 1003 (1999) .................................................................................... 24

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986) ............................................................................................. 29

*Dragon v. Vanguard Indus.*,
    89 P.3d 908, 917 (Kan. 2004) .............................................................................................. 25

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) .................................................................................................. 9

*Esplin v. Hirschi*,
    402 F.2d 94 (10th Cir. 1968) ................................................................................................. 9

*Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    122 F.R.D. 177 (E.D. Pa. 1988) .......................................................................................... 22

*Feuerabend v. UST, Inc.*,
    No. 2002CV007124, Decision and
    Order Granting Plaintiff's Motion
    for Class Certification (Wis. Cir. Ct. May 10, 2004) ........................................................... 11

*Fisherman's Wharf Bay Cruise
    Corp. v. Superior Court*,
    114 Cal.App.4th 309
    (Cal. Ct. App. 2003) ............................................................................................................. 29

*Flaherty v. Allstate Ins. Co.*,
    822 A.2d 1159 (Me. 2003) ................................................................................................... 25

*Four B Corp. v. Daicel Chem. Indus., Ltd.*,
    253 F. Supp. 2d 1147 (D. Kan. 2003) .................................................................................. 28

*Freeman v. San Diego Ass'n of Realtors,*
   77 Cal. App. 4th 171, 200 n.32
   (Cal. Ct. App. 1999) ........................................................................................... 28

*Friedman, P.C. v. Microsoft Corp.,*
   No. CV2000-000722, Minute Entry
   (Ariz. Super. Ct. Nov. 14, 2000) ...................................................................... 12

*Goda v. Abbott Labs.,*
   No. 01445-96, 1997 WL 156541
   (D.C. Super. Ct. Feb. 3, 1997) ........................................................................ 11

*Gold Strike Stamp Co. v. Christensen,*
   436 F.2d 791 (10th Cir. 1970)........................................................................... 31

*Gordon v. Microsoft Corp.,*
   No. 00-5994, 2001 WL 366432
   (Minn. Dist. Ct. Mar. 30, 2001), *review denied,* 645 N.W.2d 393 (Minn. 2002),
   2003 WL 23105552
   (Minn. Dist. Ct. Mar. 14, 2003) .................................................................. 12, 52

*Green Leaf Nursery v. E.I. Du Pont de Nemours & Co.,*
   341 F.3d 1292 (11th Cir. 2003) ....................................................................... 25

*Gruber v. Price Waterhouse,*
   117 F.R.D. 75 (E.D. Pa. 1987)........................................................................... 22

*Gulf Oil Co. v. Bernard,*
   452 U.S. 89 (1981) .............................................................................................. 9

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011(9th Cir. 1998)..................................................................45, 48, 49

*Hataway v. McKinley,*
   830 S.W.2d 53 (Tenn. 1992) ............................................................................ 25

*Hawaii v. Standard Oil Co. of Cal.,*
   405 U.S. 251 (1972) ............................................................................................ 9

*Heinze v. Heinze,*
   742 N.W.2d 465, 274 Neb. 595, 598 (Neb. 2007) ........................................... 25

*Hopkins v. De Beers Centenary AG,*
   No. CGC04-432954, Order Certifying Plaintiff Class
   (Cal. Super. Ct. Apr. 18, 2005) ...........................................................11, 31, 33

*Howe v. Microsoft Corp.,*
   656 N.W.2d 285 (N.D. 2003)......................................................................... 12, 52

*Hurtado v. Superior Court,*
   11 Cal. 3d 574 (1974)................................................................................... 26, 29

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977) .......................................................................................... 26

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
No. C 04-1511, 2007 WL 1689899,
(N.D. Cal. June 11, 2007) ................................................................................. 21, 33

*In re Am. Investors Life Ins. Co. Annuity Mktg.*
*& Sales Practices Litig.*,
MDL No. 1712, 2007 WL 2541216,
(E.D. Pa. Aug. 29, 2007) ........................................................................................ 23

*In re Automotive Refinishing Paint Cases*,
J.C.C.P. No. 4199, Order Granting
Motion of Plaintiffs for Class Certification (Cal. Super. Ct. June 17, 2004) ........................... 11

*In re Cipro Cases I and II*,
121 Cal. App. 4th 402
(Cal. Ct. App. 2004) .................................................................................... 11, 32, 40

*In re Cmty. Bank of N. Va. & Guar. Nat'l*
*Bank of Tallahassee Second*
*Mortgage Loan Litig.*,
418 F.3d 277 (3d Cir. 2005) ............................................................................. 16, 28

*In re Cree, Inc. Securities Litig.*,
219 F.R.D. 369(M.D.N.C. 2003) .............................................................................. 54

*In re DaimlerChrysler AG Sec. Litig.*,
216 F.R.D. 291 (D. Del. 2003) ......................................................................... passim

*In re Estate of Gilmore*,
946 P.2d 1130 N.M. Ct. App. 1997) ......................................................................... 25

*In re Fla. Microsoft Antitrust Litig.*,
No. 99-27340, 2002 WL 31423620
(Fla. Cir. Ct. Aug. 26, 2002) ............................................................................ 12, 52

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472, (W. D. Pa. 1999) ............................................................................ 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) .............................................................................. 44, 46

*In re Hydrogen Peroxide Antitrust Litig.*,
240 F.R.D. 163 (E.D. Pa. 2007) ........................................................................ passim

*In re Intel Corp. Microprocessor Antitrust Litig.*,
MDL No. 05-1717,
526 F. Supp. 2d 461 (D. Del. 2007) .................................................................. 18, 27, 43

*In re Linerboard Antitrust Litig.*,
203 F.R.D. 197 (E.D. Pa. 2001) ............................................................................. 10

*In re Linerboard Antitrust Litig.*,
305 F.3d 145, 152-53 (3d Cir. 2002),
*cert. denied sub nom. Gaylord Container Corp. v. Garrett Paper, Inc.*,
538 U.S. 977 (2003) ........................................................................................... 36

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   202 F.R.D. 12 (D.D.C. 2001).................................................................................11, 15, 46

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993)........................................................................... 40

*In re Mass. Smokeless Tobacco Litig.*,
   No. 03-5038 BLS, Memorandum
   and Order (Suffolk Cty. Super. Ct. Dec. 7, 2004)............................................... 11

*In re Microcrystalline Cellulose Antitrust Litig.*,
   218 F.R.D. 79 (E.D. Pa. 2003)........................................................................... 36

*In re ML-Lee Acquisition Fund II, L.P.*
   *and M-L Lee Acquisition Fund (Retirement Accounts) II,*
   *L.P. Sec. Litig.*, 848 F. Supp. 527,
   (D. Del. 1994) ...........................................................................................10, 21, 45

*In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig.*,
   No. D-0101-CV-2000-1697,
   Decision and Order on Motion for
   Class Certification
   (N.M. Dist. Ct. Oct. 2, 2002) .............................................................................. 12

*In re ORFA Sec. Litig.*,
   654 F. Supp. 1449 (D.N.J. 1987)......................................................................... 22

*In re OSB Antitrust Litigation.*,
   2007 WL 2253425 (E.D. Pa.)...................................................................... passim

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   233 F.R.D. 229 (D. Mass. 2006)...............................................................45, 49, 51

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995)......................................................................... 18

*In re Pressure Sensitive Labelstock*
   *Antitrust Litig,*
   2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) ....................................10, 35, 38, 55

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
   148 F.3d 283 (3d Cir. 1988)......................................................................44, 45, 47

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004) ................................................................ passim

*In re S.D. Microsoft Antitrust Litig.*,
   657 N.W.2d 668 (S.D. 2003) ......................................................................... 12, 52

*In re Sch. Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986),
   *cert. denied sub nom. Nat'l Gypsum Co. v. Sch. Dist. of Lancaster*, 479 U.S. 915 (1986)...... 44

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998)........................................................................... 17

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007) ................................................................. 17, 18

*In re Terazosin Hydrochloride Antitrust Litig.*,
  220 F.R.D. 672 (S.D. Fla. 2004) ................................................................. passim

*In re Visa Check/Mastermoney Antitrust Litig.*,
  192 F.R.D. 68 (E.D.N.Y. 2000)
  *aff'd*, 280 F.3d 124 (2d Cir. 2001),
  *cert. denied*, 536 U.S. 917 (2002) ........................................................ 11, 18, 28

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ...................................................................... passim

*In re Wells Fargo Overtime Pay Litig.*,
  MDL No. 06-1770, Mem. & Order
  Re: Nationwide Plaintiffs' Motion
  to Certify a Class and Collective Action, slip op.
  N.D. Cal. Oct. 18, 2007) .......................................................................... 24, 32

*In re: Prudential Ins. Co. of Am. Sales Practice Litig.*,
  148 F.3d 283 (3d Cir. 1998), *cert.*
  *denied*, 525 U.S. 1114 (1999) .............................................................. 16, 28, 48

*In re: Scrap Metal Antitrust Litig.*,
  No. 06-4511, Slip. Op. at 12 (6th Cir. May 15, 2008) ..................................... 38

*Int'l Bhd. of Teamsters Local 734 Health & Welfare Fund v. Philip Morris, Inc.*,
  34 F. Supp. 2d 656(N.D. Ill. 1998), *aff'd*, 196 F.3d 818 (7th Cir. 1999) ................. 40

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc.*,
  225 F.R.D. 208 (S.D. Ohio 2003) .................................................................. 11

*Jackson v. Danberg*,
  240 F.R.D. 145 (D. Del. 2007) ..................................................................... 13

*Jefferson v. Ingersoll Int'l Inc.*,
  195 F.3d 894 (7th Cir. 1999) ....................................................................... 21

*Jennings Oil Co. v. Mobil Oil Corp.*,
  80 F.R.D. 124 (S.D.N.Y. 1978) .................................................................... 15

*Johnston v. HBO Film Mgmt.*,
  265 F.3d 178 (3d Cir. 2001) .................................................................... passim

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939 (2002) ............................................................................... 27

*Kearney v. Salomon Smith Barney*,
  137 P.3d 914 (Cal. 2006) ........................................................................... 26

*Kelley v. Microsoft Corp.*,
  No. C07-475MJP, 2008 WL 509332,
  (W.D. Wash. Feb. 22, 2008) ........................................................................ 30

*Klaxon Co. v. Stentor Elec. Mfg., Co.*,
  313 U.S. 487 (1941) .................................................................................. 23

*Kozoway v. Massey-Ferguson, Inc.*,
   722 F. Supp. 641 (D. Colo. 1989) ............................................................................... 30

*Kraus v. Trinity Management Servs., Inc.*,
   23 Cal. 4th 116 (2000) ............................................................................................... 32

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003),
   *cert. denied*, 542 U.S. 953 (2004) ......................................................................... 5, 7

*Lerch v. Citizens First Bancorp, Inc.*,
   144 F.R.D. 247 (D.N.J. 1992) ................................................................................... 22

*Marian Bank v. Elec. Payment Servs., Inc.*,
   No. 95-614-SLR, 1997 WL 811552
   (D. Del. Dec. 30, 1997) ....................................................................................... 14, 41

*Microsoft I-V Cases*,
   J.C.C.P. No. 4106, 2000-2 Trade Cas. ¶ 73,013 (Cal. Super. Ct. Aug. 29, 2000) ........... passim

*Mid-West Paper Products Co. v. Cont'l Group, Inc.*,
   596 F.2d 573 (3d Cir. 1979) ..................................................................................... 19

*Newton v. Merrill Lynch, Pierce,*
   *Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ....................................................................... 10, 15, 34

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
   998 F.2d 1224 (3d Cir. 1993) ................................................................................... 39

*Pharmaceutical Cases I, II, and III*,
   J.C.C.P. Nos. 2969, 2971 & 2972,
   Order Certifying Consumer Class
   (Cal. Super. Ct. Aug. 16, 1995) ............................................................................... 11

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797, 816-17 (1985) ................................................................................... 25

*Pigford v. Glickman*, 1
   82 F.R.D. 341 (D.D.C. 1998) ................................................................................... 15

*Powers v. Lycoming Engines*,
   245 F.R.D. 226
   (E.D. Pa. 2007) ................................................................................................. 15, 22

*Redwood Theatres, Inc. v. Festival Ents., Inc.*,
   200 Cal. App.3d 687 (Cal. Ct. App. 1988) ............................................................... 29

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ................................................................................................... 9

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) ....................................................................................... 1

*Robinson v. EMI Music Distribution, Inc.*,
   No. L-10462, 1996 WL 495551
   (Tenn. Cir. Ct. July 8, 1996) ............................................................................... 11, 51

*Romero v. Philip Morris Inc.*,
   109 P.3d 768 (N.M. Ct. App. 2005) .................................................................................. 11

*Rosack v. Volvo of Am. Corp.*,
   131 Cal. App. 3d 741 (Cal. Ct. App. 1982)
   *cert. denied*, 460 U.S. 1012 (1983) ...............................................................11, 35, 36

*Rothschild v. Tyco Int'l. (US), Inc.*,
   83 Cal.App.4th 488 (Cal. Ct. App.
   2000) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)) ............ 27, 34

*Shersher v. Superior Court*,
   154 Cal. App. 4th 1491 (2007) ...................................................................................... 32

*Sherwood v. Microsoft Corp.*,
   No. 99C-3562, Memorandum and Order
   (Tenn. Cir. Ct. Dec. 20, 2002) ................................................................................. 12, 52

*Sollenbarger v. Mountain States Tel. & Tel. Co.*,
   121 F.R.D. 417 (D.N.M. 1988) ...................................................................................... 11

*Spark v. MBNA Corp.*,
   178 F.R.D. 431 (D. Del. 1998) .................................................................................... 9, 16

*State Farm Fire & Cas. Co. v. Superior Court* 45
   Cal.App.4th 1093 (1996) ............................................................................................... 34

*Stephenson v. Bell Atl. Corp.*,
   177 F.R.D. 279 (D.N.J. 1997) ...............................................................................11, 31, 33

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001) .......................................................................................... 13

*Ticconi v. Blue Shield of Calif. Life & Health Ins. Co.*,
   160 Cal. App. 4th 528 2008) .......................................................................................... 32

*Union Carbide Corp. v. Superior Court*,
   36 Cal. 3d 15, 20 (1984) ............................................................................................... 26

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005),
   *cert. denied*, 546 U.S. 1089 (2006) ............................................................................... 5

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964) ...................................................................................................... 23

*Wachtel v. Guardian Life Ins. Co. of Am.*,
   453 F.3d 179 (3d Cir. 2006) .......................................................................................... 10

*Washington Mut. Bank v. Superior Court*,
   24 Cal. 4th 906 (Cal. 2001) ........................................................................................... 26

*Wershba v. Apple Computer, Inc.*,
   91 Cal. App. 4th 224
   (Cal. Ct. App. 2001) ................................................................................................. 24, 27

ix

*Wiesfeld v. Sun Chem. Corp.*,
    84 Fed. Appx. 257 (3d Cir. 2004) ................................................................................ 1

*Zinberg v. Washington Bancorp, Inc.*,
    138 F.R.D. 397 (D.N.J. 1990) .................................................................................. 22

**Statutes**

Cal. Bus. & Prof. Code § 16750(a) ......................................................................... 27

Cal. Bus. & Prof. Code § 17203 .............................................................................. 27

Kan. Stat. § 50-115; Tenn. Code. § 47-25-106 ........................................................ 27

**Other Authorities**

1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3:10 (4th ed. 2002) ................ 15

15 U.S.C. § 15 ........................................................................................................ 19

5 James Wm. Moore, et al., *Moore's Federal Practice* 23.25 [4][b][ii] (3d ed. 2003)) .............. 17

Cal. Bus. & Prof. Code § 16720 .............................................................................. 32

Restatement (Second) Conflict of Laws § 145 (1971) ........................................... 29, 30

Restatement (Second) Conflict of Laws § 6(2)(c) ................................................... 31

**Rules**

Federal Rule of Civil Procedure 23 ...................................................................... 54, 57

I.    **INTRODUCTION**

Defendant Intel Corporation ("Intel"), in concert with others, has engaged in a course of conduct to establish and maintain an illegal monopoly in the market for x86 microprocessors through anticompetitive means.  Intel has used its monopoly power to impose an unlawful overcharge on the microprocessors it sells, and that overcharge has been passed on to purchasers of personal computers that contain those chips.  Intel's anticompetitive scheme, which was developed in and implemented from its headquarters in California and which included anticompetitive "bribes" paid by Intel to key computer manufacturers and other important customers in exchange for limiting the market share of Intel's competitors, has had a market-wide impact resulting in inflated prices on Intel-powered personal computers nationwide.  For most PC users in this country, the only realistic chance they have to recover for being forced by Intel for years to overpay for their computers is through the class action device.

Class Plaintiffs seek certification of the following nationwide class:[1]

> All persons and entities residing in the United States who, from June 28, 2001 through the present, purchased an x86 microprocessor in the United States, other than for resale, indirectly from the Defendant or any controlled subsidiary or affiliate of the Defendant, as part of a desktop or mobile personal computer.  The Class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which the Defendant has a controlling interest.  The Class also excludes all federal, state or local governmental entities and all judicial officers presiding over this action.

The proposed nationwide class should be certified under both Rule 23(b)(2), for injunctive relief under the federal antitrust laws, and Rule 23(b)(3), for damages under the California Cartwright Act and for restitutionary relief under the California Unfair Competition

---

[1]    This definition is narrower than the one proposed in the First Amended Consolidated Complaint ("FACC") in that it excludes purchases of servers or stand-alone microprocessors. *See Wiesfeld v. Sun Chem. Corp.*, 84 Fed. Appx. 257 (3d Cir. 2004) ("The District Court considered this revised class definition in its analysis, and we will do the same."); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (holding that a court "is not bound by the class definition proposed in the complaint").

Law ("UCL"). Under a choice of law analysis, California law applies to the claims for damages of all putative class members, and the requirements of Rule 23 are met for this proposed class.

As a first alternative, the Court should certify, pursuant to Rule 23(b)(3), a single 26-state subclass seeking damages or restitutionary relief under the laws of Arkansas, Arizona, California, the District of Columbia, Florida, Idaho, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island,[2] South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin in addition to a nationwide class seeking injunctive relief.

As a second alternative, the Court should certify, pursuant to Rule 23 (b)(3), 26 separate statewide subclasses for damages or restitutionary relief under the laws of these 26 states in addition to a nationwide class seeking class seeking injunctive relief.

Finally, the Class Plaintiffs respectfully request that the Court appoint three of the Interim Class Counsel, along with a fourth firm discussed below, as Class Counsel pursuant to Rule 23(g), and also appoint Liaison Counsel.[3]

## II.    STATEMENT OF FACTS

Intel maintains a monopoly in the market for x86 microprocessors, with a market share exceeding 80 percent. *See* First Amended Consolidated Complaint filed May 26, 2006, D.I. 108 ("FACC") ¶¶ 1, 130; Leffler Decl. ¶ 14. It sells these chips to distributors and to original equipment manufacturers ("OEMs"), which manufacture computers and other devices. *See*

---

[2]    With respect to Rhode Island, the proposed subclass includes only those persons who purchased a personal computer for personal, family, or household purposes.

[3]    In support of their motion, Class Plaintiffs rely on this memorandum of law and its annexes, as well as the Declaration of Keith B. Leffler, Ph.D., a professor of economics at the University of Washington with over thirty years of experience performing economic analysis in antitrust and patent matters. *See* Declaration of Keith B. Leffler, Ph.D. ("Leffler Decl."), ¶¶ 1-2 & Ex. A. Professor Leffler has been qualified as an economic expert in proceedings before federal and state courts and regulatory agencies and the Federal Trade Commission. *See id.* ¶ 2. Plaintiffs also rely on the Declaration of Jon T. King (attaching various documents produced in this matter), and the Compendium of Unpublished Decisions. "Ex." indicates an exhibit to the King Declaration, and "Comp. Ex." indicates an exhibit to the Compendium.

    Throughout this memorandum, all emphasis in quoted material has been added unless otherwise indicated.

FACC ¶ 134; Leffler Decl. ¶¶ 15, 20. OEMs sell computers directly to end-users or to retailers or value added resellers ("VARs") that resell them to end-users. *See* FACC ¶ 137; Leffler Decl. ¶ 22. These end-users include businesses, institutions, and individual consumers. *See* Leffler Decl. ¶ 21.

As set forth in Class Plaintiffs' complaint (D.I. 108),[4] Intel, in combination with others, has illegally monopolized the x86 market through the following conduct that created barriers to entry or expansion and raised the costs of actual and potential competitors:

- Intel has forced major customers into exclusive or near-exclusive deals.

- Intel has conditioned rebates, allowances, and market development funding on customers' agreement to severely limit or forego purchases from AMD [Advanced Micro Devices, Inc.] or other competitors.

- Intel has established a system of first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD and others.

- Intel has threatened retaliation against customers introducing AMD-powered computer platforms, particularly in strategic market segments.

- Intel has forced PC makers and technology partners to boycott AMD product launches and promotions.

- Intel has abused its market power by forcing on the industry technical standards that have as their central purpose the handicapping of AMD and others in the marketplace.[5]

---

[4]    References to "D.I. ___" are to docket items in MDL No. 05-1717 unless otherwise noted.

[5]    Intel's anticompetitive conduct has created artificial barriers to entry or expansion that have slowed the pace of technological innovation that would have otherwise existed in a marketplace free of Intel's anticompetitive conduct. Slower innovation directly impacts consumers who are left with fewer and worse choices in the marketplace, and who must ultimately pay premium prices for under-configured products. Intel also pushed innovation in an Intel-centric direction through improper means. ███████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ At other times, Intel used its market dominance to induce third parties to make anti-AMD design decisions. █████████████████

███████████████████████████████████████ Intel also wanted to exclude

FACC ¶ 2. Class Plaintiffs allege that this conduct "has unfairly and artificially capped AMD's and other's market shares, and it has constrained AMD and others from expanding to reach the minimum efficient levels of scale necessary to compete with Intel . . . ." *Id.* ¶ 5.

Although discovery is ongoing, the evidence obtained thus far supports Class Plaintiffs' allegations. In particular, the documents demonstrate that Intel has unlawfully paid "bribes" to key OEMs in exchange for limiting the market share of Intel's competitors.



Such payments are the opposite of fair



AMD from contributing its expertise to this cutting-edge technology.

---

6

7

---

8    Intel's bribes were funneled through various rebate programs. Each program had a different function, but all were included under the generic title MCP [meet competition program].

competition. *See, e.g., LePage's, Inc. v. 3M*, 324 F.3d 141, 158 (3d Cir. 2003), *cert. denied*, 542 U.S. 953 (2004) (holding that the jury reasonably could have found that "the purpose and effect of 3M's payments to the retailers," such as a $1 million "growth" reward, were anticompetitive); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190-93 (3d Cir. 2005), *cert. denied*, 546 U.S. 1089 (2006) (similar conduct claimed). During the period from 2002 through 2006, Intel paid at least $██████ to the top nine recipients, *see* Leffler Decl. ¶ 25 n.36, which the OEMs understood as buying their loyalty to Intel:





- 

Similarly, the Japanese Fair Trade Commission found evidence of payments to OEMs tied to maintenance of a high Intel market share. *See* http://www.jftc.go.jp/eacpf/cases/intel.pdf ("IJKK [Intel Kabushiki Kaisha], since May 2002, has made the five major Japanese OEMs refrain from adopting competitors' CPUs for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred as 'MDF' (Market Development Fund) in order to maximize their MSS . . . .") (footnotes omitted). Intel did not contest these findings. More recently, competition authorities in Europe charged Intel with anticompetitive conduct injurious to consumers, *see* http://europa.eu/rapid/ pressReleasesAction.do?reference=MEMO/07/314&format=HTML&aged= 0&language=EN&guiLanguage=en; South Korea's Fair Trade Commission issued a statement of objection relating to Intel's similar conduct in that country, *see* http://www.tgdaily.com/content/view/33811/118/; and the New York Attorney General has begun an investigation of Intel's practices, *see* http://www.oag.state.ny.us/press/2008/jan/jan10a_08.html.

Intel understood the significance of keeping AMD from penetrating key accounts or otherwise growing its market share.





The reason Intel has sought to keep AMD small is clear. "Absent Intel's alleged anticompetitive conduct, AMD and/or other competitors would have achieved greater scale, lower costs, faster innovation, and lower prices. Intel would have been 'forced' by stronger competition to offer buyers better microprocessors, and the microprocessors it actually sold would have been sold at lower prices." Leffler Decl. ¶ 28.[10]

Intel designed its system of "bribes" primarily so that the payments would ensure market share without reducing computer prices to end-users. *Cf. LePage's*, 324 F.3d at 163 (discussing evidence that "the payment of the rebates after the end of the year discouraged passing the rebate on to the ultimate customers"). Intel understood that if the recipients of these bribes used the money to lower their computer prices, other OEMs would be forced to charge less as well and to then demand that Intel reduce its microprocessor prices to them. The documents illustrate this point:



___

[10]

- 

Thus, in exchange for Intel's "bribes," the major OEMs agreed to exclude AMD entirely, to keep it out of important market segments, or to limit it to a small market share.[12] This policy of bribing select OEMs with MCP payments also allowed Intel to avoid a price war and instead to charge inflated prices for its microprocessors. *See* Leffler Decl. ¶¶ 31-32. Documents produced to date vividly illustrate this point as follows:



---

[11]    Intel was also concerned that AMD penetration in key market segments like enterprise client (corporate laptops and desktops) would cause price wars.

[12]    Other documents further support Plaintiffs' allegations that Intel coerced and threatened its customers to prevent them from doing business with Intel's competitors.

- ████████████████████████████████████████████████

Intel's inflated prices were passed on to members of the proposed class who paid higher prices for PCs. *See* Leffler Decl. ¶56-66. Indeed, Intel admits anecdotally that there is a direct relationship between microprocessor prices paid by OEMs and PC prices paid by consumers:

- ████████████████████████████████████████████████

## III.    CLASS CERTIFICATION IS APPROPRIATE IN THIS CASE

### A.    Standard for Class Certification

As the Supreme Court has recognized, class actions play an important role in the enforcement of the antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[C]lass actions serve an important function in our system of civil justice."). For this reason, "[t]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968)); *see also Spark v. MBNA Corp.*, 178 F.R.D. 431, 434 (D. Del. 1998) ("The Third Circuit has indicated that class actions should be looked upon favorably.").

Class actions must satisfy "the threshold requirements of Rule 23(a)" as well as one of the subdivisions of Rule 23(b). *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004). Here, Class Plaintiffs satisfy the requirements of Rule 23(a) as well as both Rule 23(b)(2) and (3).

Importantly, "it is not necessary for the plaintiffs to establish the merits of their case at the class certification stage, and . . . in determining whether a class will be certified, the substantive allegations of the complaint must be taken as true." *Chiang v. Veneman*, 385 F.3d 256, 262 (3d Cir. 2004). Thus, "the merits of disputed facts are not reached at the class certification stage." *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 183 n.5 (3d Cir. 2006) (internal quotation marks omitted); *see also In re ML-Lee Acquisition Fund II, L.P. and M-L Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 562 (D. Del. 1994) ("The court is not willing to delve into what could be a protracted inquiry to settle . . . contested issue[s] of fact at the class certification stage.").

While it is true that "a *preliminary* inquiry into the merits is sometimes necessary," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001) (emphasis added), the Court may not "credit Plaintiffs' evidence over Defendants' or vice versa." *In re Pressure Sensitive Labelstock Antitrust Litig.*, MDL Docket No. 1556, 2007 WL 4150666, at *6 (M.D. Pa. Nov. 19, 2007). For example, "[t]o the extent that [class certification] involves a battle of experts, it [is] not appropriate for the Court to determine which expert is more credible at this time." *Id.* at *7 (quoting *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001)).

For this reason, any merits inquiry must be limited "to the minimum necessary at this juncture." *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 170 (E.D. Pa. 2007). "Class certification is concerned primarily with the nature of the proof plaintiffs will offer, not its quantity or sufficiency. So long as plaintiffs demonstrate their intention to prove a significant portion of their case [through] factual evidence and legal arguments common to all class members, that will now suffice." *Hydrogen Peroxide*, 240 F.R.D. at 170.

**B.    Other Courts Have Certified Classes in Similar Cases**

Many other courts have certified classes of consumers and other end-users who indirectly purchased a product from a monopolist at an inflated price. *See, e.g.*, Comp. Ex. 1, *Hopkins v. De Beers Centenary AG*, No. CGC04-432954, Order Certifying Plaintiff Class (Cal. Super. Ct. Apr. 18, 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004); *In re Cipro Cases I and II*, 121 Cal. App. 4th 402 (Cal. Ct. App. 2004); Comp. Ex. 2, *In re Mass. Smokeless Tobacco Litig.*, No. 03-5038 BLS, Memorandum and Order (Suffolk Cty. Super. Ct. Dec. 7, 2004); Comp. Ex. 3, *Feuerabend v. UST, Inc.*, No. 2002CV007124, Decision and Order Granting Plaintiff's Motion for Class Certification (Wis. Cir. Ct. May 10, 2004); Comp. Ex. 4, *Smokeless Tobacco Cases I-IV*, J.C.C.P. Nos. 4250, 4258, 4259 & 4262, Order Granting Motion for Class Certification (Cal. Super. Ct. Jan. 29, 2004); Comp. Ex. 5, *Chance v. United States Tobacco Co.,* No. 02-C-12, Journal Entry (Kan. Dist. Ct. July 29, 2003).  Similar analysis has led numerous courts to certify classes of direct purchasers alleging unlawful monopolization[13] and indirect purchasers in non-monopoly cases.[14]

In a particularly analogous series of cases, courts in eleven states certified class actions brought by indirect purchasers against Microsoft for its monopolistic conduct involving

---

[13]    *See, e.g., Behrend v. Comcast Corp.*, 245 F.R.D. 195 (E.D. Pa. 2007); *Bradburn Parent/Teacher Store, Inc. v. 3M*, Civ. A. No. 02-7676, 2004 WL 1842987 (E.D. Pa. Aug. 18, 2004); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc.*, 225 F.R.D. 208 (S.D. Ohio 2003); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001); *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279 (D.N.J. 1997); *Davis v. S. Bell Tel. & Tel. Co.*, 1993 WL 593999 (S.D. Fla. Dec. 23, 1993); *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417 (D.N.M. 1988).

[14]    *See, e.g., Romero v. Philip Morris Inc.*, 109 P.3d 768 (N.M. Ct. App. 2005); Comp. Ex. 6, *In re Automotive Refinishing Paint Cases*, J.C.C.P. No. 4199, Order Granting Motion of Plaintiffs for Class Certification (Cal. Super. Ct. June 17, 2004); *Goda v. Abbott Labs.*, No. 01445-96, 1997 WL 156541 (D.C. Super. Ct. Feb. 3, 1997); *Robinson v. EMI Music Distribution, Inc.*, No. L-10462, 1996 WL 495551 (Tenn. Cir. Ct. July 8, 1996); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341 (Cal. Ct. App. 1987); *Rosack v. Volvo of Am. Corp.*, 131 Cal. App. 3d 741 (Cal. Ct. App. 1982), *cert. denied*, 460 U.S. 1012 (1983); Comp. Ex. 11, *Pharmaceutical Cases I, II, and III*, J.C.C.P. Nos. 2969, 2971 & 2972, Order Certifying Consumer Class (Cal. Super. Ct. Aug. 16, 1995).

computer software. Comp. Ex. 7, *See Charles I. Friedman, P.C. v. Microsoft Corp.*, No. CV2000-000722, Minute Entry (Ariz. Super. Ct. Nov. 14, 2000); Comp. Ex. 8, *Microsoft I-V Cases*, J.C.C.P. No. 4106, 2000-2 Trade Cas. ¶ 73,013 (Cal. Super. Ct. Aug. 29, 2000); *In re Fla. Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002); *Comes v. Microsoft Corp.*, 696 N.W.2d 318 (Iowa 2005); *Bellinder v. Microsoft Corp.*, No. 00-C-0855, 2001 WL 1397995 (Kan. Dist. Ct. Sept. 7, 2001); *Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001), *review denied*, 645 N.W.2d 393 (Minn. 2002), 2003 WL 23105552, at *10 (Minn. Dist. Ct. Mar. 14, 2003); Comp. Ex. 9, *In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig.*, No. D-0101-CV-2000-1697, Decision and Order on Motion for Class Certification (N.M. Dist. Ct. Oct. 2, 2002); *Howe v. Microsoft Corp.*, 656 N.W.2d 285 (N.D. 2003); *Cox v. Microsoft Corp.*, 809 N.Y.S.2d 480 (N.Y. Sup. Ct. 2005); *In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668 (S.D. 2003); Comp. Ex. 10, *Sherwood v. Microsoft Corp.*, No. 99C-3562, Memorandum and Order (Tenn. Cir. Ct. Dec. 20, 2002). In the *Microsoft* litigation, as in this case, computer manufacturers and others purchased a component (there software, here microprocessors) from a monopolist and resold it, ultimately to consumers and other end-users. *See Microsoft I-V Cases*, 2000-2 Trade Cas. at 88,561. Class certification is similarly appropriate in this case.

## C.    Certification of a Nationwide Class Is Appropriate

Certification of a nationwide class is appropriate where, as here, the requirements of Rule 23 are met. The Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy of representation are satisfied, and certification is appropriate under two different subsections of Rule 23(b). Class Plaintiffs' claims for injunctive relief under federal law should be certified pursuant to Rule 23(b)(2) because Intel has acted on grounds generally applicable to the class, making class-wide injunctive relief appropriate. With respect to Class Plaintiffs' state law

claims for monetary relief, a choice of law analysis demonstrates that California law applies, and the claims of a nationwide class should be certified pursuant to Rule 23(b)(3) because common issues predominate over individual issues and a class action is the superior method of adjudicating the controversy.

### 1.    Class Plaintiffs Satisfy the Rule 23(a) Prerequisites

#### a.    Class Members Are Sufficiently Numerous

There is no "rigid minimum number of class members necessary to warrant certification; rather, joinder of all members need only be impractical, not impossible." *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 295 (D. Del. 2003); *see also Stewart v. Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."). Indeed, as few as sixteen class members have been held to be sufficient. *See Jackson v. Danberg*, 240 F.R.D. 145, 147 (D. Del. 2007).

"Courts are permitted to 'accept common sense assumptions' about the numerosity requirement." *Hydrogen Peroxide*, 240 F.R.D. at 168 (quoting *Linerboard*, 203 F.R.D. at 205). According to data previously cited by Intel in this litigation, approximately 43 million households purchased a computer between 2001 and 2003. *See* U.S. Census Bureau, *Computer and Internet Use in the United States: October 2003*, Detailed Tables for P23-208, Table 1C, http://www.census.gov/population/www/socdemo/computer/2003.html; *see also* Declaration of Gregory F. Wells, D.I. 30, attachment #2 in C.A. No. 06-265-JJF, filed Oct. 3, 2005 (using this data source to estimate the number of computers with Intel microprocessors sold in Kansas). Using Intel's methodology of multiplying the total by the 80 percent market share alleged, *see* FACC ¶ 130, and considering that this figure does not include businesses and that additional

households have purchased computers with Intel microprocessors since 2003, the proposed class would number in the tens of millions.

This proposed class, with tens of millions of members dispersed throughout the United States, satisfies the numerosity requirement. *See Marian Bank v. Elec. Payment Servs., Inc.*, No. 95-614-SLR, 1997 WL 811552, at *15 (D. Del. Dec. 30, 1997) ("[T]he court finds that the practical difficulties of joinder weigh in favor of plaintiff given the large size and geographic diversity of the proposed class."); *Behrend v. Comcast Corp.*, No. 03-6604, 2007 WL 2972601, at *5 (E.D. Pa. Oct. 10, 2007) (holding that "literally millions" of class members "would make joinder of all members impracticable"); *see also DaimlerChrysler*, 216 F.R.D. at 295 (finding numerosity when there were hundreds of millions of shares purchased or exchanged during the class period, even though the exact number of shareholders was unknown).

> b.    Common Questions of Law and Fact Exist

"[T]he commonality standard of Rule 23(a)(2) is not a high bar: it does not require identical claims or facts among class member[s], as 'the commonality requirement will be satisfied if the named plaintiffs share at least one question of law or fact in common with the grievances of the prospective class.'" *Chiang*, 385 F.3d at 265 (quoting *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3d Cir. 2001)). Thus, this requirement is "easily met." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994); *see also Marian Bank*, 1997 WL 811552, at *15 (noting that there is a "low threshold" for this prerequisite).

In this case, there are numerous common questions of law and fact, including questions relating to the definition of the relevant market, whether Intel has monopoly power in this market, whether Intel monopolized this market through anticompetitive means, whether Intel acted in concert with other entities, whether Intel's actions violated state and federal law, the effect of Intel's conduct on the prices of microprocessors and personal computers, the

appropriate measure of damages sustained by the members of the proposed class, the amount of those damages, whether the members of the proposed class are entitled to injunctive relief, and the appropriate form of that relief. *See Jennings Oil Co. v. Mobil Oil Corp.*, 80 F.R.D. 124, 128 (S.D.N.Y. 1978) ("The monopolization claims are contingent upon a showing of monopoly power and an examination of the manner in which such power was acquired or maintained. These issues, along with others, are questions that are undoubtedly common to all the members of the putative class.") (citation omitted); 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3:10 (4th ed. 2002) ("In an antitrust action on behalf of purchasers who have bought the defendants' products at prices that have been maintained above competitive levels by unlawful conduct, the courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy the Rule 23(a)(2) prerequisite.").

c.    The Class Representatives Have Typical Claims

Like commonality, typicality is "broadly defined" and "focus[es] on similar aspects of the alleged claims." *Newton*, 259 F.3d at 182 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)). The Third Circuit has "set a low threshold for satisfying both requirements." *Id.* at 183. "Typicality is met 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'" *Lorazepam*, 202 F.R.D. at 27 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998)); *accord Powers v. Lycoming Engines*, 245 F.R.D. 226, 228 (E.D. Pa. 2007).

The typicality requirement "does not require that all putative class members share identical claims." *Johnston*, 265 F.3d at 184. For this reason, "[w]here the plaintiffs' claims arise from the same event, practice or conduct and is based upon the same legal theory, factual differences among the class members will not be sufficient to render the claim atypical."

*DaimlerChrysler*, 216 F.R.D. at 298; *see also Baby Neal*, 43 F.3d at 58 ("[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."). Furthermore, "[c]ourts will liberally construe the typicality requirement" in the absence of express conflicts. *Spark*, 178 F.R.D. at 436.

Here, all members of the proposed nationwide class will base their claims on the same facts and the same legal theories: that Intel's anticompetitive conduct violated the Sherman Act, Cartwright Act, and California UCL, resulting in unlawful overcharges passed on to class members and entitling them to damages and injunctive relief. *See Microsoft I-V Cases*, 2000-2 Trade Cas. ¶ 73,013 at 88,589 n.4 ("The named plaintiffs' claims here, that they paid illegal overcharges due to defendant's antitrust violations, are identical to those of the class, and are, therefore, typical of those of the class."); *Terazosin*, 220 F.R.D. at 687 ("Here, the claims of the consumer and the third-party payer class representatives are not only typical of the claims of all class members, they are virtually identical in nature, notwithstanding variations in the amount of damages. Consequently, if one class representative is able to prove that Defendants' alleged anticompetitive acts caused an overcharge for terazosin hydrochloride, or that Defendants were unjustly enriched at Indirect Purchaser Plaintiffs' expense, such proof will likewise prove the case on liability for every other class member.").[15]

Differences among class members in terms of the prices they paid, the products they purchased, the quantity they purchased, or whether they are individuals or businesses do not defeat typicality. *See, e.g., In re: Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999) (quoting *Baby Neal*, 43 F.3d at 56 ("'actual differences among the claims of the putative class members do not defeat certification'")); *In re*

---

[15]     "The mere fact that some members of the class may have additional state or federal law claims, not asserted by the named plaintiffs, does not preclude a finding of typicality." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortgage Loan Litig.*, 418 F.3d 277, 303 (3d Cir. 2005).

*Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W. D. Pa. 1999) ("[t]he overarching scheme is the linchpin of plaintiffs amended complaint, regardless of the product purchased, the market involved or the price ultimately paid."). *See also, e.g., In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649 (N.D. Cal. 2007) ("The fact that named plaintiffs purchased different types of tableware products at different prices from those of the absent class members does not render their claim atypical."); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) ("[F]actual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class."); *DeLoach v. Philip Morris Cos., Inc.*, 206 F.R.D. 551, 555 (M.D.N.C. 2002) ("The fact that the class includes small farmers, corporations, and various types of tobacco producers in between does not destroy typicality."). Thus, the claims of the class representatives are typical of the claims of the proposed class.

        d.    <u>Class Plaintiffs Will Adequately Represent the Class</u>

In analyzing this factor, "the court must determine whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class." *Johnston*, 265 F.3d at 185. Here, there are no conflicts and – as discussed in Section IV, below – Interim Class Counsel are capable of representing the class and should be appointed Class Counsel.

Conflicts "'must be more than merely speculative or hypothetical' before a named representative can be deemed inadequate." *Bradburn*, 2004 WL 1842987, at *4 (quoting 5 James Wm. Moore, et al., *Moore's Federal Practice* 23.25 [4][b][ii] (3d ed. 2003)). Here, all members of the proposed class have the same interest in establishing Intel's liability and their right to damages and injunctive relief, so no conflict exists. *See In re Visa Check / Mastermoney*

*Antitrust Litig.*, 280 F.3d 124, 144 (2d Cir. 2001) ("All class members, regardless of their debit/credit proportion, wish to prove that the debit card fees would be significantly lower without the tie. Every member also has an interest in establishing the hypothetical, 'untied' price as low as possible in order to maximize recovery of damages."); *Tableware*, 241 F.R.D. at 649 ("Members of the class were allegedly overcharged for tableware and have a mutual and coterminous interest in establishing defendants' liability and recovering damages."). Of course, should any class members disagree with participating in a class action, they may exercise their right to opt out. *See In re Potash Antitrust Litig.*, 159 F.R.D. 682, 692 (D. Minn. 1995) ("[T]hose large-volume purchasers who do not wish to participate in the proposed class action are free to opt out of the class pursuant to the procedure set forth in Rule 23(c)(2).").[16]

Fifty plaintiffs, including individuals and businesses from around the country, seek to serve as representatives of the class. All of them are members of the proposed class and are willing to fulfill their responsibilities as class representatives. For example, they already have produced documents, answered interrogatories, and appeared for depositions in this case. Detailed information about each of the proposed class representatives taken from their depositions and interrogatory responses is set forth in Annex A.

### 2. Class Plaintiffs Meet the Requirements of Rule 23(b)(2) for Certification of a Nationwide Class for Injunctive Relief

Certification under Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

---

[16]     Furthermore, this Court has already held in this case that class representatives' financial status is not relevant to the adequacy determination. *See In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717, 526 F. Supp. 2d 461 (D. Del. 2007). In addition, it has noted in an earlier case that "plaintiffs in this Circuit are held to a 'very minimal requirement of knowledge about the litigation and the facts upon which it is based.'" *DaimlerChrysler*, 216 F.R.D. at 300 (quoting *ML-Lee*, 848 F. Supp. at 559-60). Class representatives need only "have a clear layperson's understanding of the nature of the action, and the conduct of certain Defendants that forms the basis of the allegations." *ML-Lee*, 848 F. Supp. at 560. The proposed class representatives satisfy these requirements and will adequately represent the class.

23(b)(2). Both parts of the rule are satisfied here. *See Baby Neal*, 43 F.3d at 64-65 ("Because this suit challenges conduct generally applicable to the class and because the court can enter appropriate declaratory and injunctive relief, this action patently satisfies the (b)(2) standard.").

Intel has acted on grounds generally applicable to the class. As described in Section II, above, Intel's anticompetitive conduct – which included the payment of "bribes" to OEMs in exchange for limiting AMD's market share – monopolized a *market* and was not specific to individual end-users. As a result, injunctive relief is appropriate with respect to the class as a whole. While indirect purchasers cannot recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, they may obtain injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. *See Mid-West Paper Products Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 594 (3d Cir. 1979); *see also In re OSB Antitrust Litigation., 2007* WL 2253425, at *16 (E.D. Pa.) ("The Third Circuit has held that indirect purchasers may request injunctive relief under this provision [Section 16 of the Clayton Act] if they demonstrate that they meet the usual requirements for equitable relief: injury, causation, and redressability.") (citing *Warfarin*, 214 F.3d at 400).

Intel's anticompetitive conduct has enabled it to overcharge for its microprocessors, resulting in inflated PC prices. This conduct is alleged to be ongoing, *see, e.g.*, FACC ¶¶ 233, 245-46, as supported by discovery received to date.[17] In particular, Intel has not stopped its anticompetitive conduct – it has only grown more secretive about it.



---

[17]     Pursuant to Case Management Order No. 3, D.I. 595, the production cut-off date for many custodians, absent a deposition reharvest, is June 1, 2006. As a result, there has been little access so far to documents created during the past two years. In addition, Intel's failure to preserve responsive e-mails generated after this case began further limits the available evidence.



Putative class members continue to purchase new computers at the higher prices flowing from Intel's ongoing unlawful conduct. *See, e.g.,* Comp. Ex. 12, Darrell Dunn, *The PC Replacement Decision,* InformationWeek (June 20, 2005) (reporting that "the average life span of a desktop PC is 43 months, and only 36 months for mobile PCs"). An injunction that forces Intel to stop its anticompetitive conduct will result in lower-priced PCs purchased by class members in the future, as well as greater innovation and wider choices.

The injunctive relief sought by Class Plaintiffs would therefore benefit the class. *See Baby Neal,* 43 F.3d at 59; *see also id.* at 64 (certifying (b)(2) class even though "not all of the orders issued will *immediately* benefit every plaintiff." (emphasis added).

The above establishes that the proposed (b)(2) class is sufficiently "cohesive" for certification. *Barnes,* 161 F.3d at 143; *see also OSB,* 2007 WL 2253425, at *18 ("Plaintiffs have

---

[18]    Documents listed herein bearing the Intel Internal Tiff ["IIT"] bates designation, are documents that have been "TIFFed" by Class Counsel for internal purposes. These documents are currently being converted into official production TIFFs by Forensic Consulting Services. Annex H contains a conversion chart which provides a Document Control Number ("DCN") for each of these documents so that they can be identified by opposing counsel.

. . . presented probative evidence that the buyers of actual OSB for end use have been and will continue to be injured by any price-fixing conspiracy, that the Defendants' conduct, if wrongful, would be the cause of such injury, that an injunction will redress this injury, and that they can establish all of these elements through common proof. Accordingly, Plaintiffs have satisfied the cohesiveness inquiry as to the end user buyers of actual OSB . . . .").

Therefore, certification of a class under Rule 23(b)(2) is appropriate here, as is the certification of an additional class under Rule 23(b)(3), discussed below. *See Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) ("It is possible to certify the injunctive aspects of the suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damages aspects."); *see also Cohen v. Chi. Title Ins. Co.*, 242 F.R.D. 295, 301 (E.D. Pa. 2007) (certifying both 23(b)(2) and 23(b)(3) classes); *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. C 04-1511, 2007 WL 1689899, at *22-*23 (N.D. Cal. June 11, 2007) (same).

### 3. Class Plaintiffs Meet the Requirements of Rule 23(b)(3) for Certification of a Nationwide Class for Damages And Restitutionary Relief Under California Law

California's strong interest in curtailing anticompetitive business practices by Intel – practices that were designed and implemented by Intel management at its headquarters in California in order to limit the market share of AMD, another corporation headquartered in California – warrants certification of a nationwide class under California law.

In *M-L Lee*, this Court noted that Delaware law would likely govern the claims of a nationwide class when most of the defendants were Delaware corporations and partnerships and when their contracts specified that Delaware law would govern. *See M-L Lee*, 848 F. Supp. at 563. Similarly, the district court in *Warfarin* held that "[w]here the defendant's headquarters are

located in Delaware and the alleged deceptive acts originated in Delaware, it is proper to apply the Delaware consumer fraud statute to a nationwide class." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 251 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004).

Other courts within this Circuit have applied the law of the state in which the defendant had its principal place of business to a nationwide class. *See, e.g., Powers*, 245 F.R.D. at 230-34 (applying Pennsylvania law to nationwide class asserting breach of warranty and unjust enrichment claims against defendant that was headquartered and manufactured the product in Pennsylvania); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1455, 1464 (D.N.J. 1987) (holding that New Jersey law applied to claims of class members who resided in multiple states when the defendant had its principal place of business in New Jersey); *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 256-57 (D.N.J. 1992) (same); *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 411-12 (D.N.J. 1990) (same); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 81-82 (E.D. Pa. 1987) (same, with respect to Pennsylvania law); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 122 F.R.D. 177, 183 (E.D. Pa. 1988) (certifying nationwide class of pendent claims for breach of contract and breach of duty).

Here, the Intel conduct at issue clearly emanated from California. Not only was California the site of Intel's headquarters and the place of business of its highest executives, it was also the location of the personnel Intel has identified as being the "persons most knowledgeable" about key issues in the case,





19

As set forth below, a choice of law analysis demonstrates that California law applies to the claims of the proposed nationwide class. Federal courts apply the forum state's choice-of-law rules to state law issues. *Klaxon Co. v. Stentor Elec. Mfg., Co..,* 313 U.S. 487, 496 (1941); *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964). In an MDL proceeding, that requires analysis of the rules applicable in the transferor court. *See In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.,* MDL No. 1712, 2007 WL 2541216, at *27 n.16 (E.D. Pa. Aug. 29, 2007) ("Although neither the Supreme Court nor the United States Court of Appeals for the Third Circuit has explicitly ruled on the issue, it appears that in MDL proceedings the transferee court applies the choice-of-law rules that would govern in the transferor forum.").

Courts have applied California law nationwide in recognition of California's "legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices"

_____

19

and its "clear and substantial interest in preventing fraudulent practices in this state which may have an effect both in California and throughout the country." *Diamond Multimedia Sys. v. Superior Ct.*, 968 P.2d 539, 556-57 (Cal. 1999), *cert. denied*, 527 U.S. 1003 (1999) (holding that California's security fraud statutes could be applied to a nationwide class of securities purchasers, including nonresident class members who purchased the stock outside California, because the conduct that caused the price of the stock to be artificially inflated occurred in California); *see also, e.g., Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 615 (Cal. Ct. App. 1987) (reversing a denial of a nationwide class asserting California claims stemming from a telecommunications company's long distance charges, recognizing "California's fraud deterrence and consumer protection interests in applying its law to the claims of nonresident plaintiffs"); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 243 (Cal. Ct. App. 2001) (holding that computer purchasers nationwide could assert California consumer claims against Apple for its termination of free technical support for its computers, reasoning that "even though transactions may have occurred outside California, the representations upon which the causes of action rested . . . necessarily emanated from California," as Apple had a substantial presence within the state); Comp. Ex. 13, *In re Wells Fargo Overtime Pay Litig.*, MDL No. 06-1770, Mem. & Order Re: Nationwide Plaintiffs' Motion to Certify a Class and Collective Action, slip op. at 12 (N.D. Cal. Oct. 18, 2007) (certifying a nationwide class of non-California residents asserting claims under the UCL when there was a common question as to whether the defendant's conduct "emanated from California").

Almost all of the putative class action complaints here were originally filed in California or Delaware. Under either the "governmental interest analysis" used by California or the "most

substantial relationship test" used by Delaware,[20] the result is the same: California law applies to the claims of a nationwide class.[21]

Moreover, the application of California law to a nationwide class meets minimum due process requirements because California has "a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class" such that California has "state interests" sufficient to ensure that the choice of its law is "not arbitrary or unfair." *Shutts*, 472 U.S. at 821-22. There can be no claim of unfairness here, where California is the site of Intel's headquarters as well as the state of residence of many of the end-users of its products. It can come as no surprise to Intel that its business practices would be subject to California law.

        (1)   California Law Applies Under the "Governmental Interest Analysis"

The "governmental interest analysis" employed by California involves a three-step process: (1) the court must determine whether the law in each of the potentially affected jurisdictions is the same or different; (2) if it is different, the jurisdictions' interests must be examined to determine if there is a true conflict; and (3) if there is a true conflict, the court must

---

[20]    The "most substantial relationship test" is also used by Florida, Idaho, Maine, Nebraska and Tennessee, where some cases were filed. *See Green Leaf Nursery v. E.I. Du Pont de Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003); *Hataway v. McKinley*, 830 S.W.2d 53, 54 (Tenn. 1992); *Flaherty v. Allstate Ins. Co.*, 822 A.2d 1159, 1165-66 (Me. 2003); *Heinze v. Heinze*, 742 N.W.2d 465, 274 Neb. 595, 598-99 (Neb. 2007); *Johnson v. Pischke*, 700 P.2d 19, 21-22 (Idaho 1985).

[21]    One case each was filed in New Mexico and Kansas, in which the choice of law rule to be applied is somewhat ambiguous. Both apply the *lex loci delicti*, or "place of the wrong," rule in certain cases. The Kansas Supreme Court, however, has expressly left open the issue of what rule should be employed in class actions. *See Dragon v. Vanguard Indus.*, 89 P.3d 908, 917-18 (Kan. 2004). In New Mexico, "policy considerations may override the place-of-the-wrong rule. . . . [W]hen the misconduct and the injury are in separate states, there may be reasons for the law of the state of the misconduct to govern the question of the actor's liability." *In re Estate of Gilmore*, 946 P.2d 1130, 1135 (N.M. Ct. App. 1997) (noting that New Mexico's "approach" is "consistent" with the "most significant relationship" test, although the state has not "embraced" the Restatement (Second) of Conflicts of Laws, from which that test is derived). In any event, the relevant substantive statutes of these states are substantially similar to California substantive law. *See* Kan. Stat. Ann. §§ 50-101, 50-108; New Mexico Stat. Ann. §§ 57-1-1, 57-1-3, 57-12-3. Thus, there is no true conflict that would prevent the application of California law here. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816-17 (1985) (holding that there is no true conflict when the laws of the relevant jurisdictions are the same, and no damage results from the application of the law); *see also infra* Section III(C)(3)(a)(1) (explaining why the "full consideration" remedy under Kansas law does not present a true conflict or prevent class certification).

carefully evaluate and compare the nature and strength of the interest of each jurisdiction "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *See Kearney v. Salomon Smith Barney*, 137 P.3d 914 (Cal. 2006) (quoting *Bernhard v. Harrah's Club*, 546 P.2d 719, 723 (Cal. 1976)); *see Washington Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 920-21 (Cal. 2001).

While there are some variations among state laws, there are no conflicts that would prevent application of California law here. [22] Because Intel is headquartered in California, there can be no true conflict where California law provides for broader liability than the law of other states. As the California Supreme Court has explained, there is no true conflict where a foreign jurisdiction's tort law is intended to limit the liability of the defendant, but where the action is brought by a foreign plaintiff against a California resident. *Hurtado v. Superior Court*, 11 Cal. 3d 574, 581-82 (1974) (holding that where a foreign state's law limited liability of defendant, the foreign state's interest would not be impaired by application of California law with no limitation of liability to California defendant).

For example, unlike some states, California has "repealed" *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), thus endorsing the view "that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution." *Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 15, 20 (1984). Under *Hurtado*, the interests of the "non-repealer" states would not be impaired by holding Intel liable to indirect purchasers under California law.

---

[22]     For the most part, there is little substantive variation among the antitrust laws of the various states or among their consumer protection laws. The relevant state antitrust statutes, or court interpretations of those statutes, provide for harmonizing state law with parallel federal authorities. *See* Annex B (chart of state antitrust laws); *cf.* Def. Intel Corp.'s Mem. Supp. Mot. Dismiss 1st Am. Consol. Compl., D.I. 488, at 12 n.11 & Annex A (arguing that these states apply federal requirements). Likewise, many of the state consumer protection laws are based on the Federal Trade Commission Act and are interpreted in accordance with that statute. *See* Annex C (chart of state consumer protection laws); *see also Relafen*, 221 F.R.D. at 278 ("With respect to substantive matters – as opposed to procedural concerns such as standing – these state statutes uniformly parallel their federal counterparts, the Sherman Act and the Federal Trade Commission Act.").

Similarly, "California's consumer protection laws are among the strongest in the country." *Wershba*, 91 Cal. App. 4th at 242. By enacting the UCL, California has demonstrated a strong interest in protecting fair and unfettered competition, the primary purpose of which "is to preserve fair business competition by extending protections traditionally available to business competitors to the consuming public." *Rothschild v. Tyco Int'l. (US), Inc.*, 83 Cal.App.4th 488, 493 (Cal. Ct. App. 2000) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)); *see also Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002) (noting that the purpose of the UCL "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services"). For this reason, "California's more favorable laws may properly apply to benefit non-resident plaintiffs when their home states have no identifiable interest in denying such persons full recovery." *Wershba*, 91 Cal. App. 4th at 243 (quoting *Clothesrigger*, 191 Cal. App. 3d at 616). Other states have little interest in preventing their residents from recovering under the strongest consumer protection laws.

California allows antitrust plaintiffs to recover treble damages. *See* Cal. Bus. & Prof. Code § 16750(a). In theory, a plaintiff might be entitled to a larger recovery under the laws of Kansas or Tennessee, which allow "full consideration" damages. *See* Kan. Stat. § 50-115; Tenn. Code. § 47-25-106.[23] This Court has not definitively resolved the issue of how these statutes might apply here, where putative class members purchased computers containing the affected microprocessors. *See In re Intel Corp. Microprocessor Antitrust Litigation,* 436 F. Supp. 2d 687, 689-90 (D. Del. 2006) (finding that remand was inappropriate whether damages were based on computer or microprocessor prices). Indeed, it would be speculative at this point – before an overcharge has been calculated – to make this determination. *See Four B Corp. v. Daicel Chem.*

---

[23]    Such a remedy, however, may not be very different from the relief contemplated by the UCL. *See* Cal. Bus. & Prof. Code § 17203 (providing for orders "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition").

*Indus., Ltd.*, 253 F. Supp. 2d 1147, 1153-54 (D. Kan. 2003) (stating that it would be "premature[]" to rule on what damages would be allowed "without evidence of the percentage of overcharge created by the inclusion of defendants' price fixed sorbates in the products purchased by plaintiffs" or a "finding of actual damages to plaintiffs").[24]

Even if such "full consideration" recovery statutes were deemed to create a conflict, the conflict relates only to damages, and as such should not bar certification of a nationwide class. *See Warfarin*, 391 F.3d at 530 (holding that variations involving "full consideration" damages "could be considered in the context of calculating damages" and did not prevent class certification); *see also Cmty. Bank*, 418 F.3d at 306 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.") (quoting *Visa Check.*, 280 F.3d at 139).

Furthermore, even if the Kansas and Tennessee statutes did apply, they would apply only to purchases made in those states; the claims of all other class members would be governed by California law. Litigating this case under the laws of three states would pose no certification problem. If necessary, damages to Kansas and Tennessee purchasers could be resolved in a separate proceeding after class-wide liability had been determined. *See Prudential*, 148 F.3d at 314-15; *In re Copley Pharm., Inc.*, 158 F.R.D. 485, 492 (D. Wyo. 1994).

Unlike some state antitrust laws, the Cartwright Act does not specifically prohibit unilateral conduct, but instead requires concerted action by two or more persons. *See* Cal. Bus. & Prof. Code § 16720; *see also Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 200-01 n.32 (Cal. Ct. App. 1999) (noting that the Cartwright Act "does not have any parallel to Sherman Act section 2's anti-monopoly provisions."). In this case, however, this is a distinction

---

[24]    In the Microsoft litigation, which similarly involved monopolization of the market for a component incorporated in personal computers, courts in Kansas and Tennessee certified classes based on an overcharge theory, not a "full consideration" approach. *See Bellinder*, 2001 WL 1397995, at *6; *Sherwood*, slip op. at 11-17.

without a difference. "Combinations to monopolize would appear to fall within the general prohibitions of the Cartwright Act," *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986), as would exclusive dealing, *see Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal.App.4th 309, 335, 338 (Cal. Ct. App. 2003); *Redwood Theatres, Inc. v. Festival Ents., Inc.*, 200 Cal. App.3d 687, 703 (Cal. Ct. App. 1988). Because the evidence here demonstrates that Intel did act in concert with other entities – including the OEMs to which it paid "bribes" – application of California law would not require greater proof than Class Plaintiffs would advance under any other state's law, and there is no true conflict under *Hurtado*.

Finally, even if a true conflict of law were deemed to exist, California has an overriding interest in having its laws — given its strong interest in protecting full and fair competition as evidenced by the generous protections of its Cartwright Act and UCL — applied to conduct formulated and implemented by a corporation headquartered in the state.

>    (2)   California Law Applies Under the "Most Significant
>          Relationship" Test

Delaware applies the "most significant relationship" test. *See David B. Lilly Co., Inc. v. Fisher,* 18 F.3d 1112, 1118-19 (3d Cir. 1994). Under that test, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Restatement (Second) Conflict of Laws § 145 (1971). The factors to be taken into account include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* Those factors are to be evaluated in accordance with their "relative importance with respect to the particular issue." *Id.* § 145. As the Restatement comments make clear, "the place of injury will not play an important role in the selection of the state of the applicable law . .

. . when the place of injury can be said to be fortuitous . . . ." *Id.* § 145 cmt. e. In such cases, "the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." *Id.*

Here, California is the state with the most significant relationship. It is the place where the conduct causing the injury occurred (such as decisions to bribe customers and establish pricing policies), where Intel is headquartered,[25] and where Intel's principal competitor, AMD – toward which much of its anticompetitive conduct was directed – is headquartered.[26] While it is true that the members of the proposed class reside and purchased computers in various states, these facts do not outweigh the other factors, all of which point to California. *See, e.g., Kelley v. Microsoft Corp.*, No. C07-475MJP, 2008 WL 509332, at *6 (W.D. Wash. Feb. 22, 2008) ("Here, the Defendant's allegedly unfair or deceptive acts caused injury throughout the country. The location of the harm suffered is fortuitous. . . . [T]he Court finds that the most significant contacts in the context of Plaintiffs' claims are to Washington, where Defendant resides and created the allegedly unfair or deceptive marketing scheme. Moreover, because the place of injury is fortuitous the Court gives greater weight to Washington, the location of the source of the injury."), *appeal denied*, No. 08-80030 (9th Cir. Apr. 21, 2008); *Kozoway v. Massey-Ferguson, Inc.*, 722 F. Supp. 641, 643 (D. Colo. 1989) (holding that Iowa had the most significant relationship when the defendant had its principal place of business in Iowa and engaged in the allegedly wrongful conduct there, even though the plaintiff resided in Alberta and purchased the product there, because "it is merely fortuitous that the plaintiff's injury happened in Alberta"); *Clark v. TAP Pharm. Prods., Inc.*, 798 N.E.2d 123, 130 (Ill. Ct. App. 2003)

---

[25]    Although Intel is incorporated in Delaware, "with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place." Restatement (Second) Conflict of Laws § 145 cmt. e.

[26]    There is no direct relationship between Intel and Plaintiffs, who are indirect purchasers of Intel's microprocessors.

(holding that Illinois had the most significant relationship when the defendant's principal places of business were in Illinois and "the fraudulent scheme to inflate the price of Lupron" was "concocted" there, even though "the plaintiffs are domiciled throughout the country").

Moreover, the Restatement identifies other factors relevant to the choice of law determination, including "the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue." Restatement (Second) Conflict of Laws § 6(2)(c). As described above with respect to the governmental interest analysis, California has the greatest interest in having its law apply.

Accordingly, because the anticompetitive practices at issue were formulated and implemented from Intel's California headquarters, California law should apply. The locations of the plaintiffs and their purchases are merely fortuitous under the circumstances of this case.

b.    Common Questions of Law and Fact Predominate

As the Supreme Court explained, "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In particular, monopolization claims are "superbly suited for class action." *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 795 (10th Cir. 1970); *see also Hopkins*, slip op. at 6 ("When a horizontal market allocation agreement or illegal monopoly has been alleged, common questions predominate over any questions affecting only individual class members."); *Stephenson*, 177 F.R.D. at 288 ("Because each member must make the same showing of anticompetitive conduct and monopolistic pricing in order to prevail on her antitrust claims, the manner of proof will not vary, and individual issues of fact and law do not predominate.").

The predominance inquiry asks "whether Plaintiffs can establish the three elements of their case through common proof: (1) existence of the alleged [antitrust violation]; (2) injury or impact; and (3) damages. At this stage, class Plaintiffs need not actually prove these elements;

rather, they must offer a valid and detailed method by which they will do so at trial." *OSB*, 2007 WL 2253425, at *6 (citations omitted). As the Third Circuit instructs, "In order to predominate, the common issues must constitute a 'significant part' of the individual cases." *Chiang*, 385 F.3d at 273 (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)). [27]

(1)   Intel's Liability For Antitrust Violations Can Be Proven
with Evidence Common to All Class Members

Class Plaintiffs will establish Intel's violation of the Cartwright Act and the California UCL through common evidence. Proof that Intel entered into an anticompetitive "combination," Cal. Bus. & Prof. Code § 16720, and engaged in an "unlawful, unfair, or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200, will be accomplished through common evidence that relates to Intel's conduct, not individual class members. *See Microsoft I-V Cases*, 2000-2 Trade Cas. ¶ 73,013 at 88,559 ("Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members."); *Cipro*, 121 Cal. App. 4th at 410 ("Determining whether the Cipro Agreements violate the Cartwright Act, the Unfair Competition Law, or the common law requires the resolution of potentially complex issues that do not vary among the individual class members. The nature and circumstances of the Cipro Agreements – and their legality under California law – raise identical factual and legal issues as to every member of the class. For every single class member to litigate these common issues separately would impose a substantial

---

[27]     The California Supreme Court has recognized that class actions under the UCL "[b]oth consumer class actions and representative UCL actions serve important roles in the enforcement of consumers rights. Class actions and representative UCL actions make it economically feasible to sue when individual claims are too small to justify the expense of litigation, and thereby encourage attorneys to undertake private enforcement actions. Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices in order to protect the public and restore to the parties in interest money or property taken by means of unfair competition. These actions supplement the efforts of law enforcement and regulatory agencies. This court has repeatedly recognized the importance of these private enforcement efforts." *Kraus v. Trinity Management Servs., Inc.*, 23 Cal. 4th 116, 126 (2000); *see Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 1496-97 (2007). Accordingly courts have found common factual issues relating to liability to be predominant in UCL class actions; *see, e.g., In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1066-67 (N.D. Cal. 2007); *Ticconi v. Blue Shield of Calif. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 543-44 (2008).

burden on the courts and the litigants.") (citations omitted); *Hopkins*, slip op. at 8 ("Proof of Defendants' alleged antitrust violations will be common to all Class members, and satisfies the predominance requirement."); *see also Norvir*, 2007 WL 1689899, at *10 ("[C]laims brought under the California Unfair Competition Act are commonly certified for class treatment.").

"Whether proceeding under federal or state antitrust law, claims of monopolization are generally proven by demonstrating: (1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance or use of that power by anticompetitive or exclusionary means." *Terazosin*, 220 F.R.D. at 695.

As to the first element, monopoly power is a "common question" that "focuses on the position of the seller, not that of individual buyers." *Hopkins*, slip op. at 7; *see also Terazosin*, 220 F.R.D. at 696 (holding that issues regarding the existence of market power, such as the power to raise prices, "are capable of determination using common proof, as they focus on [the defendant's] power and are not impacted by any individual determinations relating to specific classes or class members"); Leffler Decl. ¶ 35 ("Because a direct market power analysis is based on Intel's margins on the sales of x86 chips, it is class-wide in nature"). The same is true for the definition of the relevant market, since "[e]ach absent member of the proposed class[] will assert the same definition." *Terazosin*, 220 F.R.D. at 696; *see also* Leffler Decl. ¶ 39 ("the proof for determining the relevant economic market is class-wide in nature").

Proof of the second element – anticompetitive acquisition, maintenance, or use of monopoly power – will likewise not vary by class member. For example, evidence that Intel paid "bribes" to OEMs or otherwise improperly induced its customers not to do business with AMD will be common to the class as a whole. *See Stephenson*, 177 F.R.D. at 288 ("Because each member must make the same showing of anticompetitive conduct and monopolistic pricing in order to prevail on her antitrust claims, the manner of proof will not vary, and individual

issues of fact and law do not predominate."); *Relafen*, 221 F.R.D. at 275 ("The alleged antitrust violation relates solely to SmithKline's conduct, and as such, constitutes a common issue subject to common proof.").

In like manner, the UCL claim will depend upon proof of Intel's unlawful, unfair, and fraudulent practices, which were designed and implemented from its headquarters in California. Although Cal. Bus. & Prof. Code, § 17200 is "sweeping" in its breadth, *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 184-185 (1999), under the "unlawful" prong, the law "borrows" from other laws, both state and federal, treating violations of those laws as independently actionable. *Rothschild v. Tyco Int'l (US), Inc.*, 83 Cal.App.4th 488, 493-494 (2000); *State Farm Fire & Cas. Co. v. Superior Court* 45 Cal.App.4th 1093, 1103 (1996). Consequently, here, proof of a violation of § 17200 under the "unlawful" prong will involve evidence of the same anticompetitive practices and policies designed and implemented by Intel in California in violation of state and federal antitrust statutes.    Thus, unlike consumer protection laws that primarily focus on the potentially deceptive or fraudulent conditions surrounding the consumer's purchase (*cf. Relafen*, 221 F.R.D.at 277), here, the focus of the § 17200 claims, like the Cartwright and Sherman Act claims, will be Intel's anticompetitive business practices.

(2)    Class-Wide Impact Can Be Proven with Evidence Common to All Class Members

Class Plaintiffs will use common evidence to establish impact on the proposed class. In this regard, "[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)." *Newton*, 259 F.3d at 188. Class Plaintiffs intend to prove class-wide impact in large part through expert evidence. *See OSB*, 2007 WL 2253425, at *8 ("An antitrust plaintiff may demonstrate predominance through expert opinion.").

At this stage, Class Plaintiffs are not required to prove impact, but need only demonstrate that impact may be established through class-wide evidence. *See Hydrogen Peroxide*, 240 F.R.D. at 174 n.16 ("Because the antitrust impact on all purchasers will be a question for the jury at trial, it is sufficient at this stage for us to find that it is amenable to class-wide proof. We need not find that such impact has already been shown or is more likely than not."); *Pressure Sensitive Labelstock*, 2007 WL 4150666, at \*13 ("The Court's concern at this stage is not whether Plaintiffs can or will establish class-wide impact, 'but whether class-wide impact may be proven by evidence common to all class members.'") (quoting *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02-6030, 2006 WL 891362, at \*10 (D.N.J. Apr. 4, 2006).

California decisions are equally strong on the issue of class treatment of Cartwright Act and UCL claims. Merely identifying variations in brand use and quantity, frequency and location of purchase does not preclude a finding of predominance particularly where, as here, it is contended that the monopoly overcharge was a component of the manufacturer's list price. *See Aguilar v. Atlantic Richfield Co.*, 1998-1 Trade Cas. (CCH) ¶72,080 at 81,497 (San Diego Super. Ct., May 1, 1997) ("this action is directed at an initial and fundamental price level. Liability, if any, of ... defendants is not greatly impacted by the retail pricing complexities. ..."). In the antitrust context, allegations of market complexity as a basis for denying certification are unpersuasive. "Identical products, uniform prices and unitary distribution patterns are not indispensable for class certification in this context." *B.W.I.*, 191 Cal.App.3d at 1350 (internal quotes omitted). *Accord Rosack*, 131 Cal.App.3d at 755-56; *Microsoft I-V Cases*, 2000-2 Trade Cas. at 88,561; *Aguilar*, 1998-1 Trade Cas. at 81,496. The complexity of a pricing scheme or the number of variables that affect an ultimate end-user price "will rarely inhibit generalized proof of impact." *Rosack*, 131 Cal.App.3d at 754.

Nor do California courts give much weight to the possibility that some retailers may not

have passed on defendants' price increases on some occasions or that some consumers may not have suffered an overcharge on some particular purchase of moist snuff. "The courts have rejected the notion that each member of the purported class must prove that he or she absorbed at least some portion of the overcharges in order to establish liability. ... The fact that certain members of the class may not have been injured at all does not defeat class certification." *Rosack*, 131 Cal.App.3d at 753-54. *Accord, id.* at 760; *B.W.I.*, 191 Cal.App.3d at 1353. As Justice Pollak similarly observed in the context of a claim based on monopolistic practices, "plaintiffs need not prove that each and every class member paid a supracompetitive price for the relevant ... product." 2000-2 Trade Cas. at 88,562-63.

The California cases construing the Cartwright Act are strong on the issue of presumption of impact. California courts have said that where price-fixing is established (and this can include vertical agreements that affect prices, such as the agreements between a manufacturer and dealers in *Rosack*, 131 Cal.App.3d at 746), impact can be inferred or presumed by purchase of the price-fixed good. *B.W.I.*, 191 Cal.App.3d at 1350-51; *Rosack*, 131 Cal.App.3d at 753 (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086 (1978)).[28] This inference applies even where the market is characterized by "individually negotiated prices, varying profit margins, and intense competition." *B.W.I.*, 191 Cal.App.3d at 1351. In *Microsoft I-V Cases*, Justice Pollak found that the legality of Microsoft's exclusionary tactics presented "issues common to all members of the classes plaintiffs seek to certify" that were "not differentiated among individual consumers." 2000-2 Trade Cas. at 88,560. "In this respect, the

---

[28]    This Circuit's so-called "*Bogosian* short-cut" has not been limited to simple price-fixing cases. *Bogosian* itself involved a form of "tie-in" arrangement where gas station tenants who licensed major oil companies' trademarks could not, while using those trademarks and associated brand names on their stations, sell gasoline purchased from sources other than the respective major oil company who licensed the trademark and brand name. 561 F.2d at 439. *Bogosian* has been applied outside the simple price-fixing conspiracy context. *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152-53 (3d Cir. 2002), *cert. denied sub nom. Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977 (2003) (conspiracy to deplete linerboard inventories in order to facilitate coordinated price increases); *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 89 (E.D. Pa. 2003) (market allocation agreement).

situation is no different from a case involving an alleged conspiracy that would constitute a per se violation of the statute." *Id.*

In his declaration, Professor Leffler concludes that class-wide economic analysis "can be conducted to show whether Intel's alleged practices would have raised prices paid by all OEMs (whether buying directly from Intel or through a distributor) for Intel x86 microprocessors used in mobile and desktop computers sold in the United States during the class damages period." Leffler Decl. ¶ 33. He further opines that "the economic issues related to the pass on of any Intel overcharges in the prices of personal computers are class-wide in nature." *Id.* ¶ 68. These conclusions are supported by the following points.

- The threshold issue in determining whether Intel's customers were overcharged for microprocessors is whether Intel had the market power to profitably impose an overcharge. *Id.* ¶ 34. The evidence and analysis bearing on this issue is class-wide in nature. *Id.* ¶¶ 35, 39-41.

- An analysis of Intel's sales data reveals minimal pricing dispersion. *Id.* ¶¶ 42-55. "[T]he limited dispersion in typical Intel prices exhibited in the actual world would be expected to also occur in the but-for world [i.e., the world but-for Intel's unlawful conduct]. However, with increased competition from AMD in the but-for world, the array or matrix of the typical Intel x86 microprocessor prices would be at a lower level, with the small price differences across OEMs still reflecting legitimate competitive differences." *Id.* ¶ 54.

- The adverse impact from Intel's alleged misconduct is not limited to inflated prices. "By limiting AMD's and other competitors' or potential competitors' ability to compete, both Intel's and other competitors' innovation incentives are expected to be adversely impacted. With less innovation in microprocessors, Plaintiffs would have faced reduced choices and paid more for lower quality goods compared to the but-for world." *Id.* ¶ 28.

- "It is a standard and accepted economic principle that overcharges at one level of the distribution chain are expected to flow through to end-users ...." *Id.* ¶ 59. "In relatively competitive sectors of the economy, the expected pass-on of an overcharge is close to one hundred percent." *Id.* ¶ 60. The computer manufacture, distribution and retail markets are highly competitive. *Id.* This and other "realities of the personal computer marketplace imply that all class members would have been injured as a result of Intel's alleged overcharges." *Id.* ¶ 65.

Thus, Professor Leffler has shown in his declaration that class-wide economic evidence and analysis are available to prove that Intel overcharged its customers, and that the overcharges were passed on to the putative class members when they paid inflated prices for personal computers equipped with Intel x86 microprocessors.

(3) Monetary Relief Can Be Proven with Evidence Common to All Class Members

Likewise, damages or restitutionary relief (with respect to California UCL claims) to the class can be proven through common evidence. "It is generally recognized that 'some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established.'" *Pressure Sensitive Labelstock*, 2007 WL 4150666, at *19 (quoting *Linerboard*, 203 F.R.D. at 220); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("[I]t does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (quoting *Hetzel v. Baltimore & Ohio R.R. Co.*, 169 U.S. 26, 39 (1898)); *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.").[29]

Determining damages or restitutionary relief involves two steps, each of which is addressed in Professor Leffler's declaration: first, measurement of the overcharges on

---

[29]    Indeed, there is no requirement that the issue of damages must predominate in certain cases alleging violations of the antitrust law. As the Sixth Circuit recently stated, "[W]e have never required a precise mathematical calculation of damages before deeming a class worthy of certification. . . . Thus, even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure." Comp. Ex. 16, *In re: Scrap Metal Antitrust Litig.*, No. 06-4511, Slip. Op. at 12 (6th Cir. May 15, 2008) (*allegations* of price-fixing and market allocation will not vary among class members, thus the "fact of damages" was a question common to the class even if the amount of damages sustained by each individual class member varied) (Citations omitted).

microprocessors sold by Intel to OEMs, and second, quantification of the extent to which these overcharges were passed on to class members who purchased Intel-powered personal computers. With respect to the first step, Professor Leffler states that "[d]etermination of any Intel overcharges for x86 chips is amenable to standard benchmark approaches using data that are or will be available." Leffler Decl. ¶ 8(H). These benchmarks include "(1) [c]ertain Intel products sold at particular times when the nature of competition was similar to that Intel would have experienced in the but-for world in the x86 microprocessor market" and "(2) [o]ther semiconductor markets subject to competition." *Id.* [30]

Once the overcharge has been calculated, "it is necessary to determine how Intel's overcharge to its customers impacted the PC prices that the OEMs, retailers or VARs charged the end-users." Leffler Decl. ¶ 91. Professor Leffler states that "[m]ultiple regression analysis can be used to calculate the expected pass-on rate using data on how the prices of personal computers to end-users changed when more or less expensive microprocessors were used, and when more or less expensive components such as video cards, hard drives, speakers, or software were included with the personal computers." *Id.* ¶ 97; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir. 1993) ("[W]e note that the scientific method used by the economists, multiple regression analysis, is reliable."). Data concerning pass-on comes from several different sources, all of which are common to the class: (a) the sales database produced by Intel; (b) data produced by third parties such as ███████████████; (c) data on the prices of computers sold on the Internet; and (d) data on the prices of computers advertised in *PC Magazine*. *See* Leffler Decl. ¶¶ 99-113.

---

[30]    At the class certification stage, Professor Leffler need not choose one particular methodology or possess all of the relevant information needed for the analysis. *See Linerboard*, 305 F.3d at 155 (affirming class certification when district court "did not require the experts to pick one particular method over another at the class certification stage, recognizing that the class certification stage is early in the overall litigation process").

Professor Leffler explains that these "empirical approaches . . . indicate that a standard, reliable and accepted economic methodology can be used to calculate the pass-on of any Intel overcharge." Id. ¶ 113. His preliminary results using currently available data "support the predictions of economic theory and the results of prior econometric analysis of pass-on rates – a reduction in the cost of manufacturing and selling a personal computer will result in a near equal or more than equal change in the price of the personal computer." Id. Such methods support certification of a class such as this one. *See Microsoft I-V Cases*, 2000-2 Trade Cas. ¶ 73,013 at 88,560-61.

Thus, the methodologies discussed by Professor Leffler would allow "estimation of the overcharge to an individual class member specific to, if necessary, the time of purchase, the source of purchase, and the x86 Intel chip family in the personal computer purchased." Leffler Decl. ¶ 115. In his declaration, Professor Leffler describes the additional analysis necessary to estimate aggregate, class-wide damages or restitutionary relief. *See id.* ¶¶ 115-19.[31]

Importantly, "it is improper to analyze the correctness or likely success of plaintiffs' proposed analytical model at the class certification stage." *Hydrogen Peroxide*, 240 F.R.D. at 175; *see also Cipro*, 121 Cal. App. 4th at 412-13 ("Whether or not Hartman is correct in his assessment of common impact or injury will ultimately be decided at trial. The class certification stage is not the proper forum in which to resolve such a dispute between experts. . . . At the class certification stage, the court must consider merely whether the evidence the

---

[31]    "In addition to being forced to pay higher prices for computers containing Intel x86 microprocessors, members of the proposed class were further impacted as a result of lower quality, less choice, and reduced innovation. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1168 (3d Cir. 1993); *Int'l Bhd. of Teamsters Local 734 Health & Welfare Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656, 663 (N.D. Ill. 1998), *aff'd*, 196 F.3d 818 (7th Cir. 1999); *see also* Leffler Decl. ¶ 44 n.55▮

plaintiffs will offer to establish aggregate damages will be sufficiently generalized in nature.")
(citation omitted).

Accordingly, common issues predominate over any individual issues for the proposed
nationwide class under California law. *See Cipro*, 121 Cal. App. 4th at 411 ("There is also
substantial evidence in the record to support the trial court's finding that the impact of the Cipro
Agreements on the class as a whole is subject to common proof at trial. The overcharge suffered
by the class depends primarily on the effect of Bayer's alleged monopoly on the overall market
for ciprofloxacin. This is a matter that is subject to class-wide proof by way of expert testimony,
without regard to the particular circumstances of each individual class member.").

c.    A Class Action is Superior to Other Available Methods of
Adjudication

"Superiority mandates that the district court determine that the class action is the best
method of fairly and efficiently resolving the controversy." *Johnston*, 265 F.3d at 185.
"Generally, if common questions are found to predominate in a proposed antitrust class action,
courts have found that the class action is a superior method of settling the controversy." *Marian
Bank*, 1997 WL 811552, at *72.

Compared to the alternative of numerous lawsuits brought by individual class members, a
class action is clearly the superior method of adjudication. *See Terazosin*, 220 F.R.D. at 700
("Multiple lawsuits brought by thousands of consumers and third-party payers in seventeen
different states would be costly, inefficient, and would burden the court system."); *Microsoft I-V
Cases*, 2000-2 Trade Cas. ¶ 73,013 at 88,564 ("[T]o the extent that purchasers of large quantities
of Microsoft software should elect to pursue their individual claims, denying class treatment
could result in repetitious litigation and inconsistent adjudication of similar issues and claims.").

Moreover, in a case such as this one, "individual consumer class members have little
interest in 'individually controlling the prosecution or defense of separate actions,' because each

consumer has a very small claim in relation to the cost of prosecuting a lawsuit." *Warfarin*, 391

F.3d at 534 (quoting Fed. R. Civ. P. 23(b)(3)(A)); *see also Pressure Sensitive Labelstock*, MDL

No. 03-1556, 2007 WL 4150666, at *22 ("The cost to most class members to prosecute

individual claims against Defendants would be disproportionately large relative to the amount of

damages claimed by each class member. Most class members, therefore, would be deterred from

bringing individual actions to redress the harm caused by Defendants' alleged unlawful

conduct."); *Microsoft I-V Cases*, 2000-2 Trade Cas. ¶ 73,013 at 88,564 ("This case involves a

very large number of claimants with relatively small amounts at stake. Most consumers have

little incentive to litigate independently since the costs of litigation undoubtedly would

overwhelm their potential recovery.").

As such, the effect of a denial of class certification would be to deny injured consumers

and businesses any relief at all. *See Hydrogen Peroxide*, 240 F.R.D. at 176 ("[F]ailure to certify

the proposed class would prevent many of the smaller claimants from seeking relief at all

because the costs of litigation would be too great."). "[A] class action has to be unwieldy indeed

before it can be pronounced an inferior alternative . . . to no litigation at all." *Carnegie v.*

*Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). As one California court recently

explained:

> Few of the present Class members could afford to undertake individual litigation
> against De Beers to recover the damages at issue here. But the failure to recover
> such damages is a real hardship to people of average means. If the class device
> were unavailable here, an economic injustice would result: the Class members
> would, as a practical matter, have no meaningful redress against De Beers, and De
> Beers would be unjustly enriched by the revenues it obtained from its alleged
> misconduct. Because use of the class device will allow the parties and the court
> to conserve valuable resources, and because this class action is perhaps the only
> vehicle for this Class of consumers to vindicate their legal rights, a class action is
> the most efficient and fair means for the adjudication of this matter.

*Hopkins*, slip op. at 11. For the same reasons, the superiority requirement is met in this case, and Rule 23(b)(3) is satisfied for a nationwide class for damages or restitutionary relief under California law.

**D.      As An Alternative, Certification of a 26-State Subclass Under Rule 23(b)(3) Is Appropriate**

Should the Court decline to certify a nationwide class for damages under California law under Rule 23(b)(3), certification of the following 26-state subclass of indirect purchasers asserting claims under the laws of those states (in addition to the nationwide class for injunctive relief) is appropriate:

> All persons and entities residing in the United States who, from June 28, 2001 through the present,[32] purchased an x86 microprocessor in one of the Included States, other than for resale, indirectly from the Defendant or any controlled subsidiary or affiliate of the Defendant, as part of a desktop or mobile personal computer. The subclass excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which the Defendant has a controlling interest. The subclass also excludes all federal, state or local governmental entities and all judicial officers presiding over this action.

The 26 "Included States" are Arkansas, Arizona, California, the District of Columbia, Florida, Idaho, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island,[33] South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.[34]

---

[32]     For purchases in Kansas, Mississippi, New Hampshire, New York, and Tennessee, the proposed subclass is limited to the period from June 28, 2002 through the present. For purchases in Idaho, the proposed subclass is limited to the period from June 28, 2003 through the present.

[33]     With respect to Rhode Island, the proposed subclass includes only those persons who purchased a personal computer for personal, family, or household purposes.

[34]     This Court dismissed Class Plaintiffs' claims under the New York antitrust statute (but not the New York consumer protection statute) and the consumer protection statutes of Alaska, Georgia, Louisiana, and Montana. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 422 (D. Del. 2007). In addition, Class Plaintiffs are no longer pursuing claims under the consumer protection statutes of Utah or Wisconsin, though they continue to pursue their claim under the Wisconsin antitrust statute.

The Third Circuit looks favorably on multi-state state-law classes such as the one proposed here. Over twenty years ago, it affirmed certification of a litigated nationwide class of school districts alleging asbestos-related damage under the laws of many states. *See In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986), *cert. denied sub nom. Nat'l Gypsum Co. v. Sch. Dist. of Lancaster*, 479 U.S. 915 (1986). Noting that variations among the jurisdictions "separates the law into four categories," the court held that "[e]ven assuming additional permutations and combinations, plaintiffs have made a creditable showing, which apparently satisfied the district court, that class certification does not present insuperable obstacles." *Id.*

Since then, the Third Circuit has twice upheld settlement classes that likewise included claims under the laws of multiple states. *See Warfarin*, 391 F.3d at 530; *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283 (3d Cir. 1988).[35]

In *Prudential*, the plaintiffs alleged that the defendants engaged in a scheme to defraud customers through standardized sales presentations, and asserted claims under the consumer protection statutes and common law of all fifty states and the District of Columbia. *See Prudential*, 148 F.3d at 292. In affirming class certification, the Third Circuit noted courts' "willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit." *Id.* at 315. It thus found that "the district court correctly analyzed whether application of the laws of the fifty states would be manageable," even though this "may no longer be necessary in the context of settlement-only class certification." *Id.* at 316 n.57 (citing *Amchem*, 521 U.S. at 620).

---

[35]    Significantly, "a district court must first find a class satisfied the requirements of Rule 23, regardless of whether it certifies the class for trial or for settlement." *Prudential*, 148 F.3d at 308. "In sum, 'a class is a class is a class,' and a settlement class, if it is to qualify under Rule 23, must meet all of its requirements." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 799-800 (3d Cir. 1995).

In *Warfarin*, the plaintiffs sought damages under the consumer protection statutes of every state and the antitrust statutes of the "indirect purchaser" states for the defendant's monopolization of a pharmaceutical market. *Warfarin,* 391 F.3d at 524-25. The Third Circuit affirmed class certification, holding that "the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance." *Id.* at 530.

This Court came to a similar conclusion in *ML-Lee* when it rejected an argument that the proposed class would "require the court to apply the laws of many different states to three separate substantive state law claims." *ML-Lee,* 848 F. Supp. at 563; *see also id.* ("[e]ven if Delaware law does not govern, the Court finds that the state law claims are appropriate for class treatment because the state law claims involve the same issues, including the same alleged omissions and misrepresentations and other wrongful conduct, as the federal law claims."). Other courts have done the same. *See, e.g., Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir. 1998) (affirming certification of settlement class that asserted "variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and 'lemon laws'"); *In re Pharm. Indus. Average Wholesale Price Litig.,* 233 F.R.D. 229, 230-31 (D. Mass. 2006) (certifying a multi-state class under the consumer protection laws of forty-one states); *Relafen,* 221 F.R.D. at 288 (certifying a multi-state class of indirect purchasers alleging monopolistic conduct in violation of the antitrust and consumer protection laws of Arizona, California, Massachusetts, and Vermont).

The state laws at issue in this case are substantially similar, as demonstrated by the charts appearing in Annexes B and C. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 525 (D.N.J. 1997), *aff'd,* 148 F.3d 283 (3d Cir. 1998), *cert. denied,* 525 U.S. 1114 (1999) ("Plaintiffs have submitted a series of charts setting forth comprehensive analyses of the

various states' laws . . . . The elements of these common law claims are substantially similar and any differences fall into a limited number of predictable patterns."); *see also GMC*, 55 F.3d at 818 ("[W]e cannot conceive that each of the forty-nine states (excluding Texas) represented here has a truly unique statutory scheme . . . ."); *Relafen*, 221 F.R.D. at 278 ("With respect to substantive matters – as opposed to procedural concerns such as standing – these state statutes uniformly parallel their federal counterparts, the Sherman Act and the Federal Trade Commission Act.").

Given these similarities, the state laws can be grouped into a small number of categories for purposes of jury instructions and findings. Attached as Annexes D and E, respectively, are selected sample jury instructions and sample verdict forms that illustrate how the various state laws could be tried in a manageable way.[36] *Prudential*, 962 F. Supp. at 525 n.49 ("Plaintiffs have submitted sample jury instructions and special verdict forms to illustrate that variations among potentially applicable state laws can be managed to permit a fair and efficient adjudication by the fact finder at trial.").[37]

The proposed 26-state subclass meets the requirements of Rule 23(a) and Rule 23(b)(3); certification is, therefore, appropriate.

### 1.    A 26-State Subclass Satisfies the Requirements of Rule 23(a)

Much of the above analysis regarding the proposed nationwide class applies equally to the alternative of a 26-state subclass. Although obviously smaller, the proposed 26-state subclass would still number in the tens of millions of members, and therefore satisfies the

---

[36]    Mechanisms are available to facilitate trial of the claims of the proposed 26-state subclass, such as a two-phase trial. In the first phase, the jury would determine liability, impact, and the percentage overcharge, using a verdict form that called for specific findings relevant to each grouping of state laws. In the second phase, the jury would make specific damages findings as to each state for which it had found a violation. *See* Annexes D & E.

[37]    Similarly, in *Lorazepam*, the court used common instructions to explain the state antitrust statutes of Minnesota, Massachusetts, and Illinois. *See, e.g.*, Comp. Ex. 14, Jury Instructions, *In re Lorazepam & Clorazepate Antitrust Litig.*, Misc. No. 99mc0276 (D.D.C.), at 35, 46, 52.

numerosity requirement. Similarly, common questions of law and fact as to Intel's conduct would continue to exist, satisfying the commonality requirement.

Regarding typicality, the application of multiple state laws does not change the fact that all class members, regardless of which state's law applies to their claims, have a "strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58. Importantly, typicality "does not require that all putative class members share *identical* claims." *Johnston*, 265 F.3d at 184 (emphasis added). Thus, in *Prudential*, the Third Circuit rejected an argument that the district court's typicality analysis was "inadequate" because it "failed to consider the variations among the laws of the 50 states . . . ." *Prudential*, 148 F.3d at 311; *see also Warfarin*, 391 F.3d at 532 (finding typicality for a multi-state class). The various state laws are similar enough to satisfy the typicality requirement.

In addition, the proposed class representatives will adequately represent the proposed 26-state subclass. As demonstrated above, all class members have the same interest in establishing Intel's liability and their right to monetary relief, and no conflict of interest exists. This is true despite the assertion of claims under different state laws. *See Prudential*, 148 F.3d at 313 (rejecting argument that "the court's failure to consider the variations among the laws of the 50 states demonstrates that there was no adequate protection of the claims of absentees"). Moreover, although there is no requirement in this Circuit that there be a class representative for each of the Included States, *see Warfarin*, 212 F.R.D. at 240 n.5 (named consumer plaintiffs resided only in four states); *Prudential*, 148 F.3d at 293 n.11 (same); *see also Relafen*, 221 F.R.D. at 268-70 (discussing authority and rejecting standing challenge), here at least one plaintiff comes from and made purchases in every one of the twenty-six states except Arkansas and Nevada. *See* Annex A.

### 2.    A 26-State Subclass Satisfies the Requirements of Rule 23(b)(3)

As with the proposed nationwide class discussed above, common questions of law and fact predominate with respect to proof of Intel's unlawful conduct, class-wide impact, and monetary relief. The same common evidence as to Intel's liability would be introduced, and the same analysis would be performed to determine the overcharge on Intel microprocessors and the extent to which that overcharge was passed on to end-users. *See* Leffler Decl. ¶ 106 ("I do not expect the pass-on rate to vary according to the state in which sales are made. However, the sales data available from the retailers . . . will . . . allow examination of the extent to which there is any significant variance in pass-on by state."). Similarly, monetary relief for the narrower subclass can be calculated with available data. *See id.* ¶¶ 117-19.

Differences among state laws will not defeat predominance. *See Warfarin*, 391 F.3d at 530 ("[T]he fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance."); *Prudential*, 148 F.3d at 315 ("We also reject Krell's contention that predominance is defeated because the class claims are subject to the laws of the fifty states."); *Hanlon*, 150 F.3d at 1022-23 ("[T]he idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims."). In fact, issues involving application of the laws of multiple states generally concern manageability, not predominance. *See Warfarin*, 391 F.3d at 529.

Here, manageability will not pose insurmountable challenges, as demonstrated by the charts, jury instructions, and verdict form in the appendices. *See Prudential*, 962 F. Supp. at 525. As in *School Asbestos*, Class Plaintiffs briefing and presentation of evidence may be tailored to meet the most stringent proof requirements for each group of state laws. *See School Asbestos*, 789 F.2d at 1000.

Certain variations in state laws are simply irrelevant to the issue of class certification here. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 84 (D. Mass. 2005) ("Courts should look at how issues are likely to play out in the context of the case to see what individual issues are likely to arise, and what state law differences are irrelevant and may be ignored."). For example, as explained above, the fact that some states require a showing of concerted conduct while others do not has no bearing on this case, in which the proof will include evidence that Intel paid "bribes" to select OEMs in exchange for limiting AMD's market share. *See supra* Section III(C)(a)(1). In any event, the jury could be asked to make a specific finding as to whether Plaintiffs had demonstrated concerted conduct. *See* Annex E.

Although the core elements of the various state statutes are generally the same, substantive differences fall into a small number of patterns. For example, the state consumer protection laws at issue prohibit four categories of conduct – deceptive, unconscionable, unfair, and unlawful – and can be addressed in a manageable way through a two-phase trial with understandable jury instructions and verdict forms. *See* Annexes D and E. Significantly, even if only the Florida consumer protection law – which prohibits all four categories of conduct – were at issue, the jury would still need to be instructed and questioned as to each of the four categories, so that the addition of other states that prohibit varying combinations of these same categories adds no significant complexity to the jury instructions or verdict forms.

Furthermore, any differences regarding damages or restitutionary relief should not bar certification of the 26-state subclass. *See Hanlon*, 150 F.3d at 1022 ("In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification."); *Relafen*, 221 F.R.D. at 288 ("The Court acknowledges that difficulties might later arise concerning, for example, the availability of certain remedies, but the Court concluded

that any damages-related difficulties could be more appropriately dealt with as they arose.") (citation omitted).

For example, the antitrust laws of four states – Arizona, Iowa, Michigan, and North Dakota – require a finding of "flagrant" conduct for an award of greater than single damages, while Mississippi provides for a $500 penalty "in each instance of injury." Annex B. All of these issues, however, can be handled through expert testimony regarding damages during the second phase of trial. Differences between states that base damages on the overcharge amount and those that use a "full consideration" approach could be addressed in a similar manner.

Finally, as this Court has recognized, it has a number of tools at its disposal to handle any manageability issues that may arise during the course of the litigation. *See, e.g., DaimlerChrysler*, 216 F.R.D. at 297-98 ("Further, the Court believes that any issue posed by the juxtaposition of these plaintiffs can be adequately dealt with by changing the class certification structure to include subclasses, if the parties deem such subclasses to be necessary as this litigation progresses. . . . To the extent that subclasses may be necessary to address certain issues, the Court retains the flexibility to modify the class structure as needed and requested by the parties."). At this stage, however, the proposed 26-state subclass is manageable and should be certified under Rule 23(b)(3) as an alternative to the proposed nationwide class under California law.

### E.    As A Second Alternative, Certification of 26 Individual State Subclasses Under Rule 23(b)(3) Is Appropriate

As a second alternative, should the Court decline to certify a nationwide class for damages or monetary relief under California law or a single 26-state damages / monetary relief subclass, Class Plaintiffs request that it certify 26 separate statewide subclasses under the laws of Arkansas, Arizona, California, the District of Columbia, Florida, Idaho, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New

Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

This would be a perfectly acceptable alternative approach. Courts have often certified multistate classes. *Pharm. Indus. Average*, 233 F.R.D. at 230-31 (certifying multi-state defendant subclasses under the consumer protection laws of 39 states); *Terazosin*, 220 F.R.D. at 702 (certified separate statewide end-payer classes in 17 states); *OSB*, 2007 WL 2253425, at *20 (certifying a multistate indirect purchaser class under the laws of eight states); *Robinson v. EMI Music Dist., Inc.*, No. L-10462, 1996 WL 495551, at *5 (Tenn. Cir. Ct. July 8, 1996) (certifying classes under the consumer protection and/or antitrust laws of 13 states and the District of Columbia).

The Rule 26(a) analysis would be the same for the 26 statewide subclasses as for a single 26-state class. The Rule 26[b] analysis, however, would be different, because each subclass would be limited to claims under the laws of a single state.

A total of 17 of the 26 states and the District of Columbia (California, Idaho, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, and Wisconsin) have statutory provisions or judicial rulings that permit indirect purchasers to sue for state antitrust violations. A total of 11 of the 26 states (Arkansas, Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, North Carolina, Tennessee, and West Virginia) have state consumer protection or unfair trade practice laws that permit indirect purchasers to sue for damages or restitution.

As noted above, in 12 of the states at issue (Arizona, California, Florida, Idaho, Iowa, Kansas, Minnesota, New Mexico, New York, North Dakota, South Dakota, and Tennessee), courts have certified indirect purchaser classes in the analogous situation of monopoly

overcharges by Microsoft for its computer software. Annex F sets forth federal and state class certification decisions under the antitrust or consumer protection laws of these 26 states. These authorities provide ample support for certification here of the requested individual statewide classes. In the Microsoft cases, state courts certified classes of end users who indirectly purchased Microsoft software, often as part of a computer purchase. Dr. Leffler was an expert in a number of these cases and the courts found his testimony on classwide injury to be persuasive. *In re Fla. Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, at *6-*17 (Fla. Cir. Ct. Aug. 26, 2002); *Bellinder v. Microsoft Corp.*, No. 00-C-0855, 2001 WL 1397995, at *6-*7 (Kan. Dist. Ct. Sept. 7, 2001); Comp. Ex. 9, *In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig.*, No. D-0101-CV-2000-1697, Decision and Order on Motion for Class Certification at 3-4 (N.M. Dist. Ct. Oct. 2, 2002); *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 290-91 (N.D. 2003); *In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668, 676-78 (S.D. 2003); Comp. Ex. 10, *Sherwood v. Microsoft Corp.*, No. 99C-3562, Memorandum and Order at 12-17 (Tenn. Cir. Ct. Dec. 20, 2002). This Court should do likewise.

In these Microsoft cases, the courts make it clear that given the importance of the class action device, an examination of the merits is inadvisable on certification and courts should not resolve battles among competing experts. *See, e.g., Bellinder*, 2001 WL 1397995, at *7; *Florida Microsoft*, 2002 WL 31423620, at *15-*17; *Howe*, 656 N.W.2d at 291-93; *South Dakota Microsoft*, 657 N.W.2d at 674-75. The courts in these cases also make it abundantly clear that monetary relief can be readily demonstrated on a classwide basis. The following quotation from *Gordon v. Microsoft Corp.*, No. MC 00-5994, 2003 WL 23105550, at *3 (Minn. Dist. Ct. Dec. 15, 2003) is typical:

> The damages question for trial is presumably not about whether a specific Microsoft price increase found its way through the distribution chain and resulted in an increase in the price paid by a specific class member. Rather, the question is how a series of Microsoft price increases, and/or a series of Microsoft failures to

reduce prices, impacted the price each consumer paid. The question of what would have happened but for Microsoft's monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about what actually happened, but must often be answered by general principles about what generally tends to happen. Thus, average pass through rates appear reasonable and even necessary to prove damages here.

In light of all of these factors, certification of 26 individual statewide classes is a viable alternative for the Court.

## IV.    THE COURT SHOULD APPOINT CLASS COUNSEL

On April 18, 2006, this Court appointed four law firms – Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; The Furth Firm LLP; Hagens Berman Sobol & Shapiro LLP; and Saveri & Saveri, Inc. – as Interim Class Counsel and appointed Prickett, Jones & Elliott, P.A. as Interim Liaison Counsel. *See* Apr. 18, 2006 Mem. Order, D.I. 51. In doing so, the Court found that these firms "have sufficient expertise to effectively represent the interests of the putative class" and "appear to be capable of drawing upon a greater pool of resources" than the competing applicant. *Id.*, slip op. at 3.

Since that time, Interim Class Counsel and their co-counsel have been prosecuting this litigation on behalf of the proposed class. Their efforts to date have included preparing and filing amended consolidated complaints, briefing motions to dismiss, litigating discovery disputes, defending depositions of the proposed class representatives, participating in depositions regarding Intel's e-mail retention, retaining and working with experts and consultants, negotiating production of Intel and third party data, participating in the review of millions of documents produced by Intel and third parties and preparing this brief.

One of these firms, The Furth Firm, has decided not to seek appointment as Class Counsel. Because the size and complexity of this case justify having four co-lead counsel, as the Court previously recognized in appointing four firms as Interim Class Counsel, it is proposed that the law firm of Zelle Hofmann Voelbel Mason & Gette LLP take The Furth Firm's place as

the fourth lead counsel.  A description of the Zelle firm, which has worked on multiple committees set up by Interim Class Counsel in this case and has played a major role in discovery, is attached hereto as Annex G.  Because the proposed Class Counsel have ably represented the proposed class, and for the additional reasons identified in the Court's prior ruling, the Court should appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; Hagens Berman Sobol & Shapiro LLP; Saveri & Saveri, Inc.; and Zelle Hofmann Voelbel Mason & Gette LLP as Class Counsel and appoint Prickett, Jones & Elliott, P.A. as Liaison Counsel.

### A.    Standard for Appointing Class Counsel

In appointing Class Counsel, the Court should apply the same standard as it did in appointing Interim Class Counsel.  *See* April 18, 2006 Mem. Order, slip. op. at 2 ("In deciding whom to appoint as class counsel, the Court must consider: the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class.") (citing Fed. R. Civ. P. 23(g)(1)(C)(i)).  "In addition, the Court may consider 'any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.'" *Id.* (quoting Fed. R. Civ. P. 23(g)(1)(C)(ii)); *see also In re Cree, Inc. Securities Litig.*, 219 F.R.D. 369, 373 (M.D.N.C. 2003) (designating a firm as lead counsel after finding that the firm had "extensive experience" with the particular area of litigation, class actions, and that "the firm ha[d] sufficient resources to prosecute this action in a thorough and expeditious manner."); *Coopersmith v. Lehman Bros., Inc.*, 344 F. Supp. 2d 783, 793 (D. Mass. 2004) (designating two law firms as co-lead counsel because "[i]t is clear that these firms have extensive experience in cases such as this and are well situated to pursue this action on behalf of the class").

**B.    Interim Class Counsel Should Be Appointed Class Counsel**

Based on the factors set forth above, three of the Interim Class Counsel firms should be appointed Class Counsel. They have done substantial work identifying, investigating, and prosecuting Class Plaintiffs' claims, as demonstrated by their extensive work on behalf of the class since these actions were filed nearly three years ago, and are prepared to continue these efforts. *See Pressure Sensitive Labelstock*, 2007 WL 4150666, at *23 ("[T]he Court has observed Co-Lead Counsel's performance thus far, and is convinced they will fairly and adequately represent the interests of the class."); *OSB*, 2007 WL 2253425, at *5 ("To date, Lead and Co-Lead Counsel have vigorously and capably prosecuted this extremely demanding case, and I am satisfied that they will continue to do so."); *Terasozin*, 220 F.R.D. at 702 ("Co-Lead Counsel's efforts have included reviewing millions of pages of documents, taking depositions around the country, surviving several motions to dismiss, and prosecuting the class certification motions.").

The Court's findings as to Interim Class Counsel's expertise and resources still apply. *See* April 18, 2006 Mem. Order, slip op. at 3. Interim Class Counsel and their co-counsel have devoted substantial resources – both in time and expenses – to litigating this case efficiently and effectively, and will continue to do so. *See Intel*, 526 F. Supp. 2d at 464 ("Indeed, the Court recognized Class Counsel's commitment and wherewithal to finance this litigation in its Memorandum Order appointing Interim Counsel. . . . These firms have reiterated their financial ability and commitment to fund this litigation . . . ."); *see also Terazosin*, 220 F.R.D. at 702 ("Co-Lead Counsel has committed substantial resources to representing the classes, already spending approximately $1,000,000 in prosecuting this action, and will continue to bear substantial expenses to represent the Indirect Purchaser Classes.").

Accordingly, the Court should appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C.;
Hagens Berman Sobol & Shapiro LLP; Saveri & Saveri, Inc.; and Zelle Hofmann Voelbel
Mason & Gette LLP as Class Counsel and appoint Prickett, Jones & Elliott, P.A. as Liaison
Counsel.

## V.    **CONCLUSION**

For the foregoing reasons, Class Plaintiffs respectfully request that the Court grant Class

Plaintiffs' Motion for Class Certification, and certify both (1) the proposed nationwide class for

injunctive relief under the Clayton Act pursuant to Federal Rule of Civil Procedure 23(b)(2), and

(2) the proposed nationwide class for monetary relief under California law pursuant to Rule

23(b)(3). In the alternative to a nationwide class for monetary relief under California law, Class

Plaintiffs request certification of the proposed 26-state subclass pursuant to Federal Rule of Civil

Procedure 23(b)(3). As a second alternative, Class Plaintiffs request that the Court certify under

Rule 23(b)(3) the proposed 26 separate statewide subclasses for monetary relief. Finally, the

Court should appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; Hagens Berman Sobol &

Shapiro LLP; Saveri & Saveri, Inc.; and Zelle Hofmann Voelbel Mason & Gette LLP as Class

Counsel and appoint Prickett, Jones & Elliott, P.A. as Liaison Counsel.

**PRICKETT JONES & ELLIOTT, P.A.**

By: ___ /s/ James L. Holzman ___
    James L. Holzman (#663)
    J. Clayton Athey (#4378)
    Laina M. Herbert (#4717)
    Melissa N. Donimirski (#4701)
    1310 King Street
    P.O. Box 1328
    Wilmington, DE  19899
    (302) 888-6500
    jlholzman@prickett.com
    jcathey@prickett.com
    lmherbert@prickett.com
    mndonimirski@prickett.com
    *Interim Liaison Counsel and Attorneys for*
    *Phil Paul, on behalf of himself and all*
    *others similarly situated*

Of Counsel:

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005

Michael P. Lehmann
Jon T. King
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA 94111

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111

Craig C. Corbitt
Judith A. Zahid
ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104