# EXHIBIT Q

O

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE  (213) 430-6000
FACSIMILE  (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

April 11, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

This will respond to your letter of March 28, 2008.

First, we are disappointed at your entirely unjustified assertion that Mr. Oji's accidental data loss somehow suggests some sort of broader "irregularities in AMD's retention efforts." It does not. And if there were some basis for such a charge, we would expect you to reveal it.

Second, the suggestion that AMD has made any misrepresentations, or that there was some untoward delay in our disclosure of Mr. Oji's accidental loss, is without basis. Mark Samuels disclosed to you, during a telephone call on December 7, 2007, that counsel had become aware of a potential data loss and that we had begun investigating it. I was on that call. Mr. Samuels expressly told you that after the investigation was completed, AMD would make any necessary disclosures. We have done so. We have also attempted to remediate that accidental loss, and have disclosed what the remedial efforts consisted of. We did all of this work in barely ninety days. And we stand ready to discuss with you any further remedial activities you believe to be appropriate under the circumstances.

Third, your attempt to leverage Mr. Oji's accidental data loss into justification for the broad inquiry in your letter is inappropriate. We have previously agreed upon the reciprocal disclosures we are prepared to make, and we stand on that record. If you have any authority that would justify broader discovery on these facts, please let us know. Intel's document preservation lapses are in no way comparable, and the agreements and orders that have been made in the wake of those disclosures do not serve as precedent outside the facts of Intel's issues. Moreover, even if the circumstances were similar, you have attempted to impose burdens of investigation and disclosure on AMD far beyond anything that Intel has done or agreed to do.

LA2:858498.1

Richard Levy, Esq., April 11, 2008 - Page 2

Simply stated, we believe the disclosure of the circumstances of Mr. Oji's accidental loss and our efforts to remediate it are more than sufficient under the circumstances. We are prepared to bring Mr. Oji to the United States for deposition, and you can ask him whatever you'd like about the circumstances of his accidental loss. Please let us know if you would like to pursue that deposition.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA2:858498.1

# EXHIBIT R

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RPlevy@gibsondunn.com

April 24, 2008

*Via E-Mail and U.S. Mail*

Direct Dial

(213) 229-7556
Fax No.

(213) 229-6556

Client No.

C 42376-00830

David L. Herron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    *AMD v. Intel:  AMD Document Production*

Dear David:

We are disappointed that your response to Intel's March 28 letter focused almost solely on Mr. Oji and the problems you recently disclosed about him when only one of the numbered paragraphs in Intel's letter addressed those problems.  Even as to that, AMD has not done or offered to do, what we reasonably requested in that letter.  Moreover, you have, for the most part, ignored the remainder of our requests.

Our letter asked for items that we have been trying, without success, to get since last April, when Bob Cooper first wrote you.  After allowing AMD several months to provide the requested information, we served upon AMD a set of document requests and a Rule 30(b)(6) notice related to document retention and production issues.  We have continued, since that time, to try and get information informally, but there is much information that AMD is apparently unwilling to provide voluntarily, and much of what it has provided is too vague to be of much use.

We therefore now must insist on AMD's compliance with our previous discovery requests.  We are prepared to meet and confer with you on your prior objections to the document requests, and if we cannot resolve those, to seek the Special Master's assistance in resolving them.  If your position remains that you are not required to reply to such discovery, please

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   BRUSSELS   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

**GIBSON, DUNN & CRUTCHER LLP**

David L. Herron
April 24, 2008
Page 2

promptly confirm that fact and we will raise the issue with the Special Master in an appropriate motion.

With regard to our deposition notice, Rule 30(b)(6) notices are self-executing, and AMD has not moved to quash the previous one, so it is still pending. We are willing to arrange a mutually convenient date and time for the deposition or depositions, and ask that you get back to us within a week with suggested dates. Barring that, you can assume that the date of the depositions is May 12, in our Los Angeles office beginning at 9:30 a.m.

You have asked for some authority that permits discovery "on these facts." We could argue about what the last qualification means, since we are aware of not only the issues with Mr. Oji, but other potential issues based only on the scant information that AMD has so far been willing to provide us. However, regardless of proof of lapses, in our view, the Federal Rules of Civil Procedure provide authority that such discovery is appropriate. A party in litigation may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents." Fed. R. Civ. P. 26(b)(1). And, as the Court in *In re eBay Seller Antitrust Lit.*, 2007 WL 2852364 (N.D. Cal. Oct. 2, 2007), recently recognized, the commentary to the recent Rule 26(f) revisions provides that "[i]n appropriate cases identification of, and early discovery from, individuals with special knowledge of a party's computer systems may be helpful." (Your firm was counsel of record for eBay in that matter.)

Likewise, your colleagues Pat Lynch and Paul Salvaty have commented that "[t]he initial round of Rule 30(b)(6) depositions . . . is valuable to take an opening round of such depositions on [subjects including] . . . the opponent's document retention policies, what steps the opponent has taken to assure retention of documents after notice of the claim." Business and Comm. Lit. in Fed. Courts 2d § 20:27 (2005).

In this case, however, there is already evidence that AMD's data retention protocols have failed. The fact is that a number of AMD custodians were not put on journaling, nor harvested, for months, or even years, after AMD admits it had retention obligations, and there may well be lost data as the result. AMD has also ignored or refused repeated requests to give Intel information about AMD's hold notices, even though you have acknowledged that there were at least some errors with respect to them. The existence of retention lapses, the absence of any procedure that would prevent other custodians from experiencing similar lapses, the fact that AMD's attorneys remained unaware of the lapse for more than seven months, leaves no doubt that Intel is entitled to this limited discovery.

We appreciate your offer to provide Mr. Oji for deposition. We may decide to take you up on that offer, but we want more general discovery before we decide whether that is necessary.

GIBSON, DUNN & CRUTCHER LLP

David L. Herron
April 24, 2008
Page 3

        We look forward to receiving your preferred Rule 30(b)(6) deposition dates, or if not, to
seeing you on May 12.

                                            Yours very truly,

                                            Richard P. Levy

cc:     Robert E. Cooper
        Kay E. Kochenderfer

# EXHIBIT S

O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 400 South Hope Street | NEW YORK |
| BRUSSELS | Los Angeles, California  90071-2899 | SAN FRANCISCO |
| CENTURY CITY | | SHANGHAI |
| HONG KONG | TELEPHONE  (213) 430-6000 | SILICON VALLEY |
| LONDON | FACSIMILE  (213) 430-6407 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |

OUR FILE NUMBER
008,346-163

May 14, 2008

WRITER'S DIRECT DIAL
(213) 430-6230

**VIA E-MAIL AND U.S. MAIL**

WRITER'S E-MAIL ADDRESS
dherron@omm.com

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

This responds to your March 28, 2008 letter, and provides additional information about AMD's evidence preservation program and efforts.

We begin by recounting the status of AMD's disclosures and the parties' agreements about them.  As you know, at AMD's request, the parties exchanged information about their respective evidence preservation plans early in the case.  On April 11, 2007 -- which, not coincidentally, was right before Intel's disclosure and proposed plan to remediate its own acknowledged evidence preservation failures was due by Court order -- Intel launched a broad, intrusive and unwarranted inquiry into AMD's preservation efforts.  Despite AMD's subsequent responsive disclosures to the extent appropriately called for, Intel then served a document request and deposition notice under Rule 30(b)(6).  AMD responded by objecting, but also by agreeing to supply further information wholly sufficient for Intel's professed desire to assess AMD's preservation program.

Meet and confer efforts culminated in your letter of November 7, 2007, which professes Intel's intent to "narrow, or even eliminate, the issues that might be open for discovery."  Your letter goes on to "outline the areas that we propose to now pursue," represents that Intel had "reduced considerably the number of topics for which we are requesting information," and states that your proposal, if accepted, would "result in what we view, as an appropriate exchange of information."  In response, our November 27 letter then outlined the reciprocal disclosures which AMD agreed to make.  That letter exchange constituted, in our view, agreement on the AMD disclosures that would fully satisfy Intel's Rule 30(b)(6) discovery, and agreement that the parties' exchanges of litigation hold notices and harvest dates would occur simultaneously.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 2

Your March 4, 2008 letter reconfirmed this agreement by defining the information Intel was requesting in precisely the same order and using almost precisely the same language as set forth in my November 27 letter to you. On March 11, 2008, AMD produced more information, including a summary of AMD's Backup Tape Retention Protocols, and AMD's custodian journaling dates. Our March 19 letter then disclosed in detail the now-remediated loss of data related to Mr. Oji.

We view your next letter of March 28, 2008, as Intel's attempt to seize upon the isolated data loss of a single AMD custodian, Mr. Oji, to substantially broaden inquiry already properly narrowed by agreement. In particular, AMD does not agree that this loss means that "Intel and AMD should be on equal footing," or somehow justifies your "request that [Intel] get additional information and assurances from AMD similar or identical" to those the Court required of Intel as a consequence of its wide-spread evidence preservation failures.

In short, Intel's attempt to equate a single, isolated mishap of an AMD custodian with Intel's institutional-level failure to implement and monitor a proper preservation program is unjustified and inappropriate. Despite our several requests, Intel has not cited any authority or facts that would even begin to justify the vastly expanded, intrusive and burdensome discovery Intel apparently contemplates and which goes well beyond what was agreed upon last year. Instead, your March 28 and April 24, 2008 letters refer only to still-unexplained supposed "irregularities" in AMD's preservation efforts, or attempt to leverage Mr. Oji's loss. We must assume that if Intel truly believed there were "irregularities in AMD's retention efforts" that somehow justified this attempted broadening of preservation discovery, it surely would have said something to us long ago.

As you know, AMD has committed itself to producing the information reasonably necessary to Intel's ability to assess AMD's preservation program and efforts, and we have also repeatedly acknowledged AMD's commitment to inform Intel of data loss. To that end, this letter and the attached materials provide the information AMD has previously agreed to supply. And in an effort to reach a compromise on the remaining items requested in your March 28 letter, we also supply additional information which we think should be more than sufficient.

These disclosures are made by AMD in keeping with our agreements on these topics, and on the understanding that they are made in full and complete satisfaction of Intel's Rule 30(b)(6) deposition notice and document request. After these disclosures and other limited disclosures (as outlined below) that the parties may agree to are completed, we expect Intel to formally withdraw that discovery and bring this costly, burdensome and largely unnecessary exercise to a close. In addition, AMD's disclosures in this and all prior letters, as well as the attachments thereto and any other disclosures AMD has made to Intel regarding preservation issues, are made without waiver of the attorney-client privilege or work product protection.

We now respond to the specific issues raised in your March 28 letter.

1.     Harvest Dates: We appreciate Intel's March 28, 2008 disclosure of harvest dates for its custodians over the time period between August 2007 to December 31, 2007, which AMD

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 3

has been requesting for some time. (*See* our letters to you dated November 27, 2007, and March 11, 2008.) Attached at Tab 1 are all of the harvest dates for designated AMD production custodians that have not previously been provided. We also provide a list of "deposition reharvest" dates for all AMD custodians for whom Intel has thus far requested such reharvests. We do not believe that Intel has produced deposition reharvest dates for its custodians. Please do so now.

You will see that the list at Tab 1 does not include the party-designated custodian "reharvest" dates, i.e., the dates on which additional harvesting was conducted of party-designated custodians in order to bring their production forward to the June 1, 2006 production date as called for by Case Management Order No. 3. We are willing to discuss whether that information should be provided, but do not believe that it is important or necessary to any assessment of AMD's preservation or production.

Here's why. Judge Farnan signed Case Management Order. No. 3 on September 19, 2007. That order, of course, required each side to supplement party-designated custodians' productions through June 1, 2006. At that time, AMD began conducting any reharvests that were necessary to fill any data "gaps" between the prior production and the June 1, 2006 cut-off date. AMD's harvesting protocols -- including those followed in regard to party-designated custodian reharvesting through June 1, 2006 -- are described in the six-page disclosure titled "Summary of AMD's Document Collection Protocols" that AMD produced to you on November 16, 2007. To reiterate, in connection with that reharvesting, AMD obtained custodial data for each custodian from all appropriate sources to assemble a full and complete collection for review and production. This included re-imaging of computer hard drives and harvesting from AMD's journal and vault, in addition to harvesting from other data sources. That harvesting occurred after September 19, 2006, and obviously before all relevant documents were produced to Intel on February 15, 2008. Given AMD's prior disclosures and the information supplied here, we do not believe that a request for each subsequent harvest date serves a legitimate purpose. If you believe this information nevertheless should be provided, please explain.

Finally with respect to harvesting dates, your March 28, 2008 letter requests such dates for all custodians on AMD's "master custodian list," rather than merely those custodians who are "in-play" by reason of having been designated as a production custodian by AMD or Intel, or a free throw custodian. AMD declines to produce that information. Whether and to what extent AMD has harvested data from non-production custodians is irrelevant to any issue in the case, and also constitutes our work product. In any event, AMD declines to undertake this unnecessary and undue burden and expense.

2.    <u>Journaling Dates</u>: AMD has provided its journaling dates to Intel. Intel has not reciprocated. We have requested this information repeatedly. Your March 28 letter promises it, but we still do not have it. Please tell us the date by which Intel will provide this information.

3.    <u>Mr. Oji's Data Loss Issues</u>: Your March 28 letter poses seriatim a long list of questions concerning issues purportedly relevant to Mr. Oji's loss of data. Other than to try to equate Mr. Oji's loss to Intel's own catastrophic preservation failings, we are at a loss to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 4

understand why Intel would attempt to seize on this isolated loss of a defined, limited and now-remediated set of data with such stridency. Nor do we believe most of the additional inquiries you have made are reasonable.

AMD has already disclosed the details concerning Mr. Oji's inadvertent loss of data, including: When the loss occurred; detailed facts about how the loss occurred; the probable volume of data that was lost; when AMD's IT department learned of the loss; the precise sources of replacement data AMD identified and why those sources seemed likely to yield the most responsive data; who Mr. Oji regularly sent emails to; and the backup tapes containing the files that AMD obtained, restored and extracted. We urge you to identify *any* disclosure made by Intel with respect to *any* of its custodians that contains even remotely this range of information or level of detail, or *any* indication of the estimated volume of lost data. We are aware of none.

The vast majority of the questions posed in your March 28 letter also are best answered by Mr. Oji himself. On April 11, 2008, we offered in writing to bring Mr. Oji to the United States for deposition so that you could ask him whatever you like about his accidental loss. Intel has declined that offer. We renew that offer now.

In addition, we note that Intel is asking for information that Intel has itself refused to provide under claims of privilege and work product. You are directed, for example, to pages 186-87, 193, 315 and 420 from Ms. Almirantearena's deposition. There, Intel instructed the witness not to answer questions concerning the timing and circumstances of Intel's counsel's discovery of Intel document preservation lapses.

We assume you agree that AMD cannot reasonably be asked to provide information Intel simultaneously asserts to be privileged and work product. Again in the spirit of compromise, however, in addition to our offering Mr. Oji for deposition, AMD will supply you with the following, which should adequately resolve any bona fide issues concerning Mr. Oji. First, you have asked for documents showing what AMD did in order to recover Mr. Oji's files. Attached at Tab 2 are three emails between Mr. Oji and AMD Japan's IT personnel that are dated as of the first several business days after Mr. Oji experienced the accidental loss. These are written in Japanese. For your convenience, we have attached a non-certified translation. These emails demonstrate that Mr. Oji reported the loss immediately, and that AMD Japan IT personnel tried every conceivable means to recover the lost data immediately after the loss occurred.

Second, you have asked that AMD restore the backup tapes for each of Mr. Oji's "frequent correspondents" as identified in our March 19, 2008 letter to you. AMD agrees to this, and is in the process of restoring the tapes now. All relevant, non-duplicative material that is recovered, if any, will be produced by AMD as soon as reasonably possible. We will keep you apprised of our progress.

4.    <u>Intel Inquiries Regarding Back-Up Tapes and AMD's IT Infrastructure</u>: Your March 28 letter raises four issues on these topics. First, you now ask that AMD provide a narrative "describing the relevant AMD IT infrastructure." AMD agrees to do so.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 5

Second, you state that you have a number of questions with respect to AMD's written disclosure about its backup tape protocols, but do not identify those questions. Please send us a list of your questions so that we can answer them if appropriate.

Third, you ask AMD to confirm that it has conducted a physical inspection of each and every backup tape generated for each and every server for each and every month since March 2005, and to confirm that AMD has all information for every AMD custodian on such backup tapes. AMD declines to do this. Our prior written disclosure clearly and adequately explained that AMD has retained monthly backups for all relevant Exchange and file servers since March 2005 in 19 separate AMD locations across the United States and around the world. This regimen has worked and is working well, and AMD has no indication of any problems with it.

Compliance with your proposal would impose undue burden and expense on AMD and serve no legitimate purpose. This proposed audit would entail a world-wide adventure at huge expense. It also would entail restoring all those tapes simply in order to be able to represent with absolute specificity and certainty that each custodian's data was captured by backup tapes at each location and at all times. There is no good reason we can think of for you to ask this of us. If you disagree, please explain to us why you think this is justified,

Finally, you ask 10 separate questions about what data is captured on backup tapes. Our question to you is: Why does Intel need this information? We are prepared to discuss this. But many of the questions posed are of such a technical nature that Intel's own IT professionals or consultants ought to be able to answer them, and the balance of them strike us as requesting information that would be expensive and time-consuming to develop, for no apparent legitimate purpose. Please explain, and we will take the issue from there.

5.    Intel's and AMD's Litigation Hold Notices: We raise two issues about Intel's production of its hold notices and how that impacts the agreed-upon reciprocal exchange.

First, we are perplexed why it took Intel so long to produce its hold notices. We first asked Intel to produce them in March 2007. They were also the subject of AMD's first set of document requests regarding Intel's preservation failures. On May 15, 2007, AMD served its remediation discovery, Document Request No. 2 of which again requested production of "Intel's Litigation Hold Notices." On June 20, 2007, Special Master Poppiti ordered Intel to complete its production of these documents by *September 28, 2007*. On November 27, 2007, and again on March 11, 2008, we requested by letter that Intel complete its production of litigation hold notices, and we told you that AMD was prepared to provide a reciprocal exchange at that time.

On March 28, 2008, Intel finally produced what it now represents is the last of its custodian litigation hold notices. The hold notice produced is, quite incredibly, dated September 27, 2007 -- that is, one day before the Court-ordered production cut-off date and six months before the date it was produced. The second litigation hold-related item is a list from April 2007 of recipients of a litigation hold notice you previously delivered. We cannot fathom why it took Intel so long to produce this oft-requested information, or why Intel believes that it is free to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 6

disregard not only our repeated requests but also the Court's order. What we do know is that Intel's conduct has unnecessarily delayed the reciprocal exchange that AMD proposed long ago.

Second, Intel has still refused to respond to AMD's very specific questions about, or to produce, the litigation hold notices delivered by Intel to its IT personnel. As stated in both our November 27, 2007, and March 11, 2008 letters to you, here again is the issue:

> "[T]horough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006. (*See* my November 27, 2007 letter at page 2.)

> One of following three things must be true: (1) Intel has, in fact, already produced the litigation hold notices it directed to its IT personnel, but we have not located them; (2) Intel has not yet produced these IT-directed litigation hold notices; or (3) Intel did not issue litigation hold notices to its IT personnel at the times and for the purposes indicated in the foregoing paragraph. If (1), please direct us to the documents; if (2), let's please set a date for a mutual exchange; and if (3), please so state in writing so that we can have a written record of this fact."

If Intel issued a litigation hold notice to its IT personnel to take the so-called "complaint freeze," AMD surely is entitled to its production. If Intel did not do so, we expect Intel to so state in writing.

More important, however, is the issue of whether Intel issued instructions or hold notices of some kind to its IT personnel when Intel discovered its preservation failures -- which occurred as early as January 2006 and certainly no later than October 2006. At that time, Intel indisputably had only a limited number of its custodians on dedicated email servers backed up on a weekly basis; hundreds more had not been migrated to any such server; many custodians were already known not to be complying with Intel's litigation hold notices; and hundreds of other custodians had never been provided with litigation hold notices at all. Again, if Intel issued any such litigation hold notice(s) to its IT personnel at that time, AMD is entitled to their production; if not, Intel should so state in writing.

AMD has promised to produce the litigation hold notice issued to its IT personnel in March 2005 in exchange for Intel's production of the same material. We stand by that offer and agreement, and will comply as soon as Intel does. At this time, AMD produces at Tab 3 the remaining litigation hold notices, not already produced, that AMD issued to its document production custodians during the course of this litigation. AMD's now-completed productions, taken together, constitute a complete set of such litigation hold notices.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 7

6.    <u>Litigation Hold Notice Dates</u>:  You have asked that AMD prepare a chart showing when each of its custodians received litigation hold notices.  AMD agrees to do so with respect to its designated production custodians in exchange for Intel's production of the same chart for its designated production custodians.  We are prepared to exchange these charts whenever you would like.

7.    <u>Litigation Hold Dates for Particular AMD Custodians</u>:  On August 10, 2007, we advised you that two party-designated custodians did not receive written litigation hold notices until September 2006.  Anticipating that Intel will agree to our proposal to exchange charts of litigation hold notice dates for production custodians, we inform you that those individuals are Fanny Chan (who received a written litigation hold notice on September 19, 2006), and Stan Lublin (who received a written litigation hold notice on September 18, 2006).

As to adversely-designated custodians, Kazuyuki Oji received a written litigation hold notice on November 10, 2006.  During Mr. Oji's new-hire orientation conducted on or immediately after October 1, 2005, however, Mr. Oji was advised by Shunsuke Yoshizawa, AMD Japan Director of Marketing, about the existence of this lawsuit, and was instructed to preserve all information related to it.

Finally, Makoto Kato, located in AMD's Tokyo, Japan, office, received a written litigation hold notice on November 10, 2006.  Mr. Kato began his employment on April 1, 2006.  Like Mr. Oji, Mr. Kato was advised by Mr. Yoshizawa immediately after his hire date about the existence of this lawsuit, and was instructed to preserve all information related to it.

8.    <u>Auto-Delete</u>:   You have asked about auto-delete functions applicable within AMD.  As stated previously, AMD has not implemented or used an auto-delete function within its Exchange environment.  Individual employees are able to set up an auto-delete function on their own Outlook account, which would operate only as to their own email account.  As you know from prior productions, the first and subsequent litigation hold notices delivered by AMD contained a "FAQ" section.  With regard to electronic documents, the FAQ section instructs, in relevant part, that:  "Also, please be sure to disable any auto-delete features on email (e.g., auto-delete of 'sent' email messages)."

AMD has identified a designated custodian who used an auto-delete setting on his Outlook account:  Nick Kepler.  AMD delivered a litigation hold notice to Mr. Kepler which included the foregoing instruction to disable "auto-delete" on July 5, 2005, and followed that with numerous reminders.  On November 21, 2005, AMD IT migrated Mr. Kepler's email box into AMD's journal and vault archiving systems.  During the time period between the July 5 and November 21, 2005, Mr. Kepler's Outlook account was set to not save "sent" items.  Mr. Kepler, however, copied himself on relevant "sent" items and preserved those emails.

9.    <u>Possible Custodian Data Loss</u>:  AMD discloses a possible data loss with respect to Michael Soares, a document custodian adversely designated by Intel.  AMD provided Mr. Soares with a litigation hold notice on February 21, 2006.  AMD IT migrated Mr. Soares' email account to its journal and vault archiving systems on March 30, 2006.  It appears that after Mr. Soares'

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 8

email account was placed into AMD's email archiving system, he experienced a problem with his laptop computer, shipped it to AMD for repair, but the computer was lost or stolen during transit. In May 2007, AMD imaged for purposes of this litigation the computer Mr. Soares was then using. The hard drive used to make that acquisition failed. AMD sent that hard drive to an outside vendor, NDCI, to attempt to recover the data. NDCI was unable to recover any data from that failed hard drive.

Mr. Soares was on leave from AMD from June 2007 to January 2008, at which he separated from his AMD employment. He did not perform work for AMD during that time period. AMD obtained Mr. Soares' laptop computer upon his separation, but it does not seem to be the same computer of which an image was taken in May 2007. It thus appears that AMD was not able to obtain images of two separate laptop computers that Mr. Soares used during the same time period his email account was maintained on AMD's journal and vault archiving systems.

We have now advised you about all of the data losses of which AMD is aware with respect to its production custodians. We again acknowledge our professional obligation to make such disclosures in the future if and as we learn of them.

If you have questions about the foregoing, please feel free to call me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1146399.1

# EXHIBIT T

**BINGHAM**

Donn P. Pickett
Direct Phone:  415.393.2082
Direct Fax:     415.262.9217
donn.pickett@bingham.com

May 30, 2008

David L. Herron, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

**Re:  AMD v. Intel: AMD Document Production**

Dear David:

First, allow me to introduce myself.  I (assisted by Tony Marks of Perkins Coie and others) will be continuing Rich Levy's efforts to learn about AMD's document retention while Rich moves on to other projects.  We look forward to dealing with you going forward.

This responds to your May 14, 2008 letter.  In that letter, AMD unambiguously refused to provide the formal discovery Intel seeks.  We will file the appropriate motion with the Special Master with regard to Intel's pending document request, and are serving an updated 30(b)(6) notice which AMD should either comply with or move to quash.  We have enclosed a copy of the new notice and would appreciate knowing your decision about compliance within a week or so.

Despite AMD's refusal to provide formal discovery, there are a few areas where a degree of informal cooperation is continuing and could be helpful to both sides.  In particular, AMD has asked for an exchange of information about hold notice distribution.  Intel hopes such cooperation will continue and expand, and includes with this letter certain information requested by AMD.  At the same time, there remain important issues where only depositions and documents can suffice, and informal exchanges of information, while they may reduce the scope of formal discovery, did not (and, from our viewpoint, will not) replace it.  Moreover, there are some points in your letter Intel feels compelled to address.  We will discuss those general points first, then respond to the numbered paragraphs in your letter.

A.  Intel's Formal Discovery Requests are Still Effective.  Without trudging through the details, Intel rejects AMD's characterization (at 1-2) of the parties' discussions and correspondence.  Intel never abandoned its formal discovery requests, and never agreed that informal exchanges of information would serve as a complete substitute for depositions under oath and document discovery.  Throughout the months following Intel's formal discovery requests AMD has limited the information it would provide to Intel.  In some cases Intel accepted AMD's limitations or accepted informal responses, but never at the expense of surrendering its right to take discovery as provided for by the Federal Rules.  In any case, the facts on the ground have changed significantly in recent weeks and months, and Intel knows things about AMD's document retention now that it did not know last November and that reinforce the need for formal discovery.  Intel is willing to remain

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T 415.393.2000
F 415.393.2286
bingham.com

SERVED ON US BY OVERNIGHT COURIER
DATED: 5/30/08

David L. Herron, Esq.
May 30, 2008
Page 2

flexible with regard to certain information (as demonstrated below) but is committed to obtaining the testimony and documents to which it is entitled.

B.  Intel Has Cited Authority Supporting Its Discovery Requests. You continue to assert that Intel has not cited any authority supporting its right to take formal discovery. We assume you mean authority that AMD finds persuasive, because we have already cited such authority in two letters.[1]  In response, AMD has not even acknowledged that authority, much less provided any authority supporting its own refusal to provide formal discovery and Intel has not discovered any in its own research.  It appears the matter will have to be resolved by the Special Master and there is no further point in using letters as preview briefs.

C.  Intel Will Not Agree to Unilateral Limitations on the Custodians Relevant to Discovery.  AMD has made it clear that it does not intend to produce information relating to document retention for non-production custodians, claiming (at 3) that information about "non-production custodians is irrelevant to any issue in the case . . . ."  Although retention lapses for non-production custodians do not result in any prejudice to the opposing party, they are nevertheless relevant to understanding the reasonableness of AMD's retention policies and practices.  As you know, Intel has disclosed information regarding both its non-production custodians and its production custodians.  AMD's unusual resistance to disclosing information about non-production custodians naturally raises suspicion.  We will insist that the playing field be level in that regard.

D.  AMD Must Disclose the Steps It Has Taken to Discover Retention Lapses. AMD's disclosures regarding its document retention are evolving.  AMD has, piecemeal over the past few months, revealed a series of new retention lapses.  And each new disclosure contradicts prior representations from AMD.  Thus, AMD insisted for months that it was aware of no data loss,[2] although its IT department had known about Mr. Oji's loss for months and had known about Mr. Soares's data loss for years.  Similarly, AMD

---

[1] 4/14/2008 Levy letter to Herron, and 9/19/2007 Levy letter to Pearl.

[2] 4/23/2007 Herron letter ("We can represent that AMD's overall preservation program appears to be working as intended and that, at this time, we are aware of no systemic failure in the execution of that preservation plan . . . ."); 8/10/2007 Samuels letter ("We are pleased to report that our preservation program appears to be operating as designed and intended; no lapses in that program have been identified."); 8/23/2007 Diamond letter (same); 9/14/2007 Samuels letter at 4 (AMD "convince[d]" that Intel's discovery requests are "largely unjustified"); 11/27/2007 Herron letter at 3 (denying knowledge of any undisclosed document retention lapses).

David L. Herron, Esq.
May 30, 2008
Page 3

assured Intel repeatedly that no relevant data could be lost to auto-delete[3] but now reveals that, in fact, one custodian allowed auto-delete to run on his sent mail.  The fact that these lapses occurred long ago indicates that AMD's attorneys either (1) knew about the lapses and said nothing, or (far more likely) (2) are just now learning facts that others at AMD have known for months or years.  Under the circumstances, Intel is entitled to know what, if anything, AMD has done or is doing to investigate whether other lapses exist.

AMD represented more than a year ago (last April) that it would undertake some type of investigation of the AMD-designated production custodians last summer, describing the investigation as a "thorough follow-up review of AMD's preservation program to date, on a custodian by custodian basis . . . ."[4]  AMD reported last August that, as a result of that review "[w]e are pleased to report that our preservation program appears to be operating as designed and intended; no lapses in that program have been identified."[5]  AMD also assured Intel that it would continue with its investigation of other production custodians.  These representations, in light of the recent disclosures, raise serious questions about the thoroughness of AMD's investigation.  Moreover, AMD has not responded to our question about whether AMD was investigating non-production custodians, and insists on withholding information about lapses among such custodians.  Intel cannot have any confidence that AMD has identified all of its retention lapses in these circumstances.  In fact, as in the case of Mr. Oji, it appears that the lapses are coming to the attention of AMD's lawyers by chance rather than as the result of any organized investigation.  We intend therefore to inquire about AMD's investigation (limiting ourselves to purely factual matters, not inquiring about any attorney-client communications, opinions, thought processes, etc.) during the 30(b)(6) deposition.  The core question is whether AMD has adequately investigated all of its custodians retention practices or not, and what actions comprised that investigation.

Let me now respond to the specific points in your letter.

    1.    <u>Harvest Dates</u>.  Enclosed at your request is a list of Intel's deposition reharvest dates.  (Attachment 1)  In the interest of cooperation, we are willing to withdraw our request that AMD provide the dates of other reharvests of its custodians.  However, we are not willing to withdraw our request that AMD provide the dates of the *initial* harvests for *all* custodians (including non-production custodians).  These dates are relevant to the

---

[3] 4/23/2007 Herron letter at 2 (stating that AMD's "email communications were being systematically preserved [from auto-delete] at the same time Intel's were being systematically destroyed.");

[4] 4/23/2007 Herron letter at 1.

[5] August 10, 2007 Herron letter at 1.

David L. Herron, Esq.
May 30, 2008
Page 4

reasonableness of AMD's retention practices and shed light, for particular custodians, on AMD's diligence in meeting other retention obligations, such as issuing hold notices and placing custodians on journaling. Moreover, Intel has provided this information to AMD. Accordingly, we will address the issue with the Special Master unless assured that the information is forthcoming promptly.

   2. <u>Journaling Dates</u>. Enclosed is a list of the dates Intel custodians were placed on journaling (Attachment 2). The list is based on our best available information and we are continuing to audit it. If we learn of any revisions that need to be made we will inform you. There are a small number of custodians for whom we currently only have fairly imprecise data about their journaling dates.[6] They were journaled between December 18, 2006 and March 18, 2007. We are working to obtain more precise dates and will provide them if and when we are able.

   3. <u>Mr. Oji's Data Loss Issues</u>. As explained in our April 24 letter, Intel's discovery requests were not triggered by, nor are they dependent upon, Mr. Oji's data loss. Even without knowledge of specific retention lapses, Intel would be entitled to the discovery it seeks.

   We look forward to receiving the promised correspondence obtained from the backup of Mr. Oji's "frequent correspondents." We also appreciate the disclosure of Mr. Oji's correspondence with AMD IT personnel. We assume there is also correspondence between AMD's lawyers and AMD IT about this issue. We request that (pursuant to Intel's RFP #5) AMD produce such correspondence, redacting out privileged or core-work product information, but providing non-core work product and factual information. As you know, Intel has produced such correspondence to AMD. That said, Intel still needs to proceed with the 30(b)(6) deposition on topics related to these data loss issues.

   4. <u>Intel Inquiries Regarding Back-Up Tapes and AMD's IT Infrastructure</u>. We appreciate AMD's agreement to provide a narrative regarding its relevant IT infrastructure. We also presented a number of questions about AMD's tape backups, and you responded by asking why we need this information. The reason is that the information will make it possible to determine whether AMD has met its obligations to retain custodian data. AMD requested the same information from Intel, and we provided it.

   AMD declines to confirm (by physical inspection) that it has monthly Exchange tapes for each AMD custodian from March 2005 to the present (with the exception of people who started at AMD after March 2005 or have left since). Although Intel has provided that information to AMD, you state that the request is illegitimate and that you

---

[6] Amar Babu, David (Hui) She, Ramunas Domarkas, Alexey Kamaev, Dimitri Klepatski, Adrian Criddle, Paul Prior, Alexey Karpukihin, Wendy Howes Pompe, Erwin Van Meer, Ramzi Abdul Baki, and Scott Trumbull.

David L. Herron, Esq.
May 30, 2008
Page 5

can think of no good reason for the request. One reason for the request is that AMD continues to disclose retention lapses. Those lapses are supposed to be backstopped by the monthly backup program AMD implemented. It is therefore legitimate to ask AMD to confirm that it has created and maintained the backups, and, at a minimum, to audit some random selection of the tapes to verify that the backup process is working.

      5.    <u>Intel's and AMD's Litigation Hold Notices</u>. The discussion under point five of AMD's letter demonstrates continuing confusion on AMD's part about what hold notices Intel has produced, and when. AMD seems to believe that Intel failed to produce custodian hold notices until March 28, 2008. This is incorrect. We have been very clear, and would refer AMD to points 5 and 6 of Mr. Levy's March 28, 2008 letter. The short answer is that Intel produced to AMD all of its custodian hold notices issued through July 2007, in unredacted form, during the approximately three-month period between July 20, 2007 and October 13, 2007. Those productions included more than 130 unique custodian hold notices, and we believed the production was complete. We audited the production recently and identified a single custodian hold notice did not disclose recipients (because it was produced in "bcc" format) so we provided a complete list of those recipients on March 28, 2008. In light of the simple fact that AMD has had essentially all of Intel's unredacted custodian hold notices for at least seven months, AMD's heated rhetoric is perplexing—especially given its contemporaneous refusal, despite repeated requests, to produce information about its own hold notices.

      AMD also remains confused about Intel's production of its IT custodians' hold notices. By August 10, 2007, Intel had produced to AMD the hold notices delivered to Intel IT through July 2007. We stated, in our March 28, 2008 letter (responding to the demand in your March 11, 2008 letter that Intel produce its IT hold notices), "[w]e have already provided you with all of Intel's IT litigation hold notices with the exception of a single one, which is enclosed." Despite this unambiguous statement, you state (at 6), "Intel has still refused to . . . produce[] the litigation hold notices delivered by Intel to its IT personnel." AMD then goes on at length lecturing Intel as if it has not produced its IT hold notices. Again, we frankly don't know what can be added to our prior representations. To assist AMD, however, Attachment 3 to this letter contains the production numbers and dates for Intel's IT hold notices (excepting the notice delivered with our March 28 letter).

      In contrast to Intel's early production of unredacted hold notices, AMD first responded to Intel's request for AMD's hold notices by producing nothing, then by producing redacted exemplars (including redactions of the dates), then by producing redacted exemplars (with the dates unredacted), then most recently by producing redacted copies of all its hold notices. But AMD has yet to produce the fundamental information that Intel produced many months ago: the date[s] on which each custodian received hold notices, and the specific hold notice each received. AMD has now agreed to provide that information in chart form for production custodians, but Intel must insist that AMD

David L. Herron, Esq.
May 30, 2008
Page 6

produce that information for *all* custodians, as Intel has.[7]  Intel will seek the Special Master's intervention to acquire this data.

      6.    <u>Litigation Hold Notice Dates</u>.  As we have repeatedly stated, Intel produced its hold notices in unredacted form.  Thus, AMD has for many months known the dates on which Intel sent each custodian his or her hold notices.  Nevertheless, based on your offer to exchange charts summarizing that very information, enclosed is a chart that does so (Attachment 4).  As you will note, the chart includes all 1,023 Intel custodians (not just production custodians) and all dates through July 2, 2007 on which the hold notice or reminder was sent.  Please reciprocate by providing a chart with the same information for AMD—not excluding non-production custodians—by June 5.

      7.    <u>Litigation Hold Dates for Particular AMD Custodians</u>.  AMD's disclosure of the names of custodians who did not timely receive hold notices (information AMD has long known, but withheld) underscores the importance of AMD coming clean about the dates all of its custodians received hold notices.  For example, we note that AMD apparently issued hold notices to at least some of its custodians (indicating knowledge that the employee might have responsive information), but failed to place them on journaling contemporaneously.  We will seek this information in our formal discovery.  Should AMD refuse to disclose hold-notice-receipt dates for all of its custodians, Intel will address that issue with the Special Master.

      We also note that AMD first raised this issue (i.e., the fact that some custodians had not received hold notices timely) in its August 10, 2007 letter.  In that same letter AMD disclosed that it had identified "a small number of custodians (including Messrs. Ruiz and Colandro) whose initial productions did not include all available .pst files."  AMD has still not disclosed the number or identities of those custodians whose PST files were not initially harvested, or how the failure to harvest occurred.  We intend to inquire about that issue during our 30(b)(6) deposition[s].

      8.    <u>Auto-Delete</u>.  Mr. Kepler's data retention lapse occurred more than three years ago (AMD admits it was aware of its data-retention obligations no later than March 2005 although Intel believes the date may have been much earlier).  The fact that this lapse is just coming to light now—despite Intel's repeated inquiries about AMD's use of auto-delete and AMD's representations that there was nothing to report—highlights the need for Intel to understand what investigation, if any, AMD has previously undertaken with regard to all of its custodians.

      9.    <u>Possible Custodian Data Loss</u>.  AMD knew about the loss of Mr. Soares's laptop sometime after March 30, 2006 (by which time AMD had determined that Soares's

---

[7] AMD's suggestion (at 6) that "Intel's conduct has unnecessarily delayed" AMD from producing this information is unsupported.

Bingham McCutchen LLP
bingham.com

David L. Herron, Esq.
May 30, 2008
Page 7

data might be relevant to the lawsuit), but did not inform Intel.  Perhaps AMD believed it was unnecessary to notify Intel about the data loss because neither party had designated him as a production custodian at that time.  Indeed, it seems certain—based on AMD's current position of withholding retention information about non-production custodians—that AMD would have continued to conceal Mr. Soares's data loss but for the fact that Intel designated Soares as a production custodian.

Perhaps more troubling is the fact that even *after* Intel designated Mr. Soares as a production custodian AMD did not disclose the loss of his laptop, and failed to disclose an additional, subsequent data loss that occurred in May 2007—months *after* Intel had designated Mr. Soares.  This subsequent data loss also occurred *after* Intel's April 11, 2007 letter requesting that AMD disclose all known data retention lapses.[8]  It is difficult to understand why this information is only coming to light now, and unavoidably raises the question, what other retention lapses remain undisclosed?

Intel is not required to rely on AMD's informal representations that its document retention program has operated "as intended" with "no lapses" identified.  Given all of the open issues and AMD's refusal to provide a variety of information, Intel must insist on compliance with its formal discovery.  We will therefore proceed with the 30(b)(6) deposition as described in the enclosed notice and move to compel compliance with our outstanding document requests.

Sincerely yours,

Donn P. Pickett

Enclosures

cc:    Robert E. Cooper, Esq.
       Peter E. Moll, Esq.
       Richard L. Horowitz, Esq.
       Anthony Marks, Esq.

---

[8] Intel asked, "Is AMD aware of the loss of any documents potentially relevant to this litigation . . . either as a result of human conduct, the operation of a computing system, or otherwise?" 4/11/2007 Cooper letter at 1.

**EXHIBIT U**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | MDL No. 05-1717-JJF |
| | | |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | C. A. No. 05-441-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants. | ) | |
| | | |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) | C. A. No. 05-485-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) | |

## NOTICE OF TAKING DEPOSITION OF
## ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL
## SALES & SERVICE, LTD.

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, defendant Intel Corporation will take the deposition of Advanced Micro Devices, Inc.

and AMD International Sales & Service, Ltd. (collectively, "AMD") on July 9 and 10 beginning

each day at 9:30 a.m., at the offices of Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue,

47th Floor, Los Angeles, California 90071, or at such other time and place as the parties may

agree.  The deposition will be recorded by stenographic and sound-and-visual (videographic)

means, will be taken before a Notary Public or other officer authorized to administer oaths, and will continue from day to day until completed, weekends and public holidays excepted.

Reference is made to the "Description of Matters on Which Examination is Requested" attached hereto as Exhibit A and incorporated herein by this reference. In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, AMD is hereby notified of its obligation to designate one or more officers, directors, or managing agents (or other persons who consent to do so) to testify on its behalf as to all matters embraced in the "Description of Matters on Which Examination is Requested" and known or reasonably available to AMD.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC  20004
(202) 783-0800

Dated:  May 30, 2008

**POTTER ANDERSON & CORROON LLP**

By: _____
    Richard L. Horwitz (#2246)
    W. Harding Drane, Jr. (#1023)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE  19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

# EXHIBIT A

**EXHIBIT A**

**DESCRIPTION OF MATTERS ON
WHICH EXAMINATION IS REQUESTED**

**I.**

**DEFINITIONS**

1.      "AMD" shall mean and refer collectively to plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd., including their respective past and present officers, directors, agents, attorneys, employees, consultants, or other persons acting on either of their behalf.

2.      "AMD Custodians" means and refers to the approximately 440 individuals identified by AMD on its Custodian List served on June 1, 2006, pursuant to the Stipulation and Order Regarding Document Production entered by the Court in this Litigation.

3.      "Complaint Freeze Tapes" means the tapes preserved in or about March 2005 as described in David Herron's October 24, 2005 letter to John J. Rosenthal.

4.      "Email Journaling System" means the system that AMD activated for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

5.      "Enterprise Vault" means the system that AMD obtained and implemented for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

6.      "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

7.      "Litigation Hold Notices" or "Hold Notices" means and refers to the means by which AMD communicated its preservation obligations to its employees concerning the Litigation (regardless of the title or name given to such communications), including all oral, written or electronic notices, reminders, or other communications by AMD to AMD Custodians or other AMD employees.

8.    "Monthly Backup Tapes" means the tapes described in David Herron's October 24, 2005 letter to John J. Rosenthal.

## II.

## SUBJECT MATTER

1.    The information sought in Robert E. Cooper's April 11, 2007 letter to David L. Herron regarding AMD's document retention activities, attached hereto as Exhibit B.

2.    The selection, design, architecture, operation, functionality, capabilities and implementation of AMD's Enterprise Vault system, including its reporting, search and production capabilities.

3.    The design, architecture, operation, functionality, capabilities and implementation of AMD's Email Journaling System, including its reporting, search and production capabilities, as well as any errors, malfunctions, or unexpected attributes of AMD's Email Journaling System.

4.    The preparation, timing, contents, and distribution of all Litigation Hold Notices, including the identity (name, location, position) of anyone receiving such Litigation Hold Notice and the date(s) of receipt by each AMD Custodian of each Litigation Hold Notice.

5.    The details and circumstances concerning any known or suspected non-compliance with the Litigation Hold Notices, whether on a systemic or individual basis, the facts and timing of AMD's discovery of such non-compliance, the identity of those persons involved in such non-compliance, and the timing and nature of all steps taken following such discovery including actions AMD has taken to investigate AMD's compliance with its document retention obligations in connection with this Litigation.

6.    The details and circumstances of any known or suspected failures, whether on a systemic or individual basis, in the preservation of potentially relevant Documents on the Complaint Freeze Tapes, Monthly Backup Tapes, Email Journaling System, Enterprise Vault or hard drive of any AMD Custodian including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

7.    AMD's harvest of data from AMD Custodians, including the harvest instructions and protocols employed and the identity of those persons involved in developing and executing such instructions and protocols, and the timing of the harvest of each AMD Custodian.

8.    The details of any steps, policies, practices or other measures undertaken by AMD to preserve the electronic data and other documents of departing AMD Custodians, including the details and timing of any AMD effort to monitor or otherwise ensure compliance with such steps, policies, practices or measures including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

9.    For each individual AMD Custodian: (a) the date(s) on which the Custodian's documents were harvested for the Litigation; (b) the date on which the Custodian was put on the

Email Journaling System; (c) the date on which the Enterprise Vault was first used to capture and preserve email for the Custodian; (d) whether the Custodian has deleted any potentially relevant Documents from the hard drive of the Custodian's laptop or desktop computer; (e) whether the Custodian has deleted any potentially relevant email from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant Documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether the data for the Custodian has been preserved on Monthly Backup Tapes, and if so, for which specific months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes.

10.     Whether AMD has discovered that any AMD Custodian manually deleted, or otherwise lost, any potentially relevant email or other electronic data prior to the date on which the Custodian's data was harvested, and if so, the date(s) and volume of such deletion or loss, and whether AMD has produced (or will produce) documents for that Custodian from the Complaint Freeze Tapes, Monthly Backup Tapes, Enterprise Vault or other source including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

11.     The existence, details and application of "AMD's document retention and destruction policies" referenced in David Herron's October 24, 2005 letter to John J. Rosenthal (attached as Exhibit C), and the suspension or deviation from such policies and practices in connection with this Litigation.

12.     Limitations on storage for individual AMD employees' email including the consequence of an AMD employee's email account reaching the storage limit and whether any AMD Custodians reached the storage limits imposed on their email account at any time after March 11, 2005.

13.     The operation, functionality and capabilities of AMD Custodians' email accounts before each custodian is or was placed on AMD's Email Journaling System and the changes to the characteristics and functionality that occur as a result of enabling AMD's Email Journaling System for a Custodian's email account.

14.     The information that is captured on each Monthly Backup Tape including what folders and types of items are included and excluded, and whether PST files are located on the Exchange servers.

15.     The "auto-delete features on email" referred to in the "Frequently Asked Questions and Answers" attached to AMD's Hold Notices, including whether and how AMD Custodians could enable or disable such features, which, if any AMD Custodians used the auto-delete feature at any time after March 11, 2005 and how AMD determined those facts, efforts made to inform AMD Custodians of the auto-delete system and whether and how to disable it, and whether auto-delete could have been disabled at a system level.

16.     The actual or potential data loss referred to in David L. Heron's March 19, 2008 and May 14, 2008 letters to Richard Levy (attached as Exhibit D), including: (a) the facts and circumstances surrounding the actual or potential loss of data from Messrs. Oji, Kepler, and

Soares; (b) the timing and details of the delay in AMD counsel learning of the data loss; (c) the extent to which AMD has investigated whether other AMD Custodians have experienced similar actual or potential data loss; (d) whether other AMD Custodians follow retention practices like those of Messrs. Oji, Kepler, and Soares described in the letters, and (e) whether such practices were known and authorized by AMD.