# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

# O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
IRVINE SPECTRUM
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

October 24, 2005

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

### VIA E-MAIL AND U.S. MAIL

John J. Rosenthal, Esq.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Re:    *AMD v. Intel:* eDiscovery Issue Regarding Preservation

Dear Mr. Rosenthal:

As agreed, this letter provides AMD's responses to the questions posed to Intel in Jeff Fowler's September 23, 2005 letter regarding preservation efforts.

### Overview of AMD's Preservation Efforts

Enterprise Level Preservation

- On March 11, 2005, AMD sent preservation notices to the appropriate IT personnel in its various offices. The oldest full backup of the Exchange servers and Windows-environment, network shared file servers were located and preserved.

- Beginning March 19, 2005, full backups were made and retained. Over the next several weeks the backup schedules were coordinated; going forward, full backups are taken and retained every month.

- The monthly full backups are retained in secure locations. Most of the sites send their tapes to Austin, although a few offices retain their backups locally. Compliance is tracked and monitored on a weekly basis.

- AMD's document retention and destruction policies were suspended to prevent the inadvertent destruction of documents that may be relevant to this lawsuit.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 2

Custodian Level Preservation

- On April 1, 2005, AMD issued its first wave of document preservation notices to approximately 150 custodians likely to have relevant information. The custodians were instructed to preserve all documents and data relevant to the lawsuit. This includes, of course, e-mail. Like Intel, AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored.

- As additional custodians are identified, preservation notices are sent to them and they are put on the litigation hold. To date, the list of custodians includes approximately 440 people. Appropriate follow-up is conducted as needed to ensure custodian understanding and continued compliance with the hold.

## Responses to Follow-up Questions

### One-Time Backup

*How many total tapes were gathered during the snapshot?*
AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups.

*How are they organized/indexed?*
These backup tapes are organized by backup type (*i.e.*, Exchange or file server), by site, and by date.

*How were instructions for the one-time backup communicated?*
The instructions for AMD's monthly backup protocol were communicated in writing. Follow-up phone calls were made to the appropriate IT personnel to confirm understanding and compliance.

*Were all snapshots taken on June 20?*
The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and are now) coordinated worldwide.

*Have any backup tapes covering periods prior to June 20 been recycled?*
Prior to the initiation of the enterprise level hold on March 11, 2005, backup tapes were recycled and rewritten in the ordinary course of business.

*Have any backup tapes covering periods after June 20 been recycled?*
Monthly backup tapes for the Exchange and Window-environment, shared network servers have not been recycled since March 2005.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 3

*Is there a legal hold on any existing backup tapes other than those constituting the one-time backup?*
Legal holds on monthly backup tapes are described above.

*Has there been any subsequent effort to target certain systems or segments of the IT structure and conduct more regular backup snapshots of those targets?*
As noted, AMD is conducting monthly backups on its Exchange and Windows-based, shared file environment. This has resulted in a large collection of tapes storing the data collected over the time period specified.

Shared Sources

*Has [AMD] engaged in any preservation efforts for shared sources other than hold notices to custodians?*
As part of the Enterprise Level Preservation, AMD is retaining monthly full backups of its Exchange and Windows-environment, shared network servers – which includes data and documents from employees company-wide.

Custodian Legal Holds

*Exactly how many hold notices have been issued?*
The current count of custodians to whom a litigation hold has been issued is roughly 440. AMD continues to assess the propriety of maintaining that hold with respect to all of these employees, some of whom AMD does not believe have any relevant information or involvement with any issue relevant to this lawsuit. Accordingly, AMD currently is in the process of reviewing its hold list and is considering paring that list, as appropriate.

*How was the hold notice communicated?*
The preservation notice was communicated in writing. Follow-up phone calls were made and emails sent on an as-needed basis.

*Please describe in specific terms the instructions given to custodians for how to preserve their electronic documents.*
At the present time, AMD will adopt Intel's approach to responding to this question.

*Is there a procedure to monitor compliance with the legal hold? What is it?*
Yes. Compliance is monitored in part by requesting acknowledgement of the custodians' receipt and understanding of the hold notice. Periodic email communications are sent to custodians reminding them of their preservation obligations and providing an opportunity to raise any questions or concerns. Follow-up communications occur on an as-needed basis.

*Is there a procedure for preserving the documents of terminated employees?*
Yes. When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate.

O'MELVENY & MYERS LLP

John J. Rosenthal, Esq., October 24, 2005 - Page 4

*Are there different hold instructions for the custodian once his or her computer has been imaged for collection?*
Not at this time.

Miscellaneous Sources

*Does [AMD] archive Instant Messages?*
No. AMD's current instant messaging ("IM") system cannot be configured to save or log IMs. Accordingly, AMD does not have an instant message archiving system.

*What efforts are being made to prevent relevant data from being deleted in Instant Messaging systems?*
Custodians have been specifically instructed not to use IMs for business-related, substantive communication. Such business information is to be conveyed via email, memorandum, or other means that can be saved and retrieved. The litigation hold applies to require preservation of any communications by this or other means that is relevant to the lawsuit.

Please feel free to contact me if you have any questions.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

cc:    Rod Stone, Esq.

CC1:720688.8

# EXHIBIT 13

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 14

## SUMMARY OF AMD'S DOCUMENT COLLECTION PROTOCOLS

The following summarizes the document collection protocols that Advanced Micro Devices ("AMD") has implemented to collect potentially responsive documents from custodians designated by the parties pursuant to the Stipulation and Order Regarding Document Production. The summary provided below applies both to the harvesting efforts conducted by AMD prior to the date hereof and to document collections that currently are ongoing.

### AMD's Collection Plan and Pre-Collection Preparations

Before commencing its collection efforts, AMD assembled a team consisting of members of AMD's in-house legal staff, its Information Technology group, its outside counsel, and its electronic discovery consultants, Forensics Consulting Solutions ("FCS"), to develop a legally-compliant electronic discovery collection plan. AMD's goals were to ensure that it used forensically-sound methods to collect the broadest amount of potentially relevant material in the custodians' possession, and to confirm that the preservation protocols that AMD had previously implemented were working as intended. AMD continues to monitor and follow its collection protocols detailed below, which includes members of AMD's team meeting on a weekly basis to ensure that the collection plan's protocols are followed.

AMD's collection plan is designed to provide a comprehensive, forensically-sound collection through three key steps:

1. Conducting attorney-led interviews with custodians to confirm that any and all potentially relevant sources of unique data have been collected;

2. Collecting forensic images or original sources of all unique electronic materials and copies of all potentially relevant hard-copy documents from the relevant time

period. AMD is not aware of any potential sources of data other than those discussed below; and

3. Delivering all designated custodians' materials to FCS, which is responsible for processing the data, tracking its chain-of-custody, and preserving the original media in a secure evidence locker.

AMD's in-house legal staff initiates the collection process for actively-employed, designated custodians by sending a written notice. This notice outlines the collection process and reminds the custodian of her or his on-going duty to preserve documents.

**Collection Interviews**

AMD requires that each custodian is interviewed by an in-house or outside counsel who is familiar with a specific custodian interview protocol. Custodian interviews cover a litany of topics and questions that are designed to elicit a comprehensive account of the existence and location of all electronic data and other materials, including such topics as how many computers the custodians use for work or any work-related purpose, where their electronic documents are stored (*e.g.*, hard drive, network space, external drives, CDs), and where their paper documents are stored (*e.g.*, office, off-site storage). The interviews also include discussion of technical issues, such as hard drive failures, that may have affected the custodians' ability to retain documents. AMD also has instructed the interviewers to remind each custodian during the course of the interview that he or she remains subject to document retention obligations, notwithstanding the harvest of the custodian's electronic data and paper documents.

The electronic discovery team has interviewed several custodians more than once. Most recently, AMD interviewed several custodians who are current employees in and after September 2007 in order to identify and collect additional potentially responsive materials pursuant to the

parties' agreed-upon June 1, 2006 cut-off date (as set forth in Stipulated Case Management Order No. 3, executed by the Court on September 19, 2007).

**Collection of Electronic Materials**

*Computers and Other Media*

AMD has used its internal IT personnel and outside vendors to acquire bit-by-bit images of computer hard drives. This bit-by-bit imaging methodology ensures that AMD has collected a forensically-sound and comprehensive image of all data stored on the hard drive. Thus, unlike Intel, AMD has not limited its harvesting to specific file types taken from custodian hard drives but, instead, captures an image of all data residing on the custodian's hard drive(s) without regard to its potential relevance to this litigation.

During the original harvest, AMD imaged the hard drive of any computer in the custodian's possession that contained potentially relevant data. During subsequent re-harvests designed to obtain responsive material through the agreed-upon June 1, 2006 cut-off, AMD imaged the hard drive of any computer that a custodian used before June 1, 2006, and that AMD had not previously collected. There are a limited number of instances where the interviewer determined that a custodian possessed the same data on multiple electronic media (*e.g.*, back-ups made of hard drives). In some of those instances, AMD chose not to copy the data from multiple sources.

Some AMD custodians make copies or back-ups of their hard drives or select files to external storage media, such as external drives or CDs. If a custodian discloses during the interview process that she or he has potentially relevant documents saved on external storage media that are not also maintained on her or his computer's hard drive, or if the custodian is uncertain as to whether or not all of the relevant data is stored not only externally but also on the

hard drive, then AMD collects and copies all external storage media. The copy of that media, or the media itself, is then delivered to FCS for processing.

### Network Space

AMD provides most, but not all, employees personal space on network file servers so that employees may save work-related materials on AMD's network (hereafter "network space"). These network spaces are personal to each employee, *i.e.*, only that employee's materials are saved in an employee's personal network space. Not all of AMD's custodians use the network space assigned to them to store any data and others are not assigned network space (*e.g.*, employees who work remotely). The electronic discovery team obtains an export of custodians' network space during a custodian's harvest and/or re-harvest. During harvesting interviews, the interviewing attorney asks the custodians how and whether they use their network space to confirm that AMD's IT department has identified and located all storage locations or media of any variety that may contain relevant custodian data. AMD also has retrieved existing data stored on network space for each former AMD employee who has been selected as a party-designated or adverse-party designated custodian for production. AMD delivers all exports of these sources to FCS for processing and storage.

### Journal and Vault Harvesting

In addition to the hard drives and network spaces collected for each custodian, AMD also collects Journal and Vault email archives. (Details concerning AMD's Journal and Vault previously have been disclosed to Intel during the informal technical exchange in September 2007.) To collect the email archives, AMD's in-house legal staff sends a directive requesting extraction of data from the Journal and/or Vault to AMD's internal IT staff. After AMD IT staff executes the request, the extracted data, organized by custodian, is saved to external storage media that is then delivered to FCS for processing.

**Paper Documents**

During the harvest interviews, attorneys ask custodians to describe how they maintain their paper or hard copy files. Following the interview, a member of the harvesting team, usually a paralegal, returns to the custodian's physical work space to collect these materials. At that time, both paper documents and any CDs or other external storage media containing relevant materials are collected (if such media have not been collected already). This includes all paper documents and, as noted above, all external storage media containing data that is dated after January 1, 2000, and is subject to the litigation hold notice and instructions. During the original harvest, AMD thus obtained paper documents containing data dated after January 1, 2000, to the date of the harvest. During the re-harvest of data designed to supplement the collection of the data of AMD's party-designated custodians through the agreed-upon date of June 1, 2006, AMD collected, or is in the process of collecting, paper documents and external storage media containing data dated after the date of the first collection through June 1, 2006.

Once the electronic discovery team has collected paper documents from the custodians who reside in AMD's principal domestic business locations, they are sent to a copy service (one located in Sunnyvale, California, and a second located in Austin, Texas) to be scanned into .pdf format. Those static images, once created, are then forwarded to FCS for processing. For custodians located outside of one of the AMD main domestic offices (*e.g.*, field sales personnel, or domestic U.S. custodians located outside of Sunnyvale, California, or Austin, Texas, and those custodians located in international offices), attorneys typically instruct the custodians to gather all AMD business-related materials subject to the litigation hold instructions and to forward the originals or copies thereof to AMD's in-house legal staff located in Austin, Texas. After receipt by AMD's in-house legal staff in Austin, the paper documents are delivered to an Austin-based copy service to be scanned into .pdf format. Those static images, once created, are then forwarded to FCS for processing. In a limited number of cases, AMD has instructed a

European-based copy service to scan documents from custodians in Europe into a .pdf format. Those static images are then forwarded to FCS for processing.

### FCS Storage and Tracking

AMD delivers all media, or copies of media, collected for designated custodians to FCS, which maintains a tracking database and stores the data. Each piece of media is sent to FCS with an evidence tracking form on which AMD describes the contents of the media, its chain of custody, and any other information needed to track the data. FCS then enters the tracking information into a database, and utilizes that information as it processes the data. FCS stores the original media in a secure evidence locker.

# EXHIBIT 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) ) )   MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES,<br>LTD., a Delaware corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>INTEL CORPORATION, a Delaware<br>corporation, and INTEL KABUSHIKI KAISHA,<br>a Japanese corporation,<br><br>                    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   C.A. No. 05-441-JJF |
| PHIL PAUL, on behalf of himself<br>And all others similarly situated,<br><br>                    Plaintiffs<br><br>          v.<br><br>INTEL CORPORATION,<br><br>                    Defendants. | ) ) ) ) ) ) ) ) ) ) )   C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

## CASE MANAGEMENT ORDER NO. 1

This Court having held Initial Conferences on April 20 and May 4, 2006 and the parties having satisfied their obligations under Fed. R. Civ. 26(f), and, pursuant to this Court's Order, submitted a proposed Case Management Order that governs all cases in MDL 1717,

IT IS HEREBY ORDERED THAT:

1.    **Pre-Discovery Disclosures.**    Pursuant to the Stipulation and Order regarding Initial Disclosures, entered August 26, 2005, the parties in C.A. No. 05-441 have exchanged information under Fed. R. Civ. P. 26(a)(1)(A) and D. Del. LR 16.2.    The parties to the consolidated class actions in MDL 1717 will make their respective Rule 26(a)(1)(A) disclosures by May 31, 2006.    All MDL 1717 parties have agreed to modify the disclosure requirements of Fed. R. Civ. P. 26(a)(1)(B).

2.    **Filings.**    All pleadings, motions and other papers filed in C.A. No 05-441 should also be filed in MDL No. 1717.    All pleadings, motions and other papers filed in the coordinated class actions shall be filed in both MDL No. 1717 and C.A. No. 05-485.

3.    **Subject Matter Jurisdiction.**    Intel's motion and opening brief relating to the Court's subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act was filed on May 2, 2006.    Intel and AMD have submitted a Stipulation regarding the briefing schedule.    The Court will schedule a hearing on Intel's motion if the Court determines such a hearing is necessary.

4.    **Consolidated Class Action Complaint.**    Intel's response to any Consolidated Class Action Complaint is due 60 days after either the Court determines that the Consolidated Class Action Complaint (filed April 28, 2006) is the operative pleading or an Amended Consolidated Class Action Complaint is filed and served.

2

5.    **Discovery.**

    a)    Discovery in MDL 1717 common to both C.A. No. 05-441 and the consolidated class actions shall be coordinated to the maximum extent practicable to promote efficiency and eliminate any duplication.

    b)    The parties, with Court approval, have implemented a process to obtain third party input on a Proposed Protective Order, and the Proposed Protective Order, as well as the positions of the Parties and third parties, will be provided to the Court on or before May 31, 2006.

    c)    Documents required to be produced under Rule 34 requests propounded as of the date of this order or under any additional Rule 34 requests served by May 31, 2006, shall be exchanged by the parties on or before December 31, 2006. The Court will entertain one agreed-upon, reasonable extension of this deadline.

    d)    Document production shall be governed by the Stipulation And Proposed Order Regarding Document Production and the Stipulation Between AMD And Intel Regarding Electronic Discovery And Format Of Document Production. Before they are effective, these Stipulations require that both Interim Class Counsel and Lead Class Counsel in the California Class Action subscribe. Accordingly, the parties shall report on the status of Class Counsel's consent on or before May 31, 2006, at which time the Court will either enter the proposed orders if Class Counsel have consented, or schedule a further conference to establish ground rules for document production and e-discovery.

    e)    Prior to or shortly after the deadline for completing document production under subparagraph (c), Intel, AMD and class plaintiffs may depose the document custodian or custodians responsible for the

3

productions to them to inquire into the completeness of document production (including electronic discovery).

f)   The parties agree that the ten deposition limit of Fed. R. Civ. P. 30 should not apply to this case. The parties are directed to meet and confer concerning the number, time limits and timing of depositions.

g)   All parties will coordinate third-party discovery to the maximum extent possible to minimize the burden on third parties. Except for those requiring use of the Hague Convention, letters rogatory or similar process, all subpoenas *duces tecum* to corporate third parties requiring a comprehensive production of their relevant documents will be served on or before June 15, 2006.

6.   **Class Certification.**   Class and merits discovery shall proceed simultaneously in accordance with this Order and the other Stipulations and Orders referred to herein. Intel and Interim Class Counsel agree to the following target dates:

| | |
|---|---|
| Plaintiffs' Class Certification Motion, Supporting Memorandum of Law and Class Expert Report | March 16, 2007 |
| Intel's Opposition and Rebuttal Class Expert Report | May 18, 2007 |
| Plaintiffs' Class Expert Reply Report | July 11, 2007 |
| Plaintiffs' Reply Brief | July 18, 2007 |
| Class Certification Hearing | July 25, 2007 |

Intel notes that the achievability of these target dates is dependent on the timing of the production of third party data and testimony that Intel believes is essential to its class certification defense.

7.   **Federal/State Coordination.**   In addition to this MDL proceeding, there is California Class Litigation which encompasses all actions filed by or on behalf of a putative California class of indirect purchasers of Intel microprocessors, including certain actions which

RLFI-3014281-1

have been or will be transferred to the Honorable Jack Komar of the Santa Clara County Superior Court by the Judicial Council for the State of California under JCCP 4443. Discovery and other pretrial matters in this MDL proceeding and the California Class Litigation shall be coordinated in accordance with any Joint Coordination Order upon entry of such Order by the California Court and this Court.

        **8.**    **Discovery Disputes.**  This Court has entered an Order Appointing a Special Master and all discovery disputes shall be handled in accordance with that Order and such procedures established by the Special Master or this Court.

        **9.**    **Applications by Motion.**

        a)    Any applications to the Court shall be by written motion filed with the Clerk of the Court in compliance with the Federal Rules of Civil Procedure and the local Rules of Civil Practice for the United States District Court for the District of Delaware (Amended Effective January 1, 1995).  Any non-dispositive motion shall contain the statement required by D. Del. LR 7.1.1.  Parties may file stipulated and unopposed Orders with the Clerk of the Court for the Court's review and signing.  The Court will not consider applications and requests submitted by letter or in a form other than a motion.

        b)    No facsimile transmissions will be accepted.

        c)    No telephone calls shall be made to Chambers.

        d)    Any party with a true emergency matter requiring the assistance of the Court shall e-mail Chambers at:  jjf_civil@ded.uscourts.gov.  The e-mail shall provide a short statement describing the emergency.

        **10.  Service of Pleadings Filed Under Seal.**  Pleadings filed under seal shall be served by email or by overnight delivery on the following attorneys:

        Class Plaintiffs:    Interim Class Counsel and Interim Liaison Counsel

AMD:  Charles P. Diamond, Mark A. Samuels and Frederick L. Cottrell

Intel:  Richard Horwitz, Darren Bernhard, Richard Ripley, Daniel Floyd

**11.**    **Settlement.**  If at any time the parties are interested in exploring a resolution of this case short of trial, they may contact Magistrate Judge Thynge.

**12.**    **Scheduling Conference and Trial.**  The Court will hold a Scheduling Conference on September 2̲7̲, 2006 to set a trial date in C.A. No. 05-441 and to deal with other matters as may be appropriate.

$\underline{\text{May 16 2006}}$
DATE

$\underline{\hspace{4cm}}$
UNITED STATES DISTRICT JUDGE

# EXHIBIT 16



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

June 30, 2008

OUR FILE NUMBER
8,346-163

**VIA EMAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(213) 430-7645

Thomas Dillickrath, Esq.
Howrey LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402

WRITER'S E-MAIL ADDRESS
ssimmons@omm.com

Re:    *AMD v. Intel*

Dear Tom:

I am writing to advise you that, in connection with AMD's continued auditing of its document collection and production, we have discovered additional responsive data for a China-based custodian, Kelvin Kwok. The data was maintained by Mr. Kwok on some external storage media and also on hard drives that appear not to have been previously harvested. FCS has received the additional data and is processing it. The data appears to cover the time period from at least April to November 2005, and it seems likely that there may be additional files dated both before and after those dates.

We intend to process, review and produce this material as soon as practicable, and will be glad to keep you apprised of progress. If you have questions, please as always feel free to call me.

Sincerely,

*Shaun M. Simmons /aem*

Shaun M. Simmons

SMS:aem

# EXHIBIT 17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | C. A. No. 05-441-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants. | ) | |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) | C. A. No. 05-485-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) | |

### NOTICE OF TAKING DEPOSITION OF
### ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL
### SALES & SERVICE, LTD.

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, defendant Intel Corporation will take the deposition of Advanced Micro Devices, Inc.

and AMD International Sales & Service, Ltd. (collectively, "AMD") on July 9 and 10 beginning

each day at 9:30 a.m., at the offices of Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue,

47th Floor, Los Angeles, California 90071, or at such other time and place as the parties may

agree. The deposition will be recorded by stenographic and sound-and-visual (videographic)

means, will be taken before a Notary Public or other officer authorized to administer oaths, and will continue from day to day until completed, weekends and public holidays excepted.

Reference is made to the "Description of Matters on Which Examination is Requested" attached hereto as Exhibit A and incorporated herein by this reference. In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, AMD is hereby notified of its obligation to designate one or more officers, directors, or managing agents (or other persons who consent to do so) to testify on its behalf as to all matters embraced in the "Description of Matters on Which Examination is Requested" and known or reasonably available to AMD.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated: May 30, 2008

**POTTER ANDERSON & CORROON LLP**

By:    */s/ W. Harding Drane, Jr.*
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

# EXHIBIT A

**EXHIBIT A**

**DESCRIPTION OF MATTERS ON
WHICH EXAMINATION IS REQUESTED**

**I.**

**DEFINITIONS**

1.    "AMD" shall mean and refer collectively to plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd., including their respective past and present officers, directors, agents, attorneys, employees, consultants, or other persons acting on either of their behalf.

2.    "AMD Custodians" means and refers to the approximately 440 individuals identified by AMD on its Custodian List served on June 1, 2006, pursuant to the Stipulation and Order Regarding Document Production entered by the Court in this Litigation.

3.    "Complaint Freeze Tapes" means the tapes preserved in or about March 2005 as described in David Herron's October 24, 2005 letter to John J. Rosenthal.

4.    "Email Journaling System" means the system that AMD activated for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

5.    "Enterprise Vault" means the system that AMD obtained and implemented for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

6.    "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

7.    "Litigation Hold Notices" or "Hold Notices" means and refers to the means by which AMD communicated its preservation obligations to its employees concerning the Litigation (regardless of the title or name given to such communications), including all oral, written or electronic notices, reminders, or other communications by AMD to AMD Custodians or other AMD employees.

8.      "Monthly Backup Tapes" means the tapes described in David Herron's October 24, 2005 letter to John J. Rosenthal.

## II.

## SUBJECT MATTER

1.      The information sought in Robert E. Cooper's April 11, 2007 letter to David L. Herron regarding AMD's document retention activities, attached hereto as Exhibit B.

2.      The selection, design, architecture, operation, functionality, capabilities and implementation of AMD's Enterprise Vault system, including its reporting, search and production capabilities.

3.      The design, architecture, operation, functionality, capabilities and implementation of AMD's Email Journaling System, including its reporting, search and production capabilities, as well as any errors, malfunctions, or unexpected attributes of AMD's Email Journaling System.

4.      The preparation, timing, contents, and distribution of all Litigation Hold Notices, including the identity (name, location, position) of anyone receiving such Litigation Hold Notice and the date(s) of receipt by each AMD Custodian of each Litigation Hold Notice.

5.      The details and circumstances concerning any known or suspected non-compliance with the Litigation Hold Notices, whether on a systemic or individual basis, the facts and timing of AMD's discovery of such non-compliance, the identity of those persons involved in such non-compliance, and the timing and nature of all steps taken following such discovery including actions AMD has taken to investigate AMD's compliance with its document retention obligations in connection with this Litigation.

6.      The details and circumstances of any known or suspected failures, whether on a systemic or individual basis, in the preservation of potentially relevant Documents on the Complaint Freeze Tapes, Monthly Backup Tapes, Email Journaling System, Enterprise Vault or hard drive of any AMD Custodian including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

7.      AMD's harvest of data from AMD Custodians, including the harvest instructions and protocols employed and the identity of those persons involved in developing and executing such instructions and protocols, and the timing of the harvest of each AMD Custodian.

8.      The details of any steps, policies, practices or other measures undertaken by AMD to preserve the electronic data and other documents of departing AMD Custodians, including the details and timing of any AMD effort to monitor or otherwise ensure compliance with such steps, policies, practices or measures including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

9.      For each individual AMD Custodian: (a) the date(s) on which the Custodian's documents were harvested for the Litigation; (b) the date on which the Custodian was put on the

Email Journaling System; (c) the date on which the Enterprise Vault was first used to capture and preserve email for the Custodian; (d) whether the Custodian has deleted any potentially relevant Documents from the hard drive of the Custodian's laptop or desktop computer; (e) whether the Custodian has deleted any potentially relevant email from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant Documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether the data for the Custodian has been preserved on Monthly Backup Tapes, and if so, for which specific months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes.

10.     Whether AMD has discovered that any AMD Custodian manually deleted, or otherwise lost, any potentially relevant email or other electronic data prior to the date on which the Custodian's data was harvested, and if so, the date(s) and volume of such deletion or loss, and whether AMD has produced (or will produce) documents for that Custodian from the Complaint Freeze Tapes, Monthly Backup Tapes, Enterprise Vault or other source including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

11.     The existence, details and application of "AMD's document retention and destruction policies" referenced in David Herron's October 24, 2005 letter to John J. Rosenthal (attached as Exhibit C), and the suspension or deviation from such policies and practices in connection with this Litigation.

12.     Limitations on storage for individual AMD employees' email including the consequence of an AMD employee's email account reaching the storage limit and whether any AMD Custodians reached the storage limits imposed on their email account at any time after March 11, 2005.

13.     The operation, functionality and capabilities of AMD Custodians' email accounts before each custodian is or was placed on AMD's Email Journaling System and the changes to the characteristics and functionality that occur as a result of enabling AMD's Email Journaling System for a Custodian's email account.

14.     The information that is captured on each Monthly Backup Tape including what folders and types of items are included and excluded, and whether PST files are located on the Exchange servers.

15.     The "auto-delete features on email" referred to in the "Frequently Asked Questions and Answers" attached to AMD's Hold Notices, including whether and how AMD Custodians could enable or disable such features, which, if any AMD Custodians used the auto-delete feature at any time after March 11, 2005 and how AMD determined those facts, efforts made to inform AMD Custodians of the auto-delete system and whether and how to disable it, and whether auto-delete could have been disabled at a system level.

16.     The actual or potential data loss referred to in David L. Heron's March 19, 2008 and May 14, 2008 letters to Richard Levy (attached as Exhibit D), including: (a) the facts and circumstances surrounding the actual or potential loss of data from Messrs. Oji, Kepler, and

Soares; (b) the timing and details of the delay in AMD counsel learning of the data loss; (c) the extent to which AMD has investigated whether other AMD Custodians have experienced similar actual or potential data loss; (d) whether other AMD Custodians follow retention practices like those of Messrs. Oji, Kepler, and Soares described in the letters, and (e) whether such practices were known and authorized by AMD.

# EXHIBIT B

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

April 11, 2007

<table>
<tr><td>Direct Dial<br>(213) 229-7179</td><td>Client No.<br>T 42376-00764</td></tr>
<tr><td>Fax No.<br>(213) 229-6179</td><td></td></tr>
</table>

David L. Herron
Jeffrey J. Fowler
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:   *AMD v. Intel - eDiscovery Issues*

Gentlemen:

In the last several weeks, Intel has shared with AMD detailed information with regard to the steps it designed to retain all documents, including emails, relevant to this litigation, the implementation of those steps, and some lapses that Intel has discovered with regard to that implementation. We are now engaged in a Court supervised accounting of those lapses and the creation of a remediation plan to deal with them. It is thus reasonable and timely for Intel to ask AMD for certain updated information with regard to its document retention activities so that Intel will be in a position, as the parties go forward in discovery, to understand whether there might be any lapses in AMD's document retention. We assume the information Intel is seeking should not be burdensome since we are merely seeking to update and confirm representations that AMD has made to Intel about its retention practices.

We do not mean to suggest that AMD has not undertaken its preservation obligations. The spirit of the Amended Federal Rules, however, contemplate that the parties will continue to keep each other apprised on the status of preservation, especially in case of this complexity and length.

A.   **Document Retention In General.**

Is AMD aware of the loss of any documents potentially relevant to this litigation, and/or any non-compliance with all hold instructions issued to AMD employees, either as a result of human conduct, the operation of a computing system, or otherwise? If so, please provide a full

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   BRUSSELS   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 2

description of the loss or non-compliance, including: (i) the custodian(s) involved; (ii) the nature of the loss or non-compliance; (iii) when AMD first discovered the loss or non-compliance; and (iv) all remedial steps undertaken by AMD to address the loss or non-compliance.

Whether or not AMD is aware of any loss or non-compliance, has AMD made any efforts to determine whether any loss or non-compliance has occurred? Please describe AMD's efforts in detail.

B.    **Enterprise Level Preservation.**

"**March 11, 2005, AMD sent preservation letters to its IT personnel in its various offices. The oldest full backup of the Exchange servers and Windows environment, network servers were located and preserved.**"

Please describe, in detail, why AMD chose March 11, 2005, to send these letters. Please also confirm that the oldest full backup of the Exchange and Windows, network servers are being preserved. In this regard, we would appreciate a list of the location of the Exchange servers and the individual custodians subject to the legal hold that is on those servers. With respect to the windows environment and network shared files servers, we would appreciate a list of those servers, a general description of their content and the date upon which the backup was created.

"**Beginning March 19, 2005, full backups were made and retained. Over the next several weeks the backup schedules were coordinated; going forward, full backups are taken and retained every month.**" (10/24/05 AMD Letter at 1)

Please confirm, as represented, that full backups were being made and retained beginning on March 19, 2005, and on a monthly basis thereafter. In particular, confirm the location and storage of the backups, including whether the backups have or are being indexed. In this regard, are there any servers that were initially part of the March 19, 2005 backups that have been taken off the monthly backup process or added to the monthly backup process? In addition, is there a person or group of people responsible for this backup process at AMD? If so, please identify that individual(s).

"**The monthly full backups are retained in secure locations. Most of these sites send their tapes to Austin, although a few offices retain their backups locally. Compliance is tracked and monitored on a weekly basis.**" (10/24/05 AMD Letter at 1)

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 3

Have each of these backups been retained?  With respect to these backup tapes, are any of these tapes lost or missing or not readable?  In addition, has AMD attempted or restored any of these backup tapes and, if so, for what purpose?

> **"AMD's document retention and destruction policies were
> suspended to prevent inadvertent description of documents
> that may be relevant to this lawsuit." (10/24/05 AMD letter at
> 1-2)**

It is unclear what you mean by the policies were "suspended."  Was this suspension limited to categories of potentially relevant records to this litigation or to all records.  And was the suspension ever lifted for any custodian or corporate groups?  Please confirm that each of the custodians subject to the legal hold has, in fact, complied with this suspension directive?  Please state whether AMD's computer system has an auto-delete process

## C.     Custodian Level Presentation And Legal Holds.

> **"On April 1, 2005, AMD issued its first wave of document
> preservation notices to approximately 150 custodians likely to
> have relevant information.  The custodians were instructed to
> preserve all documents and data relevant to the lawsuit.  This
> includes, of course, e-mail." (10/24/05 AMD Letter at 2)**

> **"As additional custodians are identified, preservation notices
> are sent to them and they are put on the litigation hold.  To
> date, the list of custodians includes approximately 440 people.
> Appropriate follow-up is conducted as needed to ensure
> custodian understanding and continued compliance with that
> hold." (10/24/05 AMD Letter at 2)**

> **"The current count of custodians to whom a litigation hold has
> been issued is roughly 440.  AMD continues to assess the
> propriety of maintaining that hold with respect to all of these
> employees, some of whom AMD does not believe have any
> relevant information or involvement with any issue relevant to
> this lawsuit.  Accordingly AMD currently is in the process of
> reviewing its hold list and is considering paring that list, as
> appropriate." (10/24/05 AMD Letter at 3)**

Please provide a list of the 440 custodians originally issued a legal hold, and the date they were issued the legal hold.  To the extent any custodians were added, please identify them by

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 4

name, job title and office location, and indicate the day they were issued legal hold notices. If AMD has identified and removed from hold custodians that "it does not believe has any relevant information or involvement with any issues relevant to this lawsuit," please identify those custodians, the date they were removed from hold and the rationale as to why they were removed?

For each witness identified on AMD's Rule 26 disclosure, provide the date on which they were provided a legal hold notice, the date on which they were placed on journaling, and whether their emails are preserved on any monthly backup tapes. Please also identify each witness on AMD's Rule 26 disclosure who, at the time of the disclosure, had not been provided a legal hold notice, and an explanation of why they had not been provided a notice.

AMD has previously suggested that the parties exchange the content of their legal hold orders, and that the production of these orders will not constitute a waiver of any privilege, including a subject matter waiver. We accept this proposal. Please provide a copy of the legal hold order sent to AMD custodians (and any differing versions) and Intel will do the same.

> "When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate." (10/24/05 AMD Letter at 3).

Please identify any custodian that was originally subject to the legal hold notice, but was terminated. As to those employees, please confirm that AMD has undertaken the preservation obligations described above. With respect to AMD's efforts, what is meant by a forensic copy (e.g., bit-by-bit). Please identify any terminated employee, whose data has been lost.

### D.     E-mail Preservation

> "AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored." (10/24/05 AMD Letter at 1).

We remain confused regarding the steps that AMD has undertaken to preserve the potentially relevant e-mails in this action. In the course of our preservation discussions in the summer of 2005, AMD represented that it was relying upon the individual custodians to preserve the relevant e-mails by the issuance of the written legal hold notice. You further indicated, and

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 5

confirmed in writing, that "AMD was in the process of moving custodians to a new Exchange server on which e-mail could be more easily stored" and, presumably, backed up per the representations described in your October 2005 letter.

In the meeting in Los Angeles in February 2007, AMD indicated that it had implemented a "journaling system" to preserve potentially relevant e-mails. It is unclear what AMD means by a "journaling system." Are you merely describing using MS Exchange Journaling of all sent and received e-mails that are then written off to backup tapes or has AMD implemented an archive solution where the e-mail is written off to some type of a storage area network drive? We would appreciate a full description of what AMD has implemented, including its configuration, when it was implemented when specific custodians subject to the legal hold in this matter where added to the system and whether AMD has experienced an issues or problems with this system.

### E.    Harvesting of Drives

Please identify the dates upon which each custodian's drive was harvested or reharvested. With respect to those drives, please identify any drive that AMD has been unable to harvest for any reason.

### F.    One-Time Backup

**"AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups." (10124/05 AMD Letter at 2).**

**"The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and are now) coordinated worldwide." (10/24/05 AMD Letter at 2).**

We are concerned about the low number of tapes taken as part of this "one-time backup." Your letter suggests that for each server, there should be two tapes: (i) the oldest full backup in rotation at that time; and (ii) a new backup taken on or about March 19, 2005. Accordingly, this would mean that only 100 potential servers were backed-up.

It would also be helpful if AMD could identify the specific severs that were backed up and the general purpose of that server (e-g., Exchange, NT shared drive). With respect to these tapes, please confirm that they have been preserved as indicated in your October 2005 letter. In

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 6

addition, are any of these tapes lost or missing or not readable? In addition, has AMD attempted to restore or restored any of these backup tapes and, if so, for what purpose?

On a separate matter, your October 2005 letter indicates that the "oldest, full backup in existence as of March 11, 2005, was preserved. This would obviously mean that AMD was contemplating litigation as early as March 11, 2005. However, we are concerned that the first legal hold notices to custodians were not issued until April 1, 2005. (10/24/05 AMD Letter at 2). Accordingly, we would like to know when AMD first contemplated litigation, who was involved in the decision to file the instant action, when that decision was made, the specific dates of any communications or meetings in which the topic of potential litigation was discussed, when did the issue of preservation of potentially relevant records first arise, whether there was any discussion about the timing of the issuance of the legal hold records and who was involved in such discussions? To the extent you are asserting privilege around these communications, we would anticipate that you will provide us with log from which we can evaluate the claim of privilege.

Finally, to the extent AMD has information about any other issues relating to the preservation of its documents, please provide us with a full report. We look forward to hearing from you on the above issues. Of course, we will be happy to discuss our requests with you and respond to any questions you may have.

Very truly yours,

Robert E. Cooper

KEK:REC/lsj

100203202_1.DOC

# EXHIBIT C

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
IRVINE SPECTRUM
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

October 24, 2005

OUR FILE NUMBER
008,346-163

### VIA E-MAIL AND U.S. MAIL

WRITER'S DIRECT DIAL
(213) 430-6230

John J. Rosenthal, Esq.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

WRITER'S E-MAIL ADDRESS
dherron@omm.com

Re:     *AMD v. Intel:* eDiscovery Issue Regarding Preservation

Dear Mr. Rosenthal:

As agreed, this letter provides AMD's responses to the questions posed to Intel in Jeff Fowler's September 23, 2005 letter regarding preservation efforts.

### Overview of AMD's Preservation Efforts

Enterprise Level Preservation

- On March 11, 2005, AMD sent preservation notices to the appropriate IT personnel in its various offices. The oldest full backup of the Exchange servers and Windows-environment, network shared file servers were located and preserved.

- Beginning March 19, 2005, full backups were made and retained. Over the next several weeks the backup schedules were coordinated; going forward, full backups are taken and retained every month.

- The monthly full backups are retained in secure locations. Most of the sites send their tapes to Austin, although a few offices retain their backups locally. Compliance is tracked and monitored on a weekly basis.

- AMD's document retention and destruction policies were suspended to prevent the inadvertent destruction of documents that may be relevant to this lawsuit.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 2

Custodian Level Preservation

- On April 1, 2005, AMD issued its first wave of document preservation notices to approximately 150 custodians likely to have relevant information. The custodians were instructed to preserve all documents and data relevant to the lawsuit. This includes, of course, e-mail. Like Intel, AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored.

- As additional custodians are identified, preservation notices are sent to them and they are put on the litigation hold. To date, the list of custodians includes approximately 440 people. Appropriate follow-up is conducted as needed to ensure custodian understanding and continued compliance with the hold.

**Responses to Follow-up Questions**

One-Time Backup

*How many total tapes were gathered during the snapshot?*
AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups.

*How are they organized/indexed?*
These backup tapes are organized by backup type (*i.e.*, Exchange or file server), by site, and by date.

*How were instructions for the one-time backup communicated?*
The instructions for AMD's monthly backup protocol were communicated in writing. Follow-up phone calls were made to the appropriate IT personnel to confirm understanding and compliance.

*Were all snapshots taken on June 20?*
The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and are now) coordinated worldwide.

*Have any backup tapes covering periods prior to June 20 been recycled?*
Prior to the initiation of the enterprise level hold on March 11, 2005, backup tapes were recycled and rewritten in the ordinary course of business.

*Have any backup tapes covering periods after June 20 been recycled?*
Monthly backup tapes for the Exchange and Window-environment, shared network servers have not been recycled since March 2005.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 3

*Is there a legal hold on any existing backup tapes other than those constituting the one-time backup?*
Legal holds on monthly backup tapes are described above.

*Has there been any subsequent effort to target certain systems or segments of the IT structure and conduct more regular backup snapshots of those targets?*
As noted, AMD is conducting monthly backups on its Exchange and Windows-based, shared file environment. This has resulted in a large collection of tapes storing the data collected over the time period specified.

Shared Sources

*Has [AMD] engaged in any preservation efforts for shared sources other than hold notices to custodians?*
As part of the Enterprise Level Preservation, AMD is retaining monthly full backups of its Exchange and Windows-environment, shared network servers – which includes data and documents from employees company-wide.

Custodian Legal Holds

*Exactly how many hold notices have been issued?*
The current count of custodians to whom a litigation hold has been issued is roughly 440. AMD continues to assess the propriety of maintaining that hold with respect to all of these employees, some of whom AMD does not believe have any relevant information or involvement with any issue relevant to this lawsuit. Accordingly, AMD currently is in the process of reviewing its hold list and is considering paring that list, as appropriate.

*How was the hold notice communicated?*
The preservation notice was communicated in writing. Follow-up phone calls were made and emails sent on an as-needed basis.

*Please describe in specific terms the instructions given to custodians for how to preserve their electronic documents.*
At the present time, AMD will adopt Intel's approach to responding to this question.

*Is there a procedure to monitor compliance with the legal hold? What is it?*
Yes. Compliance is monitored in part by requesting acknowledgement of the custodians' receipt and understanding of the hold notice. Periodic email communications are sent to custodians reminding them of their preservation obligations and providing an opportunity to raise any questions or concerns. Follow-up communications occur on an as-needed basis.

*Is there a procedure for preserving the documents of terminated employees?*
Yes. When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 4

*Are there different hold instructions for the custodian once his or her computer has been imaged for collection?*
Not at this time.

<u>Miscellaneous Sources</u>

*Does [AMD] archive Instant Messages?*
No. AMD's current instant messaging ("IM") system cannot be configured to save or log IMs. Accordingly, AMD does not have an instant message archiving system.

*What efforts are being made to prevent relevant data from being deleted in Instant Messaging systems?*
Custodians have been specifically instructed not to use IMs for business-related, substantive communication. Such business information is to be conveyed via email, memorandum, or other means that can be saved and retrieved. The litigation hold applies to require preservation of any communications by this or other means that is relevant to the lawsuit.

Please feel free to contact me if you have any questions.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

cc:    Rod Stone, Esq.

CC1:720688.8

# EXHIBIT D

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

March 19, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:   *AMD v. Intel*

Dear Rich:

As promised in my letter of March 11, this will respond to your March 4 inquiry regarding "known losses of relevant data from an AMD custodian's hard drive due to file corruption, lost laptop or other, similar means of loss." Based on our investigation to date, and consistent with our agreement of December 7, 2007, we describe below the apparent loss of relevant data by one of AMD's custodians during the preservation period.

Kazuyuki Oji experienced an inadvertent loss of email dated during the period October 1, 2005 through March 2007. As described more fully below, AMD has attempted to recover this lost data by obtaining all of Mr. Oji's email from all sources identified by AMD as reasonably likely to contain it. AMD currently is in the process of reviewing that data for production.

AMD hired Mr. Oji as a Regional Sales Manager on October 1, 2005. Mr. Oji has worked on the Toshiba account since joining AMD. From October 1 through December 1, 2005, Mr. Oji reported directly to Akihiro Nakamura, Director of Sales, who in turn reported to David Uze, then-President of AMD Japan. On December 1, 2005, Mr. Oji began reporting directly to Keisuke Matsumoto (who reported to Mr. Uze). Masatoshi Morishita began his tenure as President of AMD Japan on November 22, 2006, at which time Mr. Matsumoto -- Mr. Oji's then and current supervisor -- began reporting to Mr. Morishita. During the course of his employment, Mr. Oji's regular practice was to copy his supervisors on important emails related to Toshiba business, and he believes that he did so with respect to a predominant majority of such emails. Mr. Oji also copied Shunsuke Yoshizawa, AMD Japan Director of Marketing, on certain of his emails.

Mr. Oji preserved email principally on his laptop computer hard drive. He also periodically backed up files to his personal external hard drive. The loss of email occurred while

Richard Levy, Esq., March 19, 2008 - Page 2

he was attempting such a back up procedure. Specifically, during the weekend of March 24-25, 2007, Mr. Oji attempted to back-up .pst files containing his email covering the time period of October 2005 to March 2007 to an external hard drive in order to preserve them. Mr. Oji estimated that the total size of these .pst files was approximately three gigabytes. In attempting this back up procedure, it appears that Mr. Oji was working with two separate folders, one of which was empty and another of which contained the subject .pst files. It appears that Mr. Oji mistakenly transferred the empty file to the external hard drive and then deleted the folder containing his email .psts. When Mr. Oji realized what had occurred, he attempted to recover the deleted files but was unsuccessful.

Mr. Oji reported this data loss to AMD Japan IT on the next business day, Monday, March 26, 2007. AMD Japan IT personnel attempted to recover Mr. Oji's data in several ways.

First, IT personnel tried to locate a copy of that data that had been created when exchanging Mr. Oji's old laptop computer for a new laptop computer in November 2006. Pursuant to AMD Japan IT's standard procedures, the process for creating such a copy is to transfer the data from the old computer to an alternate storage location, transfer the data from that location to the new computer's hard drive and, after confirming successful transfer, to delete the image from the temporary storage location. This process was followed in Mr. Oji's case, such that IT's copy of Mr. Oji's data no longer existed. Second, IT personnel located and checked Mr. Oji's pre-November 2006 computer, but found that the data had been removed from the hard drive after it had been transferred to the new computer. Third, AMD Japan IT personnel purchased what they believed to be the best commercially-available data recovery software for the specific purpose of recovering Mr. Oji's lost files and ran it on Mr. Oji's laptop hard drive. Although some data was recovered (approximately 335 megabytes), the subject .psts were not. Finally, AMD Japan IT checked the file server but found no .pst files from the end of December 2006 (which would have been the date that such files possibly could have been temporarily copied to a file server when switching out Mr. Oji's old computer). In sum, despite these many efforts, IT personnel were unable to recover the inadvertently-deleted email files.

Intel adversely designated Mr. Oji on September 2007. AMD's counsel learned about Mr. Oji's inadvertent loss of data in November 2007. Given the fact and nature of the loss, AMD then immediately collected Mr. Oji's data from all of the sources on which he stored data as well as all back up or subsidiary sources that AMD identified as containing Mr. Oji's data.

First, consistent with its harvesting protocols, AMD obtained an image of Mr. Oji's laptop computer. AMD also obtained and extracted files from his personal external hard drive; obtained files from the personal network space assigned to Mr. Oji; and obtained files from Mr. Oji's home computer that were work-related.

Second, AMD obtained the 18 monthly back up tapes applicable to Mr. Oji covering the time period from October 2005 through March 2007. These back up tapes were made pursuant to AMD's back up tape protocols for this litigation. The applicable back up tapes were restored by an outside vendor, and the Exchange mailbox items related to Mr. Oji were extracted.

Richard Levy, Esq., March 19, 2008 - Page 3

Third, AMD conducted a search across its journaling system and vault repository for emails sent or received by Mr. Oji. This search captured emails sent or received by Mr. Oji for the AMD employees, some of whom were on those systems as early as November 2005.

Finally, AMD created a data repository of hard drive images of the laptop computers and, as applicable, the personal network space of the five supervisors whom Mr. Oji regularly copied on work-related email, Messrs. Nakamura, Uze, Matsumoto, Morishita and Yoshizawa. This material was searched for Mr. Oji's emails, which were exported for review.

On February 15, 2008, AMD produced 21,345 of Mr. Oji's files to Intel. Both the data collected from Mr. Oji's own computer and storage devices as well as the additional data referenced above contain a significant amount of Japanese language text. That material is currently under review for anticipated production by March 31, the date by which each side is to supplement productions with foreign language documents. AMD will make its best efforts to produce all of Mr. Oji's responsive data by that date, but it is possible that review and production of some portion of the recovered data will not be concluded by that time. Should that be the case, we will keep you apprised of our progress.

Given the significant document production on February 15, AMD continues to assess and monitor document preservation and possible data losses, and we assume Intel is doing so as well. AMD will make additional disclosures promptly, if any become necessary.

If you have questions, please feel free to contact me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1145562.1



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

May 14, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

This responds to your March 28, 2008 letter, and provides additional information about AMD's evidence preservation program and efforts.

We begin by recounting the status of AMD's disclosures and the parties' agreements about them. As you know, at AMD's request, the parties exchanged information about their respective evidence preservation plans early in the case. On April 11, 2007 -- which, not coincidentally, was right before Intel's disclosure and proposed plan to remediate its own acknowledged evidence preservation failures was due by Court order -- Intel launched a broad, intrusive and unwarranted inquiry into AMD's preservation efforts. Despite AMD's subsequent responsive disclosures to the extent appropriately called for, Intel then served a document request and deposition notice under Rule 30(b)(6). AMD responded by objecting, but also by agreeing to supply further information wholly sufficient for Intel's professed desire to assess AMD's preservation program.

Meet and confer efforts culminated in your letter of November 7, 2007, which professes Intel's intent to "narrow, or even eliminate, the issues that might be open for discovery." Your letter goes on to "outline the areas that we propose to now pursue," represents that Intel had "reduced considerably the number of topics for which we are requesting information," and states that your proposal, if accepted, would "result in what we view, as an appropriate exchange of information." In response, our November 27 letter then outlined the reciprocal disclosures which AMD agreed to make. That letter exchange constituted, in our view, agreement on the AMD disclosures that would fully satisfy Intel's Rule 30(b)(6) discovery, and agreement that the parties' exchanges of litigation hold notices and harvest dates would occur simultaneously.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 2

Your March 4, 2008 letter reconfirmed this agreement by defining the information Intel was requesting in precisely the same order and using almost precisely the same language as set forth in my November 27 letter to you. On March 11, 2008, AMD produced more information, including a summary of AMD's Backup Tape Retention Protocols, and AMD's custodian journaling dates. Our March 19 letter then disclosed in detail the now-remediated loss of data related to Mr. Oji.

We view your next letter of March 28, 2008, as Intel's attempt to seize upon the isolated data loss of a single AMD custodian, Mr. Oji, to substantially broaden inquiry already properly narrowed by agreement. In particular, AMD does not agree that this loss means that "Intel and AMD should be on equal footing," or somehow justifies your "request that [Intel] get additional information and assurances from AMD similar or identical" to those the Court required of Intel as a consequence of its wide-spread evidence preservation failures.

In short, Intel's attempt to equate a single, isolated mishap of an AMD custodian with Intel's institutional-level failure to implement and monitor a proper preservation program is unjustified and inappropriate. Despite our several requests, Intel has not cited any authority or facts that would even begin to justify the vastly expanded, intrusive and burdensome discovery Intel apparently contemplates and which goes well beyond what was agreed upon last year. Instead, your March 28 and April 24, 2008 letters refer only to still-unexplained supposed "irregularities" in AMD's preservation efforts, or attempt to leverage Mr. Oji's loss. We must assume that if Intel truly believed there were "irregularities in AMD's retention efforts" that somehow justified this attempted broadening of preservation discovery, it surely would have said something to us long ago.

As you know, AMD has committed itself to producing the information reasonably necessary to Intel's ability to assess AMD's preservation program and efforts, and we have also repeatedly acknowledged AMD's commitment to inform Intel of data loss. To that end, this letter and the attached materials provide the information AMD has previously agreed to supply. And in an effort to reach a compromise on the remaining items requested in your March 28 letter, we also supply additional information which we think should be more than sufficient.

These disclosures are made by AMD in keeping with our agreements on these topics, and on the understanding that they are made in full and complete satisfaction of Intel's Rule 30(b)(6) deposition notice and document request. After these disclosures and other limited disclosures (as outlined below) that the parties may agree to are completed, we expect Intel to formally withdraw that discovery and bring this costly, burdensome and largely unnecessary exercise to a close. In addition, AMD's disclosures in this and all prior letters, as well as the attachments thereto and any other disclosures AMD has made to Intel regarding preservation issues, are made without waiver of the attorney-client privilege or work product protection.

We now respond to the specific issues raised in your March 28 letter.

1.     Harvest Dates: We appreciate Intel's March 28, 2008 disclosure of harvest dates for its custodians over the time period between August 2007 to December 31, 2007, which AMD

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 3

has been requesting for some time. (*See* our letters to you dated November 27, 2007, and March 11, 2008.) Attached at Tab 1 are all of the harvest dates for designated AMD production custodians that have not previously been provided. We also provide a list of "deposition reharvest" dates for all AMD custodians for whom Intel has thus far requested such reharvests. We do not believe that Intel has produced deposition reharvest dates for its custodians. Please do so now.

You will see that the list at Tab 1 does not include the party-designated custodian "reharvest" dates, i.e., the dates on which additional harvesting was conducted of party-designated custodians in order to bring their production forward to the June 1, 2006 production date as called for by Case Management Order No. 3. We are willing to discuss whether that information should be provided, but do not believe that it is important or necessary to any assessment of AMD's preservation or production.

Here's why. Judge Farnan signed Case Management Order. No. 3 on September 19, 2007. That order, of course, required each side to supplement party-designated custodians' productions through June 1, 2006. At that time, AMD began conducting any reharvests that were necessary to fill any data "gaps" between the prior production and the June 1, 2006 cut-off date. AMD's harvesting protocols -- including those followed in regard to party-designated custodian reharvesting through June 1, 2006 -- are described in the six-page disclosure titled "Summary of AMD's Document Collection Protocols" that AMD produced to you on November 16, 2007. To reiterate, in connection with that reharvesting, AMD obtained custodial data for each custodian from all appropriate sources to assemble a full and complete collection for review and production. This included re-imaging of computer hard drives and harvesting from AMD's journal and vault, in addition to harvesting from other data sources. That harvesting occurred after September 19, 2006, and obviously before all relevant documents were produced to Intel on February 15, 2008. Given AMD's prior disclosures and the information supplied here, we do not believe that a request for each subsequent harvest date serves a legitimate purpose. If you believe this information nevertheless should be provided, please explain.

Finally with respect to harvesting dates, your March 28, 2008 letter requests such dates for all custodians on AMD's "master custodian list," rather than merely those custodians who are "in-play" by reason of having been designated as a production custodian by AMD or Intel, or a free throw custodian. AMD declines to produce that information. Whether and to what extent AMD has harvested data from non-production custodians is irrelevant to any issue in the case, and also constitutes our work product. In any event, AMD declines to undertake this unnecessary and undue burden and expense.

2.    Journaling Dates:  AMD has provided its journaling dates to Intel. Intel has not reciprocated. We have requested this information repeatedly. Your March 28 letter promises it, but we still do not have it. Please tell us the date by which Intel will provide this information.

3.    Mr. Oji's Data Loss Issues:  Your March 28 letter poses seriatim a long list of questions concerning issues purportedly relevant to Mr. Oji's loss of data. Other than to try to equate Mr. Oji's loss to Intel's own catastrophic preservation failings, we are at a loss to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 4

understand why Intel would attempt to seize on this isolated loss of a defined, limited and now-remediated set of data with such stridency. Nor do we believe most of the additional inquiries you have made are reasonable.

AMD has already disclosed the details concerning Mr. Oji's inadvertent loss of data, including: When the loss occurred; detailed facts about how the loss occurred; the probable volume of data that was lost; when AMD's IT department learned of the loss; the precise sources of replacement data AMD identified and why those sources seemed likely to yield the most responsive data; who Mr. Oji regularly sent emails to; and the backup tapes containing the files that AMD obtained, restored and extracted. We urge you to identify *any* disclosure made by Intel with respect to *any* of its custodians that contains even remotely this range of information or level of detail, or *any* indication of the estimated volume of lost data. We are aware of none.

The vast majority of the questions posed in your March 28 letter also are best answered by Mr. Oji himself. On April 11, 2008, we offered in writing to bring Mr. Oji to the United States for deposition so that you could ask him whatever you like about his accidental loss. Intel has declined that offer. We renew that offer now.

In addition, we note that Intel is asking for information that Intel has itself refused to provide under claims of privilege and work product. You are directed, for example, to pages 186-87, 193, 315 and 420 from Ms. Almirantearena's deposition. There, Intel instructed the witness not to answer questions concerning the timing and circumstances of Intel's counsel's discovery of Intel document preservation lapses.

We assume you agree that AMD cannot reasonably be asked to provide information Intel simultaneously asserts to be privileged and work product. Again in the spirit of compromise, however, in addition to our offering Mr. Oji for deposition, AMD will supply you with the following, which should adequately resolve any bona fide issues concerning Mr. Oji. First, you have asked for documents showing what AMD did in order to recover Mr. Oji's files. Attached at Tab 2 are three emails between Mr. Oji and AMD Japan's IT personnel that are dated as of the first several business days after Mr. Oji experienced the accidental loss. These are written in Japanese. For your convenience, we have attached a non-certified translation. These emails demonstrate that Mr. Oji reported the loss immediately, and that AMD Japan IT personnel tried every conceivable means to recover the lost data immediately after the loss occurred.

Second, you have asked that AMD restore the backup tapes for each of Mr. Oji's "frequent correspondents" as identified in our March 19, 2008 letter to you. AMD agrees to this, and is in the process of restoring the tapes now. All relevant, non-duplicative material that is recovered, if any, will be produced by AMD as soon as reasonably possible. We will keep you apprised of our progress.

4.    Intel Inquiries Regarding Back-Up Tapes and AMD's IT Infrastructure: Your March 28 letter raises four issues on these topics. First, you now ask that AMD provide a narrative "describing the relevant AMD IT infrastructure." AMD agrees to do so.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 5

Second, you state that you have a number of questions with respect to AMD's written disclosure about its backup tape protocols, but do not identify those questions. Please send us a list of your questions so that we can answer them if appropriate.

Third, you ask AMD to confirm that it has conducted a physical inspection of each and every backup tape generated for each and every server for each and every month since March 2005, and to confirm that AMD has all information for every AMD custodian on such backup tapes. AMD declines to do this. Our prior written disclosure clearly and adequately explained that AMD has retained monthly backups for all relevant Exchange and file servers since March 2005 in 19 separate AMD locations across the United States and around the world. This regimen has worked and is working well, and AMD has no indication of any problems with it.

Compliance with your proposal would impose undue burden and expense on AMD and serve no legitimate purpose. This proposed audit would entail a world-wide adventure at huge expense. It also would entail restoring all those tapes simply in order to be able to represent with absolute specificity and certainty that each custodian's data was captured by backup tapes at each location and at all times. There is no good reason we can think of for you to ask this of us. If you disagree, please explain to us why you think this is justified,

Finally, you ask 10 separate questions about what data is captured on backup tapes. Our question to you is: Why does Intel need this information? We are prepared to discuss this. But many of the questions posed are of such a technical nature that Intel's own IT professionals or consultants ought to be able to answer them, and the balance of them strike us as requesting information that would be expensive and time-consuming to develop, for no apparent legitimate purpose. Please explain, and we will take the issue from there.

5.     Intel's and AMD's Litigation Hold Notices: We raise two issues about Intel's production of its hold notices and how that impacts the agreed-upon reciprocal exchange.

First, we are perplexed why it took Intel so long to produce its hold notices. We first asked Intel to produce them in March 2007. They were also the subject of AMD's first set of document requests regarding Intel's preservation failures. On May 15, 2007, AMD served its remediation discovery, Document Request No. 2 of which again requested production of "Intel's Litigation Hold Notices." On June 20, 2007, Special Master Poppiti ordered Intel to complete its production of these documents by *September 28, 2007.* On November 27, 2007, and again on March 11, 2008, we requested by letter that Intel complete its production of litigation hold notices, and we told you that AMD was prepared to provide a reciprocal exchange at that time.

On March 28, 2008, Intel finally produced what it now represents is the last of its custodian litigation hold notices. The hold notice produced is, quite incredibly, dated September 27, 2007 -- that is, one day before the Court-ordered production cut-off date and six months before the date it was produced. The second litigation hold-related item is a list from April 2007 of recipients of a litigation hold notice you previously delivered. We cannot fathom why it took Intel so long to produce this oft-requested information, or why Intel believes that it is free to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 6

disregard not only our repeated requests but also the Court's order. What we do know is that Intel's conduct has unnecessarily delayed the reciprocal exchange that AMD proposed long ago.

Second, Intel has still refused to respond to AMD's very specific questions about, or to produce, the litigation hold notices delivered by Intel to its IT personnel. As stated in both our November 27, 2007, and March 11, 2008 letters to you, here again is the issue:

> "[T]horough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006. (*See* my November 27, 2007 letter at page 2.)

> One of following three things must be true: (1) Intel has, in fact, already produced the litigation hold notices it directed to its IT personnel, but we have not located them; (2) Intel has not yet produced these IT-directed litigation hold notices; or (3) Intel did not issue litigation hold notices to its IT personnel at the times and for the purposes indicated in the foregoing paragraph. If (1), please direct us to the documents; if (2), let's please set a date for a mutual exchange; and if (3), please so state in writing so that we can have a written record of this fact."

If Intel issued a litigation hold notice to its IT personnel to take the so-called "complaint freeze," AMD surely is entitled to its production. If Intel did not do so, we expect Intel to so state in writing.

More important, however, is the issue of whether Intel issued instructions or hold notices of some kind to its IT personnel when Intel discovered its preservation failures -- which occurred as early as January 2006 and certainly no later than October 2006. At that time, Intel indisputably had only a limited number of its custodians on dedicated email servers backed up on a weekly basis; hundreds more had not been migrated to any such server; many custodians were already known not to be complying with Intel's litigation hold notices; and hundreds of other custodians had never been provided with litigation hold notices at all. Again, if Intel issued any such litigation hold notice(s) to its IT personnel at that time, AMD is entitled to their production; if not, Intel should so state in writing.

AMD has promised to produce the litigation hold notice issued to its IT personnel in March 2005 in exchange for Intel's production of the same material. We stand by that offer and agreement, and will comply as soon as Intel does. At this time, AMD produces at Tab 3 the remaining litigation hold notices, not already produced, that AMD issued to its document production custodians during the course of this litigation. AMD's now-completed productions, taken together, constitute a complete set of such litigation hold notices.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 7

6.    Litigation Hold Notice Dates: You have asked that AMD prepare a chart showing when each of its custodians received litigation hold notices. AMD agrees to do so with respect to its designated production custodians in exchange for Intel's production of the same chart for its designated production custodians. We are prepared to exchange these charts whenever you would like.

7.    Litigation Hold Dates for Particular AMD Custodians: On August 10, 2007, we advised you that two party-designated custodians did not receive written litigation hold notices until September 2006. Anticipating that Intel will agree to our proposal to exchange charts of litigation hold notice dates for production custodians, we inform you that those individuals are Fanny Chan (who received a written litigation hold notice on September 19, 2006), and Stan Lublin (who received a written litigation hold notice on September 18, 2006).

As to adversely-designated custodians, Kazuyuki Oji received a written litigation hold notice on November 10, 2006. During Mr. Oji's new-hire orientation conducted on or immediately after October 1, 2005, however, Mr. Oji was advised by Shunsuke Yoshizawa, AMD Japan Director of Marketing, about the existence of this lawsuit, and was instructed to preserve all information related to it.

Finally, Makoto Kato, located in AMD's Tokyo, Japan, office, received a written litigation hold notice on November 10, 2006. Mr. Kato began his employment on April 1, 2006. Like Mr. Oji, Mr. Kato was advised by Mr. Yoshizawa immediately after his hire date about the existence of this lawsuit, and was instructed to preserve all information related to it.

8.    Auto-Delete: You have asked about auto-delete functions applicable within AMD. As stated previously, AMD has not implemented or used an auto-delete function within its Exchange environment. Individual employees are able to set up an auto-delete function on their own Outlook account, which would operate only as to their own email account. As you know from prior productions, the first and subsequent litigation hold notices delivered by AMD contained a "FAQ" section. With regard to electronic documents, the FAQ section instructs, in relevant part, that: "Also, please be sure to disable any auto-delete features on email (e.g., auto-delete of 'sent' email messages)."

AMD has identified a designated custodian who used an auto-delete setting on his Outlook account: Nick Kepler. AMD delivered a litigation hold notice to Mr. Kepler which included the foregoing instruction to disable "auto-delete" on July 5, 2005, and followed that with numerous reminders. On November 21, 2005, AMD IT migrated Mr. Kepler's email box into AMD's journal and vault archiving systems. During the time period between the July 5 and November 21, 2005, Mr. Kepler's Outlook account was set to not save "sent" items. Mr. Kepler, however, copied himself on relevant "sent" items and preserved those emails.

9.    Possible Custodian Data Loss: AMD discloses a possible data loss with respect to Michael Soares, a document custodian adversely designated by Intel. AMD provided Mr. Soares with a litigation hold notice on February 21, 2006. AMD IT migrated Mr. Soares' email account to its journal and vault archiving systems on March 30, 2006. It appears that after Mr. Soares'

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 8

email account was placed into AMD's email archiving system, he experienced a problem with his laptop computer, shipped it to AMD for repair, but the computer was lost or stolen during transit. In May 2007, AMD imaged for purposes of this litigation the computer Mr. Soares was then using. The hard drive used to make that acquisition failed. AMD sent that hard drive to an outside vendor, NDCI, to attempt to recover the data. NDCI was unable to recover any data from that failed hard drive.

Mr. Soares was on leave from AMD from June 2007 to January 2008, at which he separated from his AMD employment. He did not perform work for AMD during that time period. AMD obtained Mr. Soares' laptop computer upon his separation, but it does not seem to be the same computer of which an image was taken in May 2007. It thus appears that AMD was not able to obtain images of two separate laptop computers that Mr. Soares used during the same time period his email account was maintained on AMD's journal and vault archiving systems.

We have now advised you about all of the data losses of which AMD is aware with respect to its production custodians. We again acknowledge our professional obligation to make such disclosures in the future if and as we learn of them.

If you have questions about the foregoing, please feel free to call me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1146399.1

# EXHIBIT 18

## EXHIBIT B

### CATEGORIES OF
### DOCUMENTS AND TANGIBLE THINGS
### REQUESTED FOR PRODUCTION

1.      "AMD" shall mean and refer collectively to plaintiffs Advanced Micro Devices,

Inc. and AMD International Sales & Service, Ltd., including their respective past and present

officers, directors, agents, attorneys, employees, consultants, or other persons acting on either of

their behalf.

2.      "AMD Custodians" means and refers to the approximately 440 individuals

identified by AMD on its Custodian List served on June 1, 2006, pursuant to the Stipulation and

Order Regarding Document Production entered by the Court in this Litigation.

3.      "Complaint Freeze Tapes" means the tapes preserved in or about March 2005 as

described in David Herron's October 24, 2005 letter to John J. Rosenthal.

4.      "Documents" shall mean and include all "writings," "recordings" or

"photographs" as those terms are defined in Rule 1001 of the Federal Rules of Evidence.

Without limiting the generality of the foregoing, the term "documents" includes both hard copy

documents as well as electronically stored data-files including email, instant messaging, shared

network files, and databases.  With respect to electronically stored data, "documents" also

includes, without limitation, any data on magnetic or optical storage media (e.g., servers, storage

area networks, hard drives, back-up tapes, CDs, DVDs, thumb/flash drives, floppy disks, or any

other type of portable storage device, etc.) stored as an "active" or back-up file, in its native

format.

5.      "Email Journaling System" means the system that AMD activated for document

retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

6.    "Enterprise Vault" means the system that AMD obtained and implemented for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

7.    "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

8.    "Litigation Hold Notices" means and refers to the means by which AMD communicated its preservation obligations to its employees concerning the Litigation (regardless of the title or name given to such communications), including all oral, written or electronic notices, reminders, or other communications by AMD to AMD Custodians or other AMD employees.

9.    "Monthly Backup Tapes" means the tapes described in David Herron's October 24, 2005 letter to John J. Rosenthal.

## INSTRUCTIONS

1.    These requests call for the production of all responsive documents that are within the possession, custody or control of AMD, including its officers, directors, agents, attorneys, employees, and other persons acting on AMD's behalf.

2.    If any document covered by these requests is withheld by reason of a claim of attorney-client privilege, attorney work product protection, or any other privilege or protection, please furnish a log providing the following information with respect to each such withheld document:  date; author; recipients; general subject matter; and legal basis upon which the document has been withheld.

3.    Unless otherwise stated, the time period covered by these Requests is January 1, 2002 to the present.

## REQUESTS

1. The Litigation Hold Notices issued by AMD in connection with this Litigation.

2. Documents sufficient to show the design, architecture, operation, functionality, capabilities and implementation of AMD's Enterprise Vault system, including its reporting, search and production capabilities.

3. Documents sufficient to show the design, architecture, operation, functionality, capabilities and implementation of AMD's Email Journaling System, including its reporting, search and production capabilities.

4. Documents sufficient to show the harvest instructions and protocols employed for the harvesting of data from AMD Custodians.

5. Documents sufficient to show the failure of preservation, if any, of potentially relevant Documents, whether on a systemic or individual basis, from the hard drive of any AMD Custodian.

6. Documents sufficient to show the failure of preservation, if any, of potentially relevant Documents, whether on a systemic or individual basis, from the Complaint Freeze Tapes, Monthly Backup Tapes, Email Journaling System, Enterprise Vault or other preservation source.

7. Documents sufficient to show the following for each AMD Custodian: (a) the date(s) on which the Custodian's documents were harvested for the Litigation; (b) the date on which the Custodian was put on the Email Journaling System; (c) the date on which the Enterprise Vault was first used to capture and preserve email for the Custodian; (d) whether the Custodian has deleted any potentially relevant Documents from the hard drive of the Custodian's laptop or desktop computer; (e) whether the Custodian has deleted any potentially relevant email from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant Documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether the data for the Custodian has been preserved on Monthly Backup Tapes, and if so, for which specific months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes.

8. Documents sufficient to describe AMD's document retention and destruction policies, and steps taken, if any, to suspend such policies to prevent the destruction of Documents that may be relevant to the Litigation.

9. Documents sufficient to identify and describe AMD's IT infrastructure relevant to the support, storage (including email storage conventions), maintenance and back-up of electronic data relevant to this Litigation, including data residing on hard drives or other off-network media.

100284739_1.DOC

# EXHIBIT 19

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | MDL No. 1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES, LTD.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation,<br><br>Defendants. | C.A. No. 05-441-JJF |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendants. | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

## PLAINTIFFS' JOINT PRELIMINARY CASE STATEMENT

## REDACTED -- PUBLIC VERSION

First, the scope of discovery must track the evidentiary burden that the discovery is intended to meet. Here, Intel will undoubtedly hold Plaintiffs to a burden of establishing material exclusion, quantitatively, geographically (the relevant market is worldwide) and temporally. To meet it, Plaintiffs will need to develop admissible evidence that, but for Intel's wrongful conduct, quarter-to-quarter over a seven-year period AMD would likely have been able to win a larger share of its customers' business around the world. Necessarily, Plaintiffs must arm themselves with evidence of what Intel constraints were in place over those quarters for each of those customers in each of those locations.

Building this record is not something Plaintiffs can achieve with a few dozen depositions. The customer landscape is panoramic. In this brief alone, we have discussed fifteen OEMs, ten system builders, and nine distributors whose executives and purchasing agents were deeply involved in negotiating exclusionary deals with Intel. In annexes to this brief, we identify 206 Intel executives, managers, salespeople and engineers, as well as 280 of their customer counterparts, ████████████████████████████████████████████████████ ██████████ The numbers are great because over time, different people occupied seats at the negotiating table, and we are dealing with a seven-year time horizon.

Second, much of the testimony Plaintiffs need to elicit, and most of the documents they need to collect, will not be read or shown to the jury. Instead, this discovery will contribute to an overall admissible record of Intel's misconduct that qualified experts can summarize and upon which they can rely. In a case of this magnitude, the jury will see only the tip of a much larger iceberg that must be made up of admissible, record evidence. Accordingly, the scope of discovery cannot be defined, as Intel would prefer, by the number of witnesses likely to be called to testify or the number of exhibits a party may eventually offer into evidence.

# EXHIBIT 20

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197

(213) 229-7000

www.gibsondunn.com

RPLevy@gibsondunn.com

November 7, 2007

*Via E-Mail and U.S. Mail*

Direct Dial
(213) 229-7556
Fax No.
(213) 229-6556

Client No.
C 42376-00830

Charles P. Diamond
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, California 90067-6035

David Herron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    *Response of AMD to Notice of Taking Deposition and
Request for Production of Documents*

Dear Chuck and Dave:

On September 19, 2007, your office served the response of AMD to Intel's Notice of Taking Deposition and Request for Production of Documents. The response consisted primarily of objections and some agreements to provide information. Since that time, we have had a number of e-mail exchanges and telephone conversations concerning the follow-up discovery with regard to the issues raised in Intel's formal discovery requests. The purpose of this letter is to address other of Intel's inquiries and discuss the offer of "informal exchanges" that have been made by your office. In doing so, hopefully, we can narrow, or even eliminate, the issues that might be open for discovery. Accordingly, let me outline the areas that we propose to now pursue. In delineating certain issues now, it is not our intention to waive the right to pursue the discovery requested in the August 22, 2007 Notice and Request but instead to see if we can address the certain targeted issues. You will see that we have, in this letter, reduced considerably the number of topics for which we are requesting information which, in turn, should simplify your task and hopefully, result in what we view, as an appropriate exchange of information.

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  BRUSSELS  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond
David Herron
November 7, 2007
Page 2

1.   In connection with Depo Topic #4, (and RFP #3) which sought information concerning AMD's e-mail journaling system, we would like to depose a knowledgeable witness regarding these issues but understand that, at least for the time being, you will consider supplying us with a "informal exchange" similar to that which we did for the AMD Enterprise Vault System with Jerry Meeker.  Please let us know if you are willing to provide us with an exchange or interview and when we might do such an interview.  As you know, the Meeker interview lasted approximately an hour so clearly we are not interested in wasting anyone's time.  We are interested simply in learning how the system worked both from an AMD user's prospective and from AMD's IT perspective.

2.   You have also offered to provide us with written summary responses to Depo Topic #8 which asked for a witness on "AMD's harvest of data from AMD's custodians, including the harvest instructions and protocols employed and the identities of those persons involved in developing and executing such instructions and protocols."  Please let us know whether you are going to provide such a written summary and when we might expect it.

3.   Depo Topic #5 (RFP #2) asked for information concerning preparation, timing, contents and distribution of all Litigation Hold Notices including the identity (name, location and position) of anyone receiving such Litigation Hold Notice and the date of receipt by each AMD Custodian of each Litigation Hold Notice.  While AMD objected on the grounds of burden and over breadth (and we are not here debating whether any of the objections which you asserted are appropriate; only that we understand that you have made them), you noted that you had provided responsive information in your letters and disclosures of 8/10/07, 8/23/07 and 9/14/07.  You further noted that AMD has already provided Intel with its general forms of preservation notice on 9/6/07.  This is an area in which we do need to have some follow-up communications, determine whether AMD will provide us with a Rule 30(b)(6) witness, an informal exchange of information and/or have a meet and confer with regard to this (and related) discovery requests.

AMD has provided us, thus far, with three undated Litigation Hold Notices ("LHNs").  The first commences with the sentence "The Japanese FTC announced recently that Intel had violated Japanese antitrust laws.  We understand that other antitrust authorities are following these developments closely and may institute proceedings against Intel on their own."  Given the timing of the Japanese announcement, this notice "might" have been circulated sometime around the beginning of March 2005 - - but we do not know.  Your office has informed us that on 3/11/05, AMD sent preservation notices to "appropriate IT personnel" in its various offices but we do not believe we have yet received the notice.  This first (undated) LHN states that "we are asking key members of CPG and other AMD individuals with relevant information to preserve all documents – whether hard copy or electronic – relating to CPG's business."  This would not appear to be the notice that was sent on 3/11/05 to the IT personnel.  You also told us that, on 4/1/05, AMD issued it's "first wave of document preservation notices to approximately

GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond
David Herron
November 7, 2007
Page 3

150 custodians likely to have relevant information." Here, again, we cannot be certain whether this first LHN is the one referenced for 4/1/05. Moreover, in the "Frequently Asked Questions and Answers" attachment to this first notice, there is a section entitled "Electronic Documents" that states, in part, "be sure to disable any auto-delete features or email (e.g., auto-delete of "sent" email messages)." In Herron's 4/23/07 letter to Cooper, he makes the statement "because AMD, unlike Intel, did not employ a routine program of automatic deletion, AMD does not face the same move-it-or-lose-it data loss issues currently facing Intel. In short, AMD's email communications were being systematically preserved at the same time Intel's were being systematically destroyed." At other times, your office has referenced the fact that AMD did not have an "auto-delete problem." If so, the Q&A response "please be sure to disable any auto-delete features on email" is confusing to us. The example given (auto-delete of "sent" email messages) further muddles the picture.

The second Litigation Hold Notice (produced by AMD) is also undated but commences: "As you know, on June 27, AMD initiated legal proceedings against Intel Corporation and Intel KK Japan . . . ." This is clearly not the 4/1/05 AMD "First Wave of Document Preservation Notices to approximately 150 custodians" referenced in Herron's 10/24/05 letter. The second notice further states (in the third paragraph): "We are asking key members of the microprocessor solution sector (MSS), or its predecessor-the Computational Products Group (CPG) and other AMD individuals with potentially relevant information to preserve all documents – whether hard copy or electronic-relating to the MSS business." The Frequently Asked Q&A section states in part that "In April 2005, the Company announced the formation of the Microprocessor Solution Section (MSS) . . . . This realignment combined the Computational Product Group (CPG) . . . under one roof. The preservation notice is intended to cover only documents related to what was formally the CPG business-i.e. X86 General Purposed Microprocessors: Opteron, Athlon, Turion, Sempron, and their predecessors." Seemingly, since the first notice was undated but referenced only "key members of CPG," it must have been distributed before the formation of MSS, but we do not know when it was first circulated. Additionally, the second LHN's Q&A has the same reference as contained in the first: "Please be sure to disable any auto-delete features on email (e.g., auto delete of 'sent' email messages)."

Finally, the third undated LHN - - which also references the filing on June 27 of the AMD/Intel legal proceedings - - does not contain the reference in the Q&A to the auto-delete issue but states that "AMD is in the process of migrating the emails of all document custodians to the AMD Enterprise Vault Archival System. The new archival system allows AMD to turn on a feature called 'Journaling' for effected employees. When this feature has been activated for a mailbox, all new emails for that mailbox will be preserved immediately and indefinitely in the archive without any action required on the employees part." Jerry Meeker (AMD IT) informed us that the institution of the Vault System commenced in November of 2005 and we can only

**GIBSON, DUNN & CRUTCHER LLP**

Charles P. Diamond
David Herron
November 7, 2007
Page 4

assume this notice came out around that time but would like confirmation of the date it was first circulated.

    As you can see, there are a number of questions that arise as a result of the three LHNs that you have provided to Intel. One, of course, is whether or not there were any other LHNs sent. The second, is what was the notice sent to the "appropriate IT personnel" on March 11, 2005. The third is what were the approximate dates of the distribution of the three LHNs that we did receive. Additional questions go to when AMD "reasonably anticipated" the filing of the lawsuit against Intel and why AMD chose the beginning of March 2005 (or whenever the first LHN was circulated) as the time to commence its document retention efforts.

    After you have had an opportunity to review this letter, please let me know how you suggest we proceed. If you do not believe that it is AMD's obligation to provide us any further information in this regard, we can have a meet and confer so that the issues can be refined and presented to the Special Master. If you believe that other kinds of exchanges or perhaps even an appropriate Rule 30(b)(6) deposition can be taken, please let us know that too.

    4.  Depo Topic #6 asks for details and circumstances concerning any known or suspected non-compliance with the LHNs and the timing and nature of all steps taken following the discovery of any non-compliance. AMD objected to providing a witness (based on burden and over breadth) and indicated it already provided responsive information on 8/10/07, 8/23/07 and 9/14/07. In that correspondence, your office has assured Intel that AMD's document retention was working well and that you are unaware of any "systemic" problem with regard to AMD's document retention efforts. That obviously raises the question of what is meant by "systemic" problems and whether there are any "non-systemic" problems/issues that might have resulted in non-compliance with the LHNs that AMD circulated. We are in need of some form of definitive response in this regard. Perhaps, there was absolutely no problem encountered by AMD and that we were thrown off by the reference to "systemic" in the responses that we received. Regardless, we do need to address this issue.

    5.  Depo Topic #7 (RFPs #5 and #6) asks for details and circumstances of any known or suspected document retention failures, whether on a systemic or individual basis, and the preservation of potentially relevant documents on the AMD's Complaint Freeze Tapes, Back-Up Tapes, e-mail journaling system, Enterprise Vault System or hard drives of any AMD custodian. AMD objected on the grounds of burden, over breadth and further indicated that it provided us with some responsive information in the letters referred to in the paragraph above. Perhaps, here again, there is nothing to be discovered and a written response can be agreed upon.

    6.  Depo Topic #10 (RFP #7) asks, with regard to each AMD Custodian, (a) the date Custodian's documents were harvested for the Litigation; (b) date on which Custodian was put

GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond
David Herron
November 7, 2007
Page 5

on Email Journaling System; ( c) the date on which Enterprise Vault was first used to capture and preserve Custodian's email; (d) whether Custodian deleted any potentially relevant documents from the hard drive of Custodian's desktop or laptop; (e) whether Custodian has deleted any potentially relevant emails from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether data for the Custodian has been preserved on Monthly Backup Tapes, and if so, what months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes. AMD objected to this request on the grounds of burden, over breadth, relevance and additionally that the topic is inappropriate for deposition and to the extent that it requires AMD to restore, load and review back up tapes. We can probably reach some accommodation that will provide Intel with most of the information we have requested (much of which is covered in the requests referred to above) based upon some kind of a written summary. Nevertheless, we do need to address it.

7. Depo Topic #11 inquires about information concerning whether any "AMD custodian manually deleted or otherwise lost any potentially relevant electronic data prior to the date on which the custodians data was harvested and posed some follow-up questions. Perhaps this request can be responded to when we address Depo Topics #6 and #7 as referenced above.

As you can see, the discovery questions specifically addressed herein greatly reduce the original requests that we have made and are specifically targeted. After you have had a chance to review this letter, please let me know when you would like to either meet to discuss these issues or whether we can anticipate some kind of written response or both. Thanks very much for your attention to these matters.

Yours very truly,

Richard Levy

RPL/shv/100333314_1.DOC

cc:    Robert Cooper
       Kay Kochenderfer
       Daniel Floyd

# EXHIBIT 21

# GIBSON, DUNN & CRUTCHER LLP

## LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197

(213) 229-7000

www.gibsondunn.com

RPlevy@gibsondunn.com

September 19, 2007

*Via E-Mail and U.S. Mail*

Direct Dial
(213) 229-7556

Fax No.
(213) 229-6556

Client No.
C 42376-00830

James Bo Pearl
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, California 90067-6035

Re:    *AMD v. Intel:  Notice by Intel of 30(b)(6) Deposition*

Dear Bo:

In response to the email request that I sent to you and Mark, seeking to be notified of the identities of the people that would be attending the deposition Intel noticed for this Friday, I received your email sent at 5:03 a.m. yesterday morning (hopefully, you were in Europe at the time). You reference the fact that your office has done a "diligent search" and has "not located any legal authority which could justify the discovery Intel seeks." You support this statement by writing that "Intel's failure to provide any such authority, despite our previous written request to you" evidently underscores our legal research. We will address these points herein.

In Chuck Diamond's letter to Bob Cooper of August 23, 2007, Chuck requested a "meet and confer" regarding the propriety and scope of the 30(b)(6) deposition notice. My understanding is that a "meet and confer" was held on September 7, at our offices, regarding several topics and that no one from your office brought up this issue at that time. Moreover, the request for the legal research for a deposition notice that is otherwise authorized under the Federal Rules of Civil Procedure, Rule 26(b)(1) and Rule 30 makes little sense to us. AMD has for months now been informing us that it has instituted document retention protocols and directives to its personnel. In his August 10, 2007 letter, Mark Samuels informed us that AMD was "pleased to report that our preservation program appears to be operating as designed and intended; no lapses in their program have been identified." Despite these representations, we provided your office with information concerning what our investigation to date has disclosed

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   BRUSSELS   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

GIBSON, DUNN & CRUTCHER LLP

James Bo Pearl
September 19, 2007
Page 2

concerning several discrepancies in those programs. While we have recently received some assurances from your office, together with dismissive responses and threats of retaliation about our concerns, we are entitled to investigate Mark's statements that AMD's program "appears" to be "operating as designed and intended." *See*, FRCP 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant . . . , including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things . . . .")

Indeed, deposing an opposing party regarding its document retention practices, seems uncontroversial. For example, in *Doe v. District of Columbia*, 230 F.R.D. 47, 55 (D.C.C. 2005), the plaintiff sought to depose the defendant's 30(b)(6) witness on, inter alia, the defendant's "document retention policies and procedures, and the process used to collect the documents that have been produced or will be produced by the [defendant] in response to plaintiff's requests for production of documents." Defendant objected to the deposition notice on the grounds of privilege. *Id.* The court rejected that argument, explaining that Rule 26(b)(1) "allow[s] for discovery of document production policies and procedures in allowing '[p]arties [to] obtain discovery regarding any matter, including the existence, description, nature, custody, condition, and location of any documents,'" and therefore plaintiff may "request information as to the 'existence,' 'custody,' or 'condition' of documents[.]" *Id.* at 56 (quoting Fed. R. Civ. P. 26(b)(1).

In Mark Samuels' most recent letter of September 14, 2007, he informed us that AMD unilaterally adopted a "near duplicate" protocol instead of a complete de-duplication called for in the Court ordered Stipulation. It is unclear from your letter precisely what that protocol is, but it does not appear to be the same protocol that was agreed upon and provided to the Court. That same letter references that there are various items evidently from Mr. Calandra's data, that "is in the queue for review and production to Intel." Mark also referenced recent productions of Mr. Calandra's documents, productions which, unfortunately, our e-discovery vendor has informed us are corrupt. (We have brought this to your office's attention and hopefully we will be receiving an uncorrupted version soon.) In any event, Mark's assertion that AMD has not completed its production for this custodian is in seeming contrast to Linda Smith's unambiguous confirmation to Mark Weber, in her May 8, 2007 letter, in which she stated "AMD will complete its production of all of its party-designated custodians on May 21, 2007."

In short, based on the limited information AMD has provided at this time, it appears that AMD has not completed its production, has adopted a de-duplication protocol with which Intel is unfamiliar, and has not fully responded to inquiries regarding the subject of legal hold notices, the timing of legal hold notices, the use of, and disabling of, AMD's "auto-delete function" on individual AMD computers and other issues pertinent to the understanding of AMD's document production and retention practices. Certainly, AMD thinks that such similar questions with regard to Intel's production are relevant. We are simply pursuing similar information in what

## GIBSON, DUNN & CRUTCHER LLP

James Bo Pearl
September 19, 2007
Page 3

seems to be the most logical, reasonable, time efficient manner provided for under the Federal Rules

We believe that the 30(b)(6) deposition should go forward as noticed, but assume that you will not produce a witness this week even though no motion for a protective order will be filed. We will, therefore, take you up on your offer to "provide some of the information" that has been requested by Intel "in an informal exchange." We are available to be at your office in connection with such an informal exchange at your earliest convenience, but we suggest doing so on the morning of September 26th or 27th. At such time, if you would like, we can also discuss any of the issues you may wish to discuss concerning our scheduled 30(b)(6) deposition.

In the meantime, we are not intending to waive any rights Intel may have to insist that such a deposition was appropriately noticed and should go forward. Please let us know if either of the dates offered for your suggested meeting are acceptable.

Yours very truly,

Richard P. Levy

RPL/shv
100301758_1 (2).DOC

cc:    Mark A. Samuels
       Robert E. Cooper
       Kay E. Kochenderfer

# EXHIBIT 22

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | MDL No. 05-1717-JJF |

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | C. A. No. 05-441-JJF DM No. 4 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) | C. A. No. 05-485-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) | |

### DECLARATION OF RICHARD P. LEVY

I, Richard P. Levy, declare as follows:

1.    I am a partner at Gibson, Dunn & Crutcher LLP, am a member in good standing of the State Bar of California and am admitted *pro hac vice* to the Bar of the District Court for the District of Delaware. I am one of the counsel of record for Intel Corporation and Intel Kabushiki Kaisha (collectively, "Intel") in this matter. I have personal knowledge of the facts stated in this declaration and could testify about them competently.

2.    On or about August 22, 2007, Intel propounded to AMD a deposition notice pursuant to Federal Rule of Civil Procedure ("FRCP") 30(b)(6) and document requests pursuant to FRCP 34. During the period following issuance of those discovery requests and continuing through the spring

of this year, I was primarily responsible for communicating on behalf of Intel with AMD's attorneys at O'Melveny and Meyers LLP, including David Herron, by letter, email and telephone regarding those discovery requests.

3.    I have reviewed AMD's Motion to Quash filed on or about June 11, 2008, and also the supporting declaration of Mr. Herron. Based on these filings, I understand that AMD has argued or implied that Intel agreed to accept informal representations from AMD's counsel relating to certain discovery requests in lieu of any formal discovery responses.

4.    Neither I, nor (to my knowledge) anyone else acting on behalf of Intel ever agreed (orally or in writing) to waive Intel's right to receive formal responses to the discovery requests served by Intel on August 22, 2007. I have reviewed the correspondence submitted by AMD in support of its motion and nothing in those communications indicates an intention by Intel to waive formal discovery. To the contrary, I intentionally preserved Intel's right to enforce the outstanding discovery requests. For example, my November 7, 2007 letter to AMD's counsel, Mr. Diamond, expressly states that, despite the ongoing exchanges of information between Intel and AMD's counsel, "it is not [Intel's] intention to waive the right to pursue the discovery requested in the August 22, 2007 Notice and Request." *See* Herron Dec. Ex. J.

5.    Intel never withdrew, and never advised AMD that it intended to withdraw, its pending discovery requests.

6.    I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on June 30, 2008 in Los Angeles, California.

By: _____
RICHARD P. LEVY

100475188_1.DOC