# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | )<br>)<br>)  MDL No. 05-1717-JJF<br>)<br>)<br>) |
| ADVANCED MICRO DEVICES, INC. a Delaware<br>corporation, and AMD INTERNATIONAL SALES<br>& SERVICE, LTD., a Delaware corporation, | )<br>) **(DM 12)**<br>)<br>) |
| Plaintiffs, | )  C. A. No. 05-441 (JJF)<br>) |
| v. | )<br>) |
| INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation, | )<br>)<br>) |
| Defendants. | )<br>) |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | )<br>)<br>) |
| Plaintiffs, | )  C.A. No. 05-485-JJF<br>) |
| v. | )  CONSOLIDATED ACTION<br>) |
| INTEL CORPORATION, | )<br>) |
| Defendant. | )<br>) |

## INTEL'S OPPOSITION TO MOTION OF UNION FEDERALE DES CONSOMMATEURS – QUE CHOISIR TO INTERVENE FOR THE PURPOSE OF SEEKING MODIFICATIONS TO PROTECTIVE ORDER AND APPLICATION PURSUANT TO 28 U.S.C. § 1782

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Michael L. Denger
Joseph Kattan, PC
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036-5306
(202) 955-8500

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  July 3, 2008

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................3

        A.     Intel and the third parties have produced millions of pages of their most
              sensitive confidential business documents.................................................3

        B.     The Protective Order was intended to prevent the use of Confidential
              Discovery Materials in foreign litigation or investigations. ....................5

        C.     Intel and the third parties relied upon the Protective Order in producing
              their confidential business information.......................................................6

        D.     QC seeks permission to use Confidential Discovery Materials in an
              unspecified set of proceedings in Europe. ................................................6

III.    ARGUMENT.............................................................................................................7

        A.     QC Must Satisfy A Two-Part Inquiry Under § 1782.................................7

        B.     This Court Does Not Have Discretion To Grant QC's Application Because
              QC Cannot Satisfy The Threshold Requirements Under § 1782..............9

              1.     QC is not an "interested person" in the EC investigation. ...........9

              2.     QC's speculative future damages litigation cannot be a basis for
                     judicial assistance under § 1782. ...............................................11

        C.     The Discretionary Factors Under § 1782 Weigh Strongly Against QC's
              Application With Respect To The EC Investigation ...............................13

              1.     The EC does not need assistance from QC in obtaining documents,
                     because it has the power to obtain all the information it needs. ...14

              2.     The EC is not receptive to U.S. judicial assistance in connection
                     with private applications under § 1782.......................................17

               3.     QC's Application is an attempt to circumvent EC procedures. .....18

               4.     QC's § 1782 Application is vastly overbroad and unduly
                     burdensome. ................................................................................21

D. The Discretionary Factors Under § 1782 Likewise Weigh Against QC's Application With Respect To Purported Future Damages Litigation In Unspecified European Courts ...............................................................................24

 1. A court in Europe hearing QC's claims could order discovery that is appropriate under the laws and procedures of that jurisdiction. ...........24

 2. QC has offered no basis to suggest that a court in France or any other EU Member State would be receptive to U.S. judicial assistance under § 1782. ........................................................................25

 3. QC's Application is an attempt to circumvent European law...................26

 4. QC's § 1782 request is overly broad and unduly burdensome .................28

E. The Court Should Deny QC's Requested Modifications To The Protective Order ..........................................................................................................29

 1. QC's proposed modifications to the Protective Order would threaten substantial prejudice to Intel and the third parties. ......................30

 2. The Court should deny QC's request to modify the protective order because the litigants and third parties have relied on the Protective Order in producing their documents ..........................................................32

 3. The considerations that sometimes weigh in favor of opening a protective order are absent here. ................................................................33

F. The Court Should Look Upon QC's Application With A Skeptical Eye .............35

CONCLUSION.....................................................................................................................37

## TABLE OF AUTHORITIES

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.*,
  2004 WL 2282320 (N.D. Cal. Oct. 4, 2004).................................................................... *passim*

*Beckman Indus., Inc. v. International Ins. Co.*,
  966 F.2d 470 (9th Cir. 1992) ................................................................................................34

*Glenmede Trust Co. v. Thompson*,
  56 F.3d 476 (3d Cir. 1995).............................................................................................30, 33

*In re Application of Digitechnic*,
  2007 WL 1367697 (W.D. Wash. May 8, 2007)...................................................................8, 27

*In re Application of Microsoft Corp. (Novell)*,
  2006 WL 1344091 (D. Mass. Apr. 17, 2006) ........................................................14, 16, 18, 21

*In re Baycol Prods. Litig.*,
  2003 WL 22331293 (D. Minn. May 6, 2003).........................................................................31

*In re Crown Prosecution Serv.*,
  870 F.2d 686 (D.C. Cir. 1989)..............................................................................................12

*In re Digitechnic*,
  2007 U.S. Dist. LEXIS 33708 (W.D. Wash. May 8, 2007).....................................................27

*In re Letters Rogatory from the Tokyo Dist. Prosecutor's Office*,
  16 F.3d 1016 (9th Cir. 1994) ................................................................................................11

*In re Microsoft Corp. (IBM)*,
  428 F. Supp. 2d 188 (S.D.N.Y. 2006)...........................................................................14, 16, 18

*In re Microsoft Corp. (Sun)*,
  2006 U.S. Dist. LEXIS 24870 (N.D. Cal. Mar. 29, 2006)............................................14, 19, 20

*In re Oxus Gold PLC*,
  2006 U.S. Dist. LEXIS 74118 (D.N.J. Oct. 10, 2006)............................................................11

*In re Plastics Additives Antitrust Litigation*,
  2005 U.S. Dist. LEXIS 23771 (E.D. Pa. Aug. 24, 2005)...................................................30, 32

*In re Request for Assistance from Ministry of Legal Affairs of Trin. & Tobago*,
  848 F.2d 1151 (11th Cir. 1988) ............................................................................................11

*In re Rubber Chemicals Antitrust Litig.*,
  486 F. Supp. 2d 1078 (N.D. Cal. 2007) ...........................................................................14, 28

*Intel Corp. v. Advanced Micro Devices, Inc.,*
542 U.S. 241 (2004)..................................................................................8, 9, 12

*Lancaster Factoring Co. v. Mangone,*
90 F.3d 38 (2d Cir. 1996)......................................................................................11

*Martindell v. International Telephone & Telegraph Corp.,*
594 F.2d 291 (2d Cir. 1979)..................................................................................33

*Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada,*
384 F. Supp. 2d 45 (D.D.C. 2005).........................................................................28

*Pansy v. Borough of Stroudsburgh,*
23 F.3d 772 (3d Cir. 1994)............................................................................. *passim*

**Statutes**

28 U.S.C. § 1782............................................................................................ *passim*

28 U.S.C. § 1782(a) .............................................................................8, 16, 19

**Other Authorities**

Michael Freedman, "Can You Say Tort? A Washington attorney is on a crusade to export America's legal system around the world. Call your lawyer." Forbes (Dec. 20, 2004) (avail. http://www.forbes.com/global/2004/1220/022_print.html) ........................36

Peter Geier, *Europe a wary step closer to class actions*, NAT'L LAW J., Dec. 4, 2006, excerpt available at http://www.cmht.com/NLJ_120406.php .................................................35

Alexia Garamfalvi, *U.S. Firms Prepare for European Class Actions*, LEGAL TIMES, June 25, 2007, available at http://www.law.com/jsp/llf/PubArticleLLF.jsp?id=1182762353567......................................35

Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L. Rev. 427 (1991) ................................................................................33

Intel Corporation ("Intel") hereby opposes the motion of Union Federale des Consommateurs - Que Choisir ("QC") to intervene for the purpose of seeking modifications to the protective order entered herein by the Court on September 26, 2006 ("Protective Order") and the application of QC pursuant to 28 U.S.C. § 1782 for an order requiring Intel and third parties to provide access to documents and deposition testimony for use in foreign proceedings (the "Application").

## I.    INTRODUCTION

QC seeks to modify the Protective Order to provide it with access to well over a hundred million pages of sensitive confidential business information of Intel and dozens of third parties that participate in the microprocessor and computer industries. QC's reasons for seeking access to this highly sensitive information come nowhere close to justifying the relief it seeks.

QC first claims that it needs access to this confidential information so it may assist the European Commission ("EC") in connection with its investigation of Intel. The EC, however, has consistently made clear that it does not want or need assistance in pursuing its investigations from U.S. district courts based on private applications under § 1782. In a letter that is submitted herewith, the EC has stated that its position is no different with respect to QC's Application. *See* Supp. Decl. of James S. Venit ("Venit Supp. Decl."), submitted herewith, Exh. A.

The EC itself is fully capable of obtaining the information it needs through its own procedures – as it has shown consistently throughout its investigation. Indeed, as recently as May 2008 the EC asked Intel to provide certain documents that had been produced in the U.S. litigation and that the EC deemed to be relevant to its investigation. In contrast to the EC, private third parties such as QC are prohibited under European law from taking their own discovery in connection with an EC investigation. To circumvent that limitation, QC has come to this Court seeking discovery not permitted under European law. But Section 1782 was not

enacted to allow foreign entities to use the U.S. district courts to obtain greater access to information than could be obtained under their own laws or from their own governments.

QC also contends that it is seeking the confidential information produced in the U.S. litigation for use in some future private damages litigation in as-yet-unidentified European courts. QC, however, can only speculate as to whether or when it will ever bring such litigation, who the parties might be, or in what court such claims might be brought. Moreover, if QC ever does bring such a claim, the laws and procedures of the jurisdiction in which the claim is brought will determine the scope of discovery it may obtain. There is no basis to permit QC to jump the gun on any such proceedings or to use this Court to circumvent the laws and procedures of France or any other EU Member State in which QC may eventually seek to bring its suit. If QC is entitled to conduct discovery in Europe, then it may do so there; on the other hand, if QC has limited or no rights to conduct discovery in Europe, then it may not turn to a U.S. district court to circumvent European laws and procedures.

On the other side of the balance, it would impose substantial burdens on Intel and the third parties if their confidential materials were turned over to QC. Modifying the Protective Order as requested by QC would create a substantial risk that the confidentiality of these materials would be lost, which would cause serious competitive harm to the producing parties. Critically, QC has not explained how this Court would have the power to enforce the terms of the Protective Order against QC – a foreign consumer association that is not a natural person and apparently has no assets in the United States – or its 124,000 members. Nor has QC explained how confidential materials would be kept confidential if QC used such materials in a foreign tribunal, or how this Court would have any power to ensure the confidentiality of information in the possession of a foreign tribunal. Moreover, even if the Protective Order were theoretically

2

enforceable over foreign entities and courts, QC's proposed modifications would impose a substantial burden on Intel and the third parties to protect the confidentiality of this information – including, for example, by pursuing QC to European courts for years to come to ensure that necessary restrictions are put in place. In light of the dubious justifications for QC's request, these burdens and risks are intolerable.

## II.   STATEMENT OF FACTS

### A.   Intel and the third parties have produced millions of pages of their most sensitive confidential business documents.

In response to the discovery requests in this litigation, Intel and the third parties have produced many millions of pages of documents. Intel alone has produced the electronic equivalent of over 150 million pages of documents. Decl. of Darren Bernhard ("Bernhard Decl."), submitted herewith, ¶ 3. The documents produced by Intel include some of Intel's most sensitive confidential business information, including pricing information, sales and marketing strategies, documents relating to negotiations with customers, product roadmaps, technical information regarding current and future products, detailed sales and cost data, and other highly sensitive strategic business documents. *Id.* ¶ 5.

In response to AMD's discovery requests, Intel has produced vast amounts of information in connection with this litigation that is not made available to its competitors (such as AMD), or its customers, or the general public. *Id.* ¶ 7. The information produced by Intel also includes sensitive business information of Intel's customers provided to Intel in confidence under non-disclosure agreements, which reflect confidential information relating to their business as well as negotiations with Intel. *Id.* ¶ 6. It would be harmful to Intel's business and harmful to competition in the market segments in which Intel and its customers compete if the confidentiality of this business information were not maintained. *Id.* ¶ 7.

Likewise, the third parties have produced their own confidential information in connection with this litigation. In the Special Master's Report and Recommendations Regarding the Proposed Protective Order (D.I. 221) ("Special Master's Report"), the Special Master explained that he gave "significant weight to the Third Parties' arguments that their Confidential Discovery Materials are of the utmost proprietary and commercially sensitive nature." Special Master's Report at 113. At the hearing in front of the Special Master regarding the proposed terms of the Protective Order, one of the third parties explained that the document productions in this litigation involve "some of the most commercially and technically sensitive documents in the world . . . what is often referred to as the Coca-Cola formula . . . in the sense that it's that sensitive." Tr. of June 12, 2006 Hearing at 19:20-20:11 (D.I. 143).

The Protective Order was put into place for the express purpose of protecting the confidentiality of the information called for by the discovery requests in this litigation to enable the parties and third parties to produce such information without harming their business interests or competition. As stated in the preamble to the Protective Order:

> . . . [T]he preparation for trial of these actions may require the discovery and use of documents and other information which constitute or contain commercial or technical trade secrets, other confidential information the disclosure of which would be competitively harmful to the producing party; and

> . . . [T]he parties anticipate that this case will involve the production of hundreds of millions of pages of documents among and between actual and potential competitors and their customers; and

> . . . [T]he parties agree that their interests, the interests of the customers of the corporate parties and of other non-parties that may be requested to provide discovery, and the public interest can be accommodated by a stipulation and order facilitating a timely production and appropriately limiting the use and dissemination of proprietary and competitively sensitive non-public discovery information entitled to confidential treatment.

Protective Order at 2.

**B.**     **The Protective Order was intended to prevent the use of Confidential Discovery Materials in foreign litigation or investigations.**

In connection with the negotiation, formation, and approval of the Protective Order, the Special Master provided an opportunity for third parties who were expected to be subject to discovery requests to comment on the proposed order. *See* Special Master's Report at 2. The Special Master also held a hearing in June 2006 to address those comments. *See* D.I. 143.

The issue that "prompted the most vehement objection by Third Parties" in connection with the comments and hearing on the proposed protective order was "whether discovery materials produced in this litigation – especially materials designated as Confidential Discovery Materials – may be used for purposes of the Japan Litigation, the California Class Litigation, and other unidentified litigations and/or investigations." Special Master's Report at 110. The Special Master explained that "[t]his issue was a lightning rod for objection by Third Parties, prompting objections from at least 10 of the Third Parties" who commented on the proposed order. *Id.* These third parties expressed

> great concerns that the Proposed Protective Order would serve as a 'blank check' to permit the Parties to utilize the Third Parties' confidential information and disclose it to participants in the Japan Litigation, the California Class Litigation and other litigations and/or investigations, without adequate assurance that the terms of the Proposed Protective Order would be honored or could be enforced if violated, particularly with respect to individuals and entities outside the jurisdiction of this Court.

*Id.* at 112.

In response to these concerns, the Special Master recommended that the proposed order be modified to prevent confidential materials from being used in any proceedings other than the litigation in this Court. Specifically, the Special Master recommended that "references to the Japan Litigation, the California Class Litigation, and other litigations and/or investigations not before this Court be stricken from the terms of the Proposed Protective Order." Special Master's

Report at 116. The recommendation from the Special Master was adopted by this Court in the final Protective Order. See D.I. 277.

### C.    Intel and the third parties relied upon the Protective Order in producing their confidential business information.

Intel relied upon the protections afforded by the Protective Order in producing its confidential information in this case. Bernhard Decl. ¶ 8. Absent those protections, Intel would not have produced its confidential business information to AMD or any of the other parties in this litigation without exhausting all judicial remedies available to it. *Id.*

In light of the third parties' objections in connection with the formation of the Protective Order, it is not surprising that QC's Application and proposed modification of the Protective Order has elicited a wave of objections from the third parties that have been subpoenaed in this litigation. The third parties have made clear that they relied heavily on the terms of the Protective Order in producing some of their most highly confidential business information. They have likewise expressed concerns about the possibility that the protections in the Protective Order would be lost if QC were to gain access to the information, as well as the burdens that would be placed on them to seek to protect the confidentiality of their proprietary information.[1]

### D.    QC seeks permission to use Confidential Discovery Materials in an unspecified set of proceedings in Europe.

QC has requested access to all of the confidential documents and deposition testimony produced by Intel and any third parties in the U.S. litigation, for use by QC in (i) "European

---

[1] *See, e.g.,* Third Parties' Hewlett-Packard Co., Microsoft Inc., and Dell Inc. Opposition to QC's Application at 4-5, 15-18 (D.I. 1027); June 26, 2008 Letter from Vernon Proctor to Special Master Poppiti on behalf of Sony Corporation, NEC Corporation, and Toshiba Corporation ("Japanese OEMs") at 2 (D.I. 1028), subsequently joined in by Fujitsu Limited (D.I. 1039); Wang Decl. ¶¶ 9-11 (D.I. 1034); Joinder of Ingram Micro Inc., Avnet, Inc., and Tech Data Corp. to Opposition of Other Third Parties (D.I. 1029).

Commission proceedings regarding Intel's alleged abuse of a dominant position," and (ii) "present or future judicial proceedings in one or more Member States of the European Union and relating to Intel's alleged abuse of a dominant position . . . ." QC Br. at 24.

While QC references "present" judicial proceedings, there are no present litigation matters in Europe (or elsewhere) that have been brought by QC against Intel. Decl. of James S. Venit ("Venit Decl.") ¶ 41. And while QC references "future judicial proceedings," QC has not specified the courts, countries within the EU, or time frame in which it may seek to bring any such "future judicial proceedings" against Intel.

## III.   ARGUMENT

This Court should reject all aspects of QC's Application – including QC's request under § 1782 to use confidential materials in the EC investigation and in future private damages litigation in Europe, as well as QC's request to modify the Protective Order. As discussed below, QC cannot meet the threshold requirements under § 1782, which means that this Court must deny QC's request under that statute (*see* Section III.B). And even if QC could satisfy those threshold requirements, the factors identified by the Supreme Court to guide a district court's discretion under § 1782 weigh heavily against QC's request. Accordingly, this Court should deny QC's request with respect to both the EC investigation (*see* Section III.C) and the future private damages litigation about which QC speculates (*see* Section III.D). Finally, QC has come nowhere close to demonstrating that it would be appropriate to modify the Protective Order to permit QC to obtain and use confidential discovery materials (*see* Section III.E).

### A.   QC Must Satisfy A Two-Part Inquiry Under § 1782

Congress and the Supreme Court have established a two-part inquiry under § 1782. First, QC must satisfy the threshold requirements under § 1782 before this Court has discretion to grant QC's Application. In particular, § 1782 provides that a district court "may" order a person

to produce documents or give testimony if (a) the discovery is "for use in a proceeding in a foreign or international tribunal," (b) the application is made by an "interested person," and (c) the person from whom discovery is sought resides or is found in the district where the application is filed. *See* 28 U.S.C. § 1782(a). If QC fails to satisfy any of these requirements, this Court must deny QC's Application.

Second, if QC can satisfy the threshold requirements, QC must demonstrate that this Court should exercise its discretion under § 1782. As the Supreme Court has explained, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel*, 542 U.S. at 264. To guide a district court's discretion, the Supreme Court identified the factors "that a district court should consider when ruling on a § 1782(a) request." *In re Application of Digitechnic*, 2007 WL 1367697, at *3 (W.D. Wash. May 8, 2007). The four factors identified by the Supreme Court are:

> First, when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. . . .

> Second, . . . a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance. . . .

> [Third], a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States. . . .

> [Fourth], unduly intrusive or burdensome requests may be rejected or trimmed.

*Intel*, 542 U.S. at 264-65 *see also Advanced Micro Devices, Inc. v. Intel Corp.*, 2004 WL 2282320, at *2-*3 (N.D. Cal. 2004) (applying four-factor test on remand). As discussed below (in Sections III.C and III.D), each of these factors weighs strongly against QC's Application.

> **B.      This Court Does Not Have Discretion To Grant QC's Application Because QC Cannot Satisfy The Threshold Requirements Under § 1782**

QC cannot satisfy the threshold requirements under § 1782 with respect to either the EC investigation or future private damages litigation in as-yet unidentified European courts. Accordingly, this Court must deny QC's Application under § 1782.

> **1.      QC is not an "interested person" in the EC investigation.**

The EC investigation of Intel is a "proceeding" in a foreign tribunal for purposes of § 1782, as the Supreme Court held in *Intel.* QC, however, is not an "interested person" in that investigation within the meaning of § 1782. Accordingly, this Court may not grant QC's petition seeking information for use in the EC investigation.

In *Intel*, the Supreme Court held that a <u>complainant</u> in an EC investigation qualifies as an "interested person." 542 U.S. at 256-57. But QC is not a complainant in the EC proceeding – it is merely a third party.

In holding that a complainant in an EC investigation is an interested person, the Supreme Court explained that "[t]he complainant who triggers a European Commission investigation has a significant role in the process," including "prompting an investigation," "the right to submit information for the [EC's] consideration," and the right to "proceed to court if the Commission discontinues the investigation or discontinues the complaint." *Id.* at 256. The Court concluded that "*[g]iven these participation rights*, a complainant . . . qualifies as an 'interested person' within" the meaning of § 1782. *Id.* (emphasis added).

Unlike the complainant in an EC investigation, a third party intervenor in an EC investigation – such as QC – lacks the "participation rights" that the Supreme Court found to be critical in *Intel*. For example, the EC regulations provide that "[c]omplainants shall be associated closely with the proceeding." Venit Decl. ¶ 10. In contrast, a third party's right to be heard is solely in the discretion of the Commission: "If the Commission considers it necessary, it may also hear other legal or natural persons." *Id.* Thus, as a non-complainant, QC has no right to be heard or submit information, but may only do so if it is invited by the Commission. *Id.* ¶¶ 10-11.

QC attempts to rely on the fact that the Commission exercised its discretion to hear QC in connection with its investigation. QC Br. at 19. QC argues that "it is clear that the European Commission considers [QC] to have a sufficient interest to intervene in its current proceedings." *Id.* But QC confuses the issue. The issue before this Court under § 1782 is not the European Commission's application of EC regulations regarding third-party participation in EC proceedings, including whether QC might be deemed an interested third-party under EC regulations. Rather, the issue here is whether QC is an "interested person" within the meaning of 28 U.S.C. § 1782. Absent a showing that Congress intended the meaning of that phrase in § 1782 to parallel the meaning of the EC's regulations regarding third-party participation in EC hearings, the fact that QC was permitted by the EC to participate in a hearing is not dispositive of the question under U.S. law. The issue properly addressed here is whether the substantive rights possessed by QC put QC into the category of "interested persons" defined by Congress, as interpreted by the Supreme Court. As discussed above, QC is not in that category.

QC cites no instance in which any court has ever held that a third-party participant in an EC investigation – or any similarly situated person in any other context – should be considered

10

an "interested person" that is entitled to seek assistance from a U.S. district court under § 1782.[2] The result is no different because QC asserts that it hopes to use the outcome of the EC investigation in a future private damages proceeding. As the EC itself stated in granting QC's request to appear in the EC hearing: "the fact that [QC's] stated purpose to possibly demand in [QC's] own name damages before national courts in the future . . . is of itself no reason to participate in the Hearing." Ex. 12 to the Decl. of Jon T. King (submitted with QC's Brief).

### 2. QC's speculative future damages litigation cannot be a basis for judicial assistance under § 1782.

QC's request for judicial assistance in connection with purported private damages action(s) is both premature and speculative, as such actions are themselves speculative, unlikely to arise for several years (if ever), and entirely contingent upon a decision of the EC that has not yet been, and may never be, adopted. Private actions in European courts of the sort proposed by QC are normally brought only after the Commission has adopted a decision establishing infringement of EU law <u>and</u> that decision has been rendered final on appeal. *See* Venit Decl. ¶ 41. QC has indicated in its brief that it intends to proceed in this manner. *See* QC Br. at 9. This means that any private case brought by QC would proceed only <u>if</u> the EC adopts a decision of infringement, and <u>if</u> any appeal of that decision is affirmed by both the Court of First Instance and the Court of Justice (in the event that Intel appeals such a decision). Venit Decl. ¶ 41; *see*

---

[2] Some examples of applicants that have been held by courts to be interested persons for purposes of § 1782 include the Tokyo district attorney, *In re Letters Rogatory from the Tokyo Dist. Prosecutor's Office*, 16 F.3d 1016, 1019 (9th Cir. 1994); the Minister of Legal Affairs in Trinidad and Tobago, *In re Request for Assistance from Ministry of Legal Affairs of Trin. & Tobago*, 848 F.2d 1151, 1155 (11th Cir. 1988); an agent for the court-appointed trustee of a foreign debtor about to enter into bankruptcy proceedings, *Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996); and the parent of a company engaged in foreign arbitration, *In re Oxus Gold PLC*, 2006 U.S. Dist. LEXIS 74118 (D.N.J. Oct. 10, 2006).

11

*also* QC Br. at 9 (noting that an EC finding of infringement of EU law may be considered proof of liability in courts in EU Member States only after appeals of the EC decision have been exhausted). This process could take perhaps five to seven years (Venit Decl. ¶ 41), and the outcome of each step of that process is uncertain.

The Supreme Court held in *Intel* that a foreign proceeding need not be "pending" for an applicant to qualify for judicial assistance under § 1782, but the foreign proceeding must "be within reasonable contemplation." 542 U.S. at 259. "[T]o guard against abuse of section 1782, the district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *In re Crown Prosecution Serv.*, 870 F.2d 686, 692 (D.C. Cir. 1989) (Ginsburg, J.) (cited with approval by *Intel*, 542 U.S. at 259). The speculative, contingent, and distant nature of any European private damages litigation involving QC renders such actions too remote for QC to invoke § 1782 in this case.

QC cannot even identify the parties that would be involved in any European damages proceeding. There is no "class action" provision under French law for QC to bring an action for damages in its own name on behalf of a class of consumers. Under French law, QC may only bring an action for damages if it is expressly assigned claims by individual persons. *See* Decl. of Jean-Pierre Farges ("Farges Decl."), submitted herewith, ¶¶ 17-18. Moreover, QC is not permitted to use a "public appeal" to solicit assignments to litigate on behalf of individuals. *Id.* ¶ 21.[3] Thus, not only has QC not yet initiated any private damages litigation, but it has not even identified any supposedly injured parties on whose behalf a damages claim might be brought.

---

[3] QC is certainly aware of this aspect of French law. In December 2007, a case brought by QC was dismissed by the Paris Court of Commerce because QC had improperly solicited consumers to join an action seeking damages. *See* Farges Decl. ¶ 22 & Exh. 10.

QC has not even shown that it has – or ever will have – the assignments from individuals that are required before QC has any right to bring any private damages action. While QC asserts that it is "contemplating the eventual institution of damages litigation," (QC Br. at 7), that is nothing more than speculation. And that speculative possibility is far too remote to support relief under § 1782.

QC has also asked this Court to modify the Protective Order to allow confidential materials to be used in unidentified EU Member States *other than* France. But QC has offered no explanation as to how or when such claims might arise, who might bring them, or in what courts, or even what countries, they might be brought.

In these circumstances, the potential for abuse of U.S. judicial assistance is far too great – and the need for such assistance far too remote – to support relief under § 1782. Congress did not contemplate U.S. judicial assistance for foreign entities in these circumstances.[4]

### C.    The Discretionary Factors Under § 1782 Weigh Strongly Against QC's Application With Respect To The EC Investigation

Since the Supreme Court defined the factors that should guide a district court's discretion under § 1782, an unbroken line of cases has <u>rejected</u> applications by private parties seeking discovery for use in EC proceedings. Starting with the remand proceeding in *Intel v. AMD*, which involved an application by AMD that sought judicial assistance in connection with the same EC investigation of Intel that is at issue here (EC Case No. 37990), the courts have unanimously rejected such applications. *See Advanced Micro Devices, Inc. v. Intel Corp.*, 2004

---

[4]  In addition to the reasons discussed above, this Court may not grant relief under § 1782 with respect to any third party that does not reside or is not found in this district. 28 U.S.C. § 1782(a). While this criterion is satisfied with respect to Intel, QC has not shown that it is satisfied with respect to any of the third parties whose documents it is seeking under § 1782.

WL 2282320 (N.D. Cal. 2004); *see also In re Rubber Chemicals Antitrust Litig.*, 486 F. Supp. 2d

1078 (N.D. Cal. 2007); *In re Microsoft Corp. (IBM)*, 428 F. Supp. 2d 188 (S.D.N.Y. 2006); *In re*

*Microsoft Corp. (Sun),* 2006 U.S. Dist. LEXIS 24870 (N.D. Cal. Mar. 29, 2006); *In re*

*Application of Microsoft Corp. (Novell)*, 2006 WL 1344091 (D. Mass. Apr. 17, 2006).

As discussed below, the reasoning of those cases applies squarely to this case and

overwhelmingly requires rejection of QC's Application with respect to the EC proceeding.

> **1.    The EC does not need assistance from QC in obtaining documents, because it has the power to obtain all the information it needs.**

It is beyond dispute that the European Commission has extensive investigatory powers,

including the ability to obtain information from Intel and third parties in connection with its case

against Intel. QC itself acknowledges that "[t]he Commission . . . possesses a range of powers

(for example the power to enter premises, seize documents, etc.) used to investigate possible

breaches of EU competition law." QC Br. at 8. Because the information sought by QC is

already available to the EC, any use of § 1782 here to assist the EC in pursuing a case against

Intel is "both unnecessary and improper." *In re Microsoft (IBM)*, 428 F. Supp. at 194.

As the EC has explained in previous cases in which it has opposed applications under

§ 1782, the EC has the power to "'require undertakings to provide all necessary information'

whether or not they are the target of an investigation or suspected of an infringement of the

competition rules." *See* Venit Decl. Ex. 8 at 10. Furthermore, "[i]f the parties or third parties do

not provide the requested information, the Commission can order and many times in the past has

ordered production and imposed heavy fines . . . in order to induce compliance." *Id.* at 11.

Accordingly, the EC "has all the power to request any information from . . . any other third

company at any time that is relevant to the proceedings . . . ." *Id.*

It is equally beyond dispute that the EC has in fact exercised its investigatory powers in pursuit of its investigation of Intel, as it has sought and obtained extensive information from Intel and third parties. *See* Venit Decl. ¶ 20. Indeed, as the district court in the remand proceeding in *AMD v. Intel* explained – in connection with this same EC investigation:

> the Supreme Court has already determined that Intel is a participant in the EC proceedings, and that participant-status is significant because the EC has jurisdiction over Intel, and therefore could simply ask Intel to produce any or all of the discovery AMD now seeks. The EC, however, has not sought the documents AMD now seeks. Therefore, the first factor weighs against granting AMD's application.

*Intel*, 2004 WL 2282320, at *2. The same is obviously true of the discovery QC now seeks – a fact that QC does not dispute. This factor thus weighs heavily against QC's Application.

QC effectively concedes that the EC can obtain information to build its case against Intel from Intel directly. The only argument offered by QC is that "the numerous third parties that have produced documents in the present case are *not* participants in the EC proceedings." QC Br. at 22 (emphasis in original). This argument, however, ignores the EC's extensive powers to obtain discovery from third parties. In fact, in connection with its investigation of Intel, the EC has already sought and received discovery from a number of the third-parties that have produced discovery in the U.S. litigation. *See* Venit Decl. ¶ 22.[5]

Moreover, QC's argument about discovery from third parties has been expressly rejected by every other court that has addressed the issue. For example, in denying a request by Microsoft to obtain discovery from Novell (a third party) for use in the EC's investigation of

---

[5] Tellingly, QC cannot identify a single third-party whose documents are both relevant to the EC's investigation and beyond the EC's reach. And even if such a third-party did exist, that could not serve as a basis to grant QC's all-encompassing application with respect to Intel and the third-parties who are subject to the EC's investigatory powers.

Microsoft, the district court explained that "in this case the Commission can, if it wishes, require Novell to produce to it the documents that Microsoft seeks. . . . Therefore, the Commission does not need the exercise of this court's § 1782(a) authority to obtain from Novell any documents in which it is interested." *In re Microsoft (Novell)*, 2006 WL 1344091, at *3. Similarly, in concluding that "§ 1782 aid [was] both unnecessary and improper" in connection with a different application by Microsoft seeking discovery from third-party IBM, the court explained that "[w]hile IBM and Cleary Gottlieb [the targets of Microsoft's application] are not 'participants,' *per se*, in the underlying antitrust proceeding, all of the documents sought by Microsoft are within the Commission's reach." *In re Microsoft (IBM)*, 428 F. Supp. 2d at 194.

QC has argued that it wishes to put the class plaintiffs' motion for class certification and expert report in front of the EC. *See* QC April 28, 2008 Letter Brief re: Timing of Briefing at 3 ("QC Timing Brief") (D.I. 863). But there is no basis to conclude that the EC needs assistance from this Court to obtain those documents. For example, in May 2008 the EC served a formal discovery request on Intel asking it to produce "a copy of all documents authored by Intel employees or received by Intel employees which are quoted or referred to" in (i) Intel's Preliminary Pretrial Statement filed in this Court, (ii) the Plaintiffs' Joint Preliminary Case Statement, (iii) Intel's Response to the Plaintiffs' Joint Preliminary Case Statement, and (iv) the Plaintiffs' Joint Response to Intel's Preliminary Pretrial Statement. *See* Venit Decl. Ex. 9. Presumably, the EC concluded that these documents were important to the prosecution of its case against Intel. Conversely, the EC has not requested production of the class plaintiffs' motion for class certification, the expert report, or supporting documents.

Moreover, QC has offered no basis to conclude that briefs, expert reports, or evidence relating to a motion for certification of a class of U.S. customers – where the alleged conduct is

16

assumed true for purposes of the motion – is at all relevant to the EC's determination of liability under European law. Likewise, QC has offered no basis to suggest that the EC has any interest in the class plaintiffs' proposed methodology for showing injury and calculating damages to U.S. consumers through class wide proof. As QC concedes, "[t]he European Commission cannot compensate consumers itself." QC Br. at 8.

Finally, even if it were the case that some documents needed by the EC were beyond the EC's direct reach, the EC itself would have the power to obtain documents residing in the United States by filing its own § 1782 application. *See* Venit Decl. ¶ 26. In its *amicus curiae* brief to the Supreme Court in *Intel v. AMD*, the EC expressed its "clear preference . . . to rely on the formal mechanisms that it has carefully negotiated with the United States specifically for the purpose of cooperation in competition law enforcement." *See* Venit Decl. Ex. 10 at 12. There is no basis whatsoever to overturn the EC's "clear preference" by permitting QC to seek over a hundred million pages of documents that the EC either already has, or has the power to obtain, or simply does not want or need.

### 2. The EC is not receptive to U.S. judicial assistance in connection with private applications under § 1782.

The EC has repeatedly made clear that it does not want or need assistance from U.S. district courts in pursuing its investigations based on private applications under § 1782. For example, in connection with AMD's § 1782 application that sought discovery for use in the same EC investigation of Intel for which QC now seeks discovery under § 1782, the district court concluded that "the EC is not receptive to judicial assistance in this case." *Intel*, 2004 WL 2282320 at *2. In other cases, the EC has reaffirmed that it "does not need and is *not* receptive to the judicial assistance sought . . . pursuant to 28 U.S.C. § 1782." *See* Venit Decl. Ex. 8 at 1 (emphasis in original); *see also* Venit Decl. Ex. 6 at 10 (same).

17

The EC has made clear that its position is no different with respect to QC's Application. *See* Venit Supp. Decl. Exh. A.

QC has offered no basis to suggest that the EC might now be receptive to judicial assistance under § 1782 to assist it in building a case against Intel. The reasons offered by the EC for opposing the use of private applications under § 1782 in previous cases are fully applicable here, including that such applications (1) "facilitate [] circumvention of the European Union's considered policies on access to information" (*see* Venit Decl. Ex. 10 at 14); (2) "seriously compromise the Commission's powers of investigation and competition law enforcement" (*see* Venit Decl. Ex. 10 at 15); and (3) undermine the Commission's right to preclude irrelevant information (*see* Venit Dec. Ex. 11 at 4).

The EC's opposition to the use of private applications under § 1782 – including QC's Application here – weighs powerfully against QC's Application. *See, e.g., In re Microsoft (IBM)*, 428 F. Supp. 2d at 194; *see also Microsoft (Novell)*, 2006 WL 1344091 at *3 (in light of EC's resistance to judicial assistance under § 1782, the second factor "strongly favors granting Novell's motion" to quash discovery sought by Microsoft under § 1782).

In this connection, it is important to note that the EC's and QC's goals in acquiring evidence to be used against Intel are closely aligned. The EC is now in the position of a prosecutor against Intel. QC obviously is not interested in portraying an even-handed representation of the facts to the EC, or any other viewpoint that might not already be within the EC's prosecutorial approach. Indeed, QC has not even asked for the opportunity to present any AMD documents to the EC.

### 3.    QC's Application is an attempt to circumvent EC procedures.

QC's Application under § 1782 is a clear attempt to circumvent and undermine EC procedures in at least four respects.

First, QC seeks to circumvent the EC's decisions regarding the materials it has chosen to pursue and review in building a case against Intel. For this same reason, the district court in the remand proceeding in *Intel* denied AMD's application under § 1782. *See Intel*, 2004 WL 2282320 at *3 ("AMD's § 1782(a) application appears to be an attempt to circumvent the EC decision not to pursue such discovery.").

The EC's investigation of Intel in File No. 37990 has been underway for years, as the EC has used its powers to conduct extensive fact-gathering targeted at Intel and a number of third-parties. *See* Venit Decl. ¶¶ 20, 22. The fact-gathering portion of the EC's proceedings in File No. 37990 in connection with the current Statement of Objections has now closed. *Id.* ¶ 15. QC, however, now seeks to gain access to well over a hundred million pages of documents that have been produced in the U.S. litigation, for the purported purpose of assisting the EC in its investigation of Intel. But the EC has already decided <u>not</u> to seek the mountains of documents that have been produced in the U.S. litigation. This Court should not assist QC in circumventing that decision. *See, e.g., In re Microsoft (Sun),* 2006 U.S. Dist. LEXIS 24870 at *12 ("As a matter of comity, this court is unwilling to order discovery when doing so will interfere with the European Commission's orderly handling of its own enforcement proceedings.").

Second, QC seeks to circumvent the EC's deliberate decision not to authorize third parties to conduct their *own* discovery in connection with an EC investigation. As the EC recently explained in opposing another § 1782 application, "the laws of the European Community embody a deliberate decision not to authorize private parties to conduct their own discovery." *See* Venit Decl. Ex. 6 at 2; *see also In re Microsoft (Sun),* 2006 U.S. Dist. LEXIS 24870 at *8-*9 ("The European Commission is part of a civil law system which differs in significant ways from the U.S. judicial system. While our system of justice relies on an

19

adversarial process, civil law systems rely on an 'inquisitional' process in which the judicial officer plays a more active role in gathering evidence.").

QC makes little effort to mask its attempt to circumvent this aspect of EC procedures. Indeed, such procedures are the very reason that QC – a European association – is now seeking to obtain documents that are purportedly relevant to a European investigation, from entities that are present in Europe, through the assistance of a U.S. district court. This is a powerful reason to deny QC's application. In passing § 1782, "Congress did not seek to place itself on a collision course with foreign tribunals and legislatures, which have carefully chosen the procedures and laws best suited to their concepts of litigation." *In re Microsoft (Sun)*, 2006 U.S. Dist. LEXIS 24870 at *12.

Third, QC seeks to circumvent the EC procedures that have been designed to prevent third parties, such as QC, from gaining access to confidential materials in connection with an EC investigation. It is beyond dispute that the EC places strict limitations on the extent to which third parties may have access to confidential documents that are relevant to an EC investigation. *See* QC Br. at 9 (acknowledging such limitations); *see also* Venit Decl. ¶ 35. As a third party to the EC investigation, QC has no right of access to the file in the EC proceeding. *See id.* Nor does QC have any right of access to the file under EC law simply because it claims to be interested in filing private damages litigation at some point in the future. As the EC wrote to QC, "the fact that your stated purpose is to possibly demand in your own name damages before national courts in the future . . . is of itself no reason to participate in the Hearing." *See* Exh. 12 to Decl. of Jon T. King, submitted with QC's Br.

Fourth, QC has not followed the applicable procedures in the EC by first requesting the EC to obtain evidence, but rather has sought to circumvent such procedures through its § 1782

Application. As the EC has made clear, a defendant seeking additional discovery for an EC competition proceeding must first ask the Commission to obtain the documents. *See* Venit Decl. Ex. 6 at 10.[6] If a defendant has to follow this procedure, *a fortiori*, an intervener such as QC, with substantially fewer procedural rights, would surely have to do so as well. To Intel's knowledge, QC has not followed this procedure in its quest to obtain the Delaware litigation documents.

><br>

**4.     QC's § 1782 Application is vastly overbroad and unduly burdensome.**

Because the other three factors of the inquiry weigh so heavily against QC's application, the fourth factor should not sway the outcome of the Court's inquiry. *See Intel*, 2004 WL 2282320 at \*3; *In re Microsoft (Novell)*, 2006 WL 1344091 at \*5 (denying § 1782 application based on first three factors, even though request was not unduly burdensome). Nonetheless, this factor also weighs heavily against QC's application.

QC attempts to place emphasis on the fact that it has issued no document requests, but rather seeks access to <u>every</u> document and deposition transcript in the U.S. litigation. But this fact weighs against, not in favor of, QC's application. Just as the district court found on remand in *Intel* with respect to AMD's § 1782 application, QC here "has made no attempt to tailor its application to the subject matter of the EC complaint." 2004 WL 2282320 at \*3. QC seeks

---

6 Thus, for example, if Intel were to seek documents from EC complainant AMD in the U.S. in furtherance of its defense of the EC investigation, it should first ask the EC to obtain such documents. If Intel made such a request and the EC refused to obtain such materials in the interest of fairness, then Intel (as the target of the investigation) would have the opportunity to seek judicial assistance under § 1782 to obtain such materials. That situation is not presented by QC's Application.

unfettered access to well over a hundred million pages of documents, a significant portion of which are irrelevant to the EC proceeding.

The disconnect between QC's discovery request and the subject matter of the EC proceedings is even more pronounced because the fact-gathering stage of the EC proceeding in Case No. 37990 on the current Statement of Objections is closed. QC has no right to present any documents to the EC at all. *See* Venit Decl. ¶ 13. There is thus no justification to impose any burden on Intel and the other third-parties in relation to the EC proceedings.

QC also attempts to downplay the burden on Intel and the third parties in the U.S. proceeding, suggesting that QC's "presence in this case will probably be hardly noticed." QC Br. at 23. QC, however, ignores the burden on Intel and the third parties that arises from the risk that massive volumes of confidential information would be exposed to competitors, customers, and the public. This risk, standing alone, is a powerful reason to deny QC's Application.

QC asserts that it "will be bound" by the Protective Order in this case, but it does not – and can not – address a number of critical questions regarding the ability of this Court or the parties to protect the confidentiality of the discovery material. For example, QC is not a natural person, has no connection to any business that operates in the United States, and apparently has no assets in the United States. QC has not explained how this Court might enforce a breach of the Protective Order by QC. A number of other questions also remain unanswered, including:

- QC has not explained how its 124,000 members – most of whom are presumably French citizens – might be bound by the terms of the Order. Thus, even if QC's offer to be bound by the Protective Order had teeth, QC has not explained how any of its members would be prevented from disclosing or misusing confidential information. Nor has QC suggested any mechanism through which this Court could assert jurisdiction or have the power to enforce the Protective Order over QC's members.

22

- QC has not explained whether French counsel are under an ethical obligation to share facts discovered in a French proceeding with their clients absent an order issued by the French Court.

- Similarly, QC has not explained how any persons retained by QC in connection with the EC investigation or a future damages claim – such as consultants or European counsel – might be bound by the terms of the Protective Order or subject to enforcement of the Order by this Court.[7]

- QC has not explained whether there are any procedures for filing confidential materials under seal in courts in France or elsewhere in Europe. Nor has QC explained how – or if – confidential materials are protected in such courts.

- Just as importantly, QC has not explained how this Court would have any power to enforce the Protective Order over European tribunals if it appeared that one or more such tribunals were prepared to release confidential information to a competitor or customer of the producing party, or into the public record.

Moreover, even if it were theoretically possible to enforce the Protective Order against QC or anyone else who might directly or indirectly come into possession of confidential information, the burden of enforcement would be tremendous. QC apparently envisions using confidential information in courts throughout Europe in litigation that might not be initiated for another five to seven years or more. If that were the case, Intel and the third parties would have the burden to chase QC, its members, and numerous other persons through unidentified European courts for years to come to protect the confidentiality of this information. Such a burden is clearly unjustified here.

QC apparently hopes that the Court will simply trust that it – as well as QC's 124,000 members, QC's counsel and consultants in Europe, European courts, and anyone else who may gain access to confidential materials as a result of QC's Application – would keep the discovery

---

[7] On information and belief, QC's counsel that have appeared in this Court in connection with this Application are not licensed to practice law in France. Accordingly, QC would be required to retain other counsel – who have not subjected themselves to the jurisdiction of this Court or agreed to be bound by the Protective Order – in order to file any case in France.

material confidential. But this Court should not put an entire industry's confidential information at risk based on the blind trust of this French consumer association that has no apparent ties to the U.S. and no apparent risk of adverse consequences should confidential information be released. Because protection of the confidentiality of this information cannot be assured, the Court should deny QC's Application in its entirety.

### D. The Discretionary Factors Under § 1782 Likewise Weigh Against QC's Application With Respect To Purported Future Damages Litigation In Unspecified European Courts

QC's Application fares no better with respect to its proposed future damages litigation in France or other European countries. As with the EC investigation, all four of the *Intel* factors weigh heavily against QC's Application. Accordingly, even if § 1782 permitted discovery with respect to QC's speculative private actions, this Court should deny the Application.

### 1. A court in Europe hearing QC's claims could order discovery that is appropriate under the laws and procedures of that jurisdiction.

Intel, of course, would be a party to any proceeding in a court in France (or any other EU Member State) in which QC or its members might bring suit. And courts in France have their own procedures in place to govern the type and amount of discovery that they have deemed to be appropriate for France's litigation system. *See, e.g.*, Decl. of Maurice-Antoine Lafortune (former judge of the French Supreme Court) ("Lafortune Decl."), submitted herewith, ¶¶ 5-7; Farges Decl. ¶¶ 24-39.

QC has offered no basis to conclude that any discovery appropriate under the laws and procedures of France (or any other EU Member State) would be unavailable to QC when – or if – QC ever gets to the point of filing a case. For example, because France is a signatory to the Hague Convention, a French court could seek evidence located in the U.S. under the procedures of the Hague Convention. *See* Lafortune Decl. ¶ 9-12. Accordingly, there is no basis for QC to

seek the assistance of this Court in connection with a foreign proceeding that might be initiated years from now, if at all.

> **2.    QC has offered no basis to suggest that a court in France or any other EU Member State would be receptive to U.S. judicial assistance under § 1782.**

QC has not identified the court – or even the country – in which it would bring a private damages claim, much less met its burden of demonstrating that such a tribunal would be receptive to U.S. judicial assistance under § 1782. In this regard, the EC's clear position in opposition to private § 1782 applications is instructive regarding the receptiveness of the as-yet-unidentified tribunals in EU Member States. There is simply no basis to suggest that France – or any other EU Member State – would be any more receptive to § 1782 discovery than is the European Commission itself.

Moreover, France (like other EU Member States) has actively resisted the importation of U.S.-style litigation and discovery into its national courts. *See, e.g.*, Farges Decl. ¶¶ 47-61; Decl. of Prof. Catherine Kessedjian ("Kessedjian Decl."), submitted herewith, ¶¶ 9-16. For example, the French government has complained in other cases that U.S.-style discovery infringes upon France's judicial sovereignty, specifically the policy in civil law countries that vests all fact-finding authority in the trial court judge. *See, e.g.,* Farges Decl. Ex. 29 at 4-5. Under France's procedures, discovery is closely controlled by the court, and the authority to gather evidence is vested in the court itself. *See* Kessedjian Decl. ¶¶ 10-11; Farges Decl. ¶¶ 24-39. The discovery that is permitted under France's procedures is far more limited than in U.S. litigation. *See* Kessedjian Decl. ¶ 11; Farges Decl. ¶ 52; Farges Decl. Ex. 29 at 4 (describing "the sharp differences . . . between the procedural rules governing discovery in civil law nations and the United States"). French authorities have made a conscious decision <u>not</u> to adopt U.S.-style discovery. *See* Kessedjian Decl. ¶¶ 12-16; Farges Decl. ¶¶ 47-58. It is thus unfathomable that a

French court would embrace the prospect of being inundated with discovery from a U.S. proceeding – particularly the nearly 200 hundred million pages of documents from what may be the largest document production in the history of U.S. litigation.

The result is no different in cases involving antitrust issues. For example, the EC recently published a "White Paper" regarding private antitrust damages actions, which contemplates limited and targeted discovery subject to active judicial oversight. *See* Venit Decl. Ex. 12 (EC White Paper on Damages Actions for breach of EC Antitrust Rules, COM (2008) 165 final (Apr. 2, 2008)). As QC argues in its brief (at 9), European national competition authorities and courts are bound by the findings made by the European Commission on competition matters. *See* Venit Decl. ¶ 43. If QC is correct, there is no need for full-scale discovery on <u>liability</u> issues in any competition case brought by any private person in Europe. As a result, the EC has recommended that access to evidence in follow-on private cases be limited to "precise categories of relevant evidence" and subject to "strict judicial control." *See* Venit Decl. Ex. 12 at 5. The EC emphasized the need to "avoid the negative effects of overly broad and burdensome disclosure obligations, including the risk of abuses" in private antitrust litigation. *Id.* The production of nearly two hundred million pages of documents from the U.S. litigation – nearly all of which would be <u>wholly irrelevant</u> to a European proceeding in which (according to QC) <u>liability</u> would <u>not</u> be at issue – would be the embodiment of the negative effects foreseen by the European Commission.

### 3.    QC's Application is an attempt to circumvent European law.

That QC has chosen not to use <u>any</u> of the discovery procedures available to it in a French court clearly demonstrates its intent to circumvent French legal rules. *See* Lafortune Decl. ¶¶ 13-17. For example, under the French Code of Civil Procedure, there is a rule that permits pre-complaint discovery by petition to a court where there is "a legitimate reason" for such

discovery. *See* Lafortune Decl. ¶ 6; Farges Decl. ¶¶ 25-26 & Ex. 12. QC, however, has not sought discovery under this rule.

Instead, QC seeks to evade French legal rules and processes for obtaining evidence by pursuing discovery in this Court. *See* Lafortune Decl. ¶¶ 13-17. QC, however, cannot contend that discovery is unavailable to it in Europe when it has never even sought such discovery. *See In re Digitechnic*, 2007 U.S. Dist. LEXIS 33708 at *9-10 (W.D. Wash. May 8, 2007), (because "Digitechnic has not even *tried* to obtain any of the discovery sought here by way of French discovery tools . . .there is . . . no reason that this Court should overlook Digitechnic's failure to attempt any discovery measures in France in making the discretionary decision [on the § 1782 application] now before it" (emphasis in original)). *See also* Lafortune Decl. ¶ 7.

QC's failure to seek discovery in France dooms QC's request to this Court. If the discovery QC seeks were available in a French court, there would be no reason for QC to involve this Court. On the other hand, as is likely to be the case, if a French court would not permit QC to seek the pre-complaint production of well over a hundred million pages of highly sensitive confidential information that have little or no bearing on the issues before a French court, then it is equally clear that QC's Application should be denied. The district court in *Digitechnic* highlighted the "obvious contradiction" in a request such as QC's:

> Digitechnic claims that because French discovery rules do not allow what it seeks here . . . this Court should allow discovery under the Federal Rules of Civil Procedure. Simultaneously, Digitechnic asserts that it is not trying to circumvent French discovery restrictions. The obvious contradiction herein suggests either that the discovery Digitechnic seeks here could have and should have been obtained much earlier in France . . . or that the discovery sought here truly cannot be obtained in France and therefore that this Court should hesitate to order discovery . . . when such discovery was not sought or is not available in that forum.

2007 WL 1367697 at *5.

Of course, QC can do nothing but speculate about what discovery might be permitted in any foreign proceeding, because such a proceeding itself is nothing more than speculation. This fact also weighs heavily against granting QC's Application. As another district court held in denying a § 1782 application, U.S. courts should be "wary of granting discovery under § 1782 when it appears that the party seeking discovery may be using the United States statutes and federal court system to 'jump the gun' on discovery in the underlying foreign suit." *Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 54 (D.D.C. 2005); *see also Rubber Chemicals*, 486 F. Supp. 2d at 1083 ("generalized searches for information whose disclosure is prohibited under foreign law are discouraged"). QC's reference to potential damages litigation in an unspecified European court is an obvious attempt to "jump the gun" on discovery, and should not be assisted by this Court.

### 4. QC's § 1782 Request Is Overly Broad And Unduly Burdensome.

For the same reasons discussed above with respect to the Commission proceeding, QC's application with respect to future damages litigation is vastly overbroad and unduly burdensome. Indeed, the over breadth is even more pronounced in the context of private damages litigation in Europe in which, as QC argues, liability would not be at issue. QC has made no effort to tailor its request to the issues that might actually be in play in a private action in France or elsewhere in Europe. And it cannot be disputed that the vast majority of the documents produced in the U.S. litigation would have no connection at all to damages claims by any European consumers – an issue on which this litigation is not focused. Under these circumstances, there is no basis to conclude that it would be more efficient to grant QC's Application than if QC were required to pursue the discovery available to it under European law.

Moreover, as discussed above, granting QC's Application would give rise to substantial concerns regarding the protection of confidential information, and it would impose substantial burdens on Intel and the third parties to seek to protect the confidentiality of information to which QC would otherwise never have had access under European law. There is no basis to impose such a burden on Intel and the third parties.

### E.     The Court Should Deny QC's Requested Modifications To The Protective Order

All of the considerations that weigh against QC's Application under § 1782 weigh equally against QC's request to modify the Protective Order. There is no need for QC to obtain widespread access to the discovery in the U.S. litigation for use in any European proceeding, and no basis for QC to use the discovery proceedings in this Court to circumvent the procedures in the EC and European courts. There is likewise no justification for the burdens and risk of disclosure of confidential information that would arise if QC's proposed modifications to the Protective Order were adopted.

QC simply cannot demonstrate that it is appropriate to modify the terms of the Protective Order. In its three-paragraph argument about its requested modification of the Protective Order, QC does not even acknowledge the controlling standard in this Circuit for such a modification – much less demonstrate that it has met that standard. *See* QC Br. at 15-16. Contrary to QC's conclusory assertions, the factors set forth by the Third Circuit in *Pansy v. Borough of Stroudsburgh*, 23 F.3d 772 (3d Cir. 1994), for consideration of a motion to modify a protective order overwhelmingly require a rejection of QC's motion.[8]

---

[8] The Third Circuit has identified a non-exhaustive list of factors that a court may consider in determining whether to grant or maintain a protective order: (1) whether disclosure will

[Footnote continued on next page]

### 1.   QC's proposed modifications to the Protective Order would threaten substantial prejudice to Intel and the third parties.

QC seeks access to massive volumes of confidential business information, including trade secrets and other competitively sensitive information of head-to-head competitors and their customers – such as pricing information, sales and marketing strategies, detailed cost data, documents relating to negotiations, product roadmaps, and other highly sensitive strategic documents. Issues relating to competition in the microprocessor industry are at the heart of the U.S. litigation, and the discovery record in this case is replete with information that, if disclosed, would cause substantial harm to the competitors as well as competition in this industry. As this Court found in approving the Protective Order, the interests of the parties and third parties in maintaining the secrecy of such information are legitimate and compelling.

QC has not argued otherwise. Nor has QC put forth any explanation as to why the confidentiality interests at issue here deserve any less protection now than when the Protective Order was entered. This dooms QC's request to modify the Protective Order.

As discussed above, there is a substantial risk that QC's modification would result in the disclosure of confidential materials, notwithstanding QC's hollow promise to be bound by the terms of the Protective Order. *See supra* at 22-23. Where – as here – access to protected material cannot be granted "without harm to legitimate secrecy interests . . . the court should

[Footnote continued from previous page]

> violate any privacy interests; (2) whether the information is being sought for a legitimate or improper purpose; (3) whether disclosure of the information will cause embarrassment to a party; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefiting from the order or confidentiality is a public entity or official; (7) whether the case involves issues important to the public; and (8) reliance by the original parties on the confidentiality order. *See In re Plastics Additives Antitrust Litig.*, 2005 U.S. Dist. LEXIS 23771 at *10 (citing *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995); *Pansy*, 23 F.3d at 788-89).

require the party seeking modification to show why the secrecy interests deserve less protection than they did when the order was granted." *Pansy*, 23 F.3d at 790 (emphasis added). In light of the risk of disclosure and QC's failure to make the requisite showing that "the secrecy interests deserve less protection than they did when the order was granted," (*id.*), this Court should deny QC's request to modify the Protective Order.[9]

For reasons that continue to be valid, this Court has already decided against making confidential discovery materials available to litigants in other jurisdictions. In particular, the "major issue in dispute" in the hearing before the Special Master regarding the terms of the Protective Order was whether confidential discovery materials could be used in litigation in Japan, California, and other foreign jurisdictions. *See* Special Master's Report at 79. The Special Master recommended against making discovery materials obtained under the Protective Order available for use in other jurisdictions, and recommended that all references to the Japan litigation, the California class litigation, or any "other litigants and/or investigations not before this Court" be stricken from the Protective Order. *Id.* at 116. These recommendations were adopted in the Protective Order that was entered by this Court. QC fails to point to any respect in which the justifications for protecting confidential discovery materials produced in this litigation are any less meaningful today than when the Protective Order was adopted.

---

[9] The lone case relied upon by QC is not to the contrary. In *In re Baycol Prods. Litig.*, 2003 WL 22331293 (D. Minn. May 6, 2003), the court expressly held that the Canadian applicants would only be granted "access to discovery material produced that are not marked confidential." *Id.* at \*7 (emphasis added).

##### 2. The Court should deny QC's request to modify the protective order because the litigants and third parties have relied on the Protective Order in producing their documents.

Where the parties have produced documents subject to a protective order, their reliance

on the protections provided by the court is a significant factor weighing against modification of a

protective order. *See In re Plastics Additives Antitrust Litigation*, 2005 U.S. Dist. LEXIS 23771

at \*15-\*16 (E.D. Pa. Aug. 24, 2005) (citing *Pansy*, 23 F.3d at 790). As the Third Circuit

explained in *Pansy*, there is "one difference" between the balancing test a court should apply

when it is assessing a protective order "in the first instance" and when it is assessing a proposed

modification to a protective order: "the reliance by the original parties on the confidentiality

order." 23 F.3d at 790.

As discussed above, QC cannot seriously challenge the propriety of the Protective Order

in this case as of the time the Order was entered. The "one difference" in the inquiry at this time

is whether the producing parties have relied upon the protections of the Order in producing their

confidential information. *Pansy*, 23 F.3d at 790. Intel and the third parties have unquestionably

relied heavily on the Protective Order in producing their confidential business materials in this

litigation. *See supra* at 6 & n.1. This factor thus bolsters an already-strong case for leaving the

Protective Order in place.

Relaxing the terms of the Protective Order – after it has been relied upon by the parties –

not only threatens harm to Intel and the third parties here, but it also risks longer-term negative

consequences for the discovery process in this Court. As one leading commentator explained:

> [T]he more readily protective orders are destabilized, the less confidence
> litigants will have in them. If protective orders are not reliable, people
> will be more likely to contest discovery requests when private or
> commercially valuable data is involved. A protective order can be
> effective as a management tool and as a mechanism for preventing
> discovery abuse only if parties believe it is credible. If the parties know
> that the protective order can be abrogated easily, cooperation in discovery

> would be compromised . . . . Thus, unless strong evidence exists that a litigant did not rely on the existence of a protective order during discovery . . . or that no legitimate interest exists in maintaining confidentiality, the balancing of the competing values that led the initial trial court to issue the order should not be undermined in a later proceeding. The reality seems obvious: for protective orders to be effective, litigants must be able to rely on them.

Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 500-01 (1991) (citations omitted). *See also Martindell v. International Telephone & Telegraph Corp.*, 594 F.2d 291, 295 (2d Cir. 1979) ("Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation, thus undermining a procedural system that has been successfully developed over the years for disposition of civil differences.").

This Court should reject QC's invitation to undermine the protections on which Intel and the third parties have relied in producing millions of pages of sensitive confidential information.

### 3.    The considerations that sometimes weigh in favor of opening a protective order are absent here.

In *Pansy*, the Third Circuit explained that a court assessing a protective order should consider whether a lawsuit "involves issues or parties of a public nature, and involves matters of legitimate public concern." 23 F.3d at 788. In contrast to *Pansy*, this case does not involve any public officials. *Cf. id.* at 786; *Glenmede Trust v. Thompson*, 56 F.3d 476, 484 (3d Cir. 1995) ("The public interest in *Pansy* was 'particularly legitimate' given that one of the parties to the action was a public entity."). Nor is the information at issue here relevant to general public health or safety. *See Pansy*, 23 F.3d at 787 ("Circumstances weighing against confidentiality exist when confidentiality is being sought over information important to public health and safety . . . .").

QC has not pointed to <u>any</u> legitimate public interest that could weigh in favor of the disclosure of the confidential business information here. QC suggests that it may be in the interest of an association of French consumers to gain access to the information here, but that is not a legitimate U.S. public interest that could justify undermining the Protective Order. It is not the role of this Court to defend the purported interests of this association of French consumers.[10]

Contrary to QC's position here, the relevant public interest is best protected by the continued protection of the confidentiality of the highly sensitive commercial information at issue here. As this Court stated in the Protective Order, "the public interest can be accommodated by a stipulation and order facilitating a timely production and appropriately limiting the use and dissemination of proprietary and competitively sensitive non-public discovery information entitled to confidential treatment." *See* Protective Order at 2.

QC also argues that "great efficiencies will be gained" by the disclosure of information to QC. QC Br. at 16. In light of the disconnect between the issues in the U.S. litigation and the issues in any future private litigation in Europe (where, according to QC, only injury and damages to European customers would be at issue), QC's assertions about efficiencies are questionable, at best. But even if efficiencies for some future European proceeding were presumed to exist, QC overlooks the reality that its modification "may slow down the initial litigation, because parties are discouraged from disclosing for fear of forced disclosure in a later action." *Beckman Indus., Inc. v. International Ins. Co.*, 966 F.2d 470, 475-76 (9th Cir. 1992).

---

[10]  To the extent that there are interests of international comity that might favor discovery assistance to a foreign entity, such interests are properly addressed under § 1782. As discussed above, however, judicial assistance under § 1782 is inappropriate here.

Likewise, QC overlooks the burden that would be imposed on Intel, the third parties, and this Court if QC's proposed modifications were granted. In particular, as QC explains, its proposed modifications of the Protective Order would give QC the ability to force Intel and/or third parties "to confer about what documents of interest to [QC] truly are Confidential Information" and would put this Court in the position of "resolv[ing] any remaining disputes." *See* QC Br. at 25. Intel and this Court are busy enough with the litigation already pending in this Court, and the third parties have already been sufficiently burdened in connection with their respective document productions. QC's speculation about efficiencies to be gained in some future French litigation is not a sufficient basis to impose any additional burdens on Intel, the third parties, or this Court.

### F. The Court Should Look Upon QC's Application With A Skeptical Eye

It is no accident that QC is represented in its Application by the same counsel who is representing the class plaintiffs in the Delaware litigation. Class counsel has made no secret about its efforts to initiate U.S.-style class or representative litigation in Europe.[11] And class counsel's efforts to pursue cases in multiple jurisdictions in order to cherry-pick the most favorable procedures from each jurisdiction to circumvent procedures in other jurisdictions are also well documented. For example, as one article described:

---

[11] *See, e.g.,* Peter Geier, *Europe a wary step closer to class actions*, NAT'L LAW J., Dec. 4, 2006, excerpt available at http://www.cmht.com/NLJ_120406.php ("Michael D. Hausfeld of Cohen Milstein said that in opening its London office, the firm is looking to establish a European practice base for class and other types of litigation, . . to help governments and courts find ways to implement class-type litigation"); Alexia Garamfalvi, *U.S. Firms Prepare for European Class Actions*, LEGAL TIMES, June 25, 2007, available at http://www.law.com/jsp/llf/PubArticleLLF.jsp?id=1182762353567 ("[Cohen, Milstein, Hausfeld & Toll] is betting that its class action expertise will soon be in demand in Europe").

> Hausfeld is planning to exploit the differences in legal systems. Great
> Britain, Ireland and Cyprus, for instance, all allow limited discovery
> before potential plaintiffs even file a claim. The U.S. provides greater
> latitude for digging up evidence once litigation is under way. So under
> one scenario Hausfeld could pry open corporate secrets in the U.K. with
> prefiling discovery and follow up with massive document dredging in the
> U.S.

*See* Michael Freedman, "Can You Say Tort? A Washington attorney is on a crusade to export

America's legal system around the world. Call your lawyer." Forbes (Dec. 20, 2004) (avail.

http://www.forbes.com/global/2004/1220/022_print.html).

The "massive document dredging" in this case is well underway. And class counsel has

now come to this Court seeking to have its work product based on that dredging exported to

Europe. Indeed, QC's briefs to this Court have expressly acknowledged that class counsel wants

to take its work product from the U.S. litigation – which was developed based on the confidential

information that was produced solely for use in the U.S. litigation – and use both that work

product and the underlying confidential discovery materials in Europe.[12]

The purpose of discovery in the U.S. litigation, however, was not to benefit class

counsel's efforts to export class action litigation around the world. This Court should not allow

the discovery in the U.S. litigation to become a tool for the benefit of class counsel (as opposed

to the litigants they represent in the U.S. proceeding). If QC, or any other foreign entity, wishes

to pursue claims in other jurisdictions, it should be required to pursue those claims under the

applicable substantive and procedural laws of such jurisdictions.

---

[12] *See, e.g.,* QC Timing Br. at 3 (explaining QC's desire to introduce the class plaintiffs' motion
for class certification, expert report, and supporting materials into the EC investigation); QC
Br. at 23 (stating that QC "intends to work with Class Counsel" to identify documents to
present to the EC and/or other European tribunals).

## CONCLUSION

Based on the foregoing, Intel respectfully requests that the Court deny QC's Application in its entirety.

Respectfully submitted,

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Michael L. Denger
Joseph Kattan, PC
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036-5306
(202) 955-8500

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  July 3, 2008

POTTER ANDERSON & CORROON LLP

By: */s/ W. Harding Drane, Jr.*
   Richard L. Horwitz (#2246)
   W. Harding Drane, Jr. (#1023)
   Hercules Plaza, 6th Floor
   1313 N. Market Street
   P.O. Box 951
   Wilmington, DE 19899-0951
   (302) 984-6000
   rhorwitz@potteranderson.com
   wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

#872715v1 v.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, W. Harding Drane, Jr., hereby certify that on July 3, 2008 the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

| | |
|---|---|
| Jesse A. Finkelstein<br>Frederick L. Cottrell, III<br>Chad M. Shandler<br>Steven J. Fineman<br>Richards, Layton & Finger<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 | James L. Holzman<br>J. Clayton Athey<br>Prickett, Jones & Elliott, P.A.<br>1310 King Street<br>P.O. Box 1328<br>Wilmington, DE 19899 |

I hereby certify that on July 3, 2008, I have Electronically Mailed the documents

to the following non-registered participants:

| | |
|---|---|
| Charles P. Diamond<br>Linda J. Smith<br>O'Melveny & Myers LLP<br>1999 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067<br>cdiamond@omm.com<br>lsmith@omm.com | Mark A. Samuels<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>msamuels@omm.com |
| Salem M. Katsh<br>Laurin B. Grollman<br>Kasowitz, Benson, Torres & Friedman LLP<br>1633 Broadway, 22nd Floor<br>New York, New York 10019<br>skatsh@kasowitz.com<br>lgrollman@kasowitz.com | Michael D. Hausfeld<br>Daniel A. Small<br>Brent W. Landau<br>Cohen, Milstein, Hausfeld & Toll , P.L.L.C.<br>1100 New York Avenue, N.W.<br>Suite 500, West Tower<br>Washington, D.C. 20005<br>mhausfeld@cmht.com<br>dsmall@cmht.com<br>blandau@cmht.com |

Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Michael P. Lehman
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
One Embarcadero Center, Suite 526
San Francisco, CA  94111
mlehmann@cmht.com

By:    /s/ W. Harding Drane, Jr
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      POTTER ANDERSON & CORROON LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com
      *Attorneys for Defendants*
      *Intel Corporation and Intel Kabushiki Kasiha*

Dated: July 3, 2008

738395 / 29282