# Exhibit A

## Supplement Declaration of Jean-Pierre Farges dated August 19, 2008

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) ) ) | MDL No. 1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES,<br>LTD.,<br>a Delaware corporation | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-441-JJF |
| v. | ) ) | |
| INTEL CORPORATION, a Delaware<br>corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation, | ) ) ) ) ) | |
| Defendants. | ) | |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | ) ) ) | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendants. | ) ) | |

## SUPPLEMENTAL DECLARATION OF JEAN-PIERRE FARGES

## SUPPLEMENTAL DECLARATION OF JEAN-PIERRE FARGES

I, Jean-Pierre Farges, make the following declaration:

1.  I make this declaration upon personal knowledge and I am competent to testify to the facts set forth herein. This declaration is based on my background in, and familiarity with, French law and procedures. The statements and opinions expressed herein are made in good faith on the basis of my understanding of the relevant facts and law.

2.  I am a partner and the head of the litigation and arbitration practice at the Paris office of Ashurst LLP. I specialise in arbitration and litigation in contractual issues, finance, industrial risk, construction, international trade, public and administrative law disputes and regulatory issues. I have been involved in a number of major disputes before State courts and arbitral tribunals, acting for listed industrial companies, banks and funds. I am an *avocat* at the Paris Bar.

3.  I earned my law degree, known as Doctorate in private international law on international arbitration from University of Paris I (Panthéon-Sorbonne), my Magistère (postgraduate degree) in private and public economic law from University of Paris I (Panthéon-Sorbonne), and my DESS (postgraduate degree) in business and tax law from University of Paris I (Panthéon-Sorbonne).

4.  In the course of my law practice, I regularly practice before courts in France. I am familiar with French competition law and the procedural rules in such courts.

5.  I make this second declaration following QC's reply brief in support of its motion to intervene for the limited purpose of seeking modification to protective orders and its application pursuant to 28 U.S.C. §1782 for an order requiring Intel and third parties to provide access to documents and a deposition testimony for use in foreign proceedings (hereafter "QC's reply brief")

6.  I understand from QC's reply brief that QC has narrowed down the possible venues for its damages action. QC now seeks the modification to protective orders in order to file a representative action either in England or in Portugal where it would represent French consumers. (QC's reply brief, at 9)

## I.   FRENCH LAW OF CONSUMER ASSOCIATIONS

7.  Article 422-1 of the French Consumer Code enables an approved consumer association recognised as a representative association to bring a representative action on behalf of consumers provided that they have received a prior mandate from at least two consumers.



8.  To the best of my knowledge, there is no French law provision that affirmatively empowers French consumer associations to seek damages through an action for breach of antitrust rules outside France and in particular in other European Countries. This is especially the case when such consumer associations are initiating or launching such an action as opposed to joining an existing action.

9.  It must be underlined that the ministry's order of 27 July 2006 which renews the authorisation of QC to act as an approved association expressly provides that this authorisation is given to QC to carry out "*throughout the country*" all rights recognised to authorised consumer association under the French Consumer Code (for a copy of this order, see Declaration of John King in support of QC's motion, April 4, 2008, Exh. 2).

10. To my best knowledge it would be the first time a French consumer association were to bring a damages action for breach of antitrust rules outside France on behalf of French consumers seeking indemnification for losses arising from purchases made in France. I also note that QC's initial brief only mentioned damages actions that it brought before French Courts (see QC's initial brief in support of its application pursuant to §1782, April 9, 2008, at 5; see also Declaration of John King in support of QC's motion, 13-16).

11. As far as I know, French law does not affirmatively authorise QC to represent non-French consumers for purchases made outside France. Therefore, it remains highly questionable that QC could rely on its governmental authorisation as an approved association to act on behalf of Portuguese or English consumers.

## 2.  PRIVATE INTERNATIONAL LAW

12. In case of an international litigation, French private international law considers that the question of capacity to bring a lawsuit is to be determined by the personal law of the claimant. QC's capacity would therefore be determined according to French law.

13. Should Portuguese or English private international law apply the same rules as French private international law, QC's legal capacity to sue would be governed by the personal law of this association (i.e. French law).

14. As a result, QC's capacity would be restricted by the conditions listed in my previous declaration and notably by the conditions laid down in article L.422-1 of the French Consumer Code (see my first declaration of 1st July 2008). For example, QC could not solicit assignment of claims from French consumers to sue Intel in foreign venues.



3. **QC'S ACTION COULD BE SEEN AS A FRAUD**

15. It has already been stated that QC's motion pursuant to §1782 "*could be seen as a fraud to the conventional rules*", including the provisions of the Hague Convention regarding the recovering of evidence abroad. (Decl. of Maurice-Antoine Lafortune, Former judge of the French Supreme Court, at 7).

16. In addition, the leading French doctrine considers that forum shopping is a fraud since it aims at obtaining from a foreign judge the judgement that the judge who would normally have jurisdiction to rule on the matter would not have rendered (P. Mayer and V. Heuzé, *Droit International Privé*, 9ème éd., Montchrestien, Paris, 2007, § 393 and 395).

17. On this basis, I consider, *a fortiori*, that the choice made by a French consumer association to launch a judicial action regarding French consumers in Portugal or in the UK depending on which is the most welcoming forum (given that the action in France raises "*significant difficulties*") could be considered as a fraud of French law (see QC's reply brief, at 9, footnote 18, mentioning these difficulties).

18. The fraud would be demonstrated by the following elements:

   • The only reason for which QC envisages to bring an action outside France is that "*there may be significant difficulties in bringing a claim of this nature in France in the current legislative context*" (QC's reply brief, at 9, footnote 18).

   • Whereas, in principle, French courts have jurisdiction, since all the elements of the litigation are located in France:

      • QC is a French association;

      • the association has only been authorised by the public authorities for actions on French territory ;

      • the defendant has a subsidiary located in France;

      • and the vast majority of the consumers it would represent (i.e. the French consumers) are located in France and they would have suffered their damages in France.

I declare, in application of Article 202 of the French Code of Civil Procedure, that I am aware that this affidavit is made to be produced before the Delaware Court and that I shall face penalties for any false statement on my behalf.

Executed on August 19th, 2008 at Paris, France.

Jean-Pierre FARGES

4

# Exhibit B

## Statement of
## Arundel McDougall
## dated August 19, 2008

**STATEMENT OF ARUNDEL McDOUGALL**

I, **ARUNDEL McDOUGALL**, of 5 Appold Street, London, EC2A 2HA, do say as follows:

1.  I make this statement upon personal knowledge and I am competent to testify to the facts set forth herein. This statement is based on my background in, and familiarity with, English law and legal procedures. The statements and opinions expressed herein are made in good faith on the basis of my understanding of the facts and the law.

2.  I am a qualified solicitor and a member of the Law Society of England and Wales certified to practice in England and Wales, and a partner in Ashurst LLP at the above address. I qualified in 1978.

3.  Since qualification I have practiced as a commercial litigation solicitor and have a broad experience of most types of contentious proceedings, often involving multi-party actions and other collective action procedures and frequently involving a transnational element.

4.  I have a particular knowledge of the emerging area, in England and Wales, of private actions for competition law damages. I have been involved in a series of ground breaking cases in England over the last six years involving claims by direct and indirect purchasers for damages alleged to arise from infringements of Article 81 EC Treaty.[1] This Article is one of the two EC competition law prohibitions set out in the EC Treaty, the other one being Article 82.

5.  I understand that Union Fédérale des Consommateurs Que Choisir ("QC"), a French consumer association, has brought proceedings under USC §1782 to intervene in proceedings before the US District Court in Delaware. The original proceedings before the Delaware Court are consolidated actions between Intel Corporation ("Intel") and Advanced Micro Devices Inc. ("AMD"), and between class plaintiffs on the one hand and Intel on the other. I understand that there has been voluminous documentation disclosed in those proceedings and that the Delaware Court has imposed a Protective Order in relation to

---

[1]   *Provimi Ltd v. Aventis Animal Nutrition SA and Ors, [2003] EWHC 961 (Comm).*
*BCL Old Co Ltd and Ors v. Aventis SA and Ors (Competition Appeal Tribunal) [2005] CAT 1.*
*Devenish and Ors v. sanofi-Aventis SA and Ors [2007] EWHC 2394 (Ch).*

confidential documents disclosed.   The purpose for which QC seek access to the documents is stated to be for use by QC in:

> " (i)    European Commission proceedings regarding Intel's alleged abuse of a dominant position and
>
> (ii)    present or future judicial proceedings in one or more Member states of the European Union and relating to Intel's alleged abuse of a dominant position. "

I understand that QC has now indicated it is no longer seeking documents in connection with the proceedings in (i) above.

6.    I further understand that QC have now narrowed down the possible European venues for a private damages action to England or Portugal.   They say (Reply Brief dated 16 July 2008, page 9):

> "In each venue QC would represent via a collective action the interests of French consumers, i.e., French purchasers of computers containing Intel microprocessors as well as English or Portuguese consumers in the respective venues."

QC had previously suggested France as its preferred venue but has now discarded that jurisdiction due to "significant difficulties in bringing a claim of this nature in France in the current legislative context".

7.    QC has not as of this date filed any court proceedings in England and has stated that it intends to do so when the European Commission issues a Decision finding, as QC expect, an infringement of Article 82 EC by Intel.

8.    I have been asked to explain the requirements under English law that QC would need to fulfil in order to commence proceedings of the sort it proposes in England.

9.    As I understand it, QC's authorisation from the French State to act as a representative body derives from an Order dated 27 July 2006 by the French Ministry of the Economy, Finance and Industry, Exhibits 1 and 2 to Jon. T. King's Declaration of 4 April 2008,

renewing the authorisation of QC to carry out all rights recognised to authorised consumers associations under the French Consumer Code for five years from 21 September 2006.

10.     QC do not assert that the French Ministry of the Economy's approval would enable it, or permit it, to represent French, or English, consumers in proceedings in England. It merely states that it intends to take such action and "is advised that it will be able to commence proceedings in a European court." (Reply Brief filed 16 July 2008, page 8). The obvious and logical European court would be in France, where it admits it has a track record of asserting consumer rights on behalf of French consumers. Instead they want to try their luck in the courts of either England or Portugal.

11.     My partner, Mr Farges' affidavit of 1 July 2008 explains the types of actions which QC can theoretically pursue in France in accordance with French law, the respects in which QC's ability to take a representative action in France is circumscribed and the fact that it does not possess a mandate from French consumers to conduct its proposed joint action. I adopt those explanations.

12.     From these I conclude that, if QC were to attempt to commence proceedings in England, there are likely to be preliminary issues as to QC's authority and title to sue in the English court. Because QC have not advanced any submissions on such issues, it is difficult to predict with any precision how QC would propose to establish such authority, or how an English Court would resolve such issues. It is reasonable to assume, however, that if and when the English court came to consider such matters QC would not be found to have a better standing to sue than is available to it under French law.

13.     However, and in any event, English law would prevent QC from bringing its proposed claim in an English court. There is only one means by which a representative body in the United Kingdom can pursue a follow-on competition damages action – under Section 47B of the Competition Act 1998. Under that Section, only a "specified body" may bring a representative damages claim on behalf of consumers. Section 47B(1) provides:

3

"A specified body may (subject to the provisions of this Act and Tribunal Rules) bring proceedings before the Tribunal which comprise consumer claims made or continued on behalf of at least 2 individuals".

The Tribunal in question is the Competition Appeal Tribunal, ("CAT"), the Tribunal Rules are the CAT's Rules, and "consumer claims" are follow-on private actions for competition law damages, which are further defined in Section 47A of the Competition Act 1998, and which would include a claim for damages alleged to be sustained as a result of infringement of Article 82 EC. Thus, the only forum in which proceedings of the nature intended by QC in England can be commenced is the CAT.

14. Section 47A(5) of the Competition Act 1998 provides that without the permission of the CAT, such proceedings cannot be commenced before any challenge to the Commission decision as to infringement on which the proceedings are based (for example, an appeal by an addressee of the decision) is exhausted in the European Court.

15. Rule 40(1) of the CAT's Rules provides:

"Power to Reject

40. – (1) The Tribunal may, of its own initiative or on the application of a party, after giving the parties an opportunity to be heard, reject in whole or in part a claim for damages at any stage of the proceedings if –

(a) it considers that there are no reasonable grounds for making the claim;

(b) in the case of proceedings under section 47B of the 1998 Act it considers that the body bringing the proceedings is not entitled to do so, or that an individual on whose behalf the proceedings are brought is not a consumer for the purposes of that section;

(c) it is satisfied that the claimant has habitually and persistently and without any reasonable ground –

(i) instituted vexatious proceedings, whether against the same person or different persons; or

4

> (ii)    made vexatious applications in any proceedings; or
>
> (d)    the claimant fails to comply with an rule, direction,
>        practice direction or order of the Tribunal."[2]

16.    Thus, Section 47B Competition Act 1998 is the only means by which a representative body in the United Kingdom can pursue a follow-on competition damages action in the United Kingdom, the body has to be a specified body and the CAT's Rules give the CAT very wide power (to which Section 47B(1) is expressly subject) to reject a claim, including a claim that it considers the representative body is not entitled to bring.

17.    QC, however, is not a specified body. Were QC to seek specified body status, it would have to satisfy the criteria for approval. These are:

> "1.    The body is so constituted, managed and controlled as to be
>        expected to act independently, impartially and with complete
>        integrity;
>
> 2.    The body is able to demonstrate that it represents and/or
>        protects the interests of consumers. This may be the interests of
>        consumers generally or specific groups of consumers;
>
> 3.    The body has the capability to take forward a claim on behalf of
>        consumers;
>
> 4.    The fact that the body has a trading arm will not disqualify it
>        from being able to bring consumer group claims, provided that
>        the trading arm does not control the body and any profits of the
>        trading arm are only used to further the stated objectives of the
>        body"[3].

Each of these criteria then has sub-criteria.

18.    In the United Kingdom, we already have an organisation, well known and respected, representing consumers. It is called the Consumers' Association, otherwise known as Which? Not only is it active on behalf of consumers generally, but it has recently, and

---

[2]    The Competition Appeal Tribunal Rules 2003, S. I. 2003 No. 1372.

[3]    "Claims on behalf of Consumers: Guidance for Prospective Specified Bodies", Department for Business, Enterprise and Regulatory Reform.

very publicly, pursued a representative follow-on competition law action for damages against a sportswear retailer in a case before the United Kingdom's Competition Appeal Tribunal[4] ("CAT"). Unlike QC, the Consumers' Association is a "specified body" for the purposes of Section 47B of the Competition Act 1998[5].

19.    If QC does not obtain specified body status for the purposes of Section 47B of the Competition Act 1998, there is no other course open to it to commence a private action for competition law damages on behalf of others. If it does obtain specified body status the CAT has power to reject its claim if it considers it is not entitled to bring it.

20.    The proposals for facilitating collective redress in private actions for competition law damages foreshadowed in the European Commission's White Paper of April 2008 and referenced on page 8 of QC's Reply Brief filed 16 July 2008 are proposals, they are not English law, or EC law. The White Paper is one step in a process of research and consultation which commenced in 2004[6] and which is still continuing. The proposals for development contained in it represent a combination of policy aspirations on the part of European competition policymakers and a synthesis of submissions from interested parties made in the course of the consultative process of which the White Paper is part. Such proposals may materialize into something in draft legislation to be considered at European or domestic level one day.

21.    The United Kingdom's Office of Fair Trading is engaged in a consultative process of its own in relation to private actions for competition law damages. Its recommendations of November 2007 contain a discussion about extending the representative body jurisdiction under Section 47B of the Competition Act 1998. They are also aspirations conceived as part of a consultation process, not law. Again, how they are converted into law, and when, is uncertain.

I believe that the facts stated in this Declaration are true.

_____                    13 August 2008
Arundel McDougall, Partner                          (Date)

---

4.    The Consumers' Association v. JJB Sports Plc, Case no. 1078/7/9/07.

5.    Article 2 Specified Body (Consumer Claims) Order 2005 S.I.2005 No. 2365.

6.    The European Commission commenced the process by commissioning a "study on the conditions of claims for damages in case of infringement of EC competition rules" from Ashurst which was published by the Commission in August 2004.

# Exhibit C

## Declaration of
## Jose Luis Da Cruz Vilaca
## dated August 19, 2008

## DECLARATION OF JOSÉ LUÍS DA CRUZ VILAÇA

I, José Luís da Cruz Vilaça, make the following declaration:

1.  I make this declaration based on my personal knowledge, including my experience and knowledge about the procedures and law of Portugal. The statements and opinions expressed below are made in good faith on the basis of my understanding of the facts and applicable laws.

2.  I hold a Law Degree and an LLM in Political-Economical Sciences from Coimbra University and a PHD in International Economics from the University of Paris I. I have been Senior Associate Member of St. Anthony's College in Oxford and Visiting Researcher at the Fordham School of Law, N. Y.

    I lectured Public Finance, Tax Law, Political Economics, Financial Economics and EU law at Coimbra University Law School and was also Full Professor of the Lusíada University Law School in Lisbon and Director of its Institute of European Studies. I am currently Visiting Professor at the Nova University Law School (Lisbon), where I teach Competition Law, and at the Catholic University Law School (Lisbon), where I teach EU Litigation, as well as Associate Professor at the International University.

    Admitted to the Portuguese Bar Association in 1969, I am currently Equity Partner and Head of EU and Competition/Antitrust Practice in PLMJ, the largest Portuguese law firm.

    Between 1986 and 1988, I was Advocate General at the Court of Justice of the European Communities and from 1989 to 1995, President of the Court of First Instance of the European Communities.

    From 2003 to 2007 I was Chairman of the Disciplinary Board of the European Commission; in 2002, I chaired the Committee charged by the Portuguese Government to prepare the new Competition Act currently in force and the setting up of the new Competition Authority.

    In the early 1980s, I was Member of the Portuguese Parliament and of the Portuguese Government as Junior Minister for Internal Affairs (1980), in the Prime Minister's Office (1981) and lastly (1981-1982) for European Integration, in charge of the negotiations for accession with EEC.

3.  In the course of my law practice, I regularly practice competition and antitrust law before European Union and Portuguese courts. I am familiar with Portuguese law and the procedural rules in Portuguese courts.

1



4.   I make this declaration in connection with Intel's opposition in United States District Court to the Motion of Union Federale Des Consommateurs – Que Choisir ("QC") to Intervene for the Purpose of Seeking Modifications to Protective Order and Application Pursuant to 28 U.S.C. § 1782 ("QC's Application").

5.   To prepare this declaration, I received a copy of the QC's brief in support of QC's Application, Intel's opposition to QC's Application, and QC's reply brief in support of its Application.

6.   I was also informed by Intel's counsel that the litigation in United States District Court in Delaware is based on allegations that Intel has illegally monopolized a market for microprocessors. Complaints have been filed against Intel by Advanced Micro Devices (AMD), a competitor of Intel, and by purchasers in the U.S. of personal computers that contain microprocessors. I understand that Intel has produced the electronic equivalent of more than 150 million pages of documents, and more than 70 third parties have produced (or have been requested to produce) documents.

7.   I understand from QC's reply brief that QC states that it wishes to pursue a representative action in either England or Portugal in which it would pursue damages claims on behalf of French consumers and possibly English or Portuguese consumers.

8.   To my knowledge, QC has not asserted that there is any basis to believe that French consumers had any contact with Portugal relating to their purchases of personal computers containing microprocessors. QC also has not asserted that any alleged unlawful conduct by Intel that affected French consumers took place in Portugal.

9.   It is my understanding that QC's reason for seeking to pursue claims in Portuguese courts on behalf of French consumers is its belief that an action by QC in France under French law would face "significant difficulties." (QC Reply, at 9 note 18.)

**I. IT IS DOUBTFUL THAT QC WOULD BE ABLE TO PURSUE A DAMAGES CLAIM IN PORTUGAL**

10.   To the best of my knowledge, no "Acção Popular" or similar collective or representative action has ever been filed in Portugal by a foreign consumer association on behalf of foreign consumers as a result of any activity performed outside of Portugal.

11.   In order for Portuguese courts to have jurisdiction over such a claim, a link with the Portuguese territory would have to be established. Even according to the very broad requirements established by EU Regulation 44/2001 in this respect,

this link must either be the place where the damage occurred or the domicile of any of the parties.

12.    Even admitting in theory that Portuguese courts would accept to hear such a claim, it is doubtful whether under Portuguese law QC may bring an action on behalf of either French consumers or Portuguese consumers (of course, if an individual had rights to sue that it expressly assigned to QC, QC might become involved in litigation by virtue of an assignment, but in such a case QC would not be suing as a consumer association in a representative capacity). It is likely that a Portuguese court would conclude that QC has no ability to bring such a claim.

13.    Portuguese law provides various rights to national, regional, or local associations in Portugal, including the right to file an "Acção Popular," which is a limited type of class action permitted under Portuguese law. Portuguese law, however, contains no provision that would extend to foreign associations the rights given to national, regional, or local associations (including not only the right to file claims, but also the right to free time on national TV and radio, exemption from court fees, and the right to have their activities sponsored by the government). To the contrary, the express grant of various rights to national, regional, or local associations allows for the conclusion that foreign associations do not have such rights.

14.    Accordingly, because QC is not a Portuguese national, regional, or local association, a Portuguese court is likely to conclude that QC does not have the right to pursue an "Acção Popular" in a Portuguese court, on behalf of foreign consumers.

15.    Furthermore, even if QC had the right to bring a claim in a Portuguese court, it is not clear that it could pursue a case seeking damages for violation of competition law by resorting to the Portuguese law permitting an "Acção Popular". Though it cannot be ruled out that an "Acção Popular" based on breach of competition law might be admitted inasmuch as consumers interests may have been hurt as a result of said breach, the existing case law raises doubts as to whether this regime can be used to claim individual damages or whether it is limited to the protection of consumers' collective interests (e.g. a free market system with undistorted competition).

16.    I am aware of no case in Portugal in which any person or entity has sought damages on behalf of a consumer class for a breach of competition law.

## II. PORTUGUESE LAW PROVIDES FOR RELEVANT DISCOVERY

17.    If it is assumed that QC has standing to pursue a claim, and that a Portuguese court would have jurisdiction over QC's claim, Portuguese law provides for relevant discovery. The discovery provisions include the following.

3



18.     QC can request the court to order any other person/entity to produce certain specific relevant documents (Arts. 528 and 531 of the Code of Civil Procedure). The documents may be identified by categories, but the categories must still be specific. Furthermore, the party must provide information sufficient to identify the document, which implies that only documents known to exist (or with sound reasons to be considered as existent) should be requested. And the party requesting documents must explain why it needs the documents in the proceedings.

19.     If the document is not presented by the opposing party, the court can impose a fine, reverse the burden of proof or order any measures it deems appropriate to obtain the document.

20.     The court can also order ex-officio disclosure of documents necessary to establish the truth.

21.     The court can summon witnesses to appear in court and apply sanctions to ensure they appear. The court has the power to order the police authorities to escort the witness to court.

22.     Portuguese law does not provide for any type of open-ended discovery system, therefore Portuguese courts would deny attempts from a party to conduct "fishing expeditions".

23.     As noted above, the judge may, on a party's request, order the other party to produce documents. Or, in other situations the judge may, on its own initiative, address such request to the parties in the proceedings or to third parties.

24.     A Portuguese judge may also direct requests for assistance to other courts, including foreign courts. This could include courts in the United States, because both Portugal and the United States are parties to the Hague convention of 18 March 1970 regarding the collection of evidence abroad.

25.     However, it should be noted that by the time of its accession to The Hague Convention, Portugal made a specific reservation with regard to rogatory letters: it specifically declared that it would not comply with rogatory letters in the context of a pre-trial discovery process originating from a common law jurisdiction (Decree-law No. 764/74, of December 30, 1974).

26.     For any of the abovementioned measures to take place a claim must be filed and the jurisdiction of the court must be established before the court accepts to deal with a request to produce documents.

27.     In conclusion, unlike common law systems, civil law systems, notably the Portuguese, do not include mechanisms of pre-trial discovery. On the contrary, the burden of proof usually rests on each party to put forward evidence capable

4

of supporting its allegations without any direct assistance from the counterparty. The parties are not automatically required to disclose before trial every information or piece of evidence in their possession that may be relevant to the litigation. Their duties in this regard are strictly limited by the abovementioned provisions: only requests for specific evidence previously known to exist are permitted and their relevance is directly assessed and controlled by a judge. The pure adversarial nature of US civil procedure, according to which most of the discovery process is driven by the parties themselves and in which the judge is a mere arbitrator thus clearly differs from the Portuguese procedural system, which is also inspired by the inquisitorial principle, in which the judge is given a more active role in reviewing the relevance of every piece evidence sought by the parties, thus limiting the parties' discretion in this respect.

28.     Hence, it seems that by resorting to US civil procedure QC is trying to gain access to documentary evidence and information that would probably be denied to it under Portuguese law and most civil law jurisdictions.

I declare that the foregoing is true and correct, and I am aware that this affidavit is made to be produced before the United States District Court in Delaware and that I shall face penalties for any false statement on my behalf.

Executed on August 19, 2008 at Lisbon, Portugal.


José Luis da Cruz Vilaça

5

# Exhibit D

## Statement of
## Charles Simon Hollander
## dated August 18, 2008

I, CHARLES SIMON HOLLANDER, of 7/8 Essex Street, London WC2R 3LD do say as follows:

1.  I am a barrister in good standing in private practice at the Bar of England and Wales. I practice from Brick Court Chambers at the above address. I was called to the Bar in 1978 by Grays' Inn, and appointed Queen's Counsel in 1999. I was appointed a Recorder of the Crown Court in 2000, and authorised to sit as a Deputy High Court Judge of the Queen's Bench Division in 2008. I have been called to the Bar in Gibraltar, Brunei and the British Virgin Islands.

2.  I have a wide-ranging practice in commercial litigation, including competition law litigation. My book "Documentary Evidence", which deals with English law and practice in relation to documents, disclosure and legal professional privilege, was first published in 1985 and is now in its 9th edition[1]. Largely because of "Documentary Evidence", I am often instructed to advise or appear in court proceedings in matters relevant to the law of disclosure and privilege, and have appeared as counsel in many of the leading reported cases in these areas in recent years. I am also one of the editors of "Phipson on Evidence", the leading English textbook on the law of evidence[2]. My other book "Conflicts of Interest" was first published in 2000 and the third edition was published last month.

3.  I have given evidence as to English law for US court proceedings on many occasions, particularly in relation to English law and practice in relation to documentary disclosure[3].

**My instructions**

4.  I understand that Union Fédérale des Consommateurs que Choisir ("QC"), a French consumer association, has brought proceedings under USC §1782 to intervene in

---

[1] 9th ed 2006. The 10th edition is expected to be published in September 2009.
[2] 1st ed 1892, 16th ed 2005.
[3] For an example of a US reported decision in which my evidence was accepted, see In Re Trygg-Hansa Insurance Co Ltd (1995) 596 Fed Supp 624, 628.

1

proceedings before the US District Court in Delaware. The original proceedings before the Delaware Court are between Intel Corporation ("Intel") and Advanced Micro Devices Inc ("AMD"). I understand that there has been voluminous documentation disclosed in those proceedings, and that the Delaware Court has imposed a Protective Order in relation to confidential documents disclosed. The purpose for which QC seek access to the documents is stated to be for use by QC in:

"(i)     European Commission proceedings regarding Intel's alleged abuse of a dominant position and

(ii)     present or future judicial proceedings in one or more Member states of the European Union and relating to Intel's alleged abuse of a dominant position. "

I understand that QC has now indicated it is no longer seeking documents in connection with the proceedings in (i) above.

5.  The EC Commission has investigated possible breaches by Intel of Article 82 EC in relation to abuse of a dominant position in the x86 processor market, in which proceedings AMD was complainant. An oral hearing took place in March 2008, but no Decision has yet been notified.

6.  I am instructed that QC may wish to commence proceedings in England. With that in mind, I am asked to consider:

(a) the applicable English law of documentary disclosure; and

(b) whether QC would be able to obtain documents relevant to its intended English proceedings under the laws and procedures in English courts.

**CPR 31**

7.  If QC were to commence proceedings before the English court against Intel, documentary disclosure would be governed by Civil Procedure Rule ("CPR") 31.

Unlike US procedures, there is no system of pre-trial oral disclosure in England, but there are procedures for disclosure of documents.

8.  In High Court litigation, disclosure of documents generally takes place after close of pleadings. The basic obligation of each party is to give Standard Disclosure, which is defined by CPR 31.6:

> "Standard disclosure requires a party to disclose only-
>
> > (a)  the documents on which he relies; and
> >
> > (b)  the documents which-
> >
> > > (i)  adversely affect his own case
> > >
> > > (ii)  adversely affect another party's case; or
> > >
> > > (iii)  support another party's case; and
> >
> > (c)  The documents which he is required to disclose by a relevant practice direction."

9.  The procedural rules which govern English High Court litigation were overhauled in 1999. Before then, the test for discovery had stood for over 100 years:

> "...documents must be disclosed which it is reasonable to suppose contain information which may enable the party applying for discovery either to advance his own case or to damage that of his adversary or which may fairly lead him to a train of enquiry which may have either of these two consequences."[4]

10.  When the rules were revised, the view was taken that the disclosure obligation on the parties was too onerous, and that was unnecessarily increasing the cost of litigation. In the final report which led to the new Civil Procedure Rules, *Access to Justice,* four categories of documents were referred to:

---

[4] Peruvian Guano v Compagnie Financiere 1882 11 QBD 55, 63.

3

(1) the parties' own documents, which they rely on in support of their
contentions in the proceedings

(2) adverse documents of which a party is aware and which to a material
extent adversely affect his own case or support another party's case

(3) documents which do not fall within categories (1) or (2) but are part of the
"story" or background, including documents which, though relevant, may
not be necessary for the fair disposal of the case

(4) train of enquiry documents; these are documents which may lead to a train
of enquiry enabling a party to advance his own case or damage that of his
opponent.[5]

11. It was the intention of those drafting the CPR that the obligation of Standard
Disclosure should only encompass categories (1) and (2) but that there should be
power to apply to the court for an order for specific disclosure, which might
encompass documents within categories (3) and (4). The Practice Direction which
is to be read with CPR 31 provides at para 5.5:

"An order for specific disclosure may in an appropriate case direct a party to-

(1) carry out a search for any documents which it is reasonable to suppose
may contain information which may-

(a) enable the party applying for disclosure either to advance his own
case or to damage that of the party giving disclosure or

(b) lead to a train of enquiry which has either of those consequences;
and

(2) disclose any documents found as a result of that search."

12. The usual obligation on each party is to search for documents which fall within the
obligation of standard disclosure. A Disclosure Statement must be signed by a

---

[5] Access to Justice, Final Report para 38

4

representative of each party, stating that the disclosing party believes the search to have been reasonable in all the circumstances and draw attention to particular limitations on the extent of the search and the reasons for the limitation adopted[6]. The standard form[7] requires specification of:

    (a) The earliest date of documents for which search was made

    (b) The places searched

    (c) Categories for which search was made.

13. The Practice Direction has recently been amended to emphasise to lawyers the importance of including electronic searches as part of the required reasonable search.[8]

14. Where application is made for disclosure of specific documents, or classes of documents, as explained above, the court will consider whether it is necessary to make an order for disclosure against a party which may be wider than standard disclosure.

**Disclosure in the Competition Appeal Tribunal**

15. I am instructed that if QC does initiate an action in the English courts and has standing to pursue such a claim, it may well be that such proceedings are commenced in the Competition Appeal Tribunal ("CAT") rather than the High Court. The CAT has a special jurisdiction to hear follow-on damages claims which rely upon the findings of infringement in a decision of the European Commission or the Office of Fair Trading. Its jurisdiction is limited to monetary claims-it cannot grant injunctive or declaratory relief.

16. Disclosure in the CAT is governed by Rule 19(2)(k) of the Competition Appeal Tribunal Rules 2003 which provides that the tribunal may give directions:

---

[6] Practice Direction 31, para 4.2
[7] N265
[8] Practice Direction 31 para 2A

"for the disclosure between, or the production by, the parties of documents or classes of documents."

17. In general, the CAT will follow applicable High Court principles in making orders for disclosure of documents, although its specialist jurisdiction may on occasion mean that it exercises its discretion in making orders slightly differently from the High Court.

**No oral disclosure**

18. This jurisdiction has never permitted pre-trial oral disclosure by way of witness deposition. It has refused to permit letters rogatory applications to the English courts to be used for that purpose. [9] Pre-trial oral disclosure is usually regarded as anathema to English procedure.

**Conclusion**

19. If the purpose of the proceedings under USC §1782 is to obtain documents required for the purpose of subsequent English proceedings, and the parties from whom the documents are sought are to be parties to the subsequent English proceedings, it is unlikely that the application under USC §1782 will achieve anything material in the way of documentary disclosure which cannot be obtained in the course of the subsequent English proceedings under CPR 31. This is because the rules for documentary disclosure in English proceedings are themselves intended to ensure that each party to those proceedings has access to those documents in the control of the other parties which it needs for the English litigation to be conducted in a proper and proportionate manner.

I believe that the facts stated in this Statement are true.

_Charles Simon Hollander QC_    _18 August 2008_
(Date)

---

[9] See s2(3) of the Evidence (Proceedings In Other Jurisdictions) Act 1975. In ratifying the Hague Convention which led to the 1975 Act the UK declared pursuant to Art 23 that it would not execute requests issued for the purpose of pre-trial disclosure as opposed to evidence for trial.

6

# Exhibit E

## European Commission
## Memo/08/517

**MEMO/08/517**

Brussels, 17th July 2008

## Antitrust: Commission confirms supplementary Statement of Objections sent to Intel

*The European Commission can confirm that it has sent a supplementary Statement of Objections (SSO) to Intel on 17th July. The SSO reinforces the Commission's preliminary view outlined in a Statement of Objections of 26 July 2007 (see MEMO/07/314) that Intel has infringed EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Central Processing Units (CPU) market.*

In the SSO, the Commission outlines its preliminary conclusion that Intel has engaged in three additional elements of abusive conduct. First, Intel has provided substantial rebates to a leading European personal computer (PC) retailer conditional on it selling only Intel-based PCs. Secondly, Intel made payments in order to induce a leading Original Equipment Manufacturer (OEM) to delay the planned launch of a product line incorporating an AMD-based CPU. Thirdly, in a subsequent period, Intel has provided substantial rebates to that same OEM conditional on it obtaining all of its laptop CPU requirements from Intel. In addition, the Commission has included in the SSO additional factual elements relating to a number of the objections outlined in the 26 July 2007 Statement of Objections.

Each of the conducts outlined in the 26 July 2007 Statement of Objections and the SSO is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that all the types of conduct reinforce each other and are part of a single overall anti-competitive strategy aimed at excluding AMD or limiting its access to the market.

Intel has eight weeks to reply to the SSO, and will then have the right to be heard in an Oral Hearing. If the Commission's preliminary views expressed in the SSO are confirmed, the Commission may decide to require Intel to cease the abuse and may impose a fine.

**Background**

A Statement of Objections is a formal step in Commission antitrust investigations in which the Commission informs the parties concerned in writing of the objections raised against them. The addressee of a Statement of Objections can reply in writing to the Statement of Objections, setting out all facts known to it which are relevant to its defence against the objections raised by the Commission. The party may also request an oral hearing to present its comments on the case.

The Commission may then take a decision on whether conduct addressed in the Statement of Objections is compatible or not with the EC Treaty's antitrust rules. Sending a Statement of Objections does not prejudge the final outcome of the procedure.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, W. Harding Drane, Jr., hereby certify that on August 20, 2008 the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on August 20, 2008, I have Electronically Mailed the

documents to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
cdiamond@omm.com
lsmith@omm.com

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
msamuels@omm.com

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, New York 10019
skatsh@kasowitz.com
lgrollman@kasowitz.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com

Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Michael P. Lehman
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
One Embarcadero Center, Suite 526
San Francisco, CA  94111
mlehmann@cmht.com

By:    /s/ W. Harding Drane, Jr
       Richard L. Horwitz (#2246)
       W. Harding Drane, Jr. (#1023)
       POTTER ANDERSON & CORROON LLP
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899-0951
       (302) 984-6000
       rhorwitz@potteranderson.com
       wdrane@potteranderson.com
       *Attorneys for Defendants*
       *Intel Corporation and Intel Kabushiki Kasiha*

Dated: August 20, 2008

738395 / 29282

2