**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION, | MDL No. 05-1717-LPS |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | C.A. No. 05-485-LPS<br><br>CONSOLIDATED ACTION<br><br>**PUBLIC VERSION** |

**DEFENDANT INTEL CORPORATION'S POST-HEARING**
**RESPONSE BRIEF IN OPPOSITION TO CLASS CERTIFICATION**

OF COUNSEL:

David M. Balabanian
Donn P. Pickett
Frank M. Hinman
Jon R. Roellke
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
(415) 393-2000

Richard L. Horwitz (#2246)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

Dated: October 15, 2013
Public version: November 1, 2013

**TABLE OF CONTENTS**

**Page**

GLOSSARY OF TERMS ........ v

I. INTRODUCTION ........ 1

II. PLAINTIFFS MISSTATE OR IGNORE THE RULE 23 STANDARDS THAT THEY FAIL TO MEET. ........ 4

III. MANY CUSTOMERS BENEFITED FROM LUMP-SUM REBATES, BUT PLAINTIFFS HAVE NO RELIABLE METHOD TO IDENTIFY THEM. ........ 6

A. OEMs Used Lump-Sum Rebates To Reduce Prices. ........ 7

B. Plaintiffs' Backup "Causation" Or "Water Table" Theories Fail to Satisfy Rule 23. ........ 8

1. Causation. ........ 9

2. Water Table. ........ 11

C. Plaintiffs Fail To Rehabilitate Leffler's Matching Exercises. ........ 13

IV. PLAINTIFFS' PURPORTED METHODS FOR PROVING A CLASSWIDE OVERCHARGE AND PASS-ON ARE UNRELIABLE AND ONLY CONFIRM THE NEED FOR INDIVIDUALIZED INQUIRIES REGARDING IMPACT. ........ 13

A. Neither Plaintiffs' Theories Nor Their Empirical Analyses Provide A Reliable, Classwide Method To Prove An Overcharge To Direct Purchasers. ........ 14

1. Plaintiffs' Abstract Theories Prove Nothing. ........ 14

2. Plaintiffs' Proposed Overcharge Analyses Are Unreliable And Refuted By Leffler's Own Work. ........ 14

a. Leffler's Own 2006 Regression Disproves The Alleged Classwide Overcharge. ........ 14

b. Leffler's Afterthought Analyses Are Makeweights. ........ 18

B. Plaintiffs Offer No Reliable, Classwide Method To Prove Pass-On. ........ 21

V. PLAINTIFFS HAVE NO RELIABLE, CLASSWIDE METHOD FOR PROVING DAMAGES ATTRIBUTABLE TO THEIR LIABILITY THEORY. ........ 23

**TABLE OF CONTENTS**
**(continued)**

**Page**

VI. PLAINTIFFS DO NOT REFUTE THE MULTIPLE OTHER REASONS WHY THEIR PROPOSED CLASSES CANNOT BE CERTIFIED. .......... 24

VII. PLAINTIFFS DO NOT REFUTE INTEL'S SHOWING THAT LEFFLER'S TESTIMONY IS UNRELIABLE AND SHOULD BE EXCLUDED. .......... 25

VIII. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ........................................ 6, 16

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ........................................ 23

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ........................................ 4

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ........................................ *passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................ 25

*Hayes v. Wal-Mart Stores, Inc.*,
725 F.3d 349 (3d Cir. 2013) ........................................ 4-5

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ........................................ 4, 6, 14, 23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ........................................ 6, 22, 23

*In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*,
722 F.3d 838 (6th Cir. 2013) ........................................ 23

*Leyva v. Medline Indus., Inc.*,
716 F.3d 510 (9th Cir. 2013) ........................................ 23

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009) ........................................ 23

## RULES

Fed. R. Civ. P. 23 ........................................ *passim*

Fed. R. Civ. P. 26 ........................................ 5

Fed. R. Evid. 702 ........................................ 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Evid. 703 ....................25

**OTHER AUTHORITIES**

D. Carlton & J. Perloff, *Modern Industrial Organization* (4th ed. 2005)....................14

## GLOSSARY OF TERMS

| **CITATIONS** | |
|---|---|
| **CCHT** | Transcript of Class Certification Hearing before Special Master Poppiti (Apr. 15, 16, & 19, 2010), WDX 74 |
| **Class Cert. Br.** | Memorandum in Support of Class Plaintiffs' Motion for Class Certification (May 16, 2008) (D.I. 917) |
| **Class Reply Br.** | Reply in Further Support of Class Plaintiffs' Motion for Class Certification (July 23, 2009) (D.I. 2017) |
| **DB** | Defendant's Post-Hearing Brief in Opposition to Class Certification (Sept. 17, 2013) (D.I. 2569) |
| **D.I.** | Docket Item for MDL No. 05-1717-LPS |
| **DPFFCL II** | Defendant's 2013 Proposed Findings of Fact and Conclusions of Law Relating to Plaintiffs' Motion for Class Certification (Sept. 17, 2013) (D.I. 2570) |
| **DPHB** | Defendant's Pre-Hearing Brief Regarding Motions for Class Certification and Defendant's Motion to Exclude Testimony of Dr. Keith Leffler (Mar. 18, 2013) (D.I. 2533) |
| **FACC** | First Amended Consolidated Complaint (May 20, 2006) (D.I. 108) |
| **FDX** | Exhibit (Tab number) to Declaration of Qianwei Fu (Sept. 17, 2013) (*see* D.I. 2576) |
| **FTAIA Order** | Memorandum Opinion Granting Motion to Dismiss Plaintiffs' Foreign Conduct Claims (Mar. 7, 2007) (D.I. 408) |
| **HX** | Exhibit presented at Hearing before Judge Stark (July 16, 17, and 18, 2013) |
| **Kaplan Rep. I** | Declaration of David P. Kaplan (Oct. 29, 2008) (D.I. 1251) |
| **Kaplan Rep. II** | Reply Declaration of David P. Kaplan (Jan. 10, 2010) (D.I. 2273) |
| **Kaplan Rep. III** | Rebuttal Declaration of David P. Kaplan (Mar. 11, 2013), WDX 84 |
| **1 Leffler** | Deposition of Keith Leffler (Aug. 28, 2008), WDX 77 |
| **2 Leffler** | Deposition of Keith Leffler (Aug. 29, 2008), WDX 78 |

## GLOSSARY OF TERMS
## (continued)

| | |
|---|---|
| **3 Leffler** | Continued Deposition of Keith Leffler (Oct. 8, 2009), WDX 79 |
| **4 Leffler** | Continued Deposition of Keith Leffler (Oct. 9, 2009), WDX 80 |
| **5 Leffler** | Continued Deposition of Keith Leffler (Feb. 6, 2013), WDX 81 |
| **6 Leffler** | Continued Deposition of Keith Leffler (Feb. 7, 2013), WDX 82 |
| **Leffler Rep. I** | Declaration of Keith Leffler (May 15, 2008) (D.I. 920) |
| **Leffler Rep. II** | Revised Reply Declaration of Keith Leffler (Aug. 25, 2009) (D.I. 2069) |
| **Leffler Rep. III** | Rebuttal Report of Keith Leffler (Jan. 14, 2013) (D.I. 2524) |
| **Objs. Resp.** | Defendant's Response to Plaintiffs' Objections to the Report and Recommendations of Special Master Vincent J. Poppiti Granting Intel's Motion to Exclude Testimony of Dr. Keith Leffler and Denying Class Plaintiffs' Motion to Certify Class (Nov. 15, 2010) (D.I. 2490) |
| **Objs. Tr.** | Transcript of Hearing before Judge Stark (Mar. 2, 2011) (D.I. 2504), WDX 75 |
| **Opp.** | Memorandum of Points and Authorities in Support of Defendant's Opposition to Plaintiffs' Motion for Class Certification (Oct. 30, 2008) (D.I. 1245) |
| **Order** | Memorandum Order [ordering additional evidentiary proceedings] (Sept. 28, 2012) (D.I. 2517) |
| **PB** | Plaintiffs' Post-Hearing Brief Regarding Class Certification (Sept. 17, 2013) (D.I. 2573) |
| **PPFOF** | Plaintiffs' 2010 Proposed Findings of Fact (Feb. 1, 2010) (D.I. 2298) |
| **PPFFCL II** | Plaintiffs' 2013 Proposed Findings of Fact and Conclusions of Law (Sept. 17, 2013) (D.I. 2574) |
| **PPHB** | Plaintiffs' Pre-Hearing Brief Regarding Class Certification (Jan. 22, 2013) (D.I. 2523) |
| **PPHRB** | Plaintiffs' Pre-Hearing Reply Brief Regarding Class Certification (Apr. 15, 2013) (D.I. 2539) |
| **PPTP** | Plaintiffs' Preliminary Trial Plan (July 23, 2009) (D.I. 2018) |

**GLOSSARY OF TERMS**
**(continued)**

| | |
|---|---|
| **R&R** | Special Master's Report & Recommendations Granting Intel's Motion to Exclude Testimony of Dr. Keith Leffler & Denying Class Plaintiffs' Motion to Certify Class (July 28, 2010) (D.I. 2471) |
| **Tr.** | Transcript of Hearing before Judge Stark (July 16, 17, and 18, 2013) (D.I. 2566, 2567, 2568), WDX 76 |
| **WD** | Declaration of Gregory Wells (Sept. 17, 2013) (D.I. 2571) |
| **WDX** | Exhibit to Declaration of Gregory Wells (Sept. 17, 2013) (*see* D.I. 2572) |

## GLOSSARY OF TERMS
## (continued)

| OTHER TERMINOLOGY | |
|---|---|
| **2006 Regression** | Multiple-regression analysis reported by Leffler in his Revised Reply Declaration comparing Intel x86 microprocessor prices in the class period to his "ideal benchmark" period, *i.e.*, the second half of 2006, originally employed to demonstrate that such prices in the "ideal benchmark" period were uniformly lower than in the class period, *see* Leffler Rep. II ¶¶ 40-41 |
| **"339"** | Analysis reported by Leffler in his Rebuttal Report of [redacted] |
| **AMD** | Advanced Micro Devices, Inc., Intel's main competitor in the market for manufacturing computer microprocessors |
| **CAP** | Customer Authorized Price, *i.e.*, "list price" |
| **COGS** | Cost of Goods Sold |
| **ECAP** | Exception to Customer Authorized Price, *i.e.*, a discount tied to the sale of a specific microprocessor sku |
| **FTAIA** | Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a |
| **Kaplan** | Defendant's Expert, David P. Kaplan |
| **LCAP** | Lump-sum exception to Customer Authorized Price, *i.e.*, a lump-sum credit or rebate from Intel to an OEM account not tied to the sale of a particular microprocessor sku |
| **Leffler** | Plaintiffs' Expert, Dr. Keith Leffler |
| **Mann-Whitney** | Mann-Whitney Two-Sample Statistic test, originally employed by Leffler to compare two price distributions, *see* Leffler Rep. II ¶ 42 n.116 |
| **Mobile [PCs]** | Laptop computers |
| **OEM** | Computer Original Equipment Manufacturer (*e.g.* Dell, HP, or IBM) |
| **PCs** | Personal computers |

## GLOSSARY OF TERMS
## (continued)

| | |
|---|---|
| **Revised Regressions** | Modified versions of 2006 Regression, reported by Leffler in his Rebuttal Report, addressing certain desktop microprocessors, disaggregated by brand and OEM, *see* Leffler Rep. III ¶¶ 32-62 |
| **Sku** | Stock-keeping unit, a unique identifier for each microprocessor model |
| **VAR** | Value-added reseller |

## I. INTRODUCTION

After two detailed evidentiary hearings and despite plaintiffs' wholesale revision of their proposed findings, the fundamental obstacle to class certification remains: Plaintiffs have no methodology, common to the class or otherwise, either to (a) determine the extent to which lump sums benefited class members, or (b) ascertain and exclude from the class the net beneficiaries of Intel's rebates. The Court aptly framed this core issue during the hearing in July, asking: "If I believe that the record shows that that box [for those who] benefitted from challenged rebates [has] any value other than zero, can I certify this class?" Tr. 671:8-10. Plaintiffs have no tenable answer to that question, and they do not even attempt to address it until page 35 of their 50-page post-hearing brief.

Most of plaintiffs' brief is instead dedicated to trying to validate the indefensible analyses that Leffler offered as common proof of impact and damages. All of those analyses are inherently unreliable because they deliberately ignore the price-reducing impact of the very rebates that the plaintiffs challenge – including those that Leffler *himself* admitted at the hearing were *not anticompetitive*. Indeed, plaintiffs relegate to a footnote their strained explanation of how their expert can simultaneously conclude that all rebates recorded as lump sums in the Intel database are illegal, while admitting that more than [redacted] of those rebates – those awarded to "Other" direct purchasers – were not anticompetitive. PB 39 n.36.

When they finally do address their fundamental obstacle to class certification, plaintiffs reveal why it is insurmountable. On page 44 of their brief, they conclude one section by arguing that illegality does *not* depend on whether OEMs decided to pass on lump-sum rebates, but instead on whether the rebates were conditioned on OEMs' loyalty to Intel. Yet plaintiffs start the very next section asserting that they are *not challenging as illegal* any lump-sum rebates that OEMs, in fact, decided to pass on. Aside from the inconsistency of these dueling positions, they

both fail because plaintiffs proffer nothing to support *either* of them. On the one hand, if it were true that illegality depends on whether a lump-sum rebate was conditioned on loyalty, irrespective of how the OEM used the rebate, then nothing Leffler has done even attempts to isolate, measure, or compare against an alleged overcharge only those lump-sum rebates that *were* allegedly conditioned on loyalty. On the other hand, if illegality does depend on whether an OEM *used* a lump-sum rebate to reduce prices, Leffler's analyses are equally useless because he makes no attempt to identify those lump sums that were used to reduce PC prices – and thus (on this theory) were "legitimate discounts" – or to differentiate them from rebates that plaintiffs claim were not legitimate discounts.

Plaintiffs' attempt to defend Leffler's discredited labeling dichotomy between lump-sum and processor-specific rebates as recorded in Intel's database fares no better. Plaintiffs argue that this unsupported methodology is "reasonable" based on nothing more than speculation that "Intel must have had *some* reason for constructing its database" to distinguish between transactional discounts and lump-sum rebates. PB 37 (emphasis added). Yet the evidence amply demonstrates that Intel did so merely as a matter of administrative convenience. And while plaintiffs assert that the administrative-convenience explanation "simply lacks credibility" and "defies common sense" (PB 38), just the opposite is true: [redacted] Indeed, plaintiffs conveniently ignore that their own counsel and even their expert conceded the rationale's validity. In any event, whatever the reason may have been for Intel's structuring its database as it did, plaintiffs offer zero evidence, nor even any plausible reason to believe, that Intel did so to reflect how *OEMs* chose to exercise their own independent discretion in setting computer prices.

Plaintiffs further strain in attempting to trivialize the evidence that substantial lump-sum rebates reduced PC prices, asserting that it is [REDACTED] and speculating that such rebates benefited only a "lucky" few. PB 6. In doing so, plaintiffs not only scuttle yet another core component of their case – until now, plaintiffs *themselves* held out [REDACTED] – but also ignore the facts that [REDACTED] and that, under plaintiffs' own theory, [REDACTED] would lead other OEMs to reduce their prices as well. In any case, plaintiffs have no answer to the evidence establishing that multiple other major OEMs – including [REDACTED] likewise used lump-sum rebates to reduce PC prices. Thus, even if [REDACTED] – which it clearly was not – the record shows that millions of additional class members who purchased PCs from other OEMs, and whom plaintiffs offer no method to identify, also benefited from the challenged rebates. Plaintiffs fail to confront this evidence, but hiding from the facts does not make them disappear.

Plaintiffs also fail to salvage either of Leffler's bankrupt methodologies for proving common impact. Both his Mann-Whitney and 339 analyses use demonstrably wrong and manipulated data, and neither even purports to explain *why* prices moved; indeed, Mann-Whitney cannot show that prices moved at all. And, when analyzed properly, both analyses only confirm that individualized inquiries are necessary to determine which, if any, putative class members paid *more* for PCs (as opposed to *less*) due to Intel's rebates – and if so, how much. The same is true of damages; plaintiffs tender the 2006 and pass-on regressions as supposed common proof of classwide damages, but in fact they prove the opposite conclusion that individualized analyses are required.

The latest hearing laid bare the incurable flaws in plaintiffs' case for certification. Plaintiffs' failure to rebut these problems in their brief confirms that their motion comes nowhere near

satisfying Rule 23 and should be denied.

## II. PLAINTIFFS MISSTATE OR IGNORE THE RULE 23 STANDARDS THAT THEY FAIL TO MEET.

Plaintiffs acknowledge the need for a "rigorous analysis" of Rule 23's requirements (PB 4), and that they bear the "burden" to prove those requirements (*id.* at 6), but they misstate those standards. For example, plaintiffs misstate the law in claiming that they need not establish predominance for "all three elements" of "liability, impact, and damages." PB 5-6; *contra Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). No court has ever certified an antitrust class action where, as here, an individualized analysis is required to determine impact. Indeed, *Hydrogen Peroxide* held that impact is "critically important" (552 F.3d at 311), and *Comcast* establishes the same principle for damages (133 S. Ct. at 1433). Plaintiffs must establish *now* a reliable method to prove impact with common evidence, and they cannot satisfy Rule 23 without meeting that burden. *Hydrogen Peroxide*, 552 F.3d at 311-12.[1]

Plaintiffs also ignore Rule 23's ascertainability requirement, which must be satisfied even where (unlike here) predominance can be shown. Plaintiffs have never proffered any "reliable, administratively feasible" method for establishing that a properly-defined class is "currently and readily ascertainable based on objective criteria." *Carrera v. Bayer Corp.*, 727 F.3d 300, 305-06 (3d Cir. 2013) (citation omitted); DPFFCL II ¶¶ 489-497; DB 46-47. Stated simply, the evidence confirms that the proposed class is not ascertainable because plaintiffs offer no methodology to identify and exclude from the class the net beneficiaries of Intel's rebates. *See Hayes v.*

[1] While acknowledging that they have the burden of proving by a preponderance of the evidence that they have met all of Rule 23's requirements, plaintiffs repeatedly attempt to shift that burden to Intel. Plaintiffs assert that "Intel has not attempted to show," or variants thereof, at least 16 times in their brief. *E.g.*, PB 23 n.23, 24, 26, 27, 32 n.29, 35, 37-38, 40, 41, 44 n.40, 48 n.45, 49. But the burden of proof is squarely on plaintiffs' shoulders. They have not carried it, and the record affirmatively demonstrates that they cannot.

*Wal-Mart Stores, Inc.*, 725 F.3d 349, 354-56 (3d Cir. 2013).

Plaintiffs similarly ignore *Comcast*'s crucial holding that a class may not be certified on internally inconsistent theories. 133 S. Ct. at 1433; *see* DB 6. Plaintiffs' liability theory is that only OEM rebates conditioned on "loyalty" are anticompetitive. *E.g.*, PB 44; Tr. 22:11-15, 562:23-25. Yet their class-certification theory is that *all* lump-sum rebates recorded in Intel's database were anticompetitive. *E.g.*, PB 36 ("Intel's lump sum payments to OEMs," *i.e.*, rebates "unassociated with specific microprocessor transactions" in "Intel's database," are the "payments that Plaintiffs challenge"). As Leffler conceded when he acknowledged that lump-sum rebates to "Others" are not conditioned on loyalty and "not anticompetitive" (Tr. 356:16-17, 357:6-10), the *labeling* of lump-sum rebates in Intel's database is irrelevant because the database "just gives [you] the numbers" (*id.* at 357:23); under plaintiffs' liability theory, what really matters are the conditions attached to a rebate (*i.e.*, whether a recipient was required to "treat AMD differently"). *Id.* at 356:18-19, 357:20-23. Leffler's concession demolishes his reliance on labels in Intel's database to identify illegal rebates, because the same reasoning applies to rebates to "major" OEMs, rendering Leffler's database approach unreliable and unfounded. *Id.* at 197:9-11, 201:1-4; *see also* Leffler Rep. III ¶¶ 17, 21. Indeed, Kaplan testified without contradiction that Leffler's concession as to "Others" requires abandoning his foundational transactional/lump-sum dichotomy, because "Leffler has now conceded that a substantial percentage of the lump sum rebates … is not a loyalty payment but is a legitimate price reduction." Tr. 402:4-11.[2]

[2] Plaintiffs' repeated citation to a report submitted by Douglas Bernheim in another case serves only to confirm the insufficiency of their evidentiary showing. PB 9, 11 n.10, 12 & n.11, 13, 16, 25 n.24, 31, 39 n.36, 42 n.37, 47; *see also* PPFFCL II 13, 17 (¶ 60 n.55, ¶ 62 n.57, ¶ 85 n.78). Plaintiffs never named Bernheim as an expert in this case or offered him for cross-examination, and therefore may not rely on his opinions here. *See* Fed. R. Civ. P. 26.

## III. MANY CUSTOMERS BENEFITED FROM LUMP-SUM REBATES, BUT PLAINTIFFS HAVE NO RELIABLE METHOD TO IDENTIFY THEM.

A glaring obstacle to class certification is plaintiffs' failure to identify a reliable, common methodology for determining on a classwide basis which particular proposed class members were net beneficiaries of Intel's lump-sum rebates. *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 167 (C.D. Cal. 2007). As plaintiffs admitted to this Court, they simply "don't have individual calculations … to say whether or not [Leffler's alleged] 14 percent [overcharge] covers every" PC price reduction funded by Intel rebates. Tr. 616:24-617:3. Plaintiffs fail to address this core issue until page 35 of their brief, where they begin with the false assertion that Intel offers no "challenge [to] the class-wide nature, reliability, or feasibility of Plaintiffs' impact and damages analyses." PB 35. Nothing could be further from the truth. Plaintiffs' analyses are incapable of reliably proving impact and damages on a classwide basis, because they do not even purport to eliminate the need for countless individualized inquiries to exclude the millions of customers who would be worse off in plaintiffs' but-for world. *See* DB 22-46; DPHB 20-40; Objs. Resp. 42-48.

Instead, Plaintiffs claim that exclusions from the class would be limited to a few "lucky" customers, citing out-of-circuit cases that they concede involved "minor overbreadth problems." PB 6-7. But in this case the record is clear that OEMs used [REDACTED] in lump-sum rebates to reduce PC prices, DB 11-13, and plaintiffs have no basis for speculating that only a "small minority" (PB 6) were uninjured, especially given Leffler's own testimony that [REDACTED] [REDACTED] in lump-sum rebates would be lost in the but-for world but that only [REDACTED] [REDACTED] in overcharges would be recouped (6 Leffler 1117:12-16). *See Comcast*, 133 S. Ct. at 1435; *Hydrogen Peroxide*, 552 F.3d at 313-14, 316; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) (rejecting "methodology [that] detects injury where

none could exist").

**A. OEMs Used Lump-Sum Rebates To Reduce Prices.**

Extensive unrebutted evidence from *multiple* OEMs conclusively demonstrates that OEMs used large portions of Intel's lump-sum rebates to reduce PC prices. DB 11-13; DPHB 14-20. For example, a [REDACTED] WDX 50 (HX 50) at [REDACTED] *see* Tr. 406:20-22 (Kaplan). The record also demonstrates that [REDACTED] used lump-sum rebates to reduce computer prices (DB 11-13), including an [REDACTED] that plaintiffs selectively excerpted to omit the statement that [REDACTED] (PB 42 n.38 (citing WDX 48 (HX 48), at REF0016034.0002)). Plaintiffs and Leffler previously *admitted* this point, and Special Master Poppiti cited overwhelming evidence to the same effect. *See* CCHT 227:19-228:9 (Leffler); Objs. Tr. 124:7-15 (plaintiffs' counsel); R&R 66-74. The elimination of these rebates in the but-for world raises individualized questions about whether individual class members would be worse or better off in that world, rendering certification improper.

Desperate to overcome their inability to identify the net beneficiaries of Intel's rebates, plaintiffs suddenly claim that the alleged overcharge may be more than the [REDACTED] PB 40. This last-minute hypothesis – which plaintiffs and Leffler did not present during the hearing – does nothing to solve the core problem that plaintiffs confront. Whether the alleged overcharge is [REDACTED] plaintiffs still have no reliable methodology for determining whether individual class members benefited more from Intel's rebates than they were allegedly overcharged. Plaintiffs' latest shift – [REDACTED] the alleged overcharge at the stroke of a pen – only confirms that they cannot demonstrate on a

classwide basis their purely speculative assertion that no (or only a few) proposed class members were net beneficiaries of the challenged rebates.

To counter overwhelming evidence that OEMs used lump-sum rebates to reduce prices, plaintiffs claim that "how a rebate is recorded in Intel's database" determines whether it is "expected to reduce PC prices," because "Intel must have had some reason for constructing its database" to distinguish transactional from lump-sum rebates. PB 37. Faced with evidence that Intel offered lump-sum rebates for "administrative convenience" to avoid thousands of individualized processor-specific negotiations with major customers, plaintiffs blithely assert that this "defies common sense." PB 38. But plaintiffs already *admitted* that Intel provided lump-sum rebates "because it's a cumbersome administrative process" to negotiate transaction-specific discounts (DPFFCL II ¶ 33), as did Leffler. CCHT 231:24-235:8 (individualized discount process "too cumbersome to apply"); *see also* Objs. Tr. 130:13 (plaintiffs' counsel); WDX 118 (Roehm, Intel) at 175:1-22.

Plaintiffs' inability to demonstrate which lump-sum rebates were passed on was keenly demonstrated by their complete flip-flop at the hearing on an [REDACTED] Tr. 545:4-7. Plaintiffs initially challenged this rebate as "money for market share." PPFOF ¶ 81. Once Intel proved that this rebate incentivized [REDACTED] however, plaintiffs reversed course by arguing that the rebates now are "transactional discounts" that they do not challenge. PB 40. This retreat underscores both the need for individualized inquiries to categorize each rebate under Leffler's theory and the unreliability of plaintiffs' proffered methods.

### B. Plaintiffs' Backup "Causation" Or "Water Table" Theories Fail to Satisfy Rule 23.

To overcome the conclusion that many PC purchasers would be worse off in the but-for world, plaintiffs offer two fallback responses. Both are untested and lack evidentiary support.

**1. Causation.**

Plaintiffs contend that even if OEMs *used* lump-sum rebates to reduce PC prices, the rebates did not "resul[t] in" the lower prices, and that OEMs "would have sold the PC *at the same price without the lump sum payment*." PB 40. Tellingly, Plaintiffs claim that Intel must *disprove* this assertion (*id.*), but it is *plaintiffs'* burden to prove it – that is, they must proffer a reliable classwide method for proving that price reductions funded by lump-sum rebates would persist in the rebates' absence. They do not even pretend to have such a method, much less one that is supported by a preponderance of the evidence that the law requires; in fact, they admit that they have neither "determined nor likely could determine definitively" "[w]hether an OEM reduced its PC prices because of lump-sum rebates" because that is a "factually intensive and difficult issue." PPHRB 12 n.10. Indeed, as Kaplan testified and plaintiffs never rebutted, Leffler did not "conduct any empirical analysis" in support of this causation theory. Tr. 432:11-13. Instead, plaintiffs try to unburden themselves by ignoring the contrary evidence and proffering a hopelessly simplistic database labeling method as purported proof that lump-sum rebates did not "cause" lower prices.

In any event, the evidence conclusively shows that Intel's lump-sum rebates *did* cause price reductions. DB 13-18; Kaplan Rep. III ¶¶ 24-26. Plaintiffs admit as much when they argue that [redacted] PB 47.[3] This is a stark concession that lump-sum rebates enabled [redacted] *See also id.* at 35 (citing "evidence that what appears to be a lump sum payment might have, in fact, been in part a

[3] Under Leffler's view of net prices, [redacted] (Kaplan Rep. III Ex. 71), [redacted] WDX 92 [redacted] at 40:24-41:24, 42:7-14 [redacted].

discount”); Tr. 417:22-418:1 (Kaplan) [redacted][4]

Plaintiffs also ignore proof that [redacted] DB 16; DPHB 19-20; WDX 144 at 67538DOC0000609 [redacted]; DPFFCL II ¶¶ 92-94. Leffler’s own theory treats such [redacted] as marginal cost reductions that cause PC prices to decrease. DB 16; 6 Leffler 1008:7-1010:6.

Although [redacted] should suffice in light of plaintiffs’ reliance on [redacted]. *See* DB 14-18. For example, Leffler’s admissions that OEMs had [redacted] (Leffler Rep. I ¶ 8.G n.4; *see also*, *e.g.*, Tr. 187:25) and faced constant “pressure to squeeze out every penny of cost” (Tr. 190:10-12) in a [redacted] (Leffler Rep. III ¶ 59) apply to all OEMs. Margin-strapped OEMs facing what plaintiffs called “robust inter-OEM competition” (PB 11) have every incentive to use substantial lump-sum rebates to reduce prices to compete more effectively. [redacted]

[4] Plaintiffs attempt to defend the implausible theory that the [redacted] PB 47. Not surprisingly, plaintiffs cite no evidence to support that assertion, and the evidence is to the contrary. *See* DB 18. The salient point is this: [redacted] *See* Tr. 417:22-418:1 (Kaplan).

[redacted] (Tr. 323:4-7). *See* DB 17.[5]

The record also establishes that lump-sum rebates reduced OEMs' cost of goods sold ("COGS"), [redacted] (DB 15 n.6) for example, and therefore drove price reductions under Leffler's own theory. DB 15. Plaintiffs say that COGS is merely an accounting convention, but Leffler testified that COGS is a "very good proxy for marginal costs," which OEMs rarely calculate directly. Tr. 330:3-9. Thus, OEMs did treat (and Intel encouraged them to treat) rebates as cost reductions. DB 17 [redacted]; DPFFCL II ¶ 84.

Plaintiffs are also wrong to argue that rebates used to reduce prices were predominantly transactional, and not lump-sum, rebates. PB 40. For example, [redacted] as Kaplan testified. Tr. 407:21-408:12; DB 11-12. In any event, plaintiffs, not Intel, bear the burden of proof on this issue, and they cannot meet it.[6]

**2. Water Table.**

The theory that plaintiffs analogized to a receding "water table" at the hearing (Tr. 616:4-20) they now describe as follows: "Even if some portion of Intel's [lump-sum] rebates … did result in lower PC prices … [s]uch money would be discounting … that would continue to exist

---

[5] Plaintiffs point to isolated examples of [redacted] PB 41. But isolated examples are not classwide proof that [redacted] DB 17. Alleged variations in Intel's rebate-related conduct simply confirm the need for individualized inquiries to assess the impact of each rebate, as Kaplan explained. Tr. 433:7-21.

[6] Plaintiffs also err in claiming that there is [redacted] PPFFCL II 32-33 (¶ 164). The document they cite to support their claim that [redacted] FDX 79 at [redacted] *see also id.* at 316 [redacted] *Id.* at 323, 329.

in the but-for world." PB 44. As Intel has shown at length (DB 18-20; DPHB 12-14), the water-table theory is meritless.

*First*, the theory posits that some lump-sum rebates would exist in the but-for world, which contradicts plaintiffs' claim that all of Intel's lump-sum rebates were illegal. Tr. 664:23-665:7. Indeed, plaintiffs' brief states that "the legality of Intel's conduct does not turn on what OEMs did with the payments" – contradicting their statement immediately thereafter that a "lump sum payment" that did "result in lower PC prices" due to OEM decisions "would be discounting, unchallenged by Plaintiffs." PB 44.

*Second*, the water-table theory lacks *any* evidentiary foundation because Leffler admitted that he has not conducted any analysis to [REDACTED] 6 Leffler 1120:6-8, 1094:9-12. Plaintiffs blame this failure on "the manner in which Intel chose to implement" the rebates – *i.e.*, Intel's database. PB 45. But plaintiffs' problem is not with Intel's database, which records every rebate that Intel gave its customers; plaintiffs' problem is that they have not performed the individualized analysis necessary to determine which rebates would survive in the but-for world under this theory.

*Third*, the water-table theory also precludes certification because, as Kaplan explained at the hearing, it renders invalid "all of the price analysis Leffler has done" – *i.e.*, his attempts to establish that impact and damages can be proved on a classwide basis. Tr. 402:14; DB 19. If lump-sum rebates did reduce some prices, as the water-table theory assumes, all of Leffler's "net" prices [REDACTED] Tr. 104:1-14) are incorrect, and his analyses are therefore based on incorrect data, proving nothing.

*Finally*, the water-table theory is based on an impermissible but-for world. [REDACTED]

[redacted] It turns antitrust law on its head to argue, as plaintiffs do, that the legality of Intel's conduct depends on the thousands of individual decisions that OEMs made regarding the prices to charge for their computers and whether to pass-on Intel's discounts. DB 20. Indeed, at the recent hearing, plaintiffs' counsel did not dispute that it "is not a valid theory of antitrust liability" to assert that "the legality of the payment depends entirely what the OEMs did with it." Tr. 665:14-25.

### C. Plaintiffs Fail To Rehabilitate Leffler's Matching Exercises.

Plaintiffs also cannot salvage Leffler's matching exercises. At the threshold, these exercises cannot support class certification because they conclude that [redacted] necessitating countless mini-trials to exclude net beneficiaries from the class. DPHB 11 n.6.

Moreover, Plaintiffs offer nothing in response to Intel's previous arguments that the matching exercises assume their own conclusions by relying on Intel's database to sort Intel's rebates; they prove nothing because they fail to examine the relevant Dell database; they impermissibly rely on data from outside the class period; and when disaggregated they show error rates far exceeding the overcharge Leffler calculated. DB 21.

## IV. PLAINTIFFS' PURPORTED METHODS FOR PROVING A CLASSWIDE OVERCHARGE AND PASS-ON ARE UNRELIABLE AND ONLY CONFIRM THE NEED FOR INDIVIDUALIZED INQUIRIES REGARDING IMPACT.

Plaintiffs concede that, to establish predominance, they must prove the "availability of reliable, feasible, class-wide analyses" to establish both (1) an overcharge to direct purchasers and (2) pass-on to class members. PB 14. Plaintiffs have not carried that burden. Absent a reliable classwide method for proving that what their theories predict would actually occur, plaintiffs

cannot satisfy Rule 23. None of plaintiffs' empirical analyses comes close.

**A. Neither Plaintiffs' Theories Nor Their Empirical Analyses Provide A Reliable, Classwide Method To Prove An Overcharge To Direct Purchasers.**

**1. Plaintiffs' Abstract Theories Prove Nothing.**

Plaintiffs continue to argue that they may carry their burden of proving a classwide overcharge based on the theories that increased competition yields lower prices, and prices in a relevant market move together. PB 15-16. Not only are those abstract propositions insufficient to establish a classwide overcharge, *see Hydrogen Peroxide*, 552 F.3d at 325, but they are useless because plaintiffs have not even attempted to establish that the necessary starting premises of their theories are true here. For example, theories such as plaintiffs' assertion that all prices in a relevant market move together "typical[ly] … assume that all products are equally good substitutes for each other." D. Carlton & J. Perloff, *Modern Industrial Organization* 220 (4th ed. 2005). While that "extremely strong assumption makes the model relatively easy to use," it is "unrealistic in some markets." *Id.* The microprocessor market is one such market. Microprocessors are highly differentiated, the diametric opposite of the homogenous, undifferentiated products that form the basis of Leffler's simplifying assumptions. *See* DB 26. Plaintiffs do not attempt to rebut this. They offer only a bald assertion that "there are high cross-elasticities of supply and demand for x86 microprocessors," PB 17, but zero proof, and Leffler admittedly has not examined the issue. Tr. 374:25-375:15; *see also id.* at 450:15-451:10. Plaintiffs may not rest their case on theories that assume key facts that plaintiffs make no effort to prove with evidence.

**2. Plaintiffs' Proposed Overcharge Analyses Are Unreliable And Refuted By Leffler's Own Work.**

**a. Leffler's Own 2006 Regression Disproves The Alleged Classwide Overcharge.**

Plaintiffs insist that an overcharge may be proved empirically, PB 18-28, but they fail to

rebut Intel's showing that Leffler's 2006 Regression *disproves* their assertion of an across-the-board overcharge. *See* DPHB 23-28; DB 28-29. Plaintiffs apparently have retreated from their assertion that it is improper to apply Leffler's regression model to *disaggregated* data, particularly in light of the evidence that Leffler himself did as much. Indeed, disaggregation is *necessary* to determine whether Leffler's aggregated results mask important individualized differences. DB 29-30. Plaintiffs instead rely on Leffler's wholesale eliminations of processors that did not experience a price decline, on the pretext that the excluded products were not subject to increased competition during his "ideal benchmark" period. *See* PB 24-28; *cf.* Leffler Rep. II ¶¶ 33-62. But Leffler's cherrypicking is the antithesis of a reliable method and cannot save their claim of common impact from the implications of Leffler's own 2006 Regression. DB 30-34.

*First*, as Intel showed and plaintiffs have not refuted, Leffler's approach of discarding contrary data conflicts directly with his own assertion that an increase in AMD competition would result in a reduction of all processor prices, which Leffler based on his theory that all prices in a relevant market move together. *See* DB 24-27. These data eliminations fundamentally contradict Leffler's own theoretical premise that, due to assumed cross-elasticities within the market, competition in some segments of the market will affect prices market-wide.[7]

Plaintiffs defend Leffler's data eliminations by claiming that "during the benchmark period, unlike the but-for world, insufficient time ha[d] passed for the increase in competition to make AMD a more formidable competitor in all market segments." PB 24. But that contradicts plaintiffs' own assertion that "[i]ncreased competition led to price drops among both the fore-

---

[7] For example, according to Leffler, chips with different speeds compete with one another, and thus a manufacturer "*can't control* the price of the three-gigahertz microprocessor even if [it is] the only seller" of such chips because customers will turn to "2.8-gigahertz" or "3.1-gigahertz microprocessor[s]." Tr. 123:10-16 (emphasis added). Directly contrary to his own example, however, [redacted] Leffler Rep. III ¶ 43; *see* DB 30-31 n.20.

closed and non-foreclosed segments of the market, just as predicted by economic theory." PB 23 n.22. Moreover, plaintiffs fail to explain why it should matter that AMD was not yet a stronger competitor in all segments of the x86 processor market in the benchmark period. If, as plaintiffs say, "there are high cross-elasticities of supply and demand for x86 microprocessors," PB 17, a competition-driven price reduction in only some segments would have yielded decreased prices in *all* segments. *Id.* It is undisputed that no such market-wide decrease occurred. PB 24.

In any event, plaintiffs' claim that AMD *would* have been a stronger competitor throughout the market and throughout the class period in the but-for world, even though it was *not* during the benchmark period, rests on nothing but their say-so. It is plaintiffs' burden to *prove* this key premise of their argument, but they offer only unsupported speculation. *See* PB 24, 25 n.24; *see also Allied Orthopedic*, 247 F.R.D. at 165, 170 (rejecting similar argument because not substantiated). [REDACTED] *See* DPFFCL II ¶¶ 281-93.

*Second*, plaintiffs offer nothing to rebut Intel's showing that Leffler's data eliminations are unfounded and improper. Contrary to plaintiffs' claim that "[Intel] does not dispute that these products were not subject to the additional AMD competition during the second half of 2006," PB 26, Intel has repeatedly refuted plaintiffs' claim that the products Leffler identified as "legacy," "strategically priced," and "commercially unsuccessful" were categorically immune from increased competition. DPHB 26-28; DB 31-33. For example, as Kaplan showed, [REDACTED] DPHB 27; DB 31-32. Plaintiffs simply ignore this evidence.

Plaintiffs also do not address the methodological flaws in Leffler's data eliminations. They do not, for example, explain why excluding huge amounts of data is appropriate instead of

*controlling* for the factors that Leffler claims distinguish the excluded products. *See* DPHB 27-28; DB 33-34. They also do not explain why Leffler eliminated data based on factors for which his regression model *already* controlled, such as processor age. *See* DPHB 28 n.30; DB 33-34. Nor do plaintiffs defend Leffler's haphazard approach for identifying the specific products that he claimed were insulated from increased competition. As Intel showed, Leffler contrived specific exclusion criteria [REDACTED] without any evidentiary basis, and others (like his assessment of legacy products) require judgment that Leffler admitted lacking the "expertise" to perform and individualized inquiries that he conceded he did not perform. DB 31-33; DPHB 26-27.

*Third*, plaintiffs have no answer to Kaplan's findings that *even with* Leffler's improper cherrypicking, the remaining data, once disaggregated and analyzed with Leffler's own regression model, *still* show that not all processor prices declined in his benchmark period. *See* Tr. 447:18-22; DB 34; DPHB 25. Thus, even if plaintiffs were correct that conclusions regarding the entire market can be "extrapolat[ed]" from Leffler's cherrypicked data (PB 25 n.24), those data only confirm that there was no classwide overcharge.

The closest plaintiffs come to disputing Kaplan's findings that prices did not decline across the board in response to increased AMD competition is their assertion that [REDACTED]

PB 25 n.24. But Leffler himself admitted that Intel never implemented that advice, Tr. 381:20-23, and the evidence is clear that [REDACTED] *see* Kaplan Rep. III ¶¶ 54-56; Tr. 448:2-449:14 (Kaplan). [REDACTED] it would not matter because *other* OEMs – [REDACTED] – also experienced no price decline in

Leffler's proposed benchmark period. *Id.* ¶¶ 47, 51.[8]

Plaintiffs' claim that Kaplan "offers no economic theory or mechanism to explain how increased competition from AMD would cause Intel's prices to *increase*" (PB 27) mischaracterizes the testimony and misallocates the burden of proof. Kaplan did not conclude that microprocessor prices *increased* in the benchmark period (let alone that they increased because of increased competition), but only that the prices for some *did not decrease* relative to normal patterns. *See*, *e.g.*, Kaplan Rep. III ¶ 44 (various OEMs [REDACTED] ); *id.* ¶¶ 47, 51 (same); DB 28-29 & n.16. Indeed, it was Leffler's own regression model that was the "mechanism" for controlling for some of the other relevant factors, and when applied correctly, it conclusively shows that increased competition from AMD did *not* cause all prices to decline.

**b. Leffler's Afterthought Analyses Are Makeweights.**

Having abandoned Leffler's 2006 Regression as proof of impact, plaintiffs fall back on two analyses – Leffler's Mann-Whitney and 339 tests – to show an overcharge in all or nearly all x86 processors. PB 18-23. Neither can bear the weight that plaintiffs pile upon them.

*First*, plaintiffs' claim that both Mann-Whitney and 399 analyze Intel's "net prices" (PB 20, 22) is plainly untrue. Leffler deliberately ignored lump-sum rebates in deriving the prices used in these tests (*see* DB 27-28; DPFFCL II ¶¶ 200, 246), despite overwhelming evidence that lump-sum rebates *did* affect direct purchasers' prices (*see supra* pp.7-13; DB 9-20). In fact, Leffler admitted this with respect to a large portion of direct purchasers – his "Others" category – which represented more than [REDACTED] of the lump sums that he calculated and failed to include in his "net" prices. *See* WDX 72 at 2 (Class Cert. Hr'g Kaplan Ex. 1). He testified that [REDACTED]

[8] If other errors in Leffler's analysis are corrected, [REDACTED] Kaplan Rep. III ¶¶ 47-49, 51-52.

[REDACTED] (Tr. 563:6-15), which – in effect – renders these rebates marginal cost reductions under his theory that lump-sum rebates that incentivize additional purchases reduce direct purchasers' marginal cost, which in turn result in reduced PC prices (*e.g.*, Leffler Rep. III ¶ 21-22 & n.13; PB 36-37).

As a result of this defect alone, both of Leffler's afterthought analyses are unreliable methods of proving common impact; they cannot prove anything about Intel's "net prices" because they did not examine the true net prices at all. This is not a minor mistake: The supposed "net prices" that Leffler analyzed left out marginal-cost reductions attributable to [REDACTED] in lump-sum rebates to the "Others" category, *see* Leffler Rep. III, Table A2(B); WDX 72 at 2 (Class Cert. Hr'g Kaplan Ex. 1), to say nothing of the [REDACTED] in lump-sum rebates to the other OEMs that used them to reduce PC prices, *see* DB 11-13. Nor can this flaw be corrected by mere arithmetic. To account properly for net prices, Leffler would have to examine the circumstances of *each* of the numerous rebates that Intel provided to direct purchasers to determine the extent to which the rebate reduced their prices. This would require countless individualized inquiries, which Leffler admitted (as to "Others") cannot be performed by examining only Intel's database. DB 10-11.

*Second*, while plaintiffs offer Mann-Whitney and 339 to show that the alleged increase in AMD competition caused price decreases to all or nearly all direct purchasers in Leffler's ideal-benchmark period, neither can show that. Leffler admitted that Mann-Whitney "*cannot tell you* whether a particular price *or even that all prices* went down." Tr. 375:22-25 (emphases added); *see* 6 Leffler 1277:17-21. This is undisputed. And both tests fail to answer the key question whether increased competition *caused* any observed price decline, because neither controls for the many other factors that affect processor price – such as processor age, speed, or sales volume

– some of which Leffler controlled for in his 2006 Regression. DB 35-36, 38. Plaintiffs' claim that Leffler's Mann-Whitney and 339 analyses did control for such factors (PB 21-23 n.22) is incorrect. As Leffler conceded, his Mann-Whitney "doesn't control" for "age," "sales volume," or any "other factors that could affect price." Tr. 377:5-11; *id.* at 171:3-6 (same).[9] No court has ever certified an antitrust class action based on a Mann-Whitney test.

As for 339, neither Leffler nor plaintiffs claim that Leffler controlled for all of the relevant explanatory factors, or even all the factors for which he controlled in his regression. *See* PB 22-23 n.22 (listing variables in regression and purported controls in 339). In any case, the only "control" plaintiffs identify is Leffler's crude eyeball comparison of the size of the price decreases that he purportedly observed with "the price drops of other processors of the same age and brand" at other times. PB 22. Plaintiffs claim that this non-scientific method provides the requisite control for age, but any assertion about the impact of age must be supported by a rigorous and reliable scientific method that isolates the impact of this variable on price. Nor is there merit to plaintiffs' claim that 339 "controls for microprocessor and customer variables" (PB 23 n.22), when that analysis examines *only* the few transactions where Leffler could find a perfect match in two time periods. Leffler's approach meant that he examined only a tiny sliver of the universe of transactions – 339 out of millions – and did nothing to ensure that his sample was representative. DB 37-38. It was not. [REDACTED] – hardly mirroring the makeup of the alleged market. DB 37-39.

[9] *See also* Tr. 377:15-19; 6 Leffler 1288:25-89:7, 1290:20-23. Plaintiffs' assertion that Leffler observed [REDACTED] in his Mann-Whitney analysis, and that "the size of this shift … was 'far, far beyond any of the other factors that could affect the pricing,'" PB 21 (emphasis added) (quoting Tr. 171:3-172:7), distorts the evidence and Leffler's testimony. Leffler did not and could not compare the "size" (PB 21) of any change in prices shown by his Mann-Whitney analysis with normal trends because Mann-Whitney cannot calculate that "size," and may even [REDACTED] 6 Leffler 1277:17-21.

*Third*, both of plaintiffs' analyses are unreliable because they are based on badly distorted data. The samples that Leffler analyzed in his Mann-Whitney and 339 analyses are skewed by the same wholesale eliminations of contrary data that Leffler applied in his Revised Regressions. DB 36-39. As explained above, *supra* pp.15-16, those eliminations contradict Leffler's own theory and the record, and have no basis in sound methodology.

**B. Plaintiffs Offer No Reliable, Classwide Method To Prove Pass-On.**

Plaintiffs claim that pass-on, like the existence of an overcharge, may be proved with abstract theories regarding general market characteristics that "Intel does not contest." PB 29. But they misstate Intel's position. As Kaplan explained, "[t]here are many, many reasons why prices change other than cost," Tr. 475:2-3 – for which any reliable theory must account, and which make tracing any price change from a manufacturer to consumers extremely difficult, *see id.* at 398:19-20, 467:12-13 – but only a handful of which Leffler's abstract theory addresses. Indeed, beyond the factors of which Leffler took note (*see id.* at 184:18-195:25), he admitted that [redacted] His theory fails to account for such factors, and is therefore unreliable.[10]

Leffler's pass-on regressions suffer from the same flaw. None controls for all of the factors that affect OEMs' and retailers' pricing decisions. *See* Tr. 472:4-22; Kaplan Rep. II ¶¶ 100-02. Leffler, in fact, [redacted] (Kaplan Rep. II ¶¶ 100-03), so that his results [redacted] And as plaintiffs admit,

[10] Moreover, not all of the generalized factors on which Leffler relies to predict classwide pass-on were present. For example, while he assumed an [redacted] Kaplan Rep. II ¶ 34 (quoting Leffler Rep. II ¶ 70 n.186).

[redacted][11]

Plaintiffs' response that "all of the factors affecting price" beside processor cost would "remain constant" in the but-for world (PB 32 n.29) is a mere assertion, and plaintiffs have not attempted to show how they would prove it at trial with common evidence. They cannot escape Leffler's failure to account for critical, individualized factors based on nothing more than unsupported assertions for which he offered no empirical support. Tellingly, Leffler claimed that regressions must account for factors such as [redacted] That amounts to an indictment of Leffler's own regressions – since [redacted] – and also belies plaintiffs' claim that controlling for such factors is unnecessary.[12]

Plaintiffs also fail to refute the other flaws that Kaplan demonstrated in Leffler's pass-on regressions. Plaintiffs do not explain how those regressions, which "by their nature" can show at most only "average effect" and "do not tell you about individuals," Tr. 380:1-15, can prove pass-

[11] The only regression that Leffler performed that purportedly controlled for other PC components and compared changes in processor cost to changes in PC prices (his Internet regression) is unreliable for an array of other reasons that Kaplan identified, and that Leffler has not refuted, including that [redacted] Kaplan Rep. I ¶¶ 83-84 (citation omitted); *see also* Kaplan Rep. II ¶ 102.

To the extent plaintiffs claim that the factors Leffler did not control for in his pass-on regressions do not matter because [redacted] *cf.* Leffler Rep. I ¶ 8(D), both Leffler and case law make clear that this is [redacted] 5 Leffler 916:15-19; *Rail Freight*, 725 F.3d at 254-55, which plaintiffs have not done here. DB 40-41 n.29. In the hearing testimony that plaintiffs cite, Leffler offered only "a couple of examples" of alleged exclusionary conduct predating the class period, PB 30 (citing Tr. 181:24-182:14), hardly sufficient to carry their burden of proof on a key element in a massive industry-wide class action.

on to all or nearly all class members. *See Reed v. Advocate Health Care*, 268 F.R.D. 573, 590-92 (N.D. Ill. 2009) (explaining insufficiency for class certification of empirical methods that reveal only average effects) (collecting cases). And plaintiffs have no answer to Kaplan's findings tha [REDACTED]

[REDACTED] Kaplan Rep. III ¶ 81; DB 43. In short, Leffler's own data and model reveal that "[s]ome people do" pass on price changes, but "some people don't." Tr. 474:7-9. That divergence means that proving pass-on will necessarily require numerous individualized inquiries.

## V. PLAINTIFFS HAVE NO RELIABLE, CLASSWIDE METHOD FOR PROVING DAMAGES ATTRIBUTABLE TO THEIR LIABILITY THEORY.

Although plaintiffs dismiss *Comcast* in a footnote, PB 4 n.4, they do not deny that it is their burden to show a reliable classwide method of proving damages that withstands the "rigorous analysis" required by Rule 23. *Hydrogen Peroxide*, 552 F.3d at 323.[13] Yet the only methods they offer for proving damages are Leffler's 2006 and Revised Regressions, which they have *abandoned* as proof of impact, and his pass-on regressions – all of which, as Intel has shown, are hopelessly flawed and only confirm that class members' experiences varied widely.[14]

[13] Plaintiffs' strained assertion that *Comcast* did not "chang[e] class certification law," as purportedly evidenced by "decisions from the Sixth, Seventh and Ninth Circuits" (not cited in plaintiffs' brief) (PB 4 n.4 (citing PPFFCL II 55-57 (¶¶ 66-69)), is incorrect, and in any event beside the point. Under *Comcast* it is now beyond dispute that the "rigorous analysis demanded by Rule 23" applies to damages. *Rail Freight*, 725 F.3d at 253. The cases to which plaintiffs allude cast no doubt on this principle. Neither *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), nor *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 860 (6th Cir. 2013), even addressed whether individualized variance precluded classwide determination of damages; each case held only that *liability* could be determined on a classwide basis. *See id.* at 860 ("the district court certified only a liability class"); *Butler*, 727 F.3d at 800 ("the district court in our case, unlike *Comcast*, neither was asked to decide nor did decide whether to determine damages on a class-wide basis"). And *Leyva v. Medline Industries, Inc.*, 716 F.3d 510 (9th Cir. 2013), held that Rule 23(b)(3) was satisfied because the plaintiffs there, unlike plaintiffs here, *did* present a method by which "damages could feasibly and efficiently be calculated" based on common evidence; an existing database "would enable the court to accurately calculate damages and related penalties for each claim." *Id.* at 514.

[14] *See, e.g.*, DB 28-31, 41-43, 45-46; *supra* pp.14-18, 21-23. Plaintiffs do not claim that ei-

Plaintiffs make no effort to defend Leffler's analyses as proof of damages, but instead assert inexplicably that "Intel does not challenge the regression methodology Dr. Leffler used to estimate damages."  PB 34.  Intel has repeatedly argued that Leffler's regressions do not provide a reliable method of proving damages for many reasons, including that all regressions (as Leffler admitted) show only "'average'" effects, and not effects on individuals, and that Leffler's regressions did not examine Intel's net prices.  DPHB 9 n.5; *see also*, *e.g.*, Objs. Resp. 42-46 & n.38; Opp. 48-50.  Moreover, as Intel established, even if Leffler's 2006 Regression model and data did provide a reliable method, they *disprove* plaintiffs' claim that the existence of a classwide overcharge or of pass-on is capable of common proof, a problem that Leffler tries but fails to conceal by eliminating mountains of contrary data in his Revised Regressions.  DB 28-34, 43, 45.  Plaintiffs do not explain why this problem is mitigated – or why Leffler's cherrypicking is more appropriate – when the same analyses are used to prove the *size* of the supposed overcharge paid by each direct purchaser and the *extent* to which it was allegedly passed on.

Plaintiffs also do not dispute that, as the Supreme Court made clear in *Comcast*, any method they offer for proving classwide damages must match their theory of liability.  *See Comcast*, 133 S. Ct. at 1433.  Yet plaintiffs do not attempt to reconcile their damages theory, which attacks rebates based on their form rather than their effects, with their liability theory, which purports to be based on alleged competitive exclusion.  *See* DB 9, 19-20; FACC ¶ 2.

## VI.   PLAINTIFFS DO NOT REFUTE THE MULTIPLE OTHER REASONS WHY THEIR PROPOSED CLASSES CANNOT BE CERTIFIED.

Plaintiffs erroneously assert that, aside from predominance, Rule 23's requirements "are not seriously in dispute" and are "in any event, easily met."  PB 4.  Intel vigorously disputes that

---

ther Leffler's theories or his Mann-Whitney or 339 analyses provide a classwide means for proving the amount of damages, and they clearly cannot.  *See*, *e.g.*, Tr. 375:22-25 (Mann-Whitney "cannot tell you whether a particular price or even that all prices went down").

the ascertainability, typicality, and adequacy requirements are satisfied, and affirmatively showed that those elements are *not* met here. Opp. 54-76; Objs. Resp. 51-62; DPHB 40-42. Plaintiffs have never refuted Intel's showings regarding any of these requirements, each of which forecloses certification, much less carried their own burden of proving each one. They also have not addressed the other bases for denying certification raised by Intel. *See* DB 46-47.

## VII. PLAINTIFFS DO NOT REFUTE INTEL'S SHOWING THAT LEFFLER'S TESTIMONY IS UNRELIABLE AND SHOULD BE EXCLUDED.

Plaintiffs similarly do not answer, but simply avoid, Intel's repeated demonstrations that Leffler's testimony should be excluded because it falls far short of the requirements of Federal Rules 702 and 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and related authorities. *Daubert* Mot. 5-24; Objs. Resp. 63-70; DPHB 42-45. Plaintiffs offer only a single sentence that asserts, incorrectly, that Intel's *Daubert* arguments "are essentially the same as its critique" of plaintiffs' attempt to prove Rule 23's elements. PB 3. Intel has also offered independent grounds for excluding Leffler's testimony. For example, Leffler's testimony contravenes antitrust principles that make competitive exclusion the touchstone of antitrust liability in a monopolization case, forbid liability in favor of indirect purchasers absent harm to direct purchasers, treat both lump-sum rebates and transactional discounts as price reductions, and require plaintiffs alleging exclusion based primarily on rebates to prove below-cost pricing. DB 50 & n.37. These direct conflicts between Leffler's testimony and controlling law require exclusion of his opinions, yet plaintiffs make no effort to confront them.

## VIII. CONCLUSION

For these reasons, class certification should be denied and Leffler's testimony excluded.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: */s/ Richard L. Horwitz*
Richard L. Horwitz (#2246)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

OF COUNSEL:

David M. Balabanian
Donn P. Pickett
Frank M. Hinman
Jon R. Roellke
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
(415) 393-2000

Dated: October 15, 2013
Public version filed November 1, 2013
1126500 / 29282

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, Richard L. Horwitz, hereby certify that on November 1, 2013, the attached document was electronically filed with the Clerk of the Court using CM/ECF, which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on November 1, 2013, the attached document was Electronically Mailed to the following person(s):

Daniel A. Small
David A. Young
Daniel H. Silverman
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
dsmall@cmht.com

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Qianwei Fu
Zelle Hofmann Voelbel & Mason LLP
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
ccorbitt@zelle.com
jzahid@zelle.com

James L. Holzman
J. Clayton Athey
Laina M. Herbert
Kevin H. Davenport
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
jholzman@prickett.com
jcathey@prickett.com
LMHerbert@prickett.com
kdavenport@prickett.com

By: */s/ Richard L. Horwitz*
Richard L. Horwitz (#2246)
POTTER, ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com